**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| OHIO TELECOM ASSOCIATION and USTELECOM – THE BROADBAND ASSOCIATION,<br><br>*Petitioners*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | Case No. 24-_____ |

**PETITION FOR REVIEW**

Pursuant to 5 U.S.C. § 706, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342-2344, and Federal Rule of Appellate Procedure 15(a), Ohio Telecom Association (OTA) and USTelecom – The Broadband Association hereby petition this Court for review of the Final Order of the Federal Communications Commission captioned *Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52 (released May 7, 2024). The Order was published in the Federal Register on May 22, 2024.

89 Fed. Reg. 45,404 (May 22, 2024). A copy of the Order is attached to this petition as Exhibit A, and the Federal Register entry is attached as Exhibit B.

The Order reclassifies broadband Internet access service as a telecommunications service subject to Title II of the Communications Act of 1934 and adopts a set of "Open Internet" rules. Order ¶¶ 25-302, 443-648.

Venue in this Circuit is proper under 28 U.S.C. § 2343, because OTA's principal office is located in Ohio. *See MISO Transmission Owners* v. *FERC*, 860 F.3d 837, 840 (6th Cir. 2017); *Global Van Lines, Inc.* v. *ICC*, 691 F.2d 773, 774 n.1 (5th Cir. 1982).

OTA is a statewide trade association that promotes the common interests of communications companies serving and employing Ohioans. USTelecom represents service providers and suppliers for the communications industry, including broadband providers serving consumers and businesses across the country. OTA and USTelecom participated in the proceeding before the Commission on behalf of their members, who are aggrieved by the Order. *See* 28 U.S.C. § 2344. Petitioners seek review of the Order on the grounds that it is arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*; in excess of the Commission's statutory authority; unconstitutional; and

otherwise contrary to law. Petitioners respectfully request that this Court hold unlawful, vacate, enjoin, and set aside the Order and provide such additional relief as may be appropriate.

MAY 28, 2024

Respectfully submitted,

/s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Petitioners Ohio Telecom Association and USTelecom – The Broadband Association*

# CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2024, the foregoing Petition for Review was electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit through the appellate CM/ECF system and two copies were sent to the Clerk of the Court by overnight Federal Express for service on the respondents pursuant to Federal Rule of Appellate Procedure 15(c)(3) at the following addresses:

Merrick B. Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

P. Michele Ellison
General Counsel
Federal Communications Commission
Office of the General Counsel
45 L Street NE
Washington, DC 20554

I further certify that there are no parties "admitted to participate in the agency proceedings" other than the respondents for purposes of Federal Rule of Appellate Procedure 15(c)(1).

/s/ Jeffrey B. Wall
JEFFREY B. WALL

MAY 28, 2024

# Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |

**DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON
RECONSIDERATION**

**Adopted:  April 25, 2024**                        **Released:  May 7, 2024**

By the Commission: Chairwoman Rosenworcel and Commissioners Starks and Gomez issuing separate
statements; Commissioners Carr and Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................................................1
II.  BACKGROUND ..................................................................................................................................11
III. DECLARATORY RULING:  CLASSIFICATION OF BROADBAND INTERNET
     ACCESS SERVICES ...........................................................................................................................25
     A. Reclassification Enhances the Commission's Ability to Fulfill Key Public Interest
        Obligations and Objectives .............................................................................................................26
        1. Ensuring Internet Openness........................................................................................................28
        2. Defending National Security and Law Enforcement...................................................................30
        3. Promoting Cybersecurity............................................................................................................42
        4. Safeguarding Public Safety ........................................................................................................51
        5. Monitoring Network Resiliency and Reliability .........................................................................59
        6. Protecting Consumers' Privacy and Data Security .....................................................................67
        7. Supporting Access to Broadband Internet Access Service...........................................................69
        8. Improving Access for People with Disabilities .........................................................................102
     B. Broadband Internet Access Service Is Best Classified as a Telecommunications Service..........106
        1. BIAS Is an Offering of Telecommunications for a Fee Directly to the Public .....................109
        2. BIAS Is Not an Information Service ..........................................................................................128
     C. Classifying BIAS as a Telecommunications Service Accords with Commission and Court
        Precedent........................................................................................................................................154
        1. Relevant Pre-1996 Act Precedent..............................................................................................157
        2. Post-1996 Act Classification Decisions ....................................................................................172
     D. Scope of Reclassification ..............................................................................................................188
        1. Broadband Internet Access Service ..........................................................................................189
        2. Non-BIAS Data Services ...........................................................................................................195
        3. Internet Traffic Exchange..........................................................................................................204
        4. Service Furnished to Edge Providers.........................................................................................208
        5. Other Excluded Services ...........................................................................................................210
     E. Mobile Broadband Internet Access Service Is Best Classified as a Commercial Mobile
        Service............................................................................................................................................214
     F. Restoring the Telecommunications Service Classification of Broadband Internet Access
        Service Is Lawful ...........................................................................................................................237

1.  The Commission Has the Authority and Responsibility to Classify BIAS.............................238
2.  The Major-Questions Doctrine Poses No Obstacle to Recognizing BIAS as a
    Telecommunications Service................................................................................................252
G.  Preemption of State and Local Regulation of Broadband Service.............................................265
H.  Impact of Reclassification on Investment.................................................................................276
IV. ORDER:  FORBEARANCE FOR BROADBAND INTERNET ACCESS SERVICES ...................303
A.  Forbearance Framework ...........................................................................................................303
B.  Maintaining Targeted Authority to Protect Consumers, Promote National Security, and
    Preserve the Broadband Ecosystem .........................................................................................321
    1.  Authority to Protect Consumers and Promote Competition (Sections 201 and 202)............323
    2.  Enforcement (Sections 206, 207, 208, 209, 216, and 217) .....................................................330
    3.  Requirement for a Certificate of Public Convenience and Necessity (Section 214)...............332
    4.  Information Collection and Reporting to Promote National Security, Public Safety,
        and Improve Network Resiliency (Sections 218, 219, and 220(a)(1), (c)-(e))........................347
    5.  Customer Privacy (Section 222)..............................................................................................349
    6.  Access to Poles, Ducts, Conduit, and Rights-of-Way (Section 224) ......................................360
    7.  Universal Service.....................................................................................................................363
    8.  Access for Persons with Disabilities (Sections 225, 255, and 251(a)(2)) ...............................372
    9.  Other Title II Provisions..........................................................................................................381
C.  Broad Forbearance from Other Title II Provisions for Broadband Internet Access Service .......383
    1.  Rate Regulation (Sections 201 and 202) .................................................................................386
    2.  Tariffing (Sections 203 and 204)..............................................................................................387
    3.  Enforcement-Related Provisions (Sections 205 and 212)........................................................394
    4.  Information Collection and Reporting (Sections 211, 213, 215, and 220(a)(2), (b), (f)-
        (j))...........................................................................................................................................396
    5.  Interconnection and Market-Opening Provisions (Sections 251, 252, and 256)....................398
    6.  Subscriber Changes (Section 258)...........................................................................................422
    7.  Other Title II Provisions..........................................................................................................423
    8.  Truth-in Billing Rules .............................................................................................................429
    9.  Roaming-Related Provisions and Regulation...........................................................................430
    10. Terminal Equipment Rules......................................................................................................432
D.  Other Regulations and Non-Title II Provisions ........................................................................433
    1.  Maintaining Authority Under Certain Title III Provisions......................................................433
    2.  Forbearance from Certain Provisions of Titles III, VI, and Other Commission Rules ..........442
V.  REPORT AND ORDER:  OPEN INTERNET RULES.....................................................................443
A.  Need for Rules .........................................................................................................................444
    1.  Promoting Free Expression and Encouraging Innovation, Competition, and
        Consumer Demand ..................................................................................................................445
    2.  Protecting Public Safety ..........................................................................................................451
    3.  BIAS Providers' Incentive and Ability to Harm Internet Openness .......................................464
    4.  The *RIF Order*'s Framework Is Insufficient to Safeguard and Secure the Open
        Internet....................................................................................................................................482
B.  Rules to Safeguard and Secure the Open Internet.....................................................................492
    1.  Bright-Line Rules ....................................................................................................................492
    2.  General Conduct Rule ..............................................................................................................513
    3.  Transparency Rule ...................................................................................................................543
C.  Reasonable Network Management ............................................................................................568
D.  Oversight of BIAS Providers' Arrangements for Internet Traffic Exchange .............................576
E.  Enforcement of Open Internet Rules ........................................................................................580
    1.  Advisory Opinions and Enforcement Advisories.....................................................................582
    2.  Complaint Processes.................................................................................................................589
F.  Legal Authority ........................................................................................................................593
    1.  Title II of the Act with Forbearance ........................................................................................595

2. Section 706 of the 1996 Act ............................................................................606
3. Title III of the Act for Mobile Providers ........................................................621
G. Other Laws and Considerations .............................................................................626
H. Cost-Benefit Analysis ...........................................................................................632
1. Title II Reclassification ...................................................................................634
2. Bright-Line Rules ............................................................................................642
3. General Conduct Rule ......................................................................................645
4. Transparency Rule ...........................................................................................647
5. Preemption .......................................................................................................648
VI. CONSTITUTIONAL CONSIDERATIONS ..................................................................649
A. First Amendment ...................................................................................................649
1. Free Speech Rights ..........................................................................................649
2. Compelled Disclosure .....................................................................................665
B. Fifth Amendment Takings .....................................................................................672
1. *Per Se* Taking .................................................................................................673
2. Regulatory Taking ...........................................................................................676
3. Confiscation .....................................................................................................681
VII. ORDER ON RECONSIDERATION ...............................................................................683
VIII.   SEVERABILITY ............................................................................................................692
IX. PROCEDURAL MATTERS ..........................................................................................695
X.  ORDERING CLAUSES .................................................................................................703
APPENDIX A – FINAL RULES
APPENDIX B – FINAL REGULATORY FLEXIBILITY ANALYSIS

# I.    INTRODUCTION

1.      Access to broadband Internet is now an unquestionable necessity.  Indeed, as Congress has explained, "access to affordable reliable, high-speed broadband is essential to full participation in modern life in the United States."[1]  High-speed Internet connections have proved indispensable to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, communication, and free expression.  The COVID-19 pandemic revealed that without a broadband connection, consumers could not fully participate in society.

2.      Today, we reclassify broadband Internet access service (BIAS)—the consumer broadband service that we use and rely on every day—as a telecommunications service under Title II of the Communications Act of 1934, as amended (the Act).  Since the Commission's abdication of authority over broadband in 2017, there has been no effectual federal oversight over this vital service.  Our classification decision today reestablishes the Commission's authority to protect consumers and resolves the pending challenges to the Commission's faulty 2017 classification decision.

3.      Our classification decision is strongly supported by the Commission's statutory obligations and the need to further critical policy objectives as the expert agency for communications services.  Chief among these is enabling the Commission to safeguard the fair and open Internet, which protects free expression, encourages competition and innovation, and is critical to public safety.  Reclassification enables the Commission to establish a nationwide framework of open Internet rules for BIAS providers that will protect consumers from conduct harmful to Internet openness while allowing the Commission to preempt any state or local measures that interfere or are incompatible with the federal

---

[1] 47 U.S.C. § 1701(1), (5) (finding also that the pandemic "has underscored the critical importance of affordable, high-speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing"); see also Digital Equity Act of 2021, 47 U.S.C. § 1722(1)(A)-(B), (5) (stating it is the sense of Congress that "a broadband connection and digital literacy are increasingly critical to how individuals (A) participate in society, economy and civic institutions of the United States;" and "(B) access health care and essential services, obtain education, and build careers," and that "achieving digital equity is a matter of social and economic justice and is worth pursuing").

regulatory framework we establish.

4.        Reclassification also will strengthen the Commission's important role in addressing national security and public safety in the communications sector, which supports the operations and associated day-to-day communications needs of other sectors.[2]  The Commission has a statutory responsibility to defend communications networks and critical infrastructure against threats to national security and law enforcement.  Although the Commission has undertaken various efforts to address these harms, the 2017 classification of BIAS as an information service created loopholes in the Commission's oversight capabilities that left communications infrastructure vulnerable to these threats.  Reclassifying BIAS under Title II expands the Commission's regulatory tools to deter and address national security and law enforcement risks to the communications sector.  In doing so, our classification decision also improves the Commission's ability to coordinate with federal partners to address national security risks to the communications industry.  The Commission's enhanced jurisdiction over BIAS providers resulting from reclassification, in combination with other statutory authority, also will allow the Commission to ensure BIAS meets the needs of public safety entities and individuals when BIAS is used for public safety purposes.  Reclassification will provide the Commission with additional authority to ensure the resiliency and reliability of the nation's communications networks—for example, by requiring that BIAS providers report network outages to the Commission—because when we lose access to this service, it disrupts modern life.

5.        Classifying BIAS as a telecommunications service will advance the Commission's responsibilities to protect the public interest in a number of other areas as well.  For instance, it will support the Commission's efforts to protect consumers' privacy and data security by restoring the Communications Act's protective privacy and data security framework for broadband, and granting the Commission enforcement and oversight authority over privacy-related practices.[3]  Our reclassification decision also will support the Commission's multifaceted efforts to support access to broadband by restoring broadband-only providers' rights to access critical infrastructure,[4] enabling the Commission (or a court) to intervene if a state or local government blocks broadband deployment,[5] and providing authority for the Commission to ensure that residents of apartment buildings can choose their own broadband provider.[6]  Additionally, authority under Title II will put the Commission on the firmest legal ground to promote the universal service goals of the Communications Act.  Finally, reclassification of BIAS under Title II will enhance the Commission's authority to ensure that people with disabilities can communicate using BIAS.

6.        We find that classification of BIAS as a telecommunications service represents the best reading of the text of the Act in light of the marketplace reality of how BIAS is offered and perceived today, as well as the factual and technical realities of how BIAS functions.  Classifying BIAS as a telecommunications service also accords with Commission and court precedent and is fully justified under the Commission's longstanding authority and responsibility to classify services subject to our jurisdiction, as necessary.  We also ensure that consumers receive the same protections when using fixed

---

[2] *See* CISA, *Communications Sector Specific Plan: An Annex to the NIPP 2013*, at 9 (2015), https://www.cisa.gov/2015-sector-specific-plans.

[3] *See* 47 U.S.C. § 222 (governing telecommunications carriers' protection, use, and disclosure of information obtained from their customers or other carriers).

[4] *See* 47 U.S.C. § 224 (providing the Commission with authority to "regulate the rates, terms, and conditions for pole attachments" to ensure they are "just and reasonable").

[5] *See* 47 U.S.C. § 253 (providing the Commission with authority to preempt enforcement of state and local requirements that "may prohibit or have the effect of prohibiting" the provision of a telecommunications service).

[6] *See* 47 U.S.C. § 201 (requiring all "charges, practices, classifications, and regulations" in connection with common carrier communications services to be "just and reasonable"); 47 CFR § 64.2500 (prohibiting common carriers from entering into certain types of agreements, including banning exclusivity contracts that bar competition outright in MTEs, and requiring disclosure of others).

and mobile BIAS by reclassifying mobile BIAS as a commercial mobile service.  As the expert agency entrusted by Congress to oversee our country's communications networks and services, our experience demonstrates that for the Commission to protect consumers and ensure a safe, secure, and open Internet, it must exercise its authority to do so under Title II of the Communications Act.  We also exercise broad forbearance—including no rate regulation, no tariffing, no unbundling of last-mile facilities, and no cost accounting rules—in the Commission's application of Title II to BIAS providers to ensure that the regulatory environment is properly tailored to protect consumers and achieve other important public interest responsibilities while not unnecessarily stifling investment and innovation.

7.      Consistent with the Commission's responsibility to promote the public interest, today we also adopt rules to return to the Commission's longstanding framework to safeguard and secure the open Internet.  We establish clear, straightforward rules prohibiting specific practices harmful to an open Internet—blocking, throttling, and paid prioritization—as well as a general conduct standard designed to prevent deployment of new practices that would harm Internet openness.  We also adopt certain enhancements to the transparency rule.  As proposed in the *2023 Open Internet NPRM*, our approach reinstates the rules that the Commission adopted in 2015.  We find that the temporary deviation from this framework, adopted by the Commission in 2017, left consumers exposed to behavior that can hinder their ability to access—and the Commission without recourse to protect and promote—an open Internet. While nearly a dozen states stepped in to protect the open Internet with laws, executive orders, and state contracting requirements when the Commission stepped back, a safe, secure, and open Internet is vital for consumers and the modern economy and merits a consistent federal standard.

8.      We thus conclude that conduct-based rules targeting specific practices are necessary to enable the Commission to prevent and address conduct that harms consumers and competition, and accordingly adopt bright-line rules to prohibit blocking, throttling, and paid prioritization by BIAS providers.  These prohibitions on blocking, throttling, and paid prioritization are critical to protecting and promoting the open Internet, and we expect that these bans will prevent many of the harms raised in the record.  We conclude, however, as the Commission found in 2015, that the Commission needs a mechanism to enable it to respond to attempts by BIAS providers to wield their gatekeeper power in ways that might otherwise compromise the open Internet, and therefore we also reinstate a no-unreasonable interference/disadvantage standard, under which the Commission can prohibit practices that unreasonably interfere with the ability of consumers or edge providers to select, access, or use BIAS to reach one another, thus causing harm to the open Internet.  This no-unreasonable-interference/disadvantage general conduct standard will operate on a case-by-case basis, applying a non-exhaustive list of factors, and is designed to evaluate other current or future BIAS provider policies or practices not covered by the bright-line rules, and prohibit those that harm them open Internet.

9.      We also update our transparency rule to reflect the important role transparency plays in preserving the open nature of the Internet.  Specifically, we modify the transparency rule by reversing the changes made to the text of the rule in 2017, restoring the requirements to disclose certain network practices and performance characteristics that were eliminated, and adopting changes to the means of disclosure, including adopting a direct notification requirement.

10.     We ground the open Internet rules we adopt today in multiple sources of independent, complementary legal authority, including Titles II and III of the Act and section 706 of the Telecommunications Act of 1996 (1996 Act).  These sources of authority work to safeguard and secure Internet openness to ensure that the Internet continues to grow as a platform for competition, free expression, and innovation; a driver of economic growth; and an engine of the virtuous cycle of broadband deployment, innovation, and consumer demand.  And finally, to provide upfront clarity, guidance, and predictability with respect to the open Internet rules, we will rely on a multifaceted enforcement framework comprised of advisory opinions, enforcement advisories, Commission-initiated investigations, and informal and formal complaints.

## II.    BACKGROUND

11.     The Commission's bipartisan efforts to ensure Internet openness date back nearly two

decades. Those efforts, and the ensuing court decisions that followed in each instance, have led to one inexorable conclusion. In order for the Commission to protect consumers and ensure a safe, secure, and open Internet, it must exercise its authority to do so under Title II of the Communications Act. We describe relevant history below to supply context for our decision today to reclassify BIAS and mobile BIAS, adopt rules supporting Internet openness, and forbear from applying various Title II provisions.

12.      The Commission's first attempt to promote an open Internet came in 2005, with the unanimous approval of the *Internet Policy Statement*, which set forth four bipartisan guiding principles designed to encourage broadband deployment and "preserve and promote the open and interconnected nature of the public Internet."[7]  The *Internet Policy Statement* thus attempted to ensure that consumers had the right to access and use the lawful content, applications, and devices of their choice online, and to do so in an Internet ecosystem defined by competitive markets.[8]

13.      The Commission continued its efforts over the next decade to apply basic "rules of the road" protecting the openness of the Internet as the principles embodied in the *Internet Policy Statement* were incorporated as conditions by the Commission into several merger orders between 2005 and 2011, including the SBC/AT&T, Verizon/MCI, and Comcast/NBCU mergers, and into the open platform requirements for a key 700 MHz license—the Upper 700 MHz C block.[9]  As a condition of approving each of these transactions, the Commission required compliance with the *Internet Policy Statement*.[10]

---

[7] *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services; Computer III Further Remand Proceedings:  Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review—Review of Computer III and ONA Safeguards and Requirements; Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, GN Docket No. 00-185; CC Docket Nos. 02-33, 01-337, 98-10, and 95-20; CS Docket No. 02-52, Policy Statement, 20 FCC Rcd 14986, 14987-88, para. 4 (2005) (*Internet Policy Statement*).

[8] Subject to "reasonable network management," the principles were intended to ensure consumers had the right to (1) "access the lawful Internet content of their choice;" (2) "run applications and use services of their choice;" (3) "connect their choice of legal devices that do not harm the network;" and (4) enjoy "competition among network providers, application and service providers, and content providers." *Id.* at 14987-88, paras. 4-5 & n.15.

[9] *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, WC Docket No. 05-65, Memorandum Opinion and Order, 20 FCC Rcd 18290, 18392, para. 211, Appx. F (2005) (*SBC/AT&T Merger Order*); *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No. 05-75, Memorandum Opinion and Order, 20 FCC Rcd 18433, 18537, para. 221 (2005) (*Verizon/MCI Merger Order*); *Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licenses*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4275, para. 94 & n.213 (2011) (*Comcast/NBCU Merger Order*); *Service Rules for the 698-746, 747-762 and 777-792 MHz Bands; Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems; Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones; Biennial Regulatory Review-Amendment of Parts 1, 22, 24, 27, and 90 to Streamline and Harmonize Various Rules Affecting Wireless Radio Services; Former Nextel Communications, Inc. Upper 700 MHz Guard Band Licenses and Revisions to Part 27 of the Commission's Rules; Implementing a Nationwide, Broadband, Interoperable Public Safety Network in the 700 MHz Band; Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Communications Requirements Through the Year 2010; Declaratory Ruling on Reporting Requirement under Commission's Part 1 Anti-Collusion Rule*, WT Docket Nos. 07-166, 06-169, 06-150, 03-264, and 96-86; PS Docket No. 06-229; CC Docket No. 94-102, Second Report and Order, 22 FCC Rcd 15289, 15364, paras. 203-04 (2007) (*700 MHz Second Report and Order*); *see also* 47 CFR § 27.16.

[10] *SBC/AT&T Merger Order*, 20 FCC Rcd at 18392, para. 211, Appx. F; *Verizon/MCI Merger Order*, 20 FCC Rcd at 18537, para. 221; *Comcast/NBCU Merger Order*, 26 FCC Rcd at 4275, para. 94 & n.213; *700 MHz Second Report and Order*, 22 FCC Rcd at 15364, paras. 203-04; 47 CFR § 27.16 (setting forth network access requirements for the C block, including, *inter alia*, the requirement that "[l]icensees offering service on spectrum subject to this section

(continued….)

During this time, the Commission also applied open Internet principles to particular enforcement proceedings aimed at addressing anticompetitive behavior by service providers.[11]

14.     In 2010, in *Comcast Corp. v. FCC*, the United States Court of Appeals for the D.C. Circuit rejected a 2008 attempt by the Commission to enforce open Internet principles based on the Commission's Title I ancillary authority.[12]  In the wake of *Comcast*, the Commission adopted the *2010 Open Internet Order*, which codified the policy principles contained in the *Internet Policy Statement*.[13]  The *2010 Open Internet Order* adopted three fundamental rules governing BIAS providers:[14]  (1) no blocking; (2) no unreasonable discrimination; and (3) transparency.[15]  The no-blocking and no-unreasonable-discrimination rules prevented BIAS providers from deliberately interfering with consumers' access to lawful content, applications, and services, while the transparency rule promoted informed consumer choice by requiring disclosure by BIAS providers of critical information relating to network management practices, performance characteristics, and terms and conditions of service.[16]  The

---

shall not deny, limit, or restrict the ability of their customers to use the devices and applications of their choice on the licensee's C Block network," subject to reasonable network management).  Additionally, the Commission used the *Internet Policy Statement* principles as a yardstick to evaluate other large-scale transactions, such as an Adelphia/Time Warner/Comcast licensing agreement, and the AT&T/BellSouth merger.  *Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Communications Corporation, (and Subsidiaries, Debtors-In-Possession), Assignors, to Time Warner Cable Inc. (Subsidiaries), Assignees*; *Adelphia Communications Corporation, (and Subsidiaries, Debtors-In-Possession), Assignors and Transferors, to Comcast Corporation (Subsidiaries), Assignees and Transferees*; *Comcast Corporation, Transferor, to Time Warner Inc., Transferee*; *Time Warner Inc., Transferor, to Comcast Corporation, Transferee*, MB Docket No. 05-192, Memorandum Opinion and Order, 21 FCC Rcd 8203, 8299, para. 223 (2006); *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5726-27, para. 119 (2007) (*AT&T/BellSouth Merger Order*).

[11] These actions resulted in a 2005 consent decree by digital-subscriber-line (DSL) service provider Madison River requiring it to discontinue its practice of blocking Voice over Internet Protocol (VoIP) telephone calls, and a 2008 Order against Comcast for interfering with peer-to-peer (P2P) file sharing, which the Commission found "contravene[d] . . . policy" by "significantly imped[ing] consumers' ability to access the content and use the applications of their choice."  *Madison River Communications, LLC and Affiliated Companies*, File No. EB-05-IH-0110, Order, 20 FCC Rcd 4295, 4297, para. 5 (EB 2005) (*Madison River Order*); *Formal Complaint of Free Press and Public Knowledge Against Comcast Corporation for Secretly Degrading Peer-to-Peer Applications*; *Broadband Industry Practices*; *Petition of Free Press et al. for Declaratory Ruling That Degrading an Internet Application Violates the FCC's Internet Policy Statement and Does Not Meet an Exception for "Reasonable Network Management,"* File No. EB-08-IH-1518, WC Docket No. 07-52, Memorandum Opinion and Order, 23 FCC Rcd 13028, 13052-54, 13057, paras. 43-44 (2008) (*Comcast Order*).  The latter was challenged by Comcast and vacated by the D.C. Circuit, which found that the Commission "failed to tie its assertion of ancillary authority" over Comcast's cable modem service "to any 'statutorily mandated responsibility.'"  *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010) (*Comcast*) (quoting *Am. Library Ass'n v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005)).

[12] *See Comcast*, 600 F.3d at 661.

[13] *Preserving the Open Internet*; *Broadband Industry Practices*, GN Docket No. 09-191, WC Docket No. 07-52, Report and Order, 25 FCC Rcd 17905 (2010) (*2010 Open Internet Order*).

[14] Over the course of nearly three decades, the Commission has referred to providers of Internet access service using different terminology.  In this proceeding, we use the term "BIAS provider" to refer to a provider of BIAS as we define that term in this proceeding.  We use the term "Internet service provider" or "ISP" as a broader term that refers to the category of providers that includes BIAS providers and other Internet access service providers, such as dial-up Internet access service providers, providers of Internet access service to enterprises, and other providers of non-BIAS Internet access service.  To the extent that commenters or prior Commission orders use terms inconsistent with this approach, we consider the context of the usage, but in most cases, for documents dated 2010 or newer, we understand the use of "ISP" to refer to "BIAS provider."

[15] *2010 Open Internet Order*, 25 FCC Rcd at 17906, para. 1.

[16] *Id.*

*2010 Open Internet Order*'s anti-discrimination rule operated on a case-by-case basis, with the Commission evaluating the conduct of fixed BIAS providers based on a number of factors, including conformity with industry best practices and technical standards, harm to competing services or end users, and impairment of free expression.[17]  The Commission made the restrictions on blocking and discrimination subject to an exception for "reasonable network management," allowing BIAS providers the freedom to address legitimate needs such as avoiding network congestion and combating harmful or illegal content.[18]

15.      Like the Commission's previous effort to ensure an open Internet, the *2010 Open Internet Order* was vacated in part and remanded in 2014 by the D.C. Circuit in *Verizon v. FCC*.[19]  The court agreed with the Commission that open Internet rules were necessary, finding that, "absent rules such as those set forth in the [*2010*] *Open Internet Order*, broadband providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment."[20]  The D.C. Circuit held that the Commission's determination that "Internet openness fosters . . . edge-provider innovation" was "reasonable and grounded in substantial evidence," and found that the Commission had "more than adequately supported and explained its conclusion that edge-provider innovation leads to the expansion and improvement of broadband infrastructure."[21]  The court also sustained the Commission's reinterpretation of section 706 of the 1996 Act as an independent grant of legal authority over broadband services.[22]  However, the court ultimately vacated the *2010 Open Internet Order*'s no-blocking and anti-discrimination provisions, finding that the rules imposed *de facto* common carrier status on BIAS providers, which ran counter to the Commission's classification of BIAS as an information service.[23]

16.      The Commission persisted in its quest to protect the open Internet, responding to the *Verizon* decision by adopting the *2015 Open Internet Order*, which established new clear, bright-line rules to prevent blocking, throttling, and paid prioritization; a strong standard of conduct designed to prevent deployment of new BIAS provider gatekeeping practices that would harm Internet openness; and enhancements to the transparency rule.[24]  The Commission concluded that the Internet's openness promotes innovation, investment, competition, free expression, and other national broadband goals, and found that the record continued to support the proposition that the Internet's openness enables the

---

[17] *Id.* at 17946, paras. 74-75.  The *2010 Open Internet Order* also addressed paid prioritization arrangements, and made clear that "pay for priority" deals and associated network practices were likely to be problematic in a number of respects.  *Id.* at 17947, para. 76.

[18] *Id.* at 17951-56, paras. 80-92.  Additionally, the Commission accounted for then-perceived differences between the fixed and mobile broadband markets by exempting mobile service providers from the anti-discrimination rule, and only barring mobile providers from blocking "consumers from accessing lawful websites" or "applications that compete with the provider's voice or video telephony services."  *Id.* at 17962, 17959, paras. 104, 99.

[19] *Verizon v. FCC*, 740 F.3d 623, 655-59 (D.C. Cir. 2014) (*Verizon*).

[20] *Id.* at 645.

[21] *Id.* at 644.

[22] *Id.* at 641.

[23] *Id.* at 656-59.  The court found that "broadband providers furnish a service to edge providers, thus undoubtedly functioning as edge providers' 'carriers,'" and held that the 2010 no-blocking and no-unreasonable-discrimination rules impermissibly "obligated [broadband providers] to act as common carriers."  *Id.* at 653.  The court also found that that authority did not allow the Commission to subject providers of information services or private mobile services to treatment as common carriers.  *Id.* at 650 (citing 47 U.S.C. §§ 153(51), 332(c)(2)).

[24] *Protecting and Promoting the Open Internet*, GN Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601, 5603, para. 4 (2015) (*2015 Open Internet Order*), *pet. for review denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (*USTA*), *reh'g denied*, 855 F.3d 381 (D.C. Cir. 2017) (*USTA II*), *cert. denied*, *Berninger v. FCC*, 139 S. Ct. 453 (2018) (*Berninger*).

virtuous cycle of innovation.[25]  As it did previously, the Commission found that broadband providers have both the incentives and ability to harm the open Internet, and that such harms had actually grown since 2010.[26]

17.        In light of the *Verizon* court's decision, the Commission recognized that the strongest basis for sustaining the newly adopted rules would be to ground those rules in multiple sources of legal authority, including both section 706, and importantly, for the first time, Title II of the Act, removing any common carriage limitation on the exercise of the Commission's authority over BIAS.[27]  Following a long line of classification decisions, the Commission exercised its authority to interpret the Act to classify BIAS, which the Commission found included Internet traffic exchange (or Internet interconnection), as a telecommunications service under Title II of the Act.[28]  The Commission exercised its Title II authority with carefully tailored forbearance from application of 27 provisions of Title II of the Act and more than 700 Commission rules.[29]  The Commission also reclassified mobile BIAS as a commercial mobile service.[30]

18.        Once again, the Commission's open Internet rules were challenged in the D.C. Circuit, but this time the D.C. Circuit upheld the *2015 Open Internet Order* in full in 2016.  In *U.S. Telecom Ass'n v. FCC*, the D.C. Circuit upheld the Commission's statutory authority to reclassify BIAS as a telecommunications service, and affirmed, among other things, the Commission's view that the Domain Name System (DNS) and caching "facilitate use of the network without altering the fundamental character of the telecommunications service."[31]  The court also rejected arguments that the grant of extensive forbearance demonstrated that Title II was a poor fit for BIAS, finding that the Commission "followed an express statutory mandate" in section 10 of the Act "requiring it to 'forbear from applying any regulation or any provision' of the Communications Act if certain criteria are met."[32]  The court also found that the Commission's classification of mobile BIAS as a commercial mobile service was "reasonable and supported by the record."[33]  Furthermore, the court rejected all challenges to the *2015 Open Internet Order*'s open Internet conduct rules, concluding that the rules were within the Commission's statutory authority to adopt, provided adequate notice of the conduct that was restricted, and were consistent with the First Amendment.[34]

19.        After 13 years of consistent efforts to ensure an open Internet, in 2017 the Commission abruptly reversed course when it adopted the *RIF Order* reclassifying BIAS as an information service, eliminating the open Internet conduct rules, and abdicating nearly all meaningful Commission oversight over the provision of BIAS.[35]  In trying to justify this course of action, the *RIF Order* asserted that a transparency rule, together with antitrust and consumer protection laws, would be sufficient to protect consumers' use of the Internet.[36]  The Commission also attempted to "preempt any state or local measures

---

[25] *See 2015 Open Internet Order*, 30 FCC Rcd at 5625-27, paras. 76-77.

[26] *See id.* at 5628-43, paras. 78-101.

[27] *See id.* at 5615-16, para. 50.

[28] *See id.* at 5743-45, paras. 331-35.

[29] *See id.* at 5603, 5838-64, paras. 5, 493-536.

[30] *Id.* at 5778-90, paras. 388-408.

[31] *See USTA*, 825 F.3d at 705.

[32] *Id.* at 706 (quoting 47 U.S.C. § 160(a)).

[33] *Id.* at 714.

[34] *Id.* at 733-44.

[35] *Restoring Internet Freedom*, WC Docket No. 17-108, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311 (2017) (*RIF Order*).

[36] *Id.* at 450-52, paras. 239-45.

that would effectively impose rules or requirements that [the Commission has] repealed or decided to refrain imposing . . . or that would impose more stringent requirements for any aspect of broadband service" addressed in the *RIF Order*.[37] Despite the D.C. Circuit upholding on multiple occasions the Commission's previous determinations that sections 706(a) and (b) constituted grants of regulatory authority, the *RIF Order* claimed those sections were better interpreted as hortatory.[38]

20.    Shortly thereafter, in considering a challenge to the *RIF Order*, the D.C. Circuit in *Mozilla v. FCC* identified a number of shortcomings and limitations in the *RIF Order* and remanded to the Commission three matters requiring further consideration.[39] The *Mozilla* court ultimately upheld the Commission's reclassification of BIAS, but the court's concurring opinions made clear that the ruling was compelled by deference to the U.S. Supreme Court's decision in *National Cable & Telecommunications Ass'n et al. v. Brand X Internet Services*[40] rather than the Commission's analysis relying on that decision, which two judges on the *Mozilla* panel characterized as clearly outdated.[41] Indeed, the *Mozilla* court repeatedly criticized the *RIF Order* or highlighted the limits of the Commission's analysis. For example, the court was skeptical of the *RIF Order*'s claims regarding the effect of Title II on investment, finding that the *RIF Order* itself recognized the "quite modest probative value" of studies seeking to demonstrate that Title II classification depressed network investment,[42] and that the dispute among competing studies was "far too sophisticated for us to credibly take sides."[43] Given the "impenetrability of the matter," the court ultimately deferred to the Commission's judgment.[44] The D.C. Circuit also criticized the *RIF Order*'s "anemic analysis" regarding the ability of antitrust and consumer protection law to obviate the need for Commission regulatory authority over BIAS, finding the Commission's analysis was "no model of agency decision-making," and "barely survive[d] arbitrary and capricious review."[45] The court also vacated the *RIF Order*'s attempt at blanket preemption of inconsistent state laws,[46] finding that the Commission "fail[ed] to ground its sweeping Preemption Directive . . . in a lawful source of statutory authority,"[47] and concluding that "in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law."[48]

21.    While barely upholding the Commission's reclassification analysis, the *Mozilla* court remanded the *RIF Order* to the Commission due to its failure to adequately evaluate the potential negative implications of moving away from a Title II regulatory framework for BIAS.[49] Specifically, the court

---

[37] *Id.* at 427, para. 195.

[38] *Id.* at 470, para. 268.

[39] *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (*Mozilla*).

[40] 545 U.S. 967 (2005) (*Brand X*).

[41] *Mozilla*, 940 F.3d at 87, 94 (Millett, J., concurring) (expressing "deep[] concern[]" that the classification of BIAS as an information service is "unhinged from the realities of modern broadband service," and stating that, in "putting singular and dispositive regulatory weight on broadband's incidental offering of DNS and caching, the Commission misses the technological forest for a twig"); *id.* at 94-95 (Wilkins, J., concurring) (noting that *Brand X* was binding on the D.C. Circuit "even though critical aspects of broadband Internet technology and marketing underpinning the Court's decision have drastically changed since 2005").

[42] *Id.* at 51, 52.

[43] *Id.* at 52, 55.

[44] *Id.*

[45] *Id.* at 59.

[46] *Id.* at 74.

[47] *Id.*; *see also ACA Connects et al. v. Bonta*, 24 F.4th 1233, 1241-48 (9th Cir. 2022).

[48] *Mozilla*, 940 F.3d at 75.

[49] *Id.* at 18.

found that the Commission did not adequately explain how the *RIF Order*'s reclassification of BIAS as an information service would affect the Commission's ability to: (1) adequately protect public safety; (2) promote infrastructure deployment through pole attachment regulation; and (3) ensure continued legal authority to provide Lifeline program support for BIAS through the Universal Service Fund (USF).[50] With respect to public safety, the *Mozilla* court found that the *RIF Order* ignored public safety concerns in the record entirely and that the Commission's "*post hoc* rationalization" on appeal regarding public safety was "facially inadequate" and "entirely misse[d] the fact that, whenever public safety is involved, lives are at stake."[51] Regarding pole attachments, "[t]he Commission offered, at best, scattered and unreasoned observations in response to comments on this issue," and at times "seemed to whistle past the graveyard," rather than adequately grappling with these concerns.[52] As to the issue of Lifeline support, the court found that the *RIF Order* "backhanded the issue" with a response that "d[id] not work," and likewise "prove[d] unable to explain itself in this litigation either."[53]

22.    The Commission attempted to respond to the three issues remanded by the D.C. Circuit in *Mozilla* in the 2020 *RIF Remand Order*, refusing to depart from its determinations in the *RIF Order*.[54] In February 2021, Common Cause et al.; INCOMPAS; Public Knowledge; and the County of Santa Clara and the Santa Clara County Central Fire Protection District (Santa Clara) each timely filed petitions for reconsideration of the *RIF Remand Order*.[55]

23.    Following the *Mozilla* court's invalidation of the Commission's attempt to preempt states from attempting to enact open Internet policies, a number of states quickly stepped in to fill the oversight void left in the wake of the *RIF Order*. These state measures were adopted in statutes, executive orders, and contracting policies.[56]

---

[50] *Id.*

[51] *Id.* at 62.

[52] *Id.* at 65-67.

[53] *Id.* at 69.

[54] *Restoring Internet Freedom*; *Bridging the Digital Divide for Low-Income Consumers*; *Lifeline and Link Up Reform and Modernization*, WC Docket Nos. 17-108, 17-287, and 11-42, Order on Remand, 35 FCC Rcd 12328, 12329, para. 2 (2020) (*RIF Remand Order*), *pets. for recon. pending*, *pet. for review pending*, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir.).

[55] Common Cause et al., Petition for Reconsideration, WC Docket Nos. 17-108, 17-287, and 11-42 (filed Feb. 8, 2021) (Common Cause et al. Petition for Reconsideration); INCOMPAS, Petition for Reconsideration, WC Docket Nos. 17-108, 17-287, and 11-42 (filed Feb. 4, 2021) (INCOMPAS Petition for Reconsideration); Public Knowledge, Petition for Reconsideration, WC Docket Nos. 17-108, 17-287, and 11-42 (filed Feb. 8, 2021) (Public Knowledge Petition for Reconsideration); County of Santa Clara et al., Petition for Reconsideration, WC Docket Nos. 17-108, 17-287, and 11-42 (filed Feb. 8, 2021) (Santa Clara Petition for Reconsideration). On October 19, 2023, the Wireline Competition Bureau sought comment on the Petitions for Reconsideration. *See Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the RIF Remand Order*, WC Docket Nos. 17-108, 17-287, and 11-42, Public Notice, DA 23-996 (WCB Oct. 19, 2023) (*Public Notice Seeking Comment on Petitions for Reconsideration*).

[56] *See, e.g.*, SB-822, 2017-2018 Reg. Sess. (Cal. 2018) (adopting open Internet-type requirements); H.B. 2282, 65th Leg., 2018 Reg. Sess. (Wash. 2018) (similar); H.B. 4155, 79th Leg. Assemb., Reg. Sess. (Or. 2018) (requiring compliance with certain open Internet-type requirements as a condition of contracting with the state government); S.289, No. 169, 2018 Sess. (Vt. 2018) (similar); LD 1364, 129th Leg., Reg. Sess. (Me. 2019) (similar); Colorado S.B. 19-078, 71st Leg., Reg. Sess. (Colo. 2019) (requiring compliance with certain open Internet-type requirements as a condition of state universal service support); NY Gen. Bus. § 399-zzzzz (N.Y. 2021) (restricting BIAS prices for low-income consumers); Mont. Exec. Order No. 3-2018 (2018), https://spb.mt.gov/_docs/Laws-Rules-EOs/EOs/EO-03-2018-Net-Freedom.pdf, *amended by* Mont. Exec. Order No. 6-2018 (2018), https://spb.mt.gov/_docs/Laws-Rules-EOs/EOs/EO-06-2018-Amended-Net-Freedom.pdf (requiring compliance with certain open Internet-type requirements as a condition of contracting with the state government); N.J. Exec.

(continued....)

24. Building on several other actions the Commission has taken since the onset of the COVID-19 pandemic to ensure that the public has access to broadband, in October 2023, we adopted a *Notice of Proposed Rulemaking* (*2023 Open Internet NPRM* or *NPRM*) that proposed to reestablish the Commission's authority over BIAS by classifying it as a telecommunications service under Title II and proposed to classify mobile BIAS as a commercial mobile service.[57] In concert with the proposed reclassification, the *2023 Open Internet NPRM* proposed to forbear from multiple provisions of Title II.[58] The *2023 Open Internet NPRM* also proposed to reestablish a national regulatory approach to protect the open Internet by preventing BIAS providers from engaging in practices harmful to consumers. This included proposals to: reinstate straightforward, clear rules that prohibit blocking, throttling, or engaging in paid or affiliated prioritization arrangements; reinstate a general conduct standard that would prohibit unreasonable interference or unreasonable disadvantage to consumers or edge providers; and retain the disclosure requirements under the existing transparency rule. The *2023 Open Internet NPRM* also sought comment on the means of disclosure under the transparency rule, the interplay between the transparency rule and the broadband label requirements, and any additional enhancements or changes to that rule.[59] The *2023 Open Internet NPRM* tentatively concluded that reclassification would provide the Commission with additional authority to safeguard national security, advance public safety, protect consumers, facilitate broadband deployment, and support broadband access.[60]

## III. DECLARATORY RULING: CLASSIFICATION OF BROADBAND INTERNET ACCESS SERVICES

25. We reinstate the telecommunications service classification of BIAS under Title II of the Act. Reclassification will enhance the Commission's ability to ensure Internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to BIAS, and improve disability access. We find that classification of BIAS as a telecommunications service represents the best reading of the text of the Act in light of how the service is offered and perceived today, as well as the factual and technical realities of how BIAS functions. Classifying BIAS as a telecommunications service also accords with Commission and court precedent and is fully and sufficiently justified under the Commission's longstanding authority and responsibility to classify services subject to the Commission's jurisdiction, as necessary. We also ensure that consumers receive the same protections when using fixed and mobile BIAS by reclassifying mobile BIAS as a commercial mobile service.

### A. Reclassification Enhances the Commission's Ability to Fulfill Key Public Interest Obligations and Objectives

26. As the record overwhelmingly demonstrates, BIAS connections are absolutely essential to modern day life, facilitating employment, education, healthcare, commerce, community-building,

---

Order No. 9 (2018), https://nj.gov/infobank/eo/056murphy/pdf/EO-9.pdf (similar); N.Y. Exec. Order No. 175 (2018) (similar); R.I. Exec. Order No. 18-02 (2018), https://governor.ri.gov/executive-orders/executive-order-18-02 (similar); Haw. Exec. Order No. 18-02 (2018), https://ballotpedia.s3.amazonaws.com/images/6/64/Executive-Order-No.-18-02-Net-Neutrality-Signed.pdf (similar).

[57] *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, Notice of Proposed Rulemaking, FCC 23-83, at 9, para. 16 (Oct. 20, 2023) (*2023 Open Internet NPRM*).

[58] *See id.* at 54-58, paras. 104-14.

[59] *See id.* at 80-86, paras. 169-86.

[60] *See id.* at 13-32, paras. 21-54.

communication, and free expression.[61]  The "forced digitization" [62] of the COVID-19 pandemic served to underscore the importance of BIAS connections in society as essential activities moved online, and the increased importance of BIAS connections has only persisted in the wake of the pandemic.[63]  It has therefore never been more important that the Commission have both the necessary authority to oversee this essential service to protect consumers, strengthen national security, and support public safety, and the full complement of tools to facilitate access to BIAS.

27.     While our conclusion that classifying BIAS as a telecommunications service represents the best reading of the Act is itself sufficient grounds for our decision, we separately conclude that important policy considerations also support this determination.  In particular, our reclassification decision will ensure the Commission can fulfill statutory obligations and policy objectives to ensure Internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to

---

[61] *See, e.g.*, Steven Renderos (filed on behalf of MediaJustice) Comments at 5 (MediaJustice) (asserting that the COVID-19 pandemic "made it clear to all that a quality education relies on a strong [BIAS] connection"); AARP Comments at 2, 4 (explaining that broadband is an essential service "providing opportunities for remote work, distance learning, telehealth, civic engagement and economic advancement"); The Greenlining Institute Reply at 2 (observing that "[p]roven pathways out of poverty such as higher education . . . are now almost exclusively available to those who have [a BIAS connection] within their homes"); County of Santa Clara et al. Comments at 19-20 (Santa Clara) (asserting that BIAS enables telemedicine); American Library Association Comments at 3 (ALA) (explaining that "[d]uring the pandemic, telehealth became a new service that public and academic libraries began to support"); NTCA—The Rural Broadband Association Comments at 2 (NTCA) (noting that "broadband is a rapidly increasing input for many sectors including agriculture, economic development, education, healthcare, and public safety"); Computer & Communications Industry Association Comments at 5-6 (CCIA); California Public Utilities Commission Comments at 29 (CPUC) (explaining that "deaf and disabled individuals increasingly rely upon Internet-based video and Voice over Internet Protocol (VoIP) communications"); ACA Connects—America's Communications Association Comments at 2, 8 (ACA Connects); American Council on Education Comments at 1 (ACE) (highlighting that "[a]ccording to an [U.S. Census Bureau] American Community Survey report, the usage of the Internet has increased from just under 20 percent of households having an Internet subscription in 1997 to 85 percent in 2018"); Antonin Scalia Law School Administrative Law Clinic Comments at 4 (Scalia Law Administrative Law Clinic) (agreeing with the Commission that BIAS is "'essential' for American consumers"); Arianna M. Peña Comments at 2; Consumer Reports Comments at 3, 7 (highlighting Consumer Reports' surveys that "affirm[] the Commission's conclusion that broadband has grown in importance in the past five years, and a majority of consumers equate its importance to that of electricity and water service"); Elizabeth Burke Comments at 1-3; Former Iowa Lieutenant Governor Patty Judge (filed on behalf of Focus on Rural America) Comments at 1 (Focus on Rural America) (highlighting that "Americans rely on high-speed internet for everything—ranging from education and business to health care and socializing—to thrive in today's digital world"); INCOMPAS Comments at 6-8, 49; Lawyers' Committee for Civil Rights Under Law Comments at 2-3 (Lawyers' Committee) (emphasizing that "[t]oday, high-speed internet is a basic and essential utility just as much as electricity, water, and telephone service"); Next Century Cities Comments at 3; Public Knowledge Comments at 1, 3-4; R Street Institute Comments at 2; Ad Hoc Telecom Users Committee Comments at 8; California Independent Small LECs Comments at 17; Digital Inclusion Alliance of San Antonio Comments at 1, 2 (DIASA); Electronic Frontier Foundation Comments at 3-6 (EFF); Letter from The Leadership Conference on Civil and Human Rights et al., to Hon. Jessica Rosenworcel et al., Chairwoman, FCC, WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (emphasizing "the important role that [BIAS] plays for the communities we represent") (The Leadership Conference Apr. 18, 2024 *Ex Parte*); Letter from Alliance of Baptists, et al., to Jessica Rosenworcel, Chairwoman, FCC, WC Docket 23-320, at 1-4 (filed Apr. 18, 2024) (discussing how broadband is "essential for our home faith institutions, to share scripture, help neighbors, support each other, and raise funds to support our work") (Faith Leaders *Ex Parte*); *see also Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 22-270, Report, FCC 24-27, at 18-19, para. 31 (Mar. 18, 2024) (*2024 Section 706 Report*) (discussing increases in telework, telehealth, and online schooling).

[62] Ad Hoc Telecom Users Committee Comments at 8.

[63] *See 2023 Open Internet NPRM* at 9-11, paras. 17-18.

BIAS, and improve disability access.[64]  As such, these policy obligations and objectives, each independently and collectively, support the reclassification of BIAS as a telecommunications service.

### 1.    Ensuring Internet Openness

28.    We find that reclassification of BIAS as a telecommunications service enables the Commission to more effectively safeguard the open Internet.[65]  In addition to protecting free expression, an open Internet encourages competition and innovation, and is critical to public safety.  As we explain below, we find that a safe, secure, and open Internet is too important to consumers and innovators to leave without the protection of federal regulatory oversight.[66]

29.    Upon today's reclassification of BIAS as a Title II telecommunications service, we rely on our authority in sections 201 and 202 of the Act, along with the related enforcement authorities of sections 206, 207, 208, 209, 216, and 217, for the open Internet rules we adopt today to address practices that are unjust, unreasonable, or unreasonably discriminatory.[67]  Specifically, we reinstate rules that prohibit BIAS providers from blocking or throttling the information transmitted over their networks or engaging in paid or affiliated prioritization arrangements, and reinstate a general conduct standard that prohibits practices that cause unreasonable interference or unreasonable disadvantage to consumers or edge providers.  As discussed more fully below, these rules, in concert with strong transparency requirements, establish clear standards for BIAS providers to maintain Internet openness and give the Commission a solid basis on which to take enforcement actions against conduct that prevents consumers from fully accessing all of the critical services available through the Internet.  The reclassification also enables the Commission to establish a nationwide framework of open Internet rules for BIAS providers and thereby exercise our authority to preempt any state or local measures that interfere or are incompatible with the federal regulatory framework we establish today, while at the same time ensuring that all consumers are protected from conduct harmful to Internet openness.

### 2.    Defending National Security and Law Enforcement

30.    The reclassification of BIAS enhances the Commission's ability to protect the nation's communications networks from entities that pose threats to national security and law enforcement.  The

---

[64] *See, e.g.*, Letter from Nell Geiser, Director of Research, CWA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (supporting the Commission's proposal to reclassify BIAS under Title II, and noting "the importance of the Open Internet docket as it relates to a sensible overall structure that:  regulates this critical infrastructure; supports affordable access to broadband by all people; and ensures such broadband policies are competitively equitable"); The Leadership Conference Apr. 18, 2024 *Ex Parte* at 1 (emphasizing the "need for the Commission to utilize the strongest possible legal framework to:  ensure that all communities have affordable access; protect consumer privacy; prohibit discrimination and promote enforcement of discrimination protections; protect accessibility for people with disabilities; and make sure BIAS networks are reliable, resilient and the source of good jobs"); Faith Leaders *Ex Parte* at 2-3 (supporting reclassification as a telecommunications service to provide critical open Internet protections for communities of faith to organize and advocate); Letter from 18 Million Rising et al., to Hon. Jessica Rosenworcel, Chairwoman, FCC, et al., WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (Title II Civil Society and Partners *Ex Parte*) ("We must restore the expert agency's oversight of these monumental public investments in this essential communications service.  Consumers require safeguards to ensure their broadband usage grants them access to the services they need.  They need guarantees for the quality they expect in times of emergency and pandemic, and in everyday usage too.  And they need the FCC to maintain regulatory oversight of [BIAS providers].").  We therefore reject arguments that we should address other issues instead of reclassifying BIAS, particularly since reclassification will enhance the Commission's ability to address many of the issues commenters raise.  *See, e.g.*, Foundation for American Innovation et al. Comments at 4 (FAI et al.); Hispanic Leadership Fund Comments at 2-5; Small Business & Entrepreneurship Council Comments at 3 (SBEC); Information Technology & Innovation Foundation Comments at 10-11 (ITIF).

[65] *2023 Open Internet NPRM* at 13-14, para. 23.

[66] *See infra* Section V.A (Need for Rules).

[67] 47 U.S.C. §§ 201(b), 202(a), 206, 207, 208, 209, 216, 217; *2023 Open Internet NPRM* at 13-14, para. 23.

*RIF Order*'s classification of BIAS as an information service under Title I raised concerns about the Commission's authority to take certain regulatory actions to address risks to BIAS providers and vulnerabilities in broadband networks. As the National Telecommunications and Information Administration (NTIA) highlights, "the Commission has encountered challenges that have hampered its ability to fully protect the public from serious national security threats."[68] For example, NTIA describes cases where the Commission identified such threats and revoked the authority of certain foreign-owned adversarial service providers to provide Title II telecommunications services (including "traditional telephony") in the United States pursuant to its section 214 authority, but was not able to stop them from providing BIAS or other Internet-based services that were then classified as Title I services.[69] Classifying BIAS under Title II alleviates those concerns, restoring a broader range of regulatory tools and enhancing the Commission's jurisdiction to cover broadband services, providers, and networks.[70] We also find that reclassification will enable the Commission to make more significant national security contributions as we continue our longstanding coordination with our federal partners.[71]

31. We find that reclassification will significantly bolster the Commission's ability to carry out its statutory responsibilities to safeguard national security and law enforcement. Congress created the Commission, among other reasons, "for the purpose of the national defense."[72] The Commission's national security responsibilities are well established. Presidential Policy Directive 21 (PPD-21) describes the Commission's roles as including "identifying communications sector vulnerabilities and working with industry and other stakeholders to address those vulnerabilities . . . [and] to increase the security and resilience of critical infrastructure within the communications sector."[73]

32. There can be no question about the importance to our national security of maintaining the

---

[68] Letter from Alan Davidson, Assistant Secretary of Commerce for Communications and Information, National Telecommunications and Information Administration, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 5 (filed Mar. 20, 2024) (NTIA *Ex Parte*).

[69] NTIA *Ex Parte* at 6.

[70] *See, e.g.*, EPIC et al. Comments at 13 (agreeing with the Commission about the "positive implications for national security . . . in applying Title II to broadband service providers"); Public Knowledge Comments at 62, 63-65 (noting that reclassification is "essential to protect public safety and national security" and asserting that it would strengthen the Commission's authorities to address security concerns posed by foreign entities).

[71] NTIA *Ex Parte* at 4 (urging the Commission to "reaffirm its longstanding commitment to a collaborative and carefully calibrated approach to these security challenges, including through interagency coordination").

[72] 47 U.S.C. § 151.

[73] The White House, Presidential Policy Directive 21: Critical Infrastructure Security and Resilience (PPD-21) (Feb. 12, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil (last visited Apr. 2, 2024) (PPD-21). The Commission's role in national security has also been recognized in recent court decisions. *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 439-40, 443 (5th Cir. 2021) (*Huawei Techs.*) (recognizing the Commission's "role in considering national security under the public interest umbrella"); *Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024) ("As we have previously written, '[w]e cannot second-guess the FCC's judgment that allowing China to access this information poses a threat to national security.'" (quoting *Pac. Networks Corp. v. FCC*, 77 F.4th 1160, 1164 (D.C. Cir. 2023)). The President's recent National Security Memorandum, NSM-22, recognized the Commission's role in securing critical infrastructure: "The Federal Communications Commission will, to the extent permitted by law and in coordination with DHS and other Federal departments and agencies: (1) identify and prioritize communications infrastructure by collecting information regarding communications networks; (2) assess communications sector risks and work to mitigate those risks by requiring, as appropriate, regulated entities to take specific actions to protect communications networks and infrastructure; and (3) collaborate with communications sector industry members, foreign governments, international organizations, and other stakeholders to identify best practices and impose corresponding regulations." National Security Memorandum on Critical Infrastructure Security and Resilience, NSM-22 (Apr. 30, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/04/30/national-security-memorandum-on-critical-infrastructure-security-and-resilience/.

integrity of our critical infrastructure, including communications networks.   As PPD-21 explains:

> The Nation's critical infrastructure provides the essential services that underpin American society.  Proactive and coordinated efforts are necessary to strengthen and maintain secure, functioning, and resilient critical infrastructure—including assets, networks, and systems—that are vital to public confidence and the Nation's safety, prosperity, and well-being . . . . The Federal Government also has a responsibility to strengthen the security and resilience of its own critical infrastructure, for the continuity of national essential functions, and to organize itself to partner effectively with and add value to the security and resilience efforts of critical infrastructure owners and operators. . . . It is the policy of the United States to strengthen the security and resilience of its critical infrastructure against both physical and cyber threats.[74]

Developments in recent years have only highlighted national security concerns arising in connection with the U.S. communications sector.[75]  These security threats also impact BIAS providers and broadband networks.  PPD-21 recognizes that "communications systems [are] uniquely critical due to the enabling functions they provide across all critical infrastructure sectors," which highlights the importance of protecting communications infrastructure—including broadband networks.[76]  Disruptions of communications can easily have significant cascading effects on other critical infrastructure sectors that rely on communications.[77]  We find that reclassification of BIAS under Title II will enable the Commission to more fully utilize its regulatory authority and rely on its subject matter expertise and operational capabilities to address these concerns and strengthen the security posture of the United States. As NTIA explains, the "lightning-fast evolutions of our communications technologies and our growing dependence on these offerings necessitate a whole-of-government approach to security that engages all available federal government resources."[78]

33.     The Commission has on multiple occasions carried out its responsibilities to protect the nation's communications networks from threats to national security and law enforcement by taking regulatory actions under Title II regarding the provision of traditional telecommunications services, including voice.  For example, the Commission denied an application for international section 214 authority[79] and revoked the section 214 authority of, certain entities that are majority-owned and

---

[74] PPD-21.

[75] *See, e.g.*, CISA, Cybersecurity Advisory, PRC State-Sponsored Actors Compromise and Maintain Persistent Access to U.S. Critical Infrastructure (Feb. 7, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-038a (warning critical infrastructure organizations that People's Republic of China state-sponsored actors such as Volt Typhoon "are seeking to pre-position themselves on IT networks for disruptive and destructive cyberattacks against U.S. critical infrastructure," including by targeting "smaller organizations with limited cybersecurity capabilities"); Dina Temple-Raston, *A 'Worst Nightmare' Cyberattack:  The Untold Story of the SolarWinds Hack*, NPR (Apr. 16, 2021), https://www.npr.org/2021/04/16/985439655/a-worst-nightmare-cyberattack-the-untold-story-of-the-solarwinds-hack (describing the cyberattack on SolarWinds which exploited a routine software update).

[76] PPD-21.

[77] The PPD-21 states, "U.S. efforts shall address the security and resilience of critical infrastructure in an integrated, holistic manner to reflect this infrastructure's interconnectedness and interdependency.  This directive also identifies energy and communications systems as uniquely critical due to the enabling functions they provide across all critical infrastructure sectors."  PPD-21.

[78] NTIA *Ex Parte* at 3-4 (supporting the Commission's effort to "ensure it has the authority to act when needed to protect national security").

[79] *China Mobile International (USA) Inc.*; *Application for Global Facilities-Based and Global Resale International Telecommunications Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended*, File No. ITC-214-20110901-00289, Memorandum Opinion and Order, 34 FCC Rcd 3361, 3361-62, para. 1 (2019) (*China Mobile USA Order*).

controlled by the Chinese government, based on recommendations and comments from interested Executive Branch agencies regarding evolving national security and law enforcement concerns.[80]  In the *China Mobile USA Order*, *China Telecom Americas Order on Revocation and Termination*, *China Unicom Americas Order on Revocation*, and *Pacific Networks and ComNet Order on Revocation and Termination*, the Commission found that these entities are subject to exploitation, influence, and control by the Chinese government, and that mitigation would not address the national security and law enforcement concerns.[81]  In the *China Telecom Americas Order on Revocation and Termination*, *China Unicom Americas Order on Revocation*, and *Pacific Networks and ComNet Order on Revocation and Termination*, the Commission also found that the significant national security and law enforcement risks associated with those entities' retention of their section 214 authority "pose a clear and imminent threat to the security of the United States."[82]  More recently, the Commission adopted the *Evolving Risks Order and Notice of Proposed Rulemaking* which, among other things, proposed rules that would require carriers to renew, every 10 years, their international section 214 authority.[83]  In the alternative, the Commission sought comment on adopting rules that would require all international section 214 authorization holders to periodically update information enabling the Commission to review the public interest and national security implications of those authorizations based on that updated information.[84]  As stated in the *Evolving Risks Order and Notice of Proposed Rulemaking*, the overarching objective of that proceeding is to adopt rule changes "that will enable the Commission, in close collaboration with relevant Executive Branch agencies, to better protect telecommunications services and infrastructure in the United States in light of evolving national security, law enforcement, foreign policy, and trade policy risks."[85]

34.    The reclassification of BIAS as a Title II service, and our decision below to decline to forbear from the entry certification requirements of section 214, will enable the Commission to exercise its section 214 authority with respect to BIAS providers, and will enhance the Commission's ability to protect the nation's communications networks from entities that pose threats to national security and law enforcement.[86]  Section 214(a) of the Act prohibits any carrier from constructing, acquiring, or operating

---

[80] *China Telecom (Americas) Corporation*, GN Docket No. 20-109, File Nos. ITC-214-20010613-00346, ITC-214-20020716-00371, ITC-T/C-20070725-00285, Order on Revocation and Termination, 36 FCC Rcd 15966, 15966-67, para. 1 (2021) (*China Telecom Americas Order on Revocation and Termination*), *aff'd*, *China Telecom. (Ams.) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022); *China Unicom (Americas) Operations Limited*, GN Docket No. 20-110, File Nos. ITC-214-20020728-00361, ITC-214-20020724-00427, Order on Revocation, 37 FCC Rcd 1480, 1480-81, para. 1 (2022) (*China Unicom Americas Order on Revocation*), *argued* No. 22-70029 (9th Cir. Feb. 15, 2023); *Pacific Networks Corp. and ComNet (USA) LLC*, GN Docket No. 20-111, File Nos. ITC-214-20090105-00006 and ITC-214-20090424-00199, Order on Revocation and Termination, 37 FCC Rcd 4220, 4220-21, para. 1 (2022) (*Pacific Networks and ComNet Order on Revocation and Termination*), *aff'd*, *Pacific Networks Corp. v. FCC*, 77 F.4th 1160 (D.C. Cir. 2023).

[81] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15967, para. 2; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1481, para. 2; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4221-22, para. 2; *China Mobile USA Order*, 34 FCC Rcd at 3365-66, para. 8.

[82] *See, e.g.*, 47 U.S.C. § 214; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16008, para. 65; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1530, para. 74; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4287, para. 74.

[83] *Review of International Section 214 Authorizations to Assess Evolving National Security, Law Enforcement, Foreign Policy, and Trade Policy Risks*; *Amendment of the Schedule of Application Fees Set Forth in Sections 1.1102 through 1.1109 of the Commission's Rules*, IB Docket No. 23-119, MD Docket No. 23-134, Order and Notice of Proposed Rulemaking, FCC 23-28, at 1, para. 1 (Apr. 25, 2023) (*Evolving Risks Order and Notice of Proposed Rulemaking*).

[84] *Id.*

[85] *Id.*

[86] *See* 47 U.S.C. § 153(51) (providing that a telecommunications carrier is a common carrier only insofar as it is providing telecommunications services).

any line, and from engaging in transmission through any such line, without first obtaining a certificate from the Commission "that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such . . . line . . . ."[87] As we discuss elsewhere, while we grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers, with exceptions, this grant of blanket authority is subject to the Commission's reserved power to revoke such authority,[88] consistent with established statutory directives and longstanding Commission determinations with respect to section 214 authorizations.[89] And we find that the Commission's determinations, based on thorough record development, in the denial and revocation actions discussed below, in which the Commission extensively evaluated national security and law enforcement considerations associated with those entities, support our decision to exclude from this blanket section 214 authority for the provision of BIAS those same entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked by the Commission because of national security and law enforcement concerns.[90] As discussed below, we find that excluding those entities and their current and future affiliates and subsidiaries from blanket section 214 authority for the provision of BIAS is warranted based on the Commission's determinations in those proceedings that the present and future public interest,

---

[87] 47 U.S.C. § 214(a); *see Reform of Rules and Policies on Foreign Carrier Entry into the U.S. Telecommunications Market*, IB Docket No. 12-299, Report and Order, 29 FCC Rcd 4256, 4256, para. 2 n.2 (2014) (*2014 Foreign Carrier Entry Order*) ("Any party seeking to provide common carrier telecommunications services between the United States, its territories or possessions, and a foreign point must request authority by application pursuant to section 214(a) of the Act, 47 U.S.C. § 214(a), and section 63.18 of the Commission's rules, 47 C.F.R. § 63.18."). The Supreme Court has determined that the Commission has considerable discretion in deciding how to make its section 214 public interest findings. *FCC v. RCA Commc'ns, Inc.*, 346 U.S. 86, 90-91 (1953) (*RCA*); *see Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, CC Docket No. 79-252, First Report and Order, 85 F.C.C.2d 1, 40-44, paras. 117-29 (1980) (*Competitive Common Carrier Rates and Facilities Report and Order*) (discussing the Commission's authority under section 214(a) of the Act); *Streamlining the International Section 214 Authorization Process and Tariff Requirements*, IB Docket No. 95-118, Notice of Proposed Rulemaking, 10 FCC Rcd 13477, 13480, para. 6 (1995) (*1995 Streamlining NPRM*); *Streamlining the International Section 214 Authorization Process and Tariff Requirements*, IB Docket No. 95-118, Report and Order, 11 FCC Rcd 12884, 12903, para. 44 n.63 (1996) (*1996 Streamlining Order*); Telecommunications Act of 1996, Pub. L. 104-104, § 402(b)(2)(A) (codified at 47 U.S.C. § 214 note) ("The Commission shall permit any common carrier—(A) to be exempt from the requirements of section 214 of the Communications Act of 1934 for the extension of any line . . . .").

[88] *See infra* Section IV.B.3; *Implementation of Section 402(b)(2)(A) of the Telecommunications Act of 1996; Petition for Forbearance of the Independent Telephone & Telecommunications Alliance*, CC Docket No. 97-11, AAD File No. 987-43, Report and Order and Second Memorandum Opinion and Order, 14 FCC Rcd 11364, 11373-74, paras. 14-16 (1999) (*Domestic 214 Blanket Authority Order*); *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market; Market Entry and Regulation of Foreign-Affiliated Entities*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23896, 23919-20, 24023, paras. 9, 61-63, 295 (1997) (*Foreign Participation Order); Rules and Policies on Foreign Participation in the U.S. Telecommunications Market*, IB Docket 97-142, Order on Reconsideration, 15 FCC Rcd 18158, 18173, 18175-76, paras. 28, 35 (2000) (*Reconsideration Order*); *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968-69, para. 4; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1482-83, 1493-94, paras. 4, 24; *Pacific Networks andComNet Order on Revocation and Termination*, 37 FCC Rcd at 4222-23, para. 4.

[89] *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11373-74, paras. 14-16; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968-69, para. 4; *China Unicom Americas Order on Revocation,* 37 FCC Rcd at 1482-83, 1493-94, paras. 4, 24; *Pacific Networks Corp. and ComNet Order on Revocation and Termination,* 37 FCC Rcd at 4222-23, para. 4. The Commission has explained that it grants blanket section 214 authority, rather than forbearing from application or enforcement of section 214 entirely, in order to remove barriers to entry without relinquishing its ability to protect consumers and the public interest by withdrawing such grants on an individual basis. *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11372-73, 11374, paras. 12-14, 16.

[90] *See generally China Mobile USA Order; China Telecom Americas Order on Revocation and Termination; China Unicom Americas Order on Revocation; Pacific Networks and ComNet Order on Revocation and Termination.*

convenience, and necessity would no longer be served by the retention of those entities' section 214 authority,[91] or that the public interest would not be served by the grant of international section 214 authority.[92]  The Commission's actions in those proceedings were based on recommendations and comments regarding evolving national security and law enforcement concerns from Executive Branch agencies,[93] including from Members of, or Advisors to, the Committee for the Assessment of Foreign Participation in the U.S. Telecommunications Sector (Committee) created pursuant to Executive Order 13913.[94]  Our action today will enable the Commission to use its section 214 authority to address threats to communications networks, working cooperatively with our federal partners and leveraging all investigative tools at our disposal.[95]

35.    Reclassification will also enhance the Commission's ability to obtain information from BIAS providers that will enable the Commission to assess national security risks, through reliance on section 214 of the Act, along with sections 201, 202, 218, 219, and 220.[96]  As one example, in the *Evolving Risks Order and Notice of Proposed Rulemaking*, the Commission adopted a one-time collection of foreign ownership information from international section 214 authorization holders, pursuant to sections 218 and 219 of the Act, among other statutory provisions.[97]  Reclassification grants the Commission additional authority to develop information collection requirements pursuant to applicable provisions under Title II with regard to BIAS providers.

36.    We anticipate as well that Title II authority, such as that provided in section 201 of the

---

[91] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15966-97, para. 1; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1480-81, para. 1; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4220-21, para. 1; *see infra* Section IV.B.3.

[92] *China Mobile USA Order*, 34 FCC Rcd at 3361-62, para. 1; *see infra* Section IV.B.3.

[93] *China Mobile USA Order*, 34 FCC Rcd at 3364-65, para. 5-6 & n.24.

[94] *See* Exec. Order No. 13913, 85 Fed. Reg. 19643 (Apr. 8, 2020) (Executive Order 13913); *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15974, para. 9 & n.37; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1483-84, para. 5 & n.12; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4224-25, para. 5 & n.14.

[95] *See infra* Section IV.B.3 (noting the Commission reserves the right to conduct *ad hoc* review of whether a provider's retention of blanket section 214 authority for the provision of BIAS presents national security, law enforcement, public safety, or other risks that warrant revocation of such authority).

[96] The Commission relies on sections 201 and 202 of the Act, and section 706 of the 1996 Act, for its authority to collect information.  47 U.S.C. §§ 201, 202, 1302; *see, e.g.*, *Modernizing the Form 477 Data Program*, WC Docket No. 11-10, Report and Order, 28 FCC Rcd 9887, 9925, para. 88 (2013) (*Modernizing the Form 477 Data Program*) (citing as authority for the Form 477 data collection, among other things, sections 201 and 403 of the Act and section 706 of the 1996 Act); *Special Access for Price Cap Local Exchange Carriers*; *AT&T Corporation Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC Docket No. 05-25, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 16318, 16338-39, para. 50 (2012) (*Special Access Report and Order and Further Notice*) (citing as authority for the special access data collection, among other things, sections 201 and 202 of the Act and section 706 of the 1996 Act). Additionally, section 218 of the Act authorizes the Commission to seek "full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created."  47 U.S.C. § 218. Section 219 of the Act provides that "[t]he Commission is authorized to require annual reports from all carriers subject to this chapter, and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, any such carrier, to prescribe the manner in which such reports shall be made, and to require from such persons specific answers to all questions upon which the Commission may need information."  *Id.* § 219. Section 220(c) of the Act provides that "[t]he Commission shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers, and the provisions of this section."  *Id.* § 220.

[97] *Evolving Risks Order and Notice of Proposed Rulemaking* at 1, 72, paras. 1, 198.

Act,[98] will be important in addressing national security and law enforcement concerns involving Internet Points of Presence (PoPs), which are usually located within data centers, as those relate to the provision of BIAS.[99]  There are serious national security and law enforcement risks associated with PoPs that are owned or operated by entities that present threats to national security and law enforcement interests and potential harms related to the services provided by such entities.[100]  In the *China Telecom Americas Order on Revocation and Termination*,[101] the Commission stated that, "[i]n cases where [China Telecom Americas' (CTA's)] PoPs reside in IX points, CTA can potentially access and/or manipulate data where it is on the preferred path for U.S. customer traffic, through its services provided pursuant to section 214 authority and those services not authorized under section 214 authority."[102]  The Commission also noted that "[t]he Executive Branch agencies refer to public reports that CTA's network misrouted large amounts of information and communications traffic over long periods, often several months, sometimes involving

---

[98] *See* 47 U.S.C. § 201 (requiring that all practices of common carriers be just and reasonable, and governing contracting for the exchange of traffic in the public interest).

[99] *2023 Open Internet NPRM* at 16, para. 27 n.100.  Today, ISPs provide BIAS through PoPs.  *Id.*; *see China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16027, paras. 91-92 ("PoPs . . . are physical locations where the network service provider offers or avails of interconnection or other Internet-related services.  To optimize connectivity among providers, the industry has established 'Internet Exchange' or 'IX' points, which are physical data centers in which carriers who wish to participate in public peering can connect to a shared local area network or optionally avail of point-to-point interconnects for private peering."); *see also* Colocation America, *What Is a Point of Presence (PoP)?* (Oct. 11, 2018), https://www.colocationamerica.com/blog/point-of-presence ("These Internet POPs usually hold multiple servers, routers, and all other interface equipment.  These physical locations are usually located within data centers.  ISPs typically have multiple POPs located around in many different areas.  Some [ISPs] have thousands of POP locations usually located at Internet Exchange Points (IXP) and colocation centers.  These physical locations allow people to be interconnected to others around the world.").

[100] For instance, in the *China Telecom Americas Order on Revocation and Termination*, the Commission addressed concerns that China Telecom (Americas) Corporation's (CTA) PoPs in the United States "are highly relevant to the national security and law enforcement risks associated with CTA" and that "CTA's PoPs in the United States provide CTA with the capability to misroute traffic and, in so doing, access and/or manipulate that traffic."  *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16027, paras. 91-92.  The Commission also stated that "CTA, like any similarly situated provider, can have both physical and remote access to its customers' equipment needed to provide such services," and "[t]his physical access to customers' equipment would allow CTA to monitor and record sensitive information."  *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16027, para. 93; *2023 Open Internet NPRM* at 17, para. 27 & n.101.  The Commission concluded that CTA's provision of services pursuant to its section 214 authority, "whether offered individually or as part of a suite of services—combined with CTA's physical presence in the United States, CTA's ultimate ownership and control by the Chinese government, and CTA's relationship with its indirect parent [China Telecommunications Corporation], which itself maintains a physical presence in the United States—present unacceptable national security and law enforcement risks to the United States," and it reached similar conclusions in the other proceedings.  *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16029, para. 98; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1554-55, 1565, paras. 110, 127; *see also Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4134, para. 113.

[101] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15967, para. 2; *see id.* ("[W]e find that CTA, a U.S. subsidiary of a Chinese state-owned enterprise, is subject to exploitation, influence, and control by the Chinese government and is highly likely to be forced to comply with Chinese government requests without sufficient legal procedures subject to independent judicial oversight."); *id.* at 15992, para. 44 ("Given the changed national security environment with respect to China since the Commission authorized CTA to provide telecommunications services in the United States, we find that CTA's ties to the Chinese government—together with Chinese laws obligating CTA and its direct and indirect parent entities and affiliates to cooperate with requests by the Chinese government—pose a clear and imminent threat to the security of the United States due to CTA's access to U.S. telecommunications infrastructure.").

[102] *Id.* at 16027, para. 91.

U.S. government traffic."[103] Notably, CTA's website indicates that the company operates 23 PoPs in the United States[104] and offers a number of services that may be available in the United States, including colocation,[105] broadband,[106] Internet access,[107] IP transit,[108] and data center services.[109] We conclude that the same national security and law enforcement concerns identified in that revocation proceeding[110] are at least as likely to be present in the context of BIAS offerings when used to route or exchange BIAS traffic. We expect that reclassification of BIAS under Title II will enable the Commission to exercise authority when necessary to prohibit a BIAS provider from exchanging Internet traffic with third parties that present threats to U.S. national security and law enforcement, such as CTA.[111]

37.     Today's reclassification decision also will provide the Commission with broader authority under Title II to safeguard BIAS providers, networks, and infrastructure from equipment and services that pose national security threats.  The Commission has undertaken significant efforts to improve supply chain security pursuant to its universal service authority in section 254 of the Act, its authority to regulate equipment in sections 302 and 303 of the Act, and new mandates established by Congress through the Secure and Trusted Communications Networks Act of 2019, as amended, and the Secure Equipment Act of 2021.[112]  In particular, the Commission has taken action to:  prohibit the use of

---

[103] *Id.* at 16024, para. 88.

[104] China Telecom Americas, *Global Data Center Map*, https://www.ctamericas.com/global-data-center-map (last visited Mar. 22, 2024).

[105] *See* China Telecom Americas, *Colocation Services*, https://www.ctamericas.com/products/data-center/colocation (last visited Mar. 22, 2024).

[106] *See* China Telecom Americas, *Broadband*, https://www.ctamericas.com/products/internet/broadband (last visited Mar. 22, 2024).

[107] *See* China Telecom Americas, *Global Internet Access*, https://www.ctamericas.com/products/internet/global-internet-access (last visited Mar. 22, 2024).

[108] *See* China Telecom Americas, *Global IP Transit*, https://www.ctamericas.com/products/Internet/global-ip-transit (last visited Mar. 22, 2024).

[109] *See* China Telecom Americas, *Data Center Products*, https://www.ctamericas.com/products/data-center (last visited Mar. 22, 2024).

[110] In the *China Telecom Americas Order on Revocation and Termination*, the Commission concluded that CTA's provision of services pursuant to its section 214 authority, "whether offered individually or as part of a suite of services—combined with CTA's physical presence in the United States, CTA's ultimate ownership and control by the Chinese government, and CTA's relationship with its indirect parent [China Telecommunications Corporation], which itself maintains a physical presence in the United States—present unacceptable national security and law enforcement risks to the United States."  *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16029, para. 98; *2023 Open Internet NPRM* at 16-17, para. 27.

[111] *See* Letter from Katie McAuliffe, Senior Director, Telecom Policy, ITI, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 1 (filed Apr. 18, 2024).

[112] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*; *Huawei Design*; *ZTE Designation*, WC Docket No. 18-89, PS Docket Nos. 19-351 and 19-352, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423, 11434-35, para. 31 (2019) (*Supply Chain First Report and Order*); *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 35 FCC Rcd 7821, 7826-27, para. 20 (2020); *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs,* WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd 14284, 14296-98, paras. 26-29 (2020) (*Supply Chain Second Report and Order*); *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*; *Protecting Against National Security Threats to the Communications Supply Chain Through the Competitive Bidding Program*, ET Docket Nos. 21-232 and 21-233, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13493, 13511-13,  paras. 39-43 (2022) (*Supply Chain Equipment Authorization Report and Order*); 47 U.S.C.

(continued….)

USF support to purchase or obtain any equipment or services produced or provided by companies posing a national security threat;[113] prohibit the use of federal subsidies administered by the Commission and used for capital expenditures to provide advanced communications service to purchase, rent, lease, or otherwise obtain such equipment or services;[114] create and maintain a list of communications equipment and services that pose an unacceptable risk to the national security ("covered equipment and services");[115] administer the Secure and Trusted Communications Networks Reimbursement Program (Reimbursement Program) to reimburse the costs providers incur to remove, replace, and dispose of covered Huawei and ZTE equipment and services from their networks;[116] and prohibit the authorization of equipment that poses a threat and the marketing and importation of such equipment in the United States.[117] Reclassification furthers these efforts by enhancing the Commission's ability to address issues raised by the use in our networks of equipment and services that pose a threat to national security and law enforcement.

38.    We are unpersuaded by commenters who argue that Title II classification is unjustified for national security purposes because they question this policy rationale,[118] argue that market forces are sufficient to address national security risks,[119] or contend that potential national security regulations under Title II would be costly or burdensome for BIAS providers.[120] The Commission's national security concerns are not new. As evidenced by the discussion above, the Commission has engaged in numerous and ongoing actions to address these risks. The nation's communications networks are critical

---

§254; Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 133 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609); Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423 (2021) (codified at 47 U.S.C. § 1601 (Statutory Notes and Related Subsidiaries)).

[113] *Supply Chain First Report and Order*, 34 FCC Rcd at 11433, para. 26 (stating that this includes prohibitions on using USF support to maintain, improve, modify, operate, manage, or otherwise support any equipment or services produced or provided by these companies); 47 CFR § 54.9.

[114] *See Supply Chain Second Report and Order*, 35 FCC Rcd at 14326, para. 9; *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Third Report and Order, 36 FCC Rcd 11958, 11989, para. 75 (2021) (*Supply Chain Third Report and Order*); 47 CFR §§ 1.50001(a) (defining "advanced communications service" as "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology with connection speeds of at least 200 kbps in either direction"); *id.* §§ 1.50004, 54.10-54.11. The Commission stated that the definition of "provider of advanced communication services" for purposes of the Reimbursement Program did not limit program eligibility to providers who offer service to end users, and included intermediate providers that carry traffic for other carriers only and do not originate or terminate traffic. *Supply Chain Third Report and Order*, 36 FCC Rcd at 11991, paras. 82-83.

[115] *See Supply Chain Second Report and Order*, 35 FCC Rcd at 14311-25, paras. 57-92; 47 CFR §§ 1.50002, 1.50003; *see also* FCC, *List of Equipment and Services Covered by Section 2 of the Secure Networks Act* (Sept. 20, 2023), https://www.fcc.gov/supplychain/coveredlist.

[116] *See Supply Chain Second Report and Order*, 35 FCC Rcd at 14331, para. 108; *Supply Chain Third Report and Order*, 36 FCC Rcd at 11965, para. 18 and Appx. A; 47 CFR § 1.50004.

[117] *See Supply Chain Equipment Authorization Report and Order*, 37 FCC Rcd at 13494-95, para. 1; 47 CFR §§ 2.901-2.910.

[118] CPAC Foundation Center for Individual Freedom Comments at 9 (CPAC CRF) (arguing that the Commission invoked national security simply to achieve its open Internet policy goals); ITIF Comments at 8 (arguing that the *2023 Open Internet NPRM* "does not provide a coherent principle for why it needs the authority of Title II as opposed to its existing authority to safeguard national security"); Innovation Economy Institute Comments at 3 (arguing that the timing of the Commission's national security concerns is suspect); Free State Foundation Comments at 21-23 (arguing that the invocation of national security to justify Title II classification is sudden).

[119] *See, e.g.*, Eric W. Burger Comments at 5-6 (arguing that market forces adequately disincentivize BIAS providers from interconnecting with bad actors); Jeffrey Westling Comments at 10 (same).

[120] NCTA Comments at 8-9; Ad Hoc Broadband Carrier and Investor Coalition Reply at 3, 6 (ABIC).

infrastructure, and therefore too important to leave entirely to market forces that may sometimes, but not always, align with necessary national security measures. Arguments regarding costs and burdens are unpersuasive given that, at this point, they represent only speculation about hypothetical costs and burdens. To the extent there are costs and burdens associated with any ultimate action the Commission may undertake, we anticipate that the benefits to national security will outweigh those costs.[121]

39. We also disagree with those commenters that reject the national security justification for reclassification on the grounds that there are no gaps that need to be filled or problems that need to be solved by the Commission,[122] that argue that the Commission has a marginal role in protecting national security,[123] or that contend Commission action would undermine the existing whole-of-government national security approach.[124] These commenters fail to recognize, as noted above, that Congress made clear, when creating the Commission, that one of its enumerated purposes was to further the "national defense."[125] Additionally, these commenters ignore the Commission's significant contributions to the whole-of-government approach to national security.[126] In addition to the regulatory actions discussed above, the Commission is actively engaged in several federal interagency working groups and policy committees that address a diverse range of national security topics, including cybersecurity, critical infrastructure resilience, emergency preparedness and response, supply chain risk management, and space systems cybersecurity.[127] Commission staff receive classified briefings from the Intelligence Community on threats to the communications sector, exchange relevant information with federal partners, and coordinate with law enforcement agencies to support various national security initiatives. The Commission also supports National Special Security Events (NSSE) and Security Event Assessment Rating (SEAR) 1 events and conducts investigations to determine if communications are being transmitted lawfully, if spectrum is being used appropriately, or if radio-frequency devices are authorized for operation. As a result of the Commission's collaborative efforts, we have learned that there are segments of the communications sector that are not subject to sufficient federal regulatory oversight, including BIAS, due to the *RIF Order*'s misclassification of the service in 2017. This lack of sufficient oversight allows security vulnerabilities to go undiscovered—and unaddressed—which can produce negative consequences for the communications sector, as well as other critical infrastructure sectors. As articulated above, reclassification directly supports the Commission's role in cross-government efforts and helps fill gaps in oversight by enabling the Commission to take regulatory actions to address national

---

[121] *See, e.g.*, *Supply Chain Second Report and Order*, 35 FCC Rcd at 14371-72, paras. 218-20; *Supply Chain First Report and Order*, 34 FCC Rcd at 11465-70, paras. 108-20.

[122] *See, e.g.*, American Consumer Institute Comments at 22 (ACI); Eric W. Burger Comments at 5; NCTA Comments at 7, 71; Taxpayers Protection Alliance Comments at 4; Free State Foundation Comments at 21; USTelecom Comments at 72; ADTRAN Reply at 3; NCTA—The Internet & Television Association et al. Reply at 22-23 (NCTA et al.); USTelecom Reply at 43-44; WISPA—Broadband Without Boundaries Reply at 15 (WISPA).

[123] ACI Comments at 21-22; CTIA Comments at 24; FAI et al. Comments at 10; Harold Furchtgott-Roth, Kirk R. Arner, and Washington Legal Foundation Comments at 10 (Harold Furchtgott-Roth et al.); Free State Foundation Comments at 24-25; USTelecom Comments at 72; USTelecom Reply at 32.

[124] Verizon Comments at 13 (arguing that Commission action would "upend the whole-of-government approach that Congress designed and agencies with superior expertise have implemented"); CTIA Comments at 30 (same); USTelecom Comments at 71 (same); NCTA et al. Reply at 24 (same); USTelecom Reply at 47-48 (same); Information Technology Industry Council Comments at 3 (ITI) (same).

[125] 47 U.S.C. § 151.

[126] NTIA *Ex Parte* at 4 ("The lightning-fast evolution of our communications technologies and our growing dependence on these offerings necessitate a whole-of-government approach to security that engages all available federal government resources. NTIA supports the Commission's effort to ensure it has the authority to act when needed to protect national security.").

[127] *See id.* at 7-8 (discussing the Commission's collaboration with Executive Branch agencies and partnership with private sector entities to address national security matters).

security risks.[128]

40.　　　We are also unpersuaded by arguments that reclassification is unjustified because we can address certain harms without such change.  Some commenters argue that it would be sufficient to prevent carriers already subject to Title II from interconnecting with any entities that pose national security risks, whether or not those entities are themselves subject to Title II.[129]  We find that merely taking this action would fall far short of what is necessary to address our national security concerns, especially given the vastly diminished role of Title II voice and other traditional telecommunications services in today's communications marketplace.  A prohibition on only regulated carriers—meaning those currently subject to Title II—from interconnecting with entities that pose a national security threat would not reach providers of BIAS without reclassification.  We find that it is instead necessary to directly address the national security risks associated with the provision of BIAS with the enhanced authorities available under Title II.  The reclassification of BIAS is an important step toward closing the national security loopholes that exist within the communications sector, especially in broadband networks.[130]

41.　　　Finally, we reject arguments of commenters that oppose reclassification as unnecessary because the Commission's existing authority is sufficient to address national security concerns for which Congress has authorized the Commission to act;[131] because the Commission does not have statutory authority to address national security concerns involving BIAS, broadband transmission services, or certain network infrastructure;[132] or because Title II does not provide the Commission with authority to address national security.[133]  The Commission relies on multiple statutory provisions when taking action to protect national security, but Title II of the Communications Act includes some of the most important authorities and vests the Commission with a broad grant of rulemaking authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."[134]  Indeed, we have articulated several sources of authority above.[135]  Similarly, we are not persuaded that using Title II authority for national security purposes would violate Article II of the Constitution.[136]  As the U.S. Court of Appeals for the Fifth Circuit recently held, the Commission's exercise of authority to address national security threats to communications networks does not violate the separation of powers or infringe upon the President's constitutional authority to conduct foreign affairs.[137]

### 3.　　　Promoting Cybersecurity

42.　　　As with national security, the Commission has an important role in addressing

---

[128] *See id.* at 5-6.

[129] NCTA Comments at 69; USTelecom Comments at 74.

[130] *See, e.g.*, NTIA *Ex Parte* at 5-6.

[131] *See* CPAC CRF Comments at 10; CTIA Comments at 27-28; ITI Comments at 3; Jeffrey Westling Comments at 10-11; NCTA Comments at 67; Verizon Comments at 11.

[132] *See* CPAC CRF Comments at 6; Digital Progress Institute Comments at 13-14; FAI et al. Comments at 8; Harold Furchtgott-Roth et al. Comments at 10; NCTA Comments at 68-70; TechFreedom Comments at 59; USTelecom Comments at 72, 74-75; *see also* Jeffrey Westling Comments at 10-11.

[133] CTIA Comments at 24; FAI et al. Comments at 13.

[134] 47 U.S.C. § 201(b).

[135] As we do not adopt any new national-security-focused rules in this Order, we need not articulate with specificity each Title II provision that would provide a source of authority for potential action that the Commission may take in the future.

[136] CTIA Reply at 27.

[137] *See Huawei Techs.*, 2 F.4th at 444 n.53 ("[W]e disagree with Huawei that constitutional avoidance principles require us to reject the FCC's construction of its authority under the Act.").

cybersecurity in communications networks that is inherent in its establishment "for the purpose of the national defense."[138]  The National Cybersecurity Strategy highlights the importance of protecting critical infrastructure as more of our "essential systems" move online.[139]  The expanding cyber threat landscape is "making cyberattacks inherently more destructive and impactful to our daily lives."[140]  This trend is especially problematic because "malicious cyber activity has evolved from nuisance defacement, to espionage and intellectual property theft, to damaging attacks against critical infrastructure, to ransomware attacks and cyber-enabled influence campaigns."[141]  Further, "offensive hacking tools and services, including foreign commercial spyware, are now widely accessible . . . [to] organized criminal syndicates."[142]  In addition, "China, Russia, Iran, North Korea, and other autocratic states . . . are aggressively using advanced cyber capabilities" to pursue economic and military objectives.[143]  These malicious cyber activities threaten "the national security, public safety, and economic prosperity of the United States and its allies and partners."[144]

43.      The communications sector is squarely in the crosshairs of malicious cyber actors, who have targeted communications providers with ransomware attacks and have exploited vulnerabilities in communications networks to carry out cyberattacks against other critical infrastructure.  For example, the 2023 Annual Threat Assessment of the U.S. Intelligence Community highlights the cyber threats to U.S. communications networks and states that "China's cyber espionage operations have included compromising telecommunications firms."[145]  More recently, Federal Bureau of Investigation (FBI) Director Christopher Wray highlighted "China's increasing buildout of offensive weapons within our critical infrastructure," which has enabled "persistent PRC access" to U.S. "critical telecommunications, energy, water, and other infrastructure."[146]

44.      The Commission actively supports the U.S. Government's efforts to protect critical infrastructure by participating in cybersecurity planning, coordination, and response activities.  However, the classification of BIAS as a Title I information service has limited the regulatory actions that the Commission could take to address cyber incidents impacting some aspects of the communications sector, as well as other critical infrastructure sectors.[147]  This is not a hypothetical concern.  As NTIA states on behalf of the Executive Branch, "[r]eclassifying BIAS is necessary to ensure that the Commission has the

---

[138] 47 U.S.C. § 151.

[139] The White House, National Cybersecurity Strategy at 2-3 (2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/National-Cybersecurity-Strategy-2023.pdf (National Cybersecurity Strategy).

[140] *Id.* at 3.

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*; *see also* Executive Branch Recommendation to the Federal Communications Commission to Revoke and Terminate [CTA's] International Section 214 Common Carrier Authorizations, File Nos. ITC-214-20010613-00346, ITC-214-20020716-00371, ITC-T/C-20070725-00285, at 2-7 (filed Apr. 9, 2020) (discussing, among other things, "[c]hanged circumstances in the national security environment, including the U.S. government's increased concern in recent years about the Chinese government's malicious cyber activities").

[145] Office of the Director of National Intelligence, 2023 Annual Threat Assessment of the U.S. Intelligence Community at 10 (2023), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2023-Unclassified-Report.pdf.

[146] FBI, *Director Wray's Remarks at the Munich Security Conference* (Feb. 15, 2024), https://www.fbi.gov/news/speeches/director-wray-s-remarks-at-the-munich-security-conference.

[147] *See* NTIA *Ex Parte* at 6 ("Having identified these threats, though, the Commission had limited ability to act" due to the lack of Title II authority).

authority it needs to advance national security objectives."[148]  In recent years, federal agencies have requested the Commission's assistance with mitigating specific risks and vulnerabilities in broadband networks that foreign adversaries could exploit to carry out cyberattacks against the United States.  The lack of Title II authority over BIAS has essentially precluded the Commission from taking regulatory action to directly address these concerns.[149]  We find that reclassifying BIAS as a Title II service will help to fill this gap by enhancing the Commission's ability to protect U.S. communications networks and infrastructure from cyberattacks and to ensure that communications devices and equipment do not pose security risks to other critical infrastructure sectors.

45.     The reclassification of BIAS significantly bolsters the Commission's existing authority to take regulatory actions to address cybersecurity risks and vulnerabilities in broadband networks.  We agree with NTIA that reclassification will enable the Commission to better "protect our networks from malicious actors . . . [by] leverag[ing] the appropriate tools at its disposal, including the relevant Title II provisions."[150]  We agree with commenters that reclassification "provides multiple new authorities for the Commission to engage on cybersecurity" and take regulatory actions to "study cybersecurity needs and impose minimum standards on BIAS providers."[151]  For example, the Commission could build on existing efforts to require BIAS providers to implement cybersecurity plans and risk management plans to protect their networks from malicious cyber activity.[152]  This enhanced authority over BIAS could also allow the Commission to obtain greater situational awareness by working in coordination on cyber incident reporting with the Cybersecurity & Infrastructure Security Agency (CISA) as it implements the Cyber Incident Reporting for Critical Infrastructure Act of 2022 (CIRCIA).[153]  It also provides the Commission with additional regulatory tools to ensure network and service reliability and better support effective 911 and emergency preparedness and response efforts.

46.     Reclassification also places the Commission in a stronger position to address vulnerabilities threatening the security and integrity of the Border Gateway Protocol (BGP), which impacts "the transmission of data from email, e-commerce, and bank transactions to interconnected Voice-over-Internet Protocol (VoIP) and 9-1-1 calls."[154]  For example, the Commission could consider

---

[148] *Id.*

[149] We note, by way of example, recent reports of efforts of China-based hackers to target Philippines government officials by carrying out cyberattacks over broadband networks in that country.  Alexander Martin, *Philippine Lawmakers Demand Briefing Following China-Linked Cyberattack*, Record (Feb. 5, 2024), https://therecord.media/philippine-lawmakers-demand-briefing-on-china-linked-cyberattack; Reuters, *Philippines Wards Off Cyber Attacks from China-Based Hackers* (Feb. 5, 2024), https://www.reuters.com/world/asia-pacific/philippines-wards-off-cyber-attacks-china-based-hackers-2024-02-05.

[150] NTIA *Ex Parte* at 6.

[151] Public Knowledge Comments at 65-67; *see also* EPIC et al. Comments at 17 ("Title II authority . . .  would enable the Commission to require fundamental minimum cybersecurity practices that evolve over time . . . .").

[152] *See, e.g.*, 47 CFR § 54.308(e)(1); *Connect America Fund:  A National Broadband Plan for Our Future High-Cost Universal Service Support et al.*, WC Docket Nos. 10-90 et al., Report and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, FCC 23-60, at 47-49, paras. 109-14 (July 24, 2023) (*Enhanced A-CAM Report and Order*); *see also* CSRIC, Recommendations to Mitigate Security Risks for Diameter Networks at 37-38 (Mar. 2018), https://www.fcc.gov/sites/default/files/csric6report_recommendationstomitigateriskdiamterprotocol032018.pdf; CSRIC, Legacy Systems Risk Reductions at 17-19 (Mar. 2017), https://www.fcc.gov/sites/default/files/CSRIC5-WG10-FinalReport031517.pdf.

[153] Cyber Incident Reporting for Critical Infrastructure Act of 2022, H.R.247—Consolidated Appropriations Act, 2022, Public Law No. 117-103.

[154] *Secure Internet Routing*, PS Docket No. 22-90, Notice of Inquiry, 37 FCC Rcd 3471, 3471, paras. 1-2 (2022) (*Secure Internet Routing NOI*); *see also* Press Release, DOJ, Department of Justice and Department of Defense Support Federal Communications Commission Inquiry into Internet Security (Sept. 14, 2022),

(continued….)

requiring service providers to deploy solutions to address BGP vulnerabilities, such as BGP hijacks.[155] The agency could also consider establishing cybersecurity requirements for BGP, including "security features to ensure trust in the information that it is used to exchange," which could prevent bad actors from "deliberately falsify[ing] BGP reachability information to redirect traffic to itself or through a specific third-party network, and prevent that traffic from reaching its intended recipient."[156] Similarly, the Commission could more effectively address security threats related to the DNS, which enables domain names to resolve to the correct IP addresses, and other naming protocols when used by BIAS providers to facilitate the operation of BIAS.

47.     Some commenters argue that reclassification is unnecessary because the Commission's existing authority is sufficient to address cybersecurity risks in areas where Congress has authorized the Commission to act.[157] Other commenters argue that the classification of BIAS is irrelevant because the Commission does not have statutory authority to address cybersecurity matters.[158] But it is well established that the Commission may—indeed must—take security and public safety considerations into account in its public interest determinations under Title II.[159] We disagree with these commenters because the classification of BIAS under Title I created a loophole that largely precluded the Commission from taking regulatory actions to address cyber risks to BIAS providers and vulnerabilities in broadband networks.[160] For example, under the Title I classification, the Commission has limited authority to require providers of non-Title II services (e.g., BIAS providers) to adopt cybersecurity standards or performance goals, report information about cyber incidents, or take defensive measures to protect

---

https://www.justice.gov/opa/pr/department-justice-and-department-defense-support-federal-communications-commission-inquiry.

[155] *2023 Open Internet NPRM* at 24-25, para. 39 n.148; *see also China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16019, para. 81 ("In the case of active attacks, bad actors, including any ISPs, can gain unauthorized access to a victim's data (e.g., through Border Gateway Protocol (BGP) hijacking) from other locations of the Internet to extract metadata or other information or to manipulate the data."); FCC, *Border Gateway Protocol Security Workshop* (July 31, 2023), https://www.fcc.gov/news-events/events/2023/07/bgp-security-workshop; Doug Montgomery, *BGP Security Level Set: Problem Space and Emerging Solutions* at 4 (2023), https://www.fcc.gov/sites/default/files/NIST%20BGP%20Level%20Set-Problem%20Space-Emerging%20Solutions%20-%20FCC%20BGP%20Wrkshp073123.pdf.

[156] *Secure Internet Routing NOI*, 37 FCC Rcd at 3471-72, para. 2; *see also China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16019, para. 81 ("In the case of passive attacks, an ISP, for example, can take advantage of its ability as a service provider to carry customer traffic and exploit the trust of its customers and other ISPs that send it traffic by monitoring, observing, and collecting customers' data and/or metadata from such traffic."); *cf.* Letter from John Morris, Principal, U.S. Internet Policy and Advocacy, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 2 (filed Apr. 17, 2024) (urging the Commission to reevaluate any plans to impose routing security or BGP mandates). We note, however, that this filing does not oppose the reclassification of BIAS under Title II, the issue being addressed in this Order.

[157] Eric W. Burger Comments at 6; NCTA Comments at 67; Telecommunications Industry Association Reply at 3 (TIA).

[158] CTIA Comments at 32-33 ("Title II would not support the adoption of technical cybersecurity requirements . . . [because] the provisions of Title II make no mention of issues such as cybersecurity."); Digital Progress Institute Comments at 16 ("No statute charges the Commission with any responsibility for overseeing cybersecurity—the word does not appear even once in the Communications Act—and a desire to expand the Commission's role . . . is not a legitimate policy reason for reclassification."); Free State Foundation at 25 ("[T]he Commission's regulatory proposal for addressing national security and cybersecurity is not based on any recognizable delegation of authority by Congress."); CTIA Reply at 27; NCTA et al. Reply at 28.

[159] *See Mozilla*, 940 F.3d at 63 ("The Commission's disregard of its duty to analyze the impact of the [RIF] Order on public safety renders its decision arbitrary and capricious in that part . . . ."); *Huawei Techs.*, 2 F.4th at 439-40 (upholding the Commission's reliance on "national security" assessment in a decision based on sections 201(b) and 254 barring use of federal universal service funds to buy equipment found to pose a national security threat).

[160] *See* NTIA *Ex Parte* at 5-6.

communications networks and critical infrastructure.  The reclassification of BIAS under Title II allows the Commission to use a broader range of regulatory tools by reestablishing the Commission's legal jurisdiction over broadband services, providers, and networks.  This change is necessary to ensure the Commission can effectively address the cyber threats to the communications sector.

48.　　We also disagree with those commenters that argue that the Commission should not take action because it lacks the expertise and resources to implement a Title II regulatory regime in the area of cybersecurity[161] and because other agencies are better equipped to address cybersecurity risks and vulnerabilities.[162]  For example, Verizon points out that CISA is "the federal leader for cyber and physical infrastructure security" and claims that the Commission plays "only a supporting role."[163]  We recognize and appreciate CISA's leadership in protecting critical infrastructure—including communications networks—from malicious cyber activity.  The Commission works closely with CISA and other federal agencies in a collaborative manner to address risks and vulnerabilities impacting the communications sector.  Chairwoman Rosenworcel currently serves as Chair of the Cybersecurity Forum for Independent and Executive Branch Regulators, "a federal interagency group that shares information and expertise to enhance the cybersecurity of America's critical infrastructure."[164]  Further, the Commission is the regulatory agency for communications and, as such, has access to regulatory authorities and investigative tools that Congress has not granted to other agencies.  For example, the Commission recently adopted a cybersecurity labeling program for Internet of Things (IoT) devices and products,[165] and proposed a pilot program to help schools and libraries improve their cybersecurity efforts through the USF.[166]  In addition, the Commission regularly investigates cyber intrusions and hacks related to the breach of regulatorily protected consumer data in the possession of common carriers, cable providers, and satellite providers.[167]  Likewise, our data protection investigations frequently involve investigating and assessing whether the regulated entities had reasonable cybersecurity protections in place to protect the networks on

[161] Eric W. Burger Comments at 7 ("[T]he Commission today has but a handful of engineers that are versed on the Internet and cybersecurity . . . . The Commission does not today have the resources to undertake . . . reviews [of cybersecurity plans].");  Free State Foundation at 25 ("The Commission is neither the exclusive nor primary expert on cybersecurity policy . . . .");  USTelecom Reply at 42, 46-47 ("[T]he Commission lacks the jurisdiction, tools, and expertise to regulate cyber and national security.").

[162] NCTA agrees, based on the fact that CISA "issue[s] administrative subpoenas to critical infrastructure entities, which includes broadband providers, to obtain information necessary to identify and notify entities of vulnerabilities in their system."  NCTA Comments at 20;  *see also* NCTA et al. Reply at 26-27;  USTelecom Reply at 43-44.

[163] Verizon Comments at 13.

[164] Press Release, FCC, Chairwoman Rosenworcel to Lead Relaunched Federal Interagency Cybersecurity Forum (Feb. 3, 2022), https://docs.fcc.gov/public/attachments/DOC-379926A1.pdf.

[165] *Cybersecurity Labeling for Internet of Things*, PS Docket No. 23-239, Report and Order and Further Notice of Proposed Rulemaking, FCC 24-26 (Mar. 15, 2024).

[166] *Schools and Libraries Cybersecurity Pilot Program*, WC Docket No. 23-234, Notice of Proposed Rulemaking, FCC 23-92 (Nov. 8, 2023).

[167] For example, cyber breaches may involve unauthorized access to personally identifiable information (PII) or customer proprietary network information (CPNI).  *See also, AT&T Inc.*, File No. EB-TCD-18-00027704, Notice of Apparent Liability for Forfeiture and Admonishment, 35 FCC Rcd 1743 (2020) (*2020 AT&T NAL*) (proposing $57.2M penalty for carrier's apparent failure to protect sensitive customer location information); *T-Mobile USA, Inc.*, File No. EB-TCD-18-00027702, Notice of Apparent Liability for Forfeiture and Admonishment, 35 FCC Rcd 1785 (2020) (*2020 T-Mobile NAL*) (proposing $91.6M penalty for carrier's apparent failure to protect sensitive customer location information); *Sprint Corp.*, File No. EB-TCD-18-00027700, Notice of Apparent Liability for Forfeiture and Admonishment, 35 FCC Rcd 1655 (2020) (*2020 Sprint NAL*) (proposing $12.2M penalty for carrier's apparent failure to protect sensitive customer location information); *Verizon Communications*, File No. EB-TCD-18-00027698, Notice of Apparent Liability for Forfeiture and Admonishment, 35 FCC Rcd 1698 (2020) (*2020 Verizon NAL*) (proposing $48.3M penalty for carrier's apparent failure to protect sensitive customer location information).

which sensitive data are housed.[168]  The reclassification of BIAS will enable the Commission to more effectively fulfill its responsibilities, including those identified in PPD-21, within the existing frameworks that support the whole-of-government approach to cybersecurity.

49.     Even though the Commission, under Title II, may not be able to address all significant cyber vulnerabilities,[169] we find that the availability of that authority meaningfully enhances our ability to address significant cybersecurity threats.  Given the interconnected nature of communications networks, any efforts to reduce the number of vulnerabilities and threat vectors that can be targeted by malicious cyber actors could provide substantial benefits to the larger communications sector.  A recent cyberattack by Russian hackers against Kyivstar, Ukraine's largest telecommunications provider, "knocked out services" for 24 million users and "completely destroyed the core" of the company's network.[170]  This incident demonstrates how cyberattacks targeting communications service providers—including BIAS providers—can have disastrous impacts by damaging network infrastructure and causing widespread service outages.  The Electronic Privacy Information Center (EPIC) asserts that "immediate regulatory action must be taken to compel ISPs to shore up their cybersecurity practices to better protect consumers," and argues that Title II reclassification of BIAS would empower the Commission to take further action.[171]  We agree with EPIC and conclude that reclassification enhances the Commission's ability to require BIAS providers to implement cybersecurity practices and take other actions to protect the confidentiality and integrity of information on the traffic that [each provider] stores or transmits.[172]

50.     Similar to certain arguments made opposing reclassification for national security purposes, commenters opposing reclassification for cybersecurity purposes argue that:  the Commission has adequate authority to address cybersecurity issues under Title I;[173] reclassification will be costly, burdensome, and too rigid for a dynamic threat landscape;[174] and industry already addresses cybersecurity risks without regulatory mandates.[175]  We find that the Commission has an essential role in promoting measures "that currently seem to best protect consumers from breaches and other cyber incidents."[176]  As described above, and consistent with our conclusions on national security matters generally,

---

[168] *See, e.g.*, *Q Link Wireless LLC and Hello Mobile Telecom LLC*, File No. EB-TCD-22-00034450, FCC 23-59, at 2 (July 28, 2023) (taking enforcement action against mobile virtual network operators (MVNOs) for apparent failures to meet baseline requirements to safeguard customer proprietary network information); *Terracom, Inc., and Yourtel America, Inc.*, File Nos. EB-TCD-13-00009175 and EB-IHD-13-00010677, Order, 30 FCC Rcd 7075 (2015) (resolving investigation into data breach of carriers' vendor exposing unencrypted sensitive customer information on publicly accessible Internet servers).

[169] NCTA Comments at 58-59; NCTA et al. Reply at 27.

[170] Tom Balmforth, *Exclusive:  Russian Hackers Were Inside Ukraine Telecoms Giant for Months*, Reuters (Jan. 5, 2024), https://www.reuters.com/world/europe/russian-hackers-were-inside-ukraine-telecoms-giant-months-cyber-spy-chief-2024-01-04 ("The SBU assessed the hackers would have been able to steal personal information, understand the locations of phones, intercept SMS-messages and perhaps steal Telegram accounts with the level of access they gained . . . .").

[171] EPIC Reply at 6.

[172] *See also China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16019, para. 81 ("As an initial matter, fundamental to protecting the security of the United States is the ability to trust that a service provider will uphold the confidentiality and integrity of information on the traffic that it stores or transmits.").

[173] INCOMPAS Comments at 27-28 (arguing that "there is no demonstrated need for the FCC to further engage in developing new cybersecurity regulations" and pointing to current Commission actions as examples); *see also* U.S. Chamber of Commerce Reply at 24-25.

[174] CTIA Comments at 30; Eric W. Burger Comments at 8; U.S. Chamber of Commerce Comments at 24-25; USTelecom Reply at 46-47.

[175] USTelecom Reply at 42-44; U.S. Chamber of Commerce Reply at 22-23.

[176] EPIC Reply at 6; *see also* National Cybersecurity Strategy at 8 (directing federal agencies to "establish cybersecurity requirements to support national security and public safety").

reclassification will provide additional authority to act when necessary and in coordination with our federal partners to address cybersecurity in the communications sector. Although the adoption of specific cybersecurity requirements is beyond the scope of this proceeding, we intend for any future proposed action to provide regulatory flexibility, "leverage existing cybersecurity frameworks," encourage "public-private collaboration," and be designed to minimize the "cost of implementation."[177]

### 4. Safeguarding Public Safety

51. Reclassifying BIAS as a telecommunications service enables the Commission to advance several public safety initiatives. Congress created the Commission, among other reasons, "for the purpose of promoting safety of life and property through the use of wire and radio communication,"[178] and as the Commission recognized in the *RIF Remand Order*, "[a]dvancing public safety is one of our fundamental obligations."[179] The *Mozilla* court explained that when "'Congress has given an agency the responsibility to regulate a market such as the telecommunications industry that it has repeatedly deemed important to protecting public safety,' then the agency's decisions 'must take into account its duty to protect the public.'"[180] The Commission's responsibility to address public safety is becoming increasingly important as the severity and frequency of natural disasters continue to rise.[181] Reclassification enhances the Commission's jurisdiction over BIAS providers, which, in combination with our other statutory authority, will allow us to ensure BIAS meets the needs of public safety entities and individuals when they use those services for public safety purposes.

52. Reclassification will empower the Commission to more effectively support public safety officials' use of BIAS for public safety purposes. Public safety officials' reliance on broadband service has become integral to their essential functions and services, even aside from their use of enterprise-level broadband services, including how they communicate with each other and how they convey information to and receive information from the public.[182] Public safety entities and first responders often rely on

---

[177] National Cybersecurity Strategy at 8; *see also* Public Knowledge Reply at 6 (arguing that "any compliance costs are outweighed by the public benefit of safe, secure, reliable broadband networks").

[178] 47 U.S.C. § 151.

[179] *RIF Remand Order*, 35 FCC Rcd at 12336, para. 21; *see also Mozilla*, 940 F.3d at 59-60 (noting that the Commission is "required to consider public safety by . . . its enabling act" (quoting *Nuvio Corp. v. FCC*, 473 F.3d 302, 307 (D.C. Cir. 2006) (*Nuvio*)); 47 U.S.C. § 154(n) (directing the Commission to take steps to promote the "maximum effectiveness from the use of radio and wire communications in connection with safety of life and property"); Santa Clara Comments at 4-6, 14-15 (describing many instances in which public safety entities rely on BIAS to perform many of its core functions and to communicate with each other including its web-based computer-aided dispatch (CAD) system and its Internet-based platforms that aggregate and disseminate data as part of its emergency operations center).

[180] *Mozilla*, 940 F.3d at 60 (quoting *Nuvio*, 473 F.3d at 307).

[181] *See, e.g.*, Adam B. Smith, *2022 U.S. Billion-Dollar Weather and Climate Disasters in Historical Context*, Climate.gov (Jan. 10, 2023), https://www.climate.gov/news-features/blogs/beyond-data/2022-us-billion-dollar-weather-and-climate-disasters-historical; Reuters, *Fact Check: Drop in Climate-Related Disaster Deaths Not Evidence Against Climate 'Emergency'* (Sept. 19, 2023), https://www.reuters.com/fact-check/drop-climate-related-disaster-deaths-not-evidence-against-climate-emergency-2023-09-19 ("Weather-related disasters have become more frequent, intense, and costly in recent decades as documented by many different sources and analyses.").

[182] INCOMPAS Petition for Reconsideration at 11 ("The Commission should not ignore the effects of reclassifying BIAS on public safety by conflating the idea that non-BIAS services are also used to address public safety issues."); Liam Sweeney Comments at 2 ("[F]irst responders rely upon these networks to do their jobs, the same can be said for almost every piece of our infrastructure."); National Association of State Utility Consumer Advocates and the Connecticut Office of State Broadband within the Connecticut Office of Consumer Counsel Comments at 8 (State Consumer Advocates) ("BIAS is crucial to the work of public safety officials and occupies a critical role in connecting the public with first responders to obtain vital information during emergencies like storms, floods, and wildfires, and to obtain essential resources and information necessary for public health and safety."); National Public

(continued....)

retail broadband services to communicate during emergency situations.[183] Increasingly, public safety entities rely on BIAS to access various databases, share data with emergency responders, and stream video into 911 and emergency operations centers.[184] Public safety officials also rely on BIAS outside the emergency context, including relying on individuals' residential security systems that use BIAS and programs that are alternatives to incarceration, which require individuals to check in with supervising officers remotely, wear electronic location monitoring devices, or use continuous alcohol monitoring devices.[185] In addition, public safety officials use services accessible over the top (OTT) of broadband connections, such as social media, to communicate important and timely information to the public and to gain valuable information from the public and build on-the-ground situational awareness.[186] For example, during the recent 911 outage that impacted several western states, public safety officials used social media "to inform the public of the issue and to provide alternate means of contacting emergency services."[187] Santa Clara describes the essential role BIAS also plays in public safety officials' ability to carry out their daily, non-emergency functions, including its importance in the functioning of its emergency communications and operations protocols.[188] Santa Clara also describes the importance of redundancies in its emergency communications and operations systems, and that many of these systems rely on BIAS, outside of its enterprise systems.[189] Public safety entities benefit as well when they rely on enterprise services, which often flow over the same facilities as mass-market retail services.[190] Reclassification

Radio Comments at 2 (NPR) ("The Internet has become a critical vehicle for public media to deliver . . . lifesaving public safety and emergency alerting."); Vincent James Mercante Comments at 1 ("[I]n numerous focus groups and community listening sessions with members of our public safety organizations they have pointed out how no/limited Internet service, as well as similar gaps in cellular coverage, could result in life-threatening repercussions."); New America's Open Technology Institute Reply at 6 ("Government agencies, first responders, emergency services, and public health officials use the web to monitor ongoing community issues and crises, disseminate information to the public via websites and social media channels, and coordinate emergency and disaster responses.").

[183] *RIF Remand Order*, 35 FCC Rcd at 12341, para. 27.

[184] *Id.*; *see also* Santa Clara Comments at 4-7, 14-15.

[185] Santa Clara Comments at 17-18, 20.

[186] *See, e.g.*, Congressional Research Service, Social Media for Emergencies and Disasters: Overview and Policy Considerations, at 1-2 (2016), https://crsreports.congress.gov/product/pdf/R/R41987/6; Ready, *Social Media Preparedness Toolkits* (Dec. 4, 2023), https://www.ready.gov/toolkits; NIST, *Spotlight: Gathering Intel From Social Media for Emergency Response* (June 30, 2022), https://www.nist.gov/news-events/news/2022/06/spotlight-gathering-intel-social-media-emergency-response; *RIF Remand Order*, 35 FCC Rcd at 12342-43, para. 29; *see also* Santa Clara Comments at 4, 8-12, 14; INCOMPAS Petition for Reconsideration at 9; Santa Clara Petition for Reconsideration at 14-16; Press Release, FEMA, Social Media and Emergency Preparedness, https://www.fema.gov/press-release/20230425/social-media-and-emergency-preparedness (last updated Apr. 25, 2023) (FEMA, *Social Media and Emergency Preparedness*); Public Knowledge Comments at 6 (noting that public safety officials themselves "rely on community members' access to social media for help to solve crimes, identify victims, apprehend suspects, and find missing persons").

[187] Letter from John Bergmayer, Legal Director, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (citing Marlene Lenthang & Brian Cheung, *Major 911 Outages in 4 States Leave Millions Without an Easy Way to Contact Authorities*, NBC News (Apr. 18, 2024), https://www.nbcnews.com/news/us-news/major-911-outages-4-states-leave-millions-way-contact-local-authoritie-rcna148345).

[188] Santa Clara Comments at 4-5.

[189] *Id.* at 5-7.

[190] For example, Emergency Services Internet (ESInet) is a managed UP network that is used for emergency services communications and which may be constructed from a mix of dedicated and shared facilities. *See* Redsky, *Emergency Services Internet (ESInet)*, https://www.redskye911.com/glossary/esinet-emergency-services-ip-network (last visited Mar. 26, 2024). ESInets can be realized in several ways with one example using the Multi-Protocol Label Switching (MPLS) standard used by many BIAS and transit providers' networks for traffic engineering and

(continued….)

gives the Commission additional jurisdiction to advance the existing uses of BIAS to support public safety operations and communications by, for example, taking regulatory actions to improve the effectiveness of emergency alerting and 911 communications. Given how crucial BIAS is to the protection of public safety and that reclassification provides the Commission with the ability to ensure that BIAS is reliable and secure during emergencies,[191] we disagree with those commenters who argue that reclassification will not enhance public safety communications on the basis that public safety entities heavily rely on enterprise-level dedicated networks that fall outside of the scope of reclassification.[192]

53.          BIAS also plays an increasingly important role in allowing the public to communicate with first responders during emergency situations.[193] In the *RIF Remand Order*, the Commission noted that retail broadband services are used to translate communications with 911 callers and patients in the field and to deliver critical information about 911 callers that is not delivered through the traditional 911 network.[194] The Commission has undertaken various efforts in recent years to improve how the public reaches and shares information with emergency service providers.[195] Title II classification of BIAS supports these current and future efforts. For example, reclassification enhances the Commission's jurisdiction to improve the flow of voice communications, photos, videos, text messages, real-time text (RTT), and other types of communications from the public to emergency service providers through Next Generation 911[196] or Wi-Fi calling.[197]

---

sharing facilities with other traffic. *See* Jeff Lupinacci, *ESInets Are a Game Changer for Public Safety and the First Step to Next-Gen 911*, (May 6, 2015), https://www.govtech.com/em/disaster/esinets-are-a-game-changer-for-public-safety.html.

[191] CWA Comments at 5 ("[R]eclassification . . . will allow the Commission to ensure secure networks are available in times of emergency . . . .").

[192] *See* CTIA Comments at 36; Free State Foundation Comments at 23; Interisle Consulting Group LLC Comments at 7 (ICG); Jeffrey Westling Comments at 7; NCTA Comments at 72; TechFreedom Comments at 47; U.S. Chamber of Commerce Comments at 37; USTelecom Comments at 83-84; CTIA Reply at 29; International Center for Law and Economics Reply at 11-12; USTelecom Reply at 39-40; NCTA et al. Reply at 29.

[193] *RIF Remand Order*, 35 FCC Rcd at 12342, para. 29.

[194] *Id.* at 12341, para. 27.

[195] *Implementing Kari's Law and Section 506 of RAY BAUM's Act et al.*, PS Docket Nos. 18-261 and 17-239, GN Docket No. 11-117, Report and Order, 34 FCC Rcd 6607, 6612-13, 6655-91, paras. 14-16, 137-220 (2019); *see also Wireless E911 Location Accuracy Requirements*, PS Docket No. 07-114, Fifth Report and Order and Fifth Further Notice of Proposed Rulemaking, 34 FCC Rcd 11592 (2019); *Wireless E911 Location Accuracy Requirements*, PS Docket No. 07-114, Sixth Report and Order and Order on Reconsideration, 35 FCC Rcd 7752 (2020); *Location-Based Routing for Wireless 911 Calls*, PS Docket No. 18-64, Notice of Proposed Rulemaking, 37 FCC Rcd 15183 (2022); *Implementation of the National Suicide Hotline Improvement Act of 2018*, WC Docket No. 18-336, Report and Order, 35 FCC Rcd 7373, 7375-76, para. 4 (2020); *Implementation of the National Suicide Hotline Improvement Act of 2018*, WC Docket No. 18-336, Second Report and Order, 36 FCC Rcd 16901 (2021).

[196] *See* CPUC Comments at 33 ("Emergency response times can be improved as a result of reclassification" because "the public will gain reliable access to and improved response by emergency services with the transition to Next Generation 911 (NG911)"); *Facilitating the Deployment of Text-to-911 and Other Next Generation 911 Applications*; *Framework for Next Generation 911 Deployment*, PS Docket Nos. 11-153 and 10-255, Second Report and Order and Third Further Notice of Proposed Rulemaking, 29 FCC Rcd 9846, 9879-80, paras. 76-78 (2014) (*Text-to-911 Second Report and Order*); 911.gov, *Next Generation 911* (June 9, 2023), https://www.911.gov/issues/ng911.

[197] FCC, Study on Emergency 911 Access to Wi-Fi Access Points and Spectrum for Unlicensed Devices When Mobile Service Is Unavailable (2021), https://www.fcc.gov/document/report-congress-911-over-wi-fi.

54. The public relies on BIAS to easily access public safety resources and information.[198] Commenters who support reclassification and petitioners for reconsideration of the *RIF Remand Order* note that social media is increasingly used as an important resource by the public to access information about emergencies and other public safety incidents.[199] We therefore disagree with commenters who argue that there is no evidence that the Commission's lack of regulatory authority over BIAS poses public safety risks.[200] Similar to the arguments made by commenters who argue that reclassification will not affect communications networks used by public safety officials, this argument ignores that both public safety officials and the public increasingly rely on BIAS. Indeed, BIAS has become for many individuals the primary way to access critical public safety services, without which there would be no other mode of communication.[201] Reclassification enables the Commission to ensure that communications are secure and reliable in times of emergency. We agree with the Communications Workers of America (CWA) that "[w]hile many providers have made strides in improving service quality and reducing outages, voluntary commitments are clearly not enough."[202] Furthermore, the fact that many states have implemented their own laws to ensure public safety communications are safeguarded demonstrates the gap that has existed since the repeal of Title II classification of BIAS.[203] We observe that the public also relies on BIAS for

---

[198] *RIF Remand Order*, 35 FCC Rcd at 12342, para. 29 (acknowledging that "consumers regularly use their mobile devices and broadband connections 'to access broadly available information regarding threatening weather, shelter-in-place mandates, ongoing active-shooter scenarios, and other matters essential to public safety'").

[199] Santa Clara Comments at 4, 8-12, 14; INCOMPAS Petition for Reconsideration at 9; Santa Clara Petition for Reconsideration at 14-16; FEMA, *Social Media and Emergency Preparedness*; Public Knowledge Comments at 6 ("Public safety entities rely on communications through social media in emergencies both to learn where danger is unfolding and to provide necessary instructions to members of the public as broadly as possible. Even temporary interruptions in the use of important services can create significant problems for public safety.").

[200] ADTRAN Comments at 11-12 ("[T]he Commission already supports public safety needs under the current Title I classification for Internet access services."); Free State Foundation Comments at 23 ("The Notice does not identify any evidence that mass commercial market retail broadband Internet services for residential and mobile subscribers pose actual national security or public safety problems."); U.S. Chamber of Commerce Comments at 37 ("While these are important objectives, as with both cybersecurity and national security, the Commission does not suggest that it is falling short of its mandate to advance public safety under Title I. . . . The Commission has not been reluctant to use its existing authority to promote public safety objectives, and if anything, the Commission's existing efforts illustrate its current authority is sufficient to support these objectives."); ADTRAN Reply at 3-4; Erika Heeren-Moon Reply at 5; Harold Furchtgott-Roth et al. Reply at 3; U.S. Chamber of Commerce Reply at 28-29; USTelecom Reply at 38-39; WISPA Reply at 16.

[201] CWA Comments at 6 ("Today, in a time where many households do not have regulated landlines, communications via broadband, VoIP, and wireless network infrastructure function as a critical public safety service."); National League of Cities Comments at 1 ("Broadband service has become a critical, and often primary, way for residents to access government services and healthcare, receive time-sensitive safety information, reach emergency services such as 9-1-1, and communicate generally.").

[202] CWA Comments at 7.

[203] CPUC Comments at 7 ("When the FCC abdicated its authority over BIAS, several states stepped in with their own policies designed to protect an Open Internet."); Consumer Federation of America Comments at 86 (CFA) ("Moreover, states with over one-quarter of the U.S. population enacted legislation that filled at least part of the gap that the [RIF] order created."); *see, e.g.*, SB-822, 2017-2018 Reg. Sess. (Cal. 2018) (adopting open Internet-type requirements); H.B. 2282, 65th Leg., 2018 Reg. Sess. (Wash. 2018) (similar); H.B. 4155, 79th Leg. Assemb., Reg. Sess. (Or. 2018) (requiring compliance with certain open Internet-type requirements as a condition of contracting with the state government); S.289, No. 169, 2018 Sess. (Vt. 2018) (similar); LD 1364, 129th Leg., Reg. Sess. (Me. 2019) (similar); Colorado S.B. 19-078, 71st Leg., Reg. Sess. (Colo. 2019) (requiring compliance with certain open Internet-type requirements as a condition of state universal service support); NY Gen. Bus. § 399-zzzzz (N.Y. 2021) (restricting BIAS prices for low income consumers); Mont. Exec. Order No. 3-2018 (2018), https://spb.mt.gov/_docs/Laws-Rules-EOs/EOs/EO-03-2018-Net-Freedom.pdf (requiring compliance with certain open Internet-type requirements as a condition of contracting with the state government), *amended by* Mont. Exec. Order No. 6-2018 (2018), https://spb.mt.gov/_docs/Laws-Rules-EOs/EOs/EO-06-2018-Amended-Net-Freedom.pdf;

(continued….)

public safety communications that occur outside of emergencies, including for telemedicine;[204] residential safety and security systems;[205] and in-home monitoring of individuals who are elderly, disabled, or otherwise able to benefit from such services.[206]

55.      BIAS is essential when used by individuals with disabilities to communicate with public safety services,[207] and the Commission has taken several steps to improve access to IP-enabled 911 communications for people with disabilities.[208]  Reclassification enhances our existing authority to ensure these communications are not interrupted or degraded by, for example, giving the Commission the jurisdiction necessary to "develop minimum standards of service and enforcement mechanisms that affect people with disabilities."[209]  Likewise, reclassification "provide[s] the FCC with the tools needed, for example, to promote broadband in rural areas lacking sufficient access to BIAS where there is no substitute for copper wires which carry 911, closed captioning, and TTY services."[210]

56.      Reclassification will enhance the Commission's ability to better protect public safety communications.  For example, Title II positions the Commission to more fully examine and investigate incidents involving BIAS providers that are alleged to have violated the Commission's rules, including those against throttling or blocking.[211]  In addition to holding any particular violative action to account, enforcement proceedings would also enable the Commission to prevent or mitigate future threats to BIAS by using data and information gathered as a result of those proceedings.  Reclassification will also enable the Commission to make the nation's alerting and warning capabilities more effective and resilient by, for example, adopting rules requiring BIAS providers to transmit emergency alerts to their subscribers.  Further, given the expanding ways in which individuals and public safety officials rely on BIAS to keep

---

N.J. Exec. Order No. 9 (2018), https://nj.gov/infobank/eo/056murphy/pdf/EO-9.pdf (similar); N.Y. Exec. Order No. 175 (2018); R.I. Exec. Order No. 18-02 (2018), https://governor.ri.gov/executive-orders/executive-order-18-02 (similar).

[204] *See RIF Remand Order*, 35 FCC Rcd at 12343, para. 30.

[205] Press Release, ResearchAndMarkets.com, The Worldwide Smart Home Security Industry Is Projected to Reach $4.6 Billion by 2027 (June 20, 2022), https://www.businesswire.com/news/home/20220620005381/en/The-Worldwide-Smart-Home-Security-Industry-is-Projected-to-Reach-4.6-Billion-by-2027---ResearchAndMarkets.com ("The Global Smart Home Security Market is estimated to be USD 1.84 [billion] in 2022 and is projected to reach USD 4.61 [billion] by 2027, growing at a [compound annual growth rate] of 20.14%.").

[206] Center for Accessible Technology and MediaJustice Comments at 3-4 (Equity Advocates) ("[U]nconnected or underconnected people with disabilities can lose their ability to talk to their doctors using telehealth visits or use medical equipment that can be monitored remotely"); AARP Comments at 13 (BIAS connections allow "for devices and services that provide in-home monitoring for individuals who are older or disabled.").

[207] For example, the Department of Health and Human Services recently announced that the 988 Suicide & Crisis Lifeline will provide direct video calling ASL services for people who are deaf and hard of hearing, as part of ongoing efforts to expand accessibility to behavioral health care for underserved communities.  This will allow an ASL user in crisis to communicate directly with a counselor in ASL.  *See* Press Release, Substance Abuse and Mental Health Administration, 988 Suicide & Crisis Lifeline Adds American Sign Language Services for Deaf and Hard of Hearing Callers (Sept. 8, 2023), https://www.samhsa.gov/newsroom/press-announcements/20230908/988-suicide-crisis-lifeline-adds-american-sign-language-services-deaf-hard-of-hearing-callers.

[208] *Transition from TTY to Real-Time Text Technology*; *Petition for Rulemaking to Update the Commission's Rules for Access to Support the Transition from TTY to Real-Time Text Technology, and Petition for Waiver of Rules Requiring Support of TTY Technology*, CG Docket No. 16-145, GN Docket No. 15-178, Report and Order and Further Notice of Proposed Rulemaking, 31 FCC Rcd 13568 (2016); *Text-to-911 Second Report and Order*, 29 FCC Rcd at 9852-55, paras. 13-17.

[209] CPUC Comments at 28.

[210] *Id.* at 29.

[211] 47 U.S.C. §§ 206-209, 216-217 (providing for the Commission's complaint proceedings and other fundamental Title II enforcement provisions).

themselves and their homes safe, Title II will enable the Commission to ensure that BIAS providers protect and securely transmit the sensitive information to which they are privy pursuant to section 222, which requires service providers to protect customer information.[212]  Thus, reclassification enables the Commission to take a wider range of regulatory actions to ensure the public can reliably and securely access life-saving public safety resources and information using BIAS.

57.     We find that the ability of the Commission to adopt *ex ante* regulations will provide better public safety protections than the *ex post* enforcement framework established by the *RIF Order*. We agree with Santa Clara and INCOMPAS, which, in their Petitions for Reconsideration of the *RIF Remand Order*, criticize the *RIF Remand Order*'s analysis of the record at that time in light of these observations, including the *RIF Remand Order*'s minimization of the opportunity for harm to public safety in the absence of reclassification and the open Internet conduct rules as well as its acceptance of industry's voluntary commitments to abide by the principles underlying the open Internet rules.[213] Reclassification and the conduct rules enable the Commission "to deal with public safety issues before a public safety situation arises—not afterwards, as the *RIF Remand Order* suggests," and do not force the Commission to rely on voluntary industry commitments to protect public safety.[214]

58.     Some commenters assert that reclassification will stymie innovation and reduce incentives for investment, which in turn, does not serve public safety goals.[215]  Both INCOMPAS and Santa Clara petitioned for reconsideration of the *RIF Remand Order* in large part on this very notion, pointing out that the asserted benefits of increased investment and innovation under Title I was unsupported by the record and that there was evidence to the contrary.[216]  We agree with Public Knowledge in that "[n]owhere has the Commission ever found that the nebulous and unsubstantiated benefits of deregulation outweigh the specific benefits of ensuring that public safety responders can communicate reliably with each other and with the public in times of crisis."[217]  Linking increases or decreases in investment and innovation with reclassification is not supported by the available evidence, as we discuss in more detail below.[218]

### 5.     Monitoring Network Resiliency and Reliability

59.     The Commission also plays a critical role in monitoring the resiliency and reliability of the nation's communications networks and helping to ensure that these networks are in fact resilient and reliable.[219]  These networks are critical lifelines for those in need during disasters and other emergency situations.  Recent events, including hurricanes, wildfires, tornadoes, earthquakes, and severe winter

---

[212] 47 U.S.C. § 222.

[213] INCOMPAS Petition for Reconsideration at 8-10; Santa Clara Petition for Reconsideration at 16.

[214] INCOMPAS Petition for Reconsideration at 12-13; *see also infra* Section V.A.2 (explaining that open Internet rules will protect public safety).

[215] CTIA Comments at 36-37; Eric W. Burger Comments at 15; Free State Foundation Comments at 25: Jeffrey Westling Comments at 6, 8; NCTA Comments at 72; USTelecom Comments at 83; Verizon Comments at 16; CTIA Reply at 29-30; NCTA et al. Reply at 30; USTelecom Reply at 39.

[216] INCOMPAS Petition for Reconsideration at 6-8; Santa Clara Petition for Reconsideration at 14-16.

[217] Public Knowledge Comments at 13.

[218] *See infra* Section III.H; *see also* CPUC Reply at 9-10 (noting that the "CPUC has found no obvious trend regarding broadband investment in California, and questions whether investment increase or decline is a result of Title II classification of BIAS").

[219] PPD-21 defines "resilience" as "the ability to prepare for and adapt to changing conditions and withstand and recover rapidly from disruptions . . . [it] includes the ability to withstand and recover from deliberate attacks, accidents, or naturally occurring threats or incidents."  PPD-21.

storms, demonstrate how communications infrastructure remains susceptible to disruption.[220]  As broadband services become more widespread, consumers increasingly rely on these connections.[221]  The Commission has taken actions consistent with its existing authority to improve the reliability and resiliency of the nation's communications networks so that the public can communicate, especially during emergencies.  However, those efforts have had to largely focus on the networks' provision of voice telephony under Title II.  Today's action to reclassify BIAS under Title II will enable the Commission to build upon these efforts by taking more effective regulatory actions to protect the resiliency and reliability of our broadband networks and infrastructure.

60.     In particular, the Commission plays a vital role in ensuring that the nation's communications networks are resilient and reliable.  For example, the Commission "monitors and analyzes communications network outages[,] . . . [takes actions] to help prevent and mitigate outages, and where necessary, assist[s] response and recovery activities."[222]  During emergencies, the Commission "collects information on the operational status of communications infrastructure to support government disaster assistance efforts and to monitor restoration and recovery."[223]  One of the principal benefits of reclassification is to enable all public safety officials to better assess the operational status of broadband networks for dissemination of emergency information and/or to better assess where support is needed.  Under the Commission's Network Outage Reporting System (NORS), qualifying service providers are required to report to the Commission network outages that satisfy certain criteria.

61.     As Free Press points out, "because NORS is limited to voice service outages, 'the Commission has historically lacked reliable outage information for today's modern, essential broadband networks.'"[224]  Reclassification also enhances the agency's ability to gain better visibility over the performance of broadband networks and also to completely and accurately determine the scope and causes of outages to these networks.  Closing this reporting gap for outages could afford the Commission and public safety officials with more consistent and reliable data to better track changes in network reliability, identify trends, pinpoint possible improvements and best practices, and disseminate actionable information.[225]  New outage reporting requirements for BIAS providers could also provide the

---

[220] *Resilient Networks*; *Amendments to Part 4 of the Commission's Rules Concerning Disruptions to Communications*; *New Part 4 of the Commission's Rules Concerning Disruptions to Communications*, PS Docket Nos. 21-346 and 15-80, ET Docket No. 04-35, Notice of Proposed Rulemaking, 36 FCC Rcd 14802, 14802, paras. 1-2 (2021) (*Resilient Networks Notice*) (addressing steps to improve the reliability and resiliency of communications networks during emergencies).

[221] As of February 2021, Pew Research estimates that 77% of adults in the United States have high-speed broadband service at home.  Pew Rsch. Ctr., Internet, Broadband Fact Sheet (Jan. 31, 2024), https://www.pewresearch.org/internet/fact-sheet/internet-broadband/#home-broadband-use-over-time.  Smartphone ownership among adults in the US is now estimated to be at 85%.  Andrew Perrin, Mobile Technology and Home Broadband 2021, Pew Rsch. Ctr. (June 3, 2021), https://www.pewresearch.org/internet/2021/06/03/mobile-technology-and-home-broadband-2021.

[222] FCC, *Cybersecurity and Communications Reliability Division, Public Safety and Homeland Security Bureau* (Mar. 11, 2024), https://www.fcc.gov/cybersecurity-and-communications-reliability-division-public-safety-and-homeland-security-bureau.

[223] *Id.*

[224] Free Press Comments at 58-59 (quoting *2023 Open Internet NPRM* at 24, para. 39).

[225] Public Knowledge Comments at 63 ("Title II would provide the Commission with the necessary authority to finally require broadband providers to report significant outages.  Title II would also provide the Commission with needed authority to impose backup power requirements and other steps the Commission may find necessary to ensure operation of broadband during national emergencies—and to ensure restoration of service as quickly as possible when service does fail.").  AARP Comments at 14 ("[A]s natural disasters become more frequent, having a national framework that addresses both outage reporting during the disasters and advances measures for network hardening is more important than ever.  According to the National Centers for Environmental Disasters at the

(continued….)

Commission with better situational awareness for major Internet outages affecting first responders, 911 services, and impacted populations that are not currently captured by NORS data. Finally, reclassification supports the Commission's authority to expand the scope of NORS by requiring BIAS providers, like Title II-regulated voice service providers, to submit outage reports in response to service incidents that cause outages or the degradation of communications services, such as cybersecurity breaches, wire cuts, infrastructure damages from natural disaster, and operator errors or misconfigurations.

62. The Commission also "oversees and monitors industry efforts to strengthen network resiliency,"[226] including through the recently adopted Mandatory Disaster Response Initiative.[227] Moreover, the Commission adopted new rules, "to require enumerated service providers (cable communications, wireline, wireless, and interconnected Voice over Internet Protocol (VoIP) providers) . . . to report on their infrastructure status during emergencies and crises in the Disaster Information Reporting System (DIRS) when activated and to submit a final report to the Commission within 24 hours of DIRS deactivation."[228] Reclassification bolsters the Commission's authority to require BIAS providers to participate in DIRS. In addition, the Commission endeavors to "identify and reduce risks to the reliability of the nation's communications network[s]," including by working with the Communications Security Reliability and Interoperability Council (CSRIC).[229]

63. Reclassifying BIAS as a telecommunications service will significantly enhance the Commission's ability to protect critical infrastructure by taking actions to address threats and vulnerabilities to communications networks. Public Knowledge agrees that "[w]ithout Title II authority, the Commission cannot impose regulations to meet the need for resilience and reliability as more and more critical traffic passes through IP networks."[230] This change in policy will enable the Commission to set goals and objectives that foster resilience and to implement risk management directives on a wider basis in order to make our broadband networks more resilient and reliable, and thus more secure. We also disagree with those commenters who argue against reclassification by contending that outage reporting targeted to BIAS networks will not serve the public interest or that there are alternative sources of authority for outage reporting.[231] The Commission is considering in a separate proceeding the extent to

---

National Oceanic and Atmospheric Administration, eight out of the ten years with the highest number of natural disasters occurred in the last decade.").

[226] FCC, *Cybersecurity and Communications Reliability Division, Public Safety and Homeland Security Bureau* (Mar. 11, 2024), https://www.fcc.gov/cybersecurity-and-communications-reliability-division-public-safety-and-homeland-security-bureau.

[227] FCC, *Wireless Network Resiliency During Disasters* (Sept. 25, 2023), https://www.fcc.gov/wireless-network-resiliency-during-disasters.

[228] *Resilient Networks*; *Amendments to Part 4 of the Commission's Rules Concerning Disruptions to Communications*; *New Part 4 of the Commission's Rules Concerning Disruptions to Communications*, PS Docket Nos. 21-346 and 15-80, ET Docket No. 04-35, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 24-5 (Jan. 26, 2024) (*Resilient Networks Second Report and Order*).

[229] FCC, *Cybersecurity and Communications Reliability Division, Public Safety and Homeland Security Bureau* (Mar. 11, 2024), https://www.fcc.gov/cybersecurity-and-communications-reliability-division-public-safety-and-homeland-security-bureau.

[230] Public Knowledge Comments at 62.

[231] *See* INCOMPAS Comments at 28 (disputing that additional outage reporting for BIAS providers will increase reliability); NCTA Comments at 73 (opposing new outage reporting requirements for BIAS providers as unnecessary and not a valid basis for the Commission to impose the other burdens NCTA claims stem from reclassification); WISPA Comments at 31 (claiming that "the Commission asserts that it is able to better ensure the resiliency and reliability of broadband networks but does not identify any existing need for it to do so, or otherwise justify the costs of outage reporting"); CTIA Reply at 29 (claiming that the potential existence of alternative sources of statutory authority for the Commission to require outage reporting for BIAS providers "undercuts the claim that Title II is needed to enhance network resiliency").

which outage reporting requirements should be placed on BIAS providers and we anticipate that having Title II as an additional source of authority will support that evaluation.[232]

64.     We also are not persuaded by other arguments that certain parties raise regarding network resilience and reliability that are consistent with their comments regarding national security.  Some commenters argue reclassification is not necessary to ensure the resiliency and reliability of the nation's communications networks, that market-driven incentives motivate broadband providers to make significant investments to increase the resiliency and reliability of their networks, or that the Commission has only a limited role to play on resilience and reliability issues.[233]  We agree with AARP and Next Century Cities, however, that reclassification is necessary to provide the Commission with sufficient authority to address network resiliency for critical infrastructure, which is too important for the Commission to be forced to rely upon mere voluntary measures and alleged market-driven incentives.[234]  As described above, and consistent with our conclusions on national security matters generally, we find that the Commission has an essential role on resilience and reliability issues, working in coordination with its federal partners.  Reclassification will allow for the direct network monitoring of the nation's broadband Internet networks and provide a robust regulatory platform so that all BIAS providers maintain the highest levels of business continuity when incidents occur.  We find that reclassification will support the Commission's efforts to protect the public by ensuring that more reliable and resilient networks are in use, including by developing voluntary frameworks and policies when practical, and compelling enforceable compliance when needed.

65.     Commenters opposing reclassification also argue that under Title I classification, broadband networks have provided robust Internet service despite unprecedented levels of demand during the COVID-19 pandemic.[235]  We find these arguments unpersuasive.  As more critical functions rely on BIAS, it is imperative for the Commission to have authority to address resiliency issues involving broadband networks to the same degree that it has for traditional voice networks.  Further, we disagree with those commenters that contend that these types of reporting, monitoring, and regulatory requirements would likely impose significant new costs on BIAS providers and potentially stifle investment and broadband deployment.[236]

66.     In conclusion, the reclassification of BIAS will secure the Commission's authority to, as necessary, implement requirements for network upgrades and changes, adopt rules relating to recovery from network outages, and improve our incident investigation and enforcement authority to mitigate

---

[232] *See Resilient Networks Second Report and Order* at 31-33, paras. 64-68; *see also Amendments to Part 4 of the Commission's Rules Concerning Disruptions to Communications*; *New Part 4 of the Commission's Rules Concerning Disruption to Communications*; *The Proposed Extension of Part 4 of the Commission's Rules Regarding Outage Reporting to Interconnected Voice Over Internet Protocol Service Providers and Broadband Internet Service Providers*, PS Docket Nos. 15-80 and 11-82, ET Docket No. 04-35, Report and Order, Further Notice of Proposed Rulemaking, and Order on Reconsideration, 31 FCC Rcd 5817, 5895, para. 201 (2016) (tentatively concluding that, under the *2015 Open Internet Order*, the Commission has ample authority to require BIAS providers to comply with outage reporting requirements).

[233] CTIA Comments at 37-38; *see also* U.S. Chamber of Commerce Reply at 30.

[234] *See* AARP Comments at 14 (arguing that "[l]eaving the determination of whether to abide by a best practice to the individual broadband provider will not ensure that all people have access to reliable communications"); Next Century Cities Comments at 6-7 (stating that "[m]any of the FCC's network resilience regulations apply only to wireless and telephony providers.  Reclassification provides the opportunity to bring BIAS providers under the same network resilience reporting schema as other forms of connectivity.  Such a centralization of resilience planning and reporting not only ensures a uniform approach to network resilience, but can enhance both wired and wireless outage reporting"); *see also* CWA Comments at 5 (submitting that "[t]he Commission's reclassification of BIAS as Title II will permit the Commission to achieve the goals of protecting the public, including ensuring a reliable and resilient network at times of emergency and natural disasters").

[235] *See, e.g.*, NCTA Comments at 72-73; USTelecom Comments at 81.

[236] *See, e.g.*, U.S. Chamber Comments at 39-40; Ohio Telecom Association Reply at 2-3; *infra* Sections III.H, V.H.

network threats and vulnerabilities. Reclassification also enables the Commission to create more stability and predictability on how providers should address disasters and emergency situations. Moreover, reclassifying broadband as a telecommunications service allows the Commission to address identified—and evolving—threats and vulnerabilities in the BIAS industry, as some BIAS providers may not have sufficient incentives to protect the traffic traversing their networks without such regulation.[237] Thus, reclassification would allow the Commission, for example, to require BIAS providers to identify and reduce harmful activities occurring across their infrastructure. These measures will be taken in support of a whole-of-government approach[238] by taking regulatory actions to enhance network reliability and resiliency in order to better protect all of our nation's networks.

### 6.     Protecting Consumers' Privacy and Data Security

67.     We find that classifying BIAS as a telecommunications service will support the Commission's efforts to protect consumers' privacy and data security. Section 222 of the Act governs telecommunications carriers' use, disclosure, and provision of access to information obtained from their customers, other telecommunication carriers, and equipment manufacturers.[239] It imposes a general duty on every telecommunications carrier to protect the confidentiality of proprietary information of its customers, other telecommunication carriers, and equipment manufacturers,[240] and imposes heightened restrictions on carriers' use, disclosure, or provision of access to customers' customer proprietary network information (CPNI)[241]—including customer location information—without consent.[242]

68.     Returning BIAS to its telecommunications service classification will bring BIAS providers back under the section 222 privacy and data security framework, restoring those protections for consumers and yielding substantial public interest benefits. In her separate remarks on the 2021 FTC Staff Report, Chair Lina Khan noted that the FCC "has the clearest legal authority and expertise to fully oversee internet service providers,"[243] a view supported by a number of commenters,[244] who assert that the Commission's specific expertise to regulate privacy matters is needed.[245] We observe that the

---

[237] *See* Nathaniel Fick et al., Confronting Reality in Cyberspace: Foreign Policy for a Fragmented Internet, Council on Foreign Relations (2022), https://www.cfr.org/task-force-report/confronting-reality-in-cyberspace/recommendations.

[238] *See* NTIA *Ex Parte* at 4.

[239] 47 U.S.C. § 222.

[240] *See* 47 U.S.C. § 222(a).

[241] CPNI is defined as "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier." 47 U.S.C. § 222(h)(1).

[242] *See* 47 U.S.C. § 222(c)(1).

[243] Remarks of Chair Lina M. Khan Regarding the 6(b) Study on the Privacy Practices of Six Major Internet Service Providers, Commission File No. P195402 at 2 (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/public_statements/1597790/20211021_isp_privacy_6b_statement_of_chair_khan_final.pdf.

[244] *See, e.g.*, AARP Comments at 10-11 (quoting same remarks by Chair Khan); EPIC et al. Comments at 7 (quoting same remarks by Chair Khan).

[245] *See, e.g.*, AARP Comments at 9-11 (arguing that the Commission "has a unique ability to protect consumers' privacy because of specific statutory directives as well as its general authority under Title II," and agreeing that "reclassification of BIAS as a telecommunications service would support the Commission's efforts to safeguard consumers' privacy and data security"); EPIC et al. Comments at 2 ("The Federal Communications Commission is a key federal privacy regulator, and the Commission's recent actions suggest an awareness of this reality and the urgency to act upon it. The current landscape, the historic behavior of broadband and other telecommunications

(continued….)

Commission's privacy authority under Title II is not limited to CPNI. Section 222(a) also imposes obligations, which we enforce, on carriers' practices with regard to protection of non-CPNI customer proprietary information and personally identifiable information (PII),[246] and section 201(b)'s prohibition on practices that are unjust or unreasonable also provides authority over privacy practices.[247] We also find that because section 222 places an obligation on telecommunications carriers to protect the confidentiality of the proprietary information of and relating to other telecommunication carriers (including resellers) and equipment manufacturers, our classification of BIAS as a telecommunications service will protect information concerning entities that interact with BIAS providers.

### 7. Supporting Access to Broadband Internet Access Service

69.     Reclassifying BIAS as a telecommunications service under Title II will support the Commission's multifaceted efforts to support access to BIAS in three ways. First, such authority will improve the Commission's ability to foster investment in and deployment of wireline and wireless infrastructure and to promote competition for, and access to, BIAS for consumers by restoring to BIAS-only providers statutory protections for pole attachments that providers of cable and telecommunications services receive. Second, reclassification facilitates our ability to ensure access to BIAS by enabling the Commission to regulate BIAS-only providers that serve multi-tenant environments to ensure they do not engage in unfair, unreasonable, and anticompetitive practices, such as exclusivity contracts. Finally, authority under Title II will put the Commission on the firmest legal ground to promote the universal service goals of the Act.

70.     *Wireline and Wireless Infrastructure.* We find that reclassifying BIAS as a telecommunications service under Title II will support the Commission's mission to foster investment in and deployment of wireline and wireless infrastructure and to promote competition and access to BIAS for consumers. Specifically, we find that the application of sections 224, 253, and 332 of the Act to BIAS-only providers will provide equitable rights to those providers and the tools to enable the Commission to reach its goals, thereby promoting greater deployment, competition, and availability of both wireline and wireless BIAS. Furthermore, we find that the *RIF Remand Order* failed to adequately address the *Mozilla* court's concerns regarding the effects of reclassification on BIAS-only providers.

---

providers, and the need for immediate action in light of the limitations on the Federal Trade Commission's capacity all point to the need for the Commission to step in and assert the authority and expertise it has with respect to broadband service providers.").

[246] *Data Breach Reporting Requirements*, WC Docket No. 22-21, Report and Order, FCC 23-111, at 58, para. 118 (Dec. 21, 2023) (*Data Breach Notification Order*) (relying on both sections 222(a) and 222(c) as "independently" providing authority to adopt rules requiring telecommunications carriers and interconnected VoIP providers to address breaches of customer information); *id.* at 59, para. 120 ("[W]e find that the phrase 'information of, and relating to, . . . customers' in section 222(a) is naturally—and indeed best—interpreted to have the same definition as PII, subject to the additional limitation that the information be 'proprietary' to the carrier—i.e., obtained in connection with establishing or maintaining a communications service."). *But see* USTelecom Comments at 66-67 (asserting that section 222(a) "is a mere introductory provision and not a freestanding source of obligations or authority").

[247] 47 U.S.C. § 201(b); *Data Breach Notification Order* at 61-62, para. 124 (finding that section 201 provides independent authority for the Commission to consider PII as protected consumer information and to require carriers to notify customers, law enforcement, and the Commission about breaches); *see also* EPIC Reply at 3-4; EPIC et al. Comments at 7 ("Applying Title II to broadband providers would not only activate all of the protections of 47 U.S.C. § 222 and corresponding regulations, but would also activate the prohibition against unjust and unreasonable practices under 47 U.S.C. § 201(b)."); Public Knowledge Comments at 55-56 (explaining that the Commission "still ha[s] the statutory framework under Title II to apply CPNI authority to broadband, protect consumer privacy, and bring enforcement actions against ISPs, as well as to issue guidelines and best practices for consumer data protection" and while the Commission "[will] not be able to reinstate the previous privacy rules verbatim, Sections 222 and 201 would provide the foundation to create rules for ISPs data privacy practices, oversee ISPs usage of the collected personal information, and prevent ISPs from abusing or exploiting their users' data").

71.     Reclassification of BIAS as a Title II service will ensure that BIAS-only providers receive the same statutory protections for pole attachments guaranteed by section 224 of the Act that providers of cable and telecommunications services receive.[248]  Section 224 defines pole attachments as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility."[249]  It authorizes the Commission to prescribe rules to ensure that the rates, terms, and conditions of pole attachments are just and reasonable;[250] requires utilities[251] to provide nondiscriminatory access to their poles, ducts, conduits, and rights-of-way to telecommunications carriers and cable television systems (collectively, attachers);[252] provides procedures for resolving pole attachment complaints;[253] governs pole attachment rates for attachers;[254] and allocates make-ready costs among attachers and utilities.[255]  As the Commission noted in 2015, it "has recognized repeatedly the importance of pole attachments to the deployment of communications networks"[256] and therefore has undertaken a series of reforms to improve access to poles under section 224.[257]  To that end,

---

[248] *See, e.g.*, Next Century Cities Comments at 8 ("Once the Commission reclassifies BIAS as a telecommunications system, it will restore Section 224 rights . . . ."); State Consumer Advocates Comments at 4 (explaining that Title II classification of BIAS "provides for favorable pole attachment treatment for BIAS providers").

[249] 47 U.S.C. § 224(a)(4).

[250] 47 U.S.C. § 224(b)(1)-(2).

[251] The Act defines a utility as a "local exchange carrier or an electric, gas, water, steam, or other public utility, . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications."  47 U.S.C. § 224(a)(1).  However, for purposes of pole attachments, a utility does not include any railroad, any cooperatively organized entity, or any entity owned by a federal or state government.  *Id.*

[252] 47 U.S.C. § 224(f).  Section 224 excludes incumbent local exchange carriers (ILECs) from the meaning of the term "telecommunications carrier," therefore these entities do not have a mandatory access right under section 224(f)(1).  *Id.* § 224(a)(5).  The Commission has held that when ILECs obtain access to poles, section 224 governs the rates, terms, and conditions of those attachments.  *Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, WC Docket No. 07-245, GN Docket No. 09-51, Report and Order and Order on Reconsideration, 26 FCC Rcd 5240, 5328, para. 202 (2011) (*Implementation of Section 224 Report and Order*).  The Act allows utilities that provide electric service to deny access to their poles, ducts, conduits, or rights-of-way because of "insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes."  47 U.S.C. § 224(f)(2).

[253] 47 U.S.C. § 224(b)(1).

[254] 47 U.S.C. § 224(d)-(e).

[255] 47 U.S.C. § 224(b), (h)-(i); 47 CFR § 1.1402(o) (defining "make-ready" as "the modification or replacement of a utility pole, or of the lines or equipment on the utility pole, to accommodate additional facilities on the utility pole").

[256] *2015 Open Internet Order*, 30 FCC Rcd at 5831, para. 478.

[257] *See, e.g.*, *Implementation of Section 224 Report and Order*; *Implementation of Section 224 of the Act; A National Broadband Plan for Our Future*, WC Docket No. 07-245, GN Docket No. 09-51, Order on Reconsideration, 30 FCC Rcd 13731 (2015); *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, WT Docket No. 17-79, Third Report and Order and Declaratory Ruling, 33 FCC Rcd 7705 (2018) (*2018 Wireline Infrastructure Order*); *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket No. 17-79, WC Docket No. 17-84, Declaratory Ruling and Third Report and Order, 33 FCC Rcd 9088 (2018) (*2018 Wireless Infrastructure Order*).  The National League of Cities urges us to revisit and overturn our *2018 Wireless Infrastructure Order* and, until that time, forbear from application of sections 253 and 332(c) to reclassified BIAS.  National League of Cities Comments at 2; *see also* National Association of Telecommunications Officers and Advisors Reply at 4-5 (NATOA) (requesting the same).  We agree with the Wireless Infrastructure Association that the former request is outside the scope of this proceeding.  Wireless Infrastructure Association Reply at 8 (WIA).  We decline to forbear from applying section 253 and 332(c) to BIAS for the reasons we discuss in Section IV.B.9.

the Commission continues to pursue solutions to improve pole access including, most recently in December 2023, by adopting new rules that, among other things, speed up the pole attachment dispute resolution process by establishing a new intra-agency rapid response team, set forth specific criteria for the response team to use when considering a complaint, and increase transparency for new broadband buildouts by requiring disclosure of pole inspection reports during the make-ready process.[258] Under a Title I classification scheme, BIAS-only providers are not entitled to any of the current or future benefits the Commission may enact to facilitate access to broadband infrastructure.

72. Section 253 of the Act provides further protections to telecommunications companies that, through Title II reclassification, will apply to BIAS-only providers. Specifically, section 253 seeks to further facilitate deployment of communications services by enabling the Commission (or a court) to intervene when a state or local regulation or legal requirement "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate *telecommunications* service."[259] Without reclassification, however, BIAS-only providers may not seek the Commission's intervention under section 253 when state or local regulations interfere with their network deployment. Moreover, state and local laws that are exclusively focused on, or exclusively implicate, the provision of BIAS, do not currently fall within the ambit of section 253 and thus cannot be the subject of Commission intervention when prohibiting or having the effect of prohibiting the provision of BIAS exclusively.

73. In the wireless context, section 332 of the Act protects regulated entities from state and local regulations that "unreasonably discriminate among providers or functionally equivalent services" or that "prohibit or have the effect of prohibiting the provision of personal wireless service."[260] However, because mobile broadband is not currently classified as a "commercial mobile service," mobile BIAS-only providers who do not offer additional regulated services are not covered by section 332. As INCOMPAS notes, it has "members who are solely focused on providing broadband services," and "[t]he current classification of BIAS and mobile broadband as Title I services makes it difficult for these providers to argue that they are building the kinds of facilities capable of commingled operation that are covered by Sections 332 and 253."[261] As with sections 224 and 253, without reclassification, mobile BIAS-only providers would be disadvantaged compared to their competitors.

74. We find that reclassifying BIAS as a Title II service levels the playing field by ensuring that BIAS-only providers enjoy the same regulatory protections—those guaranteed by sections 224, 253, and 332—as their competitors who offered services already classified as telecommunications services in addition to BIAS prior to our classification decision today. As the Commission found in 2015, "[a]ccess to poles and other infrastructure is crucial to the efficient deployment of communications networks including, and perhaps especially, new entrants."[262] INCOMPAS notes that BIAS providers face "significant barriers to deploy broadband network infrastructure—among them access to poles, ducts, and conduit."[263] The CPUC explains further that "[a]ccess to poles, conduits, and rights-of-way may affect cost, feasibility, and timing of constructing and offering broadband services."[264] Sections 224, 253, and

---

[258] *See generally Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Fourth Report and Order, Declaratory Ruling, and Third Further Notice of Proposed Rulemaking, FCC 23-109, at 4-5, para. 7 (Dec. 15, 2023) (2023 *Pole Attachments* Order).

[259] 47 U.S.C. § 253(a), (d) (emphasis added).

[260] *Id.* § 332(c)(7)(B)(i).

[261] INCOMPAS Comments at 24.

[262] *2015 Open Internet Order*, 30 FCC Rcd at 5617, para. 56; *see also* CPUC Comments at 15 ("All forms of telecommunications, including broadband, require access to rights-of-way generally, and specifically to poles and conduits, which are controlled by incumbent local exchange carriers and other entities.").

[263] INCOMPAS Comments at 18-19 (adding that BIAS providers may also encounter "significant permitting costs and delays from government—federal, state and local agencies—as well as from railroads").

[264] CPUC Comments at 15.

332 however, seek to remove these barriers by guaranteeing providers access to utility poles at just and reasonable rates and by ensuring that state and local laws do not prohibit deployment.[265] Even WISPA, which otherwise opposes our reclassification decision, highlights the benefits of extending section 224 rights to BIAS-only providers.[266]

75.    NCTA argues that restoring section 224 rights will only provide "illusory" benefits to BIAS-only providers.[267] We disagree. Under Title II, BIAS-only providers will be guaranteed access to utility poles at just and reasonable rates. BIAS-only providers, therefore, will no longer be forced to negotiate for the right of pole access directly with each set of pole owners, which will not only ensure they pay the same rates as their competitors but will also ensure that deployment of their networks is not unnecessarily bogged down by the negotiation process. While such benefits may seem "illusory" to the competitors who already enjoy such privileges, we find that eliminating one of the "significant barriers to deploy[ment] [of] broadband network infrastructure,"[268] is in fact a very real benefit for BIAS-only providers. Indeed, NCTA, who claims that the benefits of pole attachment rights will prove to be illusory, has consistently taken issue with the costs of pole attachments,[269] even under the existing regime, and has regularly supported and championed the Commission's efforts to reduce the costs and burdens of obtaining pole access.[270]

76.    We find that in addition to guaranteed pole attachment rates and more efficient deployment, Title II reclassification will also ensure that BIAS-only providers are protected by section 253, which provides that "no [s]tate or local statute or regulation, or other [s]tate or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any

---

[265] 47 U.S.C. §§ 224, 253, 332; *see, e.g., id.* at 15 ("BIAS providers must receive nondiscriminatory access to utility support structures, including poles and conduits, at just and reasonable rates, terms, and conditions, in order to promote the deployment and availability of BIAS."); INCOMPAS Comments at 18 ("Reclassification of BIAS as a Title II service will help ensure that BIAS-only providers can exercise their rights to deploy broadband infrastructure and the protections afforded by Title II in the Act to enable more competition in the BIAS marketplace . . . ."); Public Knowledge Comments at 47 ("Congress recognized that access to utility poles at affordable rates is critical to providers of wireline services, and that requiring providers of wireline services to build new poles along the same routes to service created a significant barrier to entry."); *id.* ("Classification under Title II will give the Commission authority to remove obstacles to broadband infrastructure deployment that create delays, inefficiencies, and competitive barriers to entry."); *id.* at 46 (explaining that Title II classification, and resulting rights under section 224, will "streamlin[e] processes for both wireline and wireless broadband infrastructure" and therefore "foster competitive markets"); Tennessee Valley Public Power Association Comments at 1-2 (TVPPA) (explaining that classification of BIAS "as a Title II telecommunications service will allow electric cooperatives that provide broadband-only services to [sic] pole attachment rights, accelerating the deployment of high-speed, affordable broadband to some of the hardest-to-reach areas of the country, rural communities"); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5831, para. 478 (noting that just and reasonable rates serve to "limit[] the input costs that broadband providers otherwise would need to incur"); *id.* at 5792, para. 413 (explaining that section 224 rights provide an important investment benefit that encourages more expeditious and efficient deployment of fiber and other competitive networks).

[266] WISPA Comments at 71-72 ("There is no question that broadband-only providers would benefit from the pole attachment rights provided under Section 224.").

[267] *See* NCTA Comments at 81-82 (stating that "any supposed benefits related to pole attachments or MTEs that the NPRM theorizes will flow from Title II reclassification are illusory, and in any case would be far outweighed by the substantial drawbacks of imposing burdensome, common-carrier regulation on all broadband providers").

[268] INCOMPAS Comments at 18.

[269] *See, e.g.*, NCTA Comments, WC Docket No. 17-84, at 6-19 (filed June 27, 2022).

[270] *See, e.g.*, Opposition of NCTA to the Coalition of Concerned Utilities Petition for Reconsideration, WC Docket No. 17-84, at 1-2 (filed Mar. 15, 2024) (defending the Commission's actions in the December 2023 *Report and Order*); Opposition of NCTA to the Edison Electric Institute's Petition for Clarification and/or Reconsideration, WC Docket No. 17-84, at 2-9, 10-12 (filed Feb. 13, 2024) (defending the Commission's actions in the December 2023 Declaratory Ruling).

interstate or intrastate telecommunications service."[271] Likewise, mobile BIAS-only providers will receive protection under section 332 which requires state and local governments to act on "any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."[272] As INCOMPAS notes, "a reclassification of BIAS . . . opens an avenue for additional protections for BIAS-only providers who may need Commission intervention to address state/local policies that restrict competitive deployment through its oversight for ensuring competitors can access new geographic markets."[273] Under Title I, BIAS-only providers cannot seek assistance from the Commission if state or local governments interfere with the deployment of BIAS-only networks—once again, leaving them worse off than their regulated competitors. For example, under a Title I regulatory regime, if state or local permitting processes effectively prohibit the deployment of BIAS networks, BIAS-only providers cannot raise the issue with the Commission. In areas where both BIAS-only and providers of comingled services operate, providers of comingled services may seek a resolution with the Commission that would resolve the issue for BIAS-only competitors as well, but BIAS-only providers would be reliant upon their competitors to bring the action to the Commission in the first place. But if a state or local legal requirement solely affects BIAS, even providers that currently offer commingled services lack the ability under section 253 to challenge it given that section 253 only applies to those state and local legal requirements that affect the provisioning of "telecommunications service."[274] Moreover, in any area where BIAS-only providers are the sole provider of service (or are seeking to be a provider of service), they would be left without recourse. We agree with INCOMPAS, which notes that "reclassification so that BIAS-only providers receive the same Title II protections as incumbent telecommunications providers is in the public interest as it will best ensure that the Communications Act's goal of the Commission enabling and promoting competition can be fulfilled and that consumers will benefit from additional choice in the marketplace."[275] Therefore, we find that restoring section 253 rights of BIAS-only providers is not only equitable, but will help ensure that BIAS-only providers are adequately protected by the Commission's authority to address state and local policies that restrict deployment.

77. In the *RIF Remand Order*, the Commission attempted to downplay its decision to strip section 224 rights from BIAS-only providers by claiming that "ISPs may gain the status of telecommunications providers, and thus become eligible for section 224 pole attachment rights."[276] Specifically, the Commission suggested that BIAS-only providers could either alter their business plans to offer other services that would then qualify them as telecommunications carriers or enter into partnerships with existing telecommunications carriers to attain section 224 rights.[277] While it may be true that BIAS-only providers could alter the business plans or partner with other regulated entities to ensure they receive equitable pole access, our regulations should not be designed to stifle innovative offerings distinct from those currently offered in the marketplace. Furthermore, each year more and more Americans are opting to forgo these additional non-BIAS telecommunications services and instead are

---

[271] 47 U.S.C. § 253(a).

[272] *Id.* § 332(c)(7)(B)(ii).

[273] INCOMPAS Comments at 22-23.

[274] 47 U.S.C. § 253(a).

[275] INCOMPAS Comments at 24.

[276] *RIF Remand Order*, 35 FCC Rcd at 12372, para. 73.

[277] *Id.* ("Further, ISPs may gain the status of telecommunications providers, and thus become eligible for section 224 pole attachment rights. . . . As another option, a broadband-only provider may also partner with an existing cable or telecommunications provider to invoke section 224 protections.").

choosing to have only a fixed BIAS connection in their homes along with a mobile connection.[278] INCOMPAS notes that because customers are opting to use over-the-top video or VoIP services, many of its fixed BIAS members were losing money on video and voice services and "have ceased offering voice and/or video options to their residential customers given that those customers can choose third-party over-the-top video or VoIP options for these services."[279] Thus, requiring BIAS-only providers to pursue declining lines of business just to receive the same legal protections as their competitors makes little sense. And in following the *RIF Remand Order*'s suggestion that BIAS-only providers could enter into partnerships with telecommunications carriers to gain pole access,[280] BIAS-only providers would just swap one barrier to entry (negotiating directly with pole owners for access) for another (negotiating with a telecommunications carrier). As a result, the supposed solution the *RIF Order* offered up is in fact no solution at all and instead leaves BIAS-only providers with a different "competitive bottleneck."[281] Moreover, the *RIF Remand Order* failed to cite to even one instance of such a partnership or provide any evidence that such a partnership would even be economically or practically feasible, only mentioning the *possibility* that BIAS-only providers might be able to pursue one. Even assuming the possibility of such a partnership, unlike with section 224, which ensures pole owners provide access at just and reasonable rates, there are no legal safeguards to ensure that potential partners agree to reasonable terms with BIAS-only providers.

78. In addition, we find that the *RIF Remand Order* erred in concluding that the ability of states under section 224(c) to establish their own pole attachment rules in place of the federal rules (often referred to as reverse-preemption)[282] minimizes the impact of the loss of section 224 rights on BIAS-only providers.[283] First, the majority of jurisdictions have not chosen to reverse-preempt the Commission and instead have opted to continue to allow the Commission to regulate pole attachments under section 224.[284] Second, we disagree with the conclusion in the *RIF Remand Order*, as well as those commenters who agree with the conclusion,[285] that "Title I classification does not impact the 22 states and the District of

---

[278] *See* Statista, *Share of TV Households Without a Traditional TV Subscription in the United States from 2014 to 2025*, https://www.statista.com/statistics/258460/number-and-share-of-cord-cutters-in-the-us (last visited Mar. 28, 2024) (noting that "[t]he share of households without a telco, cable, or satellite TV provider amounted to 53 percent in 2022, up from 47 percent the year before. The forecast suggests a further increase in 2025 to 75 percent"); *see also* Andrew Van Dam, *Barely a Quarter of Americans Still Have Landlines. Who Are They?*, Wash. Post (June 23, 2023), https://www.washingtonpost.com/business/2023/06/23/landline-telephone-holdouts (noting that "73 percent of American adults lived in a household without a landline at the end of last year—a figure that has tripled since 2010").

[279] INCOMPAS Comments at 19.

[280] *RIF Remand Order*, 35 FCC Rcd at 12372, para. 73.

[281] *See id.* at 12372, para. 74 (agreeing with a commenter that referred to utility pole access as a "competitive bottleneck," but stating that the Commission did not believe reclassification of BIAS as a Title I information service would "significantly limit" new entrants or limit the effectiveness of the Commission's "one-touch-make-ready rules").

[282] *See* 47 U.S.C. § 224(c).

[283] *RIF Remand Order*, 35 FCC Rcd at 12375, para. 76.

[284] *See States That Have Certified That They Regulate Pole Attachments*, WC Docket No. 10-101, Public Notice, 37 FCC Rcd 6724, 6724-25 (WCB 2022) (*2022 State Pole Attachment PN*) (listing the 23 states and District of Columbia that regulate pole attachments at the state level).

[285] WISPA Comments at 72 ("Section 224(c) expressly gives states the ability to 'reverse-preempt' the Commission's authority over pole attachments and regulate pole attachments themselves—and 23 states and the District of Columbia have in fact done so. The reclassification of broadband as a Title II service would therefore do nothing to extend the Commission's pole attachment protections to broadband-only providers in nearly half of the states in the country.").

Columbia that have chosen to reverse-preempt our rules."[286]  As INCOMPAS notes, some of the jurisdictions that have reverse-preempted the Commission have simply mirrored the Commission's rules so that any changes implemented by the Commission are also directly implemented by the state.[287]  For example, Pennsylvania has reverse-preempted the Commission but chosen to adopt the "rates, terms and conditions of access to and use of utility poles, ducts, conduits and rights-of-way to the full extent provided for in 47 U.S.C. § 224 and 47 CFR Chapter I, Subchapter A, Part 1, Subpart J (relating to pole attachment complaint procedures), inclusive of future changes as those regulations may be amended."[288]  Therefore, because the Pennsylvania code reflects the "rates, terms, and conditions of access to" poles adopted by the Commission, reclassifying BIAS as a Title II service will provide pole access to BIAS-only providers in Pennsylvania even though Pennsylvania regulates its own poles.  The same is true in West Virginia, another state that has reverse-preempted the Commission, where the West Virginia Public Service Commission, at the direction of the state legislature, adopted the FCC's pole attachment regulations in their entirety, including subsequent modifications, superseded existing pole attachment regulations that conflicted with federal regulations, and otherwise rejected stakeholder requests to alter the Commission's regulations.[289]  Similarly, at least two other jurisdictions, the District of Columbia and Ohio, have reverse-preempted the Commission but continue to point to the Commission's regulations for reference.[290]  Three other states seemingly have only partially preempted the Commission's rules by opting to regulate only the attachments of other public utilities or cable television providers.[291]  In those states, the Commission's rules will continue to govern the attachments of telecommunications carriers.  Thus, the Commission's pole attachment rules will continue to play a vital role in several jurisdictions that have elected to reverse-preempt, or partially reverse-preempt, the Commission.

79.     The *RIF Remand Order* further posits that "if a state prefers to adopt a different regulatory approach, that state has the opportunity to exercise its authority to expand the reach of government oversight of pole attachments."[292]  But, as the CPUC, the Public Utility Commission for a state which has reverse preempted the Commission, argues, it is not entirely clear states can grant BIAS-

---

[286] *RIF Remand Order*, 35 FCC Rcd 12372, para. 76.  An additional state, Florida, has subsequently reverse preempted the Commission's jurisdiction since the issuance of the *RIF Remand Order.  See 2022 State Pole Attachment PN*, 37 FCC Rcd at 6724.

[287] INCOMPAS Petition for Reconsideration at 22 ("The FCC's reliance on state reverse-preemption is fraught for two reasons.  First, although the *Remand Order* cites the various state codes where states regulate information service providers, there are some state codes that reverse-preempt but specifically rely on section 224 as a reference point in their pole attachment regulations.  These state codes will be affected by the FCC's regulations even though these states have reverse-preempted the Commission.").

[288] 52 Pa. Code § 77.4(a); *see also id.* § 77.2(b) ("For the purposes of this chapter, the Commission will apply the definition of 'pole attachments' as codified in section 224(a)(4) of the Pole Attachments Act (47 U.S.C. § 224(a)(4)), the definition of 'utility' as codified in 47 U.S.C. § 224(a)(1), and the definition of 'telecommunications carrier' as codified in 47 CFR 1.1402(h).").

[289] *See* W.Va. Code § 31G-4-4; Public Service Commission of West Virginia, General Order No. 261, In the Matter of Adopting and Implementing Rules Governing Pole Attachments and Assumption of Commission Jurisdiction Over Pole Attachments, at 17, https://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=52881&Format=PDF ("The Commission disagrees . . . that the Commission may adopt rules that deviate materially from the FCC Regulations"); *id.* at 19 ("To the extent there is a conflict [with the current West Virginia code], the statute passed later will apply.").

[290] *See* D.C. Mun. Reg. tit. 15, § 1600 (stating that the D.C. utilities commission "shall ensure that all Pole Attachment rates, terms and conditions prescribed in accordance with this chapter are just and reasonable, and shall regulate the matters described in this chapter in accordance with District of Columbia law, federal law, and to the extent applicable, Federal Communications Commission rules and regulations"); Ohio Admin. Code 4901:1-3-03 ("A public utility will comply with the duty to provide access and notifications pursuant to 47 C.F.R 1.1403 . . . .").

[291] *See* Alaska Admin. Code tit. 3, § 52.940; Conn. Agencies Regs. § 16-333-4; Idaho Code § 61-538.

[292] *See RIF Remand Order*, 35 FCC Rcd at 12375, para. 76.

only providers pole access pursuant to their section 224 reverse-preemption authority if the Commission itself has specifically chosen to exclude BIAS-only providers from the purview of Title II, the very source of authority from which section 224 authority emanates.[293] Thus, under Title I classification, the right of BIAS-only providers to access poles in those states that have chosen to self-regulate is subject to uncertainty; and in the majority of jurisdictions, which are governed by the Commission's rules, such providers have no right to pole access at all.

80.     Furthermore, as the CPUC and other commenters note, the lack of clear legal authority to regulate BIAS-only providers presents public safety issues as states may not be able to enforce safety regulations on BIAS-only providers that do manage to attach to poles.[294] The CPUC states, however, that "reclassifying BIAS as a telecommunications service would eliminate this potential argument and the commensurate delay in responding to safety violations."[295] We agree and find that, in addition to the economic benefits of affording section 224 rights to BIAS-only providers, reclassification will also ensure that the Commission and state utility commissions have the requisite legal authority to protect public safety concerns associated with the deployment of broadband-only infrastructure.

81.     We also find to be without merit the arguments of commenters who echo the Commission's contention in the *RIF Remand Order* that the loss of section 224 rights is not a serious issue because the majority of BIAS providers offer comingled services.[296] To be clear, we do not dispute the fact that the majority of BIAS providers offer at least one Title II-regulated service in addition to BIAS, as some commenters contend.[297] We believe, however, that the small number of BIAS-only providers is not due just to the popularity of other regulated services, but also because BIAS-only providers, many of which are smaller competitive companies, do not enjoy the competitive advantages of larger enterprises like many of their competitors.[298] As a result, competitive bottlenecks and obstacles to

---

[293] CPUC Comments at 14 ("This reverse preemption, however, applies to nondiscriminatory access by *telecommunications carriers*. Under the 'information services' classification, it is unclear how states can enforce terms and conditions on BIAS providers under this statute—including regulations relating to 'safety, reliability and generally applicable engineering purposes,' if those providers are not deemed to provide telecommunications services.").

[294] *Id.* at 16 ("Unauthorized, and sometimes hazardous, attachments to poles are a regular problem, and in a state like California with some 4.2 million poles, effective policing of pole attachments is a constant challenge. Our concern here is that a BIAS provider may ignore, avoid, deny, or undercut the CPUC's safety authority by virtue of BIAS's classification as an information service. A standalone BIAS provider might pledge compliance with the CPUC's safety regulations to obtain access to utility infrastructure, yet subsequently commit a major safety violation with impunity. A BIAS provider may attempt to argue that, as a provider of information services, it is exempt from a [sic] the CPUC's authority to investigate the incident or impose fines, sanctions, or other remedies."); *see also* INCOMPAS Comments at 4-5 ("In our Petition, we asserted that '[u]nder the current case law, the Commission cannot ensure that the public interest is met in either of these areas [public safety and pole attachments] but-for exercising its oversight authority pursuant to Title II with BIAS as a telecommunications service.'"); CFA Comments at 86 ("We believe that the RIF Remand Order was too quick to dismiss concerns regarding public safety, pole attachments, and low-income universal service support as speculative or unproven.").

[295] CPUC Comments at 16.

[296] *See, e.g.*, NCTA Comments at 81-82; *see also RIF Remand Order*, 35 FCC Rcd at 12370-71, paras. 72-73.

[297] NCTA Comments at 80 (arguing that "the Commission estimated in 2020 that *96 percent or more* of ISPs provide at least one other regulated service in addition to broadband—a figure that holds true today").

[298] *See* Public Knowledge Comments at 48 (discussing how new federal funding sources "will allow new entrants, smaller regional ISPs, community networks, and other broadband-only providers to invest in new broadband infrastructure in unserved and underserved communities" and that "[g]ranting broadband-only providers access to pole attachments through Section 224 is a necessity to ensure that this unprecedented investment in closing the digital divide is spent efficiently, and that there is robust competition among broadband providers"); INCOMPAS, Reply to Opposition, WC Docket Nos. 17-108, 17-287, and 11-42, at 5-6 (filed Jan. 17, 2024) (explaining that as a result of BEAD funding, "we can reasonably expect to see an increase in the number and importance of broadband-

(continued....)

deployment, such as access to poles at just and reasonable rates, present significant challenges to BIAS-only providers that may make breaking into markets with large entrenched incumbents next to impossible. As the CPUC notes, "[a]ll forms of telecommunications, including broadband, require access to rights-of-way generally, and specifically to poles and conduits, which are controlled by incumbent local exchange carriers and other entities. Access to poles, conduits, and rights-of-way may affect cost, feasibility, and timing of constructing and offering broadband services."[299] Furthermore, we believe that the *RIF Remand Order* completely overlooked the future competitive realities for BIAS-only providers and the resulting harms that its decision will yield. As we discussed above, consumers are becoming more reliant on BIAS and are continually foregoing the purchase of services offered alongside BIAS (i.e., cable and voice). As a result, there is no reason to doubt that more and more providers will begin offering only BIAS and without reclassification would have no rights pursuant to section 224.[300] Therefore, we find that restoring the section 224 rights and easing the burdens of pole access is likely to ensure that the number of BIAS-only providers does not artificially shrink due to inequitable treatment under the law.

82. Furthermore, we find that equitable regulatory treatment of BIAS-only providers, particularly with regard to regulations designed to speed network deployment, will also increase competition, ultimately benefitting consumers and assisting the Commission's goal of achieving universal service. We agree with INCOMPAS which states that "[a]dditional competition is key to tackling our nation's internet challenges" and that the Commission must ensure that its policies do not further entrench large telecommunications carriers, reducing the viability of smaller, innovative alternative providers and also reducing the service options available to consumers.[301] USTelecom states that "[t]he NPRM cites no evidence that there are broadband-only providers that could not receive those benefits today or that the availability of the Broadband Equity, Access, and Deployment funding is leading to the creation of such providers,"[302] but INCOMPAS specifically notes that it "expect[s] that many entities that will be competing for BEAD dollars will be BIAS-only"[303] and states that those entities "cannot exercise any rights afforded by Title II to speed their deployment."[304] USTelecom further contends that "there is no record evidence that Title I classification is preventing [BIAS-only providers] from obtaining just and

---

[299] only providers that will participate, as well as serious harms if these providers cannot receive the same legal protections as telecommunication service providers and cable operators under Section 224 so that they can obtain non-discriminatory and reasonable access to poles in deploying government-funded BEAD networks"); *see also* INCOMPAS Petition for Reconsideration at 19 ("While there may not be an abundance of examples in the record of BIAS-only providers currently being stripped of statutory protections, the Commission should also be future-oriented and promote the deployment of competitive BIAS. The Commission has greatly overlooked the future realities of BIAS-only providers and the resulting harms that its decision will yield. As consumers become more reliant on BIAS and cut their wired voice and cable services, there is no reason to doubt that more providers will be offering BIAS-only services and have no rights pursuant to section 224.").

[299] CPUC Comments at 15.

[300] INCOMPAS Petition for Reconsideration at 19.

[301] INCOMPAS Comments at 8 ("[O]ften INCOMPAS'[s] small, competitive BIAS providers that offer an alternative to large incumbent cable and telcos are marketing their service as privacy and open-internet friendly, as well as offering faster speeds, better service, and more affordable pricing."); *see also id.* at 16 ("[I]n the context of the Infrastructure Investment and Jobs Act . . . , INCOMPAS advocates for policies that enable additional competitive options through open access or wholesale policies so that government funding does not entrench monopolies, and instead, will result in new networks and new resale competitors that will enable competitive options, thereby driving more innovation, investment, and better and more affordable service for BIAS over time to communities and individual customers.").

[302] USTelecom Comments at 88.

[303] INCOMPAS Comments at 19-20.

[304] *Id.* at 18.

reasonable pole attachment rates."[305]  Even accepting USTelecom's statement as true, it still misses the mark.  Even if BIAS-only providers are somehow able to negotiate directly with pole owners to ultimately achieve rates that are just and reasonable, BIAS-only providers must still suffer the costs of securing pole access through private negotiations, and without any leverage, with each set of pole owners, unlike their regulated peers who have guaranteed access rights under section 224.  Clearly then, by failing to provide equal access to the Act's legal protections on a nondiscriminatory basis, the Title I regime favors large incumbents at the expense of BIAS-only providers.[306]

83.     *Multiple Tenant Environments (MTEs).*  In the *2023 Open Internet NPRM*, we sought comment on how reclassification of BIAS might impact the Commission's authority to regulate service providers in MTEs.[307]  Specifically, we asked how reclassification might provide the Commission additional authority to foster competition and promote consumer choice for those living and working in MTEs.[308]  We conclude now that reclassification of BIAS as a telecommunications service facilitates these goals by enabling the Commission to regulate broadband-only providers that serve MTEs and thereby to end unfair, unreasonable, and anticompetitive practices facing MTE residents.  That is, reclassification would give the Commission authority to require BIAS-only providers to abide by the same kinds of rules—including those that prohibit exclusivity contracts that bar competition outright in MTEs—that other telecommunications and cable providers must currently follow.  Such rules in turn would secure the same protections for all residents of MTEs, regardless of the kind of service offered by providers in their building; reduce regulatory asymmetry between broadband-only providers and other kinds of providers; and potentially improve competition in the MTE marketplace.

84.     More than 100 million people in the United States live or work in MTEs, including a disproportionate number of lower-income residents and members of marginalized communities.[309]  The Commission's rules, which regulate the kinds of agreements service providers may enter into with MTE owners, currently extend to telecommunications carriers as well as cable operators and multichannel video programming distributors (MVPDs).[310]  Developed pursuant to congressional direction to protect consumer choice in emerging communications technologies for residents of MTEs,[311] these rules include, for example, a prohibition on exclusivity contracts that grant the provider the sole right to access and offer service in an MTE.[312]

85.     However, these rules do not govern broadband-only providers today.  Although many

---

[305] USTelecom Comments at 88.

[306] Because we opt to restore the Title II classification of BIAS, we find it unnecessary to address commenters who suggest the Commission can provide similar rights to BIAS-only providers through other sections of the Communications Act.  *See, e.g.*, WISPA Comments at 72 ("As WISPA and others have previously maintained, the Commission has authority under other provisions of the Act to extend pole attachment benefits to broadband-only providers.").

[307] *2023 Open Internet NPRM* at 30-31, para. 52.

[308] *Id.* at 31, para. 52.

[309] *See* Steven Kauffman & Octavian Carare, *An Empirical Analysis of Broadband Access in Residential Multi-Tenant Environments* 1 (FCC Off. Econ. & Analytics, OEA Staff Working Paper No. 49, 2019), https://docs.fcc.gov/public/attachments/DOC-358298A1.pdf; U.S. Census Bureau, 2019 American Housing Survey (2020), https://www.census.gov/programs-surveys/ahs.html (indicating that, compared to 22% of U.S. households generally, 34% of residential MTE residents have income below 150% of the poverty line).

[310] 47 CFR §§ 64.2500-2502 (governing telecommunications carriers); *id.* § 76.2000 (governing cable operators and MVPDs).

[311] *Improving Competitive Broadband Access to Multiple Tenant Environments*, GN Docket No. 17-142, Report and Order and Declaratory Ruling, 37 FCC Rcd 2448, 2450, para. 3 (2022) (*2022 MTE Report and Order and Declaratory Ruling*).

[312] 47 CFR § 64.2500(a)-(b).

BIAS providers offer telecommunications, video programming, and other commingled services that subject them to the Commission's MTE rules, a provider offering only BIAS exists outside the scope of its rules. This means that while the Commission can, for example, impose rules on an entity offering both broadband and traditional phone service in an MTE, there is uncertainty about whether and when it could regulate a provider offering only the former. Even if such a provider entered into an agreement with an MTE owner barring competitors from the building outright—a type of agreement that the Commission has long declared anathema to the public interest[313]—the Commission's rules would not apply and the Commission is not currently aware of other authority it could rely on to prevent such an agreement.

86. We thus find that reclassification of BIAS as a Title II service, which would provide us authority to regulate broadband-only providers, enables the Commission to address these potential regulatory gaps and ensure that all MTE tenants may benefit from the pro-consumer MTE rules the Commission has adopted and may adopt in the future as part of its current open proceeding.[314] We therefore agree with Public Knowledge that reclassification would have many benefits for MTE residents including, among others, greater competition and innovation in MTEs, lower costs for consumers, and improved customer service.[315] Reclassification would also create the potential for parity between BIAS-only and other providers serving MTEs,[316] as well as protections for BIAS-only providers unable to compete against those employing anticompetitive practices.[317]

87. We disagree with CTIA's contention, citing the Commission's *2022 MTE Report and Order and Declaratory Ruling*, that reclassification and regulation of the "few" BIAS-only providers in MTEs would "disregard[] the Commission's 'incremental approach' in this area," and that the Commission offers "no significant evidence as to why the Commission should change course now."[318] The *2022 MTE Report and Order and Declaratory Ruling* adopted new rules and targeted additional practices that reduce consumer choice in MTEs.[319] We note that in that proceeding's record, some commenters urged the Commission to "subject broadband-only providers to our rules governing MTE access, citing . . . potential harms that could result from regulatory asymmetry if [it] did not."[320] The Commission declined to extend its rules to broadband-only providers at the time, citing its historically incremental approach to MTE regulation but noting explicitly that it would "continue to monitor competition in MTEs to determine whether we should alter the scope of [the] rules."[321] However, nothing in the *2022 MTE Report and Order and Declaratory Ruling* belies commenters' claims about the harms arising out of the regulatory asymmetry, which we find remain valid today.[322] Meanwhile, commenters in opposition to reclassification fail to raise arguments that justify failing to extend the benefits of the Commission's rules to MTE residents where a broadband-only provider offers service to a building.

---

[313] *Promotion of Competitive Networks in Local Telecommunications Markets*, WT Docket No. 99-217, Report and Order, 23 FCC Rcd 5385, 5389-91, paras. 12-13 (2008).

[314] *See generally 2022 MTE Report and Order and Declaratory Ruling*, 37 FCC Rcd 2448; Press Release, FCC, FCC Chairwoman Announces Push to Lower Broadband Costs & Increase Choice for Families Living in Apartment Buildings (Mar. 5, 2024), https://docs.fcc.gov/public/attachments/DOC-400915A1.pdf.

[315] Public Knowledge Comments at 51-52.

[316] *See* Next Century Cities Comments at 13-14.

[317] *See* INCOMPAS Comments at 21-22.

[318] CTIA Reply at 32.

[319] *2022 MTE Report and Order and Declaratory Ruling*, 37 FCC Rcd at 2449-50, paras. 1-2.

[320] *Id.* at 2456, para. 14 (citing Cities of Boston et al. Reply, GN Docket No. 17-142, at 11 (filed Nov. 19, 2021); INCOMPAS Comments, GN Docket No. 17-142, at 25-26 (filed Oct. 20, 2021); NCTA Comments, GN Docket No. 17-142, at 3-5, 11 (filed Oct. 20, 2021)).

[321] *Id.*

[322] *Id.*

88. We are also unpersuaded by CTIA's claims that broadband-only providers are so few in number that it justifies the Commission not taking any additional action to curb anticompetitive, unfair, and unreasonable practices by broadband-only providers in MTEs.[323] Even assuming that CTIA is correct, or that the majority of service providers offer commingled services,[324] it is unclear whether this will remain true in the future.[325] And while some commenters claim that the Commission failed to identify widespread abuses by BIAS-only providers in the *2023 Open Internet NPRM*,[326] others, such as AARP, highlight that such abuses may indeed be ongoing, pointing to an alleged instance of a broadband-only provider exploiting its status to enter into an exclusivity contract.[327] We therefore find that these abuses are not merely speculative or theoretical, and provide additional support for the Commission's decision to reclassify BIAS as a Title II service.

89. Some commenters contend that the Commission need not reclassify BIAS to protect tenants and can instead rely on its ancillary or other existing authority to address broadband-only providers.[328] Such authority, however, does not provide the same firm legal footing as Title II and thus is less likely to offer enduring protections for residents of MTEs.

90. Finally, we disagree with WISPA that any purported benefits of applying our MTE rules would be outweighed by a slowdown in broadband investment in MTEs precipitated by the need for BIAS-only providers to "assess the impact [reclassification more broadly would have] on their business plans."[329] We find that to the extent our reclassification of BIAS as a Title II service would cause a BIAS-only provider to re-think an exclusive contract to serve an MTE or an otherwise anticompetitive arrangement in an MTE, that would be an additional benefit to consumers, not a drawback. Moreover, our ability to regulate BIAS-only providers in MTEs is but one reason moving us to reclassify BIAS as a Title II service. Thus, the benefits outlined elsewhere in addition to those detailed here must be considered in the aggregate.

91. *Universal Service.* Reclassifying BIAS as a telecommunications service will also promote the universal service goals of section 254 by enabling more efficient deployment of broadband

---

[323] *See, e.g.*, CITA Comments at 43; CTIA Reply at 32.

[324] *See* NCTA Comments at 80-82 (claiming that 96% or more of BIAS providers provide commingled services); *see also* NCTA et al. Reply at 35; CTIA Comments at 43; USTelecom Reply at 52-53.

[325] *See* INCOMPAS Comments at 19; INCOMPAS Petition for Reconsideration at 19. Indeed, as INCOMPAS explains, reclassification may afford protections to competitive BIAS-only providers, which in turn may lead to their growth. INCOMPAS Comments at 21-22.

[326] *See, e.g.*, USTelecom Reply at 53; NCTA Comments at 81-82.

[327] AARP Comments at 12 & n.38.

[328] *See, e.g.*, NCTA Comments at 82 & n.278; NCTA et al. Reply at 35. WISPA, in its comments, expresses concern that reclassification of BIAS would result in rule protections for over-the-air reception devices (OTARDs) no longer being available to fixed wireless broadband-only providers and contends that this will discourage deployment of broadband in multi-tenant environments, neighborhoods lacking access to nearby towers, and similar environments. WISPA Comments at 29-30; Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-320, 17-108 (filed Apr. 15, 2024) (urging the Commission to consider in a further notice whether to revise the definition of hub and relay antenna in OTARD rule). We acknowledge WISPA's concerns, and we will examine whether to revise § 1.4000(a)(5) in another proceeding. While classification of BIAS may affect the scope of services that are covered under the Commission's rules regarding over-the-air reception devices, classification of BIAS as telecommunications service may also qualify fixed wireless broadband services for the protections available under sections 332(c)(7) and 253. Although sections 253 and 332(c)(7) do not apply to restrictions by private landlords they do provide for federal preemption of state and local zoning restrictions that "prohibit or have the effect of prohibiting" "the ability of any entity to provide any interstate or intrastate telecommunications service" and "the provision of personal wireless services." *See* 47 U.S.C. §§ 253, 332(c)(7).

[329] WISPA Comments at 30.

networks and greater access to affordable broadband service.  In the *2023 Open Internet NPRM*, we asked how reclassification might better enable the Commission to steward our universal service programs in a way that is responsive to the communications needs of the modern economy.[330]  We specifically sought comment on how reclassification might strengthen the Commission's statutory authority to provide BIAS through the USF, eventually allow broadband-only providers to once again participate in the Lifeline program, and protect public investment in BIAS access and affordability.[331]  Reclassification enhances the Commission's ability and flexibility to address affordability and availability issues across the country, both immediately and in the future.[332]

92.    Universal Service is the principle that all Americans should have access to telecommunications services and advanced communications services at just, reasonable, and affordable rates in all regions of the nation.[333]  The Commission administers four programs in furtherance of these principles using contributions from telecommunications carriers to the USF:[334]  the High Cost program, which helps eligible carriers recover some of the cost of providing access to modern communications networks to consumers in rural, insular, and high-cost areas;[335] the Lifeline program, which provides discounted voice service and BIAS through eligible carriers to qualifying low-income subscribers;[336] the E-Rate program, which provides discounts to eligible schools, school districts, and libraries to purchase affordable BIAS;[337] and the Rural Health Care program, which provides funding to eligible health care providers to purchase telecommunications and broadband services necessary for the provision of health care.[338]  All four USF programs fund BIAS or infrastructure and are able to rely on statutory authority to do so regardless of BIAS's classification.[339]  Classifying BIAS as a telecommunications service, however, will put the Commission on the firmest legal ground to promote the universal service goals of section 254 by enabling the Commission and states to designate BIAS-only providers as eligible telecommunications carriers (ETCs).

---

[330] *See 2023 Open Internet NPRM* at 29-30, paras. 49-51.

[331] *Id.*

[332] So as to not unnecessarily disrupt the current marketplace without ample consideration, the Commission does not designate BIAS as a supported service or extend ETC eligibility to BIAS-only providers at this time.  Such action would best be considered in a future proceeding.  *See also infra* Section IV.B.7.

[333] *See* 47 U.S.C. § 254; 47 CFR § 54.1 *et seq.*; FCC, *Universal Service*, https://www.fcc.gov/general/universal-service (last visited Mar. 28, 2024); FCC, *Universal Service Fund*, https://www.fcc.gov/general/universal-service-fund (last visited Mar. 28, 2024).

[334] *See* FCC, *Universal Service*, https://www.fcc.gov/general/universal-service (last visited Mar. 28, 2024).

[335] *See* 47 CFR § 54.302 *et seq.*; FCC, *Universal Service for High Cost Areas—Connect America Fund*, https://www.fcc.gov/general/universal-service-high-cost-areas-connect-america-fund (last visited Mar. 28, 2024).

[336] *See* 47 CFR § 54.400 *et seq.*; FCC, *Lifeline Program for Low-Income Consumers*, https://www.fcc.gov/general/lifeline-program-low-income-consumers (last visited Mar. 28, 2024).

[337] *See* 47 CFR § 54.500 *et seq.*; FCC, *E-Rate—Schools & Libraries USF Program*, https://www.fcc.gov/general/e-rate-schools-libraries-usf-program (last visited Mar. 28, 2024).

[338] *See* 47 CFR § 54.600 *et seq.*; FCC, *Rural Health Care Program*, https://www.fcc.gov/general/rural-health-care-program (last visited Mar. 28, 2024).

[339] *See* 47 U.S.C. § 254(c)(3), (e), (h)(2); *see, e.g.*, *Connect America Fund et al.*, WC Docket Nos. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17683-91, paras. 60-73 (2011) (*USF/ICC Transformation Order*), *upheld in In Re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014); *RIF Remand Order*, 35 FCC Rcd at 12378-88, paras. 82-103; *Modernizing the E-Rate Program for Schools and Libraries*, WC Docket No. 13-184, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8870, 8895-98, paras. 67-75 (2014) (*Modernizing the E-Rate Program for Schools and Libraries Order)*; *Rural Health Care Support Mechanism*, WC Docket No. 02-60, Report and Order, 27 FCC Rcd 16678, 16700-01, 16704, 16715, paras. 49, 59, 79-80 (2012) (*Rural Health Care Support Mechanism Order*).

93. The Commission has concluded that section 254(e) of the Act allows for the use of universal service funds to benefit both the facilities used to provide supported telecommunications service, and the supported telecommunications services themselves, which permits the Commission to provide High Cost and Lifeline program support for non-telecommunications services offered over networks that also provide telecommunications services.[340] The Commission currently conditions receipt of support on the provision of broadband service in funded networks in 11 of the 15 High Cost program funds,[341] and also supports broadband through the Lifeline program.[342]

94. The Commission has distinct authority to provide support for BIAS and connections through the E-Rate and Rural Health Care programs.[343] Section 254(c)(3) specifies that "the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)."[344] Subsection (h) reads, in part: "[t]he Commission shall establish competitively neutral rules—to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries."[345] The Commission has acted pursuant to section 254(c)(3) to designate BIAS as eligible for support under both the E-Rate and Rural Health Care programs.[346] The Commission concluded at the inception of the E-Rate program that it has the authority to support BIAS access and connections "provided by both telecommunications carriers and non-telecommunications carriers" through the E-Rate program because "such services enhance access to advanced telecommunications and information services for public and non-profit elementary and secondary school classrooms and libraries."[347] The Commission also determined that it could fund BIAS support through the Rural Health Care program under section 254(h).[348]

95. However, section 214(e) limits providers receiving USF support to common carriers providing telecommunications services and designated as ETCs after undergoing Commission or state commission approval processes.[349] Currently, only carriers that offer qualifying voice telephony services can be designated as ETCs and receive support from the two USF programs that provide funds directly to carriers, the High Cost and Lifeline programs.[350] Reclassification will allow BIAS-only providers to act as common carriers providing telecommunications service and enable them to be designated as ETCs. Indeed, after the *2015 Open Internet Order*, the Wireline Competition Bureau designated ten such providers as "Lifeline Broadband Providers" (LBPs), and some of those providers began providing

---

[340] *See* 47 U.S.C. § 254(e); *USF/ICC Transformation Order*, 26 FCC Rcd at 17683-91, paras. 60-73; *RIF Remand Order*, 35 FCC Rcd at 12378-88, paras. 82-103; Letter from Henry G. Hultquist, Vice President—Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Mar. 29, 2024).

[341] USAC, *Funds*, https://www.usac.org/high-cost/funds (last visited Mar. 28, 2024).

[342] *RIF Remand Order*, 35 FCC Rcd at 12385-86, para. 97.

[343] *See* 47 U.S.C. § 254(c)(3), (h)(2).

[344] *Id.* § 254(c)(3).

[345] *Id.* § 254(h)(2).

[346] *See id.* § 254(c)(3); *Modernizing the E-Rate Program for Schools and Libraries Order*, 29 FCC Rcd at 8895-98, paras. 67-75; *Rural Health Care Support Mechanism Order*, 27 FCC Rcd at 16700-01, 16704, 16715, paras. 49, 59, 79-80; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5834, para. 486.

[347] *Modernizing the E-Rate Program for Schools and Libraries Order*, 29 FCC Rcd at 8895-96, para. 68; *see Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd 8776, 9008-15, 9084-90, paras. 436-49, 589-600 (1997) (*Universal Service First Report and Order*), *rev'd in part on other grounds*, *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999).

[348] *See Rural Health Care Support Mechanism Order*, 27 FCC Rcd at 16700-01, 16704, 16715, paras. 49, 59, 79-80.

[349] 47 U.S.C. § 214(e); *see id.* § 254(e).

[350] *See id.* §§ 214(e), 254(c); 47 CFR §§ 54.101, 54.201(d).

service that was subsidized by Lifeline support.[351]  But in 2017, the Bureau rescinded those designations,[352] and since the *RIF Order* and the *RIF Remand Order*, standalone broadband providers have remained unable to receive critical Lifeline universal service support.

96.     Allowing BIAS-only providers to participate in the High Cost and Lifeline programs would enhance both programs.  Both programs are already oriented overwhelmingly toward BIAS over other service types.  As discussed above, providers in most High Cost program funds are required to build BIAS-capable networks.[353]  Moreover, as of September 2023 approximately 96% of Lifeline customers subscribe to a plan that includes broadband service.[354]  Several commenters echo many of the anticipated benefits of allowing carriers that do not provide voice services to participate in the High Cost and Lifeline programs discussed in the *2023 Open Internet NPRM*, including increased competition, program participation, consumer choice, rural coverage, and affordability.[355]  The Commission also has recognized that "encourag[ing] market entry and increased competition among Lifeline providers, which will result in better services for eligible consumers to choose from and more efficient usage of universal service funds."[356]  One commenter stresses that allowing BIAS-only providers to become ETCs will particularly benefit consumers in areas where there are currently few or no ETCs that provide BIAS.[357]  The need to

---

[351] *Telecommunications Carriers Eligible for Universal Service Support*, WC Docket No. 09-197, Order, 32 FCC Rcd 784 (WCB 2017); *Telecommunications Carriers Eligible for Universal Service Support*, WC Docket No. 09-197, Order, 31 FCC Rcd 12736 (WCB 2016).

[352] *Telecommunications Carriers Eligible for Universal Service Support*, WC Docket No. 09-197, Order, 32 FCC Rcd 1095 (WCB 2017).

[353] USAC, *Funds*, https://www.usac.org/high-cost/funds (last visited Mar. 28, 2024).

[354] USAC, Board Materials for October 2023, *High Cost & Low Income Committee Briefing Book* at 52, https://www.usac.org/wp-content/uploads/about/documents/leadership/materials/hcli/2023/2023.10.30-HCLI-Briefing-Book-Public.pdf (last visited Mar. 28, 2024).

[355] *See 2023 Open Internet NPRM* at 29-30, para. 50; Next Century Cities Comments at 9-11 ("In order for USF programs to remain as robust as possible, the Commission should seek to give communities as many options to connect. . . .  Redefining broadband as a telecommunications service would empower the Commission to ensure that USF policies reflect on-the-ground reality."); Harold Hallikainen Comments at 2 ("Making BIAS providers Title II telecommunications providers would allow them to contribute and benefit from the USF."); NRECA Comments at 11 ("Similarly, Title II classification of BIAS will enable BIAS-only providers to more readily participate in the Lifeline program, for which ETC designation has proven to be a substantial hurdle and disincentive to provider participation."); Public Knowledge Comments at 50 ("Reclassifying BIAS as a telecommunications service would allow broadband-only providers to once again participate in the Lifeline program, allow for rural and Tribal households to benefit from the Link Up program, and unlock other opportunities for further support for BIAS through USF programs."); Santa Clara Comments at 21 (arguing that the *2015 Open Internet Order*'s reclassification benefited the BIAS and edge provider markets by increasing Lifeline provider eligibility and therefore the number of people that can use the program, in addition to making the Internet more beneficial to all BIAS subscribers, including Lifeline customers); ACLU Comments at 8-15 (arguing that expanding provider eligibility will minimize situations in which "customers seeking to use their Lifeline benefit on broadband are severely limited in their choice of provider.  Those who live in an area that isn't served by an eligible provider are unable to use the benefit at all"); Free Press Comments at 50, 66-67; NDIA Comments at 2-4; CPUC Comments at 10-13 (arguing that failure to reclassify BIAS prevents the FCC from supporting BIAS provision as much as it can, especially in rural areas); AARP Comments at 16 (arguing that reclassification would "strengthen the Commission's ability to ensure that low-income families have a meaningful support program available to provide them sustainable connectivity and to advance its deployment efforts in the High Cost program, as well as promoting connectivity in schools, libraries and rural health clinics"); Equity Advocates Comments at 7 ("Reclassification will benefit all low-income households, particularly low-income households with people with disabilities and households of color.").

[356] *Lifeline and Link Up Reform and Modernization et al.*, WC Docket Nos. 11-42 et al., Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd 3962, 4040, para. 217 (2016) (*Lifeline Third Report and Order*).

[357] *See* ACLU Comments at 9-10.

allow BIAS-only providers to become ETCs is more important and will provide more utility than it did when BIAS was last classified under Title II, as the 2015 classification allowed Lifeline subscribers to apply the benefit to a "new generation of ISPs that [did] not use their facilities to offer voice services," and now there are even more ways to provide BIAS via innovative, affordable, and user-friendly technologies.[358]

97.     Thus, we adopt the *2023 Open Internet NPRM*'s tentative conclusion "that classifying BIAS as a telecommunications service will strengthen our policy initiatives to support the availability and affordability of BIAS through USF programs."[359]  The majority of commenters support this conclusion.[360] Commenters state that, through the USF, the federal government has made significant investments in networks to ensure BIAS is available to all consumers and in service subsidies to ensure BIAS is affordable for all consumers,[361] and reclassification "will enable the Commission to protect these investments on an ongoing basis by ensuring that these connections benefit users."[362]  Commenters further stated that "[t]he Commission needs clear authority over broadband-only services to implement and maintain an effective and efficient Lifeline policy."[363]

98.     A minority of commenters disagree with the *2023 Open Internet NPRM*'s tentative conclusion that we adopt today.[364]  Several commenters argue that USF considerations are relatively unimportant because direct appropriations programs such as the Commission's ACP and NTIA's Broadband Equity, Access, and Deployment (BEAD) Program are viable alternatives to achieving USF

---

[358] *See* Free Press Comments at 50.

[359] *2023 Open Internet NPRM* at 29, para. 49.

[360] *See* CWA Comments at 16-21; Next Century Cities Comments at 3-4, 9-11; NRECA Comments at 3, 10-12; TVPPA Comments at 1-2 (supporting comments of NRECA); INCOMPAS Comments at 5, 15-17; Harold Hallikainen Comments at 2; Free Press Comments at 48-55; NDIA Comments at 2-3; CPUC Comments at 10-12; Public Knowledge Comments at 49-51; Santa Clara Comments at 21; AARP Comments at 15-16; ACLU Comments at 8-11; ALA Comments at 17-18; Equity Advocates Comments at 7; *see also* CPUC Comments, WC Docket No. 17-108, at 4 (filed Dec. 14, 2023) (CPUC Petitions for Reconsideration Comments) (supporting the Petitions for Reconsideration); Arianna M. Peña Comments at 2-3.

[361] *See* ALA Comments at 17-18; Next Century Cities Comments at 3-4, 9-11; Public Knowledge Comments at 49-51; *see also* INCOMPAS Comments at 55 (encouraging the Commission not to forbear from section 254(d) by arguing in part that "all of the USF distribution programs today have been modernized to support BIAS services in order to increase broadband availability and affordability"); NDIA Comments at 2-3 (providing that the USF programs "now support critical anchor institutions, rural, and low-income households").

[362] ALA Comments at 18; *see also* CWA Comments at 17-18 (arguing that reclassification will provide stronger legal footing for the Commission to support BIAS through the Lifeline program); Free Press Comments at 54-55 (asserting that the Commission needs "clear authority" over BIAS-only providers "to implement and maintain an effective and efficient Lifeline policy," as BIAS-only services continue to grow); CPUC Comments at 11-12 ("Reclassifying BIAS as a telecommunications service puts the FCC on firm legal ground to include BIAS as a federal Lifeline service under Section 254 and allows BIAS-only providers to participate in the program.").

[363] Free Press Comments at 55.

[364] *See, e.g.*, ITI Comments at 8-9 (writing that "ITI and its members disagree with the application of Title II to BIAS, and we also note that the Commission does not require Title II authority to extend USF assessments to BIAS revenues"); NCTA Comments at 84 n.287; ACA Connects Comments at 31-33; USTelecom Comments at 89-90; Verizon Comments at 18; R Street Institute Comments at 6-7; CTIA Reply at 32-33 & n.133; USTelecom Reply at 41; *see also* ITIF Comments at 5-6 ("While the FCC is correct to say that reclassification would put its [USF] support on stronger footing, such USF funds no longer play a pivotal role in closing the remainder of the digital divide."); NTCA Comments at 16-17 (arguing that many of the goals the Commission highlighted in the *2023 Open Internet NPRM*, including those related to universal service, can be accomplished without "expansive new rules").

goals.[365]  We do not believe that the strength of other programs dependent on different funding sources should prevent the Commission from strengthening the USF.  Closing the digital divide is a large undertaking that benefits from multiple programs, and we note that some of these alternative programs are winding down given their lack of funding.[366]  Moreover, the Commission is statutorily required to preserve and advance the USF.[367]  Neglecting it because of the existence of other programs defies this mandate.  One commenter argues that the Commission should focus on "ensuring that funding issued through the Universal Service Funds or the Affordable Connectivity Program are not wasted or subject to fraud or abuse" instead of reclassification.[368]  The Commission currently has strong program integrity protections for the USF programs and continues to update them as needed.[369]  USF program integrity, however, is only tangentially related to BIAS reclassification and does not have a significant impact on our actions taken today.[370]

99.  We reject some commenters' assertions that as to universal service, reclassification is a solution in search of a problem because USF programs are functioning properly, the Commission currently has a strong legal basis to support BIAS through USF programs, and reclassification would not further, and would possibly hinder, affordability and availability goals.[371]  While we agree that the USF

---

[365] *See* ITIF Comments at 5; R Street Institute Comments at 7; NCTA Comments at 84-86; Verizon Comments at 18.  Some commenters further argue that reclassification will deter private sector participation in the BEAD program.  *See* Citizens Against Government Waste Comments at 10-12; ITIF Comments at 5; NCTA Comments at 84-86.  We find these claims to be speculative and give them no weight.  Given that there is no definitive evidence that reclassification adversely affects *privately* funded BIAS investment, if it has any effect at all, *see infra* Section III.H, we find the claim that reclassification would adversely affect BIAS investment that is substantially *publicly* funded to not be credible.  Furthermore, we find as a general matter that new obligations on BIAS providers are unlikely to be more onerous under Title II than is the case currently, *see infra* Section V.H, and therefore find it unlikely that BIAS providers' decisions to participate in publicly funded programs would be meaningfully impacted as a result of reclassification.  At least one commenter stressed the importance of funding the ACP or making the ACP part of the USF.  *See, e.g.*, CWA Comments at 18-19; *see also* Hispanic Technology & Telecommunications Partnership et al. Comments at 2 (arguing that BEAD and ACP "should be given an opportunity to be fully implemented and assessed to ascertain whether they have the intended impact of creating the desired access, equity and opportunity on the internet that the commission is seeking").  Another party stressed both the need to renew ACP funding and the risks of making ACP part of the USF.  Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, at 1 (filed Feb. 21, 2024).  These issues are the remit of Congress and the Commission is unable to accomplish either through this or any proceeding.  We therefore decline to address them here.

[366] *See Affordable Connectivity Program*, WC Docket No. 21-450, Order, DA 24-23 (WCB Jan. 11, 2024) (announcing requirements and guidance for the wind-down of the Affordable Connectivity Program).

[367] *See* 47 U.S.C. § 254.  One commenter contends that the benefits of reclassification to the Commission's universal service goals may not be realized because BIAS-only providers may be unwilling to assume increased oversight by state or federal regulators to obtain ETC designation.  *See* CTIA Reply at 32.  This claim is not only speculative, it ignores the new opportunities that Title II offers to these providers to expand their networks and subscriber base through potential eligibility to participate in the High Cost and Lifeline programs.  Moreover, as discussed above, the record shows significant consumer interest in allowing BIAS-only providers to become ETCs.  We also make clear that reclassification only provides an opportunity to BIAS-only providers to become ETCs; it does not mandate it.

[368] Citizens Against Government Waste Comments at 10-12.

[369] *See, e.g.*, GAO, Improper Payments—Fiscal Year 2022 Opportunities for Improvement at 12 (2023), https://www.gao.gov/assets/gao-23-106285.pdf.

[370] We also decline to address commenters arguing for reforms to the portions of the USF that states regulate because they are similarly unrelated to the proceeding.  *See* NARUC Comments at 13-17; CPUC Comments at 23-25; Calaveras Telephone Company, et al. Comments at 21-24; California Independent Small LECs Reply at 5-9.

[371] *See* ACA Connects Comments at 31-33; USTelecom Comments at 89-90; NCTA Comments at 84 n.287; CTIA Reply at 32 n.133; USTelecom Reply at 41; CTIA Comments at 43-44.

programs are currently well positioned to further BIAS availability and affordability, we disagree that reclassification cannot better position the statutory basis for the Commission's universal service efforts. As noted above, with reclassification, we remove any doubt about the ability of the Commission to support BIAS-only providers with our universal service programs.[372] While the Commission is not taking steps today to allow BIAS-only providers to receive High Cost or Lifeline program support, the ever-changing nature of communications offerings may necessitate such future action to ensure that limited Commission resources are going towards services consumers need. Our action today bolsters our existing legal framework and gives the Commission flexibility to establish BIAS as a supported telecommunications service.[373]

100.    We also adopt the *2023 Open Internet NPRM*'s tentative conclusion that classifying BIAS as a telecommunications service would protect public investments in BIAS access and affordability.[374] Establishing firmer legal authority to fund BIAS through the High Cost and Lifeline programs ensures that public funds can continue to flow into network buildouts and discounted service. Commenters agree that reducing barriers to USF participation, including by potentially allowing BIAS-only carriers to participate in the High Cost and Lifeline programs in the future, will protect public investment by increasing the number of entities eligible to receive it, including small providers previously ineligible to become ETCs and providers in rural areas where there had been no or few ETCs prior.[375] We are unpersuaded by one commenter's argument that "the NPRM's tentative conclusion that reclassification 'protects public investments in [broadband] access and affordability' ignores the fact that, in the bipartisan [Infrastructure Investment and Jobs Act of 2021 (IIJA)], Congress appropriated tens of billions of dollars for broadband deployment, adoption, and affordability without subjecting broadband to

---

[372] *See RIF Remand Order*, 35 FCC Rcd at 12385-87, para. 101.

[373] *See 2023 Open Internet NPRM* at 29-30, paras. 49-50. Petitioners who urged the Commission to reconsider its earlier Title I classification concur that Title II classification will further the Commission's ability to support BIAS through the USF. *See* INCOMPAS Petition for Reconsideration at 23 ("Title II authority allows for stronger universal service support under USF and increased affordability for low-income consumers"); Common Cause et al. Petition for Reconsideration at 2-9 ("At its best, the Commission's current Title I framework constrains Lifeline support for broadband through legacy telecom carriers who are offering voice service."); *see also* INCOMPAS Comments at 4-5 (arguing that the Commission should grant petitions for reconsideration of the *RIF Remand Order* so that the D.C. Circuit can consider whether the Commission properly addressed its concerns in *Mozilla*); CPUC Petitions for Reconsideration Comments at 4-5 (writing in support of the Petitions for Reconsideration of the *RIF Remand Order* that "the Remand Order did not sufficiently explain how reclassification of BIAS will impact the federal Lifeline program").

[374] *See 2023 Open Internet NPRM* at 30, para. 51.

[375] *See* Public Knowledge Comments at 49-50 ("Title I classification has weakened the Commission's ability to support broadband service through USF programs because section 254(c) specifically defines universal service as an 'evolving level of telecommunications services.' This has created issues in allowing broadband-only providers to qualify as supported services under section 254(c). Reclassifying BIAS as a telecommunications service would allow broadband-only providers to once again participate in the Lifeline program, allow for rural and Tribal households to benefit from the Link Up program, and unlock other opportunities for further support for BIAS through USF programs."); Next Century Cities Comments at 9-11 ("In order for USF programs to remain as robust as possible, the Commission should seek to give communities as many options to connect. As more telecommunications carriers leave markets or relinquish their ETC designation, Lifeline subscribers may only be able to turn to BIAS-only providers. However, without reclassification, BIAS-only providers will be unable to provide the low-cost options."); *see also* CWA Comments at 18-19 ("The success of the ACP, which continues to provide essential BIAS to 22 million households as of this writing, demonstrates the strong need for a federal program supporting the affordability of BIAS for low-income households."); New America's Open Technology Institute Comments at 40-41 ("Assessing BIAS providers as USF contributors could be essential to establishing a permanent broadband affordability program and addressing other calls to modernize the USF to better meet the public's needs in a manner that allows stable, long-term investment.").

any Title II requirements."[376]  Congress's choice to support discrete public investment through special appropriations does not affect whether reclassification furthers the Commission's ability to protect ongoing public investment distinct from or in concert with appropriations.

101.    While we agree with the potential for expanded access to our universal service programs, we do not, however, designate BIAS as a supported service at this time.  Section 254(c)(1)'s requirement that the Commission "shall establish periodically" which telecommunications services meet the USF supported service standard does not require the Commission to designate universal services at any specific interval or time, much less the moment a service is classified as a telecommunications service.[377] The record created in this proceeding is insufficient to properly and effectively address all of the concerns raised by designating BIAS a supported service.  Rather than adjust our USF rules on a piecemeal basis, retaining existing supported universal services and, by extension, ETC eligibility standards, provides us the flexibility for holistically examining reclassification's effects on the USF at a later time.  For this reason, we decline at this time to revise our definition of supported services.

### 8.      Improving Access for People with Disabilities

102.    We find that reclassification of BIAS under Title II will enhance the Commission's authority to ensure that people with disabilities can communicate using BIAS.  Specifically, we agree with commenters that reclassification will enable the Commission to utilize its authority under sections 225, 255, 251(a)(2), and the newly adopted open Internet rules to ensure that BIAS is accessible for people with disabilities.[378]

103.    People with disabilities who have access to BIAS rely on Internet-based forms of communications for more effective and efficient direct and relayed communications.[379]  Reclassification of BIAS under Title II and prohibiting BIAS providers from blocking or throttling information transmitted over their BIAS networks, engaging in paid or affiliated prioritization arrangements, and engaging in practices that cause unreasonable interference or disadvantage to consumers will allow the Commission to better safeguard access to Internet-based telecommunications relay services (TRS).[380] Reclassification will also allow the Commission to ensure that BIAS and equipment used for BIAS are accessible to and usable by people with disabilities[381] and precludes the installation of "network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to

---

[376] USTelecom Reply at 41; *see also* NCTA et al. Reply at 33.

[377] *See* 47 U.S.C. § 254(c)(1).

[378] *See* CPUC Comments at 29 (supporting reclassification of BIAS as a Title II telecommunications service and placing section 255 obligations on BIAS providers); Public Knowledge Comments at 54 (supporting reclassification of BIAS under Title II and forbearance from section 255); TDIforAccess, Inc. et al. Reply at 1, 2-3 (Accessibility Advocacy Organizations); Equity Advocates Comments at 7, 10.

[379] *See, e.g., Access to Video Conferencing; Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010; Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities; Petition of Sorenson Communications, LLC for a Limited Waiver of the Privacy Screen Rule*, CG Docket Nos. 23-161, 10-213, and 03-123, Report and Order and Notice of Proposed Rulemaking, FCC 23-50, at 2, 4-5, paras. 2, 7 (June 12, 2023) (*Video Conferencing Order*) (recognizing growth of video-conferencing applications among disabled persons); *2015 Open Internet Order*, 30 FCC Rcd at 5824-25, para. 468 (recognizing that persons with hearing and speech disabilities are increasingly using Video Relay Services (VRS) to communicate with hearing and non-hearing individuals).

[380] *See 2015 Open Internet Order*, 30 FCC Rcd at 5824-25, para. 468 (noting that network management practices that degrade networks carrying VRS services deny people with disabilities "functionally equivalent" communication methods in violation of 47 U.S.C. § 225).

[381] 47 U.S.C. § 255.

section 255 . . . ."[382]  These provisions work in concert with sections 716[383] and 718[384] of the Act, giving the Commission authority to increase and to maintain access for people with disabilities to modern communications.

104.   For example, persons who are deaf, hard of hearing, or have speech disabilities use BIAS to connect to Internet-based video applications to communicate directly with other persons who use sign language (point-to-point) and other individuals who do not use the same form of communication.[385] These applications include Video Relay Service (VRS), which involves multi-party synchronous high-definition video and audio streaming requiring users to have a high-speed broadband connection with sufficient data and bandwidth.[386]  Under section 225, the Commission may make a telecommunications relay service like VRS available to people with disabilities, but to use VRS, those individuals must still subscribe to BIAS or mobile BIAS.[387]  Section 225 enables us to ensure that individuals with hearing and speech disabilities can use BIAS-based services to communicate in a "manner that is functionally equivalent" to the ability of a person who does not have a hearing or speech disability.[388]  As the Commission recognized in the *2015 Open Internet Order*, BIAS providers may impede the ability of the Commission to ensure BIAS-based forms of TRS are functionally equivalent if they adopt network management practices that have the effect of degrading the connections carrying video communications of persons with hearing and speech disabilities.[389]  For instance, bandwidth limits, data caps, or requirements to pay additional fees to obtain sufficient capacity can have a disproportionate negative impact on those people with disabilities who use VRS.  These video-based services are used by people whose first language is sign language and are the only means of direct communications or a communications service that is functionally equivalent to voice communications services used by persons without hearing or speech disabilities.[390]

105.   We reject the argument by some commenters that reclassification of BIAS under Title II will not enhance the Commission's authority to ensure the accessibility of BIAS or will not improve accessibility of BIAS for people with disabilities, given the existence of the Twenty-First Century Communications and Video Accessibility Act (CVAA).[391]  For example, USTelecom and CTIA argue that reclassification is "not necessary" or would have "no impact on accessibility" because Congress has

---

[382] *Id.* § 251(a)(2).

[383] Section 716 of the Act requires that advanced communications services be accessible to and usable by people with disabilities.  *Id.* § 617.  Advanced communications services are:  "(A) interconnected VoIP service; (B) non-interconnected VoIP service; (C) electronic messaging service; (D) interoperable video conferencing service; and (E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."  *Id.* § 153(1).

[384] Section 718 of the Act requires that Internet browsers installed on mobile phones be accessible to people who are blind or visually impaired to ensure the accessibility of mobile services.  *Id.* § 619.

[385] *2015 Open Internet Order*, 30 FCC Rcd at 5824-25, para. 468 (recognizing that persons with hearing and speech disabilities are increasingly using VRS services to communicate with hearing and non-hearing individuals).

[386] *See id.* (noting that VRS applications generally are highly data-intensive and have high bandwidth requirements); CPUC Comments at 30 (noting that VRS applications are highly data-intensive).

[387] 47 U.S.C. § 225; *see* CPUC Comments at 29-33.

[388] *See* 47 U.S.C. § 225; CPUC Comments at 29-33.

[389] *2015 Open Internet Order*, 30 FCC Rcd at 5824-25, para. 468 (noting that network management practices that degrade networks carrying VRS services deny people with disabilities "functionally equivalent" communication methods in violation of 47 U.S.C. § 225).

[390] *Id.*

[391] Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010) (codified in various sections of 47 U.S.C.) (CVAA), *amended by* Pub. L. No. 111-265, 124 Stat. 2795 (2010) (technical corrections).

already given the Commission the requisite authority to ensure the accessibility of BIAS in sections 716 and 718, which do not rely on the classification of BIAS.[392]  Reclassification will apply statutory provisions to BIAS that will enhance our ability to improve the accessibility of BIAS and Internet-based communication services for people with disabilities.[393]  We disagree with USTelecom that these benefits are negligible.[394]  While the CVAA permits the Commission to adopt certain regulations concerning "advanced communications services,"[395] BIAS itself is not an advanced communications service, as specifically defined in the CVAA.[396]  Accordingly, reclassifying BIAS allows us to regulate that service under Title II in ways that complements our authority over advanced communications services under the CVAA.  For example, under Title II, providers of BIAS and manufacturers of BIAS equipment and BIAS customer premises equipment must ensure that such equipment and services are accessible to and usable by individuals with disabilities, if readily achievable.[397]

> **B.      Broadband Internet Access Service Is Best Classified As a Telecommunications Service**

        106.    We conclude that BIAS is best classified as a telecommunications service based on the ordinary meaning of the statutory definitions for "telecommunications service"[398] and "information service"[399] established in the 1996 Act.[400]  This conclusion reflects the best reading of the statutory terms applying basic principles of textual analysis to the text, structure, and context of the Act[401] in light of (1) how consumers understand BIAS and (2) the factual particulars of how the technology that enables the

---

[392] *See, e.g.*, USTelecom Comments at 91; CTIA Comments at 44; *see also* Verizon Comments at 17-18; NCTA Comments at 79; Digital Progress Institute Comments at 18-19.

[393] Specifically, as discussed below, we do not forbear from the application of sections 225, 251(a), and 255 or their implementing regulations.  *See infra* Section IV.B.8; 47 U.S.C. §§ 225, 251(a), 255; *see also* Accessibility Advocacy Organizations Reply at 1 (agreeing that reclassification of BIAS as a telecommunications service will enhance the Commission's ability to implement and enforce section 716 accessibility requirements).

[394] USTelecom Reply at 52 (acknowledging that reclassification would result in the application of section 255, but arguing that any benefits of reclassification, including those resulting in application of section 255, would be negligible given the scope of the CVAA).

[395] For example, the CVAA directs the Commission to enact regulations to prescribe, among other things, that networks used to provide advanced communications services "may not impair or impede the accessibility of information content when accessibility has been incorporated into that content for transmission through . . . networks used to provide [advanced communications services]."  47 U.S.C. § 617(e)(1)(B); *see also* 47 CFR § 14.20(c).

[396] *See* 47 U.S.C. § 153(1).  Under section 617, *id.* § 617, a manufacturer of equipment used for advanced communications services must ensure that such equipment is accessible to and usable by individuals with disabilities, if achievable; and similarly providers of advanced communications services must ensure that those services are accessible to and usable by individuals with disabilities, if achievable.

[397] *Id.* § 255(b)-(c).  In addition, section 251(a)(2) prohibits providers of telecommunications services from installing network features, functions, or capabilities that impede accessibility.  *See id.* § 251(a)(2).

[398] *Id.* § 153(53); *see, e.g.*, Tejas N. Narechania Comments at 11 (arguing that the structure of the Act and past Commission precedent mean "Congress must have intended for BIAS carriers to be treated a[s] providing a telecommunications service"); Public Knowledge Comments at 26 (arguing that reclassification is both reasonable and the best reading of the statute); NARUC Comments at 4-5 (supporting reclassification).

[399] 47 U.S.C. § 153(24).

[400] *See 2015 Open Internet Order*, 30 FCC Rcd at 5757-58, paras. 355-56 (concluding that BIAS is a telecommunications service based on an interpretation of these terms); *RIF Order*, 33 FCC Rcd at 320-21, para. 26 (concluding that BIAS is an information service based on an interpretation of these terms).

[401] We recognize that when interpreting a statute, our "analysis begins with the text" of the statute "and we look to both 'the language itself [and] the specific context in which that language is used.'"  *Merit Mgmt. Grp. v. FTI Consulting*, 583 U.S. 366, 378 (2018).

delivery of BIAS functions.[402]  We also conclude that BIAS is not best classified as an information service.

107.    Our application of the statutory definitions to BIAS is driven by how typical users understand the BIAS offering.  For an offering to meet the "telecommunications service" definition, the telecommunications component of the offering, from the perspective of the end user, must have a sufficiently separate identity from the other components to constitute a separate offering of service.  As the Supreme Court explained in *Brand X*, "[i]t is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product."[403]  The D.C. Circuit affirmed that consumer perception is important to determining the proper classification of a service in *USTA*.[404]  Furthermore, the Commission has consistently analyzed consumers' understanding of the offering in its decisions classifying broadband services.[405]  The *2015 Open Internet Order* and *RIF Order* both analyzed their classification decisions based on consumers' understanding of the offering.[406]  That we should understand the Act's definitional terms based on the consumer perception of the offering is also supported by the references to the "user" in

---

[402] As explained below, the Commission also has well-established and longstanding authority and responsibility, provided by Congress, to classify services subject to the Commission's jurisdiction, as necessary, using the Act's definitional criteria, including the statutory provisions enacted as part of the 1996 Act.  *See infra* Section III.F.1. And though not necessary to our conclusion that treating BIAS as a telecommunications service is the best reading of the Act based on the statutory text, structure, and context, our decision here is further supported by the principles set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (*Chevron*). *Brand X*, 545 U.S. at 980-82, 986-1000 (holding that the Commission's classification of cable modem service was entitled to deference under *Chevron*); *Chevron*, 467 U.S. 837 (1984).  Our analysis is also appropriately afforded deference under *Skidmore v. Swift & Co.* (*Skidmore*).  *See United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001) (even when *Chevron* does not apply, an agency's well-reasoned views provide "experience and informed judgment to which courts and litigants may properly resort for guidance," and should be given a "fair measure of deference" consistent with "the agency's care, its consistency, formality, and relative expertness" (footnotes omitted) (quoting and citing *Skidmore*, 323 U.S. 134, 139-40 (1944)).  Commenters in the record take various positions about possible judicial deference regimes that might (or might not) apply to our classification decision. *Compare, e.g.*, Tejas N. Narechania Comments at 2 (arguing that deference should apply); Next Century Cities Comments at 5-6 (similar), *with, e.g.*, Free State Foundation Comments at 14 (arguing that no deference should apply); NCTA Comments at 39 n.135 (similar).  We need not linger over those disputes given that we find our classification of BIAS reflects the best reading of the Act irrespective of such considerations.  *See, e.g.*, Public Knowledge Comments at 28 (observing that even setting aside question of deference, BIAS is best understood as a telecommunications service).

[403] *Brand X*, 545 U.S. at 990; *USTA*, 825 F.3d at 697-98.

[404] *USTA*, 825 F.3d at 697-98 (affirming the U.S. Supreme Court's holding in *Brand X* that "it was 'consistent with the statute's terms' for the Commission to take into account 'the end user's perspective' in classifying a service as 'information' or 'telecommunications'" (citing *Brand X*, 545 U.S. at 993)).

[405] *See, e.g.*, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities et al.*, CC Docket Nos. 02-33, 01-337, 95-20, and 98-10; WC Docket Nos. 04-242 and 05-271, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853, 14910, para. 104 (2005) (*Wireline Broadband Classification Order*) (noting that "whether a telecommunications service is being provided turns on . . . *customers' understanding* of that service," as well as the functionality of the offering (emphasis added) (quoting 47 U.S.C. § 153(46) and citing *Brand X*, 545 U.S. at 989-90)); *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, WT Docket No. 07-53, Declaratory Ruling, 22 FCC Rcd 5901, 5909, para. 21 (2007) (*Wireless Broadband Classification Order*) (stating that the broadband service definition "appropriately focuses on the end user's experience").

[406] *2015 Open Internet Order*, 30 FCC Rcd at 5750, 5751-55, paras. 342, 346-50 (discussing consumer perception of the offering); *RIF Order*, 33 FCC Rcd at 335, para. 46 (stating that, consistent with *Brand X*, "[w]e begin by considering the ordinary customer's perception of the ISP's offer of broadband Internet access service").

the definition of "telecommunications."[407]  The record also provides support for relying on consumer perception to conduct our classification analysis,[408] and in light of the record and the well-established basis for relying on consumer perception and BIAS provider marketing, we disagree with commenters who argue that this consideration is unsuitable to our classification analysis.[409]

　　　　108.　　Our classification decision also is guided by an evaluation of the statutory definitions based on the factual particulars of how the technology that enables the delivery of BIAS functions.  In *Brand X*, the Supreme Court noted that the question of what service is being offered depends on "the factual particulars of how Internet technology works and [how the service] is provided."[410]  Past Commission classification decisions also indicate that evaluation of the underlying technology is an important factor.[411]  Consistent with the *2015 Open Internet Order*, we also find that the functionality of the offering is also informed by how BIAS providers market the offering, including whether the offering is focused on the transmission capabilities of the service or any information service component or capabilities that may be provided with the transmission component.[412]  We therefore disagree with commenters who argue that this consideration should not apply to our classification analysis.[413]

---

[407] *See* 47 U.S.C. § 153(50) ("The term 'telecommunications' means the transmission, between or among points specified by the *user*, of information of the *user's* choosing, without change in the form or content of the information as sent and received." (emphasis added)).

[408] *See, e.g.*, ACA Connects Reply at 30-31 n.78 (arguing that, consistent with *Brand X* and *USTA*, "the Commission must examine consumer perception"); EFF Comments at 18 (arguing that *Brand X*'s reliance on consumer perception was correct); U.S. Chamber of Commerce Comments at 41 (acknowledging that the Commission "has historically used consumer perception as a tool for evaluating how services are properly classified under the Communications Act").

[409] *See, e.g.*, USTelecom Reply at 6 (offering the conclusory and circular assertion that, unlike at the time of *Brand X*, the perception of BIAS is not relevant today because "[a]ll agree that ISPs offer a single, integrated 'broadband internet access service'"); USTelecom Comments at 24; CTIA Comments at 82; Mitchell Lazarus Comments at 4.

[410] *Brand X*, 545 U.S. at 991.

[411] *See, e.g.*, *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities et al.*, GN Docket No. 00-185, CS Docket No. 02-52, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798, 4822, para. 38 (2002) (*Cable Modem Declaratory Ruling*) (concluding that "the classification of cable modem service turns on the *nature of the functions* that the end user is offered" (emphasis added)); *Wireline Broadband Classification Order*, 20 FCC Rcd at 14910, para. 104 (noting that "whether a telecommunications service is being provided turns on *what* the entity is 'offering . . . to the public'" (emphasis added) (quoting 47 U.S.C § 153(46) and citing *Brand X*, 545 U.S. at 989-90)); *Wireless Broadband Classification Order*, 22 FCC Rcd at 5909, para. 21 (stating that the understanding of the offering "factor[s] in both the functional characteristics and speed of transmission associated with the service").

[412] *2015 Open Internet Order*, 30 FCC Rcd at 5755-57, paras. 351-54 (evaluating BIAS providers' marketing and pricing strategies and technical characteristics of BIAS in classifying BIAS as a telecommunications service); *see also* CFA Comments Attach. D, Mark Cooper, *The Public Interest in Open Communications Networks* at 8, Consumer Fed'n America (July 2004) (Mark Cooper, *Open Communications Networks*), https://consumerfed.org/elements/www.consumerfed.org/file/Public_Interest_in_Open_Communications_Networks_White_Paper.pdf (arguing that, under the Act, "[t]he nature of a service is not defined by the technology or the protocols used to manage the network; it is defined by what the service does and how it is offered to the public").

[413] *See, e.g.*, Mitchell Lazarus Comments at 4 (arguing that "ISPs' marketing practices" are "irrelevant" to a classification analysis); USTelecom Comments at 24 ("[A]dvertising neither dictates the statutory classification of a service generally nor does it suggest . . . that ISPs are not also 'offering' information processing capabilities as part of the service, or even that consumers do not perceive the offering of such capabilities."); CTIA Reply at 39-40 ("[T]he mere fact that ISPs highlight certain features of their offerings in ads . . . as they compete with one another does not change the fact that they are offering the capabilit[ies] of an information service enumerated in the statutory definition—which is all that matters for classification." (alteration in original) (internal quotation marks omitted)).

1.          **BIAS Is an Offering of Telecommunications for a Fee Directly to the Public**

109.      We conclude that BIAS is best classified as a "telecommunications service" under the Act because it is an "offering of telecommunications for a fee directly to the public."[414]  In support of this conclusion, we find that BIAS provides "telecommunications," as defined in the Act, because it provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[415]

110.      As the Commission has previously observed, the critical distinction between a telecommunications service and an information service turns on what the provider is "offering."[416]  The record in this proceeding leads us to the conclusion that BIAS is perceived by consumers and functions as a transmission conduit that does not alter the information it transmits.  The record also demonstrates that consumers perceive—and BIAS providers market—BIAS as a standalone offering of such telecommunications, which is separate and distinct from the applications, content, and services to which BIAS provides access, and which are generally information services offered by third parties.[417]  Additionally, no party in the record disputes that BIAS providers routinely market BIAS widely and directly to the public for a fee, and therefore that BIAS is not a private carriage service.

a.          **BIAS Provides Telecommunications**

111.      The record evinces significant support for the general proposition that BIAS provides "telecommunications"; that is, BIAS provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[418]

---

[414] 47 U.S.C. § 153(53); *2015 Open Internet Order*, 30 FCC Rcd at 5763-65, paras. 363-65; *see also, e.g.*, Scott Jordan Comments at 38-51 (arguing BIAS meets the definition of a telecommunications service); Free Press Comments at 23-34 (same); Ad Hoc Telecom Users Committee Comments at i-ii (same); Jon Peha Comments at 3-6 (same); Tejas N. Narechania Comments at 9-13 (same); INCOMPAS Comments at 4-5 (same); New America's Open Technology Institute Comments at 3, 13-32 (same, but focusing on mobile BIAS); Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 9, 2024) ("Broadband perfectly fits the legal definition of a telecommunications service that Congress crafted in its forward-looking overhaul of the Communications Act in 1996.  Broadband is a service offered to the public to carry their data between the points of their choosing without altering that data.").  The *RIF Order* did not dispute that BIAS providers offer BIAS directly to the public for a fee.

[415] 47 U.S.C. § 153(50); *2015 Open Internet Order*, 30 FCC Rcd at 5761-63, paras. 361-62; Home Telephone Company, Inc. Comments at 7-8 (Home Telephone) ("BIAS is without question[] a telecommunication[s] transport service.").

[416] *2015 Open Internet Order*, 30 FCC Rcd at 5757, para. 355.

[417] While we ground our conclusion that consumers perceive—and BIAS providers market—BIAS as a telecommunications service on the record before us in this proceeding, we also find that the conclusions reached by the *2015 Open Internet Order* about consumer perception and BIAS provider marketing were not only accurate regarding the BIAS offered at the time, but remain accurate concerning BIAS today.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5750-58, paras. 341-54, 356 (reviewing the factual record regarding consumer perception and BIAS provider marketing practices before concluding that BIAS is "today sufficiently independent of . . . information services that it is a separate 'offering'" of telecommunications); *USTA*, 825 F.3d at 697-98 (finding that the *2015 Open Internet Order*'s conclusions found "extensive support in the record and together justify the Commission's decision to reclassify broadband as a telecommunications service"); *see also id.* at 704-705 ("[T]he record contains extensive evidence that consumers perceive a standalone offering of transmission, separate from the offering of information services like email and cloud storage.").

[418] 47 U.S.C. § 153(50); *2015 Open Internet Order*, 30 FCC Rcd at 5761, para. 361; *2023 Open Internet NPRM* at 40, para. 71; *see, e.g.*, Ad Hoc Telecom Users Committee Comments at 3-4 (agreeing with the *2023 Open Internet NPRM* that BIAS meets the statutory definition of telecommunications); CCIA Comments at 2-3 (arguing that the definition is met because information "is simply carried from one end user to another"); Home Telephone

(continued….)

112.     *BIAS Transmits Information of the User's Choosing.*  BIAS transmits information of a user's choosing both functionally and from a user's perspective, providing two independent, alternative grounds for this conclusion.  Functionally, as a packet-switched transmission service using Internet Protocol (IP), BIAS transmits information of a user's choosing because a user decides what information to place in each IP packet that is transmitted when the user decides what information to send and receive.[419]  A user chooses to send or receive particular information when the user visits a particular website, uses a particular application, or operates a particular online device or service.  We are therefore unpersuaded by USTelecom's argument that BIAS does not provide telecommunications because users often receive information that is not of their choosing, such as display advertising on a web page.[420]  That the user may not know exactly what information the user will receive does not mean that the information was not "of the user's choosing."  Just as traditional voice service provides telecommunications even though a user making a telephone call does not necessarily know who will answer or what information will be conveyed in the call,[421] BIAS provides telecommunications even when a user does not necessarily know exactly what information will be received in response to the user's selections.[422]

113.     *BIAS Transmits Information Between or Among Points Specified by the User.*  The consumer perspective and technological functionality confirm that BIAS transmits information between or among points specified by the user, providing two independent, alternative grounds for this conclusion as well.  A typical consumer understands the phrase "points specified by the user" to mean the person, business, or service provider with which the user intends to share information.  Therefore, when a consumer chooses to use a particular website, application, or online device or service, the user perceives

---

Comments at 10 (arguing that "[a]ddressing protocols" and "caching" are used by the BIAS provider to "facilitate the transmission of information of the user's choosing"); Public Knowledge Comments at 28 (agreeing that both BIAS and telephony provide "telecommunications in the same sense"); The Writers Guild of America West, Inc. & Writers Guild of America East Comments at 2 (WGA) (agreeing that BIAS has "long fit" this description); Harold Hallikainen Comments at 1 (explaining that BIAS "transparently transmits user supplied data from one IP address to another"); Scott Jordan Reply at 14 (concluding that BIAS provides telecommunications); Andrew Gallo Comments at 5 (arguing that "there is no reason to depart from [the] conclusion" that "BIAS provides 'telecommunications'"); Jon Peha Comments at 4 (arguing that BIAS "is fundamentally an IP Packet Transfer service," and that "IP Packet Transfer clearly fits the statutory definition of 'telecommunications'").

[419] *2015 Open Internet Order*, 30 FCC Rcd 5761, para. 361 n.995; Jon Peha Comments at 4 ("It is clear that IP Packet Transfer means transmission of information that is of the packet sender's choosing, because the sender chooses what information to put in each packet."); Scott Jordan Reply at 11 (arguing that the transmission component of BIAS "enable[s] the operation of the end-to-end transmission of IP packets. . . . The flow of communications is the end-to-end transmission of IP packets, and computer mediation is provided by the end user devices and applications"); Free Press Comments at 27 ("A BIAS provider performs one main function: transmitting [IP] packets between the addresses of the user's choosing."); USTelecom Comments at 23 (agreeing that "the end user . . . specifies information the end user wants to retrieve" by sending a request, but arguing that the end user does not specify the specific "point to which the end user's communication is directed").

[420] USTelecom Comments at 23 (arguing that users often receive information they do not request, such as web advertising).

[421] *See AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services et al.*, WC Docket Nos. 03-133 et al., Order and Notice of Proposed Rulemaking, 20 FCC Rcd 4826, 4831, para. 16 (2005) (*AT&T Calling Card Order*) (concluding that requiring the user of a calling card service to listen to a pre-recorded advertisement as a condition of using the service is an "adjunct-to-basic" feature, and that the advertisement "does not in any way alter the fundamental character of that telecommunications service").

[422] We are likewise unconvinced by NCTA's argument that BIAS does not transmit information of the user's choosing because, "unlike traditional, circuit-switched voice services, in which the user chooses and sends the information—*i.e.*, his or her voice—to a particular called party, broadband involves continual interaction between computers and the transmission network, as well as among computers themselves."  NCTA Comments at 47.  To the extent BIAS is continually sending and receiving information, it is doing so because users are choosing to interact with websites, applications, or online devices or services, and they are therefore directing the sending and receiving of such information.

that the user is specifying the points for the transmission of the information that the user is sending or receiving.[423]  This is true, contrary to some commenters' claims,[424] even if a user does not know the specific geographic location of that person, business, or service provider or the precise physical or virtual location or address where the requested content is stored.[425]  Functionally, a user is also specifying the IP address of their desired point even when the user enters a fully qualified domain name, such as www.example.com, because the domain is resolved by the DNS to the appropriate IP address.[426]  Additionally, the fact that users may specify a point associated with more than one virtual location or address (e.g., due to load balancing) "does not transform that service to something other than

---

[423] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361.  The ordinary meaning of the terms "specify" and "point," taken together, demonstrates that users understand that when they "specify" the "point," of their choosing, they are specifying the website, application, online device, or service with which they wish to communicate, regardless of its physical or virtual location.  *See, e.g.*, *Specify*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "specify" as, among other things, to "name or mention expressly"); *Specify*, Collins College Dictionary (1995 ed.) (defining "specify" as, among other things, "to state or describe (something) clearly"); *Specify*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "specify" as, among other things, to "name or state explicitly or in detail"); *Point*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "point" as, among other things, "a particular place or position"); *Point*, Collins College Dictionary (1995 ed.) (defining "point" as, among other things, "a location or position," and, in turn, defining "position" as, among other things, "place or location:  *the hotel is in an elevated position above the River Wye*"); *Point*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "point" as, among other things, "a particular place:  LOCALITY <having come from distant [point]s>"); *Locality*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "locality" as, among other things, "a particular place, situation, or location," and, in turn, defining "location" as, among other things, "a position or site occupied or available for occupancy or marked by some distinguishing feature").  We conclude that when BIAS users expressly or explicitly identify to BIAS providers the particular website, application, or online device or service they wish to access, they would understand themselves to be specifying the points between or among which the relevant information will be transmitted.  Even assuming *arguendo* that "points specified by the user" should be interpreted more narrowly, the applications users are controlling to access information may actually know the specific destination before the transmission occurs, which provides an independent alternative basis for our conclusion.  *See* Scott Jordan Reply at 14-15 (arguing that a CDN, acting on behalf of the desired content provider selected by the user, and not the BIAS provider, may specify the IP address destination, and the domain name to IP address translation "occurs before the transmission of information of the user's choosing . . . .  By the time of this transmission, the user (or the application acting on behalf of the user) knows the IP address of the other party.  Thus, the transmission of information of the user's choosing is between or among points specified by the user").

[424] *See* NCTA Comments at 47; CTIA Comments at 52-53.

[425] *2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361; *see, e.g.*, Ad Hoc Telecom Users Committee Comments at 4 (agreeing with the *2023 Open Internet NPRM* that "uncertainty concerning the geographic location of an endpoint of communication is irrelevant for the purpose of determining whether a broadband Internet access service is providing telecommunications" (internal quotation marks omitted)); Andrew Gallo Comments at 2 & n.3 (considering "valid and appropriate comparison[s]" the Commission's analogies to other telecommunications services in which a consumer does not know the geographic location of the desired endpoint, such as "cell phone service, toll free 800 service, and call bridging service").

[426] *See* Eric W. Burger Comments at 19 ("The DNS is simply a mapping of names to IP addresses.  The Internet *only* knows about IP addresses.  IP addresses are the *singular* address on the Internet.  The DNS *application* happens to translate names in a particular hierarchical format to IP addresses.  There are many Internet applications that do not use fully qualified domain names.  Conversely, there is no Internet application that is operative without IP addresses."); Scott Jordan Reply at 14 (arguing that, because a BIAS user "specifies the end point of each packet even if the user utilizes the DNS to find the IP address of the intended recipient," BIAS offers users the capability to "specify the points between and among which information is transmitted"); *see also* Jon Peha Comments at 5 ("In most cases, an end device connected to a BIAS already knows the destination IP address of a packet it is about to send, because that device has sent a packet to or received a packet from that destination at some time in the past.  When the end device doesn't know the IP address, it may or may not use the BIAS provider's DNS service to find out.").

telecommunications."[427]  Indeed, the Commission has "never understood the definition of 'telecommunications' to require that users specify—or even know—information about the routing or handling of their transmissions along the path to the end point, nor do we do so now."[428]  This understanding of the "points specified by the user" phrase is consistent with the *2015 Open Internet Order*, which noted that users "would be quite upset if their Internet communications did not make it to their intended recipients or the website addresses they entered into their browser would take them to unexpected web pages."[429]  Thus, "there is no question that users specify the end points of their Internet communications."[430]

114.    That users specify the points for the transmission of their information when using BIAS is consistent with the functionality of other forms of telecommunications.[431]  For example, in the context of mobile voice service,[432] when a user dials a number, the call is routed to a cell tower near the called party—likely the one that would provide the best user experience—just as how a BIAS user's query to a video streaming service is often directed toward the server nearest to the user.[433]  In neither case does the user know the precise geographic location of the "point" specified.  With toll-free 800 service,[434] a call dialed to a single telephone number may route to multiple locations that are unknown to the user.[435]

---

[427] *See 2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361; Richard Bennett Comments Attach., Brief of Richard Bennett et al. as Amici Curiae Supporting Respondents at 8, *Mozilla*, 940 F.3d 1 (No. 18-1051) (Richard Bennett et al. Amicus Brief) ("BIAS provider networks dynamically switch traffic from highly-loaded to less-loaded routes to stave off congestion before it becomes critical, in a process known as load balancing."); Scott Jordan Reply at 15 (agreeing with the Commission that DNS enables load balancing).

[428] *2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361; Scott Jordan Reply at 14 (explaining that users themselves effectively specify the end points of their Internet communications when the "application acting on behalf of the user[] knows the IP address of the other party").

[429] *2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361; *2023 Open Internet NPRM* at 40, para. 71; *see also* Ad Hoc Telecom Users Committee Comments at 4 (agreeing with *2023 Open Internet NPRM* and *2015 Open Internet Order*); Public Knowledge Comments at 29 (same).

[430] *2015 Open Internet Order*, 30 FCC Rcd at 5761-62, para. 361.

[431] *See id.*; Jon Peha Comments at 4 ("In both the Internet and the telephone network, the sender/caller may not know the physical location associated with that IP address/telephone number, and some IP addresses/telephone numbers (such as 1-800 numbers) may be associated with multiple physical locations, but the IP address/telephone number still specifies the intent of the caller/sender."); Ad Hoc Telecom Users Committee Comments at 5 (stating that "the experience of connecting with a content provider over a BIAS connection parallels that of connecting with a content provider over a traditional voice connection" and noting that, in both cases, the end user's "desired termination point" is wherever the website or called party is located based on their addressing information); CCIA Comments at 3 ("These Internet transmission paths are functionally no different from the end user's perspective than paths that carry plain old telephone traffic."); *see also* CTIA Reply at 69 n.295 (citing *N.Y. State Telecomms. Ass'n v. James*, 544 F. Supp. 3d 269, 285 (E.D.N.Y. 2021) for the proposition that the Internet is jurisdictionally interstate because of "the nature of the communication itself rather than the physical location of the technology or the consumers served").

[432] *Universal Service First Report and Order*, 12 FCC Rcd at 9175, para. 780; *see also* 47 U.S.C. § 332(c)(1)(A) (providers of commercial mobile radio service shall be treated as common carriers).

[433] *See, e.g.*, Netflix Reply at 23 (noting that Netflix has deployed its CDN storage nodes at BIAS providers' network edge so that "[w]hen an end user requests particular content, [the CDN] serves a copy of the content that is geographically closest to the end user").

[434] *Universal Service First Report and Order*, 12 FCC Rcd at 9175, para. 780; *see also AT&T Corp. v. Winback & Conserve Program, Inc.*, File No. E-97-02, Memorandum Opinion and Order, 16 FCC Rcd 16074, 16075, para. 2 (2001).

[435] *2015 Open Internet Order*, 30 FCC Rcd at 5762, para. 361; *2023 Open Internet NPRM* at 40, para. 71; *U.S. Department of Health & Human Services Substance Abuse & Mental Health Services Administration Petition for Permanent Reassignment of Three Toll Free Suicide Prevention Hotline Numbers et al.*, WC Docket Nos. 07-271 et

(continued….)

Similarly, with call bridging services, when a user dials a telephone number, the call is routed often to multiple points, all with geographic locations that are unknown to the user.[436]  Additionally, when the Commission first had the opportunity to classify a broadband service—namely, xDSL-based advanced service—in the *Advanced Services Order*, it concluded that the end user chooses the destination of the IP packets sent beyond the central office where the tariffed service of Bell Operating Companies (BOCs) ended, relying on the function of such voice services.[437]  The Commission did not understand any of these services to fall outside the meaning of telecommunications simply because the user did not know the precise location of the points.

115.    The statutory context reinforces this understanding.  The 1996 Act, which enacted the "telecommunications" definition, also included section 706, which directs the Commission to "encourage the deployment . . . of advanced telecommunications capability," and to conduct marketplace reviews in that regard.[438]  Section 706 defines the specific sorts of "telecommunications capability" at issue as "enabl[ing] users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology"[439]—but does not separately define "telecommunications capability" or "telecommunications."  Consequently, pursuant to section 3(b) of the 1996 Act, the definition from section 3 of the Communications Act—i.e., the "telecommunications" definition we are applying here—applies to the use of "telecommunications" in section 706 of the 1996 Act.[440]  It is improbable that users could be expected to have more knowledge of the specific geographic or virtual locations between or among which "high-quality voice, data, graphics, and video" are transmitted than they do in the case of BIAS transmissions.  Similarly, that Congress considered the information a user receives in the form of "high-quality voice, data, graphics, and video" to fall within "advanced telecommunications capability" accords with the understanding that users likewise have chosen the information they receive when accessing the Internet using BIAS, even if they have not anticipated and specified its minutest details.

---

al., Memorandum Opinion and Order and Order on Review, 24 FCC Rcd 13022, 13023, para. 3 (2009) ("The hotlines are routing mechanisms for hundreds of local suicide prevention organizations.  When a person calls a hotline, the call is directly routed to a trained crisis counselor in the organization local to the caller who can assess the situation and determine the proper steps to follow to assist the caller."), *vacated*, *Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586 (D.C. Cir. 2010); *Ensuring the Reliability and Resiliency of the 988 Suicide & Crisis Lifeline et al.*, PS Docket Nos. 23-5 et al., Report and Order, FCC 23-57, at 4-5, para. 7 (July 21, 2023) (*988 Report and Order*) (describing how calls made to 988 are routed to 1-800-273-TALK and then routed to individual crisis centers based on various factors and, in certain cases "the system automatically routes callers to a backup center").

[436] *See Request for Review by InterCall, Inc. of Decision of Universal Service Administrator*, CC Docket No. 96-45, Order, 23 FCC Rcd 10731, 10734-35, paras. 10-11 (2008) (*InterCall Order*) (explaining that calls are transmitted to the conference bridge and then on to multiple endpoints).

[437] *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, First Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 4761, 4767, para. 12 (1999) ("Once [the xDSL transmission is] on the packet-switched network, the data traffic is routed to the location selected by the customer . . . ."); *see also Teleconnect Co. v. Bell Telephone Co. of Penn. et al.*, File Nos. E-88-83 et al., Memorandum Opinion and Order, 10 FCC Rcd 1626, 1630, para. 14 (1995) (concluding that an 800 call "conveys a single communication from the caller to the called party[,]" regardless of any "intermediate switching during the call").

[438] Telecommunications Act of 1996, Pub. L. 104-104, § 706(a), (b) (codified as amended at 47 U.S.C. § 1302(a), (b)).

[439] 47 U.S.C. § 706(c) (codified at 47 U.S.C. § 1302(d)(1)).

[440] 47 U.S.C. § 3(b) ("Except as otherwise provided in this Act, the terms used in this Act have the meanings provided in section 3 of the Communications Act of 1934 (47 U.S.C. 153), as amended by this section.").

116.     *BIAS Transmits Information Without Change in the Form or Content as Sent and Received.*  BIAS transmits information "without a change in its form or content as sent and received"[441] from a user perspective.  The record demonstrates that users expect that their information will be sent and received without change and does not show that these user expectations are not being met.[442]  When a user "chooses" to stream a music video, for example, the user expects to hear the song and see the choreography without it being changed by their BIAS provider.  The record does not show that the user perceives any processing or intelligence that is employed to deliver the video, let alone understands that processing or intelligence to cause a change in the form or content of that information.

117.     BIAS also does not change the form or content of the information it transmits from a technical perspective.  As we explain above, BIAS transmits the information of users' choosing because users decide what information should be placed in the packets that are transmitted.  There is no change in the form or content of that information because the packet payload is not altered in transit.[443]  Although BIAS may use a variety of protocols to deliver information from one point to another, the fundamental premise of the Internet is to enable the transmission of information without change in the form or content

---

[441] 47 U.S.C. § 153(50); *2015 Open Internet Order*, 30 FCC Rcd at 5762-3, para. 362; *2023 Open Internet NPRM* at 40, para. 71.

[442] *See* Free Press Comments at 25 ("[F]rom a non-technical perspective, BIAS obviously transmits information without a change in the form or content of what is sent and received.  If a consumer subscribes to a cloud storage service, the photos and files they upload and download . . . are transmitted by BIAS without change in form or content.  If this were not the case, and their broadband carrier transformed this information, they would find no value in the service."); Public Knowledge Comments at 28-9 (arguing that the purpose and consumer expectation of the Internet are that it would act as a "dumb pipe" without BIAS providers modifying the content of the transmission); EFF Comments at 19 (arguing that consumers do not expect and would not accept a service that resulted in the change in the form or content of the information sent or received); Ad Hoc Telecom Users Committee Comments at 7 ("[C]onsumers expect that their desired content will be transmitted between specified points and applications without any change in form or other interference by their ISP.").  There is even record evidence that consumers have rejected past attempts by BIAS providers to change the form or content of their information.  *See* Harold Hallikainen Comments at 1 ("BIAS provider attempts to modify that data (such as Verizon's 'super cookie') resulted in a public backlash and pushed the public to encrypt content such that it could not be modified."); Natasha Singer & Brian X. Chen, *Verizon's Mobile 'Supercookies' Seen as Threat to Privacy*, N.Y. Times (Jan. 15, 2015), https://www.nytimes.com/2015/01/26/technology/verizons-mobile-supercookies-seen-as-threat-to-privacy.html.

[443] *2023 Open Internet NPRM* at 41, para. 72; *2015 Open Internet Order*, 30 FCC Rcd at 5762, paras. 361-62 & n.995 (explaining that "it is the nature of [packet delivery] that the 'form and content of the information' is precisely the same when an IP packet is sent by the sender as when that same packet is received by the recipient"); USTelecom Comments Exh. A, Michael Kende et al., *Evolution of the Internet in the U.S. Since 2015*, at 9 (Dec. 12, 2023) (Michael Kende et al. Report) (arguing that the main driver of the growth of Internet applications is the separation and lack of interaction between the "application specific 'intelligence'[] managed at the edge of the networks [and] the wide range of devices that send and receive packets"); *see also Independent Data Communications Manufacturers Association Petition for Declaratory Ruling That AT&T's InterSpan Frame Relay Service Is a Basic Service et al.*, Memorandum Opinion and Order, 10 FCC Rcd 13717, 13719, para. 11 (CCB 1995) (*Frame Relay Order*) ("The use of packet switching and error control techniques 'that facilitate the economical, reliable movement of [such] information [do] not alter the nature of the basic service.'  Thus, for example . . . the Commission has determined that packet-switched networks following X.25 protocols provide a basic transport service under the Commission's rules." (alterations in original)); *Communications Protocols Under Section 64.702 of the Commission's Rules and Regulations*, GN Docket No. 80-756, Memorandum Opinion, Order, and Statement of Principles, 95 F.C.C.2d 584, 591, para. 15 (1983) ("[A] basic switched service may properly include those forms of protocol processing which are necessary for a switched service to be offered. . . . This principle applies to entire calls made on a switched network . . . . and to individual messages which are, in essence, individual calls themselves (e.g., to packets on a packet-switched network."); *see also United States v. W. Elec. Co.*, 714 F.Supp 1, 19 (D.D.C. 1988) (noting that "[e]ven the basic packet switching function, performed on an intra-LATA basis by Regional Companies, involves the breakdown of data or voice communications into small bits of information that are then collected and transmitted . . . . These bits of data are subject to constant storage, error checking, and retransmission, *as required for accurate transmission*." (emphasis added)).

across interconnected networks, and any such changes would undermine that very functionality.[444]

118.     It is therefore not the case, as some commenters at the time of the *RIF Order* contended[445] and some commenters here repeat, that the processing or intelligence that is combined with the transmission component, and that may act upon a user's information for routing purposes, changes the form or content of that information.  NCTA argues, for example, that while packet content may not change, the packet switching architecture itself—"the breaking apart, routing, and reconfiguration of these packets"—"involves a 'change in the form or content' of the information requested or sent by the user."[446]  Making a similar argument, CTIA uses streaming a video as an example, claiming that the "significant information-processing, from transforming keystrokes and clicks into machine readable languages, to dividing information into packets, to intelligently routing those packets to a server close to the user, to retrieving and processing the video data for transmission," is what makes BIAS an information service.[447]  CTIA also suggests that the form of information transmitted by BIAS is changed because the "coded information actually being transmitted looks quite different from anything the user would recognize."[448]  But the salient question under the statute is whether there is a change in form or content of the information "as sent and received."[449]  The statutory focus thus is on either end of the transmission, irrespective of any processing that occurs in between.  With data communications, while the information may be fragmented into packets and unintelligible to users while in transit, "such fragmentation does not change the form or content, as the pieces are reassembled before the packet is

[444] Free Press Comments at 24 ("Nothing in the <u>offering</u> of BIAS suggests that the ISP will change the form or content of the information."); *id.* at 26 ("From a more technical perspective, if a broadband carrier did use protocols that modified the content or format of a customer's data, this would break the internet and make it completely insecure.  Encryption protocols like HTTPS and IPSEC, which are critical to online commerce, would not work."); Michael Kende et al. Report at 4 ("The *layering* principle relates to the fact that internet applications are provided separately from the networks, with the Internet Protocol (IP) acting as an interface between these two 'layers' . . . . [I]t means that any application that can be effectively encapsulated and delivered via IP . . . . can be provided over any network that is accepting this protocol. . . . [C]ontent providers offering content, applications, and services, can operate separately from ISPs, without any required coordination or tailoring of the applications to any individual network."); CFA Comments at 26 (explaining that the Internet architecture allows edge providers to "design applications without the need for coordination with or permission from broadband Internet access service providers who offer the lower layer IP packet transfer service"); EFF Comments at 19 (arguing that the layered Internet architecture "frees application developers from the burden of adapting to many different kinds of physical and network architecture" and that this is the reason why "vital Internet services, including email and the Web, work equally well over DOCSIS cable, fiber-to-the-home, DSL, wireless, and even satellite Internet service"); *see generally* Tim Wu, The Master Switch 198 (2010) (explaining among other things how the Transmission Control Protocol's encapsulation of data into packet "envelopes" and the common adoption of shared protocols across interconnected networks "allow the Internet to run on any infrastructure, and carry any application, its packets traveling any type of wire or radio broadcast band, even those owned by an entity . . . given to strict controls"); Mark A. Lemley & Lawrence Lessig, *The End of End-to-End:  Preserving the Architecture of the Internet in the Broadband Era*, 48 UCLA L. Rev. 925, 930-31 (2001) ("[T]he extraordinary growth of the Internet rests fundamentally upon its design principles. . . . Among [such] principles is . . . [the end-to-end principle] . . . [that] counsels that the 'intelligence' in a network be located . . . at its 'ends,' where users put information . . . onto the network . . . and the communications protocols themselves (the 'pipes' through which information flows) should be as simple and as general as possible.  One consequence of this design is a principle of nondiscrimination among applications.").

[445] *See RIF Order*, 33 FCC Rcd at 338, para. 49 & n.175.

[446] NCTA Comments at 46 n.164.

[447] CTIA Comments at 49-50.

[448] *Id.* at 53.

[449] 47 U.S.C. § 153(50).

handed over to the application at the destination,"[450] and thus the information is delivered to or from the desired endpoint as it was sent and therefore without a change in "form or content" within the meaning of the statute.[451]

119.     NCTA's and CTIA's arguments also fail to acknowledge that BIAS is not unique or distinguished from processing and intelligent routing used by traditional telecommunications services. Mobile voice telephone service for example, relies on similar processing to support essential functions including mobile call routing, mobile paging, and handover between cellular towers.[452]  Similarly, modern voice telephony (both fixed and mobile) can convert circuit-switched voice transmissions into IP packets, route those packets using the same processing as a BIAS provider does, and convert those packets back to a circuit-switched format to deliver the call.[453]  Contrary to NCTA's and CTIA's view, none of these services are or can be understood to fall outside the meaning of telecommunications on the theory that there is a change in the form or content of the information as sent or received.[454]  Indeed, given the prevalence of such technologies used in transmission, reaching a contrary conclusion effectively would suggest that no transmission services could ever be telecommunications, which could not have been what Congress intended.[455]

---

[450] *2015 Open Internet Order*, 30 FCC Rcd at 5762, para. 362 n.1004 (citing Internet Eng'g Task Force, DARPA Internet Program Protocol Specification, RFC 791 (Sept. 1981), https://tools.ietf.org/html/rfc791); *cf.* Mark Cooper, *Open Communication Networks* at 9 ("That a transmission begins and ends as a voice call, for example, but is managed by being divided into packets, does not make it an information service.").

[451] The Commission has found in other contexts that protocol "processing" involved in broadband transmission causes no net change in the form or content of the information being transmitted.  *See Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended*, CC Docket No. 96-149, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 21905, 21956-58, paras. 104-06 (1996) (*Non-Accounting Safeguards Order*) (finding that protocol processing services where there is "no net protocol conversion to the end user" falls under the telecommunications systems management exception while concluding that other protocol processing services are information services).  CTIA erroneously argues that the *Non-Accounting Safeguards Order* held that all protocol processing is an information service while ignoring the Commission's finding that non-net protocol processing falls under the telecommunications systems management exception.  CTIA Comments at 61 n.232.

[452] For circuit-switched calls on these networks, when a mobile user moves from one serving base station area to another serving base station area, the call is handed over from the current serving base station to the new serving base station with the help of the base station controller and the mobile switching center.

[453] *Petition for Declaratory Ruling that AT&T's Phone to Phone IP Telephony Services are Exempt from Access Charges*, Order, 19 FCC Rcd 7457, 7464, para. 11 (2004) (examining AT&T's "IP in the middle" service).  Similar conversions historically have been present in other packet-switched transmission services as well.  *See, e.g., Frame Relay Order*, 10 FCC Rcd at 13719, para. 11 (discussing "[t]he use of packet switching and error control techniques that facilitate the economical [and] reliable movement" of frame relay communications (internal citations omitted)).

[454] CTIA tries to distinguish voice and data services, arguing that "the internet and PSTN are two fundamentally different networks" because the Internet uses packet switching to route data while the PSTN uses SS7 signaling to route calls, which it says explains why they "are completely incompatible with each other and cannot directly interoperate."  CTIA Comments Exh. B, Declaration of Peter Rysavy at 20-21 (Peter Rysavy Declaration).  But CTIA does not explain why these distinct protocols and their incompatibility are independently relevant to classification determinations, and its argument merely underscores that both BIAS and voice networks involve inherent processing and signaling to ensure that information is efficiently and correctly routed.

[455] *See, e.g.*, Free Press Comments at 27 n.41 ("Of course, it is true that Internet Protocol packets contain protocol information that is processed, but this is true of any telecommunications network, including the PSTN." (citing Comments of Free Press, WC Docket No. 17-108, at 29 (rec. July 17, 2017)).  The only services that reclassification opponents argue include a net protocol conversion are certain forms of VoIP.  *See* Peter Rysavy Declaration at 23.  But even assuming *arguendo* the merits of the commenters' technological description, they do not demonstrate that users of VoIP consider the conversion to effectuate material changes, let alone that they should inform our understanding of how BIAS users perceive that service, as relevant to the "telecommunications" definition.

120.     Our understanding of the "telecommunications" definition in this regard also is supported by the scope of services encompassed by the meaning of "advanced telecommunications capability" in section 706 of the 1996 Act.  The purported changes in form or content that some commenters associate with BIAS are no less likely to be associated with the accessing of "high-quality voice, data, graphics, and video" that Congress included within the scope of "advanced telecommunications capability" under section 706.  This elicits harmonization within the 1996 Act between the "telecommunications" definition and section 706, supporting our application of the "telecommunications" definition to BIAS here.[456]

121.     The user perspective and functionality of BIAS is also consistent with the ordinary meaning of the words "form" and "content," as they were understood at the time of the 1996 Act's adoption.  The word "form" was understood as "a shape; an arrangement of parts," "the outward aspect (esp. apart from colour) or shape of a body," or "the mode in which a thing exists or manifests itself (*took the form of a book*)";[457] "the shape or appearance of something" or "the particular mode in which a thing or person appears:  *wood in the form of paper*";[458] and "the shape and structure of something as distinguished from its material."[459]  Thus, in the context of BIAS, the question is whether the shape or appearance of the information being transmitted is changed.  This might occur, for example, if BIAS manipulated the appearance of a website that a user is accessing or the presentation of the information that appears in an application—but it does not.  When a user visits a website or uses an application, the information is presented in exactly the form intended by the content provider, and not a form determined by the BIAS provider.[460]  As such, BIAS transmits the form of the information to and from an end user as

---

[456] Elsewhere, this Order interprets section 706 of the 1996 Act as a grant of regulatory authority, *see infra* Section V.F.2.  We make clear, however, that our consideration of section 706 in our analysis here does not depend on whether section 706 is understood as a grant of regulatory authority.  Separately, we recognize that the *RIF Order* concluded that BIAS is made available "via telecommunications" by reference to an amorphous set of inputs that BIAS providers use when offering service.  *See, e.g.*, *RIF Order*, 33 FCC Rcd at 341-43, para. 52.  But even accepting that, it raises more questions than answers as far as section 706 is concerned.  For instance, it fails to address whether a BIAS provider's own use of telecommunications as an input into BIAS would be enough to bring it within the scope of section 706, and if so, whether the entirety of the service would fall within the scope or just those aspects—ill-defined by the *RIF Order*—that rely on telecommunications inputs.  The *RIF Order* also fails to explain how those amorphous details about the underlying inputs used in BIAS could be a meaningful factor in understanding the "telecommunications" definition from a user perspective.  Even if those questions had answers, we find our approach best harmonizes the "telecommunications" definition and the meaning of "advanced telecommunications capability" in section 706.

[457] *Form*, The Concise Oxford Dictionary of Current English (9th ed. 1995).

[458] *Form*, Collins College Dictionary (1995 ed.).

[459] *Form*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993).  In support of its view, CTIA cites a recent Second Circuit case purporting to define "form" as "pattern or schema," which we do not find to differ fundamentally from the definitions we provide from the time of the 1996 Act's passage.  *See* CTIA Comments at 53 n.199 (citing *Am. Civ. Liberties Union Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 657 (2d Cir. 2023), which actually says that dictionary definitions of "form" *and* "format" "indicate that records might be supplied in whatever 'pattern or schema' . . . requested").

[460] In addition to the arguments discussed above, USTelecom argues that content filtering and video optimization means that information transmission virtually never occurs "without change in the form or content."  USTelecom Comments at 23.  Insofar as this involves "content filtering," USTelecom Comments at 23 n.78 (citing Peter Rysavy Declaration at 17-18), the filtered-out information is not information we consider the user to have chosen to receive in the first place.  Similarly in the case of measures that guard against the distribution of malware, USTelecom Comments at 23 n.78 (citing Peter Rysavy Declaration at 19), whether or not consumers must affirmatively opt-in to such services, the record provides no reason to believe that malware is information that BIAS users have chosen to receive.  USTelecom also cites video optimization—e.g., to "reduce the demand of high-resolution video on mobile devices with small screens, mobile operators optimize the content so as to consume less bandwidth."  USTelecom Comments at 23 n.78 (citing Peter Rysavy Declaration at 18).  But such functionality likely falls within the telecommunications systems management exception to the information service definition, *see infra* Section III.B.2.b,

(continued….)

it is sent. The same holds true for the "content" of the information, a term which was understood at the time of the 1996 Act's adoption as "the substance or material dealt with (in a speech, work of art, etc.) as distinct from its form or style");[461] "the meaning or substance of a piece of writing, often as distinguished from its style or form");[462] "substance, gist" or "meaning, significance."[463] BIAS providers do not change the substance of a news article on a website, a social media post, the lyrics or melody of a streaming song, or the images that appear in a photograph or video, and thus BIAS providers do not change the content under the ordinary meaning of that term.[464]

## b. BIAS Is a Telecommunications Service

122. BIAS is a "telecommunications service" because consumers perceive it—and BIAS providers market it—as a standalone "offering" of telecommunications that is separate and distinct from the applications, content, and services to which BIAS provides access, and which are generally information services offered by third parties.[465] BIAS providers also market BIAS directly to the public for a fee, and it therefore is not a private carriage service.

123. *Consumers Perceive BIAS as a Standalone Offering of Telecommunications.* As evidenced in the record, there is wide agreement, among both supporters and even some opponents of reclassification, that consumers today perceive BIAS to be a telecommunications service that is primarily a transmission conduit used as a means to send and receive information to and from third-party services.[466] The D.C. Circuit recognized this in 2016, when it stated that "[e]ven the most limited

---

and in any event, USTelecom does not suggest that video optimization causes the desired video not to play, changes the content of the video as originally sent, or causes the content not to present to the user as a video. *See 2015 Open Internet Order*, 30 FCC Rcd at 5766-67, para. 367 & n.1029 (noting that compression functionality is among those intelligent features that would be expected to fall within the telecommunications systems management exception). The relevant statutory question is whether a BIAS user would see video optimization as sufficient to constitute a change in the form or content of the information chosen by the user, and the record here does not make that case.

[461] *Content*, The Concise Oxford Dictionary of Current English (9th ed. 1995).

[462] *Content*, Collins College Dictionary (1995 ed.).

[463] *Content*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993).

[464] ACA Connects argues that BIAS includes certain capabilities, namely retrieval and storage, that can fit within the information service definition even though they do not require net protocol conversion. Letter from Brian Hurley, Chief Regulatory Counsel, ACA Connects, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-320 and 17-108, at 2 n.2 (filed Apr. 16, 2024) (ACA Connects Apr. 16, 2024 *Ex Parte*). But ACA Connects does not explain if the capabilities to which it is referring are actually offered by BIAS providers (as opposed to edge providers) or are different from those we already address in this Order. *See infra* Section III.B.2.b-c. ACA Connects also does not appear to grapple with whether such capabilities—if indeed there are any we have not already addressed—would fall under the telecommunications systems management exception or are otherwise separable. In any event, that some information-processing capabilities do not necessarily change the form or content of information only further demonstrates that when information-processing capabilities facilitate the use of BIAS, they do not inherently cause BIAS to change the form or content of the information it transmits.

[465] *See 2015 Open Internet Order*, 30 FCC Rcd at 5750, para. 341; *USTA*, 825 F.3d at 698 (upholding the Commission's telecommunications service classification given that, based on the record, "it would be hard to deny [third-party content's] dominance in the broadband experience. . . . The same assuredly cannot be said for broadband providers' own add-on applications."); *RIF Order*, 33 FCC Rcd at 325, para. 33 n.99; *Mozilla*, 940 F.3d at 90 (Millett, J., concurring) (noting that by the time of the *2015 Open Internet Order*, a BIAS provider's own add-on offerings "have dwindled as consumers routinely deploy 'their high-speed Internet connection to take advantage of competing services offered by third parties.' That is why the [the *RIF Order*] makes no effort to rely on those ancillary services" (citing *2015 Open Internet Order*, 30 FCC Rcd at 5753, para. 347)).

[466] *See, e.g.*, Equity Advocates Comments at 18 ("The NPRM correctly identifies that consumer[s] view broadband service as a service that provides telecommunications."); Home Telephone Comments at 11 (explaining that "[c]onsumers expect their ISP to function as a common carrier. They are not paying the ISP to control/edit/curate

(continued….)

examination of contemporary broadband usage reveals that consumers rely on the service primarily to access third-party content."[467] Since that time, this consumer perception of BIAS as a gateway to third-party services has only become more pronounced.[468] The dramatic increase in consumers' reliance on BIAS to participate in vital aspects of daily life during the COVID-19 pandemic set in stark relief the central—and critical—importance of using BIAS to access third-party services.[469] And, as Home

the information the consumer requests or sends. The service provider is expected to transport traffic in a non-discriminatory manner without change in form or content of the traffic. The consumer does not want or expect the ISP to store, transform or process the information being sent over the Internet via BIAS. The consumer wants information delivered to the party the consumer directs it to and wants the reply returned from the requested party."); Public Knowledge Comments at 30 (agreeing with the *2023 Open Internet NPRM* that consumers increasingly perceive BIAS to be a standalone telecommunications service because they use it to access third-party services, and "not . . . their ISP's cloud storage or email offerings, assuming they even know they exist"); EFF Comments at 18 (arguing that BIAS today, unlike in 2002, "is perceived by consumers as a data transmission service, separate and distinct from all of the applications it provides access to"); Free Press Comments at 32 ("The Commission is absolutely correct that consumers perceive BIAS as an essential service. But they perceive it as such <u>because it is a telecommunications service</u>. . . . [T]hey may transmit the information of their choosing between the points of their choosing, without change in the form or content of the information as sent or received." (internal quotation marks omitted)); Home Telephone Comments at 11 (explaining that "[c]onsumers are looking for their ISPs to provide BIAS to enable communications with the edge provider or another user of their choosing"); Michael Kende et al. Report at 17 ("The increased adoption and usage of the internet is driven by[,] . . . [i]n particular[,] . . . streaming video services, and real-time communications services."); AT&T Comments at 23 (admitting that consumers have "longstanding . . . expectations [of receiving] full, high-quality access to the open internet" from their BIAS provider); NCTA Comments at 40 ("[T]he heart of broadband Internet access is the capability to interact with and manipulate data stored on remote computers by the provider or third party."); ACA Connects Reply at 27 (quoting and agreeing with NCTA); ACA Connects Comments at 30 n.57 (conceding that "broadband service may seem to the average subscriber like a simple connection to internet content and applications," but also arguing that the Commission "should not rely exclusively upon the perceptions of consumers" because classification should also depend on the data processing functions of which the user is unaware); INCOMPAS Comments at 19 (noting that "[s]ince 2015, INCOMPAS has witnessed that our members offering residential fixed BIAS have ceased offering voice and/or video options to their residential customers given that those customers can choose third-party over-the-top or VoIP options for these services"); Free Press Comments at 31 (noting that "there are numerous cable TV providers now encouraging their customers to drop their traditional cable TV service and instead use an over-the-top-alternative" (emphasis omitted)); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5755, para. 350 ("Thus, as a practical matter, [BIAS] is useful to consumers today primarily as a conduit for reaching modular content, applications, and services that are provided by unaffiliated third parties.").

[467] *USTA*, 825 F.3d at 698; *see id.* at 674 (upholding the Commission's telecommunications service classification given that, based on the record, "it would be hard to deny [third-party Internet content's] *dominance* in the broadband experience. . . . The same assuredly cannot be said for a broadband providers' own add-on applications" (emphasis added)); *2015 Open Internet Order*, 30 FCC Rcd at 5753, para. 347 ("[W]idespread penetration of broadband Internet access service has led to the development of third-party service and devices and has increased the modular way consumers have come to use them. As more American households have gained access to [BIAS], the market for Internet-based services provided by parties other than [BIAS] providers has flourished.").

[468] Public Knowledge Comments at 30 (agreeing with the Commission's conclusion in the *2023 Open Internet NPRM* that "consumers' perception and use of BIAS as a standalone telecommunications service is even more pronounced now than it was in 2015" (internal citation omitted)).

[469] *See, e.g.*, Consumer Reports Comments at 3 ("Examining the results of these surveys affirms the Commission's conclusion that broadband has grown in importance in the past five years, and a majority of consumers equate its importance to that of electricity and water service."); *id.* ("In 2017, 68 percent of Americans said they relied upon the internet seven days a week. When asked a similar question in October of 2023, that number jumped to 85 percent, up from 75 percent from February of 2021 . . . ."); Chloe Reisen Reply at 3 (explaining that when she "cannot pay bills due to . . . industry disruptions[, she] often take[s] jobs . . . through [third-party services such as] task rabbit, . . . instacart or uber eats, and other online services that are impacted when access to the internet . . . is throttled"); *id.* at 3 (noting that BIAS "is now an essential service"); David Sokal Comments at 1 ("I . . . volunteer to

(continued….)

Telephone notes, while a consumer "may decide to use edge services provided by the ISP, . . . the consumer certainly is not expecting the ISP to dictate the edge services available to them when subscribing to BIAS."[470]  It is thus clearer now, more than ever before, that consumers view BIAS as a neutral conduit (or, in the words of one commenter, a "dumb pipe") through which they may transmit information of their choosing, between or among points they specify,[471] "without change in the form or content of the information as sent and received," and "not as an end in itself."[472]

124.    *BIAS Providers Market BIAS as a Standalone Offering of Telecommunications.*  We also find that BIAS providers market BIAS as a telecommunications service that is essential for accessing third-party services, and this marketing has become more pronounced during and since the COVID-19 pandemic.  In the *2015 Open Internet Order*, the Commission concluded that BIAS providers market their BIAS "primarily as a conduit for the transmission of data across the Internet," with fixed providers distinguishing service offerings on the basis of transmission speeds, while mobile providers advertise speed, reliability, and coverage of their networks.[473]  Although the *RIF Order* contended that "ISPs generally market and provide information processing capabilities and transmission capabilities together as a single service," it did not provide examples.[474]  BIAS providers' marketing today appears even more focused than in 2015 on the capability of BIAS to transmit information of users' choosing between Internet endpoints, rather than any capability to generate, acquire, store, transform, process, retrieve, utilize, or make available that information.  Such marketing emphasizes faster speeds aimed at connecting

---

support a local artist-run gallery.  Many of the functions of this tax-exempt nonprofit rely on the internet.  For example, we use cloud-based QuickBooks for bookkeeping.  We use Google Workspace for Nonprofits for email, file storage, surveys, registration and more.  We use Square.com for our retail functions.  We even use an online vendor to file our annual form 990 with the IRS!  The list goes on and on.").

[470] Home Telephone Comments at 11.

[471] Public Knowledge Comments at 28-29 ("Telecommunications services are a conduit—a 'dumb pipe'—hired by users to connect them to the people and services ('information services' such as websites, social media, video and music storage, web productivity apps, online storage, and more). . . . It is not an end in itself . . . .").

[472] 47 U.S.C. § 153(50) (defining "telecommunications").  It is also clear from the record that the third-party services themselves rely on the neutral-conduit property of BIAS to reach their customers.  Netflix emphasizes that "[their] members . . . depend on an open Internet that ensures that they can access our content and the content of many other companies through their ISP's networks without interruption."  Netflix Reply at 3; *see also id.* (noting that they "compete heavily, both with companies affiliated with ISPs and with independent online entertainment providers").

[473] *2015 Open Internet Order*, 30 FCC Rcd at 5757, para. 354.

[474] *RIF Order*, 33 FCC Rcd at 335, para. 46; *see also Mozilla*, 940 F.3d at 94-95 (Wilkins, J., concurring) (concluding that *Brand X* required the court to uphold the *RIF Order*'s determinations even though "critical aspects of broadband Internet technology and marketing underpinning the [*Brand X*] Court's decision have drastically changed since 2005").

multiple devices,[475] unlimited data for mobile service,[476] and reliable and secure coverage.[477]
INCOMPAS notes that "some mobile BIAS providers offering 5G services are now marketing their
network capacity to serve the fixed BIAS marketplace."[478]  Public Knowledge notes that "[a] brief survey
of television and online advertising for both mobile and fixed broadband shows that ISPs compete with
each other on the basis of speed, price, ease of use, reliability and availability."[479]  In those cases where
BIAS providers mention edge provider services, they often advertise them as separate offerings that can
be bundled with or added on to their broadband Internet access services,[480] such as discounted
subscriptions to unaffiliated video and music streaming services[481] or access to mobile security apps.

125.    *BIAS Providers Market BIAS Directly to the Public for a Fee.*  The concept of the
"offering" within the telecommunications service definition is based on the principles of common
carriage.  If the offering meets the statutory definition of "telecommunications service," then the Act

---

[475] *See, e.g.*, Free Press Comments at 31 (noting that "just about any ISP advertisement is built around how fast their transmission speeds are, and how customers can use their broadband services to watch streaming content");  Free Press Reply at 7 (arguing that BIAS providers know "full well that they market their BIAS products primarily by . . . transmission speeds between the customer's home and the servers hosting third-party content");  *id.* at 19 (noting that BIAS is marketed and sold as a "transmission service" in "tiers based on transmission speed (megabits per second) and/or capacity (gigabytes per month)" and that "[u]sers that stream more generally pay more, either through higher prices for faster transmission speeds, or higher prices for additional or unlimited capacity"); Comcast Xfinity, *Explore Speeds and Prices*, https://www.xfinity.com/learn/internet-service [https://perma.cc/UPB9-8Z32] (last visited Feb. 29, 2024) (advertising speed tiers and the appropriate number of devices for each tier);  Verizon Fios, *Get Verizon Fios*, https://www.verizon.com/home/fios [https://perma.cc/6TSW-R663] (last visited Feb. 29, 2024) (advertising fiber capacity as enabling "more bandwidth for everyone in your home at the same time"); AT&T, *AT&T Fiber with All-Fi*, https://www.att.com/internet/fiber [https://perma.cc/NFZ9-QK2U] (last visited Feb. 29, 2024) (advertising fiber service as a means to "[c]onnect all your devices");  *see also* Charter Spectrum, *4 Benefits of Faster Internet Speed at Home*, https://www.spectrum.com/resources/internet-wifi/4-benefits-of-faster-internet-speed-at-home [https://perma.cc/48AL-V9CM] (last visited Feb. 29, 2024) ("As we connect more users and more devices to our home networks, high-speed Internet is becoming essential to our lives.");  *see also RIF Order*, 33 FCC Rcd at 337-38, para. 48 & n.171 (agreeing that consumers value speed as a means to access third-party services).

[476] *See, e.g.*, T-Mobile, *Compare Our Unlimited Cell Phone Plans*, https://www.t-mobile.com/cell-phone-plans [https://perma.cc/FNZ4-QATZ] (last visited Feb. 29, 2024) (advertising all cell phone plans as including "unlimited 5G and 4G LTE data"); USCellular, *Unlimited Plans*, https://www.uscellular.com/plans/unlimited [https://perma.cc/L7UJ-EF8D] (last visited Feb. 29, 2024) (offering unlimited data plans);  Verizon, *Unlimited*, https://www.verizon.com/plans/unlimited [https://perma.cc/L7UJ-EF8D] (last visited Feb. 29, 2024) (same).

[477] *See, e.g.*, AT&T, *AT&T Wireless*, https://www.att.com/wireless [https://perma.cc/Q643-NMVC] (last visited Feb. 29, 2024) (advertising 5G service as fast, reliable, and secure); T-Mobile, *What Is 5G?*, https://www.t-mobile.com/5g [https://perma.cc/GP3B-ABZT] (last visited Feb. 29, 2024) (advertising 5G as enabling "greater bandwidth and faster data transfer," which "creates opportunity for quicker downloads, smoother streaming, and more responsive and reliable online experiences, even in spots with high network traffic"); Charter Spectrum, *Internet*, https://www.spectrum.com/internet [https://perma.cc/6TKP-7C6W] (last visited Feb. 29, 2024) ("Surf, stream and stay connected with speeds and reliability you can count on, even when your whole family is online.").

[478] *See* INCOMPAS Comments at 7.

[479] Public Knowledge Comments at 22.

[480] *See* Public Knowledge Comments at 23 ("To the extent ISPs advertise additional features, they offer non-integrated services such as partnerships with streaming video, discounts on bundles, or equipment discounts.").

[481] *See, e.g.*, Verizon Wireless, *Unlimited*, https://www.verizon.com/plans/unlimited [https://perma.cc/GPG8-JLUN] (last visited Feb. 29, 2024) (advertising Disney Bundle and Apple One with certain unlimited plans);  Charter, *Spectrum*, https://www.spectrum.com/cable-tv/streaming?predirect=peacock [https://perma.cc/YCU2-MED2] (last visited Feb. 29, 2024) (offering a Disney+ Basic subscription with an eligible Spectrum Internet package);  T-Mobile, *Cell Phone Plans*, https://www.t-mobile.com/cell-phone-plans [https://perma.cc/4F96-DHA3] (last visited Feb. 29, 2024) (offering a Netflix subscription with certain plans); *see also* Free Press Comments at 31-32 (noting that both Verizon and Comcast executives promote the use of their broadband service to access streaming services).

makes clear that a provider "shall be treated as a common carrier" under the Act "to the extent that it is engaged in providing" such a service.[482]

126. The record does not dispute that BIAS providers market BIAS directly to the public for a fee. This factual reality aligns with our definition of BIAS as a mass-market retail service as such services are necessarily offered to the public for a fee. Because BIAS providers do in fact offer BIAS as a mass-market retail service, we conclude, as the Commission did previously, that BIAS is not a private carriage offering,[483] We note that no party argues that BIAS is offered on a private carriage basis.[484]

127. Additionally, since we conclude below that BIAS includes the exchange of traffic by an edge provider or an intermediary with the BIAS provider's network (i.e., peering, traffic exchange or interconnection),[485] we again conclude that the implied promise to make arrangements for such exchange does not make the traffic exchange itself a separate offering from BIAS—private carriage, or otherwise.[486] Even if a traffic exchange arrangement involves some individualized negotiation,[487] that

---

[482] 47 U.S.C. § 153(51). The Commission also has interpreted the language of the "telecommunications service" definition in such a way that meeting that definition also necessarily means the service meets the definition of a common carrier service. *See Universal Service First Report and Order*, 12 FCC Rcd at 9177, para. 785 ("We find that the definition of 'telecommunications services' in which the phrase 'directly to the public' appears is intended to encompass only telecommunications provided on a common carrier basis."); *Cable & Wireless, PLC Application for a License to Land and Operate in the United States a Private Submarine Fiber Optic Cable Extending Between the United States and the United Kingdom*, File No. SCL-96-005, Cable Landing License, 12 FCC Rcd 8516, 8521, para. 13 (1997) ("[T]he definition of telecommunications services is intended to clarify that telecommunications services are common carrier services."); *see also* Free Press Comments at 11 (arguing that common carriage is "not merely synonymous or co-extensive with a 'public utility' or a 'regulated monopoly'" but rather it is a "legal principle that applies to a carrier that holds itself out . . . to carry for all people indifferently" (internal citations omitted)). We note that a service can be a telecommunications service even where the service is not held out to all end users equally. *See Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Order on Remand, 16 FCC Rcd 571, 573-74, paras. 7-10 (2000), *aff'd U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1332-33 (D.C. Cir. 2002) ("[A] carrier offering its services only to a legally defined class of users may still be a common carrier if it holds itself out indiscriminately to serve all within that class."); *Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (*NARUC I*) ("One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population. And business may be turned away either because it is not of the type normally accepted or because the carrier's capacity has been exhausted.").

[483] *See* CCIA Comments at 2 ("Of particular import is the criterion that the service be 'mass-market retail service,' which is the earmark of common carriage: holding oneself out as serving all requesting parties. This choice to serve the retail mass market is what imbues a service provider with the obligation to provide service in a reasonable and nondiscriminatory manner under the Communications Act of 1934."); *2015 Open Internet Order*, 30 FCC Rcd at 5763-64, para. 363. Because the *RIF Order* concluded that BIAS was an information service, it did not need to reach the question of whether any aspect of the BIAS transmission offering was common or private carriage. *See RIF Order*, 33 FCC Rcd at 341, para. 52.

[484] While ADTRAN argues that the Commission permits "a carrier to choose how to structure its offerings and decide whether to operate as a common carrier or a private carrier," it does not argue that any particular BIAS offering is structured as a private carriage service. *See* ADTRAN Reply at 17.

[485] *See infra* Section III.D.3.

[486] *2015 Open Internet Order*, 30 FCC Rcd at 5764-65, para. 364.

[487] *Id.* at 5763-64, para. 363 ("Some individualization in pricing or terms is not a barrier to finding that a service is a telecommunications service."); *Business Data Services in an Internet Protocol Environment et al.*, WC Docket Nos. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3540, paras. 184-85 (2017) (*Business Data Services Order*) (maintaining contract tariffs, subject to sections 201, 202, and 208, for DS1 and DS3 transmission services in non-competitive areas so that parties will "be able to negotiate individualized rates"). We again conclude that some types of individualized negotiations are analogous to other telecommunications carriers whose customer service representatives may offer variable terms and conditions to customers in circumstances where the customer threatens

(continued....)

does not change the underlying fact that a BIAS provider holds the end-to-end service out directly to the public.[488]  Therefore the end-to-end service remains a telecommunications service.

## 2. BIAS Is Not an Information Service

128.    We find that BIAS, as offered today, is not an information service under the best reading of the Act because it is not itself "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."[489]  Rather, BIAS functions as a conduit that provides end users the ability to access and use information services that provide those capabilities.[490]  DNS, caching, and other information-processing capabilities, when used with BIAS, either fall within the telecommunications systems management exception to the definition of "information service," or are separable information services not inextricably intertwined with BIAS, or both, and therefore do not convert BIAS into an information service.[491]  Additionally, BIAS is not perceived by consumers or marketed by BIAS providers as an information service.

### a. BIAS Does Not Offer the Capability to Process Information in the Ways Provided in the Act

129.    Information services are applications whose information payload is transmitted via

---

to switch service providers.  *Cf. Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) (allowing individualized negotiation under sections 201 and 202 of the Act).

[488] *2015 Open Internet Order*, 30 FCC Rcd at 5764, para. 364.

[489] 47 U.S.C. § 153(24); *2023 Open Internet NPRM* at 41, para. 74; *see, e.g.*, Public Knowledge Comments at 26-30 (agreeing with this conclusion, and arguing that the Commission's focus on what the provider is "offering" leads to a reasonable conclusion that BIAS is not best classified as an information service); Ad Hoc Telecom Users Committee Comments at 2-3, 5-7 (supporting a conclusion that a classification of BIAS as an information service is "woefully dated [and] does not reflect the technological reality of BIAS in 2023"); Scott Jordan Reply at 16-17 (supporting a conclusion that BIAS is not best classified as an information service).

[490] *See* Scott Jordan Reply at 17 ("Broadband Internet access service enables end users to utilize information services."); EFF Comments at 18 ("Maintaining the regulatory distinction between Internet access on one hand and Internet services on the other is also consistent with the technical architecture of the Internet."); *see also USTA*, 825 F.3d at 698 (agreeing with an amicus brief that "consumers today 'pay telecommunications providers for access to the Internet, and *access* is exactly what they get.  For *content*, they turn to [the] creative efforts . . . of others'").

[491] *2023 Open Internet NPRM* at 42, para. 75; *2015 Open Internet Order*, 30 FCC Rcd at 5765, para. 365; *see also* Scott Jordan Reply at 8.

telecommunications.[492]  These applications provide end users with the capability to process[493] the information they send or receive via telecommunications in the ways Congress specified in the information service definition, including the capability to:  "generate" and "make available" information to others through e-mail and blogs; "acquire" and "retrieve" information from sources such as websites, online streaming services, and file sharing tools; "store" information in the cloud; "transform" and "process" information through image and document manipulation tools, online gaming, cloud computing, and machine learning capabilities; "utilize" information by interacting with stored data; and publish information on social media sites.[494]  In all these respects, information services are the platforms that edge providers offer today.[495]  Furthermore, all these information services are completely distinct from the conduit—i.e., the telecommunications—via which the payload for these services is sent and received.[496]  Although BIAS providers may separately offer some of these services to their subscribers, the information services most often accessed by users are provided by third parties.[497]

130.    The *RIF Order* and its proponents who commented in this proceeding engage in analytical gymnastics in an attempt to fit BIAS into the definition of "information service."  We are unconvinced.  They first claim that BIAS itself offers subscribers the ability to process information in the

---

[492] *See* 47 U.S.C. § 153(24) (defining "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications").  ACA Connects argues that since "information services by definition are offered 'via telecommunications,' . . . just because a service has a material transmission component does not necessarily mean it is a telecommunications service."  ACA Connects Apr. 16, 2024 *Ex Parte* at 1 n.2.  We acknowledge in our discussion of precedent that information services are offered "via telecommunications" and that the existence of a material transmission component does not necessarily render a service a telecommunications service, *see infra* Section III.C, but the classification of a service depends on the how consumers understand it and the factual particulars of how the technology functions.  As we explain at length, BIAS is best classified as a telecommunications service because consumers perceive it as such and because the transmission component has a distinct identity from any information-processing capabilities.  By contrast, ACA Connects diminishes, if not ignores, the core nature of the transmission component to BIAS.  Moreover, ACA Connects' entire claim that BIAS is an information service offering "via telecommunications" rests entirely on its assertion that BIAS is an offering of DNS, caching, and third-party information service offerings.  But the service BIAS providers offer that we are classifying is BIAS, and as we explain herein, BIAS is not those other services.

[493] We use the term "process" to reference all the terms described in the information service definition:  generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available.  *See* 47 U.S.C. § 153(24).

[494] *See, e.g.*, EFF Comments at 19 (arguing that "[i]t is applications such as Web browsers, email clients, videoconferencing software, mobile apps, and specialized 'Internet of Things' devices that" perform the functions listed in the Act's information service definition); Free Press Comments at 25 (arguing that a cloud storage provider "is the information service provider offering the capability to store and retrieve information via telecommunications, while the broadband provider simply carries that information between points selected by the user").

[495] Ad Hoc Telecom Users Committee Comments at 6-7 (explaining that Internet applications "are obtained separately by consumers from a broad range of edge providers 'via telecommunications'"); EFF Comments at 18 (stating that "the public is far more likely to look to edge providers for 'information services'").

[496] *See* Scott Jordan Reply at 4 ("[B]roadband Internet access service does not include applications offered by edge providers"); Michael Kende et al. Report at 28 ("The provision of applications is separated from the provision of the underlying network by the layering principle.").  Below we discuss how certain such services can be used for the management, control, and operation of a telecommunications system or management of a telecommunications service, and how in those instances, those services fall into the telecommunications systems management exception to the information service definition.

[497] *See infra* Section III.B.2.c (concluding that information-processing capabilities are not inextricably intertwined with BIAS).

ways prescribed by Congress's information service definition.[498] This claim simply rehashes old arguments about the integration of DNS, caching, or other information-processing capabilities into BIAS offerings, which we address below.[499] For its own part, the *RIF Order* arbitrarily found that the term "capability" is "broad and expansive" and then used that understanding to reach the conclusion that the information service definition encompasses BIAS.[500] But the *RIF Order*'s focus was misplaced. The question is not how broad the meaning of "capability" is, but what the service itself has the capability to do. As even the *RIF Order* makes clear, BIAS does not itself have the capability to process information in the ways the statute prescribes, it only "has the capacity or potential ability *to be used* to engage in the activities within the information service definition."[501] The *RIF Order* tries to prop up its flawed analysis by claiming that the "fundamental purposes" of BIAS are "for its use in" processing information in the ways described in the information service definition and that BIAS was "designed and intended" to perform those functions.[502] But this claim amounts to nothing more than statutory eisegesis: reading words into the definition of "information service" that are not there to reach the *RIF Order*'s predetermined outcome.[503] Having the "fundamental purpose" or being "designed and intended" to do something does not mean a service actually has the capability to do that thing.[504] In any event, the fundamental purpose of BIAS is to serve as a conduit through which users can access and use the applications we describe above that are themselves information services.[505] Put differently, a consumer with a BIAS connection could not generate, acquire, store, transform, process, retrieve, utilize, or make available information using that connection if those applications did not exist.[506]

131. The *RIF Order*'s expansive reading of "capability" also logically sweeps into the information service definition a category of services that is objectively different and obliterates the

---

[498] *See RIF Order*, 33 FCC Rcd at 322-23, para. 30; ACA Connects Comments at 26-27; USTelecom Comments at 7, 9-10, 18; U.S. Chamber of Commerce Comments at 41; CTIA Reply at 36; NCTA et al. Reply at 9; ADTRAN Comments at 4-16.

[499] *See, e.g.*, ACA Connects Comments at 5, 23, 27-28; NCTA Comments at 39; *infra* Section III.B.2.c (concluding that information-processing capabilities are not inextricably intertwined with BIAS).

[500] *RIF Order*, 33 FCC Rcd at 322, para. 30 (relying on a single, unrelated Commission item that used a dictionary definition of "capability" to find that the term is "broad and expansive"); CFA Comments at 62 (characterizing the *RIF Order*'s classification decision as "wrong on the technology").

[501] *RIF Order*, 33 FCC Rcd at 322, para. 30 (emphasis added); *see also* Scott Jordan Reply at 16 ("The [*RIF*] *Order* misconstrues the meaning of 'the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications'. The service must itself offer such a capability. It is not sufficient that the service enables the use of other services that offer such capabilities.").

[502] *RIF Order*, 33 FCC Rcd at 322, para. 30.

[503] *United States v. Calamaro*, 354 U.S. 351, 358-59 (1957) (holding that an agency may not insert an "addition to the statute of something which is not there"); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

[504] *See Mozilla*, 940 F.3d at 115 (Millett, J., concurring) (describing the *RIF Order* as concluding that "broadband itself need not include any data processing at all to satisfy the information-service definition" given that it found that BIAS "is 'designed and intended' with the 'fundamental purpose[]' of facilitating access to third-party information services," and noting that such a conclusion "is incompatible with *Brand X*, the basic mechanics of Title II, and the texts of the relevant definition provisions").

[505] Public Knowledge Comments at 29 ("The purpose of broadband is to connect users *to* the internet and 'interactive computer services [that] offer a 'forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.' It is not an end in itself." (quoting 47 U.S.C. § 230(a)(3))).

[506] We thus disagree with ACA Connects' conflation of the service offered by edge providers and the service offered by BIAS providers. *See* ACA Connects Reply at 28.

statutory distinction between telecommunications services and information services.  For instance, under the *RIF Order*'s conception of information services, the broadband Internet access services provided by BIAS providers like Comcast, Verizon, and AT&T are classified as the same type of services provided by edge providers like Netflix, DuckDuckGo, and Wikipedia.  But that defies reality.[507]  Furthermore, if the *RIF Order*'s framework was followed through to its logical conclusion, even the most obvious of telecommunications services, traditional switched telephone service, would be classified as an information service, as it provides customers with the ability to make information available to others (e.g., public service announcements), retrieve information from others (e.g., through a simple phone call with another person), and utilize stored information from others (e.g., by interacting with a call menu or accessing voice mailbox services).[508]  The *RIF Order* tries to get around this problem by comparing the "design," "functionality," "nature," and "purpose" of traditional telephony and BIAS, and then concluding that because they are different, BIAS cannot be a telecommunications service.[509]  But Congress did not design the Act's definitional terms to preclude the Commission from ever classifying new offerings that differ from traditional telephony as telecommunications services.[510]  Rather the Act simply provides the Commission with statutory definitions for "telecommunications service" and "information service" with which the Commission can make classification determinations on an ongoing basis.  As discussed above, the better reading of these definitions makes clear that BIAS is a telecommunications service as defined by the 1996 Act.

132.    We are also unpersuaded by the *RIF Order*'s contention, and that of some commenters in this proceeding, that BIAS is an information service by virtue of its provision of access to third-party information services.[511]  This argument conflates the critical distinction between the information services that are typically offered by third parties and are not part of the BIAS offering itself with the

---

[507] *See, e.g.*, Public Knowledge Comments at 29 (noting that the "current classification of broadband providers as 'information services,' as though a high-speed fiber ISP or a 5G network was equivalent to Etsy.com or Netflix, is an absurdity"); EFF Comments at 18 ("Today's successors to information services like America Online are not BIAS providers like Comcast, AT&T, and Verizon but rather social networks like . . . Facebook, search engines like Google and DuckDuckGo, and content sources such as news, television, movie, and sports websites."); *see also id.* at 18-19 (observing that BIAS providers offer services at different layers of the "network stack" from edge providers).

[508] *See* Free Press Comments at 27 ("The character and function of the telecom network does not change just because there is some protocol processing involved in the broadband transmission.  If that transmission processing were enough to morph a telecom service into an information service, then the PSTN would be an information service too."); Scott Jordan Reply at 16 ("Telephone exchange service enables the use of information services via the telephone exchange service.  For instance, telephone exchange service enables an end user to perform acquisition of information, namely the information transmitted via the telephone exchange service.  Telephone exchange service also enables an end user to perform storing of information, e.g., using an answering machine.  But clearly this does not make telephone exchange service an information service."); *see also Mozilla*, 940 F.3d at 116 (Millett, J., concurring) ("[T]he Commission's capacious view of 'information service' would imperil the one proposition on which everyone has so far been able to agree:  traditional telephony belongs within Title II.").

[509] *RIF Order*, 33 FCC Rcd at 346, para. 56.

[510] If Congress had intended to foreclose that option, it could have easily done so.

[511] *See RIF Order*, 33 FCC Rcd at 323, para. 31; ADTRAN Comments at 6-8; Fiber Broadband Association Comments at 6 (FBA); NCTA Comments at 40.  NCTA points to the U.S. Supreme Court's statement that, "[w]hen an end user accesses a third-party's Web site, . . . he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site . . . ."  NCTA Comments at 40 (quoting *Brand X*, 545 U.S. at 998-99).  However, the Court's statement stemmed from its affirmation of the reasonableness of the Commission's "understanding of the nature of cable modem service," as offered at the time, an understanding which we do not find applicable to BIAS as offered today.  *Brand X*, 545 U.S. at 998.

telecommunications services that BIAS providers offer to their customers.[512]  In doing so, the *RIF Order* and its supporters largely eliminate the category of "telecommunications services" established in the Act, which Congress could not have intended.[513]  Specifically, under the *RIF Order*'s framework, all telecommunications offerings used to access third-party information services that themselves have the "capability" to "store" or "transform" information would logically be transformed into information services.[514]  But the Commission has never, until the *RIF Order*, imputed the capabilities of such third-party information services to the telecommunications services that provide access to them.[515]  The *RIF Order* implicitly acknowledges the absurdity of this argument in finding the need to clarify that information services accessed via traditional telephone service do not convert that telephone service into an information service.[516]

### b.    DNS and Caching, When Used with BIAS, Fall Within the

---

[512] *See* Scott Jordan Reply at 10 ("The *2015 Open Internet Order* limited the scope of broadband Internet access service to these two sets of capabilities:  the end-to-end transmission of IP packets (the primary service) and applications that under the Order fall within the telecommunications systems management exception (adjunct services)."); *id.* at 21 (BIAS "does not include applications that do not fall within the telecommunications systems management exception."); *cf. 2010 Open Internet Order*, 25 FCC Rcd at 17934, para. 50 ("[T]hese rules apply only to the provision of broadband Internet access service and not to edge provider activities, such as the provision of content or applications over the Internet.").

[513] Congress would not have devised a scheme where the definition of "information service" would largely moot the "telecommunications service" definition or confine it only to telephone service, particularly when Congress was aware that non-telephone transmission services had been offered for years under the *Computer Inquiries* as basic services.  *See, e.g., Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment that renders superfluous another portion of the same law."); *Mozilla*, 940 F.3d at 93 (Millett, J., concurring) (noting that if "pure data transmission is an information service just because its 'purpose' is to facilitate access to other information services," then "[n]othing of any meaning would be left to qualify as a telecommunications service").

[514] Such a conclusion would be inconsistent with Commission precedent.  *See, e.g., GTE Telephone Operating Cos. GTOC Tariff No. 1, GTOC Transmittal No. 1148*, CC Docket No. 98-79, Memorandum Opinion and Order, 13 FCC Rcd 22466, 22481, para. 27 (1998) (*GTE Tariffing Order*) (concluding that where an xDSL service is used to connect to a corporate LAN, it would remain a telecommunications service), *recon. denied*, 17 FCC Rcd 27409 (1999); *id.* at 22477, para. 20 (affirming the Commission's prior conclusion that a telecommunications service does not "lose its character as such simply because it is being used as a component in the provision of a[n] [information service] that is not subject to Title II" (quoting *Filing and Review of Open Network Architecture Plans*, CC Docket No. 88-2, Memorandum Opinion and Order, 4 FCC Rcd 1, 67 n.617 (1988)); *Business Data Services Order*, 32 FCC Rcd at 3461, 3463, paras. 3, 6 (noting that business broadband services, such as DS1s, DS3s, and Ethernet, are used for "bandwidth-hungry applications, mainly video services (teleconferencing, training, etc.) as well as by web and cloud based services"); *id.* at 3568, para. 270 n.666 ("There appears to be no dispute in the record that business data services enable the transmission by customers of []intelligence of their own design and choosing and meet the telecommunications definition.").

[515] *See Mozilla*, 940 F.3d at 93 (Millett, J., concurring) (characterizing the *RIF Order* as setting forth a "novel and utterly capacious definition of information services" and noting that, "[h]istorically, the Commission has viewed telephony as pure transmission because that is exactly what it is.  Any information services—from directory assistance to automated ordering systems—to which the phone provided access were *never* thought to bear upon telephony's classification status as a telecommunications service, and not an information service.  At least not until now" (emphasis added)).

[516] *See RIF Order*, 33 FCC Rcd at 346, para. 56 ("Under pre-1996 Act MFJ precedent, for example, although the provision of time and weather services was an information service, when a BOC's traditional telephone service was used to call a third party time and weather service the Operating Company does not provide information services within the meaning of section II(D) of the decree; it merely transmits a call under the tariff.  In other words, the fundamental nature of traditional telephone service . . . [is] not changed by its incidental use, on occasion, to access information services." (internal quotation marks omitted)).

**Telecommunications Systems Management Exception**

133.    We find that information-processing capabilities, such as DNS, caching, and others, when used with BIAS, fall within the telecommunications systems management exception to the definition of "information service."[517]  The Act excludes from the definition of information service the use of information-processing capabilities "for the management, control, or operation of a telecommunications system or the management of a telecommunications service."[518]  BIAS providers sometimes use information-processing capabilities, such as DNS and caching, to manage, control, and operate the telecommunications system they operate and the telecommunications service they offer.[519]  Thus, when BIAS providers use DNS, caching, and other information-processing capabilities in that way, those services fall within the telecommunications systems management exception and therefore do not serve to convert the entire BIAS offering into an information service.[520]

134.    We find that DNS, caching, and other services the BIAS providers use with their BIAS offering comfortably fit within the telecommunications systems management exception, either because they are used to manage a telecommunications service; used to manage, control, or operate a telecommunications system; or both.[521]  We reach this conclusion by evaluating these services under the exception based on the text, structure, and context of the Act in light of the functionality of the service,

---

[517] *2023 Open Internet NPRM* at 42, para. 75; *2015 Open Internet Order*, 30 FCC Rcd at 5765, para. 365.  ACA Connects suggests that we "disregard or downplay information processing capabilities" used by BIAS providers even though we provide a fulsome analysis herein of the role those capabilities play in the provisioning of BIAS.  ACA Connects Apr. 16, 2024 *Ex Parte* at 1 n.2.  At the same time, in its filings, ACA Connects disregards or downplays the existence of the telecommunications systems management exception and how it applies to those capabilities.  *See* ACA Connects Reply at 30 n.78 (offering only a cursory assessment).

[518] 47 U.S.C. § 153(24).  We refer to this as the "telecommunications systems management exception."

[519] *See 2015 Open Internet Order*, 30 FCC Rcd at 5770, para. 372 (finding that, "[w]hen offered as a part of a broadband Internet access service, caching [and] DNS [are] simply used to facilitate the transmission of information so that users can access other services").  We disagree with those commenters who argue that we should treat the transmission component of BIAS differently than the complete BIAS offering that often uses information-processing capabilities, like DNS and caching, to facilitate competition and achieve policy goals.  For instance, ADTRAN advocates that we give BIAS providers a choice between complying with Title II requirements from which we do not forbear and our open Internet rules for their BIAS offerings, or alternatively offering the transmission component of BIAS as a separate service subject to Title II regulation.  *See* ADTRAN Comments at 34-37.  And Mitchell Lazarus advocates that the Commission institute a Title II regime for the transport component of BIAS and forbear from all Title II regulation except a requirement that facilities-based ISPs open their facilities to competing ISPs.  Mitchell Lazarus Comments at 15; *see also* ICG Comments Attach., Comments of Interisle Consulting Group, GN Docket No. 14-28, at 31-33 (filed July 15, 2014) (ICG July 15, 2014 Comments).  Both these proposals share the same fault in that they fail to recognize that the entire BIAS offering is best classified as a telecommunications service, as we explain in this Order.  Because we already have identified a legally sound approach to address the issues taken up in this Order we are not persuaded that we should instead take these approaches, which these commenters recognize would likely necessitate that we defer action and issue a further notice of proposed rulemaking to address the practical details of these alternative approaches.  *See, e.g.*, ADTRAN Comments at 36-37; Mitchell Lazarus Comments at 15-17.  And at least to the second proposal, it would likely compel all BIAS providers to separately offer the transmission component of BIAS as a telecommunications service, but the Commission, in 2017, expressed doubt about its "statutory authority to compel common carriage offerings . . . if the provider has not voluntarily" offered such a service itself.  *See Business Data Services Order*, 32 FCC Rcd 3459, 3575-76, para. 280.

[520] *2023 Open Internet NPRM* at 42, para. 75; *2015 Open Internet Order*, 30 FCC Rcd at 5765, para. 365; Internet Infrastructure Coalition Comments at 15-17 (i2Coalition) (supporting this conclusion); Scott Jordan Reply at 22-26 (same).

[521] Even if specific capabilities might seem most naturally to fit in one category or another, so long as they ultimately fit within the telecommunications systems management exception as a whole—which we find to be the case for all the capabilities at issue here—we need not precisely identify the specific category.

how the service is offered, and how consumers perceive the service.  We also take into consideration the harmonization of the 1996 Act's definitional framework with the pre-1996 Act classification framework, as we discuss in greater detail below.[522]

135.     The text, structure, and context of the Act reveal that the telecommunications systems management exception operates in the aggregate to exempt from the "information service" definition those capabilities that facilitate the operation of the telecommunications system and the telecommunications service offered or provided on such system.  While "telecommunications service" is a statutorily defined term,[523] "telecommunications system" is not.  Based on a number of uses of "system" in the Act, as well as the ordinary meaning of "system,"[524] we find that "telecommunications system" is best understood as the facilities, equipment, and devices that a provider uses in a network to offer or provide telecommunications services.[525]  Thus, management of a telecommunications service necessarily

---

[522] *See infra* Section III.C.

[523] 47 U.S.C. § 153(53).

[524] *See, e.g., System*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "system" as, among other things, "a complex whole; a set of connected things or parts; an organized body of material or immaterial things," "a set of devices (e.g. pulleys) functioning together," or "[c]omputing a group of related hardware units or programs or both, esp. when dedicated to a single application"); *System*, Collins College Dictionary (1995 ed.) (defining "system" as, among other things, "a method or set of methods for doing or organizing something:  a new system of production or distribution" or "a network of communications, transportation, or distribution"); *System*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "system" as, among other things, "a regularly interacting or interdependent group of items forming a unified whole" such as in "a number [system]," or "a group of devices or artificial objects or an organization forming a network esp. for distributing something or serving a common purpose," such as in "a telephone [system]" or "a data processing [system]").  Definitions from specialized sources provide similar definitions.  *See, e.g., System*, Newton's Telecom Dictionary (10th ed. 1996) (defining a "system" as "[a]n organized assembly of equipment, personnel, procedures, and other facilities designed to perform a specific function or set of functions").

[525] *See, e.g.*, 47 U.S.C. § 153(8) (defining "cable system" by reference to 47 U.S.C. § 522(7), which defines "cable system" as:  "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community," subject to certain exclusions); *id.* § 153(54) (defining "telephone exchange service" to include a certain service "within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange" or a certain "comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof)"); *id.* § 203(a) (requiring, among other things, tariffed charges "for interstate and foreign wire or radio communication between the different points on its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other carrier subject to this chapter"); *id.* § 225(b)(1) (referring to "the telephone system of the Nation"); *id.* § 229(b) (providing in a subsection entitled "Systems Security and Integrity" requiring rules to implement CALEA by ensuring that carriers, among other things, "to maintain secure and accurate records of any interception or access with or without such authorization"); *id.* § 302a(a) (authorizing "minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy"); *id.* § 314 (establishing certain ownership restrictions with respect to "any cable or wire telegraph or telephone line or system between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any foreign country" and "any station or the apparatus therein, or any system for transmitting and/or receiving radio communications or signals between any place in any State, Territory, or possession of the United States, or in the District of Columbia, and any place in any foreign country"); *id.* § 322 (addressing the exchange of communications among mobile systems by providing, among other things, that such "exchange . . . shall be without distinction as to radio systems or instruments adopted by each station"); *id.* § 354(h) (requiring radiotelegraph-equipped ships, under certain circumstances, to have "an efficient two-way system for calling and voice communication which shall be independent of any other communication system in the ship"); *id.* § 623 (prohibiting the sale or lease of "a multi-line telephone system, unless such system is pre-configured such that, when properly installed . . . a user may directly initiate a call to 9–1–1 from any station equipped with dialing facilities, without dialing any additional digit, code, prefix, or post-fix").

is closely interrelated with the management, control, and operation of the underlying network, equipment, and facilities used to offer or provide that service. While "manage,"[526] "control,"[527] and "operate"[528] each have independent meanings, their ordinary meanings substantially overlap. We find that these terms are therefore best viewed as sweeping into the exception any uses of information-processing capabilities with the telecommunications service or telecommunications system that satisfy that aggregate understanding, regardless of whether one might think they are better categorized within one of those terms or another. Read together, we find that these terms are meant to encompass the full scope of how a provider may use information-processing capabilities to manage a telecommunications service or manage, control, or

---

[526] *See, e.g.*, *Management*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "management" as, among other things, "the process of managing or being managed; the act of managing"); *Manage*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "manage" as, among other things, to "organize; regulate; be in charge of (a business, household, team, a person's career, etc." or "handle or wield (a tool, weapon, etc.)"); *Regulate*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "regulate" as, among other things, "control by rule," "subject to restrictions," "adapt to requirements," or "alter the speed of (a machine or a clock) so that it may work accurately"); *Management*, Collins College Dictionary (1995 ed.) (defining "management" as, among other things, "the technique or practice of managing or controlling"); *Manage*, Collins College Dictionary (1995 ed.) (defining "manage" as, among other things, "to be in charge of; administer: the company is badly managed," or "to keep under control: she disapproved of taking drugs to manage stress"); *Management*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "management" as, among other things, "the act or art of managing: the conducting or supervising of something (as a business)" or "judicious use of means to accomplish an end"); *Manage*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "manage" as, among other things, "to handle or direct with a degree of skill," or "to make and keep compliant," or "to exercise executive, administrative, and supervisory direction of").

[527] *See, e.g.*, *Control*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "control" as, among other things, "the power of directing, command (under the control of)" or "a means of restraint; a check"); *Control*, Collins College Dictionary (1995 ed.) (defining "control" as, among other things, "to regulate or operate (a machine)"); *Regulate*, Collins College Dictionary (1995 ed.) (defining "regulate" as, among other things, "to control by means of rules," such as in "a code of practice to regulate schools," or "to adjust slightly," such as in taking medicine "to regulate [the] heartbeat"); *Control*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "control" as, among other things, "to exercise restraining or directing influence over," "to have power over," or "to reduce the incidence or severity of esp. to innocuous levels"); *Regulate*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "regulate" as, among other things, "to govern or direct according to rule," "to bring order, method, or uniformity," or "to fix or adjust the time, amount, degree, or amount of"); *Rule*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "rule" as, among other things, "to exert control, direction, or influence on" or "to exercise control over esp. by curbing or restraining").

[528] *See, e.g.*, *Operation*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "operation" as, among other things, "the action or process or method of working or operating"); *Operate*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "operate" as, among other things, "manage, work, control; put or keep in a functional state"); *Work*, The Concise Oxford Dictionary of Current English (9th ed. 1995) (defining "work" as, among other things, to "operate or function, esp. effectively," "(of a part of a machine) run, revolve; go through regulation motions," or "carry on, manage, or control"); *Operation*, Collins College Dictionary (1995 ed.) (defining "operation" as, among other things, "the act or method of operating"); *Operate*, Collins College Dictionary (1995 ed.) (defining "operate" as, among other things, "to work," "to control the working of (a machine)," or "to manage, direct, or run (a business or system)"); *Work*, Collins College Dictionary (1995 ed.) (defining "work" as, among other things, "physical or mental effort directed to doing or making something" or "to operate (a machine or piece of equipment)"); *Operation*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "operation" as, among other things, the "performance of a practical work or of something involving the practical application of principles or processes" or "an exercise of power or influence"); *Operate*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "operate" as, among other things, "to perform a function: exert power or influence," "to cause to function," or "to put or keep in operation"); *Work*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "work" as, among other things, "to set or keep in motion, operation, or activity" or "cause to operate or produce").

operate a telecommunications system.[529]

136.    When evaluating information-processing capabilities under the telecommunications systems management exception, it is immaterial that a service may benefit consumers as well as providers.  As the D.C. Circuit affirmed in *USTA*, the relevant question for determining whether a service falls within the exception is whether "a carrier uses a service that would ordinarily be an information service—such as DNS or caching—to manage a telecommunications service"[530] or to manage, control, or operate a telecommunications system.  Inevitably, a capability used to manage a telecommunications service or manage, control, or operate a telecommunications system will provide benefits to the provider, but the provider may also choose to use such capabilities to benefit consumers.  Indeed, a service that facilitates the use of the system and service may provide better resource management for the provider and a better experience for the consumer.  The relative benefit to providers and to consumers falls on a spectrum, rather than being a bright line distinction.[531]  It is therefore not the case, as the *RIF Order* claimed and some commenters reassert, that the primary or exclusive benefit of a service that falls within the telecommunications systems management exception must be directed to the providers' operations.[532]

137.    *DNS Falls Within the Telecommunications Systems Management Exception.*  We conclude that DNS, when used with BIAS, falls within the telecommunications systems management exception to the definition of "information service."[533]  DNS "is most commonly used to translate domain names, such as 'nytimes.com,' into numerical IP addresses that are used by network equipment to locate the desired content."[534]  By analogy, just as a telephone book or 411 directory assistance service enables customers of telephone service to ascertain the telephone number of a desired call recipient, DNS enables customers of BIAS to ascertain the IP address of a desired Internet endpoint.[535]  DNS uses computer

---

[529] Consequently, we ultimately need not resolve the precise contours of the individual terms in order to determine the proper classification of BIAS, and we elect not to do so at this time because such decisions could have broader implications for other classification decisions outside the context of this proceeding.

[530] *USTA*, 825 F.3d at 706.

[531] *See infra* Section III.C.1 (discussing relevant pre-1996 Act precedent).

[532] *See RIF Order*, 33 FCC Rcd at 328-31, paras. 36-39; USTelecom Comments at 22; ACA Connects Reply at 30 n.78; NCTA et al. Reply at 13-14; CTIA Comments at 64.

[533] As explained in the *2015 Open Internet Order*, DNS, when offered on a standalone basis by third parties, is likely an information service.  *2015 Open Internet Order*, 30 FCC Rcd at 5769-70, para. 370 n.1046 ("To be clear, we do not find that DNS is a telecommunications service (or part of one) when provided on a stand-alone basis by entities other than the provider of Internet access service.  In such instances, there would be no telecommunications service to which DNS is adjunct, and the storage functions associated with stand-alone DNS would likely render it an information service."); *see also* NetChoice Comments at 1 (arguing that standalone DNS services are information services); ITI Comments at 7 (same); i2Coalition Comments at 16-17 (same); Innovation Economy Institute Comments at 3-4 (observing that the *2023 Open Internet NPRM* omitted mention of the classification of standalone DNS service); NTIA Mar. 20, 2024 *Ex Parte* at 2 n.4.

[534] *2015 Open Internet Order*, 30 FCC Rcd at 5768, para. 356 n.972 (citing *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4810, para. 17 n.76).  We note, as we did in 2015, that although a BIAS provider's DNS server may offer other functionalities, BIAS does not depend on such functionalities and therefore they are separable from BIAS.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5768-69, para. 369; Scott Jordan Reply at 24.

[535] *See, e.g.*, Jon Peha Comments at 6 (writing that DNS "support[s] . . . BIAS, exactly as 411 is [used] in telephone networks"); Harold Hallikainen Comments at 1 ("DNS is like a telephone book that relates a name or domain name to a number or IP address.").  DNS may still be considered analogous to an adjunct-to-basic service that would not impact the classification of the transmission service under Commission precedent, given that it facilitates use of BIAS and does not alter the fundamental character of BIAS.  *See North American Telecommunications Association Petition for Declaratory Ruling Under § 64.702 of the Commission's Rules Regarding the Integration of Centrex, Enhanced Services, and Customer Premises Equipment*, 101 F.C.C.2d 349, 359-61, paras. 24, 27, 28 (1985) (*NATA Centrex Order*) (setting forth adjunct-to-basic classification standard); *North American Telecommunications Association Petition for Declaratory Ruling Under Section 64.702 of the Commission's Rules Regarding the*

(continued….)

processing to convert the domain name that the end user enters into an IP address number capable of routing the communication to the intended recipient.[536]  In addition to providing benefits to consumers, a BIAS provider's DNS service benefits the provider, as it "may significantly reduce the volume of DNS queries passing through its network"[537] and can be employed by BIAS providers for "load balancing" and enabling efficient use of limited network resources during periods of high traffic or congestion.[538]  We thus agree with the *2015 Open Internet Order*'s conclusion that DNS "allows more efficient use of the telecommunications network by facilitating accurate and efficient routing from the end user to the receiving party."[539]

138.    USTelecom argues that because DNS is "undeniably [an] information service[] when offered by third parties," we cannot also conclude that same service is used for telecommunications management by BIAS providers.[540]  It contends that *Brand X*'s holding—that the statutory definitions do not distinguish between facilities-based and non-facilities-based carriers but on the capabilities the provider offers via the service—forecloses that conclusion.[541]  We disagree.  As the statute's text makes clear, the telecommunications systems management exception explicitly provides that information-processing capabilities are not information services when they are used for the purposes of managing a telecommunications service or managing, controlling, or operating a telecommunications network.[542]  Thus, the purpose for which a capability is used is key to evaluating the capability under the exception.[543]

*Integration of Centrex, Enhanced Services, and Customer Premises Equipment*, ENF 84-2, Memorandum Opinion and Order, 3 FCC Rcd 4385, 4386, para. 11 (1988) (classifying "communications between a subscriber and the network itself for call setup . . . [and] call cessation," two essential functionalities for using telephone service, as adjunct to basic); Scott Jordan Reply at 24 (agreeing that DNS facilitates use of the network and does not alter the fundamental character of BIAS); Letter from Scott Jordan & Jon Peha, Professors, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-2 (filed Mar. 28, 2024) (Jordan/Peha Mar. 28, 2024 *Ex Parte*) (same); *see also* Andrew Gallo Comments at 1-2 ("Does conversion of a user-dialed (DTMF or dial-pulse) number into an ISDN setup message or SS7 ISUP message change the classification of that service?  No, of course not.").

[536] *See 2015 Open Internet Order*, 30 FCC Rcd at 5767, para. 367; *see, e.g.*, i2Coalition Comments at 16-17 (arguing that the "fundamental purpose [of DNS] is to route information").

[537] Scott Jordan Reply at 24.

[538] *See, e.g.*, CTIA Comments at 53 & n.197 (citing Peter Rysavy Declaration at 14 for the proposition that "DNS provided by the service provider often plays an integral role in caching and load balancing"); *see also* Scott Jordan Reply at 15 (noting that "the fact that the DNS . . . may resolve the same domain name to one or more virtual locations (e.g., due to load balancing) does not change" the conclusion that "the transmission of information of the user's choosing is between or among points specified by the user").

[539] *2015 Open Internet Order*, 30 FCC Rcd at 5768, para. 368; *see also id.* at 5768, para. 368 n.1037 ("DNS manages the network in the sense of facilitating efficient routing and call completion.  In any event, even if DNS were not viewed as facilitating network management, it clearly would fall within the exception as a capability used for the 'operation of a telecommunications system.'  47 U.S.C. § 153(24). . . . [C]aching and other services which provide a benefit to subscribers, like DNS, also serve as a capability used for the operation of a telecommunications system by enabling the efficient retrieval of information.").

[540] *See* USTelecom Comments at 21; *see also* ACA Connects Apr. 16, 2024 *Ex Parte* at 2 n.2 (arguing that DNS and caching cannot be classified as management when offered by BIAS providers).

[541] *See id.* (citing *Brand X*, 545 U.S. at 997).

[542] 47 U.S.C. § 153(24).

[543] We note that USTelecom attempts to relitigate an argument that was settled by the D.C. Circuit in *USTA*.  *See* USTelecom Comments at 21 (arguing that *Brand X* "foreclosed" the conclusion upheld by *USTA*); *USTA*, 825 F.3d at 706 ("Again, US Telecom has given us no basis for questioning the reasonableness of this conclusion.  Once a carrier uses a service that would ordinarily be an information service—such as DNS or caching—to manage a telecommunications service, *that service no longer qualifies as an information service under the Communications Act*.  The same service, though, when unconnected to a telecommunications service, remains an information service." (emphasis added)).  We are not persuaded to depart from the court's understanding as reflected in *USTA*.

In the case of DNS, "[i]t is important to distinguish between a DNS server operated by a broadband provider and a DNS server operated by an unaffiliated entity, as they have different reasons for operating a DNS server."[544] While DNS offered by a third party likely does not fall within the exception because the third party is not "us[ing] . . . such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service,"[545] the fact that BIAS providers use DNS to manage BIAS or manage, control, or operate their BIAS networks causes it to fall within the exception.

139. *Caching Falls Within the Telecommunications Systems Management Exception.* We conclude that caching, when used with BIAS, falls within the telecommunications systems management exception to the definition of "information service."[546] Caching "is the storing of copies of content at locations in a network closer to subscribers than the original source of the content."[547] BIAS providers use caching "to facilitate the transmission of information so that users can access other services, in this case by enabling the user to obtain 'more rapid retrieval of information' through the network," and thereby offer faster BIAS to consumers.[548] A BIAS provider also uses caching for a number of internal benefits, including "to decrease its own bandwidth" and for "capacity management," so that the strain of subscribers' traffic on certain network segments or equipment is reduced,[549] and to "reduce its own transit

---

[544] Scott Jordan Reply at 23-24.

[545] 47 U.S.C. § 153(24).

[546] *2023 Open Internet NPRM* at 44, para. 78. Caching used by BIAS providers is distinct from CDN caching. CDNs are a "system of computers networked together across the Internet that cooperate transparently to deliver content to end users, in order to improve performance, scalability, and cost efficiency." *CDN*, Newton's Telecom Dictionary (31st ed. 2018). These servers, typically owned and managed by third-party CDN providers and not BIAS providers, cache edge provider content close to BIAS subscribers to improve subscribers' load times. *See* Netflix Reply at 25; *see also* Akamai Technologies, Inc. Comments at 3 (Akamai) ("On behalf of its customer, Akamai then optimizes end user access to the customer's content and applications over the end user's own internet connection."); *id*. at 8 (explaining that "CDN services are marketed and sold to content providers and other businesses"); Cloudflare Comments at 10 (noting that CDNs are not sold to end users but "[r]ather, they offer the 'edge providers,' those Internet destinations that BIAS customers seek to reach, [and] ways to improve [their] security and efficiency"). As explained in the *2015 Open Internet Order*, CDNs, when offered on a standalone basis, such as by third parties, likely provision an information service. *2015 Open Internet Order*, 30 FCC Rcd at 5771, para. 372; *see also* Akamai Comments at 2 ("Akamai caches its customers' content and optimizes access to their applications in and via distributed, Akamai-controlled servers in locations at the network edge."); Cloudflare Comments at 10 ("A CDN is a distributed network of servers that caches content close to end users, reducing load times."); Jon Peha (DNS et al.) Reply at 3 ("Some of the comments refer to content distribution network (CDN) service and traditional transparent caching as if they were the same thing, but they differ from a technical perspective, from a business perspective, and from a regulatory perspective."). As discussed below, we exclude third-party CDNs from the scope of BIAS. *See infra* Section III.D.1. One commenter references an amicus brief to argue that caching "is not a network management function" because "caching is often done not by BIAS providers, but by third parties." Richard Bennett et al. Amicus Brief at 16. This only serves to demonstrate how dispensable caching is to the provisioning of BIAS and highlights how a service can fall within the telecommunications systems management exception when used by a provider to provision a telecommunications service and not fall within the exception when it is used for another purpose. *See USTA*, 825 F.3d at 706.

[547] *2015 Open Internet Order*, 30 FCC Rcd at 5758, para. 356 n.973 (citing *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4810, para. 17 n.76).

[548] *2015 Open Internet Order*, 30 FCC Rcd at 5770, para. 372 (quoting *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4810, para. 17 n.76); Scott Jordan Reply at 24 (explaining that "if a broadband provider chooses to implement caching inside its network . . . then it is doing so in order to manage its broadband Internet access service").

[549] Andrew Gallo Comments at 2.

costs, because cached information need[] not be retrieved across a tier-1 backbone network."[550] Indeed, Verizon currently describes its caching of video content as "network management."[551] For these reasons, we conclude that caching, when offered by a BIAS provider, falls within the telecommunications systems management exception to the definition of information service.[552]

### c.    Information-Processing Capabilities Are Not Inextricably Intertwined with BIAS

140.    Even if, *arguendo*, DNS, caching, and other information-processing capabilities did not fall within the telecommunications systems management exception to the definition of "information service," BIAS providers offer these capabilities as separate components that are not inextricably intertwined with BIAS, and therefore they do not convert BIAS into an information service.[553]

141.    Whether an information service is inextricably intertwined with a telecommunications service turns principally on whether users view the offering as a bundle of a telecommunications service and one or more information services or instead as a single integrated offering that is an information service.[554] Users' perception of the offering can be supported by a functional evaluation focused on whether the information service components are separable from the telecommunications service components.[555] In this case, the evidence of consumer perception and the separability of the functions at

---

[550] Jon Peha (DNS et al.) Reply at 3. We are therefore unpersuaded by assertions that caching is used primarily or exclusively to benefit end users, and for the reasons provided above, disagree that any benefits to users disqualify caching from the telecommunications systems management exception. *See RIF Order*, 33 FCC Rcd at 332-33, para. 42; NCTA Comments at 43, 45. Richard Bennett similarly argues that caching falls outside the exception because it "does not affect the transmission rate of bits on the network medium." Richard Bennett et al. Amicus Brief at 16. But Richard Bennett does not point to any statutory language or Commission precedent that requires a service to "affect the transmission rate of bits" in order to fall within the exception. *Id.*

[551] S*ee* Verizon, *Network Management*, https://www.verizon.com/about/our-company/network-management [https://perma.cc/RQN2-9ULT] (describing "video caching" as an "optimization technolog[y]" that "transmit[s] data files in a more efficient manner to allow available network capacity to benefit the greatest number of users").

[552] *See* Jon Peha (DNS et al.) Reply at 3 ("Thus, transparent caching falls within the management exemption, i.e., transparent caching is 'for the management, control, or operation of a telecommunications system or the management of a telecommunications service.'"); Scott Jordan Reply at 24 ("[I]f a broadband provider chooses to implement caching inside its network, and not as a content delivery network service offered to edge providers, then it is doing so in order to manage its broadband Internet access service.").

[553] *2023 Open Internet NPRM* at 42, para. 75; *2015 Open Internet Order*, 30 FCC Rcd at 5670-71, paras. 370-71 (concluding that DNS is not inextricably intertwined with BIAS, and noting that BIAS provider caching is "distinct from third party caching services provided by parties other than the provider of internet access service"); *see, e.g.*, Jon Peha Comments at 5 (supporting this conclusion); Free Press Comments at 29-30 (same); i2Coalition Comments at 15-16 (same); Jon Peha (DNS et al.) Reply at 3 (same); Free Press Reply at 8-11 (same); Scott Jordan Reply at 22-24 (same).

[554] *See Brand X*, 545 U.S. at 990 ("It is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product, as the dissent concedes."); *Brand X*, 545 U.S. at 1006-07 (Scalia, J., dissenting) ("The relevant question [in determining what is offered,] is whether the individual components in a package being offered still possess sufficient identity to be described as separate objects of the offer, or whether they have been so changed by their combination with the other components that it is no longer reasonable to describe them in that way."); *Mozilla*, 940 F.3d at 90 (Millett, J., concurring) (concluding that "what led the Supreme Court to accept [the Commission's cable modem service classification rationale is] that information services like email, newsgroups, caching and DNS were *sufficiently significant* to define the overall 'offering' and thus, to control the classification decision." (emphasis added)).

[555] *See Brand X*, 545 U.S. at 997 (concluding that under the Commission's approach, where an information and telecommunications service are offered together, the telecommunications service is a separate offering when it is only "trivially affected" by the information service); *id.* at 991 (explaining that whether services bundled with BIAS

(continued....)

issue both point to one conclusion—BIAS is not an integrated information service.[556]

142.	We base our conclusion first and foremost on an examination of the consumer perception of the BIAS offering, which shows that consumers do not perceive the offering as an information service. We also examine the role that DNS, caching, and other information-processing capabilities functionally play in provisioning BIAS today and find that they are separable.  We reiterate the factual reality that the core element of BIAS, as offered by BIAS providers today, is the transmission component.[557]  Without the transmission component, BIAS, as offered today, would be no service at all.  As we elaborate below, the same cannot be said for DNS, caching, and other information-processing capabilities, and thus they cannot reasonably be viewed to convert the core, indispensable transmission component of BIAS into an information service.[558]  We also discuss below that the availability of those services from third parties, and the use of those third-party services by consumers, demonstrate that BIAS providers' DNS and caching components are neither integral nor indispensable to their provisioning of BIAS.  Given consumer perception and these functional realities, DNS, caching, and other information-processing capabilities cannot be inextricably intertwined with BIAS and therefore they do not convert BIAS into an integrated information service.

143.	The *RIF Order* tried to fortify its information service classification by asserting that DNS, caching, and other information-processing capabilities are inextricably intertwined with the transmission component of BIAS, thereby transforming BIAS into a single, functionally integrated

are functionally integrated "turns not on the language of the Act, but on the factual particulars of *how Internet technology works* and how it is provided" (emphasis added)).  Thus, the mere act of bundling an information service with a telecommunications service, does not, on its own, automatically cause the services to become inseparable or inextricably intertwined.  *See, e.g., Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 98-11, 98-147, 98-26, 98-32, 98-78, and 98-91, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 24012, 24030, para. 36 (1998) (*Advanced Services Order*) ("Incumbent LECs have proposed, and are currently offering, a variety of [information] services in which they use xDSL technology and packet switching to provide members of the public with a transparent, unenhanced, transmission path.  Neither the petitioners, nor any commenter, disagree with our conclusion that a carrier offering such a service is offering a 'telecommunications service.'").

[556] To the extent that prior Commission decisions suggested that an "inextricably intertwined" analysis was an independent prerequisite to a telecommunications service classification, we are now changing course in light of our evaluation of the statute.

[557] *See, e.g.,* Jon Peha Comments at 4 ("BIAS is fundamentally an IP Packet Transfer service . . . ."); Scott Jordan Reply at 14 ("The core component of broadband Internet access service is the end-to-end transmission of IP packets.").  Our definition of BIAS, remaining unchanged since 2010, makes clear that the "data transport service," or "telecommunications component," and BIAS are indeed one in the same.  *See infra* Section III.D.1 (defining broadband Internet access service as a service that provides the capability "to transmit data to and receive data from all or substantially all Internet endpoints").

[558] We thus disagree with commenters who argue that the *RIF Order*'s approach to understanding inextricably intertwined services "best implements the Commission's long-standing view that Congress intended the definitions of 'telecommunications service' and 'information service' to be mutually exclusive."  *RIF Order*, 33 FCC Rcd at 343, para. 53; *see id.* (concluding its approach is the best way to do so because Internet access, when combined with information-processing capabilities, "cannot be a 'stand-alone' offering of telecommunications"); *see also* ADTRAN Comments at 8 (citing *RIF Order*); CTIA Reply at 42-43; USTelecom Comments at 9 (concluding that the categories are mutually exclusive and that "[b]ecause broadband internet access service meets the statutory 'information service' definition, it cannot be a telecommunications service.").  That reasoning is tautological, relying on the assumption that BIAS is an information service on the basis that it combines information-processing capabilities and a transmission component, and ignores our showing here that the information-processing capabilities fall within the telecommunications systems management exception, are separable information services, or both.

information service[559]—and some commenters in this proceeding endorse that proposition.[560] But the *RIF Order* treated its "inextricably intertwined" analysis as entirely separate and distinct from the question of how users perceive the relevant "offer" without identifying any statutory basis for doing so.[561] Even relying on this narrow analysis, the *RIF Order* reached the wrong conclusion. Although the *RIF Order* recognized that "the Internet marketplace has continued to develop in the years since the earliest classification decisions,"[562] it failed to give "serious technological reconsideration and engagement" to those new factual developments.[563] Instead, the *RIF Order* found that DNS and caching, specifically, were "indispensable functionalit[ies] of broadband Internet access service" at the time the *RIF Order* was adopted.[564] At the same time, the *RIF Order* tried to downplay the primacy of the transmission component in the BIAS offering.[565] But "the Commission's exclusive reliance on DNS and caching blinkered itself off from modern broadband reality, and untethered the service 'offer[ed]' from both the real-world marketplace and the most ordinary of linguistic conventions."[566] As Judge Millett wrote in her concurrence to the D.C. Circuit's decision in *Mozilla*, "the roles of DNS and caching themselves have changed dramatically since *Brand X* was decided. And they have done so in ways that strongly favor classifying broadband as a telecommunications service, as Justice Scalia had originally advocated."[567]

144.    *Consumers Do Not Perceive BIAS as an Information Service.* Contrary to record assertions,[568] consumers do not perceive BIAS as an information service. As an initial matter, the record does not show that consumers perceive information-processing capabilities, such as DNS and caching, let alone understand those capabilities as information services and thereby view the entire BIAS offering as an information service based on those capabilities.[569] Moreover, unlike the situation with ISPs of 30

---

[559] *RIF Order*, 33 FCC Rcd at 338-39, paras. 49-50.

[560] *See, e.g.*, CTIA Comments at 80-81; USTelecom Comments at 17-10; Rysavy Declaration at 17; NCTA Comments at 43; NCTA et al. Reply at 11; *id.* at 12; Ohio Telecom Association Reply at 2.

[561] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 338-39, para. 49.

[562] *Id.* at 321, para. 28.

[563] *Mozilla*, 940 F.3d at 91 (Millett, J., concurring).

[564] *See RIF Order*, 33 FCC Rcd at 326, para. 34; *see also Mozilla*, 940 F.3d at 22 ("In passages echoing *Brand X*, the Commission characterized the essential roles of DNS and caching. As to DNS, it observed that DNS is 'indispensable to ordinary users as they navigate the Internet. . . . [T]he absence of ISP-provided DNS would fundamentally change the online experience for the consumer.' This formulation is actually a good deal more cautious than that of the Court in *Brand X*, which declared that without DNS a 'user cannot reach a third party's Web site.'" (internal citations omitted)).

[565] *RIF Order*, 33 FCC Rcd at 342-43, para. 52 ("Because we find it more reasonable to conclude that at least some telecommunications is being used as an input into broadband Internet access service—thereby satisfying the 'via telecommunications' criteria—we need not further address the scope of the 'telecommunications' definition in order to justify our classification of broadband Internet access service as an information service.").

[566] *Mozilla*, 940 F.3d at 91 (Millett, J., concurring).

[567] *Id.* at 90 (Millett, J., concurring); *see also id.* at 94-95 (Wilkins, J., concurring) ("As Judge Millett's concurring opinion persuasively explains, we are bound by the Supreme Court's decision in [*Brand X*], even though *critical aspects of broadband Internet technology and marketing underpinning the Court's decision have drastically changed since 2005.*" (emphasis added)).

[568] *See, e.g.*, NCTA Comments at 45; USTelecom Reply at 7.

[569] Of the consumers that do perceive these information-processing capabilities, they are likely the consumers that would configure their system to obtain these information-processing capabilities from third parties and therefore view them as a separate offering. In its reply, CTIA claims, without evidence, that "[c]onsumers also *know* that BIAS offer[s] these [information service] capabilities—that is why they purchase BIAS—and that BIAS relies on advanced under-the-hood technologies, regardless of whether they understand the precise mechanics of those technologies, such as advanced DNS, caching, protocol translation, dynamic network management, and other

(continued….)

years ago, today's BIAS consumers do not purchase BIAS to receive an all-in-one suite of information services offered by their provider, or to gain access to a "walled garden" of Internet endpoints cached by their provider.[570] Instead, as already explained, consumers' desired information services are generally the applications, content, or services offered by third-party edge providers across the global Internet that provide end users with the capability to process the information they send or receive via the BIAS provider's telecommunications.[571] Consumers view these information services as completely distinct and separable from the transmission conduits offered by BIAS providers today. Consumers understand that when they access Netflix or an Apple iCloud storage account, the BIAS provider is "offering" the "capability" to *access* these third-party services,[572] and not that these information services are being offered by the BIAS provider itself.[573] While consumers may "highly value" the ability to access third-party services using their BIAS connections, that does not support a conclusion that BIAS is an information service.[574] Additionally, consumers' relationship with their BIAS providers is distinct from

---

evolving services." CTIA Reply at 40 (internal quotation marks omitted). But CTIA undercuts this claim about consumer perception in a later filing where it and USTelecom assert that nearly all consumers "do not even know what DNS does." Letter from Scott H. Angstreich et al., Counsel for USTelecom—The Broadband Association, to Marlene H. Dortch, Secretary, FCC, at 3 (Mar. 22, 2024) (CTIA/USTelecom Mar. 22, 2024 *Ex Parte*).

[570] *Mozilla*, 940 F.3d at 90 (Millett, J., concurring) ("[T]he significance of the walled garden is . . . likely what led the Supreme Court to accept[] that information services like email, newsgroups, caching, and DNS were sufficiently significant to define the overall 'offering' and, thus, to control the classification decision. The only question was whether those services were sufficiently integrated with transmission to constitute a single offering."); *see 2015 Open Internet Order*, 30 FCC Rcd at 5753, para. 347 (noting that, in the time of the *Cable Modem Declaratory Ruling*, "subscribers to cable modem services 'usually d[id] not need to contract separately' for 'discrete services or applications' such as e-mail. Today, [BIAS] providers still provide various Internet applications, including e-mail, online storage, and customized homepages, in addition to newer services such as music streaming and instant messaging. But consumers are very likely to use their high-speed Internet connections to take advantage of competing services offered by third parties."); *see, e.g.*, EFF Comments at 18-19 (arguing that consumers perceive the BIAS transmission service as separate from the applications to which it provides access); Ad Hoc Telecom Users Committee Comments at 6 (asserting that, unlike in the early days of the Internet, "[t]he internet access service is merely the *connection* to the additional [features and applications]—a vital connection, but a simple conduit providing telecommunications in order to effectuate the transmission of information of the user's choosing, as requested, and unchanged in form or content from origination to termination").

[571] *Mozilla*, 940 F.3d at 89-90 (Millett, J., concurring) (concluding that today's "typical broadband offering bears little resemblance to its *Brand X* version. The walled garden has been razed and its fields sown with salt. The add-ons described in *Brand X*—'a cable company's e-mail service, its Web page, and the ability it provides consumers to create a personal Web page,'—have dwindled as consumers routinely deploy 'their high-speed Internet connections to take advantage of competing services offered by third parties'"); *see also* Cloudflare Comments at 12 ("The fundamental role that CDNs and similar services play in the Internet ecosystem from the perspective of the end user . . . has not changed since . . . the *2015 Open Internet Order*.").

[572] *See* Ad Hoc Telecom Users Committee Comments at 6-7 ("[C]onsumers purchase BIAS from an ISP and [separately] obtain email, browsers, storage, and a universe of other features and applications . . . . from a broad range of edge providers . . . .").

[573] *See* EFF Comments at 18 ("[T]he public is far more likely to look to edge providers for 'information services[]' [such as] TikTok and Facebook, . . . Google and DuckDuckGo, . . . news, television, movie, and sports websites."); *cf.* Akamai Comments at 8-9 (comparing consumer perception of BIAS with that of CDNs, a non-telecommunications service).

[574] *RIF Order*, 33 FCC Rcd at 335, para. 46 n.161 (supporting its information service classification by noting that consumers "highly value the capabilities their BIAS providers offer to acquire information from websites" and that BIAS allows them to "interact with information online"); ADTRAN Comments at 7 ("[C]ustomers value highly these [information service] capabilities' ability to interact with others rapidly and reliably."). The *RIF Order*'s primary argument that consumers perceive BIAS as an information service rests on its misunderstanding that DNS and caching convert BIAS into an information service rather than fall into the telecommunications systems management exception, as we establish above. *See RIF Order*, 33 FCC Rcd at 335, para. 46 (asserting that because

(continued….)

their relationships with edge providers. Most consumers have relationships with one or two BIAS providers—e.g., one for fixed residential service and one for mobile service—to gain access to the Internet.[575] Conversely, consumers may have relationships with dozens or even hundreds of edge providers to utilize the wide range of services that ride over the top of their BIAS connections.[576] Accordingly, we are unconvinced by USTelecom's assertion that its consumer surveys show we are wrong to conclude that consumers perceive BIAS as a telecommunications service and not an information service.[577]

---

BIAS providers "generally market and provide information processing capabilities and transmission capability together as a single service[,] . . . it is not surprising that consumers perceive the offer of broadband Internet access service to include more than mere transmission").

[575] *See 2024 Section 706 Report* at 11, para. 20 (reporting U.S. Census American Community Survey data showing 81% of households subscribe to fixed and mobile service and describing a recent Pew Research study that found 85% of consumers own a smartphone and 77% have home broadband).

[576] *Top 100: The Most Visited Websites in the US*, Semrush Blog, https://www.semrush.com/blog/most-visited-websites (last updated Feb. 2024).

[577] *See* USTelecom Reply at 7; Letter from Scott H. Angstreich, Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, at 4 (filed Feb. 27, 2024) (USTelecom Feb. 27, 2024 *Ex Parte*); Letter from Scott H. Angstreich, Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, at 1 (filed Apr. 18, 2024) (USTelecom Apr. 18, 2024 *Ex Parte*). USTelecom relies on two consumer surveys to support its assertion. The first survey purports to show that 92% of consumers perceive broadband as providing information service capabilities, while only 8% of respondents said their broadband service offers only the capability to transmit information between or among points of their choosing. *See* USTelecom Reply at 7. The second survey purports to remedy the faults of the first, but it not only fails to do so, it serves to further undermine the first survey. *See* USTelecom Apr. 18, 2024 *Ex Parte*. The first survey suffers from two primary faults. To start, the results are misleading because the survey was weighted by providing four "information service" options to one "telecommunications service" option and the respondents' information service selections were aggregated. *See* USTelecom Reply Exh. B, Recon Analytics, *Broadband Survey Results* at 1-2, 8 fig.4 (First Recon Analytics Survey). USTelecom argues that "a question structure that offers multiple information service capability options, while directing respondents to select all that apply, does not bias the results." USTelecom Apr. 18, 2024 *Ex Parte* at 1. But when there are only two categories to begin with, providing one option for one category and four options for the other objectively biases the results. That fact is very clearly proven by the results of the second survey, which provided one option for the information service category and had a wildly different result. Specifically, while in the first survey, "59% of respondents selected at least one information service option without also selecting the telecommunications service option," in the second survey, only 10.8% of respondents selected the information service option without also selecting the telecommunications service option. *See id.*; USTelecom Apr. 18, 2024 *Ex Parte* Attach., Recon Analytics, *Broadband Survey Results — Response to Draft Order* at 1-2 (Second Recon Analytics Survey). Returning to the first survey, the second fault is that the terminology it used misrepresented the statutory language by suggesting that BIAS itself has the capability to perform the functions listed in the statute, and also used plain English language for the so-called "information service" options while using more technical language for the "telecommunications service" option. *See* USTelecom Reply Exh. B, Recon Analytics, *Broadband Survey Results* at 8 fig.4 (First Recon Analytics Survey) (asking respondents which options their broadband service "offer[s] the capability to perform," and including one option that closely resembles the statutory definition of "telecommunications"—"Transmit information between or among points of your choosing, without changing the information's form or content"—and four options that loosely represent the "information service" definition—(1) "Retrieve, acquire, or use information on websites;" (2) "Store photos and files in the cloud;" (3) "Make information available to other people through social media;" and (4) "Generate, transform or process your own information or others' information"). USTelecom claims "[t]hat is not a valid criticism of the survey. . . ." USTelecom Apr. 18, 2024 *Ex Parte* at 2. But to suggest that the reliability of the survey does not depend on the formulation of the questions is not only fallacious, it is proven wrong by the second survey. While both surveys profess to measure consumer perception of broadband, their different question formulations result in markedly different results. *Compare* First Recon Analytics Survey at 6 fig.1 (showing 59% chose solely information service options, 8% chose the sole telecommunication service option, and 33% chose the telecommunications service option and one or more information service options), *with* Second Recon Analytics Survey at 5 fig.1 (showing that for the formulation using statutory wording, 10.8% chose the information service

(continued….)

145. Consumer perception is also backed by BIAS providers' marketing practices, which also do not show, as some commenters claim, that BIAS is best understood as an information service.[578] Contrary to NCTA's contention, BIAS providers' marketing practices do not support a conclusion that they compete on the basis of their offering of "online storage, spam filters, [or] security protections," for example.[579] While consumers may be "aware of and value" the features offered by their BIAS providers,[580] and some of these features also may be mentioned in BIAS providers' advertising,[581] that does not undercut the significant evidence that BIAS providers predominantly market BIAS as a transmission service.[582] We also agree with Public Knowledge that "BIAS provider[s'] various attempts to enter adjacent markets or bundle services with broadband do not change the nature of the service they offer, no[r] do they change 'what the consumer perceives to be the integrated finished product.'"[583] ACA Connects argues that the "marketing of broadband service has not undergone substantial change since the inception of the service," and that such marketing "has always emphasized both the always-on capabilities that broadband service affords subscribers, including the ability to retrieve, store, and utilize the panoply of available internet content and applications, and the fast speeds at which they are able to stream, download, and upload internet content."[584] However, ACA Connects deflects from its failure to provide evidence to support such sweeping claims[585] by adding that, "[t]o the extent that our Members' marketing may place a greater emphasis on speed, this is a response to increased consumer familiarity

---

option, 12.8% chose the telecommunications service option, 35.5% chose both, and 40.9% did not know, and that for the formulation using "common wording," 10.9% chose the information service option, 13.1% chose the telecommunications service option, 44% chose both, and 32% did not know). Both surveys share the same additional fault in that they fail to treat the telecommunications service and information service categories as mutually exclusive, as we must. Thus, far from clarifying consumers' perception about BIAS, the results from the two surveys, and their shortcomings, only demonstrate that they cannot be viewed as reliable sources of consumer perception of BIAS. However, it is worth noting, given the importance of evaluating consumer perception of the offering, as established by the Supreme Court in *Brand X* and consistently affirmed by Commission and court precedent, *see supra* Section III.B (discussing precedent relying on consumer perception), that USTelecom's surveys do not show that consumers perceive BIAS as an information service, as opponents of reclassification would have us conclude. Indeed the second survey, which used more reliable question and answer formulations than the first, shows that more consumers perceive BIAS as providing the capabilities of a telecommunications service than providing the capabilities of an information service.

[578] *See, e.g.*, NCTA Comments at 45; ADTRAN Comments at 7.

[579] *See* NCTA Comments at 45.

[580] *Id.*; *see also RIF Order*, 33 FCC Rcd at 335, para. 46 ("[R]ecord evidence confirms that consumers highly value the capabilities their ISPs offer to acquire . . . and otherwise process such information.").

[581] *See, e.g.*, NCTA Comments at 45; ACA Connects Comments Attach. A, Declaration of Patrice Carroll, ImOn Communications at 4 (ImOn Communications Declaration).

[582] *See supra* Section III.B.1.b.

[583] *See* Public Knowledge Comments at 30 & n.83 (quoting *Brand X*, 545 U.S. at 990); *see also* ICG Comments at 9 (noting that "[b]undles and offers do not define a service. Vertical integration of a retail product to include additional non-telecommunications services does not change the nature of the underlying services"); Public Knowledge Comments at 30 ("People use their broadband connections to access social media, attend remote classes, read the news, participate in video calls, and listen to music—to access the Internet at large—not to use their ISP's cloud storage or email offerings, assuming they even know they exist.").

[584] ACA Connects Comments at 29.

[585] We note that at least one of ACA Connects' members, Sjoberg's Cable TV, does not appear to emphasize or even mention *any* of the information- service capabilities in its advertisement for BIAS. *See Sjoberg's Cable T.V.*, https://visittrf.com/media/images/Screen_Shot_2020-01-08_at_7.33.47_PM.max-800x600.png [https://perma.cc/Q999-LGGN] (last visited Feb. 29, 2024).

with the capabilities offered by broadband service."[586]  We are not convinced.  We find that a more reasonable conclusion drawn from BIAS providers' marketing practices is that consumers select a BIAS provider based on the quality of its transmission service offering, and thus BIAS providers compete on this basis.

146.     *DNS Is Not Inextricably Intertwined with BIAS.*  In reviewing the factual particulars of how DNS is functionally provided today, we find that it is a separable service that is not inextricably intertwined with BIAS and therefore does not convert BIAS into an information service.[587]  Claims that the Internet "would not work" without DNS,[588] that DNS "is a must for broadband to function properly,"[589] or that there "is no Internet service without DNS,"[590] are simply not borne out by the architecture of BIAS.  The record reveals that DNS is not necessary to IP packet transfer, which is the core function of the service.[591]  As Professor Jon Peha explains, DNS is an "application that run[s] on top of IP packet transfer"[592] and that, "[f]rom the beginning, the DNS . . . was designed to be separate from the systems that provide IP Packet Transfer Service."[593]

147.     Even if DNS were necessary to the functionality of BIAS, the DNS offerings of BIAS providers are not themselves essential to BIAS, and therefore cannot be inextricably intertwined with

---

[586] ACA Connects Comments at 29.  Indeed, ACA Connects' own members state that their "current marketing focuses on differentiating ourselves from our competitors by touting the speeds and process of our service packages" and "[t]he marketing of our broadband services *puts primary emphasis* on the speeds we offer, network reliability, and performance."  ACA Connects Comments at 29 n.56 (emphasis added) (internal quotation marks omitted) (quoting ACA Connects Comments Attach. B, Declaration of Katherine Gessner, Massillon Cable TV, Inc. at 4 and ACA Connects Comments Attach. C, Declaration of James Gleason, Vexus Fiber, LLC at 3 (Vexus Fiber Declaration)).  ACA Connects attempts to preserve its argument by asserting that "it is unremarkable that broadband providers emphasize . . . speeds and reliability . . . while ignoring basic information-processing capabilities" because that advertising choice does not undermine its assertion that the information-processing capabilities are integrated into the offering.  ACA Connects Apr. 16, 2024 *Ex Parte* at 4 n.7.  But the question here is what consumers perceive to be the offering, and in part due to the focus of BIAS providers' advertising on factors critical to transmission of information, consumers perceive the offering as a telecommunications service.  Whether information-processing capabilities are integrated is a question of functionality that we discuss below.

[587] Indeed, as Free Press notes, "many ISPs have moved away from making these same tired and demonstrably false arguments that DNS service and caching transform a telecommunications service into an information service."  Free Press Reply at 8.  As we noted in the *2015 Open Internet Order*, now that we conclude that DNS falls within the telecommunications systems management exception, "prior factual findings that DNS was inextricably intertwined with the transmission feature of cable modem service do not provide support for the conclusion that cable modem service is an integrated information service."  *2015 Open Internet Order*, 30 FCC Rcd at 5759, para. 358.

[588] USTelecom Reply at 8; CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 2.

[589] NCTA et al. Reply at 14 (quoting *Mozilla*, 940 F.3d at 32, which was quoting the *RIF Order*, 33 FCC Rcd at 326, para. 34, as making this assertion).

[590] Richard Bennett Comments at 6.

[591] *See, e.g.*, Jon Peha Comments at 5 (noting that "DNS is not a core function of BIAS" and that it is "simply [an] application[] that run[s] on top of IP packet transfer"); Jon Peha (DNS et al.) Reply at 3 (same); i2Coalition Comments at 15 ("IP packet transfer can work without DNS . . . ."); Scott Jordan Reply at 24 (DNS "does not alter the fundamental character of" BIAS); *2015 Open Internet Order*, 30 FCC Rcd at 5769, para. 370 n.1043 (citing comments supporting this conclusion); *USTA*, 825 F.3d 674, 705 (D.C. Cir. 2016) (stating that both DNS and caching "facilitate use of the network without altering the fundamental character of the telecommunications service").

[592] Jon Peha Comments at 5.

[593] *Id.* at 5 (citing IETF, DHCP Options and BOOTP Vendor Extensions, RFC 2132 (Mar. 1997), https://tools.ietf.org/html/rfc2132).

their BIAS.[594]  As Professor Scott Jordan explains, because a BIAS provider's DNS server rarely serves as the authoritative resource for an IP address, their DNS server plays only a limited role in DNS—and that role is replaceable.[595]  Commenters explain that third-party-provided DNS is now widely available and used by consumers.[596]  Consumers often use third-party DNS services because their web browsers, apps, and IoT devices are configured to use those third-party DNS services.[597]  Other consumers may choose to use such third-party DNS services, which they can do with a simple configuration change.[598]  The record presents evidence that third-party DNS services may now make up a significant portion of all DNS services today.[599]  Indeed, commenters who otherwise argue that DNS is essential to the functionality of BIAS carefully avoid saying that DNS *supplied by BIAS providers* is essential to BIAS's

---

[594] *2015 Open Internet Order*, 30 FCC Rcd at 5770, para. 371; *see, e.g.*, i2Coalition Comments at 6-7 (arguing that the *RIF Order*'s conclusion that "components of BIAS," such as DNS, "are so intertwined that it is impossible to distinguish and separate elements . . . is wrong from a technical perspective," and noting that such services are "separated when offered by a provider other than the BIAS provider"); Free Press Comments at 29 ("ISPs may provide DNS services, but they are hardly inextricably intertwined.").

[595] Scott Jordan Reply at 23-24.

[596] *See, e.g.*, Jon Peha Comments at 5-6 (suggesting that third-party DNS alternatives have, since the *RIF Order*, "become even more accessible thanks to the emergence of" DNS over HTTPS and DNS over TLS); Free Press Reply at 8-9 (agreeing with Professor Jon Peha's conclusions about DNS offered by third parties); Mozilla Reply at 9-10 (discussing how circumstances have changed since the *Cable Modem Declaratory Ruling* such that DNS is no longer "exclusively operated by ISPs"); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5769, para. 370.

[597] Jordan/Peha Mar. 28, 2024 *Ex Parte* at 1 ("[O]perating systems, web browsers, and other applications can today easily choose to use DNS servers other than those provided by BIAS providers, and that this is much easier to do today than it was in 2017 due to the evolution of standards."); CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 2 (explaining that "[IoT] devices that consumers attach to their home networks routinely hardcode the manufacturer's chosen DNS servers into their equipment, thus bypassing the ISP's integrated DNS servers"); Eric W. Burger Comments at 19 (explaining that there are a number of third-party DNS services that "explicitly bypass the BIAS provider's DNS service, offering enhanced value to the American consumer"); Christopher Yoo et al. Comments at 5-6 (suggesting that BIAS providers usually rely on free "open" DNS services offered by edge providers).

[598] *See, e.g.*, Scott Jordan Reply at 23 ("[A]n end user may designate another DNS server of their choice by simply entering the IP address of that server into a network settings menu."); Free Press Comments at 29 (noting that "[i]t is trivial to change to a third-party DNS provider"); Scott Jordan Reply at 23 (explaining that, while "[t]he default setting in most operating systems and home routers is to use the DNS server designated by the end user's broadband provider, . . . an end user may designate another DNS server of their choice by simply entering the IP address of that server into a network settings menu.  Many entities offer DNS servers for this purpose"); First Recon Analytics Survey at 6 fig.2 (showing that 7.5% of respondents to a consumer survey who know what DNS does use a third-party DNS system).  Notably, Verizon provides instructions on its website for how to change the default DNS settings or perform manual DNS lookups.  *See* Verizon, *Configure Dynamic DNS—Verizon 4G LTE Broadband Router*, https://www.verizon.com/support/knowledge-base-65777 [https://perma.cc/76N5-KVTX] (last visited Mar. 11, 2024); Verizon, *DNS Lookup—Verizon 4G LTE Broadband Router*, https://www.verizon.com/support/knowledge-base-65192 [https://perma.cc/9X5Y-NUNY] (last visited Mar. 11, 2024).

[599] Jon Peha (DNS et al.) Reply at 3 (presenting evidence in an IBM report that "Google, Cloudflare and OpenDNS alone accounted for 41% of DNS look-ups in Washington DC, and 35% in Atlanta" and concluding that, "[r]egardless of the exact percentages in other localities across the U.S., it is clear that BIAS subscribers can turn to sources other than their BIAS provider for DNS service if they wish, and many already do.  DNS is not inextricably tied with BIAS"); *see also* Free Press Reply at 7 (explaining that fewer and fewer customers use BIAS providers' DNS service); Mozilla Reply at 10 (citing a study highlighting the increased use of third-party DNS in spite of the default DNS offered by BIAS providers).  CTIA complains that "[t]he IBM study makes no effort to distinguish IoT manufacturers' choices from consumers' choices" and "therefore does not meaningfully address what consumers perceive as the finished service that BIAS providers offer them."  CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 3.  But the question about consumer perception of the "offer" is separate from the question of whether BIAS providers' DNS is essential to BIAS, and we have already shown that consumers perceive the BIAS offering as a telecommunications service and not an information service.

functionality.[600]  And contrary to CTIA and USTelecom's assertion,[601] if BIAS providers were to stop offering DNS, their DNS functionality would be quickly replaced by alternatives without consumers needing to take any action.[602]

148.    We are unmoved by CTIA and USTelecom's arguments that the availability of third-party DNS and its use by consumers does not mean that BIAS providers' DNS is not functionally integrated with their BIAS.  They first argue that consumers' use of third-party DNS is not determinative because "the statutory touchstone when classifying services is the capability 'offer[ed].'"[603]  But consumers' use of third-party services speaks to whether the capabilities offered by BIAS providers are functionally integrated, and the separate question of what is being offered by BIAS providers is about what consumers understand is the integrated finished product, not what discrete capabilities a BIAS provider claims itself to be offering.[604]  CTIA and USTelecom also argue "that almost all BIAS users rely

---

[600] *See, e.g.*, CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 2 ("[W]ithout DNS, customers' BIAS service would not work . . . ."); USTelecom Reply at 8 ("[T]he internet as we know it would not work without DNS . . . ."); NCTA et al. Reply at 14 ("At a bare minimum, DNS is a must . . . ."); ACA Connects Reply at 30 n.78 (arguing that DNS is an "essential component[] of the end user's experience of the Internet access service"); Richard Bennett Comments at 6 ("[T]here is no Internet service without DNS . . . ."); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 5-6 (filed Apr. 15, 2024) (USTelecom Apr. 15, 2024 *Ex Parte*) ("[R]ecord evidence the Draft Order cites does not change the fact that broadband internet access service will not work without properly configured DNS (which the vast majority of consumers use out of the box as integrated with the broadband service).").

[601] CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 2.

[602] *See* Jordan/Peha Mar. 28, 2024 *Ex Parte* at 3 ("If BIAS providers ceased offering domain name to IP address translation bundled with BIAS, then applications and operating systems that today do not set a default DNS server other than that offered by a BIAS provider would quickly do so."); Jon Peha Comments at 6 ("If all BIAS providers in the U.S. decided to stop offering DNS services," the end user's applications would likely reconfigure to use third-party DNS services "in a routine software update" such that "the typical Internet user would not even notice the change").

[603] USTelecom Comments at 18; *see also* CTIA Reply at 39-40 (same); *RIF Order*, 33 FCC Rcd at 339, para. 50 (making a similar argument).

[604] *See Brand X*, 545 U.S. at 990; *USTA*, 825 F.3d at 697-98.  USTelecom claims we assert that evidence of consumer perception shows that consumers perceive DNS as separable from BIAS, which it says contradicts USTelecom's survey about consumer perception of DNS, but we do no such thing.  Letter from Scott H. Angstreich, Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 5 (filed Apr. 16, 2024) (USTelecom Apr. 16, 2024 *Ex Parte*).  Rather, we explicitly state here and above that consumer perception is evaluated on how consumers perceive the entire offering, not how consumers perceive the individual components, and we show in this Order that consumers perceive the offering of BIAS as a telecommunications service and not an information service.  Conversely, the question of whether individual components are separable is a question of functionality, and we show here that DNS is functionally separable.  As such, USTelecom's assertions about consumer perception of DNS based on its survey are irrelevant.  But even if consumer perception of DNS were relevant, USTelecom's survey does not show that consumers perceive BIAS providers' DNS as integrated with BIAS, as USTelecom claims.  *Id.*  The survey says that only 17% of respondents could even identify the functionality of DNS, and only 4.8% of those respondents said they use their BIAS providers' DNS, while 83.5% of respondents did not know which DNS they use.  First Recon Analytics Survey at 6 fig 2.  The survey then claims those results "*suggest* that 92% of the respondents—those who affirmatively said they are using their ISP provider's DNS as well as those who do not know what DNS does and those who know what it does but are not sure which DNS they use—are using their ISP provider's DNS." *Id.* at 2 (emphasis added).  This conclusion is based entirely on an assumption that all BIAS providers have a proprietary DNS system and preset that as the default DNS system for their BIAS, which USTelecom has not demonstrated, rather than use a third-party DNS system.  In any event, consumers' use of their BIAS provider's DNS is not the same thing as consumers' perception as to whether their BIAS provider's DNS is functionally integrated with their BIAS.  Moreover, because the survey does not say anything about whether consumers *only* use a BIAS provider's DNS, and given that browsers, apps, and devices can be preset to use third-party DNS systems, the survey results could be potentially interpreted  to support the

(continued….)

on the DNS provided by their BIAS provider."[605]  A BIAS provider's choice to offer a separable feature that is bundled with BIAS, and a consumer's use of that feature, do not on their own make that feature essential to, or functionally integrated with, BIAS.  USTelecom tries to sustain the argument, asserting that just as "[a]ftermarket vendors commonly offer consumers the ability to change out integrated features in the products they buy," the "ability of end users to select different DNS servers [does not] mean that ISPs do not integrate DNS into the broadband service they offer."[606]  But as the Supreme Court held in *Brand X*, the entire question of whether DNS as provided with BIAS is functionally integrated or functionally separate turns on the "factual particulars of how Internet technology works and how it is provided."[607]  And as we have already shown, DNS is a separable, application-layer service that does not technologically alter the ability of consumers to use BIAS as a transmission conduit to reach all or substantially all Internet endpoints.

149.    We also reject the related argument that BIAS provider DNS is intertwined with BIAS because a customer using third-party DNS loses the alleged unique benefits that arise from BIAS provider DNS, such as efficient routing of traffic to cached information.[608]  As an initial matter, there is conflicting evidence in the record on whether using BIAS provider DNS has a material benefit to end users over third-party DNS.[609]  Even if it does, we find that the mere existence of a potential consumer benefit resulting from BIAS provider DNS does not compel the conclusion that DNS is inextricably intertwined with BIAS.  In any event, record evidence suggests it is more likely that BIAS providers, rather than their customers, are the true beneficiaries of their customers' use of in-house DNS given its potential to reduce BIAS providers' own transit costs.[610]

---

proposition that consumers use third-party DNS in addition to or instead of their BIAS provider's DNS.  So to the extent that consumers' default use of DNS speaks to their perception of DNS, a question that we find is not dispositive to the underlying classification, the better conclusion is that consumers perceive DNS as relevant to their use of BIAS generally, not as integrated with a BIAS provider's BIAS offering specifically.

[605] *See, e.g.,* CTIA Comments at 80; *see also* USTelecom Comments at 18; CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 3.

[606] USTelecom Comments at 19; *see also id.* (comparing DNS to "the radio and speakers or even the engines in cars; the hard drives, RAM, and graphics cards in desktop computers; the hand brakes, seat, and pedals on bicycles; and so on").  Even if, *arguendo*, DNS were functionally integrated with BIAS, that does not mean that DNS converts BIAS into an information service—either functionally or from a consumer perspective—any more than an engine converts a car into merely a device that changes gasoline into energy, a hard drive converts a computer into a data storage device, or hand brakes convert a bicycle into a mere stopping mechanism.

[607] *Brand X*, 545 U.S. at 991.

[608] ACA Connects Reply at 30; ImOn Communications Declaration at 4; Peter Rysavy Declaration at 14.

[609] An updated version of an article cited by CTIA, *see* Peter Rysavy Declaration at 16 n.28, states that "[p]ublic DNS servers are often faster than those provided by ISPs due to closer geographic locations, enabling quicker DNS resolutions" while noting that "an untrustworthy DNS server could slow performance or pose security threats."  *See also* Clement Adegbenro, *21 Best Free & Public DNS Servers (for Every Country) in 2024*, WizCase (last updated Dec. 25, 2023), https://www.wizcase.com/blog/best-free-public-dns-servers; Mozilla Reply at 10 ("While there may have been response time advantages in the past, current research suggests that any differences are unlikely to be noticeable to end users.").  It is also not evident that the EDNS Client Subnet (ECS) extension, when enabled by BIAS providers, ensures better performance over third-party DNS offerings that have also enabled the extension.  CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 2.  In any event, that ECS is an extension that can be enabled (and disabled) shows that it is even more separable from DNS itself.  *Cf.* Mozilla Reply at 10.

[610] *See* Jon Peha (DNS et al.) Reply at 3 ("A BIAS provider would adopt transparent caching to reduce its own transit costs, because cached information need not be retrieved across a tier-1 backbone network.  Thus, transparent caching falls within the management exception . . . .");  Scott Jordan Reply at 24 ("A broadband provider benefits from operating its own DNS server since this may significantly reduce the volume of DNS queries passing through its network.").

150. *Caching Is Not Inextricably Intertwined with BIAS.* In reviewing the factual particulars of how caching is functionally provided today, we find that it is a separable offering that is not inextricably intertwined with BIAS and therefore does not convert BIAS into an information service.[611] In particular, we find that caching offered by a BIAS provider is separable from BIAS because caching is not necessary for BIAS to work—end users can and do access data that is not cached at all.[612] Indeed, the inherent nature of caching—to store content that has been requested by the end users and is likely to be requested again soon—means that users will request and be able to receive information that has not yet been cached.[613]

151. The record also demonstrates that BIAS provider caching is separable because of the drastic reduction in its use and relevance and the rise of third-party CDN caching since *Brand X*. As Mozilla explains in its comments, "caching and CDNs have been taken out of the hands of ISPs and are largely operated by large content providers or independent companies."[614] Such third-party caching is now dominant because, according to record evidence, caching offered by a BIAS provider does not work with encrypted traffic—the overwhelming majority of traffic today.[615] Moreover, CDNs are uniquely

---

[611] *See Brand X*, 545 U.S. at 991; Free Press Comments at 29 (arguing that, "to the extent" services, including caching, "are sometimes used in conjunction with BIAS, they are not inextricably intertwined" (emphasis omitted)); Scott Jordan Reply at 21 ("The core component of [BIAS] is the capability to transmit data to and receive data from substantially all Internet endpoints . . . . IP [packet transfer] service is separable from all Internet applications . . . such as . . . caching . . . .").

[612] Jon Peha (DNS et al.) Reply at 3 (noting that BIAS provider caching "might keep those web pages in storage that have been requested many times in the last hour, while a web page that is requested only once will eventually be discarded"); Cloudflare Comments at 11 ("For content not cached at the CDN server, the request will be directed to the origin hosting provider, which will deliver the content through its own access provider over the Internet and ultimately to the end user."); Akamai Comments at 6 (noting that "a vast amount of internet traffic does not use" third-party CDNs either).

[613] Jon Peha (DNS et al.) Reply at 3-4 (noting that in BIAS provider caching "information is kept in storage if there is reason to believe that the system will be asked to forward that information some time soon, regardless of . . . who produced it . . . . [i]n contrast [to] a CDN service, [where] information is stored at the request of the information provider, regardless of how frequently or infrequently that information is accessed"); Michael Kende et al. Report at 8 (arguing that CDN-cached content will change over time based on what the CDN provider believes is likely to be commonly accessed).

[614] Mozilla Reply at 9; *see also* ACA Connects Comments Attach. E, Declaration of Chris Kyle, Shenandoah Telecommunications Co. at 4 (explaining that Shentel does not cache data on its own, but rather "has partnered with several content providers to deploy and host their content delivery network . . . appliances. Requested content is sourced directly from these CDN appliances, which eliminates traffic over Shentel's transit peering arrangements, making delivery of content to subscribers more efficient and reliable"); *id.* at 4-5 ("When content is unavailable on these CDN appliances, content can be delivered over the private peering networks with the content providers."); ACA Connects Comments Attach. F, Declaration of Dick Sjoerg, Sjoerg's, Inc. at 3 ("Sjoberg's has no carrying or caching arrangements with any content provider."); Harold Hallikainen Comments at 1 (arguing that caching is a separate information service because it need not be provided by the BIAS provider); Free Press Reply at 16 (noting the "decline of ISP caching" supports a telecommunications service classification).

[615] Free Press Comments at 30 ("ISPs cannot cache encrypted web pages or transmissions. And almost all internet traffic in 2023 is encrypted."); Free Press Reply at 10 ("[I]n a content market where most data is encrypted, ISPs have nothing to cache."); Andrew Gallo Comments at 2 ("Provider-managed caching is decreasing in part because, as the NPRM notes, encryption and per-user/per-page/per-request webpage customization makes caching useless. Rather . . . (CDN)-owned and/or managed nodes deep within access networks is the more common deployment scenario."); Jon Peha (DNS et al.) Reply at 4 (arguing that BIAS provider caching "has become less useful due to the increasing use of encryption. If users A and B both want access to the same webpage, but that information is encrypted with different keys, caching the webpage no longer helps," but, by contrast, CDN caching "is easily compatible with encryption."). CTIA and USTelecom attempt to minimize the effect of encryption on BIAS provider caching, explaining that even when a website uses HTTPS, a BIAS provider can still see the top level of the website and asserting that they "use that information to cache entire websites, so they can resolve requests for

(continued....)

able to meet consumer expectations for streaming video from third-party services.[616]  We therefore disagree with NCTA that BIAS provider caching is "as integrated into broadband offerings today as they were when *Brand X* was decided."[617]  *Brand X* was decided at a time when encryption was limited and there was much lower demand for streaming video (and therefore few, if any, CDNs).[618]  Opponents do not directly dispute that BIAS provider caching is incompatible with encryption, but try to downplay this by arguing that their DNS can direct user requests to the appropriate caching server.  But DNS is a separate functionality from caching and the server to which they are referring is not the BIAS providers' caching server but a third-party CDN.[619]  In any event, even if BIAS provider caching were unaffected by the increasing prevalence of encryption, no commenter disputes that CDN caching is now dominant.[620]

---

pages associated with that website to the cached content . . . ."  CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 4.  But this assertion is disputed in the record.  *See* Jordan/Peha Mar. 28, 2024 *Ex Parte* at 3 ("Although a BIAS provider can see the domain name of a website a consumer is accessing, it cannot cache the webpages on a website that uses HTTPS.  [CTIA and USTelecom] apparently don't understand that [the declaration] to which they cite for this assertion, is only talking about storage of content by a CDN, not about transparent caching by a BIAS provider.").

[616] *See* Mozilla Reply at 9 ("YouTube was founded in 2005 but streaming media did not become widely popular until years later.  With the rise of streaming media came independent 3rd party caching initiatives by content providers. . . . Today tens of thousands of independent CDNs exist around the world."); Michael Kende et al. Report at 17 ("The increased adoption and usage of the internet is driven by[,] . . . [i]n particular[,] . . . streaming video services, and real-time communications services. . . . As demand for content increases, content providers have invested in *hosting* facilities that are necessary for the storage and processing of their applications. . . . They have also invested in *delivery*, particularly in caching, as well as facilities to carry traffic between their data centers and where their content is cached.").

[617] NCTA Comments at 41.  The *RIF Order* incoherently reached a similar conclusion that BIAS provider caching and DNS are "inextricably intertwined" with transmission even though it acknowledged that "some consumers" use third-party caching and excluded CDN caching from the definition of BIAS.  *See RIF Order*, 33 FCC Rcd at 338-39, paras. 49-50; *id.* at 325, para. 33 n.99 (explaining that it is primarily relying on DNS and caching being "inextricably intertwined" with transmission to justify an information service classification); *id.* at 320, para. 24 ("Broadband Internet access service also does not include . . . content delivery networks (CDNs), . . . consistent with past Commission precedent.").

[618] *See* Mozilla Reply at 9 ("In 2005, caching of content by ISPs was widespread . . . .  However, this caching was dependent on the fact that web servers at the time used the unencrypted HTTP protocol to serve content. . . . [W]ith the introduction, and increasing adoption, of HTTPS[,] . . . the content of user web requests became opaque to ISPs.  This reduced the utility of generic caching services operated by ISPs. . . .  The Brand X decision also predates the rise of streaming media and modern [CDNs].").

[619] *See* Rysavy Declaration at 11 ("Even if the content server delivers encrypted traffic, DNS can direct the client to the appropriate caching server, such as a streaming server, whether located remotely or close by in a content delivery network.  The transmission is then encrypted between the destination server and the user. . . . [A]n ISP-provided DNS, in combination with a content delivery network hosted by the ISP, provides users an optimum internet experience."); *see also* CTIA/USTelecom Mar. 22, 2024 *Ex Parte* at 4.

[620] Some commenters conflate transparent caching offered by BIAS providers with CDN caching offered by third parties to assert that caching is inextricably intertwined with BIAS, but we are not fooled by this chicanery.  *See* Peter Rysavy Declaration at 9 ("All major ISPs cache content using caching services located within the ISP's network or through direct connection with content delivery networks.  Because the cache stores and retrieves information, it is an information service. . . .  In some cases, the ISP owns and operates the cache.  In other cases, the cache hardware can be provided or managed by a third party but is still operated at the ISP's location.  Alternatively, many ISPs have collaborative direct connections to content delivery networks.  In all cases, the cache is part of the [BIAS] service offered by the ISP . . . ."); CTIA Comments at 81 (arguing that "[t]he involvement of third parties is similarly beside the point; even when caching is performed on hardware provided by third parties who contract with the BIAS provider (at the BIAS provider location), the caches remained a part of the BIAS offered by the ISP that is inextricably linked to that service" (internal citations omitted)).  These commenters provide no justification for concluding that CDN caching, primarily sold to, and for the benefit of, third-party content providers, and which is explicitly excluded from the definition of BIAS, is also a functionally integrated component of a BIAS provider's

(continued….)

152. *Other Information-Processing Capabilities Are Not Inextricably Intertwined With BIAS.* We are not convinced by commenters who argue that BIAS is an information service because the routing and transmission of IP packets involves information-processing capabilities.[621] CTIA, for example, argues that, because IP packet routing "involves examination and processing of the packet at every router the packet traverses," information processing is inextricably intertwined with the transmission capability of BIAS itself.[622] As an initial matter, as discussed above, the user's data—forming part of a payload within the IP packet—remains unchanged from the moment it reaches the BIAS provider's network to the moment it arrives at the desired endpoint.[623] Thus, BIAS does not in fact *offer subscribers* the capability for processing their data—such capabilities occur at the Internet endpoint selected by the subscriber. Other commenters raise old arguments that the existence of IPv4-to-IPv6 protocol transition mechanisms within BIAS is evidence of information processing that would convert BIAS into an information service.[624] But we find that these mechanisms are designed to ensure the effective and efficient transmission of BIAS traffic and thus fit comfortably in the telecommunications systems management exception.[625]

153. We also disagree with commenters[626] who argue that BIAS is a functionally integrated information service because it may be offered in conjunction with information services such as electronic mail,[627] security software,[628] smartphone applications,[629] parental controls or spam and content filtering

---

BIAS offering—and we do not find any such justification either. *See* Free Press Reply at 11 (explaining that "nothing about these [third-party caching arrangements] is 'inextricably intertwined,' as an ISP is still offering a pure transmission path between its customers and the servers that host the content those customers requested"); Jon Peha (DNS et al.) Reply at 3 ("Some of the comments refer to [CDN] service and traditional transparent caching as if they were the same thing, but they differ from a technical perspective, from a business perspective and from a regulatory perspective.").

[621] *See, e.g.*, Peter Rysavy Declaration at 5-9; *see also* Richard Bennett et al. Amicus Brief at 7-11; TechFreedom Comments at 23-25 (noting that routers "store and forward" packets as they move along the transmission path).

[622] Peter Rysavy Declaration at 5; *see also* Richard Bennett et al. Amicus Brief at 7-9; TechFreedom Comments at 24-25.

[623] *2015 Open Internet Order*, 30 FCC Rcd at 5762-63, para. 362; *see supra* Section III.B.1.a (discussing how user data is transmitted without change from the network origination point to the network endpoint).

[624] *See, e.g.*, Peter Rysavy Declaration at 4, 7-8; NCTA et al. Reply at 11. In 2016, the Internet Corporation for Assigned Names and Numbers (ICANN), a "not-for-profit entity responsible for the technical coordination of the Internet's domain name system," NTIA, *ICANN*, https://www.ntia.gov/category/icann (last visited Dec. 26, 2023), announced that its Internet Assigned Numbers Authority (IANA) allocated "the last remaining IPv4 . . . Internet addresses from a central pool" and that "future expansion of the Internet is now dependent on the successful deployment of the next generation of Internet protocol, called IPv6." Press Release, ICANN, Available Pool of Unallocated IPv4 Internet Addresses Now Completely Emptied (Feb. 3, 2011), https://itp.cdn.icann.org/en/files/announcements/release-03feb11-en.pdf.

[625] *See 2015 Open Internet Order*, 30 FCC Rcd at 5772, para. 375. Given the difference in packet header formats between IPv4 packets and IPv6 packets, transition mechanisms permit the interoperability between IPv4-compliant and IPv6-compliant networks, servers, and routers. *See* IETF, Basic Transition Mechanisms for IPv6 Hosts and Routers, RFC 4213 (Oct. 2005), https://datatracker.ietf.org/doc/html/rfc4213.

[626] *See, e.g.*, ACA Connects Comments at 27; CTIA Comments at 51; NCTA Comments at 45; NCTA et al. Reply at 11.

[627] *See* ImOn Communications Declaration at 4.

[628] *See id.*; CTIA Comments at 51.

[629] *See* ImOn Communications Declaration at 4; Vexus Fiber Declaration at 3-4.

software,[630] distributed denial-of-service (DDoS) mitigation,[631] botnet notification,[632] and firewalls.[633] Commenters have not demonstrated, beyond making conclusory statements,[634] that these bundled information services are not used for telecommunications systems management[635] or are inextricably intertwined with BIAS, rather than being included in the product offering simply as the result of a marketing decision not to offer them separately.[636] As the Supreme Court affirmed in *Brand X*, the mere packaging of separable information services with a telecommunications service does not convert the telecommunications service into an information service.[637] The Interisle Consulting Group (ICG) also notes that "[b]undles and offers do not define a service. Vertical integration of a retail product to include additional non-telecommunications services does not change the nature of the underlying services."[638] Many of these services, such as smartphone applications, electronic mail, and content filtering software, are indeed "offered at the application layer" of the IP stack, and thus are separable from the lower network layers that facilitate transmission and routing of packets.[639] No commenter has argued that any of these services are necessary for IP packet transfer to function. Thus, as explained in the *2015 Open*

---

[630] ICG Comments at 3; CTIA Comments at 51.

[631] NCTA Comments at 43; NCTA et al. Reply at 10.

[632] NCTA Comments at 43; NCTA et al. Reply at 10.

[633] Peter Rysavy Declaration at 4.

[634] *See, e.g.*, CTIA Comments at 51-52 (concluding without analysis that applications such as content filtering and malware detection are "inherently intertwined"); NCTA et al. Reply at 11 (concluding without analysis that applications such as firewalls, malware detection and alerting, and spam and content filtering are "inextricably intertwined").

[635] As explained in the *2015 Open Internet Order*, spam filtering and DDoS mitigation fall within the telecommunications systems management exception. *See 2015 Open Internet Order*, 30 FCC Rcd at 5771, para. 373 ("Some security functions, e.g., blocking denial of service attacks, fall within the telecommunications systems management exception because they are used exclusively for the management, control, or operation of the telecommunications system.").

[636] *See id.* at 5773, para. 376 (citing *Brand X*, 545 U.S. at 1009 (Scalia, J., dissenting)); *id.* at 5771-72, para. 373 ("Other security functions—firewalls and parental controls, for example—either fall within the telecommunications systems management exception because they are used exclusively for management of the telecommunication service or are separable information services that are offered by providers other than providers of broadband Internet access service. Such security features simply filter out unwanted traffic, and do not alter the fundamental character of the underlying telecommunications service offered to users.").

[637] *Brand X*, 545 U.S. at 997-98 (explaining that a telephone company's bundling of voice mail with the telephone service does not cause telephone service to be an information service); *see also Mozilla*, 940 F.3d at 90 (Millett, J., concurring) (explaining that the Commission "abandoned its reliance on any additional technologies provided by broadband").

[638] ICG Comments at 9.

[639] *2015 Open Internet Order*, 30 FCC Rcd at 5773-74, para. 378; *see* Scott Jordan Reply at 20 ("The Internet's architecture guarantees that the IP packet transfer service, which provides end-to-[end ]transmission of information of the user's choosing, is separable from the applications (such as webpage hosting, caching of newsgroup articles, and email) riding over it. Protocols at the physical, data link, and network layers are designed separately from Internet applications. The Internet Protocol that transmits packets from one end of the Internet to another end is standardized, and is independent of all of the Internet applications that are offered via it. . . . In a layered architecture, a module at one layer may request a network service provided by a lower layer. Although it may pass information to a higher layer, it may not request a network service from a higher layer. Thus, while a service at one layer may rely on the network services provided by lower layers, it may not rely on network service provided by higher layers.").

*Internet Order*, BIAS "is only trivially affected, if at all" by these services' functionalities.[640]  For these reasons, we find that commenters have not provided new evidence of functionalities that would cause BIAS to be properly classified as a functionally integrated information service.

### C.  Classifying BIAS as a Telecommunications Service Accords with Commission and Court Precedent

154.    The Commission has engaged in classification decisions of various services that operate at the nexus of telecommunications and computer-based data processing for almost half a century.  As has been the case in previous proceedings when the Commission has classified broadband services, the record reveals a debate regarding the relevance and precedential value of these Commission decisions and related court rulings.  As a general matter, we assign limited value to many of these past Commission decisions and find that our classification of BIAS as a telecommunications service is fully and independently supported by an evaluation of the statutory text of the 1996 Act.  Nevertheless, when viewed as a whole and in the proper context, we find that, on balance, Commission and court precedent also support our classification of BIAS as a telecommunications service and that arguments from opponents of reclassification that attempt to use such precedent to undercut our statutory interpretation are unavailing.

155.    Our consideration of past precedent takes two forms.  In the case of pre-1996 Act precedent, we consider whether and how such precedent might have informed Congress's understanding of the definitional language it used in the 1996 Act, and how that, in turn, might support particular interpretations that otherwise flow from the statutory language and statutory context.  Given the role of the Commission's *Computer Inquiries* precedent in the Commission's regulatory scheme, we are persuaded to give that precedent appropriate (if modest) weight and conclude that it reinforces our classification of BIAS as a telecommunications service under the best reading of the Act.  We are more circumspect with respect to precedent related to the 1984 Modification of Final Judgment (MFJ)—the consent decree which mandated the breakup of the Bell System—as the 1996 Act expressly abrogated the MFJ's requirements.  Although we do not affirmatively rely on any of that precedent, we also consider the *RIF Order* to have mischaracterized that precedent to reach an information service classification of BIAS.[641]

156.    In the case of post-1996 Act precedent concerning classification of  services that relate to Internet connectivity, we evaluate whether each decision supports, is distinguishable from, or is in tension with our decision, and explain any change in course.  As discussed below, we find certain precedent addressing DSL service, while not precisely analogous with the circumstances here, helps reinforce our classification decision.  More directly relevant and supportive are important court decisions addressing the classification of cable modem service.  Other broadband service classification decisions prior to the *2015 Open Internet Order* we find distinguishable on the basis of their factual predicates and/or the sufficiency or persuasiveness of the Commission's assessment of those facts.  We further conclude that the classification of BIAS as a telecommunications service in the *2015 Open Internet Order*, ultimately affirmed by the D.C. Circuit in *USTA*, reinforces our conclusion that BIAS is a telecommunications service under the best reading of the Act.  Likewise, the D.C. Circuit's numerous, substantial concerns about the *RIF Order*'s decision being "unhinged from the realities of modern broadband service," also militate in favor of our classification of BIAS as a telecommunications service.[642]

---

[640] *2015 Open Internet Order*, 30 FCC Rcd at 5773, para. 377 (analogizing such services to voice mail packaged with traditional telephone service) (citing *Brand X*, 545 U.S. at 998).  Even the *RIF Order* stated that it did "not find the offering of these information processing capabilities determinative of the classification of broadband Internet access service."  *RIF Order*, 33 FCC Rcd at 325, para. 33 n.99.

[641] *RIF Order*, 33 FCC Rcd at 327-29, 333-34, paras. 35-36, 43-44 (relying on MFJ precedent regarding "gateway services," related storage functionality, and the telecommunications systems management exception to support its information service classification of BIAS).

[642] *Mozilla*, 940 F.3d at 87 (Millett, J., concurring).

### 1.    Relevant Pre-1996 Act Precedent

157.    Pre-1996 Act precedent helps to inform our understanding of the definitions used in the 1996 Act and reinforces our decision to classify BIAS as a telecommunications service.  We agree as a general matter with the significant number of commenters that submit that the pre-1996 Act *Computer Inquiries* and MFJ service definitions informed Congress's adoption of the definitional terms "telecommunications service," along with "telecommunications," and "information service," inclusive of the telecommunications systems management exception.[643]  However, we find that the *RIF Order*'s heavy reliance on isolated MFJ precedent to understand the meaning of those terms in search of its predetermined information service classification was problematic.[644]  Contrary to the *RIF Order*'s analysis, we find that Congress, in giving those terms meaning, would not have relied upon precedent that arose from a single isolated pre-1996 Act case, or passages of such cases, without also considering the marketplace or regulatory context present at the time of enactment of the 1996 Act.  Rather, as the *Brand X* Court surmised, it is likely that Congress would have looked to "settled . . . administrative . . . interpretation[s]" of the analogous pre-1996 Act terms.[645]  Because much of the precedent that the *RIF Order* relied upon does not fall into the category of settled administrative interpretation, particularly the MFJ precedent, we conclude that it is not relevant to the classification of BIAS.

158.    *The FCC's Computer Inquiries.*  Through a series of proceedings collectively known as the *Computer Inquiries*, the Commission sought to foster the development of the emerging data processing marketplace by ensuring enhanced service providers' access to communications facilities and services necessary to the growth and success of that marketplace.[646]  To that end, the *Computer II Final Decision* in 1980 established "a regulatory scheme that distinguishes a carrier's basic transmission

---

[643] *See, e.g.*, Scott Jordan Comments at 39 (concluding that the *Computer Inquiries* framework "would later serve as a model for the *Modification of Final Judgment* and for the [1996 Act]"); Free Press Comments at 27-28 (noting that the pre-Act adjunct-to-basic precedent was pulled forward by the 1996 Act); Tejas N. Narechania Comments at 9 ("The 1996 Act reflects the Commission's Computer II framework."); CTIA Comments at 56-57 (arguing that "Congress deliberately imported legal terms that included BIAS and its precursor technologies within the scope of 'information service' and outside the scope of 'telecommunications service'").

[644] *See RIF Order*, 33 FCC Rcd at 327-29, paras. 35-36.

[645] *Brand X*, 545 U.S. at 992-93 (quoting *Commissioner of Internal Revenue v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993) (*Keystone*)) (concluding that the meaning of "telecommunications service" and "information service" were informed by the analogous *Computer Inquiry* definitions and "regulatory history," and quoting *Keystone* for the proposition that there is a "presumption that Congress is aware of 'settled judicial and administrative interpretation[s]' of terms when it enacts a statute").

[646] *See, e.g.*, *Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities*, Docket No. 16979, Final Decision and Order, 28 F.C.C.2d 267, 268-69, paras. 7-8 (1971) (*Computer I Final Decision*) (identifying the interrelationship between a successful data processing marketplace and the regulation of providers of the transmission facilities and services upon which data processing relied); *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, CC Docket No. 20828, Final Decision, 77 F.C.C.2d 384, 419, para. 94 (1980) (*Computer II Final Decision*) (observing that "[m]ore and more the thrust is for carriers to provide bandwidth or data rate capacity adequate to accommodate a subscriber's communications needs, regardless of whether subscribers use it for voice, data, video, facsimile, or other forms of transmission"); *Amendment to Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry) et al.*, CC Docket No. 85-229, Report and Order, 104 F.C.C.2d 958, 1001, para. 77 (1986) (*Computer III Phase I Order*) ("We seek to maximize the public's ability to obtain efficient, low-cost telecommunications service, with emphasis in this proceeding on enhanced services."); *see also* Media Inequality and Change Center Attach., Victor Pickard & David Elliot Berman, After Net Neutrality:  A New Deal for the Digital Age 24 (2019) ("The FCC feared that common carriers such as AT&T could engage in anti-competitive practices by privileging their own data processing activities.  The FCC therefore attempted to enact a structural separation between 'pure communications' and 'pure data processing" services.  The problem was that computer processing was increasingly involved in both communication and data transmission.").

services from its enhanced services."[647]  The Commission concluded that "basic [services]" were those that offered "pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information."[648]  By contrast, "enhanced services," which the Commission said had "intertwined" communications and data processing technologies, were, for example, used to "act on the content, code, protocol, and other aspects of the subscriber's information," and provide the subscriber "additional, different, or restructured information . . . through various processing applications performed on the transmitted information, or other actions . . . taken by either the vendor or the subscriber based on the content of the information transmitted through editing, formatting, etc."[649]  Under the *Computer II* regulatory approach, basic services offered on a common carrier basis were subject to Title II while enhanced services were not.[650]  The Commission used this approach to classify a wide range of services, including, for example voicemail[651] and frame relay transmission service.[652]

159.    Despite the Commission's hope that its basic–enhanced dichotomy would be "relatively clear-cut,"[653] it acknowledged certain features of a service that "might indeed fall within [the] literal reading[]" of the definition of an enhanced service, but that would not change the classification of a basic service under its *Computer Inquiries* regulations because the features "are clearly 'basic' in purpose and use and [they] bring maximum benefits to the public through their incorporation in the network."[654]  The Commission coined the term "adjunct-to-basic" to describe those kinds of features,[655] which, when included as part of a basic service, would be regulated the same way as the basic service itself.[656]

160.    Under the *Computer II* adjunct-to-basic analytical framework, the Commission permitted carriers to offer "call forwarding, speed calling, directory assistance, itemized billing, traffic management studies, voice encryption, etc." as part of the basic service, concluding that these "ancillary services directly related to the [provision of basic service] do not raise questions about the fundamental . . . nature of a given service."[657]  Carriers were also allowed to offer as basic services "memory or storage within the network" that is used only to "facilitate the transmission of the information from the origination to its

---

[647] *Computer II Final Decision*, 77 F.C.C.2d at 419, para. 92; *see also* Scott Jordan Comments at 38 ("Two of the issues facing the Commission in [*Computer II*] were (1) the regulatory treatment of computer processing services, and (2) the regulatory treatment of common carriers in the provision of such services.  Both issues required a classification of computer processing services and of the underlying transmission service.").

[648] *Computer II Final Decision*, 77 F.C.C.2d at 420, para. 96.

[649] *Id.* at 420-21, 430, paras. 97, 120.

[650] *Id.* at 428, para. 114.

[651] *NATA Centrex Order*, 101 F.C.C.2d at 361, para. 27 ("By using a voice mailbox-type service, on the other hand, subscribers obtain the use of a storage facility into which messages can be placed for later retrieval.  A transmission channel is not created between caller and the intended destination of the caller's communication.  Such a service has, accordingly, been found to be enhanced, because it employs subscriber interactions with stored information for the purpose of providing a service which is not a basic transmission channel.").

[652] *See Frame Relay Order*, 10 FCC Rcd at 13718, para. 6 (classifying frame relay service, a "high-speed packet-switching technology used to communicate digital data between, among other things, geographically dispersed local area networks (LANs)," as a basic service).

[653] *Computer II Final Decision*, 77 F.C.C.2d at 420, para. 97.

[654] *NATA Centrex Order*, 101 F.C.C.2d at 359, para. 24.

[655] *See, e.g., id.*

[656] *See, e.g., Beehive Telephone Inc. et al. v. The Bell Operating Companies*, File No. E-94-57, Memorandum Opinion and Order, 10 FCC Rcd 10562, 10566, para. 21 (1995) (In the *NATA Centrex Order* the Commission held that "[t]hose services that are incidental or adjunct to the common carrier transmission service are to be regulated in the same way as the common carrier transmission service.").

[657] *Computer II Final Decision*, 77 F.C.C.2d at 421, para. 98.

destination."[658]  Similarly, the Commission found that computer processing features, including "bandwidth compression techniques," "packet switching," and "error control techniques" that "facilitate [the] economical, reliable movement of information [did] not alter the nature of the basic service."[659]  The Commission justified its inclusion of these features in the basic service to encourage "integrat[ion] of technological advances conducive to the more efficient transmission of information through the network."[660]  Continuing this approach, in the 1985 *NATA Centrex Order*, the Commission concluded that transmission of telephone numbers, even when "transformed" by the network into a format that can be displayed to the call recipient on a display, were considered adjunct-to-basic because the number display is derived from the basic transmission service.[661]  In subsequently applying these principles, the Commission concluded that the adjunct-to-basic exception applies to optional features or functions that are not necessary for the "basic" service to work but are merely helpful to that function.[662]

161.    In other decisions under the adjunct-to-basic framework, the Commission concluded that optional enhanced features of basic services or the use of basic services to access third-party information did not change the classification.  Where enhanced features or functions are *accessed* via a provider's basic service, but are not a part, or a "capability," of the provider's own network or service (i.e., are a third-party service), the service remained a basic service.[663]  Where a consumer is offered optional

---

[658] *Id.* at 420, para. 95; *see also Brand X*, 545 U.S. at 976 ("By 'pure' or 'transparent' transmission, the Commission meant a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network . . . .").

[659] *Computer II Final Decision*, 77 F.C.C.2d at 420, para. 95; *see also Petitions for Wavier of Rules filed by Pacific Bell et al.*, ENF-84-15 et al., Memorandum Opinion and Order, 100 F.C.C.2d 1057, 1088, para. 78 (1985) (concluding that "[p]acket switching can be used and is used, to implement conventional switched and unswitched basic telephone service"); *see also Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, Memorandum Opinion and Order, 84 F.C.C.2d 50, 60, para. 26 (1980) (*Computer II Order on Reconsideration*) ("In a basic service, while various conversions may take place within the network, the result of the common carrier offering is not a change in protocol.").

[660] *Computer II Final Decision*, 77 F.C.C.2d at 423, para. 101.  We note that the *Computer III* regime did not alter this approach.  *See Filing and Review of Open Network Architecture Plans*, CC Docket No. 88-2, Memorandum Opinion and Order, 4 FCC Rcd 1, 141, para. 274 (1988) ("Since the Computer II regime, we have consistently held that that the addition of the specified types of enhancements (as defined in our rules) to a basic service neither changes the nature of the underlying basic service when offered by a common carrier nor alters the carrier's tariffing obligations . . . .  Computer III does not change this principle.").

[661] *NATA Centrex Order*, 101 F.C.C.2d at 370, para. 52 ("We find that calling party number, like the other signaling information discussed above, is not additional information in the sense intended [by the definition of enhanced services] . . . .  That number may be thought of as representing, in a different form, the type of information communicated by the caller's loop . . . .  Also, such information is often transmitted forward to other central offices in digital form.  Provision of this part of the calling party's transmission . . . does not represent an addition to the original  transmission.").  Call forwarding was also considered adjunct to basic because "it does not materially change the nature of a telephone call placed to that subscriber."  *Id.* at 360, para. 27.

[662] *Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards*, CC Docket No. 91-115, Report and Order and Request for Supplemental Comment, 7 FCC Rcd 3528, 3531, para. 21 (1992) ("We also reject the LECs' argument that access to validation data must be technologically necessary to call completion in order to be incidental to the provision of local exchange access service.  A particular service may be properly considered 'incidental' to transmission within the meaning of Section 3(a), even if it is not strictly 'necessary' to complete a call . . . .").

[663] *Computer II Order on Reconsideration*, 84 F.C.C.2d at 54-55, paras. 12-13 (classifying as enhanced AT&T's "Dial-It" service, which allows the customer to call a number and obtain information about "news, stock prices, sports reports, etc." stored on AT&T's own network); *AT&T 900 Dial-It Services and Third Party Billing and Collection Services*, File No. ENF-88-05, Memorandum Opinion and Order, 4 FCC Rcd 3429, 3430, para. 9 (CCB

(continued….)

enhanced service components that could be combined with the basic service, but need not be, the underlying service remained a basic service, regardless of whether the consumer actually purchased the enhanced service components.[664]

162.　　Given that data processing services relied on communications facilities, the ability of facilities-based carriers to also offer enhanced services over their networks created a risk that they would have the incentive and ability to discriminate against their enhanced service provider rivals.[665]　To protect against that risk, in *Computer II*, the Commission specified that facilities-based carriers wishing to directly provide enhanced services over their own facilities were obligated to both offer the transmission component of their enhanced offerings—including Internet access service—on a common carrier basis governed by Title II and acquire transmission capacity for their enhanced offerings under the same tariffed transmission service offering they made available to other enhanced service providers.[666]

163.　　By the time the 1996 Act was enacted, the Commission had been using the *Computer Inquiries* framework and its subject-matter expertise to classify data services as either "basic" or "enhanced" for almost 16 years.[667]　Thus, Congress was well aware of the Commission's well-established

---

1989) (describing the Dial-It service as a service in which "the sponsor/subscriber's message originates from the sponsor's premises and is recorded and stored by the sponsor" (internal quotes omitted)); *id.* at 3431, paras. 16-17 ("[A]s presently configured and tariffed, AT&T Dial-It 900 Information Arrangement service no longer provides for interaction with subscriber information stored in [AT&T's] network.　Instead, subscriber information is provided by the subscriber, and AT&T facilities are used merely to provide a transmission path from callers to subscriber-stored information . . . .　Nor does the service provide subscribers with 'additional, different, or restructured information'" or "'employ computer processing applications that act on the format, code, protocol or similar aspects of the subscriber's transmitted information,'" and "[f]or all these reasons, . . . we conclude that AT&T['s] . . . service is a basic transmission service . . . .").

[664] *Frame Relay Order*, 10 FCC Rcd at 13722, para. 40 ("We conclude that AT&T provides a basic frame relay service (alone or bundled with enhanced protocol processing) that must be offered under tariff. . . . AT&T provides transport of customer data transparently across the AT&T frame relay network. . . . [T]he vast majority of AT&T's frame relay customers terminate to, and receive from, the network frame relay data that do not require conversion to frame relay protocol.　Since in these cases AT&T's frame relay service provides a pure transmission capability in a communication's path, without any protocol conversion, we find that this is a basic service." (internal quotation marks omitted)).

[665] *Computer II Final Decision*, 77 F.C.C.2d at 474-75, para. 231; *see also* ICG July 15, 2014 Comments at 9　("The obligation of LECs to provide common carriage to competing ISPs was a direct consequence of the Computer Inquiries.").

[666] *Computer II Final Decision*, 77 F.C.C.2d at 475, para. 231 ("[T]hose carriers that own common carrier transmission facilities and provide enhanced services, but are not subject to the separate subsidiary requirement, must acquire transmission capacity pursuant to the same prices, terms, and conditions reflected in their tariffs when their own facilities are utilized.　Other offerors of enhanced services would likewise be able to use such a carrier's facilities under the same terms and conditions.").　Due to these obligations, any Internet access provider, including an Internet access provider affiliated with the facilities-based carrier and an unaffiliated, non-facilities-based enhanced service provider, was able to obtain common carrier transmission necessary to offer Internet access to end users on the same tariffed terms and conditions under Title II.　An end user could also obtain transmission on the same basis to connect with the Internet access provider of its choice.　*See, e.g.*, *Bell Operating Companies Joint Petition for Waiver of Computer II Rules*, Order, 10 FCC Rcd 13758, 13768, para. 65 (CCB 1995) (concluding that Pacific Bell would satisfy its *Computer Inquiries* obligations because "its Internet access provider will take all basic underlying network services, including advanced transport services, pursuant to tariff[,]" and going on to observe that "end users control access to the advanced transport services they are purchasing from the BOCs, so they are free to use such advanced transport services to interconnect with any Internet access provider they desire, whether or not the provider is BOC-affiliated").

[667] *Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report to Congress, 13 FCC Rcd 11501, 11524, para. 45 (1998) (*Stevens Report*); *see* Tejas N. Narechania Comments at 5-6 ("Before Congress's enactment of the 1996 Act, the Commission exercised its authority to define the regulatory treatment of analogous

(continued….)

classification framework at the time it enacted the 1996 Act.[668] "[A] decision by Congress to overturn *Computer II*, and subject [enhanced] services to regulatory constraints by creating an expanded 'telecommunications service' category incorporating enhanced services, would have effected a major change in the regulatory treatment of those services."[669] Although the Commission stated that it "would have implemented such a major change if Congress had required it," it did not find "an intent by Congress to do so."[670] Rather, the Commission found "that Congress intended the 1996 Act to maintain the *Computer II* framework."[671]

164. Given the myriad and complex array of *Computer Inquiries* decisions, we do not attempt to detail here with specificity the ways in which the Commission's *Computer Inquiries* precedent lends support to the classification decision we reach today.[672] We instead take a more measured approach, declining to give significant weight to isolated statements or draw analogies to particular classification outcomes dealing with services other than BIAS. It suffices to say that the *2015 Open Internet Order* did describe the basis for such support when classifying BIAS as a telecommunications service and that the D.C. Circuit recognized the importance of the *Computer Inquiries* to the "structure of the current regulatory scheme" on its way to upholding that classification decision.[673] Thus, where *Computer Inquiries* precedents are consistent with our determination that BIAS, as offered today, is best classified as a telecommunications service, they lend some support to that conclusion, and to the extent any such precedent is in tension or conflict with that understanding, we do not view them as undercutting that determination grounded in the best understanding of the statutory text.[674]

---

services . . . . [T]hese agency decisions establish a long tradition of Commission authority to select a regulatory classification for high-speed data transmission services such as BIAS.").

[668] There is a "presumption that Congress is aware of 'settled judicial and administrative interpretation[s]' of terms when it enacts a statute." *Brand X*, 545 U.S. at 993 (quoting *Keystone*, 508 U.S. at 159).

[669] *Stevens Report*, 13 FCC Rcd at 11524, para. 45.

[670] *Id.*

[671] *Id.*; *see also Universal Service First Report and Order*, 12 FCC Rcd at 9179-80, para. 788 ("In the *Non-Accounting Safeguards* [*Order*], in which the Commission found that all services previously considered 'enhanced services' are 'information services,' the Commission indicated that, to ensure regulatory certainty and continuity, it was preserving the definitional scheme by which certain services (enhanced and information services) are exempted from regulation under Title II of the Act.").

[672] *Cf. Mozilla*, 940 F.3d at 30 ("[T]he Commission's historical approach to adjunct-to-basic has hardly been clear-cut in its own right. As we have previously said, 'it is difficult to discern any clear policy' in the Commission's application of its 'various formulations' of what counts as adjunct-to-basic, so that '[t]he Commission's rulings reflect a highly fact-specific, case-by-case style of adjudication.'" (citing *American Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 333 (D.C. Cir. 2006)).

[673] *See 2015 Open Internet Order*, 30 FCC Rcd at 5735-36, paras. 311-313; *USTA*, 825 F.3d at 691.

[674] *Cf. Mozilla*, 940 F.3d at 31-32 ("[E]ven if the Commission's interpretation of the [telecommunications systems management exception] comes at the cost of certain incongruities with the concept of adjunct-to-basic services, it reasonably regards alignment with the text and purposes of the 1996 Act, and the unifying policy vision animating the 2018 Order, as more weighty factors"). We are therefore uncompelled by the *RIF Order's* suggestion that only a "drop" of an information service (i.e., DNS or caching) combined with the transmission component, is sufficient to transform BIAS into an information service, regardless of consumer perception or the functional realities of the offering. *See RIF Order*, 33 FCC Rcd at 325, para. 34 & n.99 (relying solely on DNS and caching and not any other service functionalities for its BIAS classification); *Brief of Petitioners in Mozilla Corp. v. FCC*, Nos. 18-1088, 18-1051, 2018 WL 6192425, *47 (2018) ("The FCC could not have reasonably concluded that a drop of DNS and caching in a sea of transmission transformed the service into something that could properly be called an information service."). The *RIF Order's* conclusion implicitly relies on isolated *Computer Inquiries* precedent finding that when a non-facilities-based ISP, as understood at the time, combines a telecommunications input purchased from a facilities-based provider with its own enhanced service, the enhanced service "contaminated" the resold

(continued….)

165.     *The MFJ Antitrust Consent Decree.*  Similar policy concerns to those at issue in the *Computer Inquiries* were at play when, in 1982, the Department of Justice (DOJ) reached a negotiated settlement with AT&T and filed an MFJ with the D.C. Federal District Court to end a decades-long antitrust case.[675]  As with the *Computer Inquiries*, a policy objective of the MFJ regulatory regime was to guard against the risk of carriers harming competitive providers of data processing services.[676]  Among other things, the MFJ prohibited BOCs from providing "interexchange telecommunications services or information services."[677]

166.     As in the *Computer Inquiries*, the MFJ distinguished between basic and enhanced services, but instead used the terms "telecommunications services" and "information services," respectively.[678]  The MFJ defined a "telecommunications service" as "the offering for hire of telecommunications facilities, or of telecommunications by means of such facilities."[679]  In turn, "telecommunications" was defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received, by means of electromagnetic transmission medium, including all instrumentalities, facilities, apparatus, and services (including the collection, storage, forwarding, switching, and delivery of such information) essential to such transmission."[680]  The court defined "information service" for the purpose of the MFJ as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications."[681]  The MFJ information service definition also included an exception analogous to the "adjunct-to-basic" exception under the *Computer Inquiries*.  Specifically, "information service" did "not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service."[682]  Over time, the courts overseeing the MFJ developed a limited body of precedent regarding what was an "information service," but did not squarely address the question of how Internet access service fit within the MFJ's definitional framework.

---

transmission service such that the combined service sold to the end user is always an enhanced service.  *See Frame Relay Order*, 10 FCC Rcd at 13719-20, paras. 17-18 & n.30 (discussing the "contamination" theory and citing *Amendment of Section 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry) Policy; and Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Thereof; Communications Protocols under Section 64.702 of the Commission's Rules and Regulations*, CC Docket No. 85-229, Phase II, Supplemental Notice, FCC 86-253, para. 43 n.52 (1986)).  As an initial matter, that theory never applied to facilities-based providers, and some BIAS providers are facilities-based.  *Frame Relay Order*, 10 FCC Rcd at 13723, para. 44 (concluding that "application of the contamination theory to a facilities-based carrier" would circumvent the underlying purposes of the *Computer Inquiry* regime).  Moreover, the 1996 Act's definition of a "telecommunications service" makes clear that definition applies "regardless of the facilities used." 47 U.S.C. § 153(53).

[675] *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 140-41 (D.D.C. 1982) (*AT&T*), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).

[676] *See, e.g., id.* at 224 (The BOCs will "be prohibited from providing long distance services and information services, and from manufacturing equipment used in the telecommunications industry.  Participation in these fields carries with it a substantial risk that the Operating Companies will use the same anticompetitive techniques used by AT&T in order to thwart the growth of their own competitors.").

[677] *Id.* at 227.

[678] *Id.* at 229.

[679] *Id.*

[680] *Id.*

[681] *Id.* at 229.

[682] *Id.* at 229.

167. The *RIF Order*'s invocation of MFJ precedent to support its classification decision reflects significant flaws. To begin, its reliance on that precedent was predicated in part on the 1996 Act's use of the information service definition established in the MFJ,[683] a fact which we do not dispute when placed in the proper context, as described below. But the historical context shows that Congress did not necessarily intend for such reliance. Unlike with the *Computer Inquiries*, which the Commission found Congress did not intend the 1996 Act's definitional framework to supplant,[684] the 1996 Act expressly abrogated the MFJ's requirements, and replaced them with those enacted as part of the 1996 Act.[685] Indeed, the regulatory approach in the MFJ is diametrically opposed to that in the 1996 Act. While the 1996 Act's regulatory approach broadly tracks that of the *Computer Inquiries*, with "telecommunications services" subject to common carrier regulation and "information services" not subject to common carrier regulation,[686] under the MFJ, an "information service" classification led to maximal regulation—a complete ban on the provision of the service—for the carriers subject to that regulatory regime. Thus, the relevance of MFJ precedent is better viewed narrowly, rather than expansively, as done in the *RIF Order*, given the origins of that precedent in a regulatory framework Congress expressly chose to displace.

168. The *RIF Order*'s reliance on MFJ precedent is also contrary to our measured approach, and thereby suffers from the same faults it claimed plagued the *2015 Open Internet Order*'s reliance on the *Computer Inquiries* precedent—namely, viewing the precedent out of context and making imperfect analogies without adequately accounting for potentially distinguishing technical details and the regulatory context.[687] It exhibited this practice most prominently by ignoring the MFJ framing of maximal regulation of information services. But it also mischaracterized specific precedent it relied upon.

169. For instance, the *RIF Order*, and some commenters, mischaracterized MFJ precedent "analyzing 'gateway' functionalities by which BOCs would provide end users with access to third party information services."[688] While the *RIF Order* acknowledged "that gateway functionalities and

---

[683] *RIF Order*, 33 FCC Rcd at 313-14, para. 7; *see also id.* at 328-29, para. 36 (asserting a particular meaning of the telecommunications systems management exception because it was drawn from the MFJ definition of information service); CTIA Comments at 56-57 (arguing that the MFJ information service definition incorporated into the Act shows that Congress intended to classify BIAS as an information service); USTelecom Comments at 13-15 (arguing that the MFJ information service terminology was adopted into the Act and this fact is relevant to the classification of BIAS); USTelecom Reply at 12-13 (same). Because the D.C. Circuit also was not presented with the considerations we identify here for giving little weight to MFJ precedent, its acceptance of certain of the *RIF Order*'s conclusions based on MFJ precedent in *Mozilla* does not undercut our contrary conclusions here. *See, e.g.*, *Mozilla*, 940 F.3d at 25-27.

[684] *Stevens Report*, 13 FCC Rcd at 11524, para. 45.

[685] Telecommunications Act of 1996, Pub. L. 104-104, § 601(a)(1); *see also, e.g.*, S. Conf. Rep. No. 104-230, 198 (Feb. 1, 1996) (1996 Act Conf. Rep.) (explaining that "all conduct or activities that are currently subject to those consent decrees, shall [following enactment], "become subject to the requirements and obligations of the Communication Act" as implemented by the Commission); *Non-Accounting Safeguards Order*, 11 FCC Rcd at 21923, para. 31 ("We stated in the Notice, and several parties agree, that section 601(a) of the 1996 Act indicates that Congress intended the provisions of the Act to supplant the MFJ."); *cf.* CTIA Comments at 55 (noting that section 601 of the 1996 Act "abrogated the AT&T Judgment and judicial modification process," but nonetheless going on to argue that the Act "codified many of its central concepts").

[686] *See infra* Section III.C.2 (explaining that post-1996 Act classification decisions are consistent with classifying BIAS as a telecommunications service).

[687] *See RIF Order*, 33 FCC Rcd at 331, para. 39 (arguing the *2015 Open Internet Order* suffered from these flaws).

[688] *See, e.g.*, *id.* at 327-28, 333-34, paras. 35, 43-44; *see also, e.g.*, *Stevens Report*, 13 FCC Rcd at 11536-37, para. 75 (stating that "[w]e note that the functions and services associated with Internet access were classed as 'information services' under the MFJ" and discussing the MFJ gateway decisions); NCTA Comments at 31-34 (arguing that the MFJ gateway decisions involved a "precursor" to broadband); USTelecom Comments at 13-14 (arguing that gateway services allowed the transmission of "information services generated by others, including

(continued….)

broadband Internet access service are not precisely coextensive in scope,"[689] it nonetheless purported to "find similarities between functionalities such as address translation and storage and retrieval to key functionalities provided by ISPs as part of broadband Internet access service," and claimed that "the court found such gateway and similar functionalities independently sufficient to warrant an information service classification under the MFJ."[690] This characterization of the MFJ court's conclusions is misleading, at best. Read in context, it is not evident the MFJ court concluded that the address translation and storage and retrieval features of the gateway service were independently sufficient grounds for an information service classification. In relying on the court's treatment of "address translation," the *RIF Order* cited a high-level statement from the court "that the transmission of information services at issue there 'involves a number of functions that by any fair reading of the term 'information services' would be included in that definition."[691] But the court never concluded that address translation was important to its conclusion that the gateway service is an information service. It merely listed address translation as one of the five functions that were part of the "infrastructure necessary for the transmission of information service," and there is no basis for concluding that all five of these functionalities were independently sufficient to justify an information service classification.[692] Although the MFJ court analyzed storage and retrieval as

---

[689] *RIF Order*, 33 FCC Rcd at 327-28, para. 35 n.113. CTIA quotes from the 1987 *MFJ Initial Gateway Decision* to argue that gateway services "rang[ed] from mere database access to such sophisticated services as teleshopping, electronic banking, order entry, and electronic mail." CTIA Comments at 55 (citing *United States v. W. Elec. Co.*, 673 F. Supp. 525, 587 (D.D.C. 1987) (*MFJ Initial Gateway Decision*)); *see also* USTelecom Comments at 14 (referencing "teleshopping" and "electronic mail"). But in the quoted passage the court is describing such services generally, not specifically the offered BOC gateway service.

[690] *RIF Order*, 33 FCC Rcd at 327-28, para. 35 n.113.

[691] *RIF Order*, 33 FCC Rcd at 327-28, para. 35 n.113 (quoting *MFJ Initial Gateway Decision*, 673 F. Supp. at 587 n.275). We also note that *RIF Order* did not address the D.C. Circuit's conclusion that the gateway service included a separate offering of telecommunications transmission, similar to the Commission's conclusion in the *Advanced Services Order* that DSL included a separate offering of transmission. *United States v. W. Elec. Co.*, 907 F.2d 160, 163 (D.C. Cir. 1990) ("[I]t is claimed that so long as the interexchange portion of the service is not separately identified to the customers and not separately charged to the customer, it is not offered for hire even though it is bundled in the overall gateway service, which is clearly offered for hire. We think appellants urge a rather strained interpretation of the language of the decree. Under their view, interexchange service, no matter how extensive, could be provided by the BOCs by simply packaging that service with some other noninterexchange telecommunications or even nontelecommunications service. That interpretation, it seems rather obvious, would create an enormous loophole in the core restriction of the decree. . . . [W]hen information services are, as here, bundled with leased interexchange lines, the activity is covered by the decree."). For this reason, as well as the other concerns we raise in relying on this case and the MFJ precedent in general, we conclude that we need not adjudicate whether the MFJ permitted the generation of information by BOCs instead of their transmission or whether that distinction is relevant to the classification determination we make today. *See, e.g.*, CTIA Comments at 55-56 (arguing that the MFJ court approved BOC generation of information content).

[692] *MFJ Initial Gateway Decision*, 673 F. Supp. at 592-95 (discussing data transmission, address translation, protocol conversion, billing management, and introductory information content). Indeed, when confronted with arguments that "the Regional Companies are entitled to provide [address translation] even now under the decree as part of the permissible 'forwarding or routing' functions of 'information access,'" the court did not respond by asserting that it actually constituted an information service, but instead by pointing out that "the Court has concluded otherwise, *particularly since section IV(F) prohibits interexchange routing*" (emphasis added)). *Id*. at 593 n.308. Further, as to some of the other listed service components, the MFJ court appears to strongly suggest that it might not cause the gateway service to be classified as an information service. *See, e.g.*, *id*. at 592-93 (discussing why various aspects of data transmission represent "an essential transmission service necessary to the performance of 'telecommunications' functions as defined by section IV(O) of the decree" or "a part of facilities testing for 'information access' under section IV(I) of the decree"). In sum, the notion that the footnote relied on by the *RIF Order* should be read to suggest that each function of the gateways was independently sufficient to constitute an

(continued….)

a distinct issue, the court's view of that functionality encompassed that are more clearly viewed as information services, "such as voice messaging, voice storage and retrieval (VSR), and electronic mail,"[693] and therefore are not coextensive with BIAS.

170.     We also conclude the *RIF Order* misinterpreted the single MFJ case it relied upon in concluding that the telecommunications systems management exception to the information service definition should exclude functions directed at end users or customers.[694]  In classifying Telecommunications Device for the Deaf (TDD) service as an information service, the MFJ court concluded that that "the very crux and purpose" of TDD service was the "transformation of information" and "it is patently obvious that what is being sought does not involve the internal management of Bell Atlantic."[695]  Although the MFJ court noted that the telecommunications systems management exception "was directed at internal operations, not at services for customers or end users," the facts did not require the court to meaningfully grapple with the full meaning of the exception.[696]

171.     In all events, the MFJ court's view of the telecommunications systems management exception is not inconsistent with the view we reiterate today that a service can fall under the 1996 Act's exception if it is used by the provider to manage, control, or operate a telecommunications system, even if the service may also benefit end users.[697]  Indeed, the court also explained that it had applied that exception to "allow[] the regional companies to provide directory assistance to their own customers,"[698] which unambiguously provides benefits for callers.  Likewise, the *Mozilla* court recognized that an evaluation of provider and customer benefit from a given function involved "a spectrum or continuum" that "requires a decider to select a point where both ends are in play."[699]  Thus, to the extent that these MFJ court precedents are relevant to our classification analysis, they do not clearly show that the relevant functions must not be so significantly focused on benefitting end users or customers (rather than providers) to fall within the telecommunications systems management exception.

## 2.     Post-1996 Act Classification Decisions

172.     As mentioned above, when Congress enacted the 1996 Act, it codified statutory definitions that reflected the dichotomy of services established by the *Computer Inquiries* and MFJ frameworks.[700]  Specifically, the 1996 Act's definitions of "telecommunications service" and

---

information service seems highly doubtful and is at most ambiguous.  Nor are we persuaded to reach a contrary conclusion by a high-level assertion by the court that a carrier's "gateway proposal appears to be a variant" of "information services." *United States v. W. Elec. Co.*, 907 F.2d at 163.

[693] *United States v. W. Elec. Co.*, 714 F. Supp. 1, 19-20 (D.D.C. 1988) (*MFJ Gateway/Storage & Retrieval Decision*) (describing these as the "most encompassing use of storage capabilities").

[694] *RIF Order*, 33 FCC Rcd at 328, para. 36 & n.117 (citing *United States v. W. Elec. Co.*, 1989 WL 119060, *1 (D.D.C. Sept. 11, 1989)).  While *Mozilla* accepted the *RIF Order*'s analysis of the MFJ case as reasonable, it did not conclude that it was the only or best reading.  *Mozilla*, 940 F.3d at 24-25 (concluding that the *RIF Order*'s application of the MFJ precedent to the Act's telecommunications systems management exception was "permissible" but was not "mandat[ed]" by the Act).

[695] *United States v. W. Elec. Co.,* 1989 WL 119060, *1 (D.D.C. Sept. 11, 1989).

[696] *Id.* (citing DOJ, *United States v. Western Electric Company, Inc., and American Telephone & Telegraph Company; Competitive Impact Statement in Connection With Proposed Modification of Final Judgment*, Notice, 47 Fed. Reg. 7170, 7176 (Feb. 17, 1982)).

[697] *See supra* Section III.B.2.b (explaining why DNS and caching, when used with BIAS, fall within the telecommunications systems management exception).

[698] *United States v. W. Elec Co.*, 1989 WL 119060 at *1 n.7.

[699] *Mozilla*, 940 F.3d at 24.

[700] Telecommunications Act of 1996, Pub. L. No. 104-104, § 3(a)(2), 110 Stat. 56, 58-60 (1996) (codified at 47 U.S.C. §§ 153(24), 153(50), 153(53)).

"information service"—including the telecommunications systems management exception to the definition of "information service"—largely track the definitions of those same terms in the MFJ.[701]  And the 1996 Act's regulatory approach to that dichotomy of services broadly tracks that of the *Computer Inquiries'* treatment of basic services, enhanced services, and adjunct-to-basic services, with "telecommunications services," inclusive of associated services that fall into the telecommunications systems management exception, subject to common carrier regulation and "information services" not subject to common carrier regulation.[702]  As noted, just two years after the 1996 Act's passage, the Commission confirmed that Congress had incorporated the Commission's prior classification scheme under the *Computer Inquiries* in adopting the 1996 Act.[703]  And the Supreme Court affirmed that understanding in *Brand X*, stating that "Congress passed the definitions in the Communications Act against the background of [the *Computer Inquiries*] regulatory history, and we may assume that the parallel terms 'telecommunications service' and 'information service' substantially incorporated their meaning, as the Commission has held."[704]

173.    In implementing the 1996 Act, the Commission harmonized its earlier classification decisions with the 1996 Act's new terms for the sake of providing regulatory certainty,[705] and continued

---

[701] *See, e.g.*, *Non-Accounting Safeguards Order*, 11 FCC Rcd at 21954, para. 99; *see also, e.g.*, H.R. Conf. Rep. No. 104-458 at 126 (Jan. 31, 1996) ("'Information service' and 'telecommunications' are defined based on the definition used in the Modification of Final Judgment."); *see also, e.g.*, Mark Jamison Comments Appx. B, Mark A. Jamison, *Net Neutrality Policies and Regulation in the United States*, 17 Rev. Network Econ. 151, 155-56 (2019) (Mark Jamison, *Net Neutrality Policies*) ("The Telecommunications Act of 1996 . . . picked up this [MFJ] terminology, defining 'information service' the same as in the MFJ."). We note that while Congress adopted the terminology of the MFJ's definition of "information service," for the reasons we discussed above, we reject the view that Congress thereby intended that the Commission would be bound by MFJ precedent going forward.

[702] *See, e.g.*, 47 U.S.C. § 153(51) (stating in pertinent part that "[a] telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services"); *Brand X*, 545 U.S. at 977 ("'Telecommunications service'[is] the analog to basic service . . . . And 'information service' [is] the analog to enhanced service . . . ."); *Non-Accounting Safeguards Order*, 11 FCC Rcd at 21934, para. 59; Tejas N. Narechania Comments at 9 ("The 1996 Act reflects the Commission's Computer II framework."); *see also* USTelecom Comments at 15 ("Congress also carried forward into the 1996 Act's definitions of 'telecommunications service' and 'information service' the Commission's pre-1996 distinctions between . . . 'basic' [and 'enhanced'] services.  Multiple courts have recognized this.").  We disagree with NCTA that the sole fact that Congress enacted the terms "telecommunications service" and "information service" "against the backdrop of [the] Commission's own refusal to treat enhanced service offerings . . . as 'basic,'" provides evidence of "Congress's intent to classify broadband as an information service."  NCTA Comments at 34-35.  NCTA attempts to connect the dots by claiming that the Commission classified "the forerunners of broadband" as enhanced services, but it only cited to a single Bureau-level order from the 1980s that classified a service wholly dissimilar from modern BIAS as an enhanced service.  *See* NCTA Comments at 33-34 & n.111; *The Bell Atlantic Telephone Companies Offer of Comparably Efficient Interconnection to Providers of Gateway Services*, Memorandum Opinion and Order, 3 FCC Rcd 6045, 6045, para. 6 (CCB 1988) (describing the service NCTA cited to include integrated data-processing features such as "'key word' search[]" capabilities and the ability for customers "to obtain the description and prices of" various enhanced service providers).  And although Commission precedent did treat "Internet access" as it existed around time of the 1996 Act as an enhanced service, as we make clear below, the nature of BIAS is significantly different than the Commission's understanding of Internet access during that period of time.

[703] *Stevens Report*, 13 FCC Rcd at 11507-08, para. 13 ("Reading the statute closely, with attention to the legislative history, we conclude that Congress intended these new terms to build upon frameworks established prior to the passage of the 1996 Act."); *id.* at 11524, para. 45 ("[L]ooking at the statute and legislative history as a whole, we conclude that Congress intended the 1996 Act to maintain the *Computer II* framework.").

[704] *Brand X*, 545 U.S. at 992.

[705] *See, e.g.*, *Non-Accounting Safeguards Order*, 11 FCC Rcd at 21956-57, para. 102 ("We conclude that all of the services that the Commission has previously considered to be 'enhanced services,' are 'information services.' . . . [This approach] provides a measure of regulatory stability for telecommunications carriers and [information service providers] alike, by preserving the definitional scheme under which the Commission exempted

(continued....)

to draw on such pre-1996 Act precedent for support in classifying services under the 1996 Act's categories.[706] Over the course of almost three decades since the passage of the 1996 Act, the Commission has considered the regulatory classification of a variety of services that relate to Internet connectivity. In those decisions, the Commission has debated the practical significance of the *Computer Inquiries* and later classification decisions that preceded the decision under consideration.[707] But as was observed by Justice Scalia in his *Brand X* dissent, the actual differences in Commission classification decisions have comparatively little to do with interpretation of statutory terms—like "offer"—and instead turn principally on the best understanding of particular facts, such as "the identity of what is offered."[708] As we describe below, over the span of time since the 1996 Act's enactment, the underlying service that ISPs offer consumers,[709] and indeed, what even constitutes "Internet access," has shifted,[710] and with it, the meaning of what constitutes an Internet service provider. This shifting landscape challenged the Commission in conducting factual analyses in connection with these classification decisions. As such, the Commission reached different classification decisions based on different factual characterizations of

---

certain services from Title II regulation."); *id.* at 21958, para. 107 ("[S]ervices that the Commission has classified as 'adjunct-to-basic' should be classified as telecommunications services, rather than information services. . . . Similarly, we conclude that 'adjunct-to-basic' services are also covered by the 'telecommunications management exception' to the statutory definition of information services, and therefore are treated as telecommunications services under the 1996 Act." (internal citations omitted)); *id.* at 21969, para. 132 ("We conclude that the Computer I, Computer II and [Open Network Architecture] requirements are consistent with the 1996 Act . . . ."). There was no need for the Commission to consider reconciling the MFJ with the 1996 Act because section 601(a)(1) of the 1996 Act expressly replaced the MFJ's requirements with those enacted as part of the 1996 Act. Telecommunications Act of 1996, Pub. L. 104-104, § 601(a)(1).

[706] *See, e.g.*, *Universal Service Contribution Methodology, Request for Review of a Decision of the Universal Service Administrator by Cisco WebEx LLC*, WC Docket No. 06-122, Order, 31 FCC Rcd 13220, 13226, para. 16 (WCB 2016) (noting that because the "statutory definitions substantially incorporated" the *Computer Inquiry* basic/enhanced terminology, "Commission decisions regarding the distinction between basic and enhanced services are relevant").

[707] *Compare, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5737-38, para. 315 & n.819 (discussing the *Advanced Services Order* and the *Advanced Services Remand Order* as supporting a telecommunications service classification of BIAS), *with, e.g.*, *RIF Order*, 33 FCC Rcd at 345-46, para. 55 n.207 (discussing those *Orders* as a function of legacy Commission rules compelling certain facilities-based carriers to offer the transmission underlying information services on a common carrier basis without relevance outside that context).

[708] *Brand X*, 545 U.S. at 1006 (Scalia, J., dissenting).

[709] *See, e.g.*, EFF Comments at 17 ("Popular dial-up Internet service providers such as CompuServe, Prodigy, and America Online used their own content and applications as the primary customer draw, with access to third-party information services offered as a supplemental feature, if at all. . . . [T]he world has changed."); Free Press Comments at 17 ("[W]hile at one time in the dial-up era the information services designation may have been appropriately applied to 'Internet Access Services' generally, it is clear that the product offered today by mass market broadband access providers is itself a telecommunications service, per the definitions of the Act."); ICG July 15, 2014 Comments at 41-42 ("By the time the Telecommunications Act had passed, online services had begun to offer Internet access, but *were still not pure ISPs*. In 1995, large services including AOL, Compuserve, and Prodigy were providing their users with access to Internet email, and were beginning to add web browsing, but they were still time-sharing services at heart. . . . Later, some time after the Telecommunications Act was passed, AOL began to offer direct TCP/IP access to its subscribers, and it became what we would today think of as a dial-up ISP. . . . [Today's ISPs] offer an IP-based network monoservice that gives the illusion of unrestricted, neutral access to the global Internet. . . . [R]egulations that would find a service such as 1996's AOL in violation [of Open Internet rules] are obviously not what was intended by a law written during a time when such 'training wheels for the Internet' services were still growing by leaps and bounds." (emphasis added)).

[710] *See* Scott Jordan Reply at 4-5 ("[T]he phrase 'Internet access service' is used in different proceedings to refer to different services with substantially different functionalities. In particular, none of the 'Internet access services' defined in the *Stevens Report*, the *Cable Modem Declaratory Ruling*, and the *Wireline Broadband Classification Order* are the same as today's broadband Internet access service.").

how the relevant "offer" would be understood from a functional and end-user perspective. These factual characterizations often were informed by—and in the case of the *RIF Order*, were motivated by—policy objectives, and as such, the factual characterizations varied in their reasonableness. For these reasons, prior classification decisions, far from being a "uniform regulatory history,"[711] do not provide consistent, let alone persuasive, evidence that modern-day BIAS is best classified as an information service under the 1996 Act.[712] In our decision today, we lay out the facts concerning how modern-day BIAS is offered based on how it functions and is perceived, and follow those facts to the most logical outcome under the best reading of the statutory text. In doing so, as detailed above, we find that BIAS is best understood as a telecommunications service under the Act's definitional framework.[713]

174. *Stevens Report*. When the Commission first considered how best to classify "Internet access service" under the 1996 Act, that service, being at a nascent stage of development,[714] differed substantially from the BIAS we classify today in how it was offered, and how consumers perceived the service. In 1997, for the purpose of implementing the universal service provisions of the 1996 Act, Congress directed the Commission to review, *inter alia*, the definitions of the term "information service," "telecommunications," and "telecommunications service," including how those definitions apply "to mixed or hybrid services and the impact of such application on universal service definitions and support . . . including with respect to Internet access."[715] In response, in 1998, the Commission adopted a

---

[711] CTIA Comments at 62; *see* CTIA Reply at 41 ("[T]he Commission has consistently upheld the view since the 1996 amendments to the Communications Act that BIAS and its precursors are an 'information service,' even while promoting open Internet policies from 2005 onward.").

[712] Some commenters observe that Commission actions shortly after the adoption of the Act can be particularly persuasive evidence of Congressional intent. *See, e.g.*, NCTA Comments at 13, 35-36 (citing precedent arguing that that agency actions interpreting a statute that are made contemporaneous with the enactment of a statute carry additional weight); USTelecom Comments at 14-15 (same). But that does not provide a justification for attempting to apply early Commission decisions implementing the 1996 Act outside their logical context, or for overriding the direction gleaned from the text and statutory context. We thus reject arguments that neglect the material differences between present circumstances for BIAS and decisions like the *Stevens Report*. *See, e.g.*, CTIA Comments at 61-62; ACA Connects Comments at 26-28.

[713] *See supra* Section III.B (explaining that BIAS is best classified as a telecommunications service).

[714] *See* Mitchell Lazarus Comments at 12 n.41 ("Some key dates: The World Wide Web appeared in 1990, bringing consumer-friendly navigation by clicking links. The National Science Foundation, which administered the early Internet, opened it to commercial ISPs in 1991. Mosaic, the first Web browser to gain widespread use, appeared in 1993. Also in 1993, AOL began offering ISP service.").

[715] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, 111 Stat. 2440, 2521-22, § 623(b)(1)-(2) (Appropriations Act); *Stevens Report*, 13 FCC Rcd at 11502-03, para. 1 n.1. We disagree with Consumer Action for a Strong Economy's argument that the 1996 Act, in "creat[ing] a new framework for Title I 'Information Services' as a modern alternative to sclerotic, New Deal-era Title II rules[,]" reflected a "bipartisan consensus for lightly regulating high-speed broadband." Consumer Action for a Strong Economy Comments at 1. But even assuming such a consensus had existed with respect not only to the fundamentally different Internet access service of the time, but also to *broadband* at such a nascent stage of its development, the *Stevens Report* makes clear that Congress preferred that the Commission decide its classification. And indeed, as we discuss below, the very year the Commission did so with respect to "Internet access service" in the *Stevens Report*, the Commission also classified broadband provided via DSL as a telecommunications service subject to Title II. We also disagree with LARIAT's contention that "Title II itself—with provisions explicitly mentioning differing charges dependent upon the source, destination, time, and purpose of communications—was not designed to regulate the Internet, especially one that was 'neutral.'" Letter from Laurence Brett Glass, LARIAT, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 1 (filed Apr. 15, 2024) (LARIAT Apr. 15, 2024 *Ex Parte*). Beyond the fact that LARIAT provides only a vague description of the provisions it claims are not well-suited to regulating BIAS—and does not appear to consider how tailored forbearance could ameliorate such concerns—we find that the *Stevens Report* makes clear that Congress did not intend to foreclose application of Title II to new services.

Report to Congress commonly referred to as the *Stevens Report*.

175.     At the time of the *Stevens Report*, Internet access service providers typically did not own facilities or provide last-mile transmission themselves, instead providing their services over an unaffiliated telecommunications carrier's public switched telephone network (PSTN).[716]  ISPs primarily offered their customers a suite of application-layer services such as World Wide Web, newsgroups, and electronic mail using their own computer systems.[717]  Some ISPs did not yet even provide their

---

[716] *See Stevens Report*, 13 FCC Rcd at 11540, para. 81 ("Internet access providers, typically, own no telecommunications facilities.  Rather, *in order to provide those components of Internet access services that involve information transport*, they lease lines, and otherwise acquire telecommunications, from telecommunications providers—interexchange carriers, incumbent local exchange carriers, competitive local exchange carriers, and others." (emphasis added)); *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, CS Docket No. 95-61, Second Annual Report, 11 FCC Rcd 2060, 2121-22, para. 127 (1995) (*1995 Marketplace Report*) (describing the various third-party communications services used to access the services of ISPs of the time); *2010 Open Internet Order*, 25 FCC Rcd at 17916; *Appropriate Framework for Broadband Access to Internet Over Wireline Facilities, Universal Service Obligations of Broadband Providers*; *Computer III Further Remand Proceedings:  Bell Operating Company Provision of Enhanced Services*; *1998 Biennial Regulatory Review—Review of Computer III and ONA Safeguards and Requirements*, CC Docket Nos. 02-33, 95-20, and 98-10, Notice of Proposed Rulemaking, 17 FCC Rcd 3019, 3027-28, para. 14 (2002); Free Press Comments at 28 n.44 (explaining that, in the past, ISPs "were not facilities-based broadband network operators" but instead "offered an internet portal, content, e-mail, and other true information services reached by using dial-up modems over other companies' telephone lines"); Scott Jordan Reply at 5 ("Dial-up Internet access service thus excludes the underlying telecommunications, which was provided in part by the telephone exchange service that an end user separately obtained in order to 'dial up.'"); Public Knowledge Reply at 9 ("The [CDA] was enacted at a time when internet access was offered separately from telecommunications:  most people used dial-up Internet, ISPs were information services, and users separately [obtained] telecommunications via their phone line.  Telephone providers were subject to common carrier nondiscrimination rules with respect to voice, and to dial-up ISP providers.").

[717] *Stevens Report*, 13 FCC Rcd at 11537-38, paras. 76-77 ("Internet access providers typically provide their subscribers with the ability to run a variety of applications, including World Wide Web browsers, FTP clients, Usenet newsreaders, electronic mail clients, Telnet applications, and others.  When subscribers store files *on Internet service provider computers* to establish 'home pages' on the World Wide Web, they are, without question, utilizing the *provider's* "capability for . . . storing . . . or making available information" to others.  The service cannot accurately be characterized from this perspective as 'transmission, between or among points specified by the user'; *the proprietor of a Web page* does not specify the points to which its files will be transmitted, because it does not know who will seek to download its files. . . . When subscribers utilize their Internet service provider's facilities to retrieve files from the World Wide Web, they are similarly interacting with stored data, *typically maintained on the facil[i]ties of either their own Internet service provider* (via a Web page "cache") or on those of another [Internet service provider]. . . . The same is true when Internet service providers offer their subscribers access to Usenet newsgroup articles.  An Internet service provider receives and stores these articles . . . *on its own computer facilities.* Each Internet service provider must choose whether to carry a full newsgroup feed, or only a smaller subset of available newsgroups.  Each Internet service provider must decide how long it will store articles in each newsgroup, and at what point it will delete them as outdated.  A user can then select among the available articles, choosing those that the user will view or read; having read an article, the user may store or forward it; and the user can post articles of his or her own, which will in turn *be stored on the facilities of his own Internet service provider* and *those of every other Internet service provider* choosing to carry that portion of the newsgroup feed.  In providing this service, the Internet service provider offers 'a capability for generating, acquiring, storing, . . . retrieving . . . and making available information through telecommunications.'  Its function seems indistinguishable from that of the database proprietor offering subscribers access to information it maintains on-site; such a proprietor offers the paradigmatic example of an information service." (emphasis added)); *see, e.g.*, EFF Comments at 17 ("Popular dial-up Internet service providers such as CompuServe, Prodigy, and America Online used their own content and applications as the primary customer draw, with access to third-party information services offered as a supplemental feature, if at all. . . . [T]he world has changed."); Free Press Comments at 17, 28 n.44 ("[W]hile at one time in the dial-up era the information services designation may have been appropriately applied to 'Internet Access Services' generally, it is clear that the product offered today by mass market broadband access providers is itself a telecommunications service, per the definitions of the Act" and that "[t]he types of ISPs described in the report were not facilities-based

(continued....)

subscribers direct access to the wider Internet, instead solely offering portals to "walled gardens" of proprietary content.[718]  In order to reach these application-layer services, an end user typically first had to purchase a telecommunications service from an unaffiliated carrier.[719]  The *Stevens Report* drew on the "intertwined" language of *Computer II*, and coined the term "inextricably intertwined" to assert its belief that, because the "core of the internet and its associated services" offered by providers were information services, "Internet access service" itself was an information service, being dominated by such components.[720]

176.      The *Stevens Report* reserved judgment on whether entities that provided Internet access over their own network facilities were offering a separate telecommunications service,[721] and observed that "the question may not always be straightforward whether, on the one hand, an entity is providing a single information service with communications and computing components, or, on the other hand, is providing two distinct services, one of which is a telecommunications service."[722]  Notably, at the time of the *Stevens Report*, BIAS was at "an early stage of deployment to residential customers" and constituted a tiny fraction of all Internet connections.[723]  As we establish above, modern-day BIAS both functions and is perceived vastly differently from the "Internet access service" considered in the *Stevens Report*, so we thus disagree with commenters who argue that the *Stevens Report*'s assessment of the service offered at

---

broadband network operators, but the providers of yesteryear that offered an internet portal, content, e-mail, and other true information services reached by using dial-up modems over other companies' telephone lines.").

[718] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5755, para. 349 n.946; ICG July 15, 2014 Comments at 41-42 ("By the time the Telecommunications Act had passed, online services had begun to offer Internet access, but *were still not pure ISPs*.  In 1995, large services including AOL, Compuserve, and Prodigy were providing their users with access to Internet email, and were beginning to add web browsing, but they were still time-sharing services at heart. . . . Later, some time after the Telecommunications Act was passed, AOL began to offer direct TCP/IP access to its subscribers, and it became what we would today think of as a dial-up ISP . . . ." (emphasis added)); Home Telephone Comments at 7 (noting that 20 years ago "Internet access was generally limited to services subscribed to by AOL in a walled garden environment"); NTCA Comments at 6-7 ("In the early days of the commercial internet, access was available through so-called 'walled garden' providers like AOL who published content that was available *only* to AOL subscribers.  In contrast, the current marketplace facilitates the proliferation of higher quality content, including applications, streaming video and cloud services . . . .").

[719] *Stevens Report*, 13 FCC Rcd at 11531-32, para. 63 (explaining that "*[e]nd users* obtain access to and send information either through dial-up connections over the public switched telephone network, or through dedicated data circuits over wireline, wireless, cable, or satellite networks," while, separately, "*[a]ccess providers*, more commonly known as Internet service providers, combine computer processing, information storage, protocol conversion, and routing with transmission to enable users to access Internet content and services"); Scott Jordan Reply at 5 ("[A]n end user separately obtained [telephone exchange service] in order to 'dial up.'").

[720] *See Stevens Report*, 13 FCC Rcd at 11537-39, 11540, paras. 76-77, 80 (noting that "Internet access service crucially . . . offers end users information-service capabilities [such as e-mail, web browsing, and others] *inextricably intertwined* with data transport" (emphasis added)).

[721] *2015 Open Internet Order*, 30 FCC Rcd at 5737, para. 315 & n.814; *see Stevens Report*, 13 FCC Rcd at 11508, para. 15.

[722] *Stevens Report*, 13 FCC Rcd at 11530, para. 60.

[723] *See Inquiry Concerning the Deployment of Advanced Telecommunications Services to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996*, CC Docket No. 98-146, Report, 14 FCC Rcd 2398, 2446, para. 91 (1999) (*First Broadband Deployment Report*); FCC, Wireline Competition Bureau, Industry Analysis Division, Trends in Telephone Service at 2-12, chart 2.10, 16-3, Tbl. 16.1 (2008), https://docs.fcc.gov/public/attachments/DOC-284932A1.pdf; Scott Jordan Reply at 5 ("Broadband Internet access service was not yet mature, and although the Report briefly considered whether such services should contribute to Universal Service, it did not attempt to apply its general analysis of facilities-based information services to broadband Internet access service.").

the time has precedential value to our decision making in this Order.[724]

177.     *Advanced Services Order and Order on Remand.*  In the same year that the Commission adopted the *Stevens Report*, the Commission first classified an early form of BIAS—namely, digital subscriber line (DSL) service provided over the wireline telephone network—as a telecommunications service.[725]  In the 1998 *Advanced Services Order*, the Commission defined DSL-based advanced service as encompassing:  (1) the transmission of a customer's data traffic from the customer's modem to the telephone company's central office;[726] (2) the transmission between the central office and an interconnection point across the telephone company's packet switched network;[727] and (3) interconnection arrangements with other providers as necessary to fulfill the service.[728]  The Commission distinguished this service—as we do today with our definition of BIAS[729]—from what it considered to be "Internet access": the same bundle of application-level offerings (e.g., World Wide Web, e-mail, newsgroups, and portals) described in the *Stevens Report*.[730]  The Commission therefore concluded that "[a]n end-user may utilize a telecommunications service together with an information service, as in the case of Internet access.  In such a case, however, we treat the two services separately:  the first service is a telecommunications service (*e.g.*, the []DSL-enabled transmission path), and the second service is an

---

[724] *See, e.g.*, NCTA Comments at 36.

[725] *Advanced Services Order*, 13 FCC Rcd at 24029, para. 35.  The *Advanced Services Order* was subject to a voluntary remand requested by the Commission.  The Commission explained in the *2015 Open Internet Order* why the further history of the *Advanced Services Remand Order* is not relevant here.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5738, para. 316 & n.817.

[726] Scott Jordan Reply at 5 (citing *Advanced Services Order*, 13 FCC Rcd at 24026, para. 29).

[727] *Id.* (citing *Advanced Services Order*, 13 FCC Rcd at 24027, paras. 30-31).

[728] *Id.* (citing *Advanced Services Order*, 13 FCC Rcd at 24035, para. 46).

[729] *See infra* Section III.D.1 (defining BIAS).  We disagree with the U.S. Chamber of Commerce which argues that the *Advanced Services Order*'s classification of "Internet access" as an information service supports "the textual reading . . . that BIAS is best classified as a Title I 'information service.'"  U.S. Chamber of Commerce Comments at 45.  As we explain here, the "Internet access" described in the *Advanced Services Order* was fundamentally different from the BIAS we classify today, being a non-facilities-based suite of application-layer information services to which users connected via their DSL-based broadband provider.  Today's BIAS, conversely, more closely resembles the DSL-based broadband classified as providing telecommunications service.  We find that BIAS (as defined in this Order) provides a transparent conduit to edge providers' information services.  We also disagree with NCTA's attempt to discount the relevance of the *Advanced Services Order*'s classification of DSL-based broadband service as a telecommunications service by claiming that the *Order* only considered the classification of "*wholesale* DSL transmission[] which incumbent telephone companies historically offered to ISPs such as AOL or Earthlink as a telecommunications service unbundled from Internet access, [rather than] *retail* broadband service."  NCTA Comments at 37.  This reading defies the very language in the *Advanced Services Order* which clearly considered the service to be offered both to end users and to ISPs.  *See Advanced Services Order*, 13 FCC Rcd at 24016, para. 7 (considering "businesses, *residential users*, schools and libraries, and other[s]" to be "end users" of the advanced "high-speed, packet-switched networks" classified in the *Order*, and identifying use cases such as providing "faster access to the Internet" to watch "feature-length movies on demand" or place video calls (emphasis added)); *id.* at 24030, para. 36 (stating that "[i]ncumbent LECs have proposed, and are currently offering, a variety of services in which they use xDSL technology and packet switching to provide *members of the public* with a transparent, unenhanced, transmission path," and that "[a]n *end-user* may utilize [the DSL-enabled transmission path] telecommunications service together with an information service, as in the case of Internet access" (emphasis added)).

[730] *See* Scott Jordan Reply at 5 ("In the *Advanced Services Order*, what today we recognize as an early version of broadband Internet access service is instead termed 'xDSL-based advanced service,' which consists of transmission between the customer's modem and the central office and end-to-end packet switching *but excludes applications such as webpage hosting and email.*" (emphasis added)).

information service, in this case Internet access."[731]  In the 1999 *Advanced Services Remand Order*, the Commission affirmed its conclusion that "[]DSL-based advanced services constitute telecommunications services as defined by section 3(46) of the Act."[732]  DSL-based broadband providers were thus subject, under these *Orders*, to Title II in relevant part.  In light of the factual circumstances underlying the Commission's classification of DSL, we find the *Advanced Services Order* informative as to the best classification of BIAS today.[733]

178.    *Classification of Cable Modem Service.*  The regulatory classification of cable modem service was unaddressed when the Ninth Circuit had occasion to consider it in *City of Portland*.[734]  There, the court found that cable modem service was a telecommunications service to the extent that the cable operator "provides its subscribers Internet transmission over its cable broadband facility."[735]

179.    Three months after the *City of Portland* decision, the Commission issued the *Cable Modem Notice of Inquiry*, which sought comment on whether cable modem service should be classified as a telecommunications service under Title II or an information service subject to Title I.[736]  That

---

[731] *Advanced Services Order*, 13 FCC Rcd at 24030, para. 36; *see* Scott Jordan Reply at 5.

[732] *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 98-11, 98-147, 98-26, 98-32, 98-78, and 98-91, Order on Remand, 15 FCC Rcd 385, 388, para. 9 (1999) (*Advanced Services Remand Order*).  The definition of telecommunications service is now in section 3(53) of the Act, 47 U.S.C. § 153(53).

[733] Although the classification decision in the *Advanced Services Order* arose in the context of the *Computer II* requirement that facilities-based carriers offer the transmission underlying their enhanced service offering on a common carrier basis, *see Advanced Services Order*, 13 FCC Rcd at 24030, para. 36, and therefore the DSL transmission service was not a "retail" service within the meaning of the resale obligation in section 251(c)(4) of the Act, that does not alter the marketplace reality that this common carrier transmission service was nevertheless available for purchase by retail end users as well as wholesale customers, despite the *RIF Order*'s suggestion to the contrary.  *RIF Order*, 33 FCC Rcd at 339-40, para. 51 n.179.  Retail end users could rely on that common carrier transmission service to access the application-layer services offered by the ISPs of the time, consistent with the explanation of telecommunications services and information services that the Commission laid out in the *Stevens Report*.  The *RIF Order*'s further complaint that DSL common carrier transmission service "[did not] itself provide Internet access[]" does not demonstrate that the purchase from two suppliers rather than a single supplier is inherently material to the classification analysis.  *Id.*

[734] *AT&T Corp. v. City of Portland*, 216 F.3d 871, 877-79 (9th Cir. 2000) (*City of Portland*).

[735] The court found that cable modem service, "like [the Internet access service of] other ISPs, . . . consists of two elements:  a 'pipeline' (cable broadband instead of telephone lines), and the Internet service transmitted through that pipeline," but "unlike [the Internet access service of] other ISPs, [the cable modem service provider] *controls all of the transmission facilities between its subscribers and the Internet*."  *City of Portland*, 216 F.3d at 878 (emphasis added).  The Ninth Circuit also noted that the Communications Act "includes cable broadband transmission as one of the 'telecommunications services' a cable operator may provide over its cable system."  *Id.* at 878 (citing 47 U.S.C. § 541(b)(3)(C)).  Following *City of Portland*, two other courts had the opportunity to consider the application of cable modem service, neither of which we find undercut the weight the Ninth Circuit's conclusion lends to our independent conclusion that today's offering of BIAS is best classified as a telecommunications service.  *See, e.g.*, *Gulf Power Co. v. FCC*, 208 F.3d 1263, 1275-78 (11th Cir. 2000) (concluding that Internet access service is neither a cable service nor a telecommunications service but without engaging in any analysis or consideration of the law or the facts itself), *rev'd on other grounds sub nom. Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2002); *MediaOne Group, Inc. v. Cnty. of Henrico*, 97 F. Supp. 2d 712, 715 (E.D. Va. 2000) (failing to reach the question of how to classify cable modem service, but holding that the ordinance at issue "violates Section 541(c)'s prohibition against 'regulation as a common carrier or utility by reason of providing any cable service'" where "[b]y reason of its provision of cable modem services, the Ordinance would require MediaOne Virginia to provide indiscriminate access to its facilities to all ISPs on set terms and conditions"), *aff'd on other grounds*, 257 F.3d 356 (4th Cir. 2001).

[736] *Inquiry Concerning High-Speed Access to the Internet over Cable & Other Facilities*, GN Docket No. 00-185, Notice of Inquiry, 15 FCC Rcd 19287, 19293 para. 15 (2000) (*Cable Modem Notice of Inquiry*).

proceeding culminated with the *Cable Modem Declaratory Ruling*.[737]  Based on a factual record that had been compiled at that time, the Commission described cable modem service as "typically includ[ing] many and sometimes all of the functions made available through dial-up Internet access service, including content, e-mail accounts, access to news groups, the ability to create a personal web page, and the ability to retrieve information from the Internet."[738]  The Commission found that cable modem service was "an offering . . . which combines the transmission of data with computer processing, information provision, and computer interactivity, enabling end users to run a variety of applications."[739]  The Commission further concluded that, "as it [was] currently offered,"[740] cable modem service as a whole met the statutory definition of "information service" because its components were best viewed as a "single, integrated service that enables the subscriber to utilize Internet access service," with a telecommunications component that was "not . . . separable from the data-processing capabilities of the service."[741]  While the *Cable Modem Declaratory Ruling* did not mention the "inextricably intertwined" language from the *Stevens Report* or the earlier "intertwined" language from *Computer II*, it followed their classification approach in concluding that cable modem service, as viewed by the end user, was dominated by the information service aspects.[742]

180.     The *Cable Modem Declaratory Ruling* faced a legal challenge, but was ultimately upheld by the U.S. Supreme Court in *Brand X*.[743]  *Brand X* recognized that the *Cable Modem Declaratory Ruling*'s Title I classification was a "reversal of agency policy" and "change [in] course" from the Commission's original classification of broadband in the *Advanced Services Order*, but held that it was permissible under the broad deference required by *Chevron*.[744]  Specifically, the Court held that the word

---

[737] *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities et al.*, GN Docket No. 00-785, CS Docket No. 02-52, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002) (*Cable Modem Declaratory Ruling*).

[738] *Id.* at 4804, 4811, paras. 10, 18 (footnotes omitted) ("These applications include traditional ISP services such as e-mail, access to online newsgroups, and creating or obtaining and aggregating content.  The cable modem service provider will also typically offer subscribers a 'first screen' or 'home page' and the ability to create a personal web page.").

[739] *Id.* at 4822, para. 38.

[740] *Id.* at 4802, para. 7.

[741] *Id.* at 4822-23, paras. 38-39; *see also* CFA Comments at 71 ("The [classification] of high-speed data transmission service as an information service [in the *Cable Modem Declaratory Ruling*] rested on a theory of 'contamination,' i.e., that the combination of telecommunications and information services in a 'bundle' turns the whole bundle into an information service.  This was a reversal of long-standing Commission policy and the regulatory structure that provided the model for the 1996 Act.  Previously, the presence of telecommunications in the bundle created a telecommunications service.").  We disagree with the U.S. Chamber of Commerce which argues that the *Cable Modem Declaratory Ruling*'s classification of cable modem service as an information service supports "the textual reading . . . that BIAS is best classified as a Title I 'information service.'"  U.S. Chamber of Commerce Comments at 45-47; *see also* ACA Connects Comments at 26 ("The Commission's original classification of broadband as an information service, and its subsequent decisions confirming that classification, were well-founded in the factual particulars of how the service was provided and the enhanced capabilities it afforded consumers to access and interact with internet content, applications, and services.  This was true in 2002, as it was in 2005, and has remained true ever since.").  As ACA Connects explains, the Commission arrived at its conclusion after reviewing the factual record of how providers offered, and consumers perceived, the service at the time.  However, we disagree with both commenters that, somehow, this 22-year-old factual record has bearing on the classification of modern-day BIAS.  As we amply show above, the record we received confirms that providers' offering of broadband service has indeed changed dramatically, and so have consumers' perception of the service.

[742] The *Brand X* Court cited to the *Stevens Report*'s use of "inextricably intertwined" to analogize to the *Cable Modem Declaratory Ruling* classification analysis.  *See Brand X*, 545 U.S. at 978.

[743] *See id.* at 974.

[744] *Id.* at 981-82, 1000-02.

"offering" in the Act's definitions of "telecommunications service" and "information service" is ambiguous, and that the Commission's finding that cable modem service is a functionally integrated information service was a permissible, though perhaps not the best, interpretation of the Act.[745] The Court explained that the Act's definitions turn on what the cable modem service provider is understood to be "offering" to consumers, which in turn depends on what consumers reasonably perceive the offering to be.[746] Based on the administrative record before the Commission in 2002, the Court found "reasonable" "the Commission's understanding of the nature of cable modem service"—namely, that "[w]hen an end user accesses a third party's Web site," that user "is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site, its e-mail service, or his personal Web page," citing as examples the roles of DNS and caching.[747] In the wake of *Brand X*, the Commission proceeded to adopt information service classifications of Internet access service offered via wireline networks,[748] power line networks,[749] and wireless networks,[750] though the Commission continued to recognize that ISPs could offer broadband transmission as a telecommunications service subject to Title II, and many did.[751]

181. The *Cable Modem Declaratory Ruling*, and the successive decisions following it, are not determinative of the classification of modern-day BIAS. The *Cable Modem Declaratory Ruling* was based on a record developed in the early 2000s—when ISPs were still viewed as playing a crucial role in the availability of websites, e-mail, newsgroup access, and the like.[752] And the follow-on classification

---

[745] *Id.* at 986-1000. NCTA misleadingly states that the Court's conclusion in *Brand X* "confirmed that Congress never clearly intended for broadband to be treated as a telecommunications service." NCTA Comments at 31. By holding that the term "offering" in the 1996 Act is ambiguous, the Court also confirmed that Congress never clearly intended for broadband to be treated as an information service, and thus deferred to the Commission's decision under *Chevron*.

[746] *See Brand X*, 545 U.S. at 990 ("It is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product . . . ."); *id.* at 1008 ("The Commission's ruling began by noting . . . how any reasonable consumer would perceive it . . . ."); *see also id.* at 976 ("The *Computer II* rules defined both basic and enhanced services by reference to how the consumer perceives the service being offered.").

[747] *Id.* at 998-1000.

[748] *Wireline Broadband Classification Order*, 20 FCC Rcd at 14911, para. 105 (stating that "[t]he record demonstrates that end users of wireline broadband Internet access service receive and pay for a single, functionally integrated service, not two distinct services").

[749] *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, WC Docket No. 06-10, Memorandum Opinion and Order, 21 FCC Rcd 13281, 13287-88, para. 9 (2006) (*BPL Classification Order*) ("find[ing] that BPL-enabled Internet access service is an information service because it offers a single, integrated service (*i.e.*, Internet access) to end users, in that BPL-enabled Internet access service combines computer processing, information provision, and computer interactivity with data transport").

[750] *Wireless Broadband Classification Order*, 22 FCC Rcd at 5911, para. 26 (finding that "[l]ike cable modem service, wireline broadband Internet access service, and BPL-enabled Internet access service, wireless broadband Internet access service offers a single, integrated service to end users, Internet access, that inextricably combines the transmission of data with computer processing, information provision, and computer interactivity, for the purpose of enabling end users to run a variety of applications").

[751] *See, e.g., Framework for Broadband Internet Service*, GN Docket No. 10-127, Notice of Inquiry, 25 FCC Rcd 7866, 7875, para. 21 (2010) (*Broadband Framework NOI*) (observing that many ISPs—"including more than 840 incumbent local telephone companies—currently offer broadband transmission as a telecommunications service" (footnote omitted)); *id.* at 7875, para. 21 n.53 (explaining that through the National Exchange Carrier Association, Inc. (NECA) DSL Access Service Tariff, "NECA members offer retail end users and wholesale Internet service providers a DSL access service that 'enables data traffic generated by a customer-provided modem to be transported to a DSL Access Service Connection Point using the Telephone Company's local exchange service facilities'").

[752] *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4804, para. 10.

decisions substantially relied on the record compiled in the *Cable Modem Declaratory Ruling* proceeding.[753]  The factual circumstances, as characterized by the Commission then, differ substantially from the functional and marketplace realities of BIAS today, to say nothing of the fact that none of these decisions considered the applicability of the telecommunications systems management exception to the information service definition.[754]

182.　　　While the *Cable Modem Declaratory Ruling* itself has limited relevance to our classification of modern-day BIAS, the Supreme Court's opinions on it lends some support to the telecommunications classification we reach today.  In upholding the *Cable Modem Declaratory Ruling* on reasonableness grounds, every Justice joined opinions that, at best, showed that the *Cable Modem Declaratory Ruling*'s understanding of the factual circumstances was becoming increasingly outdated even at the time.  Justice Thomas, writing for the majority, noted that "our conclusion that it is *reasonable* to read the Communications Act to classify cable modem service solely as an 'information service' leaves untouched *Portland's* holding that the Commission's interpretation is not the *best* reading of the statute."[755]  Justice Breyer's concurrence cautioned that the Commission's information service classification was "perhaps just barely" permissible.[756]  And in dissent, Justice Scalia, joined by Justices Souter and Ginsburg, found that the Commission had adopted "an implausible reading of the statute"[757] and that "the telecommunications component of cable-modem service retains such ample independent identity" that it could only reasonably be classified as a separate telecommunications service.[758]  As we demonstrate above, today's BIAS is now entirely divorced from providers' information service offerings on which the *Cable Modem Declaratory Ruling* rested its classification decision.  If cable modem service may have been best understood as a telecommunications service then, modern BIAS most certainly is best understood as a telecommunications service now.[759]

183.　　　*2015 Open Internet Order.*  In 2015, the Commission first considered the classification of "broadband Internet access service," as defined by the *2010 Open Internet Order*, narrowly focused on the transmission component of the service and any capabilities that are incidental to and enable the operation of that service, and irrespective of the technology over which that service is provided.[760]  In

---

[753] *See Wireline Broadband Classification Order*, 20 FCC Rcd at 14863, para. 14 ("[L]ike cable modem service . . . wireline broadband Internet access service combines computer processing, information provision, and computer interactivity with data transport, enabling end users to run a variety of applications (e.g., e-mail, web pages, and newsgroups)." (citing the *Cable Modem Declaratory Ruling* and the *Stevens Report*)); *BPL Classification Order*, 21 FCC Rcd at 13286, para. 9 (referencing the prior classifications of cable modem service and wireline broadband Internet access service); *Wireless Broadband Classification Order*, 22 FCC Rcd at 5911, para. 26 (stating that applications run by wireless broadband Internet access users are "identical to those provided by cable modem service, wireline broadband Internet access, or BPL-enabled Internet access" and therefore finding that wireless broadband Internet access service meets the definition of an information service).

[754] The *Cable Modem Declaratory Ruling* and the *Wireline Broadband Classification Order* mentioned the exception in quoting the statutory definition of "information service," but did not analyze its potential applicability, such as to DNS.  *Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4820, para. 34; *Wireline Broadband Classification Order*, 20 FCC Rcd at 14863, para. 13.

[755] *Brand X*, 545 U.S. at 985-86.

[756] *Id.* at 1003 (Breyer, J., concurring).

[757] *Id.* at 1005 (Scalia, J., dissenting).

[758] *Id.* at 1008 (Scalia, J., dissenting).

[759] *See supra* Section III.B.1.

[760] *2015 Open Internet Order*, 30 FCC Rcd at 5682, 5745-47, paras. 336-37; *2010 Open Internet Order*, 25 FCC Rcd at 17932, para. 44; Scott Jordan Reply at 7-8 ("Unlike cable modem service, wireline broadband Internet access service, or wireless broadband Internet access service, broadband Internet access service is technology agnostic . . . [and] [b]roadband Internet access service does not include applications that do not fall within the telecommunications systems management exception.").

doing so, as we do here, the Commission reviewed its prior classification decisions concerning dial-up Internet access service, DSL-based advanced service, cable modem service, wireline broadband service, and wireless broadband service, and weighed the relevance of such decisions on a classification of BIAS based on the factual circumstances under which it was then offered.[761] The Commission concluded that fixed and mobile "broadband Internet access service" is a telecommunications service,[762] finding that "broadband Internet access service, as offered by both fixed and mobile providers, is best seen, and is in fact most commonly seen," as a "separate 'offering'" of transmission capacity that "is today sufficiently independent of . . . information services" such as "email and online storage."[763] The *2015 Open Internet Order* also concluded that the bundling of certain services, such as DNS and caching, with broadband Internet access service, does not "turn broadband Internet access service into a functionally integrated information service."[764]

184. In 2016, the D.C. Circuit upheld the *2015 Open Internet Order* in full in *USTA*.[765] The court found that the Commission's conclusion that consumer perception of BIAS as a separate offering of telecommunications found "extensive support in the record," "justify[ing] the Commission's decision to reclassify broadband as a telecommunications service."[766] It also affirmed the Commission's view that DNS and caching fall under the telecommunications systems management exception because they "facilitate use of the network without altering the fundamental character of the telecommunications service."[767] Similarly, the court found "reasonable and supported by the record" the Commission's classification of mobile BIAS as a commercial mobile service.[768] It also concluded that the Commission fully justified its change in course.[769]

185. *RIF Order.* In 2017, the Commission reclassified the technology-agnostic BIAS as an information service, reversing the conclusion of the *2015 Open Internet Order*.[770] While maintaining the same narrowly drawn definition of BIAS used since the *2010 Open Internet Order*, the Commission nevertheless considered BIAS (1) to provide subscribers the capability "to engage in all of the information processes listed in the information service definition"; (2) to involve "information processing

---

[761] *See 2015 Open Internet Order*, 30 FCC Rcd at 5736-42, paras. 314-27 (discussing prior classification decisions); *see also id.* at 5750-51, paras. 343-44 (discussing the *Cable Modem Declaratory Ruling* and *Wireline Broadband Classification Order*); *id.* at 5751, para. 345 (discussing the *Wireless Broadband Classification Order*).

[762] *Id.* at 5743-44, 5745, paras. 331, 335. The Commission first defined "broadband Internet access service" in the *2010 Open Internet Order. See 2010 Open Internet Order*, 25 FCC Rcd at 17932-33, paras. 44-46.

[763] *2015 Open Internet Order*, 30 FCC Rcd at 5615, 5758, paras. 46, 356 ("Today, broadband providers are offering stand-alone transmission capacity.").

[764] *Id.* at 5765, para. 365.

[765] *USTA*, 825 F.3d at 674. Requests for rehearing en banc were denied in 2017 in *USTA II*, 855 F.3d 381. Of note, two judges concurring in the denial of rehearing en banc reiterated *Brand X's* conclusion that a telecommunications service classification was both reasonable and the best reading of the Act. *See id.* at 384 (Srinivasan, C.J., joined by Tatel, J., concurring in the denial of rehearing en banc) ("To affirm the FCC's statutory discretion to select [in the Cable Modem Declaratory Ruling] between [two classification choices] was necessarily to countenance the agency's treatment of cable broadband as a telecommunications service. Indeed, the Court [in *Brand X*] went so far as to affirmatively 'leave[] untouched' the court of appeal's belief that the better reading of the statute—albeit not the one that had been adopted by the agency—called for treating broadband providers as telecommunications carriers.").

[766] *USTA*, 825 F.3d at 697-98.

[767] *Id.* at 705.

[768] *Id.* at 714.

[769] *Id.* at 707 (finding that the Commission justified its approach by explaining why open Internet rules were necessary, and that the only way to implement those rules was through reclassification); *id.* ("This, in our view, represents a perfectly 'good reason' for the Commission's change in position.").

[770] *RIF Order*, 33 FCC Rcd at 318, para. 20.

functions itself, such as DNS and caching"; and (3) to be inextricably intertwined with other information-processing capabilities offered by the BIAS provider or third parties.[771]  In conducting its factual analysis, the *RIF Order* relied on the *Cable Modem Declaratory Ruling*, along with *Brand X*, in addition to the isolated MFJ precedent we previously addressed.

186.    In addition to the *RIF Order*'s misapplication of the statutory definitions, which we discuss above, its application of Commission precedent to arrive at its preordained information service classification was flawed.[772]  By the time the *RIF Order* ventured to reconsider the classification of BIAS, the factual characterizations in the *Cable Modem Declaratory Ruling*, which *Brand X* showed were becoming outdated even at the time, were positively antiquated.  Nevertheless, the *RIF Order* at times erroneously leaned on that proceeding's factual record in its analysis of modern-day BIAS.[773]

187.    On review in *Mozilla*, the D.C. Circuit was skeptical of the *RIF Order*'s classification decision, and in particular its reliance on *Brand X* and the underlying *Cable Modem Declaratory Ruling*.  As Judge Millett pointed out in her *Mozilla* concurrence, and as we likewise find here:  "Today, the typical broadband offering bears little resemblance to its *Brand X* version.  The walled garden has been razed and its fields sown with salt.  The add-ons described in *Brand X*—'a cable company's e-mail service, its Web page, and the ability it provides consumers to create a personal Web page,'—have dwindled as consumers routinely deploy 'their high-speed Internet connections to take advantage of competing services offered by third parties.'"[774]  Although, the court ultimately upheld the *RIF Order*, it did so not because the *RIF Order* best represented the factual realities of the offering or most closely accorded with precedent, but under the judicial principles concerning deference and binding precedent.[775]  As Congress has granted the Commission the authority and responsibility to classify services,[776] we are not so bound.  Given the *RIF Order*'s flawed analysis of the statutory terms and misplaced reliance on aging conceptions of how Internet access service is offered today, we thus decline to give the *RIF Order*'s classification determination any precedential value, and instead find that our classification of BIAS as a telecommunications service is not only the best reading of the statute under the factual circumstances of how BIAS is offered today but also best accords with Commission and court precedent.

## D.    Scope of Reclassification

188.    Our classification decision continues to rely on the same definition of "broadband Internet access service" the Commission has used since the *2010 Open Internet Order*, which encompasses mass market, retail data transmission and capabilities that are incidental to and enable its operation.[777]  We continue to exclude non-BIAS data services and clarify the framework for identifying those services.  To the extent that the exchange of Internet traffic by an edge provider or an intermediary with the BIAS provider's network supports the capability to reach all or substantially all Internet endpoints and enables the operation of the service, we find that BIAS includes such Internet traffic exchange.  However, we clarify that service to edge providers is not itself BIAS.  We also continue to

---

[771] *Id.* at 321, para. 27; *see also* Scott Jordan Reply at 11 (arguing that the *RIF Order* should have expanded the definition of BIAS to properly include these separate services within the definition).

[772] *See, e.g.*, CFA Comments at 64 (characterizing the *RIF Order* as making "claims . . . about [BIAS] . . . that are incorrect—inconsistent with the actual history[ and] at odds with the market reality").

[773] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 347-48, para. 57 & n.218.

[774] *Mozilla*, 940 F.3d at 89-90 (Millett, J., concurring) (citations omitted);  *see also, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5737, 5743, 5753, 5755, paras. 315, 330, 347, 350 (discussing changes in the marketplace).

[775] *Mozilla*, 940 F.3d at 19 ("Our review is governed by the familiar *Chevron* framework in which we defer to an agency's construction of an ambiguous provision in a statute that it administers if that construction is reasonable."); *id.* at 94 (Millett, J., concurring) ("Yet, as a lower court, we are bound to the [Supreme Court] case which directly controls, and so we must follow *Brand X*, as the court's opinion does." (quotations omitted)).

[776] *See infra* section III.F.1.

[777] *See 2010 Open Internet Order*, 25 FCC Rcd at 17932, para. 44.

exclude premises operators and end users who provide access to their BIAS connections when not offered on a mass-market, retail basis.

### 1.    Broadband Internet Access Service

189.    We continue to define "broadband Internet access service" as a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service.[778]  We also continue to include in this term any service that we find to provide a functional equivalent of the service described in the definition, or that is used to evade the protections set forth in part 8 of the Commission's rules.[779]  The Commission has retained this definition since it first defined broadband Internet access service in the *2010 Open Internet Order*,[780] and a broad range of commenters support us continuing to do so.[781]

---

[778] *See* 47 CFR § 8.1(b); *2023 Open Internet NPRM* at 34, para. 59.  Our use of the term "broadband" in this Order includes, but is not limited to, services meeting the threshold for "advanced telecommunications capability."  *2015 Open Internet Order*, 30 FCC Rcd at 5610, para. 25 n.27, 5746, para. 336 n.880; 47 U.S.C. § 1302(d)(1) (defining "advanced telecommunications capability" as "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology").  We continue to exclude dial-up Internet access service from the definition of BIAS because of the different market and regulatory landscape for that service.  *See RIF Order*, 33 FCC Rcd at 319, para. 21 n.59 (citing *2010 Open Internet Order*, 25 FCC Rcd at 17935, para. 51); *2015 Open Internet Order*, 30 FCC Rcd at 5746, para. 336 n.881 (citing same).  We also make clear that the definition of BIAS does not include VoIP service and we do not classify VoIP service in this Order.  State Attorneys General Reply at 3 (asking for clarification that our action does not "affect, reclassify, or otherwise impact or alter the treatment of VoIP service providers").  We agree that IP packet transfer is "the core function of BIAS," and therefore is the foundation for defining BIAS.  Jon Peha Comments at 3; *see also* Scott Jordan Reply at 14 (agreeing with Professor Jon Peha that "[t]he core component of broadband Internet access service is the end-to-end transmission of IP packets").  We do not, however, find it appropriate to define BIAS as solely the "commercial offering of an IP packet transfer service" because such a description would expand the scope beyond the focus of this proceeding and our actions in this Order.  Indeed, such a high-level—and therefore broad—definition could sweep in services using IP packet transfer for reasons completely unrelated to Internet access.

[779] *See* 47 CFR § 8.1(b); *2023 Open Internet NPRM* at 34, para. 59; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5746, para. 336, 5883, Appx. A § 8.2.

[780] *See 2010 Open Internet Order*, 25 FCC Rcd at 17932-33, paras. 44-46; *2015 Open Internet Order*, 30 FCC Rcd at 5746, para. 336; *RIF Order*, 33 FCC Rcd at 318-20, paras. 21-25 (refraining from altering the definition affirmed in the *2015 Open Internet Order*); *see also* 47 CFR § 8.1(b).

[781] *See, e.g.*, CCIA Comments at 1-2 (supporting all three elements in the definition); Cloudflare Comments at 2 (supporting reaffirmation of the *2015 Open Internet Order*'s definition); Ericsson Comments at 18 (generally supporting the adoption of the *2023 Open Internet NPRM*'s definition of BIAS); INCOMPAS Comments at 34-35 (supporting all three elements in the definition); T-Mobile Comments at 26-27, 36 (supporting all three elements in the definition); The Quilt Comments at 1-5 (urging the Commission "not to alter its current and well-established definitions for [BIAS]"); ITI Comments at 4 (supporting "the Commission's current definition of BIAS as a mass market service"); Internet2 Comments at 4 (supporting the *2023 Open Internet NPRM*'s proposal to "limit the scope of any reclassification adopted in this proceeding to the definition of BIAS the Commission has previously utilized"); Lumen Comments at 21 (supporting retention of the "existing definition of BIAS, consistent with the *2015 Open Internet Order*"); ICG Comments at 8 ("We agree that the Commission's definition of 'BIAS' and 'mass market' do not need revision."); Microsoft Comments at 2, 14 ("[T]he Commission should define the scope of regulated [BIAS] no more broadly than it did in the *2015 Open Internet Order*."); CTIA Reply at 74 (supporting the adoption of the *2023 Open Internet NPRM*'s proposed definition of BIAS); Ericsson Reply at 9 (same); Scott Jordan Reply at 4 ("The Commission should retain the existing definition."); The Quilt Reply at 1-4, 5-6 (urging the Commission "not to alter current and well-established definitions for [BIAS]"); T-Mobile Reply at 13-14 (acknowledging "broad support for reaffirming the existing definition of [BIAS]" and arguing that "[m]aintaining the existing definition of [BIAS] will avoid the legal and economic risks that would come with a more sweeping

(continued….)

190. As the Commission has previously determined, the term "broadband Internet access service" includes services provided over any technology platform, including, but not limited to, wire, terrestrial wireless (including fixed and mobile wireless services using licensed or unlicensed spectrum), and satellite.[782] "Fixed" broadband Internet access service refers to a broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment, such as the modem that connects an end user's home router, computer, or other Internet access device to the Internet, and encompasses the delivery of fixed broadband service over any medium, including various forms of wired broadband service (e.g., cable, DSL, fiber), fixed wireless access (FWA) broadband service (including fixed services using unlicensed spectrum and cellular fixed wireless access[783]), and fixed satellite broadband service.[784] "Mobile" broadband Internet access service refers to a broadband Internet access service that serves end users primarily using mobile stations, and includes, among other things, services that use smartphones or mobile-network-enabled tablets or devices as the primary endpoints for connection to the Internet, as well as mobile satellite broadband service.[785] We continue to encompass within the definition of broadband Internet access service all providers of any such service, regardless of whether the BIAS provider leases or owns the facilities used to provide the service.[786]

191. We disagree with the Information Technology and Innovation Foundation's (ITIF) argument that our definition of BIAS undermines the applicability of the open Internet rules we adopt by rendering the rules "essentially voluntary" as long as an entity offers a service that does not provide indiscriminate access to all or substantially all Internet endpoints and discloses its network management practices.[787] This argument conflates not providing BIAS at all with providing BIAS while violating the rules.[788] A BIAS provider cannot simply declare that it is not providing BIAS; the determination is dependent on the nature of the service the BIAS provider offers, as reasonably understood by consumers.[789] An ISP offering that is clearly identified and marketed to consumers as providing edited or curated Internet access—rather than service that consumers reasonably understand and expect to provide indiscriminate access to all or substantially all Internet applications and services of their choosing—

---

definition"); USTelecom Reply at 72-73 (arguing that "the Commission should reject" all changes to the "long-standing definition" of BIAS that are suggested in the record); NTIA *Ex Parte* at 2 n.7.

[782] *See 2015 Open Internet Order*, 30 FCC Rcd at 5746-47, para. 337; *RIF Order*, 33 FCC Rcd at 319, para. 22; *see* INCOMPAS Comments at 35 (supporting this approach); *cf.* NCTA et al. Reply at 68-69 (arguing that the Commission's open Internet rules should "apply on a competitively and technologically neutral basis").

[783] Cellular fixed wireless access refers to a specific subclass of FWA offered using 4G or 5G mobile technologies and shares the mobile network. *See* Datablaze, *What Is Fixed Wireless Access?  A Technical Viewpoint*, https://datablaze.com/resources/articles/what-is-fixed-wireless-access-a-technical-viewpoint (last visited Jan. 23, 2024).

[784] *See RIF Order*, 33 FCC Rcd at 319, para. 22; *2015 Open Internet Order*, 30 FCC Rcd at 5746-47, para. 337.

[785] *Id.*

[786] *2015 Open Internet Order*, 30 FCC Rcd at 5683, para. 188 & n.458, 5746-47, para. 337; *RIF Order*, 33 FCC Rcd at 319, para. 22; *see, e.g.*, INCOMPAS Comments at 35-36 (supporting this approach); *see also Brand X*, 545 U.S. at 997 (observing that "the relevant definitions do not distinguish facilities-based and non-facilities-based carriers").

[787] *See* ITIF Comments at 10; *see also* TechFreedom Reply at 36-37 (arguing that if BIAS providers engage in "blocking, throttling, or discrimination," the service that they offer would not be covered by our rules prohibiting such practices, so long as the BIAS providers made clear that they provide a filtered service).

[788] Notably, if ITIF's argument were true, it would also be the case that the transparency rule maintained by the *RIF Order* would also be voluntary, and yet ITIF did not raise this issue as a concern in that proceeding. *See* ITIF Comments, WC Docket No. 17-108 (rec. July 17, 2017); ITIF Reply, WC Docket No. 17-108 (rec. Aug. 28, 2017).

[789] *See NARUC I*, 525 F.2d at 644 ("A particular system is a common carrier by virtue of its functions, rather than because it is declared to be so."); Public Knowledge Comments at 68 ("Common carriage is not an optional regulatory category, but a legal status that stems from the functionality of the carriage service offered, and how it is offered to consumers."); T-Mobile Reply at 16-17 (agreeing with Public Knowledge's statement).

would fall outside the scope of this Order, but an ISP may not provide consumers what appears to be ordinary mass-market broadband service and then engage in discriminatory practices that deny customers the service they reasonably expect.[790] An ISP that currently provides BIAS but seeks to instead provide a service that falls outside the definition of BIAS, particularly as a means to avoid the service being subject to the Commission's rules, may find that this exercise could have non-trivial commercial and regulatory consequences.[791]

192.     *Mass Market.* We continue to find that a "mass-market" service is "a service marketed and sold on a standardized basis to residential customers, small businesses, and other end-user customers, such as schools and libraries."[792] In addition to including broadband Internet access service purchased with support from the E-Rate, Lifeline, and Rural Health Care programs, as well as any broadband Internet access service offered using networks supported by the High Cost program,[793] "mass market" services include any broadband Internet access service purchased with support from the Affordable Connectivity Program (or any successor program offering discounts to eligible households for standardized broadband service offerings) or the Connected Care Pilot Program.[794] Consistent with the *2015 Open Internet Order* and *RIF Order*, and with broad record support, we continue to interpret mass market to exclude enterprise Internet access service offerings as well as other services, such as Business Data Services (BDS), that do not provide access to all, or substantially all, Internet endpoints.[795] The

---

[790] *See infra* Section IV.A; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5872, para. 556 (noting that providers "are free to offer 'edited' services and engage in expressive conduct through the provision of other data services"); *2010 Open Internet Order*, 25 FCC Rcd at 17933, para. 47 (providing examples of services that likely would fall within the scope of BIAS, such as "an Internet access service that provides access to a substantial subset of Internet endpoints based on end users preference to avoid certain content, applications, or services").

[791] *See USTA II*, 855 F.3d at 390 (Srinivasan, J., concurring in denial of rehearing en banc) ("[N]o ISP has suggested an interest in [providing curated, non-BIAS service] in this court. That may be for an understandable reason: a broadband provider representing that it will filter its customers' access to web content based on its own priorities might have serious concerns about its ability to attract subscribers."). That decision also may carry other important consequences. For example, an ISP that is not providing BIAS might not qualify to participate in federal and state programs to fund broadband deployment and affordability, might not benefit from the Commission's pole attachment rights under section 224 and rules concerning access to MTEs, and might not be able to petition the Commission under section 253 to preempt state and local requirements that prohibit the provision of the non-BIAS service. *See* 47 U.S.C. §§ 224, 254(c)(1), 253; 47 CFR §§ 64.2500-64.2502, 76.800-76.806, 76.2000.

[792] The Commission has retained this interpretation of "mass market" since the *2010 Open Internet Order*, *see 2010 Open Internet Order*, 25 FCC Rcd at 17932, para. 45; *2015 Open Internet Order*, 30 FCC Rcd at 5683-84, para. 189; *RIF Order*, 33 FCC Rcd at 318, para. 21 n.58, and the record supports continuing to retain this definition, *see* Lumen Comments at 21 (supporting retaining the current definition of "mass market"); The Quilt Comments at 1, 4 (same); INCOMPAS Comments at 35 (same); ICG Comments at 8 (same); Internet2 Comments at 4, 7 (same); CCIA Comments at 2 (noting that "the criterion that the service be 'mass-market retail service,' . . . is the earmark of common carriage [and] imbues a service provider with the obligation to provide service in a reasonable and nondiscriminatory manner under the Communications Act of 1934"). In order to maintain consistency with this interpretation, we decline Ad Hoc Telecom Users Committee's request to remove the word "small" from "small business" in considering what constitutes a "mass market" service. *See* Ad Hoc Telecom Users Committee Comments at 7-11. We note that in examining whether a service is "mass market," how a service generally is marketed and sold, rather than the entity purchasing the service, is the key determination.

[793] *See RIF Order*, 33 FCC Rcd at 318-19, para. 21 n.58; *2015 Open Internet Order*, 30 FCC Rcd at 5683-84, para. 189 & n.464; *2010 Open Internet Order*, 25 FCC Rcd at 17932, para. 45.

[794] *See 2023 Open Internet NPRM* at 34, para. 60. These programs statutorily support BIAS regardless of its classification status.

[795] *See Business Data Services Order*, 32 FCC Rcd at 3463, para. 6 (characterizing business data services as providing "dedicated point-to-point transmission of data at certain guaranteed speeds and service levels using high-capacity connections"). Our determination that enterprise services are not included within the definition of BIAS should not be understood to mean that non-private-carriage enterprise services cannot otherwise be subject to

(continued….)

services we exclude from being considered mass market exhibit distinct marketplace and technological characteristics from those of BIAS. They are typically offered and sold to large businesses through customized or individually negotiated arrangements and thus depart significantly from BIAS offerings.[796] We make clear that enterprise services are excluded from the definition of BIAS even when they are supported by the Commission's broadband access and affordability programs.[797]

193. *Retail.* We retain the word "retail" in the definition of BIAS and hold that BIAS includes retail service provided by both facilities-based providers and resellers.[798] In doing so, we maintain the definition of BIAS that the Commission has consistently applied since the definition originated in 2010.[799] We therefore decline, at this time, INCOMPAS's request to delete the word "retail" from the definition of BIAS.[800] The applicability of the Commission's reclassification and rules to wholesale services was not

---

regulation as telecommunications services. We believe it is likely that at least some such services are indeed offered as telecommunications services and note that would be consistent with previous Commission statements that non-private-carrier enterprise services are telecommunications services. *See, e.g., 2015 Open Internet Order*, 30 FCC Rcd at 5765, para. 364 (stating that the Commission has long held "certain enterprise broadband services . . . to be common carriage telecommunications services subject to Title II"); *id.* at 5800, para. 424 (noting that "key provisions of Title II apply to certain enterprise broadband services" and citing a variety of orders forbearing from the application of a number of Title II provisions to various enterprise service providers); *Business Data Services Order*, 32 FCC Rcd at 3500, para. 89 (stating that packet-based business data services are "telecommunications services [which] remain subject to the Commission's regulatory authority under sections 201, 202, and 208 of the Act"); *Petition of ACS of Anchorage, Inc. Pursuant to Section 10 of the Communications Act of 1934, as Amended (47 U.S.C. § 160(c)), for Forbearance from Certain Dominant Carrier Regulation of Its Interstate Access Services, and for Forbearance from Title II Regulation of Its Broadband Services, in the Anchorage, Alaska, Incumbent Local Exchange Carrier Study Area*, WC Docket No. 06-109, 22 FCC Rcd 16304, 16354, para. 111 (2007) (refusing to grant "forbearance from Title II as a whole" for ACS's enterprise broadband services).

[796] *See 2015 Open Internet Order*, 30 FCC Rcd at 5683-84, para. 189; *RIF Order*, 33 FCC Rcd at 318, para. 21 n.58; Cloudflare Comments at 14-15 (arguing that, because the market for enterprise services "is fundamentally different than the market for mass-market consumer Internet access," and is "intensely competitive," the Commission should continue to exclude enterprise services from the definition of BIAS); INCOMPAS Comments at 35 (arguing that there is "no reason to alter [this] approach because enterprise customers and broadband providers negotiate to deliver the service that those customers need"); *see also Supporting Survivors of Domestic and Sexual Violence et al.*, WC Docket Nos. 22-238 et al., Report and Order, FCC 23-96, at 11-12, para. 23 (Nov. 16, 2023) (*Safe Connections Act Report and Order*) (concluding that "enterprise services are those products or services that are not ordinarily available to mass market customers and are primarily offered to entities to support and manage business operations, which may provide greater security, integration, support or other features than are ordinarily available to mass market customers, and excludes services marketed and sold on a standardized basis to residential customers and small businesses").

[797] *See Empowering Broadband Consumers Through Transparency*, CG Docket No. 22-2, Order on Reconsideration, FCC 23-68, at 6-8, paras. 24-26, Appx. A (Aug. 29, 2023) (*Broadband Label Reconsideration Order*) (stating that for purposes of the broadband label requirements, "'mass-market' services exclude service offerings customized for the customer through individually negotiated agreements even when the services are supported by federal universal service support"); *see also* The Quilt Comments at 5-6 (supporting this approach); ITI Comments at 4 (same); INCOMPAS Comments at 35 (same). No commenter opposes this approach.

[798] *See* T-Mobile Reply at 14 n.40 (disagreeing generally that removing of the word "retail" is appropriate).

[799] *See 2010 Open Internet Order*, 25 FCC Rcd at 17932-33, paras. 44-46. We note that rules adopted by the *2015 Open Internet Order* and ultimately upheld by the D.C. Circuit used this same definition of BIAS. *See* 47 CFR § 8.2(a) (2016); *USTA*, 825 F.3d at 689.

[800] INCOMPAS Comments at 36; *see also* Letter from Lindsay Stern, Attorney & Policy Manager, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 14, 2024) (INCOMPAS Mar. 14, 2024 *Ex Parte*); Letter from Lindsay Stern, Attorney & Policy Manager, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 20, 2024) (INCOMPAS Mar. 20, 2024 *Ex Parte*); *id.* at 2 (asserting that wholesalers "usually have the power to dictate the terms of wholesale contracts with resellers" since they have no legal duty to offer wholesale broadband service to resellers and "have the incentive to restrict the scope of resale

(continued....)

directly raised in the *2023 Open Internet NPRM* and we find that it would be premature for the Commission to take further action regarding wholesale services based on the current record.[801] Nevertheless, we agree with commenters that broadband wholesalers should not engage in anticompetitive practices or sell or operate their wholesale offerings in a manner that prevents resellers from offering retail broadband service that is in compliance with our BIAS rules.[802] If wholesale providers did engage in such harmful practices, the Commission would be able to take action to address them pursuant to its Title II authority, without including those wholesale providers within the scope of BIAS. That wholesale services do not fall within the definition of BIAS does not mean that they do not fall within the ambit of Title II in some circumstances or otherwise may be subject to the Commission's oversight under section 201(b), which provides the Commission authority to ensure that all practices "in connection with" BIAS are "just and reasonable."[803] Indeed, we agree with INCOMPAS that the Commission "has the authority under Sections 201 and 202 to adjudicate disputes between wholesalers and resellers of BIAS."[804]

194. We conclude that our approach should provide consumers with necessary protections without unfairly burdening resellers with violations resulting from the actions of their wholesale providers. Our BIAS definition includes services from both facilities-based providers and resellers, and therefore any BIAS rules we adopt apply to both categories of service providers. As explained in the *2015 Open Internet Order*, while "a reseller's obligation under the rules is independent from the obligation of the facilities-based provider that supplies the underlying service to the reseller, . . . the extent of compliance by the underlying facilities-based provider will be a factor in assessing compliance by the reseller."[805] Thus, if a reseller has employed reasonable measures to ensure it is able to comply with its obligations under our rules, non-compliance by the reseller's underlying facilities-based provider will not be imputed to the reseller.[806] We not only expect resellers to take care that the service they

---

to market segments that the wholesaler would not otherwise focus on serving while preventing resellers from providing consumers an alternative in the many market segments that the fixed BIAS provider does prioritize"); *see also* INCOMPAS Mar. 14, 2024 *Ex Parte* at 7-10 (arguing that, absent "[c]lassifying wholesale BIAS as a telecommunications service," wholesalers would have the incentive to act anticompetitively and engage in open Internet harms); Public Knowledge Reply at 14-17 (agreeing with INCOMPAS's proposal because it "will ensure that Title II protections apply to broadband wholesalers"). *But see* USTelecom Reply at 73 (responding that INCOMPAS does not identify the existence of any disputes between wholesalers and resellers that require Commission intervention to resolve).

[801] For the same reasons, we decline Public Knowledge's request that the Commission "clarify" that wholesale services are subject to Title II. *See* Letter from John Bergmayer, Legal Director, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 1, 2024) (Public Knowledge Apr. 1, 2024 *Ex Parte*).

[802] *See id.* at 3; INCOMPAS Mar. 20, 2024 *Ex Parte* at 1-2.

[803] 47 U.S.C. § 201(b). We thus disagree with INCOMPAS's suggestion that a specific classification of wholesale service as a telecommunications service is a necessary prerequisite for protecting consumers and resellers from the unjust or unreasonable actions of wholesale service providers. *See* INCOMPAS Mar. 20, 2024 *Ex Parte* at 3 (arguing that removing the word "retail" from the definition of BIAS, and thereby classifying wholesale service as a telecommunications service, "would . . . enable the Commission to monitor and, where appropriate, to address unjust, unreasonable, and unreasonably discriminatory terms in wholesale BIAS contracts").

[804] INCOMPAS Comments at 17; *see also* Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Mar. 11, 2024) (Public Knowledge Mar. 11, 2024 *Ex Parte*) (focusing on the inclusion of wholesale broadband service within the scope of Title II as opposed to within the definition of BIAS).

[805] *2015 Open Internet Order*, 30 FCC Rcd at 5683, para. 188 n.458.

[806] *See* NCTA Mar. 21, 2024 *Ex Parte* at 6 (noting that "resellers are free to seek (and routinely do seek) contractual guarantees that the service they resell complies with legal requirements applicable to retail services"). What constitutes reasonable measures will depend on the factual circumstances, including the details of the reseller's

(continued….)

choose to resell to retail customers would not expose them to compliance issues under our rules,[807] but we also expect that facilities-based providers that choose to provide wholesale service will not sell a service that does not allow resellers to comply with our rules.[808] In any event, we intend to monitor the wholesale service marketplace and will take appropriate prescriptive or enforcement action to protect consumers and resellers should the need arise.

## 2. Non-BIAS Data Services

195. We continue to exclude non-BIAS data services (formerly "specialized services") from the scope of broadband Internet access service.[809] As the Commission explained in the *2015 Open Internet Order*, non-BIAS data services are certain services offered by BIAS providers that share capacity with broadband Internet access service over BIAS providers' last-mile facilities but are not broadband Internet access service or another type of Internet access service, such as enterprise services.[810] Such services generally share the following characteristics: (1) are only used to reach one or a limited number of Internet endpoints; (2) are not a generic platform, but rather a specific "application level" service; and (3) use some form of network management to isolate the capacity used by these services from that used by broadband Internet access services.[811] These characteristics are non-exhaustive and do not comprise elements of a definition of non-BIAS data services.[812] Thus, services with these characteristics will not

---

[807] *See* Letter from Scott H. Angstreich, Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Mar. 27, 2024) ("Reseller ISPs have the same economic incentives as facilities-based ISPs to ensure that the broadband service they sell to consumers complies with the rules the Commission proposes to reimpose.").

[808] *Id.* at 2 ("[N]o reseller ISP would buy a service from a wholesale ISP that reserved the right to block, throttle, or engage in other conduct that would drive the reseller's retail customers away.").

[809] *2023 Open Internet NPRM* at 36, para. 64; *RIF Order*, 33 FCC Rcd at 319-20, para. 23 (excluding non-BIAS data services from the definition of BIAS); *2015 Open Internet Order*, 30 FCC Rcd at 5698, para. 211 (concluding that the Commission's rules should continue to treat non-BIAS data services differently than BIAS); *2010 Open Internet Order*, 25 FCC Rcd at 17965-66, paras. 112-13 (distinguishing "specialized services" from BIAS and declining to adopt policies specific to such services); *see, e.g.*, Jon Peha Comments at 10 (supporting our continued exemption of non-BIAS data services from the scope of BIAS); Lumen Comments at 21 (same); NRECA Comments at 7-8 (same); T-Mobile Comments at 24 (same); CTIA Reply at 74 (same); Free State Foundation Reply at 21 (same); Gogo Business Aviation LLC Reply at 5-6 (same); NCTA et al. Reply at 3, 64 (same); *cf.* ICG Comments at 8 (arguing that non-BIAS data services "are usually Title II common carriage" services, but nevertheless "should not be subject to Internet-specific regulation of any kind").

[810] *2015 Open Internet Order*, 30 FCC Rcd at 5696, para. 207; *see also RIF Order*, 33 FCC Rcd at 319-20, para. 23; *2010 Open Internet Order*, 25 FCC Rcd at 17965, para. 112 (using the term "specialized services").

[811] *See 2015 Open Internet Order*, 30 FCC Rcd at 5697, para. 209; *RIF Order*, 33 FCC Rcd at 319-20, para. 23; New America's Open Technology Institute Comments at 74 ("[W]e strongly support maintaining the three definitional characteristics of non-BIAS services adopted in the Commission's 2015 Order."); INCOMPAS Comments at 37 (stating that the characteristics established in the *2015 Open Internet Order* "still appropriately describe non-BIAS data services").

[812] We clarify this in light of confusion in the record that the characteristics established in the *2015 Open Internet Order* constituted elements of a definition of non-BIAS data service. *See* New America's Open Technology Institute Reply at 21 (erroneously characterizing the *2015 Open Internet Order* as "*requiring* . . . that non-BIAS services . . . be a specific application level service . . . and . . . use some form of network management to isolate the capacity used by these services from that used by the [BIAS]" (internal quotation marks omitted) (emphasis added)); Barbara van Schewick Reply at 20-21 (noting that "some commenters have interpreted the NPRM as saying that services that exhibit the defining characteristics listed in the Notice are non-BIAS data services to which the Open Internet rules do not apply. . . . That would be an inaccurate reading of the 2015 Open Internet Order").

always be considered non-BIAS data services.[813]  In 2015, the Commission identified examples of some services that, at the time, likely fit within the category of non-BIAS data services.[814]

196.    *Innovation and Investment.*  We anticipate that maintaining an exclusion of non-BIAS data services from the definition of BIAS will foster innovation and investment in BIAS and non-BIAS data services.[815]  We agree with Professor van Schewick that excluding non-BIAS data services from the scope of BIAS "allows applications to emerge that would not be able to function on the open internet because they need special treatment that the open internet cannot provide."[816]  We further expect that our approach will guard against artificial marketplace distortions by providing a level playing field for like data services under our rules:  those that fit the "core" definition of BIAS, represent its functional equivalent, or are used in an attempt to evade our rules governing BIAS will be treated the same under our rules, while data services that fall outside the scope of BIAS—whether established or new—will be treated comparably.  Additionally, we anticipate that, under our regulatory approach, BIAS providers will be motivated to innovate and invest in the development and deployment of new technologies that will help enable them to meet growing network capacity demands for both BIAS and non-BIAS data services utilizing the same network infrastructure, rather than responding to those growing demands through blocking, throttling, paid prioritization, or other conduct harmful to the broader public interest.

197.    *Evasion and Enforcement.*  Key to promoting these benefits is ensuring that our exclusion of non-BIAS data services is not used as a means to evade the rules we place on BIAS, including the open Internet rules we adopt today.  To do so, we will continue to closely monitor the development and use of these services and will act to prevent harm to the open Internet, as necessary.[817]  We are especially concerned about activities that may undermine national security or public safety, hinder consumers' access to or use of BIAS, or impede the ability of over-the-top services to compete with other data

---

[813] *See* Barbara van Schewick Reply at 22 (noting that the *2015 Open Internet Order* "never suggested that services with these characteristics would always be allowed under the Open Internet framework").

[814] *2015 Open Internet Order*, 30 FCC Rcd at 5696, paras. 207-08.  The Commission identified some BIAS providers' existing facilities-based VoIP and IP-video offerings, connectivity bundled with e-readers, heart monitors, energy consumption sensors, limited-purpose devices such as automobile telematics, and services that provide schools with curriculum-approved applications and content as examples of non-BIAS data services.  *See id.* at 5696-97, para. 208; *RIF Order*, 33 FCC Rcd at 319-20, para. 23; *2010 Open Internet Order*, 25 FCC Rcd at 17933, para. 47 & n.149 (using the term "specialized services"); *see also* Public Knowledge Comments at 69 ("Non-BIAS services have coexisted with and shared capacity with broadband for as long as broadband has existed.  Cable broadband shares capacity with cable TV, and voice service shares capacity with DSL.  Modern fiber broadband networks often have capacity dedicated to VoIP and video service, and wireless networks standards, in addition to dedicated voice capacity, often have the ability to deliver services other than BIAS."); Barbara van Schewick Reply at 11 (explaining, for example, that heart monitors do not meet the definition of BIAS because they "send data to a limited number of internet end points—the servers of the device manufacturer").

[815] *See 2015 Open Internet Order*, 30 FCC Rcd at 5698, para. 211.

[816] *See* Barbara van Schewick Reply at 4 (stating that excluding non-BIAS data services from the scope of BIAS is important as "it allows applications to emerge that would not be able to function on the open internet because they need special treatment that the open internet cannot provide").

[817] *See 2015 Open Internet Order*, 30 FCC Rcd at 5696, 5698, paras. 207, 212; *see, e.g.*, INCOMPAS Comments at 37-38 (arguing that the Commission "should maintain the *2015 Open Internet Order*'s approach and continue to closely monitor the development of non-BIAS data services, especially so that they do not undermine consumers' use of and ability to access BIAS"); Transatel Comments at 2-3 (same); New America's Open Technology Institute Comments at 67 (same); *see also* Letter from Dan Ball, Public Policy Director, Meta Platforms, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 5, 2024) (supporting guardrails to prevent evasion of open Internet rules).  *But see* Letter from Scott K. Bergman, Senior Vice President, Regulatory Affairs, CTIA, et al., to Marlene H. Dortch, Secretary FCC, WC Docket Nos. 23-320, 17-108 (filed Apr. 16, 2024) (urging the Commission to provide certainty for providers of non-BIAS data services).

services.[818]  If we determine that a particular service is providing the functional equivalent of BIAS or is being used to evade the protections set forth in our rules, we will take appropriate action.[819]  We will be watchful of consumer retail offerings, and will evaluate if necessary whether they actually require isolated capacity for a specific functionality or level of quality of service that cannot be met over the open Internet,[820] but we will presume that application-level enterprise offerings do not evade our rules.[821]  For example, we are likely to find that connectivity for video conferencing offered to consumers would evade the protections we establish for BIAS if the video-conferencing provider is paying the BIAS provider for prioritized delivery.[822]  Conversely, we are likely to find that connectivity for remote surgery is properly categorized as a non-BIAS data service given its "stringent requirements for reliability" and lack of

---

[818] *See 2015 Open Internet Order*, 30 FCC Rcd at 5697, para. 210; Public Knowledge Comments at 71-72 (requesting that we take steps to ensure that BIAS providers' deployment of non-BIAS service does not harm consumers, such as by "disadvantag[ing] or discriminat[ing] against certain populations or areas," "stifl[ing] competition and innovation," or "affect[ing] consumer choice and pricing structures"); INCOMPAS Comments at 38 ("Such monitoring should continue to consider whether online content services are impeded in their ability to compete with other services.  INCOMPAS members are offering streaming, voice, and texting services that compete directly with BIAS providers' services.").

[819] *See 2015 Open Internet Order*, 30 FCC Rcd at 5697, para. 210; Barbara van Schewick Reply at 5 (affirming that, under the *2015 Open Internet Order*, non-BIAS data services "may not be used to provide a functional equivalent of BIAS"); *id.* at 23 ("The 2015 Open Internet Order clearly prohibited specialized services from evading the Open Internet rules. . . . [T]he FCC should restore this framework."); INCOMPAS Reply at 6 (arguing that non-BIAS data services must not have the purpose or effect of evading open Internet protections that apply to BIAS).

[820] *See 2015 Open Internet Order*, 30 FCC Rcd at 5675, para. 167; *see also, e.g.*, Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Mar. 22, 2024), Attach. Open Technology Institute at New America et al., Net Neutrality & Non-BIAS Data Services, at 7 (Mar. 20, 2024) (New America's Open Technology Institute Mar. 22, 2024 *Ex Parte* Attachment) (asserting that a service evades open Internet protections unless "the particular type of application requires a specific level of quality of service, which is objectively necessary for the specific type of application, that cannot be met over a well-provisioned broadband Internet access service in compliance with the Open Internet protections"); CCIA Mar. 14, 2024 *Ex Parte* at 4 ("If subscribers of other broadband Internet access services use the particular type of application over their broadband Internet access service, that is dispositive evidence that the Quality of Service requirements of this type of application can be met over a broadband Internet access service."); Letter from Scott Jordan and Jon Peha, to Marlene H. Dortch, WC Docket No. 23-320, at 4 (filed Apr. 19, 2024) (Peha/Jordan Apr. 19, 2024 *Ex Parte*) ("Many classes of applications that may benefit from QoS can be supported just as well by QoS offered as part of BIAS as by QoS offered as part of a non-BIAS data service."); *cf.* Jon Peha Comments at 12 (suggesting we use the term "specialized services" and define them as services whose primary use "is not to access content, services, or systems that are accessible through an Internet access service"); Public Knowledge Comments at 69-70 (suggesting that a service is more likely a "genuine" non-BIAS data service rather than "merely a re-labeled edge service" if it "can only be offered to users on dedicated, specific, last-mile infrastructure," has a "technical justification" for not being made "available to any Internet user," or "require[s] specialized treatment" for a "legitimate technical need").

[821] *See, e.g.*, Letter from Michael Calabrese, Director, Wireless Future, Raza Panjwani, Senior Policy Counsel, New America's Open Technology Institute, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 15, 2024) (New America's Open Technology Institute Apr. 18, 2024 *Ex Parte*) (advocating for more clarity to distinguish enterprise and consumer-facing non-BIAS data services); Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Apr. 18, 2024) (Barbara van Schewick Apr. 18, 2024 *Ex Parte*) ("ISPs are free to use technologies such as 5G network slicing to offer enterprise services.").

[822] Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at Attach., Barbara van Schewick, *How to Strengthen the Open Internet NPRM by Closing Loopholes and Matching the 2015 Open Internet Protections*, at 5 (Mar. 12, 2024) (filed Mar. 12, 2024) (Barbara van Schewick, *Closing Loopholes*) (asserting that BIAS providers want to use network slicing "to create 5G fast lanes for certain applications such as online video conferencing, online video, and online gaming"); New America's Open Technology Institute Apr. 15, 2024 *Ex Parte* at 2.

latency that "cannot be met over the Open Internet."[823]  We also will closely monitor any services that have a negative effect on the performance of BIAS or the capacity available for BIAS over time.[824]  And we will take appropriate action if a non-BIAS data service is undermining investment, innovation, competition, or end-user benefits.[825]  To assist us in monitoring non-BIAS data services, we continue to require BIAS providers to disclose:  what non-BIAS data services they offer to end users; whether and how any non-BIAS data services may affect the last-mile capacity available for, and the performance of, BIAS; and a description of whether the service relies on particular network practices and whether similar functionality is available to applications and services offered over BIAS.[826]

198.    *Alternative Approaches.*  We resist calls from some commenters that we eschew this approach and instead adopt an abstract, expansive definition of non-BIAS data services and/or a more detailed list of such services, as doing so would not account for the evolving, innovative nature of these services and the importance of ensuring BIAS providers cannot evade our rules.[827]  Adopting an abstract, expansive definition of non-BIAS data services would encompass services functionally equivalent to BIAS and those used to evade our rules for BIAS, contradicting our BIAS definition and potentially undermining our ability to address services that cause open Internet, national security, public safety, or other harms we identify in this Order.  Similarly, providing an extensive list of non-BIAS data services

---

[823] Barbara van Schewick, *Closing Loopholes* at 6; *see also* Letter from American Civil Liberties Union et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (Mar. 27, 2024) (Public Interest Groups Mar. 27, 2024 *Ex Parte*) (explaining that the category of non-BIAS data services is "meant for applications that can't operate on the normal internet (for instance remote surgery)").

[824] *See* Barbara van Schewick Reply at 24 (explaining that non-BIAS data services "delivered over the same last-mile connection as a customer's regular broadband internet access service can negatively impact the capacity available for and the performance of regular BIAS" if the BIAS provider takes away bandwidth from a consumer's BIAS and uses that bandwidth "for a specialized service that the same person (and, potentially, the provider of the specialized services) is paying for separately" or "if the [BIAS provider] allocate[s] more of the last-mile connections' capacity to [non-BIAS data services] over time"); New America's Open Technology Institute Mar. 22, 2024 *Ex Parte* Attachment at 49 (asserting that non-BIAS data services "may only minimally affect the performance of BIAS, including during times of congestion" and "may not constrict or slow the growth of the capacity available for, and the performance of, BIAS over time"); Letter from Stephanie Joyce, Chief of Staff and Senior Vice President, Computer & Communications Industry Association, to Marlene H. Dortch, Secretary, FCC, at 4 (filed Mar. 14, 2024) (CCIA Mar. 14, 2024 *Ex Parte*) (same); *see also* NCTA Mar. 21, 2024 *Ex Parte* at 2 (specifically arguing that the Commission "should not allow non-BIAS network slices to have a negative effect on BIAS services on the same network").  We decline to explicitly state that non-BIAS service may not share capacity with BIAS, as Professor Peha requests, Jon Peha Comments at 12, as this may inhibit innovative uses of existing capacity that do not otherwise harm the open Internet.  *See* Letter from Michael Calabrese, Director, Wireless Future, New America's Open Technology Institute, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 6 (filed Mar. 25, 2024) (noting "there is tremendous potential for innovation in network slicing" under certain conditions); *see also* CTIA Apr. 16, 2024 *Ex Parte* at 2-3 (asking the Commission to "avoid intruding on dynamic traffic management and efficient use of network resources").

[825] *See 2015 Open Internet Order*, 30 FCC Rcd at 5697, para. 210.

[826] *See infra* Section V.B.3.a; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5675, para. 167.

[827] *See, e.g.*, T-Mobile Comments at 25-26 (urging us to "affirm that the category of 'non-BIAS data services' is expansive and covers all services that are not BIAS and requesting detailed examples of non-BIAS data services); Free State Foundation Reply at 22 (requesting detailed examples of non-BIAS data services); The Quilt Reply at 4-5 (same); T-Mobile Reply at 19-20 (same); Hispanic Leadership Fund Reply at 1 (same); European Telecommunications Network Operators' Associations Comments at 4 (ETNOA) (requesting that we "provide legal certainty on what services are considered 'not broadband Internet access service' [so as] not to inhibit service innovation and new business models which will help deliver a wide range of use cases"); NRECA Comments at 7-8 (requesting that we specify that "smart grid" services are non-BIAS data services).  Our approach aligns with the approach taken towards non-BIAS data services in the *2015 Open Internet Order*.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5699, para. 213 ("We disagree with commenters who argue that the Commission should adopt a more-detailed definition for non-BIAS data services . . . .").

could harm consumers if BIAS providers develop methods to use an identified service on the list to somehow circumvent our rules. Moreover, a more detailed definition of non-BIAS data services would require us to accurately predict the forms that "functionally equivalent" services or services used to "evade" our rules could take in the future. The record here does not persuade us that we could reliably do so, nor would we be positioned to maintain and update such a list in a timely manner as new services are developed. Additionally, rather than promote innovation, as the European Telecom Operators' Association suggests,[828] developing an extensive and detailed list may instead constrain innovation by disincentivizing BIAS providers from offering or developing services that are not on the list.

199. *Network Slicing.* Consistent with the approach we lay out above, we decline at this time to categorize network slicing or the services delivered through network slicing as inherently either BIAS or non-BIAS data services, or to opine on whether any particular use of network slicing or the services delivered through network slicing would be considered a reasonable network management practice under the open Internet rules we adopt below.

200. Network slicing is a technique that enables mobile network operators (MNOs) to create multiple virtualized subnetworks (each known as a "slice") using shared physical wireless network infrastructure and common computing resources.[829] Network slicing is often described as a "logical" segmentation of the network, which means that each slice may correspond to a unique set of network management rules tailored for specific technical requirements, but without any physical division or dedication of network resources.[830] MNOs can use network management rules to configure each slice for customized use cases and quality-of-service (QoS) targets.[831] Network slicing is a key innovation of standalone 5G networks, which are in varying stages of deployment for different providers, and it cannot be deployed on non-standalone 5G networks (i.e., 5G networks with a 4G LTE core network).[832]

201. Proponents of network slicing ask us to clarify that network slicing or certain services delivered using network slicing are "non-BIAS"[833]—and thus not subject to Title II regulation—or are

---

[828] *See* ETNOA Comments at 4.

[829] ACI Comments at 19; Center for Individual Freedom Reply at 1 (CFIF); T-Mobile Comments at 5; Nokia Comments at 8, 10; TIA Comments at 8; CTIA Reply at 75-76; Nokia Reply at 6.

[830] T-Mobile Comments at 5 & n.7; R Street Institute Reply at 6.

[831] CFIF Reply at 1; Nokia Comments at 10; T-Mobile Comments at 5; Written *Ex Parte* of New America's Open Technology Institute, et al., at 2 (filed Mar. 11, 2024) (New America's Open Technology Institute Mar. 11, 2024 Written *Ex Parte*).

[832] *See* ACI Comments at 20 (noting "earlier generations of cellular networks could only support network slicing to a limited degree, network slicing is a crucial feature of 5G," and citing Kinza Yasar & John Burke, *Network Slicing*, TechTarget (last updated Jan. 2024), https://www.techtarget.com/whatis/definition/network-slicing); Press Release, T-Mobile, T-Mobile Launches First-Ever 5G Network Slicing Beta for Developers (Aug. 2, 2023), https://www.t-mobile.com/news/network/t-mobile-launches-first-ever-5g-network-slicing-beta-for-developers (noting "[n]etwork slicing is a new technology enabled by 5G standalone architecture"); Center for Democracy & Technology Reply at 11 (CDT); CFIF Reply at 1; T-Mobile Comments at 10-11 (discussing 5G and network slicing offerings in the market); *id.* at 56-58 (identifying network slicing use cases in foreign countries).

[833] *See, e.g.*, T-Mobile Comments at 27, 30-31 (arguing that "[c]larifying that specialized services created using 5G network slicing are 'non-BIAS' fits with the Commission's longstanding approach"); 5G Americas Comments at 6, 12-13; CTIA Reply at 77 (citing T-Mobile Comments at 27 and noting that "[s]ervice offerings using network slicing technology are often non-BIAS data services"); ITIF Reply at 2-3 (arguing that the Commission "should make clear that network slicing is a non-BIAS service" and is presumptively allowed); T-Mobile Reply at 11 (asserting that many of the applications supported by network slicing are not BIAS); *see also* TIA Reply at 2 (asserting that "the Commission should proactively state that network slicing is permissible under whatever rules it may adopt"); R Street Institute Reply at 6 (arguing that any Commission rules should anticipate "new innovations like network slicing in order to build a forward-looking framework that anticipates new innovation instead of handcuffing the industry to antiquated regimes"); *see also* Letter from Scott K. Bergmann, Senior Vice President,

(continued....)

reasonable network management practices under our open Internet rules.[834] They argue that network slicing allows for the efficient management of finite mobile network resources and eliminates the need for the deployment of separate physical networks for different types of services.[835] For instance, network slicing proponents contend that it allows MNOs to establish separate slices for mobile broadband and fixed wireless traffic, while simultaneously offering customized slices for enterprise private networks, video calls, and a variety of other uses.[836] They further assert that network slicing is more resilient to cyberattacks because breaches can be contained in one slice and prevented from affecting other parts of the network.[837]

202. Other commenters raise concerns about the implications of network slicing.[838] They specifically express concern that network slicing will be used to circumvent our prohibition on paid

---

Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-3 (filed Mar. 28, 2024) (CTIA Mar. 28, 2024 *Ex Parte*) (arguing that the Commission should refrain from imposing any restrictions that would limit the ability of wireless providers to use network slicing for non-BIAS services).

[834] *See, e.g.*, T-Mobile Comments at 38, 42 (arguing that uses of network slicing "are network management purposes that the Commission has always considered legitimate"); Nokia Comments at 6 (arguing that network slicing "is fundamental to reasonable network management and must not be conflated with any network neutrality 'paid prioritization' prohibitions over BIAS"); 5G Americas Comments at 7-8, 12-13; ITIF Reply at 2-3; WIA Reply at 6 (noting "[n]etwork management like [network slicing] will be key in unlocking the full potential of 5G networks").

[835] Nokia Comments at 8-9 (claiming that network slicing enables MNOs "to manage their finite resources more efficiently to ensure a high level of service for all customers" and that "slicing can be used to uphold the bedrock principles of network neutrality" as "the operator can ensure unfettered access to content, devices, applications and services, without throttling, and without the need to implement fee-based preferential packet processing"); T-Mobile Comments at 9-10, 42-43; *see also* Nokia Reply at 5-6; CTIA Reply at 75-77; ACI Comments at 20-21; Letter from Scott K. Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Mar. 29, 2024) (CTIA Mar. 29, 2024 *Ex Parte*); Letter from James Erwin, Digital Liberty, to Commissioner Gomez, WC Docket No. 23-320, at 2 (filed Apr. 12, 2024) (Digital Liberty Letter); Letter from Scott K. Bergman, Senior Vice Pres. Fed. Reg., Thomas C. Power, Senior Vice Pres. & Gen. Counsel, Amy Bender, Vice Pres. Fed. Reg, CTIA to Marlene H. Dortch, Secretary FCC, WC Docket Nos. 23-320, 17-108, at 3-4 (filed Apr. 18, 2024) (CTIA Apr. 18, 2024 *Ex Parte*) ("Network slicing is part of a set of 5G capabilities that can tailor multiple quality-of-service ('QoS') considerations, not just throughput, to improve a specific offering the slice enables and the end-user enjoys. The network slice experience, therefore, is not restricted to matters of relative bandwidth or congestion management, but instead can enable different non-prioritized, QoS characteristics like device density, security, or real-time latency, or any combination thereof depending on the service.").

[836] T-Mobile Comments at 9-10; *see also* Ericsson Comments at 11-12 (identifying current examples of network slicing for private network uses). For example, these supporters state that network slicing might be used for: AR/VR, automotive, agriculture, energy, health, manufacturing, IoT, public safety, smart cities, and other functions. ACI Comments at 20; CFIF Reply at 1; CTIA Reply at 76; Nokia Comments at 10-14; T-Mobile Reply at 11; Letter from Glenn Reynolds, Vice President Government Affairs North America, Nokia, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Mar. 11, 2024) (Nokia Mar. 11, 2024 *Ex Parte*); CTIA Mar. 28, 2024 *Ex Parte* at 2-3; Letter from Hank Hultquist, Vice President, Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 15, 2024).

[837] ACI Comments at 20; Nokia Comments at 11-12; T-Mobile Comments at 43; CTIA Reply at 76; CTIA Mar. 29, 2024 *Ex Parte* at 2.

[838] *See, e.g.*, New America's Open Technology Institute Comments at 74 (encouraging the Commission to closely monitor the development of non-BIAS data services); New America's Open Technology Institute Reply at 6 (arguing "the Commission should reject suggestions that what mobile carriers decide to label or structure as a mobile 5G "network slice" is presumably a non-BIAS service and exempt from open internet protections"); New America's Open Technology Institute Apr. 15, 2024 *Ex Parte* at 2-3; INCOMPAS Reply at 8 (noting "[a]ny use of network slicing can and should stay consistent with net neutrality protections for the open internet"); Barbara van Schewick Reply at 15 ("The FCC should make it very clear that ISPs can't try to use the specialized services exemption to give preferential treatment, including via network slices, to select apps or categories of apps,

(continued….)

prioritization, throttling, or unreasonable discrimination.[839]  Public Knowledge also contends that allowing network slicing for specialized services will negatively affect the quality and capacity of general Internet access,[840] and New America's Open Technology Institute contends that exempting applications, content, or services delivered over a slice of a mobile network from the rules "is likely to harm mobile market competition," particularly for "independent MVNO competitors since they purchase wholesale bandwidth, cannot 'slice' their networks, and could also see their capacity and quality of service crowded out over time as the more profitable edge providers are pushed to pay for special delivery" over the large mobile networks.[841]

203.    The record reflects that the potential use cases for network slicing are still under development[842] and that MNOs are in the early stages of adopting the technique, with some moving more

---

regardless of whether it is charging for the privilege."); CDT Reply at 11 (noting that "[w]ithout appropriate safeguards, network slicing could undermine an open internet").

[839] *See, e.g.*, New America's Open Technology Institute Mar. 11, 2024 Written *Ex Parte* at 6-7; Jon Peha Comments at 10 (arguing that network slicing might lead to priority Internet services receiving a blanket exemption from the Commission's open Internet rules); Jon Peha (Network Slicing et al.) Reply at 3 (asserting that network slicing should not be used as a means to discriminate by content, application, non-harmful device or service); New America's Open Technology Institute Comments at 72 (asserting that "there is a risk that the Commission's exception for non-BIAS data service will become a giant loophole that enables widespread paid prioritization on mobile networks"); New America's Open Technology Institute Reply at 22, 26; *see also* ALA Reply at 5 (citing Jon Peha Comments and stating that BIAS providers should be prohibited from becoming gatekeepers); ETNOA Comments at 2 (expressing concern that network slicing might be used as a way to limit end-user choice of the content, services, and applications they can access through their devices); INCOMPAS Reply at 8 (asserting that network slicing should not be used as "a reason to weaken or circumvent net neutrality protections"); Greenlining Institute Reply at 4 (arguing that there should not be a blanket exemption for applications delivered by network slicing); Barbara van Schewick Reply at 15 (contending that network slicing should not be used to give preferential treatment to select applications or categories of applications regardless of whether a provider is charging for this privilege); Barbara van Schewick Apr. 18, 2024 *Ex Parte* at 2-3 ("[N]etwork slicing as a technology is neither harmful nor beneficial.  It's simply another way to treat some applications differently than others and should be evaluated under the same rules as other forms of differential treatment . . . . Network slicing lets ISPs differentiate between apps and wall off different parts of the network from others.  Thus, a 5G network slice is just another way to treat some internet traffic differently than others—it's a 5G fast lane."). *But see* CTIA Apr. 18, 2024 *Ex Parte* at 3 ("[I]t is inaccurate to simplify network slicing as a technology that offers a "fast lane" or that it prioritizes one internet application over another.").

[840] Public Knowledge Comments at 21-22; *see also* Letter from Barbara van Schewick, Director, Stanford Law School Center for Internet and Technology, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, Attach. at 5 (filed Mar. 13, 2024) (Barbara van Schewick Mar. 13, 2024 *Ex Parte*); Ex Parte Comments of Matthew Labonville, WC Docket No. 23-320 (filed Apr. 15, 2024) (Matthew Labonville *Ex Parte*) ("Allowing 5G network slicing defies the openness that makes the internet great.").

[841] Letter from Michael Calabrese, Director, Wireless Future, New America's Open Technology Institute, to Marlene H. Dortch, Secretary, FCC, at 4 (filed Feb. 12, 2024); *see also* Letter from New America's Open Technology Institute & Public Knowledge, to Marlene H. Dortch, Secretary, FCC, at 6-8 (filed Mar. 11, 2024) (asking the Commission to clarify how it will determine whether non-BIAS data services that use technologies such as network slicing evade the open Internet protections and proposing approach to determine "evasion"); Letter from Stephanie A. Joyce, Chief of Staff and Senior Vice President, CCIA, and Angie Kronenberg, President, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2-3 (filed Mar. 14, 2024) (asking the Commission to "clarify how it will determine whether non-BIAS data services that use technologies such as network slicing are used inappropriately to circumvent the Open Internet protections").

[842] *See, e.g.*, 5G Americas Comments at 6 (noting the mobile industry has invested billions of dollars "with the expectation of offering network slicing as one of its network and service capabilities" and further 5G deployment could be "jeopardized" by creating regulatory uncertainty for "more promising use cases [of network slicing]"); T-Mobile Comments at 10 (noting "AT&T and Verizon are actively developing their own network slicing offerings" and citing Isabelle Bousquette, *Carriers Look to Offer Fast-Lane Access on 5G Networks*, Wall St. J. (Nov. 3, 2023), https://on.wsj.com/3u2yOsi).

quickly than others.[843]  Given the nascent nature of network slicing, we conclude that it is not appropriate at this time to make a categorical determination regarding all network slicing and the services delivered through the use of network slicing.[844]  We agree with NCTA that we "should not allow network slicing to be used to evade [the] Open Internet rules" that we adopt.[845]  In the meantime, MNOs should evaluate whether their particular uses of network slicing fall within the definition of BIAS, and if so, ensure their uses of network slicing are consistent with the conduct rules we adopt today.[846]  And to the extent uses of network slicing fall outside of BIAS, we will closely monitor those uses to evaluate if they are providing the functional equivalent of BIAS, being used to evade our open Internet rules, or otherwise undermining investment, innovation, competition, or end-user benefits in the Internet ecosystem.[847]  We will also monitor if network slicing affects the last-mile capacity available for, and the performance of, BIAS.[848]  If necessary, we will take action to address harmful uses of network slicing.[849]  We believe this approach will allow for the continued development and implementation of network slicing while at the same time ensuring that the use of network slicing in connection with BIAS conforms to the classification and rules adopted in this Order.

---

[843] For instance, T-Mobile states it has begun offering a network slicing beta program that allows developers to begin building advanced video calling functionality using its infrastructure.  T-Mobile Comments at 10; *see also* MediaJustice Comments at 7 & n.9; New America's Open Technology Institute Comments at 72.  Other MNOs are actively developing their own network slicing offerings, and equipment manufacturers are also preparing to update their operating systems to support network slicing applications.  Nokia Comments at 12; T-Mobile Comments at 10-11.

[844] *See* Letter from Matthew A. Brill, Counsel for NCTA, Latham & Watkins LLP, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Mar. 21, 2024) (NCTA Mar. 21, 2024 *Ex Parte*) (requesting that the Commission "refrain from issuing any blanket determination that network slicing will be treated as a non-BIAS data service"); Letter from William H. Johnson, Senior Vice President, Federal Regulatory & Legal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 12, 2024) (Verizon Apr. 12, 2024 *Ex Parte*) ("Placing unnecessary restrictions on this technology could stifle [network slicing] in its infancy, to the detriment of consumers and our nation's leadership position in the mobile economy."); CTIA Apr. 18, 2024 *Ex Parte* at 3-4 ("[I]t is a mistake to impose *ex ante* limits on any slicing-enabled preferential treatment as it would unnecessarily impede innovation and the capabilities available to 5G networks in the U.S., without any demonstrated impact on other network traffic or users); New America's Open Technology Institute Apr. 15, 2024 *Ex Parte* at 1 (supporting the approach of declining at this time to categorize network slicing or the services delivered through network slicing as BIAS or non-BIAS).  *But see* Letter from Randolph J. May, President, The Free State Foundation, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 11, 2024); Statement of Johnathan Myles Laurier Cannon, Policy Council, Technology & Innovation, R Street Institute, before Anna M. Gomez, Commissioner, FCC, WC Docket No. 23-320, at 3-4 (filed Apr. 16, 2024) (R Street Institute Apr. 16, 2024 Statement) (asserting that the draft Order's conclusion as to network slicing is "condemning the technology to regulatory purgatory at the expense of innovation").

[845] NCTA Mar. 21, 2024 *Ex Parte* at 2; *see also* Letter from ACLU et al., to Marlene H. Dortch, Secretary, FCC, at 4 (filed Mar. 27, 2024) (agreeing with NCTA that the Commission "should not allow [BIAS providers] to circumvent the Open Internet protections" through network slicing techniques).

[846] MNOs may also use the advisory opinion process we establish below as a tool to seek Commission guidance on their use of network slicing.  *See infra* Section V.E.1 (Advisory Opinions and Enforcement Advisories).

[847] *See infra* Section V.B.3.a.

[848] *See id.*;  CCIA Mar. 14, 2024 *Ex Parte* at 3;  Barbara van Schewick Reply at 23-24;  New America's Open Technology Institute Mar. 11, 2024 Written *Ex Parte* at 5;  New America's Open Technology Institute Comments at 5-6;  *see also* INCOMPAS Reply at 8; Public Knowledge Comments at 70-71.

[849] CDT Reply at 12 (among other recommendations, suggesting that the Commission monitor the development of network slicing);  Free Press Mar. 29, 2024 *Ex Parte* at 2;  CCIA Mar. 14, 2024 *Ex Parte* at 4-5; New America's Open Technology Institute Mar. 11, 2024 Written *Ex Parte* at 6;  Nokia Mar. 11, 2024 *Ex Parte* at 2; *see also* INCOMPAS Reply at 8;  Public Knowledge Mar. 11, 2024 *Ex Parte* at 6.

### 3. Internet Traffic Exchange

204. Consistent with the *2015 Open Internet Order*,[850] we find that BIAS, as defined above, includes the exchange of Internet traffic by an edge provider or an intermediary with the BIAS provider's network (i.e., Internet peering, traffic exchange, or interconnection), to the extent that the exchange supports the "capability to transmit data to and receive data from all or substantially all internet endpoints . . . [and] enable the operation of the communications service."[851] As the Commission explained in 2015, "[t]he representation to retail customers that they will be able to reach 'all or substantially all Internet endpoints' necessarily includes the promise to make the interconnection arrangements necessary to allow that access"[852] and "the promise to transmit traffic to and from those Internet end points back to the user."[853] We also conclude that the Commission's findings and rationale regarding Internet traffic exchange in the *2015 Open Internet Order*—that service to edge providers resulting from Internet traffic exchange is derivative of BIAS and constitutes the same traffic to the consumers—remain valid.[854] We observe that the *RIF Order* does not appear to dispute the

---

[850] *See 2015 Open Internet Order*, 30 FCC Rcd at 5686, para. 195 ("The definition for broadband Internet access service includes the exchange of Internet traffic by an edge provider or an intermediary with the broadband provider's network.").

[851] *See 2023 Open Internet NPRM* at 36, para. 66; *2015 Open Internet Order*, 30 FCC Rcd at 5686, para. 194 n.482 ("As a general matter, Internet traffic exchange involves the exchange of IP traffic between networks. An Internet traffic exchange arrangement determines which networks exchange traffic and the destinations to which those networks will deliver that traffic. In the aggregate, Internet traffic exchange arrangements allow an end user of the Internet to interact with other end users on other Internet networks, including content or services that make themselves available by having a public IP address, similar to how the global public switched telephone networks consists of networks that route calls based on telephone numbers."); Scott Jordan Reply at 14 ("[T]raffic exchange arrangements enable the operation of the communications service."). We address below whether and how sections 201 and 202 of the Act, and our open Internet rules, apply to Internet traffic exchange agreements. *See infra* Section V.D.

[852] *See 2015 Open Internet Order*, 30 FCC Rcd at 5610, 5693-94, paras. 28, 204; Scott Jordan Reply at 12-14. We disagree with the ITI that "interconnection, peering, traffic exchange, . . . and similar arrangements should be excluded from the definition of BIAS." ITI Comments at 8. For a BIAS provider to offer to its subscribers the capability to reach all or substantially all Internet endpoints, it must make arrangements with other network operators that have the capability (whether via its own network or via another interconnected network) to reach those endpoints. Indeed, this system of interconnection is the core concept of the "Internet"—it is a network of networks. *See, e.g.*, Michael Kende et al. Report at 2, 5 ("The internet is a *network of networks . . . .* As long as each network uses the internet protocols and shares routing information with at least one other network, they can—at the same time—operate independently from one another, and interconnect so that traffic can flow freely between and through them *from any origin to any destination.*" (emphasis added)); ETNOA Comments at 4 ("The Internet is a network of networks, made up of thousands of interconnected networks."); *see also Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 889 (1997) (*Reno*) (O'Connor, J., concurring) ("Cyberspace . . . is no more than the interconnection of electronic pathways."); *2015 Open Internet Order*, 30 FCC Rcd at 5687, para. 196 ("Since broadband Internet access service providers cannot, on their own, connect to every end point on the Internet in order to provide full Internet access to their customers, they historically paid third-party backbone service providers for transit. Backbone service providers interconnected upstream until traffic reached Tier 1 backbone service providers, which peered with each other and thereby provided their customer networks with access to the full Internet.").

[853] *2015 Open Internet Order*, 30 FCC Rcd at 5748, para. 339; *see also USTA*, 825 F.3d at 713 (explaining that the issue in *Verizon* was the Commission's failure to classify BIAS as a Title II telecommunications service; the Commission overcame this by classifying BIAS in the *2015 Open Internet Order* "and the interconnection arrangements necessary to provide it" as a telecommunications service).

[854] *See 2015 Open Internet Order*, 30 FCC Rcd at 5748, para. 339 (referring to a BIAS provider's promise to transmit traffic to and from Internet endpoints back to the user as the "edge service"). The Ad Hoc Broadband Carrier and Investor Coalition asks us to confirm that edge service "would be treated as part of BIAS *only* to the extent they are offered as part of a 'mass-market retail' Internet access service." Ad Hoc Broadband Carrier and Investor Coalition Comments at 12-13 (ABIC); *see also* ABIC Reply at 6-7. Internet traffic arrangements are

(continued....)

Commission's previous conclusion that BIAS includes Internet traffic exchange, and instead determined that Internet traffic exchange arrangements were appropriately regulated as an information service by virtue of its conclusion that BIAS is an information service.[855] Many commenters support our approach.[856]

205. We disagree with USTelecom's arguments that the D.C. Circuit in *USTA* erred in concluding that the Commission has the authority to include Internet traffic exchange within the scope of BIAS.[857] USTelecom first asserts that sections 251(a), 251(c)(2), and 201(a) of the Act, which concern interconnection, "refute[] any notion that classification of a retail service as a Title II common-carrier service carries with it authority for the Commission to regulate on a common-carrier basis the terms and conditions on which those retail providers interconnect."[858] USTelecom specifically asserts that were this not the case, "the specific limitations on the Commission's authority in Sections 251(c)(2) and 201(a) would be rendered obsolete."[859] But USTelecom rests its conclusion on the mere existence of these provisions and not any express statutory language prohibiting further Commission authority over interconnection. USTelecom's understanding of section 201(a) is undercut by the history of the Commission's treatment of interconnection and traffic exchange-related matters as cognizable under section 201(b).[860] Nor does USTelecom grapple with the fact that section 251 expressly preserves the

---

derivative of all services that meet the definition of BIAS, which not only includes mass-market retail services, but also services that provide the functional equivalent of BIAS or that evade the protections set forth in part 8 of the Commission's rules.

[855] *See RIF Order*, 33 FCC Rcd at 410, para. 166 ("Today, we return to the pre-*Title II Order* status quo by classifying broadband Internet access service as an information service and, in doing so, reverse that Order's extension of Title II authority to Internet traffic exchange arrangements."); *id.* at 416, para. 173 (criticizing the *2015 Open Internet Order*'s classification of BIAS as a telecommunications service, and by extension, its treatment of interconnection).

[856] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 11-13; CCIA Comments at 2; ITI Comments at 2, 4; INCOMPAS Comments at 38-46 (supporting the continued inclusion of Internet traffic exchange in the scope of BIAS, but challenging our tentative conclusion that edge service is derivative of BIAS and that broadband providers function as edge providers' carriers); Microsoft Comments at 13-14 (supporting the same approach towards Internet traffic exchange as in the *2015 Open Internet Order*); *see also* Public Knowledge Comments at 60-61 (requesting that the Commission grant INCOMPAS's Petition for Reconsideration and assert authority over interconnection). We address INCOMPAS's Petition for Reconsideration separately. *See infra* Section VII. Additional commenters, by supporting our adoption of rules governing Internet traffic exchange arrangements, also support *sub silentio* the inclusion of Internet traffic exchange within the scope of BIAS. *See, e.g.*, Lumen Comments at 13-19; Public Knowledge Comments at 82-87.

[857] *See* USTelecom Comments at 94-97.

[858] *Id.* at 96.

[859] *Id.*

[860] *See, e.g.*, *AT&T Corp. v. Wide Voice LLC*, Proceeding No. 20-362, Memorandum Opinion and Order, 36 FCC Rcd 9771, 9779, para. 20 (2021) (finding that "Wide Voice has violated section 201(b) of the Act" by, among other things, "intentionally causing call congestion in an effort to force the IXCs into commercial arrangements that required the payment of tandem charges" and "unilaterally declaring a new interconnection point that does not create a net public benefit"); *Northern Valley Communications, LLC, Tariff F.C.C. No. 3*, Transmittal No. 12, Memorandum Opinion and Order, 35 FCC Rcd 6198, 6207, para. 21 (2020) ("Commission precedent is clear that when analyzing compliance with section 201(b), the Commission requires carriers to make reasonable decisions about interconnection and carriage and that in evaluating whether a carrier has done so the Commission will look at the totality of the relevant circumstances"); *Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Service*, GN Docket No. 93-252, Second Report and Order, 9 FCC Rcd 1411, 1500-01, para. 239 (1994) (*Second CMRS Report and Order*) ("[I]f a complaint shows that a common carrier provides interconnection to CMRS licensees while denying interconnection of the same type and at the same rate to PMRS licensees, the carrier will bear the burden of establishing why this would not constitute denial of a reasonable request for service in violation of Section 201(a), establishment of an unreasonable condition of service in violation of

(continued….)

Commission's prior authority under section 201 in its entirety.[861]  Thus, we do not read section 201(a) and/or section 251(c)(2) as limitations on other authority as relevant here—notably including section 201(b).

206.    Assuming, *arguendo*, that USTelecom were correct that the Commission lacks authority to include Internet traffic exchange within the scope of BIAS, it goes on to claim that "[i]n the absence of such implicit authority," the Commission may only regulate Internet traffic exchange arrangements "if the Commission classified such arrangements as a telecommunications service," which it cannot do given that "such arrangements by definition involve information service providers on both sides."[862]  Importantly, USTelecom conspicuously ignores the statutory prescription of section 201(b) of the Act that all activities performed "in connection with" a telecommunications service be just and reasonable.[863]  For purposes of section 201(b), it does not matter whether the practice, classification, or regulation itself involves a separate telecommunications service if it is provided "in connection" with a telecommunications service. Accordingly, and as the *USTA* court affirmed, we need not classify Internet traffic exchange arrangements as telecommunications services for the retail service that depends upon such arrangements for its operation to be within the scope of our Title II regulatory authority.[864]

207.    Lastly, we dispute USTelecom's characterization that the inclusion of Internet traffic exchange within the scope of BIAS is flawed because we are compelling BIAS providers to offer Internet traffic exchange arrangements on a common carrier basis when they "do not satisfy the *NARUC* test for classifying a service as common carriage rather than private carriage."[865]  In offering BIAS to its end-user customers, a BIAS provider has voluntarily assumed an obligation to arrange the transfer of that traffic on and off its network.[866]  BIAS providers hold themselves out to carry the traffic desired by the BIAS provider's end-user customers regardless of source and regardless of whether an edge provider has a

---

Section 201(b), and unreasonable discrimination in violation of Section 202(a)."); *Developing a Unified Intercarrier Compensation Regime*; *Establishing Just and Reasonable Rates for Local Exchange Carriers*, CC Docket No. 01-92, WC Docket No. 07-135, Declaratory Ruling, 27 FCC Rcd 1351, 1355-56, para. 12 (WCB 2012) (*ICC Declaratory Ruling*) ("[I]t is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to ensure that intermediate providers, least-cost routers, or other entities acting for or employed by the carrier are performing adequately. . . . Carriers do have tools to manage termination suppliers, and it would be unreasonable for a carrier not to make appropriate use of such tools to ensure calls that its customers make to rural areas terminate reliably." (footnote omitted)).  Our regulatory approach to the traffic exchange element of BIAS also is far removed from the type of case-by-case orders for physical interconnection between two carriers that is the subject matter of the interconnection requirements of section 201(a).  47 U.S.C. § 201(a).

[861] 47 U.S.C. § 251(i) ("Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.").  We separately note that under section 251 "the term 'interconnection' refers solely to the physical linking of two networks, and *not* to the exchange of traffic between networks."  *Total Telecommunications Services, Inc. v. AT&T Corporation*, File No. E-97-003, Memorandum Opinion and Order, 16 FCC Rcd 5726, 5736-37, para. 23 (2001).

[862] USTelecom Comments at 96.

[863] 47 U.S.C. § 201; *see also See* Public Knowledge Comments at 60 (noting that "the first express statutory power Congress granted the Commission in 1934 was the power to order carriers 'to establish physical connections with other carriers'").

[864] *USTA*, 825 F.3d at 713.  We also disagree with USTelecom that all Internet traffic arrangements "by definition involve information service providers on both sides" as that presumes that BIAS is an information service, which as we conclude in this Order, it is not.  USTelecom Comments at 96.

[865] USTelecom Comments at 96-97 ("ISPs do not voluntarily offer to enter internet traffic exchange arrangements on a common-carrier basis.  Nor do the explicit or implicit terms of ISPs' contracts with their customers commit them to offer to enter internet traffic exchange arrangements with third-party networks on such a basis.").

[866] *2015 Open Internet Order*, 30 FCC Rcd at 5764-65, para. 364.

specific arrangement with the BIAS provider.[867]  While broadband providers may not need to enter into any specific agreement with any specific traffic exchange partner, by choosing to offer BIAS, they have bound themselves to enter into such agreements in general.  In the absence of such agreements, they would be unable to provide BIAS because users would be unable to reach "all or substantially all Internet endpoints."  Thus, our treatment of Internet traffic exchange is based on the marketplace realities of how BIAS is offered today, not based on any compulsion that BIAS providers enter any arrangements on a common carriage basis.[868]  Additionally, as the Commission did in 2015,[869] we apply a case-by-case approach to exercising our section 201(b) authority over Internet traffic exchange underlying retail BIAS offerings, and we do not concede—and USTelecom has not demonstrated—that such regulatory oversight will in practice require BIAS providers to enter traffic exchange arrangements with edge providers or intermediaries in a way that, *per se*, requires them to act as common carriers.

### 4.    Service Furnished to Edge Providers

208.    We agree with ICG's contention that edge service—insofar as the term "edge service" refers to "the service that the *Verizon* court identified as being furnished to the edge"[870]—is not itself BIAS.[871]  In its review of the *2010 Open Internet Order*, the D.C. Circuit in *Verizon* concluded that "in addition to the retail service provided to consumers, 'broadband providers furnish a service to edge providers,'"[872] and in the *2015 Open Internet Order*, "the Commission agree[d] that a two-sided market exists and that the beneficiaries of the non-consumer side either are or potentially could be all edge providers."[873]  The *RIF Order* reflected the same understanding of the marketplace.[874]  Thus, we agree that any service BIAS providers provide to edge providers is at least technically distinct from the "retail" and "mass market" service that we define BIAS to be.  At the same time, we reaffirm the understanding that "the 'service to edge providers' is subsumed within the promise made to the retail customer of the BIAS service."[875]  Whether the last-mile BIAS provider carries the traffic directly from an edge provider's endpoint on the BIAS provider's own network or from a data center or other interconnection point does not change the fact that the BIAS provider is carrying that traffic, on behalf of the edge provider, to the BIAS subscriber as part of the *subscriber's* broadband Internet access service.[876]  Just as BIAS can and does include the exchange of Internet traffic without requiring us to classify the underlying service arrangements into which BIAS providers enter to enable that exchange of traffic, so too can and

---

[867] *Id.*

[868] At the same time, nothing rules out those arrangements being common carriage arrangements if, as a factual matter, that is, in fact, how they are offered.  Whether an offering is private or common carriage does not depend upon what a provider may assert is the nature of the offering, but rather on the factual particulars of how the service is offered and to whom.  *See supra* Section III.D.1 (explaining that an ISP cannot evade our rules by simply declaring that it is not providing BIAS).  Therefore, simply because a BIAS provider's terms of service disclaims offering Internet traffic exchange on a common carrier basis does not make it so.  *See* USTelecom Comments at n.352 (noting that one provider's terms of service makes just such a disclaimer).

[869] *See 2015 Open Internet Order*, 30 FCC Rcd at 5694, para. 205.

[870] *Id.* at 5748-49, para. 339.

[871] ICG Comments at 9 ("Edge services are almost always provided out of a data center, not on or as a BIAS service.").

[872] *2015 Open Internet Order*, 30 FCC Rcd at at 5747-48, para. 338 (quoting *Verizon*, 740 F.3d at 653).

[873] *Id.* at 5747-48, para. 338.

[874] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 380, para. 119.

[875] *2015 Open Internet Order*, 30 FCC Rcd at 5747-48, para. 338.

[876] *See* Netflix Reply at 10 ("All Internet content requested by a broadband subscriber must pass through an ISP's interconnection point before reaching that end user. . . . Customers subscribe to broadband service from an ISP to be able to connect to all Internet endpoints.  To meet this obligation to their customers, ISPs permit other ISPs and content providers to interconnect with their network through both 'peering' and 'transit' arrangements.").

does BIAS include the transmission of edge provider traffic—as sought by BIAS end users—without requiring us to classify the companion transmission service provided to edge providers that was identified by the *Verizon* court and accepted by subsequent Commission precedent.[877] Specifically, "the so-called 'edge service' is secondary, and in support of, the promise made to the end user" to "transport and deliver traffic to and from all or substantially all Internet endpoints," given that it "necessarily includes the promise to transmit traffic to and from those Internet end points back to the user."[878]

209. We decline INCOMPAS's suggestion that we "clearly state th[at BIAS providers] serve their BIAS customers, [and] not edge providers, in the provision of BIAS."[879] As explained above, the *Verizon* court identified this "edge service" as distinct from the retail service we define as BIAS here, and the Commission ultimately endorsed the understanding of it as a separate service in the *2015 Open Internet Order* and the *RIF Order*. Beyond claiming, without further explanation or evidence, that BIAS providers do not serve edge providers,[880] INCOMPAS does not provide any justification for why we should change this understanding of the marketplace.[881] INCOMPAS also contends that "edge service is *not* derivative of BIAS," but its arguments in that regard fall short.[882] Insofar as INCOMPAS argues that the edge provider is not a customer of the BIAS provider,[883] that disputes an underlying premise—that there exists an edge service in the first place—rather than explaining why such service, if it exists, should not be understood as derivative of BIAS. And insofar as INCOMPAS argues that the Commission "should account for the fact that edge service may be provided to some customers via connections that are not reliant on BIAS," it misunderstands the nature of our finding. We do not conclude that services provided by edge providers are inherently derivative of BIAS or that they always are delivered via a BIAS connection. Rather, the issue only arises in our analysis as it relates specifically to traffic carried between edge providers and BIAS end users via a BIAS connection. INCOMPAS's argument thus does not identify any flaw in our conclusion as understood in the proper context. Nor does INCOMPAS otherwise demonstrate how or why any of this impacts our classification decision or decisions regarding open Internet rules. Indeed, some of INCOMPAS's concerns appear entirely misplaced. The Commission did "not reach the regulatory classification of the service that the *Verizon* court identified as being furnished to the edge" in the *2015 Open Internet Order*, nor do we do so here.[884] Thus, INCOMPAS's concern about the *Verizon* court's description of BIAS providers as edge providers'

---

[877] *Compare, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5693-94, para. 204 ("Broadband Internet access service involves the exchange of traffic between a last-mile broadband provider and connecting networks. The representation to retail customers that they will be able to reach 'all or substantially all Internet endpoints' necessarily includes the promise to make the interconnection arrangements necessary to allow that access." (footnote omitted)), *with, e.g.*, *id.* at 5748-49, para. 339 ("[A] broadband Internet access service provider's representation to its end-user customer that it will transport and deliver traffic to and from all or substantially all Internet endpoints necessarily includes the promise to transmit traffic to and from those Internet end points back to the user. Thus, the so-called 'edge service' is secondary, and in support of, the promise made to the end user." (footnote omitted)).

[878] *Id.* at 5748-49, para. 339.

[879] INCOMPAS Comments at 39.

[880] *See id.*

[881] Even assuming *arguendo* that one accepted INCOMPAS's assertion that while "BIAS providers and edge providers may share the BIAS customer—the end user who pays for the BIAS— . . . that does not make the edge provider a customer of the BIAS provider," it would not persuade us to alter our understanding of the marketplace. INCOMPAS Comments at 39 n.93. As the *Verizon* court observed, "[i]t is true, generally speaking, that the 'customers' of broadband providers are end users. But that hardly means that broadband providers could not also be [a service provider] with respect to edge providers." *Verizon*, 740 F.3d at 653.

[882] INCOMPAS Comments at 39 n.93.

[883] *Id.*

[884] *2015 Open Internet Order*, 30 FCC Rcd at 5748-49, para. 339.

"carriers" is not implicated here.[885]

### 5.    Other Excluded Services

210.    Consistent with the manner in which the Commission has historically defined broadband Internet access service,[886] we exclude premises operators and end users who provide access to their BIAS connections but do not offer it on a mass-market, retail basis.  Thus, to the extent coffee shops, bookstores, airlines, private end-user networks such as libraries and universities, and other businesses acquire broadband Internet access service from a BIAS provider to enable patrons to access the Internet from their respective establishments, the provision of such service by the premise operator would not itself be considered BIAS unless it were offered to patrons as a retail mass-market service.[887]  Likewise, when a user employs, for example, a wireless router or a Wi-Fi hotspot to create a personal Wi-Fi network that is not intentionally offered for the benefit of others, we find that he or she is not offering a broadband Internet access service under our definition, because the user is not marketing and selling such service to residential customers, small businesses, and other end-user customers.[888]  Our decision to retain this approach received record support, and no opposition.[889]

211.    We also continue to view CDNs,[890] virtual private network (VPN) services,[891] web hosting services,[892] and data storage services[893] as outside the scope of broadband Internet access service.[894]  As evidenced in the record, these services are not "mass market" services and/or do not provide the capability to transmit data to and receive data from all or substantially all Internet

---

[885] INCOMPAS Comments at 38-39.

[886] *See 2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340; *RIF Order*, 33 FCC Rcd at 320, para. 25.

[887] *2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340; *RIF Order*, 33 FCC Rcd at 320, para. 24; *see* The Quilt Comments at 4 (supporting this approach).

[888] *2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340; *RIF Order*, 33 FCC Rcd at 320, para. 25; *see, e.g.*, INCOMPAS Comments at 36 (supporting this approach); The Quilt Comments at 4 (same).

[889] *See* INCOMPAS Comments at 36; The Quilt Comments at 3-4.

[890] *See, e.g.*, Akamai Comments at 5 ("Rather than providing the capability to transmit data to or from internet endpoints, the servers operated by CDNs are themselves internet endpoints."); i2Coalition Comments at 10-11 ("CDNs cache data at endpoints geographically close to end users, reducing congestion and latency to the benefit of users, content providers and BIAS providers."); Cloudflare Comments at 10-13 (explaining how CDNs operate, and supporting the exclusion of CDNs from the scope of BIAS).

[891] *See, e.g.*, i2Coalition Comments at 8-9 (explaining how "VPNs do not provide internet access" but rather "act as intermediary services providing data security and anonymity, while BIAS providers . . . provide network connectivity and access to the Internet"); Cloudflare Comments at 13-14 (describing VPN services as "over-the-top" services that are not BIAS); CCIA Comments at 7-8 (noting that "VPN providers do not offer 'transmission' but instead relay on transmission provided by others" and then employ information-processing functions).

[892] *See, e.g.*, i2Coalition Comments at 11-12 ("Web hosting services store websites or web applications and make them easily accessible across different devices . . . .  In so doing they are not operators of a backbone or a network.").

[893] *See, e.g.*, i2Coalition Comments at 13 (arguing that a data storage service "is an individualized service to support data storage and other functionality; it is not a service that is purchased for Internet access").  For purposes of this Order, the term "data storage service" is distinct from "caching," which involves the temporary storage of data for purposes of delivering content to specific endpoints.

[894] *See 2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340; *RIF Order*, 33 FCC Rcd at 320, paras. 24-25.  In classifying BIAS as a telecommunications service today, we do not, and need not, reach the question of whether and how these services are classified under the Act.  *2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340 n.900.

endpoints.[895]  Commenters are unified in supporting the continued exclusion of such services from the definition of BIAS.[896]

212.     We decline at this time to make any further determinations regarding whether other services fall within the scope of BIAS, given the paucity of the record concerning such services. Regarding 5G IoT services specifically, while Transatel acknowledges that any such determination "requires the assessment of individual 5G IoT services . . . against the Commission[']s proposed definition of BIAS and mass market," Transatel nevertheless urges us to "exclud[e] all 5G IoT services from the definition of BIAS and classify[] the[m] as either non-BIAS data services or enterprise services on a use case by use case basis."[897]  Transatel argues that doing so will ensure "these valued services will continue to be provided not only to end-users but also enterprise customers without constraining innovation or investment."[898]  Although we anticipate that many 5G IoT services may qualify as non-BIAS data services, enterprise services, or other edge services, we decline to provide a blanket exclusion of these services.  We first note that Transatel does not provide any evidence to support its claim that failing to provide this blanket exclusion would constrain innovation or investment of 5G IoT services. Second, given the range of 5G IoT services that Transatel itself identifies,[899] we find that the public interest would be best served by assessing these services on an individualized basis as necessary.

213.     We similarly also decline the suggestion of some commenters to explicitly exclude all in-flight entertainment and connectivity (IFEC) services from the scope of BIAS.[900]  The record suggests that not all IFEC services are alike, with some airlines operating as BIAS providers themselves, and other airlines, aircraft owners, or aircraft lessees acquiring services from unaffiliated providers.[901]  Given this variety, a general exclusion of IFEC services from the scope of BIAS may be inappropriately broad.[902]

---

[895] *Id.* at 5749, para. 340; *see, e.g.*, INCOMPAS Comments at 46 (noting that VPN services do not offer access to all Internet endpoints); i2Coalition Comments at 6 (same); *id.* at 12 (explaining that web hosting services are "not . . . mass market service[s] to provide the capability to transmit data to and receive data from all or substantially all Internet endpoints"); Akamai Comments at 4 (noting that CDNs are not mass-market services); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5749, para. 340.

[896] *See, e.g.*, Akamai Comments at 4-7; Cloudflare Comments at 2, 10-14; CCIA Comments at 7-8; INCOMPAS Comments at 46-48; ITI Comments at 2, 8; ICG Comments at 9; i2Coalition Comments at 3-17; Lumen Comments at 25; Microsoft Comments at 2, 5, 12-14; Mozilla Reply at 9 (noting that CDNs are "managed by the CDN companies themselves" not by BIAS providers, and "are not themselves transport mechanisms"); Netflix Reply at 20-27 (arguing that CDNs should be excluded from BIAS); *id.* at 28 (arguing that web hosting and data storage should be excluded from BIAS); NTIA *Ex Parte* at 2 n.7; *see also* Jon Peha (DNS, et al.) Reply at 4 (CDNs "should be viewed as a separate offering from BIAS" even if a BIAS provider chooses to offer its own CDN service).

[897] Transatel Comments at 2.

[898] *Id.*

[899] *Id.* at 2 (listing automotive telematics services, in-car infotainment services, and in-car 5G connectivity).

[900] *See, e.g.*, Thales Avionics, Inc. Comments at 3; Panasonic Avionics Comments at 3-9; Gogo Business Aviation LLC Reply at 2-7.

[901] *See* Panasonic Avionics Comments at 5-6 ("[T]he airline may in some cases serve as its own Internet service provider"); Gogo Business Aviation LLC Reply at 4 (describing arrangements whereby aircraft owners may acquire services from an unaffiliated provider for themselves or for the use of third-party aircraft lessees).

[902] As discussed above, consistent with the *2015 Open Internet Order* and the *2010 Open Internet Order*, we continue to exclude airlines from the scope of BIAS when they are functioning in the role of premise operators.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5685, para. 191 ("We again decline to apply the open Internet rules to premises operators—such as . . . airlines . . . that acquire broadband Internet access service from a broadband provider to enable patrons to access the Internet from their respective establishments—to the extent they may be offering broadband Internet access service as we define it today."); *2010 Open Internet Order*, 25 FCC Rcd at 17935, para. 52 ("[W]e decline to apply our rules directly to . . . airlines . . . when they acquire Internet service from a broadband provider to enable their patrons to access the Internet from their establishments . . . .").

Additionally, by offering only vague notions of "promot[ing] investment," protecting "flexibility," limiting the "potential adverse consequences of regulatory overreach," and avoiding amorphous concepts of "harm," commenters fail to convince us that a specific determination about IFEC service is necessary.[903]  Should evidence of specific harms arise which necessitates additional regulatory clarity for IFEC service, we will analyze the classification of such services on a case-by-case basis.

> ### E. Mobile Broadband Internet Access Service Is Best Classified as a Commercial Mobile Service

214.    In addition to our decision to reinstate the classification of BIAS as a telecommunications service, we adopt our proposal to reinstate the classification of mobile BIAS as a commercial mobile service.[904]  We further conclude that, even if mobile BIAS does not meet the definition of "commercial mobile service," it is the functional equivalent of a commercial mobile service and, therefore, not a private mobile service.[905]  As such, there is no obstacle to treating mobile BIAS "as a common carrier . . . under [the Communications Act]."[906]

215.    Section 332(d)(1) of the Act defines "commercial mobile service" as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission."[907]  We find that mobile BIAS meets the elements of this definition.  Mobile BIAS is a "mobile service" because subscribers access the service through their mobile devices,[908] and it is provided "for profit" because BIAS providers offer it to subscribers with the intent of receiving compensation.[909]  Mobile BIAS is also widely available to the public, without restriction on who may receive it.[910]  We also find that mobile BIAS is an "interconnected service."

216.    *Definition of Public Switched Network*.  Under section 332(d)(2) the term "interconnected service" means a "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)."[911]  In the *2015 Open Internet Order*, the Commission reached the conclusion that mobile BIAS is an interconnected service through the application of an updated definition of "public switched network" that included networks that use public IP addresses.[912]  In the *RIF Order*, the Commission reversed course, reinstating the prior definition of "public switched network" and

---

[903] Gogo Business Aviation LLC Reply at 6; Panasonic Avionics Comments at 8; Thales Avionics, Inc. Comments at 3.  Gogo Business Aviation claims that considering IFEC services within the scope of BIAS could somehow compromise aircraft safety functions but fails to adequately explain why that would be the case or why an aircraft's use of safety functionality would violate Commission rules.  *See* Gogo Business Aviation LLC Reply at 6.

[904] *2023 Open Internet NPRM* at 46, para. 85.

[905] *Id.* at 49, para. 92.

[906] *See* 47 U.S.C. § 332(c)(2).

[907] 47 U.S.C. § 332(d)(1).  The commercial mobile service provisions of the Act are implemented under section 20.3 of the Commission's rules, which employs the term "commercial mobile service" (CMRS).

[908] *See* 47 U.S.C. § 153(33) (defining "mobile service").

[909] The *Second CMRS Report and Order* defined the statutory phrase "for profit" to include:  "any mobile service that is provided with the intent of receiving compensation or monetary gain."  *See Second CMRS Report and Order*, 9 FCC Rcd at 1427, para. 43.

[910] In the *Second CMRS Report and Order*, the Commission determined that a service is available "to the public" if it is "offered to the public without restriction in who may receive it."  *Id.* at 1439, para. 65.

[911] 47 U.S.C. § 332(d)(1).

[912] *2015 Open Internet Order*, 30 FCC Rcd at 5779-86, paras. 391-99; *see USTA*, 825 F.3d at 717 (upholding the *2015 Open Internet Order*'s definition of "public switched network").

concluding that mobile BIAS was not a commercial mobile service.[913]  The Commission found the prior definition to be "more consistent with the ordinary meaning and commonly understood definition of the term and with Commission precedent."[914]

217.    In the *2023 Open Internet NPRM*, we proposed reinstating the definition of "public switched network" from the *2015 Open Internet Order* and indicated our belief that the Commission's decision in the *RIF Order* failed "to align with the technological reality and widespread use of mobile BIAS."[915]  We indicated our view that the proposed definition, which included IP addresses, "embodies the current technological landscape and the widespread use of mobile broadband networks, and is therefore more consistent with the Commission's recognition that the public switched network will grow and change over time."[916]  We proposed that, based on this reinstated definition, mobile BIAS would be an interconnected service and we sought comment on our analysis and proposed approach.[917]

218.    Commenters express differing views of the Commission's proposal.  Professor Scott Jordan and New America's Open Technology Institute express support for readopting the definition of the public switched network from the *2015 Open Internet Order*.[918]  New America's Open Technology Institute notes that "public switched network" in section 332 "is not limited to the legacy telephone network and should be updated."[919]  In contrast, CTIA and Free State Foundation oppose readopting the definition and instead express support for the reasoning in the *RIF Order*, with CTIA arguing that "public switched network" "refers unambiguously to the telephone network."[920]  Wired Broadband et al. also oppose the proposed definition and argue that evidence of the growth and widespread use of mobile broadband services provides insufficient justification for readopting the revised definition.[921]

219.    We adopt our proposal to reinstate the definition of "public switched network" from the *2015 Open Internet Order,* and we define it to mean "the network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use[s] the North American Numbering Plan, or public IP addresses, in connection with the provision of switched services."[922]  As the Commission determined in the *2015 Open*

---

[913] *RIF Order*, 33 FCC Rcd at 355, para. 75.

[914] *Id.*

[915] *2023 Open Internet NPRM* at 46-47, para. 87.

[916] *Id.*

[917] *Id.*

[918] Scott Jordan Comments at 52-54; New America's Open Technology Institute Comments at 19-29.

[919] New America's Open Technology Institute Comments at 25.

[920] CTIA Comments at 67; Free State Foundation Reply at 17; *see also* CTIA Reply at 47-48 (arguing that the legislative history of section 332 "confirms that Congress understood the term 'commercial mobile service' to mean a service 'that is interconnected with the Public switched telephone network'").  CTIA misstates the legislative history here.  The portion it cites is actually language from a Conference Report explaining that the House bill, which was not adopted, used the term "public switched telephone network."  H.R. Rep. No. 103-213, at 495 (1993) (Conf. Rep.) (*1993 Conference Report*).  That report language was mistaken because the House bill (like the Senate bill), as CTIA acknowledges, CTIA Comments at 48, used the term "public switched network" (without "telephone").  *See* 103 H.R. 2264 RH (May 25, 1993, Reported in House).  The Conference Report went on to explain that the Senate amendment "expressly recognizes the Commission's authority to define the terms used in defining 'commercial mobile service'" and that the Conference Report was adopting the Senate definitions with minor changes.  *1993 Conference Report* at 496.  This is further evidence that the statutory language means what it says, i.e., that the Commission has authority to define these terms to reflect current technology and that it is not limited to telephones.

[921] Wired Broadband et al. Comments at 3-4.

[922] *2023 Open Internet NPRM* at 47, para. 87; *see 2015 Open Internet Order*, 30 FCC Rcd at 5779, para. 391.

*Internet Order*, the definition we adopt recognizes "that today's broadband Internet access networks use their own unique address identifier, IP addresses, to give users a universally recognized format for sending and receiving messages across the country and worldwide."[923]

220.     We find that the *RIF Order*'s and opponents' assertions, that the term "public switched network" may only be defined to mean the traditional telephone network, fail to give sufficient weight to Congress's express delegation of authority to the Commission to define the term "public switched network" and to the Commission's own prior recognition that the definition of "public switched network" should evolve over time.  Congress, in section 332(d)(2), defined the term "interconnected service" to mean a "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)."[924]  The argument that the Commission may not define "public switched network" to mean anything other than the public switched telephone network runs counter to the statutory language in section 332 because, if Congress had intended "public switched network" to mean only the public switched telephone network, it would have included the word "telephone."  Instead, Congress not only used the broader term "public switched network" but also gave the Commission express authority to define the term.  Congress's delegation of authority to the Commission would have been unnecessary if Congress had intended the term to refer only to the public switched telephone network based on a regulatory understanding asserted to exist before 1993.[925]

221.     Nothing in the text of the "public switched network" definition requires that the Commission's implementing definitional regulations be limited to telephone service.[926]  Even at the time of the enactment of section 332(d)(2), such terminology was understood as a technological matter to be potentially more expansive than mere telephone service.[927]  Exercising the Commission's authority to define "public switched network" by regulation to update the definition with evolving technological and marketplace realities also better reflects the broader statutory context.  Section 1 of the Act explains that

---

[923] *2015 Open Internet Order*, 30 FCC Rcd at 5779, para. 391.  CTIA and the Wired Broadband et al. highlight technical distinctions between the telephone networks and IP-based networks.  *See* CTIA Comments at 68-69; CTIA Reply at 44; Wired Broadband et al. Comments at 3.  CTIA, for example, states that "[t]he telephone network uses North American Numbering Plan numbers across a single network, while the Internet is a decentralized network of networks that relies on IP addresses and uses a variety of protocols and architectures for different purposes."  CTIA Reply at 44.  These operational characteristics, however, do not govern our determination of whether mobile BIAS should be considered a commercial mobile service under the Commission's rules.

[924] 47 U.S.C. § 332(d)(2).

[925] Wired Broadband et al. suggest that Congress failed to use the term "public switched telephone network" in the statute "precisely because it was commonly understood that PSN and PSTN were identical, the terms were used interchangeably."  Wired Broadband et al. Reply at 5.  As a fundamental matter, we disagree and find that this argument fails to give sufficient weight to the text of the statute and to Congress's express delegation of authority to the Commission to define the term "public switched network."  But independently, even on its terms, their argument fails.  Under section 332(d)(1), CMRS must "make[] interconnected service available," and section 332(d)(2), in turn, provides that  "interconnected service" "means service that is interconnected with the public switched network."  47 U.S.C. § 332(d)(1), (2).  But even if "public switched network" were understood as limited to the public switched telephone network, we find that mobile BIAS is interconnected with the public switched telephone network by virtue of VoIP applications.

[926] *Cf. Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 653 (2020) ("[T]he limits of the drafters' imagination supply no reason to ignore the law's demands.  When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.  Only the written word is the law, and all persons are entitled to its benefit.").

[927] *See, e.g.*, *Public switched network*, Newton's Telecom Dictionary (6th ed. 1993) (defining "public switched network" as:  "Any common carrier network that provides circuit switching between public users.  The term is usually applied to the public telephone network but it could be applied more generally to other switched networks such as Telex, MCI's Execunet, etc."); *Public network*, Newton's Telecom Dictionary (6th ed. 1993) (defining "public network" as:  "A network operated by common carriers or telecommunications administrators for the provision of circuit-switched, packet-switched and leased-line circuits to the public").

Congress created the Commission "to make available, so far as possible, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications."[928]  And section 706 of the 1996 Act directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans."[929]  Given the increasing importance of BIAS, these objectives can be advanced more effectively if mobile BIAS is classified as a commercial mobile service, strengthening our ability to adopt measures to promote such infrastructure deployment through regulated access to pole attachments and universal service support,[930] the ability to deploy infrastructure,[931] and the Commission's enhanced ability to protect public safety and national security through protections afforded by section 214.[932]  It also is clear from the legislative history that Congress expected some services that were previously private land mobile services to become common carrier services as a result of the enactment of section 332.[933]  The D.C. Circuit affirmed this interpretation in the *USTA* decision.[934]

222.    In exercising its authority and defining "public switched network" in the *Second CMRS Report and Order*, the Commission determined that the term "should not be defined in a static way."[935]  The Commission considered but rejected calls to define "public switched network" as the public switched telephone network and found that a broader definition was more consistent with the use of the term "public switched network" in section 332 rather "than the more technologically based term 'public

---

[928] 47 U.S.C. § 151.

[929] 47 U.S.C. § 1302(a).

[930] 47 U.S.C. § 224 (regulating access to utilities' pole attachments for any "cable television system or provider of telecommunications service"); *Id.* § 254(c)(1) (pursuant to that provision, "[u]niversal service is an evolving level of telecommunications services"); *see also Mozilla*, 940 F.3d at 65-70 (remanding the Commission's classification of BIAS as an information service because, among other things, the Commission failed to grapple with the fact that "the statute textually forecloses any pole-attachment protection for standalone broadband providers," as well as "Congress's overriding command to provide '*telecommunication services* to consumers'" under section 254).

[931] 47 U.S.C. § 332(c)(7) (preempting certain "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government," where "personal wireless facilities" are defined as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services").

[932] *See, e.g., 2023 Open Internet NPRM* at 16-17, para. 27 (noting that "[i]n the *China Telecom Americas Order on Revocation and Termination*, *China Unicom Americas Order on Revocation*, and *Pacific Networks and ComNet Order on Revocation and Termination*, the Commission extensively evaluated national security and law enforcement considerations raised by existing section 214 authorizations and determined, based on the record, that the present and future public interest, convenience, and necessity was no longer served by those carriers' retention of their section 214 authority," but observing that "Section 214, however, applies to common carriers, and thus does not apply to BIAS under its current classification as an information service, potentially exposing the nation's communications networks to national security and law enforcement threats by entities providing BIAS" (footnote omitted)); *see also Mozilla*, 940 F.3d at 59-63 (remanding the Commission's classification of BIAS as an information service due to, among other things, "the Commission's failure to consider the implications for public safety of its changed regulatory posture in the 2018 Order").  Although CMRS providers currently have forbearance from domestic section 214 requirements, they remain subject to international section 214 requirements.  *See* 47 CFR § 20.15.  And even as to domestic section 214 requirements, the Commission could revisit forbearance from those requirements if necessary to better enable the agency to address public safety and national security concerns.  *See infra* Section IV.B.3.

[933] *See 1993 Conference Report* at 498.

[934] *USTA*, 825 F.3d at 718 ("If Congress meant for the phrase 'public switched network' to carry the more restrictive meaning attributed to it by . . . petitioners, Congress could (and presumably would) have used the more limited—and more precise—term 'public switched telephone network.'").

[935] *Second CMRS Report and Order*, 9 FCC Rcd at 1436, para. 59.

switched telephone network.'"[936] The Commission recognized that the public switched network was "continuously growing and changing because of new technology and increasing demand."[937] Consistent with these determinations, in the *2015 Open Internet Order*, the Commission found that it was necessary to update the definition of "public switched network" to reflect the growth and changes to the network that occurred since the time the Commission adopted its original definition.

223. Today, consistent with the Commission's original determination that the definition of "public switched network" should evolve over time, we update the definition to reflect significant changes that have occurred in the technological landscape for mobile services. Since the time the Commission defined "public switched network" for purposes of section 332 in 1994, mobile broadband technologies have developed and become ubiquitous. In 1994, the Commission chose to define "public switched network" with reference to telephone numbers "because participation in the North American Numbering Plan provides the participant with ubiquitous access to all other participants in the Plan," concluding that "this approach to the public switched network is consistent with creating a system of universal service where all people in the United States can use the network to communicate with each other."[938] This is the reality of the Internet, and IP addresses, today. Mobile broadband services are available everywhere and millions of subscribers use them to communicate. Evidence in the record shows, for example, that 85% of Americans own smartphones.[939] In 2022, 72.6% of adults lived in wireless-only households with no landline.[940] In addition, data show that Americans are using their smartphones more than ever, with more than 73 trillion megabytes of mobile data traffic exchanged in the United States in 2022, representing a 38% increase from the previous year.[941] Continued growth of mobile BIAS is expected, with one forecast predicting that there will be 430 million 5G mobile subscriptions in North America by 2029.[942] We find that it serves the public interest to adopt a definition of "public switched network" that reflects today's technological landscape for mobile communications technology and the widespread use of mobile broadband services. We disagree with the *RIF Order*'s finding that the Commission's analysis from the *2015 Open Internet Order* placed undue emphasis on the wide availability of mobile BIAS in finding it to be an interconnected service.[943] We likewise disagree with comments arguing that data showing the prevalence and use of mobile broadband technologies are irrelevant to a determination about whether to adopt a modernized definition of "public switched network."[944] To the contrary, we find that these data provide evidence of the extent to which today's

---

[936] *Id.*

[937] *Id.*

[938] *Id.* at 1437, para. 60.

[939] New America's Open Technology Institute Comments at 30 (citing a 2021 report from the Pew Research Center finding that 85% of American adults own a smartphone (up from 81% in 2019)); Andrew Perrin, Mobile Technology and Home Broadband 2021, Pew Rsch. Ctr. (June 3, 2021), https://www.pewresearch.org/internet/2021/06/03/mobile-technology-and-home-broadband-2021; *see also 2024 Section 706 Report* at 11-12, para. 20.

[940] Stephen J. Blumberg & Julian V. Luke, Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2022, Nat'l Ctr. for Health Stat. (May 2023), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless202305.pdf.

[941] CTIA, *2023 Annual Survey Highlights* (July 25, 2023), https://www.ctia.org/news/2023-annual-survey-highlights.

[942] Ericsson, Ericsson Mobility Report at 7 (Nov. 2023), https://www.ericsson.com/4ae12c/assets/local/reports-papers/mobility-report/documents/2023/ericsson-mobility-report-november-2023.pdf; *see also 2024 Section 706 Report* at 58-59 n.307 (discussing current average mobile usage and future projections).

[943] *RIF Order*, 33 FCC Rcd at 357, para. 78.

[944] Wired Broadband et al. Comments at 3-4; CTIA Comments at 69. We note that while Wired Broadband et al. also argue that "smartphone penetration has barely changed (by less than 3% of the population) since 2018," they do

(continued....)

mobile broadband networks provide an essential and universal means of communication among members of the public which is essential to our determination that mobile BIAS is a commercial rather than a private mobile service. Indeed, given the substantial changes in technology and the telecommunications market since 1994, it does not make sense to disregard mobile broadband networks in the Commission's current definition of "public switched network."[945] This is especially so because, in distinguishing between the "commercial mobile service" and "private mobile service" definitions in the Act, it is only logical to take into account the ubiquity of technology as it stands today, and thereby interpret as commercial a service offered to, and universally adopted by, the public.

224.     We also disagree with the *RIF Order* and arguments in the record that the definition we adopt is impermissible because it does not refer to a "single" network.[946] CTIA contends that there "is no single, overarching network that combines the telephone network and the Internet."[947] This argument fails to recognize that the Commission's definition of "public switched network" has always referred to a composite of networks, covering "any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers."[948] Our decision today to include networks that use public IP addresses as part of the public switched network follows the same approach and treats mobile voice and broadband networks as components of a single public switched network.[949]

225.     *Mobile BIAS Is an Interconnected Service.* We conclude that mobile BIAS is an interconnected service because it is interconnected with the "public switched network," as we define it today. Mobile BIAS is also an interconnected service because it is a broadly available mobile service that gives users the ability to send and receive communications to and from all other users of the Internet. We find that the best reading of section 332 is reflected in the Commission's determinations in the *Second CMRS Report and Order* that, by using the phrase "interconnected service," Congress intended that mobile services should be classified as commercial services if they make interconnected service broadly available through their use of the "public switched network" and that "the purpose underlying the congressional approach . . . is to ensure that a mobile service that gives its customers the capability to communicate to or receive communication from other users of the public switched network should be treated as a common carriage offering."[950] By contrast, mobile services classified as private are those

---

not dispute the evolution in the growth and use of mobile broadband services that has occurred since the time the Commission adopted the 1994 definition of "public switched network." Wired Broadband et al. Comments at 3. That evolution of mobile communications technology is the basis for the action we take today to adopt a modernized definition of the term.

[945] *See Mozilla*, 940 F.3d at 39 (noting that "the possibility of technological changes so substantial and material that they render the policy judgment [supporting the previous definition] irrational" could require "broadening the concept of the public switched network").

[946] *RIF Order*, 33 FCC Rcd at 355-56, para. 76; CTIA Comments at 68-69.

[947] CTIA Comments at 68-69.

[948] 47 CFR § 20.3.

[949] In their respective comments, Wired Broadband et al. and ICG oppose defining "public switched network" to include networks that use IP addresses, noting that the Commission lacks jurisdiction over the Internet. *See* Wired Broadband et al. Comments at 2-3 (noting that "Congress has not given FCC authority over IP numbering"); ICG Comments at 10 (stating that "Mobile BIAS is important but does not necessitate a highly questionable plenary redefinition of the Internet . . . into a regulated public switched data network"). We clarify that the modernized definition of public switched network we adopt in section 20.3 of the Commission's rules in no way asserts Commission jurisdiction over the Internet at large or over the assignment or management of IP addressing by the Internet Numbers Registry System.

[950] *Second CMRS Report and Order*, 9 FCC Rcd at 1434, para. 54. New America's Open Technology Institute notes that Congress intended to differentiate between services that were broadly available to the public and those that were private special purpose services, such as taxi dispatch services. New America's Open Technology Institute

(continued….)

mobile services that do not make communications broadly available.[951]  The Commission found in the *2015 Open Internet Order* that "mobile broadband Internet access service fits the [commercial mobile service] classification as millions of subscribers use it to send and receive communications on their mobile devices every day."[952]  Today, as the data described above demonstrate, it is clear that this remains the case as millions of Americans continue to communicate using mobile broadband services.[953]

226.     We also find that mobile BIAS is an interconnected service for the additional reason that it provides users with the capability to communicate with other users of the Internet and with people using telephone numbers through VoIP applications.  In the *2015 Open Internet Order*, the Commission found that "users on mobile networks can communicate with users on traditional copper based networks and IP based networks, making more and more networks using different technologies interconnected."[954]  The Commission further identified mobile VoIP, as well as over-the-top mobile messaging, as "among the increasing number of ways in which users communicate indiscriminately between [North American Numbering Plan (NANP)] and IP endpoints on the public switched network."[955]  In the *RIF Order*, the Commission disagreed and found that the "definition of 'interconnected service' focuses on the characteristics of the offered mobile service itself."[956]  In the *2023 Open Internet NPRM*, we sought comment on whether "there have been any material changes in technology, the marketplace, or other facts that would warrant refinement or revision of the analysis regarding the interconnected nature of mobile BIAS from the *2015 Open Internet Order*."[957]

227.     We find that there is no evidence in the record showing material changes in technology or the marketplace that would warrant a revision to the Commission's 2015 analysis of the interconnected nature of mobile BIAS.  To the contrary, evidence shows that mobile BIAS users continue to communicate using these tools and that today "VoIP applications are even more functionally integrated"

---

Comments at 13, 15, 17-18, 22-23.  CTIA argues that the statute does not limit private mobile services to such types of services and that instead the only relevant question under the statute in determining whether a service is a private mobile service is whether or not the service is interconnected.  CTIA Reply at 46-47.  Wired Broadband et al. similarly argue that the statutory definition is the only relevant consideration for determining what services are private mobile services.  Wired Broadband et al. Reply at 5.  Even though section 332(d)(3) does not limit private mobile service to specific types of mobile services, it does provide that private mobile services are those mobile services that are not commercial mobile services or functionally equivalent.  47 U.S.C. § 332(d)(3).  For the reasons outlined above, we find that mobile BIAS *is* an interconnected commercial mobile service and therefore by statute cannot be private mobile service.  Moreover, we find more persuasive the argument that private mobile service is intended to refer to those services offered only to a more limited group of users, such as taxi fleets.  This follows from both the ordinary meaning of the terms "commercial" and "private" and the state of the marketplace at the time of the 1996 Act.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5779-80, 5788, paras. 391, 404; *USTA*, 825 F.3d at 715.

[951] 47 U.S.C. § 332(d)(1), (d)(3).

[952] *2015 Open Internet Order*, 30 FCC Rcd at 5785, para. 398.

[953] *See* New America's Open Technology Institute Comments at 30; Harold Hallikainen Comments at 2 (stating that "Internet access via cellular devices is clearly an 'interconnected communication service'" and noting that "[a] typical private mobile service allows employees of a business to communicate with other employees of the business, but not with others outside the business.  Internet access via cellular devices is clearly a common carrier service since any other IP address can be communicated with through the device.").

[954] *2015 Open Internet Order*, 30 FCC Rcd at 5787, para. 401

[955] *Id.*

[956] *RIF Order*, 33 FCC Rcd at 358, para. 80.

[957] *2023 Open Internet NPRM* at 48, para. 89.

into mobile broadband services than they were in 2015.[958]  Although some commenters argue that it is the VoIP applications themselves, rather than mobile BIAS, that should be viewed as providing interconnected service,[959] we find that such arguments fail to recognize the extent to which VoIP applications have become "functionally integrated" into mobile broadband services.  Moreover, as the D.C Circuit recognized in the *USTA* decision, "[n]othing in the statute . . . compels the Commission to draw a talismanic (and elusive) distinction between (i) mobile broadband alone enabling a connection, and (ii) mobile broadband enabling a connection through use of an adjunct application such as VoIP."[960]  Today, in view of the evidence regarding the extent to which VoIP applications continue to be integrated with mobile BIAS, we readopt the Commission's analysis from the *2015 Open Internet Order* and find that mobile BIAS may be considered an interconnected service because it provides users with the capability to communicate with other users of the Internet and with people using telephone numbers through VoIP applications.[961]

228.    In connection with this approach, in the *2023 Open Internet NPRM* we sought comment about whether we should also readopt the *2015 Open Internet Order*'s revised definition of "interconnected service" in section 20.3 of the Commission's rules.[962]  We noted that, in the *2015 Open Internet Order*, the Commission redefined "interconnected service" to mean a service that gives subscribers the ability to "communicate to or receive communications from other users of the public switched network," removing the requirement that such service provide the ability to communicate with *all* other users of the public switched network.[963]  The *RIF Order* reverted to the prior definition, concluding that "the best reading of 'interconnected service' is one that enables communication between its users and all other users of the public switched network."[964]  In the *2023 Open Internet NPRM*, we sought comment on whether it is necessary to return to the definition of "interconnected service" in the *2015 Open Internet Order* to ensure that all appropriate services are covered by the definition.[965]  Professor Jordan expresses support for readopting the revised definition from the *2015 Open Internet Order* and argues that the statute does not require interconnected services to give subscribers the ability to communicate to *all* other users of the public switched network and that such a requirement is inconsistent with how mobile services actually operate.[966]

---

[958] New America's Open Technology Institute Comments at 27 (noting that "today applications such as Google Voice, Skype, Zoom Phone and Viber reflect the fully interconnected nature of the mobile broadband and legacy telephone network"), 30; Ines Khouider Comments at 1 (noting that with services such as Facetime and Whatsapp, users can call others with their mobile BIAS connection).

[959] CTIA Comments at 67-68 n.261, 69; Eric W. Burger Comments at 20.  CTIA also argues that, even with VoIP, mobile BIAS should not be viewed as interconnected because IoT devices, such as Internet-connected lighting systems or Internet-connected security cameras, cannot make calls.  *Id.*  We disagree and conclude that we may find mobile BIAS to be an interconnected service even if there are some other broadband services or devices that are not designed to provide communications.  Our findings in this Order apply in the context of BIAS, and to the extent that other types of broadband services do not meet the definition of BIAS, they are not within the scope of this Order.

[960] *USTA*, 825 F.3d at 721.

[961] While the D.C. Circuit in the *Mozilla* decision upheld the *RIF Order*'s findings regarding the distinction between mobile VoIP applications and mobile BIAS itself, the Court nonetheless recognized that the Commission has discretion to make such a determination.  *Mozilla*, 940 F.3d at 40.

[962] *2023 Open Internet NPRM* at 48, para. 90.

[963] *2015 Open Internet Order*, 30 FCC Rcd at 5787-88, para. 402 n.1175.

[964] *See RIF Order*, 33 FCC Rcd at 356-57, 358, paras. 77, 80.

[965] *2023 Open Internet NPRM* at 48, para. 90.

[966] Scott Jordan Comments at 58 (noting that "interconnected service does not by itself give subscribers the capability to communicate to or receive communications from all other users on the public switched network.  This communication requires that other users have compatible interconnected service and compatible devices"); Scott

(continued….)

229. We readopt the revised definition from the *2015 Open Internet Order* and define "interconnected service" to mean a service that gives subscribers the ability to communicate to or receive communications from other users of the public switched network.[967] We remove the requirement adopted by the Commission in the *RIF Order* that such service provide the ability to communicate with *all* other users of the public switched network.[968] We conclude that mobile services that provide the ability for users to communicate with others through the public switched network should be considered "interconnected" even if they are limited in certain ways and do not provide the ability to communicate with *all* other users on the network. We find that revising the definition in this way will clarify the scope of services that may be viewed as interconnected and is consistent with section 332's focus on differentiating between mobile services that are available "to the public" or to "a substantial portion of the public" and those that are not.[969]

230. In addition, because we also have reclassified mobile BIAS as a telecommunications service, we find that classifying it as a commercial mobile service will avoid the inconsistency that would result if the service were both a telecommunications service and a private mobile service. The Commission explained this reasoning in the *2015 Open Internet Order*, and we adopt our proposal from the *2023 Open Internet NPRM* to apply a consistent rationale here.[970] Because we have determined mobile BIAS to be a telecommunications service, we find that designating it also as a commercial mobile service subject to Title II is most consistent with Congressional intent to apply common carrier treatment to telecommunications services. Consistent with the Commission's analysis in 2015, we find that classifying mobile BIAS as a commercial mobile service is necessary to avoid a statutory contradiction that would result if the Commission were to conclude both that mobile BIAS was a telecommunications service and also that it was not a commercial mobile service.[971] A statutory contradiction would result from such a finding because, while the Act requires that providers of telecommunications services be treated as common carriers, it prohibits common carrier treatment of mobile services that do not either meet the definition of commercial mobile service or serve as the functional equivalent of commercial mobile service.[972] We find that classifying mobile BIAS as a commercial mobile service avoids this statutory contradiction and is also most consistent with the Act's intent to apply common carrier treatment to providers of telecommunications services.

231. *Functional Equivalence.* In the alternative, even to the extent that mobile BIAS were understood to fall outside the definition of "commercial mobile service," we conclude that it is also the functional equivalent of a commercial mobile service and, thus, not private mobile service.[973] In the *2015 Open Internet Order*, the Commission found that mobile BIAS was functionally equivalent to commercial mobile service because, "like commercial mobile service, it is a widely available, for profit mobile service that offers mobile subscribers the capability to send and receive communications on their mobile device

---

Jordan Reply at 31 (noting that "a telecommunications service offers transmission between points specified by the user, but in order to meaningfully communicate end users must acquire the necessary services and CPE" and that "[w]hereas once upon a time CPE for voice communication consisted of devices dedicated exclusively to that application, today one may use a voice app on a smartphone, a tablet, or a PC. The CPE necessary for meaningful communication has thus become the combination of hardware and/or software that includes functionality to generate and/or process content, to address communicating parties, and to set up and maintain connections with communicating parties.").

[967] *2015 Open Internet Order*, 30 FCC Rcd at 5787-88, para. 402 n.1175.

[968] *See RIF Order*, 33 FCC Rcd at 356-57, 358, paras. 77, 80.

[969] 47 U.S.C. § 332(d)(1).

[970] *2023 Open Internet NPRM* at 48-49, paras. 91-92.

[971] *2015 Open Internet Order*, 30 FCC Rcd at 5788, para. 403.

[972] 47 U.S.C. § 332(c)(2).

[973] *2023 Open Internet NPRM* at 49, para. 92.

to and from the public."[974]  The *RIF Order* found that the *2015 Open Internet Order*'s focus on the public's "ubiquitous access" to mobile BIAS alone was "insufficient" to establish functional equivalency and that the test established in the *Second CMRS Report and Order* provided a more thorough consideration of factors of whether a service is closely substitutable for a commercial mobile service.[975]

232.    In the *2023 Open Internet NPRM*, we sought comment on both of these analyses and on whether we should adopt "any other or different definition of 'functional equivalent.'"[976]  CTIA and Wired Broadband et al. argue that the Commission cannot find that mobile BIAS is functionally equivalent to commercial mobile service by assessing how widely it is used but instead it must assess functional equivalence based on the factors outlined in the Commission's rules, such as whether the services are substitutable, whether a change in the price of one service would prompt customers to change to the other, and whether the service is advertised to the same targeted market.[977]  Under these factors, they contend, mobile BIAS is not functionally equivalent to commercial mobile service.[978]

233.    We disagree with these arguments and find that, to the extent mobile BIAS falls outside the definition of commercial mobile service, it is the functional equivalent of a commercial mobile service.  Consistent with our proposal in the *2023 Open Internet NPRM*, and with the analysis in the *2015 Open Internet Order*,[979] we find that mobile BIAS is the functional equivalent of commercial mobile service because like commercial mobile service, it is a widely available, for-profit mobile service that offers mobile subscribers the capability to send and receive communications on their mobile device to and from the public.  We disagree with CTIA's argument that this finding relies impermissibly on an overly general description of mobile BIAS to show functional equivalence.[980]  To the contrary, we find that the fact that mobile BIAS is used to send and receive communications broadly among members of the public is a critical factor in assessing its functional equivalence to commercial mobile service.  Although mobile BIAS uses IP addresses rather than telephone numbers, consumers use both mobile voice service and mobile BIAS to communicate with others on their mobile devices.  The fact that mobile BIAS may be used for some purposes that are different than what mobile voice services are used for does not mean that the services do not provide functional equivalence with respect to their capability to send and receive communications.

234.    As the *RIF Order* acknowledges, the Commission has express delegated authority from Congress to make a policy determination on whether a particular mobile service may be the functional equivalent of a commercial mobile service.[981]  Specifically, section 332 of the Act defines "private mobile service" as "any mobile service . . . that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission."[982]  While the factors outlined in section 20.3 of the Commission's rules may be used in making a determination about the functional equivalence of a particular service, they do not prohibit the Commission from designating a category of service to be the functional equivalent of a commercial mobile service in a rulemaking and they do not prevent us from considering other factors in making our determination regarding the

---

[974] *2015 Open Internet Order*, 30 FCC Rcd at 5788-89, para. 404.

[975] *RIF Order*, 33 FCC Rcd at 361, para. 84 (citing *Second CMRS Report and Order*, 9 FCC Rcd at 1447, paras. 78, 79).

[976] *2023 Open Internet NPRM* at 49, para. 92.

[977] CTIA Comments at 70-74; Wired Broadband et al. Comments at 5.

[978] CTIA Comments at 71-72; Wired Broadband et al. Comments at 5.

[979] *2023 Open Internet NPRM* at 49, para. 92; *2015 Open Internet Order*, 30 FCC Rcd at 5789, para. 404.

[980] CTIA Comments at 73-74.

[981] *RIF Order*, 33 FCC Rcd at 361, para. 84.

[982] 47 U.S.C. § 332(d)(1).

functional equivalence of mobile BIAS.[983]  Based on this authority, the reasons outlined above and in the *2015 Open Internet Order*, and in light of the continued widespread use and availability of mobile broadband services, we find that mobile BIAS is the functional equivalent of commercial mobile service, and is therefore not private mobile service.

235.     Finally, in the *2023 Open Internet NPRM*, we sought comment on the potential impact of applying openness requirements to mobile providers and on the "policy consequences that commenters believe may result from the proposed reclassification of mobile BIAS."[984]  Several commenters stress the importance of applying the same open Internet rules to fixed and mobile BIAS.[985]  CTIA, Verizon, and AT&T, however, oppose openness requirements for mobile providers contending that such requirements are unnecessary and may discourage investment and innovation in mobile broadband networks.[986]

236.     We find that returning mobile BIAS to its classification as a commercial mobile service and reinstating openness requirements on mobile BIAS providers will help protect mobile broadband consumers while allowing mobile providers to continue to compete successfully and develop new products and services.  We agree with commenters who note that because consumers use both fixed and mobile BIAS regularly, it is critical that we apply the same rules to both services.[987]  In addition, as commenters point out, mobile broadband services are particularly important to certain groups, such as low-income consumers, who may not be able to afford to subscribe to both fixed and mobile broadband service, and it is critical to ensure that these consumers are able to benefit from a free and open Internet.[988]  The Commission's previous experience applying open access rules to upper 700 MHz C Block licensees has shown that mobile operators subject to openness requirements have continued to compete successfully in the marketplace, and we expect mobile BIAS providers will continue to compete successfully under the openness requirements we adopt today.[989]

### F.     Restoring the Telecommunications Service Classification of Broadband Internet

---

[983] 47 CFR § 20.3.  Subsection (c) of the "commercial mobile radio service" definition notes that "[a] variety of factors may be evaluated" to make a determination regarding functional equivalence "including" the enumerated factors.  *Id*. § 20.3(c).

[984] *2023 Open Internet NPRM* at 49-50, para. 93.

[985] ALA Comments at 10; CPUC Comments at 2; INCOMPAS Comments at 14-15; New America's Open Technology Institute Comments at 32-37; N.Y. State School Boards Association Comments at 3.

[986] CTIA Comments at 6; Verizon Comments at 1-7, AT&T Comments at 22-25.

[987] ALA Comments at 10; CPUC Comments at 2; INCOMPAS Comments at 14-15; New America's Open Technology Institute Comments at 32-37; N.Y. State School Boards Association Comments at 3.

[988] *See, e.g.*, INCOMPAS Comments at 14-15; New America's Open Technology Institute Comments at 14-15.

[989] *Service Rules for the 698-746, 747-762 and 777-792 MHz Bands; Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems; Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones; Biennial Regulatory Review-Amendment of Parts 1, 22, 24, 27, and 90 to Streamline and Harmonize Various Rules Affecting Wireless Radio Services; Former Nextel Communications, Inc. Upper 700 MHz Guard Band Licenses and Revisions to Part 27 of the Commission's Rules; Implementing a Nationwide, Broadband, Interoperable Public Safety Network in the 700 MHz Band; Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Communications Requirements Through the Year 2010; Declaratory Ruling on Reporting Requirement under Commission's Part 1 Anti-Collusion Rule*, WT Docket Nos. 07-166, 06-169, 06-150, 03-264, 96-86; PS Docket No. 06-229; CC Docket No. 94-102, Second Report and Order, 22 FCC Rcd 15289, 15364, paras. 203-04 (2007) (*700 MHz Second Report and Order*); 47 CFR § 27.16.  ADTRAN contends that the C Block openness requirements drove down the price of C Block spectrum at auction.  ADTRAN Comments at 32.  While any number of factors may affect the price of any spectrum at auction, it is clear that Upper 700 MHz C Block licensees, including Verizon, invested heavily in deploying mobile broadband service over their C Block spectrum.  *See, e.g.*, Verizon, *Financial Reporting Summary*, https://www.verizon.com/about/investors/financial-reporting (last visited Apr. 10, 2024).

**Access Service Is Lawful**

237.    Our classification of BIAS as a telecommunications service is fully and sufficiently justified under the Commission's longstanding authority and responsibility, provided by Congress, to classify services subject to our jurisdiction, as necessary.  This authority and responsibility is not supplanted by the major-questions doctrine.

## 1.    The Commission Has the Authority and Responsibility to Classify BIAS

238.    The Commission's authority and responsibility to classify services subject to our jurisdiction, as necessary, is borne out of Congress's well-established and longstanding reliance on the Commission to exercise this authority.  Our decision to revisit the classification of BIAS derives from ordinary administrative law principles and the factual circumstances surrounding the *RIF Order*.  And the classification decision we reach is consistent with the broader context of the Act.

239.    *Congress Authorized and Expected the Commission to Classify BIAS.*  No one disputes that Internet access services are within the Commission's subject-matter jurisdiction and historically have been supervised by the Commission.[990]  Congress created the Commission "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communication."[991]  Section 2 of the Act grants the Commission jurisdiction over "all interstate and foreign communication by wire or radio."[992]

240.    Since the original enactment of the Communications Act in 1934, Congress routinely has specified regulatory regimes that apply to particular communications services or service providers that meet statutorily defined categories, and Congress has relied on the Commission to determine whether a particular service or provider falls within the statutory definitions that trigger those regulatory frameworks.  For example, when the Act originally was enacted in 1934, Congress adopted the statutory category of "common carrier," and specified the associated regulatory framework under Title II for such providers, leaving it to the Commission to determine which specific entities were common carriers based on the statutory criteria, drawing on the historical backdrop of common carriage.[993]  Likewise, in 1934 Congress defined "radio station[s]" and "broadcasting" in the Act, and specified the regulatory regimes that the Commission was to apply when those definitions were met.[994]  Congress did so again, for instance, in the 1984 Cable Act for "cable operator[s]" and "cable service."[995]  In 1993, Congress did the same with respect to "commercial mobile service" and "private mobile service";[996] and again in 1994 in

---

[990] *See Comcast*, 600 F.3d at 646-47; *Brand X*, 545 U.S. at 981.

[991] 47 U.S.C. § 151.

[992] 47 U.S.C. § 152(a).

[993] Communications Act of 1934, Pub. L. 73-416, §§ 3, 201-221 (1934).  For example, common carriers are, among other things, subject by default to various rate regulation, accounting, tariffing, market entry, and service discontinuance requirements, implemented by the Commission.  47 U.S.C. §§ 201-221.

[994] Communications Act of 1934, Pub. L. 73-416, §§ 3, 301-329 (1934).  For example, radio stations and broadcasters are, among other things, subject by default to various licensing and authorization requirements to ensure their operation consistent with the public interest, implemented by the Commission.  47 U.S.C. §§ 301-329.

[995] Cable Communications Act of 1984, Pub. L. 98-145, § 2 (1984) (1984 Cable Act) (amending the Communications Act to add a new Title VI).  For example, cable operators are, among other things, subject by default to channel carriage requirements and ownership restrictions implemented by the Commission.  47 U.S.C. §§ 532-533.

[996] Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, Title VI (1993) (adopting, among other things, amendments to Title III of the Communications Act).  For example, commercial mobile service providers are,

(continued….)

the Communications Assistance for Law Enforcement Act (CALEA), for "telecommunications carriers" as defined there.[997] When Congress enacted the definitional frameworks and associated regulatory regimes to be applied by the Commission in the 1996 Act, it continued its well-established, longstanding approach reflected in those historical examples—an approach that Congress has since continued to follow.[998] Classification decisions under each of those frameworks are consequential in their own way, yet it is well established that Congress relies on the Commission to make just such determinations.

241. Provisions enacted as part of the 1996 Act amply detail Congress' expectation that the Commission would classify services and providers under the "telecommunications service" and "information service" statutory definitions. The Act is replete with examples of provisions expressly to be implemented by the Commission that turn on the Commission's interpretation and application of those statutory definitions to classify particular services and service providers. As relevant here, for example:

- Section 10 of the Act directs the Commission to forbear from applying provisions of the Act or Commission rules to telecommunications carriers or telecommunications services if certain statutory criteria are met.[999]

- Section 11 of the Act requires the Commission to biennially review its rules "that apply to the operations or activities of any provider of telecommunications service" and determine if any such rules are no longer necessary in the public interest based on certain marketplace developments.[1000]

- Section 224 of the Act requires the Commission to ensure just and reasonable rates, terms, and conditions for pole attachments, among other circumstances, when provided by a telecommunications carrier to a provider of telecommunications service.[1001]

- Sections 251 and 252 of the Act direct the Commission to effectuate certain market-opening requirements for telecommunications carriers, including setting rules to be applied by state commissions when arbitrating interconnection agreements among carriers to implement those statutory requirements.[1002]

- Section 253 directs the Commission to preempt certain state or local requirements that actually or effectively prohibit the ability of any entity to provide any telecommunications service.[1003]

---

among other things, subject by default to the requirements governing common carriers under Title II of the Communications Act, while private mobile service providers are not. 47 U.S.C. § 332(c)(1), (2).

[997] Communications Assistance for Law Enforcement Act, Pub. L. 103-414, § 102 (1994) (CALEA) (adopting definitions); *id.* tit. III (amending the Communications Act to, among other things, direct the Commission to adopt rules implementing CALEA). For example, entities that qualify as telecommunications carriers for purposes of CALEA are, among other things, subject by default to the requirement to file with the Commission and maintain up-to-date System Security and Integrity plans designed to help preserve the ability of law enforcement agencies to conduct electronic surveillance while protecting the privacy of information outside the scope of the investigation. 47 U.S.C. §§ 229, 1004.

[998] *See, e.g.*, Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105 (2019) (TRACED Act) (adopting, among other things, robocall prevention requirements for providers of "voice service"); Twenty-First Century Communications and Video Accessibility Act, Pub. L. 111-260 (2010) (amending the Communications Act to adopt regulatory requirements associated with "advanced communications services," among other things).

[999] 47 U.S.C. § 160.

[1000] 47 U.S.C. § 161(a).

[1001] 47 U.S.C. § 224.

[1002] 47 U.S.C. §§ 251-252.

[1003] 47 U.S.C. § 253.

- Section 254 of the Act requires the Commission to adopt rules to preserve and advance universal service, defined principally in terms of "an evolving level of telecommunications services" established by the Commission, and to fund universal service support by contributions from "[e]very telecommunications carrier that provides interstate telecommunications services" along with certain other "provider[s] of interstate telecommunications," and to rely on certain principles to inform its universal service rules, including providing access to telecommunications and information services.[1004]

- Section 272 of the Act gives the Commission the responsibility to implement certain separate affiliate safeguards for the former BOCs in connection with, among other things, the provision of certain information services.[1005]

These illustrative examples, all enacted as part of the 1996 Act, amply demonstrate the Commission's authority—and responsibility, as necessary—to classify services under the definitional criteria established by the 1996 Act.

242. Congress reaffirmed that it had granted the Commission this authority when, less than two years after the 1996 Act's passage, it directed the Commission to explain, in what came to be known as the *Stevens Report*, how the new statutory terms apply "with respect to Internet access" for the purposes of universal service administration and support.[1006] As Public Knowledge notes, "[t]he Stevens Report represents . . . a clear demonstration that Congress had committed the question of classification of services to the FCC," and "it is undeniable that the Stevens Report reflects the FCC's interpretation—supported by the initial report requirement from Congress—that Congress assigned it the authority to classify services as either information services or telecommunications services."[1007]

243. *Revisiting the Classification of BIAS Is Not Inherently Suspect.* We conclude that our decision to revisit the classification of BIAS does not somehow render it inherently suspect.[1008] As a threshold matter, it derives from ordinary administrative-law principles. The U.S. Supreme Court has observed that there is "no basis in the Administrative Procedure Act [(APA)] or in our opinions for a requirement that all agency change be subjected to more searching review. . . . [I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."[1009] Relevant precedent holds that

---

[1004] 47 U.S.C. § 254.

[1005] 47 U.S.C. § 272.

[1006] Appropriations Act, 111 Stat. at 2521-22, § 623(b)(1)-(2) (stating that the Commission shall review "the impact of the Commission's interpretation of those definitions on the current and future provision of universal service . . . [and] the application of those definitions to mixed or hybrid services [such as] Internet access").

[1007] Public Knowledge Comments at 41. Given the Commission's longstanding, well-established authority and responsibility to classify services, we disagree with commenters who contend that the Commission does not have such authority or should defer to Congress to determine the classification of BIAS. *See, e.g.*, Harold Furchtgott-Roth et al. Comments at 2-5; Citizens Against Government Waste Comments at 3; CTIA Comments at 7; Free State Foundation Comments at 20; ITIF Comments at 7; Business Roundtable Comments at 2; Innovation Economy Institute Comments at 4; Jeffrey Westling Comments at 11-15; International Center for Law & Economics Comments at 4; Richard Bennett Comments at 6; SBEC Comments at 2; Verizon Comments at 1; WIA Comments at 3; LGBT Tech Comments at 1; United Spinal Association Reply at 2.

[1008] *See, e.g., Mary v. Harris*, 776 F.3d at 24 ("What the Commission did in the past is of no moment, however, if its current approach reflects a permissible interpretation of the statute."). The D.C. Circuit also stated that the *Fox* test does not "equate to a 'heightened standard' for reasonableness." *Id.*

[1009] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514, 515 (2009) (*Fox*); *see also Verizon*, 740 F.3d at 636-37 ("In the *Open Internet Order*, however, the Commission has offered a reasoned explanation for its changed understanding of section 706(a). . . . In these circumstances . . . we have no basis for saying that the Commission 'casually ignored prior policies and interpretations or otherwise failed to provide a reasoned explanation' for its changed interpretation.").

we need only "examine the relevant data and articulate a satisfactory explanation for [our] action," a duty we fully satisfy here.[1010] The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."[1011] Consistent with these principles, the Commission's reasoned determination today that classifying BIAS as a telecommunications service is superior first and foremost as a matter of textual interpretation—while also recognizing that public policy supports the change in direction—is sufficient to justify our action under ordinary administrative-law principles, even absent any new facts or changes in circumstances.

244.     But even assuming, *arguendo*, that an agency must go beyond ordinary administrative-law principles and show new facts to justify its action,[1012] our decision to revisit the classification of BIAS is particularly warranted under the factual circumstances here. Our classification of BIAS flows in significant part from concerns with the *RIF Order* highlighted in *Mozilla*—to "bring the law into harmony with the realities of the modern broadband marketplace"[1013]—which is itself a sufficient justification for our classification here.[1014] Separately and secondarily, our classification decision accounts for certain statutory responsibilities and policy concerns[1015]—especially safeguarding public safety and providing a uniform regulatory framework for BIAS—where the *RIF Order*'s approach was called into doubt by *Mozilla*.[1016] The Commission's attempt to respond to the *Mozilla* remand has remained subject to the petitions for reconsideration, which we resolve today, and a petition for judicial review held in abeyance pending further Commission action.[1017] Given the *Mozilla* court's palpable criticism of the *RIF Order*'s regulatory approach to BIAS, and that the merits of this approach were never brought to a final resolution, we find it especially appropriate for the Commission to resolve these lingering disputes now.

245.     *Reclassification Is Consistent with the Broader Context of the Act.* We also find that our classification of BIAS as a telecommunications service accords with the goals and directives found in the 1996 Act. To begin with, section 706, which while worded in terms of encouraging the deployment of

---

[1010] *Fox*, 556 U.S. at 513 (internal quotation marks omitted).

[1011] *Domestic Sec. Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003) (quoting *Schoenbohm v. FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000)) (internal quotation marks omitted).

[1012] *USTA*, 825 F.3d at 709 ("But we need not decide whether there 'is really anything new' because . . . the Commission concluded that changed factual circumstances were not critical to its classification decision . . . ."); *2015 Open Internet Order*, 30 FCC Rcd at 5761, para. 360 n.993 ("[E]ven assuming, *arguendo*, that the facts regarding how BIAS is offered had not changed, in now applying the Act's definitions to these facts, we find that the provision of BIAS is best understood as a telecommunications service, . . . and disavow our prior interpretations to the extent they held otherwise."); *RIF Order*, 33 FCC Rcd at 405, para. 156.

[1013] *Mozilla*, 940 F.3d at 94 (Millett, J., concurring).

[1014] The U.S. Supreme Court observed in *Brand X* that "the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis." *Brand X*, 545 U.S. at 981 (citation and internal quotation marks omitted). In addition, if an agency's predictions "prove erroneous," as we show is the case with the *RIF Order*, the agency will need to reconsider the associated regulatory actions "in accordance with its continuing obligation to practice reasoned decision-making." *Aeronautical Radio v. FCC*, 928 F.2d 428, 445 (D.C. Cir. 1991) (*Aeronautical Radio*).

[1015] *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (explaining that agencies are "entitled to assess administrative records and evaluate priorities" in light of current policy judgments).

[1016] *See, e.g.*, *Mozilla*, 940 F.3d at 59-63 (discussing the *RIF Order*'s inadequate consideration of the effect of an information service classification of BIAS on public safety); *id.* at 74-86 (vacating the preemption adopted in the *RIF Order* because "in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law").

[1017] Common Cause et al. Petition for Reconsideration; INCOMPAS Petition for Reconsideration; Public Knowledge Petition for Reconsideration; Santa Clara Petition for Reconsideration; *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir. filed Jan. 14, 2021).

"advanced telecommunications capability,"[1018] has long been understood to encompass the goal of encouraging broadband Internet access.[1019] Congress specifically directed the Commission to encourage the deployment of advanced telecommunications capability "by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment."[1020] The list of specific regulating methods—price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market—all are authorities the Commission has long had, or that were granted by the 1996 Act, with respect to telecommunications services.[1021]

246.     The *Mozilla* court's critiques of the *RIF Order* highlight specific areas where the objectives of section 706 of the 1996 Act—and the operative provisions of the Communications Act itself—would be more effectively carried out if BIAS is classified as a telecommunications service. As we discuss above,[1022] reclassification will further enable the Commission to promote broadband access by granting to BIAS-only providers just and reasonable access and rates for pole attachments under section 224, a key pro-competitive provision of the Act that the *Mozilla* court chastised the *RIF Order* for failing to properly grapple with when taking such rights from BIAS-only providers.[1023] The D.C. Circuit in *Mozilla* also was concerned about the effect of the *RIF Order* on the continued availability of funding for BIAS through universal service support—a tool Congress provided in section 254 of the 1996 Act to address barriers to infrastructure investment. Expressing particular concern with respect to Lifeline support in light of the arguments raised on review, the court highlighted that section 254(c)(1) "declared that '[u]niversal service is an evolving level of telecommunications services'" and sections 254(e) and 214(e) "tethered Lifeline eligibility to common-carrier status."[1024] Our classification recognizes that BIAS itself meets the criteria for inclusion in "universal service" under section 254(c)(1) and therefore provides a direct basis for support that is not contingent on BIAS's relationship to the network facilities used to offer voice service.[1025] Furthermore, reclassification would enable the Commission to provide

---

[1018] 47 U.S.C. § 1302(a), (b).

[1019] *See, e.g.*, *2024 Section 706 Report* at 1, para. 1 n.1 (clarifying that "all services providing advanced telecommunications capability are 'broadband,' and that the Report "necessarily consider[s] the availability of various broadband services that contribute to advanced telecommunications capability in [the] analysis under the statute"); *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations by Time Warner Inc. and America Online, Inc., Transferors, to AOL Time Warner Inc., Transferee*, CS Docket No. 00-30, Memorandum Opinion and Order, 16 FCC Rcd 6547, 6571-72, para. 63 n.185 (2001) ("The Commission's *Second 706 Report* contains a detailed description of high-speed Internet access *via* various technologies."); *Local Competition and Broadband Reporting*, CC Docket No. 99-301, Notice of Proposed Rulemaking, 15 FCC Rcd 7717, 7719-20, para. 3 (2000); *Local Competition and Broadband Reporting*, CC Docket No. 99-301, Notice of Proposed Rulemaking, 14 FCC Rcd 18100, 18102, para. 2 (1999) (adopting an information collection program to "enable us to better assess the availability of broadband services such as high-speed Internet access, so that we can better satisfy our duty to encourage the deployment of advanced telecommunications capability as Congress directed us to do in section 706 of the 1996 Act"); *First Broadband Deployment Report*, 14 FCC Rcd 2442-43, para. 86 ("At present, the demand for high-speed Internet access is the primary driver of consumers' desire for broadband."); *id.* at 2400, para. 1 (explaining that "broadband" is the term the Commission is using for "what Congress has called 'advanced telecommunications capability'"). That "advanced telecommunications capability" is not identical to BIAS as defined for purposes of this Order does not diminish the substantial extent to which section 706 has been—and is—understood as encouraging BIAS deployment.

[1020] 47 U.S.C. § 1302(a).

[1021] *See, e.g.*, 47 U.S.C. §§ 160, 201, 202, 224, 253, 332(c).

[1022] *See supra* Section III.A.7.

[1023] *Mozilla*, 940 F.3d at 66-67.

[1024] *Id.* at 68 (citing 47 U.S.C. §§ 214(e), 254(c)(1), (e)).

[1025] *See supra* Section III.A.7.

universal service support to BIAS providers that solely supply BIAS.

247.    By reclassifying BIAS as a telecommunications service, we also help to effectuate the intent of section 706 of the 1996 Act by empowering the Commission to focus section 253 on actions relating to BIAS, an advanced telecommunications capability.  In addition to the market-opening amendments to pole access under section 224 of the Act, the 1996 Act also sought to open markets to competition by granting authority to the Commission in section 253 to preempt "State or local legal requirement[s that] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."[1026]  If the Commission is to truly realize section 706's command to encourage the deployment of advanced telecommunications capability through "measures that promote competition in the local telecommunications market," it should not have to resort to applying section 253 to a co-mingled telecommunications service that may not even constitute "advanced telecommunications capability."[1027]

248.    Contrary to the *RIF Order*'s suggestion,[1028] our classification of BIAS as a telecommunications service is not undercut by section 230 of the Act, which was enacted as part of the 1996 Act.  Section 230(b)(2) adopts the policy of "preserv[ing] the vibrant and competitive free market *that presently exists* for the Internet and other interactive computer services, unfettered by Federal or State regulation."[1029]  Section 230 also finds that "[t]he Internet and other interactive computer services *have* flourished, to the benefit of all Americans, with a minimum of government regulation."[1030]  As we discuss above, at the time the 1996 Act was enacted, the transmission component of enhanced services—namely, Internet access—was subject to regulation under Title II of the Act.[1031]  Thus, the regulatory *status quo* that "presently exist[ed]" and under which the Internet and other interactive computer services "ha[d]" flourished at the time of section 230's enactment as part of the 1996 Act included Title II regulation of the transmission services used to access the Internet.  We are not persuaded by Commissioner Carr's suggestion that our rules are incompatible with section 230(c)(2),[1032] which is entitled "Civil Liability" and provides in relevant part that "No provider or user of an interactive computer service shall be held liable on account of any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . ."  We take no position here on when, if ever a BIAS provider's actions to discriminate against certain Internet content, application, or services could be characterized as good-faith action to address "objectionable" content within the meaning of section 230(c)(2).  Moreover, section 230(c)(2)'s title and text indicate, that provision merely immunizes providers against civil liability, such as damages, for their content-moderation decisions.  It does not purport to otherwise immunize BIAS providers from any regulatory obligations, and if a BIAS provider violates our rules, the rules may be validly enforced through other means—such as a writ of injunction under section 401(b), or potentially criminal sanctions under section 501.  In addition, the Commission could issue a declaratory ruling identifying a violation of the conduct rules by a given provider, 47 CFR § 1.2, with the potential to consider that determination in subsequent adjudications not involving civil liability—such as evaluating the public interest when granting or denying licenses or authorizations, or crafting policies governing eligibility for universal service funding.

249.    We also reject the contention of the *RIF Order* and certain commenters that narrow-

---

[1026] 47 U.S.C. § 253.

[1027] 47 U.S.C. § 1302(a).

[1028] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 312, 314, 331, 358-49, paras. 1, 8, 39, 58.

[1029] 47 U.S.C. § 230(b)(2) (emphasis added).

[1030] 47 U.S.C. § 230(a)(4) (emphasis added).

[1031] *See infra* Section III.C.1 (discussing relevant pre-1996 Act precedent).

[1032] *See* Dissenting Statement of Commissioner Brendan Carr at 23 (Carr Dissent).

purpose statutory provisions like sections 230(f)(2) and 231 of the Act either settled the classification of BIAS or are even relevant to our telecommunications service classification.[1033]  Section 230(f)(2) defines "for purposes of this section" an "interactive computer service" to "mean[] any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet."[1034]  Likewise, section 231(e)(4) provides that "for purposes of" section 231—which was added a year after the enactment of the 1996 Act[1035]—"'Internet access service' means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, . . . [and] does not include telecommunications services."[1036]  In a similar vein, NCTA seeks to invoke language in section 231 of the Act, stating that "[n]othing in this section shall be construed to treat interactive computer services as common carriers or telecommunications carriers."[1037]  But had Congress wanted those provisions to settle the classification of Internet access service, it easily could have added those definitions—or others—to the definitions in section 3 of the Communications Act, and thereby made them generally applicable (as the 1996 Act did with respect to many other definitions).  Thus, we agree with the D.C. Circuit in *USTA* that it is "unlikely that Congress would attempt to settle the regulatory status of BIAS in such an oblique and indirect manner, especially given the opportunity to do so when it adopted" the 1996 Act.[1038]  And as we discuss above,[1039] that the Internet access service prevalent at the time those provisions were enacted bears so little resemblance to the BIAS we classify today reinforces our decision not to pull those definitions out of their statutory context and apply them to a fundamentally dissimilar service.

250.     We also reject arguments that the IIJA counsels against reclassification.[1040]  USTelecom points out that through the IIJA "Congress established numerous programs to promote digital equity" including actions to foster "deployment to unserved and underserved areas," to "provide[] a discount for broadband service to eligible households," "to establish three grants with the goal of ensuring that all people have the skills, technology, and capacity needed to participate in the digital economy," and to "facilitat[e] equal access to broadband, including by preventing and eliminating digital discrimination."[1041]  USTelecom then asserts that "Congress's decision to address equal access directly—in the way that it chose—demonstrates that it did not intend for the Commission to attempt to address the issue through Title II reclassification of broadband."[1042]  But such an argument proceeds from a mistaken assumption.  First and foremost, as discussed above, the Act clearly grants the Commission authority and

---

[1033] *RIF Order*, 33 FCC Rcd at 349-51, paras. 59-62; U.S. Chamber of Commerce Comments at 43-45 ("Because broadband is an Internet access service, and hence an 'interactive computer service,' it is a Title I 'information service,' and thus exempt from the non-discrimination mandates that Title II reserves for 'telecommunications services' alone."); NCTA Comments at 24-25 (arguing that language in sections 230 and the Child Online Protection Act indicate that Congress did not intend BIAS to be classified as a telecommunications service); LARIAT Apr. 19, 2024 *Ex Parte* at 1.

[1034] 47 U.S.C. § 230(f), (f)(2).

[1035] Child Online Protection Act, Pub. L. No. 105-277, 112 Stat. 2681-736, § 1403 (1998).

[1036] 47 U.S.C. § 231(e)(4).

[1037] NCTA Comments at 25; 47 U.S.C. § 223(e)(6).

[1038] *USTA*, 825 F.3d at 703 (quoting *2015 Open Internet Order*, 30 FCC Rcd at 5777, para. 386); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

[1039] *See supra* Sections III.B.2, III.C.2.

[1040] *See, e.g.*, USTelecom Comments at 90-91.

[1041] *Id.*

[1042] *Id.* at 91.

responsibility to classify services such as BIAS—the status of which remained unsettled by the unresolved challenges to the *RIF Remand Order*—where necessary to fulfill its statutory duties. And we classify BIAS as a telecommunications service because we conclude that represents the best reading of the Act.[1043] Second, even to the extent that we evaluate policy considerations as independently reinforcing our classification decision,[1044] we find USTelecom's argument unpersuasive. We see nothing in the text of the IIJA to indicate that the targeted efforts to address BIAS-related policy concerns taken up in the IIJA were intended to comprehensively address BIAS policy in any or all of the targeted policy areas to the exclusion of other existing statutory authorities. Indeed, at the time the IIJA was enacted in 2021, there were pending petitions for reconsideration and a pending petition for judicial review of the *RIF Remand Order*,[1045] and thus we cannot assume Congress would have reached a conclusion about what the ultimate classification of BIAS would be at the time of the IIJA's enactment.

251. We conclude that a finding of market power is not a prerequisite to classifying a service as a telecommunications—and thus common carrier—service and are unpersuaded by arguments to the contrary.[1046] The Act is abundantly clear that common carrier regulation applies—at least absent forbearance—even in the case of services subject to competition. The 1996 Act is replete with examples of provisions making clear that Congress desired telecommunications carriers—which are treated as common carriers in their provision of telecommunications services[1047]—to be subject to competition.[1048] For example, among other things:

- Section 10 of the Act directs the Commission to forbear from applying provisions of the Act or Commission rules to telecommunications carriers or telecommunications services if certain statutory criteria are met and provides that the public interest evaluations in section 10(a)(3) will be met if forbearance "will promote competitive market conditions, including . . . competition among providers of telecommunications services."[1049]

- Section 11 of the Act requires the Commission to biennially review its rules "that apply to the operations or activities of any provider of telecommunications service" and determine if any such rules are no longer necessary "as the result of meaningful economic competition between providers of such service."[1050]

---

[1043] *See supra* Section III.B.

[1044] *See supra* Section III.A.

[1045] Common Cause et al. Petition for Reconsideration; INCOMPAS Petition for Reconsideration; Public Knowledge Petition for Reconsideration; Santa Clara Petition for Reconsideration; *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir. filed Jan. 14, 2021). Below, we grant in part, and dismiss in part the four Petitions for Reconsideration. *See infra* Section VII.

[1046] *See, e.g.*, Comcast Comments at 7-8 ("Title II was developed not only 'in recognition of the monopoly position held by the providers of what Congress deemed to be an essential public service,' but also 'primarily . . . to constrain the exercise of substantial market power possessed by firms providing communications services in 1934.'" (footnote and emphasis omitted) (quoting *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, Further Notice of Proposed Rulemaking, 84 F.C.C.2d 445, 447, 457, paras. 6, 35 (1980)); International Center for Law & Economics Comments at 34 ("The premise of Title II and other public utility regulation is that ISPs can exercise market power sufficient to substantially distort economic efficiency and harm end users." (quoting *RIF Order*, 33 FCC Rcd at 382, para. 123)).

[1047] 47 U.S.C. § 153(51) (stating in pertinent part that "[a] telecommunications carrier shall be treated as a common carrier under this chapter . . . to the extent that it is engaged in providing telecommunications services").

[1048] Indeed, one of the main goals of the 1996 Act was to foster competition amongst common carriers. *See* Telecommunications Act of 1996, Pub. L. 104-104, § 257(b) (codified as amended at 47 U.S.C. § 257(b)).

[1049] 47 U.S.C. § 160(b).

[1050] 47 U.S.C. § 161(a).

- Section 251 of the Act provides for an array of requirements specifically designed to facilitate local competition for telecommunications services.[1051]

- Section 254(k) of the Act prohibits telecommunications carriers from "us[ing] services that are not competitive to subsidize services that are subject to competition."[1052]

- Section 271 of the Act predicated the BOCs' provision of long distance services on anticipated competition in local markets for telecommunications services, including through requirements designed to foster that competition.[1053]

Even prior to the 1996 Act, it was apparent that common carrier regulation under the Communications Act was not tied to market power or similar considerations. For example, section 332(c)(1) provided that commercial mobile service providers "shall, insofar as such person is so engaged, be treated as a common carrier," but authorized the Commission to designate certain Title II provisions as inapplicable if certain statutory criteria are met, including an analysis of whether such relief "will enhance competition among providers of commercial mobile services."[1054] Likewise, the Supreme Court, in *MCI*, evaluated the Commission's pre-1996 Act efforts to grant relief from Title II requirements for common carriers that lacked market power, and ultimately rejected such efforts as beyond the Commission's authority under the Communications Act.[1055]

## 2. The Major-Questions Doctrine Poses No Obstacle to Recognizing BIAS as a Telecommunications Service

252. We conclude that the major-questions doctrine—the notion that in certain extraordinary cases, a court will not lightly find that Congress has delegated authority to an agency[1056]—is no obstacle to our classification of BIAS as a telecommunications service.[1057]

---

[1051] *See, e.g.*, 47 U.S.C. § 251(b), (c).

[1052] 47 U.S.C. § 254(k).

[1053] *See, e.g.*, 47 U.S.C. § 271(c)(1), (2).

[1054] 47 U.S.C. § 332(c)(1)(A), (C).

[1055] *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 221, 234 (1994) (*MCI*) (explaining that the Commission's policy distinguished between dominant carriers (which possessed market power) and nondominant carriers (which did not), and rejecting the Commission's detariffing policy for nondominant carriers because "our estimations, and the Commission's estimations, of desirable policy cannot alter the meaning of the Federal Communications Act of 1934").

[1056] The Supreme Court first articulated the "major-questions doctrine" as such in 2022, *see West Virginia v. EPA*, 597 U.S. 697, 721-32 (2022) (*West Virginia*), and has since applied it in only one other case, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2372-75 (2023). But the Court derived the doctrine from a number of earlier cases, *see West Virginia*, 597 U.S. at 721-24, including, for example, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[1057] We also reject TechFreedom's assertion that our actions violate the non-delegation doctrine. *See* TechFreedom Comments at 23-25; TechFreedom Reply at 22-24. The Supreme Court has repeatedly held that "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (*Gundy*) (plurality opinion) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (*Mistretta*)); *see also J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928) (*J.W. Hampton, Jr. & Co.*). In other words, a statutory delegation is constitutional if Congress provides "standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). The test is plainly satisfied here. The Act contains specific definitions of "information service" and "telecommunications service," which enable courts to assess whether the Commission has properly classified BIAS under the Act. *See* 47 U.S.C. § 153(24), (53). Similarly, the statute provides that the Commission may engage in regulatory forbearance only if it makes certain statutorily specified determinations. *See id.* § 160(a)-(b). Thus,

(continued....)

253. To begin with, for several reasons, we do not think the major-questions doctrine properly comes into play in this context at all. For one, we are simply following the best reading of the Communications Act, as demonstrated by the statute's plain text, structure, and historical context; there is no call for deference to an interpretation that is not the statute's most natural reading.[1058]

254. Moreover, as the D.C. Circuit has recognized, the Supreme Court's *Brand X* decision establishes that the major-questions doctrine does not restrict our authority to determine the proper classification of BIAS.[1059] *Brand X* held that the Commission has the authority to determine the proper statutory classification of BIAS.[1060] If the major-questions doctrine were an obstacle to reclassification here, then it also should have applied to the earlier reclassification in that case from Title II to Title I.[1061] After all, a decision to adopt a Title I classification would simply be the obverse of a decision to adopt a Title II classification, with the same economic and political stakes (but in the opposite direction).[1062] But, in reviewing the *Cable Modem Declaratory Ruling* in *Brand X*, the Supreme Court recognized and upheld the Commission's authority to determine the proper classification of BIAS without identifying any concern over whether that classification presents a major question.[1063] Indeed, the Court identified no

---

consistent with the Constitution, the Act sets forth intelligible principles to guide the Commission in exercising its delegated authority.

[1058] *See, e.g.*, *West Virginia*, 597 U.S. at 723 (the major-questions doctrine promotes "a practical understanding of legislative intent"); *id.* at 721 (tying the doctrine to the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"); *King v. Burwell*, 576 U.S. 473, 498 (2015) ("[I]n every case we must respect the role of the Legislature, and take care not to undo what it has done. A fair reading of legislation demands a fair understanding of the legislative plan."); *see also Biden v. Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring) ("[T]he major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation."); *id.* at 2384 ("Our decision today does not 'trump' the statutory text" but "[i]nstead . . . gives Congress's words their best reading."); *cf.* Ilan Wurman, *Importance and Interpretive Questions*, 110 Va. L. Rev. (forthcoming 2024) (arguing that the major-questions doctrine makes sense only as a linguistic rule of thumb to help understand what the statutory language used by Congress most naturally means).

[1059] *USTA*, 825 F.3d at 704; *see also USTA II*, 855 F.3d at 383-88 (Srinivasan, J., concurring in denial of rehearing en banc).

[1060] *Brand X*, 545 U.S. at 980-85; *see USTA II*, 855 F.3d at 387 (Srinivasan, J., concurring in denial of rehearing en banc) (*Brand X* "involved the same statute (the Communications Act), the same agency (the FCC), the same factual context (the provision of broadband internet access), and the same issue (whether broadband BIAS providers are telecommunications providers, and hence common carriers, under the Act). *Brand X* unambiguously recognizes the agency's statutorily delegated authority to decide that issue.").

[1061] *See Brand X*, 545 U.S. at 981-82 (recognizing that the *Cable Modem Declaratory Ruling* was a "reversal of policy" from past practice of classifying broadband as including an offering of telecommunications under Title II).

[1062] We are unpersuaded by suggestions that a deregulatory Title I classification would not be a major question, yet a Title II classification would be. *See USTA II*, 855 F.3d at 425-26 n.5 (Kavanaugh, J., dissenting from denial of rehearing). The Supreme Court has construed its earlier decision in *MCI* as a "major questions" case. *See West Virginia*, 597 U.S. at 723 (citing *MCI*, 512 U.S. at 229). And in *MCI*, the Court overturned a Commission order adopting a *deregulatory* interpretation of the Act, holding that the Commission's authority to "modify" certain tariff-filing requirements did not permit elimination of the tariff-filing requirement for nondominant carriers altogether. *See MCI*, 512 U.S. at 224-34. It is therefore apparent that the major-questions doctrine applies equally to agency actions that are regulatory or deregulatory. Thus, if the major-questions doctrine applies to an interpretation that BIAS is a Title II telecommunications service, then the doctrine equally would apply to an interpretation that BIAS is a Title I information service. We therefore find that the major-questions doctrine does not resolve this issue or place a thumb on the scale in favor of one interpretation over the other.

[1063] *See USTA II*, 855 F.3d at 383-88 (Srinivasan, J., concurring in denial of rehearing en banc).

major-questions problem even though several parties expressly raised the issue.[1064]

255.    We also do not think any inference can be drawn from Congress's failure to clarify the regulatory status of BIAS one way or the other.[1065]    Failed legislation on both sides of this issue "tell[s] us little if anything about" Congress's views on the proper classification of broadband.[1066]    The record of indecision and inaction from Congress on the classification of broadband, against the backdrop of the Commission's prior actions, readily distinguishes the situation here from that in *FDA v. Brown & Williamson Tobacco Corp.*[1067]    There, the FDA asserted jurisdiction to regulate tobacco products after having "disclaimed the authority to [do so] . . . for more than eighty years," and "Congress had repeatedly legislated against this background."[1068]    By contrast, in the period since Congress enacted the 1996 Act, the Commission's treatment of broadband service has wavered between Title II and Title I and remained unsettled.[1069]    And even during much of the Title I era, the Commission repeatedly sought to enforce policies that closely resemble the open Internet rules we adopt today.[1070]    The Commission "never disclaimed any authority to regulate the Internet or Internet providers altogether, nor is there any similar history of congressional reliance on such a disclaimer."[1071]

256.    Even if the major-questions doctrine were to come into play, we do not think it would ultimately apply to the actions we take here.    To determine whether the major-questions doctrine applies,

---

[1064] *See* Br. for Resp'ts Earthlink, Inc., et al., *Brand X*, 535 U.S. 967 (2005) (Nos. 04-277 & 04-281), 2005 WL 435900, at *33-35.

[1065] Commenters point out that several bills were introduced in Congress to specify that broadband should be regulated under Title II, but were not enacted.  NCTA Comments at 27; U.S. Chamber of Commerce Comments at 57; USTelecom Comments at 31-32; WISPA Comments at 89-90.  But other bills were introduced in Congress to specify that broadband must be regulated under Title I, and those bills also failed to pass.  Numerous failed bills would have required that broadband "shall be considered to be an information service."  Open Internet Preservation Act, H.R. 2136, 116th Cong., sec. 2, § 14(e); H.R. 1101, sec. 1, § 14(e) (2019); S. 2853, 115th Cong., sec. 1, § 13(e) (2018); Open Internet Preservation Act, S. 2510, 115th Cong., sec. 2, § 13(f) (2018); Open Internet Preservation Act, H.R. 4682, 115th Cong., sec. 2, § 13(f) (2017).  Another failed bill would have required that "[t]he Commission may not impose regulations on broadband internet access service or any component thereof under title II."  Open Internet Act of 2019, H.R. 1006, 116th Cong., sec. 2, § 14(c)(1) (2019).  Three other failed bills proposed to overturn and preclude reenactment of the *2015 Open Internet Order*'s Title II classification and rules.  Restoring Internet Freedom Act, S. 993, 115th Cong., sec. 2 (2017); Restoring Internet Freedom Act, S. 2602, 114th Cong., sec. 2 (2016); Internet Freedom Act, H.R. 1212, 114th Cong., sec. 2 (2015).  And yet another bill proposed to classify broadband under a new Title VIII.  21st Century Internet Act, H.R. 6393, 115th Cong., sec. 2 (2018).  This record of unenacted legislation on both sides reflects only indecision and inaction from Congress, not that Congress discernibly refused or rejected any particular approach.

[1066] *Verizon*, 740 F.3d at 639.

[1067] 529 U.S. 120.

[1068] *Verizon*, 740 F.3d at 638 (citing *Brown & Williamson*, 529 U.S. at 143-59); *USTA*, 825 F.3d at 704 (same).

[1069] *See supra* Section III.C.2.  In the years soon after passage of the 1996 Act, the Commission classified DSL as including an offer of telecommunications service subject to Title II.  In 2002, the Commission reversed course and classified cable broadband as a single integrated offering of information service subject only to Title I (although its legal status remained uncertain, with the Ninth Circuit initially overturning that classification, until the Supreme Court upheld it in 2005).  From 2015 to 2018, the Commission regulated broadband as a Title II telecommunications service.  And then in 2018, the Commission reverted to classifying broadband as a Title I information service.

[1070] *See, e.g.*, *2005 Internet Policy Statement*, 20 FCC Rcd 13987-88, para. 4 (announcing principles "to ensure that broadband networks are widely deployed, open, affordable, and accessible to all consumers"—including that consumers are entitled "to access the lawful Internet content of their choice," "to run applications and use services of their choice," and "to competition among network providers, application and service providers, and content providers"—and providing that the Commission would "incorporate the[se] principles into its policymaking activities"); *Comcast Order*, 23 FCC Rcd 13028, *vacated by Comcast*, 600 F.3d 642; *see also supra* Section II.

[1071] *Verizon*, 740 F.3d at 638.

courts weigh several factors,[1072] including (1) "the economic and political significance" of the agency action,[1073] (2) whether the agency is "claim[ing] to discover in a long-extent statute an unheralded power,"[1074] (3) whether the action falls within the agency's "comparative expertise,"[1075] and (4) whether Congress "has consistently rejected" similar efforts.[1076]

257.    We do not think the rules we adopt today have the extraordinary economic and political effect required to implicate the major-questions doctrine.  To be sure, we believe the rules we adopt today will have substantial benefits for the American public.  But not every regulatory action that has substantial effects is so momentous as to trigger the major-questions doctrine.  BIAS providers have previously been regulated under Title II—including several years under the 2015 rules that were materially identical to those we adopt today—yet the record does not show that our past Title II rules had any extraordinary negative impact on BIAS providers or the Internet economy, which continued to flourish while those rules were in effect.  Instead, commenters arguing that our actions today cross the major-questions threshold appear to exaggerate the potential effect of this Order by focusing on the economic value of the Internet economy as a whole or the total amount of capital that has been spent to construct the Internet, rather than the effect of the specific actions we take here,[1077] or by relying on provisions that we have *forborne* from applying, or bare platitudes and *ipse dixit*.[1078]  The Internet will continue to sustain its enormous economic and social value under our actions today, just as it did under the *2015 Open Internet Order*.  And as with that *Order*, our broad forbearance from any particularly onerous requirements under Title II will significantly mitigate any economic impact on BIAS providers.  As Justice Scalia observed in his dissent in *Brand X*, "the Commission's statutory authority to forbear from imposing most Title II regulations" ensures that the economic effect of a Title II classification is "not a worry."[1079]

[1072] *See generally* Brianne J. Gorod et al., *Major Questions:  An Extraordinary Doctrine for "Extraordinary" Cases*, 58 Wake Forest L. Rev. 599, 617-27 (2023) (Gorod et al., *Major Questions*); Democracy Forward Foundation Reply at 2-6, 13.

[1073] *West Virginia*, 597 U.S. at 700 (quoting *Brown & Williamson*, 529 U.S. at 159-60).

[1074] *Id.* at 724 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[1075] *Id.* at 729 (internal quotation marks omitted).

[1076] *Id.* at 731-32.

[1077] When considering economic effects, the Supreme Court has focused on the actual magnitude of a challenged action's effect on an industry, rather than just the size of the underlying industry.  *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. at 2372 (emphasizing that the challenged policy would "release 43 million borrowers from their obligation to repay $430 billion in student loans" and that "[a] budget model issued by the Wharton School of the University of Pennsylvania estimate[d] that the program will cost taxpayers 'between $469 billion and $519 billion'"); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("While the parties dispute the financial burden on landlords, Congress has provided nearly $50 billion in emergency rental assistance—a reasonable proxy of the moratorium's economic impact.").

[1078] *See, e.g.*, ACA Connects Comments at 35-36; CTIA Comments at 75-76; Free State Foundation Comments at 12, 15-18; International Center for Law & Economics Comments at 39; NCTA Comments at 15-16, 19-22; USTelecom Comments at 30-31; U.S. Chamber of Commerce Comments at 51-53; WISPA Comments at 88; Christopher Yoo et al. Comments at 10-12.  To the extent parties have pointed to attempts to isolate the effects of Title II or the 2015 rules, we agree with the *Mozilla* court that "the Title II Order's effect on investment [is] subject to honest dispute" and that the available studies are of only "quite modest probative value" and "could only be reliably adduced as evidence of the *directionality* of broadband investment, not 'the absolute size of the change' attributable to the Title II Order," *Mozilla*, 940 F.3d at 51-55, for the reasons we discuss below.  *See infra* Section III.H.

[1079] *Brand X*, 545 U.S. at 1011-12 (Scalia, J., dissenting); *see also* T-Mobile Reply at 37-38 ("[F]orbearance could help an eventual Commission decision in this proceeding survive legal review under the major questions doctrine:

(continued….)

258.     But even if the economic and political significance of our order met the first prong of the major-questions doctrine, the other factors militate against applying it here.[1080]  In every other respect, the situation here is the antithesis of the Supreme Court's major-questions cases.

259.     To start, we are not "claim[ing] to discover in a long-extant statute an unheralded power."[1081]  There is nothing novel about the Commission's exercise of its classification power here.  On the contrary, the Commission regularly classified services under the basic–enhanced *Computer II* framework even before Congress adopted the 1996 Act;[1082] Congress effectively codified that regulatory regime into the 1996 Act under the telecommunications service and information service definitions;[1083] the Commission has continued to regularly exercise that authority under the 1996 Act, including by classifying DSL service as including a Title II telecommunications service in 1998 and classifying all BIAS as a Title II telecommunications service in 2015;[1084] and the Supreme Court expressly upheld the Commission's authority to classify broadband service in *Brand X*.[1085]  That is not some "newfound power,"[1086] but instead a power that the Commission has possessed and asserted all along.[1087]  Our exercise of that authority today thus comes as no surprise.  And given the important role that a service's classification plays under numerous provisions of the Act, as well as the persistent focus on that issue in numerous classification decisions over the years, the classification power cannot be dismissed as some

---

[1080] the more restraint the Commission exercises when applying Title II and its implementing regulations to BIAS, the stronger the argument that reclassification is not itself an issue of 'vast economic and political significance.'").

[1080] *Compare Biden v. Missouri*, 142 S. Ct. 647, 658 (2022) (Thomas, J., dissenting) ("The omnibus rule is undoubtedly significant—it requires millions of healthcare workers to choose between losing their livelihoods and acquiescing to a vaccine they have rejected for months."), *with id.* at 652-53 (per curiam) (holding that the major-questions doctrine nonetheless did not apply because the claimed authority was "not a surpris[e]" in view of "longstanding practice" and because "addressing infection problems in Medicare and Medicaid facilities is what [the agency] does"); *see also* Gorod et al., *Major Questions* at 620-21 ("It makes sense that 'extraordinary' cases triggering a departure from 'the ordinary tools of statutory interpretation' require something more than just a large economic or political impact.  After all, agencies routinely make such decisions at Congress's direction.  In 2020 alone, more than 160 agency actions met the definition of a 'major rule' under the Congressional Review Act."); *id.* at 619-20 & nn.161-62 (observing that the Supreme Court recently declined to apply the major-questions doctrine in cases having economic impact of billions of dollars per year).

[1081] *West Virginia*, 597 U.S. at 724 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[1082] *See supra* Section III.C.1.

[1083] *See supra* Section III.C.2.

[1084] *Id.*

[1085] *See Brand X*, 545 U.S. at 989 (explaining that because the term "offering" in section 153(46) admits "of two or more reasonable ordinary usages, the Commission's choice of one of them is entitled to deference"); *id.* at 992 ("[T]he statute fails unambiguously to classify the telecommunications component of cable modem service as a distinct offering.  This leaves federal telecommunications policy in this technical and complex area to be set by the Commission."); *id.* at 1002-03 ("The questions the Commission resolved in the order under review involve a subject matter [that] is technical, complex, and dynamic.  The Commission is in a far better position to address these questions than we are." (internal citation and quotation marks omitted)); *see also id.* at 1003 (Breyer, J., concurring) ("I join the Court's opinion because I believe that the Federal Communications Commission's decision falls within the scope of its statutorily delegated authority—though perhaps just barely.").

[1086] *West Virginia*, 597 U.S. at 724.

[1087] We also reject claims that our order would "effect[] a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation' into an entirely different kind."  *Id.* at 701 (quoting *MCI*, 512 U.S. at 231).  That may have been true in *MCI*, which concerned a change from "from a scheme of rate regulation in long-distance common-carrier communications to a scheme of rate regulation only where effective competition does not exist."  *MCI*, 512 U.S. at 231-32.  But under the forbearance authority that Congress added to the Communications Act in response to that case, our Order today specifically forbears from any tariff-filing requirements or rate regulation, ensuring that our classification decision will not alter those fundamental aspects of the regulatory scheme.

mere "'ancillary provision[]' of the Act . . . that was designed to function as a gap filler and had rarely been used in the preceding decades."[1088]

260.    On top of that, regulating communications services and determining the proper regulatory classification of broadband falls squarely within the Commission's wheelhouse.  Regulating communications networks "is what [the Commission] does,"[1089] consistent with our statutory mandate to "regulat[e] interstate and foreign commerce in communications by wire and radio so as to make available . . . a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities at reasonable charges."[1090]  No one should be surprised to see the Commission classifying and regulating communications services.  Our action today is thus nothing like the Centers for Disease Control and Prevention seeking to regulate evictions,[1091] the Occupational Safety and Health Administration seeking to regulate non-occupational public health hazards,[1092] the Internal Revenue Service addressing healthcare policy,[1093] or the Attorney General making medical judgments.[1094]  In contrast to those cases, our Order today falls directly within the agency's core statutory responsibility.[1095]

261.    The regulatory issues we address today also fall squarely within the Commission's technical and policy expertise.  The issues here "turn[] . . . on the factual particulars of how Internet technology works and how it is provided,"[1096] and they "involve a 'subject matter [that] is technical, complex, and dynamic,'" which the agency is well positioned "to address" through "its expert policy judgment."[1097]  In light of that relevant expertise, it is entirely appropriate and unsurprising that Congress would "leave[] federal telecommunications policy in this technical and complex area to be set by the Commission."[1098]

262.    For the reasons explained above, we also do not believe that, on the facts here, anything can be inferred from Congress's failure to clarify the regulatory status of broadband one way or the other.  Against a pre-1996 Act backdrop in which the Commission regularly classified emerging services as either basic services (now known as telecommunications services) or enhanced services (now known as information services), Congress essentially adopted that framework in the 1996 Act.[1099]  But Congress chose not to directly specify *which* classification applies to broadband, which the Supreme Court understood in *Brand X* as "leav[ing] it to the Commission to resolve in the first instance" in the exercise of its expert technical and policy judgment.[1100]  In the years since *Brand X*, Congress has failed to adopt several bills that would require broadband to be regulated under Title I and has also failed to adopt several

---

[1088] *West Virginia*, 597 U.S. at 710.

[1089] *Biden v. Missouri*, 142 S. Ct. at 653.

[1090] 47 U.S.C. § 151.

[1091] *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021) (per curiam).

[1092] *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022) (per curiam) (Whereas "the Act's provisions typically speak to hazards that employees face at work, . . . . no provision of the Act addresses public health more generally, which falls outside of OSHA's sphere of expertise.").

[1093] *See King v. Burwell*, 576 U.S. 473, 486 (2015).

[1094] *See Gonzales v. Oregon*, 546 U.S. 243, 266-67 (2006).

[1095] *Cf. Verizon*, 740 F.3d at 639 ("FCC regulation of broadband providers is no elephant, and section 706(a) is no mousehole.").

[1096] *Brand X*, 545 U.S. at 991.

[1097] *Id.* at 1002-03 (quoting *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 339 (2002)).

[1098] *Brand X*, 545 U.S. at 992.

[1099] *See supra* Section III.C.2.

[1100] *Brand X*, 545 U.S. at 991; *see also id.* at 992, 1002-03.

bills that would instead provide for broadband to be regulated under Title II. Rather than casting any doubt on our regulatory authority, we think this recent stalemate leaves in place the prior understanding articulated in *Brand X*—i.e., that the Communications Act "leaves federal telecommunications policy in this technical and complex area to be set by the Commission."[1101]

263. The situation here again stands in stark contrast to *Brown & Williamson*. In that case, the Court "d[id] not rely on Congress' failure to act" as casting doubt on agency action, but instead on *affirmative* action by Congress that appeared to chart an incompatible course.[1102] There is no comparable record of incompatible action by Congress here. Here, the only affirmative action Congress has taken on broadband regulation in recent years was a 2017 resolution to invalidate broadband privacy rules promulgated by the Commission under section 222 of the Act.[1103] That resolution overturned only a specific set of privacy rules while leaving in place the underlying Title II classification and other rules that were then in effect, and so casts no doubt on the actions we take today.[1104]

264. Finally, in the event that (despite all the considerations above) the major-questions doctrine does apply here, we nonetheless think our authority to classify and regulate broadband is sufficiently clear under the Communications Act. We agree with the D.C. Circuit that the Supreme Court already held as much in *Brand X*, in which "the Supreme Court expressly recognized that

---

[1101] *Id.* at 992; *see also MCI*, 512 U.S. at 232-33 ("Both sides of this dispute contend that Congress has manifested in later legislation agreement with their respective interpretations of the Communications Act. . . . At most, these conflicting arguments indicate that Congress was aware of the decade-long tug of war . . . over the [issue], and at different times proceeded on different assumptions as to who would win. We have here not a consistent history of legislation to which one or the other[] interpretation of the Act is essential; but rather two pieces of legislation to which first one, and then the other, interpretation of the Act is more congenial. That is not enough to change anything.").

[1102] *Brown & Williamson*, 529 U.S. at 155-156 (emphasizing that "Congress has enacted several statutes . . . creating a distinct regulatory scheme for" tobacco products which "is, in an important respect, incompatible with FDA jurisdiction"; that it "enacted this legislation against the background of the FDA repeatedly and consistently asserting that it lacks jurisdiction" over tobacco products; that "Congress has persistently acted to preclude a meaningful role for *any* administrative agency in making policy on the subject of tobacco and health"; and that "Congress'[s] tobacco-specific legislation has effectively ratified the FDA's previous position that it lacks jurisdiction to regulate tobacco"); *see also Ala. Ass'n of Realtors*, 141 S. Ct. at 2486-87, 2489-90 (finding that Congress's affirmative enactment of a pair of time-limited eviction moratoria that it then opted not to renew contravened the CDC's effort to effect an extended and more open-ended moratorium without legislative authorization).

[1103] *See* Resolution of Disapproval, Pub. L. No. 115-22, 131 Stat. 88 (2017) (Resolution of Disapproval).

[1104] We disagree with USTelecom's contention that Congress's authorization of the BEAD grant program somehow bears on the classification of BIAS under the Communications Act. *See* USTelecom Comments at 32. USTelecom observes that, in authorizing that program, section 60102(h)(5)(D) of the IIJA states that "[n]othing in this title"— meaning Title I of Division F of the IIJA—"may be construed to authorize the Assistant Secretary [of Commerce] or the National Telecommunications and Information Administration to regulate the rates charged for broadband service." Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, § 60102(h)(5)(D), 135 Stat. 429, 1201 (IIJA). But a disclaimer that Congress was not authorizing *the Department of Commerce or its subagency* to regulate broadband rates as part of a subsidy program that exists outside the Communications Act does not speak at all to how the Commission may or should administer the Communications Act. And even if the IIJA had adopted a broader prohibition on any rate regulation under the Communications Act—something that this Order does not impose, and indeed affirmatively forbears from—that would not speak to other forms of common-carriage treatment or to the rules we adopt today prohibiting blocking, throttling, and paid prioritization. On its face, the IIJA is entirely agnostic about how BIAS should be classified under the Communications Act and whether the Commission should have the power to impose the rules we adopt today. If Congress wanted to prohibit Title II regulation of broadband in the IIJA or to otherwise restrict the Commission's authority, it surely could have done so, but USTelecom errs in trying to read into the IIJA an unstated prohibition that Congress nowhere adopted.

Congress . . . had delegated to the Commission the power to regulate broadband service."[1105]  Indeed, in a subsequent major-questions case, the Court expressly pointed to *Brand X* as a case finding that the agency's "authority is clear" based on "the language of the statute itself."[1106]  That conclusion from the statute was clearly correct.  The Communications Act is full of provisions that depend on whether a service is classified as a telecommunications service or an information service.  The Commission cannot administer those provisions without first deciding how a service should be classified.  To that end, section 4(i) of the Act expressly empowers the Commission to "perform any and all acts, make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions."[1107]  Likewise, section 201(b) empowers the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of" the Act.[1108]  And section 303(r) again empowers the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions . . . as may be necessary to carry out the provisions of" the Act.[1109]  The grant of authority required under the major-questions doctrine "may come from specific words in the statute, but context can also do the trick," including "[s]urrounding circumstances, whether contained within the statutory scheme or external to it."[1110]  Here, as the Supreme Court has opined in numerous Commission-related cases, "[i]t suffices . . . [that] Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication," and the Commission necessarily must be able to assess the proper classification of BIAS "in the exercise of that authority."[1111]

### G. Preemption of State and Local Regulation of Broadband Service

265.    Consistent with the Commission's approach in the *2015 Open Internet Order*, we will exercise our authority to preempt any state or local measures that interfere or are incompatible with the federal regulatory framework we establish today.[1112]  And as in the *2015 Open Internet Order*, we will

---

[1105] *USTA*, 825 F.3d at 704; *accord USTA II*, 855 F.3d at 383 (Srinivasan, J., concurring in denial of rehearing en banc) ("[A]ssuming . . . that the rule in this case qualifies as a major one . . . the question posed by the doctrine is whether the FCC has clear congressional authorization to issue the rule.  The answer is yes.  Indeed, we know Congress vested the agency with [this] authority . . . because the Supreme Court has specifically told us so [in *Brand X*].");  *id.* at 384 ("[T]he Court made clear in its decision—over and over—that the Act left the matter to the agency's discretion.");  *id.* at 385 ("[T]he question then is whether the [FCC] clearly has authority under the Act to make that choice.  In *Brand X*, the Supreme Court definitively—and authoritatively, for our purposes as an inferior court— answered that question yes.");  *id.* at 387 (*Brand X* "involved he same statute (the Communications Act), the same agency (the FCC), the same factual context (the provision of broadband internet access), and the same issue (whether broadband BIAS providers are telecommunications carriers, and hence common carriers, under the Act).  *Brand X* unambiguously recognizes the agency's statutorily delegated authority to decide that issue.").

[1106] *Gonzalez v. Oregon*, 546 U.S. 243, 289 (2006).

[1107] 47 U.S.C. § 154(i).

[1108] 47 U.S.C. § 201(b).

[1109] 47 U.S.C. § 303(r).

[1110] *Biden v. Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring).

[1111] *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013); *see also Brand X*, 545 U.S. at 980 ("Congress has delegated to the Commission the authority to 'execute and enforce' the Communications Act and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act." (citations omitted));  *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999) (*Iowa Utils. Bd.*) ("We think that the grant in §201(b) means what it says: The FCC has rule-making authority to carry out the 'provisions of this Act' . . . .");  *United States v. Storer Broad. Co.*, 351 U.S. 192, 202-03 (1956) (*Storer*) (Sections 4(i) and 303(r) "grant general rulemaking power" as is "necessary for the ordinary conduct of [the Commission's] business," recognizing that the Commission's "authority covers new and rapidly developing fields" and that "[t]he Communications Act must be read as a whole and with appreciation for the responsibilities of the body charged with its fair and efficient operation.").

[1112] *See 2015 Open Internet Order*, 30 FCC Rcd at 5804, para. 433.

proceed incrementally by considering such measures on a case-by-case basis as they arise "in light of the fact specific nature of particular preemption inquiries."[1113]

266. Commenters broadly agree that Title II gives the Commission authority to preempt state or local requirements that interfere with our exercise of federal regulatory authority over interstate communications.[1114] Under a doctrine known as the impossibility exception to state jurisdiction, the Commission may, in the exercise of its preeminent federal regulatory authority over interstate communications, preempt state law when (1) it is impossible or impracticable to regulate the intrastate use of a communications service without affecting interstate communications, and (2) state regulation would interfere with the Commission's exercise of its authority to regulate interstate communications.[1115] General principles of conflict preemption also lead to the same conclusion.[1116]

267. The D.C. Circuit held in *Mozilla* that the Commission could not invoke the impossibility exception to preempt state law after it classified BIAS as an information service under Title I.[1117] But that was because "[c]lassifying broadband as an information service . . . placed broadband *outside* of [the Commission's] Title II jurisdiction," and "in any area where the Commission lacks the authority to

---

[1113] *Id.*; *cf. Mozilla*, 940 F.3d at 81-82 ("Because a conflict-preemption analysis involves fact-intensive inquiries . . . [w]ithout the facts of any alleged conflict before us, we cannot begin to make a conflict-preemption assessment in this case, let alone a categorical determination . . . ." (internal quotation marks omitted)). We reject requests by some parties that advocated for changes to specific elements of our preemption discussion in this section. *See, e.g.*, Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 2 (filed Apr. 5, 2024); Letter from Matthew A. Brill, Counsel for NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 2-5 (filed Apr. 15, 2024); Letter from Scott K. Bergmann, Senior Vice President, Regulatory Affairs, CTIA, et al., to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 5 (filed Apr. 16, 2024); Letter from Jenna Leventoff, ACLU, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 1 (filed Apr. 19, 2024); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 3-4 (filed Apr. 16, 2024); Letter from Cristina Chou, Vice President, Altice USA Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 1-3 (filed Apr. 17, 2024). We are not persuaded to depart from our description of the basic preemption framework here, particularly given our approach of generally deferring specific preemption analyses to future case-by-case assessments where the relevant issues can be fully vetted as warranted.

[1114] *See, e.g.*, CTIA Comments at 107-108; Pennsylvania PUC Comments at 7-8; Public Knowledge Comments at 98; T-Mobile Comments at 50 n.162.

[1115] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 429-31, paras. 198-201; *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, Memorandum Opinion and Order, 19 FCC Rcd 22404, 22413-15, 22418-24, paras. 17-19, 23-32 (2004) (*Vonage Preemption Order*); *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007) (*Minnesota PUC*) ("[T]he 'impossibility exception' of 47 U.S.C. § 152(b) allows the FCC to preempt state regulation" when "federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies."); *California v. FCC*, 39 F.3d 919, 931-33 (9th Cir. 1994) (*California III*); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375 n.4 (1986) (*Louisiana PUC*) ("FCC pre-emption of state regulation [has been] upheld where it was *not* possible to separate the interstate and intrastate components of the asserted FCC regulation."); *Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198, 214 (D.C. Cir. 1982) ("Courts have consistently held that when state regulation of intrastate equipment or facilities would interfere with achievement of a federal regulatory goal, the Commission's jurisdiction is paramount and conflicting state regulations must necessarily yield to the federal regulatory scheme.").

[1116] "Under ordinary conflict pre-emption principles[,] a state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law is preempted." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). In *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2002), for example, the Court "found that [a] state law stood as an obstacle to the accomplishment of a significant federal regulatory objective" embodied in Department of Transportation regulations and was therefore preempted.

[1117] *Mozilla*, 940 F.3d at 76-78.

regulate, it equally lacks the power to preempt state law."[1118] Because our Order today restores and rests on the broad regulatory authority conferred on the Commission by Title II, *Mozilla* does not cast any doubt on the Commission's power, under the impossibility exception as well as ordinary principles of conflict preemption, to preempt state law when exercising—or when forbearing from—our affirmative regulatory authority over broadband.[1119]

268.    We decline requests to categorically preempt all state or local regulation affecting BIAS in the absence of any specific determination that such regulation interferes with our exercise of federal regulatory authority.[1120]  The Act establishes a dual federal–state regulatory system in which the federal government and the states may exercise concurrent regulatory authority over communications networks.[1121]  While the Commission has occasionally described the Internet as "jurisdictionally interstate" or "predominantly interstate,"[1122] we cannot find it to be *exclusively* interstate.  BIAS providers operate in and significantly affect local markets,[1123] and there are intrastate aspects of BIAS providers' operations that could reasonably be handled differently in different jurisdictions.[1124]  The Commission has previously stated that "whenever possible," preemption should be applied "narrow[ly]" in order "to

---

[1118] *Id.* at 75-76; *see id.* at 77-78 ("[T]he impossibility exception presupposes the existence of statutory authority to regulate"); *accord ACA Connects v. Bonta*, 24 F.4th 1233, 1239-40, 1242-43 (9th Cir. 2022) (agreeing with *Mozilla* that "[b]y reclassifying broadband as an information service, the FCC surrendered its authority to regulate with respect to net neutrality," which "also stripped it of its power to preempt").

[1119] *Mozilla*, 940 F.3d at 80 ("The Commission could choose to enact heavier or lighter regulation under Title II by exercising less or more of its Title II forbearance authority, with symmetrical 'preemption implications.'"); *cf. ACA Connects*, 24 F.4th at 1244; *see* 47 U.S.C. § 202(b) (providing rulemaking authority to ensure just and reasonable rates and practices); *id.* § 253(d) (providing express authority to preempt state or local barriers to telecommunications service); *id.* § 160(e) (providing that states "may not continue to apply or enforce any provision of [the Act] that the Commission has determined to forbear from applying"); *id.* § 556(c) ("[A]ny provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded."); *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable TV Consumer Protection and Competition Act of 1992*, Third Report and Order, 34 FCC Rcd 6844, 6890, para. 81 (2019) ("The reference in section 636(c) to 'this chapter' means that Congress intended to preempt any state or local law (or any franchise provision) that is inconsistent with any provision of the Communications Act, whether or not codified in Title VI."). We reiterate, as we have in the past, that the reclassification decision made herein provides no justification for a state or local franchising authority to require a party with a franchise to operate a cable system under Title VI of the Act, to obtain an additional or modified franchise in connection with the provision of BIAS, or to pay any new franchise fees in connection with the provision of such services. *See 2015 Open Internet Order*, 30 FCC Rcd at 5804, para. 433 n.1285.

[1120] *See, e.g.*, ACA Connects Comments at 45-48; ACA Connects Reply at 40; Lumen Comments at 30-31; NRECA Comments at 12-13; Letter from Scott K. Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Mar. 20, 2024). *But see* 47 CFR § 76.43; *City of Eugene v. FCC*, 998 F.3d 701, 710-16 (6th Cir. 2021). Because we think preemption decisions will, at least in general, best be reached on a record specific to whether and how a state or local regulation conflicts with our federal requirements, we also decline at this time to preempt specific state or local regulations insofar as we lack a specific and robust record in this proceeding.

[1121] *Mozilla*, 940 F.3d at 81 (discussing "the Communications Act's vision of dual federal-state authority and cooperation in this area"); *see Louisiana PSC*, 476 U.S. at 360 (rejecting the view that the Act could "divide the world of [communications regulation] neatly into two hemispheres").

[1122] *See RIF Order*, 33 FCC Rcd at 429-30, para. 199 & n.739.

[1123] *See, e.g.*, Tejas N. Narechania Comments at 14-15.

[1124] For example, different laws might apply to customer relationships and billing practices depending on a customer's billing or service address.

accommodate differing state views while preserving federal goals."[1125]  And as the Commission recognized even in the *RIF Order*, it would be inappropriate to "disturb or displace the states' traditional role in generally policing such matters as fraud, taxation, and general commercial dealings."[1126]  Where state or local laws do unduly frustrate or interfere with interstate communications, however, we have ample authority to address and preempt those laws on a case-by-case basis as they arise.  We will not hesitate to exercise that authority.[1127]

269.     California's Internet Consumer Protection and Network Neutrality Act of 2018, also known as SB-822,[1128] appears largely to mirror or parallel our federal rules.  Thus we see no reason at this time to preempt it.[1129]  The law's legislative history states that it was specifically designed to "codify portions of the [then]-rescinded Federal Communications Commission rules" by "recast[ing] and implement[ing] the 'bright line rules' . . . established in the 2015 Open Internet Order."[1130]  To that end, the California law makes it "unlawful" for any BIAS provider to engage in "blocking," throttling (i.e., "[i]mpairing or degrading" Internet traffic), or "paid prioritization."[1131]  The law also prohibits BIAS providers from "unreasonably interfering" with or "unreasonably disadvantaging" Internet content or services, similar to our general conduct rule.[1132]  And the law includes a disclosure requirement that closely resembles our transparency rule.[1133]

270.     On its face, the California law generally tracks the federal rules we restore today, including the bright-line rules prohibiting blocking, throttling, and paid-prioritization, as well as the general conduct rule and transparency disclosures.  A state law that requires regulated parties to comply with the same requirements that already apply under federal law is by definition unlikely to interfere with or frustrate those federal rules.

271.     Nor do we see any reason at this time to preempt California from independently enforcing the requirements imposed by our rules or by the state's parallel rules through appropriate state enforcement mechanisms.  On the contrary, we think state enforcement generally supports our regulatory efforts by dedicating additional resources to monitoring and enforcement, especially at the local level, and thereby ensuring greater compliance with our requirements.[1134]  However, should California state

---

[1125] *Computer III Remand Proceedings: Bell Operating Company Safeguards and Tier I Local Exchange Company Safeguards*, Report and Order, 6 FCC Rcd 7571, 7631, para. 121 (1991), *pets. for review denied in relevant part*, *California III*, 39 F.3d at 931-33.

[1126] *RIF Order*, 33 FCC Rcd at 428-20, para. 196; *see also Vonage Preemption Order*, 19 FCC Rcd at 22405, para. 1 (recognizing states' "vital role in protecting consumers from fraud, enforcing fair business practices, for example, in advertising and billing, and generally responding to consumer inquiries and complaints").

[1127] *Cf. 2015 Open Internet Order*, 30 FCC Rcd at 5804, para. 433 ("[W]e will act promptly, whenever necessary, to prevent state regulations that would conflict with the federal regulatory framework or otherwise frustrate federal broadband policies.").

[1128] Senate Bill No. 822, ch. 976, 2018 Cal. Stat. 89 (codified at Cal. Civil Code §§ 3100-3104).

[1129] *Cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996) (state-law requirements not preempted "when those duties parallel federal requirements" and "merely provide[] another reason for [regulated parties] to comply with identical existing requirements under federal law" (internal quotation marks omitted)).

[1130] Cal. S. Judiciary Comm., SB-822 Analysis 1, 3 (Apr. 23, 2018).

[1131] Cal. Civil Code § 3101(a)(1)-(2), (4); *see also id.* § 3101(a)(3)(B)-(C) (prohibiting charges to avoid blocking or throttling).

[1132] Cal. Civil Code § 3101(a)(7)(A).

[1133] Cal. Civil Code § 3101(a)(8).

[1134] *See* ACLU Comments at 14; CPUC Comments at 8-9; CPUC Reply at 7; CWA Reply at 14-15; Tejas N. Narechania Comments at 16-17; New America's Open Technology Institute Reply at 10-11; Public Knowledge Comments at 97-98, 100.

enforcement authorities or state courts seek to interpret or enforce these requirements in a manner inconsistent with how we intend our rules to apply, we will consider whether appropriately tailored preemption is needed at that time.

272.     Some parties suggest that the California law might go further than our federal requirements with respect to interconnection or zero-rating.[1135]  We are not persuaded on the record currently before us that the California law is incompatible with the federal rules we adopt today with respect to either issue.  As to the former, California prohibits BIAS providers from requiring interconnection agreements "that have the purpose or effect of evading the other prohibitions" by blocking, throttling, or charging for traffic at the interconnection point.[1136]  We have likewise stated in this Order that BIAS providers may not engage in interconnection practices that circumvent the prohibitions contained in the open Internet rules.[1137]  As to the latter, California restricts zero-rating when applied discriminatorily to only a subset of "Internet content, applications, services, or devices in a category" or when performed "in exchange for consideration, monetary or otherwise, from a third party."[1138]  We have likewise explained in this Order that sponsored-data programs—where a BIAS provider zero rates an edge product in exchange for consideration (monetary or otherwise) from a third party or where a BIAS provider *favors* an affiliate's edge products—raise concerns under the general conduct standard.[1139]  The California Attorney General represents that these provisions of California law "are consistent with, and not in conflict with, the Commission's proposal" that we adopt today, because the Commission has "included protections against interconnection circumvention" and stated that we "may take action against zero-rating practices under the general conduct provision on a case-by-case basis."[1140]  Nothing in the record gives us any reason to doubt that representation.  The California law has been in effect since early 2022, yet there is no record evidence that these provisions have unduly burdened or interfered with interstate communications service.[1141]  And in contrast to our treatment of rate regulation, from which we have affirmatively forborne, we have not determined that regulation of zero-rating and interconnection is detrimental, leaving room for states to experiment and explore their own approaches within the bounds of our overarching federal framework.

273.     We caution, however, that we stand ready to revisit these determinations if evidence arises that state policies are creating burdens on interstate communications that interfere or are incompatible with the federal regulatory framework we have established.  Our determination here simply reflects that no convincing evidence has been presented to us in this proceeding.

274.     A group of California Independent Small LECs ask us to preempt several CPUC decisions regulating rates for intrastate telephone service, insofar as those telephone service rates take into account a company's broadband revenues or those of its affiliates.[1142]  We find that those decisions are

---

[1135] *See* ACA Connects Reply at 42-43; N.Y. State School Boards Association Comments at 3; Public Knowledge Comments at 100; WGA Comments at 7-8.  Notably, most of these commenters express support for these requirements and urge against preempting them.

[1136] Cal. Civil Code § 3101(a)(9).

[1137] *See infra* Section V.D.

[1138] Cal. Civil Code §§ 3100(t), 3101(a)(5)-(6).

[1139] *See infra* Section V.B.2.

[1140] California AG Bonta Comments at 2.

[1141] *See id.* at 4 ("The Commission requested comment on whether state net neutrality laws pose a regulatory or compliance burden on ISPs . . . . The answer is a resounding no. . . . There is no evidence to support the view that large ISPs cannot afford to comply with net neutrality laws like SB 822 and, in general, the market appears to be complying with California law without operational issue.").

[1142] California Independent Small LECs Comments at 24-27; California Independent Small LECs Reply at 7-9. Specifically, the California Independent Small LECs seek to preempt CPUC Decisions 21-04-005, 21-08-042, 23-

(continued….)

outside the scope of this proceeding, which concerns the regulatory framework that applies to BIAS, not rates for or regulation of traditional telephone service.[1143]  The California Independent Small LECs or other parties are free to raise this issue in an appropriate proceeding, but we express no views on it here.

275.     Some commenters ask us to address more broadly the extent of state authority to adopt broadband affordability programs.[1144]  The comments received in this proceeding do not contain a focused and robust record or discussion concerning any particular state broadband affordability program, so we decline to address any particular program here.  Nevertheless, we find that states have a critical role to play in promoting broadband affordability and ensuring connectivity for low-income consumers.[1145]  We also clarify that the mere existence of a state affordability program is not rate regulation.[1146]

### H.     Impact of Reclassification on Investment

276.     Consistent with our tentative conclusion in the *2023 Open Internet NPRM*,[1147] and contrary to the conclusion reached in the *RIF Order*, we find arguments that the reclassification of BIAS would lead to a substantial adverse impact on BIAS investment to be unsubstantiated.  In the *RIF Order*, the Commission's primary policy justification for reclassifying BIAS as a Title I information service was its conclusion regarding the alleged harm to investment by Title II classification.[1148]  However, the *RIF Order* failed to consider the evidence to the contrary, including the *2015 Open Internet Order*'s evidence that investment in mobile voice and DSL thrived during the period in which they were regulated as Title II services.[1149]  As the record in this proceeding clearly shows, the impact of reclassification on BIAS investment is uncertain.  This finding comports with the literature on open Internet regulations, the available empirical evidence, and the literature on regulation more broadly.

277.     Commenters disagree as to whether reclassification of BIAS as a Title II service will discourage investment in broadband infrastructure or the Internet generally.  Several commenters contend that the current classification of BIAS as a Title I information service fosters investment, claim that investment increased following the *RIF Order*, and raise the concern that reclassification of BIAS under Title II will increase regulatory burdens and uncertainty, leading to a reduction in investment and

---

01-004, and 23-02-008, as well as certain proposed decisions, and/or the underlying California Public Utilities Code provisions to the extent they have been interpreted to support those decisions.

[1143] *See* CPUC Reply at 12-13.

[1144] *See, e.g.*, Letter from Nat Purser, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, at 2-3 (Apr. 15, 2023); Digital Liberty Letter at 3.

[1145] The BEAD grant program established by the IIJA, for example, requires state BEAD programs to ensure that ISPs offer a "low-cost broadband service option" for eligible subscribers.  47 U.S.C. § 1702(h)(4)(B), (h)(5).

[1146] *See infra* Section IV.C.1. (describing the Commission's forbearance from rate regulation).

[1147] *2023 Open Internet NPRM* at 32, para. 56.

[1148] *RIF Order*, 33 FCC Rcd at 362-63, paras. 86-87.  The *RIF Order* also advanced two additional policy rationales for reclassifying BIAS under Title I:  (1) a claim that there were no demonstrated harms and that BIAS providers would be incentivized to maintain Internet openness; and (2) a claim that existing consumer protection and competition laws were sufficient to protect an open Internet.  *See id.* at 364-403, paras. 88-154.  As we discuss further below, we also disagree with the *RIF Order*'s analysis regarding these policy justifications.  *See infra* Sections V.A.3, V.A.4 (explaining that BIAS providers have the incentive and ability to harm an open Internet and that the *RIF Order*'s framework is insufficient to safeguard an open Internet).

[1149] *See 2015 Open Internet Order*, 30 FCC Rcd at 5612-13, para. 39 ("History demonstrates that this careful approach to the use of Title II will not impede investment.  First, mobile voice services have been regulated under a similar light-touch Title II approach since 1994—and investment and usage boomed. . . . And, of course, wireline DSL was regulated as a common-carrier service until 2005—including a period in the late '90s and the first five years of this century that saw the highest levels of wireline broadband infrastructure investment to date."); *see also Wireline Broadband Classification Order*, 20 FCC Rcd at 14858, para. 5.

innovation.[1150]  AT&T argues that investment decisions depend on long-run:  (1) expected costs (including the costs of regulatory compliance), (2) expected revenues, and (3) the degree of uncertainty about costs and revenues; and it claims that Title II regulation would worsen all three.[1151]  WISPA contends that regulatory compliance costs will disproportionately impact small service providers that lack the resources to handle the new compliance obligations.[1152]  Several commenters claim that Title II classification, particularly the application of a general conduct rule, would increase uncertainty and therefore chill investment and innovation.[1153]  Commenters also claim that application of section 214 to BIAS would create a regulatory burden and reduce network investment and innovation.[1154]  Finally, many commenters claim that applying public-utility style regulation to the Internet would result in high prices and chronic underinvestment.[1155]

278.    Other commenters argue that Title II reclassification would not reduce investment or innovation, and that there is no evidence that the *2015 Open Internet Order* reduced BIAS investment or that investment increased following the 2017 *RIF Order*.[1156]  Some of these commenters offer evidence that in fact the opposite occurred:  BIAS deployment and investment increased following the *2015 Open Internet Order* and declined following the 2017 *RIF Order*.[1157]  The California Independent Small LECs argue that adopting Title II with strong forbearance, as we do here, would increase investment incentives by reducing uncertainty due to our rules preempting potentially different regulatory regimes within each state.[1158]

279.    We disagree with those commenters that argue our application of Title II with broad forbearance would reduce investment incentives or innovation.  Regulation is but one of several factors that drive investment and innovation in the telecommunications and digital-media markets.[1159]

---

[1150] AT&T Comments at 3-10;  U.S. Chamber of Commerce Comments at 15-21;  Comcast Comments at 3-8, 33-34;  Verizon Comments at 3-7;  Free State Foundation Comments at 15-20; ACI Comments at 4-5, 15-16;  ACA Connects Comments at 6;  USTelecom Comments at 61-64; Americans for Tax Reform Comments at 4;  Richard Bennett Comments at 4;  FAI et al. Comments at 3, 20; Scalia Law Administrative Law Clinic Comments at 3-4;  SBEC Comments at 2;  Spence Purnell (filed on behalf of Reason Foundation) Comments at 2-3;  WISPA Comments at 18-19 and 25;  ITIF Comments at 4;  Phoenix Center Comments at 1-3; CEI Comments at 11-12;  R Street Institute Apr. 16, 2024 Statement at 1.

[1151] AT&T Comments at 4.

[1152] WISPA Comments at 27-30, 42-43.

[1153] CTIA Comments at 97; CEI Comments at 11-12; U.S. Chamber of Commerce Comments at 66; T-Mobile Comments at 20; USTelecom Comments at 54-59; TIA Comments at 6-7; ITIF Comments at 8; NCTA Comments at 21-22; NCTA Comments Exh. A, Declaration of Mark Israel, Brian Keating & Allan Shampine at 7 (Mark Israel et al. Declaration).

[1154] *See, e.g.*, CTIA Comments at 35; ACA Connects Comments at 51-53; AT&T Comments at 28; USTelecom Comments at 102-03; WISPA Comments at 66.

[1155] Comcast Comments at 5, 8; NCTA Comments at 47, 91; CEI Comments at 5-11; ITIF Comments at 4.

[1156] Free Press Comments at 74-120; NHMC Comments at 5-6; Letter from S. Derek Turner, Senior Advisor, Yanni Chen, Policy Counsel, and Matthew F. Wood, VP of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 1-2 (filed Apr. 1, 2024) (Free Press Apr. 1, 2024 *Ex Parte*).

[1157] Free Press Comments at 80-116.

[1158] California Independent Small LECs Comments at 3.

[1159] *See, e.g.*, Knut Blind, *The Influence of Regulations on Innovation:  A Quantitative Assessment for OECD Countries*, 41 Rsch. Pol'y 391, 393, 399 (2012) (Knut Blind, *The Influence of Regulations on Innovation*) (discussing how the interaction of different types of regulation with industry characteristics impacts investment incentives, including when regulation forces firms to make significant innovations to meet new standards, and how important regulations that support the foundation of new enterprises are to innovation, exactly what our rules do for edge providers); *see also* Knut Blind, *The Impact of Regulation on Innovation*, *in* The Handbook of Innovation

(continued....)

Regulation interacts with demand conditions, innovation opportunities created by technological advances, and the competitive intensity of markets.[1160] Appropriate regulation is often required to create market conditions that support infrastructure investment, as regulation can enhance competition, mitigate transaction costs between market players, and otherwise reduce market uncertainty, thus boosting investment and innovation.[1161] We find that the approach we take today will foster a more competitive broadband marketplace, increase overall regulatory certainty, and provide a more level playing field for all market participants. We acknowledge that regulation generally, and open Internet regulations in particular, can affect market participants differently. On balance, however, we conclude that our approach is unlikely to reduce, and would likely promote, overall investment and innovation in the Internet ecosystem.[1162]

280. The *RIF Order* and at least one commenter argue that regulation in general, and the prospect of future price regulation in particular, which we clearly disclaim, will chill BIAS provider investment.[1163] However, research on the relationship between regulation and investment shows that the impact of regulation is more nuanced. For example, the findings of empirical research on how Commission regulations concerning the provision and pricing of network elements affected investment reaches different conclusions with respect to incumbent firms and competitors.[1164] Thus, a generic claim

---

Policy Impact 450 (Jakob Edler et al. eds., 2016) (Knut Blind, *The Impact of Regulation on Innovation*). Given the varying factors that underlie BIAS providers' investment decisions, we are not persuaded by CTIA and NCTA's cursory assertions that our classification decision would upset their investment-backed reliance interests. CTIA Comments at 86; CTIA Reply at 57, 61; NCTA et al. Reply at 36.

[1160] Knut Blind, *The Impact of Regulation on Innovation* at 451 (explaining that generally regulations can encourage innovation, and that even a regulation that discourages innovation in the short run can in the long run encourage innovation).

[1161] *See* Johannes M. Bauer & Erik Bohlin, *Regulation and Innovation in 5G Markets*, 46 Telecomm. Pol'y 1, 6-11 (2022).

[1162] *See* Benjamin E. Hermalin & Michael L. Katz, *The Economics of Product-Line Restrictions with an Application to the Network Neutrality Debate*, 19 Info. Econ. & Pol'y 215 (2007); *see also* Shane Greenstein et al., *Net Neutrality: A Fast Lane to Understanding the Trade-Offs*, 30 J. Econ. Perspectives 127 (2016); *cf.*, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*; *Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, CC Docket Nos. 96-98, 95-185, First Report and Order, 11 FCC Rcd 15499 (1996) (*Local Competition First Report and Order*) (implementing the 1996 Act, which, *inter alia*, attempted to open local telecommunications markets to competition by imposing several obligations on ILECs—such as the obligation to interconnect at any technically feasible point, the obligation to provide non-discriminator access to network elements on an unbundled basis, the obligation to provide physical collocation of equipment within ILEC premises, and the obligation to offer retail services to competitors for resale at regulated wholesale rates)—while imposing significantly fewer obligations on competitive local exchange carriers).

[1163] *See RIF Order*, 33 FCC Rcd at 368-71, paras. 99-102; ACA Connects Comments 40-47.

[1164] To facilitate new entry into the local exchange market, the Telecommunications Act of 1996 required an ILEC to, among other things, offer new competitive carriers interconnection at any technically feasible point in the ILEC's network, access to unbundled network elements (UNEs) on a rate-regulated basis, and make retail services available for resale at regulated wholesale rates. 47 U.S.C. § 251(c)(2)-(4); *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-98, Notice of Proposed Rulemaking, 11 FCC Rcd 14171, 14177, para. 10 (1996). Researchers have reached different conclusions regarding how the Commission's implementation of this requirement has affected ILEC and CLEC investment. *See, e.g.*, Jerry A. Hausman & J. Gregory Sidak, *Did Mandatory Unbundling Achieve Its Purpose? Empirical Evidence from Five Countries*, 1 J. Competition L. & Econ. 173 (2005) (arguing, based on empirical evidence and a review of other studies, that mandatory unbundling does not serve as a stepping stone to increased investment by CLECs); Robert W. Crandall et al., *Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 B.E. J. Econ. Analysis & Pol'y 1 (2004) (finding that lower UNE rates discouraged CLEC investment); Hsihui Chang et al., *Regulation and Investment Behaviour in the Telecommunications Sector: Policies and Patterns in US and Europe*, 27 Telecomm. Pol'y 677 (2003) (finding that lower UNE prices were associated with higher levels of ILEC

(continued....)

that regulation will chill investment cannot be sustained.[1165]  Furthermore, we emphasize that we do not consider the effect of regulation solely on investment in broadband infrastructure—whether positive or negative.  Rather, we assess the overall effect of regulation on consumer welfare, evaluating changes in broadband investment along with effects on the prices and quality of broadband access and edge services, and on edge provider investment and innovation.

281.  We find the comparison made by certain commenters between Title II classification coupled with open Internet rules and public-utility regulation to be inapt for several reasons.[1166]  First, unlike utilities such as water, electricity, and gas, BIAS is a two-sided platform with BIAS subscribers on one side of the market and edge providers on the other.[1167]  Therefore, the type of regulation required and the effects of those regulations will necessarily be different for BIAS than for such utilities.  Second, and most importantly, the rules we now adopt are carefully tailored to avoid the potential issues that commenters claim are problematic in the regulations of utilities.  In particular, unlike the range of utility-style regulations that were applied to monopoly telephone service under Title II, including rate regulation, we forbear from many of these provisions and do not adopt any rate regulation, which is a hallmark of utility regulation.  The Commission has long recognized that regulating rates is not its preferred approach, and therefore has spent decades promoting competition in the market rather than relying on rate regulation.[1168]  The approach we adopt in this proceeding is consistent with this longstanding policy objective.

282.  Economics literature shows that open Internet provisions may increase investment and innovation, and may have welfare-enhancing effects.[1169]  Contrary to BIAS provider claims that open

---

investment); Letter from Joan Marsh, Director, Federal Government Affairs, AT&T, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 01-338, Attach., Robert D. Willig et al., *Stimulating Investment and the Telecommunications Act of 1996* (2002) (filed Oct. 11, 2002) (finding that reduced UNE rates encouraged CLEC activity and ILEC investment).

[1165] *See generally* Knut Blind, *The Influence of Regulations on Innovation*, 41 Rsch. Pol'y at 392-403, 399 (explaining that, while things like compliance costs act like a tax that reduces innovation incentives, especially in the short run, other or the same regulations can increase investment incentives in the long run).

[1166] *See* Free State Foundation Comments at 40; CEI Comments at 5-11; ITIF Comments at 4; U.S. Chamber of Commerce Comments at 1; Comcast Comments at 5, 8; NCTA Comments at 47.

[1167] *See, e.g.*, Marc Rysman, *The Economics of Two-Sided Markets*, 23 J. Econ. Persps. 125, 125-26 (2009) ("Broadly speaking, a two-sided market is one in which: 1) two sets of agents interact through an intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents . . . [because] there is some kind of interdependence or externality between groups of agents that the intermediary serves."). Rysman's definition aptly describes the BIAS virtuous cycle between consumer demand and edge provider innovation. Consumers value BIAS more as the diversity and quality of valuable edge services increase, and edge providers see value in investing and innovating as the breadth and depth of consumer demand increases.  We note that Rysman specifically lists "Internet . . . markets" under his examples.  *See id.* at 125.  In contrast, in water and traditional gas and electricity markets, the value to the consumer of having access to the utility does not materially increase with the number of suppliers through an interdependency, and even modern energy markets only exhibit limited aspects of multisided markets.

[1168] *See, e.g.*, *Competitive Common Carrier Rates and Facilities Report and Order*, 85 F.C.C.2d at 10-12 (eliminating rate regulation of nondominant carriers); *Competition in the Interstate Interexchange Marketplace*, CC Docket No. 90-132, Report and Order, 6 FCC Rcd 5880 (1991) (eliminating rate regulation of AT&T's services sold to large- and medium-sized business customers); *Motion of AT&T Corp. to Be Reclassified as a Non-Dominant Carrier*, Order, 11 FCC Rcd 3271 (1996) (finding AT&T to be nondominant in all of its domestic, interstate, interexchange services and accordingly freeing AT&T from price-cap regulation for such services); *Access Charge Reform et al.*, CC Docket Nos. 96-262 et al., First Report and Order, 12 FCC Rcd 15982 (1997) (freeing CLECs from rate regulation of interstate access charges).

[1169] *But see, e.g.*, Nicholas Economides & Benjamin E. Hermalin, *The Economics of Network Neutrality*, 43 RAND J. Econ. 602 (2012) (Nicholas Economides, *The Economics of Network Neutrality*) (providing an ambiguous finding
(continued….)

Internet provisions would diminish their investment incentives, some economics literature shows that allowing BIAS providers to sell prioritized access, for instance, can actually lower investment incentives. For example, Professors Jay Pil Choi and Byung-Cheol Kim show under their assumptions that, if paid prioritization is allowed, BIAS providers have an incentive to reduce investment because expanding broadband capacity would lower the price that they can charge for priority access.[1170] In addition, the authors find that content provider investment incentives are also lower absent neutrality regulation due to BIAS providers potentially expropriating the benefits of content provider investment by charging for access to their customers.[1171] Another paper by Professors Nicholas Economides and Benjamin Hermalin finds that prohibiting BIAS providers from charging for priority access unambiguously reduces BIAS provider investment in their model.[1172]

283. Given that economics literature supports a conclusion that the effects of applying open Internet provisions may not be harmful, and can actually be beneficial to BIAS investment incentives, the *RIF Order* and opponents of reclassification in this proceeding cite studies that claim to show there was a decline in investment following the reclassification of BIAS to Title II in the United States, or after other countries implemented similar regulations.[1173] We find the evidence presented to be unpersuasive for the following reasons.

284. First, as the *RIF Order* correctly recognized, network infrastructure is a long-term irreversible investment that often requires years of planning, preparation, and approvals before construction can begin.[1174] The *RIF Order* then proceeds to suggest, however, that there is a causal link between the adoption of the *2015 Open Internet Order* and declines in broad measures of BIAS provider investment that occurred in the same year that *Order* was adopted, noting that this was the first year of decline since 2009.[1175] The *RIF Order* goes on to review studies that compare BIAS provider investment before and after adoption of the *2015 Open Internet Order* and suggests that the brief two-year reclassification of BIAS under Title II resulted in a decline in BIAS provider investment of up to 5.6%

---

on the overall effect of network neutrality regulation on social welfare because social welfare is the sum of consumer welfare and producer surplus, including any surplus that accrues to edge providers); Jay Pil Choi et al., *Net Neutrality, Network Capacity, and Innovation at the Edges*, 66 J. Indus. Econ. 172 (2018) (finding that whether a ban on paid prioritization increases or decreases edge investment and innovation depends on the relative size of the BIAS provider's network capacity to an edge provider's bandwidth usage); *see also* Mark A. Jamison Comments 1-7 & Appx. A, Mark A. Jamison et al. Comments, WC Docket No. 17-108 (rec. July 15, 2017) (*Economic Scholars' Summary of Economic Literature Regarding Title II Regulation of the Internet*); Mark Jamison, *Net Neutrality Policies* (providing surveys of economic studies of net neutrality regulation that show both welfare enhancing and potentially welfare reducing effects).

[1170] *See, e.g.*, Jay Pil Choi & Byung-Cheol Kim, *Net Neutrality and Investment Incentives*, 41 RAND J. Econ. 446 (2010).

[1171] *Id.*

[1172] *See* Nicholas Economides, *The Economics of Network Neutrality*. However, the study's finding on the overall effect of net neutrality regulation on social welfare is still ambiguous because social welfare is the sum of consumer welfare and producer surplus, including any surplus that accrues to edge providers. *See also* Nicholas Economides & Joacim Tåg, *Network Neutrality on the Internet: A Two-Sided Market Analysis*, 24 Info. Econ. & Pol'y 91 (2012).

[1173] U.S. Chamber of Commerce Comments at 6-11; ETNOA Comments at 6-7; R Street Institute Comments at 6; Texas Public Policy Foundation Comments at 3-4; John Mayo (filed on behalf of Georgetown Center for Business and Public Policy) Comments at 2; NCTA Comments at 87, 91-93; Americans for Tax Reform Comments at 2-4; Citizens Against Government Waste Comments at 6-7.

[1174] *RIF Order*, 33 FCC Rcd at 364, para. 89.

[1175] *Id.* at 364-65, para. 90.

between 2014 and 2016.[1176] Given the substantial planning, preparation and permitting required to make most large-scale capital investments in broadband networks, it is implausible that the *2015 Open Internet Order* would have resulted in such an immediate and substantial decline in BIAS provider investment. Such a finding is also inconsistent with the reaction of investors to Title II reclassification,[1177] the findings of investment analysts,[1178] multiple statements made by company executives to investors following Title II reclassification,[1179] and common sense. In short, a proper evaluation of the investment effects of Title II reclassification, or open Internet rules more generally, would require a longer time period in order to properly evaluate any potential effects on investment.

285. Second, as the *RIF Order* also correctly recognized, many of the studies that it cites and evidence it presents did not account for other factors that likely have a much larger impact on investment decisions than the classification of BIAS.[1180] These include the broader economic conditions, capacity

---

[1176] *See id.* at 365, para. 91 (citing Hal J. Singer, *2016 Broadband Capex Survey: Tracking Investment in the Title II Era* (Mar. 1, 2017), https://haljsinger.wordpress.com/2017/03/01/2016-broadband-capex-survey-tracking-investment-in-the-title-ii-era).

[1177] An "event study" analysis that examined the effect of the Title II decision on ISP and edge provider stock prices found that the decision had almost no impact, except for a very short-term decline in the stock prices of a few cable ISPs. Robert W. Crandall, *The FCC's Net Neutrality Decision and Stock Prices*, 50 Rev. Indus. Org. 555, 560-73 (2017).

[1178] *See, e.g.*, Philip Cusick et al., *Net Neutrality: Prepared for Title II But We Take Less Negative View*, J.P. Morgan (Nov. 11, 2014) ("We wouldn't change any of the fundamental assumptions on cable companies under our coverage under Title II, and shares are likely to rebound over time."); Paul Gallant, *Title 2 Appears Likely Outcome at FCC, But Headline Risk May Exceed Real Risk*, Guggenheim Sec., LLC (Dec. 8, 2014) ("We would not view a Title II decision by the FCC as changing the existing Washington framework for cable broadband service. The marketplace reality under Title II would be far less problematic for cable/telcos than most believe."); Paul de Sa et al., Bernstein Rsch. (Nov. 17, 2014) ("We think net neutrality is largely irrelevant for fundamental value drivers. But headline noise in the coming months will likely result in fears about price regulation, increasing volatility and perhaps temporarily depressing cable & telco equity values.").

[1179] Sprint's Chief Technology officer stated that Sprint "does not believe that a light touch application of Title II, including appropriate forbearance, would harm the continued investment in, and deployment of, mobile broadband services." Letter from Stephen Bye, Chief Technology Officer, Sprint, to Thomas Wheeler, Chairman, FCC, GN Docket No. 14-28, at 1 (filed Jan. 15, 2015) (Sprint Jan. 15, 2015 *Ex Parte*); *see also* Transcript of Verizon Communications Presents at UBS 42nd Annual Global Media and Communications Conference Call, Seeking Alpha (Dec. 9, 2014), http://seekingalpha.com/article/2743375-verizon-communications-vz-presents-at-ubs-42nd-annualglobal-media-and-communications-conference-transcript (quoting Verizon CFO Fran Shammo as saying "I mean, to be real clear, I mean this does not influence the way we invest. I mean we're going to continue to invest in our networks and our platforms, both in Wireless and Wireline FiOS and where we need to. So nothing will influence that. I mean if you think about it, look, I mean we were born out of a highly regulated company, so we know how this operates."); Brian Fung, *Verizon: Actually, Strong Net Neutrality Rules Won't Affect Our Network Investment*, Wash. Post (Dec. 10, 2014), https://www.washingtonpost.com/news/the-switch/wp/2014/12/10/verizon-actually-strong-net-neutrality-rules-wont-affect-our-network-investment; Brian Fung, *Comcast, Charter and Time Warner Cable All Say Obama's Net Neutrality Plan Shouldn't Worry Investors*, Wash. Post (Dec. 16, 2014), https://www.washingtonpost.com/news/the-switch/wp/2014/12/16/comcast-charter-and-time-warner-cable-all-tell-investors-strict-net-neutrality-wouldnt-change-much; Letter from Angie Kronenberg, COMPTEL to Marlene H. Dortch, FCC, GN Docket No. 14-28, at 1 (filed Dec. 10, 2014); *see also* Free Press Apr. 1, 2024 *Ex Parte* at 36 (noting that, "[d]espite the Senate finally seating a fifth FCC Commissioner in 2023, which finally allowed the Commission to move ahead with this proceeding, not a single ISP representative raised the issue of Title II on their full-year 2023 results calls to our knowledge, and not one analyst asked a question about the issue on any of these calls").

[1180] The *RIF Order* notes that "[t]hese types of comparisons can only be regarded as suggestive, since they fail to control for other factors that may affect investment (such as technological change, the overall state of the economy, and the fact that large capital investments often occur in discrete chunks rather than being spaced evenly over time), and companies may take several years to adjust their investment plans." *RIF Order*, 33 FCC Rcd at 365-66, para. 92.

constraints, increasing demand for broadband, technology changes (such as the transition from 3G to 4G and then to 5G networks), and BIAS providers' general business development decisions. Commenters in this proceeding point to the recent increase above trend in aggregate broadband capital expenditures as evidence that a "light touch" regulatory approach promotes broadband investment. However, such claims do not adjust for macroeconomic factors such as inflation, new technologies like 5G New Radio (NR), and myriad other factors that likely explain most if not all of the observed increases in investment since the *RIF Order*.[1181]

286.    Third, it is widely known in statistics that correlation does not imply causation. In the broadest sense, correlation measures the degree to which two random variables are associated with one another, and tests of correlation measure the strength of such a relationship. However, just because two variables—e.g., Title II reclassification and changes in investment—are observed to occur together, does not imply that one variable (reclassification) caused the other (observed changes in investment).[1182] To determine whether Title II reclassification caused the change in investment, we would need to determine what the level of investment would have been if Title II reclassification had not been adopted.

287.    The "gold standard" in empirical research for determining what would have happened is the randomization of research subjects into treatment and control groups, such as is commonly done in drug and other medical trials. In a randomized clinical trial, the outcomes of the control group that did not receive a treatment serve as the counterfactual for measuring the effect of a treatment that is given to the other group (the treatment group). However, in many real-world scenarios, such as the evaluation of the effect of open Internet regulations, it is obviously not possible to randomize companies into treatment and control groups to determine investment effects. For this reason, there are a number of "quasi-experimental" empirical methods that have been developed in statistics that attempt to use observational data in a manner that mimics a randomized experiment.[1183]

288.    Only a few studies cited in the present record and in the *RIF Order* record attempt to perform any type of rigorous analysis of the effects on investment of open Internet regulations or Title II reclassification with forbearance. As for those, we find, as we discuss below, that, in all cases, the results of these studies are inconclusive due to methodological issues. As an initial matter, no study in the record attempts to measure changes in edge provider investment under Title II reclassification, so no study can make claims about the effect of reclassification on the relevant investment variable of interest from a policy perspective, which is total investment in the Internet ecosystem. Further, even if total investment in the Internet ecosystem were shown to be lower, that would not be determinative of whether

---

[1181] *See, e.g.*, Comcast Comments at 4 (citing USTelecom, 2022 Broadband Capex Report (2022), https://ustelecom.org/wp-content/uploads/2023/09/2022-Broadband-Capex-Report-Final.pdf). In his dissent, Commissioner Carr points to a decline in wireless investment in 2016 and 2017 as evidence that the 2015 Open Internet Order caused wireless investment to decline. *See* Carr Dissent at 37-39. However, these two years are the period when wireless carriers had mostly concluded building their 4G networks. *See* Free Press Comments filed in WC Docket No. 17-108 (filed July 17, 2017) at 135. And the subsequent increase in wireless investment was due to carriers beginning to deploy 5G in 2018. *See* CTIA The Wireless Industry, 5G in America https://www.ctia.org/the-wireless-industry/5g-in-america (noting that wireless providers began investing in 5G starting in 2018). Thus, after accounting for all relevant factors, the data Commissioner Carr cites does not undercut our investment analysis.

[1182] For example, ice cream sales and violent crime rates tend to exhibit a strong positive association. However, it is not the case that ice cream sales cause crime, or that higher crime causes increased ice cream sales, but rather that a third variable, temperature, affects both. Not adjusting for average daily temperature could lead a researcher to draw an incorrect conclusion. *See* Justin Peters, *When Ice Cream Sales Rise, So Do Homicides. Coincidence, or Will Your Next Cone Murder You?*, Slate (July 9, 2013), https://slate.com/news-and-politics/2013/07/warm-weather-homicide-rates-when-ice-cream-sales-rise-homicides-rise-coincidence.html.

[1183] Some of the statistical techniques used to perform such an analysis are fixed effects, instrumental variables (IV), differences-in-differences, and matching estimators. *See* Joshua D. Angrist & Jörn-Steffen Pischke, Mostly Harmless Econometrics: An Empiricist's Companion §§ 5.1, 4.1, 5.2, 3.3 (2009) (Joshua Angrist & Jörn-Steffen, Mostly Harmless Econometrics).

reclassification of BIAS under Title II with forbearance is socially beneficial. To make this determination, changes in social welfare, notably accounting for consumer benefits, would need to be examined. There is no empirical study in the record that attempts to measure such changes in social welfare, and as noted above, the theoretical literature is ambiguous in terms of whether open Internet regulations would raise or lower social welfare.

289. One empirical study cited prominently in the record and in the *RIF Order* uses a Differences-in-Differences (DiD) estimator on aggregate investment data by industry from the Bureau of Economic Analysis (BEA) to conclude that the 2010 announcement by Chairman Genachowski that the Commission was considering reclassifying BIAS under Title II raised uncertainty and reduced BIAS provider network investment on average by about 20% from 2011 to 2016.[1184] We find several other issues with this paper that lead us to give it no probative value in this proceeding.[1185]

290. The study conducts a DiD analysis by choosing five other industries that the author claims will have comparable trends in investment to the "Broadcasting and Telecommunications" industry that serves as the treatment group for purposes of assessing the impact of Title II reclassification on investment. The BEA industry classifications that the author chose as comparable to telecommunications are: wholesale trade; transportation and warehousing; machinery manufacturing; computer and electronics products; and plastics and rubber products.[1186] It is not clear why this diverse set of industries with very different technology and productivity shocks would be an appropriate control group for telecommunications. Visual inspection comparing the pre-2010 (pre-treatment) investment trends of the control industries with the trends in telecommunications and broadcasting investment confirm that the controls are inappropriately chosen. Prior to the 2010 announcement of potential Title II reclassification, there are sharp divergences in the investment trends between the two groups, which implies that the "parallel trends" assumption of the DiD estimator may be violated and that biased estimates will be produced as a result.[1187] In fact, over 60% of the growth in investment in the control group between the pre-treatment and treatment periods is being driven in this study by the inclusion of

---

[1184] *See* George S. Ford, *Regulation and Investment in the U.S. Telecommunications Industry*, 50 Applied Econ. 6073 (2018) (George Ford, *Regulation and Investment*). This evidence is also presented in Phoenix Center Comments Attach. 1, George S. Ford, *Investment in the Virtuous Circle: Theory and Empirics* (Phoenix Center Policy Paper No. 62, 2023) (George Ford, *Investment in the Virtuous Circle*), and George S. Ford, *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 Rev. Network Econ. 175 (2019) (George Ford, *Net Neutrality and Investment*).

[1185] ITIF criticizes our dismissal of this study, but it does nothing to address the fundamental concerns with the study. Testimony of Joe Kane, Director of Broadband and Spectrum Policy, ITIF, WC Docket No. 23-320, at 2 (filed Apr. 10, 2024). ITIF also fails to provide support for its contention that the Commission should only reclassify BIAS as a Title II telecommunications service if there is evidence doing so will enhance broadband investment. *Id.* In any event, we show below that the benefits of reclassification will outweigh the costs. *See infra* Section V.H.

[1186] The BEA series identification numbers for the industries used are "i3n51301es00" for telecommunications, "i3n42001es00" for wholesale trade, "i3n48001es00" transportation and warehousing, "i3n33301es00" for machinery manufacturing, "i3n33401es00" for computer and electronics products, and "i3n32601es00" for plastics and rubber products. Bureau Econ. Analysis, *Series Register*, https://apps.bea.gov/national/FixedAssets/Release/TXT/SeriesRegister.txt (last visited Mar. 26, 2024).

[1187] *See* George Ford, *Regulation and Investment*. This paper is the published version of a 2017 Phoenix Center working paper that many commenters cite in the record titled George S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis* (2017). Similar evidence is also presented in George Ford, *Investment in the Virtuous Circle*, and George Ford, *Net Neutrality and Investment*. The 2023 Phoenix Center paper, George Ford, *Investment in the Virtuous Circle*, uses USTelecom investment data for its measure of telecommunications investment and BEA data for its measure of investment in other industries, which may be problematic given that the two data sources may not be comparable. In addition, staff was unable to replicate this paper due to the author not describing the twenty industries that were used in the control group.

investment in the transportation and warehousing industry.[1188]  Investment in transportation and warehousing rose dramatically during the post-2010 time period due to the boom in e-commerce that occurred.[1189]  This trend makes this industry a poor choice for predicting what the trend in telecommunications investment would have been absent the announcement of the potential for BIAS to be reclassified as a Title II service.  A more appropriate method to choose the control group industries to avoid these problems is to choose a weighted combination of the potential controls where the weights are chosen to minimize the pre-treatment differences between the treatment group and the control group, but this procedure was not followed.[1190]

291.    The aggregate measure of investment used by the author as the primary variable of interest is also too broad to provide meaningful estimates, both in terms of the business entities and types of investments included in the measure.  There are currently 2,201 BIAS providers in the United States that would be affected by Title II reclassification,[1191] but the BEA collects investment data from nearly 125,000 business entities in the telecommunications, broadcasting, motion picture, and video production industries when calculating their "Broadcasting and Telecommunications" investment data.[1192]  Title II reclassification would therefore be expected to have little direct effect on most of the businesses reported in the author's measure of broadband investment.  Furthermore, investments captured within this broad measure would include investments in buildings, trucks, office equipment, software, and other investment categories that likely would be unaffected by Title II reclassification.  A proper analysis would focus on discretionary investments by BIAS providers that would be expected to actually be impacted by reclassification.

292.    Finally, the BEA data used by the author has been substantially revised since this study was published and the corrected data undercut the conclusion that open Internet regulations led to a decline in telecommunications investment.  The Census Bureau conducts an Economic Census every five years that forms the basis of the investment data published by the BEA and used by the author in this study.[1193]  In the intervening years, the BEA estimates investment within each industry and then revises these estimates when the actual investment data becomes available from the newly conducted Economic Census.[1194]  Whereas the author found that telecommunications investment declined by 6.2% in real terms when comparing the 2004-2009 period to the 2011-2016 period in his data, the corrected data now available on the BEA website show that telecommunications real investment in fact rose 10.2% between

---

[1188] *See* George Ford, *Regulation and Investment* at fig.1.

[1189] According to Census Bureau data, e-commerce sales increased by over 120 percent from Q4 2009 to Q4 2016.  *See* Press Release, U.S. Census Bureau, Quarterly Retail E-Commerce Sales (Feb. 20, 2024), https://www.census.gov/retail/ecommerce.html.  However, investment is forward-looking, and this retail sales data does not capture expected future sales.  As one measure of forward-looking expectations for the e-commerce sales that drove investment in this industry, the stock price of Amazon increased by more than 400% over this same period.

[1190] For a discussion of how to properly construct a synthetic control group, *see* Alberto Abadie, *Using Synthetic Controls:  Feasibility, Data Requirements, and Methodological Aspects*, 59 J. Econ. Lit. 391, 394-98 (2021).

[1191] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 Communications Marketplace Report, 37 FCC Rcd 15514, 15528, para. 26 (2022).

[1192] The BEA classifications are based on the North American Industry Classification System (NAICS).  For the NAICS codes and industries included in the BEA Telecommunications and Broadcasting data, *see* Bureau Econ. Analysis, New and Revised Statistics of the U.S. Digital Economy, 2005-2021 at Appx. (Nov. 2022), https://www.bea.gov/system/files/2022-11/new-and-revised-statistics-of-the-us-digital-economy-2005-2021.pdf.  There are 124,788 business entities that fall under the telecommunications NAICS code. *See* NAICS Ass'n, *NAICS Code Description*, https://www.naics.com/naics-code-description/?code=517 (last visited Mar. 26, 2024).

[1193] *See generally* Bureau Econ. Analysis, *Concepts and Methods of the U.S. National Income and Product Accounts* (Dec. 2023), https://www.bea.gov/resources/methodologies/nipa-handbook/pdf/all-chapters.pdf.

[1194] *Id.*

these two periods.[1195]  The revised data also substantially affect the results of the DiD regression analysis performed by the author.  When Commission staff re-estimate his baseline regression model in Table 2 with the corrected data, rather than finding a statistically significant 22% decline in telecommunications investment as the author found, the corrected regression finds only a 6.2% decline relative to expectations based on the control group industries and this is not statistically significant.  If the inappropriate "transport and warehousing" control group is then removed from the model, for all practical purposes the model predicts no decline in telecommunications investment resulting from the potential for Title II reclassification.[1196]  Therefore, if this paper supports anything, it supports the position that Title II reclassification had no effect on BIAS provider investment.

293.    The study's author, Dr. George Ford, offers a critique of the Commission's analysis and attempts to resuscitate his earlier assertions regarding Title II investment impacts with new analysis— neither his critique nor new analysis are persuasive.[1197]  As an initial matter, we note that Dr. Ford does not dispute that the underlying data was revised by the BEA since his study was performed, or that substituting the revised data into his previous model changes the results to show a statistically insignificant difference in investment following the announcement of Title II reclassification.  Dr. Ford's primary argument is that we did not replicate his study when reaching our conclusions because we did not follow his "entire research process" when updating his analysis with the new BEA data.[1198]  Dr. Ford implies that we should have changed his underlying model, including the control groups, as he proceeds to do in his new analysis.[1199]  But his new analysis, like his prior analysis, does not conduct a proper DiD regression analysis with a replicable research process.  As discussed below, Dr. Ford did not use a rigorous and principled methodology for selecting his control groups, and as such, there is no way that the Commission could predict which control groups Dr. Ford would choose now that the revised BEA data and original model no longer support his previous conclusions.  Dr. Ford also changed his criteria for

[1195] The current BEA investment data can be found in worksheet "FAAt307ESI-A" in workbook "Section3All_xls.xls."  Bureau Econ. Analysis, "Section 3—Private Fixed Assets by Industry" (Nov. 2, 2023) https://apps.bea.gov/national/FixedAssets/Release/XLS/Section3All_xls.xlsx.  The previous estimates used by Dr. Ford can be found in worksheet "307ESI Ann" in the similarly named workbook "Section3All_xls.xls."  Bureau Econ. Analysis, Section 3—Private Fixed Assets by Industry (Aug. 23, 2017),https://apps.bea.gov/histdata/Releases/FA/2016/AnnualUpdate_August-23-2017/Section3ALL_xls.xls.  We replicated the author's regression analysis exactly based on this previous data and found, as he did, that real investment in telecommunications in the uncorrected data declined between the 2004-2009 and 2011-2016 periods, which leads us to conclude that the change in the conclusion based on the revised data is due entirely to changes in the underlying data and not differences in model specification.  *See* Letter from Giulia McHenry, Chief, Office of Economics and Analytics, FCC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 11, 2024).

[1196] While telecommunications investment is still estimated to be -2.7% in the period following the announcement of potential Title II reclassification, the p-value is .71, which indicates that there is a 71% chance of obtaining a negative effect at least this large even if the null hypothesis of no effect on investment is true.  In other words, this small negative effect is very likely due to random noise rather than there being a true negative effect of Title II regulation on investment.

[1197] Letter from Lawrence J. Spiwak, President, Phoenix Center for Advanced Legal & Economic Public Policy Studies, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, Attach., George S. Ford, *In Response to the FCC . . .*, Phoenix Ctr. Persps., Apr. 18, 2024 (filed Apr. 18, 2024) (*Ford Response*).

[1198] *Id.* at 3.  We note that Dr. Ford fails to cite a professionally accepted definition of replication from a peer-reviewed article on this topic, but rather cites merely a website post for his definition.

[1199] *See, e.g. id.* at 4  ("[R]eplication requires the application of the 'methods' and not just haphazardly running a regression suitable for one dataset on another dataset. The Commission does not offer a new and suitable control group for the revised data.").

choosing the control groups,[1200] the level of aggregation at which control groups were selected,[1201] and his standard error procedure.[1202] His "entire research process," therefore, could not have been replicated.[1203]

294. Even if we had been able to replicate his entire research process, the process he employs lacks rigor and is not in line with recommended best practices from the empirical economics literature. Dr. Ford appears to advocate basing the selection of DiD control groups entirely on a comparison of the pre-treatment trends in the outcome between the treatment and control groups.[1204] However, such a process is known to be theoretically dubious and statistically problematic.[1205] Rigorous DiD analysis employs the following three principles when choosing controls: (1) there should be no reason to believe the untreated group would suddenly change around the time of treatment; (2) the treated group and untreated groups should be generally similar in many ways; and (3) the treated group and untreated groups should have similar trajectories for the dependent variable before treatment.[1206] In his analyses, Dr. Ford focuses only on the last principle and does not consider the first two principles.[1207] In a proper DiD research design, observing parallel trends in outcomes prior to treatment should be a consequence of choosing controls that are generally similar to the treated group, not the tool by which the controls are chosen.[1208]

---

[1200] *See id.* at 5 (changing the pseudo-treatment dummy test compared to his analysis in table 5 of his original study and also admitting that the previous control groups still satisfy his previous criteria for selecting controls based on there being no statistical difference between pre-treatment growth rates in investment between the treatment and controls).

[1201] *See id.* at 15 n. 29 (providing his new BEA industry controls which are now a mix of aggregate industry codes and specific industries in contrast to his previous study which used only aggregated industry codes).

[1202] *See id.* at 5 (noting that he switched to Driscoll-Kraay standard errors rather than the clustered t-statistics and randomized inference procedure he reported using in his previous study). As Dr. Ford acknowledges, the standard error procedure he now adopts for many of his new analyses would be more likely to (incorrectly) conclude that there is a statistically significant difference in investment when there is not. *See id.* ("With few clusters and one treated cluster, the standard errors may be too small, however.").

[1203] Even by his own—and not generally accepted—definition of replication, Dr. Ford also chose not to replicate his original study in the *Ford Response,* from which we conclude that he appears to be retracting the original study, or at least, conceding that it no longer supports the theory that Title II negatively impacts ISP investment.

[1204] *Id.* at 3.

[1205] Jonathan Roth, *Pretest with Caution: Event-Study Estimates After Testing for Parallel Trends,* 4 *Amer. Econ. Rev.: Insights* 305 (2022) (cautioning against this practice, since it can exacerbate the bias and leave confidence intervals too small). Dr. Ford is correct that one requirement for the DiD estimator to produce valid estimates is that "the selected control group for the industries of interest plausibly satisfy the parallel paths (or common trends) assumption, where the investment of the control group serves as a reliable counterfactual for the treated group during the treatment period." *Ford Response* at 3. However, demonstrating this plausibility requires much more than the "visual inspection and some descriptive statistics" methodology that he reports employing. *Id.* at 14 n.15.

[1206] *See* Nick Huntington-Klein, *The Effect: An Introduction to Research Design and Causality* 435 (2022), a*vailable at* https://theeffectbook.net/.

[1207] In fact, Dr. Ford explicitly argues against following principles 1 and 2 in the *Ford Response* and criticizes the *Draft Order* for raising this issue. *See Ford Response* at 3, 14 n.19. Dr. Ford's other DiD analyses also do not properly construct an appropriate control group which further leads us to give no probative value to his findings. *See, e.g.*, George S. Ford, Investment in the Virtuous Circle.

[1208] We note that the use of synthetic control methods does obviate the need to follow the first two principles. For example, in a widely cited synthetic control analysis of the economic effects of German reunification, even among OECD countries, the authors excluded Luxemburg and Iceland "because of their small size and because of the peculiarities of their economies." This illustrates that the authors followed principle 2. In addition, they excluded Canada, Finland, Sweden, and Ireland "because these countries were affected by profound structural shocks during the sample period." This demonstrates that the authors also followed principle 1. *See* Alberto Abadie et al., *Comparative Politics and the Synthetic Control Method,* 59 Am. J. Pol. Sci. 495, 497 n.4 (2015).

295.     Just as Dr. Ford's choice of the Transportation and Warehousing industry as a control in the previous analysis was in violation of the first principle, Dr. Ford makes the same mistake in his new synthetic DiD (sDiD) analysis where this same control actually receives the largest weight.[1209] Dr. Ford also does not follow the second principle in both his previous and current analyses because he never explains why or how the treatment and control group industries are "generally similar" and would be expected to have similar technology and productivity shocks as the telecommunications industry. If Dr. Ford had properly chosen the initial control groups, then the controls would be valid in both the previous BEA data and revised BEA data. It is not accepted practice to change control groups and research design in response to changes in the underlying data. Finally, we note that both graphical and statistical comparisons between Dr. Ford's original data and the revised data confirm that the pre-treatment data for both the treatment and control groups are nearly identical between the two datasets.[1210] Only the post-2010 investment data for the telecommunications industry was significantly revised by the BEA. The pre-treatment trends remain essentially unchanged,[1211] suggesting that even by Dr. Ford's methodology, there is no basis for switching the control groups he originally selected.[1212]

296.     The only other paper in the record that uses rigorous analytical methods and data to evaluate the effect of open Internet regulations on investment uses a panel data set for 32 OECD countries covering the period from 2003 to 2019 and a fixed effects model to examine the impact of open-Internet-type regulations on the deployment of new fiber connections.[1213] The paper finds that the adoption of open-Internet-type regulations in a country is associated with a 45% decrease in fiber investments. However, we have serious concerns regarding this paper that lead us to heavily discount its findings.

297.     Our first concern is that it is not clear whether the results of this study are even applicable to the present circumstances. The policies adopted by various countries and the market dynamics within them are wide ranging and quite different from the U.S. context. If the types of regulations adopted were not similar to those adopted here (for example, if a country adopted rate regulation), then these results would not be a good proxy for how the regulations we adopt in this Order would be expected to affect U.S. broadband investment.

298.     A second concern is that, in the present U.S. context, the size of the effect on broadband investment is implausibly large. The authors admit that the large magnitude of the effect is likely driven by the fact that, at the beginning of their sample, countries had almost no fiber connections so the growth rate in fiber connections was very high, while, at the end of their data sample, fiber coverage rates exceeded 100% in many countries with correspondingly low fiber connection growth rates.[1214] The

---

[1209] *See Ford Response* at 16 n.34. The Transportation and Warehousing industry is industry code 48 and receives a weight of 18.7% in his analysis.

[1210] This is not surprising because the BEA conducts an Economic Census every five years and the newly collected data in the 2017 Census would generally have little impact on the investment data prior to 2012 when the last Economic Census was conducted.

[1211] *See* George Ford, *Regulation and Investment* at 1, 5.

[1212] According to the control group selection methodology set forth in Dr. Ford's previous paper, the old control groups remain valid because "the pre-treatment growth rates are (statistically) the same between the treated and control groups." *See Ford Response* at 5. Therefore, even by Dr. Ford's own statements and line of reasoning, the Commission was correct to retain the old control groups when replicating his study. We further note that his only evidence that the control group industries are now inappropriate is that a "pseudo-treatment" dummy from 2007-2010 is now positive and statistically significant using his revised standard errors. However, Dr. Ford includes 2010, the year the Commission first sought comment on potential Title II classification, so this is an improper test under this method as it used data from the treatment period. *See Ford Response* at 5.

[1213] Wolfgang Briglauer et al., *Net Neutrality and High-Speed Broadband Networks: Evidence from OECD Countries*, 55 Eur. J.L. & Econ. 533 (2022) (Wolfgang Briglauer et al., *Net Neutrality and High-Speed Broadband Networks*).

[1214] *Id.* at n.10.

crucial assumption the authors make to claim that they are identifying causal effects of the change in regulations is that decisions to implement or withdraw open-Internet-type regulations have been made exogenously, i.e., the timing of these decisions is effectively random because these decisions are made for ideological reasons and politicians make these decisions without considering market outcome variables such as the number of fiber connections in the country.[1215]

299. We find that this identifying assumption may be faulty and the findings of this paper may be due to spurious correlations rather than the authors having identified true causal effects of the impact of open-Internet-type regulation on investment. Contrary to the authors' assertions, we find that it is likely that changes in which political party controls a country is likely to have direct effects on investment unrelated to the adoption of open-Internet-type regulations. For example, if more left-leaning parties in Europe tax investments at a higher rate than their right-leaning counterparts, then the authors' findings could be due to unaccounted-for changes in the tax system or other national policy change that occurred at the same time as the adoption or relaxation of open-Internet-type rules. The authors' instrumental variable estimates may be flawed for this same reason. The authors use how "left" or "right" the current political party is as an instrument.[1216] However, this measure likely has a direct effect on broadband investment through multiple other channels, so it violates the fundamental assumption of an instrumental variable that it must be uncorrelated with the outcome of interest—broadband investment in this case—conditional on the other variables in model.[1217]

300. There is a simple alternative explanation for why the authors find such strong negative effects of open-Internet-type regulation on broadband investment. If countries do not adopt open-Internet-type regulations until BIAS becomes an essential service in the country, as is the case in the United States, and the countries for which it is essential have much higher fiber connection bases, then we would expect exactly the results the authors find. The growth rates in fiber connections in these mature broadband economies would be much lower than the growth rates in fiber connections in countries that have a low base number of such fiber connections due to a less mature broadband market. If this is the case, these lower observed fiber growth rates in countries with open-Internet-type regulations would not be due to the adoption of those regulations. Consistent with this view, the two countries that were among the earliest adopters of open-Internet-type regulations in the authors' data sample, South Korea and Japan, were also the countries that had by far the greatest deployment of fiber connections at the time they adopted the rules between 2010-2011. In 2010, 58% of broadband subscriptions in Japan were provisioned by fiber-based technologies and 55% in South Korea were fiber-based, which far exceeded the rates observed in the next OECD country, the Slovak Republic at 29%, and many OECD countries had almost no fiber-based connections at the time.[1218] In short, it would not be possible for the growth rates in fiber access in these two early adopting countries of open-Internet-type regulations to keep pace with the later adopting countries that had fiber access in the low single digits at the time, and the model

---

[1215] *Id.* at 535.

[1216] *Id.* at 547.

[1217] In this context, instrumental variables estimation is often used when a treatment may not have been assigned to subjects randomly. In this case, the treatment is net neutrality regulations and OECD countries are the subjects of the experiment. An appropriate instrument in this example would be a third variable that is strongly correlated with the passage of net neutrality regulations in a country but, conditional on all the variables in the model, is not associated with the investment outcome except through its effect on the probability of net neutrality regulations being adopted. We find that whether the party in power is more "left" or "right" on the political spectrum is likely to exert a direct effect on ISP investment through many channels, and therefore this crucial "exclusion restriction" assumption is violated and the resulting estimates are biased. *See* Joshua Angrist & Jörn-Steffen, Mostly Harmless Econometrics at ch. 4.

[1218] *See* OECD, OECD Science, Technology and Industry Scorecard 128 (10th ed. 2011), *available at* https://www.oecd-ilibrary.org/docserver/sti_scoreboard-2011-39-en.pdf?expires=1708973108&id=id&accname=guest&checksum=5B7FCBB55DAD15033F4AA481933386F9#:~:text=Wireless%20broadband%20subscriptions%20in%20OECD,The%20OECD%20average%20is%2037%25.

specification estimated by the authors is not sufficiently rich to correct for these issues.[1219]  We conclude that it is not appropriate to compare fiber growth rates across these countries using this model.

301.     Finally, the authors admit that the results of all of their models are inconsistent and biased because the lagged dependent variable and the error term are correlated.[1220]  For the only consistent and unbiased model they estimate, the bias-corrected fixed effects estimator, open-Internet-type regulations are found to have a statistically insignificant effect on BIAS provider investment.[1221]

302.     As our detailed analysis demonstrates, the Commission's conclusions in the *RIF Order* that BIAS provider investment is closely tied to the classification of BIAS were not based on sound empirical analysis, and no new studies submitted in the current record support the conclusions of the *RIF Order*.[1222]  Indeed, the record in both this and the *RIF Order* proceeding on the likely effect of Title II classification is ambiguous, offering conflicting viewpoints regarding the potential investment effects.[1223]  The theoretical literature, empirical studies, and comments are all inconclusive.  As such, we conclude that any changes in BIAS provider investment following the adoption of each *Order* were more likely the result of other factors unrelated to the classification of BIAS.

## IV.     ORDER:  FORBEARANCE FOR BROADBAND INTERNET ACCESS SERVICES

### A.     Forbearance Framework

303.     Section 10 of the Act provides that the Commission shall forbear from applying any regulation or provision of the Communications Act to telecommunications carriers or telecommunications

---

[1219] The authors include country fixed effects, year dummies, lags in investment and time-varying covariates in their model, however, these controls are not sufficient to address our concerns and satisfy the fundamental identifying assumption of DiD models that "the interventions are as good as random, conditional on time and group fixed effects."  *See* Marianne Bertrand et al., *How Much Should We Trust Differences-in-Differences Estimates?*, 119 Q.J. Econ. 249 (Feb. 2004).

[1220] Wolfgang Briglauer et al., *Net Neutrality and High Speed Broadband Networks* at 547.

[1221] *Id.* at tbl. 2, column 5.

[1222] The *RIF Order* also relied on a second study that used a "natural experiment," but this study was not submitted into the record of this proceeding.  It found that DSL subscribership exhibited a statistically significant upward shift relative to its baseline trend after the Commission removed line-sharing rules on DSL in 2003 and again in response to the reclassification of DSL as a Title I information service in 2005.  *See RIF Order*, 33 FCC Rcd at 366, para. 94 & n.349 (citing Thomas W. Hazlett & Joshua D. Wright, *The Effect of Regulation on Broadband Markets: Evaluating the Empirical Evidence in the FCC's 2015 'Open Internet' Order*, 50 Rev. Indus. Org. 487, 499 (2017)).  There appear to be several serious problems with this study.  First, it considers changes in DSL subscribership, not changes in DSL investment, so it is not clear what inferences can be drawn about the effect of the regulatory changes on investment.  Further, the authors attribute the increase in subscribers solely to the regulatory changes, without accounting for other factors that may have explained the increase.  In particular, the authors ignore the fact that VDSL and ADSL2 were developed and began to be deployed in 2001 and 2002, respectively, and both of these technologies significantly improved DSL speeds.  *See* Tong Bai et al., *Discrete Multi-Tone Digital Subscriber Loop Performance in the Face of Impulsive Noise* at fig.1, IEEE (2017), https://ieeexplore.ieee.org/document/7939973.  It may be that these technological innovations and lagging DSL market shares led to the aggressive DSL price cuts that occurred starting in 2003 and this—not a change in regulations—led to the observed strong DSL subscriber gains relative to cable starting in 2003.  *See* Jim Hu, *U.S. Broadband Access Leaped 42 Percent in 2023*, CNET (June 9, 2004), https://www.cnet.com/tech/tech-industry/u-s-broadband-access-leaped-42-percent-in-2003 ("The Bells have succeeded in closing the [subscriber] gap by offering steep discounts and slashing prices.  Cable companies have refused to cut prices, opting instead to boost download speeds.").  Finally, we note that this study is also methodologically flawed.  The effects of the 2003 and 2005 regulatory changes that applied to DSL, if any, would also impact the other broadband providers in the market due to such providers being substitutes.  Therefore, cable is not an appropriate comparison group and the inclusion of the growth rate in cable modem subscriptions in the estimation equation is endogenous (i.e., correlated with the error term), which results in statistically biased and inconsistent estimates.

[1223] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 365, para. 91 (discussing the conflicting viewpoints).

services if the Commission determines that:

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.[1224]

304. Our approach to forbearance here builds on the Commission's approach in the *2015 Open Internet Order*. In that *Order*, the Commission broadly granted forbearance—to the full extent of its authority under section 10 of the Act—with respect to provisions of the Act and Commission rules that newly would have applied by virtue of the classification of BIAS as a telecommunications service there, subject only to exceptions in the case of certain expressly identified statutory provisions and Commission rules.[1225] The Commission also recognized that prior to the *2015 Open Internet Order* some carriers chose to offer Internet transmission services as telecommunications services subject to the full range of Title II requirements, and clarified that those carriers could elect to operate under the *2015 Open Internet Order*'s forbearance framework instead of that legacy framework.[1226]

305. It is unclear what effect the *RIF Order* had on the forbearance granted in the *2015 Open Internet Order*. It is possible to view the *RIF Order* as implicitly vacating the forbearance granted in the *2015 Open Internet Order*, so that forbearance does not remain in effect when we return to a Title II classification.[1227] Alternatively, the *RIF Order*'s silence on this issue can be read to leave the forbearance granted in the *2015 Open Internet Order* in place, so that it continues to apply automatically to BIAS once reclassified as a telecommunications service here, absent some action on our part to the contrary.[1228] We conclude that the forbearance set forth in this Order is justified under either understanding. Except as expressly modified herein, the record in this proceeding and our own assessment each support and provide no reason to question the forbearance granted in the *2015 Open Internet Order*, as we explain

---

[1224] 47 U.S.C. § 160(a). "In making the determination under subsection (a)(3) [that forbearance is in the public interest], the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest." *Id.* § 160(b). In addition, "[a] State commission may not continue to apply or enforce any provision" from which the Commission has granted forbearance under section 10. *Id.* § 160(e).

[1225] *See generally 2015 Open Internet Order*, 30 FCC Rcd at 5804-67, paras. 434-542.

[1226] *Id.* at 5819, para. 460 & n.1378 (discussing the process for electing the *2015 Open Internet Order*'s forbearance framework in lieu of the historical regulatory approach under which these carriers had operated).

[1227] *See RIF Order*, 33 FCC Rcd at 416-17, para. 174 (stating that the *RIF Order* was "return[ing] to the pre-[*2015 Open Internet Order*] status quo" and that "carriers are no longer permitted to use the [*2015 Open Internet Order*] forbearance framework (i.e., no carrier will be permitted to maintain, or newly elect, the [*2015 Open Internet Order*] forbearance framework)").

[1228] *Id.* (characterizing the issue of forbearance as "moot" and not engaging in an analysis of the statutory forbearance requirements to assess whether forbearance should be reversed); *cf. Broadband Framework NOI*, 25 FCC Rcd at 7906-7907, para. 98 ("[T]o reverse a forbearance decision, the Commission must find that at least one of the criteria is no longer met with regard to a particular statutory provision.").

below, regardless of how the *RIF Order*'s effect on that prior forbearance is conceptualized.[1229]

306.     In evaluating and applying the section 10(a) forbearance criteria, we follow the same basic analytical approach used by the Commission in the *2015 Open Internet Order*[1230] and affirmed by the D.C. Circuit in its *USTA* decision.[1231]  As a threshold matter, we do not grant forbearance beyond the scope of our authority under section 10 of the Act.  As the Commission explained in the *2015 Open Internet Order*, "[c]ertain provisions or regulations do not fall within the categories of provisions of the Act or Commission regulations encompassed by that language because they are not applied to telecommunications carriers or telecommunications services, and we consequently do not forbear as to those provisions or regulations."[1232]

307.     We also target our forbearance analysis to those provisions of the Act or Commission rules that would not apply but for our classification of BIAS as a telecommunications service and our classification of mobile BIAS as a commercial mobile service.  That follows the Commission's approach in the *2015 Open Internet Order*,[1233] and also is how we contemplated targeting forbearance as proposed in the *2023 Open Internet NPRM* in this proceeding.[1234]  The record does not persuade us to depart from that focus here, but BIAS providers remain free to seek relief from other provisions or regulations through

---

[1229] We reject arguments that "ambiguity regarding the scope of forbearance risks undermining its efficacy."  NCTA Comments at 96.  In purporting to find ambiguity in the *2015 Open Internet Order*'s approach to forbearance, NCTA cites a paragraph providing a high-level summary of aspects of the forbearance granted in that *Order*—which does not even appear in the forbearance section.  *Id.*  That does not persuade us that the scope of forbearance as actually described in the forbearance section of the *2015 Open Internet Order*—or the scope of forbearance as described in our forbearance section here—is ambiguous in a way that undercuts the efficacy of that regulatory relief.  In further support of its claims of ambiguity, NCTA contends that "the *NPRM* itself does not specifically propose to forbear from Section 251(c) . . . or even discuss the Commission's intent with respect to unbundling and other similar common-carrier requirements under Title II of the Act."  *Id.* at 97.  But the *2023 Open Internet NPRM* was clear that the Commission was proposing "to use the forbearance granted in the *2015 Open Internet Order* as the starting point for our consideration of the appropriate scope of forbearance," *2023 Open Internet NPRM* at 54, para. 104, and the *2015 Open Internet Order* was explicit in the forbearance it was granting from (among other things) section 251(c) of the Act and common carrier requirements such as those that would enable *ex ante* rate regulation.  *2015 Open Internet Order*, 30 FCC Rcd at 5814, 5851-52, paras. 451-52, 514; *see also 2023 Open Internet NPRM* at 55, para. 105 ("[W]hile we do not propose to forbear from sections 201 and 202 of the Act as a general matter, we do not and cannot envision adopting new *ex ante* rate regulation or *ex post* rate regulation of BIAS, and we therefore propose to forbear from applying sections 201 and 202 to BIAS insofar as they would support adoption of rate regulations for BIAS." (internal quotation marks omitted)).  Independently, as the Commission observed in this regard in 2015, "the Commission cannot impose a penalty for conduct in the absence of 'fair notice of what is prohibited.'" *2015 Open Internet Order*, 30 FCC Rcd at 5860-61, para. 529 n.1635 (quoting *Fox*, 567 U.S. at 253).  Consequently, we are not persuaded that our approach to forbearance results in ambiguity regarding the scope of relief that undercuts its efficacy.

[1230] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5805-08, 5838-41, 5864-67, paras. 435-39, 493-96, 537-42.

[1231] *USTA*, 825 F.3d at 726-33.

[1232] *2015 Open Internet Order*, 30 FCC Rcd at 5860-61, para. 529; *see also, e.g.*, *id.* at 5861, para. 530 (citing as examples of provisions that the Commission does not forbear from as those that impose "certain obligations on the Commission without creating enforceable obligations that the Commission would apply to telecommunications carriers or telecommunications services," and "provisions insofar as they merely reserve state authority"); CPUC Comments at 9 (arguing that the Commission cannot and should not forbear from statutory provisions that reserve state authority); NARUC Comments at 19-21 (arguing that the Commission cannot and should not forbear from statutory provisions that reserve or grant state authority); Public Knowledge Comments at 89 ("Forbearance can only apply to those provisions where Congress has placed a duty upon a carrier, and not the Commission or another party . . . .").

[1233] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5861, para. 530.

[1234] *2023 Open Internet NPRM* at 57, para. 109 & n.379.

appropriate filings with the Commission.[1235]

308.     Section 706 of the 1996 Act once again informs our forbearance analysis here, as well.[1236] That provision "explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.'"[1237] Within the statutory framework that Congress established, the Commission "possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband."[1238] Thus, as in 2015, we seek to strike the appropriate balance between retaining statutory protections and our open Internet rules to adequately protect the public, while minimizing the burdens on BIAS providers and ensuring incentives for broadband deployment consistent with the objectives of section 706 of the 1996 Act.[1239]

309.     One element of adopting a balanced regulatory approach is giving BIAS providers reasonable regulatory predictability about the obligations that will or will not be applied under that framework.[1240] We thus reject broad-brush arguments that we should not forbear from applying provisions that are by their own terms discretionary in some manner.[1241] As a threshold matter, we see no indication in the text of section 10 that provisions of the Act that give the Commission discretion in their application to telecommunications carriers or telecommunications are somehow categorically beyond the purview of forbearance. Independently, insofar as forbearance incrementally increases the clarity BIAS providers have about the regulatory framework we are adopting here—given the need to grapple with the section 10 criteria in addition to any discretion within a forborne-from provision itself before it could be applied in the future[1242]—we find it reasonable to account for the benefit provided by such greater regulatory predictability in our application of the section 10 criteria.[1243]

310.     At the same time, we also are not persuaded that our forbearance decisions here provide insufficient clarity and regulatory predictability about providers' regulatory obligations.[1244] Fundamentally, these commenters' concerns are not truly directed at our approach to forbearance but instead at the threshold classification decision. We have determined that BIAS is a telecommunications

---

[1235] *See, e.g.*, 47 CFR §§ 1.3, 1.53-1.59, 1.401.

[1236] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5806, 5839-41, paras. 437, 495-96.

[1237] *EarthLink v. FCC*, 462 F.3d 1, 8-9 (D.C. Cir. 2006) (*Earthlink*) (alteration in original).

[1238] *Ad Hoc Telecommc'ns Users Comm. v. FCC*, 572 F.3d 903, 907-08 (D.C. Cir. 2009) (*Ad Hoc*); *see also, e.g.*, Public Knowledge Comments at 88 (quoting *Ad Hoc*, 572 F.3d at 908).

[1239] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5804-05, para. 434.

[1240] *Id.* at 5866-67, para. 541 (discussing the role of such considerations in the Commission's approach to forbearance).

[1241] *See, e.g.*, Public Knowledge Comments at 89.

[1242] *See, e.g.*, *Business Data Services Order*, 32 FCC Rcd at 3535-36, para. 174 ("We recognize that modifying or reversing forbearance once granted by the Commission or by operation of law is a step that should be taken with great care. We find this narrowly tailored action [partially reversing prior forbearance] is appropriate in this case because such reversal is consistent with the substance of the statutory forbearance requirements."); *Broadband Framework NOI*, 25 FCC Rcd at 7906-07, para. 98 (Section 10 "requires the Commission to forbear if the statutory criteria are met. Thus, to reverse a forbearance decision, the Commission must find that at least one of the criteria is no longer met with regard to a particular statutory provision." (footnote omitted)).

[1243] *See, e.g.*, USTelecom Reply at 81 (citing commenters that "agree with USTelecom that transparent and robust forbearance is essential to provide concrete and reliable guidance to providers").

[1244] *See, e.g.*, CEI Comments at 11-12; International Center for Law & Economics Comments at 40; NCTA Comments at 23, 97-98; Nokia Comments at 3, 7-8; ADTRAN Reply at 17; CTIA Reply at 88; ITIF Reply at 3; NCTA et al. Reply at 71; TIA Reply at 8-9.

service under the best reading of the Act and its application to the record evidence here.[1245]  As a result, certain legal consequences under the Act flow from that by default.  The substantial forbearance we grant from rules and provisions reaches the full extent of what we find warranted at this time under the section 10 framework, which is the tool Congress provided for the Commission to tailor those default regulatory consequences.[1246]  To the extent that commenters are concerned that forbearance decisions could be revisited, they do not demonstrate that it would be trivial for the Commission to do so, particularly if reasonable reliance interests could be demonstrated.  Nor does the record reveal ways that the Commission could provide even greater regulatory predictability to providers beyond the approach adopted here while still honoring what we find to be the best understanding of the Act in our classification of BIAS.

311.    We also follow the conceptual approach from the *2015 Open Internet Order* by considering the practical realities under an "information service" classification of BIAS to inform our section 10(a) analysis.[1247]  As the Commission observed in 2015, although that baseline is not itself dispositive of the appropriate regulatory approach to BIAS, it is reasonable for the Commission to weigh concerns about the burdens or regulatory uncertainty that could arise from sudden changes in the actual or potential regulatory requirements and obligations.[1248]  Given agencies' discretion to proceed incrementally,[1249] our forbearance analysis accounts for benefits from adopting an incremental approach here.  That said, although our conceptual approach in this regard tracks what the Commission did in 2015, our application of that approach naturally accounts for the additional experience and insight the Commission has gained in the years since the *RIF Order*.[1250]  In addition, there is a petition for judicial review of the *RIF Remand Order* still pending and the petitions for reconsideration of that *Order* were pending until our action today.  Consequently, the insights we draw from the recent past account for the likelihood that the unresolved status of the regulatory approach adopted in the *RIF Order* could well have tempered BIAS providers' conduct relative to what they otherwise might have engaged in.

312.    In addition, our analytical approach as to all the provisions and regulations from which

---

[1245] *See supra* Section III.

[1246] We therefore reject the suggestion that we improperly are using forbearance to increase regulation.  *See, e.g.*, TechFreedom Comments at 23 (quoting *USTA II*, 855 F.3d at 396(Brown, J., dissenting from the denial of rehearing en banc) ("Logically, forbearance is a tool for lessening common carrier regulation, not expanding it.")).  Our classification decision simply "bring[s] the law into harmony with the realities of the modern broadband marketplace," *Mozilla*, 940 F.3d at 94 (Millett, J., concurring), and against that backdrop our use of forbearance plays its traditional role in granting relief from the legal consequences that otherwise would flow by default from that determination as warranted by the section 10 criteria.  *Cf.* Free Press Reply at 14 ("What policies should flow after the Commission follows the law and classifies BIAS as a telecommunications service?  Those questions are of course important to consider, as are the questions about the parts of Title II for which the Commission should grant industry-wide and nation-wide forbearance.  But these and all other policy questions are secondary to the classification question.").

[1247] *2015 Open Internet Order*, 30 FCC Rcd at 5839-40, para. 495.

[1248] *Id*.

[1249] *See, e.g.*, *Mass. v. EPA*, 549 U.S. 497, 524 (2007) ("Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." (citations omitted)).  While we find that the tailored regulatory framework we adopt today strikes the right balance, we note that the D.C. Circuit has recognized the Commission's authority to revisit its decision should that prove not to be the case.  *EarthLink*, 462 F.3d at 12; *see also id.* ("'[A]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable,'" but the agency necessarily must have the ability to "reassess[] the situation if its predictions are not borne out." (citations omitted)).

[1250] *See, e.g.*, Public Knowledge Comments at 14 (arguing that "the additional experience since reclassification in 2018 warrant both reclassification and some additional adjustments to the Commission's 2015 forbearance").

we forbear in this Order is consistent with section 10(a) as interpreted by the Commission and courts. Consistent with precedent, in interpreting the word "necessary" in section 10(a)(1) and (a)(2) we consider whether a current need exists for a rule or statutory requirement.[1251]  Under section 10(a)(1), we consider here whether particular provisions and regulations are "necessary" to ensure "just and reasonable" rates and practices with respect to BIAS.[1252]  And under section 10(a)(2), we consider whether particular provisions and regulations are "necessary for the protection of consumers."[1253]  Consistent with our conclusion in the *2015 Open Internet Order*, when evaluating whether there is a current need for a rule or provision to ensure just and reasonable rates and practices and to protect consumers, we can account for policy trade-offs that can arise under particular regulatory approaches.[1254]  Thus, even when confronted with arguments that applying a rule or provision could have some near-term benefit, we nonetheless reasonably could conclude that application of the rule or provision is not currently necessary within the meaning of section 10(a)(1) or (a)(2) based on countervailing intermediate- or longer-term consequences of applying the rule or provision.  This approach also is consistent with how the Commission has applied the "just and reasonable" criteria and otherwise evaluated consumers' interests under other provisions of the Act.[1255]

313.    Under section 10(a)(3), the Commission considers whether forbearance is consistent with the public interest.[1256]  This inquiry allows us to account for additional factors beyond the sort of

---

[1251] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5805, para. 436 & n.1288 (citing precedent); *see also, e.g.*, *Petition of AT&T Inc. for Forbearance under 47 U.S.C § 160 from Enforcement of Certain of the Commission's Cost Assignment Rules*, WC Docket Nos. 07-21, 05-342, Memorandum Opinion and Order, 23 FCC Rcd 7302, 7314, para. 20 (2008) (*AT&T Cost Assignment Forbearance Order*) (citing *Cellular Telecommunications & Internet Ass'n v. FCC*, 330 F.3d 502, 512 (2003) (evaluating the Commission's interpretation of section 10(a)(2))).

[1252] 47 U.S.C. § 160(a)(1).  In full, section 10(a)(1) directs the Commission to consider whether enforcement "is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory."  *Id.*  As a shorthand, we refer to that as requiring an analysis of whether rates and practices will be just and reasonable.

[1253] *Id.* § 160(a)(2).

[1254] *See 2015 Open Internet Order*, 30 FCC Rcd at 5805, 5840-41, paras. 436, 496; Barbara van Schewick Nov. 20, 2023 *Ex Parte* at 1 (asking that we "forbear from all provisions in Title II that are not needed to protect consumers").

[1255] *See, e.g.*, *Application of American Telephone and Telegraph Company, et al.*, File No. W-P-C-3071, Memorandum Opinion, Order, and Authorization, 84 F.C.C.2d 303, 311-12, paras. 19-20 (1981) (authorizing the deployment of fiber rather than upgrading existing cable under section 214 of the Act despite certain "short term economic considerations" because the "experience is necessary to foster the technological developments that will lead to 'learning curve' decreases in cost," without which "we may never see some of the advances that fiber technology promises to bring to telecommunications users"); *Communications Satellite Corporation, Investigation into Charges, Practices, Classifications, Rates, and Regulations*, Docket No. 16070, Decision, 56 F.C.C.2d 1101, 1122, para. 93 (1975) (allowing recovery of "the costs of satellites that failed to achieve proper orbit and satellites that malfunctioned in orbit" under the "just and reasonable" standards of section 201(c)(2) of the Communications Satellite Act of 1962 and section 201(b) of the Communications Act in light of the fact that "Comsat's mission was the commercial exploitation of this new satellite technology"); *Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776, 781 (D.C. Cir. 1990) (in ensuring just and reasonable rates under section 201(b), the Commission reasonably differentiated the rate base treatment of different types of plant under construction, allowing some to be included in the rate base "in order to encourage the carrier to acquire assets, such as land and buildings, before they are urgently needed, by which time their prices may have risen by more than the time value of their current prices," while excluding other plant "in order to encourage the carrier, once it has begun a construction project, to complete it expeditiously").

[1256] 47 U.S.C. § 160(a)(3).

considerations we evaluate under section 10(a)(1) and (a)(2),[1257] guided by the Commission's statutory duties.[1258]

314.    We agree with the *2015 Open Internet Order* that persuasive evidence of competition is not a necessary prerequisite to granting forbearance under section 10 so long as the section 10 criteria otherwise are met.[1259] As the *2015 Open Internet Order* observed, although competition can be a sufficient basis to grant forbearance, it is not inherently necessary in order to find section 10 satisfied.[1260] Nothing in the text of section 10 requires that forbearance be premised on a finding of sufficient competition where the Commission can conclude that the rules or provisions are not "necessary" under section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3) on other grounds.[1261] That interpretation of section 10 is not altered where the rules or provisions at issue involve measures to facilitate competition, despite some claims to the contrary.[1262] Even when implementing such provisions, the Commission often has rejected a single-minded focus on competition to the exclusion of other policies such as network deployment consistent with the goals of section 706 of the 1996 Act,[1263]

---

[1257] *See AT&T Cost Assignment Forbearance Order*, 23 FCC Rcd at 7321, para. 32 (forbearing "because there is no current, federal need for the [rules in question] in these circumstances, *and the section 10 criteria otherwise are met*" (emphasis added)).

[1258] *See, e.g.*, 47 U.S.C. § 151 (identifying the purposes for which the Commission was established); *id.* § 1302(a) (directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans"); Public Knowledge Comments at 89 (advocating that "the Commission should understand its Section 10 abilities as a means to ensure that the ultimate goals of the Communications Act," which "are also generally reflected in the provisions of Title II"); *id.* at 92 (discussing the need to consider statutory goals "such as media diversity, robust competition, and technological innovation").

[1259] *2015 Open Internet Order*, 30 FCC Rcd at 5807-08, para. 439.

[1260] *Id.* at 5807-08, 5840-41, paras. 439, 496 n.1502. To the extent that commenters cite prior forbearance decisions relying on competition as sufficient to justify forbearance, that precedent does not persuade us that competition is inherently necessary to justify forbearance. *See, e.g.*, Phoenix Center Comments at 3; *id.* at Attach. 4, George S. Ford & Lawrence J. Spiwak, *Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service*, 67 Fed. Comm. L.J. 1 (2015) (George Ford & Lawrence Spiwak, *Tariffing Internet Termination*); *id.* at Attach. 5, Lawrence J. Spiwak, USTelecom *and Its Aftermath*, 71 Fed. Comm. L.J. 39 (2019) (Lawrence Spiwak, USTelecom *and Its Aftermath*).

[1261] A statute that "by its terms merely requires the Commission to consider" some factor does not mean that the Commission must "give any specific weight" to the factor, and the Commission may "ultimately conclude[] that it should not be given any weight." *Time Warner Ent. Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995) (quoting *Cent. Vt. Ry. v. ICC*, 711 F.2d 331, 336 (D.C. Cir. 1983)).

[1262] *See, e.g.*, Public Knowledge Comments at 91-92. To the extent that Congress wanted the Commission to make additional findings beyond the general requirements of section 10(a) in order to forbear from particular market-opening provisions of the Act, it did so explicitly, precluding the Commission from forbearing from the application of sections 251(c) or 271 of the Act "until it determines that those requirements have been fully implemented." 47 U.S.C. § 160(d). Given that we have found those provisions to be fully implemented, we reject the view that we cannot simply apply the section 10(a) criteria according to their terms when evaluating forbearance from market opening provisions of the Act and instead must make different or more specific findings to justify forbearance. *See Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area*, WC Docket No. 04-223, Memorandum Opinion and Order, 20 FCC Rcd 19415, 19440-42, paras. 53-56 (2005) (section 251(c) has been fully implemented); *Petition for Forbearance of the Verizon Telephone Companies Pursuant to 47 U.S.C. § 160(c)* et al., WC Docket Nos. 01-338 et al., Memorandum Opinion and Order, 19 FCC Rcd 21496, 21503, para. 15 (2004) (*Section 271 Broadband Forbearance Order*) (section 271 has been fully implemented), *aff'd sub nom. EarthLink*, 462 F.3d at 1.

[1263] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5851-52, para. 514 n.1582 (citing precedent); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 544, 580 (D.C.Cir. 2004) ("[T]he Commission reasonably interpreted § 251(c)(3) to allow it to withhold unbundling orders, even in the face of some impairment, where such unbundling would pose excessive impediments to infrastructure investment."). In any case, the D.C. Circuit has "found reasonable the Commission's

(continued….)

and we see nothing in section 10 of the Act that would require a single-minded focus on competition when considering forbearance from such rules or provisions.[1264]

315.     We reject claims that an identified need for regulation in one respect to address shortcomings in competition—such as with respect to BIAS providers' gatekeeper role—implies a need for regulation in other respects, as well.[1265]  In other contexts the Commission has, for example, regulated charges that certain carriers impose on other carriers without finding it necessary to adopt *ex ante* regulation of those same carriers' end-user charges.[1266]  And the Commission has recognized such distinctions between charges imposed on other providers and charges imposed on end users in this context, as well.[1267]  Separately and independently, although the *2015 Open Internet Order* did not find pervasive evidence of competition or treat it as in itself sufficient to justify forbearance, it would be a mistake to conclude that competition plays no role at all in our analysis.  As the Commission concluded in 2015, "there is some amount of competition for broadband Internet access service," even if "it is limited in key respects," and the Commission's overall regulatory approach to BIAS, by striking the right balance between current regulation and longer-term investment incentives, "thus does advance competition in important ways."[1268]  This kind of recognition of potential trade-offs associated with particular regulatory approaches is consistent with our reading of the section 10(a) criteria, as discussed above.  In addition, we note that, during the last 15 years, when BIAS was classified as Title I information service or subject to forbearance under Title II, we have seen no significant increases in prices or unreasonably discriminatory pricing that would seem to warrant the imposition of rate regulation or tariffing requirements.

316.     As in the 2015 approach, "[b]ecause the Commission is not responding to a petition under section 10(c), we conduct our forbearance analysis under the general reasoned decision making requirements of the Administrative Procedure Act, without the burden of proof requirements that section 10(c) petitioners face."[1269]  Consistent with that approach, in our rulemaking decision here, we explain our application of the statutory forbearance criteria and other relevant statutory objectives such as section 706

---

conclusion that its section 10 analysis did not need to incorporate any statutory requirement arising from section 251."  *USTA*, 825 F.3d at 729.

[1264] Judge Williams, dissenting in part in *USTA*, contended that Commission forbearance precedent had not, to that point, involved the convergence of rules or provisions designed to facilitate competition that were subject to a grant of forbearance without heavy reliance on a competitive analysis.  *See, e.g.*, *USTA*, 825 F.3d at 776-78 (Williams, J., concurring in part and dissenting in part).  Whether or not Commission precedent prior to the *2015 Open Internet Order* involved the precise convergence of factors identified by Judge Williams, we see nothing in section 10 of the Act that would categorically preclude the Commission from granting such forbearance.

[1265] *See, e.g.*, Lawrence Spiwak, USTelecom *and Its Aftermath*, at 54-55 (criticizing the Commission's 2015 analysis for acting to address BIAS providers' gatekeeper role by banning blocking, throttling, and paid prioritization without regulating in other respects, such as requiring the filing of tariffs for BIAS and cited in Phoenix Center Comments at 3).

[1266] *See, e.g.*, *Cost Review Proceeding for Residential and Single-Line Business Subscriber Line Charge (SLC) Caps*; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket Nos. 96-262 and 94-1, Order, 17 FCC Rcd 10868, 10870 n.8 (2002) (explaining that interstate end-user charges of CLECs are not regulated); *Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, CC Docket No. 96-262, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd 9923, 9924, paras. 1-3 (2001) (*Access Charge Reform Seventh Report and Order*) (establishing benchmark rates for certain CLEC intercarrier charges).

[1267] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5633-34, para. 84 ("Broadband providers have the ability to act as gatekeepers even in the absence of 'the sort of market concentration that would enable them to impose substantial price increases on end users.'  We therefore need not consider whether market concentration gives broadband providers the ability to raise prices.  The Commission came to this conclusion in the [*2010*] *Open Internet Order*, and we conclude the same here." (footnote omitted)).

[1268] *Id.* at 5810-11, 5843, paras. 444, 501.

[1269] *Id.* at 5806-07, para. 438; *see also, e.g.*, CCIA Comments at 16.

of the 1996 Act in the level of detail necessitated by the record and our own assessment of the merits of forbearance from applying particular rules or provisions.[1270]  We conclude that satisfies our statutory obligations under section 10 of the Act and the APA.[1271]

317.    Once again, where warranted we also evaluate forbearance assuming *arguendo* that particular provisions of the Act or Commission rules apply to BIAS, rather than "first exhaustively determining provision-by-provision and regulation-by-regulation whether and how particular provisions and rules apply to this service."[1272]  We agree with the *2015 Open Internet Order*'s reasoning that "to achieve the balance of regulatory and deregulatory policies adopted here for BIAS, we need not—and thus do not—first resolve potentially complex and/or disputed interpretations and applications of the Act and Commission rules that could create precedent with unanticipated consequences for other services beyond the scope of this proceeding, and which would not alter the ultimate regulatory outcome in this Order in any event."[1273]

318.    Given our approach in this regard, we conclude that simple counts of provisions of the Act or Commission rules subject to forbearance do not shed meaningful light on the extent to which our regulatory approach to BIAS under this Order differs in practice from the default obligations under Title II of the Act or otherwise for purposes of arguments that a telecommunications service classification of BIAS (and commercial mobile service classification of mobile BIAS) are contrary to the Act's statutory scheme.[1274]  As in the *2015 Open Internet Order*, forbearance is not used solely to grant relief from

---

[1270] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5805-08, 5838-41, 5864-67, paras. 435-39, 493-96, 537-42. We agree with Public Knowledge that we should not grant forbearance "cavalierly."  Public Knowledge Comments at 90.  But we disagree with Public Knowledge insofar as it suggests that we approach the section 10 analysis with a presumption against forbearance. *See id.*; *see also, e.g.*, Equity Advocates Comments at 1-2 (advocating that the Commission use forbearance "sparingly").  We seek to faithfully apply the section 10 forbearance criteria here without artificially placing a thumb on the scale either for or against forbearance.  That approach best effectuates the Act as a whole, which not only reflects Congress's default regulatory approach for telecommunications carriers and telecommunications service but also directs that the Commission "shall" forbear where the section 10 criteria are met, as part and parcel of that overall legal framework.

[1271] We are unpersuaded by claims that our application of the section 10 forbearance criteria in a manner akin to that done in the *2015 Open Internet Order* would violate the nondelegation doctrine. *See, e.g.*, *USTA II*, 855 F.3d at 407-08 (Brown, J., dissenting from the denial of rehearing en banc).  Under Supreme Court precedent, a delegation is constitutionally permissible if Congress has "la[id] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."  *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr. & Co.*, 276 U.S. at 409); *see also Gundy*, 139 S. Ct. at 2123-30 (plurality opinion).  Section 10 readily satisfies that standard by directing the Commission that it shall forbear where the rule or provision is not necessary to ensure just and reasonable rates and practices; is not necessary for the protection of consumers; and where forbearance is in the public interest—including based on its competitive effects.  47 U.S.C. § 160(a), (b).  These are the types of assessments that Congress has entrusted to the Commission since the original enactment of the Communications Act. *See, e.g.*, 47 U.S.C. §§ 201, 202, 214, 303, 307, 309.  The Commission's authority to act in the public interest is not "unlimited."  *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940).  "[T]he words 'public interest' in a regulatory statute" do not give an agency "broad license to promote the general public welfare," but rather "take meaning from the purposes of the regulatory legislation."  *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976).  Thus, for example, the Supreme Court has held that the Communications Act's public interest standard, in context, is sufficiently definite to overcome a nondelegation challenge. *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943) (*NBC*).  We likewise conclude that the section 10(a) analysis is guided by intelligible principles set down by Congress, and we therefore reject the view that section 10 of the Act violates the nondelegation doctrine either in general or as applied here.

[1272] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5867, para. 542 (discussing the general approach).

[1273] *Id.*

[1274] *See, e.g.*, *RIF Order*, 33 FCC Rcd at 351-52, para. 64; *see also, e.g.*, CEI Comments at 11-12; International Center for Law & Economics Comments at 39-40; NCTA Comments at 20; USTelecom Comments at 36; U.S. Chamber of Commerce Comments at 54-55; CTIA Reply at 88-89; TechFreedom Reply at 21, 29-31.

default regulatory requirements affirmatively known and established to be both applicable and burdensome. Rather, outside of certain key requirements affirmatively determined to fall outside the scope of justified forbearance, we grant forbearance broadly even as to requirements that *theoretically* could newly apply by virtue of the classification decision and, if they applied, would represent *any manner* of departure from the preexisting *status quo* under an information service classification. The Commission has taken this approach not based on an affirmative determination that the default regulatory requirements are somehow inherently incompatible with BIAS but in the interest of being crystal clear about the targeted ways in which the regulatory regime being applied here will depart from the *status quo* under an information service classification. We thus find that simply counting the number of provisions of the Act or Commission rules subject to forbearance sheds no meaningful light on the magnitude of any practical departure in our regulatory approach here from the default requirements of the Act and our implementing rules.

319. Independently, the notion that even extensive forbearance would illustrate the incompatibility of our approach with the statutory scheme established by Congress fails to appreciate the full scope and operation of the 1996 Act understood against its regulatory backdrop. The Commission's section 10 forbearance authority was part and parcel of the regulatory regime enacted for telecommunications carriers and telecommunications services in the 1996 Act.[1275] The criteria specified in section 10 for when the Commission shall forbear from applying the Act or Commission rules to telecommunications carriers or telecommunications services track nearly verbatim the standard Congress established in 1993 in section 332(c)(1) of the Act for the Commission to specify requirements of Title II that would be inapplicable to commercial mobile service providers.[1276] And prior to the enactment of the

---

[1275] 47 U.S.C. § 160; *see also, e.g.*, T-Mobile Comments at 52 ("Even an expansive grant of forbearance does not contradict the statutory scheme of the Communications Act."). We disagree with arguments that our exercise of forbearance is contrary to *MCI v. AT&T and Biden v. Nebraska*. *See* Carr Dissent at 26-27. In *MCI*, the Supreme Court rejected the Commission's attempt to eliminate tariffing for competitive common carriers, concluding that exempting carriers from those obligations represented a "fundamental revision of the statute" that Congress was unlikely to have authorized through "a subtle device" in the statutory language like the Commission's authority to "modify" tariffing requirements. *MCI*, 512 U.S. at 231-32. And relying on *MCI*, the Court in *Biden v. Nebraska* similarly concluded that "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (quoting *MCI*, 512 U.S. at 225). By contrast, as the Commission has long recognized, Congress enacted section 10 forbearance authority in response to *MCI*—to grant the Commission the authority to make more extensive changes that the MCI Court previously found lacking. *See, e.g.*, *Policy and Rules Concerning the Interstate, Interexchange Marketplace; Implementation of Section 254(g) of the Communications Act of 1934, as amended*, Second Report and Order, 11 FCC Rcd 20730, 20737-38, paras. 11-13 (1996) (discussing the prior FCC detariffing efforts that formed part of the backdrop for the enactment of section 10 of the Act, and citing, among other things, *MCI*, 512 U.S. 218). That fact—coupled with Congress's decision to model section 10 on section 332(c)(1) under which the Commission previously granted broad forbearance in the past, *see infra* note 1276 and accompanying text—amply demonstrates that section 10 forbearance authority was intentionally designed by Congress to authorize more expansive changes than what would flow from distinct statutory language of the sort at issue in *MCI* and *Biden v. Nebraska*. And the circumstances here also bear no meaningful similarity to the Court's objection in *Biden v. Nebraska* that the Department of Education was seeking to "augment[] and expand[] existing [statutory] provisions dramatically." *Biden v. Nebraska*, 143 S. Ct. at 2371. In this case, after exercising the explicitly-granted forbearance authority in accordance with the terms specified by Congress, the remaining requirements that we apply flow directly from the statutory regime Congress enacted as applied to BIAS consistent with our classification decision here.

[1276] *Compare* 47 U.S.C. § 160(a) (providing that the Commission shall grant forbearance if it "determines that—(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory; (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and (3) forbearance from applying such provision or regulation is consistent with the public interest"), *and id.* § 160(b) ("In making the determination under subsection (a)(3), the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of

(continued….)

1996 Act, the Commission already had relied on that section 332(c)(1) authority to grant commercial mobile service providers broad relief from the requirements of Title II, including relief from, among other things, the tariffing requirements[1277] that the Supreme Court characterized as "the heart of the common-carrier section of the Communications Act" under the pre-1996 Act framework.[1278] There can be little doubt that when Congress enacted section 10 of the Act against that backdrop, it contemplated that services meeting the definition of "telecommunications services" likewise could—and would—be subject to broad forbearance where justified by the statutory criteria. Such an outcome thus is entirely compatible with the overall legal framework Congress enacted in the 1996 Act.

320. Finally, our forbearance with respect to BIAS does not encompass Internet transmission services that incumbent local exchange carriers or other common carriers chose to offer as telecommunications services subject to the full range of Title II requirements prior to the *2015 Open Internet Order*. The *RIF Order* observed that such services "have never been subject to the [*2015 Open Internet Order*] forbearance framework," and stated that "carriers that choose to offer transmission service on a common carriage basis are, as under the *Wireline Broadband Classification Order*, subject to the full set of Title II obligations, to the extent they applied before the" *2015 Open Internet Order*.[1279] The *2015 Open Internet Order* did, however, allow a provider previously offering broadband transmission on a common carrier basis "to change to offer Internet access services pursuant to the construct adopted in" that *Order* subject to filing with and review by the Wireline Competition Bureau of the provider's proposal for the steps it would take to convert to such an approach.[1280] In the *2023 Open Internet NPRM* we proposed to follow the same approach again here, and no commenter opposes that proposal.[1281] As such, our forbearance with respect to BIAS does not encompass such services.

## B. Maintaining Targeted Authority to Protect Consumers, Promote National Security, and Preserve the Broadband Ecosystem

321. We find that the standard for forbearance is not met with respect to BIAS for the following limited provisions:

- Sections 201, 202, and 208, along with the related enforcement provisions of sections 206, 207, 209, 216, and 217, and the associated complaint procedures; and the Commission's implementing regulations (but, to be clear, the Commission forbears from all ratemaking authority based on, or

---

telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest."), *with id.* § 332(c)(1)(A) (providing that the Commission shall specify provisions of Title II other than sections 201, 202, and 208 as inapplicable to commercial mobile service providers if it "determines that—(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory; (ii) enforcement of such provision is not necessary for the protection of consumers; and (iii) specifying such provision is consistent with the public interest"), *and id.* § 332(c)(1)(C) ("As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest").

[1277] *Second CMRS Report and Order*, 9 FCC Rcd at 1479-80, paras. 177-80 (granting forbearance from the tariffing requirements of section 203 and the associated tools for enforcing tariffs in section 204 and 205).

[1278] *MCI*, 512 U.S. at 229.

[1279] *RIF Order*, 33 FCC Rcd at 418-19, paras. 177, 179.

[1280] *2015 Open Internet Order*, 30 FCC Rcd at 5819, para. 460 n.1378.

[1281] *2023 Open Internet NPRM* at 54, para. 103.

ratemaking regulations adopted under, sections 201 and 202);

- Section 214 entry certification requirements, pursuant to which the Commission considers all aspects of the public interest associated with section 214 authorizations, including national security, law enforcement, and other concerns. We grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers,[1282] with exceptions and subject to the Commission's reserved power to revoke such authority and waive the Commission's implementing rules in section 214(a)-(d) of the Act.[1283] We forbear from section 214 exit certification requirements regarding the discontinuance, reduction, or impairment of BIAS and the Commission's implementing section 214(a)-(d) rules;[1284]

- Sections 218, 219, and 220(a)(1) and (c)-(e), which enable the Commission to conduct inquiries and obtain information;

- Section 222, which establishes core customer privacy protections (while waiving application of our current implementing rules to BIAS);

- Section 224 and the Commission's implementing rules, which grant certain benefits that foster network deployment by providing telecommunications carriers with regulated access to poles, ducts, conduits, and rights-of-way;

- Sections 225, 255, and 251(a)(2), and the Commission's implementing rules, which collectively advance access for persons with disabilities, except that the Commission forbears from the requirement that BIAS providers contribute to the Telecommunications Relay Service (TRS) Fund at this time; and

- Section 254, the interrelated requirements of section 214(e), and the Commission's implementing regulations to strengthen the Commission's ability to support broadband, supporting the Commission's ongoing efforts to support broadband deployment and adoption.

322. Our forbearance decision in this subsection focuses on addressing consequences arising from the reclassification of BIAS in this Order. Thus, we do not forbear with respect to requirements to the extent that they already applied prior to this Order without regard to the classification of BIAS. Similarly, consistent with the *2015 Open Internet Order*, to the extent that provisions or regulations apply to an entity by virtue of other services it provides besides BIAS, the forbearance in this Order does not extend to that context.[1285]

---

[1282] *See infra* Section IV.B.3.

[1283] Our grant of blanket section 214 authority includes authority for entry, acquisitions (including transfers of control and assignments), and temporary or emergency service and related requirements.

[1284] In addition, since we classify mobile BIAS as a commercial mobile service in this Order, the existing forbearance from all domestic section 214 requirements for CMRS providers applies to mobile BIAS providers. That forbearance is maintained and undisturbed by this Order. *See Implementation of Sections 3(N) and 332 of the Communications Act Regulatory Treatment of Mobile Services*, GN Docket No. 93-252, Second Report and Order, 9 FCC Rcd 1411, 1480-81, para. 182 (1994).

[1285] Consistent with the Commission's conclusions in the *2015 Open Internet Order*, this Order does not alter any additional or broader forbearance previously granted that already might encompass BIAS in certain circumstances, for example, insofar as BIAS, when provided by mobile providers, is a CMRS service. As one example, the Commission has granted some forbearance from section 310(d) for certain wireless licensees that meet the definition of "telecommunications carrier." *See generally Federal Communications Bar Association's Petition for Forbearance from Section 310(d) of the Communications Act*, Memorandum Opinion and Order, 13 FCC Rcd 6293 (1998) (*FCBA Forbearance Order*). But section 310(d) is not itself framed in terms of "common carriers" or "telecommunications carriers" or providers of "CMRS" or the like, nor is it framed in terms of "common carrier services," "telecommunications services," "CMRS services" or the like. To the extent that such forbearance thus

(continued….)

1.      **Authority to Protect Consumers and Promote Competition (Sections 201 and 202)**

323.      The Commission has previously described sections 201 and 202 as lying "at the heart of consumer protection under the Act," providing, along with their attendant enforcement sections, "bedrock consumer protection obligations."[1286]  The Commission has never previously completely forborne from these important statutory protections,[1287] and we generally do not find forbearance warranted here.[1288]  We find sections 201 and 202 of the Act, along with section 208 and certain fundamental Title II enforcement authority, necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and necessary to protect consumers under section 10(a)(1) and (a)(2).  We also find that forbearance from these provisions would not be in the public interest under section 10(a)(3), and therefore do not grant forbearance from those provisions and associated enforcement procedural rules with respect to BIAS.  However, particularly in light of the protections the open Internet rules provide and the ability to employ sections 201 and 202 in case-by-case adjudications, we are otherwise persuaded to forbear from applying sections 201 and 202 of the Act to the extent they would permit the adoption of *ex ante* rate regulation of BIAS in the future, as discussed below.[1289]

324.      Section 201 enables the Commission to protect consumers against unjust or unreasonable charges, practices, classifications, and regulations in connection with BIAS.[1290]  And section 202 prohibits discrimination in the provision of communications services,[1291] thereby advancing the Commission's goals of ending digital discrimination and promoting universal service and digital equity.[1292]  In order to forbear from these statutory provisions, we would have to conclude, among other things, that their enforcement is not necessary for consumer protection,[1293] something the record provides no basis to do.  Indeed, the Commission has previously taken enforcement action against providers under section 201 for

_____

goes beyond the forbearance for wireless providers granted in this Order, this Order does not narrow or otherwise modify that pre-existing grant of forbearance.

[1286] *2015 Open Internet Order*, 30 FCC Rcd at 5809, para. 441; *Personal Communications Industry Association's Broadband Personal Communications Services Allian's Petition for Broadband Personal Communications Services et al.*, WT Docket No. 98-100, GN Docket No. 94-33, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 16857, 16864, para. 15 (1998) (*PCIA Forbearance Order*).

[1287] *2015 Open Internet Order*, 30 FCC Rcd at 5817, para. 456; *PCIA Forbearance Order*, 13 FCC Rcd at 16865, para. 15.

[1288] *See, e.g.*, NCTA Comments at 15 ("Such a narrow and targeted application of a backstop would be consistent with Sections 201 and 202 of [the Act], which require service to be provided upon reasonable request, codifies a carrier's duty to interconnect, and prohibits unjust and unreasonable discrimination."); CDT Comments at 13 (explaining that Title II classification has the added benefit of giving the Commission the ability to apply sections 201 and 202); Free Press Comments at 61-66 (arguing that the Commission cannot forbear from applying section 201, 202, and 208 because they are the core sections of Title II and doing so would be inconsistent with past Congressional instruction regarding the Act).

[1289] To be clear, this *ex ante* rate regulation forbearance does not extend to inmate calling services and therefore has no effect on our ability to address rates for inmate calling services under section 276.  *See infra* Section IV.C.1.

[1290] 47 U.S.C. § 201; *see also* AARP Comments at 5.

[1291] 47 U.S.C. § 202; *see also* AARP Comments at 5.

[1292] NDIA Comments at 4 (highlighting the Commission recently passing rules to address digital discrimination of access and positing that "[u]pon reclassification, Title II offers additional authority for the Commission to take action to address discriminatory practices by internet service providers"); Lawyers' Committee Comments at 11-14; AARP Comments at 5; *see also Implementing the Infrastructure Investment and Jobs Act:  Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-100, at 2, para. 1 (Nov. 20, 2023) (*Preventing Digital Discrimination Order and FNPRM*) (stating that "addressing digital discrimination of access is an important part of closing the digital divide").

[1293] 47 U.S.C. § 160(a)(2).

violation of consumers' privacy rights.[1294]  And Congress itself recognized the importance of sections 201 and 202 when it specifically excluded them (along with section 208) from earlier CMRS-specific forbearance authority under section 332(c)(1)(A).[1295]

325.  Additionally, sections 201 and 202 reinforce the Commission's ability to preserve Internet openness, and applying these provisions benefits the public broadly by helping foster innovation and competition at the edge,[1296] thereby promoting broadband infrastructure investment nationwide.[1297]  As explained below, the open Internet rules adopted in this Order reflect more specific protections against unjust or unreasonable practices for or in connection with BIAS.[1298]  These benefits—which can extend beyond the specific dealings between a particular BIAS provider and customer—persuade us that forbearance from sections 201 and 202 here is not in the public interest.[1299]

326.  We also observe that section 201(b) enables the Commission to regulate BIAS-only providers that serve MTEs and thereby end unfair, unreasonable, and anticompetitive practices facing MTE residents, furthering the Commission's goals to foster competition and promote consumer choice for those living and working in MTEs.[1300]  Obligating BIAS-only providers to abide by the same kinds of rules—including those that prohibit exclusivity contracts that bar competition outright in MTEs—that other telecommunications and cable providers must currently follow will secure the same protections for all residents of MTEs, regardless of the kind of service offered by providers in their building; reduce regulatory asymmetry between BIAS-only providers and other kinds of providers; and potentially improve competition in the MTE marketplace.  Therefore, we do not forbear from section 64.2500 of our rules as to BIAS providers, which prohibits common carriers from entering into certain types of agreements and requires disclosure of others.[1301]  BIAS-only providers should therefore ensure that all MTE-related contracts entered into subsequent to the effective date of this Order are in compliance with section 64.2500.  With respect to pre-existing MTE-related contracts, we temporarily waive section 64.2500 with respect to these contracts for BIAS-only providers for a period of 180 days to allow these providers to bring their pre-existing contracts into compliance with section 64.2500.  The Commission may waive its rules and requirements for "good cause shown,"[1302] which may be found "where particular facts would make strict compliance inconsistent with the public interest."[1303]  In making this determination, the Commission may "take into account considerations of hardship, equity, or more

---

[1294] *See TerraCom, Inc. & YourTel Am., Inc.*, File No. EB-TCD-13-00009175, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325, paras. 1-2 (2014) (*TerraCom and YourTel America NAL*) (imposing a forfeiture for violations of sections 201(b) and 222(a) in connection with the storage of consumers' "names, addresses, Social Security numbers, driver's licenses, and other proprietary information on unprotected Internet servers that anyone in the world could access"); Public Knowledge Comments at 56.

[1295] 47 U.S.C. § 332(c)(1)(A) (providing that the Commission "may not specify any provision of section 201, 202, or 208" for forbearance).

[1296] Thus, in this respect, our decision to apply the provisions actually will promote competitive market conditions at the edge.  *See* 47 U.S.C. § 160(b) (directing the Commission, in "making the determination under subsection (a)(3), [to] consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services").

[1297] *See infra* Section V.A.1.

[1298] *See infra* Section V.A.

[1299] 47 U.S.C. § 160(a)(3).

[1300] *See, e.g.*, *2022 MTE Report and Order and Declaratory Ruling*, 37 FCC Rcd at 2469, para. 33.

[1301] *See* 47 CFR § 64.2500.

[1302] 47 CFR § 1.3.

[1303] *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (*Ne. Cellular Tel. Co*).

effective implementation of overall policy,"[1304] and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[1305] We find good cause in this instance to provide adequate notice and time to give BIAS-only providers an opportunity to bring pre-existing contracts for MTEs into compliance with our newly applicable MTE rules.[1306]

327. For the foregoing reasons we find that sections 201 and 202 of the Act are necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and necessary to protect consumers under sections 10(a)(1) and (a)(2). Moreover, retaining these provisions is in the public interest because it provides the Commission direct statutory authority to protect Internet openness and promote fair competition while allowing the Commission to adopt a tailored approach and forbear from most other requirements. We find that our section 201 and 202 authority provides a more flexible framework better suited to the broadband marketplace than many of the alternative regulations—such as *ex ante* rate regulations and interconnection requirements—from which we are forbearing but which otherwise would be necessary.[1307] Such considerations provide additional grounds for our conclusion that section 10(a)(3) is not satisfied as to forbearance from sections 201 and 202 of the Act with respect to BIAS.

328. We disagree with commenters urging the Commission to forbear from sections 201 and 202 outright. WISPA disputes the value section 202 brings to the Commission's antidiscrimination efforts, highlighting the broad enforcement powers Congress conferred upon the Commission and the rules established in our digital discrimination proceeding.[1308] But these sections enable the Commission to advance digital equity in other ways not contemplated elsewhere, including providing authority for our open Internet rules.

329. We also disagree with ACA Connects and WISPA that the Commission should forbear from applying sections 201 and 202 to small BIAS providers. ACA Connects contends that reclassification would impose burdensome costs and that smaller service providers lack the resources, such as in-house legal staff, needed to operate in a Title II world.[1309] They thus argue that the Commission should grant forbearance from direct application of sections 201 and 202 and instead "bring *ad hoc* enforcement actions . . . for conduct that falls outside the scope of the proposed conduct-based rules."[1310] Similarly, WISPA asserts that there is "ample evidence that application of these requirements to smaller

---

[1304] *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969) (*WAIT Radio*).

[1305] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1306] We note that this 180-day period is consistent with the time the Commission has previously granted providers to bring their pre-existing contracts into compliance with newly enacted MTE rules. *See 2022 MTE Report and Order and Declaratory Ruling*, 37 FCC Rcd at 2463-64, para. 32. We reject LARIAT's request that the Commission exempt small providers from "restrictions" on "bulk billing of multi-tenant dwellings." LARIAT Apr. 19, 2024 *Ex Parte* at 2. LARIAT does not provide a specific justification for exempting small BIAS providers from our MTE requirements, but rather generalizes that these provisions (along with others) "could" impose "tremendous unnecessary burdens on our company . . . and also harm consumers." *Id.* We have provided all BIAS-only providers a suitable period of time to come into compliance with these provisions, and further, the Commission's MTE provisions are designed to protect, not harm, consumers and LARIAT provides no evidence to the contrary.

[1307] We thus reject the arguments of some commenters against the application of these provisions insofar as they assume that such additional regulatory requirements also will apply in the first instance. *See, e.g.*, CEI Comments at 11-14 (explaining that "Title II contains numerous detailed and onerous regulatory powers that enable the Commission to regulate almost every aspect of a carrier's business" and that forbearance from 201 and 202 is not sufficient to avoid deterring BIAS provider investment and innovation); WISPA Comments at 26-31, 54-59 (explaining that Title II regulation will impose additional regulatory costs on providers and that our proposed non-forbearance of sections 201 and 202 would lead to rate regulation).

[1308] WISPA Reply at 11 (citing *Preventing Digital Discrimination Order and FNPRM*).

[1309] ACA Connects Comments at 48-49; ACA Connects Reply at 20-21.

[1310] ACA Connects Comments at 50; ACA Connects Reply at 7; *see also* Lumen Oct. 11, 2023 *Ex Parte* at 1-2.

providers will do more harm than good."[1311] These arguments fail to consider that sections 201 and 202 serve as a legal basis for adoption of the open Internet conduct rules. Further, in making these arguments, commenters fail to acknowledge the legal framework applied in the CMRS context, where sections 201 and 202 have applied for years. This history should allay any "concerns . . . about potential burdens, or uncertainty, resulting from the application of sections 201 and 202,"[1312] and we conclude that providers, both small and large, will find ample guidance about the application of sections 201 and 202 via our open Internet rules.[1313]

### 2. Enforcement (Sections 206, 207, 208, 209, 216, and 217)

330. We also do not forbear from section 208's complaint proceeding rules and other fundamental Title II enforcement provisions.[1314] In particular, we do not forbear from applying section 208 of the Act and the associated procedural rules, which provide a complaint process for enforcement of applicable provisions of the Act or any Commission rules.[1315] We also retain additional statutory provisions that we find necessary to ensuring a meaningful enforcement process. In particular, we do not forbear from sections 206, 207, and 209. Without these provisions that permit "redress through collection of damages," section 208's complaint protections would be "virtually meaningless."[1316] Section 208 and its associated procedural rules,[1317] as well as sections 206 and 207, which serve as a necessary adjunct to the complaint process,[1318] provide the public the means to "file a complaint with the Commission and seek redress."[1319] We similarly do not forbear from sections 216 and 217, which "were intended to ensure that a common carrier could not evade complying with the Act by acting through others over whom it has control or by selling its business."[1320] Thus, we do not forbear from enforcing these key Title II enforcement provisions with respect to BIAS.

331. In the event that a carrier violates its common carrier duties, the section 208 complaint process would permit challenges to a carrier's conduct, and many commenters advocate for section 208 to

---

[1311] WISPA Reply at 10; *see also* WISPA Comments at 26-31; ACA Connects Comments at 40-45.

[1312] *2015 Open Internet Order*, 30 FCC Rcd at 5812, para. 447.

[1313] *Supra* Section V.A.

[1314] *See* 47 U.S.C. §§ 206-208, 216-217.

[1315] *Id.* § 208; *see, e.g.*, 47 CFR §§ 1.711-1.740 (informal and formal complaints regarding common carriers); *see also* NTCA Comments at 15 ("Sections 206, 207, and 208 of the Act could also offer an avenue for the resolution of complaints and enforcement mechanisms should the need arise.").

[1316] *2015 Open Internet Order*, 30 FCC Rcd at 5818, para. 453; *Second CMRS Report and Order*, 9 FCC Rcd at 1482, para. 186. Allowing for the recovery of damages does not mean that an award of damages necessarily would be appropriate in all, or even most, cases. The Commission has discretion to deny an award of damages and grant only prospective relief where a case raises novel issues on which the Commission has not previously spoken, or where the measurement of damages would be speculative. The Commission also has authority to adopt rules and procedures that are narrowly tailored to address the circumstances under which damages would be available in particular types of cases.

[1317] *See, e.g.*, 47 CFR §§ 1.711-1.740 (governing informal and formal complaints regarding common carriers).

[1318] 47 U.S.C. § 206 (providing that common carriers shall be liable to injured parties for damages); *id.* § 207 (providing that an injured party may either make complaint to the Commission or bring suit for the recovery of damages against liable common carriers).

[1319] *2015 Open Internet Order*, 30 FCC Rcd at 5815, para. 454.

[1320] *Second CMRS Report and Order*, 9 FCC Rcd at 1482, para. 186; *Implementation of Section 3(n) and 332 of the Communications Act*, GN Docket No. 93-252, Report and Order and Order on Reconsideration, 10 FCC Rcd 7824 (1995).

apply.[1321]  The Commission's procedural rules establish mechanisms to carry out that enforcement function in a manner that is well-established and clear for all parties involved.  The Commission has never previously forborne from section 208.[1322]  Indeed, we find it instructive that in the CMRS context Congress specifically precluded the Commission from using section 332 to forbear from section 208.[1323]  Commenters also observe the important interrelationship between section 208 and sections 206, 207, 216, and 217,[1324] which the Commission itself has recognized in the past, as discussed above.[1325]  In addition, to forbear from sections 216 and 217 would create a loophole in our ability to evenly enforce the Act, which would imperil our ability to protect consumers and to protect against unjust or unreasonable conduct, and would be contrary to the public interest.  The prospect that carriers may be forced to defend their practices before the Commission supports the strong public interest in ensuring the reasonableness and nondiscriminatory nature of those actions, protecting consumers, and advancing our overall public interest objectives.[1326]  While some commenters express fears of burdens arising from the application of these provisions to BIAS,[1327] we find such arguments to be speculative, particularly given the lack of evidence of such actions where those provisions historically have applied (including in the CMRS context).  As a result, for all of the foregoing reasons, we conclude that none of the section 10(a) criteria is met as to forbearance from these fundamental Title II enforcement provisions and the associated Commission procedural rules with respect to BIAS.  As explained above, sections 201 and 202 do not pose the existential threat that some commenters claim they do.  Moreover, individuals harmed by a provider's unlawful practices must have some means of being made whole, and we agree with the Lawyers' Committee that section 208 is "essential" for pursuing claims of discrimination and other

---

[1321] *See, e.g.*, NDIA Comments at 4-5; Lawyers' Committee Comments at 10-14; Public Knowledge Comments at 93-96; *see also* AARP Comments at 7 ("Despite the work AARP and others are doing to prevent fraud and scams, a much stronger deterrence is needed from the Commission with its full complement of rulemaking and enforcement tools available to fight scams and frauds as they evolve.");  Free Press Comments at 61.

[1322] *2015 Open Internet Order*, 30 FCC Rcd at 5815-16, para. 455; *2010 Broadband Classification NOI*, 25 FCC Rcd at 7898, para. 75; *see also* Free Press Comments at 61-65.

[1323] 47 U.S.C. § 332(c)(1).

[1324] *See, e.g.*, Public Knowledge et al. Comments at 93.

[1325] We note, however, that in complaint proceedings filed pursuant to section 207, courts have historically been careful to consider the Commission's views as a matter of primary jurisdiction on the reasonableness of a practice under section 201(b).  A federal district court may determine that the Commission is better to suited to answer the particular question before the court in the first instance and elect to invoke the primary jurisdiction doctrine.  The primary jurisdiction doctrine applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.  *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940); *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993).

[1326] For the reasons discussed above, we thus reject the assertions of some commenters that enforcement is unduly burdensome.  *See, e.g.*, ACA Connects Comments at 40; Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-2 (filed Oct. 5, 2023); Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 16, 2024) (WISPA Apr. 16, 2024 *Ex Parte*) (urging the Commission issue a Further Notice examining, among other things, costs of complying with sections 206, 207, and 208 for small BIAS providers).  In particular, we are not persuaded that such concerns outweigh the overarching interest advanced by the enforceability of sections 201 and 202.  Nothing in the record demonstrates that our need for enforcement differs among broadband providers based on their size, and we thus are not persuaded that a different conclusion in our forbearance analysis should be reached in the case of small broadband providers, for example.

[1327] *See, e.g.*, ACA Connects Comments at 54; WISPA Comments at 61.

harms.[1328]

### 3.    Requirement for a Certificate of Public Convenience and Necessity (Section 214)

332.    We do not forbear from the entry certification requirements of section 214(a)-(d) of the Act with respect to the provision of BIAS.  Section 214(a) requires carriers to obtain a Commission certification to construct, acquire, operate, or engage in transmission over lines of communication.[1329]  By reclassifying BIAS as a Title II telecommunications service subject to section 214, the Commission can ensure that the "present or future public convenience and necessity" is served,[1330] including its obligation to protect the nation's telecommunications networks and to protect the United States from entities that pose threats to national security and law enforcement interests.  To ensure continued service for consumers and to provide regulatory certainty to BIAS providers, however, we grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers, with exceptions and subject to the Commission's reserved power to revoke such authority.  Specifically, to protect national security and law enforcement interests, we exclude the following entities and their current and future affiliates and subsidiaries from this blanket section 214 authority—China Mobile International (USA) Inc. (China Mobile USA),[1331] China Telecom (Americas) Corporation (CTA), China Unicom (Americas) Operations Limited (CUA), Pacific Networks Corp. (Pacific Networks), and ComNet (USA) LLC (ComNet)—whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked by the Commission in view of national security and law enforcement concerns.[1332]

333.    Section 214 entry certification, albeit blanket certification, is consistent with our conclusion that reclassifying BIAS as a telecommunications service will significantly bolster the Commission's ability to carry out its statutory public interest responsibilities to safeguard national security and law enforcement.[1333]  Exercising this section 214 authority achieves two core purposes—

---

[1328] Lawyers' Committee Comments at 11 (asserting that the section 208 complaint procedures "are essential to enabling communities to vindicate their own rights when they suffer discrimination").

[1329] Section 214(a) provides in relevant part that "no carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line." 47 U.S.C. § 214(a). Sections 214(b)-(d) address in relevant part, notifications, conditions, and other requirements associated with an application for a certificate for the construction, extension, operation, or acquisition of a line or channel of communication.  *Id*. § 214(b)-(d).

[1330] *Id.* § 214(a).

[1331] This Order does not modify China Mobile USA's blanket domestic section 214 authority to provide other domestic interstate services and to construct or operate any other domestic transmission line, which was not addressed in the *China Mobile USA Order.  See China Mobile USA Order*; *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11365-66, para. 2.  The Commission retains the authority to revoke a carrier's blanket domestic section 214 authority when warranted.  *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11374, para. 16.

[1332] *See China Mobile USA Order*; *China Telecom Americas Order on Revocation and Termination*; *China Unicom Americas Order on Revocation*; *Pacific Networks and ComNet Order on Revocation and Termination*.  We also exclude these entities' current and future affiliates and subsidiaries.

[1333] The Supreme Court has determined that the Commission has considerable discretion in deciding how to make its section 214 public interest findings.  *RCA*, 346 U.S. at 90; *see Competitive Common Carrier Rates and Facilities Report and Order*, 85 F.C.C.2d at 40-44, paras. 117-29 (discussing the Commission's authority under section 214(a) of the Act); *1995 Streamlining NPRM*, 10 FCC Rcd at 13480, para. 6; *1996 Streamlining Order*, 11 FCC Rcd at 12903, para. 44 n.63; Telecommunications Act of 1996, Pub. L. 104-104, § 402(b)(2)(A) (codified at 47 U.S.C. § 214 note) ("The Commission shall permit any common carrier—(A) to be exempt from the requirements of section 214 of the Communications Act of 1934 for the extension of any line . . . .").

national security and the promotion of safety of life and property—and is integral to the Commission's public interest assessment of providers seeking to provide essential BIAS to consumers.[1334] The *2023 Open Internet NPRM* recognized that reclassification of BIAS "is necessary to unlock tools the Commission needs to fulfill its objectives and responsibilities to safeguard this vital service."[1335]

334. The importance of section 214 of the Act with regard to the Commission's national security efforts is evident in the Commission's actions concerning entities that are majority-owned and controlled by the Chinese government. Over the past several years, the Commission denied an application for international section 214 authority[1336] and revoked certain carriers' section 214 authority based on recommendations and comments from interested Executive Branch agencies regarding evolving national security and law enforcement concerns.[1337] We disagree with commenters that contend that an insignificant fraction of all BIAS providers serving U.S. customers "present the type of national security risk that the Commission intends to address,"[1338] or that "there is no indication that any of the carriers whose section 214 authorizations the Commission revoked in recent years provides BIAS service."[1339] At the time the Commission took these actions, section 214 did not apply to BIAS, potentially exposing the nation's communications networks to national security and law enforcement threats by entities providing

---

[1334] 47 U.S.C. § 214; *see Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66, *recon. denied, Reconsideration Order*; *see also Supply Chain First Report and Order*, 34 FCC Rcd at 11436, para. 34;; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968, para. 3; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1481, para. 3; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4222, para. 3; *Evolving Risks Order and NPRM* at 8, 14, paras. 13, 29.

[1335] *2023 Open Internet NPRM* at 13, para. 21.

[1336] *China Mobile USA Order*, 34 FCC Rcd at 3361-62, 3365-66, 3376-77, 3380, paras. 1, 6, 8, 31-33, 38 (denying China Mobile USA's international section 214 application upon a finding that a grant would not serve the public interest, in light of the Chinese government's likely intention and ability to use the international section 214 authorization to cause substantial harm to U.S. critical infrastructure, national security, and law enforcement activities and would raise substantial and serious national security and law enforcement risks that could not be addressed through a mitigation agreement). In that proceeding, the Executive Branch agencies and the Commission confronted the implications of changed circumstances in the national security environment on the evaluation of international section 214 authority. *See id.* at 3372, 3379, paras. 20, 37.

[1337] *See China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15966-68, 15974, 15992-16030, paras. 1-3, 9, 44-99; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1489-90, 1508-55, paras. 1-3, 16, 49-110; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4220-22, 4232-33, 4251-4314, paras. 1-3, 14, 44-113. In each of these revocation actions, the Commission extensively evaluated national security and law enforcement concerns raised by existing section 214 authorizations and determined, based on thorough record development, that the present and future public interest, convenience, and necessity was no longer served by those carriers' retention of their section 214 authority. *2023 Open Internet NPRM* at 16-17, para. 27; *China Telecom Americas Order on Revocation and Termination, aff'd, China Telecom (Ams.) Corp. v. FCC*; *China Unicom Americas Order on Revocation*; *Pacific Networks and ComNet Order on Revocation and Termination*.

[1338] ABIC Comments at 8-9 ("In reality, however, only a miniscule fraction of all BIAS providers serving U.S. customers present the type of national security risk that the Commission intends to address. For example, a subset of BIAS providers may already offer other telecommunications services pursuant to domestic Section 214 authority.").

[1339] Lumen Comments at 26; *see* CTIA Comments at 31 ("The *Notice* states that reclassification would allow the Commission to build upon its actions revoking the Section 214 authorizations of certain Chinese telecommunications companies, but those companies focused on enterprise services and not U.S. mass market services such as BIAS. Indeed, the Commission's revocation orders did not describe any of these companies as offering BIAS."); NCTA Comments at 68-69 (stating "the records in those proceedings nowhere indicate that any of the Chinese carriers provides mass market broadband and thus they would not be subject to the Title II regulatory framework proposed by the *NPRM*"); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-3 (filed Mar. 20, 2024); Letter from Matthew A. Brill, Counsel for NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Mar. 21, 2024).

BIAS or seeking to provide BIAS.[1340] We believe the same national security and law enforcement concerns identified in the Commission's recent denial and revocation and/or termination proceedings equally exist with respect to these and other entities providing BIAS or seeking to provide BIAS.[1341] We agree with arguments in the record that applying section 214 of the Act to the provision of BIAS may have significant future national security, law enforcement, and other benefits by enhancing the Commission's ability to act immediately in response to future threats.[1342] By declining to forbear from the application of the section 214 entry authorization requirement to BIAS, we build upon these and other actions the Commission has taken to strengthen and advance its ability to protect U.S. telecommunications networks and critical infrastructure against national security threats.[1343]

335. We find that BIAS is subject to section 214 on the basis of it being both a domestic and an international telecommunications service.[1344] BIAS is defined as a "service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints,"[1345] and our interpretation of "all Internet endpoints" includes, without distinction, foreign as well as domestic endpoints.[1346] Thus, BIAS necessarily involves "foreign communication" as well as

---

[1340] *See 2023 Open Internet NPRM* at 16-17, para. 27.

[1341] *See id.*

[1342] Free Press Comments at 59 ("We agree with the Commission's conclusion that classifying BIAS as a telecommunications service would enhance its 'ability to protect the nation's communications networks from entities that pose threats to national security and law enforcement pursuant to its authority under section 214 of the Act.'"); Public Knowledge Comments at 63 ("With regard to national security, the NPRM correctly observes that the Commission cannot address concerns over foreign networks without Title II authority. Specifically, the Commission must have authority under Section 214 to revoke the right of networks to operate.").

[1343] For instance, in November 2019, the Commission prohibited the use of public funds from the Commission's Universal Service Fund (USF) to purchase, obtain, maintain, improve, modify, or otherwise support any equipment or services produced or provided by companies posing a national security threat to the integrity of communications networks or the communications supply chain. *Supply Chain First Report and Order*, 34 FCC Rcd at 11433, para. 26; *see also, e.g., Supply Chain Second Report and Order*, 35 FCC Rcd at 14292-99, 14311, 14325-26, 14331-68, 14368-71, paras. 21-31, 58, 94-95, 108-208, 209-17; *Public Safety and Homeland Security Bureau Announces Publication of the List of Equipment and Services Covered by Section 2 of the Secure Networks Act*, WC Docket No. 18-89, Public Notice, 36 FCC Rcd 5534 (PSHSB 2021) (announcing the publication of a list of communications equipment and services (the Covered List) that are deemed to pose an unacceptable risk to the national security of the United States or the security and safety of United States persons). In March 2022 and September 2022, the Public Safety and Homeland Security Bureau announced additions to the Covered List. *Public Safety and Homeland Security Bureau Announces Additions to the List of Equipment and Services Covered by Section 2 of the Secure Networks Act*, WC Docket No. 18-89, Public Notice, 37 FCC Rcd 4078 (PSHSB 2022); *Public Safety and Homeland Security Bureau Announces Additions to the List of Equipment and Services Covered by Section 2 of the Secure Networks Act*, WC Docket No. 18-89, Public Notice, 37 FCC Rcd 10735 (PSHSB 2022).

[1344] The Commission has employed different rules for domestic and international section 214 authorizations to date. *See, e.g.*, 47 CFR §§ 63.01-63.25. Within the category of international section 214 authorizations, it has adopted a regulatory approach that turns, among other things, on the particular destination country to be served. *See, e.g.*, 47 CFR § 63.12(c).

[1345] 47 CFR § 8.1(b); *see supra* Section III.D.1; *2023 Open Internet NPRM* at 34, para. 59.

[1346] 47 CFR § 8.1(b) (defining "[b]roadband Internet access service" as "provid[ing] the capability to transmit data to and receive data from all or substantially all Internet endpoints"); *2023 Open Internet NPRM* at 34, para. 59; *2015 Open Internet Order*, 30 FCC Rcd at 5682, para. 187.

"interstate communication" (and at least some intrastate communication, as well).[1347]  Given the global nature of BIAS,[1348] we find it appropriate to treat BIAS as a mixed domestic and international service.[1349]

### a. Blanket Section 214 Authority Is Granted for the Provision of BIAS, with Exceptions and Subject to the Commission's Reserved Power to Revoke Such Authority

336.    While section 214 entry authorization is critical to protect national security and law enforcement interests, we recognize that entry certification entails costs.  Commenters argue that the Commission should forbear from section 214, citing potential costs, delays, and administrative burdens on BIAS providers.[1350]  They raise concerns about lengthy and burdensome application processes,

---

[1347] 47 U.S.C. § 153(21), (28).

[1348] *See, e.g.*, Letter from Joseph C. Cavender, Vice President and Deputy General Counsel, Lumen, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1, 4-5 (filed Feb. 26, 2024) (stating that a BIAS provider offers customers access to endpoints in the United States as well as other countries around the world and that the Commission should grant blanket domestic and international authorizations for the provision of BIAS "but retain the ability to revoke authorization if necessary"); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2-3 (filed Feb. 27, 2024) (stating that the Commission should limit obligations to requiring BIAS providers to have an international section 214 authorization to enter the marketplace and grant blanket international section 214 authority with the ability to revoke the authority to address national security concerns, and that "doing so would effectively preclude that provider from offering broadband Internet access service, as it would no longer be able to offer American customers access to all or substantially all internet end points, many of which are outside the U.S."); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-3 (filed Mar. 8, 2024).

[1349] We recognize that the Commission stated in the *2015 Open Internet Order* that "[b]roadband Internet access service involves the exchange of traffic between a last-mile broadband provider and connecting networks."  *2015 Open Internet Order*, 30 FCC Rcd at 5693-94, para. 204; *see also id.* ("The representation to retail customers that they will be able to reach 'all or substantially all Internet endpoints' necessarily includes the promise to make the interconnection arrangements necessary to allow that access.").  But what could be termed the "physical" location or scope of a service does not dictate its jurisdictional status, which instead turns on the jurisdiction of the communications being carried.  *See, e.g.*, *Core Commc'ns, Inc. v. FCC*, 592 F.3d 139, 144 (D.C. Cir. 2010) (recognizing that "[d]ial-up internet traffic is special because it involves interstate communications that are delivered through local calls" and was subject to the Commission's section 201 authority); *American Telephone and Telegraph Company; Illinois Bell Telephone Company; Southwestern Bell Telephone Company; Pacific Telephone and Telegraph Company Interconnections with Private Interstate Communications Systems*, Memorandum Opinion and Order, 71 F.C.C.2d 1, 6-7, para. 15 (1979) ("The Commission and the courts have in a number of cases held that the physical location of facilities is not determinative of whether they are interstate or intrastate for regulatory purposes.  Rather, the key issue in determining the interstate or intrastate nature of a facility for regulatory purposes is the nature of the communications which pass through the facilities.").

[1350] INCOMPAS Comments at 26-27; ITI Comments at 3-4; George Ford, *Investment in the Virtuous Circle* at 25; ADTRAN Comments at 14; ABIC Comments at 5-8; CTIA Comments at 35; ICG Comments at 6.  *But see, e.g.*, CWA Comments at 8 (expressing that "CWA's chief concern, primarily related to domestic section 214 requirements, is the impact on network reliability associated with the enforcement of the requirement that carriers may not discontinue service to the community without the Commission first determining that the public convenience or necessity will not be adversely affected by the discontinuation"); Free Press Comments at 60 ("While it would seem unfathomable to many that an ISP could just drop all of its customers without warning, this does happen. . . . While managing discontinuances may ultimately be a duty that is best handled jointly by state and federal authorities, it is certainly the case that classifying BIAS under Title II would give the Commission the power to protect consumers in situations like this if state commissions or Local Franchising Authorities are unable or incapable of acting."); Letter from the United States Hispanic Chamber of Commerce, et al., to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320, at 1 (claiming that application of section 214 to BIAS would create regulatory delays and slow broadband deployment).

especially for small BIAS providers,[1351] and consequences for investment and innovation.[1352] To address these concerns while protecting our telecommunications networks, and supported by the record,[1353] we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specific identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current and future affiliates and subsidiaries.[1354]

337. Such blanket section 214 authority is subject to the Commission's reserved power to revoke,[1355] consistent with established statutory directives and longstanding Commission determinations with respect to section 214 authorizations.[1356] We believe that blanket section 214 authority will allow BIAS providers to continue operating and providing BIAS without the need for Commission-approved applications at this time.[1357] Our decision to condition grant of blanket section 214 authority for the provision of BIAS on the Commission's reserved power to revoke such authority is consistent with the

---

[1351] WISPA Comments at 66-67 (expressing particular concern about the impact of transfer of control application processes on small providers). At least one commenter claims that the networks of smaller BIAS providers "are not prone" to evolving national security and other concerns, and the Commission should not apply section 214 to smaller BIAS providers. *See* ACA Connects Comments at 51-53.

[1352] Business Roundtable Comments at 1; CTIA Comments at 35; NCTA Comments at 22, 94-95; Mark Israel et al. Declaration at 46; Letter from Joe Kane, Director Broadband and Spectrum Policy, Information Technology & Innovation Foundation, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-2 (filed Mar. 25, 2024).

[1353] *See, e.g.*, Public Knowledge Comments at 63-64 ("With regard to national security, the NPRM correctly observes that the Commission cannot address concerns over foreign networks without Title II authority. Specifically, the Commission must have authority under Section 214 to revoke the right of networks to operate. The Commission can achieve this by granting blanket authority to operate under Section 214 without the need to apply for a specific license—although the Commission may require foreign networks to apply for a license rather than grant them blanket authority . . . ."); Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4-5 (filed Mar. 11, 2024); Transatel Comments at 2 ("To assure that BIAS providers continue to invest in their product and services to the benefit of U.S. consumers, Transatel respectfully urges the Commission, at a minimum, to grant temporary blanket domestic and international 214 authorizations to BIAS providers."); Lumen Comments at 4; USTelecom Reply at 85; Letter from William H. Johnson, Senior Vice President, Federal Regulatory & Legal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-2 (filed Apr. 12, 2024) (Verizon Apr. 12, 2024 *Ex Parte*); USTelecom Apr. 15, 2024 *Ex Parte* at 2.

[1354] *See infra* Section IV.B.3.b.

[1355] *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11373-74, paras. 14-16; *Foreign Participation Order*, 12 FCC Rcd at 23896, 23919-20, 24023, paras. 9, 61-63, 295; *Reconsideration Order*, 15 FCC Rcd at 18173, 18175-76, paras. 28, 35; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968-69, para. 4; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1482-83, 1493-94, paras. 4, 24; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4222-23, para. 4.

[1356] *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11373-74, paras. 14-16; *China Telecom Americas Order on Revocation and Termination*; *China Unicom Americas Order on Revocation*; *Pacific Networks and ComNet Order on Revocation and Termination*. The Commission has explained that it grants blanket section 214 authority, rather than forbearing from application or enforcement of section 214 entirely, in order to remove barriers to entry without relinquishing its ability to protect consumers and the public interest by withdrawing such grants on an individual basis. *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11372-73, 11374, paras. 12-14, 16. This Order does not alter the Commission's current rules implementing section 214 as applied to all other services subject to section 214 of the Act.

[1357] While certain benefits arising from our decision not to forbear may be difficult to quantify, such as the current and future protection of national security, law enforcement, or other public interest benefits, we nevertheless conclude that the expected benefits of applying section 214 entry authority to the provision of BIAS through this Order greatly exceed any potential costs to providers. The costs to providers are, in any event, minimized by our grant of blanket authority with no prescriptive entry requirements.

established statutory directives and longstanding Commission determinations with respect to section 214 authorizations.[1358]  Indeed, when the Commission opened the U.S. telecommunications market to foreign participation in the late 1990s, it delineated a non-exhaustive list of circumstances where it reserved the right to designate for revocation an international section 214 authorization based on public interest considerations[1359] and stated that it considers "national security" and "foreign policy" concerns when granting authorizations under section 214 of the Act.[1360]

338.    Based on the key public interest considerations that inform our action in this Order, we reserve the right to conduct *ad hoc* review of whether a provider's retention of blanket section 214 authority for the provision of BIAS presents national security, law enforcement, public safety, or other risks that warrant revocation of such authority.  We disagree that this important safeguard associated with blanket section 214 authority causes uncertainty for BIAS providers[1361] as the Commission has clearly established that it continues to reassess on an *ad hoc* basis whether a carrier's retention of section 214 authority presents national security or other risks that warrant revocation of its section 214 authority.[1362] The Executive Branch agencies also may recommend that the Commission modify or revoke an existing authorization if they at any time identify unacceptable risks to national security or law enforcement interests of the United States.[1363]  If revocation or termination may be warranted, the Commission may institute a revocation proceeding to "provide the authorization holder such notice and an opportunity to respond as is required by due process and applicable law, and appropriate in light of the facts and circumstances."[1364]

b.      **China Mobile USA, CTA, CUA, Pacific Networks, ComNet, and Their Current and Future Affiliates and Subsidiaries Are Excluded**

---

[1358] In previously granting all telecommunications carriers blanket domestic section 214 authority, the Commission found that the "present and future public convenience and necessity require the construction and operation of all domestic new lines pursuant to blanket authority," subject to the Commission's ability to revoke a carrier's section 214 authority when warranted to protect the public interest.  *Domestic 214 Blanket Authority Order*, 14 FCC Rcd at 11374, para. 16; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968-69, para. 4; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1482, 1493-94, paras. 4, 24; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4222-23, para. 4; *Evolving Risks Order and NPRM* at 14, para. 30.

[1359] *See, e.g.*, *Foreign Participation Order*, 12 FCC Rcd at 24023, para. 295; *Reconsideration Order*, 15 FCC Rcd at 18173, 18175-76, paras. 28, 35; *see also* 47 CFR § 63.11(g)(2); *2014 Foreign Carrier Entry Order*, 29 FCC Rcd at 4259, 4266, paras. 6, 22; *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15968-99, para. 4; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1482, 1493-94, paras. 4, 24; *Pacific Networks/ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4222-23, para. 4; *Evolving Risks Order and NPRM* at 14, para. 30.

[1360] *Foreign Participation Order*, 12 FCC Rcd at 23896, 23919-20, paras. 9, 61-63; *Evolving Risks Order and NPRM* at 14, para. 30.

[1361] ITIF Testimony at 3.

[1362] *See Evolving Risks Order and NPRM* at 7, para. 10; *see generally China Telecom Americas Order on Revocation and Termination*; *China Unicom Americas Order on Revocation*; *Pacific Networks and ComNet Order on Revocation and Termination*.

[1363] Executive Order No. 13913 of April 4, 2020, Establishing the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector, 85 Fed. Reg. 19643, 19645 (Sec. 6(a)); *see also id.* at 19646 (Sec. 9(b)); *Evolving Risks Order and NPRM* at 7, para. 10.

[1364] *Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket No. 16-155, Report and Order, 35 FCC Rcd 10927, 10964, para. 92; *id.* at 10962-64, paras. 90-92; *Evolving Risks Order and NPRM* at 7, para. 10.

**from Blanket Section 214 Authority for BIAS**

339. To further protect the nation's telecommunications networks from threats to national security and law enforcement, we exclude China Mobile USA, CTA, CUA, Pacific Networks, ComNet, and their current and future affiliates and subsidiaries from grant of blanket section 214 authority for the provision of BIAS.[1365] We find that excluding these Chinese government-owned entities and their current and future affiliates and subsidiaries from blanket section 214 authority is warranted based on the Commission's prior determinations that the present and future public interest, convenience, and necessity would no longer be served by these Chinese government-owned entities' retention of section 214 authority,[1366] or that the public interest would not be served by the grant of international section 214 authority.[1367]

340. The Commission found that these entities are subject to exploitation, influence, and control by the Chinese government,[1368] and that mitigation would not address the national security and law enforcement concerns.[1369] The Commission identified national security and law enforcement concerns with respect to the entities' access to Internet PoPs (usually located within data centers)[1370] and other harms in relation to the services provided by those entities pursuant to section 214 authorization.[1371] To deter evasion of our exclusion of these entities, and consistent with the Commission's inclusion of these entities and their affiliates and subsidiaries in the list of equipment and services covered by section 2 of the Secure and Trusted Communications Networks Act,[1372] we also exclude their current and future affiliates and subsidiaries from our grant of blanket section 214 authority.[1373]

c. **Transition Period for China Mobile USA, CTA, CUA, Pacific**

---

[1365] *See* 47 CFR § 2.903(c) (defining "affiliate" and "subsidiary").

[1366] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15966-97, para. 1; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1480-81, para. 1; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4220-21, para. 1. The Commission concluded that those entities' retention of section 214 authority presented national security and law enforcement risks that warranted revocation of their section 214 authority. *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16008, para. 65; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1530, para. 74; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4287, para. 74.

[1367] *China Mobile USA Order*, 34 FCC Rcd at 3361-62, para. 1; *id.* at 3376, para. 30 (concluding that it "find[s] persuasive in the current security environment the argument that there is a significant risk that the Chinese government would use China Mobile USA to conduct activities that would seriously jeopardize the national security interests and law enforcement activities of the United States").

[1368] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15967, para. 2; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1481, para. 2; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4221, para. 2; *China Mobile USA Order*, 34 FCC Rcd at 3365-66, para. 8.

[1369] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 15967, para. 2; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1481, para. 2; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4221-22, para. 2; *China Mobile USA Order*, 34 FCC Rcd at 3365-66, para. 8.

[1370] *2023 Open Internet NPRM* at 16, para. 27 & n.100. Today, ISPs provide BIAS through PoPs. *Id.*; *see China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16027, paras. 91-92.

[1371] *2023 Open Internet NPRM* at 16, para. 27 & n. 101; *see China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16027, paras. 91-92; *see supra* Section III.A.2.

[1372] *See* 47 CFR § 1.50002; FCC, *List of Equipment and Services Covered by Section 2 of the Secure Networks Act* (last updated Sept. 20, 2023).

[1373] Of course, any entity affected by this exclusion remains free to petition the Commission for section 214 authority under the statute and demonstrate how grant of the authority would serve the public interest, convenience, and necessity.

**Networks, and ComNet**

341.    We direct China Mobile USA, CTA, CUA, Pacific Networks, and ComNet and their affiliates and subsidiaries to discontinue any and all provision of BIAS no later than sixty (60) days after the effective date of this Order as established in the *Federal Register*.  We require these entities to provide notice of service discontinuance to all affected customers within thirty (30) days after the effective date of this Order as established in the Federal Register.[1374]  Such notice shall be in writing to each affected customer.  We further require the entities to file a copy of the standard notice(s) sent to their customers (without providing the Commission with any customers' personally identifiable information (PII)) in the docket of this proceeding through the Commission's Electronic Comment Filing System (ECFS) within sixty (60) days after the effective date of this Order as established in the *Federal Register*.  If the entity does not provide BIAS, the entity shall file a letter attesting to this information and certified by a corporate officer in ECFS within sixty (60) days after the effective date of this Order as established in the *Federal Register*.  We find this transition reasonable, as the Commission previously gave CTA, CUA, Pacific Networks, and ComNet this same transition period to discontinue all services previously provided under section 214 authority, and it should mitigate any difficulties BIAS customers may face in finding other providers.[1375]

**d.    Waiver of Rules Implementing Section 214(a)-(d) of the Act**

342.    We recognize that application of the Commission's current rules implementing section 214(a)-(d) of the Act, which historically have addressed traditional telecommunications services, may raise operational issues in the context of BIAS.[1376]  In addition, some commenters suggest that the Commission should pursue a further rulemaking to consider implementation of rules under section 214(a)-(d) that are tailored to BIAS in view of our classification of BIAS herein.[1377]  The Commission expects to release a Further Notice at a future time to examine whether any section 214 rules specifically

---

[1374] This Order shall be effective sixty (60) days after publication in the *Federal Register*.

[1375] *China Telecom Americas Order on Revocation and Termination*, 36 FCC Rcd at 16059-60, para. 154; *China Unicom Americas Order on Revocation*, 37 FCC Rcd at 1567-68, para. 133; *Pacific Networks and ComNet Order on Revocation and Termination*, 37 FCC Rcd at 4351, para. 162.

[1376] For example, the current rules contain requirements with respect to the regulatory classification of U.S. international carriers as "either dominant or non-dominant for the provision of particular international communications services on particular routes"; notification by, and prior approval for, U.S. international carriers that are, or propose to become, affiliated with a foreign carrier; conditions applicable to all international section 214 authorizations; conditions applicable to authorized facilities-based international carriers; and conditions applicable to carriers authorized to resell the international services of other authorized carriers.  *See* 47 CFR §§ 63.10, 63.11, 63.21, 63.22, 63.23.

[1377] *See, e.g.*, Free Press Comments at 68 ("[W]e strongly urge the Commission to consider all Section 214 matters raised by reclassification of Title II in a separate proceeding."); INCOMPAS Comments at 57 ("Given the record in the pending international 214 proceeding—where there is unanimous concern from industry on the new proposed regulatory regime for international Section 214 authorizations—the FCC should forbear on this statutory provision and rules for BIAS providers, and at the very least waive Section 214 requirements and seek further comment on the appropriate (if any) 214 regime for BIAS providers."); ABIC Comments at i ("Requiring licensure under Section 214 and all that it entails would be a sea change for BIAS providers and their owners.  Merely seeking comment on amorphous 'implementation issues' without proposing a specific regulatory framework does not meet the Commission's burden.  Similar flaws exist with the Commission's other national security proposals and how they would apply to providers that already offer services classified as telecommunications services.  The Commission should issue a new notice to clarify its intent on these issues."); Free Press Reply at 22 ("These requests for new proceedings or further development of the record in this proceeding are reasonable, and we urge the Commission to proceed incrementally on most matters that lie outside of the basic classification question and the full restoration of the Open Internet rules and guidance in the 2015 order.").

tailored to BIAS, including for small providers, are warranted.[1378]  But in light of the current record and the blanket authority we grant herein, we find it appropriate to waive the current rules implementing section 214(a)-(d) of the Act with respect to BIAS to the extent they are otherwise applicable.[1379]

343.    The Commission may waive its rules and requirements for "good cause shown."[1380] Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest."[1381]  In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy,"[1382] and whether "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[1383]  The current rules were established in the context of traditional telecommunications services. Given our consideration of hardship and equity that may arise by immediate application of those rules to BIAS following our action in this Order, we find there is good cause to waive those rules pending the adoption of BIAS-specific rules at some future time to the extent the public interest dictates.

344.    We find that the public interest is served by this waiver as it will ensure that consumers can continue to receive the broadband Internet access services to which they presently subscribe and avoid any disruption to, or uncertainty for, BIAS consumers and BIAS providers.[1384]

---

[1378] Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3-4 (filed Apr. 17, 2024) (requesting that the Commission examine in a further proceeding whether section 214 of the Act should apply to small BIAS providers) .

[1379] 47 CFR §§ 1.763, 43.82, 63.03-63.04, 63.09-63.14, 63.17-63.18, 63.20-63.25, 63.50-63.53, 63.65, 63.66, 63.100, 63.701-63.702.  In light of the forbearance we grant for section 214 related exit authority, i.e., discontinuance requirements, it is unnecessary to waive our discontinuance rules to the extent they would be applicable to BIAS as a telecommunications service.  *See, e.g.*, *id.* §§ 63.19, 63.60, 63.61, 63.62, 63.63, 63.71, 63.90, 63.500-63.501, 63.504-63.505, 63.601-63.602.

[1380] 47 CFR § 1.3 ("Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.").  In the *2023 Open Internet NPRM*, we sought comment on issues related to implementation of section 214, including whether we should adopt temporary forbearance, grant blanket section 214 authority, or act in some other manner.  *2023 Open Internet NPRM* at 56-57, para. 108.  One commenter proposed issuing a waiver of the rules if the Commission does not forbear from section 214.  *See* Letter from Lindsay Stern, Attorney & Policy Manager, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Feb. 26, 2024) (stating that if the Commission does not forbear from section 214 for BIAS providers, it should "at least waive the requirements in the upcoming Order and seek further comment on a potential 214 regime in a separate proceeding.").

[1381] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1382] *WAIT Radio*, 418 F.2d at 1159.

[1383] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1384] We reiterate that with respect to mobile BIAS, because we conclude herein that mobile BIAS is a commercial mobile service, it is subject to the forbearance granted for CMRS providers as a whole in 1994.  *See CMRS Second Report and Order*, 9 FCC Rcd at 1480-81, para. 182.  We note that this forbearance from domestic section 214 requirements as applied to mobile BIAS providers will also apply to mobile satellite service providers, to the extent they provide mobile satellite broadband service, that are licensed as common carriers for the provision of service that meets the statutory definition of CMRS (e.g., mobile earth station licensees).  *See, e.g.*, *The Establishment of Policies and Service Rules for the Mobile Satellite Service in the 2 Ghz Band*, IB Docket No. 99-81, Report and Order, 15 FCC Rcd 16127, 16173-74, paras. 96-97 (2000) (finding that "[w]e will treat the mobile earth terminal component of the 2 GHz MSS as common carriage for regulatory purposes.  We will, however, reserve the right to review individual applications on a case-by-case basis to determine if this regulatory classification is appropriate"); *Flexibility for Delivery of Communications by Mobile Satellite Service Providers in the 2 Ghz Band, the L-Band, and the 1.6/2.4 Ghz Bands*; *Review of the Spectrum Sharing Plan Among Non-Geostationary Satellite Orbit Mobile Satellite Service Systems in the 1.6/2.4 Ghz Bands*, IB Docket No. 02-364, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 11030, 12073-75, paras. 231-34 (2003) (affirming the Commission's previous findings in the *2 GHz MSS Rules Order* and holding that, "if a mobile handset authorization

(continued….)

e.      **The Commission Will Forbear from the Section 214 Exit Certification Requirement**

345.      We find the section 10 criteria met for forbearance from applying the exit certification requirements in section 214(a)-(d) and the Commission's implementing rules to the extent they would newly apply through the classification of BIAS as a Title II telecommunications service.[1385]  As explained above, we focus our regulatory oversight on the entry certification requirement for BIAS providers and find it prudent to forbear from mandating an exit certification that would require them to obtain approval from the Commission to discontinue, reduce, or impair service to a community.  Knowing that we can ensure that the Commission can review existing and future BIAS participants serving consumers through their blanket entry into the market, we find that there is no current need to also require exit certifications.  Doing so would conflict with the overall tailored regulatory approach we adopt and that is designed to promote infrastructure investment and innovation.[1386]  We are persuaded by commenters that BIAS providers' freedom to make network investments is optimized when they need not divert capital to outdated network equipment and services while seeking discontinuance approval.[1387]  We agree that applying section 214 in a targeted and narrow manner to address national security and law enforcement concerns allows us to monitor market entrants that may then invest and innovate without being "locked in" to maintaining those investments as circumstances and technology evolve.[1388]  This is also consistent with the *2015 Open Internet Order*, which acknowledged that discontinuance obligations entail costs and that it is important to incrementally apply regulations beyond the *status quo*.[1389]  Thus, applying the exit

---

meets the statutory definition of CMRS in section 332(d)(1) of the Act, then the service will be regulated as CMRS").  Under our decision in this Order, mobile BIAS, including mobile satellite broadband service, will continue to  be subject to international section 214 requirements for their international operations, but as discussed, we are granting blanket section 214 authority for the provision of BIAS set forth in this Order.  The Commission anticipates issuing a Further Notice to consider what rules should apply going forward.  As we observed in the *2023 Open Internet NPRM*, our Title III licensing authority with respect to facilities-based mobile BIAS providers independently "grant[s] us important authority that can be used to advance national security and public safety with respect to the services and equipment subject to licensing."  *2023 Open Internet NPRM*, at 57, para. 109.

[1385] Section 214(a) provides, in relevant part, that "no carrier shall discontinue, reduce, or impair service . . . unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby."  47 U.S.C. § 214(a).  Sections 214(b)-(d) address, in relevant part, notifications, conditions, and other requirements associated with an application for a certificate for the discontinuance, reduction, or impairment of service.  *Id*. § 214(b)-(d).

[1386] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501 ("[T]he record also does not provide a strong basis for concluding that the forbearance granted in this Order is likely to directly impact the competitiveness of the marketplace for broadband Internet access services.  We note that the forbearance we grant is part of an overall regulatory approach designed to promote infrastructure investment in significant part by preserving and promoting innovation and competition at the edge of the network.  Thus, even if the grant of forbearance does not directly promote competitive market conditions, it does so indirectly by enabling us to strike the right balance at this time in our overall regulatory approach." (footnotes omitted)); *id*. at 5849-51, para. 513 (relying on the quoted reasoning in evaluating forbearance from interconnection and market-opening requirements).

[1387] *See, e.g.*, AT&T Comments at 28-29; INCOMPAS Comments at 57-59; CTIA Reply at 89; T-Mobile Comments at 37, 40-41; Letter from Scott K. Bergmann, Senior Vice President, Regulatory Affairs, Thomas C. Power, Senior Vice President and General Counsel, and Amy Bender, Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3-4 (filed Mar. 27, 2024); Verizon Apr. 12, 2024 *Ex Parte* at 1-2; USTelecom Apr. 15, 2024 *Ex Parte* at 2.

[1388] USTelecom Comments at 102.

[1389] *2015 Open Internet Order*, 30 FCC Rcd at 5848, para. 510.

certification provision of section 214(a) of the Act is not "necessary" under sections 10(a)(1) and (a)(2).[1390]

346.     For those same reasons, we also find that forbearance is in the public interest under section 10(a)(3).  Some commenters have raised important issues regarding the ability of consumers and companies to maintain awareness of potential service changes and disruptions, including for alarm companies monitoring and public safety activities.[1391]  Carriers remain subject to section 214 discontinuance requirements for all telecommunications services other than BIAS, including for telephone exchange and other services, and for services being transitioned to IP-based technology, which appear to be the focus of AICC's concerns at this time.  As services evolve, providers must ensure that customers remain informed.  As we stated in the *2015 Open Internet Order*, our universal service rules are designed to advance the deployment of broadband networks, including in rural and high-cost areas.[1392]  Providers receiving funding to deploy networks are subject to public interest obligations that protect consumers subscribing to BIAS, including in rural areas or in areas that might have only one provider.[1393]  In addition, the conduct standards in our open Internet rules are a necessary backstop to ensure BIAS providers act reasonably and provide protections against reduction or impairment of BIAS short of complete cessation of providing that service.  As the Commission determined in the *2015 Open Internet Order*, all of these protections are sufficient to protect consumers.[1394]

### 4.     Information Collection and Reporting to Promote National Security, Public Safety, and Improve Network Resiliency (Sections 218, 219, and 220(a)(1), (c)-(e))

347.     We do not forbear from sections 218, 219, and 220(a)(1) and (c)-(e) of the Act.  The Commission was created in part "[f]or the purpose of obtaining maximum effectiveness from the use of radio and wire communications in connection with safety of life and property."[1395]  As we conclude in this Order, reclassification of BIAS is essential to protecting national security and public safety.[1396]  Sections 218, 219, and 220(a)(1) and (c)-(e) of the Act provide the Commission with the ability to inquire into the

---

[1390] We thus disagree with those commenters that support not forbearing from section 214 exit requirements because of alleged public safety benefits with respect to discontinuance requirements.  The services for which they are primarily concerned are not BIAS and remain subject to our section 214 discontinuance rules.  *See, e.g.*, AICC Comments at iv, 7-8; CWA Comments at 8; CWA Reply at 6-8; Free Press Comments at 59-60; Public Knowledge Reply at 5.

[1391] *See* AICC Comments at iv, 2, 8; Free Press Comments at 59-60 (asserting that customers can lose service without warning, including in rural areas); Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Apr. 16, 2024).  To the extent that Public Knowledge urges the Commission to avoid forbearance and instead waive the section 214 exit certification requirements, we note that while the Commission may waive its rules, it may not generally waive a provision of a statute.  Forbearance is the mechanism for not applying statutory provisions when warranted.  *Maricopa Community College District Request for Experimental Authority to Relax Standards for Public Radio Underwriting Announcements*, FID Nos. 40095, 40096, Memorandum Opinion and Order, 29 FCC Rcd 15042, 15044-45, para. 7 (2014); 47 CFR § 1.3; *see also* USTelecom Apr. 18, 2024 *Ex Parte* at 2 (recognizing that the statutory exit certification requirements in sections 214 cannot be waived by the Commission).

[1392] *2015 Open Internet Order*, 30 FCC Rcd at 5847-48, para. 509.

[1393] *See, e.g.*, *Enhanced A-CAM Report and Order* at 9, para. 19 (adopting an Enhanced Alternative Connect America Cost Model program to support broadband deployment for a total of 15 years, with associated obligations and requirements); *NTIA Notice of Funding Opportunity, Broadband Equity, Access, and Deployment Program* at 7-8, 36-46 (2022) (describing minimum factors in proposals submitted by eligible entities to deploy broadband to unserved and underserved locations).

[1394] *2015 Open Internet Order*, 30 FCC Rcd at 5847-48, para. 509.

[1395] 47 U.S.C. § 154(n).

[1396] *See supra* Sections III.A.2-III.A.6.

management of providers, collect information, and require reporting, among other things, in order to carry out the Commission's duties.[1397]  Sections 218, 219, and 220 provide additional tools necessary to ensure that our nation's networks are reliable, secure, and protected from bad actors seeking to disrupt our communications and access sensitive information.  For example, sections 218 and 220(a)(1) and (c) will enhance the Commission's ability to require BIAS providers to report outages through NORS and DIRS, which promotes the Commission's ongoing efforts to improve network resiliency and increase situation awareness during disasters.[1398]  Further, sections 218, 219, and 220(a)(1) and (c)-(e) will provide the Commission with the ability to obtain information from BIAS providers that is essential to the Commission's performance of its duties and statutory responsibilities.[1399]  For example, in the *Evolving Risks Order and NPRM*, the Commission adopted a one-time collection of foreign ownership information from international section 214 authorization holders,[1400] noting that the information will assist the Commission in developing a timely and effective process for prioritizing the review of international section 214 authorizations that are most likely to raise national security, law enforcement, foreign policy, and/or trade policy concerns.[1401]  Additionally, sections 220(a)(1) and (c) will enhance the Commission's ability to require BIAS providers to establish cybersecurity risk management plans and other best practices to mitigate exploitation of BIAS networks.  For these reasons, we find that forbearance from sections 218, 219, and 220(a)(1) and (c)-(e) of the Act would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers.[1402]

---

[1397] 47 U.S.C. § 218 (providing that the Commission "may inquire into the management of the business of all carriers subject to this chapter," and "may obtain from such carriers and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, such carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created"); 47 U.S.C. § 219 (providing that the Commission "is authorized to require annual reports from all carriers subject to this chapter, and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, any such carrier, to prescribe the manner in which such reports shall be made, and to require from such persons specific answers to all questions upon which the Commission may need information").  Section 220(a)(1) provides that the Commission "may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to this chapter," and section 220(c) provides that "[t]he Commission shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers."  47 U.S.C. § 220(a)(1), (c).  Subsections (d)-(e) of section 220 provide for the enforcement mechanism.  47 U.S.C. §§ 220(d)-(e).

[1398] *See supra* Section III.A.5; *see also Resilient Networks Second Report and Order* at 66, para. 68 & n.164; *988 Report and Order* at 29-30, paras. 49-51 (imposing outage reporting requirements on covered 988 service providers).

[1399] 47 U.S.C. §§ 218, 219, 220; Public Knowledge Comments at 94-95 (discussing the utility of sections 218, 219, and 220 in facilitating the Commission's satisfaction of its obligations); Free Press Comments at 69 (contending that sections 218 and 220 could prove "an important source of investigative authority for the Commission, should it be unable to use other authorities to compel a reluctant carrier to cooperate with Commission inquiries").

[1400] *Evolving Risks Order and NPRM* at 1, 9-12, 72, paras. 1, 16-23, 198.

[1401] *Id.* at 9, para. 16.  Such examples run contrary to the arguments of commenters that sections 218, 219, or 220 may impose data collection burdens that are unnecessary.  *See* WISPA Comments at 69-70 (contending that enforcement of section 218 is "not necessary"); T-Mobile Reply at 39 (arguing that the Commission has previously identified the use of such sections as principally related to rate-making and thus should be forborne from); ACA Connects Reply at 21-22 (agreeing with WISPA); NCTA et al. Reply at 4 (citing WISPA and claiming that section 218 is unnecessary).

[1402] 47 U.S.C. § 160(a)(2)-(3).  Although WISPA argues that section 220(a)(2)'s recordkeeping requirements would be unduly burdensome for smaller providers, WISPA itself acknowledges the Commission's ability to tailor application thereof as necessary.  *See* WISPA Comments at 20; *see also* Free Press Comments at 69 (observing that

(continued….)

348.    We agree with Free Press that we should exclude section 218 from forbearance because it could be an important source of investigative authority, and that we should retain section 220(c) to address national security.[1403]  We are not persuaded by CCIA that we should forbear from these sections because the Commission forbore from them in 2015.[1404]  Because of the changed circumstances since 2015, we find that the national security and public safety benefits require that we exclude these sections from forbearance.  We also disagree with WISPA that enforcement of sections 218 and 220 will be burdensome to small providers.[1405]  Arguments about the hypothetical costs and burdens to providers are speculative if and until we take additional regulatory action pursuant to those sections, at which time the Commission would consider the impact on small providers.  Furthermore, we find that the benefits to national security, public safety, and network resiliency likely weigh in favor of not forbearing from these sections.

### 5.    Customer Privacy (Section 222)

349.    As proposed,[1406] we do not forbear from section 222 of the Act, which establishes core privacy protections for customers of telecommunications services, as well as other entities that do business with Title II providers.  We do, however, waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service by virtue of today's Order.  Section 222 governs telecommunications carriers' protection, use, and disclosure of information obtained from their customers or other carriers.  The requirements of section 222 themselves impose duties on carriers, and the Commission has recognized its ability to directly enforce the statutory requirements of section 222 even in the absence of rules specifically addressing a given issue.[1407]  We find that forbearance from section 222 would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers.[1408]  Our decision today conforms to the Commission's long history of protecting consumer privacy,[1409] and the Commission's long-held understanding that "[c]onsumers' privacy needs are no less important when consumers communicate over and use broadband Internet access than when they rely on [telephone] services."[1410]  We also find that because section 222 places an obligation on telecommunications carriers to protect the confidentiality of the proprietary information of, and relating to, other telecommunications carriers (including resellers),

---

the "Commission need not apply the accounting requirements found in Section 220(a)(2) or 220(b), but in the interest of national security it" should retain the general investigative authority found therein).

[1403] Free Press Comments at 69; *see also* Public Knowledge Comments at 94-95 (requesting that we not forbear from sections 218-220, among other sections that it requests we exclude from forbearance).

[1404] CCIA Comments at 16 (asking that the Commission forbear from applying sections 215-221 in full, among other sections).

[1405] WISPA Comments at 69-71; WISPA Apr. 16, 2024 *Ex Parte* at 2 (urging the Commission issue a further notice examining, among other things, the costs of complying with sections 218 and 220 for small BIAS providers).

[1406] *2023 Open Internet NPRM* at 54, para. 104.

[1407] *See, e.g.*, *Bright House Networks, LLC, et al. v. Verizon Cal., Inc.*, File No. EB-08-MD-002, Memorandum Opinion and Order, 23 FCC Rcd 10704, 10708-09, para. 11 (2008) (granting in part a formal complaint for violating section 222(b) of the Act), *aff'd sub nom. Verizon, Cal., Inc. v. FCC*, 555 F.3d 270 (D.C. Cir. 2009); *Implementation of the Telecommunications Act of 1996 et al.*, CC Docket Nos. 96-115 et al., Second Report and Order and Further Notice of Proposed Rulemaking, 13 FCC Rcd 8061, para. 10 (1998) (explaining that "the LEC's duty exists presently," under section 222(e), "independent of any implementing rules we might promulgate in the future"); *see also, e.g.*, *TerraCom and YourTel America NAL*, 29 FCC Rcd at 13330, para. 13 (issuing an NAL based on apparent liability for violating section 222(a)).

[1408] 47 U.S.C. § 160(a)(2), (3).

[1409] *See, e.g.*, *Wireline Broadband Classification Order*, 20 FCC Rcd at 14931, para. 149 & n.447 (emphasizing the Commission's role in developing privacy requirements prior to the enactment of section 222 of the Act).

[1410] *See id.* at 14930, para. 148.

equipment manufacturers, and business customers, requiring BIAS providers to comply with section 222 will protect information concerning entities that interact with BIAS providers.

350.     As discussed above, the record supports our finding that BIAS providers serve as a necessary conduit for information passing between their customers and Internet sites or other users, and are thus situated to collect vast swaths of sensitive information about their customers, including personal information, financial information, precise location information, and information regarding their online activity.[1411]  And this finding, in turn, supports our conclusion not to forbear from section 222.  A 2021 FTC Staff Report found that BIAS providers collect and combine data across product lines, collect data beyond what is necessary to provide the service (including the websites that customers visit, the shows they watch, the apps they use, details about their home energy use, their real-time and historical location, and their Internet search queries), use web data to target ads, group consumers using sensitive characteristics, and share real-time location data with third parties.[1412]  Evidence suggests that consumers may not fully comprehend—and therefore may not be able to meaningfully consent to—BIAS providers' collection, processing, and disclosure of customer information.[1413]  Further, as the American Library Association explains, "due to the lack of competition, even if consumers understand the extent to which their ISP collects their personal data, they most likely do not have the option to switch to an ISP that aligns with their privacy and data security goals."[1414]  As just one example that illustrates the fact that providers do not compete on privacy—and the importance of the Commission's domain-specific expertise

---

[1411] *See supra* Section III.F.6; *see also, e.g.*, AARP Comments at 9 ("The health information, financial information and other personal information that flows over their networks can be extremely sensitive.  In addition to that data, broadband providers can collect information about time of use, location of use, and other information that can help them as they develop a more complete picture of their customer.  That information can be quite valuable not only to sell to advertisers but for hackers to target."); ACLU Comments at 8 ("Because broadband is such a critical component of our daily lives, ISPs are able to monitor consumers as they go about their daily lives.  This has enabled them to amass, use, disclose and sometimes sell a wealth of data about consumers, including demographic information (like race, ethnicity, sexual orientation, economic status, political affiliations, or religious beliefs), browsing history, live and historical location data, and contacts."); ALA Comments at 16; Lawyers' Committee Comments at 16-17 ("Mobile broadband providers also can track physical movements, and with greater precision than virtually any other private actor, through cell-site location information (CSLI). . . . The Commission needs to protect location data for many reasons, including to protect people seeking reproductive healthcare.").

[1412] *See* FTC, A Look at What ISPs Know About You:  Examining Privacy Practices of Six Major Internet Service Providers at 33-34 (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf (2021 FTC Staff Report); CDT Reply at 14-15; EPIC et al. Comments at 4-6.

[1413] *See, e.g.*, 2021 FTC Staff Report at 34-35 (finding that "while consumers certainly expect ISPs to use information about the websites they wish to visit in providing the internet services itself, they would likely be surprised at the extent of data that is collected, retained, and combined for purposes unrelated to providing the service, particularly in ways that could cause them harm.  Indeed, the collection, and use practices of many of the ISPs in our study could run counter to many consumers' preferences"); *id.* at 30 ("Although many of the ISPs in our study purported to offer consumers access to their information, this offer is largely illusory, given that the information is either indecipherable or nonsensical without context."); ALA Comments at 16.

[1414] *See* ALA Comments at 16; *see also* Consumer Reports Comments at 8-9 ("Strong default protections are especially necessary when it comes to broadband service, where consumers typically do not have many alternative options, and service providers insulated from robust competition are incentivized to monetize data in ways that may be contrary to consumers' preferences and interests."); Mozilla Comments at 9 (asserting that "customers have little opportunity to object to harmful practices and similar inability to switch to a provider with better privacy practices"); EPIC et al. Comments at 4-6 (explaining that BIAS customers "often face challenges that prevent them from changing providers in response to their dissatisfaction with inadequate data security, including contract periods and local monopolies," and that "[o]ften customers aren't even able to abandon companies with poor security practices, as many of them build 'digital moats' to lock their users in" (quoting Bruce Schneier, *The Uber Hack Exposes More Than Failed Data Security*, N.Y. Times (Sept. 26, 2022), https://www.nytimes.com/2022/09/26/opinion/uber-hack-data.html)).

in the area of privacy enforcement—we note that all of the nationwide wireless carriers are currently subject to Forfeiture Orders for their similar failures to protect customer location information.[1415] We remain concerned that, absent statutory and regulatory requirements to do so, BIAS providers have minimal incentive to adopt adequate administrative, technical, physical, and procedural safeguards to protect their customers' data from improper or excessive uses by providers themselves, or from further disclosure and misuse by third parties.[1416] Additionally, WISPA's contention that protection of CPNI may be particularly burdensome for small providers is not itself cause for forbearance from section 222 outright.[1417] A customer's privacy needs do not fluctuate with the size of a provider, and therefore section 10(a)'s forbearance criteria, which focus on whether a requirement is necessary to ensure just and reasonable and nondiscriminatory practices, do not justify the relief requested by WISPA.

351.    We also disagree with CCIA's position that the Commission must, at this time, apply section 222 to BIAS providers only with respect to "'information' that is a clear analog to the non-BIAS telecommunications service information that the Commission is charged with protecting."[1418] As an initial matter, we observe that the Commission has never provided an exhaustive list of what constitutes CPNI. But more importantly, as explained above, the Commission's privacy authority under Title II is not limited to CPNI.[1419] Sections 222(a) and 201 also impose obligations, which we enforce, on carriers' practices with regard to non-CPNI customer proprietary information and PII.[1420] We see no reason to depart from that approach with respect to BIAS; on the contrary, the types of sensitive information to which BIAS providers have access by virtue of their provision of BIAS as a service underscores the imperative of applying section 222 to BIAS providers broadly—i.e., without limiting its application to only particular information types.[1421]

352.    We reject assertions that application of section 222 to BIAS will lead to "regulatory bifurcation" of privacy on the Internet,[1422] or that it would be arbitrary and capricious for the Commission

---

[1415] *See T-Mobile USA, Inc.*, File No.: EB-TCD-18-00027702, Forfeiture Order, FCC 24-43 (adopted Apr. 17, 2024, released Apr. 29, 2024); *Sprint Corp*, File No.: EB-TCD-18-00027700, Forfeiture Order, FCC 24-42 (adopted Apr. 17, 2024, released Apr. 29, 2024); *Verizon Communications*, File No.: EB-TCD-18-00027698, FCC 24-41 (adopted Apr. 17, 2024, released Apr. 29, 2024); *AT&T, Inc.*, File No.: EB-TCD-18-00027704, FCC 24-40 (adopted Apr. 17, 2024, released Apr. 29, 2024).

[1416] *See, e.g.*, EPIC et al. Comments at 4-6 (asserting that "normal market forces are unlikely to be able to correct for these cybersecurity deficiencies" and "the reality is that the market does not reward healthy security"); *see also* Consumer Reports Comments at 8 (explaining that section 222 provides "better certainty and stronger protections" because, unlike the FTC's authority, "providers have an affirmative duty of confidentiality over customer data, and [Section 222] limits data processing to what is reasonably necessary to provide the services requested by a consumer").

[1417] WISPA Comments at 26-27 (citing small providers' lack of familiarity with the requirements of CPNI, potentially necessitating that they take various steps to come into compliance, such as, e.g., training employees and employing outside firms).

[1418] CCIA Comments at 17 ("No one could reasonably dispute that information revealing the 'technical configuration' and 'quantity' of BIAS, as well as the URLs an end user visits and the lawful content they view, should be protected from disclosure absent court compulsion. There are aspects of BIAS, however, that have no true analog in traditional telephony, such as metadata, or are outside the bounds of what Section 222 governs, such as the actual content an end user views").

[1419] *See supra* Section III.F.6.

[1420] *See TerraCom and YourTel America NAL*, 29 FCC Rcd at 13325, paras. 1-2; *Data Breach Notification Order* at 58, 62, paras. 118, 124.

[1421] Similarly, we are unpersuaded by USTelecom's suggestion that section 222 only applies to CPNI, as defined therein, and does not provide authority beyond that as cause for forbearance. USTelecom Comments at 67.

[1422] *See* Privacy for America Comments at 1, 4-5 (asserting that imposing requirements under section 222 on data collected by BIAS providers "that are different from the requirements for other Internet technology and services

(continued….)

to impose privacy requirements on BIAS providers while leaving larger edge, content, or social media platforms, such as Google, Apple, and Meta, subject to the FTC's section 5 authority.[1423]  As an initial matter, we think that the statutory framework makes clear that the Commission has authority over the misuse of the "underlying communications infrastructure by consumer-facing service providers, whereas the FTC . . . concerns itself with businesses offering their products and services by means of that infrastructure."[1424]  Further, we disagree that BIAS providers' access to user data "is not comprehensive."[1425]  And, as the Lawyers' Committee explains, "even when communications content is encrypted or uninspected, unshielded metadata can still reveal highly sensitive information."[1426]

353.    In addition, assertions that "[i]t is confusing for consumers when privacy regimes differ based on who holds the information"[1427] ignore the fact that consumers are already subject to a dichotomy of privacy regimes.  Currently, a provider of mobile voice service is subject to the section 222 privacy and data protection framework, while mobile BIAS offered by the same provider, *and used on the same device*, is currently not subject to the same framework under the *RIF Order*.[1428]  We are skeptical of claims,[1429] and find no actual evidence in the record, that consumers view their use of over-the-top applications like Google Maps, YouTube, or TikTok—applications that a consumer chooses to download and to which they consent to provide their information—as more closely comparable to BIAS than they view BIAS as comparable to other communications services, like voice services, which are typically provided by, and billed in conjunction with, their broadband services.  On the contrary, we find that declining to forbear from applying section 222 to BIAS will support a consistent privacy and data security framework for voice and data services, which consumers often subscribe to from one provider in a bundle and perceive to be part of the same service, particularly for mobile services.[1430]

providers . . . would reduce competition in the online marketplace within which [BIAS providers] operate, and would create inconsistent privacy rules that would be difficult for consumers to understand, while degrading consumer welfare"); ADTRAN Comments at 30-31; Citizens Against Government Waste Comments at 6.

[1423] *See, e.g.*, CTIA Comments at 86; Free State Foundation Comments at 44-45; NTCA Comments at 26; WISPA Comments at 93; NCTA Comments at 48-49.

[1424] EPIC Reply at 5.

[1425] NTCA Comments at 25-27 ("A BIAS provider obtains information about a user only when that customer is using the service.  In contrast, firms that are capable of 'cross network' and 'cross device' monitoring can paint a more comprehensive image of the user that is fed by more data . . . .").

[1426] Lawyers' Committee Comments at 15-16 ("A provider does not need to know what a user is doing on a site to expose a user's vulnerability.  Just like tracking someone's physical movements, tracking someone's virtual movements 'reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. The [provider] can store such records and efficiently mine them for information years into the future.'" (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring) (citation omitted))).

[1427] USTelecom Comments at 64-65; *see also* CTIA Comments at 39-40 (asserting that the "foreseeable gulf between the Commission's approach to BIAS and the FTC's approach to other segments of the Internet ecosystem would result in a non-level playing field and consumer confusion").

[1428] *See* EPIC Reply at 4.

[1429] *See, e.g.*, USTelecom Comments at 64-65 (asserting that consumers' "confusion will be especially pronounced because social media platforms, streaming sites, data brokers, and ad exchanges have access to vast amounts of consumer data—far more than ISPs").

[1430] *Compare, e.g.*, 47 CFR § 64.2007(c) (requiring telecommunications carriers to obtain "opt-in" approval for using, disclosing, or permitting access to CPNI unless for marketing communications-related services to the customer (subject to opt-out customer approval), *with* Verizon, *Full Privacy Policy*, https://www.verizon.com/about/privacy/full-privacy-policy#acc-item-34 (last visited Apr. 15, 2024) (explaining that Verizon will use information about the websites customers visit and the apps customers use on their mobile device, including usage patterns within this information derived from broadband services as part of its "Custom Experience" program unless a customer chooses to opt out).

354. Finally, we also disagree with commenters' assertions that application of section 222 to BIAS is inconsistent with the Congressional Review Act (CRA).[1431] As one independent basis for our decision, this argument fails because it attempts to impute Congress's 2017 CRA resolution with respect to the Commission's *2016 Privacy Order* to the Commission's *2015 Open Internet Order*. Specifically, in the *2015 Open Internet Order*, the Commission classified BIAS as a telecommunications service and granted forbearance from the Commission rules implementing section 222, but did not grant forbearance from section 222 itself.[1432] Thus, the application of section 222 to BIAS was established by the *2015 Open Internet Order*, and that *Order* was not subject to a resolution of disapproval.

355. The argument about the 2017 CRA resolution of disapproval also fails for additional, independent reasons. Subsequent to the 2015 reclassification of BIAS as a telecommunications service subject to section 222, the Commission attempted to further address privacy requirements for BIAS providers, adopting rules in the *2016 Privacy Order* that applied to BIAS providers in addition to other telecommunications carriers and interconnected VoIP providers.[1433] In 2017, however, Congress nullified those 2016 revisions to the Commission's privacy rules under the CRA.[1434] Pursuant to the language of the Resolution of Disapproval, the *2016 Privacy Order* was rendered "of no force or effect."[1435] That resolution conformed to the procedure set out in the CRA, which requires agencies to submit most rules to Congress before they can take effect and provides a mechanism for Congress to disapprove of such rules. Pursuant to the operation of the CRA, the *2016 Privacy Order* "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."[1436]

356. Commenters' CRA arguments are unavailing on their own terms, however. As the Commission explained in the *Data Breach Notification Order*, "the CRA is best interpreted as prohibiting the Commission from reissuing the *2016 Privacy Order* in whole, or in substantially the same form, or from adopting another item that is substantially the same as the *2016 Privacy Order*."[1437] It does not prohibit the application of Title II generally, or sections 222 or 201 specifically, to BIAS, nor does it

---

[1431] *See, e.g.*, Privacy for America Comments at 7-8 (asserting that the Commission may not have authorization to apply section 222 to BIAS providers because Congress overturned the 2016 rules implementing section 222 with respect to BIAS); ACA Connects Comments at 33-34; Digital Progress Institute Comments at 17; NCTA Comments at 78-79; CTIA Comments at 39-40.

[1432] *2015 Open Internet Order*, 30 FCC Rcd at 5820-54, paras. 462-67. While Commissioner Carr's dissent suggests that enforcement under the statute might fall short because "'calls' are the only telecommunications services specifically mentioned in section 222," see Carr Dissent at 52-53, this argument overlooks the fact that the relevant requirements under section 222 – specifically section 222(a) and section 222(c) – and the definition of CPNI found in section 222(h) do not refer to "calls" but instead to "telecommunications" services, thus allowing for Commission enforcement under the Act. 47 U.S.C. § 222(a), (c), (h). Indeed, we note that such enforcement was specially contemplated by the Commission following the CRA resolution. *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services et al.*, WC Docket Nos. 16-106 et al., Order, 32 FCC Rcd 5442, 5442-43, para. 2 (2017).

[1433] *See generally Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, WC Docket No. 16-106, Report and Order, 31 FCC Rcd 13911 (2016) (*2016 Privacy Order*).

[1434] *See* Resolution of Disapproval; 5 U.S.C. § 801(b)(1), (f); *see also Protecting the Privacy of Customers of Broadband and Other Telecommunications Services; Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, WC Docket No. 16-106, CC Docket No. 96-115, Order, 32 FCC Rcd 5442 (2017) (*2017 CRA Disapproval Implementation Order*).

[1435] Resolution of Disapproval.

[1436] 5 U.S.C. § 801(b)(2).

[1437] *Data Breach Notification Order* at 67, para. 135.

prohibit the Commission from considering the later adoption of regulations implementing those obligations. We do not, through our reclassification of BIAS as a telecommunications service, reinstate the *2016 Privacy Order* or, for that matter, any of the rules that it adopted. And even if one considers the aggregate effect of Commission actions related to privacy, we are not persuaded that they collectively adopt or effectuate rules that are substantially the same as the *2016 Privacy Order* as a whole.[1438] If the Commission later initiates a proceeding to consider privacy rules for BIAS pursuant to Title II, it will be bound by the CRA not to issue a rule that is substantially the same as the *2016 Privacy Order*.[1439]

357. Indeed, even if, as some parties argue, the CRA prohibits the Commission from adopting rules similar to some of the aspects of the *2016 Privacy Order*, we believe that reinstating the applicability of the statutory obligations and the Commission's ability to consider other regulatory obligations still would not be contrary to the Resolution of Disapproval, and serves the public interest. As explained in the *Data Breach Notification Order*, the *2016 Privacy Order* "made a number of changes to the Commission's privacy rules that, among other things, required carriers to disclose their privacy practices, revised the framework for customer choice regarding carriers' access, use, and disclosure of the customers' information, and imposed data security requirements in addition to data breach notification requirements."[1440] For example, the *2016 Privacy Order* specified in detail the contents that had to be included in privacy notices, including mandatory disclosures related to other substantive requirements adopted in the *2016 Privacy Order*, requirements for translation into languages other than English, and detailed requirements for where and how the notice is made available and updated.[1441] As another example, the *2016 Privacy Order* adopted detailed customer approval requirements, including when opt-out approval was permitted; when and how approval must be solicited; and detailed requirements for a mandatory mechanism to grant, deny, or withdraw approval at any time.[1442] And as another example, the *2016 Privacy Order* restricted BIAS providers' conditioning service on waiver of privacy rights, including limiting the incentives BIAS providers could offer customers in exchange for authorization to use, disclose, and/or permit access to the customer's personal information.[1443] Although the basic principles underlying the requirements adopted in the *2016 Privacy Order* obviously flow from the statutory requirements of section 222 themselves, section 222 alone (even when coupled with open Internet rules like the transparency rule) leaves BIAS providers with leeway in the details of how they go about complying with those obligations to a materially greater extent than the much more prescriptive 2016 rules.

358. In addition, the Commission Order effectuating the 2017 resolution of disapproval explicitly recognized that BIAS providers would "remain subject to Section 222" itself.[1444] Thus, even at

---

[1438] This is particularly true because the *2016 Privacy Order* was focused in substantial part on privacy rules for BIAS providers, and as discussed in the next paragraph, our application of section 222 to BIAS providers here is not substantially the same as the rules adopted for BIAS providers in the *2016 Privacy Order*.

[1439] We are doubtful that future Commission actions that recapitulated some or even all of the data elements that constituted customer proprietary network information in the BIAS context under the *2016 Privacy Order* would run afoul of the CRA resolution, as suggested by Commissioner Carr's dissent. *See* Carr Dissent at 52. And, in any event, based on the Commission's long experience enforcing section 222 without having offered a comprehensive definition of CPNI, we do not anticipate any difficulty in enforcing section 222 with respect to BIAS providers without first adopting a comprehensive definition of BIAS CPNI that includes virtually all data and metadata elements.

[1440] *Data Breach Notification Order* at 70, para. 141.

[1441] *2016 Privacy Order*, 31 FCC Rcd at 14081-83, Appx. A (adopting notice requirements, 47 CFR § 64.2003).

[1442] *Id.* at 14083-84, Appx. A (adopting customer approval requirements, 47 CFR § 64.2004).

[1443] *Id.* at 14086, Appx. A (adopting requirements regarding customer waiver of privacy rights, 47 CFR § 64.2011).

[1444] *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services et al.*, WC Docket Nos. 16-106 et al., Order, 32 FCC Rcd 5442, 5442-43, para. 2 (2017). As such, we reject assertions that the

(continued….)

the time of the 2017 Resolution of Disapproval, the Commission saw no inconsistency between that resolution and the application of the statutory requirements of section 222. As such, we reject arguments that today's classification is contrary to Congress's disapproval to the *2016 Privacy Order* in 2017.

359. We nevertheless find it appropriate to waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service by virtue of today's Order. The Commission may waive its rules and requirements for "good cause shown."[1445] Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest."[1446] In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy,"[1447] and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[1448] We observe that many of the Commission's current rules implementing section 222 were adopted to address specific concerns in the voice context, as the Commission recognized in 2015 when initially reclassifying broadband as a Title II telecommunications service.[1449] Additionally, there is nothing in the record to indicate that the current rules implementing section 222 would be a good fit for BIAS to the extent that they impose more specific requirements than section 222 itself. Thus, insofar as rules focused on addressing problems in the voice service context are among the central underpinnings of our CPNI rules, we find the public interest better served by waiving all of our CPNI rules at this time, insofar as they would apply to BIAS, to give us the opportunity to carefully evaluate appropriate rules for BIAS, particularly given the need to consider the effect of the Resolution of Disapproval.[1450] As the Commission explained in 2015, it is within the agency's discretion to proceed incrementally, and we similarly find that adopting an incremental approach here "guards against any unanticipated and undesired detrimental effects on broadband deployment that could arise."[1451] We find that requiring BIAS providers to comply with section 222,[1452] while at the same time waiving application of our voice-specific rules, will allow providers the flexibility to adopt security practices that are effective and appropriate in the BIAS context, enhancing protections for customers without placing undue costs on providers, including small providers.[1453]

---

Commission may not have authorization to apply section 222 to BIAS providers because Congress overturned the 2016 rules implementing section 222 with respect to BIAS. *See, e.g.*, Privacy for America Comments at 7-8.

[1445] 47 CFR § 1.3 ("Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.").

[1446] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1447] *WAIT Radio*, 418 F.2d at 1159.

[1448] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1449] *See 2015 Open Internet Order*, 30 FCC Rcd at 5823, para. 467 (explaining that the Commission's then "current rules implementing section 222 [were] . . . fundamentally modified . . . in various ways subsequent to decisions classifying broadband Internet access service as an information service, and certain of those rules appear more focused on concerns that have been associated with voice service").

[1450] *Cf.* T-Mobile Feb. 23, 2024 *Ex Parte* at 1 (arguing that if the Commission reclassifies BIAS as a Title II service, it should forbear from applying "new regulations, such as . . . privacy regulations, while addressing those issues in a separate proceeding").

[1451] *2015 Open Internet Order*, 30 FCC Rcd at 5839-40, para. 495.

[1452] As discussed above, we continue to apply section 222 of the Act itself, as well as section 201(b)'s prohibition on practices that are unjust or unreasonable, which also provides authority over privacy practices. 47 U.S.C. § 201(b); *see also supra* Section III.F.6.

[1453] *Cf. Protecting Consumers from SIM Swap and Port-Out Fraud*, WC Docket No. 21-341, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-95, at 14-15, paras. 22-23 ("By setting baseline requirements and giving wireless providers flexibility on how to meet them, we allow providers to adopt the most cost-effective and least burdensome solutions to achieve the level of security needed to protect customers against SIM swap and port-out fraud in a given circumstance.").

## 6. Access to Poles, Ducts, Conduit, and Rights-of-Way (Section 224)

360.    We do not forbear from section 224 and the Commission's associated rules with respect to BIAS.  Section 224 governs the Commission's regulation of pole attachments.[1454]  It authorizes the Commission to prescribe rules to ensure that the rates, terms, and conditions of pole attachments are just and reasonable;[1455] requires utilities[1456] to provide nondiscriminatory access to their poles, ducts, conduits, and rights-of-way to telecommunications carriers and cable television systems (collectively, attachers);[1457] provides procedures for resolving pole attachment complaints;[1458] governs pole attachment rates for attachers;[1459] and allocates make-ready costs among attachers and utilities.[1460]  The Commission has recognized repeatedly the importance of pole attachments to the deployment of communications networks,[1461] and pole attachments remain critical to the development of communications networks.[1462]

361.    As explained above, applying section 224 to BIAS will ensure that BIAS-only providers receive the same statutory protections for pole attachments guaranteed by section 224 of the Act that providers of cable and telecommunications services receive,[1463] thereby promoting greater deployment,

---

[1454] 47 U.S.C. § 224(b)(1)-(2).  Section 224 defines pole attachments as "any attachment by a cable television system or provider of telecommunications service to a pole, duct conduit, or right-of-way owned or controlled by a utility."

[1455] 47 U.S.C. § 224(a)(4).

[1456] The Act defines a utility as a "local exchange carrier or an electric, gas, water, steam, or other public utility, . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications."  47 U.S.C. § 224(a)(1).  However, for purposes of pole attachments, a utility does not include any railroad, cooperatively-organized entity, or entity owned by a Federal or state government.  *Id.*

[1457] 47 U.S.C. § 224(f).  Section 224 excludes ILECs from the meaning of the term "telecommunications carrier."  Therefore these entities do not have a mandatory access right under section 224(f)(1).  *Id.* at § 224(a)(5).  The Commission has held that when ILECs obtain access to poles, section 224 governs the rates, terms, and conditions of those attachments.  *Implementation of Section 224 Report and Order*, 26 FCC Rcd at 5328, para. 202.  The Act allows utilities that provide electric service to deny access to their poles, ducts, conduits, or rights-of-way because of "insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes."  47 U.S.C. § 224(f)(2).

[1458] *Id.* § 224(b)(1).

[1459] *Id.* § 224(d)-(e).

[1460] *Id.* § 224(b), (h)-(i).

[1461] *See, e.g.*, *2023 Pole Attachments Order* at 1-2, paras. 1-2; *2018 Wireline Infrastructure Order*, 33 FCC Rcd at 7706, para. 1; *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Notice of Proposed Rulemaking, Notice of Inquiry, and Request for Comment, 32 FCC Rcd 3266, 3267, para. 3 (2017); *Implementation of Section 224 Report and Order*, 26 FCC Rcd at 5241-43, paras. 1-6.

[1462] *See supra* Section III.A.7.  Indeed, section 224 is critical to certain carriers' ability to comply with the deployment obligations associated with their receipt of federal funding.  *2023 Pole Attachments Order* at 1-2, para. 1 ("With the support of the Commission's universal service fund, the Infrastructure Investment and Jobs Act, which included the largest ever federal investment in broadband, as well as other federal and state broadband deployment programs, more funding than ever is available to build the necessary infrastructure to bring much-needed broadband services to unserved and underserved areas in the United States.  Key to these broadband projects are the utility poles that support the wires and the wireless equipment that carry broadband to American homes and businesses." (footnotes omitted)).  *But see* Wired Broadband et al. Comments at 6 (asserting that if the Commission reclassifies BIAS as a Title II service, it should forbear from applying section 224 requirements to data-only mobile BIAS and fixed wireless BIAS); CCIA Comments at 16 (asserting, mistakenly, that the Commission forbore from section 224 in the *2015 Open Internet Order*).

[1463] *See, e.g.*, Next Century Cities Comments at 8 ("Once the Commission reclassifies BIAS as a telecommunications system, it will restore Section 224 rights . . . ."); State Consumer Advocates Comments at 4 (explaining that Title II classification of BIAS "provides for favorable pole attachment treatment for BIAS providers").

competition, and availability of BIAS.[1464]  Instead of being forced to privately negotiate for pole access with each pole owner, BIAS-only providers will be statutorily guaranteed a right of nondiscriminatory access and will also be entitled by statute to the same rates as their competitors.  As we noted above, BIAS-only providers face "significant barriers to deploy broadband network infrastructure—among them access to poles, ducts, and conduit."[1465]  Section 224 seeks to remove these barriers by guaranteeing providers access to utility poles at just and reasonable rates.  We reiterate our findings from above that restoring section 224 rights and easing the burdens of pole access is likely to ensure that the number of BIAS-only providers does not artificially shrink due to inequitable treatment under the law, and that equitable regulatory treatment of BIAS-only providers, particularly with regard to regulations designed to speed network deployment, will also increase competition, ultimately benefitting consumers and assisting the Commission's goal of achieving universal service.[1466]  Further, as discussed above, applying section 224 to BIAS will ensure that the Commission and state utility commissions have the requisite legal authority to protect public safety concerns associated with the deployment of BIAS-only infrastructure.[1467]

362.    Consistent with our findings in the *2015 Open Internet Order*, we thus conclude that applying these provisions will help ensure just and reasonable rates for BIAS by continuing pole access and thereby limiting the input costs that BIAS providers otherwise would need to incur.[1468]  Leveling the pole attachment playing field for new entrants that offer solely BIAS also removes barriers to deployment and fosters additional broadband competition.[1469]  For similar reasons, we find that applying these provisions will protect consumers and advance the public interest, and therefore the requirements for forbearance under sections 10(a)(2) and (a)(3) are not met.[1470]

---

[1464] *See supra* Section III.A.7.

[1465] *Supra* Section III.A.7 (quoting INCOMPAS Comments at 18-19); *see also* CPUC Comments at 15.

[1466] *See supra* Section III.A.7; *see also* INCOMPAS Comments at 8 ("Additional competition is key to tackling our nation's internet challenges and often INCOMPAS' small, competitive BIAS providers that offer an alternative to large incumbent cable and telcos are marketing their service as privacy and open-internet friendly, as well as offering faster speeds, better service, and more affordable pricing.").

[1467] *See supra* Section III.A.7.

[1468] *See* CPUC Comments at 15 ("BIAS providers must receive nondiscriminatory access to utility support structures, including poles and conduits, at just and reasonable rates, terms, and conditions, in order to promote the deployment and availability of BIAS.  Competitive bottlenecks and barriers to entry in the telecommunications network limit new network entrants and may raise prices for some telecommunications services above efficiently competitive levels."); Next Century Cities Comments at 7-8 (noting that without section 224 rights, "BIAS providers have no statutory avenue to attach to poles in a state that does not reverse preempt the Commission").

[1469] *See, e.g.*, Free Press Comments at 48-49, 56.  *But see* CTIA Comments at 41-42 (arguing that granting pole attachment rights is not itself a significant issue that should move the Commission to reclassify BIAS as a Title II service, noting that the vast majority of providers offer commingled services and that the few BIAS-only providers have not encountered difficulties).

[1470] *See* CPUC Comments at 15 ("Accordingly, access to poles at nondiscriminatory, just, and reasonable terms and conditions will promote broadband deployment and support universal service goals."); CFA Comments at 84 ("The D.C. Circuit's *Mozilla* decision also highlighted the potential benefits of Title II classification of BIAS for the Commission's authority to encourage deployment through regulation of pole attachments and to provide universal service support for low-income households."); Next Century Cities Comments at 8 ("In states that have not reverse-preempted the Commission, there is a stark lack of regulations to promote consumer protection and enforcement regimes needed to achieve universal service deployment."); INCOMPAS Comments at 19 ("By reclassifying BIAS as a telecommunications service, BIAS-only companies will be able to exercise the same rights as incumbent telephone and cable television systems that they compete with, and competitors rightly will receive the same protections the Communications Act affords.  This is only fair and non-discriminatory and will enable more competition for customers—which is needed and is the goal of the 1996 Act.").

### 7. Universal Service

363. We find the statutory test is met for certain forbearance under section 10(a) from applying portions of sections 254(d), (g), and (k), as discussed below, but we otherwise will apply section 254, section 214(e), and our implementing rules with respect to BIAS, as supported by a number of commenters.[1471] Section 254, the statutory foundation of our universal service programs, requires the Commission to promote universal service goals, including "[a]ccess to advanced telecommunications and information services . . . in all regions of the Nation."[1472] Section 214(e) provides the framework for determining which carriers are eligible to participate in universal service programs.[1473] As discussed in greater detail above, the Commission already exercises its authority to support broadband services to schools, libraries, and health care providers and to support deployment of broadband-capable networks in high-cost areas.[1474] BIAS is a key focus of those universal service policies, and classification today simply provides another statutory justification in support of these policies going forward.[1475] Under our broader section 10(a)(3) public interest analysis, the historical focus of our universal service policies on advancing end users' access to BIAS persuades us that strengthening the foundation of our universal service activities is justified and will have limited impact on BIAS providers. Because forbearance would not be in the public interest under section 10(a)(3), we generally apply sections 254 and 214(e), and our implementing rules, to BIAS.

364. However, we find it appropriate—as the Commission previously found in 2015—to forbear from the first sentence of section 254(d) and our associated rules insofar as they would immediately require new universal service contributions to be assessed on broadband Internet access service to end users.[1476] The first sentence of section 254(d) states that "[e]very telecommunications

---

[1471] *See, e.g.*, Public Knowledge Comments at 96 ("As noted in the NPRM, the Commission decided in 2015 not to forbear from Section 254 and 214(e). The Commission should apply the same approach here."); *see also* Free Press Comments at 61 ("[W]e generally agree with the Commission's proposals [regarding forbearance]."); New America's Open Technology Institute Comments at 37 (noting that it "generally supports" the Commission's approach to mostly return to the 2015 forbearance framework); T-Mobile Reply at 36 ("Commenters broadly supported the Commission's proposal to forbear from most provisions of Title II and its implementing regulations.").

[1472] 47 U.S.C. § 254(b)(2).

[1473] 47 U.S.C. § 214(e). More specifically, an entity must be designated an eligible telecommunications carrier (ETC) under section 214(e) in order to get High Cost or Lifeline program support, but the same constraint does not apply with respect to receipt of support under the E-Rate or Rural Health Care programs. *See* 47 CFR § 54.201(a).

[1474] *See supra* Section III.A.7.

[1475] Even assuming *arguendo* that section 706 of the 1996 Act may also enhance the Commission's ability to achieve its universal service policies in certain targeted ways, *see, e.g.*, INCOMPAS Comments at 32 ("The FCC also has authority to advance broadband deployment and affordability through Section 706 of the Telecommunications Act of 1996."), the likely limits of that authority mean that we are not persuaded simply to rely on section 706 of the 1996 Act in lieu of section 254. *See, e.g.*, *Connect America Fund et al.*, WC Docket Nos. 10-90 et al., Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 FCC Rcd 4554, 4579, para. 67 (2011) (asking whether using section 706 authority as the basis for expanding USF assessments would violate appropriations laws).

[1476] *See* 47 U.S.C. § 254(d); 47 CFR §§ 54.706-54.713; *2023 Open Internet NPRM* at 55, para. 105. In addition, pursuant to our forbearance from 254(d) to maintain the *status quo* for contributions based on the provision of BIAS, and consistent with the *2015 Open Internet Order*, we maintain the *status quo* with respect to states' ability to impose state-level contribution obligations on the provision of BIAS for state universal service programs. 47 U.S.C. § 160(e); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5803-5804, para. 432; Letter from Matthew A. Brill, Counsel for NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 et al., at 5 (filed Apr. 15, 2024) (NCTA Apr. 15, 2024 *Ex Parte*); Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 et al., at 3 (filed Apr. 15, 2024) (USTelecom Apr. 15, 2024 *Ex Parte*). State commission contribution assessments would necessarily involve problematic debates about jurisdictional

(continued….)

carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the" USF.[1477]  In the *2015 Open Internet Order*, however, the Commission "forb[ore] in part from the first sentence of section 254(d) and our associated rules insofar as they would immediately require new universal service contributions associated with [BIAS]."[1478]  The Commission stated that, as with forbearance from requiring new TRS contributions, forbearing from requiring new universal service contributions to be assessed on BIAS would permissibly "'balance the future benefits' of encouraging broadband deployment 'against [the] short term impact' from" forbearing from immediate new contribution assessments.[1479]  The Commission also pointed to other parallel proceedings, both before the Commission and before other bodies, examining "a wide range of issues regarding how contributions should be assessed, including whether to continue to assess contributions based on revenues or to adopt alternative methodologies for determining contribution obligations."[1480]  The Commission thus determined to "forbear[] from applying the first sentence of section 254(d) and our implementing rules insofar as they would immediately require new universal service contributions for [BIAS] but not insofar as they authorize the Commission to require such contributions in a rulemaking in the future."[1481]

365.    We agree with commenters who say that the Universal Service Fund helps to protect consumers and to ensure that communications services are available to all Americans on just and reasonable rates and terms, and indeed for that reason we have found it important to reclassify BIAS as a Title II telecommunications service to ensure that we can continue to support the availability and affordability of BIAS through USF programs.[1482]  But the record does not show that assessing new USF contribution requirements on BIAS is necessary for the Universal Service Fund to fulfill those goals at this time.[1483]  On the contrary, the Universal Service Fund has been funding broadband access and affordability for well over a decade without imposing contribution requirements on BIAS providers.[1484]  And the record does not show that anything would substantially change in that regard without imposing contribution requirements on BIAS.  In fact, the Universal Service Fund successfully operated under a materially identical set of contribution and support schemes throughout the time that the *2015 Open Internet Order* was in effect.  To be sure, several commenters contend that it would be preferable to expand the contribution base to include BIAS, or that doing so might become necessary in the future,[1485] but the record does not convincingly show that imposing universal service contribution requirements on BIAS is necessary at this time.

366.    We conclude that forbearing from imposing new universal service contribution

---

determinations.  *See* NCTA Apr. 15, 2024 *Ex Parte* at 5; US Telecom Apr.15, 2024 *Ex Parte* at 3; WISPA Comments at 33-34.  *But see* Public Knowledge Mar. 11, 2024 *Ex Parte* at 3-4; CPUC Comments at 13; Tejas N. Narechania Comments at 15-20.

[1477] 47 U.S.C. § 254(d).

[1478] *2015 Open Internet Order*, 30 FCC Rcd at 5835, para. 488.

[1479] *Id.* at 5836, para. 490 (quoting *EarthLink*, 462 F.3d at 8-9).

[1480] *Id.* at 5836, para. 489 & n.1471.

[1481] *Id.* at 5836, para. 490.

[1482] *See supra* Section III.A.7.

[1483] *Cf.* 47 U.S.C. § 160(a)(1)-(2).

[1484] *See, e.g.*, *In re FCC 11-161*, 753 F.3d at 1044-48 (upholding the Commission's authority to provide USF support for broadband networks without imposing contribution requirements on BIAS).

[1485] *See, e.g.*, AARP Comments at 15-16; CPUC Comments at 12-13; ITI Comments at 8; New America's Open Technology Institute Comments at 39; NCTA Comments at 31-32; Public Knowledge Comments at 50-51.

requirements on BIAS at this time is in the public interest.[1486] For one thing, we agree with commenters who warn that suddenly and unnecessarily imposing new fees on BIAS could pose "major upheaval in what is actually a stable and equitable contribution system."[1487] Rather than risk this upheaval, we believe it to be in the public interest to proceed cautiously and incrementally.[1488] The Commission thus recognized in 2015 that it is appropriate to forbear from extending new contribution requirements to BIAS pending ongoing deliberations, both before the Commission and before other bodies, on future USF contribution reform. Contrary to the assumption of some commenters,[1489] Commission efforts remain ongoing in this area.[1490] Congress has also been actively deliberating on legislative proposals to reform

---

[1486] *See* 47 U.S.C. § 160(a)(3); *see also* 47 U.S.C. § 1302(a) (directing the Commission to exercise "regulatory forbearance" to promote broadband service "in a matter consistent with the public interest, convenience, and necessity"). Numerous commenters agree with this proposal. *See, e.g.*, CWA Comments at 21-29; NRECA Comments at 11; Free Press Comments at 66-67; California Independent Small LECs Comments at 20; USTelecom Reply at 74-76; NCTA et al. Reply at 33-34; Jeffrey Westling et al. Reply at 6-7; WISPA Reply at 13-14; T-Mobile Reply at 36-38, 42-45; Letter from Scott H. Angstreich, Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Mar. 6, 2024); Letter from J. Breck Blalock, T-Mobile USA, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 11, 2024); Letter from Matthew A. Brill, Counsel, NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Feb. 26, 2024); Letter from Matthew A. Brill, Counsel, NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Mar. 21, 2024). CWA, which initially supported forbearance in its comments, later joined a coalition of organizations urging the Commission arguing that forbearance "is unnecessary and not supported by the record." Letter from Greg Guice, Chair, Affordable Broadband Campaign, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 7, 2024). Others disagree with this proposal, primarily arguing that not forbearing from section 254(d) and our implementing rules would abandon a much-needed expansion of contributors, decrease the contribution amount for each provider, increase the size of the USF, complicate future USF reform, and/or be an unnecessary step toward precluding BIAS providers from assessment. *See, e.g.*, Next Century Cities Comments at 12-13; Harold Hallikainen Comments at 2; Smithwick & Belendiuk, PC Comments at 20-23 (Smithwick & Belendiuk); INCOMPAS Comments at 54-55; New America's Open Technology Institute Comments at 5, 37; National Consumer Law Center et al. Comments at 205 (NCLC et al.); Letter from Michael Romano, Executive Vice President, NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Oct. 5, 2023); WTA Comments at 2-3, 8-11; Public Knowledge Comments at 50-51; Letter from Derrick B. Owens and Gerard J. Duffy, Senior Vice President of Government and Industry Affairs and Regulatory Counsel, WTA, to Marlene H. Dortch, Secretary, FCC, WC Docket 23-320 et al., at 2 (filed Jan. 19, 2024); Ad Hoc Telecom Users Committee Comments at 31-37; NCLC et al. Comments at 2-6; CPUC Comments at 10-13; NDIA Comments at 3-4; NTCA Reply at 12-14; State Consumer Advocates Reply at 14-16; CPUC Reply at 8-9; Letter from Greg Guice, Chair, Affordable Broadband Campaign, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Mar. 7, 2024); Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 et al., at 3 (filed Feb. 16, 2024).

[1487] Free Press Comments at 67; *see also* WISPA Reply at 13 ("[I]mmediately applying the contribution obligations on thousands of providers who have never collected it for these services will pose insurmountable challenges . . . . It is no exaggeration to say that such a decision would result in complete chaos . . . .").

[1488] *See Nat'l Ass'n of Broad. v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984) ("In classifying economic activity, agencies . . . need not deal in one fell swoop with the entire breadth of a novel development; instead, 'reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind.'" (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)); *see also Brand X*, 545 U.S. at 1002 (endorsing the Commission's discretion to proceed "incrementally").

[1489] *See* Smithwick & Belendiuk Comments at 21-22; New America's Open Technology Institute Comments at 38; NTCA Comments at 29-34; AARP Comments at 15-17; Ad Hoc Telecom Users Committee Comments at 33-35; INCOMPAS Comments at 54-55; NTCA Reply at 12-13.

[1490] *See, e.g.*, *Report on the Future of the Universal Service Fund*, WC Docket No. 21-476, Report, 37 FCC Rcd 10041 (2022) (*Future of USF Report*); Letter from Jessica Rosenworcel, Chairwoman, FCC, to the Honorable Ben Ray Luján (Jan. 12, 2024) (Luján Letter). In the Luján Letter, Chairwoman Rosenworcel stressed that "[t]here are a number of potential options for reforming the USF contribution system, each with advantages and disadvantages, and, critically, different cost burdens on consumers . . . . Nonetheless, any reform efforts would benefit from further

(continued....)

the USF contribution and funding mechanisms.[1491] USF contribution reform is an immensely complex and delicate undertaking with far-reaching consequences, and we believe that any decisions on whether and how to make BIAS providers contribute to the USF are best addressed holistically in those ongoing discussions of USF contribution reform, with a full record and robust input from all interested parties, rather than in this proceeding.[1492]

367. Forbearance will also serve the important public interest goals of broadband access and affordability. As always, we are mindful of section 706's directive to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . regulatory forbearance."[1493] That directive is echoed in the universal service principles set forth in section 254(b) of the Act, which include "access . . . in all regions of the Nation" at "just, reasonable, and affordable rates."[1494] Here, estimates show that assessing contribution requirements on BIAS could result in a material increase in consumer broadband bills, potentially in the range of roughly $5 to $18 per month.[1495] The impact of those additional fees is likely to be highly regressive, with a disproportionate

inquiry, such as a rulemaking or data collection, to fully appreciate the potential burdens on consumers and any other unforeseen, negative downstream effects." Luján Letter at 2. She added that any such effort "must result in a sustainable funding model and also fully consider the current telecommunications marketplace and the potential cost burdens on consumers." *Id.* at 1. Several commenters also suggested that the Commission should seek and obtain statutory authority to assess edge providers, while another stressed that assessing edge providers "would undermine the ultimate goal of universal connectivity by imposing new fees on the very services that drive consumers to seek broadband connections in the first place." ITI Comments at 9; *see also* WTA Comments at 2-3, 10; USTelecom Reply at 75-76; NCTA et al. Reply at 33-34; Letter from Derrick B. Owens and Gerard J. Duffy, Senior Vice President of Government and Industry Affairs and Regulatory Counsel, WTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 et al., at 2 (filed Jan. 19, 2024).

[1491] *See* S.3321—118th Congress (2023-2024): Lowering Broadband Costs for Consumers Act of 2023, S.3321, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/senate-bill/3321; S.975—Reforming Broadband Connectivity Act of 2023, 118th Cong. (2023) https://www.congress.gov/bill/118th-congress/senate-bill/975; S.856—FAIR Contributions Act, 118th Cong. (2023) https://www.congress.gov/bill/118th-congress/senate-bill/856; The State of Universal Service, Before the Subcomm. on Commc'ns, Media and Broadband of the S. Comm. on Com., Science, & Transp., 118th Cong. (2023); Press Release, Ben Ray Luján, Luján, Thune Announce Bipartisan Working Group on the Universal Service Fund and Broadband Access (May 11, 2023), https://www.lujan.senate.gov/newsroom/press-releases/lujan-thune-announce-bipartisan-working-group-on-the-universal-service-fund-and-broadband-access; Luján Letter at 2-6; WTA Comments at 2-3, 10; USTelecom Reply at 75-76; Jeffrey Westling et al. Reply at 6-7; John Fetterman, *American Families Need Broadband: We Should Invest in It,* PennLive Patriot-News (Nov. 12, 2023), https://www.pennlive.com/opinion/2023/11/american-families-need-broadband-we-should-invest-in-it-opinion.html; U.S. Senate Comm. on Com., Sci., & Transp., Protecting Americans from Hidden FCC Tax Hikes: A Blueprint for Universal Service Fund Reform (2024), https://www.commerce.senate.gov/services/files/45983F37-2FA5-4586-BCCA-8E044955E3AF.

[1492] *See, e.g.,* CWA Comments at 22-23, 25; Free Press Comments at 67; T-Mobile Reply at 45; WISPA Reply at 13-14; Letter from J. Breck Blalock, T-Mobile USA, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 11, 2024).

[1493] 47 U.S.C. § 1302(a).

[1494] 47 U.S.C. § 254(b)(1), (2); *see also id.* § 254(b)(3) ("Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . at rates that are reasonably comparable to rates charged for similar services in urban areas.").

[1495] Luján Letter at 2-3 (citing *Future of USF Report*, 37 FCC Rcd at 10088, para. 94). "The monthly household payment would increase, even though the contribution factor would decrease, because the contribution factor would be applied for the first time to customer broadband bills (in addition to telephone bills) which are generally higher than telephone bills." *Id.* at 3; *see also* USTelecom Reply at 74 ("Immediately subjecting [BIAS] revenues to universal service contributions, without pursuing broader contributions reform, would significantly raise the cost of broadband to consumers."); Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H.

(continued....)

impact on low-income consumers who may be particularly sensitive to price increases.[1496] Imposing new contribution requirements on BIAS could therefore be detrimental to the goal of promoting broadband adoption and affordability.[1497] For these reasons, as with our forbearance from TRS contribution requirements,[1498] we deem it appropriate and in the public interest to forbear from the imposition of new contribution requirements on BIAS at this time. .

368. We are not persuaded that allowing BIAS providers to continue to forgo USF contributions would be contrary to section 254(d)'s requirement that providers contribute "on an equitable and nondiscriminatory basis" even if we were not forbearing from that requirement.[1499] Forbearance essentially maintains the longstanding *status quo*.[1500] Our rules generally permit carriers to recoup their universal service contributions from their customers through surcharges on customers' monthly bills, so most of the burden ultimately falls on end users.[1501] Given estimates that extending the contribution requirements to BIAS could considerably increase consumers' broadband bills and would require residential consumers to bear a much greater share of the burden relative to business users, forbearing from new contribution requirements may be more equitable.[1502] And in any event, we do not think it inequitable to forbear from imposing new and unnecessary costs on BIAS when seeking to promote

Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 18, 2024) ([B]roadening the base to include BIAS now would significantly shift the USF contribution burden away from businesses and towards individuals and family. It would result in as much as a $4 billion annual wealth transfer from consumers to corporations, and depending on what is paid out to USF recipients, a leap in the USF fees that consumers pay of anywhere from $2 to $18 a month.") (emphasis in original). INCOMPAS disputes these figures, citing materials that it has previously submitted to the Commission, including materials fully considered in the *Future of USF Report*. *See* Letter from Lindsay Stern, INCOMPAS, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 2-4 (filed Apr. 16, 2024); *id.* at 3 (citing a competing estimate that "any [net] price increase for broadband-only households would be $2.22/month"). We decline to revisit those figures here without a fully updated record and comprehensive input from a full array of interested parties. Indeed, INCOMPAS itself acknowledges "the need to develop a fuller record on contribution reform." *Id.* at 2. Our forbearance preserves for now the longstanding status quo in this complex and developing area.

[1496] *See* Letter from S. Derek Turner et al., Free Press, to Marlene H. Dortch, FCC, WC Docket No. 23-320 (Apr. 15, 2024); Free Press Comments at 67. Although price-cap and rate-of-return carriers cannot pass through universal service contributions to Lifeline customers, *see* 47 CFR §§ 69.131, 69.158, that does not account for the many other BIAS providers or the low-income consumers that might not be formally identified as ILEC Lifeline recipients.

[1497] *See* CWA Reply at 19; NCTA et al. Reply at 33; USTelecom Reply at 74, 76.

[1498] *See infra* Section IV.B.8.

[1499] 47 U.S.C. § 254(d).

[1500] Under the final sentence of section 254(d), the Commission has had discretion to impose contribution requirements on BIAS providers even under Title I, but no one has argued it is unlawful not to do so. *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1238-41 (D.C. Cir. 2007). Arguments by commenters that forbearance from contribution requirements would improperly permit BIAS providers to receive USF support without having to contribute likewise neglect that operation of our current contribution rules. *See* ACLU Comments at 10; Ad Hoc Telecom Users Committee Comments at 36; WTA Comments at 2, 9; CPUC Comments at 12-13, INCOMPAS Comments at 56; Smithwick & Belendiuk Comments at 22-23; State Consumer Advocates Reply at 16.

[1501] *See* 47 CFR §§ 54.706, 54.712; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1099 (D.C. Cir. 2009).

[1502] *See* Luján Letter at 3 ("Currently, residential customers pay approximately 40 percent of USF contributions, with the balance paid by business customers. However, residential customers make up approximately 75 to 75 percent of mass market broadband customers. That means that residential customers [would] both see an increase in their broadband bills and also be responsible for a greater percentage of USF contributions with the addition of broadband into the contributions base."); *see also Future of USF Report*, 37 FCC Rcd at 10089, para. 94; CWA Comments at 27 ("[H]ouseholds should not contribute a disproportionate share compared to business users," and "the burden of funding universal service must be imposed equitably on those most able to pay."); USTelecom Reply at 75 ("Adding consumer broadband to the Universal Service Fund contributions base . . . would shift a greater portion of the burden to consumers, as opposed to businesses.").

universal broadband availability, while requiring contributions from more mature services that have already achieved near-universal penetration.[1503]

369. We caution, as the Commission did in 2015, that our determination to forbear at this time is based on the present record in a complex and developing area.[1504] We do not disclaim our authority to require new universal service contributions in a future rulemaking, and our decision today is not intended to prejudge or limit how the Commission might take action in the future.[1505]

370. Some commenters contend that the Commission could refrain from assessing BIAS providers for USF contributions without forbearing by instead "clarify[ing] that it will pause from immediately enforcing the statute and that BIAS providers are not required to include those revenues until the Commission moves to Order on that contribution reform."[1506] However, we explain above why the forbearance standard is met and why we find it in the public interest under that standard to rely on the Commission's well-established statutory forbearance authority to ensure that BIAS providers are not immediately assessed contributions.[1507] Moreover, the Commission's waiving the application of section 54.706 of its rules for BIAS providers as some commenters propose as an alternative to forbearance[1508]

[1503] We are likewise unpersuaded by claims that forbearance would give BIAS a competitive advantage over non-BIAS services. *See* Ad Hoc Telecom Users Committee Comments at 37; INCOMPAS Comments at 57. It is not evident that BIAS and non-BIAS services are generally competitive substitutes even if there is limited evidence of substitution in some instances, *see, e.g.*, *Broadband Data Services Order*, 32 FCC Rcd at 3474-75, para. 31, or that USF fees have enough of a price impact to give rise to significant or widespread substitution. In any event, this issue would be better raised and addressed as part of a broader holistic proceeding on USF contribution reform, based on a full record and full input on all relevant issues, than in this proceeding.

[1504] *2015 Open Internet Order*, 30 FCC Rcd at 5835-37, paras. 488-90.

[1505] *Id.* at 5836-37, para. 490. Some commenters express concern that "it will be difficult, if not impossible, to 'unforbear'" from the contributions-related forbearance that applies in this context. NTCA Comments at 29; *see* ACLU Comments at 15; INCOMPAS Comments at 56-57; New America's Open Technology Institute Comments at 40; NTCA Reply at 15; CWA Reply at 16; CPUC Reply at 8-9; *see also* NTCA Comments at 34-35; Letter from Neil Geiser, Director of Research, Communications Workers of America, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-320 et al., at 1-2 (filed Apr. 18, 2024) (CWA Apr. 18, 2024 *Ex Parte*) (noting concerns that forbearance action today should not limit future consideration of the contributions question). We find that this concern is unfounded. It is appropriate for the Commission to reverse a forbearance decision if "[c]ontinued forbearance from this regulation would be inconsistent with the statutory forbearance criteria" and the Commission has done so previously. *Business Data Services Order*, 32 FCC Rcd at 3535-37, para. 175; *see id.* at 3535-37, paras. 173-75; *Ad Hoc v. FCC* 572 F.3d 903, 911 (D.C. Cir. 2009) (noting that "the relevant point is that the FCC's forbearance decision in this particular matter . . . *is not chiseled in marble*. So Congress and the FCC will be able to reassess as they reasonably see fit based on changes in market conditions, technical capabilities, or policy approaches to regulation in this area." (emphasis added)). We are confident that, if any future USF contribution reform renders continued forbearance from BIAS USF assessments inconsistent with statutory forbearance criteria, the Commission could and would reverse that grant of forbearance.

[1506] INCOMPAS Comments at 57; *see* NDIA Comments at 3-4; Letter from Lindsay Stern, Attorney & Policy Manager, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Feb. 29, 2024).

[1507] We therefore decline WTA's request to delete any discussion of section 254(d) forbearance until a rulemaking is conducted. *See* Letter from Derrick B. Owens, Senior Vice President of Government and Industry Affairs, WTA — Advocates for Rural Broadband, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 at 2 (filed Apr. 16, 2024).

[1508] Letter from Michael Romano, Executive Vice President, NTCA–The Rural Broadband Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2-3 (filed Apr. 17, 2024), (NTCA Apr. 17, 2024 *Ex Parte*); *see also* Letter from Lindsay Stern, Attorney & Policy Manager, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2-5 (filed Apr. 16, 2024) (INCOMPAS Apr. 16, 2024 *Ex Parte*); Letter from Michael Calabrese, Director, New America's Open Technology Institute, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 at 8 (filed Apr. 15, 2024).

would not alter the Commission's underlying statutory obligation under section 254(d).[1509]  We therefore decline to adopt a different approach.

371.    We also forbear from applying section 254(g) and (k) and our associated rules.  Section 254(g) requires "that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high-cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas."[1510]  Section 254(k) prohibits the use of revenues from a non-competitive service to subsidize a service that is subject to competition.[1511]  As with the *2015 Open Internet Order*, we are not persuaded that applying these provisions is necessary for purposes of section 10(a)(1) and (a)(2), particularly given the availability of the core BIAS requirements.[1512]  Likewise, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance from enforcing section 254(g) and (k) is in the public interest under section 10(a)(3).  Forbearance from section 254(g) also is consistent with our commitment to forbear from all provisions that would permit rate regulation of BIAS.  We also note that comments addressing section 254 appear focused on provisions regarding universal service support for BIAS networks and universal service contributions, addressed above, and not on the requirements of section 254(g) and (k) and our implementing rules.  We thus forbear from applying these provisions insofar as they would be newly triggered by the classification of BIAS in this Order.  Nothing in our forbearance with respect to section 254(k) for BIAS is intended to encompass, however, situations where ILECs or other common carriers voluntarily choose to offer Internet transmission services as telecommunications services subject to the full scope of Title II requirements for such services.  As a result, such providers remain subject to the obligations that arise under section 254(k) and the Commission's rules by virtue of their elective provision of such services.[1513]

---

[1509] *See Maricopa Community College District Request for Experimental Authority to Relax Standards for Public Radio Underwriting Announcements*, 29 FCC Rcd at 15044-45, para. 7; *Rural Health Care Support Mechanism*, WC Docket No. 02-60, Order, 22 FCC Rcd 20360, 20415-16, para. 106 (2007) ("[A]lthough the Commission has authority to waive regulatory requirements, it does not have authority to waive a requirement imposed by statute. . . . Thus, regardless of whether we were to waive our rule, the statutory prohibition on resale would still remain."). Section 254(d) directs the Commission to establish mechanisms—including contribution requirements—to preserve and advance universal service.  47 U.S.C. § 254(d).  Some commenters attempt to rely on various precedents to argue that section 254(d) is not "self-effectuating."  *See, e.g.*, NTCA Reply at 14; Letter from Greg Guice, Chair, Affordable Broadband Campaign, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3-5 (filed Apr. 2, 2024); INCOMPAS Apr. 16, 2024 *Ex Parte* at 4; NTCA Apr. 17, 2024 *Ex Parte*, at 3.  We find that the examples cited—the initial implementation of section 254, the assessment of wireless voice providers, the assessment of VoIP providers, and the brief period of assessment of wireline BIAS providers—are inapposite and are not germane as to whether the statute is self-effectuating.  Indeed, these examples are not analogous to the assessment of contributions for BIAS providers because the wireless providers in questions were in fact required to contribute to the USF immediately pending the development of a Commission-specified allocation methodology; the VoIP providers were assessed based on permissive, not mandatory, authority; and the 2005 wireline BIAS providers were subject to an existing contribution methodology on a time-limited basis to maintain the status quo.  Notably in this case, the Commission already has established requirements that, by their terms, would require contributions on BIAS revenues if they immediately applied.

[1510] 47 U.S.C. § 254(g).

[1511] 47 U.S.C. § 254(k).

[1512] *See 2015 Open Internet Order*, 30 FCC Rcd at 5837-38, para. 492.  By "core BIAS requirements," we mean the provisions of the Act and regulations expressly excluded from the scope of forbearance under this Order, along with section 706 of the 1996 Act, and our open Internet rules.  *See id.* at 5818, para. 457 (using similar terminology as a convenient shorthand).

[1513] *See, e.g.*, *Wireline Broadband Classification Order*, 20 FCC Rcd at 14927-29, paras. 139-44 (discussing the application of section 254(k) and related cost-allocation rules).  For example, if a rate-of-return incumbent LEC (or other provider) voluntarily offers Internet transmission outside the forbearance framework adopted in this Order, it

(continued....)

## 8. Access for Persons with Disabilities (Sections 225, 255, and 251(a)(2))

372. We do not forbear from those provisions of Title II that ensure access to BIAS by individuals with disabilities. Consistent with our conclusion above that BIAS is essential, we find that all Americans, including those with disabilities, must be able to reap the benefits of an open Internet.[1514] Application of sections 225, 255, and 251(a)(2)[1515] is necessary to ensure access for these individuals, thereby protecting consumers and furthering the public interest.[1516]

373. Section 225 mandates that telecommunications relay services be made available on an interstate and intrastate basis[1517] to individuals who are deaf, hard of hearing, deafblind, and who have speech disabilities in a manner that is "functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio."[1518] To achieve this, the Commission has required all interstate service providers (other than one-way paging services) to provide TRS.[1519] People who are deaf, hard of hearing, deafblind, and who have speech disabilities increasingly rely upon Internet-based video communications, both to communicate directly (point-to-point) with other persons who are deaf or hard of hearing who use sign language and through video relay service[1520] with individuals who do not use the same mode of communication that they do.[1521] In doing so, they rely on high definition two-party or multiple-party video conferencing that

---

remains subject to the pre-existing Title II rights and obligations, including those from which we forbear in this Order.

[1514] *See, e.g.*, Equity Advocates Comments at 10-11; CFA Comments at 43, 45 ("Since the pandemic and the spread and penetration of broadband policy to accelerate use by low income, disabled and rural households is more, not less, urgently needed."); ACLP Comments Attach. 3, Anita Aaron et al. Comments, WC Docket No. 07-52, at 3 (rec. Apr. 26, 2010) (Filing Parties Apr. 26, 2010 Comments).

[1515] Section 251(a)(2) precludes the installation of "network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256." 47 U.S.C. § 251(a)(2).

[1516] *See, e.g.*, Equity Advocates Comments at 10-11; CPUC Comments at 28-32. As explained in greater detail below, this Order does, however, forbear in part from the application of TRS contribution obligations that otherwise would apply to BIAS.

[1517] 47 U.S.C. § 225(b)(1).

[1518] 47 U.S.C. § 225(a)(3) (defining telecommunications relay service).

[1519] *See generally Telecommunications Relay Services for Hearing-Impaired and Speech-Impaired Individuals, and the Americans with Disabilities Act of 1990*, CC Docket No. 90-571, Notice of Proposed Rulemaking, 5 FCC Rcd 7187 (1990); *Telecommunications Services for Individuals with Hearing and Speech Disabilities, and the Americans with Disabilities Act of 1990*, CC Docket No. 90-571, Report and Order and Request for Comments, 6 FCC Rcd 4657, 4660, para. 17 (1991) (*TRS Order*); *Telecommunications Services for Individuals with Hearing and Speech Disabilities, and the Americans with Disabilities Act of 1990*, CC Docket No. 90-571, Order on Reconsideration, Second Report and Order, and Further Notice of Proposed Rulemaking, 8 FCC Rcd 1802 (1993) (*TRS II*); *Telecommunications Relay Services, and the Americans with Disabilities Act of 1990*, CC Docket No. 90-571, Third Report and Order, 8 FCC Rcd 5300 (1993) (*TRS III*).

[1520] VRS is a form of TRS that allows people who are blind, hard of hearing, deafblind, and who have speech disabilities who use sign language to communicate with voice telephone users through a communications assistant using video transmissions over the Internet. *See* 47 CFR § 64.601(a)(51).

[1521] *See 2023 Open Internet NPRM* at 249, para. 468; Filing Parties Apr. 26, 2010 Comments at 3 ("The disability community likewise 'relies heavily on the network' and uses broadband to access a universe of text- and video-based content. For example, the 'blind and visually impaired population has benefitted greatly from . . . increased broadband connectivity and innovation over the past decade. New technologies have made what was once thought impossible [a] reality for many of those in [the] community. Communication, education and even recreation has become easier to access and all of these contribute to a greater sense of connectivity for people who are blind and visually impaired.' People who are deaf and people who are hard of hearing also benefit from broadband by, among other things, using new tools like Video Relay Services which operate in a real-time manner."); *see generally*

(continued....)

necessitates a broadband connection.[1522]  Indeed, the Commission recognized the increased importance for persons with disabilities to have access to video conferencing services that arose during the COVID-19 pandemic and its aftermath.[1523]

374.    Section 225 is forward-looking and requires the Commission to adopt TRS regulations that encourage the use of existing technologies and not discourage or impair the development of new technologies.[1524]  As technology advances, the obligations of section 225 carry forward to ensure the Commission makes available to all individuals in the United States a rapid, efficient, nationwide communications service.[1525]  Limits imposed on bandwidth use through network management practices that might otherwise appear neutral, could have an adverse effect on Internet-based TRS users who use sign language to communicate by degrading the underlying service carrying their video communications.  This result could potentially deny these individuals access to a functionally equivalent communications service.  Additionally, if VRS and other Internet-based TRS users are limited in their ability to use BIAS or are assessed extra costs for BIAS in order to access or use Internet-based TRS or point-to-point services, this could cause discrimination against them because for many such individuals, TRS is the only form of communication that affords service that is functionally equivalent to what voice users have over the telephone.  Moreover, limiting their bandwidth capacity could compromise their ability to obtain access to emergency services via VRS and other forms of Internet-based TRS, which is required by the Commission's rules implementing section 225.[1526]

---

*Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *E911 Requirements for IP-Enabled Service Providers*, CG Docket No. 03-123, WC Docket No. 05-196, Report and Order and Further Notice of Proposed Rulemaking, 23 FCC Rcd 11591 (2008) (*First Internet-Based TRS Order*); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *E911 Requirements for IP-Enabled Service Providers*, CG Docket No. 03-123, WC Docket No. 05-196, Second Report and Order and Order on Reconsideration, 24 FCC Rcd 791 (2008) (*Second Internet-Based TRS Order*).  In addition, these populations rely on other forms of Internet-based TRS, including Internet Protocol Relay Service (IP Relay) and Internet Protocol Captioned Telephone Service (IP CTS).  IP Relay is a "telecommunications relay service that permits an individual with a hearing or a speech disability to communicate in text using an Internet Protocol-enabled device via the Internet, rather than using a text telephone (TTY) and the public switched telephone network."  47 CFR § 64.601(a)(24).  IP CTS is a "telecommunications relay service that permits an individual who can speak but who has difficulty hearing over the telephone to use a telephone and an Internet Protocol-enabled device via the Internet to simultaneously listen to the other party and read captions of what the other party is saying."  47 CFR § 64.601(a)(23).

[1522] *See, e.g., Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51, Declaratory Ruling, Order and Notice of Proposed Rulemaking, 25 FCC Rcd 6012, 6014, para. 3 (2010).

[1523] *See Video Conferencing Order* at 3, paras. 3-4.

[1524] *See* 47 U.S.C. § 225(b)(2).

[1525] *See* 47 U.S.C. § 225(b)(1); *see also 2023 Open Internet NPRM* at 61, para. 121; CPUC Comments at 28; California Public Utilities Commission Comments, WC Docket Nos. 17-108, 17-287, and 11-42, at 10 (Apr. 20, 2020) (CPUC Petitions for Reconsideration Comments).  For example, in 2007, the Commission extended the application of section 225 requirements to interconnected VoIP providers, relying at the time on its ancillary authority to the Commission's to carry out the purposes established under section 1 of the Act, make available to all individuals in the United States a rapid, efficient nationwide communication service, and increase the utility of the telephone system.  *IP-Enabled Services*; *Implementation of Sections 255 and 251(A)(2): Access to Telecommunications Service, Telecommunications Equipment and Customer Premises Equipment by Persons with Disabilities et al.*, WC Docket Nos. 04-36 et al., Report and Order, 22 FCC Rcd 11275, 11292-93, paras. 34-35 (2007) (*2007 VoIP TRS Order*).  The Commission also relied on an express authority under section 225(d)(3)(B) to issue regulations that "shall generally provide that costs caused by interstate relay services shall be covered from all subscribers for every interstate service" to require VoIP providers to contribute to the TRS fund.  *2007 VoIP TRS Order*, 22 FCC Rcd at 11293-94, paras. 36-37.  Congress, in the CVAA, subsequently codified the obligations of interconnected and non-interconnected VoIP providers to contribute to the TRS fund.  *See* 47 U.S.C. § 616.

[1526] *See* 47 CFR § 9.14.

375.     As emphasized in the *2015 Open Internet Order*, section 225 is important not only as a basis for future rules adopting additional protections but also to clarify Internet-based TRS providers' obligations under existing rules.[1527]  To be compensated from the TRS fund, providers' services must comply with section 225 and the Commission's TRS rules and orders.[1528]  A number of IP-based TRS services are delivered through users' broadband Internet access services.  Forbearing from applying section 225 and our TRS service requirements would risk creating loopholes in the protections otherwise afforded to users of Internet-based TRS services, or even just uncertainty that might result in degradation of these services.  More specifically, if we were to forbear from applying these provisions, we run the risk of allowing actions taken by BIAS providers to come into conflict with the overarching goal of section 225, i.e., ensuring that communication services made available through TRS are functionally equivalent, that is, mirror as closely as possible the voice communication services available to the general public.  Enforcement of this functional equivalency mandate will protect against such degradation of service.  In sum, we find that the enforcement of section 225 is necessary for the protection of consumers, and that forbearance would not be in the public interest.

376.     Notwithstanding the foregoing, we forbear at this time, for reasons similar to those discussed above relating to our forbearance of universal service contributions for BIAS providers,[1529] from the application of TRS fund contribution obligations that otherwise would newly apply to BIAS.[1530] We find that applying new TRS fund contribution requirements at this time is not necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers or for the protection of consumers under section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3).[1531] We limit our action only to forbearing from applying section 225(d)(3)(B) and our implementing rules insofar as they would immediately require new TRS fund contributions from BIAS providers.[1532]

377.     Consistent with the Commission's approach in 2015, nothing in our forbearance from TRS fund contribution requirements for BIAS is intended to encompass situations when ILECs or other common carriers voluntarily choose to offer Internet transmission services as telecommunications services subject to the full scope of Title II requirements for such services.  As a result, such providers remain subject to the TRS fund contribution obligations that arise under section 225 and the Commission's rules by virtue of their elective provision of such services until such time as the Commission further addresses such contributions in the future.[1533]

378.     Further, with respect to BIAS, we do not forbear from applying sections 255 and 251(a)(2), and the associated rules, that require telecommunications carriers and equipment manufacturers

---

[1527] *2015 Open Internet Order*, 30 FCC Rcd at 5825, para. 469.

[1528] 47 CFR § 64.604(c)(5)(iii)(E), (F).

[1529] *See supra* Section IV.B.7.

[1530] 47 U.S.C. § 225(d)(3)(B); 47 CFR § 64.604(c)(5)(iii); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5825, para. 470 (forbearing from these requirements).

[1531] 47 U.S.C. § 160.

[1532] We reserve the ability to conduct a future rulemaking to require such contributions in the event future developments necessitate such action.  *Cf. Misuse of Internet Protocol (IP) Captioned Telephone Service*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 13-24 and 03-123, Order and Notice of Proposed Rulemaking, 28 FCC Rcd 703, 707, para. 7 (2013) (describing potential Anti-Deficiency Act issues that could arise if there were insufficient TRS funds available and the impact that would have on all TRS programs), *rev'd, Sorenson v. FCC*, 755 F.3d 702 (2014) (finding, in pertinent part, that the Commission had not sufficiently demonstrated the actual imminence of a fiscal calamity to support good cause to forgo notice and comment).  Before adopting any TRS-related contributions requirements, the Commission would assess the need for such funding, and the appropriate contribution level, given the totality of concerns implicated in this context. *2015 Open Internet Order*, 30 FCC Rcd at 5825, para. 470.

[1533] *2015 Open Internet Order*, 30 FCC Rcd at 5826, para. 471.

to make their services and equipment accessible to individuals with disabilities, unless not readily achievable,[1534] and preclude the installation of "network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255."[1535]  In prior proceedings, the Commission has emphasized its commitment to implementing the important policy goals of section 255 in the Internet access service context.[1536]  Commenters have noted that broadband adoption, while growing, still lags among certain groups, including individuals with disabilities.[1537]  Adoption of BIAS by persons with disabilities can enable these individuals to achieve greater productivity, independence, and integration into society in a variety of ways.[1538]  These capabilities, however, are not available to persons with disabilities if they face barriers to BIAS usage, such as inaccessible hardware, software, or services.[1539]  We anticipate that increased adoption of services and technologies accessible to individuals with disabilities will, in turn, spur further availability of such capabilities, and of BIAS deployment and usage more generally.

379.    Our forbearance analysis regarding sections 255 and 251(a)(2), and our implementing rules, is also informed by the incremental nature of the requirements imposed.  The CVAA addressed advanced communication services (regardless of their regulatory classification) to ensure that such products and services are accessible to persons with disabilities, unless it is not achievable to do so.[1540]  While the CVAA permits the Commission to adopt regulations that networks used to provide advanced communications services "may not impair or impede the accessibility of information content when accessibility has been incorporated into that content for transmission,"[1541] such provisions alone do not help the Commission ensure that BIAS is accessible to people with disabilities.

---

[1534] 47 U.S.C. § 255.

[1535] 47 U.S.C. § 251(a)(2).

[1536] *See, e.g.*, *First Broadband Deployment Report*, 14 FCC Rcd at 2437-38, paras. 75-77 ("We caution, however, that the promise of advanced telecommunications capability for people with disabilities will not be realized unless inherent barriers in telecommunications products and services are removed, and accessible equipment and services are widely available through mainstream markets. . . . [W]e are committed to taking advantage of any opportunities to encourage the deployment of advanced telecommunications service to people with disabilities.  Plans for the deployment of advanced services should also address the needs of persons with disabilities."); *Wireline Broadband Classification Order*, 20 FCC Rcd at 14919-22, paras. 121-24 ("[T]he Commission will remain vigilant in monitoring the development of wireline broadband Internet access service and its effects on the important policy goals of section 255.  As noted above, we will exercise our Title I ancillary jurisdiction to ensure achievement of important policy goals of section 255 and also section 225 of the Act.").

[1537] CFA Comments at 43 (explaining that households headed by persons with disabilities tend to be lower income, and as a result tend to have lower penetration of broadband and Internet); Equity Advocates Comments at 3 (noting that people with disabilities have one of the lowest levels of connectivity of any demographic group regularly considered, even as overall levels of connectivity have increased).

[1538] Microsoft Comments at 3-4 (submitting that remote learning offers a means of accessing education or training that might otherwise be inaccessible); Equity Advocates Comments at 3 (stating that people with disabilities are highly dependent on affordable and reliable telecommunications in order to live independently); *see also* Public Knowledge Comments at 54.

[1539] CPUC Comments at 30-31 (arguing that reclassification of BIAS as a Title II telecommunications service will also improve the accessibility of BIAS to persons with disabilities under sections 225, 255, and 251(a)(2)).

[1540] 47 U.S.C. § 617.  Advanced communications services means:  "(A) interconnected VoIP service; (B) non-interconnected VoIP service; (C) electronic messaging service; (D) interoperable video conferencing service; and (E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."  47 U.S.C. § 153(1).

[1541] 47 U.S.C. § 617(e)(1)(B); *see also* 47 CFR § 14.20(c).

380. As explained above, we find the provisions of the CVAA, while significant, are not sufficient protections in the context of BIAS, despite the claims of several commenters.[1542] Insofar as sections 255, 251(a)(2), and our implementing rules impose different requirements that are reconcilable with the CVAA, we find it appropriate to apply those additional protections in the context of BIAS for the reasons described above.[1543] For example, providers of BIAS must ensure that network services and equipment do not impair or impede accessibility pursuant to the sections 255 and 251(a)(2) framework.[1544] In particular, we find that these provisions and regulations are necessary for the protection of consumers and forbearance would not be in the public interest.[1545]

## 9. Other Title II Provisions

381. We adopt our proposal to not grant forbearance to the extent it was considered and rejected for particular statutory provisions in the *2015 Open Internet Order*.[1546] The record does not reflect that the Commission's forbearance criteria or analyses must be updated with regard to these obligations, and no commenter suggests we should forbear from these provisions. Specifically, we do not forbear from section 257 of the Act[1547] and provisions insofar as they only reserve state or local

---

[1542] *See also* US Telecom Reply at 52 (arguing that any incremental benefit would be negligible, given the breadth of the CVAA and the Commission's current implementing regulations); NCTA et al. Reply at 32-33 (arguing that the Title II advocates fail to recognize that Congress already enacted a statute—the CVAA—to ensure that IP-enabled services are accessible to persons with disabilities); Verizon Comments at 17-18 (contending that Congress addressed the issue of reclassification to ensure broadband access for persons with disabilities when it enacted the CVAA).

[1543] *See, e.g.*, *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)) (alteration in original). We recognize that the Commission previously has held that "[s]ection 2(a) of the CVAA exempts entities, such as Internet service providers, from liability for violations of Section 716 when they are acting only to transmit covered services or to provide an information location tool. Thus, service providers that merely provide access to an electronic messaging service, such as a broadband platform that provides an end user with access to a web-based e-mail service, are excluded from the accessibility requirements of Section 716." *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010 et al.*, CG Docket Nos. 10-213 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 14557, 14576, para. 45 (2011). Our decision here is not at odds with Congress's approach to such services under the CVAA, however, because we also have found that "relative to Section 255, Section 716 requires a higher standard of achievement for covered entities." *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010 et al.*, CG Docket Nos. 10-213 et al., Notice of Proposed Rulemaking, 26 FCC Rcd 3133, 3136-37, para. 5 (2011). Thus, under our decision here, BIAS will remain excluded from the "higher standard of achievement" required by the CVAA to the extent provided by that law, and instead will be subject to the lower standard imposed under section 255 in those cases where the CVAA does not apply.

[1544] *See* 47 CFR § 6.9. Because this section requires pass through of telecommunications in an accessible format, and 47 CFR § 14.20(c) requires pass through of advanced communications services in an accessible format, the two sections work in tandem with each other, and forbearance from sections 255 and 251(a)(2) would therefore result in a diminution of accessibility.

[1545] *See* Public Knowledge Comments at 54 (arguing that section 255 is specifically intended to promote accessibility for persons with disabilities, and that the Commission should decline to forbear from the section in order to enhance its authority to implement and enforce sections 716 and 718).

[1546] *2023 Open Internet NPRM* at 55-56, para. 106.

[1547] *2015 Open Internet Order*, 30 FCC Rcd at 5861, para. 531; *2023 Open Internet NPRM* at 55-56, para. 106; *see, e.g.*, WISPA Comments at 95-96 (suggesting that section 257 could provide authority to regulate the marketplace to promote competition).

authority,[1548] as these provisions impose certain obligations on the Commission without creating enforceable obligations that the Commission would apply to telecommunications carriers or telecommunications services.[1549]  Section 257 also may enhance public safety by giving the Commission additional authority to address outage reporting requirements.[1550]  We also decline requests to forbear from applying sections 253 and 332(c), which provide us authority to preempt state and local requirements, which is consistent with the preemption approach we articulate in this Order, and we therefore find it is in the public interest to continue applying those provisions.[1551]  Additionally, for the reasons fully elaborated on in the *2015 Open Internet Order*, we decline to forbear from the CALEA requirements in section 229.[1552]  To the extent we do not forbear from these or any other provisions or regulations, BIAS providers remain free to seek relief from such provisions or regulations through appropriate filings with the Commissions.[1553]

382.    We also similarly do not forbear from applying Title II provisions that could be viewed as a benefit to BIAS providers, such as sections 223, 230(c), and 231.[1554]  Section 230(c) was not covered by the scope of forbearance in the *2015 Open Internet Order* because "its application does not vary based on the classification of BIAS here."[1555]  Since section 230(c)'s application has not changed since the Commission adopted the *2015 Open Internet Order*, the Commission again does not forbear.[1556]  Similarly, applying sections 223 and 231 (to the extent enforced) and their associated limitations on liability,[1557] still do not vary with BIAS's classification, and are not encompassed by the forbearance in

---

[1548] *2015 Open Internet Order*, 30 FCC Rcd at 5861, para. 531 & n.1644; *2023 Open Internet NPRM* at 55-56, para. 106; *see, e.g.*, Wired Broadband et al. Comments at 3 (asking that the Commission forbear from applying section 332(c)(7) of the Act to mobile data-only BIAS if we reclassify that service as a telecommunications service); NARUC Comments at 20 & n.28 (discussing the reservation of state authority under various sections of the Act, such as sections 214(e)(2), 253(b), 261, 254(i), 153(41), and 601(c), and arguing that that we cannot forbear from sections that preserve state authority); State Consumer Advocates Comments at 20 (discussing sections 214(e)(2) and 253).

[1549] *See supra* Section IV.A.

[1550] *See* Free State Foundation Comments at 11-12 (suggesting that the Commission has the authority under section 257(a) and possibly other legislative provisions to impose additional outage reporting requirements).

[1551] *See, e.g.*, NATOA Reply at 4-5 (asking that the Commission forbear from applying sections 253 and 332(c) to recognize that "[s]tate and local governments can deliver responsive consumer protections, public safety, access for all, and siting supervision of providers' physical facilities because local governments are adept at resolving the discrete issues that arise from local conditions and circumstance"); National League of Cities Comments at 2 (urging the Commission to revisit and overturn the 2018 preemption order and, until that time, forbear application of sections 253 and 332(c) to reclassified BIAS because it will aid the Commission's deployment goals); *see also supra* Section III.G.

[1552] *2015 Open Internet Order*, 30 FCC Rcd at 5862-63, para. 533; *2023 Open Internet NPRM* at 55-56, para. 106.

[1553] *See, e.g.*, 47 CFR §§ 1.3, 1.53-1.59, 1.401.

[1554] *2015 Open Internet Order*, 30 FCC Rcd at 5862, para. 532; *2023 Open Internet NPRM* at 55-56, para. 106. Sections 223, 230(c), and 231 limit, or establish defenses for, liability under those respective sections.  47 U.S.C. §§ 223, 230(c), 231.

[1555] *2015 Open Internet Order*, 30 FCC Rcd at 5862, para. 532.

[1556] *Id.*

[1557] *Id.* at 5862, para. 532 & n.1647.  Many of the relevant provisions in these sections stem from the Child Online Protection Act (COPA), which has been enjoined as unconstitutional.  *See id.*  COPA amended the Communications Act by adding sections 230(d) and 231 and amending parts of sections 223(h)(2) and 230(d)-(f).  *See* Child Online Protection Act, Pub. L. No. 105-277, §§ 1401-1405, 112 Stat. 2681-736–2681-741 (1998).  A federal court held that COPA is unconstitutional and placed a permanent injunction against its enforcement, and that decision was affirmed on appeal.  *ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007) (entering a permanent injunction against

(continued….)

this Order.[1558] We also find that, to the extent that Title II provisions benefit BIAS providers and newly apply by virtue of reclassification, applying those provisions better serve the public interest because they promote broadband deployment.[1559]

### C. Broad Forbearance from Other Title II Provisions for Broadband Internet Access Service

383. Beyond the specific statutory provisions and regulations expressly excluded from forbearance as discussed above and in the sections below, we apply broad forbearance, to the full extent permitted by our authority under section 10 of the Act, from provisions of Title II of the Act and implementing Commission rules that would apply to BIAS by virtue of its classification as a Title II telecommunications service.[1560] We are persuaded that this forbearance is appropriate and in the public interest based on our predictive judgment regarding the adequacy of other protections where needed, the role of section 706 of the 1996 Act, and how we have tailored our forbearance to account for updated conclusions in this proceeding regarding the application of particular rules, requirements, and sources of authority to BIAS.[1561] The record also provides support for the forbearance approach we take here.[1562]

384. Consistent with our analysis in 2015,[1563] we conclude that our analytical approach as to all the provisions and regulations from which we forbear in this Order is consistent with section 10(a).[1564] Under section 10(a)(1), we consider here whether particular provisions and regulations are "necessary" to ensure "just and reasonable" conduct by BIAS providers.[1565] In interpreting that terminology, we conclude that we reasonably can account for policy trade-offs that can arise under particular regulatory approaches, as discussed above.[1566] For one, we find it reasonable in the BIAS context for our

---

enforcement of the Act after holding that it is facially unconstitutional), *aff'd*, 534 F.3d 181 (3d Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009) (mem.).

[1558] *2015 Open Internet Order*, 30 FCC Rcd at 5862, para. 532.

[1559] *Id.* at 5862, para. 532 & n.1649 (providing as examples, *inter alia*, sections 223 and 231).

[1560] *2023 Open Internet NPRM* at 52, 56, paras. 98, 107; *2015 Open Internet Order*, 30 FCC Rcd at 5838-60, paras. 493-528.

[1561] *2015 Open Internet Order*, 30 FCC Rcd at 5838, para. 493; *2023 Open Internet NPRM* at 52, para. 98; *see* WISPA Comments at 60 (asking that if the Commission reclassifies BIAS, then we show that forbearance has been applied fully to the correct sections of Title II and explain the scope of forbearance sufficiently).

[1562] *See, e.g.*, CCIA Comments at 16 (supporting the Commission re-adopting the same forbearance as the *2015 Open Internet Order*, and asking that we forbear from applying sections 201 and 202 to the extent that they would authorize adoption of rate regulations for BIAS; sections 215 through 221 in full; sections 224 through 226 in full; and section 228 in full); INCOMPAS Comments at 59-60 (asserting that our proposed forbearance meets forbearance analysis under section 10); T-Mobile Comments at 51 ("T-Mobile strongly supports the Commission's initial conclusion that broad forbearance remains just as essential to protecting an open and secure internet now as the Commission found it to be in 2015.").

[1563] *2015 Open Internet Order*, 30 FCC Rcd at 5840-41, para. 496.

[1564] We also decline WISPA's request that we conduct a cost-benefit analysis of the imposition of Title II regulations in the context of deciding which regulations we should or should not forbear from. WISPA Comments at 60. This is unnecessary, as we find that our forbearance is in the public interest and is consistent with 10(a) analysis.

[1565] 47 U.S.C. § 160(a)(1).

[1566] *See supra* Section IV.A. While the specific balancing at issue in *EarthLink*, 462 F.3d at 8-9, may have involved trade-offs regarding competition, we nonetheless believe the view expressed in that decision accords with our conclusion here that we permissibly can interpret and apply all the section 10(a) criteria to also reflect the competing policy concerns here. As the D.C. Circuit also has observed, within the statutory framework that Congress established, the Commission "possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband." *Ad Hoc*, 572 F.3d at 906-07.

interpretation and application of section 10(a)(1) to be informed by section 706 of the 1996 Act.[1567]  As discussed above,[1568] section 706 of the 1996 Act "explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans,'"[1569] and our recent negative section 706(b) determination triggers a duty under section 706 for the Commission to "take immediate action to accelerate deployment."[1570]  As discussed in greater detail below, a tailored regulatory approach avoids disincentives for broadband deployment, which we weigh in considering what outcomes are just and reasonable—and whether the forborne-from provisions are necessary to ensure just and reasonable conduct—under our section 10(a)(1) analyses in this item. Furthermore, our forbearance in this Order, informed by past experience and the record in this proceeding, reflects the recognition that, beyond the specific provisions from which we decline to forbear above and the bright-line open Internet rules we adopt below, particular conduct by a BIAS provider can have mixed consequences, rendering a case-by-case evaluation superior to bright-line rules. Consequently, based on those considerations, we predict that, outside the authority we retain and the rules we apply in this Order, just and reasonable conduct by BIAS providers is better ensured under section 10(a)(1) by the case-by-case regulatory approach we adopt—which enables us to account for the countervailing policy implications of given conduct—rather than any of the more bright-line requirements that would have flowed from the provisions and regulations from which we forbear.[1571]  These same considerations underlie our section 10(a)(2) analyses as well, since advancing BIAS deployment and ensuring appropriately nuanced evaluations of the consequences of BIAS provider conduct better protects consumers.[1572]  Likewise, these same policy considerations are central to the conclusion that the forbearance granted in this Order, against the backdrop of the protections that remain, best advance the public interest under section 10(a)(3).[1573]

385.  The Commission's practical experience with the classification of BIAS informs our section 10(a) analysis for the remaining statutory and regulatory obligations triggered by classifying BIAS as a Title II telecommunications service.  Although practical experience in and of itself does not resolve the appropriate regulatory treatment of BIAS, it suggests that our approach guards against undue burden that could hinder BIAS deployment or otherwise be contrary to the public interest.[1574]  The record

---

[1567] Given the characteristics specific to BIAS that we find on the record here—including, among other things, protections from the newly adopted open Internet rules and the overlay of section 706—we limit our forbearance from the relevant provisions and regulations to the context of BIAS.  Outside that context, they will continue to apply as they have previously, unaffected by this Order.  CWA Comments at 23-25 (arguing that if the Commission chooses forbearance, then we should follow the Commission's prior, correct conclusion, that it should be guided by section 706 in implementing section 10 forbearance).

[1568] *See supra* Section IV.A.

[1569] *EarthLink*, 462 F.3d at 8-9 (alteration in original).

[1570] *2024 Section 706 Report* at 3.

[1571] As explained above, we conclude that while competition can be a sufficient basis to grant forbearance, it is not inherently necessary to find section 10 satisfied.  *See supra* Section IV.A.

[1572] 47 U.S.C. § 160(a)(2).

[1573] 47 U.S.C. § 160(a)(3).

[1574] We are not persuaded by arguments to the contrary, nor that we should not adopt the regulatory framework in this Order because it will impose such high compliance costs on providers relative to the *status quo* from the near-term past.  *See infra* Section V.H; *see, e.g.,* WISPA Comments at 54-55 ("In sum, both the vague general conduct rule and the NPRM's unclear articulation of its forbearance from rate regulation are the two most obvious areas where Title II rules will lead to regulatory creep."); CEI Comments at 12 (arguing that the need to broadly forbear shows that Title II reclassification is inappropriate, that the proposed forbearance is insufficient because it is not foreclosure from enforcement, and a future Commission could discontinue forbearance and impose any Title II regulation or rate regulation); ACA Connects Comments at 48 (explaining that it does not support proposed forbearance framework because it is too narrow to alleviate the harms that Title II regulation would impose on

(continued….)

reflects that providers were not deterred from network investment after the Commission adopted a similar regulatory approach in the *2015 Open Internet Order* and that some providers voluntarily continue to follow certain conduct rules.[1575]  We note in this regard that when exercising its section 10 forbearance authority "[g]uided by section 706," the Commission permissibly may "decide[] to balance the future benefits" of encouraging broadband deployment "against [the] short term impact" from a grant of forbearance.[1576]  Under the section 10(a) analysis, we are particularly persuaded to give greater weight to the likely benefits of proceeding cautiously given the speculative or otherwise limited nature of the arguments in the current record regarding the forbearance approach adopted here, which we discuss in greater detail below.[1577]

## 1.     Rate Regulation (Sections 201 and 202)

386.     Although we conclude, as the Commission did in 2015, that the section 10 criteria are not met with respect to forbearance from section 201 and 202 in full, "because we do not and cannot envision adopting new *ex ante* rate regulation" or *ex post* rate regulation of BIAS beyond the scope of our open Internet conduct rules in the future, we forbear from applying sections 201 and 202 to BIAS to the extent they would permit such regulation.[1578]  Given the protection of our open Internet rules, we do not find *ex*

---

smaller BIAS providers, much like the forbearance in the *2015 Open Internet Order*); NCTA Comments at 94, 96-98 (arguing that the policy harms of reimposing Title II regulation cannot be mitigated sufficiently through forbearance and is contrary to "permissionless innovation," and that ambiguity regarding the scope of forbearance undermines its efficacy); USTelecom Comments at 3 (arguing against reclassification and the forbearance framework because it would subject BIAS providers, "but not their thousands of traffic exchange partners—to Title II regulation of peering and traffic exchange agreements, including adjudicating disputes as to whether ISPs' proposed interconnection rates, terms, and conditions are appropriate"); CTIA Comments at 97 (arguing that our proposed forbearance would threaten innovation).

[1575] *See supra* Section III.H (Impact of Reclassification on Investment); Mozilla Reply at 6 (arguing that "large ISPs do not provide convincing evidence that these compliance costs would constitute a substantial fraction of their operating costs"); *2023 Open Internet NPRM* at 64, para. 129 & n.422.

[1576] *EarthLink*, 462 F.3d at 9.

[1577] Although we adopt firm forbearance from all direct rate regulation, with respect to other provisions from which we forbear here, we note that it also is within the Commission's discretion to proceed incrementally, and we find that adopting an incremental approach here—by virtue of the forbearance granted here—guards against any unanticipated and undesired detrimental effects on broadband deployment that could arise.  *See, e.g.*, *Mass. v. EPA*, 549 U.S. 497, 524 (2007) ("Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." (citations omitted)).  While we find that the tailored regulatory framework we adopt today strikes the right balance, we note that the D.C. Circuit has recognized the Commission's authority to revisit its decision should that prove not to be the case.  *EarthLink*, 462 F.3d at 12; *see also id.* ("'[A]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable,'" but the agency necessarily must have the ability to "reassess[] the situation if its predictions are not borne out." (citations omitted)).

[1578] *2015 Open Internet Order*, 30 FCC Rcd at 5814, para. 451; *see also* ACA Connects Comments at 49 (agreeing with the Commission's proposal to forbear from applying sections 201 and 202 to BIAS insofar as they would support adoption of rate regulation); Competitive Enterprise Institute Comments at 12-14 (CEI); Free State Foundation Comments at 45-48.  Contrary to New America's Open Technology Institute's claim, our sections 201 and 202 forbearance with respect to rate regulation is consistent with the Commission's approach in 2015.  *See 2015 Open Internet Order*, 30 FCC Rcd at 5814, para. 451; Letter from Michael Calabrese, Director, New America's Open Technology Institute, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 8 (filed Apr. 15, 2024).  In forbearing from sections 201 and 202 in this manner, we reiterate that states may have a role to play in promoting broadband affordability.  *See supra* Section III.G. (finding that states have a role to play in promoting broadband affordability and ensuring connectivity for low-income customers, such as, for example, through the BEAD program); *see also* Letter from Nat Purser, Government Affairs Policy Advocate, Public Knowledge, to

241

(continued….)

*ante* or *ex post* rate regulation necessary for purposes of section 10(a)(1) and (a)(2), and we find it in the public interest to forbear from applying sections 201 and 202 insofar as they would permit the adoption of such rate regulations for BIAS in the future.[1579]  We therefore find to be unfounded claims that our refusal to forbear entirely from sections 201 and 202 means that the Commission could introduce rate regulation of BIAS despite our commitment not to do so.[1580]

## 2.    Tariffing (Sections 203 and 204)

387.    We find the section 10(a) criteria met and forbear from applying section 203 of the Act insofar as it newly applies to BIAS providers by virtue of our classification of BIAS.[1581]  Section 203 requires Title II common carriers to file a schedule of rates and charges for interstate common carrier services.[1582]  We forbear from tariffing provisions because we predict that the other protections that remain in place are adequate to guard against unjust and unreasonable, and unjustly and unreasonably discriminatory, rates and practices in accordance with section 10(a)(1) and to protect consumers under section 10(a)(2).[1583]  We also conclude that those other protections reflect the appropriate calibration of regulation of BIAS at this time, such that forbearance is in the public interest under section 10(a)(3).[1584]

388.    We find that section 203's requirements are not necessary to ensure just and reasonable, and not unjustly or unreasonably discriminatory, rates and practices under section 10(a)(1) nor to protect consumers under 10(a)(2).  Sections 201 and 202 of the Act, from which we do not forbear, and our open Internet rules are designed to preserve and protect Internet openness by prohibiting unjust and unreasonable, and unjustly or unreasonably discriminatory, conduct by BIAS providers for or in connection with BIAS, protecting the retail mass market customers of BIAS.[1585]  In calibrating that legal framework, we considered, among other things, the operation of the marketplace in conjunction with those protections.  This regulatory scheme is substantially similar to the one we used in the *2015 Open Internet Order*, since there is no evidence that approach did not adequately protect the interests of consumers—including the interest in just, reasonable, and nondiscriminatory conduct—that might otherwise be threatened by the actions of BIAS providers.  As such, we make the same finding in this Order.[1586]  In the event that BIAS providers violate sections 201 or 202 of the Act, the open Internet rules, or any other BIAS requirements, they remain subject to complaints and Commission enforcement

---

Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 12, 2024) (Public Knowledge Apr. 12, 2024 *Ex Parte*); Letter from Jenna Leventoff, ACLU, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Apr. 19, 2024) (ACLU Apr. 19, 2024 *Ex Parte*).

[1579] *2015 Open Internet Order*, 30 FCC Rcd at 5814, para. 451.  Nothing in our forbearance from rate regulation under these provisions impinges on the Commission's authority to protect consumers under sections 201 and 202.  *See* Public Knowledge Apr. 12, 2024 *Ex Parte* at 2; ACLU Apr. 19, 2024 *Ex Parte* at 3; Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 18, 2024).

[1580] *See, e.g.*, ADTRAN Comments at 29-30; CEI Comments at 12-14; Free State Foundation Comments at 45-48; Phoenix Center Comments at 14-18; ACA Connects Reply at 22-23; NCTA Comments at 21.

[1581] *2015 Open Internet Order*, 30 FCC Rcd at 5841-42, para. 497.

[1582] 47 U.S.C. § 203.

[1583] *2015 Open Internet Order*, 30 FCC Rcd at 5841-42, para. 497.

[1584] *Id.*; *see* George Ford & Lawrence Spiwak, *Tariffing Internet Termination* at 15 (presuming that proponents of reclassification assume that the Commission will forbear from section 203).

[1585] *See infra* Section V; *2015 Open Internet Order*, 30 FCC Rcd at 5842, para. 498 ("In particular, under our open Internet rules and the application of sections 201 and 202, we establish both *ex ante* legal requirements and a framework for case-by-case evaluations governing broadband providers' actions.  In calibrating the legal framework in that manner, we consider, among other things, the operation of the marketplace in conjunction with open Internet protections.").

[1586] *2015 Open Internet Order*, 30 FCC Rcd at 5842, para. 498.

action.[1587]

389.    That the Commission has never before imposed tariffing requirements on BIAS as defined here also supports our section 10 analysis.[1588]  This practical experience informs what issues may arise with forbearance from tariffing requirements in this proceeding and underlies our prediction that the remaining rules and requirements are sufficient to fulfill the requirements under section 10.[1589]  Additionally, our forbearance from section 203 is consistent with our broad forbearance from all Title II provisions that could be used to impose *ex ante* or *ex post* rate regulation on BIAS providers, and we therefore make clear that we will not impose any such rate regulation nor any requirement of advanced Commission approval of rates and practices as otherwise would have been imposed under section 203 on BIAS providers.[1590]

390.    We find that forbearance from tariffing requirements for BIAS satisfies section 10(a)(1) and (a)(2) and is consistent with the public interest under section 10(a)(3) in light of the objectives of section 706.[1591]  As explained above, section 706 of the 1996 Act "explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.'"[1592]  The D.C. Circuit has further held that the Commission "possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband."[1593]  We find that the scope of our adopted forbearance strikes the right balance at this time between, on the one hand, providing the regulatory protections clearly required by the evidence and our analysis to, among other things, guard the virtuous cycle of Internet innovation and investment and, on the other hand, avoiding additional regulations that do not appear required at this time and that risk needlessly detracting from BIAS providers' broadband investments.[1594]

391.    We also conclude that the public interest supports forbearing from tariffing requirements for BIAS under section 10(b)'s requirement that we analyze the impact forbearance would have on competitive market conditions.[1595]  While we consider the section 10(b) criteria in our section 10(a)(3) public interest analysis, our public interest determination rests on other grounds.  In particular, under the entirety of our section 10(a)(3) analysis, as discussed above, we conclude that the public interest supports

---

[1587] *Id.*

[1588] *Id.* at 5842, para. 499.

[1589] *Id.*; *see, e.g.*, Nokia Comments at 2 (suggesting that we should not apply tariffing requirements to BIAS because those and other requirements are outdated); State Consumer Advocates at 4 (considering arguments that Title II reclassification will be onerous not credible because, in part, we do not require filing tariffs at the state or Federal level); Free Press Comments at 21 (explaining that the Commission's previous forbearance "from applying sections 203, 204, 205, 211, 212 and 214 [of the Act] to CMRS providers" demonstrates that the Commission has "a strong preference for competitive forces" over burdensome regulation).

[1590] *2015 Open Internet Order*, 30 FCC Rcd at 5842, para. 499; *2023 Open Internet NPRM* at 55, para. 105.

[1591] *2015 Open Internet Order*, 30 FCC Rcd at 5842-43, para. 500.

[1592] *EarthLink*, 462 F.3d at 8-9 (alteration in original).

[1593] *Ad Hoc*, 572 F.3d at 906-907.

[1594] We clarify that although we forbear from applying to BIAS section 203 and, as noted below, section 204, forbearing from tariffing does not limit the Commission's existing authority to study rates or competition. *See, e.g.*, New America's Open Technology Institute Comments at 42 (requesting that the Commission clarify that forbearing from "tariff setting does not limit the Commission's ability to study the price of service for purposes including, but not limited to determining availability and affordability of BIAS, competition in the marketplace, or discriminatory practices").

[1595] *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501.

the forbearance adopted in this Order.[1596]  Nonetheless, we also believe that our overall regulatory approach, viewed broadly, advances competition in important ways.[1597]  The record reflects that competition is still limited, and does not provide a strong basis for concluding that the forbearance granted in this Order is likely to directly affect the competitiveness of the marketplace for BIAS.[1598]  Our granted forbearance continues to be part of an overall regulatory approach designed to promote infrastructure investment in significant part by preserving and promoting innovation and competition at the edge of the network, and we similarly conclude that a grant of forbearance from section 203 indirectly promotes market competition by enabling us to strike the right balance at this time in our overall regulatory approach.[1599]

392.    We disagree with Public Knowledge that we should not forbear from section 203 for BIAS because tariff filings "provide consumers with the transparency necessary to protect their interests."[1600]  The transparency rule and the broadband label requirements are designed to provide consumers with disclosures of BIAS providers' commercial terms, including rates, as well as a wide array of other information about their services, and Public Knowledge fails to explain why these requirements are insufficient to provide consumers with information they need to protect their interest.[1601]  We are thus not persuaded to depart from our section 10(a) findings above regarding section 203.

393.    We also forbear from applying section 204 of the Act insofar as it newly applies to providers by virtue of our classification of BIAS.[1602]  Section 204 provides for Commission investigation of a carrier's rates and practices newly filed with the Commission, and to order refunds, if warranted.[1603]  Since we forbear from section 203's tariffing requirements, it is not clear what purpose section 204 would serve, and we thus apply our overarching section 10(a) forbearance analysis above to section 204.[1604]

### 3.    Enforcement-Related Provisions (Sections 205 and 212)

394.    We forbear from applying certain enforcement-related provisions of Title II to BIAS beyond the core Title II enforcement authority discussed above, and find this forbearance warranted under section 10(a).  Section 205 provides for Commission investigation of existing rates and practices and to prescribe rates and practices if it determines that the carrier's rates or practices do not comply with the

---

[1596] These same section 10(b) findings likewise apply in the case of our other section 10(a)(3) public interest evaluations with respect to BIAS, and should be understood as incorporated there.

[1597] *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501.

[1598] *See infra* Section V.A.3; *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501.

[1599] *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501 (explaining that this is true even if forbearance does not directly promote competitive market conditions); *see infra* Section V.A.1.

[1600] Public Knowledge Comments at 90-91 (explaining that "[m]any other Title II provisions, including the Section 203 requirements of carriers to report rates" provide the transparency needed to take legal action or exercise buying power and suggesting that these provisions give consumers "the necessary information to distinguish between providers").

[1601] *See, e.g.*, *2010 Open Internet Order*, 25 FCC Rcd at 17936-37, para. 53; *infra* Section V.B.3; *Empowering Broadband Consumers Through Transparency*, CG Docket No. 22-2, Report and Order and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13686 (2022) (*Broadband Label Order* or *Broadband Label Further Notice*).

[1602] *2015 Open Internet Order*, 30 FCC Rcd at 5845, para. 505.

[1603] 47 U.S.C. § 204.

[1604] We decline Public Knowledge's suggestion that the Commission retain section 204.  We are not persuaded by Public Knowledge's argument that "[t]here appears to be no a priori reason to assume that the Commission can adequately protect consumers by disclaiming its authority to suspend unjust rates and practices (Section 204)." Public Knowledge Comments at 95.  Public Knowledge fails to explain why our remaining authority and regulations would be insufficient to protect consumers, or how section 204 would effectuate that purpose once we have forborne from applying section 203.

Communications Act.[1605]  The Commission has forborne from enforcing section 205 when it sought to adopt a tailored, limited regulatory environment and, notwithstanding that forbearance, sections 201 and 202 and other complaint processes continued to apply.[1606]  The Commission previously forbore from enforcing section 205 in the *2015 Open Internet Order*, finding that the core Title II enforcement authority, along with the ability to pursue claims in court, as discussed below, provide adequate enforcement options and the statutory forbearance test is met for section 205.[1607]  Since we are adopting a substantially similar regulatory scheme as the *2015 Open Internet Order* and there is no evidence that those enforcement options were inadequate, we make the same finding in this Order.  Consistent with our analysis above, we predict that these provisions are not necessary to ensure just, reasonable, and nondiscriminatory conduct by providers of BIAS or to protect consumers under section 10(a)(1) and (a)(2).  In addition, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3).  We thus reject claims that we should not forbear from section 205 insofar as it is triggered by our classification of BIAS.[1608]

395.  We also forbear from applying section 212 to the extent that it newly applies by virtue of our classification of BIAS.[1609]  Section 212 empowers the Commission to monitor interlocking directorates, i.e., the involvement of directors or officers holding such positions in more than one common carrier.[1610]  The Commission has granted forbearance from section 212 in the CMRS context on the grounds that forbearance would reduce regulatory burdens without adversely affecting rates in the CMRS market.[1611]  In so doing, the Commission noted that section 212 was originally placed in the Communications Act to prevent interlocking officers from engaging in anticompetitive practices, such as price fixing, but found protections of section 201(b),[1612] 221,[1613] and antitrust laws[1614] were sufficient to protect consumers against the potential harms from interlocking directorates.  Forbearance also reduced an unnecessary regulatory cost imposed on carriers.[1615]  The Commission later extended this forbearance to dominant carriers and carriers not yet found to be non-dominant, repealing part 62 of its rules and

---

[1605] 47 U.S.C. § 205.

[1606] *Second CMRS Report and Order*, 9 FCC Rcd at 1479, para. 176.

[1607] *2015 Open Internet Order*, 30 FCC Rcd at 5845, para. 506.

[1608] Public Knowledge requests that we not forebear from enforcing sections 205, 209, 206, 216-217, and 212 because they provide consumers adequate remedies and the Commission the ability to hold providers accountable.  Public Knowledge Comments at 95-96.  But by Public Knowledge's own admission applying these provisions is unnecessary, as we "arguably have similar authority under the broad grant of Sections 201 and 202 and its general authority under Section 4(i)" with regard to sections 205 and other provisions it requests that we not forebear from enforcement.  Public Knowledge Comments at 95-96.

[1609] *2015 Open Internet Order*, 30 FCC Rcd at 5845-46, para. 507.

[1610] 47 U.S.C. § 212.

[1611] *See Second CMRS Report and Order*, 9 FCC Rcd at 1485, paras. 195-97.

[1612] *Id.* at 1485, paras. 197 & n.389.

[1613] The Commission noted that section 221 provided protections against interlocking directorates, but section 221(a) was repealed in the Telecommunications Act of 1996.  This section gave the Commission the power to review proposed consolidations and mergers of telephone companies.  While section 221(a) allowed the Commission to bolster its analysis to forbear from section 212 in the *Second CMRS Report and Order*, the protections against interlocking directorates provided by section 201(b) and 15 U.S.C. § 19 provide sufficient protection to forbear from section 212 for BIAS.

[1614] *See Second CMRS Report and Order*, 9 FCC Rcd at 1485, para. 197 & n.390 (citing the Clayton Act's protections governing interlocking directorates).

[1615] *See id.* at 1485, para. 197.

granting forbearance from the provisions of section 212.[1616]  Since we are adopting a substantially similar regulatory scheme as the *2015 Open Internet Order* and there is no evidence that other protections are not adequate, we make the same finding in this Order.[1617]  We predict that other protections will adequately ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and protect consumers here, and thus conclude that the application of section 212 is not necessary for purposes of sections 10(a)(1) or 10(a)(2).[1618]  Moreover, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3).  We thus reject Public Knowledge's claim that we should not forbear from section 212 insofar as it is triggered by our classification of BIAS.[1619]

### 4.    Information Collection and Reporting (Sections 211, 213, 215, and 220(a)(2), (b), (f)-(j))

396.    Outside the national security and public safety context, which we discuss above, we forbear from applying information collection and reporting provisions of the Act insofar as they would newly apply by virtue of our classification of BIAS as a Title II telecommunications service.  These provisions principally are used by the Commission to implement its traditional rate-making authority over common carriers.[1620]  Since we are not applying tariffing requirements to BIAS nor engaging in *ex ante* or *ex post* rate regulation of BIAS, it is not clear what purpose these provisions would serve.[1621]  The Commission also has undertaken the Broadband Data Collection and adopted broadband labeling requirements since the *2015 Open Internet Order*, both of which empower consumers by providing them with greater transparency as to their broadband service and further suggest these information collection requirements are unnecessary.[1622]  Given both our intention to tailor the regulations applicable to BIAS and our responsibility under section 706 to encourage deployment, we conclude that forbearance of these information collection and reporting provisions is in the public interest under section 10(a)(3) and applying these sections is not necessary within the meaning of section 10(a)(1) and (a)(2).

397.    We disagree, in part, with Public Knowledge, which broadly argues that we should not forbear from sections 211, 213, 215, and 220.[1623]  As discussed earlier, we retain sections 218 and 219,

---

[1616] *See generally 1998 Biennial Regulatory Review—Repeal of Part 62 of the Commission's Rules*, CC Docket No. 98-195, Report and Order, 14 FCC Rcd 16530 (1999) (*Part 62 Repeal Report and Order*).

[1617] *2015 Open Internet Order*, 30 FCC Rcd at 5845-46, para. 507.

[1618] *Id*.

[1619] Public Knowledge Comments at 95-96 ("There appears to be no a priori reason to assume that the Commission can adequately protect consumers" without section 212, but does not provide an example of or explain why protections without section 212 would be insufficient.").

[1620] *2015 Open Internet Order*, 30 FCC Rcd at 5846-47, para. 508 & n.1548 ("Specifically, section 211 allows the Commission to require common carriers to file contracts[;] section[] 213 authorizes the Commission to make a valuation of all or of any part of the property owned or used by any carrier; section 215 gives the Commission the authority to examine carrier activities and transactions likely to limit the carrier's ability to render adequate service to the public or to affect rates . . . .  We note that certain of these requirements might not, by their terms, apply to the broadband subscriber Internet service.  For example, aspects of section 215 and 220 appear specific to telephone service.  Because we find forbearance warranted under the section 10 criteria, we need not resolve the possible application of these provisions more precisely.").

[1621] *2023 Open Internet NPRM* at 55, para. 105; *2015 Open Internet Order*, 30 FCC Rcd at 5846-47, para. 508.

[1622] *See Broadband Label Order*, 37 FCC Rcd 13686; FCC, *Broadband Data Collection* (Jan. 19, 2024), https://www.fcc.gov/BroadbandData.

[1623] Public Knowledge Comments at 94-95 (requesting that we not forbear from sections 211, 213, 215, and 218 through 220).  We also disagree with Public Knowledge that there is "no reason to forbear simply for the sake of forbearing when a waiver will minimize any regulatory burden without depriving the Commission of useful tools for the future."  Letter from John Bergmayer, Legal Director, Public Knowledge, to Marlene H. Dortch, Secretary, FCC,

(continued….)

and certain provisions of section 220, which Public Knowledge also asserts should be excluded from forbearance, to ensure that the Commission has the ability to collect information and require reporting if necessary, including for national security and public safety purposes, and to ensure network resiliency.[1624] We conclude that excluding sections 218 and 219, and the section 220 provisions from forbearance, as detailed above, ensures that the Commission can collect information necessary to carry out its duties with respect to the public interest. Public Knowledge does not name any uncollected information that would enhance our "ability to make informed policy choices that promote the Congressional goals of ubiquitous, affordable deployment."[1625]

**5.      Interconnection and Market-Opening Provisions (Sections 251, 252, and 256)**

398.     We find the section 10 criteria met for forbearance from applying the interconnection and market-opening provisions in sections 251 (other than section 251(a)(2)), 252, and 256 to the extent that they would newly apply through the classification of BIAS as a Title II service.[1626] Given otherwise-existing authority that we retain under our open Internet rules and provisions of the Act from which we do not forbear, we find that there is no current federal need for those provisions—and, indeed, that they would conflict with the regulatory approach to BIAS that we find most appropriate.[1627] Thus, applying those provisions of the Act is not "necessary" under section 10(a)(1) and (a)(2). For those same reasons, we also find that forbearance is in the public interest under section 10(a)(3).[1628]

---

WC Docket No. 23-320, at 4 (filed Apr. 18, 2024). We again note that while the Commission may waive its rules, it may not generally waive a provision of a statute. Forbearance is the mechanism for not applying statutory provisions when warranted. *Maricopa Community College District Request for Experimental Authority to Relax Standards for Public Radio Underwriting Announcements*, 29 FCC Rcd at 15044-45, para. 7; 47 CFR § 1.3.

[1624] *See supra* Section IV.B.4.

[1625] Public Knowledge Comments at 94-95.

[1626] 47 U.S.C. §§ 251, 252, 256. As a result of the forbearance granted from section 251, section 252 thus is inapplicable, insofar as it is simply a tool for implementing the section 251 obligations. Although we do not forbear from applying section 251(a)(2) with respect to BIAS, we note that the Commission previously has held that the procedures of section 252 are not applicable in matters simply involving section 251(a). *See, e.g.*, *CoreComm Communications, Inc., and Z-Tel Communications, Inc. v. SBC Communications, Inc. et al.*, File No. EB-01-MD-017, Order on Reconsideration, 19 FCC Rcd 8447, 8454-55, para. 18 (2004) (asserting that "[n]either the general interconnection obligation of section 251(a) nor the interconnection obligation arising under section 332 is implemented through the negotiation and arbitration scheme of section 252"), *vacated on other grounds*, *SBC Commc'ns, Inc. v. FCC*, 407 F.3d 1223 (D.C. Cir. 2005); *Qwest Communications International Inc. Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangements Under Section 252(a)(1)*, WC Docket No. 02-89, Memorandum Opinion and Order, 17 FCC Rcd 19337, 19341 n.26 (2002) (stating that "only those agreements that contain an ongoing obligation relating to section 251(b) or (c) must be filed" with the state commission pursuant to section 252(a)(1)). To the extent that the Commission nonetheless could be seen as newly applying section 252 with respect to BIAS as a result of our classification decision here, we find the section 10 criteria met for forbearance from that provision for the same reasons discussed below with respect to section 251.

[1627] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5843, para. 501 ("[T]he record also does not provide a strong basis for concluding that the forbearance granted in this Order is likely to directly impact the competitiveness of the marketplace for broadband Internet access services . . . . We note that the forbearance we grant is part of an overall regulatory approach designed to promote infrastructure investment in significant part by preserving and promoting innovation and competition at the edge of the network. Thus, even if the grant of forbearance does not directly promote competitive market conditions, it does so indirectly by enabling us to strike the right balance at this time in our overall regulatory approach." (footnote omitted)); *id.* at 5849-51, para. 513 (relying on the quoted reasoning in evaluating forbearance from interconnection and market-opening requirements).

[1628] We note that the Commission has determined that section 251(c) has been fully implemented throughout the United States, and thus permissibly is within the scope of the Commission's section 10 forbearance authority. *See*

(continued....)

399. We begin by putting the key market-opening requirements of the sections 251 and 252 framework in their broader legal and regulatory context under current precedent (while saving discussion of the more limited role of section 256 for our targeted analysis of interconnection below). At a high level, section 251 provides a graduated set of interconnection requirements and other obligations designed to foster competition in telecommunications markets, particularly local markets.[1629] The nature and scope of these obligations vary depending on the type of service provider involved.

- Section 251(a) sets forth general duties applicable to all telecommunications carriers, including the section 251(a)(1) duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers."[1630]

- Section 251(b) sets forth additional duties for local exchange carriers pertaining to resale of services, number portability, dialing parity, access to rights-of-way, and reciprocal compensation—the duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications (i.e., arrangements for exchange of traffic terminating on another carrier's network).[1631]

- Section 251(c) sets forth the most detailed obligations, which apply to ILECs, the group of local telephone companies that, prior to the 1996 Act, generally had been subject to little or no competition.[1632] These section 251(c) obligations include: the duty to "negotiate in good faith in accordance with section 252 the particular terms and conditions of agreements" to fulfill the section 251(b) and (c) requirements; additional direct, physical interconnection obligations; requirements to unbundle network elements; the duty to allow resale of telecommunications services at wholesale rates; requirements to provide notice of network changes; and a requirement to allow collocation of equipment.[1633]

400. In turn, section 252 directs state commissions to mediate and arbitrate interconnection disputes involving an ILEC,[1634] as well as to review interconnection agreements arrived at "by negotiation and arbitration."[1635] ILECs are required to negotiate the implementation of section 251(b) and (c) requirements through interconnection agreements subject to section 252,[1636] and the Commission has held that the section 252 process applies even when a request involves section 251(a) and (b) alone, without

---

*Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area*, WC Docket No. 04-223, Memorandum Opinion and Order, 20 FCC Rcd 19415, 19440-42, paras. 53-56 (2005), *aff'd*, *Qwest Corp. v. FCC*, 482 F.3d 471 (D.C. Cir. 2007).

[1629] *See, e.g.*, *Petition of CRC Communications of Maine, Inc. and Time Warner Cable Inc. for Preemption Pursuant to Section 253 of the Communications Act, As Amended et al.*, WC Docket No. 10-143 et al., Declaratory Ruling, 26 FCC Rcd 8259, 8260-61, para. 4 (2011) (*CRC Maine Declaratory Ruling*).

[1630] 47 U.S.C. § 251(a)(1).

[1631] *CRC Maine Declaratory Ruling*, 26 FCC Rcd at 8260-61, para. 4 (discussing 47 U.S.C. § 251(b)).

[1632] *Id.* (discussing 47 U.S.C. § 251(c)); *see also* 47 U.S.C. §§ 251(h), 252(j) (defining ILEC).

[1633] 47 U.S.C. § 251(c).

[1634] 47 U.S.C. § 252(a)(2), (b)(1).

[1635] 47 U.S.C. § 252(a)(1), (e)(1). The Commission has declined to adopt rules advising the state commissions on how to conduct mediations and arbitrations, and has stated that the states are in a better position to develop mediation and arbitration rules that support the objectives of the 1996 Act. *CRC Maine Declaratory Ruling*, 26 FCC Rcd at 8261-62, para. 6.

[1636] 47 U.S.C. § 251(c)-(c)(1) ("[E]ach incumbent local exchange carrier has . . . [t]he duty to negotiate in good faith in accordance with section 252 the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) and this subsection.").

any request under section 251(c).[1637]  The Commission also has concluded that section 252 provides a state forum for disputes involving two carriers that are not ILECs regarding the implementation of section 251(b) duties.[1638]

401.     Although the Commission has authority to adopt rules governing the implementation of section 251(b) and (c), precedent demonstrates that state commissions acting under section 252 can resolve interconnection disputes even as to issues where the Commission has not adopted rules.[1639] Further, agreements between ILECs and other parties under section 252 can be entered "without regard to the standards set forth in subsections (b) and (c) of section 251 of this title."[1640]  And while interconnection agreements are subject to approval, by default that entails approval by a state commission—not the FCC.[1641]  Further, parties aggrieved by state commission actions under section 252 do not raise those with the FCC—instead, they go in the first instance to federal district court.[1642]

402.     Even stated at that high level of abstraction, it is clear that the section 251/252 framework is significantly at odds with the regulatory framework we find warranted for BIAS to implement the "just and reasonable" requirements of sections 201 and 202; to protect consumers; and to advance the public interest.[1643]  Our bright-line conduct rules implementing sections 201 and 202, Title III of the Act, and section 706 of the 1996 Act, squarely address key issues regarding the carriage of traffic, subject to

---

[1637] *CRC Maine Declaratory Ruling*, 26 FCC Rcd at 8269-70, paras. 19-20.

[1638] *USF/ICC Transformation Order*, 26 FCC Rcd at 18024-25, para. 967.

[1639] *See, e.g.*, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*; *Inter-Carrier Compensation for ISP-Bound Traffic*, Declaratory Ruling in CC Docket No. 96-98 and Notice of Proposed Rulemaking in CC Docket No. 99-68, 14 FCC Rcd 3689, 3703, para. 22 (1999) ("Currently, the Commission has no rule governing inter-carrier compensation for ISP-bound traffic. In the absence of such a rule, parties may voluntarily include this traffic within the scope of their interconnection agreements under sections 251 and 252 of the Act, even if these statutory provisions do not apply as a matter of law.  Where parties have agreed to include this traffic within their section 251 and 252 interconnection agreements, they are bound by those agreements, as interpreted and enforced by the state commissions."); *Southern New England Tel. Co. v. Comcast Phone of Conn.*, 718 F.3d 53, 59 (2d Cir. 2013) ("Although the FCC has been considering the regulation of transit service for a number of years, it has not yet adopted a final position. . . . [W]e have little difficulty concluding that with regard to transit service Congress did not intend to preempt state regulation, the text of the TCA does not support preemption, and the FCC's indecision simply reflects its current preference for continued experimentation by state commissions."); *Centennial P.R. License Corp. v. Telecommc'ns Regul. Bd. of P.R.*, 634 F.3d 17, 35 (1st Cir. 2011) ("A determination that it would be imprudent to adopt a rule imposing interconnection standards and obligations on every mobile service provider at the national level is a far cry from a determination that state commissions should be barred from imposing requirements on individual LECs in the context of an arbitrated interconnection agreement because they might affect wireless interconnection."); *Global Naps, Inc. v. Mass. Dept. of Telecommc'ns & Energy*, 427 F.3d 34, 46 (1st Cir. 2005) ("The model under the TCA is to divide authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states." (internal citation omitted)); *MCI Telecommc'ns Corp. v. BellSouth Telecommc'ns Inc.*, 298 F.3d 1269, 1274 (11th Cir. 2002) (per curiam) ("[E]nforcement and compensation provisions, including the liquidated damages provision desired by MCI, fall within the realm of 'conditions . . . required to implement' the agreement under section 252(b)(4)(C).  "A schedule for implementation would be potentially meaningless without some mechanism to enforce it; thus, enforcement mechanisms like those desired by MCI are clearly contemplated by the Act and within the FPSC's authority.").

[1640] 47 U.S.C. § 252(a)(1).

[1641] 47 U.S.C. § 252(e).

[1642] 47 U.S.C. § 252(e)(6) ("In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.").

[1643] *See supra* Section III.G; *infra* Section V.

reasonable network management.[1644]  We otherwise deliberately elect to take a case-by-case approach in evaluating BIAS-related conduct, including traffic exchange agreements.[1645]  And although we do not categorically preempt all state or local regulation affecting BIAS, we clearly express our intention to preempt conflicting state and local regulations—including regulations more onerous than the regulatory framework we adopt.

403.     Trying to square our chosen regulatory approach to BIAS with the section 251/252 framework is problematic, to say the least.  As described above, the section 251/252 framework presupposes heavy state involvement in its implementation, providing for states to resolve previously unaddressed legal and policy questions under the federal framework while also leaving states to impose state law requirements.  Sections 251 and 252 also render all such decisions subject to state commission interpretation and enforcement in the first instance, with any direct review coming not from the FCC but from federal courts.  Given our conscious choice to leave significant issues to case-by-case evaluation, if the section 251/252 framework applied we would risk forgoing the ability to be the first one to pass on previously unaddressed policy issues, instead yielding those decisions to state commissions.  Although we could seek to constrain states by adopting *ex ante* rules in this regard specifically implementing section 251,[1646] that would force us down a course we have expressly disavowed as unwarranted under the general conduct rule and oversight of traffic exchange agreements, where we find case-by-case review most appropriate.  What is more, tying our rules to the section 251/252 framework opens the door for them to be disregarded entirely through intercarrier agreements entered into "without regard to the standards set forth in subsections (b) and (c) of section 251."[1647]  In sum, rather than a primarily federal policy framework administered in the first instance by the Commission—and our choice of the best mix of bright-line rules and case-by-case review—applying the section 251/252 framework risks forcing us into a choice between preserving case-by-case review in many scenarios, but leaving unresolved policy questions to be first addressed by states in many cases, or else forgoing case-by-case review even where we think it is warranted in favor of *ex ante* rules that might have the perverse consequence of opening the door for providers to disregard them.

404.     That backdrop is a key overlay to all of our forbearance analyses in this regard.  Insofar as applying the section 251/252 framework would undermine the regulatory approach we have identified as the best way to ensure just and reasonable rates and practices under sections 201 and 202 of the Act, and the best way to protect consumers, that is highly relevant to our evaluation of whether there is a current federal need for the section 251/252 framework in the BIAS context under the section 10(a)(1) and (a)(2) forbearance criteria.  Those considerations also carry significant weight in our public interest evaluation under section 10(a)(3).  Although Congress directed the Commission, in section 706 of the 1996 Act, to encourage the deployment of advanced telecommunications capability through, among other things, "measures that promote competition in the local telecommunications market"—and we concede that the section 251/252 framework is one such example—we nonetheless conclude that our approach correctly reflects the overall legal framework Congress established in the 1996 Act.  Congress recognized that our preexisting section 201 authority could enable us, in the case of interstate and international services, to do many of the same things addressed for intrastate services as well under section 251, and thus expressly preserved that authority against any inference of an implicit repeal or narrowing through its

---

[1644] *See infra* Section V.B.1.

[1645] *See infra* Sections V.B.2, V.D.

[1646] Even then, section 251(d)(3) specifies: "In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that- (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part."  47 U.S.C. § 251(d)(3).

[1647] 47 U.S.C. § 252(a)(1).

enactment of section 251.[1648]  Likewise, the Commission previously has sought to balance the advancement of competition policy with the duty to encourage advanced services deployment pursuant to section 706,[1649] which we conclude is advanced by our tailored regulatory approach here.

### a. Interconnection and Traffic Exchange

405.     Arguments in the record that identify concrete scenarios where sections 251(a)(1), 251(b)-(c), 252, and 256 could be relevant only involve the related issues of interconnection[1650] and traffic exchange.  Most significantly, WTA argues that the section 251/252 framework could help resolve problems rural carriers experience when dealing with "large Internet backbone and middle mile transport providers"[1651] due to "disadvantages and discrepancies in negotiation power and resources"—including "refusals to upgrade the capacity and quality of middle mile facilities, take-it-or-leave it offers rather than *bona fide* negotiations of IP interconnection and traffic exchange terms and conditions, and demands that broadband traffic be accepted at and delivered to large carrier facilities in distant cities at the WTA member's expense."[1652]  Although those are important concerns, we are not persuaded that applying the

---

[1648] 47 U.S.C. § 251(i) ("Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.").

[1649] *See, e.g.*, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 01-338, 96-98, and 98-147, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd 16978, 17141-54, paras. 272-97 (2003) (*Triennial Review Order*), *aff'd in part, remanded in part, vacated in part*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d at 564-93 (considering the objectives of section 706, the Commission imposed only limited unbundling obligations on ILECs' mass-market next-generation broadband loop architectures); *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 01-338, 96- 98, and 98-147, Order on Reconsideration, 19 FCC Rcd 15856, 15859-61, paras. 7-9 (2004) (*MDU Reconsideration Order*) (determining that the same section 706 considerations justified extending the *Triennial Review Order*'s fiber-to-the-home (FTTH) unbundling relief to encompass FTTH loops serving predominantly residential multiple dwelling units (MDUs)); *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 01-338, 96-98, and 98-147, Order on Reconsideration, 19 FCC Rcd 20293, 20297-303 paras. 9-19 (2004) (*FTTC Reconsideration Order*) (finding that the FTTH analysis applied to fiber-to-the-curb (FTTC) loops, as well, and granting the same unbundling relief to FTTC as applied to FTTH); *Section 271 Broadband Forbearance Order*, 19 FCC Rcd at 21512, para. 34 (analyzing the public interest of relieving BOCs of unbundling obligations under section 271 under the umbrella of section 706); *Wireline Broadband Classification Order*, 20 FCC Rcd at 14894-98, paras. 77-85 (stating that in assessing the alternate regulatory frameworks for wireline broadband Internet access services, the Commission must ensure that the balance struck provides adequate incentives for infrastructure investment, in accordance with section 706's Congressional objectives).  Our overall analysis of the record on investment incentives—including evidence and arguments regarding more extensive or less extensive regulation than the tailored approach adopted here—is discussed in greater detail above.  *See supra* Section III.H.

[1650] We clarify that for purposes of this section we use the term "interconnection" solely in the manner it is used and defined for purposes of these provisions.  47 U.S.C. §§ 251, 252, 256; s*ee also* 47 CFR § 51.5 (defining "interconnection" for purposes of the Commission's implementation of the section 251/252 framework).

[1651] As with our forbearance analysis more generally, we can proceed by assuming that certain requirements apply and evaluate the section 10 criteria on that basis.  And because we forbear from the relevant requirements we need not, and do not, resolve whether BIAS could constitute "telephone exchange service" or "exchange access," nor whether any particular non-BIAS provider seeking to interconnect and exchange traffic with a BIAS provider is a carrier.

[1652] WTA Comments at 3; *see also id.* at 2, 10-12 (similar); WTA Jan. 19, 2024 *Ex Parte* at 2-3 (reiterating its position and explaining that we should retain sections 251/252 "because RLECs and other small broadband service

(continued….)

section 251/252 framework—or section 256—would be an appropriate course of action.

406.     *Sections 251(a)(1) and 256.*  Section 251(a)(1) requires all carriers to interconnect with other carriers directly or indirectly.[1653]  However, the identified concerns do not demonstrate a refusal to interconnect (even indirectly).  Rather, they reflect dissatisfaction with the claimed inconvenience and expense.  Thus, section 251(a)(1) does not appear even potentially to be a solution to these concerns.

407.     Likewise, section 256 does not appear any more relevant of a solution, even in theory.  Section 251(a)(2)—which we do not forbear from applying, as explained above[1654]—prohibits carriers from "install[ing] network features, functions, or capabilities that do not comply with the guidelines and standards established" pursuant to two other provisions of the Act.[1655]  The first of those provisions is section 255 of the Act, which is designed to make networks more usable by individuals with disabilities[1656]—and which is the premise of our decision not to forbear from applying section 251(a)(2).  The second of those provisions is section 256, which, without granting the Commission any new authority, provides for the Commission to encourage coordinated network planning and network interconnectivity, including through participating in industry standards-setting.[1657]  But again, the types of industry standards or network planning contemplated by section 256 do not appear to address the concerns raised by rural carriers about the cost and inconvenience of interconnection.

408.     Consequently, because these concretely identified concerns about interconnection would not be addressed by section 251(a)(1) and section 256 in any case, we see no current federal need to apply those provisions of the Act insofar as they would be newly triggered by our classification of BIAS.  Indeed, the Commission retains authority under sections 201 and 202, and the open Internet rules, to address interconnection issues should they arise, including through evaluating whether BIAS providers' conduct is just and reasonable on a case-by-case basis.[1658]  These remaining legal protections that apply with respect to BIAS providers will enable us to act if needed to ensure that a provider does not unreasonably refuse to provide service or interconnect.[1659]  Thus, we do not find it "necessary" to apply section 251(a)(1) or section 256 to ensure just and reasonable rates and practices under section 10(a)(1) or to protect consumers under section 10(a)(2).  For those same reasons, we find forbearance in the public interest under section 10(a)(3), consistent with our decision to proceed incrementally and make clear the

---

providers are subject to the same disparities in negotiating power that these provisions were adopted to address in the Regional Bell Operating Company ('RBOC') and competitive local exchange carrier world of the mid-1990s").  To the extent that WTA goes beyond BIAS and argues that the section 251/252 framework should apply to "any other IP broadband services" or "other IP interconnection," *see* WTA Comments at 3, 10, it does not explain what it means in a way that would undercut—or even demonstrate the relevance of—those other scenarios to the forbearance at issue here.  We thus do not depart from the forbearance analysis above on the basis of such undeveloped references.

[1653] 47 U.S.C. § 251(a)(1).

[1654] *See supra* section IV.B.8.

[1655] 47 U.S.C. § 251(a)(2).

[1656] 47 U.S.C. § 255.

[1657] 47 U.S.C. § 256.

[1658] 47 U.S.C. § 201.

[1659] *See* 47 U.S.C. § 201; *Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, CC Docket No. 96-262, Eighth Report and Order and Fifth Order on Reconsideration, 19 FCC Rcd 9108, 9137-38, paras. 59-61 (2004); *People's Telephone Cooperative, Inc., Complainant v. Southwestern Bell Telephone Company and General Telephone Company of the Southwest, Defendants*, Docket No. 21019, Memorandum Opinion and Order, 62 F.C.C.2d 113, 116, para. 7 (1976); *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers; and Letter of Chief, Common Carrier Bureau, Dated October 19, 1973, to Laurence E. Harris, Vice President, MCI Telecommunications Corp.*, Docket No. 19896, Decision, 46 F.C.C.2d 413, 418-19, paras. 7-8 (1974).

limited extent of our departure from the preexisting regulatory *status quo*.

409. *Sections 251(c)(2) and 252.* We next turn to the interconnection requirements of section 251(c)(2). That provision requires ILECs to provide interconnection "at any technically feasible point within the carrier's network . . . on rates, terms, and conditions that are just, reasonable, and nondiscriminatory."[1660] Because it is a provision implemented under the combined section 251/252 framework, it squarely implicates the full array of concerns discussed above about the conflict between that framework and the regulatory approach to BIAS that we conclude is most appropriate.

410. WTA's arguments do not persuade us that forbearance is unwarranted. For one, it does not appear that WTA's concerns about rural carriers' need to carry traffic "to large carrier facilities in distant cities at the WTA member's expense"[1661] meaningfully would be remedied by the application of section 251(c)(2), which still requires the carrier invoking section 251(c)(2) to get its traffic to a "point within the [ILEC's] network."[1662] Although WTA's concerns about "refusals to upgrade the capacity and quality of middle mile facilities" and "take-it-or-leave it offers rather than *bona fide* negotiations of IP interconnection . . . terms and conditions"[1663] theoretically could be addressed under section 251(c)(2) where that provision applies, the practical scope of that provision appears quite limited as relevant here. Even assuming *arguendo* that the Internet backbone providers and middle mile providers of concern to WTA would be telecommunications carriers (or else they would not be subject to the section 251/242 framework in the first place), the universe of ILECs providing such service—the only providers actually subject to section 251(c)—is far more limited. And even then, section 251(c) does not apply to many rural carriers by virtue of section 251(f).[1664]

411. But once we assume *arguendo* that the Internet backbone providers and middle mile providers of concern to WTA would be telecommunications carriers, that scenario is one that the Commission can address far more comprehensively through sections 201 and 202 on a case-by-case basis. And it will be the FCC—rather than state commissions—addressing previously unresolved policy issues and generating a more uniform federal regulatory framework for BIAS. We otherwise have determined that an FCC-led case-by-case evaluation is the best approach to Internet traffic exchange arrangements consistent with our obligation to ensure just and reasonable rates and practices under sections 201 and 202 of the Act. Because we conclude that the section 251(c)(2)/252 framework would interfere with that approach, and because we find that our regulatory approach will enable us to more comprehensively and consistently address any issues that arise in this regard, while appropriately balancing BIAS providers' investment incentives, we conclude that applying those provisions is not "necessary" under section 10(a)(1) and (a)(2), and that forbearance is in the public interest under section 10(a)(3).

412. *Section 251(b)(5) and 252.* The final concrete issue raised by WTA—its concern about "take-it-or-leave it offers rather than *bona fide* negotiations of IP . . . traffic exchange terms and

---

[1660] 47 U.S.C. § 251(c)(2).

[1661] WTA Comments at 3; *see* WTA Jan. 19, 2024 *Ex Parte* at 3 ("It appears that some of the large broadband trunk providers may be threatening to require RLECs and other small providers to bear the cost of bringing their traffic to a couple of large urban traffic exchange points.").

[1662] 47 U.S.C. § 251(c)(2).

[1663] WTA Comments at 3; *see* WTA Jan. 19, 2024 *Ex Parte* at 3.

[1664] Section 251(f)(1) of the Act establishes a default exemption from all of section 251(c) for a "rural telephone company" absent a request from a carrier invoking section 251(c) and an affirmative determination by a state commission "that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof)." 47 U.S.C. § 251(f)(1). Further, under section 251(f)(2), "[a] local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c)" of section 251. *Id.*

conditions"[1665]—requires a clarification about terminology. When the Commission referred to "Internet traffic exchange arrangements" in the *2015 Open Internet Order* and again here, it contemplated arrangements or agreements potentially dealing with both the physical linking of networks and the associated exchange of traffic.[1666] Section 251 reflects a different approach. Subsections (a)(1) and (c)(2) address the linking of networks, while subsection (b)(5) addresses compensation arrangements for traffic exchange.[1667] Thus, when considering concerns associated with traffic exchange under section 251, we must focus on subsection (b)(5).

413.    Section 251(b)(5) requires LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[1668] In the Commission's implementation of this provision (in conjunction with other statutory provisions) outside the BIAS context, it has established an extensive series of rules addressing traffic exchange arrangements between local carriers and other carriers, that generally has moved in the direction of "bill-and-keep" arrangements rather than per-minute (or other) intercarrier compensation payments.[1669] Under bill-and-keep arrangements, a carrier generally looks to its end users—which are the entities and individuals making the choice to subscribe to that network—rather than looking to other carriers and their customers to pay for the costs of its network.[1670] The changes to the preexisting intercarrier rate regulations were paired with universal service support when appropriate to account for lost revenues,[1671] and with a state role in defining the specific point in the network where each carrier is responsible for its own costs in delivering the network (called the "network edge").[1672]

414.    Because section 251(b)(5)—like section 251(c)(2)—is a provision implemented under the combined section 251/252 framework, it squarely implicates the full array of concerns discussed above about the conflict between that framework and the regulatory approach to BIAS that we conclude is most appropriate. Against that backdrop, the record on this issue likewise does not persuade us that forbearance is unwarranted.

415.    As a threshold matter, we are not persuaded to simply apply our existing rules implementing section 251(b)(5) in the case of BIAS traffic. Those rules reflect a carefully calibrated regulatory regime designed to account for historical reliance interests as well as the interests of universal service contributors being asked to bear costs associated with revenue replacement mechanisms. They were not adopted with the expectation that they would apply to BIAS traffic, and abruptly doing so could seriously unsettle that careful balance.

416.    Although there is debate in the record about whether and when bill-and-keep could be appropriate in this context irrespective of those intercarrier compensation rules,[1673] our past experience

---

[1665] WTA Comments at 3; *see also id*. at 2, 10-12 (similar); WTA Jan. 19, 2024 *Ex Parte* at 3.

[1666] *See, e.g.*, *supra* Section III.D.3; *2015 Open Internet Order*, 30 FCC Rcd at 5687-95, paras. 196-206.

[1667] 47 U.S.C. § 251(a)(1), (b)(5), (c)(2); *Access Charge Reform Seventh Report and Order*, 16 FCC Rcd at 9960, para. 92 (distinguishing the linking of networks from traffic exchange arrangements under section 251); *Total Telecommunications Services v. AT&T Corporation*, File No. E-97-003, Memorandum Opinion and Order, 16 FCC Rcd 5726, 5737, para. 25 (2001) (same); *Local Competition First Report and Order*, 11 FCC Rcd at 15514, para. 26 (same).

[1668] 47 U.S.C. § 251(b)(5).

[1669] *See generally USF/ICC Transformation Order*, 26 FCC Rcd at 17663.

[1670] *Id*. at 17904, para. 737.

[1671] *Id.* at 17956-18002, paras. 847-932.

[1672] *Id*. at 17922-23, para. 776.

[1673] *Compare, e.g.*, Free Press Comments at 135-36 (noting that "[i]n wireless voice, and increasingly in [Plain Old Telephone Service], the Commission established policies that are essentially 'bill-and-keep.' There's no reason the

(continued….)

counsels for a cautious approach. As noted above, before adopting a shift to bill-and-keep for traffic historically subject to intercarrier compensation, the Commission evaluated a comprehensive record on the merits of such an approach, the associated reliance interests that could be affected, and how to employ universal service support in response to any legitimate reliance interests or need for revenues beyond what could be recovered from end users.[1674] Absent a carefully calibrated regulatory approach founded on such a record, an industry-wide shift to mandatory bill-and-keep for BIAS traffic risks disruptive consequences for end-user BIAS rates, overall industry recovery, and provider viability.

417. Thus, we find that either applying our existing intercarrier compensation framework implementing section 251(b)(5) (along with section 201(b) and 254, among other provisions) or adopting bill-and-keep here as the industry approach to traffic exchange arrangements for BIAS traffic under section 251(b)(5) itself risks undermining just and reasonable rates and practices and harming consumers. Thus, applying such requirements naturally is not necessary to ensure just and reasonable rates and practices under section 10(a)(1) or for the protection of consumers under section 10(a)(2). And for those same reasons, we find forbearance to be in the public interest under section 10(a)(3).

418. The remaining near-term issue is the choice between relying on case-by-case assessments under the regulatory framework for BIAS we already have identified as most appropriate, or instead on attempting case-by-case assessments under the section 251(b)(5)/252 framework. As discussed above, there are inherent incompatibilities between the federal case-by-case review we contemplate and any approach that relies on the heavily state-commission-dependent section 251/252 framework. Thus, we do not see it as realistically viable to maintain both approaches simultaneously in disparate forums with the likelihood of divergent policy decisions from different decisionmakers. And the record does not reveal benefits from the section 251(b)(5)/252 framework that would offset the harms to what we have identified as the best way to ensure just and reasonable rates and practices, to protect consumers, and to advance the public interest.

419. As an alternative to case-by-case evaluation of traffic exchange issues, we find the section 251(b)(5)/252 framework inferior. For one, as contemplated by our regulatory approach based principally on sections 201 and 202 of the Act, oversight of Internet traffic exchange arrangements can encompass both interconnection and traffic exchange issues. But section 251(b)(5) is limited narrowly to traffic exchange, and at best could be paired with the broadly applicable interconnection requirement of section 251(a)(1) that imposes limited substantive duties unlikely to address the concerns raised in the record and/or the (theoretically) somewhat helpful substantive requirement of section 251(c)(2) that appears likely to apply to at most a very narrow subset of the providers of concern. Further, the notion of a truly case-by-case approach under section 251(b)(5) is at least somewhat illusory. Given the wording of section 251(b)(5), an "originating carrier is barred from charging another carrier for delivery of traffic that falls within the scope of section 251(b)(5)."[1675] Thus, section 251(b)(5) itself constrains the possible outcomes of traffic exchange arrangements as compared to the greater flexibility we find in our approach grounded in sections 201 and 202.

420. For all those reasons, we conclude that application of the section 251(b)(5)/252 framework is not necessary under section 10(a)(1) and (a)(2). For those same reasons, we also conclude that forbearance is in the public interest under section 10(a)(3).

---

ISP last mile should be any different"), and Ad Hoc Telecom Users Committee Comments at 21-24 (arguing that bill-and-keep should apply because it protects consumers and marketplace competition), with, e.g., NCTA and USTelecom Feb. 23, 2024 Ex Parte at 3-5 (arguing that "bill-and-keep" is not necessary under certain circumstances), and USTelecom Feb. 27, 2024 Ex Parte at 4 (explaining that "proposals from some commenters to regulate internet traffic exchange rates by mandating 'bill-and-keep' would raise regulatory issues—such as determining where the network edge is—that has proven intractable in the PSTN context").

[1674] See generally USF/ICC Transformation Order, 26 FCC Rcd at 17663.

[1675] 8YY Access Charge Reform, WC Docket No. 18-156, Report and Order, 35 FCC Rcd 11594, 11644, para. 113 (2020).

### b. Generalized Arguments About Competition

421.     We also do not depart from our forbearance analysis above—or the forbearance from sections 251 (other than subsection (a)(2)),[1676] 252, and 256 in the *2015 Open Internet Order*—based on generalized arguments about the need for, or benefits of, competition.[1677]  Competition is important, and the regulatory framework for BIAS that we adopt here will contribute to increased competition for BIAS itself[1678] as well as for the broader Internet marketplace.[1679]  At the same time, it is not the Commission's purpose to protect specific competitors—or even competition merely for its own sake—but ultimately to seek the benefit of end users.[1680]  Thus, generalized arguments about competition do not persuade us to depart from the forbearance analysis above, the forbearance analysis in the *2015 Open Internet Order*, or the forbearance from sections 251 (other than subsection (a)(2)), 252, and 256 granted there.[1681]

### 6. Subscriber Changes (Section 258)

422.     We forbear from applying section 258 insofar as it would newly apply by virtue of our classification of BIAS as a Title II telecommunications service.  Section 258 and the Commission's implementing rules provide important protections to voice service customers against unauthorized carrier changes.[1682]  As was the case when the Commission adopted the *2015 Open Internet Order*, the record does not indicate whether or how unauthorized changes involving BIAS providers could occur.[1683]

---

[1676] To be clear, we forbear from applying all of section 251 other than subsection (a)(2) insofar as it would newly apply to BIAS or a BIAS provider by virtue of our classification of BIAS as a telecommunications service.

[1677] *See, e.g.*, Public Knowledge Comments at 91 ("Section 10(b) emphasizes the importance of promoting competition in the public interest, indicating that a provision should not be forborne if it is necessary to promote competition. . . . The Commission cannot abdicate its responsibilities under the various pro-competitive sections of Title II unless it first finds that competition can be promoted without the authority granted by those provisions."). Public Knowledge asserts that "[a] wide variety of provisions that the Commission proposes to forbear from enforcing are essential to promoting competition," but does not identify specifically what provisions it has in mind. *Id.*  Against the backdrop of the *2015 Open Internet Order* having identified sections 251, 252, and 256 as involving interconnection and market-opening provisions, we consider Public Knowledge's arguments in that context here. *See 2015 Open Internet Order*, 30 FCC Rcd at 5849-52, paras. 513-14.  To the extent that Public Knowledge had other provisions in mind, its high-level arguments about competition divorced from any reference to specific provisions or requirements does not persuade us to depart from the forbearance approach adopted in the *2015 Open Internet Order*.

[1678] *See, e.g.*, *supra* Section III.A.7.

[1679] *See, e.g.*, *supra* Section III.A.1.

[1680] *See, e.g.*, *Petition of USTelecom for Forbearance Pursuant to 47 U.S.C. § 160(c) to Accelerate Investment in Broadband and Next-Generation Networks*, WC Docket No. 18-141, Memorandum Opinion and Order, 34 FCC Rcd 6503, 6517, para. 26 (2019) ("[O]ur concern is not for the fate of particular competitors but of competition and, more fundamentally, end users.").

[1681] *2015 Open Internet Order*, 30 FCC Rcd at 5849-52, paras. 513-14.

[1682] *See, e.g.*, *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996; Policies and Rules Concerning Unauthorized Changes of Consumers Long Distance Carriers*, CC Docket No. 94-129, Second Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 1508, 1517-18, para. 12 (1998) (*Slamming Second Report and Order*); *Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996; Policies and Rules Concerning Unauthorized Changes of Consumers Long Distance Carriers*, CC Docket No. 94-129, Further Notice of Proposed Rulemaking and Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 10674, 10678, para. 4 (1997); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5852-53, para. 515 (explaining that these are "important protections given the ability of a new provider to effectuate a carrier change not only without the consent of the customer but also without direct involvement of the customer's existing carrier").

[1683] We disagree with Public Knowledge that we should not forbear from section 258.  Public Knowledge Comments at 90-91 (arguing that section 258 is an important consumer protection provision).  While we do not disagree that

(continued….)

Consequently, it remains unclear what purpose applying this provision would serve, especially given the consumer protections afforded by the core BIAS requirements.[1684]  As under our analyses of other Title II provisions from which we forbear, we conclude that application of section 258 is not necessary for purposes of section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3).

### 7.    Other Title II Provisions

423.    Beyond the provisions already addressed above, we also forbear from applying additional Title II provisions that could give rise to new requirements by virtue of our classification of BIAS to the extent our section 10 authority allows.  We find it notable that no commenter raises significant concerns about forbearing from these requirements, which reinforces our analysis below.

424.    We conclude that the three-part statutory test under section 10(a) is met to forbear from applying certain provisions concerning BOCs in sections 271-276 of the Act to the extent that they would impose new requirements arising from classifying BIAS as a Title II telecommunications service, as the Commission did in the *2015 Open Internet Order*.[1685]  Sections 271, 272, 274, and 275 establish requirements and safeguards regarding the provision of interLATA services, electronic publishing, and alarm monitoring services by the BOCs and their affiliates.[1686]  Section 273 addresses the manufacturing, provision, and procurement of telecommunications equipment and customer premises equipment (CPE) by the BOCs and their affiliates, the establishment and implementation of technical standards for telecommunications equipment and CPE, and joint network planning and design, among other matters.[1687]  Section 276 addresses the provision of "payphone service," and in particular establishes nondiscrimination standards applicable to BOCs' provision of payphone service.[1688]

425.    We again conclude that the application of any newly triggered provisions of sections 271 through 276 to BIAS is not necessary within the meaning of section 10(a)(1) or (a)(2), and that forbearance from these requirements is consistent with the public interest under section 10(a)(3), with one exception regarding section 276 that we discuss below.[1689]  Many of the provisions in these sections are

---

section 258 can provide consumers protections for voice services, Public Knowledge fails to articulate how an unauthorized carrier change could occur in the context of BIAS.

[1684] *2015 Open Internet Order*, 30 FCC Rcd at 5852-53, para. 515.

[1685] *Id*. at 5853, para. 517.

[1686] 47 U.S.C. §§ 271-272, 274-275.  The Commission has determined that section 271 has been fully implemented throughout the United States.  *Section 271 Broadband Forbearance Order*, 19 FCC Rcd at 21503, para. 15.  Therefore, the prohibition in section 10(d) of the Act against forbearing from section 271 prior to such a determination is not applicable.

[1687] 47 U.S.C. § 273.

[1688] 47 U.S.C. § 276(a).

[1689] *2015 Open Internet Order*, 30 FCC Rcd at 5853-54, para. 518.  The Alarm Industry Communications Committee (AICC) argues that we should not forbear from section 275 because it  "would actively strip the alarm industry of existing protections."  Alarm Industry Communications Committee Comments at 8-9 (AICC); *see also* Letter from Sascha Kylau, Co-Chair, AICC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 16, 2024).  AICC asserts that refraining from forbearance of section 275 would be consistent with the *2015 Open Internet Order* because "that *Order* held that forbearance from section 275 was only appropriate where it would impose new requirements arising from the reclassification of BIAS as a Title II service."  AICC Comments at 9.  We note that the *2015 Open Internet Order* specifically said that it forbears from section 275, *inter alia*, "to the extent that [it] would impose new requirements arising from the classification of broadband Internet access service in this Order."  *2015 Open Internet Order*, 30 FCC Rcd at 5853-54, para. 518.  We take the same approach in this Order, and therefore find that this Order does not strip the alarm industry of any protections that may have existed prior to our reclassification of BIAS.

not currently in effect at all.[1690]  Others impose continuing obligations that are, at most, tangentially related to the provision of BIAS.[1691]  Forbearance from any application of these provisions with respect to BIAS insofar as they are newly triggered by our classification of that service will not meaningfully affect the charges, practices, classifications, or regulations for or in connection with that service, consumer protection, or the public interest.[1692]

426.  We generally forbear from applying sections 221 and 259 of the Act, consistent with our forbearance throughout this Order.  First, as described elsewhere, we forbear from all *ex ante* and *ex post* rate regulation, tariffing, and related recordkeeping and reporting requirements insofar as they would arise from our classification of BIAS.  Second, we likewise forbear from unbundling and network access requirements that would newly apply based on the classification decision in this Order.[1693]  We predict that other protections will be adequate to ensure just, reasonable, and nondiscriminatory conduct by providers of BIAS and to protect consumers for purposes of sections 10(a)(1) and (a)(2).  Further, informed by our responsibilities under section 706, we adopt a regulatory approach that we find strikes the appropriate public interest balance under section 10(a)(3).  For these reasons, we also forbear from

---

[1690] *See, e.g.*, 47 U.S.C. § 271(d)(1)-(4) (setting forth procedural requirements regarding BOC applications for authorization to provide in-region, interLATA services); *id.* § 274(g)(2) (specifying that the provisions of section 274 shall not apply to conduct occurring more than four years after the enactment of the 1996 Act); *id.* § 274(a) (prohibiting BOC entry into the provision of alarm monitoring services for five years from the enactment of the 1996 Act); *compare id.* § 272(f) (providing for the sunset of the provisions of section 272, other than subsection (e), absent a Commission rule or order extending the period in which those provisions remain in effect), *with Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules; Petition of AT&T Inc. for Forbearance Under 47 U.S.C. § 160(c) with Regard to Certain Dominant Carrier Regulations for In-Region, Interexchange Services*, WC Docket Nos. 02-112 and 06-120, CC Docket No. 00-175, Report and Order and Memorandum Opinion and Order, 22 FCC Rcd 16440, 16479-83, paras. 79-86 (2007) (*Section 272 Sunset Order*) (declining to extend the section 272 safeguards with regard to interLATA telecommunications services); *Request for Extension of the Sunset Date of the Structural, Nondiscrimination, and Other Behavioral Safeguards Governing Bell Operating Company Provision of In-Region, InterLATA Information Services*, CC Docket No. 96-149, Order, 15 FCC Rcd 3267 (2000) (*Information Services Sunset Order*) (denying request to extend the section 272 safeguards with regard to interLATA information services).

[1691] *See, e.g.*, 47 U.S.C. § 273(c) (requiring each BOC to "maintain and file with the Commission full and complete information with respect to the protocols and technical requirements for connection with and use of its telephone exchange service facilities"); *id.* § 273(d)(3) (setting forth procedures for establishing industry-wide standards for telecommunications equipment and CPE).

[1692] Consistent with our general approach to forbearance here, which seeks to address new requirements that could be triggered by our classification of BIAS, we do not forbear with respect to provisions to the extent that they already applied prior to this Order.  For example, section 271(c) establishes substantive standards that a BOC was required to meet to obtain authorization to provide interLATA services in an in-region state, which it must continue to meet to retain that authorization.  *See Application by Qwest Communications International for Authority to Provide In-Region, InterLATA Service in Arizona*, WC Docket No. 03-194, Memorandum Opinion and Order, 18 FCC Rcd 25504 (2003) (granting the last section 271 application to authorize BOC long distance entry in a state); 47 U.S.C. § 271(c); *see id.* § 271(d)(6) (authorizing various Commission actions in the event the Commission determines that a BOC has ceased to meet the conditions for authorization to provide in-region, interLATA services).  In addition, section 271(c)(2)(B)(iii), which requires that a BOC provide nondiscriminatory access to poles, ducts, conduits, and rights-of-way in accordance with the requirements of section 224 of the Act, does not depend upon the classification of BOCs' BIAS.  In combination with section 271(d)(6), this provision provides the Commission with an additional mechanism to enforce section 224 against the BOCs.  We also do not forbear from section 271(d)(6) to the extent that it provides for enforcement of the provisions we do not forbear from here.  In addition, while the BOC-specific provisions of section 276 theoretically could be newly implicated insofar as the reclassification of BIAS might result in some entities newly being treated as a BOC, the bulk of section 276 appears independent of the classification of BIAS and we thus do not forbear as to those provisions.

[1693] NCTA Feb. 26, 2024 *Ex Parte* at 1 (asking that we "grant broad forbearance from all Title II provisions that would authorize the Commission to regulate rates and mandate unbundling").

section 221's property records classification and valuation provisions, which would be used in the sort of rate regulation that we do not find warranted for BIAS.[1694] Likewise, just as we forbear from broader unbundling obligations, that same analysis persuades us to forbear from applying section 259's infrastructure-sharing and notification requirements.[1695]

427. We also again grant forbearance from other miscellaneous provisions to the extent that they would newly apply as a result of our classification insofar as they do not appear necessary or even relevant for BIAS.[1696] Section 226 protects consumers making interstate operator services calls from pay telephones and other public telephones from unreasonably high rates and anti-competitive practices.[1697] Section 227(c)(3) imposes on carriers certain notification obligations related to the Telephone Consumer Protection Act (TCPA),[1698] and section 227(e) restricts the provision of inaccurate caller identification information associated with any telecommunications service.[1699] Section 228 regulates the offering of pay-per-call services and requires carriers, *inter alia*, to maintain lists of information providers to whom they assign a telephone number, to provide a short description of the services the information providers offer, and to provide a statement of the cost per minute or the total cost for each service.[1700] Section 260 regulates LEC practices with respect to the provision of telemessaging services.[1701] It remains unclear how these provisions would be relevant to BIAS, and commenters do not explain how or argue that they would. Since the core BIAS requirements would also still be available to the Commission, we find that enforcing these provisions, to the extent they would newly apply by virtue of our classification of BIAS, is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with BIAS providers are just and reasonable and are not unjustly or unreasonably discriminatory under section 10(a)(1).[1702] Enforcement also is not necessary for the protection of consumers under section 10(a)(2), and forbearance from applying these provisions is consistent with the public interest under section 10(a)(3), particularly given our conclusion, informed by section 706, that it is

---

[1694] 47 U.S.C. § 221.

[1695] *See* 47 U.S.C. § 259.

[1696] *2015 Open Internet Order*, 30 FCC Rcd at 5955-56, para. 520; *see, e.g.* CCIA Comments at 16 (supporting forbearing as the Commission did in the *2015 Open Internet Order* and asking that the Commission specifically forbear from applying "Sections 201 and 202 to the extent that they would authorize adoption of rate regulations for BIAS; Sections 215 through 221 in full; Sections 224 through 226 in full; and Section 228 in full").

[1697] 47 U.S.C. § 226. "Operator services" include collect or person-to-person calls, calls billed to a third number, and calls billed to a calling card or credit card. These services may be provided by an automated device as well as by a live operator. Telephone Operator Consumer Services Improvement Act of 1990, S. Rep. No. 439, 101st Cong., 2d Sess. at 1 (1990).

[1698] 47 U.S.C. § 227(c)(3)(B), (C), (L). Because we are forbearing from these substantive requirements, we note that, as a consequence, there will not be a private right of action granted under section 227(c)(5) based on alleged violations of those forborne-from requirements in the context of BIAS. We note that while the universe of "calls" covered by section 227(b)(1)(A)(iii) is prerecorded or autodialed calls to "a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call" even with the reclassification of mobile BIAS we do not interpret there to be any new or expanded restrictions arising from that provision because the relevant calls also would need to be specifically to a "telephone number" assigned to the relevant service. *Id.* § 227(b)(1)(A)(iii). As a result, there also would not be any private right of action under section 227(b)(3) that is newly triggered by the decisions in this *Order*. *Id.* § 227(b)(3).

[1699] 47 U.S.C. § 227(e).

[1700] 47 U.S.C. § 228.

[1701] 47 U.S.C. § 260.

[1702] 47 U.S.C. § 160(a)(1).

appropriate to adopt a tailored approach here.[1703]‘

428.     We clarify that we will not forbear from applying section 276 to the extent it applies to incarcerated people's communications services (IPCS) or the Commission's IPCS rules.[1704]  Though the IPCS rules themselves do not appear to vary depending on whether BIAS is an "information service" or "telecommunications service," the Commission previously made this clarification in the *2015 Open Internet Order* to respond to a concern that forbearance "could be misconstrued as a limitation on the Commission's authority with respect to any advanced ICS services (such as video visitation) that may replace or supplement traditional ICS telephone calls."[1705]  Though no commenter raises similar concerns in this proceeding, we make the same clarification, consistent with the Commission's ongoing efforts to grant relief from exorbitantly high rates for calls between incarcerated people and their loved ones,[1706] particularly in light of Congress recently recognizing the increased role that advanced communications plays in these communications.[1707]  This also is consistent with the Commission not forbearing from section 225, as the Commission has acted to improve communications access for incarcerated people with disabilities.[1708]  We therefore find that forbearance would fail to meet the statutory test of section 10 of the Act, in that the protections of section 276 remain necessary to protect consumers and serve the public interest.[1709]

---

[1703] 47 U.S.C. § 160(a)(2), (a)(3).

[1704] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14115, para. 14 (2013) (*2013 ICS Order and NPRM*) ("[S]ection 276 directs the Commission to 'establish a per call compensation plan to ensure that all payphone service providers'— which the statute defines to include providers of ICS—'are fairly compensated for each and every completed intrastate and interstate call.' . . . Section 276 makes no mention of the technology used to provide payphone service and makes no reference to 'common carrier' or 'telecommunications service' definitions." (internal citations omitted)), *pets. for stay granted in part sub nom. Securus Techs. v. FCC*, No. 13-1280 (D.C. Cir. Jan. 13, 2014); 47 CFR § 64.6000 *et seq.*

[1705] *2015 Open Internet Order*, 30 FCC Rcd at 5856, para. 521.  Subsequent to the *2015 Open Internet Order*, the Commission began relying on section 201(b) in its oversight of IPCS.  *See, e.g.*, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8486, para. 4 (2020) (exercising oversight pursuant to the Commission's section 201(b) authority).  Congress amended section 276 of the Act in January 2023 to expand the Commission's authority over IPCS under that provision, but the ultimate scope and bounds of that expanded authority is the subject of a pending rulemaking proceeding.  *See Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669 (2023) (*2023 ICS Order and NPRM*).  Consistent with our conclusion below that it would be contrary to the public interest to forbear from applying section 276 to the extent it applies to IPCS or the Commission's IPCS rules, given open questions about the scope of the Commission's expanded authority under section 276, we find it prudent at this time—and consistent with the public interest—to retain our full section 201(b) authority specifically in the context of IPCS, as well.

[1706] *See, e.g.*, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519 (2021) (*2021 ICS Order and NPRM*); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, 37 FCC Rcd 11900 (2022) (*2022 ICS Order and NPRM*); *see 2013 ICS Order and NPRM*, 28 FCC Rcd at 14109-10, para. 3 (finding in 2013 that the ICS market "is failing to protect the inmates and families who pay [ICS] charges").

[1707] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (Martha Wright-Reed Act); 47 U.S.C. §§ 152(b), 153(1)(E), 276(b)(1)(A), (d); *see also 2023 ICS Order and NPRM*, 38 FCC Rcd at 2670, para. 2 (seeking comment on how to implement the "Martha Wright-Reed Act to adopt just and reasonable rates and charges for incarcerated people's audio and video communications services").

[1708] *2021 ICS Order and NPRM*, 36 FCC Rcd at 11901-02, paras. 1-4.

[1709] *2015 Open Internet Order*, 30 FCC Rcd at 5856, para. 521.

### 8. Truth-in-Billing Rules

429.     We again forbear from applying our truth-in-billing rules insofar as they are triggered by our classification of BIAS here.[1710]  As with our section 10 analysis above, we conclude that our truth-in-billing rules are not needed for the purposes of section 10(a)(1) and (2) and that forbearance is in the public interest under section 10(a)(3).  No commenter discusses whether we should or should not forbear from our truth-in-billing rules, and we have no reason to believe that "our core BIAS requirements, including the requirement of just and reasonable conduct under section 201(b), will not provide important protections in this context even without specific rules."[1711]

### 9. Roaming-Related Provisions and Regulation

430.     We adopt our proposal to grant the same conditional forbearance from common carrier roaming regulations as in the *2015 Open Internet Order* and find that doing so meets the section 10(a) analysis.[1712]  As there is no record discussion regarding our forbearance from applying the Commission's roaming rules, we have no reason to believe that we should depart from the forbearance in the *2015 Open Internet Order* or that it would fail to meet the section 10(a) analysis.  The Commission has established two different regimes to govern the roaming obligations of commercial mobile providers.  One requires certain CMRS providers, "on reasonable request, to provide automatic roaming on reasonable and not unreasonably discriminatory terms and conditions."[1713]  The second requires providers of commercial mobile data services, as defined and including mobile BIAS, to "offer roaming arrangements to other such providers on commercially reasonable terms and conditions, subject to certain specified limits."[1714]  As the Commission previously determined in the *2015 Open Internet Order*, it remains the case that "reclassify[ing] [mobile BIAS] as CMRS potentially affects the roaming obligations of [mobile BIAS] providers in two ways.  First, absent any action by the Commission to preserve data roaming obligations, the determination that [mobile BIAS] is an interconnected service would result in providers of [mobile BIAS] no longer being subject to the data roaming rule, which . . . applies only to non-interconnected services.  Second, the determination that [mobile BIAS] is CMRS potentially subjects [mobile BIAS] providers to the terms of the CMRS roaming rules."[1715]

431.     We again forbear from the application of the CMRS roaming rule, section 20.12(d) of the Commission's rules, to mobile BIAS, conditioned on such providers continuing to be subject to the obligations, process, and remedies under the data roaming rule codified in section 20.12(e).[1716]  Retaining the roaming obligations for mobile BIAS that applied prior to reclassification remains consistent with our tailored approach, and we are again persuaded that the Commission rules in section 20.12(e) and our remaining core BIAS requirements render the forborne-from rules unnecessary.[1717]  We thus find that applying the forborne-from rules is not necessary for purposes of section 10(a)(1) and (a)(2) and that the

---

[1710] *Id.* at 5856-57, para. 522.

[1711] *Id.*

[1712] *2023 Open Internet NPRM* at 58, para. 112; *2015 Open Internet Order*, 30 FCC Rcd at 5857-58, paras. 523-26 (providing a brief history of each regime and explaining that they were established in 2007 and 2011, respectively).

[1713] *2015 Open Internet Order*, 30 FCC Rcd at 5857, para. 523; 47 CFR § 20.12(a)(2), (d).

[1714] *2015 Open Internet Order*, 30 FCC Rcd at 5857, para. 524; 47 CFR § 20.12(e); *see Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, WT Docket No. 05-265, Second Report and Order, 26 FCC Rcd 5411, 5411-12, paras. 1, 2 (2011); 47 CFR §§ 20.3, 20.12(a)(3), (d).

[1715] *2015 Open Internet Order*, 30 FCC Rcd at 5857, para. 525.

[1716] *Id.* at 5857-58, para. 526.

[1717] *Id.*

conditional forbearance is in the public interest under section 10(a)(3).[1718]

## 10. Terminal Equipment Rules

432. We also again forbear from applying certain terminal equipment rules to the extent that they would newly apply by virtue of the classification of BIAS.[1719] Similar to the rules adopted in the *2015 Open Internet Order*, the open Internet rules we adopt in this Order will prevent BIAS providers from restricting the use of non-harmful devices subject to reasonable network management.[1720] The record does not discuss whether we should forbear from our terminal equipment rules. We thus find that applying the Commission's terminal equipment rules, insofar as they would newly apply to BIAS providers by virtue of our classification decision here, are necessary for purposes of section 10(a)(1) and (a)(2), particularly given the availability of the core BIAS requirements, and in particular our bright-line rules. Likewise, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3).[1721]

## D. Other Regulations and Non-Title II Provisions

### 1. Maintaining Authority Under Certain Title III Provisions

#### a. Wireless Licensing

433. We clarify that we do not forbear from applying—or waive—our rules governing the wireless licensing process and authorities and clarify that our adopted forbearance does not encompass Title III licensing, except to the extent specifically noted below.[1722] Among other benefits, we find that maintaining these provisions will support our national security goals, as they will allow us to continue to review wireless license applications under our normal processes,[1723] including to determine whether they

---

[1718] *Id.*

[1719] Specifically, sections 68.100, 68.102, 68.105, 68.108, 68.110, 68.201, 68.211, 68.213-215, 68.214, 68.215, 68.218, 68.300, 68.318, 68.320, 68.321, 68.322, 68.324, 68.326, 68.346, 68.348, 68.350, 68.354, 68.417, 68.418, 68.419, 68.420, and 68.423 of the Commission's rules. 47 CFR §§ 68.100, 68.102, 68.105, 68.108, 68.110, 68.201, 68.211, 68.213-215, 68.214, 68.215, 68.218, 68.300, 68.318, 68.320, 68.321, 68.322, 68.324, 68.326, 68.346, 68.348, 68.350, 68.354, 68.417, 68.418, 68.419, 68.420, 68.423.

[1720] *See infra* Sections V.B.1, V.C.

[1721] *2015 Open Internet Order*, 30 FCC Rcd at 5857-58, para. 527.

[1722] *2023 Open Internet NPRM* at 57, para. 109; *2015 Open Internet Order*, 30 FCC Rcd at 58663-64, paras. 534-36; *see, e.g.*, 47 U.S.C. §§ 309, 310(d); 47 CFR §§ 1.933, 1.939, 1.948, 27.10.

[1723] As we observed in the *2023 Open Internet NPRM*, our Title III licensing authority with respect to facilities-based mobile BIAS providers independently "grant[s] us important authority that can be used to advance national security and public safety with respect to the services and equipment subject to licensing." *2023 Open Internet NPRM* at 57, para. 109. In determining whether to grant an original application for a license or permit or an application for renewal of a license under Title III (47 U.S.C. § 309(a)), approve the assignment or transfer of control of a Title III license or permit (47 U.S.C. § 310(d)), or revoke a Title III license or permit (47 U.S.C. § 312(a)(2)), the Commission considers whether the applicant has the requisite citizenship, character, and other necessary qualifications. 47 U.S.C. § 308(b). The Commission also must "determine whether the public interest, convenience, and necessity will be served" by granting the application or revoking the license or permit. Among the factors the Commission may consider are national security, law enforcement, public safety, or other risks. *See generally Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 60-66. Therefore, given the Commission's public interest obligations in licensing decisions, and based on the key public interest considerations that inform our action in this Order, we retain the right to review fully original applications and applications for assignment or transfer of control of Title III licenses and permits, and we reserve the right to conduct *ad hoc* review of whether a licensee's retention of a Title III license presents national security, law enforcement, public safety, or other risks that warrant revocation of such authority.

are in the public interest—which includes consideration of national security.[1724] The record does not address whether we should adopt the same forbearance for Title III wireless licensing as the Commission did in the *2015 Open Internet Order*, so we have no basis for adopting different findings here.[1725] Adopting this approach also has the added benefit of being consistent with the Commission adopting largely the same broad forbearance as the *2015 Open Internet Order*. Consequently, as the Commission found in the *2015 Open Internet Order*, we find that forbearing from the Commission's flexible use rules would be against the public interest under section 10(a)(3) because it would lead to inaccurate license information.[1726] Accordingly, we do not forbear from applying—or waive—the wireless licensing requirements under Title III and the Commission's rules, except to the extent specified below.

> **b.** **Foreign Ownership of Common Carrier Wireless Licensees (Section 310(a) and (b))**

434. With limited exceptions, we do not forbear from section 310(a) and (b) of the Act, which requires the Commission to review foreign investment in radio station licenses and imposes specific limitations on who may hold certain types of radio station licenses.[1727] As discussed below, we find that forbearance from section 310(a) and (b), except to the extent the Commission previously determined to forbear from section 310(b)(3) for wireless common carriers, would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers.[1728] We anticipate a future proceeding will, among other things, develop a fuller record on the application of the Commission's rules implementing section 310(b)(3) and (b)(4) in the context of BIAS.

435. By this Order, we find that foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS is in the public interest under section 310(b)(3) when such foreign ownership is held in the licensee through a U.S. entity that does not control the licensee, and under section 310(b)(4).[1729] We also waive the associated requirements for such licensees to request a declaratory ruling under sections 1.5000 through 1.5004 of the Commission's rules,[1730] until the adoption of any rules for BIAS.

436. Section 310(a) and (b) of the Act provide for Commission review of foreign investment in radio station licenses and impose specific restrictions on who may hold certain types of radio station licenses.[1731] Section 310(a) prohibits foreign governments or their representatives from holding any radio station license, and section 310(b)(1) and (b)(2) prohibits foreign individuals or their representatives and corporations organized under the laws of a foreign government from holding a broadcast, common

---

[1724] We discuss how our review under Title III requirements intersects with our determinations regarding foreign ownership requirements below.

[1725] We do mean, however, to apply current Title III wireless licensing requirements (i.e., ones that are new or revised since the *2015 Open Internet Order*).

[1726] *2015 Open Internet Order*, 30 FCC Rcd at 5863, para. 535.

[1727] 47 U.S.C. § 310(a)-(b).

[1728] 47 U.S.C. § 160(a)(2)-(3). As noted below, the Commission previously determined that forbearance from the application of section 310(b)(3) to wireless common carriers, which now includes wireless BIAS providers, was in the public interest with respect to a discrete type of foreign ownership.

[1729] *Id.*§ 310(b)(3)-(4). Common carrier wireless licensees that are providing other common carrier services in addition to BIAS will still need a ruling for their indirect foreign ownership above the statutory benchmarks, as the waiver will only apply to BIAS and not other common carrier wireless services. *See generally Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, IB Docket 11-133, Second Report and Order, 28 FCC Rcd 5741 (2013) (*2013 Foreign Ownership Second Report and Order*).

[1730] 47 CFR §§ 1.5000-1.5004.

[1731] 47 U.S.C. § 310(a)-(b).

carrier, or aeronautical en route and aeronautical fixed (hereinafter, aeronautical) radio station license.[1732] Section 310(b)(3) prohibits foreign individuals, governments, and corporations from owning or voting more than 20% of the capital stock of a broadcast, common carrier, or aeronautical radio station licensee.[1733] Section 310(b)(4) establishes 25% benchmarks for investment by foreign individuals, governments, and corporations in a U.S.-organized entity that directly or indirectly controls a U.S. broadcast, common carrier, or aeronautical radio licensee.[1734] Foreign individuals, governments, or entities may own, directly or indirectly, more than 25% (and up to 100%) of the stock of a U.S.-organized entity that holds a controlling interest in a broadcast, common carrier, or aeronautical radio licensee, unless the Commission finds that the public interest will be served by refusing to permit such foreign ownership.[1735] In the *2012 Foreign Ownership First Report and Order*, the Commission determined to forbear from applying the foreign ownership limits in section 310(b)(3) to the class of common carrier licensees in which the foreign investment is held in the licensee through a U.S.-organized entity that does not control the licensee, to the extent the Commission determines such foreign ownership is consistent with the public interest under the policies and procedures that apply to the Commission's public interest review of foreign ownership subject to section 310(b)(4) of the Act.[1736] The Commission codified this forbearance approach in the *2013 Foreign Ownership Second Report and Order*, which adopted rules to treat foreign investment under section 310(b)(4) and the forbearance approach of section 310(b)(3)

---

[1732] 47 U.S.C. § 310(a), (b)(1)-(2). The prohibitions in section 310(a), (b)(1), and (b)(2) are absolute, and the Commission has no discretion to waive them. *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5748, 5749 nn.26, 29. The Commission has stated that, for purposes of section 310(a), a "'representative'" is a person or entity that acts "'in behalf of'" or "'in connection with'" the foreign government. *Id.* at 5748 n.26 (citing *Applications of QVC Network, Inc., for Commission Consent to Interim Transfer of Control of Paramount Communications*, Inc., File No. BTCCT-931029KL-KR, Memorandum Opinion and Order, 8 FCC Rcd 8485, 8490-91, para. 21 (1993); *Letter from the Commission to Russell G. Simpson, Esq.*, 2 F.C.C. 2d 640 (1966)).

[1733] 47 U.S.C. § 310(b)(3) ("No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country."). Section 310(b)(3), unlike section 310(b)(4), does not give the Commission the discretion to permit foreign ownership above the statutory threshold. *See Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 15-236, Report and Order, 31 FCC Rcd 11272, 11278, para. 8, n.21 (2016) (*2016 Foreign Ownership Order*) (explaining that unlike section 310(b)(4), section 310(b)(3) does not afford the Commission discretion to approve foreign investment above the statutory threshold).

[1734] 47 U.S.C. § 310(b)(4) ("No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.").

[1735] *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 9837, para. 10; *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5.

[1736] *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act, as Amended*, IB Docket No. 11-133, First Report and Order, 27 FCC Rcd 9832 (2012) (*2012 Foreign Ownership First Report and Order*); *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5 n.11. The Commission's forbearance authority does not extend to broadcast or aeronautical radio station licensees covered by section 310(b)(3). *See* 47 U.S.C. § 160; *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9832-33, para. 1; *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5749, para. 9 n.31. The forbearance approach that the Commission adopted in the *2012 Foreign Ownership First Report and Order* applies only to foreign ownership in common carrier licensees held through intervening U.S.-organized entities that do not control the licensee. *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9833, para. 1; *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5749, para. 9 n.31.

consistently.[1737]

437. *Forbearance Is Not in the Public Interest with Limited Exceptions*. We do not forbear from section 310(a) and (b) of the Act except to (1) extend our existing section 310(b)(3) forbearance policy to not require the filing of a petition for declaratory ruling or similar request where and to the extent the Commission has already found the foreign ownership at issue to be in the public interest and (2) provide a reasonable period for other BIAS providers newly subject to section 310(b)(3) to reduce their foreign ownership interests below the statutory limit or restructure their holdings to include an intervening, non-controlling U.S. interest holder. Our determination that this limited forbearance is in the public interest rests on the same reasoning as our determination below that waiver of the associated rules is in the public interest.[1738] Except to this limited extent, we find that forbearance from section 310(a) and (b) would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers.[1739] Congress created the Commission, among other reasons, "for the purpose of the national defense [and] for the purpose of promoting safety of life and property through the use of wire and radio communication."[1740] We find that our decision not to forbear ensures the Commission can continue to advance the public interest, and furthers two core purposes— national security and the promotion of safety of life and property—for which Congress created the Commission.[1741] In evaluating a petition for a declaratory ruling seeking a determination that it is in the public interest to exceed the statutory foreign ownership benchmarks, the Commission's public interest analysis under section 310(b)(3) and (b)(4) considers, among other things, any national security, law enforcement, foreign policy, and trade policy concerns raised by the proposed foreign investment.[1742] We find that our decision not to forbear further from section 310(a) and (b) is consistent with the Commission's statutory responsibilities under section 10(a) and is warranted based on the key public interest considerations that inform our action in this Order and to enable the Commission to address national security, public safety, and other public interest concerns with respect to BIAS.[1743]

---

[1737] *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5763, paras. 36-37.

[1738] The Commission concluded in 2012 that application of the statutory threshold is not necessary to ensure that rates are just and reasonable and not unjustly or unreasonably discriminatory, and we determine below that consumers will benefit from our decision not to require BIAS-only providers to file petitions for declaratory ruling under the circumstances described here. *See 2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9839, para. 15; 47 U.S.C. § 160(a).

[1739] 47 U.S.C. § 160(a)(2)-(a)(3).

[1740] 47 U.S.C. § 151.

[1741] *See id*. In the *2023 Open Internet NPRM*, we sought comment "on any other provisions of the Act or Commission rules that likewise should be expressly excluded from the scope of forbearance based on national security and/or public safety considerations, including, for example, sections 305, 310, and 332 of the Act." *2023 Open Internet NPRM* at 57, para. 109.

[1742] 47 U.S.C. § 310(b)(3)-(4); *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66; *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9843, para. 27; *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751, para. 13. The Commission has also identified public safety and security of critical infrastructure as relevant to the Commission's review of foreign investment under section 310(b)(4). *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751 n.44 (citing *Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, WT Docket No. 00-230, Second Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking, 19 FCC Rcd 17503, 17515, para. 22 (2004); *Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, WT Docket No. 00-230, Second Order on Reconsideration, 23 FCC Rcd 15081, 15084, para. 6 (2008)); *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9841, para. 20.

[1743] *2023 Open Internet NPRM* at 52-53, 57, paras. 98-99, 109.

438. *Public Interest Finding and Waiver of Rules.*[1744] Under the existing section 310(b)(3) forbearance policy, and under the Commission's rules applicable to section 310(b)(4), wireless common carriers must file a petition for declaratory ruling before they may exceed the statutory foreign ownership thresholds. The Commission applies the same rules to both types of petitions for declaratory ruling.[1745] We recognize that application of these rules may raise operational issues in the context of BIAS. WISPA, for example, addresses the potential impact on common carrier wireless licensees that would be subject to section 310(b) pursuant to our reclassification of BIAS under Title II.[1746] The Commission anticipates releasing a further notice of proposed rulemaking to address this and other comments. By this Order, and pending the outcome of a further notice of proposed rulemaking, we find that foreign ownership interests that exceed the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS are in the public interest under section 310(b)(3)—when such foreign ownership is held in the licensee through a U.S. entity that does not control the licensee[1747]—and under section 310(b)(4).[1748] For such licensees, we waive the requirements to request a declaratory ruling under sections 1.5000 through 1.5004

---

[1744] Notwithstanding the determination about public interest considerations supporting our decisions regarding section 310(b)'s application to BIAS, we reserve the right, as part of our review under Title III licensing provisions, to override that determination with respect to specific applications.

[1745] *See* 47 CFR §§ 1.5000-1.5004. Sections 1.5000 to 1.5004 of the Commission's rules implement section 310(b)(3)—with regard to the class of common carrier radio station licensees subject to the forbearance approach adopted in the *2012 Foreign Ownership First Report and Order* that seek Commission approval to exceed the 20% foreign ownership limit in section 310(b)(3)—and section 310(b)(4) of the Act. *See id.* § 1.5000 ("The rules in this subpart establish the requirements and conditions for obtaining the Commission's prior approval of foreign ownership in broadcast, common carrier, aeronautical en route, and aeronautical fixed radio station licensees and common carrier spectrum lessees that would exceed the 25 percent benchmark in section 310(b)(4) of the Act. These rules also establish the requirements and conditions for obtaining the Commission's prior approval of foreign ownership in common carrier (but not broadcast, aeronautical en route or aeronautical fixed) radio station licensees and spectrum lessees that would exceed the 20 percent limit in section 310(b)(3) of the Act . . . .").

[1746] WISPA Comments at 63-64 ("Applying Section 214 to broadband providers means . . . some or all of a provider's non-common carrier wireless licenses will presumably be considered to be common carrier licenses, meaning the provider will be subject to the foreign ownership thresholds of Section 310(b) of the Act and would be required to file a Petition for Declaratory Ruling under Section 1.5000 *et seq.* and receive Commission approval should foreign ownership exceed those thresholds. This, then, means that applying Section 214 will result in significant administrative burdens on both the federal government and individual broadband providers that have never before been deemed to hold a Section 214 authorization.").

[1747] 47 U.S.C. § 310(b)(3); *see 2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9832-33, para. 1. The waiver that we adopt today shall not apply to any common carrier wireless licensee providing only BIAS that does not fall within this class, including foreign ownership held directly in a common carrier wireless licensee under section 310(b)(3). Foreign ownership held directly in common carrier licensees under section 310(b)(3) is not subject to the forbearance approach adopted in the *2012 Foreign Ownership First Report and Order* and shall not be covered in the waiver that we adopt in this Order. *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9844, para. 28 ("Foreign interests that are held in the licensee itself, and not through an intervening U.S.-organized entity, are not subject to forbearance under today's decision and therefore shall not under any circumstances exceed the statutory maximum of 20 percent."). As such, the 20% foreign ownership limit set forth in section 310(b)(3) shall apply to such common carrier wireless licensee providing only BIAS that does not fall within this class.

[1748] 47 U.S.C. § 310(b)(4). For the same reasons discussed below in support of our waiver of the rules, and in furtherance of our decision to extend our existing section 310(b)(3) forbearance policy for common carrier licensees to BIAS-only providers, we temporarily find that foreign ownership in a common carrier wireless licensee providing only BIAS is in the public interest where foreign interests are held in a licensee through an intervening U.S. entity that does not control the licensee, even though we are temporarily not requiring the filing of a petition for declaratory ruling as to such interests.

of the Commission's rules,[1749] pending adoption of any rules for BIAS.[1750]

439. We further find that temporary forbearance is warranted to afford additional time after the Order's effective date for other BIAS providers newly subject to Title II to restructure to the extent necessary to bring any direct foreign ownership interest in the licensee below the statutory limit or to include a non-controlling intervening U.S. interest holder.[1751] We find that a compliance period of twelve months after the effective date is reasonable based on the amount of time that it could take to restructure corporate ownership or take other similar steps to come into compliance given our experience with transactions of a similar scale and type[1752] and strikes the right balance between maximizing public interest benefits and minimizing potential public interest harm. For that period of time, enforcement of the statutory prohibition in section 310(b)(3) is not necessary to protect consumers or ensure just and reasonable and nondiscriminatory rates and practices. Forbearing from enforcement of the prohibition for that period of time serves the public interest by allowing newly covered BIAS providers to continue providing service during the limited time necessary to protect existing investments in such businesses without presenting undue risk of harm given the limited duration of this temporary forbearance. Following that period of time, forbearance will no longer serve the public interest except as the Commission adopted in the *2012 Foreign Ownership First Report and Order* and as applied herein with respect to foreign interests held in the licensee through a non-controlling U.S. interest holder.

440. The Commission may waive its rules and requirements for "good cause shown."[1753]

---

[1749] 47 CFR §§ 1.5000-1.5004. We recognize that, for the period for which we waive section 1.5000 through 1.5004 of the rules as specified herein, we will not be receiving petitions for declaratory ruling seeking prior approval to exceed the section 310(b)(3) and (b)(4) statutory benchmarks—as set out in the existing rules—from common carrier wireless licensees that are providing only BIAS, and it is our intent to address this matter in a further notice of proposed rulemaking. This waiver of those rules as it relates to the foreign ownership of common carrier wireless licensees providing only BIAS will not apply to foreign ownership held directly in such licensees under section 310(b)(3).

[1750] We note that the blanket section 214 authority that we grant to such common carrier wireless licensees providing BIAS, pursuant to our reclassification of BIAS in this Order, is subject to the Commission's power to revoke such authority. *See supra* Section IV.B.3. The Commission also has the power to revoke a Title III station license, including "for willful or repeated violation of, or willful or repeated failure to observe any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States." 47 U.S.C. § 312(a)(4); *see id.* § 312(a).

[1751] WISPA asked the Commission to provide time for these providers to come into compliance with section 310(b)(3) and the terms of the forbearance policy applicable to BIAS providers with foreign interests in the licensee held through a non-controlling U.S. entity. *See* Letter from Jeffrey J. Carlisle, Counsel to WISPA, to Marlene H. Dortch, Secretary, FCC (filed Apr. 15, 2024).

[1752] *See Existing Shareholders of Clear Channel Communications, Inc. (Transferors) and Shareholders of Thomas H. Lee Equity Fund VI, L.P., Bain Capital (CC) IX, L.P., and BT Triple Crown Capital Holdings III, Inc. (Transferees) for Consent to Transfers of Control of Ackerly Broadcasting Fresno, LLC et al.,* File Nos. BTCCT-20061212AVR et al., Memorandum Opinion and Order, 23 FCC Rcd 1421, 1437, para. 43 (2008) (requiring sale of stations held in trust within six months of trustee's acquisition or submission of required report); *Citadel Broadcasting Company for Renewal of Licenses for Stations*, *WWWZ(FM), Summerville, South Carolina, et al*, File Nos. BRH-20030801BMZ et al., Memorandum Opinion and Order and Notice of Apparent Liability, 22 FCC Rcd 7083, 7108, para. 63 (2007) (trustee must consummate sale of stations held in trust within six months of acquisition or provide required report); *Existing Shareholders of Cumulus Media, Inc. (Transferors) and Existing Shareholders of Citadel Broadcasting Corporation (Transferors) and New Shareholders of Cumulus Media, Inc. (Transferees) for consent to Transfers of Control of et al.*, File Nos. BTC-20110330ALU et al., Memorandum Opinion and Order, 26 FCC Rcd 12956, 12966, para. 21 (MB 2011) (licensee must submit assignment applications for sale of stations within six months of transaction consummation date or provide the Commission with a detailed explanation of efforts to sell).

[1753] 47 CFR § 1.3 ("Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.").

Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest."[1754]  In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy,"[1755] and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[1756]  As discussed above, the current rules that implement section 310(b)(3) and (b)(4) of the Act establish requirements and conditions for obtaining the Commission's prior approval of foreign ownership in common carrier wireless licensees, among other licensees.[1757]  Importantly, the current rules that we waive, as set out in this Order, were established in the context of traditional telecommunications services, and thus we find there is good cause to waive those rules pending adoption of any rules for BIAS.

441.    As such, we find that, for the period leading to adoption of any rules for BIAS, foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS is in the public interest under section 310(b)(3) when such foreign ownership is held in the licensee through a U.S.-organized entity that does not control the licensee[1758] and under section 310(b)(4).[1759]  For such licensees, we waive the requirements to request a declaratory ruling under sections 1.5000 through 1.5004 of the Commission's rules,[1760] pending the adoption of any rules for BIAS.  We find that our decision to waive section 1.5000 through 1.5004 of the Commission's rules with respect to this class of licensees is in the public interest given our consideration of hardship and equity that may be raised by immediate application of those rules to such licensees following our action in this Order.  The reclassification of BIAS under Title II is a special circumstance that requires careful consideration of rules concerning BIAS and thus warrants deviation at this time from the application of

---

[1754] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1755] *WAIT Radio*, 418 F.2d at 1159.

[1756] *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[1757] 47 U.S.C. § 310(b)(3)-(4); 47 CFR §§ 1.5000-1.5004.

[1758] 47 U.S.C. § 310(b)(3); *see 2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9832-33, para. 1.  We find that it is in the public interest not to disturb the section 310(b)(3) forbearance approach the Commission adopted in the *2012 Foreign Ownership First Report and Order* and to temporarily apply it to those common carrier wireless licensees providing only BIAS as set out in this Order.  We recognize that the forbearance analysis adopted in the *2012 Foreign Ownership First Report and Order* relied on the filing of a declaratory ruling and prior approval of the Commission.  At this time, however, we find that there is good cause to apply the section 310(b)(3) forbearance approach to those common carrier wireless licensees providing only BIAS, where strict compliance with the rules implementing section 310(b)(3)—in those instances where the foreign ownership is held in the licensee through a U.S. entity that does not control the licensee—would be inconsistent with the public interest based on consideration of hardship and equity that may be raised by immediate application of those rules until the Commission releases a further notice of proposed rulemaking to develop a fuller record on this matter.  Pending such further notice of proposed rulemaking, we note that the Commission stated in the *2012 Foreign Ownership First Report and Order*, with regard to the class of common carrier licensees subject to the forbearance approach adopted in that Order, "that the public interest would be served by not applying the foreign ownership limit of section 310(b)(3) to licensees subject to section 310(b)(3) forbearance . . . for the same reasons that the public interest is served when we allow, under section 310(b)(4), greater than 25 percent foreign ownership in a U.S.-organized entity that does control the licensee under otherwise identical circumstances." *2012 Foreign Ownership First Report and Order*, 27 FCC Rcd at 9840-41, para. 19.  The approach that we adopt in this Order would allow us to treat foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees providing only BIAS consistently under section 310(b)(4) and (b)(3), respectively, whether the foreign ownership is held through a controlling U.S. parent of the common carrier licensee or through an intervening U.S. entity that does not control the licensee, by including such licensees here and waiving section 1.5000 through 1.5004 of the Commission's rules until adoption of any rules.

[1759] 47 U.S.C. § 310(b)(3)-(4).

[1760] 47 CFR §§ 1.5000-1.5004.

our current rules implementing section 310(b)(3) and (b)(4), pending a further notice of proposed rulemaking. We find that the public interest is served as our approach will ensure that consumers can continue to receive the BIAS services to which they subscribe. Additionally, by waiving the requirements to request a declaratory ruling under sections 1.5000 through 1.5004 of the Commission's rules, where it pertains to the foreign ownership of common carrier wireless licensees that are providing only BIAS as set out in this Order, we will avoid any disruption to or uncertainty for BIAS consumers and BIAS providers. As we conclude in the present Order, our action to reclassify BIAS under Title II will protect consumers and ensure a safe, secure, and open Internet. Accordingly, we find that granting a waiver of the requirements to request a declaratory ruling under sections 1.5000 through 1.5004 of the Commission's rules, where it pertains to the foreign ownership of common carrier wireless licensees that are providing only BIAS as set out in this Order, is fully consistent with our responsibility to account for the effective implementation of our overall obligations and objectives to address national security, law enforcement, public safety, or other public interest concerns while ensuring the uninterrupted provision of BIAS for consumers pending a further notice of proposed rulemaking to develop a fuller record. This waiver as set out in this Order will remain in effect pending such further notice of proposed rulemaking and the adoption of any rules for BIAS.

## 2. Forbearance from Certain Provisions of Titles III, VI, and Other Commission Rules

442. We forbear from applying other provisions of the Act insofar as they would be triggered by classifying BIAS as a telecommunications service, to the extent of our section 10 authority.[1761] In particular, beyond the Title II provisions and certain implementing rules discussed above, we grant forbearance, as the Commission did in the *2015 Open Internet Order*, from obligations related to BIAS providers' provision of BIAS under certain provisions of Title III, Title VI, and associated Commission rules.[1762] We conclude that the same analysis justifies forbearance from these provisions, and the record does not dispute that. We thus predict, as we did in the *2015 Open Internet Order*, that other provisions and rules will be adequate to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and to protect consumers for purposes of section 10(a)(1) and (a)(2).[1763] Further, informed by our responsibilities under section 706, we find the tailored regulatory approach we adopt strikes the appropriate public interest balance under section 10(a)(3).[1764] Accordingly, we adopt the following forbearance:

- First, we forbear from applying certain provisions of Titles III and VI[1765] and Commission

---

[1761] *2015 Open Internet Order*, 30 FCC Rcd at 5858-60, para. 528; *see also Forbearance from Applying Provisions of the Communications Act to Wireless Telecommunications Carriers*, WT Docket No. 98-100, First Report and Order, 15 FCC Rcd 17414, 17427, para. 28 (2000) (holding that "the three-prong [section 10] forbearance test is inapplicable to UTC's request because the Commission lacks forbearance authority over non-common carriers such as UTC," where UTC had sought modification of Commission rules "to allow private microwave licensees to act as providers to other carriers"); *FCBA Forbearance Order*, 13 FCC Rcd at 6299, para. 9 ("[L]icensees governed by these rule parts who do not meet the definition of 'telecommunications carrier' (e.g., public safety and private microwave licensees) are beyond the scope of our section 10 forbearance authority, and therefore are not subject to the revised procedures established by this Order").

[1762] *2015 Open Internet Order*, 30 FCC Rcd at 5858-60, para. 528.

[1763] *Id.*

[1764] *Id.*

[1765] The Commission has forborne from provisions of Title II and from Commission rules in many instances in the past. However, nothing in the language of section 10 categorically limits the scope of Commission forbearance only to the provisions of Title II, *see generally* 47 U.S.C. § 160, and although it has been less common for the Commission to forbear from provisions of Title III and VI, it has done so at times. *See, e.g., FCBA Forbearance Order*, 13 FCC Rcd 6293 (granting certain forbearance from section 310(d) under section 10 of the Act); *Petition for Declaratory Ruling to Clarify 47 U.S.C. § 572 in the Context of Transactions Between Competitive Local Exchange*

(continued….)

rules[1766] associated with those Titles or the provisions of Title II from which we forbear that may apply by their terms to providers classified in particular ways.[1767] As to this first category of requirements, and except as to the core BIAS requirements, we forbear from any such provisions and regulations to the full extent of our authority under section 10, but only insofar as a BIAS provider falls within those categories or provider classifications by virtue of its provision of BIAS, but not insofar as those entities fall within those categories of classifications by virtue of other services they provide.

- Second, we forbear from applying certain provisions of Titles III and VI and Commission rules associated with those Titles or the provisions of Title II from which we forbear that may apply by their terms to services classified in particular ways.[1768] Regarding this second category of requirements (to the extent not already covered by the first category), and except as to the core BIAS requirements, we forbear from any such provisions and regulations to the full extent of our authority under section 10 specifically with respect to BIAS, but do not forbear from these requirements as to any other services (if any) that BIAS providers offer that are subject to these requirements.

- Third, while commenters do not appear to have identified such rules, there potentially could be other Commission rules for which our underlying authority derives from provisions of the Act all of which we forbear from under the first two categories of requirements identified above, but which are not already subject to that identified scope of forbearance. To the extent not already identified in the first two categories of requirements above, and except as to the core BIAS requirements, we forbear to the full extent of our authority under section 10 from rules based entirely on our authority under provisions from which we forbear under the first and second categories above (or for which the forborne-from provisions provide essential authority) insofar as the rules newly apply as a result of the classification of BIAS.

- Fourth, we include within the scope of our broad forbearance for BIAS any preexisting rules with the primary focus of implementing the requirements and substantive Commission jurisdiction in sections 201 and/or 202, including forbearing from preexisting pricing, accounting, billing, and

---

*Carriers and Cable Operators; Conditional Petition for Forbearance From Section 652 of the Communications Act for Transactions Between Competitive Local Exchange Carriers and Cable Operators*, WC Docket No. 11-118, Order, 27 FCC Rcd 11532 (2012) (granting certain forbearance from section 652 under section 10 of the Act).

[1766] For clarity, we note that by "rules" we mean both codified and uncodified rules. In addition, by "associated" Commission rules, we mean rules implementing requirements or substantive Commission jurisdiction under provisions in Title II, III, and/or VI of the Act from which we forbear.

[1767] The Order's classification of BIAS could trigger requirements that apply by their terms to "common carriers," "telecommunications carriers," "providers" of common carrier or telecommunications services, or "providers" of CMRS or commercial mobile services. Similarly, other provisions of the Act and Commission rules may impose requirements on entities predicated on an entity's classification as a "common carrier," "telecommunications carrier," "provider" of common carrier or telecommunications service, or "provider" of CMRS or commercial mobile service without being framed in those terms. As illustrative examples, *see, e.g.*, 47 CFR § 61.3 (defining a "tariff" as "[s]chedules of rates and regulations filed by common carriers"); *id.* § 64.2101 (defining "covered provider" to include, for example, "a local exchange carrier as defined in § 64.4001(e), an interexchange carrier as defined in § 64.4001(d), a provider of commercial mobile radio service as defined in § 20.3 of this chapter").

[1768] The classification of BIAS as a telecommunications service and, in the mobile context, CMRS, under the Communications Act, thus could trigger any requirements that apply by their terms to "common carrier services," "telecommunications services," or "CMRS" or "commercial mobile" services. Similarly, other provisions of the Act and Commission rules may impose requirements on services predicated on a service's classification as a "common carrier service," "telecommunications service," "CMRS," or "commercial mobile" service without being framed in those terms. *See, e.g.*, 47 CFR § 64.708(i) (defining "operator services" as certain interstate telecommunications services).

recordkeeping rules.[1769]  As with the rules identified under the first and second categories above, we do not forbear insofar as a provider is subject to these rules by virtue of some other service it provides.

- Fifth, the classification of BIAS as a telecommunications service could trigger certain contributions to support mechanisms or fee payment requirements under the Act and Commission rules, including some beyond those encompassed by the categories above.  Insofar as any provisions or regulations not already covered above would immediately require the payment of contributions or fees by virtue of the classification of BIAS (rather than merely providing Commission authority to assess such contributions or fees) they are included within the scope of our forbearance.  As under the first and second categories above, we do not forbear insofar as a provider is subject to these contribution or fee payments by virtue of some other service it provides.

## V. REPORT AND ORDER:  OPEN INTERNET RULES

443.  The rules we adopt today mark the return to the Commission's longstanding basic framework governing BIAS provider conduct to protect the open Internet.  We establish "rules of the road" that are straightforward and clear, prohibiting specific practices harmful to an open Internet—blocking, throttling, and paid prioritization—as well as a strong standard of conduct designed to prevent deployment of new practices that would harm Internet openness, and certain enhancements to the transparency rule.  Our rules are designed to prevent BIAS providers from engaging in practices that are harmful to consumers, competition, and public safety.  As proposed in the *2023 Open Internet NPRM*, our approach reinstates the rules that the Commission adopted in 2015.[1770]  We find that the temporary deviation from this framework, which the Commission adopted in the *RIF Order*, left consumers exposed to behavior that can hinder their ability to access—and the Commission without recourse to protect and promote—an open Internet.[1771]  As we explained in the *2023 Open Internet NPRM*, we find that the rules we adopt today are "consistent with numerous other steps the Commission has taken to ensure that this country has access to affordable, competitive, secure, and reliable broadband."[1772]

### A. Need for Rules

444.  We affirm our tentative conclusion from the *2023 Open Internet NPRM* that baseline Internet conduct rules for BIAS providers are necessary to enable the Commission to prevent and address

---

[1769] This forbearance would not include rules implementing our substantive jurisdiction under provisions of the Act from which we do not forbear that merely cite or rely on sections 201 or 202 in some incidental way, such as by, for example, relying on the rulemaking authority provided in section 201(b).  Consistent with our discussions above, this category also does not include our open Internet rules or MTE rules.

[1770] *2023 Open Internet NPRM* at 58-59, paras. 115-16.

[1771] *Id.* at 59, para. 115.

[1772] *Id.* at 59, para. 116; *see, e.g., Affordable Connectivity Program Emergency*; *Broadband Benefit Program*, WC Docket Nos. 21-450 and 20-445, Report and Order and Further Notice of Proposed Rulemaking, 37 FCC Rcd 484 (2022) (taking steps to ensure broadband connections were affordable through the Emergency Broadband Benefit Program and successor Affordable Connectivity Program, as directed by Congress); *Establishing Emergency Connectivity Fund to Close the Homework Gap*, WC Docket No. 21-93, Report and Order, 36 FCC Rcd 8696 (2021) (extending the benefits of broadband connections available to schools and libraries to students and patrons who needed connections at home through the Emergency Connectivity Fund); *Promoting Telehealth for Low-Income Consumers*; *COVID-19 Telehealth Program*, WC Docket Nos. 18-213 and 20-89, Report and Order, 35 FCC Rcd 3366, 3368, para. 4 (2020) (establishing the COVID-19 Telehealth Program to help health care providers provide connected care services to patients at their homes or mobile locations in response to the pandemic); *2022 MTE Report and Order and Declaratory Ruling*, 37 FCC Rcd 2448 (taking steps to ensure that consumers in multi-tenant environments can obtain broadband service offerings from competing providers); *Preventing Digital Discrimination Order and FNPRM*, FCC 23-100 (adopting rules pursuant to section 60506 of the Infrastructure Act that establish a framework to facilitate equal access to BIAS by preventing digital discrimination of access).

conduct that harms consumers and competition.[1773] BIAS is an essential service that is critical to so many aspects of everyday life, from healthcare and education to work, commerce, and civic engagement.[1774] Because of its importance, we conclude that rules are necessary to promote free expression; encourage innovation, competition, and consumer demand; and protect public safety. As the Commission found in both 2010 and 2015, BIAS providers continue to have the incentive and ability to harm Internet openness. We find that the framework the Commission adopted in the *RIF Order* provides insufficient protection from these dangers, and that a safe, secure, and open Internet is too important to consumers and innovators to leave unprotected.

### 1. Promoting Free Expression and Encouraging Innovation, Competition, and Consumer Demand

445.     The Internet serves as a cornerstone for free expression, fostering a diverse and inclusive digital space where individuals can share ideas, opinions, and information without undue influence or interference.[1775] It promotes the exchange of diverse perspectives, ultimately enriching society by exposing individuals to a wide range of thoughts and experiences. As the Supreme Court noted in 1997, the Internet enables any person to "become a town crier with a voice that resonates farther than it could from any soapbox."[1776] In the *2023 Open Internet NPRM*, we sought comment on the need for conduct rules to protect free expression, innovation, and investment.[1777] The record confirms the Commission's long-held tenet that an open Internet is critical to facilitate the free flow of diverse speech and content, and serves as a platform for speech and civic engagement.[1778] Several commenters highlight that open Internet rules would ensure that BIAS providers cannot discriminate against content, thereby providing a space for all voices, including those from diverse and minority backgrounds.[1779] We agree with the Communications Workers of America that a BIAS provider's "ability to place restrictions on what speech

---

[1773] *2023 Open Internet NPRM* at 59, para. 117; *see also* NTIA *Ex Parte* at 2-3 (supporting the Commission's adoption of open Internet rules)

[1774] *2023 Open Internet NPRM* at 59, para. 117.

[1775] 47 U.S.C. § 230(a)(3).

[1776] *Reno*, 521 U.S. at 870; *see also Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general . . . ." (quoting *Reno*, 521 U.S. at 868)).

[1777] *2023 Open Internet NPRM* at 59, para. 118.

[1778] ACLU Comments at 4 (agreeing wholeheartedly that rules to prohibit blocking, throttling, and paid prioritization will lead to a more open Internet which is critical to its ability to serve as a platform for speech and civic engagement); NPR Comments at 10 (stating that, "[a]s the public increasingly relies on BIAS to access public service provided by public media, including noncommercial educational news, information, and cultural programming that promote civic engagement, the open internet is more critical than ever to the future of public media"); EDUCAUSE et al. Comments at 4 (asserting that the elimination of clear rules prohibiting blocking, throttling, and paid prioritization practices "left the door open to public broadband Internet access providers blocking or throttling traffic to research and speech that they may disagree with or find controversial . . . [which] would threaten the principle of academic freedom that stands at the heart of all aspects of the higher education mission, and thus generate unique harms to colleges and universities above and beyond the harms to end-users and edge providers in general that would result from such infringement"); Public Knowledge Comments at 53 (emphasizing that the U.S. Supreme Court has acknowledged the importance of protecting online speech under the First Amendment).

[1779] DIASA Comments at 1 (expressing concerns that "[w]ithout net neutrality, ISPs could potentially create a two-tiered internet system, disproportionately affecting low-income and minority communities, widening the digital divide, and impeding our mission towards digital equity"); EFF Comments at 8, 10 (stating that an open Internet is "digital oxygen" for minority and religious communities); Artists for Net Neutrality Reply at 1 (highlighting the need for net neutrality so that artists have spaces to freely and safely express themselves).

is permitted on its platform creates a chilling effect on civic discourse."[1780]

446. In addition to protecting free expression, an open Internet encourages competition and ensures that breakthrough innovations are not limited. In the *2015 Open Internet Order*, the Commission recognized that "innovations at the edges of the network enhance consumer demand, leading to expanded investments in broadband infrastructure that, in turn, spark new innovations at the edge."[1781] This self-reinforcing cycle, which the Commission has referred to as a "virtuous cycle" and which was a primary basis for the actions the Commission took in the *2010 Open Internet Order* and the *2015 Open Internet Order*,[1782] was accepted by the *Verizon* court.[1783] The *Verizon* court found that "the Commission's determination that Internet openness fosters the edge-provider innovation that drives this 'virtuous cycle' was . . . reasonable and grounded in substantial evidence," and that "the Commission has adequately supported and explained its conclusion that, absent rules such as those set forth in the *Open Internet Order*, broadband providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment."[1784]

447. In the *RIF Order*, the Commission did not question the existence of the virtuous cycle or the fact that, at least in theory, BIAS providers might take actions that undermine the cycle.[1785] However, the Commission pointed out that BIAS providers may also contribute to the "virtuous cycle," and, without presenting any evidence or reasoned analysis, opined that the three potential sources of harm by BIAS providers to the "virtuous cycle" "have been overestimated, and can be substantially eliminated or reduced by the more light-handed approach [the *RIF Order*] implements."[1786]

448. In the *2023 Open Internet NPRM*, we sought comment on the "virtuous cycle" and whether "it is necessary to secure the open Internet to preserve the virtuous cycle."[1787] Of the few parties that comment on this issue, none question the validity of the "virtuous cycle" or the fact that innovations at the edge of the network can increase consumer demand, which can lead to expanded investments in broadband infrastructure, which in turn stimulate further innovation at the edge. Rather, those opposing the proposed bright-line rules instead either argue that BIAS providers lack the incentive or ability to engage in activities that would undermine the "virtuous cycle" or that BIAS providers have not engaged in such activities,[1788] or they suggest, irrelevantly, that other entities, including large edge providers,

---

[1780] CWA Comments at 11.

[1781] *2015 Open Internet Order*, 30 FCC Rcd at 5663, para. 142.

[1782] *2010 Open Internet Order*, 25 FCC Rcd at 17927, para. 38; *2015 Open Internet Order*, 30 FCC Rcd at 5625-26, paras. 75-76.

[1783] *Verizon*, 740 F.3d at 644 (finding that "the Commission has more than adequately supported and explained its conclusion that edge-provider innovation leads to the expansion and improvement of broadband infrastructure" and that "[t]he Commission's emphasis on this connection between edge-provider innovation and infrastructure development is uncontroversial.").

[1784] *Id.* at 644-45.

[1785] *RIF Order*, 33 FCC Rcd at 380-81, paras. 119-21 ("In a two-sided market, three potential reasons for Title II regulation arise: the extent to which ISPs have market power in selling Internet access to end users; the extent to which ISPs have market power in selling to edge providers access to the ISP's subscribers (end users) . . . , and the extent to which the positive externalities present in a two-sided market might lead to market failure even in the absence (or because of that absence) of ISP market power.").

[1786] *Id.* at 380-81, paras. 120-21.

[1787] *2023 Open Internet NPRM* at 65, paras. 131-32.

[1788] *See, e.g.*, ADTRAN Comments at 22 ("Internet service providers have not actually engaged in any such conduct that would stifle edge provider innovation."); AT&T Comments at 23 ("ISPs lack the ability and incentive to engage in such [anticompetitive] conduct."); Free State Foundation Comments at 37 ("[B]roadband ISPs lack financial incentives and ability to block, throttle, or otherwise harm consumer access to lawful Internet content.");

(continued….)

transit providers, backbone providers, and CDNs can also affect and undermine the consumer experience.[1789]

449. We agree with Netflix that "where both affiliated and independent content providers compete on a level playing field that offers the same access to terminating access networks, these companies are spurred to compete vigorously and to continue to improve their offerings by investing in quality content and technology."[1790] The record reflects wide agreement that the Internet ecosystem has become more diverse during the past decade with the entrance of new network operators, new intermediaries such as CDNs and interexchange carriers, and new edge providers.[1791] Small and emerging edge providers constitute particularly dynamic drivers of innovation and are a critical part of the diversity of the Internet ecosystem.[1792] Research on Internet-based innovation shows that the innovative generativity of the Internet is strongly related to its open, transparent, and modular architecture. These technological design choices greatly reduce the costs of innovation for edge providers and hence stimulate more innovation experiments.[1793] They enable coordination and the realization of synergies between the participants in the Internet ecosystem.[1794] However, this generativity can be weakened, and the

---

USTelecom Comments at 45-46 ("ISPs have no economic incentive to engage in blocking, throttling, or paid prioritization, and do not engage in them."); NCTA Comments at 64 ("ISPs have strong, market-based incentives not to undermine the value and competitiveness of their services by engaging in blocking, throttling, or other harmful conduct."); Verizon Comments at 2 ("Verizon (like other providers) continues to commit to not blocking, throttling, or unfairly prioritizing traffic not because of any Commission or state law requirement, but because that is what our customers demand—a demand that competing providers will eagerly satisfy if we do not."); George Ford, *Investment in the Virtuous Circle* at 1 (asserting that "broadband providers have no apparent incentive to depart from the neutral treatment of traffic").

[1789] NTCA Reply at 9 (discussing transit providers, backbone providers, and CDNs); USTelecom Comments at 52 (arguing that "[t]he Big Tech giants effectively function as the gateway to information on the internet, . . . . [and their] algorithms . . . affect which content users see and, thereby, influence where they go on the internet"). We note that, to the extent that other entities may have the incentive or ability to engage in anticompetitive activities that undermine the virtuous cycle, such activities are beyond the scope of this proceeding.

[1790] Netflix Comments at 4 (further arguing that without open Internet rules, if BIAS providers "engage in non-neutral behavior, this will undermine competition, reduce innovation, and harm consumers").

[1791] *See, e.g.*, NTCA Comments at 10-11.

[1792] *See, e.g.*, Engine Comments at 4 (stating that the "Internet has sparked a new industrial revolution led by hundreds of thousands of small entrepreneurs disrupting industries and challenging dominant incumbents"); EFF Comments at 11-12; Free Press Comments at 136-45. In March 2023, 1,054,052 business establishments in the United States (11.6% of all businesses) were less than one year old and 2,436,791 (26.8% of all businesses) were less than three years old. U.S. Bureau Lab. Stat., Number of Private Sector Establishments by Age, https://www.bls.gov/bdm/us_age_naics_00_table5.txt. Although many of these companies may go out of business, others innovate successfully and become a major impetus to innovation and growth in the economy. Most of these businesses depend on reliable, open Internet connections to build and scale their businesses. *See* SBEC Comments at 3 (arguing that small to mid-size BIAS providers are "essential to ensuring competition in the industry and the connectivity of rural and exurban customers"); Henry Chesbrough & Marshall Van Alstyne, *Permissionless Innovation*, 58 Commc'ns ACM 24-26 (2015); *see also* Philippe Aghion et al., The Power of Creative Destruction: Economic Upheaval and the Wealth of Nations 5-8 (2021) (showing that the youngest firms exhibit stronger net job growth and that nations with a strong startup dynamic experience higher income per capita growth).

[1793] *See, e.g.*, Barbara van Schewick, Internet Architecture and Innovation (2010); David D. Clark, Designing an Internet (2018); Carliss Y. Baldwin & Kim B. Clark, 1 Design Rules: The Power of Modularity (2000).

[1794] These insights are congruent with recent research in innovation economics. This work shows that particularly important innovation drivers are (1) the contestability of a market (that is, the intensity of competition in the market segment and the competitive threats exerted by potential new entrants); (2) the available technological and business innovation opportunities; and (3) the appropriability of temporary risk premiums that reward taking the innovation risk. *See, e.g.*, Carl Shapiro, *Competition and Innovation: Did Arrow Hit the Bull's Eye?*, *in* The Rate and Direction of Inventive Activity Reconsidered 361-404 (Josh Lerner & Scott Stern eds., 2018). In digital ecosystems,

(continued....)

innovation performance degraded, if individual market participants have incentives that impede this complementary innovation process.[1795]  While we do not disagree with commenters who argue that excessive regulation can stifle innovation by creating barriers to entry and reduce competition,[1796] we do dispute that the rules we adopt today would constitute the type of regulation that would stifle innovation.  If anything, the surge in innovation over the past 25 years underscores the success of innovators under an open Internet.[1797]  We believe this success can be attributed, at least in part, to the absence of any preemptive control by service providers or any other entities over new applications, services, or content.[1798]  We agree with the Electronic Frontier Foundation, which asserts that an open Internet is also

_____

innovation is further stimulated by synergies between market participants (e.g., between ISPs and edge providers) but it is impeded by coordination costs between market participants.  The importance of synergies and complementarities in interdependent innovation processes was examined rigorously in Timothy F. Bresnahan & Manuel Trajtenberg, *General Purpose Technologies:  'Engines of Growth'?*, 65 J. Econometrics 83 (1995), and in subsequent research literature, *see, e.g.*, OECD, *Competition and Innovation:  A Theoretical Perspective*, OECD Competition Policy Roundtable Background Note (2023), www.oecd.org/daf/competition/competition-and-innovation-a-theoretical-perspective-2023.pdf (surveying recently the state of this research).  An important insight from this research is that innovation is stimulated in a reciprocal process, with edge provider innovation stimulating infrastructure innovation.  In turn, infrastructure innovation enhances the innovation opportunities and activities of edge providers.  The negative effects of coordination costs, such as the costs of adapting an application to different ISPs and the costs of negotiating agreements, on innovation is discussed in Johannes M. Bauer & Erik Bohlin, *Regulation and Innovation in 5G Markets*, 46 Telecomm. Pol'y 102260 (2022).

[1795] The more recent innovation research often uses the term "complementary innovation" or "interdependent innovation" to refer to the reciprocal synergies that exist in digital innovation systems.  The notion of a virtuous cycle of innovation and investment, used in the *2010 Open Internet Order* and *2015 Open Internet Order*, describes key features of such complementary innovation processes.  The more recent research clarifies that several types of complementary innovation coexist in the advanced Internet that thrive under different conditions.  A vast set of innovation opportunities will thrive in a best-effort Internet offering that is transparent and provides nondiscriminatory connectivity for edge providers and users.  Emerging technologies such as new forms of edge computing and open RAN will further expand these innovation opportunities.  *See, e.g.*, K. C. Claffy & David Clark, *Platform Models for Sustainable Internet Regulation*, 4 J. Info. Pol'y 463 (2014); David D. Clark & K. C. Claffy, *Anchoring Policy Development Around Stable Points:  An Approach to Regulating the Co-evolving ICT Ecosystem*, 39 Telecomm. Pol'y 848 (2015).  In all these cases, the virtuous cycle of complementary innovation creates synergies between innovation processes in networks, applications, services, and devices.

[1796] ADTRAN Comments at 3 (arguing that the lack of clarity and certainty in the "vague" proposed rules will discourage investment and innovation); CPAC CRF Comments at 3 (stating that "[e]xcessive regulation can stifle innovation by creating barriers to entry and reducing competition"); Innovation Economy Institute Comments at 6 (reasoning that under the light-touch regimes of "1996 until 2015, and then again in the late 20-teens, the internet was routinely bringing new, exciting innovations forward"); International Center for Law & Economics Comments at 5, 7, 23-24, 27-28 (arguing that the proposed regulations will harm investment, innovation and competition); Jeffrey Westling Comments at 2 (articulating that "allowing providers control over traffic incentivizes innovations in market practices that improve the quality and variety of services available to consumers"); TechFreedom Comments at 27-28 (arguing that the claims made in the *2010* and *2015 Open Internet Orders* and the *2023 Open Internet NPRM* about Internet openness, innovation, free expression, and free speech being imperiled by BIAS providers fail to account for the power of edge providers to do the same);  LARIAT Apr. 15, 2024 *Ex Parte*.

[1797] EFF Comments at 11 (providing several examples of how an open Internet has enabled an explosion of innovation, such as the creation of digital marketplaces like Google, eBay, and Etsy).

[1798] *See id.* (emphasizing that the large companies we rely on today would not have been able to enter the market if they were faced with economic resistance:  "Google, for instance, started as two students with a better search algorithm.  If Google had been forced to negotiate deals with ISPs, it might never have overcome the search giants of the time:  Excite and Alta Vista.  The same holds true for many other innovators, including marketplaces like eBay, Craigslist, and Etsy, and online communication platforms like Facebook"); CDT Reply at 6 ("Edge providers benefit from an open internet because it promotes edge provider innovation and competition and allows them to operate on a more level playing field in competing for audience."); Microsoft Comments at 2-4 (stating that

(continued….)

essential to help new businesses find investors.[1799] As the Greenlining Institute explains, "[w]ithout net neutrality rules, the next Amazon or YouTube may never get off the ground and an *ex post* regulatory intervention will be too little, too late."[1800] As discussed below, we find that BIAS providers have the incentive and technical ability to engage in activities that harm edge providers, which can reduce investment and innovation at the edge, which in turn can harm consumers and ultimately reduce incentives to invest in broadband infrastructure. As the Commission explained in the *2010 Open Internet Order*:

> Widespread interference with the Internet's openness would likely slow or even break the virtuous cycle of innovation that the Internet enables, and would likely cause harms that may be irreversible or very costly to undo. . . . If the next revolutionary technology or business is not developed because broadband provider practices chill entry and innovation by edge providers, the missed opportunity may be significant, and lost innovation, investment, and competition may be impossible to restore after the fact. Moreover, because of the Internet's role as a general purpose technology, erosion of Internet openness threatens to harm innovation, investment in the core and at the edge of the network, and competition in many sectors, with a disproportionate effect on small, entering, and non-commercial edge providers that drive much of the innovation on the Internet. . . . Effective open Internet rules can prevent or reduce the risk of these harms, while helping to assure Americans unfettered access to diverse sources of news, information, and entertainment, as well as an array of technologies and devices that enhance health, education, and the environment.[1801]

Moreover, as the Commission explained in the *2015 Open Internet Order,* such "behavior [by BIAS providers to throttle or degrade edge content] has the potential to cause a variety of other negative externalities that hurt the open nature of the Internet."[1802]

450.    Thus, the conduct that we seek to prevent can not only harm edge providers, which will reduce their incentives to invest and innovate, but can also harm consumers. This harmful conduct may even reduce other BIAS providers' incentives to invest in broadband infrastructure. Overall, the record before us corroborates the need for a balanced approach to safeguard edge innovation while allowing entrepreneurial experimentation to advance innovation. This Order achieves this balance by establishing a framework of bright-line rules for BIAS. These rules offer guardrails to safeguard important open Internet principles that will maintain edge-provider innovation and protect the smallest and most vulnerable edge providers. At the same time, the ability of BIAS providers to offer specialized and innovative new services is preserved by allowing BIAS providers to use appropriate network management, offer enterprise services, and offer non-BIAS data services. We believe that, overall, the

---

"markets and individual freedoms flourish when internet users have access to lawful content, applications, devices, and services of their choice without unreasonable interference").

[1799] EFF Comments at 12 ("[V]enture capitalists looking to invest in the next big thing now have to consider the possibility that the winners in the marketplace can now be determined by the ISPs that control Internet traffic to their subscribers, not by consumers themselves.").

[1800] The Greenlining Institute Reply Attach., The Greenlining Institute Comments, WC Docket No. 17-108, at A-9 (filed July 17, 2017) (The Greenlining Institute July 17, 2017 Comments) (asserting that classifying BIAS as a Title I information service will make it more difficult and expensive for content creators to enter the market and connect with broader audiences, "reducing their ability to innovate and invest in new applications and content").

[1801] *2010 Open Internet Order*, 25 FCC Rcd at 17927-28, para. 38.

[1802] *2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 83. The Commission went on to explain that "[b]roadband providers have incentives to engage in practices that will provide them short term gains but will not adequately take into account the effects on the virtuous cycle. . . . [and] that the unaccounted-for harms to innovation are negative externalities [that] are likely to be particularly large because of the rapid pace of Internet innovation, and wide-ranging because of the role of the Internet as a general purpose technology." *Id.*

benefits of this balanced approach, which secures an open Internet while allowing flexibility for edge and BIAS provider innovation, outweigh its costs. As such, we conclude that the protections we adopt today will help to facilitate "the development of diverse, content, applications, and services," and enable "a virtuous cycle of innovation."[1803]

### 2. Protecting Public Safety

451. The conduct rules that we adopt today are necessary to prevent and mitigate harms to public safety that could result from blocking, throttling, paid prioritization, and other actions that have the potential to impair public safety communications.[1804] The prohibited conduct could make it more difficult for the public to receive emergency services and critical information and could impair the ability of first responders to communicate during emergency situations. As discussed above, one of the Commission's fundamental obligations is to advance public safety.[1805] The *Mozilla* court highlighted this obligation and recognized its significance, emphasizing that "whenever public safety is involved, lives are at stake."[1806] The court went on to note that "[a]ny blocking or throttling of [safety officials'] Internet communications during a public safety crisis could have dire, irreversible results."[1807] Similarly, in the *2015 Open Internet Order*, the Commission recognized that paid prioritization and peering disagreements can negatively affect public safety communications traveling over the same networks.[1808]

452. Above, we discuss the wide range of public safety communications and applications that rely on broadband networks and the related national security concerns impacting broadband services, providers, and critical infrastructure.[1809] The CPUC points out that first responders use "communications tools to respond to life-threatening situations," such as by "notify[ing] residents and businesses by mobile phone, text message, email and social media with time-sensitive, geographically specific emergency notifications."[1810] We agree with the CPUC that the ability of first responders to "communicate with the public in a timely manner is, literally, a matter of life and death."[1811]

453. We conclude that open Internet conduct rules are necessary to support public safety communications by preventing "harmful practices that could impede emergency response and critical information sharing."[1812] The D.C. Circuit found that "the harms from blocking and throttling during a public safety emergency are irreparable . . . [because] people could be injured or die."[1813] Santa Clara

---

[1803] *Id.* at 5627, para. 77.

[1804] These conduct rules may also support consumer use of telehealth service and remote healthcare monitoring, such as through connected devices, by ensuring consumers can continue to access these services without the threat of blocking, throttling, or other degradation.

[1805] *See supra* Section III.A.4; 47 U.S.C. § 151.

[1806] *Mozilla*, 940 F.3d at 59-60, 62.

[1807] *Id.* at 61; *see also id.* at 60 (pointing out that "public safety officials explained at some length how allowing ISPs to prioritize Internet traffic as they see fit, or to demand payment for top-rate speed, could imperil the ability of first responders, providers of critical infrastructure, and members of the public to communicate during a crisis").

[1808] *2015 Open Internet Order*, 30 FCC Rcd at 5654-55, 5689-90, paras. 126, 199.

[1809] *See supra* Section III.A.4.

[1810] CPUC Comments at 3.

[1811] *Id.* at 3; *see also* Letter from John Bergmayer, Legal Director, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (referencing a widespread 911 outage affecting several western states and underscoring the importance of social media for emergency communications, in which "public safety officials in several states used social media (Facebook and X) to inform the public of the issue and to provide alternate means of contacting emergency services").

[1812] New America's Open Technology Institute Comments at 8.

[1813] *Mozilla*, 940 F.3d at 62.

asserts that "such practices could interfere with the communications about the existence of a fire line or evacuation zone, the location of flooding, or the location of criminal suspects or missing individuals, among many other critical and time-sensitive communications."[1814]

454. Several commenters emphasize the importance of the conduct rules for public safety. For example, the AICC contends that the proposed "bright-line rules would serve a vital role in protecting public safety" by preventing "interruptions in signal transmissions between customers and the monitoring centers which serve them."[1815] New America's Open Technology Institute agrees, stating that "it is imperative that the Commission . . . regulate BIAS . . . and take enforcement action in the interest of public safety through Title II classification and the creation of conduct standards."[1816] The CPUC also agrees, arguing that "strong, non-discriminatory rules are needed to ensure that providers of emergency services or public safety agencies are not impaired in providing comprehensive, timely information to the public in a crisis."[1817]

455. We also agree with commenters who assert that the conduct rules will provide other public safety benefits beyond emergency communications. As the CPUC points out, "[t]he 'Internet of things' is deeply intertwined with many facets of society, including critical infrastructure such as the energy grid and water pipelines."[1818] The CPUC contends that "[a]llowing ISPs to engage in paid prioritization deals with energy suppliers" could have detrimental impacts on demand response programs that are vital to "California's battle against catastrophic wildfires."[1819] The CPUC further explains that, "[s]ince demand response relies on fast, instantaneous communication to the customer, non-discriminatory Open Internet rules are vital to dispatching demand response during times of extreme grid stress."[1820] The CPUC concludes that "it is critical to energy safety and reliability that Internet communications . . . not be subject to paid prioritization delays, payment demands, or service degradation due to priority accorded to other users who pay extra."[1821]

456. We conclude that the conduct rules will benefit public safety as proactive actions to protect life and property by preventing potential harms from occurring, as opposed to the Commission solely taking enforcement actions after the harms have already occurred. Santa Clara recognizes the benefits of the conduct rules, which "impose requirements on ISPs *ex ante*, that is, *before* their blocking, throttling, or unreasonable interference can hinder or prevent time-sensitive, life-saving public safety communications from reaching their destinations."[1822] In addition, Santa Clara reiterates that "*ex post* remedies cannot adequately protect against or compensate for the harms that ISP interference can cause to public safety."[1823] Free Press agrees because, "[w]ithout agency authority for *ex post* enforcement (or authority for *ex ante* rules) the Commission cannot do its job to promote public safety."[1824] INCOMPAS also agrees with the need for *ex ante* rules, on the basis that the Commission's "fundamental obligation to

---

[1814] Santa Clara Comments at 20.

[1815] AICC Comments at 6.

[1816] New America's Open Technology Institute Reply at 9.

[1817] CPUC Comments at 19-20.

[1818] *Id.* at 36.

[1819] *Id.* at 19-20 ("During high temperatures, or when fire or other emergencies make conservation urgent, utilities can send real-time communications to their customers over mass-market BIAS to achieve immediate load reduction.").

[1820] *Id.* at 20-21.

[1821] *Id.* at 21.

[1822] Santa Clara Comments at 20.

[1823] *Id.* at 20.

[1824] Free Press Comments at 58.

promote and protect public safety . . . includes ensuring that emergency situations are prevented, mitigated, and/or handled immediately."[1825] We agree that "[t]he harm caused by blocking and throttling [public safety] communications simply cannot be remedied after the fact."[1826] We also agree that the conduct rules are needed to enable the Commission to "deal with public safety issues before a public safety situations arises—not afterwards."[1827] Notably, the *Mozilla* court expressed skepticism about the Commission's contention in the *RIF Order* that post-activity enforcement is a suitable method to address harmful conduct in the public safety context, finding that "the harm to the public cannot be undone" by *ex post* enforcement.[1828] For these reasons, we conclude that the conduct rules are necessary because *ex ante* regulations would provide better public safety protections than an *ex post* enforcement framework.

457.     Some commenters also contend that the conduct rules would have a limited impact on public safety because public safety entities heavily rely on enterprise-level dedicated networks, which fall outside of the scope of reclassification.[1829] As explained above,[1830] public safety officials' reliance on BIAS has become integral to their essential functions and services, aside from their reliance on enterprise-based systems.[1831] We agree with INCOMPAS's analysis in its petition for reconsideration that "[t]he Commission should not ignore the effects of reclassifying BIAS on public safety by conflating the idea that non-BIAS services are also used to address public safety issues."[1832]

458.     We reject the argument of some commenters that the conduct rules are unnecessary due to the lack of evidence of public safety harms.[1833] Multiple commenters refute these arguments. For example, New America's Open Technology Institute cites the Mendocino Complex Fire in 2018 as evidence that, "in the absence of general conduct standards and rules against blocking, throttling, or prioritization, ISP behavior did directly impact public safety efforts."[1834] New America's Open

---

[1825] INCOMPAS Petition for Reconsideration at 12.

[1826] Santa Clara Petition for Reconsideration at 9.

[1827] INCOMPAS Petition for Reconsideration at 12-13.

[1828] *Mozilla*, 940 F.3d at 61.

[1829] *See, e.g.*, AT&T Comments at 22; CTIA Comments at 36; Free State Foundation Comments at 23-24; ICG Comments at 7; Jeffrey Westling Comments at 7; NCTA Comments at 72; TechFreedom Comments at 47; U.S. Chamber of Commerce Comments at 37; USTelecom Comments at 83-84.

[1830] *See supra* Section III.A.4.

[1831] Liam Sweeney Comments at 2 ("[F]irst responders rely upon these networks to do their jobs, the same can be said for almost every piece of our infrastructure."); State Consumer Advocates Comments at 8 ("BIAS is crucial to the work of public safety officials and occupies a critical role in connecting the public with first responders to obtain vital information during emergencies like storms, floods, and wildfires, and to obtain essential resources and information necessary for public health and safety."); NPR Comments at 2 ("The internet has become a critical vehicle for public media to deliver . . . lifesaving public safety and emergency alerting."); Vincent James Mercante Comments at 1 ("[I]n numerous focus groups and community listening sessions with members of our public safety organizations they have pointed out how no/limited Internet service, as well as similar gaps in cellular coverage, could result in life-threatening repercussions."); New America's Open Technology Institute Reply at 6 ("Government agencies, first responders, emergency services, and public health officials use the web to monitor ongoing community issues and crises, disseminate information to the public via websites and social media channels, and coordinate emergency and disaster responses.").

[1832] INCOMPAS Petition for Reconsideration at 11.

[1833] *See, e.g.*, USTelecom Comments at 84-85 ("Mass-market retail customers use their broadband service to access public safety information or to send information to public safety entities. But the NPRM does not suggest that any ISP has ever interfered with any customer's ability to use their broadband service to access or send such information—nor has the Commission ever posited any theory on which any ISP would have an incentive to do so."); Scalia Law Administrative Law Clinic Comments at 6; TechFreedom Reply at 42.

[1834] New America's Open Technology Institute Reply at 8.

Technology Institute states that "the full extent of these impacts . . . is unknown" but cites to other comments to explain that "it is difficult, if not impossible, for governments to identify harms caused by violations of net neutrality principles."[1835] INCOMPAS notes that, with regard to the Santa Clara County incident, "there [was] no agency authority to determine whether [the service provider] violated the rules, and that in itself is dangerous for public safety."[1836] We agree with INCOMPAS that the Commission needs the authority to address public safety matters through *ex ante* rules before a public safety situation arises.[1837]

459.    Commenters reach differing conclusions regarding the significance of the 2018 Mendocino Complex Fire. Commenters who support reclassification point to the wildfire incident as an example demonstrating the need for the open Internet rules and for the Commission to have greater authority to examine and investigate such incidents, and ultimately, to prevent future harms from occurring.[1838] Without such rules, these commenters warn, BIAS providers will engage in conduct that could result in harm to public safety, and that voluntary commitments are insufficient to ensure public safety.[1839] Commenters who oppose reclassification contend that the wildfire incident is irrelevant to, and an unpersuasive example used in support of, reclassification and the open Internet rules, because "the data plan at issue was marketed to government users, and therefore not covered by the FCC's 2015 rules, nor by the definition of BIAS contained in the NPRM" and that Verizon's actions would not have violated the *2015 Open Internet Order*.[1840] In other words, they state that the type of data use plan that Verizon offered and that the Santa Clara fire department purchased did not violate the *2015 Open Internet Order*.[1841] Opponents also argue that the Santa Clara fire department did not purchase a data plan that was appropriate for their needs.[1842] In our view, the 2018 Mendocino Complex Wildfire incident

---

[1835] *Id*. at 8-9 ("Service disruptions can come from many sources, and local governments would be hard-pressed—and plainly do not currently have the resources—to investigate the source of these disruptions and trace them to violations of net neutrality principles. And even if they could, this information historically has proved virtually impossible to obtain." (citing Santa Clara Comments at 11)).

[1836] INCOMPAS Petition for Reconsideration at 10.

[1837] *Id*. at 12-13.

[1838] AICC Comments at 6 ("The Commission will recall Verizon's reported throttling of firefighter communications during a fire emergency, accompanied by a demand for the purchase of more capacity. Verizon reportedly characterized this as a "mistake," but it was surely impactful. Accordingly, the Commission's proposed bright-line rules would serve a vital role in protecting public safety."); Santa Clara Comments at 20-26; EFF Comments at 22-23 ("During the devastating 2018 fire season, firefighters in Santa Clara county found their command-and-control system's data connection was being throttled—not because of any network congestion, but because they had used more than their allotment of 25GB. Not for the first time, firefighters and civilians were endangered because of Verizon's throttling practices.").

[1839] California AG Bonta Comments at 3 ("California's experience demonstrates that large ISPs will engage in harmful behavior when left to their own devices, even when it threatens public safety. Perhaps most egregiously, in August 2018, Verizon throttled Internet service to the Santa Clara County fire service . . . down to 1/200th of previous speeds while County Fire was responding to the Mendocino Complex Fire . . . ."); Carly Scheidemantel Comments at 2 ("With more uniform regulations overseen by a more centralized entity, the FCC could strengthen emergency response communications through the protection of crisis lines and prioritization of citizen urgency.").

[1840] TechFreedom Reply at 42; Jeffrey Westling Comments at 3; Richard Bennett Comments at 3-4; R Street Institute Comments at 5; Letter from Rick Chessen, NCTA—The Internet & Television Association, Nirali Patel, USTelecom—The Broadband Association, and Thomas Power, CTIA—The Wireless Association, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-320 et al., at 3 (filed Apr. 18, 2024) (NCTA et al. Apr. 18, 2024 *Ex Parte*).

[1841] TechFreedom Comments at 50.

[1842] *See* Jeffrey Westling Comments at 3; Eric W. Burger Comments at 10; TechFreedom Comments at 44.

demonstrates that given the high stakes at issue—the loss of life and property—reliance on the free market alone is insufficient in the area of public safety.[1843]

460.    We also disagree with commenters that argue open Internet rules could deter providers from blocking or throttling access to websites that pose a threat to public safety for fear of violating the rules.[1844]  We find that these concerns lack merit because the rules we adopt today only apply to lawful content and the use of non-harmful devices.  As was the case with the 2015 open Internet rules,[1845] transfers of unlawful content or unlawful transfers of content are not covered by the no-throttling and no-blocking rules.

461.    *Public Safety Accessibility for People with Disabilities.*  We find that the adoption of the open Internet conduct rules will allow the Commission to ensure that people with disabilities both have access to essential information and can communicate with public safety personnel during emergencies.[1846]

462.    Many people with hearing- and speech-based disabilities rely on data-intensive, latency-sensitive video applications, such as VRS and other types of Internet-based relay services, to communicate with public safety personnel.[1847]  In the *2023 Open Internet NPRM*, we tentatively concluded that such data-intensive, latency-sensitive applications would be at a higher risk of being degraded by BIAS providers during emergency situations.[1848]  Throttling or paid prioritization of certain services over others has the effect of degrading the network carrying individuals with hearing and speech disabilities' essential video communications, and discriminating against them by preventing them from communicating in the same manner as individuals without disabilities.[1849]  We also tentatively concluded in the *2023 Open Internet NPRM* that the proposed conduct rules would prevent this degradation of such communications.[1850]  In their comments, both the CPUC and the Equity Advocates support this finding and argued that the application of "strong net neutrality protections" to BIAS networks would benefit people with disabilities.[1851]  Applying the prohibitions on blocking, throttling, and paid prioritization to BIAS will ensure that individuals with hearing and speech disabilities who need to use data-intensive video applications have access to reliable and accessible means to communicate with emergency service operators.  As a result of the rules prohibiting throttling and blocking of lawful content, any person who uses Internet-based relay services to communicate with emergency management agencies can be confident that they can do so without experiencing a degraded network connection.  Additionally, the general conduct rule we adopt will ensure that BIAS providers do not unreasonably interfere with,

---

[1843] INCOMPAS Petition for Reconsideration at 10 ("[A]s the Government Petitioners explained:  '[t]he free market cannot always be trusted to advance the public good.'  Moreover, '[n]othing in the Order would stop a BIAS provider from abandoning its voluntary commitments.'  The Commission must grapple with the aforementioned public safety risks rather than continuing to rely on the claim that investment and regulatory certainty are more important for public safety.").

[1844] *See* Harold Furchtgott-Roth et al. Comments at 10; Eric W. Burger Comments at 11.

[1845] *2015 Open Internet Order*, 30 FCC Rcd at 5731, para. 299.

[1846] *See supra* Section III.A.8 (discussing BIAS accessibility for people with disabilities).

[1847] *See generally First Internet-Based TRS Order*, 23 FCC Rcd 11591; *Second Internet-Based TRS Order*, 24 FCC Rcd 791.

[1848] *See 2023 Open Internet NPRM* at 61, para. 121.

[1849] *2015 Open Internet Order*, 30 FCC Rcd at 5824-25, para. 468.

[1850] *2023 Open Internet NPRM* at 60-61, paras. 119-21.

[1851] *See* CPUC Comments at 30 (supporting reclassification as ensuring "equitable access and nondiscriminatory treatment for persons with disabilities[] whose usage patterns generally consume large amounts of data"); Equity Advocates Comments at 10 (supporting the Commission's ability to enforce "strong net neutrality protections" to protect people with disabilities); *see also* Accessibility Advocacy Organizations Reply at 3 (noting that providers are currently free to engage in practices such as de-prioritizing the traffic of others, including those of people with disabilities).

disadvantage, or discriminate against the Internet-based relay services that individuals with disabilities use for emergency communications.

463.    The conduct rules prohibiting throttling and blocking, and governing the general conduct of BIAS providers will ensure that people with disabilities have access to essential information during emergencies.  As Santa Clara raises in its comments, cities, localities, states, and other entities operating during emergencies increasingly rely on BIAS networks to send out essential information through social-media, e-mail, and other Internet-supported channels.[1852]  For some people with disabilities, accessing information through these Internet-supported channels may be their preferred way of receiving accessible information alerting them, for example, of a wildfire or a hurricane.[1853]  The same populations may use BIAS to communicate to friends and families that they have evacuated or taken other safety precautions during emergencies.[1854]  We agree with commenters that it is essential for members of the disability community to be able to receive information and for emergency service organizations to be able to transmit public safety information.[1855]  In sum, the conduct rules that we adopt today will ensure that people with disabilities, especially those individuals with hearing or visual disabilities, can access essential public safety information.

### 3.    BIAS Providers' Incentive and Ability to Harm Internet Openness

464.    Based on the record in this proceeding, and consistent with the findings of the Commission in both the *2010 Open Internet Order* and the *2015 Open Internet Order*, we find that open Internet rules are needed because BIAS providers have the economic incentive and technical ability to engage in practices that pose a threat to Internet openness and have engaged in such practices in the past.[1856]

465.    As explained below, BIAS providers may have incentives to block, throttle, or otherwise degrade service to specific edge providers, classes of edge providers, or end users.  They also have incentives to increase revenues by charging edge providers in addition to end users.  And, if BIAS providers can charge for prioritized access, BIAS providers will have incentives to degrade the quality of service to non-prioritized traffic classes and users.[1857]

---

[1852] *See, e.g.*, Santa Clara Comments at 4-5, 8-12 (describing use of social media by local governments, including public safety organizations, during emergencies).

[1853] *See id*. at 8 n.25 (citing a source that claims that use of social media can increase the reach of public safety messages in the disabled community); *see also* Minn. Dep't Hum. Servs., *Making Emergency Communications Accessible*, https://edocs.dhs.state.mn.us/lfserver/Public/DHS-8060-ENG (last visited Mar. 26, 2024) (describing IP-based means to make emergency communications accessible to disabled communities).

[1854] *See* Accessibility Advocacy Organizations Reply at 3 (stating that the current regulatory framework for BIAS permits providers to de-prioritize Internet traffic that may be important to people with disabilities).

[1855] *See* Santa Clara Comments at 20-23 (describing impact of throttling, blocking, and general conduct rule on public safety communications); CPUC Comments at 21-23 (describing the importance of open Internet protections in ensuring access to "emergency notifications, access evacuation and outage maps, contact family and friends, and reach emergency responders").

[1856] *2015 Open Internet Order*, 30 FCC Rcd at 5625, para. 75; *2010 Open Internet Order*, 25 FCC Rcd at 17915, para. 21.

[1857] *See, e.g.*, INCOMPAS Comments at 12 (arguing that "large BIAS providers are in the position to require payment from third party streamers, gamers, and cloud computing companies, and recent examples show how BIAS providers have disadvantaged online competitors and can do so based on their terminating monopoly for their BIAS customers"); Lumen Comments at 5-8, 11-12; CWA Comments at 11-13; Netflix Reply at 7-8 ("As a result of their terminating access monopolies and high switching costs, ISPs have the ability to engage in practices that threaten an open Internet.  They also have the incentive to exercise this market power to the detriment of consumers for at least two reasons.  First, exercising market power allows ISPs to increase revenues by both charging their subscribers to access all Internet endpoints and also charging content providers to access their customers. . . . Second, many ISPs

(continued….)

466.     In the *2010 Open Internet Order*, the Commission explained that BIAS providers may face at least three types of incentives to reduce the current openness of the Internet.[1858] We find that this analysis continues to be correct, even after accounting for developments in the broadband ecosystem and advances in broadband technology over the last decade.

467.     First, a BIAS provider may have incentives to block, degrade, or otherwise disadvantage services offered by specific edge providers or classes of edge providers by controlling the transmission of network traffic over the provider's broadband connection.  These incentives are particularly strong if a third party's services compete with the BIAS provider's own revenue-generating offerings.[1859] For example, if a large, vertically integrated BIAS provider offers video streaming and other content services, such as cable television service, in competition with content offered by edge providers, it would have an incentive to discriminate against those edge providers.[1860] Unless safeguards are in place, a vertically integrated BIAS provider may have incentives to interfere with the transmission of such competing services.  Similarly, a vertically integrated BIAS provider may have an incentive to limit the entry of new content or application providers that may compete with its own offerings in the future.[1861] The record suggests that BIAS providers have engaged in such behavior.[1862]

468.     Such incentives also exist if a BIAS provider has contractual arrangements with a third-party edge provider in which the third-party pays the ISP to terminate traffic.  Commissioner Carr in his dissent suggests that, because a small BIAS provider is unlikely to block access to Netflix, this suggests that regulation is unnecessary.[1863] This argument fails for a number of reasons, most importantly because, if a BIAS provider, regardless of its size, provides a service that competes directly with an edge provider's service (or is affiliated with a provider of a competing service or has a contractual relationship with such a competing provider), that BIAS provider will have an incentive to block or degrade access to the competing provider's service in order to increase its own profits.  Whether a small BIAS provider in Louisiana could provide a service comparable to Netflix's may or may not be possible, but that does not mean there would not be other services and edge providers for which a small provider might have a stronger incentive to degrade access.  In this case, the BIAS providers would have an incentive to

---

have affiliated Pay TV and/or streaming content services that directly compete with independent, online content companies.  ISPs with affiliated services have a clear incentive to advantage their affiliated services by either (1) degrading the quality of their competitors' content or (2) increasing their competitors' costs.").

[1858] *2010 Open Internet Order*, 25 FCC Rcd at 17915, para. 21.

[1859] *Id.*; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5629-31, para. 80 (explaining that BIAS providers may seek to advantage their own or affiliated content).

[1860] *See, e.g.*, *Comcast/NBCU Merger Order*, 26 FCC Rcd at 4268-73, paras. 78-86 (finding that vertically integrated Comcast/NBCU would have the incentive and ability to discriminate or take anticompetitive actions against online video distributors).

[1861] *See generally* Patrick Rey & Jean Tirole, *A Primer on Foreclosure*, *in* 3 Handbook of Industrial Organization 2147 (M. Armstrong & R. Porter eds., 2007) (Patrick Rey & Jean Tirole, *A Primer on Foreclosure*) (discussing various ways a vertically integrated dominant firm can engage in partial or complete foreclosure against rivals).

[1862] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 14-20 (arguing that the terminating monopoly problem requires the Commission to protect an open Internet); EFF Comments at 7-8 (providing multiple examples of discriminatory behavior); Free Press Comments at 133-36; Jon Peha Comments at 3; Lumen Comments at 5-9 (arguing that large consumer BIAS providers continue to abuse their gatekeeper role and harm the open Internet); Public Knowledge Comments at 16-22 (providing examples of blocking, service degradation, and harmful zero rating as well as evidence from BIAS provider practices overseas).  *See also* Fangfan Li et al., *A Large-Scale Analysis of Deployed Traffic Differentiation Practices* (Feb. 2018), https://wehe.meddle.mobi/papers/wehe.pdf (identifying widespread traffic shaping on mobile networks);  *but see* CTIA Apr. 16, 2024 *Ex Parte* at 7-8.

[1863] *See* Carr Dissent at 43.

interfere with and degrade the quality of the transmission provided to non-affiliated content providers.[1864] Some commenters contend that, in both cases (of vertical integration of the BIAS provider and contractual agreements with third-party content providers), paid peering and interconnection agreements may be used to raise rival content providers' costs through inefficiently high payments and that such practices will negatively affect the Internet ecosystem.[1865]

469.     Second, a BIAS provider may have an incentive to charge specific edge providers or classes of edge providers for access or prioritized access to the provider's end users. A BIAS provider could have an incentive to charge inefficiently high fees to edge providers because the BIAS provider is typically an edge-provider's only option for reaching a particular end user. Thus, as the Commission noted in the *2015 Open Internet Order*, BIAS providers have the ability to act as gatekeepers.[1866] The additional cost associated with these fees, in turn, would reduce the incentives of edge providers to innovate. Harms from such inefficiently high charges could be particularly impactful because many edge innovations generate large benefits for the Internet as a whole (what economists call positive spillover effects).[1867] Reduced edge innovation activity therefore may cause harms for the Internet ecosystem that extend beyond an individual edge provider.

470.     Third, if a BIAS provider can profitably charge edge providers for prioritized access to end users, it may have an incentive to strategically degrade, or decline to maintain or increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access.[1868] And even though the quality of broadband access generally has improved over time, as reflected in higher download and upload speeds, a BIAS provider might withhold or decline to expand capacity in order to "squeeze" and degrade nonprioritized traffic, thus increasing network congestion.[1869]

471.     We note, as the Commission did in both the *2015 Open Internet Order* and the *2010 Open Internet Order*, that BIAS providers need not possess monopoly power over end users in order to

---

[1864] *2010 Open Internet Order*, 25 FCC Rcd at 17914-15, para. 23; *see also* Ad Hoc Telecom Users Committee Comments 16-17; WGA Comments at 3-4; *see generally* Thomas G. Krattenmaker & Steven C. Salop, *Competition and Cooperation in the Market for Exclusionary Rights*, 76 Am. Econ. Rev. 109 (1986) (noting that a firm at one level may contract with a firm at another level, such as an input supplier, to exclude or discriminate against competitors); Patrick Rey & Jean Tirole, *A Primer on Foreclosure* at 2150 (noting that a bottleneck owner can contract with a firm or group of firms offering complementary products to exclude rivals).

[1865] *See, e.g.*, Scott Jordan et al. Comments at 5; Lumen Comments at 13-21.

[1866] *2015 Open Internet Order*, 30 FCC Rcd at 5629, para. 80 ("Once the broadband provider is the sole provider of access to an end user, this can influence the network's interactions with edge providers, end users, and others. As the Commission and the court have recognized, broadband providers are in a position to act as a 'gatekeeper' between end users' access to edge providers' applications, services, and devices and reciprocally for edge providers' access to end users."); *see also 2010 Open Internet Order*, 25 FCC Rcd at 17919, para. 24; Robin S. Lee & Tim Wu, *Subsidizing Creativity Through Network Design: Zero-Pricing and Net Neutrality*, 23 J. Econ. Persps., 61 (2009) (suggesting that in the absence of open Internet regulation, BIAS providers may have the incentive to charge edge providers for access to end users); Nicholas Economides, *"Net Neutrality," Non-Discrimination and Digital Distribution of Content Through the Internet,* 4 I/S: J.L. & Pol'y for Info. Soc'y 209, 232 (2008) (same); Hsing Kenneth Cheng et al., *The Debate on Net Neutrality: A Policy Perspective,* 22 Info. Sys. Rsch. 60 (2011) (same); *cf.* ETNOA Comments (arguing that BIAS providers need to be able to charge edge content providers in order to support their networks).

[1867] *See* Christiaan Hogendorn, *Spillovers and Network Neutrality*, *in* Regulation and the Performance of Communication and Information Networks 191-208 (Gerald Faulhaber et al. eds., 2012); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 83 (explaining that BIAS providers' behavior has the potential to cause a variety of externalities that can hurt the open nature of the Internet); *2010 Open Internet Order*, 25 FCC Rcd at 17919-20, para. 25 (harms to edge providers caused by BIAS providers generate negative externalities).

[1868] *See* Nicholas Economides, *The Economics of Net Neutrality; see also 2015 Open Internet Order*, 30 FCC Rcd at 5632, para. 82; *2010 Open Internet Order,* 25 FCC Rcd at 17922, para. 29.

[1869] *See, e.g.*, Lumen Comments at 6; Public Knowledge Comments at 19-20.

engage in conduct that harms edge providers, consumers, and the open Internet.[1870] We recognize, however, that BIAS providers generally possess some degree of market power. As discussed below this market power generally arises from product differentiation and a limited choice among BIAS providers, significant switching costs, and customer inertia, though the incentive and ability to engage in such conduct is likely exacerbated by an increase in market power.[1871] As the Commission explained in the *2010* and *2015 Open Internet Orders*, a "broadband provider's incentive to favor affiliated content or the content of unaffiliated firms that pay for it to do so, its incentive to block or degrade traffic or charge edge providers for access to end users, and its incentive to squeeze non-prioritized transmission will all be greater if end users are less able to respond by switching to rival broadband providers."[1872] Similarly, in the *2015 Open Internet Order*, the Commission observed that "a broadband provider's incentive to favor affiliated content or the content of unaffiliated firms that pay for it to do so, to block or degrade traffic, to charge edge providers for access to end users, and to disadvantage non-prioritized transmission all increase when end users are less able to respond by switching to rival broadband providers."[1873]

472. In *Verizon*, the D.C. Circuit found that the Commission "adequately supported and explained" that, absent open Internet rules, "broadband providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment."[1874] And in the *2015 Open Internet Order*, the Commission generally adopted the analysis underlying the Commission's *2010 Open Internet Order*.[1875] Based on the record in this proceeding, we continue to find the analysis contained in both the *2010* and *2015 Open Internet Orders* persuasive.

473. Opponents of open Internet regulation present several arguments as to why BIAS providers will not have the incentive or ability to engage in conduct that harms the open Internet. As discussed below, we find that none of these arguments are well-founded. First, opponents argue that BIAS providers lack the incentive to block, throttle, or otherwise disadvantage unaffiliated edge providers because they face effective competition and because end users can switch to other service providers.[1876] The Commission has acknowledged that the gatekeeper role of BIAS providers could be "mitigated if a

---

[1870] *2010 Open Internet Order*, 25 FCC Rcd at 17923, para. 32 ("[T]hese threats to Internet-enabled innovation, growth, and competition do not depend upon broadband providers having market power with respect to end users . . . ."); *2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 84 ("Broadband providers have the ability to act as gatekeepers even in the absence of 'the sort of market concentration that would enable them to impose substantial price increases on end users.' We therefore need not consider whether market concentration gives broadband providers the ability to raise prices." (quoting *Verizon*, 740 F.3d at 648)).

[1871] *2010 Open Internet Order*, 25 FCC Rcd at 17923, para. 32 ("Although these threats to Internet-enabled innovation, growth, and competition do not depend upon broadband providers having market power with respect to end users, most would be exacerbated by such market power. A broadband provider's incentive to favor affiliated content or the content of unaffiliated firms that pay for it to do so, its incentive to block or degrade traffic or charge edge providers for access to end users, and its incentive to squeeze non-prioritized transmission will all be greater if end users are less able to respond by switching to rival broadband providers. The risk of market power is highest in markets with few competitors, and most residential end users today have only one or two choices for wireline broadband Internet access service."); *2015 Open Internet Order,* 30 FCC Rcd at 5631, para. 81 ("The broadband provider's position as gatekeeper is strengthened by the high switching costs consumers face when seeking a new service."); *Verizon*, 740 F.3d at 646-47 ("[I]f end users could immediately respond to any given broadband provider's attempt to impose restriction on edge providers by switching broadband providers, this gatekeeper power might well disappear . . . . But we see no basis for questioning the Commission's conclusion that end users are unlikely to react in this fashion.").

[1872] *2010 Open Internet Order*, 25 FCC Rcd at 17923, para. 32; *2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 82.

[1873] *2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 82.

[1874] *Verizon*, 740 F.3d at 645.

[1875] *2015 Open Internet Order*, 15 FCC Rcd at 5601.

[1876] *See, e.g.*, USTelecom Comments at 45-46; USTelecom Reply at 82; Free State Foundation Comments at 8.

consumer could easily switch broadband providers."[1877]  However, there are several problems with the opponents' argument in practice.  While the number of BIAS providers is increasing and BIAS providers are expanding their networks, many consumers still lack a choice of BIAS providers or, where they do have a choice, they have a choice of only two providers and/or the services offered by competing providers are often not close substitutes.[1878]  The *2024 Section 706 Report* shows that as of year-end 2022, 37.4% of households lived in areas where only one provider offered wireline or terrestrial fixed wireless broadband Internet access services at 100 Mbps download and 20 Mbps upload speeds (100/20 Mbps), the new benchmark for defining advanced telecommunications capability, and the Commission's fixed speed benchmark for broadband, while 36.6% of households lived in areas with two providers offering 100/20 Mbps service, and only 18.2% lived in areas where they had a choice of three or more providers offering 100/20 Mbps service.[1879]  At the Commission's long-term speed goal of 1,000 Mbps download and 500 Mbps upload,[1880] 34.4% of households lived in areas with one provider of such service, 3.5% lived in areas with two providers, and only 0.2% lived in areas offering a choice of three or more providers.[1881]  In most locations, end users also have access to satellite and mobile broadband services.  However, the Commission has found that fixed and mobile broadband services are not full substitutes to each other and both services are necessary to ensure that all Americans have access to advanced telecommunications capability.  Both have different service capabilities and use cases, and because these services are complements, and many consumers subscribe to both, which means that the incentives to

---

[1877] *2015 Open Internet Order*, 30 FCC Rcd at 5630-31, para. 80.

[1878] *See, e.g.*, EFF Comments at 6-7 (asserting that most BIAS providers face little competitive pressure).

[1879] *See 2024 Section 706 Report* at 37 fig.4.  7.9% of households did not have any terrestrial fixed broadband provider offering 100/20 Mbps service.  The figures in the text include fixed wireless services at 100/20 Mbps.  If fixed wireless is excluded, then 49.8% of households had a choice of only one provider offering 100/20 Mbps, 34.9% of households had a choice of two providers offering these speeds, and only 5.1% of households had a choice of three or more providers offering 100/20 Mbps.  We reach no conclusion as to whether, or how close, a substitute fixed wireless is for wireline fixed broadband, though we note that subscription rates for fixed wireless are only 4%, which may suggest that fixed wireless is not a close substitute for fixed wireline service at 100/20 Mbps.  *See id.* at 32, para. 59 & n.225.  NCTA takes issue with the Commission's reliance on these data, which represent the most recent Commission-analyzed competition data, claiming that the June 2023 Broadband Data Collection data demonstrate "existing competition is already sufficient to prevent open Internet harms while it is driving increased investment and deployment."  Letter from Pamela Arluk, Vice President and Associate General, NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Apr. 18, 2024) (NCTA Apr. 18, 2024 Arluk *Ex Parte*).  As discussed above, we do not rest our findings about BIAS providers' incentives and abilities to harm Internet openness solely or even primarily on the competitive state of the marketplace, though to be sure, these incentives are influenced by a consumer's ability to switch to a competitive provider.  In any event, even if we take NCTA's June 2023 data calculations at face value, we find that the incremental increases in competition do not meaningfully change our incentive and ability analysis.  *See id.* at Attach., *Ex Parte* White Paper of Israel, Keating, and Shampine at 3 (claiming that the number of locations with more than 2 fixed terrestrial providers offering 100/20 Mbps service increased from 17.7% in December 2022 to 27% in June 2023, while the number of locations served by 2 providers *decreased* from 36.8% to 35.1%).  NCTA also submits that the Commission should account for wireless and low Earth orbit satellite providers in its competitive analysis.  *See id.* at 6-8.  However, the Commission has consistently found that fixed and mobile broadband services are not full substitutes, *2024 Section 706 Report* at 5, para. 9, and given the nascent availability of low Earth orbit satellite services, we find it is premature to make a determination regarding the potential substitutability of these services for fixed terrestrial service.  Furthermore, with respect to NCTA's claims regarding the impact of future potential competition, we find that our analysis is best conducted based on the current state of the marketplace rather than speculation regarding future BIAS deployment.  NCTA Apr. 18, 2024 Arluk *Ex Parte* at Attach., *Ex Parte* White Paper of Israel, Keating, and Shampine at 4-5.

[1880] *See 2024 Section 706 Report* at 2, para. 2.  To report service availability at the long-term speed goal, the Commission uses BDC data reporting 940GB download and 500 Mbps upload.  *See id.* at 27 n.196.

[1881] *Id.* at 37, fig. 4.

degrade one of these services would not fully affect consumers' use of the other service.[1882]  Further, the *2024 Section 706 Report* observed that satellite services have a relatively low subscription rate despite their apparent widespread service availability, and satellite capacity limits the number of subscribers that can be served without service degradation.[1883]

474.    Several commenters argue that the development of cellular FWA[1884] as an alternative to more traditional fixed BIAS is an example that broadband deployment, innovation, and competition are flourishing, and that the Commission's proposed rules are unnecessary.[1885]  As USTelecom notes, "[n]ew 5G fixed wireless offerings provide a competitive alternative to . . . wireline offerings."[1886]  INCOMPAS and Free Press, conversely, suggest that claims of cellular FWA's competitive effects on the fixed BIAS market may be exaggerated, arguing that the fixed BIAS market is highly concentrated and requires open Internet regulation.[1887]  While we acknowledge the availability of cellular FWA as an alternative to wired home Internet offerings, we note that the development of this technology—and any resulting impact on competition—is not sufficient by itself to outweigh our concerns regarding BIAS providers' incentives.

475.    A second response to the argument that BIAS providers lack the incentive to engage in conduct that harms edge providers is that even where consumers face a choice among BIAS providers that are close substitutes, they likely face high switching costs.[1888]  As the Commission explained in the *2015 Open Internet Order*, consumers may face "high upfront device installation fees; long-term contracts and early termination fees; the activation fee when changing service providers; and compatibility costs of owned equipment not working with the new service."[1889]  In addition, BIAS providers can use bundling

---

[1882] *Id.* at 9-13, paras. 18-21.

[1883] *See id.* at 31, para. 58.

[1884] Cellular FWA, the subclass of FWA offered using 4G or 5G mobile technologies, is a relatively new residential fixed wireless broadband Internet access service offered by nationwide providers AT&T, T-Mobile, and Verizon. *See* Roger Entner, *FWA: And Then There Were Three—Entner*, Fierce Wireless (Aug. 22, 2023), https://www.fiercewireless.com/wireless/fwa-and-then-there-were-three-entner; Datablaze, *What Is Fixed Wireless Access?  A Technical Viewpoint*, https://datablaze.com/resources/articles/what-is-fixed-wireless-access-a-technical-viewpoint (last visited Mar. 26, 2024).

[1885] *See, e.g.*, 5G Americas Comments at 5; Comcast Comments at 18-20, 23-25; CTIA Comments at 5, 16-18; International Center for Law & Economics Comments at 12, 16, 19; Verizon Comments at 2, 6; FAI et al. Reply at 6-7; Free State Foundation Reply at 5; Richard Bennett Reply at 3-4; Progressive Policy Institute Reply at 2.

[1886] USTelecom Comments at 48; *see also* CTIA Comments at 17 (stating that "90% of net broadband adds in 2022 were by fixed wireless providers").

[1887] INCOMPAS Comments at 9-10; Free Press Comments at 43.  While Free Press acknowledges fixed wireless as a potential source of competition for home broadband, it argues in favor of the need to reclassify broadband as Title II "regardless of how competitive the market is."  Free Press Comments at 43.

[1888] The record shows broad support for the relevance of switching costs in reducing the intensity of competition. *See, e.g.*, CDT Comments at 8; INCOMPAS Comments at 11; Netflix Reply at 5-6; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5631-32, para. 81; *accord 2010 Open Internet Order*, 25 FCC Rcd at 17921, para. 27.  Other commenters emphasize that competition among BIAS providers has reduced switching costs and increased customer choice options.  *See, e.g.*, CTIA Comments at 16; Mark Israel et al. Declaration at 37-39 (arguing, *inter alia*, that "[t]he ability to switch fixed broadband providers is demonstrated by the fact that churn is an important strategic focus in the broadband industry"); USTelecom Comments at 41-47 (explaining that "competition has intensified significantly in recent years, leading to more consumer choices and lower switching costs").  While we recognize that these competitive forces may exist to lower switching costs for some consumers in some areas, many areas and groups remain for whom switching costs remain high.

[1889] *2015 Open Internet Order*, 30 FCC Rcd at 5631-32, para. 81.

strategies to increase switching costs.[1890]

476.    Third, even where a BIAS provider degrades the quality of an edge provider's service to the extent that it is noticeable to the consumer, the consumer may not be able to determine whether the poor quality is due to the BIAS provider or to the edge provider.[1891]  Consumers often lack the information needed to understand how the practices of their current BIAS provider may affect their user experience and are confused by the complexity of multifaceted pricing plans and discount offers.[1892]  This uncertainty reduces consumers' willingness to switch, solidifying the gatekeeper position of BIAS providers, and weakening the checks provided by competing providers.

477.    Another argument raised by opponents of open Internet rules is that BIAS providers will not have the incentive to degrade or disadvantage edge providers to the extent that BIAS and edge services are complements.[1893]  We find that this argument does not always hold.  For example, if a BIAS provider is vertically integrated with a content provider or has a contractual relationship with an edge provider that competes directly against other edge providers, then the BIAS provider may have an incentive to block or degrade access to unaffiliated edge providers.[1894]  Similarly, if a BIAS provider sees an edge provider as a potential future competitor in an upstream market, it may have the incentive to discriminate in providing access.[1895]  Finally, each BIAS provider only accounts for how its actions impact its own profits and ignores the effect it has on other BIAS providers and the broader Internet ecosystem.  As a result, each individual BIAS provider's profit-maximizing decision, when aggregated across all BIAS providers, can be harmful.  For example, an individual BIAS provider may find charging edge providers a small amount increases its profits.  To the extent that charge leads edge providers to degrade output, the BIAS provider would only account for the impact on its own customers, but not the impact on customers of other BIAS providers.  While the BIAS provider might use some of its revenue from the edge providers to compensate its own customers and negate the harm, other users of the edge providers' services would still be harmed by the charge.  While the harm caused when a single BIAS provider takes such action may be small, all BIAS providers have an incentive to behave this way,

---

[1890] *See* Netflix Reply at 5 (citing *2022 Communications Marketplace Report*, 37 FCC Rcd at 15550, para. 45); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5631-32, para. 81 (explaining that "[b]undled pricing can also play a role, as single-product subscribers are four times more likely to churn than triple-play subscribers") (internal quotation marks omitted).

[1891] *See, e.g.*, Free Press Comments at 4 (asserting that immediately prior to the *2015 Open Internet Order*, major U.S. BIAS providers "were refusing to accept the data traffic from companies delivering the streaming video, but consumers were left in the dark as to the cause).

[1892] *See* Jonathan Schwantes, Broadband Pricing:  What Consumer Reports Learned from 22,000 Internet Bills at 4, Consumer Rep. (2022), https://advocacy.consumerreports.org/wp-content/uploads/2022/11/FINAL.report-broadband.november-17-2022-2.pdf.

[1893] *See, e.g.*, Free State Foundation Comments at 37 (asserting that BIAS providers have no incentive to block or throttle edge content because it is complementary to the ISP service); George S. Ford, *Investment in the Virtuous Circle*.

[1894] *See, e.g.*, Massimo Motta, *Self-Preferencing and Foreclosure in Digital Markets:  Theories of Harm for Abuse Cases*, 90 Int'l J. Indus. Org. 1 (2023) (examining conditions in which a dominant firm may have the incentive and ability to exclude or discriminate against a firm operating in a vertically related or complementary market); Joseph Farrell & Phillip Weiser, *Modularity, Vertical Integration, and Open Access Policies:  Towards a Convergence of Antitrust and Regulation in the Internet Age*, 17 Harv. J.L. & Tech. 85, 104-105 (2003) (identifying several exceptions to the general principle that a vertically integrated firm may not seek to discriminate against firms that provide services that are strong complements); Patrick Rey & Jean Tirole, *A Primer on Foreclosure* (same).

[1895] *See* Massimo Motta, *Self-Preferencing and Foreclosure in Digital Markets*:  *Theories of Harm for Abuse* Cases, 90 Int'l J. Indus. Org. 1 (2023);  Joseph Farrell & Phillip Weiser, *Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age*, 17 Harv. J.L. & Tech. 85, 104-105 (2003);  Patrick Rey & Jean Tirole, *A Primer on* Foreclosure.

substantially harming edge provision.

478.     Opponents of the proposed open Internet rules further argue that a supposed lack of examples of BIAS providers blocking or throttling edge content proves that such rules are not needed.[1896] We find this argument unpersuasive.  As an initial matter, we note that open Internet rules and active enforcement of such rules have been in effect nearly continuously in some form since 2010.  Following the *RIF Order*, various states began enacting their own open Internet rules, and given the national scope of many BIAS providers and services, such state rules provided at least some constraint on the ability of BIAS providers to engage in behavior that would harm Internet openness.  Indeed, AT&T abandoned its sponsored data plan that zero-rated affiliated DirecTV video as a direct result of the passage of the California open Internet regulations.[1897]  As we explained above, BIAS providers continue to have strong incentives and the ability to favor some edge provider content and to discriminate against other content, especially when a BIAS provider is vertically integrated, or has contractual relationships, with edge provider content that competes with unaffiliated content.  Therefore, the perceived lack of examples of BIAS providers engaging in practices that harm Internet openness is more likely evidence in favor of the effectiveness of open Internet regulation and enforcement rather than evidence of a lack of incentives for BIAS providers to engage in such activities.

479.     However, there have been repeated cases of discriminatory conduct that often required Commission action to resolve and would likely be addressed by the rules we adopt today.  The record and independent research document a list of incidences, such as blocking, throttling, and other forms of conduct that harm edge providers.  This includes the blocking by Madison River Communications of VoIP service provided by Vonage;[1898] the throttling and blocking of peer-to-peer (P2P) traffic by cable providers;[1899] the blocking of video calling on the Apple FaceTime app by AT&T;[1900] and, as discussed below, recent evidence that major BIAS providers are currently engaged in throttling.[1901]  In addition,

---

[1896] *See, e.g.*, AT&T Comments at 23; ADTRAN Comments at 22; International Center for Law & Economics Comments at 7; USTelecom Comments at 45-46.

[1897] AT&T stated that, "[g]iven that the Internet does not recognize state borders, the new law not only ends our ability to offer California customers such free data services but also similarly impacts our customers in states beyond California."  *See* AT&T Blog Team, *Impact of California 'Net Neutrality' Law on Free Data Services* (Mar. 17, 2021), https://www.attpublicpolicy.com/uncategorized/impact-of-california-net-neutrality-law-on-free-data-services/?source=email.

[1898] *Madison River Order*, 20 FCC Rcd 4295;  *see* EFF Comments at 7-8.

[1899] BIAS provider RCN settled a class action lawsuit related to its throttling of P2P traffic on its network.  *See* Chin v. RCN Corp., No. 08 Civ. 7349 § 3.2 (S.D.N.Y. Mar. 29, 2010), *available at* https://casetext.com/case/chin-v-rcn-corporation-2.  RCN denied any wrongdoing, but it acknowledged that in order to ease network congestion, it targeted specific P2P applications.  *See* Letter from Jean L. Kiddoo, RCN, to Marlene H. Dortch, FCC, GN Docket No. 09-191, WC Docket Nos. 09-191 and 07-52, at 2-5 (filed May 7, 2010).  A 2008 study by the Max Planck Institute revealed significant blocking of BitTorrent applications in the United States.  Comcast and Cox were both cited as examples of providers blocking traffic.  *See generally* Marcel Dischinger et al., *Detecting BitTorrent Blocking* (2008), *available at* https://people.mpi-sws.org/~mdischin/papers/08_imc_blocking.pdf; *see also* Max Planck Inst. for Software Sys., *Glasnost:  Results from Tests for BitTorrent Traffic Shaping*, https://broadband.mpi-sws.org/transparency/results (last visited Mar. 26, 2024); Christian Kreibich et al., *Netalyzr:  Illuminating Edge Network Neutrality, Security, and Performance* at 15, Int'l Comput. Sci. Inst. (2010), www.icsi.berkeley.edu/pubs/techreports/TR-10-006.pdf; EFF Comments at 7-8.

[1900] AT&T initially restricted use of Apple's FaceTime application to times when the end user was connected to Wi-Fi and thus to another BIAS provider.  *See* David Goldman, *AT&T's FaceTime Fight Is a Very Slippery Slope*, CNN (Aug. 23, 2012), https://money.cnn.com/2012/08/23/technology/att-facetime;  *see also* EFF Comments at 7-8.

[1901] *See* David Choffnes Comments at 2-3; Jeffrey Westling Comments at 3; ACLU Comments at 4-5; California AG Bonta Comments at 2-4; Evan Simmons Comments at 1-2; Ines Khouider Comments at 1; Measurement Lab Comments at 2; Raeghan Brousseau Comments at 3; WGA Comments at 2-4; *see infra* Section V.B.1.b (describing bright-line rule prohibiting throttling).

there have been many instances over the past decade where BIAS providers changed the traffic that was requested by their users, including by redirecting search requests to websites chosen by the BIAS provider in exchange for payments;[1902] injecting JavaScript code into traffic, raising security concerns;[1903] adding unique tracking IDs to web requests, raising privacy concerns;[1904] and stripping e-mail encryption requests, raising security and privacy concerns.[1905]

480. The *RIF Order* asserted that there are only a few examples of BIAS providers engaging in practices harmful to Internet openness, and that proponents of the *2015 Open Internet Order* "relied on purely speculative threats."[1906] It argued that, in a holistic view, both BIAS and edge providers "are important drivers of the virtuous cycle" of investment and innovation, and that regulatory analysis must examine this two-sided market interaction.[1907] The *RIF Order* then concludes that, seen through a two-sided market lens, BIAS providers "face material competitive constraints."[1908] Furthermore, it contended that the terminating monopoly problem forces BIAS providers to compete for subscribers, thus creating downward price pressure for end users. Moreover, it claimed that smaller BIAS providers cannot exercise market power against large edge providers.[1909] Finally, the *RIF Order* argued that positive externalities associated with the general-purpose technology Internet and their regulatory implications were not substantiated by commenters who supported the *2015 Open Internet Order*'s approach and thus considered their support of the application of Title II regulation to all BIAS providers "unreasonable and unreasoned."[1910]

481. As our analysis in this section shows, these arguments are not persuasive. Although it is correct that both BIAS and edge providers provide impetus for innovation, the interests of BIAS providers and edge providers often conflict with each other. BIAS providers have incentives to disadvantage competing edge providers and edge providers that might offer competing services in the future. And as discussed above, even where end users have competitive choices, they generally face significant switching costs and often lack the ability to identify when their BIAS provider is degrading the quality of particular edge services. Consequently, even from a two-sided-market perspective, the interactions between each side of the market are not well aligned. Finally, externalities deserve serious consideration as they imply that the decentralized decisions of BIAS providers and edge providers can have undesirable sectoral outcomes, even when BIAS providers have no incentives to favor their own

---

[1902] EFF Comments at 7-8; *see also* Jim Giles, *US Internet Providers Hijacking Users' Search Queries*, NewScientist (Aug. 9, 2011), https://www.newscientist.com/article/dn20768-us-internet-providers-hijacking-users-search-queries.

[1903] EFF Comments at 7-8; *see also* Sidney Fussell, *Comcast to Customer Who Noticed It Secretly Injecting Code: Maybe It's Your Fault?*, Gizmodo (Dec. 13, 2017), https://gizmodo.com/comcast-customer-who-noticed-it-secretly-injecting-c-1821235362.

[1904] EFF Comments at 7-8; *see also* DiGiViE Commc'ns, *Verizon's Cookies Are Tracking Your Web Visits Without You Knowing It*, https://digivie.com/verizons-cookies-are-tracking-your-web-visits-without-you-knowing-it (last visited Feb. 15, 2024).

[1905] EFF Comments at 7-8; *see also* Mike Masnick, *Revealed: ISPs Already Violating Net Neutrality to Block Encryption and Make Everyone Less Safe Online*, TechDirt (Oct. 13, 2014), https://www.techdirt.com/2014/10/13/revealed-isps-already-violating-net-neutrality-to-block-encryption-make-everyone-less-safe-online.

[1906] *RIF Order*, 33 FCC Rcd at 378, para. 116.

[1907] *Id.* at 380, para. 119.

[1908] *Id.* at 382-89, paras. 123-32.

[1909] *Id.* at 391-92, paras. 136-38.

[1910] *Id.* at 393, para. 139.

operations.[1911] A BIAS provider's mere exploitation of its existing market power will reduce edge provider investment, a harm the BIAS provider will only account for to the extent it reduces its own profits, ignoring the damage to the broader Internet ecosystem.

### 4. The *RIF Order*'s Framework Is Insufficient to Safeguard and Secure the Open Internet

482.     We find that framework in the *RIF Order* does not adequately protect consumers from the potential harms of BIAS provider misconduct. As discussed above, BIAS providers have the incentive and technical ability to engage in conduct that undermines the openness of the Internet. In 2018, when the Commission repealed the open Internet conduct rules, the Commission asserted that a modified transparency rule, combined with the effects of competition, would prevent BIAS provider conduct that might threaten the Internet's openness.[1912] Notwithstanding this conclusion, the Commission found that "[i]n the unlikely event that ISPs engage in conduct that harms Internet openness," preexisting antitrust and consumer protection laws will protect consumers.[1913] We believe that this framework is insufficient to safeguard and secure the open Internet.[1914]

483.     While the D.C. Circuit found the *RIF Order*'s framework to represent a reasonable policy view, the court was skeptical of the Commission's analysis.[1915] Even while upholding the Commission's reliance on consumer protection and antitrust law to protect the open Internet in *Mozilla*, the court observed that the *RIF Order*'s "discussion of antitrust and consumer protection law is no model of agency decisionmaking."[1916] As the court explained, although "[t]he Commission theorized why antitrust and consumer protection law is preferred to *ex ante* regulations [it] failed to provide any meaningful analysis of whether these laws would, in practice, prevent blocking and throttling."[1917] Consequently, although "the Commission opine[d] that '[m]ost of the examples of net neutrality violations discussed in the [*2015 Open Internet Order*] could have been investigated as antitrust violations,'" the *RIF Order* "fail[ed] to explain what, if any, concrete remedies might address these antitrust violations."[1918] The court found it "concerning that the Commission provide[d] such an anemic analysis of the safety valve that it insists will

---

[1911] For example, if a BIAS provider imposes an access fee on an edge provider, it is only considering the effect of such a charge on its own profits, and not the potential reduced edge provider innovation and investment caused by the new cost imposed on the edge provider. *See 2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 83.

[1912] *See RIF Order*, 33 FCC Rcd at 450, paras. 240-41; *see also* CTIA Comments at 18-19, 86 ("[M]arket forces and transparency are sufficient to prevent harm to openness, and there is no basis to re-impose the Internet conduct rules."); 5G Americas Comments at 8 ("[T]he existing transparency rule is sufficient to protect against unlikely discriminatory conduct, making the general conduct rule, as well as the blocking and throttling prohibitions, unnecessary."); ITIF Comments at 7 (arguing that violations of the basic open Internet principles are already very rare because the *RIF Order*'s "transparency requirements ensure that these practices cannot happen in secret"); Free State Foundation Comments at 39 ("Importantly, the Commission's transparency rule and FTC enforcement jurisdiction provide enforceable consumer protections that constrain the ability of broadband ISPs to surreptitiously engage in blocking, throttling, or any other type of harmful anticompetitive conduct—even assuming they wanted to do so."); Richard Bennett Comments at 1 (supporting the *RIF Order*'s framework of a transparency rule coupled with FTC authority to police anticompetitive and unfair behavior).

[1913] *RIF Order*, 33 FCC Rcd at 393-94, para. 140. In the *RIF Order*, the Commission further found that even if the conduct rules adopted by the Commission in 2015 provided "any additional marginal deterrence," those benefits were not worth the costs. *Id.* at 452, para. 245.

[1914] *See 2023 Open Internet NPRM* at 66, para. 135 (stating that the Commission "believe[s] the *RIF Order* failed to ensure the most basic protections for the open Internet—prohibitions on blocking and throttling—let alone other threats to the open Internet identified in the *2015 Open Internet Order*").

[1915] *See Mozilla*, 940 F.3d at 78-82.

[1916] *Id.* at 59.

[1917] *Id.*

[1918] *Id.* (citation omitted).

limit anticompetitive behavior among broadband providers."[1919]

484. Consistent with the D.C. Circuit's skepticism of the *RIF Order*'s approach, we find that the consumer protection and antitrust laws, even combined with transparency requirements, are insufficient to protect against blocking, throttling, and other conduct that harms the open Internet. We believe that the approach we adopt today, based on the *2015 Open Internet Order*, is consistent with a light-touch regulatory framework to protect Internet openness.[1920] Even while upholding the *RIF Order*, the D.C. Circuit was "troubled by the Commission's failure to grapple with the fact that, for much of the past two decades, broadband providers were subject to some degree of open Internet restrictions,"[1921] and we aim to return to the Commission understanding that existed from the 2005 *Internet Policy Statement* through the repeal of the *2015 Open Internet Order* in 2017.[1922]

485. As an initial matter, we find the *RIF Order*'s reliance on transparency as a deterrent for problematic practices to be insufficient to protect consumers and edge providers from BIAS provider misconduct. We affirm our tentative conclusion from the *2023 Open Internet NPRM* that there are types of conduct, such as blocking, throttling, and traffic discrimination, that require *ex ante* intervention to prevent their occurrence in the first instance.[1923] We agree with those commenters that argue it is not enough for the Commission to require that BIAS providers disclose their policies on these network practices in the commercial terms of their service offerings because it does not restrict BIAS providers from engaging in harmful behavior.[1924] We conclude that a comprehensive set of conduct rules, which includes a transparency element, is required to protect consumers from harmful BIAS provider conduct,[1925] and that the open Internet rules we adopt today, including bright-line rules, are necessary to safeguard and secure the open Internet.

486. Furthermore, based on the record in this proceeding, we find that the *RIF Order*'s reliance on the DOJ and the FTC for enforcement of the consumer protection and antitrust laws is unlikely to provide sufficient deterrence to BIAS providers from engaging in conduct that may harm consumers, edge providers, and the open Internet.[1926] Both the DOJ and the FTC have authority to

---

[1919] *Id.*

[1920] *See 2023 Open Internet NPRM* at 66, para. 136.

[1921] *Mozilla*, 940 F.3d at 79.

[1922] *2023 Open Internet NPRM* at 67, para. 136.

[1923] *Id.* at 67, para. 137.

[1924] *See* INCOMPAS Comments at 50 n.125; David Choffnes Comments at 3 (asserting that "transparency alone is not sufficient" to protect consumers); CCIA Comments at 10, 14-15 ("The Transparency Rule . . . is helpful but cannot be a replacement or a proxy for rules that aim directly at the manner in which BIAS is provisioned.").

[1925] As discussed above, we find that: (1) BIAS providers may have the incentive to engage in conduct that harms edge providers and the open Internet even where they lack market power over end users; and (2) contrary to the claims of some commenters, there have been several instances of conduct that the Commission felt a need to address and correct, despite the fact that there were open Internet rules in place.

[1926] *See, e.g.*, Gianni Thompson Comments at 2 ("The FTC, . . . rather than prevention, deals with consequences as it is reactive rather than preventative."); Public Knowledge Comments at 18 (highlighting that state and federal enforcement of consumer protection laws has not impacted BIAS provider behavior that the Commission's open Internet rules would prevent, and asserting that "neither consumer protection laws or antitrust laws provide any deterrence to ISPs."); *id.* at 59 (stating that consumers and edge providers "cannot rely on antitrust law alone to protect their access to an open internet"); INCOMPAS Comments at 50 n.125 (agreeing with the Commission's tentative conclusion that the transparency rule on its own "is not sufficient to protect customers because it does not restrict ISPs from engaging in harmful behavior," and that the *RIF Order*'s framework "was inadequate by largely relying on transparency disclosure and FTC antitrust oversight"); WGA Comments at 2-4 (arguing that current antitrust and consumer protection laws neither disincentivize nor provide sufficient protections against blocking, throttling, and paid prioritization and therefore the original conduct rules should be reinstated).

enforce the federal antitrust laws, and particularly sections 1 and 2 of the Sherman Act.[1927]  In the *2010 and 2015 Open Internet Orders*, the Commission found that it was necessary to adopt certain rules to protect the openness of the Internet and that sole reliance on enforcement of the antitrust laws by the DOJ and FTC was insufficient to protect edge providers, consumers, and the open Internet.[1928]  In the *RIF Order*, the Commission reconsidered and concluded that conduct that harms the openness of the Internet was unlikely, and that other legal regimes—particularly antitrust law and section 5 of the Federal Trade Commission Act (FTC Act)—were sufficient to protect consumers.[1929]

487.    We disagree with commenters who argue that existing consumer protection and antitrust laws provide adequate protection against the harms the open Internet rules we adopt today seek to prevent.[1930]  To begin with, the FTC's section 5 authority does not apply to "common carriers subject to" the Communications Act, so if BIAS providers are properly classified as common carriers, section 5 does not apply at all.[1931]  With respect to antitrust oversight, it is not clear that all conduct that could harm consumers and edge providers would constitute an "unfair method of competition" under section 5 of the FTC Act[1932] or a violation of section 1 or 2 of the Sherman Act.  For example, if a vertically integrated BIAS provider blocked or throttled the content of a particular edge provider with which it competed in the content market, it is not clear whether such conduct would constitute a violation of section 2 of the Sherman Act.  It is well settled that there are two elements to the offense of unlawful monopolization under section 2 of the Sherman Act:  "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[1933]  As the Commission has repeatedly explained, however, it is not necessary for a BIAS provider to have "market power with respect to end users" for it to be able to engage in conduct that harms edge providers, the open Internet,

---

[1927] Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . , or conspiracy in restraint of trade . . . among the several States," while Section 2 prohibits monopolization, attempts to monopolize, or combinations or conspiracies to monopolize "any part of the trade or commerce among the several States."  15 U.S.C. §§ 1, 2.

[1928] *See 2010 Open Internet Order*, 25 FCC Rcd at 17930-31, 17950, paras. 42 n.141, 78 n.242; *2015 Open Internet Order*, 30 FCC Rcd at 5645-46, para. 104 n.237.

[1929] *RIF Order*, 33 FCC Rcd at 393-94, para. 140.

[1930] *See, e.g.*, CTIA Comments at 17 ("[A]ntitrust law and consumer protection law provide safeguards against the unlikely scenario that a provider would violate openness principles."); NCTA Comments at 2, 98 (arguing that market-driven incentives combined with enforcement by the DOJ, FTC, and state attorneys general preserve the openness of the Internet); TechFreedom Comments at 28 ("Net neutrality has survived without FCC rules because consumers *demand* unrestricted access to the Internet, ISPs promise to meet that demand, and the FTC already ensures that consumers get what they're promised."); International Center for Law & Economics Comments at 32-36 (supporting *ex post* regulation under the antitrust laws); Free State Foundation Comments at 39 (favoring enforcement by the DOJ and FTC); Americans for Tax Reform Comments at 6;  R Street Institute Apr. 16, 2024 Statement at 3 (arguing that the FTC "can address consumer harms caused by bad actors including BIAS providers," and because the FTC has not brought any such case between 2017 and the present, there must be no such alleged violation).

[1931] 15 U.S.C. § 45(a)(2); *see also id.* § 44 (cross-referencing the Communications Act).

[1932] *Federal Trade Commission, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act,* Commission File No. P221202, at 8 (Nov. 10, 2022).  The FTC goes on to explain that conduct that violates Section 5 includes practices "deemed to violate the antitrust laws," "conduct deemed to be an incipient violation of the antitrust laws," and "conduct that violates the spirit of the antitrust laws," *id.* at 12-16, but none of the examples cited by the FTC clearly address the types of conduct the open Internet rules seek to prohibit.

[1933] *United States v. Grinnell Corp.*, 284 U.S. 563, 570-71 (1966); *see also Verizon Commc'ns v. Law Offs. Curtis V. Trinko*, 540 U.S. 398, 407 (2004) (*Trinko*) (stating that "it is settled law that [an offense under section 2 of the Sherman Act] requires[] . . . the possession of monopoly power in the relevant market").

and consumers.[1934] This conclusion was accepted and affirmed by the D.C. Circuit in *Verizon*, where it stated:

> Broadband providers' ability to impose restriction on edge providers does not depend on their benefiting from the sort of market concentration that would enable them to impose substantial price increases on end users—which is all the Commission said in declining to make a market power finding. . . . Rather, broadband providers' ability to impose restriction on edge providers simply depends on end users not being fully responsive to the imposition of such restrictions.[1935]

Thus, section 2 of the Sherman Act will not provide adequate protection, at least in cases where the BIAS provider lacks monopoly power over its end user customers. In *Mozilla*, the D.C. Circuit reiterated its concern about the insufficiency of the *RIF Order*'s reliance on antitrust law, explaining that the *RIF Order* "fail[ed] to explain what, if any, concrete remedies might address these antitrust violations."[1936] As such, while the Sherman Act may complement the rules we adopt today, it would not be sufficient on its own to protect edge providers, consumers, and the open Internet.

488. Similarly, it is not clear that all conduct that harms edge providers, consumers, and the open Internet would necessarily violate section 5 of the FTC Act's prohibition on "unfair or deceptive acts or practices" even while BIAS providers are not classified as common carriers and thus are subject to the FTC Act.[1937] Commenters argue that the FTC is a more appropriate enforcer of open Internet principles, emphasize that the FTC has the authority to enforce BIAS provider pledges and commitments not to block, throttle, or otherwise harm consumers.[1938] But these commenters do not address whether the FTC would have any enforcement authority with respect to a BIAS provider that does not make affirmative pledges or commitments.[1939] Nor is it clear how the FTC would rule should a BIAS provider engage in other types of conduct that do not amount to blocking or throttling, but that nevertheless harm edge providers and the open Internet. As such, we disagree that consumer protection law is adequate to protect the open Internet.

489. We also find that there are significant advantages to adopting *ex ante* bright-line rules compared with relying on an *ex post* case-by-case approach, the latter of which is necessary for the DOJ and FTC. First, *ex ante* bright-line rules can reduce regulatory uncertainty and provide better guidance to

---

[1934] *2015 Open Internet Order*, 30 FCC Rcd at 5633, para. 84; *see also 2010 Open Internet Order*, 25 FCC Rcd at 17923-24, para. 32.

[1935] *Verizon*, 740 F.3d at 648.

[1936] *Mozilla*, 940 F.3d at 82.

[1937] 15 U.S.C. § 45(a)(2); *see also id.* § 44 (cross-referencing the Communications Act). Whether an act is unfair or deceptive under consumer protection law each depends on its own subjective test. *See* FTC, *A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority* (May 2021), https://www.ftc.gov/about-ftc/mission/enforcement-authority (explaining that an act or practice is "deceptive" if it "involve[es] a material representation, omission or practice that is likely to mislead a consumer acting reasonably in the circumstances," and that "[a]n act or practice is 'unfair' if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves, and not outweighed by countervailing benefits to consumers or to competition").

[1938] *See, e.g.*, Free State Foundation Comments at 39 ("[T]he FTC [h]as [a]uthority to [e]nforce ISP [p]ledges [n]ot to [b]lock, [t]hrottle, or [o]therwise [h]arm [c]onsumers."); CTIA Comments at 18 ("BIAS providers have made meaningful commitments to their customers, in keeping with the transparency rule, not to block or throttle or engage in paid prioritization, which the [FTC] can enforce under many circumstances").

[1939] Christopher Yoo et al. Comments at 2 (acknowledging that the FTC's consumer protection authority applies only "[t]o the extent that [BIAS providers] commit to providing fast, open, and fair service to their users").

BIAS providers, edge providers, and end users.[1940]  In contrast, *ex post* case-by-case enforcement like that under the FTC and DOJ involves greater expense, longer delays in prosecuting enforcement actions, and greater uncertainty as to which types of conduct are allowed or proscribed.

490.    We further find that the oversight and enforcement elements of the *RIF Order*'s framework likely do not provide consumers a meaningful opportunity to obtain relief.[1941]  The primary means by which the *RIF Order* suggests consumers might seek redress for harmful BIAS provider conduct is to submit complaints to the FTC, with the hope that the complaint might spark an agency investigation.[1942]  The *Mozilla* court criticized the *RIF Order*'s reliance on antitrust and consumer protection law.[1943]  Moreover, the Supreme Court's decision in *AMG Capital Management v. Federal Trade Commission* restricted the FTC's ability to seek monetary relief on behalf of consumers.[1944] Finally, while the Commission also suggested that consumers could seek non-legal forms of relief by switching to an alternative BIAS provider and bringing public attention to the BIAS provider conduct at issue to influence that provider into changing its behavior, we find that there may be high costs associated with trying to switch providers.[1945]  While some of these options may provide relief for some subset of consumers,[1946] overall, they are far from widely available.  As discussed above, the D.C. Circuit expressed concern that the *RIF Order* "failed to provide any meaningful analysis of whether [antitrust and

---

[1940] In the antitrust context, the U.S. Supreme Court has created certain *per se* rules that prohibit particular types of conduct.  *See Northern Pac. Ry Co. v. United States*, 356 U.S. 1, 5 (1958) (stating that "[t]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.  This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken").  It has described this *per se* approach as "reflect[ing] broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful."  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92-93 (2002).  Where, as here, however, no commenter claims that the blocking or throttling of a specific edge-provider's lawful content will increase consumer or social welfare, we find it reasonable and efficient to adopt a bright-line prohibition.

[1941] *2023 Open Internet NPRM* at 69, para. 141.

[1942] *See id*.; EFF Comments at 17-18 ("Reforms are certainly needed here in order to adequately protect consumers. We believe that the Supreme Court's regrettable 2021 ruling restricting the FTC's ability to seek monetary relief on behalf of consumers reduces the deterrent effect of FTC enforcement actions.").

[1943] *See Mozilla*, 940 F.3d at 59.

[1944] *AMG Cap. Mgmt. v. FTC*, 141 S. Ct. 1341, 1347 (2021) (holding that section 13(b) does not authorize the FTC to obtain court-ordered monetary relief).

[1945] *2023 Open Internet NPRM* at 69, para. 142.

[1946] As part of arguments opposing the re-adoption of Internet conduct rules, some commenters highlight the example of a small ISP in the Pacific Northwest as positive proof that consumer backlash can prevent violations of open Internet principles.  *See, e.g.*, TechFreedom Comments at 27-28.  In this circumstance, a small BIAS provider announced that it would block access to social media sites that had permanently banned the former president.  After public criticism, the BIAS provider backtracked.  We do not doubt that transparency plays an important role in policing BIAS provider behavior, as this example demonstrates.  However, we observe that this particular situation involves an important public figure and some of the largest social media companies in the country.  It is not clear that a situation that did not involve some of the largest figures in the country would gain the same type of traction with the public, and a smaller edge provider would not be in the same position as those in this example to draw attention to the behavior.  This lack of predictability makes reliance on transparency an uncertain course for consumers to obtain relief.

consumer protection] laws would, in practice, prevent blocking and throttling."[1947]  Furthermore, the harms contemplated in Section V.A.3 may not always be observable to the average consumer.[1948]

491.    Finally, we agree with Public Knowledge that "Congress correctly identified that telecommunications services require sector-specific rules from an expert regulator:  the FCC."[1949]  To the extent that the conduct complained of does not involve a violation of a bright-line rule, as with enforcement under the Sherman Act and to the extent that section 5 of the FTC Act might apply, it seems inefficient to place enforcement responsibility with generalist agencies rather than with the FCC, which possesses the technical and market knowledge and expertise concerning communications and broadband technologies.  Indeed, the common carrier exception in section 5 of the FTC Act appears to presume that telecommunications carriers should instead be principally governed by sector-specific FCC rules.  Moreover, because the FCC is constantly monitoring the telecommunications markets that it is charged with regulating, it is more likely to detect and deter conduct that harms the open Internet.  Finally, the FCC is better placed to enforce open Internet rules and such violations where remedying harmful conduct is likely to require ongoing monitoring and supervision by the expert agency's enforcement oversight.[1950]  Thus, we reaffirm our belief that the Commission, as the expert agency on communications, is best positioned to safeguard Internet openness.[1951]  In the *RIF Order*, the Commission removed its own authority to enforce open Internet requirements, leaving the responsibility of addressing harmful BIAS provider conduct to the FTC.[1952]  The current Chair of the FTC has recognized the need for the Commission's critical oversight.[1953]  In remarks released in 2021, Chair Lina M. Khan noted that "the Federal Communications Commission has the clearest legal authority and expertise to fully oversee internet service providers."[1954]  In response to the *2023 Open Internet NPRM*, several commenters agreed, arguing that the Commission's general expertise is needed.[1955]

---

[1947] *Mozilla*, 940 F.3d at 59.

[1948] *See* EFF Comments at 17-18 (agreeing with the Commission that "the RIF Order's assumption that ISP-perpetrated consumer harms would be obvious and widespread is belied by the recent FTC staff report; indeed, these harmful practices can be opaque even to regulators let alone to consumers").

[1949] Public Knowledge Comments at 59.

[1950] *Cf. Trinko*, 124 S. Ct. at 883 ("Effective remediation of violations of regulatory sharing requirements require continuing supervision of a highly detailed decree. . . . An antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.").

[1951] *2023 Open Internet NPRM* at 66, para. 134.

[1952] *Id.*; *RIF Order*, 33 FCC Rcd at 393-403, paras. 140-54.

[1953] *2023 Open Internet NPRM* at 66, para. 134.

[1954] Remarks of FTC Chair Lina M. Khan Regarding the 6(b) Study on the Privacy Practices of Six Major Internet Service Providers, Commission File No. P195402, 2 (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/public_statements/1597790/20211021_isp_privacy_6b_statement_of_chair_khan_final.pdf.  She continued that she "support[s] efforts to reassert [the FCC's] authority and once again put in place the nondiscrimination rules, privacy protections, and other basic requirements needed to create a healthier market."  *Id.*

[1955] *See, e.g.*, AARP Comments at 10-11 (quoting same remarks by Chair Khan); EPIC et al. Comments at 7 (same); David Choffnes Comments at 3-4 ("I believe that the FTC, which regulates *nearly all of commerce*, is right to expect the FCC to regulate telecommunication.  The Commission alone has the technical expertise and authority to do so, and expecting the FTC to regulate ISPs is misguided."); INCOMPAS Comments at 50 ("A federal agency with network expertise—the FCC—to ensure an open internet policy in the U.S. is readily available will best serve broadband customers and their access to competitive online content, applications, and services."); Andrew Gallo Comments at 1 (writing that twenty years after the Commission approved the *Internet Policy Statement*, "the United States still needs a strong, federal, expert   driven agency to establish a consistent and fair national Internet policy").

B.      **Rules to Safeguard and Secure the Open Internet**

1.      **Bright-Line Rules**

492.    The record in this proceeding is rife with support for the reinstatement of strong, enforceable open Internet rules to prohibit BIAS providers from blocking, throttling, or engaging in paid or affiliated prioritization arrangements.[1956]  Without rules in place to safeguard and secure the open Internet, the incentives BIAS providers have to act in ways that are harmful to investment and innovation threaten both broadband networks and edge content, as the D.C. Circuit has recognized.[1957]  We find that a safe, secure, and open Internet is too important to consumers and innovators to leave unprotected.  As in 2015, we believe that conduct-based rules targeting specific practices are necessary, and accordingly adopt bright-line rules to prohibit blocking, throttling, and paid prioritization by providers of both fixed and mobile BIAS.[1958]  For the reasons described below, we find each of these practices inherently unjust and unreasonable, in violation of section 201(b) of the Act, and that these practices threaten the virtuous cycle of innovation and investment.[1959]

493.    We disagree with commenters that assert that reinstatement of conduct rules is unnecessary because BIAS providers have not engaged in widespread blocking or throttling of traffic since the elimination of the conduct rules in 2018.[1960]  As an initial matter, there exists evidence[1961]—as

---

[1956] *See, e.g.*, AARP Comments at 4-5 (highlighting that the conduct rules "acted as a deterrent from providers interfering with consumers' access to the internet"); Ad Hoc Telecom Users Committee Comments at 24-29; ACLU Comments at 4-6; ALA Comments at 10-13 (endorsing the reestablishment of the 2015 conduct rules, explaining that without such protections "BIAS providers can decide which viewpoints and sources of information may receive preferential treatment . . . [which] is not aligned with American values nor with the professional values and public mission of America's librarians"); Andrew Gallo Comments at 2; Becca Stocknoff Comments at 2-3; CWA Comments at 11 (stating that the proposed conduct rules are "reasonable codifications of existing practice"); Cloudflare Comments at 7-8; CCIA Comments at 10-12; CPUC Comments at 37; David Choffnes Comments at 4; DIASA Comments at 1 (stating that "[r]estoring net neutrality rules is essential to ensure that all communities, particularly those historically underserved or marginalized, have equitable access to these vital resources"); EFF Comments at 1, 15-16 (asserting that the bright-line rules "are clear and create a predictable regulatory environment for BIAS providers and Internet users"); Engine Comments at 6 (expressing that "startups benefit from bright line rules that prevent ISPs from making it harder for end users to reach the edge providers of their choice"); Home Telephone Comments at 15-16 (advocating for conduct rules to be reinstated to protect small providers to ensure that upstream transport is not interrupted by other broadband providers); Hispanic Technology & Telecommunications Partnership et al. Comments at 1; Media Inequality & Change Center Comments at 1; MediaJustice Comments at 3-7 (advocating for the reinstatement of rules to ensure the Internet remains open for communities of color); NanaAfua Asamoah Comments at 2 ("Without net neutrality, these companies could potentially engage in discriminatory practices, further exacerbating the digital divide by throttling or blocking access to services crucial for rural residents . . . ."); Nokia Comments at 2 (stating that "neutral management of networks free of interference with the content, application, and service choices of consumers has receded as a contested point by most parties"); Public Knowledge Comments at 15-17 (explaining how "[b]locking, degradation of service, zero rating, and other harms have cropped up, both overseas and in the United States even despite state-level consumer protection measures"); Santa Clara Comments Exh. 1, Incorporated *RIF Ex Parte* at 1, 20-25 (advocating for the imposition of conduct rules to support local governments in fulfilling their primary responsibilities, such as protecting public safety and enhancing their residents' health and wellbeing); WGA Comments at 2-4; WTA Comments at 4 (expressing general support for no blocking, throttling, and paid prioritization rules, while asserting that small providers do not have economic incentives to harm the open nature of the Internet).

[1957] *Verizon*, 740 F.3d at 644-45 (finding that the Commission "adequately supported and explained" that absent open Internet rules, "broadband providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment").

[1958] *2015 Open Internet Order*, 30 FCC Rcd at 5647, para. 110.

[1959] *Id.*

[1960] *See, e.g.*, 5G Americas Comments at 8 (asserting that there have not been any recent instances of unlawful conduct because "internet business models require delivering the lawful content consumers want, at the speeds they

well as numerous consumer allegations[1962]—that BIAS providers have not refrained from this conduct. To the extent that some BIAS providers have acted consistently with open Internet principles, we agree with Netflix and Mozilla that the combination "of individual state laws and a pending regulatory proceeding disincentivized ISPs from undermining the open Internet."[1963]  In any event, we find that it is

expect"); ACI Comments at 18-19 (arguing that the Internet is already fast, open, and fair); CEI Comments at 14 (arguing that bright-line rules barring blocking, throttling, and paid prioritization are unneeded because BIAS providers already indicate they do not engage in these practices); CTIA Comments at 10-12, 18-21 (arguing that the *2023 Open Internet NPRM* fails to provide evidence that would warrant reinstating the *2015 Open Internet Order*'s conduct rules); Ericsson Comments at 14 (same); International Center for Law & Economics Comments at 32-33 (same); NCTA Comments at 51-55; Mark Israel et al. Declaration at 27-28, 43 (advocating that the lack of evidence of misconduct is because "it is in ISPs' interests in the highly competitive broadband marketplace to offer customers service that does not block, throttle, or engage in paid prioritization"); NTCA Comments at 7 (advocating that small rural BIAS providers are less likely to limit their subscribers' ability to access content because they lack the "market power or bargaining strength to demand concessions of larger platforms or even to negotiate on 'even terms'"); Scalia Law Administrative Law Clinic Comments at 7 (contending that the fear of blocking or throttling is unfounded and that "consumer pressure encourages providers to keep all content easily accessible"); WISPA Comments at 6-8, 17-18, 37-38 (asserting that small providers competing for subscribers would be unlikely to "spend money and time to implement technical barriers to block access to content when it has no affiliated content production that would benefit from this strategy, and when doing so would render its service less attractive to consumers and likely reduce the amount consumers would pay for it"); USTelecom Reply at 20 (emphasizing that it is not in a BIAS provider's best interest to engage in misconduct in the current competitive market where consumers can switch providers if they are not satisfied with their service).

[1961] *See, e.g.*, David Choffnes Comments at 2 ("[N]early every cellular provider that offers mobile BIAS in the US throttles at least one video streaming service."); EFF Comments at 7-8 (offering several examples of BIAS providers engaging in non-neutral, discriminatory practices); Measurement Lab Comments at 2; Public Knowledge Comments at 16-17 (providing examples of BIAS providers blocking and degrading service, e.g., "the ISP YourT1WiFi.com announced in email to its customers on January 15, 2021 that it would block access to Facebook and Twitter in response to those services deplatforming then-President Trump.  Although based in Idaho, YourT1WiFi.com . . . also offered service around Spokane, Washington.  When asked about compliance with Washington State's net neutrality law that prohibited such blocking, YourT1WiFi clarified that it would only block subscribers who affirmatively asked to block Facebook and Twitter").  Contrary to industry assertions claiming that rules are unnecessary because YourT1Wifi.com reversed its policy, we do not believe that consumers should have to rely on public outcry alone to be able to reach all content of their choosing.  *Cf.* NCTA et al. Apr. 18, 2024 *Ex Parte* at 1-2.

[1962] The Commission has received nearly 40,000 consumer complaints since adoption of the *RIF Order* raising speed, throttling, open Internet, and data cap concerns.  Some consumers assert, for example, that certain video traffic was throttled by their BIAS provider, as demonstrated by the fact that VPN-masked video traffic had no similar issues.  *See, e.g.*, FCC Consumer Inquiries and Complaints Center, Complaint #5363215 ("Nextlink is throttling my connection speed to Twitch, Steam, and Netflix.  Paying for 1gig, getting close to 5mb download speed on those platforms.  When connecting to VPN, issue disappears and I get advertised speeds."); FCC Consumer Inquiries and Complaints Center, Complaint #3904346 ("Frontier is throttling my internet in the evening. I know this because using a VPN gets me around this issue.  They claim on their website that they do not throttle speeds or applications at any time."); FCC Consumer Inquiries and Complaints Center, Complaint #2775894 (asserting that the customer was unable to load Netflix content after waiting one hour using multiple devices, while other content was accessible, and that when using a VPN, the customer was able to view Netflix:  "It was obvious that Cable One was only throttling Netflix content if they could see it was Netflix content").  We make no determinations regarding the allegations in these complaints in this Order.

[1963] *See* Netflix Reply at 9-10 (asserting that the combination of these factors "would have been against ISPs' interests to exercise market power and engage in easy-to-detect, non-neutral behavior"); *id.* at 9-10 ("There has also been widespread understanding since 2020, with the change in FCC leadership, that the Commission would soon initiate a proceeding to reconsider its rules."); Mozilla Reply at 4 (contending that state net neutrality laws, as well as the value people place in having an open Internet, "has provided significant temporary disincentive for ISPs to block, throttle, and degrade"); Free Press Comments at 70-74 (highlighting that the absence of known violations

(continued….)

not acceptable for consumers to be beholden to the voluntary whims of their BIAS provider or be selectively protected depending on the state in which they live or the size of their provider,[1964] nor is it sufficient to promote innovation among edge providers.[1965]  In adopting strong, enforceable open Internet rules, we will ensure a safe and open Internet for all consumers nationwide and promote innovation that fuels the virtuous cycle.[1966]

### a. Preventing Blocking of Lawful Content, Applications, Services, and Non-Harmful Devices

494.    We reinstate a bright-line rule prohibiting BIAS providers from blocking lawful content, applications, services, or non-harmful devices.  This "no-blocking" principle has long been a cornerstone of the Commission's policies.[1967]  While first applied in the Internet context as part of the Commission's

---

after the *RIF Order* is not evidence of the lack of need for rules—particularly while the state laws protecting Net Neutrality and public pressure are holding the line").

[1964] *See, e.g.*, ACA Connects Comments at 45 (urging the Commission to delay application of the rules to smaller BIAS providers for at least one year after the rules become effective and until all court review is completed); Letter from Brian Hurley, ACA Connects, to Marlene H. Dortch, FCC, WC Docket Nos. 23-320 et al., at 4 (filed Apr.16, 2024) (ACA Connects Apr. 16, 2024 *Ex Parte*) (urging the Commission not to enforce sections 201 and 202 of the Act or the general conduct rule for at least six months after the Order's effective date); Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1-2 (filed Apr. 17, 2024) (WISPA Apr. 17, 2024 *Ex Parte*) (urging the Commission to temporarily exempt small BIAS providers with 250,000 or fewer subscribers from the proposed rules, while further examining its application to small BIAS providers in a Further Notice); LARIAT Apr. 19, 2024 *Ex Parte* (urging the Commission to exempt small providers from the general conduct rule).  As we explain throughout this section, there is nothing in the record that convinces us that customers of small BIAS providers are entitled to less protection than customers of large BIAS providers. Nor do we find that imposition of these open Internet rules on small BIAS providers will be so burdensome as to justify a six-month or one-year delay in implementation for these providers (except where we provide a temporary exemption for certain of the transparency rule requirements, as discussed below), particularly given that ACA Connects itself indicates that small BIAS providers are already complying with the open Internet principles. *See* Letter from Brian Hurley, ACA Connects, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 2 (filed Feb. 22, 2024) (asserting that "the record does not indicate that our Members are violating open Internet principles"); ACA Connects Apr. 16, 2024 *Ex Parte* at 2-3 (explaining that ACA Connects members lack incentives to undermine the open Internet and, "in fact, possess strong incentives to uphold it").  We are similarly not convinced of the need for a Further Notice, as requested by WISPA, examining, among other things, whether the "Regulatory Flexibility Act requires the Commission to exempt small BIAS providers from the rules" and the "costs to comply with all of the regulatory obligations the Commission has imposed on BIAS providers over the past two years," and "propos[ing] to permanently exempt small providers from the bright line rules, the general conduct rule, and the new transparency requirements." *See, e.g.*, WISPA Apr. 16, 2024 *Ex Parte* at 1-2.  The Commission sought comment on the effect of the proposed rules and policies on small entities in the *2023 Open Internet NPRM* and the accompanying Initial Regulatory Flexibility Analysis. *See, e.g.*, *2023 Open Internet NPRM* at 73, 75, 76, 82, 86, 87, Appx. B, paras. 153, 157, 161, 173, 183, 189.  The Commission has carefully considered these impacts in adopting the requirements in this Order, and as such, a Further Notice examining these issues is not necessary.

[1965] *See, e.g.*, Letter from Ryan Singel, Founder, Outpost Publishers Cooperative, and Holmes Wilson, Founder, Quiet, to Hon. Jessica Rosenworcel, Chairwoman, FCC, et al., WC Docket No. 23-320, at 1-2 (filed Apr. 18, 2024) (Outpost/Quiet Apr. 18, 2024 *Ex Parte*) (explaining that bright-line rules "provide certainty to companies like ours" and "allow us to be sure that we can build new applications without getting permission from or paying royalties to network operators").

[1966] *Id.* at 6 (asserting that the proposed rules "are crucial for the success of startups, entrepreneurs, the next generation of decentralized and federated applications, news sites, and millions of other speakers and businesses").

[1967] *Internet Policy Statement*, 20 FCC Rcd at 14987-88, para. 4; *see also, e.g.*, *USF/ICC Transformation Order*, 26 FCC Rcd at 17903, para. 734 (reiterating that call blocking is impermissible in intercarrier compensation disputes); *Establishing Just and Reasonable Rates for Local Exchange Carriers; Call Blocking by Carriers*, WC Docket No. 07-135, Declaratory Ruling and Order, 22 FCC Rcd 11629, 11629, 31, paras. 1, 6 (WCB 2007) (*2007 ICC Declaratory Ruling*) (reiterating that call blocking is impermissible as a self-help measure to address intercarrier

(continued….)

*Internet Policy Statement*, the no-blocking concept dates back to the Commission's protection of end users' rights to attach lawful, non-harmful devices to communications networks.[1968]  We continue to find, as the Commission has previously, that "the freedom to send and receive lawful content and to use and provide applications and services without fear of blocking continues to be essential to the Internet's openness."[1969]  Because of BIAS providers' potential incentives to block edge providers' content in certain circumstances, the need to protect a consumer's right to access lawful content, applications, services, and to use non-harmful devices is as important today as it was when the Commission adopted the first no-blocking rule in 2010.[1970]  Consistent with our proposal,[1971] we reinstate the no-blocking rule, which is widely supported in the record:[1972]

> *A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.*

495.     Consistent with the 2015 no-blocking rule, the phrase "content, applications, and services" refers to all traffic transmitted to or from end users of a broadband Internet access service, including traffic that may not fit clearly into any of these categories.[1973]  The no-blocking rule applies to transmissions of lawful content only and does not prevent or restrict a BIAS provider from refusing to transmit unlawful material, such as child pornography or copyright-infringing materials.[1974]  The no-blocking rule also entitles end users to connect, access, and use any lawful device of their choice, provided that the device does not harm the network.  The no-blocking rule prohibits network practices that block a specific application or service, or any particular class of applications or services, unless it is found to be reasonable network management.  Finally, as with the 2010 and 2015 no-blocking rules, today's no-blocking rule prohibits BIAS providers from charging edge providers a fee to avoid having edge providers' content, services, or applications blocked from reaching BIAS providers' end-user customers.[1975]

496.     We agree with the Free State Foundation that, "[b]y offering subscribers access to

---

compensation dispute); *Blocking Interstate Traffic in Iowa*, Memorandum Opinion and Order, 2 FCC Rcd 2692 (1987) (denying application for review of Bureau order, which required petitioners to interconnect their facilities with those of an interexchange carrier in order to permit the completion of interstate calls over certain facilities).

[1968] *See, e.g.*, *Use of the Carterfone Device in Message Toll Telephone Service et al.*, Docket Nos. 16942 et al., Decision, 13 F.C.C.2d 420, 424 (1968) (*Carterfone*); *Computer II Final Decision*, 77 F.C.C.2d at 388.

[1969] *2015 Open Internet Order*, 30 FCC Rcd at 5647-48, para. 111 (quoting *2010 Open Internet Order*, 25 FCC Rcd at 17941-42, para. 62).

[1970] *Id.* at 5647-48, para. 111; *see also supra* Section V.A.3.

[1971] *2023 Open Internet NPRM* at 72, para. 152.

[1972] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 24-29; ALA Comments at 14; Cloudflare Comments at 7-8; CCIA Comments at 10-12; EDUCAUSE et al. Comments at 4 (stating that clear rules against blocking are needed because "the elimination of clear rules barring such behavior left the door open to public broadband Internet access providers blocking or throttling traffic to research and speech that they may disagree with or find controversial"); Harold Hallikainen Comments at 1 (encouraging the reinstatement of no-blocking rules to prevent BIAS providers from blocking competing VoIP communications); Home Telephone Comments at 15-16 (encouraging the Commission to adopt no blocking rules with exemptions and modifications for smaller providers); ITI Comments at 4-5; NPR Comments at 10; MediaJustice Comments at 3-5 (emphasizing the importance of no-blocking rules to protect the voices and viewpoints of communities of color); Public Knowledge Comments at 16-17 (providing examples for why rules against blocking are necessary); Raeghan Brousseau Comments 3-4 (highlighting the need for unrestricted access to online educational resources).

[1973] *2015 Open Internet Order*, 30 FCC Rcd at 5648-49, para. 113.

[1974] *Id.* at 5649, para. 113.

[1975] *Id.*

whatever lawful Internet content they want, broadband ISPs enhance the perceived value of their services and thereby increase demand, subscribership, and opportunities for financial returns and profits."[1976] Further, we expect that provider costs for compliance with the no-blocking rule will be minimal, given that many BIAS providers have continued to comply with the no-blocking rule even after its repeal in 2018,[1977] and that providers themselves assert that they have every incentive not to block traffic.[1978]

> **b.** **Preventing Throttling of Lawful Content, Applications, Services, and Non-Harmful Devices**

497. Consistent with our proposal, we reinstate a separate bright-line rule prohibiting BIAS providers from impairing or degrading lawful Internet traffic on the basis of content, application, service, or use of non-harmful device—conduct that was prohibited under the commentary to the no-blocking rule adopted in the *2010 Open Internet Order*,[1979] and that the Commission explicitly prohibited in 2015.[1980] We use the term "throttling" to refer to conduct that is not outright blocking, but that inhibits the delivery of particular content, applications, or services, or particular classes of content, applications, or services.[1981]

498. We adopt the following no-throttling rule applicable to BIAS providers, which tracks the language of the Commission's *2015 Open Internet Order*:

> *A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management.*

499. With the no-throttling rule, we ban conduct that is not outright blocking, but inhibits the delivery of particular content, applications, or services, or particular classes of content, applications, or services.[1982] Likewise, we prohibit conduct that impairs or degrades lawful traffic to a non-harmful device or class of devices. We interpret this prohibition to include, for example, any conduct by a BIAS provider that impairs, degrades, slows down, or renders effectively unusable particular content, services,

---

[1976] Free State Foundation Comments at 37.

[1977] *See, e.g.*, *Xfinity Internet Broadband Disclosures*, Xfinity, https://www.xfinity.com/policies/internet-broadband-disclosures [https://perma.cc/Y7L5-KMXD]; *Network Practices*, AT&T, https://about.att.com/sites/broadband/network [https://perma.cc/S9HK-A6WA]; *Network Management*, Verizon, https://www.verizon.com/about/our-company/network-management [https://perma.cc/RQN2-9ULT].

[1978] *See, e.g.*, Verizon Comments at 2 (explaining that BIAS providers already commit to not blocking, throttling, or unfairly prioritizing traffic because of customer expectation); Scalia Law Administrative Law Clinic Comments at 7 (contending that the fear of blocking or throttling is unfounded and that "consumer pressure encourages providers to keep all content easily accessible"); WISPA Comments at 6-8, 17-18, 37-38 (asserting that small BIAS providers would not block access because it "would render its service less attractive to consumers and likely reduce the amount consumers would pay for it").

[1979] *2010 Open Internet Order*, 25 FCC Rcd at 17943, para. 66 ("We make clear that the no-blocking rule bars broadband providers from impairing or degrading particular content, applications, services, or non-harmful devices.").

[1980] *2015 Open Internet Order*, 30 FCC Rcd at 5651, para. 119.

[1981] *Id.* at 5651-52, para. 120; *see also* Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Feb. 7, 2024) (Barbara van Schewick Feb. 7, 2023 *Ex Parte*) (explaining that "net neutrality rightly prohibits ISPs from degrading or favoring certain apps or classes of apps"); Waxman Oct. 3 2014 *Ex Parte* at 10 n.32 ("The term 'throttling' is not limited to the technique of slowing down or delaying Internet packets, but more broadly refers to methods that can be used to differentiate, or 'shape' Internet traffic.").

[1982] *See 2015 Open Internet Order*, 30 FCC Rcd at 5651-52, para. 120; *supra* Section V.B.1.a.

applications, or devices, that is not reasonable network management.[1983] Our interpretation of "throttling" encompasses a wide variety of conduct that could impair or degrade an end user's ability to access content of their choosing. We clarify that a BIAS provider's decision to speed up "on the basis of Internet content, applications, or services" would "impair or degrade" other content, applications, or services which are not given the same treatment.[1984] For purposes of this rule, "content, applications, and services" has the same meaning given to this phrase in the no-blocking rule. Like the no-blocking rule, BIAS providers may not impose a fee on edge providers to avoid having the edge providers' content, service, or application throttled.[1985] Further, transfers of unlawful content or unlawful transfers of content are not protected by the no-throttling rule. As in past *Orders*, we continue to recognize that in order to optimize end-user experience, BIAS providers must be permitted to engage in reasonable network management practices.[1986]

500.    Because our no-throttling rule addresses instances in which a BIAS provider targets

---

[1983] *See 2015 Open Internet Order*, 30 FCC Rcd at 5651-52, para. 120.

[1984] *See* Peha/Jordan Apr. 19, 2024 *Ex Parte* at 4 (explaining that a BIAS provider's decision to "speed up" specific content, applications, or services (or classes thereof), "which would be unreasonably discriminatory if it does not qualify as reasonable network management, would impair or degrade other content, applications, or services not given the same treatment"); Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 23, 2024) (advocating that "a BIAS provider's decision to speed up specific content, applications, or services would 'impair or degrade' other content, applications, or services not given the same treatment" and therefore "would be subject to the bright-line ban on throttling"); Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 23, 2024); Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 1 (filed Mar. 29, 2024) (Free Press Mar. 29, 2024 *Ex Parte*); Letter from Matthew F. Wood, Vice President of Policy, Free Press, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 18, 2024) (Free Press Apr. 18, 2024 *Ex Parte*); ACLU Apr. 19, 2024 *Ex Parte* at 2 ("Speeding up web traffic and slowing down web traffic have the same effect - when one website is faster, others are necessarily slower. The resulting 'fast lanes' will distort consumer behavior because consumers are inevitably drawn towards faster websites, and away from slower ones."); Outpost/Quiet Apr. 19, 2024 *Ex Parte* at 2 (asserting that "[b]eing put in a slow lane by an ISP has the exact same effect as being left out of a fast lane by an ISP," and that "[s]tartups needs to be protected from both"); Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at Attach., Barbara van Schewick, *Clarifying the No-Throttling Rule*, at 1 (filed Apr. 2, 2024) (asking that the Commission "clarify that its proposed no-throttling rule prohibits ISPs from speeding up *and* slowing down applications and classes of applications"); Barbara van Schewick, *Closing Loopholes* at 2 (urging the Commission to "clarify that its no-throttling rule prohibits positive *and* negative discrimination among apps and classes of apps, subject to reasonable network management"); Public Interest Groups Mar. 27, 2024 *Ex Parte* at 1-2; New America's Open Technology Institute Apr. 18, 2024 *Ex Parte* at 5 (asserting that when a BIAS provider "gives preferential treatment to a specific application (e.g., Zoom), or some but not all applications in a category (e.g. Netflix, Disney+, Max), it indirectly impairs the traffic of competing applications (Teams), or applications excluded from the category . . . that from the end users perspective would suffer by comparison"); New America's Open Technology Institute Apr. 19, 2024 *Ex Parte* at 4-5. *But see* CTIA Apr. 18 2024 *Ex Parte* at 2-3 (asserting that that the *2015 Open Internet Order* proscribed positive discrimination only where third-party payment or affiliated content was involved).

[1985] *See supra* Section V.B.1.a.

[1986] *2015 Open Internet Order*, 30 FCC Rcd at 5652, para. 124; International Center for Law & Economics Comments at 29 (arguing that some level of throttling is necessary to manage network congestion and improve the consumer experience—"allowing application-specific throttling gives companies incentives to streamline data demands. . . . If networks cannot limit bandwidth-hungry apps during busy periods, then smartphone app developers lose incentives to tighten data usage"). We note, however, that the record reflects that "[t]here are many factors that limit video impact, including the fact that video providers use adaptive bitrates to select video resolution (bitrates) according to available bandwidth, they use congestion-control algorithms while transmitting, and network providers expanded network capacity during the COVID lockdown era." David Choffnes Comments at 5; *see also* Netflix Reply at 14-15 (explaining Netflix's investments in technological developments to make streaming more efficient).

particular content, applications, services, or non-harmful devices, it does not address the practice of slowing down or speeding up an end user's connection to the Internet based on a choice clearly made by the end user.[1987]  For example, a BIAS provider may offer a data plan in which a subscriber receives a set amount of data at one speed tier and any remaining data at a lower tier.[1988]  If there were Internet openness concerns with the particulars of a data plan, the Commission could undertake a review under the general conduct standard, discussed below.  In contrast, if a BIAS provider degraded the delivery of a particular application or class of application, it would violate the bright-line no-throttling rule.[1989]  Further, consistent with the *2015 Open Internet Order*, the no-throttling rule also addresses conduct that impairs or degrades content, applications, or services that might compete with a BIAS provider's affiliated content.[1990]  For example, if a BIAS provider and an unaffiliated entity both offered over-the-top applications, the no-throttling rule would prohibit the BIAS provider from constraining bandwidth for the competing over-the-top offering to prevent it from reaching the BIAS provider's end user in the same manner as the affiliated application.[1991]

501.    We agree with the Information Technology Industry Council that the no-throttling rule "ensures the Internet remains a vibrant platform for any individual, startup, or company to provide new, innovative, and competitive offerings without needing to worry that access to their offerings may be blocked or degraded for anticompetitive purposes."[1992]  Because we find that BIAS providers have the incentive and ability to throttle or otherwise interfere with traffic of competing content providers,[1993] we conclude that a bright-line rule prohibiting throttling, subject to reasonable network management, is necessary.[1994]  Further, we believe that the bright-line rule we adopt today to protect consumers' right to

---

[1987] *2015 Open Internet Order*, 30 FCC Rcd at 5652, para. 122.

[1988] *Id*.  We note that user-selected data plans with reduced speeds must comply with our transparency rule, such that the limitations of the plan are clearly and accurately communicated to the subscriber.

[1989] *Id*.

[1990] *Id.* at 5662, para. 123.

[1991] *Id.*

[1992] ITI Comments at 4; *see also* David Choffnes Comments at 3 (explaining that throttling of some video providers "create[s] an unlevel playing field for video providers, where some can stream in high definition while others are forced to use low resolution," and that some throttling implementations "can force video providers to retransmit large volumes of data, incurring substantial additional operational expenses for edge providers," which can be a significant challenge for small players and new entrants, "limit[ing] their competitiveness with incumbents"); Outpost/Quiet Apr. 18, 2024 *Ex Parte* at 4 (observing that "[h]ow high a site appears in search rankings is affected by a site's speed and responsiveness," and the "faster your site loads and responds to user input, the higher it shows up in search rankings").

[1993] *See supra* Section V.A.3; *see also* David Choffnes Comments at 2; Measurement Lab Comments at 2 (explaining that "[s]ince 2019, the Wehe team has continued to collect open data, in partnership with M-Lab, to show that service providers have continued to" regularly throttle video content, and that some content providers, YouTube in particular, "are throttled more than others" and asserting that their work "demonstrates that there is a strong reason to believe that ISPs will engage in conduct that harms the open Internet"); Zeinab Shmeis et al., *Localizing Traffic Differentiation*, Proceedings of the ACM Internet Measurement Conference (IMC) (Oct. 24, 2023);  *but see* CTIA Apr. 16, 2024 *Ex Parte* at 7-8.

[1994] *See, e.g.*, California AG Bonta Comments at 3-4; Chloe Reisen Comments at 1-3 (supporting a no-throttling rule, and providing personal examples of the detriment to content being throttled working in the film and television industry); CWA Comments at 12 (highlighting that discriminatory throttling harms consumers disproportionately: "Studies have shown that, unless they are carefully targeted at localized congestion for temporary periods, throttling and data caps are primarily motivated by companies' desires to price segregate among consumers."); The Greenlining Institute Reply at 3, A10-A11 ("Without net neutrality, ISPs could make their 'priority' service more attractive by throttling traffic, or underinvesting in infrastructure to create artificial network scarcity."); Evan Simmons Comments at 1-2; Measurement Lab Comments at 2 (asserting that throttling of video traffic "is particularly harmful to students who use mobile service to access popular content providers, such as YouTube, as

(continued….)

access lawful Internet traffic of their choice without impairment or degradation will not impose significant compliance burdens or costs,[1995] particularly given that many BIAS providers continue to advertise on their website that they do not throttle traffic except in limited circumstances.[1996]  Finally, we disagree with commenters that argue that concerns about throttling lack persuasiveness, citing the datedness of examples provided in the record.[1997]  Professor David Choffnes explains that data show that "nearly every cellular provider that offers mobile BIAS in the US throttles at least one video streaming service," explaining that there is "direct empirical evidence that ISPs in the US . . . [use] special networking equipment called middleboxes that inspect the contents of our network traffic to make guesses as to what application is being used, and then potentially limit the bandwidth available to that application in response."[1998]  While we do not rely on these findings as justification for the no-throttling rule,[1999] they remain instructive regarding BIAS providers' technical ability to throttle traffic.

### c.     No Paid or Affiliated Prioritization

502.     We reinstate the prohibition on paid or affiliated prioritization practices, subject to a narrow waiver process.  In the *2023 Open Internet NPRM*, the Commission proposed to reestablish a ban on arrangements in which a BIAS provider accepts consideration (monetary or otherwise) from a third party to manage its network in a manner that benefits particular content, applications, services, or devices, or manages its network in a manner that favors the content, applications, services, or devices of an affiliated entity.[2000]  After consideration of the record, we conclude that paid prioritization network practices harm consumers, competition, and innovation, as well as create disincentives to promote broadband deployment and, as such, we reinstate a bright-line rule prohibiting such practices.

503.     We adopt the following paid prioritization rule applicable to BIAS providers, which tracks the language of the Commission's *2015 Open Internet Order*:

> *A person engaged in the provision of broadband Internet access service, insofar as such person is engaged, shall not engage in paid prioritization.*

---

their primary form of education or work"); Philo Comments at 4 (raising the importance of no-throttling rules for small tech service providers to avoid having their competitors slowing down their content); Santa Clara Comments at 23-24 (stating that the "preferences, politics, and whims of individual Americans who own ISPs can have profound and deleterious effects on the availability of broadband Internet for millions of people, even in the most urgent, life-and-death-situations").

[1995] *See* CTIA Comments at 12 (stating that the Commission fails to "meaningfully show how redress" in the limited examples of misconduct "outweighs the overall costs of imposing Title II and the proposed Internet conduct rules").

[1996] *See, e.g.*, Xfinity, *Xfinity Internet Broadband Disclosures*, https://www.xfinity.com/policies/internet-broadbanddisclosures [https://perma.cc/Y7L5-KMXD]; AT&T, *Network Practices*, https://about.att.com/sites/broadband/network [https://perma.cc/S9HK-A6WA]; Verizon, *Network Management*, https://www.verizon.com/about/our-company/network-management [https://perma.cc/RQN2-9ULT].

[1997] CTIA Comments at 10-12; Free State Foundation Comments at 30-36; International Center for Law & Economics Comments at 5 (arguing that evidence of "throttling of application-service providers is virtually nonexistent and that consumers are largely indifferent to throttling policies as currently practiced"); NCTA et al. Apr. 18, 2024 *Ex Parte* at 1-2.

[1998] David Choffnes Comments at 2.

[1999] *See* CTIA Apr. 16, 2024 *Ex Parte* at 7-8 (disputing the Commission's reliance on the study, asserting that the study does not control for the user's data plan, content providers' selective video resolution, or varying network conditions, and that WeHe do not "assign blame when differentiation is detected" but rather assumes that it is the customer's BIAS provider); NCTA et al. Apr. 18, 2024 *Ex Parte* at 2.

[2000] *2023 Open Internet NPRM* at 75, para. 158.  The Act defines "affiliate" as "a person that (directly or indirectly) owns or controls, is owned or controlled by, or is under common ownership or control with, another person.  For purposes of this paragraph, the term 'own' means to own an equity interest (or the equivalent thereof) of more than 10 percent."  47 U.S.C. § 153(2).

*"Paid prioritization" refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity.*

504.     We find that the same concerns present in 2015 remain true today, that preferential treatment arrangements have the potential to create a chilling effect, disrupting the Internet's virtuous cycle of innovation, consumer demand, and investment.[2001]  In the *2023 Open Internet NPRM*, we tentatively concluded that, absent open Internet rules, BIAS providers might engage in practices that "could unravel the virtuous cycle" and that there are "far more edge services that are small . . . which the *RIF Order* does not acknowledge or evaluate."[2002]  We sought comment on these tentative conclusions and on whether small edge providers had any leverage in negotiations with BIAS providers and on whether BIAS providers "seeking paid prioritization arrangements . . . would disproportionately harm small edge providers.[2003]  As discussed above, we find, in general, that BIAS providers have the incentive and ability engage in conduct that harms edge providers, particularly small edge providers.[2004]  Based on the record and related research on competition in vertically related markets, we find more specifically that forms of paid and affiliate prioritization can be used by BIAS providers in ways that may harm edge providers and edge innovation.  In particular, BIAS providers may use paid or affiliated prioritization to raise the costs of edge providers that compete with their vertically integrated edge affiliates or with edge providers with whom they have a contractual arrangement.  In addition, if BIAS providers can profitably charge edge providers for prioritized access, they may have an incentive to strategically degrade, or decline to maintain or increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access.[2005]  Thus, BIAS providers might withhold or decline to expand capacity in order to "squeeze" and degrade nonprioritized traffic, thus increasing network congestion.  These types of conduct create competitive disadvantages for unaffiliated edge providers.  Other things being equal, they increase the costs of innovation for edge providers and reduce the number of innovation experiments.[2006]  In turn, this will likely decrease the rate of edge and network innovation.

---

[2001] While small BIAS providers argue that they have neither the incentive nor market power to limit access to edge provider applications, services, and devices, and "reciprocally to control or limit edge provider access to their small customer bases," for the reasons we describe below we find it appropriate to establish a bright-line rule applicable to all BIAS providers in order to provide certainty to BIAS and edge providers alike.  *See* WTA Comments at 5-6 (noting that the *2023 Open Internet NPRM*'s assumptions regarding the economic incentives of BIAS providers to exploit their "gatekeeper role" to block or disadvantage edge providers and otherwise to harm "the open nature of the Internet" are not applicable to WTA members and other RLECs); WISPA Comments at 7-8, 39 (agreeing with the *RIF Order* that it is highly unlikely for small wireless BIAS providers to exercise substantial market power in negotiations with larger companies).

[2002] *2023 Open Internet NPRM* at 70, para. 143.

[2003] *Id.*

[2004] *See supra* Section V.A.3.

[2005] *See, e.g.*, Engine Comments at 4 (highlighting examples of BIAS providers engaging in paid prioritization to the detriment of edge providers and Internet users, including "Comcast interfering with peer-to-peer technologies . . . Verizon, AT&T, and T-Mobile blocking Google Wallet, while all three companies are part of a competing mobile payments joint venture . . . [and] Comcast's dispute with Level 3 and Netflix over termination fees and congested transit"); The Greenlining Institute Reply at A4, A-11 (stating that "one positive benefit of reclassification has been to prevent broadband providers from engaging in practices that increase costs for content creators (also called edge providers) and consumers").

[2006] *See, e.g.*, EFF Comments at 11 (asserting that an open Internet ensures that new innovative experiments "have a fair opportunity to thrive alongside centralized commercial ventures that have the resources to pay ISPs to slow down traffic to competitors"); Faith Leaders *Ex Parte* at 3 (describing how paid prioritization could disadvantage non-profit communities and their many uses of the Internet).

505.    The Commission has previously found it well established that BIAS providers have both the incentive and the ability to engage in paid prioritization.[2007]  In its *Verizon* opinion, the D.C. Circuit noted the powerful incentives BIAS providers have to accept fees from edge providers in return for excluding their competitors or for granting prioritized access to end users.[2008]  The record reflects commenter concerns regarding preferential treatment arrangements, with many advocating for a flat ban on paid prioritization.[2009]  Commenters argue, for example, that permitting paid prioritization will result in a two-tiered Internet, with a "fast" lane for those willing and able to pay, and a "slow" lane for everyone else.[2010]  Other commenters argue that paid prioritization will distort the market; harm competition,[2011] consumers,[2012] edge providers (particularly small edge providers),[2013] and free expression;[2014] and discourage innovation.  The American Library Association also expressed concern that permitting paid prioritization would also disadvantage "non-profit or public interest entities such as libraries and other

---

[2007] *2023 Open Internet NPRM* at 76, para. 160 (citing *2015 Open Internet Order*, 30 FCC Rcd at 5655-56, para. 127); *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 15-49, Memorandum Opinion and Order, 31 FCC Rcd 6327, 6375, para. 95 (2016) (*Charter/Time Warner Cable Merger Order*) ("BIAS providers with large numbers of subscribers have greater leverage to negotiate preferential terms and prices with edge providers seeking to reach those subscribers."); INCOMPAS Comments at 13.

[2008] *2015 Open Internet Order*, 30 FCC Rcd at 5655-56, para. 127 (citing *Verizon*, 740 F.3d at 645-46).

[2009] *See, e.g.*, CWA Comments at 9 (supporting the proposal to adopt the 2015 conduct rules to protect Internet openness); Ad Hoc Telecom Users Committee Comments at 24-29 (articulating the importance of no paid prioritization rules "as such behaviors permit ISPs to exploit their terminating access monopoly to the detriment of edge providers and, ultimately, end users"); Cloudflare Comments at 7-8 (expressing support for no-prioritization rules while acknowledging the need for flexibility in rules as technology evolves).

[2010] Philo Comments at 3 (agreeing that allowing paid prioritization would result in fast and slow lanes inside a BIAS provider's network and that paid prioritization practices would substantially increase bandwidth costs); WGA Comments at 4 ("Practices like blocking, throttling, and paid prioritization give ISPs the ability to charge content providers for faster access to consumers, or vice versa, threatening 'fast' and 'slow' lanes for content.").

[2011] MediaJustice Comments at 5-7 (arguing that "[f]ast lanes reward those that have the deep pockets to pay those fees, making it impossible for new entrants and those without vast amounts of capital to compete with those that can pay such fees"); WGA Comments at 5 (asserting that paid prioritization is, "by its nature, anti-competitive, disadvantaging new entrants and other independent edge providers").

[2012] MediaJustice Comments at 5-7 (advocating for a ban on paid prioritization or affiliated fees because of the potential harm to communities of color); CCIA Comments at 12-13 ("[T]he BIAS provider is positioned to decide, either for financial consideration garnered apart from subscriber fees or to favor its own applications and content, which bit stream 'wins.'  This conduct disadvantages subscribers who, as customers paying the required subscription fee, are situated exactly the same as other paying subscribers."); Accessibility Advocacy Organizations Reply at 3 (arguing that BIAS providers could zero-rate or de-prioritize Internet traffic away from commercial partners "who might display a heightened commitment to the rights and interests of persons with disabilities").

[2013] EFF Comments at 11 ("Etsy, Inc., for example has said that it would likely have failed if it had to pay for priority access to users.  Other small businesses, their users, and Internet creators have echoed those concerns."); Seth Bradley Comments at 1-3 (expressing concerns about how paid prioritization practices can have damaging effects on small businesses).  *But see* International Center for Law & Policy Reply at 23 (asserting that "non-neutrality offers the prospect that a startup might be able to buy priority access to overcome the inherent disadvantage of newness, and to better compete with an established company").

[2014] Equity Advocates Comments at 9 (agreeing that "paid prioritization harms content creation from non-commercial edge providers (e.g. religious groups, non-profits like MediaJustice, and platforms for people of color like Color of Change) because they would be least positioned to pay additional costs to reach their intended audience"); EDUCAUSE et al. Comments at 3 (stating that "the potential for public broadband access providers to engage in paid prioritization is particularly disconcerting for colleges, universities, and research libraries given their general inability to absorb the costs that prioritization schemes would present, the increased expenses they would likely encounter as a result of content providers having to pay for prioritization themselves, and the distortion in the Internet's development that paid prioritization would tend to produce").

public institutions that often operate under very tight budgets."[2015]

506.      Our concerns regarding paid prioritization are compounded by the fact that documenting the harms could prove challenging, as it is impossible to identify small businesses and new applications that are stifled before they become commercially viable.[2016]  We are also concerned that the widespread use of paid prioritization practices would cause damage to Internet openness that would be difficult to reverse.[2017]  As we noted in the *2023 Open Internet NPRM*, we find it encouraging that some BIAS providers continue to advertise that they do not engage in paid or affiliated prioritization practices.[2018]  As with our no-blocking and no-throttling bright-line rules, however, we continue to believe that the potential harm to the open Internet is too significant to rely on promises from BIAS providers because "the future openness of the Internet should not turn on the decision[s] of a particular company."[2019]

507.      The record reflects some positive use cases of paid prioritization, and conversely, some costs associated with a ban on such practices.  For example, ADTRAN asserts that "requiring free prioritization ignores the costs that are incurred in enabling that service and encourages over-consumption,"[2020] and also highlights uses of paid prioritization in other settings.[2021]  The International Center for Law and Economics emphasizes the importance of prioritization when congestion is detected on the network.[2022]  While we do not discount the potential benefits of paid prioritization, we remain convinced that the potential harms to consumers and the open Internet outweigh any speculative benefits.[2023]

508.      As in 2015, we find that there are advantages to adopting a bright-line rule prohibiting paid prioritization.  For one, we believe it will protect consumers against a harmful practice that may be difficult to understand, even if disclosed.  In addition, this approach relieves small edge providers, innovators, and consumers of the burden of detecting and challenging instances of harmful paid

---

[2015] ALA Comments at 12-14.

[2016] *2015 Open Internet Order*, 30 FCC Rcd at 5656, para. 127.

[2017] *2023 Open Internet NPRM* at 75, para. 159 (citing *2015 Open Internet Order*, 30 FCC Rcd at 5655-56, para. 127); *see also* Ad Hoc Telecom Users Committee Comments at 27 (stating "'pay-for-priority' and 'pay to avoid blocking or throttling' arrangements would distort the consumer's choices among content and edge providers. Consumers would see (at least) two classes of such providers, the fast and the slow, which would inevitably affect their choice of content to consume or otherwise distort competition in the edge providers' markets.  But the speed of delivery of a 'fast' edge provider's content would have nothing to do with the edge provider's choice to deliver its content in a more efficient way (by, for example, buying more capacity on its 'originating' end to deliver its content into the Internet backbone).  Speed differences would instead reflect only the content provider's decision (made under economic duress) to pay the end user's ISP not to bump its traffic to the back of the line").

[2018] *2023 Open Internet NPRM* at 76, para. 160; *see also* Xfinity, *Xfinity Internet Broadband Disclosures*, https://www.xfinity.com/policies/internet-broadbanddisclosures [https://perma.cc/Y7L5-KMXD]; AT&T, *Network Practices*, https://about.att.com/sites/broadband/network [https://perma.cc/S9HK-A6WA]; Verizon, *Network Management*, https://www.verizon.com/about/our-company/network-management [https://perma.cc/RQN2-9ULT].

[2019] *2015 Open Internet Order*, 30 FCC Rcd at 5656, para. 127.

[2020] ADTRAN Comments at 25 (acknowledging the benefits of paid prioritization, including BIAS providers' "willingness to invest to meet increasing demand will only occur if the service provider believes it will be able to collect sufficient revenues to cover the cost of the needed investment and earn a reasonable rate of return").

[2021] *See id.* at 25-26 (providing examples including "paying more to ride a faster train on Acela than on the regular Amtrak, paying more at the Post Office for priority mail, allowing single-passenger cars to pay to use HOT lanes on interstate highways, paying more for obtaining a passport on an expedited basis and paying to enroll in CLEAR in order to go through a shorter security line at the airport"); Scalia Law Administrative Law Clinic Comments at 7 (noting that in other sectors, paid prioritization has been used to increase competition).

[2022] International Center for Law & Economics Comments at 26-27.

[2023] *2015 Open Internet Order*, 30 FCC Rcd at 5653-55, para. 126.

prioritization.[2024] Prohibiting paid prioritization outright will also likely help foster broadband network investment by setting clear boundaries of acceptable and unacceptable behavior.[2025] Thus, we find it most appropriate to adopt a bright-line rule banning paid prioritization arrangements, while entertaining waiver requests under limited circumstances. Consistent with the *2015 Open Internet Order*[2026] and the record,[2027] we clarify that the ban on paid prioritization does not restrict the ability of a BIAS provider to enter into an agreement with a CDN to store content locally within the BIAS provider's network.

509. Under the Commission's longstanding waiver rule, the Commission may waive any rule in whole or in part, for good cause shown.[2028] A general waiver of the Commission's rules is only appropriate if special circumstances warrant a deviation from the general rule and such a deviation will serve the public interest.[2029] In 2015, the Commission found that it was appropriate to adopt specific rules concerning the factors that it will use to examine a waiver request of the paid prioritization ban,[2030] and we proposed to adopt a waiver rule for the paid prioritization ban consistent with the *2015 Open Internet Order*.[2031] We conclude that it remains appropriate to accompany a rule prohibiting paid prioritization arrangements with specific guidance on how the Commission would evaluate subsequent waiver requests.

510. Accordingly, we adopt a rule concerning waiver of the paid prioritization ban that establishes a balancing test, consistent with our proposal, as follows:

> *The Commission may waive the ban on paid prioritization only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the Internet.*

511. In accordance with the framework established in 2015, applicants seeking a waiver of the paid prioritization ban will be required to make two related showings. First, the applicant must demonstrate that the practice will have some significant public interest benefit.[2032] The applicant can make such a showing by providing evidence that the practice furthers competition, innovation, consumer demand, or investment.[2033] Second, the applicant must demonstrate that the practice does not harm the open nature of the Internet, including, but not limited to, providing evidence that the practice: (i) does not materially degrade or threaten to materially degrade the BIAS of the general public; (ii) does not hinder consumer choice; (iii) does not impair competition, innovation, consumer demands, or investment; and (iv) does not impede any forms of expression, types of service, or points of view.[2034] An applicant seeking waiver relief under this rule faces a high bar. We anticipate approving such exemptions only in exceptional cases.[2035]

---

[2024] *Id.* at 5657-58, para. 129.

[2025] *Id.*

[2026] *2015 Open Internet Order*, 30 FCC Rcd at 5657, para. 128.

[2027] *See, e.g.*, Letter from Paul Caritj, Counsel to Akamai Technologies, Inc., to Marlene Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 11, 2024); INCOMPAS Apr. 16, 2024 *Ex Parte* at 7; INCOMPAS Comments at 47; Akamai Comments at 11-12; Cloudflare Comments at 12; i2Coalition Comments at 10-11; Netflix Reply at 26-27; ESA Reply at 3

[2028] 47 CFR § 1.3.

[2029] *See WAIT Radio*, 418 F.2d at 1159; *Ne. Cellular Tel. Co.*, 897 F.2d at 1166.

[2030] *2015 Open Internet Order*, 30 FCC Rcd at 5658, para. 130.

[2031] *2023 Open Internet NPRM* at 77, para. 162.

[2032] *2015 Open Internet Order*, 30 FCC Rcd at 5658, para. 131.

[2033] *Id.*

[2034] *Id.*

[2035] *Id.* at 5658, para. 132.

512. We disagree with commenters that assert that delays associated with the waiver process will deter investment and innovation in prioritization services.[2036] As an initial matter, we find that prioritization services themselves generally deter investment and innovation. In any event, the Commission has shown itself capable of handling a variety of different types of waiver requests on a timely basis, so assertions about delay are speculative at this juncture. We also disagree with the parties that suggest the waiver process we re-adopt today provides insufficient guidance to potential waiver applicants.[2037] We are not merely relying on the Commission's general longstanding waiver standard and instead provide specific factors that the Commission will evaluate in considering such waiver requests, which, for instance, provide guidance on how a party might show a "public benefit" or show how the conduct "does not harm the open nature of the Internet."

## 2. General Conduct Rule

513. In addition to the three bright-line rules, we also reinstate a no-unreasonable interference/disadvantage standard, under which the Commission can prohibit practices that unreasonably interfere with the ability of consumers or edge providers to select, access, and use BIAS to reach one another, thus causing harm to the open Internet. This no-unreasonable interference/disadvantage general conduct standard will operate on a case-by-case basis, applying a non-exhaustive list of factors, and is designed to evaluate other current or future BIAS provider policies or practices—not covered by the bright-line rules—and prohibit those that harm the open Internet.[2038] Our prohibitions on blocking, throttling, and paid prioritization are critical to protecting and promoting the open Internet, and we expect that these bans will prevent many of the harms identified above.[2039] We conclude, however, as the Commission found in 2015,[2040] that the Commission needs a mechanism to enable it to respond to attempts by BIAS providers to wield their gatekeeper power in ways that might otherwise compromise the open Internet. In other words, the general conduct rule is a necessary backstop to ensure that BIAS providers do not find a technical or economic means to evade the bright-line prohibitions on blocking, throttling, and paid prioritization.

514. In the *2023 Open Internet NPRM*, we proposed adopting a general conduct rule that tracks the language and approach that the Commission adopted in the *2015 Open Internet Order*.[2041] We sought comment on our analysis that a general conduct rule is still needed to operate as a catch-all backstop to the three bright-line prohibitions we proposed,[2042] and on the need and characteristics of any potential modifications we should make to the version of the rule that the Commission had previously

---

[2036] *See* 5G Americas Comments at 8-9 (arguing that the waiver process will be resource intensive on both the Commission and industry, especially since waivers will only be granted in limited cases, and explaining that "waivers would cause delays in rolling out services that benefit consumers and would waste limited" Commission and industry resources).

[2037] *See, e.g.*, ACI Comments at 19 (suggesting that the language "for good cause shown" is vague and arbitrary, providing little opportunity for BIAS providers to object); ADTRAN Comments at 27 (questioning what constitutes a "public benefit" and how to prove what "would not 'harm the open nature of the Internet,'" and further arguing that the vagueness and delay in waiver requests will deter investment and innovation); Scott Wallsten et al. Comments at 12-13 (expressing concerns that the waiver process "would be discretionary and subject to changing political administrations"); *see also* David Choffnes Comments at 1 (suggesting that waivers "be considered via a public process where the ISP request, the FCC analysis, and final decision are all made publicly available and thus face broad scrutiny").

[2038] *2023 Open Internet NPRM* at 77-80, paras. 164-68.

[2039] *See supra* Section V.A.

[2040] *2015 Open Internet Order*, 30 FCC Rcd at 5659, para. 135.

[2041] *2023 Open Internet NPRM* at 77-80, paras. 164-68.

[2042] *Id.* at 78, para. 164.

adopted, if commenters deemed such a rule necessary.[2043] We also sought comment on the accuracy of the *RIF Order*'s critiques that the general conduct rule was "vague and ha[d] created regulatory uncertainty in the marketplace hindering investment and innovation,"[2044] and steps the Commission might take to increase BIAS providers' understanding of potentially prohibited practices under a re-adopted rule.[2045]

515. The Commission has long identified the need to protect consumers and edge providers from discriminatory conduct by BIAS providers. In 2010, the Commission enshrined this goal in a no-unreasonable discrimination rule that enabled the Commission to evaluate, on a case-by-case basis, the conduct of fixed BIAS providers based on a number of factors.[2046] When challenged, the D.C. Circuit accepted the Commission's underlying policy rationale for the regulations in the *2010 Open Internet Order*, including its nondiscrimination rule;[2047] however, the court vacated the Commission's anti-discrimination and no-blocking rules for imposing *de facto* common carrier status on BIAS providers in violation of the Commission's then-classification of BIAS as an information service.[2048] In 2015, when the Commission reclassified BIAS as a telecommunications service, it adopted a revised general conduct rule that was designed to prevent BIAS providers from unreasonably interfering with, or disadvantaging, consumers' ability to reach the Internet content, services, and applications of their choosing or edge providers' ability to access consumers using the Internet.[2049] The D.C. Circuit subsequently upheld the *2015 Open Internet Order* in full, including the Commission's new no-unreasonable interference/disadvantage standard (i.e., the 2015 general conduct rule).[2050]

516. We agree with the goals of the Commission's previous nondiscrimination and general conduct rules, and we conclude that such a rule is still needed as a backstop to the bright-line prohibitions on blocking, throttling, and paid prioritization to protect the open nature of the Internet. Accordingly, we adopt the following general conduct rule to address unreasonable discrimination:

> *Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule.*[2051]

---

[2043] *See id.* at 78-79, paras. 165-66.

[2044] *RIF Order*, 33 FCC Rcd at 452-53, paras. 246-47.

[2045] *See 2023 Open Internet NPRM* at 79-80, para. 167.

[2046] *2010 Open Internet Order*, 25 FCC Rcd at 17944-46, paras. 70-74 (specifying that the Commission examine whether the conduct was transparent, how it affected end-user control, whether the conduct was use- or application-agnostic, and whether the conduct conformed with industry best practices). At the time, the *2010 Open Internet Order* exempted mobile BIAS providers from the anti-discrimination rule. *Id.* at 17962, para. 104.

[2047] *Verizon*, 740 F.3d at 644-49 (noting that "nothing in the record gives us any reason to doubt the Commission's determination that broadband providers may be motivated to discriminate against and among edge providers").

[2048] *Id.* at 655-59.

[2049] *2015 Open Internet Order*, 30 FCC Rcd at 5659, para. 135.

[2050] *USTA*, 825 F.3d at 689, 738-39.

[2051] Consistent with the Commission's guidance in 2015, we note that the general conduct standard we adopt today "represents our interpretation of sections 201 and 202 in the broadband Internet access context and, independently, our interpretation—upheld by the *Verizon* court—that rules to protect Internet openness promote broadband deployment via the virtuous cycle under section 706 of the 1996 Act." *2015 Open Internet Order*, 30 FCC Rcd at 5660, para. 137.

For the purposes of this rule, we define "edge provider" as "any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet."[2052] And we define "end user" as "any individual or entity that uses a broadband Internet access service."[2053]

517. We find that this rule is necessary to protect the ability of consumers and edge providers to use the open Internet for several reasons. First, we agree with the American Civil Liberties Union and other commenters that the rule will allow the Commission to respond to harmful conduct not easily categorized as blocking, throttling, or paid prioritization.[2054] Second, because of the "constantly evolving nature of technologies underlying the internet ecosystem," it is difficult to predict all of the practices that might harm the openness of the Internet,[2055] and we agree with those commenters, such as the Ad Hoc Telecom Users Committee and Cloudflare, who argue that the Commission needs flexibility to address consumer and competitive harms as technology evolves.[2056] And third, the general conduct rule will provide the Commission a means of addressing BIAS providers that develop policies and practices that evade the bright-line prohibitions.[2057] As Professor Jon Peha notes, even with the adoption of the bright-line rules, BIAS providers would still have the incentive to act as gatekeepers.[2058]

518. Consistent with our proposal, we adopt a case-by-case approach that will consider the totality of the circumstances when analyzing whether conduct satisfies the general conduct standard to

---

[2052] *See infra* Appx. A (new 47 CFR § 8.1(c)).

[2053] *See infra* Appx. A (new 47 CFR § 8.1(d)).

[2054] ACLU Comments at 6 ("The Commission's proposed general conduct rule is necessary to protect consumers against a slew of current and future ISP behaviors that are not otherwise covered by the rules against blocking, throttling, and paid prioritization."); Ad Hoc Telecom Users Committee Comments at 29 ("As a backstop to the proposed rules, Ad Hoc also supports adoption of a general conduct standard."); CCIA Comments at 13-14 ("CCIA supports this proposed rule as a narrow but necessary addition to the blocking, throttling, and paid prioritization rules. It is unreasonable to demand that the Commission predict every type of BIAS provider conduct that could hinder an end user's Internet access; a rule codifying the general protection of BIAS transmissions puts both end users and BIAS providers on notice that unreasonable conduct that interferes with a transmission, even if the conduct does not fall neatly into one of the three identified categories, will not be permitted."); Jon Peha Comments at 7 (explaining that there are forms of unreasonable discrimination that do not fall cleanly under the umbrellas of blocking, throttling, or paid prioritization); New America's Open Technology Institute Comments at 6, 51-52 (agreeing that bright-line rules related to network management "are necessary but not sufficient to preserve an open internet").

[2055] *See* Ad Hoc Telecom Users Committee Comments at 30; *see also* Cloudflare Comments at 8 (writing that "bright-line rules can be brittle, especially as technology changes rapidly"); N.Y. State School Boards Association Comments at 3 ("This is a vital safeguard and backstop to ensuring equitable internet access, because technology and society will continue to develop and new problems will continue to arise.").

[2056] Cloudflare Comments at 8 ("Enacting bright-line rules can ossify approaches to addressing consumer and competitive harms that risk making the rules ineffective or even counterproductive as technology evolves."); Ad Hoc Telecom Users Committee Comments at 30; Home Telephone Comments at 16 (supporting a general conduct rule for "limited use" to provide the Commission the "flexibility to address future unforeseen issues").

[2057] Cloudflare Comments at 8 ("Enacting bright-line rules can incentivize the kind of innovation that is aimed at evading those rules rather than improving and expanding access to the Internet."); ACLU Comments at 6 ("A general conduct rule will enable the FCC to close newly found loopholes, and may discourage ISPs from seeking out those loopholes in the first place."); WGA Comments at 6 (supporting a general conduct rule because it, alongside bright-line rules, will protect against further harm to competition among edge providers).

[2058] Jon Peha Comments at 6 ("The FCC was also right to conclude that these three rules are insufficient. With only these three rules, a BIAS provider would still have the ability and incentive to act as a gatekeeper. For that reason, the FCC should not adopt these three rules, decline to adopt the 'general conduct standard,' and establish no other rules in its place.").

protect the open Internet.[2059]  We endeavor to maintain an Internet ecosystem that balances the Commission's ability to protect consumers and edge providers from harmful conduct, while still allowing BIAS providers the flexibility and encouragement to develop new technologies and business practices. We conclude, based on the record before us, that evaluating potential conduct on a case-by-case basis will allow the Commission to respond to emerging practices that may harm the open nature of the Internet while enabling BIAS providers to offer innovative services that keep pace with evolving technology and business practices.[2060]  We make clear that the general conduct rule is not an attempt to institute any form of rate regulation;[2061] nor is it an attempt by the Commission to expand our bright-line conduct rules in an indeterminate manner.[2062]  The general conduct rule is designed to operate as a backstop to the Commission's prohibitions on blocking, throttling, and paid prioritization to address, on a case-by-case basis, practices that may harm the open nature of the Internet.

519.    To provide guidance to BIAS providers regarding the application of the general conduct rule, we adopt a non-exhaustive list of factors that we will consider to aid in our analysis.[2063]  These factors include:  (i) whether a practice allows end-user control and enables consumer choice; (ii) whether a practice has anticompetitive effects in the market for applications, services, content, or devices; (iii) whether a practice affects consumers' ability to select, access, or use lawful broadband services, applications, or content; (iv) the effect a practice has on innovation, investment, or broadband deployment; (v) whether a practice threatens free expression; (vi) whether a practice is application agnostic; and (vii) whether a practice conforms to best practices and technical standards adopted by open, broadly representative, and independent Internet engineering, governance initiatives, or standards-setting organizations.  Consistent with the *2015 Open Internet Order*, we note that in addition to this list, there may be other considerations relevant to determining whether a particular practice violates the no-unreasonable interference/disadvantage standard.[2064]  We decline to adopt the New York State School Boards Association's proposal that we adopt an additional factor that "weighs whether a practice will

---

[2059] *2023 Open Internet NPRM* at 78, para. 166.

[2060] Ad Hoc Telecom Users Committee Comments at 30 ("Maintaining a method for pursuing case-by-case analysis of potentially discriminatory practices shows foresight.  The constantly evolving nature of technologies underlying the internet ecosystem makes it difficult to predict all practices that would amount to unreasonable discrimination of content by ISPs."); CCIA Comments at 14 (urging "the Commission to continue the pro-consumer balanced approach adopted by the Commission in 2015, which provides regulatory certainty and flexibility but maintains case-by-case review as a backstop"); INCOMPAS Comments at 51 (writing that they "believe[] that the case-by-case approach continues to be the proper course. . . . [T]hat approach allows the Commission to promote consumer benefits and competition that new service offerings may bring, while continuing to monitor adherence to the principles of net neutrality").

[2061] AT&T Comments at 5, 26-28; USTelecom Comments at 3, 61, 100; USTelecom Reply at 24 n.93; ADTRAN Reply at 6 & n.10.

[2062] USTelecom Comments at 57 (writing that the general conduct rule expands beyond the bright-line rules "indefinitely" and that it will "mak[e] it easy for the Commission to find a violation in nearly any practice while providing broadband providers with no certainty that any given practice would be deemed proper"); USTelecom Reply at 31-32 ("That standard does not limit the Commission, but instead empowers it to strike down conduct based on any considerations it believes appropriate."); ACA Connects Comments at 54 ("[T]he whole purpose of the standard is to enable the Commission to bring claims that lie outside the scope of the express open Internet rules or clear Commission guidance."); WISPA Comments at 55-56 (writing that "the general conduct standard is an extremely broad standard *the sole purpose of which is to lead to further regulation*"); AT&T Comments at 5-6, 25-27 ("This standardless 'standard' is a textbook invitation to regulatory creep, and it would cast a dark shadow of uncertainty over ISPs' efforts to cost-justify future broadband investment initiatives."); U.S. Chamber of Commerce Comments at 68 ("The Commission should decline to . . . adopt[] a vague standard that provides no guidance as to what constitutes compliance, but provides license to the FCC to adopt controversial and anti-consumer rules and enforcement policies.").

[2063] *2023 Open Internet NPRM* at 78-79, para. 166.

[2064] *See 2015 Open Internet Order*, 30 FCC Rcd at 5661, para. 138.

inhibit the ability of educational institutions to provide educational materials to students."[2065]  We believe that the educational access concerns raised are adequately covered by the existing "free expression" and "consumer ability to access" factors or could be considered on a case-by-case basis as needed.

520.     When the D.C. Circuit upheld the general conduct rule as adopted in the *2015 Open Internet Order*, it recognized the need to build flexibility into the rule.[2066]  The court noted that, if regulations were too specific, it would open up large loopholes,[2067] a concern that the court observed was especially applicable because of the speed at which broadband technology evolves.[2068]  We conclude that evaluating potential conduct against these factors will allow BIAS providers to "reasonably discern whether certain practices would violate the rule,"[2069] and that "having clear standards for evaluation of questionable behavior in the form of the general conduct factors . . . will permit more rapid resolution of potentially harmful practices."[2070]  To address concerns raised in the record concerning the meaning of the

---

[2065] *See* N.Y. State School Boards Association Comments at 3.

[2066] *USTA*, 825 F.3d at 737 ("[A] regulation is not impermissibly vague because it is 'marked by flexibility and reasonable breadth, rather than meticulous specificity.' . . . [T]he flexible approach adopted by the General Conduct Rule aims to address that concern in a field in which 'specific regulations cannot begin to cover all of the infinite variety of conditions.'").

[2067] *Id.* ("We are mindful, moreover, that 'by requiring regulations to be too specific courts would be opening up large loopholes allowing conduct which should be regulated to escape regulation.'").

[2068] *Id*. ("That concern is particularly acute here, because of the speed with which broadband technology continues to evolve.  The dynamic market conditions and rapid pace of technological development give rise to pronounced concerns about ready circumvention of particularized regulatory restrictions.").

[2069] CPUC Comments at 37 n.67 ("To arguments claiming the standard is 'vague,' the CPUC notes that the rule sets out numerous factors regarding application of the rule, such that carriers can reasonably discern whether certain practices would violate the rule."); Ad Hoc Telecom Users Committee Comments at 30 (writing that it "agrees with the proposed factors meant to enable appropriately well-examined assessments of potential violations of the general conduct rule"); CCIA Comments at 13-14 (stating that the general conduct rule "is flexible enough to fill an appreciable gap in the protections afforded in the other granular rules but sufficiently precise to give fair notice to BIAS providers of what they may not do"); INCOMPAS Comments at 50-51 (agreeing with the Commission's view that "the rule as crafted provides sufficient guidance to ISPs to ensure compliance"); N.Y. State School Boards Association Comments at 3 (stating that it is "supportive of the factors the Commission proposes to weigh to determine whether an ISP action violates the general conduct standard").

[2070] Ad Hoc Telecom Users Committee Comments at 30.

factors,[2071] how the factors will be weighed against each other,[2072] and the list's non-exhaustive nature,[2073] we describe in detail each of the factors below and we establish an advisory opinion process for BIAS providers to seek Commission advice on potential conduct, if they so choose.[2074] We anticipate that the factors we outline for consideration of practices will provide important guideposts for consumers, edge providers, and BIAS providers on whether practices are likely to unreasonably disadvantage or interfere with end users ability to reach the Internet content, services, and applications of their choosing or of edge providers to access consumers using the Internet.

521. *End-User Control.* We reaffirm our conclusion from the *2015 Open Internet Order* and find that a practice that allows end-user control and that is consistent with promoting consumer choice is less likely to unreasonably interfere with or cause an unreasonable disadvantage affecting the end user's ability to use the Internet as he or she sees fit.[2075] It is critical that consumers' decisions, rather than those of BIAS providers, remain the driving force behind the development of the Internet.[2076] Practices that

---

[2071] Free State Foundation Comments at 9, 48-49, 54 ("This proposed 'catch-all backstop' consists of several unclear factors that are not tied to any safe harbors, ascertainable economic theory, or legal precedents that would provide predictable application. The elasticity of those factors would enable the Commission to restrict nearly any network practice it chooses."); Jon Peha Comments at 7 ("It is not sufficiently self-evident what 'unreasonably interfere with or unreasonably disadvantage' means. One problem is that terms like 'interfere with' and 'disadvantage' implies that a packet or packet stream has some natural state, and that the ISP then imposes on that natural state; this does not map easily to how networks actually work. This can lead to cases where the rule is unclear. It is much clearer to say that a provider should not treat two packet streams differently, i.e. *discriminate*, simply because the two streams differ in some factor that the provider should not be using for this purpose."); Paul Ray Comments at 1-2 ("[T]he only guidance for the application of the policy is a set of seven factors, each of which is (to varying degrees) itself indefinite.").

[2072] Paul Ray Comments at 1-2; AT&T Comments at 5-6, 25-27 ("Application of that [general conduct] 'rule' would turn on a 'non-exhaustive list' of five open-ended 'factors,' no one of which would be necessary to a liability finding, leaving the Commission free to condemn any business practice whenever it sees fit, in an impressionistic 'case-by-case approach that would consider the totality of the circumstances.'"); Free State Foundation Comments at 50; International Center for Law & Economics Reply at 36-37; USTelecom Comments at 55.

[2073] Free State Foundation Comments at 9, 48-49, 54; Paul Ray Comments at 1-2; WISPA Comments at 42; USTelecom Comments at 55; U.S. Chamber of Commerce Comments at 66.

[2074] *See infra* Section V.E.1; *USTA*, 825 F.3d at 738 (finding that "the advisory-opinion procedure accompanying the General Conduct Rule cures it of any potential lingering constitutional deficiency," because "[t]he opportunity to obtain prospective guidance thus provides regulated entities with 'relief from [remaining] uncertainty'"). *But see* Free State Foundation Comments at 9, 48-49, 54 ("[A]dvisory opinions would have no controlling legal effect and do not bind the Commission. In other words, those opinions do not provide ISPs with certainty about whether their conduct complies with the general conduct standard or not."); USTelecom Reply at 23 (same); AT&T Comments at 26 (asserting that "the de facto requirement to seek non-binding (and slow-in-coming) 'advice' from Commission staff before undertaking any conceivably controversial business practice would slam the brakes on innovation"); USTelecom Comments at 59 (arguing that the 2015 version of the advisory process "never worked" and "the NPRM's proposal to reinstate the advisory opinion process does not eliminate the problem that the general conduct standard creates").

[2075] *2015 Open Internet Order*, 30 FCC Rcd at 5661, para. 139; *see also* Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, Attach. at 25-27 (filed Mar. 26, 2024) (citing Comcast's low-latency DOCSIS field trials as an example of an innovative service offered over BIAS that is application agnostic, end-user controlled and paid, and that protects the quality of the default BIAS).

[2076] *2015 Open Internet Order*, 30 FCC Rcd at 5661-62, para. 139. We observe that there are competing narratives surrounding certain mobile plans that provide different video resolution levels. *Compare* CTIA Apr. 16, 2024 *Ex Parte* at 5-7, *and* Letter from Henry G. Hultquist, Vice President Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 15, 2024) (AT&T Apr. 15, 2024 *Ex Parte*), *and* Verizon Apr. 17, 2024 *Ex Parte* at 2, *with* Barbara van Schewick Apr. 17, 2024 *Ex Parte* at 1-2, *and* ACLU Apr. 19, 2024 *Ex*

(continued….)

favor end-user control and empower meaningful consumer choice are more likely to satisfy the general conduct standard than those that do not.[2077]  As the Commission recognized in 2010 and 2015,[2078] we remain aware of the reality that user control and network control are not mutually exclusive.  Rather, practices will fall somewhere on a spectrum between more end-user control and more BIAS provider control.[2079]  There also may be practices that involve complete BIAS provider control that nonetheless satisfy the general conduct rule.[2080]  Some commenters point to the fact that the Commission recognizes this range between end-user control and BIAS provider control as evidence of this factor's vagueness problem.[2081]  However, we find that our approach is consistent with the Commission's regulatory approach in other contexts that require the Commission, and providers, to balance competing interests,[2082] and we believe that this approach provides appropriate guidance to BIAS providers while still enabling them to experiment and innovate with practices that function across this spectrum.[2083]  We emphasize that in all practices, BIAS providers should be fully transparent to the end user and effectively reflect end users' choices.[2084]

522.     *Competitive Effects*.  As discussed above,[2085] we find that BIAS providers have incentives to interfere with and disadvantage the operation of third-party Internet-based services that compete with the providers' own services or with those of an edge provider with which the BIAS provider has a contractual relationship.  A practice that has anticompetitive effects in the market for applications, services, content, or devices would likely unreasonably interfere with, or unreasonably disadvantage, edge providers' ability to reach consumers in ways that would have a dampening effect on innovation,

---

*Parte* at 2.  We find that the current record lacks sufficient specificity about specific plans to make a definitive determination.

[2077] *2015 Open Internet Order*, 30 FCC Rcd at 5661-62, para. 139.

[2078] *Id.*; *2010 Open Internet Order*, 25 FCC Rcd at 17944-45, para. 71.

[2079] *2015 Open Internet Order*, 30 FCC Rcd at 5661-62, para. 139.

[2080] *Id.*

[2081] *See* Free State Foundation Comments at 49 ("And it appears the Commission will readopt those same descriptions [from 2015], even though they exacerbate the vagueness problem."); Paul Ray Comments at 2 ("What of practices that facilitate end-user control but do not promote consumer choice, or vice versa?  Even whether a practice promotes one or the other of these objectives will surely be debatable in many cases.").

[2082] *See, e.g.*, *WDBJ Television, Inc. License of Station WDBJ(DT) Roanoke, Virginia*, File Nos. EB-IHD-14-00016819 and EB-12-IH-1363, Notice of Apparent Liability for Forfeiture, 30 FCC Rcd 3024, 3026-28 (2015) (explaining that in analyzing whether broadcast material is patently offensive, the Commission applies a three-factor balancing test); *Application of Verizon Communications Inc. and América Móvil S.A.B. de C.V for Consent to Transfer Control of International Section 214 Authorization*, GN Docket No. 21-112, IBFS File No. ITC-T/C-20200930-00173, Memorandum Opinion and Order, 36 FCC Rcd 16994, 17001, para. 21 (2021) (*Verizon-TracFone Order*) (explaining that in the context of analyzing a proposed transfer of control of a section 214 authorization, the Commission employs a balancing test that weighs any potential public interest harms of the proposed transaction against any potential public interest benefits, and that the applicant bears the burden of proving that "the proposed transaction, on balance, serves the public interest")

[2083] *See 2015 Open Internet Order*, 30 FCC Rcd at 5661, para. 138.

[2084] The Electronic Frontier Foundation asserts that "in practice transparency is a poor substitute for meaningful choice."  EFF Comments at 22;  *see also id.* ("Providers may simply ask users to agree to complex contracts in which they unknowingly sign away many of their rights and interests, and then claim that the users consented to the providers' practices.  As long as such contracts of adhesion are upheld as fair bargains by the courts, 'user control' is unlikely to hold much weight as an independent factor.").  As part of our case-by-case analysis for this factor, the Commission will examine whether transparency regarding the practice at issue actually enables meaningful consumer choice.

[2085] *See supra* Section V.A.3.

interrupting the virtuous cycle.[2086]  We find that practices like this, i.e., anticompetitive practices, are likely to harm consumers' and edge providers' ability to use BIAS to reach one another.[2087]  In contrast, more competition leads to more options for consumers in services, applications, content, and devices.[2088]  Therefore, we find that practices that would enhance competition would weigh in favor of promoting consumers' and edge providers' ability to use BIAS to reach one another.[2089]  We disagree with Free State Foundation's contention that considering the competitive effects of a practice is unhelpful because it is not tied to particular economic theory.[2090]  Commission staff, and in particular the Commission's Office of Economics and Analytics, is well versed in examining the competitive effects of our rules and of industry practices, using generally accepted economic theory and analytical techniques.  And this is particularly true where the Commission has examined potentially anticompetitive conduct by vertically integrated firms.[2091]  Furthermore, as part of the Commission's review of the competitive effects of a given practice, we will also review the relevant entities' corporate structure, to consider the extent of an entity's vertical integration as well as its relationships with affiliated entities.[2092]

523.    *Consumer Protection*.  As in 2015, we intend the general conduct rule to act as a strong consumer protection standard.  It prohibits BIAS providers from employing any deceptive or unfair practice that will unreasonably interfere with or unreasonably disadvantage end-user consumers' ability to select, access, or use broadband services, applications, or content, so long as the services are lawful, subject to the exception for reasonable network management.[2093]  For example, unfair or deceptive billing practices, as well as practices that fail to protect the confidentiality of end users' proprietary information, will be unlawful if they unreasonably interfere with or unreasonably disadvantage end-user consumers' ability to select, access, or use broadband services, applications, or content, so long as the services are lawful, subject to the exception for reasonable network management.[2094]

---

[2086] *2015 Open Internet Order*, 30 FCC Rcd at 5662, para. 140.

[2087] For example, fees that discourage consumer choice among BIAS providers could fall within the rule's scope.

[2088] *2015 Open Internet Order*, 30 FCC Rcd at 5662, para. 140.

[2089] *Id.*

[2090] Free State Foundation Comments at 50 ("Additionally, the listed factors regarding effects of network management practices on competition as well as on innovation, investment, or broadband deployment are unhelpful because they are not tethered to any clearly ascertainable economic theory to provide predictable and consistent application.").

[2091] For example, since the introduction of competition into the interstate long-distance telephone market, the Commission has repeatedly investigated claimed anticompetitive concerns raised by vertically integrated firms. *See, e.g.*, *Policies and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, CC Docket No. 79-252, First Report and Order, 85 F.C.C.2d 1 (1980) (examining and addressing possible anticompetitive conduct by ILECs if they were to begin providing enhanced services); *Non-Accounting Safeguards Order*, 11 FCC Rcd at 21908, para. 2 (adopting safeguards to prevent anticompetitive conduct by the regional BOCs as they enter the interstate, interLATA telephone market); *General Motors Corp. and Hughes Electronics Corp., Transferors and The News Corp. Ltd, Transferee, for Authority to Transfer Control*, 19 FCC Rcd 473 (2004) (examining and addressing potential anticompetitive effects of proposed vertical merger); *Comcast/NBCU Merger Order*, 26 FCC Rcd 4238 (same).

[2092] *2015 Open Internet Order*, 30 FCC Rcd at 5662, para. 140.

[2093] *Id.* at 5662, para. 141.

[2094] *Id.*  As the Commission explained in 2015, while each practice will be evaluated on a case-by-case basis, this rule is intended to include protection against fraudulent practices such as "cramming" and "slamming" that have long been viewed as unfair and disadvantageous to consumers.  FCC, *Understanding Your Telephone Bill* (Feb. 19, 2021), https://www.fcc.gov/consumers/guides/understanding-your-telephone-bill (defining "cramming" as the "illegal act of placing unauthorized charges on your wireline, wireless, or bundled services telephone bill"); FCC, *Slamming: Switching Your Authorized Telephone Company Without Permission* (Apr. 22, 2021),

(continued….)

524.    *Effect on Innovation, Investment, or Broadband Deployment*.  We continue to find that Internet openness drives a "virtuous cycle" in which innovations at the edges of the network enhance consumer demand, leading to expanded investments in broadband infrastructure that, in turn, spark new innovations at the edge.[2095]  As such, a practice that will act to stifle innovation, investment, or broadband deployment would likely unreasonably interfere with or unreasonably disadvantage end users' or edge providers' use of the Internet.[2096]

525.    *Free Expression*.  Consistent with the Commission's findings in the *2015 Open Internet Order*, we believe that practices that threaten the use of the Internet as a platform for free expression would also likely unreasonably interfere with or unreasonably disadvantage consumers' and edge providers' ability to use broadband service to communicate with each other, thereby causing harm to that ability.[2097]  Such practices, in turn, would dampen consumer demand for broadband services, disrupting the virtuous cycle, and harming end user and edge provider use of the Internet under the general conduct rule we adopt today.[2098]

526.    *Application Agnosticism*.  We further find that application-agnostic (sometimes referred to as use-agnostic) practices likely will not cause an unreasonable interference with or an unreasonable disadvantage to end users' or edge providers' ability to use BIAS to communicate with each other.[2099]  Because application-agnostic practices do not interfere with end users' choices about which content, applications, services, or devices to use, neither do they distort competition and unreasonably disadvantage certain edge providers,[2100] they likely would not cause harm by unreasonably interfering with or unreasonably disadvantaging end users or edge providers' ability to communicate using BIAS.[2101]  A network practice is application-agnostic if it does not differentiate in treatment of traffic, or if it differentiates in treatment of traffic without reference to the content, application, or device.  We will consider a practice to be application-specific if it is not application-agnostic.  Application-specific network practices include, for example, those applied to traffic that has a particular source or destination, that is generated by a particular application or by an application that belongs to a particular class of applications, that uses a particular application- or transport-layer protocol, or that has particular

---

https://www.fcc.gov/slamming (defining "slamming" as "the illegal practice of switching a consumer's traditional wireline telephone company for local, local toll, or long distance service without permission").

[2095] *See supra* Section V.A.3; *2015 Open Internet Order*, 30 FCC Rcd at 5663, para. 142; *see also Verizon*, 740 F.3d at 644 (accepting the Commission's finding that Internet openness drives a virtuous cycle as "reasonable and grounded in substantial evidence").

[2096] *2015 Open Internet Order*, 30 FCC Rcd at 5663, para. 142.  *But see* Free State Foundation Comments at 50 ("Additionally, the listed factors regarding effects of network management practices on competition as well as on innovation, investment, or broadband deployment are unhelpful because they are not tethered to any clearly ascertainable economic theory to provide predictable and consistent application.").

[2097] *2015 Open Internet Order*, 30 FCC Rcd at 5663, para. 143; *see also* EFF Comments at 21-22 ("The free expression impact factor is the rationale underlying net neutrality protections, and its primacy needs no justification.").

[2098] As the Commission found in 2015, we find that the general conduct standard we adopt today does not unconstitutionally burden any of the First Amendment rights held by BIAS providers because BIAS providers are conduits, not speakers, with respect to BIAS.  *2015 Open Internet Order*, 30 FCC Rcd at 5663, para. 143 n.343; *see infra* Section VI.A.

[2099] *2015 Open Internet Order*, 30 FCC Rcd at 5663-64, para. 144; *see also* EFF Comments at 22 ("By definition, application-agnostic practices are unlikely to disfavor certain sites, applications, or services based on content; in other words, application agnostic practices are content-neutral.  They are also less likely to create unfair barriers to innovation, because they help ensure that users can access new sites, services and applications on the same terms as established ones.  The marketplace of ideas should decide which applications and speech rise to the top.").

[2100] *2015 Open Internet Order*, 30 FCC Rcd at 5663-64, para. 144.

[2101] *Id*.

characteristics (e.g., the size, sequencing, and/or timing of packets). There may still be circumstances where application-agnostic practices raise competitive concerns, and as such may violate our standard to protect the open Internet. As with all practices, the Commission will evaluate these situations on a case-by-case basis.[2102]

527. *Standard Practices.* Lastly, in evaluating whether a practice violates our general conduct rule, we will consider whether a practice conforms to best practices and technical standards adopted by open, broadly representative, and independent Internet engineering, governance initiatives, or standards-setting organizations.[2103] These technical advisory groups play an important role in the Internet ecosystem, and at times are convened by the Commission.[2104] We make clear, however, that we are not delegating authority to interpret or implement our rules to outside bodies.

528. *Rejection of Alternatives.* We decline to adopt the alternative approaches to the general conduct rule suggested in the record, including: reliance on the "just and reasonable" language of sections 201 and 202;[2105] prohibiting unreasonable discrimination;[2106] assessing only whether the practice at issue promotes or hinders free expression, and whether the practice is "application agnostic";[2107] or adopting a "commercial reasonableness" standard for overseeing BIAS provider conduct under section 706 of the 1996 Act and our ancillary authority.[2108] As we explain above, we find it important for the Commission to be able to weigh all of the factors we describe in order to provide the maximum flexibility to providers in managing their networks and developing innovative services, plans, and packages for customers, particularly given the rapidly developing and evolving technological landscape in both the network and at the edge, and some of the proposed alternatives would not advance that interest as well as the rule we adopt. We agree with commenters that evaluating conduct using the multi-factor analysis under the general conduct rule will likely result in faster resolution for BIAS providers,[2109] and is easier for consumers and edge providers to use when evaluating BIAS provider conduct.[2110] We also find that,

---

[2102] *Id.* at 5663-64, para. 144 n.344. *But see* Free State Foundation Comments at 49-50 (pointing to the Commission's acknowledgment that there might still be an application-agnostic practice that raises competitive concerns as evidence of the general conduct rule's vagueness).

[2103] *2015 Open Internet Order*, 30 FCC Rcd at 5664, para. 145.

[2104] *Id.*

[2105] *See* WISPA Comments at 45 (asserting that the Commission can rely on the "just and reasonable" language in sections 201 and 202).

[2106] *See* Jon Peha Comments at 7 ("I propose a simpler approach: prohibiting *unreasonable discrimination*, where discrimination is considered unreasonable when it is based on lawful content, application, service provider, or non-harmful device. This includes discrimination that is primarily technical, primarily economic, or both."); *id.* at 8 (providing examples of discrimination based on application and content, and explaining why such practices would be considered unreasonable discrimination in violation of proposed prohibition).

[2107] *See* EFF Comments at 1, 21-22 (proposing that "the Commission should replace the general conduct rule with a simpler assessment of whether (1) the practice at issue promotes or hinders free expression; and (2) whether the practice is 'application agnostic'").

[2108] Free State Foundation Comments at 65-72 (proposing that the Commission use its "limited but sufficient" section 706 and Title I ancillary authority to adopt a "commercial reasonableness" standard for overseeing BIAS provider conduct).

[2109] ADTRAN Comments at 29 (arguing that while it does not support reclassification or the conduct rules, when considering alternatives to the general conduct rule, it suggests that "determining compliance with Sections 201 and 202 would likely require long and extensive investigations").

[2110] *See* Ad Hoc Telecom Users Committee Comments at 30 ("The general conduct standard and the specified factors meant to help evaluate potential violations thereof provide helpful metrics for edge providers to review if they are concerned that their content is being treated in a potentially discriminatory manner. It will be easier for an edge provider to review those factors and determine if it needs to raise the treatment issue with an ISP than it is for

(continued....)

as a general matter, practices evaluated under the alternative standards outlined in the record would likely result in the same outcome if evaluated under the general conduct standard we adopt today, given the substantial overlap in the factors.[2111]  However, we believe the factors we outline for consideration of practices will provide more clarity to consumers, edge providers, and BIAS providers, as well as more flexibility for BIAS providers to innovate.  We consequently find that the additional guidance provided by our general conduct rule has certain advantages for case-by-case adjudications over proceeding purely under the text of sections 201 and 202 alone.  Finally, as the Commission concluded in 2015, we are unpersuaded that adopting a rule prohibiting commercially unreasonable practices is the most appropriate approach for protecting and promoting an open Internet.[2112]  Internet openness involves many relationships that are not business-to-business and serves many purposes that are noncommercial.  Further, smaller edge providers also may not "have the resources to fight against commercially unreasonable practices, which could result in an unfair playing field before the Commission,"[2113] potentially stifling innovation and harming competition.

529.    We conclude that the language we adopt today offers sufficient clarity to BIAS providers, consumers, and edge providers on what conduct is prohibited, while still allowing and encouraging innovation and technological development.[2114]  We disagree with those commenters who argue that the proposed general conduct rule is too vague and unclear,[2115] and that the rule's alleged vagueness would cause regulatory uncertainty that will stifle investment and harm innovation.[2116]  Because of the insight into our approach provided by the rule itself and our guidance above, we conclude that stakeholders have more clarity—not less—than they would have had if we relied on sections 201 and 202 of the Act

---

an edge provider who likely is not familiar with the Communications Act to determine whether an ISP's behavior is 'just and reasonable.'").

[2111] For example, Professor Jon Peha explains that under a bright-line prohibition against unreasonable discrimination, it would be permissible if a subscriber chose for their BIAS provider to discriminate in order to ensure that a telemedicine application receives superior quality of service.  Jon Peha Comments at 8.  As part of its consideration of the practice under the general conduct standard we adopt, the Commission would weigh the fact that the practice allows end-user control and is consistent with promoting consumer choice.

[2112] *2015 Open Internet Order*, 30 FCC Rcd at 5665-56, para. 150.

[2113] *Id*.

[2114] CCIA Comments at 13-14 ("This 'general conduct rule' is flexible enough to fill an appreciable gap in the protections afforded in the other granular rules but sufficiently precise to give fair notice to BIAS providers of what they may not do.").

[2115] *See, e.g.*, ADTRAN Comments at 27; Free State Foundation Comments at 9, 48-49, 54; Jon Peha Comments at 7 (supporting a nondiscrimination rule, but arguing that it "is not sufficiently self-evident what 'unreasonably interfere with or unreasonably disadvantage' means"); U.S. Chamber of Commerce Comments at 66; Verizon Comments at 7.

[2116] *See* ACA Connects Comments at 40, 53-54; ADTRAN Reply at 12; AT&T Comments at 5-6, 25-27; CEI Comments at 16-17; EFF Comments at 1, 21; International Center for Law & Economics Reply at 35-38; ITIF Comments at 8; NCTA Comments at 92-93; Nokia Comments at 3 (arguing that researching and developing new deployments "can take a decade or longer, during which time as many as four different Chairpersons may preside over the Commission, each with their own ideas regarding . . . permissible conduct under the [general conduct standard]"); NTCA Comments at 28; TIA Comments at 6-7 (arguing that "[b]illion-dollar decisions employing thousands of Americans cannot hinge on a vague 'I'll know it when I see it' standard"); USTelecom Comments at 3, 54-55, 57-59, 63 ("The need to seek permission in advance would also harm competition by requiring a provider to give its rivals a public heads up before launching innovative services, thereby weakening its incentives to offer those services in the first place."); USTelecom Reply at 23, 31-32; WISPA Comments at 42-43, 55-56; ACLP Comments Attach. 1, ACLP Comments, WC Docket No. 17-108, at 18-21 (rec. July 17, 2017) (ACLP July 17, 2017 Comments).

alone.[2117]

530.    Second, our advisory opinion process is available to allow BIAS providers to seek a determination of the legality of a practice, without having to actually engage in that practice and risk being held in violation in order to obtain a decision.[2118]  As explained below, the Enforcement Bureau will not bring an enforcement action against a requesting party with respect to any action taken in good faith reliance upon an advisory opinion if all of the relevant facts were fully, completely, and accurately presented to the Bureau, and where such action was promptly discontinued upon notification of recission or revocation of the Commission's or the Bureau's approval.[2119]

531.    Third, although we conclude that our rule, coupled with the guidance above, gives providers warning of a range of prohibited conduct, our priority with this rule is ensuring that harmful practices can be stopped when they are identified.  Thus, although we certainly will consider the imposition of penalties when specific interpretations or applications of our rule address particular conduct, we otherwise will focus solely on remedying the provider's behavior going forward.  This is consistent with the approach the Commission has taken in the past in cases of violations of Internet policy.[2120]

532.    Finally, as the D.C. Circuit found in 2016 when it upheld the *2015 Open Internet Order* in full, the Commission's general conduct rule is not impermissibly vague, and provides sufficient notice to the affected entities of what conduct would be prohibited moving forward.[2121]  We adopt the same rule and framework today that the D.C. Circuit upheld in 2016, and, as discussed further below, we conclude that the general conduct rule, and the multi-factor framework we offer to provide guidance on its application, provides BIAS providers sufficient notice regarding what conduct is prohibited under the rule.

533.    *Application to Zero Rating.*  In the *2023 Open Internet NPRM*, we sought comment on whether there were additional steps we should take to ensure that BIAS providers understand the types of conduct and practices that might be prohibited under the proposed general conduct standard, asking, for example, whether "there are any zero rating or sponsored data practices that raise particular concerns under the proposed general conduct standard."[2122]  Based on the record, and consistent with the *2015 Open Internet Order* and our proposal,[2123] we find it appropriate to assess zero-rating programs under the general conduct standard to determine whether such practices cause harm to the open nature of the

---

[2117] We nevertheless retain authority to address practices under sections 201 and 202 of the Act except to the extent that we forbear from doing so.

[2118] *See infra* Section V.E.1.

[2119] *See id.*

[2120] *See, e.g., Comcast Order*, 23 FCC Rcd at 13059-60, para. 34, *rev'd on other grounds Comcast*, 600 F.3d 642 ("Our overriding aim here is to end Comcast's use of unreasonable network management practices, and our remedy sends the unmistakable message that Comcast's conduct must stop.").

[2121] *USTA*, 825 F.3d at 734-39.  *But see* Free State Foundation Comments at 53 (arguing that the Supreme Court may reach a different conclusion); International Center for Law & Economics Reply at 34 ("While the [D.C. Circuit] may have found the General Conduct Standard was not vague in all its applications, the Court did not consider that, under *State Farm*, the Commission's choice to implement such a far-reaching, ambiguous standard lacked a rational connection with FCC's proffered facts."); TIA Comments at 7 ("[W]hile the Title II Order's "non-exhaustive list of Factors" provided enough certainty to preserve the General Conduct Standard from legal challenge, the vague and unclear standard does not provide the industry enough certainty as a business matter."); USTelecom Comments at 56-57 (writing that "[t]he D.C. Circuit's prior decision upholding the general conduct rule against a vagueness challenge was wrongly decided").

[2122] *2023 Open Internet NPRM* at 78-79, paras. 165, 167.

[2123] *2015 Open Internet Order*, 30 FCC Rcd at 5667, para. 152; *2023 Open Internet NPRM* at 79, para. 167.

Internet.[2124] We acknowledge that sponsored data programs—where a BIAS provider zero rates an edge product for economic benefit, either by receiving consideration from a third party to have the edge product zero rated or where a BIAS provider *favors* an affiliate's edge products—raise concerns under the general conduct standard. Nonetheless, we will continue to evaluate such programs based on a totality of the circumstances.

534. Zero rating is the practice of a BIAS provider exempting edge services, devices, applications, and/or content (edge products) from an end user's usage allowance or data cap.[2125] Zero rating enables the BIAS provider to make some edge products cheaper to access, which can put those edge products at an advantage over others.[2126] In the *2015 Open Internet Order*, the Commission recognized that zero rating had the potential to distort the market and incentivize restrictive caps,[2127] but noted that "new service offerings, depending on how they are structured, could benefit consumers and competition."[2128] Based on this, the Commission stated that it would "look at and assess such practices under the no-unreasonable interference/disadvantage standard, based on the facts of each individual case, and take action as necessary."[2129]

535. The record indicates that zero-rating programs can be structured in a manner that benefits consumers,[2130] competition,[2131] and traffic management.[2132] Allowing a mechanism that lowers the cost of accessing certain edge products could be beneficial to consumers,[2133] and at least one commenter contends that zero-rating programs can help bring new entrants online.[2134]

---

[2124] We address the implications of our decision on zero rating on California's net neutrality law in the preemption discussion. *See supra* Section III.G.

[2125] *See 2015 Open Internet Order*, 30 FCC Rcd at 5666, para. 151.

[2126] *See, e.g.*, The Effects of Zero Rating, OECD Digital Economy Papers, No. 285, at 12 (Jul. 2019), https://www.oecd-ilibrary.org/deliver/6eefc666-en.pdf?itemId=%2Fcontent%2Fpaper%2F6eefc666-en&mimeType=pdf (OECD, Effects of Zero Rating) ("In connection with zero rating, this might mean that this form of throttling would not apply to all traffic, but only in a discriminatory way to the zero-rated traffic.").

[2127] *2015 Open Internet Order*, 30 FCC Rcd at 5666-67, para. 151.

[2128] *Id.* at 5668, para. 152.

[2129] *Id*.

[2130] *See, e.g.*, N.Y. State School Boards Association Comments at 2; U.S. Chamber of Commerce Comments at 67 n.293; INCOMPAS Reply at 13; CCIA Comments at 14; International Center for Law & Economics Reply at 42; CTIA Reply at 85.

[2131] *See, e.g.*, CTIA Reply at 85; International Center for Law & Economics Reply at 38-39; NCTA et al. Reply at 62-63; R Street Institute Reply at 3.

[2132] *See, e.g.*, Jeffrey Westling Comments at 4-5; Jon Peha Comments at 9; *see also* International Center for Law & Economics Reply at 39 ("The goal of broadband policy should be to optimize internet use in a way that maximizes value for consumers, while offering incentivizes [sic] for innovation and investment. This requires usage-based pricing and prioritization models tailored to address congestion issues efficiently.").

[2133] INCOMPAS Comments at 51-52; U.S. Chamber of Commerce Comments at 67 n.293 ("Zero-rating practices can have many consumer benefits, among them: helping to lower the costs of accessing data; bringing, and keeping, new consumers online; facilitating online work, learning, health care, and civic and social engagements; and expanding the diversity of content, applications, and services."); *see also* ITI Comments at 6-7; CDT Reply at 10 ("There may be potentially limited circumstances that merit allowing zero rating, particularly as a strategy to encourage broadband adoption . . . ."); OECD, Effects of Zero Rating at 30 ("Zero rating can simultaneously allow some customers to discover new applications and websites with the free access with which they are provided, and encourage others to stick to applications and websites that are zero-rated.").

[2134] ITI Comments at 6-7.

536. However, the record also reveals concerns about certain forms of zero rating, such as where BIAS providers use zero rating to favor some edge products over others, especially as a business practice in exchange for consideration or to favor a provider's affiliates.[2135] Commenters claim that since adoption of the *2015 Open Internet Order*, BIAS providers have adopted such programs that favor affiliates and charge competing edge providers high per-gigabyte rates.[2136] Commenters express concern that where there is an economic incentive to use zero rating to favor some edge products over others, zero rating can create the same harms to the open Internet as paid prioritization.[2137] Further, the record reflects that sponsored data programs may favor large edge providers, as they are the only providers that can afford to participate in such programs.[2138] These comments also suggest that zero rating, like paid prioritization, is a practice that could result in distortions in the Internet market by creating negative

---

[2135] *See* ALA Reply at 4-5 (arguing that charging edge providers can strain library budgets but some zero rating can be beneficial, such as zero rating when usage is lowest); Mozilla Reply at 6 (noting that zero-rating practices "can stifle opportunities for small players to compete"); CDT Reply at 10; The Greenlining Institute Reply at 4.

[2136] New America's Open Technology Institute Comments at 61-62; Tejas N. Narechania Comments at 3 n.1; Public Knowledge Comments at 17; CDT Reply at 10 ("AT&T engaged in this practice when it exempted HBO and DirecTV, two properties it owns, from its data cap."); ALA Reply at 4; CPUC Reply at 3; The Greenlining Institute Reply at 4 ("AT&T and Verizon exploited this gray area by zero-rating their own online video apps, while all other online video services used people's data."); New America's Open Technology Institute Reply at 17-18; Tejas N. Narechania Reply at 4; New America's Open Technology Institute Feb. 12, 2024 *Ex Parte* at 5-6; *see also* AT&T Blog Team, *Impact of California 'Net Neutrality' Law on Free Data Services*, AT&T Connects (Mar. 17, 2021), https://www.attconnects.com/impact-of-california-net-neutrality-law-on-free-data-services (discussing the state of AT&T's sponsored data service "that allowed companies to pay for, or 'sponsor,' the data usage of their customers who are also AT&T wireless customers"); Barbara van Schewick, *In a Win for the Open Internet, AT&T Stops Zero-Rating Its Own Video*, Center for Internet & Society, Stanford L. Sch. (Mar. 17, 2021), https://cyberlaw.stanford.edu/blog/2021/03/in-a-win-open-internet-att-stops-zero-rating-its-own-video (commenting on AT&T's decision to suspend its sponsored data program nationwide); Verizon, *Fios TV Mobile App. Stream Live TV, Movies and More*, https://www.verizon.com/home/fios-tv/mobile-app [https://perma.cc/UB64-WUV4] ("Verizon Wireless Data-Free Streaming (not available in California): Req. postpay 4G LTE service. Non-streaming activity and app diagnostics (e.g., app downloads, starting/restarting the app, going off airplane mode and transitioning from Wi-Fi to 4G LTE) will incur data charges. For Verizon Unlimited customers, app data usage will be counted, not billed.").

[2137] David Choffnes Comments at 4-5; EFF Comments at 15-16; Four Stanford Law Students Comments at 2; N.Y. State School Boards Association Comments at 2; New America's Open Technology Institute Comments at 7, 67; Public Knowledge Comments at 73; MediaJustice Comments at 9-10; ALA Reply at 4; Mozilla Reply at 4-5; New America's Open Technology Institute Reply at 16-18, 20; ACLU Apr. 19, 2024 *Ex Parte* at 3.

[2138] Engine Comments at 6, Appx. A at 28-29; Mozilla Reply at 6 ("Practices like zero-rating, mentioned above, can stifle opportunities for potential small players to compete."); Philo Comments at 6; Public Knowledge Comments at 75 (citing OECD, Effects of Zero Rating at 9); *id.* at 77 ("It can particularly harm small or new entrants who cannot afford to pay for zero-rating."); *id.* at 81; OECD, Effects of Zero Rating at 30 (concluding that zero rating "can also increase the market share of an already dominant ISP or [content provider]").

externalities that raise the cost for the entire edge market,[2139] which can decrease innovation and harm the virtuous cycle.[2140]

537. Given the potential benefits and harms of zero-rating practices and their potential effect on the virtuous cycle, we will analyze zero-rating programs under the multi-factor analysis of the general conduct standard to ensure that innovative offerings are permitted and encouraged where the open Internet is not harmed.[2141] By placing zero-rating programs under the general conduct standard, we do not preclude beneficial zero-rating innovations that may assist BIAS providers needing to manage scarce resources fairly and reasonably, while also potentially allowing lower-cost access to edge products of exceptional societal value or of value to particular consumers, as chosen by those consumers.[2142] But

---

[2139] New America's Open Technology Institute Comments at 59-60 ("[F]ailing to clearly prohibit discriminatory forms of zero rating will incentivize mobile BIAS providers to invest in new ways to monetize the scarcity of their existing network rather than deploy new infrastructure."); MediaJustice Comments at 10 ("ISPs that use zero-rating keep data caps low and make unlimited plans expensive. Those make zero-rated sites and services attractive, and motivates companies with deep pockets to pay to be exempted from the cap."); ALA Reply at 4-5 (arguing zero rating will negatively affect libraries of all types, because "libraries do not have the resources to make these deals with ISPs," forcing libraries "to make tough decisions about which digital resources to keep and which to cancel to cover these increased costs, thus reducing the content libraries provide to their communities"); Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 7 (filed Apr. 22, 2024) (Barbara van Schewick Apr. 22, 2024 *Ex Parte*) ("As we saw with zero-rating, smaller players do not have the resources to do this work, and even when they make the effort to try to be included in a program, ISPs often don't get back to them or prioritize working with larger players first. That means the biggest apps will end up in all the fast lanes, while most others would be left out: startups, small businesses, sites serving marginalized communities or niche audiences, millions of other apps & sites in the long tail. As a result, ISP-controlled fast lanes hamper startups & small businesses and help cement platform dominance."); *cf.* Engine Comments at 44-45, Appx. B ("Indeed, our investment decisions in Internet companies are dependent upon the certainty of an equal-opportunity marketplace, and the low barriers to entry that have existed on the Internet. . . . Further, investors like us will be wary of investing in anything that access providers might consider part of their future product plans for fear they will use the same technical infrastructure to advantage their own services or use network management as an excuse to disadvantage competitive offerings.").

[2140] Mozilla Comments at 6-7 ("Zero-rating deals between content providers and operators are often technically complex to implement, especially for higher volume streaming services. Thus, in spite of rules that prohibit pay to play services, operators are incentivised to favor deals with the largest and wealthiest content providers. This is likely to stifle innovation for potential startup competitors to existing zero-rated content platforms, who may be dissuaded from even starting a competing service in the face of zero-rated competition."); Public Knowledge Comments at 74-75 ("Zero-rating can also drive online consolidation, further entrenching the market position of today's Internet giants and content incumbents. An OECD report found that, '[E]specially in markets with insufficient competition, zero rating may have negative effects on competition between different [online content providers]. It can, for example, support market dominance, if the content of a dominant player is zero-rated while the content of its competitors is not. Consequently, this might impede other companies from entering the market and undermine the benefit of the Internet as an open platform for innovation.'") (quoting OECD, Effects of Zero Rating at 9).

[2141] *See* CCIA Comments at 14; INCOMPAS Comments at 51-52; INCOMPAS Reply at 2, 12-13; OECD, Effects of Zero Rating at 30 ("This means that when zero rating offers are being assessed, case by case analysis is almost indispensable."). *But see* ACLU Apr. 19, 2024 *Ex Parte* at 3 ("[I]nternet service providers are likely to engage in behavior that is subject to the general conduct rule and not a bright line rule, because there is a greater chance that the Commission will allow their behavior to continue. In many cases, it is simply more profitable for an ISP to act first, and pay later if their conduct is found to violate the general conduct rule."); Barbara van Schewick Apr. 22, 2024 *Ex Parte* at 8.

[2142] *See* Jon Peha Comments at 9 (noting that a zero-rating practice that does not discriminate based on content, application, service provider, or device, and that "a BIAS provider does without demanding a fee, is likely not to be harmful to the public interest"); ALA Reply at 5 (quoting Jon Peha Comments at 9); N.Y. State School Boards Association Comments at 2; CDT Reply at 10 ("There may be potentially limited circumstances that merit allowing zero rating, particularly as a strategy to encourage broadband adoption, or if the data cap is application-agnostic.").

each zero-rating program can be different, and we find that applying the multi-factor analysis of the general conduct standard on a case-by-case basis[2143] allows for such innovations while curbing potentially market-distorting behavior by BIAS providers.

538.     To provide greater clarity, we identify certain types of programs that may raise concerns under the general conduct standard because they may be more likely to unreasonably interfere with, or unreasonably disadvantage, consumers and edge providers.  Specifically, a zero-rated program is likely to raise concerns under the general conduct standard where it zero rates an edge product (1) in exchange for consideration (monetary or otherwise) from a third party, or (2) to favor an affiliated entity.[2144]  These sponsored data programs are examples of business practices that are not a part of reasonable network management[2145] and therefore fall outside of "best practices and technical standards" developed by standards-setting organizations.  The information in the record regarding sponsored data programs offered since 2015 indicates that those programs raise concerns under the general conduct standard, in that they may unreasonably interfere with end users' ability to select, access, and use BIAS or the lawful Internet content, applications, services, or devices of their choice[2146] and unreasonably disadvantage edge providers' ability to make lawful content, applications, services, or devices available to end users, raising the cost to bring innovative new options to the edge market.[2147]

539.     We are not convinced by commenters that argue that sponsored data programs should always be permitted because they lower the cost of subscribing to BIAS.[2148]  The record suggests that

---

[2143] *2015 Open Internet Order*, 30 FCC Rcd at 5666-67, paras. 151-52.

[2144] *See* Engine Comments, Appx. A at 28; Philo Comments at 6-7; WGA Comments at 5; CDT Reply at 10; New America's Open Technology Institute Comments at 6-7, 61-66; New America's Open Technology Institute Reply at 5, 16-21; The Greenlining Institute Reply at 4; New America's Open Technology Institute Feb. 12, 2024 *Ex Parte* at 5-6; Barbara van Schewick Mar. 13, 2024 *Ex Parte* at Attach. at 10-11.

[2145] *See infra* Section V.C.

[2146] *See* Public Knowledge Comments at 73 ("Customers are more likely to prefer a service that does not count against their data cap than one that does, which can disadvantage competing services as much as throttling or paid prioritization."); MediaJustice Comments at 9-10 ("These harmful zero-rating schemes push Internet customers to use the websites and applications chosen by their ISP."); N.Y. State School Boards Association Comments at 2 ("Generally, zero-rating can act as a form of paid or affiliated prioritization, where providers choose content or websites that align with their business or ideological interests; this conceptually violates the principles of net neutrality by removing user choice."); ALA Reply at 4.

[2147] *See* David Choffnes Comments at 4-5 ("Similar to paid prioritization, zero rating and sponsored data are ways to give more or less priority to certain traffic by shifting the financial burden of that traffic."); MediaJustice Comments at 10; ALA Reply at 4; Mozilla Reply at 4 ("[A] brief review of the history, as well as ISP comments in this proceeding, make clear that network operators have the means and motives to institute paid prioritization via zero-rating.").  Thousands of express comments filed in the docket state that "[t]he agency must move forward a strong rule that rejects zero rating."  *See* Demand Progress Reply at 1.

[2148] AT&T Comments at 5; CCIA Comments at 14; CTIA Reply at 85 (""[F]ree data helps to address' barriers to adoption 'by enhancing the value proposition for non-adopters,' making zero-rating a tool that is able 'to play a key role in helping to close the digital divide by addressing cost concerns and strengthening the value proposition offered to skeptical non-users.'") (quoting MMTC, *Understanding and Appreciating Zero-Rating:  The Use and Impact of Free Data in the Mobile Broadband Sector* at 2, 10 (2016), https://mmtconline.org/WhitePapers/MMTC_Zero_Rating_Impact_on_Consumers_May2016.pdf); R Street Institute Reply at 3-4; ITI Comments at 6; Free State Foundation Comments at 51, 54; Harold Furchtgott-Roth et al. Comments at 8-9; INCOMPAS Comments at 51 n.130; Jeffrey Westling Comments at 4-5; U.S. Chamber of Commerce Comments at 67 n.293; USTelecom Comments at 54.  *But see* MediaJustice Comments at 10 ("Plans like Verizon's zero-rating of its video services are dangerous because they create a second-class experience online and make it harder for our voices, which are not on Verizon's cable channels, to be heard.").

zero-rating programs can increase the prices to consumers directly,[2149] and indirectly in the form of passed-through charges by the edge provider.[2150]  Nor are we convinced by suggestions made by two commenters that sponsored data programs are the equivalent of toll free calling, presumably because with toll free calling, the business assumes the cost of the call rather than the consumer.[2151]  On this basis alone, they suggest that sponsored data programs, like toll free calling, should be permitted.[2152]  We find this comparison to be unpersuasive, given the many distinctions between toll free calling in the telephony context, as compared to edge products offered over BIAS (e.g., an 800 number is used to *reach* a business, whereas the edge product is often the edge provider's entire business; the edge provider might be dependent on the BIAS provider to reach the BIAS provider's end users).  Finally, other proponents of sponsored data zero-rating contend that such programs can increase consumer choice when accessing edge products.[2153]  However, other commenters suggest sponsored data zero-rating programs can distort consumer choice by pressuring consumers to access the cheaper edge products chosen for them by the

---

[2149] New America's Open Technology Institute Comments at 60 (noting a 2016 study "showing that €30 plans from European carriers that zero-rate video had data caps that were 8 times higher" (citing Rewheel Research, *Tight Oligopoly Mobile Markets in EU28 in 2016* (Dec. 2016), https://research.rewheel.fi/insights/2016_dec_pro_tightoligopoly)); Public Knowledge Comments at 75 (referring to a "study comparing European markets that 'found that the availability of zero-rating offers coincides with prices being on average 9.9 higher than we would predict them to be without such offers present'" (citing Epicenter.works, *The Net Neutrality Situation in the EU* at 57-59 (2019), https://epicenter.works/fileadmin/import/2019_netneutrality_in_eu-epicenter.works-r1.pdf)); MediaJustice Comments at 10 ("For example, in the European Union, ISPs that don't offer zero rating give subscribers paying €30 per month 8 times more data than ISPs that zero-rate video give for the same price.  And when the European Union's telcom authority BEREC made clear in 2022 that harmful zero-rating violated EU net neutrality law, EU ISPs responded by removing the zero-rating programs and giving users on those plans much more data—sometimes as much as 50GB more or bumping them to unlimited plans." (citing Telecompaper, *Vodafone Italia Offering 50GB/mth After Phasing Out Zero-Rated Passes* (Apr. 30, 2023), https://www.telecompaper.com/news/vodafone-italia-offering-50gbmth-after-phasing-out-zero-rated-passes--146162)).

[2150] Public Knowledge Comments at 75 (noting that the extra that the edge provider pays would then be passed on to the consumer by the edge provider raising its prices); MediaJustice Comments at 8 ("Platforms such as Shopify, Patreon and Etsy provide ways for entrepreneurs of color to launch products that appeal to their community, with those platforms taking a small commission.  However, if large ISPs are allowed to charge those platforms for access to the ISP's customers, the platforms will necessarily have to pass that cost onto their customers.  That simply means that entrepreneurs of color will be paying a tax to every ISP as a cost of doing business.").

[2151] Harold Hallikainen Comments at 2 ("There have been proposals to prohibit 'zero rate' services where the cost of telecommunications is paid for by the edge provider instead of the end user. . . . this is very similar to 800 toll free telephone service and should be permitted."); AT&T Comments at 27 (raising concern that under the *2015 Open Internet Order*, the Commission's previous treatment of sponsored data programs, which it calls "the equivalent of toll-free calling," was akin to rate regulation).

[2152] Harold Hallikainen Comments at 2; AT&T Comments at 27.  In suggesting that zero rating should be treated the same as toll free calling, however, one commenter notes that zero rating should still be "offered on a nondiscriminatory basis with special attention paid to its use by content providers co-owned with the telecommunications provider to avoid cross-subsidy situations."  Harold Hallikainen Comments at 2.

[2153] CTIA Reply at 85; INCOMPAS Reply at 12; NCTA et al. Reply at 63.

BIAS provider,[2154] counter to the aims of an open Internet.[2155] Despite these concerns, we will continue to evaluate such programs based on a totality of the circumstances, including potential benefits.

540. While we identify sponsored data programs as the type of practices that may raise concerns under the general conduct standard, subject to a totality of circumstances determination, we note that there could be other types of zero-rating practices that are less likely to raise concerns under the general conduct standard, again based on a case-by-case evaluation. For example, some commenters have asserted that zero rating all edge products during low traffic hours[2156] or zero rating all of the edge products within the same category of products[2157] would be unlikely to cause unreasonable interference/disadvantage to edge products, as well as being application agnostic under the general

---

[2154] N.Y. State School Boards Association Comments at 2; Public Knowledge Comments at 76; MediaJustice Comments at 9-10; Four Stanford Law Students Comments at 2; ACLU Comments at 6; Jon Peha Comments at 9; CDT Reply at 10; *see also* OFCOM, Net Neutrality Review at 37 (Oct. 26, 2023), https://www.ofcom.org.uk/__data/assets/pdf_file/0017/270260/Statement-Net-Neutrality-Review.pdf ("[Z]ero-rating offers largely benefit consumers, although in limited circumstances they may reduce consumer choice."); Barbara van Schewick, *T-Mobile's Binge On Violates Key Net Neutrality Principles*, Ctr. for Internet & Soc'y Blog, Stanford L. Sch. (Jan. 29, 2016), https://cyberlaw.stanford.edu/blog/2016/01/t-mobiles-binge-violates-key-net-neutrality-principles (finding that T-Mobile's Binge On zero-rating program "is harming competition, innovation, user choice, and free speech on the Internet").

[2155] *See 2023 Open Internet NPRM* at 3, para. 3 ("We believe that the actions we propose today are critical to protecting the nation's security and the public's safety and to ensuring that consumers and competition can flourish in the modern Internet economy."); *id.* at 3, para. 4 ("As former Chairman Michael Powell noted in 2004, 'ensuring that consumers can obtain and use the content, applications and devices they want . . . is critical to unlocking the vast potential of the broadband Internet.' In recognition of this fact, in 2005, the Commission unanimously approved the *Internet Policy Statement*, which laid out four guiding principles designed to encourage broadband deployment and 'preserve and promote the open and interconnected nature of the public Internet.' These principles sought to ensure that consumers had the right to access and use the lawful content, applications, and devices of their choice online, and to do so in an Internet ecosystem defined by competitive markets.").

[2156] Jon Peha Comments at 9 ("[A] BIAS provider might choose to zero-rate all traffic between midnight and 6AM, simply because it finds that there is usually excess capacity in these hours. That should be allowed."); ALA Reply at 5 (quoting Jon Peha Comments at 9); Barbara van Schewick Mar. 13, 2024 *Ex Parte* Attach. at 10-11 ("Your ISP can still exempt data usage from your cap at certain times of day or as a promotion; it just can't force you to use that data on a specific site. ISPs in other countries have innovated with offers such as unmetered data from midnight to 6 a.m., unmetered data on the weekend, or letting users choose hours per month where their data usage is uncounted.").

[2157] EFF Comments at 15; New America's Open Technology Institute Reply at 5, 16-19; New America's Open Technology Institute Feb. 12, 2024 *Ex Parte* at 5-6; Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Apr. 11, 2024) (Barbara van Schewick Apr. 11, 2024 *Ex Parte*). New America's Open Technology Institute asks the Commission to clarify that it is "likely to find that a zero rating practice is unreasonably discriminatory if BIAS customers are offered an exemption from their data caps or limits for the applications, content or service provided by one or more specific edge providers to the exclusion of other similar or competing edge providers, whether or not the BIAS provider receives payment or is favoring an affiliate." Letter from Michael Calabrese, Director, Wireless Future, New America's Open Technology Institute et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 5 (filed Apr. 16, 2024). While zero rating all apps in the same category is more likely to be an acceptable zero rating practice under the general conduct standard, providers, acting in good faith, may have difficulty determining which apps should and should not be included in the same categories or have other logistical issues when including similar apps. Accordingly, we will review such zero rating on a case-by-case basis under the general conduct standard. *See* Public Knowledge Comments at 73-74 ("Say an ISP wanted to zero-rate both Apple Music and Spotify. The Spotify app also provides podcasts, and delivers them to users the same way it delivers music. Are those zero-rated as well? If Spotify podcasts are zero-rate—how does this compare with Apple Music?"). Professor Barbara van Schewick observes that there can be competitive concerns with any categorization. *See* Barbara van Schewick Apr. 22, 2024 *Ex Parte* at 7.

conduct rule factors.[2158]  We will consider those practices, as well as any other zero-rating practices, under the general conduct standard, which relies on case-by-case review based on established factors.

541.    *Application to Data Caps*.  Data caps—also referred to as usage allowances or in some cases, a type of usage-based billing—are a BIAS provider restriction on the amount of data a customer can consume over a specified period of time (e.g., 25GB per month).[2159]  Professor Scott Jordan urges the Commission to find that data caps that do not qualify as reasonable network management are likely to violate the general conduct standard.[2160]  In particular, Professor Jordan explains that, based on his research, data caps that are not tailored to a primary purpose of managing congestion are likely to have negative effects on competition,[2161] network investments,[2162] broadband deployment, innovation, and investment by edge providers;[2163] and are likely to reduce end user control.[2164]  In their white paper submitted by USTelecom and NCTA, Dr. Mark Israel et al. dispute Professor Jordan's claims, asserting that usage-based pricing "offers a mechanism for broadband providers to create incentives for users to internalize the costs that they impose on broadband networks and to distribute the greater costs of the network onto those users that make greater use of the network while putting downward pressure on the prices that light users pay," and that if such plans were prohibited by the Commission, "moderate and light users (including those with lower incomes) would likely be forced to pay more than if [data caps are] allowed."[2165]

---

[2158] *See, e.g.*, CDT Reply at 10 ("There may be potentially limited circumstances that merit allowing zero rating, particularly as a strategy to encourage broadband adoption, or if the data cap is application-agnostic.").

[2159] *See 2015 Open Internet Order*, 30 FCC Rcd at 5632, para. 82; *see also* Jon Brodkin, *AT&T Exempts HBO Max from Data Caps but Still Limits Your Netflix Use*, Ars Technica (June 2, 2020), https://arstechnica.com/tech-policy/2020/06/att-exempts-hbo-max-from-data-caps-but-still-limits-your-netflix-use ("The traditional data caps limit customers to certain amounts of data each month before they have to pay overage fees or face extreme slowdowns for the rest of the month.").

[2160] Scott Jordan Comments at 37; *see also* EFF Comments at 14-15 (arguing that as more fiber is deployed, BIAS providers have less justification for throttling, paid prioritization, and data caps because of the increase in capacity); New America's Open Technology Institute Reply at 18 (arguing that discriminatory forms of zero rating incentivize BIAS providers to keep data caps low, and noting that "needlessly low data caps create bandwidth scarcity that can be auctioned off to content or application providers seeking a competitive advantage, or to favor an affiliate.").

[2161] Scott Jordan Comments at 37 (explaining that "[i]f a broadband provider offers non-broadband services such as video, then such data caps unreasonably interfere with or unreasonably disadvantage competing over-the-top video providers, because the overage charges are substantially higher than necessary to recover the cost associated with heavy usage").

[2162] *Id.* (explaining that not enough of the associated revenue is reinvested in network capacity).

[2163] *Id.* (asserting that data caps are unlikely to increase broadband subscription).

[2164] *Id.* at 38 (asserting that data caps reduce heavy usage by more than the amount that reflects end user valuations on traffic volume, and thus unreasonably interfere with, or unreasonably disadvantage, an end user's ability to use high-volume Internet content).

[2165] Letter from Scott H. Angstreich, Counsel for USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at Attach., Mark Israel et al., *Ex Parte White Paper* 3, 34-50 (Feb. 23, 2024) (Mark Israel et al. *Ex Parte White Paper*); *see also* USTelecom and NCTA Feb. 23, 2024 *Ex Parte* at 27-28 (arguing that a ban on data caps would lead to "a substantial increase in traffic," which would worsen the Internet experience for all users or require massive BIAS provider investment, and also asserting that the Commission's proposal to analyze tiered data plans under section 201 or 202 of the Act, or under the proposed general conduct rule, would amount to rate regulation); International Center for Law & Economics Reply at 37-42 (arguing that prohibiting usage-based pricing would harm consumers, lead to inefficient network-usage, and prevent innovation in "more nuanced pricing approaches"); CTIA Reply at 84-86 (arguing that usage-based pricing increases consumer choice, improves efficiency and promotes access, and that "[c]ritically, usage-based pricing and zero-rating are rate structures, and the Commission must reject claims to regulate them, as any such activity would be impermissible

(continued….)

542.     We agree with Professor Jordan that the Commission can evaluate data caps under the general conduct standard.[2166]  We do not at this time, however, make any blanket determinations regarding the use of data caps based on the record before us.  The record demonstrates that while BIAS providers can implement data caps in ways that harm consumers or the open Internet, particularly when not deployed primarily as a means to manage congestion, data caps can also be deployed as a means to manage congestion or to offer lower-cost broadband services to consumers who use less bandwidth.  As such, we conclude that it is appropriate to proceed incrementally with respect to data caps, and we will evaluate individual data cap practices under the general conduct standard based on the facts of each individual case, and take action as necessary.[2167]

### 3.     Transparency Rule

543.     Transparency has long been a key element of the Commission's framework for protecting the open nature of the Internet, recognized and upheld by both the courts[2168] and Congress,[2169] and today we update our transparency rule to reflect that important role.  Specifically, we modify the transparency rule by reversing the changes made to the text of the rule under the *RIF Order*, restoring the requirements to disclose certain network practices and performance characteristics eliminated by the *RIF Order*, and adopting changes to the means of disclosure, including adopting a direct notification requirement.  We find that these actions appropriately balance the benefits to consumers and edge providers and the costs to BIAS providers.  As explained below, we find that any changes or modifications to disclosures required by the *Broadband Label Order* are most appropriately addressed in response to that proceeding's *Further Notice*.[2170]

544.     In the *2010 Open Internet Order*, the Commission adopted a transparency rule that required a BIAS provider to "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings."[2171]  The *2011 Advisory Guidance* advised providers on appropriate methods for disclosing performance metrics, network practices, and commercial terms, and clarified how providers could comply with the requirement to

---

rate regulation"); NCTA et al. Reply at 60-64 (providing that the Commission should continue to allow usage-based billing because such policies enhance end-user control and are fairer to consumers that "are light Internet users," any limitation on usage-based billing would constitute rate regulation, and such consumption-based pricing models are widely accepted for other types of goods and services); Letter from Matthew A. Brill and Matthew T. Murchison, Counsel for NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 and Attach., Debra J. Aron et al., *The Economics of Usage-Based Pricing, Speed Tiers, and Overage Charges in the Pricing of Broadband Services* (filed Apr. 18, 2024) (arguing that usage-based pricing plans "bring substantial consumer benefits and contribute significantly to the Commission's policy goals" as demonstrated by the attached report).

[2166] *See* Letter from Scott Jordan and Ali Nikkhah to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 4 (filed Mar. 12, 2024) (Jordan & Nikkhah Mar. 12, 2024 *Ex Parte*).

[2167] *See also* INCOMPAS Comments at 51-52 & n.130 (noting their support for a case-by-case approach to examining zero-rating policies, and stating that INCOMPAS "remains concerned about data caps from incumbent, dominant wireline BIAS providers").

[2168] *See Verizon*, 740 F.3d at 635-59 (upholding the Commission's transparency rule); *Mozilla*, 940 F.3d at 46-49 (same).

[2169] IIJA § 60504(a).

[2170] *Broadband Label Further Notice*, 37 FCC Rcd 13686.

[2171] *2010 Open Internet Order*, 25 FCC Rcd at 17937, para. 54.

provide such information to consumers at the "point-of-sale."[2172]  The *2014 Advisory Guidance* reminded providers that their transparency rule disclosures and advertising claims must be consistent.[2173]

545.       Finding that BIAS end-users and edge providers would be better served and informed by additional disclosures, the Commission adopted targeted, incremental enhancements to the 2010 transparency rule in the *2015 Open Internet Order* requiring providers to disclose additional information about performance characteristics, commercial terms, and network practices.[2174]  Specifically, in regards to performance characteristics, the Commission required providers to disclose all performance characteristics, including packet loss, for each broadband service offered, and mandated that all performance-related disclosures reasonably reflect the performance a consumer could expect in the geographic area in which the consumer would be purchasing service.[2175]  The Commission also required that BIAS providers provide more precise information regarding commercial terms, including the full monthly service charge during the promotional period, the full monthly charge after the expiration of a promotional rate, any one-time or recurring fees or surcharges, and data caps and allowances.[2176]  Regarding network practices, the Commission required BIAS providers to make additional disclosures pertaining to congestion management, application-specific behavior, device attachment rules, and security.[2177]  Lastly, the Commission required BIAS providers to directly notify end users "if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion that is likely to have a significant impact on the end user's use of service."[2178]  To assist providers with compliance, the Commission also offered a voluntary broadband label "safe harbor." Shortly thereafter, the Commission also adopted the *2016 Advisory Guidance*, detailing acceptable methods for reporting performance characteristics and clarifying the "point-of-sale" requirements.[2179]

546.       In 2017, however, the Commission reversed course and in the *RIF Order* eliminated the enhancements adopted by the *2015 Open Internet Order*, including the requirements to:  (1) disclose packet loss; (2) ensure performance related-characteristics reasonably reflect the performance a consumer could expect in the geographic area in which the consumer would be purchasing service; (3) ensure network performance is measured over a reasonable period of time and during times of peak service; (4) disclose any network practice applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user; and (5) directly notify a user if an individual use of a network would trigger a network practice based on demand prior to a period of

---

[2172] *FCC Enforcement Bureau and Office of General Counsel Issue Advisory Guidance for Compliance with Open Internet Transparency Rule*, WC Docket No. 09-191, Public Notice, 26 FCC Rcd 9411, 9411 (EB/OGC 2011) (*2011 Advisory Guidance*).

[2173] *FCC Enforcement Advisory, Open Internet Transparency Rule:  Broadband Providers Must Disclose Accurate Information to Protect Consumers*, Public Notice, 29 FCC Rcd 8606, 8607 (2014) (*2014 Advisory Guidance*).

[2174] *2015 Open Internet Order*, 25 FCC Rcd at 5672, para. 162 ("We conclude that enhancing the existing transparency rule as described below will better enable end-user consumers to make informed choices about broadband services by providing them with timely information tailored more specifically to their needs, and will similarly provide edge providers with the information necessary to develop new content, applications, services, and devices that promote the virtuous cycle of investment and innovation.").

[2175] *2015 Open Internet Order*, 25 FCC Rcd at 5674-75, paras. 165-66; *see also RIF Order*, 33 FCC Rcd at 436-37, para. 214 (describing the additional reporting requirements).

[2176] *2015 Open Internet Order*, 30 FCC Rcd at 5672-73, para. 164; *see also RIF Order*, 33 FCC Rcd at 436-37, para. 214 (describing the additional reporting requirements).

[2177] *2015 Open Internet Order*, 30 FCC Rcd at 5672-73, para. 164; *see also RIF Order*, 33 FCC Rcd at 436-37, para. 214 (describing the additional reporting requirements).

[2178] *See 2015 Open Internet Order*, 30 FCC Rcd at 5677, para. 171.

[2179] *See Guidance on Open Internet Transparency Requirements*, Public Notice, GN Docket No. 14-28, 31 FCC Rcd 5330 (2016) (*2016 Advisory Guidance*).

congestion that is likely to have a significant impact on the end user's service.[2180]  Additionally, because the *RIF Order* eliminated the bright-line rules prohibiting blocking, throttling, and paid or affiliated prioritization practices, the Commission revised the obligations of the transparency rule to require BIAS providers to disclose such practices.[2181]  The Commission also revised the text of the rule to require that "[a]ny person providing broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings," in order to reflect the Commission's reliance on section 257 of the Act as authority for the transparency rule.[2182]

547.    As part of the Infrastructure Act in 2021, Congress directed the Commission to promulgate rules for an FDA nutrition-style label of broadband facts to be displayed at the point-of-sale by providers based on the *2015 Open Internet Order* broadband label safe harbor.[2183]  In November 2022, the Commission adopted the *Broadband Label Order* implementing this congressional direction, which requires "ISPs to display, at the point of sale, labels that disclose certain information about broadband prices, introductory rates, data allowances, and broadband speeds, and to include links to information about their network management practices, [and ] privacy policies."[2184]  Providers also must make clear whether the price for a given service is an introductory rate and, if so, what the price will be after the introductory period ends.[2185]  Since April 10, 2024, providers with more than 100,000 subscribers have been obligated to display the broadband label.[2186]

### a.    Content of the Transparency Rule

548.    We adopt the transparency rule originally adopted in 2010 and reaffirmed in 2015.

---

[2180] *See RIF Order*, 33 FCC Rcd at 437, para. 215 ("Today, we retain the transparency rule as established in the [*2010*] *Open Internet Order*, with some modifications, and eliminate the additional reporting obligations of the [*2015 Open Internet Order*]."). The Commission also eliminated the *2016 Advisory Guidance*, which advised providers on how to report performance characteristics consistent with the *2015 Open Internet Order* enhancements. *Id.* at 442, para. 225.

[2181] *See id.* at 440, para. 220 (listing blocking, throttling, affiliated prioritization, and paid prioritization as required disclosures).

[2182] *Id.* at 438, para. 213. The *Verizon* court upheld the transparency rule as a reasonable exercise of the Commission's authority under section 706 of the 1996 Act. *Verizon*, 740 F.3d at 635-59. In the *RIF Order*, the Commission departed from its long-held view and instead concluded that the directives to the Commission in section 706 of the 1996 Act are better interpreted as hortatory, and not as grants of regulatory authority. *RIF Order*, 33 FCC Rcd at 470-80, paras. 268-283. As a result, the Commission relied on authority under section 257 of the Act for the transparency rule. *See RIF Order*, 33 FCC Rcd at 445, para. 232. Section 257(a) directs the Commission to "identify[] and eliminat[e] . . . market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services." 47 U.S.C. § 257(a). Section 257(c) directed the Commission to triennially report to Congress on such marketplace barriers and how they have been addressed by regulation or could be addressed by recommended statutory changes. 47 U.S.C. § 257(c) (2017). Congress later repealed subsection (c) of section 257 and replaced it with section 13, 47 U.S.C. § 163, which imposes a substantially similar reporting requirement.

[2183] IIJA § 60504(a).

[2184] *See Broadband Label Order*, 37 FCC Rcd at 13687, para. 3. The Commission recently declined broad reconsideration of the broadband label rules but does have an ongoing *Further Notice*. *See Broadband Label Reconsideration Order*.

[2185] *See Broadband Label Order*, 37 FCC Rcd at 13687, para. 2.

[2186] *Consumer and Governmental Affairs Bureau Announces Compliance Dates of April 10, 2024 and October 10, 2024 for Broadband Label Rules*, Public Notice, DA 23-943, at 1 (CGB Oct. 10, 2023).

Doing so caters to a broader relevant audience of interested parties than the audience identified in the *RIF Order*. As such, we revise the transparency rule to read as follows:

> *A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.*

549.     The *RIF Order* revised the text of the transparency rule, which had been in place since 2010 and upheld by the courts twice as a lawful exercise of the Commission's regulatory authority under section 706 of the 1996 Act, and independently under the Commission's exercise of its authority under Title II. When the Commission found it did not have independent regulatory authority under section 706 in the *RIF Order*, finding instead that section 706 was "merely hortatory," it eliminated the Commission's underlying authority for the transparency rule. Instead, it chose to rely solely on section 257 of the Act and revised the text of the rule to reflect that reliance. As discussed further below, we reaffirm our interpretation of section 706 of the 1996 Act as an independent source of regulatory authority, and rely on our regulatory authority under section 706, our authority under Title II of the Act to prohibit unjust and unreasonable practices, and our authority under section 257 as the legal bases for the transparency rule.[2187] As such, we return to the prior formulation of the transparency rule, which more appropriately captures the relevant audience of BIAS providers' transparency disclosures—content, application, service, and device providers.[2188] Reinstating the text of the transparency rule from the *2010 Open Internet Order* is also consistent with the Commission's finding in the *Broadband Label Order* that while the labels primarily serve as a quick reference tool, "the transparency rule seeks to enable a deeper dive into details of broadband Internet service offerings, which could be relevant not only for consumers as a whole, but also for consumers with particularized interests or needs, as well as a broader range of participants in the Internet community—notably including the Commission itself."[2189] We find that content, application, service, and device providers are vital to the health of the Internet ecosystem and that given their reliance on broadband services, returning the scope of the transparency rule to explicitly cover their interests is warranted and alleviates any confusion created by the changes adopted in the *RIF Order*.

550.     Consistent with prior Commission guidance, we make clear that BIAS providers must maintain the accuracy of all disclosures. Thus, "whenever there is a material change in a provider's disclosure of commercial terms, network practices, or performance characteristics, the provider has a duty to update the disclosure in a manner that is 'timely and prominently disclosed in plain language accessible to current and prospective end users and edge providers, the Commission, and third parties who wish to monitor network management practices for potential violations of open Internet principles.'"[2190] A

---

[2187] *See infra* Section V.F.

[2188] *See* Scott Jordan Comments at 8 ("The Commission should return to the requirement that the information be sufficient for all content, application, service, and device providers, not merely for entrepreneurs and other small businesses. As the *2010 Open Internet Order* recognized, 'disclosure supports innovation, investment, and competition by ensuring that startups and other edge providers have the technical information necessary to create and maintain online content, applications, services, and devices, and to assess the risks and benefits of embarking on new projects.'"); New America's Open Technology Institute Comments at 44 ("This version is noticeably different in two ways from the 2010 version of the rule. First, the original rule required information regarding network management practices, performance, and commercial terms to be sufficient for all "content, application, service, and device providers," rather than just entrepreneurs and small businesses. The Commission should reverse this arbitrary substitution and avoid any confusion about the scope of the transparency rule that may have been introduced by the 2017 order's different description of the relevant audience.").

[2189] *Broadband Label Order*, 37 FCC Rcd at 13721, para. 107.

[2190] *2015 Open Internet Order*, 30 FCC Rcd at 5671, para. 161 (quoting *2010 Open Internet Order*, 25 FCC Rcd at 17928-39, para. 56).

"material change" is "any change that a reasonable consumer or edge provider would consider important to their decisions on their choice of provider, service, or application."[2191]

551.    Beginning with the *2010 Open Internet Order*, the Commission has provided guidance on the network management practices, performance, and commercial terms that BIAS providers must disclose.[2192]  We repeat the relevant guidance here, updated as appropriate based on the record.

**Network Practices**

- *Congestion Management.*  Descriptions of congestion management practices, if any. These descriptions should include the types of traffic subject to practices; purposes served by practices; the practices' effects on end users' experience; criteria used in practices, such as indicators of congestion that trigger a practice, including any usage limits triggering the practice, and the typical frequency of congestion; usage limits and the consequences of exceeding them; and references to engineering standards, where appropriate.

- *User-Based Practices.*  Practices that are applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user, the purpose of the practice, which users or data plans may be affected, the triggers that activate the use of the practice, the types of traffic that are subject to the practice, and the practice's likely effects on end users' experiences.[2193]

- *Affiliated Prioritization.*  Any practice that directly or indirectly favors some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, or resource reservation, to benefit an affiliate, including identification of the affiliate.

- *Paid Prioritization.*  Any practice that directly or indirectly favors some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, or resource reservation, in exchange for consideration, monetary or otherwise.

- *Zero Rating.*  Any practice that exempts edge services, devices, applications, and content (edge products) from an end user's usage allowance or data cap.

- *Application-Specific Behavior.*  Whether and, if applicable, why the provider blocks or rate-controls specific protocols or protocol ports, modifies protocol fields in ways not prescribed by the protocol standard, or otherwise inhibits or favors certain applications or classes of applications.

- *Device Attachment Rules.*  Any restrictions on the types of devices and any approval procedures for devices to connect to the network.  Mobile providers must disclose their third-party device and application certification procedures, if any; clearly explain their criteria for any restrictions on the use of their network; and expeditiously inform device and application providers of any decisions to deny access to the network or of a failure to approve their particular devices or applications.[2194]

---

[2191] *Id.* at 5671-72, para. 161.

[2192] *See 2010 Open Internet Order*, 25 FCC Rcd at 17938-39, para. 56.

[2193] *2015 Open Internet Order*, 30 FCC Rcd at 5676-77, para. 169.

[2194] *2010 Open Internet Order*, 25 FCC Rcd at 17959, para. 98.  Mobile providers should also follow the guidance the Commission provided to licensees of the upper 700 MHz C Block spectrum regarding compliance with their disclosure obligations, particularly regarding disclosure to third-party application developers and device manufacturers of criteria and approval procedures (to the extent applicable).  For example, these disclosures include, to the extent applicable, establishing a transparent and efficient approval process for third parties, as set forth in Rule 27.16(b).  *Id.*

- *Security.* Practices used to ensure end-user security or security of the network, including types of triggering conditions that cause a mechanism to be invoked (but excluding information that could reasonably be used to circumvent network security).[2195]

**Performance Characteristics**

- *Service Description.* A general description of the service, including the service technology, expected and actual access speed and latency,[2196] packet loss, and the suitability of the service for real-time applications. Actual network performance data should be reasonably related to the performance the consumers would likely experience in the geographic area in which the consumer is purchasing service, and should be measured in terms of average performance over a reasonable period of time and during times of peak usage.

- *Impact of Non-BIAS Data Services.* What non-BIAS data services, if any, are offered to end users; whether and how any non-BIAS data services may affect the last-mile capacity available for, and the performance of, BIAS; and a description of whether the service relies on particular network practices and whether similar functionality is available to applications and services offered over BIAS.

**Commercial Terms**

- *Pricing.* For example, monthly prices,[2197] usage-based fees, other fees,[2198] data caps and allowances,[2199] and fees for early termination or additional network services.

---

[2195] As the Commission has previously explained, we expect BIAS providers to exercise their judgment in deciding whether it is necessary and appropriate to disclose particular security measures. We do not expect BIAS providers to disclose internal network security measures that do not bear on a consumer's choices. *See RIF Order*, 33 FCC Rcd at 440-41 n.814.

[2196] Fixed BIAS providers may use the methodology from the Measuring Broadband America (MBA) program to measure actual performance, or may disclose actual performance based on internal testing, consumer speed test data, or other data regarding network performance, including reliable, relevant data from third-party sources. BIAS providers that have access to reliable information on network performance may disclose the results of their own or third-party testing. Those mobile BIAS providers that do not have reasonable access to such network performance data may disclose a Typical Speed Range (TSR) representing the range of speeds and latency that can be expected by most of their customers, for each technology/service tier offered, along with a statement that such information is the best approximation available to the broadband provider of the actual speeds and latency experienced by its subscribers. *RIF Order*, 33 FCC Rcd at 441 n.818 (citing 2011 Advisory Guidance, 26 FCC Rcd at 9415-16).

[2197] Monthly pricing shall include the full monthly service charge, and any promotional rates should be clearly noted as such, specify the duration of the promotional period, and note the full monthly service charge the consumer will incur after the expiration of the promotional period. *2015 Open Internet Order*, 30 FCC Rcd at 5673, para. 164. We clarify that price disclosure requirements, which have been part of the transparency rule since 2010, will not lead to the publishing of data that will act as a *de facto* tariff system, as the International Center for Law & Economics cautions. International Center for Law & Economics Comments at 36. We observe that the transparency requirements, including publication of commercial terms, such as rates, have been upheld by the D.C. Circuit under section 706 and in any event, Congress specifically gave the Commission authority to require that broadband providers publish their rates in the IIJA. *See* IIJA § 60504(a); *Broadband Label Order*, 37 FCC Rcd at 13697-701, paras. 23-36.

[2198] Other fees include all additional one time and/or recurring fees and/or surcharges the consumer may incur either to initiate, maintain, or discontinue service, including the name, definition, and cost of each additional fee. These may include modem rental fees, installation fees, service charges, and early termination fees, among others. *2015 Open Internet Order*, 30 FCC Rcd at 5673, para. 164.

[2199] BIAS providers should disclose any data caps or allowances that are a part of the plan the consumer is purchasing, as well as the consequences of exceeding the cap or allowance (e.g., additional charges, loss of service for the remainder of the billing cycle). *2015 Open Internet Order*, 30 FCC Rcd at 5673, para. 164.

- *Privacy Policies.* For example, whether network management practices entail inspection of network traffic, and whether traffic information is stored, provided to third parties, or used by the carrier for non-network management purposes.

- *Redress Options.* Practices for resolving end-user and edge provider complaints and questions.

Below, we discuss in more detail our rationale for revisions to the current transparency rule.

552.    *Network Practices.* As an initial matter, because we no longer permit blocking, throttling, affiliated prioritization, or paid prioritization under this Order, we find that there is no need to continue requiring providers to report such practices as was required under the *RIF Order*, except to the extent that a provider engages in paid or affiliated prioritization subject to a Commission waiver.[2200] We agree with commenters who assert that the *RIF Order* created unnecessary confusion around the required network practice disclosures,[2201] and we reaffirm that providers must disclose congestion management practices, application-specific behavior, device attachment rules, and security practices.[2202] We also reaffirm that the transparency rule requires that BIAS providers disclose any practices applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user.[2203] We also require that "disclosures of user-based or application-based practices [must] include the purpose of the practice, which users or data plans may be affected, the triggers that activate the use of the practice, the types of traffic that are subject to the practice, and the practice's likely effects on end users' experiences."[2204] In addition, we require BIAS providers to disclose any zero-rating practices, specifically, any practice that exempts particular edge services, devices, applications, and content (edge products) from an end user's usage allowance or data cap. We find that requiring disclosure of information pertaining to zero-rating practices will better enable the Commission and Internet researchers to identify those zero-rating practices that may harm the openness of the Internet.[2205] And as the Commission has previously explained, "[t]hese disclosures with respect to network practices are necessary: for the public and the Commission to know about the existence of network practices that may be evaluated under the rules, for users to understand when and how practices may affect them, and for edge providers to develop Internet offerings."[2206]

---

[2200] *See supra* Section V.B.1.c.

[2201] Scott Jordan Comments at 19 ("Disclosure of 'the purpose of the practice, which users or data plans may be affected, the triggers that activate the use of the practice, the types of traffic that are subject to the practice, and the practice's likely effects on end users' experiences' give end-users the most basic and most relevant information about *how* a network practice will affect them. What disclosures about network practices could possibly be more basic and more relevant? Furthermore, these disclosures were *unanimously* recommended by BITAG." (quoting Broadband Internet Technical Advisory Group, Real-Time Network Management of Internet Congestion at 43 (2013), http://www.bitag.org/documents/BITAG_-_Congestion_Management_Report.pdf)).

[2202] *2015 Open Internet Order*, 30 FCC Rcd at 5676, para. 169.

[2203] As the Commission explained in the *2015 Open Internet Order*, for example, a BIAS provider "may define user groups based on the service plan to which users are subscribed, the volume of data that users send or receive over a specified time period of time or under specific network conditions, or the location of users." *2015 Open Internet Order*, 30 FCC Rcd at 5676, para. 169.

[2204] *Id.* at 5676-77, para. 169.

[2205] *See, e.g.*, Jon Peha Comments at 14 ("For example, it is not enough to know that a BIAS provider uses zero rating somewhere in its network for some subscribers. Precisely what traffic is zero-rated, and with what data cap, and for which subscribers if not all? Do these details differ from location to location? From time to time? The FCC could do useful analysis with this kind of information . . . ."); New America's Open Technology Institute Comments at 52-53 (asserting that the Commission's "ability to examine and distinguish among such practices will be critical both to protecting consumers and promoting competition going forward").

[2206] *2015 Open Internet Order*, 30 FCC Rcd at 5677, para. 169.

553.     We decline the request by one commenter to require BIAS providers to make disclosures that would permit end users to identify application-specific usage or to distinguish which user or device contributed to which part of the total data usage.[2207]  We find, as we did in the *2015 Open Internet Order*, that collection of application-specific usage data by a BIAS provider may require use of deep packet inspection practices that may pose privacy concerns for consumers.[2208]

554.     *Performance Characteristics*.  We reinstate the enhanced performance characteristics disclosures eliminated by the *RIF Order* to require BIAS providers to disclose packet loss under the transparency rule.[2209]  As Professor Scott Jordan explains, the three primary network performance metrics are speed (throughput), latency (end-to-end delay), and packet loss, which have been consistently recognized as such since the early days of the Internet.[2210]  Latency and packet loss are particularly relevant metrics to real-time applications.[2211]  We agree with Professor Jordan that "both latency and packet loss are critical to the user-perceived performance of real-time applications," such as video-conferencing applications, and the record reflects that the suitability of BIAS for real-time applications depends on both of these metrics.[2212]  We believe that such information is also readily available to BIAS providers from commercial network performance measurement companies, along with speed and latency measurements.[2213]

555.     Contrary to AT&T's assertions that requiring disclosure of packet loss would be burdensome,[2214] we expect that many BIAS providers "already measure packet loss today, as this primary network performance metric is required in order to determine the suitability of their [services] for the real-

---

[2207] Measurement Lab Comments at 6-7 ("[T]he Commission should consider adopting additional disclosure requirements . . . 'that permit end users to identify application-specific usage or to distinguish which user or device contributed to which part of the total data usage.'").

[2208] *See 2015 Open Internet Order*, 30 FCC Rcd at 5677, para. 170 ("We decline at this time to require such disclosures, noting that collection of application-specific usage by a broadband provider may require use of deep packet inspection practices that may pose privacy concerns for consumers.").

[2209] Scott Jordan Comments at 29 ("The Commission should also add packet loss to the broadband label."); Jon Peha Comments at 13-14 (asserting that consumers "want to know the upstream speed, downstream speed, latency and packet loss of a BIAS"); New America's Open Technology Institute Comments at 46 (advocating for the inclusion of "packet loss, which was specified in the 2015 order but has not appeared in current mock-ups for broadband nutrition labels"); ALA Comments at 17 (noting that packet loss should be a required disclosure either in the broadband label or the transparency rule).  This proceeding is not the appropriate forum for us to determine whether such disclosures should be added to the broadband label as some commenters request, and in any event, the Commission recently declined this suggested addition to the broadband label in the *Broadband Label* proceeding. *See Broadband Label Order*, 37 FCC Rcd at 13700-02, paras 45-46.

[2210] *See* Scott Jordan Comments at 9.

[2211] *Id.*; *see also* David Choffnes Comments at 6 ("Metrics that capture properties such as expected videoconferencing performance, streaming quality, and other important quality of experience metrics are likely to be better received by consumers.").

[2212] Scott Jordan Comments at 10; *see also* Barbara van Schewick Mar. 12, 2024 *Ex Parte*, Attach. at 7-8 ("Packet loss is critical for many real-time applications such as online video  conferencing.  For example, applications like Zoom and Microsoft Teams recommend a packet loss of 2% or less.  Thus, the 2017 disclosure rule makes it impossible for consumers that need to use online video conferencing for work, school, or other purposes to determine which of the potential internet service plans allows them to do so."); Peha/Jordan Apr. 19, 2024 *Ex Parte* at 6 (explaining that "in a typical videoconferencing application, packet loss can cause noticeable disruption in video quality, even when delay and throughput are excellent").

[2213] *See* Scott Jordan Comments at 12, 16-17.

[2214] AT&T Apr. 15, 2024 *Ex Parte* at 2 (asserting that requiring reporting of packet loss may require it to "develop new systems and software; collect, analyze, and verify vast amounts of new data; train thousands of employees and contractors; potentially install new equipment in dozens of vehicles used for drive testing; potentially add thousands of miles to existing drive test routes; and implement numerous other costly initiatives").

time applications that are important to many of their customers."[2215] As Professors Peha and Jordan explain, "measurements of latency, which are already required, inevitably enable simultaneous measures of packet loss with de minimis effort."[2216] And to the extent CTIA argues that the Office of Management and Budget's (OMB)'s previous "refusal to approve packet loss should foreclose collecting that information from mobile providers,"[2217] we disagree. In its 2016 review, OMB found that "packet loss will not be a required performance metric for mobile disclosure" at this time, and directed the Commission to assess "i. the practical utility of packet loss as it relates to mobile performance disclosure;" "ii. 'accurate' methods of calculating mobile packet loss (i.e., drive testing, voluntary app, etc.);" and "iii. whether using voluntary consensus standards would be a viable alternative."[2218] We agree with Professors Peha and Jordan that the "practical utility of packet loss as it relates to mobile performance is clearly established by the rapidly increasing number of end users who utilize video conference apps on their smartphones."[2219] Finally, while we acknowledge that the Commission recently declined to require packet loss as part of the broadband label,[2220] the Commission nonetheless found that packet loss "may provide useful information to certain consumers."[2221] We also observe that the disclosures required by the transparency rule serve to inform more than just consumers—they also serve edge providers and other interested third parties, including the Commission. Limiting the transparency rule requirements to information displayed via the broadband label would therefore not provide adequate insight for edge providers, Internet researchers, certain consumers, or the Commission.[2222]

---

[2215] Scott Jordan Comments at 12 (observing that the providers of the two most popular consumer speed tests—Ookla Speedtest and Mlab—both measure packet loss, and that there is "no incremental cost" for BIAS providers that are already using any of these methodologies to measure download speed, upload speed, and latency).

[2216] Peha/Jordan Apr. 19, 2024 *Ex Parte* at 7 ("In order to measure latency, a large number of packets are sent from a measurement client to a measurement server, and, for each received packet, the measurement server returns acknowledgements to the measurement client. Latency is measured by recording the time between when a packet is sent and when the corresponding acknowledgement is received. Packet loss is measured by simply counting the number of acknowledgements that are *not* received.").

[2217] Letter from Scott K. Bergmann et al., CTIA, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 4 (filed Apr. 16, 2024) (CTIA Apr. 16, 2024 *Ex Parte*). We also note that interested parties will have the opportunity to comment on any burdens associated with these requirements pursuant to the Paperwork Reduction Act (PRA). *See infra* Section IX.

[2218] *See* Notice of Office of Management and Budget Action, ICR Reference No. 201612-3060-012, (Dec. 15, 2016), https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201612-3060-012 (OMB 2016 Notice of Action).

[2219] Peha/Jordan Apr. 19, 2024 *Ex Parte* at 6-7.

[2220] *Broadband Label Order*, 37 FCC Rcd at 13700-02, paras 45-46; AT&T Apr. 15, 2024 *Ex Parte* at 2; USTelecom Apr. 15, 2024 *Ex Parte* at 5 (asserting that the Commission recognized that packet loss information "is largely irrelevant to consumers").

[2221] *Broadband Label Order*, 37 FCC Rcd at 13702, para. 46; *see also* Peha/Jordan Apr. 19, 2024 *Ex Parte* at 6 (asserting that in a recent consumer survey conducted by researchers at Carnegie Mellon University, over two thirds of survey respondents indicated that getting information on packet loss was either "very important or extremely important to them").

[2222] *See id.* at 13743, para. 107 ("Broadband labels . . . are designed to play a unique role . . . by providing a quick reference tool enabling easy comparisons among different service plans at the time of purchase. By contrast, the transparency rule seeks to enable a deeper dive into details of broadband Internet service offerings, which could be relevant not only for consumers as a whole, but also for consumers with particularized interests or needs, as well as a broader range of participants in the Internet community—notably including the Commission itself."). As such, we reject arguments by commenters that the Commission should not require packet loss disclosure under the transparency rule because it declined to do so in the *Broadband Label* proceeding. *See* USTelecom Apr. 15, 2024 *Ex Parte* at 5; AT&T Apr. 15, 2024 *Ex Parte* at 2. To the extent commenters express concern regarding the performance characteristics disclosures required under the *Broadband Label Order*, the *Broadband Label* proceeding is the appropriate forum in which to address them. *See, e.g.*, CTIA Reply at 88 ("[I]t would not be

(continued....)

556.     We also reinstate the transparency requirements in the *2015 Open Internet Order* and *2016 Advisory Guidance* that require performance characteristics to be reported with greater geographic granularity[2223] and to be "measured in terms of average performance over a reasonable period of time and during times of peak usage."[2224]  The record reflects that mobile BIAS providers "have access to substantially different amounts of spectrum in different geographical regions, and thus speeds may vary substantially by region,"[2225] and that disclosure requirements with geographic granularity are "essential to determine real-time application performance and provide consumers with necessary information to make an informed choice."[2226]  We thus disagree with AT&T that disclosure of actual network performance reasonably related to the performance that consumers would likely experience in the geographic areas in which a customer is purchasing service is of "little to no meaningful or beneficial use for consumers to make informed decisions."[2227]  Further, we find that peak usage performance can differ substantially from non-peak usage period performance and from all day performance, and we agree that "peak usage period speeds are more useful information to consumers" than are speeds calculated from measurements over 24-hour periods.[2228]  As such we find it appropriate to reinstate these enhancements to the transparency rule.

557.     We are not persuaded by AT&T's assertions that reporting actual peak usage metrics on a geographically disaggregated basis would be "an enormous undertaking,"[2229] and agree with Professor Jordan that "it is implausible that broadband providers do not already today measure broadband performance in various geographical regions," as providers likely use that information to inform their decisions regarding additional spectrum purchases in various geographical regions as well decisions about when and where to place additional cellular antennas to improve performance in these granular

---

appropriate for the Commission to modify the consumer broadband label requirements in this proceeding, as it has a Further Notice of Proposed Rulemaking on the topic pending in a separate docket.").

[2223] Scott Jordan Comments at 13 ("Commission should reinstate the requirement that actual network performance be reasonably related to the performance the consumer would likely experience in the geographic area in which the consumer is purchasing service."); Jon Peha Comments at 13-14 (stating that "the FCC should also require BIAS providers to clearly identify the geographic region for which all performance measures are applicable" on the label or separately as part of the transparency rule because "the FCC can use this information to understand the broadband market and trusted third parties like *Consumer Reports* can use it to inform consumers."); New America's Open Technology Institute Comments at 44-45 ("OTI believes that restoring . . . actual network performance metrics (including bandwidth, latency, and packet loss) with geographic granularity are essential to determine real-time application performance and provide consumers with the necessary information to make an informed choice.").

[2224] *See* Scott Jordan Comments at 16 ("[T]he Commission should reinstate the requirement that network performance be measured in terms of average performance over a reasonable period of time and during times of peak usage.  In addition, the Commission should determine the peak usage period."); New America's Open Technology Institute Comments at 49 (noting that consumers want to know "about when and by how much listed performance metrics may change during peak usage or other times"); ALA Comments at 17 (noting that the labels should reflect "[d]ownstream speed, upstream speed, latency, and packet loss in both normal and poor performance times"); Jon Peha Comments at 13-14 (noting that consumers want to know the performance characteristics of a network "when performance is poor").

[2225] Scott Jordan Comments at 13.

[2226] New America's Open Technology Institute Comments at 44-45; Barbara van Schewick Mar. 12, 2024 *Ex Parte*, Attach. at 7-8 ("Especially on mobile networks, network performance often varies considerably, depending on the amount of spectrum, and the quality of that spectrum, in each area.  To find the internet service plan that is right for them, consumers need to know the actual quality of the networks in their area.").

[2227] AT&T Apr. 15, 2024 *Ex Parte* at 3.

[2228] Scott Jordan Comments at 16 (providing evidence from Q2 2019 that speeds from 5pm-8pm were 42% lower than speeds from 7am-9am).

[2229] AT&T Apr. 15, 2024 *Ex Parte* at 3.

geographic areas.[2230]

558. In response to concerns about reporting peak usage in the record,[2231] we make clear that peak usage periods may be based solely on the local time zone, and that BIAS providers retain flexibility to determine the appropriate peak usage periods for their network performance metrics (but must disclose the peak usage periods chosen for such disclosures).[2232] We decline to otherwise codify specific methodologies for measuring the actual performance required by the transparency rule, finding, as in 2010 and 2015, that there is a benefit in permitting measurement methodologies to evolve and improve over time, with further guidance from Bureaus and Offices—like in 2011 and 2016—as to acceptable methodologies.[2233] We delegate authority to the Office of Engineering Technology (OET) and the Consumer and Governmental Affairs Bureau (CGB) to lead this effort.[2234]

559. The record demonstrates, however, that unlike their larger counterparts, BIAS providers that have 100,000 or fewer broadband subscribers may generally lack access to the resources necessary to easily comply with these enhanced performance characteristic transparency requirements.[2235] As such, we temporarily exempt (with the potential to become permanent) BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider,[2236] from the requirements to disclose packet loss and report their performance characteristics

---

[2230] Scott Jordan Comments at 14 (noting also that broadband performance is available for a variety of granularities of geographical regions through the Ookla *Speedtest Intelligence*); Peha/Jordan Apr. 19, 2024 *Ex Parte* at 7.

[2231] *See, e.g.*, CTIA Apr. 16, 2024 *Ex Parte* at 4; AT&T Apr. 15, 2024 *Ex Parte* at 3.

[2232] *See 2016 Advisory Guidance*, 31 FCC Rcd at 5335; Peha/Jordan Apr. 19, 2024 *Ex Parte* at 8.

[2233] *See 2015 Open Internet Order*, 30 FCC Rcd at 5675, para. 166; *2011 Advisory Guidance*, 26 FCC Rcd 9411; *2016 Advisory Guidance*, 31 FCC Rcd 5330.

[2234] We expect this effort will include, among other things, examining the appropriate geographic measurement units for reporting. *See* OMB 2016 Notice of Action; CTIA Apr. 16, 2024 *Ex Parte* at 4. We need not determine, at this time, the accuracy of CTIA's assertion that "consumers have no idea what [Cellular Market Areas (CMAs)] are, and even if they did, they likely would not know what CMA they are in at any given time since they use wireless on the go." CTIA Apr. 16, 2024 *Ex Parte* at 4. Consumers know where they live and likely purchased service, and as long as BIAS providers "show the measurements associated with the CMA containing the consumer's listed address," as T-Mobile did for several years following the *2015 Open Internet Order*, the consumer "does not have to know where the CMAs are, or even what a CMA is." Peha/Jordan Apr. 19, 2024 *Ex Parte* at 7.

[2235] *See* WISPA Comments at 49 ("In addition to the costs of creating and implementing broadband labels that providers must incur, making changes to disclosure statements also would impose costs that smaller providers may find difficult to manage alongside the other unfunded mandates embodied in other regulatory requirements Congress has imposed."); NRECA Comments at 10 (noting that additional transparency requirements "might be managed by larger ISPs without significant impact, but it would create considerable additional burden (and compliance minefield) for small ISPs with limited administrative and regulatory compliance personnel"); *see also* ACA Connects Reply at 4 ("Because they lack the same resources as the Fortune 100 companies that dominate the broadband landscape, [small and mid-sized providers] are less able to absorb the costs of compliance with additional and possibly novel regulatory mandates."); INCOMPAS Comments at 6 ("[The Commission] must balance any new requirements against potential new burdens, especially for small BIAS providers."); NFIB Comments at 3 ("The FCC should recognize that a small business provider of BIAS, as compared to large providers such as Comcast or AT&T, has fewer resources and capabilities available to learn about, decipher, and implement FCC BIAS regulations."); *see also* LARIAT Apr. 19, 2024 *Ex Parte* at 1-2 (requesting a small provider exemption from the transparency requirements and other provisions).

[2236] We observe that our description of small providers to which we apply this exemption aligns with exceptions the Commission has previously provided for small providers, including the implementation of the Safe Connections Act, a longer implementation period for certain providers in the *Broadband Label* proceeding, a delayed deadline to implement caller ID authentication rules stemming from the permanent TRACED Act, and in describing which small providers are exempt from certain rural call completion rules. *See Safe Connections Act Report and Order* at 72, para. 140; 47 CFR § 64.6304(a)(2); *Broadband Label Order*, 37 FCC Rcd at 13723-24, paras. 118-119; *Call Authentication Trust*

(continued….)

with greater geographic granularity and to be measured in terms of average performance over a reasonable period of time and during times of peak usage. While we believe that reinstating these performance characteristic transparency enhancements will have minimal costs for most larger BIAS providers, we take seriously the concerns raised in the record about the additional compliance costs for small businesses. Moreover, we observe that the Commission provided a temporary exception (with the potential to become permanent) for some providers from the enhancements adopted in the *2015 Open Internet Order*.[2237] In light of the concerns in the record, past precedent, and the expenditures BIAS providers that have 100,000 or fewer broadband subscribers have already made—and continue to make— to address the requirements adopted by the *Broadband Label Order*,[2238] we find that an exemption for these providers is supported in this case. We delegate to CGB the authority to determine whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We direct CGB to seek comment on the question and adopt an order announcing whether it is maintaining an exemption by no later than 18 months after publication of this Order in the *Federal Register*.[2239]

560. We decline, however, to require disclosure of additional performance characteristics, as suggested by Measurement Lab, such as the source, location, timing, or duration of network congestion; and packet corruption and jitter.[2240] Noting that "congestion may originate beyond the broadband provider's network and the limitations of a broadband provider's knowledge of some of these performance characteristics," the Commission specifically declined to require the source, location, timing, or duration of network congestion in 2015.[2241] The Commission also declined to include packet corruption and jitter because of concerns around the difficulty of defining metrics for such performance characteristics.[2242] We find that Measurement Lab fails to adequately address the concerns expressed by the Commission in the *2015 Open Internet Order* and we thus decline to require these additional disclosures.

561. *Commercial Terms*. We find that additional disclosures pertaining to commercial terms are not necessary at this time. The broadband label now requires largely the same commercial term

---

*Anchor*, WC Docket No. 17-97, Second Report and Order, 36 FCC Rcd 1859, 1877-82, paras. 40-48 (2020); *Rural Call Completion*, WC Docket No. 13-39, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 16154, 16168, para. 27 (2013).

[2237] *See 2015 Open Internet Order*, 30 FCC Rcd at 5677-79, paras. 172-75.

[2238] *Cf.* WISPA Apr. 16, 2024 *Ex Parte* at 2 (requesting that the Commission issue a Further Notice examining "the costs to small BIAS providers in order to comply with all of the regulatory obligations the Commission has imposed on BIAS providers over the past two years (*e.g.*, broadband consumer labels, broadband data collection, data breach reporting requirements, and digital discrimination rules)"). We note that in each of those proceedings, the Commission specifically sought comment on, and considered the impact of, its proposals on small entities, consistent with the requirements of the Regulatory Flexibility Act.

[2239] *Cf. id.* at 1-2 (requesting that the Commission issue a Further Notice "inquiring into the scope of the temporary exemptions to the transparency requirements, the costs that any new transparency requirements are likely entail, and the impact those costs will have on small providers' planned investments and network expansion and upgrades"). WISPA also requests that the Commission apply any temporary or permanent exemptions to BIAS providers with 250,000 or fewer subscribers. WISPA Apr. 17, 2024 *Ex Parte* at 1-2. WISPA provides no explanation as to how many additional small providers would be covered by its proposed change to the scope of our exemptions, nor does it explain why such an expansion ins scope is needed, other than asserting that "[i]f exempting small ISPs from these rules was important in 2016, it is all the more important now given the other burdensome regulations that the Commission has imposed on BIAS providers." *Id.* at 2. As such, we decline to expand the temporary exemptions in this Order to BIAS providers with 250,000 or fewer subscribers.

[2240] *See, e.g.*, Measurement Lab Comments at 6-7 (urging the Commission to "consider adopting additional disclosure requirements regarding 'the source, location, timing, or duration of network congestion', 'packet corruption and jitter'").

[2241] *See 2015 Open Internet Order*, 30 FCC Rcd at 5675-76, para. 168.

[2242] *See id.*

disclosures, including information about promotional rates, fees, and/or surcharges, and all data caps or data allowances as those the Commission required in the *2015 Open Internet Order*.[2243]  Thus, we find no need to restore the commercial term enhancements required by the *2015 Open Internet Order*.  To the extent the record identifies requests for additional pricing information,[2244] we find that a potential addition aimed at informing consumers about pricing would be best considered in the broadband label docket.  We also decline to require more extensive privacy disclosures, as some commenters request,[2245] as we find that this is not the appropriate proceeding in which to address the content of BIAS providers' privacy notices.

562.    *Requested Updates to the Broadband Label.*  The record indicates that in addition to packet loss, commenters urge a wide variety of additional disclosures or changes to the broadband label, including requirements to disclose speed ranges for fixed and mobile broadband;[2246] to change how speeds are reported (e.g., change "typical" speeds and latency to median speeds and median latency);[2247] to include specific privacy disclosures directly on the label;[2248] to incorporate network management tables directly on the label;[2249] to include cybersecurity disclosures;[2250] to include network reliability measurements (e.g., number of minutes of outage per year);[2251] and to include the labels on a user's

---

[2243] *See, e.g.*, Lumen Comments at 32 (stating that "the additional specifications in the *2015 Open Internet Order* regarding pricing and related terms essentially would have required the same information about such subjects that are now required by the labeling rules (monthly price, additional fees, promotional pricing)—just in a slightly modified way from that already developed after careful deliberation in the 2022 Broadband Label Order").

[2244] *See* Greenlining Institute Reply at 3-4 (requesting that the Commission require BIAS providers to disclose "pricing information across geographies so that consumers can identify and report potential price discrimination or disinvestment and promote competition").

[2245] *See* Lawyers' Committee Comments at 21-22 ("Providers should thus be required to explain their data collection, use, and sharing policies and practices in two ways: (1) exhaustive long form privacy policies that can be scrutinized by experts, researchers, watchdogs, and regulators; and (2) simple short form notices that are easy for any consumer to understand and quickly digest."); *see also* Mozilla Comments at 7-8 (generally supporting more extensive transparency disclosures).

[2246] Scott Jordan Comments at 24 ("Given the desire for a uniform fixed broadband label that can be used to compare broadband plans, the best option is disclosure of the pair of median and 10th percentile speeds (along with an explanation that the 10th percentile means when performance is poor)."); New America's Open Technology Institute Comments at 45-46 ("Labels should display median download speeds and identify a standardized range to determine speed percentile rather than relying on providers to determine and display 'typical' speeds."); Jon Peha Comments at 13-14 ("The FCC should require that all of this information be reported, including measures like (i) reliability (e.g. minutes of outage per year), (ii) packet loss, (iii) 20th percentile (or some other low percentile specified by the FCC) of upstream speed, and (iv) 20th percentile (or other low percentile) of downstream speed, none of which are currently on the mandatory label.").

[2247] New America's Open Technology Institute Comments at 45-46 ("Labels should display median download speeds and identify a standardized range to determine speed percentile rather than relying on providers to determine and display "typical" speeds."); Scott Jordan Comments at 21 ("On the fixed broadband label, 'typical' speeds should be changed to median speeds, or to the pair of 10th percentile and median speeds.").

[2248] Scott Jordan Comments at 30 ("The broadband label should affirmatively state these two privacy practices:  (1) whether consumers' personal information is used for purposes other than providing broadband service, and (2) whether consumers' personal information is shared with third parties.").

[2249] *Id.* at 30 ("The Commission should add network management tables to the broadband label. The tables should include the type of practice and its effect.").

[2250] EPIC et al. Comments at 18 ("We also believe it would be valuable to include cybersecurity information on a secondary layer of the label, as EPIC and Public Knowledge argued in the Commission's docket on labels for Internet of Things devices.").

[2251] Jon Peha Comments at 13-14 (stating that consumers want to know a measure of reliability and that the Commission should include measures like reliability on the label).

monthly bill (in addition to the point of sale).[2252]  The Commission considered many of these requests as part of the record in the *Broadband Label* proceeding, and rejected them in the *Broadband Label Order*.[2253]  We find that such requests are more properly considered in that proceeding, as are requests for additional changes or additions that were raised in the *Broadband Label Further Notice*.[2254]

## b.    Means of Disclosure

563.    We agree with New America's Open Technology Institute that "[t]o be truly 'publicly available,' these disclosures must be where the public would expect to find them—on provider websites marketing these services."[2255]  As such, we require providers to disclose all information required by the transparency rule on a publicly-available, easily-accessible website.  We believe that consumers expect to find information about a provider's services on the provider's public website and that most consumers would not consider visiting the Commission's website, particularly the ECFS, to find information about a provider's services.  We find that by requiring providers to provide disclosures on their own websites, consumers will have greater access, and if there is any additional cost to providers, it would be minimal.  Ensuring disclosures under the transparency rule are accessible to individuals with disabilities remains a priority,[2256] and as such, we require BIAS providers to post the disclosures on their websites using an accessible format.  Consistent with the Commission's approach in the *Broadband Label Order*, we strongly encourage BIAS providers to use the most current version of the Web Content Accessibility Guidelines, an approach unopposed in the record.

564.    *Machine-Readable Format*.  As with the broadband label, we require that all transparency disclosures made pursuant to the transparency rule also be made available in machine-readable format.[2257]  By "machine readable," we mean providing "data in a format that can be easily processed by a computer without human intervention while ensuring no semantic meaning is lost."[2258]  The machine-readable disclosures should be made available in a spreadsheet file format such as the comma-separated values (.csv) format and be available on the same page and accessible via the same URL as the relevant "non-machine-readable" disclosures (e.g., network practice disclosures should be available in both the traditional narrative format and the machine-readable format on the same page of the provider's website).  We agree with commenters who note that machine readability enables interested parties to better compare the transparency disclosures of different companies. [2259]  As a result, this information can be more easily

---

[2252] New America's Open Technology Institute Comments at 50 ("While such information is useful for consumers at point of sale, they should also have access to the information after final purchase on their monthly bills."); New America's Open Technology Institute Reply at 16 ("Since BIAS providers are already required to publish broadband nutrition labels describing their service, there is no additional cost to providers to include these labels in their bills, while doing so can significantly benefit consumers.").

[2253] *See Broadband Label Order*, 37 FCC Rcd at 13700-02, paras. 42-50.

[2254] *See, e.g., id.* at 13706, para. 63 ("In the Further Notice, however, we seek comment on whether to include a reliability metric in the label that is uniformly applicable and easily comprehensible, and we seek comment on the details of its implementation."); *see also Broadband Label Further Notice*, 37 FCC Rcd at 13731, paras. 140-41 (seeking comment on a reliability metric).

[2255] New America's Open Technology Institute Comments at 44; *see also* Scott Jordan Comments at 8 ("The Commission should return to the requirement of the prominent display of disclosures on a publicly available website and disclosure of relevant information at the point of sale.  As the *2010 Open Internet Order* recognized, end users must be able to easily identify relevant disclosures, and having to search a Commission website for them is not reasonable.").

[2256] *See 2023 Open Internet NPRM* at 85, para. 180.

[2257] *See Broadband Label Order*, 37 FCC Rcd at 13708, paras. 68 (discussing the machine-readability requirement).

[2258] *See* 44 U.S.C. § 3502(18).

[2259] Measurement Lab Comments at 7 (urging the Commission to "require the disclosures to be in machine-readable format, akin to the Commission's recently-adopted approach for broadband consumer labels. . . . Users, advocates

(continued….)

studied by third parties and then more easily conveyed by those third parties to end users, who may otherwise be unable to, or uninterested in, understanding detailed privacy or network management practices. We find, therefore, that machine readability will further increase transparency. Notably, no commenter objects to this specific requirement in the record.[2260]

### c. Direct User Notification

565. Consistent with our findings in the *2015 Open Internet Order*, we require BIAS providers to directly notify end users "if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion, that is likely to have a significant impact on the end user's use of the service."[2261] The Commission eliminated this requirement in the *RIF Order*, finding it "unduly burdensome" for BIAS providers, without any analysis.[2262] Commenters in opposition of such a requirement contend that because consumers are provided advance notice of network management practices, any subsequent notification about particular actions is unnecessary and unduly burdensome to providers.[2263] As the Commission explained in the *2015 Open Internet Order*, however, "[t]he purpose of such notification is to provide the affected end users with sufficient information and time to consider adjusting their usage to avoid application of the practice."[2264] While our transparency rule requires BIAS providers to disclose details regarding their network practices, the record provides no evidence that consumers are easily able to track their usage to identify when their usage is likely to trigger a network practice so that they may then adjust their usage accordingly.[2265] We find that because providers must already monitor their networks in order to apply network practices when a user takes a particular action, a specific event occurs, or a data cap threshold is reached, providers are better positioned to advise customers about the circumstances surrounding the applied network practice than are users positioned to

---

and the [C]ommission need to be able to analyze the data at scale"); ALA Comments at 17 ("Standards should be set for measuring metrics so information can be easily compared and storing the data in a machine-readable format so that third-party tools can extract information."); David Choffnes Comments at 6 ("Machine-readable disclosures, paired with digital recordkeeping, is a promising path forward for minimizing the burdens of reporting and assessing compliance. This approach facilitates automation, which makes regular reporting and long-term data collection/maintenance simple. Further, assessments of such machine-readable information can be automated as well, facilitating compliance testing and enforcement. I believe that such an approach will help inform the Commission's evaluation of the effectiveness of the rule and the need for changes over time.").

[2260] We note that some commenters did object to the machine-readability requirement in the *Broadband Label Order*. In that proceeding, however, we found that transferring the data into machine-readable format did not impose a high burden upon providers or require a high degree of technical difficulty. As no commenter has raised any specific objections to machine-readability in the current proceeding, we conclude that there is no reason to depart from the findings we made with regard to the machine-readability requirement for the broadband label. *Broadband Label Order*, 37 FCC Rcd at 13708-12, paras. 68-80.

[2261] *2015 Open Internet Order*, 30 FCC Rcd at 5677, para. 171.

[2262] *See RIF Order*, 33 FCC Rcd at 444-445, para. 230.

[2263] WISPA Comments at 53 ("The 'broader purpose' of the transparency rule does not warrant a requirement that providers provide notice to end users every time they trigger a network management solution. In fact, the transparency requirement is designed to provide end users with advance notice of the circumstances that might trigger a network practice so that they can adjust their broadband usage habits and relieve broadband providers from ongoing direct notification obligations."); WTA Comments at 7; Lumen Comments at 33 (asserting that the direct notification requirement has "been rendered entirely superfluous by new disclosures on that same subject mandated by the RIF Order").

[2264] *2015 Open Internet Order*, 30 FCC Rcd at 5677, para. 171.

[2265] BroadbandNow, *Internet Providers with Data Caps*, https://broadbandnow.com/internet-providers-with-data-caps (last visited Feb. 12, 2024) (noting that as of Feb. 2, 2024, at least 119 providers have data caps on some plans, and also noting that not all providers offer meters for customers to check when they are approaching or have exceeded a data cap).

track and identify such occurrences on their own.

566. We are also skeptical of WTA's assertion that "direct notification would entail major hardship and unnecessary expense for service providers to maintain accurate and up-to-date versions of the frequently changing lists of their customers and contact addresses (whether email, text or physical),"[2266] as providers need customer contact information for billing purposes. Thus, because providers must necessarily actively monitor their networks in order to apply network practices and already collect contact information for their users, we believe that any additional burden would come from identifying the particular application of a network practice and notifying the user. We do not anticipate that the burdens associated with notifying customers would be significant, as we expect that most providers who offer plans without unlimited data already provide an automated notification to users notifying them that they will be billed an additional fee for additional data upon reaching their data threshold or provide some method of tracking monthly usage.[2267] Therefore, we find that the benefits to consumers outweigh any additional costs to BIAS providers, particularly since, as in 2015, we do not require real-time notifications.

567. *Temporary Exemption for BIAS Providers with 100,000 or Fewer Broadband Subscribers.* In response to concerns expressed in the record pertaining to the direct customer disclosure requirement,[2268] we provide a temporary exemption (with the potential to become permanent) to the direct notification requirement for BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all provider affiliates.[2269] We believe that providers that have 100,000 or fewer broadband subscribers are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications, and we

---

[2266] WTA Comments at 7.

[2267] For example, mobile BIAS providers either automatically notify users when they will soon go over a data cap or permit them to turn on data usage notifications. AT&T provides notification to users subject to a data threshold when they reach 75% of the threshold. AT&T, *Network Practices*, https://about.att.com/sites/broadband/network [https://perma.cc/S9HK-A6WA] ("For customers on plans subject to a data usage threshold for triggering the foregoing congestion management practice, we will notify them during each billing cycle when their usage reaches 75% of their threshold (so, for example, 16.5GB for plans with a 22GB threshold and 37.5GB for plans with a 50GB threshold) so they can adjust their usage to avoid network management practices that may result in slower data speeds."); *see also* Verizon , *My Verizon Website—Turn On Usage Alerts*, https://www.verizon.com/support/knowledge-base-72298 [https://perma.cc/HRS5-TTLC] (explaining to customers how they can receive data usage alerts when they have reached a given amount of data during a billing cycle); T-Mobile, *Additional Information—Avoiding Bill Shock*, https://www.t-mobile.com/responsibility/consumer-info/additional-info/avoiding-bill-shock [https://perma.cc/XM33-N3DL] ("For data plans with a monthly allotment, T-Mobile will notify you via free text message before you reach your allotted data plan usage, and again when you've reached your allotment. This message is also sent to the Primary Account Holder to notify you/them when you've exceeded your limit."). Fixed providers with data caps also provide similar notifications or offer similar tools to track usage. Cox, *Learn About Internet Data Usage*, https://www.cox.com/residential/internet/learn/data-usage.html [https://perma.cc/T7XN-E997] (stating that Cox has a 1.25 TB data cap, and that after a one-time waiver, exceeding the data cap results in an automatic $10 fee for an additional 50GBs); Xfinity, *All Internet Is Powered by Data*, https://www.xfinity.com/learn/internet-service/data [https://perma.cc/7DZK-PRXX] (in some regions Xfinity has a data cap of 1.2 terabytes of data monthly and provides a tracker for consumers to use).

[2268] WISPA Comments at 53 ("As the Commission concluded in the *RIF Order*, a direct notification requirement would be 'unduly burdensome to ISPs and unnecessary in light of the other forms of public disclosure required.'"); WTA Comments at 7 ("Requiring direct notification would entail major hardship and unnecessary expense for service providers to maintain accurate and up-to-date versions of the frequently changing lists of their customers and contact addresses (whether email, text or physical).").

[2269] We observe that this temporary exemption aligns with the longer implementation period for the broadband label applicable to certain providers. *Broadband Label Order*, 37 FCC Rcd at 13723-24, paras. 118-19.

therefore afford such providers additional time to develop appropriate systems.[2270] We delegate to CGB the authority to determine whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We direct CGB to seek comment on the question and adopt an Order announcing whether it is maintaining an exemption no later than 18 months after publication of this Order in the *Federal Register*.

## C. Reasonable Network Management

568. The record broadly supports maintaining an exception for reasonable network management.[2271] We agree that a reasonable network management exception to the no-blocking rule, the no-throttling rule, and the general conduct rule is necessary for BIAS providers to optimize overall network performance and maintain a consistent quality experience for consumers while carrying a variety of traffic over their networks.[2272] Therefore, the no-blocking rule, the no-throttling rule, and the general conduct rule will be subject to reasonable network management for both fixed and mobile BIAS providers.[2273] In retaining the exception, we return to the definition of reasonable network management adopted by the Commission in 2015:[2274]

> *A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network*

---

[2270] *Cf. id.* at 13724, paras. 118, 119 (extending broadband label implementation period for BIAS providers with 100,000 or fewer broadband subscribers because implementation tasks "may require more time for providers that are less likely to have in-house attorneys and compliance departments to assist in preparing their broadband labels").

[2271] *See, e.g.*, T-Mobile Comments at 38 ("T-Mobile views continued use of a reasonable network management exception as essential to network optimization and strongly supports the Commission's proposal to retain it as an indispensable part of the regulatory landscape."); SpaceX Comments at 1 ("For the last two decades and over four separate network neutrality proceedings, a rare point of unanimous agreement has been the need for a flexible network management standard that allows different technologies to optimize performance and best serve consumers."); CTIA Comments at 100 ("It is essential that wireless providers have the flexibility needed to operate their networks effectively and efficiently. Even if the Commission makes the mistake of adopting rules, it must maintain protections for reasonable network management."); Eric W. Burger Comments at 10 ("Network management when the network is under stress is critically important so that users who are in the [national security and emergency preparedness] community can have access to the network."); TIA Comments at 8-9 ("The Commission should continue to offer flexibility to allow ISPs to engage in reasonable network management to enable quality consumer experiences."); WTA Comments at 15 (explaining that it "has no objection to the proposed blocking, throttling or paid prioritization rules as long as they are subject to reasonable network management exceptions").

[2272] The transparency rule does not include an exception for reasonable network management. We clarify, however, that the transparency rule "does not require public disclosure of competitively sensitive information or information that would compromise network security or undermine the efficacy of reasonable network management practices." *2015 Open Internet Order*, 30 FCC Rcd at 5700, para. 215 n.557; *2010 Open Internet Order*, 25 FCC Rcd at 17937-38, para. 55.

[2273] We note that unlike conduct implicating the no-blocking, no-throttling, or general conduct rule, paid or affiliated prioritization is not a network management practice because it does not primarily have a technical network management purpose. Paid prioritization would be evaluated under the standards set forth in Section V.B.1.c, *supra*.

[2274] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 31 (finding no fault with "differential treatment of traffic by ISPs where applied uniformly to similar types of traffic, regardless of the content or the content provider's identity, where limited to technical requirements for reasonable network management"); New America's Open Technology Institute Comments at 36-37 ("Any technical differences between BIAS networks—whether cable, satellite, mobile LTE or some other technology—are best accommodated by a Reasonable Network Management exception that is flexible but also strictly limited to purely technical (and not business) considerations."); Jon Peha (Network Slicing et al.) Reply at 8 (asserting that the definition of reasonable network management should be kept narrow, as most forms of network management should not involve discrimination based on application).

*architecture and technology of the broadband Internet access service.*

569. When considering whether a practice violates the no-blocking rule, no-throttling rule, or general conduct rule, the Commission may first evaluate whether a practice falls within the exception for reasonable network management. For a practice to even be considered under this exception, a BIAS provider must first show that the practice is primarily motivated by a technical network management justification rather than other business justifications. If a practice is primarily motivated by another non-network related justification, then that practice will not be considered under this exception. The term "particular network architecture and technology" refers to the differences across broadband access platforms of any kind, including cable, fiber, DSL, satellite, unlicensed Wi-Fi, fixed wireless, and mobile wireless.[2275]

570. We find that permitting reasonable network management practices that are primarily technical in nature will provide BIAS providers sufficient flexibility to manage their networks, while at the same time will help protect against BIAS providers using the exception to circumvent open Internet protections. We agree with Professor Jon Peha that if a practice can be considered reasonable network management "simply because it is needed in support of a 'business practice,' this opens potentially a large loophole unless one severely limits the meaning of 'business practice.'"[2276] Likewise, as Public Knowledge explains, "any traffic management practice, including one that is nakedly anticompetitive, can be characterized as having some technical purpose—for example, to slow down a rival's traffic."[2277] We agree that restricting the scope of "reasonable network management" to practices that are *primarily* justified as traffic management techniques will help prevent the exception from becoming a loophole permitting otherwise unlawful business and traffic management practices.[2278]

571. We believe that the reasonable network management exception provides both fixed and mobile BIAS providers sufficient flexibility to manage their networks.[2279] We recognize, consistent with the consensus in the record, that the additional challenges involved in mobile BIAS network management mean that mobile BIAS providers may have a greater need to apply network management practices, including mobile-specific network management practices, and to do so more often to balance supply and

---

[2275] *See 2015 Open Internet Order*, 30 FCC Rcd at 5700, para. 216; *2010 Open Internet Order*, 25 FCC Rcd at 17952, para. 82.

[2276] *See* Jon Peha (Network Slicing et al.) Reply at 8; *see also* Public Knowledge Reply at 17 ("Recent efforts by ISPs to dilute this requirement raise concerns about the potential misuse of network management as a pretext for implementing practices that primarily benefit their commercial interests, rather than serving the broader goal of fair and efficient network management.").

[2277] Public Knowledge Reply at 17.

[2278] *See, e.g.*, Scott Jordan Comments at 6-7 (arguing that requiring a primarily technical network management justification provides sufficient certainty and will help ensure that the network management exception is not used to circumvent the proposed rules); Public Knowledge Reply at 17; INCOMPAS Reply at 11 (asserting that the proposals by mobile providers in this record "would seriously undermine the principles of net neutrality, allowing them virtually unfettered opportunity to engage in prohibited practices under the guise of 'reasonable network management,'" and that "[a]llowing any purpose, if coupled with some technical purpose, rather than requiring a *primarily technical* purpose, would open the door to limitless post-hoc justifications for practices that block, throttle, or interfere with otherwise lawful content or applications"); CCIA Comments at 18-19 (cautioning against allowing BIAS providers to use the standard to restrict free speech and circumvent open Internet rules, and arguing that returning to the 2015 definition will prevent BIAS providers from "using the exception to dismiss legitimate complaints about unreasonable traffic manipulation"); N.Y. State School Boards Association Comments at 2 (arguing that retuning to the 2015 definition of reasonable network management will provide additional protection against zero rating).

[2279] *See, e.g.*, Scott Jordan Comments at 6-7 ("The *2015 Open Internet Order*'s definition of reasonable network management provides an appropriate amount of flexibility. Its definition does not dictate how to implement any particular network management practice; it merely requires that it be primarily used for and tailored to network management purposes.").

demand while accommodating mobility.[2280]  As the Commission has previously observed, mobile network management practices must address dynamic conditions that fixed networks typically do not, such as the changing location of users as well as other factors affecting signal quality.[2281]  Similarly, SpaceX argues that satellite providers require additional network management flexibility to account for the same challenges that the *2015 Open Internet Order* recognized in the context of mobile and Wi-Fi networks, including dynamic conditions, spectrum constraints, and congestion issues.[2282]  WISPA likewise explains that fixed wireless providers face challenges "managing networks of multiple spectrum bands."[2283]  The ability to address these dynamic conditions in mobile, wireless, and satellite network management is especially important given capacity constraints these BIAS providers, many of them small, face.[2284]  The Commission will take into account when and how network management measures are applied as well as the particular network architecture and technology of the BIAS in question, in determining if a network management practice is reasonable.[2285]

572.     We disagree with Ericsson that just because a network management practice can have both a primary technical reason and other business practices, our definition "presents a false dichotomy."[2286]  As an initial matter, the standard we adopt today does not require that a network management practice's purpose be *solely* technical in nature, but rather *primarily* technical in nature.  The exemption does not exclude practices that have multiple purposes, so long as the practice's purpose is

---

[2280] *See, e.g.*, WIA Reply at 6 (explaining that network management is of particular importance to mobile wireless networks because the "scarce nature of wireless spectrum has always necessitated operators to maximize their utilization of limited resources," a need that "is even more acute as we enter the era of true 5G deployment"); CTIA Reply at 82 (asserting that "protection for reasonable network management is necessary, as wireless providers face especially complicated network management challenges and need flexibility to operate their networks effectively and efficiently"); CTIA Comments at 99-101; New America's Open Technology Institute Comments at 36 (acknowledging that mobile networks can in certain times and places become more congested or require more dynamic network management practices); Ericsson Comments at 18 ("[T]raffic management plays a crucial role in optimizing users' broadband experiences, and this is particularly so for wireless networks.  In the 5G realm, BIAS providers are already putting leading-edge traffic management practices to use to better serve users.").

[2281] *See 2010 Open Internet Order*, 25 FCC Rcd at 17956, para. 94; *2015 Open Internet Order*, 30 FCC Rcd at 5703, para. 223; *see also, e.g.*, CTIA Comments at 99-100 ("Wireless providers face especially complicated network management challenges given factors such as high demand, limited spectrum with varying propagation characteristics, dynamic sources of interference, on-the-go users, highly variable usage over time at any given site, the multitude of end-user devices, and constant changes in network standards and technology.").

[2282] SpaceX Comments at 8-9; *see also* INCOMPAS Comments at 15 ("The same is true for emerging satellite BIAS services and potentially some fixed wireless providers that deliver last mile BIAS service using spectrum.  The FCC should ensure that reasonable network management standards have sufficient flexibility for spectrum constraints that these providers may face.").

[2283] WISPA Comments at 46; *see also* INCOMPAS Comments at 15; Letter from Scott K. Bergmann et al., CTIA, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 4-5 (filed Apr. 18, 2024).  *But see* Letter from Matthew A. Brill, Counsel for NCTA, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 6-7 (filed Apr. 15, 2024).

[2284] *See, e.g.*, SpaceX Comments at 5 (explaining that satellite network management practices must account for an extremely congested and shared spectrum, as well as dynamic physical challenges that require sophisticated networking protocols and scheduling algorithms); WIA Reply at 6.

[2285] *See* INCOMPAS Comments at 15 ("As a policy matter, it would be prudent to have the same rules apply— recognizing that the agency may need to adjust its implementation of such oversight to account for the technical differences between networks that deliver service over spectrum versus wired technologies, for example.").

[2286] Ericsson Reply at 12-13 ("By example, a network management practice can be technical in nature, such as better handling of more users and use-cases during peak capacity periods, but simultaneously serve a business case, such as delivering more network capacity to attract and retain more customers.  It is also the "business case" that can drive the decision to add capacity, densify a network, or take other engineering actions that require investment and could positively impact network performance to all end- users, for example, if a new manufacturing facility is built in a growing community.  That business interest does not undermine the technical case.").

primarily technical. It would, however, not extend to network management practices established for other purposes that lack a primarily technical purpose. To the extent that a BIAS provider engages in a network management practice for purposes other than a primarily technical reason, such practice is not *per se* prohibited, but would be evaluated under the general conduct standard or assessed for compliance with the prohibitions against blocking and throttling. We thus reject assertions in the record that distinctions of intent are not workable, that technical and business decision-making are not severable,[2287] or that the 2015 definition will adversely impact "business models that allow mobile operators to optimize their networks in response to consumers' choices and could even bar any practice that affects the provider's costs or revenues."[2288] Further, we find unavailing commenters' assertions that the reasonable network management exception we adopt today is vague or ambiguous.[2289] While we acknowledge, as the Commission has previously,[2290] the advantages a more detailed definition of reasonable network management can have on long-term network investment and transparency, we conclude that a more detailed definition risks quickly becoming outdated as technology evolves, as borne out by commenters' own assertions.[2291]

573. *Evaluating Network Management Practices*. We recognize the need to ensure that the reasonable network management exception will not be used to circumvent the open Internet rules while still allowing BIAS providers flexibility to experiment and innovate as they reasonably manage their networks. We therefore elect to maintain a case-by-case approach. Case-by-case analysis will allow the Commission to use the conduct-based rules adopted today to take action against practices that are known to harm consumers without interfering with BIAS providers' beneficial network management practices.[2292] The case-by-case review also allows sufficient flexibility to address mobile-specific management practices because, by the terms of our rule, a determination of whether a network management practice is reasonable takes into account the particular network architecture and

---

[2287] *See, e.g.*, CEI Comments at 17 ("The current successful broadband experience without bright line rules demonstrates that there is no need to impose these arbitrary restrictions on how technologists and engineers structure and manage networks."); T-Mobile Comments at 39 (arguing that the distinction between "primarily technical" and "other business practices" may cause uncertainty about whether network virtualization and network slicing are considered legitimate network management practices); CTIA Reply at 82-83 (asserting that the Commission should not return to the 2015 definition of "reasonable network management" because distinctions of intent are not workable; the requirement is "rife with uncertainty, pitting engineers against lawyers"; and that given the "unique challenges, network architecture, and network management of mobile broadband networks," technical and business decision-making are not severable); T-Mobile Comments at 24, 41.

[2288] CTIA Comments at 100-01.

[2289] *See, e.g.*, ADTRAN Comments at 23-24 ("And for both the no blocking and no throttling rules, the Internet service provider can block or throttle if it is 'reasonable network management,' a vague term that is not made much clearer by the proposed definition of 'reasonable network management.'"); Ericsson Comments at 19 ("[T]he 2015 version applied a definition rife with uncertainty, pitting engineers against lawyers grappling with an ambiguous standard of reasonable network management"); Free State Foundation Comments at 51 ("The line between technical network and other business justifications is by no means clear.").

[2290] *See 2015 Open Internet Order*, 30 FCC Rcd at 5702, para. 222; *2010 Open Internet Order*, 25 FCC Rcd at 17953, para. 85.

[2291] *See, e.g.*, T-Mobile Comments at 39 ("The Commission developed this approach prior to the advent of the 5G New Radio standard and well before network virtualization and Massive Volumes mMTC and Massive Performance URLLC services became commercially feasible. Unsurprisingly, the Commission did not design the reasonable network management exception with these network architectures and services in mind . . . ."); CTIA Comments at 101 (noting that BIAS providers operate in an ever-evolving national security and law enforcement environment, in which security risks are constantly changing).

[2292] Beneficial practices include protecting their broadband Internet access services against malicious content or offering a service limited to "family friendly" materials to end users who desire only such content. *See 2015 Open Internet Order*, 30 FCC Rcd at 5703, para. 222 n.575; *2010 Open Internet Order*, 25 FCC Rcd at 17954-55, paras. 88-89.

technology.[2293]  We also note that our transparency rule requires disclosures that provide an important mechanism for monitoring whether providers are inappropriately exploiting the exception for reasonable network management.[2294]

574.     We decline to specify particular network management practices as *per se* unreasonable, as advocated by WISPA,[2295] in order to afford BIAS providers maximum flexibility in managing their dynamic networks.  While we are sensitive to the needs of small BIAS providers, we do not believe the record currently supports a one-size-fits-all approach.  However, to provide greater clarity, particularly for small BIAS providers, and to further inform the Commission's case-by-case analysis, we offer the following guidance regarding legitimate network management purposes.  We also note that, consistent with the 2010 and 2015 reasonable network management exceptions, BIAS providers may request a declaratory ruling or an advisory opinion from the Commission before deploying a network management practice, but are not required to do so.[2296]

575.     As with the network management exception in the *2015 Open Internet Order*, BIAS providers may implement network management practices that are primarily used for, and tailored to, ensuring network security and integrity, including by addressing traffic that is harmful to the network, such as traffic that constitutes a denial-of-service attack on specific network infrastructure elements.[2297]  Likewise, BIAS providers may also implement network management practices that are primarily used for, and tailored to, addressing traffic that is unwanted by end users.[2298]  Further, network management practices that alleviate congestion without regard to the source, destination, content, application, or service are also more likely to be considered reasonable network management practices in the context of this exception.[2299]  In evaluating congestion management practices, a subset of network management

---

[2293] *See, e.g.*, GSMA Comments at 3 (asserting that traffic management practices are essential for mobile operators to maintain and improve quality of experience for end users, optimize their investments, cope with traffic growth in the short and long term, and accommodate the growing complexity of traffic types and applications); INCOMPAS Reply at 11 (urging the Commission to retain flexibility to consider differences in network technology and architecture in assessing whether a given network management practice is or is not reasonable).

[2294] *See supra* Section V.B.3.a (requiring BIAS providers to disclose descriptions of congestion management practices, if any; application-specific behavior; and any practices used to ensure end-user security or security of the network; among other things).

[2295] *See* WISPA Comments at 48 (advocating that we designate certain business and network management practices as *per se* unreasonable).

[2296] *See* 47 CFR § 1.2 (providing for "a declaratory ruling terminating a controversy or removing uncertainty"); *see also infra* Section V.E.1 (describing the advisory opinion process).

[2297] *See 2015 Open Internet Order*, 30 FCC Rcd at 5701, para. 220; *2010 Open Internet Order*, 25 FCC Rcd at 17954, para. 88; *see also, e.g.*, Jon Peha (Network Slicing et al.) Reply at 8 (explaining that the reasonable network management exemption was created "for those relatively unusual cases in which BIAS providers should be allowed to discriminate by content, application, device or service," particularly for cases involving protecting the network or its end users from threats); NCTA Comments at 74 (urging the Commission to make clear that "reasonable network management" includes BIAS provider policies and practices aimed at detecting and deterring the flow of malicious and unlawful traffic and devices, including addressing threats from unsecured or compromised devices and practices addressing traffic that constitutes a denial-of-service attack on specific network infrastructure elements, as well as other cybersecurity measures); CTIA Comments at 101 (suggesting that the Commission expressly state that "ensuring network security and integrity" is an example of permissible network management).

[2298] *See 2015 Open Internet Order*, 30 FCC Rcd at 5702, para. 220.

[2299] *See id.*; Ad Hoc Telecom Users Committee Comments at 31 (finding no fault with differential treatment of traffic by BIAS providers where applied uniformly to similar types of traffic, regardless of the content or the content provider's identity, where limited to technical requirements for reasonable network management); CCIA Comments at 19 (urging the Commission to make clear that a BIAS provider may not "impose its own commercial preferences or ownership affiliations with respect to data sources or content in the guise of making network engineering

(continued….)

practices, we will also consider whether the practice is triggered only during times of congestion and whether it is based on a user's demand during the period of congestion.[2300] In addition, we maintain the guidance that a network management practice is more likely to be found reasonable if it is transparent and allows the end user to control it.[2301] Finally, we also reaffirm that reasonable network management practices should be as application-agnostic as possible.[2302]

## D. Oversight of BIAS Providers' Arrangements for Internet Traffic Exchange

576. Because we conclude that BIAS necessarily includes the exchange of Internet traffic by an edge provider or an intermediary with the BIAS provider's network,[2303] disputes involving a BIAS provider regarding Internet traffic exchange that interfere with the delivery of a BIAS end user's traffic are subject to our authority under Title II of the Act. The Commission has previously found,[2304] and the current record reflects,[2305] that anticompetitive and discriminatory practices in this portion of BIAS could

---

decisions"). As in the no-throttling rule and the general conduct standard, we include classes of content, applications, services, or devices.

[2300] *See* David Choffnes Comments at 6-7 ("Similarly, a policy that throttles traffic as a way of managing traffic load on the network should not be considered reasonable if it is enacted 24/7, i.e., *not* in response to loads."); Scott Jordan Comments at 6 (explaining that these characteristics of congestion management practices "are exactly those *unanimously* identified by BITAG, a multi-stakeholder organization focused on bringing together engineers and technologists to develop consensus on broadband network management practices").

[2301] *See 2015 Open Internet Order*, 30 FCC Rcd at 5701, para. 221.

[2302] *See id.*; *see also* Public Knowledge Reply at 17-18 (advocating that requiring network management be as application-agnostic as possible is "essential to prevent ISPs from selectively throttling specific applications (e.g., favoring Netflix over YouTube) or types of applications (such as gaming) during high traffic periods, regardless of whether such measures are necessary for managing congestion"); Letter from Barbara van Schewick, M. Elizabeth Magill Professor of Law, Stanford Law School, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, Attach. at 3-4 (filed Mar. 12, 2024).

[2303] *See supra* Section III.D.3.

[2304] *See, e.g.*, *Charter/Time Warner Cable Merger Order*, 31 FCC Rcd at 6380, 6383-84, paras. 108, 109, 115, 118, 120 ("We conclude that increased interconnection costs can disrupt the virtuous cycle of innovation by diverting funds towards interconnection fees that could have otherwise been used for further innovation or price reductions for consumers."); *see also* INCOMPAS Comments at 43 ("Moreover, the Department of Justice and the Commission also have investigated interconnection issues extensively in several large ISP mergers, resulting in conditions being placed on those merged entities to ensure that they would not be able to use interconnection disputes to harm consumers or edge providers. Charter was outright prohibited from imposing interconnection fees in particular situations, and AT&T was required to submit its interconnection agreements with the Commission for review.").

[2305] *See, e.g.*, Netflix Reply at 11-12 (asserting that the ability of BIAS providers to charge access fees in interconnection agreements creates perverse incentives to create congestion on networks, which causes BIAS customers to receive poor streaming-video performance for content or services not provided by the BIAS provider); *id.* (asserting that "the threat of ISP traffic manipulation undermines competition between ISP-affiliated and non-affiliated content providers by forcing independent companies, such as Netflix, either to pay an access fee to the ISP or to suffer congestion and quality degradation compared to their competitors," which could be particularly damaging for smaller content providers, non-profits, and educational organizations); Lumen Comments at 12 ("Lumen has first-hand experience with a small number of large BIAS providers, both in the United States and abroad, attempting to exploit these dynamics to impose unjustifiable access tolls."); INCOMPAS Comments at 42 ("It still holds true today that ISPs can use the interconnection points to demand payment in exchange for not blocking or throttling internet traffic, and they have the incentive to do so."); New America's Open Technology Institute Comments at 10-11 ("Once a consumer has selected a BIAS provider, that provider effectively holds a monopoly over delivery of data to that customer. From an edge provider's perspective, it is immaterial how many BIAS providers are offering a consumer service; the edge provider has only one path to reach their users: via the BIAS provider to which the user has subscribed."); Letter from Barbara van Schewick, Director, Stanford Law School Center for Internet and Society, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Feb. 26, 2024) (Barbara van Schewick Feb. 26, 2024 *Ex Parte*) (quoting the New York Attorney General's finding

(continued….)

have a deleterious effect on the open Internet. When Internet traffic exchange breaks down—regardless of the cause—it risks preventing consumers from reaching the services and applications of their choosing, disrupting the virtuous cycle, and potentially causing public safety or other harms. Further, consumers' ability to respond to unjust or unreasonable BIAS provider practices are limited by switching costs.[2306] We therefore retain targeted authority under sections 201, 202, and 208 of the Act (and related enforcement provisions) to protect against such practices, and will continue to monitor BIAS providers' Internet traffic exchange arrangements to ensure that they are not harming or threatening to harm the open nature of the Internet.[2307] We conclude, consistent with the *2015 Open Internet Order*, that case-by-case review[2308] under sections 201 and 202 is the appropriate vehicle for enforcement "where disputes are primarily over commercial terms and that involve some very large corporations, including companies like transit providers and CDNs, that act on behalf of smaller edge providers."[2309] Thus, the Commission will be available to hear disputes raised under sections 201 and 202 on a case-by-case basis.[2310] We also observe that section 706 provides the Commission with an additional, complementary source of authority to ensure that Internet traffic exchange practices do not harm the open Internet.

577. We disagree with USTelecom's assertions that our oversight of BIAS providers' arrangements for Internet traffic exchange would "result in irrationally asymmetric regulation of bilateral

from 2017 that "recent and ongoing investigations of major providers of [BIAS] . . . have uncovered documentary evidence revealing—for the first time—that from at least 2013 to 2015, major BIAS providers made the deliberate business decision to let their networks' interconnection points become congested with Internet traffic and used that congestion as leverage to extract payments from backbone providers and edge providers, despite knowing that this practice lowered the quality of their customers' Internet service"); Letter from Alissa Starzak, Vice President, Global Head of Public Policy, Cloudflare, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 2 (filed Mar. 6, 2024) (Cloudflare Mar. 6, 2024 *Ex Parte*) (sharing that "one large ISP in Germany appears to systematically under-provision capacity on IP transit networks to try to force direct bilateral peering at whatever price is demanded"). The record evidence thus undermines USTelecom's assertion that because "transit providers and their customers almost always rely on multiple redundant paths for the exchange of traffic to customers on any ISP's network, and edge providers dynamically shift between transit providers in real time to avoid congestion," a BIAS provider "thus could not execute a 'degradation by congestion' strategy without limiting capacity across all of its peering points for extended periods." USTelecom Reply at 58-59.

[2306] *See supra* Section V.A.3; *see also* Barbara van Schewick Feb. 26, 2024 *Ex Parte* at 2 ("The records of the merger proceedings and the New York State Attorney General's investigations also demonstrate that BIAS customers 'do not switch BIAS providers when confronted with poor edge provider performance,' and that they did not do so when they experienced bad performance as a result of large BIAS providers' decision to let congest [sic] all unpaid connections into their network that were willing and able to take on additional traffic." (footnote omitted)).

[2307] *See, e.g.*, INCOMPAS Comments at 39 (agreeing that "it is important for the Commission to maintain oversight of a BIAS provider's interconnection arrangements that result in internet traffic exchange, so that it cannot evade net neutrality rules at interconnection points"); Cloudflare Comments at 11 ("Although the Commission should ensure that interconnection policy is not used by BIAS providers to circumvent the open Internet rules, the Commission should also ensure that its policies around interconnection do not undermine Internet innovation."). This regulatory backstop is not a substitute for robust competition. The Commission's regulatory and enforcement oversight, including over common carriers, is complementary to vigorous antitrust enforcement. *See generally* 47 U.S.C § 152(b) ("[N]othing in this Act . . . shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws."). Thus, it will remain essential for the Commission, as well as the DOJ, to continue to carefully monitor, review, and where appropriate, take action against any anticompetitive mergers, acquisitions, agreements or conduct, including where BIAS is concerned.

[2308] *See, e.g.*, Netflix Reply at 13 (agreeing with the Commission's proposed case-by-case approach); INCOMPAS Reply at 2, 4 (same); Cloudfare Comments at 8-9 ("Cloudflare supports the proposed case-by-case review of interconnection disputes to ensure that BIAS providers are not evading the open Internet rules through interconnection policy."); Ad Hoc Telecom Users Committee Comments at 12-13.

[2309] *2015 Open Internet Order*, 30 FCC Rcd at 5686, para. 193.

[2310] In addition, federal courts will also be able to adjudicate complaints brought under Title II. *See* 47 U.S.C. § 207.

negotiations" and "would leave the ISP's counterparty . . . an unregulated entity immune from such complaints, giving it new opportunities for regulatory gamesmanship."[2311]  While BIAS providers would be subject to the Commission's prohibitions against unjust and unreasonable practices, the other parties to such agreements are not without oversight; such parties would remain subject to the FTC's oversight of "unfair and deceptive" practices as well as the FTC's and DOJ's antitrust authority.[2312]  Further, we observe that should a complaint arise regarding BIAS provider Internet traffic exchange practices, practices by edge providers (and their intermediaries) would be considered as part of the Commission's evaluation as to whether BIAS provider practices were "just and reasonable" under the Act.

578.    We decline to apply any open Internet rules to Internet traffic exchange.[2313]  Internet traffic exchange agreements have historically been and will continue to be commercially negotiated.[2314]  . Given the constantly evolving market for Internet traffic exchange, we conclude that at this time it would be difficult to predict what new arrangements will arise to serve consumers' and edge providers' needs going forward, as usage patterns, content offerings, and capacity requirements continue to evolve.[2315]  Consistent with the Commission's findings in 2015 and subsequent inquiries, we find that the best approach with the respect to arrangements for Internet traffic exchange is to rely on the regulatory backstop of sections 201 and 202,which prohibit common carriers from engaging in unjust and unreasonable practices.[2316]  Our "light touch" approach therefore does not directly regulate interconnection practices.  We make clear, however, that BIAS providers may not engage in interconnection practices that "circumvent the prohibitions contained in the open Internet rules"[2317] or that have the purpose or effect of evading our rules to protect Internet openness.

---

[2311] USTelecom Reply at 63.

[2312] See RIF Order, 33 FCC Rcd at 394-98, paras. 141-46.

[2313] See, e.g., Microsoft Comments at 13 (concluding that the 2015 Open Internet Order appropriately placed BIAS providers' Internet traffic exchange arrangements outside the scope of any ex ante regulations); ITI Comments at 8 (agreeing with the Commission's proposal "to decline to apply any open Internet rules to Internet traffic exchange," while disagreeing with the inclusion of any of these services within the definition of BIAS).  We note that this exclusion also extends to interconnection with CDNs.  See 2015 Open Internet Order, 30 FCC Rcd at 5686, para. 193; Cloudflare Mar. 6, 2024 Ex Parte at 2.

[2314] See, e.g., Lumen Comments at 13 ("As a general matter, market negotiations relating to Internet traffic exchange produce reasonable results.  While negotiation leverage can of course vary between market participants, there is no substantial, persistent problem requiring intervention relating to interconnection outside of the context of the largest BIAS providers.  That is so because it is only BIAS providers that play the gatekeeper role that the Commission's open Internet rules are designed to address, and it is only the largest BIAS providers that have sufficient leverage to impose access tolls.  Even in that context, though, there is no need for burdensome rules to govern negotiation."); see also USTelecom Reply at 58 (asserting that "content-originating networks come to the table with commensurate bargaining leverage of their own, which they derive from the consumer appeal of the content they deliver.  No ISP, for example, can afford to deprive its customers of Netflix, YouTube, or Prime Video," and that "ISPs typically negotiate direct interconnection arrangements not with individual content providers as such, but with the operators of large content delivery networks ('CDNs') or transport networks, which benefit from the collective market power of their content-provider customers").

[2315] Compare, e.g., Barbara van Schewick Feb. 26, 2024 Ex Parte (citing past evidence of BIAS providers' deliberate congestion of interconnection points), with Mark Israel et al. Ex Parte White Paper at 26-27 (filed Feb. 23, 2024) (asserting that BIAS providers' "interconnection arrangements are not congested even at peak times" and that "[b]ecause of the complementarity between edge content and broadband service, it would make no sense for any broadband service provider to attempt to degrade their users' Netflix or other content experience").

[2316] Letter from Michael Calabrese and Raza Panjwani, New America's Open Technology Institute, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 6 (filed Apr. 15, 2024) (New America's Open Technology Institute Apr. 15, 2024 Ex Parte).

[2317] Netflix Reply at 13; see also INCOMPAS Reply at 1, 4; Barbara van Schewick Feb. 26, 2024 Ex Parte at 1-2; Cloudflare Mar. 6, 2024 Ex Parte at 2-3; Letter from Lindsay Stern, INCOMPAS, to Marlene H. Dortch, FCC, WC

(continued….)

579. We conclude that it would be premature to adopt prescriptive rules to address any problems that have arisen or may arise,[2318] and we decline at this time to adopt a rule requiring BIAS providers to offer settlement free peering to edge providers and transit providers that agree to reasonably localize the exchanged traffic, or to otherwise prohibit fees associated with Internet traffic exchange arrangements, as some commenters suggest.[2319] The record reflects competing narratives regarding the imposition of paid peering arrangements. For example, one research study claims that paid peering results in higher prices for consumers, reduces consumer surplus, and results in higher profits for broadband providers.[2320] In contrast, USTelecom asserts that "the providers of such double-sided platforms [like ISPs] routinely assess fees on both sides, and it is well understood that charges to one side of the platform (here, direct-interconnection fees) exert downward pressure on charges to the other side (here, resulting in lower consumer broadband bills)."[2321] USTelecom further argues that "eliminating direct-interconnection fees would eliminate price signals that, today, give content-originating networks efficient incentives to reduce unnecessary costs in their transmission of Internet traffic," explaining that "the prospect of such fees currently gives streaming video providers incentives to implement efficient

Docket No. 23-320, at 2 (filed Feb. 29, 2024) (INCOMPAS Feb. 29, 2024 *Ex Parte*); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5695, para. 206 ("[O]ur assertion of authority of Internet traffic exchange practices . . . provid[es] us with the necessary case-by-case enforcement tools to identify practices that may constitute price evasion and address them.").

[2318] *See, e.g.*, Lumen Comments at 8 ("In Lumen's experience, smaller providers do not try to extract access tolls from content providers, CDNs, and other ISPs, likely because the threat of losing the ability to interact with a small number of potential end users is not especially motivating. On the other hand, the largest BIAS providers serve tens of millions of customers, and the threat to restrict access to that many end users is significant even to very large edge providers and intermediaries. That larger providers pose a greater threat than smaller providers, too, is not a novel insight: the Department of Justice and the Commission blocked the proposed merger of Comcast and Time Warner Cable because of the increased threat that combination would have posed to online video service providers.").

[2319] *See* Letter from Scott Jordan and Ali Nikkhah to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Jan. 9, 2024) & Attach. at 40-41 (explaining that traffic is sufficiently localized if: (1) edge providers and transit providers interconnect at a reasonable number of interconnection points, (2) the locations of these interconnection points span the country, and (3) the proportion of traffic that is exchanged at an interconnection point that is relatively close to the end user is sufficiently high); New America's Open Technology Institute Comments at 10 (recommending that the Commission "establish a default presumption that paid peering agreements are unreasonable or unreasonably discriminatory absent justification as to cost (e.g., due to limited points of interconnection or low levels of data localization)"); Public Knowledge Comments at 85 (proposing that BIAS providers be required to interconnect with other providers on a settlement-free basis, provided "1) That traffic is reasonably localized, and 2) That the interconnecting provider meet a minimum traffic threshold"); Lumen Comments at 13-15 (proposing that the Commission adopt a rule requiring that "[a] BIAS provider with more than 1,000,000 BIAS customers . . . exchange its BIAS customers' Internet traffic on a settlement-free basis with requesting ISPs, CDNs, and edge providers that are willing to reasonably localize traffic").

[2320] *See* Scott Jordan et al. Comments at 4-5; New America's Open Technology Institute Comments at 9, 10-11 (asserting that "recent research shows that the costs of paid peering agreements will likely be borne by consumers" and that paid peering fees "eventually and inevitably come out of the consumer's wallet in the form of either higher prices or inferior service from edge providers, without any visibility into the true driver of that increase"); Philo Comments at 8 ("Early in December 2023, we saw the harmful consequences of ISPs charging interconnection fees to the services that the ISPs' own customers use."); *see also* Letter from Lindsay Stern, INCOMPAS, to Marlene H. Dortch, FCC, WC Docket No. 23-320, at 6 (filed Apr. 16, 2024) (asserting that the "overwhelming majority of ISPs exchange traffic with content providers through settlement-free peering arrangements, where neither party pays the other because both benefit from interconnection," and the "the rare exception is large ISPs").

[2321] USTelecom Reply at 60; Letter from NCTA and USTelecom to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-320 et al., at 4 (filed Feb. 23, 2024) (NCTA/USTelecom Feb. 23, 2024 *Ex Parte*) ("Because of the two-sided nature of the marketplace, forbidding ISPs from charging for interconnection would exert upward pressure on consumer broadband prices."); *see also* USTelecom Reply at 64-65 (asserting that commenters' settlement-free proposal would be challenging to apply in practice because it is unclear what would constitute "reasonably" localized traffic or a "reasonable" number of interconnection points).

forms of digital compression that reduce traffic loads while still providing high video quality to end users" and that "[i]mposing a new obligation of settlement-free direct interconnection would undermine those efficiency-inducing price signals, generate wasteful over-expenditure of finite network resources, and thus impose on broadband providers avoidable costs that consumers would ultimately bear in the form of higher broadband bills."[2322] Lumen, in response, asserts that "the fees large BIAS providers attempt to impose are indeed supracompetitive . . . and can exceed what Lumen charges for transit service,"—a highly competitive market—demonstrating "conclusively" that their charges are supracompetitive.[2323] And New America's Open Technology Institute asserts that "[e]dge providers have plenty of price incentives to move, manage, and deliver traffic efficiently without the BIAS provider extracting a toll for access to their subscribers."[2324] We are cautious of imposing a one-size-fits-all rule on this dynamic sector of the broadband industry based on the record before us, which raises potential concerns about such arrangements but lacks detail regarding specific incidences of such actions. Instead, we will proceed on a case-by-case basis regarding assertions or claims that arrangements for Internet traffic exchange, including fee-based arrangements, violate sections 201 or 202 of the Act, or are being used to circumvent or evade open Internet protections.[2325]

### E. Enforcement of Open Internet Rules

580. Effective and timely conflict resolution and clear guidance on permitted and prohibited practices under the rules we adopt in this Order are important to further our goal to secure and safeguard an open Internet. As in the past, we expect that many disputes that will arise can and should be resolved by the parties without Commission involvement.[2326] We continue to encourage parties to resolve disputes through informal discussion and private negotiations whenever possible.

581. At the same time, we are prepared to enforce our open Internet rules as the need arises. To that end, we will rely on a multifaceted enforcement framework comprised of advisory opinions,

---

[2322] USTelecom Comments at 65; NCTA/USTelecom Feb. 23, 2024 *Ex Parte* at 4; *see also* Netflix Reply at 14-15 (explaining that in the past five years, Netflix has invested "to make our streaming twice as efficient, halving the amount of data needed to produce the same quality viewing experience," and that Netflix and other edge providers' investments in such technologies "help ISPs optimize their networks and deliver the best experience to consumers").

[2323] Letter from Joseph C. Cavender, Vice President & Deputy General Counsel, Federal Regulatory Affairs, Lumen, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Mar. 5, 2024) (Lumen Mar. 5, 2024 *Ex Parte*) ("It also demonstrates that USTelecom's recycled claim that transit pricing disciplines BIAS providers' access charges is incorrect as a factual matter, in addition to being backwards analytically." (footnote omitted)); Letter from Joseph C. Cavender, Vice President & Deputy General Counsel, Federal Regulatory Affairs, Lumen, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320, at 3 (filed Apr. 2, 2024) ("Transit competition did not for Netflix, and cannot for other providers, discipline the largest BIAS providers' direct connection charges, for the same reason Lumen and others have explained repeatedly: all roads to a BIAS subscriber's customers must go over the BIAS provider's network. . . . The only 'alternative' available to the edge provider is to forego connectivity to those customers, which is no option at all where the largest BIAS networks are concerned.").

[2324] New America's Open Technology Institute Apr. 15, 2024 *Ex Parte* at 7 ("USTelecom . . . assumes edge provider traffic magically appears at the doorstep of the BIAS providers network. In reality, edge providers are paying in some form or another—whether investing in their own fiber pipes, paying transit providers, or paying to distribute their content through first or third party Content Delivery Networks, etc.").

[2325] As we note above, the Commission has taken action to require settlement-free peering agreements where appropriate. *See Charter/Time Warner Cable Merger Order*, 31 FCC Rcd at 6392-93, para. 134 (requiring Charter to modify its interconnection policies to ensure that a "larger proportion of traffic into New Charter's network will be available for settlement-free interconnection, clarify that transit, CDNs, and edge providers may all qualify for settlement-free interconnection, and permit these third-parties greater flexibility to grow their traffic in response to consumer demand").

[2326] *2015 Open Internet Order*, 30 FCC Rcd at 5704, para. 225; *2010 Open Internet Order*, 25 FCC Rcd at 17986, para. 151.

enforcement advisories, Commission-initiated investigations, and informal and formal complaints.[2327] The advisory opinions and enforcement advisories should provide upfront clarity, guidance, and predictability with respect to the open Internet rules, thereby giving providers an avenue to avoid formal complaint litigation, remediation, or fines after the fact.[2328] Commission-initiated investigations will also play a role in our enforcement framework.[2329] Investigations may stem from review of informal complaints, from which trends of behavior can be identified, or information otherwise brought to the Commission's attention. When the Commission determines a violation has occurred, we will pursue remedies and penalties.[2330] Lastly, the formal complaint processes will provide parties options to bring open Internet rule violations to the Commission's attention and to resolve specific disputes.[2331] We find that, when necessary, the formal complaint process will provide a backstop framework that will effectively and timely address open Internet disputes and provide guidance on practices that are permitted or prohibited under our rules.

### 1. Advisory Opinions and Enforcement Advisories

582. *Advisory Opinions.* The Commission previously concluded in 2015 that the use of advisory opinions would be in the public interest and had the potential to provide clarity, guidance, and predictability concerning the Commission's open Internet rules.[2332] In 2017, the *RIF Order* ended the use of enforcement advisory opinions, asserting that they were no longer necessary due to the elimination of the conduct rules.[2333] Today, we reaffirm the conclusions of the *2015 Open Internet Order*,[2334] and adopt an updated process[2335] for providers seeking an advisory opinion from Commission staff regarding the open Internet rules to provide upfront clarity, guidance, and predictability.[2336]

583. Under the process we adopt today, any BIAS provider may request an advisory opinion regarding the permissibility of its proposed policies and practices affecting access to BIAS.[2337] We hereby delegate to the Enforcement Bureau the authority to receive such requests and issue such advisory

---

[2327] Some commenters endorse a multi-faceted enforcement framework. *See, e.g.*, NDIA Comments at 4-5 (endorsing the need for both informal and formal complaints).

[2328] *See 2015 Open Internet Order*, 30 FCC Rcd at 5706, 5709-10, paras. 229, 240-41.

[2329] *See* 47 U.S.C. § 403; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5710-11, paras. 242, 245; *2010 Open Internet Order*, 25 FCC Rcd at 17989, para. 160.

[2330] *See* 47 U.S.C. §§ 503(b), 312(b); *see also* 47 CFR §§ 1.80, 1.89.

[2331] 47 CFR §§ 1.41, 1.711-1.718, 1.720-1.740; *see also* 47 U.S.C. § 208; *2015 Open Internet Order*, 30 FCC Rcd at 5704-05, para. 226. As explained *infra*, the Enforcement Bureau's Market Disputes Resolution Division provides confidential mediation services, at no cost, to assist parties in settling or narrowing disputed issues. 47 CFR § 1.737.

[2332] *2015 Open Internet Order*, 30 FCC Rcd at 5706, para. 229.

[2333] *RIF Order*, 33 FCC Rcd at 490, para. 303.

[2334] *2015 Open Internet Order*, 30 FCC Rcd at 5706, para. 229.

[2335] Updated process steps are not intended to substantively differ from those outlined in the *2015 Open Internet Order*.

[2336] We continue to believe an advisory opinion process will provide clarity and guidance to providers seeking to comply with our regulations. Commenters assert that the advisory opinion process is time-consuming, cumbersome, and reflects "regulatory creep." NCTA Comments at 6, 45; Smithwick & Belendiuk Comments at 24; WISPA Comments at 83. Relatedly, CTIA asserts that, "[n]o advisory opinion process could possibly move at the pace necessary for innovation." CTIA Comments at 99. We believe the advisory opinion process we adopt today will help, and not impede, innovation by providing published guidance that illustrates how we implement our laws and regulations.

[2337] As noted in our rules, requests for an advisory opinion may be filed via the Commission's website or with the Office of the Secretary. 47 CFR § 8.6(a). Requests must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

opinions, and we direct the Enforcement Bureau to coordinate closely with other relevant Bureaus and Offices regarding such advisory opinions. The Enforcement Bureau will have discretion to determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question. The Enforcement Bureau shall decline to issue an advisory opinion if the relevant policy or practice is the subject of a pending government investigation or proceeding.

584. BIAS providers may submit requests for advisory opinions regarding prospective policies and practices affecting broadband access. A request must pertain to a policy or practice that the requesting party intends to utilize, rather than a mere possible or hypothetical scenario. As a general matter, the Enforcement Bureau will prioritize requests involving substantial questions with no clear Commission precedent and/or subject matter involving significant public interest.[2338]

585. When submitting requests, BIAS providers must include all material information such that Commission staff can make a fully informed determination on the matter. Requesting parties will also be required to certify that factual representations made to the Enforcement Bureau are truthful, accurate, and do not contain material omissions. The Enforcement Bureau will have discretion to request additional information from the requesting entity and from other parties that might have relevant information or be impacted by the request. These might include, for example, impacted consumers or state, local, or Tribal governments.

586. Our advisory opinion process will affect BIAS providers and the Commission's enforcement actions as described below. First, the process is fully voluntary. No BIAS provider will be rewarded or penalized for seeking an advisory opinion, and the seeking (or not) of an advisory opinion will not itself influence any enforcement-related decision by the Commission.[2339] Second, in an advisory opinion, the Enforcement Bureau will issue a determination of whether or not the policy or practice detailed in the request complies with the open Internet rules.[2340] The Bureau will not respond to requests for opinions that relate to ongoing or prior conduct, and the Bureau may initiate an enforcement investigation to determine whether such conduct violates the open Internet rules. Third, a requesting party may rely on an advisory opinion to the extent that its request fully and accurately describes all material facts and circumstances. Fourth, advisory opinions will be issued without prejudice to the Enforcement Bureau's or the Commission's ability to reconsider the questions involved, and rescind the opinion.[2341]

587. The Enforcement Bureau will attempt to respond to requests for advisory opinions as

---

[2338] Other federal agencies have similar advisory opinion processes. For example, the Rules of Practice of the FTC provide that the FTC or its staff, in appropriate circumstances, may offer industry guidance in the form of an advisory opinion. *See* 16 CFR §§ 1.1-1.4. The FTC specifies that it will consider requests for advisory opinions, where practicable, under the following circumstances: "(1) The matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent; or (2) The subject matter of the request and consequent publication of Commission advice is of significant public interest." *Id.* § 1.1(a).

[2339] *See 2015 Open Internet Order*, 30 FCC Rcd at 5708, para. 234.

[2340] We disagree with Smithwick & Belendiuk's assertion that the Commission must provide the public an opportunity to comment on a BIAS provider's request for an advisory opinion, or eliminate the process entirely. Smithwick & Belendiuk Comments at 24-25. As Smithwick & Belendiuk itself acknowledges, a BIAS provider may "face a legitimate potential for competitive harm if its operational plan are made public at the advisory opinion stage," *id.*, and further, the Commission does not routinely seek public input on its interpretation of its own rules.

[2341] *2015 Open Internet Order*, 30 FCC Rcd at 5708, para. 235. We disagree with commenters who assert that advisory opinions are not helpful because they would only apply to the requesting party and the facts at hand and not other providers or because any guidance would be revocable and not binding. *See* WISPA Comments at 83; Smithwick & Belendiuk Comments at 24; USTelecom Comments at 59; USTelecom Reply at 23; Free State Foundation Comments at 52; T-Mobile Reply at 26-27. While advisory opinions will specifically engage with the facts provided by a requesting party, we believe published advisory opinions will inform other providers with similar questions, and that usefulness will still apply even if the Commission subsequently revises its guidance.

efficiently as possible. We decline to establish firm deadlines, however, because we anticipate that the nature, complexity, and magnitude of requests may vary widely. Furthermore, it may take time for Commission staff to request any additional information needed to issue an opinion. Once issued, the Enforcement Bureau will make the advisory opinion available to the public.[2342] And to provide further guidance to industry and consumers, the Bureau will also release the initial request and any additional materials deemed necessary to contextualize the opinion.

588. We continue to believe an advisory opinion process will provide clarity and guidance to providers seeking to comply with our regulations. While some commenters assert that seeking an advisory opinion would potentially harm the requesting party,[2343] the advisory opinion process we adopt today does not contemplate the Enforcement Bureau taking enforcement action solely in response to a provider seeking an advisory opinion.[2344]

### 2. Complaint Processes

589. *Informal Complaints.* As stated in the *2023 Open Internet NPRM*, the Commission's informal complaint process under section 1.41 of the rules "remain[s] available to parties with respect" to open Internet rules.[2345] Commenters support continued use of the informal complaint process as an effective enforcement mechanism of our rules.[2346] The Commission previously found, and we continue to find, that section 1.41 provides "a simple and cost-effective option for calling attention to open Internet rule violations."[2347] With reclassification, sections 1.711 through 1.717 also apply to informal complaints arising under Title II of the Act.[2348] Consumers may submit informal complaints online, and no filing fee is required.[2349] Informal complaints are filed through the Commission's user-friendly complaint interface, the Consumer Inquires and Complaint Center Help Center.[2350] Those who wish to file an informal

---

[2342] Entities concerned about privacy and sensitive market information may request confidential treatment of certain information, as provided under Commission rules. *See* 47 CFR §§ 0.457, 0.459; T-Mobile Comments at 33 (expressing concern that disclosing a BIAS provider's contemplated service offerings through the Commission's public docket runs the risk of revealing sensitive information to competitors); USTelecom Comments at 59.

[2343] *See* AT&T Comments at 30-31 (arguing that "'[t]he Commission's vague avenues for enforcement'" could lead to an "ensuing threat of severe forfeiture penalties and damages"); USTelecom Comments at 59 (asserting that "seeking guidance can trigger an enforcement proceeding").

[2344] *See 2015 Open Internet Order*, 30 FCC Rcd at 5708, para. 234.

[2345] *2023 Open Internet NPRM* at 89, para. 193; 47 CFR § 1.41; *see* 47 CFR § 1.711.

[2346] For example, NDIA affirms the value of the informal complaint pathway in its "accessibility to most consumers." NDIA Comments at 4; *see also* WISPA Comments at 62 ("[I]ndividuals can still bring informal complaints against smaller providers and the Commission can initiate enforcement proceedings to target bad behavior.").

[2347] *2010 Open Internet Order*, 25 FCC Rcd at 17986, para. 153 ("[E]nd users, edge providers, and others should have an efficient vehicle to bring potential open Internet violations to the Commission, and indeed such a vehicle is already available. Parties may submit complaints to the Commission pursuant to [s]ection 1.41 of the Commission's rules."); *2015 Open Internet Order*, 30 FCC Rcd at 5710, para. 242 (stating that commenters agree "with the value of retaining" three existing enforcement mechanisms, including the informal complaint process).

[2348] *See* 47 CFR §§ 1.711-1.717.

[2349] *2023 Open Internet NPRM* at 89, para.193 n.607; *see also 2010 Open Internet Order*, 25 FCC Rcd at 17986, para. 153.

[2350] *See* FCC, *Consumer Inquiries and Complaint Center*, https://consumercomplaints.fcc.gov/hc/en-us (last visited Apr. 2, 2024). We note that the Commission's Consumer Complaint Center is responsive on mobile devices and that the Commission's call center is staffed by both English- and Spanish-speaking agents who can file complaints on behalf of consumers. Individuals who use videophones and are fluent in American Sign Language (ASL) may call the Commission's ASL Consumer Support line for assistance in ASL with filing informal complaints or

(continued….)

complaint may simply visit the Consumer Inquiries and Complaint Center portal on the Commission's website and click the Internet icon to access relevant information and the online complaint intake system.[2351]  These complaints will be reviewed and may be served on the consumer's BIAS provider for investigation and response to the consumer within 30 days.[2352]  Although individual informal complaints will not typically result in written Commission Orders, the Enforcement Bureau will examine trends or patterns in complaints to identify potential targets for investigation and enforcement action.  The availability of complaint procedures does not bar the Commission from initiating separate and independent enforcement proceedings for potential violations.[2353]

590.  *Formal Complaints.*  The *RIF Order* eliminated the open Internet complaint rules adopted in the *2010 Open Internet Order* and preserved in the *2015 Open Internet Order*.[2354]  With our action today to reclassify BIAS as a Title II telecommunications service, absent adoption of a different approach, the section 208 formal complaint rules will apply.[2355]  In the *2023 Open Internet NPRM*, we sought comment on whether it would be beneficial to re-establish a formal complaint process for complaints arising under our open Internet rules and whether our section 208 formal complaint process is sufficient for this purpose.[2356]  We agree with commenters that the formal complaint process should continue to be part of the enforcement framework for the open Internet rules.[2357]  We further conclude that

---

obtaining consumer information.  FCC, *FCC ASL Consumer Support Line*, https://www.fcc.gov/fcc-asl-consumer-support-line (last updated Jan. 12, 2022).

[2351] FCC, *Consumer Inquiries and Complaint Center*, https://consumercomplaints.fcc.gov/hc/en-us (last visited Apr. 2, 2024).  Consistent with our current process and procedures, consumers may also file informal complaints by fax or postal mail.  The informal consumer complaint process facilitates a conversation between the consumer and the provider to address disputed issues.  It does not involve arbitration, mediation, or investigation.

[2352] FCC, *Consumer Inquiries and Complaint Center*, https://consumercomplaints.fcc.gov/hc/en-us (last visited Apr. 2, 2024).  WISPA requests a 30-day negotiating period before filing an informal complaint.  *See* WISPA Comments at 80.  We decline WISPA's request, but we note that the informal complaint process is designed to allow parties to reach an informal, negotiated resolution before proceeding to a more formal process.

[2353] *See* 47 CFR § 0.111(a)(17).  The Commission reviews informal complaints and, when applicable, will initiate investigations internally in furtherance of our enforcement efforts.  These include Commission-initiated inquiries under section 403 of the Act, which may lead to the issuance of forfeitures under section 503(b) of the Act.  47 U.S.C. §§ 403, 503(b).

[2354] *2010 Open Internet Order*, 25 FCC Rcd at 17987, para. 155 (adopting open-Internet-specific formal complaint rules based on Part 76 cable access complaint rules); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5713, para. 252 (retaining open-Internet-specific formal complaint rules); *RIF Order*, 33 FCC Rcd at 1082-83, 1091, paras. 297, 302 (repealing open-Internet-specific formal complaint rules).

[2355] 47 U.S.C. § 208(a) ("Any person . . . complaining of anything done or omitted to be done by any common carrier subject to this chapter . . . may apply to said Commission by petition . . . .  If such carrier or carriers shall not satisfy the complaint . . . or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper."); 47 CFR § 1.720 ("The following procedural rules apply to formal complaint proceedings under 47 U.S.C. § 208 . . . ."); *see* Lawyers' Committee Comments at 4-5, 11, 14.

[2356] *See 2023 Open Internet NPRM* at 89, para. 193.

[2357] Several commenters state that formal complaint procedures are necessary to ensure equal access to BIAS and support having a structured formal complaint process.  *See* NDIA Comments at 4-5 (endorsing use of the Commission's authority under section 208 "to develop a structured formal complaint process"); Lawyers' Committee Comments at 11, 14 (declaring section 208 to be "a 'key enforcement authority' that should be available to protect equal opportunity to access and enjoy broadband internet access service").  In its comment, the U.S. Chamber of Commerce objects to "adopt[ing] a formal complaint mechanism under Section 208 of the Communications Act for alleged instances of digital discrimination."  U.S. Chamber of Commerce Reply at 47-48.  The instant Order, however, only concerns open Internet rules and takes no position on the applicability of section

(continued….)

the existing formal complaint rules codified at sections 1.720 through 1.740 of our rules should apply to formal open Internet complaints.[2358]

591. The Commission updated the existing section 208 rules in 2018, and they govern all formal complaint proceedings delegated to the Enforcement Bureau.[2359] These comprehensive rules are largely the same as the prior open-Internet-specific formal complaint rules,[2360] providing for a complaint, answer, and reply, as well as discovery and briefing, as appropriate.[2361] They also establish deadlines for the resolution of complaints.[2362] Moreover, we believe that using the section 208 formal complaint rules will avoid the potential for two different complaint processes if a complaint includes both open Internet violations and other Title II violations.

592. ACA Connects expresses concern about the burden and cost associated with defending

---

202 to the digital discrimination rules. *See 2023 Open Internet NPRM* at 89, para. 193; *see also Preventing Digital Discrimination Order and FNPRM* at 71, para. 143.

[2358] 47 CFR §§ 1.720-1.740; *see* NFIB Comments at 3 ("[T]he Commission should make its regulations as concise and simple as possible."). Applying these well-known and well-used formal complaint rules accords with that request.

[2359] *Amendment of Procedural Rules Governing Formal Complaint Proceedings Delegated to the Enforcement Bureau*, Report and Order, 33 FCC Rcd 7178 (2018) (*Formal Complaint Rules Order*).

[2360] *Compare 2015 Open Internet Order*, 30 FCC Rcd at 5713, para. 252, *with* 47 CFR § 1.721(b)-(d) (requiring a complainant to plead with specificity the basis of its claim and provide supporting facts); *compare 2015 Open Internet Order*, 30 FCC Rcd at 5713, para. 252, *with* 47 CFR § 1.726(b) (requiring a defendant to respond to all material allegations about the challenged practice); *see also 2015 Open Internet Order*, 30 FCC Rcd at 5713, para. 252 (explaining that the open-Internet-specific formal complaint rules are "comparable" to the section 208 formal complaint rules).

[2361] *See* 47 CFR § 1.721 (general pleading requirements); *id.* § 1.722 (form and content of complaints); *id.* § 1.726 (answers); *id.* § 1.728 (replies); *id.* § 1.730 (discovery); *id.* § 1.732(a) (other required submissions).

[2362] *See id.* § 1.740(a) ("Except in extraordinary circumstances, final action on a formal complaint filed pursuant to section 208 of the Act, and not governed by section 208(b)(1), should be expected no later than 270 days from the date the complaint is filed with the Commission."). We reject WISPA's request that the Commission be required to render a decision on any complaint within 60 days from the date the BIAS provider files its response to the Commission. *See* WISPA Comments at 81. The formal complaint rules are designed to resolve complaints on a written record and give defendants sufficient opportunity to respond to the allegations against them so as to afford due process. The rules contemplate the exchange of information and other efforts to narrow the issues in dispute and streamline the adjudicative process. *See, e.g.*, 47 CFR § 1.730 (discovery); *id.* § 1.737 (mediation); *id.* § 1.733(a) (status conference to simplify and narrow issues and identifying stipulations and admissions of fact as elements of the status conference); *id.* § 1.1733(b)(1) (pre-status conference meeting to discuss settlement prospects and stipulations); *id.* § 1.733(b)(2) (requiring the parties to prepare a joint statement of stipulated facts and of all proposals agreed to, along with identification of remaining disputes). A 60-day deadline would not provide adequate time for the development of a complete record in a complex case. We also reject WISPA's request for a shortened, one-year statute of limitations from the time of an alleged open Internet rule violation. WISPA Comments at 81. Section 415 of the Act generally provides that complaints be filed within two years from the time the cause of action accrues, *see* 47 U.S.C. § 415(a)-(c), and WISPA provides no basis justifying a departure from this statutory requirement. For these reasons, we find it unnecessary, as WISPA requests, for the Commission to seek additional comment on streamlined enforcement procedures and timeframes for BIAS providers with 250,000 or fewer subscribers. *See* WISPA Apr. 16, 2024 *Ex Parte* at 2. We find that the size of the defendant BIAS provider (or the number of subscribers it has) does not determine the complexity or scope of the violations alleged, nor does it form the basis for developing a separate set of procedures or deadlines. Furthermore, we find it unnecessary to examine whether to establish a specific forfeiture amount for smaller providers under Part 8 of the Commission's rules. The Commission's rules already provide for discretion when assessing penalties, so there is no need to limit that discretion solely for small BIAS providers. *See* 47 CFR § 1.80 (allowing for downward adjustments for minor violations, carrier voluntary or good faith disclosures, a past history of compliance, or an inability to pay).

potential complaint proceedings.[2363]  We find such proceedings are likely to be rare and unlikely to be particularly burdensome.  To reiterate, we view formal complaint litigation as a last resort.  The section 208 formal complaint rules require a complainant to certify that it has made a good faith effort to settle the dispute.[2364]  Additionally, either party may seek voluntary mediation at the Commission—before a complaint is filed or while the complaint is pending—in an effort to avoid litigation.[2365]  Mediation often obviates the need for litigation or, barring settlement of the entire dispute, may narrow issues for adjudication.

### F.    Legal Authority

593.     We rely on multiple sources of independent, complementary legal authority for the open Internet rules we adopt today, including Titles II and III of the Act and section 706 of the 1996 Act. These are the same sources of authority that the Commission relied upon when it adopted rules in the *2015 Open Internet Order*,[2366] which were upheld in full by the D.C. Circuit.[2367]  These sources of authority work to safeguard and secure Internet openness to ensure that the Internet continues to grow as a platform for competition, free expression, and innovation; to be a driver of economic growth; and to be an engine of the virtuous cycle of broadband deployment, innovation, and consumer demand.

594.     In this Order, we find that BIAS is a telecommunications service subject to Title II, with forbearance where appropriate under section 10 of the Act, allowing the Commission to exercise its authority under sections 201 and 202 of the Act to ensure that BIAS providers do not engage in unjust and unreasonable practices or preferences.  As described below, under section 706, the Commission has the authority to adopt these open Internet rules to encourage and accelerate the deployment of broadband to all Americans.  The rules are also supported by Title III of the Act, under which the Commission has broad spectrum management authority to protect the public interest through spectrum licensing and regulations.  Each of these sources of authority provides an alternative ground to independently support our open Internet rules.  With respect to our revised transparency rule, we rely on the same sources of authority along with section 257 of the Act (and associated authority now in section 13 of the Act), consistent with the relevant reasoning of the *2010 Open Internet Order*[2368] and the *RIF Order*.[2369]  Below, we discuss the basis and scope of each of these sources of authority, provide an overview of prior precedents which justifies such use, and then explain their application to the open Internet rules we adopt today.

### 1.    Title II of the Act with Forbearance

595.     As in the *2015 Open Internet Order*, we find that the open Internet rules we adopt today are also supported by our legal authority under Title II to regulate telecommunications services.[2370]  We

---

[2363] *See* ACA Connects Comments at 50-51; *see also* Digital Liberty *Ex Parte* at 3-4 (filed Apr. 12, 2024) (arguing the Commission's actions could create additional litigation costs).

[2364] *See* 47 CFR § 1.722(g) ("Such certification shall include a statement that, prior to the filing of the complaint, the complainant notified each defendant in writing of the allegations that form the basis of the complaint and invited a response within a reasonable period of time.  A refusal by a defendant to engage in discussions contemplated by this rule may constitute an unreasonable practice under the Act.  The certification shall also include a brief summary of all additional steps taken to resolve the dispute prior to the filing of the formal complaint.").

[2365] *See* 47 CFR § 1.1737.  Mediation may be requested by a letter or by filing an informal complaint with the Enforcement Bureau's Market Disputes Resolution Division.  *See id.* § 1.1737(c).

[2366] *2015 Open Internet Order*, 30 FCC Rcd at 5720-31, paras. 273-98.

[2367] *USTA*, 825 F.3d 674; *see also Verizon*, 740 F.3d 623, 643 (accepting the Commission's reinterpretation of section 706 as an independent grant of legal authority over BIAS).

[2368] *See 2010 Open Internet Order*, 25 FCC Rcd at 17980-81, para. 136 n.444.

[2369] *See RIF Order*, 33 FCC Rcd at 445, para. 232.

[2370] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5724, para. 283.

rely on sections 201, 202, and 208 of the Act, along with the related enforcement authorities of sections 206, 207, 209, 216, and 217, as additional legal authority for the open Internet rules we adopt today.[2371]

596.    Section 201(a) places a duty on common carriers to furnish communications services subject to Title II "upon reasonable request" and "establish physical connections with other carriers" where the Commission finds it to be in the public interest."[2372]  Section 201(b) provides that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful."[2373]  Section 201(b) also gives the Commission the authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."[2374]  Section 202(a) makes it "unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."[2375]

597.    Thus, the unjust and unreasonable standards in sections 201 and 202 afford the Commission significant discretion to distinguish acceptable behavior from behavior that violates the Act. Indeed, the very terms "unjust" and "unreasonable" are broad, inviting the Commission to undertake the kind of line-drawing that is necessary to differentiate just and reasonable behavior on the one hand from unjust and unreasonable behavior on the other.[2376]  Acting within this discretion, the Commission has exercised its authority under section 201(b), through both adjudication and rulemaking, to ban unjust and unreasonable carrier practices as unlawful under the Act.[2377]  Although the particular circumstances have varied, in reviewing these precedents, we find that the Commission generally takes this step where necessary to protect competition and consumers against carrier practices for which there was either no cognizable justification for the action or where the public interest in banning the practice outweighed any countervailing policy concerns.[2378]

---

[2371] *See, e.g., id.* at 5724-25, 5726-28, paras. 283-84, 289-92.

[2372] 47 U.S.C. § 201(a).

[2373] 47 U.S.C. § 201(b).

[2374] *Id.*

[2375] *47 U.S.C. § 202(a).*

[2376] As the D.C. Circuit has stated, for example, "the generality of these terms . . . opens a rather large area for the free play of agency discretion, limited of course by the familiar 'arbitrary' and 'capricious' standard in the Administrative Procedure Act."  *Bell Atlantic Tel. Co. v. FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996).  Stated differently, because both sections "set out broad standards of conduct," it is up to the "Commission [to] give[] the standards meaning by defining practices that run afoul of carriers' obligation, either by rulemaking or by case-by-case adjudication."  *PCIA Forbearance Order*, 13 FCC Rcd at 16865, para. 15.

[2377] The Commission need not proceed through adjudication in announcing a broad ban on a particular practice.  *See, e.g., Rural Call Completion Order*, 28 FCC Rcd at 16155-56, para. 29; *Truth in Billing and Billing Format*, CC Docket No. 98-17, First Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 7492 (1999) (*Truth in Billing Order*) (relying, in part, on section 201(b) in adopting truth-in-billing requirements).  Indeed, the text of section 201(b) itself gives the Commission authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."  47 U.S.C. § 201(b).

[2378] *See Long Distance Direct, Inc., Apparent Liability for Forfeiture*, File No. ENF-99-01, Memorandum Opinion and Order, 15 FCC Rcd 3297, 3302, para. 14 (2000) (*LDDI MO&O*) (finding that the company's practice of cramming membership and other unauthorized fees on consumer telephone bills was an unjust and unreasonable practice in connection with communication services); *Central Telecom Long Distance, Inc. Apparent Liability for Forfeiture*, File No. EB-TCD-13-00011651, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 5517, 5523-

(continued....)

598.    Our rulemaking actions interpret and apply the statutory authority at issue here, thereby enabling the Commission to address the sorts of core communications policy issues that the agency has dealt with since the enactment of the Communications Act.  This is illustrated by the many historical precedents for the regulation of carriers consistent with the conduct rules we adopt.

599.    *Prohibitions on Blocking and Throttling.*  The conduct rules we adopt today are consistent with longstanding Commission precedent under the Act, and in some respects also historical common carriage requirements more generally.  Our rules prohibiting blocking or throttling of traffic except for purposes of reasonable network management or at the desire of end users aligns with policies the Commission long has applied to carriers under the Communications Act.[2379]  These rules also accord with longstanding requirements imposed on common carriers of various sorts to defer to their customers regarding the content being carried and to ensure that content gets to its destination in a timely and reliable manner.[2380]

600.    *Restriction on paid prioritization.*  Our rule banning paid prioritization also reflects the Commission's historical recognition that just and reasonable rates and practices can require regulating carriers' relationships with other communications suppliers.  The Commission historically has regulated those relationships as needed, including to restrict carriers' ability to impose charges on providers delivering them communications traffic.[2381]  We recognize that in addition to benefitting BIAS customers,

---

27, paras. 14-21 (2014) (*Central NAL*); *U.S. Telecom Long Distance, Inc. Apparent Liability for Forfeiture*, File No. EB-TCD-13-00008959, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 823, 829-34, paras. 14-20 (2014) (*USTLD NAL*); *Central Telecom Long Distance, Inc., Apparent Liability for Forfeiture*, File No. EB-TCD-13-00006333, Notice of Apparent Liability for Forfeiture, 28 FCC Rcd 17196, 17202-06, paras. 15-22 (2013); *see also NobelTel LLC, Apparent Liability for Forfeiture*, File No. EB-TCD-12-0000412, Notice of Apparent Liability for Forfeiture, 27 FCC Rcd 11760, 11762-63, para. 6 (2012) (finding that "unfair and deceptive marketing practices by interstate common carriers constitute unjust and unreasonable practices under Section 201(b)").

[2379] *See, e.g.*, *USF/ICC Transformation Order*, 26 FCC Rcd at 17903, para. 734 ("Commission precedent provides that no carriers, including interexchange carriers, may block, choke, reduce or restrict traffic in any way." (internal quotation marks omitted)); *id.* (reiterating that call blocking is impermissible in intercarrier compensation disputes); *Developing an Unified Intercarrier Compensation Regime*; *Establishing Just and Reasonable Rates for Local Exchange Carriers*, WC Docket No. 07-135, CC Docket No. 01-92, Declaratory Ruling, 27 FCC Rcd 1351, 1354, para. 9 (WCB 2012) (discussing call blocking in rural call completion context); *2007 ICC Declaratory Ruling*, 22 FCC Rcd at 11629-31, paras. 1, 6 (reiterating that call blocking is impermissible as a self-help measure to address intercarrier compensation dispute); *see also, e.g.*, *Implementation of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Services et al.*, GN Docket No. 93-252 et al., Third Report and Order, 9 FCC Rcd 7988, 8088-89, para. 207 (1994) (observing that "CMRS licensees are subject to the common carrier obligation to serve the public under Section 201 of the Act," and "[t]hus, they may not restrict use of their facilities based on the purpose of the communication"); *Blocking Interstate Traffic in Iowa*, Memorandum Opinion and Order, 2 FCC Rcd 2692 (1987) (denying application for review of Bureau order, which required petitioners to interconnect their facilities with those of an interexchange carrier in order to permit the completion of interstate calls over certain facilities); *Frontier Broadcasting Co. v. J.E. Collier et al.*, 24 F.C.C. 251, 253-54 (1958) (explaining that where an entity is a common carrier "[t]he choice of the specific intelligence to be transmitted is, . . . the sole responsibility or prerogative of the subscriber and not the carrier").

[2380] *See, e.g.*, *Am. Trucking Ass'ns v. Atchison, Topeka, & Santa Fe Ry. Co.*, 387 U.S. 397, 406 (1967) ("From the earliest days, common carriers have had a duty to carry all goods offered for transportation."); *W. Union Tel. Co. v. James*, 162 U.S. 650, 660 (1896); *Bank of Ky. v. Adams Express Co.*, 93 U.S. 174, 181 (1876); *The Commander-in-Chief*, 68 U.S. 43, 50-51 (1863); *Propeller Niagara v. Cordes*, 62 U.S. 7, 22 (1858); *Chesapeake & Potomac Tel. Co. of Baltimore City v. Baltimore & Oh. Tel. Co. of Baltimore City*, 7 A. 809, 811 (Md. 1887).

[2381] *See, e.g.*, *USF/ICC Transformation Order*, 26 FCC Rcd at 17915, para. 760 (relying on, among other authority, section 201(b) to regulate intercarrier compensation payments, including mandating bill-and-keep as the default compensation arrangement for certain traffic); *International Settlement Rates*, IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19806, 19937-39, paras. 283-86 (1997) (stating that section 201(b) gives the Commission authority to regulate the international settlement rates paid by domestic carriers); *MTS and WATS Market Structure*,

(continued….)

our justification for the ban on paid prioritization rests in part on the identified harms to edge provider operations and innovation—but that, too, is consistent with how the Commission has exercised its authority historically. For example, the Supreme Court has rejected the view that section 201(b) limits the Commission to addressing practices exclusively when they harm customers, rather than also encompassing harms to communications service suppliers,[2382] basing its rationale in part on historical regulation under the Interstate Commerce Act.[2383] Further, a policy goal of the historical *Computer Inquiries* regime was to guard against the risk of carriers harming competitive providers of enhanced services.[2384]

601. *General Conduct Rule.* Our general conduct rule, by which we evaluate conduct not covered by the bright-line rules, is consistent with the Commission's historical exercise of authority under the Act. Since its original enactment in 1934, the Communications Act has prohibited unjust, unreasonable, and unjustly or unreasonably discriminatory, rates and practices by carriers,[2385] and the Commission has regularly judged carriers' conduct against those standards on a case-by-case basis.[2386] The origins of common carrier duties under common law, and then under the Interstate Commerce Act, likewise commonly were subject to case-by-case adjudication.[2387]

602. The specific considerations that guide the application of the general conduct rule also reflect the types of factors the Commission historically has weighed in evaluating the justness and reasonableness of carrier conduct.

- For example, section 201(b) of the Act has long been understood to allow for carrier

---

CC Docket No. 78–72, Phase I, Memorandum Opinion and Order, 97 F.C.C.2d 682, 715, para. 83 (1983) (providing that, under its intercarrier compensation rules, enhanced services providers are not subject to intercarrier access charges but instead obtain access to the network by purchasing connections available to end users).

[2382] *Global Crossing Telecommc'ns, Inc. v. Metrophones Telecommc'ns, Inc.*, 550 U.S. 45, 62-63 (2007) (*Global Crossing*); *see also, e.g., Slamming Second Report and Order*, 14 FCC Rcd at 1570-71, para. 103 (a carrier that unreasonably fails to execute or unreasonably delays in executing a change in a customer's presubscribed long distance provider violates section 201(b) of the Act).

[2383] *Global Crossing*, 550 U.S. at 63 (citing *Chicago & N. W. Transp. Co. v. Atchison T. & S. F. Ry. Co*, 609 F.2d 1221, 1225-26 (7th Cir. 1978) ("Act . . . provides for the regulation of inter-carrier relations as a part of its general rate policy"); *see also id.* (distinguishing situations involving "a firm that supplies office supplies or manual labor," with a *cf.* cite to *Missouri Pac. R. Co. v. Norwood*, 283 U.S. 249, 257 (1931) as holding that "'practice' in § 1 of the Interstate Commerce Act does not encompass employment decisions").

[2384] *See, e.g., Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, et al.*, CC Docket No. 83-115, Report and Order, 95 F.C.C.2d 1117, 1133-36, paras. 42-47 (1983) (discussing how control over local exchange facilities could enable carriers to disadvantage competitive enhanced services providers absent the *Computer Inquiries* requirements); *California III*, 39 F.3d at 924 (noting that one objective of the *Computer Inquiries* rules was to address the Commission's "concern[] that the BOCs would gain an unfair competitive edge in the enhanced services industry by discriminating in favor of their own enhanced services in providing access to the telephone transmission facilities").

[2385] 47 U.S.C. §§ 201(b), 202(a).

[2386] *See, e.g., Truth in Billing Order*, 14 FCC Rcd at 7528, para. 57; *Hi-Tech Furnace Systems, Inc. v. Sprint Communications Company, L.P.*, File No. E-98-36, Memorandum Opinion and Order, 14 FCC Rcd 8040, 8045, para. 12 (1999); *PCIA Forbearance Order*, 13 FCC Rcd at 16865, para. 15; *Am. Broad. Cos. v. FCC*, 663 F.2d 133, 138-39 (D.C. Cir. 1980); *Western Union Int'l, Inc. v. FCC*, 568 F.2d 1012, 1018 (2d Cir. 1977); *Am. Trucking Ass'ns v. FCC*, 377 F.2d 121, 130 (D.C. Cir. 1966); *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, CC Docket No. 79-252, Second Report and Order, 91 F.C.C.2d 59, 70, paras. 22-23 (1982).

[2387] *See, e.g., Interstate Com. Comm'n v. Baltimore & O. Ry. Co.*, 145 U.S. 263, 275-77 (1892); *Ariz. Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370, 383-85 (1932).

practices that enable end users to control their use of the service to which they have subscribed as just and reasonable, absent a countervailing adverse public impact.[2388]

- Consumer protection, such as protection against deceptive or misleading practices, also has been a part of the Commission's implementation of section 201(b) of the Act.[2389]

- The Commission historically has implemented the Act to guard against conduct that would have harmful competitive effects, as well.[2390]

- The Commission not only has considered effects on innovation and investment in its implementation of longstanding provisions of the Act,[2391] but since the enactment of the 1996 Act also has relied on the mandate to advance broadband deployment in section 706 of that statute.[2392]

- The Commission also has treated compliance with industry standards or best practices as relevant—though not dispositive—to its evaluation of the justness and reasonableness of carrier practices.[2393]

---

[2388] *See, e.g.*, *Advanced Methods to Target and Eliminate Unlawful Robocalls*; *Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4883-84, para. 22 (2019); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 et al.*, CG Docket No. 02-278 et al., Declaratory Ruling and Order, 30 FCC Rcd 7961, 8034, 8036-37, paras. 154, 158 (2015); *American Telephone and Telegraph Company Revisions to Tariff F.C.C. Nos. 260 and 267 Concerning Resale and Shared Use*, Transmittal No. 12715, Memorandum Opinion and Order, 64 F.C.C.2d 1003, 1011, para. 18 (1977); *Carterfone*, 13 F.C.C.2d at 423; *Hush-a-Phone Corp. v. United States*, 238 F.2d 266, 269 (D.C. Cir. 1956).

[2389] *See, e.g.*, *Long Distance Consolidated Billing Company*, File No. EB-TCD-14-00017401, Forfeiture Order, 34 FCC Rcd 1871, 1873-74, para. 8 (2019); *id.* at 1873-74, para. 8 n.24 (citing precedent); *Curt Himmelman v. MCI Communications Corp. et al.*, EB-00-TC-F-003 et al., Declaratory Order, 17 FCC Rcd 5504, 5508, para. 12 (2002); *Petition for Declaratory Ruling on Issues Contained in Count I of White v. GTE*, WT Docket No. 00-164, Memorandum Opinion and Order, 16 FCC Rcd 11558, 11562-63, para. 14 (2001).

[2390] *See, e.g.*, *Part 62 Repeal Report and Order*, 14 FCC Rcd at 16540, para. 14; *Petitions for Rule Making Concerning Proposed Changes to the Commission's Cellular Resale Policies*, CC Docket No. 91-33, Report and Order, 7 FCC Rcd 4006, 4008, para. 15 (1992) (*1992 CMRS Resale Order*); *Investigation of Access and Divestiture Related Tariffs, Phase I*, CC Docket No. 83-1145, Memorandum Opinion and Order, 97 F.C.C.2d 1082, 1177 (1984); *American Telephone and Telegraph Company (Long Lines Department) Revisions to Tariff FCC No. 259, Wide Area Telecommunications Service (WATS), Transmittal No. 12745*, Memorandum Opinion and Order, 66 F.C.C.2d 9, 56-57, para. 113 (1977).

[2391] *See, e.g.*, *Promoting Interoperability in the 700 MHz Commercial Spectrum et al.*, WT Docket No. 12-332 et al., Report and Order and Order of Proposed Modification, 28 FCC Rcd 15122, 15122-23, para. 1 (2013); *1992 CMRS Resale Order*, 7 FCC Rcd at 4008, para. 15; *Regulatory Policies Concerning Resale and Share Use of Common Carrier Domestic Public Switched Network Services*, CC Docket No. 80-54, Report and Order, 83 F.C.C.2d 167, 171-73, paras. 8-10 (1980); *Resale and Shared Use of Common Carrier Services*, Docket No. 20097, Report and Order, 60 F.C.C.2d 261, 302, para. 86 (1976).

[2392] *See, e.g.*, *Lifeline Third Report and Order*, 31 FCC Rcd at 4063, para. 272 (application of the section 10(a) forbearance criteria "is guided by the Commission's responsibilities under section 254 of the Act and section 706 of the 1996 Act"); *USF/ICC Transformation Order*, 26 FCC Rcd at 17687-91, paras. 66-73 (relying on section 706 of the 1996 Act in support of conditioning certain high-cost universal service support on the provision of BIAS).

[2393] *See, e.g.*, *Curt Himmelman v. MCI Communications Corp. et al.*, File Nos. EB-00-TC-F-003 et al., Declaratory Order, 17 FCC Rcd 5504, 5508, para. 14 (2002); *Erdman Technologies Corporation v. US Sprint Communications Company*, File No. E-94-20, Order on Reconsideration, 15 FCC Rcd 7232, 7245-46, para. 24 (1999); *Southwestern Bell Mobile Systems, Inc., Petition for Declaratory Ruling Regarding the Just and Reasonable Nature of, and State Challenges to, Rates Charged by CMRS Providers When Charging for Incoming Calls and Charging for Calls in Whole-Minute Increments*, 14 FCC Rcd 19898, 19904-05, para. 15 (1999).

Thus, the consideration of such factors through a case-by-case reasonableness evaluation is fully consistent with longstanding historical practice.

603.     The record also provides broad support for relying on authority in sections 201 and 202 of the Act.[2394]  Some commenters oppose relying on sections 201 and 202, because these sections may be unduly burdensome, particularly on smaller providers.  In such cases, commenters urge the Commission to forbear from sections 201, 202, and 208 for smaller BIAS providers, or alternatively, initiate a new proceeding to define the limits of obligations for small BIAS providers.[2395]  Other commenters argue that the Commission should focus on Title II authority rather than section 706.[2396]  For the reasons set forth above, we find the open Internet rules we adopt today are supported by our legal authority under Title II.

604.     As proposed in the *2023 Open Internet NPRM*,[2397] and consistent with the *2010 Open Internet Order* and the *RIF Order*,[2398] and as affirmed by the D.C. Circuit in *Mozilla*,[2399] we rely on section 257 of the Act (now in conjunction with section 13 of the Act)[2400] as additional legal authority for the transparency requirements we retain.  Section 257(a) directs the Commission to "identify[] and eliminate[] . . . market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services."[2401]  In carrying out section 257(a), the Commission "shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity."[2402]

605.     We continue to find that section 13(d)(3) is properly understood as not only imposing a current obligation to "consider market barriers for entrepreneurs and other small businesses in the

---

[2394] *See, e.g.*, AARP Comments at 5; Ad Hoc Telecom Users Committee Comments at 30; CPUC Comments at 5-6; California Independent Small LECs Comments at 18; CCIA Comments at 8-10, 15; CFA Comments at 20; Free Press Comments at 66; INCOMPAS Comments at 59; Lawyers' Committee Comments at 11-14; Tejas N. Narechania Comments at 13 & n.13; Public Knowledge Comments at 26.

[2395] *See, e.g.*, ADTRAN Comments at 14; ACA Connects Comments at 40-41; WISPA Comments at v.

[2396] These commenters contend that the Commission should focus on Title II authority rather than section 706.  *See, e.g.*, California Independent Small LECs Comments at 18; CCIA Comments at 8-10; ICG Comments at 20-21, 31-32.

[2397] *2023 Open Internet NPRM* at 92-93, para. 202.

[2398] Both the *2010 Open Internet Order* and the *RIF Order* recognized section 257 as a source of authority.  *2010 Open Internet Order*, 25 FCC Rcd at 17980-91, para. 136 n.444; *RIF Order*, 33 FCC Rcd at 445-47, paras. 232-33.

[2399] *Mozilla*, 940 F.3d at 47-49.

[2400] The RAY BAUM'S Act of 2018 eliminated section 257(c) of the Act, and instead included language in new section 13 of the Act, 47 U.S.C. § 163, requiring similar review under that provision.  RAY BAUM'S Act of 2018, Pub. L. 115-141, § 402(f), 132 Stat. 1089 (2018); *see, e.g.*, *Mozilla*, 940 F.3d at 47 (noting that while section 257(c) was removed from the Communications Act before the *RIF Order* became effective, it was not altered in any material respect for purposes of the Commission's authority in this regard, and that Congress emphasized that "[n]othing in this title or the amendments made by this title shall be construed to expand or contract the authority of the Commission").  Thus, to be clear, section 257 previously included subsection (c), which directed the Commission to submit a triennial report to Congress on the market entry barriers for entrepreneurs and other small businesses.  The RAY BAUM's Act now requires the Commission to submit a biennial report that is similar to the report previously required under section 257(c).  *Mozilla*, 940 F.3d at 47 ("The 2018 legislation that amended the Act introduced a biennial reporting requirement quite similar to the triennial reporting requirement contained in the former Section 257(c).").  *See* RAY BAUM'S Act of 2018, Pub. L. No. 115-141, Div. P, §§ 401, 402(f), 132 Stat. at 1087-89 (codifying a reporting requirement at 47 U.S.C. § 163).

[2401] 47 U.S.C. § 257(a).

[2402] 47 U.S.C. § 257(b).

communications marketplace in accordance with the national policy under section 257(b)," but also imposing an ongoing obligation to do so.[2403]  In this regard, section 13(a) directs the Commission to submit a report to Congress, "[i]n the last quarter of every even-numbered year, on the state of the communications marketplace."[2404]  The report must "assess the state of competition in the communications marketplace, including competition to deliver voice, video, audio, and data services among providers of telecommunications, providers of commercial mobile service (as defined in section 332 of this title), multichannel video programming distributors (as defined in section 522 of this title), broadcast stations, providers of satellite communications, Internet service providers, and other providers of communications services."[2405]  The report must "assess whether laws, regulations, regulatory practices (whether those of the Federal Government, States, political subdivisions of States, Indian tribes or tribal organizations (as such terms are defined in section 5304 of title 25), or foreign governments), or demonstrated marketplace practices pose a barrier to competitive entry into the communications marketplace or to the competitive expansion of existing providers of communications services."[2406]  Section 163(d)(3) further directs that, "[i]n assessing the state of competition . . . and regulatory barriers . . . , the Commission shall consider market entry barriers for entrepreneurs and other small businesses in the communications marketplace in accordance with the national policy under section 257(b) of this title."[2407]

### 2.    Section 706 of the 1996 Act

606.    We adopt our proposal to return to the Commission's prior judicially affirmed interpretation of section 706 of the 1996 Act as granting the Commission regulatory authority.[2408]  We do so in light of the considerations that persuaded the Commission to adopt such interpretations in the past, and that persuaded courts to affirm those interpretations.[2409]  Consistent with the prior approach, we rely on section 706(a) as part of our authority for the adoption of open Internet rules.  We also rely on section 706(b) to the extent that the Commission concludes under section 706(a) that advanced telecommunications capability is not being deployed to all Americans in a reasonably timely fashion.[2410]  The record reflects support for returning to the Commission's prior interpretation of section 706(a) and (b) as grants of regulatory authority from a range of commenters, including state and local groups, public

---

[2403] *RIF Order*, 33 FCC Rcd at 445-46, para. 232.

[2404] 47 U.S.C. § 163(a).

[2405] 47 U.S.C. § 163(b)(1).

[2406] 47 U.S.C. § 163(b)(3).

[2407] 47 U.S.C. § 163(d)(3).

[2408] *2023 Open Internet NPRM* at 90, paras. 195-97.

[2409] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5720-24, 5731, paras. 274-82, 298 (explaining that sections 706(a) and (b) each represent a grant of regulatory authority to the Commission and that the Commission can adopt and enforce implementing rules and rejecting arguments to the contrary); *2010 Open Internet Order*, 25 FCC Rcd at 17968-72, paras. 117-23 (explaining that sections 706(a) and (b) each represent a grant of regulatory authority to the Commission and rejecting arguments to the contrary); *Verizon*, 740 F.3d at 635-42 (affirming as reasonable the Commission's interpretation that sections 706(a) and (b) are grants of regulatory authority); *In re FCC 11-161*, 753 F.3d 1015, 1049-54 (10th Cir. 2014) (while failing to recognize that the Commission had interpreted section 706(a) as a grant of regulatory authority in the *2010 Open Internet Order*, affirming the Commission's reliance on section 706(b) as a grant of regulatory authority); *USTA*, 825 F.3d at 733-34 (affirming as reasonable the Commission's interpretation that sections 706(a) and (b) are grants of regulatory authority).

[2410] The Commission's most recent section 706 report issued last month concluded that advanced telecommunications capability was *not* being deployed to all Americans in a reasonable and timely fashion.  *See 2024 Section 706 Report* at 2, para. 4.

interest groups, think tanks, academia, and others.[2411] These commenters generally argue that interpreting section 706 as a grant of regulatory authority provides a better reading of the statute than the interpretation adopted in the *RIF Order*, is supported by judicial and Commission precedent, is supported by legislative history, and will survive judicial scrutiny even with limited deference.[2412] The record also reflects commenters who oppose returning to interpreting section 706 as a grant of regulatory authority, for reasons such as the provision should be viewed as exhortative rather than as a directive, the provision is not supported by statutory interpretation, and the provision is not supported by clear congressional intent.[2413] For the reasons discussed by the Commission in the *2010 Open Internet Order* and the *2015 Open Internet Order*, the D.C. Circuit in *Verizon* and *USTA*, the Tenth Circuit in *In re FCC*, and in this Order, we disagree. We also disagree with other commenters' claims that the Commission could adopt rules using section 706 and Title I authority.[2414]

607. The *RIF Order* principally grounded its rationale for changing the interpretation of section 706 on its view that section 706 was better interpreted as hortatory.[2415] As explained below, upon further analysis, we conclude that interpreting section 706(a) and (b) as grants of regulatory authority represents the better reading of the statute and likewise provides a basis for us to change our interpretation.

608. For one, we have ample support for relying on specific rationales for interpreting sections 706(a) and (b) of the 1996 Act as grants of regulatory authority. In *Comcast*, the D.C. Circuit identified Section 706(a) as a provision that "at least arguably . . . delegate[s] regulatory authority to the Commission," and in fact "contain[s] a direct mandate—the Commission 'shall encourage.'"[2416] In the *2010 Open Internet Order*, the Commission explained why section 706(a) and (b) each represent a grant of regulatory authority to the Commission after considering the statutory text, regulatory and judicial precedent, and legislative history, and rejecting objections to that interpretation.[2417] In particular, the

---

[2411] *See, e.g.*, ACLP July 17, 2017 Comments at 27; ACE Comments at 2; ALA Comments at 15; CPUC Comments at 40-41; CFA Comments at 90; Maya Chubet Comments at 5; NARUC Comments at 12; Next Century Cities Comments at 5-6; Tejas N. Narechania Comments at 11 & n.5; WISPA Comments at 96.

[2412] *See, e.g.*, NARUC Comments at 10 (arguing that if a court today were to rely on judicial and Commission precedent and legislative history, interpreting section 706 as a grant of regulatory authority would provide a "return to a common sense reading of the statute" and thus provides a better reading of the statute).

[2413] *See, e.g.*, Alamo Broadband Comments at 1 (expressing support for an open Internet, but nevertheless adamantly opposing the Commission's proposal to regulate BIAS under Title II and section 706); CCIA Comments at 8-9 (expressing support for Title II authority, but opposing relying on section 706 as a primary source of authority, arguing that the primary purpose of section 706 is to foster infrastructure investment and the *Verizon* and *Comcast* courts rejected arguments that "this largely hortatory instruction authorizes oversight of the manner in which BIAS providers operate their broadband transmission facilities"); Free State Foundation Comments at 10 (acknowledging that the Court affirmed the Commission's prior interpretations of section 706 as affirmative grants of authority, but asserts that the deferential standard of review may no longer be valid); James Madison Institute Comments at 4 ("Section 706 is the closest Congress came to providing clear intent, but the language only states that the FCC is to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.'); Jeffrey Westling Comments at 15 (asserting that while Congress considered the Commission's role in promoting broadband deployment in section 706(b), the statute never mentions regulating broadband as a utility, and instead limited the Commission's authority to incentivizing broadband deployment through removing barriers and promoting competition); TechFreedom Comments at 65-66 (agreeing with Commissioner Pai's dissent from the *2015 Open Internet Order* on review, that "[t]he text, statutory structure, and legislative history all make clear that Congress intended section 706 to be hortatory—not delegatory—in nature").

[2414] *See* ADTRAN Comments at 33-34; Christopher Yoo et al. Comments at 3, 14; Free State Foundation Comments at 67.

[2415] *RIF Order*, 33 FCC Rcd at 470, para. 268.

[2416] *Comcast*, 600 F.3d at 658.

[2417] *See 2010 Open Internet Order*, 25 FCC Rcd at 17968-72, paras. 117-23.

Commission explained:[2418]

> In directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment,"[2419] Congress necessarily invested the Commission with the statutory authority to carry out those acts. Indeed, the relevant Senate Report explained that the provisions of Section 706 are "intended to ensure that one of the primary objectives of the [1996 Act]—to accelerate deployment of advanced telecommunications capability—is achieved," and stressed that these provisions are "a necessary fail-safe" to guarantee that Congress's objective is reached.[2420] It would be odd indeed to characterize Section 706(a) as a "fail-safe" that "ensures" the Commission's ability to promote advanced services if it conferred no actual authority. Here, under our reading, Section 706(a) authorizes the Commission to address practices, such as blocking VoIP communications, degrading or raising the cost of online video, or denying end users material information about their broadband service, that have the potential to stifle overall investment in Internet infrastructure and limit competition in telecommunications markets.

609. The Commission went on to explain:[2421]

> Section 706(a) accordingly provides the Commission a specific delegation of legislative authority to promote the deployment of advanced services, including by means of the open Internet rules adopted today. Our understanding of Section 706(a) is, moreover, harmonious with other statutory provisions that confer a broad mandate on the Commission. Section 706(a)'s directive to "encourage the deployment [of advanced telecommunications capability] on a reasonable and timely basis" using the methods specified in the statute is, for example, no broader than other provisions of the Commission's authorizing statutes that command the agency to ensure "just" and "reasonable" rates and practices, or to regulate services in the "public interest."[2422] Indeed, our authority under Section 706(a) is generally consistent with—albeit narrower than—the understanding of ancillary jurisdiction under which this Commission operated for decades before the *Comcast* decision. The similarities between the two in fact explain why the Commission has not heretofore had occasion to describe Section 706(a) in this way: In the particular proceedings prior to *Comcast*, setting out the understanding of Section 706(a) that we articulate in this Order would not meaningfully have increased the authority that we understood the Commission already to possess.

610. In addition, in the *2015 Open Internet Order*, the Commission built on the foundation of its explanations in the *2010 Open Internet Order*, rejecting various objections to the interpretation of section 706(a) and (b) as grants of regulatory authority and elaborating on the Commission's authority to adopt rules implementing that provision, and to enforce those rules.[2423]

611. The Commission concluded in the *2015 Open Internet Order* and *2010 Open Internet Order* that open Internet rules were a reasonable way to implement Commission authority under section

---

[2418] *Id.* at 17969-70, para. 120.

[2419] 47 U.S.C. § 1302(a).

[2420] S. Rep. No. 104-23, at 50-51 (1995).

[2421] *2010 Open Internet Order*, 25 FCC Rcd at 17971, para. 122 (some footnotes omitted).

[2422] *See, e.g.*, 47 U.S.C. §§ 201(b), 309(a).

[2423] *See 2015 Open Internet Order*, 30 FCC Rcd at 5720-24, 5731, paras. 274-82, 298.

706(a) and (b),[2424] and the nexus between open Internet rules and the directives in section 706(a) and (b) was affirmed by the D.C. Circuit in *Verizon*.[2425] For those same reasons, we find that the open Internet rules we adopt here are a reasonable exercise of section 706(a) authority. As the Commission recently concluded that advanced telecommunications capability is not being deployed to all Americans in a reasonable and timely fashion under section 706(b),[2426] the open Internet rules we adopt here are a reasonable exercise of authority under that provision as well.

612. To be clear, we interpret section 706(a) and (b) as independent, complementary sources of affirmative Commission authority for the rules adopted today. Our interpretation of section 706(a) as a grant of express authority is in no way dependent upon our findings in the section 706(b) inquiry. Thus, even if the Commission's inquiry were to have resulted in a positive conclusion such that our section 706(b) authority were not triggered, this would not eliminate the Commission's authority to take actions to encourage broadband deployment under section 706(a). And Commission actions adopted pursuant to a negative section 706(b) determination would not simply be swept away by a future positive section 706(b) finding, and subsequently render those actions unnecessary or unauthorized without any further Commission process.[2427] The Commission takes such measures precisely to achieve section 706(b)'s goal of accelerating deployment.

613. Our return to an interpretation of section 706 of the 1996 Act as granting the Commission regulatory authority and, in turn, as a basis for open Internet rules is also propelled by the realization that BIAS has become even more essential to consumers for work, health, education, community, and everyday life.[2428] While Internet access has long been important to daily life, the COVID-19 pandemic and the subsequent rapid shift of work, education, and health care online has demonstrated how essential BIAS connections are for consumers' participation in our society and economy. In light of this reality, we believe that returning to the Commission's prior interpretation of section 706 is necessary and timely given the critical importance of ensuring the Commission's authority to fulfill policy objectives and responsibilities to protect this vital service.

614. We find that the Commission has the legal authority to return to the prior, judicially affirmed, pre-*RIF Order* interpretations of section 706(a) and (b) of the 1996 Act. The APA's requirement of reasoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation.[2429] But so long as an agency "adequately explains the reasons for a reversal of policy," its new interpretation of a statute cannot be rejected simply because it is new.[2430] In *Fox*, the Supreme Court emphasized that, although an agency must acknowledge that it is changing course when it adopts a new construction of an ambiguous statutory provision, "it need not demonstrate to

---

[2424] *See, e.g.*, *id.* at 5721, 5723-24, paras. 275, 281-82; *2010 Open Internet Order*, 25 FCC Rcd at 17968, 17971-72, paras. 117, 122, 123.

[2425] *Verizon*, 740 F.3d at 642-49.

[2426] *See 2024 Section 706 Report* at 2, para. 4.

[2427] Throwing away such measures because they are working would be like "throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby v. Holder*, 133 S. Ct. 2612, 2650 (2013) (Ginsburg, J., dissenting). Even if that were not the case, independent section 706(a) authority would remain. We mention, however, two legal requirements that appear relevant. First, section 408 of the Act mandates that "all" Commission orders (other than orders for the payment of money) "shall continue in force for the period of time specified in the order or until the Commission or a court of competent jurisdiction issues a superseding order." 47 U.S.C. § 408. Second, the Commission has a "continuing obligation to practice reasoned decisionmaking" that includes revisiting prior decisions to the extent warranted. *Aeronautical Radio*, 928 F.2d 428. We are aware of no reason why these requirements would not apply in this context.

[2428] *See supra* Section III.A.

[2429] *See Fox*, 556 U.S. at 515; *Brand X*, 545 U.S. at 981.

[2430] *Brand X*, 545 U.S. at 981.

a court's satisfaction that the reasons for the new policy are better than the reasons for the old one . . . ."[2431]  Rather, it is sufficient that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates."[2432]  We have so done here.

615.     We are unpersuaded by arguments in the *RIF Order* that section 706(a) and (b) of the 1996 Act are better interpreted as hortatory, and not as grants of regulatory authority.[2433]  For the reasons set forth below, we find there are deficiencies in the *RIF Order*'s analysis that lead us to conclude that the *RIF Order*'s reasoning, which has already been rejected by a court,[2434] is misguided and misplaced, and once again should be rejected.  We therefore return to the Commission's prior judicially affirmed interpretation of section 706(a) and (b) of the 1996 Act as grants of regulatory authority and conclude that it is a better reading of the statute.

616.     First, according to the *RIF Order*'s reasoning, the language in sections 706(a) and (b) should be viewed as statutory surplusage that neither grants nor restrains Commission authority, but merely expresses the sense of Congress that advanced telecommunications are important.  The D.C. Circuit has already twice affirmatively rejected this line of reasoning.  In *Verizon*, the court affirmed as reasonable the Commission's interpretation that section 706(a) and (b) are grants of regulatory authority.[2435]  The court held that section 706(a) "vest[s] the Commission with actual authority to utilize the regulatory methods set forth in the statute to "encourage the development of advanced telecommunications capability."[2436]  This authority, Congress explained, is a "fail safe" to enable the Commission to achieve the goal of permitting all Americans to send and receive information in all forms—voice, data, graphics, and video—over a high-speed, switched, interactive broadband, transmission capability."[2437]  And section 706(b) imposes an affirmative duty on the Commission "to conduct a regular inquiry 'concerning the availability of advanced telecommunications capability.'"[2438]  And in the event that it determines that such capability is not "being deployed to all Americans in a reasonable and timely fashion," the statute compels the Commission to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market."[2439]  In *USTA*, the court likewise affirmed as reasonable the Commission's interpretations that section 706(a) and (b) are grants of regulatory authority.[2440]  Moreover, although the Tenth Circuit failed to recognize that the Commission had, in fact,

---

[2431] *Fox*, 556 U.S. at 515 (interpreting statutory ban on indecent broadcasts).

[2432] *Id.*; *see also Verizon*, 740 F.3d at 636-37 ("In the *Open Internet Order*, however, the Commission has offered a reasoned explanation for its changed understanding of section 706(a). . . . In these circumstances . . . we have no basis for saying that the Commission 'casually ignored prior policies and interpretations or otherwise failed to provide a reasoned explanation' for its changed interpretation.").

[2433] *RIF Order*, 33 FCC Rcd at 470, 472-73, 479-80, paras. 268, 271, 282.

[2434] *See, e.g.*, *Verizon*, 740 F.3d at 636-42 (rejecting arguments that it was unreasonable for the Commission to interpret sections 706(a) and (b) as granting regulatory authority); *In re FCC 11-161*, 753 F.3d at 1054 (rejecting arguments that it was unreasonable for the Commission to interpret Section 706(b) as granting regulatory authority); *USTA*, 825 F.3d at 733-34 (reaffirming the holding in *Verizon* regarding section 706).

[2435] *Verizon*, 740 F.3d at 635-42.

[2436] *Id.* at 637.

[2437] S. Rep. No. 104-23, 51 (1995); *see also Verizon*, 740 F.3d at 639 ("In fact, section 706(a)'s legislative history suggests that Congress may have, somewhat presciently, viewed that provision as an affirmative grant of authority to the Commission whose existence would become necessary if other contemplated grants of authority were for some reason unavailable.").

[2438] *See Verizon*, 740 F.3d at 635 (citing 47 U.S.C. § 1302(b)).

[2439] *Id.*

[2440] *USTA*, 825 F.3d at 733-34.

interpreted section 706(a) as a grant of regulatory authority in the *2010 Open Internet Order*, it affirmed the Commission's reliance on section 706(b) as a grant of regulatory authority.[2441]

617.    Second, the *RIF Order* was too quick to dismiss the importance of the term "shall" in section 706(a) ("shall encourage") and (b) ("shall take immediate action"), a term which describes a particularly potent word in statutory construction that "usually connotes a requirement,"[2442] and serves as a legislative mandate for regulation.  Although the *RIF Order* recognized that the term "shall" generally indicates a command that admits of no discretion, it gave short shrift to the importance of its use in these statutory provisions, and instead interpreted the provisions as exhortative.[2443]  The *RIF Order* reasoned that the Commission has other authority in the Communications Act under which it can exercise the mandates in section 706(a) and (b), and thus there is no need to interpret these provisions as directives, in spite of the significant contrary evidence.[2444]  But the D.C. Circuit explained in *Verizon* that section 706 "does not limit the Commission to using other regulatory authority already at its disposal, but instead grants it the power necessary to fulfill the statute's mandate."[2445]  We believe that acceptance of the *RIF Order*'s reasoning would contravene the statute's clear language and structure and nullify textually applicable provisions.  Indeed, if such faulty reasoning were allowed to stand, the term "shall" could be nullified in any other textually applicable provision where there may be other sources of authority under the Act, an outcome we reject.

618.    Third, we also are unpersuaded by the *RIF Order*'s argument that if sections 706(a) and (b) were interpreted as grants of regulatory authority, it would enable the Internet and information services to be heavily regulated in a manner inconsistent with the policy goals reflected in the Act.[2446]  Although the *RIF Order* acknowledged that the Commission's prior interpretation of section 706 was, by its own terms, constrained in order to be consistent with the Act, it claimed that such constraints did not adequately address its statutory concerns.[2447]  In the view of the *RIF Order*, seemingly the only outcomes of interpreting section 706 as granting regulatory authority would be extreme results where those constraints had little meaning and left the Commission with essentially unbounded authority or were such severe limitations as to render section 706 of little possible use.[2448]  But as prior Commission and judicial precedents explain, there are several limitations to section 706(a) authority, which makes these views unfounded.  In *Verizon*, the D.C. Circuit agreed with the Commission that while authority under section 706 may be broad, it is not unbounded.[2449]  Specifically, authority under section 706(a) must fall within the scope of the Commission's subject-matter jurisdiction over "interstate and foreign commerce in communications by wire and radio."[2450]  Additionally, the Commission's actions under section 706(a) must be designed to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans."[2451]  Moreover, the court in *Verizon* firmly concluded that the Commission's *2010 Open Internet Order* regulations fell within the scope of section 706.  It

---

[2441] *In re FCC 11-161*, 753 F.3d at 1049-54.

[2442] *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016).

[2443] *RIF Order*, 33 FCC Rcd at 472, para. 270.

[2444] *Id.*

[2445] *See Verizon*, 740 F.3d at 641 (citing *2010 Open Internet Order*, 25 FCC Rcd at 17972, para. 123).

[2446] *See RIF Order*, 33 FCC Rcd at 473-474, paras. 273-74.

[2447] *Id.* at 475-76, paras. 276-77.

[2448] *See id.*

[2449] *Verizon*, 740 F.3d at 639-40.

[2450] *Id.*; *2015 Open Internet Order*, 30 FCC Rcd at 5723-24, para. 281; *2010 Open Internet Order*, 25 FCC Rcd at 17970, para. 121.

[2451] *2010 Open Internet Order*, 25 FCC Rcd at 17970, para. 121.

explained that the rules "not only apply directly to broadband providers, the precise entities to which section 706 authority to encourage broadband deployment presumably extends, but also seek to promote the very goal that Congress explicitly sought to promote."[2452] Further, the court credited "the Commission's prediction that the [2010] Open Internet Order regulations will encourage broadband deployment."[2453] The same is true of the open Internet rules we adopt today. Our regulations again only apply to last-mile providers of BIAS—a service that is not only within our subject-matter jurisdiction, but also expressly within the terms of section 706. And, again, each of our rules is designed to remove barriers in order to achieve the express purposes of section 706. We also find that our rules will provide additional benefits by promoting competition in telecommunications markets, such as, for example, by fostering competitive provision of VoIP and video services and informing consumers' choices.

619. Fourth, we are also unpersuaded by the *RIF Order*'s concerns about our ability to enforce violations of requirements adopted under section 706(a) and (b) of the 1996 Act.[2454] The rules we adopt today implement the provisions of the Communications Act[2455] and are thus are covered by our Titles IV and V authorities to investigate and enforce violations of these rules.[2456] With specific respect to section 706, in *Verizon*, the D.C. Circuit suggested that section 706 was part of the Communications Act of 1934.[2457] Under such a reading, rules adopted pursuant to section 706 fall within our Title IV and V authorities.[2458]

620. But even if this were not the case, we believe it reasonable to interpret section 706 itself as a grant of authority to investigate and enforce our rules.[2459] Our enforcement authority was not explicitly discussed in either the *2010 Open Internet Order* or *Verizon*. The court did cite as reasonable, however, the Commission's view that Congress, in placing upon the Commission the obligation to carry out the purposes of section 706, "necessarily invested the Commission with the statutory authority to carry out those acts."[2460] We believe it likewise reasonable to conclude that, having provided the Commission with affirmative legal authority to take regulatory measures to further section 706's goals, Congress invested the Commission with the authority to enforce those measures as needed to ensure those goals are achieved. Courts have long recognized the Commission's authority to interpret and implement

---

[2452] *Verizon*, 740 F.3d at 643.

[2453] *Id.* at 644.

[2454] *RIF Order*, 33 FCC Rcd at 477-79, paras. 279-80.

[2455] *See, e.g.*, 47 U.S.C. §§ 201, 202, 303, 316.

[2456] 47 U.S.C. §§ 403, 501, 503.

[2457] *See Verizon*, 740 F.3d at 650 (stating that "Congress expressly directed that the 1996 Act . . . be inserted into the Communications Act of 1934" (citation omitted)).

[2458] The 1996 Act incorporated the relevant statutory definitions in the Act, which the Commission has broad authority to implement. *See, e.g.*, 47 U.S.C. §§ 154(i), 201(b), 303(r); *see also City of Arlington*, 569 U.S. at 293, 307. The 1996 Act also required the Commission to adopt rules or orders that turned on the interpretation of those statutory definitions. *See, e.g.*, 47 U.S.C. §§ 160, 224, 251, 253, 254.

[2459] Moreover, to the extent that section 706 was not viewed as part of the Communications Act, we have authority under section 4(i) of the Communications Act to adopt rules implementing section 706. Thus, even then the Commission's rules, insofar as they are based on our substantive jurisdiction under section 706, nonetheless would be issued under the Communications Act. "[B]y its terms our section 4(i) rulemaking authority is not limited just to the adoption of rules pursuant to substantive jurisdiction under the Communications Act, and the *Verizon* court cited as reasonable the Commission's view that Congress, in placing upon the Commission the obligation to carry out the purposes of section 706, 'necessarily invested the Commission with the statutory authority to carry out those acts.'" *2015 Open Internet Order*, 30 FCC Rcd at 5723, para. 280. Under such a reading, rules adopted pursuant to section 706 fall within our Titles IV and V authorities. The Commission would also have all of its standard rulemaking authority under sections 4(i), 201(b), and 303(r).

[2460] *Verizon*, 740 F.3d at 638 (quoting *2010 Open Internet Order*, 25 FCC Rcd at 17969, para. 120).

the Communications Act of 1934.[2461]  Both the *2015 Open Internet Order* and the *RIF Order* recognized this authority.[2462]

### 3. Title III of the Act for Mobile Providers

621.    As in the *2015 Open Internet Order*, we find that the open Internet rules we adopt today are further supported in the case of mobile BIAS by our broad legal authority under Title III of the Act to protect the public interest through spectrum licensing and regulations, including sections 303 and 316 of the Act.[2463]

622.    Section 303(b) directs the Commission, consistent with the public interest, to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class."[2464]  The open Internet rules we adopt today prescribe the nature of the service to be rendered by licensed entities providing mobile BIAS.  Today's rules specify the form this service must take for those who seek licenses to offer it.  In providing such licensed service, BIAS providers must adhere to the rules we adopt today.

623.    This authority is bolstered by at least two additional provisions.  First, as the D.C. Circuit has explained, section 303(r) provides the Commission authority to "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter."[2465]  Second, section 316 authorizes the Commission to adopt new conditions on existing licenses if it determines that such action "will promote the public interest, convenience, and necessity."[2466]  Moreover, today's rules do not make any fundamental changes to those licenses.[2467]  Rather, our rules are largely consistent with the current operation of the Internet and the current practices of mobile BIAS providers.[2468]

624.    The *RIF Order* acknowledged that the Commission could rely on Title III licensing

---

[2461] *See, e.g.*, *NBC*, 319 U.S. at 219 ("In the context of the developing problems to which it was directed, the Act gave the Commission . . . expansive powers."); *Storer*, 351 U.S. at 203 (noting "the power of the Commission" to exercise "the rulemaking authority necessary for the orderly conduct of its business," and explaining that sections 4(i) and 303(r) of the Act "grant general rulemaking power not inconsistent with the Act or law"); *Iowa Utils. Bd.*, 525 U.S. at 378 (stating that "[w]e think that the grant in § 201(b) means what it says:  The FCC has rulemaking authority to carry out the 'provisions of this Act'"); *Brand X*, 545 U.S. at 980-82 (finding that the Commission has authority to classify services—and BIAS, in particular—and to change course in its classification of BIAS if it acknowledges that it is doing so and justifies its decision); *Phila. Television Broad. Co. v. FCC*, 359 F.2d 282, 283 (D.C. Cir. 1966) (recognizing the Commission's authority to determine whether community antenna television "systems are common carriers within the meaning of the Communications Act"); *NARUC I*, 525 F.2d 630 (affirming the FCC's classification of Specialized Mobile Radio Systems (SMRS) as non-common carriers and observing that a different classification could be warranted in the future "should the actual operations of SMRS appear to bring them within the common carrier definition").

[2462] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5742, 5743-44, paras. 328, 331-35; *RIF Order*, 33 FCC Rcd at 403-05, paras. 155-56.

[2463] *See, e.g.*, *2015 Open Internet Order*, 30 FCC Rcd at 5725, paras. 285-87; 47 U.S.C. § 303(b); *Cellco P'ship v. FCC*, 700 F.3d 534, 542-43 (D.C. Cir. 2012) (*Cellco*).

[2464] 47 U.S.C. § 303(b).

[2465] *Cellco*, 700 F.3d at 543 (citing *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002)); 47 U.S.C. § 303(r).

[2466] 47 U.S.C. § 316.  The Commission also has ample authority to impose conditions to serve the public interest in awarding licenses in the first instance.  *See id.* §§ 309(a), 307(a).

[2467] *Cellco*, 700 F.3d at 543-44.

[2468] *See, e.g.*, Ad Hoc Telecom Users Committee at 3-4 (supporting the proposal to classify mobile BIAS as a commercial mobile service under Title III); CCIA Comments at 1 & n.1 (supporting reliance on Title III authority to ensure that fixed and mobile wireless BIAS providers receive the same safeguards as wireline providers).

authority to support conduct rules but declined to follow the Commission's historical approach due to concerns about disparate treatment of wireline and wireless Internet service providers.[2469]  As discussed above, we classify BIAS as a Title II service and mobile BIAS as commercial mobile service.  We believe that our reclassification avoids any inconsistent treatment between different categories of BIAS providers that may have resulted under the *RIF Order*'s classification.  Moreover, we recognize that the D.C. Circuit's *Mozilla* decision includes a brief statement as part of its review of the *RIF Order*'s preemption decision stating that BIAS is not "radio transmission," so Title III does not apply.[2470]  But the *RIF Order* did not attempt to apply (or justify applying) Title III to BIAS, and the *Mozilla* decision did not develop any reasoning in support of that assertion.  Rather, we read the *Mozilla* court's statement that "BIAS is not 'radio transmission'" as limited to the court's decision to vacate the *RIF Order*'s blanket preemption of state and local regulation of BIAS.  In particular, the D.C. Circuit found that the Commission "fail[ed] to ground its sweeping Preemption Directive . . . in a lawful source of statutory authority," and concluded that "in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law."[2471]  Given this backdrop, we do not believe the court's statement should be read to call into question the Commission's prior recognition that mobile BIAS falls within the scope of Title III.  Commenters did not address the court's statement regarding radio transmission in the *Mozilla* decision or the Commission's view that the court's statement does not call into question our prior recognition that mobile BIAS falls within the scope of Title III.

625.     Finally, CTIA argues that the Act forbids applying Title II common carrier regulations to BIAS, and in particular, to mobile BIAS.[2472]  Similarly, a broad coalition consisting of local groups and individuals located throughout the U.S. urges the Commission to avoid reclassifying any mobile data-only service, but if it does, it should maintain the current regulatory classification under section 332(c)(2) as a non-common-carrier private mobile service and thereafter exercise authority over mobile data-only service under sections 301, 302, 304, 309, and 316 of the Act.[2473]  For the reasons discussed above,[2474] we reject these arguments and conclude that mobile BIAS is best viewed as a commercial mobile service, or, in the alternative, the functional equivalent of commercial mobile service, and therefore, not private mobile service.

### G.     Other Laws and Considerations

626.     As the Commission did in the *2015 Open Internet Order*, we make clear that the open Internet rules we adopt today do not expand or contract BIAS providers' rights or obligations with respect to other laws or preclude them from responding to safety and security considerations—including the needs of emergency communications and law enforcement, public safety, and national security authorities—or affect the ability of BIAS providers to make reasonable efforts to address transfers of unlawful content and unlawful transfers of content.[2475]

627.     *Emergency Communications and Safety and Security Authorities.*  Consistent with our proposal in the *2023 Open Internet NPRM*, and the *2010* and *2015 Open Internet Orders*, we adopt a rule that acknowledges the ability of BIAS providers to serve the needs of law enforcement and the needs of

---

[2469] *RIF Order*, 33 FCC Rcd at 485, para. 292 & n.1067.

[2470] *Mozilla*, 940 F.3d at 76.

[2471] *Id*. at 74.

[2472] CTIA Comments at 47-74.

[2473] Wired Broadband et al. Comments at 2.

[2474] *See supra* Section III.E.

[2475] *2023 Open Internet NPRM* at 94, paras. 208-09; *2015 Open Internet Order*, 30 FCC Rcd at 5731-33, paras. 299-305.

emergency communications and public safety, national, and homeland security authorities,[2476] which reads as follows:

> *Nothing in this part supersedes any obligation or authorization a provider of broadband Internet access service may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.*

628.    We reiterate that the purpose of the safety and security provision is first to ensure that open Internet rules do not restrict BIAS providers in addressing the needs of law enforcement authorities, and second to ensure that BIAS providers do not use the safety and security provision without the imprimatur of a law enforcement authority, as a loophole to the rules.[2477]  As the Commission has previously explained, application of the safety and security rule should be tied to invocation by relevant authorities rather than to a BIAS provider's independent notion of the needs of law enforcement.[2478]

629.    The record reflects no disagreement that the open Internet rules we adopt today do not supersede any obligation a BIAS provider may have—or limit its ability—to address the needs of emergency communications or law enforcement, public safety, or homeland or national security authorities (together, "safety and security authorities").  BIAS providers have obligations under statutes such as CALEA,[2479] the Foreign Intelligence Surveillance Act,[2480] and the Electronic Communications Privacy Act[2481] that could in some circumstances intersect with open Internet protections.  Likewise, in connection with an emergency, there may be federal, state, tribal, and local public safety entities, homeland security personnel, and other authorities that need guaranteed or prioritized access to the Internet in order to coordinate disaster relief and other emergency response efforts, or for other emergency communications.

630.    *Transfers of Unlawful Content and Unlawful Transfers of Content.*  We also adopt our proposal to make clear that the open Internet rules protect only *lawful* content, and are not intended to inhibit efforts by BIAS providers to address unlawful transfers of content or transfers of unlawful content, to ensure that open Internet rules are not used as a shield to enable unlawful activity or to deter prompt action against such activity.[2482]  Specifically, we find as follows:

> *Nothing in this part prohibits reasonable efforts by a provider of broadband Internet access service to address copyright infringement or other unlawful activity.*[2483]

631.    For example, as the Commission explained in the *2015 Open Internet Order*, the no-blocking rule should not be invoked to protect copyright infringement, which has adverse consequences for the economy, nor should it protect child pornography.[2484]  We reiterate that our rules do not alter copyright laws and are not intended to prohibit or discourage voluntary practices undertaken to address or

---

[2476] *2023 Open Internet NPRM* at 94-95, para. 209; *2010 Open Internet Order*, 25 FCC Rcd at 17963, para. 107; *2015 Open Internet Order*, 30 FCC Rcd at 5732, para. 300.

[2477] *See 2010 Open Internet Order*, 25 FCC Rcd at 17964, paras. 108-10.

[2478] *2015 Open Internet Order*, 30 FCC Rcd at 5732, para. 301.

[2479] *See* 47 U.S.C. § 1002(a).

[2480] *See* 50 U.S.C. §§ 1802(a)(4), 1804, 1805(c)(2).

[2481] *See* 18 U.S.C. §§ 2518, 2705.

[2482] *2023 Open Internet NPRM* at 95, para. 210; *2015 Open Internet Order*, 30 FCC Rcd at 5732-33, paras. 304-05.

[2483] *2023 Open Internet NPRM* at 95, para. 210.  The record is generally supportive of our proposal to make clear that the open Internet rules protect only lawful content, and are not intended to inhibit efforts by BIAS providers to address unlawful transfer of content or transfers of unlawful content.  *See, e.g.*, RIAA Comments at 3; MPA Comments at 1-2; CCIA Comments at 11-12; EFF Comments at 16.

[2484] *2015 Open Internet Order*, 30 FCC Rcd at 5732-33, para. 304.

mitigate the occurrence of copyright infringement.[2485]  However, as in 2015, we note that we "retain the discretion to evaluate the reasonableness of broadband providers' practices under this rule on a case-by-case basis."[2486]

## H. Cost–Benefit Analysis

632.    In the *2023 Open Internet NPRM*, we sought comment on the costs and benefits of Title II reclassification of BIAS and the proposed open Internet rules.[2487]  The record reflects a broad range of views on the potential costs and benefits of both.  We apply a cost–benefit framework to evaluate the overall effect (net benefits or net costs) of reclassifying BIAS as a Title II telecommunications service and the open Internet rules.  While the record, and indeed the nature of the benefits and costs under consideration,[2488] do not allow us to quantify the magnitude of the effects of the key decisions in this Order, we are able to reasonably assess their directional impact, that is, whether the result is on-net beneficial or costly.[2489]

633.    The primary benefits and costs attributable to this Order are the changes in the economic welfare of consumers, BIAS providers, and edge providers that would occur due to our actions.[2490]  We evaluate the costs and benefits of reclassifying BIAS as a Title II telecommunications service and of adopting our open Internet rules relative to the regulatory framework introduced by the *RIF Order*, but adjust that baseline in light of changes since the Commission adopted it.  Therefore, we compare the expected costs and benefits of these actions against the *RIF Order* framework of Title I classification of BIAS, but account for the existence of state open Internet requirements, the statutorily required broadband label, and other changed circumstances since the *RIF Order*.[2491]  We find that the benefits of Title II reclassification and the proposed open Internet rules outweigh the costs.

### 1. Title II Reclassification

634.    *Fulfilling Key Public Interest Obligations and Objectives*.  As discussed in detail above, our reclassification decision will ensure the Commission can fulfill statutory obligations and important policy objectives.[2492]  BIAS providers function as gatekeepers for both their end-user customers who access the Internet, and for the edge providers, transit providers, and CDNs that require reliable access to BIAS end-user subscribers.[2493]  The reclassification of BIAS and the rules we set forth in this Order will ensure that the Internet remains open and that the virtuous cycle of edge innovation and broadband investment continues unabated.  Furthermore, we find our reclassification of BIAS as a Title II service will have substantial additional benefits enabling the Commission to defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer

---

[2485] *2010 Open Internet Order*, 25 FCC Rcd at 17964-65, para. 111; *see, e.g.*, MPA Comments at 1-2.

[2486] *2015 Open Internet Order*, 30 FCC Rcd at 5733, para. 305.

[2487] *See, e.g.*, *2023 Open Internet NPRM* at 13, 32-33, 53, 59, 65-66, 71-72, paras. 21-22, 56-57, 99, 117, 133, 150.

[2488] For example, it is difficult to quantify with precision the benefits of a more vibrant and thriving Internet ecosystem, or of increased national security or public safety.

[2489] *Cf.* Off. of Mgmt. & Budget, Circular A-4, at 5, 40 (2023); *Mozilla*, 940 F.3d at 70-71; *see also RIF Order*, 33 FCC Rcd at 491, para. 304 (recognizing in 2018 that "the record provides little data that would allow us to quantify the magnitudes of many of the effects").

[2490] Our cost–benefit analysis nets out transfers among these economic actors.

[2491] Relevant changes that have occurred since the *RIF Order* include the national security environment, *see supra* Section III.A.2, and the increased need for cybersecurity, *see supra* Section III.A.3;  *see also* Public Knowledge Comments at 55 (describing NTIA's BEAD program, which is increasing demand for pole access, as well as increased threats to consumer privacy).

[2492] *See supra* Section III.A.

[2493] *See supra* Section V.A.3.

privacy and data security, support consumer access to BIAS, enable access to infrastructure, and improve disability access.[2494] Although many of these policy benefits do not readily lend themselves to quantification, they flow directly from our reclassification of BIAS as a telecommunications service.

635.    *Effect on Investment.* Commenters argue that one of the greatest potential costs of reclassifying BIAS as a Title II telecommunications service is that it will lower BIAS provider investment incentives by reducing profits associated with the provision of BIAS, as well as by increasing regulatory uncertainty.[2495] These commenters claim that BIAS provider investment declined following previous announcements of Title II reclassification, and they cite studies that purport to demonstrate empirically that the application of Title II to BIAS providers harms investment.[2496] As our detailed analysis above shows, the concerns of these commenters are unfounded, as there is little compelling evidence that applying Title II to BIAS has such a measurable effect on investment.[2497]

636.    We first note that generic claims that regulation can be harmful to investment and innovation do not persuade us in this specific case. Regulation is just one of several factors that drive investment and innovation in the broadband marketplace.[2498] In addition, the effects of regulations depend on the nature of the regulations adopted and on market conditions, and they may vary by market participant.[2499] As research and past experience show, appropriate telecommunications regulation may be required to create market conditions that are conducive to infrastructure investment, and we conclude that this is true in the present case.[2500] In terms of open Internet regulations in particular, many studies in the economics literature find that regulation can have positive effects on both BIAS and edge provider investment incentives, and also find that overall economic welfare may be higher.[2501]

637.    Given the lack of clear direction provided by the theoretical economics literature on how reclassification may affect BIAS investment, commenters and our own analysis draw on the empirical

---

[2494] *See supra* Section III.A. As explained in that section above, we conclude that the *RIF Order* and *RIF Remand Order* did not fully consider, or gave too little weight, to those benefits of the classification of BIAS as a telecommunications service. Consequently, we reject those cost–benefit analyses as predicated on a finding of too little benefit from a Title II classification of BIAS. *See, e.g., RIF Order*, 33 FCC Rcd at 493, paras. 311-12; *RIF Remand Order*, 35 FCC Rcd at 12368-69, 12376-77, 12385, 12386-87, paras. 67, 78-80, 96, 99-101.

[2495] *See supra* Section III.H.

[2496] *See id.*

[2497] *See id.* As we explain in that section above, our assessment of the available evidence regarding the effect of reclassification on investment leads to a different conclusion than that in the *RIF Order*. Insofar as the *RIF Order*'s and *RIF Remand Order*'s cost–benefit analyses were predicated on that different understanding of the effect of reclassification on investment, we reject them on that basis. *See, e.g., RIF Order*, 33 FCC Rcd at 492-93, paras. 308-12; *see also, e.g., RIF Remand Order*, 35 FCC Rcd at 12368-69, 12376-77, 12388, paras. 67, 78-80, 103 (relying on the *RIF Order*'s view of the effects of a Title II classification on investment when assessing costs and benefits of that classification with respect to public safety, pole attachment, and Lifeline support).

[2498] Today, new state and federal support programs are a significant driver of BIAS investment, and we expect Title II classification to allow BIAS-only providers to face lower deployment costs, for example, because they will be able to take advantage of our pole attachment rules under section 224 or seek assistance from the Commission or courts under section 253. *See supra* Section III.A.7.

[2499] *See supra* Section III.H; *see also* Knut Blind, *The Influence of Regulations on Innovation* at 393, 399 (discussing how the interaction of different types of regulation with industry characteristics impacts investment incentives, including when regulation forces firms to make significant innovations to meet new standards, and how important regulations that support the foundation of new enterprises are to innovation, exactly what our rules do for edge providers); Knut Blind, *The Impact of Regulation on Innovation* at 450.

[2500] *See* Johannes M. Bauer & Erik Bohlin, *Regulation and Innovation in 5G Markets* at 6-11. The Cable Act of 1984 and its subsequent regulatory implementation by the Commission also dramatically increased investment in the cable industry by providing access to poles, ducts, conduits and public rights of way.

[2501] *See supra* Section III.H; *see also* Jay Pil Choi & Byung-Cheol Kim, *Net Neutrality and Investment Incentives*.

economics literature to evaluate the likely impact.[2502]  In contrast to the claims by commenters opposed to Title II reclassification, and the authors of the studies they cite, our analysis persuades us that reduced BIAS provider investment has not been causally linked to Title II reclassification.  We find that the studies in the record that claim to establish this link are in some cases not applicable to the U.S. context and in all cases suffer from methodological and data issues that render their conclusions unreliable.  With regard to the one rigorous empirical study where the underlying data used by the author were readily available, we find that, after correcting the data, which had been revised and updated by the Bureau of Economic Analysis, and fixing the methodological problems identified with the study, the correct conclusion from the study is that there is no evidence that the announcement of Title II reclassification had any statistically significant effect on investment.[2503]  This study was heavily relied upon by the *RIF Order* to reach a conclusion that Title II reclassification is harmful to investment,[2504] but after these corrections, this study supports our conclusion that there is no empirical evidence in the record that Title II reclassification would have any significant negative impact on broadband investment.[2505]  We therefore give little weight to these claims and view these claimed costs as being relatively limited in our cost–benefit analysis.

638.     *Regulatory Compliance Costs.*  Commenters separately argue that Title II classification will result in higher regulatory compliance costs compared to Title I classification, and that increased compliance costs will disproportionately impact small BIAS providers that lack the resources to handle the new compliance obligations.[2506]  Although no commenter provided quantitative estimates of the magnitude of these potential compliance costs, we acknowledge that reclassifying BIAS as a Title II telecommunications service may lead to some increase in compliance costs.  In our predictive judgment, and based on qualitative analysis, however, we believe that these compliance costs are likely to be small and are outweighed by the benefits of reclassification that have been identified in our analysis.

639.     We first note that any direct increase in compliance costs from the regulatory changes adopted in this Order appears modest, and to the extent we adopt any new rules governing BIAS in the future, we will assess incremental compliance costs, if any, at that time as part of a cost–benefit analysis.  We further note that we have taken several steps to reduce compliance burdens, especially for BIAS providers with 100,000 or fewer subscribers.[2507]  In the cases where we do apply a Title II provision to BIAS, we attempt to minimize compliance costs in the application of the provision.  For example, we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specifically identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current or future affiliates and subsidiaries.[2508]  Similarly, we waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service and any future application of rules will be undertaken only after seeking public comment and considering the costs of such rules.[2509]  In all cases where applying a provision may increase regulatory compliance costs, we have been careful to apply the provisions of Title II to BIAS providers only in a manner in which the expected benefits exceed expected costs.  For example, we do not apply sections 201 and 202

---

[2502] *See supra* Section III.H.

[2503] *See id.*  We note that a second study by Briglauer et al. was cited in the record but the underlying data for this study were not available to us in our analysis.  *See id.*

[2504] *See RIF Order*, 33 FCC Rcd at 367, para. 95.

[2505] *See supra* Section III.H.

[2506] *See, e.g.*, WISPA Comments at 27-30, 42-43.

[2507] *See, e.g.*, *supra* Section V.B.3 (exempting providers with 100,000 or fewer subscribers from certain aspects of the revised transparency rule).

[2508] *See supra* Section IV.B.3.

[2509] *See supra* Section IV.B.5.

in their entirety because we conclude that the costs of applying the provisions to impose *ex ante* or *ex post* rate regulation on BIAS would exceed the benefits.[2510]  Finally, the Title II provisions that assist BIAS network deployment, including sections 224 and 253 (in addition to section 332), do not impose affirmative obligations or compliance costs on BIAS providers.  Rather, they simply give BIAS providers new rights to seek assistance from the Commission and/or courts, if they find that such assistance is on-net beneficial.[2511]

640.     The adoption of bright-line rules should also generally lower overall compliance costs because they provide greater certainty to market participants in regard to conduct that would likely result in an enforcement action relative to the current regulatory framework established by the *RIF Order* in which there is uncertainty as to which conduct would be deemed to be harmful to edge providers or the open Internet and such conduct is subject to *ex post*, case-by-case enforcement by antitrust or consumer protection authorities, or by states that have passed open Internet rules.  The *RIF Order* framework could therefore lead to lengthy enforcement actions and ultimately higher compliance costs for BIAS providers as they are required to determine through a trial-and-error process whether actions that would violate the bright-line rules we adopt would be subject to enforcement at the state or federal level.  In our judgment, establishing bright-line federal rules and enforcing those rules through a single expert agency will achieve timelier and more consistent outcomes and reduce the costs of uncertainty for all interest holders, and thus yield significant public interest benefits.[2512]

641.     *"Regulatory Creep."*  The last broad set of potential costs that some commenters raise with respect to reclassification of BIAS as a Title II telecommunications service pertain to "regulatory creep."[2513]  Although we forbear from applying Title II rate regulation provisions to BIAS, some commenters express concern that the Commission will adopt future rate regulation.[2514]  We are not persuaded by these unsupported assertions.  We have carefully tailored application of all Title II provisions to current broadband market conditions and avoided any unnecessary regulations.[2515]  Moreover, decades of Commission precedent suggest that, in contrast to regulatory creep, the Commission has tended to deregulate over time and to forbear from additional statutory provisions and Commission rules.  For example, the Commission in 1980 streamlined the regulation of non-dominant interexchange carriers by eliminating *ex ante* rate regulation and streamlining existing section 214 requirements.[2516]  And after Congress gave the Commission forbearance authority under the 1996 Act, the Commission has forborne from dozens of statutory provisions and Commission rules, where it found that enforcement was not necessary to preserve "just and reasonable" terms of service, to protect consumers, or to serve the public interest.[2517]  The Commission's forbearance decisions include eliminating tariff-

---

[2510] *See supra* Section IV.C.1.

[2511] For example, a BIAS provider seeking pole access under section 224 would only do so if it were to its benefit.  Similarly, a BIAS provider would only seek Commission or court intervention under section 253 if it were to its benefit.

[2512] As noted above, *supra* Section III.G., our approach to preemption also provides regulatory certainty insofar as it is clear that the Commission, versus another federal agency, will address, and as needed preempt, on a case-by-case basis, state or local laws that unduly frustrate or interfere with interstate communications.

[2513] *See, e.g.*, CTIA Comments at 97; CEI Comments at 11-12; U.S. Chamber of Commerce Comments at 66; T-Mobile Comments at 20; USTelecom Comments at 54-59; TIA Comments at 6-7; ITIF Comments at 8; NCTA Comments at 21-22; Michael Israel et al. Declaration at 7.

[2514] *See, e.g.*, WISPA Comments at 54-55 ("In sum, both the vague general conduct rule and the NPRM's unclear articulation of its forbearance from rate regulation are the two most obvious areas where Title II rules will lead to regulatory creep.").

[2515] *See generally supra* Section IV.

[2516] *Competitive Common Carrier Rates and Facilities Report and Order*, 85 F.C.C.2d 1.

[2517] 47 U.S.C. § 160(a).

filing requirements,[2518] the ending of certain Automated Reporting Management Information System (ARMIS) reporting requirements,[2519] and streamlining the regulation of business data services.[2520] We see no reason the Commission would depart from this general tendency to remove regulations when they are no longer required due to changed circumstances. Finally, we note that any changes to this framework or future rules the Commission considers adopting under the Title II framework would be subject to notice and comment and an analysis of the record, including any purported costs, prior to adoption.

### 2. Bright-Line Rules

642. *No-Blocking and No-Throttling Rules*. While larger BIAS providers have repeatedly assured their customers and publicly advertised that they will not block access to legal content or engage in throttling, not all BIAS providers have made such commitments. Moreover, there are no assurances that providers will continue to make or adhere to such commitments in the future, and the framework established in the *RIF Order* allows BIAS providers to engage in such activities as long as they disclose these practices to consumers.[2521] Given that BIAS providers have incentives and the ability to engage in blocking and throttling, our rules against this conduct protect free expression online, reduce uncertainty for edge providers when developing new services and applications, and provide necessary foundations for preventing anticompetitive or discriminatory conduct that harms edge providers and the open Internet.[2522] Even if, in the absence of rules, BIAS providers generally would not block or throttle the edge services offered today, our bright-line rules will reduce uncertainty for, and protect, innovators seeking to offer new edge services, particularly if those new services would compete with services that BIAS providers offer now or will offer in the future. If investors fear future blocking or throttling could be forthcoming despite current BIAS provider commitments, such investments in new edge services may not be undertaken. At the same time, the no-blocking and no-throttling rules, because they are clear bright-line rules, should deter such conduct, or to the extent such conduct does occur, should enable the Commission to aggressively respond. Thus, we conclude that these rules will create substantial economic value for edge providers and consumers, and for the economy broadly. We note that even the *RIF Order* acknowledged that "the costs of [banning blocking and throttling] are likely small," though it went on to state that the rule "may create some compliance costs."[2523] We agree that the costs of banning blocking and throttling are likely to be small and further conclude that any compliance costs are also likely small, particularly for those BIAS providers that have committed to refrain from—and intend to continue refraining from—such conduct.[2524]

643. *No Paid or Affiliated Prioritization*. As discussed above, we find that, absent regulation, BIAS providers may use paid and affiliated prioritization in ways that harm edge providers and the open

---

[2518] *See generally MCI WorldCom v. FCC*, 209 F.3d 760 (D.C. Cir. 2000) (summarizing history of detariffing).

[2519] *See, e.g.*, *United States Telecom Association Petition for Forbearance Under 47 U.S.C. § 160(c) from Enforcement of Certain Legacy Telecommunications Regulations*, WC Docket No. 12-61, Order, 28 FCC Rcd 2605 (2013).

[2520] *Business Data Services Order*, 32 FCC Rcd at 3459.

[2521] *See RIF Order*, 33 FCC Rcd at 437, para. 215.

[2522] *See supra* Section V.B.1.

[2523] *RIF Order*, 33 FCC Rcd at 378, para. 322.

[2524] We part ways with the *RIF Order* insofar as it also concluded that the benefits of those rules also are likely to be small based on the availability of "antitrust and consumer protection law, coupled with consumer expectations and ISP incentives." *RIF Order*, 33 FCC Rcd at 495, para. 323. As we discuss above, by contrast, we find antitrust and consumer protection laws to be insufficient to guard the open Internet. *See supra* Section V.A.4. We also conclude that the marketplace alone is not sufficient to guard against harmful blocking and throttling of Internet traffic. *See supra* Section V.B.1.a, V.B.1.b. Consequently, in contrast to the *RIF Order*, we not only find the costs of our rules banning blocking and throttling to be low, but we also conclude that these rules provide meaningful benefits that more than outweigh those limited costs.

Internet.[2525]  In particular, they could have the incentive and ability to use paid or affiliated prioritization to raise the costs of edge providers that compete with their vertically integrated edge affiliates or with edge providers with whom they have contractual arrangements.[2526]  Moreover, if they can profitably charge edge providers for prioritized access, BIAS providers may have an incentive to strategically degrade, or decline to maintain or increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access.[2527]  We further find that adopting a bright-line rule prohibiting paid and affiliated prioritization has the advantage of relieving small edge providers, innovators, and consumers of the burden of detecting and challenging cases of socially harmful paid prioritization.

644.     The *RIF Order*'s cost–benefit analysis concluded that a ban on paid prioritization has a net negative effect on economic welfare.[2528]  We find that this conclusion was the result of the *RIF Order* heavily discounting the benefits of banning paid prioritization identified above and substantially overstating the costs.  On the cost side, the *RIF Order* first contends that "the ban on paid prioritization has created uncertainty and reduced ISP investment,"[2529] but, as we have demonstrated, claims regarding the *2015 Open Internet Order*'s allegedly detrimental effect on investment were unsupported.[2530]  The *RIF Order* analysis further states "that the ban [on paid prioritization] is likely to prevent certain types of innovative applications from being developed or adopted."[2531]  We disagree with this statement for two reasons.  First, the rules adopted today do not prohibit BIAS providers from developing innovations that require quality of service differentiation that are compatible with the open Internet rules.  Second, while we recognize that there may also be positive use cases of paid prioritization and some costs associated with a ban on such practices, we find that such positive use cases may be addressed through the waiver rule we adopt.[2532]  Consequently, the *RIF Order*'s claim that there would be high costs in the form of forgone investment and innovation cannot be sustained.  Thus, we find the benefits of adopting a bright-line rule prohibiting paid prioritization exceed its costs.

### 3.     General Conduct Rule

645.     We also find that the expected benefits of the general conduct standard we adopt will exceed the expected costs.  We find, as the Commission found in 2015,[2533] that the Commission needs a backstop mechanism to respond to attempts by BIAS providers to wield their gatekeeper power in ways that do not violate the bright-line rules, but nevertheless may compromise the open Internet.[2534]  We acknowledge that several commenters raise concerns about possible regulatory uncertainty created by the general conduct rule and its potential negative effects on investment and innovation.[2535]  To the extent that these commenters are addressing the costs and benefits of our decision, we find that these concerns should be reduced as a result of our providing a list of factors that we will consider in our analysis and our creation of an advisory opinion process.[2536]  Indeed, in upholding the *2015 Open Internet Order*'s general

---

[2525] *See supra* Section V.B.1.c.

[2526] *See id.*

[2527] *See id.*

[2528] *See RIF Order*, 33 Rcd at 495, paras. 319-21.

[2529] *See id.* at 495, para. 319.

[2530] *See supra* Section III.H.

[2531] *See RIF Order*, 33 Rcd at 495, para. 319.

[2532] *See supra* Section V.B.1.c.

[2533] *2015 Open Internet Order*, 30 FCC Rcd at 5659, para. 135.

[2534] *See supra* Section V.B.2.

[2535] *See id.*

[2536] *See id.*

conduct rule, the D.C. Circuit cited with approval to "the Commission's articulation of the Rule's objectives and the specification of factors that will inform its application," and emphasized that the Commission "also included a description of how each factor will be interpreted and applied" with examples "specifically identif[ying] the kind of conduct that would violate the Rule."[2537]  In this context, the court explained, "[t]he flexible approach adopted by the General Conduct Rule aims to address that concern [of over-specificity leading to loopholes] in a field in which 'specific regulations cannot begin to cover all of the infinite variety of conditions.'"[2538]  Exercising our predictive judgment, we find that the general conduct rule should not impose significant *ex ante* compliance costs on BIAS providers, but it should enable the Commission on a case-by-case basis to address conduct that is not covered by the bright-line rules, but that nevertheless harms consumers, edge providers, and the open Internet.  Creating a flexible general conduct rule allows more agile Commission responses to developments that might harm the open Internet,[2539] and should spur innovation experiments and experiential learning by providing guidance on the types of actions that are likely to harm the open Internet.

646.    We recognize that this conclusion differs substantially from the *RIF Order*, which found that the costs of the general conduct rule exceed the benefits.[2540]  We find that the Commission's analysis in the *RIF Order* significantly understated the benefits of the general conduct rule and overstated costs. The *RIF Order* analysis asserts that the benefits of the general conduct rule are nearly zero because the consumer protection and antitrust laws provide adequate protections and because examples of harmful conduct are rare.[2541]  We disagree with both premises as we have shown that BIAS providers have the incentive and ability to harm edge providers and have provided examples of when such conduct has occurred.[2542]  Furthermore, we find that existing antitrust and consumer protection enforcement are insufficient to protect consumers and edge providers from BIAS provider conduct that may harm the open Internet.[2543]  In addition, the primary costs associated with the conduct rule that the *RIF Order* identified were that it would reduce investment, and we have shown that the evidence the *RIF Order* presented as the basis for these concerns is unreliable.[2544]  We conclude that the general conduct rule is a necessary component of a forward-looking regulatory framework that will provide both greater flexibility for the Commission to address new issues as they arise and greater certainty to BIAS providers in terms of the factors that will be considered when assessing whether new practices will be likely to harm the open Internet.

### 4.    Transparency Rule

647.    In evaluating the potential costs and benefits of the transparency rule we adopt, we need to compare it to the *status quo*.  As discussed above, as part of the IIJA, Congress directed the Commission to promulgate rules for a broadband label to be displayed at the point of sale by BIAS providers.[2545]  The *Broadband Label Order* responded to this Congressional directive and reintroduced

---

[2537] *USTA*, 825 F.3d at 736-37.

[2538] *Id.* at 737.

[2539] *See supra* Section V.B.2.

[2540] *See RIF Order*, 33 FCC Rcd at 494, paras. 316-18.

[2541] *See id.* at 363, 494, paras. 87, 317.

[2542] *See supra* Section V.A.3.

[2543] *See supra* Section V.A.4.

[2544] *See RIF Order*, 33 FCC Rcd at 453-44, para. 249 ("We anticipate that eliminating the vague Internet Conduct Standard will reduce regulatory uncertainty and promote network investment and service-related innovation. As we discussed above, regulatory uncertainty serves as a major barrier to investment and innovation."); *supra* Section III.H. (finding the investment evidence relied upon by the *RIF Order* to reach this conclusion to be unreliable).

[2545] *See supra* Section V.B.3.

many of the transparency requirements eliminated in the *RIF Order* as required by the IIJA.[2546] Therefore, the baseline transparency framework against which costs and benefits are compared has changed significantly since the cost–benefit analysis performed in the *RIF Order*. The transparency rules established in this Order represent only small, incremental changes relative to the prevailing statutorily required regulations. The most important incremental changes relative to this new baseline is our adoption of the direct customer disclosure requirement and our re-adoption of the 2015 enhancements to the performance characteristics disclosure requirements.[2547] However, as we explain above, given that such performance characteristic information is widely commercially available and large BIAS providers already have direct notification capabilities in their networks, and that we provide a temporary exemption for BIAS providers with 100,000 or fewer subscribers, the current change in incremental costs of adopting this rule are small.[2548] Furthermore, adopting these changes will provide consumer benefits that exceed these small costs by enabling consumers to select the appropriate BIAS that meets their needs and by ensuring that the consumer notification capabilities that are already in place are consistently providing consumers with sufficient information and time to consider adjusting their usage to avoid their BIAS provider from applying a network management practice that could result in additional unwanted charges or other adverse effects.

### 5.    Preemption

648.    As discussed above, we preempt state or local measures that "interfere or are incompatible with the federal regulatory framework we establish today."[2549] Further, we will proceed on a case-by-case basis to consider challenged measures "in light of the fact specific nature of particular preemption inquiries."[2550] We find that, under this standard and approach, the Commission can preempt incompatible state and local regulations, which we predict will reduce the costs on BIAS providers caused by inconsistent state and local regulations and reduce regulatory uncertainty. At the same time, this standard recognizes and accommodates the "concurrent regulatory authority [of states] over communications networks."[2551] This stands in contrast to the situation under the *RIF Order* where the D.C. Circuit invalidated the *RIF Order*'s attempt at preemption,[2552] thereby allowing for the emergence of inconsistent state laws, which could increase compliance costs. Consequently, we find that the benefits of the approach we adopt here will exceed the costs.

## VI.    CONSTITUTIONAL CONSIDERATIONS

### A.    First Amendment

#### 1.    Free Speech Rights

649.    We believe that the rules we adopt today fully comport with the First Amendment and do not unlawfully infringe any free speech rights, contrary to the few commenters who suggest otherwise.[2553] That is so for two reasons. First, when BIAS providers are carrying their users' communications, they are not themselves acting as speakers or engaged in any expressive activity subject to the First Amendment,

---

[2546] IIJA § 60504(a).

[2547] *See supra* Section V.B.3.a and V.B.3.c.

[2548] *See id.*

[2549] *See supra* Section III.G.

[2550] *Id.* (quoting *2015 Open Internet Order*, 30 FCC Rcd at 5804, para. 433).

[2551] *Id.*

[2552] *See Mozilla*, 940 F.3d at 75.

[2553] *See, e.g.*, CTIA Comments at 29-31; U.S. Chamber of Commerce Comments at 62-63; Christopher Yoo et al. Comments at 8-10; Alamo Broadband Comments at 1. We note that most of the comments filed by BIAS providers and their trade associations in this proceeding have not raised or joined these First Amendment arguments. *Cf. USTA II*, 855 F.3d at 392 (Srinivasan, J., concurring in denial of rehearing en banc).

but instead are acting as mere conduits for the speech of others. Alternatively, even if BIAS providers were treated as speakers themselves when carrying their customers' communications, the rules we adopt today withstand the applicable intermediate standard of scrutiny because they are tailored to serve important governmental interests without unduly burdening speech.

650. The Supreme Court has rejected similar arguments that private parties have a freestanding First Amendment right to refuse to carry or allow third-party speech when it does not interfere with the private party's own ability to speak. In *PruneYard Shopping Center v. Robins*, the Court rejected a shopping mall's First Amendment challenge to a state law requiring it to allow members of the public to distribute pamphlets on the mall's property.[2554] The Court explained that allowing others to distribute their messages would not impair the mall owner's right to free expression because "[t]he views expressed by members of the public" in a forum open to the public "will not likely be identified with those of the owner," and because the owner always "can expressly disavow any connection with the message . . . and could explain that the persons are communicating their own messages by virtue of [the] state law."[2555] Similarly, in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, the Court unanimously rejected several law schools' First Amendment challenge to a law requiring them to permit military recruiters access to school facilities, despite the schools' ideological objections to the military's employment policies, as a condition for federal funding.[2556] The Court held that permitting access by military recruiters would not violate the schools' First Amendment rights because "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing . . . restricts what the law schools may say about the military policies."[2557]

651. The rules we adopt today do not abridge any speech or expression by BIAS providers because, when a BIAS provider offers BIAS as understood by consumers and as defined in this Order— that is, a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints—the BIAS provider is acting merely as a conduit for others' speech, not as a speaker itself. In other words, when providing BIAS, BIAS providers "merely facilitate the transmission of the speech of others rather than engage in speech in their own right."[2558] Consumers "expect that they can obtain access to all content available on the Internet, without the editorial intervention of their broadband provider."[2559] When BIAS providers deliver content that has been requested by their customers, they are no different from telephone companies or package delivery services like FedEx, which have never been thought to be engaging in their own expressive activity when merely carrying the messages of others.[2560]

---

[2554] 447 U.S. 74, 85-88 (1980) (*PruneYard*).

[2555] *Id.* at 86.

[2556] 547 U.S. 47 (2006) (*Rumsfeld*).

[2557] *Id.* at 65; *see also id.* at 60 ("[The access requirement] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*."); *id.* at 64 ("[A]ccommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions.").

[2558] *USTA*, 825 F.3d at 741.

[2559] *Id.* (quoting *2015 Open Internet Order*, 30 FCC Rcd at 5869, para. 549).

[2560] Stuart Minor Benjamin, *Common Sense and Key Questions*, 127 Harv. L. Rev. F. 346, 348, 349 (2014) (Stuart Minor Benjamin, *Common Sense and Key Questions*); *see also USTA*, 825 F.3d at 742 ("[T]he communicative intent of the individual speakers who use such transmission networks does not transform the networks themselves into speakers.").

652.     Unlike newspapers,[2561] websites, social media platforms,[2562] or even cable operators,[2563] BIAS providers do not select, alter, arrange, annotate, or contextualize the content that their users request or that edge providers deliver in response.[2564]  BIAS providers neither select which information to present nor determine how it is presented.  Consumers understand and expect BIAS providers providing BIAS to transparently transmit information to and from the applications and services of *the consumers'* choosing, not *their BIAS providers'* choosing, without change in form or content.[2565]  Consumers do not understand a BIAS provider to be selecting or compiling speech to present the BIAS provider's own expressive offering.  Unlike the editors of a newspaper, the curators of a library or museum, or the managers of a theater, BIAS providers do not select which speech to feature, nor do they arrange or compile the speech they transmit into a new form of expression.  BIAS providers instead deliver the content that their users independently have chosen, without engaging in any distinct expressive activity or communicating any distinct message.

653.     The record in this proceeding confirms this conclusion.[2566]  In the *2023 Open Internet NPRM*, we sought comment on "whether or to what extent ISPs engage in content moderation, curation, or otherwise limit or exercise control over what third-party content their users are able to access on the Internet."[2567]  We further observed that "some social media platforms and other edge providers purport to engage in various forms of content moderation or editorial control" and asked whether there is "any record of ISPs announcing and engaging in comparable activity?"[2568]  In response, no BIAS provider has identified *any* evidence of BIAS providers engaging or wishing to engage in any such practices, nor has any other commenter.  We find that silence telling.  Despite our asking, there is no evidence in the record that any BIAS provider covered by our Order engages in any exercise of editorial control, curation, or other expressive activity.  And, we note, BIAS providers have often relied on their status as mere conduits and their lack of editorial control to obtain immunity from copyright violations and other liability for material distributed over their networks.[2569]

---

[2561] *See Miami Herald Pub'g Co. v. Tornillo*, 418 U.S. 241 (1974).

[2562] *See NetChoice, LLC v. Att'y Gen.*, 43 F.4th 1196 (11th Cir. 2022) (*NetChoice v. Moody*), *cert. granted*, 2023 WL 6319654 (U.S. Sept. 29, 2023).

[2563] *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (*Turner I*) (holding that cable operators, in view of their limited carriage capacity and the need to pay for programming, traditionally "exercis[e] editorial discretion" over which stations to carry).

[2564] *USTA*, 825 F.3d at 743 ("In contrast to newspapers and cable companies, the exercise of editorial discretion is entirely absent with respect to broadband providers . . . . [T]he role of broadband providers is analogous to that of telephone companies: they act as neutral, indiscriminate platforms for transmission of speech of any and all users.").

[2565] *See supra* Section III.B.1.b; *see also USTA II*, 855 F.3d at 390 (Srinivasan, J., concurring in denial of rehearing en banc) (noting that BIAS is understood to offer "a 'go wherever *you*'d like to go' service" rather than "a 'go where *we*'d like you to go' service").

[2566] *See, e.g.*, Equity Advocates Comments at 18 ("Under the current rules and historical practice, broadband providers allow internet end users to access all or substantially all content on the internet, without alteration, blocking, or editorial intervention.  Therefore, broadband providers serve as mere conduits for the messages of others, not as agents exercising editorial discretion subject to First Amendment protections.").

[2567] *2023 Open Internet NPRM* at 96, para. 216.

[2568] *Id.*

[2569] Susan Crawford, *First Amendment Common Sense*, 127 Harv. L. Rev. 2343, 2373 & n.165 (2014) (Susan Crawford, *First Amendment Common Sense*); EFF Comments at 18 ("[I]n 2003, Verizon argued that it was not subject to the subpoena provisions of 17 U.S.C. 512(h) (the Digital Millennium Copyright Act) because it is an 'ISP acting as a conduit for . . . communications.'  The D.C. Circuit agreed that Verizon was 'an ISP functioning as a conduit for user-directed communications' and thus was not a proper recipient of a DMCA subpoena." (citing *Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1234 (D.C. Cir. 2003)); *In re Charter*

(continued….)

654.　We further agree with the D.C. Circuit that, in providing BIAS, BIAS providers do not communicate any distinct or discernible message of their own:[2570]　"The Supreme Court has explained that the First Amendment comes 'into play' only . . . when an 'intent to convey a particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message would be understood by those who viewed it.'"[2571]　But a BIAS provider's delivery of content requested by a user neither reflects an intent to convey any particular message nor is likely to be perceived or understood by the user as conveying the provider's message.[2572]　"[W]hen a subscriber uses his or her broadband service to access internet content of her own choosing, she does not understand the accessed content to reflect her broadband provider's editorial judgment or viewpoint," and "nothing about affording indiscriminate access to internet content suggests that the broadband provider *agrees* with the content an end user happens to access."[2573]

655.　Similarly, we are not persuaded that a BIAS provider's decision to block or throttle a given website or application would, standing alone, constitute expressive or communicative conduct implicating the First Amendment.　Blocking or throttling Internet traffic is not inherently expressive:　A customer "may have no reason to suppose that her inability to access a particular application, or that the markedly slow speeds she confronts when attempting to use it, derives from her ISP's choices rather than from some deficiency in the application.　After all, if a subscriber encounters frustratingly slow buffering of videos when attempting to use Netflix, why would she naturally suspect the fault lies with her ISP rather than Netflix itself?"[2574]　Such conduct would not convey a message without some separate "explanatory speech"—that is, the conduct would support a message "only [if the BIAS provider] accompanied [its] conduct with speech explaining it," such as a statement on its website or in its customer bills explaining what content it restricts and why.[2575]　And the Supreme Court has explained that where conduct "is not inherently expressive" without separate explanatory speech, parties "are not speaking" when they seek to engage in that conduct, so the conduct itself is not protected by the First Amendment.[2576]　BIAS providers may still express their views on any Internet content or other matters by stating those views on their websites, in their customer bills, or elsewhere, and that explanatory speech would receive full First Amendment protection—but the separate *act* of blocking or throttling individual websites or applications is not "inherently expressive" conduct and is not protected by the First

---

*Commc'ns, Inc.*, 393 F.3d 771, 773 (8th Cir. 2005) (broadband provider "is confined to acting as a conduit in the transfer of files through its network").

[2570] *USTA*, 825 F.3d at 741-44.

[2571] *Id.* at 741 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) and *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (per curiam) (alterations in original)); *see also* Stuart Minor Benjamin, *Common Sense and Key Questions* at 347 ("[U]nder the Supreme Court's jurisprudence, First Amendment coverage seems to require a speaker who seeks to transmit some substantive message or messages to a listener who can recognize that message."); Stuart Minor Benjamin, *Transmitting, Editing, and Communicating: Determining What "The Freedom of Speech" Encompasses*, 60 Duke L.J. 1673, 1696-1711 (2011) (Stuart Minor Benjamin, *Transmitting, Editing, and Communicating*) (discussing what substantive communication is required for the First Amendment to apply).

[2572] Stuart Minor Benjamin, *Transmitting, Editing, and Communicating* at 1689 ("The transmission of bits fails this test.　Mere transmission does not reveal an intent to convey a message, and no message is likely to be understood.").

[2573] *USTA*, 825 F.3d at 743; *cf. Turner I*, 512 U.S. at 655-56 (even for cable operators, which *do* exercise editorial control over which stations to carry, "there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator" (citing *PruneYard*, 447 U.S. at 87)).

[2574] *USTA II*, 855 F.3d at 389 (Srinivasan, J., concurring in denial of rehearing en banc) (citation omitted).

[2575] *Rumsfeld*, 547 U.S. at 66; *see NetChoice v. Moody*, 43 F.4th at 1216.

[2576] *Rumsfeld*, 547 U.S. at 64-66; *see also id.* at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

Amendment.[2577]

656.    We find additional support for this view in the long history of common carriage regulation in the United States.  "The common carrier doctrine is a body of common law dating back long before our Founding" that "vests [the government] with the power to impose nondiscrimination obligations on communication and transportation providers that hold themselves out to serve all members of the public without individualized bargaining."[2578]  The Supreme Court has frequently distinguished common carriers from speakers, broadcasters, or editors engaged in First Amendment activity.[2579]  As the D.C. Circuit has observed, common carriers "have long been subject to nondiscrimination and equal access obligations akin to" those we adopt here "without raising any First Amendment question."[2580]  This "absence of any First Amendment concern in the context of common carriers rests on the understanding that such entities, insofar as they are subject to equal access mandates, merely facilitate the transmission of the speech of others rather than engage in speech in their own right."[2581]  And "[g]iven the firm rooting of common carrier regulation in our Nation's constitutional tradition, any interpretation of the First Amendment that would make [it] facially unconstitutional would be highly incongruous."[2582]

657.    To be sure, a different question would be presented if a BIAS provider were to create and market a curated Internet access product that caters to some target audience and is clearly presented as such to consumers.[2583]  The rules we adopt today apply only to offerings of mass-market broadband service providing indiscriminate access to all or substantially all Internet endpoints, which consumers understand to transparently transmit information to and from the Internet applications and services of their choosing without being curated or edited by their BIAS provider.[2584]  A curated Internet product, if clearly

---

[2577] *See* Susan Crawford, *First Amendment Common Sense* at 2382 (Under *Rumsfeld*, "[t]here is nothing inherently expressive about transmitting others' data packets, at a subscriber's direction, over the Internet.").

[2578] *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 469 (5th Cir. 2022) (opinion of Oldham, J.) (*NetChoice v. Paxton*), *cert. granted*, 2023 WL 6319654 (U.S. Sept. 29, 2023); *see id.* at 469-73; *Biden v. Knight First Am. Inst.*, 141 S. Ct. 1220, 1222-23 (2021) (Thomas, J., concurring in denial of certiorari) ("[O]ur legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers. . . . [T]here is clear historical precedent for regulating transportation and communications networks in a similar manner as traditional common carriers."); *see also Cellco*, 700 F.3d 534, 545 ("Borrowing from English common law traditions that imposed certain duties on individuals engaged in 'common callings,' such as innkeepers, ferrymen, and carriage drivers, American common law has long applied the concept of common carriage to transportation and communications enterprises."); Susan Crawford, *First Amendment Common Sense* at 2365-75 (reviewing the history of common carriage and its application to broadband providers).

[2579] *See, e.g.*, *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 739 (1996) (plurality opinion) (distinguishing rights of "newspapers or television broadcasters" from those of "common carriers, such as telephone companies"); *FCC v. League of Women Voters*, 468 U.S. 364, 378 (1994) ("Unlike common carriers, broadcasters are 'entitled under the First Amendment to exercise . . . journalistic freedom'").

[2580] *USTA*, 825 F.3d at 740; *accord id.* ("Equal access obligations of th[is] kind have long been imposed on telephone companies, railroads, and postal services, without raising any First Amendment issue."); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023) (recognizing the "nondiscrimination rules the common law sometimes imposed on common carriers," including enterprises that "hosted or transported others or their belongings").

[2581] *USTA*, 825 F.3d at 741; *see* Stuart Minor Benjamin, *Transmitting, Editing, and Communicating* at 1686-87 ("Courts have placed common carriers and other mere conduits at the opposite end of the spectrum from speakers, and have held that conduits do not have free speech rights of their own.").

[2582] *NetChoice v. Paxton*, 49 F.4th at 469 (opinion of Oldham, J.); *see also* Stuart Minor Benjamin, *Transmitting, Editing, and Communicating* at 1686 ("[A]pplication of the First Amendment to the regulation of common carriers . . . . would fly in the face of history and the consistent legal treatment of such carriers.").

[2583] *Cf. NetChoice v. Moody*, 34 F.4th at 1204 (discussing curated social media platforms "like Roblox (a child-oriented gaming network), ProAmericaOnly (a network for conservatives), and Vegan Forum (self-explanatory)").

[2584] *See supra* Section III.D.1.

identified and marketed as such, would fall outside the scope of this Order.[2585]  And if a BIAS provider "represent[s] itself to consumers as affording them less of a 'go wherever *you*'d like to go' service and more of a 'go where *we*'d like you to go' service," that might well be an expressive offering receiving First Amendment protection.[2586]  A BIAS provider that wishes to provide such a curated service may freely do so, so long as the BIAS provider "make[s] adequately clear its intention to provide edited services of that kind, so as to avoid giving customers a mistaken impression that they would enjoy indiscriminate access to all content available on the internet[] without the editorial intervention of their broadband provider."[2587]

658.  If a BIAS provider decides to offer a service that is clearly identified as providing edited or curated Internet access, consumers would be free to decide whether to subscribe to that curated offering based on its expressed editorial policies or viewpoint.[2588]  But what BIAS providers may not do is provide consumers what purports to be ordinary mass-market broadband service, which consumers reasonably understand to provide indiscriminate access to all or substantially all Internet applications and services of their choosing, and then engage in discriminatory practices that deny customers the service they reasonably expect.[2589]  Our rules thus simply ensure that BIAS providers "act in accordance with their customers' legitimate expectations."[2590]  We agree with the *USTA* decision that nothing supports "the counterintuitive notion that the First Amendment entitles an ISP to engage in the kind of conduct barred by the net neutrality rule—i.e., to hold itself out to potential customers as offering them an unfiltered pathway to any web content of *their* own choosing, but then, once they have subscribed, to turn around and limit their access to certain web content based on the *ISP's* own commercial preferences."[2591]

659.  Even if our rules were construed to somehow implicate BIAS providers' First Amendment speech rights, they would still be permissible as content-neutral regulations satisfying intermediate scrutiny.[2592]  The rules make no distinction based on content or viewpoint, and a content-neutral regulation will be upheld if it "furthers an important or substantial government interest . . . unrelated to the suppression of free expression" and if it "do[es] not burden substantially more speech

---

[2585] *See USTA*, 825 F.3d at 743 ("[T]he Order itself excludes such providers from the rules. . . . The rules therefore would not apply to such providers, as the FCC has affirmed."); *USTA II*, 855 F.3d at 389 (Srinivasan, J., concurring in denial of rehearing en banc) ("[T]he rule does not apply to an ISP holding itself out as providing something other than a neutral, indiscriminate pathway—i.e., an ISP making sufficiently clear to potential customers that it provides a filtered service involving the ISP's exercise of 'editorial intervention.'").

[2586] *USTA II*, 855 F.3d at 390 (Srinivasan, J., concurring in denial of rehearing en banc); *accord* Stuart Minor Benjamin, *Transmitting, Editing, and Communicating* at 1702-03 ("[W]henever an Internet access provider is willing to not only to substantively edit but also to make that editing clear—'We block the content you don't want' or 'We edit the Internet for you'—then it is engaged in speech for First Amendment purposes.").

[2587] *USTA II*, 855 F.3d at 390 (Srinivasan, J., concurring in denial of rehearing en banc) (citations and internal quotation marks omitted).

[2588] No commenter has offered evidence of any curated Internet access product in the marketplace, and we take no position on whether there is market demand for such a product.  *Cf. USTA II*, 855 F.3d at 390 (Srinivasan, J., concurring in denial of rehearing en banc) ("[N]o ISP has suggested an interest in doing so in this court.  That may be for an understandable reason: a broadband provider representing that it will filter its customers' access to web content based on its own priorities might have serious concerns about its ability to attract subscribers.").

[2589] *USTA II*, 855 F.3d at 391 (Srinivasan, J., concurring in denial of rehearing en banc) ("The First Amendment does not give an ISP the right to present itself as affording a neutral, indiscriminate pathway but then conduct itself otherwise.").

[2590] *Id.*

[2591] *Id.* at 382.

[2592] *See* EFF Reply at 1-2 (arguing that open Internet rules would satisfy intermediate scrutiny under *Turner*).

than is necessary."[2593]

660.     The rules we adopt today serve multiple important—indeed compelling—governmental interests.  To begin, the rules "[a]ssur[e] that the public has access to a multiplicity of information sources" by promoting "the widest possible dissemination of information from diverse and antagonistic sources."[2594]  The Supreme Court has declared this to be "a governmental purpose of the highest order," as it "promotes values central to the First Amendment."[2595]  The rules we adopt today also enable fair competition among edge providers and ensure a level playing field for a wide variety of speakers who might otherwise be disadvantaged, and the Supreme Court has likewise deemed it "undisputed" that "the Government has an interest in eliminating restraints on fair competition . . . , even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment."[2596]  And we find that our rules will substantially further the national interest in ensuring that Americans have widespread access to a vibrant Internet on reasonable terms.[2597]  Indeed, Congress has specifically directed the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans"[2598] and to "promote the continued development of the Internet and other interactive computer services and other interactive media."[2599]

661.     None of these important governmental interests involves the suppression of free expression or targets any speakers' messages based on their content.  For the reasons we have explained, moreover, we firmly believe the actions we take today further these interests.[2600]  And the rules we adopt are tailored to accomplish those interests without placing an unnecessary burden on speech:  BIAS providers themselves remain free to speak on an unlimited range of subjects, including by publicizing their views on their own websites or by delivering their messages on inserts accompanying customers' monthly bills; they simply may not unreasonably suppress the speech of others in their capacity as conduits.[2601]

662.     We disagree with CTIA's argument that under the Supreme Court's *Turner* decisions, the government can satisfy intermediate First Amendment scrutiny only by providing specific evidence that a

---

[2593] *Turner I*, 512 U.S. at 662 (internal quotation marks omitted); *see also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 213 (1997) (*Turner II*) ("Content-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do, and thus are subject to a less rigorous analysis, which affords the Government latitude in designing a regulatory solution." (internal quotation marks and citation omitted)).

[2594] *Turner I*, 512 U.S. at 663.

[2595] *Id.*; *see also Turner II*, 520 U.S. at 189-90 ("reaffirm[ing]" the "'governmental purpose of the highest order' in ensuring public access to 'a multiplicity of information sources'").

[2596] *Turner II*, 520 U.S. at 190 (quoting *Turner I*, 512 U.S. at 664); *see also id.* at 194 ("Federal policy . . . has long favored preserving a multiplicity of [voices] regardless of whether the conduct that threatens it is motivated by anticompetitive animus or rises to the level of an antitrust violation.").

[2597] *See Verizon*, 740 F.3d at 642-49; *2015 Open Internet Order*, 30 FCC Rcd at 5872, para. 554.

[2598] 47 U.S.C. § 1302.

[2599] 47 U.S.C. § 230(b)(1).

[2600] *See supra* Section V.A.1; *cf. Turner II*, 520 U.S. at 195-96 (emphasizing "the deference owed administrative agencies because of their expertise," which "has special significance in cases like this one, involving . . . judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technical change").

[2601] And in any event, "even on the doubtful assumption that a narrower but still practicable . . . rule could be drafted . . . content-neutral regulations are not 'invalid simply because there is some imaginable alternative that might be less burdensome on speech.'" *Turner II*, 520 U.S. at 217.

given BIAS provider possesses market power within its specific geographic market.[2602]  For one thing, *Turner* discussed three important interests:  (1) preserving free broadcast television, (2) promoting a multiplicity of voices, and (3) promoting fair competition.[2603]  For another, even as to competition-related interests, the Court held that there is an important federal interest in "preserving a multiplicity of broadcast outlets *regardless of whether the conduct that threatens it . . . rises to the level of an antitrust violation.*"[2604]

663.    More generally, such a market power requirement would be at odds with the ordinary operation of intermediate scrutiny under the First Amendment, which has routinely been articulated as requiring "an important or substantial governmental interest . . . unrelated to the suppression of free expression"[2605] but never as requiring any specific showing of market power.  And it would be ahistorical for a constitutional amendment adopted in 1791 to be predicated on modern-day concepts of market power.  To be sure, the Court in the *Turner* cases found that cable companies had "bottleneck" control, but in doing so, did not rely on granular empirical evidence or market-by-market analysis, but instead largely on legislative findings, anecdotal testimony, and general economic principles.[2606]  Our explanation of "how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers"—that is, that a BIAS provider possesses a terminating-access monopoly over edge providers' ability to reach the BIAS provider's customer, sustained by barriers to entry arising from switching costs and imperfect information, which allows BIAS providers to act as gatekeepers—is at least as sufficient to sustain the rules we adopt today.[2607]

664.    In sum, the rules we adopt today do not unconstitutionally abridge any speech or expression by BIAS providers.  As the record confirms, BIAS providers are merely conduits for others' speech—not speakers themselves—when delivering content that has been requested by their users.  BIAS providers do not select, alter, arrange, annotate, or contextualize the content that their users request or that edge providers deliver in response, and there is no evidence in the record that any BIAS providers covered by our order engage in any exercise of editorial control, curation, or other expressive activity.  And even if BIAS providers could somehow show that they were engaged in expression protected by the First Amendment, the rules we adopt today would still satisfy constitutional requirements because they further important governmental interests without any substantially greater burden on speech than necessary to fulfill those interests.

---

[2602] CTIA Comments at 93-95 (citing *USTA II*, 855 F.3d at 431 (Kavanaugh, J., dissenting from denial of rehearing en banc)).

[2603] *Turner I*, 512 U.S. at 662-64; *Turner II*, 520 U.S. at 189-90.  *Turner I* also forecloses the view that the "*Buckley* principle" calls for heightened scrutiny and precludes reliance on a diversity-of-voices rationale without a showing of market power.  *Compare USTA II*, 855 F.3d at 432-33 (Kavanaugh, J., dissenting from denial of rehearing) (articulating this view), *with Turner I*, 512 U.S. at 657-59 (holding that *Buckley* does not apply to open-access requirements when they do not "reflect the Government's preference for the substance of what favored speakers have to say (or aversion to what the disfavored speakers have to say)").

[2604] *Turner II*, 520 U.S. at 194 (emphasis added); *see also Biden v. Knight First Am. Inst.*, 141 S. Ct. at 1222-23 (2021) (Thomas, J., concurring in denial of certiorari) (The government may "limit[] a company's right to exclude when that company is a public accommodation . . . . regardless of the company's market power.").

[2605] *Turner I*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

[2606] *See Turner II*, 520 U.S. at 196-208 (plurality opinion); *id.* at 208-13 (opinion of the Court).  In response to *the dissent's* argument that a court must carefully and independently examine the economic evidence, the Court acknowledged it was ultimately upholding the challenged must-carry rules based on "defer[ence] to the reasonable judgment of a legislative body" and opined that "[t]he level of detail in factfinding required by the dissent would be an improper burden for courts to impose on the Legislative Branch."  *Id.* at 212-13.

[2607] *See supra* Sections V.A.3, V.A.4; *Verizon*, 740 F.3d at 646-47; *2015 Open Internet Order*, 30 FCC Rcd at 5628-33, paras. 78-84.

## 2. Compelled Disclosure

665. CTIA—alone—briefly argues that our updated transparency rule unconstitutionally compels speech.[2608] We disagree. The Supreme Court held in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio* (*Zauderer*) that requiring businesses to disclose "purely factual and uncontroversial information" about their services is generally permissible so long as the requirements are not "unjustified" or "unduly burdensome."[2609] Our transparency rule complies with that standard, just like the similar 2010, 2015, and 2018 transparency rules embraced by multiple administrations and upheld through multiple court challenges.

666. Here, as in *Zauderer*, our updated transparency rule is a reasonable measure to prevent deception or consumer confusion, among other things.[2610] The record of consumer complaints received by the Commission reflects that consumers are often unaware of or confused by practices that may result in slowed or impaired access to Internet applications and services, impose data caps, or otherwise fail to provide the level of service reasonably expected at the advertised rates.[2611] Our rules ensure that consumers purchasing BIAS receive what they reasonably expect—that is, unimpeded access to all or substantially all Internet endpoints of their choosing.[2612] Courts have recognized that BIAS providers have both the incentive and the ability to engage in harmful conduct, often in ways that might not be readily apparent to users;[2613] without enforceable transparency measures, consumers might have no ability to know if their BIAS provider is engaging in such practices.[2614]

667. The disclosures required by the updated transparency rule will also provide essential information the Commission needs to fulfill its statutory mandate to biennially report to Congress on the state of the communications marketplace, including the state of competition in the marketplace and any marketplace practices that pose a barrier to competitive entry into the marketplace.[2615]

668. Other important governmental interests also strongly support our updated transparency rule.[2616] The disclosures required by our transparency rule protect competition and curb the incentive of BIAS providers to interfere with, or disadvantage, third-party edge providers' services by helping to ensure that such practices come to light. More generally, accurate information about BIAS provider practices encourages innovation and the development of high-quality services, and in turn helps drive

---

[2608] CTIA Comments at 94-95.

[2609] 471 U.S. 626, 651 (1985) (*Zauderer*).

[2610] *See Zauderer*, 471 U.S. at 651 (upholding disclosure requirements that "are reasonably related to the State's interest in preventing deception of consumers").

[2611] *See, e.g.*, *supra* Section V.B.1; *see also 2015 Open Internet Order*, 30 FCC Rcd at 5874, para. 562 & n.1730.

[2612] *See, e.g.*, *supra* Sections III.B.1.b, V.B.3; *cf. USTA II*, 855 F.3d at 391 (Srinivasan, J., concurring in denial of rehearing en banc) ("The First Amendment does not give an ISP the right to present itself as affording a neutral, indiscriminate pathway but then conduct itself otherwise. The FCC's Order requires ISPs to act in accordance with their customers' legitimate expectations.").

[2613] *Verizon*, 740 F.3d at 645-47; *see USTA*, 825 F.3d at 694.

[2614] *USTA II*, 855 F.3d at 389 (Srinivasan, J., concurring in denial of rehearing en banc) ("[A] subscriber might well have no awareness of her ISP's practices of that kind in the first place: she may have no reason to suppose that her inability to access a particular application, or that the markedly slow speeds she confronts when attempting to use it, derives from her ISP's choices rather than from some deficiency in the application. After all, if a subscriber encounters frustratingly slow buffering of videos when attempting to use Netflix, why would she naturally suspect the fault lies with her ISP rather than with Netflix itself?" (citation omitted)).

[2615] *See* 47 U.S.C. § 163.

[2616] *See Am. Meat Inst. v. USDA*, 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc) (holding that *Zauderer* "sweeps far more broadly than the interest in remedying deception"); *e.g.*, *id.* at 23 (country-of-origin labeling); *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 556-58 (6th Cir. 2012) (health warnings for tobacco).

consumer demand and broadband investment.[2617]  Transparency and disclosure of BIAS provider practices further ensure that edge providers have the information they need to develop conforming applications and services.  And transparency ultimately helps ensure that consumers, edge providers, and all other participants in the Internet economy have confidence in the networks and business practices of the BIAS providers they rely on for their communications.

669.     The need for our transparency rule is thus clear.  And on the other side of the ledger, CTIA makes no showing that requiring BIAS providers to disclose "purely factual and uncontroversial information about the terms under which . . . services will be available" would be unduly burdensome.[2618]

670.     Finally, even if *Zauderer* did not apply, we find that the updated transparency rule would withstand scrutiny even under the *Central Hudson* framework for substantially the same reasons, and for the reasons given in the *RIF Order*.[2619]  Recognizing that the First Amendment "affords a lesser protection to commercial speech than to other constitutionally guaranteed expression," the government may regulate commercial speech under *Central Hudson* to directly advance a substantial government interest so long as the regulation is not more extensive than necessary to fulfill that interest.[2620]

671.     As explained, our transparency rule serves multiple substantial governmental interests in preventing deception and consumer confusion, protecting competition, and encouraging innovation.  The rule also directly advances those interests.  For consumers, "subscribers will be able to use the disclosed information to evaluate BIAS offerings and determine which offering will best enable the use of the applications and service they desire."[2621]  "In addition," these disclosures "help ensure accountability by ISPs and the potential for quick remedies if problematic practices occur."[2622]  Meanwhile, edge providers who "might be particularly sensitive to the manner in which an ISP provides broadband Internet access service potentially could benefit from [this information] to better ensure the performance of th[eir] Internet applications and services" and "to evaluate how well their offerings will perform."[2623]  This transparency "helps reduce barriers to entry that otherwise could exist and encourages entrepreneurs' and small businesses' ability to compete and develop and advance innovating offerings in furtherance of our statutory objectives." [2624]  Moreover, disclosure of information to the Commission will allow the Commission to publish reports and information for consideration by consumers and edge providers, and "will provide the Commission the information it needs for the evaluation required by [section 13] of the Act, enabling [the agency] to spur regulatory action or seek legislative changes as needed."[2625]  And the transparency rule is appropriately tailored to these interests and no more extensive than necessary to substantially fulfill them.

---

[2617] *2015 Open Internet Order*, 30 FCC Rcd at 5874-75, para. 563; *see also supra* Section V.A.1.

[2618] *Zauderer*, 471 U.S. at 651.

[2619] *See RIF Order*, 33 FCC Rcd at 448-50, paras. 235-38.

[2620] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564-66 (1980) (*Central Hudson*). We note that the *Central Hudson* test is a peculiar fit here because it purports to govern "restrictions" on speech, whereas disclosure requirements are not restrictions.

[2621] *RIF Order*, 33 FCC Rcd at 449, para. 237.

[2622] *Id.* (citing *2010 Open Internet Order*, 25 FCC Rcd at 17936-37, para. 53).

[2623] *Id.*

[2624] *Id.*

[2625] *Id.*  The *RIF Order* cited section 257 of the Act, which directed the Commission to "to report to Congress on such marketplace barriers and how they have been addressed by regulation or could be addressed by recommended statutory changes."  47 U.S.C. § 257(c) (2017).  Congress later repealed subsection (c) of section 257 and replaced it with section 13, 47 U.S.C. § 163, which imposes a substantially similar reporting requirement.  *See supra* Section V.B.3.

### B.    Fifth Amendment Takings

672.    As with the Commission's analysis under the Fifth Amendment's Takings Clause in the *2015 Open Internet Order*, we do not identify any takings concerns with our actions here.[2626]  Because our actions here merely regulate the commercial relationship between BIAS providers and their customers, they do not grant a right to physical occupation of the broadband providers' property and thus do not constitute a *per se* taking.  Our actions also do not constitute a regulatory taking under the relevant ad hoc balancing test because of the minimal effect on BIAS providers' reasonable investment-backed expectations and the nature of our actions, which are far removed from a traditional physical invasion of property by the government.  Nor are our actions confiscatory, because our regulatory approach enables BIAS providers to obtain a fair return on the network costs incurred in carrying traffic to and from BIAS end users.

#### 1.    *Per Se* Taking

673.    We reject claims that our actions would effect a *per se* taking by granting third parties a right to physically occupy broadband providers' facilities.[2627]  As a threshold matter, as the Commission observed in the *2015 Open Internet Order*, "[c]ourts have repeatedly declined to extend *per se* takings analysis to rules regulating the transmission of communications traffic over a provider's facilities,"[2628] and "these decisions comport with the Supreme Court's perspective that permanent physical occupation of property is a narrow category of takings jurisprudence and is 'easily identifiable' when it does occur."[2629]  Since our rules also do not impose requirements that otherwise could be understood as

---

[2626] *2015 Open Internet Order*, 30 FCC Rcd at 5875-79, paras. 564-73.

[2627] *See, e.g.*, CTIA Comments at 95-97; *see also* Daniel A. Lyons, *Virtual Takings:  The Coming Fifth Amendment Challenge to Net Neutrality Regulation*, 86 Notre Dame L. Rev. 65, 92-101 (2013) (Daniel Lyons, *Virtual Takings*), cited in FAI et al. Comments at 8.  The record does not reflect a concern that our actions today deprive BIAS providers of all economically beneficial use of their property—nor would we find such a concern merited.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (*Lucas*) (recognizing a *per se* taking where the government completely deprives an owner of all economically beneficial use of their property).  We therefore limit our discussion to the physical occupation theory of *per se* takings.

[2628] *2015 Open Internet Order*, 30 FCC Rcd at 5876-77, para. 568 (citing *Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 98 (2d Cir. 2009) (*Cablevision*) (upholding the Commission's finding that a must-carry obligation did not constitute a physical occupation because "the transmission of WRNN's signal does not involve a physical occupation of Cablevision's equipment or property"); *Qwest v. United States*, 48 Fed. Cl. 672, 693-94 (Fed. Cl. 2001); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982) (*Loretto*) ("The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude . . . , [which] are subject to a more complex balancing process to determine whether they are a taking.")).  The record here does not reveal precedent to the contrary.  At most, the record notes concurring or dissenting statements of judges or justices—frequently merely tentatively noting and/or setting aside possible takings questions—that predate most of the precedent on which we rely.  *See, e.g.*, Daniel Lyons, *Virtual Takings* at 96-98.  The record also references an argument made in cable must-carry-related advocacy before the Commission seeking to rely on precedent addressing the scenario where "the Government has condemned business property with the intention of carrying on the business, as where public-utility property has been taken over for continued operation by a governmental authority."  *Id.* at 98-99 (discussing advocacy citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 12 (1949) (*Kimball Laundry*) (internal quotation marks omitted)).  But *Kimball Laundry* referenced the government's takeover of an entire going concern, citing specific examples involving water utilities.  *Kimball Laundry,* 338 U.S. at 12.  We are not persuaded that it automatically follows from such precedent that any step short of that—including regulation of the transmissions over a carrier's network—must be understood as involving a physical intrusion that triggers a *per se* taking analysis, particularly given the separate line of precedent—not invoked here—that a *per se* taking occurs where a property owner is denied all economically beneficial use of property.  *See, e.g., id.* at 13 ("The owner retains nothing of the going-concern value that it formerly possessed; so far as control of that value is concerned, the taker fully occupies the owner's shoes.").

[2629] *2015 Open Internet Order*, 30 FCC Rcd at 5876-77, para. 568 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)).

requiring physical access to BIAS providers' property, we are not persuaded that there is a government-required physical occupation of BIAS providers' property here at all.[2630]

674. Independently, requirements like those restricting blocking and throttling regulate BIAS providers' commercial relationship with their end-user customers. Such requirements simply ensure that end users can use the service that BIAS providers have offered them, and that the end users have paid for, to obtain access to content, applications, and services that end users have elected to receive.[2631] The Commission explained in 2015 that where "owners voluntarily invite others onto their property—through contract or otherwise—the courts will not find that a physical occupation has occurred for purposes of constituting a *per se* taking."[2632] Where, as here, BIAS providers have invited traffic on their networks through the offering of BIAS, reasonable conduct regulations can be imposed on the use of such properties without raising *per se* takings concerns.[2633] Thus, to the extent that BIAS providers allow customers to transmit or receive information over their networks, the imposition of reasonable conduct rules on the provision of BIAS does not constitute a *per se* taking.

675. Finally, even if the rules did impose a type of physical occupation on the facilities of BIAS providers, such an imposition is not an unconstitutional taking because BIAS providers are compensated for the traffic passing over their networks through end-user revenues.

## 2. Regulatory Taking

676. Contrary to CTIA's claims,[2634] the actions we take today also do not constitute a regulatory taking under the "essentially ad hoc, factual inquiries" into a variety of unweighted factors used by courts.[2635] Those factors evaluate the "economic impact of the regulation," the degree of interference with "investment-backed expectations," and "the character of the government action."[2636] "[E]ach of these [factors] focuses directly upon the severity of the burden that government imposes upon private property rights."[2637] Because our actions in this order are far removed from anything "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the

---

[2630] *Cablevision*, 570 F.3d at 98 (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252-53 (1987) (*Fla. Power Corp.*) ("[The] touchstone [of *per se* takings] is 'required acquiescence' to the occupation of the property by an uninvited stranger or an 'interloper with a government license.'")).

[2631] Note that our rules do not apply to "curated" services and, where our bright-line conduct rules apply, allow for reasonable network management.

[2632] *2015 Open Internet Order*, 30 FCC Rcd at 5877-78, para. 569 (citing *Loretto*, 458 U.S. at 440 ("So long as these regulations do not *require* the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.")); *Loretto*, 458 U.S. at 441 n.19 (hypothesizing that the New York statute in question could have required landlords "to provide cable installation if a tenant so desires" if the landlord owned the installation)); *see also, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) ("Limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public.").

[2633] *2015 Open Internet Order*, 30 FCC Rcd at 5877-78, para. 569 (citing *Hilton Wash. Corp. v. D.C.*, 777 F.2d 47 (D.C. Cir. 1985) (holding that a non-discrimination requirement with respect to hotel taxi stands was not a taking under *Loretto*); *Yee v. City of Escondido*, 503 U.S. 519, 531 (1992) (noting that because mobile home park petitioners "voluntarily open their property to occupation by others, petitions cannot assert a *per se* right to . . . exclude particular individuals"); *PruneYard*, 447 U.S. at 83-84; *Fla. Power Corp.*, 480 U.S. at 251-53.

[2634] *See* CTIA Comments at 96.

[2635] *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (*Penn Central*).

[2636] *Id.* at 124.

[2637] *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005) (discussing application of the *Penn Central* factors).

owner from his domain,"[2638] we find no regulatory taking.

677. As relevant to the multi-factor takings analysis, we find the economic impact of our actions on BIAS providers' property interests to be limited. As we explain above, our classification of BIAS as a telecommunications service is unlikely to be closely tied to BIAS provider investment decisions, which instead are more likely driven by broader economic conditions, technology changes, and BIAS providers' general business development decisions.[2639] And in any case, although some diminution in value of property is necessary, it is not itself sufficient to constitute a taking.[2640]

678. We also find no meaningful interference with BIAS providers' investment-based expectations. "[T]o support a claim for a regulatory taking, an investment-backed expectation must be reasonable," involving "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiff] should have anticipated."[2641] As a general matter, property owners cannot expect that existing legal requirements regarding their property will remain entirely unchanged,[2642] and the Commission explained at length in 2015 the history of Commission jurisdiction and regulatory oversight over BIAS.[2643] Such considerations have even greater force in light of intervening events. The regulatory approach adopted by the Commission in the *2015 Open Internet Order* was affirmed by the D.C. Circuit in the face of legal challenges, and petitions for rehearing en banc and certiorari were rejected by the D.C. Circuit and the Supreme Court, respectively.[2644] By contrast, when the Commission sought to change course in the *RIF Order*, the regulatory approach adopted there was vacated in part and the classification decision was remanded.[2645] The Commission's attempt to respond to the remand in the *RIF Remand Order* is subject to petitions for reconsideration before the Commission[2646] and judicial review in the D.C. Circuit,[2647] which have remained pending until today.[2648] That history subsequent to the *2015 Open Internet Order* demonstrates that BIAS providers have even less basis than before to reasonably expect

---

[2638] *Id.*

[2639] *See supra* Section III.H.

[2640] *See, e.g., Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993) (*Concrete Pipe & Prods.*); *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014) (*A&D Auto Sales*).

[2641] *A&D Auto Sales*, 748 F.3d at 1159 (quoting *Cienega Gardens v. U.S.*, 331 F.3d 1319, 1346 (Fed. Cir. 2003) (internal quotation marks omitted)); *see also, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (stating that "reasonable investment-backed expectations" are one factor in the takings analysis); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc) ("'Distinct investment-backed expectations' implies reasonable probability, like expecting rent to be paid . . . .").

[2642] *Lucas*, 505 U.S. at 1027; *Gen. Tel. Co. of Sw. v. United States*, 449 F.2d 846, 864 (5th Cir. 1971). Additionally, persons operating in a regulated environment develop fewer reliance interests in industries subject to comprehensive regulation. *See, e.g., Concrete Pipe & Prods.*, 508 U.S. at 645-46.

[2643] *See, e.g., 2015 Open Internet Order*, 30 FCC Rcd at 5878-79, para. 572.

[2644] *USTA*, 825 F.3d 674, *reh'g denied, USTA II*, 855 F.3d 381, *cert. denied, Berninger*, 139 S. Ct. 453. We recognize that the federal government, in opposing the petitions for certiorari, pointed to the fact that the *2015 Open Internet Order* had been superseded by the *RIF Order*. Brief for the Federal Respondents, *Berninger v. FCC, et al.*, No. 17-498 et al. (filed Aug. 2, 2018). But the issue is not whether the regulatory approach in the *2015 Open Internet Order* was set in stone, but the reasonableness of any BIAS provider expectation that such a regulatory approach was foreclosed. Irrespective of the specific arguments made by the federal government at that time, we see the Supreme Court's denial of certiorari as at least one part of the overall history relevant to evaluating BIAS providers' reasonable expectations.

[2645] *Mozilla*, 940 F.3d 1.

[2646] Common Cause et al. Petition for Reconsideration; INCOMPAS Petition for Reconsideration; Public Knowledge Petition for Reconsideration; Santa Clara Petition for Reconsideration.

[2647] *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir.).

[2648] We dispense with the petitions for reconsideration in this item. *See infra* Section VII.

that they would operate under a materially different regulatory approach than what we adopt in this Order.

679.     The character of our actions here also cuts against a finding of a regulatory taking.  In that regard, the *Penn Central* Court held that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[2649]  As we already have explained when rejecting a *per se* takings claim, our regulatory approach to BIAS simply seeks to ensure that end users can use the service that BIAS providers have offered them and that the end users have paid for, rather than involving something that properly could be understood as a physical invasion by the government.[2650]

680.     Finally, because we do not regulate BIAS providers' ability to set market rates for the broadband Internet access services they offer end users, there is no reason to believe that our actions will deprive broadband providers of just compensation, thus fully addressing any takings claim.

### 3.     Confiscation

681.     Commenters fare no better when they seek to invoke Fifth Amendment precedent from the ratemaking context.[2651]  As the Supreme Court has held:  "The guiding principle [in the ratemaking context] has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory. . . .  If the rate does not afford sufficient compensation, the [government] has taken the use of utility property without paying just compensation."[2652]  Because we leave BIAS providers free to set market rates for the broadband Internet access services they offer end-users, we see no evidence that our regulatory approach "threaten[s] an [ISP's] financial integrity" and is confiscatory.[2653]

682.     We reject commenters' efforts to reach a contrary conclusion by identifying a separate, service that BIAS providers may offer to edge providers and focusing narrowly on what BIAS providers can charge edge providers for such a service.[2654]  As the Commission recognized in 2015, and we affirm today,[2655] any such "'edge service' is secondary, and in support of, the promise made to the end user, and broadband provider practices with respect to edge providers—including terms and conditions for the transfer and delivery of traffic to (and from) the BIAS subscriber—impact the broadband provider's

---

[2649] *Penn Central*, 438 U.S.at 124 (citation omitted); *see also Am. Cont'l Corp. v. United States*, 22 Cl. Ct. 692, 696 (Cl. Ct. 1991) ("Courts have been hesitant to find a fifth amendment taking where, as here, the government's alleged interference with property 'arises from a public program that adjusts the benefits and burdens of economic life to promote the common good.'" (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986))).

[2650] *See supra* Section VI.B.1.

[2651] *See, e.g.*, Phoenix Center Comments at 3 (citing and attaching George Ford & Lawrence Spiwak, *Tariffing Internet Termination* and Lawrence Spiwak, USTelecom *and Its Aftermath*).

[2652] *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) (*Duquesne Light*).

[2653] *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 524 (2002) (a rate is "so unjust as to be confiscatory" where it "threaten[s] an incumbent's financial integrity" (quoting *Duquesne Light*, 488 U.S. at 307 (internal quotation marks omitted))); *see also, e.g.*, *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 605 (1944) ("Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called 'fair value' rate base."); *Ill. Bell Tel. Co. v. FCC*, 988 F.2d 1254, 1263 (D.C. Cir. 1993) (*Illinois Bell*) (rejecting a takings claim where "[t]here simply has been no demonstration that the FCC's rate base policy threatens the financial integrity of the [service providers] or otherwise impedes their ability to attract capital").

[2654] *See, e.g.*, Lawrence Spiwak, USTelecom *and Its Aftermath* at 43-47; George Ford & Lawrence Spiwak, *Tariffing Internet Termination* at 10-13; USTelecom Comments at 3; CTIA Reply at 86; NCTA et al. Reply at 63-64; AT&T Comments at 5; Free State Foundation Comments at 46.

[2655] *See supra* Section III.D.4.

provision of the Title II broadband Internet access service."[2656]  Given the relationship between BIAS end users and edge providers, it is the same traffic delivery that is at issue whether viewed from the perspective of the end user or the edge provider—the traffic demanded by end users, for example, is the traffic that edge providers seek to deliver, with the BIAS provider serving as the intermediary from the perspective of either end of the exchange.  From a takings standpoint, we thus conclude that the relevant issue is whether a BIAS provider's use of its network for the carriage of BIAS traffic is subject to confiscatory Commission regulation.  Today's Order leaves BIAS providers free to charge market-based rates for the use of its facilities to carry the relevant traffic.[2657]  We are persuaded that "the end result" of the regulatory approach we adopt here allows for the "attraction of capital and compensation for risk" for a BIAS provider's investment in its network used to carry BIAS traffic.[2658]

# VII.    ORDER ON RECONSIDERATION

683.    We now turn to the Petitions for Reconsideration of Common Cause et al., INCOMPAS, Public Knowledge, and Santa Clara seeking reconsideration of the *RIF Remand Order*.[2659]  As described more fully below, we grant these petitions to the extent consistent with and described in this Order and otherwise dismiss as moot all four petitions.  In particular, for the reasons discussed in this Order,[2660] we vacate the *RIF Remand Order* and find that through the *2023 Open Internet NPRM* and this Order, we provide the relief petitioners have sought.

684.    In *Mozilla*, the D.C. Circuit remanded the *RIF Order* for further consideration, finding that the Commission failed to adequately evaluate and address the potential negative effects of reclassifying BIAS as a Title I information service on (1) protecting public safety; (2) promoting infrastructure deployment by regulating pole attachment rights; and (3) providing Lifeline support for BIAS to low-income consumers through the Universal Service Fund.[2661]  In response to the court's remand, the Wireline Competition Bureau issued a Public Notice seeking to refresh the record on these issues.[2662]  Subsequently, the Commission adopted the *RIF Remand Order*, in which it reaffirmed its conclusions from the *RIF Order* and found that reclassification of BIAS as a Title I information service would promote public safety, facilitate broadband infrastructure deployment, and allow the Commission to continue to provide Lifeline support for BIAS.[2663]

685.    The *RIF Remand Order* (and, through it, the *RIF Order*) has remained under further administrative and judicial review.  One week after the *RIF Remand Order* was published in the *Federal*

---

[2656] *2015 Open Internet Order*, 30 FCC Rcd at 5748-49, para. 339.

[2657] Indeed, the freedom to charge market-based end-user rates has been—and remains—a consistent part of the Commission's overall regulatory approach for BIAS whether under the framework of the *2015 Open Internet Order*, the *RIF Order*, or this Order and is consistent with the Commission strong commitment to not engage in rate regulation, despite speculative claims from some commenters that the Commission may someday decide to reverse course.  *See* ADTRAN Comments at 14-15; Mark Israel et al. Declaration at 7; Phoenix Center Comments at 3.

[2658] *Illinois Bell*, 988 F.2d at 1263.

[2659] Common Cause et al. Petition for Reconsideration; INCOMPAS Petition for Reconsideration; Public Knowledge Petition for Reconsideration; Santa Clara Petition for Reconsideration.

[2660] *See supra* Sections III.A.1 (Safeguarding Public Safety), III.A.7 (Supporting Access to Broadband Internet Access Service), III.F.4 (The Commission Has the Authority and Responsibility to Classify BIAS); III.H (Impact of Reclassification in Investment).

[2661] *Mozilla*, 940 F.3d at 18; *see id.* at 59-63, 65-70.

[2662] *Wireline Competition Bureau Seeks to Refresh Record in Restoring Internet Freedom and Lifeline Proceedings in Light of the D.C. Circuit's Mozilla Decision*, WC Docket Nos. 17-108, 17-287, and 11-42, Public Notice, 35 FCC Rcd 1446 (2020).

[2663] *RIF Remand Order*, 35 FCC Rcd at 12336, para. 18.

*Register*, the CPUC filed a petition for judicial review in the D.C. Circuit.[2664]  Meanwhile, Common Cause et al., INCOMPAS, Public Knowledge, and Santa Clara filed timely petitions for agency reconsideration of the *RIF Remand Order* (discussed further below).  The D.C. Circuit has held judicial review of the *RIF Remand Order* in abeyance pending the Commission's consideration of the petitions for reconsideration.[2665]

686.    On October 19, 2023, the Wireline Competition Bureau issued a Public Notice seeking comment on the issues raised in the four petitions for reconsideration and on the connection between those issues and the recently adopted *2023 Open Internet NPRM*.[2666]  Several commenters responded to the Bureau's Public Notice, either in separate filings that specifically discuss the merits of one or more petitions[2667] or as part of their overall comments to the *2023 Open Internet NPRM*.[2668]

687.    Petitioners ask that the Commission reverse, vacate, or withdraw the *RIF Remand Order*, and request that the Commission initiate a new rulemaking to reclassify BIAS as a Title II telecommunications service and reinstate the open Internet conduct rules.[2669]  Collectively, petitioners

---

[2664] Petition for Review, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir. filed Jan. 14, 2021).

[2665] *See* Order, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir. Apr. 8, 2021).

[2666] *Public Notice Seeking Comment on Petitions for Reconsideration*.

[2667] CPUC Petitions for Reconsideration Comments; WISPA Comments, WC Docket Nos. 17-108, 17-287, and 11-42, at 5-9 (rec. Dec. 14, 2023) (writing that WISPA opposes INCOMPAS's Petition because WISPA does not support the classification of BIAS as a Title II telecommunications service and believes that the Commission has existing statutory authority to extend pole attachment benefits to BIAS-only providers); INCOMPAS Reply to Opposition, WC Docket Nos. 17-108, 17-287, and 11-42, at 3-6 (rec. Jan. 17, 2024) (responding to WISPA's opposition and arguing that each of the alternative means of extending pole attachment benefits to BIAS-only providers that WISPA suggests are "highly speculative and uncertain").

[2668] AT&T Comments, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (stylizing comments as "Comments" and "Opposition to Petitions for Reconsideration"); USTelecom Comments, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (same); Verizon Comments, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (same); Public Knowledge Comments, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (discussing its support for the petitions as a part of its overall comments to the *2023 Open Internet NPRM*); Letter from Amy Bender, Vice President, Regulatory Affairs, CTIA to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (explaining that CTIA opposes the petitions and submits one comment in response to both the *2023 Open Internet NPRM* and the Petitions); CTIA Comments, WC Docket No. 23-320 (rec. Dec. 14, 2023); Letter from Amy Bender, Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 17-108, 17-287, and 11-42 (filed Jan. 17, 2024) (submitting CTIA's reply to the *2023 Open Internet NPRM* for consideration in response to the petitions also); CTIA Reply, WC Docket Nos. 17-108, 17-287, and 11-42 (rec. Jan. 17, 2024); NCTA Comments, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Dec. 14, 2023) (submitting comments in response to both the *2023 Open Internet NPRM* and the *Public Notice Seeking Comment on Petitions for Reconsideration*); NCTA Reply, WC Docket Nos. 23-320, 17-108, 17-287, and 11-42 (rec. Jan. 17, 2023) (same).  To the extent necessary, we grant INCOMPAS's request that we waive the page limitation set forth in Section 1.429 of the Commission's rules that applies to Oppositions to Petitions for Reconsideration and Replies to Oppositions.  INCOMPAS Comments Attach., Motion for Waiver of Page Limit.  Given that the two proceedings are interrelated and in light of the number and complexity of issues, we find that good cause is shown and that it is in the public interest to allow stakeholders to submit filings responsive to both proceedings that may exceed the page limitation.

[2669] *See* Santa Clara Petition for Reconsideration at 2 (asserting that "the Commission should reverse or vacate the *Order on Remand*, vacate the *2018 Order*, and revert to the mandatory open internet conduct rules set out in the Commission's *2015 Title II Order* . . . .  To the extent the Commission determines necessary, the Commission can conduct a rulemaking to further expand the record upon which it makes its decision."); Common Cause et al. Petition for Reconsideration at 2-3 (arguing that "the significant shortcomings in the Commission's Title I analysis to maintain broadband support in Lifeline require the Commission to vacate the *Remand Order* and open a proceeding to reinstate broadband as a Title II service"); INCOMPAS Petition for Reconsideration at 1-2 (arguing that "[t]he Commission should reverse the [*RIF Remand Order*], reclassify BIAS, and issue a new NPRM to

(continued….)

make several procedural arguments for why the Commission should reconsider the *RIF Remand Order*. Common Cause et al. and Public Knowledge each assert that procedural deficiencies in the process the Commission used to adopt the *RIF Remand Order* are cause for reconsideration.[2670] Common Cause et al. argue that because the Commission failed to open the record to receive comment on the impact of the COVID-19 pandemic, it failed to adequately consider harms of reclassifying BIAS as a Title I information service on public safety, pole attachments, and the Lifeline program.[2671] In addition, Public Knowledge claims that because the Commission did not adopt a notice of proposed rulemaking prior to adopting the *RIF Remand Order*, and instead sought comment through a Bureau-issued public notice, the Commission did not follow the proper rulemaking procedures under the APA.[2672]

688. Common Cause et al., INCOMPAS, and Santa Clara also each provide several substantive arguments for why the *RIF Remand Order* should be reconsidered. Common Cause et al. argue that the *RIF Remand Order* weakened the Lifeline program at a time when it was most needed.[2673] In limiting the Lifeline program to facilities-based broadband-capable networks that support voice service, Common Cause et al. argue that the Commission failed to account for how this would affect BIAS during the COVID-19 pandemic and ignored evidence of BIAS-only providers that were seeking to enter the Lifeline program.[2674] These petitioners also take issue with the *RIF Remand Order*'s conclusion that even if a court were to reject the Commission's legal authority to provide Lifeline support to the BIAS of a common carrier, the overall benefits of reclassification would outweigh this cost.[2675] Common Cause et al. assert that this position contradicts both the Commission's policy and statutory goals of achieving universal service,[2676] and that it also goes against the purpose for which the Lifeline program was first created.[2677]

689. Santa Clara argues in its Petition that, despite the Commission's statutory mandate to

---

reinstate the open internet rules and assert jurisdiction over interconnection practices of large BIAS providers"); Public Knowledge Petition for Reconsideration at 1-2 (contending that the Commission should "withdraw the *Remand Order* and issue a proper NPRM to address the concerns remanded by the Mozilla court").

[2670] *See* Common Cause et al. Petition for Reconsideration at 2; Public Knowledge Petition for Reconsideration at 1-6.

[2671] *See* Common Cause et al. Petition for Reconsideration at 2 ("In its haste to respond to the issues remanded by the [D.C. Circuit], the Commission failed to adequately consider the harms of classifying broadband as a Title I service to public safety, pole attachment rights for competitive broadband providers, and affordable broadband for low-income households through the Lifeline program. Because the Commission failed to open the record to consider the lessons learned from, and the facts established by, the COVID-19 pandemic, its findings 'entirely fail to consider an important aspect of the problem.'"). The Wireline Competition Bureau accepted comments through April 20, 2020, and reply comments through May 20, 2020, on the Public Notice seeking to refresh the record in light of the D.C. Circuit's decision in *Mozilla*. *See RIF Remand Order*, 35 FCC Rcd at 12335, para. 17 (describing that the Bureau granted one partial 21-day extension request but denied other requests for more time).

[2672] *See* Public Knowledge Petition for Reconsideration at 1-6 (arguing that in issuing a public notice instead of a notice of proposed rulemaking, the Commission (1) failed to keep a sufficiently open mind when considering the issues remanded by the *Mozilla* court, and (2) limited itself in the *RIF Remand Order* to inadequately elaborating only on the reasoning that the *Mozilla* court rejected or improperly providing post-hoc rationalizations).

[2673] *See* Common Cause et al. Petition for Reconsideration at 2.

[2674] *See id.* at 5-6.

[2675] *See id.* at 6.

[2676] *See id.* at 6-7 ("In the 1996 Act, Congress specifically codified universal service principles on which the Commission must base policies, including access to services at affordable rates. The *Remand Order* fails to show how broadband deregulation advances the Commission's policy goal of ensuring affordable communications services.").

[2677] *Id.* ("The Commission's conclusion to prioritize broadband deregulation also runs contrary to the purpose of the Lifeline program.").

consider and promote public safety, the Commission failed to seriously consider this issue in either the *RIF Order* or the *RIF Remand Order*.[2678] Because modern public safety efforts rely on the public's access to BIAS,[2679] Santa Clara argues that the Commission needs the ability to adopt *ex ante* conduct rules in order to fulfill its public safety mandate.[2680] Santa Clara disagrees with the *RIF Order*'s analysis that consumers and edge providers will be protected from BIAS provider misconduct by a combination of market forces, consumer choice, public pressure, and *ex post* antitrust and consumer protection remedies.[2681] And it argues that instead of responding to the *Mozilla* court's criticism of this reasoning, the *RIF Remand Order* simply restates it without further analysis.[2682] Furthermore, Santa Clara criticizes the *RIF Remand Order* for the negative impact it will have on the development of public-safety-focused edge provider content.[2683] Finally, Santa Clara rejects the *RIF Remand Order*'s conclusion that reclassification of BIAS as a Title I information service will increase investment and innovation,[2684] and that these benefits will outweigh any harm to public safety,[2685] and further argues that the Commission ignored evidence of the harmful impact of reclassification on public safety.[2686]

690. INCOMPAS asserts in its Petition that the *RIF Remand Order* did not sufficiently address the *Mozilla* court's concerns regarding public safety and pole attachments.[2687] With regard to public safety, INCOMPAS argues broadly that the *RIF Remand Order* is flawed because it "turns its back

---

[2678] *See* Santa Clara Petition for Reconsideration at 2-3 ("Despite that clear mandate, the Commission wholly failed to consider public safety in the *2018 Order*. . . . While the Order on Remand pays lip service to this fact and repeatedly mentions the phrase 'public safety,' it fails to actually consider what 'public safety' communications look like in the 21st century, to account for the reality that 'lives are at stake' when public safety operations are hampered, and to acknowledge that public safety harms are irreparable once they occur.").

[2679] *Id.* at 4-7 (rejecting as insufficient the *RIF Remand Order*'s praise of networks such as FirstNet, which are dedicated for use by first responders: the existence of such networks "is irrelevant to the question *Mozilla* directed the Commission to address: whether and to what extent to modify the *2018 Order* itself due to its adverse effects on public safety and the myriad ways that public safety operations rely on mass-market BIAS").

[2680] *See id.* at 7-11 (arguing that the *RIF Remand Order* "wrongly assum[ed] that after-the-fact remedies can effectively take the place of *ex ante* rules that would prohibit the harmful conduct in the first place").

[2681] *Id.* at 8-11.

[2682] *Id.* ("[T]he *Order on Remand* essentially repeats, without new evidence or analysis, the FCC's litigation position that market forces and *ex post* remedies adequately respond to public safety concerns, as well as to edge providers' and consumers' concerns. Simply restating the FCC's litigation position is contrary to *Mozilla* and unsupported by any reasoning.").

[2683] *See id.* at 11-13 (arguing that "[l]ocal governments around the country rely on public safety-focused startup edge providers," and "[w]hen those startup edge providers' Internet traffic is blocked, throttled, or deprioritized, public safety suffers").

[2684] *Id.* at 14-18 ("[W]hile increased innovation and investment are desirable, there is simply no evidence to support the *Order on Remand*'s insistence that the *2018 Order*'s repeal of *Title II Order* Net Neutrality Rules made ISPs more likely to invest and innovate. Nor is there evidence that innovation and investment are more likely to occur without net neutrality rules, or that investment and innovation cannot coexist with such rules. The Commission's unsupported repetition of these talking points is wholly inadequate to satisfy its obligation on remand.").

[2685] *See id.* at 14.

[2686] *See id.* at 16-18.

[2687] INCOMPAS Petition for Reconsideration at 3-4 ("The *Remand Order* did not sufficiently explain how reclassification of BIAS will impact the remanded issues. Instead, it restated its positions from [the *RIF Order*] and overlooked harms explained in the record."). INCOMPAS notes that while it supports the Commission's reconsideration of the *RIF Remand Order* due to the harms to Lifeline consumers, it focuses its petition on public safety and pole attachment concerns because those are the issues that directly relate to the issues that its member companies face. *Id.* at 3 n.6.

on the historical role of the Commission to protect the public's ability to connect without permission.'"[2688] More specifically, INCOMPAS asserts that the *RIF Remand Order* relies on unsubstantiated claims of increased investment to support its conclusions that the benefits of Title I classification outweigh potential public safety concerns.[2689]  INCOMPAS also argues that the Commission wrongly dismisses the potential harms to public safety submitted into the record[2690] and overlooks the importance of having an expert agency with the authority to create *ex ante* rules to protect the public.[2691]  And in reaching its conclusions, the petitioner criticizes the Commission for not properly accounting for the lack of competition in the residential BIAS market or the harms that large BIAS providers will cause consumers and edge providers.[2692]  With respect to pole attachments, INCOMPAS contends that the *RIF Remand Order*'s examination of the issue similarly does not comply with the *Mozilla* court's instructions.[2693]  INCOMPAS takes issue with the inadequate consideration the *RIF Remand Order* gives to how reclassification will eliminate BIAS-only providers' pole attachment rights;[2694] rejects the *RIF Remand Order*'s argument that this lack of pole attachment rights under section 224 will allow BIAS-only providers to enter into more flexible and innovative arrangements;[2695] and argues that, contrary to its suggestion otherwise, the *RIF Remand Order* does not resolve the issue of state authority to regulate pole attachments.[2696]

691.    In light of the Commission's actions today, we grant in large part and otherwise dismiss as moot each of the four Petitions for Reconsideration of the *RIF Remand Order*.  The Commission will consider a petition for reconsideration when the petitioner shows either a material error in the Commission's original order, or raises additional facts or arguments, not known or existing at the time of the petitioner's last opportunity to present such matters.[2697]  Petitions for reconsideration which rely on facts or arguments not previously presented to the Commission but which were known or existing at the time of the petitioner's last opportunity to present such matters may nonetheless be granted if the

---

[2688] *Id.* at 4.

[2689] *Id.* at 6-7 ("The FCC's decision to reclassify BIAS relies on an unsubstantiated claim of increased investments.").

[2690] *Id.* at 8-12 (writing that, "the Commission disregards real harms to public safety in its cost-benefit analysis").

[2691] *Id.* at 12-14 ("The 'wait-and-see' approach that the Commission condones here is very dangerous for public safety.  Issuing ex-post rules that will necessarily come from RIFO will not allow the Commission to deal with public safety issues before or as they arise, and forcing consumers to wait for a response after an emergency occurs is dangerous and unacceptable.").

[2692] *See id.* at 14-18.

[2693] *See id.* at 18 ("The *Mozilla* Court directed the FCC to 'grapple with the lapse in legal safeguards' that results from reclassification eliminating section 224 pole attachment rights of BIAS-only providers that, by definition, lack a commingled telecommunications or cable service.  The Commission's reasoning in the *Remand Order* does not satisfy the Court's instructions.").

[2694] See *id.* at 18-20 (rejecting the *RIF Remand Order*'s suggestion that BIAS-only providers could still have section 224 protections by combining cable or telecommunications services with their broadband service, writing that "the FCC is asking BIAS-only providers to change their business model to gain their statutory rights by either becoming a telecommunications provider or partnering with one—that is not an easy, or appropriate, ask for the Commission to make").

[2695] *Id.* at 20-21 (arguing that "if this were true, Congress would not have created section 224 rights intended to enable network deployment").

[2696] *Id.* at 21-22 (arguing that the *RIF Remand Order*'s reliance on state reverse-preemption is inadequate because some state codes that reverse-preempt specifically rely on section 224 as a reference point and some states have regulations that prevent their public utilities commissions from exercising authority over BIAS).

[2697] *See* 47 CFR § 1.106(c)-(d); *see also WWIZ, Inc. et al.*, Docket No. 14537 et al., Memorandum Opinion and Order, 37 F.C.C. 685, 686 (1964), *aff'd sub nom. Lorain Journal Co. v. FCC*, 351 F.2d 824 (D.C. Cir. 1965), *cert. denied*, *W.W.I.Z., Inc. et al. v. FCC*, 383 U.S. 967 (1966), *reh'g denied*, *W.W.I.Z., Inc. et al. v. FCC*, 384 U.S. 947 (1966).

Commission determines that consideration of the facts and arguments relied on is required in the public interest.[2698] While the Petitioners raise some arguments that existed at the time of the filing of their Petitions, we find it would serve the public interest to consider them today, when we have fully considered how the Title II classification and our open Internet rules impact public safety, pole attachments, and Lifeline service. Indeed, we explain above how classification of BIAS as an information service is inconsistent with the best interpretation of the statute and cannot be reconciled with our responsibilities with regard to public safety, pole attachments, and universal service support to low-income consumers. Thus, to the extent the Petitions requested that the Commission reconsider and/or vacate the *RIF Remand Order* or *RIF Order* itself, we do so here. As a procedural matter, we find that we have effectively provided the relief sought by each of the Petitions through a combination of the *2023 Open Internet NPRM* and today's actions. To the extent the Petitions sought readoption or reimposition of open Internet conduct rules consistent with the *2015 Open Internet Order* and reclassification and/or reversion of BIAS as a Title II telecommunications service, we find that we have done so today. As a substantive matter, for the reasons explained above, we agree with the petitioners that the Commission's analysis in the *RIF Order* and *RIF Remand Order* was insufficient in addressing the public safety, pole attachment, and Lifeline-related repercussions of classifying BIAS as a Title I information service.[2699] To the extent the Petitions sought a new open-Internet-related rulemaking in response to the *Mozilla* remand, we dismiss them as moot in light of the rulemaking proceeding we have conducted to consider precisely those issues. To the extent concerns or issues raised in the Petitions remain, we dismiss them as moot on the basis that the adoption of today's Order effectively replace and overturn the *RIF Order* and *RIF Remand Order*.[2700]

## VIII. SEVERABILITY

692. We consider the actions we take today to be separate and severable such that in the event any particular action or decision is stayed or determined to be invalid, we would find that the resulting regulatory framework continues to fulfill our goal of preserving and protecting the open Internet and that it shall remain in effect to the fullest extent permitted by law. Though complementary, each of the rules, requirements, classifications, definitions, and other provisions that we establish in this Order operate independently to promote and protect the open Internet, safeguard national security and public safety, and promote the deployment of broadband on a timely basis.

693. *Severability of Open Internet Rules from One Another.* The open Internet rules we adopt today each operate independently to protect the open Internet, promote the virtuous cycle, and encourage the deployment of broadband on a timely basis. The severability of the Commission's open Internet rules was recognized by the *Verizon* court, which held that the Commission's transparency rule established in the *2010 Open Internet Order* was severable from the nondiscrimination and no-blocking rules also established in that *Order*.[2701] We continue to apply that view to the transparency, no-blocking, no-throttling, no-paid prioritization, and general conduct rules we adopt today. While today's newly adopted rules put in place a suite of open Internet protections, we find that each of these rules, on its own, serves to protect the open Internet. Each rule protects against different potential harms and thus operates semi-independently from one another. For example, the no-blocking rule protects consumers' right to access

---

[2698] *See* 47 CFR § 1.106(c)(2); *see also Amendment of Section 73.202(b), Table of Allotments, FM Broadcast Stations (Scranton and Surfside Beach, South Carolina)*, MM Docket No. 87-434, Memorandum Opinion and Order, 4 FCC Rcd 2366 (MB 1989).

[2699] *See supra* Section III.A 7 (Supporting Access to Broadband Internet Access Service); Section III.H.

[2700] The *RIF Order* was vacated in part and otherwise remanded to the Commission by the D.C. Circuit. *Mozilla*, 940 F.3d at 86 (vacating "the portion of the [*RIF Order*] purporting to preempt 'any state or local requirements that are inconsistent with [the Commission's] deregulatory approach'" (alteration in original)). Because the majority of the *RIF Order* framework thus remained in effect, our action on reconsideration has only prospective consequences, rather than having retrospective effect of the sort not possible through our new rulemaking action here.

[2701] *Verizon*, 740 F.3d at 659.

lawful content, applications, and services by constraining BIAS providers' incentive to block competitors' content.[2702] The no-throttling rule serves as an independent supplement to this prohibition on blocking by banning the impairment or degradation of lawful content that does not reach the level of blocking.[2703] Should the no-blocking rule be declared invalid, the no-throttling rule would still afford consumers and edge providers significant protection, and thus could independently advance the goals of the open Internet, if not as comprehensively were the no-blocking rule still in effect. The same reasoning holds true for the ban on paid prioritization, which protects against particular harms independent of the other bright-line rules. Finally, the no-unreasonable interference/disadvantage standard governs BIAS provider conduct generally, providing independent protections against those three harmful practices along with other and new practices that could threaten to harm Internet openness. Were any of these individual rules held invalid, the resulting regulations would remain valuable tools for protecting the open Internet.

694.    *Severability of Rules Governing Mobile/Fixed Providers.* We have also made clear today that our rules apply to both fixed and mobile BIAS.[2704] These are two different services, and thus the application of our rules to either service functions independently. Accordingly, we find that should application of our open Internet rules to either fixed or mobile BIAS be held invalid, the application of those rules to the remaining fixed or mobile service would still fulfill our regulatory purposes and remain intact.

## IX.    PROCEDURAL MATTERS

695.    *Paperwork Reduction Act Analysis.* This Order may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. All such requirements will be submitted to OMB for review under Section 3507(d) of the PRA. OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198,[2705] we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

696.    In this Order, we adopt the transparency rule originally adopted in 2010 and reaffirmed in 2015, which caters to a broader relevant audience of interested parties than the audience identified in the *RIF Order.* We reinstate enhancements to the transparency rule disclosures pertaining to network practices and performance characteristics. Specifically, with regard to network practices, we reaffirm that the transparency rule requires that BIAS providers disclose any practices applied to traffic associated with a particular user or user group (including any application-agnostic degradation of service to a particular end user), and requires that disclosures of user-based or application-based practices must include the purpose of the practice; which users or data plans may be affected; the triggers that activate the use of the practice; the types of traffic that are subject to the practice; and the practice's likely effects on end users' experiences. In addition, we require BIAS providers to disclose any zero-rating practices.

697.    We reinstate the enhanced performance characteristics disclosures eliminated in 2017 to require BIAS providers to disclose packet loss and to require that performance characteristics be reported with greater geographic granularity and be measured in terms of average performance over a reasonable period of time and during times of peak usage. We also require BIAS providers to directly notify end users if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion, that is likely to have a significant impact on the end user's use of the service. We

---

[2702] *See supra* section V.B.1.a (Preventing Blocking of Lawful Content, Applications, Services, and Non-Harmful Devices).

[2703] *See supra* Section V.B.1.b (Preventing Throttling of Lawful Content, Applications, Services, and Non-Harmful Devices).

[2704] *See supra* Section III.D.1 (defining BIAS).

[2705] *See* 44 U.S.C. § 3506(c)(4).

temporarily exempt (with the potential to become permanent) BIAS providers that have 100,000 or fewer BIAS subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider, from the requirements to disclose packet loss and report their performance characteristics with greater geographic granularity and in terms of average performance over a reasonable period of time and during times of peak usage, as well as from the direct notification requirement to provide them additional time to develop appropriate systems. We delegate to the Consumer and Governmental Affairs Bureau (CGB) the authority to determine whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We require providers to disclose all information required by the transparency rule on a publicly available, easily accessible website and that all transparency disclosures made pursuant to the transparency rule also be made available in machine-readable format.

698.    In addition, to provide upfront clarity, guidance, and predictability, we adopt an updated process for providers seeking an advisory opinion from Commission staff regarding the open Internet rules, through which any BIAS provider may request an advisory opinion regarding the permissibility of its proposed policies and practices affecting access to BIAS.

699.    *Regulatory Flexibility Act.*  The Regulatory Flexibility Act of 1980, as amended (RFA),[2706] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[2707]  Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of the rule and policy changes adopted in this Order on small entities. The FRFA is set forth in Appendix B.

700.    *Congressional Review Act.*  The Commission has determined, and  the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget concurs, that this rule is "major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

701.    *People with Disabilities.*  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the FCC's Consumer and Governmental Affairs Bureau at 202-418-0530.

702.    *Additional Information.*  For additional information on this proceeding, contact the Wireline Competition Bureau at OpenInternet2023@fcc.gov.

# X.    ORDERING CLAUSES

703.    Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 2, 3, 4, 10, 13, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, and 602 of the Communications Act of 1934, as amended, and section 706 of the Telecommunications Act of 1996, as amended, 47 U.S.C §§ 151, 152, 153, 154(i)-(j), 160, 163, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, 522, 1302, that this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration IS ADOPTED and that Parts 8 and 20 of the Commission's Rules, 47 CFR pts. 8, 20, ARE AMENDED as set forth in Appendix A.

704.    IT IS FURTHER ORDERED, pursuant to sections 1, 4(i), 4(j), 214, 215, 218, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 214, 215, 218, 403, and sections 1.1, 2.903, 63.12, 63.18, and 63.21 of the Commission's rules, 47 CFR §§ 1.1, 2.903, 63.12, 63.18, 63.21, that blanket section 214 authority for the provision of broadband Internet access service is granted to any entity currently providing or seeking to provide broadband Internet access service except

---

[2706] *See* 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601–612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2707] 5 U.S.C. § 605(b).

for China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC and their current and future affiliates and subsidiaries.

705.     IT IS FURTHER ORDERED, pursuant to sections 1, 4(i), 4(j), 214, 215, 218, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 214, 215, 218, 403, and sections 1.1, 2.903, 63.12, 63.18, and 63.21 of the Commission's rules, 47 CFR §§ 1.1, 2.903, 63.12, 63.18, 63.21, that China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC, and their affiliates and subsidiaries as defined pursuant to 47 CFR § 2.903(c), shall discontinue any and all provision of BIAS no later than sixty (60) days after the effective date of this Order as established in the *Federal Register*.

706.     IT IS FURTHER ORDERED, pursuant to sections 1, 2, 4(i), 4(j), 160, 201-205, 211, 214, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 160, 201-205, 211, 214, 303(r); sections 1-6 of the Cable Landing License Act of 1921, 42 Stat. 8, 47 U.S.C. §§ 34-39; section 402(b)(2)(B), (c) of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 47 U.S.C. §§ 204 note, 208 note, 214 note; and section 1.3 of the Commission's rules, 47 CFR § 1.3, that sections 1.763, 43.82, 63.03-63.04, 63.09-63.14, 63.17-63.18, 63.20-63.25, 63.50-63.53, 63.65, 63.66, 63.100, and 63.701-63.702 of the Commission's rules, 47 CFR §§ 1.763, 43.82, 63.03-63.04, 63.09-63.14, 63.18, 63.20-63.25, 63.50-63.53, 63.65, 63.66, 63.100, 63.701-63.702, are waived as applied to the provision of broadband Internet access service.

707.     IT IS FURTHER ORDERED that a copy of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration shall be sent by Certified Mail, Return Receipt Requested, and by regular first-class mail to the addresses of record of China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC, and shall be posted in the Office of the Secretary pursuant to section 413 of the Communications Act of 1934, as amended, 47 U.S.C. § 413.

708.     IT IS FURTHER ORDERED, pursuant to sections 1, 2, 4(i), 4(j), 10, 303(r), 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 160, 303(r), 309, 310, 403, and sections 1.3 and 1.5000-5004 of the Commission's rules, 47 CFR §§ 1.3, 1.5000-1.5004, that the requirements to request a declaratory ruling pursuant to section 310(b)(3)-(4) of the Act and sections 1.5000-1.5004 of the Commission's rules are waived for common carrier wireless licensees that are providing *only* broadband Internet access service pending the adoption of any rules for broadband Internet access service.

709.     IT IS FURTHER ORDERED, pursuant to sections 1, 2, 4(i), 4(j), 222, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 222, 303(r), and section 1.3 of the Commission's rules, 47 CFR § 1.3, that Part 64, Subpart U of the Commission's rules is waived as applied to the provision of  broadband Internet access service.

710.     IT IS FURTHER ORDERED that this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration SHALL BE EFFECTIVE 60 days after publication in the *Federal Register*, except that those amendments which contain new or modified information collection requirements will not become effective until after the Office of Management and Budget completes any review that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act.  The Commission directs the Wireline Competition Bureau to announce the effective date for those amendments by subsequent Public Notice.  It is our intention in adopting the foregoing Declaratory Ruling, Order, Report and Order, and Order on Reconsideration that, if any provision of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, or the application thereof to any person or circumstance, is held to be unlawful, the remaining portions of such Declaratory Ruling, Order, Report and Order, and Order on Reconsideration not be deemed unlawful, and the application of such Declaratory Ruling, Order, Report and Order, and Order on Reconsideration to other person or circumstances, shall remain in effect to the fullest extent permitted by law.

711.     IT IS FURTHER ORDERED that the Office of the Secretary, Reference Information Center SHALL SEND a copy of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, including the Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

712.     IT IS FURTHER ORDERED that the Office of the Managing Director, Performance and Program Management, SHALL SEND a copy of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

713.     IT IS FURTHER ORDERED that, pursuant to 47 CFR § 1.4(b)(1), the period for filing petitions for reconsideration or petitions for judicial review of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration will commence on the date that a summary of this Declaratory Ruling, Order, Report and Order, and Order on Reconsideration is published in the *Federal Register*.

714.     IT IS FURTHER ORDERED that the Petitions for Reconsideration of the *Restoring Internet Freedom Remand Order* are GRANTED to the extent described herein and otherwise DISMISSED AS MOOT.


FEDERAL COMMUNICATIONS COMMISSION



Marlene H. Dortch
Secretary

**APPENDIX A**

**Final Rules**

The Federal Communications Commission amends Chapter I of Title 47 of the Code of Federal Regulations as follows:

1.        Under the authority of 47 U.S.C §§ 151, 152, 153, 154(i)-(j), 160, 163, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, 522, 1302, revise the heading for subchapter A to read as follows:

**Subchapter A** — Internet Openness

**Part 8 – SAFEGUARDING AND SECURING THE OPEN INTERNET**

2.        The authority citation for part 8 is revised to read as follows:

**Authority:** 47 U.S.C. 151, 152, 153, 154, 163, 201, 202, 206, 207, 208, 209, 216, 217, 257, 301, 302a, 303, 304, 307, 309, 312, 316, 332, 403, 501, 503, 522, 1302, 1753.

3.        Revise the heading for part 8 to read as set forth above.

**§ 8.1 [Redesignated as § 8.2]**

4.        Redesignate § 8.1 as § 8.2.

5.        Add new § 8.1 to read as follows:

**§ 8.1 Definitions.**

(a) [Reserved]

(b) *Broadband Internet access service.* A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part.

(c) *Edge provider.* Any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

(d) *End user.* Any individual or entity that uses a broadband Internet access service.

(e) *Reasonable network management.* A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service.

**§ 8.2 [Amended]**

6.        Amend newly redesignated § 8.2 by removing paragraph (c).

7.        Delayed indefinitely, further amend newly redesignated § 8.2 by:

a.    Revising the introductory text of paragraph (a);

b.    Removing paragraph (a)(7); and

c.    Revising paragraph (b).

The revisions read as follows:

## § 8.2 Transparency.

(a) A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings. Disclosures made under this paragraph (a) must be displayed on the broadband Internet access service provider's website in a machine-readable format.

* * * * *

(b) Compliance with paragraphs (a)(1), (2), and (4) through (6) of this section for providers with 100,000 or fewer subscriber lines is required as of October 10, 2024, and for all other providers is required as of April 10, 2024, except that compliance with the requirement in paragraph (a)(2) of this section to make labels accessible in online account portals will not be required for all providers until October 10, 2024. Compliance with paragraph (a)(3) of this section is required for all providers as of October 10, 2024.

8.    Add § 8.3 to read as follows:

## § 8.3 Conduct-based rules.

(a) *No blocking.* A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

(b) *No throttling.* A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management.

(c) *No paid prioritization.*

(1) A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not engage in paid prioritization. "Paid prioritization" refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either:

(i) In exchange for consideration (monetary or otherwise) from a third party; or

(ii) To benefit an affiliated entity.

(2) The Commission may waive the ban on paid prioritization only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the Internet.

(d) *No unreasonable interference or unreasonable disadvantage standard for Internet conduct.*

(1) Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage:

(i) End users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice; or

(ii) Edge providers' ability to make lawful content, applications, services, or devices available to end users.

(2) Reasonable network management shall not be considered a violation of this paragraph (d).

(e) *Effect on other obligations or authorizations.* Nothing in this part supersedes any obligation or

authorization a provider of broadband Internet access service may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so. Nothing in this part prohibits reasonable efforts by a provider of broadband Internet access service to address copyright infringement or other unlawful activity.

9.     Add § 8.6 to read as follows:

**§ 8.6 Advisory opinions.**

(a) *Procedures*.

(1) Any entity that is subject to the Commission's open Internet rules in this part may request an advisory opinion from the Enforcement Bureau regarding the permissibility of its proposed policies and practices relating to broadband Internet access service. Requests for advisory opinions may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

(2) The Enforcement Bureau may, in its discretion, determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.

(3) Requests for advisory opinions must relate to a proposed policy or practice that the requesting party intends to pursue. The Enforcement Bureau will not respond to requests for opinions that relate to ongoing or prior conduct, and the Bureau may initiate an enforcement investigation to determine whether such conduct violates the open Internet rules in this part. Additionally, the Bureau will not respond to requests if the same or substantially the same conduct is the subject of a current government investigation or proceeding, including any ongoing litigation or open rulemaking at the Commission.

(4) Requests for advisory opinions must be accompanied by all material information sufficient for Enforcement Bureau staff to make a determination on the policy or practice for which review is requested. Requesters must certify that factual representations made to the Bureau are truthful and accurate, and that they have not intentionally omitted any information from the request. A request for an advisory opinion that is submitted by a business entity or an organization must be executed by an individual who is authorized to act on behalf of that entity or organization.

(5) Enforcement Bureau staff will have discretion to ask parties requesting advisory opinions, as well as other parties that may have information relevant to the request or that may be impacted by the proposed conduct, for additional information that the staff deems necessary to respond to the request. Such additional information, if furnished orally or during an in-person conference with Bureau staff, shall be promptly confirmed in writing. Parties are not obligated to respond to staff inquiries related to advisory opinions. If a requesting party fails to respond to a staff inquiry, then the Bureau may dismiss that party's request for an advisory opinion. If a party voluntarily responds to a staff inquiry for additional information, then it must do so by a deadline to be specified by Bureau staff. Advisory opinions will expressly state that they rely on the representations made by the requesting party, and that they are premised on the specific facts and representations in the request and any supplemental submissions.

(b) *Response*. After review of a request submitted under this section, the Enforcement Bureau will:

(1) Issue an advisory opinion that will state the Bureau's present enforcement intention with respect to whether or not the proposed policy or practice detailed in the request complies with the Commission's open Internet rules in this part;

(2) Issue a written statement declining to respond to the request; or

(3) Take such other position or action as it considers appropriate.  An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party.  Advisory opinions will be issued without prejudice to the Enforcement Bureau or the Commission to reconsider the questions involved, or to rescind or revoke the opinion.  Advisory opinions will not be subject to appeal or further review.

(c) *Enforcement effect*.  The Enforcement Bureau will have discretion to indicate the Bureau's lack of enforcement intent in an advisory opinion based on the facts, representations, and warranties made by the requesting party.  The requesting party may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion.  The Bureau will not bring an enforcement action against a requesting party with respect to any action taken in good faith reliance upon an advisory opinion if all of the relevant facts were fully, completely, and accurately presented to the Bureau, and where such action was promptly discontinued upon notification of rescission or revocation of the Commission's or Bureau's approval.

(d) *Public disclosure*.  The Enforcement Bureau will make advisory opinions available to the public on the Commission's website.  The Bureau will also publish the initial request for guidance and any associated materials.  Parties soliciting advisory opinions may request confidential treatment of information submitted in connection with a request for an advisory opinion pursuant to § 0.459 of this chapter.

(e) *Withdrawal of request*.  Any requesting party may withdraw a request for review at any time prior to receipt of notice that the Enforcement Bureau intends to issue an adverse opinion, or the issuance of an opinion.  The Enforcement Bureau remains free, however, to submit comments to such requesting party as it deems appropriate.  Failure to take action after receipt of documents or information, whether submitted pursuant to this procedure or otherwise, does not in any way limit or stop the Bureau from taking such action at such time thereafter as it deems appropriate.  The Bureau reserves the right to retain documents submitted to it under this procedure or otherwise and to use them for all governmental purposes.

## PART 20 – COMMERCIAL MOBILE SERVICES

10.    The authority citation for part 20 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152(a), 154(i), 155, 157, 160, 201, 214, 222, 251(e), 301, 302, 303, 303(b), 303(r), 307, 307(a), 309, 309(j)(3), 316, 316(a), 332, 610, 615, 615a, 615b, and 615c, unless otherwise noted.

11.    Amend § 20.3 by:

a.  Revising the definition for "Commercial mobile radio service";

b.  Removing the definition of "Interconnected Service" and adding the definition for "Interconnected service" in its place; and

c.  Removing the definition for "Public Switched Network" and adding the definition for "Public switched network" in its place.

The revisions and additions read as follows:

## § 20.3 Definitions.

\* \* \* \* \*

*Commercial mobile radio service.*  A mobile service that is:

(1)

(i) Provided for profit, *i.e.*, with the intent of receiving compensation or monetary gain;

(ii) An interconnected service; and

(iii) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or

(2) The functional equivalent of such a mobile service described in paragraph (1) of this definition, including a mobile broadband Internet access service as defined in § 8.1 of this chapter.

(3) A variety of factors may be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: Consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service, would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

(4) Unlicensed radio frequency devices under part 15 of this chapter are excluded from this definition of *commercial mobile radio service*.

* * * * *

*Interconnected service.*  A service:

(1) That is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from other users on the public switched network; or

(2) For which a request for such interconnection is pending pursuant to section 332(c)(1)(B) of the Communications Act, 47 U.S.C. 332(c)(1)(B). A mobile service offers interconnected service even if the service allows subscribers to access the public switched network only during specified hours of the day, or if the service provides general access to points on the public switched network but also restricts access in certain limited ways. Interconnected service does not include any interface between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes.

* * * * *

*Public switched network.*  The network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that uses the North American Numbering Plan, or public IP addresses, in connection with the provision of switched services.

* * * * *

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Safeguarding and Securing the Open Internet Notice of Proposed Rulemaking* (*2023 Open Internet NPRM*), released October of 2023.[2] The Commission sought written public comment on the proposals in the *2023 Open Internet NPRM*, including comment on the IRFA. The comments received are discussed below in Section B. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration**

2.        Broadband Internet access service (BIAS) connections, not unlike other essential utilities, have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression. The COVID-19 pandemic revealed that without a BIAS connection, consumers could not fully participate in vital aspects of daily life. We find, and the record overwhelmingly reflects, that BIAS is not a luxury, but a necessity for education, communication, healthcare, and participation in the economy. The actions taken today to restore the Commission's Title II authority over BIAS, reclassify mobile BIAS as a commercial mobile service, and adopt open Internet conduct rules are necessary to help ensure the health, vitality, and security of the entire Internet ecosystem.

3.        *Need for, and objective of, reclassification*. Our classification decision today reestablishes the Commission's authority to protect consumers and resolves the pending challenges to the Commission's 2017 classification decision. We conclude that BIAS is best classified as a telecommunications service based on an analysis of the statutory definitions for "telecommunications service"[4] and "information service"[5] established in the 1996 Act. This conclusion reflects the best reading of the statutory terms applying basic principles of textual analysis to the text, structure, and context of the Act in light of (1) how consumers understand BIAS and (2) the factual particulars of how the technology that enables the delivery of BIAS functions. We also conclude that BIAS is not best classified as an information service. Classifying BIAS as a telecommunications service accords with Commission and court precedent and is fully and sufficiently justified under the Commission's longstanding authority and responsibility to classify services subject to the Commission's jurisdiction, as necessary. Additionally, as the expert agency entrusted by Congress to oversee our country's communications networks and services, our experience demonstrates that for the Commission to protect consumers and ensure a safe, reliable, and open Internet, it must exercise its authority to do so under Title II of the Communications Act. As such, we also separately conclude that multiple policy considerations, relating to Internet openness, national security, public safety, consumer privacy, broadband deployment, and disability access, each independently and collectively, support the reclassification of BIAS as a telecommunications service.

4.        We also reclassify mobile BIAS as a commercial mobile service. As we explain in the Declaratory Ruling, reclassifying mobile BIAS as a commercial mobile service is necessary to avoid the

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C § 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-12 1, Title II, 110 Stat. 857 (1996).

[2] *Safeguarding and Securing the Open Internet,* WC Docket No. 23-320, Notice of Proposed Rulemaking, FCC 23-83, at Appx. B (Oct. 19, 2023) (*2023 Open Internet NPRM*).

[3] *See* 5 U.S.C. § 604.

[4] 47 U.S.C. § 153(53).

[5] *Id.* § 153(24).

statutory contradiction that would result if the Commission were to conclude that mobile BIAS is a telecommunications service but not a commercial mobile service. Moreover, as we discuss in the Declaratory Ruling, because consumers regularly use both fixed and mobile broadband, it is critical to protect both services equally.

5. *Need for, and objectives of, the open Internet rules*. We affirm our belief from the *2023 Open Internet NPRM* that baseline Internet conduct rules for BIAS providers are necessary to enable the Commission to prevent and address conduct that harms consumers and competition.[6] BIAS is an essential service that is critical to so many aspects of everyday life, from healthcare and education to work, commerce, and civic engagement. Because of its importance, we conclude that rules are necessary to promote free expression, encourage innovation, competition, and consumer demand, and protect public safety. As the Commission found in both 2010 and 2015, BIAS providers continue to have the incentive and ability to harm Internet openness. We find that the framework that the Commission adopted in 2017 provides insufficient protection from these dangers, and that a safe, secure, and open Internet is too important to consumers and innovators to leave unprotected. As in 2015, we find that conduct-based rules targeting specific practices are necessary, and accordingly adopt bright-line rules to prohibit blocking, throttling, and paid prioritization by providers of both fixed and mobile broadband Internet access service.

6. First, we reimpose a bright-line rule that prohibits providers from blocking lawful content, applications, services, or non-harmful devices, subject to reasonable network management. This "no-blocking" principle has long been a cornerstone of the Commission's policies, and in the Internet context, dates back to the Commission's *Internet Policy Statement*. Second, we reimpose a separate bright-line rule prohibiting BIAS providers from impairing or degrading lawful Internet traffic on the basis of content, application, service, or use of non-harmful device, subject to reasonable network management. We interpret this prohibition to include, for example, any conduct by a BIAS provider that impairs, degrades, slows down, or renders effectively unusable particular content, services, applications, or devices, that is not reasonable network management. We find this prohibition to be a necessary complement to the no-blocking rule. Without an equally strong no-throttling rule, BIAS providers might be able to thwart the no-blocking rule by throttling or degrading traffic that is essentially blocking but that does not quite meet the no-blocking standard. Third, we reimpose the prohibition on paid or affiliated prioritization practices, subject to a narrow waiver process. As in 2015, we find that a prohibition on paid prioritization is necessary because preferential treatment arrangements have the potential to create a chilling effect, disrupting the Internet's virtuous cycle of innovation, consumer demand, and investment.

7. In addition to the three bright-line rules, we also reinstate a no-unreasonable interference/disadvantage standard, under which the Commission can prohibit practices that unreasonably interfere with the ability of consumers or edge providers to select, access, and use broadband Internet access service to reach one another, thus causing harm to the open Internet. This no-unreasonable interference/disadvantage general conduct standard will operate on a case-by-case basis, applying a non-exhaustive list of factors, and is designed to evaluate other current or future BIAS provider policies or practices—not covered by the bright-line rules— and prohibit those that harm the open Internet. While we believe that our prohibitions on blocking, throttling, and paid prioritization will prevent many harms to the open Internet, we believe that reimplementing the general conduct standard is a necessary backstop to ensure that BIAS providers do not find technical or economic ways to evade our bright-line rules.

8. We also restore the text of the transparency rule to its original format adopted in 2010 and reaffirmed in 2015. We believe this change is necessary in order to encompass a broader relevant audience of interested parties than that captured by the *RIF Order* and more appropriately reflects the nature of the current transparency landscape where the broadband labels serve as a quick reference for consumers, and the transparency rule enables a deeper dive. Furthermore, we made minor revisions to the disclosures required by the transparency rule to better enable end-user consumers to make informed

---

[6] *2023 Open Internet NPRM* at 59, para. 117.

choices about broadband services and similarly to provide edge providers with the information necessary to develop new content, applications, services, and devices that promote the virtuous cycle of investment and innovation. In revising the specific transparency requirements, we contemplated the recently adopted broadband label rules to minimize unnecessary duplication and improve efficiency for providers.

B.    **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

9.    In response to the *2023 Open Internet NPRM*, four entities filed comments or reply comments that specifically addressed the IRFA to some degree: WISPA, NTCA—the Rural Broadband Association (NTCA), ACA Connects, and NRECA.[7] Some of these entities, as well as others, filed comments or reply comments that more generally considered the small business impact of our proposals.[8] We considered the proposals and concerns described by the various commenters in adopting the Order and accompanying rules.

10.    Some commenters expressed concern that reclassification and reimplementation of the open Internet rules would be particularly onerous for small providers and suggest that the Commission issue a blanket exemption for small providers or from "all but the most essential" rules.[9] ACA Connects urges the commission to delay application of the rules on small providers for at least six months or one year, forbear from applying sections 201, 202, and 208 to small providers, or defer sections 201 and 202 obligations into another proceeding to specifically define and limit the obligations for small providers.[10] NFIB recommends that the Commission add certain language to our rules to protect small providers.[11] NTCA states that even with proposed forbearance, small BIAS providers will face significant economic burdens, and there is no marketplace justification for regulatory intervention.[12] WISPA urges the Commission to issue a Further Notice that examines whether to exempt small providers from the bright-line rules, general conduct rule, and transparency enhancements and to apply any exemptions to BIAS providers with 250,000 or fewer subscribers.[13] WISPA also requests that the Commission reconsider

---

[7] WISPA Comments at 46-47, 74-78; NTCA Reply Comments at 8; ACA Connects Comments at 44; NRECA Comments at 5-6.

[8] NFIB Comments at 2-4 ("The Regulatory Flexibility Act calls for agencies to consider the needs of America's small business when the agencies make rules."); R Street Reply at 5 (urging us to consider the downstream effect of the economic burdens of reclassification on small providers); INCOMPAS Comments at 31-33 (advocating that the Commission consider the effects of additional regulations on small providers); Small Business & Entrepreneurship Council at 3-4 (stating that costs for, and time spent on, compliance leave fewer resources and cause a disproportionate burden for small to mid-size businesses); Outpost/Quiet Apr. 18, 2024 *Ex Parte* at 5 (expressing support for bright-line rules because "[s]tartups, federated and decentralized apps, and small businesses don't have resources to litigate case-by-case fights at the FCC" and "[s]tartups (and their investors) need certainty in advance"); Letter from Laurence Brett Glass, d/b/a/ LARIAT, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-320 (filed Apr. 19, 2024) (LARIAT Apr. 19, 2024 *Ex Parte*).

[9] *See* WISPA Comments at 73-78; *see also* NRECA Comments at 4; LARIAT Apr. 19, 2024 *Ex Parte* at 1-2 (raising concerns about the Order's application to small businesses and requesting that the Commission exempt small businesses from the general conduct rule, the transparency enhancements, and restrictions on zero rating, network slicing, and bulk billing of multi-tenant dwellings).

[10] ACA Connects Comments at 45 (explaining the specific actions the Commission can take to limit the impact on small providers); *see also* ACA Connects Apr. 16, 2024 *Ex Parte* at 1-2, 4 (urging the Commission to defer enforcement of sections 201 and 202 of the Act and the general conduct rule for at least six months from the effective date of the Order).

[11] NFIB Comments at 3-4 (requesting that the commission provide specific educational materials for small businesses, take into the size, resources, and good-faith efforts to comply, provide written notice to small businesses and an opportunity to correct the violation before enforcement, and take into consideration the extent to which a violation "inflicted a commercial injury on one or more small businesses.").

[12] NTCA Comments at 6-7, 28; *see also* NTCA Reply at 2-5; LARIAT Apr. 19, 2024 *Ex Parte* at 1.

[13] WISPA Apr. 16, 2024 *Ex Parte* at 2

application of sections 206, 207, 208, 214, 218 and 220 of the Act to small providers and permanently exempt small BIAS-only providers from the Commission's transfer-of-control requirements.[14] We carefully considered the effects reclassification and our rules would have on all BIAS providers and small entities, and while we did not create exemptions for small providers, we included temporary exemptions (with the potential to become permanent) for providers with 100,000 or fewer subscribers from the performance characteristic reporting enhancements and the direct notification requirement under the transparency rule, which will have the effect of benefitting many small providers. We do not believe exemptions beyond that which we have provided are necessary or in the public interest, particularly a blanket exemption from all rules, as the record fails to demonstrate customers of small BIAS providers should be afforded less protection than those of larger BIAS providers. Furthermore, as we noted above, in certain cases, reclassification will afford small providers additional rights (e.g., pole attachment rights) to which they are currently not entitled.

11. NRECA urges the commission to define "small entities" as those with 100,000 broadband customers or less rather than those with 1,500 employees or less as we proposed in our IRFA.[15] NRECA suggests that our proposed definition is problematic because it would "create a situation where a small-entity exception would swallow the general rule."[16] According to NRECA, because most covered entities would fall within the "small entity" category under the SBA size thresholds used in the IRFA, these thresholds would "limit the Commission's ability to implement small-entity exceptions that would be meaningful for truly small entities."[17] NTCA echoed NRECA's concerns regarding the definition.[18] WISPA, however, does not agree with NRECA's proposed definition.[19] We decline commenters' invitation to deviate from the SBA size standards for purposes of the regulatory flexibility analysis. NRECA does not argue that the size standard is inappropriate for regulatory flexibility analysis purposes. Rather, it focuses on exemptions from the rules adopted herein "and for subsequent Title II regulations."[20] As noted above, however, we have largely declined to provide exemptions from the rules adopted in this Order, as customers of all BIAS providers should be afforded their protection.[21]

## C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

12. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the

---

[14] *Id.*

[15] NRECA Comments at 5-6.

[16] *Id.* at 6.

[17] *Id.*

[18] NTCA Reply at 8 ("However, the IRFA itself notes that definition could include the majority of BIAS providers, thereby calling into question whether, in fact, the Commission would be create any meaningful exemptions for 'small businesses,' including very small businesses like NTCA members, who average 35 employees.").

[19] WISPA Reply at 10 ( "WISPA does not agree with NRECA's proposal to define a size threshold of 100,000 broadband customers for a broadband provider to be considered a 'small' provider."); WISPA Apr. 17, 2024 *Ex Parte* at 1-2 (urging the Commission to temporarily exempt BIAS providers with 250,000 or fewer subscribers from all proposed rules and issue a Further Notice to explore whether the Commission should permanently exempt BIAS providers with 250,000 or fewer subscribers from the rules).

[20] NRECA Comments at 6.

[21] The exceptions are temporary exemptions (with the potential to become permanent) from the performance characteristics disclosure enhancements and direct notification requirement for BIAS providers that we reason are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications or the resources to immediately report this information. *See supra* Section V.B.3.a and V.B.3.c.

proposed rules as a result of those comments.[22]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

> **D.** **Description and Estimate of the Number of Small Entities to Which Rules Will Apply**

13.    The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[23]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[24]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[25]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[26]

> **1.** **Total Small Entities**

14.    *Small Businesses, Small Organizations, Small Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[27]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[28]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[29]

15.    Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[30]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[31]  Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less

---

[22] 5 U.S.C. § 604(a)(3).

[23] *See id.* § 604(a)(3).

[24] *Id.* § 601(6).

[25] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[26] *See* 15 U.S.C. § 632.

[27] 5 U.S.C. § 601(3)-(6).

[28] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[29] *Id.*

[30] 5 U.S.C. § 601(4).

[31] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

according to the registration and tax data for exempt organizations available from the IRS.[32]

16.	Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[33]  U.S. Census Bureau data from the 2022 Census of Governments[34] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[35]  Of this number, there were 36,845 general purpose governments (county,[36] municipal, and town or township[37]) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts[38]) with enrollment populations of less than 50,000.[39]  Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."[40]

---

[32] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii.  This data includes information for Puerto Rico (469).

[33] 5 U.S.C. § 601(5).

[34] 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7."  *See also* Census of Governments, https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[35] *See* U.S. Census Bureau, 2022 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2022 [CG2200ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[36] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 2,097 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[37] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[38] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 11,879 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[39] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[40] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (11,879), from the 2022 Census of Governments - Organizations tbls. 5, 6 & 10.

## 2. Wired Broadband Internet Access Service Providers

17.    *Wired Broadband Internet Access Service Providers (Wired ISPs)*.[41]  Providers of wired broadband Internet access service include various types of providers except dial-up Internet access providers.  Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[42]  Wired broadband Internet services fall in the Wired Telecommunications Carriers industry.[43]  The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[44]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[45]  Of this number, 2,964 firms operated with fewer than 250 employees.[46]

18.    Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies.[47]  The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard.  However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report*,[48] we believe that the majority of wireline Internet access service providers can be considered small entities.

## 3. Wireline Providers

19.    *Wired Telecommunications Carriers*. The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[49]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network

---

[41] Formerly included in the scope of the Internet Service Providers (Broadband), Wired Telecommunications Carriers and All Other Telecommunications small entity industry descriptions.

[42] *See* 47 CFR § 1.7001(a)(1).

[43] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[44] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[45] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[46] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[47] *See* Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27 fig.30 *(IAS Status 2019)*, Industry Analysis Division, Office of Economics & Analytics (Mar. 2022).  The report can be accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports.  The technologies used by providers include aDSL, sDSL, Other Wireline, Cable Modem and FTTP). Other wireline includes: all copper-wire based technologies other than xDSL (such as Ethernet over copper, T-1/DS-1 and T3/DS-1) as well as power line technologies which are included in this category to maintain the  confidentiality of the providers.

[48] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 Communications Marketplace Report, 2022 WL 18110553 at *10, paras. 26-27 figs.II.A.5-7. (2022) (*2022 Communications Marketplace Report*).

[49] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[50]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[51]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[52]

20.      The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[53]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[54]  Of this number, 2,964 firms operated with fewer than 250 employees.[55]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[56]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[57]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

21.      *Incumbent Local Exchange Carriers (Incumbent LECs)*.  Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers[58] is the closest industry with an SBA small business size standard.[59] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[60]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[61]  Of this number, 2,964 firms operated with fewer than

---

[50] *Id.*

[51] *Id.*

[52] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[53] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[54] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[55] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[56] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf. https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf

[57] *Id.*

[58] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[59] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[60] *Id.*

[61] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

250 employees.[62]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local exchange service providers.[63]  Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees.[64]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

22. *Competitive Local Exchange Carriers (Competitive LECs).* Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers.  Wired Telecommunications Carriers[65] is the closest industry with an SBA small business size standard.[66]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[67]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[68]  Of this number, 2,964 firms operated with fewer than 250 employees.[69]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local exchange service providers.[70]  Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees.[71]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

23. *Interexchange Carriers (IXCs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers.  Wired Telecommunications Carriers[72] is the closest industry with a SBA small business size standard.[73]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[74]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry

---

[62] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[63] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[64] *Id.*

[65] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[66] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[67] *Id.*

[68] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[69] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[70] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[71] *Id.*

[72] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[73] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[74] *Id.*

for the entire year.[75]  Of this number, 2,964 firms operated with fewer than 250 employees.[76]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services.  Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees.[77]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

24.     *Operator Service Providers (OSPs)*.  Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers.  The closest applicable industry with a SBA small business size standard is Wired Telecommunications Carriers.[78]  The SBA small business size standard classifies a business as small if it has 1,500 or fewer employees.[79]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[80]  Of this number, 2,964 firms operated with fewer than 250 employees.[81]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 20 providers that reported they were engaged in the provision of operator services.[82]  Of these providers, the Commission estimates that all 20 providers have 1,500 or fewer employees.[83]  Consequently, using the SBA's small business size standard, all of these providers can be considered small entities.

25.     *Other Toll Carriers*.  Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers.  This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers.  Wired Telecommunications Carriers[84]  is the closest industry with a SBA small business size standard.[85]  The SBA small business size standard for Wired

---

[75] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[76] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[77] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[78] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[79] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[80] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[81] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[82] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf. https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf

[83] *Id.*

[84] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[85] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[86]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[87]  Of this number, 2,964 firms operated with fewer than 250 employees.[88]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 90 providers that reported they were engaged in the provision of other toll services.[89]  Of these providers, the Commission estimates that 87 providers have 1,500 or fewer employees.[90]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### 4.     Wireless Providers – Fixed and Mobile

26.     *Wireless Broadband Internet Access Service Providers (Wireless ISPs or WISPs)*.[91]  Providers of wired broadband Internet access service include various types of providers except dial-up Internet access providers.  Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the Internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules.[92]  Wired broadband Internet services fall in the Wired Telecommunications Carriers industry.[93]  The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small.[94]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[95]  Of this number, 2,964 firms operated with fewer than 250 employees.[96]

27.     Additionally, according to Commission data on Internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies.[97]  The Commission does not collect data on the number of

---

[86] *Id.*

[87] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[88] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[89] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf

[90] *Id.*

[91] Formerly included in the scope of the Internet Service Providers (Broadband), Wired Telecommunications Carriers and All Other Telecommunications small entity industry descriptions.

[92] *See* 47 CFR § 1.7001(a)(1).

[93] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[94] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[95] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[96] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[97] *See* Federal Communications Commission, Internet Access Services: Status as of June 30, 2019 at 27 fig.30 *(IAS Status 2019)*, Industry Analysis Division, Office of Economics & Analytics (Mar. 2022).  The report can be accessed at https://www.fcc.gov/economics-analytics/industry-analysis-division/iad-data-statistical-reports.  The

(continued….)

employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard. However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report*,[98] we believe that the majority of wireline Internet access service providers can be considered small entities.

28.    *Wireless Telecommunications Carriers (except Satellite)*. The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[99] Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[100] By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[101] Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[102]

29.    The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[103] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[104] Of this number, 2,964 firms operated with fewer than 250 employees.[105] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[106] Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[107] Consequently, using the SBA's small business size

---

technologies used by providers include aDSL, sDSL, Other Wireline, Cable Modem and FTTP). Other wireline includes: all copper-wire based technologies other than xDSL (such as Ethernet over copper, T-1/DS-1 and T3/DS-1) as well as power line technologies which are included in this category to maintain the  confidentiality of the providers.

[98] *See Communications Marketplace Report*, GN Docket No. 22-203, 2022 WL 18110553 at 10, paras. 26-27, Figs. II.A.5-7. (2022) (*2022 Communications Marketplace Report*).

[99] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[100] *Id.*

[101] *Id.*

[102] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers. Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[103] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[104] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[105] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[106] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26 tbl.1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[107] *Id.*

standard, most of these providers can be considered small entities.

30.     *Wireless Communications Services*.  Wireless Communications Services (WCS) can be used for a variety of fixed, mobile, radiolocation, and digital audio broadcasting satellite services. Wireless spectrum is made available and licensed for the provision of wireless communications services in several frequency bands subject to Part 27 of the Commission's rules.[108]  Wireless Telecommunications Carriers (*except* Satellite)[109] is the closest industry with an SBA small business size standard applicable to these services.  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[110]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[111]  Of this number, 2,837 firms employed fewer than 250 employees.[112]  Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

31.     The Commission's small business size standards with respect to WCS involve eligibility for bidding credits and installment payments in the auction of licenses for the various frequency bands included in WCS.  When bidding credits are adopted for the auction of licenses in WCS frequency bands, such credits may be available to several types of small businesses based average gross revenues (small, very small and entrepreneur) pursuant to the competitive bidding rules adopted in conjunction with the requirements for the auction and/or as identified in the designated entities section in Part 27 of the Commission's rules for the specific WCS frequency bands.[113]

32.     In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.  Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.  Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

33.     *Wireless Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Wireless Resellers.  The closest industry with a SBA small business size standard is Telecommunications Resellers.[114]  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[115]  Establishments in this industry resell telecommunications and

---

[108] *See* 47 CFR §§ 27.1 – 27.1607.

[109] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[110] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[111] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[112] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[113] *See* 47 CFR §§ 27.201–27.1601. The Designated entities sections in Subparts D – Q each contain the small business size standards adopted for the auction of the frequency band covered by that subpart.

[114] *See* U.S. Census Bureau, *2017 NAICS Definition, "517911 Telecommunications Resellers,"* https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[115] *Id*.

they do not operate transmission facilities and infrastructure.[116] Mobile virtual network operators (MVNOs) are included in this industry.[117] Under the SBA size standard for this industry, a business is small if it has 1,500 or fewer employees.[118] U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services during that year.[119] Of that number, 1,375 firms operated with fewer than 250 employees.[120] Thus, for this industry under the SBA small business size standard, the majority of providers can be considered small entities.

34. *1670–1675 MHz Services*. These wireless communications services can be used for fixed and mobile uses, except aeronautical mobile.[121] Wireless Telecommunications Carriers (except Satellite)[122] is the closest industry with an SBA small business size standard applicable to these services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[123] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[124] Of this number, 2,837 firms employed fewer than 250 employees.[125] Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

35. According to Commission data as of November 2021, there were three active licenses in this service.[126] The Commission's small business size standards with respect to 1670–1675 MHz Services involve eligibility for bidding credits and installment payments in the auction of licenses for these services. For licenses in the 1670-1675 MHz service band, a "small business" is defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" is defined as an entity that, together with its affiliates and controlling interests, has had average annual gross revenues not exceeding $15 million for the preceding three years.[127] The 1670-1675 MHz service band auction's winning bidder did not claim

---

[116] *Id.*

[117] *Id.*

[118] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[119] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[120] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[121] *See* 47 CFR § 27.902.

[122] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[123] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[124] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[125] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[126] Based on a FCC Universal Licensing System search on November 8, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = BC; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[127] *See* 47 CFR § 27.906(a).

small business status.[128]

36.     In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

37.     *Wireless Telephony*. Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers. The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite).[129] The size standard for this industry under SBA rules is that a business is small if it has 1,500 or fewer employees.[130] For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated the entire year.[131] Of this number, 2,837 firms employed fewer than 250 employees.[132] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 331 providers that reported they were engaged in the provision of cellular, personal communications services, and specialized mobile radio services.[133] Of these providers, the Commission estimates that 255 providers have 1,500 or fewer employees.[134] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

38.     *Broadband Personal Communications Service*. The broadband personal communications services (PCS) spectrum encompasses services in the 1850-1910 and 1930-1990 MHz bands.[135] The closest industry with a SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (except Satellite).[136] The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[137] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[138] Of this number,

---

[128] *See 1670–1675 MHz Band Auction Closes; Winning Bidder Announced*; *FCC Form 600s Due May 12,2003,* Public Notice, DA-03-1472, Report No. AUC-03-46-H (Auction No.46) (May 2, 2003).

[129] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[130] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[131] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[132] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[133] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[134] *Id.*

[135] *See* 47 CFR § 24.200.

[136] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[137] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[138] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312,

(continued….)

2,837 firms employed fewer than 250 employees.[139] Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

39. Based on Commission data as of November 2021, there were approximately 5,060 active licenses in the Broadband PCS service.[140] The Commission's small business size standards with respect to Broadband PCS involve eligibility for bidding credits and installment payments in the auction of licenses for these services. In auctions for these licenses, the Commission defined "small business" as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" as an entity that, together with its affiliates and controlling interests, has had average annual gross revenues not exceeding $15 million for the preceding three years.[141] Winning bidders claiming small business credits won Broadband PCS licenses in C, D, E, and F Blocks.[142]

40. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

41. *Specialized Mobile Radio Licenses.* Special Mobile Radio (SMR) licenses allow licensees to provide land mobile communications services (other than radiolocation services) in the 800 MHz and 900 MHz spectrum bands on a commercial basis including but not limited to services used for voice and data communications, paging, and facsimile services, to individuals, Federal Government entities, and other entities licensed under Part 90 of the Commission's rules. Wireless Telecommunications Carriers (except Satellite)[143] is the closest industry with a SBA small business size standard applicable to these services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[144] For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[145] Of this number, 2,837

---

https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[139] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[140] Based on a FCC Universal Licensing System search on November 16, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = CW; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[141] *See* 47 CFR § 24.720(b).

[142] *See* Federal Communications Commission, Office of Economics and Analytics, Auctions, Auctions 4, 5, 10, 11, 22, 35, 58, 71 and 78, https://www.fcc.gov/auctions.

[143] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[144] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[145] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

firms employed fewer than 250 employees.[146]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 95 providers that reported they were of SMR (dispatch) providers.[147]  Of this number, the Commission estimates that all 95 providers have 1,500 or fewer employees.[148]  Consequently, using the SBA's small business size standard, these 119 SMR licensees can be considered small entities.[149]

42.      Based on Commission data as of December 2021, there were 3,924 active SMR licenses.[150]  However, since the Commission does not collect data on the number of employees for licensees providing SMR services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.  Nevertheless, for purposes of this analysis the Commission estimates that the majority of SMR licensees can be considered small entities using the SBA's small business size standard.

43.      *Lower 700 MHz Band Licenses*.  The lower 700 MHz band encompasses spectrum in the 698-746 MHz frequency bands.  Permissible operations in these bands include flexible fixed, mobile, and broadcast uses, including mobile and other digital new broadcast operation; fixed and mobile wireless commercial services (including FDD- and TDD-based services); as well as fixed and mobile wireless uses for private, internal radio needs, two-way interactive, cellular, and mobile television broadcasting services.[151]  Wireless Telecommunications Carriers (*except* Satellite)[152] is the closest industry with a SBA small business size standard applicable to licenses providing services in these bands.  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[153]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[154]  Of this number, 2,837 firms employed fewer than 250 employees.[155]  Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

---

[146] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[147] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf. https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf

[148] *Id*.

[149] We note that there were also SMR providers reporting in the "Cellular/PCS/SMR" classification, therefore there are maybe additional SMR providers that have not been accounted for in the SMR (dispatch) classification.

[150] Based on a FCC Universal Licensing System search on December 15, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match radio services within this group", Radio Service = SMR; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[151] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auctions 44, 49, 60: Lower 700 MHz Band, Fact Sheet, Permissible Operations, https://www.fcc.gov/auction/44/factsheet, https://www.fcc.gov/auction/49/factsheet, https://www.fcc.gov/auction/60/factsheet.

[152] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[153] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[154] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[155] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

44. According to Commission data as of December 2021, there were approximately 2,824 active Lower 700 MHz Band licenses.[156] The Commission's small business size standards with respect to Lower 700 MHz Band licensees involve eligibility for bidding credits and installment payments in the auction of licenses. For auctions of Lower 700 MHz Band licenses the Commission adopted criteria for three groups of small businesses. A very small business was defined as an entity that, together with its affiliates and controlling interests, has average annual gross revenues not exceeding $15 million for the preceding three years, a small business was defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and an entrepreneur was defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $3 million for the preceding three years.[157] In auctions for Lower 700 MHz Band licenses seventy-two winning bidders claiming a small business classification won 329 licenses,[158] twenty-six winning bidders claiming a small business classification won 214 licenses,[159] and three winning bidders claiming a small business classification won all five auctioned licenses.[160]

45. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

46. *Upper 700 MHz Band Licenses*. The upper 700 MHz band encompasses spectrum in the 746-806 MHz bands. Upper 700 MHz D Block licenses are nationwide licenses associated with the 758-763 MHz and 788-793 MHz bands.[161] Permissible operations in these bands include flexible fixed, mobile, and broadcast uses, including mobile and other digital new broadcast operation; fixed and mobile wireless commercial services (including FDD- and TDD-based services); as well as fixed and mobile wireless uses for private, internal radio needs, two-way interactive, cellular, and mobile television broadcasting services.[162] Wireless Telecommunications Carriers (*except* Satellite)[163] is the closest industry

---

[156] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = WY, WZ; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[157] *See* 47 CFR § 27.702(a)(1)-(3).

[158] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 44: Lower 700 MHz Guard Bands, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/44/charts/44cls2.pdf.

[159] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 49: Lower 700 MHz Guard Bands, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/49/charts/49cls2.pdf.

[160] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 60: Lower 700 MHz Guard Bands, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/60/charts/60cls2.pdf.

[161] *See* 47 CFR § 27.4.

[162] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 73: 700 MHz Band, Fact Sheet, Permissible Operations, https://www.fcc.gov/auction/73/factsheet. We note that in Auction 73, Upper 700 MHz Band C and D Blocks as well as Lower 700 MHz Band A, B, and E Blocks were auctioned.

[163] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

with a SBA small business size standard applicable to licenses providing services in these bands. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[164] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[165] Of that number, 2,837 firms employed fewer than 250 employees.[166] Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

47.     According to Commission data as of December 2021, there were approximately 152 active Upper 700 MHz Band licenses.[167] The Commission's small business size standards with respect to Upper 700 MHz Band licensees involve eligibility for bidding credits and installment payments in the auction of licenses. For the auction of these licenses, the Commission defined a "small business" as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years.[168] Pursuant to these definitions, three winning bidders claiming very small business status won five of the twelve available licenses.[169]

48.     In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

49.     *700 MHz Guard Band Licensees*.  The 700 MHz Guard Band encompasses spectrum in 746-747/776-777 MHz and 762-764/792-794 MHz frequency bands. Wireless Telecommunications Carriers (*except* Satellite)[170] is the closest industry with a SBA small business size standard applicable to licenses providing services in these bands. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[171] U.S. Census Bureau data for 2017

---

[164] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[165] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[166] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[167] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = WP, WU; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[168] *See* 47 CFR § 27.502(a).

[169] *See Auction of 700 MHz Band Licenses Closes; Winning Bidders Announced for Auction 73*, Public Notice, DA-08-595, Attachment A, Report No. AUC-08-73-I (Auction 73) (March 20, 2008).  The results for Upper 700 MHz Band C Block can be found on pp. 62-63.

[170] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (*except* Satellite*),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[171] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

show that there were 2,893 firms that operated in this industry for the entire year.[172]  Of this number, 2,837 firms employed fewer than 250 employees.[173]  Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

50.     According to Commission data as of December 2021, there were approximately 224 active 700 MHz Guard Band licenses.[174]  The Commission's small business size standards with respect to 700 MHz Guard Band licensees involve eligibility for bidding credits and installment payments in the auction of licenses.  For the auction of these licenses, the Commission defined a "small business" as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years.[175]  Pursuant to these definitions, five winning bidders claiming one of the small business status classifications won 26 licenses, and one winning bidder claiming small business won two licenses.[176]  None of the winning bidders claiming a small business status classification in these 700 MHz Guard Band license auctions had an active license as of December 2021.[177]

51.     In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.  Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.  Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

52.     *Air-Ground Radiotelephone Service*  Air-Ground Radiotelephone Service is a wireless service in which licensees are authorized to offer and provide radio telecommunications service for hire to subscribers in aircraft.[178]  A licensee may provide any type of air-ground service (i.e., voice telephony, broadband Internet, data, etc.) to aircraft of any type, and serve any or all aviation markets (commercial, government, and general).  A licensee must provide service to aircraft and may not provide ancillary land

---

[172] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[173] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[174] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = WX; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[175] *See* 47 CFR § 27.502(a).

[176] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 33: Upper 700 MHz Guard Bands, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/33/charts/33cls2.pdf, Auction 38: Upper 700 MHz Guard Bands, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/38/charts/38cls2.pdf.

[177] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = WX; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[178] 47 CFR § 22.99.

mobile or fixed services in the 800 MHz air-ground spectrum.[179]

53.     The closest industry with an SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (*except* Satellite).[180]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[181]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[182]  Of this number, 2,837 firms employed fewer than 250 employees.[183]  Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

54.     Based on Commission data as of December 2021, there were approximately four licensees with 110 active licenses in the Air-Ground Radiotelephone Service.[184]  The Commission's small business size standards with respect to Air-Ground Radiotelephone Service involve eligibility for bidding credits and installment payments in the auction of licenses.  For purposes of auctions, the Commission defined "small business" as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" as an entity that, together with its affiliates and controlling interests, has had average annual gross revenues not exceeding $15 million for the preceding three years.[185]  In the auction of Air-Ground Radiotelephone Service licenses in the 800 MHz band, neither of the two winning bidders claimed small business status.[186]

55.     In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.  Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.  Additionally, the Commission does not collect data on the number of employees for licensees providing these services therefore, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

56.     Advanced Wireless Services (AWS) - (1710–1755 MHz and 2110–2155 MHz bands (AWS-1); 1915–1920 MHz, 1995–2000 MHz, 2020–2025 MHz and 2175–2180 MHz bands (AWS-2); 2155–2175 MHz band (AWS-3); 2000-2020 MHz and 2180-2200 MHz (AWS-4)).  Spectrum is made

---

[179] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 65: 800 MHz Air-Ground Radiotelephone Service, Fact Sheet, Permissible Operations, https://www.fcc.gov/auction/65/factsheet.

[180] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[181] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[182] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[183] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[184] Based on a FCC Universal Licensing System search on December 20, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = CG, CJ; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[185] *See* 47 CFR § 22.223(b).

[186] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 65: 800 MHz Air-Ground Radiotelephone Service, Summary, Closing Charts, Licenses by Bidder, https://www.fcc.gov/sites/default/files/wireless/auctions/65/charts/65cls2.pdf.

available and licensed in these bands for the provision of various wireless communications services.[187] Wireless Telecommunications Carriers (except Satellite)[188] is the closest industry with a SBA small business size standard applicable to these services. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[189] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[190] Of this number, 2,837 firms employed fewer than 250 employees.[191] Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

57. According to Commission data as of December 2021, there were approximately 4,472 active AWS licenses.[192] The Commission's small business size standards with respect to AWS involve eligibility for bidding credits and installment payments in the auction of licenses for these services. For the auction of AWS licenses, the Commission defined a "small business" as an entity with average annual gross revenues for the preceding three years not exceeding $40 million, and a "very small business" as an entity with average annual gross revenues for the preceding three years not exceeding $15 million.[193] Pursuant to these definitions, 57 winning bidders claiming status as small or very small businesses won 215 of 1,087 licenses.[194] In the most recent auction of AWS licenses 15 of 37 bidders qualifying for status as small or very small businesses won licenses.[195]

58. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

59. *3650–3700 MHz band*. Wireless broadband service licensing in the 3650-3700 MHz band provides for nationwide, non-exclusive licensing of terrestrial operations, utilizing contention-based

---

[187] *See* 47 CFR § 27.1(b).

[188] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[189] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[190] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[191] *Id*. The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[192] Based on a FCC Universal Licensing System search on December 10, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = AD, AH, AT, AW; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[193] *See* 47 CFR §§ 27.1002, 27.1102, 27.1104, 27.1106.

[194] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 66: Advanced Wireless Services (AWS-1), Summary, Spreadsheets, https://www.fcc.gov/sites/default/files/wireless/auctions/66/charts/66cls2.pdf.

[195] *See* Auction of Advanced Wireless Services (AWS-3) Licenses Closes; Winning Bidders Announced for Auction 97, Public Notice, DA-15-131, Attachs. A-B (Auction No. 97) (Jan. 30, 2015).

technologies, in the 3650 MHz band (i.e., 3650–3700 MHz).[196] Licensees are permitted to provide services on a non-common carrier and/or on a common carrier basis.[197] Wireless broadband services in the 3650-3700 MHz band fall in the Wireless Telecommunications Carriers (*except* Satellite)[198] industry with an SBA small business size standard that classifies a business as small if it has 1,500 or fewer employees.[199] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[200] Of this number, 2,837 firms employed fewer than 250 employees.[201] Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

60.     The Commission has not developed a small business size standard applicable to 3650–3700 MHz band licensees. Based on the licenses that have been granted, however, we estimate that the majority of licensees in this service are small Internet Access Service Providers (ISPs). As of November 2021, Commission data shows that there were 902 active licenses in the 3650–3700 MHz band.[202] However, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

61.     *Fixed Microwave Services*. Fixed microwave services include common carrier,[203] private-operational fixed,[204] and broadcast auxiliary radio services.[205] They also include the Upper Microwave Flexible Use Service (UMFUS),[206] Millimeter Wave Service (70/80/90 GHz),[207] Local Multipoint Distribution Service (LMDS),[208] the Digital Electronic Message Service (DEMS),[209] 24 GHz

---

[196] *See* 47 CFR §§ 90.1305, 90.1307.

[197] *See id.* § 90.1309.

[198] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[199] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[200] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[201] *Id*. The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[202] Based on a FCC Universal Licensing System search on November 19, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service = NN; Authorization Type =All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[203] *See* 47 CFR pt. 101, Subparts C and I.

[204] *See id*. Subparts C and H.

[205] Auxiliary Microwave Service is governed by Part 74 of Title 47 of the Commission's Rules. *See* 47 CFR pt. 74. Available to licensees of broadcast stations and to broadcast and cable network entities, broadcast auxiliary microwave stations are used for relaying broadcast television signals from the studio to the transmitter, or between two points such as a main studio and an auxiliary studio. The service also includes mobile TV pickups, which relay signals from a remote location back to the studio.

[206] *See* 47 CFR Part 30.

[207] *See* 47 CFR Part 101, Subpart Q.

[208] *See id*. Subpart L.

[209] *See id*. Subpart G.

Service,[210] Multiple Address Systems (MAS),[211] and Multichannel Video Distribution and Data Service (MVDDS),[212] where in some bands licensees can choose between common carrier and non-common carrier status.[213] Wireless Telecommunications Carriers (*except* Satellite)[214] is the closest industry with a SBA small business size standard applicable to these services. The SBA small size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[215] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[216] Of this number, 2,837 firms employed fewer than 250 employees.[217] Thus under the SBA size standard, the Commission estimates that a majority of fixed microwave service licensees can be considered small.

62. The Commission's small business size standards with respect to fixed microwave services involve eligibility for bidding credits and installment payments in the auction of licenses for the various frequency bands included in fixed microwave services. When bidding credits are adopted for the auction of licenses in fixed microwave services frequency bands, such credits may be available to several types of small businesses based average gross revenues (small, very small and entrepreneur) pursuant to the competitive bidding rules adopted in conjunction with the requirements for the auction and/or as identified in Part 101 of the Commission's rules for the specific fixed microwave services frequency bands.[218]

63. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

64. *Broadband Radio Service and Educational Broadband Service.* Broadband Radio Service systems, previously referred to as Multipoint Distribution Service (MDS) and Multichannel Multipoint Distribution Service (MMDS) systems, and "wireless cable,"[219] transmit video programming to subscribers and provide two-way high speed data operations using the microwave frequencies of the Broadband Radio Service (BRS) and Educational Broadband Service (EBS) (previously referred to as the

---

[210] *See id.*

[211] *See id.* Subpart O.

[212] *See id.* Subpart P.

[213] *See* 47 CFR §§ 101.533, 101.1017.

[214] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers* (*except Satellite*)," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[215] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[216] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[217] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[218] *See* 47 CFR §§ 101.538(a)(1)-(3), 101.1112(b)-(d), 101.1319(a)(1)-(2), 101.1429(a)(1)-(3).

[219] The use of the term wireless cable does not imply that it constitutes cable television for statutory or regulatory purposes.

Instructional Television Fixed Service (ITFS)).[220] Wireless cable operators that use spectrum in the BRS often supplemented with leased channels from the EBS, provide a competitive alternative to wired cable and other multichannel video programming distributors. Wireless cable programming to subscribers resembles cable television, but instead of coaxial cable, wireless cable uses microwave channels.[221]

65. In light of the use of wireless frequencies by BRS and EBS services, the closest industry with a SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (*except* Satellite).[222] The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[223] U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[224] Of this number, 2,837 firms employed fewer than 250 employees.[225] Thus under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

66. According to Commission data as December 2021, there were approximately 5,869 active BRS and EBS licenses.[226] The Commission's small business size standards with respect to BRS involves eligibility for bidding credits and installment payments in the auction of licenses for these services. For the auction of BRS licenses, the Commission adopted criteria for three groups of small businesses. A very small business is an entity that, together with its affiliates and controlling interests, has average annual gross revenues exceed $3 million and did not exceed $15 million for the preceding three years, a small business is an entity that, together with its affiliates and controlling interests, has average gross revenues exceed $15 million and did not exceed $40 million for the preceding three years, and an entrepreneur is an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $3 million for the preceding three years.[227] Of the ten winning bidders for BRS licenses, two bidders claiming the small business status won 4 licenses, one bidder claiming the very

---

[220] See 47 CFR § 27.4; see also *Amendment of Parts 21 and 74 of the Commission's Rules with Regard to Filing Procedures in the Multipoint Distribution Service and in the Instructional Television Fixed Service*; *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, MM Docket No. 94-131, PP Docket No. 93-253, Report and Order, 10 FCC Rcd 9589, 9593, para. 7 (1995).

[221] Generally, a wireless cable system may be described as a microwave station transmitting on a combination of BRS and EBS channels to numerous receivers with antennas, such as single-family residences, apartment complexes, hotels, educational institutions, business entities and governmental offices. The range of the transmission depends upon the transmitter power, the type of receiving antenna and the existence of a line-of-sight path between the transmitter or signal booster and the receiving antenna.

[222] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite)*," https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[223] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[224] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[225] *Id*. The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[226] Based on a FCC Universal Licensing System search on December 10, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service =BR, ED; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[227] *See* 47 CFR § 27.1218(a).

small business status won three licenses and two bidders claiming entrepreneur status won six licenses.[228] One of the winning bidders claiming a small business status classification in the BRS license auction has an active licenses as of December 2021.[229]

67. The Commission's small business size standards for EBS define a small business as an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $55 million for the preceding five (5) years, and a very small business is an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $20 million for the preceding five (5) years.[230] In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

### 5. Satellite Service Providers

68. *Satellite Telecommunications*. This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[231] Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small.[232] U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year.[233] Of this number, 242 firms had revenue of less than $25 million.[234] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 65 providers that reported they were engaged in the provision of satellite telecommunications services.[235] Of these providers, the Commission estimates that

---

[228] *See* Federal Communications Commission, Economics and Analytics, Auctions, Auction 86: Broadband Radio Service, Summary, Reports, All Bidders, https://www.fcc.gov/sites/default/files/wireless/auctions/86/charts/86bidder.xls.

[229] Based on a FCC Universal Licensing System search on December 10, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp. Search parameters: Service Group = All, "Match only the following radio service(s)", Radio Service =BR; Authorization Type = All; Status = Active. We note that the number of active licenses does not equate to the number of licensees. A licensee can have one or more licenses.

[230] *See* 47 CFR § 27.1219(a).

[231] *See* U.S. Census Bureau, *2017 NAICS Definition, "517410 Satellite Telecommunications,"* https://www.census.gov/naics/?input=517410&year=2017&details=517410.

[232] *See* 13 CFR § 121.201, NAICS Code 517410.

[233] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517410, https://data.census.gov/cedsci/table?y=2017&n=517410&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[234] *Id*. The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard. We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[235] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26 tbl.1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

approximately 42 providers have 1,500 or fewer employees.[236]  Consequently, using the SBA's small business size standard, a little more than half of these providers can be considered small entities.

69.    *All Other Telecommunications*.  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[237]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[238]  Providers of Internet services (e.g. dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[239]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[240]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[241]  Of those firms, 1,039 had revenue of less than $25 million.[242]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

### 6.    Cable Service Providers

70.    *Cable and Other Subscription Programming*.  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating studios and facilities for the broadcasting of programs on a subscription or fee basis.[243]  The broadcast programming is typically narrowcast in nature (e.g., limited format, such as news, sports, education, or youth-oriented).  These establishments produce programming in their own facilities or acquire programming from external sources.[244]  The programming material is usually delivered to a third party, such as cable systems or direct-to-home satellite systems, for transmission to viewers.[245]  The SBA small business size standard for this industry classifies firms with annual receipts less than $41.5 million as small.[246]  Based on U.S. Census Bureau data for 2017, 378 firms operated in this industry during that year.[247]  Of that number, 149 firms operated with revenue of less than

---

[236] *Id.*

[237] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[238] *Id.*

[239] *Id.*

[240] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[241] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[242] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[243] *See* U.S. Census Bureau, *2017 NAICS Definition, "515210 Cable and Other Subscription Programming,"* https://www.census.gov/naics/?input=515210&year=2017&details=515210.

[244] *Id.*

[245] *Id.*

[246] *See* 13 CFR § 121.201, NAICS Code 515210 (as of 10/1/22, NAICS Code 516210).

[247] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 515210, https://data.census.gov/cedsci/table?y=2017&n=515210&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview

(continued….)

$25 million a year and 44 firms operated with revenue of $25 million or more.[248]  Based on this data, the Commission estimates that a majority of firms in this industry are small.

71.       *Cable Companies and Systems (Rate Regulation)*.  The Commission has developed its own small business size standard for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide.[249]  Based on industry data, there are about 420 cable companies in the U.S.[250]  Of these, only seven have more than 400,000 subscribers.[251]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[252]  Based on industry data, there are about 4,139 cable systems (headends) in the U.S.[253]  Of these, about 639 have more than 15,000 subscribers.[254]  Accordingly, the Commission estimates that the majority of cable companies and cable systems are small.

72.       *Cable System Operators (Telecom Act Standard)*.  The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[255]  For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 498,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator.[256]  Based on industry data, only six cable system operators have more than 498,000 subscribers.[257]  Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard.  We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose

---

w=false.  The US Census Bureau withheld publication of the number of firms that operated for the entire year to avoid disclosing data for individual companies (see Cell Notes for this category).

[248] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in all categories of revenue less than $500,000 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories). Therefore, the number of firms with revenue that meet the SBA size standard would be higher than noted herein. We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[249] 47 CFR § 76.901(d).

[250] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[251] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q* (last visited May 26, 2022); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (Apr. 2022).

[252] 47 CFR § 76.901(c).

[253] S&P Global Market Intelligence, S&P Capital IQ Pro, U.S. MediaCensus, *Operator Subscribers by Geography* (last visited May 26, 2022).

[254] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q (*last visited May 26, 2022).

[255] 47 U.S.C. § 543(m)(2).

[256] *FCC Announces Updated Subscriber Threshold for the Definition of Small Cable Operator*, Public Notice, DA 23-906 (MB 2023) (*2023 Subscriber Threshold PN*).  In this Public Notice, the Commission determined that there were approximately 49.8 million cable subscribers in the United States at that time using the most reliable source publicly available.  *Id.*  This threshold will remain in effect until the Commission issues a superseding Public Notice..  *See* 47 CFR § 76.901(e)(1).

[257] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 06/23Q (*last visited Sept. 27, 2023); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (Apr. 2022).

gross annual revenues exceed $250 million.[258]  Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

### 7.    **Other**

73.    *Electric Power Generators, Transmitters, and Distributors.*  The U.S. Census Bureau defines the utilities sector industry as comprised of "establishments, primarily engaged in generating, transmitting, and/or distributing electric power.[259]  Establishments in this industry group may perform one or more of the following activities:  (1) operate generation facilities that produce electric energy; (2) operate transmission systems that convey the electricity from the generation facility to the distribution system; and (3) operate distribution systems that convey electric power received from the generation facility or the transmission system to the final consumer."[260]  This industry group is categorized based on fuel source and includes Hydroelectric Power Generation, Fossil Fuel Electric Power Generation, Nuclear Electric Power Generation, Solar Electric Power Generation, Wind Electric Power Generation, Geothermal Electric Power Generation, Biomass Electric Power Generation, Other Electric Power Generation, Electric Bulk Power Transmission and Control and Electric Power Distribution.[261]

74.    The SBA has established a small business size standard for each of these groups based on the number of employees which ranges from having fewer than 250 employees to having fewer than 1,000 employees.[262]  U.S. Census Bureau data for 2017 indicate that for the Electric Power Generation, Transmission and Distribution industry there were 1,693 firms that operated in this industry for the entire year.[263]  Of this number, 1,552 firms had less than 250 employees.[264]  Based on this data and the associated SBA size standards, the majority of firms in this industry can be considered small entities.

75.    *All Other Information Services.*  This industry comprises establishments primarily engaged in providing other information services (except news syndicates, libraries, archives, Internet publishing and broadcasting, and Web search portals).[265]  The SBA small business size standard for this industry classifies firms with annual receipts of $30 million or less as small.[266]  U.S. Census Bureau data for 2017 show that there were 704 firms in this industry that operated for the entire year.[267]  Of those

---

[258] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(e) of the Commission's rules.  *See* 47 CFR § 76.910(b).

[259] *See* U.S. Census Bureau, *2017 NAICS Definition, "Sector 22- Utilities, 2211 Electric Power Generation, Transmission and Distribution,"* https://www.census.gov/naics/?input=2211&year=2017&details=2211.

[260] *See id.*

[261] *Id.*

[262] *See* 13 CFR § 121.201, NAICS Codes 221111, 221112, 221113, 221114, 221115, 221116, 221117, 221118, 221121, 221122.

[263] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 2211, https://data.census.gov/cedsci/table?y=2017&n=2211&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[264] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[265] *See* U.S. Census Bureau, *2017 NAICS Definition, "519190 All Other Information Services,"* https://www.census.gov/naics/?input=519190&year=2017&details=519190.

[266] *See* 13 CFR § 121.201, NAICS Code 519190 (as of 10/1/22, NAICS Codes 519290).

[267] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 519190,

(continued….)

firms, 556 had revenue of less than $25 million.[268]  Consequently, we estimate that the majority of firms in this industry are small entities.

76.    *Internet Service Providers (Non-Broadband).*  Internet access service providers using client-supplied telecommunications connections (e.g., dial-up ISPs) as well as VoIP service providers using client-supplied telecommunications connections fall in the industry classification of All Other Telecommunications.[269]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[270]  For this industry, U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[271]  Of those firms, 1,039 had revenue of less than $25 million.[272]  Consequently, under the SBA size standard a majority of firms in this industry can be considered small.

### E.    Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

77.    Reclassifying broadband as a Title II service may lead to some increase in compliance costs for small entities, however we find that these compliance costs are likely to be quite small.  The Order reimposes the text of the transparency rule from 2015, and clarifies and adopts certain changes to the transparency rule that may impact small entities.  We reinstate rules that prohibit BIAS providers from blocking or throttling the information transmitted over their networks or engaging in paid or affiliated prioritization arrangements, and reinstate a general conduct standard that prohibits practices that cause unreasonable interference or unreasonable disadvantage to consumers or edge providers.  We modify the transparency rule by reversing the changes made under the *RIF Order*, restoring the requirements to disclose certain network practices and performance characteristics eliminated by the *RIF Order*, and adopting changes to the means of disclosure, including adopting a direct notification requirement.  Below, we summarize the recordkeeping and reporting obligations of the accompanying Order.

78.    First, we describe the specific commercial terms, network performance characteristics, and network practices providers must disclose to ensure compliance with the transparency rule.  For example, to fully satisfy their duty to disclose network performance characteristics, providers must now disclose their zero rating practices.  Specifically, BIAS providers must report any practice that exempts particular edge services, devices, applications, and content (edge products) from an end user's usage

---

https://data.census.gov/cedsci/table?y=2017&n=519190&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[268] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue of less than $100,000 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in this category).  Therefore, the number of firms revenue that meet the SBA size standard would be higher than noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[269] *See* U.S. Census Bureau, *2017 NAICS Definition, "517919 All Other Telecommunications,"* https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[270] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[271] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[272] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

allowance or data cap. We reinstate the enhanced performance characteristics disclosures eliminated in 2017 to require BIAS providers to disclose packet loss and to require that performance characteristics be reported with greater geographic granularity and be measured in terms of average performance over a reasonable period of time and during times of peak usage. We temporarily (with the potential to become permanent) exempt BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider, from these latter requirements.

79.     Second, we require that providers make all necessary disclosures on their own publicly-available websites. We no longer permit direct disclosure to the Commission, as allowed under the *RIF Order*. Additionally, we require that all disclosures made pursuant to the transparency rule be made in machine-readable format. By "machine readable," we mean providing "data in a format that can be easily processed by a computer without human intervention while ensuring no semantic meaning is lost."

80.     Third, we re-implement the requirement for BIAS providers to directly notify end users if their particular use of a network will trigger a network practice, based on a user's demand during more than the period of congestion, that is likely to have a significant impact on the end user's use of the service. The purpose of such notification is to provide the affected end users with sufficient information and time to consider adjusting their usage to avoid application of the practice. Recognizing the extra burden this requirement creates, we provide a temporary exemption, with the potential to become permanent, for providers with 100,000 or fewer subscribers that will be promulgated by the Consumer & Governmental Affairs Bureau. We discuss this exemption and other steps to minimize compliance costs in Section F, below.

### F.     Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

81.     The RFA requires an agency to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[273]

82.     We have considered the factors for reinstating the obligations above and modifying the transparency rule subsequent to receiving substantive comments from the public and potentially affected entities. The Commission has considered the economic impact on small entities, as identified in comments filed in response to the *2023 Open Internet Notice* and its IRFA in reaching its final conclusions and taking action in this proceeding.

83.     We considered, for example, whether to fully reimplement the transparency requirements from the *2015 Open Internet Order* and adopted a temporary (with the potential to become permanent) exemption for providers with 100,000 or fewer subscribers from the compliance with certain reporting requirements regarding performance characteristics to minimize burdens for providers.[274] Furthermore, in response to concerns expressed by some commenters, we provided a temporary (with the potential to become permanent) exemption from compliance with the direct notification requirement for providers with 100,000 or fewer subscribers, as such providers are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications. This exemption, which will have the effect of benefitting many small providers, provides regulatory flexibility while maintaining the Commission's goals and is similar to exemptions we have adopted in other

---

[273] 5 U.S.C. § 604(a)(6).

[274] NRECA Comments at 10 (noting that "[a]n overelaborate transparency disclosure framework might be managed by larger ISPs without significant additional impact, but it would create a considerable additional burden (and compliance minefield) for small ISPs with limited administrative and regulatory compliance personnel.").

contexts.[275]

84.    As we did in 2015, we determined that a flat ban on paid prioritization has advantages over alternative approaches, particularly in relieving small edge providers, innovators, and consumers of the burden of detecting and challenging instances of harmful paid prioritization.  In developing our rule, we specifically noted the concerns commenters expressed over the harms that would particularly befall small edge providers should they be required to pay for priority access.[276]  We believe that the adoption of a bright-line rule prohibiting paid prioritization will likely lower compliance costs for small and other entities because they provide greater certainty to market participants.  Also, costs for compliance will be lower compared to the current regulatory framework where harmful conduct would be subject to *ex post*, case-by-case enforcement by antitrust and consumer protection authorities.  This could lead to lengthy enforcement actions and higher compliance costs for BIAS providers.  In our judgment, enforcement by an expert agency will achieve timelier and more consistent outcomes and reduce the costs of uncertainty resulting in significant public interest benefits.

85.    In reimplementing our no-unreasonable interference/disadvantage standard, we were mindful of how a rule that operates on a case-by-case basis may be more difficult for smaller providers.  As such, we attempted to provide an extensive list of factors that we will consider in our analysis.  Moreover, in consideration of the concerns raised by certain commenters that this rule will create difficulty for smaller providers, we implemented an advisory opinion process whereby providers may seek specific guidance from the Commission.[277]

86.    We continue to find that our existing informal complaint rule offers an accessible and effective mechanism for parties—including consumers and small businesses with limited resources—to report possible noncompliance with our open Internet rules without being subject to burdensome evidentiary or pleading requirements.  In formulating our open Internet formal complaint rules, we noted NFIB's request to "make [our] regulations as concise and simple as possible," and opted to maintain our existing formal complaint rules codified at sections 1.720-1.740 to streamline the complaint process, which should accord with NFIB's request.[278]

87.    Upon finding that BIAS is best classified under the statute as a telecommunications service under Title II, we broadly forbear, to the full extent permitted by our authority under section 10 of the Act, from applying provisions of Title II of the Act and implementing Commission rules that would apply to BIAS by virtue of its classification as a Title II service—including from all *ex ante* direct rate regulation—to minimize the burdens an all BIAS providers, including small BIAS providers.  For provisions of Title II that the Commission finds it is not in the public interest from which to forbear with

---

[275] *See* Order, *supra* Section V.B.3.c.  For example, for the broadband labels proceeding, we created a longer implementation period for certain providers.  *Empowering Broadband Consumers Through Transparency, Report and Order and Further Notice of Proposed Rulemaking*, 37 FCC Rcd 13686, 13723-24, paras. 118-19 (Nov. 17, 2022).

[276] EFF Comments at 11 ("Etsy, Inc., for example has said that it would likely have failed if it had to pay for priority access to users.  Other small businesses, their users, and Internet creators have echoed those concerns."); Seth Bradley Comments at 1-3 (expressing concerns on how paid prioritization practices can have damaging effects on small businesses); *but see* International Center for Law & Policy Reply at 22 (asserting that "non-neutrality offers the prospect that a startup might be able to buy priority access to overcome the inherent disadvantage of newness, and to better compete with an established company"); Outpost/Quiet Apr. 18, 2024 *Ex Parte* (asserting that Title II oversight and open Internet protections "are crucial for the success of startups, entrepreneurs, the next generation of decentralized and federated applications, news sites, and millions of other speakers and businesses").

[277] *See, e.g.*, WISPA Comments at 42-43, 55-56 (noting that under the "vague, uncertain, general conduct" rule, "smaller broadband providers would be forced to engage legal counsel before making business decisions . . ., diverting investment and revenues from deployment and chilling their willingness to take risks introducing innovative new features or services.")

[278] NFIB Comments at 3.

respect to BIAS providers, we take additional actions to minimize the effects on small providers. For example, in applying section 222 to BIAS, we waive application of all of the Commission's rules implementing section 222 to BIAS. Likewise, to address the potential impact on BIAS providers that will be subject to section 214 of the Act, we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specific identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current and future affiliates and subsidiaries. We also waive the current rules implementing section 214(a)-(d) of the Act with respect to BIAS to the extent they are otherwise applicable. Additionally, we find that foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing only BIAS is in the public interest under section 310(b) (3) when such foreign ownership is held in the licensee through a U.S.-organized entity that does not control the licensee, and under section 310(b)(4) of the Act, and we waive the requirements to request a declaratory ruling under sections 1.5000-1.5004 of the Commission's rules pending adoption of any rules for BIAS. The Commission expects to release a Further Notice at a future time to examine whether any section 214 rules specifically tailored to BIAS, including for small providers, are warranted. Consistent with our tailored regulatory approach, we also considered the impact of section 214 exit certification requirements and find that it is prudent and in the public interest to forbear from requiring providers seeking approval from the Commission to discontinue, reduce, or impair service to a community. We expect that this will minimize burdens on small entities.

88. We also considered the benefits certain Title II provisions offer to providers, particularly BIAS-only providers, which are frequently small providers, in making its forbearance determination. For example, the Commission did not find the standards for forbearance to be met with respect to sections 224, 253, and 332, which all assist providers with network deployment. Section 224 guarantees pole attachment rights to all BIAS providers, including BIAS-only providers, who are frequently small entities. Section 253 permits BIAS-only providers to seek the Commission's intervention when state or local regulations interfere with their network deployment. Meanwhile, section 332 guarantees that state and local governments act on requests by wireless providers, including BIAS-only providers, to place, construct, or modify personal wireless service facilities within a reasonable period of time.

### G. Report to Congress

89. The Commission will send a copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[279] In addition, the Commission will send a copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration*, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration* and FRFA (or summaries thereof) will also be published in the Federal Register.

---

[279] *Id.* § 801(a)(1)(A).

**STATEMENT OF**
**CHAIRWOMAN JESSICA ROSENWORCEL**

Re: *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320; *Restoring Internet Freedom*, WC Docket 17-108; Declaratory Ruling, Report and Order, Order, and Order on Reconsideration (April 25, 2024)

Four years ago the pandemic changed life as we know it. We were told to stay home, hunker down, and live online. So much of work, school, and healthcare migrated to the internet. If we wanted to engage with the world, we needed to do it all through a broadband connection.

It became clear that no matter who you are or where you live, you need broadband to have a fair shot at digital age success. It went from nice-to-have to need-to-have for everyone, everywhere. Broadband is now an essential service. Essential services—the ones we count on in every aspect of modern life—have some basic oversight.

So let's be clear about what we are doing today. This agency—the Nation's leading communications authority—believes every consumer deserves internet access that is fast, open, and fair. That is why we determine that the Federal Communications Commission should be able to assist consumers and take action when it comes to the most important communications of our time—and that's broadband.

This is common sense. But in a world where up is down and down is up, the last FCC threw this authority away and decided broadband needed no supervision. As a result, it tossed out net neutrality policies grounded in Title II of the Communications Act that have deep origins in communications law and history.

These net neutrality policies ensured you can go where you want and do what you want online without your broadband provider making choices for you. They made clear your broadband provider should not have the right to block websites, slow services, or censor online content. These policies were court tested and approved. They were wildly popular. In fact, studies show that 80 percent of the public support the FCC's net neutrality policies and opposed their repeal.

Now for a plot twist. After the last FCC took away these policies despite broad public opposition, a curious thing happened. When Washington stepped out, California rode in with its own open internet regime. Other states, too. All in all, nearly a dozen put net neutrality rules into state law, executive orders, and contracting policies. So in effect, we have net neutrality policies that providers are abiding by right now in this country—they are just coming from Sacramento and places like it.

I think in a modern digital economy we should have a national net neutrality policy and make clear the Nation's expert on communications has the ability to act when it comes to broadband. This is good for consumers, good for public safety, and good for national security. And that is why we are taking this action today under Title II of the Communications Act.

Let's start with consumers. They spoke out in droves when this agency repealed net neutrality. They jammed our in-boxes, overwhelmed our online comment system, and clogged our phone lines. They clamored to get net neutrality back. In the intervening years, they have not stopped. Thousands of consumers write us month after month seeking to have this agency help them navigate issues with their broadband service. Yet, as a result of the last FCC throwing these policies out and backing away from broadband, we can only take action when they have issues with their long distance voice service. There is nothing modern about that.

Consumers have made clear to us they do not want their broadband provider cutting sweetheart deals, with fast lanes for some services and slow lanes for others. They do not want their providers engaging in blocking, throttling, and paid prioritization. And if they have problems they expect the Nation's expert authority on communications to be able to respond. Because we put national net neutrality rules back on the books, we fix that today.

Let's talk about public safety. When there is a network outage, all eyes turn to the FCC. But because the last FCC backed away from basic broadband oversight, the agency has only been able to gather outage data when long distance voice service fails, but cannot do the same for broadband. In a modern digital economy, it's crazy that we cannot collect mandatory data about broadband outages. Because it makes it harder to identify patterns of internet failure, fix them when they occur, and put in place policies to make our networks more resilient across the board.

The importance of public safety and broadband was driven home to me earlier this month when I visited the Santa Clara County Fire Department. They told me how when they were responding to an emergency, they discovered that the internet connection in one of their command vehicles was being throttled, compromising their ability to keep connected and fight fires. They want net neutrality rules back. They could not fathom that the last FCC gave up the ability to even investigate what happened, let alone help them or any other consumer having problems with their broadband connection. They're right—and we fix it today.

Let's talk about national security. While this agency has taken a series of actions to reduce our dependence on insecure telecommunications equipment to keep potentially-hostile actors from connecting to our networks, it is not enough to keep our adversaries at bay. There are vulnerabilities in our broadband networks and our ability to do something about them was sidelined by the last FCC withdrawing from the arena.

Take service authorization. Under Title II of the Communications Act, the FCC grants carriers the right to provide communications in the United States. It also has the power to take away that right. We did this during the last several years when we stripped state-affiliated companies from China of their authority to operate in this country. But it is important to understand that our actions did not extend to broadband, thanks to the work of the last FCC. So in essence, we took away the right of CCP-affiliated providers to offer long distance voice service in the United States. But broadband? We lacked the authority to stop that. This is not a modern approach to national security and service authorization. We need to fix it.

Take cybersecurity. Our national security authorities are on record detailing how state-affiliated Chinese carriers and others have exploited insecure internet routing protocols to hijack our internet traffic. When we were asked to do something about it, thanks to the last FCC stepping out of the broadband fray the best we could offer was a forum in the Commission Meeting Room. I don't think that deters our adversaries. We need to fix this.

Take security issues with data centers. When the FCC chose to leave broadband outside its purview, it left interconnection rights without any basic oversight. That means the agency has nothing to say about broadband providers in the United States interconnecting with data centers controlled by CCP-affiliated companies. Again, this needs a fix.

Finally, let me say a few words about what we don't do today. This is not about rate regulation—no how, no way. And we will not undermine incentives to invest in networks. In fact, broadband investment was higher when net neutrality rules were in place than after they were repealed. How about that? The action we take here is good for consumers, public safety, national security—and investment. It's also good for privacy because Title II of the Communications Act does not let your voice provider sell your location data, among other sensitive information. Your broadband provider shouldn't be able to do this either—to anyone or any new artificial intelligence model looking for a payday from your data without your permission.

In our post-pandemic world, we know that broadband is a necessity, not a luxury. We know that it is an essential service. And when a consumer has a problem with it, they should be able to reach out to the Nation's expert on communications and get the help they need. They should be able to count on a national net neutrality policy that is grounded in the law and history of communications in the United States. That is why we take this action today to help ensure that broadband is fast, open, and fair—for all of us.

A proceeding this important and complex requires a large team so let me thank everyone from the Wireline Competition Bureau, Consumer and Governmental Affairs Bureau, Enforcement Bureau, Public Safety and Homeland Security Bureau, Wireless Telecommunications Bureau, Office of Economics and Analytics, Office of Communications Business Opportunities, Office of International Affairs, and Office of General Counsel who worked on this effort.  They are broadband champions, all of them.

## DISSENTING STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:     *Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and
        Order on Reconsideration, WC Docket Nos. 23-320, 17-108 (Apr. 25, 2024)

The Internet in America has thrived in the absence of 1930s command and control regulation by the government.  Indeed, bipartisan consensus emerged early on that the government should not regulate the Internet like Ma Bell's copper line telephone monopoly.

In the Telecommunications Act of 1996, a Republican Congress and a Democrat President came together and agreed "to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation."[1]  Just two years later, the FCC issued a report addressing the terms Congress added to the Communications Act of 1934 in that 1996 enactment—including the distinction Congress had drawn between a lightly regulated Title I "information service" and a heavily regulated Title II "telecommunications service."[2]  The FCC, chaired at the time by a Democrat and President Clinton appointee, confirmed that Internet access service is a Title I information service under the statute.

For decades, that bipartisan position held.  It held through the remainder of the Clinton Administration.  It held through all eight years of the Bush Administration.  And it held through the first six years of the Obama Administration.  Every FCC Chair across those nearly 20 years, Republican and Democrat alike, repeatedly affirmed that broadband Internet access service (BIAS) remained a Title I information service, not a Title II telecommunications service.  The FCC did so again[3] and again[4] and again[5] and again.[6]  And it even did so while pursuing a variety of "net neutrality" initiatives.[7]

Indeed, while activists on the political fringe lobbied for years to persuade the FCC to change course and regulate the Internet as a public utility under Title II, the FCC never wavered.  Not once.

---

[1] *See* Telecommunications Act of 1996, § 509, P.L. 104-104, 100 Stat. 56, 137 (1996) (1996 Act); *see* 47 U.S.C. § 230(b)(2).

[2] See *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501 (1998) (*Stevens Report*); *see also* Dissenting Statement of Commissioner Ajit Pai, *Protecting and Promoting the Open Internet, Order on Remand Order and Declaratory Ruling*, 30 FCC Rcd 5601, at 33-35 (rel. Mar. 12, 2015), https://docs.fcc.gov/public/attachments/FCC-15-24A5.pdf (*Pai 2015 Title II Dissent*).

[3] *See Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002) (classifying broadband Internet access service over cable systems), *aff'd sub nom. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

[4] *See Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities et al.*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853 (2005) (classifying broadband Internet access service over wireline facilities).

[5] *See United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd 13281 (2006) (classifying broadband Internet access service over power lines).

[6] *See Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901 (2007) (classifying broadband Internet access service over wireless networks).

[7] *Preserving the Open Internet; Broadband Industry Practices*, 25 FCC Rcd 17905, 17972-80, 17981, paras. 124-35, 137 (2010) (2010 *Open Internet Order*); *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities et al.*, Policy Statement, 20 FCC Rcd 14986 (2005).

Classifying the Internet as a Title II service remained the third rail of communications policy—both unlawful and misguided.

All of that changed in a flash.  In fact, the years of bipartisan consensus vanished over the course of just 117 seconds.  On November 10, 2014, President Obama published a YouTube video calling on the FCC to label broadband Internet access service a Title II telecommunications service for the first time ever and to impose sweeping new government controls on the Internet in the name of "net neutrality."[8]



President Obama's one minute and 57 second video was the culmination of an unprecedented and coordinated effort by the Executive Branch to pressure an independent agency into grabbing power that the Legislative Branch never said it had delegated.  Indeed, on the very same morning that President Obama released his video calling for Title II, activists showed up at the home of the FCC Chairman and used their bodies to blockade his driveway, demanding that he classify the Internet as a Title II service or else they would not let him leave.  They returned to his home again that same night.  Chairman Wheeler would later write an email suggesting that he believed those activists that showed up at his home did not act independently from the White House.[9]




---

[8] *See* Ezra Mechaber, *President Obama Urges FCC to Implement Stronger Net Neutrality Rules*, White House Blog (Nov. 10, 2014), https://obamawhitehouse.archives.gov/blog/2014/11/10/president-obama-urges-fcc-implement-stronger-net-neutrality-rules.

[9] *See* Hearing before the Committee on Oversight and Government Reform, House of Representatives, *FCC: Process and Transparency*, at 14-19 (Mar. 17, 2015), https://oversight.house.gov/wp-content/uploads/2016/04/3-17-15-FCC-Process-and-Transparency.pdf (2015 *FCC Process and Transparency Hearing*); *see also* Hearing before the Committee on Oversight and Government Reform, House of Representatives, *FCC: Process and Transparency. FCC Hearing Packet*, at 3 (Mar. 17, 2015), https://oversight.house.gov/wp-content/uploads/2015/03/FCC-Hearing-Packet.pdf (2015 *Oversight Hearing Packet*).

The pressure campaign continued to mount. Just weeks later, Title II activists rushed the dais during the FCC's monthly Commission meeting—obstructing an official proceeding—and unfurled a "Reclassify Now" banner behind the heads of FCC Commissioners before FCC security intervened.

 

And just days before President Obama released his Title II video, Jeff Zients—who serves today as President Biden's Chief of Staff, but was serving then as President Obama's Director of the National Economic Council—took the unprecedented step of visiting the FCC Chairman in his FCC office so that he could deliver a message about President Obama's upcoming announcement on Title II.

Why this flurry of pressure from the White House in November of 2014? As FCC emails show, the FCC Chairman was just days away from circulating a draft decision that would have adopted net neutrality rules but stopped short of full Title II classification.[10] The White House decided that it had to stop this FCC plan before the FCC Chairman took it public. So it acted to derail the compromise path that the FCC Chair had been charting.

The Wall Street Journal ran a deeply reported story on all of this, titled "Net Neutrality: How White House Thwarted FCC Chief."[11] It describes "an unusual, secretive effort inside the White House, led by two aides . . . [a]cting like a parallel version of the FCC itself."[12] Internal FCC communications later obtained by Congress only confirmed and added additional concerning details to this reporting.[13]

The Legislative Branch caught wind of the Executive Branch's power play. It did not sit idly by. The Chief of Staff to then Senate Majority Leader Harry Reid wrote the FCC Chair. He said that he had spoken to the White House again and "told them to back off Title II. Went through once again the problems its creates for us."[14] Majority Leader Reid's Chief of Staff followed up adding: "My main point

---

[10] *See* U.S. Senator Ron Johnson, *Regulating the Internet: How the White House Bowled Over FCC Independence. A Majority Staff Report of the Committee on Homeland Security and Governmental Affairs,* United States Senate, at 9-17 (2016), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/FCC%20Report_FINAL.pdf (2016 *Senate Report*).

[11] *See* Gautham Nagesh and Bordy Mullins, *Net Neutrality: How the White House Thwarted FCC Chief*, Wall St. J. (Feb. 4, 2015), https://www.wsj.com/articles/how-white-house-thwarted-fcc-chief-on-internet-rules-1423097522.

[12] *Id.*

[13] *See* 2016 *Senate Report* at 9-17; *see also* 2015 *FCC Process and Transparency Hearing* at 13-17; 2015 *Oversight Hearing Packet* at 1-7.

[14] 2015 *Oversight Hearing Packet* at 4; *see also* 2015 *FCC Process and Transparency Hearing* at 22-23, 41-42.

to the WH is how can you declare that regulations written in the 1930's will work fine for 2014 technology.  Let Tom do his job and this will be fine."[15]



Except the White House did not let the FCC Chair do his job.  The President intervened.  He flipped him.

Reflecting on the White House campaign while testifying before Congress, FCC Chairman Wheeler was asked about President Obama's November 10 announcement and whether it had an impact on the Title II debate at the FCC.  "Of course it did," Chairman Wheeler testified.[16]  "[W]hen Jeff Zients came to see me and said this is what the President is going to do.  That was substantial significance."[17] That testimony is true.  Emails confirm that the FCC stopped the presses on its compromise or hybrid approach, delayed the vote, and quickly drafted a decision that went full Title II—just as the President had demanded.[18]  Chairman Wheeler would refer to the episode in an email as his "Damascus Road experience."[19]

Ever since President Obama flipped FCC Chairman Wheeler,[20] there has been no turning back. Title II is now a matter of civic religion for activists on the left.  They demand that the FCC go full Title

---

[15] 2015 *Oversight Hearing Packet* at 4.

[16] 2015 *FCC Process and Transparency Hearing* at 5.

[17] 2015 *FCC Process and Transparency Hearing* at 40.

[18] 2016 *Senate Report* at 17-29.

[19] 2016 *Senate Report* at 5, 14.

[20] *See Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) (2015 *Title II Order*).

II whenever a Democrat is President. Everyone knows what is expected. Indeed, President Biden made restoring Title II a campaign promise, and Jeff Zients is back in the White House.[21]

So, yes, millions of comments have been filed at the FCC on Title II and net neutrality over the years. But none of them mattered. None of them persuaded the FCC to go full Title II. Only the President mattered. This also explains why the FCC has never been able to come up with a credible reason or policy rationale for Title II. It's all shifting sands. And that's because the agency is just doing what it has been told to do by the Executive Branch and cobbling together *post hoc* rationalizations as it goes along.

*          *          *

Now, you may wonder why I am starting out my statement by recounting this bit of FCC history. Well, for starters, I think it tells an important part of the Title II story. The FCC's position on Title II did not simply evolve over the course of years. The Overton window on Title II did not just naturally shift. President Obama forced the FCC's hand. I understand that there are many people that would like to sweep that entire episode under the rug and forget about it. I am not one of them.

But I am also starting out my statement here for a more fundamental reason. After all, it is not surprising that the Executive Branch tried to pressure another component of the government into doing something the President thought would benefit him politically. In many ways, that is a story as old as the Republic itself. But what is surprising is that it succeeded—that the courts sanctioned the power grab.

You see, the Framers understood the nature of those in power, and they set up a series of checks and balances to avoid government overreach. Chief among them is the Constitution's separation of powers. In Article I, "the People" vested "[a]ll" federal "legislative powers . . . in Congress."[22] As Chief Justice Marshall put it, this means that "important subjects . . . must be entirely regulated by the legislature itself," even if Congress may leave the Executive Branch to "fill up the details."[23] That did not happen here. Congress never passed a law saying that the Internet should be heavily regulated like a utility, nor did it pass one giving the FCC authority to make that monumental determination. The Executive Branch pressured the agency into claiming a power that remained—and remains—with the Legislative Branch.

Fundamentally, I would argue, much of the fault lies with the judiciary's application of *Chevron*. The Supreme Court's decision in *Chevron* created a situation where the Executive Branch could engage in the type of pressure campaigns that we witnessed with Title II. That is because *Chevron*, at least as applied by some courts, has allowed agencies to seize big, new powers without an express grant of authority from Congress. If a statute were ambiguous, *Chevron* held, an agency could go ahead and regulate. In cases of vast economic or political significance at least, *Chevron* not only creates an environment in which agencies push beyond the bounds of their authority, it creates an incentive for the Executive Branch or other political actors to pressure them into doing so.

That is why the Supreme Court's decision in *West Virginia v. EPA* is so important.[24] It makes clear that on matters of enormous significance, like the one before us today, administrative agencies must point to far more than an ambiguous statute to persuade a reviewing court that Congress authorized the agency to act. After all, as a constitutional matter, Congress does not operate like a sieve—inadvertently

---

[21] *See, e.g.*, Biden-Sanders Unity Task Force Recommendations, at 13 (July 8, 2020), https://joebiden.com/wp-content/uploads/2020/08/UNITY-TASK-FORCE-RECOMMENDATIONS.pdf.

[22] U.S. Const. Art. I. § 1; U.S. Const. preamble.

[23] *Wayman v. Southard*, 10 Wheat. 1, 42-43 (1825).

[24] *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022). *See infra* I.A.1-2.

spilling grants of massive new authorities. After *West Virginia*, Congress's delegation of authority in these types of cases can no longer be implicit; it must be explicit. Properly applied, *West Virgina* will stop the flip-flopping and eliminate the incentives for the Executive Branch to engage in the type of pressure campaigns we have seen on Title II. It will help improve administrative agency decisions, too, by ensuring that they are driven by the facts, the law, and the record. It will allow the natural forces of compromise to work their will on legislating, rather than winner-take-all party line votes at agencies. And it will ensure that the legislative powers will remain with Congress unless and until the Legislature decides to delegate them.[25]

If that weren't enough, today's Order independently violates the Supreme Court's command in *West Virginia* through its unrestrained use of forbearance.[26] Although the FCC may forbear from parts of Title II, the Order indiscriminately applies that authority to fundamentally rewrite the 1996 Act by line-item vetoing more than a dozen provisions central to Title II's legislative design. As multiple Supreme Court decisions confirm, that unrestrained application of forbearance is illegitimate. Indeed, just last year, the Supreme Court struck down the Biden Administration's use of analogous waiver authority after the Education Department tried to use it to wipe away student loan debt.[27] As a matter of statutory construction and implied delegation, the FCC is not presumed to have the sweeping power to refashion Title II into an entirely new legislative scheme by picking and choosing which parts of Title II will apply.

\* \* \*

The FCC's flip-flopping also informs how seriously one should take the Order's policy arguments. The FCC tries to dress up its latest power grab in a 400-plus page Order that offers a laundry list of bogus justifications. Few of them rely on actual evidence. Virtually none point to real problems. All fall apart under casual scrutiny. Indeed, it's not even clear the FCC believes the reasons it offers today for Title II.

Today's Order is not about "net neutrality."[28] When we abandoned Title II in 2017, proponents of greater government control flooded the zone with apocalyptic rhetoric. Media outlets and politicians mindlessly parroted their claims. They predicted "the end of the Internet as we know it" and that "you'll get the Internet one word at a time." Consumers would have to pay to reach websites. None of it happened. Americans were subjected to one of the greatest hoaxes in regulatory history.

Nor is today's Order about preventing Internet "gatekeepers" from squashing innovation and free expression.[29] Again, check the receipts. After 2017, it was not the ISPs that abused their positions in the Internet ecosystem. It was not the ISPs that blocked links to the New York Post's Hunter Biden laptop story, old Twitter did that. It was not the ISPs that just one day after lobbying the FCC on this Order blocked all posts from a newspaper and removed all links to the outlet after it published a critical article,

---

[25] *See* Letter from the Hons. Cathy McMorris Rodgers and Ted Cruz *et al.* to the Hon. Jessica Rosenworcel, Chairwoman, FCC, at 2 (Apr.. 23, 2024) ("Congress's decision to treat broadband Internet access as an information service, rather than a telecommunications service, was a deliberate policy choice."); Letter from the Hon. Josh Gottheimer *et al.* to the Hon. Jessica Rosenworcel, Chairwoman, FCC, at 2 (Apr. 20, 2024) ("Given that there is no threat of imminent harm requiring Commission action, we ask the Commission to defer action on the NPRM to allow this legislative process to continue and to avoid imperiling important federal policy objectives.").

[26] *See infra* I.A.3.

[27] *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

[28] *See infra* II.A.1.

[29] *See infra* II.A.3.

Facebook did that.[30]  It was not the ISPs that earlier this month blocked the links of California-based news organizations from showing up in search results to protest a state law, Google did that.[31]  And it was not the ISPs that blocked Beeper Mini, an app that enabled interoperability between iOS and Android messaging, Apple did that.[32]

Since 2017, we have learned that the real abusers of gatekeeper power were not ISPs operating at the physical layer, but Big Tech companies at the application layer.  Perversely, today's Order makes Big Tech behemoths even stronger than before.

And today's Order is not about correcting a market failure.  Broadband access is more vibrant and competitive than ever, no matter how you slice the reams of data.  Americans benefited from lower prices, faster speeds, broader and deeper coverage, increased competition, and accelerated Internet builds.

Here's what the data show.  Internet speeds are up 430% since 2017 on the fixed broadband side, and they are up 647% on the mobile side.  In real terms, the prices for Internet services have dropped by about 9% since the beginning of 2018, according to BLS CPI data.  On the mobile broadband side alone, real prices have dropped by roughly 18% since 2017, according to BLS and industry data.  And for the most popular broadband speed tiers, real prices are down 54%, and for the fastest broadband speed tiers, prices are down 55%, over the past 8 years, according to BLS and industry data.[33]

\*     \*     \*

The FCC realizes that the old justifications for Title II will no longer cut it.  So, as if nothing ever happened, as if the old predictions were not disproven, the agency invents new justifications.  The FCC throws whatever it can think of against the wall to see if anything sticks.  The Order now claims Title II is necessary for national security, for public safety, for law enforcement, for pole attachments, for accessibility, for privacy and cybersecurity—the list goes on and on.

But the FCC's latest set of claims fare no better than those trotted out back in 2015.  They are simply new pretext to justify an old power grab.

Take national security.[34]  The FCC has identified no gap in national security that Title II is necessary to fill.  Rather, the FCC record makes clear that Congress has already empowered agencies with national security expertise—including the Departments of Homeland Security, Justice, Commerce, and Treasury—to address these issues in the communications sector.  Indeed, the Biden Administration's own filing in this proceeding confirms national security agencies already have and "exercise substantial authorities with respect to the information and communications sectors."

In particular, the Biden Administration already has the authority to prohibit entities controlled by the Chinese Communist Party (CCP) from operating in the U.S. today.  Indeed, the Commerce Department codified one such set of authorities back in 2021.  So Title II fills no gap in authority.

---

[30] *See* Sherman Smith, *Facebook Apologizes for Blocking Kansas Reflector, Then Expends Crackdown to Other News Sites*, Kansas Reflector (Apr. 5, 2024), https://kansasreflector.com/2024/04/05/facebook-apologizes-for-blocking-kansas-reflector-then-expands-crackdown-to-other-news-sites/.

[31] *See* Gerrit De Vynck and Laura Wagner, *California Wants Big Tech to Pay for News.  Google is Fighting Back* (Apr. 21, 2024), https://www.washingtonpost.com/technology/2024/04/21/google-blocks-california-news/.

[32] *See* Emma Roth, *FCC Commissioner Wants to Investigate Apple Over Beeper Mini Shutdown*, The Verge (Feb. 12, 2024), https://www.theverge.com/2024/2/12/24071226/fcc-commissioner-brendan-carr-apple-beeper-mini.

[33] *See infra* II.A.4; Statement of FCC Commissioner Brendan Carr, *New Data Confirm What Americans Already Know: The Internet Is Not Broken and President Biden's Plan for Government Control Won't "Fix It,"* (Apr. 19, 2024), https://docs.fcc.gov/public/attachments/DOC-401950A1.pdf.

[34] *See infra* II.B.1.

Indeed, as to those specific CCP-aligned companies, the FCC's own database of ISPs shows that they are not offering any broadband services that would be subject to Title II even after reclassification.

Or take consumer privacy.[35]  The FTC already regulates ISPs and their privacy practices.  Indeed, at this very moment, broadband consumers benefit from the same set of federal privacy rules that protect consumers across the economy.  But those federal rules go away with respect to broadband if the FCC votes for Title II.  That is because, by law, the FTC loses 100% of its authority over any service that is regulated by the FCC under Title II.  In turn, the FCC's Title II decision would leave broadband consumers with no federal privacy rules to protect them because Congress prohibited the FCC from applying its own privacy rules or any substantially similar ones to ISPs back in 2017.  While the FCC claims that there would still be some residual Section 222 statutory privacy provisions that could apply to ISPs, that assertion is dubious at best given the 2017 law.  So, far from filling a gap in consumer privacy rules, an FCC decision to apply Title II to broadband would create one.

Or take cybersecurity.[36]  Once again, the agency makes no serious attempt to argue that Title II is necessary to promote cybersecurity.  For one, Congress and the Executive Branch have already formulated a comprehensive cybersecurity regime that is solidly grounded in existing law.  That effort is led, not by the FCC, but by the Cybersecurity & Infrastructure Security Agency, which is part of DHS.  Nothing in Title II gives the FCC any additional authorities when it comes to participating in the federal government's CISA-led process.  For another, Title II does not authorize the FCC to adopt national cybersecurity standards.  Indeed, even under the FCC's reading, Title II does not even apply to the vast range of cyber targets, like cloud providers and tech platforms, further undermining any claim that Title II is necessary to ensure America's cybersecurity.

Or take network resiliency and outage reporting.[37]  Here, too, the FCC makes no coherent case for Title II advancing any of these interests.  For one, the FCC already collects outage reports, operational status, and restoration information from broadband service providers.  For another, America's broadband networks are more robust and resilient than those in countries with far more heavy-handed or Title II-like regulatory regimes.  And with respect to 911 in particular, the FCC already has specific rules in place today that address outages that impact this public safety service.

Or take public safety.[38]  The FCC rests this claim on a single event that, it turns out, has nothing to do with Title II or net neutrality.  In that 2018 incident, a fire department purchased a data-limited plan and experienced reduced speeds after exceeding its limits.  The ISP made an exception and lifted the reduction.  Although it constantly invokes this event, the FCC studiously avoids stating that this type of issue would be prevented by Title II.  Under today's Order, it would remain lawful for multiple reasons.

<p style="text-align:center">*          *          *</p>

Misleading the American people is one thing, but the Order also leaves them worse off.

Everything we love about the Internet comes from *investment*.  Our broadband networks are built on private capital, and those investment decisions in turn depend on a company's best guess of the long-term financial horizon.  Will ISPs invest as intensively when the rules of the road are opaque, when business choices can be second-guessed without notice, when regulators reserve the right to dictate the rate of return, or when upgrades and innovations require more and more paperwork and approvals?

Uncertainty riddles every aspect of this Order.  Will consumers pay new broadband taxes?  Not today, but maybe tomorrow.  Can ISPs offer customized plans for consumers with unique data, speed, or

---

[35] *See infra* II.B.2.

[36] *See infra* II.B.1.

[37] *See infra* II.B.3.

[38] *See id.*

cost needs? Possibly, but it depends. What about intelligent networks to prevent congestion? Sure, but only if a handful of indeterminate factors are met. Does the FCC intend to issue new regulations? Definitely, but you will have to wait and see what the agency does.

By all indications, things will get worse before they get better. Apart from this Order, the Biden Administration is on a spree of unchecked regulatory excess. At President Biden's urging, the FCC adopted a *Digital Equity Order* that hands the Administrative State veto power over every decision about the provision of Internet service in the country. Elsewhere, the FCC is laser focused on nullifying private contracts, micromanaging advertising, dictating rates, blindsiding companies by enforcing legal expectations that aren't on the books, and stepping into the swim lanes traditionally occupied by other federal agencies.

The FCC apparently doesn't understand—or doesn't care—how this volatile and punitive climate of regulation will deter investment in broadband networks. This isn't just heady economic theory. Again, let's go to the tape. Broadband investment slowed down after the FCC imposed Title II in 2015, and it picked back up after we restored Title I in 2017. Or look at Europe, where regulators have long applied centralized, utility-style controls to their continent's Internet infrastructure. While America's digital economy is the envy of the world, sluggish European networks suffer from chronic underinvestment.

Without greater investment, the Biden Administration's broader policy objectives fall apart. The Administration wants ISPs to opt into federal support programs so they can bring broadband to high-cost, unserved communities. But who will take that financial risk when an ISP's returns can be wiped away with the stroke of a bureaucrat's pen? This Administration has pushed ISPs to deploy open, interoperable networks to offer competitive options beyond the dominant Chinese equipment manufacturers. But who will invest in Open RAN when its core functionalities—virtualization and network slicing—might violate an amorphous rule against "impairing" or "degrading" traffic?

While misrepresenting Title II's benefits, the Order takes an ostrich-like approach to its documented harms. It is a textbook example of "arbitrary and capricious" agency action to reach a predetermined outcome.

In the end, though, I remain optimistic. I am confident that we will right the ship. And I am certain that the courts will overturn this unlawful power grab. I dissent.

# I.  THE FCC LACKS STATUTORY AUTHORITY TO RECLASSIFY BROADBAND AS A TITLE II SERVICE.

## A.  The Major Questions Doctrine Prohibits the FCC from Reclassifying Broadband Under Title II

In the inevitable appeal of today's Order, the reviewing court will ask a fundamental but straightforward question: Did Congress authorize the FCC to impose Title II utility-style regulations on broadband Internet access service? The court will start there for a simple reason. In Article I of the Constitution, "the People" vested "[a]ll" federal "legislative powers . . . in Congress."[39] If Congress has not lawfully delegated a power to an agency, then it remains for Congress, not an unelected administrative agency, to decide whether to exercise that legislative power.

On appeal, the FCC will argue that Congress has provided it with the requisite authority. And the agency will undoubtedly seek refuge in prior judicial rulings—whether *Brand X*, *Mozilla*, or *U.S. Telecom*—that upheld the FCC's assertion of statutory authority to classify broadband as a Title I or Title II service. In those rulings, the courts applied *Chevron*'s familiar two-step test to affirm, in the

---

[39] U.S. Const. Art. I. § 1; U.S. Const. preamble.

circumstances particular to those cases, what the courts found to be the FCC's reasonable interpretation of an ambiguous statute.[40]

But those cases provide no support for the FCC's position today because *Chevron* is not the standard that will apply. In 2022, the Supreme Court formally adopted the "major questions doctrine" (MQD) in its seminal *West Virginia v. EPA* decision.[41] As articulated in *West Virginia*, an agency exceeds its statutory bounds when it renders a "decision of vast economic or political significance" without "clear congressional authorization" for the power it asserts.[42] Applied here, the MQD requires the FCC to possess an unambiguous congressional delegation of power, through a clear grant of statutory authority, to regulate ISPs as common carriers under Title II.

Whether sounding as a "clear statement" canon of statutory construction or a substantive prohibition against the delegation of legislative power, the MQD reflects a bedrock principle of constitutional law. Administrative agencies like the FCC do not have *sub silentio* authority to act as roving policymakers, with the unbounded discretion to enact economy-altering regulations at whim. Rather, agencies "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line."[43] Agencies must interpret statutes through the lens of separation of powers and "a practical understanding of legislative intent," for "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[44] As Justice Scalia aptly framed it many years earlier: Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions."[45]

Although it was not formally established until 2022, the MQD has its origins in so-called "step zero" decisions from the Supreme Court beginning more than two decades ago in *Brown & Williamson*.[46] Under this line of cases, the deferential *Chevron* standard was considered inapt to guide the judicial review of significant agency actions. This makes sense because, whatever the merits of *Chevron* deference in the mine-run of minor administrative agency decisions, it should be clear that questions of vast economic and political consequence have been addressed by Congress in the first instance.

In *U.S. Telecom II*, the D.C. Circuit upheld the FCC's 2015 *Title II Order* under *Chevron* and its progeny, but before the Supreme Court fully developed and formally recognized the MQD. Since *U.S. Telecom II*, however, *Chevron* has fallen into desuetude and may be soon overruled. Meanwhile, the Court has applied the MQD with greater frequency and articulated the circumstances under which the doctrine will govern exceptional assertions of agency authority. With the exception of then-Judge Kavanaugh, who presciently foresaw the MQD and would have employed it to invalidate the 2015 *Title II Order*,[47] the courts have not fully grappled with the MQD's application to Title II, given that the Supreme Court formally institutionalized the doctrine in 2022 and reaffirmed it in 2023.

---

[40] *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005); *Mozilla Corp. v. FCC*, 940 F. 3d 1 (D.C. Cir. 2018); *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 422 (D.C. Cir. 2017) (*U.S. Telecom II*); *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (*U.S. Telecom I*); *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014); *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[41] *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022).

[42] *West Virginia*, 142 S. Ct. at 2605; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

[43] *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

[44] *West Virginia*, 142 S. Ct. at 2609 (quoting *U.S. Telecom II*, 855 F.3d at 419 (Kavanaugh, J., dissenting from denial of rehearing en banc)).

[45] *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001).

[46] *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120 (2000).

[47] *U.S. Telecom II*, 855 F.3d at 422 (Kavanaugh, J., dissenting from the denial of rehearing en banc).

Today's Order is unlawful because it satisfies both prongs of the MQD, as discussed at greater length in the sections below.[48]

*First*, the Order's decision to regulate broadband as a public utility under Title II represents a "major question" of "vast economic and political significance." No single factor is determinative on this question under the Court's precedent. In evaluating agency actions, the Court has considered their broader economic impact, their impact on industry sectors, the scope and scale of regulatory burdens they impose on the public at large, their political ramifications, and the extent to which they discover unheralded new powers in long-extant statutes. By any measure, the Order has decided a major question.

*Second*, the Order lacks "clear congressional authorization" under the 1996 Act to apply Title II regulation to ISPs. Starting from first principles, the statute's text, the 1996 Act's deregulatory purpose, and the FCC's regulatory antecedents confirm that broadband is best considered an "information service." But even if the 1996 Act's meaning were ambiguous, as the Supreme Court and lower courts have recognized time and again, that ambiguity decisively cuts against today's Order. If the statute is ambiguous about Title II regulation of broadband, Congress could not have clearly authorized it as *West Virginia* requires. Indeed, even if the FCC were to establish a plausible textual basis for its position, *West Virginia* would still require courts to vacate this Title II decision. Plausibility alone is not enough; there must be clear congressional authorization.

Experts across ideological and partisan lines agree. Two former Solicitors General from the Obama Administration—individuals who support Title II regulation of broadband as a policy matter— have concluded "[t]here is no doubt" that whether broadband may be classified as a Title II service "presents a major question," and "the Commission lacks clear statutory authority to reclassify broadband under Title II."[49]

*Finally*, the Order independently violates the MQD through its unrestrained use of forbearance. Although Section 10 of the 1996 Act allows the FCC to forbear from provisions of Title II, the Order indiscriminately applies that authority to fundamentally rewrite the 1996 Act by excising more than a dozen provisions central to Title II's legislative design. Two Supreme Court decisions confirm that the Order's application of forbearance is illegitimate. As a matter of statutory construction and implied delegation, the FCC is not presumed to have the sweeping power to refashion Title II into an entirely new legislative scheme by picking and choosing which sections will apply, with the resulting economic impact in the billions of dollars.

### 1. The Order Decides a Policy Question of "Vast Economic and Political Significance"

The FCC's decision to impose Title II regulation on broadband constitutes a major question. As the D.C. Circuit confirmed in its 2014 *Verizon* decision, the "regulation of broadband Internet providers certainly involves decisions of great 'economic and political significance.'"[50] As then-Judge Kavanaugh observed in 2017, it is "indisputable" that Title II presents a major question, and "any other conclusion would fail the straight-face test."[51] And as Judge Millett wrote in 2019, this is an area "fraught with political contest."[52]

---

[48] Citing a law review article, the Order misstates the Supreme Court's two-prong MQD test by recasting it as an amorphous multifactorial balancing test comprising of various factors at play in the various decisions. *See* Order at para. 256 & n.1073. But the Court has never described the MQD in the manner the Order describes.

[49] Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, at 10, 13 (Sept. 20, 2023), https://aboutblaw.com/bazq.

[50] *Verizon*, 740 F.3d at 639 (D.C. Cir. 2014) (quoting *Brown & Williamson*, 529 U.S. at 160).

[51] *U.S. Telecom II*, 855 F.3d at 417 (Kavanagh, J., dissenting from denial of rehearing en banc).

[52] *Mozilla*, 940 F. 3d at 95 (Millett, J., concurring).

Those conclusions are only more true today. Over the last 25 years, the Supreme Court's MQD decisions and their forerunners have considered various criteria under which agency action touches on policy questions of "vast economic and political significance." All of these criteria are present here.

Consider Title II's political significance.[53] So-called "net neutrality" is perhaps the most contentious political issue that the modern FCC has ever confronted. No wonder President Biden, like President Obama before him, took the extraordinary step to pressure the FCC—an independent agency that is designed to operate outside undue political influence from the Executive Branch—to reinstate Title II regulation of broadband.[54] No wonder that President Obama's Director of the National Economic Council personally paid the FCC Chair a visit back in 2014 to discuss this issue. And no wonder that the FCC's previous Title II proceedings were the most active in the agency's history, receiving millions of comments. But Congress has evaluated and rejected many bills that would have given the FCC authority to regulate broadband as a Title II, common carrier service.[55] This is the quintessential issue best left to Congress to decide.

Or consider first the scope and scale of expanded FCC powers over the communications industry.[56] Title II does not merely regulate more at the margins. It regulates virtually everything. And Title II does not create incremental liability risk. It makes ISPs potentially liable for everything they do. The Order's application of Title II entails the following:

- **Vague standards** through amorphous "reasonableness" and "nondiscrimination" requirements that encourage anyone to complain about almost anything;[57]

- **Unlimited regulation** through new rulemaking powers to implement any provision in Title II, including the "reasonableness" and "nondiscrimination" requirements;[58]

- **Unlimited punishment** through new enforcement powers that the FCC can apply whenever it wants;[59]

- **Endless lawsuits** through a new private right of action and money damages for any violation in Title II;[60] and

---

[53] *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (observing that the Attorney General's ban on prescribing drugs for physician-assisted suicide implicated a "subject of an earnest and profound debate across the country").

[54] Executive Order on Promoting Competition in the American Economy, § 5(l)(2) (July 9, 2021).

[55] *U.S. Telecom II*, 855 F.3d at 417 (Kavanaugh, J., dissenting from denial of rehearing en banc) (citing H.R. 5252, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); H.R. 5417, 109th Cong. (2006); S. 2360, 109th Cong. (2006); S. 2686, 109th Cong. (2006); S. 2917, 109th Cong. (2006); S. 215, 110th Cong. (2007); H.R. 5353, 110th Cong. (2008); H.R. 5994, 110th Cong. (2008); H.R. 3458, 111th Cong. (2009); S. 74, 112th Cong. (2011); S. 3703, 112th Cong. (2012); H.R. 2666, 114th Cong. (2016)).

[56] *West Virginia*, 142 S. Ct. at 2609 (observing that EPA regulation to effectively shift energy protection away from coal-fired plants implicated "unprecedented power over American industry"); *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994) ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion …").

[57] 47 U.S.C. §§ 201(b), 202(a).

[58] 47 U.S.C. § 201(b).

[59] 47 U.S.C. §§ 208-209.

[60] 47 U.S.C. §§ 206-207.

- **Government permission** for ISPs to enter the broadband market.[61]

But it does not end there.  Using its Title II authority, the Order adopts the Internet Conduct Rule, which makes almost every aspect of an ISP's network management potentially illegal, subject to a bureaucrat's "case-by-case" review of "a non-exhaustive list of factors."[62]  Today, the Order says the following practices *might* be illegal, without saying when:

- **Free and sponsored data plans**, like when a wireless provider offers Netflix without counting against data caps;[63]

- **5G network slicing**, an innovative technology to offer customized connectivity for public-safety, cybersecurity, autonomous vehicles, automated factories, and other applications that have unique speed, capacity, or latency requirements;[64]

- **Usage-based pricing**, which allows ISPs to offer cheaper plans to consumers with limited data needs;[65]

- **Techniques to deliver streaming mobile video**, using bitrate management techniques to provide high-quality resolution on small screens without overloading the network;[66] and

- **Wholesale practices**, which involve no direct relationship with consumers.[67]

The Order's pervasive ambiguity on these issues is compounded by the FCC's decision to insert language, at the eleventh hour, to expand the definition of "throttling" to cover plans that offer faster speeds but leave no consumer worse off.[68]  This novel idea, barely if ever contemplated in the NPRM, creates a new maze of internal contradictions and ambiguities.  For one, the faster-is-throttling rule runs headlong into the no-throttling rule as traditionally understood, which requires that some other traffic streams be made worse off—*i.e.*, "degraded" or "impaired."[69]  But even as advocates for faster-is-throttling concede, network resources are "not a zero-sum game."[70]  In other words, users on the network often will see no impairment or degradation simply because others contract for a guaranteed quality-of-service (QoS).  For another, the faster-is-throttling rule drives a truck through the no-paid-prioritization rule, which prohibits favoring traffic *only when* it involves (a) affiliated content or (b) paid content.[71]  Through a flick of the wrist at the last minute, the FCC suddenly throws another wrench into the Title II Rube Goldberg machine.

---

[61] 47 U.S.C. § 214(a).

[62] Order at para. 513.

[63] Order at para. 533.

[64] Order at paras. 199-203.

[65] Order at para. 542.

[66] Order at paras. 196-97, 500-01.

[67] Order at para. 193.

[68] Order at paras. 499, 500.

[69] Order at para. 498.

[70] Letter from Scott Jordan & Jon Peha, WC Docket No. 23-320, at 4 & n.24 (Apr. 19, 2024).

[71] Order at para. 503.

And it does not end there, for the FCC envisions more Title II rulemakings. While the Order does not offer the full list, it gives us a sneak preview of what ISPs might be forced to do in the future:

- **Financial restrictions** through ownership limitations that force mobile providers, especially smaller ones, to divest critical investment from overseas;[72]

- **Data restrictions** that would cover only ISPs while leaving Big Tech, data brokers, and other privacy abusers regulated under a different set of rules;[73] and

- **Government approvals** for mobile ISPs to offer service by obtaining authorizations traditionally limited to subsea cables and other international services.[74]

Or consider the Order's sweep on private parties.[75] The United States has more than 2,000 ISPs. As then-Judge Kavanaugh observed, Title II regulation "will affect every Internet service provider, every Internet content provider, and every Internet consumer."[76] But the Order goes even further than the 2015 *Title II Order*, asserting Title II authority to regulate wholesalers (and potentially other upstream entities that offer economic inputs in the broader supply chain) that interact with broadband providers.[77]

Or consider the Order's economic impact to a "significant portion of the U.S. economy."[78] The U.S. broadband market, by some accounts, generates at least $150 billion in annual revenue.[79] And one study estimates that "the persistent prospect of Title II policy reduced investment by about 10%, on average, between 2011 and 2020."[80] That reduction in investment, in turn, translated into tens of billions in foregone broadband capital spending, a $1.45 trillion loss in GDP over ten years, and "an annual loss to the nation of about 81,500 information sector and 195,600 total jobs."[81] Another study projected a 20% reduction in capital spending thanks to Title II.[82]

---

[72] Order at para. 438.

[73] Order at para. 359.

[74] Order at para. 344 & n.1386.

[75] *Nat'l Federation of Independent Business v. OSHA*, 142 S. Ct. 661 (2022) (observing that OSHA vaccine mandate would cover roughly 84 million workers); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) (observing that EPA limits on greenhouse gas emissions would have "require[d] permits for the construction and modification of tens of thousands, and the operation of millions, of small sources nationwide").

[76] *U.S. Telecom II*, 855 F.3d at 417 (Kavanagh, J., dissenting from denial of rehearing en banc).

[77] *See* Order at para. 193.

[78] *Brown & Williamson*, 529 U.S. at 160; *see also Alabama Association of Realtors v. Dept of HHS*, 141 S. Ct. 2485 (2021) (observing that the HHS eviction moratorium on rental properties had an economic impact of $50 billion).

[79] *See* IBISWorld, *Internet Service Providers in the US – Market Size* (Sept. 11, 2023), https://www.ibisworld.com/industry-statistics/market-size/internet-service-providers-unitedstates/ (estimating size of U.S. broadband market by total annual revenue).

[80] George S. Ford, *Investment in the Virtuous Cycle: Theory and Empirics*, 22-23 (Dec. 12, 2023), https://phoenix-center.org/pcpp/PCPP62Final.pdf.

[81] *Id.*

[82] George S. Ford, *Regulation and Investment in the U.S. Telecommunications Industry*, 50 Applied Economics 6073–6084 (2018), https://www.fcc.gov/ecfs/document/1214841324432/3; *see also* George S. Ford, *In Response to the FCC ...*, Phoenix Center Perspectives 24-04 (Apr. 18, 2024), https://www.phoenix-center.org/perspectives/Perspective24-04Final.pdf ("As detailed here, the Commission's effort to discredit my earlier work [in the draft Order] on investment through replication falls flat. … Properly analyzed, including

(continued….)

In response, the FCC asserts that broad application of forbearance authority mitigates the Order's economic impact and thus renders the MQD inapplicable.[83]  That is wrong twice over.  Even with forbearance, the Order affects a "significant portion of the U.S. economy" by opening the door to plenary rulemaking and enforcement authority over the broadband industry.  And, independently, the Order's unrestrained use of forbearance actually confirms why it violates the MQD, as discussed below.[84]

Likewise, the FCC asserts that "[w]e do not think the rules we adopt today have the extraordinary economic and political effect required."[85]  But this ostrich-like claim, one that will be entitled to no deference, is not credible.  The FCC itself asserts in the Order that these regulations are vital in its view to advancing everything from national security, law enforcement, cybersecurity, public safety, network resiliency, consumer privacy and data security, access to broadband itself, access for people with disabilities, and free expression on the Internet.  Title II's proponents have furthered argued that common carriage is "one of the most important … legal frameworks in human history"[86] and potentially "transformative" for society.[87]  The same agency or outside entities that put these claims forward cannot now be heard to argue that this decision lacks the relevant significance for MQD purposes.

Or consider the FCC's claim of comparative expertise.[88]  As discussed in the sections below, the FCC can lay no claim as the expert agency in many of the areas for which it allegedly needs Title II— whether national security, law enforcement, cybersecurity, consumer protection, privacy, or data security.

Or consider the Order's "claim to discover in a long-extant statute an unheralded power."[89]  The FCC has regulated broadband under Title I for all but two years since the 1996 Act.  We have done so repeatedly on a bipartisan basis—rejecting Title II both as a general matter (1998, 2010, 2017, 2020)[90] and in the technology-specific context of wireline facilities (2005),[91] cable modem services (2005),[92]

---

estimation using the method of Synthetic Counterfactuals as recommended in the Draft Order, the revised [Bureau of Economic Analysis] data reveals large and negative investment effects.").

[83] Order at para. 257.

[84] *See infra* I.A.3.

[85] Order at para. 257.

[86] Comments of Free Press, WC Docket No. 23-320, at 2 (Dec. 14, 2023).

[87] Comments of Public Knowledge, WC Docket No. 23-320, at 46 (Dec. 14, 2023).

[88] *Biden v. Missouri*, 142 S. Ct. at 653.

[89] *West Virginia*, 142 S. Ct. at 2610 (observing that the agency "claim[ed] to discover in a long-extant statute an unheralded power").

[90] *Restoring Internet Freedom*, Order on Remand, 35 FCC Rcd 12328 (2020) (2020 *Restoring Internet Freedom Remand Order*); *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311 (2017); *Preserving the Open Internet*, Report and Order, 25 FCC Rcd 17905, n.381 (2010) ("The open Internet rules that we adopt today do not regulate Internet applications, much less impose Title II (i.e., common carrier) regulation on such applications"); *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501 (1998) (*Stevens Report*) (classifying Internet access service).

[91] *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities et al.*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853, para. 14 (2005).

[92] *Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, GN Docket No. 00-185, CS Docket No. 02-52, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002) (Cable Modem Order) (classifying broadband Internet access service over cable systems), *aff'd sub nom. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

broadband over power lines (2006),[93] and wireless broadband (2007).[94] The FCC's claim that Congress implicitly delegated the agency authority to heavily regulate broadband as a Title II utility service all the way back in 1996—in a deregulatory enactment—but the FCC simply did not discover that authority until decades later, further confirms that the Commission's decision triggers the MQD.[95]

And as discussed below, the 1996 Act's contemporaneous history is similarly clear: before and after passing the 1996 Act, Congress repeatedly rejected the unheralded power that the Order asserts, consistent with a virtually unbroken line of precedent treating broadband as a Title I service.

> **2.** **Congress Did Not Clearly Authorize the FCC to Regulate Broadband as Public Utility.**

The MQD's second prong requires an administrative agency to establish "clear congressional authorization" to regulate in the manner at issue.[96] This part of the inquiry serves a vital purpose. It ensures that the legislative power that the Framers vested in Congress remains with Congress unless and until Congress decides to delegate it. And it ensures that agencies like the FCC cannot reach up and seize power that belongs to the people's elected representatives. This is one way in which the MQD marks a sea change in administrative law. When it comes major questions, administrative agencies can no longer rely on implicit or ambiguous provisions of law to make the case that Congress empowered them to act.

This portion of the MQD inquiry also operates to avoid the type of regulatory flip-flopping on major questions that *Chevron* would have otherwise allowed—a whiplashing on matters of vast significance that serves no legitimate long-term interest. That whiplashing with every change in political administration, in turn, offers persuasive evidence that Title II is properly within Congress's remit, not the FCC's.

The FCC puts forward just two main arguments for why its decision today satisfies *West Virginia*'s "clear congressional authorization" standard. Except the FCC does not get out of the starting blocks with either argument. In both cases, the FCC simply argues against the Court's holding in *West Virginia* rather than showing why the FCC has satisfied it in the Order.

*First*, the FCC pretends that the Supreme Court never decided *West Virginia*. It argues that Congress has provided the FCC with clear congressional authorization because the D.C. Circuit's decision in *U.S. Telecom* relied on the Supreme Court's 2005 opinion in *Brand X*, which upheld the

---

[93] *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, WC Docket No. 06-10, Memorandum Opinion and Order, 21 FCC Rcd 13281 (2006) (classifying broadband Internet access service over power lines).

[94] *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, WT Docket No. 07-53, Declaratory Ruling, 22 FCC Rcd 5901 (2007) (*Wireline Broadband Internet Access Services Order*) (classifying broadband Internet access service over wireless networks).

[95] The 1998 *Advanced Services Order* is not to the contrary, and broadband today presents a more straightforward instance of an information service. In the *Advanced Services Order*, the FCC considered digital subscriber line (DSL) technology, which allowed "transmission of data over the copper loop at vastly higher speeds than those used for voice telephony or analog data transmission" between each "subscriber's premises" and "the telephone company's central office." *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 24012, 24026–27, para. 29 (1998). For this service, a DSL access multiplexer would direct the traffic onto a carrier's packet-switched data network, where it could then be routed to a "location selected by the customer" like a "gateway to a . . . set of networks, like the Internet." *Id.* at paras. 30–31. The FCC then classified only the *last-mile transmission service* between the end user and the ISP as a telecommunications service, while observing that the Internet access service itself was still an information service. *Id.* at para. 36.

[96] *West Virginia*, 142 S. Ct. at 2609.

FCC's authority to classify broadband as a Title I service.[97]  But *Brand X* determined that the relevant statutory language is ambiguous.[98]  Bootstrapping your way back to *Brand X* is fine as far as it goes, but it just does not get the FCC where it wants.  Neither *U.S. Telecom* nor *Brand X* stand for the proposition that Congress provided the FCC with clear congressional authorization as required by the Court's 2022 *West Virginia* decision.

Quite the opposite.  The FCC can hug *Brand X* all it wants, but after *West Virginia* it operates as an anchor not a life preserver for the FCC's position here today.  *Brand X* forecloses any FCC assertion that it has the requisite clear congressional authority because the Court determined that the statute is ambiguous on the classification question at issue.  In other words, for this FCC argument to prevail, the agency would need the Supreme Court to reverse *West Virginia* and go all the way back to the *Chevron* standard.

*Second*, the FCC lodges an argument that would not only require the Supreme Court to overturn *West Virginia*, but would also require the Court to confer even more discretion on administrative agencies than even *Chevron* allows.  Specifically, the FCC argues that, as a general matter, it is not controversial to read the Communications Act as giving the FCC power to classify some services as Title I services and others as Title II services.[99]  Indeed, the FCC says, the Communications Act must be read as giving the FCC that general authority.  It necessarily flows from there, the FCC asserts, that the Communications Act must also be read as giving the FCC authority to regulate broadband as a utility service under Title II because that regulation flows from the FCC's classification decision.  In other words, to hear the FCC tell it, Congress has provided the FCC with clear congressional authorization to classify services and it is merely exercising that power here.[100]

But that bit of sophistry mischaracterizes Supreme Court precedent.  The relevant inquiry under *West Virginia* is not whether the FCC possess authority as a general manner to classify services.  The question is whether, in the category of major questions cases to which MQD applies, the agency has "clear congressional authorization for the power it claims" or, as stated elsewhere in the decision, "'clear congressional authorization' to regulate in that manner."[101]  In other words, the question required by *West Virginia* is whether Congress provided the FCC with clear congressional authorization to subject broadband to the heavy-handed regulatory regime adopted here.

Think about it.  If the FCC's position were correct, and the relevant question of legal authority were simply a matter of deciding what statutory terms mean, then an agency could use a statute that authorized it to regulate cars as a basis for regulating airplanes.  Under the FCC's theory, that automobile agency must necessarily have authority to determine what constitutes a car and therefore, the FCC's argument would go, Congress has provided clear congressional authorization for it to label anything, whether airplanes, cars, or boats.

And if the FCC's position were correct, then MQD would be a dead letter, for any agency could invoke the power to interpret the law to circumvent the MQD.  After all, *Chevron* presumes that, in the ordinary course, agencies possess delegated authority from Congress to give reasonable interpretations to

---

[97] Order at para. 264.

[98] *Brand X*, 545 U.S. at 989-997.

[99] Order at para. 264.

[100] The FCC relatedly argues that if the MQD applies to this Title II decision today, then the MQD should also have applied to the *Restoring Internet Freedom Order*.  *See* Order at para. 254 & n.1063.  Whatever the merits of that claim, it provides no basis for evading MQD review in this case.  In any event, the Order's use of forbearance distinguishes it under the MQD.  Forbearing from a statutory consequence (as is the case here) is decidedly different for MQD purposes than deciding to leave a service in its status quo deregulatory position (as was the case in the *Restoring Internet Freedom Order*).

[101] *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

ambiguous statutes. But the MQD operates as an exception to *Chevron*. So, whatever implied delegated authority an agency may have under normal circumstances to interpret ambiguous statutes in a reasonable fashion, that delegated authority is no longer presumed to exist when the agency asserts powers of "vast economic and political significance."

And if the FCC's position were correct, the Supreme Court's specific MQD holdings would make little sense. The FDA's authority to interpret the words "drugs" and "devices" would have conferred power to regulate and ban tobacco, contrary to *Brown & Williamson*.[102] The EPA's authority to interpret the term "air pollutants" would have conferred power to regulate greenhouse gases, contrary to *Utility Air*.[103] The CDC's authority to adopt measures "necessary to prevent the ... spread of" disease would have conferred power to issue a nationwide eviction moratorium on residential properties, contrary to *Alabama Association of Realtors*.[104]

In particular, the FCC's position cannot be squared with *West Virginia*. Indeed, the FCC presents the same argument that the EPA ran in that case. There, the EPA argued that Congress clearly authorized it to establish emissions caps at a level reflecting, in the statute's language, "the application of the best system of emission reduction."[105] And the EPA argued that its generation shifting regulations were simply one such system. The Court rejected this argument out of hand, explaining that EPA failed to point to clear congressional authorization to regulate generation shifting.

Nor can the FCC's position be squared with *Chevron*. Even under *Chevron*, the question is not whether a statute is clear as a general matter and, whether, in turn, it follows that the agency is entitled to deference. The question in *Chevron* is whether the statute is clear or ambiguous as applied to and in the context of a particular assertion of agency power over a specific subject. *Chevron* rejected the notion that courts should define congressional intent at a high level of generality. Instead, the Court indicated that the proper inquiry is whether Congress spoke "directly" to the "precise question at issue."[106]

To say it another way, the relevant question is not whether the FCC has the *abstract authority* to interpret statutes or classify some services, but whether it has the *precise authority* to interpret *the precise statutory provisions* at issue in *precisely the way* it has done. That is to say, the question is "whether Congress in fact meant to confer the power the agency has asserted"[107]—imposing massive regulatory controls over the broadband industry, through a Frankenstein scheme that uses forbearance to pick and choose what statutory provisions will apply going forward.

The FCC does not clearly have such power. As discussed below, the statute's text, legislative intent, and regulatory history indicate that if Congress clearly intended anything it was to keep broadband a lightly regulated Title I service. But even if those authorities were ambiguous, the Order would still fail under the MQD, for mere ambiguity—indeed, even a plausible textual basis—is not enough to give the FCC the massive powers it claims here.

>    *a. Broadband Is an Information Service Under the 1996 Act's Text and History.*

**1.** Start with the statute. The Telecommunications Act of 1996 establishes two mutually exclusive categories of regulation over communications technologies. On one end are lightly regulated "information services" (Title I), which involve the "offering of a capability for generating, acquiring,

---

[102] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

[103] *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014).

[104] *Alabama Ass'n of Realtors v. Dep't of HHS*, 141 S. Ct. 2485 (2021).

[105] *West Virginia*, 142 S. Ct. at 2601.

[106] *Chevron*, 467 U.S. 837, 842-43.

[107] *West Virginia*, 142 S. Ct. at 2608.

storing, transforming, processing, retrieving, utilizing, *or* making available information via telecommunications, and includes electronic publishing."[108] On the other are heavily regulated "telecommunications services" (Title II), which refer to the "offering of telecommunications for a fee directly to the public."[109] Both definitions incorporate the term "telecommunications," which refers to the "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." A Title II service offers a certain type of "telecommunications" to the public, whereas a Title I service offers capabilities "via telecommunications."

Closely reading these definitions makes one thing obvious: Congress tilted the statutory structure to ensure that most services offered through communications networks would be lightly regulated under Title I. "Information service" is defined broadly. It establishes a list of eight expansive, qualifying capabilities, set apart with the disjunctive "or." If broadband involves *any* of the eight criteria, it must be regulated under the light-touch Title I regime. A "telecommunications service," by contrast, is a restrictive category involving many hoops, all of which must be met. To fall under Title II, broadband must involve the sale of an offering "to the public" of pure "transmission" between two points "specified by the user" without any change in the "form or content."

For starters, broadband falls under Title I because it involves at least one of the capabilities listed in the definition of "information service."[110] In fact, broadband involves all eight. An ISP offers the capability to "generate" information through emails, social media, video streams, and file-sharing protocols. It offers the capability "store" information through cloud storage. It allows users to "acquire" and "retrieve" information through the domain name system (DNS) and caching. It "utilizes" data, applications, and services made available by other users in formats, most often unknown to the requesting user. And broadband access regularly "transforms" information by converting human instructions into a series of digital packets, which are routed through dynamic algorithms to optimize the quality of service, and then sent back to the user and converted into human readable output.

In particular, the FCC has long recognized, and the Supreme Court in *Brand X* has confirmed, that DNS and caching are integrated information-processing components. The Order does not dispute that DNS and caching provide "information-processing capabilities"[111] and would be an information service if offered by a third party. Instead, the Order claims that DNS and caching, when used by ISPs, do not render broadband an information service. The Order makes two assertions to support that claim: (1) DNS and caching fall into the exception under the definition of "information service" for telecommunications system management;[112] and (2) DNS and caching are not "inextricably intertwined" with broadband. Both assertions fail.

DNS takes the website's name that a user enters ("www.fcc.gov") and translates it into the IP addresses of servers that host the requested websites. As the Commission found in 2018, DNS "is indispensable to ordinary users as they navigate the Internet."[113] While the Order cites the availability of

---

[108] 47 U.S.C. § 153(24) (emphasis added).

[109] 47 U.S.C. § 153(53).

[110] *See* Decl. of Peter Rysavy, at paras 3–7, 27 (attached to Comments of CTIA, WC Docket No. 23-320 (Dec. 14, 2023)) (Rysavy Decl.), https://www.fcc.gov/ecfs/document/1214144547233/1.

[111] Order at para. 133.

[112] *See* 47 U.S.C. 153(24) ("information service … does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.")

[113] *Restoring Internet Freedom Order* at para. 34 (2018) (quoting Comments of AT&T Services Inc., WC Docket No. 17- 108, at 74 (July 17, 2017)).

third-party DNS services as evidence that DNS is not "inextricably intertwined" with broadband,[114] that does nothing to undermine the dispositive fact that DNS is offered as an integrated part of broadband that ISPs offer.  More than 90% of time,[115] users rely on the DNS provided by the ISP.  Without DNS servers preconfigured by the ISP, broadband service would be unusable out of the box, unless the user were sophisticated enough to customize her router's configuration.  If you don't believe me, see what happens if you change your router's DNS address.  Your emails would not send, your browser would not load websites, and your cat videos would not stream.  DNS service is thus integrated into ISPs' retail broadband offerings and relevant to broadband's status as an "information service."  And DNS falls outside the exception for telecommunications system management because it is intended to benefit consumers by facilitating web access, not to aid ISPs in managing their networks.

Caching, likewise, is an "information service" that is inextricably intertwined with broadband and designed to enhance the consumer experience.  Indeed, "[a]ll major ISPs cache content using caching servers located within the ISP network," and "[u]sers cannot directly opt out of" this caching functionality; rather it is "inextricably linked" to providers' delivery of online content.[116]  As the *Restoring Internet Freedom Order* correctly found, "[c]aching does much more than simply enable the user to obtain more rapid retrieval of information through the network" by storing content closer to customer locations; "caching depends on complex algorithms to determine what information to store where and in what format."[117]  This information-processing functionality thus "enables and enhances consumers' access to and use of information online"—and, like DNS, caching is "provided as part and parcel of the broadband Internet access service."[118]

Just as fixed broadband is an "information service," so too is mobile broadband under Section 332 of the 1996 Act.  A "commercial mobile service," as relevant here, is any mobile service that "makes interconnected service available."[119]  An "interconnected service" refers to a "service that is interconnected with the public switched network"[120]and "gives subscribers the capability to communicate to or receive communication from all other users on the public switched network."[121]  The "public switched network" means the public switched telephone network—that is, the "common carrier switched network . . . that use[s] the North American Numbering Plan in connection with the provision of switched services."[122]  And "private mobile service" is the reverse of commercial mobile service: "any mobile service . . . that is not a commercial mobile service or the functional equivalent of a commercial mobile service."[123]

As the D.C. Circuit in *Cellco* explained, "providers of 'commercial mobile services,' such as wireless voice-telephone service, are common carriers, whereas providers of other mobile services are

---

[114] Order at para. 148.

[115] *See* Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results* at 2 (attached to USTelecom Reply Comments, WC Docket No. 23-320 (Jan. 17, 2024)), https://www.fcc.gov/ecfs/document/10117636723266/3.

[116] Rysavy Decl. at paras. 17-18.

[117] *Restoring Internet Freedom Order* at para. 41 (quoting Comments of the Information Technology and Innovation Foundation, WC Docket No. 17-108, at 74 (July 17, 2017)).

[118] *Restoring Internet Freedom Order* at para. 42.

[119] 47 U.S.C. § 332(d)(1).

[120] 47 U.S.C. § 332(d)(2).

[121] 47 C.F.R. § 20.3.

[122] 47 C.F.R. § 20.3.

[123] 47 C.F.R. § 332(d)(3).

exempt from common carrier status."[124]  In particular, the court recognized Section 332's "statutory exclusion of mobile-internet providers from common carrier status."[125]  And due to the Communications Act's separate prohibition on treating information services providers as common carriers, the court in *Cellco* concluded that mobile ISPs are "statutorily immune, perhaps twice over, from treatment as common carriers."[126]  The D.C. Circuit in *Verizon* affirmed that conclusion: The "treatment of mobile broadband providers as common carriers would violate section 332."[127]

**2.**  It is no accident that, within the broader landscape of the 1996 Act, Title II represents a small island of utility-style regulation within the vast ocean of a light-touch treatment.  Congress did not create the distinction between Title I and Title II services out of thin air.  Rather, it incorporated the rich historical backdrop of precedent before the Telecommunications Act of 1996[128] that is decisive here.[129]

As an initial matter, the 1996 Act was intended to be a deregulatory piece of legislation to open up competition in the communications market following the breakup of the AT&T monopoly a decade before.  The 1996 Act's preamble makes this clear:  "To promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[130]

A bipartisan group of Senators confirmed that "[n]othing in the 1996 Act or its legislative history suggests that Congress intended to alter the current classification of Internet and other information services or to expand traditional telephone regulation to new and advanced services."[131]  Or as Senator John McCain put it, "[i]t certainly was not Congress's intent in enacting the supposedly pro-competitive, deregulatory 1996 Act to extend the burdens of current Title II regulation to Internet services, which historically have been excluded from regulation."[132]  The FCC confirmed the 1996 Act's deregulatory intent in the *Stevens Report*, which found that internet access was an "information service" both under the 1996 Act and the pre-Act precedent that Congress incorporated into the statute.[133]

The 1996 Act's deregulatory intent informed its distinction between Title I "information services" and Tile II "telecommunications services."  That distinction reflected Congress' intent to codify the decades-old understanding in the FCC's pre-1996 precedent that "basic services" subject to common carrier regulation (like telephone service) are materially dissimilar for regulatory purposes from

---

[124] *Cellco Partnership v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012).

[125] *Id.*

[126] *Id.*

[127] *Verizon*, 740 F.3d at 650.

[128] *See Brand X*, 545 U.S. at 993; *Mozilla*, 940 F.3d at 25. 203.

[129] *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007) (noting that a statute's historical backdrop can "hel[p] to illuminate the proper interpretation and application" of its provisions); *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (cleaned up) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it.").

[130] *See* Preamble, Telecommunications Act of 1996, P.L. 104-104, 100 Stat. 56 (1996).

[131] Letter from Senators John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden to the Honorable William E. Kennard, Chairman, FCC, at 1 (Mar. 23, 1998) (Five Senators Letter), http://apps.fcc.gov/ecfs/document/view?id=2038710001.

[132] *Stevens Report*, 13 FCC Rcd at 11519, para. 37 (quoting Letter from Senator John McCain to the Honorable William E. Kennard, Chairman, FCC).

[133] See *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501 (1998) (*Stevens Report*).

"enhanced services" (like computer processing over telephone lines).[134] That distinction was also informed by the Modification of Final Judgment breaking up the Bell system.[135]

**3.** Developments following the passage of the 1996 Act confirm that Congress intended to regulate broadband as a Title I "information service."

*For one*, Section 230 of the Communications Decency Act confirms that broadband is an information service. Congress defined the term "interactive computer service" to mean an "information service" that "provides or enables computer access by multiple users to a computer server."[136] If that definition were not clear enough, Section 230 expressly states that an "interactive computer service" includes "specifically a service or system that provides access to the Internet."[137] Section 230's treatment of "provid[ing] access to the Internet" as an "information service" contradicts the Order's Title II classification.

And Section 230 renders the conduct rules the FCC adopts here—including for blocking, throttling, prioritization, and general conduct—unenforceable. Section 230 immunizes interactive computer services from federal and state law for "restrict[ing] access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."[138]

Congress was not ambiguous about its deregulatory intentions behind Section 230. As it found: "The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation."[139] And it went on to state the "policy of the United States . . . [is] to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation."[140]

*For another*, Congress has given the FCC limited, piecemeal authority over broadband since the 1996 Act. When Congress wants to address the internet or broadband, it uses that very word.[141] Congress knows how to delegate authority over broadband to the FCC—but it's only done so in narrow circumstances. Tellingly, these rifle-shot authorities were not codified in Title II, but rather in separate sections, particularly a chapter titled "Broadband."[142]

*And for another*, since the 1996 Act, Congress has repeatedly rejected legislation that would expressly classify (or authorize the FCC to classify) broadband as a Title II service.[143] As the Supreme

---

[134] *In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 FCC 2d 384, 417-423, ¶¶ 86-101 (1980) (*Computer II*).

[135] *United States v. AT&T Co.*, 552 F. Supp. 131, 229 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).

[136] 47 U.S.C. § 230(f)(2).

[137] 47 U.S.C. § 230(f)(2).

[138] 47 U.S.C. § 230(c)(2).

[139] 47 U.S.C. § 230(a)(4).

[140] 47 U.S.C. § 230(b)(2).

[141] *See* Broadband Deployment Accuracy and Technological Availability Act, Pub. L. No. 116-130, 134 Stat. 228 (2020) (codified at 47 U.S.C. §§ 641-646); Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423 (2021) (codified at 47 U.S.C. § 1601); Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 133 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609); 47 U.S.C. § 1302.

[142] *See generally* 47 U.S.C. §§ 1301-1307.

[143] *See* Net Neutrality and Broadband Justice Act of 2022, H. R. 8573, 117th Cong. § 2 (2022) (proposing to amend the Communications Act's definition of telecommunications service to "include[] the offering of broadband internet

(continued….)

Court has explained, the courts cannot turn a blind eye to a new power discovered by an agency that "Congress considered and rejected multiple times."[144]

In short, the Communications Act does not clearly provide—anywhere—that the Commission may treat broadband as a form of telecommunications service, and if anything indicates that the opposite is true.

    *b.* Brand X *Confirms that Title II Violates the Major Questions Doctrine.*

In *Brand X*, the Supreme Court upheld the FCC's determination that broadband was an information service and did not involve a separate offering of telecommunications service. The question before the Court was whether a broadband provider "offers" a separate telecommunications service in the form of last-mile transmission, even though the provider's broadband offering qualified as an "information service."[145] As the Court explained, "it does not inexorably follow as a matter of ordinary language that [broadband providers] also 'offe[r]' consumers the high-speed data transmission (telecommunications) that is an input used to provide [broadband] service."[146] The Communications Act, the Court concluded, "fails unambiguously to classify . . . information service providers that use telecommunications inputs to provide an information service as 'offer[ors]' of 'telecommunications.'"[147]

The Court's ruling in *Brand X* decisively shows why the FCC cannot classify broadband under Title II. The FCC must point to "clear congressional authorization"[148] for the power it claims today, but *Brand X* confirms that such authority is, at best, ambiguous. If the statute is ambiguous about regulating broadband under Title II, Congress cannot have clearly authorized it as *West Virginia* requires. Indeed, when defending its 2015 *Title II Order*, the FCC conceded that "the Communications Act did not clearly resolve the question of how broadband should be classified."[149]

Now, it is true that the D.C. Circuit panel in *U.S Telecom II* considered and rejected a version of this argument, upholding the 2015 *Title II Order* based on the reasoning that *Brand X* found a congressional delegation of authority for the FCC to decide how broadband would be classified. But *U.S. Telecom II* will not save today's Order for several reasons.

*First*, the Court's analysis in *Brand X* is outdated in key respects such that the FCC would not receive deference for the contestable statutory interpretations in the Order. *Brand X* predates the Supreme Court's seminal MQD decisions in *West Virginia v. EPA* and *Biden v. Nebraska* and the desuetude of *Chevron* in favor of a harder look at agency decisions.

*Second*, the D.C. Circuit panel in *U.S. Telecom II* ignored a key distinction when it found that *Brand X* controlled instead of the Court's pre-MQD precedent. The FCC order at issue in *Brand X* involved a deregulatory FCC decision *not* to regulate broadband under Title II. So the FCC did not—and could not—claim a newfound power of "vast economic and political significance" that would have triggered the Court's application of MQD precursors. As a result, the Court in *Brand X* had no occasion

---

access service"); Save the Internet Act of 2019, H.R. 1644, 116th Cong. § 2(b)-(c) (2019) (proposing to "restore[ ] as in effect" the Commission's 2015 classification of broadband as a telecommunications service subject to Title II).

[144] *West Virginia*, 142 S. Ct. at 2614 (internal quotations and citations omitted).

[145] *Brand X*, 545 U.S. at 988, 997.

[146] *Brand X*, 545 U.S. at 989.

[147] *Brand X*, 545 U.S. at 986.

[148] *West Virginia*, 142 S. Ct. at 2609.

[149] *U.S. Telecom II*, 855 F.3d at 425 (Kavanagh, J., dissenting from denial of rehearing en banc).

to consider the MQD. That is not the case with today's Order, where the FCC asserts massive powers to regulate the entire broadband industry after decades of light-touch treatment.

*And finally*, modern broadband presents a far easier case than the technology *Brand X* considered. At issue was the *last-mile transmission service* between the end user and the ISP, which the carrier could offer as common carriage or private carriage.[150] In his dissent, Justice Scalia characterized that service as a telecommunications service. As he put it: "Since . . . the broad-band connection between the customer's computer and the cable company's computer-processing facilities[] is downstream from the computer-processing facilities, there is no question that it merely serves as a conduit for the information services that have already been 'assembled' by the cable company in its capacity as ISP."[151] Modern broadband as regulated by the FCC in today's Order, by contrast, is not limited to the last-mile transmission service between a customer and an ISP's point of presence. ISPs carry data all the way to the point of interconnection, where traffic is exchanged at the Internet's backbone, and where information processing functionalities take place.

Or to rephrase it in the terms used by Justice Scalia in his *Brand X* dissent: today's Order is not limited to the segment between the pizza shop and its customers this go around; it instead covers the entire supply chain, from the wheat fields to the processing plants to the delivery of the dough to the pizza shop and beyond. If you were to call up the farmer and ask them if they provide pizza delivery, I don't think the conversation would get very far. But bringing the discussion back to the Order before us—even if there were an argument that broadband were a standalone transmission service in *Brand X*, the same cannot be said of the ecosystem regulated by the FCC today.

### 3. The Order Cannot Circumvent the Major Questions Doctrine Through Forbearance.

In an effort to escape the MQD, the Order points out that it forbears from more than a dozen provisions in Title II. The Order's forbearance framework extends to *ex ante* ratemaking regulation, Section 214 discontinuance authorization, universal service contribution, interconnection, truth-in-billing, roaming, and many other requirements. Forbearing from these requirements, the Order asserts, "will significantly mitigate any economic impact on [broadband] providers."[152]

As an initial matter, that argument fails on its own terms. As noted below, even with forbearance, the rules that the Order keeps in place are significant enough to trigger the MQD. Consider Sections 201(b) and 202(a), which give the FCC unbounded rulemaking authority over the justness and reasonableness of telecommunications practices while imposing open-ended "nondiscrimination" requirements on ISPs. Only the imagination limits how the FCC might regulate broadband providers going forward. Or consider the amorphous Internet Conduct Rule, which puts all network management decisions in the FCC's crosshairs, subject only to the whim of a bureaucrat's "case-by-case" review of "a non-exhaustive list of factors."[153] It is risible to assert, as the Order does, that extending monopoly regulation to a competitive sector of the U.S. economy will not affect long-term investment by creating a cloud of regulatory uncertainty.

In any case, I am concerned that the Order's argument is a bait and switch. Despite the Order's protestations, nothing stops the FCC from reinstating any rule that it forbears from today—whether *ex ante* rate regulation, new broadband taxes, or requiring permission to retire legacy technologies. Likewise, the FCC remains free to adopt new rules under the broad rulemaking powers in Sections 201(b) and 202(a), an outcome the Order plainly envisions.

---

[150] *Wireline Broadband Internet Access Services Order*, 20 FCC Rcd at 14899, para. 86.

[151] *Brand X*, 545 U.S. at 1010 (Scalia, J., dissenting).

[152] Order at para. 257.

[153] Order at para. 518-519.

The FCC's lawless application of forbearance, in fact, shows why the Order cannot survive under the MQD. Through forbearance, the FCC effectively creates a bespoke regulatory framework from scratch. In this Frankenstein scheme, the Order casts aside more than a dozen provisions integral to the overall legislative design of Title II. Although the 1996 Act authorizes forbearance, the Order's promiscuous use of it fundamentally alters the regulatory scheme, making the resulting mishmash unrecognizable to the Congress that enacted the 1996 Act.

Two Supreme Court decisions squarely address the issue and illustrate why the Order's forbearance determinations violate the MQD.[154]

*First*, in *Biden v. Nebraska*, the Court invalidated the Secretary of Education's attempt to cancel $430 billion in student loan debt.[155] The Secretary invoked their power under a post-9/11 relief statute to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs."[156] The Secretary's authority to "waive or modify" was subject only to the conditions that it was "deem[ed] necessary in connection with a war or other military operation or national emergency" and "necessary to ensure" that student debtors were not made worse off.[157]

Despite this broad language, the Court nonetheless held that the Secretary lacked statutory authority to forgive student debt under the MQD. As the Court found, the "waive or modify" language did not give the Secretary unbounded authority to act as they pleased. The debt relief was not a "waiver" because it "augment[ed] and expand[ed] existing provisions dramatically."[158] It was, likewise, not a "modification," which connotes "modest" changes, not the transformational power to rewrite an entire statute.[159]

Several MQD-based factors informed the Court's interpretation of these statutory terms. First, student debt relief was a politically charged topic, much like Title II net neutrality.[160] Congress was undoubtedly aware of it. Had Congress intended to authorize debt relief, surely it would have used express language to that effect just years earlier when it enacted the COVID relief bill. Second, the magnitude of the action was unprecedented. Never before had the Secretary employed the waiver/modification language this way.[161] Finally, even though the Secretary's action imposed no new obligations on the public, and instead relaxed the burden on student debtors, the "economic and political significance" was nonetheless "staggering by any measure."[162]

*Second*, in *MCI v. AT&T*, a MQD precursor, the Court invalidated the FCC's attempt to eliminate the tariffing requirement for non-dominant carriers under the pre-1996 Act framework. The statute required common carriers to file tariffs, but allowed the FCC "in its discretion and for good cause shown,

---

[154] The Order's use of forbearance also defeats the FCC's claim that if the MQD invalidated the Order, then the MQD would also invalidate a Title I decision, such as the *Restoring Internet Freedom Order*. *See* Order at para. 254 & n.1063. Forbearance distinguishes the Order from *Restoring Internet Freedom Order* under the MQD. Rewriting a statutory scheme through forbearance is decidedly different for MQD purposes than deciding to leave a service in its status quo deregulatory position wholly in place.

[155] *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

[156] *Biden v. Nebraska*, 143 S. Ct. at 2363-64 (quoting 20 U.S.C. § 1098bb(a)(1)).

[157] *Id.*

[158] *Id.* at 2371.

[159] *Id.* at 2359.

[160] *Id.* at 2373.

[161] *Id.* at 2372.

[162] *Id.* at 2373.

modify any requirement made by or under the authority of this section."[163]  But the FCC's seemingly unrestricted authority to modify, the Court held, did not give it the power to effect a "fundamental revision of the statute."[164]  That is exactly what the FCC did by eliminating the tariffing requirement, a tenet so central to the pre-1996 Act that Congress surely would not have intended to allowed the FCC to eliminate it without express language.[165]

Here, the Order's boundless application of forbearance under Section 10 of the Act renders it unlawful under *Nebraska* and *MCI*.  For one, whereas the agencies in *Nebraska* and *MCI* enjoyed expansive authority to waive or modify rules, Section 10 gives the FCC less latitude.  To forbear from a Title II provision, the FCC must show that: (1) enforcement of the provision is not necessary to ensure just and reasonable charges, practices, classifications, or regulations; (2) the provision is not necessary to protect consumers; and (3) forbearance is consistent with the public interest.[166]  In that sense, this Order starts off on weaker footing than the agency actions in *Nebraska* and *MCI*.

The Order also "fundamentally rewrites" Title II through forbearance.  Consider the fact that the Order refrains from extending Title II rules plainly intended for legacy telephone service because they are "tangentially related to [broadband]."[167]  These rules expressly refer to "Bell operating companies" and "local exchange carriers" while regulating services like "payphones."[168]  Simply put, the FCC recognizes that applying Title II as written to broadband would lead to absurd outcomes.  That is a dead giveaway why it cannot be the correct interpretation of the Communications Act.  To avoid illogical consequences, the Order is forced to use forbearance to retrofit the statute in a systematic and customized manner.  That is the exercise of raw legislative power, not an implementation of judgments that Congress already made.

And the "economic and political significance" of the Order's forbearance is "staggering by any measure."[169]  Take just one example: the decision to forbear from requiring contributions to the universal service fund.  At stake are hundreds of billions of dollars in funding collected by broadband providers, which would be passed along to every American with an Internet subscription; the broader solvency of the USF program; and years-long legislative efforts within Congress to reform our broadband funding mechanisms.  Forbearance from the contribution requirement alone implies a major question.

But, of course, the Order does not simply forbear from a single requirement.  There is also interconnection, Section 214 discontinuance, truth-in-billing, roaming, and more.  When you tally up every requirement the Order decides not to apply, it isn't a particularly close call: the FCC is acting like a legislature instead of an expert agency with limited powers.  That is precisely the outcome the MQD is intended to prevent.

It is of no relevance that the Order refrains from new requirements rather than imposing them.  The MQD still applies, as *Nebraska* and *MCI* confirm, and an agency cannot fundamentally rewrite a statute by picking and choosing what regulations will apply using its power to "waive," "modify," or "forbear."  Yet that is precisely what the Order does.  Far from saving the Order, forbearance further dooms it.

---

[163] *MCI*, 512 U.S. at 225 (quoting 47 U.S.C. § 203 (1988 ed. and Supp. IV)).

[164] *MCI*, 512 U.S. at 231-32.

[165] *Id.* at 230.

[166] 47 U.S.C. § 160(a).

[167] Order at para. 425.

[168] 47 U.S.C. §§ 271-276.

[169] *Biden v. Nebraska*, 143 S. Ct. at 2373.

### B.        Section 706 Does Not Authorize Title II.

In a last-ditch argument, the Order cites Sections 706(a)[170] and 706(b)[171] of the 1996 Act as "independent, complementary sources of affirmative Commission authority for the rules adopted today."[172]  Apart from that evasive language, the Order offers scant explanation of what work these provisions do to support new conduct rules, or how these provisions could possibly authorize Title II. And understandably so.  Section 706 cannot salvage the Order for many reasons.  Here are some of the highlights.

*First*, the D.C. Circuit unequivocally held in *Verizon* that Section 706(a) and 706(b) do *not* give the FCC legal authority to impose Title II duties on broadband providers.  In *Verizon*, the court considered the FCC's attempt in 2010 to adopt disclosure, blocking, and conduct rules on broadband providers.  At the time, broadband was a Title I service.  The 2010 Order did not try to reclassify broadband under Title II, but instead invoked Sections 706(a) and 706(b) as the basis to adopt new rules without reclassification.  The *Verizon* court properly rejected the FCC's end-run around Title II: the blocking and discrimination rules, the court found, "relegated [broadband providers] to common carrier status."[173]  Such common carrier treatment, the court held, was unlawful while broadband remained a Title I service.

*Second*, while the Order seeks to reclassify broadband, it cannot lawfully rely on Section 706 to do so under the MQD.  Section 706 is at most an ambiguous source of authority to issue *any* regulation—a point the D.C. Circuit expressly confirmed in *Verizon*[174] and reaffirmed in *Mozilla*.[175]  Section 706(a) merely states that the FCC "shall encourage" the reasonable and timely deployment of broadband. Section 706(b), meanwhile, states that the FCC "shall take immediate action to" accelerate broadband deployment if the FCC finds that broadband is not being deployed to all Americans in a reasonable and timely manner.

As that language makes clear, Section 706 can "certainly be read as simply setting forth a statement of congressional policy."[176]  After all, Congress knows how to confer rulemaking authority on the FCC.  It does so throughout the Communications Act, and when it wants to give the FCC that

---

[170] 47 U.S.C. § 1302(a) ("The Commission … shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment."); *see also* 47 U.S.C. § 1302(d)(1) ("The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.").

[171] 47 U.S.C. § 1302(b) ("The Commission shall [on an annual basis] initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) …. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.").

[172] Order at para. 612.

[173] *Verizon*, 740 F.3d at 652 (cleaned up).

[174] *Verizon*, 740 F.3d at 635-36.

[175] *Mozilla*, 940 F.3d at 46.

[176] *Verizon*, 740 F.3d at 637.

authority, it uses far more precise language than the words employed in Section 706.[177]  As the *Restoring Internet Freedom Order* outlined at extensive length, Section 706 is devoid of the elementary details that would normally accompany a congressional grant of agency power, like "the providers or entities whose conduct could be regulated."[178]  Given its nebulous mandate and lack of specificity, Section 706 appears to be "hortatory" and "better read as directing the Commission regarding its exercise of regulatory authority granted elsewhere."[179]

While the Order strains to justify Section 706 rulemaking authority under first principles, that effort is ultimately futile.  The D.C. Circuit in *Mozilla* and *Verizon* found it reasonable to read Section 706 as a statement of policy rather than a freestanding source of unbounded regulatory power.  Because the courts have determined that Section 706 does not provide "clear congressional authorization" to issue any regulation, the MQD precludes the FCC from using that ambiguous language to justify today's decision of "vast economic or political significance."

*Third*, the Order's reliance on stale data and outcome-driven analysis sinks its ability to rely on Section 706(b), which states that the FCC shall "accelerate deployment" of broadband "by removing barriers to infrastructure investment and by promoting competition in the telecommunications market" if the FCC determines broadband is not being deployed to Americans in a timely and reasonable manner.[180] The FCC's *Section 706 Report*, conveniently released weeks before today's Order, made a negative finding about the pace, cadence, speed of broadband deployment.[181]

As I explained in considerable detail,[182] these factual findings defy the impressive progress in broadband deployment—whether fiber, fixed wireless, 5G, or high-speed satellite—that every American consumer has seen with their own eyes since 2017.  To accomplish this, the *Section 706 Report* rests on outdated and error-ridden datasets that understate the scope and scale of broadband availability, even though better information was at the FCC's fingertips.  The *Section 706 Report* also inflated the number of purportedly unserved Americans by excluding high-speed satellite broadband covering more than 99% of the United States and by relying on a more demanding speed benchmark (100/20 Mbps) for the first time to effectively move the goalposts.

*Finally*, assuming the FCC had rulemaking authority under Section 706, and assuming further that it validly made a negative determination under Section 706(b), the Order fails to provide specific explanations, based on the record, how utility-style regulation would "encourage the deployment on a

---

[177] *See* 47 U.S.C. § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection"); *id.* § 251(d)(1) ("the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section"); *id.* § 201(b) ("The Commission[] may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act"); *id.* § 205(a) ("the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge"); *id.* § 205(a) ("the Commission is authorized and empowered . . . to make an order that the carrier or carriers shall cease and desist"); *id.* § 213(b) ("The Commission may at any time require any such carrier to file with the Commission an inventory of all or of any part of the property owned or used by said carrier").

[178] *Restoring Internet Freedom Order* at para. 271.

[179] *Id.*

[180] 47 U.S.C. § 1302(b).

[181] *See Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Report, FCC 24-27, GN Docket No. 22-270 (Mar. 18, 2024) (*Section 706 Report*).

[182] Dissenting Statement of Commissioner Brendan Carr, *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Section 706 Report, GN Docket No. 22-270 (Mar. 14, 2024), https://docs.fcc.gov/public/attachments/DOC-401205A3.pdf.

reasonable and timely basis of advanced telecommunications capability to all Americans"[183] or "accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market."[184] Indeed, concluding that monopoly-style regulation "remov[e]s barriers to infrastructure investment" and "promot[es] competition" stretches words to their breaking point.

As noted below,[185] Title II threatens investment and competition by saddling providers with new costs and regulatory uncertainty. And while the Order tries to nitpick the reams of real-world economic data, based on our natural experiment before and after Title II, the Order offers no affirmative finding that the opposite would be true. In other words, the Order makes no positive finding that Title II will lead to more infrastructure investment. Indeed, in paragraph after paragraph discussing Title II's effect on investment after 2017, the most the Order can say is that the empirical evidence is "inconclusive."[186]

## II.     THE ORDER'S ADOPTION OF TITLE II IS ARBITRARY AND CAPRICIOUS.

Even if the FCC had clear congressional authorization to apply Title II to broadband, the Order would still violate the law by running afoul of the Administrative Procedures Act (APA).

The APA requires agencies like the FCC to examine "the relevant data" and articulate "a satisfactory explanation" for the conclusions it reached and the rules it adopted, "including a rational connection between the facts found and the choice made."[187] When an agency changes its policy, as the FCC does here, it must "show that there are good reasons for the new policy."[188] But an agency must go further and provide a "more detailed justification" either when: (1) "its new policy rests upon factual findings that contradict those which underlay its prior policy"; or (2) "its prior policy has engendered serious reliance interests that must be taken into account."[189] While both circumstances are present here, sufficient justifications from the FCC are not.

The Order trots out the now-familiar parade of justifications for Title II that the agency invoked back in the 2015 *Title II Order*: Internet "openness," the "virtuous cycle of innovation," and "gatekeeper" theories of vertical integration and foreclosure. But the last six years without Title II brought more competition, more investment, more capacity, faster speeds, and lower prices. Since 2017, meanwhile, there have been no credible allegations that ISPs have made the Internet less open to edge providers or to consumers. Simply put, the FCC has no plausible argument that the Internet ecosystem will not continue to thrive in the absence of Title II, let alone a claim that broadband will be left without federal oversight.

The FCC has apparently realized that these warmed-over justifications for Title II are not selling today the way they did during those earlier rounds of debate. Indeed, according to former FCC Chairman Wheeler, they are "yesterday's issue."[190] So, in addition to burning down the usual straw men, for the first time in the history of the FCC's net neutrality proceedings, the Order pivots to a grab bag of new reasons *that have nothing to do with net neutrality*: privacy, cybersecurity, national security, broadband

---

[183] 47 U.S.C. § 1302(a).

[184] 47 U.S.C. § 1302(b).

[185] *See infra* II.A.2.

[186] Order at para. 288.

[187] *State Farm*, 463 U.S. at 43 (1983) (internal quotation marks omitted).

[188] *Fox*, 556 U.S. at 515.

[189] *Id.*

[190] Stern Overly, *The future of the net neutrality fight*, Politico (Mar. 18, 2024), https://www.politico.com/newsletters/digital-future-daily/2024/04/18/the-future-of-the-net-neutrality-fight-00153126.

access, and network resiliency. While the goalposts have moved, the goal remains the same: increasing government control over the Internet.

Every rationale the Order puts forward—old or new—fails. Before discussing each, it is worth highlighting three errors that apply across the board to infect the Order's overall reasoning.

*First*, today's Order is predicated on the false assertion that "there has been no effectual federal oversight" over ISPs since "the Commission's abdication of authority over broadband in 2017."[191] This factual assertion is wrong—twice over.

For starters, the claim is contradicted by the legal authorities the Federal Trade Commission (FTC) already has. The FTC oversees ISP practices and has pursued allegations of ISP misconduct on everything from billing[192] to advertising[193] to credit and consumer practices[194] to data security[195] to consumer privacy[196] to mobile cramming.[197] In 2019, for example, the FTC settled a $60 million lawsuit with an ISP over deceptive throttling disclosures.[198] The FTC would lose that authority following Title II because the FTC lacks authority over common carriers.[199]

For another, the FCC itself has asserted broad and direct regulatory authority over ISPs without Title II. Indeed, just last year, this FCC voted to give itself regulatory power over practically every decision regarding the provision of Internet service in the country.[200] In the *Digital Equity Order*, the

---

[191] Order at para. 2.

[192] *FTC v. Verity Int'l, Ltd.*, 335 F. Supp. 2d 479 (S.D.N.Y. 2004).

[193] *Juno Online Servs., Inc.*, No. C-4016 (F.T.C. June 25, 2001), https://www.ftc.gov/enforcement/cases-proceedings/002-3061/juno-online-services-inc; *CompuServe, Inc.*, No. C-3789 (F.T.C. Mar. 16, 1998), https://www.ftc.gov/enforcement/cases-proceedings/962-3096/compuserve-inc-matter; *Prodigy Servs. Corp.*, No. C-3788 (F.T.C. Mar. 16, 1998), https://www.ftc.gov/enforcement/cases-proceedings/952-3332/prodigy-services-corporation-matter; *Am. Online Inc.*, No. C-3787 (F.T.C. Mar. 16, 1998), https://www.ftc.gov/enforcement/cases-proceedings/952-3331/america-online-inc-matter.

[194] *United States v. Sprint Corp.*, 2:15-cv-9340 (D. Kan. Oct. 21, 2015), https://www.ftc.gov/enforcement/cases-proceedings/142-3094/sprint-corporation-sprint-asl-program-0; *United States v. Time Warner Cable, Inc.*, 13-cv-8998 (S.D.NY. Dec. 20, 2013), https://www.ftc.gov/enforcement/cases-proceedings/122-3149/time-warner-cable-inc.

[195] *FTC v. Pricewert LLC*, No. C-09-CV-2407 RMW (N.D. Cal. Apr. 8, 2010), https://www.ftc.gov/enforcement/cases-proceedings/092-3148/pricewert-llc-dba-3fnnet-ftc; Letter from Maneesha Mithal, Assoc. Dir. of the Div. of Privacy & Identity Prot., Fed. Trade Comm'n (Nov. 12, 2014), https://www.ftc.gov/system/files/documents/closing_letters/verizon-communications-inc./141112verizonclosingletter.pdf.

[196] *See* FTC Staff Report, *A Look At What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* (2021), https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf.

[197] *FTC v. T-Mobile USA, Inc.*, No. 2:14-cv-0097-JLR (W.D. Wa. Dec. 19, 2014), https://www.ftc.gov/enforcement/cases-proceedings/132-3231/t-mobile-usa-inc; *FTC v. AT&T Mobility, LLC*, No. 1:14-cv-3227-HLM (N.D. Ga. Oct. 8, 2014), https://www.ftc.gov/enforcement/cases-proceedings/132-3248/att-mobility-llc.

[198] Press Release, Federal Trade Commission, *AT&T to Pay $60 Million to Resolve FTC Allegations It Misled Consumers with 'Unlimited Data' Promises* (Nov. 5, 2019), https://www.ftc.gov/news-events/news-press-releases/2019/11/att-pay-60-million-resolve-ftc-allegations-it-misled-consumers-unlimited-data-promises.

[199] 15 U.S.C. § 45(a)(2).

[200] *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order and Further Notice of Proposed Rulemaking, GN Docket No. 22-69, FCC 23-100 (rel. Nov. 20, 2023) (*Digital Equity Order*).

FCC claimed the roving enforcement and information-collection powers to prohibit ISP "policies or practices" that have the intent or effect of "differentially impact[ing] consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin."[201] The *Digital Equity Order*'s text expressly empowers the FCC to regulate each and every ISP's:

- "network infrastructure deployment, network reliability, network upgrades, network maintenance, customer-premises equipment, and installation";

- "speeds, capacities, latency, data caps, throttling, pricing, promotional rates, imposition of late fees, opportunity for equipment rental, installation time, contract renewal terms, service termination terms, and use of customer credit and account history"; and

- "mandatory arbitration clauses, pricing, deposits, discounts, customer service, language options, credit checks, marketing or advertising, contract renewal, upgrades, account termination, transfers to another covered entity, and service suspension."[202]

As exhausting as it is to read that list, the FCC says it is not an exhaustive list. And the *Digital Equity Order* reserves the right under this plan to regulate both "actions and omissions, whether recurring or a single instance."[203] In other words, if you take any action, you may be liable, and if you do nothing, you may be liable.

Now, the *Digital Equity Order* is unlawful, and I am confident will be struck down in court, as I explained elsewhere.[204] But this FCC clearly does not believe that, and the *Digital Equity Order* itself is the law on the books today. So, the question remains: what is the Order's basis for claiming Title II rulemaking[205] and enforcement authority[206] over "unjust or unreasonable charges, practices, and regulations"[207] and "unjust or unreasonable discrimination"[208] when they largely duplicate the open-ended list of topics in the *Digital Equity Order*? Likewise, given the *Digital Equity Order*'s list of commercial practices, including "throttling," what is the basis for the Internet Conduct Rule, which prohibits ISP practices that "unreasonably disadvantage" broadband access and is enforced on a "case-by-case basis" using a "non-exhaustive list of factors"?[209] The Order does not say.[210]

---

[201] *Digital Equity Order* at para. 3.

[202] *Id.* at para. 102.

[203] *Id.*

[204] *See* Dissenting Statement of Commissioner Brendan Carr, *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order and Further Notice of Proposed Rulemaking, GN Docket No. 22-69, FCC 23-100 (rel. Nov. 20, 2023) (*Carr Digital Equity Order Dissent*), https://docs.fcc.gov/public/attachments/DOC-398477A3.pdf.

[205] 47 U.S.C. § 201(b).

[206] 47 U.S.C. §§ 206-208, 216-217.

[207] 47 U.S.C. § 201(b)

[208] 47 U.S.C. § 202(a).

[209] Order at para. 518.

[210] The Order states that Sections 201 and 202 "enable the Commission to advance digital equity in other ways not contemplated elsewhere, including providing authority for our open Internet rules." Order at para. 328. But the Order does not meaningfully grapple with the overlap in authorities, including the *Digital Equity Order*'s express regulation of various commercial terms that play a role in the Internet Conduct Rule, including "throttling."

The *Digital Equity Order* is merely one example of powers the FCC already has, but nonetheless claims to need from Title II. Others abound. Even without Title II, for instance, the FCC can adopt a "Transparency Rule" that compels ISPs to disclose their network management practices, performance characteristics, and commercial terms. In fact, the *Restoring Internet Freedom Order* did just that. What is more, Congress gave the FCC specific authority to require so-called "broadband nutrition labels," which the agency adopted last year.[211] So, why does the FCC need Title II for the laundry list of new ISP disclosures the Order adopts today, including disclosures this agency previously considered and found too uninformative or burdensome for broadband labels?[212] Here again, the Order does not say.

Beyond the *Broadband Labels Order* and the *Digital Equity Order*, more than 96% of ISPs already offer some other FCC-regulated service—whether voice telephony, VoIP, or cable television.[213] That means every ISP offering comingled services is already subject to FCC rules governing outage disclosures, pole attachments, and more. Here again, this is merely another example why ISPs are not falling through the cracks. Others are discussed below.

*Second*, the notion that the FCC needs more control over ISPs to prevent harmful outcomes finds precious little support in actual facts. The Order is chock full of conjecture and speculation. Repeatedly, we are told the FCC needs Title II because ISPs "could," "may," "would," or "have the incentive or ability" to do many things the FCC dislikes. But actual evidence comes in short supply.

*Finally*, even if the FCC had prevailed in establishing that some of sort of regulatory "gap" existed, the agency has fallen far short of showing that it justifies the leap to Title II. The Order has failed the APA's tailoring requirement to demonstrate a rational connection between the facts found and the Title II choice it has made. Strong claims require strong evidence. If this agency wants to treat ISPs like public utilities, it must come to the table with the goods. Going full Title II on this record is like deciding to scuttle a ship today because it might spring a small leak in the future.

That is especially the case for the Order's cost-benefit analysis. While misrepresenting Title II's benefits, the Order takes an ostrich-like approach to Title II's potential harms, especially the chilling effect of indeterminate utility-style rules on investment. Contrary to the FCC's claims, Title II is not "light-touch." At root, Title II means: (1) a collection of amorphous "reasonableness" and "nondiscrimination" requirements that encourage anyone to complain about almost anything; and (2) virtually unbounded rulemaking authority that permits the FCC to do whatever it wants. Even assuming *arguendo* the benefits the Order claims, the FCC would still flunk any semblance of rigorous cost-benefit analysis by failing to account for Title II's significant costs.

So, to recap, the Order identifies no meaningful gap that Title II regulation would be necessary to close. And it points to no meaningful problem that Title II regulation would be necessary to solve. All of this makes the Order illegal under bedrock principles of administrative law. Because the Order strays from "the bounds of reasoned decisionmaking,"[214] it is "arbitrary and capricious" under the APA[215]

---

[211] *See Empowering Broadband Consumers Through Transparency*, CG Docket No. 22-2, Report and Order and Further Notice of Proposed Rulemaking, CG Docket No. 22-2, FCC 22-86 (2022) (*Broadband Labels Order*).

[212] *Compare Broadband Labels Order* at para. 43 (declining to require disclosure of speeds based on peak usage periods), and *id.* at para. 45 (declining to require disclosure of packet loss), *with* Order at para. 554 (requiring disclosure of packet loss), and *id.* at para. 556 (requiring disclosure of speeds based on peak usage periods).

[213] About 950,000 Added Broadband in Q3-2023, https://leichtmanresearch.com/wp-content/uploads/2023/11/LRG-Press-Release-11-13-2023.pdf; *accord* 2020 *Restoring Internet Freedom Remand Order* at para. 73; Order at para. 88.

[214] *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

[215] 5 U.S.C. § 706(2)(A).

### A.    The Internet Did Not Break After the FCC Returned to Light-Touch Regulation.

In many ways, the FCC's decision today pulls up the 2015 *Title II Order*, selects all, presses control + C, and then presses control + V into a new document.  In doing so, it brings forward into today's Order the same old justifications for Title II that the agency offered up in 2015.  To the extent those arguments carried any water back then (they didn't), they are particularly bone dry today.  The FCC's rationales provide no support for Title II.

### 1.    Internet Openness

Let's start with the FCC's claims about Title II being necessary to ensure a free and open Internet.

Six years ago, Americans lived through one of the greatest hoaxes in regulatory history.  They were told that the 2017 *Restoring Internet Freedom Order*'s decision to overturn Title II would quite literally break the Internet.  It was a viral disinformation campaign replete with requisite doses of Orwellian wordplay.  Rather than shedding light on this debate, far too many people in DC simply fanned the false flames of fear.  While some have tried to memory hole this entire episode, it is important to remember what we were told about Title II.

Senator Bernie Sanders stated that "This is the end of the Internet as know it" and "If this passes, the internet and its free exchange of information as we have come to know it will cease to exist."[216] Senator Ed Markey stated that "If the @FCC kills #NetNeutrality, the internet will never be the same"[217] and that "If we don't #SaveNetNeutrality @AjitPaiFCC will turn the Internet into a digital oligarchy." Senator John Tester wrote that "Ending #NetNeutrality ends the Internet as we know it."[218]  Senate Democrats asserted that "If we don't save net neutrality, you'll get the internet one word at a time."[219]

The media parroted these false claims.  The *New York Times* ran an article headlined "The Internet Is Dying.  Repealing Net Neutrality Hastens That Death."  Another *New York Times* opinion piece warned of a "nightmare scenario [at] America's digital doorstep" that would result in a "digital dystopia" rivaling Chinese-style censorship.[220]  *GQ* published, in its news section, an article titled "How the FCC's Killing of Net Neutrality Will Ruin the Internet Forever."[221]  Not to be outdone, *CNN* ran a bolded, banner headline across the top of its main page proclaiming the "End of the internet as we know it."[222]  *The Verge* predicted broadband providers would "do practically whatever they like—including paid prioritization, throttling, and otherwise messing with traffic as it moves across the internet" and potentially "reshape the internet in very ugly ways."[223]

Not surprisingly, people believed the Apocalyptic rhetoric that the so-called "experts" on this issue were feeding them.  One person was sentenced to prison for threatening to murder the family of then FCC Chairman Ajit Pai over Title II.  Another was indicted for calling in a bomb threat to the FCC's

---

[216] *See* Dissenting Statement of Commissioner Brendan Carr, *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-83 (Oct. 19, 2023), https://docs.fcc.gov/public/attachments/DOC-397827A3.pdf (*Carr Title II NPRM Dissent*).

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] Nick Frisch, *What if You Couldn't See This Page?*, New York Times (Dec. 14, 2017), https://www.nytimes.com/2017/12/14/opinion/net-neutrality-china-internet.html.

[221] Jack Moore, How the FCC's Killing of Net Neutrality Will Ruin the Internet Forever (Nov. 20, 2017), https://www.gq.com/story/fcc-killing-net-neutrality-explained.

[222] *See Carr Title II NPRM Dissent* at 3.

[223] Makena Kelly, *Net neutrality is dead—what now?*, The Verge (June 11, 2018), https://www.theverge.com/2018/6/11/17439456/net-neutrality-dead-ajit-pai-fcc-internet.

headquarters, which resulted in us having to evacuate the Commission meeting room during our vote on repealing Title II.

Did any one of the predictions following the 2017 *Restoring Internet Freedom Order* come to pass? Of course not. And the Order points to no relevant examples of consumer abuses since we returned to Title I in 2017.

In fairness, the Order does try. But what it cobbles together is so weak that it barely merits discussion. As expected, the Order retreats to the same handful of tired examples that Title II advocates have been complaining about for more than 20 years (such as the Madison River incident). As then-Commissioner Pai reflected in 2015:

> The evidence of these continuing threats? There is none; it's all anecdote, hypothesis, and hysteria. A small ISP in North Carolina allegedly blocked VoIP calls a decade ago. Comcast capped BitTorrent traffic to ease upload congestion eight years ago. Apple introduced FaceTime over Wi-Fi first, cellular networks later. Examples this picayune and stale aren't enough to tell a coherent story about net neutrality. The bogeyman never had it so easy.[224]

These stories, now the stuff of urban legends, have been debunked time and again by this point. Each example was either successfully addressed without Title II or irrelevant to broader concerns about net neutrality.[225] The Order even goes so far to credit Public Knowledge's allegations about ISP conduct outside the United States.[226]

Elsewhere, the Order engages in misdirection, claiming that "major [ISPs] are currently engaged in throttling"[227] but only citing evidence that mobile operators manage streaming video bitrates to deal with network congestion.[228] That is not a net neutrality violation, but something even this Order recognizes can be a permissible form of "reasonable network management."[229] Likewise, the Order cites the so-called Wehe Study,[230] long since discredited,[231] which claims to establish mobile "throttling" by comparing video quality on a mobile network and test devices in a laboratory setting. To show "throttling" in any meaningful sense, the study would need to establish that *the ISP* impaired or degraded lawful traffic based on its content, application, or service, and for reasons unrelated to reasonable network

---

[224] *Pai 2015 Title II Dissent* at 14.

[225] *See Restoring Internet Freedom Order*, at paras. 111-115 (rebutting the relevance of the Order's cited examples of Madison River, Comcast/BitTorrent, and AT&T/FaceTime, *see* Order at para. 472); NCTA Reply Comments, WC Docket No. 23-320, at 19-21 (Jan. 17, 2024) (explaining that allegations of self-preferencing that the Order credits, *see* Order at para. 460 & n.1821, did not involve net neutrality concerns but rather interconnection disputes, which the Order forbears from regulating, *see* Order at paras. 392-415, or privacy complaints, which I address below).

[226] *See* Order at n.1821 (citing Public Knowledge Comments at 16-22).

[227] Order at para. 479.

[228] Order at n.1860 (citing David Choffnes Comments at 2-3). The other examples cited in this footnote are similarly irrelevant and involve issues unrelated to ISP throttling, like interconnection disputes, which the Order declines to address.

[229] *See* Order at paras. 500, 575.

[230] *See* Order at n.1821 (citing Fangfan Li *et al.*, *A Large-Scale Analysis of Deployed Traffic Differentiation Practices* (Feb. 2018), https://wehe.meddle.mobi/papers/wehe.pdf (Wehe Study)).

[231] *See* CTIA Reply Comments, WC Docket No. 23-320, at 10-18 (Jan. 17, 2024); Ross Marchand, *New Evidence Debunks Big Myth That Repealing Internet Rules Caused Throttling*, The Federalist (Sept. 19, 2018), https://thefederalist.com/2018/09/19/new-evidence-debunks-big-myth-repealing-net-neutrality-caused-throttling/ (rebutting the Wehe Study, explaining that the traffic variations detected by the researchers "reflect data management rather than a plot to prioritize in-house streaming").

management. The Wehe Study did no such thing. It admits that it could not pinpoint whether video resolution quality was the result of the user's data plan,[232] a setting selected by the streaming service,[233] "confounding factors such as varying network conditions,"[234] or "IP addresses, peering arrangements, interconnection congestion, traffic volume, or other factors independent of IP payloads."[235]

If a net neutrality problem existed, that information would be readily available for the Order to cite, instead of grasping at apocryphal tales or irrelevant examples. After all, the *Restoring Internet Freedom Order* enshrined a Transparency Rule, still in effect, that requires ISPs to disclose network management practices, on their websites or an FCC docket, that identifies blocking, throttling, and prioritization practices. But ISP disclosures disprove the premise of ongoing abuses,[236] and the Order does not contend otherwise.

## 2.        Broadband Investment

The Order's agnosticism about Title II's effect on investment also misses the mark.

**1.** Private investment in broadband networks drives faster speeds, more competition, greater capacity, and lower prices. The broadband industry is famously capital intensive. Without hundreds of billions of dollars in long-term investment, ISPs cannot dig trenches, lay fiber, build towers, purchase and deploy spectrum, launch satellites, virtualize networks, develop intermodal and multimodal services, and take other steps to deliver broadband.

The 2017 *Restoring Internet Freedom Order* observed that Title II regulation of ISPs from 2015-2017 accompanied a decline in broadband investment. The *Restoring Internet Freedom Order* also predicted that "reclassification of broadband Internet access service from Title II to Title I is likely to increase ISP investment and output."[237]

The Order must disprove those conclusions. To lawfully change its policy of light regulation, the FCC must meaningfully address factual findings that "underlay" its return to Title I in 2017.[238] And investment effects represent "serious reliance interests" that "must be taken into account" when an agency

---

[232] Wehe Study at 136 § 5, 132 § 3.3, 138 § 6.2.

[233] *Id.* at 140 § 7.2.

[234] *Id.* at 131 § 3.1.

[235] *Id.* at 132 § 3.3.

[236] *See, e.g.*, Verizon, *Network Management*, https://verizon.com/about/our-company/network-management (last visited Apr. 24, 2024) ("Verizon Online does not affirmatively manage congestion on the network through mechanisms such as real-time throttling, blocking, or dropping of specific end user traffic based on source or content. There are no usage caps applicable to Verizon Online's internet access services."); AT&T, *Network Practices* (last visited Apr. 24, 2024), https://about.att.com/sites/broadband/network ("AT&T does not favor certain websites or internet applications by blocking or throttling   lawful internet traffic on the basis of content, application, service, user, or use of nonharmful devices on its broadband internet access services."); Comcast, *Xfinity Internet Broadband Disclosures*, https://www.xfinity.com/policies/internet-broadband-disclosures (last visited Apr. 24, 2024) ("Comcast does not directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, or resource reservation, to benefit an affiliate. … Comcast does not degrade or impair access to lawful Internet traffic on the basis of content, application, service, user, or use of a non-harmful device.").

[237] *Restoring Internet Freedom Order* at para. 98.

[238] *Fox*, 556 U.S. at 515.

changes its policy.[239]   Besides, any cost-benefit analysis is illegitimate unless it considers how Title II controls undermine private investment decisions.  In all cases, the Order fails to meet its legal burden.

**2.**  Start with the historical evidence of broadband investment, which validates the *Restoring Internet Freedom Order*'s conclusions and predictions.

After the FCC adopted the 2015 *Title II Order*, many ISPs reduced their investments and halted the expansion of their networks.  Indeed, it was the only period of time outside of a recession where broadband investment declined.  One study found that the 2015 Title II rules reduced broadband investment by $5.6 billion.[240]  Another found that "[t]he persistent prospect of Title II policy reduced investment by approximately 10% on average, between 2011 and 2020, about $8.1 billion annually, with a total loss of investment over a ten-year period of about $81.5 billion."[241]  That study calculated "$145 billion annual losses in Gross Domestic Product, amounting to "$1.45 trillion over ten years."

And after the FCC repealed Title II rules in 2017, broadband providers set new records for building out Internet infrastructure. This makes sense because a regulatory onslaught from Washington and new compliance costs are not actions that free up more capital for constructing networks.  In 2022, the broadband industry invested a record $102.4 billion in U.S. communications infrastructure, which represents a 21-year high for investment and a 19% year-over-year increase.[242]

Data from the wireless industry vividly illustrates the dip in investment brought about by Title II and resurgence in investment after the FCC returned to Title I.

---

[239] *Id.*

[240] *See* Michael Horney, *Broadband Investment Slowed by $5.6 Billion Since Open Internet Order*, Free State Foundation Blog (May 5, 2017), https://freestatefoundation.blogspot.com/2017/05/broadband-investment-slowed-by-56.html.

[241] George S. Ford, *Investment in the Virtuous Circle: Theory and Empirics*, Phoenix Center Perspectives, at 5-6 (Dec. 2023), https://phoenix-center.org/pcpp/PCPP62Final.pdf.

[242] USTelecom, *2022 Broadband Capex Report: Broadband Providers Invested $102.4B in Communications Infrastructure Last Year* (Sept. 8. 2023), https://www.ustelecom.org/wpcontent/uploads/2023/09/2022-Broadband-Capex-Report-final.pdf.

**Figure 2: Mobile Wireless Investment (Annual) (2010-2022)**



*Source:* CTIA, "CTIA's Wireless Industry Indices Report," July 2023, Table 16.

    A peer-reviewed study published in 2023 confirms the *Restoring Internet Freedom Order*'s finding about the negative relationship between broadband investment and Title II regulation.  This econometric study analyzed 2000-2021 data across OECD countries, spanning both the two years of Title II and the subsequent six years under Title I.[243]  The study found that utility-style net neutrality rules was associated with a 22-25% decrease in fiber investments.  The study's finding held even after controlling for other factors that might have influenced investment, like macroeconomic conditions.

    The Order offers no persuasive response.  At the outset, the Order suggests that regulations have virtually no impact on investment—a point that appears divorced from reality.  The Order then finds that the empirical evidence is "inconclusive due to methodological issues."[244]  Next, the Order seemingly acknowledges that investment declined after 2015 and picked up after 2017, but offhandedly attributes

---

[243] Wolfgang Briglauer, Carlo Cambini, Klaus Gugler, & Volker Stocker, *Net neutrality and high-speed broadband networks: Evidence from OECD countries*, 55 Eur. J. L. & Econ. 533-571 (2023).

[244] Order at para. 288.

that fluctuation to other factors.[245]  Finally, the Order relies on theoretical studies, mostly before 2015, that are either speculative,[246] uninformative to the matter at hand,[247] or outright wrong.[248]

Tellingly, the Order presents no affirmative empirical findings of its own.  Nor does the Order point to post-2015 studies that reviewed the data and contradicted the *Restoring Internet Freedom*'s conclusions about Title II's effect on investment.

Think about that.  The FCC now has investment data from 2015-2017 and from 2018 onward.  If Title II increased investment, or if Title I depressed it, surely the Order would have touted that finding from the rooftop.  The FCC's failure to do either is a dead giveaway that it does not believe in Title II's positive effect on investment.

**3.**  Turning from the past to the future, the Order predicts Title II will have minimal effects on broadband investment going forward.  To support that prediction, the FCC says it adopts "a light-touch regulatory framework" that merely reinstates net neutrality while forbearing from burdensome rules.[249]

That characterization is pure gaslighting.  The FCC apparently hopes the public will not understand how much control the agency is wresting.  Far from "light-touch," Title II regulates virtually every aspect of how an ISP does business.

For starters, Title II common carrier regulation has two centerpieces: (1) a collection of broad and amorphous "reasonableness" and "nondiscrimination" requirements that encourage anyone to complain about almost anything; and (2) virtually unbounded rulemaking and enforcement authority that permit the FCC to take virtually any action it wishes.

Using this new rulemaking authority, the FCC adopts the Internet Conduct Rule, which allows the FCC to prohibit any network management practice after the fact, based on a "non-exhaustive list of factors" applied on a "case-by-case basis."  In practice, the Internet Conduct Rule operates as a backdoor form of *ex post* rate regulation, for it ultimately governs how ISPs may price their data and capacity.  Already, the Order makes clear that longstanding ISP practices to optimize network performance while offering consumer services in a cost-efficient manner—from zero-rating to usage-based pricing to network slicing to managing the bitrate for streaming mobile video—may violate the Internet Conduct Rule based on indeterminate criteria applied sometime in the future.  These nebulous requirements

---

[245] Order at para. 285 & n.1182 (relying on, *inter alia*, 2017 comments from Free Press).  The Order attributes the post-2015 dip in broadband investment, along with the post-2017 rebound, to the putatively coincidental timing of 4G/5G deployment lifecycles.  That explanation, however, assumes the very conclusion in dispute by treating 4G/5G deployment decisions as exogenous to Title II rather than influenced by it.  Having made no effort to establish causal directionality, the Order's latest explanation should be afforded no probative value, as it lacks the rigor the FCC purports to expect from numerous peer-reviewed studies that found a deleterious effect on investment from Title II.

[246] Order at para. 284 & nn.1179-1180 (investor guidance from 2014).

[247] Order at n.1165 (citing old studies on the effect of UNE unbundling); *id.* at n.1168 (citing generic studies on the interaction between regulation and innovation).

[248] Order at para. 282 & n.1171 ("[I]f paid prioritization is allowed, ISPs have an incentive to reduce investment because expanding broadband capacity would lower the price that ISPs can charge for priority access.") (quoting Jay P. Choi & Byung-Cheol Kim, *Net Neutrality and Investment Incentives*, 43 RAND J. Econ. 446 (2010)).  The quoted prediction in the Order is wrong, of course, because paid prioritization *was* allowed after 2017, and investment *increased* as ISPs' revenue per gigabyte *declined*.

[249] Order at para. 484.

threaten to chill investment at the margins by always casting doubt on the legality of any innovative ISP network technique or business model that benefits consumers.

In effect, the FCC has assumed the power to regulate rates and impose price controls surreptitiously. How an ISP manages and monetizes its network capacity directly impacts how much it can charge. If a wireless provider is required to deliver 8K video without managing network congestion, the cost per gigabit of service will skyrocket. I have heard that it may cost at least one provider close to a billion dollars to deliver full-resolution video in all circumstances. Those costs will translate into higher prices for consumers. And without sponsored data plans, consumers will be forced to pay for capacity they get for free today. While the Order says it does not adopt "*ex ante* rate regulation," that assurance offers no comfort, for the FCC intends to indirectly regulate rates *ex post*. The FCC would do by subterfuge what it says it will not do openly. But the bank shot still counts.

The FCC's new powers do not end there. Through its Section 214 authority, the FCC assumes the power to prohibit any ISP from the U.S. market.[250] That power to ban an ISP is not an authority that the FCC has today under Title I. Applying Title II, moreover, appears to give the President the authority to ban broadband service in the U.S. altogether during times of emergency.[251] And any alleged violations of Title II would subject ISPs to endless lawsuits through a new private right of action and money damages,[252] along with enforcement authority that the FCC can apply whenever it wants.[253]

**4.** The Order will threaten investment until the door is definitively shut on price controls. I have repeatedly warned about this Administration's inexorable march towards rate regulation.[254] The Order, for its part, repeatedly disavows the intent to impose *ex ante* and *ex post* price controls given their dampening effect on investment.[255] It is important that this rare point of consensus—one that spanned Title I and Title II—not unravel.

In a new paragraph, the Order asserts that a "state affordability program" is not necessarily preempted simply because it is labeled as a "state affordability program."[256] That is true as far as it goes. Whether a state law is preempted turns on its substance, not its branding. For instance, a state law that, in the name of "affordability," lowers permitting fees to encourage more robust competition, and thus leans on market forces to put downward pressure on prices, is not preempted by the Order even if it were called a "state affordability program." By the same token, the Order does *not* provide that any state initiative—regardless of its substance—survives a run in with the Supremacy Clause merely because lawmakers label it a "state affordability program."[257]

---

[250] Order at para. 513.

[251] 47 U.S.C. § 606(d).

[252] 47 U.S.C. §§ 206-207.

[253] 47 U.S.C. § 208-209.

[254] *See Carr Title II NPRM Dissent* at 6; *Carr Digital Equity Order Dissent* at 3; Dissenting Statement of Commissioner Brendan Carr, *Promoting Competition in the American Economy: Cable Operator and DBS Provider Billing Practices*, Notice of Proposed Rulemaking, FCC-23-106, MB Docket No. 23-405 (2023), https://docs.fcc.gov/public/attachments/FCC-23-106A3.pdf.

[255] Order at paras. 280-281, 386. As noted above, however, I read the Order as leaving open the possibility of indirect *ex post* rate regulation by targeting the cost structure of broadband capacity.

[256] Order at para. 275.

[257] While the Order does not define "state affordability program," it drops a reference to the Infrastructure Investment and Jobs Act (IIJA), which requires state BEAD programs to ensure that ISPs offer a "low-cost broadband service option" for eligible subscribers. *See* Order at n.1146 (citing 47 U.S.C. §§ 1702(h)(4)(B), (h)(5)). However, the IIJA is equally clear that nothing therein authorizes NTIA to "regulate the rates charged for broadband service." Pub. L. 117-158 § 60102(h)(5)(D) (2021).

If it were otherwise, states would be free to undermine what the Order calls "a more uniform federal regulatory framework for BIAS."[258] Take New York's so-called "Affordable Broadband Act" as an example.[259] In my view, it is the type of naked rate regulation that is plainly preempted by today's Order, regardless of the legislation's title.

That conclusion does not change with the Second Circuit's recent decision to uphold the New York law.[260] While the Second Circuit issued its decision one day after the FCC voted on the Order, the court's decision did not turn on the Order or its Title II classification. Quite the opposite. In the court's view, Title I regulation (which applied when the litigation commenced and will apply until the Order's effective date) did not preempt New York's rate regulation. Putting aside my views on the merits of the Second Circuit decision, its analysis in my opinion is now moot and no longer controlling. As the court explained, a far different preemption analysis would apply if the law sought to regulate the rates of a Title II service.[261] Thus, in my view, the Order and the Second Circuit's opinion should be read as preempting New York's broadband price controls.

In short, neither the states nor the courts should interpret the Order as an invitation to regulate rates. The Order must be read to mean what it says about barring both *ex ante* and *ex post* price controls.[262] For my part, I intend to hold the FCC accountable for its representations and assurances, if laws like New York's are brought to this agency for a preemption determination. Whatever the politics, the legal analysis is straightforward.

Even so, ISPs face a regulatory climate rife with uncertainty. Will the FCC seize its newfound powers to adopt cradle-to-grave regulation, as it did immediately after the 2015 *Title II Order*? How will the FCC interpret the minefield of ambiguous provisions buried in this Order? These and other unknowns will be priced into investment decisions.

So, to say Title II's effect on investment is indeterminate, as the Order does, defies credulity. And to say this regime is "light-touch," as the Order does, strays even further from the truth. ISPs will give second thought before spending money to develop network innovations or business models that benefit consumers. And in many cases, it simply won't be worth the hassle.

**5.** In two particular cases, Title II makes hassles of the Biden Administration's signature broadband initiatives—BEAD and Open RAN.

The BEAD program will disburse $42.45 billion in federal grants for ISPs to deploy high-speed broadband in unserved areas. These areas also happen to present the greatest business risk. Even as it provides financial support, the BEAD program depends critically on complementary private investment known as "matches."[263] NTIA encourages states, in distributing BEAD program support, to "encourage[] to require a match from" participating broadband providers.[264] States "are required to" encourage "matches of greater than 25 percent from [ISPs] wherever feasible" and must give preference to proposals

---

[258] Order at para. 411.

[259] N.Y. Gen. Bus. Law § 399-zzzzz(2).

[260] *See N.Y. State Telecomms. Ass'n, Inc. v. James*, No. 21-1975, 2024 WL 1814541 (2d Cir. Apr. 26, 2024).

[261] *Id.* at *14.

[262] *See, e.g.*, Order at para. 386 ("Given the protection of our open Internet rules, we do not find *ex ante* or *ex post* rate regulation necessary for purposes of section 10(a)(1) and (a)(2), and we find it in the public interest to forbear from applying sections 201 and 202 insofar as they would permit the adoption of such rate regulations for BIAS in the future.").

[263] *See* NTIA, *Broadband Equity, Access, and Deployment Program Notice of Funding Opportunity*, § III.B.1 (May 12, 2022), https://broadbandusa.ntia.doc.gov/sites/default/files/2022-05/BEAD%20NOFO.pdf (BEAD NOFO).

[264] BEAD NOFO § III.B.2.

from broadband providers that commit to larger match amounts (and thereby will reduce the amount of BEAD program funding needed to complete projects).[265]

With or without matches, ISPs assume a great deal of upfront risk when they participate in BEAD, which only covers the expenses of building broadband. BEAD does not cover the costs of operating and maintaining broadband networks going forward. Those costs will fall entirely on ISPs. By increasing ISPs' costs and depressing their rates of return, Title II may cause ISPs to devote less private capital for matches. With fewer matching funds, the federal government would spend more per location, thereby accelerating the depletion of the BEAD fund. Perversely, Title II might magnify the risk that BEAD leaves many parts of America behind.

That is to say nothing of the risk that some ISPs will decide that BEAD is not worth the financial risk when their business motives are always questioned under a Title II regime. If ISPs opt out of BEAD, that would not only increase the per-location cost, but it also could result in less-qualified ISPs' receiving a greater share of the available funding, further imperiling the initiative's success.

The same is true of Open RAN. The Biden Administration has embraced Open RAN technologies—whether to encourage more competition against dominant and untrustworthy equipment vendors like Huawei and ZTE through an ecosystem of radio network manufacturers and interoperable standards—or for other policy reasons. Open RAN proponents generally describe the technology as critical to advancing both U.S. leadership in wireless and our national security.

For wireless providers with brownfield networks, however, Open RAN is an expensive proposition. It requires providers to replace radio units and other proprietary components with new equipment that is compatible with Open RAN standards. Many providers have not embraced Open RAN out of the gate due to its questionable return on investment. Congress has sought to incentivize Open RAN deployment by establishing a $1.5 billion Public Wireless Supply Chain Innovation Fund that is administered by the Department of Commerce.

As noted above, Title II would chill infrastructure investment necessary for Open RAN's success. But it is even worse than that. Title II would eliminate some of the key advantages of Open RAN standards. Popular implementations of Open RAN move much of the network's intelligence from equipment at the cell site to the core. Virtualized networks based in the cloud are attractive because they allow for the kinds of network management that Title II suddenly imperils, including network slicing and artificial intelligence. Superimposing a "mother, may I" regime would threaten Open RAN technology right at the time when the ecosystem needs more incentives and investment.

### 3.    Market Power and Competition

**1.**  As if the last six years never happened, today's Order reinstates the 2015 *Title II Order* through the regulatory equivalent of cut-and-paste. To justify this massive expansion in economic control over the broadband industry, today's Order repeats the FCC's speculative musings from 2010 and 2015 that ISPs have the "incentive and ability" to harm edge providers and consumers by favoring ISP-delivered content, like pay-television bundles.[266]

Broadband service is a two-sided market, and the Order must therefore rely on two distinct market power claims: (1) an upstream market power claim, alleging that ISPs will choke off edge

---

[265] *Id.*; *see also id.* §§ IV.B.7.a.ii, IV.B.7.b.i-.ii.

[266] Order at para. 464 & n.1859 (citing *2015 Title II Order* at para. 75; *2010 Open Internet Order* at para. 21).

providers by extracting anticompetitive tolls, and (2) a downstream market power claim, alleging that consumers are locked in due to insufficiently robust retail competition.

One might have expected the Order to demonstrate evidence of market power or market failure to support these conjectures. After all, the FCC[267] and federal courts[268] have determined that anticompetitive vertical restraints, like the "foreclosure" and "self-preferencing" theories that animate large parts of the Order, typically require a showing of market power absent direct evidence of consumer harm (which, as noted above, does not exist). But the Order does not venture to prove market power, claiming that the 1996 Act does not require it.[269]

Even as it disclaims the burden to prove market power or market failure, the Order turns around and baldly asserts that broadband providers are "gatekeepers" that "generally possess some degree of market power" that arises from "limited choice" and which "exacerbate[s]" the "incentive and ability" to engage in anticompetitive conduct.[270] Elsewhere, the Order points to incomplete and gerrymandered statistical evidence to suggest retail competition is weak.[271] The Order also labels ISPs as "terminating access monopolies" over edge providers, an anachronistic term that is irrelevant to ISPs because it refers to a market dynamic peculiar to the monopoly telephone system.[272]

Reasoned decision-making is the very least required of administrative agencies like the FCC.[273] If Title II generally, and the Internet Conduct Rule specifically, depend on assumptions about the economic structure of the ISP market, the Order must back those assumptions with rigorous analysis. If the Order wishes to present an affirmative claim about the state of ISP competition, it should do so directly instead of lobbing drive-by assertions. The Order cannot have it both ways, alleging market power in passing while disavowing the legal obligation to prove it.

In any event, market power is the hallmark of Title II "common carrier" regulation.[274] So, to apply monopoly-era Title II rules consistent with the APA's requirement of reasoned decision-making, and to support its finding that the benefits outweigh the costs, the FCC was obligated to prove the existence of durable market power and a market failure that only common-carrier regulation could address.

---

[267] *Restoring Internet Freedom Order* at para. 123.

[268] *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018) (to demonstrate indirectly that a vertical restraint in a two-sided market violates Section 1 of the Sherman Act, the plaintiff must offer "proof of market power plus some evidence that the challenged restraint harms competition"). *See generally* Herbert Hovenkamp, *Antitrust and Self-Preferencing*, 38 Antitrust Vol. 1, at 7 (2023) ("To generalize, while current United States antitrust law has many prohibitions on self-preferencing, they apply only when the firm in question has market power in the dominant good and competitive harm results from the refusal to give equal treatment."), https://www.americanbar.org/content/dam/aba/publications/antitrust/magazine/2023/vol-38-issue-1/antitrust-and-self-preferencing.pdf.

[269] Order at para. 251.

[270] Order at para. 471.

[271] Order at para. 663.

[272] *Restoring Internet Freedom Order* at n.493 ("We note that the terminating monopoly problem in voice telecommunications is one created by common-carriage regulation, not one solved by it. Specifically, carriers must interconnect with each other and originating carriers must pay terminating carriers rates set by the terminating carrier in their tariff (with some government oversight). That leads to a "bargaining" situation where one party sets the terms of the deal and the other must accept it or complain to the regulator—in other words, the regulations prohibit a normal free market from developing. Such regulatory requirements do not exist in broadband.").

[273] *State Farm*, 463 U.S. at 52.

[274] *Restoring Internet Freedom Order* at para. 123 ("The premise of Title II and other public utility regulation is that ISPs can exercise market power sufficient to substantially distort economic efficiency and harm end users.").

**2.** Start with the Order's upstream marker power claims about ISPs' status as "gatekeepers" over edge providers.

To see why a market power showing is necessary, consider a hypothetical. Say a small ISP in Louisiana tries to restrict access to Netflix. Is that possibility real enough to justify regulation? Only if the ISP can get away with it. And that depends on whether consumers can switch to another provider, whether the ISP can realistically hold Netflix hostage to extract above-market rates, and whether the ISP has a financial reason, like promoting a rival video service, to act this way.

If that hypothetical sounds far-fetched, it is. ISPs—especially the thousands of small ones across the United States—cannot play hardball with the world's largest tech companies. The companies that primarily drive of Internet traffic—Microsoft, Google, Meta, Amazon, Apple—have market capitalizations in the trillions of dollars. The *Restoring Internet Freedom Order* observed that "the market capitalization of the smallest of these five companies, Amazon, is more than twice that of the largest ISP, Comcast, and the market capitalization of Google alone is greater than every cable company in America combined."[275]

Since 2017, the power differential between Big Tech and ISPs has ballooned as the market capitalization of each Big Tech firm has climbed from the hundreds of billions of dollars in 2017 into the trillions of dollars in 2024.[276] The idea that ISPs, especially the hundreds of small and rural ISPs across the country, can exercise "gatekeeper" power over Big Tech is farfetched. Yet that is exactly what the Order assumes in all cases, for all providers in all markets, based on zero proof, and regardless of the facts.

The Order's reliance on *ipse dixit* instead of actual evidence of market power is especially inexcusable in 2024, even if the FCC might have gotten away with it in 2015.[277] Back then, the FCC applied Title II to ISPs for the first time in American history. Some measure of predictive judgment might have been acceptable at the time. Now we have a natural experiment: two years with Title II (2015-2017) and the last six years without it (2018-2024). As noted above, the Order cannot point to an example after 2017 where a provider successfully leveraged gatekeeper power in the way net neutrality proponents envision. It is no longer enough for the FCC to engage in fact-free postulation, as the Order does today, that broadband providers are "gatekeepers" with the "incentive and ability" to harm edge innovation.[278]

Apart from the Order's lack of evidence, it is difficult to imagine a scenario under which the FCC's gatekeeper theory of broadband would be plausible. That is because both the "incentive" and the "ability" sides of the equation fall short. And that is even more true today than it was in 2015 or 2017.

Start with ISPs' "incentive." Net neutrality was originally premised on the idea that broadband providers would unfairly compete with edge providers in preferencing ISPs' rival media, content, and other applications.[279] An ISP's control over the last mile, according to Big Tech talking points, would provide an anticompetitive advantage to dictate consumer choices and keep them in walled gardens.

---

[275] *Restoring Internet Freedom Order* at para. 134.

[276] Companies Market Cap, *Largest Companies by Market Cap*, https://companiesmarketcap.com/ (last visited Apr. 24, 2024).

[277] *U.S. Telecom II*, 825 F. 3d at 708 (D.C. Cir. 2016).

[278] The Order floats the self-defeating thesis that state net neutrality regulation of ISPs prevented such behavior after 2017. *See* Order at para. 493. Even if that were true, it would obviate the need for Title II at the federal level.

[279] Tim Wu, *Network Neutrality, Broadband Discrimination*, 2 J. on Telecomm. & High Tech. L. 141 (2003); Mark A Lemley & Lawrence Lessig, *The End of End-to-End: Preserving the Architecture of the Internet in the Broadband Era*, 48 UCLA L. Rev. 925 (2001).

If that were true, ISPs would have a chokehold on pay-television—once the crown jewel from a revenue standpoint—after 2017. But linear, facilities-based television—whether satellite TV or cable—has experienced a freefall as millions of consumers switched to over-the-top video offered by streaming behemoths like Netflix and Disney+.[280] And while broadband providers once considered expanding their businesses to the edge more than a decade ago, that experiment turned out to be a failure for market-based reasons. ISPs have since reversed course and deleveraged, returning their focus to connectivity.[281]

The idea of net neutrality also originated during an era of crude network management techniques and crippling bandwidth scarcity. When they offered 56 kbps speeds, ISPs faced severe capacity constraints and struggled to keep up with peer-to-peer sharing and web 2.0 startups, whose success resulted in an explosion of traffic. Whatever the merits of net neutrality as an economic construct nearly 25 years ago, it holds no relevance today. Bandwidth is more plentiful and far cheaper than ever, even compared to the last Title II proceeding six years ago. A provider's revenue per megabyte has declined by orders of magnitude since 2017,[282] after ISPs invested billions of dollars to boost network capacity through spectrum, fiber, infrastructure, and intelligent network management.

Providers also have far less "ability" to behave in the way that the Order supposes. Since 2015, Big Tech has dominated the modern economy to the point where Congress and competition agencies worldwide have taken action. The idea that even the largest ISP holds enough negotiating leverage to threaten cutting off Amazon Prime or Apple+ is laughable. For one, Big Tech is heavily invested in internet infrastructure, including content delivery networks, cloud backends, fiber, and undersea cables, which also carry unaffiliated ISP traffic. That means the leverage is not one-sided, and ISPs also depend on Big Tech for critical connectivity inputs. Since 2015, Big Tech has shown that it will retaliate against companies who play hardball in the way the Order envisions.[283]

**3.** Now turn to downstream market power, concerning the state of retail competition and the extent to which consumers are locked into their current ISPs.

The disciplining effect of competition explains why ISPs lack the "incentive" or "ability" to restrict access to content. Consumers enjoy more choices as intermodal competition has intensified since 2017. In what is by now a familiar pattern, the Order discounts the existence of ISP competition without undertaking a rigorous competition analysis. The Order asserts, without offering data, that "switching costs" remain high.[284] It suggests, without saying so, that new forms of intermodal ISP competition are not viable substitutes.[285] And it relies on the artificially high speed benchmark of 100/20 Mbps, without

---

[280] *See* Pew Research Center, *Cable and Satellite TV Use Has Dropped Dramatically in the U.S. since 2015* (Mar. 17, 2021), https://www.pewresearch.org/short-reads/2021/03/17/cable-and-satellite-tv-use-has-dropped-dramatically-in-the-u-s-since-2015/; NS Screen Media, US Traditional Pay TV, https://nscreenmedia.com/us-pay-tv/, (last visited Apr. 24, 2024); Keith Nissen, US Q3'23 Video Cord Cutter Update: Viewing Live TV Makes a Comeback (Nov. 8, 2023), https://www.spglobal.com/marketintelligence/en/news-insights/research/us-q3-23-video-cord-cutter-update-viewing-live-tv-makes-a-comeback.

[281] *See, e.g.*, Press Release, AT&T, AT&T *Discovery Close WarnerMedia Transaction* (Apr. 8, 2022), https://about.att.com/story/2022/close-warnermedia-transaction.html.

[282] Bryan Keating, *An Economic Analysis of Mobile Wireless Competition in the United States*, at para. 43 (Dec. 11, 2023), https://api.ctia.org/wp-content/uploads/2023/12/CL_Dec-2023.pdf (attached to Comments of CTIA, WC Docket No. 23-320 (Dec. 14, 2023) (*Mobile Wireless Competition*) ("Revenue per GB has declined by 98 percent since 2012 and by 75 percent since 2017.").

[283] *See, e.g.*, Tim Marcin, *Meta briefly blocked a local news organization critical of Facebook*, Mashable (Apr. 6, 2024), https://mashable.com/article/meta-block-kansas-reflector.

[284] *See* Order at para. 471 & n.1874.

[285] *See* Order at para. 473 & n.1882.

explaining why consumers are "unserved" if they do not have a 20 Mbps upload speed that bears little practical relevance to modern edge services.[286]

The evidence belies the Order's prognostications about the state of ISP rivalry. By any measure, the competitive melee for customers is more cutthroat than ever. Just look at how much ISPs spend on advertising, which demonstrates not only their need to attract and keep customers, but also their belief that consumers are willing to switch.[287] Or look at the rate of churn, which exemplifies consumers' revealed willingness to switch.[288] Or look at the declining average revenue per user (ARPU), which illustrates competitive pressures on profitability.[289]

Or look at the existence of new entrants in the fixed wireless, satellite, and fiber sectors. The FCC's latest data shows 2,193 fixed ISPs, 1,534 of which offer broadband over fiber to the premises. There are also 57 separate operators offering mobile broadband, 54 of which offer 4G LTE service and 16 of which offer 5G service. According to the latest National Broadband Map, 100% of serviceable locations have 25/3 Mbps service and 99.96% have 100/20 Mbps service. In the latest *Section 706 Report*, the FCC estimates 99.7% of households have more than three options for 25/3 Mbps service and more than 60% of households have multiple options for 100/20 Mbps service.[290]

*For one*, wireless ISPs—both traditional mobile broadband operators and WISPs—are leveraging network improvements to offer fixed wireless to the home at a breakneck pace. 5G fixed wireless access is growing so rapidly that it accounted for 90% of the net new broadband subscriptions in 2022, compared to only 20% in 2021.[291] According to Ookla, fixed wireless has taken market share from cable and DSL providers, and the "aggressive pricing strategies of [fixed wireless] providers have driven prices down across the market, with cable providers for example offering slimmed down broadband and content packages at competitive prices, while AT&T Fiber now prices its entry fiber package of 300 Mbps at $55/month."[292] Fixed wireless is projected to account for approximately 90% of net subscriber additions over the next couple of years.[293] All told, the latest Broadband Map shows 66.0 million locations with fixed wireless service at 100/20 Mbps.

---

[286] Dissenting Statement of Commissioner Brendan Carr, *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Section 706 Report, GN Docket No. 22-270, FCC 24-27 (Mar. 14, 2024), https://docs.fcc.gov/public/attachments/DOC-401205A3.pdf.

[287] *See* Declaration of Mark Israel, Brian Keating & Allan Shampine, at para. 71 (appended to NCTA Comments, WC Docket No. 23-320 (Dec. 14, 2023), https://www.fcc.gov/ecfs/document/121484978453/1).

[288] *Mobile Wireless Competition*, at para. 59 (noting a monthly average churn of 1.53% for wireless carriers, translating to 18% turnover from one carrier to another on an annualized basis).

[289] *Mobile Wireless Competition*, at para. 42 (cleaned up) ("CTIA data indicate that ARPU declined by 29 percent from 2012 to 2022 when excluding equipment revenue and by 16 percent when including equipment revenue. CTIA data also show declines in ARPU from $38.66 in 2017 to $34.56 in 2022 (a decline of approximately eleven percent) even as the BLS indices were approximately flat. Taking general inflation into account reveals even more favorable price trends: the real (as opposed to nominal) ARPU has declined by 45 percent since 2012 and by 26 percent since 2017.").

[290] *Section 706 Report* at Fig. 6; Order at para. 471.

[291] *See* Leichtman Rsch. Grp. Press Release, About 3,500,000 Added Broadband from Top Providers in 2022 (Mar. 2, 2023), https://leichtmanresearch.com/about-3500000-added-broadband-fromtop-providers-in-2022/.

[292] Mike Giles, *U.S. – The Rise of 5G FWA & the Battle for Fixed Broadband Customers* (Dec. 20, 2023), https://www.ookla.com/articles/fixed-wireless-access-us-q3-2023.

[293] Mike Dano, *FWA to Remain 'Biggest Disruptor' through 2024* (June 29, 2023), https://www.lightreading.com/fixed-wireless-access/fwa-to-remain-biggest-disruptor-through-2024

*For another*, the industry is in the middle of a massive fiber rollout. That is especially so for traditional wireless carriers that are building out their wireline assets. Verizon has invested billions in its Fios network, a "wide-scale, all-fiber deployment to bring new broadband competition" that is expected to pass 18 million homes by the end of 2025.[294] AT&T has already deployed fiber-based broadband to more than 26 million locations."[295] T-Mobile has rolled out fiber in 13 markets at symmetrical 2 Gbps speeds.[296]

*And for another*, low-earth orbit satellite ISPs now provide new sources of intermodal competition. Satellite providers offered high-speed broadband at 100/20 Mbps speeds to 99.6% of locations, as of June 30, 2023. That is up from 16.09% according to the previous version of the FCC's National Broadband Map. Starlink successfully launched approximately 1,000 satellites between December 31, 2022 and June 30, 2023.[297]

### 4.    Prices, Speed, and Availability

The FCC's claim that Title II is necessary to ensure improved connectivity also fails. The robust competition and investment since our return to Title I has brought better performance to consumers. The proof can be seen in the latest data from Ookla:

- Median fixed download speeds in the U.S. have increased by more than five-fold or approximately 430% since 2017, according to Ookla data.

- Median mobile download speeds have increased by more than seven-fold or approximately 647% since 2017, according to Ookla data.

- The United States has leapfrogged other countries since 2017 and now ranks among the highest in the world for fixed, mobile, and 5G broadband speeds, according to Ookla data.

Industry data tells a similar story. 5G wireless networks are capable of delivering peak speeds up to 20 Gbps and average speeds of greater than 100 Mbps.[298] Median download speeds have quadrupled over the past seven years and have more than doubled in the past three years.[299] Starlink's average download speed increased from 89.38 Mbps to 129.64 Mbps from 2022 to 2023, upload speed increased from 10 Mbps to 15 Mbps, and latency decreased by 10ms.[300]

---

[294] Masha Abarinova, *Verizon Fiber Exec Dishes on Build Progress, Cell Site Upgrades* (Oct. 3, 2023), https://www.fiercetelecom.com/broadband/verizon-fiber-exec-dishes-build-progress-cell-site-upgrades.

[295] Sean Buckley, *AT&T eyes extending its fiber reach beyond its 30M target*, Broadband News (Jan. 24, 2024), https://www.broadbandtechreport.com/home/article/14304075/att-eyes-extending-its-fiber-reach-beyond-its-30m-target.

[296] Linda Hardesty, T-Mobile Now Offers Fiber Broadband in 13 Markets (Feb 7, 2024), https://www.fiercetelecom.com/broadband/t-mobile-now-offers-fiber-broadband-13-markets.

[297] *See* Wikipedia, List of Starlink and Starshield launches, https://en.wikipedia.org/wiki/List_of_Starlink_and_Starshield_launches (last visited Mar. 8, 2023).

[298] Qualcomm, *Everything you need to know about 5G*, https://www.qualcomm.com/5g/what-is-5g (last visited Apr. 24, 2024).

[299] *Mobile Wireless Competition* at para. 4.

[300] Jessica Dine & Joe Kane, *The State of US Broadband in 2022: Reassessing the Whole Picture*, Info. Tech. & Innovation Found. (Dec. 5, 2022), https://itif.org/publications/2022/12/05/state-of-usbroadband-in-2022-reassessing-the-whole-picture/; Brian Westover, *Starlink Speed: How Much Faster Is Elon's Satellite Internet in 2023 vs. 2022?*, PC Mag. (May 17, 2023), https://www.pcmag.com/news/starlinkspeed-tests-2023-vs-2022.

And prices?  They're down across the board since we returned to Title I.  From 2022 to 2023, the inflation-adjusted price of fixed providers' most popular broadband speed tier dropped by 18.1%, and the price of fixed providers' fastest speed tier option dropped by 6.5%.[301]  The U.S. weighted average nominal price for the most popular speed tiers by subscription has decreased by 37% over the past eight years (54.7% drop adjusting for inflation), and the weighted average price for the fastest speed tiers has decreased by 38.6% (55.8% drop adjusting for inflation).[302]  The declining cost of consumer broadband stands in marked contrast to the rising cost of other essential consumer goods and services, which have increased during the same period by approximately 28%.[303]  As for mobile broadband, inflation-adjusted real prices have dropped by 18-19% since 2017.[304]

In contrast to America's successful, light-touch approach, regulators in Europe have long applied centralized, utility-style controls to their continent's Internet infrastructure.  This is a marked difference from the light-touch approach that a bipartisan set of U.S. lawmakers pioneered in 1996 and applied to networks here in America—an approach that has allowed the free and open Internet to thrive in this country and our Internet economy to become the envy of the world.  Indeed, networks in America far outpace those in Europe.

- U.S. networks are faster than in every single country in Europe, as Ookla's fixed, median download speed rankings show.[305]

- U.S. networks are more competitive than those in Europe, with the U.S. having a nearly two-fold or 40 percentage point lead (87% to 45%) when it comes to households with access to two or more wired, facilities-based providers.[306]

- U.S. networks bridge the digital divide more so than those in Europe, with the U.S. leading Europe by 11 percentage points (98% to 87%) when it comes to households with high-speed, fixed broadband, and by an even larger, 31 percent (91% to 60%) in rural areas.[307]

- U.S. 5G networks cover 95% of the U.S. population compared to just 72% in Europe, according to EU officials.[308]

- U.S. networks are benefiting from providers here investing three-fold more per household than their European counterparts.[309]

---

[301] Arthur Menko, 2023 Broadband Pricing Index, USTelecom, https://ustelecom.org/wp-content/uploads/2023/10/USTelecom-2023-BPI-Report-final.pdf.

[302] *Id.*

[303] *See id*; *see also* News Release, Bureau of Labor Statistics, Consumer Price Index – October 2023 (Nov. 14, 2023), https://www.bls.gov/news.release/archives/cpi_11142023.htm.

[304] *Mobile Wireless Competition*, at para. 40.

[305] Speedtest Global Index, *Median County Speeds March 2024* (last visited Apr. 24, 2024), https://www.speedtest.net/global-index.

[306] *See* USTelecom, US vs. EU Broadband Trends 2012-2020, at 13 (Apr. 1, 2022) ("*Broadband Trends*"), https://ustelecom.org/research/us-eu-broadband-trends/.

[307] *See id.*

[308] *See* Foo Yun Chee, *EU's Breton Cites Telcos' Investment Gap for Big Tech Network Fee Push,* Reuters (June 6, 2023) (*Reuters Story*), https://www.reuters.com/business/media-telecom/eus-breton-cites-telcos-investment-gap-big-tech-network-fee-push-2023-06-06/.

[309] *See Broadband Trends* at 13.

Indeed, this gap is why one of the EU's top regulators recently remarked that "[i]n terms of 5G deployment, the EU lags behind other regions of the world."[310]

During the pandemic, as remote work and stay-at-home mandates spread across the world, Internet traffic surged dramatically. With the sudden spike in online traffic, COVID-19 represented the ultimate stress test for a country's approach to network regulation. In Europe, regulators responded to the upswing in traffic by asking Netflix and YouTube to throttle down their online services "to prevent the internet collapsing under the strain of unprecedented usage."[311] Asking Netflix and others to ration their Internet streams was part of what one EU regulator described as "a joint responsibility to take steps to ensure the smooth functioning of the internet during the battle against the virus."[312]

European regulators had good reason to think that their continent's fragile, underinvested networks—a product of Europe's outdated utility regulation—would fail to sustain the surge in Internet traffic that spiked in the spring of 2020. Indeed, "[t]he performance of the EU's networks deteriorated significantly" at the time and "Expose[d] Europe's Creaking Internet for All to See," as many reports noted.[313]

In the U.S., we did not have to ask streamers like Netflix or Disney+ to degrade the quality of consumers' streams because we got it right with our successful, light-touch approach to Internet regulation. Our framework created the incentives for the private sector to invest massive, record-breaking sums and build out robust, resilient, and competitive networks. Or, as former FCC Chairman Tom Wheeler wrote while reflecting on the performance of U.S. networks during COVID-19: "Credit is due to the nation's broadband providers. The fact we can work from home is the result of hundreds of billions of investment dollars and construction and operational skill."[314]

Here's the bottom line. America's networks are not broken. Our light-touch regulatory model has not failed. But Europe's utility-style regime has. But that will change with a return to Title II, as the FCC emulates a regulatory framework that would make networks in America look more like the fragile, underinvested ones in Europe.

> **B.** **New Title II Justifications Fare No Better: More Problems that Do Not Exist In Search of Solutions that Do Not Work.**

Given that the Commission cannot justify its return to Title II classification with evidence of new open internet violations or a need to foster competition, investment, or innovation, the Commission instead seeks refuge in a grab bag of new rationales that have nothing to do with "net neutrality"—such as privacy, cybersecurity, national security, public safety, and network resiliency. None of them provide a basis for today's Order that would survive APA review.

---

[310] *See Reuters Story.*

[311] *See* Hadas Gold, *Netflix and YouTube are Slowing Down in Europe to Keep the Internet from Breaking*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/19/tech/netflix-internet-overload-eu/.

[312] *Id.*

[313] *See* Chiara Albanese, Thomas Seal, Rodrigo Orihuela, *Pandemic Exposes Europe's Creaking Internet for All to See, Bloomberg* (Oct. 9, 2020), https://www.bloomberg.com/news/articles/2020-10-09/europe-s-bad-internet-risks-missing-out-on-133-billion-a-year; Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic* (June 2020), https://cbpp.georgetown.edu/news/anna-maria-kovacs-releases-policy-paper-us-broadband-networks-rise-to-the-challenge-of-surging-traffic-during-the-pandemic/.

[314] Tom Wheeler, Why the Internet Didn't Break (Apr. 2, 2020), https://www.brookings.edu/articles/why-the-internet-didnt-break/.

1.     **National Security and Law Enforcement**

The Order asserts that Title II will enhance the FCC's ability to protect "networks from entities that pose threats to national security and law enforcement."[315]  But this claim is nothing more than pretext.

For starters, the Order does not say specifically why the FCC's oversight must be "enhanced" or how Title II would accomplish it.  At most, the Order vaguely insinuates that Title II is necessary to deal with Chinese state-owned entities providing private data services on U.S. soil.[316]  But the Order stops short of claiming that the FCC could take additional action against these entities under Title II.

And for good reason.  None of those providers—not China Telecom Americas, not China Unicom, not Pacific Networks, and not ComNet—appears on the FCC's list of 2000-plus ISPs that offer the kind of retail broadband service that Title II now covers.[317]  That is because the FCC already revoked their Section 214 authorizations without Title II authority over broadband.[318]  At most, as their Form 499 registrations confirm, those companies currently either offer private data services, or are designated as no longer active.[319]  So, it is unclear how Title II gives the FCC additional authority against these entities.

To be sure, the Order does point to a real problem: ISPs interconnecting with PRC state-backed carriers through their points-of-presence.  That is why, since 2020, I have called for the FCC to "start a proceeding that examines whether we should prohibit regulated carriers from directly interconnecting with entities that pose a national security threat," even if those entities do not have Section 214 authorizations.  We did not need Title II to open such an inquiry.[320]  And we could have addressed the issue using a scalpel instead of a chainsaw.  But this FCC did not seem interested in exploring such an option.  The FCC's failure to examine this long-known issue belies its stated concern for national security here, and provides more evidence that national security is merely a pretext for more control over the broadband industry.

Indeed, it would be quite odd if, as the Order suggests, the U.S. government were powerless to address these cyber threats or malicious foreign control over our Internet infrastructure in the absence of President Roosevelt's Title II.  In fact, that is not the case.  The U.S. government has ample authorities today without Title II.

---

[315] Order at para. 30.

[316] Order at para. 36.

[317] *See* FCC National Broadband Map, "Provider Summary – Fixed Broadband," https://broadbandmap.fcc.gov/datadownload/nationwide-data?version=jun2023.

[318] *See China Telecom (Americas) Corporation*, GN Docket No. 20-109, File Nos. ITC-214-20010613-00346, ITC214-20020716-00371, ITC-T/C-20070725-00285, Order on Revocation and Termination, 36 FCC Rcd 15966 (2021) (China Telecom Americas Order on Revocation and Termination), *aff'd China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022); *China Unicom (Americas) Operations Limited*, GN Docket No. 20-110, File Nos. ITC-214-20020728-00361, ITC-214-20020724-00427, Order on Revocation, 37 FCC Rcd 1480 (2022), argued 9th Cir. Argued Feb. 15, 2023; *Pacific Networks Corp. and ComNet (USA) LLC*, GN Docket No. 20-111, File Nos. ITC214-20090105-00006, ITC-214-20090424-00199, Order on Revocation and Termination, 37 FCC Rcd 4220 (2022), *aff'd Pacific Networks Corp. and ComNet (USA) LLC v. FCC*, No. 22-1054 (D.C. Cir. 2023).

[319] *See, e.g.*, 499 Registration, China Telecom (Americas) Corporation, https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=822646; 499 Registration, China Unicom Americas Operations LTD, https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=824402; 499 Registration, Comnet (USA), LLC, https://apps.fcc.gov/cgb/form499/499detail.cfm?FilerNum=823684.

[320] Statement of Commissioner Brendan Carr, *Pacific Networks Corp. and ComNet (USA) LLC*, GN Docket No. 20-111; ITC-214-20090105- 00006; ITC-214-20090424-00199, https://docs.fcc.gov/public/attachments/FCC-22-22A3.pdf.

The Executive Branch already has the authority to prohibit Chinese entities from continuing to offer private data services in the U.S. Indeed, President Trump issued an Executive Order in 2019,[321] and the Commerce Department codified a set of implementing rules in 2021,[322] that are more than sufficient to deal with this specific threat. These authorities allow the Secretary of Commerce to prohibit "information communications technologies and services" subject to the control or influence of foreign adversaries that pose unacceptable risks to national security. The Commerce Secretary's authority extends broadly over foreign adversary hardware or software "primarily intended to fulfill or enable the function of information or data processing, storage, retrieval, or communication by electronic means," including "transmission, storage or display."[323]

Today, security threats to Internet infrastructure are addressed by a combination of multistakeholder initiatives, public-private partnerships, and Executive Branch agencies directly accountable to the President as the commander in chief. These agencies include CFIUS, the Department of Homeland Security (including CISA), the Department of Commerce, the Department of Justice (including the FBI), and the Department of Defense. In recent years, the capabilities of these agencies have been augmented to deal with emerging threats. Among these authorities, Congress established CISA in 2018 as the Federal leader for cyber and physical infrastructure security.[324] And the Presidential Policy Directive 21[325] and the National Infrastructure Protection Plan[326] designated DHS, not the FCC, as the lead agency to address critical infrastructure threats in the communications sector.

Undeterred, the Order asserts that the FCC lacks the authority it needs to address national security threats without Title II.[327] Here again, the Order identifies no such gap. If one existed, the FCC would have gone straight to Congress instead of waiting years for the votes to push through Title II. Congress would have then passed targeted legislation to deal with the threat. That is what normally happens. Two recent examples include the Secure and Trusted Communications Network Act of 2019[328] and the Secure Equipment Act of 2021,[329] which collectively prohibited FCC authorization of untrustworthy Chinese equipment in the United States. It would be incredible, if it were true, that the FCC has known about a national security threat for years now, simply stood by the wayside, did not seek to eliminate it through existing authorities or new ones, and waited to raise it until now—in fact, that is not credible.

The Order also asserts that Title II will give the FCC a seat at the table to participate in a "whole-of-government" approach to protect national security.[330] The Order identifies no empty seat. Indeed,

---

[321] Exec. Order No. 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22689 (May 15, 2019).

[322] 15 C.F.R. pt. 7.

[323] 15 C.F.R. § 7.2.

[324] Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, 132 Stat. 4168.

[325] The White House, Presidential Policy Directive 21, *Critical Infrastructure Security and Resilience* (Feb. 12, 2023), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-criticalinfrastructure-security-and-resil.

[326] DHS, *National Infrastructure Protection Plan: Partnering for Critical Infrastructure Security and Resilience*, at 23 (2013), https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

[327] Order at para. 40.

[328] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423, paras. 26, 43 (2019).

[329] *See Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13493, para. 32 (2022).

[330] Order at para. 39.

none of the Executive Branch agencies mentioned above came forward in this proceeding to support the FCC's view that it could not meaningfully contribute to national security. The Administration's filing, submitted by NTIA, offered the FCC tepid support at best on national security. NTIA said that "to the extent that regulations are necessary, they should be narrowly tailored," and asked the FCC to defer when its authority "may overlap with that of another agency with appropriate expertise."[331] Hardly a ringing invitation for Title II.

As for law enforcement, the Department of Justice and the FBI have ample authority over ISPs through the Foreign Surveillance Intelligence Act, the Electronic Communications Privacy Act, the Wiretap Act, and other authorities. As for the FCC's limited role, the Communications Assistance for Law Enforcement Act (CALEA) already applies to broadband providers without Title II regulation.[332]

## 2. Privacy and Data Security

As the Order tells it, the need to protect broadband privacy justifies Title II.[333] That is more than wrong. By wresting oversight from the Federal Trade Commission, Title II creates a gaping doughnut hole that would leave no broadband privacy rules in place.

As an initial matter, the Order identifies no privacy gap for the FCC to fill. The FTC already regulates broadband providers and their privacy practices through its authority to enforce unfair and deceptive trade practices under Section 5 of the FTC Act.[334] The FTC is recognized as the federal privacy cop on the beat. Indeed, at this very moment, broadband consumers benefit from the same set of federal privacy rules that protect consumers across the economy.

But those federal rules would go away if broadband were regulated under Title II. The FTC lacks statutory authority over "common carrier" services, including those the FCC regulates under Title II.[335]

The FCC is powerless to fill that regulatory gap using Title II. In a 2017 resolution adopted pursuant to the Congressional Resolution Act (CRA), Congress prohibited the FCC from applying Title II broadband privacy rules, which the FCC issued in 2016.[336] Because a rule disapproved by Congress "may not be reissued in substantially the same form, and a new rule that is substantially the same . . . may not be issued," the FCC lacks authority to reissue any privacy rules that are "substantially the same" as those in the FCC's 2016 broadband privacy order.[337]

While the Order claims that some baseline statutory privacy provisions could still apply to ISPs, even with the 2017 congressional resolution, that assertion is dubious at best. *First*, voice "calls" are the only telecommunications services specifically mentioned in Section 222. Indeed, the Order waives the FCC's existing CPNI rules to broadband providers, finding that they "were adopted to address specific concerns in the voice context" and not a "good fit" for broadband.[338] *Second*, the CRA would not permit the FCC to reinstate any one of the invalidated rules (or even some combination of them), even if the FCC

---

[331] Comments of NTIA, WC Docket No. 23-320, at 7 (Mar. 20, 2024).

[332] *Communications Assistance for Law Enforcement Act (CALEA) and Broadband Access and Services*, First Report and Order and Further Notice of Proposed Rulemaking, 20 FCC Rcd 14989 (2005).

[333] Order at paras. 67-68.

[334] 15 U.S.C. § 45(a)(2).

[335] 15 U.S.C. § 45(a)(2).

[336] *See* Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Federal Communications Commission relating to "Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," Pub. L. No. 115-22, 131 Stat. 88 (2017) (*2017 CRA*) (stating, consistent with the terms of the CRA, that the rules "shall have no force or effect").

[337] 5 U.S.C. § 801(b)(2).

[338] Order at para. 359.

did not reinstate all of them.[339] That means the FCC could not reinstate the invalidated rules that would extend Section 222 to broadband providers.[340] Nor could it reinstate a definition of CPNI that covers data and metadata elements specifically collected by broadband providers.[341] Without these foundational components, the FCC could take no further action over ISP privacy.

So, far from filling a gap in consumer privacy rules, the Order's decision to apply Title II to broadband would create one. And far from providing lawful justification for Title II, privacy considerations provide one more reason why the Order is arbitrary and capricious.

### 3. Public Safety, Resiliency, and Reliability

The Order's claim that Title II is necessary for public safety[342] rests on a single event that, it turns out, has nothing to do with the FCC's Title II net neutrality rules. In that 2018 incident, a fire department purchased a data-limited plan that cost less than an unlimited data plan. When the fire department hit that pre-specified limit, the service experienced a speed reduction as outlined in its plan before the provider made an exception and lifted the reduction.[343] The FCC invokes this incident in a way that leaves one with the impression that this violated net neutrality.[344]

But it did not, as the FCC's own rulemaking record makes clear. For one, the FCC's Title II rules do not apply to data plans marketed only to government users like public safety agencies. The 2015 *Title II Order* carved out enterprise plans—like the plan Santa Clara subscribed to—from the definition of "broadband internet access service."[345] For another, the 2015 *Title II Order* expressly allowed data-limited plans, like the plan Santa Clara voluntarily purchased.[346] Indeed, the Order notes all of these points and does not disagree with them. That is why the Order studiously avoids stating that this type of issue would be prevented by Title II despite the agency's consistent invocation of the event.[347]

The Santa Clara incident, to the extent it has any relevance, actually reveals the FCC's deep mischaracterization of public safety in the real world. The Order envisions that public safety professionals will rely on the "best efforts" Internet,[348] and traffic would compete with cat videos for scarce bandwidth. But that is not how public safety systems work. Not in the least. Rather, these systems need the kind of priority treatment (known as "preemption") that Title II would make illegal in the retail context. As FirstNet describes it, preemption is a "mission-critical feature" that "moves first responders to the front of the 'communications line,' prioritizing their network needs."[349] In fact, public

---

[339] Dissenting Statement of Commissioner Brendan Carr, *Data Breach Reporting Requirements*, Report and Order, WC Docket No. 22-21, FCC 23-111, https://docs.fcc.gov/public/attachments/FCC-23-111A3.pdf.

[340] *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services, et al.*, Order, 32 FCC Rcd 5442, at paras. 39-40 (2016), *abrogated by 2017 CRA*.

[341] *Id.* at paras. 46-105.

[342] Order at paras. 51-58, 451-463.

[343] Daniel Lyons, *One More Time: The Verizon-Santa Clara Fire Dispute Has Nothing to Do with Net Neutrality*, American Enterprise Institute (Nov. 13, 2019), https://www.aei.org/technology-and-innovation/one-more-time-the-verizon-santa-clara-fire-dispute-has-nothing-to-do-with-net-neutrality/.

[344] Order at para. 458.

[345] 2015 *Title II Order* at para. 207.

[346] *Id.* at para. 82.

[347] Order at para. 458-49.

[348] Order at para. 52.

[349] AT&T, *FirstNet Launches Ruthless Preemption for First Responders* (Dec. 12, 2017), https://about.att.com/story/preemption_for_first_responders.html.

safety represents one of the most obvious applications of network slicing,[350] another innovation the Order would threaten to make illegal in the retail context. Prioritizing public safety is no different in concept than allowing an ambulance to bypass traffic congestion to get to the hospital.

Stripped of a single example that proved nothing at all, the Order cannot point to a public-safety consideration that Title II would improve:

- Not outage reporting in the Disaster Information Reporting System (DIRS), which the FCC extended to ISPs, without Title II, to collect outage reports, operational status, and restoration information;[351]

- Not the Wireless Emergency Alert (WEA) program, which is voluntary by statute and already commands participation from the three major wireless carriers;[352]

- Not 911 outrage reporting, which already applies to cable, satellite, wireless and wireline systems;[353]

- Not network resiliency and reliability standards, which the FCC made mandatory on wireless carriers a few years ago;[354]

- And not disability access during emergencies, which is covered in the *Digital Equity Order*'s nebulous rules over ISPs.[355]

At bottom, resilient commercial networks and reliable public-safety systems depend on investment and innovation. Thanks to massive investment over the last six years, America's broadband networks are more robust and resilient than ever, especially when compared to networks in countries with far more heavy-handed or Title II-like regulatory regimes. Just look at Europe. When COVID-19 hit and Internet traffic levels suddenly surged to unprecedented levels, median network speeds in America exceeded those in the Old World by 83%.[356] Nothing would impair public safety, resiliency, or reliability more than reducing private investment in American networks—which is precisely what Title II threatens to do.

### 4. Broadband Access and Infrastructure

The Order asserts that Title II will enhance access to pole attachments and allow for greater regulation of multi-tenant environments (MTEs). But more than 96% of ISPs are already covered by

---

[350] *See* Karen Schulz, *Verizon Accelerates Network Slicing Technology with New Public Safety Use Case*, Verizon (Nov. 28, 2023), https://www.verizon.com/about/news/network-slicing-technology-public-safety.

[351] *See Resilient Networks et al.*, Second Report and Order and Second Further Notice of Proposed Rulemaking, PS Docket No. 21-346 *et al.*, FCC 24-5, at para. 10 (2024) (requiring "cable communications, wireline, wireless, and interconnected VoIP providers (subject providers) to report their infrastructure status information in DIRS daily when the Commission activates DIRS in geographic areas in which they provide service").

[352] *See* Warning, Alert, and Response Network Act, Title VI of the Security and Accountability for Every Port Act of 2006, Pub. L. No. 109-347, 120 Stat. 1884 (2006) (WARN Act); 47 U.S.C. § 1201(a); 47 C.F.R. § 10.10(d).

[353] 47 C.F.R. § 4.9.

[354] *See Resilient Networks et al.*, Report and Order and Further Notice of Proposed Rulemaking, 37 FCC Rcd 8059, at para. 10 (2022).

[355] *Digital Equity Order* at para. 102.

[356] Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic*, at 3 (June 2020), https://georgetown.app.box.com/s/8e76udzd1ic0pyg42fqsc96r1yzkz1jf.

existing rules because they offer some other FCC-regulated service—whether voice telephony, VoIP, or cable television.[357] The Order does not dispute that figure.[358] We need Title II for 100% of ISPs to deal with something that has to do with only 4% of them? In any event, since 2017, the FCC has faced no regulatory impediments to tightening its rules on MTEs or pole attachments.[359]

Of the few broadband-only ISPs that exist, the Order utterly fails to demonstrate that they have been stymied from pole access or face higher attachment costs that deter deployment or impede competition. Likewise, the Order offers no examples of broadband-only ISPs' exploiting their status to engage in anti-competitive behavior with respect to MTEs, much less any evidence of a widespread market failure attributable to the existing scope of the MTE regime.

If anything, Title II will deter broadband access and infrastructure deployment. The Commission has historically preempted state, local, and private rules that impair the ability of antenna users to install, maintain, or use such as small satellite TV dishes. In 2021, the Commission preempted state and local regulation of over-the-air reception devices (OTARDs) for fixed wireless access.[360] Because the Communications Act preserves some state and local regulation over certain Title II "commercial mobile services,"[361] the 2021 OTARD rule limited preemption to information services, which at the time included standalone fixed wireless.[362] Title II reclassification, however, will likely invalidate the legal basis for the 2021 OTARD rule and open the door for state and local regulation that could frustrate fixed wireless adoption. This is more than theoretical, as state and local governments have called for Title II so they can penalize broadband providers and slow down infrastructure deployment through pretextual regulation.[363]

### 5. Accessibility

The Order asserts that Title II will improve access for those with disabilities.[364] In the four paragraphs devoted to the topic, the draft Order identifies no example of an accessibility problem that Title II is necessary to solve. The FCC already has broad authority under the Twenty-First Century Communications and Video Accessibility Act (CVAA) to ensure that "advanced communications services" are accessible to and usable by people with disabilities. The CVAA does not turn on Title II. Furthermore, the *Digital Equity Order* already governs disparate treatment by ISPs against persons with disabilities.

---

[357] About 950,000 Added Broadband in Q3-2023, https://leichtmanresearch.com/wp-content/uploads/2023/11/LRG-Press-Release-11-13-2023.pdf; *accord Restoring Internet Freedom Remand Order* at para. 73; Order at para. 88.

[358] Order at para. 88.

[359] *See, e.g., Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Fourth Report and Order, Declaratory Ruling, and Third Further Notice of Proposed Rulemaking, WC Docket No. 17-84, FCC 23-109 (2023); *Improving Competitive Broadband Access to Multiple Tenant Environments*, Report and Order and Declaratory Ruling, 37 FCC Rcd 2448 (2022).

[360] *Updating the Commission's Rule for Over-the-Air Reception Devices*, Report and Order, 36 FCC Rcd 537, at para. 20 (2021).

[361] *See* 47 U.S.C. § 332(c)(7)(A).

[362] 47 C.F.R. § 1.4000(a)(5).

[363] Order at para. 80 (crediting the CPUC's argument that Title II would allow state and local governments to apply "safety regulations" to ISPs).

[364] Order at paras. 102-105.

### III.      CONCLUSION

As I noted at the beginning of this proceeding, I am well aware that neither my position nor reason will prevail today.  Reinstating Title II is now an article of faith for many in Washington (and a handy fundraising tool to boot).

But make no mistake: this FCC decision to impose Title II on the Internet will be overturned by the courts, by Congress, or by a future FCC.

I dissent.

# STATEMENT OF
# COMMISSIONER GEOFFREY STARKS

Re:   *Safeguarding and Securing the Open Internet*, WC Docket No 23-320, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration.

Today, we take the important and necessary step to give control of the Internet to those who deserve it:

**Consumers**.

That is what this item is really about. Some, no doubt today, will claim that it is all a scheme for government control of the Internet. But let's be real. It is about ensuring that each and every American can use their broadband subscription to access the legal content of their choosing. It is about empowering consumers to control how they experience the Internet while ensuring that their provider isn't impeding, blocking, favoring, or prioritizing certain content. It is about ensuring that broadband, the foundation for so many interactions every day, has real oversight.

I'll say it again: today's item puts consumers in the driver's seat. Not ISPs, not middle men who can throw money around – consumers. Too often the rhetoric around controversial proceedings is focused on extreme examples and worst case scenarios. In zooming in that way, we overlook the individuals our decisions are designed to impact. Not me. Today, of all days, I think about people like Ron, a senior and a veteran. He uses his broadband connection to contact the VA to set appointments and check the status of his medications. As a volunteer with American Legion, he shares his experience with post-traumatic stress disorder with fellow veterans. Broadband gives him the opportunity to share his story with others near and far. It gives him the power to choose how to connect, and with whom.

Or consider Ms. Ana, the leader of the Bethel Native Corporation. She graciously welcomed me into her home in Bethel, Alaska last summer with a bowl of moose chili. There are no major roads to Bethel; if you want to leave town or visit, you do it by boat or plane. As we ate, Ms. Ana told me about the exciting vision of tomorrow: new fiber deployments that would enable her community of 6,000—and the residents of even smaller villages along the Kuskokwim River—to secure the necessities of modern life without having to leave the place they call home. Employment through remote work. Healthcare through telehealth visits. Better education for their kids. Benefits of a free and open Internet.

Or, Paul, who says broadband access is "like air." He uses his broadband connection to stay in contact with long-separated relatives in Greece. He told me they cry every time they see him. Now that's a powerful connection.

It is inherent in our shared humanity – the need to connect. The ability to facilitate those connections is one of the reasons I'm proud to serve as a Federal Communications Commission Commissioner. But more importantly, it guides our action here today. Empowering consumers. Setting the proper guardrails for providers. Recognizing that network security is national security. And securing our networks so that they can meet the moment when public safety requires.

***

I'd like to highlight the issue of national security. Broadband is in our homes and offices, powering our devices, and supporting our infrastructure. Its security is paramount. Today's effort clarifies our authority to help make sure that our broadband networks are safe in light of constant attacks against them. More fundamentally, it ensures that there is oversight over broadband for the first time in years.

The Commission has long played a role in protecting communications networks in the United States, going back far before the creation of the Internet. On that point, there is little debate. This began with the adoption of the Communications Act of 1934, wherein Congress recognized the importance of

securing our communications networks and explicitly created the FCC as the expert agency on communications, as well as to further the "national defense."[1]

Those who argue that the Commission has no role in national security overlook the substantial efforts the Commission undertakes every day.[2] We regulate foreign ownership of our service providers, we prohibit those who pose a threat to the United States from accessing our databases and resources, such as numbering resources, and we help secure the actual physical infrastructure that makes this all possible. So, I continue to struggle to understand those who applaud our efforts to protect the United States and its people from threats, but who balk at the Commission doing the same for our communications networks.

The threats against our networks are real. The FCC has authority and investigatory tools that are unique among our federal government. The Executive Branch explicitly recognizes and supports the unique role the Commission plays in ensuring our national security as it relates to broadband within the whole-of-government approach, asserting that "[r]eclassifying BIAS is necessary to ensure that the Commission has the authority it needs to advance national security objectives,"[3] and that reclassification will enable the Commission to better "protect our networks from malicious actors . . . [by] leverag[ing] the appropriate tools at its disposal, including the relevant Title II provisions."[4]

Simply put, without Title II, many of the safeguards necessary to protect the networks of our future will be out of reach. Across the nation, numerous ISPs and network operators are working hard to protect Americans against the onslaught of daily attacks against their networks. As I've emphasized, we rightfully (and unanimously) revoked the international section 214 authorizations of certain Chinese providers following recommendations from the Executive Branch. However, because of the repeal of the 2015 open Internet rules, those revocations only prohibited those specific Chinese providers from offering common carrier service. Our national security action did not touch their BIAS offerings, meaning that providers already identified as posing an unacceptable national security and law enforcement risk could still operate BIAS networks in the United States without recourse. Today's item remedies that mistake. As I predicted, even after we revoked China Telecom's international section 214 authority years ago, they continued to operate in the United States. Their website currently shows that the company operates 26 Points of Presence in the United States, and offers colocation, broadband, IP transit, and data center services. They are interconnecting with other networks and have access to important Points of Presence and data centers. This is part of a larger problem—and I renew my call for a closer look at the threats that adversarial providers pose to our data and data centers. Only through reclassification can we truly secure our networks from entities that pose very real threats to our national security.

\*\*\*

A few additional highlights. I want to thank the Chairwoman for working with me to further improve this Order. I'd like to highlight three points. First, the Order makes clear that this item is not an effort to regulate rates. I repeat: I do not support rate regulation. Some have gone so far as to argue that any program or effort to ensure that ISPs provide affordable broadband constitutes rate regulation. I strongly and fundamentally disagree. The Affordable Connectivity Program is not a rate regulation program. Nor are similar efforts to ensure that broadband is within the reach of low-income households.

I would be remiss if I did not take this moment to say that we need to find a permanent funding mechanism for ACP. The time to act is now. I continue to push for the ACP Extension Act, and remain

---

[1] 47 U.S.C. § 151 (explaining that among the reasons Congress created the Commission was "for the purpose of the national defense").

[2] As the National Telecommunications and Information Administration (NTIA) highlighted, "the Commission has encountered challenges that have hampered its ability to fully protect the public from serious national security threats." *See* Ex Parte Comments of National Telecommunications and Information Administration, WC Docket No. 23-320, NTIA *Ex Parte* at 6 (filed Mar. 20, 2024).

[3] *Id.* at 5.

[4] *Id.*

open to other solutions that create a permanent funding mechanism for the 48 million households that struggle to subscribe to broadband due to the issue of affordability.

Second, I am glad the item clarifies that our efforts to properly target nefarious actors within our domestic broadband networks will not have negative unintended consequences for global data flows and international interconnection agreements.

Last, I appreciate working with the Chairwoman's efforts to clarify our throttling rule to ensure that we avoid loopholes in our net neutrality framework.

<p align="center">***</p>

Now, I previously committed to taking a close look at the record in light of developments in administrative law. Doing so has left me even more convinced that Congress empowered us to proceed. Title II opponents continue to cling to the *2017 Order's* view that virtually any service that connects users to information amounts to a Title I service. This "utterly capacious"[5] interpretation would read "via telecommunications" right out of the Act's definition of an "information service."[6] Taken to its logical conclusion, it also would lead to the deregulation of basically every communication service, including traditional voice telephony, undoing Congress's will in enacting Title II.[7] But in case you missed it, the Supreme Court has otherwise cautioned agencies against adopting expansive, unbounded definitions that would effect a regulatory sea change from the status quo.[8] The Court's admonition also applies to interpretations that would have a deregulatory result.[9]

To avoid the problem, Title II opponents continue to talk about DNS and caching as justification for their assertion that broadband is an information service. That view has become at best obsolete if it hasn't exited the realm of reason entirely. Just ask consumers what they think they're buying from their ISP. Is it really just an address book? Or is it a pipeline to the services they want to access online?

Ironically, Title II opponents believe Congress could not have acted with the clarity required under the major questions doctrine because the term "telecommunications service" is ambiguous under *Brand X*. This analysis just doesn't hold up. Whether or not that term is ambiguous, our authority to apply it to services like broadband is clear as day—and that's what matters here.[10] More importantly, before a court even reaches that issue, it would need to conclude that "this is a major questions case."[11] Yet major questions review is reserved for only "extraordinary cases"[12]— and this one doesn't come close. There's no "unheralded power" that we're purporting to discover in the annals of an old, dusty statute[13]—we've been classifying communications services one way or the other for decades, and the 1996 Act expressly codified our ability to continue that practice.[14] With respect to the classification of this service in particular, years of litigation, up to and including Supreme Court review, has resulted in

---

[5] *Mozilla Corp. v. FCC*, 940 F.3d 1, 93 (D.C. Cir. 2019) (Millet, J., concurring) (*Mozilla*).

[6] 47 U.S.C. § 153(24).

[7] *Mozilla*, 940 F.3d at 93-95 (Millet, J., concurring).

[8] *See Biden v. Nebraska*, 143 S. Ct. 2355 (2023); *West Virginia v. EPA*, 597 U.S. 697 (2022).

[9] *See MCI v. AT&T*, 512 U.S. 218 (1994) (finding that the Commission went too far in detariffing nondominant carriers); *West Virginia*, 597 U.S. at 723 (likening the challenged rule to the unlawful detariffing in *MCI*); *Biden*, 143 S. Ct. at 2382 (same).

[10] *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 383 (Srinivasan, J., concurring in denial of rehearing) (*USTA II*).

[11] *West Virginia*, 597 U.S. at 721-722.

[12] *Id.*

[13] *Id.* at 724; *Utility Air v. EPA*, 573 U.S. 302, 324 (2014).

[14] *See National Cable & Telecommunications Ass'n et al. v. Brand X Internet Services*, 545 U.S. 967, 975-978, 981-982) (2005).

multiple court decisions recognizing our authority.[15]  And with respect to open internet requirements in particular, network neutrality became FCC policy almost 20 years ago, under a Republican administration,[16] and the exact framework we adopt today has already been road-tested on appeal.[17]  No matter how you look at it, this just isn't a case of an agency pushing the limits.

<div align="center">***</div>

I'm thankful that broadband is no longer without oversight.  Consumers will benefit in the end. This proceeding is a monumental undertaking and I thank the many members of the Commission that dedicated their nights and weekends to this item.  I strongly approve.

---

[15] *Id.*; *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (*USTA I*); *USTA II*, 855 F.3d at 383.

[16] *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, CC Docket 02-33, Policy Statement, 20 FCC Rcd 14986 (2005); *Madison River Communications, LLC and Affiliated Companies*, File No. EB-05-IH0110, Order, 20 FCC Rcd 4295, 4297, para. 5 (EB 2005).

[17] *See USTA I*, 825 F.3d at 674, *reh'g denied*, 855 F.3d at 381, *cert. denied*, 139 S. Ct. at 453.

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re:     *Safeguarding and Securing the Open Internet and Restoring Internet Freedom*, WC Docket Nos. 23-320, 17-108, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration (April 25, 2024).

Net neutrality is one of those catchphrases that tricks you into thinking that there is no other side of the argument. Who, after all, would support net *non*-neutrality? Who would support net *discrimination?* That sounds almost like opposing milk for babies.

But while political activists can hide behind empty catchphrases and slogans, ISPs and their customers have to contend with the real world. The internet is a limited capacity network, and performance characteristics like bandwidth, latency, and jitter are scarce resources that need to be allocated, ideally in a way that promotes competition and maximizes value to consumers. This is not an abstract point. High latency or jitter means not just choppy video calls and lagging video games but also unreliable control of physical systems like drones, cars, and industrial machinery. Conversely, high latency has little to no perceivable effect on web browsing or video streaming. So, it benefits the public for ISPs to be able to offer special low latency routing and make sure that only applications that benefit from it receive it.

Don't take my word for it. Professor Tim Wu himself, in the very same 2003 paper in which he coined the term "network neutrality," conceded that treating all internet traffic equally would not benefit consumers.[1] He asked his readers to "[c]onsider that it doesn't matter whether an email arrives now or a few milliseconds later. But it certainly matters for applications that want to carry voice or video."[2] He counsels that "[d]elivering the full possible range of applications either requires an impracticable upgrade of the entire network, or some tolerance of close vertical relationships" through which different kinds of traffic could be handled differently.[3]

This seems to fly in the face of the tired net neutrality catchphrase: "no blocking, no throttling, and no paid prioritization." A Commission mandate to not throttle traffic would prohibit ISPs from prioritizing the delivery of video call data over web browsing data, even when the user's subjective web browsing experience would be unaffected. And even if a ban on throttling were sufficiently caveated, a ban on paid prioritization would mean that ISPs must determine by diktat which kinds of traffic are more worthy than others, and somehow enforce that in the face of perverse incentives for everyone to mark all of their traffic as being of utmost importance. It would be like not allowing the post office to charge more for overnight delivery, but instead requiring it to determine for itself which kinds of packages are important and to trust senders to not always claim that their box contains perishable medicine. Indeed, to distinguish between different kinds of traffic is the opposite of "neutrality," it is discrimination. But it's desirable discrimination. The kind of discrimination that allows you to pay more for your package to arrive overnight instead of in two weeks.

This is why every time the Commission has attempted to impose net neutrality, it has had to create various exceptions. Inevitably, the exceptions are so expansive that they swallow the rule, so narrow that they fail to accommodate necessary traffic differentiation practices, or so vague that they stunt action through legal uncertainty rather than proscription. In any case, "no blocking, no throttling, and no paid prioritization" is reduced to an empty catchphrase, and the exceptions themselves become the

---

[1] Tim Wu, *Network Neutrality, Broadband Discrimination*, 2 J. on Telecomm. & High Tech. L. 141 (2003).

[2] *Id.* at 148.

[3] *Id.* at 149.

real rules. It's no coincidence that this is exactly where Professor Wu went wrong in his 2003 paper. He proposed a law prohibiting broadband providers from "impos[ing] restrictions on the use of an Internet connection" and then lists six exceptions that, at best, provide no actionable principles by which to guide conduct, or at worst, countenance the Commission and ISPs sitting as central planners of the Internet and decreeing which kinds of traffic are more worthy than others.[4]

It's been over 20 years since Professor Wu wrote his article, but it might as well have been yesterday. It is a testament to just how much net neutrality has become an object of political piety, instead of sober analysis, that the order we approve today is hardly more sophisticated and nuanced than Professor Wu's first cut at the topic in 2003.

The central exception that this order relies upon is "reasonable network management practices." The order defines a "network management practice" as one that has a primarily technical, rather than business, justification. And it says such practices are reasonable only if they are primarily aimed at a "legitimate network purpose.[5]" Those legitimate network purposes include security, blocking unwanted traffic, and alleviating congestion. But the order casts skepticism on the legitimacy of congestion-alleviating measures that are not agnostic to "source, destination, content, application or service.[6]" With all of these vague definitions and skepticism, it's not clear that there is room for prioritizing the latency of real-time applications.

The escape valve for the rigidity of being unable to use market mechanisms for reasonable network management is yet another exception, the exclusion of non-BIAS data services from the rules. But the order can't even tell us what a non-BIAS data service *is*, and refuses to give a definition. It says non-BIAS data services are typically only used to reach a small number of internet endpoints, provide application-level services, and use "network management to isolate [their] capacity from that used by broadband Internet access services." But just in case that definition was not unhelpful enough, the order makes clear that a service could meet all of these criteria but still not be deemed a non-BIAS data service.[7] It goes on to say that, to make sure this exception is not used to avoid the net neutrality rules, the Commission will be skeptical of any services that could function just as well (how well is just as well?) over the open internet. And in a further hit to any sense of certainty this exception might impart, the order says that these services should not "have a negative effect on the performance of BIAS . . . or the capacity available for BIAS over time" (emphasis added).[8] But the whole point of this exception is supposed to be that traffic from a specialized service (like a remote-controlled surgery) will be routed more quickly and reliably, at the expense of other traffic (like web browsing).

The vitality of this exception is further cast into doubt by language in the order stating that the Commission is "likely to find that connectivity used for video conferencing offered to consumers would evade the protections we establish for BIAS if the video-conferencing provider is paying the BIAS provider for prioritized delivery.[9]" But how else, other than through payment, is an ISP supposed to tell apart different kinds of video conferencing, like virtual reality video conferencing? And how is it supposed to weigh prioritization of those against other prioritized use cases altogether? Without a market

---

[4] *Id.* at 166-7.

[5] *Safeguard and Securing the Open Internet and Restoring Internet Freedom*, WC Docket Nos. 23-320, 17-108, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration (April 25, 2024) ("*2024 Open Internet Order*") at ¶ 568.

[6] *Id.* at ¶ 575.

[7] *Id.* at ¶ 195.

[8] *Id.* at ¶ 197.

[9] *Id.*

mechanism, the ISP and Commission have to sit as central planner and decide what's important, instead of allowing consumers and businesses tell them with the price they are willing to pay.

Amazingly, somehow concerned that these inadequate and vague exceptions might still provide too much freedom of action for ISPs, the order imposes a general conduct standard, under which the Commission reserves the right to find an operator in violation of net neutrality rules even if it didn't violate them. The general conduct standard prohibits any person from "unreasonably interfer[ing]" with end users' ability to use the internet as they wish and edge providers ability to offer the services they want to. But just in case that vague formulation goes too far, it too has its own exception, for "reasonable network management."[10]

To the extent these rules guide conduct, they do it by making it very legally risky for an ISP to invest in innovative internet routing offerings. Perhaps if the broadband industry were plagued with anti-competitive behavior, then the benefits of discouraging and punishing such conduct would outweigh the risks of overly stringent or vague regulations stifling investment and innovation, but remarkably, this order identifies no major instances of anticompetitive conduct by ISPs in their internet routing decisions in the last decade.

The action we take today is to offer a solution in search of a problem. It's hard to imagine a more brazen violation of our duty under the Administrative Procedures Act to refrain from arbitrary and capricious rulemaking. Further, Section 10 of the Communications Act itself requires the Commission to forbear from applying any part of Title II that is unnecessary for preventing wrongdoing, protecting consumers, or otherwise protecting the public interest. This order fails that test throughout.

Even more significant than the misguided adoption of net neutrality rules is the declaratory ruling's imposition of Title II of the Communications Act on the broadband industry. The Commission is flip-flopping, yet again, on whether broadband is a "telecommunications service" subject to regulation under Parts I and II of Title II.[11]

This reclassification is how the Commission gives itself the power to impose net neutrality rules, but also much more. Parts I and II of Title II combine to create one of the most comprehensive suites of regulatory authority known to any agency in this country. With this reclassification, the Commission could claim the power to require prior authorization for the deployment of every new inch of fiber, every new service offering, every contract, every interconnection agreement, and every change in price in the broadband industry. The Commission could force ISPs to allow their competitors to use their infrastructure. It could even require ISPs to continue offering service indefinitely in unprofitable areas,

---

[10] *2024 Open Internet* Order at ¶ 516.

[11] It is often said that a service is *either* an "information service" or a "telecommunications service" under the Communications Act, but this is not strictly true. First, there is a third category, "common carriers"—defined as anyone "engaged as a common carrier for hire[] in interstate or foreign communication by wire or radio"—that are subject to Part I but not Part II of Title II. Notably, and unlike the definition of "telecommunications," the definition of "common carrier" does not contain the caveat that the transmission must be "without change in the form or content of the information as sent and received." All telecommunications services are common carrier services, but the opposite is not true. Second, nowhere does the Act say that an information service cannot also be a common carrier service. The significance of this is that when properly addressing what services are subject to Title II, we need to consider the possibility that a service might be properly classified as a common carrier service despite not meeting the definition of a telecommunications service. In that case, it would be subject to (most of) Part I of Title II, but not Part II. It is likely, for example, that online communications systems like email and instant messaging are properly classified as common carriage services under the Act, since they hold themselves as open to the public for carriage of communication by wire or radio. Supporting this, Section 2 of the Act contemplates the existence of common carriers that are "engaged in foreign or interstate communication solely through physical connection with the facilities of another carrier…" and makes only Sections 201 through 205 of the Act applicable to them.

essentially seizing their private property. Instead of asking what the Commission can do under Title II, the better question is what it *cannot* do. The sobering answer: not much.

For now at least, the Commission is forbearing from many of these authorities, but that should be of little comfort to the broadband industry. The Commission is always one notice and comment period away from reversing course on any of these forbearances and imposing stringent regulations whenever it sees fit. Take rate regulation. My colleagues have all promised Congress they have no plans to impose rate regulations under Section 201, but plans can change quickly. It's not hard to imagine my Democratic colleagues turning to rate regulation if the Affordable Connectivity Program (ACP) is not reauthorized by Congress or if the federal courts strike down the Digital Discrimination Order, two Commission programs that operate as *de facto* rate regulation already.

Is the reclassification of broadband as a Title II service legal? Commissioner Carr, and many commenters, make a compelling case that it is not. On the other hand, proponents of applying Title II to ISPs point to the D.C. Circuit upholding the *2015 Open Internet Order*, to supportive dicta from the same court when it considered the *2017 Restoring Internet Freedom Order*, and to Justice Scalia's dissent in the *BrandX* case, in which the Supreme Court upheld the classification of broadband as *not* a Title II service. As those decisions show, the federal courts have let the Commission have it either way, as an exercise of *Chevron* deference.

But if the Supreme Court abolishes *Chevron* deference this summer, as many expect, then they will face a new question when they consider challenges to the present order. Instead of being able to say that the Commission's interpretation is reasonable enough in the face of some statutory ambiguity, they will have to determine whether our declaratory reasoning reflects the *best* read of the law. I urge the courts to take this opportunity to settle once and for all whether ISPs are subject to Title II—either as "common carriers" or "telecommunications carriers"—and put an end to this embarrassing and harmful regulatory whiplash. The legitimacy of the Commission is called into question if after every change of administration, it reverses course on a question so fundamental as whether broadband is a common carriage service. This uncertainty also robs regulated companies and their customers of the confidence in their rights and responsibilities that the rule of law is supposed to provide them, the confidence that forms the cornerstone of investment and innovation.

I want to specifically note that if the Court dispenses with *Chevron* deference, the reasonableness of the Commission's position on whether this or that Title II authority is necessary to serve the public interest becomes irrelevant to the question of whether the Title II reclassification is legal. After all, the political merits or demerits of a law do not usually bear on its interpretation. But these forbearance and non-forbearance decisions *do* have to meet the criteria of Section 10 of the Act, which as I already explained, require the Commission forebear from applying any part of Title II unless it needs those authorities to prevent wrongful practices, protect consumers, or otherwise serve the public interest. Today's decision not to forbear from various sections of Title II repeatedly fails to meet this standard.

One thing is clear: nothing in the law *required* the Commission to take this action today. The D.C. Circuit upheld the *2017 Restoring Internet Freedom Order*, in which the Commission ruled that broadband was not subject to Title II of the Act. The Supreme Court declined to hear an appeal from that case. We would be on the firmest of legal ground to keep that order in effect. Given the demonstrated lack of necessity for Title II authority over broadband, we would have been wise to do so.

The *2015 Open Internet Order* dispensed with the traditional justification of Title II BIAS classification under the "local monopoly" theory. This pivot was clearly warranted because, by 2015, broadband internet was already becoming multimodal; cable and fiber were beginning to be more effectively supplemented or replaced by satellite and fixed wireless, and the local monopoly theory was going to be more and more a mere relic of the Bell System landline era as time went on. The 2015

Commission correctly called this trend. We have seen low-latency, high-speed satellite and fixed wireless explode in uptake since, both domestically and abroad.

This created a problem for the 2015 Commission. If the local monopoly theory is off the table, what new basis could be found to justify a Title II BIAS classification order? The 2015 Commission decided upon, and the present one has also adopted, a novel "gatekeeper theory"[12] that places Title II obligations upon any intermediary between a consumer and a service by characterizing such "gatekeeper" as a terminating monopoly even in the absence of market power analysis.[13]

This may, however, prove too much. Gatekeepers that otherwise do not resemble terminating monopolies abound on the Internet. For example, app stores and platforms have been described as "gatekeepers"[14] and leverage their intermediary capacities to generate much of their revenue. With the last mile out of the equation, does the FCC have a principled reason to exclude platforms from gatekeeper analysis, or are we just going after BIAS because it's a quadrennial tradition?

While we waste our time and saddle a well-functioning industry with unnecessary rules and investment-stifling legal uncertainty, this Commission continues to give a free pass to the real villains of the free and open internet: large edge providers. There is no bigger threat to free speech in this country than the edge providers who have anointed themselves the arbiters of which ideas are allowed to be expressed and which are not. Every day, they abuse their market power, and positions as gatekeepers in the digital marketplace, to pick and choose who is allowed to speak and who is not. They keep armies of advocates on their payroll whose sole task is to prevent Americans from sharing and reading about dissenting views on issues of national importance. And they maintain their market power through anti-competitive practices like refusing interconnection with competing platforms.

We need to put an end to these abuses. All options should be on the table. I am calling for a thorough inquiry into the Commission's potential authority over social media and other internet companies. Whether we can find the powers we need in Title II of the Communications Act, in Section 230, or in other existing or new legislation, no stone should be left unturned.

Sadly, this order today is part of the edge providers' agenda to insulate their abusive monopolies from competition. Major ISPs are among the few companies well-positioned to challenge the market power of Google and Facebook in the advertising market, or of Amazon and Microsoft in the cloud hosting business. But internet platform companies have successfully convinced the Commission to make such competition illegal. Themselves unrestrained by any comprehensive federal privacy laws, these edge providers are aggressively lobbying the Commission to adopt privacy rules that ban ISPs from running the exact same kind of advertising networks that they themselves do. And net neutrality rules will make it very difficult for ISPs to use their physical facilities across the country to build competitors to cloud services like AWS and Azure, lest they be accused of prioritizing their own traffic or violating the general conduct standard.

For all of these reasons, I dissent.

---

[12] *Protecting and Promoting the Open Internet*, WC Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) at ¶ 78-84.

[13] *See* Lawrence J. Spivak, *What are the Bounds of FCC Authority over Broadband Service Providers? A Review of the Recent Case Law*, Vol. 18 No. 7, J. of Internet L., p. 1, 28 at fn. 88 (January 2015).

[14] *See, e.g.*, John Bergmayer, Public Knowledge, *Tending the Garden: How to Ensure that App Stores Put Users First* (June 2020) at p. 8 (https://publicknowledge.org/policy/tending-the-garden-how-to-ensure-that-app-stores-put-users-first/).

## STATEMENT OF
## COMMISSIONER ANNA M. GOMEZ

Re: *Safeguarding and Securing the Open Internet*, Docket No. 23-320, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration (April 25, 2024)

As of today, April 25, 2024, I have been an FCC Commissioner for seven months. In the past seven months, I've had the privilege of meeting with stakeholders, industry, civil rights and public interest groups, and members of the public. I've met with advocates who support today's item, and advocates who don't. I've met with people across the country, who emphasize just how necessary their broadband Internet connection is to their everyday lives.

- I've heard from Veterans and Care Providers that 80% of medical treatment for recovery requires a broadband connection.

- I've heard from parents, students, and teachers, that a broadband connection is necessary to complete much of the homework assigned to students.

- I've heard from consumers about the importance of a broadband connection for keeping in touch with friends and family, particularly to those who live abroad.

- I've received messages from parents who are concerned about losing their broadband connection, and what that will do to the economic opportunity of their family and kids.

- I've heard from first responders that having a reliable broadband connection, especially in times of emergency, can save lives and speed up recovery efforts.

So, I will start with the thing on which we all agree: broadband access to the Internet is a critical conduit that is essential for modern life. *We all agree*. And, as a nation, we have recognized the importance of connectivity and have made a historic multi-billion dollar investment in broadband for all. Despite this unanimous agreement of the importance and value that this critical infrastructure plays in our modern society, since 2017, there has not been a federal framework in place to protect and secure the integrity of our networks. We've had a patchwork of state net neutrality rules that have upheld the foundation, yet, there is no expert agency ensuring at a national level that the internet is open and fair.

Protecting this critical infrastructure that is essential to the safety, economy, health, education, and well-being of this country is good public policy. The value is so great, that we cannot wait for the flood to arrive before we start to build the levee. That would leave us woefully behind in an increasingly digital world where this critical resource is constantly at play.

That is why what we are doing here today is so important. Today, we reinstate appropriate guardrails to ensure that this critical conduit remains accessible and secure for all. We restore FCC oversight of broadband Internet access, the essential telecommunications service of this century, with bedrock authority in Title II of the Communications Act.

I want to be very clear about what we are doing. Today, we reinstate guardrails to safeguard and secure broadband infrastructure, to protect consumers, and to ensure that the Internet remains open and available to all content providers and consumers. We return to legally sustainable rules that track those that have been upheld in court, and affirm the principles that have governed the growth of the Internet since 1998.

This is not about controlling Internet content. It is not about stifling investment, regulating rates, or reducing competition. It is not about controlling the Internet.

Instead, the rules we adopt today ensure that access to the Internet remains open, safe, and secure. These rules ensure that all viewpoints—including ones with which I disagree—are heard, without discrimination. More so, these rules protect consumers while also maintaining a healthy competitive broadband Internet ecosystem, because we know that competition is required for access to a healthy, open

Internet that is accessible for all. They ensure that the next generation of innovators and start-ups have the same opportunities that the large tech companies of today had when they were starting out in garages and dorm rooms. Our goal is to implement this framework that continues to encourage innovation and the investment we've seen while net neutrality policies were in place prior to 2017, and the continued massive investment after 2017 when states stepped in and implemented a patchwork of rules in response to the elimination of federal protections.

The framework we adopt today is balanced and reflects the feedback that the Commission has received from stakeholders and consumers. It adopts a framework that is tried and true, and reinstates similar rules to those that were in effect for providers between 2015 and 2017. We understand that smaller providers are the backbone of Internet access in many rural and underserved areas, and our approach is crafted with their vital role in mind. We've taken special consideration of smaller providers by exempting these providers of certain transparency requirements, and temporarily forbearing from certain foreign ownership requirements.

Most importantly, I support today's item because it prioritizes consumers and gives the Commission more tools to close the digital divide. It ensures that consumers are in charge of what they do online and that they can be confident that when they send information over their broadband connection, it will not be blocked or altered by their provider. These protections are essential for all consumers, but especially for those communities who have been historically left on the wrong side of the digital divide.

Thank you to the many advocates, stakeholders, and members of the public who provided feedback and participated in this proceeding. My staff and I met with over 45 parties, and appreciated hearing all of your feedback. The item that we adopt today is stronger because of these meetings.

And thank you to the staff throughout the agency for their work on this item, and to the Wireline Competition Bureau for leading the effort.

# Exhibit B

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Parts 8 and 20**

[WC Docket Nos. 23–320, 17–108; FCC 24–52, FR ID 219926]

**Safeguarding and Securing the Open Internet; Restoring Internet Freedom**

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission or FCC) adopts a *Declaratory Ruling, Report and Order, Order, and Order on Reconsideration* that reestablishes the Commission's authority over broadband internet access service (BIAS). The *Declaratory Ruling* classifies broadband internet access service as a telecommunications service under Title II of the Communications Act, providing the Commission with additional authority to safeguard national security, advance public safety, protect consumers, and facilitate broadband deployment. The *Order* establishes broad, tailored forbearance of the Commission's application of Title II to broadband providers while maintaining Title II provisions the Commission needs to fulfill its obligations and objectives. The *Report and Order* reinstates straightforward, clear rules that prohibit blocking, throttling, or engaging in paid or affiliated prioritization arrangements, adopts certain enhancements to the transparency rule, and reinstates a general conduct standard that prohibits unreasonable interference or unreasonable disadvantage to consumers or edge providers. The *Order on Reconsideration* partially grants and otherwise dismisses as moot four petitions for reconsideration filed in response to the 2020 *Restoring Internet Freedom Remand Order.*

**DATES:** Effective July 22, 2024, except for amendatory instruction 7 (revisions to 47 CFR 8.2(a) and (b)), which is delayed indefinitely. The FCC will publish a document in the **Federal Register** announcing the effective date.

As of September 19, 2024, China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC, and their affiliates and subsidiaries as defined pursuant to 47 CFR 2.903(c), shall discontinue any and all provision of broadband internet access service.

**ADDRESSES:** Federal Communications Commission, 45 L Street SW, Washington, DC 20554. In addition to filing comments with the Office of the Secretary, a copy of any comments on the Paperwork Reduction Act information collection requirements contained herein should be submitted to Nicole Ongele, Federal Communications Commission, 45 L Street SW, Washington, DC 20554, or send an email to *PRA@fcc.gov.*

**FOR FURTHER INFORMATION CONTACT:** For further information, contact Chris Laughlin, Wireline Competition Bureau at 202–418–2193. For additional information concerning the Paperwork Reduction Act information collection requirements contained in this document, send an email to *PRA@fcc.gov* or contact Nicole Ongele, *Nicole.Ongele@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Declaratory Ruling, Order, Report and Order, and Order on Reconsideration in WC Docket Nos. 23–320 and 17–108, FCC 24–52, adopted on April 25, 2024, and released on May 7, 2024. The full text of the document is available on the Commission's website at *https://docs.fcc.gov/public/attachments/FCC-24-52A1.pdf.* To request materials in accessible formats for people with disabilities (*e.g.,* braille, large print, electronic files, audio format, etc.), send an email to *FCC504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at (202) 418–0530 (voice).

**Paperwork Reduction Act of 1995 Analysis**

This document contains new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, will invite the general public to comment on the information collection requirements contained in the Report and Order as required by the Paperwork Reduction Act of 1995, Public Law 104–13. In addition, the Commission notes that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, *see* 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

In the Report and Order, we adopt the transparency rule originally adopted in 2010 and reaffirmed in 2015, which caters to a broader relevant audience of interested parties than the audience identified in the *Restoring Internet Freedom (RIF) Order* (83 FR 7852 (Feb. 22, 2018)). We reinstate enhancements to the transparency rule disclosures pertaining to network practices and performance characteristics. Specifically, with regard to network practices, we reaffirm that the transparency rule requires that BIAS providers disclose any practices applied to traffic associated with a particular user or user group (including any application-agnostic degradation of service to a particular end user), and requires that disclosures of user-based or application-based practices must include the purpose of the practice; which users or data plans may be affected; the triggers that activate the use of the practice; the types of traffic that are subject to the practice; and the practice's likely effects on end users' experiences. In addition, we require BIAS providers to disclose any zero-rating practices.

We reinstate the enhanced performance characteristics disclosures eliminated in 2017 to require BIAS providers to disclose packet loss and to require that performance characteristics be reported with greater geographic granularity and be measured in terms of average performance over a reasonable period of time and during times of peak usage. We also require BIAS providers to directly notify end users if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion, that is likely to have a significant impact on the end user's use of the service. We temporarily exempt (with the potential to become permanent) BIAS providers that have 100,000 or fewer BIAS subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider, from the requirements to disclose packet loss and report their performance characteristics with greater geographic granularity and in terms of average performance over a reasonable period of time and during times of peak usage, as well as from the direct notification requirement to provide them additional time to develop appropriate systems. We delegate to the Consumer and Governmental Affairs Bureau (CGB) the authority to determine whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We require providers to disclose all information required by the transparency rule on a publicly available, easily accessible website and that all transparency disclosures made pursuant to the transparency rule also be made available in machine-readable format.

In addition, to provide upfront clarity, guidance, and predictability, we adopt an updated process for providers seeking an advisory opinion from Commission staff regarding the open

internet rules, through which any BIAS provider may request an advisory opinion regarding the permissibility of its proposed policies and practices affecting access to BIAS.

**Congressional Review Act**

The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

**Synopsis**

**I. Declaratory Ruling: Classification of Broadband Internet Access Services**

1. We reinstate the telecommunications service classification of BIAS under Title II of the Act. Reclassification will enhance the Commission's ability to ensure internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to BIAS, and improve disability access. We find that classification of BIAS as a telecommunications service represents the best reading of the text of the Act in light of how the service is offered and perceived today, as well as the factual and technical realities of how BIAS functions. Classifying BIAS as a telecommunications service also accords with Commission and court precedent and is fully and sufficiently justified under the Commission's longstanding authority and responsibility to classify services subject to the Commission's jurisdiction, as necessary. We also ensure that consumers receive the same protections when using fixed and mobile BIAS by reclassifying mobile BIAS as a commercial mobile service.

*A. Reclassification Enhances the Commission's Ability To Fulfill Key Public Interest Obligations and Objectives*

2. As the record overwhelmingly demonstrates, BIAS connections are absolutely essential to modern day life, facilitating employment, education, healthcare, commerce, community-building, communication, and free expression. The "forced digitization" of the COVID–19 pandemic served to underscore the importance of BIAS connections in society as essential

activities moved online, and the increased importance of BIAS connections has only persisted in the wake of the pandemic. It has therefore never been more important that the Commission have both the necessary authority to oversee this essential service to protect consumers, strengthen national security, and support public safety, and the full complement of tools to facilitate access to BIAS.

3. While our conclusion that classifying BIAS as a telecommunications service represents the best reading of the Act is itself sufficient grounds for our decision, we separately conclude that important policy considerations also support this determination. In particular, our reclassification decision will ensure the Commission can fulfill statutory obligations and policy objectives to ensure internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to BIAS, and improve disability access. As such, these policy obligations and objectives, each independently and collectively, support the reclassification of BIAS as a telecommunications service. We therefore reject arguments that we should address other issues instead of reclassifying BIAS, particularly since reclassification will enhance the Commission's ability to address many of the issues commenters raise.

1. Ensuring Internet Openness

4. We find that reclassification of BIAS as a telecommunications service enables the Commission to more effectively safeguard the open internet. In addition to protecting free expression, an open internet encourages competition and innovation, and is critical to public safety. As we explain below, we find that a safe, secure, and open internet is too important to consumers and innovators to leave without the protection of Federal regulatory oversight.

5. Upon this document's reclassification of BIAS as a Title II telecommunications service, we rely on our authority in sections 201 and 202 of the Act, along with the related enforcement authorities of sections 206, 207, 208, 209, 216, and 217, for the open internet rules we adopt in the Declaratory Ruling, Order, Report and Order, and Order (Order) to address practices that are unjust, unreasonable, or unreasonably discriminatory. Specifically, we reinstate rules that prohibit BIAS providers from blocking

or throttling the information transmitted over their networks or engaging in paid or affiliated prioritization arrangements, and reinstate a general conduct standard that prohibits practices that cause unreasonable interference or unreasonable disadvantage to consumers or edge providers. As discussed more fully below, these rules, in concert with strong transparency requirements, establish clear standards for BIAS providers to maintain internet openness and give the Commission a solid basis on which to take enforcement actions against conduct that prevents consumers from fully accessing all of the critical services available through the internet. The reclassification also enables the Commission to establish a nationwide framework of open internet rules for BIAS providers and thereby exercise our authority to preempt any state or local measures that interfere or are incompatible with the Federal regulatory framework we establish in the Order, while at the same time ensuring that all consumers are protected from conduct harmful to internet openness.

2. Defending National Security and Law Enforcement

6. The reclassification of BIAS enhances the Commission's ability to protect the Nation's communications networks from entities that pose threats to national security and law enforcement. The *RIF Order*'s classification of BIAS as an information service under Title I raised concerns about the Commission's authority to take certain regulatory actions to address risks to BIAS providers and vulnerabilities in broadband networks. As the National Telecommunications and Information Administration (NTIA) highlights, "the Commission has encountered challenges that have hampered its ability to fully protect the public from serious national security threats." For example, NTIA describes cases where the Commission identified such threats and revoked the authority of certain foreign-owned adversarial service providers to provide Title II telecommunications services (including "traditional telephony") in the United States pursuant to its section 214 authority, but was not able to stop them from providing BIAS or other internet-based services that were then classified as Title I services. Classifying BIAS under Title II alleviates those concerns, restoring a broader range of regulatory tools and enhancing the Commission's jurisdiction to cover broadband services, providers, and networks. We also find that reclassification will enable the

Commission to make more significant national security contributions as we continue our longstanding coordination with our Federal partners.

7. We find that reclassification will significantly bolster the Commission's ability to carry out its statutory responsibilities to safeguard national security and law enforcement. Congress created the Commission, among other reasons, "for the purpose of the national defense." The Commission's national security responsibilities are well established. Presidential Policy Directive 21 (PPD–21) describes the Commission's roles as including "identifying communications sector vulnerabilities and working with industry and other stakeholders to address those vulnerabilities . . . [and] to increase the security and resilience of critical infrastructure within the communications sector." The President's recent National Security Memorandum, NSM–22, recognized the Commission's role in securing critical infrastructure: "The Federal Communications Commission will, to the extent permitted by law and in coordination with DHS and other Federal departments and agencies: (1) identify and prioritize communications infrastructure by collecting information regarding communications networks; (2) assess communications sector risks and work to mitigate those risks by requiring, as appropriate, regulated entities to take specific actions to protect communications networks and infrastructure; and (3) collaborate with communications sector industry members, foreign governments, international organizations, and other stakeholders to identify best practices and impose corresponding regulations."

8. There can be no question about the importance to our national security of maintaining the integrity of our critical infrastructure, including communications networks. As PPD–21 explains:

The Nation's critical infrastructure provides the essential services that underpin American society. Proactive and coordinated efforts are necessary to strengthen and maintain secure, functioning, and resilient critical infrastructure—including assets, networks, and systems—that are vital to public confidence and the Nation's safety, prosperity, and well-being . . . . The Federal Government also has a responsibility to strengthen the security and resilience of its own critical infrastructure, for the continuity of national essential functions, and to organize itself to partner effectively with and add value to the security and resilience efforts of critical infrastructure owners and operators . . . . It is the policy of the United States to strengthen the security and

resilience of its critical infrastructure against both physical and cyber threats.

Developments in recent years have only highlighted national security concerns arising in connection with the U.S. communications sector. These security threats also impact BIAS providers and broadband networks. PPD–21 recognizes that "communications systems [are] uniquely critical due to the enabling functions they provide across all critical infrastructure sectors," which highlights the importance of protecting communications infrastructure—including broadband networks. Disruptions of communications can easily have significant cascading effects on other critical infrastructure sectors that rely on communications. The PPD–21 states, "U.S. efforts shall address the security and resilience of critical infrastructure in an integrated, holistic manner to reflect this infrastructure's interconnectedness and interdependency. This directive also identifies energy and communications systems as uniquely critical due to the enabling functions they provide across all critical infrastructure sectors." We find that reclassification of BIAS under Title II will enable the Commission to more fully utilize its regulatory authority and rely on its subject matter expertise and operational capabilities to address these concerns and strengthen the security posture of the United States. As NTIA explains, the "lightning-fast evolutions of our communications technologies and our growing dependence on these offerings necessitate a whole-of-government approach to security that engages all available federal government resources."

9. The Commission has on multiple occasions carried out its responsibilities to protect the Nation's communications networks from threats to national security and law enforcement by taking regulatory actions under Title II regarding the provision of traditional telecommunications services, including voice. For example, the Commission denied an application for international section 214 authority and revoked the section 214 authority of, certain entities that are majority-owned and controlled by the Chinese government, based on recommendations and comments from interested Executive Branch agencies regarding evolving national security and law enforcement concerns. In the *China Mobile USA Order, China Telecom Americas Order on Revocation and Termination,* and *Pacific Networks and ComNet Order on*

*Revocation and Termination,* the Commission found that these entities are subject to exploitation, influence, and control by the Chinese government, and that mitigation would not address the national security and law enforcement concerns. In the *China Telecom Americas Order on Revocation and Termination, China Unicom Americas Order on Revocation,* and *Pacific Networks and ComNet Order on Revocation and Termination,* the Commission also found that the significant national security and law enforcement risks associated with those entities' retention of their section 214 authority "pose a clear and imminent threat to the security of the United States." More recently, the Commission adopted the *Evolving Risks Notice of Proposed Rulemaking (NPRM)* (88 FR 50486 (Aug. 1, 2023)), which, among other things, proposed rules that would require carriers to renew, every 10 years, their international section 214 authority. In the alternative, the Commission sought comment on adopting rules that would require all international section 214 authorization holders to periodically update information enabling the Commission to review the public interest and national security implications of those authorizations based on that updated information. As stated in the *Evolving Risks NPRM,* the overarching objective of that proceeding is to adopt rule changes "that will enable the Commission, in close collaboration with relevant Executive Branch agencies, to better protect telecommunications services and infrastructure in the United States in light of evolving national security, law enforcement, foreign policy, and trade policy risks."

10. The reclassification of BIAS as a Title II service, and our decision below to decline to forbear from the entry certification requirements of section 214, will enable the Commission to exercise its section 214 authority with respect to BIAS providers, and will enhance the Commission's ability to protect the Nation's communications networks from entities that pose threats to national security and law enforcement. Section 214(a) of the Act prohibits any carrier from constructing, acquiring, or operating any line, and from engaging in transmission through any such line, without first obtaining a certificate from the Commission "that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such . . . line . . . ." The Supreme Court has determined that the Commission has

considerable discretion in deciding how to make its section 214 public interest findings. As we discuss elsewhere, while we grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers, with exceptions, this grant of blanket authority is subject to the Commission's reserved power to revoke such authority, consistent with established statutory directives and longstanding Commission determinations with respect to section 214 authorizations. The Commission has explained that it grants blanket section 214 authority, rather than forbearing from application or enforcement of section 214 entirely, in order to remove barriers to entry without relinquishing its ability to protect consumers and the public interest by withdrawing such grants on an individual basis. And we find that the Commission's determinations, based on thorough record development, in the denial and revocation actions discussed below, in which the Commission extensively evaluated national security and law enforcement considerations associated with those entities, support our decision to exclude from this blanket section 214 authority for the provision of BIAS those same entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked by the Commission because of national security and law enforcement concerns. As discussed below, we find that excluding those entities and their current and future affiliates and subsidiaries from blanket section 214 authority for the provision of BIAS is warranted based on the Commission's determinations in those proceedings that the present and future public interest, convenience, and necessity would no longer be served by the retention of those entities' section 214 authority, or that the public interest would not be served by the grant of international section 214 authority. The Commission's actions in those proceedings were based on recommendations and comments regarding evolving national security and law enforcement concerns from Executive Branch agencies, including from Members of, or Advisors to, the Committee for the Assessment of Foreign Participation in the U.S. Telecommunications Sector (Committee) created pursuant to Executive Order 13913. Our action in the Order will enable the Commission to use its section 214 authority to address threats to communications networks, working cooperatively with our Federal partners and leveraging all investigative tools at our disposal.

11. Reclassification will also enhance the Commission's ability to obtain information from BIAS providers that will enable the Commission to assess national security risks, through reliance on section 214 of the Act, along with sections 201, 202, 218, 219, and 220. The Commission relies on sections 201 and 202 of the Act, and section 706 of the 1996 Act, for its authority to collect information. Additionally, section 218 of the Act authorizes the Commission to seek ''full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created.'' Section 219 of the Act provides that ''[t]he Commission is authorized to require annual reports from all carriers subject to this chapter, and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, any such carrier, to prescribe the manner in which such reports shall be made, and to require from such persons specific answers to all questions upon which the Commission may need information.'' Section 220(c) of the Act provides that ''[t]he Commission shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers, and the provisions of this section.'' As one example, in the *Evolving Risks Order* (88 FR 85514 (Dec. 8, 2023)), the Commission adopted a one-time collection of foreign ownership information from international section 214 authorization holders, pursuant to sections 218 and 219 of the Act, among other statutory provisions. Reclassification grants the Commission additional authority to develop information collection requirements pursuant to applicable provisions under Title II with regard to BIAS providers.

12. We anticipate as well that Title II authority, such as that provided in section 201 of the Act, will be important in addressing national security and law enforcement concerns involving internet Points of Presence (PoPs), which are usually located within data centers, as those relate to the provision of BIAS. Today, internet service providers (ISPs) provide BIAS through PoPs. There are serious national security and law enforcement risks associated with PoPs that are owned or operated by entities that present threats to national security and law enforcement interests and potential harms related to the services provided by such entities. For instance, in the *China Telecom Americas Order on Revocation and Termination,* the Commission addressed concerns that China Telecom (Americas) Corporation's (CTA) PoPs in the United States ''are highly relevant to the national security and law enforcement risks associated with CTA'' and that ''CTA's PoPs in the United States provide CTA with the capability to misroute traffic and, in so doing, access and/or manipulate that traffic.'' The Commission also stated that ''CTA, like any similarly situated provider, can have both physical and remote access to its customers' equipment needed to provide such services,'' and ''[t]his physical access to customers' equipment would allow CTA to monitor and record sensitive information.'' The Commission concluded that CTA's provision of services pursuant to its section 214 authority, ''whether offered individually or as part of a suite of services—combined with CTA's physical presence in the United States, CTA's ultimate ownership and control by the Chinese government, and CTA's relationship with its indirect parent [China Telecommunications Corporation], which itself maintains a physical presence in the United States—present unacceptable national security and law enforcement risks to the United States,'' and it reached similar conclusions in the other proceedings. In the *China Telecom Americas Order on Revocation and Termination,* the Commission stated that ''[i]n cases where [China Telecom Americas' (CTA's)] PoPs reside in IX points, CTA can potentially access and/or manipulate data where it is on the preferred path for U.S. customer traffic, through its services provided pursuant to section 214 authority and those services not authorized under section 214 authority.'' The Commission also noted that ''[t]he Executive Branch agencies refer to public reports that CTA's network misrouted large amounts of information and communications traffic over long periods, often several months, sometimes involving U.S. government traffic.'' Notably, CTA's website indicates that the company operates 23 PoPs in the United States and offers a number of services that may be available in the United States, including colocation, broadband, internet access, IP transit, and data center services. We conclude that the same national security and law enforcement concerns identified in that revocation proceeding are at least as likely to be present in the context of BIAS offerings when used to route or exchange BIAS traffic. In the *China*

*Telecom Americas Order on Revocation and Termination,* the Commission concluded that CTA's provision of services pursuant to its section 214 authority, ''whether offered individually or as part of a suite of services—combined with CTA's physical presence in the United States, CTA's ultimate ownership and control by the Chinese government, and CTA's relationship with its indirect parent [China Telecommunications Corporation], which itself maintains a physical presence in the United States—present unacceptable national security and law enforcement risks to the United States.'' We expect that reclassification of BIAS under Title II will enable the Commission to exercise authority when necessary to prohibit a BIAS provider from exchanging internet traffic with third parties that present threats to U.S. national security and law enforcement, such as CTA.

13. This document's reclassification decision also will provide the Commission with broader authority under Title II to safeguard BIAS providers, networks, and infrastructure from equipment and services that pose national security threats. The Commission has undertaken significant efforts to improve supply chain security pursuant to its universal service authority in section 254 of the Act, its authority to regulate equipment in sections 302 and 303 of the Act, and new mandates established by Congress through the Secure and Trusted Communications Networks Act of 2019, as amended, and the Secure Equipment Act of 2021. In particular, the Commission has taken action to: prohibit the use of universal service fund (USF) support to purchase or obtain any equipment or services produced or provided by companies posing a national security threat; prohibit the use of Federal subsidies administered by the Commission and used for capital expenditures to provide advanced communications service to purchase, rent, lease, or otherwise obtain such equipment or services; create and maintain a list of communications equipment and services that pose an unacceptable risk to the national security (''covered equipment and services''); administer the Secure and Trusted Communications Networks Reimbursement Program (Reimbursement Program) to reimburse the costs providers incur to remove, replace, and dispose of covered Huawei and ZTE equipment and services from their networks; and prohibit the authorization of equipment that poses a

threat and the marketing and importation of such equipment in the United States. Reclassification furthers these efforts by enhancing the Commission's ability to address issues raised by the use in our networks of equipment and services that pose a threat to national security and law enforcement. Notably, the Commission stated that the definition of ''provider of advanced communication services'' for purposes of the Reimbursement Program did not limit program eligibility to providers who offer service to end users, and included intermediate providers that carry traffic for other carriers only and do not originate or terminate traffic.

14. We are unpersuaded by commenters who argue that Title II classification is unjustified for national security purposes because they question this policy rationale, argue that market forces are sufficient to address national security risks, or contend that potential national security regulations under Title II would be costly or burdensome for BIAS providers. The Commission's national security concerns are not new. As evidenced by the discussion above, the Commission has engaged in numerous and ongoing actions to address these risks. The Nation's communications networks are critical infrastructure, and therefore too important to leave entirely to market forces that may sometimes, but not always, align with necessary national security measures. Arguments regarding costs and burdens are unpersuasive given that, at this point, they represent only speculation about hypothetical costs and burdens. To the extent there are costs and burdens associated with any ultimate action the Commission may undertake, we anticipate that the benefits to national security will outweigh those costs.

15. We also disagree with those commenters that reject the national security justification for reclassification on the grounds that there are no gaps that need to be filled or problems that need to be solved by the Commission, that argue that the Commission has a marginal role in protecting national security, or that contend Commission action would undermine the existing whole-of-government national security approach. These commenters fail to recognize, as noted above, that Congress made clear, when creating the Commission, that one of its enumerated purposes was to further the ''national defense.'' Additionally, these commenters ignore the Commission's significant contributions to the whole-of-government approach to national security. In addition to the regulatory actions discussed above, the

Commission is actively engaged in several Federal interagency working groups and policy committees that address a diverse range of national security topics, including cybersecurity, critical infrastructure resilience, emergency preparedness and response, supply chain risk management, and space systems cybersecurity. Commission staff receive classified briefings from the Intelligence Community on threats to the communications sector, exchange relevant information with Federal partners, and coordinate with law enforcement agencies to support various national security initiatives. The Commission also supports National Special Security Events (NSSE) and Security Event Assessment Rating (SEAR) 1 events and conducts investigations to determine if communications are being transmitted lawfully, if spectrum is being used appropriately, or if radio-frequency devices are authorized for operation. As a result of the Commission's collaborative efforts, we have learned that there are segments of the communications sector that are not subject to sufficient Federal regulatory oversight, including BIAS, due to the *RIF Order's* misclassification of the service in 2017. This lack of sufficient oversight allows security vulnerabilities to go undiscovered—and unaddressed—which can produce negative consequences for the communications sector, as well as other critical infrastructure sectors. As articulated above, reclassification directly supports the Commission's role in cross-government efforts and helps fill gaps in oversight by enabling the Commission to take regulatory actions to address national security risks.

16. We are also unpersuaded by arguments that reclassification is unjustified because we can address certain harms without such change. Some commenters argue that it would be sufficient to prevent carriers already subject to Title II from interconnecting with any entities that pose national security risks, whether or not those entities are themselves subject to Title II. We find that merely taking this action would fall far short of what is necessary to address our national security concerns, especially given the vastly diminished role of Title II voice and other traditional telecommunications services in today's communications marketplace. A prohibition on only regulated carriers—meaning those currently subject to Title II—from interconnecting with entities that pose a national security threat would not reach

providers of BIAS without reclassification. We find that it is instead necessary to directly address the national security risks associated with the provision of BIAS with the enhanced authorities available under Title II. The reclassification of BIAS is an important step toward closing the national security loopholes that exist within the communications sector, especially in broadband networks.

17. Finally, we reject arguments of commenters that oppose reclassification as unnecessary because the Commission's existing authority is sufficient to address national security concerns for which Congress has authorized the Commission to act; because the Commission does not have statutory authority to address national security concerns involving BIAS, broadband transmission services, or certain network infrastructure; or because Title II does not provide the Commission with authority to address national security. The Commission relies on multiple statutory provisions when taking action to protect national security, but Title II of the Communications Act includes some of the most important authorities and vests the Commission with a broad grant of rulemaking authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." Indeed, we have articulated several sources of authority above. As we do not adopt any new national-security-focused rules in the Order, we need not articulate with specificity each Title II provision that would provide a source of authority for potential action that the Commission may take in the future. Similarly, we are not persuaded that using Title II authority for national security purposes would violate Article II of the Constitution. As the U.S. Court of Appeals for the Fifth Circuit recently held, the Commission's exercise of authority to address national security threats to communications networks does not violate the separation of powers or infringe upon the President's constitutional authority to conduct foreign affairs.

### 3. Promoting Cybersecurity

18. As with national security, the Commission has an important role in addressing cybersecurity in communications networks that is inherent in its establishment "for the purpose of the national defense." The National Cybersecurity Strategy highlights the importance of protecting critical infrastructure as more of our "essential systems" move online. The expanding cyber threat landscape is

"making cyberattacks inherently more destructive and impactful to our daily lives." This trend is especially problematic because "malicious cyber activity has evolved from nuisance defacement, to espionage and intellectual property theft, to damaging attacks against critical infrastructure, to ransomware attacks and cyber-enabled influence campaigns." Further, "offensive hacking tools and services, including foreign commercial spyware, are now widely accessible . . . [to] organized criminal syndicates." In addition, "China, Russia, Iran, North Korea, and other autocratic states . . . are aggressively using advanced cyber capabilities" to pursue economic and military objectives. These malicious cyber activities threaten "the national security, public safety, and economic prosperity of the United States and its allies and partners."

19. The communications sector is squarely in the crosshairs of malicious cyber actors, who have targeted communications providers with ransomware attacks and have exploited vulnerabilities in communications networks to carry out cyberattacks against other critical infrastructure. For example, the 2023 Annual Threat Assessment of the U.S. Intelligence Community highlights the cyber threats to U.S. communications networks and states that "China's cyber espionage operations have included compromising telecommunications firms." More recently, Federal Bureau of Investigation (FBI) Director Christopher Wray highlighted "China's increasing buildout of offensive weapons within our critical infrastructure," which has enabled "persistent PRC access" to U.S. "critical telecommunications, energy, water, and other infrastructure."

20. The Commission actively supports the U.S. Government's efforts to protect critical infrastructure by participating in cybersecurity planning, coordination, and response activities. However, the classification of BIAS as a Title I information service has limited the regulatory actions that the Commission could take to address cyber incidents impacting some aspects of the communications sector, as well as other critical infrastructure sectors. This is not a hypothetical concern. As NTIA states on behalf of the Executive Branch, "[r]eclassifying BIAS is necessary to ensure that the Commission has the authority it needs to advance national security objectives." In recent years, Federal agencies have requested the Commission's assistance with mitigating specific risks and vulnerabilities in broadband networks that foreign adversaries could exploit to carry out

cyberattacks against the United States. The lack of Title II authority over BIAS has essentially precluded the Commission from taking regulatory action to directly address these concerns. We note, by way of example, recent reports of efforts of China-based hackers to target Philippines government officials by carrying out cyberattacks over broadband networks in that country. We find that reclassifying BIAS as a Title II service will help to fill this gap by enhancing the Commission's ability to protect U.S. communications networks and infrastructure from cyberattacks and to ensure that communications devices and equipment do not pose security risks to other critical infrastructure sectors.

21. The reclassification of BIAS significantly bolsters the Commission's existing authority to take regulatory actions to address cybersecurity risks and vulnerabilities in broadband networks. We agree with NTIA that reclassification will enable the Commission to better "protect our networks from malicious actors . . . [by] leverag[ing] the appropriate tools at its disposal, including the relevant Title II provisions." We agree with commenters that reclassification "provides multiple new authorities for the Commission to engage on cybersecurity" and take regulatory actions to "study cybersecurity needs and impose minimum standards on BIAS providers." For example, the Commission could build on existing efforts to require BIAS providers to implement cybersecurity plans and risk management plans to protect their networks from malicious cyber activity. This enhanced authority over BIAS could also allow the Commission to obtain greater situational awareness by working in coordination on cyber incident reporting with the Cybersecurity & Infrastructure Security Agency (CISA) as it implements the Cyber Incident Reporting for Critical Infrastructure Act of 2022 (CIRCIA). It also provides the Commission with additional regulatory tools to ensure network and service reliability and better support effective 911 and emergency preparedness and response efforts.

22. Reclassification also places the Commission in a stronger position to address vulnerabilities threatening the security and integrity of the Border Gateway Protocol (BGP), which impacts "the transmission of data from email, e-commerce, and bank transactions to interconnected Voice-over-Internet Protocol (VoIP) and 9–1–1 calls." For example, the Commission could

consider requiring service providers to deploy solutions to address BGP vulnerabilities, such as BGP hijacks. The agency could also consider establishing cybersecurity requirements for BGP, including "security features to ensure trust in the information that it is used to exchange," which could prevent bad actors from "deliberately falsify[ing] BGP reachability information to redirect traffic to itself or through a specific third-party network, and prevent that traffic from reaching its intended recipient." We note, however, that this filing does not oppose the reclassification of BIAS under Title II, the issue being addressed in the Order. Similarly, the Commission could more effectively address security threats related to the Domain Name System (DNS), which enables domain names to resolve to the correct IP addresses, and other naming protocols when used by BIAS providers to facilitate the operation of BIAS.

23. Some commenters argue that reclassification is unnecessary because the Commission's existing authority is sufficient to address cybersecurity risks in areas where Congress has authorized the Commission to act. Other commenters argue that the classification of BIAS is irrelevant because the Commission does not have statutory authority to address cybersecurity matters. But it is well established that the Commission may—indeed must—take security and public safety considerations into account in its public interest determinations under Title II. We disagree with these commenters because the classification of BIAS under Title I created a loophole that largely precluded the Commission from taking regulatory actions to address cyber risks to BIAS providers and vulnerabilities in broadband networks. For example, under the Title I classification, the Commission has limited authority to require providers of non-Title II services (*e.g.,* BIAS providers) to adopt cybersecurity standards or performance goals, report information about cyber incidents, or take defensive measures to protect communications networks and critical infrastructure. The reclassification of BIAS under Title II allows the Commission to use a broader range of regulatory tools by reestablishing the Commission's legal jurisdiction over broadband services, providers, and networks. This change is necessary to ensure the Commission can effectively address the cyber threats to the communications sector.

24. We also disagree with those commenters that argue that the Commission should not take action because it lacks the expertise and resources to implement a Title II regulatory regime in the area of cybersecurity and because other agencies are better equipped to address cybersecurity risks and vulnerabilities. For example, Verizon points out that CISA is "the federal leader for cyber and physical infrastructure security" and claims that the Commission plays "only a supporting role." NCTA—The Internet & Television Association (NCTA) agrees, based on the fact that CISA "issue[s] administrative subpoenas to critical infrastructure entities, which includes broadband providers, to obtain information necessary to identify and notify entities of vulnerabilities in their system." We recognize and appreciate CISA's leadership in protecting critical infrastructure—including communications networks—from malicious cyber activity. The Commission works closely with CISA and other Federal agencies in a collaborative manner to address risks and vulnerabilities impacting the communications sector. Chairwoman Rosenworcel currently serves as Chair of the Cybersecurity Forum for Independent and Executive Branch Regulators, "a federal interagency group that shares information and expertise to enhance the cybersecurity of America's critical infrastructure." Further, the Commission is the regulatory agency for communications and, as such, has access to regulatory authorities and investigative tools that Congress has not granted to other agencies. For example, the Commission recently adopted a cybersecurity labeling program for Internet of Things (IoT) devices and products, and proposed a pilot program to help schools and libraries improve their cybersecurity efforts through the USF. In addition, the Commission regularly investigates cyber intrusions and hacks related to the breach of regulatorily protected consumer data in the possession of common carriers, cable providers, and satellite providers. For example, cyber breaches may involve unauthorized access to personally identifiable information (PII) or customer proprietary network information (CPNI). Likewise, our data protection investigations frequently involve investigating and assessing whether the regulated entities had reasonable cybersecurity protections in place to protect the networks on which sensitive data are housed. The reclassification of BIAS will enable the Commission to more effectively fulfill its responsibilities, including those identified in PPD–21, within the existing frameworks that support the whole-of-government approach to cybersecurity.

25. Even though the Commission, under Title II, may not be able to address all significant cyber vulnerabilities, we find that the availability of that authority meaningfully enhances our ability to address significant cybersecurity threats. Given the interconnected nature of communications networks, any efforts to reduce the number of vulnerabilities and threat vectors that can be targeted by malicious cyber actors could provide substantial benefits to the larger communications sector. A recent cyberattack by Russian hackers against Kyivstar, Ukraine's largest telecommunications provider, "knocked out services" for 24 million users and "completely destroyed the core" of the company's network. This incident demonstrates how cyberattacks targeting communications service providers—including BIAS providers—can have disastrous impacts by damaging network infrastructure and causing widespread service outages. The Electronic Privacy Information Center (EPIC) asserts that "immediate regulatory action must be taken to compel ISPs to shore up their cybersecurity practices to better protect consumers," and argues that Title II reclassification of BIAS would empower the Commission to take further action. We agree with EPIC and conclude that reclassification enhances the Commission's ability to require BIAS providers to implement cybersecurity practices and take other actions to protect the confidentiality and integrity of information on the traffic that [each provider] stores or transmits.

26. Similar to certain arguments made opposing reclassification for national security purposes, commenters opposing reclassification for cybersecurity purposes argue that: the Commission has adequate authority to address cybersecurity issues under Title I; reclassification will be costly, burdensome, and too rigid for a dynamic threat landscape; and industry already addresses cybersecurity risks without regulatory mandates. We find that the Commission has an essential role in promoting measures that "currently seem to best protect consumers from breaches and other cyber incidents." As described above, and consistent with our conclusions on national security matters generally, reclassification will provide additional authority to act when necessary and in coordination with our Federal partners to address cybersecurity in the communications sector. Although the adoption of specific cybersecurity

requirements is beyond the scope of this proceeding, we intend for any future proposed action to provide regulatory flexibility, "leverage existing cybersecurity frameworks," encourage "public-private collaboration," and be designed to minimize the "cost of implementation."

4. Safeguarding Public Safety

27. Reclassifying BIAS as a telecommunications service enables the Commission to advance several public safety initiatives. Congress created the Commission, among other reasons, "for the purpose of promoting safety of life and property through the use of wire and radio communication," and as the Commission recognized in the *RIF Remand Order* (86 FR 994 (Jan. 7, 2021)), "[a]dvancing public safety is one of our fundamental obligations." The *Mozilla* court explained that when "'Congress has given an agency the responsibility to regulate a market such as the telecommunications industry that it has repeatedly deemed important to protecting public safety,' then the agency's decisions 'must take into account its duty to protect the public.'" The Commission's responsibility to address public safety is becoming increasingly important as the severity and frequency of natural disasters continue to rise. Reclassification enhances the Commission's jurisdiction over BIAS providers, which, in combination with our other statutory authority, will allow us to ensure BIAS meets the needs of public safety entities and individuals when they use those services for public safety purposes.

28. Reclassification will empower the Commission to more effectively support public safety officials' use of BIAS for public safety purposes. Public safety officials' reliance on broadband service has become integral to their essential functions and services, even aside from their use of enterprise-level broadband services, including how they communicate with each other and how they convey information to and receive information from the public. Public safety entities and first responders often rely on retail broadband services to communicate during emergency situations. Increasingly, public safety entities rely on BIAS to access various databases, share data with emergency responders, and stream video into 911 and emergency operations centers. Public safety officials also rely on BIAS outside the emergency context, including relying on individuals' residential security systems that use BIAS and programs that are alternatives to incarceration, which require individuals to check in with supervising

officers remotely, wear electronic location monitoring devices, or use continuous alcohol monitoring devices. In addition, public safety officials use services accessible over the top (OTT) of broadband connections, such as social media, to communicate important and timely information to the public and to gain valuable information from the public and build on-the-ground situational awareness. For example, during the recent 911 outage that impacted several western states, public safety officials used social media "to inform the public of the issue and to provide alternate means of contacting emergency services." Santa Clara describes the essential role BIAS also plays in public safety officials' ability to carry out their daily, non-emergency functions, including its importance in the functioning of its emergency communications and operations protocols. Santa Clara also describes the importance of redundancies in its emergency communications and operations systems, and that many of these systems rely on BIAS, outside of its enterprise systems. Public safety entities benefit as well when they rely on enterprise services, which often flow over the same facilities as mass-market retail services. For example, Emergency Services Internet (ESInet) is a managed UP network that is used for emergency services communications and which may be constructed from a mix of dedicated and shared facilities. ESInets can be realized in several ways with one example using the Multi-Protocol Label Switching (MPLS) standard used by many BIAS and transit providers' networks for traffic engineering and sharing facilities with other traffic. Reclassification gives the Commission additional jurisdiction to advance the existing uses of BIAS to support public safety operations and communications by, for example, taking regulatory actions to improve the effectiveness of emergency alerting and 911 communications. Given how crucial BIAS is to the protection of public safety and that reclassification provides the Commission with the ability to ensure that BIAS is reliable and secure during emergencies, we disagree with those commenters who argue that reclassification will not enhance public safety communications on the basis that public safety entities heavily rely on enterprise-level dedicated networks that fall outside of the scope of reclassification.

29. BIAS also plays an increasingly important role in allowing the public to communicate with first responders during emergency situations. In the *RIF*

*Remand Order,* the Commission noted that retail broadband services are used to translate communications with 911 callers and patients in the field and to deliver critical information about 911 callers that is not delivered through the traditional 911 network. The Commission has undertaken various efforts in recent years to improve how the public reaches and shares information with emergency service providers. Title II classification of BIAS supports these current and future efforts. For example, reclassification enhances the Commission's jurisdiction to improve the flow of voice communications, photos, videos, text messages, real-time text (RTT), and other types of communications from the public to emergency service providers through Next Generation 911 or Wi-Fi calling.

30. The public relies on BIAS to easily access public safety resources and information. Commenters who support reclassification and petitioners for reconsideration of the *RIF Remand Order* note that social media is increasingly used as an important resource by the public to access information about emergencies and other public safety incidents. We therefore disagree with commenters who argue that there is no evidence that the Commission's lack of regulatory authority over BIAS poses public safety risks. Similar to the arguments made by commenters who argue that reclassification will not affect communications networks used by public safety officials, this argument ignores that both public safety officials and the public increasingly rely on BIAS. Indeed, BIAS has become for many individuals the primary way to access critical public safety services, without which there would be no other mode of communication. Reclassification enables the Commission to ensure that communications are secure and reliable in times of emergency. We agree with the Communications Workers of America (CWA) that "[w]hile many providers have made strides in improving service quality and reducing outages, voluntary commitments are clearly not enough." Furthermore, the fact that many states have implemented their own laws to ensure public safety communications are safeguarded demonstrates the gap that has existed since the repeal of Title II classification of BIAS. We observe that the public also relies on BIAS for public safety communications that occur outside of emergencies, including for telemedicine; residential safety and security systems; and in-home

monitoring of individuals who are elderly, disabled, or otherwise able to benefit from such services.

31. BIAS is essential when used by individuals with disabilities to communicate with public safety services, and the Commission has taken several steps to improve access to IP-enabled 911 communications for people with disabilities. For example, the Department of Health and Human Services recently announced that the 988 Suicide & Crisis Lifeline will provide direct video calling ASL services for people who are deaf and hard of hearing, as part of ongoing efforts to expand accessibility to behavioral health care for underserved communities. This will allow an ASL user in crisis to communicate directly with a counselor in ASL. Reclassification enhances our existing authority to ensure these communications are not interrupted or degraded by, for example, giving the Commission the jurisdiction necessary to "develop minimum standards of service and enforcement mechanisms that affect people with disabilities." Likewise, reclassification "provide[s] the FCC with the tools needed, for example, to promote broadband in rural areas lacking sufficient access to BIAS where there is no substitute for copper wires which carry 911, closed captioning, and TTY services."

32. Reclassification will enhance the Commission's ability to better protect public safety communications. For example, Title II positions the Commission to more fully examine and investigate incidents involving BIAS providers that are alleged to have violated the Commission's rules, including those against throttling or blocking. In addition to holding any particular violative action to account, enforcement proceedings would also enable the Commission to prevent or mitigate future threats to BIAS by using data and information gathered as a result of those proceedings. Reclassification will also enable the Commission to make the Nation's alerting and warning capabilities more effective and resilient by, for example, adopting rules requiring BIAS providers to transmit emergency alerts to their subscribers. Further, given the expanding ways in which individuals and public safety officials rely on BIAS to keep themselves and their homes safe, Title II will enable the Commission to ensure that BIAS providers protect and securely transmit the sensitive information to which they are privy pursuant to section 222, which requires service providers to protect customer information. Thus, reclassification

enables the Commission to take a wider range of regulatory actions to ensure the public can reliably and securely access life-saving public safety resources and information using BIAS.

33. We find that the ability of the Commission to adopt *ex ante* regulations will provide better public safety protections than the *ex post* enforcement framework established by the *RIF Order.* We agree with Santa Clara and INCOMPAS, which, in their Petitions for Reconsideration of the *RIF Remand Order,* criticize the *RIF Remand Order's* analysis of the record at that time in light of these observations, including the *RIF Remand Order's* minimization of the opportunity for harm to public safety in the absence of reclassification and the open internet conduct rules as well as its acceptance of industry's voluntary commitments to abide by the principles underlying the open internet rules. Reclassification and the conduct rules enable the Commission "to deal with public safety issues before a public safety situation arises—not afterwards, as the *RIF Remand Order* suggests," and do not force the Commission to rely on voluntary industry commitments to protect public safety.

34. Some commenters assert that reclassification will stymie innovation and reduce incentives for investment, which in turn, does not serve public safety goals. Both INCOMPAS and Santa Clara petitioned for reconsideration of the *RIF Remand Order* in large part on this very notion, pointing out that the asserted benefits of increased investment and innovation under Title I was unsupported by the record and that there was evidence to the contrary. We agree with Public Knowledge in that "[n]owhere has the Commission ever found that the nebulous and unsubstantiated benefits of deregulation outweigh the specific benefits of ensuring that public safety responders can communicate reliably with each other and with the public in times of crisis." Linking increases or decreases in investment and innovation with reclassification is not supported by the available evidence, as we discuss in more detail below.

5. Monitoring Network Resiliency and Reliability

35. The Commission also plays a critical role in monitoring the resiliency and reliability of the Nation's communications networks and helping to ensure that these networks are in fact resilient and reliable. PPD–21 defines "resilience" as "the ability to prepare for and adapt to changing conditions and withstand and recover rapidly from

disruptions . . . [it] includes the ability to withstand and recover from deliberate attacks, accidents, or naturally occurring threats or incidents." The Nation's networks are critical lifelines for those in need during disasters and other emergency situations. Recent events, including hurricanes, wildfires, tornadoes, earthquakes, and severe winter storms, demonstrate how communications infrastructure remains susceptible to disruption. As broadband services become more widespread, consumers increasingly rely on these connections. As of February 2021, Pew Research estimates that 77% of adults in the United States have high-speed broadband service at home. Smartphone ownership among adults in the US is now estimated to be at 85%. The Commission has taken actions consistent with its existing authority to improve the reliability and resiliency of the Nation's communications networks so that the public can communicate, especially during emergencies. However, those efforts have had to largely focus on the networks' provision of voice telephony under Title II. This document's action to reclassify BIAS under Title II will enable the Commission to build upon these efforts by taking more effective regulatory actions to protect the resiliency and reliability of our broadband networks and infrastructure.

36. In particular, the Commission plays a vital role in ensuring that the Nation's communications networks are resilient and reliable. For example, the Commission "monitors and analyzes communications network outages[,] . . . [takes actions] to help prevent and mitigate outages, and where necessary, assist[s] response and recovery activities." During emergencies, the Commission "collects information on the operational status of communications infrastructure to support government disaster assistance efforts and to monitor restoration and recovery." One of the principal benefits of reclassification is to enable all public safety officials to better assess the operational status of broadband networks for dissemination of emergency information and/or to better assess where support is needed. Under the Commission's Network Outage Reporting System (NORS), qualifying service providers are required to report to the Commission network outages that satisfy certain criteria.

37. As Free Press points out, "because NORS is limited to voice service outages, 'the Commission has historically lacked reliable outage information for today's modern,

essential broadband networks.' '' Reclassification also enhances the agency's ability to gain better visibility over the performance of broadband networks and also to completely and accurately determine the scope and causes of outages to these networks. Closing this reporting gap for outages could afford the Commission and public safety officials with more consistent and reliable data to better track changes in network reliability, identify trends, pinpoint possible improvements and best practices, and disseminate actionable information. New outage reporting requirements for BIAS providers could also provide the Commission with better situational awareness for major internet outages affecting first responders, 911 services, and impacted populations that are not currently captured by NORS data. Finally, reclassification supports the Commission's authority to expand the scope of NORS by requiring BIAS providers, like Title II-regulated voice service providers, to submit outage reports in response to service incidents that cause outages or the degradation of communications services, such as cybersecurity breaches, wire cuts, infrastructure damages from natural disaster, and operator errors or misconfigurations.

38. The Commission also ''oversees and monitors industry efforts to strengthen network resiliency,'' including through the recently adopted Mandatory Disaster Response Initiative. Moreover, the Commission adopted new rules, ''to require enumerated service providers (cable communications, wireline, wireless, and interconnected Voice over Internet Protocol (VoIP) providers) . . . to report on their infrastructure status during emergencies and crises in the Disaster Information Reporting System (DIRS) when activated and to submit a final report to the Commission within 24 hours of DIRS deactivation.'' Reclassification bolsters the Commission's authority to require BIAS providers to participate in DIRS. In addition, the Commission endeavors to ''identify and reduce risks to the reliability of the nation's communications network[s],'' including by working with the Communications Security Reliability and Interoperability Council (CSRIC).

39. Reclassifying BIAS as a telecommunications service will significantly enhance the Commission's ability to protect critical infrastructure by taking actions to address threats and vulnerabilities to communications networks. Public Knowledge agrees that ''[w]ithout Title II authority, the Commission cannot impose regulations

to meet the need for resilience and reliability as more and more critical traffic passes through IP networks.'' This change in policy will enable the Commission to set goals and objectives that foster resilience and to implement risk management directives on a wider basis in order to make our broadband networks more resilient and reliable, and thus more secure. We also disagree with those commenters who argue against reclassification by contending that outage reporting targeted to BIAS networks will not serve the public interest or that there are alternative sources of authority for outage reporting. The Commission is considering in a separate proceeding the extent to which outage reporting requirements should be placed on BIAS providers and we anticipate that having Title II as an additional source of authority will support that evaluation.

40. We also are not persuaded by other arguments that certain parties raise regarding network resilience and reliability that are consistent with their comments regarding national security. Some commenters argue reclassification is not necessary to ensure the resiliency and reliability of the Nation's communications networks, that market-driven incentives motivate broadband providers to make significant investments to increase the resiliency and reliability of their networks, or that the Commission has only a limited role to play on resilience and reliability issues. We agree with AARP and Next Century Cities, however, that reclassification is necessary to provide the Commission with sufficient authority to address network resiliency for critical infrastructure, which is too important for the Commission to be forced to rely upon mere voluntary measures and alleged market-driven incentives. As described above, and consistent with our conclusions on national security matters generally, we find that the Commission has an essential role on resilience and reliability issues, working in coordination with its Federal partners. Reclassification will allow for the direct network monitoring of the Nation's broadband internet networks and provide a robust regulatory platform so that all BIAS providers maintain the highest levels of business continuity when incidents occur. We find that reclassification will support the Commission's efforts to protect the public by ensuring that more reliable and resilient networks are in use, including by developing voluntary frameworks and policies when practical,

and compelling enforceable compliance when needed.

41. Commenters opposing reclassification also argue that under Title I classification, broadband networks have provided robust internet service despite unprecedented levels of demand during the COVID–19 pandemic. We find these arguments unpersuasive. As more critical functions rely on BIAS, it is imperative for the Commission to have authority to address resiliency issues involving broadband networks to the same degree that it has for traditional voice networks. Further, we disagree with those commenters who contend that these types of reporting, monitoring, and regulatory requirements would likely impose significant new costs on BIAS providers and potentially stifle investment and broadband deployment.

42. In conclusion, the reclassification of BIAS will secure the Commission's authority to, as necessary, implement requirements for network upgrades and changes, adopt rules relating to recovery from network outages, and improve our incident investigation and enforcement authority to mitigate network threats and vulnerabilities. Reclassification also enables the Commission to create more stability and predictability on how providers should address disasters and emergency situations. Moreover, reclassifying broadband as a telecommunications service allows the Commission to address identified—and evolving—threats and vulnerabilities in the BIAS industry, as some BIAS providers may not have sufficient incentives to protect the traffic traversing their networks without such regulation. Thus, reclassification would allow the Commission, for example, to require BIAS providers to identify and reduce harmful activities occurring across their infrastructure. These measures will be taken in support of a whole-of-government approach by taking regulatory actions to enhance network reliability and resiliency in order to better protect all of our Nation's networks.

6. Protecting Consumers' Privacy and Data Security

43. We find that classifying BIAS as a telecommunications service will support the Commission's efforts to protect consumers' privacy and data security. Section 222 of the Act governs telecommunications carriers' use, disclosure, and provision of access to information obtained from their customers, other telecommunication carriers, and equipment manufacturers. It imposes a general duty on every telecommunications carrier to protect

the confidentiality of proprietary information of its customers, other telecommunication carriers, and equipment manufacturers, and imposes heightened restrictions on carriers' use, disclosure, or provision of access to customers' customer proprietary network information (CPNI)—including customer location information—without consent. CPNI is defined as ''(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier.''

44. Returning BIAS to its telecommunications service classification will bring BIAS providers back under the section 222 privacy and data security framework, restoring those protections for consumers and yielding substantial public interest benefits. In her separate remarks on the 2021 Federal Trade Commission (FTC) Staff Report, Chair Lina Khan noted that the FCC ''has the clearest legal authority and expertise to fully oversee internet service providers,'' a view supported by a number of commenters, who assert that the Commission's specific expertise to regulate privacy matters is needed. We observe that the Commission's privacy authority under Title II is not limited to CPNI. Section 222(a) also imposes obligations, which we enforce, on carriers' practices with regard to protection of non-CPNI customer proprietary information and personally identifiable information (PII), and section 201(b)'s prohibition on practices that are unjust or unreasonable also provides authority over privacy practices. We also find that because section 222 places an obligation on telecommunications carriers to protect the confidentiality of the proprietary information of and relating to other telecommunication carriers (including resellers) and equipment manufacturers, our classification of BIAS as a telecommunications service will protect information concerning entities that interact with BIAS providers.

### 7. Supporting Access to Broadband Internet Access Service

45. Reclassifying BIAS as a telecommunications service under Title II will support the Commission's multifaceted efforts to support access to BIAS in three ways. First, such

authority will improve the Commission's ability to foster investment in and deployment of wireline and wireless infrastructure and to promote competition for, and access to, BIAS for consumers by restoring to BIAS-only providers statutory protections for pole attachments that providers of cable and telecommunications services receive. Second, reclassification facilitates our ability to ensure access to BIAS by enabling the Commission to regulate BIAS-only providers that serve multi-tenant environments to ensure they do not engage in unfair, unreasonable, and anticompetitive practices, such as exclusivity contracts. Finally, authority under Title II will put the Commission on the firmest legal ground to promote the universal service goals of the Act.

46. *Wireline and Wireless Infrastructure.* We find that reclassifying BIAS as a telecommunications service under Title II will support the Commission's mission to foster investment in and deployment of wireline and wireless infrastructure and to promote competition and access to BIAS for consumers. Specifically, we find that the application of sections 224, 253, and 332 of the Act to BIAS-only providers will provide equitable rights to those providers and the tools to enable the Commission to reach its goals, thereby promoting greater deployment, competition, and availability of both wireline and wireless BIAS. Furthermore, we find that the *RIF Remand Order* failed to adequately address the *Mozilla* court's concerns regarding the effects of reclassification on BIAS-only providers.

47. Reclassification of BIAS as a Title II service will ensure that BIAS-only providers receive the same statutory protections for pole attachments guaranteed by section 224 of the Act that providers of cable and telecommunications services receive. Section 224 defines pole attachments as ''any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.'' It authorizes the Commission to prescribe rules to ensure that the rates, terms, and conditions of pole attachments are just and reasonable; requires utilities to provide nondiscriminatory access to their poles, ducts, conduits, and rights-of-way to telecommunications carriers and cable television systems (collectively, attachers); provides procedures for resolving pole attachment complaints; governs pole attachment rates for attachers; and allocates make-ready costs among attachers and utilities. The

Act defines a utility as a ''local exchange carrier or an electric, gas, water, steam, or other public utility, . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications.'' However, for purposes of pole attachments, a utility does not include any railroad, any cooperatively organized entity, or any entity owned by a Federal or State government. Section 224 excludes incumbent local exchange carriers (ILECs) from the meaning of the term ''telecommunications carrier,'' therefore these entities do not have a mandatory access right under section 224(f)(1). The Commission has held that when ILECs obtain access to poles, section 224 governs the rates, terms, and conditions of those attachments. The Act allows utilities that provide electric service to deny access to their poles, ducts, conduits, or rights-of-way because of ''insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.'' As the Commission noted in 2015, it ''has recognized repeatedly the importance of pole attachments to the deployment of communications networks'' and therefore has undertaken a series of reforms to improve access to poles under section 224. The National League of Cities urges us to revisit and overturn our *2018 Wireless Infrastructure Order* (83 FR 51867 (Oct. 15, 2018)) and, until that time, forbear from application of sections 253 and 332(c) to reclassified BIAS. We agree with the Wireless Infrastructure Association that the former request is outside the scope of this proceeding. We decline to forbear from applying section 253 and 332(c) to BIAS for the reasons we discuss in section IV.B.9. To that end, the Commission continues to pursue solutions to improve pole access including, most recently in December 2023, by adopting new rules that, among other things, speed up the pole attachment dispute resolution process by establishing a new intra-agency rapid response team, set forth specific criteria for the response team to use when considering a complaint, and increase transparency for new broadband buildouts by requiring disclosure of pole inspection reports during the make-ready process. Under a Title I classification scheme, BIAS-only providers are not entitled to any of the current or future benefits the Commission may enact to facilitate access to broadband infrastructure.

48. Section 253 of the Act provides further protections to telecommunications companies that,

through Title II reclassification, will apply to BIAS-only providers. Specifically, section 253 seeks to further facilitate deployment of communications services by enabling the Commission (or a court) to intervene when a State or local regulation or legal requirement "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate *telecommunications* service." Without reclassification, however, BIAS-only providers may not seek the Commission's intervention under section 253 when State or local regulations interfere with their network deployment. Moreover, State and local laws that are exclusively focused on, or exclusively implicate, the provision of BIAS, do not currently fall within the ambit of section 253 and thus cannot be the subject of Commission intervention when prohibiting or having the effect of prohibiting the provision of BIAS exclusively.

49. In the wireless context, section 332 of the Act protects regulated entities from State and local regulations that "unreasonably discriminate among providers or functionally equivalent services" or that "prohibit or have the effect of prohibiting the provision of personal wireless service." However, because mobile broadband is not currently classified as a "commercial mobile service," mobile BIAS-only providers who do not offer additional regulated services are not covered by section 332. As INCOMPAS notes, it has "members who are solely focused on providing broadband services," and "[t]he current classification of BIAS and mobile broadband as Title I services makes it difficult for these providers to argue that they are building the kinds of facilities capable of commingled operation that are covered by Sections 332 and 253." As with sections 224 and 253, without reclassification, mobile BIAS-only providers would be disadvantaged compared to their competitors.

50. We find that reclassifying BIAS as a Title II service levels the playing field by ensuring that BIAS-only providers enjoy the same regulatory protections—those guaranteed by sections 224, 253, and 332—as their competitors who offered services already classified as telecommunications services in addition to BIAS prior to our classification decision in the Order. As the Commission found in 2015, "[a]ccess to poles and other infrastructure is crucial to the efficient deployment of communications networks including, and perhaps especially, new entrants." INCOMPAS notes that BIAS providers face "significant barriers to deploy

broadband network infrastructure—among them access to poles, ducts, and conduit." The California Public Utilities Commission (CPUC) explains further that "[a]ccess to poles, conduits, and rights-of-way may affect cost, feasibility, and timing of constructing and offering broadband services." Sections 224, 253, and 332 however, seek to remove these barriers by guaranteeing providers access to utility poles at just and reasonable rates and by ensuring that State and local laws do not prohibit deployment. Even WISPA—the Association for Broadband Without Boundaries (WISPA), which otherwise opposes our reclassification decision, highlights the benefits of extending section 224 rights to BIAS-only providers.

51. NCTA argues that restoring section 224 rights will only provide "illusory" benefits to BIAS-only providers. We disagree. Under Title II, BIAS-only providers will be guaranteed access to utility poles at just and reasonable rates. BIAS-only providers, therefore, will no longer be forced to negotiate for the right of pole access directly with each set of pole owners, which will not only ensure they pay the same rates as their competitors but will also ensure that deployment of their networks is not unnecessarily bogged down by the negotiation process. While such benefits may seem "illusory" to the competitors who already enjoy such privileges, we find that eliminating one of the "significant barriers to deploy[ment] [of] broadband network infrastructure," is in fact a very real benefit for BIAS-only providers. Indeed, NCTA, who claims that the benefits of pole attachment rights will prove to be illusory, has consistently taken issue with the costs of pole attachments, even under the existing regime, and has regularly supported and championed the Commission's efforts to reduce the costs and burdens of obtaining pole access.

52. We find that in addition to guaranteed pole attachment rates and more efficient deployment, Title II reclassification will also ensure that BIAS-only providers are protected by section 253, which provides that "no [s]tate or local statute or regulation, or other [s]tate or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Likewise, mobile BIAS-only providers will receive protection under section 332 which requires State and local governments to act on "any request for authorization to place, construct, or modify personal wireless service facilities within a

reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." As INCOMPAS notes, "a reclassification of BIAS . . . opens an avenue for additional protections for BIAS-only providers who may need Commission intervention to address state/local policies that restrict competitive deployment through its oversight for ensuring competitors can access new geographic markets." Under Title I, BIAS-only providers cannot seek assistance from the Commission if State or local governments interfere with the deployment of BIAS-only networks—once again, leaving them worse off than their regulated competitors. For example, under a Title I regulatory regime, if State or local permitting processes effectively prohibit the deployment of BIAS networks, BIAS-only providers cannot raise the issue with the Commission. In areas where both BIAS-only and providers of comingled services operate, providers of comingled services may seek a resolution with the Commission that would resolve the issue for BIAS-only competitors as well, but BIAS-only providers would be reliant upon their competitors to bring the action to the Commission in the first place. But if a State or local legal requirement solely affects BIAS, even providers that currently offer commingled services lack the ability under section 253 to challenge it given that section 253 only applies to those State and local legal requirements that affect the provisioning of "telecommunications service." Moreover, in any area where BIAS-only providers are the sole provider of service (or are seeking to be a provider of service), they would be left without recourse. We agree with INCOMPAS, which notes that "reclassification so that BIAS-only providers receive the same Title II protections as incumbent telecommunications providers is in the public interest as it will best ensure that the Communications Act's goal of the Commission enabling and promoting competition can be fulfilled and that consumers will benefit from additional choice in the marketplace." Therefore, we find that restoring section 253 rights of BIAS-only providers is not only equitable, but will help ensure that BIAS-only providers are adequately protected by the Commission's authority to address State and local policies that restrict deployment.

53. In the *RIF Remand Order,* the Commission attempted to downplay its decision to strip section 224 rights from

BIAS-only providers by claiming that "ISPs may gain the status of telecommunications providers, and thus become eligible for section 224 pole attachment rights." Specifically, the Commission suggested that BIAS-only providers could either alter their business plans to offer other services that would then qualify them as telecommunications carriers or enter into partnerships with existing telecommunications carriers to attain section 224 rights. While it may be true that BIAS-only providers could alter the business plans or partner with other regulated entities to ensure they receive equitable pole access, our regulations should not be designed to stifle innovative offerings distinct from those currently offered in the marketplace. Furthermore, each year more and more Americans are opting to forgo these additional non-BIAS telecommunications services and instead are choosing to have only a fixed BIAS connection in their homes along with a mobile connection. INCOMPAS notes that because customers are opting to use over-the-top video or VoIP services, many of its fixed BIAS members were losing money on video and voice services and "have ceased offering voice and/or video options to their residential customers given that those customers can choose third-party over-the-top video or VoIP options for these services." Thus, requiring BIAS-only providers to pursue declining lines of business just to receive the same legal protections as their competitors makes little sense. And in following the *RIF Remand Order's* suggestion that BIAS-only providers could enter into partnerships with telecommunications carriers to gain pole access, BIAS-only providers would just swap one barrier to entry (negotiating directly with pole owners for access) for another (negotiating with a telecommunications carrier). As a result, the supposed solution the *RIF Order* offered up is in fact no solution at all and instead leaves BIAS-only providers with a different "competitive bottleneck." Moreover, the *RIF Remand Order* failed to cite to even one instance of such a partnership or provide any evidence that such a partnership would even be economically or practically feasible, only mentioning the *possibility* that BIAS-only providers might be able to pursue one. Even assuming the possibility of such a partnership, unlike with section 224, which ensures pole owners provide access at just and reasonable rates, there are no legal safeguards to ensure that potential partners agree to reasonable terms with BIAS-only providers.

54. In addition, we find that the *RIF Remand Order* erred in concluding that the ability of states under section 224(c) to establish their own pole attachment rules in place of the Federal rules (often referred to as reverse-preemption) minimizes the impact of the loss of section 224 rights on BIAS-only providers. First, the majority of jurisdictions have not chosen to reverse-preempt the Commission and instead have opted to continue to allow the Commission to regulate pole attachments under section 224. Second, we disagree with the conclusion in the *RIF Remand Order,* as well as those commenters who agree with the conclusion, that "Title I classification does not impact the 22 states and the District of Columbia that have chosen to reverse-preempt our rules." An additional state, Florida, has subsequently reverse preempted the Commission's jurisdiction since the issuance of the *RIF Remand Order.* As INCOMPAS notes, some of the jurisdictions that have reverse-preempted the Commission have simply mirrored the Commission's rules so that any changes implemented by the Commission are also directly implemented by the state. For example, Pennsylvania has reverse-preempted the Commission but chosen to adopt the "rates, terms and conditions of access to and use of utility poles, ducts, conduits and rights-of-way to the full extent provided for in 47 U.S.C. 224 and 47 CFR chapter I, subchapter A, part 1, subpart J (relating to pole attachment complaint procedures), inclusive of future changes as those regulations may be amended." Therefore, because the Pennsylvania code reflects the "rates, terms, and conditions of access to" poles adopted by the Commission, reclassifying BIAS as a Title II service will provide pole access to BIAS-only providers in Pennsylvania even though Pennsylvania regulates its own poles. The same is true in West Virginia, another State that has reverse-preempted the Commission, where the West Virginia Public Service Commission, at the direction of the State legislature, adopted the FCC's pole attachment regulations in their entirety, including subsequent modifications, superseded existing pole attachment regulations that conflicted with Federal regulations, and otherwise rejected stakeholder requests to alter the Commission's regulations. Similarly, at least two other jurisdictions, the District of Columbia and Ohio, have reverse-preempted the Commission but

continue to point to the Commission's regulations for reference. Three other states seemingly have only partially preempted the Commission's rules by opting to regulate only the attachments of other public utilities or cable television providers. In those states, the Commission's rules will continue to govern the attachments of telecommunications carriers. Thus, the Commission's pole attachment rules will continue to play a vital role in several jurisdictions that have elected to reverse-preempt, or partially reverse-preempt, the Commission.

55. The *RIF Remand Order* further posits that "if a state prefers to adopt a different regulatory approach, that state has the opportunity to exercise its authority to expand the reach of government oversight of pole attachments." But, as the CPUC, the Public Utility Commission for a State which has reverse preempted the Commission, argues, it is not entirely clear states can grant BIAS-only providers pole access pursuant to their section 224 reverse-preemption authority if the Commission itself has specifically chosen to exclude BIAS-only providers from the purview of Title II, the very source of authority from which section 224 authority emanates. Thus, under Title I classification, the right of BIAS-only providers to access poles in those states that have chosen to self-regulate is subject to uncertainty; and in the majority of jurisdictions, which are governed by the Commission's rules, such providers have no right to pole access at all.

56. Furthermore, as the CPUC and other commenters note, the lack of clear legal authority to regulate BIAS-only providers presents public safety issues as states may not be able to enforce safety regulations on BIAS-only providers that do manage to attach to poles. The CPUC states, however, that "reclassifying BIAS as a telecommunications service would eliminate this potential argument and the commensurate delay in responding to safety violations." We agree and find that, in addition to the economic benefits of affording section 224 rights to BIAS-only providers, reclassification will also ensure that the Commission and State utility commissions have the requisite legal authority to protect public safety concerns associated with the deployment of broadband-only infrastructure.

57. We also find to be without merit the arguments of commenters who echo the Commission's contention in the *RIF Remand Order* that the loss of section 224 rights is not a serious issue because the majority of BIAS providers offer

comingled services. To be clear, we do not dispute the fact that the majority of BIAS providers offer at least one Title II-regulated service in addition to BIAS, as some commenters contend. We believe, however, that the small number of BIAS-only providers is not due just to the popularity of other regulated services, but also because BIAS-only providers, many of which are smaller competitive companies, do not enjoy the competitive advantages of larger enterprises like many of their competitors. As a result, competitive bottlenecks and obstacles to deployment, such as access to poles at just and reasonable rates, present significant challenges to BIAS-only providers that may make breaking into markets with large entrenched incumbents next to impossible. As the CPUC notes, "[a]ll forms of telecommunications, including broadband, require access to rights-of-way generally, and specifically to poles and conduits, which are controlled by incumbent local exchange carriers and other entities. Access to poles, conduits, and rights-of-way may affect cost, feasibility, and timing of constructing and offering broadband services." Furthermore, we believe that the *RIF Remand Order* completely overlooked the future competitive realities for BIAS-only providers and the resulting harms that its decision will yield. As we discussed above, consumers are becoming more reliant on BIAS and are continually foregoing the purchase of services offered alongside BIAS (*i.e.,* cable and voice). As a result, there is no reason to doubt that more and more providers will begin offering only BIAS and without reclassification would have no rights pursuant to section 224. Therefore, we find that restoring the section 224 rights and easing the burdens of pole access is likely to ensure that the number of BIAS-only providers does not artificially shrink due to inequitable treatment under the law.

58. Furthermore, we find that equitable regulatory treatment of BIAS-only providers, particularly with regard to regulations designed to speed network deployment, will also increase competition, ultimately benefitting consumers and assisting the Commission's goal of achieving universal service. We agree with INCOMPAS which states that "[a]dditional competition is key to tackling our nation's internet challenges" and that the Commission must ensure that its policies do not further entrench large telecommunications carriers, reducing the viability of smaller, innovative alternative providers and also reducing the service options available to consumers. USTelecom states that "[t]he NPRM cites no evidence that there are broadband-only providers that could not receive those benefits today or that the availability of the Broadband Equity, Access, and Deployment funding is leading to the creation of such providers," but INCOMPAS specifically notes that it "expect[s] that many entities that will be competing for BEAD dollars will be BIAS-only" and states that those entities "cannot exercise any rights afforded by Title II to speed their deployment." USTelecom further contends that "there is no record evidence that Title I classification is preventing [BIAS-only providers] from obtaining just and reasonable pole attachment rates." Even accepting USTelecom's statement as true, it still misses the mark. Even if BIAS-only providers are somehow able to negotiate directly with pole owners to ultimately achieve rates that are just and reasonable, BIAS-only providers must still suffer the costs of securing pole access through private negotiations, and without any leverage, with each set of pole owners, unlike their regulated peers who have guaranteed access rights under section 224. Clearly then, by failing to provide equal access to the Act's legal protections on a nondiscriminatory basis, the Title I regime favors large incumbents at the expense of BIAS-only providers. Because we opt to restore the Title II classification of BIAS, we find it unnecessary to address commenters who suggest the Commission can provide similar rights to BIAS-only providers through other sections of the Communications Act.

59. *Multiple Tenant Environments (MTEs).* In the *2023 Open Internet NPRM* (88 FR 76604 (Nov. 3, 2023)), we sought comment on how reclassification of BIAS might impact the Commission's authority to regulate service providers in MTEs. Specifically, we asked how reclassification might provide the Commission additional authority to foster competition and promote consumer choice for those living and working in MTEs. We conclude now that reclassification of BIAS as a telecommunications service facilitates these goals by enabling the Commission to regulate broadband-only providers that serve MTEs and thereby to end unfair, unreasonable, and anticompetitive practices facing MTE residents. That is, reclassification would give the Commission authority to require BIAS-only providers to abide by the same kinds of rules—including those that prohibit exclusivity contracts that bar competition outright in MTEs—that other telecommunications and cable providers must currently follow. Such rules in turn would secure the same protections for all residents of MTEs, regardless of the kind of service offered by providers in their building; reduce regulatory asymmetry between broadband-only providers and other kinds of providers; and potentially improve competition in the MTE marketplace.

60. More than 100 million people in the United States live or work in MTEs, including a disproportionate number of lower-income residents and members of marginalized communities. The Commission's rules, which regulate the kinds of agreements service providers may enter into with MTE owners, currently extend to telecommunications carriers as well as cable operators and multichannel video programming distributors (MVPDs). Developed pursuant to congressional direction to protect consumer choice in emerging communications technologies for residents of MTEs, these rules include, for example, a prohibition on exclusivity contracts that grant the provider the sole right to access and offer service in an MTE.

61. However, these rules do not govern broadband-only providers today. Although many BIAS providers offer telecommunications, video programming, and other commingled services that subject them to the Commission's MTE rules, a provider offering only BIAS exists outside the scope of its rules. This means that while the Commission can, for example, impose rules on an entity offering both broadband and traditional phone service in an MTE, there is uncertainty about whether and when it could regulate a provider offering only the former. Even if such a provider entered into an agreement with an MTE owner barring competitors from the building outright—a type of agreement that the Commission has long declared anathema to the public interest—the Commission's rules would not apply and the Commission is not currently aware of other authority it could rely on to prevent such an agreement.

62. We thus find that reclassification of BIAS as a Title II service, which would provide us authority to regulate broadband-only providers, enables the Commission to address these potential regulatory gaps and ensure that all MTE tenants may benefit from the pro-consumer MTE rules the Commission has adopted and may adopt in the future as part of its current open proceeding.

We therefore agree with Public Knowledge that reclassification would have many benefits for MTE residents including, among others, greater competition and innovation in MTEs, lower costs for consumers, and improved customer service. Reclassification would also create the potential for parity between BIAS-only and other providers serving MTEs, as well as protections for BIAS-only providers unable to compete against those employing anticompetitive practices.

63. We disagree with CTIA—The Wireless Association's (CTIA) contention, citing the Commission's *2022 MTE Report and Order and Declaratory Ruling* (87 FR 51267 (Aug. 22, 2022)), that reclassification and regulation of the "few" BIAS-only providers in MTEs would "disregard[ ] the Commission's 'incremental approach' in this area," and that the Commission offers "no significant evidence as to why the Commission should change course now." The *2022 MTE Report and Order and Declaratory Ruling* adopted new rules and targeted additional practices that reduce consumer choice in MTEs. We note that in that proceeding's record, some commenters urged the Commission to "subject broadband-only providers to our rules governing MTE access, citing . . . potential harms that could result from regulatory asymmetry if [it] did not." The Commission declined to extend its rules to broadband-only providers at the time, citing its historically incremental approach to MTE regulation but noting explicitly that it would "continue to monitor competition in MTEs to determine whether we should alter the scope of [the] rules." However, nothing in the *2022 MTE Report and Order and Declaratory Ruling* belies commenters' claims about the harms arising out of the regulatory asymmetry, which we find remain valid today. Meanwhile, commenters in opposition to reclassification fail to raise arguments that justify failing to extend the benefits of the Commission's rules to MTE residents where a broadband-only provider offers service to a building.

64. We are also unpersuaded by CTIA's claims that broadband-only providers are so few in number that it justifies the Commission not taking any additional action to curb anticompetitive, unfair, and unreasonable practices by broadband-only providers in MTEs. Even assuming that CTIA is correct, or that the majority of service providers offer commingled services, it is unclear whether this will remain true in the future. And while

some commenters claim that the Commission failed to identify widespread abuses by BIAS-only providers in the *2023 Open Internet NPRM,* others, such as AARP, highlight that such abuses may indeed be ongoing, pointing to an alleged instance of a broadband-only provider exploiting its status to enter into an exclusivity contract. We therefore find that these abuses are not merely speculative or theoretical, and provide additional support for the Commission's decision to reclassify BIAS as a Title II service.

65. Some commenters contend that the Commission need not reclassify BIAS to protect tenants and can instead rely on its ancillary or other existing authority to address broadband-only providers. Such authority, however, does not provide the same firm legal footing as Title II and thus is less likely to offer enduring protections for residents of MTEs. WISPA, in its comments, expresses concern that reclassification of BIAS would result in rule protections for over-the-air reception devices (OTARDs) no longer being available to fixed wireless broadband-only providers and contends that this will discourage deployment of broadband in multi-tenant environments, neighborhoods lacking access to nearby towers, and similar environments. We acknowledge WISPA's concerns, and we will examine whether to revise § 1.4000(a)(5) in another proceeding. While classification of BIAS may affect the scope of services that are covered under the Commission's rules regarding over-the-air reception devices, classification of BIAS as telecommunications service may also qualify fixed wireless broadband services for the protections available under sections 332(c)(7) and 253. Although sections 253 and 332(c)(7) do not apply to restrictions by private landlords they do provide for Federal preemption of State and local zoning restrictions that "prohibit or have the effect of prohibiting" "the ability of any entity to provide any interstate or intrastate telecommunications service" and "the provision of personal wireless services."

66. Finally, we disagree with WISPA that any purported benefits of applying our MTE rules would be outweighed by a slowdown in broadband investment in MTEs precipitated by the need for BIAS-only providers to "assess the impact [reclassification more broadly would have] on their business plans." We find that to the extent our reclassification of BIAS as a Title II service would cause a BIAS-only provider to re-think an exclusive contract to serve an MTE or an otherwise anticompetitive arrangement

in an MTE, that would be an additional benefit to consumers, not a drawback. Moreover, our ability to regulate BIAS-only providers in MTEs is but one reason moving us to reclassify BIAS as a Title II service. Thus, the benefits outlined elsewhere in addition to those detailed here must be considered in the aggregate.

67. *Universal Service.* Reclassifying BIAS as a telecommunications service will also promote the universal service goals of section 254 by enabling more efficient deployment of broadband networks and greater access to affordable broadband service. In the *2023 Open Internet NPRM,* we asked how reclassification might better enable the Commission to steward our universal service programs in a way that is responsive to the communications needs of the modern economy. We specifically sought comment on how reclassification might strengthen the Commission's statutory authority to provide BIAS through the USF, eventually allow broadband-only providers to once again participate in the Lifeline program, and protect public investment in BIAS access and affordability. Reclassification enhances the Commission's ability and flexibility to address affordability and availability issues across the country, both immediately and in the future. So as to not unnecessarily disrupt the current marketplace without ample consideration, the Commission does not designate BIAS as a supported service or extend eligible telecommunications carrier (ETC) eligibility to BIAS-only providers at this time. Such action would best be considered in a future proceeding.

68. Universal Service is the principle that all Americans should have access to telecommunications services and advanced communications services at just, reasonable, and affordable rates in all regions of the Nation. The Commission administers four programs in furtherance of these principles using contributions from telecommunications carriers to the USF: the High Cost program, which helps eligible carriers recover some of the cost of providing access to modern communications networks to consumers in rural, insular, and high-cost areas; the Lifeline program, which provides discounted voice service and BIAS through eligible carriers to qualifying low-income subscribers; the E-Rate program, which provides discounts to eligible schools, school districts, and libraries to purchase affordable BIAS; and the Rural Health Care program, which provides funding to eligible health care providers to purchase telecommunications and

broadband services necessary for the provision of health care. All four USF programs fund BIAS or infrastructure and are able to rely on statutory authority to do so regardless of BIAS's classification. Classifying BIAS as a telecommunications service, however, will put the Commission on the firmest legal ground to promote the universal service goals of section 254 by enabling the Commission and states to designate BIAS-only providers as ETCs.

69. The Commission has concluded that section 254(e) of the Act allows for the use of universal service funds to benefit both the facilities used to provide supported telecommunications service, and the supported telecommunications services themselves, which permits the Commission to provide High Cost and Lifeline program support for non-telecommunications services offered over networks that also provide telecommunications services. The Commission currently conditions receipt of support on the provision of broadband service in funded networks in 11 of the 15 High Cost program funds, and also supports broadband through the Lifeline program.

70. The Commission has distinct authority to provide support for BIAS and connections through the E-Rate and Rural Health Care programs. Section 254(c)(3) specifies that ''the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).'' Subsection (h) reads, in part: ''[t]he Commission shall establish competitively neutral rules—to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries.'' The Commission has acted pursuant to section 254(c)(3) to designate BIAS as eligible for support under both the E-Rate and Rural Health Care programs. The Commission concluded at the inception of the E-Rate program that it has the authority to support BIAS access and connections ''provided by both telecommunications carriers and non-telecommunications carriers'' through the E-Rate program because ''such services enhance access to advanced telecommunications and information services for public and non-profit elementary and secondary school classrooms and libraries.'' The Commission also determined that it could fund BIAS support through the Rural Health Care program under section 254(h).

71. However, section 214(e) limits providers receiving USF support to common carriers providing telecommunications services and designated as ETCs after undergoing Commission or State commission approval processes. Currently, only carriers that offer qualifying voice telephony services can be designated as ETCs and receive support from the two USF programs that provide funds directly to carriers, the High Cost and Lifeline programs. Reclassification will allow BIAS-only providers to act as common carriers providing telecommunications service and enable them to be designated as ETCs. Indeed, after the *2015 Open Internet Order* (80 FR 19738 (Apr. 13, 2015)), the Wireline Competition Bureau designated ten such providers as ''Lifeline Broadband Providers'' (LBPs), and some of those providers began providing service that was subsidized by Lifeline support. But in 2017, the Bureau rescinded those designations, and since the *RIF Order* and the *RIF Remand Order,* standalone broadband providers have remained unable to receive critical Lifeline universal service support.

72. Allowing BIAS-only providers to participate in the High Cost and Lifeline programs would enhance both programs. Both programs are already oriented overwhelmingly toward BIAS over other service types. As discussed above, providers in most High Cost program funds are required to build BIAS-capable networks. Moreover, as of September 2023 approximately 96% of Lifeline customers subscribe to a plan that includes broadband service. Several commenters echo many of the anticipated benefits of allowing carriers that do not provide voice services to participate in the High Cost and Lifeline programs discussed in the *2023 Open Internet NPRM,* including increased competition, program participation, consumer choice, rural coverage, and affordability. The Commission also has recognized that ''encourag[ing] market entry and increased competition among Lifeline providers, which will result in better services for eligible consumers to choose from and more efficient usage of universal service funds.'' One commenter stresses that allowing BIAS-only providers to become ETCs will particularly benefit consumers in areas where there are currently few or no ETCs that provide BIAS. The need to allow BIAS-only providers to become ETCs is more important and will provide more utility than it did when BIAS was last classified under Title II, as the 2015 classification allowed Lifeline subscribers to apply the benefit to a ''new generation of ISPs that [did] not use their facilities to offer voice services,'' and now there are even more ways to provide BIAS via innovative, affordable, and user-friendly technologies.

73. Thus, we adopt the *2023 Open Internet NPRM's* tentative conclusion ''that classifying BIAS as a telecommunications service will strengthen our policy initiatives to support the availability and affordability of BIAS through USF programs.'' The majority of commenters support this conclusion. Commenters state that, through the USF, the Federal government has made significant investments in networks to ensure BIAS is available to all consumers and in service subsidies to ensure BIAS is affordable for all consumers, and reclassification ''will enable the Commission to protect these investments on an ongoing basis by ensuring that these connections benefit users.'' Commenters further stated that ''[t]he Commission needs clear authority over broadband-only services to implement and maintain an effective and efficient Lifeline policy.''

74. A minority of commenters disagree with the *2023 Open Internet NPRM's* tentative conclusion that we adopt in the Order. Several commenters argue that USF considerations are relatively unimportant because direct appropriations programs such as the Commission's Affordable Connectivity Program (ACP) and NTIA's Broadband Equity, Access, and Deployment (BEAD) Program are viable alternatives to achieving USF goals. Some commenters further argue that reclassification will deter private sector participation in the BEAD program. We find these claims to be speculative and give them no weight. Given that there is no definitive evidence that reclassification adversely affects *privately* funded BIAS investment, if it has any effect at all, *see infra* section III.H, we find the claim that reclassification would adversely affect BIAS investment that is substantially *publicly* funded to not be credible. Furthermore, we find as a general matter that new obligations on BIAS providers are unlikely to be more onerous under Title II than is the case currently, and therefore find it unlikely that BIAS providers' decisions to participate in publicly funded programs would be meaningfully impacted as a result of reclassification. At least one commenter stressed the importance of funding the ACP or making the ACP part of the USF. Another party stressed both the need to renew ACP funding and the risks of making ACP part of the

USF. These issues are the remit of Congress and the Commission is unable to accomplish either through this or any proceeding. We therefore decline to address them here. We do not believe that the strength of other programs dependent on different funding sources should prevent the Commission from strengthening the USF. Closing the digital divide is a large undertaking that benefits from multiple programs, and we note that some of these alternative programs are winding down given their lack of funding. Moreover, the Commission is statutorily required to preserve and advance the USF. One commenter contends that the benefits of reclassification to the Commission's universal service goals may not be realized because BIAS-only providers will be unwilling to assume increased oversight by State or Federal regulators to obtain ETC designation. This claim is not only speculative, it ignores the new opportunities that Title II offers to these providers to expand their networks and subscriber base through potential eligibility to participate in the High Cost and Lifeline programs. Moreover, as discussed above, the record shows significant consumer interest in allowing BIAS-only providers to become ETCs. We also make clear that reclassification only provides an opportunity to BIAS-only providers to become ETCs; it does not mandate it. Neglecting it because of the existence of other programs defies this mandate. One commenter argues that the Commission should focus on ''ensuring that funding issued through the Universal Service Funds or the Affordable Connectivity Program are not wasted or subject to fraud or abuse'' instead of reclassification. The Commission currently has strong program integrity protections for the USF programs and continues to update them as needed. USF program integrity, however, is only tangentially related to BIAS reclassification and does not have a significant impact on our actions taken in the Order. We also decline to address commenters arguing for reforms to the portions of the USF that states regulate because they are similarly unrelated to the proceeding.

75. We reject some commenters' assertions that as to universal service, reclassification is a solution in search of a problem because USF programs are functioning properly, the Commission currently has a strong legal basis to support BIAS through USF programs, and reclassification would not further, and would possibly hinder, affordability and availability goals. While we agree that the USF programs are currently

well positioned to further BIAS availability and affordability, we disagree that reclassification cannot better position the statutory basis for the Commission's universal service efforts. As noted above, with reclassification, we remove any doubt about the ability of the Commission to support BIAS-only providers with our universal service programs. While the Commission is not taking steps in the Order to allow BIAS-only providers to receive High Cost or Lifeline program support, the ever-changing nature of communications offerings may necessitate such future action to ensure that limited Commission resources are going towards services consumers need. Our action in the Order bolsters our existing legal framework and gives the Commission flexibility to establish BIAS as a supported telecommunications service.

76. We also adopt the *2023 Open Internet NPRM*'s tentative conclusion that classifying BIAS as a telecommunications service would protect public investments in BIAS access and affordability. Establishing firmer legal authority to fund BIAS through the High Cost and Lifeline programs ensures that public funds can continue to flow into network buildouts and discounted service. Commenters agree that reducing barriers to USF participation, including by potentially allowing BIAS-only carriers to participate in the High Cost and Lifeline programs in the future, will protect public investment by increasing the number of entities eligible to receive it, including small providers previously ineligible to become ETCs and providers in rural areas where there had been no or few ETCs prior. We are unpersuaded by one commenter's argument that ''the NPRM's tentative conclusion that reclassification 'protects public investments in [broadband] access and affordability' ignores the fact that, in the bipartisan [Infrastructure Investment and Jobs Act of 2021 (IIJA)], Congress appropriated tens of billions of dollars for broadband deployment, adoption, and affordability without subjecting broadband to any Title II requirements.'' Congress's choice to support discrete public investment through special appropriations does not affect whether reclassification furthers the Commission's ability to protect ongoing public investment distinct from or in concert with appropriations.

77. While we agree with the potential for expanded access to our universal service programs, we do not, however, designate BIAS as a supported service at this time. Section 254(c)(1)'s requirement that the Commission ''shall

establish periodically'' which telecommunications services meet the USF supported service standard does not require the Commission to designate universal services at any specific interval or time, much less the moment a service is classified as a telecommunications service. The record created in this proceeding is insufficient to properly and effectively address all of the concerns raised by designating BIAS a supported service. Rather than adjust our USF rules on a piecemeal basis, retaining existing supported universal services and, by extension, ETC eligibility standards, provides us the flexibility for holistically examining reclassification's effects on the USF at a later time. For this reason, we decline at this time to revise our definition of supported services.

8. Improving Access for People With Disabilities

78. We find that reclassification of BIAS under Title II will enhance the Commission's authority to ensure that people with disabilities can communicate using BIAS. Specifically, we agree with commenters that reclassification will enable the Commission to utilize its authority under sections 225, 255, 251(a)(2), and the newly adopted open internet rules to ensure that BIAS is accessible for people with disabilities.

79. People with disabilities who have access to BIAS rely on internet-based forms of communications for more effective and efficient direct and relayed communications. Reclassification of BIAS under Title II and prohibiting BIAS providers from blocking or throttling information transmitted over their BIAS networks, engaging in paid or affiliated prioritization arrangements, and engaging in practices that cause unreasonable interference or disadvantage to consumers will allow the Commission to better safeguard access to internet-based telecommunications relay services (TRS). Reclassification will also allow the Commission to ensure that BIAS and equipment used for BIAS are accessible to and usable by people with disabilities and precludes the installation of ''network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 . . . .'' These provisions work in concert with sections 716 and 718 of the Act, giving the Commission authority to increase and to maintain access for people with disabilities to modern communications. Section 716 of the Act requires that advanced communications services be accessible to and usable by people with

disabilities. Advanced communications services are: "(A) interconnected VoIP service; (B) non-interconnected VoIP service; (C) electronic messaging service; (D) interoperable video conferencing service; and (E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used." Section 718 of the Act requires that internet browsers installed on mobile phones be accessible to people who are blind or visually impaired to ensure the accessibility of mobile services.

80. For example, persons who are deaf, hard of hearing, or have speech disabilities use BIAS to connect to internet-based video applications to communicate directly with other persons who use sign language (point-to-point) and other individuals who do not use the same form of communication. These applications include Video Relay Service (VRS), which involves multi-party synchronous high-definition video and audio streaming requiring users to have a high-speed broadband connection with sufficient data and bandwidth. Under section 225, the Commission may make a telecommunications relay service like VRS available to people with disabilities, but to use VRS, those individuals must still subscribe to BIAS or mobile BIAS. Section 225 enables us to ensure that individuals with hearing and speech disabilities can use BIAS-based services to communicate in a "manner that is functionally equivalent" to the ability of a person who does not have a hearing or speech disability. As the Commission recognized in the *2015 Open Internet Order,* BIAS providers may impede the ability of the Commission to ensure BIAS-based forms of TRS are functionally equivalent if they adopt network management practices that have the effect of degrading the connections carrying video communications of persons with hearing and speech disabilities. For instance, bandwidth limits, data caps, or requirements to pay additional fees to obtain sufficient capacity can have a disproportionate negative impact on those people with disabilities who use VRS. These video-based services are used by people whose first language is sign language and are the only means of direct communications or a communications service that is functionally equivalent to voice communications services used by

persons without hearing or speech disabilities.

81. We reject the argument by some commenters that reclassification of BIAS under Title II will not enhance the Commission's authority to ensure the accessibility of BIAS or will not improve accessibility of BIAS for people with disabilities, given the existence of the Twenty-First Century Communications and Video Accessibility Act (CVAA). For example, USTelecom and CTIA argue that reclassification is "not necessary" or would have "no impact on accessibility" because Congress has already given the Commission the requisite authority to ensure the accessibility of BIAS in sections 716 and 718, which do not rely on the classification of BIAS. Reclassification will apply statutory provisions to BIAS that will enhance our ability to improve the accessibility of BIAS and internet-based communication services for people with disabilities. Specifically, as discussed below, we do not forbear from the application of sections 225, 251(a), and 255 or their implementing regulations. We disagree with USTelecom that these benefits are negligible. While the CVAA permits the Commission to adopt certain regulations concerning "advanced communications services," BIAS itself is not an advanced communications service, as specifically defined in the CVAA. For example, the CVAA directs the Commission to enact regulations to prescribe, among other things, that networks used to provide advanced communications services "may not impair or impede the accessibility of information content when accessibility has been incorporated into that content for transmission through . . . networks used to provide [advanced communications services]." Under section 716, 47 U.S.C. 617, a manufacturer of equipment used for advanced communications services must ensure that such equipment is accessible to and usable by individuals with disabilities, if achievable; and similarly providers of advanced communications services must ensure that those services are accessible to and usable by individuals with disabilities, if achievable. Accordingly, reclassifying BIAS allows us to regulate that service under Title II in ways that complements our authority over advanced communications services under the CVAA. For example, under Title II, providers of BIAS and manufacturers of BIAS equipment and BIAS customer premises equipment must ensure that such equipment and services are

accessible to and usable by individuals with disabilities, if readily achievable. In addition, section 251(a)(2) prohibits providers of telecommunications services from installing network features, functions, or capabilities that impede accessibility.

*B. Broadband Internet Access Service Is Best Classified as a Telecommunications Service*

82. We conclude that BIAS is best classified as a telecommunications service based on the ordinary meaning of the statutory definitions for "telecommunications service" and "information service" established in the 1996 Act. This conclusion reflects the best reading of the statutory terms applying basic principles of textual analysis to the text, structure, and context of the Act in light of (1) how consumers understand BIAS and (2) the factual particulars of how the technology that enables the delivery of BIAS functions. We recognize that when interpreting a statute, our "analysis begins with the text" of the statute "and we look to both 'the language itself [and] the specific context in which that language is used.'" As explained below, the Commission also has well-established and longstanding authority and responsibility, provided by Congress, to classify services subject to the Commission's jurisdiction, as necessary, using the Act's definitional criteria, including the statutory provisions enacted as part of the 1996 Act. And though not necessary to our conclusion that treating BIAS as a telecommunications service is the best reading of the Act based on the statutory text, structure, and context, our decision here is further supported by the principles set forth by the Supreme Court in *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.* (*Chevron*). Our analysis is also appropriately afforded deference under *Skidmore* v. *Swift & Co.* Commenters in the record take various positions about possible judicial deference regimes that might (or might not) apply to our classification decision. We need not linger over those disputes given that we find our classification of BIAS reflects the best reading of the Act irrespective of such considerations. We also conclude that BIAS is not best classified as an information service.

83. Our application of the statutory definitions to BIAS is driven by how typical users understand the BIAS offering. For an offering to meet the "telecommunications service" definition, the telecommunications component of the offering, from the perspective of the end user, must have

a sufficiently separate identity from the other components to constitute a separate offering of service. As the Supreme Court explained in *Brand X,* "[i]t is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product." The D.C. Circuit affirmed that consumer perception is important to determining the proper classification of a service in *USTA.* Furthermore, the Commission has consistently analyzed consumers' understanding of the offering in its decisions classifying broadband services. The *2015 Open Internet Order* and *RIF Order* both analyzed their classification decisions based on consumers' understanding of the offering. That we should understand the Act's definitional terms based on the consumer perception of the offering is also supported by the references to the "user" in the definition of "telecommunications." The record also provides support for relying on consumer perception to conduct our classification analysis, and in light of the record and the well-established basis for relying on consumer perception and BIAS provider marketing, we disagree with commenters who argue that this consideration is unsuitable to our classification analysis.

84. Our classification decision also is guided by an evaluation of the statutory definitions based on the factual particulars of how the technology that enables the delivery of BIAS functions. In *Brand X,* the Supreme Court noted that the question of what service is being offered depends on "the factual particulars of how internet technology works and [how the service] is provided." Past Commission classification decisions also indicate that evaluation of the underlying technology is an important factor. Consistent with the *2015 Open Internet Order,* we also find that the functionality of the offering is also informed by how BIAS providers market the offering, including whether the offering is focused on the transmission capabilities of the service or any information service component or capabilities that may be provided with the transmission component. We therefore disagree with commenters who argue that this consideration should not apply to our classification analysis.

### 1. BIAS Is an Offering of Telecommunications for a Fee Directly to the Public

85. We conclude that BIAS is best classified as a "telecommunications service" under the Act because it is an "offering of telecommunications for a fee directly to the public." The *RIF Order* did not dispute that BIAS providers offer BIAS directly to the public for a fee. In support of this conclusion, we find that BIAS provides "telecommunications," as defined in the Act, because it provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."

86. As the Commission has previously observed, the critical distinction between a telecommunications service and an information service turns on what the provider is "offering." The record in this proceeding leads us to the conclusion that BIAS is perceived by consumers and functions as a transmission conduit that does not alter the information it transmits. The record also demonstrates that consumers perceive—and BIAS providers market—BIAS as a standalone offering of such telecommunications, which is separate and distinct from the applications, content, and services to which BIAS provides access, and which are generally information services offered by third parties. While we ground our conclusion that consumers perceive—and BIAS providers market—BIAS as a telecommunications service on the record before us in this proceeding, we also find that the conclusions reached by the *2015 Open Internet Order* about consumer perception and BIAS provider marketing were not only accurate regarding the BIAS offered at the time, but remain accurate concerning BIAS today. Additionally, no party in the record disputes that BIAS providers routinely market BIAS widely and directly to the public for a fee, and therefore that BIAS is not a private carriage service.

#### a. BIAS Provides Telecommunications

87. The record evinces significant support for the general proposition that BIAS provides "telecommunications"; that is, BIAS provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."

88. *BIAS Transmits Information of the User's Choosing.* BIAS transmits information of a user's choosing both functionally and from a user's perspective, providing two independent, alternative grounds for this conclusion. Functionally, as a packet-switched transmission service using Internet Protocol (IP), BIAS transmits information of a user's choosing because a user decides what information to place in each IP packet that is transmitted when the user decides what information to send and receive. A user chooses to send or receive particular information when the user visits a particular website, uses a particular application, or operates a particular online device or service. We are therefore unpersuaded by USTelecom's argument that BIAS does not provide telecommunications because users often receive information that is not of their choosing, such as display advertising on a web page. That the user may not know exactly what information the user will receive does not mean that the information was not "of the user's choosing." Just as traditional voice service provides telecommunications even though a user making a telephone call does not necessarily know who will answer or what information will be conveyed in the call, BIAS provides telecommunications even when a user does not necessarily know exactly what information will be received in response to the user's selections. We are likewise unconvinced by NCTA's argument that BIAS does not transmit information of the user's choosing because, "unlike traditional, circuit-switched voice services, in which the user chooses and sends the information—*i.e.,* his or her voice—to a particular called party, broadband involves continual interaction between computers and the transmission network, as well as among computers themselves." To the extent BIAS is continually sending and receiving information, it is doing so because users are choosing to interact with websites, applications, or online devices or services, and they are therefore directing the sending and receiving of such information.

89. *BIAS Transmits Information Between or Among Points Specified by the User.* The consumer perspective and technological functionality confirm that BIAS transmits information between or among points specified by the user, providing two independent, alternative grounds for this conclusion as well. A typical consumer understands the phrase "points specified by the user" to mean the person, business, or service provider with which the user intends to share information. Therefore, when a consumer chooses to use a particular

website, application, or online device or service, the user perceives that the user is specifying the points for the transmission of the information that the user is sending or receiving. The ordinary meaning of the terms ''specify'' and ''point,'' taken together, demonstrates that users understand that when they ''specify'' the ''point,'' of their choosing, they are specifying the website, application, or online device, or service with which they wish to communicate, regardless of its physical or virtual location. We conclude that when BIAS users expressly or explicitly identify to BIAS providers the particular website, application, or online device or service they wish to access, they would understand themselves to be specifying the points between or among which the relevant information will be transmitted. Even assuming *arguendo* that ''points specified by the user'' should be interpreted more narrowly, the applications users are controlling to access information may actually know the specific destination before the transmission occurs, which provides an independent alternative basis for our conclusion. This is true, contrary to some commenters' claims, even if a user does not know the specific geographic location of that person, business, or service provider or the precise physical or virtual location or address where the requested content is stored. Functionally, a user is also specifying the IP address of their desired point even when the user enters a fully qualified domain name, such as *www.example.com*, because the domain is resolved by the DNS to the appropriate IP address. Additionally, the fact that users may specify a point associated with more than one virtual location or address (*e.g.,* due to load balancing) ''does not transform that service to something other than telecommunications.'' Indeed, the Commission has ''never understood the definition of 'telecommunications' to require that users specify—or even know—information about the routing or handling of their transmissions along the path to the end point, nor do we do so now.'' This understanding of the ''points specified by the user'' phrase is consistent with the *2015 Open Internet Order,* which noted that users ''would be quite upset if their internet communications did not make it to their intended recipients or the website addresses they entered into their browser would take them to unexpected web pages.'' Thus, ''there is no question that users specify the end points of their internet communications.''

90. That users specify the points for the transmission of their information when using BIAS is consistent with the functionality of other forms of telecommunications. For example, in the context of mobile voice service, when a user dials a number, the call is routed to a cell tower near the called party—likely the one that would provide the best user experience—just as how a BIAS user's query to a video streaming service is often directed toward the server nearest to the user. In neither case does the user know the precise geographic location of the ''point'' specified. With toll-free 800 service, a call dialed to a single telephone number may route to multiple locations that are unknown to the user. Similarly, with call bridging services, when a user dials a telephone number, the call is routed often to multiple points, all with geographic locations that are unknown to the user. Additionally, when the Commission first had the opportunity to classify a broadband service—namely, digital subscriber line (xDSL)-based advanced service—in the *Advanced Services Order* (63 FR 45140 (Aug. 24, 1998)), it concluded that the end user chooses the destination of the IP packets sent beyond the central office where the tariffed service of Bell Operating Companies (BOCs) ended, relying on the function of such voice services. The Commission did not understand any of these services to fall outside the meaning of telecommunications simply because the user did not know the precise location of the points.

91. The statutory context reinforces this understanding. The 1996 Act, which enacted the ''telecommunications'' definition, also included section 706, which directs the Commission to ''encourage the deployment . . . of advanced telecommunications capability,'' and to conduct marketplace reviews in that regard. Section 706 defines the specific sorts of ''telecommunications capability'' at issue as ''enabl[ing] users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology''—but does not separately define ''telecommunications capability'' or ''telecommunications.'' Consequently, pursuant to section 3(b) of the 1996 Act, the definition from section 3 of the Communications Act— *i.e.,* the ''telecommunications'' definition we are applying here— applies to the use of ''telecommunications'' in section 706 of the 1996 Act. It is improbable that users could be expected to have more

knowledge of the specific geographic or virtual locations between or among which ''high-quality voice, data, graphics, and video'' are transmitted than they do in the case of BIAS transmissions. Similarly, that Congress considered the information a user receives in the form of ''high-quality voice, data, graphics, and video'' to fall within ''advanced telecommunications capability'' accords with the understanding that users likewise have chosen the information they receive when accessing the internet using BIAS, even if they have not anticipated and specified its minutest details.

92. *BIAS Transmits Information Without Change in the Form or Content as Sent and Received.* BIAS transmits information ''without a change in its form or content as sent and received'' from a user perspective. The record demonstrates that users expect that their information will be sent and received without change and does not show that these user expectations are not being met. There is even record evidence that consumers have rejected past attempts by BIAS providers to change the form or content of their information. When a user ''chooses'' to stream a music video, for example, the user expects to hear the song and see the choreography without it being changed by their BIAS provider. The record does not show that the user perceives any processing or intelligence that is employed to deliver the video, let alone understands that processing or intelligence to cause a change in the form or content of that information.

93. BIAS also does not change the form or content of the information it transmits from a technical perspective. As we explain above, BIAS transmits the information of users' choosing because users decide what information should be placed in the packets that are transmitted. There is no change in the form or content of that information because the packet payload is not altered in transit. Although BIAS may use a variety of protocols to deliver information from one point to another, the fundamental premise of the internet is to enable the transmission of information without change in the form or content across interconnected networks, and any such changes would undermine that very functionality.

94. It is therefore not the case, as some commenters at the time of the *RIF Order* contended and some commenters here repeat, that the processing or intelligence that is combined with the transmission component, and that may act upon a user's information for routing purposes, changes the form or content of that information. NCTA argues, for example, that while packet content may

not change, the packet switching architecture itself—"the breaking apart, routing, and reconfiguration of these packets"—"involves a 'change in the form or content' of the information requested or sent by the user." Making a similar argument, CTIA uses streaming a video as an example, claiming that the "significant information-processing, from transforming keystrokes and clicks into machine readable languages, to dividing information into packets, to intelligently routing those packets to a server close to the user, to retrieving and processing the video data for transmission," is what makes BIAS an information service. CTIA also suggests that the form of information transmitted by BIAS is changed because the "coded information actually being transmitted looks quite different from anything the user would recognize." But the salient question under the statute is whether there is a change in form or content of the information "as sent and received." The statutory focus thus is on either end of the transmission, irrespective of any processing that occurs in between. With data communications, while the information may be fragmented into packets and unintelligible to users while in transit, "such fragmentation does not change the form or content, as the pieces are reassembled before the packet is handed over to the application at the destination," and thus the information is delivered to or from the desired endpoint as it was sent and therefore without a change in "form or content" within the meaning of the statute. The Commission has found in other contexts that protocol "processing" involved in broadband transmission causes no net change in the form or content of the information being transmitted. CTIA erroneously argues that the *Non-Accounting Safeguards Order* (62 FR 2991 (Jan. 21, 1997)) held that all protocol processing is an information service while ignoring the Commission's finding that non-net protocol processing falls under the telecommunications systems management exception.

95. NCTA's and CTIA's arguments also fail to acknowledge that BIAS is not unique or distinguished from processing and intelligent routing used by traditional telecommunications services. Mobile voice telephone service for example, relies on similar processing to support essential functions including mobile call routing, mobile paging, and handover between cellular towers. For circuit-switched calls on these networks, when a mobile user moves from one serving base station area to another serving base station area, the call is handed over from the current serving base station to the new serving base station with the help of the base station controller and the mobile switching center. Similarly, modern voice telephony (both fixed and mobile) can convert circuit-switched voice transmissions into IP packets, route those packets using the same processing as a BIAS provider does, and convert those packets back to a circuit-switched format to deliver the call. Similar conversions historically have been present in other packet-switched transmission services as well. Contrary to NCTA's and CTIA's view, none of these services are or can be understood to fall outside the meaning of telecommunications on the theory that there is a change in the form or content of the information as sent or received. CTIA tries to distinguish voice and data services, arguing that "the internet and PSTN are two fundamentally different networks" because the internet uses packet switching to route data while the PSTN uses SS7 signaling to route calls, which it says explains why they "are completely incompatible with each other and cannot directly interoperate." But CTIA does not explain why these distinct protocols and their incompatibility are independently relevant to classification determinations, and its argument merely underscores that both BIAS and voice networks involve inherent processing and signaling to ensure that information is efficiently and correctly routed. Indeed, given the prevalence of such technologies used in transmission, reaching a contrary conclusion effectively would suggest that no transmission services could ever be telecommunications, which could not have been what Congress intended. The only services that reclassification opponents argue include a net protocol conversion are certain forms of VoIP. But even assuming *arguendo* the merits of the commenters' technological description, they do not demonstrate that users of VoIP consider the conversion to effectuate material changes, let alone that they should inform our understanding of how BIAS users perceive that service, as relevant to the "telecommunications" definition.

96. Our understanding of the "telecommunications" definition in this regard also is supported by the scope of services encompassed by the meaning of "advanced telecommunications capability" in section 706 of the 1996 Act. The purported changes in form or content that some commenters associate with BIAS are no less likely to be associated with the accessing of "high-quality voice, data, graphics, and video" that Congress included within the scope of "advanced telecommunications capability" under section 706. This elicits harmonization within the 1996 Act between the "telecommunications" definition and section 706, supporting our application of the "telecommunications" definition to BIAS here. Elsewhere, the Order interprets section 706 of the 1996 Act as a grant of regulatory authority. We make clear, however, that our consideration of section 706 in our analysis here does not depend on whether section 706 is understood as a grant of regulatory authority. Separately, we recognize that the *RIF Order* concluded that BIAS is made available "via telecommunications" by reference to an amorphous set of inputs that BIAS providers use when offering service. But even accepting that, it raises more questions than answers as far as section 706 is concerned. For instance, it fails to address whether a BIAS provider's own use of telecommunications as an input into BIAS would be enough to bring it within the scope of section 706, and if so, whether the entirety of the service would fall within the scope or just those aspects—ill-defined by the *RIF Order*—that rely on telecommunications inputs. The *RIF Order* also fails to explain how those amorphous details about the underlying inputs used in BIAS could be a meaningful factor in understanding the "telecommunications" definition from a user perspective. Even if those questions had answers, we find our approach best harmonizes the "telecommunications" definition and the meaning of "advanced telecommunications capability" in section 706.

97. The user perspective and functionality of BIAS is also consistent with the ordinary meaning of the words "form" and "content," as they were understood at the time of the 1996 Act's adoption. The word "form" was understood as "a shape; an arrangement of parts," "the outward aspect (esp. apart from colour) or shape of a body," or "the mode in which a thing exists or manifests itself (*took the form of a book*)"; "the shape or appearance of something" or "the particular mode in which a thing or person appears: *wood in the form of paper*"; and "the shape and structure of something as distinguished from its material." In support of its view, CTIA cites a recent Second Circuit case purporting to define "form" as "pattern or schema," which we do not find to differ fundamentally from the definitions we provide from the time of the 1996 Act's passage. Thus, in the context of BIAS, the

question is whether the shape or appearance of the information being transmitted is changed. This might occur, for example, if BIAS manipulated the appearance of a website that a user is accessing or the presentation of the information that appears in an application—but it does not. When a user visits a website or uses an application, the information is presented in exactly the form intended by the content provider, and not a form determined by the BIAS provider. USTelecom also argues that content filtering and video optimization means that information transmission virtually never occurs ''without change in the form or content.'' Insofar as this involves ''content filtering,'' the filtered-out information is not information we consider the user to have chosen to receive in the first place. Similarly in the case of measures that guard against the distribution of malware, whether or not consumers must affirmatively opt-in to such services, the record provides no reason to believe that malware is information that BIAS users have chosen to receive. Additionally, USTelecom cites video optimization— *e.g.,* to ''reduce the demand of high-resolution video on mobile devices with small screens, mobile operators optimize the content so as to consume less bandwidth.'' But such functionality likely falls within the telecommunications systems management exception to the information service definition, and in any event, USTelecom does not suggest that video optimization causes the desired video not to play, changes the content of the video as originally sent, or causes the content not to present to the user as a video. The relevant statutory question is whether a BIAS user would see video optimization as sufficient to constitute a change in the form or content of the information chosen by the user, and the record here does not make that case. As such, BIAS transmits the form of the information to and from an end user as it is sent. The same holds true for the ''content'' of the information, a term which was understood at the time of the 1996 Act's adoption as ''the substance or material dealt with (in a speech, work of art, etc.) as distinct from its form or style''); ''the meaning or substance of a piece of writing, often as distinguished from its style or form''); ''substance, gist'' or ''meaning, significance.'' BIAS providers do not change the substance of a news article on a website, a social media post, the lyrics or melody of a streaming song, or the images that appear in a photograph or video, and

thus BIAS providers do not change the content under the ordinary meaning of that term. ACA Connects argues that BIAS includes certain capabilities, namely retrieval and storage, that can fit within the information service definition even though they do not require net protocol conversion. But ACA Connects does not explain if the capabilities to which it is referring are actually offered by BIAS providers (as opposed to edge providers) or are different from those we already address in the Order. ACA Connects also does not appear to grapple with whether such capabilities—if indeed there are any we have not already addressed—would fall under the telecommunications systems management exception or are otherwise separable. In any event, that some information-processing capabilities do not necessarily change the form or content of information only further demonstrates that when information-processing capabilities facilitate the use of BIAS, they do not inherently cause BIAS to change the form or content of the information it transmits.

b. BIAS Is a Telecommunications Service

98. BIAS is a ''telecommunications service'' because consumers perceive it—and BIAS providers market it—as a standalone ''offering'' of telecommunications that is separate and distinct from the applications, content, and services to which BIAS provides access, and which are generally information services offered by third parties. BIAS providers also market BIAS directly to the public for a fee, and it therefore is not a private carriage service.

99. *Consumers Perceive BIAS as a Standalone Offering of Telecommunications.* As evidenced in the record, there is wide agreement, among both supporters and even some opponents of reclassification, that consumers today perceive BIAS to be a telecommunications service that is primarily a transmission conduit used as a means to send and receive information to and from third-party services. The D.C. Circuit recognized this in 2016, when it stated that ''[e]ven the most limited examination of contemporary broadband usage reveals that consumers rely on the service primarily to access third-party content.'' Since that time, this consumer perception of BIAS as a gateway to third-party services has only become more pronounced. The dramatic increase in consumers' reliance on BIAS to participate in vital aspects of daily life during the COVID–19 pandemic set in stark relief the central—and critical—

importance of using BIAS to access third-party services. And, as Home Telephone notes, while a consumer ''may decide to use edge services provided by the ISP, . . . the consumer certainly is not expecting the ISP to dictate the edge services available to them when subscribing to BIAS.'' It is thus clearer now, more than ever before, that consumers view BIAS as a neutral conduit (or, in the words of one commenter, a ''dumb pipe'') through which they may transmit information of their choosing, between or among points they specify, ''without change in the form or content of the information as sent and received,'' and ''not as an end in itself.'' It is also clear from the record that the third-party services themselves rely on the neutral-conduit property of BIAS to reach their customers. Netflix emphasizes that ''[their] members . . . depend on an open internet that ensures that they can access our content and the content of many other companies through their ISP's networks without interruption.''

100. *BIAS Providers Market BIAS as a Standalone Offering of Telecommunications.* We also find that BIAS providers market BIAS as a telecommunications service that is essential for accessing third-party services, and this marketing has become more pronounced during and since the COVID–19 pandemic. In the *2015 Open Internet Order,* the Commission concluded that BIAS providers market their BIAS ''primarily as a conduit for the transmission of data across the internet,'' with fixed providers distinguishing service offerings on the basis of transmission speeds, while mobile providers advertise speed, reliability, and coverage of their networks. Although the *RIF Order* contended that ''ISPs generally market and provide information processing capabilities and transmission capabilities together as a single service,'' it did not provide examples. BIAS providers' marketing today appears even more focused than in 2015 on the capability of BIAS to transmit information of users' choosing between internet endpoints, rather than any capability to generate, acquire, store, transform, process, retrieve, utilize, or make available that information. Such marketing emphasizes faster speeds aimed at connecting multiple devices, unlimited data for mobile service, and reliable and secure coverage. INCOMPAS notes that ''some mobile BIAS providers offering 5G services are now marketing their network capacity to serve the fixed BIAS marketplace.'' Public Knowledge notes that ''[a] brief

survey of television and online advertising for both mobile and fixed broadband shows that ISPs compete with each other on the basis of speed, price, ease of use, reliability and availability.'' In those cases where BIAS providers mention edge provider services, they often advertise them as separate offerings that can be bundled with or added on to their broadband internet access services, such as discounted subscriptions to unaffiliated video and music streaming services or access to mobile security apps.

101. *BIAS Providers Market BIAS Directly to the Public for a Fee.* The concept of the ''offering'' within the telecommunications service definition is based on the principles of common carriage. If the offering meets the statutory definition of ''telecommunications service,'' then the Act makes clear that a provider ''shall be treated as a common carrier'' under the Act ''to the extent that it is engaged in providing'' such a service. The Commission also has interpreted the language of the ''telecommunications service'' definition in such a way that meeting that definition also necessarily means the service meets the definition of a common carrier service. We note that a service can be a telecommunications service even where the service is not held out to all end users equally.

102. The record does not dispute that BIAS providers market BIAS directly to the public for a fee. This factual reality aligns with our definition of BIAS as a mass-market retail service as such services are necessarily offered to the public for a fee. Because BIAS providers do in fact offer BIAS as a mass-market retail service, we conclude, as the Commission did previously, that BIAS is not a private carriage offering. Because the *RIF Order* concluded that BIAS was an information service, it did not need to reach the question of whether any aspect of the BIAS transmission offering was common or private carriage. We note that no party argues that BIAS is offered on a private carriage basis. While ADTRAN argues that the Commission permits ''a carrier to choose how to structure its offerings and decide whether to operate as a common carrier or a private carrier,'' it does not argue that any particular BIAS offering is structured as a private carriage service.

103. Additionally, since we conclude below that BIAS includes the exchange of traffic by an edge provider or an intermediary with the BIAS provider's network (*i.e.,* peering, traffic exchange or interconnection), we again conclude that the implied promise to make

arrangements for such exchange does not make the traffic exchange itself a separate offering from BIAS—private carriage, or otherwise. Even if a traffic exchange arrangement involves some individualized negotiation, that does not change the underlying fact that a BIAS provider holds the end-to-end service out directly to the public. We again conclude that some types of individualized negotiations are analogous to other telecommunications carriers whose customer service representatives may offer variable terms and conditions to customers in circumstances where the customer threatens to switch service providers. Therefore the end-to-end service remains a telecommunications service.

2. BIAS Is Not an Information Service

104. We find that BIAS, as offered today, is not an information service under the best reading of the Act because it is not itself ''the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications.'' Rather, BIAS functions as a conduit that provides end users the ability to access and use information services that provide those capabilities. DNS, caching, and other information-processing capabilities, when used with BIAS, either fall within the telecommunications systems management exception to the definition of ''information service,'' or are separable information services not inextricably intertwined with BIAS, or both, and therefore do not convert BIAS into an information service. Additionally, BIAS is not perceived by consumers or marketed by BIAS providers as an information service.

a. BIAS Does Not Offer the Capability To Process Information in the Ways Provided in the Act

105. Information services are applications whose information payload is transmitted via telecommunications. These applications provide end users with the capability to process the information they send or receive via telecommunications in the ways that Congress specified in the information service definition, including the capability to: ''generate'' and ''make available'' information to others through email and blogs; ''acquire'' and ''retrieve'' information from sources such as websites, online streaming services, and file sharing tools; ''store'' information in the cloud; ''transform'' and ''process'' information through image and document manipulation tools, online gaming, cloud computing,

and machine learning capabilities; ''utilize'' information by interacting with stored data; and publish information on social media sites. We use the term ''process'' to reference all the terms described in the information service definition: generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available. In all these respects, information services are the platforms that edge providers offer today. Furthermore, all these information services are completely distinct from the conduit—*i.e.,* the telecommunications— via which the payload for these services is sent and received. Although BIAS providers may separately offer some of these services to their subscribers, the information services most often accessed by users are provided by third parties. Below we discuss how certain such services can be used for the management, control, and operation of a telecommunications system or management of a telecommunications service, and how in those instances, those services fall into the telecommunications systems management exception to the information service definition.

106. ACA Connects argues that since ''information services by definition are offered 'via telecommunications,' . . . just because a service has a material transmission component does not necessarily mean it is a telecommunications service.'' We acknowledge in our discussion of precedent that information services are offered ''via telecommunications'' and that the existence of a material transmission component does not necessarily render a service a telecommunications service, but the classification of a service depends on the how consumers understand it and the factual particulars of how the technology functions. As we explain at length, BIAS is best classified as a telecommunications service because consumers perceive it as such and because the transmission component has a distinct identity from any information-processing capabilities. By contrast, ACA Connects diminishes, if not ignores, the core nature of the transmission component to BIAS. Moreover, ACA Connects' entire claim that BIAS is an information service offering ''via telecommunications'' rests entirely on its assertion that BIAS is an offering of DNS, caching, and third-party information service offerings. But the service BIAS providers offer that we are classifying is BIAS, and as we explain herein, BIAS is not those other services.

107. The *RIF Order* and its proponents who commented in this proceeding engage in analytical gymnastics in an attempt to fit BIAS into the definition of "information service." We are unconvinced. They first claim that BIAS itself offers subscribers the ability to process information in the ways prescribed by Congress's information service definition. This claim simply rehashes old arguments about the integration of DNS, caching, or other information-processing capabilities into BIAS offerings, which we address below. For its own part, the *RIF Order* arbitrarily found that the term "capability" is "broad and expansive" and then used that understanding to reach the conclusion that the information service definition encompasses BIAS. But the *RIF Order's* focus was misplaced. The question is not how broad the meaning of "capability" is, but what the service itself has the capability to do. As even the *RIF Order* makes clear, BIAS does not itself have the capability to process information in the ways the statute prescribes, it only "has the capacity or potential ability *to be used* to engage in the activities within the information service definition." The *RIF Order* tries to prop up its flawed analysis by claiming that the "fundamental purposes" of BIAS are "for its use in" processing information in the ways described in the information service definition and that BIAS was "designed and intended" to perform those functions. But this claim amounts to nothing more than statutory eisegesis: reading words into the definition of "information service" that are not there to reach the *RIF Order's* predetermined outcome. Having the "fundamental purpose" or being "designed and intended" to do something does not mean a service actually has the capability to do that thing. In any event, the fundamental purpose of BIAS is to serve as a conduit through which users can access and use the applications we describe above that are themselves information services. Put differently, a consumer with a BIAS connection could not generate, acquire, store, transform, process, retrieve, utilize, or make available information using that connection if those applications did not exist. We thus disagree with ACA Connects' conflation of the service offered by edge providers and the service offered by BIAS providers.

108. The *RIF Order's* expansive reading of "capability" also logically sweeps into the information service definition a category of services that is objectively different and obliterates the statutory distinction between telecommunications services and information services. For instance, under the *RIF Order's* conception of information services, the broadband internet access services provided by BIAS providers like Comcast, Verizon, and AT&T are classified as the same type of services provided by edge providers like Netflix, DuckDuckGo, and Wikipedia. But that defies reality. Furthermore, if the *RIF Order's* framework was followed through to its logical conclusion, even the most obvious of telecommunications services, traditional switched telephone service, would be classified as an information service, as it provides customers with the ability to make information available to others (*e.g.,* public service announcements), retrieve information from others (*e.g.,* through a simple phone call with another person), and utilize stored information from others (*e.g.,* by interacting with a call menu or accessing voice mailbox services). The *RIF Order* tries to get around this problem by comparing the "design," "functionality," "nature," and "purpose" of traditional telephony and BIAS, and then concluding that because they are different, BIAS cannot be a telecommunications service. But Congress did not design the Act's definitional terms to preclude the Commission from ever classifying new offerings that differ from traditional telephony as telecommunications services. If Congress had intended to foreclose that option, it could have easily done so. Rather the Act simply provides the Commission with statutory definitions for "telecommunications service" and "information service" with which the Commission can make classification determinations on an ongoing basis. As discussed above, the better reading of these definitions makes clear that BIAS is a telecommunications service as defined by the 1996 Act.

109. We are also unpersuaded by the *RIF Order's* contention, and that of some commenters in this proceeding, that BIAS is an information service by virtue of its provision of access to third-party information services. For instance, NCTA points to the U.S. Supreme Court's statement that, "[w]hen an end user accesses a third-party's website, . . . he is equally using the information service provided by the cable company that offers him internet access as when he accesses the company's own website . . ." However, the Court's statement stemmed from its affirmation of the reasonableness of the Commission's "understanding of the nature of cable modem service," as offered at the time, an understanding which we do not find applicable to BIAS as offered today. This argument conflates the critical distinction between the information services that are typically offered by third parties and are not part of the BIAS offering itself with the telecommunications services that BIAS providers offer to their customers. In doing so, the *RIF Order* and its supporters largely eliminate the category of "telecommunications services" established in the Act, which Congress could not have intended. Congress would not have devised a scheme where the definition of "information service" would largely moot the "telecommunications service" definition or confine it only to telephone service, particularly when Congress was aware that non-telephone transmission services had been offered for years under the *Computer Inquiries* as basic services. Specifically, under the *RIF Order's* framework, all telecommunications offerings used to access third-party information services that themselves have the "capability" to "store" or "transform" information would logically be transformed into information services. Such a conclusion would be inconsistent with Commission precedent. But the Commission has never, until the *RIF Order,* imputed the capabilities of such third-party information services to the telecommunications services that provide access to them. The *RIF Order* implicitly acknowledges the absurdity of this argument in finding the need to clarify that information services accessed via traditional telephone service do not convert that telephone service into an information service.

b. DNS and Caching, When Used With BIAS, Fall Within the Telecommunications Systems Management Exception

110. We find that information-processing capabilities, such as DNS, caching, and others, when used with BIAS, fall within the telecommunications systems management exception to the definition of "information service." The Act excludes from the definition of information service the use of information-processing capabilities "for the management, control, or operation of a telecommunications system or the management of a telecommunications service." We refer to this as the "telecommunications systems management exception." BIAS providers sometimes use information-processing capabilities, such as DNS and caching, to manage, control, and operate the telecommunications system

they operate and the telecommunications service they offer. Thus, when BIAS providers use DNS, caching, and other information-processing capabilities in that way, those services fall within the telecommunications systems management exception and therefore do not serve to convert the entire BIAS offering into an information service. ACA Connects suggests that we "disregard or downplay information processing capabilities" used by BIAS providers even though we provide a fulsome analysis herein of the role those capabilities play in the provisioning of BIAS. At the same time, in its filings, ACA Connects disregards or downplays the existence of the telecommunications systems management exception and how it applies to those capabilities.

111. We disagree with those commenters who argue that we should treat the transmission component of BIAS differently than the complete BIAS offering that often uses information-processing capabilities, like DNS and caching, to facilitate competition and achieve policy goals. For instance, ADTRAN advocates that we give BIAS providers a choice between complying with Title II requirements from which we do not forbear and our open internet rules for their BIAS offerings, or alternatively offering the transmission component of BIAS as a separate service subject to Title II regulation. And Mitchell Lazarus advocates that the Commission institute a Title II regime for the transport component of BIAS and forbear from all Title II regulation except a requirement that facilities-based ISPs open their facilities to competing ISPs. Both these proposals share the same fault in that they fail to recognize that the entire BIAS offering is best classified as a telecommunications service, as we explain in the Order. Because we already have identified a legally sound approach to address the issues taken up in the Order we are not persuaded that we should instead take these approaches, which these commenters recognize would likely necessitate that we defer action and issue a further notice of proposed rulemaking to address the practical details of these alternative approaches. And at least to the second proposal, it would likely compel all BIAS providers to separately offer the transmission component of BIAS as a telecommunications service, but the Commission, in 2017, expressed doubt about its "statutory authority to compel common carriage offerings . . . if the provider has not voluntarily" offered such a service itself.

112. We find that DNS, caching, and other services the BIAS providers use with their BIAS offering comfortably fit within the telecommunications systems management exception, either because they are used to manage a telecommunications service; used to manage, control, or operate a telecommunications system; or both. Even if specific capabilities might seem most naturally to fit in one category or another, so long as they ultimately fit within the telecommunications systems management exception as a whole— which we find to be the case for all the capabilities at issue here—we need not precisely identify the specific category. We reach this conclusion by evaluating these services under the exception based on the text, structure, and context of the Act in light of the functionality of the service, how the service is offered, and how consumers perceive the service. We also take into consideration the harmonization of the 1996 Act's definitional framework with the pre-1996 Act classification framework, as we discuss in greater detail below.

113. The text, structure, and context of the Act reveal that the telecommunications systems management exception operates in the aggregate to exempt from the "information service" definition those capabilities that facilitate the operation of the telecommunications system and the telecommunications service offered or provided on such system. While "telecommunications service" is a statutorily defined term, "telecommunications system" is not. Based on a number of uses of "system" in the Act, as well as the ordinary meaning of "system," we find that "telecommunications system" is best understood as the facilities, equipment, and devices that a provider uses in a network to offer or provide telecommunications services. Definitions from specialized sources provide similar definitions. Thus, management of a telecommunications service necessarily is closely interrelated with the management, control, and operation of the underlying network, equipment, and facilities used to offer or provide that service. While "manage," "control," and "operate" each have independent meanings, their ordinary meanings substantially overlap. We find that these terms are therefore best viewed as sweeping into the exception any uses of information-processing capabilities with the telecommunications service or telecommunications system that satisfy that aggregate understanding, regardless

of whether one might think they are better categorized within one of those terms or another. Read together, we find that these terms are meant to encompass the full scope of how a provider may use information-processing capabilities to manage a telecommunications service or manage, control, or operate a telecommunications system. Consequently, we ultimately need not resolve the precise contours of the individual terms in order to determine the proper classification of BIAS, and we elect not to do so at this time because such decisions could have broader implications for other classification decisions outside the context of this proceeding.

114. When evaluating information-processing capabilities under the telecommunications systems management exception, it is immaterial that a service may benefit consumers as well as providers. As the D.C. Circuit affirmed in *USTA*, the relevant question for determining whether a service falls within the exception is whether "a carrier uses a service that would ordinarily be an information service— such as DNS or caching—to manage a telecommunications service" or to manage, control, or operate a telecommunications system. Inevitably, a capability used to manage a telecommunications service or manage, control, or operate a telecommunications system will provide benefits to the provider, but the provider may also choose to use such capabilities to benefit consumers. Indeed, a service that facilitates the use of the system and service may provide better resource management for the provider and a better experience for the consumer. The relative benefit to providers and to consumers falls on a spectrum, rather than being a bright line distinction. It is therefore not the case, as the *RIF Order* claimed and some commenters reassert, that the primary or exclusive benefit of a service that falls within the telecommunications systems management exception must be directed to the providers' operations.

115. *DNS Falls Within the Telecommunications Systems Management Exception.* We conclude that DNS, when used with BIAS, falls within the telecommunications systems management exception to the definition of "information service." As explained in the *2015 Open Internet Order,* DNS, when offered on a standalone basis by third parties, is likely an information service. DNS "is most commonly used to translate domain names, such as 'nytimes.com,' into numerical IP addresses that are used by network equipment to locate the desired

content.'' We note, as we did in 2015, that although a BIAS provider's DNS server may offer other functionalities, BIAS does not depend on such functionalities and therefore they are separable from BIAS. By analogy, just as a telephone book or 411 directory assistance service enables customers of telephone service to ascertain the telephone number of a desired call recipient, DNS enables customers of BIAS to ascertain the IP address of a desired internet endpoint. DNS may still be considered analogous to an adjunct-to-basic service that would not impact the classification of the transmission service under Commission precedent, given that it facilitates use of BIAS and does not alter the fundamental character of BIAS. DNS uses computer processing to convert the domain name that the end user enters into an IP address number capable of routing the communication to the intended recipient. In addition to providing benefits to consumers, a BIAS provider's DNS service benefits the provider, as it ''may significantly reduce the volume of DNS queries passing through its network'' and can be employed by BIAS providers for ''load balancing'' and enabling efficient use of limited network resources during periods of high traffic or congestion. We thus agree with the *2015 Open Internet Order*'s conclusion that DNS ''allows more efficient use of the telecommunications network by facilitating accurate and efficient routing from the end user to the receiving party.''

116. USTelecom argues that because DNS is ''undeniably [an] information service[ ] when offered by third parties,'' we cannot also conclude that same service is used for telecommunications management by BIAS providers. It contends that *Brand X*'s holding—that the statutory definitions do not distinguish between facilities-based and non-facilities-based carriers but on the capabilities the provider offers via the service—forecloses that conclusion. We disagree. As the statute's text makes clear, the telecommunications systems management exception explicitly provides that information-processing capabilities are not information services when they are used for the purposes of managing a telecommunications service or managing, controlling, or operating a telecommunications network. Thus, the purpose for which a capability is used is key to evaluating the capability under the exception. We note that USTelecom attempts to relitigate an argument that was settled by the D.C. Circuit in *USTA.* We are not persuaded to depart from the court's understanding as reflected in

*USTA.* In the case of DNS, ''[i]t is important to distinguish between a DNS server operated by a broadband provider and a DNS server operated by an unaffiliated entity, as they have different reasons for operating a DNS server.'' While DNS offered by a third party likely does not fall within the exception because the third party is not ''us[ing] . . . such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service,'' the fact that BIAS providers use DNS to manage BIAS or manage, control, or operate their BIAS networks causes it to fall within the exception.

117. *Caching Falls Within the Telecommunications Systems Management Exception.* We conclude that caching, when used with BIAS, falls within the telecommunications systems management exception to the definition of ''information service.'' Caching ''is the storing of copies of content at locations in a network closer to subscribers than the original source of the content.'' BIAS providers use caching ''to facilitate the transmission of information so that users can access other services, in this case by enabling the user to obtain 'more rapid retrieval of information' through the network,'' and thereby offer faster BIAS to consumers. A BIAS provider also uses caching for a number of internal benefits, including ''to decrease its own bandwidth'' and for ''capacity management,'' so that the strain of subscribers' traffic on certain network segments or equipment is reduced, and to ''reduce its own transit costs, because cached information need[ ] not be retrieved across a tier-1 backbone network.'' Indeed, Verizon currently describes its caching of video content as ''network management.'' We are therefore unpersuaded by assertions that caching is used primarily or exclusively to benefit end users, and for the reasons provided above, disagree that any benefits to users disqualify caching from the telecommunications systems management exception. Richard Bennett similarly argues that caching falls outside the exception because it ''does not affect the transmission rate of bits on the network medium.'' But Richard Bennett does not point to any statutory language or Commission precedent that requires a service to ''affect the transmission rate of bits'' in order to fall within the exception. For these reasons, we conclude that caching, when offered by a BIAS provider, falls within the telecommunications systems management exception to the definition of information service.

118. Caching used by BIAS providers is distinct from content delivery network (CDN) caching. CDNs are a ''system of computers networked together across the internet that cooperate transparently to deliver content to end users, in order to improve performance, scalability, and cost efficiency.'' These servers, typically owned and managed by third-party CDN providers and not BIAS providers, cache edge provider content close to BIAS subscribers to improve subscribers' load times. As explained in the *2015 Open Internet Order,* CDNs, when offered on a standalone basis, such as by third parties, likely provision an information service. As discussed below, we exclude third-party CDNs from the scope of BIAS. One commenter references an amicus brief to argue that caching ''is not a network management function'' because ''caching is often done not by BIAS providers, but by third parties.'' This only serves to demonstrate how dispensable caching is to the provisioning of BIAS and highlights how a service can fall within the telecommunications systems management exception when used by a provider to provision a telecommunications service and not fall within the exception when it is used for another purpose.

c. Information-Processing Capabilities Are Not Inextricably Intertwined With BIAS

119. Even if, *arguendo,* DNS, caching, and other information-processing capabilities did not fall within the telecommunications systems management exception to the definition of ''information service,'' BIAS providers offer these capabilities as separate components that are not inextricably intertwined with BIAS, and therefore they do not convert BIAS into an information service.

120. Whether an information service is inextricably intertwined with a telecommunications service turns principally on whether users view the offering as a bundle of a telecommunications service and one or more information services or instead as a single integrated offering that is an information service. Users' perception of the offering can be supported by a functional evaluation focused on whether the information service components are separable from the telecommunications service components. Thus, the mere act of bundling an information service with a telecommunications service, does not, on its own, automatically cause the services to become inseparable or inextricably intertwined. In this case,

the evidence of consumer perception and the separability of the functions at issue both point to one conclusion— BIAS is not an integrated information service. To the extent that prior Commission decisions suggested that an "inextricably intertwined" analysis was an independent prerequisite to a telecommunications service classification, we are now changing course in light of our evaluation of the statute.

121. We base our conclusion first and foremost on an examination of the consumer perception of the BIAS offering, which shows that consumers do not perceive the offering as an information service. We also examine the role that DNS, caching, and other information-processing capabilities functionally play in provisioning BIAS today and find that they are separable. We reiterate the factual reality that the core element of BIAS, as offered by BIAS providers today, is the transmission component. Our definition of BIAS, remaining unchanged since 2010, makes clear that the "data transport service," or "telecommunications component," and BIAS are indeed one in the same. Without the transmission component, BIAS, as offered today, would be no service at all. As we elaborate below, the same cannot be said for DNS, caching, and other information-processing capabilities, and thus they cannot reasonably be viewed to convert the core, indispensable transmission component of BIAS into an information service. We thus disagree with commenters who argue that the *RIF Order's* approach to understanding inextricably intertwined services "best implements the Commission's long-standing view that Congress intended the definitions of 'telecommunications service' and 'information service' to be mutually exclusive." That reasoning is tautological, relying on the assumption that BIAS is an information service on the basis that it combines information-processing capabilities and a transmission component, and ignores our showing here that the information-processing capabilities fall within the telecommunications systems management exception, are separable information services, or both. We also discuss below that the availability of those services from third parties, and the use of those third-party services by consumers, demonstrate that BIAS providers' DNS and caching components are neither integral nor indispensable to their provisioning of BIAS. Given consumer perception and these functional realities, DNS, caching,

and other information-processing capabilities cannot be inextricably intertwined with BIAS and therefore they do not convert BIAS into an integrated information service.

122. The *RIF Order* tried to fortify its information service classification by asserting that DNS, caching, and other information-processing capabilities are inextricably intertwined with the transmission component of BIAS, thereby transforming BIAS into a single, functionally integrated information service—and some commenters in this proceeding endorse that proposition. But the *RIF Order* treated its "inextricably intertwined" analysis as entirely separate and distinct from the question of how users perceive the relevant "offer" without identifying any statutory basis for doing so. Even relying on this narrow analysis, the *RIF Order* reached the wrong conclusion. Although the *RIF Order* recognized that "the internet marketplace has continued to develop in the years since the earliest classification decisions," it failed to give "serious technological reconsideration and engagement" to those new factual developments. Instead, the *RIF Order* found that DNS and caching, specifically, were "indispensable functionalit[ies] of broadband internet access service" at the time the *RIF Order* was adopted. At the same time, the *RIF Order* tried to downplay the primacy of the transmission component in the BIAS offering. But "the Commission's exclusive reliance on DNS and caching blinkered itself off from modern broadband reality, and untethered the service 'offer[ed]' from both the real-world marketplace and the most ordinary of linguistic conventions." As Judge Millett wrote in her concurrence to the D.C. Circuit's decision in *Mozilla,* "the roles of DNS and caching themselves have changed dramatically since *Brand X* was decided. And they have done so in ways that strongly favor classifying broadband as a telecommunications service, as Justice Scalia had originally advocated."

123. *Consumers Do Not Perceive BIAS as an Information Service.* Contrary to record assertions, consumers do not perceive BIAS as an information service. As an initial matter, the record does not show that consumers perceive information-processing capabilities, such as DNS and caching, let alone understand those capabilities as information services and thereby view the entire BIAS offering as an information service based on those capabilities. Of the consumers that do perceive these information-processing capabilities, they are likely the consumers that would configure their

system to obtain these information-processing capabilities from third parties and therefore view them as a separate offering. In its reply, CTIA claims, without evidence, that "[c]onsumers also *know* that BIAS offer[s] these [information service] capabilities—that is why they purchase BIAS—and that BIAS relies on advanced under-the-hood technologies, regardless of whether they understand the precise mechanics of those technologies, such as advanced DNS, caching, protocol translation, dynamic network management, and other evolving services." But CTIA undercuts this claim about consumer perception in a later filing where it and USTelecom assert that nearly all consumers "do not even know what DNS does." Moreover, unlike the situation with ISPs of 30 years ago, today's BIAS consumers do not purchase BIAS to receive an all-in-one suite of information services offered by their provider, or to gain access to a "walled garden" of internet endpoints cached by their provider. Instead, as already explained, consumers' desired information services are generally the applications, content, or services offered by third-party edge providers across the global internet that provide end users with the capability to process the information they send or receive via the BIAS provider's telecommunications. Consumers view these information services as completely distinct and separable from the transmission conduits offered by BIAS providers today. Consumers understand that when they access Netflix or an Apple iCloud storage account, the BIAS provider is "offering" the "capability" to *access* these third-party services, and not that these information services are being offered by the BIAS provider itself. While consumers may "highly value" the ability to access third-party services using their BIAS connections, that does not support a conclusion that BIAS is an information service. The *RIF Order's* primary argument that consumers perceive BIAS as an information service rests on its misunderstanding that DNS and caching convert BIAS into an information service rather than fall into the telecommunications systems management exception, as we establish above. Additionally, consumers' relationship with their BIAS providers is distinct from their relationships with edge providers. Most consumers have relationships with one or two BIAS providers—*e.g.,* one for fixed residential service and one for mobile service—to gain access to the internet. Conversely, consumers may have relationships with dozens or even hundreds of edge

providers to utilize the wide range of services that ride over the top of their BIAS connections.

124. Accordingly, we are unconvinced by USTelecom's assertion that its consumer surveys show we are wrong to conclude that consumers perceive BIAS as a telecommunications service and not an information service. USTelecom relies on two consumer surveys to support its assertion. The first survey purports to show that 92% of consumers perceive broadband as providing information service capabilities, while only 8% of respondents said their broadband service offers only the capability to transmit information between or among points of their choosing. The second survey purports to remedy the faults of the first, but it not only fails to do so, it serves to further undermine the first survey. The first survey suffers from two primary faults. To start, the results are misleading because the survey was weighted by providing four "information service" options to one "telecommunications service" option and the respondents' information service selections were aggregated. USTelecom argues that "a question structure that offers multiple information service capability options, while directing respondents to select all that apply, does not bias the results." But when there are only two categories to begin with, providing one option for one category and four options for the other objectively biases the results. That fact is very clearly proven by the results of the second survey, which provided one option for the information service category and had a wildly different result. Specifically, while in the first survey, "59% of respondents selected at least one information service option without also selecting the telecommunications service option," in the second survey, only 10.8% of respondents selected the information service option without also selecting the telecommunications service option. Returning to the first survey, the second fault is that the terminology it used misrepresented the statutory language by suggesting that BIAS itself has the capability to perform the functions listed in the statute, and also used plain English language for the so-called "information service" options while using more technical language for the "telecommunications service" option. USTelecom claims "[t]hat is not a valid criticism of the survey. . . ." But to suggest that the reliability of the survey does not depend on the formulation of the questions is not only fallacious, it is proven wrong by the second survey.

While both surveys profess to measure consumer perception of broadband, their different question formulations result in markedly different results. Both surveys share the same additional fault in that they fail to treat the telecommunications service and information service categories as mutually exclusive, as we must. Thus, far from clarifying consumers' perception about BIAS, the results from the two surveys, and their shortcomings, only demonstrate that they cannot be viewed as reliable sources of consumer perception of BIAS. However, it is worth noting, given the importance of evaluating consumer perception of the offering, as established by the Supreme Court in *Brand X* and consistently affirmed by Commission and court precedent, that USTelecom's surveys do not show that consumers perceive BIAS as an information service, as opponents of reclassification would have us conclude. Indeed the second survey, which used more reliable question and answer formulations than the first, shows that more consumers perceive BIAS as providing the capabilities of a telecommunications service than providing the capabilities of an information service.

125. Consumer perception is also backed by BIAS providers' marketing practices, which also do not show, as some commenters claim, that BIAS is best understood as an information service. Contrary to NCTA's contention, BIAS providers' marketing practices do not support a conclusion that they compete on the basis of their offering of "online storage, spam filters, [or] security protections," for example. While consumers may be "aware of and value" the features offered by their BIAS providers, and some of these features also may be mentioned in BIAS providers' advertising, that does not undercut the significant evidence that BIAS providers predominantly market BIAS as a transmission service. We also agree with Public Knowledge that "BIAS provider[s'] various attempts to enter adjacent markets or bundle services with broadband do not change the nature of the service they offer, no[r] do they change 'what the consumer perceives to be the integrated finished product.' " ACA Connects argues that the "marketing of broadband service has not undergone substantial change since the inception of the service," and that such marketing "has always emphasized both the always-on capabilities that broadband service affords subscribers, including the ability to retrieve, store, and utilize the panoply of available internet content and applications, and

the fast speeds at which they are able to stream, download, and upload internet content." However, ACA Connects deflects from its failure to provide evidence to support such sweeping claims by adding that, "[t]o the extent that our Members' marketing may place a greater emphasis on speed, this is a response to increased consumer familiarity with the capabilities offered by broadband service." We are not convinced. We find that a more reasonable conclusion drawn from BIAS providers' marketing practices is that consumers select a BIAS provider based on the quality of its transmission service offering, and thus BIAS providers compete on this basis.

126. We note that at least one of ACA Connects's members, Sjoberg's Cable TV, does not appear to emphasize or even mention *any* of the information-service capabilities in its advertisement for BIAS. Indeed, ACA Connects' own members state that their "current marketing focuses on differentiating ourselves from our competitors by touting the speeds and process of our service packages" and "[t]he marketing of our broadband services *puts primary emphasis* on the speeds we offer, network reliability, and performance." ACA Connects attempts to preserve its argument by asserting that "it is unremarkable that broadband providers emphasize . . . speeds and reliability . . . while ignoring basic information-processing capabilities" because that advertising choice does not undermine its assertion that the information-processing capabilities are integrated into the offering. But the question here is what consumers perceive to be the offering, and in part due to the focus of BIAS providers' advertising on factors critical to transmission of information, consumers perceive the offering as a telecommunications service. Whether information-processing capabilities are integrated is a question of functionality that we discuss below.

127. *DNS Is Not Inextricably Intertwined with BIAS.* In reviewing the factual particulars of how DNS is functionally provided today, we find that it is a separable service that is not inextricably intertwined with BIAS and therefore does not convert BIAS into an information service. Indeed, as Free Press notes, "many ISPs have moved away from making these same tired and demonstrably false arguments that DNS service and caching transform a telecommunications service into an information service." As we noted in the *2015 Open Internet Order,* now that we conclude that DNS falls within the telecommunications systems management exception, "prior factual

findings that DNS was inextricably intertwined with the transmission feature of cable modem service do not provide support for the conclusion that cable modem service is an integrated information service.'' Claims that the internet ''would not work'' without DNS, that DNS ''is a must for broadband to function properly,'' or that there ''is no internet service without DNS,'' are simply not borne out by the architecture of BIAS. The record reveals that DNS is not necessary to IP packet transfer, which is the core function of the service. As Professor Jon Peha explains, DNS is an ''application that run[s] on top of IP packet transfer'' and that, ''[f]rom the beginning, the DNS . . . was designed to be separate from the systems that provide IP Packet Transfer Service.''

128. Even if DNS were necessary to the functionality of BIAS, the DNS offerings of BIAS providers are not themselves essential to BIAS, and therefore cannot be inextricably intertwined with their BIAS. As Professor Scott Jordan explains, because a BIAS provider's DNS server rarely serves as the authoritative resource for an IP address, their DNS server plays only a limited role in DNS—and that role is replaceable. Commenters explain that third-party-provided DNS is now widely available and used by consumers. Consumers often use third-party DNS services because their web browsers, apps, and IoT devices are configured to use those third-party DNS services. Other consumers may choose to use such third-party DNS services, which they can do with a simple configuration change. Notably, Verizon provides instructions on its website for how to change the default DNS settings or perform manual DNS lookups. The record presents evidence that third-party DNS services may now make up a significant portion of all DNS services today. Indeed, commenters who otherwise argue that DNS is essential to the functionality of BIAS carefully avoid saying that DNS *supplied by BIAS providers* is essential to BIAS's functionality. CTIA complains that ''[t]he IBM study makes no effort to distinguish IoT manufacturers' choices from consumers' choices'' and ''therefore does not meaningfully address what consumers perceive as the finished service that BIAS providers offer them.'' But the question about consumer perception of the ''offer'' is separate from the question of whether BIAS providers' DNS is essential to BIAS, and we have already shown that consumers perceive the BIAS offering as a telecommunications service and not

an information service. And contrary to CTIA and USTelecom's assertion, if BIAS providers were to stop offering DNS, their DNS functionality would be quickly replaced by alternatives without consumers needing to take any action.

129. We are unmoved by CTIA and USTelecom's arguments that the availability of third-party DNS and its use by consumers does not mean that BIAS providers' DNS is not functionally integrated with their BIAS. They first argue that consumers' use of third-party DNS is not determinative because ''the statutory touchstone when classifying services is the capability 'offer[ed].' '' But consumers' use of third-party services speaks to whether the capabilities offered by BIAS providers are functionally integrated, and the separate question of what is being offered by BIAS providers is about what consumers understand is the integrated finished product, not what discrete capabilities a BIAS provider claims itself to be offering.

130. USTelecom claims we assert that evidence of consumer perception shows that consumers perceive DNS as separable from BIAS, which it says contradicts USTelecom's survey about consumer perception of DNS, but we do no such thing. Rather, we explicitly state here and above that consumer perception is evaluated on how consumers perceive the entire offering, not how consumers perceive the individual components, and we show in the Order that consumers perceive the offering of BIAS as a telecommunications service and not an information service. Conversely, the question of whether individual components are separable is a question of functionality, and we show here that DNS is functionally separable. As such, USTelecom's assertions about consumer perception of DNS based on its survey are irrelevant. But even if consumer perception of DNS were relevant, USTelecom's survey does not show that consumers perceive BIAS providers' DNS as integrated with BIAS, as USTelecom claims. The survey says that only 17% of respondents could even identify the functionality of DNS, and only 4.8% of those respondents said they use their BIAS providers' DNS, while 83.5% of respondents did not know which DNS they use. The survey then claims those results ''*suggest* that 92% of the respondents—those who affirmatively said they are using their ISP provider's DNS as well as those who do not know what DNS does and those who know what it does but are not sure which DNS they use—are using their ISP provider's DNS.'' This conclusion is based entirely on an assumption that all

BIAS providers have a proprietary DNS system and preset that as the default DNS system for their BIAS, which USTelecom has not demonstrated, rather than use a third-party DNS system. In any event, consumers' use of their BIAS provider's DNS is not the same thing as consumers' perception as to whether their BIAS provider's DNS is functionally integrated with their BIAS. Moreover, because the survey does not say anything about whether consumers *only* use a BIAS provider's DNS, and given that browsers, apps, and devices can be preset to use third-party DNS systems, the survey results could be potentially interpreted to support the proposition that consumers use third-party DNS in addition to or instead of their BIAS provider's DNS. So to the extent that consumers' default use of DNS speaks to their perception of DNS, a question that we find is not dispositive to the underlying classification, the better conclusion is that consumers perceive DNS as relevant to their use of BIAS generally, not as integrated with a BIAS provider's BIAS offering specifically.

131. CTIA and USTelecom also argue ''that almost all BIAS users rely on the DNS provided by their BIAS provider.'' A BIAS provider's choice to offer a separable feature that is bundled with BIAS, and a consumer's use of that feature, do not on their own make that feature essential to, or functionally integrated with, BIAS. USTelecom tries to sustain the argument, asserting that just as ''[a]ftermarket vendors commonly offer consumers the ability to change out integrated features in the products they buy,'' the ''ability of end users to select different DNS servers [does not] mean that ISPs do not integrate DNS into the broadband service they offer.'' USTelecom compares DNS to ''the radio and speakers or even the engines in cars; the hard drives, RAM, and graphics cards in desktop computers; the hand brakes, seat, and pedals on bicycles; and so on.'' Even if, *arguendo,* DNS were functionally integrated with BIAS, that does not mean that DNS converts BIAS into an information service—either functionally or from a consumer perspective—any more than an engine converts a car into merely a device that changes gasoline into energy, a hard drive converts a computer into a data storage device, or hand brakes convert a bicycle into a mere stopping mechanism. As the Supreme Court held in *Brand X,* the entire question of whether DNS as provided with BIAS is functionally integrated or functionally separate turns on the ''factual

particulars of how internet technology works and how it is provided.'' And as we have already shown, DNS is a separable, application-layer service that does not technologically alter the ability of consumers to use BIAS as a transmission conduit to reach all or substantially all internet endpoints.

132. We also reject the related argument that BIAS provider DNS is intertwined with BIAS because a customer using third-party DNS loses the alleged unique benefits that arise from BIAS provider DNS, such as efficient routing of traffic to cached information. As an initial matter, there is conflicting evidence in the record on whether using BIAS provider DNS has a material benefit to end users over third-party DNS. An updated version of an article cited by CTIA states that ''[p]ublic DNS servers are often faster than those provided by ISPs due to closer geographic locations, enabling quicker DNS resolutions'' while noting that ''an untrustworthy DNS server could slow performance or pose security threats.'' It is also not evident that the EDNS Client Subnet (ECS) extension, when enabled by BIAS providers, ensures better performance over third-party DNS offerings that have also enabled the extension. In any event, that ECS is an extension that can be enabled (and disabled) shows that it is even more separable than DNS itself. In any event, that ECS is an extension that can be enabled (and disabled) shows that it is even more separable than DNS itself. Even if DNS does have a material benefit to end users over third-party DNS, we find that the mere existence of a potential consumer benefit resulting from BIAS provider DNS does not compel the conclusion that DNS is inextricably intertwined with BIAS. In any event, record evidence suggests it is more likely that BIAS providers, rather than their customers, are the true beneficiaries of their customers' use of in-house DNS given its potential to reduce BIAS providers' own transit costs.

133. *Caching Is Not Inextricably Intertwined With BIAS.* In reviewing the factual particulars of how caching is functionally provided today, we find that it is a separable offering that is not inextricably intertwined with BIAS and therefore does not convert BIAS into an information service. In particular, we find that caching offered by a BIAS provider is separable from BIAS because caching is not necessary for BIAS to work—end users can and do access data that is not cached at all. Indeed, the inherent nature of caching—to store content that has been requested by the end users and is likely to be requested

again soon—means that users will request and be able to receive information that has not yet been cached.

134. The record also demonstrates that BIAS provider caching is separable because of the drastic reduction in its use and relevance and the rise of third-party CDN caching since *Brand X.* As Mozilla explains in its comments, ''caching and CDNs have been taken out of the hands of ISPs and are largely operated by large content providers or independent companies.'' Such third-party caching is now dominant because, according to record evidence, caching offered by a BIAS provider does not work with encrypted traffic—the overwhelming majority of traffic today. CTIA and USTelecom attempt to minimize the effect of encryption on BIAS provider caching, explaining that even when a website uses HTTPS, a BIAS provider can still see the top level of the website and asserting that they ''use that information to cache entire websites, so they can resolve requests for pages associated with that website to the cached content . . . .'' But this assertion is disputed in the record. Moreover, CDNs are uniquely able to meet consumer expectations for streaming video from third-party services. We therefore disagree with NCTA that BIAS provider caching is ''as integrated into broadband offerings today as they were when *Brand X* was decided.'' The *RIF Order* incoherently reached a similar conclusion that BIAS provider caching and DNS are ''inextricably intertwined'' with transmission even though it acknowledged that ''some consumers'' use third-party caching and excluded CDN caching from the definition of BIAS. *Brand X* was decided at a time when encryption was limited and there was much lower demand for streaming video (and therefore few, if any, CDNs). Opponents do not directly dispute that BIAS provider caching is incompatible with encryption, but try to downplay this by arguing that their DNS can direct user requests to the appropriate caching server. But DNS is a separate functionality from caching and the server to which they are referring is not the BIAS providers' caching server but a third-party CDN. In any event, even if BIAS provider caching were unaffected by the increasing prevalence of encryption, no commenter disputes that CDN caching is now dominant. Some commenters conflate transparent caching offered by BIAS providers with CDN caching offered by third parties to assert that caching is inextricably intertwined with BIAS, but we are not

fooled by this chicanery. These commenters provide no justification for concluding that CDN caching, primarily sold to, and for the benefit of, third-party content providers, and which is explicitly excluded from the definition of BIAS, is also a functionally integrated component of a BIAS provider's BIAS offering—and we do not find any such justification either.

135. *Other Information-Processing Capabilities Are Not Inextricably Intertwined With BIAS.* We are not convinced by commenters who argue that BIAS is an information service because the routing and transmission of IP packets involves information-processing capabilities. CTIA, for example, argues that, because IP packet routing ''involves examination and processing of the packet at every router the packet traverses,'' information processing is inextricably intertwined with the transmission capability of BIAS itself. As an initial matter, as discussed above, the user's data—forming part of a payload within the IP packet—remains unchanged from the moment it reaches the BIAS provider's network to the moment it arrives at the desired endpoint. Thus, BIAS does not in fact *offer subscribers* the capability for processing their data—such capabilities occur at the internet endpoint selected by the subscriber. Other commenters raise old arguments that the existence of IPv4-to-IPv6 protocol transition mechanisms within BIAS is evidence of information processing that would convert BIAS into an information service. In 2016, the Internet Corporation for Assigned Names and Numbers (ICANN), a ''not-for-profit entity responsible for the technical coordination of the internet's domain name system,'' announced that its Internet Assigned Numbers Authority (IANA) allocated ''the last remaining IPv4 . . . internet addresses from a central pool'' and that ''future expansion of the internet is now dependent on the successful deployment of the next generation of internet protocol, called IPv6.'' We find that these mechanisms are designed to ensure the effective and efficient transmission of BIAS traffic and thus fit comfortably in the telecommunications systems management exception. Given the difference in packet header formats between IPv4 packets and IPv6 packets, transition mechanisms permit the interoperability between IPv4-compliant and IPv6-compliant networks, servers, and routers.

136. We also disagree with commenters who argue that BIAS is a functionally integrated information service because it may be offered in

conjunction with information services such as electronic mail, security software, smartphone applications, parental controls or spam and content filtering software, distributed denial-of-service (DDoS) mitigation, botnet notification, and firewalls. Commenters have not demonstrated, beyond making conclusory statements, that these bundled information services are not used for telecommunications systems management or are inextricably intertwined with BIAS, rather than being included in the product offering simply as the result of a marketing decision not to offer them separately. As explained in the *2015 Open Internet Order,* spam filtering and DDoS mitigation fall within the telecommunications systems management exception. As the Supreme Court affirmed in *Brand X,* the mere packaging of separable information services with a telecommunications service does not convert the telecommunications service into an information service. The Interisle Consulting Group (ICG) also notes that "[b]undles and offers do not define a service. Vertical integration of a retail product to include additional non-telecommunications services does not change the nature of the underlying services." Many of these services, such as smartphone applications, electronic mail, and content filtering software, are indeed "offered at the application layer" of the IP stack, and thus are separable from the lower network layers that facilitate transmission and routing of packets. No commenter has argued that any of these services are necessary for IP packet transfer to function. Thus, as explained in the *2015 Open Internet Order,* BIAS "is only trivially affected, if at all" by these services' functionalities. Even the *RIF Order* stated that it did "not find the offering of these information processing capabilities determinative of the classification of broadband Internet access service." For these reasons, we find that commenters have not provided new evidence of functionalities that would cause BIAS to be properly classified as a functionally integrated information service.

## C. Classifying BIAS as a Telecommunications Service Accords With Commission and Court Precedent

137. The Commission has engaged in classification decisions of various services that operate at the nexus of telecommunications and computer-based data processing for almost half a century. As has been the case in previous proceedings when the Commission has classified broadband

services, the record reveals a debate regarding the relevance and precedential value of these Commission decisions and related court rulings. As a general matter, we assign limited value to many of these past Commission decisions and find that our classification of BIAS as a telecommunications service is fully and independently supported by an evaluation of the statutory text of the 1996 Act. Nevertheless, when viewed as a whole and in the proper context, we find that, on balance, Commission and court precedent also support our classification of BIAS as a telecommunications service and that arguments from opponents of reclassification that attempt to use such precedent to undercut our statutory interpretation are unavailing.

138. Our consideration of past precedent takes two forms. In the case of pre-1996 Act precedent, we consider whether and how such precedent might have informed Congress's understanding of the definitional language it used in the 1996 Act, and how that, in turn, might support particular interpretations that otherwise flow from the statutory language and statutory context. Given the role of the Commission's *Computer Inquiries* precedent in the Commission's regulatory scheme, we are persuaded to give that precedent appropriate (if modest) weight and conclude that it reinforces our classification of BIAS as a telecommunications service under the best reading of the Act. We are more circumspect with respect to precedent related to the 1984 Modification of Final Judgment (MFJ)—the consent decree which mandated the breakup of the Bell System—as the 1996 Act expressly abrogated the MFJ's requirements. Although we do not affirmatively rely on any of that precedent, we also consider the *RIF Order* to have mischaracterized that precedent to reach an information service classification of BIAS.

139. In the case of post-1996 Act precedent concerning classification of services that relate to internet connectivity, we evaluate whether each decision supports, is distinguishable from, or is in tension with our decision, and explain any change in course. As discussed below, we find certain precedent addressing DSL service, while not precisely analogous with the circumstances here, helps reinforce our classification decision. More directly relevant and supportive are important court decisions addressing the classification of cable modem service. Other broadband service classification decisions prior to the *2015 Open*

*Internet Order* we find distinguishable on the basis of their factual predicates and/or the sufficiency or persuasiveness of the Commission's assessment of those facts. We further conclude that the classification of BIAS as a telecommunications service in the *2015 Open Internet Order,* ultimately affirmed by the D.C. Circuit in *USTA,* reinforces our conclusion that BIAS is a telecommunications service under the best reading of the Act. Likewise, the D.C. Circuit's numerous, substantial concerns about the *RIF Order's* decision being "unhinged from the realities of modern broadband service," also militate in favor of our classification of BIAS as a telecommunications service.

### 1. Relevant Pre-1996 Act Precedent

140. Pre-1996 Act precedent helps to inform our understanding of the definitions used in the 1996 Act and reinforces our decision to classify BIAS as a telecommunications service. We agree as a general matter with the significant number of commenters that submit that the pre-1996 Act *Computer Inquiries* and MFJ service definitions informed Congress's adoption of the definitional terms "telecommunications service," along with "telecommunications," and "information service," inclusive of the telecommunications systems management exception. However, we find that the *RIF Order's* heavy reliance on isolated MFJ precedent to understand the meaning of those terms in search of its predetermined information service classification was problematic. Contrary to the *RIF Order's* analysis, we find that Congress, in giving those terms meaning, would not have relied upon precedent that arose from a single isolated pre-1996 Act case, or passages of such cases, without also considering the marketplace or regulatory context present at the time of enactment of the 1996 Act. Rather, as the *Brand X* Court surmised, it is likely that Congress would have looked to "settled . . . administrative . . . interpretation[s]" of the analogous pre-1996 Act terms. Because much of the precedent that the *RIF Order* relied upon does not fall into the category of settled administrative interpretation, particularly the MFJ precedent, we conclude that it is not relevant to the classification of BIAS.

141. *The FCC's Computer Inquiries.* Through a series of proceedings collectively known as the *Computer Inquiries,* the Commission sought to foster the development of the emerging data processing marketplace by ensuring enhanced service providers' access to communications facilities and services

necessary to the growth and success of that marketplace. To that end, the *Computer II Final Decision* (45 FR 31319 (May 13, 1980)) in 1980 established "a regulatory scheme that distinguishes a carrier's basic transmission services from its enhanced services." The Commission concluded that "basic [services]" were those that offered "pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." By contrast, "enhanced services," which the Commission said had "intertwined" communications and data processing technologies, were, for example, used to "act on the content, code, protocol, and other aspects of the subscriber's information," and provide the subscriber "additional, different, or restructured information . . . through various processing applications performed on the transmitted information, or other actions . . . taken by either the vendor or the subscriber based on the content of the information transmitted through editing, formatting, etc." Under the *Computer II* regulatory approach, basic services offered on a common carrier basis were subject to Title II while enhanced services were not. The Commission used this approach to classify a wide range of services, including, for example voicemail and frame relay transmission service.

142. Despite the Commission's hope that its basic–enhanced dichotomy would be "relatively clear-cut," it acknowledged certain features of a service that "might indeed fall within [the] literal reading[ ]" of the definition of an enhanced service, but that would not change the classification of a basic service under its *Computer Inquiries* regulations because the features "are clearly 'basic' in purpose and use and [they] bring maximum benefits to the public through their incorporation in the network." The Commission coined the term "adjunct-to-basic" to describe those kinds of features, which, when included as part of a basic service, would be regulated the same way as the basic service itself.

143. Under the *Computer II* adjunct-to-basic analytical framework, the Commission permitted carriers to offer "call forwarding, speed calling, directory assistance, itemized billing, traffic management studies, voice encryption, etc." as part of the basic service, concluding that these "ancillary services directly related to the [provision of basic service] do not raise questions about the fundamental . . . nature of a given service." Carriers were also allowed to offer as basic services

"memory or storage within the network" that is used only to "facilitate the transmission of the information from the origination to its destination." Similarly, the Commission found that computer processing features, including "bandwidth compression techniques," "packet switching," and "error control techniques" that "facilitate [the] economical, reliable movement of information [did] not alter the nature of the basic service." The Commission justified its inclusion of these features in the basic service to encourage "integrat[ion] of technological advances conducive to the more efficient transmission of information through the network." We note that the *Computer III* (51 FR 24350 (July, 3, 1986)) regime did not alter this approach. Continuing this approach, in the 1985 *NATA Centrex Order,* the Commission concluded that transmission of telephone numbers, even when "transformed" by the network into a format that can be displayed to the call recipient on a display, were considered adjunct-to-basic because the number display is derived from the basic transmission service. Call forwarding was also considered adjunct-to-basic because "it does not materially change the nature of a telephone call placed to that subscriber." In subsequently applying these principles, the Commission concluded that the adjunct-to-basic exception applies to optional features or functions that are not necessary for the "basic" service to work but are merely helpful to that function.

144. In other decisions under the adjunct-to-basic framework, the Commission concluded that optional enhanced features of basic services or the use of basic services to access third-party information did not change the classification. Where enhanced features or functions are *accessed* via a provider's basic service, but are not a part, or a "capability," of the provider's own network or service (*i.e.,* are a third-party service), the service remained a basic service. Where a consumer is offered optional enhanced service components that could be combined with the basic service, but need not be, the underlying service remained a basic service, regardless of whether the consumer actually purchased the enhanced service components.

145. Given that data processing services relied on communications facilities, the ability of facilities-based carriers to also offer enhanced services over their networks created a risk that they would have the incentive and ability to discriminate against their enhanced service provider rivals. To protect against that risk, in *Computer II,*

the Commission specified that facilities-based carriers wishing to directly provide enhanced services over their own facilities were obligated to both offer the transmission component of their enhanced offerings—including internet access service—on a common carrier basis governed by Title II and acquire transmission capacity for their enhanced offerings under the same tariffed transmission service offering they made available to other enhanced service providers. Due to these obligations, any internet access provider, including an internet access provider affiliated with the facilities-based carrier and an unaffiliated, non-facilities-based enhanced service provider, was able to obtain common carrier transmission necessary to offer internet access to end users on the same tariffed terms and conditions under Title II. An end user could also obtain transmission on the same basis to connect with the internet access provider of its choice.

146. By the time the 1996 Act was enacted, the Commission had been using the *Computer Inquiries* framework and its subject-matter expertise to classify data services as either "basic" or "enhanced" for almost 16 years. Thus, Congress was well aware of the Commission's well-established classification framework at the time it enacted the 1996 Act. There is a "presumption that Congress is aware of 'settled judicial and administrative interpretation[s]' of terms when it enacts a statute." "[A] decision by Congress to overturn *Computer II,* and subject [enhanced] services to regulatory constraints by creating an expanded 'telecommunications service' category incorporating enhanced services, would have effected a major change in the regulatory treatment of those services." Although the Commission stated that it "would have implemented such a major change if Congress had required it," it did not find "an intent by Congress to do so." Rather, the Commission found "that Congress intended the 1996 Act to maintain the *Computer II* framework."

147. Given the myriad and complex array of *Computer Inquiries* decisions, we do not attempt to detail here with specificity the ways in which the Commission's *Computer Inquiries* precedent lends support to the classification decision we reach in the Order. We instead take a more measured approach, declining to give significant weight to isolated statements or draw analogies to particular classification outcomes dealing with services other than BIAS. It suffices to say that the *2015 Open Internet Order* did describe the basis for such support when

classifying BIAS as a telecommunications service and that the D.C. Circuit recognized the importance of the *Computer Inquiries* to the "structure of the current regulatory scheme" on its way to upholding that classification decision. Thus, where *Computer Inquiries* precedents are consistent with our determination that BIAS, as offered today, is best classified as a telecommunications service, they lend some support to that conclusion, and to the extent any such precedent is in tension or conflict with that understanding, we do not view them as undercutting that determination grounded in the best understanding of the statutory text. We are therefore uncompelled by the *RIF Order's* suggestion that only a "drop" of an information service (*i.e.,* DNS or caching) combined with the transmission component, is sufficient to transform BIAS into an information service, regardless of consumer perception or the functional realities of the offering. The *RIF Order's* conclusion implicitly relies on isolated *Computer Inquiries* precedent finding that when a non-facilities-based ISP, as understood at the time, combines a telecommunications input purchased from a facilities-based provider with its own enhanced service, the enhanced service "contaminated" the resold transmission service such that the combined service sold to the end user is always an enhanced service. As an initial matter, that theory never applied to facilities-based providers, and some BIAS providers are facilities-based. Moreover, the 1996 Act's definition of a "telecommunications service" makes clear that definition applies "regardless of the facilities used."

148. *The MFJ Antitrust Consent Decree.* Similar policy concerns to those at issue in the *Computer Inquiries* were at play when, in 1982, the Department of Justice (DOJ) reached a negotiated settlement with AT&T and filed an MFJ with the D.C. Federal District Court to end a decades-long antitrust case. As with the *Computer Inquiries,* a policy objective of the MFJ regulatory regime was to guard against the risk of carriers harming competitive providers of data processing services. Among other things, the MFJ prohibited BOCs from providing "interexchange telecommunications services or information services."

149. As in the *Computer Inquiries,* the MFJ distinguished between basic and enhanced services, but instead used the terms "telecommunications services" and "information services," respectively. The MFJ defined a "telecommunications service" as "the

offering for hire of telecommunications facilities, or of telecommunications by means of such facilities." In turn, "telecommunications" was defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received, by means of electromagnetic transmission medium, including all instrumentalities, facilities, apparatus, and services (including the collection, storage, forwarding, switching, and delivery of such information) essential to such transmission." The court defined "information service" for the purpose of the MFJ as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications." The MFJ information service definition also included an exception analogous to the "adjunct-to-basic" exception under the *Computer Inquiries.* Specifically, "information service" did "not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." Over time, the courts overseeing the MFJ developed a limited body of precedent regarding what was an "information service," but did not squarely address the question of how internet access service fit within the MFJ's definitional framework.

150. The *RIF Order's* invocation of MFJ precedent to support its classification decision reflects significant flaws. To begin, its reliance on that precedent was predicated in part on the 1996 Act's use of the information service definition established in the MFJ, a fact which we do not dispute when placed in the proper context, as described below. But the historical context shows that Congress did not necessarily intend for such reliance. Because the D.C. Circuit also was not presented with the considerations we identify here for giving little weight to MFJ precedent, its acceptance of certain of the *RIF Order's* conclusions based on MFJ precedent in *Mozilla* does not undercut our contrary conclusions here. Unlike with the *Computer Inquiries,* which the Commission found Congress did not intend the 1996 Act's definitional framework to supplant, the 1996 Act expressly abrogated the MFJ's requirements, and replaced them with those enacted as part of the 1996 Act. Indeed, the regulatory approach in the MFJ is diametrically opposed to that in the 1996 Act. While the 1996 Act's

regulatory approach broadly tracks that of the *Computer Inquiries,* with "telecommunications services" subject to common carrier regulation and "information services" not subject to common carrier regulation, under the MFJ, an "information service" classification led to maximal regulation—a complete ban on the provision of the service—for the carriers subject to that regulatory regime. Thus, the relevance of MFJ precedent is better viewed narrowly, rather than expansively, as done in the *RIF Order,* given the origins of that precedent in a regulatory framework Congress expressly chose to displace.

151. The *RIF Order's* reliance on MFJ precedent is also contrary to our measured approach, and thereby suffers from the same faults it claimed plagued the *2015 Open Internet Order's* reliance on the *Computer Inquiries* precedent— namely, viewing the precedent out of context and making imperfect analogies without adequately accounting for potentially distinguishing technical details and the regulatory context. It exhibited this practice most prominently by ignoring the MFJ framing of maximal regulation of information services. But it also mischaracterized specific precedent it relied upon.

152. For instance, the *RIF Order,* and some commenters, mischaracterized MFJ precedent "analyzing 'gateway' functionalities by which BOCs would provide end users with access to third party information services." While the *RIF Order* acknowledged "that gateway functionalities and broadband internet access service are not precisely coextensive in scope," it nonetheless purported to "find similarities between functionalities such as address translation and storage and retrieval to key functionalities provided by ISPs as part of broadband internet access service," and claimed that "the court found such gateway and similar functionalities independently sufficient to warrant an information service classification under the MFJ." CTIA quotes from the 1987 *MFJ Initial Gateway Decision* to argue that gateway services "rang[ed] from mere database access to such sophisticated services as teleshopping, electronic banking, order entry, and electronic mail." But in the quoted passage the court is describing such services generally, not specifically the offered BOC gateway service. This characterization of the MFJ court's conclusions is misleading, at best. Read in context, it is not evident the MFJ court concluded that the address translation and storage and retrieval features of the gateway service were

independently sufficient grounds for an information service classification. In relying on the court's treatment of "address translation," the *RIF Order* cited a high-level statement from the court "that the transmission of information services at issue there 'involves a number of functions that by any fair reading of the term 'information services' would be included in that definition.'" But the court never concluded that address translation was important to its conclusion that the gateway service is an information service. It merely listed address translation as one of the five functions that were part of the "infrastructure necessary for the transmission of information service," and there is no basis for concluding that all five of these functionalities were independently sufficient to justify an information service classification. Indeed, when confronted with arguments that "the Regional Companies are entitled to provide [address translation] even now under the decree as part of the permissible 'forwarding or routing' functions of 'information access,'" the court did not respond by asserting that it actually constituted an information service, but instead by pointing out that "the Court has concluded otherwise, *particularly since section IV(F) prohibits interexchange routing*." Further, as to some of the other listed service components, the MFJ court appears to strongly suggest that it might not cause the gateway service to be classified as an information service. In sum, the notion that the footnote relied on by the *RIF Order* should be read to suggest that each function of the gateways was independently sufficient to constitute an information service seems highly doubtful and is at most ambiguous. Nor are we persuaded to reach a contrary conclusion by a high-level assertion by the court that a carrier's "gateway proposal appears to be a variant" of "information services." Although the MFJ court analyzed storage and retrieval as a distinct issue, the court's view of that functionality encompassed that are more clearly viewed as information services, "such as voice messaging, voice storage and retrieval (VSR), and electronic mail," and therefore are not coextensive with BIAS. We also note that *RIF Order* did not address the D.C. Circuit's conclusion that the gateway service included a separate offering of telecommunications transmission, similar to the Commission's conclusion in the *Advanced Services Order* that DSL included a separate offering of transmission. For this reason, as well as the other concerns we raise in relying

on this case and the MFJ precedent in general, we conclude that we need not adjudicate whether the MFJ permitted the generation of information by BOCs instead of their transmission or whether that distinction is relevant to the classification determination we make in the Order.

153. We also conclude the *RIF Order* misinterpreted the single MFJ case it relied upon in concluding that the telecommunications systems management exception to the information service definition should exclude functions directed at end users or customers. While *Mozilla* accepted the *RIF Order's* analysis of the MFJ case as reasonable, it did not conclude that it was the only or best reading. In classifying Telecommunications Device for the Deaf (TDD) service as an information service, the MFJ court concluded that that "the very crux and purpose" of TDD service was the "transformation of information" and "it is patently obvious that what is being sought does not involve the internal management of Bell Atlantic." Although the MFJ court noted that the telecommunications systems management exception "was directed at internal operations, not at services for customers or end users," the facts did not require the court to meaningfully grapple with the full meaning of the exception.

154. In all events, the MFJ court's view of the telecommunications systems management exception is not inconsistent with the view we reiterate in the Order that a service can fall under the 1996 Act's exception if it is used by the provider to manage, control, or operate a telecommunications system, even if the service may also benefit end users. Indeed, the court also explained that it had applied that exception to "allow[ ] the regional companies to provide directory assistance to their own customers," which unambiguously provides benefits for callers. Likewise, the *Mozilla* court recognized that an evaluation of provider and customer benefit from a given function involved "a spectrum or continuum" that "requires a decider to select a point where both ends are in play." Thus, to the extent that these MFJ court precedents are relevant to our classification analysis, they do not clearly show that the relevant functions must not be so significantly focused on benefitting end users or customers (rather than providers) to fall within the telecommunications systems management exception.

## 2. Post-1996 Act Classification Decisions

155. As mentioned above, when Congress enacted the 1996 Act, it codified statutory definitions that reflected the dichotomy of services established by the *Computer Inquiries* and MFJ frameworks. Specifically, the 1996 Act's definitions of "telecommunications service" and "information service"—including the telecommunications systems management exception to the definition of "information service"—largely track the definitions of those same terms in the MFJ. We note that while Congress adopted the terminology of the MFJ's definition of "information service," for the reasons we discussed above, we reject the view that Congress thereby intended that the Commission would be bound by MFJ precedent going forward. And the 1996 Act's regulatory approach to that dichotomy of services broadly tracks that of the *Computer Inquiries'* treatment of basic services, enhanced services, and adjunct-to-basic services, with "telecommunications services," inclusive of associated services that fall into the telecommunications systems management exception, subject to common carrier regulation and "information services" not subject to common carrier regulation. As noted, just two years after the 1996 Act's passage, the Commission confirmed that Congress had incorporated the Commission's prior classification scheme under the *Computer Inquiries* in adopting the 1996 Act. And the Supreme Court affirmed that understanding in *Brand X*, stating that "Congress passed the definitions in the Communications Act against the background of [the *Computer Inquiries*] regulatory history, and we may assume that the parallel terms 'telecommunications service' and 'information service' substantially incorporated their meaning, as the Commission has held." We disagree with NCTA that the sole fact that Congress enacted the terms "telecommunications service" and "information service" "against the backdrop of [the] Commission's own refusal to treat enhanced service offerings . . . as 'basic,' " provides evidence of "Congress's intent to classify broadband as an information service." NCTA attempts to connect the dots by claiming that the Commission classified "the forerunners of broadband" as enhanced services, but it only cited to a single Bureau-level order from the 1980s that classified a service wholly dissimilar from modern BIAS as an enhanced service. And although

Commission precedent did treat "internet access" as it existed around time of the 1996 Act as an enhanced service, as we make clear below, the nature of BIAS is significantly different than the Commission's understanding of internet access during that period of time.

156. In implementing the 1996 Act, the Commission harmonized its earlier classification decisions with the 1996 Act's new terms for the sake of providing regulatory certainty, and continued to draw on such pre-1996 Act precedent for support in classifying services under the 1996 Act's categories. There was no need for the Commission to consider reconciling the MFJ with the 1996 Act because section 601(a)(1) of the 1996 Act expressly replaced the MFJ's requirements with those enacted as part of the 1996 Act. Over the course of almost three decades since the passage of the 1996 Act, the Commission has considered the regulatory classification of a variety of services that relate to internet connectivity. In those decisions, the Commission has debated the practical significance of the *Computer Inquiries* and later classification decisions that preceded the decision under consideration. But as was observed by Justice Scalia in his *Brand X* dissent, the actual differences in Commission classification decisions have comparatively little to do with interpretation of statutory terms—like "offer"—and instead turn principally on the best understanding of particular facts, such as "the identity of what is offered." As we describe below, over the span of time since the 1996 Act's enactment, the underlying service that ISPs offer consumers, and indeed, what even constitutes "internet access," has shifted, and with it, the meaning of what constitutes an internet service provider. This shifting landscape challenged the Commission in conducting factual analyses in connection with these classification decisions. As such, the Commission reached different classification decisions based on different factual characterizations of how the relevant "offer" would be understood from a functional and end-user perspective. These factual characterizations often were informed by—and in the case of the *RIF Order,* were motivated by— policy objectives, and as such, the factual characterizations varied in their reasonableness. For these reasons, prior classification decisions, far from being a "uniform regulatory history," do not provide consistent, let alone persuasive, evidence that modern-day BIAS is best

classified as an information service under the 1996 Act. Some commenters observe that Commission actions shortly after the adoption of the Act can be particularly persuasive evidence of Congressional intent. But that does not provide a justification for attempting to apply early Commission decisions implementing the 1996 Act outside their logical context, or for overriding the direction gleaned from the text and statutory context. We thus reject arguments that neglect the material differences between present circumstances for BIAS and decisions like the *Stevens Report.* In our decision in the Order, we lay out the facts concerning how modern-day BIAS is offered based on how it functions and is perceived, and follow those facts to the most logical outcome under the best reading of the statutory text. In doing so, as detailed above, we find that BIAS is best understood as a telecommunications service under the Act's definitional framework.

157. *Stevens Report.* When the Commission first considered how best to classify "internet access service" under the 1996 Act, that service, being at a nascent stage of development, differed substantially from the BIAS we classify in the Order in how it was offered, and how consumers perceived the service. In 1997, for the purpose of implementing the universal service provisions of the 1996 Act, Congress directed the Commission to review, *inter alia,* the definitions of the term "information service," "telecommunications," and "telecommunications service," including how those definitions apply "to mixed or hybrid services and the impact of such application on universal service definitions and support . . . including with respect to internet access." In response, in 1998, the Commission adopted a Report to Congress commonly referred to as the *Stevens Report.* We disagree with Consumer Action for a Strong Economy's argument that the 1996 Act, in "creat[ing] a new framework for Title I 'Information Services' as a modern alternative to sclerotic, New Deal-era Title II rules[,]" reflected a "bipartisan consensus for lightly regulating high-speed broadband." But even assuming such a consensus had existed with respect not only to the fundamentally different internet access service of the time, but also to *broadband* at such a nascent stage of its development, the *Stevens Report* makes clear that Congress preferred that the Commission decide its classification. And indeed, as we discuss below, the very year the

Commission did so with respect to "internet access service" in the *Stevens Report,* the Commission also classified broadband provided via DSL as a telecommunications service subject to Title II. We also disagree with LARIAT's contention that "Title II itself—with provisions explicitly mentioning differing charges dependent upon the source, destination, time, and purpose of communications—was not designed to regulate the internet, especially one that was 'neutral.' " Beyond the fact that LARIAT provides only a vague description of the provisions it claims are not well-suited to regulating BIAS— and does not appear to consider how tailored forbearance could ameliorate such concerns—we find that the *Stevens Report* makes clear that Congress did not intend to foreclose application of Title II to new services.

158. At the time of the *Stevens Report,* internet access service providers typically did not own facilities or provide last-mile transmission themselves, instead providing their services over an unaffiliated telecommunications carrier's public switched telephone network (PSTN). ISPs primarily offered their customers a suite of application-layer services such as World Wide Web, newsgroups, and electronic mail using their own computer systems. Some ISPs did not yet even provide their subscribers direct access to the wider internet, instead solely offering portals to "walled gardens" of proprietary content. In order to reach these application-layer services, an end user typically first had to purchase a telecommunications service from an unaffiliated carrier. The *Stevens Report* drew on the "intertwined" language of *Computer II,* and coined the term "inextricably intertwined" to assert its belief that, because the "core of the internet and its associated services" offered by providers were information services, "internet access service" itself was an information service, being dominated by such components.

159. The *Stevens Report* reserved judgment on whether entities that provided internet access over their own network facilities were offering a separate telecommunications service, and observed that "the question may not always be straightforward whether, on the one hand, an entity is providing a single information service with communications and computing components, or, on the other hand, is providing two distinct services, one of which is a telecommunications service." Notably, at the time of the *Stevens Report,* BIAS was at "an early stage of deployment to residential customers"

and constituted a tiny fraction of all internet connections. As we establish above, modern-day BIAS both functions and is perceived vastly differently from the "internet access service" considered in the *Stevens Report*, so we thus disagree with commenters who argue that the *Stevens Report*'s assessment of the service offered at the time has precedential value to our decision making in the Order.

160. *Advanced Services Order and Order on Remand.* In the same year that the Commission adopted the *Stevens Report*, the Commission first classified an early form of BIAS—namely, digital subscriber line (DSL) service provided over the wireline telephone network—as a telecommunications service. The *Advanced Services Order* was subject to a voluntary remand requested by the Commission. The Commission explained in the *2015 Open Internet Order* why the further history of the *Advanced Services Remand Order* (65 FR 7744 (Feb. 16, 2000)) is not relevant here. In the 1998 *Advanced Services Order*, the Commission defined DSL-based advanced service as encompassing: (1) the transmission of a customer's data traffic from the customer's modem to the telephone company's central office; (2) the transmission between the central office and an interconnection point across the telephone company's packet switched network; and (3) interconnection arrangements with other providers as necessary to fulfill the service. The Commission distinguished this service—as we do in the Order with our definition of BIAS—from what it considered to be "internet access": the same bundle of application-level offerings (*e.g.*, World Wide Web, email, newsgroups, and portals) described in the *Stevens Report*. The Commission therefore concluded that "[a]n end-user may utilize a telecommunications service together with an information service, as in the case of internet access. In such a case, however, we treat the two services separately: the first service is a telecommunications service (*e.g.*, the [ ]DSL-enabled transmission path), and the second service is an information service, in this case internet access." In the 1999 *Advanced Services Remand Order*, the Commission affirmed its conclusion that "[ ]DSL-based advanced services constitute telecommunications services as defined by section 3(46) of the Act." The definition of telecommunications service is now in section 3(53) of the Act. DSL-based broadband providers were thus subject, under these *Orders*, to Title II in relevant part. In light of the factual

circumstances underlying the Commission's classification of DSL, we find the *Advanced Services Order* informative as to the best classification of BIAS today. Although the classification decision in the *Advanced Services Order* arose in the context of the *Computer II* requirement that facilities-based carriers offer the transmission underlying their enhanced service offering on a common carrier basis, and therefore the DSL transmission service was not a "retail" service within the meaning of the resale obligation in section 251(c)(4) of the Act, that does not alter the marketplace reality that this common carrier transmission service was nevertheless available for purchase by retail end users as well as wholesale customers, despite the *RIF Order*'s suggestion to the contrary. Retail end users could rely on that common carrier transmission service to access the application-layer services offered by the ISPs of the time, consistent with the explanation of telecommunications services and information services that the Commission laid out in the *Stevens Report*. The *RIF Order*'s further complaint that DSL common carrier transmission service "[did not] itself provide internet access[ ]" does not demonstrate that the purchase from two suppliers rather than a single supplier is inherently material to the classification analysis.

161. We disagree with the U.S. Chamber of Commerce which argues that the *Advanced Services Order*'s classification of "internet access" as an information service supports "the textual reading . . . that BIAS is best classified as a Title I 'information service.'" As we explain here, the "internet access" described in the *Advanced Services Order* was fundamentally different from the BIAS we classify in the Order, being a non-facilities-based suite of application-layer information services to which users connected via their DSL-based broadband provider. Today's BIAS, conversely, more closely resembles the DSL-based broadband classified as providing telecommunications service. We find that BIAS (as defined in the Order) provides a transparent conduit to edge providers' information services. We also disagree with NCTA's attempt to discount the relevance of the *Advanced Services Order*'s classification of DSL-based broadband service as a telecommunications service by claiming that the *Order* only considered the classification of "*wholesale* DSL transmission[ ] which incumbent telephone companies

historically offered to ISPs such as AOL or Earthlink as a telecommunications service unbundled from internet access, [rather than] *retail* broadband service." This reading defies the very language in the *Advanced Services Order* which clearly considered the service to be offered both to end users and to ISPs.

162. *Classification of Cable Modem Service.* The regulatory classification of cable modem service was unaddressed when the Ninth Circuit had occasion to consider it in *City of Portland*. There, the court found that cable modem service was a telecommunications service to the extent that the cable operator "provides its subscribers internet transmission over its cable broadband facility." The court found that cable modem service, "like [the internet access service of] other ISPs, . . . consists of two elements: a 'pipeline' (cable broadband instead of telephone lines), and the internet service transmitted through that pipeline," but "unlike [the internet access service of] other ISPs, [the cable modem service provider] *controls all of the transmission facilities between its subscribers and the internet.*" The Ninth Circuit also noted that the Communications Act "includes cable broadband transmission as one of the 'telecommunications services' a cable operator may provide over its cable system." Following *City of Portland*, two other courts had the opportunity to consider the application of cable modem service, neither of which we find undercut the weight the Ninth Circuit's conclusion lends to our independent conclusion that today's offering of BIAS is best classified as a telecommunications service.

163. Three months after the *City of Portland* decision, the Commission issued the *Cable Modem Notice of Inquiry* (65 FR 60441 (Oct. 11, 2000)), which sought comment on whether cable modem service should be classified as a telecommunications service under Title II or an information service subject to Title I. That proceeding culminated with the *Cable Modem Declaratory Ruling* (67 FR 18848 (Apr. 17, 2002)). Based on a factual record that had been compiled at that time, the Commission described cable modem service as "typically includ[ing] many and sometimes all of the functions made available through dial-up internet access service, including content, email accounts, access to news groups, the ability to create a personal web page, and the ability to retrieve information from the internet." The Commission found that cable modem service was "an offering . . . which combines the transmission of data with computer

processing, information provision, and computer interactivity, enabling end users to run a variety of applications." The Commission further concluded that, "as it [was] currently offered," cable modem service as a whole met the statutory definition of "information service" because its components were best viewed as a "single, integrated service that enables the subscriber to utilize internet access service," with a telecommunications component that was "not . . . separable from the data-processing capabilities of the service." We disagree with the U.S. Chamber of Commerce which argues that the *Cable Modem Declaratory Ruling's* classification of cable modem service as an information service supports "the textual reading . . . that BIAS is best classified as a Title I 'information service.'" As ACA Connects explains, the Commission arrived at its conclusion after reviewing the factual record of how providers offered, and consumers perceived, the service at the time. However, we disagree with both commenters that, somehow, this 22-year-old factual record has bearing on the classification of modern-day BIAS. As we amply show above, the record we received confirms that providers' offering of broadband service has indeed changed dramatically, and so have consumers' perception of the service. While the *Cable Modem Declaratory Ruling* did not mention the "inextricably intertwined" language from the *Stevens Report* or the earlier "intertwined" language from *Computer II*, it followed their classification approach in concluding that cable modem service, as viewed by the end user, was dominated by the information service aspects. The *Brand X* Court cited to the *Stevens Report's* use of "inextricably intertwined" to analogize to the *Cable Modem Declaratory Ruling* classification analysis.

164. The *Cable Modem Declaratory Ruling* faced a legal challenge, but was ultimately upheld by the U.S. Supreme Court in *Brand X*. *Brand X* recognized that the *Cable Modem Declaratory Ruling's* Title I classification was a "reversal of agency policy" and "change [in] course" from the Commission's original classification of broadband in the *Advanced Services Order,* but held that it was permissible under the broad deference required by *Chevron.* Specifically, the Court held that the word "offering" in the Act's definitions of "telecommunications service" and "information service" is ambiguous, and that the Commission's finding that cable modem service is a functionally integrated information service was a permissible, though perhaps not the best, interpretation of the Act. NCTA misleadingly states that the Court's conclusion in *Brand X* "confirmed that Congress never clearly intended for broadband to be treated as a telecommunications service." By holding that the term "offering" in the 1996 Act is ambiguous, the Court also confirmed that Congress never clearly intended for broadband to be treated as an information service, and thus deferred to the Commission's decision under *Chevron.* The Court explained that the Act's definitions turn on what the cable modem service provider is understood to be "offering" to consumers, which in turn depends on what consumers reasonably perceive the offering to be. Based on the administrative record before the Commission in 2002, the Court found "reasonable" "the Commission's understanding of the nature of cable modem service"—namely, that "[w]hen an end user accesses a third party's website," that user "is equally using the information service provided by the cable company that offers him internet access as when he accesses the company's own website, its email service, or his personal web page," citing as examples the roles of DNS and caching. In the wake of *Brand X,* the Commission proceeded to adopt information service classifications of internet access service offered via wireline networks, power line networks, and wireless networks, though the Commission continued to recognize that ISPs could offer broadband transmission as a telecommunications service subject to Title II, and many did.

165. The *Cable Modem Declaratory Ruling,* and the successive decisions following it, are not determinative of the classification of modern-day BIAS. The *Cable Modem Declaratory Ruling* was based on a record developed in the early 2000s—when ISPs were still viewed as playing a crucial role in the availability of websites, email, newsgroup access, and the like. And the follow-on classification decisions substantially relied on the record compiled in the *Cable Modem Declaratory Ruling* proceeding. The factual circumstances, as characterized by the Commission then, differ substantially from the functional and marketplace realities of BIAS today, to say nothing of the fact that none of these decisions considered the applicability of the telecommunications systems management exception to the information service definition. The *Cable Modem Declaratory Ruling* and the *Wireline Broadband Classification Order* (70 FR 60222 (Oct. 17, 2005)) mentioned the exception in quoting the statutory definition of "information service," but did not analyze its potential applicability, such as to DNS.

166. While the *Cable Modem Declaratory Ruling* itself has limited relevance to our classification of modern-day BIAS, the Supreme Court's opinions on it lends some support to the telecommunications classification we reach in the Order. In upholding the *Cable Modem Declaratory Ruling* on reasonableness grounds, every Justice joined opinions that, at best, showed that the *Cable Modem Declaratory Ruling's* understanding of the factual circumstances was becoming increasingly outdated even at the time. Justice Thomas, writing for the majority, noted that "our conclusion that it is *reasonable* to read the Communications Act to classify cable modem service solely as an 'information service' leaves untouched *Portland's* holding that the Commission's interpretation is not the *best* reading of the statute." Justice Breyer's concurrence cautioned that the Commission's information service classification was "perhaps just barely" permissible. And in dissent, Justice Scalia, joined by Justices Souter and Ginsburg, found that the Commission had adopted "an implausible reading of the statute" and that "the telecommunications component of cable-modem service retains such ample independent identity" that it could only reasonably be classified as a separate telecommunications service. As we demonstrate above, today's BIAS is now entirely divorced from providers' information service offerings on which the *Cable Modem Declaratory Ruling* rested its classification decision. If cable modem service may have been best understood as a telecommunications service then, modern BIAS most certainly is best understood as a telecommunications service now.

167. *2015 Open Internet Order.* In 2015, the Commission first considered the classification of "broadband internet access service," as defined by the *2010 Open Internet Order* (76 FR 59192 (Sept. 23, 2011)), narrowly focused on the transmission component of the service and any capabilities that are incidental to and enable the operation of that service, and irrespective of the technology over which that service is provided. In doing so, as we do here, the Commission reviewed its prior classification decisions concerning dial-up internet access service, DSL-based advanced service, cable modem service, wireline broadband service, and wireless broadband service, and weighed the relevance of such decisions

on a classification of BIAS based on the factual circumstances under which it was then offered. The Commission concluded that fixed and mobile "broadband internet access service" is a telecommunications service, finding that "broadband internet access service, as offered by both fixed and mobile providers, is best seen, and is in fact most commonly seen," as a "separate offering' " of transmission capacity that "is today sufficiently independent of . . . information services" such as "email and online storage." The Commission first defined "broadband internet access service" in the *2010 Open Internet Order*. The *2015 Open Internet Order* also concluded that the bundling of certain services, such as DNS and caching, with broadband internet access service, does not "turn broadband internet access service into a functionally integrated information service."

168. In 2016, the D.C. Circuit upheld the *2015 Open Internet Order* in full in *USTA*. Requests for rehearing en banc were denied in 2017 in *USTA II*, 855 F.3d 381. Of note, two judges concurring in the denial of rehearing en banc reiterated *Brand X's* conclusion that a telecommunications service classification was both reasonable and the best reading of the Act. The court found that the Commission's conclusion that consumer perception of BIAS as a separate offering of telecommunications found "extensive support in the record," "justify[ing] the Commission's decision to reclassify broadband as a telecommunications service." It also affirmed the Commission's view that DNS and caching fall under the telecommunications systems management exception because they "facilitate use of the network without altering the fundamental character of the telecommunications service." Similarly, the court found "reasonable and supported by the record" the Commission's classification of mobile BIAS as a commercial mobile service. It also concluded that the Commission fully justified its change in course.

169. *RIF Order*. In 2017, the Commission reclassified the technology-agnostic BIAS as an information service, reversing the conclusion of the *2015 Open Internet Order*. While maintaining the same narrowly drawn definition of BIAS used since the *2010 Open Internet Order*, the Commission nevertheless considered BIAS (1) to provide subscribers the capability "to engage in all of the information processes listed in the information service definition"; (2) to involve "information processing functions itself, such as DNS and caching"; and (3) to be inextricably

intertwined with other information-processing capabilities offered by the BIAS provider or third parties. In conducting its factual analysis, the *RIF Order* relied on the *Cable Modem Declaratory Ruling*, along with *Brand X*, in addition to the isolated MFJ precedent we previously addressed.

170. In addition to the *RIF Order's* misapplication of the statutory definitions, which we discuss above, its application of Commission precedent to arrive at its preordained information service classification was flawed. By the time the *RIF Order* ventured to reconsider the classification of BIAS, the factual characterizations in the *Cable Modem Declaratory Ruling*, which *Brand X* showed were becoming outdated even at the time, were positively antiquated. Nevertheless, the *RIF Order* at times erroneously leaned on that proceeding's factual record in its analysis of modern-day BIAS.

171. On review in *Mozilla,* the D.C. Circuit was skeptical of the *RIF Order's* classification decision, and in particular its reliance on *Brand X* and the underlying *Cable Modem Declaratory Ruling.* As Judge Millett pointed out in her *Mozilla* concurrence, and as we likewise find here: "Today, the typical broadband offering bears little resemblance to its *Brand X* version. The walled garden has been razed and its fields sown with salt. The add-ons described in *Brand X*—'a cable company's email service, its web page, and the ability it provides consumers to create a personal web page,'—have dwindled as consumers routinely deploy 'their high-speed internet connections to take advantage of competing services offered by third parties.' " Although, the court ultimately upheld the *RIF Order,* it did so not because the *RIF Order* best represented the factual realities of the offering or most closely accorded with precedent, but under the judicial principles concerning deference and binding precedent. As Congress has granted the Commission the authority and responsibility to classify services, we are not so bound. Given the *RIF Order's* flawed analysis of the statutory terms and misplaced reliance on aging conceptions of how internet access service is offered today, we thus decline to give the *RIF Order's* classification determination any precedential value, and instead find that our classification of BIAS as a telecommunications service is not only the best reading of the statute under the factual circumstances of how BIAS is offered today but also best accords with Commission and court precedent.

*D. Scope of Reclassification*

172. Our classification decision continues to rely on the same definition of "broadband internet access service" the Commission has used since the *2010 Open Internet Order,* which encompasses mass market, retail data transmission and capabilities that are incidental to and enable its operation. We continue to exclude non-BIAS data services and clarify the framework for identifying those services. To the extent that the exchange of internet traffic by an edge provider or an intermediary with the BIAS provider's network supports the capability to reach all or substantially all internet endpoints and enables the operation of the service, we find that BIAS includes such internet traffic exchange. However, we clarify that service to edge providers is not itself BIAS. We also continue to exclude premises operators and end users who provide access to their BIAS connections when not offered on a mass-market, retail basis.

1. Broadband Internet Access Service

173. We continue to define "broadband internet access service" as a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. We also continue to include in this term any service that we find to provide a functional equivalent of the service described in the definition, or that is used to evade the protections set forth in part 8 of the Commission's rules. The Commission has retained this definition since it first defined broadband internet access service in the *2010 Open Internet Order,* and a broad range of commenters support us continuing to do so. Our use of the term "broadband" in the Order includes, but is not limited to, services meeting the threshold for "advanced telecommunications capability." We continue to exclude dial-up internet access service from the definition of BIAS because of the different market and regulatory landscape for that service. We also make clear that the definition of BIAS does not include VoIP service and we do not classify VoIP service in the Order. We do not, however, find it appropriate to define BIAS as solely the "commercial offering of an IP packet transfer service" because such a description would expand the scope beyond the focus of this proceeding and our actions in the Order.

Indeed, such a high-level—and therefore broad—definition could sweep in services using IP packet transfer for reasons completely unrelated to internet access.

174. As the Commission has previously determined, the term "broadband internet access service" includes services provided over any technology platform, including, but not limited to, wire, terrestrial wireless (including fixed and mobile wireless services using licensed or unlicensed spectrum), and satellite. "Fixed" broadband internet access service refers to a broadband internet access service that serves end users primarily at fixed endpoints using stationary equipment, such as the modem that connects an end user's home router, computer, or other internet access device to the internet, and encompasses the delivery of fixed broadband service over any medium, including various forms of wired broadband service (*e.g.*, cable, DSL, fiber), fixed wireless access (FWA) broadband service (including fixed services using unlicensed spectrum and cellular fixed wireless access), and fixed satellite broadband service. Cellular fixed wireless access refers to a specific subclass of FWA offered using 4G or 5G mobile technologies and shares the mobile network. "Mobile" broadband internet access service refers to a broadband internet access service that serves end users primarily using mobile stations, and includes, among other things, services that use smartphones or mobile-network-enabled tablets or devices as the primary endpoints for connection to the internet, as well as mobile satellite broadband service. We continue to encompass within the definition of broadband internet access service all providers of any such service, regardless of whether the BIAS provider leases or owns the facilities used to provide the service.

175. We disagree with the Information Technology and Innovation Foundation's (ITIF) argument that our definition of BIAS undermines the applicability of the Open Internet rules we adopt by rendering the rules "essentially voluntary" as long as an entity offers a service that does not provide indiscriminate access to all or substantially all internet endpoints and discloses its network management practices. This argument conflates not providing BIAS at all from providing BIAS while violating the rules. Notably, if ITIF's argument were true, it would also be the case that the transparency rule maintained by the *RIF Order* would also be voluntary, and yet ITIF did not raise this issue as a concern in that proceeding. A BIAS provider cannot simply declare that it is not providing BIAS; the determination is dependent on the nature of the service the BIAS provider offers, as reasonably understood by consumers. An ISP offering that is clearly identified and marketed to consumers as providing edited or curated internet access—rather than service that consumers reasonably understand and expect to provide indiscriminate access to all or substantially all internet applications and services of their choosing—would fall outside the scope of the Order, but an ISP may not provide consumers what appears to be ordinary mass-market broadband service and then engage in discriminatory practices that deny customers the service they reasonably expect. An ISP that currently provides BIAS but seeks to instead provide a service that falls outside the definition of BIAS, particularly as a means to avoid the service being subject to the Commission's rules, may find that this exercise could have non-trivial commercial and regulatory consequences. That decision also may carry other important consequences. For example, an ISP that is not providing BIAS might not qualify to participate in Federal and State programs to fund broadband deployment and affordability, might not benefit from the Commission's pole attachment rights under section 224 and rules concerning access to MTEs, and might not be able to petition the Commission under section 253 to preempt State and local requirements that prohibit the provision of the non-BIAS service.

176. *Mass Market.* We continue to find that a "mass-market" service is "a service marketed and sold on a standardized basis to residential customers, small businesses, and other end-user customers, such as schools and libraries." The Commission has retained this interpretation of "mass market" since the *2010 Open Internet Order*, and the record supports continuing to retain this definition. In order to maintain consistency with this interpretation, we decline Ad Hoc Telecom Users Committee's request to remove the word "small" from "small business" in considering what constitutes a "mass market" service. We note that in examining whether a service is "mass market," how a service generally is marketed and sold, rather than the entity purchasing the service, is the key determination. In addition to including broadband internet access service purchased with support from the E-Rate, Lifeline, and Rural Health Care programs, as well as any broadband internet access service offered using networks supported by the High Cost program, "mass market" services include any broadband internet access service purchased with support from the Affordable Connectivity Program (or any successor program offering discounts to eligible households for standardized broadband service offerings) or the Connected Care Pilot Program. These programs statutorily support BIAS regardless of its classification status. Consistent with the *2015 Open Internet Order* and *RIF Order*, and with broad record support, we continue to interpret mass market to exclude enterprise internet access service offerings as well as other services, such as Business Data Services (BDS), that do not provide access to all, or substantially all, internet endpoints. The services we exclude from being considered mass market exhibit distinct marketplace and technological characteristics from those of BIAS. They are typically offered and sold to large businesses through customized or individually negotiated arrangements and thus depart significantly from BIAS offerings. We make clear that enterprise services are excluded from the definition of BIAS even when they are supported by the Commission's broadband access and affordability programs. No commenter opposes this approach. Our determination that enterprise services are not included within the definition of BIAS should not be understood to mean that non-private-carriage enterprise services cannot otherwise be subject to regulation as telecommunications services. We believe it is likely that at least some such services are indeed offered as telecommunications services and note that would be consistent with previous Commission statements that non-private-carriage enterprise services are telecommunications services.

177. *Retail.* We retain the word "retail" in the definition of BIAS and hold that BIAS includes retail service provided by both facilities-based providers and resellers. In doing so, we maintain the definition of BIAS that the Commission has consistently applied since the definition originated in 2010. We therefore decline, at this time, INCOMPAS's request to delete the word "retail" from the definition of BIAS. The applicability of the Commission's reclassification and rules to wholesale services was not directly raised in the *2023 Open Internet NPRM* and we find that it would be premature for the Commission to take further action regarding wholesale services based on the current record. For the same reasons, we decline Public Knowledge's request that the Commission "clarify"

that wholesale services are subject to Title II. Nevertheless, we agree with commenters that broadband wholesalers should not engage in anticompetitive practices or sell or operate their wholesale offerings in a manner that prevents resellers from offering retail broadband service that is in compliance with our BIAS rules. If wholesale providers did engage in such harmful practices, the Commission would be able to take action to address them pursuant to its Title II authority, without including those wholesale providers within the scope of BIAS. That wholesale services do not fall within the definition of BIAS does not mean that they do not fall within the ambit of Title II in some circumstances or otherwise may be subject to the Commission's oversight under section 201(b), which provides the Commission authority to ensure that all practices "in connection with" BIAS are "just and reasonable." We thus disagree with INCOMPAS's suggestion that a specific classification of wholesale service as a telecommunications service is a necessary prerequisite for protecting consumers and resellers from the unjust or unreasonable actions of wholesale service providers. Indeed, we agree with INCOMPAS that the Commission "has the authority under sections 201 and 202 to adjudicate disputes between wholesalers and resellers of BIAS."

178. We conclude that our approach should provide consumers with necessary protections without unfairly burdening resellers with violations resulting from the actions of their wholesale providers. Our BIAS definition includes services from both facilities-based providers and resellers, and therefore any BIAS rules we adopt apply to both categories of service providers. As explained in the *2015 Open Internet Order,* while "a reseller's obligation under the rules is independent from the obligation of the facilities-based provider that supplies the underlying service to the reseller, . . . the extent of compliance by the underlying facilities-based provider will be a factor in assessing compliance by the reseller." Thus, if a reseller has employed reasonable measures to ensure it is able to comply with its obligations under our rules, non-compliance by the reseller's underlying facilities-based provider will not be imputed to the reseller. What constitutes reasonable measures will depend on the factual circumstances, including the details of the reseller's arrangement with the wholesale provider and the reseller's diligence in seeking to enforce the terms of that

arrangement. We not only expect resellers to take care that the service they choose to resell to retail customers would not expose them to compliance issues under our rules, but we also expect that facilities-based providers that choose to provide wholesale service will not sell a service that does not allow resellers to comply with our rules. In any event, we intend to monitor the wholesale service marketplace and will take appropriate prescriptive or enforcement action to protect consumers and resellers should the need arise.

## 2. Non-BIAS Data Services

179. We continue to exclude non-BIAS data services (formerly "specialized services") from the scope of broadband internet access service. As the Commission explained in the *2015 Open Internet Order,* non-BIAS data services are certain services offered by BIAS providers that share capacity with broadband internet access service over BIAS providers' last-mile facilities but are not broadband internet access service or another type of internet access service, such as enterprise services. Such services generally share the following characteristics: (1) are only used to reach one or a limited number of internet endpoints; (2) are not a generic platform, but rather a specific "application level" service; and (3) use some form of network management to isolate the capacity used by these services from that used by broadband internet access services. These characteristics are non-exhaustive and do not comprise elements of a definition of non-BIAS data services. We clarify this in light of confusion in the record that the characteristics established in the *2015 Open Internet Order* constituted elements of a definition of non-BIAS data service. Thus, services with these characteristics will not always be considered non-BIAS data services. In 2015, the Commission identified examples of some services that, at the time, likely fit within the category of non-BIAS data services. The Commission identified some BIAS providers' existing facilities-based VoIP and IP-video offerings, connectivity bundled with e-readers, heart monitors, energy consumption sensors, limited-purpose devices such as automobile telematics, and services that provide schools with curriculum-approved applications and content as examples of non-BIAS data services.

180. *Innovation and Investment.* We anticipate that maintaining an exclusion of non-BIAS data services from the definition of BIAS will foster innovation and investment in BIAS and non-BIAS

data services. We agree with Professor van Schewick that excluding non-BIAS data services from the scope of BIAS "allows applications to emerge that would not be able to function on the Open Internet because they need special treatment that the Open Internet cannot provide." We further expect that our approach will guard against artificial marketplace distortions by providing a level playing field for like data services under our rules: those that fit the "core" definition of BIAS, represent its functional equivalent, or are used in an attempt to evade our rules governing BIAS will be treated the same under our rules, while data services that fall outside the scope of BIAS—whether established or new—will be treated comparably. Additionally, we anticipate that, under our regulatory approach, BIAS providers will be motivated to innovate and invest in the development and deployment of new technologies that will help enable them to meet growing network capacity demands for both BIAS and non-BIAS data services utilizing the same network infrastructure, rather than responding to those growing demands through blocking, throttling, paid prioritization, or other conduct harmful to the broader public interest.

181. *Evasion and Enforcement.* Key to promoting these benefits is ensuring that our exclusion of non-BIAS data services is not used as a means to evade the rules we place on BIAS, including the open internet rules we adopt in the Order. To do so, we will continue to closely monitor the development and use of these services and will act to prevent harm to the open internet, as necessary. We are especially concerned about activities that may undermine national security or public safety, hinder consumers' access to or use of BIAS, or impede the ability of over-the-top services to compete with other data services. If we determine that a particular service is providing the functional equivalent of BIAS or is being used to evade the protections set forth in our rules, we will take appropriate action. We will be watchful of consumer retail offerings, and will evaluate if necessary whether they actually require isolated capacity for a specific functionality or level of quality of service that cannot be met over the open internet, but we will presume that application-level enterprise offerings do not evade our rules. For example, we are likely to find that connectivity for video conferencing offered to consumers would evade the protections we establish for BIAS if the video-conferencing provider is paying the

BIAS provider for prioritized delivery. Conversely, we are likely to find that connectivity for remote surgery is properly categorized as a non-BIAS data service given its "stringent requirements for reliability" and lack of latency that "cannot be met over the Open Internet." We also will closely monitor any services that have a negative effect on the performance of BIAS or the capacity available for BIAS over time. We decline to explicitly state that non-BIAS service may not share capacity with BIAS, as Professor Peha requests, as this may inhibit innovative uses of existing capacity that do not otherwise harm the open internet. And we will take appropriate action if a non-BIAS data service is undermining investment, innovation, competition, or end-user benefits. To assist us in monitoring non-BIAS data services, we continue to require BIAS providers to disclose: what non-BIAS data services they offer to end users; whether and how any non-BIAS data services may affect the last-mile capacity available for, and the performance of, BIAS; and a description of whether the service relies on particular network practices and whether similar functionality is available to applications and services offered over BIAS.

182. *Alternative Approaches.* We resist calls from some commenters that we eschew this approach and instead adopt an abstract, expansive definition of non-BIAS data services and/or a more detailed list of such services, as doing so would not account for the evolving, innovative nature of these services and the importance of ensuring BIAS providers cannot evade our rules. Our approach aligns with the approach taken towards non-BIAS data services in the *2015 Open Internet Order.* Adopting an abstract, expansive definition of non-BIAS data services would encompass services functionally equivalent to BIAS and those used to evade our rules for BIAS, contradicting our BIAS definition and potentially undermining our ability to address services that cause open internet, national security, public safety, or other harms we identify in the Order. Similarly, providing an extensive list of non-BIAS data services could harm consumers if BIAS providers develop methods to use an identified service on the list to somehow circumvent our rules. Moreover, a more detailed definition of non-BIAS data services would require us to accurately predict the forms that "functionally equivalent" services or services used to "evade" our rules could take in the future. The record here does not persuade us that we could reliably do so, nor would we

be positioned to maintain and update such a list in a timely manner as new services are developed. Additionally, rather than promote innovation, as the European Telecom Operators' Association suggests, developing an extensive and detailed list may instead constrain innovation by disincentivizing BIAS providers from offering or developing services that are not on the list.

183. *Network Slicing.* Consistent with the approach we lay out above, we decline at this time to categorize network slicing or the services delivered through network slicing as inherently either BIAS or non-BIAS data services, or to opine on whether any particular use of network slicing or the services delivered through network slicing would be considered a reasonable network management practice under the open internet rules we adopt below.

184. Network slicing is a technique that enables mobile network operators (MNOs) to create multiple virtualized subnetworks (each known as a "slice") using shared physical wireless network infrastructure and common computing resources. Network slicing is often described as a "logical" segmentation of the network, which means that each slice may correspond to a unique set of network management rules tailored for specific technical requirements, but without any physical division or dedication of network resources. MNOs can use network management rules to configure each slice for customized use cases and quality-of-service (QoS) targets. Network slicing is a key innovation of standalone 5G networks, which are in varying stages of deployment for different providers, and it cannot be deployed on non-standalone 5G networks (*i.e.,* 5G networks with a 4G LTE core network).

185. Proponents of network slicing ask us to clarify that network slicing or certain services delivered using network slicing are "non-BIAS"—and thus not subject to Title II regulation—or are reasonable network management practices under our open internet rules. They argue that network slicing allows for the efficient management of finite mobile network resources and eliminates the need for the deployment of separate physical networks for different types of services. For instance, network slicing proponents contend that it allows MNOs to establish separate slices for mobile broadband and fixed wireless traffic, while simultaneously offering customized slices for enterprise private networks, video calls, and a variety of other uses. For example, these supporters state that network slicing might be used for: augmented reality

(AR)/virtual reality (VR), automotive, agriculture, energy, health, manufacturing, IoT, public safety, smart cities, and other functions. They further assert that network slicing is more resilient to cyberattacks because breaches can be contained in one slice and prevented from affecting other parts of the network.

186. Other commenters raise concerns about the implications of network slicing. They specifically express concern that network slicing will be used to circumvent our prohibition on paid prioritization, throttling, or unreasonable discrimination. Public Knowledge also contends that allowing network slicing for specialized services will negatively affect the quality and capacity of general internet access, and New America's Open Technology Institute contends that exempting applications, content, or services delivered over a slice of a mobile network from the rules "is likely to harm mobile market competition," particularly for "independent MVNO [mobile virtual network operators] competitors since they purchase wholesale bandwidth, cannot 'slice' their networks, and could also see their capacity and quality of service crowded out over time as the more profitable edge providers are pushed to pay for special delivery" over the large mobile networks.

187. The record reflects that the potential use cases for network slicing are still under development and that MNOs are in the early stages of adopting the technique, with some moving more quickly than others. For instance, T-Mobile states it has begun offering a network slicing beta program that allows developers to begin building advanced video calling functionality using its infrastructure. Other MNOs are actively developing their own network slicing offerings, and equipment manufacturers are also preparing to update their operating systems to support network slicing applications. Given the nascent nature of network slicing, we conclude that it is not appropriate at this time to make a categorical determination regarding all network slicing and the services delivered through the use of network slicing. We agree with NCTA that we "should not allow network slicing to be used to evade [the] Open internet rules" that we adopt. In the meantime, MNOs should evaluate whether their particular uses of network slicing fall within the definition of BIAS, and if so, ensure their uses of network slicing are consistent with the conduct rules we adopt in the Order. MNOs may also use the advisory opinion process we

establish below as a tool to seek Commission guidance on their use of network slicing. And to the extent uses of network slicing fall outside of BIAS, we will closely monitor those uses to evaluate if they are providing the functional equivalent of BIAS, being used to evade our open internet rules, or otherwise undermining investment, innovation, competition, or end-user benefits in the internet ecosystem. We will also monitor if network slicing affects the last-mile capacity available for, and the performance of, BIAS. If necessary, we will take action to address harmful uses of network slicing. We believe this approach will allow for the continued development and implementation of network slicing while at the same time ensuring that the use of network slicing in connection with BIAS conforms to the classification and rules adopted in the Order.

3. Internet Traffic Exchange

188. Consistent with the *2015 Open Internet Order,* we find that BIAS, as defined above, includes the exchange of internet traffic by an edge provider or an intermediary with the BIAS provider's network (*i.e.,* internet peering, traffic exchange, or interconnection), to the extent that the exchange supports the "capability to transmit data to and receive data from all or substantially all internet endpoints . . . [and] enable the operation of the communications service." As the Commission explained in 2015, "[t]he representation to retail customers that they will be able to reach 'all or substantially all internet endpoints' necessarily includes the promise to make the interconnection arrangements necessary to allow that access" and "the promise to transmit traffic to and from those internet end points back to the user." We disagree with the Information Technology Industry Council that "interconnection, peering, traffic exchange, . . . and similar arrangements should be excluded from the definition of BIAS." For a BIAS provider to offer to its subscribers the capability to reach all or substantially all internet endpoints, it must make arrangements with other network operators that have the capability (whether via its own network or via another interconnected network) to reach those endpoints. Indeed, this system of interconnection is the core concept of the "internet"—it is a network of networks. We also conclude that the Commission's findings and rationale regarding internet traffic exchange in the *2015 Open Internet Order*—that service to edge providers resulting from internet traffic exchange is derivative of BIAS and constitutes the

same traffic to the consumers—remain valid. The Ad Hoc Broadband Carrier and Investor Coalition asks us to confirm that edge service "would be treated as part of BIAS *only* to the extent they are offered as part of a 'mass-market retail' internet access service." Internet traffic arrangements are derivative of all services that meet the definition of BIAS, which not only includes mass-market retail services, but also services that provide the functional equivalent of BIAS or that evade the protections set forth in part 8 of the Commission's rules. We observe that the *RIF Order* does not appear to dispute the Commission's previous conclusion that BIAS includes internet traffic exchange, and instead determined that internet traffic exchange arrangements were appropriately regulated as an information service by virtue of its conclusion that BIAS is an information service. Many commenters support our approach. Additional commenters, by supporting our adoption of rules governing internet traffic exchange arrangements, also support *sub silentio* the inclusion of internet traffic exchange within the scope of BIAS.

189. We disagree with USTelecom's arguments that the D.C. Circuit in *USTA* erred in concluding that the Commission has the authority to include internet traffic exchange within the scope of BIAS. USTelecom first asserts that sections 251(a), 251(c)(2), and 201(a) of the Act, which concern interconnection, "refute[] any notion that classification of a retail service as a Title II common-carrier service carries with it authority for the Commission to regulate on a common-carrier basis the terms and conditions on which those retail providers interconnect." USTelecom specifically asserts that were this not the case, "the specific limitations on the Commission's authority in Sections 251(c)(2) and 201(a) would be rendered obsolete." But USTelecom rests its conclusion on the mere existence of these provisions and not any express statutory language prohibiting further Commission authority over interconnection. USTelecom's understanding of section 201(a) is undercut by the history of the Commission's treatment of interconnection and traffic exchange-related matters as cognizable under section 201(b). Nor does USTelecom grapple with the fact that section 251 expressly preserves the Commission's prior authority under section 201 in its entirety. Thus, we do not read section 201(a) and/or section 251(c)(2) as limitations on other authority as relevant here—notably including

section 201(b). Our regulatory approach to the traffic exchange element of BIAS also is far removed from the type of case-by-case orders for physical interconnection between two carriers that is the subject matter of the interconnection requirements of section 201(a). We separately note that under section 251 "the term 'interconnection' refers solely to the physical linking of two networks, and *not* to the exchange of traffic between networks."

190. Assuming, *arguendo,* that USTelecom were correct that the Commission lacks authority to include internet traffic exchange within the scope of BIAS, it goes on to claim that "[i]n the absence of such implicit authority," the Commission may only regulate internet traffic exchange arrangements "if the Commission classified such arrangements as a telecommunications service," which it cannot do given that "such arrangements by definition involve information service providers on both sides." Importantly, USTelecom conspicuously ignores the statutory prescription of section 201(b) of the Act that all activities performed "in connection with" a telecommunications service be just and reasonable. For purposes of section 201(b), it does not matter whether the practice, classification, or regulation itself involves a separate telecommunications service if it is provided "in connection" with a telecommunications service. Accordingly, and as the *USTA* court affirmed, we need not classify internet traffic exchange arrangements as telecommunications services for the retail service that depends upon such arrangements for its operation to be within the scope of our Title II regulatory authority. We also disagree with USTelecom that all internet traffic arrangements "by definition involve information service providers on both sides" as that presumes that BIAS is an information service, which as we conclude in the Order, it is not.

191. Lastly, we dispute USTelecom's characterization that the inclusion of internet traffic exchange within the scope of BIAS is flawed because we are compelling BIAS providers to offer internet traffic exchange arrangements on a common carrier basis when they "do not satisfy the *NARUC* test for classifying a service as common carriage rather than private carriage." In offering BIAS to its end-user customers, a BIAS provider has voluntarily assumed an obligation to arrange the transfer of that traffic on and off its network. BIAS providers hold themselves out to carry the traffic desired by the BIAS provider's end-user customers

regardless of source and regardless of whether an edge provider has a specific arrangement with the BIAS provider. While broadband providers may not need to enter into any specific agreement with any specific traffic exchange partner, by choosing to offer BIAS, they have bound themselves to enter into such agreements in general. In the absence of such agreements, they would be unable to provide BIAS because users would be unable to reach "all or substantially all internet endpoints." Thus, our treatment of internet traffic exchange is based on the marketplace realities of how BIAS is offered today, not based on any compulsion that BIAS providers enter any arrangements on a common carriage basis. At the same time, nothing rules out those arrangements being common carriage arrangements if, as a factual matter, that is, in fact, how they are offered. Whether an offering is private or common carriage does not depend upon what a provider may assert is the nature of the offering, but rather on the factual particulars of how the service is offered and to whom. Therefore, simply because a BIAS provider's terms of service disclaims offering internet traffic exchange on a common carrier basis does not make it so. Additionally, as the Commission did in 2015, we apply a case-by-case approach to exercising our section 201(b) authority over internet traffic exchange underlying retail BIAS offerings, and we do not concede—and USTelecom has not demonstrated—that such regulatory oversight will in practice require BIAS providers to enter traffic exchange arrangements with edge providers or intermediaries in a way that, *per se,* requires them to act as common carriers.

4. Service Furnished to Edge Providers

192. We agree with ICG's contention that edge service—insofar as the term "edge service" refers to "the service that the *Verizon* court identified as being furnished to the edge"—is not itself BIAS. In its review of the *2010 Open Internet Order,* the D.C. Circuit in *Verizon* concluded that "in addition to the retail service provided to consumers, 'broadband providers furnish a service to edge providers,'" and in the *2015 Open Internet Order,* "the Commission agree[d] that a two-sided market exists and that the beneficiaries of the non-consumer side either are or potentially could be all edge providers." The *RIF Order* reflected the same understanding of the marketplace. Thus, we agree that any service BIAS providers provide to edge providers is at least technically distinct from the "retail" and "mass market"

service that we define BIAS to be. At the same time, we reaffirm the understanding that "the 'service to edge providers' is subsumed within the promise made to the retail customer of the BIAS service." Whether the last-mile BIAS provider carries the traffic directly from an edge provider's endpoint on the BIAS provider's own network or from a data center or other interconnection point does not change the fact that the BIAS provider is carrying that traffic, on behalf of the edge provider, to the BIAS subscriber as part of the *subscriber's* broadband internet access service. Just as BIAS can and does include the exchange of internet traffic without requiring us to classify the underlying service arrangements into which BIAS providers enter to enable that exchange of traffic, so too can and does BIAS include the transmission of edge provider traffic—as sought by BIAS end users—without requiring us to classify the companion transmission service provided to edge providers that was identified by the *Verizon* court and accepted by subsequent Commission precedent. Specifically, "the so-called 'edge service' is secondary, and in support of, the promise made to the end user" to "transport and deliver traffic to and from all or substantially all internet endpoints," given that it "necessarily includes the promise to transmit traffic to and from those internet end points back to the user."

193. We decline INCOMPAS's suggestion that we "clearly state th[at BIAS providers] serve their BIAS customers, [and] not edge providers, in the provision of BIAS." As explained above, the *Verizon* court identified this "edge service" as distinct from the retail service we define as BIAS here, and the Commission ultimately endorsed the understanding of it as a separate service in the *2015 Open Internet Order* and the *RIF Order.* Beyond claiming, without further explanation or evidence, that BIAS providers do not serve edge providers, INCOMPAS does not provide any justification for why we should change this understanding of the marketplace. Even assuming *arguendo* that one accepted INCOMPAS's assertion that while "BIAS providers and edge providers may share the BIAS customer—the end user who pays for the BIAS— . . . that does not make the edge provider a customer of the BIAS provider," it would not persuade us to alter our understanding of the marketplace. As the *Verizon* court observed, "[i]t is true, generally speaking, that the 'customers' of broadband providers are end users. But that hardly means that broadband

providers could not also be [a service provider] with respect to edge providers." INCOMPAS also contends that "edge service is *not* derivative of BIAS," but its arguments in that regard fall short. Insofar as INCOMPAS argues that the edge provider is not a customer of the BIAS provider, that disputes an underlying premise—that there exists an edge service in the first place—rather than explaining why such service, if it exists, should not be understood as derivative of BIAS. And insofar as INCOMPAS argues that the Commission "should account for the fact that edge service may be provided to some customers via connections that are not reliant on BIAS," it misunderstands the nature of our finding. We do not conclude that services provided by edge providers are inherently derivative of BIAS or that they always are delivered via a BIAS connection. Rather, the issue only arises in our analysis as it relates specifically to traffic carried between edge providers and BIAS end users via a BIAS connection. INCOMPAS's argument thus does not identify any flaw in our conclusion as understood in the proper context. Nor does INCOMPAS otherwise demonstrate how or why any of this impacts our classification decision or decisions regarding open internet rules. Indeed, some of INCOMPAS's concerns appear entirely misplaced. The Commission did "not reach the regulatory classification of the service that the *Verizon* court identified as being furnished to the edge" in the *2015 Open Internet Order,* nor do we do so here. Thus, INCOMPAS's concern about the *Verizon* court's description of BIAS providers as edge providers' "carriers" is not implicated here.

5. Other Excluded Services

194. Consistent with the manner in which the Commission has historically defined broadband internet access service, we exclude premises operators and end users who provide access to their BIAS connections but do not offer it on a mass-market, retail basis. Thus, to the extent coffee shops, bookstores, airlines, private end-user networks such as libraries and universities, and other businesses acquire broadband internet access service from a BIAS provider to enable patrons to access the internet from their respective establishments, the provision of such service by the premise operator would not itself be considered BIAS unless it were offered to patrons as a retail mass-market service. Likewise, when a user employs, for example, a wireless router or a Wi-Fi hotspot to create a personal Wi-Fi network that is not intentionally offered

for the benefit of others, we find that he or she is not offering a broadband internet access service under our definition, because the user is not marketing and selling such service to residential customers, small businesses, and other end-user customers. Our decision to retain this approach received record support, and no opposition.

195. We also continue to view CDNs, virtual private network (VPN) services, web hosting services, and data storage services as outside the scope of broadband internet access service. In classifying BIAS as a telecommunications service in the Order, we do not, and need not, reach the question of whether and how these services are classified under the Act. As evidenced in the record, these services are not "mass market" services and/or do not provide the capability to transmit data to and receive data from all or substantially all internet endpoints. Commenters are unified in supporting the continued exclusion of such services from the definition of BIAS.

196. We decline at this time to make any further determinations regarding whether other services fall within the scope of BIAS, given the paucity of the record concerning such services. Regarding 5G IoT services specifically, while Transatel acknowledges that any such determination "requires the assessment of individual 5G IoT services . . . against the Commission[']s proposed definition of BIAS and mass market," Transatel nevertheless urges us to "exclud[e] all 5G IoT services from the definition of BIAS and classify[ ] the[m] as either non-BIAS data services or enterprise services on a use case by use case basis." Transatel argues that doing so will ensure "these valued services will continue to be provided not only to end-users but also enterprise customers without constraining innovation or investment." Although we anticipate that many 5G IoT services may qualify as non-BIAS data services, enterprise services, or other edge services, we decline to provide a blanket exclusion of these services. We first note that Transatel does not provide any evidence to support its claim that failing to provide this blanket exclusion would constrain innovation or investment of 5G IoT services. Second, given the range of 5G IoT services that Transatel itself identifies, we find that the public interest would be best served by assessing these services on an individualized basis as necessary.

197. We similarly also decline the suggestion of some commenters to explicitly exclude all in-flight entertainment and connectivity (IFEC)

services from the scope of BIAS. The record suggests that not all IFEC services are alike, with some airlines operating as BIAS providers themselves, and other airlines, aircraft owners, or aircraft lessees acquiring services from unaffiliated providers. Given this variety, a general exclusion of IFEC services from the scope of BIAS may be inappropriately broad. As discussed above, consistent with the *2015 Open Internet Order* and the *2010 Open Internet Order,* we continue to exclude airlines from the scope of BIAS when they are functioning in the role of premise operators. Additionally, by offering only vague notions of "promot[ing] investment," protecting "flexibility," limiting the "potential adverse consequences of regulatory overreach," and avoiding amorphous concepts of "harm," commenters fail to convince us that a specific determination about IFEC service is necessary. Gogo Business Aviation claims that considering IFEC services within the scope of BIAS could somehow compromise aircraft safety functions but fails to adequately explain why that would be the case or why an aircraft's use of safety functionality would violate Commission rules. Should evidence of specific harms arise which necessitates additional regulatory clarity for IFEC service, we will analyze the classification of such services on a case-by-case basis.

### E. Mobile Broadband Internet Access Service Is Best Classified as a Commercial Mobile Service

198. In addition to our decision to reinstate the classification of BIAS as a telecommunications service, we adopt our proposal to reinstate the classification of mobile BIAS as a commercial mobile service. We further conclude that, even if mobile BIAS does not meet the definition of "commercial mobile service," it is the functional equivalent of a commercial mobile service and, therefore, not a private mobile service. As such, there is no obstacle to treating mobile BIAS "as a common carrier . . . under [the Communications Act]."

199. Section 332(d)(1) of the Act defines "commercial mobile service" as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission." The commercial mobile service provisions of the Act are implemented under § 20.3 of the Commission's rules, which employs the

term "commercial mobile service" (CMRS). We find that mobile BIAS meets the elements of this definition. Mobile BIAS is a "mobile service" because subscribers access the service through their mobile devices, and it is provided "for profit" because BIAS providers offer it to subscribers with the intent of receiving compensation. The *Second CMRS Report and Order* (59 FR 18493 (Apr. 19, 1994)) defined the statutory phrase "for profit" to include: "any mobile service that is provided with the intent of receiving compensation or monetary gain." Mobile BIAS is also widely available to the public, without restriction on who may receive it. In the *Second CMRS Report and Order,* the Commission determined that a service is available "to the public" if it is "offered to the public without restriction in who may receive it." We also find that mobile BIAS is an "interconnected service."

200. *Definition of Public Switched Network.* Under section 332(d)(2) the term "interconnected service" means a "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)." In the *2015 Open Internet Order,* the Commission reached the conclusion that mobile BIAS is an interconnected service through the application of an updated definition of "public switched network" that included networks that use public IP addresses. In the *RIF Order,* the Commission reversed course, reinstating the prior definition of "public switched network" and concluding that mobile BIAS was not a commercial mobile service. The Commission found the prior definition to be "more consistent with the ordinary meaning and commonly understood definition of the term and with Commission precedent."

201. In the *2023 Open Internet NPRM,* we proposed reinstating the definition of "public switched network" from the *2015 Open Internet Order* and indicated our belief that the Commission's decision in the *RIF Order* failed "to align with the technological reality and widespread use of mobile BIAS." We indicated our view that the proposed definition, which included IP addresses, "embodies the current technological landscape and the widespread use of mobile broadband networks, and is therefore more consistent with the Commission's recognition that the public switched network will grow and change over time." We proposed that, based on this reinstated definition, mobile BIAS would be an interconnected service and we sought comment on our analysis and proposed approach.

202. Commenters express differing views of the Commission's proposal. Professor Scott Jordan and New America's Open Technology Institute express support for readopting the definition of the public switched network from the *2015 Open Internet Order.* New America's Open Technology Institute notes that "public switched network" in section 332 "is not limited to the legacy telephone network and should be updated." In contrast, CTIA and Free State Foundation oppose readopting the definition and instead express support for the reasoning in the *RIF Order,* with CTIA arguing that "public switched network" "refers unambiguously to the telephone network." CTIA misstates the legislative history here. The portion it cites is actually language from a Conference Report explaining that the House bill, which was not adopted, used the term "public switched telephone network." That report language was mistaken because the House bill (like the Senate bill), as CTIA acknowledges, used the term "public switched network" (without "telephone"). The Conference Report went on to explain that the Senate amendment "expressly recognizes the Commission's authority to define the terms used in defining 'commercial mobile service'" and that the Conference Report was adopting the Senate definitions with minor changes. This is further evidence that the statutory language means what it says, *i.e.,* that the Commission has authority to define these terms to reflect current technology and that it is not limited to telephones. Wired Broadband et al. also oppose the proposed definition and argue that evidence of the growth and widespread use of mobile broadband services provides insufficient justification for readopting the revised definition.

203. We adopt our proposal to reinstate the definition of "public switched network" from the *2015 Open Internet Order,* and we define it to mean "the network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use[s] the North American Numbering Plan, or public IP addresses, in connection with the provision of switched services." As the Commission determined in the *2015 Open Internet Order,* the definition we adopt recognizes "that today's broadband internet access networks use their own unique address identifier, IP addresses, to give users a universally recognized format for sending and receiving messages across the country

and worldwide." CTIA and the Wired Broadband et al. highlight technical distinctions between the telephone networks and IP-based networks. CTIA, for example, states that "[t]he telephone network uses North American Numbering Plan numbers across a single network, while the internet is a decentralized network of networks that relies on IP addresses and uses a variety of protocols and architectures for different purposes." These operational characteristics, however, do not govern our determination of whether mobile BIAS should be considered a commercial mobile service under the Commission's rules.

204. We find that the *RIF Order*'s and opponents' assertions, that the term "public switched network" may only be defined to mean the traditional telephone network, fail to give sufficient weight to Congress's express delegation of authority to the Commission to define the term "public switched network" and to the Commission's own prior recognition that the definition of "public switched network" should evolve over time. Congress, in section 332(d)(2), defined the term "interconnected service" to mean a "service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission)." The argument that the Commission may not define "public switched network" to mean anything other than the public switched telephone network runs counter to the statutory language in section 332 because, if Congress had intended "public switched network" to mean only the public switched telephone network, it would have included the word "telephone." Instead, Congress not only used the broader term "public switched network" but also gave the Commission express authority to define the term. Congress's delegation of authority to the Commission would have been unnecessary if Congress had intended the term to refer only to the public switched telephone network based on a regulatory understanding asserted to exist before 1993. Wired Broadband et al. suggest that Congress failed to use the term "public switched telephone network" in the statute "precisely because it was commonly understood that PSN and PSTN were identical, the terms were used interchangeably." As a fundamental matter, we disagree and find that this argument fails to give sufficient weight to the text of the statute and to Congress's express delegation of authority to the Commission to define the term "public switched network."

But independently, even on its terms, their argument fails. Under section 332(d)(1), CMRS must "make[ ] interconnected service available," and section 332(d)(2), in turn, provides that "interconnected service" "means service that is interconnected with the public switched network." But even if "public switched network" were understood as limited to the public switched telephone network, we find that mobile BIAS is interconnected with the public switched telephone network by virtue of VoIP applications.

205. Nothing in the text of the "public switched network" definition requires that the Commission's implementing definitional regulations be limited to telephone service. Even at the time of the enactment of section 332(d)(2), such terminology was understood as a technological matter to be potentially more expansive than mere telephone service. Exercising the Commission's authority to define "public switched network" by regulation to update the definition with evolving technological and marketplace realities also better reflects the broader statutory context. Section 1 of the Act explains that Congress created the Commission "to make available, so far as possible, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." And section 706 of the 1996 Act directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." Given the increasing importance of BIAS, these objectives can be advanced more effectively if mobile BIAS is classified as a commercial mobile service, strengthening our ability to adopt measures to promote such infrastructure deployment through regulated access to pole attachments and universal service support, the ability to deploy infrastructure, and the Commission's enhanced ability to protect public safety and national security through protections afforded by section 214. Although CMRS providers currently have forbearance from domestic section 214 requirements, they remain subject to international section 214 requirements. And even as to domestic section 214 requirements, the Commission could revisit forbearance from those requirements if necessary to better enable the agency to address public safety and national security

concerns. It also is clear from the legislative history that Congress expected some services that were previously private land mobile services to become common carrier services as a result of the enactment of section 332. The D.C. Circuit affirmed this interpretation in the *USTA* decision.

206. In exercising its authority and defining "public switched network" in the *Second CMRS Report and Order,* the Commission determined that the term "should not be defined in a static way." The Commission considered but rejected calls to define "public switched network" as the public switched telephone network and found that a broader definition was more consistent with the use of the term "public switched network" in section 332 rather "than the more technologically based term 'public switched telephone network.'" The Commission recognized that the public switched network was "continuously growing and changing because of new technology and increasing demand." Consistent with these determinations, in the *2015 Open Internet Order,* the Commission found that it was necessary to update the definition of "public switched network" to reflect the growth and changes to the network that occurred since the time the Commission adopted its original definition.

207. In the Order, consistent with the Commission's original determination that the definition of "public switched network" should evolve over time, we update the definition to reflect significant changes that have occurred in the technological landscape for mobile services. Since the time the Commission defined "public switched network" for purposes of section 332 in 1994, mobile broadband technologies have developed and become ubiquitous. In 1994, the Commission chose to define "public switched network" with reference to telephone numbers "because participation in the North American Numbering Plan provides the participant with ubiquitous access to all other participants in the Plan," concluding that "this approach to the public switched network is consistent with creating a system of universal service where all people in the United States can use the network to communicate with each other." This is the reality of the internet, and IP addresses, today. Mobile broadband services are available everywhere and millions of subscribers use them to communicate. Evidence in the record shows, for example, that 85% of Americans own smartphones. In 2022, 72.6% of adults lived in wireless-only households with no landline. In addition, data show that Americans are using their smartphones more than ever, with more than 73 trillion megabytes of mobile data traffic exchanged in the United States in 2022, representing a 38% increase from the previous year. Continued growth of mobile BIAS is expected, with one forecast predicting that there will be 430 million 5G mobile subscriptions in North America by 2029. We find that it serves the public interest to adopt a definition of "public switched network" that reflects today's technological landscape for mobile communications technology and the widespread use of mobile broadband services. We disagree with the *RIF Order'*s finding that the Commission's analysis from the *2015 Open Internet Order* placed undue emphasis on the wide availability of mobile BIAS in finding it to be an interconnected service. We likewise disagree with comments arguing that data showing the prevalence and use of mobile broadband technologies are irrelevant to a determination about whether to adopt a modernized definition of "public switched network." We note that while Wired Broadband et al. also argue that "smartphone penetration has barely changed (by less than 3% of the population) since 2018," they do not dispute the evolution in the growth and use of mobile broadband services that has occurred since the time the Commission adopted the 1994 definition of "public switched network." That evolution of mobile communications technology is the basis for the action we take in the Order to adopt a modernized definition of the term. To the contrary, we find that these data provide evidence of the extent to which today's mobile broadband networks provide an essential and universal means of communication among members of the public which is essential to our determination that mobile BIAS is a commercial rather than a private mobile service. Indeed, given the substantial changes in technology and the telecommunications market since 1994, it does not make sense to disregard mobile broadband networks in the Commission's current definition of "public switched network." This is especially so because, in distinguishing between the "commercial mobile service" and "private mobile service" definitions in the Act, it is only logical to take into account the ubiquity of technology as it stands today, and thereby interpret as commercial a service offered to, and universally adopted by, the public.

208. We also disagree with the *RIF Order* and arguments in the record that the definition we adopt is impermissible because it does not refer to a "single" network. CTIA contends that there "is no single, overarching network that combines the telephone network and the internet." This argument fails to recognize that the Commission's definition of "public switched network" has always referred to a composite of networks, covering "any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers." Our decision in the Order to include networks that use public IP addresses as part of the public switched network follows the same approach and treats mobile voice and broadband networks as components of a single public switched network. In their respective comments, Wired Broadband et al. and ICG oppose defining "public switched network" to include networks that use IP addresses, noting that the Commission lacks jurisdiction over the internet. We clarify that the modernized definition of public switched network we adopt in § 20.3 of the Commission's rules in no way asserts Commission jurisdiction over the internet at large or over the assignment or management of IP addressing by the Internet Numbers Registry System.

209. *Mobile BIAS Is an Interconnected Service.* We conclude that mobile BIAS is an interconnected service because it is interconnected with the "public switched network," as we define it in the Order. Mobile BIAS is also an interconnected service because it is a broadly available mobile service that gives users the ability to send and receive communications to and from all other users of the internet. We find that the best reading of section 332 is reflected in the Commission's determinations in the *Second CMRS Report and Order* that, by using the phrase "interconnected service," Congress intended that mobile services should be classified as commercial services if they make interconnected service broadly available through their use of the "public switched network" and that "the purpose underlying the congressional approach . . . is to ensure that a mobile service that gives its customers the capability to communicate to or receive communication from other users of the public switched network should be treated as a common carriage offering." New America's Open Technology Institute notes that Congress intended to differentiate between services that were broadly available to the public and those that were private special purpose services, such as taxi dispatch services.

CTIA argues that the statute does not limit private mobile services to such types of services and that instead the only relevant question under the statute in determining whether a service is a private mobile service is whether or not the service is interconnected. Wired Broadband et al. similarly argue that the statutory definition is the only relevant consideration for determining what services are private mobile services. Even though section 332(d)(3) does not limit private mobile service to specific types of mobile services, it does provide that private mobile services are those mobile services that are not commercial mobile services or functionally equivalent. For the reasons outlined above, we find that mobile BIAS *is* an interconnected commercial mobile service and therefore by statute cannot be private mobile service. Moreover, we find more persuasive the argument that private mobile service is intended to refer to those services offered only to a more limited group of users, such as taxi fleets. This follows from both the ordinary meaning of the terms ''commercial'' and ''private'' and the state of the marketplace at the time of the 1996 Act. By contrast, mobile services classified as private are those mobile services that do not make communications broadly available. The Commission found in the *2015 Open Internet Order* that ''mobile broadband internet access service fits the [commercial mobile service] classification as millions of subscribers use it to send and receive communications on their mobile devices every day.'' Today, as the data described above demonstrate, it is clear that this remains the case as millions of Americans continue to communicate using mobile broadband services.

210. We also find that mobile BIAS is an interconnected service for the additional reason that it provides users with the capability to communicate with other users of the internet and with people using telephone numbers through VoIP applications. In the *2015 Open Internet Order,* the Commission found that ''users on mobile networks can communicate with users on traditional copper based networks and IP based networks, making more and more networks using different technologies interconnected.'' The Commission further identified mobile VoIP, as well as over-the-top mobile messaging, as ''among the increasing number of ways in which users communicate indiscriminately between [North American Numbering Plan (NANP)] and IP endpoints on the public switched network.'' In the *RIF Order,*

the Commission disagreed and found that the ''definition of 'interconnected service' focuses on the characteristics of the offered mobile service itself.'' In the *2023 Open Internet NPRM,* we sought comment on whether ''there have been any material changes in technology, the marketplace, or other facts that would warrant refinement or revision of the analysis regarding the interconnected nature of mobile BIAS from the *2015 Open Internet Order.*''

211. We find that there is no evidence in the record showing material changes in technology or the marketplace that would warrant a revision to the Commission's 2015 analysis of the interconnected nature of mobile BIAS. To the contrary, evidence shows that mobile BIAS users continue to communicate using these tools and that today ''VoIP applications are even more functionally integrated'' into mobile broadband services than they were in 2015. Although some commenters argue that it is the VoIP applications themselves, rather than mobile BIAS, that should be viewed as providing interconnected service, we find that such arguments fail to recognize the extent to which VoIP applications have become ''functionally integrated'' into mobile broadband services. CTIA also argues that, even with VoIP, mobile BIAS should not be viewed as interconnected because IoT devices, such as internet-connected lighting systems or internet-connected security cameras, cannot make calls. We disagree and conclude that we may find mobile BIAS to be an interconnected service even if there are some other broadband services or devices that are not designed to provide communications. Our findings in the Order apply in the context of BIAS, and to the extent that other types of broadband services do not meet the definition of BIAS, they are not within the scope of the Order. Moreover, as the D.C. Circuit recognized in the *USTA* decision, ''[n]othing in the statute . . . compels the Commission to draw a talismanic (and elusive) distinction between (i) mobile broadband alone enabling a connection, and (ii) mobile broadband enabling a connection through use of an adjunct application such as VoIP.'' In the Order, in view of the evidence regarding the extent to which VoIP applications continue to be integrated with mobile BIAS, we readopt the Commission's analysis from the *2015 Open Internet Order* and find that mobile BIAS may be considered an interconnected service because it provides users with the capability to communicate with other users of the internet and with people

using telephone numbers through VoIP applications. While the D.C. Circuit in the *Mozilla* decision upheld the *RIF Order's* findings regarding the distinction between mobile VoIP applications and mobile BIAS itself, the Court nonetheless recognized that the Commission has discretion to make such a determination.

212. In connection with this approach, in the *2023 Open Internet NPRM* we sought comment about whether we should also readopt the *2015 Open Internet Order's* revised definition of ''interconnected service'' in § 20.3 of the Commission's rules. We noted that, in the *2015 Open Internet Order,* the Commission redefined ''interconnected service'' to mean a service that gives subscribers the ability to ''communicate to or receive communications from other users of the public switched network,'' removing the requirement that such service provide the ability to communicate with *all* other users of the public switched network. The *RIF Order* reverted to the prior definition, concluding that ''the best reading of 'interconnected service' is one that enables communication between its users and all other users of the public switched network.'' In the *2023 Open Internet NPRM,* we sought comment on whether it is necessary to return to the definition of ''interconnected service'' in the *2015 Open Internet Order* to ensure that all appropriate services are covered by the definition. Professor Jordan expresses support for readopting the revised definition from the *2015 Open Internet Order* and argues that the statute does not require interconnected services to give subscribers the ability to communicate to *all* other users of the public switched network and that such a requirement is inconsistent with how mobile services actually operate.

213. We readopt the revised definition from the *2015 Open Internet Order* and define ''interconnected service'' to mean a service that gives subscribers the ability to communicate to or receive communications from other users of the public switched network. We remove the requirement adopted by the Commission in the *RIF Order* that such service provide the ability to communicate with *all* other users of the public switched network. We conclude that mobile services that provide the ability for users to communicate with others through the public switched network should be considered ''interconnected'' even if they are limited in certain ways and do not provide the ability to communicate with *all* other users on the network. We find that revising the definition in this way

will clarify the scope of services that may be viewed as interconnected and is consistent with section 332's focus on differentiating between mobile services that are available "to the public" or to "a substantial portion of the public" and those that are not.

214. In addition, because we also have reclassified mobile BIAS as a telecommunications service, we find that classifying it as a commercial mobile service will avoid the inconsistency that would result if the service were both a telecommunications service and a private mobile service. The Commission explained this reasoning in the *2015 Open Internet Order,* and we adopt our proposal from the *2023 Open Internet NPRM* to apply a consistent rationale here. Because we have determined mobile BIAS to be a telecommunications service, we find that designating it also as a commercial mobile service subject to Title II is most consistent with Congressional intent to apply common carrier treatment to telecommunications services. Consistent with the Commission's analysis in 2015, we find that classifying mobile BIAS as a commercial mobile service is necessary to avoid a statutory contradiction that would result if the Commission were to conclude both that mobile BIAS was a telecommunications service and also that it was not a commercial mobile service. A statutory contradiction would result from such a finding because, while the Act requires that providers of telecommunications services be treated as common carriers, it prohibits common carrier treatment of mobile services that do not either meet the definition of commercial mobile service or serve as the functional equivalent of commercial mobile service. We find that classifying mobile BIAS as a commercial mobile service avoids this statutory contradiction and is also most consistent with the Act's intent to apply common carrier treatment to providers of telecommunications services.

215. *Functional Equivalence.* In the alternative, even to the extent that mobile BIAS were understood to fall outside the definition of "commercial mobile service," we conclude that it is also the functional equivalent of a commercial mobile service and, thus, not private mobile service. In the *2015 Open Internet Order,* the Commission found that mobile BIAS was functionally equivalent to commercial mobile service because, "like commercial mobile service, it is a widely available, for profit mobile service that offers mobile subscribers the capability to send and receive communications on their mobile device

to and from the public." The *RIF Order* found that the *2015 Open Internet Order's* focus on the public's "ubiquitous access" to mobile BIAS alone was "insufficient" to establish functional equivalency and that the test established in the *Second CMRS Report and Order* provided a more thorough consideration of factors of whether a service is closely substitutable for a commercial mobile service.

216. In the *2023 Open Internet NPRM,* we sought comment on both of these analyses and on whether we should adopt "any other or different definition of 'functional equivalent.' " CTIA and Wired Broadband et al. argue that the Commission cannot find that mobile BIAS is functionally equivalent to commercial mobile service by assessing how widely it is used but instead it must assess functional equivalence based on the factors outlined in the Commission's rules, such as whether the services are substitutable, whether a change in the price of one service would prompt customers to change to the other, and whether the service is advertised to the same targeted market. Under these factors, they contend, mobile BIAS is not functionally equivalent to commercial mobile service.

217. We disagree with these arguments and find that, to the extent mobile BIAS falls outside the definition of commercial mobile service, it is the functional equivalent of a commercial mobile service. Consistent with our proposal in the *2023 Open Internet NPRM,* and with the analysis in the *2015 Open Internet Order,* we find that mobile BIAS is the functional equivalent of commercial mobile service because like commercial mobile service, it is a widely available, for-profit mobile service that offers mobile subscribers the capability to send and receive communications on their mobile device to and from the public. We disagree with CTIA's argument that this finding relies impermissibly on an overly general description of mobile BIAS to show functional equivalence. To the contrary, we find that the fact that mobile BIAS is used to send and receive communications broadly among members of the public is a critical factor in assessing its functional equivalence to commercial mobile service. Although mobile BIAS uses IP addresses rather than telephone numbers, consumers use both mobile voice service and mobile BIAS to communicate with others on their mobile devices. The fact that mobile BIAS may be used for some purposes that are different than what mobile voice services are used for does not mean that the services do not

provide functional equivalence with respect to their capability to send and receive communications.

218. As the *RIF Order* acknowledges, the Commission has express delegated authority from Congress to make a policy determination on whether a particular mobile service may be the functional equivalent of a commercial mobile service. Specifically, section 332 of the Act defines "private mobile service" as "any mobile service . . . that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission." While the factors outlined in § 20.3 of the Commission's rules may be used in making a determination about the functional equivalence of a particular service, they do not prohibit the Commission from designating a category of service to be the functional equivalent of a commercial mobile service in a rulemaking and they do not prevent us from considering other factors in making our determination regarding the functional equivalence of mobile BIAS. Paragraph (c) of the "commercial mobile radio service" definition notes that "[a] variety of factors may be evaluated" to make a determination regarding functional equivalence "including" the enumerated factors. Based on this authority, the reasons outlined above and in the *2015 Open Internet Order,* and in light of the continued widespread use and availability of mobile broadband services, we find that mobile BIAS is the functional equivalent of commercial mobile service, and is therefore not private mobile service.

219. Finally, in the *2023 Open Internet NPRM,* we sought comment on the potential impact of applying openness requirements to mobile providers and on the "policy consequences that commenters believe may result from the proposed reclassification of mobile BIAS." Several commenters stress the importance of applying the same open internet rules to fixed and mobile BIAS. CTIA, Verizon, and AT&T, however, oppose openness requirements for mobile providers contending that such requirements are unnecessary and may discourage investment and innovation in mobile broadband networks.

220. We find that returning mobile BIAS to its classification as a commercial mobile service and reinstating openness requirements on mobile BIAS providers will help protect mobile broadband consumers while allowing mobile providers to continue to compete successfully and develop

new products and services. We agree with commenters who note that because consumers use both fixed and mobile BIAS regularly, it is critical that we apply the same rules to both services. In addition, as commenters point out, mobile broadband services are particularly important to certain groups, such as low-income consumers, who may not be able to afford to subscribe to both fixed and mobile broadband service, and it is critical to ensure that these consumers are able to benefit from a free and open internet. The Commission's previous experience applying open access rules to upper 700 MHz C Block licensees has shown that mobile operators subject to openness requirements have continued to compete successfully in the marketplace, and we expect mobile BIAS providers will continue to compete successfully under the openness requirements we adopt in the Order. ADTRAN contends that the C Block openness requirements drove down the price of C Block spectrum at auction. ADTRAN Comments at 32. While any number of factors may affect the price of any spectrum at auction, it is clear that Upper 700 MHz C Block licensees, including Verizon, invested heavily in deploying mobile broadband service over their C Block spectrum.

*F. Restoring the Telecommunications Service Classification of Broadband Internet Access Service Is Lawful*

221. Our classification of BIAS as a telecommunications service is fully and sufficiently justified under the Commission's longstanding authority and responsibility, provided by Congress, to classify services subject to our jurisdiction, as necessary. This authority and responsibility is not supplanted by the major-questions doctrine.

1. The Commission Has the Authority and Responsibility To Classify BIAS

222. The Commission's authority and responsibility to classify services subject to our jurisdiction, as necessary, is borne out of Congress's well-established and longstanding reliance on the Commission to exercise this authority. Our decision to revisit the classification of BIAS derives from ordinary administrative law principles and the factual circumstances surrounding the *RIF Order.* And the classification decision we reach is consistent with the broader context of the Act.

223. *Congress Authorized and Expected the Commission to Classify BIAS.* No one disputes that internet access services are within the Commission's subject-matter

jurisdiction and historically have been supervised by the Commission. Congress created the Commission "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communication." Section 2 of the Act grants the Commission jurisdiction over "all interstate and foreign communication by wire or radio."

224. Since the original enactment of the Communications Act in 1934, Congress routinely has specified regulatory regimes that apply to particular communications services or service providers that meet statutorily defined categories, and Congress has relied on the Commission to determine whether a particular service or provider falls within the statutory definitions that trigger those regulatory frameworks. For example, when the Act originally was enacted in 1934, Congress adopted the statutory category of "common carrier," and specified the associated regulatory framework under Title II for such providers, leaving it to the Commission to determine which specific entities were common carriers based on the statutory criteria, drawing on the historical backdrop of common carriage. For example, common carriers are, among other things, subject by default to various rate regulation, accounting, tariffing, market entry, and service discontinuance requirements, implemented by the Commission. Likewise, in 1934 Congress defined "radio station[s]" and "broadcasting" in the Act, and specified the regulatory regimes that the Commission was to apply when those definitions were met. For example, radio stations and broadcasters are, among other things, subject by default to various licensing and authorization requirements to ensure their operation consistent with the public interest, implemented by the Commission. Congress did so again, for instance, in the 1984 Cable Act for "cable operator[s]" and "cable service." For example, cable operators are, among other things, subject by default to channel carriage requirements and ownership restrictions implemented by the Commission. In 1993, Congress did the same with respect to "commercial mobile service" and "private mobile service." For example, commercial

mobile service providers are, among other things, subject by default to the requirements governing common carriers under Title II of the Communications Act, while private mobile service providers are not. It did so again in 1994 in the Communications Assistance for Law Enforcement Act (CALEA), for "telecommunications carriers" as defined there. For example, entities that qualify as telecommunications carriers for purposes of CALEA are, among other things, subject by default to the requirement to file with the Commission and maintain up-to-date System Security and Integrity plans designed to help preserve the ability of law enforcement agencies to conduct electronic surveillance while protecting the privacy of information outside the scope of the investigation. When Congress enacted the definitional frameworks and associated regulatory regimes to be applied by the Commission in the 1996 Act, it continued its well-established, longstanding approach reflected in those historical examples—an approach that Congress has since continued to follow. Classification decisions under each of those frameworks are consequential in their own way, yet it is well established that Congress relies on the Commission to make just such determinations.

225. Provisions enacted as part of the 1996 Act amply detail Congress' expectation that the Commission would classify services and providers under the "telecommunications service" and "information service" statutory definitions. The Act is replete with examples of provisions expressly to be implemented by the Commission that turn on the Commission's interpretation and application of those statutory definitions to classify particular services and service providers. As relevant here, for example:

• Section 10 of the Act directs the Commission to forbear from applying provisions of the Act or Commission rules to telecommunications carriers or telecommunications services if certain statutory criteria are met.

• Section 11 of the Act requires the Commission to biennially review its rules "that apply to the operations or activities of any provider of telecommunications service" and determine if any such rules are no longer necessary in the public interest based on certain marketplace developments.

• Section 224 of the Act requires the Commission to ensure just and reasonable rates, terms, and conditions for pole attachments, among other

circumstances, when provided by a telecommunications carrier to a provider of telecommunications service.

• Sections 251 and 252 of the Act direct the Commission to effectuate certain market-opening requirements for telecommunications carriers, including setting rules to be applied by State commissions when arbitrating interconnection agreements among carriers to implement those statutory requirements.

• Section 253 directs the Commission to preempt certain State or local requirements that actually or effectively prohibit the ability of any entity to provide any telecommunications service.

• Section 254 of the Act requires the Commission to adopt rules to preserve and advance universal service, defined principally in terms of "an evolving level of telecommunications services" established by the Commission, and to fund universal service support by contributions from "[e]very telecommunications carrier that provides interstate telecommunications services" along with certain other "provider[s] of interstate telecommunications," and to rely on certain principles to inform its universal service rules, including providing access to telecommunications and information services.

• Section 272 of the Act gives the Commission the responsibility to implement certain separate affiliate safeguards for the former BOCs in connection with, among other things, the provision of certain information services.

These illustrative examples, all enacted as part of the 1996 Act, amply demonstrate the Commission's authority—and responsibility, as necessary—to classify services under the definitional criteria established by the 1996 Act.

226. Congress reaffirmed that it had granted the Commission this authority when, less than two years after the 1996 Act's passage, it directed the Commission to explain, in what came to be known as the *Stevens Report,* how the new statutory terms apply "with respect to internet access" for the purposes of universal service administration and support. As Public Knowledge notes, "[t]he Stevens Report represents . . . a clear demonstration that Congress had committed the question of classification of services to the FCC," and "it is undeniable that the Stevens Report reflects the FCC's interpretation—supported by the initial report requirement from Congress—that Congress assigned it the authority to classify services as either information

services or telecommunications services." Given the Commission's longstanding, well-established authority and responsibility to classify services, we disagree with commenters who contend that the Commission does not have such authority or should defer to Congress to determine the classification of BIAS.

227. *Revisiting the Classification of BIAS Is Not Inherently Suspect.* We conclude that our decision to revisit the classification of BIAS does not somehow render it inherently suspect. As a threshold matter, it derives from ordinary administrative-law principles. The U.S. Supreme Court has observed that there is "no basis in the Administrative Procedure Act [(APA)] or in our opinions for a requirement that all agency change be subjected to more searching review. . . . [I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." Relevant precedent holds that we need only "examine the relevant data and articulate a satisfactory explanation for [our] action," a duty we fully satisfy here. The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consistent with these principles, the Commission's reasoned determination in the Order that classifying BIAS as a telecommunications service is superior first and foremost as a matter of textual interpretation—while also recognizing that public policy supports the change in direction—is sufficient to justify our action under ordinary administrative-law principles, even absent any new facts or changes in circumstances.

228. But even assuming, *arguendo,* that an agency must go beyond ordinary administrative-law principles and show new facts to justify its action, our decision to revisit the classification of BIAS is particularly warranted under the factual circumstances here. Our classification of BIAS flows in significant part from concerns with the *RIF Order* highlighted in *Mozilla*—to "bring the law into harmony with the realities of the modern broadband marketplace"—which is itself a sufficient justification for our classification here. The U.S. Supreme Court observed in *Brand X* that "the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis." Separately and secondarily, our classification decision accounts for

certain statutory responsibilities and policy concerns—especially safeguarding public safety and providing a uniform regulatory framework for BIAS—where the *RIF Order's* approach was called into doubt by *Mozilla.* The Commission's attempt to respond to the *Mozilla* remand has remained subject to the petitions for reconsideration, which we resolve in the Order, and a petition for judicial review held in abeyance pending further Commission action. Given the *Mozilla* court's palpable criticism of the *RIF Order's* regulatory approach to BIAS, and that the merits of this approach were never brought to a final resolution, we find it especially appropriate for the Commission to resolve these lingering disputes now.

229. *Reclassification Is Consistent with the Broader Context of the Act.* We also find that our classification of BIAS as a telecommunications service accords with the goals and directives found in the 1996 Act. To begin with, section 706, which while worded in terms of encouraging the deployment of "advanced telecommunications capability," has long been understood to encompass the goal of encouraging broadband internet access. That "advanced telecommunications capability" is not identical to BIAS as defined for purposes of the Order does not diminish the substantial extent to which section 706 has been—and is—understood as encouraging BIAS deployment. Congress specifically directed the Commission to encourage the deployment of advanced telecommunications capability "by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." The list of specific regulating methods—price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market— all are authorities the Commission has long had, or that were granted by the 1996 Act, with respect to telecommunications services.

230. The *Mozilla* court's critiques of the *RIF Order* highlight specific areas where the objectives of section 706 of the 1996 Act—and the operative provisions of the Communications Act itself—would be more effectively carried out if BIAS is classified as a telecommunications service. As we discuss above, reclassification will further enable the Commission to promote broadband access by granting

to BIAS-only providers just and reasonable access and rates for pole attachments under section 224, a key pro-competitive provision of the Act that the *Mozilla* court chastised the *RIF Order* for failing to grapple with when tracking such rights from BIAS-only providers. The D.C. Circuit in *Mozilla* also was concerned about the effect of the *RIF Order* on the continued availability of funding for BIAS through universal service support—a tool Congress provided in section 254 of the 1996 Act to address barriers to infrastructure investment. Expressing particular concern with respect to Lifeline support in light of the arguments raised on review, the court highlighted that section 254(c)(1) "declared that '[u]niversal service is an evolving level of telecommunications services'" and sections 254(e) and 214(e) "tethered Lifeline eligibility to common-carrier status." Our classification recognizes that BIAS itself meets the criteria for inclusion in "universal service" under section 254(c)(1) and therefore provides a direct basis for support that is not contingent on BIAS's relationship to the network facilities used to offer voice service. Furthermore, reclassification would enable the Commission to provide universal service support to BIAS providers that solely supply BIAS.

231. By reclassifying BIAS as a telecommunications service, we also help to effectuate the intent of section 706 of the 1996 Act by empowering the Commission to focus section 253 on actions relating to BIAS, an advanced telecommunications capability. In addition to the market-opening amendments to pole access under section 224 of the Act, the 1996 Act also sought to open markets to competition by granting authority to the Commission in section 253 to preempt "State or local legal requirement[s that] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." If the Commission is to truly realize section 706's command to encourage the deployment of advanced telecommunications capability through "measures that promote competition in the local telecommunications market," it should not have to resort to applying section 253 to a co-mingled telecommunications service that may not even constitute "advanced telecommunications capability."

232. Contrary to the *RIF Order*'s suggestion, our classification of BIAS as a telecommunications service is not undercut by section 230 of the Act, which was enacted as part of the 1996 Act. Section 230(b)(2) adopts the policy of "preserv[ing] the vibrant and competitive free market *that presently exists* for the internet and other interactive computer services, unfettered by Federal or State regulation." Section 230 also finds that "[t]he internet and other interactive computer services *have* flourished, to the benefit of all Americans, with a minimum of government regulation." As we discuss above, at the time the 1996 Act was enacted, the transmission component of enhanced services— namely, internet access—was subject to regulation under Title II of the Act. Thus, the regulatory *status quo* that "presently exist[ed]" and under which the internet and other interactive computer services "ha[d]" flourished at the time of section 230's enactment as part of the 1996 Act included Title II regulation of the transmission services used to access the internet. We are not persuaded by Commissioner Carr's suggestion that our rules are incompatible with section 230(c)(2), which is entitled "Civil Liability" and provides in relevant part that "No provider or user of an interactive computer service shall be held liable on account of any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . ." We take no position here on when, if ever, a BIAS provider's actions to discriminate against certain internet content, application, or services could be characterized as good-faith action to address "objectionable" content within the meaning of section 230(c)(2). Moreover, section 230(c)(2)'s title and text indicate, that provision merely immunizes providers against civil liability, such as damages, for their content-moderation decisions. It does not purport to otherwise immunize BIAS providers from any regulatory obligations, and if a BIAS provider violates our rules, the rules may be validly enforced through other means— such as a writ of injunction under section 401(b), or potentially criminal sanctions under section 501. In addition, the Commission could issue a declaratory ruling identifying a violation of the conduct rules by a given provider, 47 CFR 1.2, with the potential to consider that determination in subsequent adjudications not involving civil liability—such as evaluating the public interest when granting or denying licenses or authorizations, or crafting policies governing eligibility for universal service funding.

233. We also reject the contention of the *RIF Order* and certain commenters that narrow-purpose statutory provisions like sections 230(f)(2) and 231 of the Act either settled the classification of BIAS or are even relevant to our telecommunications service classification. Section 230(f)(2) defines "for purposes of this section" an "interactive computer service" to "mean[ ] any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the internet." Likewise, section 231(e)(4) provides that "for purposes of" section 231—which was added a year after the enactment of the 1996 Act—"'internet access service' means a service that enables users to access content, information, electronic mail, or other services offered over the internet, . . . [and] does not include telecommunications services." In a similar vein, NCTA seeks to invoke language in section 231 of the Act, stating that "[n]othing in this section shall be construed to treat interactive computer services as common carriers or telecommunications carriers." But had Congress wanted those provisions to settle the classification of internet access service, it easily could have added those definitions—or others—to the definitions in section 3 of the Communications Act, and thereby made them generally applicable (as the 1996 Act did with respect to many other definitions). Thus, we agree with the D.C. Circuit in *USTA* that it is "unlikely that Congress would attempt to settle the regulatory status of BIAS in such an oblique and indirect manner, especially given the opportunity to do so when it adopted" the 1996 Act. And as we discuss above, that the internet access service prevalent at the time those provisions were enacted bears so little resemblance to the BIAS we classify in the Order reinforces our decision not to pull those definitions out of their statutory context and apply them to a fundamentally dissimilar service.

234. We also reject arguments that the IIJA counsels against reclassification. USTelecom points out that through the IIJA "Congress established numerous programs to promote digital equity" including actions to foster "deployment to unserved and underserved areas," to "provide[ ] a discount for broadband service to eligible households," "to establish three grants with the goal of ensuring that all people have the skills, technology, and capacity needed to participate in the digital economy," and

to "facilitat[e] equal access to broadband, including by preventing and eliminating digital discrimination." USTelecom then asserts that "Congress's decision to address equal access directly—in the way that it chose—demonstrates that it did not intend for the Commission to attempt to address the issue through Title II reclassification of broadband." But such an argument proceeds from a mistaken assumption. First and foremost, as discussed above, the Act clearly grants the Commission authority and responsibility to classify services such as BIAS—the status of which remained unsettled by the unresolved challenges to the *RIF Remand Order*—where necessary to fulfill its statutory duties. And we classify BIAS as a telecommunications service because we conclude that represents the best reading of the Act. Second, even to the extent that we evaluate policy considerations as independently reinforcing our classification decision, we find USTelecom's argument unpersuasive. We see nothing in the text of the IIJA to indicate that the targeted efforts to address BIAS-related policy concerns taken up in the IIJA were intended to comprehensively address BIAS policy in any or all of the targeted policy areas to the exclusion of other existing statutory authorities. Indeed, at the time the IIJA was enacted in 2021, there were pending petitions for reconsideration and a pending petition for judicial review of the *RIF Remand Order,* and thus we cannot assume Congress would have reached a conclusion about what the ultimate classification of BIAS would be at the time of the IIJA's enactment.

235. We conclude that a finding of market power is not a prerequisite to classifying a service as a telecommunications—and thus common carrier—service and are unpersuaded by arguments to the contrary. The Act is abundantly clear that common carrier regulation applies—at least absent forbearance—even in the case of services subject to competition. The 1996 Act is replete with examples of provisions making clear that Congress desired telecommunications carriers—which are treated as common carriers in their provision of telecommunications services—to be subject to competition. Indeed, one of the main goals of the 1996 Act was to foster competition amongst common carriers. For example, among other things:

• Section 10 of the Act directs the Commission to forbear from applying provisions of the Act or Commission rules to telecommunications carriers or telecommunications services if certain statutory criteria are met and provides that the public interest evaluations in section 10(a)(3) will be met if forbearance "will promote competitive market conditions, including . . . competition among providers of telecommunications services."

• Section 11 of the Act requires the Commission to biennially review its rules "that apply to the operations or activities of any provider of telecommunications service" and determine if any such rules are no longer necessary "as the result of meaningful economic competition between providers of such service."

• Section 251 of the Act provides for an array of requirements specifically designed to facilitate local competition for telecommunications services.

• Section 254(k) of the Act prohibits telecommunications carriers from "us[ing] services that are not competitive to subsidize services that are subject to competition."

• Section 271 of the Act predicated the BOCs' provision of long distance services on anticipated competition in local markets for telecommunications services, including through requirements designed to foster that competition.

Even prior to the 1996 Act, it was apparent that common carrier regulation under the Communications Act was not tied to market power or similar considerations. For example, section 332(c)(1) provided that commercial mobile service providers "shall, insofar as such person is so engaged, be treated as a common carrier," but authorized the Commission to designate certain Title II provisions as inapplicable if certain statutory criteria are met, including an analysis of whether such relief "will enhance competition among providers of commercial mobile services." Likewise, the Supreme Court, in *MCI,* evaluated the Commission's pre-1996 Act efforts to grant relief from Title II requirements for common carriers that lacked market power, and ultimately rejected such efforts as beyond the Commission's authority under the Communications Act.

## 2. The Major-Questions Doctrine Poses No Obstacle to Recognizing BIAS as a Telecommunications Service

236. We conclude that the major-questions doctrine—the notion that in certain extraordinary cases, a court will not lightly find that Congress has delegated authority to an agency—is no obstacle to our classification of BIAS as a telecommunications service. We also reject TechFreedom's assertion that our actions violate the non-delegation doctrine. The Supreme Court has repeatedly held that "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.' " In other words, a statutory delegation is constitutional if Congress provides "standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." The test is plainly satisfied here. The Act contains specific definitions of "information service" and "telecommunications service," which enable courts to assess whether the Commission has properly classified BIAS under the Act. Similarly, the statute provides that the Commission may engage in regulatory forbearance only if it makes certain statutorily specified determinations. Thus, consistent with the Constitution, the Act sets forth intelligible principles to guide the Commission in exercising its delegated authority.

237. To begin with, for several reasons, we do not think the major-questions doctrine properly comes into play in this context at all. For one, we are simply following the best reading of the Communications Act, as demonstrated by the statute's plain text, structure, and historical context; there is no call for deference to an interpretation that is not the statute's most natural reading.

238. Moreover, as the D.C. Circuit has recognized, the Supreme Court's *Brand X* decision establishes that the major-questions doctrine does not restrict our authority to determine the proper classification of BIAS. *Brand X* held that the Commission has the authority to determine the proper statutory classification of BIAS. If the major-questions doctrine were an obstacle to reclassification here, then it also should have applied to the earlier reclassification in that case from Title II to Title I. After all, a decision to adopt a Title I classification would simply be the obverse of a decision to adopt a Title II classification, with the same economic and political stakes (but in the opposite direction). But, in reviewing the *Cable Modem Declaratory Ruling* in *Brand X,* the Supreme Court recognized and upheld the Commission's authority to determine the proper classification of BIAS without identifying any concern over whether that classification presents a major question. Indeed, the Court identified no major-questions problem even though several parties expressly raised the issue. We are unpersuaded by suggestions that a deregulatory Title I classification would not be a major

question, yet a Title II classification would be. The Supreme Court has construed its earlier decision in *MCI* as a ''major questions'' case. And in *MCI*, the Court overturned a Commission order adopting a *deregulatory* interpretation of the Act, holding that the Commission's authority to ''modify'' certain tariff-filing requirements did not permit elimination of the tariff-filing requirement for nondominant carriers altogether. It is therefore apparent that the major-questions doctrine applies equally to agency actions that are regulatory or deregulatory. Thus, if the major-questions doctrine applies to an interpretation that BIAS is a Title II telecommunications service, then the doctrine equally would apply to an interpretation that BIAS is a Title I information service. We therefore find that the major-questions doctrine does not resolve this issue or place a thumb on the scale in favor of one interpretation over the other.

239. We also do not think any inference can be drawn from Congress's failure to clarify the regulatory status of BIAS one way or the other. Commenters point out that several bills were introduced in Congress to specify that broadband should be regulated under Title II, but were not enacted. But other bills were introduced in Congress to specify that broadband must be regulated under Title I, and those bills also failed to pass. Numerous failed bills would have required that broadband ''shall be considered to be an information service.'' Another failed bill would have required that ''[t]he Commission may not impose regulations on broadband internet access service or any component thereof under title II.'' Three other failed bills proposed to overturn and preclude reenactment of the *2015 Open Internet Order*'s Title II classification and rules. And yet another bill proposed to classify broadband under a new Title VIII. This record of unenacted legislation on both sides reflects only indecision and inaction from Congress, not that Congress discernibly refused or rejected any particular approach. Failed legislation on both sides of this issue ''tell[s] us little if anything about'' Congress's views on the proper classification of broadband. The record of indecision and inaction from Congress on the classification of broadband, against the backdrop of the Commission's prior actions, readily distinguishes the situation here from that in *FDA* v. *Brown & Williamson Tobacco Corp.* There, the Food and Drug Administration (FDA) asserted jurisdiction to regulate tobacco products

after having ''disclaimed the authority to [do so] . . . for more than eighty years,'' and ''Congress had repeatedly legislated against this background.'' By contrast, in the period since Congress enacted the 1996 Act, the Commission's treatment of broadband service has wavered between Title II and Title I and remained unsettled. In the years soon after passage of the 1996 Act, the Commission classified DSL as including an offer of telecommunications service subject to Title II. In 2002, the Commission reversed course and classified cable broadband as a single integrated offering of information service subject only to Title I (although its legal status remained uncertain, with the Ninth Circuit initially overturning that classification, until the Supreme Court upheld it in 2005). From 2015 to 2018, the Commission regulated broadband as a Title II telecommunications service. And then in 2018, the Commission reverted to classifying broadband as a Title I information service. And even during much of the Title I era, the Commission repeatedly sought to enforce policies that closely resemble the open internet rules we adopt in the Order. The Commission ''never disclaimed any authority to regulate the internet or internet providers altogether, nor is there any similar history of congressional reliance on such a disclaimer.''

240. Even if the major-questions doctrine were to come into play, we do not think it would ultimately apply to the actions we take here. To determine whether the major-questions doctrine applies, courts weigh several factors, including (1) ''the economic and political significance'' of the agency action, (2) whether the agency is ''claim[ing] to discover in a long-extent statute an unheralded power,'' (3) whether the action falls within the agency's ''comparative expertise,'' and (4) whether Congress ''has consistently rejected'' similar efforts.

241. We do not think the rules we adopt in the Order have the extraordinary economic and political effect required to implicate the major-questions doctrine. To be sure, we believe the rules we adopt in the Order will have substantial benefits for the American public. But not every regulatory action that has substantial effects is so momentous as to trigger the major-questions doctrine. BIAS providers have previously been regulated under Title II—including several years under the 2015 rules that were materially identical to those we adopt in the Order—yet the record does not show that our past Title II rules had

any extraordinary negative impact on BIAS providers or the internet economy, which continued to flourish while those rules were in effect. Instead, commenters arguing that our actions in the Order cross the major-questions threshold appear to exaggerate the potential effect of the Order by focusing on the economic value of the internet economy as a whole or the total amount of capital that has been spent to construct the internet, rather than the effect of the specific actions we take here, or by relying on provisions that we have *forborne* from applying, or bare platitudes and *ipse dixit.* When considering economic effects, the Supreme Court has focused on the actual magnitude of a challenged action's effect on an industry, rather than just the size of the underlying industry. To the extent parties have pointed to attempts to isolate the effects of Title II or the 2015 rules, we agree with the *Mozilla* court that ''the Title II Order's effect on investment [is] subject to honest dispute'' and that the available studies are of only ''quite modest probative value'' and ''could only be reliably adduced as evidence of the *directionality* of broadband investment, not 'the absolute size of the change' attributable to the Title II Order,'' for the reasons we discuss below. The internet will continue to sustain its enormous economic and social value under our actions in the Order, just as it did under the *2015 Open Internet Order.* And as with that *Order,* our broad forbearance from any particularly onerous requirements under Title II will significantly mitigate any economic impact on BIAS providers. As Justice Scalia observed in his dissent in *Brand X,* ''the Commission's statutory authority to forbear from imposing most Title II regulations'' ensures that the economic effect of a Title II classification is ''not a worry.''

242. But even if the economic and political significance of our order met the first prong of the major-questions doctrine, the other factors militate against applying it here. In every other respect, the situation here is the antithesis of the Supreme Court's major-questions cases.

243. To start, we are not ''claim[ing] to discover in a long-extant statute an unheralded power.'' There is nothing novel about the Commission's exercise of its classification power here. On the contrary, the Commission regularly classified services under the basic-enhanced *Computer II* framework even before Congress adopted the 1996 Act; Congress effectively codified that regulatory regime into the 1996 Act under the telecommunications service

and information service definitions; the Commission has continued to regularly exercise that authority under the 1996 Act, including by classifying DSL service as including a Title II telecommunications service in 1998 and classifying all BIAS as a Title II telecommunications service in 2015; and the Supreme Court expressly upheld the Commission's authority to classify broadband service in *Brand X.* That is not some "newfound power," but instead a power that the Commission has possessed and asserted all along. We also reject claims that our order would "effect[ ] a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation' into an entirely different kind." That may have been true in *MCI,* which concerned a change from "from a scheme of rate regulation in long-distance common-carrier communications to a scheme of rate regulation only where effective competition does not exist." But under the forbearance authority that Congress added to the Communications Act in response to that case, the Order specifically forbears from any tariff-filing requirements or rate regulation, ensuring that our classification decision will not alter those fundamental aspects of the regulatory scheme. Our exercise of that authority in the Order thus comes as no surprise. And given the important role that a service's classification plays under numerous provisions of the Act, as well as the persistent focus on that issue in numerous classification decisions over the years, the classification power cannot be dismissed as some mere "'ancillary provision[ ]' of the Act . . . that was designed to function as a gap filler and had rarely been used in the preceding decades."

244. On top of that, regulating communications services and determining the proper regulatory classification of broadband falls squarely within the Commission's wheelhouse. Regulating communications networks "is what [the Commission] does," consistent with our statutory mandate to "regulat[e] interstate and foreign commerce in communications by wire and radio so as to make available . . . a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities at reasonable charges." No one should be surprised to see the Commission classifying and regulating communications services. Our action in the Order is thus nothing like the Centers for Disease Control and Prevention seeking to regulate evictions,

the Occupational Safety and Health Administration seeking to regulate non-occupational public health hazards, the Internal Revenue Service addressing healthcare policy, or the Attorney General making medical judgments. In contrast to those cases, the Order falls directly within the agency's core statutory responsibility.

245. The regulatory issues we address in the Order also fall squarely within the Commission's technical and policy expertise. The issues here "turn[ ] . . . on the factual particulars of how internet technology works and how it is provided," and they "involve a 'subject matter [that] is technical, complex, and dynamic,'" which the agency is well positioned "to address" through "its expert policy judgment." In light of that relevant expertise, it is entirely appropriate and unsurprising that Congress would "leave[ ] federal telecommunications policy in this technical and complex area to be set by the Commission."

246. For the reasons explained above, we also do not believe that, on the facts here, anything can be inferred from Congress's failure to clarify the regulatory status of broadband one way or the other. Against a pre-1996 Act backdrop in which the Commission regularly classified emerging services as either basic services (now known as telecommunications services) or enhanced services (now known as information services), Congress essentially adopted that framework in the 1996 Act. But Congress chose not to directly specify *which* classification applies to broadband, which the Supreme Court understood in *Brand X* as "leav[ing] it to the Commission to resolve in the first instance" in the exercise of its expert technical and policy judgment. In the years since *Brand X,* Congress has failed to adopt several bills that would require broadband to be regulated under Title I and has also failed to adopt several bills that would instead provide for broadband to be regulated under Title II. Rather than casting any doubt on our regulatory authority, we think this recent stalemate leaves in place the prior understanding articulated in *Brand X—i.e.,* that the Communications Act "leaves federal telecommunications policy in this technical and complex area to be set by the Commission."

247. The situation here again stands in stark contrast to *Brown & Williamson.* In that case, the Court "d[id] not rely on Congress' failure to act" as casting doubt on agency action, but instead on *affirmative* action by Congress that appeared to chart an incompatible course. There is no comparable record

of incompatible action by Congress here. Here, the only affirmative action Congress has taken on broadband regulation in recent years was a 2017 resolution to invalidate broadband privacy rules promulgated by the Commission under section 222 of the Act. That resolution overturned only a specific set of privacy rules while leaving in place the underlying Title II classification and other rules that were then in effect, and so casts no doubt on the actions we take in the Order. We disagree with USTelecom's contention that Congress's authorization of the BEAD grant program somehow bears on the classification of BIAS under the Communications Act. USTelecom observes that, in authorizing that program, section 60102(h)(5)(D) of the IIJA states that "[n]othing in this title"—meaning Title I of Division F of the IIJA—"may be construed to authorize the Assistant Secretary [of Commerce] or the National Telecommunications and Information Administration to regulate the rates charged for broadband service." But a disclaimer that Congress was not authorizing *the Department of Commerce or its subagency* to regulate broadband rates as part of a subsidy program that exists outside the Communications Act does not speak at all to how the Commission may or should administer the Communications Act. And even if the IIJA had adopted a broader prohibition on any rate regulation under the Communications Act—something that the Order does not impose, and indeed affirmatively forbears from—that would not speak to other forms of common-carriage treatment or to the rules we adopt in the Order prohibiting blocking, throttling, and paid prioritization. On its face, the IIJA is entirely agnostic about how BIAS should be classified under the Communications Act and whether the Commission should have the power to impose the rules we adopt in the Order. If Congress wanted to prohibit Title II regulation of broadband in the IIJA or to otherwise restrict the Commission's authority, it surely could have done so, but USTelecom errs in trying to read into the IIJA an unstated prohibition that Congress nowhere adopted.

248. Finally, in the event that (despite all the considerations above) the major-questions doctrine does apply here, we nonetheless think our authority to classify and regulate broadband is sufficiently clear under the Communications Act. We agree with the D.C. Circuit that the Supreme Court already held as much in *Brand X,* in which "the Supreme Court expressly recognized that Congress . . . had

delegated to the Commission the power to regulate broadband service.'' Indeed, in a subsequent major-questions case, the Court expressly pointed to *Brand X* as a case finding that the agency's ''authority is clear'' based on ''the language of the statute itself.'' That conclusion from the statute was clearly correct. The Communications Act is full of provisions that depend on whether a service is classified as a telecommunications service or an information service. The Commission cannot administer those provisions without first deciding how a service should be classified. To that end, section 4(i) of the Act expressly empowers the Commission to ''perform any and all acts, make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions.'' Likewise, section 201(b) empowers the Commission to ''prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of'' the Act. And section 303(r) again empowers the Commission to ''[m]ake such rules and regulations and prescribe such restrictions and conditions . . . as may be necessary to carry out the provisions of'' the Act. The grant of authority required under the major-questions doctrine ''may come from specific words in the statute, but context can also do the trick,'' including ''[s]urrounding circumstances, whether contained within the statutory scheme or external to it.'' Here, as the Supreme Court has opined in numerous Commission-related cases, ''[i]t suffices . . . [that] Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication,'' and the Commission necessarily must be able to assess the proper classification of BIAS ''in the exercise of that authority.''

### G. Preemption of State and Local Regulation of Broadband Service

249. Consistent with the Commission's approach in the *2015 Open Internet Order,* we will exercise our authority to preempt any State or local measures that interfere or are incompatible with the Federal regulatory framework we establish in the Order. And as in the *2015 Open Internet Order,* we will proceed incrementally by considering such measures on a case-by-case basis as they arise ''in light of the fact specific nature of particular preemption inquiries.'' We are not persuaded to depart from our description of the basic preemption framework here, particularly given our approach of generally deferring specific preemption analyses to future case-by-case assessments where the relevant issues can be fully vetted as warranted.

250. Commenters broadly agree that Title II gives the Commission authority to preempt State or local requirements that interfere with our exercise of Federal regulatory authority over interstate communications. Under a doctrine known as the impossibility exception to State jurisdiction, the Commission may, in the exercise of its preeminent Federal regulatory authority over interstate communications, preempt State law when (1) it is impossible or impracticable to regulate the intrastate use of a communications service without affecting interstate communications, and (2) State regulation would interfere with the Commission's exercise of its authority to regulate interstate communications. General principles of conflict preemption also lead to the same conclusion. ''Under ordinary conflict pre-emption principles[,] a state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law is preempted.'' In *Geier* v. *Am. Honda Motor Co.,* for example, the Court ''found that [a] state law stood as an obstacle to the accomplishment of a significant federal regulatory objective'' embodied in Department of Transportation regulations and was therefore preempted.

251. The D.C. Circuit held in *Mozilla* that the Commission could not invoke the impossibility exception to preempt State law after it classified BIAS as an information service under Title I. But that was because ''[c]lassifying broadband as an information service . . . placed broadband *outside* of [the Commission's] Title II jurisdiction,'' and ''in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law.'' Because the Order restores and rests on the broad regulatory authority conferred on the Commission by Title II, *Mozilla* does not cast any doubt on the Commission's power, under the impossibility exception as well as ordinary principles of conflict preemption, to preempt State law when exercising—or when forbearing from— our affirmative regulatory authority over broadband. We reiterate, as we have in the past, that the reclassification decision made herein provides no justification for a State or local franchising authority to require a party with a franchise to operate a cable system under Title VI of the Act, to obtain an additional or modified franchise in connection with the provision of BIAS, or to pay any new franchise fees in connection with the provision of such services.

252. We decline requests to categorically preempt all State or local regulation affecting BIAS in the absence of any specific determination that such regulation interferes with our exercise of Federal regulatory authority. Because we think preemption decisions will, at least in general, best be reached on a record specific to whether and how a State or local regulation conflicts with our Federal requirements, we also decline at this time to preempt specific State or local regulations insofar as we lack a specific and robust record in this proceeding. The Act establishes a dual Federal–State regulatory system in which the Federal government and the states may exercise concurrent regulatory authority over communications networks. While the Commission has occasionally described the internet as ''jurisdictionally interstate'' or ''predominantly interstate,'' we cannot find it to be *exclusively* interstate. BIAS providers operate in and significantly affect local markets, and there are intrastate aspects of BIAS providers' operations that could reasonably be handled differently in different jurisdictions. For example, different laws might apply to customer relationships and billing practices depending on a customer's billing or service address. The Commission has previously stated that ''whenever possible,'' preemption should be applied ''narrow[ly]'' in order ''to accommodate differing state views while preserving federal goals.'' And as the Commission recognized even in the *RIF Order,* it would be inappropriate to ''disturb or displace the states' traditional role in generally policing such matters as fraud, taxation, and general commercial dealings.'' Where State or local laws do unduly frustrate or interfere with interstate communications, however, we have ample authority to address and preempt those laws on a case-by-case basis as they arise. We will not hesitate to exercise that authority.

253. California's Internet Consumer Protection and Network Neutrality Act of 2018, also known as SB–822, appears largely to mirror or parallel our Federal rules. Thus we see no reason at this time to preempt it. The law's legislative history states that it was specifically designed to ''codify portions of the [then]-rescinded Federal Communications Commission rules'' by ''recast[ing] and implement[ing] the 'bright line rules' . . . established in the 2015 Open Internet Order.'' To that end, the California law makes it ''unlawful'' for any BIAS provider to engage in

''blocking,'' throttling (*i.e.,* ''[i]mpairing or degrading'' internet traffic), or ''paid prioritization.'' The law also prohibits BIAS providers from ''unreasonably interfering'' with or ''unreasonably disadvantaging'' internet content or services, similar to our general conduct rule. And the law includes a disclosure requirement that closely resembles our transparency rule.

254. On its face, the California law generally tracks the Federal rules we restore in the Order, including the bright-line rules prohibiting blocking, throttling, and paid-prioritization, as well as the general conduct rule and transparency disclosures. A State law that requires regulated parties to comply with the same requirements that already apply under Federal law is by definition unlikely to interfere with or frustrate those Federal rules.

255. Nor do we see any reason at this time to preempt California from independently enforcing the requirements imposed by our rules or by the state's parallel rules through appropriate State enforcement mechanisms. On the contrary, we think State enforcement generally supports our regulatory efforts by dedicating additional resources to monitoring and enforcement, especially at the local level, and thereby ensuring greater compliance with our requirements. However, should California State enforcement authorities or State courts seek to interpret or enforce these requirements in a manner inconsistent with how we intend our rules to apply, we will consider whether appropriately tailored preemption is needed at that time.

256. Some parties suggest that the California law might go further than our Federal requirements with respect to interconnection or zero-rating. Notably, most of these commenters express support for these requirements and urge against preempting them. We are not persuaded on the record currently before us that the California law is incompatible with the Federal rules we adopt in the Order with respect to either issue. As to the former, California prohibits BIAS providers from requiring interconnection agreements ''that have the purpose or effect of evading the other prohibitions'' by blocking, throttling, or charging for traffic at the interconnection point. We have likewise stated in the Order that BIAS providers may not engage in interconnection practices that circumvent the prohibitions contained in the open internet rules. As to the latter, California restricts zero-rating when applied discriminatorily to only a subset of ''Internet content, applications, services, or devices in a category'' or when performed ''in exchange for consideration, monetary or otherwise, from a third party.'' We have likewise explained in the Order that sponsored-data programs—where a BIAS provider zero rates an edge product in exchange for consideration (monetary or otherwise) from a third party or where a BIAS provider *favors* an affiliate's edge products—raise concerns under the general conduct standard. The California Attorney General represents that these provisions of California law ''are consistent with, and not in conflict with, the Commission's proposal'' that we adopt in the Order, because the Commission has ''included protections against interconnection circumvention'' and stated that we ''may take action against zero-rating practices under the general conduct provision on a case-by-case basis.'' Nothing in the record gives us any reason to doubt that representation. The California law has been in effect since early 2022, yet there is no record evidence that these provisions have unduly burdened or interfered with interstate communications service. And in contrast to our treatment of rate regulation, from which we have affirmatively forborne, we have not determined that regulation of zero-rating and interconnection is detrimental, leaving room for states to experiment and explore their own approaches within the bounds of our overarching Federal framework.

257. We caution, however, that we stand ready to revisit these determinations if evidence arises that State policies are creating burdens on interstate communications that interfere or are incompatible with the Federal regulatory framework we have established. Our determination here simply reflects that no convincing evidence has been presented to us in this proceeding.

258. A group of California Independent Small LECs ask us to preempt several CPUC decisions regulating rates for intrastate telephone service, insofar as those telephone service rates take into account a company's broadband revenues or those of its affiliates. We find that those decisions are outside the scope of this proceeding, which concerns the regulatory framework that applies to BIAS, not rates for or regulation of traditional telephone service. The California Independent Small LECs or other parties are free to raise this issue in an appropriate proceeding, but we express no views on it here.

259. Some commenters ask us to address more broadly the extent of State authority to adopt broadband affordability programs. The comments received in this proceeding do not contain a focused and robust record or discussion concerning any particular State broadband affordability program, so we decline to address any particular program here. Nevertheless, we find that states have a critical role to play in promoting broadband affordability and ensuring connectivity for low-income consumers. The BEAD grant program established by the IIJA, for example, requires State BEAD programs to ensure that ISPs offer a ''low-cost broadband service option'' for eligible subscribers. We also clarify that the mere existence of a State affordability program is not rate regulation.

## H. Impact of Reclassification on Investment

260. Consistent with our tentative conclusion in the *2023 Open Internet NPRM,* and contrary to the conclusion reached in the *RIF Order,* we find arguments that the reclassification of BIAS would lead to a substantial adverse impact on BIAS investment to be unsubstantiated. In the *RIF Order,* the Commission's primary policy justification for reclassifying BIAS as a Title I information service was its conclusion regarding the alleged harm to investment by Title II classification. The *RIF Order* also advanced two additional policy rationales for reclassifying BIAS under Title I: (1) a claim that there were no demonstrated harms and that BIAS providers would be incentivized to maintain internet openness; and (2) a claim that existing consumer protection and competition laws were sufficient to protect an open internet. As we discuss further below, we also disagree with the *RIF Order's* analysis regarding these policy justifications. However, the *RIF Order* failed to consider the evidence to the contrary, including the *2015 Open Internet Order's* evidence that investment in mobile voice and DSL thrived during the period in which they were regulated as Title II services. As the record in this proceeding clearly shows, the impact of reclassification on BIAS investment is uncertain. This finding comports with the literature on open internet regulations, the available empirical evidence, and the literature on regulation more broadly.

261. Commenters disagree as to whether reclassification of BIAS as a Title II service will discourage investment in broadband infrastructure or the internet generally. Several commenters contend that the current classification of BIAS as a Title I information service fosters investment,

claim that investment increased following the *RIF Order,* and raise the concern that reclassification of BIAS under Title II will increase regulatory burdens and uncertainty, leading to a reduction in investment and innovation. AT&T argues that investment decisions depend on long-run: (1) expected costs (including the costs of regulatory compliance), (2) expected revenues, and (3) the degree of uncertainty about costs and revenues; and it claims that Title II regulation would worsen all three. WISPA contends that regulatory compliance costs will disproportionately impact small service providers that lack the resources to handle the new compliance obligations. Several commenters claim that Title II classification, particularly the application of a general conduct rule, would increase uncertainty and therefore chill investment and innovation. Commenters also claim that application of section 214 to BIAS would create a regulatory burden and reduce network investment and innovation. Finally, many commenters claim that applying public-utility style regulation to the internet would result in high prices and chronic underinvestment.

262. Other commenters argue that Title II reclassification would not reduce investment or innovation, and that there is no evidence that the *2015 Open Internet Order* reduced BIAS investment or that investment increased following the 2017 *RIF Order.* Some of these commenters offer evidence that in fact the opposite occurred: BIAS deployment and investment increased following the *2015 Open Internet Order* and declined following the 2017 *RIF Order.* The California Independent Small LECs argue that adopting Title II with strong forbearance, as we do here, would increase investment incentives by reducing uncertainty due to our rules preempting potentially different regulatory regimes within each state.

263. We disagree with those commenters that argue our application of Title II with broad forbearance would reduce investment incentives or innovation. Regulation is but one of several factors that drive investment and innovation in the telecommunications and digital-media markets. Given the varying factors that underlie BIAS providers' investment decisions, we are not persuaded by CTIA and NCTA's cursory assertions that our classification decision would upset their investment-backed reliance interests. Regulation interacts with demand conditions, innovation opportunities created by technological advances, and the competitive intensity of markets.

Appropriate regulation is often required to create market conditions that support infrastructure investment, as regulation can enhance competition, mitigate transaction costs between market players, and otherwise reduce market uncertainty, thus boosting investment and innovation. We find that the approach we take in the Order will foster a more competitive broadband marketplace, increase overall regulatory certainty, and provide a more level playing field for all market participants. We acknowledge that regulation generally, and open internet regulations in particular, can affect market participants differently. On balance, however, we conclude that our approach is unlikely to reduce, and would likely promote, overall investment and innovation in the internet ecosystem.

264. The *RIF Order* and at least one commenter argue that regulation in general, and the prospect of future price regulation in particular, which we clearly disclaim, will chill BIAS provider investment. However, research on the relationship between regulation and investment shows that the impact of regulation is more nuanced. For example, the findings of empirical research on how Commission regulations concerning the provision and pricing of network elements affected investment reaches different conclusions with respect to incumbent firms and competitors. To facilitate new entry into the local exchange market, the Telecommunications Act of 1996 required an ILEC to, among other things, offer new competitive carriers interconnection at any technically feasible point in the ILEC's network, access to unbundled network elements (UNEs) on a rate-regulated basis, and make retail services available for resale at regulated wholesale rates. Researchers have reached different conclusions regarding how the Commission's implementation of this requirement has affected ILEC and CLEC investment. Thus, a generic claim that regulation will chill investment cannot be sustained. Furthermore, we emphasize that we do not consider the effect of regulation solely on investment in broadband infrastructure—whether positive or negative. Rather, we assess the overall effect of regulation on consumer welfare, evaluating changes in broadband investment along with effects on the prices and quality of broadband access and edge services, and on edge provider investment and innovation.

265. We find the comparison made by certain commenters between Title II classification coupled with open internet rules and public-utility

regulation to be inapt for several reasons. First, unlike utilities such as water, electricity, and gas, BIAS is a two-sided platform with BIAS subscribers on one side of the market and edge providers on the other. According to economist Mark Rysman, "a two-sided market is defined as one in which: (1) two sets of agents interact through an intermediary or platform, and (2) the decisions of each set of agents affects the outcomes of the other set of agents . . . [because] there is some kind of interdependence or externality between groups of agents that the intermediary serves." Rysman's definition aptly describes the BIAS virtuous cycle between consumer demand and edge provider innovation. Consumers value BIAS more as the diversity and quality of valuable edge services increase, and edge providers see value in investing and innovating as the breadth and depth of consumer demand increases. We note that Rysman specifically lists "internet . . . markets" under his examples. In contrast, in water and traditional gas and electricity markets, the value to the consumer of having access to the utility does not materially increase with the number of suppliers through an interdependency, and even modern energy markets only exhibit limited aspects of multisided markets. Therefore, the type of regulation required and the effects of those regulations will necessarily be different for BIAS than for such utilities. Second, and most importantly, the rules we now adopt are carefully tailored to avoid the potential issues that commenters claim are problematic in the regulations of utilities. In particular, unlike the range of utility-style regulations that were applied to monopoly telephone service under Title II, including rate regulation, we forbear from many of these provisions and do not adopt any rate regulation, which is a hallmark of utility regulation. The Commission has long recognized that regulating rates is not its preferred approach, and therefore has spent decades promoting competition in the market rather than relying on rate regulation. The approach we adopt in this proceeding is consistent with this longstanding policy objective.

266. Economics literature shows that open internet provisions may increase investment and innovation, and may have welfare-enhancing effects. Contrary to BIAS provider claims that open internet provisions would diminish their investment incentives, some economics literature shows that allowing BIAS providers to sell prioritized access, for instance, can

actually lower investment incentives. For example, Professors Jay Pil Choi and Byung-Cheol Kim show under their assumptions that, if paid prioritization is allowed, BIAS providers have an incentive to reduce investment because expanding broadband capacity would lower the price that they can charge for priority access. In addition, the authors find that content provider investment incentives are also lower absent neutrality regulation due to BIAS providers potentially expropriating the benefits of content provider investment by charging for access to their customers. Another paper by Professors Nicholas Economides and Benjamin Hermalin finds that prohibiting BIAS providers from charging for priority access unambiguously reduces BIAS provider investment in their model. However, the study's finding on the overall effect of net neutrality regulation on social welfare is still ambiguous because social welfare is the sum of consumer welfare and producer surplus, including any surplus that accrues to edge providers.

267. Given that economics literature supports a conclusion that the effects of applying open internet provisions may not be harmful, and can actually be beneficial to BIAS investment incentives, the *RIF Order* and opponents of reclassification in this proceeding cite studies that claim to show there was a decline in investment following the reclassification of BIAS to Title II in the United States, or after other countries implemented similar regulations. We find the evidence presented to be unpersuasive for the following reasons.

268. First, as the *RIF Order* correctly recognized, network infrastructure is a long-term irreversible investment that often requires years of planning, preparation, and approvals before construction can begin. The *RIF Order* then proceeds to suggest, however, that there is a causal link between the adoption of the *2015 Open Internet Order* and declines in broad measures of BIAS provider investment that occurred in the same year that *Order* was adopted, noting that this was the first year of decline since 2009. The *RIF Order* goes on to review studies that compare BIAS provider investment before and after adoption of the *2015 Open Internet Order* and suggests that the brief two-year reclassification of BIAS under Title II resulted in a decline in BIAS provider investment of up to 5.6% between 2014 and 2016. Given the substantial planning, preparation and permitting required to make most large-scale capital investments in broadband networks, it is implausible that the *2015 Open Internet Order* would have

resulted in such an immediate and substantial decline in BIAS provider investment. Such a finding is also inconsistent with the reaction of investors to Title II reclassification, the findings of investment analysts, multiple statements made by company executives to investors following Title II reclassification, and common sense. An "event study" analysis that examined the effect of the Title II decision on ISP and edge provider stock prices found that the decision had almost no impact, except for a very short-term decline in the stock prices of a few cable ISPs. And Sprint's Chief Technology officer stated that Sprint "does not believe that a light touch application of Title II, including appropriate forbearance, would harm the continued investment in, and deployment of, mobile broadband services." In short, a proper evaluation of the investment effects of Title II reclassification, or open internet rules more generally, would require a longer time period in order to properly evaluate any potential effects on investment.

269. Second, as the *RIF Order* also correctly recognized, many of the studies that it cites and evidence it presents did not account for other factors that likely have a much larger impact on investment decisions than the classification of BIAS. The *RIF Order* notes that "[t]hese types of comparisons can only be regarded as suggestive, since they fail to control for other factors that may affect investment (such as technological change, the overall state of the economy, and the fact that large capital investments often occur in discrete chunks rather than being spaced evenly over time), and companies may take several years to adjust their investment plans." These include the broader economic conditions, capacity constraints, increasing demand for broadband, technology changes (such as the transition from 3G to 4G and then to 5G networks), and BIAS providers' general business development decisions. Commenters in this proceeding point to the recent increase above trend in aggregate broadband capital expenditures as evidence that a "light touch" regulatory approach promotes broadband investment. However, such claims do not adjust for macroeconomic factors such as inflation, new technologies like 5G New Radio (NR), and myriad other factors that likely explain most if not all of the observed increases in investment since the *RIF Order*. We also note that following the release of the *RIF Order*, major mobile BIAS providers began investing in 5G

NR technology, and this increase in investment would have occurred even absent the adoption of the *RIF Order*. In his dissent, Commissioner Carr points to a decline in wireless investment in 2016 and 2017 as evidence that the *2015 Open Internet Order* caused wireless investment to decline. However, these two years are the period when wireless carriers had mostly concluded building their 4G networks. And the subsequent increase in wireless investment was due to carriers beginning to deploy 5G in 2018. Thus, after accounting for all relevant factors, the data Commissioner Carr cites does not undercut our investment analysis.

270. Third, it is widely known in statistics that correlation does not imply causation. In the broadest sense, correlation measures the degree to which two random variables are associated with one another, and tests of correlation measure the strength of such a relationship. However, just because two variables—*e.g.,* Title II reclassification and changes in investment—are observed to occur together, does not imply that one variable (reclassification) caused the other (observed changes in investment). For example, ice cream sales and violent crime rates tend to exhibit a strong positive association. However, it is not the case that ice cream sales cause crime, or that higher crime causes increased ice cream sales, but rather that a third variable, temperature, affects both. Not adjusting for average daily temperature could lead a researcher to draw an incorrect conclusion. To determine whether Title II reclassification caused the change in investment, we would need to determine what the level of investment would have been if Title II reclassification had not been adopted.

271. The "gold standard" in empirical research for determining what would have happened is the randomization of research subjects into treatment and control groups, such as is commonly done in drug and other medical trials. In a randomized clinical trial, the outcomes of the control group that did not receive a treatment serve as the counterfactual for measuring the effect of a treatment that is given to the other group (the treatment group). However, in many real-world scenarios, such as the evaluation of the effect of open internet regulations, it is obviously not possible to randomize companies into treatment and control groups to determine investment effects. For this reason, there are a number of "quasi-experimental" empirical methods that have been developed in statistics that attempt to use observational data in a

manner that mimics a randomized experiment. Some of the statistical techniques used to perform such an analysis are fixed effects, instrumental variables (IV), differences-in-differences, and matching estimators.

272. Only a few studies cited in the present record and in the *RIF Order* record attempt to perform any type of rigorous analysis of the effects on investment of open internet regulations or Title II reclassification with forbearance. As for those, we find, as we discuss below, that, in all cases, the results of these studies are inconclusive due to methodological issues. As an initial matter, no study in the record attempts to measure changes in edge provider investment under Title II reclassification, so no study can make claims about the effect of reclassification on the relevant investment variable of interest from a policy perspective, which is total investment in the internet ecosystem. Further, even if total investment in the internet ecosystem were shown to be lower, that would not be determinative of whether reclassification of BIAS under Title II with forbearance is socially beneficial. To make this determination, changes in social welfare, notably accounting for consumer benefits, would need to be examined. There is no empirical study in the record that attempts to measure such changes in social welfare, and as noted above, the theoretical literature is ambiguous in terms of whether open internet regulations would raise or lower social welfare.

273. One empirical study cited prominently in the record and in the *RIF Order* uses a Differences-in-Differences (DiD) estimator on aggregate investment data by industry from the Bureau of Economic Analysis (BEA) to conclude that the 2010 announcement by Chairman Genachowski that the Commission was considering reclassifying BIAS under Title II raised uncertainty and reduced BIAS provider network investment on average by about 20% from 2011 to 2016. We find several other issues with this paper that lead us to give it no probative value in this proceeding. ITIF criticizes our dismissal of this study, but it does nothing to address the fundamental concerns with the study. ITIF also fails to provide support for its contention that the Commission should only reclassify BIAS as a Title II telecommunications service if there is evidence doing so will enhance broadband investment. In any event, we show below that the benefits of reclassification will outweigh the costs.

274. The study conducts a DiD analysis by choosing five other industries that the author claims will have comparable trends in investment to the "Broadcasting and Telecommunications" industry that serves as the treatment group for purposes of assessing the impact of Title II reclassification on investment. The BEA industry classifications that the author chose as comparable to telecommunications are: wholesale trade; transportation and warehousing; machinery manufacturing; computer and electronics products; and plastics and rubber products. The BEA series identification numbers for the industries used are "i3n51301es00" for telecommunications, "i3n42001es00" for wholesale trade, "i3n48001es00" transportation and warehousing, "i3n33301es00" for machinery manufacturing, "i3n33401es00" for computer and electronics products, and "i3n32601es00" for plastics and rubber products. It is not clear why this diverse set of industries with very different technology and productivity shocks would be an appropriate control group for telecommunications. Visual inspection comparing the pre-2010 (pre-treatment) investment trends of the control industries with the trends in telecommunications and broadcasting investment confirm that the controls are inappropriately chosen. Prior to the 2010 announcement of potential Title II reclassification, there are sharp divergences in the investment trends between the two groups, which implies that the "parallel trends" assumption of the DiD estimator may be violated and that biased estimates will be produced as a result. This study is the published version of a 2017 working paper that many commenters cite in the record. Two other papers by the same author present similar evidence, the latter of which, George Ford, *Investment in the Virtuous Circle,* uses USTelecom investment data for its measure of telecommunications investment and BEA data for its measure of investment in other industries, which may be problematic given that the two data sources may not be comparable. In addition, staff was unable to replicate this paper due to the author's not describing the twenty industries that were used in the control group. In fact, over 60% of the growth in investment in the control group between the pre-treatment and treatment periods is being driven in this study by the inclusion of investment in the transportation and warehousing industry. Investment in transportation and warehousing rose dramatically during the post-2010 time

period due to the boom in e-commerce that occurred. According to Census Bureau data, e-commerce sales increased by over 120 percent from Q4 2009 to Q4 2016. However, investment is forward-looking, and this retail sales data does not capture expected future sales. As one measure of forward-looking expectations for the e-commerce sales that drove investment in this industry, the stock price of Amazon increased by more than 400% over this same period. This trend makes this industry a poor choice for predicting what the trend in telecommunications investment would have been absent the announcement of the potential for BIAS to be reclassified as a Title II service. A more appropriate method to choose the control group industries to avoid these problems is to choose a weighted combination of the potential controls where the weights are chosen to minimize the pre-treatment differences between the treatment group and the control group, but this procedure was not followed.

275. The aggregate measure of investment used by the author as the primary variable of interest is also too broad to provide meaningful estimates, both in terms of the business entities and types of investments included in the measure. There are currently 2,201 BIAS providers in the United States that would be affected by Title II reclassification, but the BEA collects investment data from nearly 125,000 business entities in the telecommunications, broadcasting, motion picture, and video production industries when calculating their "Broadcasting and Telecommunications" investment data. Title II reclassification would therefore be expected to have little direct effect on most of the businesses reported in the author's measure of broadband investment. Furthermore, investments captured within this broad measure would include investments in buildings, trucks, office equipment, software, and other investment categories that likely would be unaffected by Title II reclassification. A proper analysis would focus on discretionary investments by BIAS providers that would be expected to actually be impacted by reclassification.

276. Finally, the BEA data used by the author has been substantially revised since this study was published and the corrected data undercut the conclusion that open internet regulations led to a decline in telecommunications investment. The Census Bureau conducts an Economic Census every five years that forms the basis of the investment data published by the BEA

and used by the author in this study. In the intervening years, the BEA estimates investment within each industry and then revises these estimates when the actual investment data becomes available from the newly conducted Economic Census. Whereas the author found that telecommunications investment declined by 6.2% in real terms when comparing the 2004–2009 period to the 2011–2016 period in his data, the corrected data now available on the BEA website show that telecommunications real investment in fact rose 10.2% between these two periods. We replicated the author's regression analysis exactly based on this previous data and found, as he did, that real investment in telecommunications in the uncorrected data declined between the 2004–2009 and 2011–2016 periods, which leads us to conclude that the change in the conclusion based on the revised data is due entirely to changes in the underlying data and not differences in model specification. The revised data also substantially affect the results of the DiD regression analysis performed by the author. When Commission staff re-estimate his baseline regression model in Table 2 with the corrected data, rather than finding a statistically significant 22% decline in telecommunications investment as the author found, the corrected regression finds only a 6.2% decline relative to expectations based on the control group industries and this is not statistically significant. If the inappropriate "transport and warehousing" control group is then removed from the model, for all practical purposes the model predicts no decline in telecommunications investment resulting from the potential for Title II reclassification. While telecommunications investment is still estimated to be −2.7% in the period following the announcement of potential Title II reclassification, the p-value is .71, which indicates that there is a 71% chance of obtaining a negative effect at least this large even if the null hypothesis of no effect on investment is true. In other words, this small negative effect is very likely due to random noise rather than there being a true negative effect of Title II regulation on investment. Therefore, if this paper supports anything, it supports the position that Title II reclassification had no effect on BIAS provider investment.

277. The study's author, Dr. George Ford, offers a critique of the Commission's analysis and attempts to resuscitate his earlier assertions regarding Title II investment impacts with new analysis—neither his critique nor new analysis are persuasive. As an initial matter, we note that Dr. Ford does not dispute that the underlying data was revised by the BEA since his study was performed, or that substituting the revised data into his previous model changes the results to show a statistically insignificant difference in investment following the announcement of Title II reclassification. Dr. Ford's primary argument is that we did not replicate his study when reaching our conclusions because we did not follow his "entire research process" when updating his analysis with the new BEA data. We note that Dr. Ford fails to cite a professionally accepted definition of replication from a peer reviewed article on this topic, but rather cites merely a website post for his definition. Dr. Ford implies that we should have changed his underlying model, including the control groups, as he proceeds to do in his new analysis. But his new analysis, like his prior analysis, does not conduct a proper DiD regression analysis with a replicable research process. As discussed below, Dr. Ford did not use a rigorous and principled methodology for selecting his control groups, and as such, there is no way that the Commission could predict which control groups Dr. Ford would choose now that the revised BEA data and original model no longer support his previous conclusions. Dr. Ford also changed his criteria for choosing the control groups, the level of aggregation at which control groups were selected, and his standard error procedure. As Dr. Ford acknowledges, the standard error procedure he now adopts for many of his new analyses would be more likely to (incorrectly) conclude that there is a statistically significant difference in investment when there is not. His "entire research process," therefore, could not have been replicated. Even by his own—and not generally accepted—definition of replication, Dr. Ford also chose not to replicate his original study in the *Ford Response,* from which we conclude that he appears to be retracting the original study, or at least, conceding that it no longer supports the theory that Title II negatively impacts ISP investment.

278. Even if we had been able to replicate his entire research process, the process he employs lacks rigor and is not in line with recommended best practices from the empirical economics literature. Dr. Ford appears to advocate basing the selection of DiD control groups entirely on a comparison of the pre-treatment trends in the outcome between the treatment and control groups. However, such a process is known to be theoretically dubious and statistically problematic. Dr. Ford is correct that one requirement for the DiD estimator to produce valid estimates is that "the selected control group for the industries of interest plausibly satisfy the parallel paths (or common trends) assumption, where the investment of the control group serves as a reliable counterfactual for the treated group during the treatment period." However, demonstrating this plausibility requires much more than the "visual inspection and some descriptive statistics" methodology that he reports employing. Rigorous DiD analysis employs the following three principles when choosing controls: (1) there should be no reason to believe the untreated group would suddenly change around the time of treatment; (2) the treated group and untreated groups should be generally similar in many ways; and (3) the treated group and untreated groups should have similar trajectories for the dependent variable before treatment. In his analyses, Dr. Ford focuses only on the last principle and does not consider the first two principles. In fact, Dr. Ford explicitly argues against following principles 1 and 2 in the *Ford Response* and criticizes the *Draft Order* for raising this issue. Dr. Ford's other DiD analyses also do not properly construct an appropriate control group which further leads us to give no probative value to his findings. In a proper DiD research design, observing parallel trends in outcomes prior to treatment should be a consequence of choosing controls that are generally similar to the treated group, not the tool by which the controls are chosen. We note that the use of synthetic control methods does obviate the need to follow the first two principles. For example, in a widely cited synthetic control analysis of the economic effects of German reunification, even among Organization for Economic Cooperation and Development (OECD) countries, the authors excluded Luxemburg and Iceland "because of their small size and because of the peculiarities of their economies." This illustrates that the authors followed principle 2. In addition, they excluded Canada, Finland, Sweden, and Ireland "because these countries were affected by profound structural shocks during the sample period." This demonstrates that the authors also followed principle 1.

279. Just as Dr. Ford's choice of the Transportation and Warehousing industry as a control in the previous analysis was in violation of the first principle, Dr. Ford makes the same

mistake in his new synthetic DiD (sDiD) analysis where this same control actually receives the largest weight. The Transportation and Warehousing industry is industry code 48 and receives a weight of 18.7% in his analysis. Dr. Ford also does not follow the second principle in both his previous and current analyses because he never explains why or how the treatment and control group industries are "generally similar" and would be expected to have similar technology and productivity shocks as the telecommunications industry. If Dr. Ford had properly chosen the initial control groups, then the controls would be valid in both the previous BEA data and revised BEA data. It is not accepted practice to change control groups and research design in response to changes in the underlying data. Finally, we note that both graphical and statistical comparisons between Dr. Ford's original data and the revised data confirm that the pre-treatment data for both the treatment and control groups are nearly identical between the two datasets. This is not surprising because the BEA conducts an Economic Census every five years and the newly collected data in the 2017 Census would generally have little impact on the investment data prior to 2012 when the last Economic Census was conducted. Only the post-2010 investment data for the telecommunications industry was significantly revised by the BEA. The pre-treatment trends remain essentially unchanged, suggesting that even by Dr. Ford's methodology, there is no basis for switching the control groups he originally selected. According to the control group selection methodology set forth in Dr. Ford's previous paper, the old control groups remain valid because "the pre-treatment growth rates are (statistically) the same between the treated and control groups." Therefore, even by Dr. Ford's own statements and line of reasoning, the Commission was correct to retain the old control groups when replicating his study. We further note that his only evidence that the control group industries are now inappropriate is that a "pseudo-treatment" dummy from 2007–2010 is now positive and statistically significant using his revised standard errors. However, Dr. Ford includes 2010, the year the Commission first sought comment on potential Title II classification, so this is an improper test under this method as it used data from the treatment period.

280. The only other paper in the record that uses rigorous analytical methods and data to evaluate the effect of open internet regulations on investment uses a panel data set for 32 OECD countries covering the period from 2003 to 2019 and a fixed effects model to examine the impact of open-internet-type regulations on the deployment of new fiber connections. The paper finds that the adoption of open-internet-type regulations in a country is associated with a 45% decrease in fiber investments. However, we have serious concerns regarding this paper that lead us to heavily discount its findings.

281. Our first concern is that it is not clear whether the results of this study are even applicable to the present circumstances. The policies adopted by various countries and the market dynamics within them are wide ranging and quite different from the U.S. context. If the types of regulations adopted were not similar to those adopted here (for example, if a country adopted rate regulation), then these results would not be a good proxy for how the regulations we adopt in the Order would be expected to affect U.S. broadband investment.

282. A second concern is that, in the present U.S. context, the size of the effect on broadband investment is implausibly large. The authors admit that the large magnitude of the effect is likely driven by the fact that, at the beginning of their sample, countries had almost no fiber connections so the growth rate in fiber connections was very high, while, at the end of their data sample, fiber coverage rates exceeded 100% in many countries with correspondingly low fiber connection growth rates. The crucial assumption the authors make to claim that they are identifying causal effects of the change in regulations is that decisions to implement or withdraw open-internet-type regulations have been made exogenously, *i.e.*, the timing of these decisions is effectively random because these decisions are made for ideological reasons and politicians make these decisions without considering market outcome variables such as the number of fiber connections in the country.

283. We find that this identifying assumption may be faulty and the findings of this paper may be due to spurious correlations rather than the authors having identified true causal effects of the impact of open-internet-type regulation on investment. Contrary to the authors' assertions, we find that it is likely that changes in which political party controls a country is likely to have direct effects on investment unrelated to the adoption of open-internet-type regulations. For example, if more left-leaning parties in Europe tax investments at a higher rate than their right-leaning counterparts, then the authors' findings could be due to unaccounted-for changes in the tax system or other national policy change that occurred at the same time as the adoption or relaxation of open-internet-type rules. The authors' instrumental variable estimates may be flawed for this same reason. The authors use how "left" or "right" the current political party is as an instrument. However, this measure likely has a direct effect on broadband investment through multiple other channels, so it violates the fundamental assumption of an instrumental variable that it must be uncorrelated with the outcome of interest—broadband investment in this case—conditional on the other variables in model. In this context, instrumental variables estimation is often used when a treatment may not have been assigned to subjects randomly. In this case, the treatment is net neutrality regulations and OECD countries are the subjects of the experiment. An appropriate instrument in this example would be a third variable that is strongly correlated with the passage of net neutrality regulations in a country but, conditional on all the variables in the model, is not associated with the investment outcome except through its effect on the probability of net neutrality regulations being adopted. We find that whether the party in power is more "left" or "right" on the political spectrum is likely to exert a direct effect on ISP investment through many channels, and therefore this crucial "exclusion restriction" assumption is violated and the resulting estimates are biased.

284. There is a simple alternative explanation for why the authors find such strong negative effects of open-internet-type regulation on broadband investment. If countries do not adopt open-internet-type regulations until BIAS becomes an essential service in the country, as is the case in the United States, and the countries for which it is essential have much higher fiber connection bases, then we would expect exactly the results the authors find. The growth rates in fiber connections in these mature broadband economies would be much lower than the growth rates in fiber connections in countries that have a low base number of such fiber connections due to a less mature broadband market. If this is the case, these lower observed fiber growth rates in countries with open-internet-type regulations would not be due to the adoption of those regulations. Consistent with this view, the two countries that were among the earliest

adopters of open-internet-type regulations in the authors' data sample, South Korea and Japan, were also the countries that had by far the greatest deployment of fiber connections at the time they adopted the rules between 2010–2011. In 2010, 58% of broadband subscriptions in Japan were provisioned by fiber-based technologies and 55% in South Korea were fiber-based, which far exceeded the rates observed in the next OECD country, the Slovak Republic at 29%, and many OECD countries had almost no fiber-based connections at the time. In short, it would not be possible for the growth rates in fiber access in these two early adopting countries of open-internet-type regulations to keep pace with the later adopting countries that had fiber access in the low single digits at the time, and the model specification estimated by the authors is not sufficiently rich to correct for these issues. The authors include country fixed effects, year dummies, lags in investment and time-varying covariates in their model, however, these controls are not sufficient to address our concerns and satisfy the fundamental identifying assumption of DiD models that "the interventions are as good as random, conditional on time and group fixed effects." We conclude that it is not appropriate to compare fiber growth rates across these countries using this model.

285. Finally, the authors admit that the results of all of their models are inconsistent and biased because the lagged dependent variable and the error term are correlated. For the only consistent and unbiased model they estimate, the bias-corrected fixed effects estimator, open-internet-type regulations are found to have a statistically insignificant effect on BIAS provider investment.

286. As our detailed analysis demonstrates, the Commission's conclusions in the *RIF Order* that BIAS provider investment is closely tied to the classification of BIAS were not based on sound empirical analysis, and no new studies submitted in the current record support the conclusions of the *RIF Order.* Indeed, the record in both the Order and the *RIF Order* proceeding on the likely effect of Title II classification is ambiguous, offering conflicting viewpoints regarding the potential investment effects. The theoretical literature, empirical studies, and comments are all inconclusive. As such, we conclude that any changes in BIAS provider investment following the adoption of each *Order* were more likely the result of other factors unrelated to the classification of BIAS.

287. The *RIF Order* also relied on a second study that used a "natural experiment," but this study was not submitted into the record of this proceeding. It found that DSL subscribership exhibited a statistically significant upward shift relative to its baseline trend after the Commission removed line-sharing rules on DSL in 2003 and again in response to the reclassification of DSL as a Title I information service in 2005. There appear to be several serious problems with this study. First, it considers changes in DSL subscribership, not changes in DSL investment, so it is not clear what inferences can be drawn about the effect of the regulatory changes on investment. Further, the authors attribute the increase in subscribers solely to the regulatory changes, without accounting for other factors that may have explained the increase. In particular, the authors ignore the fact that very high-speed digital subscriber line (VDSL) and asymmetric digital subscriber line (ADSL2) were developed and began to be deployed in 2001 and 2002, respectively, and both of these technologies significantly improved DSL speeds. It may be that these technological innovations and lagging DSL market shares led to the aggressive DSL price cuts that occurred starting in 2003 and this—not a change in regulations—led to the observed strong DSL subscriber gains relative to cable starting in 2003. Finally, we note that this study is also methodologically flawed. The effects of the 2003 and 2005 regulatory changes that applied to DSL, if any, would also impact the other broadband providers in the market due to such providers being substitutes. Therefore, cable is not an appropriate comparison group and the inclusion of the growth rate in cable modem subscriptions in the estimation equation is endogenous (*i.e.,* correlated with the error term), which results in statistically biased and inconsistent estimates.

## II. Order: Forbearance for Broadband Internet Access Services

### A. Forbearance Framework

288. Section 10 of the Act provides that the Commission shall forbear from applying any regulation or provision of the Communications Act to telecommunications carriers or telecommunications services if the Commission determines that:

• enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or

telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

• provision is not necessary for the protection of consumers; and

• forbearance from applying such provision or regulation is consistent with the public interest.

289. In making the determination under section 10(a)(3) that forbearance is in the public interest, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest. In addition, "[a] State commission may not continue to apply or enforce any provision" from which the Commission has granted forbearance under section 10.

290. Our approach to forbearance here builds on the Commission's approach in the *2015 Open Internet Order*. In that *Order,* the Commission broadly granted forbearance—to the full extent of its authority under section 10 of the Act— with respect to provisions of the Act and Commission rules that newly would have applied by virtue of the classification of BIAS as a telecommunications service there, subject only to exceptions in the case of certain expressly identified statutory provisions and Commission rules. The Commission also recognized that prior to the *2015 Open Internet Order* some carriers chose to offer internet transmission services as telecommunications services subject to the full range of Title II requirements, and clarified that those carriers could elect to operate under the *2015 Open Internet Order's* forbearance framework instead of that legacy framework.

291. It is unclear what effect the *RIF Order* had on the forbearance granted in the *2015 Open Internet Order*. It is possible to view the *RIF Order* as implicitly vacating the forbearance granted in the *2015 Open Internet Order,* so that forbearance does not remain in effect when we return to a Title II classification. Alternatively, the *RIF Order's* silence on this issue can be read to leave the forbearance granted in the *2015 Open Internet Order* in place, so that it continues to apply automatically to BIAS once reclassified as a telecommunications service here, absent some action on our part to the

contrary. We conclude that the forbearance set forth in the Order is justified under either understanding. Except as expressly modified in the Order, the record in this proceeding and our own assessment each support and provide no reason to question the forbearance granted in the *2015 Open Internet Order,* as we explain below, regardless of how the *RIF Order*'s effect on that prior forbearance is conceptualized. We reject NCTA's arguments that ''ambiguity regarding the scope of forbearance risks undermining its efficacy.'' In purporting to find ambiguity in the *2015 Open Internet Order*'s approach to forbearance, NCTA cites a paragraph providing a high-level summary of aspects of the forbearance granted in that *Order*—which does not even appear in the forbearance section. That does not persuade us that the scope of forbearance as actually described in the forbearance section of the *2015 Open Internet Order*—or the scope of forbearance as described in our forbearance section here—is ambiguous in a way that undercuts the efficacy of that regulatory relief. In further support of its claims of ambiguity, NCTA contends that ''the *NPRM* itself does not specifically propose to forbear from Section 251(c) . . . or even discuss the Commission's intent with respect to unbundling and other similar common-carrier requirements under Title II of the Act.'' But the *2023 Open Internet NPRM* was clear that the Commission was proposing ''to use the forbearance granted in the *2015 Open Internet Order* as the starting point for our consideration of the appropriate scope of forbearance,'' and the *2015 Open Internet Order* was explicit in the forbearance it was granting from (among other things) section 251(c) of the Act and common carrier requirements such as those that would enable *ex ante* rate regulation. Independently, as the Commission observed in this regard in 2015, ''the Commission cannot impose a penalty for conduct in the absence of 'fair notice of what is prohibited.' '' Consequently, we are not persuaded that our approach to forbearance results in ambiguity regarding the scope of relief that undercuts its efficacy.

292. In evaluating and applying the section 10(a) forbearance criteria, we follow the same basic analytical approach used by the Commission in the *2015 Open Internet Order* and affirmed by the D.C. Circuit in its *USTA* decision. As a threshold matter, we do not grant forbearance beyond the scope of our authority under section 10 of the Act. As the Commission explained in the *2015 Open Internet Order,* ''[c]ertain

provisions or regulations do not fall within the categories of provisions of the Act or Commission regulations encompassed by that language because they are not applied to telecommunications carriers or telecommunications services, and we consequently do not forbear as to those provisions or regulations.''

293. We also target our forbearance analysis to those provisions of the Act or Commission rules that would not apply but for our classification of BIAS as a telecommunications service and our classification of mobile BIAS as a commercial mobile service. That follows the Commission's approach in the *2015 Open Internet Order,* and also is how we contemplated targeting forbearance as proposed in the *2023 Open Internet NPRM* in this proceeding. The record does not persuade us to depart from that focus here, but BIAS providers remain free to seek relief from other provisions or regulations through appropriate filings with the Commission.

294. Section 706 of the 1996 Act once again informs our forbearance analysis here, as well. That provision ''explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.' '' Within the statutory framework that Congress established, the Commission ''possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband.'' Thus, as in 2015, we seek to strike the appropriate balance between retaining statutory protections and our open internet rules to adequately protect the public, while minimizing the burdens on BIAS providers and ensuring incentives for broadband deployment consistent with the objectives of section 706 of the 1996 Act.

295. One element of adopting a balanced regulatory approach is giving BIAS providers reasonable regulatory predictability about the obligations that will or will not be applied under that framework. We thus reject broad-brush arguments that we should not forbear from applying provisions that are by their own terms discretionary in some manner. As a threshold matter, we see no indication in the text of section 10 that provisions of the Act that give the Commission discretion in their application to telecommunications carriers or telecommunications services are somehow categorically beyond the purview of forbearance. Independently, insofar as forbearance incrementally increases the clarity BIAS providers have about the regulatory framework we

are adopting here—given the need to grapple with the section 10 criteria in addition to any discretion within a forborne-from provision itself before it could be applied in the future—we find it reasonable to account for the benefit provided by such greater regulatory predictability in our application of the section 10 criteria.

296. At the same time, we also are not persuaded that our forbearance decisions here provide insufficient clarity and regulatory predictability about providers' regulatory obligations. Fundamentally, these commenters' concerns are not truly directed at our approach to forbearance but instead at the threshold classification decision. We have determined that BIAS is a telecommunications service under the best reading of the Act and its application to the record evidence here. As a result, certain legal consequences under the Act flow from that reality. The substantial forbearance we grant from rules and provisions reaches the full extent of what we find warranted at this time under the section 10 framework, which is the tool Congress provided for the Commission to tailor those default regulatory consequences. We therefore reject the suggestion that we improperly are using forbearance to increase regulation. Our classification decision simply ''bring[s] the law into harmony with the realities of the modern broadband marketplace'' and against that backdrop our use of forbearance plays its traditional role in granting relief from the legal consequences that otherwise would flow by default from that determination as warranted by the section 10 criteria. To the extent that commenters are concerned that forbearance decisions could be revisited, they do not demonstrate that it would be trivial for the Commission to do so, particularly if reasonable reliance interests could be demonstrated. Nor does the record reveal ways that the Commission could provide even greater regulatory predictability to providers beyond the approach adopted here while still honoring what we find to be the best understanding of the Act in our classification of BIAS.

297. We also follow the conceptual approach from the *2015 Open Internet Order* by considering the practical realities under an ''information service'' classification of BIAS to inform our section 10(a) analysis. As the Commission observed in 2015, although that baseline is not itself dispositive of the appropriate regulatory approach to BIAS, it is reasonable for the Commission to weigh concerns about the burdens or regulatory uncertainty

that could arise from sudden changes in the actual or potential regulatory requirements and obligations. Given agencies' discretion to proceed incrementally, our forbearance analysis accounts for benefits from adopting an incremental approach here. While we find that the tailored regulatory framework we adopt in the Order strikes the right balance, we note that the D.C. Circuit has recognized the Commission's authority to revisit its decision should that prove not to be the case. That said, although our conceptual approach in this regard tracks what the Commission did in 2015, our application of that approach naturally accounts for the additional experience and insight the Commission has gained in the years since the *RIF Order.* In addition, there is a petition for judicial review of the *RIF Remand Order* still pending and the petitions for reconsideration of that *Order* were pending until our action in the Order. Consequently, the insights we draw from the recent past account for the likelihood that the unresolved status of the regulatory approach adopted in the *RIF Order* could well have tempered BIAS providers' conduct relative to what they otherwise might have engaged in.

298. In addition, our analytical approach as to all the provisions and regulations from which we forbear in the Order is consistent with section 10(a) as interpreted by the Commission and courts. Consistent with precedent, in interpreting the word "necessary" in section 10(a)(1) and (a)(2) we consider whether a current need exists for a rule or statutory requirement. Under section 10(a)(1), we consider here whether particular provisions and regulations are "necessary" to ensure "just and reasonable" rates and practices with respect to BIAS. In full, section 10(a)(1) directs the Commission to consider whether enforcement "is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory." As a shorthand, we refer to that as requiring an analysis of whether rates and practices will be just and reasonable. And under section 10(a)(2), we consider whether particular provision and regulations are "necessary for the protection of consumers." Consistent with our conclusion in the *2015 Open Internet Order,* when evaluating whether there is a current need for a rule or provision to ensure just and

reasonable rates and practices and to protect consumers, we can account for policy trade-offs that can arise under particular regulatory approaches. Thus, even when confronted with arguments that applying a rule or provision could have some near-term benefit, we nonetheless reasonably could conclude that application of the rule or provision is not currently necessary within the meaning of section 10(a)(1) or (a)(2) based on countervailing intermediate- or longer-term consequences of applying the rule or provision. This approach also is consistent with how the Commission has applied the "just and reasonable" criteria and otherwise evaluated consumers' interests under other provisions of the Act.

299. Under section 10(a)(3), the Commission considers whether forbearance is consistent with the public interest. This inquiry allows us to account for additional factors beyond the sort of considerations we evaluate under section 10(a)(1) and (a)(2), guided by the Commission's statutory duties.

300. We agree with the *2015 Open Internet Order* that persuasive evidence of competition is not a necessary prerequisite to granting forbearance under section 10 so long as the section 10 criteria otherwise are met. As the *2015 Open Internet Order* observed, although competition can be a sufficient basis to grant forbearance, it is not inherently necessary in order to find section 10 satisfied. To the extent that commenters cite prior forbearance decisions relying on competition as sufficient to justify forbearance, that precedent does not persuade us that competition is inherently necessary to justify forbearance. Nothing in the text of section 10 requires that forbearance be premised on a finding of sufficient competition where the Commission can conclude that the rules or provisions are not "necessary" under section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3) on other grounds. A statute that "by its terms merely requires the Commission to consider" some factor does not mean that the Commission must "give any specific weight" to the factor, and the Commission may "ultimately conclude[ ] that it should not be given any weight." That interpretation of section 10 is not altered where the rules or provisions at issue involve measures to facilitate competition, despite some claims to the contrary. To the extent that Congress wanted the Commission to make additional findings beyond the general requirements of section 10(a) in order to forbear from particular market-opening provisions of the Act, it did so explicitly, precluding the Commission

from forbearing from the application of sections 251(c) or 271 of the Act "until it determines that those requirements have been fully implemented." Given that we have found those provisions to be fully implemented, we reject the view that we cannot simply apply the section 10(a) criteria according to their terms when evaluating forbearance from market opening provisions of the Act and instead must make different or more specific findings to justify forbearance. Even when implementing such provisions, the Commission often has rejected a single-minded focus on competition to the exclusion of other policies such as network deployment consistent with the goals of section 706 of the 1996 Act, and we see nothing in section 10 of the Act that would require a single-minded focus on competition when considering forbearance from such rules or provisions. In any case, the D.C. Circuit in *USTA* has "found reasonable the Commission's conclusion that its section 10 analysis did not need to incorporate any statutory requirement arising from section 251." Judge Williams, dissenting in part in *USTA,* contended that Commission forbearance precedent had not, to that point, involved the convergence of rules or provisions designed to facilitate competition that were subject to a grant of forbearance without heavy reliance on a competitive analysis. Whether or not Commission precedent prior to the *2015 Open Internet Order* involved the precise convergence of factors identified by Judge Williams, we see nothing in section 10 of the Act that would categorically preclude the Commission from granting such forbearance.

301. We reject claims that an identified need for regulation in one respect to address shortcomings in competition—such as with respect to BIAS providers' gatekeeper role—implies a need for regulation in other respects, as well. In other contexts the Commission has, for example, regulated charges that certain carriers impose on other carriers without finding it necessary to adopt *ex ante* regulation of those same carriers' end-user charges. And the Commission has recognized such distinctions between charges imposed on other providers and charges imposed on end users in this context, as well. Separately and independently, although the *2015 Open Internet Order* did not find pervasive evidence of competition or treat it as in itself sufficient to justify forbearance, it would be a mistake to conclude that competition plays no role at all in our analysis. As the Commission concluded in 2015, "there is some amount of

competition for broadband internet access service," even if "it is limited in key respects," and the Commission's overall regulatory approach to BIAS, by striking the right balance between current regulation and longer-term investment incentives, "thus does advance competition in important ways." This kind of recognition of potential trade-offs associated with particular regulatory approaches is consistent with our reading of the section 10(a) criteria, as discussed above. In addition, we note that, during the last 15 years, when BIAS was classified as Title I information service or subject to forbearance under Title II, we have seen no significant increases in prices or unreasonably discriminatory pricing that would seem to warrant the imposition of rate regulation or tariffing requirements.

302. As in the 2015 approach, "[b]ecause the Commission is not responding to a petition under section 10(c), we conduct our forbearance analysis under the general reasoned decision making requirements of the Administrative Procedure Act, without the burden of proof requirements that section 10(c) petitioners face." Consistent with that approach, in our rulemaking decision here, we explain our application of the statutory forbearance criteria and other relevant statutory objectives such as section 706 of the 1996 Act in the level of detail necessitated by the record and our own assessment of the merits of forbearance from applying particular rules or provisions. We conclude that satisfies our statutory obligations under section 10 of the Act and the APA. We agree with Public Knowledge that we should not grant forbearance "cavalierly." But we disagree with Public Knowledge insofar as it suggests that we approach the section 10 analysis with a presumption against forbearance. We seek to faithfully apply the section 10 forbearance criteria here without artificially placing a thumb on the scale either for or against forbearance. That approach best effectuates the Act as a whole, which not only reflects Congress's default regulatory approach for telecommunications carriers and telecommunications service but also directs that the Commission "shall" forbear where the section 10 criteria are met, as part and parcel of that overall legal framework. We are unpersuaded by claims that our application of the section 10 forbearance criteria in a manner akin to that done in the *2015 Open Internet Order* would violate the nondelegation doctrine. Under Supreme Court precedent, a delegation is

constitutionally permissible if Congress has "la[id] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Section 10 readily satisfies that standard by directing the Commission that it shall forbear where the rule or provision is not necessary to ensure just and reasonable rates and practices; is not necessary for the protection of consumers; and where forbearance is in the public interest— including based on its competitive effects. These are the types of assessments that Congress has entrusted to the Commission since the original enactment of the Communications Act. The Commission's authority to act in the public interest is not "unlimited." "[T]he words 'public interest' in a regulatory statute" do not give an agency "broad license to promote the general public welfare," but rather "take meaning from the purposes of the regulatory legislation." Thus, for example, the Supreme Court has held that the Communications Act's public interest standard, in context, is sufficiently definite to overcome a nondelegation challenge. We likewise conclude that the section 10(a) analysis is guided by intelligible principles set down by Congress, and we therefore reject the view that section 10 of the Act violates the nondelegation doctrine either in general or as applied here.

303. Once again, where warranted we also evaluate forbearance assuming *arguendo* that particular provisions of the Act or Commission rules apply to BIAS, rather than "first exhaustively determining provision-by-provision and regulation-by-regulation whether and how particular provisions and rules apply to this service." We agree with the *2015 Open Internet Order's* reasoning that "to achieve the balance of regulatory and deregulatory policies adopted here for BIAS, we need not— and thus do not—first resolve potentially complex and/or disputed interpretations and applications of the Act and Commission rules that could create precedent for other services beyond the scope of this proceeding, and which would not alter the ultimate regulatory outcome in this Order in any event."

304. Given our approach in this regard, we conclude that simple counts of provisions of the Act or Commission rules subject to forbearance do not shed meaningful light on the extent to which our regulatory approach to BIAS under the Order differs in practice from the default obligations under Title II of the Act or otherwise for purposes of arguments that a telecommunications

service classification of BIAS (and commercial mobile service classification of mobile BIAS) are contrary to the Act's statutory scheme. As in the *2015 Open Internet Order,* forbearance is not used solely to grant relief from default regulatory requirements affirmatively known and established to be both applicable and burdensome. Rather, outside of certain key requirements affirmatively determined to fall outside the scope of justified forbearance, we grant forbearance broadly even as to requirements that *theoretically* could newly apply by virtue of the classification decision and, if they applied, would represent *any manner* of departure from the preexisting *status quo* under an information service classification. The Commission has taken this approach not based on an affirmative determination that the default regulatory requirements are somehow inherently incompatible with BIAS but in the interest of being crystal clear about the targeted ways in which the regulatory regime being applied here will depart from the *status quo* under an information service classification. We thus find that simply counting the number of provisions of the Act or Commission rules subject to forbearance sheds no meaningful light on the magnitude of any practical departure in our regulatory approach here from the default requirements of the Act and our implementing rules.

305. Independently, the notion that even extensive forbearance would illustrate the incompatibility of our approach with the statutory scheme established by Congress fails to appreciate the full scope and operation of the 1996 Act understood against its regulatory backdrop. The Commission's section 10 forbearance authority was part and parcel of the regulatory regime enacted for telecommunications carriers and telecommunications services in the 1996 Act. The criteria specified in section 10 for when the Commission shall forbear from applying the Act or Commission rules to telecommunications carriers or telecommunications services track nearly verbatim the standard Congress established in 1993 in section 332(c)(1) of the Act for the Commission to specify requirements of Title II that would be inapplicable to commercial mobile service providers. And prior to the enactment of the 1996 Act, the Commission already had relied on that section 332(c)(1) authority to grant commercial mobile service providers broad relief from the requirements of Title II, including relief from, among other things, the tariffing requirements

that the Supreme Court characterized as "the heart of the common-carrier section of the Communications Act" under the pre-1996 Act framework. There can be little doubt that when Congress enacted section 10 of the Act against that backdrop, it contemplated that services meeting the definition of "telecommunications services" likewise could—and would—be subject to broad forbearance where justified by the statutory criteria. Such an outcome thus is entirely compatible with the overall legal framework Congress enacted in the 1996 Act.

306. We disagree with arguments that our exercise of forbearance is contrary to *MCI* v. *AT&T* and *Biden* v. *Nebraska*. In *MCI,* the Supreme Court rejected the Commission's attempt to eliminate tariffing for competitive common carriers, concluding that exempting carriers from those obligations represented a "fundamental revision of the statute" that Congress was unlikely to have authorized through "a subtle device" in the statutory language like the Commission's authority to "modify" tariffing requirements. And relying on *MCI,* the Court in *Biden* v. *Nebraska* similarly concluded that "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." By contrast, as the Commission has long recognized, Congress enacted section 10 forbearance authority in response to *MCI*—to grant the Commission the authority to make more extensive changes that the *MCI* Court previously found lacking. That fact—coupled with Congress's decision to model section 10 on section 332(c)(1) under which the Commission previously granted broad forbearance in the past—amply demonstrates that section 10 forbearance authority was intentionally designed by Congress to authorize more expansive changes than what would flow from distinct statutory language of the sort at issue in *MCI* and *Biden* v. *Nebraska*. And the circumstances here also bear no meaningful similarity to the Court's objection in *Biden* v. *Nebraska* that the Department of Education was seeking to "augment[] and expand[] existing [statutory] provisions dramatically." In this case, after exercising the explicitly-granted forbearance authority in accordance with the terms specified by Congress, the remaining requirements that we apply flow directly from the statutory regime Congress enacted as applied to BIAS consistent with our classification decision here.

307. Finally, our forbearance with respect to BIAS does not encompass internet transmission services that

incumbent local exchange carriers or other common carriers chose to offer as telecommunications services subject to the full range of Title II requirements prior to the *2015 Open Internet Order*. The *RIF Order* observed that such services "have never been subject to the [*2015 Open Internet Order*] forbearance framework," and stated that "carriers that choose to offer transmission service on a common carriage basis are, as under the *Wireline Broadband Classification Order,* subject to the full set of Title II obligations, to the extent they applied before the" *2015 Open Internet Order*. The *2015 Open Internet Order* did, however, allow a provider previously offering broadband transmission on a common carrier basis "to change to offer internet access services pursuant to the construct adopted in" that *Order* subject to filing with and review by the Wireline Competition Bureau of the provider's proposal for the steps it would take to convert to such an approach. In the *2023 Open Internet NPRM* we proposed to follow the same approach again here, and no commenter opposes that proposal. As such, our forbearance with respect to BIAS does not encompass such services.

*B. Maintaining Targeted Authority To Protect Consumers, Promote National Security, and Preserve the Broadband Ecosystem*

308. We find that the standard for forbearance is not met with respect to BIAS for the following limited provisions:

• Sections 201, 202, and 208, along with the related enforcement provisions of sections 206, 207, 209, 216, and 217, and the associated complaint procedures; and the Commission's implementing regulations (but, to be clear, the Commission forbears from all ratemaking authority based on, or ratemaking regulations adopted under, sections 201 and 202);

• Section 214 entry certification requirements, pursuant to which the Commission considers all aspects of the public interest associated with section 214 authorizations, including national security, law enforcement, and other concerns. We grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers, with exceptions and subject to the Commission's reserved power to revoke such authority and waive the Commission's implementing rules in section 214(a)–(d) of the Act. Our grant of blanket section 214 authority includes authority for entry, acquisitions (including transfers of control and assignments), and

temporary or emergency service and related requirements. We forbear from section 214 exit certification requirements regarding the discontinuance, reduction, or impairment of BIAS and the Commission's implementing section 214(a)–(d) rules. In addition, since we classify mobile BIAS as a commercial mobile service in the Order, the existing forbearance from all domestic section 214 requirements for CMRS providers applies to mobile BIAS providers. That forbearance is maintained and undisturbed by the Order;

• Sections 218, 219, and 220(a)(1) and (c)–(e), which enable the Commission to conduct inquiries and obtain information;

• Section 222, which establishes core customer privacy protections (while waiving application of our current implementing rules to BIAS);

• Section 224 and the Commission's implementing rules, which grant certain benefits that foster network deployment by providing telecommunications carriers with regulated access to poles, ducts, conduits, and rights-of-way;

• Sections 225, 255, and 251(a)(2), and the Commission's implementing rules, which collectively advance access for persons with disabilities, except that the Commission forbears from the requirement that BIAS providers contribute to the Telecommunications Relay Service (TRS) Fund at this time; and

• Section 254, the interrelated requirements of section 214(e), and the Commission's implementing regulations to strengthen the Commission's ability to support broadband, supporting the Commission's ongoing efforts to support broadband deployment and adoption.

309. Our forbearance decision in this subsection focuses on addressing consequences arising from the reclassification of BIAS in the Order. Thus, we do not forbear with respect to requirements to the extent that they already applied prior to the Order without regard to the classification of BIAS. Similarly, consistent with the *2015 Open Internet Order,* to the extent that provisions or regulations apply to an entity by virtue of other services it provides besides BIAS, the forbearance in the Order does not extend to that context. Consistent with the Commission's conclusions in the *2015 Open Internet Order,* the Order does not alter any additional or broader forbearance previously granted that already might encompass BIAS in certain circumstances, for example, insofar as BIAS, when provided by mobile providers, is a CMRS service. As one example, the Commission has

granted some forbearance from section 310(d) for certain wireless licensees that meet the definition of "telecommunications carrier." But section 310(d) is not itself framed in terms of "common carriers" or "telecommunications carriers" or providers of "CMRS" or the like, nor is it framed in terms of "common carrier services," "telecommunications services," "CMRS services" or the like. To the extent that such forbearance thus goes beyond the forbearance for wireless providers granted in the Order, the Order does not narrow or otherwise modify that pre-existing grant of forbearance.

1. Authority To Protect Consumers and Promote Competition (Sections 201 and 202)

310. The Commission has previously described sections 201 and 202 as lying "at the heart of consumer protection under the Act," providing, along with their attendant enforcement sections, "bedrock consumer protection obligations." The Commission has never previously completely forborne from these important statutory protections, and we generally do not find forbearance warranted here. We find sections 201 and 202 of the Act, along with section 208 and certain fundamental Title II enforcement authority, necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and necessary to protect consumers under section 10(a)(1) and (a)(2). We also find that forbearance from these provisions would not be in the public interest under section 10(a)(3), and therefore do not grant forbearance from those provisions and associated enforcement procedural rules with respect to BIAS. However, particularly in light of the protections the open internet rules provide and the ability to employ sections 201 and 202 in case-by-case adjudications, we are otherwise persuaded to forbear from applying sections 201 and 202 of the Act to the extent they would permit the adoption of *ex ante* rate regulation of BIAS in the future, as discussed below. To be clear, this *ex ante* rate regulation forbearance does not extend to inmate calling services and therefore has no effect on our ability to address rates for inmate calling services under section 276.

311. Section 201 enables the Commission to protect consumers against unjust or unreasonable charges, practices, classifications, and regulations in connection with BIAS. And section 202 prohibits discrimination in the provision of communications services, thereby advancing the Commission's goals of ending digital discrimination and promoting universal service and digital equity. In order to forbear from these statutory provisions, we would have to conclude, among other things, that their enforcement is not necessary for consumer protection, something the record provides no basis to do. Indeed, the Commission has previously taken enforcement action against providers under section 201 for violation of consumers' privacy rights. And Congress itself recognized the importance of sections 201 and 202 when it specifically excluded them (along with section 208) from earlier CMRS-specific forbearance authority under section 332(c)(1)(A).

312. Additionally, sections 201 and 202 reinforce the Commission's ability to preserve internet openness, and applying these provisions benefits the public broadly by helping foster innovation and competition at the edge, thereby promoting broadband infrastructure investment nationwide. Thus, in this respect, our decision to apply the provisions actually will promote competitive market conditions at the edge. As explained below, the open internet rules adopted in the Order reflect more specific protections against unjust or unreasonable practices for or in connection with BIAS. These benefits—which can extend beyond the specific dealings between a particular BIAS provider and customer—persuade us that forbearance from sections 201 and 202 here is not in the public interest.

313. We also observe that section 201(b) enables the Commission to regulate BIAS-only providers that serve MTEs and thereby end unfair, unreasonable, and anticompetitive practices facing MTE residents, furthering the Commission's goals to foster competition and promote consumer choice for those living and working in MTEs. Obligating BIAS-only providers to abide by the same kinds of rules—including those that prohibit exclusivity contracts that bar competition outright in MTEs—that other telecommunications and cable providers must currently follow will secure the same protections for all residents of MTEs, regardless of the kind of service offered by providers in their building; reduce regulatory asymmetry between BIAS-only providers and other kinds of providers; and potentially improve competition in the MTE marketplace. Therefore, we do not forbear from § 64.2500 of our rules as to BIAS providers, which prohibits common carriers from entering into certain types of agreements and requires disclosure of others. BIAS-only providers should therefore ensure that all MTE-related contracts entered into subsequent to the effective date of the Order we adopt in the Order are in compliance with § 64.2500. With respect to pre-existing MTE-related contracts, we temporarily waive § 64.2500 with respect to these contracts for BIAS-only providers for a period of 180 days to allow these providers to bring their pre-existing contracts into compliance with § 64.2500. The Commission may waive its rules and requirements for "good cause shown," which may be found "where particular facts would make strict compliance inconsistent with the public interest." In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy," and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." We find good cause in this instance to provide adequate notice and time to give BIAS-only providers an opportunity to bring pre-existing contracts for MTEs into compliance with our newly applicable MTE rules. We note that this 180-day period is consistent with the time the Commission has previously granted providers to bring their pre-existing contracts into compliance with newly enacted MTE rules. We reject LARIAT's request that the Commission exempt small providers from "restrictions" on "bulk billing of multi-tenant dwellings." LARIAT does not provide a specific justification for exempting small BIAS providers from our MTE requirements, but rather generalizes that these provisions (along with others) "could" impose "tremendous unnecessary burdens on our company . . . and also harm consumers." We have provided all BIAS-only providers a suitable period of time to come into compliance with these provisions, and further, the Commission's MTE provisions are designed to protect, not harm, consumers and LARIAT provides no evidence to the contrary.

314. For the foregoing reasons we find that sections 201 and 202 of the Act are necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and necessary to protect consumers under sections 10(a)(1) and (a)(2). Moreover, retaining these provisions is in the public interest because it provides the Commission direct statutory authority to protect internet openness and promote fair competition while allowing the Commission to adopt a tailored

approach and forbear from most other requirements. We find that our sections 201 and 202 authority provides a more flexible framework better suited to the broadband marketplace than many of the alternative regulations—such as *ex ante* rate regulations and interconnection requirements—from which we are forbearing but which otherwise would be necessary. We thus reject the arguments of some commenters against the application of these provisions insofar as they assume that such additional regulatory requirements also will apply in the first instance. Such considerations provide additional grounds for our conclusion that section 10(a)(3) is not satisfied as to forbearance from sections 201 and 202 of the Act with respect to BIAS.

315. We disagree with commenters urging the Commission to forbear from sections 201 and 202 outright. WISPA disputes the value section 202 brings to the Commission's antidiscrimination efforts, highlighting the broad enforcement powers Congress conferred upon the Commission and the rules established in our digital discrimination proceeding. But these sections enable the Commission to advance digital equity in other ways not contemplated elsewhere, including providing authority for our open internet rules.

316. We also disagree with ACA Connects and WISPA that the Commission should forbear from applying sections 201 and 202 to small BIAS providers. ACA Connects contends that reclassification would impose burdensome costs and that smaller service providers lack the resources, such as in-house legal staff, needed to navigate a Title II world. They thus argue that the Commission should grant forbearance from direct application of sections 201 and 202 and instead "bring *ad hoc* enforcement actions . . . for conduct that falls outside the scope of the proposed conduct-based rules." Similarly, WISPA asserts that there is "ample evidence that application of these requirements to smaller providers will do more harm than good." These arguments fail to consider that sections 201 and 202 serve as a legal basis for adoption of the open internet conduct rules. Further, in making these arguments, commenters fail to acknowledge the legal framework applied in the CMRS context, where sections 201 and 202 have applied for years. This history should allay any "concerns . . . about potential burdens, or uncertainty, resulting from the application of sections 201 and 202," and we conclude that providers, both small and large, will find ample guidance about the application of

sections 201 and 202 via our open internet rules.

2. Enforcement (Sections 206, 207, 208, 209, 216, and 217)

317. We also do not forbear from section 208's complaint proceeding rules and other fundamental Title II enforcement provisions. In particular, we do not forbear from applying section 208 of the Act and the associated procedural rules, which provide a complaint process for enforcement of applicable provisions of the Act or any Commission rules. We also retain additional statutory provisions that we find necessary to ensuring a meaningful enforcement process. In particular, we do not forbear from sections 206, 207, and 209. Without these provisions that permit "redress through collection of damages," Section 208's complaint protections would be "virtually meaningless." Allowing for the recovery of damages does not mean that an award of damages necessarily would be appropriate in all, or even most, cases. The Commission has discretion to deny an award of damages and grant only prospective relief where a case raises novel issues on which the Commission has not previously spoken, or where the measurement of damages would be speculative. The Commission also has authority to adopt rules and procedures that are narrowly tailored to address the circumstances under which damages would be available in particular types of cases. Section 208 and its associated procedural rules, as well as sections 206 and 207, which serve as a necessary adjunct to the complaint process, provide the public the means to "file a complaint with the Commission and seek redress." We similarly do not forbear from sections 216 and 217, which "were intended to ensure that a common carrier could not evade complying with the Act by acting through others over whom it has control or by selling its business." Thus, we do not forbear from enforcing these key Title II enforcement provisions with respect to BIAS.

318. In the event that a carrier violates its common carrier duties, the section 208 complaint process would permit challenges to a carrier's conduct, and many commenters advocate for section 208 to apply. The Commission's procedural rules establish mechanisms to carry out that enforcement function in a manner that is well-established and clear for all parties involved. The Commission has never previously forborne from section 208. Indeed, we find it instructive that in the CMRS context Congress specifically precluded the Commission from using section 332

to forbear from section 208. Commenters also observe the important interrelationship between section 208 and sections 206, 207, 216, and 217, which the Commission itself has recognized in the past, as discussed above. We note, however, that in complaint proceedings filed pursuant to section 207, courts have historically been careful to consider the Commission's views as a matter of primary jurisdiction on the reasonableness of a practice under section 201(b). A Federal district court may determine that the Commission is better to suited to answer the particular question before the court in the first instance and elect to invoke the primary jurisdiction doctrine. The primary jurisdiction doctrine applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. In addition, to forbear from sections 216 and 217 would create a loophole in our ability to evenly enforce the Act, which would imperil our ability to protect consumers and to protect against unjust or unreasonable conduct, and would be contrary to the public interest. The prospect that carriers may be forced to defend their practices before the Commission supports the strong public interest in ensuring the reasonableness and nondiscriminatory nature of those actions, protecting consumers, and advancing our overall public interest objectives. For the reasons discussed above, we thus reject the assertions of some commenters that enforcement is unduly burdensome. In particular, we are not persuaded that such concerns outweigh the overarching interest advanced by the enforceability of sections 201 and 202. Nothing in the record demonstrates that our need for enforcement differs among broadband providers based on their size, and we thus are not persuaded that a different conclusion in our forbearance analysis should be reached in the case of small broadband providers, for example. While some commenters express fears of burdens arising from the application of these provisions to BIAS, we find such arguments to be speculative, particularly given the lack of evidence of such actions where those provisions historically have applied (including in the CMRS context). As a result, for all of the foregoing reasons, we conclude

that none of the section 10(a) criteria is met as to forbearance from these fundamental Title II enforcement provisions and the associated Commission procedural rules with respect to BIAS. As explained above, sections 201 and 202 do not pose the existential threat that some commenters claim they do. Moreover, individuals harmed by a provider's unlawful practices must have some means of being made whole, and we agree with the Lawyers' Committee that section 208 is "essential" for pursuing claims of discrimination and other harms.

### 3. Requirement for a Certificate of Public Convenience and Necessity (Section 214)

319. We do not forbear from the entry certification requirements of section 214(a)–(d) of the Act with respect to the provision of BIAS. Section 214(a) requires carriers to obtain a Commission certification to construct, acquire, operate, or engage in transmission over lines of communication. By reclassifying BIAS as a Title II telecommunications service subject to section 214, the Commission can ensure that the "present or future public convenience and necessity" is served, including its obligation to protect the Nation's telecommunications networks and to protect the United States from entities that pose threats to national security and law enforcement interests. To ensure continued service for consumers and to provide regulatory certainty to BIAS providers, however, we grant blanket section 214 authority for the provision of BIAS to all current and future BIAS providers, with exceptions and subject to the Commission's reserved power to revoke such authority. Specifically, to protect national security and law enforcement interests, we exclude the following entities and their current and future affiliates and subsidiaries from this blanket section 214 authority—China Mobile International (USA) Inc. (China Mobile USA), China Telecom (Americas) Corporation (CTA), China Unicom (Americas) Operations Limited (CUA), Pacific Networks Corp. (Pacific Networks), and ComNet (USA) LLC (ComNet)—whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked by the Commission in view of national security and law enforcement concerns. The Order does not modify China Mobile USA's blanket domestic section 214 authority to provide other domestic interstate services and to construct or operate any other domestic transmission line, which was not addressed in the *China Mobile USA Order.* The Commission retains the authority to revoke a carrier's blanket domestic section 214 authority when warranted.

320. Section 214 entry certification, albeit blanket certification, is consistent with our conclusion that reclassifying BIAS as a telecommunications service will significantly bolster the Commission's ability to carry out its statutory public interest responsibilities to safeguard national security and law enforcement. The Supreme Court has determined that the Commission has considerable discretion in deciding how to make its section 214 public interest findings. Exercising this section 214 authority achieves two core purposes— national security and the promotion of safety of life and property—and is integral to the Commission's public interest assessment of providers seeking to provide essential BIAS to consumers. The *2023 Open Internet NPRM* recognized that reclassification of BIAS "is necessary to unlock tools the Commission needs to fulfill its objectives and responsibilities to safeguard this vital service."

321. The importance of section 214 of the Act with regard to the Commission's national security efforts is evident in the Commission's actions concerning entities that are majority-owned and controlled by the Chinese government. Over the past several years, the Commission denied an application for international section 214 authority and revoked certain carriers' section 214 authority based on recommendations and comments from interested Executive Branch agencies regarding evolving national security and law enforcement concerns. In one of those proceedings, the Executive Branch agencies and the Commission confronted the implications of changed circumstances in the national security environment on the evaluation of international section 214 authority. In each of these revocation actions, the Commission extensively evaluated national security and law enforcement concerns raised by existing section 214 authorizations and determined, based on thorough record development, that the present and future public interest, convenience, and necessity was no longer served by those carriers' retention of their section 214 authority. We disagree with commenters that contend that an insignificant fraction of all BIAS providers serving U.S. customers "present the type of national security risk that the Commission intends to address," or that "there is no indication that any of the carriers whose section 214 authorizations the Commission revoked in recent years provides BIAS." At the time the Commission took these actions, section 214 did not apply to BIAS, potentially exposing the Nation's communications networks to national security and law enforcement threats by entities providing BIAS or seeking to provide BIAS. We believe the same national security and law enforcement concerns identified in the Commission's recent denial and revocation and/or termination proceedings equally exist with respect to these and other entities providing BIAS or seeking to provide BIAS. We agree with arguments in the record that applying section 214 of the Act to the provision of BIAS may have significant future national security, law enforcement, and other benefits by enhancing the Commission's ability to act immediately in response to future threats. By declining to forbear from the application of the section 214 entry authorization requirement to BIAS, we build upon these and other actions the Commission has taken to strengthen and advance its ability to protect U.S. telecommunications networks and critical infrastructure against national security threats. For instance, in November 2019, the Commission prohibited the use of public funds from the Commission's Universal Service Fund (USF) to purchase, obtain, maintain, improve, modify, or otherwise support any equipment or services produced or provided by companies posing a national security threat to the integrity of communications networks or the communications supply chain.

322. We find that BIAS is subject to section 214 on the basis of it being both a domestic and an international telecommunications service. The Commission has employed different rules for domestic and international section 214 authorizations to date. Within the category of international section 214 authorizations, it has adopted a regulatory approach that turns, among other things, on the particular destination country to be served. BIAS is defined as a "service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints," and our interpretation of "all internet endpoints" includes, without distinction, foreign as well as domestic endpoints. Thus, BIAS necessarily involves "foreign communication" as well as "interstate communication" (and at least some intrastate communication, as well). Given the global nature of BIAS, we find it appropriate to treat BIAS as a mixed

domestic and international service. We recognize that the Commission stated in the *2015 Open Internet Order* that "[b]roadband internet access service involves the exchange of traffic between a last-mile broadband provider and connecting networks." But what could be termed the "physical" location or scope of a service does not dictate its jurisdictional status, which instead turns on the jurisdiction of the communications being carried.

a. Blanket Section 214 Authority Is Granted for the Provision of BIAS, With Exceptions and Subject to the Commission's Reserved Power To Revoke Such Authority

323. While section 214 entry authorization is critical to protect national security and law enforcement interests, we recognize that entry certification entails costs. Commenters argue that the Commission should forbear from section 214, citing potential costs, delays, and administrative burdens on BIAS providers. They raise concerns about lengthy and burdensome application processes, especially for small BIAS providers, and consequences for investment and innovation. At least one commenter claims that the networks of smaller BIAS providers "are not prone" to evolving national security and other concerns, and the Commission should not apply section 214 to smaller BIAS providers. To address these concerns while protecting our telecommunications networks, and supported by the record, we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specific identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current and future affiliates and subsidiaries.

324. Such blanket section 214 authority is subject to the Commission's reserved power to revoke, consistent with established statutory directives and longstanding Commission determinations with respect to section 214 authorizations. The Commission has explained that it grants blanket section 214 authority, rather than forbearing from application or enforcement of section 214 entirely, in order to remove barriers to entry without relinquishing its ability to protect consumers and the public interest by withdrawing such grants on an individual basis. The Order does not alter the Commission's current rules

implementing section 214 as applied to all other services subject to section 214 of the Act. We believe that blanket section 214 authority will allow BIAS providers to continue operating and providing BIAS without the need for Commission-approved applications at this time. While certain benefits arising from our decision not to forbear may be difficult to quantify, such as the current and future protection of national security, law enforcement, or other public interest benefits, we nevertheless conclude that the expected benefits of applying section 214 entry authority to the provision of BIAS through the Order greatly exceed any potential costs to providers. The costs to providers are, in any event, minimized by our grant of blanket authority with no prescriptive entry requirements. Our decision to condition grant of blanket section 214 authority for the provision of BIAS on the Commission's reserved power to revoke such authority is consistent with the established statutory directives and longstanding Commission determinations with respect to section 214 authorizations. In previously granting all telecommunications carriers blanket domestic section 214 authority, the Commission found that the "present and future public convenience and necessity require the construction and operation of all domestic new lines pursuant to blanket authority," subject to the Commission's ability to revoke a carrier's section 214 authority when warranted to protect the public interest. Indeed, when the Commission opened the U.S. telecommunications market to foreign participation in the late 1990s, it delineated a non-exhaustive list of circumstances where it reserved the right to designate for revocation an international section 214 authorization based on public interest considerations and stated that it considers "national security" and "foreign policy" concerns when granting authorizations under section 214 of the Act.

325. Based on the key public interest considerations that inform our action in the Order, we reserve the right to conduct *ad hoc* review of whether a provider's retention of blanket section 214 authority for the provision of BIAS presents national security, law enforcement, public safety, or other risks that warrant revocation of such authority. We disagree that this important safeguard associated with blanket section 214 authority causes uncertainty for BIAS providers as the Commission has clearly established that it continues to reassess on an *ad hoc* basis whether a carrier's retention of section 214 authority presents national

security or other risks that warrant revocation of its section 214 authority. The Executive Branch agencies also may recommend that the Commission modify or revoke an existing authorization if they at any time identify unacceptable risks to national security or law enforcement interests of the United States. If revocation or termination may be warranted, the Commission may institute a revocation proceeding to "provide the authorization holder such notice and an opportunity to respond as is required by due process and applicable law, and appropriate in light of the facts and circumstances."

b. China Mobile USA, CTA, CUA, Pacific Networks, ComNet, and Their Current and Future Affiliates and Subsidiaries Are Excluded From Blanket Section 214 Authority for BIAS

326. To further protect the Nation's telecommunications networks from threats to national security and law enforcement, we exclude China Mobile USA, CTA, CUA, Pacific Networks, ComNet, and their current and future affiliates and subsidiaries from grant of blanket section 214 authority for the provision of BIAS. We find that excluding these Chinese government-owned entities and their current and future affiliates and subsidiaries from blanket section 214 authority is warranted based on the Commission's prior determinations that the present and future public interest, convenience, and necessity would no longer be served by these Chinese government-owned entities' retention of section 214 authority, or that the public interest would not be served by the grant of international section 214 authority.

327. The Commission found that these entities are subject to exploitation, influence, and control by the Chinese government, and that mitigation would not address the national security and law enforcement concerns. The Commission identified national security and law enforcement concerns with respect to the entities' access to internet PoPs (usually located within data centers) and other harms in relation to the services provided by those entities pursuant to section 214 authorization. To deter evasion of our exclusion of these entities, and consistent with the Commission's inclusion of these entities and their affiliates and subsidiaries in the list of equipment and services covered by section 2 of the Secure and Trusted Communications Networks Act, we also exclude their current and future affiliates and subsidiaries from our grant of blanket section 214 authority. Of course, any entity affected by this

exclusion remains free to petition the Commission for section 214 authority under the statute and demonstrate how grant of the authority would serve the public interest, convenience, and necessity.

c. Transition Period for China Mobile USA, CTA, CUA, Pacific Networks, and ComNet

328. We direct China Mobile USA, CTA, CUA, Pacific Networks, and ComNet and their affiliates and subsidiaries to discontinue any and all provision of BIAS no later than sixty (60) days after the effective date of the Order as established in the **Federal Register**. We require these entities to provide notice of service discontinuance to all affected customers within thirty (30) days after the effective date of the Order as established in the **Federal Register**. The Order shall be effective sixty (60) days after publication in the **Federal Register**. Such notice shall be in writing to each affected customer. We further require the entities to file a copy of the standard notice(s) sent to their customers (without providing the Commission with any customers' personally identifiable information (PII)) in the docket of this proceeding through the Commission's Electronic Comment Filing System (ECFS) within sixty (60) days after the effective date of the Order as established in the **Federal Register**. If the entity does not provide BIAS, the entity shall file a letter attesting to this information and certified by a corporate officer in ECFS within sixty (60) days after the effective date of the Order as established in the **Federal Register**. We find this transition reasonable, as the Commission previously gave CTA, CUA, Pacific Networks, and ComNet this same transition period to discontinue all services previously provided under section 214 authority, and it should mitigate any difficulties BIAS customers may face in finding other providers.

d. Waiver of Rules Implementing Section 214(a)–(d) of the Act

329. We recognize that application of the Commission's current rules implementing section 214(a)–(d) of the Act, which historically have addressed traditional telecommunications services, may raise operational issues in the context of BIAS. For example, the current rules contain requirements with respect to the regulatory classification of U.S. international carriers as "either dominant or non-dominant for the provision of particular international communications services on particular routes"; notification by, and prior approval for, U.S. international carriers that are, or propose to become, affiliated with a foreign carrier; conditions applicable to all international section 214 authorizations; conditions applicable to authorized facilities-based international carriers; and conditions applicable to carriers authorized to resell the international services of other authorized carriers. In addition, some commenters suggest that the Commission should pursue a further rulemaking to consider implementation of rules under section 214(a)–(d) that are tailored to BIAS in view of our classification of BIAS herein. The Commission expects to release a further notice of proposed rulemaking (FNPRM) at a future time to examine whether any section 214 rules specifically tailored to BIAS, including for small providers, are warranted. But in light of the current record and the blanket authority we grant herein, we find it appropriate to waive the current rules implementing section 214(a)–(d) of the Act with respect to BIAS to the extent they are otherwise applicable. In light of the forbearance we grant for section 214 related exit authority, *i.e.*, discontinuance requirements, it is unnecessary to waive our discontinuance rules to the extent they would be applicable to BIAS as a telecommunications service.

330. The Commission may waive its rules and requirements for "good cause shown." In the *2023 Open Internet NPRM*, we sought comment on issues related to implementation of section 214, including whether we should adopt temporary forbearance, grant blanket section 214 authority, or act in some other manner. One commenter proposed issuing a waiver of the rules if the Commission does not forbear from section 214. Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest." In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy," and whether "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." The current rules were established in the context of traditional telecommunications services. Given our consideration of hardship and equity that may arise by immediate application of those rules to BIAS following our action in the Order, we find there is good cause to waive those rules pending the adoption of BIAS-specific rules at some future time to the extent the public interest dictates.

331. We find that the public interest is served by this waiver as it will ensure that consumers can continue to receive the broadband internet access services to which they presently subscribe and avoid any disruption to, or uncertainty for, BIAS consumers and BIAS providers. We reiterate that with respect to mobile BIAS, because we conclude herein that mobile BIAS is a commercial mobile service, it is subject to the forbearance granted for CMRS providers as a whole in 1994. We note that this forbearance from domestic section 214 requirements as applied to mobile BIAS providers will also apply to mobile satellite service providers, to the extent they provide mobile satellite broadband service, that are licensed as common carriers for the provision of service that meets the statutory definition of CMRS (*e.g.*, mobile earth station licensees). Under our decision in the Order, mobile BIAS, including mobile satellite broadband service, will continue to be subject to international section 214 requirements for their international operations, but as discussed, we are granting blanket section 214 authority for the provision of BIAS set forth in the Order. The Commission anticipates issuing an FNPRM to consider what rules should apply going forward. As we observed in the *2023 Open Internet NPRM*, our Title III licensing authority with respect to facilities-based mobile BIAS providers independently "grant[s] us important authority that can be used to advance national security and public safety with respect to the services and equipment subject to licensing."

e. The Commission Will Forbear From the Section 214 Exit Certification Requirement

332. We find the section 10 criteria met for forbearance from applying the exit certification requirements in section 214(a)–(d) and the Commission's implementing rules to the extent they would newly apply through the classification of BIAS as a Title II telecommunications service. As explained above, we focus our regulatory oversight on the entry certification requirement for BIAS providers and find it prudent to forbear from mandating an exit certification that would require them to obtain approval from the Commission to discontinue, reduce, or impair service to a community. Knowing that we can ensure that the Commission can review existing and future BIAS participants serving consumers through their blanket entry into the market, we find that there is no current need to also require exit certifications. Doing so would conflict with the overall tailored regulatory approach we adopt and that is designed to promote infrastructure investment and innovation. We are persuaded by

commenters that BIAS providers' freedom to make network investments is optimized when they need not divert capital to outdated network equipment and services while seeking discontinuance approval. We agree that applying section 214 in a targeted and narrow manner to address national security and law enforcement concerns allows us to monitor market entrants that may then invest and innovate without being "locked in" to maintaining those investments as circumstances and technology evolve. This is also consistent with the *2015 Open Internet Order,* which acknowledged that discontinuance obligations entail costs and that it is important to incrementally apply regulations beyond the *status quo.* Thus, applying the exit certification provision of section 214(a) of the Act is not "necessary" under section 10(a)(1) and (a)(2). We thus disagree with those commenters that support not forbearing from section 214 exit requirements because of alleged public safety benefits with respect to discontinuance requirements. The services for which they are primarily concerned are not BIAS and remain subject to our sections 214 discontinuance rules.

333. For those same reasons, we also find that forbearance is in the public interest under section 10(a)(3). Some commenters have raised important issues regarding the ability of consumers and companies to maintain awareness of potential service changes and disruptions, including for alarm companies monitoring and public safety activities. To the extent that Public Knowledge urges the Commission to avoid forbearance and instead waive the section 214 exit certification requirements, we note that while the Commission may waive its rules, it may not generally waive a provision of a statute. Forbearance is the mechanism for not applying statutory provisions when warranted. Carriers remain subject to section 214 discontinuance requirements for all telecommunications services other than BIAS, including for telephone exchange and other services, and for services being transitioned to IP-based technology, which appear to be the focus of the Alarm Industry Communications Committee's (AICC) concerns at this time. As services evolve, providers must ensure that customers remain informed. As we stated in the *2015 Open Internet Order,* our universal service rules are designed to advance the deployment of broadband networks, including in rural and high-cost areas. Providers receiving funding to deploy networks are subject

to public interest obligations that protect consumers subscribing to BIAS, including in rural areas or in areas that might have only one provider. In addition, the conduct standards in our open internet rules are a necessary backstop to ensure BIAS providers act reasonably and provide protections against reduction or impairment of BIAS short of complete cessation of providing that service. As the Commission determined in the *2015 Open Internet Order,* all of these protections are sufficient to protect consumers.

4. Information Collection and Reporting To Promote National Security, Public Safety, and Improve Network Resiliency (Sections 218, 219, and 220(a)(1), (c)–(e))

334. We do not forbear from sections 218, 219, and 220(a)(1) and (c)–(e) of the Act. The Commission was created in part "[f]or the purpose of obtaining maximum effectiveness from the use of radio and wire communications in connection with safety of life and property." As we conclude in the Order, reclassification of BIAS is essential to protecting national security and public safety. Sections 218, 219, and 220(a)(1) and (c)–(e) of the Act provide the Commission with the ability to inquire into the management of providers, collect information, and require reporting, among other things, in order to carry out the Commission's duties. Sections 218, 219, and 220 provide additional tools necessary to ensure that our Nation's networks are reliable, secure, and protected from bad actors seeking to disrupt our communications and access sensitive information. For example, sections 218 and 220(a)(1) and (c) will enhance the Commission's ability to require BIAS providers to report outages through NORS and DIRS, which promotes the Commission's ongoing efforts to improve network resiliency and increase situation awareness during disasters. Further, sections 218, 219, and 220(a)(1) and (c)–(e) will provide the Commission with the ability to obtain information from BIAS providers that is essential to the Commission's performance of its duties and statutory responsibilities. For example, in the *Evolving Risks Order,* the Commission adopted a one-time collection of foreign ownership information from international section 214 authorization holders, noting that the information will assist the Commission in developing a timely and effective process for prioritizing the review of international section 214 authorizations that are most likely to raise national security, law enforcement, foreign policy, and/or trade policy

concerns. Additionally, sections 220(a)(1) and (c) will enhance the Commission's ability to require BIAS providers to establish cybersecurity risk management plans and other best practices to mitigate exploitation of BIAS networks. For these reasons, we find that forbearance from sections 218, 219, and 220(a)(1) and (c)–(e) of the Act would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers. Although WISPA argues that section 220(a)(2)'s recordkeeping requirements would be unduly burdensome for smaller providers, WISPA itself acknowledges the Commission's ability to tailor application thereof as necessary.

335. We agree with Free Press that we should exclude section 218 from forbearance because it could be an important source of investigative authority, and that we should retain section 220(c) to advance national security. We are not persuaded by the Computer & Communications Industry Association (CCIA) that we should forbear from these sections because the Commission forbore from them in 2015. Because of the changed circumstances since 2015, we find that the national security and public safety benefits require that we exclude these sections from forbearance. We also disagree with WISPA that enforcement of sections 218 and 220 will be burdensome to small providers. Arguments about the hypothetical costs and burdens to providers are speculative if and until we take additional regulatory action pursuant to those sections, at which time the Commission would consider the impact on small providers. Furthermore, we find that the benefits to national security, public safety, and network resiliency likely weigh in favor of not forbearing from these sections.

5. Customer Privacy (Section 222)

336. As proposed, we do not forbear from section 222 of the Act, which establishes core privacy protections for customers of telecommunications services, as well as other entities that do business with Title II providers. We do, however, waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service by virtue of the Order. Section 222 governs telecommunications carriers' protection, use, and disclosure of information obtained from their customers or other carriers. The requirements of section 222 themselves impose duties on carriers, and the Commission has recognized its ability to directly enforce

the statutory requirements of section 222 even in the absence of rules specifically addressing a given issue. We find that forbearance from section 222 would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers. Our decision in the Order conforms to the Commission's long history of protecting consumer privacy, and the Commission's long-held understanding that ''[c]onsumers' privacy needs are no less important when consumers communicate over and use broadband internet access than when they rely on [telephone] services.'' We also find that because section 222 places an obligation on telecommunications carriers to protect the confidentiality of the proprietary information of, and relating to, other telecommunications carriers (including resellers), equipment manufacturers, and business customers, requiring BIAS providers to comply with section 222 will protect information concerning entities that interact with BIAS providers.

337. As discussed above, the record supports our finding that BIAS providers serve as a necessary conduit for information passing between their customers and internet sites or other users, and are thus situated to collect vast swaths of sensitive information about their customers, including personal information, financial information, precise location information, and information regarding their online activity. And this finding, in turn, supports our conclusion not to forbear from section 222. A 2021 FTC Staff Report found that BIAS providers collect and combine data across product lines, collect data beyond what is necessary to provide the service (including the websites that customers visit, the shows they watch, the apps they use, details about their home energy use, their real-time and historical location, and their internet search queries), use web data to target ads, group consumers using sensitive characteristics, and share real-time location data with third parties. Evidence suggests that consumers may not fully comprehend—and therefore may not be able to meaningfully consent to—BIAS providers' collection, processing, and disclosure of customer information. Further, as the American Library Association explains, ''due to the lack of competition, even if consumers understand the extent to which their ISP collects their personal data, they most likely do not have the option to switch to an ISP that aligns

with their privacy and data security goals.'' As just one example that illustrates the fact that providers do not compete on privacy—and the importance of the Commission's domain-specific expertise in the area of privacy enforcement—we note that all of the nationwide wireless carriers are currently subject to Forfeiture Orders for their similar failures to protect customer location information. We remain concerned that, absent statutory and regulatory requirements to do so, BIAS providers have minimal incentive to adopt adequate administrative, technical, physical, and procedural safeguards to protect their customers' data from improper or excessive uses by providers themselves, or from further disclosure and misuse by third parties. Additionally, WISPA's contention that protection of CPNI may be particularly burdensome for small providers is not itself cause for forbearance from section 222 outright. A customer's privacy needs do not fluctuate with the size of a provider, and therefore section 10(a)'s forbearance criteria, which focus on whether a requirement is necessary to ensure just and reasonable and nondiscriminatory practices, do not justify the relief requested by WISPA.

338. We also disagree with CCIA's position that the Commission must, at this time, apply section 222 to BIAS providers only with respect to ''information' that is a clear analog to the non-BIAS telecommunications service information that the Commission is charged with protecting.'' As an initial matter, we observe that the Commission has never provided an exhaustive list of what constitutes CPNI. But more importantly, as explained above, the Commission's privacy authority under Title II is not limited to CPNI. Sections 222(a) and 201 also impose obligations, which we enforce, on carriers' practices with regard to non-CPNI customer proprietary information and PII. We see no reason to depart from that approach with respect to BIAS; on the contrary, the types of sensitive information to which BIAS providers have access by virtue of their provision of BIAS as a service underscores the imperative of applying section 222 to BIAS providers broadly—*i.e.*, without limiting its application to only particular information types. Similarly, we are unpersuaded by USTelecom's suggestion that section 222 only applies to CPNI, as defined therein, and does not provide authority beyond that as cause for forbearance.

339. We reject assertions that application of section 222 to BIAS will lead to ''regulatory bifurcation'' of

privacy on the internet, or that it would be arbitrary and capricious for the Commission to impose privacy requirements on BIAS providers while leaving larger edge, content, or social media platforms, such as Google, Apple, and Meta, subject to the FTC's section 5 authority. As an initial matter, we think that the statutory framework makes clear that the Commission has authority over the misuse of the ''underlying communications infrastructure by consumer-facing service providers, whereas the FTC . . . concerns itself with businesses offering their products and services by means of that infrastructure.'' Further, we disagree that BIAS providers' access to user data ''is not comprehensive.'' And, as the Lawyers' Committee explains, ''even when communications content is encrypted or uninspected, unshielded metadata can still reveal highly sensitive information.''

340. In addition, assertions that ''[i]t is confusing for consumers when privacy regimes differ based on who holds the information'' ignore the fact that consumers are already subject to a dichotomy of privacy regimes. Currently, a provider of mobile voice service is subject to the section 222 privacy and data protection framework, while mobile BIAS offered by the same provider, *and used on the same device*, is currently not subject to the same framework under the *RIF Order*. We are skeptical of claims, and find no actual evidence in the record, that consumers view their use of over-the-top applications like Google Maps, YouTube, or TikTok—applications that a consumer chooses to download and to which they consent to provide their information—as more closely comparable to BIAS than they view BIAS as comparable to other communications services, like voice services, which are typically provided by, and billed in conjunction with, their broadband services. On the contrary, we find that declining to forbear from applying section 222 to BIAS will support a consistent privacy and data security framework for voice and data services, which consumers often subscribe to from one provider in a bundle and perceive to be part of the same service, particularly for mobile services.

341. Finally, we also disagree with commenters' assertions that application of section 222 to BIAS is inconsistent with the Congressional Review Act (CRA). As one independent basis for our decision, this argument fails because it attempts to impute Congress's 2017 CRA resolution with respect to the Commission's *2016 Privacy Order* (81

FR 87274 (Jan. 3, 2017)) to the Commission's *2015 Open Internet Order.* Specifically, in the *2015 Open Internet Order,* the Commission classified BIAS as a telecommunications service and granted forbearance from the Commission rules implementing section 222, but did not grant forbearance from section 222 itself. Thus, the application of section 222 to BIAS was established by the *2015 Open Internet Order,* and that *Order* was not subject to a resolution of disapproval. While Commissioner Carr's dissent suggests that enforcement under the statute might fall short because "'calls' are the only telecommunications services specifically mentioned in section 222,'' this argument overlooks the fact that the relevant requirements under section 222—specifically section 222(a) and 222(c)—and the definition of CPNI found in section 222(h) do not refer to ''calls'' but instead to ''telecommunications'' services, thus allowing for Commission enforcement under the Act. Indeed, we note that such enforcement was specially contemplated by the Commission following the CRA resolution.

342. The argument about the 2017 CRA resolution of disapproval also fails for additional, independent reasons. Subsequent to the 2015 reclassification of BIAS as a telecommunications service subject to section 222, the Commission attempted to further address privacy requirements for BIAS providers, adopting rules in the *2016 Privacy Order* that applied to BIAS providers in addition to other telecommunications carriers and interconnected VoIP providers. In 2017, however, Congress nullified those 2016 revisions to the Commission's privacy rules under the CRA. Pursuant to the language of the Resolution of Disapproval, the *2016 Privacy Order* was rendered ''no force or effect.'' That resolution conformed to the procedure set out in the CRA, which requires agencies to submit most rules to Congress before they can take effect and provides a mechanism for Congress to disapprove of such rules. Pursuant to the operation of the CRA, the *2016 Privacy Order* ''may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.''

343. Commenters' CRA arguments are unavailing on their own terms, however. As the Commission explained in the *Data Breach Notification Order* (89 FR 9968 (Feb. 12, 2024)), ''the CRA is best interpreted as prohibiting the Commission from reissuing the *2016 Privacy Order* in whole, or in substantially the same form, or from adopting another item that is substantially the same as the *2016 Privacy Order.*'' It does not prohibit the application of Title II generally, or sections 222 or 201 specifically, to BIAS, nor does it prohibit the Commission from considering the later adoption of regulations implementing those obligations. We do not, through our reclassification of BIAS as a telecommunications service, reinstate the *2016 Privacy Order* or, for that matter, any of the rules that it adopted. And even if one considers the aggregate effect of Commission actions related to privacy, we are not persuaded that they collectively adopt or effectuate rules that are substantially the same as the *2016 Privacy Order* as a whole. This is particularly true because the *2016 Privacy Order* was focused in substantial part on privacy rules for BIAS providers, and as discussed in the next paragraph, our application of section 222 to BIAS providers here is not substantially the same as the rules adopted for BIAS providers in the *2016 Privacy Order.* If the Commission later initiates a proceeding to consider privacy rules for BIAS pursuant to Title II, it will be bound by the CRA not to issue a rule that is substantially the same as the *2016 Privacy Order.* We are doubtful that future Commission actions that recapitulated some or even all of the data elements that constituted customer proprietary network information in the BIAS context under the *2016 Privacy Order* would run afoul of the CRA resolution, as suggested by Commissioner Carr's dissent. And, in any event, based on the Commission's long experience enforcing section 222 without having offered a comprehensive definition of CPNI, we do not anticipate any difficulty in enforcing section 222 with respect to BIAS providers without first adopting a comprehensive definition of BIAS CPNI that includes virtually all data and metadata elements.

344. Indeed, even if, as some parties argue, the CRA prohibits the Commission from adopting rules similar to some of the aspects of the *2016 Privacy Order,* we believe that reinstating the applicability of the statutory obligations and the Commission's ability to consider other regulatory obligations still would not be contrary to the Resolution of Disapproval, and serves the public interest. As explained in the *Data Breach Notification Order,* the *2016 Privacy Order* ''made a number of changes to the Commission's privacy rules that, among other things, required carriers to disclose their privacy practices, revised the framework for customer choice regarding carriers' access, use, and disclosure of the customers' information, and imposed data security requirements in addition to data breach notification requirements.'' For example, the *2016 Privacy Order* specified in detail the contents that had to be included in privacy notices, including mandatory disclosures related to other substantive requirements adopted in the *2016 Privacy Order,* requirements for translation into languages other than English, and detailed requirements for where and how the notice is made available and updated. As another example, the *2016 Privacy Order* adopted detailed customer approval requirements, including when opt-out approval was permitted; when and how approval must be solicited; and detailed requirements for a mandatory mechanism to grant, deny, or withdraw approval at any time. And as another example, the *2016 Privacy Order* restricted BIAS providers' conditioning service on waiver of privacy rights, including limiting the incentives BIAS providers could offer customers in exchange for authorization to use, disclose, and/or permit access to the customer's personal information. Although the basic principles underlying the requirements adopted in the *2016 Privacy Order* obviously flow from the statutory requirements of section 222 themselves, section 222 alone (even when coupled with open internet rules like the transparency rule) leaves BIAS providers with leeway in the details of how they go about complying with those obligations to a materially greater extent than the much more prescriptive 2016 rules.

345. In addition, the Commission Order effectuating the 2017 Resolution of Disapproval explicitly recognized that BIAS providers would ''remain subject to Section 222'' itself. As such, we reject assertions that the Commission may not have authorization to apply section 222 to BIAS providers because Congress overturned the 2016 rules implementing section 222 with respect to BIAS. Thus, even at the time of the 2017 Resolution of Disapproval, the Commission saw no inconsistency between that resolution and the application of the statutory requirements of section 222. As such, we reject arguments that this document's classification is contrary to Congress's disapproval to the *2016 Privacy Order* in 2017.

346. We nevertheless find it appropriate to waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service by virtue of the Order. The Commission may waive its rules and requirements for "good cause shown." Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest." In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy," and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." We observe that many of the Commission's current rules implementing section 222 were adopted to address specific concerns in the voice context, as the Commission recognized in 2015 when initially reclassifying broadband as a Title II telecommunications service. Additionally, there is nothing in the record to indicate that the current rules implementing section 222 would be a good fit for BIAS to the extent that they impose more specific requirements than section 222 itself. Thus, insofar as rules focused on addressing problems in the voice service context are among the central underpinnings of our CPNI rules, we find the public interest better served by waiving all of our CPNI rules at this time, insofar as they would apply to BIAS, to give us the opportunity to carefully evaluate appropriate rules for BIAS, particularly given the need to consider the effect of the Resolution of Disapproval. As the Commission explained in 2015, it is within the agency's discretion to proceed incrementally, and we similarly find that adopting an incremental approach here "guards against any unanticipated and undesired detrimental effects on broadband deployment that could arise." We find that requiring BIAS providers to comply with section 222, while at the same time waiving application of our voice-specific rules, will allow providers the flexibility to adopt security practices that are effective and appropriate in the BIAS context, enhancing protections for customers without placing undue costs on providers, including small providers. As discussed above, we continue to apply section 222 of the Act itself, as well as section 201(b)'s prohibition on practices that are unjust or unreasonable, which also provides authority over privacy practices.

## 6. Access to Poles, Ducts, Conduit, and Rights-of-Way (Section 224)

347. We do not forbear from section 224 and the Commission's associated rules with respect to BIAS. Section 224 governs the Commission's regulation of pole attachments. It authorizes the Commission to prescribe rules to ensure that the rates, terms, and conditions of pole attachments are just and reasonable; requires utilities to provide nondiscriminatory access to their poles, ducts, conduits, and rights-of-way to telecommunications carriers and cable television systems (collectively, attachers); provides procedures for resolving pole attachment complaints; governs pole attachment rates for attachers; and allocates make-ready costs among attachers and utilities. The Act defines a utility as a "local exchange carrier or an electric, gas, water, steam, or other public utility, . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications." However, for purposes of pole attachments, a utility does not include any railroad, cooperatively-organized entity, or entity owned by a Federal or State government. Section 224 excludes ILECs from the meaning of the term "telecommunications carrier." Therefore, these entities do not have a mandatory access right under section 224(f)(1). The Commission has held that when ILECs obtain access to poles, section 224 governs the rates, terms, and conditions of those attachments. The Act allows utilities that provide electric service to deny access to their poles, ducts, conduits, or rights-of-way because of "insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes." The Commission has recognized repeatedly the importance of pole attachments to the deployment of communications networks, and pole attachments remain critical to the development of communications networks. Indeed, section 224 is critical to certain carriers' ability to comply with the deployment obligations associated with their receipt of Federal funding.

348. As explained above, applying section 224 to BIAS will ensure that BIAS-only providers receive the same statutory protections for pole attachments guaranteed by section 224 of the Act that providers of cable and telecommunications services receive, thereby promoting greater deployment, competition, and availability of BIAS. Instead of being forced to privately negotiate for pole access with each pole owner, BIAS-only providers will be statutorily guaranteed a right of nondiscriminatory access and will also be entitled by statute to the same rates as their competitors. As we noted above, BIAS-only providers face "significant barriers to deploy broadband network infrastructure—among them access to poles, ducts, and conduit." Section 224 seeks to remove these barriers by guaranteeing providers access to utility poles at just and reasonable rates. We reiterate our findings from above that restoring section 224 rights and easing the burdens of pole access is likely to ensure that the number of BIAS-only providers does not artificially shrink due to inequitable treatment under the law, and that equitable regulatory treatment of BIAS-only providers, particularly with regard to regulations designed to speed network deployment, will also increase competition, ultimately benefitting consumers and assisting the Commission's goal of achieving universal service. Further, as discussed above, applying section 224 to BIAS will ensure that the Commission and State utility commissions have the requisite legal authority to protect public safety concerns associated with the deployment of BIAS-only infrastructure.

349. Consistent with our findings in the *2015 Open Internet Order,* we thus conclude that applying these provisions will help ensure just and reasonable rates for BIAS by continuing pole access and thereby limiting the input costs that BIAS providers otherwise would need to incur. Leveling the pole attachment playing field for new entrants that offer solely BIAS also removes barriers to deployment and fosters additional broadband competition. For similar reasons, we find that applying these provisions will protect consumers and advance the public interest, and therefore the requirements for forbearance under sections 10(a)(2) and (a)(3) are not met.

## 7. Universal Service

350. We find the statutory test is met for certain forbearance under section 10(a) from applying portions of sections 254(d), (g), and (k), as discussed below, but we otherwise will apply section 254, section 214(e), and our implementing rules with respect to BIAS, as supported by a number of commenters. section 254, the statutory foundation of our universal service programs, requires the Commission to promote universal service goals, including "[a]ccess to advanced telecommunications and information services . . . in all regions of the Nation." Section 214(e) provides the framework for determining which

carriers are eligible to participate in universal service programs. More specifically, an entity must be designated an eligible telecommunications carrier (ETC) under section 214(e) in order to get High Cost or Lifeline program support, but the same constraint does not apply with respect to receipt of support under the E-Rate or Rural Health Care programs. As discussed in greater detail above, the Commission already exercises its authority to support broadband services to schools, libraries, and health care providers and to support deployment of broadband-capable networks in high-cost areas. BIAS is a key focus of those universal service policies, and classification in the Order simply provides another statutory justification in support of these policies going forward. Even assuming *arguendo* that section 706 of the 1996 Act may also enhance the Commission's ability to achieve its universal service policies in certain targeted ways, the likely limits of that authority mean that we are not persuaded simply to rely on section 706 of the 1996 Act in lieu of section 254. Under our broader section 10(a)(3) public interest analysis, the historical focus of our universal service policies on advancing end users' access to BIAS persuades us that strengthening the foundation of our universal service activities is justified and will have limited impact on BIAS providers. Because forbearance would not be in the public interest under section 10(a)(3), we generally apply sections 254 and 214(e), and our implementing rules, to BIAS.

351. However, we find it appropriate—as the Commission previously found in 2015—to forbear from the first sentence of section 254(d) and our associated rules insofar as they would immediately require new universal service contributions to be assessed on broadband internet access service to end users. In addition, pursuant to our forbearance from section 254(d) to maintain the *status quo* for contributions based on the provision of BIAS, and consistent with the *2015 Open Internet Order,* we maintain the *status quo* with respect to states' ability to impose state-level contribution obligations on the provision of BIAS for State universal service programs. The first sentence of section 254(d) states that ''[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the'' USF. In the *2015 Open Internet Order,* however, the Commission

''forb[ore] in part from the first sentence of section 254(d) and our associated rules insofar as they would immediately require new universal service contributions associated with [BIAS].'' The Commission stated that, as with forbearance from requiring new TRS contributions, forbearing from requiring new universal service contributions to be assessed on BIAS would permissibly '' 'balance the future benefits' of encouraging broadband deployment 'against [the] short term impact' from'' forbearing from immediate new contribution assessments. The Commission also pointed to other parallel proceedings, both before the Commission and before other bodies, examining ''a wide range of issues regarding how contributions should be assessed, including whether to continue to assess contributions based on revenues or to adopt alternative methodologies for determining contribution obligations.'' The Commission thus determined to ''forbear[ ] from applying the first sentence of section 254(d) and our implementing rules insofar as they would immediately require new universal service contributions for [BIAS] but not insofar as they authorize the Commission to require such contributions in a rulemaking in the future.''

352. We agree with commenters who say that the Universal Service Fund helps to protect consumers and to ensure that communications services are available to all Americans on just and reasonable rates and terms, and indeed for that reason we have found it important to reclassify BIAS as a Title II telecommunications service to ensure that we can continue to support the availability and affordability of BIAS through USF programs. But the record does not show that assessing new USF contribution requirements on BIAS is necessary for the Universal Service Fund to fulfill those goals at this time. On the contrary, the Universal Service Fund has been funding broadband access and affordability for well over a decade without imposing contribution requirements on BIAS providers. And the record does not show that anything would substantially change in that regard without imposing contribution requirements on BIAS. In fact, the Universal Service Fund successfully operated under a materially identical set of contribution and support schemes throughout the time that the *2015 Open Internet Order* was in effect. To be sure, several commenters contend that it would be preferable to expand the contribution base to include BIAS, or

that doing so might become necessary in the future, but the record does not convincingly show that imposing universal service contribution requirements on BIAS is necessary at this time.

353. We conclude that forbearing from imposing new universal service contribution requirements on BIAS at this time is in the public interest. Others disagree with this proposal, primarily arguing that not forbearing from section 254(d) and our implementing rules would abandon a much-needed expansion of contributors, decrease the contribution amount for each provider, increase the size of the USF, complicate future USF reform, and/or be an unnecessary step toward precluding BIAS providers from assessment. For one thing, we agree with commenters who warn that suddenly and unnecessarily imposing new fees on BIAS could pose ''major upheaval in what is actually a stable and equitable contribution system.'' Rather than risk this upheaval, we believe it to be in the public interest to proceed cautiously and incrementally. The Commission thus recognized in 2015 that it is appropriate to forbear from extending new contribution requirements to BIAS pending ongoing deliberations, both before the Commission and before other bodies, on future USF contribution reform. Contrary to the assumption of some commenters, Commission efforts remain ongoing in this area. In the Luján Letter, Chairwoman Rosenworcel stressed that ''[t]here are a number of potential options for reforming the USF contribution system, each with advantages and disadvantages, and, critically, different cost burdens on consumers . . . . Nonetheless, any reform efforts would benefit from further inquiry, such as a rulemaking or data collection, to fully appreciate the potential burdens on consumers and any other unforeseen, negative downstream effects.'' She added that any such effort ''must result in a sustainable funding model and also fully consider the current telecommunications marketplace and the potential cost burdens on consumers.'' Several commenters also suggested that the Commission should seek and obtain statutory authority to assess edge providers, while another stressed that assessing edge providers ''would undermine the ultimate goal of universal connectivity by imposing new fees on the very services that drive consumers to seek broadband connections in the first place.'' Congress has also been actively deliberating on legislative proposals to reform the USF

contribution and funding mechanisms. USF contribution reform is an immensely complex and delicate undertaking with far-reaching consequences, and we believe that any decisions on whether and how to make BIAS providers contribute to the USF are best addressed holistically in those ongoing discussions of USF contribution reform, with a full record and robust input from all interested parties, rather than in this proceeding.

354. Forbearance will also serve the important public interest goals of broadband access and affordability. As always, we are mindful of section 706's directive to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . regulatory forbearance." That directive is echoed in the universal service principles set forth in section 254(b) of the Act, which include "access . . . in all regions of the Nation" at "just, reasonable, and affordable rates." Here, estimates show that assessing contribution requirements on BIAS could result in a material increase in consumer broadband bills, potentially in the range of roughly $5 to $18 per month. "The monthly household payment would increase, even though the contribution factor would decrease, because the contribution factor would be applied for the first time to customer broadband bills (in addition to telephone bills) which are generally higher than telephone bills." INCOMPAS disputes these figures, citing materials that it has previously submitted to the Commission, including materials fully considered in the *Future of USF Report.* We decline to revisit those figures here without a fully updated record and comprehensive input from a full array of interested parties. Indeed, INCOMPAS itself acknowledges "the need to develop a fuller record on contribution reform." Our forbearance preserves for now the longstanding status quo in this complex and developing area. The impact of those additional fees is likely to be highly regressive, with a disproportionate impact on low-income consumers who may be particularly sensitive to price increases. Although price-cap and rate-of-return carriers cannot pass through universal service contributions to Lifeline customers, that does not account for the many other BIAS providers or the low-income consumers that might not be formally identified as ILEC Lifeline recipients. Imposing new contribution requirements on BIAS could therefore be detrimental to the goal of promoting

broadband adoption and affordability. For these reasons, as with our forbearance from TRS contribution requirements, we deem it appropriate and in the public interest to forbear from the imposition of new contribution requirements on BIAS at this time.

355. We are not persuaded that allowing BIAS providers to continue to forgo USF contributions would be contrary to section 254(d)'s requirement that providers contribute "on an equitable and nondiscriminatory basis" even if we were not forbearing from that requirement. Forbearance essentially maintains the longstanding *status quo.* Under the final sentence of section 254(d), the Commission has had discretion to impose contribution requirements on BIAS providers even under Title I, but no one has argued it is unlawful not to do so. Arguments by commenters that forbearance from contribution requirements would improperly permit BIAS providers to receive USF support without having to contribute likewise neglect that operation of our current contribution rules. Our rules generally permit carriers to recoup their universal service contributions from their customers through surcharges on customers' monthly bills, so most of the burden ultimately falls on end users. Given estimates that extending the contribution requirements to BIAS could considerably increase consumers' broadband bills and would require residential consumers to bear a much greater share of the burden relative to business users, forbearing from new contribution requirements may be more equitable. And in any event, we do not think it inequitable to forbear from imposing new and unnecessary costs on BIAS when seeking to promote universal broadband availability, while requiring contributions from more mature services that have already achieved near-universal penetration. We are likewise unpersuaded by claims that forbearance would give BIAS a competitive advantage over non-BIAS services. It is not evident that BIAS and non-BIAS services are generally competitive substitutes even if there is limited evidence of substitution in some instances, or that USF fees have enough of a price impact to give rise to significant or widespread substitution. In any event, this issue would be better raised and addressed as part of a broader holistic proceeding on USF contribution reform, based on a full record and full input on all relevant issues, than in this proceeding.

356. We caution, as the Commission did in 2015, that our determination to forbear at this time is based on the

present record in a complex and developing area. We do not disclaim our authority to require new universal service contributions in a future rulemaking, and our decision in the Order is not intended to prejudge or limit how the Commission might take action in the future. Some commenters express concern that "it will be difficult, if not impossible, to 'unforbear'" from the contributions-related forbearance that applies in this context. We find that this concern is unfounded. It is appropriate for the Commission to reverse a forbearance decision if "[c]ontinued forbearance from this regulation would be inconsistent with the statutory forbearance criteria" and the Commission has done so previously. We are confident that, if any future USF contribution reform renders continued forbearance from BIAS USF assessments inconsistent with statutory forbearance criteria, the Commission could and would reverse that grant of forbearance.

357. Some commenters contend that the Commission could refrain from assessing BIAS providers for USF contributions without forbearing by instead "clarify[ing] that it will pause from immediately enforcing the statute and that BIAS providers are not required to include those revenues until the Commission moves to Order on that contribution reform." However, we explain above why the forbearance standard is met and why we find it in the public interest under that standard to rely on the Commission's well-established statutory forbearance authority to ensure that BIAS providers are not immediately assessed contributions. We therefore decline WTA—Advocates for Rural Broadband's (WTA) request to delete any discussion of section 254(d) forbearance until a rulemaking is conducted. Moreover, the Commission's waiving the application of § 54.706 of its rules for BIAS providers as some commenters propose as an alternative to forbearance would not alter the Commission's underlying statutory obligation under section 254(d). We therefore decline to adopt a different approach. Section 254(d) directs the Commission to establish mechanisms—including contribution requirements—to preserve and advance universal service. Some commenters attempt to rely on various precedents to argue that section 254(d) is not "self-effectuating." We find that the examples cited—the initial implementation of section 254, the assessment of wireless voice providers, the assessment of VoIP providers, and the brief period of assessment of wireline BIAS providers—are inapposite and are not

germane as to whether the statute is self-effectuating. Indeed, these examples are not analogous to the assessment of contributions for BIAS providers because the wireless providers in questions were in fact required to contribute to the USF immediately pending the development of a Commission-specified allocation methodology; the VoIP providers were assessed based on permissive, not mandatory, authority; and the 2005 wireline BIAS providers were subject to an existing contribution methodology on a time-limited basis to maintain the status quo. Notably in this case, the Commission already has established requirements that, by their terms, would require contributions on BIAS revenues if they immediately applied.

358. We also forbear from applying section 254(g) and (k) and our associated rules. Section 254(g) requires "that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high-cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas." Section 254(k) prohibits the use of revenues from a non-competitive service to subsidize a service that is subject to competition. As with the *2015 Open Internet Order,* we are not persuaded that applying these provisions is necessary for purposes of section 10(a)(1) and (a)(2), particularly given the availability of the core BIAS requirements. By "core BIAS requirements," we mean the provisions of the Act and regulations expressly excluded from the scope of forbearance under the Order, along with section 706 of the 1996 Act, and our Open Internet rules. Likewise, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance from enforcing section 254(g) and (k) is in the public interest under section 10(a)(3). Forbearance from section 254(g) also is consistent with our commitment to forbear from all provisions that would permit rate regulation of BIAS. We also note that comments addressing section 254 appear focused on provisions regarding universal service support for BIAS networks and universal service contributions, addressed above, and not on the requirements of section 254(g) and (k) and our implementing rules. We thus forbear from applying these provisions insofar as they would be newly triggered by the classification of BIAS in the Order. Nothing in our forbearance with respect to section 254(k) for BIAS is intended to

encompass, however, situations where ILECs or other common carriers voluntarily choose to offer internet transmission services as telecommunications services subject to the full scope of Title II requirements for such services. As a result, such providers remain subject to the obligations that arise under section 254(k) and the Commission's rules by virtue of their elective provision of such services. For example, if a rate-of-return incumbent LEC (or other provider) voluntarily offers internet transmission outside the forbearance framework adopted in the Order, it remains subject to the pre-existing Title II rights and obligations, including those from which we forbear in the Order.

**8. Access for Persons With Disabilities (Sections 225, 255, and 251(a)(2))**

359. We do not forbear from those provisions of Title II that ensure access to BIAS by individuals with disabilities. Consistent with our conclusion above that BIAS is essential, we find that all Americans, including those with disabilities, must be able to reap the benefits of an open internet. Application of sections 225, 255, and 251(a)(2) is necessary to ensure access for these individuals, thereby protecting consumers and furthering the public interest.

360. Section 225 mandates that telecommunications relay services be made available on an interstate and intrastate basis to individuals who are deaf, hard of hearing, deafblind, and who have speech disabilities in a manner that is "functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio." To achieve this, the Commission has required all interstate service providers (other than one-way paging services) to provide TRS. People who are deaf, hard of hearing, deafblind, and who have speech disabilities increasingly rely upon internet-based video communications, both to communicate directly (point-to-point) with other persons who are deaf or hard of hearing who use sign language and through video relay service with individuals who do not use that mode of communication that they do. VRS is a form of TRS that allows people who are blind, hard of hearing, deafblind, and who have speech disabilities who use sign language to communicate with voice telephone users through a communications assistant using video transmissions over the internet. In addition, these populations rely on other forms of

internet-based TRS, including Internet Protocol Relay Service (IP Relay) and Internet Protocol Captioned Telephone Service (IP CTS). IP Relay is a "telecommunications relay service that permits an individual with a hearing or a speech disability to communicate in text using an Internet Protocol-enabled device via the internet, rather than using a text telephone (TTY) and the public switched telephone network." IP CTS is a "telecommunications relay service that permits an individual who can speak but who has difficulty hearing over the telephone to use a telephone and an Internet Protocol-enabled device via the internet to simultaneously listen to the other party and read captions of what the other party is saying." In using these forms of video communications, they rely on high definition two-party or multiple-party video conferencing that necessitates a broadband connection. Indeed, the Commission recognized the increased importance for persons with disabilities to have access to video conferencing services that arose during the COVID–19 pandemic and its aftermath.

361. Section 225 is forward-looking and requires the Commission to adopt TRS regulations that encourage the use of existing technologies and not discourage or impair the development of new technologies. As technology advances, the obligations of section 225 carry forward to ensure the Commission makes available to all individuals in the United States a rapid, efficient, nationwide communications service. For example, in 2007, the Commission extended the application of section 225 requirements to interconnected VoIP providers, relying at the time on its ancillary authority to the Commission's to carry out the purposes established under section 1 of the Act, make available to all individuals in the United States a rapid, efficient nationwide communication service, and increase the utility of the telephone system. The Commission also relied on an express authority under section 225(d)(3)(B) to issue regulations that "shall generally provide that costs caused by interstate relay services shall be covered from all subscribers for every interstate service" to require VoIP providers to contribute to the TRS fund. Congress, in the CVAA, subsequently codified the obligations of interconnected and non-interconnected VoIP providers to contribute to the TRS fund. Limits imposed on bandwidth use through network management practices that might otherwise appear neutral, could have an adverse effect on internet-based TRS users who use sign language to communicate by degrading the

underlying service carrying their video communications. This result could potentially deny these individuals access to a functionally equivalent communications service. Additionally, if VRS and other internet-based TRS users are limited in their ability to use BIAS or are assessed extra costs for BIAS in order to access or use internet-based TRS or point-to-point services, this could cause discrimination against them because for many such individuals, TRS is the only form of communication that affords service that is functionally equivalent to what voice users have over the telephone. Moreover, limiting their bandwidth capacity could compromise their ability to obtain access to emergency services via VRS and other forms of internet-based TRS, which is required by the Commission's rules implementing section 225.

362. As emphasized in the *2015 Open Internet Order,* section 225 is important not only as a basis for future rules adopting additional protections but also to clarify internet-based TRS providers' obligations under existing rules. To be compensated from the TRS fund, providers' services must comply with section 225 and the Commission's TRS rules and orders. A number of IP-based TRS services are delivered through users' broadband internet access services. Forbearing from applying section 225 and our TRS service requirements would risk creating loopholes in the protections otherwise afforded to users of internet-based TRS services, or even just uncertainty that might result in degradation of these services. More specifically, if we were to forbear from applying these provisions, we run the risk of allowing actions taken by BIAS providers to come into conflict with the overarching goal of section 225, *i.e.,* ensuring that communication services made available through TRS are functionally equivalent, that is, mirror as closely as possible the voice communication services available to the general public. Enforcement of this functional equivalency mandate will protect against such degradation of service. In sum, we find that the enforcement of section 225 is necessary for the protection of consumers, and that forbearance would not be in the public interest.

363. Notwithstanding the foregoing, we forbear at this time, for reasons similar to those discussed above relating to our forbearance of universal service contributions for BIAS providers, from the application of TRS fund contribution obligations that otherwise would newly apply to BIAS. We find

that applying new TRS fund contribution requirements at this time is not necessary to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers or for the protection of consumers under section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3). We limit our action only to forbearing from applying section 225(d)(3)(B) and our implementing rules insofar as they would immediately require new TRS fund contributions from BIAS providers. We reserve the ability to conduct a future rulemaking to require such contributions in the event future developments necessitate such action. Before adopting any TRS-related contributions requirements, the Commission would assess the need for such funding, and the appropriate contribution level, given the totality of concerns implicated in this context.

364. Consistent with the Commission's approach in 2015, nothing in our forbearance from TRS fund contribution requirements for BIAS is intended to encompass situations when ILECs or other common carriers voluntarily choose to offer internet transmission services as telecommunications services subject to the full scope of Title II requirements for such services. As a result, such providers remain subject to the TRS fund contribution obligations that arise under section 225 and the Commission's rules by virtue of their elective provision of such services until such time as the Commission further addresses such contributions in the future.

365. Further, with respect to BIAS, we do not forbear from applying sections 255 and 251(a)(2), and the associated rules, that require telecommunications carriers and equipment manufacturers to make their services and equipment accessible to individuals with disabilities, unless not readily achievable, and preclude the installation of ''network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255.'' In prior proceedings, the Commission has emphasized its commitment to implementing the important policy goals of section 255 in the internet access service context. Commenters have noted that broadband adoption, while growing, still lags among certain groups, including individuals with disabilities. Adoption of BIAS by persons with disabilities can enable these individuals to achieve greater productivity, independence, and integration into society in a variety of ways. These capabilities, however, are

not available to persons with disabilities if they face barriers to BIAS usage, such as inaccessible hardware, software, or services. We anticipate that increased adoption of services and technologies accessible to individuals with disabilities will, in turn, spur further availability of such capabilities, and of BIAS deployment and usage more generally.

366. Our forbearance analysis regarding sections 255 and 251(a)(2), and our implementing rules, is also informed by the incremental nature of the requirements imposed. The CVAA addressed advanced communication services (regardless of their regulatory classification) to ensure that such products and services are accessible to persons with disabilities, unless it is not achievable to do so. While the CVAA permits the Commission to adopt regulations that networks used to provide advanced communications services ''may not impair or impede the accessibility of information content when accessibility has been incorporated into that content for transmission,'' such provisions alone do not help the Commission ensure that BIAS is accessible to people with disabilities.

367. As explained above, we find the provisions of the CVAA, while significant, are not sufficient protections in the context of BIAS, despite the claims of several commenters. Insofar as sections 255, 251(a)(2), and our implementing rules impose different requirements that are reconcilable with the CVAA, we find it appropriate to apply those additional protections in the context of BIAS for the reasons described above. For example, providers of BIAS must ensure that network services and equipment do not impair or impede accessibility pursuant to the sections 255 and 251(a)(2) framework. Because this section requires pass through of telecommunications in an accessible format, and 47 CFR 14.20(c) requires pass through of advanced communications services in an accessible format, the two sections work in tandem with each other, and forbearance from sections 255 and 251(a)(2) would therefore result in a diminution of accessibility. In particular, we find that these provisions and regulations are necessary for the protection of consumers and forbearance would not be in the public interest. We recognize that the Commission previously has held that section 2(a) of the CVAA exempts entities, such as internet service providers, from liability for violations of section 716 when they are acting only to transmit covered services or to

provide an information location tool. Thus, service providers that merely provide access to an electronic messaging service, such as a broadband platform that provides an end user with access to a web-based email service, are excluded from the accessibility requirements of section 716. Our decision here is not at odds with Congress's approach to such services under the CVAA, however, because we also have found that "relative to section 255, section 716 requires a higher standard of achievement for covered entities." Thus, under our decision here, BIAS will remain excluded from the "higher standard of achievement" required by the CVAA to the extent provided by that law, and instead will be subject to the lower standard imposed under section 255 in those cases where the CVAA does not apply.

9. Other Title II Provisions

368. We adopt our proposal to not grant forbearance to the extent it was considered and rejected for particular statutory provisions in the *2015 Open Internet Order.* The record does not reflect that the Commission's forbearance criteria or analyses must be updated with regard to these obligations, and no commenter suggests we should forbear from these provisions. Specifically, we do not forbear from section 257 of the Act and provisions insofar as they only reserve State or local authority, as these provisions impose certain obligations on the Commission without creating enforceable obligations that the Commission would apply to telecommunications carriers or telecommunications services. Section 257 also may enhance public safety by giving the Commission additional authority to address outage reporting requirements. We also decline requests to forbear from applying sections 253 and 332(c), which provide us authority to preempt State and local requirements, which is consistent with the preemption approach we articulate in the Order, and we therefore find it is in the public interest to continue applying those provisions. Additionally, for the reasons fully elaborated on in the *2015 Open Internet Order,* we decline to forbear from the CALEA requirements in section 229. To the extent we do not forbear from these or any other provisions or regulations, BIAS providers remain free to seek relief from such provisions or regulations through appropriate filings with the Commissions.

369. We also similarly do not forbear from applying Title II provisions that could be viewed as a benefit to BIAS providers, such as sections 223, 230(c), and 231. Section 230(c) was not covered by the scope of forbearance in the *2015 Open Internet Order* because "its application does not vary based on the classification of BIAS here." Since section 230(c)'s application has not changed since the Commission adopted the *2015 Open Internet Order,* the Commission again does not forbear. Similarly, applying sections 223 and 231 (to the extent enforced) and their associated limitations on liability, still do not vary with BIAS's classification, and are not encompassed by the forbearance in the Order. Many of the relevant provisions in these sections stem from the Child Online Protection Act (COPA), which has been enjoined as unconstitutional. A Federal court held that COPA is unconstitutional and placed a permanent injunction against its enforcement, and that decision was affirmed on appeal. We also find that, to the extent that Title II provisions benefit BIAS providers and newly apply by virtue of reclassification, applying those provisions better serve the public interest because they promote broadband deployment.

*C. Broad Forbearance From Other Title II Provisions for Broadband Internet Access Service*

370. Beyond the specific statutory provisions and regulations expressly excluded from forbearance as discussed above and in the sections below, we apply broad forbearance, to the full extent permitted by our authority under section 10 of the Act, from provisions of Title II of the Act and implementing Commission rules that would apply to BIAS by virtue of its classification as a Title II telecommunications service. We are persuaded that this forbearance is appropriate and in the public interest based on our predictive judgment regarding the adequacy of other protections where needed, the role of section 706 of the 1996 Act, and how we have tailored our forbearance to account for updated conclusions in this proceeding regarding the application of particular rules, requirements, and sources of authority to BIAS. The record also provides support for the forbearance approach we take here.

371. Consistent with our analysis in 2015, we conclude that our analytical approach as to all the provisions and regulations from which we forbear in the Order is consistent with section 10(a). We also decline WISPA's request that we conduct a cost-benefit analysis of the imposition of Title II regulations in the context of deciding which regulations we should or should not forbear from. WISPA Comments at 60.

This is unnecessary, as we find that our forbearance is in the public interest and is consistent with 10(a) analysis. Under section 10(a)(1), we consider here whether particular provisions and regulations are "necessary" to ensure "just and reasonable" conduct by BIAS providers. In interpreting that terminology, we conclude that we reasonably can account for policy trade-offs that can arise under particular regulatory approaches, as discussed above. While the specific balancing at issue in *EarthLink* v. *FCC* may have involved trade-offs regarding competition, we nonetheless believe the view expressed in that decision accords with our conclusion here that we permissibly can interpret and apply all the section 10(a) criteria to also reflect the competing policy concerns here. As the D.C. Circuit also has observed, within the statutory framework that Congress established, the Commission "possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband." For one, we find it reasonable in the BIAS context for our interpretation and application of section 10(a)(1) to be informed by section 706 of the 1996 Act. Given the characteristics specific to BIAS that we find on the record here— including, among other things, protections from the newly adopted open internet rules and the overlay of section 706—we limit our forbearance from the relevant provisions and regulations to the context of BIAS. Outside that context, they will continue to apply as they have previously, unaffected by the Order. As discussed above, section 706 of the 1996 Act "explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans,'" and our recent negative section 706(b) determination triggers a duty under section 706 for the Commission to "take immediate action to accelerate deployment." As discussed in greater detail below, a tailored regulatory approach avoids disincentives for broadband deployment, which we weigh in considering what outcomes are just and reasonable—and whether the forborne-from provisions are necessary to ensure just and reasonable conduct— under our section 10(a)(1) analyses in this item. Furthermore, our forbearance in the Order, informed by past experience and the record in this proceeding, reflects the recognition that, beyond the specific provisions from which we decline to forbear above and

the bright-line open internet rules we adopt below, particular conduct by a BIAS provider can have mixed consequences, rendering a case-by-case evaluation superior to bright-line rules. Consequently, based on those considerations, we predict that, outside the authority we retain and the rules we apply in the Order, just and reasonable conduct by BIAS providers is better ensured under section 10(a)(1) by the case-by-case regulatory approach we adopt—which enables us to account for the countervailing policy implications of given conduct—rather than any of the more bright-line requirements that would have flowed from the provisions and regulations from which we forbear. As explained above, we conclude that while competition can be a sufficient basis to grant forbearance, it is not inherently necessary to find section 10 satisfied. These same considerations underlie our section 10(a)(2) analyses as well, since advancing BIAS deployment and ensuring appropriately nuanced evaluations of the consequences of BIAS provider conduct better protects consumers. Likewise, these same policy considerations are central to the conclusion that the forbearance granted in the Order, against the backdrop of the protections that remain, best advance the public interest under section 10(a)(3).

372. The Commission's practical experience with the classification of BIAS informs our section 10(a) analysis for the remaining statutory and regulatory obligations triggered by classifying BIAS as a Title II telecommunications service. Although practical experience in and of itself does not resolve the appropriate regulatory treatment of BIAS, it suggests that our approach guards against undue burden that could hinder BIAS deployment or otherwise be contrary to the public interest. We are not persuaded by arguments to the contrary, nor that we should not adopt the regulatory framework in the Order because it will impose such high compliance costs on providers relative to the *status quo* from the near-term past. The record reflects that providers were not deterred from network investment after the Commission adopted a similar regulatory approach in the *2015 Open Internet Order* and that some providers voluntarily continue to follow certain conduct rules. We note in this regard that when exercising its section 10 forbearance authority "[g]uided by section 706," the Commission permissibly may "decide[ ] to balance the future benefits" of encouraging broadband deployment "against [the]

short term impact" from a grant of forbearance. Under the section 10(a) analysis, we are particularly persuaded to give greater weight to the likely benefits of proceeding cautiously given the speculative or otherwise limited nature of the arguments in the current record regarding the forbearance approach adopted here, which we discuss in greater detail below. Although we adopt firm forbearance from all direct rate regulation, with respect to other provisions from which we forbear here, we note that it also is within the Commission's discretion to proceed incrementally, and we find that adopting an incremental approach here—by virtue of the forbearance granted here—guards against any unanticipated and undesired detrimental effects on broadband deployment that could arise. While we find that the tailored regulatory framework we adopt in the Order strikes the right balance, we note that the D.C. Circuit has recognized the Commission's authority to revisit its decision should that prove not to be the case.

1. Rate Regulation (Sections 201 and 202)

373. Although we conclude, as the Commission did in 2015, that the section 10 criteria are not met with respect to forbearance from section 201 and 202 in full, "because we do not and cannot envision adopting new *ex ante* rate regulation'' or *ex post* rate regulation of BIAS beyond the scope of our open internet conduct rules in the future, we forbear from applying sections 201 and 202 to BIAS to the extent they would permit such regulation. Contrary to New America's Open Technology Institute's claim, our sections 201 and 202 forbearance with respect to rate regulation is consistent with the Commission's approach in 2015. In forbearing from sections 201 and 202 in this manner, we reiterate that states may have a role to play in promoting broadband affordability. Given the protection of our open internet rules, we do not find *ex ante* or *ex post* rate regulation necessary for purposes of section 10(a)(1) and (a)(2), and we find it in the public interest to forbear from applying sections 201 and 202 insofar as they would permit the adoption of such rate regulations for BIAS in the future. We therefore find to be unfounded claims that our refusal to forbear entirely from sections 201 and 202 means that the Commission could introduce rate regulation of BIAS despite our commitment not to do so.

2. Tariffing (Sections 203 and 204)

374. We find the section 10(a) criteria met and forbear from applying section 203 of the Act insofar as it newly applies to BIAS providers by virtue of our classification of BIAS. Section 203 requires Title II common carriers to file a schedule of rates and charges for interstate common carrier services. We forbear from tariffing provisions because we predict that the other protections that remain in place are adequate to guard against unjust and unreasonable, and unjustly and unreasonably discriminatory, rates and practices in accordance with section 10(a)(1) and to protect consumers under section 10(a)(2). We also conclude that those other protections reflect the appropriate calibration of regulation of BIAS at this time, such that forbearance is in the public interest under section 10(a)(3).

375. We find that section 203's requirements are not necessary to ensure just and reasonable, and not unjustly or unreasonably discriminatory, rates and practices under section 10(a)(1) nor to protect consumers under 10(a)(2). Sections 201 and 202 of the Act, from which we do not forbear, and our open internet rules are designed to preserve and protect internet openness by prohibiting unjust and unreasonable, and unjustly or unreasonably discriminatory, conduct by BIAS providers for or in connection with BIAS, protecting the retail mass market customers of BIAS. In calibrating that legal framework, we considered, among other things, the operation of the marketplace in conjunction with those protections. This regulatory scheme is substantially similar to the one we used in the *2015 Open Internet Order,* since there is no evidence that approach did not adequately protect the interests of consumers—including the interest in just, reasonable, and nondiscriminatory conduct—that might otherwise be threatened by the actions of BIAS providers. As such, we make the same finding in the Order. In the event that BIAS providers violate sections 201 or 202 of the Act, the open internet rules, or any other BIAS requirements, they remain subject to complaints and Commission enforcement action.

376. That the Commission has never before imposed tariffing requirements on BIAS as defined here also supports our section 10 analysis. This practical experience informs what issues may arise with forbearance from tariffing requirements in this proceeding and underlies our prediction that the remaining rules and requirements are sufficient to fulfill the requirements under section 10. Additionally, our

forbearance from section 203 is consistent with our broad forbearance from all Title II provisions that could be used to impose *ex ante* or *ex post* rate regulation on BIAS providers, and we therefore make clear that we will not impose any such rate regulation nor any requirement of advanced Commission approval of rates and practices as otherwise would have been imposed under section 203 on BIAS providers.

377. We find that forbearance from tariffing requirements for BIAS satisfies section 10(a)(1) and (a)(2) and is consistent with the public interest under section 10(a)(3) in light of the objectives of section 706. As explained above, section 706 of the 1996 Act "explicitly directs the FCC to 'utiliz[e]' forbearance to 'encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.'" The D.C. Circuit has further held that the Commission "possesses significant, albeit not unfettered, authority and discretion to settle on the best regulatory or deregulatory approach to broadband." We find that the scope of our adopted forbearance strikes the right balance at this time between, on the one hand, providing the regulatory protections clearly required by the evidence and our analysis to, among other things, guard the virtuous cycle of internet innovation and investment and, on the other hand, avoiding additional regulations that do not appear required at this time and that risk needlessly detracting from BIAS providers' broadband investments. We clarify that although we forbear from applying to BIAS section 203 and, as noted below, section 204, forbearing from tariffing does not limit the Commission's existing authority to study rates or competition.

378. We also conclude that the public interest supports forbearing from tariffing requirements for BIAS under section 10(b)'s requirement that we analyze the impact forbearance would have on competitive market conditions. While we consider the section 10(b) criteria in our section 10(a)(3) public interest analysis, our public interest determination rests on other grounds. In particular, under the entirety of our section 10(a)(3) analysis, as discussed above, we conclude that the public interest supports the forbearance adopted in the Order. These same section 10(b) findings likewise apply in the case of our other section 10(a)(3) public interest evaluations with respect to BIAS, and should be understood as incorporated there. Nonetheless, we also believe that our overall regulatory approach, viewed broadly, advances competition in important ways. The record reflects that competition is still limited, and does not provide a strong basis for concluding that the forbearance granted in the Order is likely to directly affect the competitiveness of the marketplace for BIAS. Our granted forbearance continues to be part of an overall regulatory approach designed to promote infrastructure investment in significant part by preserving and promoting innovation and competition at the edge of the network, and we similarly conclude that a grant of forbearance from section 203 indirectly promotes market competition by enabling us to strike the right balance at this time in our overall regulatory approach.

379. We disagree with Public Knowledge that we should not forbear from section 203 for BIAS because tariff filings "provide consumers with the transparency necessary to protect their interests." The transparency rule and the broadband label requirements are designed to provide consumers with disclosures of BIAS providers' commercial terms, including rates, as well as a wide array of other information about their services, and Public Knowledge fails to explain why these requirements are insufficient to provide consumers with information they need to protect their interest. We are thus not persuaded to depart from our section 10(a) findings above regarding section 203.

380. We also forbear from applying section 204 of the Act insofar as it newly applies to providers by virtue of our classification of BIAS. Section 204 provides for Commission investigation of a carrier's rates and practices newly filed with the Commission, and to order refunds, if warranted. Since we forbear from section 203's tariffing requirements, it is not clear what purpose section 204 would serve, and we thus apply our overarching section 10(a) forbearance analysis above to section 204. We decline Public Knowledge's suggestion that the Commission retain section 204. We are not persuaded by Public Knowledge's argument that "[t]here appears to be no a priori reason to assume that the Commission can adequately protect consumers by disclaiming its authority to suspend unjust rates and practices (Section 204)." Public Knowledge fails to explain why our remaining authority and regulations would be insufficient to protect consumers, or how section 204 would effectuate that purpose once we have forborne from applying section 203.

### 3. Enforcement-Related Provisions (Sections 205 and 212)

381. We forbear from applying certain enforcement-related provisions of Title II to BIAS beyond the core Title II enforcement authority discussed above, and find this forbearance warranted under section 10(a). Section 205 provides for Commission investigation of existing rates and practices and to prescribe rates and practices if it determines that the carrier's rates or practices do not comply with the Communications Act. The Commission has forborne from enforcing section 205 when it sought to adopt a tailored, limited regulatory environment and, notwithstanding that forbearance, sections 201 and 202 and other complaint processes continued to apply. The Commission previously forbore from enforcing section 205 in the *2015 Open Internet Order,* finding that the core Title II enforcement authority, along with the ability to pursue claims in court, as discussed below, provide adequate enforcement options and the statutory forbearance test is met for section 205. Since we are adopting a substantially similar regulatory scheme as the *2015 Open Internet Order* and there is no evidence that those enforcement options were inadequate, we make the same finding in the Order. Consistent with our analysis above, we predict that these provisions are not necessary to ensure just, reasonable, and nondiscriminatory conduct by providers of BIAS or to protect consumers under section 10(a)(1) and (a)(2). In addition, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3). We thus reject claims that we should not forbear from section 205 insofar as it is triggered by our classification of BIAS. Public Knowledge requests that we not forbear from enforcing sections 205, 209, 206, 216–217, and 212 because they provide consumers adequate remedies and the Commission the ability to hold providers accountable. But by Public Knowledge's own admission applying these provisions is unnecessary, as we "arguably have similar authority under the broad grant of Sections 201 and 202 and its general authority under Section 4(i)" with regard to section 205 and other provisions it requests that we not forbear from enforcement.

382. We also forbear from applying section 212 to the extent that it newly applies by virtue of our classification of BIAS. Section 212 empowers the Commission to monitor interlocking

directorates, *i.e.,* the involvement of directors or officers holding such positions in more than one common carrier. The Commission has granted forbearance from section 212 in the CMRS context on the grounds that forbearance would reduce regulatory burdens without adversely affecting rates in the CMRS market. In so doing, the Commission noted that section 212 was originally placed in the Communications Act to prevent interlocking officers from engaging in anticompetitive practices, such as price fixing, but found protections of sections 201(b) and 221 and antitrust laws were sufficient to protect consumers against the potential harms from interlocking directorates. (The Commission noted that section 221 provided protections against interlocking directorates, but section 221(a) was repealed in the Telecommunications Act of 1996. This section gave the Commission the power to review proposed consolidations and mergers of telephone companies. While section 221(a) allowed the Commission to bolster its analysis to forbear from section 212 in the *Second CMRS Report and Order,* the protections against interlocking directorates provided by section 201(b) and 15 U.S.C. 19 provide sufficient protection to forbear from section 212 for BIAS.) Forbearance also reduced an unnecessary regulatory cost imposed on carriers. The Commission later extended this forbearance to dominant carriers and carriers not yet found to be non-dominant, repealing part 62 of its rules and granting forbearance from the provisions of section 212. Since we are adopting a substantially similar regulatory scheme as the *2015 Open Internet Order* and there is no evidence that other protections are not adequate, we make the same finding in the Order. We predict that other protections will adequately ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and protect consumers here, and thus conclude that the application of section 212 is not necessary for purposes of section 10(a)(1) or 10(a)(2). Moreover, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3). We thus reject Public Knowledge's claim that we should not forbear from section 212 insofar as it is triggered by our classification of BIAS.

4. Information Collection and Reporting (Sections 211, 213, 215, and 220(a)(2), (b), (f)–(j))

383. Outside the national security and public safety context, which we discuss above, we forbear from applying information collection and reporting provisions of the Act insofar as they would newly apply by virtue of our classification of BIAS as a Title II telecommunications service. These provisions principally are used by the Commission to implement its traditional rate-making authority over common carriers. Since we are not applying tariffing requirements to BIAS nor engaging in *ex ante* or *ex post* rate regulation of BIAS, it is not clear what purpose these provisions would serve. The Commission also has undertaken the Broadband Data Collection and adopted broadband labeling requirements since the *2015 Open Internet Order,* both of which empower consumers by providing them with greater transparency as to their broadband service and further suggest these information collection requirements are unnecessary. Given both our intention to tailor the regulations applicable to BIAS and our responsibility under section 706 to encourage deployment, we conclude that forbearance of these information collection and reporting provisions is in the public interest under section 10(a)(3) and applying these sections is not necessary within the meaning of section 10(a)(1) and (a)(2).

384. We disagree, in part, with Public Knowledge, which broadly argues that we should not forbear from sections 211, 213, 215, and 220. We also disagree with Public Knowledge that there is "no reason to forbear simply for the sake of forbearing when a waiver will minimize any regulatory burden without depriving the Commission of useful tools for the future." We again note that while the Commission may waive its rules, it may not generally waive a provision of a statute. Forbearance is the mechanism for not applying statutory provisions when warranted. As discussed earlier, we retain sections 218 and 219, and certain provisions of section 220, which Public Knowledge also asserts should be excluded from forbearance, to ensure that the Commission has the ability to collect information and require reporting if necessary, including for national security and public safety purposes, and to ensure network resiliency. We conclude that excluding sections 218 and 219, and the section 220 provisions from forbearance, as detailed above, ensures that the Commission can collect

information necessary to carry out its duties with respect to the public interest. Public Knowledge does not name any uncollected information that would enhance our "ability to make informed policy choices that promote the Congressional goals of ubiquitous, affordable deployment."

5. Interconnection and Market-Opening Provisions (Sections 251, 252, and 256)

385. We find the section 10 criteria met for forbearance from applying the interconnection and market-opening provisions in sections 251 (other than sections 251(a)(2)), 252, and 256 to the extent that they would newly apply through the classification of BIAS as a Title II service. As a result of the forbearance granted from section 251, section 252 thus is inapplicable, insofar as it is simply a tool for implementing the section 251 obligations. Although we do not forbear from applying section 251(a)(2) with respect to BIAS, we note that the Commission previously has held that the procedures of section 252 are not applicable in matters simply involving section 251(a). To the extent that the Commission nonetheless could be seen as newly applying section 252 with respect to BIAS as a result of our classification decision here, we find the section 10 criteria met for forbearance from that provision for the same reasons discussed below with respect to section 251. Given otherwise-existing authority that we retain under our open internet rules and provisions of the Act from which we do not forbear, we find that there is no current Federal need for those provisions—and, indeed, that they would conflict with the regulatory approach to BIAS that we find most appropriate. Thus, applying those provisions of the Act is not "necessary" under section 10(a)(1) and (a)(2). For those same reasons, we also find that forbearance is in the public interest under section 10(a)(3). We note that the Commission has determined that section 251(c) has been fully implemented throughout the United States, and thus permissibly is within the scope of the Commission's section 10 forbearance authority.

386. We begin by putting the key market-opening requirements of the sections 251 and 252 framework in their broader legal and regulatory context under current precedent (while saving discussion of the more limited role of section 256 for our targeted analysis of interconnection below). At a high level, section 251 provides a graduated set of interconnection requirements and other obligations designed to foster competition in telecommunications markets, particularly local markets. The

nature and scope of these obligations vary depending on the type of service provider involved.

• Section 251(a) sets forth general duties applicable to all telecommunications carriers, including the section 251(a)(1) duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers."

• Section 251(b) sets forth additional duties for local exchange carriers pertaining to resale of services, number portability, dialing parity, access to rights-of-way, and reciprocal compensation—the duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications (*i.e.,* arrangements for exchange of traffic terminating on another carrier's network).

• Section 251(c) sets forth the most detailed obligations, which apply to ILECs, the group of local telephone companies that, prior to the 1996 Act, generally had been subject to little or no competition. These section 251(c) obligations include: the duty to "negotiate in good faith in accordance with section 252 the particular terms and conditions of agreements" to fulfill the section 251(b) and (c) requirements; additional direct, physical interconnection obligations; requirements to unbundle network elements; the duty to allow resale of telecommunications services at wholesale rates; requirements to provide notice of network changes; and a requirement to allow collocation of equipment.

387. In turn, section 252 directs State commissions to mediate and arbitrate interconnection disputes involving an ILEC, as well as to review interconnection agreements arrived at "by negotiation and arbitration." The Commission has declined to adopt rules advising the State commissions on how to conduct mediations and arbitrations, and has stated that the states are in a better position to develop mediation and arbitration rules that support the objectives of the 1996 Act. ILECs are required to negotiate the implementation of section 251(b) and (c) requirements through interconnection agreements subject to section 252, and the Commission has held that the section 252 process applies even when a request involves section 251(a) and (b) alone, without any request under section 251(c). The Commission also has concluded that section 252 provides a State forum for disputes involving two carriers that are not ILECs regarding the implementation of section 251(b) duties.

388. Although the Commission has authority to adopt rules governing the implementation of section 251(b) and (c), precedent demonstrates that State commissions acting under section 252 can resolve interconnection disputes even as to issues where the Commission has not adopted rules. Further, agreements between ILECs and other parties under section 252 can be entered "without regard to the standards set forth in subsections (b) and (c) of section 251 of this title." And while interconnection agreements are subject to approval, by default that entails approval by a State commission—not the FCC. Further, parties aggrieved by State commission actions under section 252 do not raise those with the FCC—instead, they go in the first instance to Federal district court.

389. Even stated at that high level of abstraction, it is clear that the section 251/252 framework is significantly at odds with the regulatory framework we find warranted for BIAS to implement the "just and reasonable" requirements of sections 201 and 202; to protect consumers; and to advance the public interest. Our bright-line conduct rules implementing sections 201 and 202, Title III of the Act, and section 706 of the 1996 Act, squarely address key issues regarding the carriage of traffic, subject to reasonable network management. We otherwise deliberately elect to take a case-by-case approach in evaluating BIAS-related conduct, including traffic exchange agreements. And although we do not categorically preempt all State or local regulation affecting BIAS, we clearly express our intention to preempt conflicting State and local regulations—including regulations more onerous than the regulatory framework we adopt.

390. Trying to square our chosen regulatory approach to BIAS with the section 251/252 framework is problematic, to say the least. As described above, the section 251/252 framework presupposes heavy State involvement in its implementation, providing for states to resolve previously unaddressed legal and policy questions under the Federal framework while also leaving states to impose State law requirements. Sections 251 and 252 also render all such decisions subject to State commission interpretation and enforcement in the first instance, with any direct review coming not from the FCC but from Federal courts. Given our conscious choice to leave significant issues to case-by-case evaluation, if the section 251/252 framework applied we would risk forgoing the ability to be the first one to pass on previously unaddressed policy issues, instead yielding those decisions to State commissions. Although we could seek

to constrain states by adopting *ex ante* rules in this regard specifically implementing section 251, that would force us down a course we have expressly disavowed as unwarranted under the general conduct rule and oversight of traffic exchange agreements, where we find case-by-case review most appropriate. Even then, section 251(d)(3) specifies that, in prescribing and enforcing regulations to implement the requirements of the section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that: (a) establishes access and interconnection obligations of local exchange carriers; (b) is consistent with the requirements of the section; and (c) does not substantially prevent implementation of the requirements of the section and the purposes of the part. What is more, tying our rules to the section 251/252 framework opens the door for them to be disregarded entirely through intercarrier agreements entered into "without regard to the standards set forth in subsections (b) and (c) of section 251." In sum, rather than a primarily Federal policy framework administered in the first instance by the Commission—and our choice of the best mix of bright-line rules and case-by-case review—applying the section 251/252 framework risks forcing us into a choice between preserving case-by-case review in many scenarios, but leaving unresolved policy questions to be first addressed by states in many cases, or else forgoing case-by-case review even where we think it is warranted in favor of *ex ante* rules that might have the perverse consequence of opening the door for providers to disregard them.

391. That backdrop is a key overlay to all of our forbearance analyses in this regard. Insofar as applying the section 251/252 framework would undermine the regulatory approach we have identified as the best way to ensure just and reasonable rates and practices under sections 201 and 202 of the Act, and the best way to protect consumers, that is highly relevant to our evaluation of whether there is a current Federal need for the section 251/252 framework in the BIAS context under the section 10(a)(1) and (a)(2) forbearance criteria. Those considerations also carry significant weight in our public interest evaluation under section 10(a)(3). Although Congress directed the Commission, in section 706 of the 1996 Act, to encourage the deployment of advanced telecommunications capability through, among other things, "measures that promote competition in the local telecommunications market"—

and we concede that the section 251/252 framework is one such example—we nonetheless conclude that our approach correctly reflects the overall legal framework Congress established in the 1996 Act. Congress recognized that our preexisting section 201 authority could enable us, in the case of interstate and international services, to do many of the same things addressed for intrastate services as well under section 251, and thus expressly preserved that authority against any inference of an implicit repeal or narrowing through its enactment of section 251. Likewise, the Commission previously has sought to balance the advancement of competition policy with the duty to encourage advanced services deployment pursuant to section 706, which we conclude is advanced by our tailored regulatory approach here. Our overall analysis of the record on investment incentives—including evidence and arguments regarding more extensive or less extensive regulation than the tailored approach adopted here—is discussed in greater detail above.

a. Interconnection and Traffic Exchange

392. Arguments in the record that identify concrete scenarios where sections 251(a)(1), 251(b)–(c), 252, and 256 could be relevant only involve the related issues of interconnection and traffic exchange. We clarify that for purposes of this section we use the term "interconnection" solely in the manner it is used and defined for purposes of these provisions. Most significantly, WTA argues that the section 251/252 framework could help resolve problems rural carriers experience when dealing with "large internet backbone and middle mile transport providers" due to "disadvantages and discrepancies in negotiation power and resources"— including "refusals to upgrade the capacity and quality of middle mile facilities, take-it-or-leave it offers rather than *bona fide* negotiations of IP interconnection and traffic exchange terms and conditions, and demands that broadband traffic be accepted at and delivered to large carrier facilities in distant cities at the WTA member's expense." Although these are important concerns, we are not persuaded that applying the section 251/252 framework—or section 256—would be an appropriate course of action. As with our forbearance analysis more generally, we can proceed by assuming that certain requirements apply and evaluate the section 10 criteria on that basis. And because we forbear from the relevant requirements we need not, and do not, resolve whether BIAS could constitute "telephone exchange service" or

"exchange access," nor whether any particular non-BIAS provider seeking to interconnect and exchange traffic with a BIAS provider is a carrier. To the extent that WTA goes beyond BIAS and argues that the section 251/252 framework should apply to "any other IP broadband services" or "other IP interconnection," it does not explain what it means in a way that would undercut—or even demonstrate the relevance of—those other scenarios to the forbearance at issue here. We thus do not depart from the forbearance analysis above on the basis of such undeveloped references.

393. *Sections 251(a)(1) and 256.* Section 251(a)(1) requires all carriers to interconnect with other carriers directly or indirectly. However, the identified concerns do not demonstrate a refusal to interconnect (even indirectly). Rather, they reflect dissatisfaction with the claimed inconvenience and expense. Thus, section 251(a)(1) does not appear even potentially to be a solution to these concerns.

394. Likewise, section 256 does not appear any more relevant of a solution, even in theory. Section 251(a)(2)— which we do not forbear from applying, as explained above—prohibits carriers from "install[ing] network features, functions, or capabilities that do not comply with the guidelines and standards established" pursuant to two other provisions of the Act. The first of those provisions is section 255 of the Act, which is designed to make networks more usable by individuals with disabilities—and which is the premise of our decision not to forbear from applying section 251(a)(2). The second of those provisions is section 256, which, without granting the Commission any new authority, provides for the Commission to encourage coordinated network planning and network interconnectivity, including through participating in industry standards-setting. But again, the types of industry standards or network planning contemplated by section 256 do not appear to address the concerns raised by rural carriers about the cost and inconvenience of interconnection.

395. Consequently, because these concretely identified concerns about interconnection would not be addressed by sections 251(a)(1) and 256 in any case, we see no current Federal need to apply those provisions of the Act insofar as they would be newly triggered by our classification of BIAS. Indeed, the Commission retains authority under sections 201 and 202, and the open internet rules, to address interconnection issues should they

arise, including through evaluating whether BIAS providers' conduct is just and reasonable on a case-by-case basis. These remaining legal protections that apply with respect to BIAS providers will enable us to act if needed to ensure that a provider does not unreasonably refuse to provide service or interconnect. Thus, we do not find it "necessary" to apply section 251(a)(1) or section 256 to ensure just and reasonable rates and practices under section 10(a)(1) or to protect consumers under section 10(a)(2). For those same reasons, we find forbearance in the public interest under section 10(a)(3), consistent with our decision to proceed incrementally and make clear the limited extent of our departure from the preexisting regulatory *status quo.*

396. *Sections 251(c)(2) and 252.* We next turn to the interconnection requirements of section 251(c)(2). That provision requires ILECs to provide interconnection "at any technically feasible point within the carrier's network . . . on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." Because it is a provision implemented under the combined section 251/252 framework, it squarely implicates the full array of concerns discussed above about the conflict between that framework and the regulatory approach to BIAS that we conclude is most appropriate.

397. WTA's arguments do not persuade us that forbearance is unwarranted. For one, it does not appear that WTA's concerns about rural carriers' need to carry traffic "to large carrier facilities in distant cities at the WTA member's expense" meaningfully would be remedied by the application of section 251(c)(2), which still requires the carrier invoking section 251(c)(2) to get its traffic to a "point within the [ILEC's] network." Although WTA's concerns about "refusals to upgrade the capacity and quality of middle mile facilities" and "take-it-or-leave it offers rather than *bona fide* negotiations of IP interconnection . . . terms and conditions" theoretically could be addressed under section 251(c)(2) where that provision applies, the practical scope of that provision appears quite limited as relevant here. Even assuming *arguendo* that the internet backbone providers and middle mile providers of concern to WTA would be telecommunications carriers (or else they would not be subject to the section 251/242 framework in the first place), the universe of ILECs providing such service—the only providers actually subject to section 251(c)—is far more limited. And even then, section 251(c) does not apply to many rural carriers by

virtue of section 251(f). Section 251(f)(1) of the Act establishes a default exemption from all of section 251(c) for a "rural telephone company" absent a request from a carrier invoking section 251(c) and an affirmative determination by a State commission "that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof)." Further, under section 251(f)(2), "[a] local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c)" of section 251.

398. But once we assume *arguendo* that the internet backbone providers and middle mile providers of concern to WTA would be telecommunications carriers, that scenario is one that the Commission can address far more comprehensively through sections 201 and 202 on a case-by-case basis. And it will be the FCC—rather than State commissions—addressing previously unresolved policy issues and generating a more uniform Federal regulatory framework for BIAS. We otherwise have determined that an FCC-led case-by-case evaluation is the best approach to internet traffic exchange arrangements consistent with our obligation to ensure just and reasonable rates and practices under sections 201 and 202 of the Act. Because we conclude that the section 251(c)(2)/252 framework would interfere with that approach, and because we find that our regulatory approach will enable us to more comprehensively and consistently address any issues that arise in this regard, while appropriately balancing BIAS providers' investment incentives, we conclude that applying those provisions is not "necessary" under section 10(a)(1) and (a)(2), and that forbearance is in the public interest under section 10(a)(3).

399. *Sections 251(b)(5) and 252.* The final concrete issue raised by WTA—its concern about "take-it-or-leave it offers rather than *bona fide* negotiations of IP . . . traffic exchange terms and conditions"—requires a clarification about terminology. When the Commission referred to "Internet traffic exchange arrangements" in the *2015 Open Internet Order* and again here, it contemplated arrangements or agreements potentially dealing with both the physical linking of networks and the associated exchange of traffic. Section 251 reflects a different approach. Subsections (a)(1) and (c)(2)

address the linking of networks, while subsection (b)(5) addresses compensation arrangements for traffic exchange. Thus, when considering concerns associated with traffic exchange under section 251, we must focus on subsection (b)(5).

400. Section 251(b)(5) requires LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." In the Commission's implementation of this provision (in conjunction with other statutory provisions) outside the BIAS context, it has established an extensive series of rules addressing traffic exchange arrangements between local carriers and other carriers, that generally has moved in the direction of "bill-and-keep" arrangements rather than per-minute (or other) intercarrier compensation payments. Under bill-and-keep arrangements, a carrier generally looks to its end users—which are the entities and individuals making the choice to subscribe to that network—rather than looking to other carriers and their customers to pay for the costs of its network. The changes to the preexisting intercarrier rate regulations were paired with universal service support when appropriate to account for lost revenues, and with a State role in defining the specific point in the network where each carrier is responsible for its own costs in delivering the network traffic (called the "network edge").

401. Because section 251(b)(5)—like section 251(c)(2)—is a provision implemented under the combined section 251/252 framework, it squarely implicates the full array of concerns discussed above about the conflict between that framework and the regulatory approach to BIAS that we conclude is most appropriate. Against that backdrop, the record on this issue likewise does not persuade us that forbearance is unwarranted.

402. As a threshold matter, we are not persuaded to simply apply our existing rules implementing section 251(b)(5) in the case of BIAS traffic. Those rules reflect a carefully calibrated regulatory regime designed to account for historical reliance interests as well as the interests of universal service contributors being asked to bear costs associated with revenue replacement mechanisms. They were not adopted with the expectation that they would apply to BIAS traffic, and abruptly doing so could seriously unsettle that careful balance.

403. Although there is debate in the record about whether and when bill-and-keep could be appropriate in this context irrespective of those intercarrier

compensation rules, our past experience counsels for a cautious approach. As noted above, before adopting a shift to bill-and-keep for traffic historically subject to intercarrier compensation, the Commission evaluated a comprehensive record on the merits of such an approach, the associated reliance interests that could be affected, and how to employ universal service support in response to any legitimate reliance interests or need for revenues beyond what could be recovered from end users. Absent a carefully calibrated regulatory approach founded on such a record, an industry-wide shift to mandatory bill-and-keep for BIAS traffic risks disruptive consequences for end-user BIAS rates, overall industry recovery, and provider viability.

404. Thus, we find that either applying our existing intercarrier compensation framework implementing section 251(b)(5) (along with sections 201(b) and 254, among other provisions) or adopting bill-and-keep here as the industry approach to traffic exchange arrangements for BIAS traffic under section 251(b)(5) itself risks undermining just and reasonable rates and practices and harming consumers. Thus, applying such requirements naturally is not necessary to ensure just and reasonable rates and practices under section 10(a)(1) or for the protection of consumers under section 10(a)(2). And for those same reasons, we find forbearance to be in the public interest under section 10(a)(3).

405. The remaining near-term issue is the choice between relying on case-by-case assessments under the regulatory framework for BIAS we already have identified as most appropriate, or instead on attempting case-by-case assessments under the section 251(b)(5)/252 framework. As discussed above, there are inherent incompatibilities between the Federal case-by-case review we contemplate and any approach that relies on the heavily state-commission-dependent section 251/252 framework. Thus, we do not see it as realistically viable to maintain both approaches simultaneously in disparate forums with the likelihood of divergent policy decisions from different decisionmakers. And the record does not reveal benefits from the section 251(b)(5)/252 framework that would offset the harms to what we have identified as the best way to ensure just and reasonable rates and practices, to protect consumers, and to advance the public interest.

406. As an alternative to case-by-case evaluation of traffic exchange issues, we find the section 251(b)(5)/252 framework inferior. For one, as

contemplated by our regulatory approach based principally on sections 201 and 202 of the Act, oversight of internet traffic exchange arrangements can encompass both interconnection and traffic exchange issues. But section 251(b)(5) is limited narrowly to traffic exchange, and at best could be paired with the broadly applicable interconnection requirement of section 251(a)(1) that imposes limited substantive duties unlikely to address the concerns raised in the record and/or the (theoretically) somewhat helpful substantive requirement of section 251(c)(2) that appears likely to apply to at most a very narrow subset of the providers of concern. Further, the notion of a truly case-by-case approach under section 251(b)(5) is at least somewhat illusory. Given the wording of section 251(b)(5), an ''originating carrier is barred from charging another carrier for delivery of traffic that falls within the scope of section 251(b)(5).'' Thus, section 251(b)(5) itself constrains the possible outcomes of traffic exchange arrangements as compared to the greater flexibility we find in our approach grounded in sections 201 and 202.

407. For all those reasons, we conclude that application of the section 251(b)(5)/252 framework is not necessary under section 10(a)(1) and (a)(2). For those same reasons, we also conclude that forbearance is in the public interest under section 10(a)(3).

b. Generalized Arguments About Competition

408. We also do not depart from our forbearance analysis above—or the forbearance from sections 251 (other than subsection (a)(2)), 252, and 256 in the *2015 Open Internet Order*—based on generalized arguments about the need for, or benefits of, competition. To be clear, we forbear from applying all of section 251 other than subsection (a)(2) insofar as it would newly apply to BIAS or a BIAS provider by virtue of our classification of BIAS as a telecommunications service. Public Knowledge asserts that ''[a] wide variety of provisions that the Commission proposes to forbear from enforcing are essential to promoting competition,'' but does not identify specifically what provisions it has in mind. Against the backdrop of the *2015 Open Internet Order* having identified sections 251, 252, and 256 as involving interconnection and market-opening provisions, we consider Public Knowledge's arguments in that context here. To the extent that Public Knowledge had other provisions in mind, its high-level arguments about

competition divorced from any reference to specific provisions or requirements does not persuade us to depart from the forbearance approach adopted in the *2015 Open Internet Order*. Competition is important, and the regulatory framework for BIAS that we adopt here will contribute to increased competition for BIAS itself as well as for the broader internet marketplace. At the same time, it is not the Commission's purpose to protect specific competitors—or even competition merely for its own sake—but ultimately to seek the benefit of end users. Thus, generalized arguments about competition do not persuade us to depart from the forbearance analysis above, the forbearance analysis in the *2015 Open Internet Order*, or the forbearance from sections 251 (other than subsection (a)(2)), 252, and 256 granted there.

6. Subscriber Changes (Section 258)

409. We forbear from applying section 258 insofar as it would newly apply by virtue of our classification of BIAS as a Title II telecommunications service. Section 258 and the Commission's implementing rules provide important protections to voice service customers against unauthorized carrier changes. As was the case when the Commission adopted the *2015 Open Internet Order*, the record does not indicate whether or how unauthorized changes involving BIAS providers could occur. Consequently, it remains unclear what purpose applying this provision would serve, especially given the consumer protections afforded by the core BIAS requirements. As under our analyses of other Title II provisions from which we forbear, we conclude that application of section 258 is not necessary for purposes of section 10(a)(1) and (a)(2) and that forbearance is in the public interest under section 10(a)(3). We disagree with Public Knowledge that we should not forbear from section 258. While we do not disagree that section 258 can provide consumers protections for voice services, Public Knowledge fails to articulate how an unauthorized carrier change could occur in the context of BIAS.

7. Other Title II Provisions

410. Beyond the provisions already addressed above, we also forbear from applying additional Title II provisions that could give rise to new requirements by virtue of our classification of BIAS to the extent our section 10 authority allows. We find it notable that no commenter raises significant concerns about forbearing from these

requirements, which reinforces our analysis below.

411. We conclude that the three-part statutory test under section 10(a) is met to forbear from applying certain provisions concerning BOCs in sections 271–276 of the Act to the extent that they would impose new requirements arising from classifying BIAS as a Title II telecommunications service, as the Commission did in the *2015 Open Internet Order*. Sections 271, 272, 274, and 275 establish requirements and safeguards regarding the provision of interLATA services, electronic publishing, and alarm monitoring services by the BOCs and their affiliates. The Commission has determined that section 271 has been fully implemented throughout the United States. Therefore, the prohibition in section 10(d) of the Act against forbearing from section 271 prior to such a determination is not applicable. Section 273 addresses the manufacturing, provision, and procurement of telecommunications equipment and customer premises equipment (CPE) by the BOCs and their affiliates, the establishment and implementation of technical standards for telecommunications equipment and CPE, and joint network planning and design, among other matters. Section 276 addresses the provision of ''payphone service,'' and in particular establishes nondiscrimination standards applicable to BOCs' provision of payphone service.

412. We again conclude that the application of any newly triggered provisions of sections 271 through 276 to BIAS is not necessary within the meaning of section 10(a)(1) or (a)(2), and that forbearance from these requirements is consistent with the public interest under section 10(a)(3), with one exception regarding section 276 that we discuss below. Many of the provisions in these sections are not currently in effect at all. Others impose continuing obligations that are, at most, tangentially related to the provision of BIAS. Forbearance from any application of these provisions with respect to BIAS insofar as they are newly triggered by our classification of that service will not meaningfully affect the charges, practices, classifications, or regulations for or in connection with that service, consumer protection, or the public interest. The Alarm Industry Communications Committee (AICC) argues that we should not forbear from section 275 because it ''would actively strip the alarm industry of existing protections.'' AICC asserts that refraining from forbearance of section 275 would be consistent with the *2015 Open Internet Order* because ''that

*Order* held that forbearance from section 275 was only appropriate where it would impose new requirements arising from the reclassification of BIAS as a Title II service." We note that the *2015 Open Internet Order* specifically said that it forbears from section 275, *inter alia,* "to the extent that [it] would impose new requirements arising from the classification of broadband internet access service in this Order." We take the same approach in the Order, and therefore find that the Order does not strip the alarm industry of any protections that may have existed prior to our reclassification of BIAS. Consistent with our general approach to forbearance here, which seeks to address new requirements that could be triggered by our classification of BIAS, we do not forbear with respect to provisions to the extent that they already applied prior to the Order. For example, section 271(c) establishes substantive standards that a BOC was required to meet to obtain authorization to provide interLATA services in an in-region state, which it must continue to meet to retain that authorization. In addition, section 271(c)(2)(B)(iii), which requires that a BOC provide nondiscriminatory access to poles, ducts, conduits, and rights-of-way in accordance with the requirements of section 224 of the Act, does not depend upon the classification of BOCs' BIAS. In combination with section 271(d)(6), this provision provides the Commission with an additional mechanism to enforce section 224 against the BOCs. We also do not forbear from section 271(d)(6) to the extent that it provides for enforcement of the provisions we do not forbear from here. In addition, while the BOC-specific provisions of section 276 theoretically could be newly implicated insofar as the reclassification of BIAS might result in some entities newly being treated as a BOC, the bulk of section 276 appears independent of the classification of BIAS and we thus do not forbear as to those provisions.

413. We generally forbear from applying sections 221 and 259 of the Act, consistent with our forbearance throughout the Order. First, as described elsewhere, we forbear from all *ex ante* and *ex post* rate regulation, tariffing, and related recordkeeping and reporting requirements insofar as they would arise from our classification of BIAS. Second, we likewise forbear from unbundling and network access requirements that would newly apply based on the classification decision in the Order. We predict that other protections will be adequate to ensure just, reasonable, and nondiscriminatory conduct by providers of BIAS and to protect consumers for purposes of section 10(a)(1) and (a)(2). Further, informed by our responsibilities under section 706, we adopt a regulatory approach that we find strikes the appropriate public interest balance under section 10(a)(3). For these reasons, we also forbear from section 221's property records classification and valuation provisions, which would be used in the sort of rate regulation that we do not find warranted for BIAS. Likewise, just as we forbear from broader unbundling obligations, that same analysis persuades us to forbear from applying section 259's infrastructure-sharing and notification requirements.

414. We also again grant forbearance from other miscellaneous provisions to the extent that they would newly apply as a result of our classification insofar as they do not appear necessary or even relevant for BIAS. Section 226 protects consumers making interstate operator services calls from pay telephones and other public telephones from unreasonably high rates and anti-competitive practices. Section 227(c)(3) imposes on carriers certain notification obligations related to the Telephone Consumer Protection Act (TCPA), and section 227(e) restricts the provision of inaccurate caller identification information associated with any telecommunications service. Because we are forbearing from these substantive requirements, we note that, as a consequence, there will not be a private right of action granted under section 227(c)(5) based on alleged violations of those forborne-from requirements in the context of BIAS. We note that while the universe of "calls" covered by section 227(b)(1)(A)(iii) is prerecorded or autodialed calls to "a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call" even with the reclassification of mobile BIAS we do not interpret there to be any new or expanded restrictions arising from that provision because the relevant calls also would need to be specifically to a "telephone number" assigned to the relevant service As a result, there also would not be any private right of action under section 227(b)(3) that is newly triggered by the decisions in the Order. Section 228 regulates the offering of pay-per-call services and requires carriers, *inter alia,* to maintain lists of information providers to whom they assign a telephone number, to provide a short description of the services the information providers offer, and to provide a statement of the cost per minute or the total cost for each service. Section 260 regulates LEC practices with respect to the provision of telemessaging services. It remains unclear how these provisions would be relevant to BIAS, and commenters do not explain how or argue that they would. Since the core BIAS requirements would also still be available to the Commission, we find that enforcing these provisions, to the extent they would newly apply by virtue of our classification of BIAS, is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with BIAS providers are just and reasonable and are not unjustly or unreasonably discriminatory under section 10(a)(1). Enforcement also is not necessary for the protection of consumers under section 10(a)(2), and forbearance from applying these provisions is consistent with the public interest under section 10(a)(3), particularly given our conclusion, informed by section 706, that it is appropriate to adopt a tailored approach here.

415. We clarify that we will not forbear from applying section 276 to the extent it applies to incarcerated people's communications services (IPCS) or the Commission's IPCS rules. Though the IPCS rules themselves do not appear to vary depending on whether BIAS is an "information service" or "telecommunications service," the Commission previously made this clarification in the *2015 Open Internet Order* to respond to a concern that forbearance "could be misconstrued as a limitation on the Commission's authority with respect to any advanced ICS services (such as video visitation) that may replace or supplement traditional ICS telephone calls." Congress amended section 276 of the Act in January 2023 to expand the Commission's authority over IPCS under that provision, but the ultimate scope and bounds of that expanded authority is the subject of a pending rulemaking proceeding. Consistent with our conclusion below that it would be contrary to the public interest to forbear from applying section 276 to the extent it applies to IPCS or the Commission's IPCS rules, given open questions about the scope of the Commission's expanded authority under section 276, we find it prudent at this time—and consistent with the public interest—to retain our full section 201(b) authority specifically in the context of IPCS, as well. Though no commenter raises similar concerns in this proceeding, we make the same clarification, consistent

with the Commission's ongoing efforts to grant relief from exorbitantly high rates for calls between incarcerated people and their loved ones, particularly in light of Congress recently recognizing the increased role that advanced communications plays in these communications. This also is consistent with the Commission not forbearing from section 225, as the Commission has acted to improve communications access for incarcerated people with disabilities. We therefore find that forbearance would fail to meet the statutory test of section 10 of the Act, in that the protections of section 276 remain necessary to protect consumers and serve the public interest.

### 8. Truth-in-Billing Rules

416. We again forbear from applying our truth-in-billing rules insofar as they are triggered by our classification of BIAS here. As with our section 10 analysis above, we conclude that our truth-in-billing rules are not needed for the purposes of section 10(a)(1) and (2) and that forbearance is in the public interest under section 10(a)(3). No commenter discusses whether we should or should not forbear from our truth-in-billing rules, and we have no reason to believe that "our core BIAS requirements, including the requirement of just and reasonable conduct under section 201(b), will not provide important protections in this context even without specific rules."

### 9. Roaming-Related Provisions and Regulation

417. We adopt our proposal to grant the same conditional forbearance from common carrier roaming regulations as in the *2015 Open Internet Order* and find that doing so meets the section 10(a) analysis. As there is no record discussion regarding our forbearance from applying the Commission's roaming rules, we have no reason to believe that we should depart from the forbearance in the *2015 Open Internet Order* or that it would fail to meet the section 10(a) analysis. The Commission has established two different regimes to govern the roaming obligations of commercial mobile providers. One requires certain CMRS providers, "on reasonable request, to provide automatic roaming on reasonable and not unreasonably discriminatory terms and conditions." The second requires providers of commercial mobile data services, as defined and including mobile BIAS, to "offer roaming arrangements to other such providers on commercially reasonable terms and conditions, subject to certain specified limits." As the Commission previously

determined in the *2015 Open Internet Order,* it remains the case that reclassifying mobile BIAS as CMRS potentially affects the roaming obligations of mobile BIAS providers in two ways. First, absent any action by the Commission to preserve data roaming obligations, the determination that mobile BIAS is an interconnected service would result in providers of mobile BIAS no longer being subject to the data roaming rule, which applies only to non-interconnected services. Second, the determination that mobile BIAS is CMRS potentially subjects mobile BIAS providers to the terms of the CMRS roaming rules.

418. We again forbear from the application of the CMRS roaming rule, § 20.12(d) of the Commission's rules, to mobile BIAS, conditioned on such providers continuing to be subject to the obligations, process, and remedies under the data roaming rule codified in § 20.12(e). Retaining the roaming obligations for mobile BIAS that applied prior to reclassification remains consistent with our tailored approach, and we are again persuaded that the Commission rules in § 20.12(e) and our remaining core BIAS requirements render the forborne-from rules unnecessary. We thus find that applying the forborne-from rules is not necessary for purposes of section 10(a)(1) and (a)(2) and that the conditional forbearance is in the public interest under section 10(a)(3).

### 10. Terminal Equipment Rules

419. We also again forbear from applying certain terminal equipment rules to the extent that they would newly apply by virtue of the classification of BIAS. Similar to the rules adopted in the *2015 Open Internet Order,* the open internet rules we adopt in the Order will prevent BIAS providers from restricting the use of non-harmful devices subject to reasonable network management. The record does not discuss whether we should forbear from our terminal equipment rules. We thus find that applying the Commission's terminal equipment rules, insofar as they would newly apply to BIAS providers by virtue of our classification decision here, are necessary for purposes of section 10(a)(1) and (a)(2), particularly given the availability of the core BIAS requirements, and in particular our bright-line rules. Likewise, as above, under the tailored regulatory approach we find warranted here, informed by our responsibilities under section 706, we conclude that forbearance is in the public interest under section 10(a)(3).

### D. Other Regulations and Non-Title II Provisions

### 1. Maintaining Authority Under Certain Title III Provisions

#### a. Wireless Licensing

420. We clarify that we do not forbear from applying—or waive—our rules governing the wireless licensing process and authorities and clarify that our adopted forbearance does not encompass Title III licensing, except to the extent specifically noted below. Among other benefits, we find that maintaining these provisions will support our national security goals, as they will allow us to continue to review wireless license applications under our normal processes, including to determine whether they are in the public interest—which includes consideration of national security. As we observed in the *2023 Open Internet NPRM,* our Title III licensing authority with respect to facilities-based mobile BIAS providers independently "grant[s] us important authority that can be used to advance national security and public safety with respect to the services and equipment subject to licensing." In determining whether to grant an original application for a license or permit or an application for renewal of a license under Title III (47 U.S.C. 309(a)), approve the assignment or transfer of control of a Title III license or permit (47 U.S.C. 310(d)), or revoke a Title III license or permit (47 U.S.C. 312(a)(2)), the Commission considers whether the applicant has the requisite citizenship, character, and other necessary qualifications. The Commission also must "determine whether the public interest, convenience, and necessity will be served" by granting the application or revoking the license or permit. Among the factors the Commission may consider are national security, law enforcement, public safety, or other risks. Therefore, given the Commission's public interest obligations in licensing decisions, and based on the key public interest considerations that inform our action in the Order, we retain the right to review fully original applications and applications for assignment or transfer of control of Title III licenses and permits, and we reserve the right to conduct *ad hoc* review of whether a licensee's retention of a Title III license presents national security, law enforcement, public safety, or other risks that warrant revocation of such authority. We discuss how our review under Title III requirements intersects with our determinations regarding foreign ownership requirements below. The record does not address whether we

should adopt the same forbearance for Title III wireless licensing as the Commission did in the *2015 Open Internet Order,* so we have no basis for adopting different findings here. We do mean, however, to apply current Title III wireless licensing requirements (*i.e.,* ones that are new or revised since the *2015 Open Internet Order*). Adopting this approach also has the added benefit of being consistent with the Commission adopting largely the same broad forbearance as the *2015 Open Internet Order.* Consequently, as the Commission found in the *2015 Open Internet Order,* we find that forbearing from the Commission's flexible use rules would be against the public interest under section 10(a)(3) because it would lead to inaccurate license information. Accordingly, we do not forbear from applying—or waive—the wireless licensing requirements under Title III and the Commission's rules, except to the extent specified below.

b. Foreign Ownership of Common Carrier Wireless Licensees (Section 310(a) and (b))

421. With limited exceptions, we do not forbear from section 310(a) and (b) of the Act, which requires the Commission to review foreign investment in radio station licenses and imposes specific limitations on who may hold certain types of radio station licenses. As discussed below, we find that forbearance from section 310(a) and (b), except to the extent the Commission previously determined to forbear from section 310(b)(3) for wireless common carriers, would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers. As noted below, the Commission previously determined that forbearance from the application of section 310(b)(3) to wireless common carriers, which now includes wireless BIAS providers, was in the public interest with respect to a discrete type of foreign ownership. We anticipate a future proceeding will, among other things, develop a fuller record on the application of the Commission's rules implementing section 310(b)(3) and (b)(4) in the context of BIAS.

422. By the Order, we find that foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS is in the public interest under section 310(b)(3) when such foreign ownership is held in the licensee through a U.S. entity that does not control the licensee, and under section 310(b)(4). Common carrier wireless licensees that are providing other common carrier services in addition to BIAS will still need a ruling for their indirect foreign ownership above the statutory benchmarks, as the waiver will only apply to BIAS and not other common carrier wireless services. We also waive the associated requirements for such licensees to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules, until the adoption of any rules for BIAS.

423. Section 310(a) and (b) of the Act provide for Commission review of foreign investment in radio station licenses and impose specific restrictions on who may hold certain types of radio station licenses. Section 310(a) prohibits foreign governments or their representatives from holding any radio station license, and section 310(b)(1) and (b)(2) prohibits foreign individuals or their representatives and corporations organized under the laws of a foreign government from holding a broadcast, common carrier, or aeronautical en route and aeronautical fixed (hereinafter, aeronautical) radio station license. The prohibitions in section 310(a), (b)(1), and (b)(2) are absolute, and the Commission has no discretion to waive them. The Commission has stated that, for purposes of section 310(a), a "'representative'" is a person or entity that acts "'in behalf of'" or "'in connection with'" the foreign government. Section 310(b)(3) prohibits foreign individuals, governments, and corporations from owning or voting more than 20% of the capital stock of a broadcast, common carrier, or aeronautical radio station licensee. Section 310(b)(3), unlike section 310(b)(4), does not give the Commission the discretion to permit foreign ownership above the statutory threshold. Section 310(b)(4) establishes 25% benchmarks for investment by foreign individuals, governments, and corporations in a U.S.-organized entity that directly or indirectly controls a U.S. broadcast, common carrier, or aeronautical radio licensee. Foreign individuals, governments, or entities may own, directly or indirectly, more than 25% (and up to 100%) of the stock of a U.S.-organized entity that holds a controlling interest in a broadcast, common carrier, or aeronautical radio licensee, unless the Commission finds that the public interest will be served by refusing to permit such foreign ownership. In the *2012 Foreign Ownership First Report and Order* (77 FR 50628 (Aug. 22, 2012)), the Commission determined to forbear from applying the foreign ownership limits in section 310(b)(3) to the class of common carrier licensees in which the foreign investment is held in the licensee through a U.S.-organized entity that does not control the licensee, to the extent the Commission determines such foreign ownership is consistent with the public interest under the policies and procedures that apply to the Commission's public interest review of foreign ownership subject to section 310(b)(4) of the Act. The Commission's forbearance authority does not extend to broadcast or aeronautical radio station licensees covered by section 310(b)(3). The forbearance approach that the Commission adopted in the *2012 Foreign Ownership First Report and Order* applies only to foreign ownership in common carrier licensees held through intervening U.S.-organized entities that do not control the licensee. The Commission codified this forbearance approach in the *2013 Foreign Ownership Second Report and Order,* which adopted rules to treat foreign investment under section 310(b)(4) and the forbearance approach of section 310(b)(3) consistently.

424. *Forbearance Is Not in the Public Interest With Limited Exceptions.* We do not forbear from section 310(a) and (b) of the Act except to (1) extend our existing section 310(b)(3) forbearance policy to not require the filing of a petition for declaratory ruling or similar request where and to the extent the Commission has already found the foreign ownership at issue to be in the public interest and (2) provide a reasonable period for other BIAS providers newly subject to section 310(b)(3) to reduce their foreign ownership interests below the statutory limit or restructure their holdings to include an intervening, non-controlling U.S. interest holder. Our determination that this limited forbearance is in the public interest rests on the same reasoning as our determination below that waiver of the associated rules is in the public interest. The Commission concluded in 2012 that application of the statutory threshold is not necessary to ensure that rates are just and reasonable and not unjustly or unreasonably discriminatory, and we determine below that consumers will benefit from our decision not to require BIAS-only providers to file petitions for declaratory ruling under the circumstances described here. Except to this limited extent, we find that forbearance from section 310(a) and (b) would neither serve the public interest under section 10(a)(3) nor satisfy the requirements of section 10(a)(2) as it pertains to the protection of consumers. Congress created the Commission,

among other reasons, "for the purpose of the national defense [and] for the purpose of promoting safety of life and property through the use of wire and radio communication." We find that our decision not to forbear ensures the Commission can continue to advance the public interest, and furthers two core purposes—national security and the promotion of safety of life and property—for which Congress created the Commission. In the *2023 Open Internet NPRM,* we sought comment "on any other provisions of the Act or Commission rules that likewise should be expressly excluded from the scope of forbearance based on national security and/or public safety considerations, including, for example, sections 305, 310, and 332 of the Act." In evaluating a petition for a declaratory ruling seeking a determination that it is in the public interest to exceed the statutory foreign ownership benchmarks, the Commission's public interest analysis under section 310(b)(3) and (b)(4) considers, among other things, any national security, law enforcement, foreign policy, and trade policy concerns raised by the proposed foreign investment. The Commission has also identified public safety and security of critical infrastructure as relevant to the Commission's review of foreign investment under section 310(b)(4). We find that our decision not to forbear further from section 310(a) and (b) is consistent with the Commission's statutory responsibilities under section 10(a) and is warranted based on the key public interest considerations that inform our action in the Order and to enable the Commission to address national security, public safety, and other public interest concerns with respect to BIAS.

425. *Public Interest Finding and Waiver of Rules.* Notwithstanding the determination about public interest considerations supporting our decisions regarding section 310(b)'s application to BIAS, we reserve the right, as part of our review under Title III licensing provisions, to override that determination with respect to specific applications. Under the existing section 310(b)(3) forbearance policy, and under the Commission's rules applicable to section 310(b)(4), wireless common carriers must file a petition for declaratory ruling before they may exceed the statutory foreign ownership thresholds. The Commission applies the same rules to both types of petitions for declaratory ruling. Sections 1.5000 through 1.5004 of the Commission's rules implement section 310(b)(3)—with regard to the class of common carrier

radio station licensees subject to the forbearance approach adopted in the *2012 Foreign Ownership First Report and Order* that seek Commission approval to exceed the 20% foreign ownership limit in section 310(b)(3)—and section 310(b)(4) of the Act. We recognize that application of these rules may raise operational issues in the context of BIAS. WISPA, for example, addresses the potential impact on common carrier wireless licensees that would be subject to section 310(b) pursuant to our reclassification of BIAS under Title II. The Commission anticipates releasing a further notice of proposed rulemaking to address this and other comments. By the Order, and pending the outcome of a further notice of proposed rulemaking, we find that foreign ownership interests that exceed the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS are in the public interest under section 310(b)(3)—when such foreign ownership is held in the licensee through a U.S. entity that does not control the licensee—and under section 310(b)(4). The waiver that we adopt in the Order shall not apply to any common carrier wireless licensee providing only BIAS that does not fall within this class, including foreign ownership held directly in a common carrier wireless licensee under section 310(b)(3). Foreign ownership held directly in common carrier licensees under section 310(b)(3) is not subject to the forbearance approach adopted in the *2012 Foreign Ownership First Report and Order* and shall not be covered in the waiver that we adopt in the Order. As such, the 20% foreign ownership limit set forth in section 310(b)(3) shall apply to such common carrier wireless licensee providing only BIAS that does not fall within this class. For the same reasons discussed below in support of our waiver of the rules, and in furtherance of our decision to extend our existing section 310(b)(3) forbearance policy for common carrier licensees to BIAS-only providers, we temporarily find that foreign ownership in a common carrier wireless licensee providing only BIAS is in the public interest where foreign interests are held in a licensee through an intervening U.S. entity that does not control the licensee, even though we are temporarily not requiring the filing of a petition for declaratory ruling as to such interests. For such licensees, we waive the requirements to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules, pending adoption of any rules for BIAS. We recognize that, for the period

for which we waive §§ 1.5000 through 1.5004 of the rules as specified herein, we will not be receiving petitions for declaratory ruling seeking prior approval to exceed the section 310(b)(3) and (b)(4) statutory benchmarks—as set out in the existing rules—from common carrier wireless licensees that are providing only BIAS, and it is our intent to address this matter in a further notice of proposed rulemaking. This waiver of those rules as it relates to the foreign ownership of common carrier wireless licensees providing only BIAS will not apply to foreign ownership held directly in such licensees under section 310(b)(3). We note that the blanket section 214 authority that we grant to such common carrier wireless licensees providing BIAS, pursuant to our reclassification of BIAS in the Order, is subject to the Commission's power to revoke such authority. The Commission also has the power to revoke a Title III station license, including "for willful or repeated violation of, or willful or repeated failure to observe any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States."

426. We further find that temporary forbearance is warranted to afford additional time after the Order's effective date for other BIAS providers newly subject to Title II to restructure to the extent necessary to bring any direct foreign ownership interest in the licensee below the statutory limit or to include a non-controlling intervening U.S. interest holder. WISPA asked the Commission to provide time for these providers to come into compliance with section 310(b)(3) and the terms of the forbearance policy applicable to BIAS providers with foreign interests in the licensee held through a non-controlling U.S. entity. We find that a compliance period of twelve months after the effective date is reasonable based on the amount of time that it could take to restructure corporate ownership or take other similar steps to come into compliance given our experience with transactions of a similar scale and type and strikes the right balance between maximizing public interest benefits and minimizing potential public interest harm. For that period of time, enforcement of the statutory prohibition in section 310(b)(3) is not necessary to protect consumers or ensure just and reasonable and nondiscriminatory rates and practices. Forbearing from enforcement of the prohibition for that period of time serves the public interest by allowing newly covered BIAS providers to continue providing service

during the limited time necessary to protect existing investments in such businesses without presenting undue risk of harm given the limited duration of this temporary forbearance. Following that period of time, forbearance will no longer serve the public interest except as the Commission adopted in the *2012 Foreign Ownership First Report and Order* and as applied herein with respect to foreign interests held in the licensee through a non-controlling U.S. interest holder.

427. The Commission may waive its rules and requirements for "good cause shown." Good cause, in turn, may be found "where particular facts would make strict compliance inconsistent with the public interest." In making this determination, the Commission may "take into account considerations of hardship, equity, or more effective implementation of overall policy," and if "special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." As discussed above, the current rules that implement section 310(b)(3) and (b)(4) of the Act establish requirements and conditions for obtaining the Commission's prior approval of foreign ownership in common carrier wireless licensees, among other licensees. Importantly, the current rules that we waive, as set out in the Order, were established in the context of traditional telecommunications services, and thus we find there is good cause to waive those rules pending adoption of any rules for BIAS.

428. As such, we find that, for the period leading to adoption of any rules for BIAS, foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing *only* BIAS is in the public interest under section 310(b)(3) when such foreign ownership is held in the licensee through a U.S.-organized entity that does not control the licensee and under section 310(b)(4). For such licensees, we waive the requirements to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules, pending the adoption of any rules for BIAS. We find that our decision to waive §§ 1.5000 through 1.5004 of the Commission's rules with respect to this class of licensees is in the public interest given our consideration of hardship and equity that may be raised by immediate application of those rules to such licensees following our action in the Order. The reclassification of BIAS under Title II is a special circumstance that requires careful consideration of rules concerning BIAS and thus

warrants deviation at this time from the application of our current rules implementing section 310(b)(3) and (b)(4), pending a further notice of proposed rulemaking. We find that the public interest is served as our approach will ensure that consumers can continue to receive the BIAS services to which they subscribe. Additionally, by waiving the requirements to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules, where it pertains to the foreign ownership of common carrier wireless licensees that are providing only BIAS as set out in the Order, we will avoid any disruption to or uncertainty for BIAS consumers and BIAS providers. As we conclude in the present Order, our action to reclassify BIAS under Title II will protect consumers and ensure a safe, secure, and open internet. Accordingly, we find that granting a waiver of the requirements to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules, where it pertains to the foreign ownership of common carrier wireless licensees that are providing only BIAS as set out in the Order, is fully consistent with our responsibility to account for the effective implementation of our overall obligations and objectives to address national security, law enforcement, public safety, or other public interest concerns while ensuring the uninterrupted provision of BIAS for consumers pending a further notice of proposed rulemaking to develop a fuller record. This waiver as set out in the Order will remain in effect pending such further notice of proposed rulemaking and the adoption of any rules for BIAS.

429. We find that it is in the public interest not to disturb the section 310(b)(3) forbearance approach the Commission adopted in the *2012 Foreign Ownership First Report and Order* and to temporarily apply it to those common carrier wireless licensees providing only BIAS as set out in the Order. We recognize that the forbearance analysis adopted in the *2012 Foreign Ownership First Report and Order* relied on the filing of a declaratory ruling and prior approval of the Commission. At this time, however, we find that there is good cause to apply the section 310(b)(3) forbearance approach to those common carrier wireless licensees providing only BIAS, where strict compliance with the rules implementing section 310(b)(3)—in those instances where the foreign ownership is held in the licensee through a U.S. entity that does not control the licensee—would be

inconsistent with the public interest based on consideration of hardship and equity that may be raised by immediate application of those rules until the Commission releases a further notice of proposed rulemaking to develop a fuller record on this matter. Pending such further notice of proposed rulemaking, we note that the Commission stated in the *2012 Foreign Ownership First Report and Order,* with regard to the class of common carrier licensees subject to the forbearance approach adopted in that Order, "that the public interest would be served by not applying the foreign ownership limit of section 310(b)(3) to licensees subject to section 310(b)(3) forbearance . . . for the same reasons that the public interest is served when we allow, under section 310(b)(4), greater than 25 percent foreign ownership in a U.S.-organized entity that does control the licensee under otherwise identical circumstances." The approach that we adopt in the Order would allow us to treat foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees providing only BIAS consistently under section 310(b)(4) and (b)(3), respectively, whether the foreign ownership is held through a controlling U.S. parent of the common carrier licensee or through an intervening U.S. entity that does not control the licensee, by including such licensees here and waiving §§ 1.5000 through 1.5004 of the Commission's rules until adoption of any rules.

2. Forbearance From Certain Provisions of Titles III, VI, and Other Commission Rules

430. We forbear from applying other provisions of the Act insofar as they would be triggered by classifying BIAS as a telecommunications service, to the extent of our section 10 authority. In particular, beyond the Title II provisions and certain implementing rules discussed above, we grant forbearance, as the Commission did in the *2015 Open Internet Order,* from obligations related to BIAS providers' provision of BIAS under certain provisions of Title III, Title VI, and associated Commission rules. We conclude that the same analysis justifies forbearance from these provisions, and the record does not dispute that. We thus predict, as we did in the *2015 Open Internet Order,* that other provisions and rules will be adequate to ensure just, reasonable, and nondiscriminatory conduct by BIAS providers and to protect consumers for purposes of section 10(a)(1) and (a)(2). Further, informed by our responsibilities under section 706, we find the tailored regulatory approach we

adopt strikes the appropriate public interest balance under section 10(a)(3). Accordingly, we adopt the following forbearance:

• First, we forbear from applying certain provisions of Titles III and VI and Commission rules associated with those Titles or the provisions of Title II from which we forbear that may apply by their terms to providers classified in particular ways. The Commission has forborne from provisions of Title II and from Commission rules in many instances in the past. However, nothing in the language of section 10 categorically limits the scope of Commission forbearance only to the provisions of Title II, and although it has been less common for the Commission to forbear from provisions of Titles III and VI, it has done so at times. For clarity, we note that by "rules" we mean both codified and uncodified rules. In addition, by "associated" Commission rules, we mean rules implementing requirements or substantive Commission jurisdiction under provisions in Title II, III, and/or VI of the Act from which we forbear. As to this first category of requirements, and except as to the core BIAS requirements, we forbear from any such provisions and regulations to the full extent of our authority under section 10, but only insofar as a BIAS provider falls within those categories or provider classifications by virtue of its provision of BIAS, but not insofar as those entities fall within those categories of classifications by virtue of other services they provide. The Order's classification of BIAS could trigger requirements that apply by their terms to "common carriers," "telecommunications carriers," "providers" of common carrier or telecommunications services, or "providers" of CMRS or commercial mobile services. Similarly, other provisions of the Act and Commission rules may impose requirements on entities predicated on an entity's classification as a "common carrier," "telecommunications carrier," "provider" of common carrier or telecommunications service, or "provider" of CMRS or commercial mobile service without being framed in those terms.

• Second, we forbear from applying certain provisions of Titles III and VI and Commission rules associated with those Titles or the provisions of Title II from which we forbear that may apply by their terms to services classified in particular ways. The classification of BIAS as a telecommunications service and, in the mobile context, CMRS, under the Communications Act, thus could trigger any requirements that

apply by their terms to "common carrier services," "telecommunications services," or "CMRS" or "commercial mobile" services. Similarly, other provisions of the Act and Commission rules may impose requirements on services predicated on a service's classification as a "common carrier service," "telecommunications service," "CMRS," or "commercial mobile" service without being framed in those terms. Regarding this second category of requirements (to the extent not already covered by the first category), and except as to the core BIAS requirements, we forbear from any such provisions and regulations to the full extent of our authority under section 10 specifically with respect to BIAS, but do not forbear from these requirements as to any other services (if any) that BIAS providers offer that are subject to these requirements.

• Third, while commenters do not appear to have identified such rules, there potentially could be other Commission rules for which our underlying authority derives from provisions of the Act all of which we forbear from under the first two categories of requirements identified above, but which are not already subject to that identified scope of forbearance. To the extent not already identified in the first two categories of requirements above, and except as to the core BIAS requirements, we forbear to the full extent of our authority under section 10 from rules based entirely on our authority under provisions from which we forbear under the first and second categories above (or for which the forborne-from provisions provide essential authority) insofar as the rules newly apply as a result of the classification of BIAS.

• Fourth, we include within the scope of our broad forbearance for BIAS any preexisting rules with the primary focus of implementing the requirements and substantive Commission jurisdiction in sections 201 and/or 202, including forbearing from preexisting pricing, accounting, billing, and recordkeeping rules. This forbearance would not include rules implementing our substantive jurisdiction under provisions of the Act from which we do not forbear that merely cite or rely on sections 201 or 202 in some incidental way, such as by, for example, relying on the rulemaking authority provided in section 201(b). Consistent with our discussions above, this category also does not include our open internet rules or MTE rules. As with the rules identified under the first and second categories above, we do not forbear insofar as a provider is subject to these

rules by virtue of some other service it provides.

• Fifth, the classification of BIAS as a telecommunications service could trigger certain contributions to support mechanisms or fee payment requirements under the Act and Commission rules, including some beyond those encompassed by the categories above. Insofar as any provisions or regulations not already covered above would immediately require the payment of contributions or fees by virtue of the classification of BIAS (rather than merely providing Commission authority to assess such contributions or fees) they are included within the scope of our forbearance. As under the first and second categories above, we do not forbear insofar as a provider is subject to these contribution or fee payments by virtue of some other service it provides.

## III. Report and Order: Open Internet Rules

431. The rules we adopt in the Order mark the return to the Commission's longstanding basic framework governing BIAS provider conduct to protect the open internet. We establish "rules of the road" that are straightforward and clear, prohibiting specific practices harmful to an open internet—blocking, throttling, and paid prioritization—as well as a strong standard of conduct designed to prevent deployment of new practices that would harm internet openness, and certain enhancements to the transparency rule. Our rules are designed to prevent BIAS providers from engaging in practices that are harmful to consumers, competition, and public safety. As proposed in the *2023 Open Internet NPRM,* our approach reinstates the rules that the Commission adopted in 2015. We find that the temporary deviation from this framework, which the Commission adopted in the *RIF Order,* left consumers exposed to behavior that can hinder their ability to access—and the Commission without recourse to protect and promote—an open internet. As we explained in the *2023 Open Internet NPRM,* we find that the rules we adopt in the Order are "consistent with numerous other steps the Commission has taken to ensure that this country has access to affordable, competitive, secure, and reliable broadband."

### A. Need for Rules

432. We affirm our tentative conclusion from the *2023 Open Internet NPRM* that baseline internet conduct rules for BIAS providers are necessary to enable the Commission to prevent and address conduct that harms

consumers and competition. BIAS is an essential service that is critical to so many aspects of everyday life, from healthcare and education to work, commerce, and civic engagement. Because of its importance, we conclude that rules are necessary to promote free expression; encourage innovation, competition, and consumer demand; and protect public safety. As the Commission found in both 2010 and 2015, BIAS providers continue to have the incentive and ability to harm internet openness. We find that the framework the Commission adopted in the *RIF Order* provides insufficient protection from these dangers, and that a safe, secure, and open internet is too important to consumers and innovators to leave unprotected.

1. Promoting Free Expression and Encouraging Innovation, Competition, and Consumer Demand

433. The internet serves as a cornerstone for free expression, fostering a diverse and inclusive digital space where individuals can share ideas, opinions, and information without undue influence or interference. It promotes the exchange of diverse perspectives, ultimately enriching society by exposing individuals to a wide range of thoughts and experiences. As the Supreme Court noted in 1997, the internet enables any person to "become a town crier with a voice that resonates farther than it could from any soapbox." In the *2023 Open Internet NPRM,* we sought comment on the need for conduct rules to protect free expression, innovation, and investment. The record confirms the Commission's long-held tenet that an open internet is critical to facilitate the free flow of diverse speech and content, and serves as a platform for speech and civic engagement. Several commenters highlight that open internet rules would ensure that BIAS providers cannot discriminate against content, thereby providing a space for all voices, including those from diverse and minority backgrounds. We agree with the Communications Workers of America that a BIAS provider's "ability to place restrictions on what speech is permitted on its platform creates a chilling effect on civic discourse."

434. In addition to protecting free expression, an open internet encourages competition and ensures that breakthrough innovations are not limited. In the *2015 Open Internet Order,* the Commission recognized that "innovations at the edges of the network enhance consumer demand, leading to expanded investments in broadband infrastructure that, in turn, spark new innovations at the edge." This self-reinforcing cycle, which the Commission has referred to as a "virtuous cycle" and which was a primary basis for the actions the Commission took in the *2010 Open Internet Order* and the *2015 Open Internet Order,* was accepted by the *Verizon* court. The *Verizon* court found that "the Commission's determination that internet openness fosters the edge-provider innovation that drives this 'virtuous cycle' was . . . reasonable and grounded in substantial evidence," and that "the Commission has adequately supported and explained its conclusion that, absent rules such as those set forth in the *Open Internet Order,* broadband providers represent a threat to internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment."

435. In the *RIF Order,* the Commission did not question the existence of the virtuous cycle or the fact that, at least in theory, BIAS providers might take actions that undermine the cycle. However, the Commission pointed out that BIAS providers may also contribute to the "virtuous cycle," and, without presenting any evidence or reasoned analysis, opined that the three potential sources of harm by BIAS providers to the "virtuous cycle" "have been overestimated, and can be substantially eliminated or reduced by the more light-handed approach [the *RIF Order*] implements."

436. In the *2023 Open Internet NPRM,* we sought comment on the "virtuous cycle" and whether "it is necessary to secure the open internet to preserve the virtuous cycle." Of the few parties that comment on this issue, none question the validity of the "virtuous cycle" or the fact that innovations at the edge of the network can increase consumer demand, which can lead to expanded investments in broadband infrastructure, which in turn stimulate further innovation at the edge. Rather, those opposing the proposed bright-line rules instead either argue that BIAS providers lack the incentive or ability to engage in activities that would undermine the "virtuous cycle" or that BIAS providers have not engaged in such activities, or they suggest, irrelevantly, that other entities, including large edge providers, transit providers, backbone providers, and CDNs can also affect and undermine the consumer experience. We note that, to the extent that other entities may have the incentive or ability to engage in anticompetitive activities that undermine the virtuous cycle, such

activities are beyond the scope of this proceeding.

437. We agree with Netflix that "where both affiliated and independent content providers compete on a level playing field that offers the same access to terminating access networks, these companies are spurred to compete vigorously and to continue to improve their offerings by investing in quality content and technology." The record reflects wide agreement that the internet ecosystem has become more diverse during the past decade with the entrance of new network operators, new intermediaries such as CDNs and interexchange carriers, and new edge providers. Small and emerging edge providers constitute particularly dynamic drivers of innovation and are a critical part of the diversity of the internet ecosystem. In March 2023, 1,054,052 business establishments in the United States (11.6% of all businesses) were less than one year old and 2,436,791 (26.8% of all businesses) were less than three years old. Although many of these companies may go out of business, others innovate successfully and become a major impetus to innovation and growth in the economy. Most of these businesses depend on reliable, open internet connections to build and scale their businesses. Research on internet-based innovation shows that the innovative generativity of the internet is strongly related to its open, transparent, and modular architecture. These technological design choices greatly reduce the costs of innovation for edge providers and hence stimulate more innovation experiments. They enable coordination and the realization of synergies between the participants in the internet ecosystem. These insights are congruent with recent research in innovation economics. This work shows that particularly important innovation drivers are (1) the contestability of a market (that is, the intensity of competition in the market segment and the competitive threats exerted by potential new entrants); (2) the available technological and business innovation opportunities; and (3) the appropriability of temporary risk premiums that reward taking the innovation risk. In digital ecosystems, innovation is further stimulated by synergies between market participants (*e.g.,* between ISPs and edge providers) but it is impeded by coordination costs between market participants. The importance of synergies and complementarities in interdependent innovation processes was examined rigorously. An important insight from this research is that innovation is

stimulated in a reciprocal process, with edge provider innovation stimulating infrastructure innovation. In turn, infrastructure innovation enhances the innovation opportunities and activities of edge providers. The negative effects of coordination costs, such as the costs of adapting an application to different ISPs and the costs of negotiating agreements. However, this generativity can be weakened, and the innovation performance degraded, if individual market participants have incentives that impede this complementary innovation process. The more recent innovation research often uses the term "complementary innovation" or "interdependent innovation" to refer to the reciprocal synergies that exist in digital innovation systems. The notion of a virtuous cycle of innovation and investment, used in the *2010 Open Internet Order* and *2015 Open Internet Order,* describes key features of such complementary innovation processes. The more recent research clarifies that several types of complementary innovation coexist in the advanced internet that thrive under different conditions. A vast set of innovation opportunities will thrive in a best-effort internet offering that is transparent and provides nondiscriminatory connectivity for edge providers and users. Emerging technologies such as new forms of edge computing and open radio access network (open RAN) will further expand these innovation opportunities. In all these cases, the virtuous cycle of complementary innovation creates synergies between innovation processes in networks, applications, services, and devices. While we do not disagree with commenters who argue that excessive regulation can stifle innovation by creating barriers to entry and reduce competition, we do dispute that the rules we adopt in the Order would constitute the type of regulation that would stifle innovation. If anything, the surge in innovation over the past 25 years underscores the success of innovators under an open internet. We believe this success can be attributed, at least in part, to the absence of any preemptive control by service providers or any other entities over new applications, services, or content. We agree with the Electronic Frontier Foundation, which asserts that an open internet is also essential to help new businesses find investors. As the Greenlining Institute explains, "[w]ithout net neutrality rules, the next Amazon or YouTube may never get off the ground and an *ex post* regulatory intervention will be too little, too late."

As discussed below, we find that BIAS providers have the incentive and technical ability to engage in activities that harm edge providers, which can reduce investment and innovation at the edge, which in turn can harm consumers and ultimately reduce incentives to invest in broadband infrastructure. As the Commission explained in the *2010 Open Internet Order,* pervasive interference with the open internet would likely slow or even break the virtuous cycle of innovation enabled by internet, likely causing irreversible or very costly harms. If broadband provider practices chill entry and innovation by edge providers and thereby prevent development of the next revolutionary technology or business, the missed opportunity may be significant, and it may be impossible to restore the lost innovation, investment, and competition after the fact. Additionally, because the internet is a general purpose technology, erosion of internet openness threatens to harm innovation, investment in the core and at the edge of the network, and competition in many sectors. This can have a disproportionate effect on small, entering, and non-commercial edge providers that drive much of the innovation on the internet. Effective open internet rules can both prevent or reduce the risk of these harms and help to ensure the public has unfettered access to diverse sources of news, information, and entertainment, as well as an array of technologies and devices that enhance health, education, and the environment. Moreover, as the Commission explained in the *2015 Open Internet Order,* such "behavior [by BIAS providers to throttle or degrade edge content] has the potential to cause a variety of other negative externalities that hurt the open nature of the internet." The Commission went on to explain that "[b]roadband providers have incentives to engage in practices that will provide them short term gains but will not adequately take into account the effects on the virtuous cycle . . . . [and] that the unaccounted-for harms to innovation are negative externalities [that] are likely to be particularly large because of the rapid pace of internet innovation, and wide-ranging because of the role of the internet as a general purpose technology."

438. Thus, the conduct that we seek to prevent can not only harm edge providers, which will reduce their incentives to invest and innovate, but can also harm consumers. This harmful conduct may even reduce other BIAS providers' incentives to invest in

broadband infrastructure. Overall, the record before us corroborates the need for a balanced approach to safeguard edge innovation while allowing entrepreneurial experimentation to advance innovation. The Order achieves this balance by establishing a framework of bright-line rules for BIAS. These rules offer guardrails to safeguard important open internet principles that will maintain edge-provider innovation and protect the smallest and most vulnerable edge providers. At the same time, the ability of BIAS providers to offer specialized and innovative new services is preserved by allowing BIAS providers to use appropriate network management, offer enterprise services, and offer non-BIAS data services. We believe that, overall, the benefits of this balanced approach, which secures an open internet while allowing flexibility for edge and BIAS provider innovation, outweigh its costs. As such, we conclude that the protections we adopt in the Order will help to facilitate "the development of diverse, content, applications, and services," and enable "a virtuous cycle of innovation."

2. Protecting Public Safety

439. The conduct rules that we adopt in the Order are necessary to prevent and mitigate harms to public safety that could result from blocking, throttling, paid prioritization, and other actions that have the potential to impair public safety communications. These conduct rules may also support consumer use of telehealth service and remote healthcare monitoring, such as through connected devices, by ensuring consumers can continue to access these services without the threat of blocking, throttling, or other degradation. The prohibited conduct could make it more difficult for the public to receive emergency services and critical information and could impair the ability of first responders to communicate during emergency situations. As discussed above, one of the Commission's fundamental obligations is to advance public safety. The *Mozilla* court highlighted this obligation and recognized its significance, emphasizing that "whenever public safety is involved, lives are at stake." The court went on to note that "[a]ny blocking or throttling of [safety officials'] internet communications during a public safety crisis could have dire, irreversible results." Similarly, in the *2015 Open Internet Order,* the Commission recognized that paid prioritization and peering disagreements can negatively affect public safety communications traveling over the same networks.

440. Above, we discuss the wide range of public safety communications and applications that rely on broadband networks and the related national security concerns impacting broadband services, providers, and critical infrastructure. The CPUC points out that first responders use "communications tools to respond to life-threatening situations," such as by "notify[ing] residents and businesses by mobile phone, text message, email and social media with time-sensitive, geographically specific emergency notifications." We agree with the CPUC that the ability of first responders to "communicate with the public in a timely manner is, literally, a matter of life and death."

441. We conclude that open internet conduct rules are necessary to support public safety communications by preventing "harmful practices that could impede emergency response and critical information sharing." The D.C. Circuit found that "the harms from blocking and throttling during a public safety emergency are irreparable . . . [because] people could be injured or die." Santa Clara asserts that "such practices could interfere with the communications about the existence of a fire line or evacuation zone, the location of flooding, or the location of criminal suspects or missing individuals, among many other critical and time-sensitive communications."

442. Several commenters emphasize the importance of the conduct rules for public safety. For example, the AICC contends that the proposed "bright-line rules would serve a vital role in protecting public safety" by preventing "interruptions in signal transmissions between customers and the monitoring centers which serve them." New America's Open Technology Institute agrees, stating that "it is imperative that the Commission . . . regulate BIAS . . . and take enforcement action in the interest of public safety through Title II classification and the creation of conduct standards." The CPUC also agrees, arguing that "strong, non-discriminatory rules are needed to ensure that providers of emergency services or public safety agencies are not impaired in providing comprehensive, timely information to the public in a crisis."

443. We also agree with commenters who assert that the conduct rules will provide other public safety benefits beyond emergency communications. As the CPUC points out, "[t]he 'Internet of Things' is deeply intertwined with many facets of society, including critical infrastructure such as the energy grid and water pipelines." The CPUC contends that "[a]llowing ISPs to engage in paid prioritization deals with energy suppliers" could have detrimental impacts on demand response programs that are vital to "California's battle against catastrophic wildfires." The CPUC further explains that, "[s]ince demand response relies on fast, instantaneous communication to the customer, non-discriminatory Open internet rules are vital to dispatching demand response during times of extreme grid stress." The CPUC concludes that "it is critical to energy safety and reliability that internet communications . . . not be subject to paid prioritization delays, payment demands, or service degradation due to priority accorded to other users who pay extra."

444. We conclude that the conduct rules will benefit public safety as proactive actions to protect life and property by preventing potential harms from occurring, as opposed to the Commission solely taking enforcement actions after the harms have already occurred. Santa Clara recognizes the benefits of the conduct rules, which "impose requirements on ISPs *ex ante*, that is, *before* their blocking, throttling, or unreasonable interference can hinder or prevent time-sensitive, life-saving public safety communications from reaching their destinations." In addition, Santa Clara reiterates that "*ex post* remedies cannot adequately protect against or compensate for the harms that ISP interference can cause to public safety." Free Press agrees because, "[w]ithout agency authority for *ex post* enforcement (or authority for *ex ante* rules) the Commission cannot do its job to promote public safety." INCOMPAS also agrees with the need for *ex ante* rules, on the basis that the Commission's "fundamental obligation to promote and protect public safety . . . includes ensuring that emergency situations are prevented, mitigated, and/or handled immediately." We agree that "[t]he harm caused by blocking and throttling [public safety] communications simply cannot be remedied after the fact." We also agree that the conduct rules are needed to enable the Commission to "deal with public safety issues before a public safety situations arises—not afterwards." Notably, the *Mozilla* court expressed skepticism about the Commission's contention in the *RIF Order* that post-activity enforcement is a suitable method to address harmful conduct in the public safety context, finding that "the harm to the public cannot be undone" by *ex post* enforcement. For these reasons, we conclude that the conduct rules are necessary because *ex ante* regulations would provide better public safety protections than an *ex post* enforcement framework.

445. Some commenters also contend that the conduct rules would have a limited impact on public safety because public safety entities heavily rely on enterprise-level dedicated networks, which fall outside of the scope of reclassification. As explained above, public safety officials' reliance on BIAS has become integral to their essential functions and services, aside from their reliance on enterprise-based systems. We agree with INCOMPAS's analysis in its petition for reconsideration that "[t]he Commission should not ignore the effects of reclassifying BIAS on public safety by conflating the idea that non-BIAS services are also used to address public safety issues."

446. We reject the argument of some commenters that the conduct rules are unnecessary due to the lack of evidence of public safety harms. Multiple commenters refute these arguments. For example, New America's Open Technology Institute cites the Mendocino Complex Fire in 2018 as evidence that, "in the absence of general conduct standards and rules against blocking, throttling, or prioritization, ISP behavior did directly impact public safety efforts." New America's Open Technology Institute states that "the full extent of these impacts . . . is unknown" but cites to other commenters to explain that "it is difficult, if not impossible, for governments to identify harms caused by violations of net neutrality principles." INCOMPAS notes that, with regard to the Santa Clara County incident, "there [was] no agency authority to determine whether [the service provider] violated the rules, and that in itself is dangerous for public safety." We agree with INCOMPAS that the Commission needs the authority to address public safety matters through *ex ante* rules before a public safety situation arises.

447. Commenters reach differing conclusions regarding the significance of the 2018 Mendocino Complex Fire. Commenters who support reclassification point to the wildfire incident as an example demonstrating the need for the open internet rules and for the Commission to have greater authority to examine and investigate such incidents, and ultimately, to prevent future harms from occurring. Without such rules, these commenters warn, BIAS providers will engage in conduct that could result in harm to public safety, and that voluntary commitments are insufficient to ensure

public safety. Commenters who oppose reclassification contend that the wildfire incident is irrelevant to, and an unpersuasive example used in support of, reclassification and the open internet rules, because "the data plan at issue was marketed to government users, and therefore not covered by the FCC's 2015 rules, nor by the definition of BIAS contained in the NPRM" and that Verizon's actions would not have violated the *2015 Open Internet Order.* In other words, they state that the type of data use plan that Verizon offered and that the Santa Clara fire department purchased did not violate the *2015 Open Internet Order.* Opponents also argue that the Santa Clara fire department did not purchase a data plan that was appropriate for their needs. In our view, the 2018 Mendocino Complex Wildfire incident demonstrates that given the high stakes at issue—the loss of life and property—reliance on the free market alone is insufficient in the area of public safety.

448. We also disagree with commenters that argue open internet rules could deter providers from blocking or throttling access to websites that pose a threat to public safety for fear of violating the rules. We find that these concerns lack merit because the rules we adopt in the Order only apply to lawful content and the use of non-harmful devices. As was the case with the 2015 open internet rules, transfers of unlawful content or unlawful transfers of content are not covered by the no-throttling and no-blocking rules.

449. *Public Safety Accessibility for People with Disabilities.* We find that the adoption of the open internet conduct rules will allow the Commission to ensure that people with disabilities both have access to essential information and can communicate with public safety personnel during emergencies.

450. Many people with hearing- and speech-based disabilities rely on data-intensive, latency-sensitive video applications, such as VRS and other types of internet-based relay services, to communicate with public safety personnel. In the *2023 Open Internet NPRM,* we tentatively concluded that such data-intensive, latency-sensitive applications would be at a higher risk of being degraded by BIAS providers during emergency situations. Throttling or paid prioritization of certain services over others has the effect of degrading the network carrying individuals with hearing and speech disabilities' essential video communications, and discriminating against them by preventing them from communicating in the same manner as individuals without

disabilities. We also tentatively concluded in the *2023 Open Internet NPRM* that the proposed conduct rules would prevent this degradation of such communications. In their comments, both the CPUC and the Equity Advocates support this finding and argued that the application of "strong net neutrality protections" to BIAS networks would benefit people with disabilities. Applying the prohibitions on blocking, throttling, and paid prioritization to BIAS will ensure that individuals with hearing and speech disabilities who need to use data-intensive video applications have access to reliable and accessible means to communicate with emergency service operators. As a result of the rules prohibiting throttling and blocking of lawful content, any person who uses internet-based relay services to communicate with emergency management agencies can be confident that they can do so without experiencing a degraded network connection. Additionally, the general conduct rule we adopt will ensure that BIAS providers do not unreasonably interfere with, disadvantage, or discriminate against the internet-based relay services that individuals with disabilities use for emergency communications.

451. The conduct rules prohibiting throttling and blocking, and governing the general conduct of BIAS providers will ensure that people with disabilities have access to essential information during emergencies. As Santa Clara raises in its comments, cities, localities, states, and other entities operating during emergencies increasingly rely on BIAS networks to send out essential information through social-media, email, and other internet-supported channels. For some people with disabilities, accessing information through these internet-supported channels may be their preferred way of receiving accessible information alerting them, for example, of a wildfire or a hurricane. The same populations may use BIAS to communicate to friends and families that they have evacuated or taken other safety precautions during emergencies. We agree with commenters that it is essential for members of the disability community to be able to receive information and for emergency service organizations to be able to transmit public safety information. In sum, the conduct rules that we adopt in the Order will ensure that people with disabilities, especially those individuals with hearing or visual disabilities, can access essential public safety information.

### 3. BIAS Providers' Incentive and Ability To Harm Internet Openness

452. Based on the record in this proceeding, and consistent with the findings of the Commission in both the *2010 Open Internet Order* and the *2015 Open Internet Order,* we find that open internet rules are needed because BIAS providers have the economic incentive and technical ability to engage in practices that pose a threat to internet openness and have engaged in such practices in the past.

453. As explained below, BIAS providers may have incentives to block, throttle, or otherwise degrade service to specific edge providers, classes of edge providers, or end users. They also have incentives to increase revenues by charging edge providers in addition to end users. And, if BIAS providers can charge for prioritized access, BIAS providers will have incentives to degrade the quality of service to non-prioritized traffic classes and users.

454. In the *2010 Open Internet Order,* the Commission explained that BIAS providers may face at least three types of incentives to reduce the current openness of the internet. We find that this analysis continues to be correct, even after accounting for developments in the broadband ecosystem and advances in broadband technology over the last decade.

455. First, a BIAS provider may have incentives to block, degrade, or otherwise disadvantage services offered by specific edge providers or classes of edge providers by controlling the transmission of network traffic over the provider's broadband connection. These incentives are particularly strong if a third party's services compete with the BIAS provider's own revenue-generating offerings. For example, if a large, vertically integrated BIAS provider offers video streaming and other content services, such as cable television service, in competition with content offered by edge providers, it would have an incentive to discriminate against those edge providers. Unless safeguards are in place, a vertically integrated BIAS provider may have incentives to interfere with the transmission of such competing services. Similarly, a vertically integrated BIAS provider may have an incentive to limit the entry of new content or application providers that may compete with its own offerings in the future. The record suggests that BIAS providers have engaged in such behavior.

456. Such incentives also exist if a BIAS provider has contractual arrangements with a third-party edge provider in which the third-party pays

the ISP to terminate traffic. Commissioner Carr in his dissent suggests that, because a small BIAS provider is unlikely to block access to Netflix, this suggests that regulation is unnecessary. This argument fails for a number of reasons, most importantly because, if a BIAS provider, regardless of its size, provides a service that competes directly with an edge provider's service (or is affiliated with a provider of a competing service or has a contractual relationship with such a competing provider), that BIAS provider will have an incentive to block or degrade access to the competing provider's service in order to increase its own profits. Whether a small BIAS provider in Louisiana could provide a service comparable to Netflix's may or may not be possible, but that does not mean there would not be other services and edge providers for which a small provider might have a stronger incentive to degrade access. In this case, the BIAS providers would have an incentive to interfere with and degrade the quality of the transmission provided to non-affiliated content providers. Some commenters contend that, in both cases (of vertical integration of the BIAS provider and contractual agreements with third-party content providers), paid peering and interconnection agreements may be used to raise rival content providers' costs through inefficiently high payments and that such practices will negatively affect the internet ecosystem.

457. Second, a BIAS provider may have an incentive to charge specific edge providers or classes of edge providers for access or prioritized access to the provider's end users. A BIAS provider could have an incentive to charge inefficiently high fees to edge providers because the BIAS provider is typically an edge-provider's only option for reaching a particular end user. Thus, as the Commission noted in the *2015 Open Internet Order,* BIAS providers have the ability to act as gatekeepers. The additional cost associated with these fees, in turn, would reduce the incentives of edge providers to innovate. Harms from such inefficiently high charges could be particularly impactful because many edge innovations generate large benefits for the internet as a whole (what economists call positive spillover effects). Reduced edge innovation activity therefore may cause harms for the internet ecosystem that extend beyond an individual edge provider.

458. Third, if a BIAS provider can profitably charge edge providers for prioritized access to end users, it may have an incentive to strategically degrade, or decline to maintain or

increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access. And even though the quality of broadband access generally has improved over time, as reflected in higher download and upload speeds, a BIAS provider might withhold or decline to expand capacity in order to "squeeze" and degrade nonprioritized traffic, thus increasing network congestion.

459. We note, as the Commission did in both the *2015 Open Internet Order* and the *2010 Open Internet Order,* that BIAS providers need not possess monopoly power over end users in order to engage in conduct that harms edge providers, consumers, and the open internet. We recognize, however, that BIAS providers generally possess some degree of market power. As discussed below this market power generally arises from product differentiation and a limited choice among BIAS providers, significant switching costs, and customer inertia, though the incentive and ability to engage in such conduct is likely exacerbated by an increase in market power. As the Commission explained in the *2010* and *2015 Open Internet Orders,* a "broadband provider's incentive to favor affiliated content or the content of unaffiliated firms that pay for it to do so, its incentive to block or degrade traffic or charge edge providers for access to end users, and its incentive to squeeze non-prioritized transmission will all be greater if end users are less able to respond by switching to rival broadband providers." Similarly, in the *2015 Open Internet Order,* the Commission observed that "a broadband provider's incentive to favor affiliated content or the content of unaffiliated firms that pay for it to do so, to block or degrade traffic, to charge edge providers for access to end users, and to disadvantage non-prioritized transmission all increase when end users are less able to respond by switching to rival broadband providers."

460. In *Verizon,* the D.C. Circuit found that the Commission "adequately supported and explained" that, absent open internet rules, "broadband providers represent a threat to internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment." And in the *2015 Open Internet Order,* the Commission generally adopted the analysis underlying the Commission's *2010 Open Internet Order.* Based on the record in this proceeding, we continue to find the analysis contained in both

the *2010* and *2015 Open Internet Orders* persuasive.

461. Opponents of open internet regulation present several arguments as to why BIAS providers will not have the incentive or ability to engage in conduct that harms the open internet. As discussed below, we find that none of these arguments are well-founded. First, opponents argue that BIAS providers lack the incentive to block, throttle, or otherwise disadvantage unaffiliated edge providers because they face effective competition and because end users can switch to other service providers. The Commission has acknowledged that the gatekeeper role of BIAS providers could be "mitigated if a consumer could easily switch broadband providers." However, there are several problems with the opponents' argument in practice. While the number of BIAS providers is increasing and BIAS providers are expanding their networks, many consumers still lack a choice of BIAS providers or, where they do have a choice, they have a choice of only two providers and/or the services offered by competing providers are often not close substitutes. The *2024 Section 706 Report* shows that as of year-end 2022, 37.4% of households lived in areas where only one provider offered wireline or terrestrial fixed wireless broadband internet access services at 100 Mbps download and 20 Mbps upload speeds (100/20 Mbps), the new benchmark for defining advanced telecommunications capability, and the Commission's fixed speed benchmark for broadband, while 36.6% of households lived in areas with two providers offering 100/20 Mbps service, and only 18.2% lived in areas where they had a choice of three or more providers offering 100/20 Mbps service. 7.9% of households did not have any terrestrial fixed broadband provider offering 100/20 Mbps service. The figures in the text include fixed wireless services at 100/20 Mbps. If fixed wireless is excluded, then 49.8% of households had a choice of only one provider offering 100/20 Mbps, 34.9% of households had a choice of two providers offering these speeds, and only 5.1% of households had a choice of three or more providers offering 100/20 Mbps. We reach no conclusion as to whether, or how close, a substitute fixed wireless is for wireline fixed broadband, though we note that subscription rates for fixed wireless are only 4%, which may suggest that fixed wireless is not a close substitute for wireline fixed service at 100/20 Mbps. NCTA takes issue with the Commission's reliance on

these data, which represent the most recent Commission-analyzed competition data, claiming that the June 2023 Broadband Data Collection data demonstrate "existing competition is already sufficient to prevent open internet harms while it is driving increased investment and deployment." As discussed above, we do not rest our findings about BIAS providers' incentives and abilities to harm internet openness solely or even primarily on the competitive state of the marketplace, though to be sure, these incentives are influenced by a consumer's ability to switch to a competitive provider. In any event, even if we take NCTA's June 2023 data calculations at face value, we find that the incremental increases in competition do not meaningfully change our incentive and ability analysis. NCTA also submits that the Commission should account for wireless and low Earth orbit satellite providers in its competitive analysis. However, the Commission has consistently found that fixed and mobile broadband services are not full substitutes, and given the nascent availability of low Earth orbit satellite services, we find it is premature to make a determination regarding the potential substitutability of these services for fixed terrestrial service. Furthermore, with respect to NCTA's claims regarding the impact of future potential competition, we find that our analysis is best conducted based on the current state of the marketplace rather than speculation regarding future BIAS deployment. At the Commission's long-term speed goal of 1,000 Mbps download and 500 Mbps upload, 34.4% of households lived in areas with one provider of such service, 3.5% lived in areas with two providers, and only 0.2% lived in areas offering a choice of three or more providers. To report service availability at the long-term speed goal, the Commission uses BDC data reporting 940GB download and 500 Mbps upload. In most locations, end users also have access to satellite and mobile broadband services. However, the Commission has found that fixed and mobile broadband services are not full substitutes to each other and both services are necessary to ensure that all Americans have access to advanced telecommunications capability. Both have different service capabilities and use cases, and because these services are complements, and many consumers subscribe to both, which means that the incentives to degrade one of these services would not fully affect consumers' use of the other service. Further, the *2024 Section 706 Report* observed that satellite services have a

relatively low subscription rate despite their apparent widespread service availability, and satellite capacity limits the number of subscribers that can be served without service degradation.

462. Several commenters argue that the development of cellular FWA as an alternative to more traditional fixed BIAS is an example that broadband deployment, innovation, and competition are flourishing, and that the Commission's proposed rules are unnecessary. Cellular FWA, the subclass of FWA offered using 4G or 5G mobile technologies, is a relatively new residential fixed wireless broadband internet access service offered by nationwide providers AT&T, T-Mobile, and Verizon. As USTelecom notes, "[n]ew 5G fixed wireless offerings provide a competitive alternative to . . . wireline offerings." INCOMPAS and Free Press, conversely, suggest that claims of cellular FWA's competitive effects on the fixed BIAS market may be exaggerated, arguing that the fixed BIAS market is highly concentrated and requires open internet regulation. While Free Press acknowledges fixed wireless as a potential source of competition for home broadband, it argues in favor of the need to reclassify broadband as Title II "regardless of how competitive the market is." While we acknowledge the availability of cellular FWA as an alternative to wired home internet offerings, we note that the development of this technology—and any resulting impact on competition—is not sufficient by itself to outweigh our concerns regarding BIAS providers' incentives.

463. A second response to the argument that BIAS providers lack the incentive to engage in conduct that harms edge providers is that even where consumers face a choice among BIAS providers that are close substitutes, they likely face high switching costs. The record shows broad support for the relevance of switching costs in reducing the intensity of competition. Other commenters emphasize that competition among BIAS providers has reduced switching costs and increased customer choice options. While we recognize that these competitive forces may exist to lower switching costs for some consumers in some areas, many areas and groups remain for whom switching costs remain high. As the Commission explained in the *2015 Open Internet Order,* consumers may face "high upfront device installation fees; long-term contracts and early termination fees; the activation fee when changing service providers; and compatibility costs of owned equipment not working with the new service." In addition,

BIAS providers can use bundling strategies to increase switching costs.

464. Third, even where a BIAS provider degrades the quality of an edge provider's service to the extent that it is noticeable to the consumer, the consumer may not be able to determine whether the poor quality is due to the BIAS provider or to the edge provider. Consumers often lack the information needed to understand how the practices of their current BIAS provider may affect their user experience and are confused by the complexity of multifaceted pricing plans and discount offers. This uncertainty reduces consumers' willingness to switch, solidifying the gatekeeper position of BIAS providers, and weakening the checks provided by competing providers.

465. Another argument raised by opponents of open internet rules is that BIAS providers will not have the incentive to degrade or disadvantage edge providers to the extent that BIAS and edge services are complements. We find that this argument does not always hold. For example, if a BIAS provider is vertically integrated with a content provider or has a contractual relationship with an edge provider that competes directly against other edge providers, then the BIAS provider may have an incentive to block or degrade access to unaffiliated edge providers. Similarly, if a BIAS provider sees an edge provider as a potential future competitor in an upstream market, it may have the incentive to discriminate in providing access. Finally, each BIAS provider only accounts for how its actions impact its own profits and ignores the effect it has on other BIAS providers and the broader internet ecosystem. As a result, each individual BIAS provider's profit-maximizing decision, when aggregated across all BIAS providers, can be harmful. For example, an individual BIAS provider may find charging edge providers a small amount increases its profits. To the extent that charge leads edge providers to degrade output, the BIAS provider would only account for the impact on its own customers, but not the impact on customers of other BIAS providers. While the BIAS provider might use some of its revenue from the edge providers to compensate its own customers and negate the harm, other users of the edge providers' services would still be harmed by the charge. While the harm caused when a single BIAS provider takes such action may be small, all BIAS providers have an incentive to behave this way, substantially harming edge provision.

466. Opponents of the proposed open internet rules further argue that a supposed lack of examples of BIAS providers blocking or throttling edge content proves that such rules are not needed. We find this argument unpersuasive. As an initial matter, we note that open internet rules and active enforcement of such rules have been in effect nearly continuously in some form since 2010. Following the *RIF Order,* various states began enacting their own open internet rules, and given the national scope of many BIAS providers and services, such State rules provided at least some constraint on the ability of BIAS providers to engage in behavior that would harm internet openness. Indeed, AT&T abandoned its sponsored data plan that zero-rated affiliated DirecTV video as a direct result of the passage of the California open internet regulations. AT&T stated that, "[g]iven that the internet does not recognize state borders, the new law not only ends our ability to offer California customers such free data services but also similarly impacts our customers in states beyond California." As we explained above, BIAS providers continue to have strong incentives and the ability to favor some edge provider content and to discriminate against other content, especially when a BIAS provider is vertically integrated, or has contractual relationships, with edge provider content that competes with unaffiliated content. Therefore, the perceived lack of examples of BIAS providers engaging in practices that harm internet openness is more likely evidence in favor of the effectiveness of open internet regulation and enforcement rather than evidence of a lack of incentives for BIAS providers to engage in such activities.

467. However, there have been repeated cases of discriminatory conduct that often required Commission action to resolve and would likely be addressed by the rules we adopt in the Order. The record and independent research document a list of incidences, such as blocking, throttling, and other forms of conduct that harm edge providers. This includes the blocking by Madison River Communications of VoIP service provided by Vonage; the throttling and blocking of peer-to-peer (P2P) traffic by cable providers; the blocking of video calling on the Apple FaceTime app by AT&T; and, as discussed below, recent evidence that major BIAS providers are currently engaged in throttling. BIAS provider RCN settled a class action lawsuit related to its throttling of P2P traffic on its network. RCN denied any wrongdoing, but it acknowledged that in

order to ease network congestion, it targeted specific P2P applications. A 2008 study by the Max Planck Institute revealed significant blocking of BitTorrent applications in the United States. Comcast and Cox were both cited as examples of providers blocking traffic. AT&T initially restricted use of Apple's FaceTime application to times when the end user was connected to Wi-Fi and thus to another BIAS provider. In addition, there have been many instances over the past decade where BIAS providers changed the traffic that was requested by their users, including by redirecting search requests to websites chosen by the BIAS provider in exchange for payments; injecting JavaScript code into traffic, raising security concerns; adding unique tracking IDs to web requests, raising privacy concerns; and stripping email encryption requests, raising security and privacy concerns.

468. The *RIF Order* asserted that there are only a few examples of BIAS providers engaging in practices harmful to internet openness, and that proponents of the *2015 Open Internet Order* "relied on purely speculative threats." It argued that, in a holistic view, both BIAS and edge providers "are important drivers of the virtuous cycle" of investment and innovation, and that regulatory analysis must examine this two-sided market interaction. The *RIF Order* then concludes that, seen through a two-sided market lens, BIAS providers "face material competitive constraints." Furthermore, it contended that the terminating monopoly problem forces BIAS providers to compete for subscribers, thus creating downward price pressure for end users. Moreover, it claimed that smaller BIAS providers cannot exercise market power against large edge providers. Finally, the *RIF Order* argued that positive externalities associated with the general-purpose technology internet and their regulatory implications were not substantiated by commenters who supported the *2015 Open Internet Order*'s approach and thus considered their support of the application of Title II regulation to all BIAS providers "unreasonable and unreasoned."

469. As our analysis in this section shows, these arguments are not persuasive. Although it is correct that both BIAS and edge providers provide impetus for innovation, the interests of BIAS providers and edge providers often conflict with each other. BIAS providers have incentives to disadvantage competing edge providers and edge providers that might offer competing services in the future. And as

discussed above, even where end users have competitive choices, they generally face significant switching costs and often lack the ability to identify when their BIAS provider is degrading the quality of particular edge services. Consequently, even from a two-sided-market perspective, the interactions between each side of the market are not well aligned. Finally, externalities deserve serious consideration as they imply that the decentralized decisions of BIAS providers and edge providers can have undesirable sectoral outcomes, even when BIAS providers have no incentives to favor their own operations. For example, if a BIAS provider imposes an access fee on an edge provider, it is only considering the effect of such a charge on its own profits, and not the potential reduced edge provider innovation and investment caused by the new cost imposed on the edge provider. A BIAS provider's mere exploitation of its existing market power will reduce edge provider investment, a harm the BIAS provider will only account for to the extent it reduces its own profits, ignoring the damage to the broader internet ecosystem.

## 4. The RIF Order's Framework Is Insufficient To Safeguard and Secure the Open Internet

470. We find that framework in the *RIF Order* does not adequately protect consumers from the potential harms of BIAS provider misconduct. As discussed above, BIAS providers have the incentive and technical ability to engage in conduct that undermines the openness of the internet. In 2018, when the Commission repealed the open internet conduct rules, the Commission asserted that a modified transparency rule, combined with the effects of competition, would prevent BIAS provider conduct that might threaten the internet's openness. Notwithstanding this conclusion, the Commission found that "[i]n the unlikely event that ISPs engage in conduct that harms internet openness," preexisting antitrust and consumer protection laws will protect consumers. In the *RIF Order,* the Commission further found that even if the conduct rules adopted by the Commission in 2015 provided "any additional marginal deterrence," those benefits were not worth the costs. We believe that this framework is insufficient to safeguard and secure the open internet.

471. While the D.C. Circuit found the *RIF Order*'s framework to represent a reasonable policy view, the court was skeptical of the Commission's analysis. Even while upholding the Commission's reliance on consumer protection and

antitrust law to protect the open internet in *Mozilla,* the court observed that the *RIF Order's* "discussion of antitrust and consumer protection law is no model of agency decisionmaking." As the court explained, although "[t]he Commission theorized why antitrust and consumer protection law is preferred to *ex ante* regulations [it] failed to provide any meaningful analysis of whether these laws would, in practice, prevent blocking and throttling." Consequently, although "the Commission opine[d] that '[m]ost of the examples of net neutrality violations discussed in the [*2015 Open Internet Order*] could have been investigated as antitrust violations,'" the *RIF Order* "fail[ed] to explain what, if any, concrete remedies might address these antitrust violations." The court found it "concerning that the Commission provide[d] such an anemic analysis of the safety valve that it insists will limit anticompetitive behavior among broadband providers."

472. Consistent with the D.C. Circuit's skepticism of the *RIF Order's* approach, we find that the consumer protection and antitrust laws, even combined with transparency requirements, are insufficient to protect against blocking, throttling, and other conduct that harms the open internet. We believe that the approach we adopt in the Order, based on the *2015 Open Internet Order,* is consistent with a light-touch regulatory framework to protect internet openness. Even while upholding the *RIF Order,* the D.C. Circuit was "troubled by the Commission's failure to grapple with the fact that, for much of the past two decades, broadband providers were subject to some degree of open internet restrictions," and we aim to return to the Commission understanding that existed from the 2005 *Internet Policy Statement* through the repeal of the *2015 Open Internet Order* in 2017.

473. As an initial matter, we find the *RIF Order's* reliance on transparency as a deterrent for problematic practices to be insufficient to protect consumers and edge providers from BIAS provider misconduct. We affirm our tentative conclusion from the *2023 Open Internet NPRM* that there are types of conduct, such as blocking, throttling, and traffic discrimination, that require *ex ante* intervention to prevent their occurrence in the first instance. We agree with those commenters that argue it is not enough for the Commission to require that BIAS providers disclose their policies on these network practices in the commercial terms of their service offerings because it does not restrict BIAS providers from engaging in harmful behavior. We conclude that a comprehensive set of conduct rules,

which includes a transparency element, is required to protect consumers from harmful BIAS provider conduct, and that the open internet rules we adopt in the Order, including bright-line rules, are necessary to safeguard and secure the open internet. As discussed above, we find that: (1) BIAS providers may have the incentive to engage in conduct that harms edge providers and the open internet even where they lack market power over end users; and (2) contrary to the claims of some commenters, there have been several instances of conduct that the Commission felt a need to address and correct, despite the fact that there were open internet rules in place.

474. Furthermore, based on the record in this proceeding, we find that the *RIF Order's* reliance on the DOJ and the FTC for enforcement of the consumer protection and antitrust laws is unlikely to provide sufficient deterrence to BIAS providers from engaging in conduct that may harm consumers, edge providers, and the open internet. Both the DOJ and the FTC have authority to enforce the Federal antitrust laws, and particularly sections 1 and 2 of the Sherman Act. Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . , or conspiracy in restraint of trade . . . among the several States," while section 2 prohibits monopolization, attempts to monopolize, or combinations or conspiracies to monopolize "any part of the trade or commerce among the several States." In the *2010* and *2015 Open Internet Orders,* the Commission found that it was necessary to adopt certain rules to protect the openness of the internet and that sole reliance on enforcement of the antitrust laws by the DOJ and FTC was insufficient to protect edge providers, consumers, and the open internet. In the *RIF Order,* the Commission reconsidered and concluded that conduct that harms the openness of the internet was unlikely, and that other legal regimes—particularly antitrust law and section 5 of the Federal Trade Commission Act (FTC Act)—were sufficient to protect consumers.

475. We disagree with commenters who argue that existing consumer protection and antitrust laws provide adequate protection against the harms the open internet rules we adopt in the Order seek to prevent. To begin with, the FTC's section 5 authority does not apply to "common carriers subject to" the Communications Act, so if BIAS providers are properly classified as common carriers, section 5 does not apply at all. With respect to antitrust oversight, it is not clear that all conduct that could harm consumers and edge providers would constitute an "unfair

method of competition" under section 5 of the FTC Act or a violation of section 1 or 2 of the Sherman Act. The FTC goes on to explain that conduct that violates section 5 includes practices "deemed to violate the antitrust laws," "conduct deemed to be an incipient violation of the antitrust laws," and "conduct that violates the spirit of the antitrust laws," but none of the examples cited by the FTC clearly address the types of conduct the open internet rules seek to prohibit. For example, if a vertically integrated BIAS provider blocked or throttled the content of a particular edge provider with which it competed in the content market, it is not clear whether such conduct would constitute a violation of section 2 of the Sherman Act. It is well settled that there are two elements to the offense of unlawful monopolization under section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." As the Commission has repeatedly explained, however, it is not necessary for a BIAS provider to have "market power with respect to end users" for it to be able to engage in conduct that harms edge providers, the open internet, and consumers. This conclusion was accepted and affirmed by the D.C. Circuit in *Verizon,* where it stated:

Broadband providers' ability to impose restriction on edge providers does not depend on their benefiting from the sort of market concentration that would enable them to impose substantial price increases on end users—which is all the Commission said in declining to make a market power finding. . . . Rather, broadband providers' ability to impose restriction on edge providers simply depends on end users not being fully responsive to the imposition of such restrictions.

Thus, section 2 of the Sherman Act will not provide adequate protection, at least in cases where the BIAS provider lacks monopoly power over its end user customers. In *Mozilla,* the D.C. Circuit reiterated its concern about the insufficiency of the *RIF Order's* reliance on antitrust law, explaining that the *RIF Order* "fail[ed] to explain what, if any, concrete remedies might address these antitrust violations." As such, while the Sherman Act may complement the rules we adopt in the Order, it would not be sufficient on its own to protect edge providers, consumers, and the open internet.

476. Similarly, it is not clear that all conduct that harms edge providers,

consumers, and the open internet would necessarily violate section 5 of the FTC Act's prohibition on "unfair or deceptive acts or practices" even while BIAS providers are not classified as common carriers and thus are subject to the FTC Act. Whether an act is unfair or deceptive under consumer protection law each depends on its own subjective test. Commenters argue that the FTC is a more appropriate enforcer of open internet principles, emphasize that the FTC has the authority to enforce BIAS provider pledges and commitments not to block, throttle, or otherwise harm consumers. But these commenters do not address whether the FTC would have any enforcement authority with respect to a BIAS provider that does not make affirmative pledges or commitments. Nor is it clear how the FTC would rule should a BIAS provider engage in other types of conduct that do not amount to blocking or throttling, but that nevertheless harm edge providers and the open internet. As such, we disagree that consumer protection law is adequate to protect the open internet.

477. We also find that there are significant advantages to adopting *ex ante* bright-line rules compared with relying on an *ex post* case-by-case approach, the latter of which is necessary for the DOJ and FTC. First, *ex ante* bright-line rules can reduce regulatory uncertainty and provide better guidance to BIAS providers, edge providers, and end users. In the antitrust context, the U.S. Supreme Court has created certain *per se* rules that prohibit particular types of conduct. It has described this *per se* approach as "reflect[ing] broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful." Where, as here, however, no commenter claims that the blocking or throttling of a specific edge-provider's lawful content will increase consumer or social welfare, we find it reasonable and efficient to adopt a bright-line prohibition. In contrast, *ex post* case-by-case enforcement like that under the FTC and DOJ involves greater expense, longer delays in prosecuting enforcement actions, and greater uncertainty as to which types of conduct are allowed or proscribed.

478. We further find that the oversight and enforcement elements of the *RIF Order's* framework likely do not provide consumers a meaningful opportunity to obtain relief. The primary means by which the *RIF Order* suggests consumers might seek redress for harmful BIAS provider conduct is to submit complaints to the FTC, with the hope that the complaint might spark an

agency investigation. The *Mozilla* court criticized the *RIF Order's* reliance on antitrust and consumer protection law. Moreover, the Supreme Court's decision in *AMG Capital Management* v. *Federal Trade Commission* restricted the FTC's ability to seek monetary relief on behalf of consumers. Finally, while the Commission also suggested that consumers could seek non-legal forms of relief by switching to an alternative BIAS provider and bringing public attention to the BIAS provider conduct at issue to influence that provider into changing its behavior, we find that there may be high costs associated with trying to switch providers. While some of these options may provide relief for some subset of consumers, overall, they are far from widely available. As part of arguments opposing the re-adoption of internet conduct rules, some commenters highlight the example of a small ISP in the Pacific Northwest as positive proof that consumer backlash can prevent violations of open internet principles. In this circumstance, a small BIAS provider announced that it would block access to social media sites that had permanently banned the former president. After public criticism, the BIAS provider backtracked. We do not doubt that transparency plays an important role in policing BIAS provider behavior, as this example demonstrates. However, we observe that this particular situation involves an important public figure and some of the largest social media companies in the country. It is not clear that a situation that did not involve some of the largest figures in the country would gain the same type of traction with the public, and a smaller edge provider would not be in the same position as those in this example to draw attention to the behavior. This lack of predictability makes reliance on transparency an uncertain course for consumers to obtain relief. As discussed above, the D.C. Circuit expressed concern that the *RIF Order* "failed to provide any meaningful analysis of whether [antitrust and consumer protection] laws would, in practice, prevent blocking and throttling." Furthermore, the harms contemplated in section V.A.3 may not always be observable to the average consumer.

479. Finally, we agree with Public Knowledge that "Congress correctly identified that telecommunications services require sector-specific rules from an expert regulator: the FCC." To the extent that the conduct complained of does not involve a violation of a bright-line rule, as with enforcement under the Sherman Act and to the

extent that section 5 of the FTC Act might apply, it seems inefficient to place enforcement responsibility with generalist agencies rather than with the FCC, which possesses the technical and market knowledge and expertise concerning communications and broadband technologies. Indeed, the common carrier exception in section 5 of the FTC Act appears to presume that telecommunications carriers should instead be principally governed by sector-specific FCC rules. Moreover, because the FCC is constantly monitoring the telecommunications markets that it is charged with regulating, it is more likely to detect and deter conduct that harms the open internet. Finally, the FCC is better placed to enforce open internet rules and such violations where remedying harmful conduct is likely to require ongoing monitoring and supervision by the expert agency's enforcement oversight. Thus, we reaffirm our belief that the Commission, as the expert agency on communications, is best positioned to safeguard internet openness. In the *RIF Order,* the Commission removed its own authority to enforce open internet requirements, leaving the responsibility of addressing harmful BIAS provider conduct to the FTC. The current Chair of the FTC has recognized the need for the Commission's critical oversight. In remarks released in 2021, Chair Lina M. Khan noted that "the Federal Communications Commission has the clearest legal authority and expertise to fully oversee internet service providers." She continued that she "support[s] efforts to reassert [the FCC's] authority and once again put in place the nondiscrimination rules, privacy protections, and other basic requirements needed to create a healthier market." In response to the *2023 Open Internet NPRM,* several commenters agreed, arguing that the Commission's general expertise is needed.

## B. Rules To Safeguard and Secure the Open Internet

### 1. Bright-Line Rules

480. The record in this proceeding is rife with support for the reinstatement of strong, enforceable open internet rules to prohibit BIAS providers from blocking, throttling, or engaging in paid or affiliated prioritization arrangements. Without rules in place to safeguard and secure the open internet, the incentives BIAS providers have to act in ways that are harmful to investment and innovation threaten both broadband networks and edge content, as the D.C.

Circuit has recognized. We find that a safe, secure, and open internet is too important to consumers and innovators to leave unprotected. As in 2015, we believe that conduct-based rules targeting specific practices are necessary, and accordingly adopt bright-line rules to prohibit blocking, throttling, and paid prioritization by providers of both fixed and mobile BIAS. For the reasons described below, we find each of these practices inherently unjust and unreasonable, in violation of section 201(b) of the Act, and that these practices threaten the virtuous cycle of innovation and investment.

481. We disagree with commenters that assert that reinstatement of conduct rules is unnecessary because BIAS providers have not engaged in widespread blocking or throttling of traffic since the elimination of the conduct rules in 2018. As an initial matter, there exists evidence—as well as numerous consumer allegations—that BIAS providers have not refrained from this conduct. Contrary to industry assertions claiming that rules are unnecessary because *YourT1Wifi.com* reversed its policy, we do not believe that consumers should have to rely on public outcry alone to be able to reach all content of their choosing. The Commission has received nearly 40,000 consumer complaints since adoption of the *RIF Order* raising speed, throttling, open internet, and data cap concerns. Some consumers assert, for example, that certain video traffic was throttled by their BIAS provider, as demonstrated by the fact that VPN-masked video traffic had no similar issues. We make no determinations regarding the allegations in these complaints in the Order. To the extent that some BIAS providers have acted consistently with open internet principles, we agree with Netflix and Mozilla that the combination "of individual state laws and a pending regulatory proceeding disincentivized ISPs from undermining the open internet." In any event, we find that it is not acceptable for consumers to be beholden to the voluntary whims of their BIAS provider or be selectively protected depending on the State in which they live or the size of their provider, nor is it sufficient to promote innovation among edge providers. As we explain throughout this section, there is nothing in the record that convinces us that customers of small BIAS providers are entitled to less protection than customers of large BIAS providers. Nor do we find that imposition of these open internet rules on small BIAS providers will be so

burdensome as to justify a six-month or one-year delay in implementation for these providers (except where we provide a temporary exemption for certain of the transparency rule requirements, as discussed below), particularly given that ACA Connects itself indicates that small BIAS providers are already complying with the open internet principles. We are similarly not convinced of the need for a FNPRM, as requested by WISPA, examining, among other things, whether the "Regulatory Flexibility Act requires the Commission to exempt small BIAS providers from the rules" and the "costs to comply with all of the regulatory obligations the Commission has imposed on BIAS providers over the past two years," and "propos[ing] to permanently exempt small providers from the bright line rules, the general conduct rule, and the new transparency requirements." The Commission sought comment on the effect of the proposed rules and policies on small entities in the *2023 Open Internet NPRM* and the accompanying Initial Regulatory Flexibility Analysis. The Commission has carefully considered these impacts in adopting the requirements in the Order, and as such, a FNPRM examining these issues is not necessary. In adopting strong, enforceable open internet rules, we will ensure a safe and open internet for all consumers nationwide and promote innovation that fuels the virtuous cycle.

a. Preventing Blocking of Lawful Content, Applications, Services, and Non-Harmful Devices

482. We reinstate a bright-line rule prohibiting BIAS providers from blocking lawful content, applications, services, or non-harmful devices. This "no-blocking" principle has long been a cornerstone of the Commission's policies. While first applied in the internet context as part of the Commission's *Internet Policy Statement,* the no-blocking concept dates back to the Commission's protection of end users' rights to attach lawful, non-harmful devices to communications networks. We continue to find, as the Commission has previously, that "the freedom to send and receive lawful content and to use and provide applications and services without fear of blocking continues to be essential to the internet's openness." Because of BIAS providers' potential incentives to block edge providers' content in certain circumstances, the need to protect a consumer's right to access lawful content, applications, services, and to use non-harmful devices is as important today as it was when the Commission

adopted the first no-blocking rule in 2010. Consistent with our proposal, we reinstate the no-blocking rule, which is widely supported in the record, providing that a person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

483. Consistent with the 2015 no-blocking rule, the phrase "content, applications, and services" refers to all traffic transmitted to or from end users of a broadband internet access service, including traffic that may not fit cleanly into any of these categories. The no-blocking rule applies to transmissions of lawful content only and does not prevent or restrict a BIAS provider from refusing to transmit unlawful material, such as child pornography or copyright-infringing materials. The no-blocking rule also entitles end users to connect, access, and use any lawful device of their choice, provided that the device does not harm the network. The no-blocking rule prohibits network practices that block a specific application or service, or any particular class of applications or services, unless it is found to be reasonable network management. Finally, as with the 2010 and 2015 no-blocking rules, this document's no-blocking rule prohibits BIAS providers from charging edge providers a fee to avoid having edge providers' content, services, or applications blocked from reaching BIAS providers' end-user customers.

484. We agree with the Free State Foundation that, "[b]y offering subscribers access to whatever lawful internet content they want, broadband ISPs enhance the perceived value of their services and thereby increase demand, subscribership, and opportunities for financial returns and profits." Further, we expect that provider costs for compliance with the no-blocking rule will be minimal, given that many BIAS providers have continued to comply with the no-blocking rule even after its repeal in 2018, and that providers themselves assert that they have every incentive not to block traffic.

b. Preventing Throttling of Lawful Content, Applications, Services, and Non-Harmful Devices

485. Consistent with our proposal, we reinstate a separate bright-line rule prohibiting BIAS providers from impairing or degrading lawful internet traffic on the basis of content, application, service, or use of non-harmful device—conduct that was

prohibited under the commentary to the no-blocking rule adopted in the *2010 Open Internet Order,* and that the Commission explicitly prohibited in 2015. We use the term "throttling" to refer to conduct that is not outright blocking, but that inhibits the delivery of particular content, applications, or services, or particular classes of content, applications, or services.

486. We adopt the following no-throttling rule applicable to BIAS providers, which tracks the language of the Commission's *2015 Open Internet Order,* providing that a person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not impair or degrade lawful internet traffic on the basis of internet content, application, or service, or use of a non-harmful device, subject to reasonable network management.

487. With the no-throttling rule, we ban conduct that is not outright blocking, but inhibits the delivery of particular content, applications, or services, or particular classes of content, applications, or services. Likewise, we prohibit conduct that impairs or degrades lawful traffic to a non-harmful device or class of devices. We interpret this prohibition to include, for example, any conduct by a BIAS provider that impairs, degrades, slows down, or renders effectively unusable particular content, services, applications, or devices, that is not reasonable network management. Our interpretation of "throttling" encompasses a wide variety of conduct that could impair or degrade an end user's ability to access content of their choosing. We clarify that a BIAS provider's decision to speed up "on the basis of internet content, applications, or services" would "impair or degrade" other content, applications, or services which are not given the same treatment. For purposes of this rule, "content, applications, and services" has the same meaning given to this phrase in the no-blocking rule. Like the no-blocking rule, BIAS providers may not impose a fee on edge providers to avoid having the edge providers' content, service, or application throttled. Further, transfers of unlawful content or unlawful transfers of content are not protected by the no-throttling rule. As in past *Orders,* we continue to recognize that in order to optimize end-user experience, BIAS providers must be permitted to engage in reasonable network management practices. We note, however, that the record reflects that "[t]here are many factors that limit video impact, including the fact that video providers use adaptive bitrates to select video resolution (bitrates) according to available bandwidth, they use congestion-control algorithms while transmitting, and network providers expanded network capacity during the COVID lockdown era."

488. Because our no-throttling rule addresses instances in which a BIAS provider targets particular content, applications, services, or non-harmful devices, it does not address the practice of slowing down or speeding up an end user's connection to the internet based on a choice clearly made by the end user. For example, a BIAS provider may offer a data plan in which a subscriber receives a set amount of data at one speed tier and any remaining data at a lower tier. We note that user-selected data plans with reduced speeds must comply with our transparency rule, such that the limitations of the plan are clearly and accurately communicated to the subscriber. If there were internet openness concerns with the particulars of a data plan, the Commission could undertake a review under the general conduct standard, discussed below. In contrast, if a BIAS provider degraded the delivery of a particular application or class of application, it would violate the bright-line no-throttling rule. Further, consistent with the *2015 Open Internet Order,* the no-throttling rule also addresses conduct that impairs or degrades content, applications, or services that might compete with a BIAS provider's affiliated content. For example, if a BIAS provider and an unaffiliated entity both offered over-the-top applications, the no-throttling rule would prohibit the BIAS provider from constraining bandwidth for the competing over-the-top offering to prevent it from reaching the BIAS provider's end user in the same manner as the affiliated application.

489. We agree with the Information Technology Industry Council that the no-throttling rule "ensures the internet remains a vibrant platform for any individual, startup, or company to provide new, innovative, and competitive offerings without needing to worry that access to their offerings may be blocked or degraded for anticompetitive purposes." Because we find that BIAS providers have the incentive and ability to throttle or otherwise interfere with traffic of competing content providers, we conclude that a bright-line rule prohibiting throttling, subject to reasonable network management, is necessary. Further, we believe that the bright-line rule we adopt in the Order to protect consumers' right to access lawful internet traffic of their choice without impairment or degradation will not impose significant compliance burdens or costs, particularly given that many BIAS providers continue to advertise on their website that they do not throttle traffic except in limited circumstances. Finally, we disagree with commenters that argue that concerns about throttling lack persuasiveness, citing the datedness of examples provided in the record. Professor David Choffnes explains that data show that "nearly every cellular provider that offers mobile BIAS in the US throttles at least one video streaming service," explaining that there is "direct empirical evidence that ISPs in the US . . . [use] special networking equipment called middleboxes that inspect the contents of our network traffic to make guesses as to what application is being used, and then potentially limit the bandwidth available to that application in response." While we do not rely on these findings as justification for the no-throttling rule, they remain instructive regarding BIAS providers' technical ability to throttle traffic.

### c. No Paid or Affiliated Prioritization

490. We reinstate the prohibition on paid or affiliated prioritization practices, subject to a narrow waiver process. In the *2023 Open Internet NPRM,* the Commission proposed to reestablish a ban on arrangements in which a BIAS provider accepts consideration (monetary or otherwise) from a third party to manage its network in a manner that benefits particular content, applications, services, or devices, or manages its network in a manner that favors the content, applications, services, or devices of an affiliated entity. The Act defines "affiliate" as "a person that (directly or indirectly) owns or controls, is owned or controlled by, or is under common ownership or control with, another person. For purposes of this paragraph, the term 'own' means to own an equity interest (or the equivalent thereof) of more than 10 percent." After consideration of the record, we conclude that paid prioritization network practices harm consumers, competition, and innovation, as well as create disincentives to promote broadband deployment and, as such, we reinstate a bright-line rule prohibiting such practices.

491. We adopt the following paid prioritization rule applicable to BIAS providers, which tracks the language of the Commission's *2015 Open Internet Order,* providing that a person engaged in the provision of broadband internet access service, insofar as such person is engaged, shall not engage in paid prioritization. "Paid prioritization" refers to the management of a broadband provider's network to directly or

indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity.

492. We find that the same concerns present in 2015 remain true in the Order, that preferential treatment arrangements have the potential to create a chilling effect, disrupting the internet's virtuous cycle of innovation, consumer demand, and investment. While small BIAS providers argue that they have neither the incentive nor market power to limit access to edge provider applications, services, and devices, and "reciprocally to control or limit edge provider access to their small customer bases," for the reasons we describe below we find it appropriate to establish a bright-line rule applicable to all BIAS providers in order to provide certainty to BIAS and edge providers alike. In the *2023 Open Internet NPRM,* we tentatively concluded that, absent open internet rules, BIAS providers might engage in practices that "could unravel the virtuous cycle" and that there are "far more edge services that are small . . . which the *RIF Order* does not acknowledge or evaluate." We sought comment on these tentative conclusions and on whether small edge providers had any leverage in negotiations with BIAS providers and on whether BIAS providers "seeking paid prioritization arrangements . . . would disproportionately harm small edge providers. As discussed above, we find, in general, that BIAS providers have the incentive and ability engage in conduct that harms edge providers, particularly small edge providers. Based on the record and related research on competition in vertically related markets, we find more specifically that forms of paid and affiliate prioritization can be used by BIAS providers in ways that may harm edge providers and edge innovation. In particular, BIAS providers may use paid or affiliated prioritization to raise the costs of edge providers that compete with their vertically integrated edge affiliates or with edge providers with whom they have a contractual arrangement. In addition, if BIAS providers can profitably charge edge providers for prioritized access, they may have an incentive to strategically degrade, or decline to maintain or increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access. Thus, BIAS

providers might withhold or decline to expand capacity in order to "squeeze" and degrade nonprioritized traffic, thus increasing network congestion. These types of conduct create competitive disadvantages for unaffiliated edge providers. Other things being equal, they increase the costs of innovation for edge providers and reduce the number of innovation experiments. In turn, this will likely decrease the rate of edge and network innovation.

493. The Commission has previously found it well established that BIAS providers have both the incentive and the ability to engage in paid prioritization. In its *Verizon* opinion, the D.C. Circuit noted the powerful incentives BIAS providers have to accept fees from edge providers in return for excluding their competitors or for granting prioritized access to end users. The record reflects commenter concerns regarding preferential treatment arrangements, with many advocating for a flat ban on paid prioritization. Commenters argue, for example, that permitting paid prioritization will result in a two-tiered internet, with a "fast" lane for those willing and able to pay, and a "slow" lane for everyone else. Other commenters argue that paid prioritization will distort the market; harm competition, consumers, edge providers (particularly small edge providers), and free expression; and discourage innovation. The American Library Association also expressed concern that permitting paid prioritization would also disadvantage "non-profit or public interest entities such as libraries and other public institutions that often operate under very tight budgets."

494. Our concerns regarding paid prioritization are compounded by the fact that documenting the harms could prove challenging, as it is impossible to identify small businesses and new applications that are stifled before they become commercially viable. We are also concerned that the widespread use of paid prioritization practices would cause damage to internet openness that would be difficult to reverse. As we noted in the *2023 Open Internet NPRM,* we find it encouraging that some BIAS providers continue to advertise that they do not engage in paid or affiliated prioritization practices. As with our no-blocking and no-throttling bright-line rules, however, we continue to believe that the potential harm to the open internet is too significant to rely on promises from BIAS providers because "the future openness of the internet should not turn on the decision[s] of a particular company."

495. The record reflects some positive use cases of paid prioritization, and conversely, some costs associated with a ban on such practices. For example, ADTRAN asserts that "requiring free prioritization ignores the costs that are incurred in enabling that service and encourages over-consumption," and also highlights uses of paid prioritization in other settings. The International Center for Law and Economics emphasizes the importance of prioritization when congestion is detected on the network. While we do not discount the potential benefits of paid prioritization, we remain convinced that the potential harms to consumers and the open internet outweigh any speculative benefits.

496. As in 2015, we find that there are advantages to adopting a bright-line rule prohibiting paid prioritization. For one, we believe it will protect consumers against a harmful practice that may be difficult to understand, even if disclosed. In addition, this approach relieves small edge providers, innovators, and consumers of the burden of detecting and challenging instances of harmful paid prioritization. Prohibiting paid prioritization outright will also likely help foster broadband network investment by setting clear boundaries of acceptable and unacceptable behavior. Thus, we find it most appropriate to adopt a bright-line rule banning paid prioritization arrangements, while entertaining waiver requests under limited circumstances. Consistent with the *2015 Open Internet Order* and the record, we clarify that the ban on paid prioritization does not restrict the ability of a BIAS provider to enter into an agreement with a CDN to store content locally within the BIAS provider's network.

497. Under the Commission's longstanding waiver rule, the Commission may waive any rule in whole or in part, for good cause shown. A general waiver of the Commission's rules is only appropriate if special circumstances warrant a deviation from the general rule and such a deviation will serve the public interest. In 2015, the Commission found that it was appropriate to adopt specific rules concerning the factors that it will use to examine a waiver request of the paid prioritization ban, and we proposed to adopt a waiver rule for the paid prioritization ban consistent with the *2015 Open Internet Order.* We conclude that it remains appropriate to accompany a rule prohibiting paid prioritization arrangements with specific guidance on how the Commission would evaluate subsequent waiver requests.

498. Accordingly, we adopt a rule concerning waiver of the paid prioritization ban that establishes a balancing test, consistent with our proposal, providing that the Commission may waive the ban on paid prioritization only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the internet.

499. In accordance with the framework established in 2015, applicants seeking a waiver of the paid prioritization ban will be required to make two related showings. First, the applicant must demonstrate that the practice will have some significant public interest benefit. The applicant can make such a showing by providing evidence that the practice furthers competition, innovation, consumer demand, or investment. Second, the applicant must demonstrate that the practice does not harm the open nature of the internet, including, but not limited to, providing evidence that the practice: (i) does not materially degrade or threaten to materially degrade the BIAS of the general public; (ii) does not hinder consumer choice; (iii) does not impair competition, innovation, consumer demands, or investment; and (iv) does not impede any forms of expression, types of service, or points of view. An applicant seeking waiver relief under this rule faces a high bar. We anticipate approving such exemptions only in exceptional cases.

500. We disagree with commenters that assert that delays associated with the waiver process will deter investment and innovation in prioritization services. As an initial matter, we find that prioritization services themselves generally deter investment and innovation. In any event, the Commission has shown itself capable of handling a variety of different types of waiver requests on a timely basis, so assertions about delay are speculative at this juncture. We also disagree with the parties that suggest the waiver process we re-adopt in the Order provides insufficient guidance to potential waiver applicants. We are not merely relying on the Commission's general longstanding waiver standard and instead provide specific factors that the Commission will evaluate in considering such waiver requests, which, for instance, provide guidance on how a party might show a "public benefit" or show how the conduct "does not harm the open nature of the internet."

### 2. General Conduct Rule

501. In addition to the three bright-line rules, we also reinstate a no-unreasonable interference/disadvantage standard, under which the Commission can prohibit practices that unreasonably interfere with the ability of consumers or edge providers to select, access, and use BIAS to reach one another, thus causing harm to the open internet. This no-unreasonable interference/disadvantage general conduct standard will operate on a case-by-case basis, applying a non-exhaustive list of factors, and is designed to evaluate other current or future BIAS provider policies or practices—not covered by the bright-line rules—and prohibit those that harm the open internet. Our prohibitions on blocking, throttling, and paid prioritization are critical to protecting and promoting the open internet, and we expect that these bans will prevent many of the harms identified above. We conclude, however, as the Commission found in 2015, that the Commission needs a mechanism to enable it to respond to attempts by BIAS providers to wield their gatekeeper power in ways that might otherwise compromise the open internet. In other words, the general conduct rule is a necessary backstop to ensure that BIAS providers do not find a technical or economic means to evade the bright-line prohibitions on blocking, throttling, and paid prioritization.

502. In the *2023 Open Internet NPRM,* we proposed adopting a general conduct rule that tracks the language and approach that the Commission adopted in the *2015 Open Internet Order.* We sought comment on our analysis that a general conduct rule is still needed to operate as a catch-all backstop to the three bright-line prohibitions we proposed, and on the need and characteristics of any potential modifications we should make to the version of the rule that the Commission had previously adopted, if commenters deemed such a rule necessary. We also sought comment on the accuracy of the *RIF Order*'s critiques that the general conduct rule was "vague and ha[d] created regulatory uncertainty in the marketplace hindering investment and innovation," and steps the Commission might take to increase BIAS providers' understanding of potentially prohibited practices under a re-adopted rule.

503. The Commission has long identified the need to protect consumers and edge providers from discriminatory conduct by BIAS providers. In 2010, the Commission enshrined this goal in a no-unreasonable discrimination rule that enabled the Commission to evaluate, on a case-by-case basis, the conduct of fixed BIAS providers based on a number of factors. At the time, the *2010 Open Internet Order* exempted mobile BIAS providers from the anti-discrimination rule. When challenged, the D.C. Circuit accepted the Commission's underlying policy rationale for the regulations in the *2010 Open Internet Order,* including its nondiscrimination rule; however, the court vacated the Commission's anti-discrimination and no-blocking rules for imposing *de facto* common carrier status on BIAS providers in violation of the Commission's then-classification of BIAS as an information service. In 2015, when the Commission reclassified BIAS as a telecommunications service, it adopted a revised general conduct rule that was designed to prevent BIAS providers from unreasonably interfering with, or disadvantaging, consumers' ability to reach the internet content, services, and applications of their choosing or edge providers' ability to access consumers using the internet. The D.C. Circuit subsequently upheld the *2015 Open Internet Order* in full, including the Commission's new no-unreasonable interference/disadvantage standard (*i.e.,* the 2015 general conduct rule).

504. We agree with the goals of the Commission's previous nondiscrimination and general conduct rules, and we conclude that such a rule is still needed as a backstop to the bright-line prohibitions on blocking, throttling, and paid prioritization to protect the open nature of the internet. Accordingly, we adopt the following general conduct rule to address unreasonable discrimination, providing that any person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage (a) end users' ability to select, access, and use broadband internet access service or the lawful internet content, applications, services, or devices of their choice, or (b) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule.

For the purposes of this rule, we define "edge provider" as "any individual or entity that provides any content, application, or service over the internet, and any individual or entity that provides a device used for accessing any content, application, or service over the internet." And we define "end user" as "any individual or entity that uses a broadband internet access service." Consistent with the Commission's guidance in 2015, we note that the general conduct standard we adopt in the Order "represents our

interpretation of sections 201 and 202 in the broadband internet access context and, independently, our interpretation—upheld by the *Verizon* court—that rules to protect internet openness promote broadband deployment via the virtuous cycle under section 706 of the 1996 Act.''

505. We find that this rule is necessary to protect the ability of consumers and edge providers to use the open internet for several reasons. First, we agree with the American Civil Liberties Union and other commenters that the rule will allow the Commission to respond to harmful conduct not easily categorized as blocking, throttling, or paid prioritization. Second, because of the ''constantly evolving nature of technologies underlying the internet ecosystem,'' it is difficult to predict all of the practices that might harm the openness of the internet, and we agree with those commenters, such as the Ad Hoc Telecom Users Committee and Cloudflare, who argue that the Commission needs flexibility to address consumer and competitive harms as technology evolves. And third, the general conduct rule will provide the Commission a means of addressing BIAS providers that develop policies and practices that evade the bright-line prohibitions. As Professor Jon Peha notes, even with the adoption of the bright-line rules, BIAS providers would still have the incentive to act as gatekeepers.

506. Consistent with our proposal, we adopt a case-by-case approach that will consider the totality of the circumstances when analyzing whether conduct satisfies the general conduct standard to protect the open internet. We endeavor to maintain an internet ecosystem that balances the Commission's ability to protect consumers and edge providers from harmful conduct, while still allowing BIAS providers the flexibility and encouragement to develop new technologies and business practices. We conclude, based on the record before us, that evaluating potential conduct on a case-by-case basis will allow the Commission to respond to emerging practices that may harm the open nature of the internet while enabling BIAS providers to offer innovative services that keep pace with evolving technology and business practices. We make clear that the general conduct rule is not an attempt to institute any form of rate regulation; nor is it an attempt by the Commission to expand our bright-line conduct rules in an indeterminate manner. The general conduct rule is designed to operate as a backstop to the Commission's prohibitions on blocking, throttling, and paid prioritization to address, on a case-by-case basis, practices that may harm the open nature of the internet.

507. To provide guidance to BIAS providers regarding the application of the general conduct rule, we adopt a non-exhaustive list of factors that we will consider to aid in our analysis. These factors include: (i) whether a practice allows end-user control and enables consumer choice; (ii) whether a practice has anticompetitive effects in the market for applications, services, content, or devices; (iii) whether a practice affects consumers' ability to select, access, or use lawful broadband services, applications, or content; (iv) the effect a practice has on innovation, investment, or broadband deployment; (v) whether a practice threatens free expression; (vi) whether a practice is application agnostic; and (vii) whether a practice conforms to best practices and technical standards adopted by open, broadly representative, and independent internet engineering, governance initiatives, or standards-setting organizations. Consistent with the *2015 Open Internet Order*, we note that in addition to this list, there may be other considerations relevant to determining whether a particular practice violates the no-unreasonable interference/ disadvantage standard. We decline to adopt the New York State School Boards Association's proposal that we adopt an additional factor that ''weighs whether a practice will inhibit the ability of educational institutions to provide educational materials to students.'' We believe that the educational access concerns raised are adequately covered by the existing ''free expression'' and ''consumer ability to access'' factors or could be considered on a case-by-case basis as needed.

508. When the D.C. Circuit upheld the general conduct rule as adopted in the *2015 Open Internet Order*, it recognized the need to build flexibility into the rule. The court noted that, if regulations were too specific, it would open up large loopholes, a concern that the court observed was especially applicable because of the speed at which broadband technology evolves. We conclude that evaluating potential conduct against these factors will allow BIAS providers to ''reasonably discern whether certain practices would violate the rule,'' and that ''having clear standards for evaluation of questionable behavior in the form of the general conduct factors . . . will permit more rapid resolution of potentially harmful practices.'' To address concerns raised in the record concerning the meaning of the factors, how the factors will be weighed against each other, and the list's non-exhaustive nature, we describe in detail each of the factors below and we establish an advisory opinion process for BIAS providers to seek Commission advice on potential conduct, if they so choose. We anticipate that the factors we outline for consideration of practices will provide important guideposts for consumers, edge providers, and BIAS providers on whether practices are likely to unreasonably disadvantage or interfere with end users ability to reach the internet content, services, and applications of their choosing or of edge providers to access consumers using the internet.

509. *End-User Control.* We reaffirm our conclusion from the *2015 Open Internet Order* and find that a practice that allows end-user control and that is consistent with promoting consumer choice is less likely to unreasonably interfere with or cause an unreasonable disadvantage affecting the end user's ability to use the internet as he or she sees fit. It is critical that consumers' decisions, rather than those of BIAS providers, remain the driving force behind the development of the internet. We observe that there are competing narratives surrounding certain mobile plans that provide different video resolution levels. We find that the current record lacks sufficient specificity about specific plans to make a definitive determination. Practices that favor end-user control and empower meaningful consumer choice are more likely to satisfy the general conduct standard than those that do not. As the Commission recognized in 2010 and 2015, we remain aware of the reality that user control and network control are not mutually exclusive. Rather, practices will fall somewhere on a spectrum between more end-user control and more BIAS provider control. There also may be practices that involve complete BIAS provider control that nonetheless satisfy the general conduct rule. Some commenters point to the fact that the Commission recognizes this range between end-user control and BIAS provider control as evidence of this factor's vagueness problem. However, we find that our approach is consistent with the Commission's regulatory approach in other contexts that require the Commission, and providers, to balance competing interests, and we believe that this approach provides appropriate guidance to BIAS providers while still enabling them to experiment and innovate with practices that function across this

spectrum. We emphasize that in all practices, BIAS providers should be fully transparent to the end user and effectively reflect end users' choices. The Electronic Frontier Foundation asserts that ''in practice transparency is a poor substitute for meaningful choice.'' As part of our case-by-case analysis for this factor, the Commission will examine whether transparency regarding the practice at issue actually enables meaningful consumer choice.

510. *Competitive Effects.* As discussed above, we find that BIAS providers have incentives to interfere with and disadvantage the operation of third-party internet-based services that compete with the providers' own services or with those of an edge provider with which the BIAS provider has a contractual relationship. A practice that has anticompetitive effects in the market for applications, services, content, or devices would likely unreasonably interfere with, or unreasonably disadvantage, edge providers' ability to reach consumers in ways that would have a dampening effect on innovation, interrupting the virtuous cycle. We find that practices like this, *i.e.,* anticompetitive practices, are likely to harm consumers' and edge providers' ability to use BIAS to reach one another. For example, fees that discourage consumer choice among BIAS providers could fall within the rule's scope. In contrast, more competition leads to more options for consumers in services, applications, content, and devices. Therefore, we find that practices that would enhance competition would weigh in favor of promoting consumers' and edge providers' ability to use BIAS to reach one another. We disagree with Free State Foundation's contention that considering the competitive effects of a practice is unhelpful because it is not tied to particular economic theory. Commission staff, and in particular the Commission's Office of Economics and Analytics, is well versed in examining the competitive effects of our rules and of industry practices, using generally accepted economic theory and analytical techniques. And this is particularly true where the Commission has examined potentially anticompetitive conduct by vertically integrated firms. For example, since the introduction of competition into the interstate long-distance telephone market, the Commission has repeatedly investigated claimed anticompetitive concerns raised by vertically integrated firms. Furthermore, as part of the Commission's review of the competitive effects of a given practice, we will also

review the relevant entities' corporate structure, to consider the extent of an entity's vertical integration as well as its relationships with affiliated entities.

511. *Consumer Protection.* As in 2015, we intend the general conduct rule to act as a strong consumer protection standard. It prohibits BIAS providers from employing any deceptive or unfair practice that will unreasonably interfere with or unreasonably disadvantage end-user consumers' ability to select, access, or use broadband services, applications, or content, so long as the services are lawful, subject to the exception for reasonable network management. For example, unfair or deceptive billing practices, as well as practices that fail to protect the confidentiality of end users' proprietary information, will be unlawful if they unreasonably interfere with or unreasonably disadvantage end-user consumers' ability to select, access, or use broadband services, applications, or content, so long as the services are lawful, subject to the exception for reasonable network management. As the Commission explained in 2015, while each practice will be evaluated on a case-by-case basis, this rule is intended to include protection against fraudulent practices such as ''cramming'' and ''slamming'' that have long been viewed as unfair and disadvantageous to consumers.

512. *Effect on Innovation, Investment, or Broadband Deployment.* We continue to find that internet openness drives a ''virtuous cycle'' in which innovations at the edges of the network enhance consumer demand, leading to expanded investments in broadband infrastructure that, in turn, spark new innovations at the edge. As such, a practice that will act to stifle innovation, investment, or broadband deployment would likely unreasonably interfere with or unreasonably disadvantage end users' or edge providers' use of the internet.

513. *Free Expression.* Consistent with the Commission's findings in the *2015 Open Internet Order,* we believe that practices that threaten the use of the internet as a platform for free expression would also likely unreasonably interfere with or unreasonably disadvantage consumers' and edge providers' ability to use broadband service to communicate with each other, thereby causing harm to that ability. Such practices, in turn, would dampen consumer demand for broadband services, disrupting the virtuous cycle, and harming end user and edge provider use of the internet under the general conduct rule we adopt in the Order. As the Commission found in 2015, we find that the general conduct standard we adopt in the Order does not

unconstitutionally burden any of the First Amendment rights held by BIAS providers because BIAS providers are conduits, not speakers, with respect to BIAS.

514. *Application Agnosticism.* We further find that application-agnostic (sometimes referred to as use-agnostic) practices likely will not cause an unreasonable interference with or an unreasonable disadvantage to end users' or edge providers' ability to use BIAS to communicate with each other. Because application-agnostic practices do not interfere with end users' choices about which content, applications, services, or devices to use, neither do they distort competition and unreasonably disadvantage certain edge providers, they likely would not cause harm by unreasonably interfering with or unreasonably disadvantaging end users or edge providers' ability to communicate using BIAS. A network practice is application-agnostic if it does not differentiate in treatment of traffic, or if it differentiates in treatment of traffic without reference to the content, application, or device. We will consider a practice to be application-specific if it is not application-agnostic. Application-specific network practices include, for example, those applied to traffic that has a particular source or destination, that is generated by a particular application or by an application that belongs to a particular class of applications, that uses a particular application- or transport-layer protocol, or that has particular characteristics (*e.g.,* the size, sequencing, and/or timing of packets). There may still be circumstances where application-agnostic practices raise competitive concerns, and as such may violate our standard to protect the open internet. As with all practices, the Commission will evaluate these situations on a case-by-case basis.

515. *Standard Practices.* Lastly, in evaluating whether a practice violates our general conduct rule, we will consider whether a practice conforms to best practices and technical standards adopted by open, broadly representative, and independent internet engineering, governance initiatives, or standards-setting organizations. These technical advisory groups play an important role in the internet ecosystem, and at times are convened by the Commission. We make clear, however, that we are not delegating authority to interpret or implement our rules to outside bodies.

516. *Rejection of Alternatives.* We decline to adopt the alternative approaches to the general conduct rule suggested in the record, including:

reliance on the "just and reasonable" language of sections 201 and 202; prohibiting unreasonable discrimination; assessing only whether the practice at issue promotes or hinders free expression, and whether the practice is "application agnostic"; or adopting a "commercial reasonableness" standard for overseeing BIAS provider conduct under section 706 of the 1996 Act and our ancillary authority. As we explain above, we find it important for the Commission to be able to weigh all of the factors we describe in order to provide the maximum flexibility to providers in managing their networks and developing innovative services, plans, and packages for customers, particularly given the rapidly developing and evolving technological landscape in both the network and at the edge, and some of the proposed alternatives would not advance that interest as well as the rule we adopt. We agree with commenters that evaluating conduct using the multi-factor analysis under the general conduct rule will likely result in faster resolution for BIAS providers, and is easier for consumers and edge providers to use when evaluating BIAS provider conduct. We also find that, as a general matter, practices evaluated under the alternative standards outlined in the record would likely result in the same outcome if evaluated under the general conduct standard we adopt in the Order, given the substantial overlap in the factors. For example, Professor Jon Peha explains that under a bright-line prohibition against unreasonable discrimination, it would be permissible if a subscriber chose for their BIAS provider to discriminate in order to ensure that a telemedicine application receives superior quality of service. As part of its consideration of the practice under the general conduct standard we adopt, the Commission would weigh the fact that the practice allows end-user control and is consistent with promoting consumer choice. However, we believe the factors we outline for consideration of practices will provide more clarity to consumers, edge providers, and BIAS providers, as well as more flexibility for BIAS providers to innovate. We consequently find that the additional guidance provided by our general conduct rule has certain advantages for case-by-case adjudications over proceeding purely under the text of sections 201 and 202 alone. Finally, as the Commission concluded in 2015, we are unpersuaded that adopting a rule prohibiting commercially unreasonable practices is the most appropriate approach for

protecting and promoting an open internet. Internet openness involves many relationships that are not business-to-business and serves many purposes that are noncommercial. Further, smaller edge providers also may not "have the resources to fight against commercially unreasonable practices, which could result in an unfair playing field before the Commission," potentially stifling innovation and harming competition.

517. We conclude that the language we adopt in the Order offers sufficient clarity to BIAS providers, consumers, and edge providers on what conduct is prohibited, while still allowing and encouraging innovation and technological development. We disagree with those commenters who argue that the proposed general conduct rule is too vague and unclear, and that the rule's alleged vagueness would cause regulatory uncertainty that will stifle investment and harm innovation. Because of the insight into our approach provided by the rule itself and our guidance above, we conclude that stakeholders will have more clarity—not less—than they would have had if we relied on sections 201 and 202 of the Act alone. We nevertheless retain authority to address practices under sections 201 and 202 of the Act except to the extent that we forbear from doing so.

518. Second, our advisory opinion process is available to allow BIAS providers to seek a determination of the legality of a practice, without having to actually engage in that practice and risk being held in violation in order to obtain a decision. As explained below, the Enforcement Bureau will not bring an enforcement action against a requesting party with respect to any action taken in good faith reliance upon an advisory opinion if all of the relevant facts were fully, completely, and accurately presented to the Bureau, and where such action was promptly discontinued upon notification of recission or revocation of the Commission's or the Bureau's approval.

519. Third, although we conclude that our rule, coupled with the guidance above, gives providers warning of a range of prohibited conduct, our priority with this rule is ensuring that harmful practices can be stopped when they are identified. Thus, although we certainly will consider the imposition of penalties when specific interpretations or applications of our rule address particular conduct, we otherwise will focus solely on remedying the provider's behavior going forward. This is consistent with the approach the

Commission has taken in the past in cases of violations of internet policy.

520. Finally, as the D.C. Circuit found in 2016 when it upheld the *2015 Open Internet Order* in full, the Commission's general conduct rule is not impermissibly vague, and provides sufficient notice to the affected entities of what conduct would be prohibited moving forward. We adopt the same rule and framework in the Order that the D.C. Circuit upheld in 2016, and, as discussed further below, we conclude that the general conduct rule, and the multi-factor framework we offer to provide guidance on its application, provides BIAS providers sufficient notice regarding what conduct is prohibited under the rule.

521. *Application to Zero Rating.* In the *2023 Open Internet NPRM,* we sought comment on whether there were additional steps we should take to ensure that BIAS providers understand the types of conduct and practices that might be prohibited under the proposed general conduct standard, asking, for example, whether "there are any zero rating or sponsored data practices that raise particular concerns under the proposed general conduct standard." Based on the record, and consistent with the *2015 Open Internet Order* and our proposal, we find it appropriate to assess zero-rating programs under the general conduct standard to determine whether such practices cause harm to the open nature of the internet. We address the implications of our decision on zero rating on California's net neutrality law in the preemption discussion. We acknowledge that sponsored data programs—where a BIAS provider zero rates an edge product for economic benefit, either by receiving consideration from a third party to have the edge product zero rated or where a BIAS provider *favors* an affiliate's edge products—raise concerns under the general conduct standard. Nonetheless, we will continue to evaluate such programs based on a totality of the circumstances.

522. Zero rating is the practice of a BIAS provider exempting edge services, devices, applications, and/or content (edge products) from an end user's usage allowance or data cap. Zero rating enables the BIAS provider to make some edge products cheaper to access, which can put those edge products at an advantage over others. In the *2015 Open Internet Order,* the Commission recognized that zero rating had the potential to distort the market and incentivize restrictive caps, but noted that "new service offerings, depending on how they are structured, could benefit consumers and competition."

Based on this, the Commission stated that it would "look at and assess such practices under the no-unreasonable interference/disadvantage standard, based on the facts of each individual case, and take action as necessary."

523. The record indicates that zero-rating programs can be structured in a manner that benefits consumers, competition, and traffic management. Allowing a mechanism that lowers the cost of accessing certain edge products could be beneficial to consumers, and at least one commenter contends that zero-rating programs can help bring new entrants online.

524. However, the record also reveals concerns about certain forms of zero rating, such as where BIAS providers use zero rating to favor some edge products over others, especially as a business practice in exchange for consideration or to favor a provider's affiliates. Commenters claim that since adoption of the *2015 Open Internet Order,* BIAS providers have adopted such programs that favor affiliates and charge competing edge providers high per-gigabyte rates. Commenters express concern that where there is an economic incentive to use zero rating to favor some edge products over others, zero rating can create the same harms to the open internet as paid prioritization. Further, the record reflects that sponsored data programs may favor large edge providers, as they are the only providers that can afford to participate in such programs. These comments also suggest that zero rating, like paid prioritization, is a practice that could result in distortions in the internet market by creating negative externalities that raise the cost for the entire edge market, which can decrease innovation and harm the virtuous cycle.

525. Given the potential benefits and harms of zero-rating practices and their potential effect on the virtuous cycle, we will analyze zero-rating programs under the multi-factor analysis of the general conduct standard to ensure that innovative offerings are permitted and encouraged where the open internet is not harmed. By placing zero-rating programs under the general conduct standard, we do not preclude beneficial zero-rating innovations that may assist BIAS providers needing to manage scarce resources fairly and reasonably, while also potentially allowing lower-cost access to edge products of exceptional societal value or of value to particular consumers, as chosen by those consumers. But each zero-rating program can be different, and we find that applying the multi-factor analysis of the general conduct standard on a case-by-case basis allows for such

innovations while curbing potentially market-distorting behavior by BIAS providers.

526. To provide greater clarity, we identify certain types of programs that may raise concerns under the general conduct standard because they may be more likely to unreasonably interfere with, or unreasonably disadvantage, consumers and edge providers. Specifically, a zero-rated program is likely to raise concerns under the general conduct standard where it zero rates an edge product (1) in exchange for consideration (monetary or otherwise) from a third party, or (2) to favor an affiliated entity. These sponsored data programs are examples of business practices that are not a part of reasonable network management and therefore fall outside of "best practices and technical standards" developed by standards-setting organizations. The information in the record regarding sponsored data programs offered since 2015 indicates that those programs raise concerns under the general conduct standard, in that they may unreasonably interfere with end users' ability to select, access, and use BIAS or the lawful internet content, applications, services, or devices of their choice and unreasonably disadvantage edge providers' ability to make lawful content, applications, services, or devices available to end users, raising the cost to bring innovative new options to the edge market. Thousands of express comments filed in the docket state that "[t]he agency must move forward a strong rule that rejects zero rating."

527. We are not convinced by commenters that argue that sponsored data programs should always be permitted because they lower the cost of subscribing to BIAS. The record suggests that zero-rating programs can increase the prices to consumers directly, and indirectly in the form of passed-through charges by the edge provider. Nor are we convinced by suggestions made by two commenters that sponsored data programs are the equivalent of toll free calling, presumably because with toll free calling, the business assumes the cost of the call rather than the consumer. On this basis alone, they suggest that sponsored data programs, like toll free calling, should be permitted. In suggesting that zero rating should be treated the same as toll free calling, however, one commenter notes that zero rating should still be "offered on a nondiscriminatory basis with special attention paid to its use by content providers co-owned with the telecommunications provider to avoid

cross-subsidy situations." We find this comparison to be unpersuasive, given the many distinctions between toll free calling in the telephony context, as compared to edge products offered over BIAS (*e.g.,* an 800 number is used to *reach* a business, whereas the edge product is often the edge provider's entire business; the edge provider might be dependent on the BIAS provider to reach the BIAS provider's end users). Finally, other proponents of sponsored data zero-rating contend that such programs can increase consumer choice when accessing edge products. However, other commenters suggest sponsored data zero-rating programs can distort consumer choice by pressuring consumers to access the cheaper edge products chosen for them by the BIAS provider, counter to the aims of an open internet. Despite these concerns, we will continue to evaluate such programs based on a totality of the circumstances, including potential benefits.

528. While we identify sponsored data programs as the type of practices that may raise concerns under the general conduct standard, subject to a totality of circumstances determination, we note that there could be other types of zero-rating practices that are less likely to raise concerns under the general conduct standard, again based on a case-by-case evaluation. For example, some commenters have asserted that zero rating all edge products during low traffic hours or zero rating all of the edge products within the same category of products would be unlikely to cause unreasonable interference/disadvantage to edge products, as well as being application agnostic under the general conduct rule factors. New America's Open Technology Institute asks the Commission to clarify that it is "likely to find that a zero rating practice is unreasonably discriminatory if BIAS customers are offered an exemption from their data caps or limits for the applications, content or service provided by one or more specific edge providers to the exclusion of other similar or competing edge providers, whether or not the BIAS provider receives payment or is favoring an affiliate." While zero rating all apps in the same category is more likely to be an acceptable zero rating practice under the general conduct standard, providers, acting in good faith, may have difficulty determining which apps should and should not be included in the same categories or have other logistical issues when including similar apps. Accordingly, we will review such zero rating on a case-by-case basis under the

general conduct standard. Professor van Schewick observes that there can be competitive concerns with any categorization. We will consider those practices, as well as any other zero-rating practices, under the general conduct standard, which relies on case-by-case review based on established factors.

529. *Application to Data Caps.* Data caps—also referred to as usage allowances or in some cases, a type of usage-based billing—are a BIAS provider restriction on the amount of data a customer can consume over a specified period of time (*e.g.,* 25GB per month). Professor Scott Jordan urges the Commission to find that data caps that do not qualify as reasonable network management are likely to violate the general conduct standard. In particular, Professor Jordan explains that, based on his research, data caps that are not tailored to a primary purpose of managing congestion are likely to have negative effects on competition, network investments, broadband deployment, innovation, and investment by edge providers; and are likely to reduce end user control. In their white paper submitted by USTelecom and NCTA, Dr. Mark Israel et al. dispute Professor Jordan's claims, asserting that usage-based pricing "offers a mechanism for broadband providers to create incentives for users to internalize the costs that they impose on broadband networks and to distribute the greater costs of the network onto those users that make greater use of the network while putting downward pressure on the prices that light users pay," and that if such plans were prohibited by the Commission, "moderate and light users (including those with lower incomes) would likely be forced to pay more than if [data caps are] allowed."

530. We agree with Professor Jordan that the Commission can evaluate data caps under the general conduct standard. We do not at this time, however, make any blanket determinations regarding the use of data caps based on the record before us. The record demonstrates that while BIAS providers can implement data caps in ways that harm consumers or the open internet, particularly when not deployed primarily as a means to manage congestion, data caps can also be deployed as a means to manage congestion or to offer lower-cost broadband services to consumers who use less bandwidth. As such, we conclude that it is appropriate to proceed incrementally with respect to data caps, and we will evaluate individual data cap practices under the general conduct standard based on the facts of each individual case, and take action as necessary.

3. Transparency Rule

531. Transparency has long been a key element of the Commission's framework for protecting the open nature of the internet, recognized and upheld by both the courts and Congress, and in the Order, we update our transparency rule to reflect that important role. Specifically, we modify the transparency rule by reversing the changes made to the text of the rule under the *RIF Order,* restoring the requirements to disclose certain network practices and performance characteristics eliminated by the *RIF Order,* and adopting changes to the means of disclosure, including adopting a direct notification requirement. We find that these actions appropriately balance the benefits to consumers and edge providers and the costs to BIAS providers. As explained below, we find that any changes or modifications to disclosures required by the *Broadband Label Order* (87 FR 76959 (Dec. 16, 2022)) are most appropriately addressed in response to that proceeding's *FNPRM* (87 FR 77048 (Dec. 16, 2022)).

532. In the *2010 Open Internet Order,* the Commission adopted a transparency rule that required a BIAS provider to "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain internet offerings." The *2011 Advisory Guidance* advised providers on appropriate methods for disclosing performance metrics, network practices, and commercial terms, and clarified how providers could comply with the requirement to provide such information to consumers at the "point-of-sale." The *2014 Advisory Guidance* reminded providers that their transparency rule disclosures and advertising claims must be consistent.

533. Finding that BIAS end-users and edge providers would be better served and informed by additional disclosures, the Commission adopted targeted, incremental enhancements to the 2010 transparency rule in the *2015 Open Internet Order* requiring providers to disclose additional information about performance characteristics, commercial terms, and network practices. Specifically, in regards to performance characteristics, the Commission required providers to disclose all performance characteristics, including packet loss, for each broadband service offered, and mandated that all performance-related disclosures reasonably reflect the performance a consumer could expect in the geographic area in which the consumer would be purchasing service. The Commission also required that BIAS providers provide more precise information regarding commercial terms, including the full monthly service charge during the promotional period, the full monthly charge after the expiration of a promotional rate, any one-time or recurring fees or surcharges, and data caps and allowances. Regarding network practices, the Commission required BIAS providers to make additional disclosures pertaining to congestion management, application-specific behavior, device attachment rules, and security. Lastly, the Commission required BIAS providers to directly notify end users "if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion that is likely to have a significant impact on the end user's use of service." To assist providers with compliance, the Commission also offered a voluntary broadband label "safe harbor." Shortly thereafter, the Commission also adopted the *2016 Advisory Guidance,* detailing acceptable methods for reporting performance characteristics and clarifying the "point-of-sale" requirements.

534. In 2017, however, the Commission reversed course and in the *RIF Order* eliminated the enhancements adopted by the *2015 Open Internet Order,* including the requirements to: (1) disclose packet loss; (2) ensure performance related-characteristics reasonably reflect the performance a consumer could expect in the geographic area in which the consumer would be purchasing service; (3) ensure network performance is measured over a reasonable period of time and during times of peak service; (4) disclose any network practice applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user; and (5) directly notify an end user if an individual use of a network would trigger a network practice based on demand prior to a period of congestion that is likely to have a significant impact on the end user's service. The Commission also eliminated the *2016 Advisory Guidance,* which advised providers on how to report performance characteristics consistent with the *2015 Open Internet Order* enhancements. Additionally,

because the *RIF Order* eliminated the bright-line rules prohibiting blocking, throttling, and paid or affiliated prioritization practices, the Commission revised the obligations of the transparency rule to require BIAS providers to disclose such practices. The Commission also revised the text of the rule to require that any person providing broadband internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband internet access services to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain internet offerings, in order to reflect the Commission's reliance on section 257 of the Act as authority for the transparency rule. The *Verizon* court upheld the transparency rule as a reasonable exercise of the Commission's authority under section 706 of the 1996 Act. In the *RIF Order,* the Commission departed from its long-held view and instead concluded that the directives to the Commission in section 706 of the 1996 Act are better interpreted as hortatory, and not as grants of regulatory authority. As a result, the Commission relied on authority under section 257 of the Act for the transparency rule. Section 257(a) directs the Commission to "identify[ ] and eliminat[e] . . . market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services." Section 257(c) directed the Commission to triennially report to Congress on such marketplace barriers and how they have been addressed by regulation or could be addressed by recommended statutory changes. Congress later repealed subsection (c) of section 257 and replaced it with section 13, which imposes a substantially similar reporting requirement.

535. As part of the Infrastructure Act in 2021, Congress directed the Commission to promulgate rules for an FDA nutrition-style label of broadband facts to be displayed at the point-of-sale by providers based on the *2015 Open Internet Order* broadband label safe harbor. In November 2022, the Commission adopted the *Broadband Label Order* implementing this congressional direction, which requires "ISPs to display, at the point of sale, labels that disclose certain information

about broadband prices, introductory rates, data allowances, and broadband speeds, and to include links to information about their network management practices, [and] privacy policies." The Commission recently declined broad reconsideration of the broadband label rules in the *Broadband Label Reconsideration Order* (88 FR 63853 (Sept. 18, 2023)) but does have an ongoing *Broadband Label FNPRM* (87 FR 77048 (Dec. 16, 2022)). Providers also must make clear whether the price for a given service is an introductory rate and, if so, what the price will be after the introductory period ends. Since April 10, 2024, providers with more than 100,000 subscribers have been obligated to display the broadband label.

a. Content of the Transparency Rule

536. We adopt the transparency rule originally adopted in 2010 and reaffirmed in 2015. Doing so caters to a broader relevant audience of interested parties than the audience identified in the *RIF Order.* As such, we revise the transparency rule to provide that a person engaged in the provision of broadband internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain internet offerings.

537. The *RIF Order* revised the text of the transparency rule, which had been in place since 2010 and upheld by the courts twice as a lawful exercise of the Commission's regulatory authority under section 706 of the 1996 Act, and independently under the Commission's exercise of its authority under Title II. When the Commission found it did not have independent regulatory authority under section 706 in the *RIF Order,* finding instead that section 706 was "merely hortatory," it eliminated the Commission's underlying authority for the transparency rule. Instead, it chose to rely solely on section 257 of the Act and revised the text of the rule to reflect that reliance. As discussed further below, we reaffirm our interpretation of section 706 of the 1996 Act as an independent source of regulatory authority, and rely on our regulatory authority under section 706, our authority under Title II of the Act to prohibit unjust and unreasonable practices, and our authority under section 257 as the legal bases for the transparency rule. As such, we return to

the prior formulation of the transparency rule, which more appropriately captures the relevant audience of BIAS providers' transparency disclosures—content, application, service, and device providers. Reinstating the text of the transparency rule from the *2010 Open Internet Order* is also consistent with the Commission's finding in the *Broadband Label Order* that while the labels primarily serve as a quick reference tool, "the transparency rule seeks to enable a deeper dive into details of broadband internet service offerings, which could be relevant not only for consumers as a whole, but also for consumers with particularized interests or needs, as well as a broader range of participants in the internet community—notably including the Commission itself." We find that content, application, service, and device providers are vital to the health of the internet ecosystem and that given their reliance on broadband services, returning the scope of the transparency rule to explicitly cover their interests is warranted and alleviates any confusion created by the changes adopted in the *RIF Order.*

538. Consistent with prior Commission guidance, we make clear that BIAS providers must maintain the accuracy of all disclosures. Thus, "whenever there is a material change in a provider's disclosure of commercial terms, network practices, or performance characteristics, the provider has a duty to update the disclosure in a manner that is 'timely and prominently disclosed in plain language accessible to current and prospective end users and edge providers, the Commission, and third parties who wish to monitor network management practices for potential violations of open internet principles.' " A "material change" is "any change that a reasonable consumer or edge provider would consider important to their decisions on their choice of provider, service, or application."

539. Beginning with the *2010 Open Internet Order,* the Commission has provided guidance on the network management practices, performance, and commercial terms that BIAS providers must disclose. We repeat the relevant guidance here, updated as appropriate based on the record.

Network Practices

• *Congestion Management.* Descriptions of congestion management practices, if any. These descriptions should include the types of traffic subject to practices; purposes served by practices; the practices' effects on end

users' experience; criteria used in practices, such as indicators of congestion that trigger a practice, including any usage limits triggering the practice, and the typical frequency of congestion; usage limits and the consequences of exceeding them; and references to engineering standards, where appropriate.

• *User-Based Practices.* Practices that are applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user, the purpose of the practice, which users or data plans may be affected, the triggers that activate the use of the practice, the types of traffic that are subject to the practice, and the practice's likely effects on end users' experiences.

• *Affiliated Prioritization.* Any practice that directly or indirectly favors some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, or resource reservation, to benefit an affiliate, including identification of the affiliate.

• *Paid Prioritization.* Any practice that directly or indirectly favors some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, or resource reservation, in exchange for consideration, monetary or otherwise.

• *Zero Rating.* Any practice that exempts edge services, devices, applications, and content (edge products) from an end user's usage allowance or data cap.

• *Application-Specific Behavior.* Whether and, if applicable, why the provider blocks or rate-controls specific protocols or protocol ports, modifies protocol fields in ways not prescribed by the protocol standard, or otherwise inhibits or favors certain applications or classes of applications.

• *Device Attachment Rules.* Any restrictions on the types of devices and any approval procedures for devices to connect to the network. Mobile providers must disclose their third-party device and application certification procedures, if any; clearly explain their criteria for any restrictions on the use of their network; and expeditiously inform device and application providers of any decisions to deny access to the network or of a failure to approve their particular devices or applications. Mobile providers should also follow the guidance the Commission provided to licensees of the upper 700 MHz C Block spectrum regarding compliance with their disclosure obligations, particularly regarding disclosure to third-party application developers and device manufacturers of criteria and approval procedures (to the extent applicable).

For example, these disclosures include, to the extent applicable, establishing a transparent and efficient approval process for third parties, as set forth in Rule § 27.16(b).

• *Security.* Practices used to ensure end-user security or security of the network, including types of triggering conditions that cause a mechanism to be invoked (but excluding information that could reasonably be used to circumvent network security). As the Commission has previously explained, we expect BIAS providers to exercise their judgment in deciding whether it is necessary and appropriate to disclose particular security measures. We do not expect BIAS providers to disclose internal network security measures that do not bear on a consumer's choices.

Performance Characteristics

• *Service Description.* A general description of the service, including the service technology, expected and actual access speed and latency, packet loss, and the suitability of the service for real-time applications. Fixed BIAS providers may use the methodology from the Measuring Broadband America (MBA) program to measure actual performance, or may disclose actual performance based on internal testing, consumer speed test data, or other data regarding network performance, including reliable, relevant data from third-party sources. BIAS providers that have access to reliable information on network performance may disclose the results of their own or third-party testing. Those mobile BIAS providers that do not have reasonable access to such network performance data may disclose a Typical Speed Range (TSR) representing the range of speeds and latency that can be expected by most of their customers, for each technology/service tier offered, along with a statement that such information is the best approximation available to the broadband provider of the actual speeds and latency experienced by its subscribers. Actual network performance data should be reasonably related to the performance the consumers would likely experience in the geographic area in which the consumer is purchasing service, and should be measured in terms of average performance over a reasonable period of time and during times of peak usage.

• *Impact of Non-BIAS Data Services.* What non-BIAS data services, if any, are offered to end users; whether and how any non-BIAS data services may affect the last-mile capacity available for, and the performance of, BIAS; and a description of whether the service relies on particular network practices and

whether similar functionality is available to applications and services offered over BIAS.

Commercial Terms

• *Pricing.* For example, monthly prices, usage-based fees, other fees, data caps and allowances, and fees for early termination or additional network services. Monthly pricing shall include the full monthly service charge, and any promotional rates should be clearly noted as such, specify the duration of the promotional period, and note the full monthly service charge the consumer will incur after the expiration of the promotional period. We clarify that price disclosure requirements, which have been part of the transparency rule since 2010, will not lead to the publishing of data that will act as a *de facto* tariff system, as the International Center for Law & Economics cautions. We observe that the transparency requirements, including publication of commercial terms, such as rates, have been upheld by the D.C. Circuit under section 706 and in any event, Congress specifically gave the Commission authority to require that broadband providers publish their rates in the IIJA. Other fees include all additional one time and/or recurring fees and/or surcharges the consumer may incur either to initiate, maintain, or discontinue service, including the name, definition, and cost of each additional fee. These may include modem rental fees, installation fees, service charges, and early termination fees, among others. BIAS providers should disclose any data caps or allowances that are a part of the plan the consumer is purchasing, as well as the consequences of exceeding the cap or allowance (*e.g.,* additional charges, loss of service for the remainder of the billing cycle).

• *Privacy Policies.* For example, whether network management practices entail inspection of network traffic, and whether traffic information is stored, provided to third parties, or used by the carrier for non-network management purposes.

• *Redress Options.* Practices for resolving end-user and edge provider complaints and questions.

Below, we discuss in more detail our rationale for revisions to the current transparency rule.

540. *Network Practices.* As an initial matter, because we no longer permit blocking, throttling, affiliated prioritization, or paid prioritization under the Order, we find that there is no need to continue requiring providers to report such practices as was required under the *RIF Order,* except to the

extent that a provider engages in paid or affiliated prioritization subject to a Commission waiver. We agree with commenters who assert that the *RIF Order* created unnecessary confusion around the required network practice disclosures, and we reaffirm that providers must disclose congestion management practices, application-specific behavior, device attachment rules, and security practices. We also reaffirm that the transparency rule requires that BIAS providers disclose any practices applied to traffic associated with a particular user or user group, including any application-agnostic degradation of service to a particular end user. As the Commission explained in the *2015 Open Internet Order,* for example, a BIAS provider ''may define user groups based on the service plan to which users are subscribed, the volume of data that users send or receive over a specified time period of time or under specific network conditions, or the location of users.'' We also require that ''disclosures of user-based or application-based practices [must] include the purpose of the practice, which users or data plans may be affected, the triggers that activate the use of the practice, the types of traffic that are subject to the practice, and the practice's likely effects on end users' experiences.'' In addition, we require BIAS providers to disclose any zero-rating practices, specifically, any practice that exempts particular edge services, devices, applications, and content (edge products) from an end user's usage allowance or data cap. We find that requiring disclosure of information pertaining to zero-rating practices will better enable the Commission and internet researchers to identify those zero-rating practices that may harm the openness of the internet. And as the Commission has previously explained, ''[t]hese disclosures with respect to network practices are necessary: for the public and the Commission to know about the existence of network practices that may be evaluated under the rules, for users to understand when and how practices may affect them, and for edge providers to develop internet offerings.''

541. We decline the request by one commenter to require BIAS providers to make disclosures that would permit end users to identify application-specific usage or to distinguish which user or device contributed to which part of the total data usage. We find, as we did in the *2015 Open Internet Order,* that collection of application-specific usage data by a BIAS provider may require use

of deep packet inspection practices that may pose privacy concerns for consumers.

542. *Performance Characteristics.* We reinstate the enhanced performance characteristics disclosures eliminated by the *RIF Order* to require BIAS providers to disclose packet loss under the transparency rule. This proceeding is not the appropriate forum for us to determine whether such disclosures should be added to the broadband label as some commenters request, and in any event, the Commission recently declined this suggested addition to the broadband label in the *Broadband Label* proceeding. As Professor Scott Jordan explains, the three primary network performance metrics are speed (throughput), latency (end-to-end delay), and packet loss, which have been consistently recognized as such since the early days of the internet. Latency and packet loss are particularly relevant metrics to real-time applications. We agree with Professor Jordan that ''both latency and packet loss are critical to the user-perceived performance of real-time applications,'' such as video-conferencing applications, and the record reflects that the suitability of BIAS for real-time applications depends on both of these metrics. We believe that such information is also readily available to BIAS providers from commercial network performance measurement companies, along with speed and latency measurements.

543. Contrary to AT&T's assertions that requiring disclosure of packet loss would be burdensome, we expect that many BIAS providers ''already measure packet loss today, as this primary network performance metric is required in order to determine the suitability of their [services] for the real-time applications that are important to many of their customers.'' As Professors Peha and Jordan explain, ''measurements of latency, which are already required, inevitably enable simultaneous measures of packet loss with de minimis effort.'' And to the extent CTIA argues that the Office of Management and Budget's (OMB)'s previous ''refusal to approve packet loss should foreclose collecting that information from mobile providers,'' we disagree. We also note that interested parties will have the opportunity to comment on any burdens associated with these requirements pursuant to the Paperwork Reduction Act (PRA). In its 2016 review, OMB found that ''packet loss will not be a required performance metric for mobile disclosure'' at this time, and directed the Commission to assess ''i. the practical utility of packet loss as it

relates to mobile performance disclosure;'' ''ii. 'accurate' methods of calculating mobile packet loss (*i.e.,* drive testing, voluntary app, etc.);'' and ''iii. whether using voluntary consensus standards would be a viable alternative.'' We agree with Professors Peha and Jordan that the ''practical utility of packet loss as it relates to mobile performance is clearly established by the rapidly increasing number of end users who utilize video conference apps on their smartphones.'' Finally, while we acknowledge that the Commission recently declined to require packet loss as part of the broadband label, the Commission nonetheless found that packet loss ''may provide useful information to certain consumers.'' We also observe that the disclosures required by the transparency rule serve to inform more than just consumers—they also serve edge providers and other interested third parties, including the Commission. Limiting the transparency rule requirements to information displayed via the broadband label would therefore not provide adequate insight for edge providers, internet researchers, certain consumers, or the Commission. As such, we reject arguments by commenters that the Commission should not require packet loss disclosure under the transparency rule because it declined to do so in the *Broadband Label* proceeding. To the extent commenters express concern regarding the performance characteristics disclosures required under the *Broadband Label Order,* the *Broadband Label* proceeding is the appropriate forum in which to address them.

544. We also reinstate the transparency requirements in the *2015 Open Internet Order* and *2016 Advisory Guidance* that require performance characteristics to be reported with greater geographic granularity and to be ''measured in terms of average performance over a reasonable period of time and during times of peak usage.'' The record reflects that mobile BIAS providers ''have access to substantially different amounts of spectrum in different geographical regions, and thus speeds may vary substantially by region,'' and that disclosure requirements with geographic granularity are ''essential to determine real-time application performance and provide consumers with necessary information to make an informed choice.'' We thus disagree with AT&T that disclosure of actual network performance reasonably related to the performance that consumers would likely experience in the geographic

areas in which a customer is purchasing service is of "little to no meaningful or beneficial use for consumers to make informed decisions." Further, we find that peak usage performance can differ substantially from non-peak usage period performance and from all day performance, and we agree that "peak usage period speeds are more useful information to consumers" than are speeds calculated from measurements over 24-hour periods. As such we find it appropriate to reinstate these enhancements to the transparency rule.

545. We are not persuaded by AT&T's assertions that reporting actual peak usage metrics on a geographically disaggregated basis would be "an enormous undertaking," and agree with Professor Jordan that "it is implausible that broadband providers do not already today measure broadband performance in various geographical regions," as providers likely use that information to inform their decisions regarding additional spectrum purchases in various geographical regions as well decisions about when and where to place additional cellular antennas to improve performance in these granular geographic areas.

546. In response to concerns about reporting peak usage in the record, we make clear that peak usage periods may be based solely on the local time zone, and that BIAS providers retain flexibility to determine the appropriate peak usage periods for their network performance metrics (but must disclose the peak usage periods chosen for such disclosures). We decline to otherwise codify specific methodologies for measuring the actual performance required by the transparency rule, finding, as in 2010 and 2015, that there is a benefit in permitting measurement methodologies to evolve and improve over time, with further guidance from Bureaus and Offices—like in 2011 and 2016—as to acceptable methodologies. We delegate authority to the Office of Engineering Technology (OET) and the Consumer and Governmental Affairs Bureau (CGB) to lead this effort. We expect this effort will include, among other things, examining the appropriate geographic measurement units for reporting. We need not determine, at this time, the accuracy of CTIA's assertion that "consumers have no idea what [Cellular Market Areas (CMAs)] are, and even if they did, they likely would not know what CMA they are in at any given time since they use wireless on the go." Consumers know where they live and likely purchased service, and as long as BIAS providers "show the measurements associated with the CMA containing the

consumer's listed address," as T-Mobile did for several years following the *2015 Open Internet Order,* the consumer "does not have to know where the CMAs are, or even what a CMA is."

547. The record demonstrates, however, that unlike their larger counterparts, BIAS providers that have 100,000 or fewer broadband subscribers may generally lack access to the resources necessary to easily comply with these enhanced performance characteristic transparency requirements. As such, we temporarily exempt (with the potential to become permanent) BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider, from the requirements to disclose packet loss and report their performance characteristics with greater geographic granularity and to be measured in terms of average performance over a reasonable period of time and during times of peak usage. We observe that our description of small providers to which we apply this exemption aligns with exceptions the Commission has previously provided for small providers, including the implementation of the Safe Connections Act, a longer implementation period for certain providers in the *Broadband Label* proceeding, a delayed deadline to implement caller ID authentication rules stemming from the TRACED Act, and in describing which small providers are exempt from certain rural call completion rules. While we believe that reinstating these performance characteristic transparency enhancements will have minimal costs for most larger BIAS providers, we take seriously the concerns raised in the record about the additional compliance costs for small businesses. Moreover, we observe that the Commission provided a temporary exception (with the potential to become permanent) for some providers from the enhancements adopted in the *2015 Open Internet Order*. In light of the concerns in the record, past precedent, and the expenditures BIAS providers that have 100,000 or fewer broadband subscribers have already made—and continue to make—to address the requirements adopted by the *Broadband Label Order*, we find that an exemption for these providers is supported in this case. We note that in each of those proceedings, the Commission specifically sought comment on, and considered the impact of, its proposals on small entities, consistent with the requirements of the Regulatory Flexibility Act. We delegate to CGB the authority to determine

whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We direct CGB to seek comment on the question and adopt an order announcing whether it is maintaining an exemption by no later than 18 months after publication of the Order in the **Federal Register**. WISPA also requests that the Commission apply any temporary or permanent exemptions to BIAS providers with 250,000 or fewer subscribers. WISPA provides no explanation as to how many additional small providers would be covered by its proposed change to the scope of our exemptions, nor does it explain why such an expansion in scope is needed, other than asserting that "[i]f exempting small ISPs from these rules was important in 2016, it is all the more important now given the other burdensome regulations that the Commission has imposed on BIAS providers." As such, we decline to expand the temporary exemptions in the Order to BIAS providers with 250,000 or fewer subscribers.

548. We decline, however, to require disclosure of additional performance characteristics, as suggested by Measurement Lab, such as the source, location, timing, or duration of network congestion; and packet corruption and jitter. Noting that "congestion may originate beyond the broadband provider's network and the limitations of a broadband provider's knowledge of some of these performance characteristics," the Commission specifically declined to require the source, location, timing, or duration of network congestion in 2015. The Commission also declined to include packet corruption and jitter because of concerns around the difficulty of defining metrics for such performance characteristics. We find that Measurement Lab fails to adequately address the concerns expressed by the Commission in the *2015 Open Internet Order* and we thus decline to require these additional disclosures.

549. *Commercial Terms.* We find that additional disclosures pertaining to commercial terms are not necessary at this time. The broadband label now requires largely the same commercial term disclosures, including information about promotional rates, fees, and/or surcharges, and all data caps or data allowances as those the Commission required in the *2015 Open Internet Order*. Thus, we find no need to restore the commercial term enhancements required by the *2015 Open Internet Order*. To the extent the record identifies requests for additional pricing information, we find that a potential addition aimed at informing consumers

about pricing would be best considered in the broadband label docket. We also decline to require more extensive privacy disclosures, as some commenters request, as we find that this is not the appropriate proceeding in which to address the content of BIAS providers' privacy notices.

550. *Requested Updates to the Broadband Label.* The record indicates that in addition to packet loss, commenters urge a wide variety of additional disclosures or changes to the broadband label, including requirements to disclose speed ranges for fixed and mobile broadband; to change how speeds are reported (*e.g.,* change "typical" speeds and latency to median speeds and median latency); to include specific privacy disclosures directly on the label; to incorporate network management tables directly on the label; to include cybersecurity disclosures; to include network reliability measurements (*e.g.,* number of minutes of outage per year); and to include the labels on a user's monthly bill (in addition to the point of sale). The Commission considered many of these requests as part of the record in the *Broadband Label* proceeding, and rejected them in the *Broadband Label Order.* We find that such requests are more properly considered in that proceeding, as are requests for additional changes or additions that were raised in the *Broadband Label FNPRM.*

### b. Means of Disclosure

551. We agree with New America's Open Technology Institute that "[t]o be truly 'publicly available,' these disclosures must be where the public would expect to find them—on provider websites marketing these services." As such, we require providers to disclose all information required by the transparency rule on a publicly-available, easily-accessible website. We believe that consumers expect to find information about a provider's services on the provider's public website and that most consumers would not consider visiting the Commission's website, particularly the ECFS, to find information about a provider's services. We find that by requiring providers to provide disclosures on their own websites, consumers will have greater access, and if there is any additional cost to providers, it would be minimal. Ensuring disclosures under the transparency rule are accessible to individuals with disabilities remains a priority, and as such, we require BIAS providers to post the disclosures on their websites using an accessible format. Consistent with the

Commission's approach in the *Broadband Label Order,* we strongly encourage BIAS providers to use the most current version of the Web Content Accessibility Guidelines, an approach unopposed in the record.

552. *Machine-Readable Format.* As with the broadband label, we require that all transparency disclosures made pursuant to the transparency rule also be made available in machine-readable format. By "machine readable," we mean providing "data in a format that can be easily processed by a computer without human intervention while ensuring no semantic meaning is lost." The machine-readable disclosures should be made available in a spreadsheet file format such as the comma-separated values (.csv) format and be available on the same page and accessible via the same URL as the relevant "non-machine-readable" disclosures (*e.g.,* network practice disclosures should be available in both the traditional narrative format and the machine-readable format on the same page of the provider's website). We agree with commenters who note that machine readability enables interested parties to better compare the transparency disclosures of different companies. As a result, this information can be more easily studied by third parties and then more easily conveyed by those third parties to end users, who may otherwise be unable to, or uninterested in, understanding detailed privacy or network management practices. We find, therefore, that machine readability will further increase transparency. Notably, no commenter objects to this specific requirement in the record. We note that some commenters did object to the machine-readability requirement in the *Broadband Label Order.* In that proceeding, however, we found that transferring the data into machine-readable format did not impose a high burden upon providers or require a high degree of technical difficulty. As no commenter has raised any specific objections to machine-readability in the current proceeding, we conclude that there is no reason to depart from the findings we made with regard to the machine-readability requirement for the broadband label.

### c. Direct User Notification

553. Consistent with our findings in the *2015 Open Internet Order,* we require BIAS providers to directly notify end users "if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion, that is likely to have a significant impact on the end user's use

of the service." The Commission eliminated this requirement in the *RIF Order,* finding it "unduly burdensome" for BIAS providers, without any analysis. Commenters in opposition of such a requirement contend that because consumers are provided advance notice of network management practices, any subsequent notification about particular actions is unnecessary and unduly burdensome to providers. As the Commission explained in the *2015 Open Internet Order,* however, "[t]he purpose of such notification is to provide the affected end users with sufficient information and time to consider adjusting their usage to avoid application of the practice." While our transparency rule requires BIAS providers to disclose details regarding their network practices, the record provides no evidence that consumers are easily able to track their usage to identify when their usage is likely to trigger a network practice so that they may then adjust their usage accordingly. We find that because providers must already monitor their networks in order to apply network practices when a user takes a particular action, a specific event occurs, or a data cap threshold is reached, providers are better positioned to advise customers about the circumstances surrounding the applied network practice than are users positioned to track and identify such occurrences on their own.

554. We are also skeptical of WTA's assertion that "direct notification would entail major hardship and unnecessary expense for service providers to maintain accurate and up-to-date versions of the frequently changing lists of their customers and contact addresses (whether email, text or physical)," as providers need customer contact information for billing purposes. Thus, because providers must necessarily actively monitor their networks in order to apply network practices and already collect contact information for their users, we believe that any additional burden would come from identifying the particular application of a network practice and notifying the user. We do not anticipate that the burdens associated with notifying customers would be significant, as we expect that most providers who offer plans without unlimited data already provide an automated notification to users notifying them that they will be billed an additional fee for additional data upon reaching their data threshold or provide some method of tracking monthly usage. For example, mobile BIAS providers either automatically notify users when they will soon go over

a data cap or permit them to turn on data usage notifications. AT&T provides notification to users subject to a data threshold when they reach 75% of the threshold. Fixed providers with data caps also provide similar notifications or offer similar tools to track usage. Therefore, we find that the benefits to consumers outweigh any additional costs to BIAS providers, particularly since, as in 2015, we do not require real-time notifications.

555. *Temporary Exemption for BIAS Providers with 100,000 or Fewer Broadband Subscribers.* In response to concerns expressed in the record pertaining to the direct customer disclosure requirement, we provide a temporary exemption (with the potential to become permanent) to the direct notification requirement for BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all provider affiliates. We observe that this temporary exemption aligns with the longer implementation period for the broadband label applicable to certain providers. We believe that providers that have 100,000 or fewer broadband subscribers are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications, and we therefore afford such providers additional time to develop appropriate systems. We delegate to CGB the authority to determine whether to maintain the exemption, and if so, the appropriate bounds of the exemption. We direct CGB to seek comment on the question and adopt an Order announcing whether it is maintaining an exemption no later than 18 months after publication of the Order in the **Federal Register**.

### C. Reasonable Network Management

556. The record broadly supports maintaining an exception for reasonable network management. We agree that a reasonable network management exception to the no-blocking rule, the no-throttling rule, and the general conduct rule is necessary for BIAS providers to optimize overall network performance and maintain a consistent quality experience for consumers while carrying a variety of traffic over their networks. The transparency rule does not include an exception for reasonable network management. We clarify, however, that the transparency rule "does not require public disclosure of competitively sensitive information or information that would compromise network security or undermine the efficacy of reasonable network

management practices." Therefore, the no-blocking rule, the no-throttling rule, and the general conduct rule will be subject to reasonable network management for both fixed and mobile BIAS providers. We note that unlike conduct implicating the no-blocking, no-throttling, or general conduct rule, paid or affiliated prioritization is not a network management practice because it does not primarily have a technical network management purpose. In retaining the exception, we return to the definition of reasonable network management adopted by the Commission in 2015, providing that a network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband internet access service.

557. When considering whether a practice violates the no-blocking rule, no-throttling rule, or general conduct rule, the Commission may first evaluate whether a practice falls within the exception for reasonable network management. For a practice to even be considered under this exception, a BIAS provider must first show that the practice is primarily motivated by a technical network management justification rather than other business justifications. If a practice is primarily motivated by another non-network related justification, then that practice will not be considered under this exception. The term "particular network architecture and technology" refers to the differences across broadband access platforms of any kind, including cable, fiber, DSL, satellite, unlicensed Wi-Fi, fixed wireless, and mobile wireless.

558. We find that permitting reasonable network management practices that are primarily technical in nature will provide BIAS providers sufficient flexibility to manage their networks, while at the same time will help protect against BIAS providers using the exception to circumvent open internet protections. We agree with Professor Jon Peha that if a practice can be considered reasonable network management "simply because it is needed in support of a 'business practice,' this opens potentially a large loophole unless one severely limits the meaning of 'business practice.'" Likewise, as Public Knowledge explains, "any traffic management practice, including one that is nakedly

anticompetitive, can be characterized as having some technical purpose—for example, to slow down a rival's traffic." We agree that restricting the scope of "reasonable network management" to practices that are *primarily* justified as traffic management techniques will help prevent the exception from becoming a loophole permitting otherwise unlawful business and traffic management practices.

559. We believe that the reasonable network management exception provides both fixed and mobile BIAS providers sufficient flexibility to manage their networks. We recognize, consistent with the consensus in the record, that the additional challenges involved in mobile BIAS network management mean that mobile BIAS providers may have a greater need to apply network-management practices, including mobile-specific network management practices, and to do so more often to balance supply and demand while accommodating mobility. As the Commission has previously observed, mobile network management practices must address dynamic conditions that fixed networks typically do not, such as the changing location of users as well as other factors affecting signal quality. Similarly, SpaceX argues that satellite providers require additional network management flexibility to account for the same challenges that the *2015 Open Internet Order* recognized in the context of mobile and Wi-Fi networks, including dynamic conditions, spectrum constraints, and congestion issues. WISPA likewise explains that fixed wireless providers face challenges "managing networks of multiple spectrum bands." The ability to address these dynamic conditions in mobile, wireless, and satellite network management is especially important given capacity constraints these BIAS providers, many of them small, face. The Commission will take into account when and how network management measures are applied as well as the particular network architecture and technology of the BIAS in question, in determining if a network management practice is reasonable.

560. We disagree with Ericsson that just because a network management practice can have both a primary technical reason and include other business practices, our definition "presents a false dichotomy." As an initial matter, the standard we adopt in the Order does not require that a network management practice's purpose be *solely* technical in nature, but rather *primarily* technical in nature. The exemption does not exclude practices

that have multiple purposes, so long as the practice's purpose is primarily technical. It would, however, not extend to network management practices established for other purposes that lack a primarily technical purpose. To the extent that a BIAS provider engages in a network management practice for purposes other than a primarily technical reason, such practice is not *per se* prohibited, but would be evaluated under the general conduct standard or assessed for compliance with the prohibitions against blocking and throttling. We thus reject assertions in the record that distinctions of intent are not workable, that technical and business decision-making are not severable, or that the 2015 definition will adversely impact "business models that allow mobile operators to optimize their networks in response to consumers' choices and could even bar any practice that affects the provider's costs or revenues." Further, we find unavailing commenters' assertions that the reasonable network management exception we adopt in the Order is vague or ambiguous. While we acknowledge, as the Commission has previously, the advantages a more detailed definition of reasonable network management can have on long-term network investment and transparency, we conclude that a more detailed definition risks quickly becoming outdated as technology evolves, as borne out by commenters' own assertions.

561. *Evaluating Network Management Practices.* We recognize the need to ensure that the reasonable network management exception will not be used to circumvent the open internet rules while still allowing BIAS providers flexibility to experiment and innovate as they reasonably manage their networks. We therefore elect to maintain a case-by-case approach. Case-by-case analysis will allow the Commission to use the conduct-based rules adopted in the Order to take action against practices that are known to harm consumers without interfering with BIAS providers' beneficial network management practices. Beneficial practices include protecting their broadband internet access services against malicious content or offering a service limited to "family friendly" materials to end users who desire only such content. The case-by-case review also allows sufficient flexibility to address mobile-specific management practices because, by the terms of our rule, a determination of whether a network management practice is reasonable takes into account the

particular network architecture and technology. We also note that our transparency rule requires disclosures that provide an important mechanism for monitoring whether providers are inappropriately exploiting the exception for reasonable network management.

562. We decline to specify particular network management practices as *per se* unreasonable, as advocated by WISPA, in order to afford BIAS providers maximum flexibility in managing their dynamic networks. While we are sensitive to the needs of small BIAS providers, we do not believe the record currently supports a one-size-fits-all approach. However, to provide greater clarity, particularly for small BIAS providers, and to further inform the Commission's case-by-case analysis, we offer the following guidance regarding legitimate network management purposes. We also note that, consistent with the 2010 and 2015 reasonable network management exceptions, BIAS providers may request a declaratory ruling or an advisory opinion from the Commission before deploying a network management practice, but are not required to do so.

563. As with the network management exception in the *2015 Open Internet Order,* BIAS providers may implement network management practices that are primarily used for, and tailored to, ensuring network security and integrity, including by addressing traffic that is harmful to the network, such as traffic that constitutes a denial-of-service attack on specific network infrastructure elements. Likewise, BIAS providers may also implement network management practices that are primarily used for, and tailored to, addressing traffic that is unwanted by end users. Further, network management practices that alleviate congestion without regard to the source, destination, content, application, or service are also more likely to be considered reasonable network management practices in the context of this exception. As in the no-throttling rule and the general conduct standard, we include classes of content, applications, services, or devices. In evaluating congestion management practices, a subset of network management practices, we will also consider whether the practice is triggered only during times of congestion and whether it is based on a user's demand during the period of congestion. In addition, we maintain the guidance that a network management practice is more likely to be found reasonable if it is transparent and allows the end user to control it. Finally, we also reaffirm that reasonable network

management practices should be as application-agnostic as possible.

*D. Oversight of BIAS Providers' Arrangements for Internet Traffic Exchange*

564. Because we conclude that BIAS necessarily includes the exchange of internet traffic by an edge provider or an intermediary with the BIAS provider's network, disputes involving a BIAS provider regarding internet traffic exchange that interfere with the delivery of a BIAS end user's traffic are subject to our authority under Title II of the Act. The Commission has previously found, and the current record reflects, that anticompetitive and discriminatory practices in this portion of BIAS could have a deleterious effect on the open internet. The record evidence thus undermines USTelecom's assertion that because "transit providers and their customers almost always rely on multiple redundant paths for the exchange of traffic to customers on any ISP's network, and edge providers dynamically shift between transit providers in real time to avoid congestion," a BIAS provider "thus could not execute a 'degradation by congestion' strategy without limiting capacity across all of its peering points for extended periods." When internet traffic exchange breaks down—regardless of the cause—it risks preventing consumers from reaching the services and applications of their choosing, disrupting the virtuous cycle, and potentially causing public safety or other harms. Further, consumers' ability to respond to unjust or unreasonable BIAS provider practices are limited by switching costs. We therefore retain targeted authority under sections 201, 202, and 208 of the Act (and related enforcement provisions) to protect against such practices, and will continue to monitor BIAS providers' internet traffic exchange arrangements to ensure that they are not harming or threatening to harm the open nature of the internet. This regulatory backstop is not a substitute for robust competition. The Commission's regulatory and enforcement oversight, including over common carriers, is complementary to vigorous antitrust enforcement. Thus, it will remain essential for the Commission, as well as the DOJ, to continue to carefully monitor, review, and where appropriate, take action against any anticompetitive mergers, acquisitions, agreements or conduct, including where BIAS is concerned. We conclude, consistent with the *2015 Open Internet Order,* that case-by-case review under sections 201 and 202 is the appropriate vehicle for enforcement

"where disputes are primarily over commercial terms and that involve some very large corporations, including companies like transit providers and CDNs, that act on behalf of smaller edge providers.'' Thus, the Commission will be available to hear disputes raised under sections 201 and 202 on a case-by-case basis. In addition, Federal courts will also be able to adjudicate complaints brought under Title II. We also observe that section 706 provides the Commission with an additional, complementary source of authority to ensure that internet traffic exchange practices do not harm the open internet.

565. We disagree with USTelecom's assertions that our oversight of BIAS providers' arrangements for internet traffic exchange would "result in irrationally asymmetric regulation of bilateral negotiations'' and "would leave the ISP's counterparty . . . an unregulated entity immune from such complaints, giving it new opportunities for regulatory gamesmanship.'' While BIAS providers would be subject to the Commission's prohibitions against unjust and unreasonable practices, the other parties to such agreements are not without oversight; such parties would remain subject to the FTC's oversight of "unfair and deceptive'' practices as well as the FTC's and DOJ's antitrust authority. Further, we observe that should a complaint arise regarding BIAS provider internet traffic exchange practices, practices by edge providers (and their intermediaries) would be considered as part of the Commission's evaluation as to whether BIAS provider practices were "just and reasonable'' under the Act.

566. We decline to apply any open internet rules to internet traffic exchange. We note that this exclusion also extends to interconnection with CDNs. Internet traffic exchange agreements have historically been and will continue to be commercially negotiated. Given the constantly evolving market for internet traffic exchange, we conclude that at this time it would be difficult to predict what new arrangements will arise to serve consumers' and edge providers' needs going forward, as usage patterns, content offerings, and capacity requirements continue to evolve. Consistent with the Commission's findings in 2015 and subsequent inquiries, we find that the best approach with the respect to arrangements for internet traffic exchange is to rely on the regulatory backstop of sections 201 and 202, which prohibit common carriers from engaging in unjust and unreasonable practices. Our "light touch'' approach therefore does not

directly regulate interconnection practices. We make clear, however, that BIAS providers may not engage in interconnection practices that "circumvent the prohibitions contained in the open internet rules'' or that have the purpose or effect of evading our rules to protect internet openness.

567. We conclude that it would be premature to adopt prescriptive rules to address any problems that have arisen or may arise, and we decline at this time to adopt a rule requiring BIAS providers to offer settlement-free peering to edge providers and transit providers that agree to reasonably localize the exchanged traffic, or to otherwise prohibit fees associated with internet traffic exchange arrangements, as some commenters suggest. The record reflects competing narratives regarding the imposition of paid peering arrangements. For example, one research study claims that paid peering results in higher prices for consumers, reduces consumer surplus, and results in higher profits for broadband providers. In contrast, USTelecom asserts that "the providers of such double-sided platforms [like ISPs] routinely assess fees on both sides, and it is well understood that charges to one side of the platform (here, direct-interconnection fees) exert downward pressure on charges to the other side (here, resulting in lower consumer broadband bills).'' USTelecom further argues that "eliminating direct-interconnection fees would eliminate price signals that, today, give content-originating networks efficient incentives to reduce unnecessary costs in their transmission of internet traffic,'' explaining that "the prospect of such fees currently gives streaming video providers incentives to implement efficient forms of digital compression that reduce traffic loads while still providing high video quality to end users'' and that "[i]mposing a new obligation of settlement-free direct interconnection would undermine those efficiency-inducing price signals, generate wasteful over-expenditure of finite network resources, and thus impose on broadband providers avoidable costs that consumers would ultimately bear in the form of higher broadband bills.'' Lumen, in response, asserts that "the fees large BIAS providers attempt to impose are indeed supracompetitive . . . and can exceed what Lumen charges for transit service,''—a highly competitive market—demonstrating "conclusively'' that their charges are supracompetitive. And New America's Open Technology Institute asserts that "[e]dge providers

have plenty of price incentives to move, manage, and deliver traffic efficiently without the BIAS provider extracting a toll for access to their subscribers.'' We are cautious of imposing a one-size-fits-all rule on this dynamic sector of the broadband industry based on the record before us, which raises potential concerns about such arrangements but lacks detail regarding specific incidences of such actions. Instead, we will proceed on a case-by-case basis regarding assertions or claims that arrangements for internet traffic exchange, including fee-based arrangements, violate sections 201 or 202 of the Act, or are being used to circumvent or evade open internet protections. As we note above, the Commission has taken action to require settlement-free peering agreements where appropriate.

*E. Enforcement of Open Internet Rules*

568. Effective and timely conflict resolution and clear guidance on permitted and prohibited practices under the rules we adopt in the Order are important to further our goal to secure and safeguard an open internet. As in the past, we expect that many disputes that will arise can and should be resolved by the parties without Commission involvement. We continue to encourage parties to resolve disputes through informal discussion and private negotiations whenever possible.

569. At the same time, we are prepared to enforce our open internet rules as the need arises. To that end, we will rely on a multifaceted enforcement framework comprised of advisory opinions, enforcement advisories, Commission-initiated investigations, and informal and formal complaints. Some commenters endorse a multi-faceted enforcement framework. The advisory opinions and enforcement advisories should provide upfront clarity, guidance, and predictability with respect to the open internet rules, thereby giving providers an avenue to avoid formal complaint litigation, remediation, or fines after the fact. Commission-initiated investigations will also play a role in our enforcement framework. Investigations may stem from review of informal complaints, from which trends of behavior can be identified, or information otherwise brought to the Commission's attention. When the Commission determines a violation has occurred, we will pursue remedies and penalties. Lastly, the formal complaint processes will provide parties options to bring open internet rule violations to the Commission's attention and to resolve specific disputes. As explained *infra,* the

Enforcement Bureau's Market Disputes Resolution Division provides confidential mediation services, at no cost, to assist parties in settling or narrowing disputed issues. We find that, when necessary, the formal complaint process will provide a backstop framework that will effectively and timely address open internet disputes and provide guidance on practices that are permitted or prohibited under our rules.

1. Advisory Opinions and Enforcement Advisories

570. *Advisory Opinions.* The Commission previously concluded in 2015 that the use of advisory opinions would be in the public interest and had the potential to provide clarity, guidance, and predictability concerning the Commission's open internet rules. In 2017, the *RIF Order* ended the use of enforcement advisory opinions, asserting that they were no longer necessary due to the elimination of the conduct rules. In the Order, we reaffirm the conclusions of the *2015 Open Internet Order,* and adopt an updated process for providers seeking an advisory opinion from Commission staff regarding the open internet rules to provide upfront clarity, guidance, and predictability. Updated process steps are not intended to substantively differ from those outlined in the *2015 Open Internet Order.* We continue to believe an advisory opinion process will provide clarity and guidance to providers seeking to comply with our regulations. We believe the advisory opinion process we adopt in the Order will help, and not impede, innovation by providing published guidance that illustrates how we implement our laws and regulations.

571. Under the process we adopt in the Order, any BIAS provider may request an advisory opinion regarding the permissibility of its proposed policies and practices affecting access to BIAS. As noted in our rules, requests for an advisory opinion may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau. We hereby delegate to the Enforcement Bureau the authority to receive such requests and issue such advisory opinions, and we direct the Enforcement Bureau to coordinate closely with other relevant Bureaus and Offices regarding such advisory opinions. The Enforcement Bureau will have discretion to determine whether to issue an advisory opinion in response to a particular request or group of requests

and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question. The Enforcement Bureau shall decline to issue an advisory opinion if the relevant policy or practice is the subject of a pending government investigation or proceeding.

572. BIAS providers may submit requests for advisory opinions regarding prospective policies and practices affecting broadband access. A request must pertain to a policy or practice that the requesting party intends to utilize, rather than a mere possible or hypothetical scenario. As a general matter, the Enforcement Bureau will prioritize requests involving substantial questions with no clear Commission precedent and/or subject matter involving significant public interest. Other Federal agencies have similar advisory opinion processes. For example, the Rules of Practice of the FTC provide that the FTC or its staff, in appropriate circumstances, may offer industry guidance in the form of an advisory opinion. The FTC specifies that it will consider requests for advisory opinions, where practicable, under the following circumstances: ''(1) The matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent; or (2) The subject matter of the request and consequent publication of Commission advice is of significant public interest.''

573. When submitting requests, BIAS providers must include all material information such that Commission staff can make a fully informed determination on the matter. Requesting parties will also be required to certify that factual representations made to the Enforcement Bureau are truthful, accurate, and do not contain material omissions. The Enforcement Bureau will have discretion to request additional information from the requesting entity and from other parties that might have relevant information or be impacted by the request. These might include, for example, impacted consumers or state, local, or Tribal governments.

574. Our advisory opinion process will affect BIAS providers and the Commission's enforcement actions as described below. First, the process is fully voluntary. No BIAS provider will be rewarded or penalized for seeking an advisory opinion, and the seeking (or not) of an advisory opinion will not itself influence any enforcement-related decision by the Commission. Second, in an advisory opinion, the Enforcement Bureau will issue a determination of whether or not the policy or practice

detailed in the request complies with the open internet rules. We disagree with Smithwick & Belendiuk's assertion that that the Commission must provide the public an opportunity to comment on a BIAS provider's request for an advisory opinion, or eliminate the process entirely. As Smithwick & Belendiuk itself acknowledges, a BIAS provider may ''face a legitimate potential for competitive harm if its operational plan are made public at the advisory opinion stage,'' and further, the Commission does not routinely seek public input on its interpretation of its own rules.

575. The Bureau will not respond to requests for opinions that relate to ongoing or prior conduct, and the Bureau may initiate an enforcement investigation to determine whether such conduct violates the open internet rules. Third, a requesting party may rely on an advisory opinion to the extent that its request fully and accurately describes all material facts and circumstances. Fourth, advisory opinions will be issued without prejudice to the Enforcement Bureau's or the Commission's ability to reconsider the questions involved, and rescind the opinion. We disagree with commenters who assert that advisory opinions are not helpful because they would only apply to the requesting party and the facts at hand and not other providers or because any guidance would be revocable and not binding. While advisory opinions will specifically engage with the facts provided by a requesting party, we believe published advisory opinions will inform other providers with similar questions, and that usefulness will still apply even if the Commission subsequently revises its guidance.

576. The Enforcement Bureau will attempt to respond to requests for advisory opinions as efficiently as possible. We decline to establish firm deadlines, however, because we anticipate that the nature, complexity, and magnitude of requests may vary widely. Furthermore, it may take time for Commission staff to request any additional information needed to issue an opinion. Once issued, the Enforcement Bureau will make the advisory opinion available to the public. Entities concerned about privacy and sensitive market information may request confidential treatment of certain information, as provided under Commission rules. And to provide further guidance to industry and consumers, the Bureau will also release the initial request and any additional materials deemed necessary to contextualize the opinion.

577. We continue to believe an advisory opinion process will provide clarity and guidance to providers seeking to comply with our regulations. While some commenters assert that seeking an advisory opinion would potentially harm the requesting party, the advisory opinion process we adopt in the Order does not contemplate the Enforcement Bureau taking enforcement action solely in response to a provider seeking an advisory opinion.

2. Complaint Processes

578. *Informal Complaints.* As stated in the *2023 Open Internet NPRM,* the Commission's informal complaint process under § 1.41 of the rules "remain[s] available to parties with respect" to open internet rules. Commenters support continued use of the informal complaint process as an effective enforcement mechanism of our rules. For example, NDIA affirms the value of the informal complaint pathway in its "accessibility to most consumers." The Commission previously found, and we continue to find, that § 1.41 provides "a simple and cost-effective option for calling attention to open internet rule violations." With reclassification, §§ 1.711 through 1.717 also apply to informal complaints arising under Title II of the Act. Consumers may submit informal complaints online, and no filing fee is required. Informal complaints are filed through the Commission's user-friendly complaint interface, the Consumer Inquiries and Complaint Center Help Center. We note that the Commission's Consumer Complaint Center is responsive on mobile devices and that the Commission's call center is staffed by both English- and Spanish-speaking agents who can file complaints on behalf of consumers. Individuals who use videophones and are fluent in American Sign Language (ASL) may call the Commission's ASL Consumer Support line for assistance in ASL with filing informal complaints or obtaining consumer information. Those who wish to file an informal complaint may simply visit the Consumer Inquiries and Complaint Center portal on the Commission's website and click the internet icon to access relevant information and the online complaint intake system. Consistent with our current process and procedures, consumers may also file informal complaints by fax or postal mail. The informal consumer complaint process facilitates a conversation between the consumer and the provider to address disputed issues. It does not involve arbitration, mediation, or investigation. These complaints will be reviewed and

may be served on the consumer's BIAS provider for investigation and response to the consumer within 30 days. WISPA requests a 30-day negotiating period before filing an informal complaint. We decline WISPA's request, but we note that the informal complaint process is designed to allow parties to reach an informal, negotiated resolution before proceeding to a more formal process. Although individual informal complaints will not typically result in written Commission Orders, the Enforcement Bureau will examine trends or patterns in complaints to identify potential targets for investigation and enforcement action. The availability of complaint procedures does not bar the Commission from initiating separate and independent enforcement proceedings for potential violations. The Commission reviews informal complaints and, when applicable, will initiate investigations internally in furtherance of our enforcement efforts. These include Commission-initiated inquiries under section 403 of the Act, which may lead to the issuance of forfeitures under section 503(b) of the Act.

579. *Formal Complaints.* The *RIF Order* eliminated the open internet complaint rules adopted in the *2010 Open Internet Order* and preserved in the *2015 Open Internet Order.* With our action in the Order to reclassify BIAS as a Title II telecommunications service, absent adoption of a different approach, the section 208 formal complaint rules will apply. In the *2023 Open Internet NPRM,* we sought comment on whether it would be beneficial to re-establish a formal complaint process for complaints arising under our open internet rules and whether our section 208 formal complaint process is sufficient for this purpose. We agree with commenters that the formal complaint process should continue to be part of the enforcement framework for the open internet rules. Several commenters state that formal complaint procedures are necessary to ensure equal access to BIAS and support having a structured formal complaint process. In its comment, the U.S. Chamber of Commerce objects to "adopt[ing] a formal complaint mechanism under section 208 of the Communications Act for alleged instances of digital discrimination." The instant Order, however, only concerns open internet rules and takes no position on the applicability of section 202 to the digital discrimination rules. We further conclude that the existing formal complaint rules codified at §§ 1.720

through 1.740 of our rules should apply to formal open internet complaints.

580. The Commission updated the existing section 208 rules in 2018, and they govern all formal complaint proceedings delegated to the Enforcement Bureau. These comprehensive rules are largely the same as the prior open-internet-specific formal complaint rules, providing for a complaint, answer, and reply, as well as discovery and briefing, as appropriate. They also establish deadlines for the resolution of complaints. We reject WISPA's request that the Commission be required to render a decision on any complaint within 60 days from the date the BIAS provider files its response to the Commission. The formal complaint rules are designed to resolve complaints on a written record and give defendants sufficient opportunity to respond to the allegations against them so as to afford due process. The rules contemplate the exchange of information and other efforts to narrow the issues in dispute and streamline the adjudicative process. A 60-day deadline would not provide adequate time for the development of a complete record in a complex case. We also reject WISPA's request for a shortened, one-year statute of limitations from the time of an alleged open internet rule violation. Section 415 of the Act generally provides that complaints be filed within two years from the time the cause of action accrues, and WISPA provides no basis justifying a departure from this statutory requirement. For these reasons we find it unnecessary, as WISPA requests, for the Commission to seek additional comment on streamlined enforcement procedures and timeframes for BIAS providers with 250,000 or fewer subscribers. We find that the size of the defendant BIAS provider (or the number of subscribers it has) does not determine the complexity or scope of the violations alleged, nor does it form the basis for developing a separate set of procedures or deadlines. Furthermore, we find it unnecessary to examine whether to establish a specific forfeiture amount for smaller providers under part 8 of the Commission's rules. The Commission's rules already provide for discretion when assessing penalties, so there is no need to limit that discretion solely for small BIAS providers. Moreover, we believe that using the section 208 formal complaint rules will avoid the potential for two different complaint processes if a complaint includes both open internet violations and other Title II violations.

581. ACA Connects expresses concern about the burden and cost associated with defending potential complaint

proceedings. We find such proceedings are likely to be rare and unlikely to be particularly burdensome. To reiterate, we view formal complaint litigation as a last resort. The section 208 formal complaint rules require a complainant to certify that it has made a good faith effort to settle the dispute. Additionally, either party may seek voluntary mediation at the Commission—before a complaint is filed or while the complaint is pending—in an effort to avoid litigation. Mediation may be requested by a letter or by filing an informal complaint with the Enforcement Bureau's Market Disputes Resolution Division. Mediation often obviates the need for litigation or, barring settlement of the entire dispute, may narrow issues for adjudication.

F. Legal Authority

582. We rely on multiple sources of independent, complementary legal authority for the open internet rules we adopt in the Order, including Titles II and III of the Act and section 706 of the 1996 Act. These are the same sources of authority that the Commission relied upon when it adopted rules in the *2015 Open Internet Order,* which were upheld in full by the D.C. Circuit. These sources of authority work to safeguard and secure internet openness to ensure that the internet continues to grow as a platform for competition, free expression, and innovation; to be a driver of economic growth; and to be an engine of the virtuous cycle of broadband deployment, innovation, and consumer demand.

583. In the Order, we find that BIAS is a telecommunications service subject to Title II, with forbearance where appropriate under section 10 of the Act, allowing the Commission to exercise its authority under sections 201 and 202 of the Act to ensure that BIAS providers do not engage in unjust and unreasonable practices or preferences. As described below, under section 706, the Commission has the authority to adopt these open internet rules to encourage and accelerate the deployment of broadband to all Americans. The rules are also supported by Title III of the Act, under which the Commission has broad spectrum management authority to protect the public interest through spectrum licensing and regulations. Each of these sources of authority provides an alternative ground to independently support our open internet rules. With respect to our revised transparency rule, we rely on the same sources of authority along with section 257 of the Act (and associated authority now in section 13 of the Act), consistent with the relevant reasoning of

the *2010 Open Internet Order* and the *RIF Order.* Below, we discuss the basis and scope of each of these sources of authority, provide an overview of prior precedents which justifies such use, and then explain their application to the open internet rules we adopt in the Order.

1. Title II of the Act With Forbearance

584. As in the *2015 Open Internet Order,* we find that the open internet rules we adopt in the Order are also supported by our legal authority under Title II to regulate telecommunications services. We rely on sections 201, 202, and 208 of the Act, along with the related enforcement authorities of sections 206, 207, 209, 216, and 217, as additional legal authority for the open internet rules we adopt in the Order.

585. Section 201(a) places a duty on common carriers to furnish communications services subject to Title II "upon reasonable request" and "establish physical connections with other carriers" where the Commission finds it to be in the public interest." Section 201(b) provides that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." Section 201(b) also gives the Commission the authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." Section 202(a) makes it unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

586. Thus, the unjust and unreasonable standards in sections 201 and 202 afford the Commission significant discretion to distinguish acceptable behavior from behavior that violates the Act. Indeed, the very terms "unjust" and "unreasonable" are broad, inviting the Commission to undertake the kind of line-drawing that is necessary to differentiate just and reasonable behavior on the one hand from unjust and unreasonable behavior on the other. As the D.C. Circuit has stated, for example, "the generality of

these terms . . . opens a rather large area for the free play of agency discretion, limited of course by the familiar 'arbitrary' and 'capricious' standard in the Administrative Procedure Act." Stated differently, because both sections "set out broad standards of conduct," it is up to the "Commission [to] give[ ] the standards meaning by defining practices that run afoul of carriers' obligation, either by rulemaking or by case-by-case adjudication." Acting within this discretion, the Commission has exercised its authority under section 201(b), through both adjudication and rulemaking, to ban unjust and unreasonable carrier practices as unlawful under the Act. The Commission need not proceed through adjudication in announcing a broad ban on a particular practice. Indeed, the text of section 201(b) itself gives the Commission authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." Although the particular circumstances have varied, in reviewing these precedents, we find that the Commission generally takes this step where necessary to protect competition and consumers against carrier practices for which there was either no cognizable justification for the action or where the public interest in banning the practice outweighed any countervailing policy concerns.

587. Our rulemaking actions interpret and apply the statutory authority at issue here, thereby enabling the Commission to address the sorts of core communications policy issues that the agency has dealt with since the enactment of the Communications Act. This is illustrated by the many historical precedents for the regulation of carriers consistent with the conduct rules we adopt.

588. *Prohibitions on Blocking and Throttling.* The conduct rules we adopt in the Order are consistent with longstanding Commission precedent under the Act, and in some respects also historical common carriage requirements more generally. Our rules prohibiting blocking or throttling of traffic except for purposes of reasonable network management or at the desire of end users aligns with policies the Commission long has applied to carriers under the Communications Act. These rules also accord with longstanding requirements imposed on common carriers of various sorts to defer to their customers regarding the content being carried and to ensure that content gets to its destination in a timely and reliable manner.

589. *Restriction on paid prioritization.* Our rule banning paid prioritization also reflects the Commission's historical recognition that just and reasonable rates and practices can require regulating carriers' relationships with other communications suppliers. The Commission historically has regulated those relationships as needed, including to restrict carriers' ability to impose charges on providers delivering them communications traffic. We recognize that in addition to benefitting BIAS customers, our justification for the ban on paid prioritization rests in part on the identified harms to edge provider operations and innovation—but that, too, is consistent with how the Commission has exercised its authority historically. For example, the Supreme Court has rejected the view that section 201(b) limits the Commission to addressing practices exclusively when they harm customers, rather than also encompassing harms to communications service suppliers, basing its rationale in part on historical regulation under the Interstate Commerce Act. Further, a policy goal of the historical *Computer Inquiries* regime was to guard against the risk of carriers harming competitive providers of enhanced services.

590. *General Conduct Rule.* Our general conduct rule, by which we evaluate conduct not covered by the bright-line rules, is consistent with the Commission's historical exercise of authority under the Act. Since its original enactment in 1934, the Communications Act has prohibited unjust, unreasonable, and unjustly or unreasonably discriminatory, rates and practices by carriers, and the Commission has regularly judged carriers' conduct against those standards on a case-by-case basis. The origins of common carrier duties under common law, and then under the Interstate Commerce Act, likewise commonly were subject to case-by-case adjudication.

591. The specific considerations that guide the application of the general conduct rule also reflect the types of factors the Commission historically has weighed in evaluating the justness and reasonableness of carrier conduct.

• For example, section 201(b) of the Act has long been understood to allow for carrier practices that enable end users to control their use of the service to which they have subscribed as just and reasonable, absent a countervailing adverse public impact.

• Consumer protection, such as protection against deceptive or misleading practices, also has been a part of the Commission's

implementation of section 201(b) of the Act.

• The Commission historically has implemented the Act to guard against conduct that would have harmful competitive effects, as well.

• The Commission not only has considered effects on innovation and investment in its implementation of longstanding provisions of the Act, but since the enactment of the 1996 Act also has relied on the mandate to advance broadband deployment in section 706 of that statute.

• The Commission also has treated compliance with industry standards or best practices as relevant—though not dispositive—to its evaluation of the justness and reasonableness of carrier practices.

Thus, the consideration of such factors through a case-by-case reasonableness evaluation is fully consistent with longstanding historical practice.

592. The record also provides broad support for relying on authority in sections 201 and 202 of the Act. Some commenters oppose relying on sections 201 and 202, because these sections may be unduly burdensome, particularly on smaller providers. In such cases, commenters urge the Commission to forbear from sections 201, 202, and 208 for smaller BIAS providers, or alternatively, initiate a new proceeding to define the limits of obligations for small BIAS providers. Other commenters argue that the Commission should focus on Title II authority rather than section 706. These commenters contend that the Commission should focus on Title II authority rather than section 706. For the reasons set forth above, we find the open internet rules we adopt in the Order are supported by our legal authority under Title II.

593. As proposed in the *2023 Open Internet NPRM,* and consistent with the *2010 Open Internet Order* and the *RIF Order,* and as affirmed by the D.C. Circuit in *Mozilla,* we rely on section 257 of the Act (now in conjunction with section 13 of the Act) as additional legal authority for the transparency requirements we retain. Section 257(a) directs the Commission to ''identify[ ] and eliminate[ ] . . . market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services.'' The RAY BAUM'S Act of 2018 eliminated section 257(c) of the Act, and instead included language in new section 13 of the Act, 47 U.S.C. 163, requiring similar

review under that provision. Thus, to be clear, section 257 previously included subsection (c), which directed the Commission to submit a triennial report to Congress on the market entry barriers for entrepreneurs and other small businesses. The RAY BAUM's Act now requires the Commission to submit a biennial report that is similar to the report previously required under section 257(c). In carrying out section 257(a), the Commission ''shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity.''

594. We continue to find that section 13(d)(3) is properly understood as not only imposing a current obligation to ''consider market barriers for entrepreneurs and other small businesses in the communications marketplace in accordance with the national policy under section 257(b),'' but also imposing an ongoing obligation to do so. In this regard, section 13(a) directs the Commission to submit a report to Congress, ''[i]n the last quarter of every even-numbered year, on the state of the communications marketplace.'' The report must assess the state of competition in the communications marketplace, including competition to deliver voice, video, audio, and data services among providers of telecommunications, providers of commercial mobile service (as defined in section 332), multichannel video programming distributors (as defined in section 522), broadcast stations, providers of satellite communications, internet service providers, and other providers of communications services. The report must ''assess whether laws, regulations, regulatory practices (whether those of the Federal Government, States, political subdivisions of States, Indian tribes or tribal organizations (as such terms are defined in section 5304 of title 25), or foreign governments), or demonstrated marketplace practices pose a barrier to competitive entry into the communications marketplace or to the competitive expansion of existing providers of communications services.'' Section 13(d)(3) further directs that, ''[i]n assessing the state of competition . . . and regulatory barriers . . ., the Commission shall consider market entry barriers for entrepreneurs and other small businesses in the communications marketplace in accordance with the national policy under section 257(b) of this title.''

2. Section 706 of the 1996 Act

595. We adopt our proposal to return to the Commission's prior judicially affirmed interpretation of section 706 of the 1996 Act as granting the Commission regulatory authority. We do so in light of the considerations that persuaded the Commission to adopt such interpretations in the past, and that persuaded courts to affirm those interpretations. Consistent with the prior approach, we rely on section 706(a) as part of our authority for the adoption of open internet rules. We also rely on section 706(b) to the extent that the Commission concludes under section 706(a) that advanced telecommunications capability is not being deployed to all Americans in a reasonably timely fashion. The Commission's most recent section 706 report issued last month concluded that advanced telecommunications capability was *not* being deployed to all Americans in a reasonable and timely fashion. The record reflects support for returning to the Commission's prior interpretation of section 706(a) and (b) as grants of regulatory authority from a range of commenters, including State and local groups, public interest groups, think tanks, academia, and others. These commenters generally argue that interpreting section 706 as a grant of regulatory authority provides a better reading of the statute than the interpretation adopted in the *RIF Order,* is supported by judicial and Commission precedent, is supported by legislative history, and will survive judicial scrutiny even with limited deference. The record also reflects commenters who oppose returning to interpreting section 706 as a grant of regulatory authority, for reasons such as the provision should be viewed as exhortative rather than as a directive, the provision is not supported by statutory interpretation, and the provision is not supported by clear congressional intent. For the reasons discussed by the Commission in the *2010 Open Internet Order* and the *2015 Open Internet Order,* the D.C. Circuit in *Verizon* and *USTA,* the Tenth Circuit in *In re FCC,* and in the Order, we disagree. We also disagree with other commenters' claims that the Commission could adopt rules using section 706 and Title I authority.

596. The *RIF Order* principally grounded its rationale for changing the interpretation of section 706 on its view that section 706 was better interpreted as hortatory. As explained below, upon further analysis, we conclude that interpreting section 706(a) and (b) as grants of regulatory authority represents the better reading of the statute and likewise provides a basis for us to change our interpretation.

597. For one, we have ample support for relying on specific rationales for interpreting section 706(a) and (b) of the 1996 Act as grants of regulatory authority. In *Comcast,* the D.C. Circuit identified section 706(a) as a provision that "at least arguably . . . delegate[s] regulatory authority to the Commission," and in fact "contain[s] a direct mandate—the Commission 'shall encourage.'" In the *2010 Open Internet Order,* the Commission explained why section 706(a) and (b) each represent a grant of regulatory authority to the Commission after considering the statutory text, regulatory and judicial precedent, and legislative history, and rejecting objections to that interpretation. In particular, the Commission explained that Congress, in directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment," necessarily vested the Commission with the statutory authority to carry out those acts. Indeed, the relevant Senate Report explained that the provisions of Section 706 are "intended to ensure that one of the primary objectives of the [1996 Act]—to accelerate deployment of advanced telecommunications capability—is achieved," and stressed that these provisions are "a necessary fail-safe" to guarantee that Congress's objective is reached. As the Commission explained, it would be odd indeed to characterize Section 706(a) as a "fail-safe" that "ensures" the Commission's ability to promote advanced services if it conferred no actual authority. As with the *2010 Open Internet Order,* our reading, Section 706(a) authorizes the Commission to address practices, such as blocking VoIP communications, degrading or raising the cost of online video, or denying end users material information about their broadband service, that have the potential to stifle overall investment in internet infrastructure and limit competition in telecommunications markets.

598. Consistent with what the Commission went on to explain, section 706(a) accordingly provides the Commission with a specific delegation of legislative authority to promote the deployment of advanced services, including by means of the open internet rules adopted in the *2010 Open Internet Order.* As the Commission explained in *2010 Open Internet Order,* our understanding of section 706(a) is also harmonious with other statutory provisions that confer a broad mandate on the Commission. For example, section 706(a)'s directive to "encourage the deployment [of advanced telecommunications capability] on a reasonable and timely basis" using the methods specified in the statute is no broader than other provisions of the Commission's authorizing statutes that command the agency to ensure "just" and "reasonable" rates and practices, or to regulate services in the "public interest." Our section 706(a) authority is also generally consistent with—though narrower than—the understanding of ancillary jurisdiction under which this Commission operated for decades before the *Comcast* decision. The similarities between the two in fact explain why the Commission had not, before the *2010 Open Internet Order,* had occasion to describe section 706(a) in this way. That is because in the particular proceedings prior to *Comcast,* providing such understanding of section 706(a) that we articulate in the *2010 Open Internet Order* would not meaningfully have increased the authority that we understood the Commission already possessed.

599. In addition, in the *2015 Open Internet Order,* the Commission built on the foundation of its explanations in the *2010 Open Internet Order,* rejecting various objections to the interpretation of section 706(a) and (b) as grants of regulatory authority and elaborating on the Commission's authority to adopt rules implementing that provision, and to enforce those rules.

600. The Commission concluded in the *2015 Open Internet Order* and *2010 Open Internet Order* that open internet rules were a reasonable way to implement Commission authority under section 706(a) and (b), and the nexus between open internet rules and the directives in section 706(a) and (b) was affirmed by the D.C. Circuit in *Verizon.* For those same reasons, we find that the open internet rules we adopt here are a reasonable exercise of section 706(a) authority. As the Commission recently concluded that advanced telecommunications capability is not being deployed to all Americans in a reasonable and timely fashion under section 706(b), the open internet rules we adopt here are a reasonable exercise of authority under that provision as well.

601. To be clear, we interpret section 706(a) and (b) as independent, complementary sources of affirmative Commission authority for the rules

adopted in the Order. Our interpretation of section 706(a) as a grant of express authority is in no way dependent upon our findings in the section 706(b) inquiry. Thus, even if the Commission's inquiry were to have resulted in a positive conclusion such that our section 706(b) authority were not triggered, this would not eliminate the Commission's authority to take actions to encourage broadband deployment under section 706(a). And Commission actions adopted pursuant to a negative section 706(b) determination would not simply be swept away by a future positive section 706(b) finding, and subsequently render those actions unnecessary or unauthorized without any further Commission process. Throwing away such measures because they are working would be like "throwing away your umbrella in a rainstorm because you are not getting wet." Even if that were not the case, independent section 706(a) authority would remain. We mention, however, two legal requirements that appear relevant. First, section 408 of the Act mandates that "all" Commission orders (other than orders for the payment of money) "shall continue in force for the period of time specified in the order or until the Commission or a court of competent jurisdiction issues a superseding order." Second, the Commission has a "continuing obligation to practice reasoned decisionmaking" that includes revisiting prior decisions to the extent warranted. We are aware of no reason why these requirements would not apply in this context.

602. The Commission takes such measures precisely to achieve section 706(b)'s goal of accelerating deployment.

603. Our return to an interpretation of section 706 of the 1996 Act as granting the Commission regulatory authority and, in turn, as a basis for open internet rules is also propelled by the realization that BIAS has become even more essential to consumers for work, health, education, community, and everyday life. While internet access has long been important to daily life, the COVID–19 pandemic and the subsequent rapid shift of work, education, and health care online has demonstrated how essential BIAS connections are for consumers' participation in our society and economy. In light of this reality, we believe that returning to the Commission's prior interpretation of section 706 is necessary and timely given the critical importance of ensuring the Commission's authority to fulfill policy objectives and responsibilities to protect this vital service.

604. We find that the Commission has the legal authority to return to the prior, judicially affirmed, pre-*RIF Order* interpretations of section 706(a) and (b) of the 1996 Act. The APA's requirement of reasoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation. But so long as an agency "adequately explains the reasons for a reversal of policy," its new interpretation of a statute cannot be rejected simply because it is new. In *Fox,* the Supreme Court emphasized that, although an agency must acknowledge that it is changing course when it adopts a new construction of an ambiguous statutory provision, "it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one . . . ." Rather, it is sufficient that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." We have so done here.

605. We are unpersuaded by arguments in the *RIF Order* that section 706(a) and (b) of the 1996 Act are better interpreted as hortatory, and not as grants of regulatory authority. For the reasons set forth below, we find there are deficiencies in the *RIF Order's* analysis that lead us to conclude that the *RIF Order's* reasoning, which has already been rejected by a court, is misguided and misplaced, and once again should be rejected. We therefore return to the Commission's prior judicially affirmed interpretation of section 706(a) and (b) of the 1996 Act as grants of regulatory authority and conclude that it is a better reading of the statute.

606. First, according to the *RIF Order's* reasoning, the language in section 706(a) and (b) should be viewed as statutory surplusage that neither grants nor restrains Commission authority, but merely expresses the sense of Congress that advanced telecommunications are important. The D.C. Circuit has already twice affirmatively rejected this line of reasoning. In *Verizon,* the court affirmed as reasonable the Commission's interpretation that section 706(a) and (b) are grants of regulatory authority. The court held that section 706(a) "vest[s] the Commission with actual authority to utilize the regulatory methods set forth in the statute to "encourage the development of advanced telecommunications capability." This authority, Congress explained, is a "fail safe" to enable the Commission to achieve the goal of permitting all

Americans to send and receive information in all forms—voice, data, graphics, and video—over a high-speed, switched, interactive broadband, transmission capability." And section 706(b) imposes an affirmative duty on the Commission "to conduct a regular inquiry 'concerning the availability of advanced telecommunications capability.'" And in the event that it determines that such capability is not "being deployed to all Americans in a reasonable and timely fashion," the statute compels the Commission to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." In *USTA,* the court likewise affirmed as reasonable the Commission's interpretations that section 706(a) and (b) are grants of regulatory authority. Moreover, although the Tenth Circuit failed to recognize that the Commission had, in fact, interpreted section 706(a) as a grant of regulatory authority in the *2010 Open Internet Order,* it affirmed the Commission's reliance on section 706(b) as a grant of regulatory authority.

607. Second, the *RIF Order* was too quick to dismiss the importance of the term "shall" in section 706(a) ("shall encourage") and (b) ("shall take immediate action"), a term which describes a particularly potent word in statutory construction that "usually connotes a requirement," and serves as a legislative mandate for regulation. Although the *RIF Order* recognized that the term "shall" generally indicates a command that admits of no discretion, it gave short shrift to the importance of its use in these statutory provisions, and instead interpreted the provisions as exhortative. The *RIF Order* reasoned that the Commission has other authority in the Communications Act under which it can exercise the mandates in section 706(a) and (b), and thus there is no need to interpret these provisions as directives, in spite of the significant contrary evidence. But the D.C. Circuit explained in *Verizon* that section 706 "does not limit the Commission to using other regulatory authority already at its disposal, but instead grants it the power necessary to fulfill the statute's mandate." We believe that acceptance of the *RIF Order's* reasoning would contravene the statute's clear language and structure and nullify textually applicable provisions. Indeed, if such faulty reasoning were allowed to stand, the term "shall" could be nullified in any other textually applicable provision where there may be other sources of

authority under the Act, an outcome we reject.

608. Third, we also are unpersuaded by the *RIF Order*'s argument that if section 706(a) and (b) were interpreted as grants of regulatory authority, it would enable the internet and information services to be heavily regulated in a manner inconsistent with the policy goals reflected in the Act. Although the *RIF Order* acknowledged that the Commission's prior interpretation of section 706 was, by its own terms, constrained in order to be consistent with the Act, it claimed that such constraints did not adequately address its statutory concerns. In the view of the *RIF Order*, seemingly the only outcomes of interpreting section 706 as granting regulatory authority would be extreme results where those constraints had little meaning and left the Commission with essentially unbounded authority or were such severe limitations as to render section 706 of little possible use. But as prior Commission and judicial precedents explain, there are several limitations to section 706(a) authority, which makes these views unfounded. In *Verizon*, the D.C. Circuit agreed with the Commission that while authority under section 706 may be broad, it is not unbounded. Specifically, authority under section 706(a) must fall within the scope of the Commission's subject-matter jurisdiction over ''interstate and foreign commerce in communications by wire and radio.'' Additionally, the Commission's actions under section 706(a) must be designed to ''encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans.'' Moreover, the court in *Verizon* firmly concluded that the Commission's *2010 Open Internet Order* regulations fell within the scope of section 706. It explained that the rules ''not only apply directly to broadband providers, the precise entities to which section 706 authority to encourage broadband deployment presumably extends, but also seek to promote the very goal that Congress explicitly sought to promote.'' Further, the court credited ''the Commission's prediction that the [2010] Open Internet Order regulations will encourage broadband deployment.'' The same is true of the open internet rules we adopt in the Order. Our regulations again only apply to last-mile providers of BIAS—a service that is not only within our subject-matter jurisdiction, but also expressly within the terms of section 706. And, again, each of our rules is designed to remove barriers in order to achieve the express

purposes of section 706. We also find that our rules will provide additional benefits by promoting competition in telecommunications markets, such as, for example, by fostering competitive provision of VoIP and video services and informing consumers' choices.

609. Fourth, we are also unpersuaded by the *RIF Order*'s concerns about our ability to enforce violations of requirements adopted under section 706(a) and (b) of the 1996 Act. The rules we adopt in the Order implement the provisions of the Communications Act and are thus are covered by our Titles IV and V authorities to investigate and enforce violations of these rules. With specific respect to section 706, in *Verizon*, the D.C. Circuit suggested that section 706 was part of the Communications Act of 1934. Under such a reading, rules adopted pursuant to section 706 fall within our Title IV and V authorities. The 1996 Act incorporated the relevant statutory definitions in the Act, which the Commission has broad authority to implement. The 1996 Act also required the Commission to adopt rules or orders that turned on the interpretation of those statutory definitions.

610. But even if this were not the case, we believe it reasonable to interpret section 706 itself as a grant of authority to investigate and enforce our rules. Moreover, to the extent that section 706 was not viewed as part of the Communications Act, we have authority under section 4(i) of the Communications Act to adopt rules implementing section 706. Thus, even then the Commission's rules, insofar as they are based on our substantive jurisdiction under section 706, nonetheless would be issued under the Communications Act. ''[B]y its terms our section 4(i) rulemaking authority is not limited just to the adoption of rules pursuant to substantive jurisdiction under the Communications Act, and the *Verizon* court cited as reasonable the Commission's view that Congress, in placing upon the Commission the obligation to carry out the purposes of section 706, 'necessarily invested the Commission with the statutory authority to carry out those acts.' '' Under such a reading, rules adopted pursuant to section 706 fall within our Titles IV and V authorities. The Commission would also have all of its standard rulemaking authority under sections 4(i), 201(b), and 303(r). Our enforcement authority was not explicitly discussed in either the *2010 Open Internet Order* or *Verizon*. The court did cite as reasonable, however, the Commission's view that Congress, in placing upon the Commission the obligation to carry out

the purposes of section 706, ''necessarily invested the Commission with the statutory authority to carry out those acts.'' We believe it likewise reasonable to conclude that, having provided the Commission with affirmative legal authority to take regulatory measures to further section 706's goals, Congress invested the Commission with the authority to enforce those measures as needed to ensure those goals are achieved. Courts have long recognized the Commission's authority to interpret and implement the Communications Act of 1934. Both the *2015 Open Internet Order* and the *RIF Order* recognized this authority.

### 3. Title III of the Act for Mobile Providers

611. As in the *2015 Open Internet Order*, we find that the open internet rules we adopt in the Order are further supported in the case of mobile BIAS by our broad legal authority under Title III of the Act to protect the public interest through spectrum licensing and regulations, including sections 303 and 316 of the Act.

612. Section 303(b) directs the Commission, consistent with the public interest, to ''[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class.'' The open internet rules we adopt in the Order prescribe the nature of the service to be rendered by licensed entities providing mobile BIAS. The rules we adopt in the Order specify the form this service must take for those who seek licenses to offer it. In providing such licensed service, BIAS providers must adhere to the rules we adopt in the Order.

613. This authority is bolstered by at least two additional provisions. First, as the D.C. Circuit has explained, section 303(r) provides the Commission authority to ''make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter.'' Second, section 316 authorizes the Commission to adopt new conditions on existing licenses if it determines that such action ''will promote the public interest, convenience, and necessity.'' The Commission also has ample authority to impose conditions to serve the public interest in awarding licenses in the first instance. Moreover, this document's rules do not make any fundamental changes to those licenses. Rather, our rules are largely consistent with the current operation of the internet and the current practices of mobile BIAS providers.

614. The *RIF Order* acknowledged that the Commission could rely on Title III licensing authority to support conduct rules but declined to follow the Commission's historical approach due to concerns about disparate treatment of wireline and wireless internet service providers. As discussed above, we classify BIAS as a Title II service and mobile BIAS as commercial mobile service. We believe that our reclassification avoids any inconsistent treatment between different categories of BIAS providers that may have resulted under the *RIF Order's* classification. Moreover, we recognize that the D.C. Circuit's *Mozilla* decision includes a brief statement as part of its review of the *RIF Order's* preemption decision stating that BIAS is not "radio transmission," so Title III does not apply. But the *RIF Order* did not attempt to apply (or justify applying) Title III to BIAS, and the *Mozilla* decision did not develop any reasoning in support of that assertion. Rather, we read the *Mozilla* court's statement that "BIAS is not 'radio transmission'" as limited to the court's decision to vacate the *RIF Order's* blanket preemption of State and local regulation of BIAS. In particular, the D.C. Circuit found that the Commission "fail[ed] to ground its sweeping Preemption Directive . . . in a lawful source of statutory authority," and concluded that "in any area where the Commission lacks the authority to regulate, it equally lacks the power to preempt state law." Given this backdrop, we do not believe the court's statement should be read to call into question the Commission's prior recognition that mobile BIAS falls within the scope of Title III. Commenters did not address the court's statement regarding radio transmission in the *Mozilla* decision or the Commission's view that the court's statement does not call into question our prior recognition that mobile BIAS falls within the scope of Title III.

615. Finally, CTIA argues that the Act forbids applying Title II common carrier regulations to BIAS, and in particular, to mobile BIAS. Similarly, a broad coalition consisting of local groups and individuals located throughout the U.S. urges the Commission to avoid reclassifying any mobile data-only service, but if it does, it should maintain the current regulatory classification under section 332(c)(2) as a non-common-carrier private mobile service and thereafter exercise authority over mobile data-only service under sections 301, 302, 304, 309, and 316 of the Act. For the reasons discussed above, we reject these arguments and conclude that mobile BIAS is best viewed as a commercial mobile service, or, in the alternative, the functional equivalent of commercial mobile service, and therefore, not private mobile service.

## G. Other Laws and Considerations

616. As the Commission did in the *2015 Open Internet Order,* we make clear that the open internet rules we adopt in the Order do not expand or contract BIAS providers' rights or obligations with respect to other laws or preclude them from responding to safety and security considerations—including the needs of emergency communications and law enforcement, public safety, and national security authorities—or affect the ability of BIAS providers to make reasonable efforts to address transfers of unlawful content and unlawful transfers of content.

617. *Emergency Communications and Safety and Security Authorities.* Consistent with our proposal in the *2023 Open Internet NPRM,* and the *2010* and *2015 Open Internet Orders,* we adopt a rule that acknowledges the ability of BIAS providers to serve the needs of law enforcement and the needs of emergency communications and public safety, national, and homeland security authorities, which provides that nothing in the part supersedes any obligation or authorization a provider of broadband internet access service may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.

618. We reiterate that the purpose of the safety and security provision is first to ensure that open internet rules do not restrict BIAS providers in addressing the needs of law enforcement authorities, and second to ensure that BIAS providers do not use the safety and security provision without the imprimatur of a law enforcement authority, as a loophole to the rules. As the Commission has previously explained, application of the safety and security rule should be tied to invocation by relevant authorities rather than to a BIAS provider's independent notion of the needs of law enforcement.

619. The record reflects no disagreement that the open internet rules we adopt in the Order do not supersede any obligation a BIAS provider may have—or limit its ability—to address the needs of emergency communications or law enforcement, public safety, or homeland or national security authorities (together, "safety and security authorities"). BIAS providers have obligations under statutes such as CALEA, the Foreign Intelligence Surveillance Act, and the Electronic Communications Privacy Act that could in some circumstances intersect with open internet protections. Likewise, in connection with an emergency, there may be Federal, state, tribal, and local public safety entities, homeland security personnel, and other authorities that need guaranteed or prioritized access to the internet in order to coordinate disaster relief and other emergency response efforts, or for other emergency communications.

620. *Transfers of Unlawful Content and Unlawful Transfers of Content.* We also adopt our proposal to make clear that the open internet rules protect only *lawful* content, and are not intended to inhibit efforts by BIAS providers to address unlawful transfers of content or transfers of unlawful content, to ensure that open internet rules are not used as a shield to enable unlawful activity or to deter prompt action against such activity. Specifically, we find that nothing in the part prohibits reasonable efforts by a provider of broadband internet access service to address copyright infringement or other unlawful activity.

621. The record is generally supportive of our proposal to make clear that the open internet rules protect only lawful content, and are not intended to inhibit efforts by BIAS providers to address unlawful transfer of content or transfers of unlawful content.

622. For example, as the Commission explained in the *2015 Open Internet Order,* the no-blocking rule should not be invoked to protect copyright infringement, which has adverse consequences for the economy, nor should it protect child pornography. We reiterate that our rules do not alter copyright laws and are not intended to prohibit or discourage voluntary practices undertaken to address or mitigate the occurrence of copyright infringement. However, as in 2015, we note that we "retain the discretion to evaluate the reasonableness of broadband providers' practices under this rule on a case-by-case basis."

## H. Cost-Benefit Analysis

623. In the *2023 Open Internet NPRM,* we sought comment on the costs and benefits of Title II reclassification of BIAS and the proposed open internet rules. The record reflects a broad range of views on the potential costs and benefits of both. We apply a cost–benefit framework to evaluate the overall effect (net benefits or net costs) of reclassifying BIAS as a Title II telecommunications service and the open internet rules. While the record,

and indeed the nature of the benefits and costs under consideration, do not allow us to quantify the magnitude of the effects of the key decisions in the Order, we are able to reasonably assess their directional impact, that is, whether the result is on-net beneficial or costly. For example, it is difficult to quantify with precision the benefits of a more vibrant and thriving internet ecosystem, or of increased national security or public safety.

624. The primary benefits and costs attributable to the Order are the changes in the economic welfare of consumers, BIAS providers, and edge providers that would occur due to our actions. Our cost–benefit analysis nets out transfers among these economic actors. We evaluate the costs and benefits of reclassifying BIAS as a Title II telecommunications service and of adopting our open internet rules relative to the regulatory framework introduced by the *RIF Order,* but adjust that baseline in light of changes since the Commission adopted it. Therefore, we compare the expected costs and benefits of these actions against the *RIF Order* framework of Title I classification of BIAS, but account for the existence of State open internet requirements, the statutorily required broadband label, and other changed circumstances since the *RIF Order.* Relevant changes that have occurred since the *RIF Order* include the national security environment and the increased need for cybersecurity. We find that the benefits of Title II reclassification and the proposed open internet rules outweigh the costs.

1. Title II Reclassification

625. *Fulfilling Key Public Interest Obligations and Objectives.* As discussed in detail above, our reclassification decision will ensure the Commission can fulfill statutory obligations and important policy objectives. BIAS providers function as gatekeepers for both their end-user customers who access the internet, and for the edge providers, transit providers, and CDNs that require reliable access to BIAS end-user subscribers. The reclassification of BIAS and the rules we set forth in the Order will ensure that the internet remains open and that the virtuous cycle of edge innovation and broadband investment continues unabated. Furthermore, we find our reclassification of BIAS as a Title II service will have substantial additional benefits enabling the Commission to defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy

and data security, support consumer access to BIAS, enable access to infrastructure, and improve disability access. As explained in that section above, we conclude that the *RIF Order* and *RIF Remand Order* did not fully consider, or gave too little weight, to those benefits of the classification of BIAS as a telecommunications service. Consequently, we reject those cost–benefit analyses as predicated on a finding of too little benefit from a Title II classification of BIAS. Although many of these policy benefits do not readily lend themselves to quantification, they flow directly from our reclassification of BIAS as a telecommunications service.

626. *Effect on Investment.* Commenters argue that one of the greatest potential costs of reclassifying BIAS as a Title II telecommunications service is that it will lower BIAS provider investment incentives by reducing profits associated with the provision of BIAS, as well as by increasing regulatory uncertainty. These commenters claim that BIAS provider investment declined following previous announcements of Title II reclassification, and they cite studies that purport to demonstrate empirically that the application of Title II to BIAS providers harms investment. As our detailed analysis above shows, the concerns of these commenters are unfounded, as there is little compelling evidence that applying Title II to BIAS has such a measurable effect on investment. As we explain in that section above, our assessment of the available evidence regarding the effect of reclassification on investment leads to a different conclusion than that in the *RIF Order.* Insofar as the *RIF Order*'s and *RIF Remand Order*'s cost–benefit analyses were predicated on that different understanding of the effect of reclassification on investment, we reject them on that basis.

627. We first note that generic claims that regulation can be harmful to investment and innovation do not persuade us in this specific case. Regulation is just one of several factors that drive investment and innovation in the broadband marketplace. Today, new State and Federal support programs are a significant driver of BIAS investment, and we expect Title II classification to allow BIAS-only providers to face lower deployment costs, for example, because they will be able to take advantage of our pole attachment rules under section 224 or seek assistance from the Commission or courts under section 253. In addition, the effects of regulations depend on the nature of the regulations adopted and on market conditions, and they may vary by

market participant. As research and past experience show, appropriate telecommunications regulation may be required to create market conditions that are conducive to infrastructure investment, and we conclude that this is true in the present case. The Cable Act of 1984 and its subsequent regulatory implementation by the Commission also dramatically increased investment in the cable industry by providing access to poles, ducts, conduits and public rights of way. In terms of open internet regulations in particular, many studies in the economics literature find that regulation can have positive effects on both BIAS and edge provider investment incentives, and also find that overall economic welfare may be higher.

628. Given the lack of clear direction provided by the theoretical economics literature on how reclassification may affect BIAS investment, commenters and our own analysis draw on the empirical economics literature to evaluate the likely impact. In contrast to the claims by commenters opposed to Title II reclassification, and the authors of the studies they cite, our analysis persuades us that reduced BIAS provider investment has not been causally linked to Title II reclassification. We find that the studies in the record that claim to establish this link are in some cases not applicable to the U.S. context and in all cases suffer from methodological and data issues that render their conclusions unreliable. With regard to the one rigorous empirical study where the underlying data used by the author were readily available, we find that, after correcting the data, which had been revised and updated by the Bureau of Economic Analysis, and fixing the methodological problems identified with the study, the correct conclusion from the study is that there is no evidence that the announcement of Title II reclassification had any statistically significant effect on investment. We note that a second study by Briglauer et al. was cited in the record but the underlying data for this study were not available to us in our analysis. This study was heavily relied upon by the *RIF Order* to reach a conclusion that Title II reclassification is harmful to investment, but after these corrections, this study supports our conclusion that there is no empirical evidence in the record that Title II reclassification would have any significant negative impact on broadband investment. We therefore give little weight to these claims and view these claimed costs as being

relatively limited in our cost–benefit analysis.

629. *Regulatory Compliance Costs.* Commenters separately argue that Title II classification will result in higher regulatory compliance costs compared to Title I classification, and that increased compliance costs will disproportionately impact small BIAS providers that lack the resources to handle the new compliance obligations. Although no commenter provided quantitative estimates of the magnitude of these potential compliance costs, we acknowledge that reclassifying BIAS as a Title II telecommunications service may lead to some increase in compliance costs. In our predictive judgment, and based on qualitative analysis, however, we believe that these compliance costs are likely to be small and are outweighed by the benefits of reclassification that have been identified in our analysis.

630. We first note that any direct increase in compliance costs from the regulatory changes adopted in the Order appears modest, and to the extent we adopt any new rules governing BIAS in the future, we will assess incremental compliance costs, if any, at that time as part of a cost–benefit analysis. We further note that we have taken several steps to reduce compliance burdens, especially for BIAS providers with 100,000 or fewer subscribers. In the cases where we do apply a Title II provision to BIAS, we attempt to minimize compliance costs in the application of the provision. For example, we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specifically identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current or future affiliates and subsidiaries. Similarly, we waive the rules implementing section 222 to the extent such rules are applicable to BIAS as a telecommunications service and any future application of rules will be undertaken only after seeking public comment and considering the costs of such rules. In all cases where applying a provision may increase regulatory compliance costs, we have been careful to apply the provisions of Title II to BIAS providers only in a manner in which the expected benefits exceed expected costs. For example, we do not apply sections 201 and 202 in their entirety because we conclude that the costs of applying the provisions to impose *ex ante* or *ex post* rate regulation

on BIAS would exceed the benefits. Finally, the Title II provisions that assist BIAS network deployment, including sections 224 and 253 (in addition to section 332), do not impose affirmative obligations or compliance costs on BIAS providers. Rather, they simply give BIAS providers new rights to seek assistance from the Commission and/or courts, if they find that such assistance is on-net beneficial. For example, a BIAS provider seeking pole access under section 224 would only do so if it were to its benefit. Similarly, a BIAS provider would only seek Commission or court intervention under section 253 if it were to its benefit.

631. The adoption of bright-line rules should also generally lower overall compliance costs because they provide greater certainty to market participants in regard to conduct that would likely result in an enforcement action relative to the current regulatory framework established by the *RIF Order* in which there is uncertainty as to which conduct would be deemed to be harmful to edge providers or the open internet and such conduct is subject to *ex post,* case-by-case enforcement by antitrust or consumer protection authorities, or by states that have passed open internet rules. The *RIF Order* framework could therefore lead to lengthy enforcement actions and ultimately higher compliance costs for BIAS providers as they are required to determine through a trial-and-error process whether actions that would violate the bright-line rules we adopt would be subject to enforcement at the State or Federal level. In our judgment, establishing bright-line Federal rules and enforcing those rules through a single expert agency will achieve timelier and more consistent outcomes and reduce the costs of uncertainty for all interest holders, and thus yield significant public interest benefits. As noted above, our approach to preemption also provides regulatory certainty insofar as it is clear that the Commission, versus another Federal agency, will address, and as needed preempt, on a case-by-case basis, State or local laws that unduly frustrate or interfere with interstate communications.

632. "*Regulatory Creep.*" The last broad set of potential costs that some commenters raise with respect to reclassification of BIAS as a Title II telecommunications service pertain to "regulatory creep." Although we forbear from applying Title II rate regulation provisions to BIAS, some commenters express concern that the Commission will adopt future rate regulation. We are not persuaded by these unsupported assertions. We have carefully tailored

application of all Title II provisions to current broadband market conditions and avoided any unnecessary regulations. Moreover, decades of Commission precedent suggest that, in contrast to regulatory creep, the Commission has tended to deregulate over time and to forbear from additional statutory provisions and Commission rules. For example, the Commission in 1980 streamlined the regulation of non-dominant interexchange carriers by eliminating *ex ante* rate regulation and streamlining existing section 214 requirements. And after Congress gave the Commission forbearance authority under the 1996 Act, the Commission has forborne from dozens of statutory provisions and Commission rules, where it found that enforcement was not necessary to preserve "just and reasonable" terms of service, to protect consumers, or to serve the public interest. The Commission's forbearance decisions include eliminating tariff-filing requirements, the ending of certain Automated Reporting Management Information System (ARMIS) reporting requirements, and streamlining the regulation of business data services. We see no reason the Commission would depart from this general tendency to remove regulations when they are no longer required due to changed circumstances. Finally, we note that any changes to this framework or future rules the Commission considers adopting under the Title II framework would be subject to notice and comment and an analysis of the record, including any purported costs, prior to adoption.

## 2. Bright-Line Rules

633. *No-Blocking and No-Throttling Rules.* While larger BIAS providers have repeatedly assured their customers and publicly advertised that they will not block access to legal content or engage in throttling, not all BIAS providers have made such commitments. Moreover, there are no assurances that providers will continue to make or adhere to such commitments in the future, and the framework established in the *RIF Order* allows BIAS providers to engage in such activities as long as they disclose these practices to consumers. Given that BIAS providers have incentives and the ability to engage in blocking and throttling, our rules against this conduct protect free expression online, reduce uncertainty for edge providers when developing new services and applications, and provide necessary foundations for preventing anticompetitive or discriminatory conduct that harms edge providers and the open internet. Even if, in the absence of rules, BIAS providers

generally would not block or throttle the edge services offered today, our bright-line rules will reduce uncertainty for, and protect, innovators seeking to offer new edge services, particularly if those new services would compete with services that BIAS providers offer now or will offer in the future. If investors fear future blocking or throttling could be forthcoming despite current BIAS provider commitments, such investments in new edge services may not be undertaken. At the same time, the no-blocking and no-throttling rules, because they are clear bright-line rules, should deter such conduct, or to the extent such conduct does occur, should enable the Commission to aggressively respond. Thus, we conclude that these rules will create substantial economic value for edge providers and consumers, and for the economy broadly. We note that even the *RIF Order* acknowledged that "the costs of [banning blocking and throttling] are likely small," though it went on to State that the rule "may create some compliance costs." We agree that the costs of banning blocking and throttling are likely to be small and further conclude that any compliance costs are also likely small, particularly for those BIAS providers that have committed to refrain from—and intend to continue refraining from—such conduct. We part ways with the *RIF Order* insofar as it also concluded that the benefits of those rules also are likely to be small based on the availability of "antitrust and consumer protection law, coupled with consumer expectations and ISP incentives." As we discuss above, by contrast, we find antitrust and consumer protection laws to be insufficient to guard the open internet. We also conclude that the marketplace alone is not sufficient to guard against harmful blocking and throttling of internet traffic. Consequently, in contrast to the *RIF Order,* we not only find the costs of our rules banning blocking and throttling to be low, but we also conclude that these rules provide meaningful benefits that more than outweigh those limited costs.

634. *No Paid or Affiliated Prioritization.* As discussed above, we find that, absent regulation, BIAS providers may use paid and affiliated prioritization in ways that harm edge providers and the open internet. In particular, they could have the incentive and ability to use paid or affiliated prioritization to raise the costs of edge providers that compete with their vertically integrated edge affiliates or with edge providers with whom they have contractual arrangements. Moreover, if they can profitably charge

edge providers for prioritized access, BIAS providers may have an incentive to strategically degrade, or decline to maintain or increase, the quality of service to non-prioritized uses and users in order to raise the profits from selling priority access. We further find that adopting a bright-line rule prohibiting paid and affiliated prioritization has the advantage of relieving small edge providers, innovators, and consumers of the burden of detecting and challenging cases of socially harmful paid prioritization.

635. The *RIF Order's* cost–benefit analysis concluded that a ban on paid prioritization has a net negative effect on economic welfare. We find that this conclusion was the result of the *RIF Order* heavily discounting the benefits of banning paid prioritization identified above and substantially overstating the costs. On the cost side, the *RIF Order* first contends that "the ban on paid prioritization has created uncertainty and reduced ISP investment," but, as we have demonstrated, claims regarding the *2015 Open Internet Order's* allegedly detrimental effect on investment were unsupported. The *RIF Order* analysis further states "that the ban [on paid prioritization] is likely to prevent certain types of innovative applications from being developed or adopted." We disagree with this statement for two reasons. First, the rules adopted in the Order do not prohibit BIAS providers from developing innovations that require quality of service differentiation that are compatible with the open internet rules. Second, while we recognize that there may also be positive use cases of paid prioritization and some costs associated with a ban on such practices, we find that such positive use cases may be addressed through the waiver rule we adopt. Consequently, the *RIF Order's* claim that there would be high costs in the form of forgone investment and innovation cannot be sustained. Thus, we find the benefits of adopting a bright-line rule prohibiting paid prioritization exceed its costs.

3. General Conduct Rule

636. We also find that the expected benefits of the general conduct standard we adopt will exceed the expected costs. We find, as the Commission found in 2015, that the Commission needs a backstop mechanism to respond to attempts by BIAS providers to wield their gatekeeper power in ways that do not violate the bright-line rules, but nevertheless may compromise the open internet. We acknowledge that several commenters raise concerns about possible regulatory uncertainty created

by the general conduct rule and its potential negative effects on investment and innovation. To the extent that these commenters are addressing the costs and benefits of our decision, we find that these concerns should be reduced as a result of our providing a list of factors that we will consider in our analysis and our creation of an advisory opinion process. Indeed, in upholding the *2015 Open Internet Order's* general conduct rule, the D.C. Circuit cited with approval to "the Commission's articulation of the Rule's objectives and the specification of factors that will inform its application," and emphasized that the Commission "also included a description of how each factor will be interpreted and applied" with examples "specifically identify[ing] the kind of conduct that would violate the Rule." In this context, the court explained, "[t]he flexible approach adopted by the General Conduct Rule aims to address that concern [of over-specificity leading to loopholes] in a field in which 'specific regulations cannot begin to cover all of the infinite variety of conditions.'" Exercising our predictive judgment, we find that the general conduct rule should not impose significant *ex ante* compliance costs on BIAS providers, but it should enable the Commission on a case-by-case basis to address conduct that is not covered by the bright-line rules, but that nevertheless harms consumers, edge providers, and the open internet. Creating a flexible general conduct rule allows more agile Commission responses to developments that might harm the open internet, and should spur innovation experiments and experiential learning by providing guidance on the types of actions that are likely to harm the open internet.

637. We recognize that this conclusion differs substantially from the *RIF Order,* which found that the costs of the general conduct rule exceed the benefits. We find that the Commission's analysis in the *RIF Order* significantly understated the benefits of the general conduct rule and overstated costs. The *RIF Order* analysis asserts that the benefits of the general conduct rule are nearly zero because the consumer protection and antitrust laws provide adequate protections and because examples of harmful conduct are rare. We disagree with both premises as we have shown that BIAS providers have the incentive and ability to harm edge providers and have provided examples of when such conduct has occurred. Furthermore, we find that existing antitrust and consumer protection enforcement are insufficient to protect

consumers and edge providers from BIAS provider conduct that may harm the open internet. In addition, the primary costs associated with the conduct rule that the *RIF Order* identified were that it would reduce investment, and we have shown that the evidence the *RIF Order* presented as the basis for these concerns is unreliable. We conclude that the general conduct rule is a necessary component of a forward-looking regulatory framework that will provide both greater flexibility for the Commission to address new issues as they arise and greater certainty to BIAS providers in terms of the factors that will be considered when assessing whether new practices will be likely to harm the open internet.

### 4. Transparency Rule

638. In evaluating the potential costs and benefits of the transparency rule we adopt, we need to compare it to the *status quo.* As discussed above, as part of the IIJA, Congress directed the Commission to promulgate rules for a broadband label to be displayed at the point of sale by BIAS providers. The *Broadband Label Order* responded to this Congressional directive and reintroduced many of the transparency requirements eliminated in the *RIF Order* as required by the IIJA. Therefore, the baseline transparency framework against which costs and benefits are compared has changed significantly since the cost–benefit analysis performed in the *RIF Order*. The transparency rules established in the Order represent only small, incremental changes relative to the prevailing statutorily required regulations. The most important incremental changes relative to this new baseline is our adoption of the direct customer disclosure requirement and our re-adoption of the 2015 enhancements to the performance characteristics disclosure requirements. However, as we explain above, given that such performance characteristic information is widely commercially available and large BIAS providers already have direct notification capabilities in their networks, and that we provide a temporary exemption for BIAS providers with 100,000 or fewer subscribers, the current change in incremental costs of adopting this rule are small. Furthermore, adopting these changes will provide consumer benefits that exceed these small costs by enabling consumers to select the appropriate BIAS that meets their needs and by ensuring that the consumer notification capabilities that are already in place are consistently providing consumers with sufficient information

and time to consider adjusting their usage to avoid their BIAS provider from applying a network management practice that could result in additional unwanted charges or other adverse effects.

### 5. Preemption

639. As discussed above, we preempt State or local measures that "interfere or are incompatible with the federal regulatory framework we establish today." Further, we will proceed on a case-by-case basis to consider challenged measures "in light of the fact specific nature of particular preemption inquiries." We find that, under this standard and approach, the Commission can preempt incompatible State and local regulations, which we predict will reduce the costs on BIAS providers caused by inconsistent State and local regulations and reduce regulatory uncertainty. At the same time, this standard recognizes and accommodates the "concurrent regulatory authority [of states] over communications networks." This stands in contrast to the situation under the *RIF Order* where the D.C. Circuit invalidated the *RIF Order's* attempt at preemption, thereby allowing for the emergence of inconsistent State laws, which could increase compliance costs. Consequently, we find that the benefits of the approach we adopt here will exceed the costs.

## IV. Constitutional Considerations

### A. First Amendment

#### 1. Free Speech Rights

640. We believe that the rules we adopt in the Order fully comport with the First Amendment and do not unlawfully infringe any free speech rights, contrary to the few commenters who suggest otherwise. That is so for two reasons. First, when BIAS providers are carrying their users' communications, they are not themselves acting as speakers or engaged in any expressive activity subject to the First Amendment, but instead are acting as mere conduits for the speech of others. Alternatively, even if BIAS providers were treated as speakers themselves when carrying their customers' communications, the rules we adopt in the Order withstand the applicable intermediate standard of scrutiny because they are tailored to serve important governmental interests without unduly burdening speech. We note that most of the comments filed by BIAS providers and their trade associations in this proceeding have not raised or joined these First Amendment arguments.

641. The Supreme Court has rejected similar arguments that private parties have a freestanding First Amendment right to refuse to carry or allow third-party speech when it does not interfere with the private party's own ability to speak. In *PruneYard Shopping Center* v. *Robins,* the Court rejected a shopping mall's First Amendment challenge to a State law requiring it to allow members of the public to distribute pamphlets on the mall's property. The Court explained that allowing others to distribute their messages would not impair the mall owner's right to free expression because "[t]he views expressed by members of the public" in a forum open to the public "will not likely be identified with those of the owner," and because the owner always "can expressly disavow any connection with the message . . . and could explain that the persons are communicating their own messages by virtue of [the] state law." Similarly, in *Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.,* the Court unanimously rejected several law schools' First Amendment challenge to a law requiring them to permit military recruiters access to school facilities, despite the schools' ideological objections to the military's employment policies, as a condition for Federal funding. The Court held that permitting access by military recruiters would not violate the schools' First Amendment rights because "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing . . . restricts what the law schools may say about the military policies."

642. The rules we adopt in the Order do not abridge any speech or expression by BIAS providers because, when a BIAS provider offers BIAS as understood by consumers and as defined in the Order—that is, a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints—the BIAS provider is acting merely as a conduit for others' speech, not as a speaker itself. In other words, when providing BIAS, BIAS providers "merely facilitate the transmission of the speech of others rather than engage in speech in their own right." Consumers "expect that they can obtain access to all content available on the internet, without the editorial intervention of their broadband provider." When BIAS providers deliver content that has been requested by their customers, they are no different from telephone companies or package

delivery services like FedEx, which have never been thought to be engaging in their own expressive activity when merely carrying the messages of others.

643. Unlike newspapers, websites, social media platforms, or even cable operators, BIAS providers do not select, alter, arrange, annotate, or contextualize the content that their users request or that edge providers deliver in response. BIAS providers neither select which information to present nor determine how it is presented. Consumers understand and expect BIAS providers providing BIAS to transparently transmit information to and from the applications and services of *the consumers'* choosing, not *their BIAS providers'* choosing, without change in form or content. Consumers do not understand a BIAS provider to be selecting or compiling speech to present the BIAS provider's own expressive offering. Unlike the editors of a newspaper, the curators of a library or museum, or the managers of a theater, BIAS providers do not select which speech to feature, nor do they arrange or compile the speech they transmit into a new form of expression. BIAS providers instead deliver the content that their users independently have chosen, without engaging in any distinct expressive activity or communicating any distinct message.

644. The record in this proceeding confirms this conclusion. In the *2023 Open Internet NPRM,* we sought comment on "whether or to what extent ISPs engage in content moderation, curation, or otherwise limit or exercise control over what third-party content their users are able to access on the internet." We further observed that "some social media platforms and other edge providers purport to engage in various forms of content moderation or editorial control" and asked whether there is "any record of ISPs announcing and engaging in comparable activity?" In response, no BIAS provider has identified *any* evidence of BIAS providers engaging or wishing to engage in any such practices, nor has any other commenter. We find that silence telling. Despite our asking, there is no evidence in the record that any BIAS provider covered by our Order engages in any exercise of editorial control, curation, or other expressive activity. And, we note, BIAS providers have often relied on their status as mere conduits for their lack of editorial control to obtain immunity from copyright violations and other liability for material distributed over their networks.

645. We further agree with the D.C. Circuit that, in providing BIAS, BIAS providers do not communicate any

distinct or discernible message of their own: "The Supreme Court has explained that the First Amendment comes 'into play' only . . . when an 'intent to convey a particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message would be understood by those who viewed it.'" But a BIAS provider's delivery of content requested by a user neither reflects an intent to convey any particular message nor is likely to be perceived or understood by the user as conveying the provider's message. "[W]hen a subscriber uses his or her broadband service to access internet content of her own choosing, she does not understand the accessed content to reflect her broadband provider's editorial judgment or viewpoint," and "nothing about affording indiscriminate access to internet content suggests that the broadband provider *agrees* with the content an end user happens to access."

646. Similarly, we are not persuaded that a BIAS provider's decision to block or throttle a given website or application would, standing alone, constitute expressive or communicative conduct implicating the First Amendment. Blocking or throttling internet traffic is not inherently expressive: A customer "may have no reason to suppose that her inability to access a particular application, or that the markedly slow speeds she confronts when attempting to use it, derives from her ISP's choices rather than from some deficiency in the application. After all, if a subscriber encounters frustratingly slow buffering of videos when attempting to use Netflix, why would she naturally suspect the fault lies with her ISP rather than with Netflix itself?" Such conduct would not convey a message without some separate "explanatory speech"— that is, the conduct would support a message "only [if the BIAS provider] accompanied [its] conduct with speech explaining it," such as a statement on its website or in its customer bills explaining what content it restricts and why. And the Supreme Court has explained that where conduct "is not inherently expressive" without separate explanatory speech, parties "are not speaking" when they seek to engage in that conduct, so the conduct itself is not protected by the First Amendment. BIAS providers may still express their views on any internet content or other matters by stating those views on their websites, in their customer bills, or elsewhere, and that explanatory speech would receive full First Amendment protection—but the separate *act* of blocking or throttling individual

websites or applications is not "inherently expressive" conduct and is not protected by the First Amendment.

647. We find additional support for this view in the long history of common carriage regulation in the United States. "The common carrier doctrine is a body of common law dating back long before our Founding" that "vests [the government] with the power to impose nondiscrimination obligations on communication and transportation providers that hold themselves out to serve all members of the public without individualized bargaining." The Supreme Court has frequently distinguished common carriers from speakers, broadcasters, or editors engaged in First Amendment activity. As the D.C. Circuit has observed, common carriers "have long been subject to nondiscrimination and equal access obligations akin to" those we adopt here "without raising any First Amendment question." This "absence of any First Amendment concern in the context of common carriers rests on the understanding that such entities, insofar as they are subject to equal access mandates, merely facilitate the transmission of the speech of others rather than engage in speech in their own right." And "[g]iven the firm rooting of common carrier regulation in our Nation's constitutional tradition, any interpretation of the First Amendment that would make [it] facially unconstitutional would be highly incongruous."

648. To be sure, a different question would be presented if a BIAS provider were to create and market a curated internet access product that caters to some target audience and is clearly presented as such to consumers. The rules we adopt in the Order apply only to offerings of mass-market broadband service providing indiscriminate access to all or substantially all internet endpoints, which consumers understand to transparently transmit information to and from the internet applications and services of their choosing without being curated or edited by their BIAS provider. A curated internet product, if clearly identified and marketed as such, would fall outside the scope of the Order. And if a BIAS provider "represent[s] itself to consumers as affording them less of a 'go wherever *you'*d like to go' service and more of a 'go where *we'*d like you to go' service," that might well be an expressive offering receiving First Amendment protection. A BIAS provider that wishes to provide such a curated service may freely do so, so long as the BIAS provider "make[s] adequately clear its intention to provide

edited services of that kind, so as to avoid giving customers a mistaken impression that they would enjoy indiscriminate access to all content available on the internet[ ] without the editorial intervention of their broadband provider."

649. If a BIAS provider decides to offer a service that is clearly identified as providing edited or curated internet access, consumers would be free to decide whether to subscribe to that curated offering based on its expressed editorial policies or viewpoint. No commenter has offered evidence of any curated internet access product in the marketplace, and we take no position on whether there is market demand for such a product. But what BIAS providers may not do is provide consumers what purports to be ordinary mass-market broadband service, which consumers reasonably understand to provide indiscriminate access to all or substantially all internet applications and services of their choosing, and then engage in discriminatory practices that deny customers the service they reasonably expect. Our rules thus simply ensure that BIAS providers "act in accordance with their customers' legitimate expectations." We agree with the *USTA* decision that nothing supports "the counterintuitive notion that the First Amendment entitles an ISP to engage in the kind of conduct barred by the net neutrality rule—*i.e.,* to hold itself out to potential customers as offering them an unfiltered pathway to any web content of *their* own choosing, but then, once they have subscribed, to turn around and limit their access to certain web content based on the *ISP's* own commercial preferences."

650. Even if our rules were construed to somehow implicate BIAS providers' First Amendment speech rights, they would still be permissible as content-neutral regulations satisfying intermediate scrutiny. The rules make no distinction based on content or viewpoint, and a content-neutral regulation will be upheld if it "furthers an important or substantial government interest . . . unrelated to the suppression of free expression" and if it "do[es] not burden substantially more speech than is necessary."

651. The rules we adopt in the Order serve multiple important—indeed compelling—governmental interests. To begin, the rules "[a]ssur[e] that the public has access to a multiplicity of information sources" by promoting "the widest possible dissemination of information from diverse and antagonistic sources." The Supreme Court has declared this to be "a governmental purpose of the highest

order," as it "promotes values central to the First Amendment." The rules we adopt in the Order also enable fair competition among edge providers and ensure a level playing field for a wide variety of speakers who might otherwise be disadvantaged, and the Supreme Court has likewise deemed it "undisputed" that "the Government has an interest in eliminating restraints on fair competition . . . , even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." And we find that our rules will substantially further the national interest in ensuring that Americans have widespread access to a vibrant internet on reasonable terms. Indeed, Congress has specifically directed the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans" and to "promote the continued development of the internet and other interactive computer services and other interactive media."

652. None of these important governmental interests involves the suppression of free expression or targets any speakers' messages based on their content. For the reasons we have explained, moreover, we firmly believe the actions we take in the Order further these interests. And the rules we adopt are tailored to accomplish those interests without placing an unnecessary burden on speech: BIAS providers themselves remain free to speak on an unlimited range of subjects, including by publicizing their views on their own websites or by delivering their messages on inserts accompanying customers' monthly bills; they simply may not unreasonably suppress the speech of others in their capacity as conduits. And in any event, "even on the doubtful assumption that a narrower but still practicable . . . rule could be drafted . . . content-neutral regulations are not 'invalid simply because there is some imaginable alternative that might be less burdensome on speech.' "

653. We disagree with CTIA's argument that under the Supreme Court's *Turner* decisions, the government can satisfy intermediate First Amendment scrutiny only by providing specific evidence that a given BIAS provider possesses market power within its specific geographic market. For one thing, *Turner* discussed three important interests: (1) preserving broadcast television, (2) promoting a multiplicity of voices, and (3) promoting fair competition. For another, even as to competition-related interests, the Court held that there is an important Federal

interest in "preserving a multiplicity of broadcast outlets *regardless of whether the conduct that threatens it . . . rises to the level of an antitrust violation.*"

654. More generally, such a market power requirement would be at odds with the ordinary operation of intermediate scrutiny under the First Amendment, which has routinely been articulated as requiring "an important or substantial governmental interest . . . unrelated to the suppression of free expression" but never as requiring any specific showing of market power. And it would be ahistorical for a constitutional amendment adopted in 1791 to be predicated on modern-day concepts of market power. To be sure, the Court in the *Turner* cases found that cable companies had "bottleneck" control, but in doing so, did not rely on granular empirical evidence or market-by-market analysis, but instead largely on legislative findings, anecdotal testimony, and general economic principles. In response to *the dissent's* argument that a court must carefully and independently examine the economic evidence, the Court acknowledged it was ultimately upholding the challenged must-carry rules based on "defer[ence] to the reasonable judgment of a legislative body" and opined that "[t]he level of detail in factfinding required by the dissent would be an improper burden for courts to impose on the Legislative Branch." Our explanation of "how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers"—that is, that a BIAS provider possesses a terminating-access monopoly over edge providers' ability to reach the BIAS provider's customer, sustained by barriers to entry arising from switching costs and imperfect information, which allows BIAS providers to act as gatekeepers—is at least as sufficient to sustain the rules we adopt in the Order.

655. In sum, the rules we adopt in the Order do not unconstitutionally abridge any speech or expression by BIAS providers. As the record confirms, BIAS providers are merely conduits for others' speech—not speakers themselves—when delivering content that has been requested by their users. BIAS providers do not select, alter, arrange, annotate, or contextualize the content that their users request or that edge providers deliver in response, and there is no evidence in the record that any BIAS providers covered by our order engage in any exercise of editorial control, curation, or other expressive activity. And even if BIAS providers

could somehow show that they were engaged in expression protected by the First Amendment, the rules we adopt in the Order would still satisfy constitutional requirements because they further important governmental interests without any substantially greater burden on speech than necessary to fulfill those interests.

2. Compelled Disclosure

656. CTIA—alone—briefly argues that our updated transparency rule unconstitutionally compels speech. We disagree. The Supreme Court held in *Zauderer* v. *Office of Disciplinary Counsel of the Supreme Court of Ohio* (*Zauderer*) that requiring businesses to disclose "purely factual and uncontroversial information" about their services is generally permissible so long as the requirements are not "unjustified" or "unduly burdensome." Our transparency rule complies with that standard, just like the similar 2010, 2015, and 2018 transparency rules embraced by multiple administrations and upheld through multiple court challenges.

657. Here, as in *Zauderer,* our updated transparency rule is a reasonable measure to prevent deception or consumer confusion, among other things. The record of consumer complaints received by the Commission reflects that consumers are often unaware of or confused by practices that may result in slowed or impaired access to internet applications and services, impose data caps, or otherwise fail to provide the level of service reasonably expected at the advertised rates. Our rules ensure that consumers purchasing BIAS receive what they reasonably expect—that is, unimpeded access to all or substantially all internet endpoints of their choosing. Courts have recognized that BIAS providers have both the incentive and the ability to engage in harmful conduct, often in ways that might not be readily apparent to users; without enforceable transparency measures, consumers might have no ability to know if their BIAS provider is engaging in such practices.

658. The disclosures required by the updated transparency rule will also provide essential information the Commission needs to fulfill its statutory mandate to biennially report to Congress on the State of the communications marketplace, including the State of competition in the marketplace and any marketplace practices that pose a barrier to competitive entry into the marketplace.

659. Other important governmental interests also strongly support our updated transparency rule. The disclosures required by our transparency rule protect competition and curb the incentive of BIAS providers to interfere with, or disadvantage, third-party edge providers' services by helping to ensure that such practices come to light. More generally, accurate information about BIAS provider practices encourages innovation and the development of high-quality services, and in turn helps drive consumer demand and broadband investment. Transparency and disclosure of BIAS provider practices further ensure that edge providers have the information they need to develop conforming applications and services. And transparency ultimately helps ensure that consumers, edge providers, and all other participants in the internet economy have confidence in the networks and business practices of the BIAS providers they rely on for their communications.

660. The need for our transparency rule is thus clear. And on the other side of the ledger, CTIA makes no showing that requiring BIAS providers to disclose "purely factual and uncontroversial information about the terms under which . . . services will be available" would be unduly burdensome.

661. Finally, even if *Zauderer* did not apply, we find that the updated transparency rule would withstand scrutiny even under the *Central Hudson* framework for substantially the same reasons, and for the reasons given in the *RIF Order.* Recognizing that the First Amendment "affords a lesser protection to commercial speech than to other constitutionally guaranteed expression," the government may regulate commercial speech under *Central Hudson* to directly advance a substantial government interest so long as the regulation is not more extensive than necessary to fulfill that interest. We note that the *Central Hudson* test is a peculiar fit here because it purports to govern "restrictions" on speech, whereas disclosure requirements are not restrictions.

662. As explained, our transparency rule serves multiple substantial governmental interests in preventing deception and consumer confusion, protecting competition, and encouraging innovation. The rule also directly advances those interests. For consumers, "subscribers will be able to use the disclosed information to evaluate BIAS offerings and determine which offering will best enable the use of the applications and service they desire." "In addition," these disclosures "help ensure accountability by ISPs and the potential for quick remedies if problematic practices occur." Meanwhile, edge providers who "might be particularly sensitive to the manner in which an ISP provides broadband internet access service potentially could benefit from [this information] to better ensure the performance of th[eir] internet applications and services" and "to evaluate how well their offerings will perform." This transparency "helps reduce barriers to entry that otherwise could exist and encourages entrepreneurs' and small businesses' ability to compete and develop and advance innovating offerings in furtherance of our statutory objectives." Moreover, disclosure of information to the Commission will allow the Commission to publish reports and information for consideration by consumers and edge providers, and "will provide the Commission the information it needs for the evaluation required by [section 13] of the Act, enabling [the agency] to spur regulatory action or seek legislative changes as needed." And the transparency rule is appropriately tailored to these interests and no more extensive than necessary to substantially fulfill them. The *RIF Order* cited section 257 of the Act, which directed the Commission "to report to Congress on such marketplace barriers and how they have been addressed by regulation or could be addressed by recommended statutory changes." Congress later repealed subsection (c) of section 257 and replaced it with section 13, 47 U.S.C. 163, which imposes a substantially similar reporting requirement.

*B. Fifth Amendment Takings*

663. As with the Commission's analysis under the Fifth Amendment's Takings Clause in the *2015 Open Internet Order,* we do not identify any takings concerns with our actions here. Because our actions here merely regulate the commercial relationship between BIAS providers and their customers, they do not grant a right to physical occupation of the broadband providers' property and thus do not constitute a *per se* taking. Our actions also do not constitute a regulatory taking under the relevant ad hoc balancing test because of the minimal effect on BIAS providers' reasonable investment-backed expectations and the nature of our actions, which are far removed from a traditional physical invasion of property by the government. Nor are our actions confiscatory, because our regulatory approach enables BIAS providers to obtain a fair return on the network costs incurred in carrying traffic to and from BIAS end users.

1. Per Se Taking

664. We reject claims that our actions would effect a *per se* taking by granting third parties a right to physically occupy broadband providers' facilities. The record does not reflect a concern that our actions in the Order deprive BIAS providers of all economically beneficial use of their property—nor would we find such a concern merited. We therefore limit our discussion to the physical occupation theory of *per se* takings. As a threshold matter, as the Commission observed in the *2015 Open Internet Order,* "[c]ourts have repeatedly declined to extend *per se* takings analysis to rules regulating the transmission of communications traffic over a provider's facilities," and "these decisions comport with the Supreme Court's perspective that permanent physical occupation of property is a narrow category of takings jurisprudence and is 'easily identifiable' when it does occur." The record here does not reveal precedent to the contrary. At most, the record notes concurring or dissenting statements of judges or justices—frequently merely tentatively noting and/or setting aside possible takings questions—that predate most of the precedent on which we rely. The record also references an argument made in cable must-carry-related advocacy before the Commission seeking to rely on precedent addressing the scenario where "the Government has condemned business property with the intention of carrying on the business, as where public-utility property has been taken over for continued operation by a governmental authority." But *Kimball Laundry* referenced the government's takeover of an entire going concern, citing specific examples involving water utilities. We are not persuaded that it automatically follows from such precedent that any step short of that—including regulation of the transmissions over a carrier's network—must be understood as involving a physical intrusion that triggers a *per se* taking analysis, particularly given the separate line of precedent—not invoked here—that a *per se* taking occurs where a property owner is denied all economically beneficial use of property. Since our rules also do not impose requirements that otherwise could be understood as requiring physical access to BIAS providers' property, we are not persuaded that there is a government-required physical occupation of BIAS providers' property here at all.

665. Independently, requirements like those restricting blocking and throttling regulate BIAS providers' commercial relationship with their end-user customers. Such requirements simply ensure that end users can use the service that BIAS providers have offered them, and that the end users have paid for, to obtain access to content, applications, and services that end users have elected to receive. Note that our rules do not apply to "curated" services and, where our bright-line conduct rules apply, allow for reasonable network management. The Commission explained in 2015 that where "owners voluntarily invite others onto their property—through contract or otherwise—the courts will not find that a physical occupation has occurred for purposes of constituting a *per se* taking." Where, as here, BIAS providers have invited traffic on their networks through the offering of BIAS, reasonable conduct regulations can be imposed on the use of such properties without raising *per se* takings concerns. Thus, to the extent that BIAS providers allow customers to transmit or receive information over their networks, the imposition of reasonable conduct rules on the provision of BIAS does not constitute a *per se* taking.

666. Finally, even if the rules did impose a type of physical occupation on the facilities of BIAS providers, such an imposition is not an unconstitutional taking because BIAS providers are compensated for the traffic passing over their networks through end-user revenues.

2. Regulatory Taking

667. Contrary to CTIA's claims, the actions we take in the Order also do not constitute a regulatory taking under the "essentially ad hoc, factual inquiries" into a variety of unweighted factors used by courts. Those factors evaluate the "economic impact of the regulation," the degree of interference with "investment-backed expectations," and "the character of the government action." "[E]ach of these [factors] focuses directly upon the severity of the burden that government imposes upon private property rights." Because our actions in the order are far removed from anything "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain," we find no regulatory taking.

668. As relevant to the multi-factor takings analysis, we find the economic impact of our actions on BIAS providers' property interests to be limited. As we explain above, our classification of BIAS as a telecommunications service is unlikely to be closely tied to BIAS provider investment decisions, which instead are more likely driven by broader economic conditions, technology changes, and BIAS providers' general business development decisions. And in any case, although some diminution in value of property is necessary, it is not itself sufficient to constitute a taking.

669. We also find no meaningful interference with BIAS providers' investment-based expectations. "[T]o support a claim for a regulatory taking, an investment-backed expectation must be reasonable," involving "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiff] should have anticipated." As a general matter, property owners cannot expect that existing legal requirements regarding their property will remain entirely unchanged, and the Commission explained at length in 2015 the history of Commission jurisdiction and regulatory oversight over BIAS. Additionally, persons operating in a regulated environment develop fewer reliance interests in industries subject to comprehensive regulation. Such considerations have even greater force in light of intervening events. The regulatory approach adopted by the Commission in the *2015 Open Internet Order* was affirmed by the D.C. Circuit in the face of legal challenges, and petitions for rehearing en banc and certiorari were rejected by the D.C. Circuit and the Supreme Court, respectively. We recognize that the Federal government, in opposing the petitions for certiorari, pointed to the fact that the *2015 Open Internet Order* had been superseded by the *RIF Order.* But the issue is not whether the regulatory approach in the *2015 Open Internet Order* was set in stone, but the reasonableness of any BIAS provider expectation that such a regulatory approach was foreclosed. Irrespective of the specific arguments made by the Federal government at that time, we see the Supreme Court's denial of certiorari as at least one part of the overall history relevant to evaluating BIAS providers' reasonable expectations. By contrast, when the Commission sought to change course in the *RIF Order,* the regulatory approach adopted there was vacated in part and the classification decision was remanded. The Commission's attempt to respond to the remand in the *RIF Remand Order* is subject to petitions for reconsideration before the Commission and judicial review in the D.C. Circuit, which have remained pending until our action in the Order. We dispense with the petitions for reconsideration in this item. That history subsequent to the *2015 Open Internet Order* demonstrates

that BIAS providers have even less basis than before to reasonably expect that they would operate under a materially different regulatory approach than what we adopt in the Order.

670. The character of our actions here also cuts against a finding of a regulatory taking. In that regard, the *Penn Central* Court held that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." As we already have explained when rejecting a *per se* takings claim, our regulatory approach to BIAS simply seeks to ensure that end users can use the service that BIAS providers have offered them and that the end users have paid for, rather than involving something that properly could be understood as a physical invasion by the government.

671. Finally, because we do not regulate BIAS providers' ability to set market rates for the broadband internet access services they offer end users, there is no reason to believe that our actions will deprive broadband providers of just compensation, thus fully addressing any takings claim.

### 3. Confiscation

672. Commenters fare no better when they seek to invoke Fifth Amendment precedent from the ratemaking context. As the Supreme Court has held: "The guiding principle [in the ratemaking context] has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory. . . . If the rate does not afford sufficient compensation, the [government] has taken the use of utility property without paying just compensation." Because we leave BIAS providers free to set market rates for the broadband internet access services they offer end-users, we see no evidence that our regulatory approach "threaten[s] an [ISP's] financial integrity" and is confiscatory.

673. We reject commenters' efforts to reach a contrary conclusion by identifying a separate, service that BIAS providers may offer to edge providers and focusing narrowly on what BIAS providers can charge edge providers for such a service. As the Commission recognized in 2015, and we affirm in the Order, any such "'edge service' is secondary, and in support of, the promise made to the end user, and broadband provider practices with respect to edge providers—including

terms and conditions for the transfer and delivery of traffic to (and from) the BIAS subscriber—impact the broadband provider's provision of the Title II broadband internet access service." Given the relationship between BIAS end users and edge providers, it is the same traffic delivery that is at issue whether viewed from the perspective of the end user or the edge provider—the traffic demanded by end users, for example, is the traffic that edge providers seek to deliver, with the BIAS provider serving as the intermediary from the perspective of either end of the exchange. From a takings standpoint, we thus conclude that the relevant issue is whether a BIAS provider's use of its network for the carriage of BIAS traffic is subject to confiscatory Commission regulation. The Order leaves BIAS providers free to charge market-based rates for the use of its facilities to carry the relevant traffic. Indeed, the freedom to charge market-based end-user rates has been—and remains—a consistent part of the Commission's overall regulatory approach for BIAS whether under the framework of the *2015 Open Internet Order,* the *RIF Order,* or the Order and is consistent with the Commission strong commitment to not engage in rate regulation, despite speculative claims from some commenters that the Commission may someday decide to reverse course. We are persuaded that "the end result" of the regulatory approach we adopt here allows for the "attraction of capital and compensation for risk" for a BIAS provider's investment in its network used to carry BIAS traffic.

## V. Order on Reconsideration

674. We now turn to the Petitions for Reconsideration of Common Cause et al., INCOMPAS, Public Knowledge, and Santa Clara seeking reconsideration of the *RIF Remand Order.* As described more fully below, we grant these petitions to the extent consistent with and described in the Order, and otherwise dismiss as moot all four petitions. In particular, for the reasons discussed in the Order, we vacate the *RIF Remand Order* and find that through the *2023 Open Internet NPRM* and the Order, we provide the relief petitioners have sought.

675. In *Mozilla,* the D.C. Circuit remanded the *RIF Order* for further consideration, finding that the Commission failed to adequately evaluate and address the potential negative effects of reclassifying BIAS as a Title I information service on (1) protecting public safety; (2) promoting infrastructure deployment by regulating pole attachment rights; and (3)

providing Lifeline support for BIAS to low-income consumers through the Universal Service Fund. In response to the court's remand, the Wireline Competition Bureau issued a Public Notice (85 FR 12555 (Mar. 3, 2020)) seeking to refresh the record on these issues. Subsequently, the Commission adopted the *RIF Remand Order,* in which it reaffirmed its conclusions from the *RIF Order* and found that reclassification of BIAS as a Title I information service would promote public safety, facilitate broadband infrastructure deployment, and allow the Commission to continue to provide Lifeline support for BIAS.

676. The *RIF Remand Order* (and, through it, the *RIF Order*) has remained under further administrative and judicial review. One week after the *RIF Remand Order* was published in the **Federal Register**, the CPUC filed a petition for judicial review in the D.C. Circuit. Meanwhile, Common Cause et al., INCOMPAS, Public Knowledge, and Santa Clara filed timely petitions for agency reconsideration of the *RIF Remand Order* (discussed further below). The D.C. Circuit has held judicial review of the *RIF Remand Order* in abeyance pending the Commission's consideration of the petitions for reconsideration.

677. On October 19, 2023, the Wireline Competition Bureau issued a Public Notice (88 FR 74389 (Oct. 31, 2023)) seeking comment on the issues raised in the four petitions for reconsideration and on the connection between those issues and the recently adopted *2023 Open Internet NPRM.* Several commenters responded to the Bureau's Public Notice, either in separate filings that specifically discuss the merits of one or more petitions or as part of their overall comments to the *2023 Open Internet NPRM.* To the extent necessary, we grant INCOMPAS's request that we waive the page limitation set forth in § 1.429 of the Commission's rules that applies to Oppositions to Petitions for Reconsideration and Replies to Oppositions. Given that the two proceedings are interrelated and in light of the number and complexity of issues, we find that good cause is shown and that it is in the public interest to allow stakeholders to submit filings responsive to both proceedings that may exceed the page limitation.

678. Petitioners ask that the Commission reverse, vacate, or withdraw the *RIF Remand Order,* and request that the Commission initiate a new rulemaking to reclassify BIAS as a Title II telecommunications service and reinstate the open internet conduct

rules. Collectively, petitioners make several procedural arguments for why the Commission should reconsider the *RIF Remand Order.* Common Cause et al. and Public Knowledge each assert that procedural deficiencies in the process the Commission used to adopt the *RIF Remand Order* are cause for reconsideration. Common Cause et al. argue that because the Commission failed to open the record to receive comment on the impact of the COVID–19 pandemic, it failed to adequately consider harms of reclassifying BIAS as a Title I information service on public safety, pole attachments, and the Lifeline program. In addition, Public Knowledge claims that because the Commission did not adopt a notice of proposed rulemaking prior to adopting the *RIF Remand Order,* and instead sought comment through a Bureau-issued public notice, the Commission did not follow the proper rulemaking procedures under the APA.

679. Common Cause et al., INCOMPAS, and Santa Clara also each provide several substantive arguments for why the *RIF Remand Order* should be reconsidered. Common Cause et al. argue that the *RIF Remand Order* weakened the Lifeline program at a time when it was most needed. In limiting the Lifeline program to facilities-based broadband-capable networks that support voice service, Common Cause et al. argue that the Commission failed to account for how this would affect BIAS during the COVID–19 pandemic and ignored evidence of BIAS-only providers that were seeking to enter the Lifeline program. These petitioners also take issue with the *RIF Remand Order's* conclusion that even if a court were to reject the Commission's legal authority to provide Lifeline support to the BIAS of a common carrier, the overall benefits of reclassification would outweigh this cost. Common Cause et al. assert that this position contradicts both the Commission's policy and statutory goals of achieving universal service, and that it also goes against the purpose for which the Lifeline program was first created.

680. Santa Clara argues in its Petition that, despite the Commission's statutory mandate to consider and promote public safety, the Commission failed to seriously consider this issue in either the *RIF Order* or the *RIF Remand Order.* Because modern public safety efforts rely on the public's access to BIAS, Santa Clara argues that the Commission needs the ability to adopt *ex ante* conduct rules in order to fulfill its public safety mandate. Santa Clara disagrees with the *RIF Order's* analysis that consumers and edge providers will

be protected from BIAS provider misconduct by a combination of market forces, consumer choice, public pressure, and *ex post* antitrust and consumer protection remedies. And it argues that instead of responding to the *Mozilla* court's criticism of this reasoning, the *RIF Remand Order* simply restates it without further analysis. Furthermore, Santa Clara criticizes the *RIF Remand Order* for the negative impact it will have on the development of public-safety-focused edge provider content. Finally, Santa Clara rejects the *RIF Remand Order's* conclusion that reclassification of BIAS as a Title I information service will increase investment and innovation, and that these benefits will outweigh any harm to public safety, and further argues that the Commission ignored evidence of the harmful impact of reclassification on public safety.

681. INCOMPAS asserts in its Petition that the *RIF Remand Order* did not sufficiently address the *Mozilla* court's concerns regarding public safety and pole attachments. INCOMPAS notes that while it supports the Commission's reconsideration of the *RIF Remand Order* due to the harms to Lifeline consumers, it focuses its petition on public safety and pole attachment concerns because those are the issues that directly relate to the issues that its member companies face. With regard to public safety, INCOMPAS argues broadly that the *RIF Remand Order* is flawed because it ''turns its back on the historical role of the Commission to protect the public's ability to connect without permission.'' More specifically, INCOMPAS asserts that the *RIF Remand Order* relies on unsubstantiated claims of increased investment to support its conclusions that the benefits of Title I classification outweigh potential public safety concerns. INCOMPAS also argues that the Commission wrongly dismisses the potential harms to public safety submitted into the record and overlooks the importance of having an expert agency with the authority to create *ex ante* rules to protect the public. And in reaching its conclusions, the petitioner criticizes the Commission for not properly accounting for the lack of competition in the residential BIAS market or the harms that large BIAS providers will cause consumers and edge providers. With respect to pole attachments, INCOMPAS contends that the *RIF Remand Order's* examination of the issue similarly does not comply with the *Mozilla* court's instructions. INCOMPAS takes issue with the inadequate consideration the *RIF Remand Order* gives to how

reclassification will eliminate BIAS-only providers' pole attachment rights; rejects the *RIF Remand Order's* argument that this lack of pole attachment rights under section 224 will allow BIAS-only providers to enter into more flexible and innovative arrangements; and argues that, contrary to its suggestion otherwise, the *RIF Remand Order* does not resolve the issue of State authority to regulate pole attachments.

682. In light of the Commission's actions in the Order, we grant in large part and otherwise dismiss as moot each of the four Petitions for Reconsideration of the *RIF Remand Order.* The Commission will consider a petition for reconsideration when the petitioner shows either a material error in the Commission's original order, or raises additional facts or arguments, not known or existing at the time of the petitioner's last opportunity to present such matters. Petitions for reconsideration which rely on facts or arguments not previously presented to the Commission but which were known or existing at the time of the petitioner's last opportunity to present such matters may nonetheless be granted if the Commission determines that consideration of the facts and arguments relied on is required in the public interest. While the Petitioners raise some arguments that existed at the time of the filing of their Petitions, we find it would serve the public interest to consider them in the Order, when we have fully considered how the Title II classification and our open internet rules impact public safety, pole attachments, and Lifeline service. Indeed, we explain above how classification of BIAS as an information service is inconsistent with the best interpretation of the statute and cannot be reconciled with our responsibilities with regard to public safety, pole attachments, and universal service support to low-income consumers. Thus, to the extent the Petitions requested that the Commission reconsider and/or vacate the *RIF Remand Order* or *RIF Order* itself, we do so here. As a procedural matter, we find that we have effectively provided the relief sought by each of the Petitions through a combination of the *2023 Open Internet NPRM* and the Order's actions. To the extent the Petitions sought readoption or reimposition of open internet conduct rules consistent with the *2015 Open Internet Order* and reclassification and/or reversion of BIAS as a Title II telecommunications service, we find that we have done so in the Order. As a substantive matter, for the

reasons explained above, we agree with the petitioners that the Commission's analysis in the *RIF Order* and *RIF Remand Order* was insufficient in addressing the public safety, pole attachment, and Lifeline-related repercussions of classifying BIAS as a Title I information service. To the extent the Petitions sought a new open-internet-related rulemaking in response to the *Mozilla* remand, we dismiss them as moot in light of the rulemaking proceeding we have conducted to consider precisely those issues. To the extent concerns or issues raised in the Petitions remain, we dismiss them as moot on the basis that the adoption of the Order effectively replace and overturn the *RIF Order* and *RIF Remand Order*. The *RIF Order* was vacated in part and otherwise remanded to the Commission by the D.C. Circuit. Because the majority of the *RIF Order* framework thus remained in effect, our action on reconsideration has only prospective consequences, rather than having retrospective effect of the sort not possible through our new rulemaking action here.

## VI. Severability

683. We consider the actions we take in the Order to be separate and severable such that in the event any particular action or decision is stayed or determined to be invalid, we would find that the resulting regulatory framework continues to fulfill our goal of preserving and protecting the open internet and that it shall remain in effect to the fullest extent permitted by law. Though complementary, each of the rules, requirements, classifications, definitions, and other provisions that we establish in the Order operate independently to promote the open internet, safeguard national security and public safety, and promote the deployment of broadband on a timely basis.

684. *Severability of Open Internet Rules from One Another.* The open internet rules we adopt in the Order each operate independently to protect the open internet, promote the virtuous cycle, and encourage the deployment of broadband on a timely basis. The severability of the Commission's open internet rules was recognized by the *Verizon* court, which held that the Commission's transparency rule established in the *2010 Open Internet Order* was severable from the nondiscrimination and no-blocking rules also established in that *Order*. We continue to apply that view to the transparency, no-blocking, no-throttling, no-paid prioritization, and general conduct rules we adopt in the Order.

While the Order's newly adopted rules put in place a suite of open internet protections, we find that each of these rules, on its own, serves to protect the open internet. Each rule protects against different potential harms and thus operates semi-independently from one another. For example, the no-blocking rule protects consumers' right to access lawful content, applications, and services by constraining BIAS providers' incentive to block competitors' content. The no-throttling rule serves as an independent supplement to this prohibition on blocking by banning the impairment or degradation of lawful content that does not reach the level of blocking. Should the no-blocking rule be declared invalid, the no-throttling rule would still afford consumers and edge providers significant protection, and thus could independently advance the goals of the open internet, if not as comprehensively were the no-blocking rule still in effect. The same reasoning holds true for the ban on paid prioritization, which protects against particular harms independent of the other bright-line rules. Finally, the no-unreasonable interference/disadvantage standard governs BIAS provider conduct generally, providing independent protections against those three harmful practices along with other and new practices that could threaten to harm internet openness. Were any of these individual rules held invalid, the resulting regulations would remain valuable tools for protecting the open internet.

685. *Severability of Rules Governing Mobile/Fixed Providers.* We have also made clear in the Order that our rules apply to both fixed and mobile BIAS. These are two different services, and thus the application of our rules to either service functions independently. Accordingly, we find that should application of our open internet rules to either fixed or mobile BIAS be held invalid, the application of those rules to the remaining fixed or mobile service would still fulfill our regulatory purposes and remain intact.

## VII. Procedural Matters

686. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the potential impact of the rule and policy changes adopted in the Order on small entities. The FRFA is set forth in section VIII.

## VIII. Final Regulatory Flexibility Analysis

687. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Safeguarding and Securing the Open Internet Notice of Proposed Rulemaking* (*2023 Open Internet NPRM*), released October of 2023. The Commission sought written public comment on the proposals in the *2023 Open Internet NPRM,* including comment on the IRFA. The comments received are discussed below in section B. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

### A. Need for, and Objectives of, the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration

688. Broadband internet access service (BIAS) connections, not unlike other essential utilities, have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression. The COVID–19 pandemic revealed that without a BIAS connection, consumers could not fully participate in vital aspects of daily life. We find, and the record overwhelmingly reflects, that BIAS is not a luxury, but a necessity for education, communication, healthcare, and participation in the economy. The actions taken in the Order to restore the Commission's Title II authority over BIAS, reclassify mobile BIAS as a commercial mobile service, and adopt open internet conduct rules are necessary to help ensure the health, vitality, and security of the entire internet ecosystem.

689. *Need for, and objective of, reclassification.* Our classification decision in the Order reestablishes the Commission's authority to protect consumers and resolves the pending challenges to the Commission's 2017 classification decision. We conclude that BIAS is best classified as a telecommunications service based on an analysis of the statutory definitions for "telecommunications service" and "information service" established in the 1996 Act. This conclusion reflects the best reading of the statutory terms applying basic principles of textual analysis to the text, structure, and context of the Act in light of (1) how consumers understand BIAS and (2) the factual particulars of how the technology that enables the delivery of BIAS functions. We also conclude that

BIAS is not best classified as an information service. Classifying BIAS as a telecommunications service accords with Commission and court precedent and is fully and sufficiently justified under the Commission's longstanding authority and responsibility to classify services subject to the Commission's jurisdiction, as necessary. Additionally, as the expert agency entrusted by Congress to oversee our country's communications networks and services, our experience demonstrates that for the Commission to protect consumers and ensure a safe, reliable, and open internet, it must exercise its authority to do so under Title II of the Communications Act. As such, we also separately conclude that multiple policy considerations, relating to internet openness, national security, public safety, consumer privacy, broadband deployment, and disability access, each independently and collectively, support the reclassification of BIAS as a telecommunications service.

690. We also reclassify mobile BIAS as a commercial mobile service. As we explain in the Declaratory Ruling, reclassifying mobile BIAS as a commercial mobile service is necessary to avoid the statutory contradiction that would result if the Commission were to conclude that mobile BIAS is a telecommunications service but not a commercial mobile service. Moreover, as we discuss in the Declaratory Ruling, because consumers regularly use both fixed and mobile broadband, it is critical to protect both services equally.

691. *Need for, and objectives of, the open internet rules.* We affirm our belief from the *2023 Open Internet NPRM* that baseline internet conduct rules for BIAS providers are necessary to enable the Commission to prevent and address conduct that harms consumers and competition. BIAS is an essential service that is critical to so many aspects of everyday life, from healthcare and education to work, commerce, and civic engagement. Because of its importance, we conclude that rules are necessary to promote free expression, encourage innovation, competition, and consumer demand, and protect public safety. As the Commission found in both 2010 and 2015, BIAS providers continue to have the incentive and ability to harm internet openness. We find that the framework that the Commission adopted in 2017 provides insufficient protection from these dangers, and that a safe, secure, and open internet is too important to consumers and innovators to leave unprotected. As in 2015, we find that conduct-based rules targeting specific practices are necessary, and accordingly

adopt bright-line rules to prohibit blocking, throttling, and paid prioritization by providers of both fixed and mobile broadband internet access service.

692. First, we reimpose a bright-line rule that prohibits providers from blocking lawful content, applications, services, or non-harmful devices, subject to reasonable network management. This "no-blocking" principle has long been a cornerstone of the Commission's policies, and in the internet context, dates back to the Commission's *Internet Policy Statement*. Second, we reimpose a separate bright-line rule prohibiting BIAS providers from impairing or degrading lawful internet traffic on the basis of content, application, service, or use of non-harmful device, subject to reasonable network management. We interpret this prohibition to include, for example, any conduct by a BIAS provider that impairs, degrades, slows down, or renders effectively unusable particular content, services, applications, or devices, that is not reasonable network management. We find this prohibition to be a necessary complement to the no-blocking rule. Without an equally strong no-throttling rule, BIAS providers might be able to thwart the no-blocking rule by throttling or degrading traffic that is essentially blocking but that does not quite meet the no-blocking standard. Third, we reimpose the prohibition on paid or affiliated prioritization practices, subject to a narrow waiver process. As in 2015, we find that a prohibition on paid prioritization is necessary because preferential treatment arrangements have the potential to create a chilling effect, disrupting the internet's virtuous cycle of innovation, consumer demand, and investment.

693. In addition to the three bright-line rules, we also reinstate a no-unreasonable interference/disadvantage standard, under which the Commission can prohibit practices that unreasonably interfere with the ability of consumers or edge providers to select, access, and use broadband internet access service to reach one another, thus causing harm to the open internet. This no-unreasonable interference/disadvantage general conduct standard will operate on a case-by-case basis, applying a non-exhaustive list of factors, and is designed to evaluate other current or future BIAS provider policies or practices—not covered by the bright-line rules—and prohibit those that harm the open internet. While we believe that our prohibitions on blocking, throttling, and paid prioritization will prevent many harms to the open internet, we believe that reimplementing the general

conduct standard is a necessary backstop to ensure that BIAS providers do not find technical or economic ways to evade our bright-line rules.

694. We also restore the text of the transparency rule to its original format adopted in 2010 and reaffirmed in 2015. We believe this change is necessary in order to encompass a broader relevant audience of interested parties than that captured by the *RIF Order* and more appropriately reflects the nature of the current transparency landscape where the broadband labels serve as a quick reference for consumers, and the transparency rule enables a deeper dive. Furthermore, we made minor revisions to the disclosures required by the transparency rule to better enable end-user consumers to make informed choices about broadband services and similarly to provide edge providers with the information necessary to develop new content, applications, services, and devices that promote the virtuous cycle of investment and innovation. In revising the specific transparency requirements, we contemplated the recently adopted broadband label rules to minimize unnecessary duplication and improve efficiency for providers.

*B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA*

695. In response to the *2023 Open Internet NPRM*, four entities filed comments or reply comments that specifically addressed the IRFA to some degree: WISPA, NTCA—the Rural Broadband Association (NTCA), ACA Connects, and National Rural Electric Cooperative Association (NRECA). Some of these entities, as well as others, filed comments or reply comments that more generally considered the small business impact of our proposals. We considered the proposals and concerns described by the various commenters in adopting the Order and accompanying rules.

696. Some commenters expressed concern that reclassification and reimplementation of the open internet rules would be particularly onerous for small providers and suggest that the Commission issue a blanket exemption for small providers or from "all but the most essential" rules. ACA Connects urges the commission to delay application of the rules on small providers for at least six months or one year, forbear from applying sections 201, 202, and 208 to small providers, or defer sections 201 and 202 obligations into another proceeding to specifically define and limit the obligations for small providers. The National Federation of Independent Businesses

(NFIB) recommends that the Commission add certain language to our rules to protect small providers. NTCA states that even with proposed forbearance, small BIAS providers will face significant economic burdens, and there is no marketplace justification for regulatory intervention. WISPA urges the Commission to issue a FNPRM that examines whether to exempt small providers from the bright-line rules, general conduct rule, and transparency enhancements and to apply any exemptions to BIAS providers with 250,000 or fewer subscribers. WISPA also requests that the Commission reconsider application of sections 206, 207, 208, 214, 218 and 220 of the Act to small providers and permanently exempt small BIAS-only providers from the Commission's transfer-of-control requirements. We carefully considered the effects reclassification and our rules would have on all BIAS providers and small entities, and while we did not create exemptions for small providers, we included temporary exemptions (with the potential to become permanent) for providers with 100,000 or fewer subscribers from the performance reporting enhancements and the direct notification requirement under the transparency rule, which will have the effect of benefitting many small providers. We do not believe exemptions beyond that which we have provided are necessary or in the public interest, particularly a blanket exemption from all rules, as the record fails to demonstrate customers of small BIAS providers should be afforded less protection than those of larger BIAS providers. Furthermore, as we noted above, in certain cases, reclassification will afford small providers additional rights (*e.g.,* pole attachment rights) to which they are currently not entitled.

697. NRECA urges the commission to define "small entities" as those with 100,000 broadband customers or less rather than those with 1,500 employees or less as we proposed in our IRFA. NRECA suggests that our proposed definition is problematic because it would "create a situation where a small-entity exception would swallow the general rule." According to NRECA, because most covered entities would fall within the "small entity" category under the Small Business Administration (SBA) size thresholds used in the IRFA, these thresholds would "limit the Commission's ability to implement small-entity exceptions that would be meaningful for truly small entities." NTCA echoed NRECA's concerns regarding the definition.

WISPA, however, does not agree with NRECA's proposed definition. We decline commenters' invitation to deviate from the SBA size standards for purposes of the regulatory flexibility analysis. NRECA does not argue that the size standard is inappropriate for regulatory flexibility analysis purposes. Rather, it focuses on exemptions from the rules adopted herein "and for subsequent Title II regulations." As noted above, however, we have largely declined to provide exemptions from the rules adopted in the Order, as customers of all BIAS providers should be afforded their protection. The exceptions are temporary exemptions (with the potential to become permanent) from the performance characteristics disclosure enhancements and direct notification requirement for BIAS providers that we reason are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications or the resources to immediately report this information.

### C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

698. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the SBA, and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D. Description and Estimate of the Number of Small Entities to Which Rules Will Apply

699. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act. Pursuant to 5 U.S.C. 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes

such definition(s) in the **Federal Register.**" A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

#### 1. Total Small Entities

700. *Small Businesses, Small Organizations, Small Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the SBA's Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.

701. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

702. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." U.S. Census Bureau data from the 2022 Census of Governments indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number, there were 36,845 general purpose governments (county, municipal, and town or township) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts) with enrollment populations of less than 50,000. Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."

2. Wired Broadband Internet Access Service Providers

703. *Wired Broadband Internet Access Service Providers (Wired ISPs).* Providers of wired broadband internet access service include various types of providers except dial-up internet access providers. Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the internet at information transfer rates exceeding 200 kilobits per second (kbps) in at least one direction is classified as a broadband connection under the Commission's rules. Wired broadband internet services fall in the Wired Telecommunications Carriers industry. The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there are 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees.

704. Additionally, according to Commission data on internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies. The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard. However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report,* we believe that the majority of wireline internet access service providers can be considered small entities.

3. Wireline Providers

705. *Wired Telecommunications Carriers.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.

706. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

707. *Incumbent Local Exchange Carriers (Incumbent LECs).* Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local exchange service providers. Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

708. *Competitive Local Exchange Carriers (Competitive LECs).* Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local exchange service providers. Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

709. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services. Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

710. *Operator Service Providers (OSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers. The closest applicable industry with a SBA small business size standard is Wired Telecommunications Carriers. The SBA small business size standard classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service

Monitoring Report, as of December 31, 2021, there were 20 providers that reported they were engaged in the provision of operator services. Of these providers, the Commission estimates that all 20 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, all of these providers can be considered small entities.

711. *Other Toll Carriers.* Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 90 providers that reported they were engaged in the provision of other toll services. Of these providers, the Commission estimates that 87 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

4. Wireless Providers—Fixed and Mobile

712. *Wireless Broadband Internet Access Service Providers (Wireless ISPs or WISPs).* Providers of wired broadband internet access service include various types of providers except dial-up internet access providers. Wireline service that terminates at an end user location or mobile device and enables the end user to receive information from and/or send information to the internet at information transfer rates exceeding 200 kbps in at least one direction is classified as a broadband connection under the Commission's rules. Wired broadband internet services fall in the Wired Telecommunications Carriers industry. The SBA small business size standard for this industry classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms

that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees.

713. Additionally, according to Commission data on internet access services as of June 30, 2019, nationwide there were approximately 2,747 providers of connections over 200 kbps in at least one direction using various wireline technologies. The Commission does not collect data on the number of employees for providers of these services, therefore, at this time we are not able to estimate the number of providers that would qualify as small under the SBA's small business size standard. However, in light of the general data on fixed technology service providers in the Commission's *2022 Communications Marketplace Report,* we believe that the majority of wireline internet access service providers can be considered small entities.

714. *Wireless Telecommunications Carriers (except Satellite).* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.

715. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.

Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

716. *Wireless Communications Services.* Wireless Communications Services (WCS) can be used for a variety of fixed, mobile, radiolocation, and digital audio broadcasting satellite services. Wireless spectrum is made available and licensed for the provision of wireless communications services in several frequency bands subject to part 27 of the Commission's rules. Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with an SBA small business size standard applicable to these services. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

717. The Commission's small business size standards with respect to WCS involve eligibility for bidding credits and installment payments in the auction of licenses for the various frequency bands included in WCS. When bidding credits are adopted for the auction of licenses in WCS frequency bands, such credits may be available to several types of small businesses based average gross revenues (small, very small and entrepreneur) pursuant to the competitive bidding rules adopted in conjunction with the requirements for the auction and/or as identified in the designated entities section in part 27 of the Commission's rules for the specific WCS frequency bands.

718. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

719. *Wireless Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Wireless Resellers. The closest industry with a SBA small business size standard is Telecommunications Resellers. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications and they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. Under the SBA size standard for this industry, a business is small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services during that year. Of that number, 1,375 firms operated with fewer than 250 employees. Thus, for this industry under the SBA small business size standard, the majority of providers can be considered small entities.

720. *1670–1675 MHz Services.* These wireless communications services can be used for fixed and mobile uses, except aeronautical mobile. Wireless Telecommunications Carriers (except Satellite) is the closest industry with an SBA small business size standard applicable to these services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees can be considered small.

721. According to Commission data as of November 2021, there were three active licenses in this service. The Commission's small business size standards with respect to 1670–1675 MHz Services involve eligibility for bidding credits and installment payments in the auction of licenses for these services. For licenses in the 1670–1675 MHz service band, a "small business" is defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" is defined as an entity that, together with its affiliates and controlling interests, has had average

annual gross revenues not exceeding $15 million for the preceding three years. The 1670–1675 MHz service band auction's winning bidder did not claim small business status.

722. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

723. *Wireless Telephony.* Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers. The closest applicable industry with an SBA small business size standard is Wireless Telecommunications Carriers (except Satellite). The size standard for this industry under SBA rules is that a business is small if it has 1,500 or fewer employees. For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 331 providers that reported they were engaged in the provision of cellular, personal communications services, and specialized mobile radio services. Of these providers, the Commission estimates that 255 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

724. *Broadband Personal Communications Service.* The broadband personal communications services (PCS) spectrum encompasses services in the 1850–1910 and 1930–1990 MHz bands. The closest industry with a SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (except Satellite). The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms

that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

725. Based on Commission data as of November 2021, there were approximately 5,060 active licenses in the Broadband PCS service. The Commission's small business size standards with respect to Broadband PCS involve eligibility for bidding credits and installment payments in the auction of licenses for these services. In auctions for these licenses, the Commission defined "small business" as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" as an entity that, together with its affiliates and controlling interests, has had average annual gross revenues not exceeding $15 million for the preceding three years. Winning bidders claiming small business credits won Broadband PCS licenses in C, D, E, and F Blocks.

726. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

727. *Specialized Mobile Radio Licenses.* Special Mobile Radio (SMR) licenses allow licensees to provide land mobile communications services (other than radiolocation services) in the 800 MHz and 900 MHz spectrum bands on a commercial basis including but not limited to services used for voice and data communications, paging, and facsimile services, to individuals, Federal Government entities, and other entities licensed under part 90 of the Commission's rules. Wireless Telecommunications Carriers (except Satellite) is the closest industry with a SBA small business size standard applicable to these services. The SBA size standard for this industry classifies a business as small if it has 1,500 or

fewer employees. For this industry, U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 95 providers that reported they were of SMR (dispatch) providers. Of this number, the Commission estimates that all 95 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, these 119 SMR licensees can be considered small entities.

728. Based on Commission data as of December 2021, there were 3,924 active SMR licenses. However, since the Commission does not collect data on the number of employees for licensees providing SMR services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard. Nevertheless, for purposes of this analysis the Commission estimates that the majority of SMR licensees can be considered small entities using the SBA's small business size standard.

729. *Lower 700 MHz Band Licenses.* The lower 700 MHz band encompasses spectrum in the 698–746 MHz frequency bands. Permissible operations in these bands include flexible fixed, mobile, and broadcast uses, including mobile and other digital new broadcast operation; fixed and mobile wireless commercial services (including FDD- and TDD-based services); as well as fixed and mobile wireless uses for private, internal radio needs, two-way interactive, cellular, and mobile television broadcasting services. Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard applicable to licenses providing services in these bands. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

730. According to Commission data as of December 2021, there were approximately 2,824 active Lower 700 MHz Band licenses. The Commission's small business size standards with respect to Lower 700 MHz Band licensees involve eligibility for bidding

credits and installment payments in the auction of licenses. For auctions of Lower 700 MHz Band licenses the Commission adopted criteria for three groups of small businesses. A very small business was defined as an entity that, together with its affiliates and controlling interests, has average annual gross revenues not exceeding $15 million for the preceding three years, a small business was defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and an entrepreneur was defined as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $3 million for the preceding three years. In auctions for Lower 700 MHz Band licenses seventy-two winning bidders claiming a small business classification won 329 licenses, twenty-six winning bidders claiming a small business classification won 214 licenses, and three winning bidders claiming a small business classification won all five auctioned licenses.

731. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

732. *Upper 700 MHz Band Licenses.* The upper 700 MHz band encompasses spectrum in the 746–806 MHz bands. Upper 700 MHz D Block licenses are nationwide licenses associated with the 758–763 MHz and 788–793 MHz bands. Permissible operations in these bands include flexible fixed, mobile, and broadcast uses, including mobile and other digital new broadcast operation; fixed and mobile wireless commercial services (including FDD- and TDD-based services); as well as fixed and mobile wireless uses for private, internal radio needs, two-way interactive, cellular, and mobile television broadcasting services. Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard

applicable to licenses providing services in these bands. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of that number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

733. According to Commission data as of December 2021, there were approximately 152 active Upper 700 MHz Band licenses. The Commission's small business size standards with respect to Upper 700 MHz Band licensees involve eligibility for bidding credits and installment payments in the auction of licenses. For the auction of these licenses, the Commission defined a ''small business'' as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years, and a ''very small business'' an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years. Pursuant to these definitions, three winning bidders claiming very small business status won five of the twelve available licenses.

734. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

735. *700 MHz Guard Band Licensees.* The 700 MHz Guard Band encompasses spectrum in 746–747/776–777 MHz and 762–764/792–794 MHz frequency bands. Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard applicable to licenses providing services in these bands. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show

that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

736. According to Commission data as of December 2021, there were approximately 224 active 700 MHz Guard Band licenses. The Commission's small business size standards with respect to 700 MHz Guard Band licensees involve eligibility for bidding credits and installment payments in the auction of licenses. For the auction of these licenses, the Commission defined a "small business" as an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $15 million for the preceding three years. Pursuant to these definitions, five winning bidders claiming one of the small business status classifications won 26 licenses, and one winning bidder claiming small business won two licenses. None of the winning bidders claiming a small business status classification in these 700 MHz Guard Band license auctions had an active license as of December 2021.

737. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

738. *Air-Ground Radiotelephone Service* Air-Ground Radiotelephone Service is a wireless service in which licensees are authorized to offer and provide radio telecommunications service for hire to subscribers in aircraft. A licensee may provide any type of air-ground service (*i.e.,* voice telephony, broadband internet, data, etc.) to aircraft of any type, and serve any or all aviation markets (commercial, government, and general). A licensee must provide

service to aircraft and may not provide ancillary land mobile or fixed services in the 800 MHz air-ground spectrum.

739. The closest industry with an SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (*except Satellite*). The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

740. Based on Commission data as of December 2021, there were approximately four licensees with 110 active licenses in the Air-Ground Radiotelephone Service. The Commission's small business size standards with respect to Air-Ground Radiotelephone Service involve eligibility for bidding credits and installment payments in the auction of licenses. For purposes of auctions, the Commission defined "small business" as an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $40 million for the preceding three years, and a "very small business" as an entity that, together with its affiliates and controlling interests, has had average annual gross revenues not exceeding $15 million for the preceding three years. In the auction of Air-Ground Radiotelephone Service licenses in the 800 MHz band, neither of the two winning bidders claimed small business status.

741. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, the Commission does not collect data on the number of employees for licensees providing these services therefore, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

742. *Advanced Wireless Services (AWS)—(1710–1755 MHz and 2110–2155 MHz bands (AWS–1); 1915–1920 MHz, 1995–2000 MHz, 2020–2025 MHz*

*and 2175–2180 MHz bands (AWS–2); 2155–2175 MHz band (AWS–3); 2000–2020 MHz and 2180–2200 MHz (AWS–4)).* Spectrum is made available and licensed in these bands for the provision of various wireless communications services. Wireless Telecommunications Carriers (except Satellite) is the closest industry with a SBA small business size standard applicable to these services. The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

743. According to Commission data as of December 2021, there were approximately 4,472 active AWS licenses. The Commission's small business size standards with respect to AWS involve eligibility for bidding credits and installment payments in the auction of licenses for these services. For the auction of AWS licenses, the Commission defined a "small business" as an entity with average annual gross revenues for the preceding three years not exceeding $40 million, and a "very small business" as an entity with average annual gross revenues for the preceding three years not exceeding $15 million. Pursuant to these definitions, 57 winning bidders claiming status as small or very small businesses won 215 of 1,087 licenses. In the most recent auction of AWS licenses 15 of 37 bidders qualifying for status as small or very small businesses won licenses.

744. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

745. *3650–3700 MHz band.* Wireless broadband service licensing in the 3650–3700 MHz band provides for nationwide, non-exclusive licensing of terrestrial operations, utilizing

contention-based technologies, in the 3650 MHz band (*i.e.,* 3650–3700 MHz). Licensees are permitted to provide services on a non-common carrier and/ or on a common carrier basis. Wireless broadband services in the 3650–3700 MHz band fall in the Wireless Telecommunications Carriers (*except* Satellite) industry with an SBA small business size standard that classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA standard, the Commission estimates that a majority of licensees in this industry can be considered small.

746. The Commission has not developed a small business size standard applicable to 3650–3700 MHz band licensees. Based on the licenses that have been granted, however, we estimate that the majority of licensees in this service are small Internet Access Service Providers (ISPs). As of November 2021, Commission data shows that there were 902 active licenses in the 3650–3700 MHz band. However, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

747. *Fixed Microwave Services.* Fixed microwave services include common carrier, private-operational fixed, and broadcast auxiliary radio services. They also include the Upper Microwave Flexible Use Service (UMFUS), Millimeter Wave Service (70/80/90 GHz), Local Multipoint Distribution Service (LMDS), the Digital Electronic Message Service (DEMS), 24 GHz Service, Multiple Address Systems (MAS), and Multichannel Video Distribution and Data Service (MVDDS), where in some bands licensees can choose between common carrier and non-common carrier status. Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with an SBA small business size standard applicable to these services. The SBA small size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of fixed

microwave service licensees can be considered small.

748. The Commission's small business size standards with respect to fixed microwave services involve eligibility for bidding credits and installment payments in the auction of licenses for the various frequency bands included in fixed microwave services. When bidding credits are adopted for the auction of licenses in fixed microwave services frequency bands, such credits may be available to several types of small businesses based average gross revenues (small, very small and entrepreneur) pursuant to the competitive bidding rules adopted in conjunction with the requirements for the auction and/or as identified in part 101 of the Commission's rules for the specific fixed microwave services frequency bands.

749. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

750. *Broadband Radio Service and Educational Broadband Service.* Broadband Radio Service systems, previously referred to as Multipoint Distribution Service (MDS) and Multichannel Multipoint Distribution Service (MMDS) systems, and "wireless cable," transmit video programming to subscribers and provide two-way high speed data operations using the microwave frequencies of the Broadband Radio Service (BRS) and Educational Broadband Service (EBS) (previously referred to as the Instructional Television Fixed Service (ITFS)). Wireless cable operators that use spectrum in the BRS often supplemented with leased channels from the EBS, provide a competitive alternative to wired cable and other multichannel video programming distributors. Wireless cable programming to subscribers resembles cable television, but instead of coaxial cable, wireless cable uses microwave channels.

751. In light of the use of wireless frequencies by BRS and EBS services, the closest industry with an SBA small business size standard applicable to these services is Wireless Telecommunications Carriers (*except* Satellite). The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates that a majority of licensees in this industry can be considered small.

752. According to Commission data as December 2021, there were approximately 5,869 active BRS and EBS licenses. The Commission's small business size standards with respect to BRS involves eligibility for bidding credits and installment payments in the auction of licenses for these services. For the auction of BRS licenses, the Commission adopted criteria for three groups of small businesses. A very small business is an entity that, together with its affiliates and controlling interests, has average annual gross revenues exceed $3 million and did not exceed $15 million for the preceding three years, a small business is an entity that, together with its affiliates and controlling interests, has average gross revenues exceed $15 million and did not exceed $40 million for the preceding three years, and an entrepreneur is an entity that, together with its affiliates and controlling interests, has average gross revenues not exceeding $3 million for the preceding three years. Of the ten winning bidders for BRS licenses, two bidders claiming the small business status won 4 licenses, one bidder claiming the very small business status won three licenses and two bidders claiming entrepreneur status won six licenses. One of the winning bidders claiming a small business status classification in the BRS license auction has an active licenses as of December 2021.

753. The Commission's small business size standards for EBS define a small business as an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $55 million for the preceding five (5) years, and a very small business is an entity that, together with its affiliates, its controlling interests and the affiliates of its controlling interests, has average gross revenues that are not more than $20 million for the preceding five (5)

years. In frequency bands where licenses were subject to auction, the Commission notes that as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Further, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated. Additionally, since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.

5. Satellite Service Providers

754. *Satellite Telecommunications.* This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications." Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small. U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year. Of this number, 242 firms had revenue of less than $25 million. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 65 providers that reported they were engaged in the provision of satellite telecommunications services. Of these providers, the Commission estimates that approximately 42 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, a little more than half of these providers can be considered small entities.

755. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Providers of Internet services (*e.g.,* dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

6. Cable Service Providers

756. *Cable and Other Subscription Programming.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating studios and facilities for the broadcasting of programs on a subscription or fee basis. The broadcast programming is typically narrowcast in nature (*e.g.,* limited format, such as news, sports, education, or youth-oriented). These establishments produce programming in their own facilities or acquire programming from external sources. The programming material is usually delivered to a third party, such as cable systems or direct-to-home satellite systems, for transmission to viewers. The SBA small business size standard for this industry classifies firms with annual receipts less than $41.5 million as small. Based on U.S. Census Bureau data for 2017, 378 firms operated in this industry during that year. Of that number, 149 firms operated with revenue of less than $25 million a year and 44 firms operated with revenue of $25 million or more. Based on this data, the Commission estimates that a majority of firms in this industry are small.

757. *Cable Companies and Systems (Rate Regulation).* The Commission has developed its own small business size standard for the purpose of cable rate regulation. Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide. Based on industry data, there are about 420 cable companies in the U.S. Of these, only seven have more than 400,000 subscribers. In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers. Based on industry data, there are about 4,139 cable systems (headends) in the U.S. Of these, about 639 have more than 15,000 subscribers. Accordingly, the Commission estimates that the majority of cable companies and cable systems are small.

758. *Cable System Operators (Telecom Act Standard).* The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000." For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 498,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator. Based on industry data, only six cable system operators have more than 498,000 subscribers. Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard. We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million. Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

7. Other

759. *Electric Power Generators, Transmitters, and Distributors.* The U.S. Census Bureau defines the utilities sector industry as comprised of "establishments, primarily engaged in generating, transmitting, and/or distributing electric power. Establishments in this industry group may perform one or more of the following activities: (1) operate generation facilities that produce electric energy; (2) operate transmission systems that convey the electricity from the generation facility to the distribution system; and (3) operate distribution systems that convey electric power received from the generation facility or the transmission system to the final consumer." This industry group is categorized based on fuel source and includes Hydroelectric Power Generation, Fossil Fuel Electric Power Generation, Nuclear Electric Power Generation, Solar Electric Power Generation, Wind Electric Power Generation, Geothermal Electric Power Generation, Biomass Electric Power Generation, Other Electric Power Generation, Electric Bulk Power Transmission and Control and Electric Power Distribution.

760. The SBA has established a small business size standard for each of these groups based on the number of employees which ranges from having fewer than 250 employees to having fewer than 1,000 employees. U.S. Census Bureau data for 2017 indicate that for the Electric Power Generation, Transmission and Distribution industry there were 1,693 firms that operated in this industry for the entire year. Of this number, 1,552 firms had less than 250 employees. Based on this data and the associated SBA size standards, the majority of firms in this industry can be considered small entities.

761. *All Other Information Services.* This industry comprises establishments primarily engaged in providing other information services (except news syndicates, libraries, archives, internet publishing and broadcasting, and web search portals). The SBA small business size standard for this industry classifies firms with annual receipts of $30 million or less as small. U.S. Census Bureau data for 2017 show that there were 704 firms in this industry that operated for the entire year. Of those firms, 556 had revenue of less than $25 million. Consequently, we estimate that the majority of firms in this industry are small entities.

762. *Internet Service Providers (Non-Broadband).* Internet access service providers using client-supplied telecommunications connections (*e.g.,* dial-up ISPs) as well as VoIP service providers using client-supplied telecommunications connections fall in the industry classification of All Other Telecommunications. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. For this industry, U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Consequently, under the SBA size standard a majority of firms in this industry can be considered small.

*E. Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities*

763. Reclassifying broadband as a Title II service may lead to some increase in compliance costs for small entities, however we find that these compliance costs are likely to be quite small. The Order reimposes the text of the transparency rule from 2015, and clarifies and adopts certain changes to the transparency rule that may impact small entities. We reinstate rules that prohibit BIAS providers from blocking or throttling the information transmitted over their networks or engaging in paid or affiliated prioritization arrangements, and reinstate a general conduct standard that prohibits practices that cause unreasonable interference or unreasonable disadvantage to consumers or edge providers. We modify the transparency rule by reversing the changes made under the *RIF Order,* restoring the requirements to disclose certain network practices and performance characteristics eliminated by the *RIF Order,* and adopting changes to the means of disclosure, including adopting a direct notification requirement. Below, we summarize the recordkeeping and reporting obligations of the Order.

764. First, we describe the specific commercial terms, network performance characteristics, and network practices providers must disclose to ensure compliance with the transparency rule. For example, to fully satisfy their duty to disclose network performance characteristics, providers must now disclose their zero rating practices. Specifically, BIAS providers must report any practice that exempts particular edge services, devices, applications, and content (edge products) from an end user's usage allowance or data cap. We reinstate the enhanced performance characteristics disclosures eliminated in 2017 to require BIAS providers to disclose packet loss and to require that performance characteristics be reported with greater geographic granularity and be measured in terms of average performance over a reasonable period of time and during times of peak usage. We temporarily (with the potential to become permanent) exempt BIAS providers that have 100,000 or fewer broadband subscribers as per their most recent FCC Form 477, aggregated over all affiliates of the provider, from these latter requirements.

765. Second, we require that providers make all necessary disclosures on their own publicly-available websites. We no longer permit direct disclosure to the Commission, as allowed under the *RIF Order.* Additionally, we require that all disclosures made pursuant to the transparency rule be made in machine-readable format. By "machine readable," we mean providing "data in a format that can be easily processed by a computer without human intervention while ensuring no semantic meaning is lost."

766. Third, we re-implement the requirement for BIAS providers to directly notify end users if their particular use of a network will trigger a network practice, based on a user's demand during more than the period of congestion, that is likely to have a significant impact on the end user's use of the service. The purpose of such notification is to provide the affected end users with sufficient information and time to consider adjusting their usage to avoid application of the practice. Recognizing the extra burden this requirement creates, we provide a temporary exemption, with the potential to become permanent, for providers with 100,000 or fewer subscribers that will be promulgated by the Consumer & Governmental Affairs Bureau. We discuss this exemption and other steps to minimize compliance costs in section F, below.

*F. Steps Taken To Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered*

767. The RFA requires an agency to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."

768. We have considered the factors for reinstating the obligations above and modifying the transparency rule subsequent to receiving substantive comments from the public and potentially affected entities. The Commission has considered the economic impact on small entities, as identified in comments filed in response to the *2023 Open Internet NPRM* and its IRFA in reaching its final conclusions and taking action in this proceeding.

769. We considered, for example, whether to fully reimplement the transparency requirements from the *2015 Open Internet Order* and adopted a temporary (with the potential to become permanent) exemption for providers with 100,000 or fewer subscribers from the compliance with certain reporting requirements regarding performance characteristics to minimize burdens for providers. Furthermore, in response to concerns expressed by some commenters, we provided a temporary (with the potential to become permanent) exemption from compliance with the direct notification requirement for providers with 100,000 or fewer subscribers, as such providers are less likely to already have in place the tools and mechanisms needed to allow customers to track usage or provide automated direct notifications. This exemption, which will have the effect of

benefitting many small providers, provides regulatory flexibility while maintaining the Commission's goals and is similar to exemptions we have adopted in other contexts. For example, for the broadband labels proceeding, we created a longer implementation period for certain providers.

770. As we did in 2015, we determined that a flat ban on paid prioritization has advantages over alternative approaches, particularly in relieving small edge providers, innovators, and consumers of the burden of detecting and challenging instances of harmful paid prioritization. In developing our rule, we specifically noted the concerns commenters expressed over the harms that would particularly befall small edge providers should they be required to pay for priority access. We believe that the adoption of a bright-line rule prohibiting paid prioritization will likely lower compliance costs for small and other entities because they provide greater certainty to market participants. Also, costs for compliance will be lower compared to the current regulatory framework where harmful conduct would be subject to *ex post,* case-by-case enforcement by antitrust and consumer protection authorities. This could lead to lengthy enforcement actions and higher compliance costs for BIAS providers. In our judgment, enforcement by an expert agency will achieve timelier and more consistent outcomes and reduce the costs of uncertainty resulting in significant public interest benefits.

771. In reimplementing our no-unreasonable interference/disadvantage standard, we were mindful of how a rule that operates on a case-by-case basis may be more difficult for smaller providers. As such, we attempted to provide an extensive list of factors that we will consider in our analysis. Moreover, in consideration of the concerns raised by certain commenters that this rule will create difficulty for smaller providers, we implemented an advisory opinion process whereby providers may seek specific guidance from the Commission.

772. We continue to find that our existing informal complaint rule offers an accessible and effective mechanism for parties—including consumers and small businesses with limited resources—to report possible noncompliance with our open internet rules without being subject to burdensome evidentiary or pleading requirements. In formulating our open internet formal complaint rules, we noted NFIB's request to "make [our] regulations as concise and simple as

possible," and opted to maintain our existing formal complaint rules codified at §§ 1.720 through 1.740 to streamline the complaint process, which should accord with NFIB's request.

773. Upon finding that BIAS is best classified under the statute as a telecommunications service under Title II, we broadly forbear, to the full extent permitted by our authority under section 10 of the Act, from applying provisions of Title II of the Act and implementing Commission rules that would apply to BIAS by virtue of its classification as a Title II service—including from all *ex ante* direct rate regulation—to minimize the burdens an all BIAS providers, including small BIAS providers. For provisions of Title II that the Commission finds it is not in the public interest from which to forbear with respect to BIAS providers, we take additional actions to minimize the effects on small providers. For example, in applying section 222 to BIAS, we waive application of all of the Commission's rules implementing section 222 to BIAS. Likewise, to address the potential impact on BIAS providers that will be subject to section 214 of the Act, we grant blanket section 214 authority for the provision of BIAS to any entity currently providing or seeking to provide BIAS—except those specific identified entities whose application for international section 214 authority was previously denied or whose domestic and international section 214 authority was previously revoked and their current and future affiliates and subsidiaries. We also waive the current rules implementing section 214(a)–(d) of the Act with respect to BIAS to the extent they are otherwise applicable. Additionally, we find that foreign ownership in excess of the statutory benchmarks in common carrier wireless licensees that are providing only BIAS is in the public interest under section 310(b)(3) when such foreign ownership is held in the licensee through a U.S.-organized entity that does not control the licensee, and under section 310(b)(4) of the Act, and we waive the requirements to request a declaratory ruling under §§ 1.5000 through 1.5004 of the Commission's rules pending adoption of any rules for BIAS. The Commission expects to release a FNPRM at a future time to examine whether any section 214 rules specifically tailored to BIAS, including for small providers, are warranted. Consistent with our tailored regulatory approach, we also considered the impact of section 214 exit certification requirements and find that it is prudent and in the public interest to forbear

from requiring providers to obtain approval from the Commission to discontinue, reduce, or impair service to a community. We expect that this will minimize burdens on small entities.

774. We also considered the benefits certain Title II provisions offer to providers, particularly BIAS-only providers, which are frequently small providers, in making its forbearance determination. For example, the Commission did not find the standards for forbearance to be met with respect to sections 224, 253, and 332, which all assist providers with network deployment. Section 224 guarantees pole attachment rights to all BIAS providers, including BIAS-only providers, who are frequently small entities. Section 253 permits BIAS-only providers to seek the Commission's intervention when State or local regulations interfere with their network deployment. Meanwhile, section 332 guarantees that State and local governments act on requests by wireless providers, including BIAS-only providers, to place, construct, or modify personal wireless service facilities within a reasonable period of time.

### G. Report to Congress

775. The Commission will send a copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration,* including the FRFA, in a report to Congress pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration,* including the FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration* and FRFA (or summaries thereof) will also be published in the **Federal Register**.

### IX. Ordering Clauses

776. Accordingly, *it is ordered,* pursuant to the authority contained in sections 1, 2, 3, 4, 10, 13, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, and 602 of the Communications Act of 1934, as amended, and section 706 of the Telecommunications Act of 1996, as amended, 47 U.S.C 151, 152, 153, 154(i)–(j), 160, 163, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, 522, 1302, that the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration *is adopted* and that parts 8 and 20 of the

Commission's Rules, 47 CFR parts 8 and 20, *are amended.*

777. *It is further ordered,* pursuant to sections 1, 4(i), 4(j), 214, 215, 218, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j), 214, 215, 218, 403, and §§ 1.1, 2.903, 63.12, 63.18, and 63.21 of the Commission's rules, 47 CFR 1.1, 2.903, 63.12, 63.18, and 63.21, that blanket section 214 authority for the provision of broadband internet access service is granted to any entity currently providing or seeking to provide broadband internet access service except for China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC and their current and future affiliates and subsidiaries.

778. *It is further ordered,* pursuant to sections 1, 4(i), 4(j), 214, 215, 218, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j), 214, 215, 218, 403, and §§ 1.1, 2.903, 63.12, 63.18, and 63.21 of the Commission's rules, 47 CFR 1.1, 2.903, 63.12, 63.18, and 63.21, that China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC, and their affiliates and subsidiaries as defined pursuant to 47 CFR 2.903(c), shall discontinue any and all provision of BIAS no later than sixty (60) days after the effective date of the Order as established in the **Federal Register**.

779. *It is further ordered,* pursuant to sections 1, 2, 4(i), 4(j), 160, 201–205, 211, 214, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i), 154(j), 160, 201–205, 211, 214, 303(r); sections 1–6 of the Cable Landing License Act of 1921, 42 Stat. 8, 47 U.S.C. 34–39; section 402(b)(2)(B), (c) of the Telecommunications Act of 1996, Public Law 104–104, 110 Stat. 56, 47 U.S.C. 204 note, 208 note, 214 note; and § 1.3 of the Commission's rules, 47 CFR 1.3, that §§ 1.763, 43.82, 63.03, 63.04, 63.09 through 63.14, 63.17, 63.18, 63.20 through 63.25, 63.50 through 63.53, 63.65, 63.66, 63.100, 63.701, and 63.702 of the Commission's rules, 47 CFR 1.763, 43.82, 63.03, 63.04, 63.09 through 63.14, 63.17, 63.18, 63.20 through 63.25, 63.50 through 63.53, 63.65, 63.66, 63.100, 63.701, and 63.702, are waived as applied to the provision of broadband internet access service.

780. *It is further ordered* that a copy of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration shall be sent by Certified Mail, Return Receipt Requested, and by regular first-class mail to the addresses of record of China Mobile International (USA) Inc., China Telecom (Americas) Corporation, China Unicom (Americas) Operations Limited, Pacific Networks Corp., and ComNet (USA) LLC, and shall be posted in the Office of the Secretary pursuant to section 413 of the Communications Act of 1934, as amended, 47 U.S.C. 413.

781. *It is further ordered,* pursuant to sections 1, 2, 4(i), 4(j), 10, 303(r), 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i), 154(j), 160, 303(r), 309, 310, 403, and §§ 1.3 and 1.5000 through 1.5004 of the Commission's rules, 47 CFR 1.3, 1.5000 through 1.5004, that the requirements to request a declaratory ruling pursuant to section 310(b)(3)–(4) of the Act and §§ 1.5000 through 1.5004 of the Commission's rules are waived for common carrier wireless licensees that are providing *only* broadband internet access service pending the adoption of any rules for broadband internet access service.

782. *It is further ordered,* pursuant to sections 1, 2, 4(i), 4(j), 222, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i), 154(j), 222, 303(r), and § 1.3 of the Commission's rules, 47 CFR 1.3, that part 64, subpart U, of the Commission's rules is waived as applied to the provision of broadband internet access service.

783. *It is further ordered* that the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration *shall be effective* 60 days after publication in the **Federal Register**, except that those amendments which contain new or modified information collection requirements will not become effective until after the Office of Management and Budget completes any review that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act. The Commission directs the Wireline Competition Bureau to announce the effective date for those amendments by subsequent Public Notice. It is our intention in adopting the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration that, if any provision of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, or the application thereof to any person or circumstance, is held to be unlawful, the remaining portions of such Declaratory Ruling, Order, Report and Order, and Order on Reconsideration not be deemed unlawful, and the application of such Declaratory Ruling, Order, Report and Order, and Order on Reconsideration to other person or circumstances, shall remain in effect to the fullest extent permitted by law.

784. *It is further ordered* that the Office of the Secretary, Reference Information Center *shall send* a copy of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, including the Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

785. *It is further ordered* that the Office of the Managing Director, Performance and Program Management, *shall send* a copy of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. 801(a)(1)(A).

786. *It is ordered,* that, pursuant to 47 CFR 1.4(b)(1), the period for filing petitions for reconsideration or petitions for judicial review of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration will commence on the date that a summary of the Declaratory Ruling, Order, Report and Order, and Order on Reconsideration is published in the **Federal Register**.

787. *It is further ordered* that the Petitions for Reconsideration of the *Restoring Internet Freedom Remand Order* (86 FR 994 (Jan. 7, 2021)) are *granted* to the extent described herein and otherwise *dismissed as moot.*

## List of Subjects for 47 CFR Parts 8 and 20

Common carriers, Communications, Communications common carriers, Radio, Reporting and recordkeeping requirements, Satellites, Telecommunications.

Federal Communications Commission.

**Katura Jackson,**

*Federal Register Liaison Officer.*

## Final Rules

For the reasons set out in this document, the Federal Communications Commission amends 47 CFR chapter I as follows:

■ 1. Under the authority of 47 U.S.C 151, 152, 153, 154(i)–(j), 160, 163, 201, 202, 206, 207, 208, 209, 214, 215, 216, 217, 218, 219, 220, 230, 251, 254, 256, 257, 301, 303, 304, 307, 309, 310, 312, 316, 332, 403, 501, 503, 522, 1302, revise the heading for subchapter A to read as follows:

Subchapter A—Internet Openness

## PART 8—SAFEGUARDING AND SECURING THE OPEN INTERNET

■ 2. The authority citation for part 8 is revised to read as follows:

**Authority:** 47 U.S.C. 151, 152, 153, 154, 163, 201, 202, 206, 207, 208, 209, 216, 217, 257, 301, 302a, 303, 304, 307, 309, 312, 316, 332, 403, 501, 503, 522, 1302, 1753.

■ 3. Revise the heading for part 8 to read as set forth above.

### § 8.1 [Redesignated as § 8.2]

■ 4. Redesignate § 8.1 as § 8.2.

■ 5. Add new § 8.1 to read as follows:

### § 8.1 Definitions.

(a) [Reserved]

(b) *Broadband Internet access service.* A mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part.

(c) *Edge provider.* Any individual or entity that provides any content, application, or service over the internet, and any individual or entity that provides a device used for accessing any content, application, or service over the internet.

(d) *End user.* Any individual or entity that uses a broadband internet access service.

(e) *Reasonable network management.* A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband internet access service.

### § 8.2 [Amended]

■ 6. Amend newly redesignated § 8.2 by removing paragraph (c).

■ 7. Delayed indefinitely, further amend newly redesignated § 8.2 by:

■ a. Revising the introductory text of paragraph (a);

■ b. Removing paragraph (a)(7); and

■ c. Revising paragraph (b).

The revisions read as follows:

### § 8.2 Transparency.

(a) A person engaged in the provision of broadband internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain internet offerings. Disclosures made under this paragraph (a) must be displayed on the broadband internet access service provider's website in a machine-readable format.

\* \* \* \* \*

(b) Compliance with paragraphs (a)(1), (2), and (4) through (6) of this section for providers with 100,000 or fewer subscriber lines is required as of October 10, 2024, and for all other providers is required as of April 10, 2024, except that compliance with the requirement in paragraph (a)(2) of this section to make labels accessible in online account portals will not be required for all providers until October 10, 2024. Compliance with paragraph (a)(3) of this section is required for all providers as of October 10, 2024.

■ 8. Add § 8.3 to read as follows:

### § 8.3 Conduct-based rules.

(a) *No blocking.* A person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management.

(b) *No throttling.* A person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not impair or degrade lawful internet traffic on the basis of internet content, application, or service, or use of a non-harmful device, subject to reasonable network management.

(c) *No paid prioritization.* (1) A person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not engage in paid prioritization. "Paid prioritization" refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either:

(i) In exchange for consideration (monetary or otherwise) from a third party; or

(ii) To benefit an affiliated entity.

(2) The Commission may waive the ban on paid prioritization only if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the internet.

(d) *No unreasonable interference or unreasonable disadvantage standard for internet conduct.* (1) Any person engaged in the provision of broadband internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage:

(i) End users' ability to select, access, and use broadband internet access service or the lawful internet content, applications, services, or devices of their choice; or

(ii) Edge providers' ability to make lawful content, applications, services, or devices available to end users.

(2) Reasonable network management shall not be considered a violation of this paragraph (d).

(e) *Effect on other obligations or authorizations.* Nothing in this part supersedes any obligation or authorization a provider of broadband internet access service may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so. Nothing in this part prohibits reasonable efforts by a provider of broadband internet access service to address copyright infringement or other unlawful activity.

■ 9. Add § 8.6 to read as follows:

### § 8.6 Advisory opinions.

(a) *Procedures.* (1) Any entity that is subject to the Commission's open internet rules in this part may request an advisory opinion from the Enforcement Bureau regarding the permissibility of its proposed policies and practices relating to broadband internet access service. Requests for advisory opinions may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

(2) The Enforcement Bureau may, in its discretion, determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.

(3) Requests for advisory opinions must relate to a proposed policy or practice that the requesting party

intends to pursue. The Enforcement Bureau will not respond to requests for opinions that relate to ongoing or prior conduct, and the Bureau may initiate an enforcement investigation to determine whether such conduct violates the open internet rules in this part. Additionally, the Bureau will not respond to requests if the same or substantially the same conduct is the subject of a current Government investigation or proceeding, including any ongoing litigation or open rulemaking at the Commission.

(4) Requests for advisory opinions must be accompanied by all material information sufficient for Enforcement Bureau staff to make a determination on the policy or practice for which review is requested. Requesters must certify that factual representations made to the Bureau are truthful and accurate, and that they have not intentionally omitted any information from the request. A request for an advisory opinion that is submitted by a business entity or an organization must be executed by an individual who is authorized to act on behalf of that entity or organization.

(5) Enforcement Bureau staff will have discretion to ask parties requesting advisory opinions, as well as other parties that may have information relevant to the request or that may be impacted by the proposed conduct, for additional information that the staff deems necessary to respond to the request. Such additional information, if furnished orally or during an in-person conference with Bureau staff, shall be promptly confirmed in writing. Parties are not obligated to respond to staff inquiries related to advisory opinions. If a requesting party fails to respond to a staff inquiry, then the Bureau may dismiss that party's request for an advisory opinion. If a party voluntarily responds to a staff inquiry for additional information, then it must do so by a deadline to be specified by Bureau staff. Advisory opinions will expressly state that they rely on the representations made by the requesting party, and that they are premised on the specific facts and representations in the request and any supplemental submissions.

(b) *Response.* After review of a request submitted under this section, the Enforcement Bureau will:

(1) Issue an advisory opinion that will state the Bureau's present enforcement intention with respect to whether or not the proposed policy or practice detailed in the request complies with the Commission's open internet rules in this part;

(2) Issue a written statement declining to respond to the request; or

(3) Take such other position or action as it considers appropriate. An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party. Advisory opinions will be issued without prejudice to the Enforcement Bureau or the Commission to reconsider the questions involved, or to rescind or revoke the opinion. Advisory opinions will not be subject to appeal or further review.

(c) *Enforcement effect.* The Enforcement Bureau will have discretion to indicate the Bureau's lack of enforcement intent in an advisory opinion based on the facts, representations, and warranties made by the requesting party. The requesting party may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion. The Bureau will not bring an enforcement action against a requesting party with respect to any action taken in good faith reliance upon an advisory opinion if all of the relevant facts were fully, completely, and accurately presented to the Bureau, and where such action was promptly discontinued upon notification of rescission or revocation of the Commission's or Bureau's approval.

(d) *Public disclosure.* The Enforcement Bureau will make advisory opinions available to the public on the Commission's website. The Bureau will also publish the initial request for guidance and any associated materials. Parties soliciting advisory opinions may request confidential treatment of information submitted in connection with a request for an advisory opinion pursuant to § 0.459 of this chapter.

(e) *Withdrawal of request.* Any requesting party may withdraw a request for review at any time prior to receipt of notice that the Enforcement Bureau intends to issue an adverse opinion, or the issuance of an opinion. The Enforcement Bureau remains free, however, to submit comments to such requesting party as it deems appropriate. Failure to take action after receipt of documents or information, whether submitted pursuant to this procedure or otherwise, does not in any way limit or stop the Bureau from taking such action at such time thereafter as it deems appropriate. The Bureau reserves the right to retain documents submitted to it under this procedure or otherwise and to use them for all governmental purposes.

## PART 20—COMMERCIAL MOBILE SERVICES

■ 10. The authority citation for part 20 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152(a), 154(i), 155, 157, 160, 201, 214, 222, 251(e), 301, 302, 303, 303(b), 303(r), 307, 307(a), 309, 309(j)(3), 316, 316(a), 332, 610, 615, 615a, 615b, and 615c, unless otherwise noted.

■ 11. Amend § 20.3 by:
■ a. Revising the definitions of "Commercial mobile radio service";
■ b. Removing the definition of "Interconnected Service" and adding the definition for "Interconnected service" in its place; and
■ c. Removing the definition for "Public Switched Network" and adding the definition for "Public switched network" in its place.

The revision and additions read as follows:

## § 20.3 Definitions.

\* \* \* \* \*

*Commercial mobile radio service.* A mobile service that is:

(1)(i) Provided for profit, *i.e.,* with the intent of receiving compensation or monetary gain;

(ii) An interconnected service; and

(iii) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or

(2) The functional equivalent of such a mobile service described in paragraph (1) of this definition, including a mobile broadband internet access service as defined in § 8.1 of this chapter.

(3) A variety of factors may be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: Consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service, would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

(4) Unlicensed radio frequency devices under part 15 of this chapter are excluded from this definition of *commercial mobile radio service.*

\* \* \* \* \*

*Interconnected service.* A service:

(1) That is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers

the capability to communicate to or receive communication from other users on the public switched network; or

(2) For which a request for such interconnection is pending pursuant to section 332(c)(1)(B) of the Communications Act, 47 U.S.C. 332(c)(1)(B). A mobile service offers interconnected service even if the service allows subscribers to access the public switched network only during specified hours of the day, or if the service provides general access to points on the public switched network but also restricts access in certain limited ways. Interconnected service does not include any interface between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes.

\* \* \* \* \*

*Public switched network.* The network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that uses the North American Numbering Plan, or public IP addresses, in connection with the provision of switched services.

\* \* \* \* \*

[FR Doc. 2024–10674 Filed 5–21–24; 8:45 am]

**BILLING CODE 6712–01–P**