Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3504, 24-3507, 24-3508, 24-3510, 24-3511, 24-3517, 24-3519, 24-3538

# In the United States Court of Appeals for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

On Petitions for Review

**JOINT REPLY IN SUPPORT OF MOTION FOR STAY OF OHIO TELECOM ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, WIRELESS INTERNET SERVICE PROVIDERS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, AND TEXAS CABLE ASSOCIATION**

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

*(Additional counsel on next page)*

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW, Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................ 1

ARGUMENT ........................................ 2

I. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS ........................................ 2

A. The Major-Questions Doctrine Applies ........................................ 2

B. The Commission Fails To Identify The Required Clear Congressional Authorization ........................................ 5

II. THE EQUITIES FAVOR A STAY ........................................ 10

A. Petitioners Have Established Irreparable Harm ........................................ 10

B. A Stay Is In The Public Interest ........................................ 12

CONCLUSION ........................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biden* v. *Nebraska*,
143 S. Ct. 2355 (2023) ........................................ 2, 3

*Kentucky* v. *Biden*,
23 F.4th 585 (6th Cir. 2022) ........................................ 13

*Kentucky* v. *Biden*,
57 F.4th 545 (6th Cir. 2023) ........................................ 10

*National Cable & Telecomm. Ass'n* v. *Brand X Internet Servs.*,
545 U.S. 967 (2005) ........................................ 2, 3, 5, 7

*NFIB* v. *OSHA*,
595 U.S. 109 (2022) ........................................ 2

*U.S. Telecom Ass'n* v. *FCC*,
855 F.3d 381 (D.C. Cir. 2017) (en banc) ........................................ 3

*Utility Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014) ........................................ 8

*West Virginia* v. *EPA*,
597 U.S. 697 (2022) ........................................ 2, 3, 4

## Statutes

47 U.S.C.
§ 153 ........................................ 5, 8
§ 160 ........................................ 8
§ 405 ........................................ 10

## Other Authorities

Federal Rule of Appellate Procedure 18 ........................................ 10

Ford Response (Apr. 18, 2024),
https://www.fcc.gov/ecfs/document/104182796806728/2................................4

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1997) ...............................9

*Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018)...........................................................................5

USTelecom & CTIA Letter (Mar. 22, 2024),
https://www.fcc.gov/ecfs/document/1032284297628/1 ...................................7

# INTRODUCTION

The Commission offers two principal objections to a stay. First, it repeatedly suggests that reclassifying broadband under Title II is not a big deal, so the Order does not implicate a major question and will not significantly harm Internet service providers (ISPs). That is simply wrong. Whether the broadband industry should be regulated like a public utility has been a political hot potato for a decade, a telltale sign of a major question. And as explained in petitioners' detailed declarations—which the Commission mostly ignores—Title II regulation imposes costs on the broadband industry that are in a class of their own.

Second, the Commission contends that because the D.C. Circuit denied a stay in 2015, this Court should too. The D.C. Circuit's one-paragraph denial contained no reasoning, which gives it little persuasive value. Regardless, petitioners' showing on every stay factor is far stronger today. On the merits, the D.C. Circuit applied a *Chevron* framework that is no longer relevant. Instead, the major-questions doctrine reverses the paradigm: whereas the D.C. Circuit's (erroneous) finding of statutory ambiguity once doomed any challenge, now it would doom the Order. On harms, what the Commission argued was speculative in 2015 is now anything but: ISPs experienced life

under Title II, and the costs were significant and singular. And on the public interest, the Commission offers only a single inapposite example of supposedly harmful ISP behavior since 2015. This Court should grant a stay.

## ARGUMENT

### I. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A. The Major-Questions Doctrine Applies.

1. The Commission mischaracterizes the major-questions doctrine from the jump. It asserts (at 19) that the doctrine "does not come into play" if the Commission has "the best reading of the statute." But the Supreme Court has described the doctrine more forcefully, as requiring a clear statement, *West Virginia* v. *EPA*, 597 U.S. 697, 724 (2022); *NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022), or at a minimum as informing the best reading of the text, *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring). It is not a mere tiebreaker for lingering ambiguity.

The Commission next argues (at 19) that *National Cable & Telecommunications Association* v. *Brand X Internet Services*, 545 U.S. 967 (2005), forecloses application of the major-questions doctrine, because the Supreme Court "squarely held that the Act empowers the FCC to determine the proper classification of broadband." *Brand X* held no such thing. On the contrary, *every* Justice agreed that "Internet access service" is an

"information service." *Id.* at 978. The only dispute was whether cable broadband providers that "offered" Internet access service *also* "offered," as a distinct telecommunications service, the pure transmission capability that is necessary for Internet access. *Id.* at 989. Neither the majority nor the dissent adopted the Commission's current view: that providers of Internet access service offer *only* pure transmission, without any information service involved.

Regardless, any room for disagreement on the proper classification of broadband would be "a *bar* to the FCC's [claim of] authority," because it would reflect the lack of clear congressional authorization. *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 483 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). The Commission dismisses then-Judge Kavanaugh's dissent as "just that—a dissent." Opp. 21. But the Supreme Court has since favorably cited that dissent in adopting its doctrinal approach. *See West Virginia*, 597 U.S. at 723; *Biden*, 143 S. Ct. at 2380 (Barrett, J., concurring).

2. The Commission also argues (at 20-23) that the Order is not major, but it cannot brush away the Order's "indisputable" significance. *U.S. Telecom*, 855 F.3d at 422 (Kavanaugh, J., dissenting). The Commission pretends that the Order merely imposes uncontroversial open-Internet rules,

emphasizing that it has forborne from some of Title II's most eye-popping provisions. Opp. 20. But the Commission simultaneously proclaims its intent to regulate in a host of other areas, such as cybersecurity and network reliability. *See* Order ¶¶ 26-105. And in any event, *West Virginia* is clear: courts should assess the full implications of an agency's claimed authority, not merely how much of the camel's nose an agency has shoved under the tent so far. 597 U.S. at 728-729.

Here, the Commission's claim of authority has massive political and economic implications. On politics, the Commission ignores the last ten years of intense debate, not to mention its own serial flip-flops. And on economics, the Commission wrongly contends that petitioners rely on a "single" "methodologically flawed" study. Opp. 20. The comment record extensively explains the Order's economic significance, and the author of the one study the Commission addresses refuted its methodological criticisms. *See* Israel Decl., App. 931-1031; Ford Response (Apr. 18, 2024), https://www.fcc.gov/ecfs/document/104182796806728/2. The Commission also misses the forest for the trees: it is asserting control over a $150-billion industry at the center of modern American life. *See* Mot. 10-11.

Finally, the Commission contends that it does not claim a "novel" power, Opp. 19, because it "classified early forms of DSL (digital subscriber line) broadband" under Title II in the late 1990s. *Id.* at 4; *see id.* at 4-11. The Commission's history lesson is misleading. The Commission applied Title II only to the last-mile, *pure-transmission* component of DSL service; it did not regulate the Internet access service that telephone companies and others offered over that DSL connection. *See* USTelecom Comments, App. 1129-1130, 1139-1140. The history actually undermines, rather than supports, the Commission's power grab—as the Commission itself once recognized. *Restoring Internet Freedom*, 33 FCC Rcd. 311, 313-318 (2018).

**B. The Commission Fails To Identify The Required Clear Congressional Authorization.**

1. On a plain reading of the statutory definitions, broadband is an information service, not a telecommunications service, because it provides consumers with the "capability" for "acquiring," "retrieving, [or] utilizing" information. 47 U.S.C. § 153(24); *see Brand X*, 545 U.S. at 987 (broadband is an information service because it "enables users . . . to browse the World Wide Web"); Mot. 14-15. The Commission has three responses, and all are wrong.

First, the Commission argues (at 12) that consumers perceive broadband merely as a "dumb pipe" through which they transmit information,

not as providing a capability to acquire and use information. But the Commission cites no empirical evidence, and ignores the multiple consumer surveys showing the opposite. *See* Mot. 15.

Second, the Commission observes (at 13-14) that accessing information on the Internet often requires the use of "third-party applications," and cannot be achieved using broadband alone. Thus, the Commission contends, it is those third-party services that are information services, not broadband. The premise is true, but the conclusion is false: *both* are information services. As a matter of ordinary language, it is perfectly natural to describe a service as an offering of the capability to achieve some outcome, even if it offers that capability in conjunction with another service. A library membership offers the capability to learn a new subject, even though members must check out a book to do so.

Third, the Commission argues (at 13) that petitioners' interpretation "proves too much": if broadband is an information service because it can be used to access information, then so is traditional telephone service, which can be used to "make a train reservation or check the weather forecast." But that is too clever by half: broadband is not an information service because it can incidentally be used to access and interact with information on

remote computers; it is an information service because it *always* entails doing just that.

2. Even under the Commission's flawed interpretation, broadband is still an "information service" because broadband itself has information-service capabilities, including DNS and caching.

Take DNS. The Commission does not contest petitioners' empirical evidence showing that the "typical user" "perceives the broadband 'offering' to include the information-processing capabilities of DNS." Mot. 16. Instead, it argues (at 15) that because tech-savvy consumers *can* replace their ISPs' pre-configured DNS service, it must be the case that ISPs offer DNS as a "separable, bundled service." But again, what matters is ordinary perception. A sophisticated buyer can replace his car's engine, but it would be "odd to describe a car dealership as 'offering'" engines bundled with a car. *Brand X*, 545 U.S. at 990. The Commission also attempts to portray caching as "vestigial," Opp. 15, but technological changes in the caching mechanism do not make caching any less integral to broadband. Rysavy Decl. ¶¶ 17-25, App. 773-776; USTelecom & CTIA Letter 4-5 (Mar. 22, 2024), https://www.fcc.gov/ecfs/document/1032284297628/1.

The Commission alternatively invokes (at 15-16) the so-called "telecommunications-management exception" in the statutory definition of "information service." 47 U.S.C. § 153(24). But ISPs do not use DNS to "manage[], control, or operat[e]" their purported "telecommunications system." *Id.* Instead, DNS provides a *user-facing* functionality (translating "www.ca6.uscourts.gov" into the right IP address). *See* USTelecom Comments, App. 1125-1127. The Commission's point that users can (if rarely) replace the ISP's DNS service underscores that: no provider of a telecommunications system would allow an unsupervised third party to "manage[], control, or operat[e]" its system.

3. The Commission has little response to petitioners' structural arguments. It first argues (at 17-18) that the Order's mass forbearance from Title II's requirements is no problem. But the fact that the Commission *can* forbear from Title II powers misses the point. Forbearance is designed to serve specific policy goals. *See* 47 U.S.C. § 160(a). That the Commission *needs* to forbear from so much of Title II to make its interpretation work is a sign that the Commission has the wrong interpretation. *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 328 (2014).

The Commission also has no sound answer on mobile broadband. It does not dispute that reclassifying broadband under Title II also requires reclassifying mobile broadband as a service "interconnected with the public switched network"—a label that does not fit. *See* Mot. 18. The Commission's only answer is that "Congress expressly gave [it] the power to define" the terms "interconnected" and "the public switched network." Opp. 18. Congress did not, however, empower the Commission to give those terms a definition that their plain meaning will not bear. And the Commission cannot plausibly define "the public switched network" to include two networks—telephone and Internet—that have no internal connections. *See Merriam-Webster's Collegiate Dictionary* 609, 780 (10th ed. 1997) (defining "network" as a "system" consisting of "internal connections between the parts or elements").

Finally, the Commission contends (at 17) that Section 706 of the 1996 Act assumes that broadband is a Title II telecommunications service, because it directs the Commission to use certain Title II tools, like forbearance, to promote broadband deployment. But in 1996, it made sense to use forbearance to do that, since broadband meant Internet access service over DSL, using telephone lines for transmission. *See supra*, p. 5 (discussing history of DSL service). Deregulating the telephone companies' Title II

telephone services allowed them to invest more in DSL-related technology and infrastructure. That does not mean that Congress thought broadband Internet access service *itself* was a Title II service, and again the Commission never regulated it that way.

## II. THE EQUITIES FAVOR A STAY.

### A. Petitioners Have Established Irreparable Harm.

On the equities, the Commission barely engages with petitioners' declarations, which show that the Order will cause their members to incur unique, unrecoverable costs during this Court's review. Its only response is to contend in a footnote (at 25 n.3) that some declarations are procedurally improper under 47 U.S.C. § 405, which precludes parties from challenging Commission orders on factual grounds that have not been previously presented to the agency. Section 405 is irrelevant here. Petitioners are not relying on the declarations to challenge the Order on the merits. They are seeking a stay, for which they must establish irreparable harm. Federal Rule of Appellate Procedure 18(a)(2)(B)(ii) explains how to make that showing: with "sworn statements supporting facts subject to dispute," like the declarations that petitioners have submitted here.

1. On substance, the Commission does not dispute that, as a legal matter, compliance costs qualify as irreparable harm. *See Kentucky* v. *Biden*,

57 F.4th 545, 556 (6th Cir. 2023). Nor does it appear to dispute that, as a factual matter, petitioners and their members are incurring extraordinary compliance costs. *See* Mot. 20-21. Petitioners' detailed declarations explain that they faced distinctive costs under the 2015 order and face similar, or worse, harms now. *See* App. 1598-1676. The Commission's primary response is that ISPs need not bother spending so much time and money on compliance because the Order is not a significant source of legal uncertainty. Opp. 23-25. But in reality, ISPs are reacting to the Order in reasonable ways, just as they did in 2015. *See* Mot. 20-23.

Nor is moving from Title I to Title II merely a change in *who* regulates ISPs (the FTC or the FCC). *See* Opp. 23. The FTC cannot regulate ISPs' rates or order ISPs to deploy new infrastructure. Concerns about potential FTC enforcement actions—which cannot even result in a fine for first-time violations—do not approach the real, concrete impacts of the Order's general conduct standard, which the Commission can enforce with massive forfeitures and private parties with damages actions. *See* Mot. 20-22. And although it is true that States could attempt to impose rules that ISPs do not like, federal preemption can be a backstop there. The here-and-now harms from more

federal regulation are not diminished by the possibility of "many separate state regulators." Opp. 24.

2. The Commission likewise dismisses the other types of harms that petitioners have established, *see* Mot. 21-24, calling them insufficiently imminent, unconnected to the Order, or too "hypothetical," Opp. 25-27. Petitioners are understandably reluctant to identify specific offerings at risk, but they have described them with reasonable detail (*e.g.*, enabling lower latency for certain use cases, or developing network-slicing technology), and provided actual examples of affected offerings from 2015. *See* Power Decl. ¶¶ 7-12, App. 1651-1655; Buono Decl. ¶¶ 18-20, App. 1604-1605; Morris Decl. ¶ 15, App. 1636; Heimann Decl. ¶¶ 26-28, App. 1619-1620. And while a stay may not fully resolve increased capital costs, it should decrease them. *See* Israel Decl. ¶¶ 17-19, App. 937-939; Stooke Decl. ¶¶ 18, 23; App. 1672-1675. Finally, on interconnection negotiations, the Order does create an obvious asymmetry—one side (ISPs) can be punished for violating a federal statute (at its counterparties' behest), and the other cannot. *See* Order ¶ 577.

**B. A Stay Is In The Public Interest.**

Against the extraordinary costs that the Order imposes, the Commission points to a *single recent example* of a supposedly harmful practice by an ISP:

AT&T's Sponsored Data program, ended in 2021, which allowed customers to stream video on DirecTV without counting against their monthly data allowance. Opp. 27. But the Commission does not demonstrate any harm to the open Internet from that offering. AT&T openly invited any entity, not just DirecTV, to participate in a program that gave consumers more data for free. If anything, the program exemplifies the kind of innovative offering that ISPs must forgo under vague Internet conduct standards. *See* Heimann Decl. ¶¶ 16-19, App. 1614-1616.

The Commission does not point to a single other real-world "harm" that immediate enforcement of the Order might prevent. Tellingly, it does not even pretend that a stay would threaten national security, privacy, or any of the Order's other newfound policy concerns. Instead, it says (at 27-28) that ISPs *could* engage in "harmful practices" that may go "undetected." That kind of unsupported prophylaxis does not justify enforcing an unlawful order. *See Kentucky* v. *Biden*, 23 F.4th 585, 612 (6th Cir. 2022).

## CONCLUSION

The Court should stay the Order.

Respectfully submitted,

s/ Helgi C. Walker
HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

s/ Matthew A. Brill
MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

s/ Thomas M. Johnson, Jr.
THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel for WISPA – The Association for Broadband Without Boundaries*

s/ Jeffrey A. Lamken
JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

JUNE 21, 2024

## CERTIFICATE OF COMPLIANCE

This reply complies with Federal Rule of Appellate Procedure 27(d) because it contains 2,597 words.

This reply also complies with the requirements of Federal Rules of Appellate Procedure 27(d) and 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JUNE 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing reply with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JUNE 21, 2024