No. 24-7000

FILED

Aug 1, 2024

KELLY L. STEPHENS, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

In re:  MCP No. 185; FEDERAL              )
COMMUNICATIONS COMMISSION, IN THE         )
MATTER OF SAFEGUARDING AND                )
SECURING THE OPEN INTERNET,               )
DECLARATORY RULING, ORDER, REPORT         )          O R D E R
AND ORDER, AND ORDER ON                   )
RECONSIDERATION, FCC 24-52, 89 Fed. Reg.  )
45404, Published May 22, 2024.            )

Before:  SUTTON, Chief Judge; CLAY and DAVIS, Circuit Judges.

PER CURIAM.  On May 22, 2024, the Federal Communications Commission issued a rule classifying broadband internet providers as common carriers subject to heightened regulatory requirements under Title II of the Communications Act of 1934.  *See Safeguarding and Securing the Open Internet*, 89 Fed. Reg. 45404 (May 22, 2024) (to be codified at 47 CFR pts. 8, 20).  The rule was set to go into effect on July 22, 2024.  We administratively stayed this effective date until August 5, 2024.  Several broadband providers asked this court to stay the final rule pending review of their petitions.  Because the broadband providers have shown that they are likely to succeed on the merits and that the equities support them, we grant the stay.

I.

Broadband internet refers to the set of platforms that permit users to access the internet at speeds faster than dial-up services.  *See* F.C.C., Getting Broadband Q&A (Jan. 25, 2024), https://www.fcc.gov/consumers/guides/getting-broadband-qa.  Over three-quarters of Americans have access to high-speed broadband service.  *Safeguarding*, 89 Fed. Reg. at 45412.  In addition

to renting or constructing the physical network connecting computers, broadband internet providers offer other services that enable subscribers to access content from "edge providers"— namely websites, such as Google, Netflix, and Amazon, that host content on their own networks. *Id.* at 45430. These services include DNS, short for Domain Name Services, a "phonebook" that matches web addresses (e.g., http://www.ca6.uscourts.gov) with their IP (internet protocol) addresses. And they include "caching" services that speed up data access by storing copies of edge provider content closer to the user's home system. *Id.* at 45428–30.

The Communications Act of 1934 covers broadband providers, and it gives the Federal Communications Commission authority to promulgate rules and regulations under the Act. The extent of that regulatory authority turns on whether the providers count as common carriers under the Act. If a business counts as a common carrier, it must comply with Title II of the Act, which includes rate-review regulations and non-discrimination obligations. *See* 47 U.S.C. §§ 201–03. For other businesses, the Commission may impose only the ancillary regulations authorized under Title I, which generally preserve the ability of companies to respond to market conditions. *See, e.g.*, *id.* §§ 154(i), 161.

The development of the internet presented the Commission with a classification challenge. When Congress first enacted this law in 1934, it defined common carriers to include anyone involved in "wire communications." Pub. L. 73-416, § 3(a), (h), 48 Stat. 1064, 1065–66 (codified at 47 U.S.C. §§ 153(11), (59)). Think telephone companies and the monopolies that went with them. But by the 1970s, telephone companies and others had begun competing to offer data processing services through telephone wires. *See In the Matter of Regul. & Pol'y Probs. Presented by the Interdependence of Comput. & Commc'n Servs. & Facilities*, 28 F.C.C.2d 291, 293–300, ¶¶ 8–28 (1970). Common carrier rules designed for telephone-wire monopolies, the Commission

realized, could inhibit the development of "data information services." *Re Second Comput. Inquiry*, 77 F.C.C.2d 384, 433, ¶ 128 (1980). The Commission responded by distinguishing the "basic transmission service" that transferred data between two points from the "enhanced service" that allowed subscribers to interact with data stored elsewhere. *Id.* at 419–22, ¶¶ 95–99.

Responding to these developments, Congress enacted the Telecommunications Act of 1996. It established a new category of "telecommunications service," which offers "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50), (53). The Commission must treat telecommunications service providers as common carriers. *See id.* § 153(51). The 1996 Act also created a new category of "information service," which applies to a company that offers "a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(24). The Commission may not treat information service providers as common carriers. *Id.* § 153(11), (51).

After passage of the 1996 Act, the Commission for many years took the view that broadband internet access services were information services, not telecommunication services. That left them free of Title II's common carrier requirements. *See In re Inquiry Concerning High-Speed Access to Internet over Cable & Other Facilities*, 17 F.C.C. Rcd. 4798, 4823, ¶¶ 38–40 (2002) (cable modem broadband); *In the Matters of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 F.C.C. Rcd. 14853, 14858, ¶ 5 (2005) (DSL); *In the Matter of United Power Line Council's Petition for Declaratory Ruling*, 21 F.C.C. Rcd. 13281, 13285–90, ¶¶ 7–15 (2006) (broadband over power lines); *In the Matter of Appropriate Regul. Treatment for Broadband Access to the Internet over Wireless Networks*, 22 F.C.C. Rcd.

5901, 5908–14, ¶¶ 18–34 (2007). (wireless broadband); *see also In the Matter of Fed.-State Joint Bd. on Universal Serv.*, 13 F.C.C. Rcd. 11501, 11540, ¶ 81 (1998) (internet access providers).

Reviewing a decision from the Ninth Circuit, the Supreme Court upheld this classification under *Chevron.  Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974 (2005).  Specifically, the Supreme Court found that the classification of broadband internet access offered through cable modems as an information service was a permissible interpretation of the Communications Act.  *Id.* at 986.

In 2010, the Commission continued to treat broadband internet services as something covered by Title I but opted to alter its rules based on a debate over the risk that broadband providers could favor some edge providers' content over others.  *See Safeguarding*, 89 Fed. Reg. at 45498.  The Commission tried to use its Title I authority to impose "open internet" rules on broadband providers that banned them from blocking or unreasonably discriminating between lawful content.  *In the Matter of Preserving the Open Internet Broadband Indus. Pracs.*, 25 F.C.C. Rcd. 17905, 17940–46, 17968, ¶¶ 59–75, 117 (2010).  A federal court invalidated this rule on the ground that the Commission could impose such requirements only under Title II.  *Verizon v. F.C.C.*, 740 F.3d 623, 650, 655–56 (D.C. Cir. 2014).

The next chapter unfolded in 2015.  That year, the Commission promulgated a rule that categorized broadband providers as common carriers and required net neutrality under Title II.  *See In the Matter of Protecting & Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5757–58, ¶¶ 355–56 (2015).  Relying on *Chevron*, the D.C. Circuit upheld the rule.  *U.S. Telecom Assoc. v. F.C.C.*, 825 F.3d 674, 697–711 (D.C. Cir. 2016).

In 2018, the Commission returned to its prior view.  It issued a new rule that broadband providers fall under Title I and do not qualify as common carriers.  *In the Matter of Restoring*

*Internet Freedom*, 33 F.C.C. Rcd. 311, 322–24, ¶¶ 30–31 (2018). The D.C. Circuit again upheld the classification and again did so under *Chevron*. *Mozilla Corp. v. F.C.C.*, 940 F.3d 1, 19–35 (D.C. Cir. 2019) (per curiam).

On May 22, 2024, the Commission switched positions again. Under its current rule, the Commission has classified broadband providers as common carriers under Title II. *Safeguarding*, 89 Fed. Reg. at 45421. The rule requires broadband providers to disclose "accurate information regarding the network management practices" and forbids them from engaging in blocking, throttling, paid prioritization, and "unreasonable interference" with users and edge providers. *Id.* at 45554 (to be codified at 47 C.F.R. §§ 8.2, 8.3(a)–(d)). The rule at this point forbears other Title II regulations, including rate regulation and tariffing. *See id.* at 45482–86.

Several broadband providers and supporting organizations petitioned for review of the rule in eight different federal circuit courts. Consistent with the relevant statute, a lottery was held to determine which circuit would handle the case. 28 U.S.C. § 2112(a)(3). The Sixth Circuit was drawn, and we consolidated the petitions for review.

II.

A stay decision rests on four factors: likelihood of success on the merits; injury to the petitioners in the absence of a stay; injury to others from a stay; and the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

*Likelihood of success.* The petitioners are likely to succeed on the merits because the final rule implicates a major question, and the Commission has failed to satisfy the high bar for imposing such regulations. Although the petitioners have raised other arguments in support of their position that the FCC exceeded its authority in promulgating the rule at issue, such as whether broadband can be classified as a telecommunications service under the Communications Act and the stare

decisis effect of the *Brand X* decision, we decline to reach those arguments at this preliminary stage.

An agency may issue regulations only to the extent that Congress permits it. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994). When Congress delegates its legislative authority to an agency, it presumably resolves "major questions" of policy itself while authorizing the agency to decide only those "interstitial matters" that arise in day-to-day practice. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (quoting Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986)). When Congress upsets that presumption and delegates its power to "alter the fundamental details of a regulatory scheme" to an agency, it must speak clearly, without "hid[ing] elephants in mouseholes." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001); *see Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). The more an agency asks of a statute, in short, the more it must show in the statute to support its rule.

Net neutrality is likely a major question requiring clear congressional authorization. As the Commission's rule itself explains, broadband services "are absolutely essential to modern day life, facilitating employment, education, healthcare, commerce, community-building, communication, and free expression," to say nothing of broadband's importance to national security and public safety. *Safeguarding*, 89 Fed. Reg. at 45405–12; *see also id.* at 45496–97. Congress and state legislatures have engaged in decades of debates over whether and how to require net neutrality. Because the rule decides a question of "vast 'economic and political significance,'" it is a major question. *Util. Air Regul. Grp.*, 573 U.S. at 324 (citation omitted).

The Communications Act likely does not plainly authorize the Commission to resolve this signal question. Nowhere does Congress clearly grant the Commission the discretion to classify

broadband providers as common carriers. To the contrary, Congress specifically empowered the Commission to define certain categories of communications services—and never did so with respect to broadband providers specifically or the internet more generally. *See* 47 U.S.C. § 153(51) (requiring the Commission to "determine whether the provision of fixed and mobile satellite service shall be treated as common carriage" under the definition of a "telecommunications carrier"); *id.* § 332(d)(1), (3) (defining mobile services in part "as specified by regulation by the Commission"). Absent a clear mandate to treat broadband as a common carrier, we cannot assume that Congress granted the Commission this sweeping power, and Petitioners have accordingly shown that they are likely to succeed on the merits.

*Other stay factors.* The petitioners also have shown a "possibility of irreparable injury." *Nken*, 556 U.S. at 434 (quotation omitted). The petitioners face delays in product rollouts and disadvantages in negotiating interconnection agreements, and such competitive injuries qualify as irreparable consequences. *See Ohio v. Becerra*, 87 F.4th 759, 781–82 (6th Cir. 2023). Plus, they will incur "unrecoverable compliance costs" in accommodating the rule. *Kentucky v. Biden*, 57 F.4th 545, 550, 555–56 (6th Cir. 2023).

The remaining stay factors, assessing the harm to the opposing party and weighing the public interest, merge in a challenge to government action. *Nken*, 556 U.S. at 435. The public interest generally "lies in a correct application" of law, and the Commission's action likely exceeds its legal authority. *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quotation omitted).

## III.

The Commission tries to head off this conclusion in several ways.

As for prospects of success, the Commission invokes its own stare decisis argument, claiming that *Brand X* supports today's rule. In its view, *Brand X*'s silence about the major-questions doctrine implies that it does not matter to today's dispute. But silence is just that. It is particularly irrelevant when it comes to comparing the 2002 *Brand X* rule (which sought only light-touch authority under Title I) and the 2024 rule (which seeks broad authority to regulate broadband providers like common carriers under Title II).

The Commission separately claims clear congressional delegation of authority to classify broadband as a common carrier. It observes that it may "prescribe such rules and regulations as may be necessary in the public interest" to effectuate Title II and other sections. 47 U.S.C. § 201(b); *see id.* §§ 154(i), 303(r). That is true. But such general or "ancillary" authority to fill gaps in Congress's regulatory scheme does not suffice to show that Congress clearly delegated authority to resolve a major question like this one. *Whitman*, 531 U.S. at 468; *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

The Commission next notes that the Act's sole mention of broadband allows the Commission to use "price cap regulation" and "regulatory forbearance" to promote "broadband telecommunications capability." 47 U.S.C. § 1302(a), (d)(1). But this authorization to impose some regulations on broadband providers does not provide the Commission with clear authority to regulate all broadband providers as common carriers. *See Verizon*, 740 F.3d at 650. The section's reference to broadband telecommunications, as opposed to broadband generally, suggests that Congress recognized the potential existence of broadband information services as well. This section also applies when the Commission determines that broadband telecommunications are not "being deployed to all Americans in a reasonable and timely fashion." 47 U.S.C. § 1302(b). That finding does not resolve whether broadband counts as a telecommunication service, and it's hard

to believe Congress hid this claimed broad delegation of power in the "Miscellaneous Provisions" of Title VII, as opposed to Title II. Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, 153.

As for the other stay factors, the Commission counters that the petitioners have not submitted quantitative estimates of their compliance costs or identified specific plans that the rule threatens. Yet the rule itself "acknowledge[s] that reclassifying [broadband providers] as a Title II telecommunications service may lead to some increase in compliance costs." *Safeguarding*, 89 Fed. Reg. at 45532. Although the Commission has found these costs to be small relative to the rule's overall benefits, *see id.* at 45532, 45551–52, we do not evaluate that tradeoff once we conclude that the Commission likely exceeded its legal authority, *see Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 120 (2022) (per curiam).

The joint motion to stay pending review of the final rule is **GRANTED**. The clerk is **DIRECTED** to schedule this case for oral argument at the court's fall sitting, October 28– November 1, 2024, so that a randomly drawn merits panel may consider the case. The petitioners are **DIRECTED** to submit their opening brief by August 12, 2024. The respondents are **DIRECTED** to submit their brief by the sooner of September 11, 2024, or thirty days after the petitioners file their opening brief. The petitioners may submit a reply brief by the sooner of October 2, 2024, or twenty-one days after the respondents have filed their brief.

SUTTON, Chief Judge, concurring. I concur in full in the per curiam opinion and write to offer one additional reason for granting the stay.

The best reading of the statute, and the one in place for all but three of the last twenty-eight years, shows that Congress likely did not view broadband providers as common carriers under Title II of the Telecommunications Act. At one level, the United States Supreme Court has already resolved this question of classification. All nine justices in *Brand X* agreed that broadband internet access—the same issue in front of us—provides an information service as the Act defines that term under Title I. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974 (2005) ("[C]able companies that sell broadband Internet service do not provide 'telecommunications servic[e]' . . . under Title II."); *id.* at 987 ("Cable modem service is an information service . . . because it provides consumers with a comprehensive capability for manipulating information using the internet via high-speed telecommunications. That service enables users, for example, to browse the World Wide Web, to transfer files . . . and to access e-mail."); *id.* at 1010 (Scalia, J., dissenting) ("[T]he delivery service provided by cable . . . merely serves as a conduit for the information services that have already been 'assembled' by the cable company in its capacity as ISP."); *id.* (Scalia, J., dissenting) ("When cable-company-assembled information enters the cable for delivery to the subscriber, the information service is already complete. The information has been (as the statute requires) generated, acquired, stored, transformed, processed, retrieved, utilized, or made available."). The only disagreement in that case centered on a separate issue, whether the Commission could treat the "offering" of last-mile broadband transmission as an integral part of that information service. *Id.* at 986–87. The majority held that the Commission reasonably concluded it did not. *Id.* at 989–90. Given the accepted premise of *Brand X*—that broadband providers are not common carriers under the Act—it would be odd for a lower court to look the other way. *See Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 484 (1989).

The history of the relevant statutory terms—"information service" and "telecommunications service"—shows that the Act likely classifies broadband as an information service. When Congress enacted the Telecommunications Act, it enshrined the Commission's prior dichotomy between basic and enhanced services within its new definitions of telecommunications and information services. *See Brand X*, 545 U.S. at 977. Telecommunications services, like basic services, offer pure data transmission without any processing. *See* 47 U.S.C. § 153(50), (53). An information service, like enhanced services, uses those telecommunication services to process information. *See id.* § 153(24). In addition to data transmission, broadband providers offer data processing and storage to users through DNS and caching services. *See Brand X*, 545 U.S. at 992–94, 999–1000. These services provide users "with a comprehensive capability for manipulating information." *Id.* at 987. Just as it did for dial-up predecessors, Congress covered broadband under information services.

Other sections of the Telecommunications Act confirm that Congress meant to exclude broadband from Title II. Section 230, for instance, begins with Congress's findings that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(4). It goes on to declare a federal policy "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *Id.* § 230(b)(2). And it defines "interactive computer service" to include "any information service . . . that provides access to the Internet." *Id.* § 230(f)(2). Section 231 adopts this same deregulatory approach, interpreting the term "internet access service" to exclude "telecommunication services." *Id.* § 231(e)(4). Only a two-faced Congress would bolster deregulation as the best means to promote the internet economy and then treat broadband providers as heavily regulated common carriers.

The Commission rejects this conclusion. It notes that the Act's sole mention of broadband allows the Commission to use "price cap regulation" and "regulatory forbearance" to promote "broadband telecommunications capability." *Id.* § 1302(a), (d)(1). But data transmission is only one component of the broader package of services offered to consumers. And, as the per curiam opinion notes, this authorization under Title VII to impose some regulations on broadband providers does not provide the Commission with the power to regulate all broadband providers as common carriers under Title II. *See Verizon v. F.C.C.*, 740 F.3d 623, 650 (D.C. Cir. 2014).

The Commission next invokes *Skidmore*, asking us to give credence to the agency's expert judgment over the technical questions implicated by this case. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). An agency's power to persuade turns on the thoroughness of its reasoning, its technical expertise, and its "consistency with earlier and later pronouncements," especially those contemporaneous with the statute's enactment. *Id.* The problem is, we do not know which group of experts to respect. Most of them since the passage of the 1996 Act have reasoned that broadband and similar services come under Title I, not Title II's coverage of common carriers. The contemporaneous interpretation of the Act, the one in place for nearly two decades, refused to treat broadband internet access services as the offering of telecommunication services. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976). In just three of the Act's twenty-eight years has the agency taken its current position that broadband internet access service qualifies as a telecommunications service as opposed to an information service. The consistency query makes matters worse. The Commission's "intention to reverse course for yet a fourth time" suggests that its reasoning has more to do with changing presidential administrations than with arriving at the true and durable "meaning of the law." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2288 (2024) (Gorsuch, J., concurring). In truth, the *Skidmore* factors, the doctrine's "power to persuade,

if lacking the power to control," *id.* at 2267 (quotation omitted), all favor the Commission's first

interpretation, not its recent one.

ENTERED BY ORDER OF THE COURT

_____
Kelly L. Stephens, Clerk