# In the United States Court of Appeals for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

On Petitions for Review

## APPENDIX TO INDUSTRY PETITIONERS' OPENING BRIEF, VOLUME II

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

*(Additional counsel on next page)*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW, Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

# TABLE OF CONTENTS

Page

## VOLUME I

**Order Under Review**

Order, *Safeguarding and Securing the Open Internet*, Docket
Nos. 23-320 & 17-108, FCC 24-52 (released May 7, 2024) .............. App. 1

**Petitions for Review**

Petition for Review, Ohio Telecom Association and USTelecom –
The Broadband Association (Docket No. 24-3449)
(May 28, 2024) .................................................................. App. 513

Petition for Review, Ohio Cable Telecommunications Association
(Docket No. 24-3450) (May 28, 2024).......................... App. 516

Petition for Review, MCTA – The Missouri Internet & Television
Association (Docket No. 24-3497) (May 28, 2024)....... App. 519

Petition for Review, CTIA – The Wireless Association
(Docket No. 24-3508) (May 29, 2024).......................... App. 522

Petition for Review, Wireless Internet Service Providers
Association (Docket No. 24-3510) (May 30, 2024)....... App. 527

Petition for Review, ACA Connects – America's Communications
Association (Docket No. 24-3511) (May 31, 2024)....... App. 531

Petition for Review, Florida Internet & Television Association
(Docket No. 24-3519) (May 28, 2024).......................... App. 534

Petition for Review, Texas Cable Association and NCTA – The
Internet & Association (Docket No. 24-3538) (May 28, 2024).... App. 537

**Orders of this Court**

Order Denying Transfer Motion, ECF No. 67-2
(June 28, 2024) .................................................................. App. 540

i

Order Granting Administrative Stay, ECF No. 61-1
(July 12, 2024) ................................................................. App. 543

Order Granting Stay Pending Judicial Review, ECF No. 71-2
(Aug. 1, 2024) .................................................................. App. 544

**Relevant Parts of the Record**

ACA Connects Comments (Dec. 14, 2023) ............................... App. 557

AT&T Comments (Dec. 14, 2023) ........................................... App. 614

CTIA Comments (Dec. 14, 2023) ............................................ App. 648

  Ex. B, Declaration of Peter Rysavy ............................. App. 764

George S. Ford, *Investment in the Virtuous Circle: Theory and
Empirics* (Dec. 14, 2023) ................................................. App. 795

# VOLUME II

**Relevant Parts of the Record, Continued**

NCTA Comments (Dec. 14, 2023) ............................................ App. 823

  Ex. A, Declaration of Mark Israel et al. ...................... App. 930

U.S. Chamber of Commerce Comments (Dec. 14, 2023) ...................... App. 1032

USTelecom Comments (Dec. 14, 2023) .................................. App. 1102

Verizon Comments (Dec. 14, 2023) .................................... App. 1210

WISPA Comments (Dec. 14, 2023) ...................................... App. 1231

NCTA Reply Comments (Jan. 17, 2024) ................................ App. 1336

  Ex. A, Comments of Anthony Scott ........................... App. 1417

USTelecom Reply Comments (Jan. 17, 2024) .......................... App. 1426

  Ex. A, Comments of Andrew J. Grotto ........................ App. 1516

ii

Ex. B, Recon Analytics, *Broadband Survey Results*.................App. 1559

Letter from USTelecom & CTIA to Marlene H. Dortch
    (Mar. 22, 2024)....................................................................App. 1572

George S. Ford, Response Letter (Apr. 18, 2024) ................................App. 1578

Letter from NCTA to Marlene H. Dortch Attachment (Israel
    Ex Parte White Paper) (Apr. 18, 2024).......................................App. 1595

Letter from NCTA, USTelecom, and CTIA to Marlene H. Dortch
    (Apr. 18, 2024) ..................................................................App. 1608

Letter from USTelecom to Marlene H. Dortch (Apr. 18, 2024)..........App. 1611

Order Denying Stay Petition (June 7, 2024)........................................App. 1613

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |
| | ) | |
| Bridging the Digital Divide for Low-Income Consumers | ) | WC Docket No. 17-287 |
| | ) | |
| Lifeline and Link Up Reform and Modernization | ) | WC Docket No. 11-42 |

## COMMENTS OF NCTA – THE INTERNET & TELEVISION ASSOCIATION

Rick C. Chessen
Steven F. Morris
Pamela S. Arluk
Robert N. Rubinovitz
NCTA – THE INTERNET & TELEVISION
   ASSOCIATION
25 Massachusetts Avenue, NW
Suite 100
Washington, DC 20001

December 14, 2023

Matthew A. Brill
Matthew T. Murchison
Charles S. Dameron
Michael H. Herman
Kiley S. Boland
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for NCTA – The Internet &*
*   Television Association*

App. 823

Page

INTRODUCTION ................................................................................................1

SUMMARY ........................................................................................................4

DISCUSSION ...................................................................................................10

I.      AS A MATTER OF LAW, THE COMMISSION CANNOT RECLASSIFY
     BROADBAND AS A TITLE II TELECOMMUNICATIONS SERVICE ......................10

     A.      The Major Questions Doctrine Prohibits the Commission From Adopting
     a Telecommunications Service Classification for Broadband ..............................11

         1.      The Commission May Not Make Policy Decisions Concerning
         Major Questions Without Clear Congressional Authorization .................12

         2.      Reclassification of Broadband as a Telecommunications Service
         Constitutes a Major Question ....................................................................14

         3.      The Communications Act Does Not Clearly Authorize
         Classification of Broadband as a Telecommunications Service ...............23

             a.      Congress Has Never Clearly Authorized the Classification
             of Broadband as a Telecommunications Service; Indeed, It
             Has Embraced the Exact Opposite Classification.........................24

             b.      Brand X Confirms That Congress Did Not Clearly Treat
             Broadband as a Telecommunications Service ...............................28

             c.      The Commission Itself Has Long Distinguished Between
             Basic Telecommunications Services and Enhanced
             Information Services....................................................................31

             d.      The Commission Contemporaneously Recognized That
             Congress Provided for an Information-Service
             Classification for Broadband ......................................................35

     B.      Under the Best Interpretation of the Communications Act, Broadband
     Qualifies as an Information Service, Not a Telecommunications Service ...........39

         1.      Broadband's Functional Attributes Satisfy the Statutory Definition
         of "Information Service"...........................................................................39

         2.      Broadband's Functional Attributes Are Incompatible With the
         Statutory Definition of "Telecommunications Service" ...........................45

C.      It Would Be Arbitrary and Capricious To Reclassify Broadband as a Telecommunications Service ...................................................................48

       1.     There Are No Genuine Problems in the Broadband Marketplace That Reclassifying Broadband as a Telecommunications Service Could Plausibly Solve..............................................................49

       2.     The Commission May Not Single Out ISPs for Onerous Regulation While Ignoring the Risks Posed By Other Participants in the Internet Ecosystem..........................................56

II.     REIMPOSING TITLE II REGULATION ON BROADBAND ALSO IS UNNECESSARY AND WOULD BE UNWISE AS A POLICY MATTER ..................61

   A.      Title II Reclassification Is Not Necessary To Promote Internet Openness ...........64

   B.      Title II Regulation of Broadband Also Is Unnecessary To Achieve the Commission's Other Asserted Policy Objectives ....................................................66

       1.     There are No "Gaps" in the Federal Government's Ability to Address National Security and Law Enforcement Risks ...........................67

       2.     Title II Reclassification Is Not Necessary To Protect Public Safety or Ensure Network Reliability and Resiliency............................................72

       3.     Cybersecurity, Data Security, and Consumer Privacy Already Are Protected Under the Existing Regime, Which Includes Oversight by the FTC, Other Expert Federal Agencies, and Extensive State Regulation ...............................................................................................73

       4.     The Commission Already Possesses Broad Authority Under the CVAA To Ensure the Accessibility of Broadband-Enabled Offerings ...............................................................................................79

       5.     The Commission's Stated Concerns Related to Pole Attachments, MTEs, and Freedom of Expression and Digital Equity Do Not Justify Title II Regulation of Broadband ...................................................80

   C.      Title II Reclassification Would Frustrate the Commission's Broadband Access and Adoption Goals .................................................................................83

   D.      Broadband's Information-Service Classification Has Created Strong Incentives for ISPs to Invest in Their Networks and Enhance Their Services .....................................................................................................86

   E.      Reclassifying Broadband as a Telecommunications Service Under Title II Would Reduce Investment and Jobs and Stifle Innovation ...................................91

F.     The Policy Harms of Reimposing Title II Regulation on Broadband
       Cannot Be Mitigated Sufficiently Through Forbearance......................................94

III.   NCTA SUPPORTS CONGRESSIONAL ACTION TO CODIFY DURABLE
       AND APPROPRIATELY TAILORED OPEN INTERNET RULES ..............................98

IV.    BROADBAND SHOULD BE SUBJECT TO EXCLUSIVE FEDERAL
       OVERSIGHT AND UNIFORM NATIONAL REQUIREMENTS ................................99

CONCLUSION....................................................................................................................103


EXHIBIT A:  Declaration of Drs. Mark Israel, Brian Keating & Allan Shampine (Dec. 14, 2023).

**App. 826**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |
| | ) | |
| Bridging the Digital Divide for Low-Income Consumers | ) | WC Docket No. 17-287 |
| | ) | |
| Lifeline and Link Up Reform and Modernization | ) | WC Docket No. 11-42 |

## COMMENTS OF NCTA – THE INTERNET & TELEVISION ASSOCIATION

NCTA – The Internet & Television Association ("NCTA") submits these comments in response to the Notice of Proposed Rulemaking released on October 20, 2023 in WC Docket No. 23-320[1] and the Public Notice released on October 19, 2023 concerning petitions for reconsideration in WC Docket Nos. 17-108, 17-287, and 11-42.[2]

## INTRODUCTION

NCTA and its members strongly support core Open Internet principles ensuring that all consumers can enjoy free and unimpeded access to the lawful Internet content of their choosing. Internet openness is a given in today's broadband marketplace. NCTA's members have repeatedly and publicly committed to consensus openness principles and have unfailingly lived up to those commitments in serving their customers and interacting with other participants in the Internet

---

[1] *See Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, Notice of Proposed Rulemaking, FCC 23-83 (rel. Oct. 20, 2023) ("*NPRM*").

[2] *See Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the RIF Remand Order*, WC Docket Nos. 17-108, 17-287, and 11-42, Public Notice, DA 23-996 (rel. Oct. 19, 2023).

App. 827

ecosystem. And they continue to have strong market-driven incentives to preserve openness going forward, backed by the consumer protection and antitrust laws enforced by the FTC, DOJ, and state attorneys general. Claims in 2018 that the Commission's return to its longstanding light-touch approach to broadband would be "the end of the Internet as we know it" and cause sites to load "one word at a time" were implausible back then and have been utterly disproved in the five years since. Indeed, since the Commission restored the information-service classification, broadband speeds have increased significantly, prices have fallen in real terms, and ISPs have deployed facilities to millions of previously unserved households. The fruits of these investments were readily apparent during the COVID-19 pandemic, when broadband networks performed remarkably well in handling a significant surge in traffic and reliably served as the primary means by which Americans learned, worked, accessed medical care, and socialized from the safety of their homes. The *NPRM* nevertheless proposes to subject the thriving broadband marketplace to a common-carrier regulatory framework from 1934, designed for monopoly telephone providers— a classic solution in search of a problem.

Since 2018, rather than indulging discredited claims that ISPs will undermine the Open Internet without heavy-handed regulation, Congress, the Commission, NTIA, and other agencies have appropriately focused on far more pressing needs—including efforts to expand access to high-speed broadband services through the Biden Administration's signature Broadband Equity, Access, and Deployment ("BEAD") program and other support mechanisms. The success of these programs has become a "top priority" for the Administration.[3] Yet subjecting ISPs to Title II

---

[3] Press Release, White House, Fact Sheet: Biden-Harris Administration Announces 10 Million Households Enroll in Broadband Affordability Program, Thanks to Bipartisan Infrastructure Law (Feb. 14, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/14/fact-sheet-biden-harris-administration-announces-10-million-households-enroll-in-broadband-affordability-program-thanks-to-bipartisan-infrastructure-law/.

regulation would jeopardize the success of those paramount objectives or at best slow progress in achieving them.

To the extent that policymakers believe that further safeguards are necessary to provide an additional backstop to the market-driven incentives of ISPs and the other protections noted above, NCTA respectfully submits that best approach would be for Congress to codify consensus Open Internet principles into law. The *NPRM*, on the other hand, appears to treat as a foregone conclusion that the Commission will exceed its statutorily delegated authority and assert plenary regulatory control over a major sector of the American economy by reclassifying broadband Internet access service ("broadband" or "BIAS") as a telecommunications service subject to Title II—a move that would go far beyond Internet openness goals and fundamentally restructure the broadband industry through onerous and ill-fitting common carrier obligations.

The Commission cannot lawfully implement that proposal. As a threshold matter, the "major questions doctrine" prohibits the Commission from subjecting broadband to common-carrier regulation as a telecommunication service under Title II of the Communications Act of 1934, as amended (the "Act"). As leading jurists and commentators have explained, it is self-evident that such an approach presents a "major question" of vast political and economic significance, and Congress has not given the Commission the clear authorization it would need to depart from the existing light-touch framework. But even apart from the insurmountable barrier imposed by the major questions doctrine, the best reading of the Act is that broadband is an information service, not a telecommunications service. Moreover, the Commission's inability to point to any credible evidence of harm in the broadband marketplace, paired with its disregard of widespread allegations of misconduct by dominant tech platforms, renders its proposed approach arbitrary and capricious under the Administrative Procedure Act ("APA"). ISPs' market-driven

incentives to preserve Internet openness, the highly and increasingly competitive and dynamic nature of the broadband marketplace as shown in the attached expert economic declaration by Compass Lexecon, and the well-documented harms to broadband investment and innovation under a common-carrier framework—marked by investment shortfalls totaling tens of billions of dollars and an attendant loss of nearly 200,000 jobs[4]—all confirm the wisdom of Congress's light-touch regulatory approach to information services like broadband, and undercut any purported rationales for Title II reclassification as a policy matter. Title II also is unnecessary to achieve any of the other newly minted policy rationales set forth in the *NPRM*—such as national security, cybersecurity, privacy, and the like—and in fact would diminish the effectiveness of the relevant legal regimes in various respects.

One thing is beyond dispute: Title II reclassification would plunge the Commission into yet another legal and policy quagmire over the regulatory treatment of broadband. Again, if additional safeguards are deemed necessary, it is *Congress* that should enshrine consensus Open Internet principles into law. Broadband also should be subject to exclusive federal oversight and a uniform national approach, so that states cannot simply override federal policy with respect to inherently interstate broadband services. But a Title II decision from the Commission that simply continues the regulatory ping-pong match over broadband, while opening the door for states to layer additional regulations on top of a federal "floor," would serve no legitimate interests.

## SUMMARY

The Commission's proposed reclassification of broadband as a telecommunications service subject to Title II is unlawful in numerous respects. To begin with, whether broadband should be

---

[4] George S. Ford, *Investment in the Virtuous Cycle: Theory and Empirics* 22-23 (Dec. 12, 2023) ("Ford Paper"), https://phoenix-center.org/pcpp/PCPP62Final.pdf.

**App. 830**

subject to common-carrier regulation as a telecommunications service under Title II is a "major question" that Congress has not clearly authorized the Commission to address. Recent Supreme Court rulings confirm that agencies may not resolve policy questions of "vast economic and political significance" without clear authorization from Congress.[5] And as numerous observers have explained—including a Solicitor General and Acting Solicitor General in the Obama Administration—"[t]here is no doubt" that whether broadband may be classified as a Title II service "presents a major question," and "the Commission lacks clear statutory authority to reclassify broadband under Title II."[6] The *NPRM* makes no bones about how sweeping this claim to power is; it asserts that Title II reclassification of broadband would enable the Commission not only to adopt Open Internet rules—which had been the Commission's only supposed justification until recently—but also to address all manner of other items on its policy wish list, including national security, cybersecurity, privacy, network resiliency, and over a half-dozen other newfound issues.[7] Under this view of the world, Title II reclassification gives the Commission a blank check to legislate in the broadband arena—an outcome clearly at odds with the statutory authority granted to the Commission by Congress. Indeed, far from authorizing Title II regulation of broadband, Congress has repeatedly made clear its expectation that ISPs would *not* be subject to common-carrier treatment—including by defining the term "interactive computer service" in Section 230(f)(2) of the Communications Act to mean "any *information service* . . . that provides or enables computer access by multiple users to a computer server, *including specifically a service*

---

[5] *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022); *see also, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

[6] Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine* 10, 13 (Sept. 20, 2023) ("Verrilli/Gershengorn Paper"), https://aboutblaw.com/bazq.

[7] *See NPRM* ¶¶ 25-55.

**App. 831**

. . . *that provides access to the Internet*;"[8] providing in Section 223(e)(6) that "[n]othing in this section shall be construed to treat interactive computer services as common carriers or telecommunications carriers,"[9] and reaffirming in the Child Online Protection Act of 1998 that the term "'Internet access service' . . . does not include telecommunications service."[10]

Even apart from that insurmountable obstacle, broadband cannot reasonably be classified as a telecommunications service based on its functional attributes.  Nor do the purported rationales for such heavy-handed regulation withstand scrutiny under the APA because (a) Title II is not necessary to fill the supposed gaps in authority identified in the *NPRM*, (b) Title II would fail to ameliorate supposed problems, and/or (c) the proposals set out in the *NPRM* unreasonably focus only on ISPs.  The Commission's myopic focus on ISPs is particularly arbitrary given that, as the experience of the last several years has shown, many of the most central policy questions in the Internet arena involve the conduct of dominant tech platforms.  If there are doubts as to the Commission's jurisdiction over such entities, that provides yet another key reason to defer to Congress so it can devise a more comprehensive framework for the Internet ecosystem.

From a policy standpoint, reclassifying broadband as a telecommunications service is not necessary to protect the openness of the Internet or to achieve the laundry list of other objectives that the Commission conjures up as purported justifications for common-carrier regulation.  There is zero evidence that broadband providers engage in the kinds of abusive practices often trotted out by proponents of Title II regulation; to the contrary, ISPs have strong, market-based incentives not to violate Open Internet norms, as their business practices have consistently demonstrated.

---

[8] 47 U.S.C. § 230(f)(2) (emphases added).

[9] *Id.* § 223(e)(6).

[10] *Id.* § 231(e)(4).

**App. 832**

Moreover, the federal government has ample authority to address national security and law enforcement risks to U.S. communications networks, and public safety and network reliability and resiliency already are adequately protected under broadband's existing information-service classification. The same is true of cybersecurity, data security, and consumer privacy, over which the Federal Trade Commission ("FTC"), other expert agencies, and the states exercise effective oversight. In addition, the Twenty-First Century Communications and Video Accessibility Act ("CVAA"), together with the Americans with Disabilities Act ("ADA"), ensure that broadband-enabled and other online services are accessible to and usable by individuals with disabilities. Nor do the Commission's concerns related to pole attachments, multi-tenant environments, or freedom of expression and digital equity justify the imposition of burdensome, utility-style regulation on all ISPs. To the extent Title II is even relevant to any of these policy objectives, it would do far more harm than good.

Imposing common-carrier mandates and restrictions on broadband services would stifle the vibrant, competitive, and well-functioning marketplace for those services, as the attached economic declaration from Drs. Mark Israel, Brian Keating, and Allan Shampine of Compass Lexecon explains in detail.[11] The Commission's classification of broadband as an information service throughout most of the Internet's existence reflects a longstanding recognition of the benefits of light-touch regulation as well as the harmful effects of Title II on investment and innovation. And in the wake of the Commission's restoration of the information service classification and reinstatement of a light-touch, transparency-based regulatory framework in 2018, broadband networks have thrived—notwithstanding overwrought predictions that

---

[11] *See* Declaration of Drs. Mark Israel, Brian Keating & Allan Shampine (Dec. 14, 2023) ("Israel/Keating/Shampine Declaration"), attached as Exhibit A.

restoration of a light-touch framework would effectively destroy the Internet.  Indeed, broadband performance was exemplary in the face of unprecedented utilization during the COVID-19 pandemic, illustrating the benefits of providers' extraordinary network investments and drawing a sharp contrast with the capacity challenges experienced in places like the European Union, where providers are governed by public-utility-style regulation.  As the accompanying Israel/Keating/Shampine Declaration concludes, this historical experience, as well as the highly and increasingly competitive and dynamic nature of the broadband marketplace—marked by rapid enhancements and expansions of existing networks and an accelerating influx of newer entrants and technologies—confirms that Title II is simply a poor fit for broadband regulation, and unnecessary to promote the Internet openness that consumers have long enjoyed.[12]  In particular, the Israel/Keating/Shampine Declaration finds:

> [T]he regulations proposed by the NPRM are not only unnecessary and unjustified, but counterproductive.  Pervasive regulation of broadband should require evidence of market failure sufficient to justify the costs and risks of that regulation.  No such market failure exists here.  To the contrary, broadband has been one of the great success stories of the U.S. economy.  The Title II regulation proposed in the *NPRM* is a "solution" in search of a non-existent problem that would impose costs that clearly outweigh any benefits.[13]

If anything, the *NPRM* seems calculated to *undermine* the certainty that has long buoyed broadband investment and innovation in the United States—by treating Title II as roving, unbounded authority to legislate on any matter the Commission wishes to address in the broadband marketplace, and by opening the door to burdensome measures that even the *2015 Order* viewed as off-limits, such as new entry, exit, and transfer-of-control requirements under Section 214 and

---

[12] *See id.* ¶¶ 14-21.

[13] *Id.* ¶ 99.

**App. 834**

a potentially limitless set of obligations under the extensive national security and other newfound public policy rationales asserted in the *NPRM*.[14] And just as the Commission has already pivoted in its attempts to justify broadband reclassification from a narrow means of bolstering Open Internet rules to these broader rationales for regulation, broadband providers will have to brace for further mission creep, including additional forms of common-carrier regulation that compound the burdens and uncertainty associated with Title II.

Title II's negative impact on investment would be particularly damaging to the Administration's $42.45 billion BEAD program, which is the cornerstone of the Biden Administration's key policy objective of delivering broadband to every American. That program depends on ISPs' coming up with "matching funds" to complement program support for infrastructure projects.[15] And that is just to *build* these next-generation networks; the substantial expenses to *operate and maintain* these networks going forward will fall entirely on the industry to fund. Like other businesses, ISPs today are navigating a challenging financial environment, marked by high interest rates and persistent inflationary pressure—and the Commission's current light-touch approach has greatly facilitated ongoing investments in broadband networks despite these economic headwinds. A Commission decision to jettison that pro-investment framework in favor of pervasive common carrier treatment would introduce significant long-term uncertainty regarding future regulatory obligations that impact ISPs' decisions about whether to commit to decades-long investments—and thus would threaten to undermine ISPs' participation in, and the ultimate success of, the BEAD program and President Biden's underlying broadband policy objectives.

---

[14] *See NPRM* ¶¶ 27, 108.

[15] *See* NTIA, Broadband Equity, Access, and Deployment Program Notice of Funding Opportunity, § III.B.1 (May 12, 2022) ("BEAD NOFO").

**App. 835**

At the same time, the *NPRM* appropriately recognizes that broadband is an inherently interstate service, and it is critical that the states be preempted from adopting separate requirements addressing ISPs' provision of broadband. The Commission has long recognized, on a bipartisan basis, that broadband is a jurisdictionally interstate service *regardless* of its regulatory classification—and the Commission can and should confirm that determination. Consistent with the initial draft of the *NPRM*, and contrary to any suggestion in the released version, the federal framework should not serve as a "floor" on top of which states may layer additional requirements or prohibitions. Rather, it should serve as both a floor and a ceiling. A uniform national approach is particularly vital today, as states have shown a growing desire to adopt measures that conflict with federal broadband regulation precisely because they disagree with and wish to undermine federal policy choices.

## DISCUSSION

## I. AS A MATTER OF LAW, THE COMMISSION CANNOT RECLASSIFY BROADBAND AS A TITLE II TELECOMMUNICATIONS SERVICE

The Commission's proposal to reclassify broadband as a telecommunications service subject to Title II of the Communications Act fails three times over as a matter of law. First, Congress has not clearly authorized Title II classification of broadband; and because whether Congress may treat broadband providers as common carriers under Title II is a "major question," the absence of such clear congressional authorization is fatal to the *NPRM*'s proposal to subject ISPs to regulation under Title II. Second, the best reading of the text and structure of the Communications Act is that the provision of broadband is properly understood as an "information service," not a telecommunications service. Third, the Commission's proposed reclassification is arbitrary and capricious and therefore fails under the APA. Each of these points independently precludes the Commission's proposal as a matter of law.

**App. 836**

## A. The Major Questions Doctrine Prohibits the Commission From Adopting a Telecommunications Service Classification for Broadband

Few public-policy questions bear as much on American economic and civic life as the question whether broadband should be subject to common-carrier regulation as a telecommunications service under Title II of the Communications Act. As Chairwoman Rosenworcel has explained, "the Internet [is] the most dynamic platform for free speech ever invented. It is our printing press. It is our town square,"[16] and "nothing in our commercial, social, and civic lives . . . has been untouched by its influence or unmoved by its power."[17] Moreover, "as our society has reconfigured itself to do so much online," the broadband networks providing access to the Internet are "the most important infrastructure of our time."[18] In short, the "future of the [I]nternet is the future of everything."[19]

For the past decade, this Commission has repeatedly considered whether the Internet should be made subject to the plenary regulatory control of this Commission pursuant to Title II of the Communications Act—a regulatory regime enacted nearly a century ago to regulate monopoly analog telephone service.[20] Discussion of this question, both within this Commission and outside it, has been intense: It has led millions of Americans to "wr[i]te this agency to make known their ideas, thoughts, and deeply-held opinions" about this issue, "clogg[ing] [the

---

[16] *Protecting and Promoting the Open Internet,* 30 FCC Rcd. 5601, 5920 (2015) (Statement of Commissioner Jessica Rosenworcel) ("*2015 Rosenworcel Statement*").

[17] *Restoring Internet Freedom*, 33 FCC Rcd. 311, 846 (2018) (Dissenting Statement of Commissioner Jessica Rosenworcel) ("*2018 Rosenworcel Statement*").

[18] Chairwoman Jessica Rosenworcel, Remarks at the National Press Club, Washington, D.C., at 1 (Sep. 26, 2023), https://docs.fcc.gov/public/attachments/DOC-397257A1.pdf ("*2023 Rosenworcel Speech*").

[19] *2018 Rosenworcel Statement*, 33 FCC Rcd. at 846.

[20] *See* Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064.

**App. 837**

Commission's] e-mail in-boxes, and jamm[ing] [the Commission's] online comment system."[21] That spirited public debate is "democracy in action."[22]

Congress has indicated that broadband should be subject to a light-touch regulatory approach, and the democratic debate over whether to supplant that model with an intrusive common-carrier regime is not for this Commission to resolve. It must be settled through the democratic process—by the public's elected representatives—in the place where federal law is made: the United States Congress. As the Supreme Court has emphasized under its major questions doctrine, Congress must "speak clearly" before an executive agency purporting to act pursuant to the laws enacted by Congress may "alter large sections of the American economy."[23] And Congress has not spoken clearly in support of the sweeping Title II reclassification now proposed by the Commission. Accordingly, the decision to classify broadband as a telecommunications service subject to Title II rests with Congress, not the Commission. The Commission's unilateral proposal to restructure the regulation of broadband in the United States is plainly unlawful.

> 1. *The Commission May Not Make Policy Decisions Concerning Major Questions Without Clear Congressional Authorization*

The executive agencies of the federal government "have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"[24] Out of a due respect for "separation of powers principles and a practical understanding of legislative intent," acts of Congress must be read against the

---

[21] *2015 Rosenworcel Statement*, 30 FCC Rcd. at 5920.

[22] *Id.*

[23] *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

[24] *West Virginia*, 142 S. Ct. at 2609 (quoting Ernest Gellhorn & Paul Verkuil, *Controlling Chevron-Based Delegations*, 20 CARDOZO L. REV. 989, 1011 (1999)).

**App. 838**

background presumption that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[25]

That principle of statutory interpretation—now characterized by the Supreme Court as the "major questions doctrine"—ensures that administrative agencies may not resolve policy questions of "vast economic and political significance" without clear authorization from Congress.[26]  Indeed, the Court has repeatedly made clear that it will "'typically greet' [agency] assertions of 'extravagant statutory power over the national economy' with 'skepticism.'"[27]  That includes when the agency claims to discover such power in a "long-extant statute,"[28] and when the agency's interpretation of that statute is contrary to a "'contemporaneous' and long-held Executive Branch interpretation of [that] statute."[29]  The Supreme Court has identified this tendency toward "asserting highly consequential power beyond what Congress could reasonably be understood to have granted" as a "particular and recurring problem" among administrative agencies.[30]  The major questions doctrine places a check on this tendency by demanding "clear congressional authorization"—and not merely the absence of congressional prohibition—for agency action in "extraordinary cases" implicating sweeping assertions of agency authority.[31]  In short, if "an

---

[25] *Id.* (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

[26] *West Virginia*, 142 S. Ct. at 2605 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *see also, e.g.*, *Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring); *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022); *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[27] *West Virginia*, 142 S. Ct. at 2609 (quoting *Util. Air Regulatory Grp.*, 573 U.S. at 324).

[28] *Util. Air Regulatory Grp.*, 573 U.S. at 324; *see also West Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring).

[29] *West Virginia*, 142 S. Ct. at 2623 (quoting *United States v. Philbrick*, 120 U.S. 52, 59 (1887)).

[30] *Id.* at 2609.

[31] *Id.*

agency wants to exercise expansive regulatory authority over some major social or economic activity . . . an *ambiguous* grant of statutory authority is not enough."[32]  Nor is it enough for the Commission to rely on generalized assertions about its "expertise and authority" with respect to communications issues more broadly.[33]  Congress must "*plainly* authorize[ ]" such regulation.[34]

2.  *Reclassification of Broadband as a Telecommunications Service Constitutes a Major Question*

The Communications Act distinguishes between "telecommunications service[s]"—that is, the "offering of telecommunications for a fee"[35]—and "information service[s]" that offer the "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information *via* telecommunications."[36]  For the vast majority of the Internet's existence, the Commission has treated broadband Internet access service as Congress intended— as an *information* service, not as a telecommunications service.  Reclassifying broadband as a telecommunications service would entail significant regulatory consequences:  Under Title II of the Communications Act, the Commission may treat providers of telecommunications services as

---

[32] *U.S. Telecom*, 855 F.3d at 421 (Kavanaugh, J., dissenting from denial of rehearing en banc).

[33] *NPRM* ¶ 82; *see also Nebraska*, 143 S. Ct. at 2374.

[34] *NFIB v. Dep't of Labor*, 142 S. Ct. at 665 (emphasis added); *see also Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring).

[35] 47 U.S.C. § 153(53).

[36] *Id.* § 153(24) (emphasis added).

14

common carriers subject to the Commission's near-plenary control over the manner in which those carriers provide their services[37] and the prices that they charge for those services.[38]

By any measure, the decision whether to classify broadband as a telecommunications service—and thereby subject broadband to Title II's common-carrier regulatory framework—is a major question. The U.S. broadband services market is at least a $150 billion industry by annual revenue,[39] and as the Commission explains in the *NPRM*, "BIAS connections have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression."[40] It thus should come as no surprise that a decision to flip the regulatory paradigm and foist burdensome restrictions on broadband would have significant economic and societal impacts. According to one study, "the persistent prospect of Title II policy reduced investment by about 10%, on average, between 2011 and 2020," resulting in tens of billions in foregone broadband capital spending, a $1.45 trillion loss in GDP over ten years, and "an annual

---

[37] *See, e.g.*, *id.* § 201(a) (allowing the Commission to order common carriers "to establish physical connections with other carriers"); *id.* § 202(a) (forbidding any "undue or unreasonable preference or advantage" with respect to "charges, practices, classifications, regulations, facilities, or services for or in connection with [a] communication service").

[38] *See, e.g.*, *id.* § 203(a) (requiring every common carrier to publish and submit to the Commission "schedules showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication between the different points on its own system"); *id.* § 204(a)(1) (providing for Commission "hearing[s]" with respect to "any new or revised charge, classification, regulation, or practice" by a common carrier); *id.* § 205(a) (authorizing the Commission to "determine and prescribe what will be the just and reasonable charge" for a given communications service).

[39] *See* IBISWorld, *Internet Service Providers in the US – Market Size*, Sep. 11, 2023, https://www.ibisworld.com/industry-statistics/market-size/internet-service-providers-united-states/ (estimating size of U.S. broadband market by total annual revenue).

[40] *NPRM* ¶ 17; *see also Protecting and Promoting the Open Internet,* Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 ¶ 1 (2015) ("*2015 Order*") (noting that broadband "drives the American economy and serves, every day, as a critical tool for America's citizens to conduct commerce, communicate, educate, entertain, and engage in the world around them").

loss to the nation of about 81,500 information sector and 195,600 total jobs."[41]   In fact, few industries are of greater economic and political importance to the United States today, and that was proven all the more so during the recent COVID-19 pandemic, in which broadband services provided the principal social and business link to the outside world for hundreds of millions of Americans, enabling them to continue to learn, work, access medical care, and interact with friends and family despite the unprecedented nature of the crisis.  Indeed, the *NPRM* observes that "the COVID-19 pandemic dramatically changed the importance of the Internet today" and confirmed as never before "how essential broadband Internet connections are for consumers' participation in our society and economy."[42]

Whether broadband may be subjected to Title II regulation carries at least as much economic and political significance as other issues that the Supreme Court has treated as "major questions" requiring clear statutory authorization for an agency to act.  In *FDA v. Brown & Williamson Tobacco Corporation*, for instance, the Court rebuffed an effort to treat tobacco as a "drug" subject to the FDA's general regulatory authority on the ground that "tobacco has its own unique political history" due to its "unique place in American history and society."[43]  There, the Court explained that the decision to regulate tobacco as a "drug" was a "decision of such economic and political significance" that any congressional authorization to do so must be clear, not "cryptic."[44]

Likewise, in *Utility Air Regulatory Group v. EPA*, the Court recognized that the question whether EPA could regulate greenhouse gases as an "air pollutant" subject to the Clean Air Act

---

[41] Ford Paper at 5-6.

[42] *NPRM* ¶¶ 1, 17.

[43] *Brown & Williamson*, 529 U.S. at 159.

[44] *Id.* at 160.

**App. 842**

was a decision of "vast 'economic and political significance.'"[45]  Because the agency's attempt to address that policy question "would bring about an enormous and transformative expansion in EPA's regulatory authority," and thereby "lay[ ] claim to extravagant statutory power over the national economy," the Court refused to recognize such authority absent "clear congressional authorization."[46]

And when the EPA announced a plan to gradually shut down the Nation's coal-fired and gas-fired power plants pursuant to the Clean Air Act, the Court held that the EPA's plan was unlawful on the basis of the major questions doctrine.  In that case, *West Virginia v. EPA*, the Court applied the major questions doctrine because the EPA's construction of the Clean Air Act purported to give the agency authority to "substantially restructure the American energy market."[47]  In such a circumstance, the Court noted, "there is every reason to 'hesitate before concluding that Congress' meant to confer" that authority on the agency.[48]

All of this is true of the question at issue here.  The availability of robust, affordable broadband offerings has utterly transformed America's economy and society over the last two decades.  As described below, broadband, and the question whether it should be subject to

---

[45] *Util. Air Regulatory Grp.*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 160).

[46] *Id.*

[47] *West Virginia*, 142 S. Ct. at 2610.

[48] *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159-60).  Even more recently the Supreme Court held that the Biden Administration's plan for forgiving student-loan debt in gross was a "major question" on the basis of its sheer fiscal effect, noting that the program would "cost taxpayers 'between $469 billion and $519 billion,' depending on the total number of borrowers ultimately covered." *Nebraska*, 143 S. Ct. at 2373.  The Court also noted that this figure was "ten times the 'economic impact' that [the Court] found significant in concluding that an eviction moratorium implemented by the Centers for Disease Control and Prevention triggered analysis under the major questions doctrine." *Id.* (citing *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).  Moreover, the Court made clear in *Nebraska* that the major questions doctrine applies to agency action with "sweeping" economic or political impact even where the agency claims it is acting on matters within its general "wheelhouse." *Id.* at 2374.

**App. 843**

common-carrier regulation, has its own "unique political history" and its own "unique place in American history and society."[49] Aside from a brief two-year interregnum between 2015 and 2017—following the Commission's 2015 declaration by regulatory fiat that broadband is subject to Title II regulation, which was the subject of an immediate challenge—broadband has always been treated by the Commission as an information service not subject to regulation under Title II. As the D.C. Circuit has noted, the debate over whether to change that regulatory classification "implicates serious policy questions, which have engaged lawmakers, regulators, businesses, and other members of the public for years."[50] Congress could, of course, determine that broadband *is* a telecommunications service subject to Title II, but it has not done so, despite repeated legislative proposals and enactments involving broadband networks and services.[51] Justice Kavanaugh (when serving on the D.C. Circuit) described it as "indisputable" that the question whether broadband should be treated as a public utility is a major question of deep economic and political

---

[49] *Brown & Williamson*, 529 U.S. at 159; *see infra* at Section I.A.3.c (discussing the unique history of Internet access service as an "enhanced service" under FCC regulation and then as an "information service" under the 1996 Act).

[50] *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014).

[51] *See, e.g.*, Save the Internet Act of 2019, H.R. 1644, 116th Cong. (2019) (proposing to reinstate the *2015 Order* and its classification of broadband as a telecommunications service); Net Neutrality and Broadband Justice Act of 2022, H.R. 8573, 117th Cong. (2022) (proposing to amend the Communications Act's definition of telecommunications service to "include[] the offering of broadband internet access service"). Notably, Congress has recently addressed other important communications policy issues by conferring on the Commission specific grants of authority *outside* Title II, which would have made no sense if it intended that Title II apply. For example, in enacting the landmark Bipartisan Infrastructure Act in 2021, Congress required ISPs that receive federal grants supporting broadband deployment to make available a low-cost broadband offering to low-income households, enhanced ISPs' transparency obligations with new consumer labels, and directed the Commission to identify steps to address "digital discrimination," while eschewing federal rate regulation under the federally funded BEAD program. *See* 47 U.S.C. § 1752 (low-cost broadband offering); *id.* § 1753 (broadband labels); *id.* § 1754 (digital discrimination) *id.* § 1702(h)(5)(D) (prohibiting rate regulation).

**App. 844**

significance.[52] Other jurists and commentators have recognized the same.[53] "[A]ny other conclusion would fail the straight-face test."[54]

Furthermore, any assertion of Title II authority over broadband would necessarily "bring about an enormous and transformative expansion in [the Commission's] regulatory authority."[55] If, as Chairwoman Rosenworcel has said, "the future of the [I]nternet is the future of everything,"[56] then the Commission's assertion of the right to undertake a "sudden, substantial expansion" of its actual and potential regulatory power over broadband[57] is an assertion of the right to take control—suddenly and substantially—of the "future of everything" and therefore marks a "major change" in the scope of the Commission's intervention in the broadband marketplace.[58] It is difficult to imagine a broader claim of authority. As President Obama's former Solicitor General and Acting Solicitor General recently concluded, "[t]he nature, scope, and effects of common carrier regulation of this indispensable element of our national economic and social lives thus raises precisely the concerns that bring the major questions doctrine into play."[59]

The *NPRM* makes no effort to hide this fact and if anything touts the sweeping claim of authority embodied in its reclassification proposal as the animating purpose of this rulemaking. The *NPRM* repeatedly emphasizes "how essential broadband Internet connections are for

---

[52] *U.S. Telecom*, 855 F.3d at 422 (Kavanaugh, J., dissenting from denial of rehearing en banc).

[53] *See, e.g.*, *U.S. Telecom*, 855 F.3d at 402 (Brown, J., dissenting from denial of rehearing en banc); Verrilli/Gershengorn Paper at 1.

[54] *U.S. Telecom*, 855 F.3d at 402 (Brown, J., dissenting from denial of rehearing en banc).

[55] *Util. Air Regulatory Grp.*, 573 U.S. at 324.

[56] *2018 Rosenworcel Statement*, 33 FCC Rcd. at 846.

[57] *2015 Order* ¶ 495.

[58] *See Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd. 11501 ¶ 45 (1998) ("*Universal Service Report*").

[59] Verrilli/Gershengorn Paper at 11.

consumers' participation in our society and economy."[60]  And based on this view, the *NPRM*

asserts that Title II reclassification "is necessary to unlock tools" the Commission believes it needs

"to fulfill its objectives" in the broadband marketplace, not just to preserve the Open Internet but

also for a breathtaking array of other newfound policy goals—relating to national security,

cybersecurity, public safety, network resiliency, consumer privacy and data protection, universal

service, infrastructure access, competition in multiple-tenant environments, robocalls and

robotexts, digital equity, and disabilities access.[61]  The sheer breadth of the *NPRM*'s contemplated

rationales for and applications of Title II regulation lays bare how the Commission views this

proceeding: as a legislative exercise to build from the ground up a comprehensive legal framework

for "the most important infrastructure of our time."[62]

The *NPRM*'s proposed forbearance framework only underscores that Title II

reclassification of broadband would trigger the major questions doctrine.  That framework reflects

a recognition that the vast majority of Title II makes little sense when applied to broadband—thus

confirming the sweeping scope of regulatory power triggered by reclassification, and

demonstrating that Congress plainly did not have broadband service in mind when enacting Title

II's provisions.  Moreover, the proposed forbearance does nothing to abate concerns that

reclassification would "bring about an enormous and transformative expansion in [the

Commission's] regulatory authority" under the major questions doctrine.[63]  Most notably, the

---

[60] *NPRM* ¶ 1; *see also, e.g.*, *id.* ¶¶ 16, 17, 19, 21, 23, 39, 49, 68, 88, 117, 129, 143, 148, 157 (all characterizing broadband Internet access as "essential" for modern life).

[61] *See id.* ¶¶ 21-55.  Tellingly, the Commission did not rely on these supposedly essential justifications when it imposed Title II regulation in the *2015 Order*; it has reached for new rationales only now that the overwrought predictions of harm in the wake of the *2018 Order* proved baseless.

[62] *2023 Rosenworcel Speech* at 1.

[63] *See Util. Air Regulatory Grp.*, 573 U.S. at 324.

*NPRM* makes clear that the Commission does *not* intend to forbear from Sections 201 or 202 of the Act, which historically have given rise to many of the most sweeping regulations ever imposed by the Commission,[64] and would enable pervasive government micromanagement of ISPs' provision of broadband services.  Indeed, in the *2015 Order*, the Commission made clear that it viewed Sections 201 and 202 as a backdoor for intrusive regulation *even in areas where it had granted forbearance from more specific Title II provisions*—repeatedly justifying forbearance from those other provisions by pointing to the expansive authority it retained under Sections 201 and 202 in case it later decided to pursue regulatory intervention in those areas.[65]  The continued application of Sections 201 and 202 thus belies any claim that the *NPRM*'s proposed "broad forbearance" from other Title II provisions actually limits the Commission's range of potential regulatory activity in any meaningful sense.  The *NPRM* also proposes to apply Sections 201 and

---

[64] *See, e.g.*, *Amendment of Section 64.702 of the Commission's Rules and Regulations, Final Decision*, 77 FCC 2d 384 ¶¶ 229-30, 239-40 (1980) (relying on Sections 201 and 202 to impose network unbundling and structural separation requirements); *Expanded Interconnection with Local Telephone Company Facilities, Memorandum Opinion and Order*, 9 FCC Rcd. 5154 ¶ 3 (1994) (relying on Sections 201 and 202 to impose collocation requirements).  Sections 201 and 202 also have been the source of various intrusive rate regulation measures over the years.  *See, e.g.*, *American Telephone & Telegraph Co. and the Associated Bell System Companies Charges for Interstate and Foreign Communication Service; American Telephone & Telegraph Co. Charges, Practices, Classifications, and Regulations for and in Connection with Teletypewriter Exchange Service*, Interim Decision and Order, 9 FCC 2d 30 ¶ 239 (1967) (establishing a rate-of-return regime for AT&T and the associated Bell System companies); *MTS and WATS Market-Structure*, Third Report and Order, 93 FCC 2d 241 ¶ 10 (1983) (establishing a comprehensive access charge regime to determine the rates interexchange carriers pay for access to local telephone company facilities used to complete interstate service offerings); *Policy and Rules Concerning Rates for Dominant Carriers*, Second Report and Order, 5 FCC Rcd. 6786 ¶¶ 1-6 (1990) (creating a system of "price cap" regulation to govern the rates of the largest incumbent local exchange carriers).  While the *NPRM* seemingly proposes to forbear from the use of Sections 201 and 202 to regulate rates, *see NPRM* ¶ 105, a future Commission may well seek to undo such forbearance, *see infra* at 97.

[65] *See, e.g.*, *2015 Order* ¶¶ 498, 506, 513, 514, 522.

**App. 847**

202 to broadband through the adoption of a vague "general conduct standard,"[66] creating a "mother may I" regime in which ISPs must either pre-clear any innovative new service features with the Commission or else face the risk of enforcement action, substantial fines, and other remedial measures—a far cry from the "permissionless innovation" championed by Chairwoman Rosenworcel and others as the key to the growth and success of the Internet.[67]

Moreover, the *NPRM* proposes to depart from the *2015 Order* by refusing to forbear from Section 214, yet another source of massive regulatory power through which the Commission could require ISPs to seek approval before launching a new broadband service, discontinuing a service, and engaging in transfer-of-control or assignment transactions. Among other concerns, the Commission could attempt to use Section 214 to compel ISPs to build out broadband networks to certain areas or to undergo a lengthy approval process merely to discontinue a particular speed tier—imposing significant burdens and forcing providers to support outdated services long after the market demand for such services has evaporated.[68] In addition, the *NPRM* proposes not to forbear from Section 222 of the Act, which would provide the Commission with authority to regulate the privacy practices of ISPs (and *only* ISPs, to the exclusion of other participants in the Internet ecosystem), notwithstanding that Congress took the extraordinary step to invoke the Congressional Review Act to nullify the Commission's earlier attempt to adopt sector-specific

---

[66] *See NPRM* ¶¶ 164-68.

[67] *See id.*, Statement of Chairwoman Jessica Rosenworcel, at 1 (asserting an interest in ensuring that the Internet remains "a haven for creating without permission"); *see also, e.g., Wireless Broadband and the Future of Spectrum Policy: Hearing Before the S. Comm. on Commerce, Science & Transportation*, 114th Cong. 2 (July 29, 2015) (statement of Commissioner Jessica Rosenworcel, Federal Communications Commission), https://docs.fcc.gov/public/attachments/DOC-334645A1.pdf (extolling the virtues of "permissionless innovation" in the Internet arena).

[68] *See infra* at 94-95 (noting additional concerns with applying Section 214 to broadband).

**App. 848**

privacy rules targeting ISPs pursuant to Section 222.[69]  Finally, a future Commission could reverse any or all of the forbearance that may be granted in this proceeding, thus leaving the prospect of even more expansive Title II regulation dangling like the sword of Damocles over the broadband industry.[70]

>   3.   *The Communications Act Does Not Clearly Authorize Classification of Broadband as a Telecommunications Service*

Nothing in the text of the Communications Act classifies broadband as a telecommunications service or authorizes (let alone clearly) the Commission to classify broadband as a telecommunications service.

Congress's failure to authorize the treatment of broadband as a telecommunications service is not the result of congressional inattention or oversight.  It is the product of a deliberate policy choice, reflecting Congress's endorsement of the Commission's own longstanding policy choices. In the 1996 Act, Congress embraced a longstanding regulatory divide found in the Commission's own orders—which distinguished between "basic transmission services" that were subject to common-carrier regulation under Title II and "enhanced services" that were not.  Congress relabeled "basic transmission services" as "telecommunications service[s]" and "enhanced services" as "information service[s]," and—in accordance with the Commission's prevailing policy—planted Internet access service firmly on the "information service" side of this line.  In short, as explained below, far from clearly authorizing the classification of broadband as a

---

[69] *See* S.J. Res. 34, 115th Cong. (2017) (enacted).

[70] *See Universal Service Report* ¶ 47 ("Notwithstanding the possibility of forbearance, we are concerned that including information service providers within the 'telecommunications carrier' classification would effectively impose a presumption in favor of Title II regulation of such providers."); *see id.* ¶ 47 n.100 ("The state of permanent uncertainty that this approach would unavoidably cause would chill future development of Internet-based services and thereby disserve the public interest." (citation omitted)).

telecommunications service, Congress has embraced the exact *opposite* classification—which has also been confirmed by the U.S. Supreme Court and the Commission itself.

a. <u>Congress Has Never Clearly Authorized the Classification of Broadband as a Telecommunications Service; Indeed, It Has Embraced the Exact *Opposite* Classification</u>

Congress has never clearly authorized the regulatory treatment of broadband as a telecommunications service. When Congress enacted the 1996 Act, it included two new definitions for two different types of "service" involving telecommunications. The first—an "information service"—referred to the offering of capabilities for "generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information *via telecommunications*."[71] The second—a "telecommunications service"—referred to the "offering of telecommunications for a fee directly to the public."[72] And "telecommunications" was defined to mean the "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[73] Neither of these definitional provisions nor any other provision of the statute expressly authorizes the Commission to classify broadband as a telecommunications service.

Indeed, the *opposite* congressional intent is revealed in the statute. Elsewhere in the Communications Act, Congress specifically referred to broadband as an information service. For example, Section 230(f)(2), added by the Communications Decency Act of 1996, provides that the "term 'interactive computer service' means any *information service* . . . that provides or enables computer access by multiple users to a computer server, *including specifically a service . . . that*

---

[71] 47 U.S.C. § 153(24) (emphasis added).

[72] *Id.* § 153(53).

[73] *Id.* § 153(50).

**App. 850**

*provides access to the Internet*."[74]  Moreover, in Section 223(e)(6), Congress provided that "[n]othing in this section shall be construed to treat interactive computer services"—which, as noted above, include Internet access services—"as common carriers or telecommunications carriers."[75]  In the Child Online Protection Act of 1998, Congress reaffirmed its understanding that the term "'Internet access service' . . . does not include telecommunications service."[76]  Far from providing "clear authorization" for classifying broadband as a telecommunications service,[77] these provisions point in the *opposite* direction, indicating that Congress has viewed broadband as outside that category.[78]

Other elements of the Communications Act offer additional strong evidence that Congress envisioned that ISPs would not be subject to common-carrier treatment under Title II.  Notably, for instance, other provisions in Section 230 explicitly authorize interactive computer services, including ISPs, to engage in good-faith content moderation by removing "disincentives for the

---

[74] *Id.* § 230(f)(2) (emphases added).

[75] *Id.* § 223(e)(6).

[76] *Id.* § 231(e)(4).

[77] *West Virginia*, 142 S. Ct. at 2614.

[78] A D.C. Circuit panel previously concluded that "it is unlikely that Congress would attempt to settle the regulatory status of [broadband] in such an oblique and indirect manner" as to do it through Section 230 and COPA, because Congress does not hide elephants in mouse holes.  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 703 (D.C. Cir. 2016) (determining that the "information service" category is "the successor to [the] enhanced service" category) (cleaned up).  But there is no elephant; when Congress enacted the 1996 Act, services offering access to the Internet had already been treated for many years as "information services" under the Bell System divestiture decree (and, equivalently, "enhanced services" in the Commission's pre-1996 regulatory regime).  Ratifying this settled regulatory framework is quite different from hiding a new one in a mouse hole.  *See, e.g.*, *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007) (using "regulatory history [to] help[] . . . illuminate the proper interpretation and application" of provisions of the Communications Act).  And the D.C. Circuit has also acknowledged that, even if Section 230 does not provide the answer on its own, it still "can help delineate the contours of statutory authority."  *Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010) (referring to Section 230).

**App. 851**

development and utilization of blocking and filtering technologies,"[79] and providing liability protection for "any action voluntarily taken in good faith to restrict access" to certain forms of content.[80]  It is difficult to square that allowance for content moderation—including discretionary blocking of content—with a Title II framework that, if imposed on ISPs, would generally obligate them to act as common carriers with respect to all lawful Internet traffic.  At the very least, had Congress sought to treat Internet service providers as common carriers, it could have been expected to reconcile its promotion of content moderation with its generally applicable common-carriage rules under Title II.  That Congress acknowledged no conflict or tension between the two once again indicates that Congress did not intend for such common-carriage principles to apply with respect to ISPs or the broadband services they provide.

Furthermore, Congress expressly endorsed the same broad deregulatory goals with respect to Internet services that has long motivated the Commission's rejection of a common-carrier regulatory framework for enhanced services.  In particular, Congress recognized that the "rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance," and that the "Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation."[81]  And Congress expressly stated that it "is the policy of the United States . . . to promote the continued development of the internet and other interactive computer services . . . [and] to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[82]  The imposition

---

[79] 47 U.S.C. § 230(b)(4).

[80] *Id.* § 230(c)(2)(A).

[81] *Id.* § 230(a)(1), (4).

[82] *Id.* § 230(b)(1)-(2).

**App. 852**

of extensive Title II regulations on broadband would be at odds with Congress's stated purpose of preserving an "unfettered" market for "the Internet and other interactive computer services," which, as noted above, Congress defined to include services like broadband that "provide[] access to the Internet." Congress's rejection of such regulations as to Internet access services like broadband—as a matter of policy—could hardly have been clearer. Indeed, this incompatibility is reflected clearly in the *NPRM* itself, which, by advancing a reclassification proposal that is premised on forbearance from numerous statutory provisions and regulations that typically apply to telecommunications carriers, reveals just how poor a fit a Title II regime would be for broadband.

This congressional rejection of Title II treatment of broadband has continued to this day. Even though Congress has frequently considered legislation that would expressly classify (or authorize the Commission to classify) broadband as a telecommunications service subject to Title II, Congress has repeatedly declined to enact such legislation.[83] As the Supreme Court has explained, courts "cannot ignore that the regulatory writ [an agency] newly uncover[s] conveniently enable[s] it to enact a program that . . . Congress considered and rejected multiple times."[84] In short, the Communications Act does not clearly provide—anywhere—that the Commission may treat broadband as a form of telecommunications service, and if anything indicates that the *opposite* is true.

---

[83] *See* Net Neutrality and Broadband Justice Act of 2022, H. R. 8573, 117th Cong. § 2 (2022) (proposing to amend the Communications Act's definition of telecommunications service to "include[] the offering of broadband internet access service"); Save the Internet Act of 2019, H.R. 1644, 116th Cong. § 2(b)-(c) (2019) (proposing to "restore[ ] as in effect" the Commission's 2015 classification of broadband as a telecommunications service subject to Title II).

[84] *West Virginia,* 142 S. Ct. at 2614 (internal quotations and citations omitted).

**App. 853**

*Brand X* Confirms That Congress Did Not Clearly Treat
       Broadband as a Telecommunications Service

As a matter of statutory construction, the Supreme Court has already held in *Brand X* that

the Communications Act is reasonably read to classify broadband solely as an information service,

without any separate telecommunications service offering—which necessarily means that the Act

does *not* clearly compel classification of any component of broadband under Title II.  The core

question in *Brand X* was whether a broadband provider, in addition to offering "Internet access"

as an information service, *also* "offers" a *separate* telecommunications service in the form of last-

mile transmission to and from the end user.[85]  As the Court explained, "companies in the broadband

Internet service business 'offe[r]' consumers an information service in the form of Internet access,"

and "it does not inexorably follow as a matter of ordinary language that they also 'offe[r]'

consumers the high-speed data transmission (telecommunications) that is an input used to provide

this service."[86]  The Communications Act thus "fails unambiguously to classify . . . information-

service providers that use telecommunications inputs to provide an information service as

'offer[ors]' of 'telecommunications.'"[87]

Thus, *Brand X* forecloses the Commission's proposal to treat broadband as a common-

carrier telecommunications service under Title II.  Per *Brand X*, the Communications Act does *not*

clearly prescribe such treatment.  That conclusion binds this Commission and bars the Title II

classification proposed by the Commission here.  Under the major questions doctrine, *ambiguous*

---

[85] *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 988, 997 (2005) (upholding as reasonable the Commission's conclusion that last-mile transmission is not a separate offering of a telecommunications service and instead is "part and parcel of [the information service] and is integral to [the information service's] other capabilities" (cleaned up)).

[86] *Id.* at 989.

[87] *Id.* at 996.

statutory language does not suffice to vest an agency with the authority to "substantially restructure" a nationwide "market,"[88] resolve questions of "deep economic and political significance,"[89] or "lay[ ] claim to extravagant statutory power over the national economy."[90] Rather, an agency claiming such authority—including, for instance, the authority to subject the nation's broadband providers to systematic common-carrier regulation under Title II—must "point to 'clear congressional authorization' to regulate in that manner."[91] And Congress has offered no "clear" authorization of this kind (again, it intended the opposite of what the Commission is proposing). The Commission's proposed order therefore fails as a matter of law.

Notably, two members of the U.S. Court of Appeals for the D.C. Circuit—Judge Brown and then-Judge Kavanaugh—concluded as much in 2017, when the D.C. Circuit was confronted with this question in connection with a petition for rehearing en banc in *U.S. Telecom Association v. FCC*,[92] even before more recent Supreme Court decisions clarifying the major questions doctrine. In that proceeding before the D.C. Circuit, the Commission asserted that, "under *Brand X*, the [Commission] has authority to classify Internet service as a telecommunications service because the statute is ambiguous."[93] But that theory was "badly mistaken," as then-Judge Kavanaugh explained: "*Brand X*'s finding of statutory ambiguity cannot be the *source* of the FCC's authority to classify Internet service as a telecommunications service. Rather, under the major [questions] doctrine, *Brand X*'s finding of statutory ambiguity is a *bar* to the FCC's authority

---

[88] *West Virginia*, 142 S. Ct. at 2610.

[89] *Nebraska*, 143 S. Ct. at 2375 (internal quotation marks and citation omitted).

[90] *Util. Air Regulatory Grp.*, 573 U.S. at 324.

[91] *Nebraska*, 143 S. Ct. at 2375 (quoting *West Virginia*, 142 S. Ct. at 2613).

[92] *See U.S. Telecom*, 855 F.3d at 403-04 (Brown, J., dissenting from denial of rehearing en banc); *id.* at 425-26 (Kavanaugh, J., dissenting from denial of rehearing en banc).

[93] *Id.* at 425 (Kavanaugh, J., dissenting from denial of rehearing en banc).

to classify Internet service as a telecommunications service," because it means that "Congress has not *clearly* authorized the FCC" to reclassify broadband as a telecommunications service.[94] That reasoning plainly accords with the Supreme Court's recent decisions articulating the operation of the major questions doctrine.[95]

Indeed, as clear as these principles were in 2017, they have become only clearer in the intervening years. Since that time, the Supreme Court has significantly fleshed out the major questions doctrine in the series of decisions discussed above—leaving no doubt that the Court would view common-carrier treatment of broadband under Title II as a major question that the Commission may not resolve absent clear congressional authorization. As a former Solicitor General and former Acting Solicitor General recently explained, while any statutory ambiguity in the Communications Act "could be resolved in favor of classifying broadband internet access services as an information service without triggering the limitations of the major questions doctrine," the decision to "classify broadband as a Title II telecommunications service would implicate [the] concerns" underlying the major questions doctrine "in the most fundamental ways," since "such a decision would vastly expand the Commission's authority and would transform the way a federal agency regulates a vitally important element of our economy and the personal and social lives of hundreds of millions of Americans."[96] Because such a transformational change in the power of this Commission requires clear statutory authority, and because *Brand X* held that Congress did not unambiguously provide such authority, *Brand X* "effectively dictates how the

---

[94] *Id.* at 425-26 (Kavanaugh, J., dissenting from denial of rehearing en banc).

[95] *See Nebraska*, 143 S. Ct. at 2375; *West Virginia*, 142 S. Ct. at 2613.

[96] Verrilli/Gershengorn Paper at 15.

**App. 856**

major questions doctrine will apply to any attempt on the part of the Commission to . . . classify broadband" as a telecommunications service.[97]

<div style="text-align:center">

c.     The Commission Itself Has Long Distinguished Between Basic Telecommunications Services and Enhanced Information Services

</div>

Even setting aside the Supreme Court's conclusion in *Brand X*, which confirmed that Congress never clearly intended for broadband to be treated as a telecommunications service, the Commission's own longstanding policy choices reinforce the determination *not* to extend the Communications Act's Title II framework to the novel context of Internet access services. The Commission's proposed order turns its back on those longstanding policy choices, which Congress enshrined in the 1996 Act.

The origins of the distinction between "telecommunications services" that are subject to Title II regulation and "information services" that are not subject to Title II regulation stretches back to the pre-Internet era. In 1966, the Commission launched an official inquiry into the "regulatory and policy questions that appeared to be emerging from the growing interdependence of computers and communications services and facilities."[98] That effort, known as the *Computer Inquiry*, culminated in an order issued by the Commission in 1970 broadly recognizing that "data processing services"—unlike the traditional communications services offered by common carriers—should be generally free from extensive government regulation.[99]

In particular, the Commission observed that a new form of service—"remote access data processing service," an early precursor of Internet access service—had come into existence, and it

---

[97] *Id.*

[98] *Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities*, Tentative Decision, 28 FCC 2d 291 ¶ 1 (1970) ("*First Computer Inquiry*").

[99] *Id.* ¶¶ 20-22.

<div style="text-align:right">

**App. 857**

</div>

defined such service as "an offering of data processing wherein communications facilities, linking a central computer to remote customer terminals, provide a vehicle for the transmission of data between such computer and customer terminals."[100] The Commission specifically distinguished between "the provision of data processing services" and "the provision of regulated common carrier communication services."[101] And in order to prevent "cross-subsidization and other unfair competitive practices" with respect to "the rendition of communication and data processing services," the Commission adopted a policy whereby "communications common carriers shall furnish data processing services only through separate corporate entities."[102] But the Commission recognized that such data processing services would generally remain free from FCC regulation.[103]

In 1977, the Commission began the process of updating the policy announced in *Computer Inquiry* in view of "[t]echnological and market developments since [the] decision in the original Computer Inquiry."[104] In this renewed policy review (known as the *Second Computer Inquiry*), the Commission proposed that "the determination as to whether a communications or data processing service is being offered [should] depend on the nature of the processing activity involved."[105]

The *Second Computer Inquiry* culminated in a 1980 order establishing "a regulatory scheme that distinguishe[d] between the common carrier offering of basic transmission services

---

[100] *Id.* ¶ 15.

[101] *Id.* ¶ 29.

[102] *Id.* ¶¶ 35-36.

[103] *Id.* ¶¶ 20-22.

[104] *Amendment of Section 64.702 of the Commission's Rules and Regulations (Computer Inquiry)*, Supplemental Notice of Inquiry and Enlargement of Proposed Rulemaking, 64 FCC 2d 771 ¶ 2 (1977).

[105] *Id.* ¶ 15.

**App. 858**

and the offering of enhanced services."[106] "Basic service" would be "limited to the common carrier offering of transmission capacity for the movement of information, whereas enhanced service combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information."[107] As the Commission explained, the "common carrier offering of basic transmission services are communications services and regulated as such under traditional Title II concepts."[108] But enhanced services would be treated differently: "[T]he absence of traditional public utility regulation of enhanced services offers the greatest potential for efficient utilization and full exploitation of the interstate telecommunications network."[109] In drawing this distinction, the Commission explained that it was "remov[ing] the threat of regulation from markets which were unheard of in 1934," when the Communications Act was enacted.[110] And the Commission applied this distinction in concluding that the precursors to broadband—so-called "gateway services" that "allow[ed] a customer with a personal computer . . . to reach an array" of "databases providing business, . . . investment, . . . and entertainment information"—were "enhanced" services.[111] Thus, as early as the 1980s, it was well

---

[106] *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Final Decision, 77 FCC 2d 384 ¶ 5 (1980) ("*Second Computer Inquiry*"); *see also United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 138 n.17, 178 n.198 (D.D.C. 1982) (embracing the same distinction in the Modification of Final Judgment that compelled AT&T's divestiture of the Bell System).

[107] *Second Computer Inquiry* ¶ 5.

[108] *Id.* ¶ 7.

[109] *Id.*

[110] *Id.* ¶ 101.

[111] *Bell Atl. Tel. Cos.*, Memorandum Opinion and Order, 3 FCC Rcd. 6045 ¶¶ 3, 7 & n.8 (1988); *see also United States v. Western Elec. Co.*, 907 F.2d 160, 163 (D.C. Cir. 1990) (describing "gateway service" as a variation of "information services").

established as a matter of Commission policy that the forerunners of broadband would *not* be subject to regulation as Title II telecommunications services.

Critically, when Congress passed the 1996 Act, amending the Communications Act, it accepted this basic regulatory distinction and codified it into law. Thus, the 1996 Act defined "telecommunications" as the "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[112] And it defined "telecommunications service" as "the offering of telecommunications for a fee directly to the public."[113] This definition of "telecommunications service" and "telecommunications" tracked the Commission's conception of "basic service." Likewise, Congress separately defined "information service" to mean "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information *via telecommunications*."[114] This understanding of "information service" closely resembled the Commission's previous definition of "enhanced service."[115] Just as in *Brown & Williamson*, where Congress legislated "against the backdrop of the FDA's consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco,"[116] Congress's adoption of distinct categories for "information service[s]" and "telecommunications service[s]" was enacted against the backdrop of this Commission's own refusal to treat enhanced service offerings—the forerunners of modern broadband—as "basic," common carrier services.

---

[112] 47 U.S.C. § 153(50).

[113] *Id.* § 153(53).

[114] *Id.* § 153(24) (emphasis added).

[115] *Compare Second Computer Inquiry* ¶ 5 (explaining that enhanced service "combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information").

[116] *Brown & Williamson*, 529 U.S. at 144.

That history alone strongly underscores Congress's intent to classify broadband as an information service.[117]

d.     <u>The Commission Contemporaneously Recognized That Congress Provided for an Information-Service Classification for Broadband</u>

Almost immediately after Congress passed the 1996 Act, the Commission recognized the plain import of Congress's policy choices. Specifically, the Commission found in its 1998 *Universal Service Report* to Congress that Congress intended that "the categories of 'telecommunications service' and 'information service' in the 1996 Act are mutually exclusive,"[118] and that "information service providers are not subject to regulation as common carriers merely because they provide their services 'via telecommunications.'"[119] The Commission also observed that Congress's definition of "telecommunications service" and "information service" were "built upon" the "Commission's prior deregulatory actions" in the *Second Computer Inquiry*,[120] and that "a decision by Congress to overturn *Computer II*, and subject [enhanced services] to regulatory constraints . . . would have effected a major change in the regulatory treatment of those services."[121] In view of the legislative history of the 1996 Act, along with the submissions to the Commission of a bipartisan group of U.S. Senators regarding Congress's intent in the 1996 Act,

---

[117] *Cf. West Virginia*, 142 S. Ct. at 2610 ("[A]s Justice Frankfurter has noted, 'just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.'") (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).

[118] *Universal Service Report* ¶ 13.

[119] *Id.* (quoting statute).

[120] *Id.* ¶ 39.

[121] *Id.* ¶ 45.

the Commission concluded that "Congress intended the 1996 Act to maintain the *Computer II* framework."[122]

The Commission also correctly determined in that report that "Internet access services are appropriately classed as information, rather than telecommunications, services."[123] As the Commission explained, "Internet access providers do not offer a pure transmission path; they combine computer processing, information provision, and other computer-mediated offerings with data transport."[124] While the Commission acknowledged that the "provision of Internet access service involves data transport elements," namely "the movement of information between customers' own computers and the distant computers with which those customers seek to interact," the Commission also explained that such service "crucially involves information-processing elements as well; it offers end users information-service capabilities inextricably intertwined with data transport."[125] In short, what Internet access providers supplied to the public is not a simple telecommunications service, like a telephone or telegraph connection; it is "Internet access," with all the "advanced capabilities" that entails.[126]

Just four years later, in 2002, the Commission reaffirmed this basic approach in its *Cable Modem Declaratory Ruling*.[127] In that proceeding, the Commission addressed the proper

---

[122] *Id.*; *see also id.* ¶¶ 37-38 (noting the comments of Senators McCain, Ashcroft, Ford, Kerry, Abraham, and Wyden arguing that nothing in the 1996 Act "suggests that Congress intended to alter the current classification of *Internet and other information services*") (emphasis added).

[123] *Id.* ¶ 73.

[124] *Id.*

[125] *Id.* ¶ 80.

[126] *Id.* ¶ 79.

[127] *See Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd. 4798 (2002) ("*Cable Modem Declaratory Ruling*").

**App. 862**

classification of broadband, then a relatively novel service for the provision of "high-speed" Internet access to homes and businesses across the country.[128]  Consistent with the *Universal Service Report*, the Commission recognized that broadband is "a single, integrated service that enables the subscriber to utilize Internet access service through a cable provider's facilities and to realize the benefits of a comprehensive service offering."[129]  That comprehensive service offering, "Internet access service, is an information service."[130]  Insofar as proponents of Title II regulation claim that digital subscriber line ("DSL") service initially was classified as a telecommunications service,[131] they are erroneously conflating *wholesale* DSL transmission, which incumbent telephone companies historically offered to ISPs such as AOL or Earthlink as a telecommunications service unbundled from Internet access, with *retail* broadband service, an integrated offering that cable operators had never offered on a common-carrier basis until compelled to do so—temporarily—by the *2015 Order*.

As the foregoing discussion illustrates, broadband has its own "unique" political and regulatory history[132]—one that emerged in conversation between the Commission and Congress, and flowed from the Commission's long-running distinction between "basic" telecommunications services like telephony and "enhanced" information services like the Internet.  As the Commission explained in 1998, if Congress had classified enhanced services like Internet access service as telecommunications services under the 1996 Act, that reclassification would have been a "major

---

[128] *Id.* ¶ 9 (noting that, at the time, only 11% of all households in the United States had a broadband connection).

[129] *Id.* ¶ 38.

[130] *Id.*

[131] *See NPRM* ¶ 56.

[132] *Brown & Williamson*, 529 U.S. at 159.

**App. 863**

change."[133] Rather than rejecting the Commission's deregulatory approach with respect to enhanced services like Internet access services, Congress embraced that approach and enshrined it in federal law. And the Commission likewise quickly recognized that this is what Congress had done. This history provides further persuasive evidence that Congress intended for broadband to be treated as an information service, not a telecommunications service. At the very least, the Commission's long-held view of broadband's proper classification under federal law is a strong sign—standing on its own—that Congress did not clearly authorize a telecommunications-service classification for broadband.[134]

<p style="text-align:center">* * *</p>

NCTA and its members are strongly of the view that the text and history of the 1996 Act and other amendments to the Communications Act, the relevant regulatory history, and the functional attributes of broadband (discussed below), all compel an information-service classification for broadband.

But the Commission's proposed reclassification ultimately fails on simpler grounds. If the Commission were lawfully to reclassify broadband as a telecommunications service, it would need to do more than conclude that broadband is best classified as a telecommunications service. Under the major questions doctrine, it would need to show that Congress has *clearly* authorized the Commission to treat broadband as a telecommunications service. For the reasons explained above, the Commission cannot do that.

---

[133] *Universal Service Report* ¶ 45.

[134] *See West Virginia*, 142 S. Ct. at 2610-11.

**Under the Best Interpretation of the Communications Act, Broadband Qualifies as an Information Service, Not a Telecommunications Service**

1. *Broadband's Functional Attributes Satisfy the Statutory Definition of "Information Service"*

Even setting aside the major questions doctrine, under the best—and indeed, the unambiguous—reading of the Communications Act, broadband remains today, as it was in 2002, an information service within the meaning of the 1996 Act.[135] As a matter of statutory interpretation, the functional attributes of broadband support an information-service classification for two distinct reasons. First, the provision of access to stored content online itself entails all of the statutory capabilities that define an information service.[136] Second, the provision of broadband involves critical information-processing functions that are central to, and inextricably intertwined with, the telecommunications capability used by ISPs.

---

[135] *Cf. NPRM* ¶ 70 (tentatively concluding that broadband meets the definition of "telecommunications service"). Although classifying broadband as an information service follows from the unambiguous text of the Act, that classification reflects the best reading of the statute even if the statute were deemed ambiguous on this point. Moreover, if the statute were deemed ambiguous, the Commission would be unable to defend a telecommunications service classification on appeal, because (1) the major questions doctrine, as discussed above, requires clear congressional authorization, which an ambiguous provision by definition does not provide; (2) even if the major questions doctrine did not apply, a reviewing court would pick the best reading of the statute (i.e., that broadband is an information service), and the Commission's contrary interpretation would not be entitled to *Chevron* deference—consistent with the arguments raised by petitioners in *Loper Bright Enterprises v. Raimondo* and *Relentless, Inc. v. Dep't of Commerce* (both currently pending before the Supreme Court); and (3) even if the major questions doctrine did not apply and *Chevron* deference did apply, Title II reclassification reflects an unreasonable interpretation of the Act.

[136] *See Brand X*, 545 U.S. at 998-99 (upholding the Commission's conclusion that "[w]hen an end user accesses a third-party's Web site, . . . he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site").

"[T]he Act's definition of 'information service' fits broadband Internet access like a glove."[137]   The statute defines an "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."[138]   An analysis of the factual particulars confirms that broadband is a quintessential information service—offering end users the "capability" to perform every one of these statutorily defined information-processing functions "via telecommunications." After all, the heart of broadband Internet access is the capability to interact with and manipulate data stored on remote computers by the provider or a third party.   The Commission has long recognized that, when a broadband provider offers customers the "capability" to "click through" to third-party websites and obtain the "contents of the requested web page[]," the subscriber is "interact[ing] with stored data," and the provider is therefore offering an "information service."[139] It makes no difference whether broadband customers use these information-processing functions to interact with third-party content; *Brand X* upheld the Commission's determination that "[w]hen an end user accesses a third-party's Web site, . . . he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site, its e-mail service, or his personal Web page."[140]   These core information-processing functions distinguish broadband from the pure transmission offered by traditional switched

---

[137] *U.S. Telecom*, 855 F.3d at 395 (Brown, J., dissenting from denial of rehearing en banc).

[138] 47 U.S.C. § 153(24).

[139] Reply Brief for the Federal Petitioners at 5-6, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281), 2005 WL 640965 (filed Mar. 18, 2005).

[140] *Brand X*, 545 U.S. at 998-99; *see also Cable Modem Declaratory Ruling* ¶ 62 (concluding that cable broadband is an information service even though providers "do not control the majority of information accessible" to subscribers).

telephone service, contrary to the *NPRM*'s implausible attempt to equate the two.[141]  Crucially, broadband offers users the ability to perform all of these statutory functionalities "via telecommunications"—*i.e.*, by making use of an inextricably combined "telecommunications" component rather than separately offering any severable "telecommunications service" to end users.

Moreover, in affirming the Commission's *Cable Modem Declaratory Ruling*, the Supreme Court in *Brand X* singled out Domain Name System ("DNS") and caching functionalities as integrated information-processing components.  While the *NPRM* seeks to muddy the waters regarding these functions,[142] both are as integrated into broadband offerings today as they were when *Brand X* was decided.

DNS is a decentralized mechanism for storing and distributing user- and data-location information throughout the Internet.  DNS matches the plain language name that a user affiliates with a website (*e.g.*, "www.google.com") with the IP addresses of the servers containing the web pages she wishes to access.  DNS's information-processing functionality therefore provides significant value by enabling consumers, "with a domain name in hand, to access a desired IP address and, more importantly, its corresponding web page without in fact *using* the IP address."[143] As the Commission found in 2018, "[b]ecause [DNS] translates human language (*e.g.*, the name of a website) into the numerical data (*i.e.*, an IP address) that computers can process, it is indispensable to ordinary users as they navigate the Internet."[144]  As the Declaration of Peter

---

[141] *See NPRM* ¶ 73.

[142] *See id.* ¶¶ 76-79.

[143] *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 473 (D.C. Cir. 2016).

[144] *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 ¶ 34 (2018) ("*2018 Order*") (quoting Comments of AT&T Services Inc., WC Docket No. 17-108, at 74 (July 17, 2017)).

**App. 867**

Rysavy explains, "DNS also provides a wide range of other services," such as enabling "reverse lookups" in which "a user queries DNS with an IP address to determine the domain name associated with the IP address," and facilitating "an error-page-assist function for a user who has supplied an invalid address and DNS suggests similar pages the user may have been intending to reach."[145] Additionally, "[m]ost ISPs implement an advanced version of DNS" that enables them to "optimize the user experience" in various other ways, including by dynamically identifying the optimal server for transmissions involving ISP-hosted content delivery networks ("CDNs")—a functionality that "does not work with third-party DNS servers."[146] And in the last several years, additional forms of DNS (DNS over HTTPs, or "DOH," and DNS over TLS, or "DOT") have been introduced to enhance privacy and security protections. Both protocols encrypt the DNS transaction to protect end users by preventing man-in-the-middle attacks from spying on the transaction, and both are computationally intensive and require performing computations across the IP packet header and its payload. Moreover, ISPs are actively incorporating new DNS capabilities closer to the network edge in a manner that reduces latency for video conferencing, gaming, and similar applications—in an effort to further improve the end-user experience. By contrast, third-party DNS offerings that are not integrated with ISPs' network architecture "creat[e] unnecessary internet traffic," resulting in "slow[er] response time[s]" and "undermining the user experience."[147]

---

[145] Declaration of Peter Rysavy, Rysavy Research, WC Docket No. 23-320, ¶ 23 (filed Dec. 14, 2023) ("Rysavy Declaration"), https://www.ctia.org/positions/documents/peter-rysavy-declaration.

[146] *Id.* ¶¶ 25, 28.

[147] *Id.* ¶ 28.

**App. 868**

Caching is similarly inextricably intertwined with broadband and provides a similar experience-enhancing function for consumers. Indeed, "[a]ll major ISPs cache content using caching servers located within the ISP network," and "[u]sers cannot directly opt out of" this caching functionality; rather it is "inextricably linked" to providers' delivery of online content.[148] As the Commission correctly found in 2018, "[c]aching does much more than simply enable the user to obtain more rapid retrieval of information through the network" by storing content closer to customer locations; "caching depends on complex algorithms to determine what information to store where and in what format."[149] This information-processing functionality thus "enables and enhances consumers' access to and use of information online"—and, like DNS, is "provided as part and parcel of the broadband Internet access service."[150]

Since *Brand X*, ISPs have integrated various additional information-processing functions[151] into their broadband offerings—each of which, on its own, is sufficient to render broadband an information service—including the following examples:

- Distributed denial of service ("DDoS") mitigation: To ensure continuity of service for end users, ISPs have made large investments in DdoS attack mitigation platforms or "scrubbers" that detect attacks and re-route traffic that is suspected of including malicious traffic through a scrubber. Using a number of sophisticated techniques, the scrubber then analyzes the re-routed traffic, filtering out any malicious traffic.

- Botnet notification: ISPs also have implemented integrated functionalities consistent with the Anti-Botnet Code of Conduct issued by the Communications Security, Reliability, and Interoperability Council to notify customers when an end-user device has been compromised and is part of a botnet. To enable notification, ISPs rely on

---

[148] *Id.* ¶¶ 17-18.

[149] *2018 Order* ¶ 41 (quoting Comments of the Information Technology and Innovation Foundation, WC Docket No. 17-108, at 74 (July 17, 2017)).

[150] *Id.* ¶ 42.

[151] *See NPRM* ¶ 80 (seeking comment on "whether there are other functionalities provided or offered with BIAS" that could affect the classification).

**App. 869**

sophisticated tools to identify infected devices and associate them with the relevant subscribers.

- Routing and border gateway protocol ("BGP") security: ISPs also have integrated functionalities into their broadband offerings to enable routers to analyze the Internet's routing table (a federated, in-memory database that is distributed across thousands of routers) and a packet's source and destination addresses to determine the optimal traffic routing path, and use BGP to exchange this information.

- Artificial intelligence ("AI")-enhanced network management and protection: ISPs rely on AI and machine learning ("ML") to predict and mitigate network congestion as well as to identify and remediate network impairments, in each case before customers are impacted. ISPs also are relying on AI and ML to improve network security and cybersecurity threat detection.

Contrary to the suggestion in the *NPRM*,[152] the fact that some of these functionalities are *also* offered by third parties "is not a basis for ignoring the capabilities that a broadband provider actually 'offers.'"[153]

The *NPRM* mischaracterizes these features in suggesting they provide information capabilities only for "the management of a telecommunications service," such that they fall outside the Communications Act's definition of "information service."[154] Indeed, both the Commission and the Department of Justice ("DOJ") expressly acknowledged to the Supreme Court in *Brand X* that DNS and caching are "*not* used 'for the management, control, or operation of a telecommunications network,'" but rather provide "information-processing capabilities . . . used to facilitate the information retrieval capabilities that are inherent in Internet access."[155] That

---

[152] *See, e.g.*, *id.* ¶¶ 77, 80.

[153] *Mozilla Corp. v. FCC*, 940 F.3d 1, 33 (D.C. Cir. 2019).

[154] *NPRM* ¶ 75. The Communications Act expressly excludes from the definition of "information service" any offering of the listed information-processing capabilities "for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).

[155] *See* Reply Brief for the Federal Petitioners at 6, n.2, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281), 2005 WL 640965 (filed Mar. 18, 2005).

**App. 870**

remains as true today as it was then. The other functionalities likewise improve the consumer experience in ways that go far beyond mere network management, and are essential features of today's broadband offerings.

In addition, ISPs' marketing of broadband offerings and consumer perceptions of those services confirm that broadband is best understood as a functionally integrated information service. Consumer surveys confirm that broadband customers are aware of and value the integrated features offered by their ISPs.[156] For example, most consumers understand that their broadband provider offers online storage, spam filters, security protections, and other information-processing functions.[157] And broadband providers prominently advertise these features.[158] Nor is it reasonable to infer from broadband providers' speed-related marketing messages that the service being offered is limited to pure transmission of unaltered information. Indeed, ISPs have advertised their speeds since *well before* the Commission's information-service classification was upheld as reasonable in the *Brand X* decision.[159]

> 2.   *Broadband's Functional Attributes Are Incompatible With the Statutory Definition of "Telecommunications Service"*

Just as broadband neatly fits within the Communications Act's definition of "information service," the "telecommunications service" classification is a demonstrably poor fit for broadband. The Act defines "telecommunications service" as a basic "offering of telecommunications for a

---

[156] *See, e.g.*, Market Strategies Int'l, *Broadband Internet Service Use*, at 6, submitted as Attachment A to Ex Parte Letter of USTelecom and NCTA, WC Docket No. 17-108 (filed Aug. 28, 2017).

[157] *See id.* at 6.

[158] *See, e.g.*, Press Release, Comcast Corporation, Comcast Launches Enhanced WiFi Parental Control Tool (Jul. 30, 2019), https://corporate.comcast.com/press/releases/home-wifi-feature-helps-parents-manage-childs-online-usage.

[159] *See, e.g.*, *Brand X*, 545 U.S. at 1007 n.1 (Scalia, J., dissenting) (remarking that broadband providers "advertise[] quick delivery as one of [their] advantages over competitors").

**App. 871**

fee directly to the public,"[160] and defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[161] As a factual matter, these definitions simply do not describe the offering of broadband.

The fundamental problem with classifying broadband as a telecommunication service is that, contrary to the belief expressed in the *NPRM*,[162] there is *always* a "change in the form or content" of information transmitted by ISPs. As the D.C. Circuit recognized in *U.S. Telecom*, "when an end user wishes to check last night's baseball scores on ESPN.com . . . ESPN's computer breaks the scores into packets of information."[163] These packets are "dispersed across the various networks, interconnection nodes, and other resources that make up the Internet's physical infrastructure" before reaching "the same destination where they are eventually reconfigured" by the ISP.[164] This contrasts with traditional voice service, which entails the "establishment of a basic

---

[160] 47 U.S.C. § 153(53).

[161] *Id.* § 153(50).

[162] *See NPRM* ¶ 71.

[163] *U.S. Telecom*, 825 F.3d at 690.

[164] *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 409 n.11 (2d Cir. 2004); *see also* Information Sciences Inst., Univ. of S. Cal., Internet Protocol: DARPA Internet Program Protocol Specification (Sept. 1981) ("IETF RFC 791"), https://tools.ietf.org/html/rfc791 (describing this process in the same way); *see also Advanced Media Networks LLC v. Gogo LLC*, 2013 WL 12123237, at *8 (C.D. Cal. June 14, 2013) (describing how IETF RFC 791 remains the authoritative TCP/IP document). Thus, even if the *NPRM* were correct that "the packet payload . . . is not altered by the variety of headers that a provider may use to route a given packet," *NPRM* ¶ 72 (internal quotation marks and citations omitted), the breaking apart, routing, and reconfiguration of these packets unquestionably involves a "change in the form or content" of the information requested or sent by the end user.

**App. 872**

transmission path over which a telephone call may be completed, without altering the fundamental character of the telephone service."[165]

Moreover, broadband also does not ordinarily transmit information "between or among points *specified by the user*."[166] Unlike with traditional voice service, in which the user dials a specific called party's telephone number, consumers are usually unaware of where online content is stored. ISPs determine the optimal routes for retrieving content—increasingly by employing the advanced DNS and caching technologies described above[167]—whereas end users typically have no idea where each transmission of content originated. The *NPRM* notably acknowledges the end user's fundamental "uncertainty concerning the geographic location of an endpoint" in broadband communications, and its terse dismissal of this fact as "irrelevant"—without offering any alternative interpretation of this critical statutory limitation—speaks volumes.[168] Similarly, broadband does not transmit "information of the user's choosing."[169] Again, unlike traditional, circuit-switched voice services, in which the user chooses and sends the information—*i.e.*, his or her voice—to a particular called party, broadband involves continual interaction between computers and the transmission network, as well as among computers themselves.

In short, it remains the case today that ISPs offer consumers an information service that inextricably combines information-processing functionalities with telecommunications. While

---

[165] *See Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended*, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd. 21905 ¶ 107 (1996).

[166] *Cf. NPRM* ¶ 71 (emphasis added).

[167] *See supra* at 41-44; *see also* Rysavy Declaration ¶¶ 10-16 (describing ISPs' routing processes and functionalities).

[168] *NPRM* ¶ 71.

[169] *Cf. id.*

**App. 873**

ISPs *make use of* telecommunications (as is the case with any information service), they do not *offer* telecommunications on a standalone basis to end users for a fee. *Brand X* confirms that point. There, as explained above, the majority held unequivocally that "[c]able companies in the broadband Internet service business *offer* consumers an *information service* in the form of Internet access," and then addressed the separate question of whether they "*also* offer consumers the high-speed data transmission (telecommunications) that is an input used to provide this service."[170] As the Commission long ago recognized, the mere fact that ISPs make use of telecommunications does not change the fact that what ISPs are selling is more than a simple telecommunications channel. ISPs are in the business of providing "Internet access," with all the "advanced capabilities" that are integral components of that service.[171] That service is an information service, not a telecommunications service.

### C. It Would Be Arbitrary and Capricious To Reclassify Broadband as a Telecommunications Service

For a variety of reasons, it also would be arbitrary and capricious under the APA for the Commission to reclassify broadband as a telecommunications service.[172] In particular, there is no genuine problem in the broadband marketplace that plausibly could be solved by reclassifying broadband as a telecommunications service under Title II. Moreover, imposing heavy-handed, utility-style regulation and Open Internet mandates only on ISPs would irrationally ignore far more

---

[170] *Brand X*, 545 U.S. at 989 (internal quotations and citations omitted) (emphases added).

[171] *Universal Service Report* ¶ 79.

[172] *See Mozilla*, 940 F.3d at 49 (explaining that, while there is "some overlap" between statutory interpretation and arbitrary-and-capricious inquiries, "the Venn diagram of the two inquiries is not a circle," and "[e]ach test must be independently satisfied" by the agency (quoting *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017))).

**App. 874**

significant debates about the risks to Internet openness posed by other major participants in the Internet ecosystem.

1. *There Are No Genuine Problems in the Broadband Marketplace That Reclassifying Broadband as a Telecommunications Service Could Plausibly Solve*

"[A]n agency regulation must be designed to address identified problems."[173] Accordingly, "[r]ules are not adopted in search of regulatory problems to solve"; rather, "they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address."[174] And because the reclassification of broadband would reverse previous agency decision-making, the Commission is obligated to show not only that it is addressing an actual problem, but that it reasonably believes the new rules "to be *better*" and has not "ignore[d] its prior factual findings" underpinning the existing rules or the "reliance interests" that have arisen from those rules.[175] That is not possible here.

The experience of the past several years shows that there is no genuine problem in the broadband marketplace, let alone a problem that reclassifying broadband under Title II could plausibly solve. As demonstrated below, *infra* at Section II.D and in the Israel/Keating/Shampine Declaration, today's broadband marketplace is more competitive, dynamic, and open than it has ever been, and the current light-touch regulatory approach has resulted in increased investment, innovation, and superlative network performance, including during the COVID-19 pandemic. Indeed, the Commission recognized in 2020 that "the digital divide continues to narrow as more

---

[173] *N.Y. Stock Exch., LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 556 (D.C. Cir. 2020).

[174] *Id.* at 556-57.

[175] *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (emphasis added); *see also FCC v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009).

**App. 875**

Americans than ever before have access to high-speed broadband."[176]  And the availability of robust, affordable broadband across the United States has only increased since then.[177]  Reclassifying broadband would reverse such progress, rather than advance it.

There also is no evidence of abusive practices by ISPs in the more than half-decade since the *2018 Order*'s release—a fact that even the *NPRM* half-heartedly acknowledges.[178]  Instead, the entire basis for imposing conduct rules rests on unfounded speculation and disproven claims. In the *2018 Order*, the Commission rightly recognized that "after roughly fifteen years of searching, proponents of Title II [regulation] have found astonishingly few" incidents of abusive ISP practices.[179]  Title II advocates predictably claimed that the sky would finally fall after the Commission repealed the *2015 Order*.[180]  But there have been no *bona fide* instances of abuse in the nearly six years since the release of the *2018 Order*.  The sole tired, inapt, and disingenuous example on which advocates rely as a post-*2018 Order* harm has been widely debunked as *not* a net neutrality violation and *not* something that even the *2015 Order* would have regulated, much

---

[176] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2020 Broadband Deployment Report, 35 FCC Rcd. 8986 ¶ 2 (2020).

[177] *See infra* at 88-91.

[178] *NPRM* ¶ 125 (making arguments "to the extent there is limited evidence of harmful conduct" in the broadband marketplace).

[179] *2018 Order* ¶ 116 (internal quotes and citations omitted); *see also Verizon v. FCC*, 740 F.3d 623, 664-65 (D.C. Cir. 2014) (Silberman, J., concurring in part) ("That the Commission was able to locate only four potential examples of [harmful] conduct is, frankly, astonishing.").

[180] *See, e.g.*, Comments of Free Press, WC Docket No. 17-108, at 65-70 (filed July 17, 2017) (predicting that repeal of *2015 Order* would, among other things, "drastically change the nature of the service that customers have come to expect from broadband providers" and "gravely inhibit [consumers'] access to the content of their own choosing").

**App. 876**

less prevented.[181]  In short, the Commission's "predictive judgments" of harm "must be based on some logic and evidence, not sheer speculation"[182]—and it is increasingly clear that no such evidence exists.

The notion that the net neutrality laws enacted by California and several other states are somehow responsible for the continued adherence to Internet openness nationwide is wholly unpersuasive.  To begin with, that claim does not account for the fact that the vast majority of states never adopted such laws, and that numerous ISPs lack any operations in California or other states with net neutrality laws and yet still adhere to consensus Open Internet principles.  That claim also overlooks the fact that ISPs nationwide adhered to Open Internet principles *long before* any federal or state mandates existed.  All this reinforces the fact that there have been no Open Internet violations by ISPs not because a handful of state net neutrality laws filled any gap in federal regulation, but rather because it is in ISPs' interest in the highly competitive broadband marketplace to offer customers service that does not block, throttle, or engage in paid prioritization.

Other parties try to downplay the potential impact of the Commission's proposed rules, arguing that the *NPRM* would merely codify the principles underlying California's net neutrality law and other state laws.  But these claims ignore the fact that the *NPRM goes well beyond* those state laws as well as the *2015 Order*, including by (i) reclassifying ISPs as Title II common carriers (which no state law does), (ii) proposing to apply entry and exit regulation under Section 214, and

---

[181] *See* Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 7-8 (filed Apr. 20, 2020); *see also, e.g.*, Daniel Lyons, *One more time: The Verizon-Santa Clara fire dispute has nothing to do with net neutrality*, American Enterprise Institute (Nov. 13, 2019), https://www.aei.org/technology-and-innovation/one-more-time-the-verizon-santa-clara-fire-dispute-has-nothing-to-do-with-net-neutrality/.

[182] *Verizon*, 740 F.3d at 663 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part); *see also, e.g., Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (same); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011) (same).

(iii) significantly expanding the types of regulations the Commission could adopt under Title II, such as for national security, cybersecurity, and various other newfound bases that have never before been relied upon by the Commission as a justification for common carrier regulation of broadband.

Despite the elimination of prescriptive conduct rules, market-based Open Internet principles have become increasingly entrenched since the *2018 Order*, as reflected by statements issued by NCTA's members and other ISPs reaffirming their commitment to protecting the open Internet.  Comcast, for example, has made clear that it "remains committed to an open Internet," with Dave Watson, President and CEO of Comcast Cable, stressing that the company "won't block, throttle or discriminate against lawful content," is "still not creating fast lanes," and has no "plans to enter into any so-called paid prioritization arrangements."[183]  Charter too has confirmed that it "support[s] an open internet," which it describes as "critical to enabling [its] customers to engage with the content they want, when they want, and as much as they want."[184]  Cox likewise "has always been committed to providing an open Internet experience for [its] customers," emphasizing that "the classification of Internet services will not change [its] commitment."[185]

The Commission has previously explained that the FTC Act's prohibition of "unfair or deceptive acts or practices"[186] prevents "companies from selling consumers one product or service

---

[183] *See* Dave Watson, *Comcast Remains Committed to an Open Internet*, Comcast (June 11, 2018), https://corporate.comcast.com/stories/comcast-remains-committed-to-an-open-internet.

[184] *See Charter Remains Committed to an Open Internet; Title II is Not Net Neutrality*, Charter Comms. (June 11, 2018), https://policy.charter.com/blog/charter-remains-committed-open-internet-title-ii-not-net-neutrality.

[185] *See Cox Communications Reaffirms Commitment to Providing an Open Internet Experience*, Cox Communications (Dec. 12, 2017), https://newsroom.cox.com/cox-committed-to-open-internet.

[186] 15 U.S.C. § 45(a).

but providing them something different," which can make "voluntary commitments enforceable."[187]  The Commission's Memorandum of Understanding with the FTC makes clear that "the FTC will investigate and take enforcement action as appropriate against [ISPs] for unfair, deceptive, or otherwise unlawful acts or practices, including but not limited to, actions pertaining to the accuracy of the disclosures such providers make pursuant to the [*2018 Order*]'s requirements, as well as their marketing, advertising, and promotional activities."[188]  The FTC's additional authority to punish "unfair methods of competition" provides yet another basis for enforcement if an ISP were to harm competition and consumers.[189]  And as the Commission is well aware, providers' commitments are enshrined in their disclosures under the Commission's Transparency Rule, which the Commission can independently enforce—holding providers to their obligations to clearly and publicly disclose on their websites the terms and conditions of their broadband offerings, including any practices regarding blocking, throttling, and paid prioritization.[190]

Nor is there even a sound *theoretical* basis to believe that ISPs would begin engaging in abusive practices or backtracking on their commitments, as ISPs lack any incentive or practical ability to block or throttle lawful Internet traffic or to harm customers by creating slow lanes.[191]  Indeed, ISPs' public commitments reflect not only their belief that an open Internet benefits customers but also their recognition that any departure from these principles would be wholly

---

[187] *2018 Order* ¶ 141 (internal quotation marks and citations omitted).

[188] Restoring Internet Freedom FCC-FTC Memorandum of Understanding at 2 (Dec. 14, 2017) ("FCC-FTC MOU"), https://www.ftc.gov/system/files/documents/cooperation_agreements/fcc_fcc_mou_internet_freedom_order_1214_final_0.pdf.

[189] 15 U.S.C. § 45(a).

[190] *See* 47 C.F.R. § 8.1; *see also 2018 Order* ¶¶ 218-23.

[191] *Cf. NPRM* ¶¶ 123-29.

App. 879

counterproductive as a business matter.[192]  As Chairwoman Rosenworcel has correctly observed,

consumers purchase broadband services because they value the ability to "go where you want and

do what you want online without your broadband provider getting in the way or making choices

for you."[193]  That is precisely why it would be irrational and self-defeating for ISPs to undermine

the very openness that has long sustained their businesses for some illusory short-term gain.[194]

     Economic analysis of the broadband marketplace powerfully confirms this intuition.  Given

the intense competition in the broadband marketplace,[195] as well as the ease with which consumers

can (and do) switch between broadband providers,[196] an ISP that interferes with its subscribers'

ability to access their chosen content and services without being blocked, throttled, or otherwise

subjected to unreasonable conduct could expect to lose existing customers and fail to attract new

---

[192] *See* Ford Paper at 11-12 ("Within a virtuous circle, *as depicted by the Commission*, there is no incentive for broadband providers to interfere with the edge services to increase profits.  Profits are not increased by blocking, choking, charging fees to edge providers, or even monopolizing edge services (even under favorable assumptions).").

[193] *2018 Order*, Dissenting Statement of Commissioner Jessica Rosenworcel, at 1.

[194] *See id.* ¶ 142 ("[W]e expect that any attempt by ISPs to undermine the openness of the Internet would be resisted by consumers and edge providers.").

[195] *See infra* at 89-90; Israel/Keating/Shampine Declaration ¶ 14 ("[T]he U.S. broadband industry is a highly competitive and well-functioning marketplace, and indeed is one of the great success stories of the U.S. economy.  The vast majority of U.S. consumers today have multiple broadband choices from a variety of providers and technologies, such as fiber, cable, and 5G home internet."); *id.* ¶¶ 23-71 (detailing the numerous indicators of robust competition in the broadband marketplace).

[196] *See, e.g.*, Israel/Keating/Shampine Declaration ¶¶ 69-70 (explaining that "approximately one fifth of customers switch providers every year," and "the credibility of a threatened switch is demonstrated by the success of such requests"); Declaration of Mark A. Israel *et al.*, at 26, attached to Comments of AT&T Services Inc., WC Docket No. 17-108 (filed July 17, 2017) ("2017 Israel Declaration") ("The ability to switch fixed access providers is demonstrated by the fact that churn is an important strategic focus in the broadband Internet access industry.").

**App. 880**

ones.[197] The risk of such backlash is as acute today as it has ever been, given the intense public focus on companies' online practices and the ease with which consumers and media outlets can disseminate information about alleged abuses. And this risk is not merely hypothetical— "consumers are well-informed about the quality attributes [of], and are sensitive to quality differences between[,] providers," with survey data confirming that "consumers switch broadband providers frequently" and that a significant majority of subscribers "would switch to a competing service if their ISP started to block or charge extra to use high-bandwidth internet services."[198]

Just as there is no evidence of pervasive market power that could justify forced common carriage, claims of a "terminating [access] monopoly" are incorrect.[199] Assertions that reclassification of broadband is necessary to combat a terminating access monopoly in the Internet marketplace are premised on a fundamental misunderstanding of the concept, which is relevant only in the context of legacy telephone service.[200] When long distance carriers were required to

---

[197] See Israel/Keating/Shampine Declaration ¶ 70 ("[S]urveys indicate that consumers would switch if they felt their broadband provider started to block, slow down, or impose other restrictions on the content they demanded. . . . [T]his is competition in action: anti-consumer actions by broadband providers would lead to substantial costs in the form of consumer departures."); 2017 Israel Declaration at 27 ("The fact that consumers have—and can make use of—a credible threat to switch fixed broadband Internet access providers is well-recognized in the industry. . . . Notably, this threat to switch also serves to discipline Internet provider behavior."); John W. Mayo *et al.*, An Economic Perspective of Title II Regulation of the Internet, WC Docket No. 17-108, at 3 (filed July 17, 2017) ("In theory, substantial switching costs facing consumers could enhance ISPs' market power by locking consumers to their initial broadband provider. In practice, however, data reveal that both a rapidly growing market (compelling competition for new customers) and the propensity of consumers to switch (compelling competition to retain customers) mitigate such concerns.").

[198] Andres V. Lerner and Janusz A. Ordover, "An Economic Analysis of Title II Regulation of Broadband Internet Access Providers," at 27-28, attached as Exhibit A to Comments of Verizon, WC Docket No. 17-108 (filed July 17, 2017); *see also* Israel/Keating/Shampine Declaration ¶¶ 69-70.

[199] *Cf. NPRM* ¶ 124.

[200] *See* Jonathan E. Nuechterlein & Christopher S. Yoo, *A Market-Oriented Analysis of the "Terminating Access Monopoly" Concept*, 14 Colo. Tech. L.J. 21, 26 (2015).

pay whatever access charge a called party's local exchange carrier ("LEC") levied pursuant to tariff in order to pass on the traffic and satisfy their call-completion obligations, the LEC did have the ability (absent regulation) to levy excessive fees to terminate the long distance carrier's traffic, given the mandatory nature of *tariffed* charges and the fact that the LEC offered the *only* last-mile route to access the end user customer. But that is simply not true with respect to ISPs, due to the *absence of tariffs* and the robustly competitive nature of the Internet peering and transit marketplace, which provides *multiple* last-mile routes to the end user customer.[201] Whereas long distance carriers had no choice but to terminate calls to the particular LEC chosen by the called party, there are many paths—many of which are "settlement free"—through which content can be delivered to ISPs' customers, thereby ensuring the efficiency of interconnection arrangements.[202] In short, the "terminating access monopoly" concept has no bearing on the broadband marketplace—and certainly provides no rational basis for classifying broadband as a Title II telecommunications service.

    2.    *The Commission May Not Single Out ISPs for Onerous Regulation While Ignoring the Risks Posed By Other Participants in the Internet Ecosystem*

Even if the Commission could rationally advance a theory of potential harm—which, as we have clearly demonstrated above, it cannot—reclassifying broadband as a telecommunications service still would be arbitrary and capricious, because it would impose heavy-handed common carrier regulation, Open Internet mandates, and new privacy and data security restrictions and

---

[201] *See* Israel/Keating/Shampine Declaration at ¶¶ 55-56 ("Transit prices have been declining for many years," and "the option to interconnect with ISP networks via transit arrangements gives content providers an alternative option should broadband providers attempt to negotiate paid interconnection.").

[202] *See* Nuechterlein & Yoo, *supra* n.200 at 30-32; *see also* Israel/Keating/Shampine Declaration ¶ 57 ("Given burgeoning consumer choice and the precipitous decline in interconnection pricing, it is clear that no terminating access monopoly exists in the broadband marketplace.").

national security-related obligations on ISPs without accounting for other major participants in the Internet ecosystem, whose business practices are not open or neutral and whose privacy-, data security-, and national security-related risks and harms have been extensively recognized, investigated, penalized, and reported by regulators, legislators, attorneys general, and the media alike.  Indeed, the proposed approach of subjecting ISPs to common carrier regulation while exempting cloud computing companies and large tech platforms from any regulatory oversight has things backwards, since policymakers and industry stakeholders have raised significant questions over whether large tech companies have been engaging in a variety of non-neutral practices.

      For example, observers recently called attention to claims that X, formerly known as Twitter, was engaging in "throttling" by "slowing the speed with which users could access links to the New York Times, Facebook and other news organizations and online competitors."[203]  Some advocates, including Harold Feld of Public Knowledge, have noted that X's alleged conduct implicates broader issues of "neutrality" and "common carriage" online.[204]  Commissioner Carr similarly has observed that "the Biden Administration is currently suing Google and others over what the government views as tech's discriminatory conduct."[205]  And as NCTA and others have documented, this is hardly the first time that the practices of dominant tech platforms—as well as other participants in the Internet ecosystem that can act as gatekeepers and otherwise impact non-

---

[203] Jeremy B. Merrill and Drew Harwell, *Elon Musk's X Is Throttling Traffic to Websites He Dislikes*, Washington Post (Aug. 16, 2023), https://www.washingtonpost.com/technology/2023/08/15/twitter-x-links-delayed/.

[204] Cristiano Lima, *Musk's Throttling of Rivals' Links Stokes Legal Concerns*, Washington Post (Aug. 16, 2023), https://www.washingtonpost.com/politics/2023/08/16/musks-throttling-rivals-links-stokes-legal-concerns/.

[205] Press Release, Office of Comm'r Brendan Carr, Fact-Checking President Biden's Myth-Filled Plan for Government Control of the Internet, 2 (Oct. 11, 2023), https://docs.fcc.gov/public/attachments/DOC-397587A1.pdf.

discriminatory access to content and services, such as CDNs and transit, cloud, and DNS providers—have raised these sorts of issues.[206]

This mismatch is particularly acute given the *NPRM*'s recognition that "[s]ocial media websites and other platforms particularly have become important platforms for free expression, political engagement, and social activism."[207] Agency action violates the APA where its purported justification is "incongruent with what the record reveals about the agency's priorities and decision-making process."[208] Here, there is significant incongruity between the Commission's proclaimed policymaking objective of protecting a free and open Internet with its inaction with respect to dominant tech platforms—which overwhelmingly have been the focus of recent public debate about Internet openness and principles of non-discrimination. The same is true of the Commission's asserted national security and data privacy rationales for reclassifying broadband under Title II, which ignore the far more significant threats to such interests posed by foreign ownership and/or control of apps such as TikTok, with which Americans—including millions of children—entrust their most sensitive personal information.[209] Similarly, the most significant

---

[206] *See, e.g.*, Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 22-25, 53 (filed Jul. 17, 2017); *cf.* Press Release, Eur. Comm'n, Digital Markets Act: Commission Designates Six Gatekeepers (Sept. 6, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_4328 (announcing the designation of Alphabet, Amazon, Apple, ByteDance, Meta, and Microsoft as Internet "gatekeepers" for purposes of the EU's Digital Markets Act); *Solicitation for Public Comments on the Business Practices of Cloud Computing Providers*, Fed. Trade Comm'n (Mar. 22, 2023), https://www.ftc.gov/policy/studies/submit-comment-cloud-computing-request-information (seeking comment "about the practices of Cloud Computing Providers and their impact on end users, customers, companies, and other businesses across the economy," including with respect to "market power, business practices affecting competition, and potential security risks").

[207] *NPRM* ¶ 53.

[208] *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

[209] *See, e.g.*, Opening Statement of Representative Frank Pallone, Jr. (D-NJ), Ranking Member, Before the U.S. House of Representatives Committee on Energy & Commerce (Mar. 23, 2023),

58

cyber vulnerabilities in the Internet ecosystem involve software in the cloud, not broadband networks.[210]

Critically, NCTA's point is not that the Commission *should* impose net neutrality-type regulations on dominant tech platforms or these other entities. Rather, it is that the Commission's failure to provide a cogent explanation for singling out ISPs for Open Internet mandates undermines the agency's stated regulatory goals.

It likewise is well-established that agency action is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the [regulatory] problem."[211] The same policymakers and stakeholders calling for more stringent regulation of ISPs have argued that dominant tech platforms' practices relating to transparency and openness present comparable, if not greater, public policy concerns.[212] To the extent that the Commission has authority outside Title II to

---

https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/Opening-Statement_Pallone_FC%20HRG_2023-3-23.pdf (asserting that TikTok poses "dangers to our country and to our privacy," and "[n]ational security experts are sounding the alarm" over the app's potential "to compromise device security, maliciously access American user data . . . and undermine American interests"); Testimony of Jon Leibowitz, Former Commissioner and Chair, Federal Trade Commission, Before the U.S. Senate Committee on Commerce, Science, and Transportation (Sept. 23, 2020), https://www.commerce.senate.gov/services/files/3171C7DB-9845-46A1-B519-3A4DDDA41385 (noting that children that "connect[] with their peers on Tik Tok" are subject to risks "from privacy predators and data-amassing cyberazzi").

[210] *See Cybersecurity Advisory: 2022 Top Routinely Exploited Vulnerabilities*, Cybersecurity & Infrastructure Security Agency (Aug. 3, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-215a (identifying vulnerabilities in cloud-based software platforms as being the top targets of routine exploitation by "malicious cyber actors").

[211] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[212] *See* Executive Order on Promoting Competition in the American Economy § 1 (July 9, 2021); Margaret Harding McGill, *How Democrats' big plans for Big Tech shrank to tiny steps*, Axios (Oct. 14, 2022), https://www.axios.com/2022/10/14/democrats-big-tech-regulations-tiny-steps (Statement of Sen. Amy Klobuchar: "There has been no tech competition legislation passed since the dawn of the internet because gatekeeper platforms will stop at nothing to maintain their market power."); Andrew Wyrich, *Talking net neutrality and the digital divide with Gigi Sohn, former*

**App. 885**

regulate broadband services[213]—something that the Commission claims in the *NPRM* by citing Section 706 and other sources of authority for its proposed actions[214]—such authority would apply equally to dominant tech platforms, as well as network providers and other participants in the Internet ecosystem that stand between consumers and their chosen content and services. For example, stakeholders have noted that the Commission could impose disclosure obligations that would require tech platforms to describe in detail their practices that implicate net neutrality concerns.[215]

To be sure, the best approach would be for the Commission to maintain the current light-touch regulatory framework for ISPs, ensuring that they remain on a similar footing as dominant

---

*FCC Counselor*, Daily Dot (Mar. 23, 2021) (Statement of Gigi Sohn: "The Obama administration, I think everybody admits, treated the big tech platforms with kid gloves and that can't be the case anymore."); Marcy Gordon, *Bills that could force Big Tech breakups unveiled in House*, Associated Press (June 11, 2021), https://apnews.com/article/government-and-politics-joe-biden-amazoncom-inc-apple-inc-technology-4c2765b955e4c556002aebb8e48d3c21 (Statement of Rep. Cicilline: "Right now, unregulated tech [platforms] . . . are in a unique position to pick winners and losers, destroy small businesses, raise prices on consumers and put folks out of work. Our agenda will level the playing field."); Lauren Feiner, *Big Tech critic Tim Wu joins Biden administration to work on competition policy*, CNBC (Mar. 5, 2021), https://www.cnbc.com/2021/03/05/big-tech-critic-tim-wu-joins-biden-administration-to-work-on-competition-policy.html (White House Press Secretary Jen Psaki stating: "Tim [Wu] will help advance the president's agenda which includes addressing the economic and social challenges posed by the growing power of tech platforms.").

[213] Notably, the Supreme Court observed in *Brand X* that the Commission may rely on its "Title I ancillary jurisdiction" to "impose special regulatory duties" on providers of information services. *Brand X*, 545 U.S. at 996. The D.C. Circuit also upheld the Commission's previous reliance on Section 706 as a source of regulatory authority to impose non-common-carrier obligations on information-service providers. *See Verizon v. FCC*, 740 F.3d 623, 628 (D.C. Cir. 2014).

[214] The D.C. Circuit held in *Verizon* that the Commission may rely on Section 706 to impose rules on information service providers governing their "treatment of Internet traffic," provided that such rules do not amount to common-carrier obligations. *See id.* at 628, 642. Section 706 accordingly cannot support the common-carrier mandates proposed in the *NPRM*, which would leave "no room at all for individualized bargaining." *Id.* at 657 (internal quotation marks and citations omitted).

[215] *See In re Section 230 of the Communications Act*, Petition for Rulemaking of the National Telecommunications and Information Administration at 49-52 (July 27, 2020).

**App. 886**

tech platforms and other entities that can impede consumers' access to content and services of their choice. If, however, the Commission intends to impose onerous regulatory obligations on ISPs alone, it can only do so if it can offer a reasoned explanation, which it has not and cannot, for why it is ignoring dominant tech platforms and other participants in the Internet ecosystem that have an equal or greater ability to stand in the way of consumer choice, an Open Internet, privacy and data security protections, and the other policy rationales asserted in the *NPRM*.

Even if the Commission believes that it lacks jurisdiction over dominant tech platforms and other edge providers, it would be required at minimum to explain why it is not proposing to coordinate with the FTC to address the transparency, openness, and other concerns presented by the practices of these other participants in the Internet ecosystem. Further, the Commission would need to explain why it lacks jurisdiction over other entities like cloud providers, CDNs, and overseas landing facilities, that occupy parts of the physical broadband network.[216]

The simple fact is that the Commission *has not provided and cannot provide* such reasoned explanations, and for this additional reason its proposed Title II regulation of broadband is arbitrary and capricious.

## II.    REIMPOSING TITLE II REGULATION ON BROADBAND ALSO IS UNNECESSARY AND WOULD BE UNWISE AS A POLICY MATTER

The *NPRM* posits that, "[g]iven how essential BIAS is to consumers' daily lives,"[217] reclassifying broadband as a telecommunications service is necessary to protect the openness of the Internet, as well as to achieve a laundry list of other policy objectives. But however essential broadband may be, that alone is insufficient to justify the imposition of heavy-handed, utility-style

---

[216] *See supra* n.206 (noting the FTC's recently opened proceeding on competitive concerns in the cloud computing marketplace).

[217] *NPRM* ¶ 21.

**App. 887**

regulation on ISPs. Scholars have long recognized that the essential nature of a product or service does not warrant regulation absent an abuse of market power,[218] which will typically involve companies with "significant and durable" monopoly power.[219] That is why many essential needs in our lives—such as food staples or housing—are not subject to utility-style regulation. Competition among sellers of essential goods and services promotes quality improvements and drives down prices. So, too, in the broadband arena: Market forces, backed by an array of existing statutory provisions and regulations, are more than sufficient to protect consumers. The *NPRM* gives short shrift to the robust and growing competition among broadband providers, failing to recognize that such competition deters practices that consumers find objectionable.[220] And while

---

[218] *See, e.g.*, Howard A. Shelanski, *Adjusting Regulation to Competition: Toward a New Model for U.S. Telecommunications Policy*, 24 YALE J. REG. 55, 58 (2007) (explaining that early justifications for telecommunications regulation stemmed from "dominant provider[s']" offering "an important service"); Stephen G. Breyer, REGULATION AND ITS REFORM 15-35, 156-83 (1982) (discussing "Typical Justifications for Regulation," including "The Control of Monopoly Power"); Alfred E. Kahn, THE ECONOMICS OF REGULATION: PRINCIPLES AND INSTITUTIONS, Vol. 1, 11 (1970) (discussing various economic rationales for the institution of regulated monopolies beyond the importance of an industry, including a firm's status as a natural monopoly and the lack of effective competitive constraints). *See also Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, Further Notice of Proposed Rulemaking, 84 FCC 2d 445 ¶ 6 (1980) (explaining that Title II was devised "primarily . . . to constrain the exercise of substantial market power possessed by firms providing communications services in 1934"); *id.* ¶ 35 (explaining that "the regulatory measures of the sort contained in Title II make sense only in the context of an industry lacking beneficial competitive restraints").

[219] FTC, *Monopolization Defined*, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined; *see also, e.g.,* DOJ, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 2*, U.S. Dep't of Just. Archives (last updated March 18, 2022), https://www.justice.gov/archives/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2 (explaining that courts have consistently defined monopoly power as "the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion").

[220] *See* Israel/Keating/Shampine Declaration ¶¶ 69-70 ("[S]urveys indicate that consumers would switch if they felt their broadband provider started to block, slow down, or impose other restrictions on the content they demanded. . . . [T]his is competition in action: anti-consumer

**App. 888**

the *NPRM* points to many supposed gaps in authority that purportedly warrant the imposition of common carrier regulation, such "gaps" are illusory, as the *NPRM* overlooks relevant Commission authority that does not depend on broadband classification, as well as extensive regulatory oversight by other agencies with relevant expertise. Even apart from the limits imposed by the major questions doctrine, the Commission cannot justify reclassification based on purported gaps in authority or oversight when other federal agencies are empowered to address the asserted policy concerns.

Moreover, many of the policy rationales asserted in the *NPRM*—including most notably expanding broadband access and adoption—would be undermined, rather than advanced, by common carrier regulation. The Biden Administration, for example, has made clear that its primary broadband policy goals include "promot[ing] competition, lower prices, and a vibrant and innovative . . . ecosystem,"[221] and it has staked the success of its signature BEAD program and other initiatives on coupling private investment with government support to expand access to broadband services.[222] The light-touch regulatory approach under which the Internet has flourished—both before and after the Commission's short-lived detour to Title II regulation of broadband between 2015 and 2017—provides the most effective means of pursuing these goals. Title II would only discourage the continued large-scale investments by industry participants that will be required for BEAD and related initiatives to succeed.

---

actions by broadband providers would lead to substantial costs in the form of consumer departures.").

[221] Executive Order on Promoting Competition in the American Economy § 5(l) (July 9, 2021).

[222] *See* Press Release, NTIA "Ensuring Robust Participation in the BEAD Program" (Nov. 1, 2023), https://www.ntia.doc.gov/blog/2023/ensuring-robust-participation-bead-program (noting that the contribution of private capital to broadband deployment efforts under the BEAD program is intended to "ensur[e] that subgrantees have the capacity not just to build and deploy high-speed Internet networks but to operate those networks for years to come, delivering Internet connectivity to areas that for too long have been left behind").

**App. 889**

## A. Title II Reclassification Is Not Necessary To Promote Internet Openness

When the Commission adopted the *2015 Order*, it asserted that doing so was necessary to provide "a strong legal foundation" for Open Internet rules "to survive and thrive."[223] Notwithstanding that broadband providers have steadfastly adhered to openness principles over the last five-plus years *without* Title II regulation—to say nothing of the long and successful period of light-touch regulation under Title I before 2015—the *NPRM* repeats that dubious rationale.[224] But the notion that Title II regulation is required to "ensure consumers can use their BIAS connections in all the lawful ways they see fit"[225] is less persuasive than ever. ISPs across the nation, large and small, provide unfettered access to lawful content, applications, and services. While proponents of Title II regulation continue to conjure up boogeymen, speculating about potential abusive practices by broadband providers, there is simply no real-world evidence of ISPs' violating Open Internet norms. That should come as no surprise, as ISPs have strong, market-based incentives not to undermine the value and competitiveness of their services by engaging in blocking, throttling, or other harmful conduct.[226] ISPs have made clear public commitments not to engage in such conduct, and the Commission has explained its view in the past that those commitments are legally enforceable by the FTC and state attorneys general under federal and state consumer protection laws.[227] The Commission also may enforce its Transparency Rule to ensure that any changes to these commitments are made public.[228] And as discussed in Section III

---

[223] *2015 Order* ¶ 5.

[224] *See NPRM* ¶¶ 21-24.

[225] *Id.* ¶ 23.

[226] *See supra* at 53-55; *see also* Ford Paper at 11-12.

[227] *See 2018 Order* ¶ 141.

[228] *See supra* n.190 and accompanying text.

below, if policymakers conclude that a further backstop to these enforceable commitments is warranted, the best approach would be for Congress to act on a bipartisan basis to codify consensus Open Internet principles into law.

Far from being necessary to protect consumers, reclassification of broadband under Title II would divest the FTC of jurisdiction over ISPs and therefore leave consumers *less* protected. As reflected in the Memorandum of Understanding between the Commission and the FTC, Section 5 of the FTC Act currently enables the FTC to "investigate and take enforcement action as appropriate against [ISPs] for unfair, deceptive, or otherwise unlawful acts or practices, including but not limited to, actions pertaining to the accuracy of the disclosures such providers make pursuant to the [*2018 Order*]'s requirements, as well as their marketing, advertising, and promotional activities."[229] Section 5 also prohibits "unfair methods of competition," providing the FTC with additional authority to address any anticompetitive ISP conduct even in the absence of ISP commitments.[230] Because the FTC lacks jurisdiction over common carriers,[231] however, reclassifying broadband as a telecommunications service would strip the agency of its authority to oversee ISPs' business practices. To be sure, the Commission would be able to replace *some* of that oversight authority under Title II, but, critically, the Commission has disclaimed authority to address far more significant threats to openness in the Internet ecosystem, as it has long taken the position that any harms caused by tech platforms fall outside the Commission's subject matter

---

[229] FCC-FTC MOU at 2; *see also* 15 U.S.C. § 45(a)(1).

[230] 15 U.S.C. § 45(a)(1).

[231] *See id.* § 45(a)(2).

jurisdiction.[232]  As a matter of both law and policy,[233] deferring to the FTC's holistic oversight of all participants in the Internet marketplace makes far more sense than subjecting ISPs to unique rules and divesting the FTC of its authority.

**B.      Title II Regulation of Broadband Also Is Unnecessary To Achieve the Commission's Other Asserted Policy Objectives**

Given the absence of evidence supporting the stale, disproven, and speculative theories that ISPs will undermine the Open Internet without Title II regulation, it is hardly surprising that the *NPRM* cobbles together a host of newly claimed rationales for reclassification.  The *NPRM* suggests that Title II reclassification suddenly is now necessary to achieve a slew of other policy goals, including expanded oversight relating to national security and law enforcement; public safety and network reliability and resiliency; cyber security, data security, and consumer privacy; disability access; and pole attachments, multi-tenant environments, and freedom of expression and digital equity.[234]  But insofar as the *NPRM* identifies legitimate policy objectives, they are already adequately addressed by existing measures implemented by the Commission and other agencies, without regard to the classification of broadband.  The Commission's effort to identify gaps in authority thus rings hollow.  And again, even if such gaps actually existed, the major questions doctrine would require that Congress address them.[235]

---

[232] *See Preserving the Open Internet, Broadband Industry Practices*, Report and Order, 25 FCC Rcd. 17905, ¶ 50 (2010) (asserting that the Open Internet rules "apply only to the provision of broadband Internet access service and not to edge provider activities, such as the provision of content or applications over the Internet," based on the view that edge provider activities do not entail "communication by wire and radio" under Section 1 of the Act).

[233] *See supra* at Section I.C (explaining why a myopic focus on ISPs would be arbitrary and capricious).

[234] *See NPRM* ¶¶ 25-55.

[235] *See supra* at Section I.A.

1. *There are No "Gaps" in the Federal Government's Ability to Address National Security and Law Enforcement Risks*

The *NPRM* proceeds from the assumption that the Commission alone is charged with safeguarding national security in the broadband arena, but that is plainly not the case. Congress has established a whole-of-government approach in which the Commission plays a circumscribed and complementary role. The Commission's existing authority, together with other agency requirements and processes under other statutes, is sufficient to safeguard America's communications networks from threats posed by foreign adversaries or other national security concerns.

As for the Commission's own authority, its robust response to national security and law enforcement concerns over the last several years—during which broadband has been classified as an information service—belies the notion that Title II reclassification is necessary to protect the U.S. communications sector from such threats. Among other actions, the Commission has prohibited the use of Universal Service Fund ("USF") support to purchase equipment and services from Huawei, ZTE, and other companies purportedly under the influence and control of the Chinese and Russian governments, pursuant to the Secure and Trusted Communications Networks Act of 2019;[236] it has begun requiring USF support recipients to remove such equipment and services from their networks altogether;[237] and it has ceased issuing equipment authorizations to

---

[236] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd. 11423 ¶¶ 26, 43 (2019).

[237] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd. 14284 ¶ 17 (2020).

**App. 893**

Huawei, ZTE, and the other covered companies, pursuant to the Secure Equipment Act of 2021.[238] Moreover, the Commission long ago required ISPs to comply with the "assistance capability requirements" under the Communications Assistance for Law Enforcement Act ("CALEA"), which facilitates lawful surveillance for national security and law enforcement purposes, and the D.C. Circuit upheld that decision.[239] None of these actions was impeded in any way by broadband's information-service classification.

The Commission also has revoked the international Section 214 authorizations of several carriers whose ties to the Chinese government were found to present significant national security and law enforcement concerns, precluding them from continuing to operate as telecommunications carriers in the United States.[240] The *NPRM* notes that these decisions do not prevent these companies from offering broadband Internet access service,[241] but that is beside the point, as the records in those proceedings nowhere indicate that any of the Chinese carriers provides mass market broadband and thus they would not be subject to the Title II regulatory framework proposed

---

[238] *See Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 ¶ 32 (2022).

[239] *See Am. Council on Educ. v. FCC*, 451 F.3d 226 (D.C. Cir. 2006) (upholding the Commission's application of CALEA to broadband, notwithstanding its information-service classification); *see also* 47 U.S.C. § 1002.

[240] *See China Telecom (Americas) Corp.*, Order on Revocation and Termination, 36 FCC Rcd. 15966 (2021); *China Unicom (Americas) Operations Ltd.*, Order on Revocation, 37 FCC Rcd. 1480 (2022) ("*China Unicom Order*"); *Pacific Networks Corp. and ComNet (USA) LLC*, Order on Revocation and Termination, 37 FCC Rcd. 4220 (2022); *Pac. Networks Corp. v. FCC*, 77 F.4th 1160, 1162 (D.C. Cir. 2023) (denying petition for review of revocation of operating authority of Pacific Networks and ComNet); *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256, 261 (D.C. Cir. 2022) (denying petition for review of revocation of China Telecom's operating authority); *see also China Mobile International (USA) Inc. Application for Global Facilities-Based and Global Resale International Telecommunications Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended*, Memorandum Opinion and Order, 34 FCC Rcd. 3361 ¶ 8 (2019) (denying application for international Section 214 authority based on related concerns).

[241] *See NPRM* ¶ 27.

by the *NPRM*.[242]  The fact that such Chinese carriers today participate in IP traffic-exchange and offer private carrier services in the enterprise marketplace—*and could continue to do so even if the Commission were to reclassify broadband as a telecommunications service under Title II*—makes clear that Title II is irrelevant to the government's ability to respond to the asserted security risks.[243]  Moreover, insofar as the Commission remains concerned about the potential risks posed by these companies' ongoing operations in the United States, it could address that concern much more directly, reasonably, and effectively by taking steps to prevent carriers over which it has authority (under Title II or otherwise) from interconnecting with them.[244]  Preventing bad actors from interconnecting with other network operators would be fatal to their viability as ISPs—just as the Commission has sought to snuff out bad-actor voice providers by preventing others from exchanging traffic with them in the robocall context.[245]  In contrast, not only would subjecting ISPs to burdensome utility-style regulation fail to address any purported national security concerns, but the Commission's attempt to combat these supposed risks by reclassifying

---

[242] *See, e.g.*, *China Unicom Order* ¶¶ 9-10 (observing that China Unicom reported providing or having provided telecommunications services such as private line services, mobile virtual network services, private leased circuits, and international wholesale voice services, as well as information services such as multi-protocol label switching virtual private line services, IP transit services, and dedicated Internet access services, but not mass-market, retail broadband services).

[243] Rather, the appropriate response would come from other governmental mechanisms described below, such as the Commerce Department's ICTS Supply Chain rule.

[244] *See* Testimony of Brendan Carr, Commissioner, Federal Communications Commission, Before the Subcommittee on Communications & Technology of the U.S. House of Representatives Committee on Energy & Commerce 3 (Mar. 31, 2022), https://docs.house.gov/meetings/IF/IF16/20220331/114545/HHRG-117-IF16-Wstate-CarrB-20220331.pdf.  Relatedly, as noted above, it would be arbitrary and capricious to limit regulation in the traffic-exchange arena to ISPs given that purported threats and harms may emanate from other sources.  *See supra* at Section I.C.2.

[245] *See, e.g.*, 47 C.F.R. § 64.6305(e)(1)-(3) (requiring voice providers to cease accepting calls directly from entities that have been de-listed from the Robocall Mitigation Database).

**App. 895**

broadband under Title II would be doubly ineffective given the likelihood that such a classification will be overturned in court or reversed with the next change in Administration.

In addition to mischaracterizing the Commission's existing authority and recent actions, the *NPRM* simply ignores the extensive oversight and remedial authority already available through other federal government mechanisms. For example, the *NPRM* overlooks the critical role played by the Committee on Foreign Investment in the United States ("CFIUS"), which reviews foreign investments in the U.S. communications sector—including investments in broadband networks and services—and can recommend that the President block or condition transactions where necessary to prevent harm from foreign adversaries. The Commission also refers applications for international Section 214 authorizations or to transfer control of such authorizations or Title III licenses to the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (informally known as "Team Telecom") for review of potential national security issues. As the Commission recognized when it forbore from Section 214 in the *2015 Order*, many such applicants—including most wireline telecommunications carriers, wireless providers, and cable operators—provide broadband services, which Team Telecom already considers in its review of applicants' telecommunications services.[246] Even more broadly, the Information and Communications Technology Supply Chain Rule ("ICTS Rule"), authorizes the Department of Commerce, in consultation with national security agencies, to block, condition, or unwind any "transaction" (which is defined very broadly to include not just mergers but also the "use" of services) involving an entity subject to the jurisdiction of a foreign adversary

---

[246] *See 2015 Order* ¶ 511 & n.1562.

that poses national security risks.[247]  Various other measures, including restrictions under the National Defense Authorization Act of 2019 on federal contractors that use covered telecommunications equipment and services from specified companies in China, Russia, and other jurisdictions deemed to pose a threat to U.S. national security; export restrictions imposed by Commerce Department's Bureau of Industry and Security ("BIS"), which regulates the export, reexport, or transfer (in-country) of technology, software, and commodities that are subject to the Export Administration Regulations ("EAR"); and trade prohibitions resulting from designations on the Chinese Military-Industrial Complex Companies List and other entity lists, further ensure that the federal government as a whole can detect and respond to potential national security threats—again, irrespective of how broadband is classified.

Notably, all of these oversight mechanisms, restrictions, and review processes, whether managed by the Commission or other agencies, were implemented pursuant to express congressional authorization.  *It is telling that Congress conferred the relevant authority on the Commission and other agencies with full knowledge of broadband's information-service classification, and nowhere suggested that reclassifying broadband was either necessary or permissible.*  If Congress identifies additional steps that it believes the Commission is in the best position to take "to protect the national defense,"[248] its recent actions leave no doubt that it will provide targeted authority as needed.

---

[247] *See* Securing the Information and Communications Technology Services Supply Chain, 86 Fed. Reg. 4909 (Jan. 19, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-19/pdf/2021-01234.pdf.

[248] *See NPRM* ¶ 26.

**App. 897**

*Title II Reclassification Is Not Necessary To Protect Public Safety or Ensure Network Reliability and Resiliency*

By the same token, public safety communications already are adequately protected under the existing regulatory regime. As the *NPRM* correctly recognizes, public safety agencies typically purchase *dedicated* Internet access services, such that any reclassification of *mass-market* broadband would have no direct bearing on such users, which already enjoy the quality-of-service guarantees associated with enterprise-grade offerings.[249] Moreover, ISPs have no incentive to block, throttle, or otherwise disrupt public safety communications, or otherwise impede the public's access to critical resources and information during emergencies.[250] If anything, retaining a light-touch regulatory regime for broadband would benefit public safety users by allowing ISPs to prioritize such critical traffic in times of emergency without fear of becoming subject to enforcement action for being "non-neutral."[251] And in all events, the robust investment and innovation attributable to the Commission's existing light-touch regulatory framework benefit both public safety agencies and consumers that communicate with those entities.

Nor is reclassifying broadband as a telecommunication service under Title II necessary to ensure the resiliency and reliability of the nation's communications networks. As an initial matter, ISPs recognize the importance of maintaining the resiliency and reliability of their networks, for public safety purposes and otherwise, and they know full well that they would have to answer to customers and policymakers if they fail to do so. ISPs' business-driven commitment to ensuring

---

[249] *See id.* ¶ 34.

[250] As noted above, the allegations concerning supposed "throttling" of a fire department's mobile broadband service in Santa Clara, California have been thoroughly debunked. *See supra* n.181 and accompanying text.

[251] *See, e.g.*, John Hendel, *VA Asking California if Net Neutrality Law Will Snag Veterans' Health App*, Politico (Mar. 24, 2021), https://www.politico.com/states/california/story/2021/03/24/va-asking-california-if-net-neutrality-law-will-snag-veterans-health-app-1369440.

network resiliency and reliability is a major reason why broadband networks in the United States passed the "stress test" of the COVID-19 pandemic with flying colors. In any event, the *NPRM*'s suggestion that the Commission "lack[s] reliable outage information for today's modern, essential broadband networks" is not accurate.[252] In addition to broadband, most ISPs also offer cable, telecommunications, or interconnected VoIP services, each of which is subject to the Commission's existing outage reporting rules.[253] Accordingly, in many cases, these ISPs' outage reports *already* cover the broadband components of their commingled networks. While the relatively few ISPs that offer only broadband are not similarly subject to these requirements, the *NPRM* does not demonstrate that obtaining a limited amount of additional information about this very small subset of broadband-only networks comes close to justifying the overwhelming burdens that Title II reclassification would impose on the entire broadband industry, much less the resultant harms for consumers and society.[254]

> 3. *Cybersecurity, Data Security, and Consumer Privacy Already Are Protected Under the Existing Regime, Which Includes Oversight by the FTC, Other Expert Federal Agencies, and Extensive State Regulation*

There is no doubt that cybersecurity, data security, and consumer privacy are vital matters on which the federal government should be focused.[255] But the *NPRM* fails to recognize that Congress already has carefully defined the Commission's authority over these issues, making clear that the FTC and other agencies have the relevant expertise and resources to provide oversight. With respect to cybersecurity, the *NPRM* observes that the Commission has been "task[ed] . . .

---

[252] *NPRM* ¶ 39.

[253] *See* 47 C.F.R. § 4.3.

[254] *See Michigan v. EPA*, 576 U.S. 743, 759-60 (2015) (explaining that agencies have a responsibility to weigh overwhelming costs against speculative benefits).

[255] *See NPRM* ¶¶ 30, 41.

with 'identifying communications sector vulnerabilities and working with industry and other stakeholders to address those vulnerabilities . . . [and] to increase the security and resilience of critical infrastructure within the communications sector,'" and that, to this end, it "is actively involved in federal interagency cybersecurity planning, coordination, and response activities."[256] Those efforts, which NCTA applauds, do not depend on classifying broadband as a Title II service, especially given the appropriate focus on cooperative efforts with industry and interagency coordination (as opposed to common carrier mandates, which would be entirely misplaced). Notably, the Commission's proposed adoption of a Cyber Trust Mark for Internet-of-Things devices would be (appropriately) based on Section 302 of the Act, and thus would apply without regard to broadband classification.[257]  The *NPRM* fails to identify any additional steps the Commission has sought to take, or might take in the future, to help protect communications or devices from cybersecurity threats that would require classification of broadband as a telecommunications service.

Moreover, as with national security, the *NPRM* ignores the reality that Congress did not charge the Commission with leading federal governmental efforts to promote cybersecurity, and that there is no gap that would justify—let alone necessitate—the new role that the Commission proposes to create for itself.  Indeed, the *NPRM* all but ignores the array of other agencies that provide a coordinated, government-wide approach to cybersecurity, as well as longstanding public-private partnerships, neither of which depend in any way on broadband classification.  The existing regime includes the following:

- In 2006, the Department of Homeland Security ("DHS") established the Critical Infrastructure Partnership Advisory Council ("CIPAC") to facilitate interaction

---

[256] *See id.* ¶ 30.

[257] *See Cybersecurity Labeling for Internet of Things*, PS Docket No. 23-239, Notice of Proposed Rulemaking, FCC 23-65, ¶ 57 (rel. Aug. 10, 2023).

between governmental entities and representatives from the community of critical infrastructure owners and operators. CIPAC is aligned with the National Infrastructure Protection Plan and Presidential Policy Directive 21, Critical Infrastructure Security and Resilience. DHS was designated as the Sector Risk Management Agency for Communications under PPD-21 in 2013.

- In 2018 Congress established the Cybersecurity and Infrastructure Security Agency ("CISA"), which reorganized and elevated the mission of DHS's former National Protection and Programs Directorate ("NPPD"), establishing CISA as the Federal leader for cyber and physical infrastructure security, complementing additional work undertaken by the National Institute of Standards and Technology and the National Telecommunications and Information Administration (both within the Commerce Department), the FTC, and other agencies.[258]

- Communications industry participants work closely with CISA and other federal agencies through three principal organizations that provide the policy, planning, and operations framework necessary to safeguard the security of communications networks and services. These include:

  o The National Security Telecommunications Advisory Committee ("NSTAC"), which was created in 1982 and includes up to 30 chief executives from major telecommunications providers and information technology, finance, and aerospace companies. NSTAC provides policy recommendations intended to assure the continuity of vital telecommunications links through any event or crisis.

  o The Communications Sector Coordinating Council ("C-SCC"), which was chartered in 2005 to help coordinate initiatives to improve the physical and cyber security of sector assets; to ease the flow of information within the sector, across sectors, and with designated Federal agencies; and to address issues related to response and recovery following an incident or event. The C-SCC includes wireline and wireless telecommunications carriers, cable operators, broadcasters, satellite providers, equipment vendors, and other industry representatives.

  o The National Coordinating Center for Telecommunications Communications, Information Sharing and Analysis Center ("C-ISAC"), which facilitates the exchange of information among government and industry participants regarding vulnerabilities, threats, intrusions, and anomalies affecting telecommunications infrastructure.[259]

---

[258] *See, e.g.*, NTIA, *One Byte at a Time: NTIA's Approach For a Trustworthy and Secure Internet* (Oct. 26, 2023), https://www.ntia.gov/blog/2023/one-byte-at-a-time-ntias-approach-for-a-trustworthy-and-secure-internet (describing NTIA's efforts, in partnership with DHS and in consultation with other federal agencies, including the Commission, "to improve the resilience of the Internet ecosystem" in the face of botnets and other automated network threats).

[259] Additional public-private initiatives under CIPAC include the Enduring Security Framework ("ESF"), a cross-sector working group that to address threats and risks to the security and stability

**App. 901**

Reclassifying BIAS as a Title II service would not improve this well-established and carefully coordinated process.[260] If anything, it would likely prove detrimental because cybersecurity requires a whole-of-government approach, not sector-specific governance.

The same is true with respect to consumer privacy. Cable operators already are subject to Section 631 of the Communications Act, which imposes various requirements to safeguard subscriber privacy for "any cable service *or other service*."[261] Moreover, relying on its authority under the Telephone Consumer Protection Act ("TCPA") and the Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act"), the Commission has acted

---

[260] of U.S. National Security Systems and critical infrastructure; the Joint Cyber Defense Collaborative, which CISA established in 2021 unify cyber defenders from organizations worldwide; the ICT Supply Chain Risk Management Task Force, a public-private partnership established in 2018 to identify challenges and develop actionable solutions to enhance global ICT supply chain resilience; and the National Security Information Exchange ("NSIE"), an information-sharing forum charged by NSTAC with devising strategies for mitigating cyber threats to telecommunications networks and enhancing national security and emergency preparedness.

[260] Should the Commission nonetheless adopt new unnecessary and unjustified rules, it must also make clear that "reasonable network management" includes ISP policies and practices aimed at detecting and deterring the flow of malicious and unlawful traffic and devices. Reaffirming that reasonable network management includes cybersecurity measures—as the Commission did in both 2010 and 2015—will advance the Commission's goal of "enhanc[ing] cybersecurity in the communications sector," *NPRM* ¶ 30, by removing uncertainty regarding the ability of ISPs to protect their networks and their subscribers from this traffic. In this regard, the Commission should also reaffirm that providers may address harmful devices and clarify that both fixed and mobile broadband providers may use reasonable network management to address the new cybersecurity threats that connected devices pose to networks and consumers. In the *2015 Open Internet Order*, the Commission expressly found that "reasonable network management" included efforts to "implement network management practices that are primarily used for, and tailored to, ensuring network security and integrity, including by addressing traffic that is harmful to the network, such as traffic that constitutes a denial-of-service attack on specific network infrastructure elements." Broadly recognizing that "reasonable network management" includes efforts by ISPs to detect and address the threat of malicious traffic, including by addressing the threats from unsecured or compromised devices, will help enhance the cybersecurity of broadband networks and consumers by giving ISPs the flexibility to deploy innovative solutions to the ever-evolving landscape of cyber threats.

[261] 47 U.S.C. § 551(a)(1) (emphasis added).

76

aggressively to protect "consumer privacy by combating illegal robocalls and robotexts."[262]  Many of these initiatives have been undertaken in partnership with industry stakeholders, and NCTA and its members are eager to continue cooperating with the Commission on such efforts.  However, to the extent that the Commission believes that it currently lacks sufficient statutory authority under the TCPA and the TRACED Act to effectively address bad actors' evolving techniques "to interrupt consumers and perpetuate fraud" via robocalls and robotexts,[263] it should look to Congress for additional authority, rather than shoehorn this important issue into the largely unrelated debate regarding the regulatory treatment of ISPs, as the *NPRM* attempts to do.

More broadly, data security and consumer privacy already are subject to comprehensive oversight by the FTC.[264]  As described above, the FTC has long exercised its consumer protection authority under Section 5 of the FTC Act to oversee ISPs' business practices, including those related to the protection of consumers' online data and the privacy.  Far from bolstering that authority, Title II reclassification would *divest* the FTC of its jurisdiction over broadband providers, thereby balkanizing federal oversight of the privacy practices of participants in the Internet ecosystem between the Commission and the FTC, depending on the type of service that a particular company provides.  Among other consequences, ISPs would no longer be permitted to participate in the Data Privacy Framework that the FTC has worked painstakingly to establish with its EU counterparts to facilitate transfers of personal data between the two jurisdictions.[265]

---

[262] *See NPRM* ¶ 45.

[263] *Id.*

[264] In addition, several states have enacted laws that impose substantive consumer data privacy requirements, and many also impose data breach reporting obligations.

[265] *See How to Join the Data Privacy Framework (DPF) Program (part 1)*, Data Privacy Framework Program, https://www.dataprivacyframework.gov/s/article/How-to-Join-the-Data-Privacy-Framework-DPF-Program-part-1-dpf (last visited Dec. 13, 2023) ("Only U.S. legal

**App. 903**

Likewise, broadband providers would not be subject to any rules that the FTC adopts in its ongoing proceeding regarding commercial surveillance and data security.[266] Such a fractured framework would be contrary to the longstanding bipartisan consensus that it would be most efficient and effective for a single agency to regulate with respect to online privacy issues.[267] Indeed, Congress took the extraordinary step of nullifying, under the Congressional Review Act, the Commission's previous effort to establish sector-specific privacy rules targeting ISPs.[268] The *NPRM* largely

---

entities subject to the jurisdiction of the [FTC] or the U.S. Department of Transportation . . . are currently eligible to participate in the DPF program.").

[266] *See Commercial Surveillance and Data Security Rulemaking*, FTC (Aug. 11, 2022), https://www.ftc.gov/legal-library/browse/federal-register-notices/commercial-surveillance-data-security-rulemaking.

[267] *See, e.g.*, Cameron F. Kerry, *Broadband privacy belongs with the FTC, not the FCC*, Brookings Institution (Dec. 16, 2021), https://www.brookings.edu/articles/broadband-privacy-belongs-with-the-ftc-not-the-fcc/ ("[I]nsofar as possible, a single set of privacy rules should apply to all sectors at the federal level, rather than add more patches to the crazy quilt of federal privacy regulation that exists in America today."); Jonathan Spalter, *5 things to know about Congress' rejection of FCC privacy rules*, Axios (Mar. 31, 2017), https://www.axios.com/2017/12/15/5-things-to-know-about-congress-rejection-of-fcc-privacy-rules-1513301292 ("According to a national survey conducted [in May 2016], 94% of consumers believe all companies should be held to the same online privacy rules—whether it's Apple, Amazon, AT&T, Comcast, Verizon, Facebook, T-Mobile, Google or Twitter."); Press Release, Erin Humiston, Inst. for Privacy Innovation, FCC Should Withdraw Privacy Order, Give FTC Lead Over Internet Privacy (Mar. 6, 2017), https://www.ipi.org/ipi_issues/detail/fcc-should-withdraw-privacy-order-give-ftc-lead-over-internet-privacy ("The [FCC] should . . . allow the [FTC] to take the lead over Internet privacy.").

[268] *See* S.J. Res. 34, 115th Cong. (2017) (enacted); *see also Protecting the Privacy of Customers of Broadband and Other Telecommunications Services et al.*, Order, 32 FCC Rcd. 5442 (2017); *see also, e.g.*, 163 Cong. Rec. at H2492 (Mar. 28, 2017) (statement of Rep. Walden) (noting in support of resolution of disapproval that the FCC's "shortsighted rules" applied only to "one part of the internet" and conflict with "the FTC's proven case-by-case approach to privacy enforcement that . . . has protected consumers, while simultaneously allowing ISPs to innovate . . . . What America needs is one standard, across-the-internet ecosystem, and the Federal Trade Commission is the best place for that standard."); *id.* at H2493 (statement of Rep. Flores) ("For 20 years, the [FTC] oversaw consumer privacy for the entire internet ecosystem: content providers, advertisers, and internet service providers, or ISPs. The FTC's privacy program focused on preserving sensitive consumer data and took the context of a consumer's relationship with businesses into consideration."); *id.* at H2495 (statement of Rep. Lance) ("[T]he FCC's rules arbitrarily treat ISPs differently from the rest of the internet, creating a false sense of privacy. . . . This legislation puts

**App. 904**

ignores that legislative action and proposes to reinstate the very sector-specific approach Congress explicitly rejected.

### 4. The Commission Already Possesses Broad Authority Under the CVAA To Ensure the Accessibility of Broadband-Enabled Offerings

The *NPRM* asks what "impact, if any, . . . reclassification may have on the Commission's goals to ensure that BIAS remains accessible to individuals with disabilities."[269]  The answer is none, as the Commission already has the requisite authority under the Twenty-First Century Communications and Video Accessibility Act to ensure that "advanced communications services," including broadband-enabled video, voice, and text-based services, are accessible to and usable by individuals with disabilities,[270] which supplements the generally applicable online accessibility requirements imposed by the Americans with Disabilities Act.[271]

---

all segments of the internet on equal footing and provides American consumers with a consistent set of privacy rules to permit the FCC and the FTC to continue to work to ensure consumer privacy through enforcement."). *See also, e.g.*, 63 Cong. Rec. at S1954 (Mar. 23, 2017) (statement of Sen. Cornyn) ("The FCC privacy rules are just another example of burdensome rules that hurt more than help and serve as another example of the government's picking winners and losers.  They unnecessarily target internet service providers and, ultimately, make our internet ecosystem less efficient by adding more red tape."); *id.* at S1928 (Mar. 22, 2017) (statement of Sen. Thune) ("Ignoring years of internet ecosystem precedent, where everyone was treated the same, the FCC's 2016 broadband privacy regulations would apply only to certain parts of the internet.  This is a source of significant concern because at any particular time, consumers will not have reasonable certainty of what the rules are and how their privacy decisions will be applied. . . .  Furthermore, the FCC unfairly distorted the marketplace when it imposed unnecessarily onerous privacy restrictions on broadband providers while leaving the rest of the internet under the strong and successful regime of the FTC. . . .  The resolution before us today is the first step toward restoring regulatory balance to the internet ecosystem.  The best way for that balance to be achieved is for there to be a single, uniform set of privacy rules for the internet—the entire internet—rules that appropriately weigh the need to protect consumers with the need to foster economic growth and continued online innovation.").

[269] *NPRM* ¶ 55.

[270] *See* 47 U.S.C. § 617; 47 C.F.R. pt. 14.

[271] *See Guidance on Web Accessibility and the ADA*, ADA.gov, U.S. Dep't of Justice, Civ. Rights Div. (Mar. 18, 2022), https://www.ada.gov/resources/web-guidance/#when-the-ada-requires-web-content-to-be-accessible.

Indeed, the Commission recently clarified that the CVAA's obligations extend to providers of videoconferencing platforms,[272] and the *NPRM* does not adequately explain why the Commission believes that its broad authority under the CVAA is insufficient to continue making strides in this area such that it must resort to Title II reclassification and the burdensome, utility-style regulation of ISPs that it entails. However, if the Commission determines that its existing authority is insufficient to achieve its disability access-related objectives, it should seek specific authority from Congress through any amendments to the CVAA and/or coordinate with the DOJ to ensure effective enforcement of the ADA's existing online accessibility standards.

    5.    *The Commission's Stated Concerns Related to Pole Attachments, MTEs, and Freedom of Expression and Digital Equity Do Not Justify Title II Regulation of Broadband*

While the *NPRM* identifies the Commission's interest in expanded authority over pole attachments and multi-tenant environments as a rationale for reclassifying broadband, it acknowledges that any purported gap in the Commission's existing authority over these matters effectively implicates *only* the narrow class of broadband-only ISPs.[273] Indeed, the Commission estimated in 2020 that *96 percent or more* of ISPs provide at least one other regulated service in addition to broadband—a figure that holds true today.[274] Accordingly, imposing burdensome,

---

[272] *See Access to Video Conferencing; Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010, et al.*, CG Docket No. 23-161, Report and Order, Notice of Proposed Rulemaking, and Order, FCC 23-50, ¶ 42 (rel. June 12, 2023).

[273] See *NPRM* ¶¶ 47, 52.

[274] *See Restoring Internet Freedom; Bridging the Digital Divide for Low-Income Consumers; Lifeline and Link Up Reform and Modernization*, Order on Remand, 35 FCC Rcd. 12328 ¶ 73 (2020) ("*2020 Remand Order*"); *see also* Press Release, Leichtman Research Grp., About 950,000 Added Broadband in 3Q 2023 (Nov. 13, 2023), https://leichtmanresearch.com/wp-content/uploads/2023/11/LRG-Press-Release-11-13-2023.pdf (reporting that cable providers, wireline telephone providers, and fixed wireless providers accounted for about 96 percent of the U.S. broadband marketplace in the third quarter of 2023).

**App. 906**

utility-style regulation on *all* broadband providers represents an outsized "solution" to "problems" of such a narrow scope and with no demonstrable impact.

In the case of pole attachments, there simply is no credible evidence that the longstanding classification of broadband as an information service has impeded broadband providers' access to poles in federally regulated jurisdictions. Under Section 224 of the Act, cable operators and telecommunications carriers are entitled to non-discriminatory and rate-regulated pole access, and the vast majority of broadband providers enjoy these protections because they also offer cable or telecommunications services.[275] The *NPRM* has not demonstrated that the relatively few broadband-only ISPs—which are rare given that offering only broadband entails forgoing the additional revenue streams available from complementary cable or telecommunications services offerings—have faced systemic issues obtaining pole access or increased pole-attachment costs that have deterred deployment or impeded competition. In any event, any such gap would be a product of choices made by Congress, and it is not the Commission's job to "fix" the statute by claiming additional authority.

Nor does the interest in ensuring access to MTEs justify Title II regulation. The Commission already has taken a series of actions to prohibit telecommunications carriers and cable operators from entering into or enforcing exclusive contracts to serve MTEs, including most recently prohibiting exclusive and graduated revenue-sharing agreements and requiring disclaimers on marketing materials informing tenants of any exclusive marketing agreements, among other things.[276] Those measures affect the vast majority of all MTE arrangements, given

---

[275] *See NCTA v. Gulf Power Co.*, 534 U.S. 327, 339 (2002) (confirming that the protections under Section 224 are available to cable operators that use the same facilities to offer broadband to their subscribers).

[276] *See NPRM* ¶ 52; *Improving Competitive Broadband Access to Multiple Tenant Environments*, Report and Order and Declaratory Ruling, 37 FCC Rcd. 2448 (2022) ("*MTE Order*").

**App. 907**

that the number of broadband-only ISPs is so small. Indeed, while the *NPRM* notes the Commission's earlier admonition "that it would 'continue to monitor competition in MTEs to determine whether [it] should alter the scope of'" its MTE rules,[277] it conspicuously fails to offer any examples of broadband-only ISPs' exploiting their status to engage in anti-competitive behavior with respect to MTEs, much less any evidence of a widespread market failure attributable to the existing scope of the MTE regime.[278]

Put simply, any supposed benefits related to pole attachments or MTEs that the *NPRM* theorizes will flow from Title II reclassification are illusory, and in any case would be far outweighed by the substantial drawbacks of imposing burdensome, common-carrier regulation on all broadband providers, particularly given the availability of alternative recourse and remedies for any instances of anti-competitive or anti-consumer behavior that might arise in these areas.

Finally, on the issues of freedom of expression and digital equity,[279] NCTA's members encourage free expression, political engagement, and social activism, are committed to diversity, equity, and inclusion, and agree with the observation in the *NPRM* that "the Internet offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."[280] But the *NPRM* offers no reason why reclassifying broadband under Title II is necessary to "promote diversity of viewpoints"—an important issue, to be sure, but one that the *NPRM* rightly acknowledges implicates "[s]ocial media websites and

---

[277] *NPRM* ¶ 52 (quoting *MTE Order* ¶ 14).

[278] In any event, as NCTA has explained, the Commission has ancillary authority to extend the exclusive access prohibition to all broadband providers—without resorting to Title II reclassification—if it concludes that such a step is necessary. *See* Comments of NCTA – The Internet & Television Association, GN Docket No. 17-142, at 4-5 (filed Oct. 20, 2021).

[279] *See NPRM* ¶¶ 53-54.

[280] *Id.* ¶ 53 (internal quotation marks and citations omitted).

**App. 908**

other platforms," not ISPs—or to advance digital equity objectives.[281]  And as the Commission is aware, digital equity in the broadband marketplace is a matter that Congress has addressed in a targeted fashion in a separate statute.[282]

### C.    Title II Reclassification Would Frustrate the Commission's Broadband Access and Adoption Goals

While the *NPRM* suggests that Title II reclassification is necessary to promote broadband access and adoption, common-carrier regulation of ISPs is not necessary to achieve, and in fact would *impede*, these important policy objectives.  The suggestion that reclassifying broadband as a telecommunications service is a prerequisite to bridging the digital divide is belied by the fact that Congress's and the Commission's pandemic-related initiatives already are enabling tremendous progress in broadband access and adoption, without any need to impose onerous utility-style regulation on ISPs.  The $1 trillion Infrastructure Investment and Jobs Act ("IIJA") that President Biden signed into law in November 2021, for example, allocates $65 billion to support broadband deployment, adoption, and digital equity across the country, *without regard* to broadband's regulatory classification.[283]  The IIJA includes the Administration's signature BEAD program—a $42.45 billion initiative to support broadband deployment and adoption.  These funds are in addition to the tens of billions of dollars that already are being made available through the American Rescue Plan Act and the Commission's Rural Digital Opportunity Fund Program to promote broadband access and adoption.[284]

---

[281] *Id.*

[282] *See* 47 U.S.C. § 1754.

[283] *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60101 *et seq.*, 135 Stat. 429 (2021) ("IIJA").

[284] *See* Press Release, White House, Fact Sheet: Biden-Harris Administration Announces Over $25 Billion in American Rescue Plan Funding to Help Ensure Every American Has Access to High

**App. 909**

The IIJA also established the Affordable Connectivity Program ("ACP") (expanding and enhancing the Emergency Broadband Benefit Program) to support low-income Americans' access to the Internet, again without regard to broadband's information-service classification.[285]  Notably, Chairwoman Rosenworcel has lauded the ACP for ensuring that American households "can afford the [I]nternet connections they need for work, school, health care and more for years."[286]  The same is true of the Commission's Emergency Connectivity Fund Program, COVID-19 Telehealth Program, and Connected Care Pilot Program—each of which was implemented under the existing light-touch regulatory regime.  Together, these initiatives have enabled millions of low-income households to obtain broadband access with little or no out-of-pocket cost and facilitated remote access to educational opportunities and medical treatment for America's schoolchildren and vulnerable patient populations.  As with legislation relating to national security and other issues, the fact that Congress took comprehensive action on broadband affordability and adoption without requiring or authorizing regulation of broadband as a Title II service speaks volumes.[287]

Also without regard to the regulatory classification of broadband, NCTA's members have long offered industry-leading low-cost broadband programs to help low-income Americans afford

---

Speed, Affordable Internet (June 7, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/07/fact-sheet-biden-harris-administration-announces-over-25-billion-in-american-rescue-plan-funding-to-help-ensure-every-american-has-access-to-high-speed-affordable-internet/; *Rural Digital Opportunity Fund, Connect America Fund*, Report and Order, 35 FCC Rcd. 686 (2020).

[285] *See* IIJA § 60501 *et seq.*

[286] Press Release, FCC, FCC Launches Affordable Connectivity Program (Dec. 31, 2021), https://docs.fcc.gov/public/attachments/DOC-378908A1.pdf.

[287] Reclassification also is unnecessary to support broadband through the Universal Service Fund ("USF").  *See NPRM* ¶¶ 49-51.  The Commission has long supported broadband under the USF program irrespective of the service's regulatory classification, and reaffirmed its ability to continue doing so in the *2020 Remand Order*.  *See 2020 Remand Order* ¶¶ 83-103.  Meanwhile, the *NPRM* makes no effort to identify any concrete problems with the distribution of USF support since the Commission's restoration of its information service classification for broadband in the *2018 Order*.

**App. 910**

high-speed Internet service.[288]  Comcast's Internet Essentials, for example, has served over 10 million customers since it was launched in 2011, and today such customers enjoy 50/5 Mbps speeds for just $9.95 per month—the same price as when the program was first introduced over 12 years ago.[289]  In 2022, Comcast also began offering a 100/20 Mbps Internet Essentials Plus plan for just $29.95, which is entirely covered by the $30 ACP benefit.[290]  Charter's Internet Assist[291] and Cox's Connect2Compete and ConnectAssist[292] programs similarly ensure that those ISPs' low-income customers have access to affordable high-speed broadband Internet service.

This remarkable commitment of funds to extend networks to unserved and underserved areas, boost adoption in such communities, and enable access to broadband offerings featuring higher speeds at lower prices nationwide demonstrates that common-carrier regulation of ISPs is not necessary to promote these vital broadband policy objectives.  To the contrary, such onerous utility-style regulation would jeopardize this progress—and even threaten to reverse it—given the demonstrated chilling effects that subjecting ISPs to Title II regulation has on broadband investment and innovation.

The negative impacts of Title II regulation on broadband investment would be particularly detrimental to the BEAD program, which will rely on significant amounts of private capital to

---

[288] *See* Digital Divide, NCTA, https://www.ncta.com/positions/digital-divide (last visited Dec. 12, 2023).

[289] *See* Internet Essentials, Comcast, https://www.internetessentials.com/ (last visited Dec. 12, 2023).

[290] *See id.*

[291] *See* Spectrum Internet Assist, Spectrum, https://www.spectrum.com/internet/spectrum-internet-assist?opredirect=browse-content-spectrum-internet-assist (last visited Dec. 12, 2023).

[292] *See* Cox Connect2Compete Package, Cox, https://www.cox.com/residential/internet/connect2compete.html (last visited Dec. 12, 2023); Cox ConnectAssist, Cox, https://www.cox.com/residential/internet/low-cost-internet-plans.html (last visited Dec. 12, 2023).

**App. 911**

achieve its ambitious broadband deployment goals. In recognition of the significant role that private investment will play in supplementing the federal dollars allocated for this purpose, states, in distributing BEAD program support, have been "encouraged to require a match from" participating broadband providers.[293] They also "are required to" encourage "matches of greater than 25 percent from [ISPs] wherever feasible" and must give preference to proposals from broadband providers that commit to larger match amounts (and thereby will reduce the amount of BEAD program funding needed to complete projects).[294] By chilling ISPs' investment in broadband networks and reducing the amount of private capital available for matches,[295] Title II reclassification would result in higher per-location federal outlays, potentially depleting the BEAD program's funding before its objectives have been achieved. The uncertainty that would arise from reclassification could even deter broadband providers from participating in the BEAD program altogether. Not only would such decreased participation likely drive up per-location costs, but, insofar as more established ISPs are among those that elect not to participate in the BEAD program, it also could result in less-qualified ISPs' receiving a greater share of the available funding, further imperiling the initiative's success.

### D. Broadband's Information-Service Classification Has Created Strong Incentives for ISPs to Invest in Their Networks and Enhance Their Services

The Commission's light-touch regulatory approach has fostered remarkable levels of broadband investment that have yielded significant benefits for American consumers and the nation's economy. In the nearly two decades during which broadband was classified as an information service, unparalleled levels of investment spurred remarkable growth in the nation's

---

[293] BEAD NOFO § III.B.2.

[294] *Id.*; *see also id.* §§ IV.B.7.a.ii, IV.B.7.b.i-.ii.

[295] *See infra* at Section II.E.

**App. 912**

broadband networks. Between 1996 and 2022, ISPs have expended more than $2.1 trillion to construct, maintain, and enhance broadband networks across the United States.[296] By 2015, before the Commission's brief detour from its light-touch approach, nearly one-quarter of global broadband investment had been made in the United States.[297] As a result, connectivity speeds had increased by a multiple of 30, prices declined substantially on a per-megabit basis, and Internet access expanded to more and more Americans.[298] And investment in U.S. broadband networks has surged since the Commission restored broadband's information-service classification in January 2018. In 2017, with the return to Title I imminent, capital investment in broadband nearly returned to pre-*2015 Order* levels,[299] and once the Commission restored broadband's information-service classification, investment reached its highest point in almost two decades, totaling $80

---

[296] *See* Israel/Keating/Shampine Declaration ¶ 61; *see also* 2022 Broadband Capex Report (Sept. 8, 2023) ("2022 USTelecom Broadband Capex Report"), https://www.ustelecom.org/wp-content/uploads/2023/09/2022-Broadband-Capex-Report-final.pdf (expressing these values in nominal dollars); ACA Connects, *ACA Connects Members: The Communities We Serve, The Communications Services We Provide, The Competition We Face*, 11 (Oct. 2022), https://acaconnects.org/index.php?checkfileaccess=/wp-content/uploads/2022/10/2022.10.05-ACA-Connects-Member-Whitepaper-FINAL.pdf ("Some ACA Connects Members spent as much as 50-80% of their annual revenue on infrastructure-related projects in 2021, and they [were] on track to do so again in 2022.").

[297] *See* Roslyn Layton, Am. Enter. Inst. for Pub. Policy Research, The European Union's Broadband Challenge 2 (Feb. 2014), https://www.aei.org/wp-content/uploads/2014/02/-the-european-unions-broadband-challenge_175900142730.pdf.

[298] *See 2018 Order* ¶ 86; *see also* NCTA, *Preview the State of America's Broadband Ahead of President Obama's Visit to Iowa* (Jan. 13, 2015), https://www.ncta.com/whats-new/preview-the-state-of-americas-broadband-ahead-of-president-obamas-visit-to-iowa (noting that between 2005 and 2015, "the average cable broadband customer [saw] top speeds increase a whopping 3200%"); Comments of Comcast Corp., GN Docket No. 12-228, at 12 (filed Sep. 20, 2012) (explaining that between 1996 and 2012, "the speed of connections offered under Comcast's standard broadband Internet service tier . . . increased by approximately 900 percent, while the price that subscribers to this service pay per Mbps . . . declined by at least 87 percent").

[299] *See infra* at Section II.E (noting the decline in broadband investment while the *2015 Order* was in effect).

billion in 2018 and $80.8 billion in 2019.[300]  By 2021, ISPs' investment in the nation's broadband networks had increased to $86 billion, up $6 billion from the previous year.[301]  And in 2022, broadband investment increased by another 19 percent, to a 21-year high of $102.4 billion.[302]  And were it not for the "persistent prospect of Title II" regulation of broadband, the amount of such investment would have been even greater.[303]

Such extraordinary levels of network investment have led to dramatic growth in the availability of cutting-edge services across the United States.[304]  Average fixed broadband speeds in the U.S. have tripled since 2017.[305]  Moreover, 85 percent of U.S. homes and businesses now have access to gigabit speeds.[306]  Similarly, between 2018 and 2021, the share of households in census blocks with access to *two or more* providers offering 100/20 and 25/3 Mbps speeds grew by more than 15 percent each, to 64 percent and 90 percent, respectively.[307]  Moreover, this

---

[300] *See* 2022 USTelecom Broadband Capex Report.

[301] *See id.*

[302] *See id*.

[303] *See* Ford Paper at 5.

[304] *See* Israel/Keating/Shampine Declaration ¶ 61 ("[B]roadband providers have not just *maintained* their networks, they have consistently *improved* the quality of their networks.  They have done so by investing in successive generations of technologies[,] . . . through improvements such as deploying fiber deeper into the networks in order to increase network capacity, resiliency, and performance, and [by] utilizing innovative software to continuously measure and monitor network performance.").

[305] *See* Press Release, Office of Comm'r Brendan Carr, The Title II Debate Was Settled When the Internet Didn't Break (Oct. 18, 2023), https://docs.fcc.gov/public/attachments/DOC-397801A1.pdf; *see also* Israel/Keating/Shampine Declaration ¶¶ 34-35 ("[N]ot only have the maximum available speeds increased greatly over time, but the average speeds have continually increased. . . . All of this expansion and improvement requires ongoing investment.").

[306] *See* Israel/Keating/Shampine Declaration ¶ 25.

[307] *See id.* ¶ 27.  In the meantime, the number of Americans with access to residential fixed services capable of *only* sub-10 Mbps download speeds decreased by nearly half, from 9.6 million to 5 million.  *See* Indus. Analysis Div., Off. of Econ. & Analytics, FCC, *Internet Access Services:*

**App. 914**

investment—and the corresponding deployment of robust broadband networks that consistently deliver substantial speed increases and other new features and functionality—paid dividends for America's consumers and economy over the course of the COVID-19 pandemic. Tellingly, despite unprecedented levels of traffic, U.S. networks continued to perform remarkably well during this period,[308] preserving Americans' ability to learn, work, access medical care, and socially interact from the safety of their homes. In contrast, Europe's broadband networks, which for years have been subject to onerous regulation that has stifled investment and innovation,[309] experienced considerable strain,[310] as did those in Australia.[311]

As a result of this investment-driven expansion and enhancement of existing broadband networks and deployment of new broadband networks, Americans have more choice in broadband providers today than ever before. As of 2021, approximately 90 percent of American households with access to 25/3 Mbps broadband service can choose from at least two fixed broadband

---

*Status as of December 31, 2021*, at 13 (Aug. 2023), https://docs.fcc.gov/public/attachments/DOC-395960A1.pdf.

[308] *See, e.g.*, Broadband Internet Technical Advisory Group, *2020 Pandemic Network Performance*, iii (Apr. 5, 2021), https://www.bitag.org/documents/bitag_report.pdf (finding that broadband Internet in the United States "has performed well during the pandemic, and continues to do so, despite unparalleled and rapid changes in traffic demands"); Roslyn Layton, *COVID-19 Has Demonstrated the Folly of Some Tech Policies*, AEI (Mar. 26, 2020), https://www.aei.org/technology-and-innovation/covid-19-has-demonstrated-the-folly-of-some-tech-policies/ ("Traffic is up 75 percent or more on many US networks, but they are still performing.").

[309] *See infra* nn.328-330 and accompanying text.

[310] *See, e.g.*, Nic Fildes & Hannah Murphy, *EU Warns of Broadband Strain as Millions Work from Home*, Financial Times (Mar. 19, 2020), https://www.ft.com/content/b4ab03db-de1f-4f98-bcc2-b09007427e1b; Mark Sweney, *Netflix To Slow Europe Transmissions To Avoid Broadband Overload*, The Guardian (Mar. 19, 2020), https://www.theguardian.com/media/2020/mar/19/netflix-to-slow-europe-transmissions-to-avoid-broadband-overload.

[311] *See, e.g.*, Josh Taylor, *Australian government asks Netflix and Stan to reduce data to avoid broadband overload*, The Guardian (Mar. 20, 2020), https://www.theguardian.com/media/2020/mar/20/australian-government-asks-netflix-and-stan-to-reduce-data-to-avoid-broadband-overload.

**App. 915**

providers offering service at those speeds.[312] In addition, approximately 64 percent of American households with access to 100/20 Mbps service can choose from at least two fixed ISPs offering such service.[313] And this competition is rapidly growing,[314] especially now that "[a]ll major U.S. mobile wireless carriers have deployed [fifth-generation (5G)] networks" that are increasingly inducing users to substitute from cable and wireline broadband providers.[315]

This burgeoning competition is delivering significant price benefits for consumers. As the Israel/Keating/Shampine Declaration explains, multiple recent studies "confirm that broadband prices have fallen in real terms, particularly once quality improvements and inflation are accounted

---

[312] *See* Israel/Keating/Shampine Declaration ¶ 27, Figure 3.

[313] *See id.* The Commission recently proposed to redefine "advanced telecommunications capability" for the purpose of reporting on the "availability" of such capability under Section 706(b) of the 1996 Act, by "increas[ing] from the existing fixed broadband speed benchmark of 25/3 Mbps to 100/20 Mbps." *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 22-270, Seventeenth Section 706 Report Notice of Inquiry, FCC 23-89, ¶ 9 (rel. Nov. 1, 2023). Importantly, if the Commission were to adopt this new definition of "advanced telecommunications capability," that action would not suddenly change the product market in which ISPs compete. It is beyond question that consumers would consider a 90 Mbps service (or, in many cases, services with somewhat lower download speeds) to be a competitive substitute for 100 Mbps service, even if the Commission chooses to apply the "advanced telecommunications capability" label only to the latter. Notably, the last time the Commission raised this speed benchmark, it acknowledged that "'advanced telecommunications capability' has a unique definition in [S]ection 706 that differs from the term 'broadband' in other contexts," and the Commission's "discussion of broadband in this Report may not apply equally to discussions of broadband in other circumstances or in other proceedings," including efforts to define product markets. *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act*, 2015 Broadband Progress Report and Notice of Inquiry on Immediate Action to Accelerate Deployment, 30 FCC Rcd. 1375 ¶ 1 n.1 (2015).

[314] *See, e.g.*, Israel/Keating/Shampine Declaration ¶¶ 27, 36.

[315] *Id.* ¶ 39; *see also id.* ¶ 43 ("In addition, several firms are in the process of deploying [low-earth orbit] satellite constellations designed to provide improved satellite broadband").

**App. 916**

for."[316]  For instance, a study analyzing the Commission's own Urban Rate Survey data found that the most popular tier of broadband service in 2015 "was, in nominal terms, 37 percent cheaper (while offering 142 percent faster speeds) in 2023 than it was in 2015, on an average-subscriber-weighted basis," and that "the highest-speed tier in 2015 was nearly 40 percent cheaper (while offering speeds that were more than twice as fast) on an average-subscriber-weighted basis in 2023."[317]  And adjusting for inflation "reveals even more favorable price trends."[318]  Recent studies show that "[t]he real (meaning inflation-adjusted) price of the most popular tier of broadband service declined by approximately 55 percent between 2015 and 2023, and the real price of the highest-speed broadband service has declined by approximately 56 percent over that same time period."[319]

E.     **Reclassifying Broadband as a Telecommunications Service Under Title II Would Reduce Investment and Jobs and Stifle Innovation**

By contrast, the evidence shows that subjecting broadband to common-carrier regulation under Title II would dampen investment, decrease service quality, and hinder innovation.  In advance of the Commission's adoption of the *2015 Order*, the broadband industry cautioned that a common-carrier classification would dampen the investment and innovation necessary to expand and enhance access to robust, cost-effective connectivity across the United States.  And those harmful effects quickly materialized during the two-year period when broadband was subject to common-carrier regulation.  According to one 2017 study, broadband's common-carrier

---

[316] *See id.* ¶ 65.

[317] *Id.* ¶ 66.

[318] *Id.*

[319] *Id.*; *see also id.*, Figure 13.

classification resulted in more than $5 billion in forgone investment in 2016 alone.[320]  Lower investment led to reduced deployment and slower network improvements.  But for the decline in investment in the two years after the Commission's classification of broadband as a telecommunications service, "U.S. broadband speeds would have been about 10% higher."[321]  And "the back-and-forth squabble over Title II classification" has resulted in an *annual* investment shortfall of $8.1 billion, *annual* job losses of more than 81,000 and 195,000 in the information sector and across the economy, respectively, and approximately $18.5 billion in lost wages *each year*.[322]

Innovation also suffered significantly under the *2015 Order*.  Perhaps most notably, that order's vague and open-ended Internet Conduct Standard, which represented the Commission's "interpretation of [S]ections 201 and 202 [of the Communications Act] in the broadband Internet access context,"[323] was found to have "denied or delayed consumer access to innovative new services."[324]  Unlike the Commission's bright-line Open Internet mandates—which provided regulated parties with some notice of what was and was not allowed—the Internet Conduct Standard's amorphous, multi-factored balancing test for assessing whether particular conduct "unreasonably interefere[d] with or unreasonably disadvantage[d]" end users' access to edge providers, and vice versa, caused significant uncertainty that had a profound chilling effect on

---

[320] *See* Michael Horney, *Broadband Investment Slowed by $5.6 Billion Since Open Internet Order* (May 5, 2017), http://freestatefoundation.blogspot.com/2017/05/broadband-investment-slowed-by-56.html.

[321] George S. Ford, Broadband Speeds Post-Reclassification: An Empirical Approach 1 (June 27, 2017), http://www.phoenix-center.org/perspectives/Perspective17-07Final.pdf.

[322] Ford Paper at 22.

[323] *2015 Order* ¶ 137.

[324] *2018 Order* ¶ 246.

innovation in broadband products and services. ISPs of all sizes struggled to assess whether planned service features and pricing models adhered to the rule.[325] And the record is replete with examples of ISPs' delaying the introduction of innovative new broadband products and services, or declining to do so altogether, out of fear of running afoul of the rule or triggering a Commission investigation under the rule[326]—which undoubtedly would have been costly and distracting even if ultimately resolved in its target's favor. Given such harms, it is little surprise that the Commission subsequently determined that the Internet Conduct Standard was "not in the public interest," and that its elimination would "reduce regulatory uncertainty and promote network investment and service-related innovation."[327]

The European experience confirms the detrimental impacts of burdensome, utility-style regulation on broadband investment and innovation. Professor Christopher Yoo of the University of Pennsylvania Carey School of Law found that the imposition of common-carrier-style regulation on ISPs in Europe has resulted in broadband investment levels that, between 2007 and 2012, were less than half of the levels of such investment in the United States, on a per-household basis—$244 in Europe versus $562 in the United States.[328] More recent studies show that this gap has only widened as Europe's utility-style regulation of broadband has persisted; between 2012 and 2018, the average annual investment per household was $230 in the European Union and $708

---

[325] *See id.* ¶ 251.

[326] *See id.* ¶ 249 & n.896 (collecting examples of ISPs' decisions "to forgo or delay innovative service offerings or different pricing plans that benefit consumers" in light of the "regulatory uncertainty under the Internet Conduct Standard . . . ").

[327] *See id.* ¶¶ 246, 249.

[328] Christopher S. Yoo, Ctr. For Tech., Innovation & Competition, U.S. vs. European Broadband Deployment: What Do the Data Say?, 13 (June 2014), https://www.law.upenn.edu/live/files/3352-us-vs-european-broadband-deployment.

**App. 919**

in the United States.[329]   The consistent increases in U.S. broadband speeds also are outpacing Europe; in fact, although Europe has a population density three times that of the United States, the U.S. still leads Europe in both broadband infrastructure deployment and broadband adoption—at all speeds.[330]

### F.  The Policy Harms of Reimposing Title II Regulation on Broadband Cannot Be Mitigated Sufficiently Through Forbearance

Even the most ardent proponents of common-carrier regulation of ISPs acknowledge that most of Title II's legacy telephone-oriented requirements and restrictions are a poor fit for today's broadband marketplace.  Insofar as the *NPRM* recognizes these constraints, however, its proposals to ameliorate the harms of Title II regulation fall short.  Indeed, the *NPRM*'s proposed forbearance framework is at odds with the Commission's rhetoric, particularly with respect to the preservation of "permissionless innovation."   Moreover, it flouts a congressional directive restricting the Commission's reliance on Title II to regulate online privacy.  In all events, even if the Commission were willing to forbear more broadly—including from Sections 214 and 222—the *NPRM*'s forbearance proposal still would be insufficient to eliminate the negative impacts of common-carrier regulation on the broadband marketplace and, in turn, consumers—especially in light of the Commission's refusal to forbear from two of the most sweeping grants of statutory authority in Title II, *i.e.*, Sections 201 and 202, as discussed above.

Perhaps most notably, the *NPRM*'s selective commitment to "permissionless innovation" illustrates that the supposed commitment to achieving "light touch" regulation through forbearance rings hollow.  Chairwoman Rosenworcel has long championed "permissionless innovation,"

---

[329]  *See* USTelecom, US vs. EU Broadband Trends 2012-2019, at 13 (Apr. 21, 2021), https://www.ustelecom.org/wp-content/uploads/2021/04/USTelecom_US-vs-EU-Broadband-Trends_2012-2019-Report.pdf.

[330]  *See id.* at 3.

**App. 920**

describing the principle as essential to the growth and success of America's Internet ecosystem.[331] She is not alone: Countless others have identified permissionless innovation as foundational to the openness of the Internet. Public Knowledge, for example, has asserted, albeit counterfactually, that a Title II regime would be appropriate precisely because it would adhere to that bedrock principle of Internet policy.[332] But the *NPRM* casts aside this commitment—for ISPs alone. Instead, in a significant departure from the *2015 Order*, it proposes not to forbear from Section 214 of the Act, which in turn would require ISPs to obtain the Commission's permission—often following a lengthy and burdensome application process—simply to enter the broadband marketplace. On top of that unprecedented proposal, applying Section 214 to broadband providers would require the Commission's blessing to cease offering any particular service or to exit the marketplace completely. Transfers of control—potentially including even pro forma reorganizations—for the first time would require Commission review and approval under Section 214. And the Commission might also attempt to mandate broadband buildouts to certain areas. These quintessential utility mandates belie the promises of a "carefully tailored" or "light touch" regime and represent the antithesis of permissionless innovation that until now has been a consensus feature of broadband policy. Adding insult to injury, the imposition of entry and exit regulation would apply to ISPs alone, exempting all other participants in the Internet marketplace. The *NPRM* offers no justification for introducing such dramatically asymmetric regulation.

---

[331] *See, e.g.*, Statement of Chairwoman Jessica Rosenworcel, Federal Communications Commission, Before the U.S. Senate Committee on Commerce, Science & Transportation 2 (July 29, 2015), https://docs.fcc.gov/public/attachments/DOC-334645A1.pdf; *see also NPRM*, Statement of Chairwoman Jessica Rosenworcel, at 1 (asserting an interest in ensuring that the Internet remains "a haven for creating without permission").

[332] *See* Shiva Stella, *FCC Chairman Pai Announces Plan to Roll Back Net Neutrality Rules*, Public Knowledge (Apr. 26, 2017), https://publicknowledge.org/fcc-chairman-pai-announces-plan-to-roll-back-net-neutrality-rules/.

The *NPRM* further undercuts its promised "light-touch application of Title II"[333] by proposing not to forbear from Section 222 of the Act. Following the *2015 Order*, the Commission adopted broadband privacy rules in the *2016 Broadband Privacy Order*. But while the *NPRM* discusses at length the purported benefits of extending the Section 222 privacy framework to broadband, it fails to grapple with Congress's 2017 resolution of disapproval striking down the *2016 Broadband Privacy Order* under the Congressional Review Act,[334] which precludes the Commission from adopting substantially similar rules going forward.[335] Even if the Commission could somehow persuade a reviewing court that the 2017 resolution of disapproval does not foreclose the extension of Section 222 to broadband services, there is no doubt that such action would flout Congress's clear intention to prevent the imposition of broadband-specific privacy requirements, based on its understanding that a uniform regime for all participants in the Internet ecosystem is vastly superior.[336] Moreover, the ambiguity regarding the scope of forbearance risks undermining its efficacy. In the *2015 Order*, for example, the Commission forbore generally from "imposing last-mile unbundling requirements,"[337] but it did not identify the particular statutory and/or regulatory provisions from which it actually was forbearing, leaving open the possibility of other forms of unbundling—such as a resale mandate—being imposed pursuant to authority to which the grant of forbearance arguably did not apply. The Commission appears poised to make the same mistakes again. For instance, while the fact sheet accompanying the release of the draft

---

[333] *See NPRM* ¶ 136.

[334] The *NPRM* notes Congress's action in passing, *see NPRM* ¶ 104 n.352, but fails utterly to consider how reinstating broadband-specific privacy rules is directly contrary to congressional intent.

[335] *See* 5 U.S.C. § 801(b)(1).

[336] *See supra* n.268 and accompanying text.

[337] *See 2015 Order* ¶ 417.

*NPRM* indicated that "the Commission will not . . . require network unbundling,"[338] the *NPRM* itself does not specifically propose to forbear from Section 251(c)—the relevant statutory provision—or even discuss the Commission's intent with respect to unbundling and other similar common-carrier requirements under Title II of the Act.

Even if the Commission were to expand the scope of its proposed forbearance in an effort to mitigate such harms, forbearance ultimately cannot cure the ills associated with converting broadband providers into common carriers. The potential for the Commission to reimpose provisions from which it previously forbore limits ISPs' ability to rely on such forbearance. Notably, that the Commission could have walked back its forbearance from *ex ante* rate regulation at any time after its adoption of the *2015 Order* contributed to the substantial uncertainty that ultimately compelled business decisionmakers to decrease ISPs' capital outlays.[339] More broadly, the Commission's willingness to reimpose Title II regulation in this proceeding after concluding in the *2018 Order* that common carrier regulation is unnecessary and harmful—and even to reduce the scope of forbearance proposed in the *NPRM* relative to the forbearance granted in the *2015 Order*, such as with respect to Section 214—makes it difficult for ISPs to take comfort in any assurances of durable forbearance. And as noted above, leaving Sections 201 and 202 in place for broadband, reimposing the vague general conduct standard, and relying on new, far-reaching justifications for Title II such as national security, cybersecurity, and network reliability and resiliency may well give rise to a host of new regulatory mandates for ISPs in the future.[340] In short, any near-term forbearance relief the Commission might grant would be insufficient because

---

[338] FCC, Fact Sheet: Safeguarding and Securing the Open Internet (Sept. 28, 2023) https://docs.fcc.gov/public/attachments/DOC-397309A1.pdf.

[339] *See supra* n.70 and accompanying text; *see also supra* at Section II.E.

[340] *See supra* at 19-22.

**App. 923**

of its limited scope and the prospect that it will be rescinded if a future Commission seeks to impose even more intrusive regulation under Title II.

## III. NCTA SUPPORTS CONGRESSIONAL ACTION TO CODIFY DURABLE AND APPROPRIATELY TAILORED OPEN INTERNET RULES

As explained above, the combination of market forces and the existing transparency-based regime—backed by the consumer protection and antitrust laws enforced by the FTC, DOJ, and state attorneys general—has proven extremely effective in promoting Internet openness and preventing harmful conduct. Indeed, the experience since the Commission adopted the *2018 Order* indicates that formal Open Internet mandates (apart from the Transparency Rule) are not necessary to protect competition or consumers, because—as the *NPRM* itself acknowledges[341]—such principles already are firmly embedded in ISPs' business practices. However, insofar as further safeguards are deemed necessary, the best approach would be for Congress to codify consensus Open Internet principles into law.[342]

---

[341] *See NPRM* ¶ 153 (noting that "[a]s far back as the Commission's *Internet Policy Statement* in 2005, major ISPs have broadly accepted a no-blocking principle"); *id.* ¶ 157 (observing that, as to throttling, ISPs have "a strong incentive to follow their voluntary commitments to maintain service consistent with certain conduct rules established in the *2015 Open Internet Order*"); *id.* ¶ 160 (characterizing the Commission's concerns with regards to anticompetitive paid prioritization as stemming from the mere *specter* of "potential harm," but failing to offer any evidence that this concern is grounded in the reality of the marketplace and not purely hypothetical).

[342] In addition, NCTA respectfully contends that any Open Internet framework that eliminates ISPs' editorial discretion across the board—including by limiting the ability of ISPs to respond to misinformation and related threats—likely would violate the First Amendment. To be sure, a panel of the D.C. Circuit concluded in *U.S. Telecom* that ISPs holding themselves out as "transmit[ting] data to and receiv[ing] data from all or substantially all Internet endpoints" are not "speakers" entitled to First Amendment protection. *U.S. Telecom*, 825 F.3d at 740-44. But NCTA believes that then-Judge Kavanaugh had it right in his separate opinion in that case, where he observed that this "'use it or lose it' theory of First Amendment rights finds no support in the Constitution or precedent," and that an ISP's "'carry all comers' decision itself is an exercise of editorial discretion" that triggers First Amendment rights. *U.S. Telecom*, 855 F.3d at 429 (Kavanaugh, J., dissenting from denial of rehearing en banc).

Stakeholders have already spent two decades wrangling over the appropriate legal foundation for Open Internet rules, and as the analysis in Section I.A makes clear, a Commission order imposing common-carrier regulation on broadband providers would be doomed because Congress must be the one to decide that major question itself. The *NPRM* nevertheless proposes to usurp Congress's authority and disregard binding Supreme Court precedent by reclassifying broadband as a telecommunications service under Title II. A legislative solution, on the other hand, would accomplish the same policy objectives that the *NPRM* touts as necessary to protect consumers, without engendering the uncertainty and legal risk that would arise from pursuing these goals through Title II reclassification.

## IV. BROADBAND SHOULD BE SUBJECT TO EXCLUSIVE FEDERAL OVERSIGHT AND UNIFORM NATIONAL REQUIREMENTS

Although NCTA disagrees with much of the *NPRM*, the Commission correctly recognizes that broadband is an interstate service that would benefit from a "national [regulatory] framework."[343] As NCTA has explained, it is Congress's responsibility—not the Commission's—to devise a "federal framework" for the regulation of broadband, and Congress has established a light-touch framework for information services like broadband.[344] But irrespective of how broadband ultimately is classified and regulated, NCTA shares Chairwoman Rosenworcel's desire for a "uniform legal framework [that] applies to the whole country,"[345] as state and local regulation would create significant burdens and uncertainty that would undermine the consensus goals of promoting increased investment, deployment, and innovation.

---

[343] *See NPRM* ¶¶ 94-95.

[344] *See supra* at Section I.A.

[345] *See NPRM*, Statement of Chairwoman Jessica Rosenworcel, at 2.

**App. 925**

The Commission has consistently recognized that broadband is "jurisdictionally interstate for regulatory purposes," regardless of whether it is classified as an information service or telecommunications service.[346]  The Commission has long treated that proposition as "well-settled"[347]—and appropriately so, because the "Internet's inherently global and open architecture" permits the provision of Internet content "through a multitude of distributed origination points, making end-to-end jurisdictional analysis extremely difficult—if not impossible—when the services at issue involve the Internet."[348]  Accordingly, it is "impossible or impracticable for ISPs to distinguish between intrastate and interstate communications over the Internet or to apply different rules in each circumstance."[349]  Indeed, despite periodic disputes as to the proper classification of broadband and the scope of the Commission's rulemaking authority, the Commission's *2015 Order* and its *2018 Order*—as well as the *NPRM*—reflect a stable, bipartisan consensus that broadband's interstate nature warrants consistent and uniform treatment under a nationwide federal regulatory regime, including through the federal preemption of state and local

---

[346] *2015 Order* ¶ 431; *see also Cable Modem Declaratory Ruling* ¶ 59 (describing broadband as "an interstate information service"); *NPRM* ¶ 95 (recognizing that "Commission decisions finding BIAS to be interstate for regulatory purposes largely resolve possible arguments premised on the limitation on FCC authority over state communications services under section 2(b) of the Act").

[347] *2018 Order* ¶ 199.

[348] *2015 Order* ¶ 431.

[349] *2018 Order* ¶ 200.

laws that would undermine that regime.[350]  Courts likewise have recognized that "the [I]nternet's

geographic reach . . . makes state regulation impracticable."[351]

State efforts to regulate broadband—such as through the emerging patchwork of discordant

state-law Open Internet measures[352]—undermine the policy goals that Congress has enshrined in

Section 230 (which calls for "promot[ing] the continued development of the Internet and other

interactive computer services and other interactive media," and "preserv[ing] the vibrant and

competitive free market that presently exists for the Internet and other interactive computer

services, unfettered by Federal and State regulation,"[353] among other objectives).  Accordingly, if

Congress enacts Open Internet requirements, or if the Commission adopts such rules, it is not

enough to preempt "contrary state requirements."[354]  Rather, any federal framework governing

broadband should serve "not only as an appropriate nationwide floor . . . but also as an appropriate

---

[350] *See 2015 Order* ¶ 433 (announcing the Commission's "firm intention to exercise our preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with the carefully tailored regulatory scheme we adopt in this Order"); *2018 Order* ¶ 198 ("[B]ecause state and local regulation of the aspects of broadband Internet access service that we identify would interfere with the balanced federal regulatory scheme we adopt today, they are plainly preempted."); *NPRM* ¶¶ 93-96 (proposing to preempt state and local laws to ensure that BIAS is "principally governed by a federal framework" and seeking comment on the appropriate legal authority for, and scope of, such preemption).  Although the *Mozilla* court vacated the express preemption directive in the *2018 Order* (based on its view that the Commission's decision to disclaim authority under Section 706 precluded such express preemption), *see Mozilla*, 940 F.3d at 74, it did not dispute the interstate nature of broadband and also noted that conflict preemption would invalidate a state law if a "state practice actually undermines" the portions of the *2018 Order* upheld by the court, *id.* at 85.

[351] *Am. Booksellers Foundation v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *see also id.* (forecasting that "the internet will soon be seen as falling within the class of subjects that are protected from State regulation because they imperatively demand[] a single uniform rule") (citation and internal quotation marks omitted).

[352] *See* Thomas B. Nachbar, *The Peculiar Case of State Network Neutrality Regulation*, 37 CARDOZO ARTS & ENTM'T L.J. 659, 667 (2019) (describing state-level net neutrality measures).

[353] 47 U.S.C. § 230(b)(1)-(2).

[354] *NPRM* ¶ 95.

ceiling."[355]  Inviting states to layer additional obligations on an interstate communications service would violate the jurisdictional allocation Congress established in Section 2(b) of the Act,[356] and also undermine the Chairwoman's call for a "uniform legal framework [that] applies to the whole country."[357]

The problem is not limited to state broadband requirements that conflict with the federal regulatory regime.  It is true, of course, that state regulations that do not simply duplicate the federal framework necessarily undermine the "reconcil[iation] [of] conflicting policies"[358] by embracing a *different policy balance*, one that will by definition *not* reflect the choices made by federal officials.  But even where a state purports to adopt the *same* requirements that Congress or the Commission have imposed, the high risk of inconsistent enforcement—*e.g.*, based on different interpretations of key terms, different judgments in weighing competing factors, different levels of expertise with the technical realities of broadband networks, etc.—implicates the same concerns.

---

[355] *Id.* ¶ 97.

[356] 47 U.S.C. § 152(b); *see also, e.g.*, *Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919) (holding that predecessor to Communications Act of 1934 put interstate communications "under federal control" and "excluded state action"); *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968) (recognizing that the Communications Act carried forward this "intent . . . to occupy the field [of interstate communications] to the exclusion of state law").

[357] *See NPRM*, Statement of Chairwoman Jessica Rosenworcel, at 2.

[358] *City of New York v. FCC*, 486 U.S. 57, 64 (1988).

**App. 928**

**CONCLUSION**

For the foregoing reasons, NCTA urges the Commission to maintain the light-touch Title I regulatory framework that has existed for virtually the entirety of the Internet's existence and defer to Congress to determine whether to enact additional Open Internet requirements.

Respectfully submitted,

_____/s/_____

Rick C. Chessen                         Matthew A. Brill
Steven F. Morris                        Matthew T. Murchison
Pamela S. Arluk                         Charles S. Dameron
Robert N. Rubinovitz                    Michael H. Herman
NCTA – THE INTERNET & TELEVISION        Kiley S. Boland
  ASSOCIATION                 LATHAM & WATKINS LLP
25 Massachusetts Avenue, NW             555 Eleventh Street, NW
Suite 100                               Suite 1000
Washington, DC 20001                    Washington, DC 20004

                                        *Counsel for NCTA – The Internet &*
December 14, 2023                         *Television Association*

App. 929

# EXHIBIT A

|  |  |
|---|---|
| In the Matter of | WC Docket No. 23-320 |
| Safeguarding and Securing the Open Internet | |

# Declaration of Mark Israel, Bryan Keating and Allan Shampine

## December 14, 2023

# TABLE OF CONTENTS

I.     QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF OPINIONS .................2

     A.     QUALIFICATIONS..........................................................................2

     B.     ASSIGNMENT AND SUMMARY OF OPINIONS ............................4

II.    THE U.S. BROADBAND INDUSTRY IS HIGHLY COMPETITIVE AND DYNAMIC WITH ONGOING ENTRY, EXPANSION, AND IMPROVEMENT ......................................................................9

     A.     CONSUMERS IN THE COMPETITIVE BROADBAND MARKETPLACE HAVE MANY OPTIONS, ALL OF WHICH ARE RAPIDLY GROWING AND IMPROVING ..........10

        1.     *Fixed Broadband Options Are Widely Available, Rapidly Growing, and Continually Improving* ........................................................................10

        2.     *Mobile Wireless Broadband Options Are Widely Available, Rapidly Growing, and Continually Improving* ...........................20

        3.     *Satellite Broadband Options Are Expanding and Improving with Multiple LEO Entrants*.................................................23

     B.     VIGOROUS COMPETITION IS TO BE EXPECTED IN LIGHT OF THE ECONOMICS OF THE BROADBAND INDUSTRY ...............25

     C.     THE PERFORMANCE OF THE BROADBAND INDUSTRY MAKES CLEAR HOW VIGOROUS COMPETITION IS ..................................31

III.   THE PROPOSED UTILITY-STYLE REGULATION CAN BE EXPECTED TO HAVE SIGNIFICANT LONG-TERM NEGATIVE IMPACTS ON BROADBAND INDUSTRY INVESTMENT AND INNOVATION AND THEREFORE ON THE ECONOMY AS A WHOLE ..................................................39

     A.     ECONOMIC THEORY IS CLEAR ON THE COSTS AND RISKS OF REGULATION ...........39

     B.     GIVEN THE SIZE AND IMPORTANCE OF THE BROADBAND INDUSTRY, THE LONG-TERM NEGATIVE IMPACTS OF REGULATION ARE LIKELY TO BE SUBSTANTIAL ................................................47

EXHIBIT A: CURRICULUM VITAE ....................................................57

# I. QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF OPINIONS

## A. QUALIFICATIONS

1.     My name is Mark Israel.  I am a Senior Managing Director at Compass Lexecon, an economic consulting firm where I have worked since 2006.  From 2000 to 2006, I served as a full-time member of the faculty at Kellogg School of Management at Northwestern University in Illinois.

2.     I am an economist by training and by profession.  I have Bachelor's, Master's and Doctoral degrees in economics.  I received my B.A. from Illinois Wesleyan University in 1991, graduating summa cum laude.  I received my M.S. from the University of Wisconsin-Madison in 1992.  I received my Ph.D. from Stanford University in 2001.

3.     I specialize in the economics of industrial organization—which is the study of competition in imperfectly competitive markets, including the study of antitrust and regulatory issues—as well as applied econometrics.  At Kellogg and Stanford, I taught graduate-level courses covering topics including business strategy, industrial organization economics, and econometrics.  My research on these topics has been published in leading peer-reviewed economics journals, including the American Economic Review, the Rand Journal of Economics, the Review of Industrial Organization, Information Economics and Policy, and the Journal of Competition Law and Economics.

4.     My work at Compass Lexecon has focused on the application of economic theory and econometric methods to competitive analysis of the impact of mergers, antitrust and pricing issues including a wide variety of single-firm and multi-firm conduct, class certification, and damages estimation.  I have analyzed these competition issues on behalf of a wide range of clients, including private companies and government entities.

5.     I have particular interest, experience, and expertise in applying economic analysis to issues involving competition and regulation in telecommunications.  I have been involved in the telecommunications industry throughout my career, have been among the lead economists on nearly all of the recent wireless telecommunications transactions of significance in North America, including the recent Sprint-T-Mobile and Verizon-Tracfone transactions in the United States and the recent Rogers-Shaw transaction in Canada.  As part of this work, I have submitted

**App. 933**

testimony related to the telecommunications industry before courts, tribunals, and regulatory bodies on many occasions.

6. I have testified in federal courts and multiple state courts in the United States, and in many regulatory and arbitration proceedings in the United States and around the world, including Canada. I have testified repeatedly before the U.S. Federal Communications Commission, which regulates international and interstate communications in the United States by, among other things, radio. In addition, I have testified before the Public Utilities Commission of the State of California ("CPUC") during my work on Verizon-TracFone, Sprint-T-Mobile, and Comcast-Time Warner Cable transactions. I have also presented my findings to the Department of Justice and the Federal Trade Commission on dozens of occasions. In addition, I have submitted expert reports, declarations, and affidavits to government agencies and federal and state/provincial courts on numerous occasions over the years.

7. My name is Bryan Keating. I am an Executive Vice President at Compass Lexecon, based in Washington, DC. I received a BA in Economics and Government in 1999 and a PhD from Stanford University in 2007. I have been with Compass Lexecon since 2007.

8. I specialize in the economics of industrial organization and competition economics. I have published papers in several economics journals, including the *Journal of Law and Economics*, the *Review of Network Economics,* the *Review of Industrial Organization,* the *European Business Organization Law Review, Antitrust Magazine,* and *Antitrust Source.* I have also authored chapters of several books related to competition economics.

9. I have applied my expertise in econometrics and applied microeconomics to a variety of matters involving mergers, regulatory proceedings, and commercial litigation. Many of these matters have involved issues relating to telecommunications. In particular, I have worked on several mergers involving wireline and wireless service providers. I have also previously submitted economic analysis in FCC regulatory proceedings. I have testified in federal court and arbitration proceedings in the United States and Canada. I have also presented economic analysis to a variety of competition, regulatory, and legislative bodies around the world.

10. My name is Allan Shampine. I am an Executive Vice-President of Compass Lexecon, an economic consulting firm. I received a B.S. in Economics and Systems Analysis

*summa cum laude* from Southern Methodist University in 1991, an M.A. in Economics from the University of Chicago in 1993, and a Ph.D. in Economics from the University of Chicago in 1996. I have been with Compass Lexecon since 1996.

11. I specialize in applied microeconomic analysis with a particular focus on technological innovation and antitrust. I am the editor of (and contributor to) the book <u>Down to the Wire: Studies in the Diffusion and Regulation of Telecommunications Technologies</u>, a contributor to the books <u>Cambridge Handbook of Technical Standardization Law</u>, <u>Antitrust Economics at a Time of Upheaval</u>, the <u>Telecom Antitrust Handbook</u>, and <u>Cartels Diagnosed: New Insight on Collusion</u>, and have been an editor of the American Bar Association journal *Antitrust Source*, branded in some periods as *Antitrust Magazine Online*, since 2011. I have published a variety of articles on technology, innovation and antitrust issues, including in the *Journal of Law and Economics, Journal of Intellectual Property Law & Practice, Review of Network Economics, Technological Forecasting & Social Change*, and the *Antitrust Law Journal*. I have previously provided economic evidence to the Patent Trial and Appeal Board, Federal Communications Commission, International Trade Commission, state public utility commissions, Federal Maritime Commission, U.S. district courts, arbitrators, European Commission, Korean Fair Trade Commission, Chinese National Development & Reform Commission, Info-Communications Development Authority of Singapore, and the Australian Competition & Consumer Commission.

12. Copies of our curriculum vitae are attached in Appendix A.

**B. ASSIGNMENT AND SUMMARY OF OPINIONS**

13. The Federal Communications Commission ("FCC") has released a Notice of Proposed Rulemaking ("*NPRM*") seeking "to reestablish the Federal Communications Commission's … authority over broadband Internet access service by classifying it as a telecommunications service under Title II of the Communications Act of 1934."[1] We have been asked by NCTA to describe, from an economic perspective, the state and evolution of

---

[1] *See Safeguarding and Securing the Open Internet*, FCC WC Docket No. 23-320, Notice of Proposed Rulemaking, FCC 23-83, ¶ 1 (rel. October 20, 2023) ("*NPRM*"). The *NPRM* sometimes refers to the 2015 order it seeks to reinstate and expand: *Protecting and Promoting the Open Internet*, FCC, GN Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, March 12, 2015 (hereinafter *2015 Order*).

4

competition in the U.S. broadband Internet access industry and to assess the likely effects of imposing Title II regulation on broadband service in light of the competitive state of the industry.

14.     Our first overall conclusion is that the U.S. broadband industry is a highly competitive and well-functioning marketplace, and indeed is one of the great success stories of the U.S. economy. The vast majority of U.S. consumers today have multiple broadband choices from a variety of providers and technologies, such as fiber, cable, and 5G home internet. Even limiting to fixed (non-mobile) broadband connections alone, most consumers have two or more 100+ Mbps options. And 5G *mobile* wireless options, which now offer download speeds of over 100 Mbps, are also available to the vast majority of consumers. In addition, satellite options of 50 to 100 Mbps or more are increasingly available and have already been selected by over a million consumers. Each of these technologies is expanding and improving, further increasing competitive options.

15.     These benefits of competition are amplified by the dynamics of the industry. The economics of broadband access technology and service – with high fixed costs to serve a customer in the first place but low marginal costs to serve them once the infrastructure is in place – create strong incentives for vigorous competition, which is exactly what is occurring. Firms have invested trillions of dollars to improve and expand their networks. Existing technologies have continually improved and expanded to new areas, and new technologies have been introduced. Average speeds have increased, and real prices have declined. Broadband has expanded so much and improved so much that associated innovation has fundamentally reshaped parts of the economy, such as how video is consumed in the United States.

16.     Our second overall conclusion is that subjecting the broadband industry to pervasive Title II regulation as proposed in the *NPRM* would put this success story at risk: It would have significant negative impacts on the industry and, because broadband has become so important to the overall U.S. economy, a significant negative impact on the economy as a whole. The FCC argues that pervasive new regulation is justified because broadband has become a very important foundation for the U.S. economy.[2] We agree that the broadband industry is a great

---

[2]     *NPRM*, ¶ 17 ("BIAS connections have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression. … '[A]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States.'").

**App. 936**

success story and has been a critical foundation for welfare-enhancing developments in the U.S. economy, but we draw the opposite inference from that success than the FCC does—such regulation would put the very success the FCC appeals to at risk, with no pervasive market failure to justify such a risk.  In our opinion, the *NPRM* is a "solution" in search of a problem. The industry has already experienced enormous expansion and entry, and imposing pervasive regulation now, just as yet more technologies (including mobile and fixed broadband access based on 5G wireless technology) are entering and multiple government programs are seeking to incentivize build-outs in low-density areas, is particularly dangerous.  The *NPRM*'s proposed regulation will chill investment during an important phase of the industry where competition and dynamism is increasing and multiple new access technologies are being deployed.

17.  The *NPRM* suggests that the proposed regulation will be clear and light, but in fact the *NPRM* is an example of continuing regulatory creep, and the proposed regulation is both pervasive and uncertain in its precise boundaries and application—exactly the setup for investment deterring regulation.  The *NPRM* proposes imposing Title II obligations and restrictions to address national security, cybersecurity, public safety, network resiliency, MDU access, and other objectives never before cited by the FCC as bases for Title II regulation.[3]  The *NPRM* also proposes that the FCC investigate disputes over interconnection;[4] "watch, learn, and act as required" in a deliberately unspecified future way with respect to "Internet traffic exchange;"[5] exercise authority over what are "reasonable network management" practices,[6] including over unlicensed Wi-Fi networks;[7] enforce the open Internet rules through investigation and the processing of complaints and possibly through the use of enforcement advisories and advisory opinions;[8] interpret and enforce Section 222 on consumer privacy under which the FCC has claimed pervasive oversight of providers' privacy practices;[9] apply Sections 225/255 and 251(a)(2) to ensure disabilities access, presumably through dictates involving deployment of

---

[3]      *NPRM*, ¶¶ 25-39, 52-54.

[4]      *NPRM*, ¶ 66.

[5]      *NPRM*, ¶ 187.

[6]      *NPRM*, ¶ 188.

[7]      *NPRM*, ¶ 61.

[8]      *NPRM*, ¶¶ 189-93.

[9]      *NPRM*, ¶¶ 41-44.

**App. 937**

infrastructure and structuring of services;[10] apply Section 224 rules on infrastructure access, noting that the rules may not be limited to pole attachments;[11] and apply Section 254 to promote universal broadband, again presumably through dictates involving deployment of infrastructure and structuring of services.[12] Such broad, sweeping regulatory intervention, without clear limits, is a recipe for deterring investment.

18.     The uncertainty with respect to the treatment of services both new and existing is compounded by the proposal for a "general conduct standard" under Sections 201 and 202, under which firms might need to obtain FCC approval before introducing new features or else risk fines and other penalties if features are later deemed not to comply with the standard.[13] Also, the FCC proposes not to forbear from Section 214, under which ISPs could be subjected to burdensome new entry and exit requirements, mandatory buildout requirements, obligations related to discontinuing services, and additional regulatory reviews of transfer-of-control and assignment transactions.[14] Firms should be concerned about rate-of-return regulation authorized under Section 201/202 of Title II, and which has been applied by the FCC to various services in the past. Those concerns are heightened by the fact that the FCC investigated zero-rating after the 2015 Order, which is a direct intervention in pricing, and this *NPRM* expressly raises the likelihood of the FCC regulating data plans and investigating "unjust and unreasonable charges and practices."[15] All of this creates risk that will further lessen investment, both by depressing the return on investment and by increasing the risks associated with investment – including risks due to regulatory creep – which increases the cost of capital and further depresses investment incentives.

19.     The *NPRM* assumes that such pervasive and uncertain regulation is costless, and argues that given how successful and important broadband has become, it is best to regulate now just in case there might be problems in the future. Regulating an industry *because* it has been

---

[10]     *NPRM*, ¶ 55.

[11]     *NPRM*, ¶ 47.

[12]     *NPRM*, ¶¶ 49-51.

[13]     *NPRM*, ¶¶ 164-67.

[14]     *NPRM*, ¶¶ 27, 108.

[15]     *NPRM*, ¶ 156.

successful gets the economics backward.  Regulation is costly.  If an industry has been successful *without* pervasive regulation, *i.e.*, there is no obvious critical market failure that needs to be addressed, then imposing such regulation is likely to damage the industry going forward, as it shows that success will be punished.  Future investment will be less attractive in light of new regulation, and will be even less attractive given the prospect of further regulatory creep.  A statement that success breeds regulation is a direct message that investment returns risk being cutoff by regulation, which will make it harder for the industry to raise capital and thus slow its growth.

20.     Uncertainty as to the extent and application of the proposed regulation and the likelihood of further regulatory creep is of particular importance right now because there are multiple providers deploying, or planning to deploy, fiber networks in rural areas under the RDOF, ARPA, and BEAD federal programs, as well as other state and local initiatives. Deploying fiber networks in low-density areas involves careful evaluation of the significant deployment costs given the more limited future revenue potential from pools of fewer potential customers.  In addition, fixed wireline providers continue to expand their networks to new areas with fiber and hybrid fiber-coax technologies that have high capacity but are expensive to deploy.  Any uncertainty regarding additional costs imposed by new regulations could put those rural and other new deployment plans on hold or in jeopardy.  In addition, fixed wireline providers continue to expand their networks to new areas with fiber and hybrid fiber-coax technologies that have high capacity but are expensive to deploy.

21.     Notably, two new access technologies – mass-market 5G fixed wireless and low-earth-orbit ("LEO") satellite – are currently in the early stages of being rolled out.  Fixed wireless has shown rapid growth in recent years, but, for it to continue to grow, the companies investing in it will be considering the long-term returns.  Similarly, the companies deploying LEO constellations of satellites must consider the costs and benefits of deploying thousands of satellites and of replacing them with new generations of satellites in the future.  Even if the companies believed that the current FCC would forbear from any economically significant changes in how they are treated – and it is hard to see why such a claim would be credible given the history of regulatory creep – the door would be open for future Commissions to stop forbearing.  The effects of uncertainty are particularly corrosive in the early stages of investment when there are long time horizons for returns, which is clearly the case for all broadband

providers, and yet the *NPRM* seeks to subject these providers to new and pervasive regulation that provides the FCC with sweeping powers to dictate how the companies do business. These concerns are not just theoretical. Regulatory impact on investment has been a serious concern in many countries, and, for example, U.S. broadband deployment and adoption are substantially higher than in the more heavily regulated European Union. Furthermore, the FCC analogizes the broadband industry to utilities, but that comparison should serve as a warning, as many regulated utilities in the United States have suffered from decades of chronic under-investment.

22. To summarize, the broadband industry is highly competitive and dynamic, and broadband competition and availability are increasing widely including by new technologies and new entrants. The regulations proposed by the *NPRM* are not only unnecessary and unjustified, but counterproductive. Pervasive regulation of broadband should require evidence of market failure sufficient to justify the costs and risks of that regulation. No such market failure exists here. To the contrary, broadband has been one of the great success stories of the U.S. economy. The Title II regulation proposed in the *NPRM* is a "solution" in search of a non-existent problem that would impose costs that clearly outweigh any benefits.

## II. THE U.S. BROADBAND INDUSTRY IS HIGHLY COMPETITIVE AND DYNAMIC WITH ONGOING ENTRY, EXPANSION, AND IMPROVEMENT

23. Competition is evident from the number of options available, their rapid growth, the huge increases in output, and the declines in real prices in the industry. Today broadband is available through copper, fiber, coaxial cable, fixed wireless, mobile wireless, LEO satellite, and geo-stationary satellite, and in many cases multiple providers are available for a given access technology. Ninety four percent of U.S. locations have access to at least one fixed broadband provider offering at least 25/3 Mbps service, and 80 percent of those have at least two fixed providers offering service.[16] Similarly, 91 percent U.S. locations have access to at least one fixed broadband provider offering at least 100/20 Mbps service, and 60 percent of those have at least two fixed providers offering service. Ninety-seven percent of the U.S. population has access to 5G service, and 90 percent has access to 5G service through at least two providers. Satellite options are widely available (essentially every location in the country can be served by

---

[16] The FCC currently defines broadband service as providing at least 25 Mbps download speeds and 3 Mbps upload speeds.

**App. 940**

geostationary satellite) and Starlink, a low-earth-orbit satellite provider, has signed up 1.5 million subscribers worldwide as of May 2023. Overall, the vast majority of the population at this point has access to broadband, with multiple programs in place to fill in the few remaining gaps.

24. Firms have collectively invested trillions of dollars to achieve this outcome. The services have also continually improved. Maximum speeds have steadily risen. Real prices for service have declined. Usage has exploded. And firms vigorously compete with one another, as evidenced by their deployments, improvements, prices, and vigorous advertising.

A. **CONSUMERS IN THE COMPETITIVE BROADBAND MARKETPLACE HAVE MANY OPTIONS, ALL OF WHICH ARE RAPIDLY GROWING AND IMPROVING**

1. **Fixed Broadband Options Are Widely Available, Rapidly Growing, and Continually Improving**

25. The great majority of locations in the U.S. tracked by the FCC are already served by fixed broadband options – by which we mean wireline or fixed wireless options. Figure 1 below, which is based on data from the FCC on service availability as of December 2022, indicates that 94 percent of U.S. locations have access to at least one fixed broadband provider offering at least 25/3 Mbps service,[17] 91 percent have access to at least one such provider offering at least 100/20 Mbps service, and 85 percent have access to at least one such provider offering 1 Gbps service.[18] These figures are conservative in light of the pace of broadband deployment and the use of 2022 data. To be clear, "unserved" in the figure refers only to this specific group of access technologies – the great majority of those locations also have access to mobile wireless or satellite options.

---

[17] Throughout this report, we use the convention of listing download speeds first and upload speeds second. For example, 25/3 Mbps service refers to 25 Mbps download speed and 3 Mbps upload speed.

[18] FCC Broadband Data Collection, December 31, 2022 As Of Date, https://broadbandmap.fcc.gov/data-download/nationwide-data?version=dec2022, 8/16/2023 Update, Retrieved 8/28/2023. See also "What is the Location Fabric?" FCC, August 2, 2023, *available at* https://help.bdc.fcc.gov/hc/en-us/articles/5375384069659-What-is-the-Location-Fabric- ("The Broadband Serviceable Location Fabric (Fabric) is a dataset of all locations in the United States and its Territories where fixed broadband internet access service is or could be installed."). The data we use represent service availability as of December 31, 2022.

**App. 941**

**Figure 1: Share of U.S. Locations with Access to Fixed Broadband Service of at Least the Specified Speed (2022)**



*Source:* FCC Broadband Data Collection.

*Notes:* Figure includes wireline and fixed wireless providers. Fixed wireless providers include those using Licensed spectrum, Licensed-by-Rule spectrum, or unlicensed spectrum. Locations include both residential and business locations that the FCC considers to be serviceable with mass market broadband (as opposed to enterprise-grade service). Locations can represent multiple households or businesses.

26. Even limiting just to fixed broadband, the great majority of U.S. locations already have multiple options. Figure 2 below indicates that, among the U.S. locations with access to at least 25/3 Mbps service from a fixed broadband provider, 80 percent have access to two or more fixed broadband providers, with 49 percent having access to three or more. Of locations with access to at least 100/20 Mbps fixed broadband service, approximately 60 percent have access to two or more providers offering such service.

**Figure 2: Share of U.S. Locations with Access to Fixed Broadband Service, by Speed and Number of Fixed Broadband Providers (2022)**



*Source:* FCC Broadband Data Collection.

*Notes:* Figure includes wireline and fixed wireless providers. Fixed wireless providers include those using Licensed spectrum, Licensed-by-Rule spectrum, or unlicensed spectrum. Locations include both residential and business locations that the FCC considers to be serviceable with mass market broadband (as opposed to enterprise-grade service). Locations can represent multiple households or businesses.

27.     Both wireline and fixed wireless providers continue to expand their availability. As a result, the percentage of households with access to multiple higher speed fixed broadband providers has steadily increased. FCC data show that, between 2018 and 2021, the share of households living in census blocks with two or more providers offering 25/3 Mbps speeds and 100/20 Mbps increased by 22.4 and 15.1 percentage points, respectively.[19]  See Figure 3.[20]

---

[19]     "2022 Communications Marketplace Report," FCC, December 30, 2022, (hereinafter *FCC 2022 Communications Marketplace Report*), Figure II.A.28.

[20]     This FCC data set is different than the one discussed in the prior section – this data set is focused on census blocks, while the prior data set is focused on individual locations tracked by the FCC. The trends are nonetheless useful as they show service being rolled out in many new census blocks.

**App. 943**

**Figure 3: Share of U.S. Households Living in Census Blocks with Access to Two or More Providers for Fixed Broadband Services (2018-2021)**



Source: FCC 2022 Communications Marketplace Report, Figure II.A.28.

28.     In addition, the share of households living in census blocks with three or more providers offering at least 25/3 Mbps speed went from 22 percent in 2018 to 69 percent in 2021. See Figure 4.

**App. 944**

**Figure 4: Share of U.S. Households Living in Census Blocks with Access to Three or More Providers Offering at Least 25/3 Mbps Fixed Broadband Service (2018-2021)**



Source: FCC 2022 Communications Marketplace Report, Figure II.A.28.

29.     With respect to wired broadband, providers continue to roll out fiber to new locations, with one report estimating that they would add, in 2023, "between 6.5 million and 7 million new locations – at a minimum."[21]  New Street Research reports that fiber deployment has been proceeding at about 4.5 million new passings added over the trailing twelve months.[22]  See Figure 5.

---

[21]     Diana Goovaerts, "Here's how much fiber US operators are planning to build in 2023," *Fierce Telecom*, February 24, 2023, *available at* https://www.fiercetelecom.com/broadband/heres-how-much-fiber-us-operators-are-planning-build-2023.

[22]     *Fiber to the Future: Key Takeaways*, New Street Research, April 3, 2023; and *Autumn for Broadband 3Q23 – the halftime report*, New Street Research, October 28, 2023.

**Figure 5: New Street Research Analysis of Fiber Locations Passed
(Trailing Twelve Months)**



*Source:* "Autumn for Broadband 3Q23 – the halftime report," New Street Research, October 28, 2023, Figure 7.

30.     The FCC has discussed how rapidly both high-capacity HFC cable and fiber-to-the-premises have expanded.  We reproduce below a figure from the FCC's 2022 Communications Marketplace Report showing the rapid growth of what the FCC characterized as "technologies that have considerable download speed capabilities."[23]  See Figure 6.  We discuss below how DOCSIS 3.1 is being replaced by DOCSIS 4.0, which offers even greater capacity.

---

[23]     *FCC 2022 Communications Marketplace Report,* ¶ 23.

**App. 946**

**Figure 6: FCC Figure on Growth of FTTP and DOCSIS 3.1**



Fig. II.A.2
U.S. Population Coverage by Technology

Source: FCC Form 477; 2020 Census data.

31.     With respect to fixed wireless, Moffett Nathanson has reported that T-Mobile and Verizon have added millions of subscribers to their fixed wireless broadband services from 2020 to 2022.  See Figure 7.  This rate of growth has continued since then.  Leichtman Research Group reports as of 2Q 2023 that "[f]ixed wireless services have acquired over 800,000 net adds in each of the past five quarters, accounting for about 4.45 million net adds in that period."[24] And fixed wireless providers exceeded that 800,000 per quarter average growth rate in 3Q 2023 – T-Mobile and Verizon alone added 941,000 fixed wireless customers.[25]

---

[24]     "About 840,000 Added Broadband in 2Q 2023," Leichtman Research Group, August 14, 2023, *available at* https://leichtmanresearch.com/about-840000-added-broadband-in-2q-2023/.

[25]     Luke Bouma, "T-Mobile is the fastest growing home Internet provider in the United States as Cord Cutting 2.0 grows," *Cord Cutters News*, November 13, 2023, *available at* https://cordcuttersnews.com/t-mobile-is-the-fastest-growing-home-internet-provider-in-the-united-states-as-cord-cutting-2-0-grows.

**App. 947**

**Figure 7: T-Mobile and Verizon Fixed Wireless Broadband Subscribers
Q4 2020 – Q4 2022**



*Source:* "Fixed Wireless Access: Where the Subscribers Are Coming From (An Update)," Moffett Nathanson, April 3, 2023, Exhibit 1.

32.     Starry is another provider of fixed wireless broadband services.  It offers a symmetrical 200/200 plan for $50/month (including equipment).[26]  Starry is available in Boston, Washington, DC, Denver, Los Angeles, and New York City, with a focus on multi-dwelling units ("MDUs").[27]  While Starry recently went through bankruptcy reorganization, the restructuring process has been approved and Starry will continue to operate.[28]

---

[26]     "Internet," Starry, *available at* https://starry.com/internet.

[27]     "Internet: Frequently Asked Questions," Starry, *available at* https://starry.com/internet.

[28]     "Starry exits Chapter 11," *Light Reading*, August 31, 2023, *available at* https://www.lightreading.com/broadband/starry-exits-chapter-11/d/d-

33.    Fixed broadband providers also continue to invest in improving services with existing infrastructure.  For example, as shown in Figure 8 below, cable network operators have deployed successive generations of standards supporting the provision of broadband over cable networks.  Since 1997, cable broadband providers have deployed three main generations of the Data-over-Cable Service Interface Specifications (DOCSIS) standard, each with improved speed, capacity, and latency.[29]  Elements of the fourth standard (DOCSIS 4.0), which initially offer symmetrical speeds of up to 2 Gbps and will ultimately support maximum download speeds of 10 Gbps (ten times what DOCSIS 3.0 would support), are now being deployed.[30]

---

id/786341#:~:text=On%20May%2026%2C%202023%2C%20the,an%20infusion%20of%20exit%20funding.

[29]    "Driving Gigabit Speeds: From Lab to Consumer," CableLabs, Fall 2018, *available at* https://www.cablelabs.com/driving-gigabit-speeds-from-lab-to-consumer.

[30]    "Comcast to Deliver Multi-Gig Symmetrical Speeds in World-First DOCSIS 4.0 Deployment," *Xfinity,* Press Release, October 12, 2023, *available at* https://corporate.comcast.com/press/releases/comcast-multi-gig-symmetrical-speeds-world-first-docsis-4-deployment.  "DOCSIS® 4.0 Technology," CableLabs, *available at* https://www.cablelabs.com/technologies/docsis-4-0-technology.  See also *FCC 2022 Communications Marketplace Report,* ¶ 18.

**App. 949**

**Figure 8: The Evolution of Cable Broadband Technology**

| THE EVOLUTION OF DOCSIS | DOCSIS 1.0 | DOCSIS 1.1 | DOCSIS 2.0 | DOCSIS 3.0 | DOCSIS 3.1 | DOCSIS 4.0 |
|---|---|---|---|---|---|---|
| HIGHLIGHTS | Initial cable broadband technology | Added voice over IP service | Higher upstream speed | Greatly enhanced capacity | Capacity and efficiency progression | **Symmetrical streaming and increased upload speeds** |
| MAX DOWNSTREAM CAPACITY | 40 Mbps | 40 Mbps | 40 Mbps | 1 Gbps | 10 Gbps | **10 Gbps** |
| MAX UPSTREAM CAPACITY | 10 Mbps | 10 Mbps | 30 Mbps | 100 Mbps | 1-2 Gbps | **6 Gbps** |
| INITIAL SPECIFICATION DATE | 1997 | 1999 | 2001 | 2006 | 2013 | **2019** |

*Source:* "Driving Gigabit Speeds: From Lab to Consumer," CableLabs, Fall 2018, *available at* https://www.cablelabs.com/driving-gigabit-speeds-from-lab-to-consumer.

34.    As a result, not only have the maximum available speeds increased greatly over time, but the average speeds have continually increased.  See Figure 9.  Between 2011 and 2022, average download speeds went from around 10 Mbps to around 250 Mbps.

**App. 950**

**Figure 9: U.S. Average Broadband Speeds (2011-2022)**



*Source:* Current and archived Ookla data maintained by NCTA.

*Note*: See also FCC data.[31]

35.     All of this expansion and improvement requires ongoing investment.  These are not "one-and-done" networks.  And, in particular, mass-market 5G fixed wireless offerings, while growing rapidly, are still in their relatively early stages.  We discuss the importance of that fact with respect to concerns about new regulation in Section III.

> **2.      Mobile Wireless Broadband Options Are Widely Available, Rapidly Growing, and Continually Improving**

36.     Mobile wireless broadband is widely available, rapidly growing, and continually improving.  The continual improvement means that it is increasingly available at speeds

---

[31]     "Charts – Measuring Fixed Broadband – Eleventh Report," FCC. December 31, 2021, *available at* https://www.fcc.gov/reports-research/reports/measuring-broadband-america/charts-measuring-fixed-broadband-eleventh underlying data for Charts 12.1 (chart12.1-sept-2021.xlsx) and 12.2 (chart12.2-sept-2021.xlsx).

**App. 951**

comparable to other broadband access technologies, and demonstrably suitable for uses such as streaming video, given that a large portion of total cellular traffic today consists of video. The prevalence of hot spot / tethering capability in wireless devices also shows they are commonly used to enable broadband connectivity.[32] The percentage of adults who have smartphones but do not use home fixed broadband was 15 percent in 2021.[33, 34] That figure was 28 percent for 18-29 year olds.[35]

37.     5G mobile wireless services are widely available. As shown in Figure 10 below, at the end of 2022, according to FCC data, 5G service covers 97 percent of the population, and, again, the great majority of locations have a choice of providers. Approximately 90 percent of the U.S. population lived in census blocks where two or more mobile-wireless broadband providers offered 5G service, and approximately 74 percent of the U.S. population lived in census blocks in which three or more mobile-wireless broadband providers offered 5G service.

---

[32]     Computerworld's guide to using phones as mobile hot spots noted that their own testing found 5G connections at over 100 Mbps. See Brian Nadel, "How to use a smartphone as a mobile hotspot," Computerworld, November 27, 2023, *available at* https://www.computerworld.com/article/2499772/how-to-use-a-smartphone-as-a-mobile-hotspot.html?page=2.

[33]     "Internet/Broadband Fact Sheet," *Pew Research Center,* April 7, 2021, *available at* https://www.pewresearch.org/internet/fact-sheet/internet-broadband/#smartphone-dependency-over-time.

[34]     Among those respondents that do not have home internet service, a majority indicate that one reason is that their smartphones and other connection options are sufficient. (Andrew Perrin, "Mobile Technology and Home Broadband 2021," *Pew Research Center,* June 3, 2021, *available at* https://www.pewresearch.org/internet/2021/06/03/mobile-technology-and-home-broadband-2021/ ("Beyond cost barriers, a little fewer than half of non-users cite having other options for internet access or the fact that their smartphone does everything online they need as a reason why they do not have a high-speed internet connection at home.").

[35]     "Mobile Fact Sheet," *Pew Research Center*, April 7, 2021, https://www.pewresearch.org/internet/fact-sheet/mobile/.

**App. 952**

**Figure 10: Percentage of U.S. Population as of December 2022 with Access to 5G Service by Number of Providers**



*Source:* FCC Broadband Data Collection; US Census Bureau.

*Note:* This figure provides estimated 5G coverage by census block.

38.     In many areas, mobile-wireless services already provide speeds that exceed the FCC's current definition of broadband and even speeds that approach or exceed 100/20 Mbps. The average of the three main carriers' median 5G download speeds was 159 Mbps in Q3 2023, up from an average median download speed of 147 Mbps in Q2 2023.[36]

39.     As noted above, all major U.S. mobile wireless carriers have deployed 5G networks and the technology is now available in most major cities and towns in the United States.[37]  DISH has also been actively building its 5G network throughout the country and its

---

[36]     "Speedtest Global Index: United States Median Country Speeds," *Speedtest,* October 16, 2023, *available at* https://www.speedtest.net/global-index/united-states#market-analysis (based on mobile data for September 2023).

[37]     Matthew Lynch, "Where is 5G Available in the US? (Updated for 2023)," May 31, 2023, *The Tech Edvocate, available at* https://www.thetechedvocate.org/where-is-5g-available-in-the-us-updated-for-

**App. 953**

network is currently available to over 70 percent of the U.S. population.[38]  The 5G network supports both home Internet use and network-compatible devices, which are expected to increase in availability throughout the year.[39]

40.     These speeds are demonstrably adequate to handle common broadband use cases such as streaming video.  Approximately 10 percent of Netflix content is watched on mobile devices and five percent on tablets,[40] and video accounts for a large portion of overall wireless network traffic.  For example, the North American carrier participating in Ericsson's June 2023 mobile traffic report indicated that over 40 percent of its total mobile network traffic was video.[41]  Continued improvement in the networks that has enabled all this video traffic on mobile networks does, of course, require continued large investments, as we return to in Section III.

### 3.     Satellite Broadband Options Are Expanding and Improving with Multiple LEO Entrants

41.     Satellite broadband access historically was provided through geostationary satellites in high earth orbit ("GEO").  Recently, LEO satellites have begun to be used.  Both technologies offer the advantage of being able to serve remote locations that may have difficulty obtaining terrestrial services.  Both have also had continuing improvements.

42.     Traditional GEO providers like Hughesnet have begun launching new satellites with improved capabilities.  For example, Hughesnet has announced it would launch an "ultra-high density JUPITER 3 satellite" that will include "service plans with speeds up to 100 Mbps

---

2023/#:~:text=As%20of%202023%2C%205G%20networks,citizens%20access%20to%20faster%20connectivity.

[38]     "The DISH 5G Network is Now Available to Over 70 Percent of the U.S. Population," *DISH,* June 15, 2023, *available at* https://about.dish.com/2023-06-15-The-DISH-5G-Network-is-Now-Available-to-Over-70-Percent-of-the-U-S-Population.

[39]     *Id.*

[40]     "Netflix Statistics – 2023," *TrueList*, January 9, 2023, *available at* https://truelist.co/blog/netflix-statistics/.

[41]     Ericsson Mobility Report, June 2023, *available at* https://www.ericsson.com/49dd9d/assets/local/reports-papers/mobility-report/documents/2023/ericsson-mobility-report-june-2023.pdf, see p. 17 and Figure 17.

**App. 954**

down."[42]  Hughesnet also offers "Fusion" plans that combine wireless and satellite, allowing improved service in areas where either option on its own might be less desirable.[43]

43.    In addition, several firms are in the process of deploying LEO satellite constellations designed to provide improved satellite broadband relative to the older high earth orbit-based satellite broadband.[44]  The most prominent of these are SpaceX's Starlink and Amazon's Project Kuiper.

44.    Starlink has launched around 4,500 LEO satellites.[45]  Starlink had 1.5 million global subscribers in May 2023, up from one million subscribers at the end of 2022.[46]  Starlink expects to have approximately 2.2 million active subscribers by the end of 2023.[47]

45.    A recent study by Ookla found that Starlink had a high net promoter score (NPS) – a measure of the loyalty of the product's customer base – indicating that customers find its service to be attractive.[48]  Ookla measured Starlink's median speed in the United States in 4Q22-

---

[42]    "HughesNet Fusion plans combine satellite and wireless technologies for a high-speed, low-latency internet experience," *Hughes Network Systems* via Cision PR Newswire, September 12, 2022, *available at* https://www.prnewswire.com/news-releases/hughes-launches-new-high-speed-low-latency-satellite-service-plans-for-consumers-301621719.html.

[43]    See, *e.g.*, "Hughesnet Fushion," *available at* https://www.hughesnet.com/fusion#:~:text=HughesNet%20Fusion%20plans%20combine%20satellite%20and%20wireless%20technologies%20to%20deliver,rich%20websites%20and%20video%20conferencing.

[44]    *FCC 2022 Communications Marketplace Report,* ¶ 6.

[45]    Mike Wall, "SpaceX launches 52 Starlink satellites, lands rocket at sea," *SPACE.com*, June 12, 2023, *available at* https://www.space.com/spacex-starlink-launch-group-5-11.

[46]    "Starlink reaches 1.5m subscriptions milestone," TeleGeography, May 10, 2023, *available at* https://www.commsupdate.com/articles/2023/05/10/starlink-reaches-1-5m-subscriptions-milestone/#:~:text=Starlink%20%E2%80%93%20the%20Low%20Earth%20Orbit,the%201.5%20million%20subscriptions%20milestone.

[47]    Brent Prokosh, "Starlink may account for up to 40% of SpaceX's 2023 revenue," *SpaceNews*, July 27, 2023, *available at* https://spacenews.com/starlink-may-account-for-up-to-40-of-spacexs-2023-revenues/.

[48]    Josh Fomon, "New Speedtest Data Shows Starlink Users Love Their Provider," Ookla, May 8, 2023, *available at* https://www.ookla.com/articles/starlink-hughesnet-viasat-performance-q1-2023.

NPS ratings are categorized into Detractors (score 0-6), Passives (score 7-8), and Promoters (score 9-10), and is calculated as (% Promoters – % Detractors) x 100.  Any NPS score above zero indicates that a provider's audience is more loyal than not.

**App. 955**

1Q23 at 67/8 Mbps.[49]  Starlink states that "users typically experience download speeds between 25 and 220 Mbps… These speeds make Starlink suitable for streaming, video calls, online gaming, and other typical household internet use."[50]

46.　　Amazon's Project Kuiper has launched two prototype satellites as of October 6, 2023, and expects to begin serving customers by the end of 2024.  Its FCC license requires that at least half of its satellite constellation be deployed and operational by July 2026.[51]  In March 2023 it showcased three customer terminals with 100 Mbps, 400 Mbps and gigabit service.[52]

47.　　Overall, there is great breadth of competitive options, with more on the horizon as existing access technologies improve and expand to serve new areas, new providers begin offering existing access technologies, and new access technologies are deployed.  The development of these services will depend on large and ongoing investments that involve a great deal of risk with the payout occurring only years hence.  The expected regulatory environment is of great concern to such investors, as we discuss in Section III.

## B.　VIGOROUS COMPETITION IS TO BE EXPECTED IN LIGHT OF THE ECONOMICS OF THE BROADBAND INDUSTRY

48.　　As described in the section above, consumers have multiple competitive options available to obtain broadband service.  Economics teaches that in markets such as broadband Internet access, the presence of even two competitors is likely to result in effective competition, which is precisely what we have seen.  In particular, the presence of high sunk costs and low variable costs in this industry means that competition is likely to be intense, even with only two providers.

---

[49]　　Josh Fomon, "New Speedtest Data Shows Starlink Users Love Their Provider," Ookla,  May 8, 2023, *available at* https://www.ookla.com/articles/starlink-hughesnet-viasat-performance-q1-2023.

[50]　　"Starlink Specifications," Starlink, *available at* https://www.starlink.com/legal/documents/DOC-1400-28829-70

[51]　　Thomas Kohnstamm, "Everything you need to know about Project Kuiper, Amazon's satellite broadband network," Amazon, October 30, 2023, *available at* https://www.aboutamazon.com/news/innovation-at-amazon/what-is-amazon-project-kuiper.

[52]　　*Id.*

**App. 956**

49.      More precisely, broadband infrastructure investments are in large part economically "sunk," which means that the relevant variable costs exclude those sunk costs, giving all providers in the area low variable costs to serve new customers and thus strong economic incentives to serve any available customer in the area.  These sunk investments thus thrust rivals into vigorous price competition.  This general proposition is well known in the economic literature.  For example, as noted by Richard Gilbert, "sunk costs are likely to contribute to exit barriers,"[53] and where such exit barriers exist, firms have strong incentives to stay and compete even as prices fall.  Put another way, once the sunk-cost network is in place, even a small return that exceeds the low marginal costs of winning or retaining customers is better than no return.  However, as we discuss in Section III, this cost structure also means that increased regulatory concerns as to whether firms will be able to recoup their investments will make them more reluctant to make sunk investments in the first place.

50.      The FCC itself has previously found that in the presence of large sunk costs with respect to business data services, most of the benefits of additional competition appear with the introduction of a second provider.  As the FCC explained:

> [T]here is a substantial competitive effect when a wireline competitor is present to discipline rates, terms, and conditions to just and reasonable levels. … [T]here is a general expectation that the largest benefits from competition come from a second provider, with added benefits of additional providers falling thereafter, in part because, consistent with other industries with large sunk costs, the impact of a second provider is likely to be particularly profound in the case of wireline network providers.  A wireline provider is willing to cut prices to as low as the incremental cost of supplying a new customer, requiring minimal contribution to its sunk costs.[54]

51.      At times, including in the *NPRM*, the FCC has suggested that even if there is retail competition, that may not matter because of terminating access monopolies or

---

[53]      Richard Gilbert, "Mobility Barriers and the Value of Incumbency," in *Handbook of Industrial Organization*, Vol. 1, Richard Schmalensee and Robert Willig, eds., 1989, p. 520.

[54]      *In the Matter of Business Data Services in an Internet Protocol Environment*, FCC, FCC 17-43, Report and Order, April 28, 2017, ¶ 120.

externalities.[55]  We have previously written about our disagreement with those concerns (as we discuss below), and we summarize our position here.

52.  Even setting aside the changes in the industry, as a general matter, "terminating access" problems are not market failures to be ameliorated by regulatory intervention, but are actually market distortions *created by* regulation, most notably in the context of landline voice long-distance services.[56]  In that context, interexchange carriers ("IXCs") required access to local exchange carrier ("LEC") networks to terminate calls. LECs could charge high fees for that access and the IXCs were required to pay those fees.  The IXCs could not charge their own customers different fees based on the LEC fees, and the LEC customers had no direct relationship with the IXCs.  Because the end users did not have to bear the higher costs, they had no reason to switch to an alternative terminating access provider, which arguably gave their local provider market power in the provision of terminating access service.

53.  In contrast, if an Internet Service Provider attempted to block or throttle specific content, its end user customers would be directly affected by that behavior, and could directly observe a decline in quality of performance, and they would have the incentive and ability to react to that conduct.  The same is true if an Internet Service Provider attempted to impose discriminatory charges on particular content providers: Unlike long distance carriers, those content providers would be under no regulatory obligation to agree to those fees, nor would they be prevented from passing them on to the customers of the Internet Service Provider ("ISP") that imposed them.  That is, because end consumers can directly observe and respond to any blocking, throttling, or cost differentials, the problem created by regulation with respect to long distance service does not exist here.  Not only are there no regulatory distortions to create terminating access monopoly concerns in broadband Internet access, but industry participants do not appear to behave as though broadband providers or firms in analogous situations have terminating access monopolies.

---

[55]    See generally 2015 Order; *NPRM,* ¶¶ 123-129.

[56]    Andres Lerner & Janusz Ordover, "The 'Terminating Access Monopoly' Theory and the Provision of Broadband Internet Access," January 14, 2015.  Jonathan Nuechterlein & Christopher Yoo, "A Market-Oriented Analysis of the 'Terminating Access Monopoly' Concept," 14 *Colo. Tech. L.J.* (2015).

**App. 958**

54.     Furthermore, there are many different ways a content provider can route its traffic.  We addressed this topic back in 2013 and 2017 when it was raised then and pointed out that there are many interconnection arrangements.[57]  For example, large content providers like Netflix have developed their own Content Delivery Networks ("CDNs") and negotiate access directly with certain ISPs.  Other content providers, including smaller content providers that do not have their own CDNs, use third-party CDNs such as Akamai to achieve the same objective.[58]  Agents of content providers, including CDNs, have many options to reach an ISP's network, including both direct peering arrangements and indirect transit arrangements.[59]  For example, CDNs can and do purchase transit services from one or more of the ISP's peering partners, many of whom exchange traffic with the broadband Internet access provider on settlement-free terms.  A CDN could also opt to send traffic via an ISP's paid transit connection, which could impose costs on the ISP.[60]

55.     The variety of options that content providers have to access an ISP's network means that an ISP cannot feasibly target particular content for disfavored treatment because, to do so, it would need to sabotage interconnection arrangements with multiple other networks and thus substantially degrade its users' access to many internet endpoints.  Similarly, the option to

---

[57]     See, for example, Stanley M. Besen & Mark A. Israel, "The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation," 25 *Info. Econ. & Pol'y* 235 (2013); Mark Israel &Bryan Keating, "Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom*," October 31, 2017.

[58]     Doing so, either via third-party CDNs or via proprietary CDNs such as Netflix Open Connect more efficiently deploys content close to where users consume it and therefore reduces load on networks.

     "A cooperative approach to content delivery," 2021, Netflix, *available at* https://openconnect.netflix.com/Open-Connect-Briefing-Paper.pdf, p. 3 ("To get content to consumers more efficiently, Netflix and ISPs worked together to deploy additional servers into ISPs' networks as well as increase capacity in our backbone network and at local internet exchange sites in order to fulfill the growing demands for Netflix content.").

[59]     Transit connections represent an alternative means for content providers to deliver content to local networks.

     Besen &Israel (2013), § 2.1 (defining transit as a situation "where one IP network (such as a local ISP) pays another IP network (such as a national backbone provider to arrange for the transmission of traffic between its end users and all other sites on the Internet.").

[60]     Besen & Israel (2013), p. 243 (explaining that non-Tier-1 ISPs' transit costs are a function of the volume of traffic received from the transit provider).

interconnect with ISP networks via transit arrangements gives content providers an alternative option should broadband providers attempt to negotiate paid interconnection.

56.     Moreover, the low costs that content providers incur to connect with ISPs that we identified in our prior submissions have continued.[61]  For example, in general, it is our understanding that CDNs such as Netflix Open Connect pay interconnection fees to a small number of large broadband providers, but that it is generally the case that interconnection fees are low or non-existent.  Even where there are fees, these fees are the result of commercial negotiations between large and sophisticated counter-parties.  There is no basis to conclude that welfare would be enhanced by regulating the terms of such negotiations.[62]  Similarly, transit prices have been declining for many years.  For example, estimates in the United States indicate that transit prices have fallen by a compound annual growth rate (CAGR) of more than 20 percent between 2017 and 2020.[63]

57.     Given burgeoning consumer choice and the precipitous decline in interconnection pricing, it is clear that no terminating access monopoly exists in the broadband marketplace.[64]  Moreover, regulating interconnection pricing by, for example, banning paid interconnection would interrupt the efficient operation of broadband networks.[65]  One mechanism by which this may occur is to generate prices that do not reflect underlying costs and thus create incorrect incentives.  Specifically, because content providers generate costs on networks by creating demand for their content and thus network traffic, it is important for those content providers to correctly internalize those costs via interconnection prices.  For example, if a content provider

---

[61]     Mark Israel & Bryan Keating, "Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom*," October 31, 2017, § II.A ("Interconnection fees are extremely small.").

[62]     For a discussion of the costs of regulating interconnection fees, see Besen & Israel (2013).

[63]     *Netflix White Paper,* p. 35 (citing Kate Reilly, "Global IP Transit Prices Keep Doing What They Do Best," *TeleGeography*, September 2020, *available at* https://blog.telegeography.com/global-ip-transit-prices-decline-pandemic-covid19).  See also "Internet Transit Prices – Historical and Projected," DrPeering, August 2010, *available at* https://drpeering.net/white-papers/Internet-Transit-Pricing-Historical-And-Projected.php (showing long-term declines in transit pricing extending back to the late 1990s).

[64]     For a general discussion of the applicability of the terminating access monopoly concept to the broadband industry, see Nuechterlein & Yoo (2015).

[65]     Besen & Israel (2013).

**App. 960**

correctly internalizes such costs, it may invest in alternative technologies (e.g., compression) to avoid inefficient overconsumption of bandwidth. Regulating such arrangements should require some evidence of market failure, but here there is no evidence of market failure. As demonstrated by the discussion above, broadband and content providers regularly negotiate arrangements that allow broadband users to access high-quality content.

58.    The *NPRM* suggests that there may be negative externalities where ISPs may favor short-term gains that have long-term social harm – specifically, that ISPs may not internalize the benefits to helping innovation of other firms and so may not undertake unspecified actions that might help such innovation. As an initial matter, we observe that ISPs likely internalize some of the benefits of innovation by edge providers to the extent that it drives demand for broadband service. More generally, the *NPRM* does not provide any specifics, but refers to the *2015 Order*, which in turn did not provide any specifics but referred to the *2010 Order*.[66] It is always the case that firms in a market maximize their own profits, and we trust the free market to efficiently allocate resources barring an obvious and economically substantial externality amenable to regulation (*e.g.*, pollution). As we have discussed, there has been enormous innovation since 2010 not only by broadband providers but by those using broadband. We provided an example where video streaming has fundamentally reshaped how video content is consumed.[67] We also pointed out that the FCC itself emphasizes how transformational broadband has been on the economy.

59.    The *NPRM* asserts that externality concerns remain a problem because of lack of competition.[68] As we have discussed above, there is more competition now than there has ever been, and we continue to see expansion and entry. Once again, the *NPRM*'s proposed regulations are a "solution" in search of a problem – and a "solution" that has significant costs

---

[66]    *NPRM*, ¶ 123. *2015 Order*, ¶ 83.

       The *2010 Order* suggested that, even if every ISP faced strong competition from many rivals, ISPs would still have incentives to act in ways that would threaten the "open internet"—e.g., by entering into special deals with edge providers that would fragment the internet into multiple walled gardens. We see no evidence of any such effects today despite the lack of regulation. In addition, full Title II regulation would be a grossly overbroad solution, imposing the type of costs described in Section III below, to any narrow concerns even if they did have validity.

[67]    See Section II.C.

[68]    *NPRM*, ¶ 124.

associated with it, as we discuss later. To the extent that the FCC believes that additional investment would be socially beneficial that the market is not providing, direct financial incentives can be provided to encourage such investment, as is happening right now with RDOF, ARPA, and BEAD, for example. Such incentives are preferable to direct regulation imposing government control on investments and business operations.

## C. THE PERFORMANCE OF THE BROADBAND INDUSTRY MAKES CLEAR HOW VIGOROUS COMPETITION IS

60. As noted above, the success and competition in the industry should not be surprising in light of the economics of the industry with high fixed costs and low variable costs. Broadband performance and the existence of effective competition are evident from a variety of metrics, including high levels of investment and innovation, and factors commonly examined when evaluating competition, including trends in output, trends in quality, trends in real prices, and the prevalence of competing advertising.

61. To begin with, U.S. broadband providers have invested over $2.1 trillion between 1996 and 2022.[69] These figures do not include LEO satellite investments. These large investments in part reflect the fact that broadband networks are costly to deploy and maintain. But broadband providers have not just *maintained* their networks, they have consistently *improved* the quality of their networks. They have done so by investing in successive generations of technologies (such as the DOCSIS upgrades by cable and the 4G to 5G upgrades by wireless), through improvements such as deploying fiber deeper into their networks in order to increase network capacity, resiliency, and performance, and utilizing innovative software to continuously measure and monitor network performance. Broadband providers also have expanded their geographic footprints, reaching new customers that historically lacked any service or that were served with older and less capable infrastructure. That is, the improvements and expansions previously discussed are enabled by these large expenditures.

---

[69]   "2022 Broadband Capex Report: Broadband Providers Invested $102.4B in Communications Infrastructure Last Year," USTelecom, September 8, 2023, *available at* https://www.ustelecom.org/research/2022-broadband-capex/.

   *USTelecom* expresses the investment in nominal dollars.

62.    The enormous investments and resulting increases in broadband quality and availability have created the basis for an entire ecosystem, and the resulting innovation by online platforms, app providers, and content creators has enabled and incentivized consumers to increase their data consumption, with large increases in total traffic. Figure 11 below shows that broadband consumption per household has increased substantially. Since 1Q 2018, average data usage has increased by more than 150 percent, from 215 GB per household to 550 GB per household in Q3 2023.[70]

**Figure 11: Average and Median U.S. Broadband Traffic (2018-2023) per Household**



*Source:* "Broadband Insights Report (OVBI)," *OpenVault,* 1Q2018 through 3Q2023, *available at* https://openvault.com/resources/ovbi/.

---

[70]    "Broadband Insights Report (OVBI)," *OpenVault*, 1Q2018 through 3Q2023, *available at* https://openvault.com/resources/ovbi/.

**App. 963**

63.     Improvements in broadband service have fundamentally altered how consumers obtain video services with more households streaming video over the internet rather than subscribing to traditional cable television services.  Traditional cable television service now accounts for a minority of U.S. households, down from roughly 60 percent in 2010.  See Figure 12.

**Figure 12: Cable TV Households in the U.S. (2010-2022)**



*Source:* "Cord-Cutting Monitor Q1'23: The Impoverishment Cycle," Moffett Nathanson, May 12, 2023, Exhibit 16.

64.     Indeed, there are many large video streaming services that are only possible because of the robust U.S. broadband infrastructure.  Netflix has around 67 million U.S. subscribers, Hulu around 48 million, Disney+ around 42 million, Paramount+ around 27 million, ESPN+ around 25 million, HBO/HBO Max around 25 million, and Peacock around 30 million.[71]

---

[71]     "US Subscribers for select US video subscription services Q1 2015 to Q1 2023," S&P Global, 2023.

According to Nielsen, streaming video has grown to account for almost 40 percent of time spent on televisions.[72] Also, services like YouTube TV and Hulu are themselves large and rapidly growing. YouTube TV's subscribers were projected to grow by roughly 48 percent between October 2022 and October 2023, hitting 15.8 million subscribers.[73]

65.     Investment and entry have resulted in real prices for broadband falling over time. Three recent studies confirm that broadband prices have fallen in real terms, particularly once quality improvements and inflation are accounted for. For example, a recent study by George Ford of the Phoenix Center finds that quality-constant real (inflation-adjusted) U.S. wireline broadband prices have declined substantially between 2015 and 2020.[74] Ford uses data from the FCC's Urban Rate Survey to calculate three broadband price indices. Each of the three indices holds quality (defined here as download speed) fixed at a different level. Each finds that quality-constant broadband prices fell. For example, the Fisher Index indicates that quality-constant broadband prices fell by approximately 36 percent between 2015 and 2020.[75]

66.     The findings of the Ford Study are similar to the results of a study sponsored by USTelecom, which analyzed the same FCC data.[76] In the USTelecom study, the most popular tier of wireline broadband service in 2015 was, in nominal terms, 37 percent cheaper (while offering 142 percent faster speeds) in 2023 than it was in 2015, on an average-subscriber-weighted basis.[77] Similarly, the highest-speed tier in 2015 was nearly 40 percent cheaper (while

---

[72]     "Streaming grabs a record 38.7% of total TV usage in July, with acquired titles outpacing new originals," Nielsen, August, 2023, *available at* https://www.nielsen.com/insights/2023/streaming-grabs-a-record-38-7-of-total-tv-usage-in-july-with-acquired-titles-outpacing-new-originals/.

[73]     Daniel Konstantinovic, "YouTube TV subscribers jumped nearly 50% in a year thanks to Sunday Ticket," *Insider Intelligence*, November 13, 2023, *available at* https://www.insiderintelligence.com/content/youtube-tv-subscribers-jumped-nearly-50-year-thanks-sunday-ticket.

[74]     George S. Ford, "Are Broadband Prices Declining? A Look at the FCC's Price Survey Data," *Phoenix Center for Advanced Legal & Economic Public Policy Studies*, October 26, 2020.

[75]     George S. Ford, "Are Broadband Prices Declining? A Look at the FCC's Price Survey Data," Phoenix Center for Advanced Legal & Economic Public Policy Studies, October 26, 2020, p. 5.

[76]     "2023 Broadband Pricing Index," USTelecom, October 11, 2023, *available at* https://ustelecom.org/research/2023-bpi/ (hereinafter *USTelecom 2023 Study*).

[77]     The study identifies each provider's most popular tier of service for each technology in 2015 and calculates subscriber-weighted prices and download speeds. It then identifies the most similar speed plan in 2023 (regardless of popularity) and again calculates subscriber-weighted prices and

offering speeds that were more than twice as fast) on an average-subscriber-weighted basis in 2023.[78]  Taking general inflation into account reveals even more favorable price trends:  The real (meaning inflation-adjusted) price of the most popular tier of broadband service declined by approximately 55 percent between 2015 and 2023, and the real price of the highest-speed broadband service has declined by approximately 56 percent over that same time period.[79]  See Figure 13. The decreasing real prices for wireline services, combined with the increase in consumption that we documented above, mean that the price per GB of traffic consumed is falling even faster.

---

download speeds.  The subscriber-weighted average download speed associated with the most popular plan increased from 43 Mbps to 104 Mbps while the subscriber-weighted average nominal monthly price declined from $65.62 to $41.10.  (*USTelecom 2023 Study*, Tables 3 and 5.)

[78]    The study identifies the fastest plan for each provider in 2015 and calculates subscriber-weighted prices and download speeds.  It then identifies the most similar speed plan in 2023 (regardless of whether it remains the fastest) and again calculates subscriber-weighted prices and download speeds.  (*USTelecom 2023 Study*, Table 3.)

[79]    *USTelecom 2023 Study*, Table 4.

**Figure 13: U.S. Broadband Real Prices are Declining (2015-2023)**
**Most Popular Plans**



*Sources*: Arthur Menko, "2023 Broadband Pricing Index: Broadband Prices Continue to Decline," *USTelecom*, 2023, *available at* https://ustelecom.org/research/2023-bpi/, Table 4; Arthur Menko, "2022 Broadband Pricing Index: A Comparative Analysis Showing Decreasing Prices and Increasing Value for U.S. Broadband Service Over Time," *USTelecom*, 2022, *available at* https://www.ustelecom.org/research/2022-bpi/, Table 2; Arthur Menko, "2020 Broadband Pricing Index: An Analysis of Decreasing Prices and Increasing Value for Broadband Service Over Time," *USTelecom*, 2020, *available at* https://www.ustelecom.org/research/2020-broadband-pricing-index-report/, Table 2.

*Notes*: [1] The prices reflect the most popular speed tier of broadband service each year weighted by the number of subscribers and adjusted for inflation.  [2] USTelecom reports do not have data from 2016-2019.

67.    Finally, a study by BroadbandNow, which samples prices from 50 national and regional broadband providers, found that average monthly prices declined by between $9 and

**App. 967**

$60 per month between the first quarter of 2016 and the fourth quarter of 2021.[80] This study found that the higher-speed plans experienced the greatest decline in prices.

68.     Real wireless prices are also falling.  An analysis by Keating found that the price of wireless has declined over the last two years while once-in-a-generation inflationary pressures have raised the prices of other products.  Wireless output has also exploded.[81]

69.     We also see substantial churn at fixed broadband providers.  For example, the FCC has cited Analysys Mason that fixed broadband churn in North America is higher than in Europe or Asia, with examples of monthly churn between 1.5 and 2 percent, which is equivalent to approximately 20 percent annual churn..[82]  In other words, approximately one fifth of customers switch providers every year.  Competition for these switching customers is intense, with that competition benefiting all subscribers including those that choose not to switch.

70.     The ability to switch fixed broadband providers is demonstrated by the fact that churn is an important strategic focus in the broadband industry.[83]  Furthermore, the fact that consumers have – and can make use of – a credible threat to switch fixed broadband Internet access providers is well-recognized in the industry.  For example, Consumer Reports has for years advocated for consumers to simply ask for discounts for Internet service.[84]  The implied

---

[80]     Jason Shevik, "Broadband Pricing Changes: 2016 to 2022: Prices for Ultra-High-Speed Plans Have Decreased by nearly $60 per Month," *BroadbandNow*, February 7, 2022, *available at* https://broadbandnow.com/internet/broadband-pricing-changes.

        The authors studied the prices of DSL, cable, fiber, and fixed wireless plans.

[81]     Bryan Keating, "An Economic Analysis of Mobile Wireless Competition in the United States," December 11, 2023, *available at* https://www.ctia.org/news/compass-lexecon-competition-report.

[82]     *FCC 2022 Communications Marketplace Report,* ¶ 44 ("Analysys Mason reports 'fixed broadband monthly churn rates in Western European markets tend to hover at around 0.9–1.2%, while those in high-income Asian markets are generally 0.8–1.0%,' yet, 'fixed broadband churn in North America is higher than that in other developed markets;' specifically, 'churn was 1.8% in Canada between 2015 and 2019.' This is in line with Frontier Communications' reported churn of 1.52% in 2021, which was a decline from their 2019 churn of 2.07%." [internal notes omitted]).

[83]     See, *e.g*., Alex Sherman, "Comcast and Charter may need new focus as broadband growth stalls amid competition," *CNBC*, August 3, 2022, *available at* https://www.cnbc.com/2022/08/03/comcast-and-charter-may-need-new-focus-as-broadband-growth-stalls-.html.

[84]     See, for example, "Telecom Service Buying Guide," Consumer Reports,  updated February 3, 2023, *available at* http://www.consumerreports.org/cro/telecom-services/buying-guide.htm.

**App. 968**

threat, of course, is that if they do not get a better deal they will take their business elsewhere, and the credibility of a threatened switch is demonstrated by the success of such requests. A survey by Consumer Reports even back in 2012 found that roughly a third of consumers surveyed had, in fact, asked for discounts and 90 percent of them had obtained discounts or upgrades as a result.[85] Consumer Reports continues to offer the same guidance today with respect to broadband services.[86] As noted above, surveys indicate that consumers would switch if they felt their broadband provider started to block, slow down, or impose other restrictions on the content they demanded.[87] Again, this is competition in action: anti-consumer actions by broadband providers would lead to substantial costs in the form of consumer departures.

71.     Finally, search costs are very low in this industry, as there is no shortage of comparative advertising, including direct mailing and circulars. For example, cable and fixed wireless providers advertise comparisons against each other's services, just as cable and telcos have done for years.[88] Comcast has a web page devoted to comparing its Internet offerings to 5G fixed wireless services,[89] while T-Mobile compares its offering to fixed wired offerings.[90] And, collectively, cable companies, telcos, and wireless carriers are among the largest advertisers

---

[85]     Carol Mangis, "Haggling for a lower telecom bill really works," Consumer Reports, May 17, 2012, *available at* https://www.consumerreports.org/cro/news/2012/05/haggling-for-a-lower-telecom-bill-really-works-says-one-cr-editor/index.htm?EXTKEY=AYFCF06 .

[86]     "CR's Guide to Getting Better Internet Without Busting Your Budget," Consumer Reports, July 13, 2021, *available at* https://www.consumerreports.org/internet/getting-better-internet-without-busting-your-budget/ ("**Threaten to go to a competitor, or to cut your TV or phone service.** That gets your call elevated right away to a rep with the clout to do what it takes to keep you." [emphasis in the original])

[87]     "71% of U.S. households would switch from providers that attempt to interfere with Internet," Consumer Reports, February 18, 2014, *available at* http://www.consumerreports.org/cro/news/2014/02/71-percent-of-households-wouldswitch-if-provider-interferes-with-internet-traffic/index.htm.

[88]     See, *e.g.*, Jeff Moore, "2022: The Year of Telecom Convergence," *Fierce Wireless*, December 21, 2022, *available at* https://www.fiercewireless.com/wireless/2022-year-telecom-convergence-moore, noting "publicity efforts and negative advertising … [which] shows how real cable/wireless competition has become".

[89]     "5 Questions You Must Ask When Considering 5G Home Internet vs Cable," Comcast website, *available at* https://www.xfinity.com/hub/internet/5g-home-internet-versus-cable.

[90]     "How our 5G internet is different," T-Mobile website, *available at* https://www.t-mobile.com/home-internet/how-5g-home-internet-works#:~:text=While%20cable%20internet%20relies%20on,to%20factors%20affecting%20cellular%20networks.

**App. 969**

in the U.S.,[91] which is consistent with their advertising reflecting robust competition between them.

## III. THE PROPOSED UTILITY-STYLE REGULATION CAN BE EXPECTED TO HAVE SIGNIFICANT LONG-TERM NEGATIVE IMPACTS ON BROADBAND INDUSTRY INVESTMENT AND INNOVATION AND THEREFORE ON THE ECONOMY AS A WHOLE

72.     Economic theory with respect to investment incentives in the broadband industry is straightforward – broadband investment decisions require an up-front commitment of large amounts of capital which will earn a return over a long time horizon. Whether those investments will be made, and how large they will be, thus turns on expected costs and revenues over that long time horizon and the level of uncertainty about those costs and revenues. The FCC's proposal to regulate broadband as a Title II service will impact all three of those considerations – expected costs, expected revenues, and level of uncertainty.

73.     Given the size and importance of the broadband industry, the long-term effects of the proposed utility-style regulation are likely to be substantial. These concerns are particularly important at the present because new technologies are poised to expand, and Congress has created funding opportunities – requiring private investment – for both incumbents and new entrants alike to expand and improve broadband. The concerns are also not just theoretical. The more heavily regulated Europe has had less widespread deployment by fewer firms than the U.S. has, and the FCC's comparison of broadband to rate-regulated utilities as a motivation for its *NPRM* should raise concerns because of the chronic under-investment in many rate-regulated utilities in the U.S.

### A.     ECONOMIC THEORY IS CLEAR ON THE COSTS AND RISKS OF REGULATION

74.     Economic theory is clear that regulation is costly and can deter investment. It can impose direct costs that make deployment more costly. It can limit expected future revenues, making deployment less likely. And it can increase risk because of uncertain interpretation and

---

[91]     See, *e.g.*, Bradley Johnson, Kevin Brown & Joy Lee, "The 25 Biggest US Advertisers, Ranked—Leading National Advertisers 2023," *Ad Age*, June 26, 2023, *available at* https://adage.com/article/datacenter/25-biggest-us-advertisers-include-amazon-comcast-and-pg/2497386, listing, for example, AT&T, Comcast, Charter, T-Mobile and Verizon.

**App. 970**

enforcement and the possibility of regulatory creep. The *NPRM* is problematic for all of these reasons.

75.     More specifically, the *NPRM* appears to be based on the premise that regulation is costless. That is not the case. Regulation comes with costs and risks. Any imposition of regulation must consider whether the potential benefits outweigh those costs and risks. Here, in our opinion, the proposed Title II regulation is a "solution" in search of a problem – one that has substantial costs and risks associated with it and no clear benefits.

76.     Regulation imposes direct costs with respect to compliance. Those costs can be substantial, and companies often have entire departments devoted to regulatory compliance. When new regulatory requirements are imposed, companies must consider whether and how those requirements implicate their existing and future operations and then sustain the costs to comply. Such efforts are costly and require resources that could be devoted to economically productive activity. There is also substantial uncertainty about how regulations will impact future costs and revenues. The FCC's proposed regulations open the door for many costly future requirements, and possible future restrictions on service offerings and even possible direct rate regulation.

77.     Basic economic theory teaches that the uncertainty created by regulation reduces investment incentives, particularly with respect to irreversible (or sunk) investments that will not be recoupable if the investment fails to deliver sufficient returns. Such sunk investments are common in this industry, and of particular importance right now given the increasingly competitive and highly dynamic nature of this industry, the rapid ongoing entry of new access technologies and the large amount of money that is about to be awarded through the BEAD program to expand broadband to unserved locations.

78.     Indeed, concern about uncertainty is one of the primary areas of interest in regulatory economics. Uncertainty about the course of future regulation can deter investment in several related ways.[92] First, investments are riskier to undertake when there is uncertainty about how the regulator will treat them in the future. For example, regulatory uncertainty creates

---

[92]     To be clear, regulation that is known with certainty to prohibit or constrain efficient actions also deters investment.

increased risk that a new product, service, or investment may later be restricted in ways that reduce returns.[93] As a fundamental matter of financial economics, such risk depresses investment incentives. The reason is that additional risk raises the rate of return (or "hurdle rate") a firm will require to undertake the investment.[94] Just as investors require higher promised interest rates when the risk of default on bonds goes up, firms will require higher hurdle rates on their investments if the risk of regulatory expropriation increases. This effect is also discussed in the economic literature on the option value of waiting. When "the outcome of a process is uncertain and potentially detrimental for a company, the option value of waiting to invest increases, which rationally compels the company to postpone investments until uncertainty is partly or fully resolved...."[95]

79.    Concern about a mid-stream change in the regulatory regime that expropriates past investments, or makes investors concerned that those investments may be devalued, also discourages future investments. The bottom line is that the increase in risk due to enhanced regulatory uncertainty means fewer investment projects will be undertaken. The higher is the firm's required rate of return, the less likely a prospective investment's expected return will meet or exceed it. Thus, fewer prospective investments will satisfy the firm's investment criteria (*i.e.*, a rule that the firm will invest only in projects whose expected returns meet or exceed the required rate of return or hurdle rate), and investment is suppressed.[96] The net result may be

---

[93]    See, *e.g.*, Christopher Decker, *Modern Economic Regulation: An Introduction to Theory and Practice*, Cambridge University Press, 2015, p. 171.

[94]    See, for example, Richard Brealey, Stewart Myers & Franklin Allen, *Principles of Corporate Finance*, Ninth Edition, McGraw-Hill, 2008, Part Two: Risk. Equivalently, the expected present value of the investment goes down with the increased risk, making it less likely that it will be undertaken in the first place, or that it may be scaled back.

[95]    Juan Lopez, Alice Sakhel & Timo Busch, "Corporate Investments and Environmental Regulation: The Role of Regulatory Uncertainty, Regulation-Induced Uncertainty, and Investment History," 35 European Management Journal, 2017, 91-101, at 92. See also James Alleman & Eli Noam (eds.), *The New Investment Theory of Real Options and its Implication for Telecommunications Economics*, Kluwer, 1999.

[96]    See, *e.g.*, FCC Commissioner Nathan Simington, quoted in David DiMolfetta, "'Regulatory ping-pong' on net neutrality slows investment, FCC's Simington says," S&P Global Market Intelligence, February 17, 2022 ("So we had dueling net neutrality orders in 2015 and 2018. If we get another one, then it would be 2022 or 2023. And then if it reverses again in the next administration, that means four changes under four presidents. So dueling orders are regulatory ping-pong, from my perspective, and they slow investments because they make the hurdle rate on

**App. 972**

firms investing instead in less productive or socially beneficial alternatives, or not investing at all. Again, this is not just a theoretical concern. Fears of such expropriation have significantly reduced infrastructure investments in many countries.[97]

80.   A specific example of investment-depressing risk is the problem of regulatory opportunism in which additional regulations are imposed *ex post*, after sunk investments are made, to produce short-term benefits to constituents such as consumers.[98] This diminishes incentives for future investment in new products or services because firms will naturally be concerned that after making those investments, regulators will later act opportunistically,

---

new infrastructure projects impossible to calculate or even really to estimate."); *Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking in the Matter of Connect America Fund,* FCC, FCC 16-33, March 30, 2016, ¶ 320 ("As Professor Bowman notes, companies subject to regulation face regulatory risk which increases the cost of capital…"); *Notice of Proposed Rulemaking in the Matter of Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, FCC, FCC 00-402, November 9, 2000, pp. 56-57 ("As with market uncertainty, regulatory uncertainty affects the distribution of assets in a market. Many firms may simply avoid markets with substantial regulatory uncertainty. … FCC actions increase regulatory risk… The FCC has taken many actions that increase regulatory risk particularly by changing the property, contract, and liability rules that apply to licensees. … Erosion of these property, contract, and liability rules ultimately increase regulatory risk, diminish the value of spectrum licenses, and discourage participation in spectrum markets."); "FCC Commissioner Susan Ness, Remarks before the Economic Strategy Conference," FCC, March 3, 1998 ("…one major deterrent to investment is risk. And one major risk confronted by investors in the telecommunications marketplace is regulatory uncertainty. As a former banker, I'm sensitive to this fact."); "Policy Framework for Investment," OECD, 2015, p. 16 ("Investors care about regulatory risks. They are anticipated through higher hurdle rates for a project and translate into lower efficiency even if the investment goes ahead because of high expected returns.) and p. 23 ("A fair, transparent, clear and predictable regulatory framework for investment is a critical determinant of investment decisions and their contribution to development. … Uncertainty about the enforceability of lawful rights and obligations raises the cost of capital, thereby weakening firms' competitiveness and reducing investment.").

[97]   See, for example, Paul Levine, John Stern & Francesc Trillas, "Utility price regulation and time inconsistency: comparisons with monetary policy" *Oxford Economic Papers* 2005, 57, at 449; and Brian Levy and Pablo T. Spiller (eds), *Regulations, Institutions and Commitment*, Cambridge University Press, Cambridge, 1996, at 2.

[98]   See, for example, Mark Armstrong & David E.M. Sappington, "Recent Developments in the Theory of Regulation," Chapter 27 of Mark Armstrong & Robert Porter, eds., *Handbook of Industrial Organization*, volume 3, Elsevier, 2007, at 1631-32. ("Once the firm has made irreversible investments, a regulator with limited commitment powers may choose not to compensate the firm for those investments, in an attempt to deliver the maximum future benefits to consumers. This expropriation might take the form of low mandated future prices. Alternatively, the expropriation might arise in the form of permitting entry into the industry… When it anticipates expropriation of some form, the firm will typically undertake too little investment.").

reducing the expected returns. Patents provide a useful analogy: Removing intellectual property protections soon after creation of an invention will reduce prices to consumers for that product in the short-term, but will reduce overall investment in the long-term. The patent system is based on the recognition of this trade-off and the importance of preserving incentives for innovation. A short-sighted view looking only at immediate consumer benefits leads to long-term net harm to consumers as they are denied the benefits of investment and future innovation. Here, it does not even appear there are any immediate benefits to be had from regulation, leaving only the costs and risks, with investors being put on notice that the FCC plans to intervene in the future.

81.     What do we mean by that? The *NPRM* claims that it will "issu[e] straightforward, clear rules that prohibit blocking, throttling, or engaging in paid or affiliated prioritization arrangements."[99] Given the many years of regulatory disputes preceding this *NPRM*, the historical rules were anything but "straightforward [and] clear." Even if the new rules were "straightforward [and] clear," there is no reason investors should believe they will remain so, or that additional rules would not be forthcoming. The current FCC may claim that it will engage in "broad forbearance" with respect to many aspects of the proposed regulation (*e.g.*, "26 Title II provisions" "and clarify that the Commission will not regulate rates or require network unbundling"[100]), but given the FCC's history of imposing such requirements on many of the companies that are currently providing broadband access, investors may not find such a claim credible. We discuss that further below. And even if they did forbear for this current Commission, the see-sawing of policy raises doubt about how future Commissions will act. In the economic literature, this is a type of "regulatory opportunism" risk that firms must consider.

82.     Investors can reasonably expect the proposed regulations to become more onerous in the future based on the history of proceedings on "net neutrality," which show steady "regulatory creep," which occurs when regulation starts as modest but steadily expands over time. (Although the initial proposed regulation is not modest, as we discuss next.) Early FCC proceedings on "net neutrality" were focused on no-blocking and no-throttling rules. Then-Chairman Powell referred to the Commission's policies, adopted in 2005, as the "four Internet

---

[99]     *NPRM*, ¶¶ 3, 23.

[100]     *NPRM*, ¶ 107; "FCC Fact Sheet: Safeguarding and Securing the Open Internet," FCC, September 28, 2023, at 1.

freedoms," with a goal of "empowering consumers without regulating the Internet."[101] Chairman Powell also noted that "broadband consumers generally enjoy such internet freedom. They can access and use the content, applications and devices of their choice. … These general conditions suggest that many, if not most, in the industry recognize that providing such access and information is in their own self-interest, particularly as infrastructure and developers struggle to discover valuable uses that will enable them to recoup their substantial investments in high-speed Internet technologies."[102] The Commission expanded the scope of regulation of broadband Internet access in the 2010 Order. This order went beyond no-blocking rules, and adopted rules on transparency, and prohibited unreasonable discrimination.[103] However, it did not impose core Title II obligations on Internet providers and also specifically exempted mobile providers from key obligations, such as any nondiscrimination rule.[104] After the D.C. Circuit struck down the 2010 Order, the Commission proposed in 2014 to bar blocking, throttling and "commercially unreasonable actions"[105] At the same time, it stated that it did *not* intend to adopt common carrier regulation under Title II. Then, after intervention by the White House, the Commission took a different and far more intrusive approach than previously contemplated in the 2014 *NPRM*.[106] In the 2015 Title II Order, it reclassified Internet services as common carrier services and created the Internet Conduct Standard, which was anything but a "bright-line" rule.

83. The current *NPRM* continues this process of "regulatory creep" and goes even further, expanding the proposed regulation to include, for example, access technologies and far-reaching policy objectives that were not covered – and in some instances did not exist – in 2015.

---

[101] The "four Internet freedoms" are freedom to access content, use applications, attach personal devices and obtain service plan information. "In the Matter of Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities," FCC, FCC 05-151, Policy Statement, September 23, 2005. See also Remarks of Michael Powell, Chairman, FCC, February 8, 2004, *available at* https://docs.fcc.gov/public/attachments/DOC-243556A1.pdf.

[102] Remarks of Michael Powell, Chairman, FCC, February 8, 2004, *available at* https://docs.fcc.gov/public/attachments/DOC-243556A1.pdf.

[103] "Report and Order in the Matter of Preserving the Open Internet Broadband Industry Practices," FCC, FCC 10-201, December 23, 2010, ¶¶ 1, 151-160.

[104] *Id.*, ¶ 94.

[105] "Notice of Proposed Rulemaking in the Matter of Protecting and Promoting the Open Internet," FCC, FCC 14-61, May 15, 2014.

[106] Gautham Nagesh & Brody Mullins, "Net Neutrality: How White House Thwarted FCC Chief," *The Wall Street Journal*, February 5, 2015.

**App. 975**

For example, the *NPRM* claims that reclassifying broadband would enable the FCC to address many policy issues beyond the core net neutrality issues from the prior regulatory history, including imposing Title II obligations and restrictions to address national security, cybersecurity, public safety, network resiliency, access in multiple-tenant environments, and other newfound objectives never before cited by the Commission as bases for Title II regulation.[107]

84.     The *NPRM* also envisions the FCC investigating disputes over interconnection;[108] being able to "watch, learn, and act as required" in a deliberately unspecified future way with respect to "Internet traffic exchange;"[109] exercising authority over what are "reasonable network management" practices[110] including over unlicensed Wi-Fi networks;[111] enforcing the open Internet rules through investigation and the processing of complaints and using "advisory opinions and enforcement advisories";[112] interpreting and enforcing Section 222 on consumer privacy under which the FCC has claimed pervasive oversight of providers' privacy practices;[113] applying Sections 225/255 and 251(a)(2) to ensure disabilities access, presumably through dictates involving deployment of infrastructure and structuring of services;[114] applying Section 224 rules on infrastructure access, noting that the rules may not be limited to pole attachments;[115] and applying Section 254 on promoting universal broadband, again presumably through dictates involving deployment of infrastructure and structuring of services.[116]  The uncertainty with respect to the treatment of services both new and existing is compounded with the proposal for a "general conduct standard" under Sections 201 and 202, under which firms might need to obtain FCC approval before introducing new features or else risk fines and other penalties if features

---

[107]     *NPRM*, ¶¶ 25-39, 52-54.

[108]     *NPRM*, ¶ 66.

[109]     *NPRM*, ¶ 187.

[110]     *NPRM*, ¶ 188.

[111]     *NPRM*, ¶ 61.

[112]     *NPRM*, ¶¶ 189-93.

[113]     *NPRM*, ¶ ¶¶ 41-44.

[114]     *NPRM*, ¶ 55.

[115]     *NPRM*, ¶ 47.

[116]     *NPRM*, ¶¶ 49-51.

**App. 976**

are later deemed not to comply with the standard.[117]  Also, the FCC proposes not to forbear from Section 214, under which ISPs could be subjected to burdensome new entry and exit requirements, mandatory buildout requirements, obligations related to discontinuing services, and additional regulatory reviews of transfer-of-control and assignment transactions.[118]  Firms may also be reasonably concerned about rate-of-return regulation authorized under Section 201/202 of Title II, and which has been applied by the FCC to various services in the past.  The FCC also investigated zero-rating after the 2015 Order, which is a direct intervention in pricing, and we filed a declaration in 2017 that pointed out how the FCC was specifically proposing rate regulation of paid prioritization of traffic.[119]  And this *NPRM* expressly raises the likelihood of the FCC regulating data plans and investigating "unjust and unreasonable charges and practices."[120]  This means, for example, that a carrier might invest in network structure and capacity on the assumption that it can control usage through, say, tiered pricing or usage buckets, and then be forbidden from using such plans.

85.     The FCC is also considering whether to allow additional regulation at the state level.  Federal broadband regulation is discussed as a potential "floor" on top of which states could impose additional obligations.[121]  A patchwork of state regulations would only add to firms' uncertainty.

86.     To be clear, fundamentally changing the form of regulation applied to an industry is a very significant step – a step that involves significant costs of its own, particularly when moving to reduce expected returns and imposing more prescriptive regulation – and one that should not be taken lightly.

---

[117]     *NPRM*, ¶¶ 164-67.

[118]     *NPRM*, ¶ 156.

[119]     Declaration of Mark A. Israel, Allan L. Shampine & Thomas A. Stemwedel, *In the Matter of Restoring Internet Freedom,* WC Docket No. 17-108, July 17, 2017.

[120]     *NPRM*, ¶¶ 27, 108.

[121]     *NPRM*, ¶ 94.

**GIVEN THE SIZE AND IMPORTANCE OF THE BROADBAND INDUSTRY, THE LONG-TERM NEGATIVE IMPACTS OF REGULATION ARE LIKELY TO BE SUBSTANTIAL**

87.    Given the size and importance of the broadband industry, the long-term negative effects of the proposed utility-style regulation are likely to be substantial.[122]  These concerns are particularly important at the present because new technologies are poised to expand, and Congress has created funding opportunities – requiring private investment – for both incumbents and new entrants alike to expand and improve broadband.  The concerns are also not just theoretical.  The more heavily regulated Europe has had less widespread deployment by fewer firms than the U.S. has, and the FCC's comparison of broadband to rate-regulated utilities as a motivation for its *NPRM* should raise concerns, both about the possibility of future rate regulation and about the chronic under-investment in many rate-regulated utilities in the U.S.

88.    We have noted that the broadband industry has already invested trillions of dollars.  The FCC has argued that broadband "connections have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression. … '[A]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States.'"[123]  We explained that broadband has enabled entirely new and important sectors of the economy such as video streaming, which has fundamentally remade how video is consumed in the U.S.  Long-term continued investment and innovation will be put at risk by pervasive utility-style regulation.  We previously noted that there is a long history of depressed investments in countries based on concerns about regulation devaluing investments.[124]  We can also look to the European experience with heavier regulation.

---

[122]    For a recent study of the historical costs of FCC regulation of broadband in the United States, see George S. Ford, "Investment in the Virtuous Circle: Theory and Empirics," Phoenix Center Policy Paper No. 62, December 2023.

[123]    *NPRM*, ¶ 17.

[124]    See, for example, Paul Levine, John Stern & Francesc Trillas, "Utility price regulation and time inconsistency: comparisons with monetary policy" *Oxford Economic Papers* 2005, 57, at 449; and Brian Levy and Pablo T. Spiller (eds),  *Regulations, Institutions and Commitment*, Cambridge University Press, Cambridge, 1996, at 2.

89.     International comparisons can be difficult in light of differences in geography, demographics, and demand factors.[125]   However, the publication of high-level data on broadband availability by the FCC and the European Commission invites comparisons as to overall availability.   These data indicate that the U.S. has consistently had broadband more widely available than in Europe, particularly with respect to "rural" areas.   The European definition of rural is less restrictive than the U.S. definition, which makes the lower availability in European "rural" areas relative to the U.S. particularly striking.[126]   Looking only at "high speed" (defined as 30 Mbps or higher) for fixed broadband, as of 2020, only 60 percent of European "rural" households had access, while 91 percent of U.S. "rural" households had access.   See Figure 14.

---

[125]     See, *e.g.*, Mark Israel, Michael Katz & Bryan Keating, "International Broadband Price Comparisons Tell Us Little about Competition and Do Not Justify Broadband Regulation," working paper, commissioned by NCTA – The Internet & Television Association, May 11, 2021.

[126]     See "US vs. EU Broadband Trends, 2012-2020," USTelecom, April 1, 2022, available at https://ustelecom.org/research/us-eu-broadband-trends/, p. 3.

**App. 979**



**Figure 14: Households Covered With Fixed Broadband at "High Speed"
U.S. and EU in All Areas and "Rural" Areas**

*Source:* USTelecom, "US vs. EU Broadband Trends, 2012 – 2020," USTelecom, April 1, 2022, p. 3.

90.     Households have access to more facilities-based providers in the U.S. than in Europe for a given area.  Looking at fixed broadband (landline or fixed wireless), as of 2020, according to the USTelecom report, in Europe, only 45 percent of households had access to at least two providers, and in "rural" areas, only 11 percent did.[127]  These figures are far lower than in the U.S., as previously discussed.

91.     More U.S. households also have high-speed connections than do households in Europe.  As of 2020, 34 percent of households had a fixed broadband subscription at 100 Mbps or more in Europe.  55 percent did in the U.S.  See Figure 15.

---

127     "US vs. EU Broadband Trends, 2012 – 2020," USTelecom, April 1, 2022, available at
https://ustelecom.org/research/us-eu-broadband-trends/, p. 5.

**App. 980**

**Figure 15: Share of Households with Fixed Broadband Subscription at >= 100 Mbps**



*Source:* USTelecom, "US vs. EU Broadband Trends, 2012 – 2020," USTelecom, April 1, 2022 p. 9.

92.     The U.S. also did well relative to Europe with respect to the robustness of its networks to demand shocks during the pandemic. Despite surges in traffic during the pandemic,[128] U.S. consumers continued to experience robust network performance without any

---

[128]     "COVID-19: How Cable's Internet Networks Are Performing," NCTA, *available at* https://www.ncta.com/COVIDdashboard, hereinafter *NCTA COVID Dashboard*) ("Over 78 million homes and business rely on broadband service delivered by cable providers, and these networks met the traffic surge and biggest stress test that the internet has ever faced"). National downstream peak traffic continued to trend upward from March 2020 through July 2021. See also "Network Performance," USTelecom, March 26, 2020, *available at* https://www.ustelecom.org/research/network-performance-data/ (hereinafter *USTelecom Network Performance*) ("This week traffic's traffic ranged from 10% to 15.3% over the pre-COVID baseline, with a mean traffic increase of 12.9% over pre-COVID baseline… [t]he average traffic increase over baseline remains consistently lower now after reaching a high of 27% on April 16.").

material decrease in the quality of service.[129] U.S. networks have better withstood the demand surges triggered by the pandemic than have those of many other nations, which reflects the relatively high levels of investment in U.S. broadband infrastructure.[130] In contrast to the situation in the United States, European and Australian regulators felt the need to suggest certain measures to households and content providers to modify throughput of Internet traffic.[131]

93. The *NPRM* likens broadband to public utilities such as electricity and water.[132] We disagree with such a comparison, but the experience of public utility regulation, and the ongoing and well-publicized problems of many utilities as compared to the broadband industry, should serve as cautionary tales.

94. Although both broadband providers and public utilities deliver services that are perceived by people to be very important, that does not mean that broadband should be regulated

---

[129]    *NCTA COVID Dashboard* ("Meeting the challenge that the pandemic placed on broadband networks was helped by years of continued investment and upgrading of networks to stay ahead of consumer demand, including offering gigabit speeds to 80% of American homes".); *USTelecom Network Performance* ("Evidence continues to show the user experience has held steady during the crisis, despite the surge in user demand.").

[130]    Anna-Maria Kovacs, Ph.D, MBA, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic*, *USTelecom*, June 2020, *available at* https://www.ustelecom.org/wp-content/uploads/2020/06/PP-2020-06-Kovacs-internet-performance.pdf, pp. 3-5 ("[O]n average, the U.S. mean download speed during the pandemic period was 138 megabits per second (mbps) while the weighted mean download speeds of the EU, EU-4, and OECD were 102 mbps, 106 mbps, and 89 mbps, respectively."); see also, "How Global Broadband Speeds Changed During COVID-19 Lockdown Periods," Cable.co.uk, *available at* https://www.cable.co.uk/broadband/speed/broadband-speeds-covid-19-lockdown/#regions, (reporting that U.S. speeds rose by 3.32 percent during the lockdown period whereas speeds in Western Europe slowed by 4.66 percent).

[131]    "Joint Statement from the Commission and the Body of European Regulators for Electronic Communications (BEREC) on coping with the increased demand for network connectivity due to the Covid-19 pandemic," BEREC and the European Commission, March 19, 2020, *available at*https://www.berec.europa.eu/sites/default/files/files/document_register_store/2020/3/BoR_20_%2866%29_Joint_Statement_Commission_BEREC_FINAL.pdf , p. 1 ("…people are encouraged to make responsible use of the Internet with settings that reduce data consumption; content and application providers are also called to cooperate with telecom providers and to consider temporarily adapting the throughput of video streaming."); Josh Taylor, "Australian government asks Netflix and Stan to reduce data to avoid broadband overload," *The Guardian*, March 20, 2020, *available at* https://www.theguardian.com/media/2020/mar/20/australian-government-asks-netflix-and-stan-to-reduce-data-to-avoid-broadband-overload.

[132]    *NPRM,* ¶ 17 ("Not unlike other essential utilities, such as electricity and water, BIAS connections have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression.").

as a public utility. In fact, traditional public-utility services and broadband service are very different from one another in fundamental respects, and these differences support *not* treating broadband as a public utility. Perhaps the most important difference from the perspective of assessing the costs and benefits of regulation is that the current and future states of competition are very different. As discussed in Section II above, broadband service is characterized by extensive and increasing facilities-based competition. By contrast, most water and electricity local distribution networks are characterized by a single connection to the home, and there appears to be no prospect of facilities-based competition in the foreseeable future. This is in contrast to the broadband industry in which, as we discussed at length above, new entrants and new technologies are appearing constantly, new areas continue to be served, and existing areas continue to benefit from new entrants and improved facilities for existing providers.

95. The broadband industry is also growing much, much faster than are public utility local distribution networks. Figure 16 below highlights the difference in growth rates: whereas broadband consumption has increased at compound annual rates of more than 40 percent (measured from 2010 to 2020), per-capita consumption of water, gas, and electricity has been declining by modest amounts.

**Figure 16: Broadband versus Public Utilities Consumption per Capita**



*Sources:* Robin Layton, "2023 report: Internet users are gobbling data by the half-terabyte," *Allconnect,* March 23, 2023, *available at* https://www.allconnect.com/blog/report-internet-use-over-half-terabyte ;"Estimated use of water in the United States in 2015," USGS, 2018, *available at* https://pubs.usgs.gov/circ/1441/circ1441.pdf; "Estimated use of water in the United States in 2010," USGS, 2014, *available at* https://pubs.usgs.gov/circ/1405/pdf/circ1405.pdf; "MonthlyEnergy Review," U.S. EIA, November 27, 2023, *available at* https://www.eia.gov/totalenergy/data/monthly/, Table 4.3 Natural Gas Consumption by Sector & Table 7.6 Electricity End Use; and Annual Estimates of the Housing Inventory: 1965 to Present," U.S. Census Bureau, *available at* https://www.census.gov/housing/hvs/data/histtabs.html, Table 7a. Annual Estimates of the Housing Inventory.

*Note:* Broadband represents average monthly broadband consumption (GB/month) per household. Water represents domestic water use (gal/day) per capita, including self-supplied withdrawals and public-supply deliveries. Natural gas represents residential natural gas consumption (billion cubic feet/year) per household. Electricity represents residential electricity consumption (million Kilowatthours/year) per household (i.e., electricity retail sales to ultimate customers). Broadband usage data are available every other year in 2010-2020; water usage data are available for 2010 and 2015.

96.     As discussed in Section II above, increasing broadband consumption is, in large part, the result of investments in broadband networks that improve the quality and capacity of those networks and create the basis for a rapidly evolving ecosystem of complementary products

and services.  Even though consumption has increased enormously, real prices for broadband have declined.  By contrast, even with price regulation, prices for water and electricity in the U.S. have increased by 63 and 38 percent, respectively, since 2010.[133]

97.     Also in contrast with the broadband industry, utilities have suffered from underinvestment.  The reasons for underinvestment are complicated, but at a minimum, holding up highly-regulated utilities with significant investment problems to motivate the regulation of the highly competitive broadband industry makes no sense—indeed, the comparison should give one pause.  The underinvestment problem is so severe in the heavily regulated electricity industry that Pacific Gas & Electric recently pled guilty to the deaths of 84 people that were blamed on underinvestment in the electrical grid that led to large forest fires in California.[134] PG&E also incurred a $1.6 billion penalty and was convicted of several felonies related to a natural gas explosion that killed eight people and injured 58 in San Bruno, CA.[135]  This underinvestment in network facilities and safety practices demonstrates that regulation is not a panacea.

98.     Although there are also calls for greater investment in broadband networks, these calls are of a different character than for utilities: the calls focus primarily on the expansion of broadband providers' network footprints (typically to high-cost, often rural, areas) rather than investment aimed at providing high-quality service within existing footprints.[136]  The government has recognized the need for high-quality broadband service to sparsely populated

---

[133]     "Consumer Price Index for All Urban Consumers (CPI-U), Electricity in U.S. city average, seasonally adjusted [CUSR0000SEHF01]," U.S. Bureau of Labor Statistics, *available at* https://data.bls.gov/timeseries/CUSR0000SEHF01; "Consumer Price Index for All Urban Consumers (CPI-U), Water and sewerage maintenance in U.S. city average, seasonally adjusted [CUSR0000SEHG01]," U.S. Bureau of Labor Statistics, *available at* https://data.bls.gov/timeseries/CUSR0000SEHG01.

[134]     "PG&E pleads guilty to 84 deaths in 2018 California wildfire," *CNBC*, June 16, 2020, *available at* https://www.cnbc.com/2020/06/16/pge-to-plead-guilty-to-deaths-from-california-wildfire.html,.

[135]     George Avalos, "San Bruno PG&E explosion: State senator plans hearings," *San Jose Mercury News,* September 9, 2020, *available at* https://www.mercurynews.com/2020/09/09/san-bruno-pge-explosion-state-senator-plans-hearings/, *site accessed* April 5, 2021.

[136]     For example, the FCC's $20 billion Rural Digital Opportunity Fund is focused on subsidizing the build out of broadband networks in currently unserved areas.  ( "Implementing the Rural Digital Opportunity Fund (RDOF) Auction," FCC, April 3, 2020, *available at* https://www.fcc.gov/implementing-rural-digital-opportunity-fund-rdof-auction).

**App. 985**

areas. The Broadband Equity, Access and Deployment (BEAD) program was authorized in 2021 to help facilitate this expansion.[137] It is generally recognized that the high costs of providing service in remote areas are the problem, rather than a more generalized market failure. The underinvestment problems in water and electricity distribution, by contrast, should serve as cautionary lessons for those who deny that regulating broadband could suppress investment within existing network footprints and worsen market performance.

99. To summarize, the broadband industry is highly competitive and dynamic, and broadband competition and availability are increasing widely including by new technologies and new entrants. Consequently, the regulations proposed by the *NPRM* are not only unnecessary and unjustified, but counterproductive. Pervasive regulation of broadband should require evidence of market failure sufficient to justify the costs and risks of that regulation. No such market failure exists here. To the contrary, broadband has been one of the great success stories of the U.S. economy. The Title II regulation proposed in the *NPRM* is a "solution" in search of a non-existent problem that would impose costs that clearly outweigh any benefits.

---

[137] FCC 2022 Communications Marketplace Report, ¶ 388. $42.5B of federal funding will be made available for broadband buildout.

_____     12/14/2023

Mark Israel

_____     12/14/2023

Bryan Keating

_____     12/14/2023

Allan Shampine

**EXHIBIT A: CURRICULUM VITAE**

# Mark A. Israel                                        December 2023
## President, Compass Lexecon

555 12th Street NW, Suite 501
Washington, DC 20004
(202) 753-5205 (direct)
(301) 938-5094 (mobile)
misrael@compasslexecon.com

## AREAS OF ECONOMIC EXPERTISE

- Antitrust and competition economics; industrial organization economics

- Applied econometrics

- Economic and econometric analysis of horizontal and vertical mergers

- Economic and econometric analysis of antitrust litigation topics, including: Class certification, damages, and liability issues in cases involving price fixing, exclusive dealing, monopolization, bundling, price discrimination, and exclusionary practices

## INDUSTRIES OF PARTICULAR EXPERTISE AND CASE HIGHLIGHTS

- Particular expertise in industries including: Wireline and wireless telecommunications, media, advertising, sports, airlines, railroads, and other transportation services.

- Additional extensive experience in industries including: Internet, software, and other high technology markets; financial markets; credit cards; insurance markets; healthcare; biotech; distribution services; energy markets; metals; hotels; rental cars, and consumer retail.

- Selected case highlights: CCB v. Rogers/Shaw; NFL Sunday Ticket Antitrust Litigation; DOJ v. Google Search Litigation; DOJ v. AA/JetBlue JV; PGA Tour v. LIV Golf; Viamedia v. Comcast; Capacitors Price Fixing Jury Trial; Rail Fuel Surcharge Litigation; Verizon-Tracfone Hearings; Sprint-T-Mobile Hearings; DOJ v. AT&T/Time Warner; AA-US Airways Merger; Comcast-NBCU Merger; DOJ Oneworld Airline Alliance Investigation.

- Research published in leading scholarly and applied journals including *The American Economic Review*, *The Rand Journal of Economics*, A*ntirust Law Journal, The Journal of Competition Law and Economics, and The Review of Network Economics.*

- Co-author of the chapter on Econometrics and Regression Analysis in the ABA Treatise, *Proving Economic Damages: Legal and Economic Issues,* 2017.

App. 989

## EDUCATION

- Ph.D., Economics, STANFORD UNIVERSITY, June 2001.
- M.S., Economics, UNIVERSITY OF WISCONSIN-MADISON, August 1992.
- B.A., Economics, ILLINOIS WESLEYAN UNIVERSITY, Summa Cum Laude, May 1991.

## EMPLOYMENT HISTORY

Compass Lexecon: *President,* December 2023 – Present.

> Previously: *Senior Managing Director and Head of Compass Lexecon North American Antitrust Practice*, January 2016 – December 2023; *Executive Vice President*, April 2013 – December 2015; *Senior Vice President*, January 2009 – March 2013; *Vice President*, January 2008 – December 2008; *Economist*, January 2006 – December 2007.

Kellogg School of Management, Northwestern University: *Associate Professor of Management and Strategy*, 2007 – 2008; *Assistant Professor of Management and Strategy*, 2000 – 2006.

State Farm Insurance: *Research Administrator*, August 1992 – August 1995.

## RECENT PROFESSIONAL RECOGNITIONS

Global Competition Review, Economist of the Year, 2023.

Who's Who Legal, Global Elite Thought Leader: 2022, 2023.

Who's Who Legal, Thought Leader in USA Competition, 2024.

Who's Who Legal, Thought Leader in Competition: 2019, 2020, 2022, 2023.

## LIVE TESTIMONIAL EXPERIENCE

Testimony as Economic Expert on behalf of Express Scripts, Inc., In the Matter of *Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, et al. v. Express Scripts, Inc., et al.*, In the United States District Court for the Northern District of Illinois Western Division, Case No. 3:20-cv-50056, Deposition: December 7, 2023.

Testimony as Economic Expert on behalf of IQVIA Holdings Inc. and Propel Media, Inc., In the Matter of *Federal Trade Commission v. IQVIA Holdings Inc. and Propel Media, Inc.*, In the United States District Court for the Southern District of New York, Case No. 1:23-cv-06188-ER, Deposition: November 9, 2023; Live Trial Testimony: November 30, 2023.

Testimony of as Economic Expert on behalf of Light & Wonder, Inc., In the Matter of an Arbitration between *Mohawk Gaming Enterprises, LLC, d/b/a Akwesasne Mohawk Casino Resort, on Behalf of Itself and All Others Similarly Situated and Light & Wonder, Inc., a Nevada Company, Formerly a Delaware Corporation, and LNW Gaming Inc., a Nevada Corporation*, American Arbitration Association, Case No. 01-20-0015-6196, and *In Re Automatic Card Shufflers Litigation*, In the United States District Court Northern District of Illinois Eastern Division, Case No. 1:21-cv-1798, Deposition: November 13, 2023.

Testimony as Economic Expert on behalf of IQVIA Holdings Inc. and Propel Media, Inc., In the Matter of *Federal Trade Commission v. IQVIA Holdings Inc. and Propel Media, Inc.*, In the United States District Court for the Southern District of New York, Case No. 1:23-cv-06188-ER, Deposition: November 9, 2023.

Testimony as Economic Expert on behalf of Google, LLC, In the Matter of *United States of America, et al. v. Google LLC* (Case No. 1:20-cv-03010-APM), and *State of Colorado, et al. v. Google LLC* (Case No. 1-20-cv-03715-APM), In the United States District Court for the District of Columbia, Deposition: November 3, 2022; November 4, 2022; Live Trial Testimony: November 2, 2023; November 3, 2023; November 6, 2023.

Testimony as Economic Expert on behalf of BNSF Railway Company, et al., In *Re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, In the United States District Court for the District of Columbia, MDL Docket No. 2925, Misc. No. 20-8 (BAH), Deposition: October 23, 2023; October 24, 2023.

Testimony as Economic Expert on behalf of Express Scripts Inc, In the Matter of *City of Rockford v. Mallinckrodt ARD, Inc., et al.* (Case No. 3:17-cv-50107), and *Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, et al. v. Express Scripts Inc., et al.* (Case No. 3:20-cv-50056), In the United States District Court for the Northern District of Illinois Western Division, Deposition: November 18, 2022; August 4, 2023.

Testimony as Economic Expert on behalf of Verra Mobility Corp., In the Matter of *Pluspass, Inc. v. Verra Mobility Corp., et al.*, In the United States District Court Central District of California – Western Division, No. 2:20-cv-10078-FWS-SK, Deposition: May 24, 2023.

Testimony as Economic Expert on behalf of United Chemi-Con, In the Matter of *Avnet Incorporated v. Hitachi Chemical Company* (*In Re Capacitors Antitrust Litigation*, No. 17-mdl-2801-JD), United States District Court Northern District of California, No. 17-cv-7046-JD, Live Trial Testimony: May 18, 2023.

**App. 991**

Testimony as Economic Expert on behalf of Rogers Communications Inc., In the Matter of the *Competition Act*, R.S.C. 1985, c. C-34 as amended; and In the Matter of the proposed acquisition by Rogers Communications Inc. of Shaw Communications Inc.; and In the Matter of an application by the Commissioner of Competition for one or more orders pursuant to section 92 of the *Competition Act*, Between the Commissioner of Competition and Rogers Communications Inc. and Shaw Communications Inc., the Competition Tribunal, CT-2022-002, Live Trial Testimony: November 30, 2022; December 1, 2022.

Testimony as Economic Expert on behalf of National Football League, *In Re National Football League Sunday Ticket Antitrust Litigation*, In the United States District Court Central District of California, Case No. ML 15-02668-PSG (JEMx), Deposition: November 23, 2022.

Testimony as Economic Expert on behalf of American Airlines, Inc., In the Matter of *United States of America, et al. v. American Airlines Group Inc. and JetBlue Airways Corporation*, In the United States District Court for the District of Massachusetts, Civil Action No. 1:21-cv-11558-LTS, Deposition: August 22, 2022; Live Trial Testimony: October 17, 2022; October 24, 2022.

Testimony as Economic Expert on behalf of Comcast Corporation, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Spotlight, LP*, In the United States District Court Northern District of Illinois Eastern Division, Case No. 16-cv-5486, Deposition: January 5, 2018; October 21, 2022.

Testimony as Economic Expert on behalf of KOA Corporation and KOA Speer Electronics, Inc., In the Matter between *Sean Allott and Panasonic Corporation., et al.,* In the Ontario Superior Court of Justice, Court File No. 1899-2015 CP, Deposition: August 16, 2022.

Testimony as Economic Expert on behalf of Arconic, Inc., et al., In the Matter of *Arconic, Corp., and Howmet Aerospace, Inc. v. Novelis, Inc., and Novelis, Corp.,* United States District Court for the Western District of Pennsylvania, Case No. 2:17-cv-014340-JFC, Deposition: April 29, 2022.

Testimony as Economic Expert on behalf of Norfolk Southern Railway Corporation, "Reciprocal Switching," In Front of the Surface Transportation Board, Docket No. EP 711 (Sub-No. 1), Live Testimony: March 16, 2022.

Live testimony in front of arbitration panel in confidential arbitration regarding wholesale roaming rate for wireless telecommunications: December 13, 2021; December 14, 2021.

Testimony as Economic Expert on behalf of Nippon Chemi-Con and United Chemi-Con, *In Re Capacitors Antitrust Litigation,* No. C 14-3264-JD, and *In Re Capacitors Antitrust Litigation (No. III)*, No. MD 17-2801 JD, United States District Court for the Northern District of California Division, No. C 14-3264-JD, Deposition: March 14, 2020; Live Jury Trial Testimony: December 8, 2021.

Testimony as Economic Expert on behalf of Norfolk Southern Railway Company, *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, In the United States District Court for the District of Columbia, MDL No. 1869, Case No. 07-0489 (PLF/GMH), Deposition: November 18, 2021.

**App. 992**

Testimony as Economic Expert on behalf of JPMorgan, Goldman Sachs and Glencore, *In Re Aluminum Warehousing Antitrust Litigation*, MDL 2481, In the United States District Court Southern District of New York, No. 16-CV-5955, Deposition: November 5, 2021.

Testimony as Economic Expert on behalf of Cox Automotive, Inc., et al., In the Matter between *Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc.; Homenet, Inc.; Kelley Blue Book Co., Inc.; Vauto, Inc.; Vinsolutions, Inc.; and Xtime, Inc. vs. The Reynolds and Reynolds Company*, American Arbitration Association, Case No. 01-19-0000-4548, Deposition: October 21, 2021.

Testimony as Economic Expert on behalf of the Joint Defense Group, In the Matter between *Cygnus Electronics Corporation and Sean Allott and Panasonic Corporation, et al.*, In the Ontario Superior Court of Justice, Court File No. 3795-14 CP, Deposition: September 29, 2021.

Testimony as Economic Expert on behalf of American Express, In the Matter of *B & R Supermarket, Inc., d/b/a Milam's Market, et al., Individually and on Behalf of All Others Similarly Situated v. Visa, Inc., et al.,* In the United States District Court Eastern District of New York, Case No. 117-cv-02738-MKB-VMS, Deposition: August 6, 2021.

Testimony as Economic Expert on behalf of Bio-Rad Laboratories, Inc., In the Matter of *Bio-Rad Laboratories, Inc. and President and Fellow of Harvard College v. 10X Genomics, Inc., and 10X Genomics, Inc. v. Bio-Rad Labs, Inc. and President and Fellow of Harvard College as Counterclaimants,* In the United States District Court for the District of Massachusetts, Civil Action No. 1:19-cv-12533-wgy, Deposition: June 1, 2021.

Testimony as Economic Expert on behalf of Joint Applicants, In the Matter of *TracFone Wireless, Inc. (U4321C), América Móvil, S.A.B. de C.V. and Verizon Communications, Inc. for Approval of Transfer of Control over TracFone Wireless, Inc.*, Public Utilities Commission of the State of California, Application 20-11-001, Opening Testimony: March 12, 2021; Rebuttal Testimony: April 9, 2021; Live Trial Testimony: May 5, 2021; Supplemental Testimony: May 28, 2021.

Testimony as Economic Expert on behalf of Peabody Energy Corporation and Arch Coal, Inc., In the Matter of *Federal Trade Commission v. Peabody Energy Corporation and Arch Coal, Inc.*, In the United States District Court for the Eastern District of Missouri, Civil Action No. 4-20-cv-000317-SEP, Deposition: June 29, 2020; Live Trial Testimony: July 24, 2020.

Testimony as Economic Expert on behalf of Authenticom, Inc., *In Re Dealer Management Systems Antitrust Litigation*, MDL 2817, United States District Court for the Northern District of Illinois Eastern Division, No. 1:18-CV-864, Deposition: January 16, 2020; January 17, 2020.

Testimony as Economic Expert on behalf of Trinity, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684, Stage 1 Testimony: May 24, 2017; Stage 2 Deposition: November 14, 2019.

Testimony as Economic Expert on behalf of Joint Applicants, In the Proposed Merger of T-Mobile US, Inc. and Sprint Communications, Inc., Public Utilities Commission, State of California, San Francisco, California, Docket Nos. A.18-07-011 and A.18-07-012, Direct Rebuttal Testimony: January 29, 2019; Live Testimony: February 7, 2019; Direct Supplemental Testimony: November 7, 2019.

Testimony as Economic Expert on behalf of Turner Network Sales, Inc., In the Matter of *DISH Network L.L.C. v. Turner Network Sales, Inc.*, JAMS Arbitration No. 1100103066, Deposition: August 9, 2019; Live Trial Testimony: August 29, 2019.

Testimony of Economic Expert on behalf of Marriott Vacations Worldwide Corporation, et al., In the Matter of *RCHFU, LLC, et al. v. Marriott Vacations Worldwide Corporation, et al.*, In the United States District Court for the Eastern District of Colorado, Civil Action No. 1:16-cv-01301-PAB-GPG, Deposition: July 12, 2019.

Testimony as Economic Expert on behalf of Oscar Insurance Company of Florida, In the Matter of *Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc., d/b/a/ Florida Blue; Health Options Inc., d/b/a/ Florida Blue HMO; and Florida Health Care Plan Inc., d/b/a/ Florida Health Care Plans*, In the United States District Court Middle District of Florida Orlando Division, Case No. 6:18-cv-01944, Live Preliminary Injunction Hearing Testimony: January 23, 2019.

Testimony as Economic Expert on behalf of Wilh. Wilhelmsen Holding ASA, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC, Deposition: May 24, 2018; Live Trial Testimony: June 12, 2018; June 13, 2018.

Testimony as Economic Expert on behalf of Joint Sports Claimants, In the Matter of *Determination of Cable Royalty Funds*, United States Copyright Royalty Judges in the Library of Congress, Docket No. 14-CRB-0010-CD (2010-2013), Live Testimony: March 12, 2018.

Testimony as Economic Expert on behalf of Energy Solutions, Inc., In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, Deposition: April 17, 2017; Live Trial Testimony: May 2, 2017; May 3, 2017.

Testimony as Economic Expert on behalf of Facebook, Inc., In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the District Court of Delaware, C.A. No. 14-1525-LPS, Deposition: March 6, 2017.

Testimony as Economic Expert on behalf of Regal Entertainment Group, In the Matter of *iPic – Gold Class Entertainment, LLC, et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, Deposition: January 12, 2016; February 15, 2017; Live Trial Testimony: January 21, 2016.

**App. 994**

Testimony as Economic Expert on behalf of Anthem Inc., In the Matter of the *United States of America, et al. v. Anthem Inc. and Cigna Corp.*, In the District Court of the District of Columbia, No. 16-cv-01493 (ABJ), Deposition: November 9, 2016; Phase 1 Live Trial Testimony: December 1, 2016; December 2, 2016; Phase 2 Live Trial Testimony: December 22, 2016.

Testimony as Economic Expert on behalf of Defendants, In the Matter of *Darren Ewert v. Nippon Yusen Kabushiki Kaisha, et al.*, Supreme Court of British Columbia, No. S-134895, Deposition: September 14, 2016.

Testimony in Commercial Arbitration on Issues Related to Mobile Wireless Competition, New York, NY, April 12, 2016.

Testimony as Economic Expert on behalf of Federal Trade Commission, In the Matter of *Federal Trade Commission, et al. v. Sysco Corporation and USF Holding Corp.*, Civil Action No. 15-cv-00256 (APM), Deposition: April 28, 2015; Live Trial Testimony: May 7, 2015; May 8, 2015; May 14, 2015.

Appearances in Federal Communications Commission, Economists Panels:
- Comcast/Time Warner, January 2015
- AT&T/T-Mobile, July 2011
- Comcast/NBCUniversal, August 2010

Appearance before California Public Utility Commission, Public Hearings on Comcast/Time Warner Merger, Los Angeles, April 2015.

Appearance as Economic Expert in front of Department of Justice, Federal Trade Commission, Federal Communications Commission, and State Regulatory Agencies in many additional transactions, including: Danaher/NetScout, AT&T/Leap Wireless, T-Mobile/MetroPCS, American Airlines/US Airways, SpectrumCo/Cox/Verizon Wireless, oneworld antitrust immunity application, PepsiCo/bottlers, Houghton Mifflin/Harcourt, Chicago Mercantile Exchange/Chicago Board of Trade.


## EXPERT REPORTS, AFFIDAVITS, AND DECLARATIONS

Reports of Dr. Mark A. Israel, In the Matter between *Topher's Beard Company and Olin Corporation, et al.*, Canadian Federal Court Proposed Class Proceeding, Court File No.: T-1365-20, Initial Report: May 23, 2023; Sur-Reply Report: December 1, 2023.

Expert Reports of Mark A. Israel, Ph.D., *In Re Dealer Management Systems Antitrust Litigation*, United States District Court for the Northern District of Illinois Eastern Division, MDL 2817, No. 1:18-CV-864, Initial Report: August 26, 2019; Reply Report: December 19, 2019; Supplemental Report: November 21, 2023.

Expert Reports of Mark A. Israel, In the Matter of *Commonwealth of Virginia, Ex. rel. and Joshua M. Harman v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Court of Circuit Court for the City of Richmond, Case No. CL 13-698, Initial Report: October 12, 2023; Supplemental Report: November 15, 2023.

Expert Report of Mark A. Israel, In the Matter of *Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, et al. v. Express Scripts, Inc., et al.*, In the United States District Court for the Northern District of Illinois Western Division, Case No. 3:20-cv-50056-IDJ-LAJ, November 13, 2023.

Submission of Mark A. Israel and Bryan G. M. Keating, "An Economic Analysis of TTC Wireless Access," In the Matter of *Conditions of License relating to the Provision of Services within the Toronto Transit Commission (TTC) Subway System* and In the Matter of *Arbitration Rules and Procedures for Provision of Service within the Toronto Transit Commission (TTC) Subway System*, Between Telus Communications Inc. and Bell Mobility Inc. and Rogers Communications Inc., November 10, 2023.

Verified Statement of Mark A. Israel, Ph.D., "Reciprocal Switching for Inadequate Rail Service," Surface Transportation Board, Docket No. EP 711 (Sub-No. 2), November 6, 2023.

Expert Report of Mark A. Israel, Ph.D., In the Matter of *Federal Trade Commission v. IQVIA Holdings Inc. and Propel Media, Inc.*, In the United States District Court for the Southern District of New York, Civil Action No. 1:23-cv-06188-ER, October 25, 2023.

Expert Report of Mark A. Israel, Ph.D., *In Re Automatic Card Shufflers Litigation*, In the United States District Court for the Northern District of Illinois Eastern Division, Case No. 1:21-CV-01798, August 20, 2023.

Expert Report of Mark A. Israel, Ph.D., *In Re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, In the United States District Court for the District of Columbia, MDL Docket No. 2925, Misc. No. 20-8 (BAH), August 15, 2023.

Expert Reports of Mark A. Israel, Ph.D., In the Matter of *City of Rockford, on behalf of itself and all others similarly situated v. Mallinckrodt ARD, Inc. formerly known as Questcor Pharmaceuticals, Inc., et al.*, In the United States District Court for the Northern District of Illinois Western Division, Case No. 3:17-cv-50107, Initial Report: October 17, 2022; Reply Report: July 10, 2023.

Expert Report of Mark A. Israel, Ph.D., In the Matter of *Pluspass, Inc. v. Verra Mobility Corp., et al.*, In the United States District Court Central District of California – Western Division, No. 2:20-cv-10078-FWS-SK, May 10, 2023.

Declarations of Mark A. Israel on behalf of AT&T, Application of Pacific Bell Telephone Company d/b/a AT&T California (U 1001 C) for Targeted Relief from Its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations, Before the Public Utilities Commission of the State of California, A.23-03-003, Declaration: March 3, 2023; Reply Declaration: April 17, 2023; Amended Declaration: May 17, 2023.

Expert Report of Mark A. Israel, Ph.D., In the Matter of *TCS John Huxley America, Inc.; TCS John Huxley Europe Limited; TCS John Huxley Asia Limited; and Taiwan Fulgent Enterprise Co., Ltd. Vs. Scientific Games Corporation; Bally Technologies, Inc., d/b/a SHFL Entertainment or Shuffle Master; and Bally Gaming, Inc., d/b/a Bally Technologies, f/k/a Bally Gaming and Systems, f/k/aa SHFL Entertainment, Inc., f/k/a Shuffle Master, Inc.,* In the United States District Court for the Northern District of Illinois Eastern Division, Case No. 1:19-CV-01846, April 14, 2023.

**App. 996**

Expert Report of Mark A. Israel, Ph.D., In the Matter of *Home Depot U.S.A., Inc. v. Lafarge North America Inc.*, In the United States District Court Eastern District of Pennsylvania, Case No. 2:18-cv-05305-MMB, March 21, 2023.

Expert Report of Mark A. Israel, Ph.D., *In Re National Football League Sunday Ticket Antitrust Litigation*, In the United States District Court Central District of California, Case No. ML 15-02668-PSG (JEMx), November 4, 2022.

Expert Reports of Mark A. Israel, In the Matter of the *Competition Act*, R.S.C. 1985, c. C-34; and In the Matter of the proposed acquisition by Rogers Communications Inc. of Shaw Communications Inc.; and In the Matter of an application by the Commissioner of Competition for one or more orders pursuant to section 92 of the *Competition Act,* Between Commissioner of Competition and Rogers Communications Inc. and Shaw Communications Inc. and the Attorney General of Alberta and Videotron Ltd., the Competition Tribunal, CT-2022-002, Initial Report: September 23, 2022; Reply Report: October 20, 2022.

Expert Reports of Mark A. Israel, In the Matters of *United States of America, et al. v. Google LLC* (Case No. 1:20-cv-03010-APM), and *State of Colorado, et al. v. Google LLC* (Case No. 1-20-cv-03715-APM), In the United States District Court for the District of Columbia, Initial Report: June 4, 2022; Rebuttal Report: August 5, 2022; Reply Report: September 23, 2022.

Reports of Dr. Mark A. Israel, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Cable Communications Management, LLC*, In the United States District Court for the Northern District of Illinois Eastern Division, Case No. 16-cv-5486, Rebuttal Report: November 30, 2017; Errata Sheet for Rebuttal Report: January 4, 2018; Rebuttal Report: September 21, 2022.

Expert Declaration of Mark Israel, In the Matter of *Phil Mickelson, et al. v. PGA Tour, Inc.*, In the United States District Court for the Northern District of California San Jose Division, Civil Action No. 5:22-cv-04486-BLF, August 7, 2022.

Expert Report of Mark A. Israel, Ph.D., In the Matter of *United States of America, et al. v. American Airlines Group Inc. and JetBlue Airways Corporation*, In the United States District Court for the District of Massachusetts, Civil Action No. 1:21-cv-11558-LTS, July 11, 2022.

Expert Reports of Mark A. Israel, Ph.D., *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, In the United States District Court for the District of Columbia, MDL No. 1869, Case No. 07-489, Initial Report: April 15, 2021; Surrebuttal Report: May 10, 2022.

Expert Reports of Mark A. Israel, Ph.D., In the Matter of *Arconic Inc. v. Novelis Inc., Novelis Corp.*, In the United States District Court for the Western District of Pennsylvania, No. 2:17-CV-01434, Initial Report: February 11, 2022; Reply Report: March 18, 2022.

Verified Statement of Mark A. Israel, Ph.D., "Reciprocal Switching," Surface Transportation Board, Docket No. EP 711 (Sub-No. 1), February 14, 2022.

Expert Report of Mark A. Israel, In the Matter between *Sean Allott and Panasonic Corporation, et al.,* In the Ontario Superior Court of Justice, Court File No. 1899-2015 CP, January 17, 2022.

**App. 997**

Expert Reports of Mark A. Israel, Ph.D., *In Re Aluminum Warehousing Antitrust Litigation*, In the United States District Court Southern District of New York, MDL No. 2481, Initial Report: September 17, 2021; Supplemental Declaration: January 14, 2022.

Expert Report of Mark Israel, In the Matter of *Chase Manufacturing, Inc. d/b/a Thermal Pipe Shields v. Johns Manville Corporation*, In the United States District Court for the District of Colorado, Civil Action No. 1:19-cv-00872-MEH, November 20, 2021.

Affidavits in confidential arbitration regarding wholesale roaming rate for wireless telecommunications, Initial Affidavit: August 23, 2021; Reply Affidavit: November 15, 2021.

Expert Report of Mark A. Israel, In the Matter of *Bio-Rad Laboratories, Inc. and President and Fellow of Harvard College v. 10X Genomics, Inc., and 10X Genomics, Inc. v. Bio-Rad Labs., Inc. and President and Fellow of Harvard College as Counterclaimants*, In the United States District Court for the District of Massachusetts, Civil Action No. 1:19-cv-12533-wgy, May 14, 2021.

Expert Report of Mark A. Israel, In the Matter of *B & R Supermarket, Inc., d/b/a Milam's Market, Grove Liquors LLC, Strouk Group LLC, d/b/a Monsieur Marcel, and Palero Food Corp. and Cagueyes Food Corp., d/b/a Fine Fare Supermarket v. Mastercard International Inc., Visa Inc., Visa U.S.A., Inc., Discover Financial Services, and American Express Company*, In the United States District Court for the Eastern District of New York, Case No. 17-CV-02738 (MKB) (JO), March 22, 2021.

Expert Report of Dr. Mark A. Israel, In the Matter of *Joshua M. Harman Qui Tam v. Trinity Industries, Inc., et al.,* In the Commonwealth of Massachusetts, Superior Court Department, Civil Action No. 2014-02364-D, February 26, 2021.

Verified Statement of Mark Israel, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), January 29, 2021.

Expert Report of Mark A. Israel, Ph.D., *In Re Comtech/Gilat Merger Litigation*, Court of Chancery of the State of Delaware, Consolidated C.A. No. 2020-0605-JRS, September 24, 2020.

Declaration of Mark Israel and Allan Shampine, In the Matter of *AMC Networks Inc. v. AT&T Inc.*, Before the Federal Communications Commission, MB Docket No. 20-254, File No. CSR-8993, August 20, 2020.

Expert Report of Mark A. Israel, In the Matter between *Ryan Kett and Mitsubishi Materials Corporation, Mitsubishi Cable Industries, Ltd., Mitsubishi Shindoh Co., Ltd., Mitsubishi Aluminum Co., Ltd., Tachibana Metal Mfg. Co., Ltd., and Diamet Corporation,* In the Supreme Court of British Columbia, Case No. VLC-S-S-1813758, July 15, 2020.

Expert Reports of Mark A. Israel, Ph.D., In the Matter of *Federal Trade Commission v. Peabody Energy Corporation and Arch Coal, Inc.*, In the United States District Court for the Eastern District of Missouri, Civil Action No. 4-20-cv-000317-SEP, Initial Report: May 26, 2020; Reply Report: June 19, 2020.

Expert Reports of Mark A. Israel, Ph.D., *In Re Domestic Airline Travel Antitrust Litigation*, United States District Court for the District of Columbia, MDL Docket No. 2656, Misc. No. 15-1404 (CKK), Initial Report: September 30, 2019; Rebuttal Report: November 14, 2019.

Expert Reports of Mark A. Israel, In the Matter of *DISH Network L.L.C. v. Turner Network Sales, Inc.*, JAMS Arbitration No. 1100103066, Initial Report: July 23, 2019; Reply Report: August 2, 2019.

Submission of Mark A. Israel, Maya Meidan, and Robert J. Calzaretta, Jr., "The Atlantic Joint Business Generates Substantial Consumer Benefits," Competition and Markets Authority, United Kingdom, July 1, 2019.

Submission of Philip Haile and Mark Israel, "Alternative Approaches to Airport Slot Allocation: Objectives and Challenges," Department for Transport, United Kingdom, June 20, 2019.

Submission of Mark A. Israel, Maya Meidan, and Robert J. Calzaretta, Jr., "The Atlantic Joint Business Has Not Harmed Competition on Nonstop Overlap Routes, Including Focus Routes," Competition and Markets Authority, United Kingdom, June 14, 2019.

Expert Reports of Mark A. Israel, In the Matter of *RCHFU, LLC, et al. v. Marriott Vacations Worldwide Corporation, et al.,* In the United States District Court for the District of Colorado, Civil Action No. 16-01301-PAB-GPG, Initial Report: December 28, 2018; Supplemental Rebuttal Report, June 14, 2019.

Submission of Mark Israel, "The Fidelity/Stewart Merger Does Not Raise Competitive Concerns in the New York Title Insurance Industry," Revised Section 1506 Application Regarding the Proposed Acquisition of Stewart Title Insurance Company by Fidelity National Financial, Inc., New York State Department of Financial Services, April 12, 2019.

Second Report of Dr. Mark A. Israel, Between *UK Trucks Claim Limited and (1) – (5) Fiat Chrysler Automobiles NV and (1) – (4) MAN Truck & Bus AG & ORS*, In the Competition Appeal Tribunal, Case No. 1282/7/7/18, April 11, 2019.

Expert Report of Mark A. Israel, In the Matter between *Ryan Kett, Erik Oun and Jim Wong and Kobe Steel, Ltd., Shinko Metal Products Co., Ltd., Shinko Aluminum Wire Co., Ltd., Shinko Wire Stainless Company, Ltd., Kobelco & Materials Copper Tube Co., and Nippon Koshuha Steel Co., Ltd.*, In the Supreme Court of British Columbia, Case No. S-1710805, March 28, 2019.

Expert Report of Dr. Mark A. Israel, Between *Road Haulage Association and (1) – (10) MAN SE and Others and (1) Daimler AG, (2) Volvo Lastvagnar Aktiebolag*, In the Competition Appeal Tribunal, Case No. 1289/7/7/18, March 22, 2019.

Submission of Robert J. Calzaretta, Jr., Mark A. Israel, and Maya Meidan, "Assessing the Effects of ATI and JV Overlaps on Nonstop Fares: An Event Study Approach," submitted as part of a Supplement to Joint Motion to Amend Order 2010-7-8 for Approval of and Antitrust Immunity for Amended Joint Business Agreement, In the Application of American Airlines, Inc., British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de España, S.A., Finnair OYJ, Aer Lingus Group DAC, Before the U.S. Department of Transportation, Washington, DC, Docket DOT-OST-2008-0252-, January 11, 2019.

Declarations of Mark A. Israel, In the Matter of *Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue; Health Options Inc., d/b/a Florida Blue HMO; and Florida Health Care Plan Inc., d/b/a Florida Health Care Plans,* In the United States District Court Middle District of Florida Orlando Division, Case No. 6:18-cv-01944, Declaration: November 19, 2018; Supplemental Declaration: December 21, 2018.

Reply Declaration of Mark Israel, Michael Katz, and Bryan Keating, In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations, Federal Communications Commission, WT Docket No. 18-197, September 17, 2018.

Expert Report of Gustavo Bamberger, Robert Calzaretta, and Mark Israel, In the Joint Application of Hawaiian Airlines, Inc. and Japan Airlines, Co., Ltd., Appendix 6 to "Joint Application for Approval of and Antitrust Immunity for Alliance Agreements," Department of Transportation, Case No. DOT-OST-2018-0084, June 13, 2018.

Expert Reports of Mark A. Israel, In the Matter between *Cygnus Electronics Corporation and Sean Allott and Panasonic Corporation, et al.,* In the Ontario Superior Court of Justice, Court File No. 3795/14CP, Initial Report: November 17, 2017; Reply Report: February 23, 2018; Supplemental Report: May 22, 2018.

Expert Report of Mark A. Israel, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC, May 11, 2018.

Declaration of Mark A. Israel, In the Matter between *Robert Foster and Murray Davenport and Sears Canada Inc., et al.*, In the Ontario Superior Court of Justice, Court File No. 766-2010 CP, November 1, 2017.

Expert Report of Mark Israel and Bryan Keating, "Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom*," Federal Communications Commission, WC Docket No. 17-108, October 31, 2017.

Written Rebuttal Testimony of Dr. Mark A. Israel, In the Matter of *Distribution of Cable Royalty Funds*, Before the Copyright Royalty Judges, Washington, D.C., No. 14-CRB-0010-CD, September 15, 2017; Written Direct Testimony: December 22, 2016.

Declaration of Mark A. Israel, Allan L. Shampine, and Thomas A. Stemwedel, In the Matter of *Restoring Internet Freedom*, Federal Communications Commission, WC Docket No. 17-108, July 17, 2017.

Expert Report of Dr. Mark A. Israel, In the Matter of *St. Clair County, Illinois, and Macon County, Illinois, Individually and on behalf of all other counties in the State of Illinois, v. Trinity Industries, Inc. and Trinity Highway Products, LLC*, In the United States District Court for the Southern District of Illinois, Civil Action No.: 3:14-cv-1320, April 25, 2017.

**App. 1000**

Expert Reports of Mark A. Israel, In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, Initial Report: March 27, 2017; Rebuttal Report: April 10, 2017.

Expert Report of Mark A. Israel, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684, March 24, 2017.

Expert Report of Mark A. Israel, In the Matter of *Honeywell International Inc. v. iControl Networks, Inc. and Alarm.com Holdings, Inc.*, In the United States District Court for the District of New Jersey, No. 2:17-cv-01227, February 26, 2017.

Expert Report of Mark Israel, In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the United States District Court for the District of Delaware, C.A. No. 14-1525-LPS, November 23, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and DENSO Corporation, et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-135610, November 15, 2016.

Expert Reports of Mark A. Israel, In the Matter of the *United States of America, et al. v. Anthem Inc. and Cigna Corp.*, In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), Initial Report: October 7, 2016; Supplemental and Rebuttal Report: October 28,2016.

Verified Statements of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), Initial Verified Statement: July 26, 2016; Reply Verified Statement: August 26, 2016.

Declarations of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 15-247, 05-25, RM-10593, Second Declaration: June 28, 2016; Third Declaration: August 9, 2016.

Expert Declaration of Mark A. Israel, In the Matter of *Liberman Broadcasting, Inc. and LBI Media, Inc. v. Comcast Corporation and Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 16-121, June 7, 2016.

Expert Report of Mark A. Israel, In the Matter of *La Crosse County, Individually, and on behalf of all others similarly situated v. Trinity Industries, INC. and Trinity Highway Products, LLC*, In the United States District Court, Western District of Wisconsin, Case No. 3:15-cv-00117-scl, May 27, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and Nippon Yusen Kabushiki Kaisha, et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-134895, May 20, 2016.

**App. 1001**

Declarations of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of *Special Access Rates for Price Cap Local Exchange Carriers*, Federal Communications Commission, WC Docket No. 05-25, Declaration: February 19, 2016; Supplemental Declaration: March 24, 2016; Second Supplemental Declaration: April 20, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Competitive Analysis of the FCC's Special Access Data Collection," Federal Communications Commission, WC Docket No. 05-25, January 26, 2016.

Declaration of Dr. Mark Israel, In the Matter of *iPic – Gold Class Entertainment, LLC, et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, January 18, 2016.

Declaration of Dennis Carlton, Mark Israel, Allan Shampine & Hal Sider, "Investigation of Certain Price Cap Local Exchange Carrier Business Data Services Tariff Pricing Plans," Federal Communications Commission, WC Docket No. 15-247, January 7, 2016.

Declaration of Mark A. Israel, Attached to "Response of AT&T Mobility LLC to Notice of Apparent Liability for Forfeiture," Federal Communications Commission, File No. EB-IHD-14-00017504, July 17, 2015.

Reports in the Matter of *Federal Trade Commission, et al. v. Sysco Corporation and USF Holding Corp.*, In the United States District Court for the District of Columbia, Civil Action No. 1:15-cv-00256 (APM), Declaration: February 18, 2015; Report: April 14, 2015; Rebuttal Report: April 21, 2015.

Declaration of Mark A. Israel, Bryan G. M. Keating, and David Weiskopf, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Voice and Broadband Services in California," December 3, 2014.

Expert Report of Mark A. Israel, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Broadband: Reply to Commenters," Federal Communications Commission, MB Docket No. 14-57, September 22, 2014.

Supplemental Declaration of Mark Israel and Allan Shampine, In the Matter of *Amendment of the Commission's Rules Related to Retransmission Consent, Appendix A to "Reply Comments of the National Association of Broadcasters*," Federal Communications Commission, MB Docket No. 10-71, July 24, 2014.

Declaration of Mark Israel and Allan Shampine, In the Matter of *Amendment of the Commission's Rules Related to Retransmission Consent, Appendix B to "Comments of the National Association of Broadcasters*," Federal Communications Commission, MB Docket No. 10-71, June 26, 2014.

Expert Report of Mark A. Israel, "Implications of the Comcast/Time Warner Cable Transaction for Broadband Competition," Federal Communications Commission, MB Docket No. 14-57, April 8, 2014.

Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Sprint's Proposed Weighted Spectrum Screen Defies Economic Logic and Is Inconsistent with Established Facts," Federal Communications Commission, WT Docket No. 12-269, March 14, 2014.

**App. 1002**

Reply Declaration of Mark A. Israel, "Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T: A Reply Declaration," Federal Communications Commission, WT Docket No. 13-193, October 23, 2013.

Declaration of Mark A. Israel, "An Economic Analysis of Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T," Federal Communications Commission, WT Docket No. 13-193, August 1, 2013.

Supplemental Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comments on Appropriate Spectrum Aggregation Policy with Application to the Upcoming 600 MHz Auction," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comment on the Submission of the U.S. Department of Justice Regarding Auction Participation Restrictions," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Spectrum Aggregation Policy, Spectrum-Holdings-Based Bidding Credits, and Unlicensed Spectrum," Federal Communications Commission, GN Docket No. 12-268, March 12, 2013.

Declaration of Igal Hendel and Mark A. Israel, "Econometric Principles That Should Guide the Commission's Analysis of Competition for Special Access Service," Federal Communications Commission, WC Docket No. 05-25, February 11, 2013.

Declarations of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, Declaration: November 28, 2012; Reply Declaration: January 7, 2013.

Declaration of Mark Israel, "An Economic Assessment of the Prohibition on Exclusive Contracts for Satellite-Delivered, Cable-Affiliated Networks," Federal Communications Commission, MB Docket Nos. 12-68, 07-18, & 05-192, September 6, 2012.

Expert Report of Mark Israel, "Implications of the Verizon Wireless & SpectrumCo/Cox Commercial Agreements for Backhaul and Wi-Fi Services Competition," Federal Communications Commission, WT Docket No. 12-4, August 1, 2012.

Expert Report of Mark A. Israel, Michael L. Katz, and Allan L. Shampine, "Promoting Interoperability in the 700 MHz Commercial Spectrum," Federal Communications Commission, WT Docket No. 12-69, July 16, 2012.

Affidavits of Dr. Mark A. Israel in the Matter of *Bloomberg L.P. v. Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 11-104, Declaration: June 21, 2012; Declaration: June 8, 2012; Supplemental Declaration: September 27, 2011; Declaration: July 27, 2011.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Response to Supplementary Comments of Hubert Horan," Docket DOT-OST-2009-1055, October 22, 2010.

**App. 1003**

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers," Docket DOT-OST-2009-1055, October 13, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Economic Analysis of the Proposed Comcast-NBCU-GE Transaction," Federal Communications Commission, MB Docket No. 10-56, July 20, 2010.

Expert Report of Mark Israel and Michael L. Katz, "The Comcast/NBCU Transaction and Online Video Distribution," Federal Communications Commission, MB Docket No. 10-56, May 4, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Application of the Commission Staff Model of Vertical Foreclosure to the Proposed Comcast-NBCU Transaction," Federal Communications Commission, MB Docket No. 10-56, February 26, 2010.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity: Response of Robert Willig, Mark Israel, and Bryan Keating" in Docket DOT-OST-2008-0252, January 11, 2010.

Affidavit of Dr. Mark A. Israel on Class Certification in the Matter of Puerto Rican Cabotage Antitrust Litigation, in the United States District Court for the District of Puerto Rico, MDL Docket No. 3:08-md-1960 (DRD), December 10, 2009.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity," Docket DOT-OST-2008-0252, September 8, 2009.

Expert Report and Supplemental Expert Report of Dennis W. Carlton and Mark Israel in the Matter of *Toys "R" Us-Delaware, Inc., and Geoffrey Inc. v. Chase Bank USA N.A.*, in American Arbitration Association New York, New York, Commercial Arbitrations No. 13-148-02432-08, Expert Report: February 27, 2009; Supplemental Expert Report: March 20, 2009.

Expert Reports of James Levinsohn and Mark Israel, In the Matter of *2006 NPM Adjustment Proceeding pursuant to Master Settlement Agreement*, October 6, 2008; January 16, 2009; March 10, 2009.


**SELECTED OTHER EXPERT WORK IN REVIEW OF MERGERS/TRANSACTIONS**

*Successful acquisition of NWEA by Houghton Mifflin Harcourt, 2023.* Served as lead economic expert for Veritas Capital, owner of Houghton Mifflin Harcourt. Provided analyses demonstrating no significant competitive overlaps, no significant vertical concerns, and substantial pro-competitive benefits via integration of curriculum materials and assessment tools. Deal cleared by DOJ without a second request.

*Successful merger of Sony's Cruncyhroll and AT&T's Funimation anime streaming platforms. 2021.* Served as lead economic expert for AT&T. Made multiple presentations to DOJ, demonstrating lack of significant competitive interaction between the parties, including extremely limited consumer switching between them, as well as extensive competition with a broader marketplace including Netflix, Amazon, and others. DOJ closed the investigation allowing the merger to proceed with no conditions.

**App. 1004**

*Successful acquisition of Innovative Industries, Inc. by Ex Libris. 2020.* Served as lead economist in interactions with FTC. Demonstrated that the acquisition would not harm competition due to the *de minimis* extent of head-to-head competition between Ex Libris and Innovative and the recent decline of Innovative' s business. FTC closed investigation allowing acquisition to proceed with no conditions.

*Successful acquisition of TD Ameritrade by Charles Schwab. 2020.* Served as lead economist in interactions with DOJ. Presented analyses demonstrating broad market for investor dollars rather than narrow market for RIA Custodian Services. DOJ closed investigation allowing acquisition to proceed with no conditions.

*Successful acquisition of Reinhart Foodservice by Performance Food Group Company. 2019.* Served as lead economic expert on behalf of the parties in the FTC's investigation of the merger. Presented data analyses showing ample competition and lack of harm to competition in any geographic market. FTC closed the investigation with no conditions.

*Successful acquisition of SGA's Food Group of companies by US Foods. 2019.* Served as lead economic expert on behalf of the parties in the FTC's investigation of the merger. Presented detailed economics and econometric analyses showing ample competition and lack of harm to competition in any geographic market. FTC cleared the merger subject to divestitures in three geographic markets in the Fall of 2019.

*Successful acquisition of Time Warner by AT&T Inc. 2017-2019.* Lead economist throughout the DOJ investigation. Then director of all economic work during trial, serving as the central connection point between all experts and counsel and directing development of all aspects of the economic case. Defendants ultimately prevailed in trial and the merger closed in June 2018.

*Successful acquisition of Keystone Foods by Tyson Foods, Inc. 2018.* Served as lead economic expert for U.S. jurisdiction. Presented economic analyses demonstrating that competition would remain strong post-merger. Ultimately, antitrust agencies in the U.S., China, Japan, and Korea cleared the transaction.

*Successful acquisition of NEX Group PLC by CME Group Inc. 2018.* Co-lead economic expert with Thomas Stemwedel. Presented several econometric analyses demonstrating that Treasury futures contracts and cash Treasury securities were economic complements rather than substitutes. Based heavily on these Compass Lexecon submissions, the DOJ and CMA closed their investigations without requiring any investigations.

*Successful acquisition of VCA Inc. by Mars, Inc. 2017.* Co-lead economic expert with Mary Coleman. Made multiple presentations to FTC demonstrating ample competition in general, emergency, and specialty veterinary services, including econometric analyses showing lack of direct competitive impact of Mars and VCA on one another. Transaction was ultimately cleared subject to a small number of divestitures.

*Successful acquisition of Mobileye by Intel. 2017.* Served as lead economic expert for Intel. Assisted counsel in preparing FTC presentations and materials demonstrating lack of significant head-to-head competition and lack of valid vertical foreclosure theories. Investigation was closed without Second Request.

**App. 1005**

*FTC litigation against DraftKings, Inc. and FanDuel Inc. (Civil Action No. 17-cv-1195 (KBJ)).* 2017. Served as economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to the parties' abandonment of the deal. Developed economic and econometric evidence that the merging parties were closest substitutes and thus likely would have increased prices as a result of their proposed merger.

*Successful merger of ASE Group and SPIL.* 2017. Lead economic expert on behalf of ASE Group. Submitted reports and testified to the Taiwan Fair Trade Commission, which ultimately cleared the transaction, then made multiple presentations to U.S. FTC, which also cleared the transaction. Economic analyses focused on implications of profit margins for market definition and competitive effects, ultimately demonstrating that the transaction was unlikely to cause significant harm to competition.

*Successful acquisition of Alarm.com of two business units (Connect and Piper) from iControl Networks.* 2017. Led team that demonstrated substantial and growing competition in home security and connected home marketplace and thus lack of competitive harm from acquisition. Work focused on importance of downstream market definition as well as empirical evidence of impact of competition on Alarm.com pricing and profitability.

*Successful acquisition of Samsung Electronics, Ltd.'s printer business by HP Inc.* 2016. Led team in evaluating the competitive effects of the acquisition, including assessing shares and competitive effects in overlap areas. Notably, the transaction gained regulatory approval in the U.S. during the initial review period without issuing a Second Request.

*Successful acquisition of Sun Products Corp. by Henkel AG.* 2016. Led team demonstrating lack of competitive impact despite overlaps in laundry detergent and related products.

*Successful acquisition of Starwood Hotels & Resorts by Marriott International.* 2016. Led team that performed detailed analysis of competitive conditions, extensive econometric analysis of pricing, and full review of Marriott's internal pricing models to demonstrate that Starwood and Marriott were not close competitors, combined ownership of the brands would not lead to upward pricing pressure, and competition would remain robust post-merger.

*Successful acquisition of PR Newswire by GTCR.* 2016. Lead economic expert for GTCR. Made presentations to DOJ showing lack of competitive harm from the transaction, based on detailed analysis of win/loss data, including calculations showing no possible upward pricing pressure (UPP) concerns regardless of the level of margins.

*Successful acquisition of Schurz Communications' Broadcast Stations by Gray Television.* 2015. Lead economic expert for Gray. Made presentations to DOJ demonstrating output expanding effects of proposed transaction in light of the scale economies in television production and advertising and the small size of the DMAs affected by the transaction.

*Successful acquisition of the Communications Business of Danaher Corporation by NetScout Systems.* 2015. Lead economic expert for NetScout. Made presentations to DOJ describing proper economic framework for analysis of competition and potential merger harms, and demonstrated that the presence of multiple viable competitors and numerous other credible threats to be used by powerful buyers in a dynamic industry made theories of anti-competitive harm from the merger implausible.

**App. 1006**

*Successful acquisition of Windmill Distribution Co. by Manhattan Beer Distributors.* 2015. Lead economic expert for Manhattan Beer Distributors. Submitted White Paper to DOJ demonstrating, based on margin data, that the merger would be highly unlikely to lead to anti-competitive effects. Transaction was granted early termination from the Hart Scott Rodino process by the DOJ.

*Proposed acquisition of Time Warner Cable by Comcast Corporation.* 2014-2015. Served as lead economic expert on broadband issues on behalf of Comcast Corporation. Submitted multiple Declarations and made multiple presentations to DOJ and FCC, explaining lack of horizontal, bargaining, or vertical/foreclosure concerns with regard to broadband competition as a result of the transaction.

*Successful acquisition of Leap Wireless by AT&T.* 2014. Lead economic expert for AT&T. Submitted multiple Declarations to FCC and made presentation to DOJ, demonstrating the transaction would generate substantial consumer benefits, while generating at most minimal upward pricing pressure in a properly defined mobile wireless services market and no issues related to spectrum concentration or other competitive concerns.

*Successful merger of American Airline and US Airways.* 2013. Lead consulting expert, managing Compass Lexecon team of over 25 economists supporting multiple experts. Made multiple presentations to DOJ, worked on expert reports in litigation, and assisted counsel with the analysis leading to settlement of litigation, permitting transaction to close.

*Successful merger of T-Mobile USA and MetroPCS.* 2013. Lead economic expert for T-Mobile USA. Conducted economic analyses of competitive effects and consumer benefits from the transaction, as well as consumer benefits from reduced costs and increased network quality. Presented analyses to both DOJ and FCC.

*FTC investigation of acquisition of Dollar Thrifty Automotive Group by* Hertz. 2012. Served as a lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to case settlement. Conducted empirical analyses based on previous rental car mergers demonstrating likely price increases from the transaction.

*Decision by Federal Communications Commission not to extend the ban on exclusive contracts for satellite-delivered, cable-affiliated networks.* 2012. Lead economic expert for National Cable and Telecommunications Association. Submitted economic analysis demonstrating that the ban on exclusive distribution of satellite-delivered, cable affiliated networks is no longer warranted given increased marketplace competition. FCC made decision to allow the ban to sunset.

*Successful sale of wireless spectrum by SpectrumCo and Cox ("Cable Companies") to Verizon Wireless and successful completion of related commercial agreements.* 2012. On behalf of the Cable Companies, performed economic analyses demonstrating lack of competitive harm from the transaction on markets for backhaul and Wi-Fi services. Presented analyses to FCC.

*Successful acquisition by LIN Media of broadcast television stations from NVTV.* 2012. Lead economic expert for LIN Media. Prepared economic analysis demonstrating lack of competitive concern over potential issues related to SSA and JSA Arrangements.

19

**App. 1007**

*Proposed acquisition of T-Mobile USA by AT&T.* 2011. Served as one of the lead economists, initially for T-Mobile (along with Michael Katz) and ultimately for both parties (along with Michael Katz and Dennis Carlton). Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop, ex parte meeting.

*Successful application for antitrust immunity by Delta and Virgin Blue.* 2010. Together with Robert Willig, Bryan Keating, and Jon Orszag, prepared economic analyses demonstrating substantial net consumer benefits from antitrust immunity. Submitted results in expert reports to Department of Transportation.

*Successful joint venture between Comcast and NBC Universal (and ultimate full acquisition of NBC Universal by Comcast).* 2010. Served as one of the lead economists (along with Michael Katz) on behalf of the merging parties. Wrote multiple reports submitted to FCC (with Michael Katz) demonstrating lack of significant competitive concerns from the transaction. Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop of economists, ex parte meeting.

*Successful application for antitrust immunity for oneworld alliance and associated joint venture of American Airlines, British Airways, and Iberia Airlines.* 2009-2010. Together with Robert Willig and Bryan Keating, prepared economic analyses demonstrating substantial net consumer benefits associated with antitrust immunity for the joint venture. Submitted results in expert reports to Department of Transportation.

*Successful acquisition by PepsiCo of bottlers, PBG and PAS.* 2009. Performed econometric and simulation analyses demonstrating pro-competitive effect of merger on PepsiCo's own brands, other brands distributed by PBG and PAS, and overall marketplace. Presented results to FTC (together with Dennis Carlton).

*Successful merger of Delta Airlines and Northwest Airlines.* 2008. In support of Dennis Carlton, developed empirical and theoretical analyses to demonstrate merger's pro-competitive nature. Work focused on (ultimately settled) private litigation opposing the merger.

*Successful acquisition of Harcourt Education by Houghton Mifflin.* 2007. Along with Daniel Rubinfeld and Frederick Flyer, developed econometric analyses demonstrating lack of competitive harm from proposed merger. Presented results to DOJ.

*Successful acquisition of Chicago Board of Trade by Chicago Mercantile Exchange.* 2007. Along with Robert Willig and Hal Sider, developed and presented multiple empirical analyses demonstrating lack of competitive harm from merger. Submitted multiple white papers and made multiple presentations to DOJ.

## SELECTED OTHER EXPERT/CONSULTING WORK

Led team supporting Dennis Carlton's testimony in Toshiba/Hannstar TFT-LCD Antitrust litigation vs. Plaintiff Best Buy, 2013.

Led team supporting Dennis Carlton's testimony in Toshiba's TFT-LCD Class Action Antitrust litigation. Named Litigation Matter of the Year for 2012 by *Global Competition Review*, 2012.

App. 1008

As economic expert for US Airways, developed econometric analysis of air traffic at major US airports, presented to Philadelphia Airport management team, 2011.

Prepared analysis of the competitive impact of low-cost-carrier competition in Washington, D.C. and New York airports. Filed with DOT, 2011.

On behalf of major pharmaceutical firm, developed econometric model to forecast pharmaceutical expenditures, 2009.

Developed econometric model to measure of the importance of network effects in credit cards in the context of measuring damages incurred by a major credit card issuer, 2007-2008.

## OTHER CONFIDENTIAL CONSULTING WORK IN THE FOLLOWING INDUSTRIES

Automobiles and Components

Consumer Durables

Consumer Services

Financial Services

Energy

Food, Beverage, and Tobacco

Healthcare Equipment and Services

Media

Pharmaceuticals, Biotechnology, and Life Sciences

Retail

Semiconductors and Semiconductor Equipment

Software and Related Services

Technology: Hardware and Equipment

Telecommunication Services

Transportation

Utilities

## PUBLICATIONS

"Guidelines Lacking Guidance: Improving the FTC/DOJ Draft Merger Guidelines," (with Daniel P. O'Brien, Jonathan Orszag, Jeremy Sandford, Loren Smith, and Nathan Wilson), available at *https://papers.ssrn.com/abstract=4575390*, September 18, 2023.

"Evaluating a Theory of Harm in a Vertical Merger: AT&T/Time Warner," (with Dennis W. Carlton, Georgi V. Giozov, and Allan L. Shampine), Chapter 5 in *Antitrust Economics at a Time of Upheaval: Recent Competition Policy Cases on Two Continents*, John Kwoka, Jr., Tommaso M. Valletti, and Lawrence J. White, eds., August 2023.

**App. 1009**

"Cheap Exclusion in Markets with Multiple Complements," (with Erica Benton and Daniel P. O'Brien), forthcoming in *International Journal of Industrial Organization*, available at *https://ssrn.com/abstract=4328818*, June 17, 2023.

"A Retrospective Analysis of the AT&T/Time Warner Merger" (with Dennis W. Carlton, Georgi V. Giozov, and Allan L. Shampine), Volume 65, Number S2, in the *Journal of Law and Economics*, November 2022.

"New Merger Guidelines Should Keep the Consumer Welfare Standard" (with Jonathan Orszag and Jeremy Sandford), *CPI Antitrust Chronicle*, November 2022.

"The Economics of the LCD Cartel: Organization, Incentives, and Practical Challenges," *Cartels Diagnosed: New Insight on Collusion* (with Dennis W. Carlton, Ian MacSwain, and Allan Shampine), available at *https://ssrn.com/abstract=4190535*, August 15, 2022.

"Vertical Mergers with Bilateral Contracting and Upstream and Downstream Investment," (with Daniel P. O'Brien), available at *https://ssrn.com/abstract=3886048*, July 15, 2021.

"International Broadband Price Comparisons Tell Us Little about Competition and Do Not Justify Broadband Regulation," working paper (with Michael Katz and Bryan Keating), commissioned by NCTA – The Internet & Television Association, May 11, 2021.

"Effects of the 2010 Horizontal Merger Guidelines on Merger Review: Based on Ten Years of Practical Experience," (with Dennis W. Carlton), Volume 58, Issue 2, in the *Review of Industrial Organization*, November 10, 2020.

"Lessons from *AT&T/Time Warner*," (with Dennis W. Carlton and Allan L. Shampine), *Competition Policy International*, July 2019.

"Are You Pushing Too Hard? Lower Negotiated Input Prices as a Merger Efficiency," (with Thomas A. Stemwedel and Ka Hei Tse), Volume 82, Issue 2, Pages 623-642, in the *Antitrust Law Journal*, April 2019.

"Vertical Integration in Multichannel Television Markets: Revisiting Regional Sports Networks Using Updated Data," (with Georgi Giozov, Nauman Ilias, and Allan Shampine), Volume 4:1 in *The Criterion Journal on Innovation*, 2019.

"Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline Mergers," (with Dennis Carlton, Ian MacSwain, and Eugene Orlov), Volume 62, Pages 58-95, in the *International Journal of Industrial Organization*, January 2018.

"Competitive Effects of International Airline Cooperation," (with Robert J. Calzaretta and Yair Eilat), Volume 13, Issue 3, Pages 501-548, in the *Journal of Competition Law & Economics*, September 2017.

"Econometrics and Regression Analysis," (with Chris Cavanagh, Paul Denis, and Bryan Keating), Chapter 6 in the *American Bar Association's Proving Antitrust Damages: Legal and Economic Issues, Third Edition*, 2017.

"Do Premiums Increase After Health Insurance Mergers? – A Reassessment of Guardado et al.'s Findings," (with Robert C. Bourke, Ben Wagner, and David A. Weiskopf), available at *https://ssrn.com/abstract=2933062*, March 16, 2017.

"Complementarity without Superadditivity," (with Steven Berry, Philip Haile, and Michael Katz), Volume 151, Pages 28-30, in *Economics Letters*, December 1, 2016.

"Antitrust in a Mobile World," (with Yonatan Even, Jonathan M. Jacobson, Scott Martin, and Dr. Helen Weeds), Chapter 17 in *International Antitrust Law & Policy: Fordham Competition Law 2015*, James Keyte, ed., 2016.

"Buyer Power in Merger Review," (with Dennis W. Carlton and Mary Coleman), Chapter 22 in *The Oxford Handbook of International Antitrust Economics*, Volume 1, Roger D. Blair and D. Daniel Sokol, eds., 2015.

"Airline Network Effects and Consumer Welfare," (with Bryan Keating, Dan Rubinfeld, and Robert Willig), *Review of Network Economics*, available at *https://ssrn.com/abstract=2473243*, November 2013.

"The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation," (with Stanley M. Besen), Volume 25 in *Information Economics and Policy*, July 24, 2013.

"The Delta-Northwest Merger: Consumer Benefits from Airline Network Effects (2008)," (with Bryan Keating, Daniel L. Rubinfeld, and Robert D. Willig), *The Antitrust Revolution*, Sixth Edition, John E. Kwoka, Jr. and Lawrence J. White, eds., July 2013.

"Proper Treatment of Buyer Power in Merger Review," (with Dennis W. Carlton), *Review of Industrial Organization*, July 2011.

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of the Courts: A Response to Carlton and Israel," (with Dennis W. Carlton), *The Antitrust Source*, December 2010.

"Will the New Guidelines Clarify or Obscure Antitrust Policy?" (with Dennis W. Carlton), *The Antitrust Source,* October 2010.

"Should Competition Policy Prohibit Price Discrimination?" (with Dennis W. Carlton), *Global Competition Review*, 2009.

"The Empirical Effects of Collegiate Athletics: An Update Based on 2004-2007 Data," (with Jonathan Orszag), Paper commissioned by National Collegiate Athletic Association, available at *http://www.epi.soe.vt.edu/perspectives/policy_news/pdf/NCAASpending.pdf*, February 2009.

"Services as Experience Goods: An Empirical Examination of Consumer Learning in Automobile Insurance," *The American Economic Review*, December 2005.

"Tenure Dependence in Consumer-Firm Relationships: An Empirical Analysis of Consumer Departures from Automobile Insurance Firms," *The Rand Journal of Economics*, Spring 2005.

"The Impact of Youth Characteristics and Experiences on Transitions Out of Poverty," (with Michael Seeborg), *Journal of Socio-Economics*, 1998.

"Racial Differences in Adult Labor Force Transition Trends," (with Michael Seeborg), *Journal of Economics*, 1994.

**App. 1011**

## SELECTED RECENT PRESENTATIONS

American Bar Association Section of Antitrust Law, "Nuts & Bolts of Presenting Economic Evidence to the Agencies: Common Pitfalls and Best Practices, Panelist, October 2019.

Dechert LLP, 2019 Annual Antitrust Spring Seminar, Keynote Speaker, March 2019.

Concurrences Review and The George Washington University Law School, 6th Bill Kovacic Antitrust Salon: Where is Antitrust Policy Going?, "A Judge's Eye View on Antitrust: Mergers, Cartels, Remedies…," Panelist, September 2018.

Fordham Competition Law Institute, 45th Annual Conference on International Antitrust Law and Policy, "Merger Remedies," Panelist, September 2018.

Georgetown Center for Business and Public Policy, "Airline Competition Conference," Panelist, July 2017.

J.P. Morgan Special Situations Investor Forum, "The Antitrust Merger Review Process," Panelist, March 2017.

American Bar Association Section of Antitrust Law, "Economic Issues Raised In The Comcast – Time Warner Cable Merger," Panelist, February 2016.

Fordham Competition Law Institute, 42nd Annual Conference on International Antitrust Law and Policy, "Antitrust in a Mobile World," Panelist, October 2015.

American Bar Association Section of Antitrust Law, "Merger Practice Workshop," Faculty Member, October 2015.

Searle Center Conference on Antitrust Economics and Competition Policy, Panel on Recent Transactions in the Telecom Industry, Panelist, September 2015.

National Bureau of Economic Research, Summer Institute 2015, Industrial Organization Meetings, "Panel Discussion of the Comcast-Time Warner Merger," Panelist, July 2015.

Federal Communications Bar Association, "How the Antitrust Agencies and the FCC are Likely to Analyze Vertical Mergers," Panelist, November 2014.

The Coca Cola Company Global Antitrust Forum, "Round Table Discussion on Use of Economics and Economists," Panel Chair, November 2014.

Compass Lexecon Competition Policy Forum, Lake Como Italy, "Consolidation of the Telecoms Industry in the EU and the U.S.," Panelist, October 2014.

The IATA Legal Symposium 2014, Aviation Law: Upfront and Center, "Merger Analysis – A sudden shift in approach by DOJ in the American Airlines and US Airways merger," Panelist, February 2014.

Georgetown Law 7th Annual Global Antitrust Enforcement Symposium, "Merger Enforcement and Policy," Panelist, September 2013.

American Bar Association Section of Antitrust Law, "Airline Mergers: First Class Results or Middle-Seat Misery?" Panelist, May 2013.

American Bar Association Section of Antitrust Law, "Go Low or Go Home!  Monopsony a Problem?" Panelist, March 2012.

**App. 1012**

Federal Communications Bar Association Transactional Committee CLE Seminar, "The FCC's Approach to Analyzing Vertical Mergers," Panelist, October 2011.

The Technology Policy Institute Aspen Forum, "Watching the Future: The Economic Implications of Online Video," Panelist, August 2011.

American Bar Association Forum on Air & Space Law, 2011 Update Conference, "Antitrust Issues: What's on the Horizon for the Industry," Panelist, February 2011.

American Bar Association Section of Antitrust Law, "Antitrust in the Airline Industry," Panelist, September 2010.


## GRANTS AND HONORS

Searle Fund for Policy Research Grant, 2004-2006, for "An Empirical Examination of Asymmetric Information in Insurance Markets."

Kellogg School of Management Chairs' Core Course Teaching Award, 2003 & 2005.

Bradley Dissertation Fellowship, Stanford University, 1999-2000.

Stanford University, Outstanding Second Year Paper Prize, 1997.


## ADVISORY, EDITORIAL, AND TRUSTEE BOARDS

Global Competition Review, Editorial Board, Member

Illinois Wesleyan University, Board of Trustees, Trustee

Kenyon College, Board of Trustees, Trustee

**App. 1013**

Compass Lexecon
555 12th St. NW, Suite 501
Washington, DC 20004
202.753.5209 (Direct)
bkeating@compasslexecon.com
https://www.compasslexecon.com/professionals/bryan-keating/



December 2023

# Bryan G. M. Keating
*Executive Vice President*

---

## Education

2007    Ph.D., Economics, Stanford University

1999    B.A., Economics and Government, Dartmouth College
        *Magna cum laude*

## Fields of Specialization

Industrial organization, applied econometrics, economic and econometric analysis of mergers (including merger simulation), economic and econometric analysis of damages in antitrust matters, economic and econometric analysis of class certification in antitrust matters

## Professional Experience

2007 – Present    Compass Lexecon, Washington, DC. Executive Vice President, April 2016 - Present; Senior Vice President, April 2013 - March 2016; Vice President, April 2010 - March 2013; Senior Economist, August 2007 - March 2010
2006 – 2007    Senior Research Analyst, Acumen, LLC, Burlingame, CA
2004 – 2006    Research Assistant for Professors Tom MaCurdy, Susan Athey, and Liran Einav, Stanford University, Palo Alto, CA
2003 – 2005    Teaching Assistant for graduate econometrics and undergraduate microeconomics, Stanford University, Palo Alto, CA
1999 – 2002    Senior Analyst, NERA Economic Consulting, Chicago, IL

## Reports, Declarations, and Testimony

Declaration of Mark Israel, Bryan Keating and Allan Shampine, *In the Matter of Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, December 14, 2023

An Economic Analysis of Mobile Wireless Competition in the United States, *available at* https://www.ctia.org/news/compass-lexecon-competition-report, December 11, 2023, Attached to CTIA's comments *In the Matter of Safeguarding and Securing the Open Internet*, WC Docket No. 23-320

*In the Matter of Conditions of License relating to the Provision of Services within the Toronto Transit Commission (TTC) Subway System and In the Matter of Arbitration Rules and Procedures for Provision of Service within the Toronto Transit Commission (TTC) Subway System Between TELUS Communications Inc. and Bell Mobility Inc. Claimants and Rogers Communications Inc. Respondent*, An Economic Analysis of TTC Wireless Access (with Mark A. Israel), November 10, 2023; An Economic Analysis of TTC Wireless Access - Responding Report (with Mark A. Israel), November 24, 2023; Testimony, December 6, 2023

Expert Rebuttal Report of Bryan G.M. Keating, *PlusPass, Inc. v. Verra Mobility Corp.*, in the United States District Court for the Central District of California, Western Division, Case No. 2:20-cv-10078-FWS-SK, May 10, 2023 (deposition: May 25, 2023)

**Reports, Declarations, and Testimony (continued)**

An Economic Approach to Defining "Economic Feasibility" to Prevent and Eliminate Digital Discrimination (with Michael Katz), *In the Matter of Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Federal Communications Commission, GN Docket No. 22-69, April 20, 2023

Economic Analysis of the Rogers-Shaw-Videotron Transaction, *Proposed Acquisition of Shaw by Rogers*, January 23, 2023 (testimony before Standing Committee on Industry and Technology (INDU), Canadian House of Commons: January 25, 2023)

An Economic Assessment of the Joint Cooperation Agreement Between Delta Air Lines and Aeromexico, *Joint Application of Delta Air Lines, Inc. and Aerovias de Mexico, S.A. de C.V. Under 49 U.S.C. §§41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements*, DOT-OST-2015-0070, March 29, 2022

Expert Rebuttal Report of Bryan G.M. Keating, *Baer's Furniture Co., Inc. v. Comcast Cable Communications Management, LLC*, in the United States District Court for the Southern District of Florida, Fort Lauderdale Division, Case No. 0:20-cv-61815-AMC/PMH, February 11, 2022 (deposition: March 23, 2022)

Supplemental Declaration of Mark A. Israel and Bryan G.M. Keating, *Order Instituting Rulemaking Regarding Broadband Infrastructure Deployment and to Support Service Providers in the State of California*, CPUC Rulemaking 20-09-001, July 26, 2021

Declaration of Mark A. Israel and Bryan G.M. Keating, *Order Instituting Rulemaking Regarding Broadband Infrastructure Deployment and to Support Service Providers in the State of California*, CPUC Rulemaking 20-09-001, July 2, 2021

Economic Assessment of the Conditions to MOLIT's Approval of the Joint Venture Between Delta Air Lines and Korean Air, *Renewal Application for Joint Venture between Delta Air Lines and Korean Air*, Ministry of Land, Infrastructure and Transport (Republic of Korea), December 11, 2020

An Economic Analysis of the Joint Venture between Delta and LATAM, *Joint Application of Delta Air Lines, Inc. and LATAM Airlines Group S.A., D/B/A LATAM Airlines, TAM Linhas Aéreas S.A., D/B/A LATAM Airlines Brasil, LAN Perú S.A., D/B/A LATAM Airlines Perú, Transportes Aereos Del Mercosur S.A., D/B/A TAM Mercosur, and Aerovías de Integración Regional, Aires S.A., D/B/A LATAM Colombia Under 49 U.S.C. §§41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements*, DOT-OST-2020-0105, July 1, 2020

Platforms, Entry, and Innovation (with Loren Smith), *FTC Hearings*, Federal Trade Commission, Docket ID FTC-2019-0032, June 30, 2019, *available at* https://www.regulations.gov/document?D=FTC-2019-0032-0016

The Conclusion that the Proposed Merger of Sprint and T-Mobile will Increase Consumer Welfare Holds Even if the Standalone Companies would Otherwise Obtain Licenses to mmWave Spectrum (with Mark Israel and Michael Katz), *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, April 22, 2019

The Proposed Merger of Sprint and T-Mobile is Procompetitive when Evaluated Using Two Additional Approaches to Estimating Diversion Ratios (with Mark Israel and Michael Katz), *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, April 12, 2019

New T-Mobile's Planned In-Home Broadband Traffic would have No Material Effect of Mobile Broadband Consumers' Welfare in 2021 and 2024 (with Mark Israel and Michael Katz), *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, March 6, 2019

# Reports, Declarations, and Testimony (continued)

Porting Data are Biased and Inferior to Both Survey Data and Structural Demand Estimation as a Means of Estimating Diversion Ratios (with Mark Israel and Michael Katz), *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, February 7, 2019

Additional Information Regarding the Estimation of Diversion Ratios (with Mark Israel and Michael Katz), *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, December 14, 2018

An Economic Analysis of Joint Venture between Delta and WestJet, *Joint Application of Delta Air Lines, Inc. and WestJet Under 49 U.S.C. §§41308 and 41309 for approval of and antitrust immunity for Alliance Agreements*, Docket DOT-OST-2018-0154, October 9, 2018

Reply Declaration of Mark Israel, Michael Katz, and Bryan Keating, *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Federal Communications Commission, WT Docket No. 18-197, September 17, 2018

An Economic Analysis of the Amended and Restated Transatlantic Joint Venture Agreement Among Delta, Air France, KLM and Virgin Atlantic, *Application of Virgin Atlantic Airways, Ltd., Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., Alitalia Compagnia Aerea Italiana S.P.A. Under 49 U.S.C. §§41308 and 41309 for approval of and antitrust immunity for Alliance Agreements*, Docket DOT-OST-2013-0068, July 20, 2018

Appendix A to Comments of NCTA - The Internet & Television Association (with Jon Orszag), *In the Matter of Applications of Tribune Media Company and Sinclair Broadcast Group For Consent to Transfer Control of Licenses and Authorizations*, MB Docket No. 17-179, June 20, 2018

Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom* (with Mark Israel), *In the Matter of Restoring Internet Freedom*, WC Docket No. 17-108, October 31, 2017

An Economic Framework for Evaluating the Effects of Regulation on Investment and Innovation in Internet-Related Services (with Dennis Carlton), *In the Matter of Restoring Internet Freedom*, WC Docket No. 17-108, July 16, 2017

Economic Analysis of the Remedies and Limitations Proposed in the Show Cause Order, *Joint Application of Delta Air Lines, Inc. and Aerovias de Mexico, S.A. de C.V. Under 49 U.S.C. §§41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements*, DOT-OST-2015-0070, November 18, 2016

Reply Declaration of Michael L. Katz and Bryan G.M. Keating (with Michael Katz), *In the Matters of Business Data services in an Internet Protocol Environment, Investigation of Certain Price Cap Local Exchange Carrier Business Data Services Tariff Pricing Plans, Special Access for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC Docket Nos. 16-143, 15-247, 05-25, RM-10593, August 9, 2016

Consumer Benefits of Immunized International Airline Alliances: Case Studies Based on Delta Air Lines' Experience (with Darin Lee), May 19, 2016

Quantifying the Economic Benefits from the Proposed Joint Cooperation Agreement between Delta Air Lines, Inc. and Aerovias de Mexico, S.A. de C.V., *Joint Application of Delta Air Lines, Inc. and Aerovias de Mexico, S.A. de C.V. Under 49 U.S.C. §§41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements*, DOT-OST-2015-0070, October 2015

## Reports, Declarations, and Testimony (continued)

The Economic Impact of Relaxing the Perimeter Rule at LaGuardia Airport (with Daniel L. Rubinfeld), on behalf of Delta Air Lines, October 2015

The Economic Impact of Delta Air Lines Seattle Expansion (with Steven Peterson), on behalf of Delta Air Lines, September 2015

Economic Analysis of the Effect of the Comcast-TWC Transaction on Voice and Broadband Services in California (with Mark A. Israel and David A. Weiskopf), Exhibit D attached to Opening Brief of Joint Applicants, *Joint Application of Comcast Corporation, Time Warner Cable Inc., Time Warner Cable Information Services (California), LLC, and Bright House Networks Information Services (California), LLC for Expedited Approval of the Transfer of Control of Time Warner Cable Information Services (California), LLC (U-6874-C); and the Pro Forma Transfer of Control of Bright House Networks Information Services (California), LLC (U-6955-C), to Comcast Corporation Pursuant to California Public Utilities Code Section 854(a)*, Application No. A. 14-04-013, December 3, 2014

Network Effects, Switching Costs, and Competition in Unified Communications (with Michael Katz), on behalf of Cisco Systems, Inc., November 2012

Review of "Competitive Assessment of Cooperative Agreements in Transatlantic Airline Markets," More Recent Results And The Research Agenda Ahead (with Robert Willig), on behalf of the U.S. Department of Transportation, September 25, 2012

An Analysis of the Benefits of Allowing Satellite Broadband Providers to Participate Directly in the Proposed CAF Reverse Auctions (with Jonathan Orszag), attached to Comments of ViaSat, Inc. *In the Matter of Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support; Developing an Unified Intercarrier Compensation Regime; Federal-State Joint Board on Universal Service Lifeline and Link-Up*, WC Docket No. 10-90, GN Docket No. 09-51, WC Docket No. 07-135, WC Docket No. 05-337, CC Docket No. 01-92, CC Docket No. 96-45, WC Docket No. 03-109, Exhibit B, April 18, 2011

Response to Supplementary Comments of Hubert Horan (with Robert Willig, Mark Israel, and Jonathan Orszag), *Joint Application of Delta Air Lines, Inc.; Virgin Blue Airlines PTY LTD; Virgin Blue International Airlines PTY LTD d/b/a V Australia; Pacific Blue Airlines (NZ) LTD; and Pacific Blue Airlines (Aust) PTY LTD*, Docket DOT-OST-2009-0155, October 22, 2010

Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers (with Robert Willig, Mark Israel, and Jonathan Orszag), Appendix to Joint Applicants' Response to Show Cause Order 2010-9-4, *Joint Application of Delta Air Lines, Inc.; Virgin Blue Airlines PTY LTD; Virgin Blue International Airlines PTY LTD d/b/a V Australia; Pacific Blue Airlines (NZ) LTD; and Pacific Blue Airlines (Aust) PTY LTD*, Docket DOT-OST-2009-0155, October 13, 2010

Competitive Effects of Airline Antitrust Immunity: Response of Robert Willig, Mark Israel, and Bryan Keating (with Robert Willig and Mark Israel), attached to Joint Applicants' Answer to the Department of Justice's Motion for Leave and Comments *in re: Joint Application of American Airlines, Inc., British Airways PLC, Finnair OYJ, Iberia Líneas Aéreas de España, S.A., and Royal Jordanian Airlines, Before the Department of Transportation*, DOT-OST-2008-0252, Exhibit 1, January 11, 2010

Competitive Effects of Airline Antitrust Immunity (with Robert Willig and Mark Israel), attached to Joint Applicants' Motion for Leave to File and Supplemental Comments *in re: Joint Application of American Airlines, Inc., British Airways PLC, Finnair OYJ, Iberia Líneas Aéreas de España, S.A., and Royal Jordanian Airlines, Before the Department of Transportation*, DOT-OST-2008-0252, Exhibit 1, September 8, 2009

## Selected Consulting Engagements

In support of Mark Israel, developed economic and econometric evidence related to market definition and competitive effects, and assisted in preparation of expert reports and testimony on behalf of the Defendants in *Federal Trade Commission v. IQVIA Holdings Inc. et al*, in the United States District Court for Southern District of New York, Case No. 1:23-cv-06188

In support of Mark Israel, developed economic and econometric evidence related to market definition and monopoly power, and assisted in preparation of expert reports and testimony on behalf of the Defendants in *United States of America et al. v. Google LLC*, in the United States District Court for District of Columbia, Case No. 1:20-cv-03010

In support of Robert Willig and Jonathan Orszag, developed economic and econometric evidence related liability and damages associated with certain challenged contractual provisions, and assisted in preparation of expert reports and testimony on behalf of the Defendants in *Sidibe v. Sutter Health*, in the United States District Court for Northern California, Case No. 3:12-cv-04854

In support of Michael Katz, developed economic and econometric evidence related to the competitive effects of the merger, and assisted in preparation of expert reports and testimony on behalf of the Defendants in *State of New York, et al., v. Deutsche Telekom, et al.*, in the United States District Court for the Southern District of New York, Case No. 1:19-cv-5434-VM-RWL

In support of Michael Katz, developed economic analysis related to royalty rates, and assisted in preparation of expert testimony on behalf of Pandora *In the Matter of Determination of Rates and Terms for Making and Distributing Phonorecords (Phonorecords III)*, Before the United States Copyright Royalty Judges, Docket No. 16-CRB-0003-PR (2018-2022)

In support of Dennis Carlton, developed economic and econometric evidence related to liability and damages, and assisted in preparation of expert reports and testimony on behalf of the Defendants *In the Matter of Arista Networks, Inc., v. Cisco Systems, Inc.*, in the United States District Court for the Northern District of California, Case No. 5:16-cv-00923 (BLF)

In support of Michael Katz, developed economic analysis related to class certification, and assisted in preparation of expert reports on behalf of the Defendants *In the Matter of Zack Ward and Thomas Buchar v. Apple Inc.*, in the United States District Court for the Northern District of California, Case No. 4:12-cv-05404 (YGR)

In support of Mark Israel, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants *In the Matter of the United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, Civil Action No. 16-cv-01056-SLR

In support of Jon Orszag, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants *In the Matter of United States and Plaintiff States v. Aetna Inc., et al.*, Civil Action No. 16-1494

In support of Robert Willig, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants *in Re: Federal Trade Commission and Commonwealth of Pennsylvania vs. Penn State Hershey Medical Center and PinnacleHealth System*, Civil Action No. 1:15-cv-02362

In support of Mark Israel, developed economic and econometric evidence related to liability and damages, and assisted in preparation of expert reports and testimony on behalf of the Defendants *In the Matter of iPic Gold Class Entertainment, LLC et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745

## Selected Consulting Engagements (continued)

In support of Mark Israel, developed economic analysis related to class certification, and assisted in preparation of expert reports and testimony on behalf of the Defendants *In the Matter of Darren Ewert v. Nippon Yusen Kabushiki Kaisha et al.*, Supreme Court of British Columbia, No. S134895

In support of Robert Willig and Jerry Hausman, developed economic and econometric evidence related to class certification, damages and liability, and assisted in preparation of expert reports on behalf of the Defendants *In re: Domestic Drywall Antitrust Litigation*, MDL No. 13-MD-2437

In support of Janusz Ordover, developed economic analysis related to class certification, and assisted in preparation of expert reports on behalf of the Defendants *In the Matter of Garber et al. v. Office of the Commissioner of Baseball, Major League Baseball Enterprises Inc et al.*, 1:12-cv-03704

In support of Janusz Ordover, developed economic analysis related to class certification, damages, and liability, and assisted in preparation of expert reports on behalf of the Defendants *In the Matter of United States and Plaintiff States v. American Express Co., et al.*, 10-CV-4496 (and related cases)

In support of Michael Katz and Mark Israel, developed economic and econometric evidence related to merger effects, and assisted in preparation of expert reports and testimony on behalf of the merging parties *In the Matter of Comcast Corporation and NBC Universal*, Federal Communications Commission, MB Docket No. 10-56

In support of Dan Rubinfeld and Robert Willig, developed economic and econometric evidence related to merger effects, and assisted in preparation of expert reports and presentations to the U.S. Department of Justice in the *Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines Corporation*

In support of Robert Willig, developed economic and econometric evidence related to class certification, and assisted in preparation of expert reports on behalf of the Defendants *In the Matter of Reed v. Advocate Health Care et al.*, Case No. 06C-3337

In support of Robert Willig, developed economic and econometric evidence related to class certification, and assisted in preparation of expert reports on behalf of the Defendants *In the Matter of Fleischman v. Albany Medical Center et al.*, 1:06-cv-00765

## Papers

Workers, Wages, and Mergers: A Back-to-Basics Guide (with Allan Shampine, Kelly Fayne, and Dan Ambar), *Antitrust Magazine Online*, June 2022

International Broadband Price Comparisons Tell Us Little About Competition or Affordability, and Do Not Justify Broadband Regulation (with Mark Israel and Michael Katz), Working Paper, May 11, 2021, *available at* https://www.ncta.com/sites/default/files/2021-05/international-price-comparisons-paper-11-may-2021.pdf

The Role of the Circle Principle in Market Definition (with Robert Willig and Jon Orszag), *Antitrust Source*, April 2018

Econometrics and Regression Analysis (with Mark Israel and Chris Cavanaugh), Chapter in *ABA Section of Antitrust Law, Proving Antitrust Damages*, 3rd Ed., 2017

Antitrust, Transaction Costs and Merger Simulation with Nonlinear Pricing (with Dennis Carlton), *Journal of Law and Economics*, 58(2):269-289, May 2015

Rethinking Antitrust in the Presence of Transaction Costs: Coasian Implications (with Dennis Carlton), *Review of Industrial Organization*, 2015

## Papers (continued)

Unilateral Effects (with Robert Willig), in *Oxford Handbook on International Antitrust Economics*, Ed. by Roger D. Blair and D. Daniel Sokol, Oxford University Press, 2015

Airline Networks and Consumer Welfare (with Robert Willig, Mark Israel, and Dan Rubinfeld), *Review of Network Economics*, November 2013

Delta-Northwest: Consumer Benefits from Airline Network Effects (2008) (with Robert Willig, Dan Rubinfeld, and Mark Israel), *The Antitrust Revolution*, 6th Ed., Ed. by John E. Kwoka, Jr. and Lawrence J. White, Oxford University Press, July 2013

Comment on Farrell, Balan, Brand, and Wendling (2011), 'Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets' (with Paolo Ramezzana, Robert Willig, and Nauman Ilias), Working Paper, May 4, 2012

The Failure of E-Commerce Businesses: A Surprise or Not? (with David S. Evans and Daniel D. Garcia Swartz), *European Business Organization Law Review*, 3(1):1-26, 2002

## Recent Presentations

Axinn Seminar, January 24, 2023, Washington, DC

GCR Live: Antitrust in the Digital Economy, May 17, 2022, San Francisco, CA

2019 Class Action Conference, Establishing the existence of a class by surveys and statistics, March 29, 2019, Haifa, Israel

GCR Live East Asia Summit, Joint ventures and strategic alliances: should they be treated like mergers or as impermissible competitor coordination?, October 19, 2017, Seoul, Republic of Korea

Fordham Competition Law Institute, Conference on International Antitrust Law and Policy, State-of-the-Art Economic Analysis of Mergers, September 13, 2017, New York, NY

Concurrences, What is Trump Antitrust?, Reforming Current Cartel Enforcement, September 11, 2017, Washington, DC

Georgetown Symposium, Airline Competition Conference, July 17, 2017, Washington, DC

New York State Bar Association: Antitrust Developments in 2016, January 25, 2017, New York, NY

Concurrences 120 Merger Regimes, September 19, 2016, Washington, DC

GCR Live Cartels, April 5, 2016, Washington, DC

Antitrust Law and Economics Institute for Judges, co-sponsored by the ABA Antitrust Section, George Mason University Law School, and the Federal Judicial Center, October 21, 2015, Washington, DC

ABA Antitrust Mock Trial, April 16, 2015, Washington, DC

Hospital – Payor Bargaining with Restricted Networks: Implications for Merger Review, IIOC, May 2013, Boston, MA

Airline Network Effects, Competition, and Consumer Welfare, The Economics of the Airlines Industry, Brookings Institution, April 2010, Washington, DC

Measuring Quality Effects in Mergers, Compass Lexecon, February 2012, Miami, FL

**Recent Presentations (continued)**

Consumer Benefits and Airline Mergers, IIOC, April 2011, Boston, MA

Airline Network Effects and Consumer Welfare, IIOC, April 2010, Vancouver, BC

**Honors and Awards**

Expert Guides: Competition and Antitrust, 2020

Who's Who Legal Thought Leaders Competition, 2023-2024

Who's Who Legal Competition Economists, 2017-2022

Who's Who Legal Consulting Experts, 2017-2022

Concurrences Antitrust Writing Awards for Best Antitrust Academic Article: Economics Category, 2016

Leonard W. Ely and Shirley R. Ely Graduate Student Fellowship, Stanford University, 2006-2007

Department of Economics First Year Fellowship, Stanford University, 2002-2003

# ALLAN SHAMPINE
## EXECUTIVE VICE PRESIDENT
### COMPASS LEXECON

**CONTACT**

332 South Michigan Avenue
Suite 1300
Chicago, IL 60604
T: +1 312 322 0294
F: +1 312 322 0218
ashampine@compasslexecon.com

**EDUCATION**

1996, *PhD in Economics,* University of Chicago
      Full scholarship from the University
      Thesis: "*An Evaluation of Technology Diffusion Models and Their Implications*"
      Field specializations: urban economics, agricultural economics
1993, *MA in Economics,* University of Chicago
      Full scholarship from the University
1991, *BS in Economics and Systems Analysis, Mathematics Minor, summa cum laude,* Southern Methodist University
      Full scholarship from the University
      Honors, Departmental Distinction

**PROFESSIONAL EXPERIENCE**

1996 - Present, Compass Lexecon

2011 - Present, *Editor, Antitrust Magazine Online / Antitrust Source*, American Bar Association

Compass Lexecon Chicago Management Committee, 2021 - Present

Chief of staff for numerous engagements, including the overall chief of staff for the economics analysis in the AT&T / Time Warner merger and trial - *United States of America v. AT&T, Inc., et al.*

**TESTIMONY AND REPORTS**

- Declaration, Before the Federal Communications Commission, In the Matter of Safeguarding and Securing the Open Internet, WC Docket No. 23-320, December 14, 2023 (with Mark Israel and Bryan Keating).

- Deposition, Before the U.S. District Court, District of Delaware, Case No. 19-804-MN, NRT Technology Corp. v. Everi Payments Inc., February 22, 2022.

- Reply Declaration, Before the U.S. District Court, Southern District of New York, LG Electronics Inc. v. Dolby Laboratories Inc., February 14, 2022.

- Declaration, Before the U.S. District Court, Southern District of New York, LG Electronics Inc. v. Dolby Laboratories Inc., December 22, 2021.

- Report, Before the U.S. District Court, District of Delaware, Case No. 19-804-MN, NRT Technology Corp. v. Everi Payments Inc., December 17, 2021.

- Declaration, Before the Federal Communications Commission, MB Docket No. 20-254, August 20, 2020 (with Mark Israel).

- Deposition, Before the U.S. District Court, District of New Jersey, Case No. 19-cv-15962-MCA-LDW, CommScope, Inc., v. Rosenberger Technology (Kunshan) Co., LTD., et al., February 17, 2020.

- Declaration, Before the U.S. District Court, District of New Jersey, Case No. 19-cv-15962-MCA-LDW, CommScope, Inc., v. Rosenberger Technology (Kunshan) Co., LTD., et al., January 31, 2020.

- Trial Testimony, Before the International Chamber of Commerce, ICC Case No. 22511/RD, December 21, 2018.

- Report, Before the Federal Communications Commission, MB Docket No. 05-311, December 14, 2018 (with Jonathan Orszag).

- Expert Rejoinder Report, Before the International Chamber of Commerce, ICC Case No. 22511/RD, November 16, 2018.

- Comments on Competition and Consumer Protection in the 21st Century, Federal Trade Commission Hearings, Project Number P181201, August 20, 2018.

- Expert Report, Before the International Chamber of Commerce, ICC Case No. 22511/RD, July 6, 2018 (with Daniel Fischel).

- Reply Declaration, Before the Federal Communications Commission, Protecting Against National Security Threats Through FCC Programs, WC Docket No. 18-89, June 29, 2018.

- Declaration, Before the Federal Communications Commission, Protecting Against National Security Threats Through FCC Programs, WC Docket No. 18-89, May 30, 2018.

- Trial Testimony, Before the U.S. District Court, Eastern District of Wisconsin, Case No. 2:14-CV-01296, Milwaukee Electric Tool Corp. et al., v. Snap-On Inc., October 24, 2017.

- Supplementary Expert Report, Before the Australian Competition & Consumer Commission, national broadband network special access undertaking variation, August 24, 2017 (with Janusz Ordover).

- Deposition, Before the U.S. District Court, Eastern District of Wisconsin, Case No. 2:14-CV-01296, Milwaukee Electric Tool Corp. et al., v. Snap-On Inc., September 15, 2017.

- Expert Report, Before the U.S. District Court, Eastern District of Wisconsin, Case No. 2:14-CV-01296, Milwaukee Electric Tool Corp. et al., v. Snap-On Inc., August 17, 2017.

- Declaration, Before the Federal Communications Commission, WC Docket No. 17-108, Restoring Internet Freedom Proceeding, July 17, 2017 (with Mark Israel and Thomas Stemwedel).

- Rebuttal Expert Witness Statement, Before the American Arbitration Association, Case No. 02-14-0002-2511, May 24, 2016.

- Deposition, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Snap-On, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01242, May 25, 2016 (IPR2015-01164 deposition entered into record).

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Snap-On, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01242, April 18, 2016.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Snap-On, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01243, April 18, 2016.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Snap-On, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01244, April 18, 2016.

- Expert Witness Statement, Before the American Arbitration Association, Case No. 02-14-0002-2511, April 15, 2016.

- Deposition, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Hilti, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01164, May 25, 2016 (joint deposition for 1164, 1165 and 1166 cases).

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Hilti, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01164, April 5, 2016.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Hilti, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01165, April 5, 2016.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Hilti, Inc. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-01166, April 5, 2016.

- Expert Report, Before the Australian Competition & Consumer Commission, national broadband network special access undertaking variation, March 24, 2016 (with Janusz Ordover).

- Declaration, Before the Federal Communications Commission, WC Docket No. 15-247, Special Access Proceeding, January 7, 2016 (with Dennis Carlton, Mark Israel and Hal Sider).

- Deposition, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Chervon et al. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-00595, February 10, 2016 (joint deposition for 595, 596 and 597 cases).

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Chervon et al. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-00595, November 23, 2015.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Chervon et al. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-00596, November 23, 2015.

- Declaration, Before the United States Patent and Trademark Office, Patent Trial and Appeal Board, Chervon et al. v. Milwaukee Electric Tool Corporation, et al., Case No. IPR2015-00597, November 23, 2015.

- Comments, Before the Info-Communications Development Authority of Singapore, August 25, 2015 (with Janusz Ordover).

- Trial Testimony, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, January 28, 2015.

- Rebuttal Witness Statement, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, December 12, 2014.

- Amended Direct Testimony, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, November 25, 2014.

- Direct Testimony, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, November 20, 2014.

- Deposition, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, October 22, 2014.

- Reply Expert Report, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, October 3, 2014.

- Expert Report, Before the United States International Trade Commission, Investigation No. 337-TA-613, Remand, September 12, 2014.

- Supplemental Declaration, Before the Federal Communications Commission, MB Docket No. 10-71, Programming Exclusivity Rules, July 24, 2014 (with Mark Israel).

- Report, Before the Korea Fair Trade Commission, Case No. 2014GiGuel1474 Regarding Microsoft Corporation and Nokia Corporation's Merger, July 21, 2014 (with Dennis Carlton).

- Declaration, Before the Federal Communications Commission, MB Docket No. 10-71, Programming Exclusivity Rules, June 26, 2014 (with Mark Israel).

- Whitepaper on Patent Licenses Negotiated Subject to Judicial Review, submitted to the Chinese NDRC on behalf of Qualcomm, May 16, 2014 (with Dennis Carlton).

- Declaration Commenting on Commitments Offered by Google to Address Competition Concerns, Case COMP/C-3/39.740 – Foundem and others, July 1, 2013 (with Janusz Ordover).

- Reply Declaration in the Matter of Special Access for Price Cap Local Exchange Carriers, Before the Federal Communications Commission, WT Docket No. 05-25, March 12, 2013 (with Dennis Carlton).

- Supplemental Declaration before the Federal Maritime Commission, Docket No. 11-12, Hanjin Shipping Co., Ltd. et al., v. the Port Authority of New York and New Jersey, January 31, 2013 (with Fredrick Flyer).

- Reply Declaration in the Matter of Policies Regarding Mobile Spectrum Holdings, Before the Federal Communications Commission, WT Docket No. 12-269, January 3, 2013.

- Declaration in the Matter of Policies Regarding Mobile Spectrum Holdings, Before the Federal Communications Commission, WT Docket No. 12-269, November 26, 2012.

- Expert Report to the Australian Competition & Consumer Commission with regards to the regulatory treatment of the National Broadband Network, September 24, 2012 (with Janusz Ordover).

- Report in the Matter of Promoting Interoperability in the 700 MHz Commercial Spectrum, Interoperability of Mobile User Equipment Across Paired Commercial Spectrum Blocks in the 700 MHz Band, Before the Federal Communications Commission, WT Docket No. 12-69, July 16, 2012 (with Mark Israel and Michael Katz).

- Declaration in the Matter of Joseph I. Marchese on Request for Inspection of Records, Comments of Deutsche Telekom AG and T-Mobile USA, Inc., FCC FOIA Control No. 2012-12, filed November 14, 2011.

- Declaration in the Matter of Joseph I. Marchese on Request for Inspection of Records, AT&T Inc.'s Opposition to Bursor & Fisher, P.A.'s FOIA Request, FCC FOIA Control No. 2012-12, filed November 14, 2011.

- Declaration in the Matter of Joseph I. Marchese on Request for Inspection of Records, Review of Freedom of Information Action, FCC FOIA Control No. 2011-445, filed September 22, 2011.

- Declaration, In Re Bursor & Fisher, P.A., v. Federal Communications Commission, Case No. 1:11-cv-05457-LAK, U.S. District Court, SDNY, August 26, 2011.

- Reply Declaration, in Re: the Merger of AT&T with T-Mobile: Before the Federal Communications Commission, WT Docket No. 11-65, June 9, 2011 (with Dennis Carlton and Hal Sider).

- Declaration, In Re: the Merger of AT&T with T-Mobile: Before the Federal Communications Commission, WT Docket No. 11-65, April 20, 2011 (with Dennis Carlton and Hal Sider).

- Declaration, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation (Master File No. 1:05-MD-1720-JG-JO), February 10, 2011.

- Declaration on behalf of the Port Authority of New York & New Jersey re CFC recovery fee, December 9, 2010 (with Fredrick Flyer).

- Supplemental Declaration to the Federal Communications Commission, in the Matter of Implementation of Section 224 of the Act; A National Broadband Plan for Our Future (WC Docket No. 07-245), November 2, 2010 (with Jonathan Orszag).

- Declaration to the Federal Communications Commission, in the Matter of Implementation of Section 224 of the Act; A National Broadband Plan for Our Future (WC Docket No. 07-245), October 4, 2010 (with Jonathan Orszag).

- Declaration, In Re Gabapentin Patent Litigation (MDL No. 1384, Master Docket No. 00-CV-2931 (FSH)), March 29, 2010.

- Reply Declaration to the Federal Communications Commission, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers (WC Docket No. 05-25), February 24, 2010 (with Dennis Carlton and Hal Sider).

- Reply Declaration to the Federal Communications Commission, Verizon Wireless / ALLTEL transaction (WT Docket No. 08-95), August 19, 2008 (with Dennis Carlton and Hal Sider).

- Declaration to the Federal Communications Commission, Verizon Wireless / ALLTEL transaction (WT Docket No. 08-95), June 13, 2008 (with Dennis Carlton and Hal Sider).

- Ex parte filing before the Federal Communications Commission on behalf of Verizon, "Verizon/MCI Merger: Analysis of Special Access," September 9, 2005 (with Gustavo Bamberger and Dennis Carlton).

- Comments to the New York Public Service Commission, In the Matter of the Joint Petition of Verizon Communications, Inc. and MCI, Inc. for a Declaratory Ruling Disclaiming Jurisdiction Over or, in the Alternative, for Approval of Agreement and Plan of Merger; and Joint Petition of SBC Communications Inc., AT&T Corporation, Together with its Certificated New York Subsidiaries, for Approval of Merger (CASE 05-C-0237 and CASE 05-C-0242), August 5, 2005 (with Gustavo Bamberger and Dennis Carlton).

- Reply Declaration to the Federal Communications Commission, In the Matter of Verizon Communications Inc. and MCI, Inc., Application for Approval of Transfer of Control (WC Docket No. 05-75), May 24, 2005 (with Gustavo Bamberger and Dennis Carlton).

- Declaration to the Federal Communications Commission, In the Matter of Verizon Communications Inc. and MCI, Inc., Application for Approval of Transfer of Control (WC Docket No. 05-75), March 9, 2005 (with Gustavo Bamberger and Dennis Carlton).

- Reply Declaration to the Federal Communications Commission, In the Matter of Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements (WC Docket No. 02-112) and 2000 Biennial Regulatory Review of Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules (CC Docket 00-175), July 28, 2003 (with Dennis Carlton and Hal Sider).

- Declaration to the Federal Communications Commission, In the Matter of Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements (WC Docket No. 02-112) and 2000 Biennial Regulatory Review of Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules (CC Docket 00-175), June 30, 2003 (with Dennis Carlton and Hal Sider).

- Reply Declaration to the Federal Communications Commission in the Matter of 2000 Biennial Regulatory Review Spectrum Aggregation Limits for Commercial Mobile Radio Services, WT Docket No. 01-14, May 14, 2001 (with Robert Gertner).

- Declaration to the Federal Communications Commission in the Matter of 2000 Biennial Regulatory Review Spectrum Aggregation Limits for Commercial Mobile Radio Services, Docket No. 01-14, April 13, 2001 (with Robert Gertner).

- Report to Directorate General IV of the European Commission: "Remedies in the United States," *in Remedies in the United States, in Remedies in EU Competition Law: The Policy and Practice of the European Commission, A Report for Directorate General IV of the European Commission*, July 1998, Report (with James Langenfeld).

**PUBLICATIONS**

**Books**

*Down to the Wire: Studies in the Diffusion and Regulation of Telecommunications Technologies,* (Editor) Nova Science Press (2003). Contributors include Debra Aron, Johannes Bauer, Peter Bernstein, David Burnstein, Robert Crandall, Nicholas Economides, Wayne Fu, Shane Greenstein, Charles Jackson, Junghyun Kim, Donald Kridel, Mercedes Lizardo, Paul Rappoport, Pablo Spiller, Lester Taylor and Steven Wildman.

**Book Chapters**

"The Economics of the LCD Cartel: Organization, Incentives, and Practical Challenges," *Cartels Diagnosed: New Insight on Collusion* (with Dennis Carlton, Mark Israel and Ian MacSwain), Joseph Harrington & Maarten Pieter, eds., forthcoming.

"Evaluating a Theory of Harm in a Vertical Merger: AT&T/Time Warner," *Antitrust Economics at a Time of Upheaval* (with Dennis Carlton, Georgi Giozov and Mark Israel), John Kwoka, Jr., Tomaso Valleti & Lawrence White, eds., 2023.

*Telecom Antitrust Handbook*, American Bar Association (3rd Ed., 2019).

"An Economic Interpretation of FRAND," with Dennis Carlton, in *FRAND Literature Selection* (Chinese, 2019).

"Economics of Patents and Standardization: Network Effects, Hold-Up, Hold-Out, Stacking," with Timothy Simcoe, in *The Cambridge Handbook of Technical Standardization Law* (2018).

"The Evolution of Telecommunications Switching in the Central Office," in *Down to the Wire: Studies in the Diffusion and Regulation of Telecommunications Technologies,* Nova Science Press (2003).

**Articles**

"A Primer on the Economics of Intellectual Property Antitrust Claims," *Antitrust Magazine Online*, American Bar Association, June 2023.

"A Retrospective Analysis of the AT&T/Time Warner Merger," (with Dennis Carlton, Georgi Giozov & Mark Israel), *Journal of Law and Economics*, November 2022.

"Workers, Wages, and Mergers: A Back-to-Basics Guide," (with Dan Ambar, Kelly Fayne & Bryan Keating), *Antitrust Magazine Online*, American Bar Association, June 2022.

Review of "Patenting Inventions or Inventing Patents? Strategic Use of Continuations at the USPTO" (by Cesare Righi & Timothy Simcoe), *Antitrust Source*, American Bar Association, April 2021.

"Can We Get There From Here?" *Jurimetrics: The Journal of Law, Science, and Technology*, Summer 2020.

"A Legal Practitioner's Guide to Event Studies," *Antitrust Source*, American Bar Association, December 2019.

"Lessons from AT&T/Time Warner," (with Dennis Carlton & Mark Israel), *Competition Policy International – Antitrust Chronicle*, July 2019.

"Vertical Integration in Multichannel Television Markets: Revisiting Regional Sports Networks Using Updated Data," (with Georgi Giozov, Nauman Ilias & Mark Israel), *Criterion Journal of Innovation,* March 2019.

"Navigating Economic Analysis in a World of Big Data" (with Loren Poulsen & Michael Sabor), *Antitrust Source*, American Bar Association, December 2018.

"The Role of Computing Infrastructure in Economic Consulting and Litigation" (with Neal Lenhoff, Loren Poulsen & Michael Sabor), *Antitrust Source*, American Bar Association, August 2018.

"What is at Stake with Supreme Court Review of United States of America et al. v. American Express?" *Antitrust Source*, December 2017.

Review of "Hedonic Prices and Patent Royalties" (by J.G. Sidak & Jeremy Skog), *Antitrust Source*, American Bar Association, October 2017.

"The Role of Behavioral Economics in Antitrust Analysis," *Antitrust Source*, American Bar Association, October 2017 (reprinted from ABA Antitrust Magazine).

"FRAND and the Smallest Saleable Unit," with Joseph Kattan & Janusz Ordover, *CPI Chronicles*, September 2016.

"Applying the Non-Discrimination Requirement of FRAND When Rates Change," *Antitrust Source*, American Bar Association, August 2016.

"Patent Litigation, Standard Setting Organizations, Antitrust and FRAND" with Dennis Carlton, 22 *Texas Intellectual Property Law Journal* 3 (2014).

"Implementing the FRAND Commitment" with Janusz Ordover, *Antitrust Source*, American Bar Association, October 2014.

"Identifying Benchmarks for Applying Non-Discrimination in FRAND" with Dennis Carlton, *CPI Antitrust Chronicle*, August 2014.

Review of "Strategic Patent Acquisitions" (by Fiona Scott Morton & Carl Shapiro), *Antitrust Source,* American Bar Association, October 2013.

"An Economic Interpretation of FRAND" with Dennis Carlton, 9 *Journal of Competition Law and Economics* 3, 2013.

"The Role of Behavioral Economics in Antitrust Analysis," 27 *Antitrust* 2, American Bar Association, Spring 2013.

"Testing Interchange Fee Models Using the Australian Experience," proceedings of the Bank of Canada Economics of Payments VI conference, May 24, 2012.

Review of "Why (Ever) Define Markets? An Answer to Professor Kaplow," (by Gregory Werden), *Antitrust Source*, American Bar Association, April 2012.

Review of "An Empirical Study of the Effects of Ex Ante Licensing Disclosure Policies on the Development of Voluntary Technical Standards," (by Jorge Contreras), *Antitrust Source*, American Bar Association, February 2012.

"Price Indexes, Hedonic Analysis and Patent Damages," 5 *Journal of Intellectual Property Law & Practice* 2 (2010).

"Credit Cards in Context: Framing the Discussion" and "Assessing the Social Effects of the Use of Credit Cards" *in The Law and Economics of Interchange Fees and Credit Card Markets*, International Center for Law & Economics, December 8-9, 2009.

"Reasonable royalties and the sale of patent rights," 4 *Journal of Intellectual Property Law & Practice* 8 (2009).

"The Evaluation of Social Welfare for Payment Methods," *2009 Oxford Business & Economics Conference Proceedings*, June 2009.

"Another Look at Payment Instrument Economics," 6 *Review of Network Economics* 4 (2007).

"The Telecom Boom and Bust: Their Losses, Our Gain?" with Hal Sider, *Milken Institute Review* (October 2007).

"Boom and Bust in Network Industries: Rising from the Ashes," with Hal Sider, *International Journal of Business & Economics*, Proceedings (2006).

"The Economics of Interchange Fees," with Alan Frankel, 73 *Antitrust Law Journal* 3 (2006).

"Handicapping Countries in the Race to Digital Switching," 5 *Review of Network Economics* 2 (2006).

"The Welfare Implications of Advertising and Extension Under Uncertainty," with George Tolley, *Technological Forecasting & Social Change* 70 (2003).

"Determinants of the Diffusion of U.S. Digital Telecommunications," *Journal of Evolutionary Economics* 11 (2001).

"Compensating for Information Externalities in Technology Diffusion Models," 80 *American Journal of Agricultural Economics* 2 (1998).

Contributor to *Guide to the Western Ephemera Collection at the DeGolyer Library*, Southern Methodist University, 1993, edited by Kristin Jacobsen.

"The Impact of Technology on the Modern Labor Market," 11 *Southwestern Journal of Economic Abstracts* 1 (1990).

**Research Papers**

"LCDs and 'Crystal' Meetings—Diamond or Rock," (with Dennis Carlton, Mark Israel & Ian MacSwain (2022 – SSRN)

"A Retrospective Analysis of the AT&T/Time Warner Merger," (with Dennis Carlton, Georgi Giozov & Mark Israel) (2021 – SSRN)

"Lessons from AT&T/Time Warner" with Dennis Carlton and Mark Israel (2019 – SSRN)

"Identifying Benchmarks for Applying Non-Discrimination in FRAND" with Dennis Carlton (2014 - SSRN)

"An Economic Interpretation of FRAND" with Dennis Carlton (2013 - SSRN)

"An Evaluation of the Social Costs of Payment Methods Literature" (2012 - SSRN)

"A New Direction in Mixed Income Housing," submitted to Chicago Housing Authority (1993).

"A Survey of the Economics of Information, Focusing on Water" (1992).

"Petroleum Price Shocks and Rationality," B.S. Honors Paper (1991).

**OTHER PROFESSIONAL EXPERIENCE**

- Member of the American Economics Association

- Associate member of the American Bar Association, Antitrust Section Leadership

- Guest lecture, Prof. Hopenhayn antitrust course, UCLA, November 24, 2021

- Panelist at American University, Washington College of Law's Patent Pledges: Developing a Research Agenda conference, May 30, 2014.

- Panelist at Texas Intellectual Property Law Journal's 15th Annual Intellectual Property Symposium, FRAND and the Antitrust / Intellectual Property Interface, February 21, 2014.

- Panelist at Georgetown University Law Center's Hotel & Lodging Legal Summits, "Navigating Antitrust Issues Arising from the Online Distribution World" (October 24-25, 2013).

- "An Economic Interpretation of FRAND" paper with Dennis Carlton, presented by Carlton at the Heath Lecture & Workshop on FRAND, University of Florida Law Advocacy Center (September 2013).

- Interviewed by IEEE Spectrum for "The High Cost of Taking Your Money" (June 2012).

- "Testing Interchange Fee Models Using the Australian Experience," presented as part of a special session "Interchange Fees: Regulation and Implications" at Economics of Payments VI conference, Bank of Canada, May 24, 2012.

- Interviewed by The Oregonian for "Those credit card rewards cost us a lot of cash" (July 31, 2010).

- Participant in "The Law and Economics of Interchange Fees and Credit Card Markets" symposium sponsored by International Center for Law & Economics (December 8-9, 2009).

- "The Evaluation of Social Welfare for Payment Methods," 2009 Oxford Business & Economics Conference (June 24-26, 2009).

- Interviewed by Cards Insider for "Payments: Cash Replacement, Anonymity provides lifeline for cash over cards" (January 28, 2008).

- "Boom and Bust in Network Industries: Rising from the Ashes," 6th Global Conference on Business & Economics, Harvard University (October 15-17, 2006), with Hal S. Sider.

- "House of Cards: The Economics of Interchange Fees," Presentation to the Federal Reserve Bank of New York Conference, Antitrust Activity in Card-Based Payment Systems: Causes and Consequences (September 16, 2005), with Alan S. Frankel.

- "The Impact of Technology on the Modern Labor Market," 68th Annual Meeting of the Southwestern Social Science Association (March 29, 1990)

- Presented papers on information externalities and technology diffusion at the Economics and Public Policy Workshop (3) and Price Theory Workshop (1), University of Chicago (1995, 1996)

- Coordinated the Conference on Valuing Non-Market Goods, University of Chicago (July 21-22, 1995)

- Assisted in coordinating the Conference on Research in Health Economics, University of Chicago (October 21-22, 1994)

- Assisted in organizing the Economic Policy and Public Finance Workshop, University of Chicago (1993 - 1996)

- Referee for the Agricultural and Resource Economics Review, American Journal of Agricultural Economics, Antitrust Law Journal, Journal of Business, Journal of Legal Studies and Journal of Evolutionary Economics.


**ACADEMIC HONORS**

**Undergraduate**

- Graduated Summa Cum Laude, Honors, Departmental Distinction
- Award for Excellence (given to the outstanding senior in the Economics Department as decided by the vote of the faculty)
- Presidential Scholarship (full scholarship)
- National Merit Scholar (honorary)
- Hyer Society (honorary society of Southern Methodist University)
- Honor Roll (1987 - 1991)
- Phi Beta Kappa
- Alpha Lambda Delta (Treasurer, honorary society recognizing academic achievement)
- Phi Eta Sigma (honorary society recognizing academic achievement)
- Omicron Delta Epsilon (honor society in mathematics)

**Graduate**

- Full Merit Scholarship (tuition and stipend)



U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |

**COMMENTS OF THE U.S. CHAMBER OF COMMERCE**

Jordan Crenshaw
*Senior Vice President*
*Chamber Technology Engagement Center*
*U.S. Chamber of Commerce*

*Outside Counsel*

Thomas M. Johnson, Jr.
Joshua S. Turner
Sara M. Baxenberg
WILEY REIN LLP
2050 M Street N.W.
Washington, D.C. 20036

December 14, 2023

**App. 1032**

# TABLE OF CONTENTS

I.  Introduction and Summary ................................................................................ 1

II.  The Internet Is Thriving Under The Restoring Internet Freedom Order's Targeted Regulatory Approach. ......................................................................... 3

    A.  The Apocalyptic Predictions Surrounding the *Restoring Internet Freedom Order* Never Happened. ........................................................................ 3

    B.  Targeted Regulation Has Improved Broadband Investment, Deployment, Speed, and Price. .......................................................................... 6

    C.  The COVID-19 Pandemic Affirms the Wisdom of *Restoring Internet Freedom Order's* Regulatory Approach. ........................................................... 12

III.  Returning to Title II Regulation Would Depress Investment, Increase Uncertainty, and Hamper Innovation. ...................................................... 15

    A.  Past Experience Demonstrates the Harms of Title II Regulation. ...................... 15

    B.  The Proposed Title II Reclassification Would Be Particularly Harmful, Especially Given How the Broadband Market Has Evolved. .................................... 19

IV.  The FCC's Purported Justifications for Title II Reclassification Lack Merit. .................. 21

    A.  Cybersecurity ........................................................................................... 22

    B.  National Security ...................................................................................... 28

    C.  Privacy .................................................................................................... 32

    D.  Public Safety ........................................................................................... 36

    E.  Network Resiliency .................................................................................. 38

V.  The Commission Lacks Legal Authority to Classify Broadband as a Title II Service. ........ 40

    A.  The Text of the Communications Act and Its Amendments Confirms that Broadband Is Best Understood as an "Information Service." ........................ 40

    B.  FCC and Supreme Court Precedent Confirm that Broadband Is Best Understood as an "Information Service." .................................................... 45

    C.  The Major Questions Doctrine Precludes Title II Classification of Broadband ............... 49

        1.  Title II Classification of Broadband Is a Major Rule. ................................. 51

        2.  Congress Has Not Clearly Authorized Title II Reclassification. .................. 58

    D.  The Proposed Rule Violates the First Amendment. ......................................... 62

VI.  The Commission Should Not Authorize State Regulation of Broadband. ...................... 63

VII.  The Proposed Internet Conduct Standard Is Vague and Unworkable. ........................... 66

VIII.  Conclusion .......................................................................................... 68



## I.  Introduction and Summary

The U.S. Chamber of Commerce ("Chamber") respectfully submits these comments in response to the notice of proposed rulemaking ("NPRM") in the above-titled proceeding.  The Chamber vigorously opposes the Federal Communication Commission's ("FCC" or "Commission") proposal to impose onerous, utility-style regulation on broadband providers by reclassifying broadband as a "telecommunications service" under Title II of the Communications Act.

Six years ago this month, the FCC voted to repeal its short-lived experiment in treating broadband providers like common carriers under the same regulatory framework that used to apply to monopoly telephone networks.  At the time, pro-Title II advocates told the public that reversing Title II classification would end the Internet as we know it, resulting in reduced speeds, higher prices, and Internet service providers ("ISPs") deciding what content consumers were allowed to see.  But as has become apparent to any reasonable observer, none of these dire predictions came to pass.  To the contrary, broadband service is faster and cheaper and consumers have more options than ever before.  Our networks helped keep the country connected during the COVID-19 pandemic at a time when millions of Americans worked from home and made significant use of the Internet for telehealth, e-learning, online gaming, and video streaming.

Nonetheless, the FCC proposes to double down on failed regulatory strategies from the past.  While the FCC cannot identify new evidence of open internet violations to support sweeping prescriptive regulation, we are now told that Title II is needed for a host of new, unrelated policy reasons—from national security to privacy to cybersecurity to public safety.

**App. 1034**

But the Commission does not come close to adequately explaining how classifying broadband as a Title II service would advance these goals, let alone be superior to other more targeted approaches under its existing authority.

Title II reclassification will accomplish one thing—increasing the FCC's control over the Internet. But this expansive assertion of authority is both unlawful and unwise. The Communications Act does not authorize Title II classification of broadband, and in any event, the Supreme Court's major questions doctrine prohibits it. In recent cases, the Supreme Court has treated skeptically broad and novel assertions of agency authority over major sectors of the economy absent clear Congressional authorization. And the Court has cited approvingly Justice Kavanaugh's seminal opinion from his time on the D.C. Circuit that addressed the precise issue raised by the NPRM and concluded that Congress did *not* clearly authorize Title II classification and the FCC exceeded its authority in deciding this major question itself.

The Commission should spare itself, the courts, and the public the time and expense involved with retreading Title II classification, when any new Title II order is destined to be vacated by the Supreme Court. In the meantime, as was true in 2015, Title II would depress innovation and investment and impose significant costs on providers—particularly new entrants and small or rural providers that lack resources to absorb significant regulatory uncertainty. The FCC should instead stay the current course and continue to treat broadband as a Title I "information service." Rather than relitigate Title II, the FCC should focus on pro-competitive, pro-growth policies that will help America continue to lead in the global race for next-generation connectivity.

## II.     The Internet Is Thriving Under The Restoring Internet Freedom Order's Targeted Regulatory Approach.

Five years after the *Restoring Internet Freedom Order* ("RIF Order"),[1] the Internet continues to flourish in a national economy increasingly reliant on a broadband connection.  As Commissioner Brendan Carr reiterated in his NPRM dissent, after the FCC's "decision to return the Internet to the same successful and bipartisan regulatory framework under which it thrived for decades, broadband speeds in the U.S. have increased, prices are down, competition has intensified, and record-breaking new broadband builds have brought millions of Americans across the digital divide."[2]  Under the RIF Order's approach, U.S. broadband providers were able to meet significant challenges, including the COVID-19 pandemic.  Rather than cause the Internet collapse that pro-Title-II advocates forewarned, the RIF Order has propelled continued growth in the broadband industry and the broader Internet economy, enabling more Americans to have access to better and faster Internet service and novel products and services.  Preserving the approach taken by the RIF Order will ensure that the Internet continues to thrive, and that the United States remains the leader in connectivity and the products and services that depend on it.

### A.     The Apocalyptic Predictions Surrounding the *Restoring Internet Freedom Order* Never Happened.

In the years that the RIF Order has been in effect, U.S. consumers have not only enjoyed an unprecedented period of broadband prosperity—as discussed in more detail below—but did so without experiencing the end of the Internet that opponents of the Order claimed would occur. Opponents asserted confidently that Title II classification was necessary because absent heavy-

---

[1] *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311 (2018), http://tinyurl.com/mt3a7bpj ("RIF Order").

[2] *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC-23-83, at 136-143 (Oct. 19, 2023), https://tinyurl.com/y6hhry6y ("NPRM") (Dissenting Statement of Commissioner Brendan Carr).

**App. 1036**

handed, utility-style regulation, broadband providers would enact anti-consumer prioritization and pricing models that would "smother innovation" and lead to consumers "'get[ting] the internet one word at a time.'"[3]  News outlets predicted that the RIF Order would empower "internet service providers to do practically whatever they like—including paid prioritization, throttling, and otherwise messing with traffic as it moves across the internet" and potentially "reshape the internet in very ugly ways."[4]  A *New York Times* opinion piece even suggested that the RIF Order created a "nightmare scenario [at] America's digital doorstep" that would result in a "digital dystopia" comparable to the Internet experience in the People's Republic of China.[5]

None of this has happened.  During the five years since the U.S. adopted the RIF Order's approach, "there has not been any evidence of ISPs blocking or erecting toll lanes on the internet as . . . predicted with unshakable certitude uttered in dark, apocalyptic tones."[6]  Rather than blocking or throttling content, "the Internet has become more competitive than ever before."[7]  Yet in the NPRM, the Commission never seeks comment on how these failed predictions should bear on its proposal to reclassify broadband as a Title II service.  Nor does the NPRM identify *any* specific concerns or examples regarding ISP conduct during the period the RIF Order has been in effect that would justify a change in regulatory regime.  Instead, the Commission looks to stakeholders to justify the decision the agency appears to have already made, requesting

---

[3] *Id.* at 136-138 (Dissenting Statement of Commissioner Brendan Carr) (quoting tweets from Senate Democrats and Ed Markey).

[4] Makena Kelly, *Net neutrality is dead—what now?*, The Verge (June 11, 2018), https://tinyurl.com/mr425fhb.

[5] Nick Frisch, *What if You Couldn't See This Page?*, New York Times (Dec. 14, 2017), https://tinyurl.com/yks78763.

[6] Michael Powell, *Net Fatality: The FCC Is About to Blow our Best Chance to Have Internet for All*, NCTA (Oct. 31, 2023), https://tinyurl.com/ymcftxdw.

[7] Jonathan Cannon &Canyon Brimhall, *The revival of net neutrality relitigates a 'solution' in search of a problem*, The Hill (Oct. 11, 2023), https://tinyurl.com/mpkbefjs.

comment on any "examples of conduct that has harmed Internet openness."[8]  In so doing, the Commission cites a single 2019 study regarding alleged throttling practices by wireless ISPs in the U.S. and elsewhere[9]—the methodology, veracity, and import of which has been contested by providers and others.[10]

The Commission's focus on potential harm—while failing to identify verified instances of harmful conduct—reveals that "worst-case-scenario nightmares of outright blocking or throttling of Internet services . . . are less realistic than ever" in a competitive broadband market with "significant checks on behavior that diminish the need for extensive regulation."[11]  By proposing to drastically alter a regulatory framework without a clear indication of need, the NPRM impliedly recognizes the RIF Order's strengths as the product of both "an extensive diagnosis of the problems the regulations are intended to solve and . . . [consideration of] the

---

[8] NPRM ¶ 129.

[9] *Id.* ¶ 129 n.421 (citing Fangfan Li et al., A Large-Scale Analysis of Deployed Traffic Differentiation Practices, SIGCOMM '19, at 130-144 (2019), https://tinyurl.com/2za46p53 ("Li Study")); *see also* Khalida Sarwari, Northeastern University Researcher Finds that Wireless Networks are Throttling Video Streaming 24/7, Northeastern Global News (Aug. 27, 2019), https://tinyurl.com/f6cvmt95).

[10] *See* Letter from Edward J. Markey et al., U.S. Senate, to Hon. Ajit Pai, Chairman, FCC, OL Docket No. 19-9 (Feb. 6, 2019), http://tinyurl.com/yk9ukzty; *id* at Attachment: Letter from AT&T (Dec. 6, 2018) (explaining that Wehe, the application created and used by the researchers in the Li Study to detect alleged throttling, "is not an accurate barometer of whether a carrier is engaged in throttling Internet traffic for several reasons[,] [t]he most critical and obvious" of which being that the app "fails to account for customer choice," which leads consumers to elect standard-definition over high-definition streaming for various reasons); *id*. at Attachment: Letter from Verizon (Dec. 6, 2018) (explaining that "the claims in the Wehe study … are inaccurate" and that "[w]hile [Verizon] manage[s] [its] network reasonably, [it] do[es] not make any distinction based on the content of the video or the source website," nor does Verizon "distinguish between one video provider and another"); *id*. at Attachment: Letter from Sprint (Dec. 6, 2018) (explaining that "Sprint does not throttle lawful internet traffic based on content, application or service, and does not single out [specific apps cited in the Li Study] for differential treatment"); *id*. at Attachment: Letter from T-Mobile (Dec. 6, 2018) (explaining that "reasonable network management" practices to accommodate customer demand for high-bandwidth activities like video streaming "have been in place for years, and these practices have always been deemed permissible – not only under the light-touch transparency-based regime set out in the …[RIF Order], but also under the previous, more prescriptive rules the FCC adopted in 2015"); Ross Marchand, *New Evidence Debunks Big Myth That Repealing Internet Rules Caused Throttling*, The Federalist (Sept. 19, 2018), https://tinyurl.com/y92exscc (explaining that the traffic variations detected by the researchers "reflect data management rather than a plot to prioritize in-house streaming").

[11] Comments of the Information Technology & Innovation Foundation ("ITIF"), WC Dockets Nos. 17-108, 17-287, 11-42, at 3-4 (filed Apr. 20, 2020), https://tinyurl.com/4s9t366u.

**App. 1038**

public choice incentives that could lead regulators to behave in a less-than-optimal way."[12] Through this analysis, the Commission that adopted the RIF Order realized that, while "the potential harm to consumers from blocking and throttling is real . . . the likelihood that broadband providers will engage in blocking or throttling is substantially mitigated because consumers value openness and broadband ISPs often face significant competition."[13]

### B.   Targeted Regulation Has Improved Broadband Investment, Deployment, Speed, and Price.

Indeed, the data bears out that under the RIF Order, the Internet has not only continued to operate, but has thrived.  The FCC's return to a targeted regulatory framework in the RIF Order has encouraged greater broadband investment and deployment, more innovation, increased broadband speeds and capacity, and decreased prices for consumers.[14]  For example, in 2017—the year that the Commission announced its intention to adopt the RIF Order—total capital expenditures on broadband first started to increase after a multi-year decline that occurred during the period that broadband was regulated under Title II.  In 2018, the RIF Order went into effect, and broadband investment reached $80 billion—the highest amount since 2001, when broadband providers were in the midst of building out the first-ever consumer broadband networks to replace dial-up services.[15]  The Commission reported that "[d]uring 2018 . . . broadband providers, both small and large, deployed fiber networks to 5.9 million new homes, the largest number ever recorded."[16]  In the years since, this upward trend has continued under the RIF

---

[12] *See* Jerry Ellig, *Restoring Internet Freedom as an Example of How to Regulate*, 3 Bus. Entrepreneurship & Tax L. Rev. 236, 238 (2019), https://tinyurl.com/5az7f29a.

[13] *Id.* at 242.

[14] *See id*.

[15] Patrick Brogan, *U.S. Broadband Investment Continued Upswing in 2018*, USTelecom (July 31, 2019), http://tinyurl.com/2dce58yx.

[16] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion,* 2019 Broadband Deployment Report, 34 FCC 3857, ¶ 3 (2019), http://tinyurl.com/5exxaysn.

**App. 1039**

Order's framework, with broadband providers investing a record $102.4 billion in capital expenditures in 2022.[17]



**Figure 1**

In the mobile broadband context, the trends are similar: surging capital investment began in 2017, reversing "historic declines" brought on by Title II regulation.[18] Since then, wireless infrastructure investment has increased—and set records—year after year, reaching $39 billion in 2022.[19]

---

[17] *2022 Broadband Capex Report*, USTelecom (Sept. 8, 2019), http://tinyurl.com/3cxdjhf9.

[18] Comments of the Telecommunications Industry Association, WC Docket Nos. 17-108, 17-287, 11-42, at 4 (filed Apr. 20, 2020), https://tinyurl.com/mrxupz7v.

[19] *2023 Annual Survey Highlights*, CTIA, at 4 (July 25, 2023), http://tinyurl.com/uu6akehw ("CTIA 2023 Annual Survey Highlights"); *see also Summary of CTIA's Annual Wireless Industry Survey*, CTIA, at 6 (2021), https://tinyurl.com/2p82mw9y (detailing cumulative capital expenditures by the U.S. wireless industry from 2001 to 2020).

**App. 1040**

**Figure 2**



These investments have allowed providers to build out infrastructure to expand coverage and keep pace with technological advancements. As a result of investment and expansion, wireless networks currently support over 73.7 trillion megabytes of traffic: "the greatest increase in mobile data traffic ever and nearly double the year-over-year increase from 2020 to 2021."[20] And in 2022, more than 142,000 small cell deployments were operational across the U.S., helping to power 5th generation ("5G") wireless networks and the high-speed, low-latency communications that 5G enables.[21] Additionally, the past five years have been significant for fiber deployment, which "passed 7.9 million additional homes in the U.S. in 2022—the highest annual deployment ever, even with challenges in materials supply chain and labor availability."[22]

---

[20] CTIA 2023 Annual Survey Highlights at 3.

[21] *Id.* at 7.

[22] Ashley Schulte, *Fiber Broadband Deployment Accelerate in 2022 Ahead of BEAD Funding Infusion, Setting New Homes Passed Record*, Fiber Broadband Association (Dec. 21, 2022), https://tinyurl.com/2ps883yt.

**App. 1041**

Considering this progress, "industry is currently on pace to deploy all-fiber networks to about 50% of U.S. households by 2025."[23]

This rapid deployment, enabled by the targeted regulatory approach and "pro-investment momentum that followed the [RIF Order's] repeal of public utility-like regulation under Title II,"[24] has allowed broadband to reach more Americans than ever before. As of January 2023, the United States has 311.3 million Internet users and 383.4 million cellular mobile connections.[25] According to FCC data, the percentage of Americans with access to two or more high-speed, fixed ISPs increased to approximately 295 million in 2022—a 30 percent increase since 2017.[26] Even by conservative estimates, more than 90 percent of U.S. households could have access to one broadband provider offering 100/20+ Mbps service—while 74 percent could have access to two—by December 2025.[27]

---

[23] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2020 Broadband Deployment Report, 35 FCC Rcd 8986, ¶ 92 (2020), http://tinyurl.com/ymabz8ve.

[24] Seth L. Cooper, *FCC Report Shows Broadband Success Under Pro-Market Policies*, The Free State Foundation (May 11, 2023), https://tinyurl.com/3v33tpwv.

[25] Simon Kemp, *Digital 2023: The United States of America: The Essential Guide to the Latest Connected Behaviors*, We Are Social (Feb. 9, 2023), https://tinyurl.com/mwbephs8.

[26]*See Communications Marketplace Report*, Report, 33 FCC Rcd 12558, 12654 (2018), http://tinyurl.com/bdd7887z (showing that, in 2017, 139.957 million Americans had access to two high-speed fixed ISPs and 91.174 million had access to more than two, resulting in approximately 229.1 million Americans (or 70.4 percent of the U.S. population) with access to two or more high-speed fixed ISPs); *Communication Marketplace Report*, 2022 Communications Marketplace Report, GN Docket No. 22-203, FCC 22-103, at 283 (Dec. 30, 2022), https://tinyurl.com/4j8n789y (showing that, as of December 31, 2021, 89.9 percent of U.S. households—or approximately 116.6 households—had access to two or more high-speed fixed ISPs, which is equivalent to 295 million Americans when multiplied by 2.53, the average number of persons per household in 2021) ("2022 Communications Marketplace Report"); *see also Broadband Competition is Thriving Across America: An ACA Connects White Paper*, ACA Connects, at 12-18 (June 23, 2022), https://tinyurl.com/3se6uw24 (describing increasing numbers of households with access to broadband providers) ("ACA Connects White Paper").

[27] ACA Connects White Paper at 4.

**App. 1042**

**Figure 3**



Percentage of Americans with Access to High-Speed Fixed Broadband at Year End

| Year | Percentage |
|------|-----------|
| 2013 | 83.6% |
| 2014 | 89.4% |
| 2015 | 89.9% |
| 2016 | 91.9% |
| 2017 | 93.5% |
| 2018 | 94.4% |
| 2019 | 95.6% |
| 2020 | 97.6% |
| 2021 | 98.4% |

*Source: FCC Broadband Deployment Reports*

Moreover, more than 94 million homes and businesses use 5G fixed broadband services, which provides Americans with one of several options for home broadband.[28]  5G will also likely comprise approximately 91 percent of U.S. wireless connections by 2028.[29]  This substantial 5G deployment will directly impact Americans, by contributing up to $1.7 trillion to U.S. GDP and creating between 3.8 million and 4.6 million jobs over the next ten years.[30]  The 5G revolution also has heralded an unprecedented era of technological advancement, enabling the vast Internet of Things ("IoT") ecosystem to become a reality.  Last year, 162 million 5G end-user devices were operational—"nearly double the number of 5G devices in 2021."[31]  This explosive growth

---

[28] NPRM at 139 (Dissenting Statement of Commissioner Brendan Carr).

[29] *The State of 5G: Evaluating Progress and Charting the Path Forward*, CTIA, at 28 (July 2023), https://tinyurl.com/yuks2uc9 ("State of 5G Report").

[30] Enrique Duarte Melo et. al, *5G Promises Massive Job and GDP Growth in the US*, Boston Consulting Group and CTIA, at 3 (Feb. 2021), https://tinyurl.com/yck7kdv3.

[31] CTIA 2023 Annual Survey Highlights at 5.

in 5G connections "play[s] an integral role in unlocking the power of IoT, with 5G networks' high capacity enabling thousands of sensors to work together and support innovations," such as drones, autonomous vehicles, smart cities, advanced manufacturing, and precision agriculture.[32]

The RIF Order's targeted approach has also propelled faster Internet speeds for Americans across the country. Currently, the United States has one of the highest average fixed broadband download speeds in the world.[33] According to September 2023 Ookla data, the United States maintains a top-ten-globally-ranked fixed Internet speed and the fastest mobile broadband speed in North America.[34] According to another Internet speed test provider, in 2022 alone, "internet speeds rose over 20% year over year to a national average of 119.03 Mbps."[35] These metrics echo the progress from 2018 to 2022, when "16 major Internet providers in the US saw speeds trending upwards, with many reaching 150 Mbps across the board."[36] This momentous improvement comes as no surprise, as Internet speeds improved by forty percent in 2018 alone—the same year that the RIF Order went into effect.[37]

In addition, the era of targeted regulation has been marked by significantly decreased prices for consumers. For wireless services, CTIA reports a 73 percent decrease in per megabyte prices for since 2017.[38] NCTA likewise reports that, according to data from the U.S. Bureau of Labor Statistics, real U.S. broadband prices, adjusted for inflation, have fallen 12 percent over

---

[32] *Id.*

[33] NPRM at 139 (Dissenting Statement of Commissioner Brendan Carr).

[34] *Median Country Speeds September 2023*, Ookla, https://tinyurl.com/4k2573jm (last visited Dec. 13, 2023).

[35] Alex Kerai, *State of the Internet in 2023: As Internet Speeds Rise, People Are More Online*, HighSpeedInternet.com (Sept. 28, 2023), https://tinyurl.com/2ncz9tjj (citing Peter Holsin, *The Fastest Internet Providers in 2023: Assessing more than 20 leading internet providers for speed and latency* (Nov. 2, 2023), https://www.highspeedinternet.com/resources/fastest-internet-providers).

[36] *Id.*

[37] Jeff Jacoby, A year after net-neutrality's repeal, the Internet is alive and well — and faster than ever, The Boston Globe (Dec. 28, 2018), https://tinyurl.com/2bur4du4.

[38] CTIA 2023 Annual Survey Highlights at 8.

**App. 1044**

that same time period.[39]  Additionally, the Technology Policy Institute estimates that monthly broadband prices have remained stable or decreased, with 1000/100 Mbps charges decreasing from over $135 in 2018 to $101 in 2022.[40]  Weighted median prices of plans offering 50, 100, and 1000 Mbps also decreased during this time.[41]  In sum, the RIF Order's Title I reclassification has fostered greater broadband investment and deployment, while increasing Internet speeds and making broadband services more accessible and affordable for consumers than ever before.[42]

### C. The COVID-19 Pandemic Affirms the Wisdom of *Restoring Internet Freedom Order's* Regulatory Approach.

The American broadband industry has not only achieved these major successes over the past five years, but did so during the COVID-19 pandemic—"the ultimate stress test" that brought unprecedented levels of broadband traffic.[43]  During the pandemic, U.S. networks "far outpace[d] those in Europe," and a favorable regulatory environment "created the incentives for the private sector to invest massive, record-breaking sums and build out robust, resilient, and competitive networks."[44]  As European networks succumbed to "a heavy-handed regulatory scheme" that "treat[ed] the internet as a static commodity," the American approach has "imagine[d] a world where consumers gain from being able to enjoy higher-quality internet services."[45]  For example, when the pandemic hit, American households had access to two or

---

[39] *Net Fatality: Internet for All at Stake*, NCTA, https://tinyurl.com/bd7j3puc (last visited Dec. 13, 2023).

[40] Scott Wallsten, *Broadband Prices Mostly Stable Last Year*, Technology Policy Institute (Dec. 22, 2022), https://tinyurl.com/3r292bf4.

[41] *Id.*

[42] *See* Scott Wallsten, *Reclassifying Broadband Under Title II Will Not Increase Competition*, Technology Policy Institute (Oct. 8, 2023), https://tinyurl.com/4www4b29 (describing increased competition in broadband and satellite capabilities under a Title I regulatory framework).

[43] Brendan Carr, Commissioner, FCC, Statement on Following Europe's Approach to Internet Regulation—With Its Sweeping Government Controls—Would Be a Serious Mistake, as COVID-19 Showed, at 1(Oct. 4, 2023), https://tinyurl.com/5rxehxxx ("Commissioner Carr Europe Statement").

[44] *Id.*

[45] Christopher S. Yoo, *Coronavirus Vindicates the FCC's 'Net Neutrality' Rollback*, WSJ (Apr. 14, 2020), https://tinyurl.com/49h23xra.

more facilities-based fixed providers at more than double the rate of European households, and five times greater for American versus European rural areas.[46]  Furthermore, American 5G networks are "the world's most available 5G networks,"[47] covering 96 percent of the population as compared with just 73 percent of Europeans.[48]  While Europe rationed Internet streaming services to preserve capacity during the pandemic, U.S. networks fostered innovation through faster Internet speeds and competition.[49]

Congress likewise understood that heavy-handed regulation was not the key to keeping Americans connected at an unprecedented time, and in fact would be detrimental.  Rather than adopting emergency legislation that imposed some type of Title II framework on ISPs, Congress responded to the pandemic by encouraging universal service through federal support.  Congress passed numerous COVID-19-era bills that appropriated funds for this purpose, including the Consolidated Appropriations Act,[50] American Rescue Plan Act of 2021,[51] and Infrastructure Investment and Jobs Act ("IIJA").[52]  The Consolidated Appropriations Act gave a total of $6.2 billion in funding for broadband, split across the FCC, National Telecommunications and Information Administration ("NTIA"), and United States Department of Agriculture ("USDA").[53]  The Act appropriated $3.2 billion to the FCC to create the Emergency Broadband

---

[46] Commissioner Carr Europe Statement (citing *U.S. vs. .EU. Broadband Trends: 2012-2020*, USTelecom, at 6, https://tinyurl.com/yc779vsx).

[47] State of 5G Report at 12.

[48]  *State of Digital Communications 2023*, European Telecommunications Network Operators' Association, at 4, 13 (Jan. 2023), https://tinyurl.com/4eh4ytu4.

[49] NPRM at 140-141 (Dissenting Statement of Commissioner Brendan Carr); *see* Commissioner Carr Europe Statement.

[50] Consolidated Appropriations Act, 2021, Pub. Law No. 116-260, 134 Stat. 1182.

[51] American Rescue Plan Act of 2021, Pub. Law No. 117-2, 135 Stat. 4.

[52] Infrastructure Investment Jobs Act, Pub. Law No. 117-58, 135 Stat. 429 (2021); Colby Leigh Rachfal, Cong. Rsch. Serv., IF12030, *The Broadband Digital Divide: What Comes Next for Congress?* (Jan. 31, 2022), https://tinyurl.com/bdhwrydd ("CRS Broadband Funding Analysis").

[53] CRS Broadband Funding Analysis at 1.

**App. 1046**

Benefit Program, a universal service program that subsidizes home broadband service and devices for low-income households and was later succeeded by the Affordable Connectivity Program.[54] The American Rescue Plan Act furnished the FCC with $7.171 billion to ensure that students, school staff, and library patrons maintained broadband connectivity and had access to devices during the pandemic.[55] And the IIJA endowed the FCC, NTIA, and USDA with a total of $64.4 billion for various broadband programs—"the largest federal broadband investment in history."[56] While Congress took several important steps to ensure federal funding was available to increase connectivity during the pandemic, at no point did any of those efforts impose utility-style regulation on providers who would use that federal support.

In the NPRM, the Commission claims that the COVID-19 pandemic justifies Title II reclassification because the pandemic "dramatically changed the importance of the Internet."[57] We agree that the pandemic underscored the importance of broadband, but as Commissioner Carr notes in his dissent, "this takes the lessons learned from the pandemic and turns them on their heads."[58] U.S. broadband networks were able to pass the tests posed by COVID-19 with flying colors, while nations with onerous, utility-style regulation struggled. American broadband has seen noteworthy success over the past five years precisely *because* of the FCC's targeted approach, not in spite of it. By maintaining the status quo, the Commission can empower the U.S. to continue being a global leader—even in the face of major challenges.

---

[54] Consolidated Appropriations Act, 2021, Pub. Law No. 116-260, div. N, tit. IX, § 904, 134 Stat. 1182, 2130 (2020).

[55] American Rescue Plan Act of 2021, Pub. Law No. 117-2, tit. VII, § 7402, 135 Stat. 4, 109-10.

[56] CRS Broadband Funding Analysis at 1.

[57] NPRM ¶ 17.

[58] *Id.* at 140 (Dissenting Statement of Commissioner Brendan Carr).

14

### III. Returning to Title II Regulation Would Depress Investment, Increase Uncertainty, and Hamper Innovation.

Evidenced by the periods where the Commission has attempted a Title II approach for broadband services, heavy-handed regulation decreases investment while increasing uncertainty and compliance costs for providers. Imposing these burdens on the broadband marketplace would yet again cause these undesirable outcomes, which are not only problematic but carry other negative consequences such as a disproportionate impact on small rural providers and subscribers. Moreover, the NPRM's far-reaching proposals suggest that this current iteration of Title II regulation would be even *more* detrimental for investment and innovation than the 2015 reclassification, particularly given that the modern-day broadband landscape is a diverse ecosystem that relies on both small and large providers as well as new technologies like advanced satellite systems in low earth orbit.

### A. Past Experience Demonstrates the Harms of Title II Regulation.

Decreased investment associated with onerous regulatory regimes stems from well-known economic theory risk factors, including greater uncertainty about regulatory requirements and increased costs of compliance. Economists have pointed to numerous such factors that necessarily impact broadband providers facing Title II regulation, including "uncertainty . . . lead[ing] to delays or suspensions of investments in innovations that could be affected by the new regulation," "diver[sion] [of] resources to compliance efforts before-the-fact," and a "raise[d] risk of introducing new products and applications," particularly given capacity constraints of broadband networks.[59] According to a study by George S. Ford at the Phoenix Center for Advanced Legal and Economic Public Policy Studies, "no negative investment

---

[59] Kevin A. Hassett & Robert J. Shapiro, *The Impact of Title II Regulation of Internet Providers on Their Capital Investments*, Georgetown McDonough School of Business, Research Paper No. 2540563, at 17 (Dec. 19, 2014), http://tinyurl.com/yvrmvttx.

consequences [were] found for the period [from 2005-2009] where Net Neutrality was enforced via the FCC's 'Four Principles' to promote an Open Internet" under Title I, "suggesting it is reclassification—and not the principles of Net Neutrality—that is reducing investment."[60] This makes sense, as Title II extends significantly beyond net neutrality and threatens more onerous regulations, including application of the Communication Act's amorphous requirements that providers' practices be "just and reasonable" and avoid "unjust or unreasonable discrimination." Further, even when the Commission forbears from other obligations in the Act (such as the NPRM's current assurances that the agency does not intend to engage in price regulation or require contributions to the Universal Service Fund), any Title II designation carries with it the possibility that the Commission could reverse those rulings in the future.

As the Commission explained in the RIF Order, and as the above discussion of the data makes plain, the imposition of Title II from 2015 to 2017 yielded "foregone investment and innovation."[61] The Commission's 2015 Title II Order interrupted a "period of intense investment, broadband deployment[,] and adoption" that had increased fixed and mobile Internet connections "from 50.2 million to 355.2 million" over ten years.[62] In contrast to the investment booms that occurred under the RIF Order's regulatory approach of the past five years, Title II-era

---

[60] George S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis*, Phoenix Center for Advanced Legal & Economic Public Policy Studies, at 2, 10 (Apr. 25, 2017), https://tinyurl.com/msvw2b59 ("Ford Analysis"). In a new study released this week, Dr. Ford estimates that "[t]he persistent prospect of Title II policy reduced investment by approximately 10% on average, between 2011 and 2020, about $8.1 billion annually, with a total loss of investment over a ten-year period of about $81.5 billion." The new findings also calculate $145 billion annual losses in Gross Domestic Product ("GDP"), amounting to "$1.45 trillion over ten years." George S. Ford, Investment in the Virtuous Circle: Theory and Empirics, Phoenix Center Perspectives, at 5-6 (Dec. 2023), http://tinyurl.com/yeuzsh8w.

[61] RIF Order ¶ 87.

[62] *Id.* ¶ 86 (citing Comments of Comcast Corporation WC Docket, No. 17-108, at Appendix A (filed July 17, 2017), https://tinyurl.com/342drd9y).

**App. 1049**

investment created "the first-ever decline outside a recession."[63]  For example, as Figure 1, *supra* page 7, demonstrates, capital expenditures by U.S. broadband providers declined in 2015, the year that Title II regulation was adopted, and remained below 2014 levels until 2018, the year that Title I regulation was restored.[64]

And these harms are not limited to when the Commission actually imposes regulations— even the mere threat of Title II classification can have significant impacts on investment.  As the Commission explained in the RIF Order, according to the Ford study discussed above, former FCC Chairman Genachowski's 2010 announcement of a Title II reclassification framework triggered "a $30 billion-$40 billion annual decline in investment . . . between 2011 and 2015."[65] This decline reportedly resulted in a 20-to-30 percent investment drop for the telecommunications industry, and essentially "cost the U.S. an entire year's worth of telecommunications investment."[66]

Moreover, increased uncertainty and compliance costs in the broadband context have an outsized impact on unserved and underserved rural areas and small providers.[67]  Despite the progress made to ensure all Americans have access to high-speed broadband services, nearly 17 percent of Americans in rural areas and 21 percent of residents in Tribal lands lack access to fixed terrestrial 25/3 Mbps broadband as of 2019.[68]  The costs imposed by Title II regulation

---

[63] Bloomberg Editorial Board, *No One Needs Another Net-Neutrality Fight*, Bloomberg (Oct. 17, 2023), https://tinyurl.com/yau6ne8h; *see 2022 Broadband Capex Report*, USTelecom (2022), https://tinyurl.com/5amzbtu7 ("2022 Broadband Capex Report Chart") (showing that investment levels decreased starting in 2015 for the first time since the 2008 recession).

[64] *See* Fig. 1, *supra* (conveying data from 2022 Broadband Capex Report Chart).

[65] RIF Order ¶ 95 (citing Ford Analysis).

[66] Ford Analysis at 2, 10.

[67] RIF Order ¶ 308.

[68] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Fourteenth Broadband Deployment Report, 26 FCC Rcd 836, ¶ 33 (2021), http://tinyurl.com/26rrhr8n.

**App. 1050**

place a "disproportionate and unfair burden on small broadband providers," who "lack the resources to implement business plans that anticipate all of the potential pitfalls inherent in comprehensive common carrier regulation."[69]  These overbearing costs create a significant problem for consumers in rural areas, especially as small providers  "disproportionately provide service in rural and underserved areas where they are either the only available broadband service option or provide the only viable alternative to an incumbent broadband provider."[70]  For affected consumers, Title II regulation reveals a stark reality: "some will likely not have access to high-speed services over fixed or mobile networks and some will not experience better service as quickly as they otherwise would under a Title I classification."[71]

The industry's experience moving from Title II to Title I regulation demonstrates the real differences that a targeted regulatory approach can have for small and rural providers and the consumers who depend on them.  For example, in 2020, the Wireless Internet Service Providers Association ("WISPA") reported that the RIF Order's reclassification back to Title I created cost savings that allowed one company not only to avoid what would have been necessary rate increases of $10-13 *per customer* to cover Title II compliance costs, but also to invest nearly $500,000 in equipment and facility upgrades.[72]  Another "invested $1.5 million dollars to expand its network by adding 12 new towers . . . [and] fully cover two additional counties."[73]  And a WISPA member from California "used the savings from reduced regulatory burdens . . . to

---

[69] Comments of the Wireless Internet Service Providers Association, WC Docket No. 17-108, at 11-12 (filed July 17, 2017), https://tinyurl.com/3rs95ema.

[70] Reply Comments of the Wireless Internet Service Providers Association, WC Docket No. 17-108, at 6-7 (filed Aug. 30, 2017), https://tinyurl.com/3475vjyu.

[71] RIF Order ¶ 308.

[72] *See* Comments of the Wireless Internet Service Providers Association, WC Docket Nos. 17-108, 17-287, 11-42, at 6-7 (Apr. 20, 2020), https://tinyurl.com/jtr9nj6c (advocating that small broadband providers, "relieved from the burdens and uncertainty of Title II regulation" can "invest[] in their networks, expand[] service areas[,] and increase[e] broadband quality").

[73] *Id.* at 7.

increase its service speeds to more than 50 Mbps for its business, local government, and residential customers."[74]  These examples highlight tangible ways in which onerous regulation prevents small and rural providers from competing in the market.

### B. The Proposed Title II Reclassification Would Be Particularly Harmful, Especially Given How the Broadband Market Has Evolved.

The regulatory overhaul contemplated by the current Commission threatens to inject significantly *more* uncertainty, and higher costs, into the broadband ecosystem than even the 2015 Title II reclassification.  This is because (as discussed in further detail in Section IV, below) the Commission raises concerns in the NPRM about new areas of policy that have not traditionally animated the Title II debate, such as national security, cybersecurity, and privacy, though the NPRM does little to explain what steps the Commission might take to address these concerns.[75]  Each of these vague proposals—and the current Commission's inclination to pursue heavy-handed regulation to meet an evolving and expanding number of policy goals—drives home that broadband providers will face larger compliance costs and greater uncertainty about the regulatory burdens ahead if the NPRM is adopted.

In addition, the impacts of this especially onerous Title II regime are likely to be particularly severe given that the universe of providers is also quite different than it was in 2015. For example, a robust space industry has emerged both to compete with and complement terrestrial services.  As the Commission explained in last year's *Communications Marketplace Report*, "[r]eductions in launch costs and other innovations have helped make it possible to cheaply put thousands of satellites in orbit," leading to a "rapid expansion of [low earth orbit]

---

[74] *Id.*

[75] NPRM ¶¶ 30, 99, 109.

**App. 1052**

satellite constellations and the emergence of new players in the commercial satellite industry."[76]

This expansion occurred mainly over the past five years, under the Title I regulatory

framework.[77] Satellite operators are investing billions of dollars into these new systems for

broadband services, and market analysts predict that, "[d]riven primarily by [NGSO] satellite

constellations . . . the satellite connectivity and video market is projected to exceed $20 billion"

by 2030.[78]

    To maximize the potential of this emerging industry, the Commission initiated its

*Supplemental Coverage from Space* proceeding earlier this year.  In the proceeding, the

Commission seeks to "take a global leadership role in facilitating the integration of satellite and

terrestrial networks by proposing . . . . a novel approach" that will allow "satellite operators

collaborating with terrestrial service providers . . . to obtain Commission authorization to operate

space stations on currently licensed, flexible-use spectrum allocated to terrestrial services."[79]

This cooperative framework is intended to "expand[] coverage to [] terrestrial licensee[s']

subscribers, especially in remote, unserved, and underserved areas" as well as spur "innovation

and investment in nascent satellite and terrestrial interoperable technologies and cross-industry

stakeholder partnerships."[80]  Yet while the Commission works to promote the nascent space-

---

[76] 2022 Communications Marketplace Report ¶ 6.

[77] In 2018, the FCC granted authorization to SpaceX for its non-geostationary orbit ("NGSO") Starlink constellation (which to date has launched nearly 4,000 satellites), followed by authorizations for other robust NGSO constellations. *Second Generation Starlink Satellites*, SPACEX,

[78] Press Release, Euroconsult, NGSO Constellations Continue to Gain Momentum, Satellite Connectivity & Video Market Expected to Double Over Next Decade (Sept. 22, 2021), https://tinyurl.com/yc6vwx6b.

[79] *Single Network Future: Supplemental Coverage from Space*, Notice of Proposed Rulemaking, GN Docket No. 23-65, IB Docket No. 22-271, FCC 23-22, ¶ 1 (rel. Mar. 17, 2023), https://tinyurl.com/ycx7b3ja.

[80] *Id.*

based broadband market with one hand, it proposes to bring down the cudgel of utility-style regulation on the other.[81]

The path forward is clear. History demonstrates that a targeted regulatory approach works, and that the onerous requirements of Title II will have significant negative impacts on investment, innovation, and unserved and underserved consumers. Current market conditions, coupled with the Commission's proposal to impose unprecedented regulation under Title II, indicate that the harms caused by adoption of this NPRM would be especially severe. Rather than disrupting the success that has given consumers across the country access to high-speed, affordable, and technologically advanced broadband services, even amid a global pandemic, the Commission should maintain the status quo.

### IV. The FCC's Purported Justifications for Title II Reclassification Lack Merit.

Given that the Commission cannot justify its return to Title II classification with evidence of new open internet violations or a need to foster competition, investment, or innovation, the Commission instead seeks refuge in a grab bag of new rationales that have nothing to do with "net neutrality"—such as privacy, cybersecurity, national security, public safety, and network resiliency. Moreover, the Commission appears unwilling to fully commit to the need for reclassification in these areas, or even to describe in detail how these new rationales support reclassification. Indeed, many of the complex policy questions raised in the NPRM would better be suited for a Notice of Inquiry ("NOI") that simply asks questions of parties to allow the Commission to form provisional views before proposing onerous, prescriptive regulation.

---

[81] *See*, Letter from Cathy McMorris Rodgers, Robert Latta, et. al., U.S. House Energy and Commerce Committee, to Hon. Jessica Rosenworcel, Chairwoman, FCC, (Oct. 17, 2023) at 4 (explaining that the NPRM "also threatens to undermine investment and innovation in the emerging satellite communications industry by imposing 1930s era regulations on an industry that did not even exist until decades after those regulations were enacted.") https://d1dth6e84htgma.cloudfront.net/FINAL_Letter_to_FCC_re_Title_II_Reclassification_5308bd2f7e.pdf.

The NPRM, for example, "tentatively concludes" only that Title II authority would "enhance the Commission's efforts to protect the national defense . . . a responsibility that underlies its other statutory obligations,"[82] and "reinforce the Commission's authority to support its efforts to enhance cybersecurity in the communications sector."[83] In fact, the NPRM uses the phrase "enhance the Commission's" "ability" or "jurisdiction" no less than 11 times. These statements presuppose, correctly, that Congress has provided the Commission with other tools to address these unrelated policy areas. And the Commission's vague suggestions that it needs Title II authority to enhance and reinforce its existing efforts cannot support reclassification, let alone justify the Commission's tentative decision not to forbear from applying Section 214 (a decision it cannot finalize without applying the relevant statutory test). To the contrary, by injecting the Commission into areas where it either has not traditionally regulated or else has a calibrated role to play informed by other sources of authority, Title II reclassification would likely *undercut* existing whole-of-government efforts in many of these areas.

## A.    Cybersecurity

The Commission offers only two concrete ways in which it believes reclassification would "support [the FCC's] effort to enhance cybersecurity"—by allowing it to adopt prescriptive cybersecurity regulations on ISPs, and by allowing it to take additional action on Border Gateway Protocol ("BGP").[84] But there is no suggestion that either of these actions would help solve the problem the Commission identifies. The Commission also asks about a range of other potential regulatory actions that it could take following reclassification, but none of these suggestions provide any basis for supporting a return to Title II.

---

[82] NPRM ¶ 26.

[83] *Id.* ¶ 30.

[84] *Id.* ¶¶ 30-31.

**App. 1055**

*First,* the agency acknowledges that it is already "actively involved in federal interagency cybersecurity planning, coordination, and response activities," including taking action pursuant to Presidential Policy Directive 21, which tasks the Commission (using its current authority) with "'identifying communications sector vulnerabilities and working with industry and other stakeholders to address those vulnerabilities . . . [and] to increase the security and resilience of critical infrastructure within the communications sector. . . .'"[85]  Nevertheless, the Commission asserts that the current classification of broadband as a Title I service "limits the regulatory and operational actions that the Commission can take," because the agency has "limited authority to require providers of non-Title II services (e.g., ISPs) to adopt cybersecurity standards or performance goals."[86]

But the Commission's role in addressing cybersecurity is part of a larger, whole-of-government effort, as its reference to the Policy Directive makes clear.  The agency's "limited authority" is not a flaw in this context; entities within both the government and the private sector must work together to address the various challenges presented by cybersecurity, and they have actively been doing so.

Additionally, federal agencies are obligated, as a matter of reasoned decision-making, to consider existing regulatory frameworks and "determine whether, under the existing regime, sufficient protections exist[]" to address the problem.[87]  The NPRM offers no reason to think that prescriptive rules imposed only on the broadband sector would be incrementally helpful to

---

[85] *Id.* ¶ 30 (citing Presidential Policy Directive/PPD-21 21: Critical Infrastructure Security and Resilience, The Obama White House (Feb. 12, 2013), http://tinyurl.com/yxmxbbs4).

[86] *Id.*

[87] *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010) ("The [U.S. Securities and Exchange Commission ("SEC")]'s "failure to analyze the efficiency of the existing state law regime renders arbitrary and capricious the SEC's judgment that applying federal securities law would increase efficiency.").

existing whole of government efforts. To the contrary, ISPs have been working collaboratively for years with the FCC and other government agencies to enhance cybersecurity practices. The Commission has not identified any incidents or circumstances where binding regulations would have led to a better result than those already being achieved through these existing procedures. The NPRM also does not consider, and the FCC should take heed, that Congress has previously made clear that cybersecurity regulations should be guided by public-private partnerships and the authority already designated to other agencies.[88]

Just as importantly, the NPRM does not mention—let alone grapple with—the costs that would come from the imposition of these regulations. The agency must take those costs into account.[89] And the costs here are not just limited to direct burdens on ISPs, though these could potentially be substantial and must be considered. They also include the damage that more prescriptive regulation by the FCC would impose on the broader cybersecurity landscape. As the Chamber explained in comments to the Office of National Cyber Director, "the current state of cybersecurity regulations is a fragmented landscape with varying standards, requirements, and compliance frameworks across jurisdictions."[90] These fragmented policy approaches to

---

[88] For example, in 2018, Congress established the Cybersecurity and Infrastructure Security Agency ("CISA"), which reorganized and elevated the mission of the Department of Homeland Security's ("DHS") former National Protection and Programs Directorate ("NPPD"), establishing CISA as the Federal leader for cyber and physical infrastructure security. The Cybersecurity and Infrastructure Security Agency Act of 2018 (H.R. 3359, Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, 132 Stat. 4168). Previously, in 2006, the Department of Homeland Security created the Critical Infrastructure Partnership Advisory Council ("CIPAC") in accordance with National Infrastructure Protection Plan and Presidential Policy Directive 21, Critical Infrastructure Security and Resilience. Presidential Policy Directive/PPD-21 21: Critical Infrastructure Security and Resilience, The Obama White House (Feb. 12, 2013), http://tinyurl.com/yxmxbbs4.

[89] *See Michigan v. EPA*, 576 U.S. 743, 760 (2015) ("We hold that EPA interpreted § 7412(n)(1)(A) unreasonably when it deemed cost irrelevant to the decision to regulate power plants."); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) ("[T]his type of reasoning, which fails to view a cost at the margin, is illogical and, in an economic analysis, unacceptable.").

[90] Comments of U.S. Chamber of Commerce, Request for Information, Office of the National Cyber Director, Executive Office of the President; Cyber Regulatory Harmonization: Opportunities for and Obstacles To Harmonizing Cybersecurity Regulations, at 2 (Oct. 31, 2023), http://tinyurl.com/3khe59sp.

**App. 1057**

cybersecurity lead to duplicative and/or confusing security requirements, splinter organizations' risk management budgets, and cause market distortions that weaken security for individual companies and collectively. Potential standards and mandates that apply only to one set of stakeholders, like those contemplated in the NPRM, will only add to this fragmentation. On the other hand, "improved harmonization of cyber regulations will allow organizations to focus more of their time, people, and resources on improving cyber programs and responding to incidents, rather than addressing overlapping, duplicative—and sometimes contradictory—state, federal, and international regulatory requirements."[91]

Instead of having a Title II approach imposed solely on broadband, the communications sector would be better served by federal, risk-based legislation that establishes clear and consistent federal guidelines to ensure that both regulators and regulated entities can direct scarce resources at significant cybersecurity risks. This legislation could recognize businesses' use of existing standards, guidelines, and/or frameworks to meet legal requirements, and offer private parties a menu of appropriate standards, guidelines, and/or frameworks to select from, facilitating choice among parties that may be subject to various regulatory requirements either domestically or internationally.

*Second*, the NPRM's cybersecurity justification suggests that Title II authority could improve the Commission's "inquiry into vulnerabilities threatening the security and integrity of the Border Gateway Protocol."[92] But as the Commission notes in the NPRM, it is already taking action on this matter. The *Secure Internet Routing* Notice of Inquiry was issued by the FCC in

---

[91] *Id.* at 1.

[92] NPRM ¶ 31.

2022,[93] pursuant to the Commission's existing authority, and the NPRM gives no explanation about *how* Title II authority might "improve" this inquiry.

In fact, what the FCC's inquiry has revealed so far is that FCC regulation of ISPs is particularly ill-suited to addressing Internet routing security challenges. BGP enables routers to move packets of data across the Internet and tells routers how to get the data from its origin to its destination. However, the scope of the Internet is enormous, with a wide variety of key players that are beyond the Commission's reach, either because they are unregulated or because they are international in scope.

By way of example, there are more than 70,000 Autonomous System ("AS") networks operating on the Internet that need to use BGP to find and talk to each other. Improved routing security starts with these AS operators, who must alter their practices to sign traffic they originate (which would allow transit providers to better recognize network security issues). Without a substantial increase in signed traffic, filtering can provide little benefit. But these operators are not ISPs and are not within the Commission's jurisdiction regardless of how broadband is classified. Instead, these AS networks are run by public and private entities, including many federal government agencies. That is why the Commission's *Secure Internet Routing* inquiry has led recently to a series of workshops aimed at addressing the contribution of these various stakeholders to improving BGP and network security. To the extent the NPRM posits that Title II regulation would somehow cut this Gordian knot, it is simply mistaken. Title II authority over consumer broadband would not provide the FCC with authority to regulate government agencies and non-provider private sector entities, that operate in the enterprise and

---

[93] *See id.* ¶ 31 n.113 (citing *Secure Internet Routing*, Notice of Inquiry, 37 FCC Rcd 3471, ¶¶ 1-2 (2022), http://tinyurl.com/8a3bypfk).

wholesale provider marketplace that are positioned to contribute to improvements in network security risk management.

Moreover, even with respect to ISPs, reclassification is not necessary and may be counterproductive. ISPs are already taking steps independently to improve BGP security. Since 2013, the Resource Public Key Infrastructure ("RPKI") has enabled ISPs to validate that the IP address blocks and AS number advertised with a route do in fact come from the AS that owns them.[94] The ISP industry has also developed Mutually Agreed Norms for Routing Security ("MANRS"), which sets baseline actions for network operators, Internet Exchange Points, content delivery networks, and cloud providers.[95] Because technical solutions aimed at increasing security can restrict routes and access, FCC regulation of these entities can undermine these core principles. Thus, any steps taken to promote secure and reliable Internet routing must be considered carefully and balanced against their potential impact on these foundational priorities.[96]

*Third,* the Commission asks about a variety of other actions that it might be able to take once it has reclassified broadband as a Title II service, such as "consider[ing] cybersecurity in its annual inquiry under Section 706 of the Telecommunications Act 1996,"[97] or taking unspecified action to "address threats related to the [Domain Name System ("DNS")]."[98] The Commission also suggests that it could mandate adoption of the Communications Security, Reliability, and Interoperability Council's ("CSRIC") best practices, enforce implementation of Executive Order

---

[94] *See NIST Technical Note 2060, BGP Secure Routing Extension (BGP-SRx): Reference Implementation and Test Tools for Emerging BGP Security Standards*, NIST (Sept. 2021), http://tinyurl.com/5avanhcc.

[95] *Protect the Internet*, MANRS, http://tinyurl.com/3zk5bxbh (last visited Dec. 13, 2023).

[96] The Commission "invite[s] commenters to address how [the] proposed classification may promote or inhibit advances in diversity, equity, inclusion, and accessibility." NPRM ¶ 54.

[97] *Id.* ¶ 32.

[98] *Id*.

**App. 1060**

("EO") 14028's network security practices,[99] establish cybersecurity requirements for Internet exchange facilities and data centers, and require comprehensive cyber incident reporting.[100] These are all areas where existing collaborative efforts are paying dividends. As with the Commission's proposal to require cybersecurity standards for ISPs, above, the Commission has not identified a need for *regulatory* action in any of these areas.

Indeed, one of the questions posed by the Commission – "[c]ould the Commission use Title II authority to require ISPs to block IP addresses that originate malicious software and ransomware" – identifies an issue that might be *more* problematic under common carrier regulation than current, Title I regulations.[101] As a general matter, imposing a regulatory obligation on providers to carry all traffic equally makes it harder to filter and block problematic traffic or destinations, which is precisely the opposite of what the Commission appears to contemplate here.

## B. National Security

The FCC's suggestion that it needs reclassification to promote national security is similarly unsupported.[102] There is already an interactive dialogue between the FCC and Congress in the security space that helps ensure the Commission obtains the authority it needs. For example, in 2019, the Commission first implemented rules to prevent the Universal Service Fund ("USF") from being used to purchase equipment and products from companies determined to threaten national security.[103] Congress subsequently responded, passing the Secure Networks

---

[99] Exec. Order No. 14028, 86 Fed. Reg. 2663 (May 17, 2021), http://tinyurl.com/ynmwwe73.

[100] NPRM ¶ 32.

[101] *Id.*

[102] *Id.* ¶ 25.

[103] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 1142 ( 2019), http://tinyurl.com/2s4fh52u.

28

Act, which codified the Commission's approach, prohibited certain Federal funding programs from being used to purchase communications equipment or services posing national security risks, and gave the FCC the authority to create the Covered List.[104]  And again, when the Commission proposed an order that would use the Covered List as a basis to deny requests for equipment authorization, Congress passed targeted legislation that clearly laid out the role it expected the FCC to play in this area.[105]  Additionally, several other agencies with comparative national security authority have roles to play, which Congress has historically taken into account in these statutes.[106]

In other words, Congress has taken a careful, surgical approach in this context, providing limited and targeted authority to the FCC as needed, building on the agency's existing authority, and considering the views and roles of other expert agencies.  By contrast, the FCC is proposing a dramatic, wholesale expansion of its authority through reclassification.  The Commission fails to explain why this blunt approach is necessary, and it would in any event have costly unintended consequences, both in the national security space and beyond.

For example, the Commission suggests that it needs Title II authority to enhance national security by expanding the scope of Section 214 authorizations.  In the 2015 Title II Order, the Commission forbore from applying Section 214 to broadband, holding that Section 214 met the statutory test under Section 10 of the Telecommunications Act of 1996.[107]  Under Section 10(a),

---

[104] *See* Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020), https://tinyurl.com/46mwpndy.

[105] *See, e.g.*, *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13493, ¶ 6 ( 2022), http://tinyurl.com/3j9hjzvy.

[106] *Id.* ¶¶ 5-23 (discussing the extensive coordination between Congress, Executive Branch agencies, and the Commission in the field of securing networks and devices against national security threats).

[107] *Protecting and Promoting the Open Internet,* Report and Order on Remand, Declaratory Ruling and Order, 30 FCC Rcd 5601, ¶ 509 (2015), http://tinyurl.com/4m6jsy8x ("Title II Order").

the Commission "shall forbear" when the statutory criteria are met.[108]  In a significant departure, the new NPRM proposes not to forbear from Section 214 and fails utterly to justify this reversal.

The NPRM refers to the China Telecom Americas Section 214 revocation and asserts that the Commission "believe[s] that the same national security and law enforcement threats identified in those proceedings equally exist with respect to entities providing BIAS, and that reclassifying BIAS as a telecommunications service would allow the Commission to use its section 214 authority to address those threats and other threats to our communications networks."[109]  But while the NPRM proposes to use the same analytical approach as the Commission did in 2015,[110] it does not actually conduct the statutory forbearance analysis that the 2015 Commission employed.[111]  The NPRM "tentatively conclude[s] that we should exclude [Section 214] from any forbearance granted here,"[112] but nowhere does the Commission conclude that application of Section 214 is "necessary" for consumer protection or any of the other reasons specified by Section 10.[113]

As with cybersecurity, the Commission appears reluctant to assert that Section 214 is "necessary," because doing so would imply that the Commission does not have adequate tools to address these issues under the current Title I classification.  The FCC cannot evade this issue indefinitely, though.  It would be arbitrary and capricious for the Commission to decline from forbearance of Section 214 without performing the statutory analysis and making the requisite

---

[108] 47 U.S.C. § 160(a).

[109] NPRM ¶ 27.

[110] *Id.* ¶ 101.

[111] Title II Order ¶ 435.

[112] NPRM ¶ 108.

[113] 47 U.S.C. § 160(a).

**App. 1063**

finding.[114]  As Judge Williams wrote in his partial dissent in *US Telecom*, this refusal to adopt a full-throated policy position may be "strategic ambiguity" on the part of the agency.[115]  "But strategic ambiguity on key propositions underlying its regulatory choices is just a polite name for arbitrary and capricious decisionmaking."[116]

The NPRM also simply ignores the costs and complexity that come with application of Section 214.  Whereas the 2015 Title II Order recognized that Section 214's discontinuance obligations "impose some costs" and that as a result the "most prudent regulatory approach at this time is to proceed incrementally when adding regulations beyond what had been the prior status quo,"[117] the new NPRM does not refer to this issue at all.  Yet "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position" – something that the Commission has not adequately done to date here.[118]

Critically, the new NPRM also does not wrestle with the possibility that state governments will seek to use reclassification and Section 214 to impose their own entry, transaction review, and other broadband regulations.  State governments may argue that the application of Section 214, and the Commission's refusal to forbear from enforcing this

---

[114] The Commission's forbearance authority comes from Section 10 of the 1996 Telecommunications Act, *Ting v. AT&T*, 319 F.3d 1126, 1132 (9th Cir. 2003), and the Commission cannot disregard the terms of Section 10 when forbearing, *Ass'n of Comm'ns. Enter. v. FCC*, 235 F.3d 662,665-66 (D.C. Cir. 2001).  Section 10 imposes a mandatory duty on the Commission to forbear when the criteria in Section 10(a) are met.  47 U.S.C. § 160(a) ("the Commission *shall* forbear from applying any regulation or any provision of this chapter . . . if it determines that" the relevant criteria are satisfied) (emphasis added).  In considering whether forbearance is warranted, the Commission cannot simply disregard this duty and the attendant statutory standard.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary where "the agency has relied on factors which Congress has not intended it to consider," or has "entirely failed to consider an important aspect of the problem").

[115] *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 744 (D.C. Cir. 2016) (Williams, J., concurring in part and dissenting in part) ("*USTA I*").

[116] *Id.*

[117] Title II Order ¶ 510.

[118] *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

provision, gives them the power to regulate local broadband providers. This is especially true given the FCC's apparent reluctance to fully embrace a uniform national standard and preempt state regulation in this area. The suggestion in the NPRM that broadband regulation should be governed "primarily" by a national "floor" of ISP conduct rules could be read to openly invite these regulatory efforts by the states.[119]

## C. Privacy

The NPRM "tentatively conclude[s] that reclassification of BIAS as a telecommunications service would support the Commission's efforts to safeguard consumers' privacy and data security. . . ."[120] Similar to other justifications, the FCC offers little in the way of specifics about how reclassification will serve this end, other than noting "[t]he Commission's efforts will rely on, among other things, its authority under section 222 of the Act."[121]

However, Congress has already rejected applying Section 222 to broadband providers. In 2016, following its first reclassification of broadband as a Title II service, the FCC adopted privacy rules that were intended to apply to broadband services.[122] Such rules were necessary, the FCC reasoned, because the common carrier exemption took the newly reclassified broadband offerings out from under the Federal Trade Commission's ("FTC") jurisdiction, and thus required that the FCC articulate its own privacy rules for these services for the first time. These broadband privacy rules were premised on the idea that Section 222(a) "imposes a duty on all telecommunications carriers to protect the confidentiality of their customers' 'proprietary

---

[119] NPRM ¶ 94.

[120] *Id.* ¶ 41.

[121] *Id.*

[122] *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, Report and Order, 31 FCC Rcd 13911, ¶ 22 (2016), http://tinyurl.com/mrumd6ze.

**App. 1065**

information,' or PI."[123]  The Broadband Privacy Order contains a lengthy discussion of this

interpretation of Section 222(a),[124] and applies it broadly to "all telecommunications carriers

providing telecommunications services subject to Title II, including broadband Internet access

service (BIAS)."[125]

In April of 2017, Congress passed a resolution of disapproval under the Congressional

Review Act[126] ("CRA") invalidating the rules adopted by the Broadband Privacy Order.[127]

Pursuant to the CRA, a rule disapproved by Congress "may not be reissued in substantially the

same form, and a new rule that is substantially the same . . . may not be issued, unless the

reissued or new rule is specifically authorized by a law enacted after the date of the joint

resolution . . . ."[128]

The FCC is thus without authority to reissue privacy regulations that are "substantially

the same" as those contained in the Broadband Privacy Order; that includes applying Section

222(a) to "Consumer proprietary information" and extending that definition to broadband.  In

light of the common carrier exemption for FTC rules, it is not clear *what* privacy rules will or

can apply to broadband if it is reclassified as a Title II service.  The FCC's NPRM thus not only

fails to explain how reclassification will enhance the Commission's authority over privacy; it

sets up a circumstance where *existing* privacy rules may be nullified without even considering

what (if anything) will replace them.  This is the apex of arbitrary and capricious rulemaking.

---

[123] *Id.*

[124] *Id.* ¶¶ 86-87.

[125] *Id.* ¶ 39.

[126] *See* 5 U.S.C. § 801.

[127] Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Federal Communications Commission relating to "Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," Pub. L. No. 115-22, 131 Stat. 88 (2017) (stating, consistent with the terms of the CRA, that the rules "shall have no force or effect").

[128] 5 U.S.C. § 801(b)(2).

**App. 1066**

Remarkably, given this potential outcome, the NPRM does not even ask about the impact of the CRA. However, the Commission has recognized the concerns that the CRA raises in other proceedings. In its 2023 Data Breach NPRM, the FCC specifically requested comment on "the effect and scope of the Congressional disapproval" of the broadband privacy rules on future rules covering the same ground.[129] The same questions apply even more directly in this proceeding, and the FCC must articulate how it plans to deal with them in order to survive judicial review.[130]

In its recent draft order adopting new data breach regulations ("Draft Data Breach Order"), the Commission previews how it might address this obstacle. The agency asserts that the CRA "does not prohibit the Commission from revising its breach notification rules in ways that are similar to, or even the same as, some of the revisions that were adopted in the 2016 Privacy Order, unless the revisions adopted are the same, in substance, as the 2016 Privacy Order as a whole."[131] The Draft Data Breach Order also asserts that, in the Commission's view, the CRA resolution of disapproval here was not motivated by the former data breach rules. Rather, "Senators who spoke in favor of the resolution cited the 2016 Privacy Order's treatment of broadband providers and the information they hold as different from providers of other services on the internet."[132]

The Commission's interpretation of the CRA in the Draft Data Breach Order cannot be squared with the statutory text that the Commission itself quotes. As the Draft Data Breach Order concedes, "[t]he statutory term 'rule,' as used in the CRA, refers to 'the whole or *a part of*

---

[129] *Data Breach Reporting Requirements*, Notice of Proposed Rulemaking, WC Docket No. 22-21, FCC 22-102, ¶ 52 (rel. Jan. 6, 2023), http://tinyurl.com/3t3py8km.

[130] *See, e.g.*, *State Farm*, 463 U.S. at 43 (agency action is arbitrary if it "entirely failed to consider an important aspect of the problem").

[131] *Data Breach Reporting Requirements*, Report and Order, Public Draft, WC Docket No. 22-21, FCC-CIRC2313-06, ¶ 125 (rel. Nov. 22, 2023), http://tinyurl.com/58sm8bhr ("Draft Data Breach Order").

[132] *Id.* ¶ 129.

an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.'"[133]  The agency further acknowledges "[t]he term 'rule' can also refer to parts of such a decision, or to various requirements as adopted or amended by such a decision."[134]  Nevertheless, the Commission concludes, contrary to this acknowledged text, "that the 'rule' to which the reissuance bar applies is the entire 2016 Privacy Order with all of the rule revisions adopted therein."

This conclusion would transform the CRA from a substantive backstop on agency authority into a mere procedural speedbump that the Commission could evade by simply reenacting all of the "parts" of a disapproved rule piecemeal.  It also impermissibly renders the references to "parts" of the agency decision in the statute mere surplusage.[135] Further, the Commission's focus on the supposed intent of Congress in adopted the CRA resolution is irrelevant.  The text of the CRA states plainly that an agency may not issue "a new rule that is substantially the same as" a "rule that does not take effect (or does not continue) . . . ."[136] Because the various rules in the Broadband Privacy Order "d[id] not take effect," they cannot be reissued—and that ends the matter.

In any event, as the FCC also admits in the Draft Data Breach Order, "privacy measures directed at broadband internet service providers" were the "primary animating justification

---

[133] *Id.* ¶ 128 n.440, quoting 5 U.S.C. § 804(3) (incorporating the definition of "rule" in 5 U.S.C. § 551, with exclusions); id. § 551(4) (defining "rule") (emphasis added).

[134] Draft Data Breach Order ¶ 126.

[135] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citations omitted).

[136] 5 U.S.C. § 801(b)(2).

behind Congressional disapproval of the 2016 Privacy Order."[137]  Even if this purpose was "irrelevant" to the Draft Data Breach Order, it is directly relevant to the NPRM in this matter—especially since the Commission is using the purported need for privacy regulations as one of the central justifications for reclassification.

It is hard to imagine how under Title II the Commission could adopt privacy regulations that apply to "broadband providers and the information they hold" that are not "different from providers of other services on the internet,"[138] which is, in the Commission's own words, the concern raised by Senators voting on the CRA.  Indeed, the FCC does not appear to be inclined to try; the *very reason* that the Commission gives for reclassification is that it believes it must impose regulations that are different from those that already apply under the FTC Act to all providers of services across the internet.  And while it is difficult to see how the Commission could avoid application of the CRA in this context, given that it is doing exactly what Congress told it not to do, at a bare minimum it must seek comment on this question.  That is something the NPRM has not done.

### D.  Public Safety

The NPRM argues that Title II authority would "advance several public safety initiatives."[139] The Commission supports this tentative conclusion with a lengthy discussion of its mandate to advance public safety and a variety of the ways public safety initiatives benefit consumers.  The NPRM notes that such efforts to improve access to emergency services and home security are "increasingly important as the severity and frequency of natural disasters are

---

[137] Draft Data Breach Order ¶ 130.

[138] *Id.* ¶ 129.

[139] NPRM ¶ 33.

**App. 1069**

on the rise."[140]  While these are important objectives, as with both cybersecurity and national security, the Commission does not suggest that it is falling short of its mandate to advance public safety under Title I.  In fact, the NPRM highlights the Commission's existing work toward this goal such as taking "important steps to improve the effectiveness of Wireless Emergency Alerts (WEAs),"[141] and undertaking "various efforts in recent years to improve how the public reaches and shares information with emergency service providers,"[142] such as the E911 requirements implemented under Kari's Law and the RAY BAUM's Act.[143] The Commission has not been reluctant to use its existing authority to promote public safety objectives, and if anything, the Commission's existing efforts illustrate its current authority is sufficient to support these objectives.

Here, too, the NPRM fails to identify specific problems that even arguably could only be solved with reclassification.  The NPRM concedes that "much of the communications between public safety entities and first responders take advantage of enterprise-level dedicated public safety broadband," which would not be covered by reclassification, but argues for reclassification on the basis that public safety entities "often rely on commercial broadband services to communicate during emergency situations." [144]

---

[140] *Id.*

[141] *Id.* ¶ 35.

[142] *Id.* ¶ 36.

[143] *See e.g.*, *Implementing Kari's Law and Section 506 of RAY BAUM's Act*, Report and Order, 34 FCC Rcd 6607, ¶¶ 14-16, 137-220 (2019), http://tinyurl.com/2p8r8e8u; *Wireless E911 Location Accuracy Requirements*, Fifth Report and Order and First Further Notice of Proposed Rulemaking, 34 FCC Rcd 11592 (2019), http://tinyurl.com/2t7tncu7; *Wireless E911 Location Accuracy Requirements*, Sixth Report and Order and Order on Reconsideration, 35 FCC Rcd 7752 (2020), http://tinyurl.com/3cxp4y86; *Location-Based Routing for Wireless 911 Calls*, Notice of Proposed Rulemaking, PS Docket No. 18-64, FCC 22-96 (rel. Dec. 22, 2022); *Implementation of the National Suicide Hotline Improvement Act of 2018*, Report and Order, 35 FCC Rcd 7373,¶ 4 (2020), http://tinyurl.com/ycyh8y95; *Implementation of the National Suicide Hotline Improvement Act of 2018*, Second Report and Order, 36 FCC Rcd 16901 (2021), http://tinyurl.com/4af6jx75.

[144] NPRM ¶ 34.

But the NPRM does not identify specific instances that it believes demand Title II authority.  In fact, it cites extensively to the RIF Order decision on this issue and does not appear to take issue with the findings in that order, nor does it offer any additional examples of this reliance on commercial broadband.  Given the number of emergencies that have occurred in the years since the RIF Order, including the COVID-19 pandemic and a variety of storms, forest fires, and other crises, it is notable that the NPRM can point to no additional examples of areas where Title I regulation has allegedly led to a negative outcome.

### E.    Network Resiliency

The NPRM also seeks to build on the Commission's prior rationales for reclassification by suggesting that reclassification "would enhance the Commission's ability to ensure the nation's communications networks are resilient and reliable."[145] The kinds of reporting, monitoring, and regulatory requirements proposed by the Commission would likely impose significant costs on providers, an issue that the NPRM does not seriously address.  And as with the other justifications floated in the NPRM, there is nothing to suggest that imposing additional regulations and the accompanying costs here will actually lead to better outcomes.

For example, the Commission asks whether it should expand the Network Outage Reporting System ("NORS") reporting requirements to ISPs.[146]  However, the Commission does not explain the need for these requirements since ISPs are already conducting this activity and resources are publicly available to track such outages.[147]  Would devoting significant additional resources to meeting arbitrary reporting requirements increase network reliability?  Are large numbers of broadband outages currently going unreported?  These basic, foundational questions,

---

[145] *Id.* ¶ 39.

[146] *Id.*

[147] *See e.g.*, *Internet Outages Map*, ThousandEyes (Cisco), https://tinyurl.com/33pdekvk (last visited Dec. 13, 2023).

**App. 1071**

which go to whether there is a need for regulatory intervention at all, are more appropriate for a Notice of Inquiry than a Notice of Proposed Rulemaking. The Commission will need to answer these foundational questions before using "enhance[d]" authority as a justification for reclassification, but the NPRM treats the need to impose these obligations as a foregone conclusion.

Similarly, the Commission suggests that it could use such authority to "facilitate the use of Wi-Fi calling during emergencies or network outages," and "apply reliability standards for Wi-Fi calling."[148] But here too the NPRM treats what should have been the subject of an NOI as a basis for imposing vast regulatory burdens. To what extent is Wi-Fi calling currently being used during emergencies? Is that calling reliable? These are, again, basic, foundational questions that the Commission has skipped right past in its search for justifications for Title II regulation.

Indeed, the Commission's proposal to reclassify broadband as a Title II service to regulate Wi-Fi calling ignores the fact that the Commission historically has not even applied Title II to interconnected VoIP calls. Rather than attempt to apply the New Deal-era Title II framework to services that have developed in recent decades like over-the-top voice capabilities, the Commission has instead drawn from its existing authorities to apply tailored regulation as needed, such as number portability or E911 calling.[149] Before imposing costly Title II classification on broadband without any clear sense of whether the uncertain benefits would make up for the certain costs, the Commission should determine whether to chart a similar

---

[148] NPRM ¶ 39.

[149] *See, e.g.*, *Voice Over Internet Protocol (VoIP)*, FCC (Dec. 30, 2019), https://tinyurl.com/ys2yjww7.

course here, examining existing authorities to see how they might any address any of the specific, narrow problems identified in the NPRM.

## V.    The Commission Lacks Legal Authority to Classify Broadband as a Title II Service.

The Commission's ambitious attempt to remake the Internet economy through Title II reclassification is not only bad policy—it is also unlawful.  Under the better reading of the Telecommunications Act of 1996, broadband internet access service is an "information service" exempt from the common-carrier framework that applies to legacy phone services under Title II of the Act.  At minimum, Congress did not *clearly* authorize the FCC to classify broadband as a Title II "telecommunications service," as evidenced by the views of all nine Justices in the Supreme Court's decision in *Brand X*.  And where Congress has not clearly spoken to a question of major political or economic significance like this—where the FCC's actions would replace the historically targeted approach to Internet regulation with costly utility-style mandates—the Commission lacks authority to adopt the Title II framework under consideration.

### A.    The Text of the Communications Act and Its Amendments Confirms that Broadband Is Best Understood as an "Information Service."

The RIF Order currently in effect has it right—the "best reading of the relevant definitional provisions of the Act supports classifying broadband Internet access service as an information service."[150]

The 1996 Act divided the world of communications services into two distinct categories. While "'telecommunications service[s]'" are subject to Title II's common-carrier requirements, the mutually exclusive category of "'information service[s]'" are not.[151]  A "telecommunications

---

[150] RIF Order ¶ 20.

[151] *Fed.-State Joint Bd. on Universal Serv.*, Report to Congress, 13 FCC Rcd 11501, ¶ 39 (1998), http://tinyurl.com/vunwfjtt ("Universal Service Report").

**App. 1073**

service" is an "offering of telecommunications for a fee directly to the public."[152]

"Telecommunications," in turn, "means the transmission, between or among points specified by

the user, of information of the user's choosing, without change in the form or content of the

information as sent and received."[153]  An "information service," on the other hand, is "the

offering of a capability for generating, acquiring, storing, transforming, processing, retrieving,

utilizing, or making available information via telecommunications."[154]

"[T]he [Communication] Act's definition of 'information service' fits broadband Internet

access like a glove."[155]  From a plain English perspective, the defining feature of Internet access

service is providing a consumer with the "capability" to manipulate data online—such as

"generating" online content, "acquiring" information, "storing" emails, "retrieving" a website

from a server, "utilizing" online apps, or "making available" a personal blog.  These capabilities

extend well beyond mere "transmission . . . without change" of information, as typically occurs

during a voice telephone call, which is classified as a telecommunications service.

Just as courts have long looked to how an average reader would understand the words in

a statute,[156] the FCC has historically used consumer perception as a tool for evaluating how

services are properly classified under the Communications Act.[157]  As the Commission found in

the RIF Order, "consumers perceive the offer of broadband Internet access service to include

more than mere transmission," and "highly value the capabilities their ISPs offer to acquire

---

[152] 47 U.S.C. § 153(53).

[153] *Id.* § 153(50).

[154] *Id.* § 153(24).

[155] *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 395 (D.C. Cir. 2017) (Brown, J., dissenting from the denial of rehearing en banc) ("*USTA II*").

[156] *See, e.g.*, *Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 148 (2023) (analyzing how an "ordinary reader" would understand statute).

[157] *See, e.g.*, RIF Order ¶ 46.

information from websites, utilize information on the Internet, retrieve such information, and otherwise process such information."[158]

Consistent with this common-sense reading, the FCC recognized in a report to Congress adopted shortly after the passage of the 1996 Act that "Internet access services are appropriately classed as information, rather than telecommunications, services."[159]  The FCC explained that "Internet access providers do not offer a pure transmission path."[160]  For example, when consumers retrieve webpages, they are "interacting with stored data, typically maintained on the facilities of either their own Internet service provider (via a Web page 'cache') or on those of another.  Subscribers can retrieve files from the World Wide Web, and browse their contents, because their service provider offers the 'capability for . . . acquiring . . . retrieving [and] utilizing . . . information.'"[161]  The FCC accordingly concluded that "the text of the 1996 Act . . . require[d]" the Commission to classify Internet access service as an "information service."[162]

The Commission's contemporary reading of the text of Titles I and II comports with the "regulatory history of the Communications Act."[163]  For decades prior to the 1996 Act, the Commission had drawn a consistent distinction between "basic" and "enhanced" services.[164] "Basic" service was "limited to the common carrier offering of transmission capacity for the movement of information."[165]  "Enhanced" service, by contrast, was defined as an "offering" of

---

[158] *Id.*

[159] Universal Service Report ¶ 73.

[160] *Id.*

[161] *Id.* ¶ 76.

[162] *Id.*

[163] *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005).

[164] *Second Computer Inquiry*, Final Decision, 77 FCC 2d 384, ¶¶ 92-101 (1980), http://tinyurl.com/42zyz48p ("Computer II Order"); *see also Brand X*, 545 U.S. at 992 (recognizing "traditional distinction between basic and enhanced service").

[165] Computer II Order ¶ 93.

**App. 1075**

"more than a basic transmission service."[166] Basic service was subject to Title II regulation; enhanced service was not.[167] Under that framework, the Commission classified "functions and services associated with Internet access" as "enhanced services" exempt from Title II regulation.[168] "Congress passed the definitions in the Communications Act against the background of this regulatory history," and thus "the parallel terms 'telecommunications service' and 'information service' substantially incorporated their meaning."[169] As the Supreme Court has held, when Congress uses terms "obviously transplanted from another legal source, . . . it brings the old soil with it."[170]

In short, in the words of the Commission following passage of the 1996 Act, "all of the services that the Commission has previously considered to be 'enhanced services' are 'information services.'"[171] Because Internet access service was an "enhanced service" under the Commission's pre-1996 precedent, Congress naturally intended for it to be an "information service" under the 1996 Act.

Neighboring provisions in the Communications Act confirm that broadband is an "information service." Section 230(b) declares it "the policy of the United States . . . "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[172] Congress defined

---

[166] *Id.* ¶ 97.

[167] *See, e.g.*, *Implementation of the Non-Acct. Safeguards of Sections 271 & 272 of the Commc'ns Act*, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 21905, ¶ 102 (1996), http://tinyurl.com/2s3my3h8 ("Non-Accounting Safeguards Order").

[168] Universal Service Report ¶ 75.

[169] *Brand X*, 545 U.S. at 992; *accord Fed.-State Joint Bd. on Universal Serv.*, Report and Order, 12 FCC Rcd 8776, ¶ 788 (1997), http://tinyurl.com/22yt3ra8.

[170] *Sekhar v. United States*, 570 U.S. 729, 733 (2013).

[171] Non-Accounting Safeguards Order ¶ 102.

[172] 47 U.S.C. § 230(b)(2); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 217 (2012), http://tinyurl.com/mw4xkvd6 (a purpose clause is a "permissible indicator of meaning").

**App. 1076**

the term "interactive computer services" in relevant part to include "any *information service*, . . . including specifically a service . . . that *provides access to the Internet*."[173]  Section 231(e), meanwhile, defines "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet," and "[s]uch term *does not include telecommunications services*."[174]  When as here Congress uses the same words in neighboring provisions of the same statute, they are presumed "to have the same meaning."[175]

While the 2015 Title II Order and D.C. Circuit previously concluded that Congress would not have resolved the question of broadband classification in such an "oblique and indirect manner,"[176] there is nothing oblique or indirect about these definitions.  They are integral to the proper operation of Sections 230 and 231 and the 1996 Act as a whole.

Sections 230 and 231 are part of the Communications Decency Act ("CDA"), which in turn was adopted as part of the 1996 amendments to the Communications Act.  The CDA was enacted in part to "remove disincentives for the development and utilization of blocking and filtering technologies" allowing parents to block offensive material online.[177]  To further this goal, Section 230 provides that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."[178]  This immunity shield, which some commentators have credited

---

[173] 47 U.S.C. § 230(f)(2) (emphases added).

[174] *Id.* § 231(e)(4) (emphasis added).

[175] *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks and citation omitted).

[176] *USTA I* at 703 (quoting Title II Order).

[177] 47 U.S.C. § 230(b)(4).

[178] *Id.* § 230(c)(2).

**App. 1077**

with creating the modern Internet,[179] specifically contemplates that "interactive computer services," including Internet access services, should be permitted to engage in good-faith content curation without exposure to liability. Indeed, some of the earliest case law interpreting the Section 230 immunity shield involved internet service providers like AOL.[180]

This immunity shield is flatly inconsistent with the rules the Commission is proposing to impose on broadband providers under Title II of the Communications Act. Relying on Title II's prescriptions that common carriers adopt policies that are "just and reasonable" and not engage in "unjust or unreasonable discrimination,"[181] the NPRM proposes that broadband providers should be *prohibited* from engaging in content-based blocking on pain of civil penalties[182]— precisely the conduct that Section 230 authorizes. This conflict only arises because the Commission has taken a wrong interpretive turn. Because broadband is an Internet access service, and hence an "interactive computer service," it is a Title I "information service," and thus exempt from the non-discrimination mandates that Title II reserves for "telecommunications services" alone.

### B. FCC and Supreme Court Precedent Confirm that Broadband Is Best Understood as an "Information Service."

Contrary to what the NPRM suggests, the FCC's early classification decisions under the 1996 Act, and the Supreme Court's related decision in *Brand X*, support the textual reading set forth above—that broadband internet access service is best classified as a Title I "information service."

---

[179] *See generally* Jeff Kosseff, *The Twenty-Six Words That Created The Internet* (1st ed. 2019).

[180] *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *see, e.g.*, *id.* 330 n.2; *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 538 (E.D. Va. 2003); *E360Insight, LLC v. Comcast Corp.*, 546 F.Supp.2d 605, 607 (N.D. Ill. 2008).

[181] *See* 47 U.S.C. §§ 201, 202.

[182] NPRM ¶¶ 151-53.

In 1998, the Commission formally classified for the first time an early form of Internet access that used telephone companies' digital subscriber line ("DSL") technology.[183]  As opposed to what the NPRM suggests, the FCC correctly recognized, consistent with its regulatory precedent, that "Internet access" "service is an information service."[184]  The FCC nonetheless concluded that, in addition to that information service, DSL providers *also* separately offered consumers "transmission of data over" the "copper telephone wire running the 'last mile'" to a subscriber's home.[185]  The FCC concluded that this pure transmission capability was a separate, standalone "telecommunications service" that subscribers utilized "together with an information service, as in the case of Internet access."[186]  In other words, under this early classification order, the Commission concluded that consumers were offered both an information service (Internet access) and a separate telecommunications service (transmission from the customer premises to the phone network).

In 2002, the Commission similarly classified high-speed Internet access service provided by cable companies ("cable modem" service) as an information service.[187]  Unlike the DSL Order, however, which was driven in part by the access requirements imposed on legacy Title II phone facilities in the provision of Internet access, the Commission concluded that cable companies did not make a separate offering of telecommunications (i.e., pure transmission) when it sent Internet content between the cable network and the end user's premises.  Rather, the FCC

---

[183] *Deployment of Wireline Servs. Offering Advanced Telecommunications Capability*, Memorandum Opinion and Order, and Notice of Proposed Rulemaking,13 FCC Rcd 24012 (1998), http://tinyurl.com/4y3rt7ak.

[184] *Id.* ¶ 36.

[185] *Id.* ¶¶ 28-29, 35-36.

[186] *Id.* ¶ 36; *see also USTA II*, 855 F.3d at 456 (Kavanaugh, J., dissenting) (explaining that the DSL "Order specified the last-mile *transmission* between the end user and the Internet Service Provider is distinct from the 'enhanced service' of Internet access itself.").

[187] *Inquiry Concerning High-Speed Access to Internet over Cable & Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798, ¶ 38 (2002), http://tinyurl.com/5t3jsb43.

reasoned that, "[a]s provided to the end user the telecommunications is part and parcel of cable modem service and is integral to its other capabilities."[188] Thus, cable providers' provision of Internet access was a unitary "information service"—"a single, integrated service that enables the subscriber to utilize Internet access service through a cable provider's facilities and to realize the benefits of a comprehensive service offering."[189]

The U.S. Supreme Court affirmed this determination in *Brand X*. The Court first noted that the Commission's decision to classify cable modem service as an "information service"— because it "provides consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications"—was "unchallenged."[190] All nine Justices agreed with this premise. The majority reasoned that the "service that Internet access providers offer to members of the public is Internet access, not a transparent ability (from the end user's perspective) to transmit information."[191] Meanwhile, the dissent acknowledged that the "Internet functionality" or "computer-processing facilities" required to make Internet access work were "information services . . . assembled by the cable company in its capacity as ISP."[192]

The only issue before the Court in *Brand X* was whether it was reasonable for the Commission to conclude that cable modem providers did not *also* "offer" a standalone telecommunications service *in addition to* a Title I Internet access service—that is, transmission from the cable companies' facilities to the customer's home. The Court held that the word "offer" in the definition of "telecommunications service" is "ambiguous about whether it

---

[188] *Id.* ¶ 39.
[189] *Id.* ¶ 38.
[190] *Brand X*, 545 U.S. at 987.
[191] *Id.* at 1000.
[192] *Id.* at 1008, 1010 (Scalia, J. dissenting).

**App. 1080**

describes only the offered finished product, or the product's discrete components as well."[193] The Court concluded that the "transmission component" in broadband is "sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering," rather than two separate services.[194] The dissent, meanwhile, would have held that the "telecommunications component of cable-modem service retains such ample independent identity that it must be regarded as" a separate "offer," like a pizzeria's offer of delivery is arguably separate from the offer of pizza itself.[195]

Whatever the merits of these competing arguments, the FCC does not currently propose (nor did it in the 2015 Title II Order) merely classifying the "last-mile" transmission between the home and a provider's network as a separate, standalone "telecommunications service." Rather, the NPRM (as in 2015) defines the proposed Title II broadband service in relevant part as a service with "the capability to transmit data to and receive data from all or substantially all internet endpoints."[196] That is, the FCC now proposes to classify *Internet access itself*—the entire, end-to-end broadband network—as a Title II service. Prior to 2015, neither Congress, nor the FCC, nor any member of the Supreme Court contemplated such an aggressive, atextual reading of the statute.

As Judge Janice Rogers Brown wrote in connection with the challenge to the 2015 Title II Order, "[n]o member of the *Brand X* Court disputed that what occurred at the Internet Service

---

[193] *Id.* at 989-90.

[194] *Id.* at 990-91.

[195] *Id.* at 1007-08.

[196] NPRM ¶ 59 (internal quotations marks omitted).

Providers' computer-processing facilities constituted an 'information service.'"[197]  Or to put it another way, "no member of the *Brand X* Court disputed that the pizzeria makes pizza."[198]

Following *Brand X*, the Commission reconsidered its conclusion that broadband over DSL facilities contained a separate, standalone telecommunications service.  Specifically, the FCC removed access requirements that applied to legacy telephone lines that provided DSL service, and concluded that, "given this new framework, the transmission component of wireline broadband Internet access is not a telecommunications service."[199]  The Commission subsequently classified other forms of broadband Internet access services as Title I services.[200] And those consistent classification decisions remained in place until the FCC's short-lived 2015 order improperly reclassified Internet access services under Title II.

<div align="center">

**C.    The Major Questions Doctrine Precludes Title II Classification of Broadband**

</div>

Even if the Communications Act contained some ambiguity as to whether broadband could properly be classified as a Title II service, the major questions doctrine would preclude it.

The Supreme Court has repeatedly identified cases that "have arisen from all corners of the administrative state" in which the "history and the breadth of the authority that [an] agency has asserted and the economic and political significance of that assertion, provide a reason to

---

[197] *USTA II*, 855 F.3d at 399 (Brown, J., dissenting from denial of rehearing) (citation omitted).

[198] *Id.*

[199] *See, e.g.*, *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853, ¶ 4 (2005), http://tinyurl.com/y2fcywht.

[200] *See, e.g.*, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901, ¶¶ 19-28 (2007), http://tinyurl.com/4vexast2; *In re United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd 13281, ¶ 1 (2006), http://tinyurl.com/8t2b46wb.

<div align="right">

**App. 1082**

</div>

hesitate before concluding that Congress meant to confer such authority."[201]  In such cases involving major questions, a "colorable" or "merely plausible textual basis" for the claimed authority is not enough.[202]  Rather, "the agency must point to 'clear congressional authorization' for the power it claims."[203]

In this area, the Supreme Court has cited approvingly to Justice Kavanaugh's seminal opinion (while still a D.C. Circuit judge), reasoning that the 2015 Title II Order exceeded the FCC's authority under the major questions doctrine—the very same rule the FCC is now reproposing with minimal changes.[204]  Should the FCC reclassify broadband as a Title II service, the Supreme Court would almost assuredly adopt the reasoning in then-Judge Kavanaugh's opinion and hold that Title II reclassification runs afoul of the major question doctrine.  For this reason too, the FCC should not adopt its new Title II proposal.

As then-Judge Kavanaugh put it in reviewing the 2015 Title II Order, "[i]n order for the FCC to issue a major rule, Congress must provide clear authorization."[205]  The analysis thus involves two questions: (1) Is Title II classification of broadband a major rule, and if so, (2) has Congress clearly authorized it?[206]  Because the NPRM proposes a major rule that Congress has not clearly authorized, it would exceed the FCC's authority to adopt it.

---

[201] *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (citation and internal quotation marks omitted); *see also id.* at 2609 (noting that the Court "'typically greet[s] [agency] assertions of extravagant statutory power over the national economy' with 'skepticism'") (citation omitted).

[202] *Id.* at 2609.

[203] *Id.* (citation omitted).

[204] *See id.*; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring); *OSHA*, 595 U.S. at 125.

[205] *USTA II*, 855 F.3d at 422 (Kavanaugh, J., dissenting).

[206] *See id.*

**App. 1083**

## 1. Title II Classification of Broadband Is a Major Rule.

It is "indisputable," as Justice Kavanaugh noted with respect to the 2015 Title II Order, that "[t]he FCC's net neutrality rule is a major rule."[207]  While "there inevitably will be close cases and debates at the margins about whether a rule qualifies as major," "under any conceivable test for what makes a rule major, the net neutrality rule qualifies."[208]  "The net neutrality rule is a major rule," he continued, "because it imposes common-carrier regulation on Internet service providers"[209]—that is, because it entails Title II classification.

Title II classification has all the characteristics of a major question.

*First*, a question is major if it is of "economic and political significance."[210]  The "financial impact" of Title II in terms of "the portion of the economy affected" and "the impact on investment in infrastructure, content, and business" is "staggering."[211]  The proposed rules would fundamentally change the regulatory regime applicable to the broadband industry, which is enormous and growing—by one estimate, total revenues in the U.S. are at least $150 billion annually.[212]  Further, prior estimates of foregone economic investment due to Title II classification, or even mere Title II proposals, range from $5 billion to $30-40 billion.[213]  And as explained in further detail in Section II above, Title II classification chilled development of new innovations and broadband projects, particularly among smaller providers.

---

[207] *Id.*

[208] *Id.* at 423.

[209] *Id.*

[210] *Biden v. Nebraska*, 143 S. Ct. at 2373.

[211] *Id.*

[212] *See* IBISWorld, *Internet Service Providers in the US – Market Size (2005-2009),* (Sept. 11, 2023), http://tinyurl.com/2dp24bak.

[213] *See* Michael Horney, *Broadband Investment Slowed by $5.6 Billion Since Open Internet Order*, The Free State Found. (May 5, 2017), http://tinyurl.com/yxx6af5f (estimating $5.6 billion lost); *see also supra* Section III.A (discussing the impact of the Commission's 2015 Title II reclassification); RIF Order ¶ 95 (estimating $30-40 billion annual decline in investment).

With respect to political impact, Title II treatment of broadband "fundamentally transforms the Internet" by "wrest[ing] control of the Internet from the people and private Internet service providers and gives control to the Government."[214] It affects "every Internet service provider, every Internet content provider, and every Internet consumer."[215]

This conclusion applies with even greater force to the current proposal than it did in 2015. As the Commission acknowledges, after the Covid-19 pandemic, Internet access "has become even more essential to consumers for work, health, education, community, and everyday life."[216] And as described above, the Commission now asserts that Title II could serve as a basis for the agency to take wholesale action on perceived issues ranging from national security to cybersecurity to privacy to public safety. It would be hard to imagine a more sweeping assertion of authority by the FCC over Internet public policy.

Unsurprisingly given the consequences, the public has "focused intensely on the net neutrality debate."[217] Indeed, debate surrounding net neutrality has "engaged lawmakers, regulators, businesses, and other members of the public for years."[218] The FCC received 4 million comments on its proposed net-neutrality rule in 2015, a record at that point "by far."[219]

---

[214] *USTA II*, 855 F.3d at 423.

[215] *Id.*

[216] NPRM ¶ 16; *see also id.* ¶ 17 (comparing need for internet to need for "electricity" and "water"); Title II Order ¶ 1 ("[t]he open internet drives the American economy and serves, every day, as a critical tool for America's citizens to conduct commerce, communicate, educate, entertain and engage in the world around them"); Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, at 10 (Sept. 20, 2023), http://tinyurl.com/3vx37269 ("Verrilli & Gershengorn") (during the Covid-19 pandemic "[b]roadband services provided the indispensable link that allowed hundreds of millions of Americans to do their jobs, go to school, and maintain vitally important personal and family relationships").

[217] *USTA II* 855 F.3d at 423 (Kavanaugh, J., dissenting).

[218] *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014); *see also id.* ("[T]he question of net neutrality implicates serious policy questions . . . .").

[219] *Id.*

The 2017 proceeding that led to the RIF Order likewise drew millions of comments.[220] And these proceedings have involved unusually direct Presidential involvement in the outcome. President Obama, for example, "publicly weighed in on the net neutrality issue" in 2015, "an unusual presidential action" that "underscores the enormous significance" of the issue.[221] President Biden, meanwhile, explicitly called for Title II classification of broadband in his early Executive Order on Competition, and the FCC Chair even attended the EO's signing ceremony.[222] And as discussed below, Members of Congress have frequently debated Title II classification as well, without ever mustering the votes to apply Title II classification to broadband. To put it mildly, the "wisdom of the net neutrality rule was, and remains, a hotly debated matter."[223]

*Second*, the major-questions doctrine ferrets out instances in which an agency has stretched statutory language "to suit its own sense of how the statute should operate."[224] The doctrine, accordingly, examines the "history" of the "authority that the agency has asserted" for clues as to whether an agency's interpretive position has been reverse-engineered to advance a policy position.[225]

As explained in detail above, prior to 2015, the FCC consistently concluded that Internet access services should not be subject to common-carriage regulation. That conclusion informed

---

[220] *See* L. Gambino & D. Rushe, *FCC flooded with comments before critical net neutrality vote*, The Guardian (Aug. 30, 2017), http://tinyurl.com/25xjhtcu.

[221] *USTA II* at 424 (Kavanaugh, J., dissenting).

[222] *See* Exec. Order No. 14036, 86 Fed. Reg. 36987, § 5(l)(i) (July 14, 2021), http://tinyurl.com/2y86mj38; John Eggerton, *Biden Executive Order Has Plenty of Advice for FCC*, The Media Institute (Jul. 9, 2021), https://tinyurl.com/23nernw6.

[223] *Id.* at 383 (Srinivasan, J., concurring in the denial of rehearing en banc); *compare Gonzales v. Oregon*, 546 U.S. 243, 267 (physician-assisted suicide is an important issue subject to "earnest and profound debate across the country") (citation omitted).

[224] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

[225] *West Virginia*, 142 S. Ct. at 2608 (citation omitted).

**App. 1086**

pre-1996 decisions in which the FCC classified early forms of Internet access as lightly-regulated "enhanced services," rather than "basic services" that were subject to common-carrier treatment. Congress then drew from this framework in adopting its definitions of Title I "information services" (which mirrored early "enhanced services") and Title II "telecommunications services" (which mirrored "basic services"). The FCC then continued to classify access services as Title I "information services" exempt from Title II requirements for decades until the Commission adopted the 2015 Title II Order.

When the FCC finally decided to reclassify broadband as a Title II service in 2015, it doubtless "reverse-engineered" its interpretive position to "suit its own sense of how the statute should operate." Apart from being inconsistent with the statutory and regulatory history of Title II to date, the FCC exercised massive forbearance from a host of requirements that were designed for legacy monopoly telephone networks to make the square peg of broadband fit the round hole of Title II. Indeed, the FCC candidly admitted in its 2015 order that it was crafting a "Modern Title II" "tailored for the 21st Century."[226]

As in 2015, the NPRM once again proposes that the FCC exercise "broad forbearance" in order to avoid saddling broadband providers with regulation that Congress obviously never intended for those companies.[227] And as in 2015, the Commission would "not in any real sense be implementing a policy choice by Congress" but rather would be "using statutory forbearance authority to create a bespoke regulatory framework from scratch."[228] In that way, Title II reclassification would be akin to the agency action at issue in *Biden v. Nebraska*, where the

---

[226] Title II Order ¶ 38.

[227] NPRM ¶ 104; *see also id.* ¶ 98 ("We propose to return to largely the same forbearance that was adopted in the[Title II Order]").

[228] Verrilli & Gershengorn at 13.

54

agency purported to "enjoy virtually unlimited power to rewrite the Education Act."[229]  Because the agency's interpretation "would effect a fundamental revision of the statute, changing it from one sort of scheme of . . . regulation into an entirely different kind," it violated the major-questions doctrine.[230]  Here, the Commission's need to reimagine forbearance "should have alerted [the agency] that it had taken a wrong interpretive turn."[231]  Agencies are "not free to adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness."[232]  The same logic applies to the FCC's reliance on forbearance to the point where it has effectively created a Modern Title II for the 21st Century— all without Congressional involvement.

*Third*, and related, the major questions doctrine applies when an agency "claims to discover in a long-extant statute" an "unheralded power to regulate a significant portion of the American economy."[233]  This "[*Utility Air*] language" is "directly on point here"—the *Utility Air* Court "might as well have been speaking about the net neutrality rule."[234]  The Commission "is relying here on a long-extant statute—namely, the Communications Act of 1934, as amended in 1996."[235]  Congress decided in the 1996 Act that emerging "interactive computer services" like broadband should be lightly regulated, and for decades prior to 2015, the Commission "respected

---

[229] *Biden v. Nebraska*, 143 S. Ct. at 2373.

[230] *Id.*

[231] *Util. Air Regul. Grp.*, 573 U.S. at 328.

[232] *Id.* (internal quotation marks and citation omitted).

[233] *Id.* at 324.

[234] *USTA II*, 855 F.3d at 424 (Kavanaugh, J., dissenting).

[235] *Id.*

**App. 1088**

the Act's deregulatory policy."[236]  Only with the 2015 Title II Order did the Commission "seek[] to end this longstanding consensus."[237]

Prior to 2015, even when the Commission previously attempted to adopt open internet principles, it did so under a Title I framework.  In 2005, the Commission adopted a policy statement to inform its enforcement discretion, asserting that consumers are entitled to the internet content and services of their choosing, under the rubric of its Title I ancillary authority.[238]  When the D.C. Circuit concluded that the FCC failed to identify sufficient authority to enforce that policy statement, the Commission next relied on Section 706 of the Telecommunications Act, another non-Title II provision, to impose anti-blocking and anti-discrimination rules.[239]  The D.C. Circuit concluded in *Verizon v. FCC* that the FCC had discretion to use Section 706 to adopt Internet conduct rules, but held that the specific rules adopted by the Commission improperly imposed common carriage requirements on broadband providers.[240]  In response to that ruling, the Commission released an NPRM that sought to use the decision in *Verizon* as a "blueprint" for restoring open internet protections while still preserving broadband's "information service" classification.[241]

The FCC only changed this longstanding view under direct White House influence following release of the 2014 NPRM, when President Obama released an extraordinary video that called for the FCC—an independent agency—"to reclassify Internet service under Title II of

---

[236] *Id.* at 394 (Brown, J., dissenting).

[237] *Id.*

[238] *See Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir. 2010).

[239] *Preserving the Open Internet*, Report and Order, 25 FCC Rcd 17905 (2010), http://tinyurl.com/3h64ckzc.

[240] *Verizon v. FCC*, 740 F.3d at 623.

[241] *Protecting and Promoting the Open Internet,* Notice of Proposed Rulemaking, 29 FCC Rcd 5561, ¶¶ 4, 89, 93 (2014).

56

a law known as the Telecommunications Act."[242]  Today, President Biden's competition EO makes the same explicit request.  The Supreme Court has previously struck down agency rules under the major questions doctrine in similar contexts—where an agency claims to discover new authority under a long-extant statute only under intense political pressure.[243]

*Fourth*, when Congress has considered and declined to enact "similar measures," an assertion of regulatory authority is "all the more suspect."[244]  Here, "Congress has been studying and debating net neutrality for years."[245]  Congress has "considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers."[246]  Indeed, members of Congress introduced legislation to reclassify broadband as a Title II service as recently as last year.[247]  Congress's repeated failure to modify the Telecommunications Act to classify broadband as a Title II service is "a sign that an agency is attempting to work around the legislative process to resolve for itself a question of great political significance."[248]

---

[242] *See USTA II,* 855 F.3d at 410-11 (Brown, J. dissenting).

[243] *E.g., Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 142 S. Ct. 661 (2022); *Biden v. Nebraska*, 600 U.S. 477, 143 S. Ct. 2355 (2023).

[244] *West Virginia*, 142 S. Ct. at 2614 (internal quotation marks and citation omitted).

[245] *USTA II*, 855 F.3d at 423 (Kavanaugh, J., dissenting).

[246] *Id.* (citing Communications Act of 2006, H.R. 5252, 109th Cong.; Network Neutrality Act of 2006, H.R. 5273, 109th Cong.; Internet Freedom and Nondiscrimination Act of 2006, H.R. 5417, 109th Cong.; Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong.; Communications, Consumer's Choice, and Broadband Deployment Act of 2006, S. 2686, 109th Cong.; Internet Freedom Preservation Act, S. 2917, 109th Cong. (2006); Internet Freedom Preservation Act, S. 215, 110th Cong. (2007); Internet Freedom Preservation Act of 2008, H.R. 5353, 110th Cong.; Internet Freedom and Nondiscrimination Act of 2008, H.R. 5994, 110th Cong.; Internet Freedom Preservation Act of 2009, H.R. 3458, 111th Cong.; Internet Freedom, Broadband Promotion, and Consumer Protection Act of 2011, S. 74, 112th Cong.; Data Cap Integrity Act of 2012, S. 3703, 112th Cong.; No Rate Regulation of Broadband Internet Access Act, H.R. 2666, 114th Cong. (2015)); *see also, e.g.*, Save the Internet Act of 2019, H.R. 1644, 116th Cong.

[247] *See* Net Neutrality and Broadband Justice Act of 2022, S. 4676, 117th Cong.

[248] *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring) (internal quotation marks and citation omitted).

**App. 1090**

All told, any suggestion that Title II reclassification does not involve a major question "would fail the straight-face test."[249]  The 2015 Title II Order was "one of the most consequential regulations ever issued by any executive or independent agency in the history of the United States."[250]  And the even broader proposal in the FCC's new NPRM is no different, and in fact is more consequential today.

### 2.  Congress Has Not Clearly Authorized Title II Reclassification.

Because Title II reclassification would be a major rule, Congress must clearly authorize the FCC to adopt it.  But here, Supreme Court precedent proves the opposite: Congress has *not* clearly authorized Title II classification of broadband.  As explained above, it was common ground in *Brand X* that Internet access services are information services.  And the *Brand X* majority even rejected the dissent's limited position that Title II required the FCC to conclude that cable modem service involved both an information service and a separate, standalone telecommunications service.  On that score, the Court held, the statute was ambiguous.  Therefore, *at minimum*, Supreme Court precedent forecloses any argument that the FCC is *required* to classify broadband internet access as a Title II service.  At most, the law is ambiguous.

This putative ambiguity in the statute "torpedoes" the FCC's proposal under the major-questions doctrine.[251]  A finding of ambiguity, after all, "by definition" "means that Congress has not clearly authorized the FCC" to classify broadband as a telecommunications service.[252]

---

[249] *USTA II*, 855 F.3d at 402 (Kavanaugh, J., dissenting).

[250] *Id.* at 417.

[251] *Id.* at 426.

[252] *Id.*

**App. 1091**

The Commission itself recognized this fatal ambiguity when defending the 2015 Title II Order, which established the "framework" the Commission "propose[s] to return to" now.[253] The Communications Act, the Commission asserted then, "did not clearly resolve the question of how broadband should be classified."[254] That is "the end of the game" under the major-questions doctrine.[255]

When a statute is ambiguous, the major questions doctrine is not indifferent to what path the agency chooses. In *Brand X*, the Commission's classification of "cable modem service" as an "information service"[256] was the most natural application of the text of the 1996 Act, and "it followed the FCC's longstanding course."[257] As a minimally-invasive classification, the choice of Title I presented no seismic political or economic question. The *Brand X* Court therefore "did not have to—and did not—consider whether classifying Internet service as a telecommunications service and imposing common-carrier regulation on the Internet would be consistent with the major rules doctrine."[258]

But the Commission's proposal here—to *break* from that longstanding course and impose utility-style regulations on the Internet—is different. As then-Judge Kavanaugh explained, *Brand X* was not a "*coup de grace* for any requirement of clear congressional authorization" such that it "allow[s] the FCC to reclassify broadband Internet access without any serious judicial scrutiny."[259] Rather, "[w]hen the statutory context and backdrop against which Congress passed the 1996 Act are considered, as they were in *Brand X*, the Supreme Court's decision

<hr>

[253] NPRM ¶ 115.

[254] *USTA II*, 855 F.3d at 425 (citing FCC Opposition Br. 9).

[255] *Id.* (Kavanaugh, J., dissenting).

[256] *Brand X*, 545 U.S. at 987.

[257] *USTA II*, 855 F.3d at 395 (Brown, J., dissenting).

[258] *Id.* at 425 (Kavanaugh, J., dissenting).

[259] *Id.* at 403.

reinforces the need for FCC to show a textual assignment of authority before it can reclassify broadband Internet access as common carriage."[260]

The FCC now attempts to overcome this problem by suggesting in the NPRM that "*Brand X* conclusively held that the Commission has the authority to determine the proper statutory classification of BIAS [i.e., broadband internet access service]."[261]  In other words, the FCC suggests that, for major questions purposes, what matters is that Congress *clearly delegated* authority to the FCC to resolve the issue, rather than *clearly resolved* the issue itself.

But the problem, as Justice Kavanaugh recognized, is that Congress did not clearly resolve either "distinct species of ambiguity."[262]  The FCC's theory that it has clear authorization to classify broadband however it wishes misreads *Brand X*, in which the Title I classification of Internet access service was "unchallenged."[263]  The Court's decision there can hardly be read to provide the FCC with boundless discretion on a question not even at issue in the case.[264]

The FCC's position is also inconsistent with the Communications Act itself, whose definitional provisions hardly qualify as *clear* authorization for the Commission to choose whether to treat broadband as a Title I or Title II service.  As shown above, the more natural reading of those provisions, coupled with the structure and purposes of the Act of the whole, support Title I classification of broadband.  At minimum, Congress nowhere clearly states that the FCC can simply ignore the textual, contextual, and historical evidence that ordinarily informs statutory construction and instead decide in its sole discretion what regulatory regime should

---

[260] *Id.* at 404.

[261] NPRM ¶ 81.

[262] *USTA II*, 855 F.3d at 426 n.6.

[263] *Brand X*, 545 U.S. at 987.

[264] *See, e.g.*, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 270 (2023) (declining to credit "precedent" on issue it "did not address").

apply to broadband.  There is no provision in the Communications Act that reads, for example, that "the FCC shall determine in its discretion whether Internet access services are Title I or Title II services."

The Communications Act, therefore, lacks the clear delegation of broadband classification authority that the FCC claims it has.  And such a broad delegation of authority, if it existed, would raise serious constitutional concerns.  Under the Constitution's Vesting Clauses, "important subjects" "must be entirely regulated by the legislature itself."[265]  Because the question whether broadband receives targeted regulation versus common-carriage regulation indisputably is an important subject, arguably only Congress may decide it.

In any event, the judicial landscape has changed markedly since the Supreme Court's decision in *Brand X*.  As two former Solicitors General under President Obama recently put it, "the Supreme Court's commitment to the major questions doctrine has intensified" in recent years, and therefore, "[f]ederal agencies can no longer expect to receive substantial deference from the courts when they interpret statutory provisions defining the nature and scope of their regulatory authority, particularly when they pursue expansive or creative interpretations of statutes to adopt rules of major consequence."[266]  Given this new judicial landscape, there is every reason to believe the Court will adopt Justice Kavanaugh's reasoning in *US Telecom* that Title II classification of broadband presents a major question and exceeds the Commission's authority.  The FCC should save the time and resources that will be spent inevitably to prove that point in Court, and instead retain the existing Title I classification.

---

[265] *Wayman v. Southard*, 23 U.S. 1, 43 (1825); *see also, e.g.*, *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari) ("major national policy decisions must be made by Congress").

[266] Verrilli & Gershengorn at 3; *see also id.* ("[T]he Supreme Court has not hesitated to invalidate agency actions that lower courts have upheld under *Chevron* when the Court concludes that agency's course of action cannot be reconciled with the most straightforward reading of the relevant statute.") (footnote omitted).

**App. 1094**

## D. The Proposed Rule Violates the First Amendment.

Finally, subjecting Internet service providers to Open Internet rules violates the First Amendment. As then-Judge Kavanaugh explained, Internet service providers engage in protected expression when they "deliver content to consumers" and "decide what content they will transmit."[267]

Although the FCC claims that "there are no First Amendment concerns" because it seeks to regulate "common carriers,"[268] the FCC lacks constitutional "authority to strip an entity of its First Amendment rights merely by labeling it a common carrier."[269] And indeed, the Supreme Court has analogized similar entities, like "cable operators[,] to the publishers, pamphleteers, and bookstore owners traditionally protected by the First Amendment."[270]

Because the proposed rules seek to regulate protected speech, they must at a minimum meet the standard articulated in *Turner,* which permits content-neutral restrictions only "if the service provider possesses 'bottleneck monopoly power' in the relevant geographic market."[271] Here, because "the FCC has not shown that Internet service providers possess market power in a relevant geographic market," it "may not tell Internet service providers how to exercise their editorial discretion about what content to carry or favor."[272] To the contrary, as shown in section I above, competition in the market for broadband services is fierce and increasing. Thus, even

---

[267] *USTA II*, 855 F.3d at 428 (Kavanaugh, J., dissenting).

[268] NPRM ¶ 214.

[269] *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1221 (11th Cir. 2022), *cert. granted in part sub nom. Moody v. Netchoice, LLC*, No. 22-277, 2023 WL 6319654 (U.S. Sept. 29, 2023).

[270] *USTA II*, 855 F.3d at 428 (Kavanaugh, J., dissenting).

[271] *Id.* at 431 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661, 666-67 (1994); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)). The FCC's suggestion that it needs Title II authority in order to pursue national security goals such as mandating blocking and filtering of particular content raises the possibility that the Commission intends to do more than simply regulate in a content-neutral fashion; content-based regulations would be subject to far more stringent strict scrutiny.

[272] *Id.* at 432-35.

assuming they are content-neutral, the Commission's proposed open internet rules are unconstitutional.

## VI.     The Commission Should Not Authorize State Regulation of Broadband.

The Chamber also strongly opposes any attempt by the Commission to empower states to adopt or maintain their own "mini-net neutrality" laws in addition to the Title II rules that the FCC proposes.

When the FCC Chair announced her plan to reinstate Title II classification, one of her principal justifications was to "[e]stablish a uniform national standard rather than a patchwork of state-by-state approaches, benefiting consumers and Internet Service Providers."[273]  The initial public draft of the NPRM reflected this commitment.[274]  However, following a meeting with state regulatory advocates, the final adopted version of the NPRM was changed to suggest that broadband should be governed "primarily" by a nationwide framework, including a "uniform floor of ISP conduct rules," but not necessarily a "ceiling."[275]  This distressing change means that, in addition to the onerous and unlawful federal Title II framework, broadband providers could continue to be subject to supplemental state-law regimes that apply even more restrictive rules on their business practices.

Even the Chair appears to recognize the risk that this change poses.  As she acknowledged in her statement accompanying the NPRM, even after it was modified, "[w]hen you are dealing with the most essential infrastructure in the digital age, come on, it's time for a

---

[273] *See Fact Sheet: FCC Chairwoman Rosenworcel Proposes to Restore Net Neutrality Rules*, FCC (Sept. 26, 2023), http://tinyurl.com/mryurjuf.

[274] *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, Public Draft, WC Docket No. 23-320, FCC-CIRC2310-01, ¶¶ 93-96 (rel. Sept. 28, 2023) http://tinyurl.com/38wwz9vt.

[275] NPRM ¶¶ 94-97.

national policy."[276]  The Chair rightfully called for a "uniform legal framework [that] applies to the whole country," rather than policies that are "coming from Sacramento and places like it."[277]

The risk is not merely hypothetical.  Seven states have passed net neutrality laws or resolutions,[278] and nearly a dozen states introduced net neutrality legislation in 2022 alone.[279]  For example, the State of California adopted SB-822, which codified the FCC's 2015 net neutrality rules at the state level, and included an even more restrictive Internet Conduct Standard than had been adopted at the federal level.[280]  Broadband trade associations, supported by the Chamber as *amicus*, sued to enjoin this state law as inconsistent with the federal judgment that broadband should be regulated under a Title I framework, and therefore preempted.  The Ninth Circuit upheld the law, concluding that the FCC had "abandon[ed] its regulatory authority with respect to net neutrality," and thus could not prevent states from "stepping into the breach to enact [their] own net neutrality protections."[281]

The Ninth Circuit's decision respectfully failed to account for how "any state regulation of an information service conflicts with the federal policy of nonregulation" of Title I services,[282] and thus how SB-822 imposed duties that "stood as an obstacle" to the targeted framework that the FCC "deliberately imposed."[283]  But even if the Ninth Circuit were correct about the FCC's

---

[276] NPRM at 135 (Statement of Chairwoman Jessica Rosenworcel).

[277] *Id.*

[278] Emily Washburn, *What is Net Neutrality and Why is it So Controversial?*, Forbes (Apr. 13, 2023), https://tinyurl.com/29ddkn2r.  These states include California, Colorado, Maine, New Jersey, Oregon, Vermont, and Washington.  *Id.*

[279] Heather Morton, *Net Neutrality 2022 Legislation*, National Conference of State Legislatures (May 4, 2022), https://tinyurl.com/bdh9vp57.  States that introduced net neutrality legislation include California, Georgia, Illinois, Kentucky, Massachusetts, Minnesota, Missouri, New Jersey, New York, Rhode Island, and South Carolina.  *Id.*

[280] *See* Cal. Civ. Code §§ 3101(a)(5), (a)(6).

[281] *ACA Connects-Am.'s Commc'ns. Ass'n v. Bonta*, 24 F.4th 1233, 1236 (9th Cir. 2022).

[282] *Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715, 718 (8th Cir. 2018).

[283] *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

App. 1097

limited ability to preempt under Title I, the Commission would have no excuse not to preempt contrary state net neutrality laws if it returns to a Title II framework, which contains numerous sources of affirmative rulemaking authority and express preemption provisions.[284]

Indeed, should the FCC decline to preempt laws like California's, it would further undermine any case the FCC could possibly make that the purpose of Title II classification is to restore uniform, national open internet protections across the United States. Because broadband networks are inherently interstate—indeed, national—in scope, providers "would be forced to comply with the state's more stringent requirements, or choose not to offer" the service at all.[285] Without strong preemption protections, states would be free to engage in a race to regulate, in which providers would have to comply with whatever ended up being the most restrictive state regime. Because California's current SB-822 is even *more* demanding than the FCC's current proposal, it would set the de facto nationwide standard for broadband conduct rules, at least until another state displaced it. This standard would impact not only large providers with California operations, but also smaller providers with no presence in California that must interconnect to nationwide networks.

Without strong federal preemption, it would be even more plain that what the FCC envisions for Title II classification of broadband is not restoring a uniform nationwide "net neutrality" standard, but instead simply effecting unprecedented government control over the Internet.

---

[284] *See* NPRM ¶ 95.
[285] *California v. FCC*, 39 F.3d 919, 933 (9th Cir. 1994).

**App. 1098**

## VII. The Proposed Internet Conduct Standard Is Vague and Unworkable.

Finally, the NPRM proposes to restore the 2015 General Conduct Standard, which placed a vague and uncertain obligation on broadband providers to "not unreasonably interfere with or unreasonably disadvantage" consumers' ability to access the Internet content or applications of their choice or tech companies' ability to make such content or applications accessible to consumers.[286]

As a legal matter, this standard "fails to provide a person of ordinary intelligence fair notice of what is prohibited."[287]  The standard's use of amorphous terms—like "unreasonably interfere" and "unreasonably disadvantage"—are "classic terms of degree," which "in th[is] context . . . have no settled usage or tradition of interpretation in law."[288]  Accordingly, regulated parties have "no principle for determining" when their conduct "pass[es] from the safe harbor . . . to the forbidden."[289]  Making matters worse, the Commission proposes a "non-exhaustive list" of factors it will consider in determining whether a violation has occurred, including things like "end-user control," "consumer choice," "effect . . . on innovation, investment, or broadband deployment," and "free expression."[290]

This list of assorted factors is "so standardless that it authorizes or encourages seriously discriminatory enforcement."[291]  Accordingly, "basic policy matters" will be decided in enforcement actions brought "on an ad hoc and subjective basis."[292]

---

[286] NPRM ¶ 165.

[287] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal quotation marks omitted).

[288] *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1049 (1991).

[289] *Id.*

[290] NPRM ¶ 166.

[291] *Fox Television Stations, Inc.*, 567 U.S. at 253.

[292] *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The short and turbulent history of the 2015 General Conduct Standard illustrates its problems. Then, as now, the FCC proposed that popular, pro-consumer "zero rating" and "sponsored data" plans might run afoul of the Standard.[293] Unable to articulate with precision why free data plans would constitute unreasonable interference with consumer access to the Internet, the FCC (through its Wireless Telecommunications Bureau) released a controversial report that set forth yet more amorphous criteria through which such plans would be evaluated.[294] Those factors included whether the plan "create[s] exclusionary arrangements" between broadband and content providers, whether consumers had "easy alternatives for switching to other [broadband] providers with different zero-rating practices," and whether "zero-rated traffic serve[s] a civic engagement purpose."[295] Under Chairman Pai, the FCC promptly rescinded this unworkable framework.[296]

The General Conduct Standard also served as part of the legal basis for the FCC's *Broadband Privacy Rules*, which sought to apply sweeping disclosure mandates on broadband providers relating to privacy practices and alleged data breaches. As noted above, Congress itself abrogated that rule pursuant to the Congressional Review Act. The fact that Congress expressly disapproved of one prominent application of the General Conduct Rule under the 2015 order should give the Commission significant pause about readopting it.

---

[293] NPRM ¶ 167. Zero-rating practices can have many consumer benefits, among them: helping to lower the costs of accessing data; bringing, and keeping, new consumers online; facilitating online work, learning, health care, and civic and social engagements; and expanding the diversity of content, applications, and services. Zero-rating gives consumers subject to a broadband subscription data cap the ability to consume data-heavy content, such as streaming video or music, without going over their cap. The FCC should continue to allow for these types of pro-consumer arrangements.

[294] *See Wireless Telecommunications Bureau Report: Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero-Rated Content and Services*, FCC (Jan. 11, 2017), http://tinyurl.com/58m2tzya.

[295] *Id.* at 4-5.

[296] *See Wireless Telecommunications Bureau Report: Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero Rated Content and Services*, Order, 32 FCC Rcd 1093 (2017), http://tinyurl.com/ndbywwtb.

**App. 1100**

The Commission should decline to go down this same path once more, adopting a vague standard that provides no guidance as to what constitutes compliance, but provides license to the FCC to adopt controversial and anti-consumer rules and enforcement policies.

**VIII.   Conclusion**

The Chamber would like to thank the Commission for considering this comment.  If you have any questions, please reach out to Matt Furlow, Policy Director, at

[mfurlow@uschamber.com](mailto:mfurlow@uschamber.com).

Respectfully submitted,

Jordan Crenshaw
Senior Vice President
Chamber Technology Engagement Center
U.S. Chamber of Commerce

*Outside Counsel*

Thomas M. Johnson, Jr.
Joshua S. Turner
Sara M. Baxenberg
WILEY REIN LLP
2050 M Street N.W.
Washington, D.C. 20036

December 14, 2023

**App. 1101**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| Lifeline and Link Up Reform and Modernization | WC Docket No. 11-42 |

## COMMENTS OF USTELECOM AND
## OPPOSITION TO PETITIONS FOR RECONSIDERATION

Diana Eisner
Vice President, Policy and Advocacy

Nirali Patel
Senior Vice President, Policy and Advocacy

USTelecom – The Broadband Association
601 New Jersey Avenue, N.W.
Suite 600
Washington, D.C. 20001

Scott H. Angstreich
Leslie V. Pope
Alex A. Parkinson
Dennis D. Howe
Nataliia Gillespie
Kelley C. Schiffman
Kellogg, Hansen, Todd, Figel
  & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Counsel for USTelecom*

December 14, 2023

**App. 1102**

# TABLE OF CONTENTS

Page

I.  Introduction and Executive Summary ............................................................. 1

II. Broadband Is an Information Service, and the Commission Has No Authority
    To Classify It as a Telecommunications Service .................................................. 9

   A.  Broadband Is an Information Service, Not a Telecommunications
       Service, Under the Plain Text of the Communications Act ...................................... 9

      1.  Broadband Is an Information Service Because It Offers
          Customers the Capability of Interacting with Information Stored
          on Computers ............................................................................... 9

      2.  Broadband Is Also an Information Service Because It Includes
          Integrated Information Processing Capabilities ............................................ 17

      3.  Broadband Is Not a Telecommunications Service ............................................ 23

   B.  To the Extent the Communications Act Is Ambiguous, the Major
       Questions Doctrine Forecloses Common-Carrier Regulation of
       Broadband ..................................................................................... 28

      1.  Recent Major Questions Doctrine Cases Will Form the
          Background for Review of the Commission's Title II Order ................................. 28

      2.  Whether To Regulate Broadband as a Common-Carrier Service
          Presents a Major Question ............................................................... 29

      3.  The NPRM's Efforts To Evade the Major Questions Doctrine
          Fail .................................................................................... 33

III. Reclassification of Broadband as a Telecommunications Service Would Be
     Arbitrary and Capricious ..................................................................... 36

   A.  The NPRM's Reasons for Concluding That Broadband Should Be
       Regulated as a Title II Service Are Arbitrary and Capricious ............................... 36

      1.  The NPRM Does Not Identify Any Harms Occurring as a
          Result of the 2018 Order — Instead, the Internet Continued To
          Flourish ................................................................................ 36

         a.  The Internet Has Continued To Flourish Since 2018 ................................... 37

         b.  The NPRM Does Not Identify Any Harms Occurring as
             a Result of the 2018 Order ......................................................... 45

2.      The General Conduct Standard Is Not Needed and Will Harm Innovation ........................................................ 54

3.      Reclassification Would Open the Door to Harmful Rate Regulation .................................................... 60

4.      Reclassification Would Undermine Investment Incentives and Undermine the Most Efficient Use of Congress's Appropriations To Close the Digital Divide .............................................. 61

5.      Reclassification Would Undermine Consumer Privacy ............................. 64

6.      The NPRM's Proposed Transparency Rules Will Impose High Costs on ISPs While Bringing No Meaningful Benefit to Consumers .................................................... 68

B.      The NPRM's New Justifications for Title II Are Pretextual ................................. 70

1.      Reclassification Will Not Aid in the Federal Government's Efforts To Address National Security Concerns ........................................ 70

2.      Reclassification Will Harm Cybersecurity ................................. 76

3.      Reclassification Is Not Necessary To Ensure Network Resiliency and Reliability ...................................... 81

4.      Reclassification Is Not Necessary To Ensure Public Safety .................... 83

5.      The NPRM's Remaining New Justifications for Title II All Lack Merit ........................................ 85

a.      Reclassification Is Not Needed To Prevent Robocalls or Robotexts ........................................ 85

b.      Reclassification Is Not Needed To Protect Access to Pole Attachments ........................................ 87

c.      Reclassification Is Not Needed To Support Broadband Through the Universal Service Fund .............................. 89

d.      Reclassification Is Unnecessary To Ensure Free Expression on the Internet ........................................ 90

e.      Reclassification Is Not Necessary To Advance Digital Equity ........................................ 90

f.      Reclassification Will Not Provide Additional Accessibility Benefits ........................................ 91

App. 1104

        g.     Reclassification Will Not Substantially Affect
Competitive Deployment to Multiple Tenant
Environments ................................................................................ 92

IV.    The Commission Cannot and Should Not Impose Common-Carrier Regulation
on One Subset of the Participants in the Internet Traffic Exchange Marketplace ........... 92

    A.     The Commission's Proposal Would Significantly Disturb and
Harmfully Distort the Well-Functioning Internet Traffic Exchange
Marketplace .......................................................................................... 92

    B.     Internet Traffic Exchange Is an Information Service, Not a Common-
Carrier Telecommunications Service ................................................... 94

V.     Broadband Internet Access Service Providers Should Be Subject to a Single
Set of Uniform, National Rules ......................................................................... 97

VI.    The Commission Should Forbear from Section 214 Obligations in Addition to
the Other Title II Obligations and Rules From Which It Proposes To Forbear ............... 99

    A.     The NPRM Correctly Proposes To Forbear From Numerous Provisions
of Title II, Including Rate Regulation Provisions ................................. 99

    B.     The Commission Should Also Forbear Broadly From Section 214(a)-
(d) ...................................................................................................... 101

VII.   Conclusion ............................................................................................. 103

Exhibit A – Michael Kende et al., Analysys Mason, *Evolution of the internet in the U.S.
since 2015* (Dec. 12, 2023)

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| Lifeline and Link Up Reform and Modernization | WC Docket No. 11-42 |

## COMMENTS OF USTELECOM AND
## OPPOSITION TO PETITIONS FOR RECONSIDERATION

USTelecom – The Broadband Association ("USTelecom") hereby submits these comments in response to the Commission's Notice of Proposed Rulemaking ("NPRM") in the above-captioned proceeding[1] and this opposition to petitions for reconsideration in the above-captioned proceedings.[2] USTelecom's members support the open internet. But this proceeding has little to do with the open internet. It is, instead, a misguided attempt to impose unnecessary regulation on a vibrant, competitive marketplace.

## I.    Introduction and Executive Summary

Since the *2018 Order*[3] took effect, American consumers have benefited from unprecedented broadband investment, availability, and competition. "Broadband speeds in the

---

[1] *See* Notice of Proposed Rulemaking, *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, FCC 23-83 (rel. Oct. 20, 2023) ("NPRM").

[2] Public Notice, *Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the RIF Remand Order*, WC Docket Nos. 17-108, 17-287, 11-42, DA 23-996 (Oct. 19, 2023).

[3] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("*2018 Order*").

U.S. have increased, prices are down, competition has intensified, and record-breaking new broadband builds have brought millions of Americans across the digital divide."[4]  ISPs have invested massively in deploying broadband to consumers, including a record $102.4 billion in U.S. communications infrastructure in 2022.  As a result of that investment, more Americans are getting connected than ever before.  And they have more options than ever before.  USTelecom's members continue to dramatically expand their fiber coverage, offering customers ever-increasing, symmetrical speeds in competition with incumbent cable broadband providers.  New 5G home internet services, which have already attracted millions of subscribers, provide additional competitive options.  In short, broadband has improved spectacularly on every single metric since 2018.

That success refutes the many predictions that the internet would stagnate and fracture without common-carrier classification and the 2015 net neutrality rules.[5]  Instead, that success is exactly what the *2018 Order* predicted would follow from returning broadband to a Title I regime:  that competition would compel broadband providers to maintain an open internet and invest to provide better service at competitive prices to more Americans.  And while the *2018 Order* could not have predicted the COVID-19 pandemic, the internet ecosystem it fostered in the United States passed the pandemic's tests with flying colors.  Unlike in Europe and other countries with public utility regimes, Americans could use their internet connections for school, work, healthcare, and entertainment at full speed, without network slowdowns or reductions in video quality.

---

[4] NPRM at 139 (dissenting statement of Commissioner Carr) (cleaned up).

[5] *See id.* at 136-38 (surveying predictions).

European regulators appear to have learned their lesson: they publicly recognize that their net neutrality rules go too far and harm broadband investment. But the Commission inexplicably seeks to snatch defeat from the jaws of victory: it proposes to derail this trajectory of innovation, investment, and consumer benefits by saddling ISPs with investment-killing common-carrier regulations under a misguided Title II framework. Readopting the "we-know-it-when-we-see-it" general conduct rule, which would enable the Commission to condemn whatever innovations it wishes, will only compound the problem. It is textbook economics that regulatory uncertainty and the potential for regulatory creep undermine investment incentives and stifle innovation. That is especially true here, where guessing wrong as to how the Commission will apply its general conduct standard in the future could potentially subject an ISP to massive forfeiture penalties and Section 208 damages actions.

In addition, while the NPRM properly proposes to forbear from all rate regulation, a future Commission may not exercise such restraint. And despite that forbearance, the general conduct standard can provide a backdoor to other forms of harmful rate regulation, as the Commission's ultimately unfinished 2016 effort to ban certain forms of zero-rating of data and the NPRM's leading questions about data caps show. Similarly, the Commission would again subject ISPs — but not their thousands of traffic exchange partners — to Title II regulation of peering and traffic exchange agreements, including adjudicating disputes as to whether ISPs' proposed interconnection rates, terms, and conditions are appropriate. The threat of future rate regulation will further undermine ISPs' incentives to continue investing in expanding and improving their broadband networks.

**App. 1108**

In a remarkable departure from the *2015 Order*[6] and earlier Commission precedent, the NPRM also proposes for the first time to require ISPs to get Commission permission under Section 214 before changing or discontinuing legacy broadband offerings.  Because that process is unpredictable and fraught with delay, it will stagnate the current, dynamic, competitive marketplace, diverting resources away from innovative services that customers demand.  And the need for permission to discontinue service will deter ISPs from making initial investments in new areas with new technologies, knowing the Commission might require them to continue offering service even after that speculative investment turned out to be unprofitable.

The Commission's proposal to slam the brakes on — and reverse — the successes of the past six years also arrives just as new technologies and new federal funding for broadband networks employing those technologies are coming online.  The Commission's action is at odds with Congress's decision — despite its awareness of the long-standing net neutrality debate — to appropriate tens of billions of dollars to fund new broadband deployment, adoption, and affordability programs *without* reclassifying broadband as a common-carrier service or authorizing the Commission to do so.  Reclassification will hamper the most effective use of the money Congress has appropriated.

The Commission, however, claims that reclassification and net neutrality rules are necessary to prevent ISPs from engaging in conduct that harms consumers or the internet. Indeed, to justify the degree of regulatory intervention the Commission proposes to inject into a thriving ecosystem, the Commission should have to identify serious problems that its Title II regime would solve.  But the NPRM does not identify a *single* violation — by any ISP, large or

---

[6] Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("*2015 Order*").

**App. 1109**

small — of the bright-line rules the Commission proposes to re-adopt, nor does it claim that current business practices would violate the general conduct standard. Instead, ISPs have stood by their public commitments not to block, throttle, or engage in paid prioritization. Broadband customers demand it, and ISPs' businesses depend on it. That is because competitive alternatives enable customers to abandon any ISP that attempted to interfere with their ability to use the internet. And USTelecom members support Congress enacting legislation that would enshrine those basic rules of the road into law.

Because any threat to the open internet remains a fantasy, rather than fact, the NPRM offers a series of brand-new reasons why the Commission supposedly needs to subject ISPs to Title II, including various national security, cybersecurity, and network resiliency and reliability concerns. Yet the NPRM's proposed reclassification — which is limited to imposing public utility regulation *only* on mass-market, retail ISPs, while leaving the rest of the internet under Title I, as it always has been — would not come close to addressing any of those concerns even if they had substance. The only conclusion is that the NPRM's novel rationales are makeweights.

For example, malevolent actors regularly target national security agencies, the military, law enforcement, critical infrastructure like power companies, airports, and hospitals, and businesses, whether as part of a ransomware attack, terrorism, or to steal trade secrets and other sensitive information. The proposed reclassification and rules will not give the Commission *any* additional national security or cybersecurity authority to respond to those serious threats. That is because it properly (and unequivocally) leaves the enterprise internet access services *those* customers purchase subject to Title I. But the Commission's late entry into this field, in which it has far less expertise than other agencies and with the apparent intent of imposing prescriptive

**App. 1110**

regulations, threatens to upend the existing successful "whole-of-government" approach to security. Expert federal agencies such as DHS already work closely with ISPs and other critical infrastructure companies to combat cybersecurity threats, in a unified — rather than balkanized, sector-specific — approach. This constant public-private collaboration is a model of success, not an area that requires Commission intervention.

Similarly, the NPRM suggests that the Commission should be able to dictate the operation of Border Gateway Protocol ("BGP"). That protocol governs the exchange of packets over routers between the many networks that compose the internet. BGP raises complex issues, involving internet networks around the globe, about which the Commission lacks the necessary technical expertise. Yet because the Commission would tell only the mass-market ISPs it proposes to subject to Title II how to implement BGP — thus leaving most network providers' BGP implementation unregulated — what the Commission envisions is an empty regulatory solution.

The NPRM also suggests a host of new, highly prescriptive rules that undermine assurances that the Commission is proposing "targeted, not heavy-handed" action.[7] For example, the NPRM previews a host of new network resiliency and reliability rules that would include "requirements for network upgrades and changes, rules relating to recovery from network outages, and improving [the Commission's] incident investigation and enforcement authority."[8] These proposals threaten to pile on massive additional compliance costs in addition to the significant expenditures that broadband providers already make to protect their networks from natural disasters and cyber threats. Yet ISPs' responses to COVID-19 and natural disasters have

---

[7] FCC, *Ten Facts About Net Neutrality Protections* at 1, https://bit.ly/3R1wURP.
[8] NPRM ¶ 39.

**App. 1111**

shown the resiliency of existing networks.  The Commission again seeks to impose regulatory solutions in the absence of any demonstrated need for regulation.

In short, the NPRM is a counterproductive distraction from what should be the Commission's overriding policy goal:  ensuring that all Americans have access to quality, reliable broadband.  But even if there were a plausible policy argument for reversing course despite the enormous successes of the past six years, that argument would lack any statutory basis and the Commission's effort will fail in the courts.[9]  As the *2018 Order* explained, broadband internet access is an information service.  It offers each of the capabilities that Congress included in the statutory definition of information service, and Congress has twice expressly identified broadband as an information service.  The regulatory history against which Congress enacted that definition confirms that offering those capabilities makes broadband an information service.  And beyond that, broadband also contains information-processing features such as DNS and caching that remain integral to the customer experience.

Even if a court today were to find statutory ambiguity, it would still reject a Title II classification under the major questions doctrine.  Common-carrier regulation of broadband is certainly a "major question" of vast economic and political significance.  The internet is far too important to the economy and modern life to find that Congress silently intended to give the Commission discretion to subject broadband to a bespoke Title II regime of the agency's own devising.  Indeed, Title II regulation of internet access has been the subject of extensive public and congressional attention in recent decades, including several failed legislative proposals to

---

[9] *See generally* Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine* (Sept. 20, 2023) ("Verrilli & Gershengorn Paper"), https://www.ustelecom.org/wp-content/uploads/2023/09/MajorQuestionsPaper_September2023-1.pdf.

**App. 1112**

expressly confer on the Commission the authority it now claims. The major questions doctrine appropriately assumes that, if Congress meant to take such a controversial action as giving the Commission control over a key engine of the economy, Congress would have said so explicitly. Congress has done nothing of the sort. The Commission's unilateral assertion of authority therefore cannot stand.

In sum, the NPRM proposes a legally unsustainable non-solution to a non-problem. Yet in the time it will take the courts to undo the Commission's unlawful arrogation of regulatory power, the internet and consumers will suffer. The uncertainty the Commission's regime will create will deter investment in new broadband networks. Reduced investment will harm consumers — as will the fact that reclassification will upend the existing, uniform FTC privacy regime that currently applies the same rules to consumer data, no matter what entity holds that data. And the Commission's apparent openness to states adopting their own diverging regulatory regimes for interstate broadband internet access — even while Title II applies — will foster the kind of patchwork regulatory regime that Democratic- and Republican-majority Commissions for decades have recognized harms the continued development of the internet. Rather than waste agency resources on this proceeding, the Commission should focus its attention on addressing actual problems, while leaving intact the light-touch regime that has served consumers so well these past six years.

## II. Broadband Is an Information Service, and the Commission Has No Authority To Classify It as a Telecommunications Service

### A. Broadband Is an Information Service, Not a Telecommunications Service, Under the Plain Text of the Communications Act

Under the Communications Act, the categories of "information service" and "telecommunications service" are mutually exclusive.[10]  Because broadband internet access service meets the statutory "information service" definition, it cannot be a telecommunications service.

#### 1. Broadband Is an Information Service Because It Offers Customers the Capability of Interacting with Information Stored on Computers

**a.** Broadband "offer[s]" each "capability" that Congress enumerated in Section 153(24): "generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."[11]  For example, broadband offers capabilities that enable users to "acquir[e]" and "retriev[e]" information, such as from websites and streaming services.[12]  Broadband likewise offers capabilities that enable users to "stor[e]" their data — such as files and photos — on servers in the cloud.[13]  Broadband also offers users the capability to "transform[]" and "process[]" the information they send, including by

---

[10] *See, e.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 41-42 (D.C. Cir. 2019) (recognizing that the two categories "have been treated as mutually exclusive by the Commission since the late 1990s"); *NARUC v. FCC*, 851 F.3d 1324, 1325 (D.C. Cir. 2017) (per curiam) ("The Communications Act, as amended by the Telecommunications Act of 1996, defines two mutually exclusive categories of communication services: 'telecommunications service' and 'information service.'"); *see also* Report to Congress, *Federal-State Joint Board on Universal Service*, 13 FCC Rcd 11501, ¶ 36 (1998) ("*Report to Congress on Universal Service*").

[11] 47 U.S.C. § 153(24).  *See 2018 Order* ¶ 30; Reply Br. for Fed. Pet'rs at 3, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281) ("FCC *Brand X* Reply") (noting that ISPs "have always been deemed to be solely providers of information services").

[12] *See* Declaration of Peter Rysavy ¶¶ 9-16, 33-38 & fig. 4 (Dec. 7, 2023) ("Rysavy Decl."), https://www.ctia.org/positions/documents/peter-rysavy-declaration.

[13] *See id.* ¶ 3.

translating plain-text URLs into numbers and computer protocols that enable the acquiring, retrieving, and storing of information.[14]  And broadband offers users the capability to "generat[e]" their own information and to "mak[e] [that information] available" to others through the numerous mechanisms that exist for sending content to and sharing content with others, including email and messaging, posting on social media sites, and maintaining the user's own webpage.[15]

Congress recognized as much in another provision it enacted contemporaneously with the statutory definition "information services."  In Section 230, Congress declared that it is "the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other *interactive computer services*, unfettered by Federal or State regulation."[16]  And in so declaring, Congress defined the "interactive computer services" that it wanted to remain "unfettered" by such regulation to include any "information service."[17]  To avoid any doubt, Congress added that such services "includ[e] specifically a service . . . that provides access to the Internet."[18]

The definition in Section 230(f) is neither "oblique" nor "indirect" in setting forth Congress's classification of internet access as an information service.[19]  Section 230 is where Congress articulated its federal policy conclusions about the proper amount of regulation of the internet and internet access services; it is the obvious place for Congress to set forth its

---

[14] *See id.* ¶ 4.

[15] *See id.* ¶ 3.

[16] 47 U.S.C. § 230(b)(2) (emphasis added).

[17] *Id.* § 230(f)(2).

[18] *Id.*; *see also Howard v. Am. Online Inc.*, 208 F.3d 741, 746 (9th Cir. 2000) (treating AOL — an ISP "that provides Internet access" — as an "interactive computer service" under Section 230).

[19] *Cf. U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 703 (D.C. Cir. 2016) ("*USTelecom I*").

**App. 1115**

classification of those services.  Further, Section 230 authorizes ISPs to assist customers in obtaining "commercially available" tools for "limiting access" to lawful but offensive — or "harmful to minors" — content.[20]  It cannot be that Congress both gave broadband providers that authorization to block harmful content *and* permitted the Commission to circumscribe that authorization by classifying broadband as a "telecommunications service" subject to Title II common carriage.[21]

Multiple other provisions of Title II enacted in 1996 along with the "information service" and "telecommunications service" definitions and Section 230, presume that telecommunications services are traditional telephone services only.[22]  The degree of forbearance that the NPRM, like the *2015 Order*, recognizes is required *just to make sense of the regime* if applied to broadband further confirms that broadband is an information service.

In addition to that contemporaneous statutory evidence, Congress also has specifically defined "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet . . . as part of a package of services offered to consumers."[23]  Those are the same capabilities that characterize an "information service" in Section 153.  Further, Congress expressly stated that this "Internet access service . . . does not include telecommunications services."[24]  Congress made these clear pronouncements —

---

[20] 47 U.S.C. § 230(d).

[21] Similarly, in another part of the 1996 Act, Congress granted the Commission some authority to identify measures to address obscene and harassing communications, while simultaneously clarifying that compliance with the Commission's measures shall not be "construed to treat interactive computer services" — again, defined to include internet access — "as common carriers or telecommunications carriers." *Id.* § 223(e)(6), (h)(2).

[22] *See id.* §§ 221 (telephone companies), 251 (ILEC obligations), 271 (interLATA services).

[23] *Id.* § 231(e)(4).

[24] *Id.*

**App. 1116**

internet access service is an information service — in exempting both "telecommunications carrier[s]" and "Internet access service" providers from potential civil penalties for information that third parties distribute over the internet,[25] further confirming that Congress did not consider internet access to be a telecommunications service subject to common carriage.

These neighboring provisions within the Act provide dispositive textual confirmation that broadband offers capabilities that make it an information service. No principle of statutory construction or interpretation could support a reading of broadband to be a "telecommunications service" here, but an "information service" there. Instead, the "normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning."[26]

Furthermore, characterizing broadband as a "telecommunications service" would lead to inconsistencies within the statutory and regulatory scheme. As another commenter reasons, mobile wireless is also immune from common carriage because it unambiguously meets the definition of a Private Mobile Radio Service.[27] And that supports treating wireline, fixed wireless, and satellite broadband as non-common-carrier services, to avoid regulatory inconsistency across competing services offering similar capabilities.[28] In short, classifying broadband as a telecommunications service yields "contradictory and absurd results."[29]

---

[25] *Id.* § 231(b)(1)-(2).

[26] *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (cleaned up).

[27] *See generally* CTIA Comments Part IV.A.2 (Dec. 14, 2023).

[28] *See 2018 Order* ¶ 82; *2015 Order* ¶ 403; Declaratory Ruling, *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd 5901, ¶¶ 48-56 (2007); *see also USTelecom I*, 825 F.3d at 724 (acknowledging "the need to avoid a statutory contradiction" between the treatment of wireline and mobile internet access services).

[29] *2018 Order* ¶ 82.

**App. 1117**

**b.**     The Commission has previously found — and the Supreme Court agreed — that when a user takes advantage of the capabilities that broadband offers to interact with information stored on remote computers — such as "[w]hen an end user accesses a third-party's Web site" — that person is "using the information service provided by the [broadband] company that offers him Internet access."[30]  The concurrence in *Mozilla*, acknowledged that *Brand X* "directly controls" on this issue.[31]  And the NPRM does not seriously address the foregoing offering of capabilities that are inherent in all broadband internet access services.

The Supreme Court's conclusion in *Brand X* is consistent with the history against which Congress enacted the Communications Act's definitions of "information service" and "telecommunication service."  Specifically, Congress carried forward both the pre-Act regime governing the AT&T/Bell breakup (the "Modification of Final Judgment" or "MFJ") that distinguished "information" from "telecommunications" services *and* the pre-Act regime the Commission had created distinguishing between "enhanced" and "basic" services.  Because services like broadband were information services under the MFJ and enhanced services under the Commission's regime, Congress's action confirms its intent to carry forward that classification for all such services.

To start, the 1996 Act's definitions of "telecommunications service" and "information service" draw directly from the MFJ's definitions of "telecommunications" and "information service."[32]  Specifically, the MFJ prohibited Bell companies from offering (without court

---

[30] *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 998-99 (2005).

[31] *Mozilla*, 940 F.3d at 94 (Millett, J., concurring).

[32] *See* First Report and Order and Further Notice of Proposed Rulemaking, *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended*, 11 FCC Rcd 21905, ¶ 99 ("*Non-Accounting Safeguards Order*"); H.R. Rep. No. 104-458, at 115 (1996) (Conf. Rep.) (" 'Information service' and 'telecommunications' are defined based on the definition used in the Modification of Final Judgment.").

**App. 1118**

approval) "information services" — a category that included "gateway functions" providing an "interface or connection point between consumers and [third-party] information service providers."[33]

While the MFJ was in effect, the Bell companies sought a waiver to transmit "information services generated by others," including "teleshopping" and "electronic mail." The supervising court partially granted that waiver but, significantly, rejected a threshold argument that no waiver was even needed because such transmissions were not "information services" in the first place.[34] The MFJ court explained that, to the contrary, such transmissions fell within "any fair reading of the term 'information services'" given "the breadth of the information services definition . . . and the inclusion therein of such terms as 'acquiring,' 'transforming,' 'processing,' 'utilizing,' and 'making available.'"[35] Those capacious terms are the same terms Congress chose to use in the 1996 Act to define an "information service."[36] And as the Commission contemporaneously recognized in its *Report to Congress on Universal Service*, Congress thus carried forward the "gateway functions" definition into the 1996 Act's

---

[33] *United States v. W. Elec. Co.*, 673 F. Supp. 525, 587, 592 (D.D.C. 1987), *aff'd in part, rev'd in part on other grounds, and remanded*, 900 F.2d 283 (D.C. Cir. 1990) (per curiam).

[34] *Id.* at 587, 592, 595.

[35] *Id.* at 587 n.275.

[36] Notably, while the House's definition of "information service" — which ultimately was included in the 1996 Act — closely mirrored the MFJ's definition of that term, *see* H. Rep. No. 104-204, pt. 1, at 46 (1995), the Senate definition was narrower, defining "information service" as "the offering of services that . . . (1) employ computer processing applications that act on the format, content, code, protocol, or similar aspects of the subscriber's transmitted information; (2) provide the subscriber additional, different, or restructured information; or (3) involve subscriber interaction with stored information," S. Rep. No. 104-23, at 79-80 (1995). By choosing the broader House version, Congress removed any possible doubt as to the classification of services that ISPs offer. Indeed, as discussed above, the court enforcing the MFJ had already concluded that "gateway" services — akin to the internet access services that ISPs offer — met the nearly identical definition used in those proceedings.

**App. 1119**

definition of an "information service" as to "functions and services associated with Internet access."[37]

Congress also carried forward into the 1996 Act's definitions of "telecommunications service" and "information service" the Commission's pre-1996 distinctions between "enhanced" and "basic" services. Multiple courts have recognized this. For example, the D.C. Circuit has noted that Congress "borrow[ed] heavily" in the 1996 Act "from" the pre-Act regime's distinction between basic and enhanced services, and that the Communications Act's statutory definitions are the "successor[s]" to the former terms.[38] And the Ninth Circuit has recognized that "information services" is "the codified term for . . . 'enhanced services'" under the pre-1996 regime,[39] and that the 1996 Act reflects Congress's intent "*to preserve*" present regulatory treatment of "the Internet."[40]

"Basic" services included services that, "like telephone service," offered "a pure transmission" capability only[41] — the Commission subjected these to common carriage. In contrast, "enhanced" services included "computer processing" services that "act on the content, code, protocol, and other aspects of the subscriber's information," such as "voice and data

---

[37] *Report to Congress on Universal Service* ¶¶ 21, 75 ("Reading the statute closely, with attention to the legislative history, we conclude that Congress intended these new terms to build upon frameworks established prior to the passage of the 1996 Act. Specifically, we find that Congress intended the categories of 'telecommunications service' and 'information service' to parallel the definitions of 'basic service' and 'enhanced service' developed in our *Computer II* proceeding, and the definitions of 'telecommunications' and 'information service' developed in the Modification of Final Judgment breaking up the Bell system.").

[38] *See USTelecom I*, 825 F.3d at 691.

[39] *AT&T Corp. v. City of Portland*, 216 F.3d 871, 878 (9th Cir. 2000).

[40] *Howard*, 208 F.3d at 752-53 (emphasis added).

[41] *Brand X*, 545 U.S. at 976

**App. 1120**

storage"[42] — these were immune to common carriage.[43]  Prior to the 1996 Act, the Commission consistently gave "enhanced service" a broad construction to include any service that would "involve subscriber interaction with stored information," even if a third party stored that information.[44]  For example, in addressing the Bell companies' request for interim waiver of the *Computer II* requirements, the Commission explained that "[e]nhanced services use the existing telephone network to deliver services that provide more than a basic transmission offering, such as voice mail, E-Mail, electronic store-and forward, fax store-and-forward, data processing, and gateways to online databases."[45]

While the D.C. Circuit has doubted that "Congress intended" the 1996 Act "to freeze in place the Commission's existing classifications of various services," *USTelecom I*, 825 F.3d at 703, that misses the point.  Congress's decision to codify in the 1996 Act the pre-Act regime's *legal standard* for service classification does not invariably determine how that standard applies to any particular service.  When that legal standard is applied to broadband, however, only one outcome is possible: broadband is an information service.

---

[42] *Id.* at 976-77.

[43] *See* Final Decision, *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384, ¶¶ 96-97, 115-123 (1980); *see also Brand X*, 545 U.S. at 976-77.

[44] 47 C.F.R. § 64.702(a); *see also* Memorandum Opinion and Order, *Bell Atlantic Telephone Cos.' Offer of Comparably Efficient Interconnection to Providers of Gateway Services*, 3 FCC Rcd 6045, ¶ 7 (1988); Memorandum Opinion and Order, *North American Telecommunications Ass'n Petition for Declaratory Ruling*, 101 F.C.C.2d 349, ¶ 26 (1985); *see generally* Final Decision, *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384, ¶ 97 (1980); *Non-Accounting Safeguards Order* ¶ 107.

[45] Memorandum Opinion and Order, *Bell Operating Cos.' Joint Petition for Waiver of Computer II Rules*, 10 FCC Rcd 1724, ¶ 1 n.3 (CCB 1995).

**App. 1121**

2.      *Broadband Is Also an Information Service Because It Includes Integrated Information Processing Capabilities*

Even aside from the many capabilities to access and manipulate information stored on remote computers that broadband offers, broadband also is an "information service" because it contains numerous integrated information "processing" capabilities.  The Supreme Court recognized in *Brand X* that these capabilities are information services, and ISPs today continue to offer them to their subscribers as integrated and essential components of broadband service.

*Domain Name System ("DNS")*.  Broadband providers use DNS to facilitate the information retrieval that is fundamental to the use of internet services.[46]  Specifically, DNS enables click-through access from one web page to another by translating language into data and back again for computer processing and information retrieval.[47]  As the Supreme Court explained, in language that is equally true today, "[f]or an Internet user, 'DNS is a must. . . . [N]early all of the Internet's network services use DNS.  That includes the World Wide Web, electronic mail, remote terminal access, and file transfer.'"[48]  In addition, by enabling an extension called EDNS Client Subnet, or "ECS," ISPs can ensure that their DNS servers resolve a user's requests with the optimal response for that particular end user.[49]  And by offering malware protection through DNS, ISPs ensure that customers do not access known harmful sites.

---

[46] *See* Rysavy Decl. ¶¶ 22-23.

[47] *See id.* ¶ 24.

[48] *Brand X*, 545 U.S. at 999.

[49] *See* Rysavy Decl. ¶ 25.  ECS allows an ISP's DNS resolvers to process and transmit a portion of the end user's IP address (the subnet) to authoritative DNS resolvers.  ISPs also separately provide information on the geography associated with the subnet (that is, the general area where the end users on that subnet are located), so that the authoritative DNS resolvers can return an IP address specific to that subnet, which points to content located on a server closest to those end users.  *See id.*

**App. 1122**

Consumers lose those benefits if they switch away from the DNS capabilities that ISPs integrate into their broadband offerings to third-party providers' DNS servers.[50]

The overwhelming majority of ISPs' customers use their ISP's own DNS servers. While Judge Millett's concurrence in *Mozilla* notes that OpenDNS and Google were processing more than 180 billion queries daily as of 2015,[51] *individual* ISPs are today processing *more than one trillion* DNS queries daily.[52] In addition, Google and other "Internet of Things" device manufacturers typically hardcode their own chosen DNS settings into devices, bypassing not only the ISP's DNS but also any contrary choice a consumer might make.[53] The DNS these IoT devices use thus says nothing about how subscribers use DNS when using mass-market broadband service to access the internet and the content they want to access — and in that situation, consumers overwhelmingly rely on the DNS provided by their own ISPs.

In any event, to the extent that a small percentage of consumers opt out of an ISP's DNS, that does not undermine the capability offered.[54] The statutory touchstone when classifying services is the capability "offer[ed]."[55] The federal government previously recognized this, explaining to the Supreme Court that "[t]he Act's definition of 'information service' encompasses the 'offering of a *capability*' for retrieving and utilizing information or engaging in various information-processing activities" and that a "subscriber's choice not to utilize certain capabilities does not eliminate that capability or change the underlying character of the service

---

[50] *See id.* ¶¶ 28-29.

[51] *Mozilla*, 940 F.3d at 90.

[52] *See id.* ¶ 30. The volume of ISP-resolved DNS queries has been *increasing*, not declining.

[53] *See* M. Hammad Mazhar & Zubair Shafiq, *Characterizing Smart Home IoT Traffic in the Wild* 1-2 (2020), arxiv.org/pdf/2001.08288.pdf.

[54] *See* NPRM ¶ 79; *see also Mozilla*, 940 F.3d at 91 (Millett, J., concurring).

[55] 47 U.S.C. § 153(20).

**App. 1123**

offering."[56] Nor does the ability of end users to select different DNS servers mean that ISPs do not integrate DNS into the broadband service they offer. Aftermarket vendors commonly offer consumers the ability to change out integrated features in the products they buy. Such vendors offer customers the ability to replace the radio and speakers or even the engines in cars; the hard drives, RAM, and graphics cards in desktop computers; the hand brakes, seat, and pedals on bicycles; and so on. The existence of those aftermarket options does not mean, for example, that car manufacturers do not integrate radios, speakers, and engines into the cars they offer to consumers.

*Caching.* Broadband providers work closely with content delivery networks ("CDNs") to offer caching capabilities to content providers, which enables the distribution and storage of information closer to end users requesting it.[57] This requires extensive information processing.[58] In *Brand X*, the Supreme Court affirmed as "reasonable" the Commission's finding that internet access service "facilitates access to third-party Web pages by offering consumers the ability to store, or 'cache,' popular content on local computer servers," which qualifies as "the 'capability for . . . acquiring, [storing,] . . . retrieving [and] utilizing information.'"[59] Further, caching works in conjunction with its ECS offering, enabling the ISP to direct customers to the cached content that optimizes their internet experience.[60] Notably, where an ISP sells caching (i.e., a CDN service), that functionality works only for the ISP's own end-user customers.[61] Again, an ISP's

---

[56] FCC *Brand X* Reply at 4.

[57] *See* Rysavy Decl. ¶¶ 17-20.

[58] *See id.* ¶ 19.

[59] 545 U.S. at 999-1000.

[60] *See* Rysavy Decl. ¶ 21.

[61] *See id.* ¶ 28.

**App. 1124**

customers lose the benefits of this integrated offering if they switch to third-party providers, which lack the ability to resolve DNS requests to the cached content.

The NPRM references Judge Millett's concurrence in *Mozilla*, which asserts that "caching has been fundamentally stymied by the explosion of Internet encryption."[62] That is incorrect. Insofar as customers are using their ISP's DNS servers, the ISP will resolve its customers' requests by connecting them with content cached within the ISP's network, whether by the ISP itself or by a third party in cooperation with the ISP.[63] That is true even if the customer is accessing that content by using "HTTPS" — the internet standard for encrypted communications — because the ISP processes the DNS request.[64] While HTTPS is nearly ubiquitous on the internet, it has no effect on the ability of ISPs to optimize their customers' experience by directing them to the closest cached content.[65] The only type of encryption that prevents an ISP from doing so is if the consumer is using a Virtual Private Network ("VPN"), and then only because the VPN integrates its own DNS server that, like all third-party DNS servers, lacks the capability to point customers to the content cached within the ISP's network.[66] A minority of broadband customers currently make use of VPNs, with relatively few using them on a daily basis.[67]

*Systems management exception.* To avoid the conclusion that DNS and caching render broadband an information service, the NPRM tentatively assigns those capabilities, "when

---

[62] 940 F.3d at 87; *cf.* NPRM ¶ 75.

[63] *See* Rysavy Decl. ¶ 21.

[64] *See id.*

[65] *See id.*

[66] *See id.* ¶ 21 n.22.

[67] *See* Michael Kende et al., Analysys Mason, *Evolution of the internet in the U.S. since 2015*, at 26 (Dec. 12, 2023) ("Kende Report"), https://www.analysysmason.com/consulting/reports/internet-evolution-USA-2023 (attached hereto as Exhibit A).

**App. 1125**

provided with BIAS,"[68] to the "telecommunications system management" exception in the definition of "information service." That statutory exception "encompasses those services that would have qualified as 'adjunct-to-basic' under the *Computer II* regime,"[69] and codifies an *identically worded* MFJ exception to the definition of an "information service." And it excludes from the "information service" definition "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service."[70]

There is, however, a fundamental flaw with the NPRM's efforts to invoke this exception: DNS and caching are undeniably information services when offered by third parties (like OpenDNS or Akamai). Despite acknowledging as much, the majority in *USTelecom I* stated it was reasonable for the Commission to conclude that when ISPs offer the very same functions they are engaging in "telecommunications management"[71] — a conclusion the NPRM (¶ 75) now echoes. This gambit fails, however, for the simple reason that the Supreme Court foreclosed it in *Brand X*, explaining that "the relevant definitions do not distinguish facilities-based and non-facilities-based carriers," but rather turn on "capabilities" the provider offers via the service at issue.[72] The same capabilities (DNS and caching) cannot be information services in one context, but not in another.

Further, the telecommunications systems management exception is a poor fit for at least three additional reasons. *First*, the predecessor MFJ's exception applied where a provider of

---

[68] NPRM ¶ 75.

[69] *USTelecom I*, 825 F.3d at 705.

[70] 47 U.S.C. § 153(24).

[71] 825 F.3d at 705-06.

[72] 545 U.S. at 997.

**App. 1126**

information services could show the "adjunct to basic" exception was necessary to enable the provider to clear a path through the company's network without user interaction for the provider's own network management.[73]  Here, by contrast, ISPs do not use DNS or caching to manage their networks, but rather to offer end-user functionalities that are essential to broadband internet access service, as customers know and use it.  DNS is integral to accessing and retrieving internet content — that is, the service ISPs sell and that end users purchase — as well as to improve the customer experience of using the internet to obtain content.[74]  Indeed, accessing websites would be almost impossible without DNS as consumers would have to know the IP address of every website they would want to visit.  *Second*, if DNS were an expendable appendage to broadband (as the NPRM suggests), then DNS *cannot* be part of network management.  End users cannot choose to replace components of an actual network management service without provider input, but that is precisely what consumers can do as to DNS, foreclosing application of the exception.  *Third*, the Commission and courts have made clear for years that this is a "narrow" exemption limited to voice functionalities that "facilitate use of the basic network without changing the nature of basic telephone service."[75]  Here, by contrast, DNS and caching provide access to databases for the purpose of retrieving and storing complex information integral to the broadband service.

---

[73] *See United States v. W. Elec. Co.*, 1989 WL 119060, at *1 (D.D.C. Sept. 11, 1989); Notice, Dep't of Justice, *United States v. Western Electric Company, Inc., and American Telephone & Telegraph Company*; Competitive Impact Statement in Connection with Proposed Modification of Final Judgment, 47 Fed. Reg. 7170, 7176 (Feb. 17, 1982).

[74] *See* Declaratory Ruling and Notice of Proposed Rulemaking, *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd 4798, ¶ 37 (2002) (regarding DNS); *see also* FCC *Brand X* Reply at 5-6 & n.2 (similar).

[75] *E.g.*, Memorandum Opinion and Order, *North American Telecommunications Ass'n Petition for Declaratory Ruling*, 101 F.C.C.2d 349, ¶ 28 (1985).

*3.    Broadband Is Not a Telecommunications Service*

Because broadband is an information service — and the categories of information service and telecommunications service are mutually exclusive — broadband cannot also be a telecommunications service.  Moreover, broadband fails the Communications Act's definition of "telecommunication service" in multiple respects.

The Act defines that phrase as the "offering of telecommunications for a fee directly to the public," with "telecommunications" defined as the transmission "between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[76]  Click-through capabilities, DNS, and caching — each integrated into broadband — are not the transmission of information to points of the end user's choosing.[77]  While the end user — or the end user's applications or Internet of Things device — specifies information the end user wants to retrieve, it is the ISP, through its DNS servers and offering of caching (either directly or in cooperation with third parties) to content providers, that determines the point to which the end user's communication is directed.  As a result, broadband providers will direct different customers seeking the same information to different points, without the customer making any choice at all.  Further, broadband users often receive information *not* "of the user's choosing" — e.g., the display advertising on a web page — and transmissions virtually never occur "without change in the form or content," such as content filtering or video optimization.[78]

The NPRM's remaining arguments that broadband is a "telecommunications service" under the Communications Act are meritless.

---

[76] 47 U.S.C. § 153(50), (53).

[77] *See Brand X*, 545 U.S. at 1000; *see also* FCC *Brand X* Reply at 5.

[78] *See* Rysavy Decl. ¶¶ 34-36 (providing other examples).

**App. 1128**

*First*, the NPRM notes that broadband providers advertise the speed of the services they offer, suggesting that shows consumers perceive broadband to be a telecommunications service.[79]  But advertising neither dictates the statutory classification of a service generally nor does it suggest — in the context of broadband latency specifically — that ISPs are not also "offering" information processing capabilities as part of the service, or even that consumers do not perceive the offering of such capabilities.  ISPs do not regularly advertise those aspects of broadband that offer the capabilities of an "information service" because the public today understands that those capabilities (e.g., the capabilities to "retrieve" content from social media websites and apps or email hosts) are the *point* of the service.  In contrast, when the first ISPs were trying to explain to potential customers what they could do with internet access services, commercials highlighted the information-processing capabilities.[80]  In all events, the Commission bases its assertions about consumer perception, purporting to know the minds of hundreds of millions of U.S. broadband users, on conjecture, not empirical evidence.

*Second*, the NPRM's reliance on the Commission's former regulation of DSL as a "basic" service subject to common carriage rests on a fundamental analytical error.[81]  The Commission did not impose common-carrier regulation on the internet access service that telephone companies and third-party ISPs provided to customers over the last-mile DSL connection running from a customer's premises to the telephone company's network.  Instead, common-carrier regulation only applied to that last-mile, copper-wire connection from the end-user access point to the DSL provider, which legacy common carrier telephone companies sold to

---

[79] *See* NPRM ¶ 19.

[80] *See* AOL Commercial (1998), https://www.youtube.com/watch?v=U80qAYUq6vg (explaining that AOL "is the Internet" and enables customers to use instant messaging, email, key word searches, and parental controls).

[81] NPRM ¶ 69.

**App. 1129**

both unaffiliated and affiliated ISPs.[82]  When an unaffiliated ISP without last-mile facilities

purchased that common-carrier DSL service, it used that service as an input into its own retail

offering of broadband internet access, which was (1) equivalent to what broadband ISPs provide

today and (2) an information service.[83]

*Third*, the NPRM cites Judge Millett's *Mozilla* concurrence, which errantly posits that

broadband cannot be an information service because it facilitates access to some information one

can also access through traditional telephony, which is a telecommunications service.  *See* 940

F.3d at 93.  Traditional telephony is a telecommunication service because its core capability is to

complete person-to-person telephone calls, that is, to provide transmission (and not more)

between specific points of the end user's choosing.  The fact that a consumer can use traditional

telephony to access information services (like voice mail) does not change or override that core

capability.  The core capabilities that broadband offers, in sharp contrast to traditional telephony,

involve interacting with *stored data* on remote computers.  Congress focused on that very

distinction when defining "information service."

---

[82] *See* Memorandum Opinion and Order, *GTE Telephone Operating Cos., GTOC Tariff No. 1, GTOC Transmittal No. 1148*, 13 FCC Rcd 22466, ¶¶ 8-11 (1998) (describing the last-mile DSL service at issue as "an interstate data special access service that provides a high speed access connection between an end user subscriber and an ISP by utilizing a combination of the subscriber's existing local exchange physical plant (*i.e.*, copper facility), a specialized DSL-equipped wire center, and transport to the network interface where the ISP will connect to GTE's network"); Report and Order and Notice of Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 FCC Rcd 14853, ¶ 74 (2005) (describing "a tariffed wireline broadband DSL service that enables . . . independent ISPs" to sell internet access), *pet. for review denied*, *Time Warner Telecom, Inc. v. FCC*, 507 F.3d 205 (3d Cir. 2007); *id.* ¶ 103 (reclassifying as a non-common carrier service DSL sold "as a wholesale input to ISPs"); *id.* ¶ 105 (noting that the FCC, until this order, had "required facilities-based providers of wireline broadband Internet access service to separate out a telecommunications transmission service [i.e., DSL] and make that service available *to competitors* [i.e., third-party ISPs] on a common carrier basis").

[83] *See* Br. for Resp'ts EarthLink et al. at 15-16, 25-26, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281) ("EarthLink *Brand X* Br.").

25

**App. 1130**

Indeed, even when internet access occurred over phone lines (i.e., dial-up service), the phone service remained a telecommunications service — but the internet access service was an information service (even when offered by the same company or an affiliate of the company selling the phone service). The Commission has never classified, and does not now propose to classify, this dial-up internet service (without an integrated last-mile connection) as a "telecommunications service," even though it provides the same end-user function as broadband, i.e., interacting with stored data to retrieve content for delivery to a consumer. It is illogical to classify differently two services offering the same basic functionality from a consumer's perspective, especially when the Commission has emphasized that services should be classified based on the consumer-perceived functions they provide.[84] The Commission cannot have it both ways.

*Finally*, the NPRM asserts that *Brand X* supports the Commission's authority to classify broadband as a telecommunications service.[85] The Commission is wrong to read *Brand X* to hold that the Act is ambiguous as to the proper classification of broadband (whether it is an information service or a telecommunications service), and that the Commission therefore has the authority to decide between those two classifications. But even if the Commission were right, that ambiguity would mean the Commission lacks authority to make the major policy decision to subject broadband to Title II regulation.

*Brand X* involved an effort by ISPs that lacked facilities connecting to end-users' homes to compel cable broadband providers to sell them that connection on regulated terms as

---

[84] *See* NPRM ¶ 11 ("The Commission had determined that consumer perception of broadband Internet access service supported classifying it as a telecommunications service . . . ."); *id.* ¶ 16 ("[C]lassification of BIAS as a telecommunications service represents the best reading of the text of the Act in light of the marketplace reality of how the service is offered and perceived today.").

[85] *See id.* ¶ 81.

**App. 1131**

"telecommunications services."  Importantly, those ISPs (e.g., EarthLink and Brand X) were *not* arguing that their own internet access service was common-carrier "telecommunications service" or that the FCC should classify that service as such.  Instead, they argued,[86] the federal government agreed,[87] and all the Justices accepted that the retail internet access service that they and the cable companies were selling were "information services" under the Communications Act.[88]

Thus, the disagreement in *Brand X* was whether the cable broadband providers *also* offered — in addition to the internet access information service — a *separate* "telecommunications service" in the form of a high-speed transmission link from the cable company's network to a customer's home.[89]  As to that disagreement, the Supreme Court found that "offering" as used in the 1996 Act does not "unambiguously" answer whether cable companies are offering two separate, bundled services — an "information service" (internet access) and a "telecommunications service" (high-speed connection from the customer's house to the cable network across that last mile) — or one, integrated information service (internet access that includes the high-speed connection).[90]

But even if the Commission were correct that *Brand X* found that the Communications Act is ambiguous about the proper classification of broadband internet access service, that

---

[86] *See* EarthLink *Brand X* Br. at 29 (describing the respondents as "independent Internet service providers (ISPs) that are in business to sell information services to residential and business customers").

[87] *See* FCC *Brand X* Reply at 3 (noting that ISPs, like respondents, "have always been deemed to be solely providers of information services").

[88] *See Brand X*, 545 U.S. at 987; *see also id.* at 1008-09 (Scalia, J., dissenting).

[89] *See* EarthLink *Brand X* Br. at 29 (explaining that, as "independent ISPs," the respondents were seeking "to purchase th[at] transmission link" from cable companies to sell their internet access service to customers over those links).

[90] *See Brand X*, 545 U.S. at 989-90 (referring to "common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product").

**App. 1132**

ambiguity would not grant the Commission authority to resolve that ambiguity by classifying broadband as a common-carrier service. That is because, as then-Judge Kavanaugh explained, the "net neutrality rule is a major rule, but Congress has not clearly authorized the FCC to issue the rule. For that reason alone, the rule is unlawful."[91] As explained below, the major questions doctrine provides an equally sufficient basis on which reviewing courts will reject any Commission effort to subject broadband to Title II.[92]

**B.** **To the Extent the Communications Act Is Ambiguous, the Major Questions Doctrine Forecloses Common-Carrier Regulation of Broadband**

*1. Recent Major Questions Doctrine Cases Will Form the Background for Review of the Commission's Title II Order*

A series of recent Supreme Court cases have confirmed that the "major questions doctrine" precludes agency attempts to regulate certain particularly important subjects without an explicit grant of authority from Congress.[93] This doctrine will prevent courts that would otherwise follow *USTelecom* and *Mozilla* in finding the Communications Act ambiguous from construing that ambiguity to allow that the Commission to regulate broadband as a public-utility, common-carrier, telecommunications service. As the Supreme Court explained in *West Virginia*, the major questions doctrine has developed to "address[ ] a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."[94]

To accomplish these ends, the major questions doctrine requires Congress to "speak clearly" if it wishes to assign to an executive agency decisions "of vast economic and political

---

[91] *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 418 (D.C. Cir. 2017) ("*USTelecom II*") (Kavanaugh, J., dissenting from denial of reh'g en banc).

[92] *See generally* Verrilli & Gershengorn Paper.

[93] *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

[94] *Id*. at 2609.

**App. 1133**

significance."[95]  As then-Judge Kavanaugh has explained, "[i]f an agency wants to exercise expansive regulatory authority over some major social or economic activity[,] . . . an *ambiguous* grant of statutory authority is not enough."[96]  Rather, "Congress must *clearly* authorize an agency to take such a major regulatory action."[97]

By imposing this clear-statement rule, the major questions doctrine effectively reverses the presumption under *Chevron* for major rules of vast economic and political significance.[98]  In such cases, statutory ambiguity will not be construed to reflect Congress's implicit delegation of policymaking authority to the agency.  Instead, Congress must clearly authorize the policymaking authority that the agency is seeking to assert, or else the rule is unlawful.

> 2.  *Whether To Regulate Broadband as a Common-Carrier Service Presents a Major Question*

The major questions doctrine forecloses the Commission's proposal to rely on purported ambiguities in the Communications Act to impose common-carrier regulation on broadband because the agency purports to assert authority of "vast 'economic and political significance'" without express authorization from Congress.[99]  In 2017, then-Judge Kavanaugh reached this very conclusion following an extensive analysis of the *2015 Order* under the Supreme Court's major questions doctrine as it existed then.  He correctly recognized that the *2015 Order* was "one of the most consequential regulations ever issued by any executive or independent agency in the history of the United States," that it would "affect every Internet service provider, every

---

[95] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) (cleaned up).

[96] *USTelecom II*, 855 F.3d at 421 (Kavanaugh, J., dissenting from denial of reh'g en banc).

[97] *Id.*

[98] *See* Cass R. Sunstein, *There Are Two "Major Questions" Doctrines*, 73 Admin. L. Rev. 475, 477-78 (2021), administrativelawreview.org/wp-content/uploads/sites/2/2001/11/73.3-Sunstein_Final.pdf.

[99] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

**App. 1134**

Internet content provider, and every Internet consumer," and that "[t]he economic and political significance of the rule is vast," thus bringing it within the scope of the major questions doctrine.[100]

That analysis applies *a fortiori* to the current NPRM.  Canvassing the Supreme Court's major questions cases, then-Judge Kavanaugh identified several factors that required application of the major questions doctrine to the Commission's *2015 Order*.  Each of those factors applies just as well today as it did then.

*First*, the scope of the authority asserted in the NPRM is tremendous.  By subjecting broadband to common-carrier regulation, the proposed rule would "fundamentally transform[] the Internet" by "wrest[ing] control of the Internet from the people and private Internet service providers and giv[ing] control to the Government."[101]  The NPRM's new explanations about the centrality and importance of broadband to all walks of modern society — including national security — merely add to those that then-Judge Kavanaugh cited in *USTelecom II*.  And the Commission's arguments in the NPRM that the pandemic has made broadband service essential to modern life only further underscore the significance of its claimed authority to subject that service to common-carrier regulation.  The Supreme Court has consistently applied the major questions doctrine where an agency asserts such an "unprecedented power over American industry."[102]

*Second*, the proposed rules threaten to upset vested interests throughout the communications industry.  Today, as in 2015, "[t]he financial impact of the rule — in terms of

---

[100] *USTelecom II*, 855 F.3d at 417 (Kavanaugh, J., dissenting from denial of reh'g en banc).

[101] *Id.* at 423.

[102] *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion).

**App. 1135**

the portion of the economy affected, as well as the impact on investment in infrastructure, content, and business — is staggering."[103]  Indeed, the threat (and brief imposition) of Title II on broadband has reduced industry investment by about $90 billion and cost about 215,000 jobs — harms that will be further exacerbated if the Commission adopts the heavy-handed regulatory scheme proposed in the NPRM.[104]  The Supreme Court has consistently found " 'reason to hesitate before concluding that Congress' meant to confer such authority . . . over 'a significant portion of the American economy.' "[105]

*Third*, "Congress has been studying and debating net neutrality regulation for years," and "has considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers."[106]  Congress has entertained, and declined to enact, more than a dozen such proposals.[107]  Most recently, in July 2022, Congress considered and rejected the Net Neutrality and Broadband Justice Act of 2022, which would have amended Section 153(53) of the Communications Act to specify that "telecommunications service" includes "the offering of broadband internet access service."[108]  These bills and their

---

[103] *USTelecom II*, 855 F.3d at 423 (Kavanaugh, J., dissenting from denial of reh'g en banc).

[104] *See* George S. Ford, *Investment in the Virtuous Circle:  Theory and Empirics*, Phoenix Ctr. Pol'y Paper No. 62, at 1 (Dec. 2023) ("Ford Paper"), https://phoenix-center.org/pcpp/PCPP62Final.pdf (estimating that industry investment over the period 2011-2020 has been about $90 billion below expectations, costing the nation about 90,000 information-sector jobs and 215,000 total jobs, as a result of regulatory uncertainty surrounding potential Title II classification of broadband).

[105] *West Virginia*, 142 S. Ct. at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000), and *Utility Air*, 573 U.S. at 324).

[106] *USTelecom II*, 855 F.3d at 423 (Kavanaugh, J., dissenting from denial of reh'g en banc).

[107] *See, e.g.*, H.R. 5252, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); H.R. 5417, 109th Cong. (2006); S. 2360, 109th Cong. (2006); S. 2686, 109th Cong. (2006); S. 2917, 109th Cong. (2006); S. 215, 110th Cong. (2007); H.R. 5353, 110th Cong. (2008); H.R. 5994, 110th Cong. (2008); H.R. 3458, 111th Cong. (2009); S. 74, 112th Cong. (2011); S. 3703, 112th Cong. (2012); H.R. 2666, 114th Cong. (2016); S. 4676, 117th Cong. (2022).

[108] S. 4676, 117th Cong., 2d Sess., § 2 (2022).

**App. 1136**

explicit provisions for common-carrier regulation of broadband indicate that the existing statutory framework does not already authorize such regulation.

And the broadband legislation that Congress *has* passed reflects the same assumption. For instance, in 2021, Congress actually *enacted* the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58), which establishes a framework for broadband that includes low-income and deployment subsidies, consumer protection rules, and price transparency requirements — but it did so without imposing, or even making reference to, Title II regulation. And, in establishing the Broadband Equity Access and Deployment Program, Congress *prohibited* NTIA from imposing rate regulation on the broadband offerings Congress's $42.5 billion appropriation will fund.[109] This congressional record — trying and failing to subject broadband to broad common carriage, and instead establishing a framework for funding and regulating broadband entirely outside of Title II — gives rise to a strong inference that Title II classification goes "beyond what Congress could reasonably be understood to have granted."[110]

*Fourth*, and finally, "[t]he public has also focused intensely on the net neutrality debate," as exemplified by the fact that the NPRM leading to the *2015 Order* generated "some 4 million comments . . . , apparently the largest number (by far) of comments that the FCC ha[d] ever received about a proposed rule."[111] All of the above facts bring the major questions doctrine to bear because "[a] decision of such magnitude and consequence" on a matter of "earnest and

---

[109] Section 60105(h)(5)(D) begins: "No regulation of rates permitted."

[110] *West Virginia*, 142 S. Ct. at 2609.

[111] *USTelecom II*, 855 F.3d at 423 (Kavanaugh, J., dissenting from the denial of reh'g en banc).

profound debate across the country" must "res[t] with Congress itself, or an agency acting pursuant to a clear delegation from that representative body."[112]

Then-Judge Kavanaugh's analysis rejecting the *2015 Order* under the major questions doctrine applies wholesale to the current NPRM, which likewise claims the expansive authority to subject broadband to public utility, common carrier regulation as a telecommunications service. If anything, the current NPRM implicates the major questions doctrine even more directly than the *2015 Order*, which unlike the NPRM did not propose to assert sweeping authority to address national security, cybersecurity, and other wide-ranging issues. Effective implementation of these substantially broader proposals would require the FCC to assert ancillary authority over the *entire* internet, not merely the mass-market, retail broadband services that it proposes to classify as telecommunications services.

Because the NPRM's proposal to regulate broadband as a public utility, common carrier, telecommunications service falls squarely within the major questions doctrine, courts must reject the assertion of such authority unless the Commission can "point to 'clear congressional authorization' for the authority it claims."[113] But the Commission cannot do so. Congress did not clearly delegate the authority to subject broadband to common-carrier regulation. Indeed, the NPRM makes no claim to have found such express authority. The major questions doctrine therefore forecloses the authority the NPRM asserts.

3.    *The NPRM's Efforts To Evade the Major Questions Doctrine Fail*

The NPRM suggests several reasons why the major questions doctrine might not apply, but none of them has merit. *First*, the NPRM (¶ 81) suggests that *Brand X* held that the

---

[112] *West Virginia*, 142 S. Ct. at 2616; *id.* at 2620 (Gorsuch, J., concurring) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006)).

[113] *West Virginia*, 142 S. Ct. at 2595 (quoting *Utility Air*, 573 U.S. at 324).

**App. 1138**

Communications Act confers the authority it claims here. As explained above, it did not. *Brand X* answered a different question, and everyone involved in that case — all the Justices, the Commission, and those challenging and defending the Commission's decision — agreed that internet access is an information service.[114] And for the same reasons, Judges Srinivasan and Tatel were wrong to conclude, in responding to then-Judge Kavanaugh in *USTelecom II*, that *Brand X* addressed "whether the [Commission] clearly has authority under the Act to" subject broadband to common-carrier regulation, let alone that the Court "definitively . . . answered that question yes."[115]

But even if the Commission were correct that, in *Brand X*, the Court held that the Communications Act is ambiguous about the proper classification of broadband, that ambiguity would not give the Commission the authority it has asserted here. As explained above, the major questions doctrine requires clarity, not ambiguity, for an agency to assert authority of vast economic and political significance. And subjecting broadband to common-carrier regulation is a claim of such authority. The Supreme Court's more recent holdings since *Brand X* make clear that in such "extraordinary cases," the agency's asserted authority requires "clear congressional authorization," and a "merely plausible textual basis" for that authority is not enough.[116]

*Second*, the NPRM (¶ 82) also points to the prior common-carrier regulation of the DSL "transmission component" of internet access service. But, as shown above, that requirement was limited to the high-speed, last mile, transmission connection from a customer's premises to the

---

[114] *See* FCC *Brand X* Reply at 3 (noting that ISPs "have always been deemed to be solely providers of information services").

[115] 855 F.3d at 385 (Srinivasan, concurring in denial of reh'g en banc).

[116] *West Virginia*, 142 S. Ct. at 2609. Further, *Brand X* approved a Commission determination that broadband internet access is a single, integrated, information service, and thus did not need to address whether the major questions doctrine would prevent the Commission from subjecting that service to Title II, common-carrier regulation.

telephone company's network — the regulated common-carrier service did not provide access to the internet. Instead, internet access was provided as an information service by a separate company (including affiliates of the telephone company). Common-carrier regulation of DSL thus does not remotely approach, nor even resemble, the power of "vast economic and political significance" that the FCC proposes to assert here.[117]

*Third*, and finally, the possibility that the Commission will forbear from exercising the full extent of its asserted Title II authority does not allow it to escape the major questions doctrine. To begin with, the NPRM already identifies numerous common-carrier regulations that the FCC intends to impose on broadband even with forbearance.[118] But more importantly, the application of the major questions doctrine depends not simply on the direct effects of a challenged rule, but also on the underlying claim of authority, even if not fully exercised. For example, in *West Virginia*, the Court applied the doctrine even though the Clean Power Plan shifted power generation only incrementally, in part because the EPA had asserted the "highly consequential power" to "announc[e] what the market share of coal, natural gas, wind, and solar must be."[119] The Commission therefore cannot evade major questions scrutiny by purportedly "tailoring" an action to make "extravagant" assertions of authority appear more "reasonable."[120]

---

[117] *Utility Air*, 573 U.S. at 324 (cleaned up).

[118] *See, e.g.*, NPRM ¶¶ 164, 156, 176.

[119] 142 S. Ct. at 2609, 2613 n.4; *see also id.* at 2612 ("[O]n this view of EPA's authority, it could go further, perhaps forcing coal plants to 'shift' away virtually all of their generation — *i.e.*, to cease making power altogether.").

[120] *Utility Air*, 573 U.S. at 324-25.

Indeed, the broad extent of the Commission's proposed forbearance — while appropriate as a policy matter, *see infra* Part VII[121] — demonstrates that Congress never intended Title II to apply to a service like broadband. The Commission's attempt to cobble together from Title II a scheme of regulation for the internet is exactly the sort of legislative effort that Congress alone may undertake. And the fact that the current Commission plans to forbear *differently* from how the *2015 Order* exercised that forbearance authority only further underscores how unlikely it is that Congress would have ceded this major policy question to agency discretion. Thus here, as in *West Virginia*, the proposed forbearance "does not so much *limit* the breadth of the Government's claimed authority as *reveal* it."[122]

## III. Reclassification of Broadband as a Telecommunications Service Would Be Arbitrary and Capricious

### A. The NPRM's Reasons for Concluding That Broadband Should Be Regulated as a Title II Service Are Arbitrary and Capricious

#### 1. The NPRM Does Not Identify Any Harms Occurring as a Result of the 2018 Order — Instead, the Internet Continued To Flourish

This rulemaking comes at a time when it is needed the least. Broadband has flourished under the *2018 Order*'s light touch, Title I regime — the regime that has governed broadband for almost the entirety of its existence. Rapidly increasing investment has led to the expansion of coverage and capabilities, and intense competition has resulted in more innovation and lower prices, benefiting consumers.[123] Thanks to the light-touch regime, which propelled investment, America's broadband providers were able to withstand unprecedented challenges of the COVID-

---

[121] Although the NPRM proposes to forbear from most of Title II, it also suggests a host of new regulatory mandates that go well beyond the *2015 Order* and that underscore the vast economic and political significance of the Commission's proposed reclassification. *See infra* Part III.B.

[122] 142 S. Ct. at 2612.

[123] *See* Ford Paper at 7-13 (explaining the "virtuous circle of innovation" that has characterized the internet's growth).

**App. 1141**

19 pandemic and outperform their counterparts in Europe and other countries that have public utility regimes for broadband.

In an attempt to fix what is not broken, the NPRM ignores or minimizes the successes since 2018 and proposes a drastic change that would subject broadband to common-carrier Title II regulation. In seeking to impose such regulation, the NPRM does not identify any instance of any ISP engaging in blocking, throttling, paid prioritization, or other conduct since 2018 that the NPRM's proposed rules would have prohibited. The conspicuous absence of a problem emphasizes that there is no need for the bright-line conduct rules or the general conduct standard that the NPRM proposes.

> *a. The Internet Has Continued To Flourish Since 2018*

The significant growth that broadband providers have achieved on multiple fronts since 2018 showcases the positive effects of the Title I regime and undermines the NPRM's asserted need for change.

**Investment.** Since 2018, private sector investment in broadband has increased dramatically. In 2022, America's broadband industry invested a record $102.4 billion in U.S. communications infrastructure, which represents a 21-year high for investment and a 19% year-over-year increase.[124] Last year alone, investment was $22.4 billion higher than investment in 2018.[125] The rapid investment growth reflects the industry's continuing commitment to advancing connectivity, including by expanding fiber deployments, integrating fiber and mobile

---

[124] USTelecom, *2022 Broadband Capex Report: Broadband Providers Invested $102.4B in Communications Infrastructure Last Year* (Sept. 8. 2023), https://www.ustelecom.org/wp-content/uploads/2023/09/2022-Broadband-Capex-Report-final.pdf.

[125] *Id.*

**App. 1142**

networks, increasing rural broadband construction, and expanding network capacity.[126]  These improvements are making broadband networks faster and more widely available.

Growing investment in broadband in the U.S. stands in sharp contrast to flagging investment in broadband in Europe, which has a prescriptive regulatory system of the type the NPRM proposes to reimpose.[127]  Recognizing that the slowing investment is a problem, EU Commissioner Thierry Breton recently has identified "a dire need to redefine the DNA of the EU's telecom regulations, suggesting loosening the regulation of telecom operators."[128]  In an attempt to find a solution, Mr. Breton has recently proposed to "organize a roundtable with the European financial sector to 'restore the appetite' to invest in the telecommunications infrastructure."[129]  No such restoration is needed in the United States.  Relatedly, the UK's communications regulator (Ofcom) has recently recognized the need to roll back some of the UK's net neutrality rules, which derived from the EU's rules prior to Brexit.  Ofcom noted that the internet "has changed significantly since [the EU's] net neutrality rules were introduced" in 2016, including the development of "large content providers" and "other providers" like Apple and Google that "hold gatekeeper positions and control the content accessed by consumers."[130]

**Cost.**  The amount most consumers are paying for broadband service has decreased, even before accounting for new federal subsidies.  From 2022 to 2023, adjusted for inflation, the price

---

[126] *Id.*; *see also* Declaration of Mark Israel, Bryan Keating & Allan Shampine ¶¶ 60-63 (Dec. 14, 2023) ("Israel et al. Decl.") (attached to NCTA Comments (Dec. 14, 2023)).

[127] *See* Israel et al. Decl. ¶¶ 87-88.

[128] Théophane Hartmann, *Breton's view of EU geopolitics in the telecom sector vis-à-vis China, US*, EURACTIV (Oct. 12, 2023), https://www.euractiv.com/section/digital/news/bretons-view-of-eu-geopolitics-in-the-telecom-sector-vis-a-vis-china-us/.

[129] Mathieu Pollet, *EU finally answers telecom industry's call for help*, Politico Pro (Oct. 27, 2023), https://www.politico.eu/article/telecom-industry-cry-for-help-fall-eu-ears/.

[130] Ofcom, *Net Neutrality Review* 4-5, 18, 33 (Oct. 26, 2023), https://www.ofcom.org.uk/__data/assets/pdf_file/0017/270260/Statement-Net-Neutrality-Review.pdf.

**App. 1143**

of providers' most popular broadband speed tier dropped by 18.1%,[131] and the price of providers' fastest speed tier option dropped by 6.5%.[132] That decrease is consistent with the long-term trend of broadband price decline.[133] Since 2015, real broadband prices have dropped by more than half.[134] The U.S. weighted average nominal price for the most popular speed tiers by subscription has decreased by 37% over the past eight years, and the weighted average price for the fastest speed tiers has decreased by 38.6%.[135] When accounting for inflation, the decreases in real prices for these services are 54.7% and 55.8%, respectively.[136] The declining cost of consumer broadband stands in marked contrast to the rising cost of other essential consumer goods and services, which have increased during the same period by approximately 28%.[137]

    **Speed.** While the cost of broadband has been declining, the speeds customers are receiving have been increasing.[138] Since 2015, the download speeds offered in providers' most popular tier increased by 141.5% while upload speeds increased by nearly 285%.[139] And in the fastest-offered tier, download speeds increased by 117.1% with upload speeds going up by nearly 90%.[140] In fact, U.S. average fixed broadband speeds are now more than 300% faster than they were in 2017.[141] The Commission's data show that the weighted average download speed was

---

[131] Arthur Menko, *2023 Broadband Pricing Index*, USTelecom, https://ustelecom.org/wp-content/uploads/2023/10/USTelecom-2023-BPI-Report-final.pdf ("*2023 Broadband Pricing Index*").

[132] *Id.*

[133] *See* Israel et al. Decl. ¶¶ 65-68 & fig. 13.

[134] *2023 Broadband Pricing Index*; *see also* Israel et al. Decl. ¶ 66.

[135] *2023 Broadband Pricing Index.*

[136] *Id.*

[137] *Id.*

[138] *See* Israel et al. Decl. ¶ 34 & fig. 9.

[139] *2023 Broadband Pricing Index.*

[140] *Id.*

[141] NCTA, *Broadband Facts & Stats*, https://www.ncta.com/broadband-facts.

62.9 Mbps in September 2017.[142] And Ookla reports that the median download speed for fixed broadband in the United States increased from 134.10 Mbps in 2021 to 189.48 Mbps in 2022.[143] In July 2023, the median U.S. download speed was 205.2 Mbps, up from 159.7 Mbps at the same time in 2022.[144] Speeds continue to increase, as evidenced by a median download speed of 215.72 Mbps in October 2023.[145] The combination of rising speeds and declining cost has translated into an approximately 80% drop over the past eight years in the real price per megabit for the most popular and fastest service offerings.[146] As a result of these changes, consumer purchasing power has grown.

**Coverage and Competition.** The broadband marketplace is robustly competitive, and that competition is intensifying as new providers enter the marketplace and existing providers expand and upgrade their networks to compete for customers.[147]

Output has massively expanded: The number of broadband subscriptions has increased significantly since 2017. For example, the number of residential fixed broadband connections with at least 100 Mbps downstream and 20 Mbps upstream increased by approximately 28.9 million users (262%) between the end of 2017 and the end of 2021 (the latest date for which the

---

[142] Engineering & Technology, FCC, *Ninth Measuring Broadband America: Fixed Broadband Report* at 10 (Aug. 2020).

[143] Josh Fomon, *The Speedtest Global Index Shows These Countries Sped Forward for Internet Experience in 2022*, Ookla (Jan. 4, 2023), https://www.ookla.com/articles/global-index-internet-speed-growth-2022.

[144] NCTA, *Broadband Facts & Stats*, https://www.ncta.com/broadband-facts.

[145] Speedtest, *Speedtest Global Index: Median Country Speeds October 2023*, https://www.speedtest.net/global-index.

[146] *2023 Broadband Pricing Index*.

[147] Bryan Keating, *An Economic Analysis of Mobile Wireless Competition in the United States* ¶¶ 6-24; 59-64 (Dec. 11, 2023) ("Keating Paper"), https://www.ctia.org/news/compass-lexecon-competition-report.

**App. 1145**

Commission has released information).[148]  And the number of residential fixed broadband connections with at least 25 Mbps downstream and 3 Mbps upstream increased by more than 33.3 million users (48%) between the end of 2017 and the end of 2021.[149]  According to the Commission's December 2022 Fabric data, 91% of U.S. locations have access to at least one fixed broadband provider offering 100/20 Mbps service, 85% have access to at least one such provider offering 1 Gbps service, and 94% of U.S. locations have access to at least one fixed broadband provider offering at least 25/3 Mbps service.[150]  These increases in output are the hallmark of a competitive market.[151]

Competition has intensified significantly in recent years, leading to more consumer choices and lower switching costs.  As explained above, the industry has been investing, and continues to invest, massively in ramping up fiber deployment.[152]  Verizon, for example, has invested billions in its Fios network, a "wide-scale, all-fiber deployment to bring new broadband competition" that is expected to pass 18 million homes by the end of 2025.[153]  Similarly, AT&T "has already deployed fiber-based broadband to about 24 million locations across 21 states and is

[148] *See* Indus. Anal. Div., Off. of Econ. & Anal., FCC, *Internet Access Services:  Status as of December 31, 2021*, at 23 fig. 25 (Aug. 2023).

[149] *Id.* at 21 fig. 21.

[150] Israel et al. Decl. ¶ 25 & fig. 1.

[151] *See Chicago Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996).

[152] Israel et al. Decl. ¶ 29 ("Providers continue to roll out fiber to new locations, with one report estimating that they would add, in 2023, 'between 6.5 million and 7 million new locations – at a minimum.'") (citing Diana Goovaerts, *Here's how much fiber US operators are planning to build in 2023*, Fierce Telecom (Feb. 24, 2023), https://www.fiercetelecom.com/broadband/heres-how-much-fiber-us-operators-are-planning-build-2023).

[153] *See* Verizon Comments at 3, GN Docket No. 22-69 (Feb. 21, 2023) (citing Verizon, *Fiber Optic Network*, https://www.verizon.com/about/our-company/high-speed-broadband).

**App. 1146**

investing billions annually to connect millions of additional locations."[154]  Brightspeed is

planning to spend $2 billion in private capital to deploy fiber to 50% of its footprint.[155]  And

Consolidated Communications added over 400,000 fiber passings in 2022, with an ultimate goal

of 1.6 million fiber passings.[156]  Other players in this space are also aggressively deploying high-

speed broadband.  For example, Google has recently started rolling out a 20 Gbps fiber

service.[157]  Additionally, 5G fixed wireless access providers are now offering options for home

broadband that compete directly with existing offerings from wireline, cable, and satellite

providers.[158]

And while the NPRM states that "fixed and *mobile* services have not proven to be

substitutable,"[159] it ignores the capabilities that fixed wireless broadband offers, as well as their

increasing popularity and availability.[160]  In fact, 5G fixed wireless access is growing so rapidly

that it accounted for 90% of the net new broadband subscriptions in 2022, compared to only 20%

in 2021.[161]  Roughly 62% of Americans can receive 5G coverage at or above 100 Mbps at

---

[154] AT&T Comments at 2, GN Docket No. 22-69 (Feb. 21, 2023) (citing AT&T, 4Q 2022 AT&T Inc. Earnings Call Tr. (Jan. 25, 2023), https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2022/4Q22/4q22-earnings-t-usq-transcript-2023-01-25.pdf).

[155] Joan Engebretson, *New CEO Shares Brightspeed's Origin Story and How the Company Plans to Invest That $2B in Its Network*, telecompetitor (Dec. 4, 2023), https://www.telecompetitor.com/new-ceo-shares-brightspeeds-origin-story-and-how-the-company-plans-to-invest-that-2b-in-its-network/.

[156] Diana Goovaerts, *Consolidated targets return to revenue growth in '24*, Fierce Telecom (Feb. 28, 2023), https://www.fiercetelecom.com/broadband/consolidated-targets-return-revenue-growth-24.

[157] Nick Saporito, *Try out 20 Gig – tell us how you will use ALL. THAT. SPEED.*, GoogleFiber (May 15, 2023), https://fiber.google.com/blog/2023/05/try-out-20-gig-tell-us-how-you-will-use.html.

[158] Keating Paper ¶¶ 25-33; Israel et al. Decl. ¶¶ 31-34 & fig. 7, 41-47.

[159] NPRM ¶ 128 (emphasis added).

[160] In all events, many consumers rely solely on a mobile broadband subscription.  Israel et al. Decl. ¶¶ 36-40.

[161] *See* Leichtman Rsch. Grp. Press Release, *About 3,500,000 Added Broadband from Top Providers in 2022* (Mar. 2, 2023), https://leichtmanresearch.com/about-3500000-added-broadband-from-top-providers-in-2022/; *see also* Keating Paper ¶ 25; Israel et al. Decl. ¶¶ 31-32 & fig. 7.

**App. 1147**

home.[162]  Further, Starlink and other satellite internet services have been increasing speeds and reducing latency.[163]  Starlink's average download speed increased from 89.38 Mbps to 129.64 Mbps from 2022 to 2023, upload speed increased from 10 Mbps to 15 Mbps, and latency decreased by 10ms.[164]

The Commission's own data show the number of households with access to two or more providers for fixed broadband services at 25/3 Mbps increased from approximately 68% at the end of 2018 to approximately 90% at the end of 2021.[165]  And the number of households with access to two or more providers for fixed broadband services at a speed of or above 100/20 Mbps increased from 51.4% at the end of 2018 to 68.2% at the end of 2021.[166]  That means that most consumers are able to switch between wired, fixed broadband providers even apart from their ability to switch to 5G home broadband services.  And data show that they do switch.  Each year, approximately 20% of fixed broadband customers change providers.[167]

The data above demonstrate that the broadband industry is as competitive as ever.  And while the NPRM asserts that Title II regulation is "critical" to ensuring that "competition can flourish,"[168] it is clear that competition has in fact flourished without Title II.

---

[162] Broadbandnow, *The True State of High-Speed 5g Coverage in the United States: 5G Map*, https://broadbandnow.com/national-5g-coverage-map.

[163] *See* Israel et al. Decl. ¶¶ 41-47.

[164] Jessica Dine & Joe Kane, *The State of US Broadband in 2022: Reassessing the Whole Picture*, Info. Tech. & Innovation Found. (Dec. 5, 2022), https://itif.org/publications/2022/12/05/state-of-us-broadband-in-2022-reassessing-the-whole-picture/; Brian Westover, *Starlink Speed: How Much Faster Is Elon's Satellite Internet in 2023 vs. 2022?*, PC (May 17, 2023), https://www.pcmag.com/news/starlink-speed-tests-2023-vs-2022.

[165] 2022 Communications Marketplace Report, *Communications Marketplace Report*, GN Docket No. 22-203, FCC 22-103, ¶ 57 fig. II.A.28 & Appx. B-2 (rel. Dec. 30, 2022).

[166] *Id.*

[167] *Id.* ¶ 44 (providing monthly churn numbers that annualize to approximately 20%).

[168] NPRM ¶ 3.

**App. 1148**

**Quality.** The progress the U.S. broadband industry has made in recent years is highlighted by the ability of ISPs to withstand the unprecedented challenges of the COVID-19 pandemic and outperform their public-utility-regulated counterparts in other countries. During the pandemic, U.S. fixed broadband download speeds exceeded speeds in the EU and the OECD countries by a wide margin. Based on speed tests conducted from March 2 to June 7, 2020, the U.S. mean download speed was 138 Mbps while the weighted mean download speeds in the EU, EU-4 (Germany, France, Italy, and Spain), and OECD were 102 Mbps, 106 Mbps, and 89 Mbps, respectively.[169] Overall, the global mean download speed was 75 Mbps.[170] The superior performance of U.S. providers is explained by much larger investment in broadband, higher prevalence of fiber and cable networks, and lighter regulations.[171] As a result of this superior performance, American consumers were able to use their internet service for school, work, healthcare, and entertainment at full speed, while regulation-heavy Europe imposed speed limits on services such as Netflix[172] and encouraged users "to make responsible use of the Internet with settings that reduce data consumption."[173]

---

[169] Anna-Maria Kovacs, *U.S. broadband networks rise to the challenge of surging traffic during the pandemic*, Georgetown Univ., at 3 (June 2020), https://georgetown.app.box.com/s/8e76udzd1ic0pyg42fqsc96r1yzkz1jf.

[170] *Id.*

[171] *Id.* at 7-9.

[172] Thomas W. Hazlett, *The Pandemic That Didn't Break the Internet*, City J. (May 7, 2020), https://www.city-journal.org/article/the-pandemic-that-didnt-break-the-internet.

[173] BEREC and European Commission, *Joint Statement from the Commission and the Body of European Regulators for Electronic Communications (BEREC) on coping with the increased demand for network connectivity due to the COVID-19 pandemic* at 1 (Mar. 19, 2020), https://www.berec.europa.eu/en/document-categories/berec/others/joint-statement-from-the-commission-and-the-body-of-european-regulators-for-electronic-communications-berec-on-coping-with-the-increased-demand-for-network-connectivity-due-to-the-covid-19-pandemic; *see also* Josh Taylor, *Australian government asks Netflix and Stan to reduce data to avoid broadband overload*, Guardian (Mar. 20, 2020), https://www.theguardian.com/media/2020/mar/20/australian-government-asks-netflix-and-stan-to-reduce-data-to-avoid-broadband-overload; Israel et al. Decl. ¶ 92; Kende Report at 15.

**App. 1149**

The ability of U.S. broadband providers to outperform their counterparts in other countries is consistent with the U.S. leading the EU on three critical connectivity metrics: consumer broadband infrastructure deployment, broadband adoption, and facilities-based competition.[174] In 2020, fixed broadband coverage in the U.S. of at least 25/3 Mbps was at 91% in rural areas and 98% in all areas, and in the EU, fixed broadband coverage of at least 25/3 Mbps was at 60% in rural areas and 87% in all areas.[175] With respect to adoption, 92% of U.S. households in 2020 had a fixed broadband subscription, while only 77% of EU households had such subscriptions.[176] And 95% of households in all U.S. areas and 83% in U.S. rural areas had two or more facilities-based competing providers, while, in the EU, only 45% of households in all areas and 11% in rural areas did.[177]

These successes — largely achieved in the absence of Title II regulation — emphasize that the rules the NPRM proposes were not needed for broadband to flourish and are not needed for it to continue to grow and offer American consumers a world-leading service.

> b.    *The NPRM Does Not Identify Any Harms Occurring as a Result of the 2018 Order*

The NPRM's inability to identify any action in recent years by any ISP that the proposed net neutrality rules would have prohibited emphasizes that these rules remain a solution in search of a problem. In reality, ISPs have no economic incentive to engage in blocking, throttling, or

---

[174] USTelecom, *US vs. EU Broadband Trends 2012-2020*, https://www.ustelecom.org/wp-content/uploads/2022/04/USTelecom-US-EU-Broadband-Trends-2012-2020.pdf.

[175] *Id.* at 3; *see also* Israel et al. Decl. ¶ 89 & fig. 14.

[176] USTelecom, *US vs. EU Broadband Trends 2012-2020*, at 7, https://www.ustelecom.org/wp-content/uploads/2022/04/USTelecom-US-EU-Broadband-Trends-2012-2020.pdf.

[177] *Id.* at 5.

**App. 1150**

paid prioritization, and do not engage in them. Additionally, ISPs' ability to engage in such conduct is severely limited by other market players.

**Economic Incentives.** ISPs have strong economic incentives to ensure that their subscribers can reach the content they seek. Broadband as a business is characterized by enormous sunk costs and comparatively low incremental (per-customer) costs, which creates intense competition for consumers.[178]

In particular, it costs much more for an ISP to deploy broadband facilities to a geographic area — which typically requires buying fiber and electronic equipment and then paying work crews to deploy it — than to serve individual customers in that area once the network is up and running. As a result, broadband rivals have strong incentives to compete fiercely to gain and retain customers even as prices fall because, whenever they lose a customer, they save minimal costs but lose significant revenues.[179] It is for precisely this reason that the Commission has concluded that even two competitors can be sufficient to ensure effective competition.[180] This economic dynamic keeps every broadband provider intensely focused on keeping its customers satisfied — and thus on meeting customer expectations for full access to the open internet. Indeed, a Consumer Reports survey indicates that "71% of U.S. households would switch" to a competing ISP if "their provider were to try to block, slow down," or impose other restrictions

---

[178] Israel et al. Decl. ¶¶ 48-50.

[179] *See id.* ¶ 49; *accord* Timothy J. Tardiff, *Changes in Industry Structure and Technological Convergence: Implications for Competition Policy and Regulation in Telecommunications*, 4 Int'l Econ. & Econ. Pol'y 109 (2006); Dennis L. Weisman, *When Can Regulation Defer to Competition for Constraining Market Power? Complements and Critical Elasticities*, 2 J. Competition L. & Econ. 101, 102 (2007) ("[P]rice increases that produce even small reductions in demand can generate large losses in contribution to joint and common costs because the firm's revenues decline much more than the costs it can avoid. It is in this manner that high margins can serve to discipline the [de]regulated firm's pricing behavior.").

[180] Report and Order, *Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459, ¶ 120 (2017) ("*Business Data Services Report*").

on the content they sought.[181]  A rational provider would therefore not engage in the conduct the NPRM's bright-line rules and general conduct standard seek to prohibit.

In addition, it is recognized that "acquiring a new customer is anywhere from five to 25 times more expensive than retaining an existing one."[182]  And the real prospect of existing customers switching to a new provider presents a significant threat to an ISP's business.  ISPs' practices confirm this.  For instance, the availability of discounts to customers, often offered through "save desks," shows broadband companies' efforts to retain customers.[183]  Recognizing consumers' ability to easily switch to a different provider and the detriment that would cause to their existing provider, *Consumer Reports* recommends "threaten[ing] to go to a competitor," for example, as a way of obtaining a discount from a broadband company.[184]

The competition that USTelecom's ISP members face can come from multiple directions. Foremost, USTelecom's members frequently deploy networks in competition with incumbent cable companies.  To be able to compete with the cable companies and win customers requires the ability to offer a superior alternative, such as end-to-end fiber.  In many areas, ISPs also face

---

[181] *71% of U.S. households would switch from providers that attempt to interfere with Internet*, Consumer Reps. (Feb. 18, 2014), https://www.consumerreports.org/cro/news/2014/02/71-percent-of-households-would-switch-if-provider-interferes-with-internet-traffic/index.htm; *see also* Israel et al. Decl. ¶ 70.

[182] Amy Gallo, *The Value of Keeping the Right Customers*, Harv. Bus. Rev. (Oct. 29, 2014), https://hbr.org/2014/10/the-value-of-keeping-the-right-customers.

[183] Nicholas Maechler et al., McKinsey & Company, *From touchpoints to journeys: Seeing the world as customers do* (Mar. 4, 2016), http://www.mckinsey.com/capabilities/growth-marketing-and-sales/our-insights/fromtouchpoints-to-journeys-seeing-the-world-as-customers-do#/ ("In economic terms, a retained customer delivered significantly greater profitability than a newly acquired customer over two years.  Churn, due to pricing, technology, and programming options, was an increasingly familiar problem in this hypercompetitive market.  So was retention.  The common methods for keeping customers were also well known but expensive — tactics like upgrade offers and discounted rate plans, or 'save desks' to intercept defectors."); *see also* Israel et al. Decl. ¶ 70.

[184] *CR's Guide to Getting Better Internet Without Busting Your Budget*, Consumer Reps. (July 13, 2021), https://www.consumerreports.org/internet/getting-better-internet-without-busting-your-budget/.

**App. 1152**

competition from other fiber broadband providers or municipal broadband networks. They also face competition from 5G mobile services. New 5G fixed wireless offerings provide a competitive alternative to all of these wireline offerings, and customers are increasingly relying solely on wireless connectivity for their broadband needs.[185] Recognizing the threat that 5G fixed wireless poses, cable companies are already running ads urging customers not to switch.[186]

Unable to identify evidence of any relevant market failure, the NPRM resorts to an abstract "gatekeeper" economic theory that has no practical application in the broadband context. Eschewing a factual analysis based on over two decades of real marketplace experience, the NPRM instead theoretically speculates that each ISP, no matter how small, possesses "gatekeeper" power over the entities seeking access to its end users.[187] As used here, the term "gatekeeper" is shorthand for the concept of a "terminating access monopoly,"[188] which refers to the putative "monopoly" that any broadband provider, large or small, supposedly derives from its ability to provide the "service" of terminating traffic to its own subscribers. These concepts are meaningless in the broadband context and provide no basis for the proposed rules.[189]

The "terminating access monopoly" concept first arose in the 1990s and early 2000s when small competitive local exchange carriers ("CLECs") began assessing inefficiently high terminating access charges on interconnecting interexchange carriers ("IXCs") for the delivery of

---

[185] Keating Paper ¶¶ 25-33.

[186] *See* iSpot.tv, *XFINITY TV Spot, 'We've Become Nocturnal' Featuring Judy Greer* (Oct. 27, 2022), https://www.ispot.tv/ad/2ByJ/xfinity-weve-become-nocturnal-featuring-judy-greer; *see also* Xfinity, *Connect 4x as many devices with Xfinity over T-Mobile Home Internet*, https://www.xfinity.com/compare/xfinity-vs-t-mobile-5g-home-internet; Israel et al. Decl. ¶ 71.

[187] NPRM ¶¶ 123, 151.

[188] *See 2015 Order* ¶ 80 n.130; *see also* Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905, ¶ 24 & n.66 (2010).

[189] *See* Israel et al. Decl. ¶¶ 51-57.

long-distance calls. Because the IXCs did not have a direct relationship with the called party, they had no means of passing on termination fees to those customers to constrain CLECs' behavior.[190] And because CLECs were new entrants with small market shares, some speculated that they could impose these excessive charges only because of a market failure associated with their "bottleneck" control of access to their end users.[191] As the Commission ultimately acknowledged, however, this "CLEC access charge" problem arose not from a market failure, but from the application of Title II regulation itself — specifically, from tariffing, mandatory interconnection, and geographic-averaging requirements.[192]

The broadband marketplace, however, is not susceptible to the same phenomenon for at least two independent reasons. *First*, no broadband ISP can "tariff" the "service" of providing access to its end users, and no backbone or other third-party network has any regulatory obligation to interconnect with any ISP, let alone pay whatever rates the ISP might wish to charge for access to its users.[193] And if an ISP imposed unreasonable interconnection fees or compromised its customers' access to tech companies' content, those companies would have

---

[190] *Id.* ¶ 52.

[191] Noel D. Uri, *Monopoly power and the problem of CLEC access charges*, 25 Telecomms. Pol'y, 611, 613 (2001).

[192] *See* Seventh Report and Order and Further Notice of Proposed Rulemaking, *Access Charge Reform*, 16 FCC Rcd 9923, ¶ 1 (2001) ("[W]e limit the application of our tariff rules to CLEC access services in order to *prevent use of the regulatory process* to impose excessive access charges[.]") (emphasis added). In particular, the Commission's Title II rules (i) entitled a CLEC to tariff its termination rates unilaterally; (ii) compelled IXCs to interconnect with the CLEC and hand off all terminating traffic bound for its customers; and (iii) required those IXCs to pay the tariffed termination rates in the process, no matter how objectionably high they might be. In addition, Section 254(g) precluded these IXCs not only from sending the bill to the called parties (i.e., to the CLEC's end users), but also from passing the inflated termination charges through to the specific calling parties who placed these particular calls. The net result of these Title II regulations was to make the CLECs' subscribers completely indifferent to the level of these termination charges — and thus to preclude any market response to them. *See* Israel et al. Decl. ¶ 52.

[193] *See* Israel et al. Decl. ¶ 53.

ample competitive responses: for example, they could pass the fees through to their customers on an explicitly ISP-specific basis or inform their customers that specific ISPs are degrading their access to content.[194]  And because of the intense competition in the broadband market, customers would be able to — and would likely — switch to an alternative broadband provider if that were to happen.

*Second*, robust competition in the peering and transit marketplaces, combined with multiple points of entry into any ISP's network, ensure that any application or content provider can reach any ISP's customers on fair and efficient terms by interconnecting either directly or indirectly with the ISP (e.g., via the ISP's own peers or transit partners).[195]  Those dynamics deprive any ISP of the market power necessary to discriminate anticompetitively against any application or content provider.

The increased competition since 2018, accompanied by the continued increases in broadband deployment and speed, as well as cost declines, all confirm that ISPs' incentive is to win more customers.  Degrading the user experience by, for example, blocking or throttling content would contradict that objective.  The NPRM's failure to identify any instances of such undesirable conduct in recent years is therefore unsurprising because ISPs have no economic incentive to engage in it.

**Power of Big Tech.**  While the NPRM repeats the old claims about ISPs having "the incentive and ability to engage"[196] in harmful conduct, it ignores marketplace changes that severely limit that theoretical ability (if it ever existed).  The internet of today contains numerous

---

[194] Given the enormous power enjoyed by many application or content providers, they could also discipline any broadband provider that sought to impose unreasonable fees by threatening to no longer deliver content to the providers' customers due to those charges.  *See id.*

[195] Kende Report at 6-9; Israel et al. Decl. ¶¶ 54-57.

[196] NPRM ¶ 126.

Big Tech companies, such as Apple, Alphabet, Amazon, Meta, TikTok, and Netflix. Those global companies have larger customer bases and larger market capitalization than any ISP. And they are far more likely to have the power to dictate terms to ISPs than ISPs are to them.

For example, Comcast, one of the country's largest wireline broadband providers, has approximately 32.3 million domestic broadband customers,[197] Verizon has 10.3 million fixed broadband subscribers,[198] and AT&T has over 8 million fiber subscribers.[199] By contrast, Apple has 135.97 million iPhone users in the United States alone, and millions more throughout the globe.[200] In 2022, YouTube had 25.5 million paying subscribers in the U.S. alone and hundreds of millions watching its ad-supported videos.[201] Facebook has 243.5 million domestic users, and TikTok has 150 million users in the United States.[202] As to market capitalization, Meta's market capitalization exceeds $800 billion, while Alphabet's exceeds $1.7 trillion.[203] In comparison,

---

[197] Comcast, *Comcast Report 2nd Quarter 2023 Results* (July 27, 2023), https://www.cmcsa.com/news-releases/news-release-details/comcast-reports-2nd-quarter-2023-results.

[198] Verizon, *Verizon reports strong 3Q results momentum, raises free cash flow guidance* (Oct. 24, 2023), https://www.verizon.com/about/news/verizon-reports-strong-3q-results-momentum-raises-free-cash-flow-guidance.

[199] AT&T, AT&T 3Q23 Highlights (2023), https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2023/3q-2023/3Q23_Highlights.pdf.

[200] Rohit Shewale, *32 iPhone User Statistics: Sales, Usage & Revenue (2023)*, Demandsage (Sept. 25, 2023), https://www.demandsage.com/iphone-user-statistics.

[201] Statista, *Number of YouTube Premium subscribers in the United States from 2020 to 2024*, https://www.statista.com/statistics/1261865/youtube-premium-subscribers/.

[202] Rohit Shewale, *68 Facebook Statistics – Users, Revenue & AI Usage (2023)*, Demandsage (Aug. 11, 2023), https://www.demandsage.com/facebook-statistics/; *46 TikTok Statistics In 2023 (Users, Creators and Revenue)*, Wallaroo (Nov. 22, 2023), https://www.demandsage.com/tiktok-user-statistics/.

[203] Companies Market Cap, Meta, https://companiesmarketcap.com/meta-platforms/marketcap/; and Alphabet, https://companiesmarketcap.com/alphabet-google/marketcap/ (last visited Dec. 8, 2023).

**App. 1156**

Comcast's market capitalization is approximately $165 billion, Verizon's market capitalization approximately $160 billion, and AT&T's about $120 billion.[204]

The Big Tech giants effectively function as the gateway to information on the internet, affecting what users see when they search for information, shop for goods, seek out news, and look for entertainment options. The Big Tech companies' algorithms — and the choices they make about what information to promote and what information to demote — affect which content users see and, thereby, influence where they go on the internet.[205] Indeed, while the NPRM lacks any examples of ISPs engaging in blocking or throttling, social media companies have reportedly been caught throttling user-posted links to other, competing platforms.[206] Additionally, Apple has slowed down the processors in its older devices with software updates.[207] Samsung imposed "performance limits" on approximately 10,000 apps, including Netflix and Google Keep.[208] And Google blocked YouTube from Amazon devices.[209] A Title II

---

[204] Companies Market Cap, Comcast, https://companiesmarketcap.com/comcast/marketcap/; Verizon, https://companiesmarketcap.com/verizon/marketcap/; and AT&T, https://companiesmarketcap.com/att/marketcap/ (last visited Dec. 8, 2023).

[205] Sang Ah Kim, *Social Media Algorithms: Why You See What You See*, 2 Geo. L. Tech. Rev. 147 (2017), https://perma.cc/J3LD-DX2H; Editorial Bd., Opinion, *Social media algorithms determine what we see. But we can't see them*, Wash. Post (Aug. 9, 2021), https://www.washingtonpost.com/opinions/2021/08/09/social-media-algorithms-determine-what-we-see-we-cant-see-them/; Dorcas Adisa, *Everything you need to know about social media algorithms*, Sproutsocial (Oct. 30, 2023), https://sproutsocial.com/insights/social-media-algorithms/.

[206] *E.g.*, Simon Hurtz, *X continues to throttle links to competitors*, Verge (Sept. 15, 2023), https://www.theverge.com/2023/9/15/23875251/x-twitter-links-throttling-facebook-instagram-threads.

[207] Samuel Martinez, *I wish we didn't have to worry about smartphone companies throttling our devices*, pocketnow (Mar. 31, 2022), https://pocketnow.com/i-wish-we-didnt-have-worry-about-smartphone-companies-throttling-our-devices/.

[208] Darryl Boxberger, *Samsung is throttling the performance of over 10,000 apps*, Apple Insider (Mar. 2, 2022), https://appleinsider.com/articles/22/03/02/samsung-is-throttling-the-performance-of-over-10000-apps.

[209] Jeffrey Dastin, *Google pulls YouTube from Amazon devices, escalating spat*, Reuters (Dec. 5, 2017), https://www.reuters.com/article/us-amazon-com-tech-alphabet/google-pulls-youtube-from-amazon-devices-escalating-spat-idUSKBN1DZ37O/.

**App. 1157**

reclassification would do nothing to address these issues, as it will not apply to Big Tech companies. The NPRM's proposal to re-adopt numerous aspects of the *2015 Order* makes no attempt to grapple with the very different marketplace dynamics that exist today.

**Externalities.** Supposed "externalities"[210] likewise cannot justify reclassification. Most internet services — indeed, innumerable goods and services in our economy generally — produce substantial externalities without triggering any need for regulation. Obvious examples include the network externalities associated with LinkedIn's social network, the Apple and Google/Android app stores, and Microsoft's desktop operating system and office productivity software.

There is no legitimate economic basis for suggesting that common carrier-type regulation is needed to protect or enhance these externalities.[211] For example, no one proposes requiring Microsoft to make its Office productivity software more interoperable with alternative word-processing and spreadsheet programs. And no U.S. policymaker seriously proposes a prescriptive scheme of regulation to determine how Apple and Google/Android should vet and arrange unaffiliated apps within their respective app stores, which together account for nearly 100% of app downloads in smartphones today.[212] There is no stronger "externalities" case to be made for regulating broadband ISPs, which is why the internet has succeeded in creating incalculable public benefits without such regulation.

**State Laws.** The NPRM suggests that it is because of the few state net neutrality laws — not competition and the incentives ISPs have to serve their customers — that there are no

---

[210] NPRM ¶ 123.

[211] *See* Israel et al. Decl. ¶ 58.

[212] David Curry, *App Store Data (2023)*, BusinessofApps (May 15, 2023), https://www.businessofapps.com/data/app-stores/ ("Outside of China, Apple and Google control more than 95 percent of the app store market share through iOS and Android, respectively.").

**App. 1158**

examples of actions that the Commission's proposed rules would prohibit.[213]  But few states enacted net neutrality laws after the *2018 Order*,[214] and there is no record of such actions in the states that did not enact their own net neutrality laws.  Most of the state laws that were enacted either have not been enforced or have not gone beyond the voluntary commitments that marketplace competition led ISPs to make to their consumers.  All of this casts serious doubt on the NPRM's suggestion that state laws are the reason for the lack of blocking, throttling, and paid prioritization during the relevant period.

California's net neutrality law stands out, in that it includes a prohibition on many forms of "zero-rating."[215]  As a result, consumers in California lost access to free data that was available to consumers in other states.[216]  The prohibition harms consumers because it deprives them of free socially valuable services.

At bottom, blocking, throttling, and paid prioritization were not issues after the Commission's brief Title II classification was reversed.  That was not because sporadic state net neutrality laws filled any gap in federal regulation, but rather because (as the *2018 Order* concluded)[217] it is in ISPs' interest not to engage in such conduct.

      2.    *The General Conduct Standard Is Not Needed and Will Harm Innovation*

The NPRM's proposal to re-adopt the *2015 Order*'s general conduct standard, which "would prohibit practices that unreasonably interfere with or disadvantage consumers or edge

---

[213] *See* NPRM ¶ 129.

[214] *See* Nat'l Regul. Rsch. Inst., *Net Neutrality Tracker* (Oct. 1, 2018), https://www.naruc.org/nrri/nrri-activities/net-neutrality-tracker/.

[215] S.B. 822, 2017-2018 Reg. Sess. (Cal. 2018).

[216] Roslyn Layton, *The Economics of California's Net Neutrality Law*, Forbes (Feb. 25, 2021), https://www.forbes.com/sites/roslynlayton/2021/02/25/the-economics-of-californias-net-neutrality-law/?sh=5ae8a6d27886.

[217] *2018 Order* ¶¶ 263-265.

providers,"[218] is no more necessary than the bright-line rules. Broadband providers have no economic incentives to harm application or content providers.[219] And the adoption of the general conduct standard threatens severe and negative consequences. The vague standard will hinder innovation and new offerings by increasing regulatory uncertainty and impeding investment.[220]

To begin with, in stating what the general conduct standard would prohibit, the NPRM leaves "unreasonably interfere" and "disadvantage" — the key terms — undefined. That gives broadband providers "no principle for determining" what conduct this Commission (or a future Commission) might decide violates the rule.[221] That concern is particularly severe because these terms have "no settled usage or tradition of interpretation in law" in the broadband context.[222] And legacy telephone-era Section 201 and Section 202 precedents applying these terms will be of little value to determining whether broadband network management practices "unreasonably interfere with or unreasonably disadvantage" application or content providers in their dealings with customers or vice versa. Unsurprisingly, when first promulgating the general conduct standard in the *2015 Order*, then-Chairman Wheeler stated that he "d[idn't] really know" what conduct the rule prohibited.[223]

The "case-by-case approach [to enforcement] that would consider the totality of the circumstances when analyzing whether conduct satisfies the standard"[224] will leave ISPs with no

---

[218] NPRM ¶ 164.

[219] *See* Ford Paper at 6-12.

[220] *See 2018 Order* ¶¶ 164-165; *see also* Israel et al. Decl. ¶¶ 74-80.

[221] *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1049 (1991).

[222] *Id.*

[223] FCC, February 2015 Open Meeting Press Conference of Chairman Tom Wheeler (Feb. 26, 2015), http://www.fcc.gov/events/open-commission-meeting-february-2015 (165:30-166:54).

[224] NPRM ¶ 166.

**App. 1160**

reasonable avenue to determine whether a new offering would satisfy the Commission. And the non-exhaustive list of seven factors the NPRM sets forth to aid the analysis does nothing to clarify what conduct would or would not satisfy the standard. If anything, those factors, which include considerations of "end-user control," "effect on innovation," and "free expression," compound the problem by introducing further confusion while providing no meaningful guidance. The non-exhaustive nature of the list adds to the uncertainty, as does the lack of guidance on how the Commission would weigh the known and unknown factors against one another.[225]

The D.C. Circuit's prior decision upholding the general conduct rule against a vagueness challenge was wrongly decided. That court failed to follow its own precedent when it concluded that the general conduct standard was sufficiently distinguishable from a vague SEC rule. The general conduct standard bears the same characteristics — and suffers from the same Due Process concerns — that the SEC rule the *Timpinaro* court was concerned about. In *Timpinaro*, the challenged rule defined "professional trading account" through seven open-ended factors that themselves contained vague terms, such as "*excessive* frequency of short-term trading."[226] In remanding, the court emphasized that the "uncertainty facing a [regulated party] . . . is all the greater when [open-ended factors] are considered in combination, according to some undisclosed system of relative weights."[227]

Just like the rule in *Timpinaro*, the general conduct standard contains several vague terms, such as "unreasonably" and "interfere," the meaning of which, like the meaning of the SEC

---

[225] *See Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993).

[226] *Id.* at 460 (emphasis added).

[227] *Id.*

rule's "excessive," remains "a mystery."[228]  And just like that rule, the NPRM does not explain the relative weight of the factors that the Commission will consider in deciding whether a practice violates the general conduct standard — worse, it does not even name all the factors that would be considered.  The *USTelecom* court's claim that the general conduct standard was proper because it was "adopted to complement the bright-line rules [and] help[ed] delineate the contours of the proscribed conduct" is unpersuasive.  The general conduct standard does not "complement" the bright-line rules, nor is it confined to the conduct those rules target — it expands them indefinitely, making it easy for the Commission to find a violation in nearly any practice while providing broadband providers with no certainty that any given practice would be deemed proper.  Through that vague standard, the Commission may venture into regulation of nearly every aspect of broadband, from data usage limits to cybersecurity practices.  And broadband providers will have no meaningful way of knowing how to predict the Commission's actions or evaluate its own initiatives.

Without certainty, broadband providers will be less likely to innovate and invest in innovation, sticking instead to old practices and old offerings that seem to have cleared the bar.[229]

---

[228] *Id.*

[229] *See* Doug Brake, Info. Tech. & Innovation Found., *What Financial Data Shows About the Impact to Title II on ISP Investment* (June 2, 2017), https://itif.org/publications/2017/06/02/what-financial-datashows-about-impact-title-ii/ ("Not only did the Open Internet Order take potential business models off the table, and throw others into uncertainty under the Internet Conduct Standard, it represents the first step down the slippery slope to more onerous utility regulations, such as network unbundling requirements or price regulation."); Kevin A. Hassett & Robert J. Shapiro, Georgetown Ctr. for Bus. & Pub. Pol'y & NDN, *Regulation and Investment: A Note on Policy Evaluation under Uncertainty, With an Application to FCC Title II Regulation of the Internet* at 21 (July 14, 2015) ("Hassett & Shapiro"), https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=dc03ae80ddb93f0ef6c1c71c393dcc148e800ae3 ("[W]e found that the negative effects on investment may well be significantly understated by these factors because the new regulation's threshold effect will maximize the negative effects of uncertainty."); *see also* Ford Paper at 12 (stating that "[b]road 'catch all' provisions, such as the General Conduct Rule adopted in the *2015 Open Internet Order* and again proposed in the *2023 NPRM*, are certain to cause concern" with respect to investment).

**App. 1162**

The NPRM's statement that it seeks comment on "whether elimination of the general conduct rule has resulted in new innovations which would not have been permissible under the general conduct rule"[230] is meaningless because, just like former Chairman Wheeler, broadband providers "don't really know" what conduct would be prohibited under the standard.

On the other hand, in the short life of the general conduct standard, the Commission invoked it to criticize consumer-benefiting innovative services and, in the process, chill innovation generally. Shortly after the *2015 Order*, Commission's Wireless Telecommunications Bureau issued a policy review condemning the use of zero-rating by mobile ISPs, a practice in which the mobile provider exempts certain content from data allowances in wireless plans that have them.[231] It did so even though this practice was indistinguishable from a bundled discount: it is simply a price concession that enables consumers to use more data at lower effective rates and thus intensifies both video and mobile competition. The agency thus invoked the general conduct standard as a tool to second guess practices that *lowered* prices to consumers. And, as discussed below, the NPRM strongly suggests that the Commission will rely on the general conduct standard as a basis for regulating certain data plans that allow ISPs to offer lower-priced data services than they otherwise could.[232] There can be no dispute that the potential for liability under such a vague standard will deter investment and innovation.[233]

---

[230] NPRM ¶ 167.

[231] FCC, *Wireless Telecommunications Bureau Report: Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero-Rated Content and Services* (Jan. 11, 2017), https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0111/DOC-342987A1.pdf.

[232] NPRM ¶ 156.

[233] Israel et al. Decl. ¶¶ 77-79.

Finally, the NPRM's proposal to reinstate the advisory opinion process does not eliminate the problem that the general conduct standard creates.[234]  Such a mother-may-I regime epitomizes the NPRM's bureaucratic overreach.  Indeed, it is hard to imagine a regulatory process more conceptually hostile to the spirit of permissionless innovation at the heart of the modern internet economy.[235]  The need to seek permission in advance would also harm competition by requiring a provider to give its rivals a public heads up before launching innovative services, thereby weakening its incentives to offer those services in the first place.[236]

Unsurprisingly, the *2015 Order*'s "mother-may-I" advisory process never worked.  It was inadequate in key respects that the NPRM does not address.  For example, Enforcement Bureau advisory opinions cannot be obtained for existing conduct, conduct subject to a pending inquiry, or conduct that is a "mere possibilit[y]."[237]  The Bureau has discretion whether even to respond to a request for guidance (and has no deadline for doing so).[238]  And any guidance is subject to revocation and is not binding.[239]  Moreover, seeking guidance can trigger an enforcement proceeding.[240]  Simply put, this advisory opinion process is unworkable as a means of eliminating the ambiguities in the general conduct standard and is harmful to the continued development of the internet.

---

[234] *See* NPRM ¶¶ 191-192.

[235] *See* Michael Kende & Pierangela Samarati, *Let a Thousand Flowers Bloom.fm*, Internet Soc'y (May 5, 2014), https://www.internetsociety.org/blog/2014/05/let-a-thousand-flowers-bloom-fm/ ("'Permissionless innovation' is a key technical principle that has guided the Internet's development and evolution ever since its inception.").

[236] *See, e.g.*, Memorandum Opinion and Order, *Petition of AT&T Inc. for Forbearance Under 47 U.S.C. § 160(c) from Title II and Computer Inquiry Rules with Respect to Its Broadband Services*, 22 FCC Rcd 18705, ¶ 33 (2007).

[237] *2015 Order* ¶¶ 231-232.

[238] *Id.* ¶¶ 231, 234.

[239] *Id.* ¶ 235.

[240] *Id.* ¶ 232.

**App. 1164**

### 3. *Reclassification Would Open the Door to Harmful Rate Regulation*

The NPRM correctly recognizes that rate regulation, whether *ex ante* or *ex post*, is undesirable and, therefore, proposes to "forbear from applying sections 201 and 202 to BIAS insofar as they would support adoption of rate regulations for" broadband.[241] The NPRM's stated intent to forbear from rate regulation is sensible. As the D.C. Circuit has recognized, "[r]ate regulation of a firm in a competitive market harms consumers: Prices set below the competitive level result in diminished quality, while prices set above the competitive level drive some consumers to a less preferred alternative."[242]

But subjecting ISPs to Title II opens the door to rate regulation, because the Commission believes that forbearance decisions are not "chiseled in marble" and a later Commission could undo them.[243] The Commission previously relied on that (purported) authority to modify a grant of forbearance.[244] And because forbearance is appropriate only where "regulation . . . is not necessary to ensure that the charges . . . for . . . [a] telecommunications service are just and reasonable," 47 U.S.C. § 160(a)(1), any future Commission that concluded that a broadband provider's rates are unjust and unreasonable could also easily conclude that it should undo the proposed forbearance from rate regulation. This Commission's forbearance would thus amount to only a minor inconvenience to rate regulation by a future Commission.

As the *2018 Order* correctly concluded, the threat of a reversal of course on the forbearance in the *2015 Order* undermined investment incentives.[245] The *2015 Order* also

---

[241] NPRM ¶ 105.

[242] *Nat'l Ass'n of Telecomms. Officers & Advisors v. FCC*, 862 F.3d 18, 25 (D.C. Cir. 2017) (citing 1 Alfred E. Kahn, *The Economics of Regulation: Principles and Institutions* 21, 66-67 (1970)).

[243] *See Ad Hoc Telecom. Users Comm. v. FCC*, 572 F.3d 903, 911 (D.C. Cir. 2009).

[244] *See Business Data Services Report* ¶¶ 171-177.

[245] *See 2018 Order* ¶ 101.

**App. 1165**

showed that the Commission can use Title II effectively to regulate rates even while purporting to forbear from the rate-setting provisions of the Communications Act. As noted above, the Commission's staff was poised to recommend using the general conduct standard to ban most forms of sponsored (or zero-rated) data programs, which are the equivalent of toll-free calling,[246] effectively mandating that providers charge customers a non-zero rate for that data.[247] The NPRM also proposes to engage in effective rate regulation by inquiring about whether to permit providers to sell broadband plans that include data caps even where "the practice of slowing down an end user's connection to the Internet [is] based on a choice clearly made by the end user."[248] The NPRM makes clear it does "not intend to leave such data plans without oversight" and proposes to "allow the Commission to review" such data plans.[249] Such regulation would reduce consumer choice and force some consumers to pay more for broadband. The market has already responded to consumer demand for unlimited data, providing such options. But some consumers prefer cheaper plans that have limits on data usage. Eliminating such plans would disadvantage those consumers by forcing them to pay for data they do not want to buy.

>    4.    *Reclassification Would Undermine Investment Incentives and Undermine the Most Efficient Use of Congress's Appropriations To Close the Digital Divide*

The NPRM states that the Commission does "not anticipate that the open Internet rules we propose today will have a harmful effect on investment."[250] That conclusion is contrary to

---

[246] *See* FCC, *Wireless Telecommunications Bureau Report: Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero-Rated Content and Services* at 12, 17 (Jan. 11, 2017), https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0111/DOC-342987A1.pdf.

[247] *See* Ford Paper at 12 (explaining that rules such as no paid prioritization are rate regulation).

[248] NPRM ¶ 156.

[249] *Id.*

[250] *Id.* ¶ 150.

**App. 1166**

empirical evidence and economic theory.[251]  In the *2018 Order*, the Commission assessed an

extensive record and concluded that Title II regulation had "decreased investment and is likely to

continue to decrease investment by ISPs," which in turn is "likely to result in less deployment"

and fewer "upgrad[es]" to broadband systems.[252]  The Commission further correctly concluded

that reclassification of broadband as an information service was "likely to increase ISP

investment and output," leading to "greater deployment" and research into and development of

"new and more advanced services for consumers."[253]  In contrast, if the Commission adopts the

proposals in the NPRM, it will impede investment, slowing down broadband deployment,

including in rural areas, and impede innovation.

      The evidence supports that conclusion.  ISPs invested significantly in broadband when it

was regulated as an information service, making capital expenditures between $64 billion and

$118 billion every year between 2000 and 2014.[254]  And as many economists predicted, capital

investment "declined sharply in 2016 relative to 2014, the last year before reclassification."[255]

The *2018 Order* similarly documented that investment slowed down when broadband was

classified as a telecommunications service, but picked up again after restoration of the

information services classification.[256]

---

[251] Ford Paper at 12-26.

[252] *See 2018 Order* ¶ 308.

[253] *Id.* ¶¶ 98-99.

[254] Patrick Brogan, *Broadband Investment Continued Trending Down in 2016*, at 2-3, USTelecom (Oct. 31, 2017), https://bit.ly/2WRzL3O.  Investment began trending upwards again in 2017 and 2018. Patrick Brogan, *U.S. Broadband Investment Continued Upswing in 2018*, at 1-2, USTelecom (July 31, 2019), https://bit.ly/3arM5fe.

[255] Hal Singer, *Bad Bet by FCC Sparks Capital Flight from Broadband*, Forbes (Mar. 2, 2017), https://www.forbes.com/sites/washingtonbytes/2017/03/02/capital-flight-from-broadband-in-the-title-ii-era/; *see also* Ford Paper at 14 (explaining that "several published and unpublished studies presented evidence of the deleterious investment effects of Net Neutrality and common carrier regulations").

[256] *2018 Order* ¶¶ 90-91.

**App. 1167**

As discussed above, the vague general conduct standard will impede investment in innovation by creating regulatory uncertainty and the potential for regulatory creep.[257] Any rational ISP will think twice before investing in innovative offerings that might someday be found to violate the Commission's (or a future Commission's) undisclosed policy preferences and thus give rise to a cease-and-desist order and potentially massive forfeiture penalties (or Section 208 damages). This concern is particularly acute because broadband innovation frequently requires sunk investments that cannot be recovered if the Commission ultimately prohibits the business practice. And the breadth of the standard would allow the Commission to assert broad regulatory authority that may even extend to rate regulation that it currently is disclaiming, further chilling investment and distorting an otherwise healthy market.

Indeed, the NPRM's proposed policy justifications for reclassifying broadband show regulatory creep in action. The NPRM envisions a host of future regulatory mandates that go even beyond the *2015 Order*, such as requirements for service and network reliability, cybersecurity measures, and exit restrictions. The network resiliency and reliability requirements in particular would force ISPs to redirect investment from extending broadband further throughout their footprints. The threat of these vague mandates will chill investment and growth, prompting ISPs to take a less risky wait-and-see strategy. The regulatory uncertainty and

---

[257] *See also* Ford Paper at 12 (stating that (stating that "[b]road 'catch all' provisions, such as the General Conduct Rule adopted in the *2015 Open Internet Order* and again proposed in the *2023 NPRM*, are certain to cause concern" with respect to investment); Doug Brake, Info. Tech. & Innovation Found., *What Financial Data Shows About the Impact to Title II on ISP Investment* (June 2, 2017), https://itif.org/publications/2017/06/02/what-financial-data-shows-about-impact-title-ii/ ("Not only did the Open Internet Order take potential business models off the table, and throw others into uncertainty under the Internet Conduct Standard, it represents the first step down the slippery slope to more onerous utility regulations, such as network unbundling requirements or price regulation."); Hassett & Shapiro at 21 ("[W]e found that the negative effects on investment may well be significantly understated by these factors because the new regulation's threshold effect will maximize the negative effects of uncertainty.").

likelihood of regulatory creep can only serve to reduce the incentive of ISPs to make investments on the margin.[258]

The NPRM underplays the harmful effect on investment that its proposals will have while conceding that they "might in some cases reduce providers' investment incentives."[259] The NPRM suggests that those harmful effects would be "far outweighed by positive effects on innovation and investment in other areas of the ecosystem."[260] The NPRM does not, however, specify what other areas of the ecosystem will be promoted or why investment in rural broadband coverage, network capacity, or innovation, among other things, should be deprioritized to benefit amorphous "other areas of the ecosystem." Nor does the NPRM address why "innovation and investment in other areas of the ecosystem" will not otherwise occur given the vast investment in broadband that is occurring in the absence of Title II regulation, encouraged by the competitive pressures on providers and consumer expectations that ensure that ISPs allow customers to access the content they desire.

### 5. Reclassification Would Undermine Consumer Privacy

As the NPRM recognizes, reclassification would divest the FTC of authority over consumer privacy with respect to broadband.[261] As a result, the same piece of consumer information will no longer be treated consistently across the internet ecosystem and instead will be subject to different rules applicable in different contexts. The rules would vary, for example,

---

[258] *See* Declaration of Mark A. Israel et al. at 43-61 (explaining that Title II regulation of broadband would create a risk of regulatory uncertainty and regulatory creep, and that, as a matter of basic economics, it will depress the investment incentives of broadband providers) (attached to Comments of AT&T Services Inc., WC Docket No. 17-108 (July 17, 2017)). The declaration is incorporated in these comments by reference. *See also* Israel et al. Decl. ¶¶ 74-80.

[259] NPRM ¶ 150.

[260] *Id.*

[261] *See id.* ¶ 134; *see also* 15 U.S.C. § 45(a)(2) (prohibiting FTC from regulating common-carriage services).

based on whether the information is provided to an ISP or an online entity (such as Google or TikTok), a retailer, or a data broker. Such fragmentation of federal privacy law, resulting from the NPRM's proposed divestiture of the FTC of its authority over consumer privacy, is highly undesirable.

The FTC is the expert federal privacy regulator and has been enforcing consumer protection requirements for nearly a century. The FTC is also the only agency that can apply consumer protection rules consistently across industries. And its technology-neutral, uniform approach to privacy regulation is required to ensure that the same protections and safeguards apply to consumer data, regardless of which entity collects that data.

It is confusing for consumers when privacy regimes differ based on who holds the information.[262] That confusion will be especially pronounced because social media platforms, streaming sites, data brokers, and ad exchanges have access to vast amounts of consumer data — far more than ISPs. It is inefficient — and makes no sense — to subject one part of the internet ecosystem to a different regime that was enacted for traditional telephone networks and divest the nation's leading privacy regulator from exercising jurisdiction over it. If anything, the patchwork regime the NPRM would create is a strong indication that Congress did not authorize the Commission to place broadband under Title II.

The NPRM also all but ignores Congress's decision to use the Congressional Review Act to vacate the Commission's 2016 broadband privacy rules.[263] Members of Congress voting to vacate those rules made clear that they did not want to undermine consumer privacy by distorting

---

[262] Cameron F. Kerry, *Broadband privacy belongs with the FTC, not the FCC*, Brookings (Dec. 16, 2021), https://www.brookings.edu/articles/broadband-privacy-belongs-with-the-ftc-not-the-fcc/.

[263] *See* S.J. Res. 34, 115th Cong. (2017). The NPRM acknowledges the disapproval of its prior privacy rules under the Congressional Review Act only in passing in a footnote. *See* NPRM ¶ 104 n.352.

**App. 1170**

the holistic, even-handed approach implemented by the FTC.[264]  That vacatur bars the Commission from adopting a rule in "substantially the same form" as the one Congress rejected, severely limiting the Commission's ability to promulgate new privacy rules.[265]  And given that the NPRM does not state that the Commission plans to initiate a new rulemaking to adopt privacy rules the Congressional Review Act would permit, a new regime will likely have to be created from scratch via private litigation and agency adjudication, based on statutory provisions that Congress enacted for legacy telephone service and not the modern internet.  Such piecemeal development of an entirely new federal privacy regime, which would apply to ISPs only, would provide no benefit and confuse consumers and providers alike.

The Commission also lacks statutory authority to comprehensively regulate consumer privacy.  The Communications Act includes a specific provision, Section 222, that governs carriers' obligations to keep certain data private.  As it applies to consumers, however, Section 222 does not impose any obligations beyond the protections it affords for consumer proprietary network information ("CPNI") in Section 222(c).  CPNI is a narrow subset of the personal information that the FTC's privacy regime currently oversees.

---

[264] 163 Cong. Rec. H2479 (daily ed. Mar. 28, 2017) ("The Federal Communications Commission's privacy rules arbitrarily treat internet service providers differently from the rest of the internet, amounting to government intervention in the free market."); *id.* at H2494 ("Instead of a uniform, technology-neutral standard that balanced data protection with consumer choice, internet users were stuck with a two-sided approach that causes confusion and dampens competition.  There is one set of rules for service providers, and one set for the rest of the internet ecosystem.  But how often do consumers really recognize the difference between where their data is accessed and where it is stored?"); 163 Cong. Rec. S1954 (daily ed. Mar. 23, 2017) ("The FCC privacy rules are just another example of burdensome rules that hurt more than they help and serve as another example of the government's picking winners and losers.  They unnecessarily target internet service providers and, ultimately, make our internet ecosystem less efficient by adding more red tape.").

[265] 5 U.S.C. § 801(b)(2).

While the Commission has in recent years suggested that Section 222(a) grants it authority to adopt consumer privacy regulations that go beyond CPNI,[266] that section is a mere introductory provision and not a freestanding source of obligations or authority. That Section 222(a) uses the phrase "proprietary information of . . . customers," rather than "customer proprietary network information," is of no moment. Section 222(a) identifies the three categories of information to which Section 222 applies: proprietary information relating to (1) carriers, (2) equipment manufacturers, and (3) customers. In the case of customer information, the operative subsection is Section 222(c), which, as explained above, is limited to CPNI.

The legislative history also confirms that, with respect to customer information, Congress intended that Section 222 apply only to CPNI as defined in Section 222(h)(1) and not to some broader category of customer "proprietary" information. In conference, Congress eliminated catch-all provisions in the House and Senate bills that would have given the Commission broader authority to regulate customer information more generally.[267] And the Conference Report described Section 222 as "striv[ing] to balance both competitive and consumer privacy interests with respect to CPNI."[268]

---

[266] *See*, *e.g.*, Second Further Notice of Proposed Rulemaking, Order on Reconsideration, Second Report and Order, and Memorandum Opinion and Order, *Lifeline and Link Up Reform and Modernization*, 30 FCC Rcd 7818, ¶¶ 234-235 (2015).

[267] H.R. Rep. No. 104-204, pt. 1, at 22-23, 89-91 (1995) (the House version's definition of CPNI as including "such other information concerning the customer as is available to the local exchange carrier by virtue of the customer's use of the carrier's telephone exchange service or telephone toll services, and specified as within the definition of such term by such rules as the Commission shall prescribe consistent with the public interest" was not adopted); S. Rep. No. 104-23, at 23-24 (1995) (the Senate version's definition of customer information covering broadly "customer-specific proprietary information," with no limiting language, was not adopted).

[268] H.R. Rep. No. 104-458, at 205 (1996) (Conf. Rep.) (Joint Explanatory Statement of the Committee of Conference).

**App. 1172**

Nor does Section 201(b) provide the Commission with additional privacy authority. Congress necessarily assumed that the Commission lacked broad authority over the privacy of consumers' data when it adopted what the Commission correctly and contemporaneously recognized was a "comprehensive new framework" in Section 222.[269]  It is therefore clear that the specific language in Section 222(c) controls over the general prohibition on unjust and unreasonable practices in Section 201(b).

6. *The NPRM's Proposed Transparency Rules Will Impose High Costs on ISPs While Bringing No Meaningful Benefit to Consumers*

The proposed return to the *2015 Order*'s enhanced disclosure requirements,[270] such as those relating to certain commercial terms and performance characteristics — including packet loss and geographically-specific disclosures — is unwarranted.  As the *2018 Order* correctly concluded, those "additional reporting obligations unduly burden ISPs without providing a comparable benefit to consumers."[271]  The cost of making such detailed, technical disclosures remains high, and the benefit to consumers, if any, is negligible.  Significantly, the NPRM contemplates going even further by adopting disclosure requirements that the *2015 Order* rejected, such as requirements regarding "the source, location, timing, or duration of network congestion, packet corruption and jitter, and disclosures that permit end users to identify application-specific usage or to distinguish which user or device contributed to which part of the total data usage."[272]  Such detailed disclosures are costly for providers and meaningless to nearly all consumers.

---

[269] *See* Second Report and Order and Further Notice of Proposed Rulemaking, *Implementation of the Telecommunications Act of 1996*, 13 FCC Rcd 8061, ¶ 14 (1998).

[270] *See* NPRM ¶ 173.

[271] *2018 Order* ¶ 225.

[272] NPRM ¶ 176 (footnotes omitted).

Moreover, the Commission should maintain its existing requirements for disclosing speed and latency. Specifically, the Commission should continue to permit fixed ISPs that participate in the Measuring Broadband America ("MBA") program to disclose their speed and latency results as a sufficient barometer for performance customers can expect to experience.[273] For fixed ISPs that do not participate in the MBA program, the Commission should continue to permit use of the methodology from the MBA program or actual performance based on internal testing or other relevant reliable data for disclosure of speed and latency.[274] As the Commission has already found, geographically specific disclosures do not provide high value to consumers but are unduly burdensome for providers.[275] Such disclosures would take significant effort to develop as providers would not be able to leverage their MBA program results or its established methodology.

Additional disclosure requirements are also unnecessary because of the potential conflict and duplication between such requirements and the Commission's recent broadband label rules. The NPRM in fact recognizes that risk and seeks comment on ways to avoid duplication and inconsistency.[276] But inconsistency and duplication are inherent in needless multiplication of rules — all to address an issue that has not even arisen. Similarly unnecessary are additional advisory guidance mandates[277] regarding the positioning and additional locations of the

---

[273] *Id.* ¶ 175.

[274] *Id.*

[275] *2018 Order* ¶ 225.

[276] NPRM ¶ 171.

[277] *Id.* ¶ 180.

**App. 1174**

disclosures,[278] the "direct notification"[279] requirement, and the burdensome recordkeeping obligation[280] that the NPRM considers.

Broadband providers have consistently supported appropriate disclosure obligations that benefit consumers. But when the NPRM — without identifying any problem with current disclosure requirements or with ISPs' compliance — engages in a "how many can you name" game, it goes too far.

### B.     The NPRM's New Justifications for Title II Are Pretextual

The NPRM offers a number of new justifications for classifying broadband under Title II that the Commission did not rely on in the *2015 Order*. But none of these new justifications supports Title II reclassification. Either there is no need for Commission intervention in the area, or Title II reclassification would not grant the Commission authority to help solve the purported problem, or both. The only reasonable conclusion that can be drawn is that these reasons are contrivances intended to support expansive and unprecedented Commission regulation and to justify a reclassification that otherwise has no support.

*1.     Reclassification Will Not Aid in the Federal Government's Efforts To Address National Security Concerns*

The Commission's asserted national security objectives will not be served by Title II regulation of broadband. The NPRM does not identify any evidence that continuing Title I regulation of mass-market broadband poses national security threats. Broadband network providers already engage with the U.S. government on critical matters of national security across numerous agencies, including, for example, through participation in government

---

[278] *Id.* ¶¶ 177, 179.

[279] *Id.* ¶ 181.

[280] *Id.* ¶ 185.

**App. 1175**

councils/committees such as the DHS Protected Critical Information Infrastructure Program's Communications Sector Coordinating Council, the Commission's Communications Security Reliability and Interoperability Council ("CSRIC") and the President's National Security Telecommunications Advisory Committee.  These long-standing points of engagement/responsibility have taken place for many years absent Title II reclassification, obviating the Commission's justification that Title II is needed on national security grounds.  These engagements also demonstrate that a number of agencies already have deep expertise, clear authority, and well-established mechanisms in place to address and mitigate any national security concerns.

Indeed, far from enhancing the ability of the federal government to address national security concerns, the Commission's proposal to interject itself into this space threatens to *undermine* national security.  Congress has established a "whole-of-government" framework where national security agencies have clear lanes and established processes for coordination.  The Commission's assertion of authority would introduce destabilizing uncertainty as to the new roles of those existing agencies, require those agencies to devote resources to coordinating with the Commission, and potentially increase risks by assigning the Commission a role where it lacks experience and expertise.

More specifically, in response to specific risks in connection with major commercial transactions, CFIUS can impose safeguards that limit foreign adversary influence in connection with internet traffic exchange and interconnection arrangements, and both CFIUS and the Commerce Department can block "covered transactions" that would introduce new security risks.  The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom") reviews applications for international

**App. 1176**

Section 214 authorizations for potential national security issues and considers the provision of broadband in its reviews even though broadband service itself is outside the scope of Section 214. The Commerce Department's Bureau of Industry and Security enforces Export Administration Regulations. And the Treasury Department levies economic sanctions on companies that present a security risk. The specific grants of power to these other agencies emphasize that Congress is keenly aware of national security threats and legislates to address them.

National security roles and responsibilities have been clearly defined in various executive branch agencies over the years, and the Commission must work within that structure. The authority the Commission has over national security is specific and limited. Congress has given the Commission the power and parameters to address specific risks as determined by expert agencies, through the Secure and Trusted Communications Networks Act of 2019, Secure Equipment Act of 2021, and the Communications Assistance for Law Enforcement Act of 1994 ("CALEA"). These examples emphasize that, when Congress wants the Commission to address a national security issue, it will grant it authority to do so — the Commission cannot manufacture that authority itself. And it is not surprising that Congress did not bestow the broad national security authority on the Commission that the NPRM attempts to claim. Other agencies, and not the Commission, have the key expertise in matters of national security. And those agencies, with — where necessary — input from the Commission, are more than capable of addressing national security concerns.

Further, over the years, the federal government has adjusted to changes in national security risks and has been able to address emerging threats. There are no significant gaps in the federal government's authority that warrant the imposition of common-carrier regulation on

**App. 1177**

mass-market broadband services to solve them.  Rather, the federal government has worked with industry to address the various threat vectors (e.g., China) for well over a decade, putting in place mechanisms for addressing evolving threats that are flexible and have stood the test of time.  The NPRM does not find that those established mechanisms have somehow failed or that the threat landscape has taken a dramatic or unanticipated turn.

Moreover, the Commission's response to national security and law enforcement concerns during the period in which broadband has been classified as an information service demonstrates that Title II regulation is not necessary to achieve the NPRM's asserted objectives.  For example, during that period, the Commission established the Covered List, pursuant to the Secure and Trusted Communications Networks Act.[281]  The Secure Equipment Act later extended the Commission's authority to equipment authorization.  The Commission took action pursuant to those Acts to prevent entities receiving Universal Service Fund ("USF") support from using that support to purchase equipment and services from entities on the Covered List, and to require USF support recipients to remove such equipment and services from their networks.[282]  The Commission added entities to the Covered List based on specific determinations that national security agencies made in accordance with the Act, and adopted rules to cease issuing equipment authorizations to entities on the Covered List, consistent with the Secure Equipment Act of 2021.  Additionally, the Commission revoked the international Section 214 authorizations of several Chinese carriers found to present significant national security and law enforcement concerns that

---

[281] Second Report and Order, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, 35 FCC Rcd 14284 (2020); 47 C.F.R. §§ 1.50002, 1.50003.

[282] Report and Order, Further Notice of Proposed Rulemaking, and Order, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, 34 FCC Rcd 11423 (2019); 47 CFR § 54.9.

**App. 1178**

various national security and law enforcement agencies, and Congress, espoused.[283] Finally, the Commission applied CALEA to facilities-based broadband providers and to providers of interconnected VoIP service nearly two decades ago, which enhanced law enforcement's independent interception and investigative authority under Title 18.[284] Again, Congress has squarely delineated the Commission's and law enforcement's authority in this area.

While the NPRM asserts that the same threats "equally exist" with respect to broadband,[285] it fails to acknowledge not only the authority of other expert agencies to address these threats, but also that those foreign entities do *not* provide mass market broadband that would be subject to Title II. These entities would be able to continue to participate in IP traffic-exchange and offer private carrier services in the enterprise marketplace. Notably, the Commission today has the ability to address concerns about these entities' ongoing operations by taking steps to prevent carriers over which it has authority from interconnecting with them.[286] And in reality, if there is a national security threat associated with a telecommunication-related company, it will be addressed by one of the agencies that has a broad national security mandate and expertise — the Commission is not the only knight who guards that wall.[287]

---

[283] Order on Revocation and Termination, *China Telecom (Americas) Corp.*, 36 FCC Rcd 15966 (2021); Order on Revocation, *China Unicom (Americas) Operations Ltd.*, 37 FCC Rcd 1480 (2022).

[284] First Report and Order and Further Notice of Proposed Rulemaking, *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, 20 FCC Rcd 14989 (2005); *see also* 18 U.S.C. §§ 2510, 3121 *et seq.*

[285] NPRM ¶ 27.

[286] *Connecting America: Oversight of the FCC: Hearing Before the H. Subcomm. on Commc'ns & Tech. of the H. Comm. on Energy & Commerce* 3 (Mar. 31, 2022) (statement of FCC Commissioner Brendan Carr).

[287] For example, in 2023, the United States Commerce Department stopped granting export licenses for China's Huawei. *See* Karen Freifeld, Alexandra Alper, and Stephen Nellis, *U.S. stops granting export licenses for China's Huawei – sources*, Reuters (Jan. 21, 2023), https://www.reuters.com/technology/us-stops-provision-licences-export-chinas-huawei-ft-2023-01-30/. And the United States Treasury Department pursued ZTE for violations of federal regulations, which resulted in a $100 settlement in favor of the U.S. government. *See* U.S. Dep't of Treasury Press Release, *Treasury*

To the extent there are legitimate national security concerns, they frequently exist in spaces that the NPRM is rightly not proposing to subject to Title II, that no Commission has ever sought to regulate under Title II, and that, in all events, other expert federal agencies cover. Such potential concerns exist with respect to the non-mass-market broadband services that government agencies and critical infrastructure providers, such as hospitals and electric utilities, purchase. Subjecting retail mass-market broadband to regulation under Title II would give the Commission no authority over these services, and a national security rationale that ignores services sold to actual national security agencies has glaring holes. Similarly, Title II classification of mass-market broadband would not authorize the Commission to address security concerns with respect to tech platforms or IP transit and peering providers. The Commission's underinclusive authority would cast doubt on the roles of those federal agencies that do have undoubted authority in these areas, and that uncertainty risks creating regulatory gaps that could be exploited by bad actors.

Reclassification could frustrate national security and law enforcement goals in another way as well. Imposing common carriage on broadband services — a legal framework premised on indiscriminate carriage of internet traffic — could make it more difficult to screen, filter, intercept, or otherwise treat suspicious traffic (e.g., from foreign adversaries) non-neutrally. The NPRM makes no attempt to reconcile its proposed "neutrality" mandates with its ostensible national security focus.

Finally, the Commission's parallel proposals to revamp its international Section 214 review process are problematic, as USTelecom and other commenters have explained in that

---

*Department Reaches $100 Million Settlement with Zhongxing Telecommunications Equipment Corporation* (Mar. 7, 2017), https://home.treasury.gov/news/press-releases/sm0023.

**App. 1180**

docket.[288]  At the very minimum, the Commission should tailor any imposition of Section 214 to apply only to foreign entities.  If adopted, applying such changes to broadband more broadly would only exacerbate problems by subjecting a broader array of services to those burdensome, non-risk-driven, unnecessary requirements.

## 2. *Reclassification Will Harm Cybersecurity*

The Commission's role in cybersecurity is limited, and the NPRM's effort to address cybersecurity does not depend on classifying broadband as a Title II service.  Congress has recognized that other agencies — such as the Department of Homeland Security — have the relevant expertise and resources to provide oversight related to cybersecurity.  In 2006, the Department of Homeland Security established the Critical Infrastructure Partnership Advisory Council to facilitate interaction between governmental entities and representatives from the community of critical infrastructure owners and operators.  And in 2018, Congress established the Cybersecurity and Infrastructure Security Agency ("CISA"), which reorganized and elevated the mission of the Department of Homeland Security's former National Protection and Programs Directorate, establishing CISA as the Federal leader for cyber and physical infrastructure security.

The NPRM ignores the robust public-private partnership — which is risk-management-based rather than a more rigid security-by-compliance approach — that is already in place to protect and enhance cybersecurity.  Communications industry participants work closely with CISA and other federal agencies through organizations that provide the policy, planning, and operations framework necessary to safeguard the security of communications networks and

---

[288] *See, e.g.*, Comments of USTelecom, IB Docket No. 23-119 (Aug. 31, 2023); Comments of Verizon, IB Docket No. 23-119, MD Docket No. 23-134 (Aug. 31, 2023).

**App. 1181**

services.[289]  Those organizations are:  the National Security Telecommunications Advisory Committee ("NSTAC"), which provides policy recommendations intended to assure the continuity of vital telecommunications links through any event or crisis; the Communications Sector Coordinating Council ("C-SCC"), which helps coordinate initiatives to improve the physical and cybersecurity of sector assets, ease the flow of information within the sector and across sectors, and address issues related to response and recovery following an incident or event; as well as the National Coordinating Center for Telecommunications Communications Information Sharing and Analysis Center ("C-ISAC"), which facilitates the exchange of information among government and industry participants regarding vulnerabilities, threats, intrusions, and anomalies affecting telecommunications infrastructure.

Reclassifying broadband as a Title II service would not improve this well-established and carefully coordinated process.  If anything, it would prove detrimental because cybersecurity requires a whole-of-government approach, not sector-specific governance.  As such, the imposition of new cybersecurity requirements via reclassification risks undermining the current harmonization effort within the U.S. government.  As the Department of Homeland Security stated in its September 19, 2023 report:  "Among the most significant challenges to harmonization are varying definitions, timelines and triggers for reporting, report content requirements, and reporting mechanisms" of the federal agencies that currently have cybersecurity responsibilities.[290]  The NPRM's proposed reclassification and assertion of authority under Title II to add yet another cybersecurity regulator — and one with far less

---

[289] AT&T Comments Part I.C (Dec. 14, 2023); Verizon Comments Part II.C (Dec. 14, 2023).

[290] U.S. Dep't of Homeland Sec., *Harmonization of Cyber Incident Reporting to the Federal Government* 15 (Sept. 19, 2023), https://www.dhs.gov/sites/default/files/2023-09/DHS%20 Congressional%20Report%20-%20Harmonization%20of%20Cyber%20Incident%20Reporting%20to%2 0the%20Federal%20Government.pdf.

**App. 1182**

expertise than the federal agencies noted above — would serve only to exacerbate these problems. The harmonization effort also recognizes that there is an entire ecosystem of access networks, data centers, devices, and users, and that any part of the ecosystem may become vulnerable to cybersecurity incidents or breaches. That includes users, who sometimes fail to protect their information.[291] Title II reclassification will do nothing to address such security threats.

Importantly, expanding cybersecurity regulation would threaten a host of unintended consequences, including: (a) slowing adaptation to evolving threats and technologies; (b) undermining resource allocation by diverting funds from other security investments; (c) imposing a one-size-fits-all approach that does not permit case-by-case exceptions; and (d) encouraging secrecy by discouraging companies from sharing information once their relationship with government shifts from partnership to adversarial. And tying cybersecurity policy to broadband reclassification will invite instability and inconsistency in the policy by causing it to change with each new Administration, and disrupt the collaborative approach that has successfully worked to build cybersecurity policy for decades.

Moreover, reclassification would result in a highly underinclusive regime that would not be fit for its purpose. For example, key goals the NPRM sets cannot even be achieved through reclassification, such as promotion of security and integrity of Border Gateway Protocol ("BGP"). BGP governs the exchange of packets between the networks that comprise the internet and is a complex area in which the Commission lacks the necessary technical expertise. In the internet routing security context, the key entities that would play a role in increasing BGP

---

[291] Verizon, *2023 Data Breach Investigations Report* at 14-18, https://www.verizon.com/ business/resources/Td9d/reports/2023-data-breach-investigations-report-dbir.pdf.

security include transit ISPs and "edge" Autonomous Systems, i.e., the infrastructure owned and operated by large entities such as corporations, government agencies, utilities, and universities that own and control their own IP space.  If the Commission plans to tell only ISPs how to implement BGP — thus leaving most network providers' BGP implementation unregulated — any regulation will be ineffective.[292]  Importantly, without the Commission's regulation, the industry has already implemented defenses to detect nefarious changes to the BGP tables, and the Commission will not be able to offer anything that could more effectively manage the issue.[293] Regarding malicious websites, the NPRM's idea to require ISPs to block traffic to IP addresses associated with those sites would solve nothing, including because of collateral damage and overbroad blocking that would occur where a hosting company has multiple sites associated with a single IP address.

The NPRM, as drafted, will not be able to address a cohort of other cybersecurity concerns.  Malevolent actors regularly target national security agencies, the military, law enforcement, critical infrastructure like power companies, airports, hospitals, and businesses, whether as part of a ransomware attack, terrorism, or to steal trade secrets and other sensitive information.  For example, the recent MOVEit hacks have hit agencies in at least four states — including most recently in Maine — as well as several federal agencies and a federal government contractor.[294]  But the NPRM will not give the Commission any additional national security or cybersecurity authority to respond to serious threats such as these, because, like the *2015 Order*,

---

[292] As explained below, reclassifying retail, mass-market broadband service sold to end-user customers as a Title II service does not give the Commission authority over those ISPs' exchange of internet traffic with other networks and that exchange of traffic — including the protocols that make it possible — is an information service.  *See infra* Part IV.

[293] Rysavy Decl. ¶ 16.

[294] Zack Whittaker, *Maine government says data breach affects 1.3 million people*, TechCrunch (Nov. 9, 2023), https://techcrunch.com/2023/11/09/maine-government-data-breach-clop-ransomware/.

it leaves the enterprise services those customers purchase subject to Title I. Unless the Commission intends to invoke its ancillary authority to expand dramatically the scope of its authority over the internet — in ways unprecedented and that the NPRM does not even suggest — the only conclusion is that these novel rationales for imposing Title II on providers of retail, mass-market internet access service are makeweights.

Finally, it is not clear, and the NPRM does not state, what specific provisions of Title II the Commission intends to use to accomplish its stated goals. Instead, the NPRM simply lists a few of the actions the Commission is interested in taking with respect to cybersecurity and seeks comment on whether reclassification would permit the Commission to take those actions. But it fails to cite a single statutory provision that would permit such exercise of authority. For example, the NPRM seeks comment on whether reclassification would "allow the Commission to mandate the adoption of Communications Security, Reliability, and Interoperability Council (CSRIC) best practices directed to ISPs."[295] But no provision in Title II would allow the Commission to require ISPs to adhere to CSRIC best practices. CSRIC itself is an advisory committee that merely offers recommendations to the Commission, and its recommendations generally are not meant to be converted into mandates. Moreover, mandating these efforts as regulation would discourage collaboration, which will undermine the quality of CSRIC's recommended best practices. The government's approach to cybersecurity has rightly been risk-management-based, not security by compliance, which would have been too rigid in the face of a constantly evolving threat landscape.

It is therefore clear that, at best, the NPRM will have no positive effect on cybersecurity. But more likely, it will hurt existing cybersecurity stakeholders by interfering with the

---

[295] NPRM ¶ 32.

**App. 1185**

harmonization effort, undermining the cooperation between the government and the private sector, and unnecessarily distorting the workable framework by subjecting cybersecurity to transformation with every change of Administration through broadband reclassification, thereby exposing the system to executive overreach.

3.       *Reclassification Is Not Necessary To Ensure Network Resiliency and Reliability*

The NPRM also suggests that Title II reclassification is necessary to ensure network reliability and resiliency.[296]  The performance of America's broadband networks during the pandemic fatally undermines this justification.  Unlike in the EU and countries with public utility regimes for broadband, Americans were able to use their internet connections for school, work, healthcare, and entertainment at full speed, without slowdowns or reductions in video quality.[297] It is hard to imagine a more significant stress test, yet Title I broadband networks continued to provide robust internet service with unprecedented levels of demand.

The NPRM not only suggests that reclassification is necessary to further network reliability and resiliency, but it previews a host of burdensome new rules.  The NPRM indicates that the Commission will use Title II to mandate new reporting obligations as well as "requirements for network upgrades and changes, rules relating to recovery from network outages, and improving [the Commission's] incident investigation and enforcement authority."[298]

Tellingly, the NPRM cites no evidence indicating that broadband providers lack incentives to deploy robust and resilient networks.  But broadband providers have made massive investment in broadband networks to ensure, as confirmed by the pandemic, that there is

---

[296] *Id.* ¶ 39.

[297] *See supra* pp. 44-45.

[298] NPRM ¶ 39.

**App. 1186**

adequate capacity even for unprecedented levels of demand.[299]  Broadband providers also invest

heavily to harden broadband networks and restore operations quickly when they are impacted by

catastrophic events.[300]  For example, AT&T has invested over a billion dollars in its Network

Disaster Recovery program to rapidly restore connectivity to areas affected by disasters.[301]  And

Verizon and other providers have invested massively in their fiber networks — which in

themselves provide substantial reliability benefits to broadband customers.[302]  Moreover, because

no two disasters are the same and different technologies demand different approaches to disaster

preparedness and response, the Commission should be building upon existing voluntary

frameworks and best practices to foster a flexible — rather than prescriptive — approach to

network resiliency.[303]

The regulatory mandates the NPRM presages not only are unnecessary, but also would

likely undermine broadband deployment.  Resiliency and reliability mandates could potentially

impose tens of billions of dollars in costs on broadband providers.[304]  By definition, such

obligations will siphon off capital that could be used to upgrade and expand broadband networks,

---

[299] *See supra* pp. 37-39, 44-45.

[300] AT&T Comments Part I.C (Dec. 14, 2023); Verizon Comments Part I.B (Dec. 14, 2023).

[301] AT&T, *Network Disaster Recovery*, https://about.att.com/pages/disaster-recovery/network-recovery.

[302] *See, e.g.*, Verizon, *Fiber vs. Cable:  Which is better?*, https://www.verizon.com/business/resources/articles/fiber-vs-cable/ (discussing reliability advantages of fiber).

[303] *See, e.g.*, Comments of USTelecom at 1-5, PS Docket Nos. 21-346 *et al.* (Dec. 16, 2021) (discussing participation by broadband providers and electric companies in the Cross-Sector Resiliency Forum to improve communication and coordination in preparing for and responding to natural disasters and cooperation and collaboration by the wireless and wireline sectors on sharing fuel resources, information sharing, debris removal, and restoring backhaul as part of disaster recovery efforts).

[304] For example, AT&T recently estimated that a potential requirement to impose 72 hours of onsite backup power in California would cost AT&T alone nearly $5 billion and take more than 10 years to implement, even assuming it could be done.  *See* Decl. of Jeff Luong in Supp. of AT&T's Opening Comments ¶ 34, *Order Instituting Rulemaking Regarding Emergency Disaster Relief Program*, R.18-03-011 (Cal. Pub. Utils. Comm'n filed Apr. 3, 2020).

**App. 1187**

particularly to high-cost areas in rural America where the economics of deployment are already challenging.[305]

### 4. *Reclassification Is Not Necessary To Ensure Public Safety*

As the NPRM recognizes, broadband plays an important role in promoting public safety.[306]  Broadband makes our communities safer in countless ways, from dissemination of health announcements to coordinating emergency responses.  Today, broadband networks across the country remain robust, resilient, and reliable.  U.S. broadband networks were able to withstand the unprecedented challenges of the COVID-19 pandemic, allowing customers to continue to receive important public safety updates, including from public safety entities, access government resources, and stay informed.  That success was achieved due to the significant investment that would not have been possible in a heavily regulated environment.  Subjecting broadband to Title II regulation would result in diminished broadband investment, to the detriment of public safety.

Reclassifying broadband as a common carrier service will do nothing to ensure that first responders and other public safety entities can communicate during a crisis.  Unlike residential consumers, public safety entities can — and normally do — purchase non-"mass-market retail service[s]" that the NPRM does not propose to subject to Title II.[307]  Instead, they generally purchase wireless and/or wired enterprise services that provide public safety customers with pre-determined amounts of capacity that can be tailored to their specific needs.  Like other services sold to enterprise customers, these information services are regularly sold to government customers through negotiated contracts, which allow those customers to adjust the services to

---

[305] *See* AT&T Comments Part I.B (Dec. 14, 2023).

[306] *See*, *e.g.*, NPRM ¶ 34.

[307] *Id.* ¶ 59.

**App. 1188**

their specific needs, such as speed or latency requirements or quality of service guarantees that go beyond ISPs' core commitments not to block or throttle traffic.[308]

In addition, since 2018, public safety agencies have access to tailored offerings that address the unique needs of public safety, such as FirstNet and Frontline. Together, these offerings have millions of connections and tens of thousands of public safety agencies and organizations as subscribers.[309] The Commission has never regulated these services under Title II and, correctly, does not propose to do so now, even though they are critical to public safety and are treated by providers as such.

Finally, the NPRM — citing the *2020 Remand Order*[310] — asserts that, "[i]ncreasingly, public safety entities rely on retail BIAS."[311] That assertion, unsupported by any evidence, is inconsistent with USTelecom's members' experience, particularly following the introduction of FirstNet and Frontline. In all events, public safety entities have choices when it comes to their service, and there is fierce competition for these customers. Public agencies could, and would, obtain their services from another provider should any one ISP implement policies that harm public safety.

Mass-market retail customers use their broadband service to access public safety information or to send information to public safety entities. But the NPRM does not suggest that any ISP has ever interfered with any customer's ability to use their broadband service to access

---

[308] *2018 Order* ¶¶ 141-142.

[309] FirstNet, *By the Numbers* (July 26, 2023), https://www.firstnet.com/content/dam/firstnet/white-papers/firstnet-by-the-numbers.pdf; Verizon, *Our commitment to public safety*, https://www.verizon.com/business/solutions/public-sector/public-safety/our-commitment/.

[310] Order on Remand, *Restoring Internet Freedom*, 35 FCC Rcd 12328 (2020) ("*2020 Remand Order*").

[311] NPRM ¶ 34 (citing *2020 Remand Order* ¶ 27).

or send such information — nor has the Commission ever posited any theory on which any ISP would have an incentive to do so. The Commission's rules require providers to disclose their practices regarding blocking, throttling, paid prioritization, and other practices for consumer broadband, which would include disclosure of any such practices affecting access to public safety websites.

The NPRM notes that public safety agencies often use social media to send out public safety information.[312] But the Big Tech companies operating those social media sites, through their algorithms, have far more control over the reach of that information and the ability of the public to receive it than any ISP does. Reclassifying broadband as a Title II service would have no effect on the ability of public safety entities to get their message out through these platforms — unless the Commission is planning to use its ancillary authority to regulate those social media companies.

Finally, broadband providers already have obligations under the CALEA, which is intended "to preserve the ability of law enforcement agencies to conduct electronic surveillance while protecting the privacy of information outside the scope of the investigation."[313] Reclassification will have no effect on their obligations under that public safety law.

5.    The NPRM's Remaining New Justifications for Title II All Lack Merit

a.    Reclassification Is Not Needed To Prevent Robocalls or Robotexts

The NPRM seeks comment on whether Title II reclassification can enhance the agency's authority to combat illegal robocalls.[314] But the NPRM fails to recognize that broadband

---

[312] *See id.*

[313] FCC, *Communications Assistance for Law Enforcement Act*, https://www.fcc.gov/calea (last visited Dec. 11, 2023).

[314] NPRM ¶ 45.

services it proposes to subject to Title II regulation are *not* the source of robocalls.  Rather, as the NPRM acknowledges, many illegal robocalls are transmitted via VoIP providers.[315]  Through the TRACED Act and the agency's ancillary authority over VoIP, the Commission has already imposed anti-robocall measures on voice service providers, including VoIP providers, that are proving impactful.  Indeed, the NPRM itself notes the myriad prior and ongoing proceedings to adopt new measures to address illegal robocalls (and robotexts) under current authorities.[316]  Just last month, Chairwoman Rosenworcel explained that these Commission efforts are "beginning to bear fruit," noting that, "[a]fter we identified the companies behind the auto warranty robocall scam, we told the rest of the industry to cut them off and auto warranty calls fell by 90 percent. We used the same method to reduce student loan scam calls by 88 percent."[317]  The Commission's successful ongoing efforts to protect consumers from the scourge of illegal robocalls do not require nor have any relation to Title II reclassification.

Furthermore, insofar as scammers are using over-the-top ("OTT") messaging services, such iMessage, WhatsApp, and Signal, to send robotexts,[318] classifying broadband as a Title II service would not address that problem.  Broadband providers do not block, throttle, or otherwise interfere with the transmission of OTT messages.  They do not intercept them (which federal law also prohibits[319]) — let alone read them.  And those messages are often end-to-end encrypted, preventing broadband providers from intercepting and reading them even if they tried (which

---

[315] *Id.*

[316] *Id.* ¶ 45 n.161.

[317] *Hearing Before the H. Subcomm. on Commc'ns & Tech. of the H. Comm. on Energy & Commerce* 3-4 (Nov. 30, 2023), https://docs.fcc.gov/public/attachments/DOC-398881A1.pdf (statement of FCC Chairwoman Jessica Rosenworcel).

[318] *See* NPRM ¶ 45.

[319] *See* 18 U.S.C. § 2511.

they do not).[320]  The responsibility for addressing robotexts in OTT messages should lie with the providers of those services.  And as the SMS context shows, Title II is not necessary to empower providers of messaging services to work to keep their offerings free of such spam.[321]  The NPRM, instead, turns to the heavy-handed suggestion of requiring ISPs to block traffic to certain IP addresses associated with websites,[322] without explaining how it would create such a list or ensure that legitimate businesses did not end up on it, harming end users.

The suggestion that the Commission might use reclassification to regulate how users interact with messages and calls delivered OTT via broadband is just one more way in which reclassification could only solve a purported problem if the Commission were planning to use ancillary authority to extend itself into all aspects of the internet.  And while the NPRM does not state that intent directly, it does ask if Title II would "grant the Commission oversight to reach *a larger class of entities*"[323]

        *b.*     *Reclassification Is Not Needed To Protect Access to Pole Attachments*

The Commission's regulation of attachments to utility poles both protects consumers from the safety risks of overloaded poles and promotes broadband deployment by preventing utilities from charging excessively high rates to attachers.  Title II regulation of broadband is unnecessary to achieve those goals.  Although broadband has been classified as an information service for nearly the entirety of its existence, the NPRM provides no evidence that Title I

---

[320] *See* Kende Report at 9-11, 25-27.

[321] The NPRM also ignores that the Commission *denied* a petition seeking to bring SMS messaging within Title II, in part because such a classification would "stop wireless providers from helping consumers by incorporating robotext-blocking, anti-spoofing measures, and other anti-spam features into their offerings."  Declaratory Ruling, *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 FCC Rcd 12075, ¶ 2 (2018); *see* NPRM ¶¶ 44-45.

[322] NPRM ¶ 45.

[323] *Id.* (emphasis added).

**App. 1192**

classification has enabled the utilities that Section 224 regulates to materially impede broadband deployment.

That is because the Commission has authority to regulate "any attachment by a cable television system or provider of telecommunications service to a pole."[324]  As the NPRM recognizes, companies that offer both broadband and either telephone or cable service benefit from the rights that Section 224 affords even while broadband is classified as an information service.[325]  The NPRM cites no evidence that there are broadband-only providers that could not receive those benefits today or that the availability of the Broadband Equity, Access, and Deployment funding is leading to the creation of such providers.[326]  Even if there are such providers, there is no record evidence that Title I classification is preventing them from obtaining just and reasonable pole attachment rates.

The Commission's concerns about broadband-only providers are thus speculative.  What is certain is that subjecting broadband to Title II regulation would deter investment throughout the rest of the market and "undermine[] the . . . buildout of broadband networks the Commission seeks to encourage."[327]  If the Commission were to identify a problem with the pole attachment rates offered to any broadband-only providers that materialize in the future, Congress can address that harm through targeted statutory relief.

---

[324] 47 U.S.C. § 224(a)(4).  This jurisdiction is revoked in states that choose to regulate poles, which makes the impact of reclassification even more limited.

[325] *See* NPRM ¶ 47; *see also 2020 Remand Order* ¶ 68 (same).

[326] *See* NPRM ¶ 47.

[327] *2018 Order* ¶ 185.

**App. 1193**

Regardless of how broadband is classified, the Commission has ample authority to address the digital divide through the Universal Service Fund.  Indeed, before the *2018 Order*, the Commission had already supported broadband services under all universal service programs, including High Cost and Lifeline.[328]  Contrary to the NPRM's assertion, the *2020 Remand Order* did not merely "assert[] a theory" allowing the inclusion of broadband in Lifeline and the High Cost program.[329]  The question whether the Commission could provide universal service support for broadband regardless of regulatory classification was litigated before the Tenth Circuit, which affirmed the agency's authority.[330]  And while the NPRM contends that reclassification would "enhance" its "ability to connect low-income households in rural areas," the NPRM ignores that its proposed reclassification will impede investment, slowing broadband deployment in rural areas, and thereby undermining the Commission's connectivity goals.  In areas where reclassification prevents broadband deployment, the Commission's asserted "enhanced" ability to help will be useless.

As with other issues, the NPRM does not cite any problems in the distribution of universal service funding to support broadband either through Lifeline or the High Cost program over the past six years that justify Title II regulation of broadband.  And while there remain issues to be solved in the universal service program — including the ever-increasing contribution

---

[328] Report and Order and Further Notice of Proposed Rulemaking, *Connect America Fund*, 26 FCC Rcd 17663, ¶¶ 60-72 (2011).

[329] NPRM ¶ 49.

[330] *See 2020 Remand Order* ¶ 83 (citing *In re FCC 11-161*, 753 F.3d 1015, 1044-48 (10th Cir. 2014)).

factor and the ever-declining contribution base — the NPRM does not propose solutions to any of them.

>    d.    *Reclassification Is Unnecessary To Ensure Free Expression on the Internet*

The NPRM would do nothing to promote free speech on the internet. As the NPRM notes, "[s]ocial media websites and other platforms particularly have become important platforms for free expression, political engagement, and social activism."[331] ISPs have expressly committed not to block or throttle access to these websites and, as noted above, the NPRM provides no evidence questioning those commitments. Even without such a commitment, market forces compel ISPs to ensure that their customers can reach whatever website they wish to visit.

Of course, as explained above, those websites and platforms — the most prominent of which Big Tech companies operate — have control over the reach of information through the algorithms they employ. But broadband providers lack that control, and the acts of content providers cannot be a justification for imposing common carriage on broadband providers.

>    e.    *Reclassification Is Not Necessary To Advance Digital Equity*

The NPRM seeks comment "on any equity-related considerations and benefits (if any) that may be associated with" its Title II proposal.[332] Reclassification is not needed to advance digital equity goals, and it can in fact undermine such goals by inhibiting private sector investment in broadband. Importantly, through the Infrastructure Investment and Jobs Act of 2021 ("IIJA"), Congress established numerous programs to promote digital equity, including the $42.45 billion Broadband Equity, Access, and Deployment program for deployment to unserved and underserved areas; the Affordable Connectivity Program, which provides a discount for

---

[331] NPRM ¶ 53.

[332] *Id.* ¶ 54 (footnote omitted).

**App. 1195**

broadband service to eligible households; the Digital Equity Act programs that provide $2.75 billion to establish three grants with the goal of ensuring that all people have the skills, technology, and capacity needed to participate in the digital economy.  In the IIJA, Congress also enacted provisions aimed at facilitating equal access to broadband, including by preventing and eliminating digital discrimination.  And Congress's decision to address equal access directly — in the way that it chose — demonstrates that it did not intend for the Commission to attempt to address the issue through Title II reclassification of broadband.

> f.      *Reclassification Will Not Provide Additional Accessibility Benefits*

The Commission has ample authority under the Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA") to ensure the accessibility of Internet-based communications services.[333]  In particular, sections 716 and 718 do not turn on whether a service is classified as a telecommunications service or an information service.  And because of the CVAA and the Commission's implementing regulations, any effect of applying Section 255 to broadband on accessibility would be quite limited.  Indeed, the NPRM does not even attempt to identify any specific benefits.

Congress is also considering updates to the CVAA, and its potential solutions notably do *not* include reclassifying broadband as a common-carrier service.[334]  The Commission should not attempt to substitute its judgment for that of Congress.

---

[333] *See 2018 Order* ¶ 205.

[334] Bill to Update the 21st Century Communications and Video Accessibility Act of 2010, S.L.C., 117th Cong., 2d Sess. (introduced by Sen. Edward J. Markey).

**App. 1196**

*Reclassification Will Not Substantially Affect Competitive*
         *Deployment to Multiple Tenant Environments*

The Commission already has ample authority to address the issues associated with

Multiple Tenant Environments ("MTEs").  As the NPRM notes, citing a host of orders, the

"Commission has long prohibited agreements between providers of certain communications

services and MTE owners that grant the provider exclusive access and rights to provide service

to the MTE."[335]  The NPRM does not identify any need for additional rules that the Commission

could not already adopt with regard to carriers or cable operators with commingled broadband

facilities.  Reclassification of broadband is therefore unnecessary for the Commission to be able

to continue to address those issues.  While reclassification would allow the Commission to

expand its rules to encompass broadband-only providers, the NPRM does not identify any

evidence that this set of providers exists, much less is entering into exclusive contracts that are

hindering competitive deployment to MTEs.

## IV.    The Commission Cannot and Should Not Impose Common-Carrier Regulation on One Subset of the Participants in the Internet Traffic Exchange Marketplace

### A.    The Commission's Proposal Would Significantly Disturb and Harmfully Distort the Well-Functioning Internet Traffic Exchange Marketplace

The internet is composed of many constituent networks, and each network must connect

either directly or indirectly with every other to ensure connectivity among their respective

customers.  To accomplish this end, networks accept and deliver traffic from any number of other

networks through a variety of peering, transit, and other interconnection arrangements.[336]  In

recent years, many content providers have supplemented their existing indirect interconnection

arrangements by also negotiating direct connections with ISPs or purchasing CDN services from

---

[335] NPRM ¶ 52.

[336] *See* Kende Report at 5-9 (explaining these various arrangements).

**App. 1197**

ISPs.[337]  And many content providers purchase specialized content delivery services from third-party CDNs such Akamai and Limelight, which in turn arrange for either direct or indirect interconnection with ISP networks.

All these commercial relationships have always been unregulated, and the interconnection marketplace has always functioned efficiently, in part because there are many routes into and out of any broadband ISP's network.[338]  Given the wide variety of interconnection possibilities, application and content providers need not even deal with an ISP directly to reach the ISP's end users; they can instead choose transit services offered by one or more of the ISP's peers (and, for many ISPs, the ISP's own transit providers).[339]  ISPs, in turn, cannot selectively degrade particular peering arrangements to harm particular providers because those providers and their transit intermediaries — not the ISP — choose the interconnection facilities they will use for sending content to the ISP's customers.[340]  This prevalence of individual negotiation and choice ensures that ISPs cannot exercise leverage over application and content providers and other consumers in the market for interconnection services.

Notably, while the *2015 Order* discussed "competing narratives" about then-current internet exchange traffic disputes,[341] the Commission did not resolve those narratives and concluded that it "would be premature to adopt prescriptive rules."[342]  By the *2018 Order*, the

---

[337] *See id.* at 8-9 (explaining the role of content delivery networks).

[338] *See id.* at 28 ("While these arrangements have evolved to address changes in applications and business models, they have done so free of regulation.").

[339] *See* Israel et al. Decl. ¶¶ 54-55.

[340] *See* Kende Report at 28 (finding "no evidence that any provider has acted as a gatekeeper, to force any interconnection conditions that require regulation to avoid or undo").

[341] *2015 Order* ¶ 200; *see id.* ¶¶ 199-201.

[342] *Id.* ¶ 202.

**App. 1198**

"record [was] devoid of evidence of consumer harm" involving interconnection arrangements.[343] The case-by-case process the Commission established in the *2015 Order* to hear any disputes with ISPs about their terms and conditions for internet traffic exchange had "gone unused."[344] The NPRM does not identify any issues that have arisen in the internet traffic exchange marketplace since the *2018 Order*. Internet traffic exchange is, instead, a well-functioning marketplace.

While not addressing any legitimate concern, the Commission's proposal has the potential to distort that marketplace by imposing regulatory obligations on one set of players, but not their counterparties. The NPRM would allow application and content providers (which the NPRM correctly notes include companies as large as, if not larger than, the ISPs)[345] to use the threat of seeking regulatory intervention to tilt negotiations in their favor, destabilizing the Internet traffic exchange marketplace in a way that would likely only require further regulatory interventions in the future.

**B.      Internet Traffic Exchange Is an Information Service, Not a Common-Carrier Telecommunications Service**

The Commission has never classified internet traffic exchange as a telecommunications service, including when offered by ISPs that also sell retail, mass-market broadband service. The NPRM does not propose to change that. Instead, it proposes to repeat the *2015 Order*'s conclusion that the Commission can regulate the terms and conditions those ISPs offer for internet traffic exchange as an adjunct to the Commission's regulation of broadband as a Title II

---

[343] *2018 Order* ¶ 168.

[344] *Id.*

[345] *See* NPRM ¶ 187.

**App. 1199**

service.[346]  While the D.C. Circuit upheld that aspect of the *2015 Order*,[347] its decision was erroneous for at least three reasons.

*First*, the D.C. Circuit's conclusion is inconsistent with the Communications Act's express provisions governing interconnection.  In the context of legacy voice telephone service, the fact that telephone companies offer Title II telecommunications services that include the ability of customers to call all other phone numbers does not give the Commission inherent authority to impose common carrier regulation on those companies' interconnection arrangements.  Instead, Congress enacted three express statutory provisions governing interconnection.  The first merely imposes a duty on all telecommunications carriers to interconnect (directly or indirectly) with other telecommunications carriers; it does not give the Commission authority to regulate the terms and conditions of those interconnection arrangements.[348]  The other two provisions do give the Commission authority over those terms and conditions, but only in limited circumstances.  The Commission can adopt rules governing the terms and conditions on which incumbent local telephone companies offer interconnection to new entrants offering local telephone service.[349]  Or the Commission can impose specific interconnection obligations through adjudication on a carrier-specific basis, but only after "an opportunity for [a] hearing" on the merits of particular interconnection disputes.[350]

---

[346] *See* NPRM ¶ 66.  Because the NPRM's asserted authority over ISPs' internet traffic exchange arrangements is explicitly contingent on its classification of broadband as a Title II service, rejection of that reclassification is sufficient to deprive the Commission of the contingent authority the NPRM asserts over internet traffic exchange arrangements.

[347] *See USTelecom I*, 825 F.3d at 713.

[348] *See* 47 U.S.C. § 251(a).

[349] *See id.* § 251(c)(2).

[350] *Id.* § 201(a).

**App. 1200**

The existence of these express provisions refutes any notion that classification of a retail service as a Title II common-carrier service carries with it authority for the Commission to regulate on a common-carrier basis the terms and conditions on which those retail providers interconnect. Indeed, the specific limitations on the Commission's authority in Sections 251(c)(2) and 201(a) would be rendered obsolete if the provision of a retail telecommunications service were sufficient to authorize common-carrier regulation of interconnection, as the NPRM claims. Nor can the Commission rely on any of the three explicit interconnection provisions to regulate internet traffic exchange arrangements. Each of them applies only to interconnection between two telecommunications carriers. Yet ISPs' internet traffic exchange counterparts are entities that the Commission is proposing to leave subject to Title I.

*Second*, absent such implicit authority, the Commission could engage in common-carrier regulation of internet traffic exchange arrangements only if the Commission classified such arrangements as a telecommunications service. But such arrangements by definition involve information service providers on both sides. Both parties to the arrangements "offer" each of the "capabilit[ies]" in Section 153(24): "for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available, information via telecommunications." And information processing is tightly integrated into those arrangements, as the NPRM recognizes in its discussion of the use of BGP.[351] For these reasons, the Commission has never classified internet traffic exchange as a telecommunications service; the NPRM rightly proposes not to depart from that decades-long treatment of such arrangements.

*Third*, even aside from the fact that internet traffic exchange arrangements are an information service, they independently do not satisfy the *NARUC* test for classifying a service

---

[351] *See* NPRM ¶ 31.

as common carriage rather than private carriage. ISPs do not voluntarily offer to enter internet traffic exchange arrangements on a common-carrier basis. Nor do the explicit or implicit terms of ISPs' contracts with their customers commit them to offer to enter internet traffic exchange arrangements with third-party networks on such a basis.[352] The NPRM also does not make any findings about market power, which would be necessary for the Commission to compel ISPs to offer such arrangements on a common-carrier basis. As discussed above, the NPRM's endorsement of the *2015 Order*'s "gatekeeper" theory of a terminating access monopoly lacks merit. Intense competition in the broadband market also constrains ISPs' ability to dictate prices and terms for their services.

For all these reasons, common-carrier regulation of Internet traffic exchange arrangements would exceed the Commission's authority under Title II of the Act, even granting the (erroneous) premise that the Communications Act authorizes the Commission to regulate mass-market retail broadband services under Title II in the first place.

## V.     Broadband Internet Access Service Providers Should Be Subject to a Single Set of Uniform, National Rules

Regardless of the action the Commission takes in this proceeding, it should state unambiguously that its rules are the only set of rules that govern broadband internet access service, as the Commission has defined that term since 2010. The Commission correctly acknowledges the importance of "establishing a national regulatory approach rather than disparate requirements that vary state-by-state."[353] Complying with "differing state open Internet

---

[352] Indeed, some providers' Terms of Services expressly disclaim offering internet traffic exchange services on a common-carrier basis. *See*, *e.g.*, AT&T Network Practices, https://about.att.com/sites/broadband/network.

[353] NPRM ¶ 3; *see also*, *e.g.*, *id*. ¶ 16 (acknowledging the importance of "a national regulatory approach" to broadband); *id*. ¶¶ 21, 24 (similar).

requirements" is likely to be "burdensome for ISPs, particularly small ISPs, thus hindering the broadband market," and ultimately consumer access to broadband.[354] To avoid that outcome, any rules the Commission adopts must apply uniformly nationwide, and be both a "floor" and "ceiling" on the requirements that can be imposed on ISPs. That is, the Commission should revert to and adopt the proposal in the draft NPRM and establish a "*uniform*, national" set of rules."[355]

If the Commission were instead to adopt rules that, in its view, functioned only as a "nationwide floor," and purported to give each state the option of building atop that floor with its own, unique set of requirements, the result would be a patchwork that would be burdensome for ISPs and a hindrance to the broadband marketplace. To the extent that ISPs are able to adjust their practices on a state-by-state basis, allowing each state to adopt its own, unique set of requirements would result in consumer confusion. The rules of the road for broadband would change when consumers move their residence. A customer relocating from one state to another might find that, even if she continues to rely on the same ISP for internet access, features, functionalities, and services she enjoyed for years are no longer available to her.

However, technical and practical limitations are likely to prevent ISPs from varying many practices by state. Therefore, individual state laws will likely require ISPs to adjust their practices nationally. Every time a state enacts a new prohibition or mandate, ISPs will likely need to adjust their practices nationwide to comply with the new rule in the relevant state. In this way, each individual state could have the power to impose burdens on ISPs nationwide, and ISPs

---

[354] *Id*. ¶ 24.

[355] *See*, *e.g.*, Draft Notice of Proposed Rulemaking, *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, FCC-CIRC2310-01, ¶¶ 3, 16, 21, 24, 93, 95, 96 (Sept. 28, 2023) (emphasis added).

**App. 1203**

could find themselves adjusting their national practices again and again as additional states adopt their own, unique sets of rules.

In the event the Commission were to adopt the onerous set of requirements for ISPs that the NPRM contemplates, any requirements states decide to impose on ISPs over and above those rules are unlikely to yield benefits sufficient to justify the cost of compliance on ISPs and the confusion to consumers. In that scenario, the potential costs to ISPs — ultimately borne by their customers — of potentially complying with more than 56 unique regimes (those of the 50 States, the District of Columbia, Puerto Rico and other inhabited territories, and the Commission's rules), easily outweighs any benefit that a state might claim that its own unique set of individual requirements would yield.

## VI. The Commission Should Forbear from Section 214 Obligations in Addition to the Other Title II Obligations and Rules From Which It Proposes To Forbear

### A. The NPRM Correctly Proposes To Forbear From Numerous Provisions of Title II, Including Rate Regulation Provisions

The *2015 Order* recognized that broadband should not be subjected to the entirety of Title II, and the NPRM correctly proposes to continue that. One important change from the draft NPRM was the expansion of the Commission's proposed forbearance from the core rate regulation provisions of Title II. While the draft NPRM's proposed forbearance would still have permitted the Commission to "rely on sections 201 and 202 to address [rates] on an *ex post* basis,"[356] the NPRM proposes to "forbear from all provisions of Title II that would permit Commission regulation of [broadband] rates," whether *ex ante* or *ex post*.[357] While that forbearance does not go far enough to protect broadband from rate regulation — both because

---

[356] Draft NPRM ¶ 104.

[357] NPRM ¶ 105.

the general conduct standard is readily misapplied to impose de facto rate regulation and because future Commissions can undo forbearance — that was a necessary change to the draft NPRM.

Any threat of future rate regulation, direct or indirect, chills investment. As the NPRM notes, broadband infrastructure deployment requires "long-term, irreversible investments."[358] Providers will be reluctant to make those investments if faced with the threat of future rate regulation that could change the economics of those investments. Indeed, New York's recent attempt at rate regulation demonstrated just that. As multiple ISPs explained in sworn declarations, a New York law capping prices for low-income broadband customers at $15/month — if that law had taken effect — would have caused them to stop planned (but not yet implemented) network expansions.[359]

Rate regulation is also "not necessary for the protection of consumers,"[360] given the increasing competition to serve broadband customers. As described above, more Americans have more broadband options than ever before, particularly with the increasing roll out and adoption of 5G fixed wireless offerings. These competitive market dynamics encourage investment and promote innovation, improving product offerings while keeping broadband prices low.

To the extent any government action were needed to ensure that broadband remains affordable, the appropriate form of intervention is direct subsidization, as Congress has already done through the Emergency Broadband Benefit program and Affordable Connectivity Program. Such direct subsidization minimizes interference with the salutary marketplace dynamics

---

[358] *Id.* ¶ 57.

[359] *See N.Y. State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d 269, 277 (E.D.N.Y. 2021).

[360] 47 U.S.C. § 160(a)(2).

referenced above, and ensures that broadband providers are not forced to bear the costs of subsidies that are appropriately funded by taxpayers generally.

### B.  The Commission Should Also Forbear Broadly From Section 214(a)-(d)

Section 214 of the Communications Act requires service providers to obtain the Commission's approval for the construction, acquisition, operation, and transmission of common carrier services, as well as before discontinuing, reducing, or impairing such services.[361]  It also requires prior approval from the Commission for any substantial transfer of control of a carrier's lines or authority.  In part due to the breadth of these requirements, the Commission has always exempted broadband from Section 214.  In 2005, the Commission granted "blanket certification to discontinue" any DSL transmission inputs to retail broadband service that had been offered on a common-carrier basis to third-party ISPs.[362]  In 2015, the Commission forbore from the entirety of Section 214(a)-(d).[363]  No party challenged that forbearance.

As the Commission recognized in 2015, against this status quo, the burden is on those proposing to impose Section 214 requirements for the first time to "persuade[ ]" the Commission that doing so "is necessary within the meaning of sections 10(a)(1) and (a)(2) or that forbearance would not be in the public interest under section 10(a)(3)."[364]  The NPRM does not even attempt to carry that burden.  While the NPRM discusses at some length potential justifications for using *international* Section 214 requirements to give the Commission the power to eject from the marketplace a hypothetical Chinese broadband provider,[365] the NPRM offers no reasons for

---

[361] 47 U.S.C. § 214.

[362] Report and Order and Notice of Proposed Rulemaking, *Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd 14853, ¶¶ 100-101 (2005).

[363] *2015 Order* ¶¶ 509-512.

[364] *Id.* ¶ 510.

[365] *See* NPRM ¶¶ 27, 108.

deviating from past practice and imposing any other Section 214(a)-(d) obligations on broadband. Instead, the Commission merely "seek[s] comment on any implementation issues concerning our domestic section 214 requirements."[366]

Regardless of whether the Commission can justify retaining Section 214 authority to rescind international Section 214 licenses from broadband providers, it should otherwise forbear from applying Section 214(a)-(d).[367] Broadband providers have always been free to roll out new and innovative offerings — and to remove older, less popular offerings — without first obtaining Commission approval. Similarly, broadband providers have been free to invest in providing broadband in new territories, knowing that if the investment does not pan out, the Commission cannot force them to continue providing unprofitable services by denying authorization under Section 214. This freedom has allowed broadband providers to make investments without fear of being "locked in" to those investments irrespective of future developments that might make the investments unprofitable.[368]

Such investments have increased innovation and resulted in faster (and for wireless, lower latency) broadband offerings. This freedom is particularly important as newer, better broadband technologies have overtaken older, costlier ones, such as DSL.[369] The Commission

---

[366] *Id.* ¶ 108.

[367] The Commission should also make clear that, insofar as it does not forbear from the requirement in Section 214(a) that carriers obtain Commission permission before "engag[ing] in transmission," all current and future broadband providers have blanket interstate and international Section 214 licenses.

[368] *See*, *e.g.*, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 628 (1974) ("Ease of entry into a market presumes ease of exit[.]"); First Report and Order, *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities*, 85 FCC 2d 1, ¶ 147 (1980) ("If regulatory exit barriers are not lowered, carriers may be discouraged from entering high risk markets for fear that they may not be able to discontinue service in a reasonably short period of time if it proves unprofitable. Ease of exit is also a fundamental characteristic of a competitive market.").

[369] *See*, *e.g.*, Report and Order, Declaratory Ruling, and Further Notice of Proposed Rulemaking, *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 32

**App. 1207**

should not impose for the first time new barriers on providers that wish to discontinue these older services so that they can focus their resources on transitioning to newer technologies that consumers are demanding.

Requiring ISPs to seek the Commission's permission every time they want to discontinue or change an existing service offering would undermine investment incentives. The prospect of being locked into providing an unprofitable service may cause providers to simply decline to make investments in the first instance. Such requirements would also impose substantial additional obligations on the Commission, even if the Commission adopted a streamlined process with automatic grants.

As there is no record of harm to any customers from the decades-long absence of Section 214 requirements for broadband providers, the Commission could not justify such a major change to their investment-backed expectations.[370] The Commission should accordingly forbear from all domestic Section 214 requirements.

## VII.    Conclusion

Contrary to the NPRM's claims, the *2018 Order* has been an unmitigated success and all its predictive judgments have been borne out. More Americans have access to broadband, have more broadband choices, and have faster and cheaper broadband options than they did in 2017. None of the problems the *2015 Order*'s rules were intended to prevent have arisen. Certainly,

FCC Rcd 11128, ¶ 83 (2018) ("The record also makes clear that the Commission's current section 214(a) discontinuance rules impose needless costs and delay on carriers that wish to transition from legacy services to next-generation, IP-based infrastructure and services. Even relatively short delays or periods of unpredictability can, in the aggregate, create significant hurdles for providers who seek to upgrade hundreds or thousands of lines across their service territory. As Verizon explains, excessive restrictions on the discontinuance of legacy services harm both consumers and competition alike 'as they delay the ability of providers to shift resources from legacy voice services to the more modern offerings that consumers demand.'") (footnotes omitted).

[370] *See, e.g.*, *Advanced Commc'ns Corp. v. FCC*, 376 F.3d 1153, 1158 (D.C. Cir. 2004); *Omnipoint Corp. v. FCC*, 78 F.3d 620, 633 (D.C. Cir. 1996).

**App. 1208**

the prophesized end of the internet did not occur.  The Commission should reject the NPRM's proposal to nonetheless revert to the *2015 Order* and then to add to the regulatory burdens that earlier order imposed with numerous new obligations.  Such a power grab is both unwarranted and unlawful.  It will not survive judicial review, but will cause turmoil in an industry that is critical to every aspect of modern life.  Rather than searching for solutions to non-existent problems, the Commission should focus on ensuring that it exercises its actual statutory authority in ways that best help close the digital divide and bring the promise of the internet to all Americans.

Respectfully submitted,

/s/ *Scott H. Angstreich*

|  |  |
|---|---|
| Diana Eisner | Scott H. Angstreich |
| Vice President, Policy and Advocacy | Leslie V. Pope |
|  | Alex A. Parkinson |
| Nirali Patel | Dennis D. Howe |
| Senior Vice President, Policy and Advocacy | Nataliia Gillespie |
|  | Kelley C. Schiffman |
| USTelecom – The Broadband Association | Kellogg, Hansen, Todd, Figel |
| 601 New Jersey Avenue, N.W. |   & Frederick, P.L.L.C. |
| Suite 600 | 1615 M Street, N.W., Suite 400 |
| Washington, D.C. 20001 | Washington, D.C. 20036 |

*Counsel for USTelecom*

December 14, 2023

**App. 1209**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| | WC Docket No. 11-42 |
| Lifeline and Link Up Reform and Modernization | |

## COMMENTS OF VERIZON
## AND OPPOSITION TO PETITIONS FOR RECONSIDERATION

William H. Johnson
*Of Counsel*

Alison N. Steger
VERIZON
1300 I Street, N.W., Suite 500E
Washington, D.C. 20005
(202) 281-9460

*Attorneys for Verizon*

December 14, 2023

**App. 1210**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY ....................................................................................... 1

I.    THE INTERNET IS THRIVING, AND BROADBAND INVESTMENT
      AND DEPLOYMENT ARE ROBUST ............................................................................. 3

      A.    The Internet Is and Will Remain Open Without Title II Control ............................ 3

      B.    Like Other Providers, Verizon Has Continued to Invest Billions in
            Broadband Deployment Without Title II Control ................................................... 4

II.   THE NOTICE'S ADDITIONAL REASONS FOR RECLASSIFYING
      BROADBAND FAIL ....................................................................................................... 8

      A.    Data Security and Consumer Privacy Concerns Do Not Warrant
            Title II Reclassification ......................................................................................... 9

      B.    National Security Concerns Do Not Warrant Title II
            Reclassification ................................................................................................... 11

      C.    Cybersecurity Concerns Do Not Warrant Title II Reclassification ..................... 13

      D.    The Notice Identifies No Other Sound Reason for Reclassification .................... 15

CONCLUSION ...................................................................................................................... 18

## INTRODUCTION AND SUMMARY

Verizon supports the open internet. Our customers demand it, and our business depends on it. We also believe it is long past time for Congress to enshrine basic net neutrality rules of the road in statute and to put an end to the regulatory ping-pong that this issue has become over the last two decades. Fortunately, there is no evidence of any current threat to the open and vibrant internet. And there is also no reason for the Commission to rush to get ahead of a lasting congressional resolution to this issue by instead unlawfully force-fitting the dynamic broadband marketplace into a counterproductive and outdated Title II regulatory framework. Instead of embarking down that wasteful path, the Commission should pursue policy issues — like the creation of a strong spectrum pipeline — that will encourage continued broadband investment, deployment, and innovation, while working with Congress on an appropriate and durable set of open internet protections.

"Reclassifying" broadband as a Title II "telecommunications service"[1] would be both unlawful and bad policy. Verizon joins in full the comments of USTelecom and CTIA, which correctly explain that reclassification would be unlawful because (among other things) Congress did not clearly authorize the Commission to subject broadband providers to common-carrier regulation[2] and because broadband is an "information service" (and in some cases a "private

---

[1] *See* 47 U.S.C. § 153(53) (defining "telecommunications service").

[2] *See United States Telecom Ass'n v. FCC*, 855 F.3d 381, 417-18 (D.C. Cir. 2017) (en banc) (Kavanaugh, J., dissenting from the denial of rehearing en banc) ("Here, because Congress never passed net neutrality legislation, the FCC relied on the 1934 Communications Act, as amended in 1996, as its source of authority for the net neutrality rule. But that Act does not supply *clear* congressional authorization for the FCC to impose common-carrier regulation on Internet service providers. Therefore, under the Supreme Court's precedents applying the major rules doctrine, the net neutrality rule is unlawful.").

mobile service") not subject to common-carrier regulation.[3]  Verizon makes these separate

comments to underscore why, as a practical matter, the policy concerns identified in the Notice

would not support reclassification, and why the Commission's proposed approach would put at

risk important national goals supporting robust, ubiquitous, and competitive broadband access.[4]

*First*, experience in the five years since the Commission issued its *2018 Order*[5] has

confirmed that Title II reclassification is not necessary to protect the openness of the internet.  As

explained below, Verizon (like other providers) continues to commit to not blocking, throttling,

or unfairly prioritizing traffic not because of any Commission or state law requirement, but

because that is what our customers demand — a demand that competing providers will eagerly

satisfy if we do not.  Further (and for similar reasons), there is no evidence that Title II

reclassification would encourage more widespread or robust broadband:  Verizon has continued

to invest billions every year in deploying its broadband network and, with the advent of our 5G

Home fixed wireless offerings in addition to our best-in-class Fios products, Verizon is now a

nationwide provider of home broadband services bringing additional broadband competition to

tens of millions of consumers.  As far as the open internet and broadband deployment are

---

[3] *See* 47 U.S.C. § 153(24) (defining "information service").

[4] Verizon submits these comments in response to the Commission's Notice of Proposed Rulemaking, *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, FCC 23-83 (rel. Oct. 20, 2023) ("NPRM" or "Notice"), and in opposition to the petitions for reconsideration in the remaining above-captioned proceedings, *see Public Notice, Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the RIF Remand Order*, WC Docket Nos. 17-108, 17-287, 11-42, DA 23-996 (Oct. 19, 2023).

[5] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("*2018 Order*") (reversing Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("*2015 Order*")).

**App. 1213**

concerned, then, reclassification is a solution in search of a problem that the Commission will not find.

*Second*, experience also shows that the Notice's other proposed bases for reclassification are unfounded. The Notice primarily relies on stated interests in a constellation of areas outside the Commission's core competency, including national security and cybersecurity. But the existing "whole of government" approach to these matters — an approach with which Verizon (like other providers) has closely cooperated — is wholly adequate to protect these interests. Further, even if the Commission had the authority and the expertise to address those matters in isolation from the rest of the federal government (which it does not), it could never effectively do so by imposing Title II regulation on mass-market broadband providers, yet leaving the rest of the internet ecosystem untouched.

For all these reasons, the Commission should not reclassify broadband as a telecommunications service subject to Title II.

## I. THE INTERNET IS THRIVING, AND BROADBAND INVESTMENT AND DEPLOYMENT ARE ROBUST

### A. The Internet Is and Will Remain Open Without Title II Control

As its lead reason for proposing reclassification, the Notice claims that Title II oversight is necessary "to ensure that the Internet is open and fair."[6] But the Notice cites no evidence in the years since the *2018 Order*'s issuance suggesting that the openness of the internet depends on Title II reclassification or is in any way at risk. It cites none because there is none, and there is

---

[6] NPRM ¶ 21.

**App. 1214**

none because that claim is not true:  The internet already is and will remain open, because that is what consumers demand of their broadband providers.

Verizon is a prime example of this, as it has publicly and expressly committed to open internet principles that apply to our consumer mass-market broadband internet access services. On our website, we explain that "[t]o enable our consumer broadband customers to take advantage of all the internet has to offer":  we "will not block any legal internet content, applications, or services based on their source or content"; "will not throttle or slow down any internet traffic based on its source or content"; "will not accept payments from any company to deliver its traffic faster or sooner than other traffic on our consumer broadband service"; will not "deliver our affiliates' internet traffic faster or sooner than third parties' "; and "will not prioritize traffic in a way that harms competition or consumers."[7]  Verizon made these public commitments because they reflect what our customers expect.  The Notice's core premise thus has no support.

### B.    Like Other Providers, Verizon Has Continued to Invest Billions in Broadband Deployment Without Title II Control

The Notice also claims that reclassification "will enable the Commission to better support the deployment of wireline and wireless infrastructure."[8]  This unfounded suggestion ignores the robust investment and deployment that currently prevails for broadband, with consumers benefiting from more and better broadband options every day based on tens of billions of dollars

---

[7] Verizon, *Verizon Broadband Commitment*, https://www.verizon.com/about/our-company/verizon-broadband-commitment (last visited Dec. 13, 2023); *see also*, *e.g.*, Verizon, *Important Information About Verizon Wireless Broadband Internet Access Services* (Verizon's data-transmission "optimization process is agnostic as to the content itself and to the website that provides it. * * * Verizon Wireless does not block sites based on content or subject, unless the Internet address hosts unlawful content or is blocked as part of an opted-in customer service."), https://www.verizon.com/support/broadband-services/ (last visited Dec. 13, 2023).

[8] NPRM ¶ 46.

**App. 1215**

of annual, private investment. According to the Commission's own studies, virtually all Americans live in areas with access to high-speed internet.[9] And providers are hardly resting on their laurels: the industry invested $102.4 billion in infrastructure last year alone, which is itself an increase of $22.4 billion more than it invested in 2018.[10] Further, the Administration's recently announced Broadband Equity, Access, and Deployment (BEAD) Program will complement this private investment with a $42.5 billion grant program to promote broadband deployment and adoption in those regions that remain underserved.[11]

As we recently set forth in great detail, Verizon has been at the forefront of these efforts.[12] In 2005, Verizon became the first provider in the U.S. to offer fiber to the premises at scale; today, between our best-in-class Fios service that operates over our fiber-optic-to-the-premises network, our fixed wireless access services (FWA), and our nationwide wireless

---

[9] *See* FCC, *National Broadband Map* (finding that, according to data as of June 30, 2023 (last updated Nov. 28, 2023), 99.96 percent of residential units were covered with broadband speeds of at least 100/20 Mbps), https://broadbandmap.fcc.gov/area-summary; *see also* 2022 Communications Marketplace Report, *Communications Marketplace Report*, GN Docket No. 22-203, FCC 22-103, at 43, Fig. II.A.28 (Dec. 30, 2022) (noting that, as of 2021, all but 5.4% of U.S. households were living in census blocks with 100/20 Mbps service), https://docs.fcc.gov/public/attachments/FCC-22-103A1.pdf.

[10] *See* USTelecom, *2022 Broadband Capex Report*, https://ustelecom.org/wp-content/uploads/2023/09/2022-Broadband-Capex-Report-final.pdf.

[11] *See* The White House, *Fact Sheet: Biden-Harris Administration Announces Over $40 Billion to Connect Everyone in America to Affordable, Reliable, High-Speed Internet* (June 26, 2023) ("Today, the Department of Commerce announced funding for each state, territory and the District of Columbia for high-speed internet infrastructure deployment through the Broadband Equity Access and Deployment (BEAD) program — a $42.45 billion grant program created in the Bipartisan Infrastructure Law and administered by the Department of Commerce."), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/26/fact-sheet-biden-harris-administration-announces-over-40-billion-to-connect-everyone-in-america-to-affordable-reliable-high-speed-internet/.

[12] *See* Verizon, *Universal Access, Universal Affordability: Verizon's Leading Role in Building America's Broadband Future* (July 31, 2023) ("*Universal Access*"), https://www.fcc.gov/ecfs/document/10731258635485/2.

**App. 1216**

network, Verizon provides internet access across the country at speeds unthinkable in recent memory.[13]  This innovation and expansion is the fruit of our huge investments over a few short years, including more than $100 billion in capital expenditures since the beginning of 2018 and an additional $52 billion in a generational investment to obtain licenses and gain access to C-band spectrum that will "help us deploy a more powerful 5G experience and expand our strong 5G network."[14] Verizon's recent investments in deploying 5G over C-band are rapidly benefiting consumers, as our C-band network already reaches more than 230 million Americans. This network expansion also supports additional consumer choice and competition for robust home broadband, with our fixed wireless offering already reaching over 40 million homes, and on its way to reaching 50 million by the end of 2025.

   None of this required the "support" of Title II control, and there is no evidence that such "support" would have yielded any greater investment or any faster deployment.  Indeed, despite its extraordinary cost, the breakneck rollout of broadband supported by a light-touch regulatory framework is perhaps the most successful and rapid deployment of transformative infrastructure in the history of the United States.[15]

---

[13] *See id.* at 3-4.

[14] Verizon, *Verizon C-Band Spectrum Auction Frequently Asked Questions* https://www.verizon.com/business/resources/factsheets/verizon-c-band-spectrum-auction-frequently-asked-questions/ (last visited Dec. 13, 2023); *see also Universal Access*, *supra* note 12, at 12 (In 2008, "Verizon took the first, foundational step in the deployment of its 4G LTE network by paying $9.4 billion for a broad set of spectrum licenses in the FCC's 700 MHz auction."); *id.* at 13-14 ("In December 2011, just as its LTE network was reaching the 200-million-person landmark, Verizon announced the purchase of the cable companies' spectrum for nearly $4 billion — then the largest purchase of spectrum on the secondary market (outside of an outright corporate merger) in U.S. history."); *id.* at 14 ("Verizon again supplemented its spectrum in 2015, spending $10.4 billion in the FCC's AWS-3 auction."); *id.* (discussing C-band auction); *id.* at 24 (As early as 2006, "Verizon committed $18 billion to the deployment of Fios.").

[15] *See Universal Access*, *supra* note 12 at 37-38 ("Indoor plumbing was introduced in the United States in 1842.  As of 1940, a century later, more than 45% of U.S. households lacked

6

If anything, reclassification will discourage investment and frustrate the collective objective of getting robust broadband to all Americans.  The Commission's first decision to subject broadband providers to Title II regulation (coming, as it did, shortly before an election) lent the issue newfound political prominence — and, as a consequence, a new recurring source of regulatory uncertainty.  In the Notice, the Commission has compounded this uncertainty by proposing to re-impose the vague "general conduct standard,"[16] asserting a continuing power to pick and choose *which* Title II provisions apply to broadband providers,[17] and — going beyond even the *2015 Order* — to subject broadband internet access services to the requirements of Section 214 (which include both entry and exit regulation).[18]  For the same reasons the *2018 Order* explained[19] and USTelecom re-explains now, all of this is likely to deter investment in innovative technologies — ultimately, harming consumers.

Accordingly, the two principal premises of the Notice — that Title II classification is required to support the open internet and to encourage investment in and the deployment of broadband infrastructure — enjoy no support in the industry's experience (including Verizon's).  That is reason enough to abandon reclassification.

---

complete indoor plumbing systems.  The spread of indoor plumbing did not cross 90% of households until the 1960s.  As of 2021, approximately 11% of Americans did not have access to basic sanitation.  Electric lighting was introduced in American cities in the 1870s, but penetration did not clear 90% of urban and non-farm rural residences until the 1940s.") (footnotes omitted).

[16] *See* NPRM ¶ 116.

[17] *See id.* ¶¶ 104-114.

[18] *See id.* ¶ 108.

[19] *See 2018 Order* ¶¶ 246-247.

## II.   THE NOTICE'S ADDITIONAL REASONS FOR RECLASSIFYING BROADBAND FAIL

The Notice also attempts to articulate a different set of reasons for reclassification resting on purported regulatory gaps, ranging from national security to public safety (and much else besides).[20]  Broadband reclassification is the wrong tool for all of these purported "gaps": subjecting mass-market broadband providers *alone* to common-carrier regulation will fail to meaningfully address those matters.  Moreover, most of these alleged gaps fall outside of the Commission's bailiwick, relating only tangentially to the Commission's core charge to regulate interstate and international communications.  Many other arms of the federal government can and do oversee those areas, and there is no reason to think that reclassifying broadband will do more to help than to hinder that whole-of-government approach.

Indeed, the Notice's attempt to justify reclassification based on policy goals that are remote from its mission is fatally flawed even in concept.  If there were some material gap in federal authority to address these matters (and there is not, as we explain below), reclassifying broadband as a Title II service would be a singularly ineffective way to close that gap.  Subjecting mass-market broadband providers alone to common-carrier regulation will leave untouched the great bulk of the internet ecosystem, including large digital platforms, content providers, and peering firms – rendering the approach underinclusive, anti-competitive, and futile.

---

[20] *See* NPRM ¶¶ 25-44.

**App. 1219**

### A. Data Security and Consumer Privacy Concerns Do Not Warrant Title II Reclassification

Consider, for example, the Commission's assertion of data security and consumer privacy as stated justifications for reclassifying broadband.[21] The Notice asserts that, "absent statutory and regulatory requirements to do so, ISPs may not adopt adequate administrative, technical, physical, and procedural safeguards to protect their customers' data."[22] False. Verizon is, and always has been, fully committed to protecting its customers' personal information, and it invests heavily in securing its networks against known and potential threats. Verizon has a team of more than 1,000 professionals dedicated to implementing corporate-wide security controls and constantly monitoring networks to identify and respond to threats and safeguard customer information. Protecting our consumers' data and maintaining their trust is vital, and Verizon by necessity takes these issues seriously. Title II has no bearing on this, and there is no evidence that applying Title II would protect data security and consumer privacy any more effectively than Verizon does currently.

Critically, the *2018 Order*'s reversal of broadband's Title II classification did not leave data security and consumer privacy to the whims of broadband providers. It instead returned oversight over broadband privacy practices to the same expert agency that governs other industries, including within the broader internet ecosystem: the Federal Trade Commission.[23] It makes no sense to subject broadband providers to regulation by the FCC, while leaving the rest of the internet ecosystem to the FTC, especially because other businesses often have much of the same personal data and the same volume of data as broadband providers – and in some instances,

---

[21] *See id.* ¶¶ 40-44.

[22] *Id.* ¶ 42.

[23] *See 2018 Order* ¶¶ 140-154.

**App. 1220**

more data.  Indeed, the result will be consumer confusion about which rules govern their personal data and which agency enforces them.

At the same time that Verizon has consistently supported returning authority over consumer privacy issues related to broadband providers to the FTC, it also has, for more than a decade, consistently urged Congress to establish a uniform federal privacy framework.[24]  That is because a privacy and security regime must treat like businesses alike and like practices alike.  Only such a consistent framework can give both businesses and their customers certainty about the rules of the road.  The Notice's proposal accomplishes the opposite result:  it singles out broadband providers for Section 222[25] regulation while ignoring other internet companies with access to vast troves of data and that are regularly the principal subject of public debate about data security and consumer privacy — therefore burdening just one portion of the internet ecosystem and confusing consumers without any corresponding benefits.  Even if the Commission were to proceed with this reclassification, the only way for it to remedy the disparate privacy and security regime for broadband would be to assert ancillary authority of unprecedented scope over the rest of the internet ecosystem — an approach that would further confirm that the Commission's regulatory reach exceeds its statutory authority.

---

[24] *See* Kathy Grillo, *Privacy:  It's Time for Congress To Do Right By Consumers*, Verizon (Oct. 9, 2018), https://www.verizon.com/about/news/privacy-its-time-congress-do-right-consumers; Karen Zacharia, *Accountability and Privacy*, Verizon (Apr. 9, 2019), https://www.verizon.com/about/news/accountability-and-privacy; Verizon, *How We Operate* ("We support federal consumer privacy legislation.  Our ability to realize the full potential of our future depends on it."), https://www.verizon.com/about/our-company/how-we-operate (last visited Dec. 13, 2023).

[25] 47 U.S.C. § 222.

## B. National Security Concerns Do Not Warrant Title II Reclassification

The Commission's existing authority, together with other agency requirements and processes under other statutes, is sufficient to advance national security and public safety concerns that implicate America's communications networks. The Commission's efforts to address these concerns while broadband has been classified as an information service illustrate this fact. Examples include:

- Establishing the Equipment Authorization program, which (as Congress directed in the Secure Networks Act[26] and the Secure Equipment Act[27]) provides a mechanism for screening untrusted suppliers from the U.S. market and its networks.[28]

- Requiring ISPs to comply with the "assistance capability requirements" of the Communications Assistance for Law Enforcement Act ("CALEA").[29]

- Revoking the international Section 214 authorizations of several Chinese carriers found to present significant national security and law enforcement concerns.[30]

---

[26] Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 133 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609).

[27] Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423 (2021) (codified at 47 U.S.C. § 1601 (Statutory Notes and Related Subsidiaries)).

[28] *See* FCC, *Prohibition on Authorization of "Covered" Equipment*, https://www.fcc.gov/laboratory-division/equipment-authorization-approval-guide/equipment-authorization-system (last visited Dec. 13, 2023); *see also* Report and Order, Order, and Further Notice of Proposed Rulemaking, *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, 37 FCC Rcd 13493 (2022).

[29] *See* FCC, *Communications Assistance for Law Enforcement Act*, https://www.fcc.gov/calea (last visited Dec. 13, 2023).

[30] *See, e.g.*, Order on Revocation and Termination, *China Telecom (Americas) Corp.*, 36 FCC Rcd 15966 (2021); *see also Connecting America: Oversight of the FCC*, Hearing before the Subcommittee on Communications and Technology of the United States House of Representatives Committee on Energy and Commerce, at 3 (Mar. 31, 2022) (Testimony of Brendan Carr) ("[T]he FCC should build on our actions in the Section 214 context by opening a new proceeding to examine whether we should prohibit regulated carriers from directly interconnecting with entities that have been deemed a national security risk, even if those entities are operating in a manner that does not require a Section 214 authorization."), https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/documents/Witness%20Testimony_Carr_CAT_2022.3.31.pdf.

Further, the Commission is hardly the only federal agency regulating communications networks and technology with a view to protecting national security and law enforcement — as should be expected, because other agencies (not the Commission) have the key expertise in those matters. Some examples include:

- The Committee on Foreign Investment in the United States reviews foreign investments in the U.S. communications sector.[31]

- The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom") reviews applications for international Section 214 authorizations for potential national security issues and already considers the provision of broadband in its reviews.[32]

- The Department of Commerce has broad authority to prohibit or condition a wide range of transactions and uses of services under the Information and Communications Technology and Services Supply Chain Rule.[33]

- Pursuant to the National Defense Authorization Act of 2019, the General Services Administration imposes restrictions on federal contractors that use covered telecommunications equipment and services from specified foreign entities.[34]

---

[31] *See* The White House, *Executive Order on Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United States* (Sept. 15, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/09/15/executive-order-on-ensuring-robust-consideration-of-evolving-national-security-risks-by-the-committee-on-foreign-investment-in-the-united-states/.

[32] *See* U.S. Dep't of Justice, Nat'l Sec. Div., *The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector — Frequently Asked Questions*, https://www.justice.gov/nsd/committee-assessment-foreign-participation-united-states-telecommunications-services-sector (last visited Dec. 13, 2023).

[33] *See* U.S. Dep't of Commerce, *Securing the Information and Communications Technology and Services Supply Chain*, https://www.commerce.gov/issues/ict-supply-chain#:~:text=The%20Executive%20Order%3A%20Securing%20the,adversaries%20are%20a%20national%20emergency (last visited Dec. 13, 2023); *see also* U.S. Dep't of Commerce, *Export Administration Regulations (EAR)*, https://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear (cataloging export regulations administered by Commerce's Bureau of Industry and Security) (last visited Dec. 13, 2023).

[34] *See* GSA, *Section 889 Policies*, https://www.acquisition.gov/Section-889-Policies#:~:text=Section%20889(a)(1,or%20as%20critical%20technology%20as (last visited Dec. 13, 2023).

These agencies took these actions pursuant to clear congressional authorization that the Commission lacks. Where Congress has determined that the Commission has a role to play in safeguarding national security and law enforcement, it has assigned specific duties, including those set forth above. The Commission's assertion that its supporting role in protecting national security and law enforcement supplies a basis for reclassifying broadband — an assertion made *without* any clear statutory authority — would upend the whole-of-government approach that Congress designed and agencies with superior expertise have implemented.

Indeed, reclassification is more likely to undermine these interests than it is to further them. For example, the duties the Commission would impose on broadband providers, premised on indiscriminate carriage of traffic, could frustrate national security and public safety goals by making it more difficult to screen, filter, or intercept suspicious traffic (e.g., from foreign adversaries). The Commission has neither the expertise nor the authority to balance those concerns under the banner of common-carrier regulation.

## C. Cybersecurity Concerns Do Not Warrant Title II Reclassification

Cybersecurity is another subject about which the Commission has only a supporting role.[35] That is not an oversight: Congress has assigned principal responsibility of that area to another agency. Specifically, in 2018, Congress established the Cybersecurity and Infrastructure Security Agency ("CISA") as the federal leader for cyber and physical infrastructure security.[36]

---

[35] *See*, *e.g.*, FCC, *Certification Mark — U.S. Cybersecurity Labeling Program for Smart Devices* (proposing adoption of voluntary mark for Internet of Things devices), https://www.fcc.gov/cybersecurity-certification-mark (last visited Dec. 13, 2023).

[36] *See* CISA, *About* ("CISA is the operational lead for federal cybersecurity and the national coordinator for critical infrastructure security and resilience. . . . Mission[:] We lead the national effort to understand, manage, and reduce risk to our cyber and physical infrastructure."), https://www.cisa.gov/about (last visited Dec. 13, 2023).

**App. 1224**

Communications industry participants work closely and collaboratively with CISA and other federal agencies through multiple organizations that provide the policy, planning, and operations framework necessary to safeguard the security of communications networks and services. They include:

- The National Security Telecommunications Advisory Committee ("NSTAC"), which was created in 1982 and includes up to 30 chief executives from major telecommunications providers and information technology, finance, and aerospace companies. NSTAC provides policy recommendations intended to assure the continuity of vital telecommunications links through any event or crisis.[37]

- The Communications Sector Coordinating Council ("CSCC"), which "was chartered in 2005 to help coordinate initiatives [1] to improve the physical and cyber security of sector assets; [2] to ease the flow of information within the sector, across sectors and with designated Federal agencies; and [3] to address issues related to response and recovery following an incident or event."[38] The CSCC includes wireline and wireless telecommunications carriers, cable operators, broadcasters, satellite providers, equipment vendors, and other industry representatives.

- The National Coordinating Center for Communications, Information Sharing and Analysis Center ("C-ISAC"), which facilitates the exchange of information among government and industry participants regarding vulnerabilities, threats, intrusions, and anomalies affecting telecommunications infrastructure.[39]

Moreover, like other providers of critical infrastructure,[40] individual broadband providers are themselves taking action to protect cybersecurity. For example, Verizon has a dedicated Chief Information Security Officer whose team is responsible for leading our information

---

[37] *See* CISA, *About the President's NSTAC*, https://www.cisa.gov/resources-tools/groups/presidents-national-security-telecommunications-advisory-committee/about-presidents-nstac (last visited Dec. 13, 2023).

[38] *See* CSCC, *About*, https://www.comms-scc.org/about/ (last visited Dec. 13, 2023).

[39] *See* CISA, National Coordinating Center for Communications, https://www.cisa.gov/resources-tools/programs/national-coordinating-center-communications (last visited Dec. 13, 2023).

[40] *See*, *e.g.*, National Institute of Standards and Technology, *Framework for Improving Critical Infrastructure Cybersecurity* (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

14

security program, which includes (among other aspects) vulnerability management, antivirus and malware protection, file integrity monitoring, encryption, and access control. This office leads an annual review and discussion with the full board of directors dedicated to Verizon's cyber risks, threats, and protections, and provides updates throughout the year, as warranted. Further, Verizon has deployed a comprehensive Enterprise Vulnerability Management program designed to identify and protect against data security risks, including risk identification, risk detection, risk evaluation, and remediation of any vulnerabilities. We also publish an annual Data Breach Investigations Report to help cybersecurity defenders in the private and public sectors better understand the cybersecurity threats they may face and how to manage these risks effectively.[41]

In sum, cybersecurity (like national security) is a matter that Congress has committed primarily to another agency's discretion and that the broadband industry has developed robust tools to address without common-carrier regulation. Reclassifying broadband as a Title II service would not improve this well-established and carefully coordinated process. If anything, it would likely prove detrimental because again (like national security) cybersecurity requires a collaborative whole-of-government approach, not sector-specific governance.

### D. The Notice Identifies No Other Sound Reason for Reclassification

The Notice raises a hodgepodge of other purported regulatory gaps, but for the reasons detailed by USTelecom, these fare no better than the previous few. The following points warrant amplification here.

*Public Safety, Network Resiliency, and Reliability.*[42] Verizon is committed to supporting the reliable service that first responders particularly need. For that reason, it offers Frontline, a

---

[41] Verizon's 2023 Data Breach Investigations Report is available here: https://www.verizon.com/business/resources/reports/dbir/.

[42] *See* NPRM ¶¶ 33-39.

**App. 1226**

purpose-built solution that harnesses the speed and coverage of Verizon's 5G network to support customizable services for public safety agencies — more than 37,000 of them.[43]  And we compete aggressively to attract and retain public safety customers.  Meeting the needs of public safety is a huge business priority for Verizon, and none of this innovation and competition has required or come about because of Title II oversight.[44]

*Robocall Mitigation*.[45]  Here, too, Title II control would fill no gap in the Commission's authority:  as the Commission itself has recognized, it already has ample authority to regulate robocalls.[46]  Indeed, this Commission "has made combatting unlawful robocalls and malicious caller ID spoofing a top consumer protection priority," as reflected in (among other things) its oversight of the industry's implementation of the STIR/SHAKEN caller identification network.[47]

---

[43] *See generally* Verizon, *Verizon Frontline:  First Responders Technology Solutions*, https://www.verizon.com/business/solutions/public-sector/public-safety/ (last visited Dec. 13, 2023).

[44] From time to time, supporters of net neutrality have pointed to a 2018 incident in which a customer service error caused Verizon inadvertently to slow the data speeds of Santa Clara County firefighters combating wildfires.  *See* NPRM at 136 (separate statement of Chairwoman Rosenworcel).  But as Verizon and others have explained, that regrettable error was just that — an error, and not a violation of the Commission's net neutrality rules.  *See* Verizon, *Verizon Statement on California Fire Allegations* (Aug. 21, 2018), https://www.verizon.com/about/news/verizon-statement-california-fire-allegations; *see also* Daniel Lyons, *One More Time:  The Verizon-Santa Clara Fire Dispute Has Nothing to Do with Net Neutrality*, American Enterprise Institute (Nov. 13, 2019), https://www.aei.org/technology-and-innovation/one-more-time-the-verizon-santa-clara-fire-dispute-has-nothing-to-do-with-net-neutrality/.

[45] *See* NPRM ¶ 45.  For simplicity's sake, these Comments use the term "robocalls" to include robotexts, as well.

[46] *See*, *e.g.*, Proposed Rule, *Advanced Methods To Target and Eliminate Unlawful Robocalls*, 88 Fed. Reg. 43,489, 43,495, ¶ 36 (July 10, 2023) ("The Commission proposes to find its legal authority for the proposed rules consistent with its authority under sections 201(b), 202(a), and 251(e) of the Communications Act of 1934, as amended (the Act) as well as from the Truth in Caller ID Act and its ancillary authority."; proceeding to rely on the TRACED Act, as well).

[47] FCC, *Robocall Response Team:  Combating Scam Robocalls & Robotexts*, https://www.fcc.gov/spoofed-robocalls (last visited Dec. 13, 2023).

**App. 1227**

Verizon's innovations as a voice carrier also illustrate voice providers' commitment to robocall mitigation. Both its "plain old telephone service" customers[48] and its consumer VoIP customers are protected by robocall mitigation technologies.[49] Further, Verizon operates industry-leading programs to identify, track down, and shut down illegal robocallers[50] and has played leading roles in developing and promoting now-standard mitigation techniques.[51]

This innovation reflects the flexibility of the "light touch" regulatory framework — flexibility that is unlikely to survive reclassification. Accordingly, reclassification will do nothing to help — and may do much to impede — robocall mitigation.

*Accessibility.*[52] Nor is Title II reclassification necessary to ensure broadband access for Americans with disabilities. On the contrary, Congress addressed this issue in the Twenty-First Century Communications and Video Accessibility Act of 2010.[53] As the Commission has explained, that statute imposes accessibility requirements on a range of internet services and products, and therefore "makes sure that accessibility laws enacted in the 1980s and 1990s are

---

[48] *See* Verizon's Comments on Public Notice, CG Docket No. 17-59 & WC Docket No. 17-97 (Jan. 29, 2020) (discussing Verizon's "Call Filter blocking tool," "SPAM?" alerts, and "network-based blocking"), https://www.fcc.gov/ecfs/document/1012988727097/1.

[49] *See* News Release, Verizon, *Verizon Protects over 80 Million Customers from More Than 20 Billion Unwanted Calls* (Feb. 17, 2022), https://www.verizon.com/about/news/verizon-protects-80-million-customers-20-billion-unwanted-calls.

[50] Comments of Verizon at 2, EB Docket No. 20-22 (July 10, 2020) (discussing Verizon's "extensive 'honeypot' program, which identifies illegal calls with a high degree of precision and certainty"), https://www.fcc.gov/ecfs/document/1071076106405/1; *see also* Letter from Christopher D. Oatway, Verizon, to G. Patrick Webre, FCC, CG Docket No. 17-59 & WC Docket No. 17-97 (Feb. 28, 2020) (similar), https://www.fcc.gov/ecfs/document/10228034766291/1.

[51] *See* Statement of Verizon Wireless Accompanying Its Certification and Request for a Voluntary Exemption Under 47 C.F.R. 64.6306(a), CG Docket No. 20-68 (Dec. 1, 2020), https://www.fcc.gov/ecfs/document/120141599338/1.

[52] *See* NPRM ¶ 55.

[53] *See* Pub. L. No. 111-260, 124 Stat. 2751.

**App. 1228**

brought up to date with 21st century technologies, including new digital, broadband, and mobile innovations."[54]  If innovations since 2010 have revealed further gaps in federal accessibility law, a common-carrier regime enacted in the 1930s is no way to fill it.

*Universal Service.*[55]  The Commission's mandate to promote universal service also provides no basis for Title II reclassification.  The Commission already provides Universal Service Fund support for broadband, and it is settled that the Commission properly did so without subjecting broadband to Title II.[56]  Further, Congress invested billions of dollars in promoting broadband deployment to close the digital divide in the Infrastructure Investment and Jobs Act of 2021,[57] including by creating the BEAD Program discussed above — not by subjecting broadband internet access service to Title II requirements.  To be clear, we continue to support Congressional action to support much-needed reforms to the Universal Service Fund contribution system to account for the realities of today's communications networks and the ecosystem at large.  But that is a matter Congress should address; neither it nor any other universal service concern supports sweeping common-carrier regulation of broadband.

## CONCLUSION

As explained in the comments of USTelecom and CTIA, the Commission has no legal authority to take the drastic step of subjecting the dynamic and competitive broadband marketplace to Title II utility regulation.  And, as explained here, there is also no factual or policy basis for doing so either.  Rather than wasting Commission and industry resources on this

---

[54] FCC, *21st Century Communications and Video Accessibility Act* (detailing these and other "highlights of the law"), https://www.fcc.gov/consumers/guides/21st-century-communications-and-video-accessibility-act-cvaa (last visited Dec. 13, 2023).

[55] *See* NPRM ¶¶ 49-50.

[56] *See In re FCC 11-161*, 753 F.3d 1015, 1044-48 (10th Cir. 2014).

[57] Pub. L. No. 117-58, 135 Stat. 429.

unnecessary pursuit, the Commission should instead devote its attention to issues that will continue to fuel the investment and innovation that benefit American consumers.

Respectfully submitted,

William H. Johnson
*Of Counsel*

*/s/ Alison N. Steger*

Alison N. Steger
VERIZON
1300 I Street, N.W., Suite 500E
Washington, D.C. 20005
(202) 281-9460

December 14, 2023

*Attorneys for Verizon*

**App. 1230**

In the Matter of )
)
Safeguarding and Securing the Open Internet ) WC Docket No. 23-320
)

To: The Commission

**COMMENTS OF**
**WISPA – *BROADBAND WITHOUT BOUNDARIES***

**WISPA –**
***BROADBAND WITHOUT BOUNDARIES***

December 14, 2023

Louis Peraertz, Vice President of Policy
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001

Stephen E. Coran
Jeffrey Carlisle
Rebecca Jacobs Goldman
David S. Keir
Shannon Sylvester
Lerman Senter PLLC
2001 L Street, NW, Suite 400
Washington, DC 20036
(202) 429-8970
*Counsel to WISPA – Broadband Without Boundaries*

## Table of Contents

Summary ................................................................................................................... v

Introduction ............................................................................................................. 1

Discussion ............................................................................................................... 8

I.  THE STATUS OF THE BROADBAND MARKETPLACE ELIMINATES
    ANY NEED FOR TITLE II REGULATION OF SMALLER BROADBAND
    PROVIDERS ................................................................................................ 10

    A.  Broadband Competition Has Increased ............................................... 11

    B.  Broadband Investment Has Increased .................................................. 14

    C.  Smaller Broadband Providers Lack The Incentive And Ability To
        Engage In Harmful Practices ............................................................... 15

    D.  Broadband Regulation Has Increased Dramatically ............................ 18

    E.  Imposing Title II Will Undermine Federal Spending on Broadband ................. 24

II. THE PROPOSED TITLE II STRUCTURE WILL CREATE UNNECESSARY
    AND DISPROPORTIONATE BURDENS ON SMALLER PROVIDERS .................. 26

    A.  Title II Regulation Will Increase Compliance Costs For Smaller
        Providers And Undermine Broadband Deployment ............................. 26

    B.  Title II Regulation Will Not Close The Door To State Regulation ...................... 31

III. THE COMMISSION SHOULD NOT REINSTITUTE CONDUCT RULES ................. 35

    A.  The Commission Should Not Restrict Blocking And Throttling So Long
        As Such Practices Remain Subject To Disclosure ................................. 37

    B.  Paid Prioritization Presents Unique Concerns ..................................... 38

    C.  The Commission Should Not Adopt A "General Conduct" Standard ................. 40

        1.  Smaller Providers Lack "Gatekeeper Power" To Compromise
            The Open Internet .................................................................... 40

        2.  Compliance Costs Would Be Uncertain And Thus Immeasurable ........... 42

        3.  There Are Better Ways To Address Harmful Conduct ........................... 43

    D.  Any Conduct Standards Must Remain Subject To "Reasonable Network
        Management" ....................................................................................... 45

1.  The Commission Has Always Acknowledged a "Reasonable Network Management" Exception ........................................... 45

2.  The Commission Should Designate Certain Network Management Practices As *Per Se* Reasonable ........................................... 47

IV. THE COMMISSION SHOULD NOT CHANGE ITS TRANSPARENCY RULE OR DISCLOSURE REQUIREMENTS .............................. 49

A.  The Current Rule Is Meeting The Needs Of Consumers And Edge Providers ........................................... 50

B.  The Current Means Of Disclosure Are Adequate ................................ 52

V.  IF THE COMMISSION APPLIES TITLE II TO BROADBAND INTERNET ACCESS SERVICE, IT SHOULD FORBEAR FROM ADDITIONAL TITLE II REQUIREMENTS ........................................... 54

A.  Even with Forbearance, Reclassifying Broadband Internet Access Service Under Title II Will Lead To Regulatory Creep ....................... 54

1.  The General Conduct Rule Is Designed To Result In Further Regulation ........................................... 55

2.  Regardless Of The Commission's Intent Today, Regulating Broadband Internet Access Service Under Title II Will Inevitably Lead To Price Regulation ........................................... 57

B.  The Scope Of Forbearance Must Be Expanded To Protect Smaller Providers ........................................... 60

1.  Sections 206, 207 and 208 ........................................... 60

2.  Section 214 ........................................... 63

3.  Section 218 ........................................... 69

4.  Section 220 ........................................... 70

C.  The Benefits Of Affording Broadband Providers Pole Attachment Rights Under Section 224 Are Insufficient To Warrant Title II Regulation ................... 71

VI. IF THE COMMISSION ADOPTS NEW RULES, IT SHOULD CATEGORICALLY EXEMPT SMALLER BROADBAND PROVIDERS, CONSISTENT WITH LAW AND PRECEDENT ........................................... 73

A.      The Commission Is Required To Consider Establishing Different Compliance And Reporting Requirements And Exemptions To Reduce Burdens On Smaller Providers..............................................................73

B.      The Commission Should Streamline Its Enforcement Procedures......................78

      1.      The Commission Should Adopt A Comprehensive And Efficient Enforcement Regime ..............................................................79

      2.      The Commission Should Not Adopt An Advisory Opinion Process ..........................................................................82

VII.      THE COMMISSION LACKS STATUTORY AUTHORITY TO CLASSIFY BROADBAND INTERNET ACCESS SERVICE AS A TITLE II TELECOMMUNICATIONS SERVICE UNDER THE ESTABLISHED "MAJOR QUESTIONS" DOCTRINE ..........................................................83

VIII.     THE COMMISSION HAS OTHER MEANS AND SOURCES OF STATUTORY AUTHORITY TO ACHIEVE ITS POLICY OBJECTIVES..................91

A.      New Title II Rules Are Not Necessary To Protect National Security ..................91

B.      The Federal Trade Commission Has Authority To Regulate Privacy And Data Security..........................................................................93

C.      Title II Is Not Required To Extend Pole Attachment Rights To Broadband Providers..........................................................94

Conclusion ..........................................................................................................96

**App. 1234**

**Summary**

In her separate statement accompanying the Notice of Proposed Rulemaking ("*NPRM*") in this proceeding,[1] Commissioner Anna M. Gomez stated that:

> we must also be cognizant of the potential effects on Internet Service Providers, especially smaller Internet Service Providers.  Many of these providers play a crucial role in fostering competition, especially in underserved and rural areas.  We must make sure that net neutrality rules do not place an undue burden on these smaller providers while still upholding the core principles of an open Internet.  I welcome their feedback in this proceeding.[2]

Commissioner Gomez's statement is consistent with WISPA's views that reclassification of broadband service as a Title II service could place undue burdens on smaller broadband providers and that "one-size-fits-all" regulation of broadband may be inappropriate, unnecessary and counterproductive to broadband deployment and investment.

In fact, that is precisely what will happen if the Commission applies Title II to smaller providers as proposed by the *NPRM*.  As WISPA's Comments show, Title II regulation will require smaller broadband providers to incur significant compliance costs and burdens that, in combination with other regulatory mandates Congress has applied to broadband since 2021, undercut the Biden Administration's efforts to invest billions of taxpayer dollars to deploy broadband service to unserved and underserved Americans.  At a time when the Commission should be removing regulatory obstacles to broadband deployment, the *NPRM* instead proposes heavy-handed, utility-style regulation on robust marketplace competitors, including smaller providers that are least able to handle the costs and burdens that would result.

---

[1] *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-83 (rel. Oct. 20, 2023) ("*NPRM*").

[2] *Id.*, Statement of Commissioner Anna M. Gomez.

Since the light-touch regulatory regime returned in 2018, WISPA's members have seen an increase in the number of competitors they face on a daily basis (some of which have been supported with federal and state funds) and in consumer demand for more bandwidth and faster speeds. WISPA's members have met this surge in demand by investing in innovative equipment and network expansion. But alongside the competitive threats that require ongoing investment, broadband providers are also facing an unprecedented onslaught of new regulations required by Congress and implemented by the Commission – broadband data collection, broadband consumer labels and, most recently, digital discrimination requirements. This proceeding, which the Commission voluntarily undertakes, cannot be viewed in a vacuum. Rather, the cumulative effect of these requirements must be considered in the context of the *NPRM* and the numerous new costs and risks that would result from their implementation.

The Commission should not move forward with its proposed reclassification. As an overarching principle, smaller providers lack "gatekeeper power" and do not have the incentive or market power to harm internet openness that is the premise for proposing Title II regulation. They do not block or throttle internet traffic. They are not compensated for prioritizing certain internet traffic. They do not have affiliates that own content delivery networks. In fact, larger edge providers have the ability to deny smaller providers access to their subscription-based content. Simply put, there are no harms to the internet, to consumers or to edge providers that smaller providers cause, and thus no legitimate basis to saddle them with utility-style regulation.

Moreover, there is no "patchwork" of state laws that would be preempted to create a national policy. Since 2018, only a handful of states have implemented some form of net neutrality regulation, so the concern over inconsistent state laws is largely illusory, especially when considering that providers will adapt their practices to the most restrictive state or federal

**App. 1236**

requirements. If the Commission decides to treat broadband as a common carrier service, though, it is far more likely, if not inevitable, that states will similarly use their existing common carrier authority to adopt laws and rules that will result in dual jurisdiction with more regulation. The result will be extended uncertainty and, ultimately, exactly the kind of patchwork that will increase the regulatory burdens on WISPA's members.

In addition, there are serious questions about whether the Commission has clear authority from Congress to adopt rules in light of the "major questions" doctrine. Undoubtedly, the Commission's Title II rules will be appealed on that basis, and recent case law strongly suggests that the rules cannot survive scrutiny under that doctrine.

But if the Commission nonetheless proceeds as proposed in the *NPRM*, it must take a number of steps to mitigate regulatory costs and burdens consistent with the mandate of the Regulatory Flexibility Act that requires the agency to consider alternatives that will reduce the economic impact of regulations.

First, there is no need to use Title II to prohibit blocking and throttling of internet traffic. The Commission also should reject a "general conduct" rule that is overly vague and amorphous, sweeping in unforeseeable and uncertain future enforcement proceedings, especially given that the *Digital Discrimination Order*[3] and Federal Trade Commission rules are well-equipped to address unfair practices and discriminatory conduct. If those prohibitions are adopted, however, the Commission must retain the "reasonable network management" exemption. To remove some level of uncertainty and expense, the Commission also should adopt WISPA's recommendation that certain network practices be deemed *per se* reasonable.

---

[3] *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, FCC 23-100 (rel. Nov. 20, 2023) ("*Digital Discrimination Order*").

Second, in addition to the Title II statutes from which the Commission proposes to forbear, the Commission should also forbear entirely from Sections 201 and 202, forbear from Section 206, 207 and 208 to foreclose expensive federal court litigation and potential damages, forbear from Section 214 with respect to the transfer of control of domestic Section 214 authorizations, and forbear from Sections 218 and 220 with respect to accounting and recordkeeping obligations. These statutory provisions are unnecessary to address purported harms that can be policed through other, less restrictive means, and will undoubtedly add cost and regulatory risk to smaller providers that are least able to cover the costs at the expense of broadband deployment.

Third, the Commission should exempt smaller providers from any rules it may adopt and apply to larger providers. For any rules it nevertheless imposes on smaller providers, the Commission should defer the effectiveness for a sufficient period of time to afford smaller providers an adequate opportunity to budget resources and engage the outside consultants and attorneys they will need to help ensure compliance and minimize regulatory and enforcement risk.

Fourth, the Commission should limit complaints to the informal complaint process. It should also adopt specific guidelines to minimize the number of complaints the Commission must investigate and reduce the costs of defending complaints.

Finally, the Commission should not make any changes to its transparency requirements. Together with the new broadband consumer label rules – again, a new regulatory obligation for broadband providers – there is no record justifying changes to the transparency rule or the means of disclosure.

**App. 1238**

In the Matter of              )
                                  )
Safeguarding and Securing the Open Internet )     WC Docket No. 23-320
                                  )

To:    The Commission

## COMMENTS OF
## *WISPA – BROADBAND WITHOUT BOUNDARIES*

WISPA – *Broadband Without Boundaries* ("WISPA"), pursuant to Sections 1.415 and 1.419 of the Commission's Rules,[1] hereby comments on the Notice of Proposed Rulemaking ("*NPRM*") in the above-captioned proceeding.[2]

### Introduction

As the trade association representing hundreds of smaller sized fixed wireless broadband providers serving more than nine million consumers in rural and other unserved and underserved areas where other providers have declined to invest, WISPA opposes, in the strongest terms, the imposition of heavy-handed, utility-style regulations that the *NPRM* seeks to adopt through the reclassification of broadband internet access service under Title II of the Communications Act of 1934, as amended ("Act"). The smaller providers that comprise WISPA's membership have benefited significantly from the light-touch regime in place for the past five years. The proposed rules would unwisely reinstitute disproportionate burdens and significant uncertainty that will reduce competition and impede network expansion and investment that have flourished during this time period.

---

[1] *See* 47 C.F.R. §§ 1.415 and 1.419.

[2] *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-83 (rel. Oct. 20, 2023) ("*NPRM*").

Moreover, there is no demonstrated need to impose the Commission's conduct rules on these smaller providers. Smaller providers have no documented history of blocking or throttling internet traffic, engaging in paid prioritization or engaging in conduct that would interfere with edge providers, and in fact lack the incentive and market power to take such actions. Although broadband may now be an essential service, it is also a thriving *competitive* service with increasingly faster speeds that does not require Title II to resolve whatever theoretical problem the Commission may perceive to exist in the marketplace. Perhaps this is why Congress has adopted a slew of new broadband-related laws and funding programs to target broadband expansion and consumer benefits – the Affordable Connectivity Program ("ACP"), the Broadband Equity, Access, and Deployment ("BEAD") program, broadband label requirements, and digital discrimination requirements – but did not seek to alter the current classification of broadband service by mandating the Commission to adopt rules under Title II.

If the Commission nevertheless adopts rules in this proceeding, it is required by the Regulatory Flexibility Act, as amended ("RFA"), to discuss "significant alternatives" that would "minimize any significant economic impact of the proposed rules on small businesses."[3] A "one-size-fits-all" approach that does not consider the circumstances of smaller providers would add to the "regulatory onslaught" providers face,[4] not just from this proceeding, but from a host of other rules the Commission has adopted as mandated by Congress or otherwise. In this regard, the Commission should heed the words of Commissioner Gomez, who stated that "[the

---

[3] Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA").

[4] *NPRM* at 141, Dissenting Statement of Commissioner Brendan Carr.

**App. 1240**

Commission] must make sure that net neutrality rules do not place an undue burden on these smaller providers while still upholding the core principles of an open Internet."[5]

It is in no way consistent with the public interest for the Commission, without Congressional mandate, to re-impose Title II regulations precisely when the federal government is making an unprecedented investment of billions of taxpayer dollars in broadband deployment. At the same time that states and territories are rolling out their BEAD programs to make $42.45 billion available for broadband deployment to supplement massive private investment, the Commission is seeking to saddle potential funding recipients with cumbersome burdens that undermine Congress' objectives of enabling ubiquitous access to all locations across the country. Undifferentiated application of utility regulation to every broadband provider undermines the bipartisan Congressional goal of universal broadband deployment and is clearly contrary to the public interest.

To the extent the Commission feels compelled to address perceived marketplace inequities, it can take targeted action through additional forbearance, exemptions from certain rules it may adopt and streamlined enforcement. The Commission may also have other sources of authority, such as Section 706 of the Telecommunications Act of 1996 ("1996 Act") and RAY BAUM's ACT. And, of course, the "major questions" doctrine[6] hangs over this entire proceeding and may very well render this proceeding fruitless when, as is inevitable, any order relying on Title II regulation is appealed to federal court.

As a final introductory point, whether the Commission adopts new rules under Title I, Title II or some other authority, the most important concern is the prospect of smaller broadband

---

[5] *Id.* at 150, Statement of Commissioner Anna M. Gomez.

[6] *See, e.g., West Virginia v. EPA,* 142 S.Ct. 2587 (2022) ("*West Virginia*").

3

providers' being burdened with additional unfunded regulatory mandates. Under rules implemented pursuant to the Broadband DATA Act, smaller providers are required without exemption to make semi-annual submissions for the Broadband Data Collection.[7] Under rules adopted pursuant to the bipartisan Infrastructure Investment and Jobs Act ("Infrastructure Act"),[8] smaller providers are required without exemption to create, display and maintain broadband labels for each of their service plans.[9] Smaller providers participating in the ACP are required without exemption to collect data and make annual certifications to the Commission.[10] And soon, smaller providers will be required without exemption to comply with new digital discrimination rules.[11] The ever-increasing mountain of paperwork Congress and the Commission have piled on smaller providers has a cumulative effect that they are ill-equipped to handle while simultaneously running their businesses, investing in network upgrades and expansion and competing against other (and, increasingly, government-funded) broadband providers. These other new rules are all creatures of Congressional action; this proceeding is not. Layering voluntarily adopted and burdensome regulations fraught with uncertain costs and outcomes is simply the wrong course for the Commission to take.

---

[7] Broadband Accuracy and Technology Availability Act, Pub. L. No. 116-130, 134 Stat. 228 (codified at 47 U.S.C. §§ 641-646) (2020) ("Broadband DATA Act").

[8] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60504, 135 Stat. 429, 1244 (2021) ("Infrastructure Act").

[9] *Empowering Broadband Consumers Through Transparency*, Report and Order and Further Notice of Proposed Rulemaking, CG Docket No. 22-2, FCC 22-86 (rel. Nov. 17, 2022) ("*Broadband Label Order*" or "*Broadband Label FNPRM*").

[10] *Affordable Connectivity Program*, Fourth Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 21-450, FCC 22-87 (rel. Nov. 23, 2022).

[11] *See Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, FCC 23-100 (rel. Nov. 20, 2023) ("*Digital Discrimination Order*").

*About WISPA and its Members*

WISPA represents the interests of more than 600 smaller sized internet service providers that deliver broadband internet connectivity services to approximately nine million consumers, businesses, first responders and community anchor institutions around the country. For more than twenty years, smaller providers like many of WISPA's members have deployed reliable and affordable broadband service with innovative and evolving fixed wireless technology. WISPA members often use a combination of the best suited spectrum bands, or fiber, depending on what is the most cost-effective means to deploy broadband – the "right tool for the job" – and invest their own capital to meet the needs of consumers, businesses, health care facilities, governmental entities, and first responders in rural areas where it has not historically been cost-efficient for larger companies to deploy.

The majority of WISPA's operator members provide fixed broadband access as a standalone service, though many do offer interconnected VoIP where there is consumer demand or where required by the Commission under its universal service program rules. In many sparsely populated, rural, exurban, and remote areas, WISPA members provide the only available terrestrial source of fixed broadband access. As shown in a report by The Carmel Group, in areas with other broadband options, they provide a community-based alternative that benefits customers by fostering competition, thereby lowering costs and improving the quality of broadband services.[12] In providing these broadband services, WISPA members have created thousands of jobs in rural and exurban areas that, in turn, attract additional businesses and

---

[12] *See Liftoff! Internet Service Providers Take Flight with Fixed-Wireless and Hybrid Networks: The 2021 Fixed-Wireless and Hybrid ISP Industry Report*, The Carmel Group (2021) at 6, Fig. 1 (depicting typical fixed wireless network architecture), *available at* https://www.wispa.org/docs/2021_WISPA_Report_FINAL.pdf.

**App. 1243**

investment. They have continually upgraded their networks with new technology, new spectrum allocations, and integrated fiber optics when appropriate to meet consumer demand, and successfully responded to the dramatic rise and shift in bandwidth consumption during the COVID-19 pandemic. According to a 2021 survey, more than 80 percent of WISPA members upgraded their networks during the pandemic to meet this increased consumer demand.

A more recent survey of WISPA's membership brings to light the very small size and rural focus of WISPA's operator members. The vast majority of respondents – approximately 65.5 percent – reported serving 2,000 or fewer residential customers, and more than 54 percent reported having 1,000 or fewer residential customers. The vast majority reported large increases in the number of subscribers since 2018. More than 60 percent of respondents have five or fewer full-time employees, more than 73 percent have ten or fewer full-time employees, and more than 84 percent have 25 or fewer full-time employees. These numbers are demonstrably less than the threshold size of 1,500 employees that the U.S. Small Business Administration uses to define "small entity" for Wireless Telecommunications Carriers (Except Satellite)[13] and at or below the threshold of 25 employees that defines "small business concern" in the Small Business Paperwork Relief Act of 2002.[14]

### WISP Industry Support of the Four "Internet Freedoms"

WISPA and its members have long supported an open internet fundamentally rooted in the four "Internet freedoms" adopted by the Commission in 2005. Since then, they have supported adherence to the "light touch" regulatory regime that existed before the effective date

---

[13] *See* 13 C.F.R. §121.201, NAICS Code 517112.

[14] *See* Small Business Paperwork Relief Act of 2002, 44 U.S.C. §§ 3501-20 (2002) ("Paperwork Relief Act").

**App. 1244**

of the 2015 *Title II Order*[15] and in the years following the effective date of the 2018 *RIF Order*.[16]  The WISP industry's support was illustrated in a letter that 70 member WISPs submitted to the Commission on May 9, 2017, in which they pledged fidelity to "freedom of consumers to access lawful content, freedom of consumers to use non-harmful applications of their choice, freedom of consumers to attach personal devices to broadband networks, and freedom of consumers to obtain service plan information."[17]  WISPA similarly stated that "WISPA supports and will continue to support the fundamental principles of openness, transparency and privacy protection for all consumers."[18]  Those commitments remain in place, and are further evidenced by WISPA members' compliance with the Commission's transparency rules and federal and state privacy laws.

These open internet principles can be preserved by maintaining the current light-touch regulatory approach.  There is no market failure or evidence of blocking, throttling, paid prioritization or bad conduct from smaller providers that justifies saddling them with monopoly-based common carrier regulations.  Contrary to the *Title II Order* and to the *NPRM*'s reliance on that eight-year-old language, smaller providers have no "economic incentives . . . to exploit this gatekeeper role, 'such as preferring their own or affiliated content, demanding fees from edge providers, or placing technical barriers to reaching end users.'"[19]  Indeed, they lack the ability to

[15] *See Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) ("*Title II Order*").

[16] *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311 (2017) ("*RIF Order*").

[17] Letter from Mark Radabaugh, President of Amplex Electric, Inc., *et al.*, to The Honorable Ajit Pai, FCC Chairman *et al.*, WC Docket No. 17-108 (filed May 9, 2017), at 1.

[18] Letter from S. Jenell Trigg, Counsel to WISPA, to Marlene H. Dortch, FCC Secretary, WC Docket No. 17-108 (filed May 11, 2017), at 1.

[19] *NPRM* at 61 (¶ 123).  To the extent the Commission believes that broadband providers are placing technical barriers to reaching end users, it has adopted the *Digital Discrimination* Order to implement

**App. 1245**

engage in such activities, as the Commission correctly acknowledged in the *RIF Order*, observing that "[i]t is unlikely that any ISP, except the very largest, could exercise substantial market power in negotiations with Google or Netflix, but almost certainly no small wireless ISP, or a larger but still small rural cable company or incumbent LEC, could do so."[20]  The Commission was wrong to conclude in 2015 that small providers would act in ways justifying utility regulation, and the Commission will repeat this mistake if it concludes so again by relying on unproven and mischaracterizations of marketplace realities.

In these Comments, WISPA makes specific recommendations on measures the Commission should take consistent with its statutory obligations and the policy objectives of enabling investment, spurring innovation, and balancing broadband deployment with consumer protection.

## Discussion

In 2018, the Commission adopted the *RIF Order* that restored broadband internet access service to Title I of the Act.  The *RIF Order* specifically cited the harms that a Title II regime had caused smaller providers, concluding that,

> The Commission's decision in 2015 to reclassify broadband Internet access service as a telecommunications service has had particularly deleterious effects on small ISPs and the communities they serve, which are often rural and/or lower-income.  The record reflects that small ISPs and new entrants

---

Congress' mandate in Section 60506 of the Infrastructure Act to adopt digital discrimination rules that specifically consider economic and technical feasibility in the context of disparate impacts on certain classes of consumers.  WISPA has noted its strong objections to the Commission's interpretation of Section 60506.  *See* Letter from Louis Peraertz, WISPA Vice President of Policy, to Marlene H. Dortch, FCC Secretary, GN Docket No. 22-69 (filed Nov. 8, 2023).

[20] *RIF Order* at 391 (¶ 136), *quoting* Comments of USTelecom, WC Docket No. 17-108 (filed July 17, 2017), at 22 ("[T]he idea that every ISP has market power because it is a 'gatekeeper' to its subscribers is clearly rebutted by the position of small broadband providers. The suggestion that ISPs with only tens or even hundreds of thousands of end-users could have market power over an edge provider like Netflix is contrary to both common sense and the experience of those ISPs.  Indeed, Netflix has set minimum size requirements for ISPs to enter into certain kinds of mutually beneficial arrangements.").

**App. 1246**

> into the market face disproportionate costs and burdens as a result of regulation. Many small ISPs lack the extensive resources necessary to comply with burdensome regulation, and the record evinces a widespread consensus that reclassification of broadband Internet access service as a telecommunications service has harmed small ISPs by forcing them to divert significant resources to legal compliance and deterring them from taking financial risks.[21]

The removal of Title II obstacles has proved to be beneficial to smaller broadband providers as well as the communities they serve. Free from the uncertainty of how the rules might be implemented and enforced, smaller providers were able to meet the challenges and demands of consumers during the COVID-19 pandemic, expand networks and obtain unprecedented third-party investment. Consumers benefited from the enhanced transparency requirements the *RIF Order* adopted and will soon be able to better compare competitive options through broadband labels. In sum, the existing rules are sufficient and they appropriately balance the interests of the internet ecosystem with the burdens on smaller providers that lack the incentives to engage in bad internet conduct and the resources to address hypothetical harms.

This proceeding does not exist in a vacuum. Rather, it must be viewed through a wider lens that follows federal law (including the RFA), considers the overall regulatory environment in which broadband providers – especially smaller providers – reside, and focuses on other sources of authority and less burdensome alternatives. Against this backdrop, the proposed imposition of Title II, even with the proffered forbearance, is unnecessary and will undermine Congressional policies designed to stimulate investment in bridging the digital divide. But should the Commission proceed down the Title II path, it cannot justify a "one-size-fits-all" regulatory scheme predicated on unproven speculation of market power and leverage that will place smaller providers at an enormous disadvantage with edge providers and diminish their

---

[21] *Id.* at 371 (¶ 103) (citations omitted).

**App. 1247**

ability to serve consumers and invest in additional network deployment and upgrades.

Forbearance alone from certain Title II requirements will be insufficient to meet the

Commission's policy goals of safeguarding and securing the open internet while at the same time

creating an environment conducive to investment, expansion, and innovation. Rather, and

consistent with its obligations under the RFA and as proposed below, the Commission should

extend forbearance to other provisions of the Act, exempt smaller providers from certain

requirements that it might apply to others, lengthen implementation time periods and streamline

enforcement mechanisms.

## I. THE STATUS OF THE BROADBAND MARKETPLACE ELIMINATES ANY NEED FOR TITLE II REGULATION OF SMALLER BROADBAND PROVIDERS

A return to a Title II regulatory regime would impose a disproportionate and unfair

burden on the small broadband providers that have gained a foothold in the market for broadband

services, in part because of the light-touch regulatory environment. Then-Commissioner Pai

noted this specific problem in his lengthy dissent from the *Title II Order*:

> Today there are thousands of smaller Internet service providers – wireless Internet service providers (WISPs), small-town cable operators, municipal broadband providers, electric cooperatives, and others – that don't have the means or the margins to withstand a regulatory onslaught. Imposing on competitive broadband companies the rules designed to constrain Cornelius Vanderbilt's railroad empire or the continent-spanning Bell telephone monopoly will do nothing but raise the costs of doing business. Smaller, rural competitors will be disproportionately affected, and the FCC's decision will diminish competition – the best guarantor of consumer welfare.[22]

What was true then is even more so today, in light of the larger number of higher-quality

broadband options from which consumers can choose and the addition of new, significant

regulatory obligations that Congress has mandated. As the discussion below makes clear, a

---

[22] *Title II Order*, 30 FCC Rcd at 5930, Dissenting Statement of Commissioner Ajit V. Pai.

return to Title II will again shackle smaller providers with unnecessary regulatory burdens that seek to address perceived problems they are not causing.

## A.    Broadband Competition Has Increased

The *NPRM* asks for "comment on the state of competition in the BIAS market," and offers a few assorted statistics from its *2022 Communications Marketplace Report* to imply a lack of competitive choice for fixed broadband services at a particular speed.[23]  The *NPRM* omits data from that same report showing that, since the Commission's previous marketplace report, "the number of fixed terrestrial residential connections capable of meeting a download speed threshold of 100 Mbps increased from approximately 66.4 million to 82.9 million, an increase of approximately 25%.  Further, approximately 64% of households are located in census blocks that have at least two options for services meeting a 100/20 Mbps speed threshold."[24]  Notably, 100/20 Mbps far exceeds the Commission's current definition of broadband, which is set at 25/3 Mbps.[25]

The *2022 Communications Marketplace Report* makes clear that consumers have more options for broadband than they did in 2018.  In 2018, 21.6 percent of households had access to

---

[23] *NPRM* at 63 (¶ 128), *citing Communications Marketplace Report*, GN Docket No. 22-203, FCC 22-103 (rel. Dec. 30, 2022) at 41-49, Figs. II.A.28 & II.A.29 (¶¶ 56-58) ("*2022 Communications Marketplace Report*") (noting that "approximately 36 percent of households lack a competitive option for fixed broadband at speeds of 100/20 Mbps and that 70 percent of households in rural areas lack such an option.").

[24] *2022 Communications Marketplace Report* at 8-9 (¶ 16) (footnote omitted).

[25] *Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, and Possible Steps to Accelerate Such Deployment Pursuant to Section 706 of the Telecommunications Act of 1996, as Amended by the Broadband Data Improvement Act*, 2015 Broadband Progress Report and Notice of Inquiry and Immediate Action to Accelerate Deployment, GN Docket No. 14-126, FCC 15-10 (rel. Feb. 4, 2015).  The Commission is proposing to increase the broadband speed to 100/20 Mbps.  *See Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, Seventeenth Section 706 Report Notice of Inquiry, GN Docket No. 22-270, FCC 23-89 (rel. Nov. 1, 2023).

**App. 1249**

at least three providers offering speeds of at least 25/3 Mbps; in 2021, that percentage jumped to 69.3 percent.[26]  Similarly, in 2018, 14.8 percent of households had access to at least three providers offering speeds of at least 100/20 Mbps; in 2021, that percentage increased to 21.3 percent.[27]  In rural areas, the statistics are even more remarkable – in 2018, only 8.2 percent of households had access to at least three providers offering speeds of at least 25/3 Mbps; in 2021, that percentage jumped to 42.5 percent, a five-fold increase.[28]  Over the same time frame, the percentage of households with zero providers or only a single provider declined, indicating that more competitors are entering the market with higher-speed service.

The results of WISPA's member survey support the Commission's findings. Approximately 65 percent of respondents have experienced an increase in the number of competitors in their markets since 2018.  More than 42 percent of survey respondents now face competition from four or more fixed broadband providers, and some report competing with as many as 10.  In addition, more than 90 percent of survey respondents indicated that, since 2018, consumers are downloading more data, are subscribing to faster speeds and are connecting more devices to their networks, reflecting significant increases in video streaming and "work from home" use since 2018.  Fairly considered, the Commission's own data and the experiences of WISPA's members point to increased market entry, increased consumer demand for faster broadband speeds and increased choice for consumers.

To a certain extent, this growth is the product of at least three main factors, in varying degrees.  First, WISPA members have embraced a "right tool for the job" approach to serving

---

[26] *Communications Marketplace Report*, at 43, Fig. II.A.28.

[27] *Id.*

[28] *Id.* at 44, Fig. II.A.29.

**App. 1250**

subscribers, with many deploying fiber along with innovative fixed wireless solutions to provide cost-effective service in rural and remote areas. Second, the COVID-19 pandemic accelerated investment plans, as many members upgraded their networks to increase speed and capacity and/or expand networks to new areas to accommodate the shift in broadband consumption to homes and to accommodate applications such as remote learning, work-from-home and telehealth. Third, the return to a light-touch regulatory environment cannot be discounted, as investors could rely on a provider's compliance with the enhanced transparency rules and the lack of disproportionate burdens with uncertain consequences. In some but not all cases, a fourth factor – leveraging government funding – has been another driver for investment.

Without question, the Commission should consider the state of competition in the broadband market in its decision on how to classify broadband internet access service.[29] During the *RIF Order* era, data shows that broadband access has become much more competitive, reflecting a lack of monopoly power that, in the past, might have justified the desire for utility-style regulation. As broadband has come to be essential, that very trait has resulted in more robust competition that has allowed the marketplace to thrive, even in more sparsely populated areas that constitute the majority of areas served by WISPA members. Whatever the impact of the *RIF Order*'s classification of broadband as an "information" service on the development of the market for broadband services, the current state of the market fails to warrant *increased* regulation. Increased competition and consumer benefit do not show any kind of market dysfunction, let alone a market failure that could conceivably justify the dramatic expansion of regulatory requirements associated with Title II.

---

[29] *NPRM* at 63 (¶ 128).

### B. Broadband Investment Has Increased

In the past few years, a number of smaller broadband providers have attracted significant investment capital.[30] This development validates WISPA's prediction in its Comments in the *RIF Order* proceeding that "granting relief from Title II and the general conduct standard will trigger investment and deployment of fixed broadband service" because "small providers – especially WISPs that can quickly deploy cost-effective service – will expand into areas that currently do not have access to service and lie beyond the geographic limits of areas where larger providers would install FTTP or cable plant."[31] Since 2018, more than 70 percent of respondents to WISPA's member survey report that they invested heavily in network expansion and upgrade during the light-touch regulatory era from 2018 to the present, with fewer than 18 percent stating that light-touch regulation had "no impact" on their network investment decisions.

Under the 2018 rules, smaller providers freed up capital for marketing, network upgrades and improved customer service, allowing them to better compete with larger providers. Smaller providers re-allocated money, which had been set aside to address Title II regulatory contingencies, toward capital expenditures instead of fiber and fixed wireless network expansion and upgrades. This made these smaller providers more attractive for both internal and external investment. These investments, made possible by light-touch regulation, resulted in undeniable

---

[30] *See, e.g.*, Dgtl Infra, *Bain Capital Credit Acquires Surf Broadband Solutions* (June 15, 2021), *available at* https://dgtlinfra.com/bain-capital-credit-surf-broadband-solutions/; Dgtl Infra, *Searchlight Capital, Simple Invest in All Points Broadband* (July 6, 2021), *available at* https://dgtlinfra.com/searchlight-capital-simple-all-points-broadband/; *Visionary Broadband Announces Strategic Investment from GTCR* (June 6, 2022), *available at* https://www.gtcr.com/visionary-broadband-announces-strategic-investment-from-gtcr/; Telecompetitor, *Fixed Wireless M&A: Newly Funded, Element8 to Acquire AtLink Services* (March 16, 2023), *available at* https://www.telecompetitor.com/fixed-wireless-ma-newly-funded-element8-to-acquire-atlink-services/; Fierce Telecom, *Element8 Invests $151M into Wisper to boost broadband in the heartland* (July 26, 2023), *available at* https://www.fiercetelecom.com/broadband/element8-invests-151m-wisper-boost-broadband-heartland.

[31] Comments of WISPA, WC Docket No. 17-108 (filed July 17, 2017) ("WISPA RIF Comments"), at 16.

**App. 1252**

benefits to consumers, as WISPA's members were better able to meet increased consumer demand during the COVID-19 pandemic and compete with a larger number of competitive options. Clearly, a light-touch regulatory environment liberated smaller providers from expending considerable resources on Title II compliance, and instead allowed them to direct their limited financial resources to expansion and upgrade of facilities to better meet consumer demand.

### C. Smaller Broadband Providers Lack The Incentive And Ability To Engage In Harmful Practices

At the same time that the competitive and investment environment shows a dynamic marketplace for smaller providers, these same providers are not engaging in the kinds of restrictive behavior the Commission apparently fears; on the contrary, smaller providers have no market power or incentive to do so.

Without distinguishing among different sizes or types of broadband providers, the *NPRM* nevertheless reached the broad tentative conclusion "that ISPs continue to have the incentive and ability to engage in practices that pose a threat to Internet openness, and seek comment on this tentative conclusion and the above analysis."[32] That analysis includes a quote from the *Title II Order* reporting on the supposed "economic incentives ISPs have to exploit this gatekeeper role, 'such as preferring their own or affiliated content, demanding fees from edge providers, or placing technical barriers to reaching end users.'"[33]

As was true in 2015 and 2018, and is still the case today, smaller providers lack any of these incentives. First, WISPA's members typically do not offer subscription-based services to their customers and do not have content-producing affiliates. The vast majority of WISPA's

---

[32] *NPRM* at 62 (¶ 126).

[33] *Id.* at 61 (¶ 123), *quoting Title II Order*, 30 FCC Rcd at 5629 (¶ 80).

**App. 1253**

members simply provide a broadband connection, facilitating access to services provided "over-the-top" of the connection. In its recent survey, only about three percent of respondents indicated that they offer subscription-based content services, citing a number of reasons, the most prominent being:

- "Not much demand, too little return."

- "We leave it to the customers to select and subscribe to content services."

- "No business case."

- "No staff to support and too small to work deals with providers."

- "We only want to provide internet service."

- "Not large enough to profitably offer video content."

- "They get their own."

Second, smaller providers are in no position to try to demand fees from edge providers. In fact, it's the other way around – edge providers have erected high barriers to entry and are requiring broadband internet access service providers to pay per-subscriber fees so that consumers can access certain streaming networks. Consumers that lack a separate account can only obtain access to the edge provider's content if the broadband provider negotiates an agreement with the edge provider or a third party to stream that content. Those agreements typically require the provider to pay fees to the edge provider based on the number of total subscribers, not on the number of users that actually access that content. For these reasons, WISPA members find it extremely difficult to offer subscription-based services, even if there is demand. Common responses to WISPA's survey were:

- "Cost of entry too high."

- "Hard to obtain rights to content."

- "Too high of barriers to entry, the big guys will not engage with us to give us a resellers program.  We would happily sell ESPN+ and other services even if we only made a 5% markup."

- "The barrier to entry for TV services is too expensive.  Customers can subscribe to over the top services and apps on their own."

- "Seems complicated to work out the rights.  And customer[s] can easily get these themselves."

- "Difficulty making deals as a small company."

Any illusions the Commission may have about the ability of smaller broadband providers to demand fees from edge providers are entirely misplaced.

Third, there is no evidence that smaller providers construct technical barriers to reaching end users, and it would be contrary to acceptable business practices for them to restrict access.  A few WISPA members report that they do not have enough bandwidth to support streaming services, but that is a consequence of spectrum availability and not a barrier intentionally erected to harm edge providers.  One struggles to imagine a situation where a small provider competing for subscribers would spend money and time to implement technical barriers to block access to content when it has no affiliated content production that would benefit from this strategy, and when doing so would render its service less attractive to consumers and likely reduce the amount consumers would pay for it.

In sum, and to answer the Commission's question, there have been no changes in the marketplace or technology since 2015 that have given smaller providers incentives and ability to engage in practices that harm edge providers or consumers.[34]  If discriminating in favor of affiliated content, demanding fees from edge providers and erecting technical barriers to access

---

[34] *See NPRM* at 62 (¶ 126).

are the main justifications for the Commission's application of Title II regulation, then the Commission must recognize that the absence of any incentive for smaller providers to engage in such behavior must warrant a very different outcome.

### D. Broadband Regulation Has Increased Dramatically

While the absence of any market power or incentive to engage in content-restrictive behavior should be sufficient to counsel against imposing Title II regulation on smaller providers, the Commission must also consider the regulatory obligations already imposed on these providers. The environment today for Title II regulation is not the environment of 2015 or even 2018. In 2015, neither Congress nor the Commission had imposed any significant regulatory requirements on broadband providers. That has changed markedly.

In its Comments in the *RIF Order* proceeding in 2018, WISPA noted that more than 80 percent of its members responding to a survey reported that they "had incurred additional expense in complying with the Title II rules, had delayed or reduced network expansion, had delayed or reduced services and had allocated budget to comply with the rules."[35] WISPA listed some of these costs and effects:

- modified web pages and terms of service;
- changes in network management;
- legal costs to assure compliance (including in one case a 300 percent increase in legal costs);
- plans to charge explicit fees to recover regulatory compliance costs;
- withdrawal from markets the WISP would have continued to serve; and
- cancellation of VoIP service to contain costs.[36]

---

[35] WISPA RIF Comments at 14.

[36] *Id.*

**App. 1256**

The Commission thus concluded in the *RIF Order* that "there is substantial record evidence that regulatory uncertainty resulting from the Commission's reclassification of broadband Internet access service in 2015 risks stifling innovation, and that it has already done so with respect to small ISPs, which ultimately harms consumers."[37]

Today, a return to Title II regulation would not only reinstitute these documented costs, but would also make matters much worse for smaller providers given the deluge of unfunded regulatory mandates recently enacted by Congress and adopted by the Commission.

First, in March 2020, Congress adopted the Broadband DATA Act, which required the Commission to adopt rules instituting the Broadband Data Collection ("BDC").[38] As a result, broadband providers are required to submit broadband availability and subscribership data to the Commission twice per year, respond to challenges and take part in staff verification of submitted data. These processes collectively require a substantial commitment of time and, in some cases, reliance on third-party GIS consultants and engineers to submit and certify the information and to assist in the challenge and verification processes. Congress did not appropriate funds to compensate broadband providers for these new regulatory obligations.

Second, in November 2021, Congress adopted the Infrastructure Act, which required the Commission to adopt rules by November 15, 2022 mandating broadband providers to post labels detailing pricing, typical speeds and other aspects of each of their service tiers.[39] Notwithstanding evidence demonstrating that the Commission underestimated the time and cost

---

[37] *RIF Order*¸ 33 FCC Rcd at 373 (¶ 105).

[38] Broadband DATA Act.

[39] Infrastructure Act § 60504; 47 U.S.C. § 1753.

**App. 1257**

for broadband providers to prepare and maintain their broadband labels,[40] the Commission nevertheless announced that broadband labels would be required by October 10, 2024, for providers having 100,000 or fewer broadband subscribers and April 10, 2024 for others.

In its Comments regarding the Paperwork Reduction Act notice, WISPA further noted that "[o]nly a handful of WISPA's more than 600 operator members have in-house legal counsel, and most small broadband providers have few if any engineers, technical writers, staff administrators or web administrators on staff that are qualified to contribute to the labels' content and design. They will need to hire outside legal counsel, engineers and consultants to comply, at substantially higher cost than the Commission assumes."[41] Here again, Congress did not appropriate funding for this new mandate, which will require all broadband providers, regardless of size, in-house expertise or financial wherewithal, to devote substantial monetary and human resources to comply with the law.

Although there is no record evidence that that the combination of the existing transparency rules and the new (but not yet effective) broadband label rules will not achieve their intended purposes, the Commission is now considering additional broadband label rules.[42] In opposing any new rules, WISPA and NTCA pointed out in their Joint Comments that:

> it is essential to differentiate between the operational models of small, locally operated companies and large providers serving markets nationwide. The former, based in their communities, have natural incentives to make all reasonable efforts to reach every consumer in their limited markets. And yet, as small companies, they are much more likely to suffer from the negative impacts of broad regulatory

---

[40] Comments of WISPA, CG Docket No. 22-2, OMB 3060-XXXX (filed Apr. 10, 2023) ("WISPA PRA Comments"), at 5. *See also* Comments of NTCA – The Rural Broadband Association, CG Docket No. 22-2, OMB 3060-XXXX (filed Apr. 10, 2023); Comments of USTelecom – The Broadband Association, CG Docket No. 22-2, OMB 3060-XXXX (filed Apr. 10, 2023).

[41] WISPA PRA Comments at 7.

[42] *See Broadband Label FNPRM*.

mandates that may require costly and burdensome processes whose goals could be met by more limited and targeted individual customer interactions.[43]

Third, the Infrastructure Act also required the Commission to adopt rules on digital discrimination by November 15, 2023.[44] On that date, the Commission adopted sweeping rules preventing providers from engaging in "digital discrimination of access," defined as "[p]olicies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or (2) are intended to have such differential impact."[45] The terms "technical and economic feasibility" include the phrase "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new [technological advances or economic conditions] clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."[46] As noted in WISPA's ex parte letter,

> The definitions are riddled with subjective terms that would lead inevitably to expensive complaint processes as broadband providers defend their practices and policies. The feasibility defenses would appear to require a provider facing a complaint to obtain information from other "covered entities," such that "success" is determined based on the experiences of other broadband providers, contractors engaged by providers, entities facilitating or "involved in" providing broadband service, entities maintaining and upgrading network infrastructure and the catch-all, entities that "otherwise affect" consumer access to broadband internet access service." Conceivably, given the *Draft Order's* statement that "we do not define technical and economic feasibility with reference to a single entity's business judgment," a broadband provider would need to conduct an extensive survey of all of these covered entities to determine first whether they have faced "similar

---

[43] Joint Comments of NTCA and WISPA, CG Docket No. 22-2 (filed Feb. 16, 2023), at 2-3.

[44] Infrastructure Act, § 60506; 47 U.S.C. § 1754.

[45] *Digital Discrimination Order* at 16-17 (¶ 33).

[46] *Id.* at Appendix A, Sections 16.2(h), (k).

**App. 1259**

circumstances" – whatever that may mean in a particular case – and then to determine "prior success."[47]

The *Digital Discrimination Order* makes clear that the Commission would be empowered to regulate

> deployment, technical terms and conditions of service, such as policies and practices regarding speeds, capacities, latency, data caps; network infrastructure deployment, network reliability, network upgrades, network maintenance, customer-premises equipment, and installation; as well as non-technical terms and conditions of service, such as policies and practices regarding contractual terms generally, mandatory arbitration clauses, pricing, deposits, discounts, customer service, language options, credit checks, marketing or advertising, contract renewal, upgrades, account termination, transfers to another covered entity, and service suspension.[48]

Further, as Commissioner Carr explained in his Dissenting Statement, the *Digital Discrimination Order* imposes price regulation on broadband providers:

> Despite the repeated refrain that the agency has no interest in regulating broadband rates, the Commission votes today to regulate broadband rates. This comes on the heels of last month's meeting where, at the eleventh hour, the FCC slightly softened its proposal to use its Title II proceeding to impose price controls. Now we know why. The order before us today expressly states that the FCC can regulate broadband pricing and even an ISP's profitability. Title II is no longer necessary to achieve that end.[49]

In addition, the Commission is seeking further comment on two proposals that would further increase costs to broadband providers. First, the Commission proposes that broadband providers "submit an annual, publicly-available supplement to the [Broadband Data Collection] describing their recent broadband investments in each state and territory."[50] The *Digital Discrimination FNPRM* asserts that "[t]he primary goal of requiring this report would be to

---

[47] Letter from Louis Peraertz, WISPA Vice President of Policy, to Marlene H. Dortch, FCC Secretary, GN Docket No. 22-69 (filed Nov. 8, 2023), at 4 (citations omitted).

[48] *Digital Discrimination Order* at 52-53 (¶ 102).

[49] *Id.* at 221, Dissenting Statement of Commissioner Brendan Carr.

[50] *Digital Discrimination FNPRM* at 90 (¶ 182).

**App. 1260**

increase transparency regarding what substantial investments providers are currently making in their networks, what communities are being served—or not served—by those investments, and how they are being served."[51]  The *FNPRM* proposes a number of items that broadband providers would be required to submit and retain.

Second, the *Digital Discrimination FNPRM* proposes that each broadband provider establish a mandatory internal compliance program requiring regular internal assessment of (a) what communities are served by recent, pending, and planned large-scale projects, and (b) whether the provider's broadband-related policies and practices might differentially impact consumers' access to broadband based on a listed characteristic and without adequate technical or economic justification.[52]  Broadband providers would be required to submit certifications from an officer and an engineer that a compliance program satisfying the Commission's requirements was in place during the calendar year covered by the annual report.[53]

In each case, the *Digital Discrimination FNPRM* seeks comment on whether any providers should be exempt from these requirements, to the extent they are adopted.[54]  Annual reporting and record retention rules and the requirement to adopt and certify to the existence and compliance with an internal digital discrimination compliance plan would impose significant burdens on broadband providers, especially smaller providers that may not track investment data and lack the resources to develop a compliance program with ongoing obligations.  The burdens are egregious given that smaller providers do not have any record of engaging in digital

---

[51] *Id.* at 91 (¶ 182).

[52] *See id.* at 90 (¶ 180).

[53] *See id.* at 94-95 (¶ 197).

[54] *See id.* at 95 (¶ 198), 98 (¶ 212).

**App. 1261**

discrimination.  And, as with the above-discussed mandates, Congress did not appropriate funding for providers to meet any of the new and proposed regulatory obligations.

### E.      Imposing Title II Will Undermine Federal Spending on Broadband

At the same time that Congress has required the Commission to adopt new regulatory requirements, the federal government embarked on its "Internet for All" initiative:  a massive, once in a generation investment in digital infrastructure and equity.  Internet for All encompasses billions of dollars of spending under a wide array of programs, including the BEAD Program, Digital Equity Act Programs, Tribal Broadband Connectivity Program, USDA ReConnect Awards, Middle Mile Awards, and ACP.[55]  With over $42 billion in funding, the BEAD program is a major part of this initiative, and promises to substantially expand internet access to all unserved and underserved Americans.  Imposing Title II regulation on broadband providers will, however, increase the cost of the program and make it harder for these taxpayer dollars to achieve the bipartisan goal of universal broadband.

NTIA's requirements for the BEAD program impose significant obligations on service providers that may qualify as subgrantees.  For example, subrecipients will be required to provide matching funds of at least 25 percent of the project cost.[56]  They also will be required to obtain and maintain a letter of credit or a performance bond, each of which will impose costs on

---

[55] *See generally* NTIA, *Internet for All*, *available at* www.internetforall.gov; The White House, *Fact Sheet: Biden-Harris Administration Announces over $40 Billion to Connect Everyone in America to Affordable, Reliable, High-Speed Internet*, (released June 26, 2023), *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/26/fact-sheet-biden-harris-administration-announces-over-40-billion-to-connect-everyone-in-america-to-affordable-reliable-high-speed-internet/.

[56] *See* NTIA, Notice of Funding Opportunity, BEAD Program (rel. May 12, 2022) ("*BEAD NOFO*") at 44-45.

subgrantees.[57]  Subgrantees must have an effective plan for a host of labor and employment obligations, including compliance with Davis-Bacon Act requirements, using project labor agreements and hiring a local workforce, to name a few.[58]  Subgrantees must observe minimum speed, latency and outage requirements, strict deployment schedules, network access requirements, and compliance with the Build America, Buy America Act.[59]  And, "[l]ow-cost broadband service options must remain available for the useful life of the network assets" – well beyond the life of the BEAD program itself.[60]  These requirements undoubtedly protect against waste, fraud and abuse and advance important federal trade and labor policies.  Nevertheless, the number and extent of program requirements subgrantees must meet unavoidably increases the cost of participation in the program, thus diverting dollars that could be spent on deploying broadband infrastructure to compliance and reporting.

With Title II, this problem increases exponentially.  Smaller providers that may have reviewed compliance costs for participating in the BEAD program and decided they were manageable will have to reassess that decision if Title II regulations are re-imposed.  Given that such costs are highly variable and difficult to calculate precisely, it is inevitable that a certain number of smaller service providers who might otherwise have competed for BEAD grants will now decide not to do so.  Imposing Title II regulation will thus narrow the field of competitors and increase overall costs of the BEAD program.

---

[57] *See id.* at 72-73.  On November 1, 2023, NTIA waived its more restrictive letter of credit requirement to reduce financial burdens on subgrantees.  *See* Department of Commerce, National Telecommunications and Information Administration, Notice of Programmatic Waiver, *available at* https://broadbandusa.ntia.doc.gov/sites/default/files/2023-10/BEAD_LOC_Waiver_Notice_10.23.23.pdf.

[58] *See BEAD NOFO* at 57.

[59] *Id.* at 56-58, 64-76, 87-88.

[60] *Id.* at 66-67.

**App. 1263**

The inflection points where the regulatory burdens of participating in BEAD, competing with other, often larger providers, and maintaining viable business operations will occur at different times and different places for broadband providers. The BEAD program will undoubtedly narrow the digital divide to some extent, and WISPA expects that some of its members will participate in the application process in states and territories where the application processes are conducive to meaningful participation and smaller providers can create viable business models for deployment and sustainable service to unserved and underserved rural consumers. But for other members, the combination of rigid BEAD program requirements, utility-style Title II regulations entirely unsuited for robust competitive markets and investment and the inherent uncertainty surrounding business risk and cost will dissuade participation and make Internet for All another version of Internet for Some.

## II. THE PROPOSED TITLE II STRUCTURE WILL CREATE UNNECESSARY AND DISPROPORTIONATE BURDENS ON SMALLER PROVIDERS

As shown above, Title II regulation is not necessary given the current competitive environment and absence of market power or incentive for smaller providers to engage in content-restrictive behavior and imposing it in the current environment will multiply already significant compliance costs and undermine federal infrastructure investment. This next section explains in greater detail how Title II regulation itself will increase costs for smaller providers by significantly expanding their federal compliance obligations, and also opening the door to parallel state common carrier regulation.

### A. Title II Regulation Will Increase Compliance Costs For Smaller Providers And Undermine Broadband Deployment

Under the framework proposed in the *NPRM*, it is undoubtedly the case that Title II regulation will impose additional costs on broadband providers in the form of legal fees to

**App. 1264**

outside counsel, time spent complying with reporting requirements, and implementation of internal compliance and monitoring programs. Those costs and burdens will have a disproportionate impact on smaller providers that lack the resources to handle these new compliance obligations. Again, every dollar spent on compliance and reporting – however good the intention behind the requirement may be – is a dollar the service provider will not spend on broadband deployment and service upgrades.

Aside from the general impact on the federal "Internet for All" initiative discussed above, reclassifying broadband as a telecommunications service will have a number of direct and unfunded impacts on fixed wireless broadband providers that will raise costs and constrain broadband expansion. First, Section 222 of the Act and the Commission's implementing rules[61] would require broadband providers to protect customer proprietary network information ("CPNI") for broadband customers, which requirements entail the creation of a CPNI manual, training of employees and employment of outside firms that handle CPNI and annual certifications to the Commission.[62] Although the small percentage of WISPA members that offer voice service (often as a requirement to receiving high-cost universal service support) are already required to comply with the Commission's CPNI rules, the majority of WISPA's members would, for the first time, be developing CPNI procedures and training staff and outside vendors. CPNI compliance is not a cookie-cutter exercise but must be tailored to correspond to the provider's business practices. Larger broadband providers with their in-house counsel and data protection teams may find CPNI compliance to be acceptable, but smaller broadband

---

[61] 47 C.F.R. § 64.2001 *et seq.*

[62] *See NPRM* at 26 (¶ 43).

**App. 1265**

providers will require external legal assistance that will divert revenues and investment from deployment.

Second, Section 218 would allow the Commission to "inquire into the management of the business" of common carriers and "obtain . . . full and complete information necessary for the Commission to perform the duties and carry out the objects for which it was created."[63]  In fact, the *NPRM* asks whether Section 218 might be authority for "more comprehensive cyber incident reporting,"[64] implying a possible future rulemaking proceeding proposing to impose additional reporting obligations on broadband providers.  The *NPRM* contains no cost-benefit analysis of what could be an excessive level of new data collection and reporting to the Commission.

Third, Section 220 would require broadband providers, as common carriers, to "maintain a system of accounting methods, procedures, and techniques (including accounts and supporting records and memoranda) which shall ensure a proper allocation of all costs to and among telecommunications services, facilities, and products (and to and among classes of such services, facilities, and products) which are developed, manufactured, or offered by such common carrier."[65]  Under Section 220, the Commission also "shall at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers, and the provisions of this section respecting the preservation and destruction of books, papers, and documents shall apply thereto."[66]  The *NPRM* contains no information on the

---

[63] 47 U.S.C. § 218.

[64] *NPRM* at 20 (¶ 32).

[65] 47 U.S.C. § 220(a).

[66] 47 U.S.C. § 220(c).  As discussed in Section IV, *infra*, the Commission also is considering changes to its transparency rule and the means of disclosure and adding new recordkeeping obligations.  *See NPRM* at 67 (¶ 137), 80-86 (¶¶ 169-186).

extent of any new accounting or recordkeeping requirements, or the costs smaller providers will incur to maintain records and comply with audits the Commission may choose to undertake. Will smaller providers be required to engage accountants with specific knowledge of the Commission's system of accounts in order to comply with Section 220? How will the Commission determine whether a broadband provider is making "a proper allocation of all costs?" Is Section 220 a foundation to rate regulation that the *NPRM* otherwise disclaims?

The *NPRM* provides no answers to these questions – in fact, it does not even mention Section 220, which becomes another in a long list of hidden mandates and costs that smaller providers would be required to bear at the expense of using those set-aside funds for broadband deployment. Moreover, this requirement will have an outsized impact on smaller providers least able to bear its costs. Many large providers inherited common carrier accounting practices from their telephone business and will thus view this as a minor incremental cost of adapting their billing systems, while very few smaller providers have ever had to comply with this kind of regulatory requirement and will have to create entirely new compliance processes.

Fourth, under Title II, the Commission's Over-the-Air Reception Devices ("OTARD") rules would no longer encourage deployment of wireless broadband. Today, the Commission's rules prohibit restrictions on any hub or relay antenna used to provide broadband service to multiple customer locations.[67] This prohibition does not, however, apply if the antenna "is used to provide any telecommunications services or services that are provided on a commingled basis with telecommunications services."[68] By reclassifying broadband internet access service as a telecommunications service, the Commission will, at a stroke, eliminate a significant protection

---

[67] 47 C.F.R. § 1.4000(a)(5).

[68] *Id.*

**App. 1267**

that encourages broadband deployment in multiple tenant environments ("MTE"), neighborhoods lacking access to nearby towers, and similar environments. In cases where infrastructure can be deployed notwithstanding the loss of OTARD protection, this will likely result in increasing the cost of reaching consumers in these areas, strand investments already made, and reduce competition. In some areas, the lack of infrastructure may preclude deployment of fixed wireless broadband altogether, and some of those areas may not be affordably connected by fiber or other technologies.

Fifth, as the Commission observes in the *NPRM*, the MTE prohibitions against exclusive and graduated revenue sharing agreements and its disclaimer requirements apply only to telecommunications carriers and multichannel video programming distributors ("MVPDs") and do not apply to broadband-only providers.[69] Whatever policy benefits the Commission may anticipate by expanding the coverage of these rules to broadband-only providers, those benefits will be far outweighed by a slowdown in broadband investment in MTEs as broadband-only providers assess the impact on their business plans.

Sixth, the Commission also tentatively concludes that reclassifying broadband under Title II could enable it to extend the scope of its Network Outage Reporting System to broadband providers.[70] The Commission states that it "has historically lacked reliable outage information for today's modern, essential broadband networks, which inhibits the Commission from fully ensuring the resiliency and reliability of those networks."[71] But the *NPRM* makes no effort to explain how the Commission's interest in collecting outage information or any expected benefit

---

[69] *NPRM* at 30-31 (¶ 52).

[70] *See id.* at 24 (¶ 39).

[71] *Id.*

**App. 1268**

to the public interest balances against the inevitable increased cost of compliance, particularly for smaller providers.  Essentially, the Commission asserts that it is able to better ensure the resiliency and reliability of broadband networks but does not identify any existing need for it to do so, or otherwise justify the costs of outage reporting.

When the Commission and other federal agencies should be removing barriers to broadband deployment, the Commission's voluntary proposal to impose a common carrier regulatory regime on broadband builds those barriers higher.  Regulatory uncertainty and increased costs will divert resources from infrastructure deployment, resulting in slower deployment to fewer people and a disproportionate impact on smaller providers that are less equipped to bear the increased cost of compliance.  While it is certainly worthwhile to continue the ongoing legislative and regulatory conversation around discrete consumer protection or security issues related to broadband service, the *NPRM* proposes undifferentiated and wholesale regulation of the entire industry, and by doing so runs directly contrary to what had been, up until the *NPRM*, a consistent and effective federal policy of encouraging broadband deployment.

### B.      Title II Regulation Will Not Close The Door To State Regulation

Federal regulation can result in benefits to consumers and providers if it preempts a hodgepodge of inconsistent state regulations by replacing the potentially high cost of complying with differing state regimes with a comparatively lower cost of complying with a single federal regime.  Certainly, the *NPRM* takes this view, as it seeks comment "on how best to exercise our preemption authority to ensure that BIAS is governed primarily by a national framework, including a uniform floor of ISP conduct rules."[72]  A review of the current environment around

---

[72] *Id.* at 50 (¶ 94).  *See also* FCC, *Fact Sheet: FCC Chairwoman Rosenworcel Proposes to Restore Net Neutrality Rules* (rel. Sept. 26, 2023) (stating that the *NPRM*'s proposals would "[e]stablish a uniform

**App. 1269**

state broadband regulation, however, shows that even the broadest possible preemptive approach is unlikely to prevent states from implementing various types of broadband regulation, resulting in more compliance costs and uncertainty for years.

Importantly, the *NPRM* does not propose any specific approach to preemption and instead asks whether it should adopt "broad preemption" or an "incremental approach" under which the Commission would "share regulatory responsibility with the states."[73] While the *NPRM* asks how to define the scope of preemption "to ensure that BIAS is principally governed by a federal framework," it then generally asks for comment on whether it should affirmatively preempt or leave to case-by-case evaluation, and for comment as to how express preemption, field preemption or conflict preemption might apply.[74] The *NPRM* even anticipates further state regulation by noting, with respect to the broad field preemption, "that the Commission has recognized in the past certain roles that states might have with respect to BIAS."[75]

Federal utility regulation is not necessary to reduce regulatory costs. In the four years since the D.C. Circuit rejected the *RIF Order*'s attempt to preempt state law regarding broadband service,[76] some states have adopted net neutrality regulation,[77] but none have proposed sweeping additional regulations of broadband and generally treated it as an otherwise unregulated or lightly regulated information service.[78]

---

national standard rather than a patchwork of state-by-state approaches, benefiting consumers and Internet Service Providers.").

[73] *NPRM* at 51 (¶ 96).

[74] *Id.* at 52 (¶ 97).

[75] *Id.* at n.335.

[76] *Mozilla v. FCC*, 940 F.3d 1, 74-86 (D.C. Cir. 2019) ("*Mozilla*").

[77] *See, e.g., ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022) (California net neutrality regulation).

[78] The obvious exception being New York, which mandated $15 and $20 per month broadband access plans under its Affordable Broadband Act. This rate regulation was, however, preliminarily then

**App. 1270**

This is certainly not rampant state regulation justifying federal standardization.  Indeed, the state net neutrality requirements are not particularly burdensome because, as explained above, most ISPs and certainly the ones represented by WISPA, lack the incentive or market power to engage in the conduct prohibited by the state requirements.  Moreover, many states have adopted legislation to remove broadband from the services that can be regulated by state public utility commissions.[79]  States are evidently not interested in revisiting this approach.  The state regulatory environment, then, is in no way the kind of confusing patchwork of varying approaches demanding Commission action:  rather, states have, at least to date, largely followed the Commission's lead in continuing to treat broadband as an information service and so have declined to adopt utility-style regulation.

But reimposing Title II regulation might very well reverse that trend and have the opposite effect of what the Commission appears to intend.  So far, the Commission and most states have treated broadband as existing outside the realm of common carrier services and thus subject to light, if any, *ex ante* regulatory treatment.  If the Commission were to now change that baseline assumption, bring broadband squarely within the ambit of common carrier regulation under Title II, and then admit the possibility of some amount of acceptable parallel state regulation, it is inevitable that state legislatures and public utility commissions will increasingly seek to apply their own approaches to utility regulation to broadband.  If broadband is regulated

---

permanently enjoined by the United States District Court of the Eastern District of New York and is now pending appeal in the Second Circuit.  *New York State Telecomm's. Ass'n, Inc. v. James*, 544 F. Supp.3d 269 (E.D.N.Y. 2021); Clerk's Amended Judgment, *New York State Telecomm's. Ass'n, Inc. v. James*, No. 2:21-cv-2389-DRH-AKT, ECF No. 34 (Aug. 10, 2021); *New York State Telecomm's. Ass'n, Inc. v. James*, Docket No. 21-1975 (2d Cir. argued Jan. 12, 2023).

[79] *See, e.g.,* Ariz. Rev. Stat. Ann. § 40-212 (2022); Fla. Stat. § 364.011 (2023); Ky. Rev. Stat. Ann. § 278.5462 (2022); Nev. Rev. Stat. § 704.684 (2022); N.C. Gen. Stat. Ann. § 62-2(B1) (2022); S.C. Code Ann. § 58-9-280(G) (2022); Tex. Util. Code Ann. § 52.002(d) (2022).

**App. 1271**

as a common carrier service at the federal level, there is little reason to doubt that state legislatures and public utility commissions will begin exploring reversal of exemption from state utility regulation and seek to impose certification requirements, contributions to state universal service and telecommunications relay funds, service requirements and so forth.  Certainly, some of these requirements might be found to be preempted by federal regulation, but in the meantime consumers, industry, the Commission and state legislatures and commissions will be subjected to years of regulatory uncertainty and litigation – again, at exactly the time the federal government wants to accelerate investment in broadband infrastructure and is betting billions of taxpayer dollars on that hopeful outcome.

Further, preemption precedent indicates that even if the Commission adopted an extremely broad approach to preempting state regulation, it is questionable whether such an approach would be upheld on appeal.  As a clear example, *Vonage Holdings Corp.* was one of the broadest possible preemptive holdings the Commission has ever made:  relying on the impossibility exception of the Act, the Commission held that it was possible to preempt any state regulation of VoIP service because of federal policies in favor of competition and deregulation.[80] The Eighth Circuit upheld this broad preemption, concluding that the Commission "did not arbitrarily or capriciously determine state regulation of VoIP service would interfere with valid federal rules or policies," regardless of whether VoIP was classified as a telecommunications service or an information service.[81]

This conclusion, however, was based entirely on strong evidence of the Commission's deregulatory policies applied to telecommunications services and information services as of

---

[80] *Vonage Holdings Corp.,* Memorandum Opinion and Order, 19 FCC Rcd 22404, 22415-16, 22424 (2004).

[81] *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578-581 (8th Cir. 2007).

**App. 1272**

2004, and a Title II order would present a very different set of facts. Here, the Commission is not proposing to preserve a lightly regulated space for a service but is instead proposing to subject the service to traditional Title II common carrier regulation. Granted, the *NPRM* also proposes to forbear from certain statutory provisions and rules but is nevertheless proposing to apply the very basic elements of Title II that define common carrier service: conduct that is just, reasonable and not unjustly or unreasonably discriminatory under Sections 201 and 202, and entry requirements under Section 214. The Commission could not credibly argue that it has broadly preempted all state common carrier requirements when it has decided to invoke them here. It is reasonable to expect, then, that myriad state requirements that parallel Commission requirements, or at least that do not conflict with them, might very well be upheld even if any eventual order in this proceeding adopted the broadest possible preemption language.

Affirmatively regulating broadband internet access service under Title II only gives an illusion of providing a better way to reduce conflicts between federal and state regulation than the *status quo*. States have thus far shown little interest in filling the void that *Mozilla* purportedly exposed and adopting their own net neutrality rules. But by moving broadband squarely into common carrier regulation, the Commission will compel states to treat broadband in a similar fashion. There is little the Commission could say in any order that would prevent years of jurisdictional uncertainty and litigation, likely resulting in a more costly patchwork of state laws and regulations.

## III.    THE COMMISSION SHOULD NOT REINSTITUTE CONDUCT RULES

While the above discussion shows that imposing Title II on broadband services is not warranted, the Commission's primary motivation for doing so, as it was in 2015, is to establish a legal basis for applying conduct rules on broadband providers. WISPA thus urges the

Commission to refrain from imposing such conduct requirements on smaller providers, and to specifically designate certain network management practices as *per se* "reasonable."

**App. 1274**

### A.    The Commission Should Not Restrict Blocking And Throttling So Long As Such Practices Remain Subject To Disclosure

The *NPRM* proposes to reinstate the no-blocking and no-throttling rules based on the unsupported prediction that broadband providers "have the incentive and ability to engage in practices that pose a threat to Internet openness."[82]   The *NPRM* reiterates the "virtuous cycle" theory that "if innovative edge services are subject to blocking, throttling, paid prioritization, or other conduct by ISPs that harms Internet openness, that conduct will reduce edge innovation. This will, in turn, reduce the quality and quantity of edge services available to consumers, and, specifically with blocking and throttling, directly inhibit consumers from accessing the edge services they desire."[83]

Whatever one may think of the "virtuous cycle" theory, it certainly cannot apply to smaller broadband providers that lack the incentive and market power to engage in conduct, such as blocking and throttling of internet traffic, that reduces the availability of edge services and discourages innovation.   WISPA's recent survey confirms that its members do not block or throttle traffic, subject to reasonable network management, and only a very small minority of its members – less than five percent – have contracted with edge providers for their services.   To the contrary, smaller providers are much more likely to be harmed by large edge providers that can exert their market dominance and deny them access to streaming services or charge higher per-subscriber rates.

This market imbalance is not new.   In Comments it filed in 2014 in the *Title II Order* proceeding, WISPA stated that:

> there is no evidence that small businesses are blocking lawful content, applications, services or non-harmful devices, or that their existing network

---

[82] *NPRM* at 61 (¶ 123) (citations omitted).

[83] *Id.* at 65 (¶ 132).

**App. 1275**

> management practices are unreasonable. Small businesses have no business incentive to block content; their main objective is to provide rural Americans with full access to all lawful broadband content and at reasonable and very competitive costs.[84]

As WISPA further stated, "[u]nder these circumstances, imposing 'no blocking' and 'no commercially unreasonable practices' obligations on small business providers penalizes the wrong party – *the one most likely to face anti-competitive blocking and discriminatory practices, and the one least attractive to edge providers and content delivery networks*."[85]

Any no-blocking or no-throttling rules the Commission may adopt should not apply to smaller providers, who cannot be the source of any harm to internet openness or to edge provider innovation. So long as providers are adequately disclosing their business practices, including the circumstances when reasonable network management may be employed, consumers and edge providers have notice of a particular provider's practices. The Commission's ability to enforce its transparency rule should be sufficient to protect consumers and edge providers from any harms to internet openness.

## B. Paid Prioritization Presents Unique Concerns

The Commission proposes to prohibit broadband providers from engaging in paid prioritization,[86] which it would define as "the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic . . . (1) in exchange for consideration (monetary or otherwise) from a third party, or (2) to benefit an affiliated entity."[87] WISPA is concerned that preferential traffic management techniques that are anti-competitive can be used

---

[84] Comments of WISPA, GN Docket No. 14-28 (filed July 16, 2014), at 22.

[85] *Id.* at 26 (emphasis in original).

[86] *NPRM* at 75-77 (¶¶ 158-163).

[87] *Id.* at 75 (¶ 159).

to disadvantage providers that are unable to secure access to certain content or lack the leverage to obtain commercial terms afforded to broadband access providers with regional and national scope.

Quoting the *Title II Order*, the *NPRM* states that paid prioritization arrangements "harm consumers, competition, and innovation, as well as create disincentives to promote broadband deployment."[88] The *NPRM* further notes that it is "well-established that ISPs have both the incentive and the ability to engage in paid prioritization,"[89] implying that *all* broadband providers have such incentive and ability. This is simply untrue. As discussed above, smaller broadband providers lack market power to negotiate traffic prioritization agreements with edge providers and content delivery networks and have no incentive to withhold content from their subscribers because they do not themselves own or have preferential access to popular video and other online content. As then-Chairman Pai stated, "[t]hey have no ability and no incentive to take on commercial giants like Netflix."[90] Unlike the large broadband providers that may have nationwide or regional footprints, market power and very substantial financial and human resources, WISPA's members are typically small, locally owned businesses with limited financial resources and small staffs. Some are one-person shops in which the owner handles sales, marketing, billing, customer service, customer premises installation and, in some instances, even tower climbing for the deployment of wireless infrastructure.

Indeed, it is powerful edge service providers that often have the ability to leverage smaller internet access providers by refusing to deal or seeking to extract onerous terms. In

---

[88] *Id.* at 75 (¶ 158), *quoting Title II Order*, 30 FCC Rcd at 5653 (¶ 125) (citation omitted).

[89] *Id.* at 76 (¶ 160) (citation omitted).

[90] *Title II Order*, 30 FCC Rcd at 5931, Dissenting Statement of Commissioner Ajit V. Pai.

**App. 1277**

some cases, an edge provider might negotiate an agreement with a larger broadband provider that could lead to the edge provider delivering a lower level of video quality to subscribers of smaller broadband companies. Where the large provider and the smaller provider compete, the large provider may even have the incentive to enter into an exclusive arrangement under which an edge provider would deny programming to the larger provider's competitor altogether.

WISPA believes that discriminatory paid prioritization is *per se* anti-competitive. While large broadband providers may have the market size and financial wherewithal to enter into paid prioritization agreements or negotiate advantageous content deals, this is simply not the case with smaller providers. Paid prioritization only becomes feasible when the broadband provider has market power over entities that seek to transmit substantial amounts of online content.

## C.  The Commission Should Not Adopt A "General Conduct" Standard

### 1.  Smaller Providers Lack "Gatekeeper Power" To Compromise The Open Internet

The *RIF Order* found that the general conduct rule adopted in the *Title II Order* was vague, created regulatory uncertainty, and hindered investment and innovation.[91] The record in that proceeding included descriptions of the standard as "amorphous," "boundless," "far-reaching and poorly defined," "ill-conceived and unnecessary," "open-ended," "problematically vague," and "undefined."[92] In eliminating the general conduct rule, the Commission agreed that "[t]he rule has created uncertainty and likely denied or delayed consumer access to innovative new services, and we believe the net benefit of the Internet Conduct Standard is negative."[93] The Commission also concluded that "the transparency rule we adopt, in combination with the state

---

[91] *RIF Order*, 33 FCC Rcd at 452 (¶ 247).

[92] Reply Comments of WISPA, CG Docket No. 17-108 (filed Aug.17, 2017), at 7 (citations omitted).

[93] *RIF Order*, 33 FCC Rcd at 452 (¶ 246) (citation omitted).

**App. 1278**

of broadband Internet access service competition and the antitrust and consumer protection laws, obviates the need for conduct rules by achieving comparable benefits at lower cost."[94]  As noted elsewhere in these Comments, the transparency rule has been supplemented by the broadband label rules, further reducing the purported need for a general conduct rule.

But despite the record and these circumstances, the Commission nevertheless proposes to reimpose its 2015 general conduct standard "as a catch-all backstop to the three bright-line prohibitions"[95] to "prohibit practices that unreasonably interfere with or disadvantage consumers or edge providers."[96]  The rationale offered in the *NPRM* is "to ensure that ISPs did not find a technical or economic means to evade these bright line bans to wield their gatekeeper power in a way that would compromise the open Internet."[97]  Even accepting this proposition as true, WISPA has established in these Comments that its members – smaller broadband providers – do not possess "gatekeeper power" and may be victims of the leverage that edge providers can exact on them by withholding content or charging excessive fees.  WISPA's recent member survey confirmed that more than 95 percent of respondents do not offer paid subscription-based services to their members for reasons such as "the cost of entry is too high," "there is no business case" and it is "difficult."[98]  Not surprisingly, no member reported that it was charging edge providers to carry their content.  Moreover, smaller providers lack affiliates that provide internet content. A general statement suggesting that *all* broadband providers possess "gatekeeper power" simply does not withstand the record evidence and the experiences of WISPA's members.  With no

---

[94] *Id.* at 450 (¶ 239).

[95] *NPRM* at 78 (¶ 164).

[96] *Id.* at 77 (¶ 164).

[97] *Id.* at 78 (¶ 164).

[98] *See* Section I.C, *supra*.

applicable rationale supporting the Commission's proposal, there can be no legitimate basis to saddle small providers with a general conduct standard.

### 2. Compliance Costs Would Be Uncertain And Thus Immeasurable

The Commission seeks comment on the cost to broadband providers, "particularly small providers," of complying with a general conduct rule.[99]  Under the current regulatory regime, smaller broadband providers have been relieved from the regulatory uncertainty of a vague standard.  Instead of budgeting funds to address what could be a complicated and lengthy enforcement process, they have, as the Commission predicted in the *RIF Order*[100] and as the recent survey results demonstrate, increased investment to meet the needs of consumers during the COVID-19 pandemic and to better compete with a growing number of companies.  WISPA members cite the return to light-touch regulation in 2018 as a motivating factor in their network expansion and upgrade investment decisions.

The Commission further asks how the proposed general conduct standard would affect broadband providers' business practices.[101]  In 2015, then-Chairman Thomas Wheeler commented on the general conduct rule by observing that "[w]e don't really know" what prohibited behavior is.[102]  Operating under a vague, uncertain, general conduct "catch-all" rule (especially alongside the very broad rules adopted in the *Digital Discrimination Order*), smaller broadband providers would be forced to engage legal counsel before making business decisions to determine whether a particular practice or pricing plan is legal, diverting investment and

---

[99] *NPRM* at 79 (¶ 167).

[100] *RIF Order*, 33 FCC Rcd at 453 (¶ 249).

[101] *NPRM* at 79 (¶ 167).

[102] *See* FCC Open Meeting, Feb. 26, 2015, Chairman Wheeler Press Conference, *available at* www.fcc.gov/news-events/events/2015/02/february-2015-open-commission-meeting.

revenues from deployment and chilling their willingness to take risks introducing innovative new features or services out of fear for engaging in unlawful behavior. Consumers likewise will be harmed by this standard, as providers facing uncertainty will not be innovating as much or providing discounts or incentives. Providers that are further required to defend themselves against arbitrary enforcement actions and/or frivolous complaints will not have the time or financial resources to invest in their businesses. These costs to comply will ultimately be borne by consumers, via higher prices, limited service offerings and upgrades, and reduced competition.

The Commission acknowledges the harms of its vague language by suggesting a "non-exhaustive list of factors" it would consider under a case-by-case, totality of the circumstances analysis.[103] But a "non-exhaustive list" does little more than state the obvious – that the Commission can consider whatever it wants to and weigh each factor (or others) differently (or not at all). Identifying some broad factors, but not all of them, is the opposite of regulatory certainty. Thus, while it may not be possible to identify specific costs of the general conduct rule with precision, it is undoubtedly the case that such a rule and the uncertainty it creates will increase costs for providers, as they subject numerous business practices and network management decisions to legal due diligence.

### 3. There Are Better Ways To Address Harmful Conduct

Applying Title II regulation and a general conduct rule will be particularly counter-productive because it will eliminate a much better and long-established enforcement mechanism for protecting against the kind of business practices that concern the Commission. If the Commission reclassifies broadband as a Title II telecommunications service, it will remove

---

[103] *NPRM* at 78-79 (¶ 166).

broadband regulation from Federal Trade Commission ("FTC") jurisdiction, as the FTC lacks authority to regulate unfair and deceptive trade practices of common carriers.[104]  The FTC's extensive body of case law regarding unfair and deceptive trade practices provides much greater certainty to broadband providers, edge providers and consumers than the general conduct rule the *NPRM* proposes.[105]  Reclassifying broadband under Title II would thus *remove* an important government tool for avoiding the kind of conduct the Commission wants to prevent.

 This was precisely the point that the United States Court of Appeals for the Ninth Circuit and the Commission made in *FTC v. AT&T Mobility* in 2018.[106]  In an *en banc* decision, the Ninth Circuit concluded that while the FTC may not regulate common carrier activities, the FTC "may regulate common carriers' non-common-carriage activities."[107]  As the Commission stated in an *amicus* brief in that case, "the Communications Act and the FTC Act fit hand-in-glove to ensure there is no gap in the federal regulation of telecommunications companies, while also conferring the FCC with exclusive jurisdiction over common-carrier services."[108]  Of course, the FTC's remit in protecting against unfair and deceptive trade practices may not cover the same activities as the Commission's regulatory authority under Title II.  But given the FTC's well-established role in consumer protection, if the Commission decides to move forward with applying Title II regulation, it must explain in any eventual order exactly what behavior it needs to regulate that is not already encompassed or addressed by the FTC's authority to prevent unfair

---

[104] *See* 15 U.S.C. § 45(a); *RIF Order*, 33 FCC Rcd at 453 n.893.

[105] *See NPRM* at 78 (¶ 165).

[106] *FTC v. AT&T Mobility*, 883 F.3d 848 (9th Cir. 2018) (*en banc*).

[107] *Id.* at 864.

[108] *Id.* at 862.

**App. 1282**

and deceptive trade practices, the Commission's labelling requirements, or the Commission's digital discrimination prohibition.

Not only is the general conduct rule an inadequate substitute for FTC regulation, it is redundant to existing, broad tools the Commission has immediately at hand. If the Commission reclassifies broadband internet access service as a Title II service and does not forbear from Sections 201 and 202, the Commission can, as it suggests in the *NPRM*, rely on the "just and reasonable" language of those statutes.[109] It can also use the recently adopted rules in the *Digital Discrimination Order* to combat practices that are intended to or result in disparate treatment of certain classes of consumers. By adopting a general conduct rule, all the Commission would do is add another vaguely defined regulatory obligation on top of statutory provisions and the digital discrimination rules that broadly overlap, fostering even greater uncertainty and chilling competition and investment in innovation to the detriment of consumers.

**D. Any Conduct Standards Must Remain Subject To "Reasonable Network Management"**

**1. The Commission Has Always Acknowledged a "Reasonable Network Management" Exception**

In the *2010 Open Internet Order*, the Commission acknowledged that broadband providers may face circumstances when it will be necessary for them to employ "reasonable network management" to block or throttle Internet traffic.[110] As general guidance, the Commission indicated that network management practices that alleviate congestion without regard to the source, destination, content, application, or service are also more likely to be

---

[109] *NPRM* at 80 (¶ 168).

[110] *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010) ("*2010 Open Internet Order*"), *aff'd in part, vacated and remanded in part, Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ("*Verizon*").

considered reasonable network management practices in the context of this exception.[111]  More specifically, the Commission recognized that fixed wireless broadband providers face "unique network management challenges" that may require network management practices that differ from larger broadband providers or those that control their own exclusive distribution networks, and that the rules should be flexibly applied to afford such providers the latitude to effectively manage their networks.[112]

In the *NPRM*, the Commission seeks comment on its proposal that "reasonable network management would not be considered a violation of prohibitions on blocking and throttling, or the general conduct rule.[113]  The *NPRM* cites the 2015 *Title II Order* to acknowledge that the reasonable network management exception "was necessary for [broadband providers] to optimize overall network performance and maintain a consistent quality experience for consumers while carrying a variety of traffic over their networks."[114]  Although the *RIF Order* eliminated the conduct rules in favor of enhanced transparency requirements, it maintained the "reasonable network management" exception, "which provides ISPs greater flexibility and certainty."[115]

Fixed wireless broadband providers, in particular, often juggle the daily challenges of managing networks of multiple spectrum bands.  Given the small business and network management challenges these providers face, the critical role they play in delivering broadband

---

[111] *See 2010 Open Internet Order*, 25 FCC Rcd at 17954 (¶ 87).

[112] *Id.* at 17953 (¶ 86).

[113] *NPRM* at 87 (¶ 188).

[114] *Id.*, *citing Title II Order*, 30 FCC Rcd at 5700 (¶ 215) (citation omitted).

[115] *RIF Order*, 33 FCC Rcd at 440 (¶ 220) (citations omitted).

**App. 1284**

to rural areas, and the requirements of Section 706 of the 1996 Act[116] and the RFA, the Commission must ensure that small broadband providers and broadband providers that use licensed and unlicensed spectrum are not saddled with burdensome requirements that could undermine the Commission policies intended to encourage the deployment of broadband services to all Americans and to reduce barriers to investment.[117] The Commission therefore should maintain "reasonable network management" as an exception to any no-blocking and no-throttling principles or rules that it may adopt.

The Commission asks how it should define "reasonable network management."[118] WISPA urges the Commission to retain to the definition first adopted in 2010 and then again in 2018, which declared that "[a] network management practice is reasonable if it is appropriate and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband internet access service."[119]

### 2. The Commission Should Designate Certain Network Management Practices As *Per Se* Reasonable

The *NPRM* asks whether the Commission should provide further guidance on the reasonable management exception.[120] Notably, the *RIF Order* provided a list of disclosures broadband providers are required to make, and this guidance has assisted broadband providers in drafting their disclosure statements and promote transparency to consumers and edge providers.[121] As a further means to create certainty for broadband providers and their

---

[116] *See* 47 U.S.C. § 1302.

[117] *See id.* at § 1302(a) and (b).

[118] *NPRM* at 87 (¶ 188).

[119] 47 C.F.R. § 8.1(c).

[120] *NPRM* at 87 (¶ 188).

[121] *RIF Order*, 33 FCC Rcd at 440 (¶ 220).

App. 1285

subscribers, the Commission should specify certain management practices as "*per se* reasonable" so as to avoid subjecting smaller providers to lengthy enforcement proceedings to establish the validity of these approaches. Practices that fall outside of the *per se* reasonable categories would be subject to case-by-case adjudication to determine their reasonableness.

Consistent with WISPA's proposals in the *Title II Order*[122] and *RIF Order* proceedings,[123] the following types of network management practices should be deemed to be *per se* reasonable if disclosed by the broadband provider in accordance with the applicable transparency requirements:

- temporarily limiting bandwidth available to users that are using a substantially disproportionate amount of bandwidth compared to and to the detriment of others at times when the network is experiencing unusual congestion;

- establishing service levels so that those subscribers who desire to use more bandwidth or are willing to pay an additional fee for more bandwidth can be free to do so;

- allowing temporary restriction of an individual user's bandwidth in the event of a violation of the provider's acceptable use policy, such as uploading or downloading multiple large video or data files simultaneously or in succession, or utilizing protocols that do not behave cooperatively in sharing network capacity;

- responding proactively to address capacity constraints outside the direct control of the provider (*e.g.*, upstream conditions) and to address cybercrime (*e.g.*, malware, distributed denial-of-service attacks); and

- providing subscribers with the option to pay different rates for accessing the service at peak times or non-peak times, thereby incentivizing a subscriber to pay a reduced fee by reducing congestion by downloading bandwidth-incentive content and applications during non-peak times.

Specifying and adopting certain network management practices as *per se* reasonable will avoid subjecting broadband providers, especially smaller providers, to lengthy and unnecessary

---

[122] *See* Comments of WISPA, GN Docket No. 14-28 (filed July 16, 2014), at 31-32.

[123] *See* WISPA RIF Comments at 38-39.

enforcement proceedings to establish the validity of these approaches, which are particularly critical for management of networks that may have less capacity or experience violations of acceptable use policies, download a disproportionate amount of data or face off-network events that constrain capacity.

## IV.  THE COMMISSION SHOULD NOT CHANGE ITS TRANSPARENCY RULE OR DISCLOSURE REQUIREMENTS

The Commission seeks comment on whether it should change its existing transparency rule to require additional disclosures.[124]  WISPA agrees that the rule should be retained, but the Commission should not make changes to the rule or require additional disclosures or different means of disclosure.  There is no evidence that the transparency rule is failing to meet its objectives and, furthermore, the new broadband label rules that will soon be required will "give[] consumers a convenient tool to research and compare broadband offerings."[125]  In addition to the costs of creating and implementing broadband labels that providers must incur, making changes to disclosure statements also would impose costs that smaller providers may find difficult to manage alongside the other unfunded mandates embodied in other regulatory requirements Congress has imposed.  Absent any showing that the benefits of requiring providers to include additional disclosures that are not already required in the existing transparency rule and the new broadband label rule outweigh the costs of additional compliance, there is no basis for the Commission to depart from the *status quo*.

---

[124] *NPRM* at 82 (¶ 172).

[125] *Id.* at 80 (¶ 169), *citing Broadband Label Order*.  The Commission is considering whether to require additional information on broadband labels.  *See Broadband Label FNPRM*.

**App. 1287**

## A.  The Current Rule Is Meeting The Needs Of Consumers And Edge Providers

The *NPRM* lacks any discussion of instances where the existing transparency rule has been shown to be deficient in informing consumers and edge providers about a broadband provider's network management practices, performance and commercial terms.  In the *Title II Order*, the Commission appropriately rejected requiring the inclusion of a host of other disclosures,[126] and it did not require these disclosures in the *RIF Order*.  The Commission points to no basis for reversing course and adding disclosures that are not important to consumers.

Even if there have been occasional complaints about whether a provider's disclosures complied with the transparency rule, there is no indication that the Commission's existing enforcement regime is incapable of investigating and resolving those complaints.  To the extent the Commission is concerned that the *RIF Order* eliminated certain enhancements to the transparency rule adopted in the *Title II Order*,[127] Congress addressed that concern in Section 60504 of the Infrastructure Act in requiring the Commission to adopt broadband label rules.  The need for amending the transparency rule to include additional disclosures is non-existent.

As WISPA and others have documented, the broadband label rules will require all broadband providers to incur costs to create, implement and maintain labels for each service tier across potentially many networks.  In a document it apparently used to generate burden estimates as required by the Paperwork Reduction Act of 1995,[128] the Commission acknowledged that providers with 100,000 or fewer broadband subscribers – nearly all of WISPA's members – "are

---

[126] *Id.* at 84 (¶ 176) (listing "additional disclosure requirements regarding 'the source, location, timing, or duration of network congestion,' packet corruption and jitter, and 'disclosures that permit end users to identify application-specific usage or to distinguish which user or device contributed to which part of the total data usage.'") (citations omitted).

[127] *See id.* at 82 (¶ 173).

[128] *See* Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (codified at 44 U.S.C §§3501-20, at §3507(c)) ("PRA").

**App. 1288**

less likely to have in-house attorneys and compliance departments to assist with their broadband labels and will need to engage outside legal resources to implement several proposed requirements."[129] As WISPA explained, "[o]nly a handful of WISPA's more than 600 operator members have in-house legal counsel, and most small broadband providers have few if any engineers, technical writers, staff administrators or web administrators on staff that are qualified to contribute to the labels' content and design. They will need to hire outside legal counsel, engineers and consultants to comply, at substantially higher cost than the Commission assumes."[130] Without in-house resources, smaller providers will be absorbing a disproportionate amount of expense in engaging outside consultants, engineers, attorneys, translators and others to create and implement their broadband labels.

Requiring broadband providers to change their disclosure statements will add to these costs, and then some. After expending time and financial resources to comply with the broadband label requirements, providers would then be required to change their transparency disclosure statements. Given the interaction between the broadband label requirements and the transparency disclosures, that may in turn require providers to change their broadband labels. To make matters worse, if the Commission adopts additional broadband label requirements pursuant to the *Broadband Label FNPRM* and the burden estimates of those rules are approved under the PRA, providers would again need to update their labels to comply with the new rules and then re-visit their disclosure statements. The "interplay between the broadband label requirements

---

[129] *Information Collection Being Reviewed by the Federal Communications Commission*, 88 Fed. Reg. 7973 (Feb. 7, 2023). The Worksheet was attached as Appendix A to the WISPA PRA Comments.

[130] WISPA PRA Comments at 7. WISPA further stated that "[f]or example, it is extremely unlikely that a broadband provider will be able to hire a qualified outside lawyer at $84.55 per hour to review the *Broadband Label Order*, understand and interpret the disclosure obligations and draft multiple compliant broadband labels that account for pricing differences and, potentially, non- English languages.").

adopted in the *Broadband Label Order*, the possible amendments raised in the *Broadband Label Further Notice*, and any modifications to the transparency rule that we might adopt here"[131] will devolve into a multi-year, ongoing cycle of review and updates to two interrelated documents. In adopting the Infrastructure Act, Congress did require the Commission to adopt broadband labeling requirements but did not require the Commission to change its transparency requirements. The Commission would be making a very poor and unilateral policy choice if it were to impose and, indeed, exacerbate these disproportionate burdens and costs on smaller providers without any track record showing that the existing rule and the new broadband label rules are inadequate to provide relevant information to consumers and edge providers.

### B.    The Current Means Of Disclosure Are Adequate

The Commission seeks comment on "how best to ensure that the content of the required disclosures is made available in a timely and effective manner without undue burdens on ISPs."[132] As the Commission required in the *RIF Order*, disclosures should continue to be made on the provider's website or to the Commission.[133] The "practical experiences"[134] of WISPA's members demonstrates that these requirements impose acceptable burdens on smaller providers.

Even so, Congress mandated the Commission to adopt rules requiring providers to create, implement and update broadband consumer labels with specific information intended to allow consumers to compare broadband offerings. Because broadband labels are required to be available at the provider's points of sale and must include hyperlinks to certain portions of the

---

[131] *NPRM* at 81 (¶ 171) (citation omitted).

[132] *Id.* at 84 (¶ 177).

[133] *RIF Order*, 33 FCC Rcd at 444 (¶ 229).

[134] *NPRM* at 84 (¶ 177).

**App. 1290**

provider's disclosure statements,[135] as a practical matter, a consumer has access to the required disclosures at the point of sale, and there thus is no reason to create an additional requirement.

Nor is there any reason to require "direct notifications" to end users "if their individual use of a network will trigger a network practice, based on their demand prior to a period of congestion, that is likely to have a significant impact on the end user's use of the service."[136] As the Commission concluded in the *RIF Order*, a direct notification requirement would be "unduly burdensome to ISPs and unnecessary in light of the other forms of public disclosure required."[137] The "broader purpose"[138] of the transparency rule does not warrant a requirement that providers provide notice to end users every time they trigger a network management solution. In fact, the transparency requirement is designed to provide end users with advance notice of the circumstances that might trigger a network practice so that they can adjust their broadband usage habits and relieve broadband providers from ongoing direct notification obligations.

Finally, WISPA opposes any requirement that broadband providers should be subject to recordkeeping requirements "governing the types of information or records ISPs rely upon to support the content of their disclosures made under the transparency rule."[139] If a provider becomes subject to a complaint, then the Commission can use its investigatory authority to seek information from the provider. A provider might be well advised to keep records voluntarily as "best practices," but it should not be required. Recordkeeping imposes both the costs to keep records and the enforcement risk of not keeping the precise records the Commission may require,

---

[135] *See Broadband Label Order* at 2 (¶ 3) (requiring links to the provider's network management practices, privacy policies and ACP).

[136] *Title II Order*, 30 FCC Rcd at 5677 (¶ 171).

[137] *RIF Order*, 33 FCC Rcd at 444 (¶ 230).

[138] *NPRM* at 85 (¶ 181).

[139] *Id.* at 86 (¶ 185).

**App. 1291**

costs that would be more burdensome on smaller providers. The Commission has no need to "identify and account for particular data sources or methodologies that prove to be especially reliable or unreliable"[140] because the information for disclosure statements comes from the provider's own network and own business practices (*e.g.*, pricing). With respect to "reasonable network management," in Section III.D.2 of these Comments, WISPA has proposed a set of practices that would be deemed *per se* reasonable, obviating the need for Commission inquiry into certain business practices.

As with other changes to the transparency rule suggested in the *NPRM*, Congress did not require additional transparency beyond what it mandated for broadband labels. There is no evidence that the existing rule – soon to be coupled with the rules adopted in the *Broadband Label Order* – is insufficient, and the costs of compliance outweigh any perceived benefits that additional disclosures, direct notification and recordkeeping might bring about. The Commission should retain its transparency rule without change.

## V. IF THE COMMISSION APPLIES TITLE II TO BROADBAND INTERNET ACCESS SERVICE, IT SHOULD FORBEAR FROM ADDITIONAL TITLE II REQUIREMENTS

### A. Even with Forbearance, Reclassifying Broadband Internet Access Service Under Title II Will Lead To Regulatory Creep

The *NPRM*'s discussion of forbearance solicits comment on a wide variety of issues and reiterates much of the Commission's earlier forbearance approach.[141] What it does not do is discuss, at any length whatsoever, why forbearance is important. Instead, the *NPRM* briefly quotes the *Title II Order*'s assertion that forbearance was designed to "strike the right balance . . .

---

[140] *Id.*

[141] *See generally NPRM* at 52-58 (¶¶ 98-114). As discussed above, the *NPRM* entirely fails to identify the sections of Title II from which the Commission proposes to *not* forbear, leaving it to commenters to uncover the additional compliance costs Title II would impose. *See* Section II, *supra*.

of minimizing the burdens on ISPs while still adequately protecting the public"[142] and vaguely asserts that rate regulation is unnecessary because the Commission can still "promote broadband deployment and competition."[143] If the Commission were actually intent on limiting regulatory burdens, one would have expected a serious discussion about how Title II regulation might increase costs and how the Commission could limit that impact by exercising forbearance authority.

The absence in the *NPRM* of a clear justification for forbearance strongly indicates that a Title II forbearance regime will give way to regulatory creep and much more regulation of broadband internet access service than the *NPRM* would otherwise indicate. Forbearance is not a hard line that can never be recrossed – the Commission can change its mind and decide to re-regulate at any time. Indeed, regulatory burdens have steadily increased even under the current Title I regime, encompassing such requirements as broadband mapping, broadband labels and, most recently, the Commission's *Digital Discrimination Order*. It is simply not credible to maintain that this regulatory pace will not continue and accelerate in a Title II environment with weakly justified forbearance, especially given that at least two parts of the *NPRM* clearly *invite* further regulation.

## 1. The General Conduct Rule Is Designed To Result In Further Regulation

First, the general conduct standard is an extremely broad standard *the sole purpose of which is to lead to further regulation.* The discussion, in Section III.C above, focuses on the

---

[142] *Id.* at 52 (¶ 98) (quoting *Title II Order* at 5805 (¶ 434).

[143] *Id.* at 55 (¶ 105).

reasons why the general conduct rule is unnecessary, but it is also important to note that the general conduct rule will inevitably lead to more broadband regulation.

As the *NPRM* pointedly notes, the United States Court of Appeals for the District of Columbia Circuit rejected an argument that the general conduct standard was "unconstitutionally vague."[144] Whatever the standard's constitutionality, it cannot be denied that the requirement is extremely broad and was designed to be broad. The *Title II Order* established the general conduct rule as a "catch-all," specifically stating that while rules against throttling, blocking and paid prioritization were important, "there may exist other current or future practices that cause the type of harms our rules are intended to address."[145] Then-Chairman Wheeler stated the purpose of the rule plainly: "[the rule] can be used to stop new and novel threats to the Internet. That means there will be basic ground rules and a referee on the field to enforce them. If an action hurts consumers, competition or innovation, the FCC will have the authority to throw the flag."[146]

The *whole point* of the general conduct rule, then, is to position the Commission to further regulate the conduct of broadband service providers, and to do so in the context of specific enforcement proceedings rather than a rulemaking of general applicability. The general conduct rule will thus serve, as it is intended to serve, as a tool for creeping regulation.

---

[144] *Id.* at 79 (¶ 167), n.528.

[145] *Title II Order*, 30 FCC Rcd at 5659 (¶ 135).

[146] *Id.* at 5915. This comparison is not entirely accurate, as it puts the general conduct rule on the same level as, for example, an offsides penalty, which is specific conduct well understood by both the players and the referee. The general conduct rule is more like allowing referees to throw a flag if they don't like the offensive play calling or the defensive scheme.

## 2. Regardless Of The Commission's Intent Today, Regulating Broadband Internet Access Service Under Title II Will Inevitably Lead To Price Regulation

The *NPRM* states that the Commission will not forbear from applying Sections 201 and 202, but then proposes that the Commission "forbear from applying sections 201 and 202 to BIAS insofar as they would support adoption of rate regulations for BIAS."[147] It was not clear in 2015 what this meant when the Commission first proposed this approach, and the *NPRM* does nothing to further explain what it means. Absent clarity, or simple forbearance from the *entirety* of Sections 201 and 202, the Commission will *inevitably* impose forms of rate regulation.

The *NPRM*'s proposed approach is unclear because even a quick review of the sections shows that forbearing from rate regulations under Sections 201 and 202 raises significant questions about the scope of the Commission's forbearance:

- Section 201(a) requires furnishing of service "upon reasonable request therefor" and allows the Commission to require common carriers to "establish physical connections with other carriers." Broadband providers might refuse to furnish service or interconnect because of concerns about cost recovery. So, would the Commission forbear from setting a service rate if it finds that a broadband provider unreasonably refused to furnish service or interconnect with another carrier? How then would it enforce Section 201(a)?

- Section 201(b) states that all "charges, practices, classifications, and regulations . . . shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful." So, notwithstanding the clear language of the Act, is the Commission stating it is forbearing from ever finding

---

[147] *NPRM* at 55 (¶ 105).

broadband access charges unjust or unreasonable?  If it is reserving this ability to do so, how could it do so without setting some just or reasonable rate?  And is the Commission also forbearing from ever finding unjust or unreasonable any practice, classification or regulation that might impact a rate for service?

- Section 202 flatly states that common carriers may not "make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services" or "make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."  As with Section 201(b), does the Commission intend to forbear from finding *any* rates, or *any* practices, classifications, regulations, facilities or services that might impact rates, unjustly or unreasonably discriminatory?  And if the Commission is not exercising such forbearance, to what extent does it believe the scope of its ability to regulate rates under Section 202 is different from the scope of its ability to regulate pricing that it recently asserted in the *Digital Discrimination Order*?[148]  Would "reasonable network management" be a defense to a claim under Section 202?

In considering the above questions, it is also important to understand that "rate regulation" does not only mean "the Commission hereby sets a rate of $X per month for this service."  Rate regulation is hardly ever so straightforward.  It is far more often the case that a federal or state agency regulates rates by requiring service providers to offer discount plans, limiting the kinds of costs that service providers can recover through end user rates, preventing service providers form charging for certain services, requiring cost averaging or reasonably

---

[148] *Digital Discrimination Order* at 53 (¶ 102), 56-57 (¶ 105).

**App. 1296**

comparable rates between urban and rural areas[149] or between other classes of customers or services areas, or implementing any of the dozens of other methods that have accumulated in the regulatory tool box over the last century.

To be clear, if the Commission proceeds with reclassification, then WISPA completely supports forbearance from rate regulation under Sections 201 and 202. But unless the Commission simply forbears *completely* from Sections 201 and 202, and certainly as has been indicated by the vague language of the *NPRM*, broadband providers will have little, if any, idea of the actual scope of the Commission's remaining authority under these sections. In such an environment, the Commission will inevitably adopt measures that regulate broadband service rates to a greater or lesser degree, even if the Commission never says "the Commission hereby sets a rate of $X per month for this service." Moreover, there will be enough ambiguity about the scope of the Commission's forbearance that it will invite state regulation of rates which, as discussed above, may or may not fall within the scope of the Commission's preemption.

In sum, both the vague general conduct rule and the *NPRM*'s unclear articulation of its forbearance from rate regulation are the two most obvious areas where Title II rules will lead to regulatory creep. But they will not be the only areas. The *NPRM*'s failure to offer a clear justification for proposed forbearance is significant. It indicates any eventual order will provide only the vaguest assurances that the Commission will examine proposed regulation in light of possible burdens on broadband providers, and smaller providers would bear those burdens

---

[149] *See Connect America Fund*, 26 FCC Rcd 17663, 17708-09 (2011) (implementing requirement under 47 U.S.C. § 254(b) that information services should be available to all consumers "at rates that are reasonably comparable to rates charged for similar services in urban areas"). While not promulgated under Sections 201 or 202, the Commission's reasonably comparability benchmarks for broadband clearly constitute a form of rate regulation by imposing mandatory limits on what eligible telecommunications carriers receiving high-cost support can charge subscribers to their supported voice and broadband services.

disproportionately to others.  WISPA thus urges the Commission to conduct a serious cost-benefit analysis of the imposition of Title II regulation in all of its manifestations, and if it does decide to reclassify broadband internet access service, show that forbearance has been applied fully to the correct sections of Title II, explaining the scope of forbearance sufficiently to foreclose inevitable future attempts to backtrack.

### B.    The Scope Of Forbearance Must Be Expanded To Protect Smaller Providers

The scope of forbearance described in the *NPRM* is insufficient to protect smaller providers from provisions of the Communications Act likely to cause high compliance costs and seriously depress investment.  As described below, if the Commission proceeds with reclassifying broadband as a Title II telecommunications service, it also should forbear from Sections 206, 207, 208, 214, 218 and 220, at least to the extent they apply to smaller providers.

### 1.    Sections 206, 207 and 208

Sections 206, 207 and 208 prescribe processes and remedies for resolution of disputes that are better resolved, at least for smaller providers, through an informal complaint process.[150] Section 206 states that any common carrier violating the Act would be liable for "the full amount of damages sustained in consequence of such violation . . . together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery."[151]  Section 207 allows "[a]ny person claiming to be damaged by any common carrier" to bring a suit in United States district court as an alternative to making a complaint to the Commission.[152]  Sections 206 and 207 also apply when the Commission promulgates regulations declaring or deeming certain practices

---

[150] *See* Section VI.B.1, *infra*.

[151] 47 U.S.C. § 206.

[152] 47 U.S.C. § 207.

unlawful under the Act.[153]  Section 208 establishes the process whereby the Commission may hear formal complaints "complaining of anything done or omitted to be done by any common carrier subject to this chapter, in contravention of the provisions thereof . . . ."[154]  Taken together, then, these sections of the Act not only require a common carrier to respond to formal complaints at the Commission, but also subject it to litigation in federal court, including potential class actions and damages.

These federal rights of action were written in 1934, when the primary actors to which they might apply were very large providers of interstate telephone and telegraph services with millions of customers.  In an environment where they will now apply to hundreds of much smaller providers – some who may only serve a few hundred or even dozens of subscribers – these tools are not just powerful they are potentially crippling.

Applying Title II to broadband service will subject providers not only to the myriad regulatory obligations discussed herein, but even with the forbearance the Commission proposes will then also subject providers to the prospect of retaining legal counsel to defend lawsuits in federal court, or to defend and manage a formal complaint at the Commission.  For small providers who count their revenues in thousands, not millions, of dollars, this completely changes the risk profile they expected when they began providing service and in investing in ongoing network upgrades and expansion.  Smaller providers could very quickly find themselves subject to suits and formal complaints – merited or not – based on, for example, an alleged failure to interconnect with competitors or content providers, alleged violations of the broadly defined requirements of the *Digital Discrimination Order*, alleged violations of broadband

---

[153] *Global Crossing Telecomm., Inc. v. Metrophones Telecomm. Inc.,* 550 U.S. 45 (2007).
[154] 47 U.S.C. § 208.

labelling requirements, alleged failure to handle CPNI appropriately, and any number of practices that might be portrayed as unjust, unreasonable, or unreasonably discriminatory.

WISPA thus strongly urges the Commission to forbear from applying Sections 206, 207 and 208 to smaller providers.  Such forbearance is entirely consistent with the requirements of Section 10 of the Act.[155]  Enforcement of Sections 206, 207 and 208 is not necessary to ensure that smaller providers' charges, practices, classifications or regulations are just, reasonable and not unjustly or unreasonably burdensome, because of widespread competition in the broadband marketplace that warrants forbearance from so many other of the provisions of Title II. Moreover, individuals can still bring informal complaints against smaller providers and the Commission can initiate enforcement proceedings to target bad behavior.  Enforcement of Sections 206, 207 and 208 is also not necessary to protect consumers for the same reasons.  And forbearance is clearly consistent with the public interest because smaller broadband providers are much more vulnerable to the costs of spurious litigation, and such forbearance will allow them to continue to provide and expand service – and increase competition and investment – without the threat of such litigation hovering over them, at least until the contours of the Commission's common carrier regime as applied to broadband become more apparent.

What are the compliance areas where broadband providers may fall short?  What are the areas that will be of most concern to consumers?  The answers to these questions are unknowable

---

[155] 47 U.S.C. § 160(a) ("Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that— (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory; (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and (3) forbearance from applying such provision or regulation is consistent with the public interest.").

**App. 1300**

immediately after the Commission adopts a Title II order – they will only become more apparent with time. Better, then, to allow that process to play out for smaller providers through informal complaints and Commission enforcement, rather than expose the most vulnerable providers to the full weight of numerous individual and class action suits and formal complaints.

## 2. Section 214

The *Title II Order* forbore from applying Section 214's requirements regarding transfers of control, reasoning that application of other protections were sufficient to ensure just, reasonable and nondiscriminatory conduct by broadband providers.[156] The *NPRM*, however, tentatively concludes that it should reverse this decision, and instead proposes to apply the entirety of Section 214 to broadband providers, as well as certain parts of Title III, including Section 310's limitations on foreign ownership of holders of common carrier wireless licenses.[157] The Commission's stated reason for now proposing to apply Section 214 is based on its recent exercise of its authority to address national security and law enforcement concerns through the review of domestic and international authorizations under Section 214.[158]

Although the *NPRM* discusses the application of Section 214 exclusively in the context of protecting national security by providing the Commission with revocation authority,[159] if Section 214 applies to broadband providers then it will result in broad imposition of transfer of control requirements to thousands of broadband providers. Applying Section 214 to broadband providers means:

---

[156] *Title II Order,* 30 FCC Rcd at 5848-49 (¶ 511).

[157] *NPRM* at 16-17 (¶ 27), 56-57 (¶¶ 108-109).

[158] *Id.*

[159] *Id.* at 56-57 (¶ 108).

**App. 1301**

- every broadband internet access service provider no matter how large or small will be deemed to have a domestic Section 214 authorization, which must then be reviewed and approved under Sections 63.03-63.04 of the Commission's rules before an assignment or transfer of control event can take place; and

- some or all of a provider's non-common carrier wireless licenses will presumably be considered to be common carrier licenses, meaning the provider will be subject to the foreign ownership thresholds of Section 310(b) of the Act and would be required to file a Petition for Declaratory Ruling under Section 1.5000 *et seq.* and receive Commission approval should foreign ownership exceed those thresholds.

This, then, means that applying Section 214 will result in significant administrative burdens on both the federal government and individual broadband providers that have never before been deemed to hold a Section 214 authorization.

Broadband providers across the country who never needed to obtain prior consent when adding a General Partner, refinancing, or engaging in numerous other kinds of purely domestic transactions would now need to file for and obtain prior Commission consent to an assignment or transfer of control. This alone will result in many more applications filed under Section 214 each year than have ever been filed before. The Commission's website lists 33 completed domestic Section 214 transfer of control transactions for 2023.[160] WISPA itself has more than 600 operator members providing broadband, and WISPA represents only a fraction of the broadband providers across the country. The Commission's most recent *Communications Marketplace Report* states that as of the end of 2021 there were 2,021 entities providing

---

[160] *See* FCC, 2023 Completed Domestic Section 214 Transfer of Control Transactions, at https://www.fcc.gov/2023-completed-domestic-section-214-transfer-control-transactions.

broadband.[161]  More recent compilations indicate the number today could be closer to 3,000.[162] If only five percent of these companies(the vast majority of which are small) file to assign or transfer control of their Section 214 authorizations each year, the number of applications filed annually will increase at least four times, and possibly up to six times.  Even assuming the majority of those applications are subject to streamlined treatment, this would constitute a huge administrative burden on Commission resources, likely leading to far longer processing times than are already faced by applicants.

Moreover, unless the transaction were entirely domestic, any transaction involving (now common carrier) wireless licenses and any transaction involving both domestic and international Section 214 authorizations would be referred to the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (the "Committee").[163] Accordingly, applying Section 214 will result in a significantly increased burden not only on the Commission, but also on the Executive Branch agencies conducting such reviews.  Even worse, as many Committee reviews result in Letters of Agreement with extensive compliance and reporting requirements, the Executive Branch agencies will likely need to expand their personnel monitoring compliance to keep up with the vast expansion of oversight authority.[164]

---

[161] *Communications Marketplace Report*, at Fig. II.A.5, 15-16 (¶ 26).

[162] *See. E.g.*, BroadbandNow, *The Complete List of Internet Companies In the US* (Dec. 12, 2023), *available at* https://broadbandnow.com/All-Providers/page/12.

[163] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership,* Report and Oder, 35 FCC Rcd 10927, 10935-36 (¶¶ 24-25) (2020) ("*Foreign Ownership Order*").

[164] *See, e.g., Applications Filed for the Transfer of Control of Certain Subsidiaries of Frontier Communications Corporation to Northwest Fiber, LLC,* Memorandum Opinion and Order and Declaratory Ruling, WC Docket No. 19-188, DA 19-1302 (rel. Dec. 19, 2019).

What this means for individual providers is that, in the best case, they will now need to retain experienced legal counsel to draft, file and prosecute the transfer application and face lag times of at least four months to obtain streamlined approval of entirely domestic Section 214 transfers, a timeframe that will probably increase significantly as the Commission retools to deal with the substantially increased volume of applications. And if a transfer of control involves foreign ownership, then the timeframe will be even longer: because any transfer implicating Section 310(b)'s thresholds will require a Petition for Declaratory Ruling and referral to the Committee, even the smallest of broadband providers can expect the process will take up to a year or more and entail significant legal fees for filing and responding to information requests.

This scale of administrative burden and cost is not something the Commission can just elide and ignore. If the Commission applies Section 214 to smaller providers, it will effectively strangle investment in those providers because many investors will deem the cost and time of the additional transfer of control processes too burdensome. They will redirect their investment dollars to industries where they do not have to wait four months to a year to close. At a time when the government is implementing and investing billions of dollars to *stimulate domestic investment* in deployment and infrastructure to advance "Internet for All," this is the kind of serious economic burden the Commission must weigh when assessing the costs and benefits of applying new regulations.[165]

Thus, while WISPA agrees that it is important for the Commission to have the tools it needs to address national security concerns, it must urge additional forbearance in this area; otherwise, both the Commission and broadband providers will be subjected to extreme

---

[165] As comparison, the *BEAD NOFO* does not include any language requiring NTIA to approve transfers of control and assignments of BEAD-funded networks.

administrative burdens that far exceed any benefit to national security. Specifically, WISPA proposes that, as applied to smaller providers, the Commission should extend forbearance to Section 214's transfer of control requirements to applications that are currently excluded from referral to the Committee.

What this would mean is that a smaller provider would not be required to file a transfer of control application under Section 214 for the following:

- transfers of standalone domestic Section 214 authorizations;

- *pro forma* transfers;

- transfers of international Section 214 authorizations where the only reportable foreign ownership is through wholly owned intermediate holding companies;

- transfers of international Section 214 authorizations where the applicant has an existing mitigation agreement, there are no new reportable foreign owners of the applicant since the date of the mitigation agreements and the applicant agrees to continue to comply with the terms of that mitigation agreement; and

- transfers of international Section 214 authorizations where the applicant was cleared by the Executive Branch within the past 18 months without mitigation and there are no new reportable foreign owners of the applicants since that review.[166]

Additionally, the Commission would forbear from treating non-common carrier wireless licenses as common carrier wireless licenses solely because of the application of Title II to broadband internet access service, thus allowing a broadband provider to transfer licenses that today would be considered non-common carrier licenses without separately filing a Petition for Declaratory Ruling should foreign ownership exceed 25 percent. The broadband provider would, of course, be required, as it is today, to file a transfer of control for the wireless licenses. This forbearance would simply allow the provider and the Commission (and the Committee) to avoid extensive further process because of the technical classification of the licenses.

---

[166] *Foreign Ownership Order*, 35 FCC Rcd at 10938 (¶ 30).

As a general matter, the Commission's discussion of the types of applications it includes and excludes from referral to the Committee provides much of the justification for extending forbearance to these kinds of applications from smaller providers.[167]  As discussed in the *Foreign Ownership Order*, many of these kinds of applications have not been subject to mitigation for national security issues, and in many of these cases there is either no change in ultimate ownership (as in *pro forma* applications) or ownership has recently been subject to review.  The same reasoning would thus apply to justify exclusion from the Commission's transfer of control requirements generally, especially to the extent that the Commission's proposed reversal on Section 214 forbearance is primarily motivated by national security concerns.  With regard to wireless licenses, if the transfer does not otherwise raise any national security concerns that would warrant review by the Commission or referral to the Committee, then it would not be in the public interest to require extensive additional process solely because wireless licenses would now be considered common carrier wireless licenses.

Moreover, forbearance as described above would be consistent with the Section 10 criteria.  Enforcement is not necessary to ensure that small providers' charges, practices, classifications or regulations are just, reasonable and not unjustly or unreasonably burdensome because the transfer of control requirements do not protect against such behavior and the Commission would retain its enforcement authority to address specific instances of bad behavior.  Moreover, it is extremely unlikely that a transfer of control of a smaller provider would result in the kind of horizontal or vertical concentration that would require Commission action to step in and prevent a reduction in actual or potential competition.  Enforcement is also not necessary to protect consumers for the same reasons.  Finally, forbearance is consistent with the public

---

[167] *See id.* at 10935-42 (¶¶ 24-39).

interest for the reasons discussed above and in the *Foreign Ownership Order*.  Sparing smaller providers from the cost of engaging in a lengthy transfer of control process will preserve funds for broadband deployment and continue to encourage investment in small, competitive providers, consistent with the Infrastructure Act and the billions of dollars Congress appropriated for broadband deployment, middle mile connectivity and digital equity, among other benefits.  Forbearance to the extent described above also will preserve Commission and Executive Branch resources for review of transactions impacting many more customers with much more significant national security stakes, and also allow the Executive Branch to concentrate its ongoing monitoring of mitigation agreements where such agreements have the broadest impact.

### 3.    Section 218

As explained above, Section 218 could impose significant costs on smaller providers as it allows the Commission to "inquire into the management of the business" of common carriers and "obtain . . . full and complete information necessary for the Commission to perform the duties and carry out the objects for which it was created."[168]  This Title II requirement would thus add a vaguely defined and potentially long list of further reporting and recordkeeping requirements to the extensive information already provided as part of broadband reporting, maintained as required by broadband labelling, and as may be required to be reported under the Commission's digital discrimination rules.  Forbearance from applying this requirement to smaller providers would meet the requirements of Section 10 of the Act.  Enforcement is not necessary to ensure that small providers' charges, practices, classifications or regulations are just, reasonable and not unjustly or unreasonably burdensome because existing obligations on broadband providers and proposed obligations under Title II focus on those areas that are of highest concern to the

---

[168] 47 U.S.C. § 218.

Commission. It is unnecessary for the Commission to have catch-all authority to impose additional reporting and recordkeeping requirements. For the same reasons, enforcement of this requirement is not necessary to protect consumers. Finally, forbearance is consistent with the public interest for the reasons discussed above. Smaller broadband providers are already diverting resources to comply with reporting and labelling requirements and expect to devote more resources to compliance with digital discrimination rules. By protecting them from the need to divert further resources to comply with a broad array of additional reporting and recordkeeping requirements, the Commission will preserve resources for investment in broadband infrastructure.

### 4. Section 220

As explained above, Section 220 could impose significant costs on smaller providers by requiring them to "maintain a system of accounting methods, procedures, and techniques (including accounts and supporting records and memoranda) which shall ensure a proper allocation of all costs to and among telecommunications services, facilities, and products (and to and among classes of such services, facilities, and products) which are developed, manufactured, or offered by such common carrier."[169] Almost no smaller providers have any experience with establishing accounts in conformity with Commission standards. Since 1991, the Commission gradually narrowed application of its Uniform System of Accounts ("USOA"), promulgated under Section 220, because price cap regulation applied to most carriers reduces the importance of having common carriers maintain a costly set of second books compliant with Commission accounting standards. Thus, the Commission restricted the USOA to the largest incumbent local exchange carriers, streamlined it for price cap carriers, and most recently

---

[169] 47 U.S.C. § 220.

allowed price cap carriers to use GAAP for all regulatory accounting purposes.[170]  Given this history, and the fact that applying Section 220 makes no sense if the Commission does not intend to apply rate regulations under Sections 201 and 202, the Commission should add Section 220 to the list of requirements from which it is forbearing.

Forbearance from applying this requirement to smaller providers would meet the requirements of Section 10 of the Act.  Requiring broadband providers to maintain systems of account is not necessary to ensure that small providers' charges, practices, classifications or regulations are just, reasonable and not unjustly or unreasonably burdensome because the Commission does not intend to regulate rates, and the same reasoning that the Commission has used to gradually streamline accounting requirements would apply here.  Likewise, enforcement of this requirement is not necessary to protect consumers.  Finally, forbearance is consistent with the public interest for the reasons discussed above.  Smaller broadband providers have no experience with Commission-mandated systems of accounts that are, in any event, of extremely limited application.  Accounting standards promulgated under Section 220 have, for all intents and purposes, been rendered unnecessary, and clearly make no sense if the Commission does not intend to regulate broadband rates.

C.    **The Benefits Of Affording Broadband Providers Pole Attachment Rights Under Section 224 Are Insufficient To Warrant Title II Regulation**

There is no question that broadband-only providers would benefit from the pole attachment rights provided under Section 224.  However, the extent of any potential benefit is limited by the scope of Section 224's applicability, and if the Commission were to reclassify broadband as a Title II service, those benefits would be insufficient to warrant the significant

---

[170] *See Comprehensive Review of the Part 32 Uniform System of Accounts,* Report and Order, 32 FCC Rcd 1735, 1739-40 (¶ 12) (2017).

**App. 1309**

costs and burdens of Title II regulation.[171]  Furthermore, Title II is not the only means by which the Commission can assure access to infrastructure.  As WISPA and others have previously maintained, the Commission has authority under other provisions of the Act to extend pole attachment benefits to broadband-only providers.[172]

Although Section 224 grants the Commission authority to regulate the rates, terms and conditions of pole attachments by cable television and telecommunications service providers, the scope of this authority is limited by the statute itself.  First, Section 224(c) expressly gives states the ability to "reverse-preempt" the Commission's authority over pole attachments and regulate pole attachments themselves – and 23 states and the District of Columbia have in fact done so.[173] The reclassification of broadband as a Title II service would therefore do nothing to extend the Commission's pole attachment protections to broadband-only providers in nearly half of the states in the country.

The Commission's authority to regulate pole attachments is further limited to only specific categories of poles owned by specific types of entities.  Poles that are not a part of a utility's electric distribution system and poles owned by municipalities, cooperatives, railroads, and Federal and state governments are all excluded from the scope of the Commission's Section 224 authority.[174]  The reclassification of broadband as a Title II service would therefore do

---

[171] *NPRM* at 27-28 (¶ 47).

[172] *See, e.g.*, WISPA Comments, WC Docket No. 17-108 (filed Apr. 20, 2020), at 11-16; *Restoring Internet Freedom*, Order on Remand, 35 FCC Rcd 12328, 12377 (¶ 81), n.323 ("*RIF Remand Order*").

[173] 47 U.S.C. § 224(c); *States That Have Certified That They Regulate Pole Attachments*, Public Notice, WC Docket No. 10-101, 37 FCC Rcd 6724 (WCB 2022).

[174] 47 U.S.C. § 224(a)(1); *Southern Co. v. FCC*, 293 F.3d 1338, 1345 (11th Cir. 2002) ("The text of the statute, coupled with the presence of this reverse-preemption clause, make it plain that the [Pole Attachment] Act's coverage was intended to be limited to the utilities' local distribution facilities …").

nothing to enable access to such poles even in those states where the Commission still retains its authority over pole attachments.

Given these limitations on Section 224's applicability, the benefits of Section 224 pole attachment rights would be far outweighed by the additional cost, regulatory burdens and overwhelming uncertainty of other Title II requirements and obligations, along with the disproportionate impact that a return to a Title II regulatory regime would have on smaller broadband providers. Rather than promoting infrastructure investment and deployment through pole access protections, the significant costs and burdens of Title II regulation will in fact undermine infrastructure deployment by requiring broadband providers – particularly smaller providers – to divert their resources away from network investment to meet expanded federal compliance obligations. Moreover, while the Commission points to the goal of enabling funding through BEAD and other programs "to go as far as possible" as a reason for extending the protections of Section 224 to broadband-only providers,[175] doing so by reclassifying broadband as a Title II service will have the opposite effect by driving up compliance costs, diverting resources and dissuading participation in BEAD and other funding programs.[176]

## VI. IF THE COMMISSION ADOPTS NEW RULES, IT SHOULD CATEGORICALLY EXEMPT SMALLER BROADBAND PROVIDERS, CONSISTENT WITH LAW AND PRECEDENT

### A. The Commission Is Required To Consider Establishing Different Compliance And Reporting Requirements And Exemptions To Reduce Burdens On Smaller Providers

In the *NPRM*, the Commission seeks comment on the impact that the proposed reclassification of broadband as a Title II service would have on smaller broadband internet

---

[175] *NPRM* at 27-28 (¶ 47).

[176] *See* Section I.E, *supra*.

**App. 1311**

access service providers.[177]  As discussed throughout these Comments, the Commission inexplicably suggests a "one-size-fits-all" regulatory model that fails to distinguish between providers with different sizes, different technologies, different business models and different affects on the marketplace.

The RFA recognizes that "the practice of treating all regulated businesses . . . as equivalent may lead to inefficient use of regulatory agency resources, enforcement problems and, in some cases, to actions inconsistent with legislative intent . . . ."[178]  The RFA expressly requires the Commission and other federal agencies to adopt an Initial Regulatory Flexibility Analysis that "contain[s] a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize[s] any significant economic impact of the proposed rule on small entities."[179]  The analysis "*shall*" discuss "*significant alternatives*" such as:

> (1) *the establishment of differing compliance or reporting requirements* or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) and *exemption from coverage from the rule*, or any part thereof, for small entities.[180]

As explained above, all but one or two of WISPA's members are considered to be "small entities" under the Small Business Act ("SBA") and the U.S. Small Business Administration's size standards.[181]  A majority of WISPA's members have fewer than 25 employees and thus would be regarded as "small business concerns" under the Paperwork Relief Act.

---

[177] *See NPRM* at 13 (¶ 21).

[178] RFA, 5 U.S.C. §§ 601 *et seq.*

[179] *Id.* at § 603(c).

[180] *Id.* at §§ 603(c)(1)-(4) (emphases added).

[181] *See* Introduction, *supra*.

Historically, the Commission has exempted small businesses from rules that it has imposed on larger companies. For example, the Commission has exempted broadcast stations with fewer than five full-time employees from certain equal employment opportunity ("EEO") requirements, while station employment units having five to ten full-time employees and/or located in an entirely smaller market only have to perform two, rather than four, EEO outreach initiatives every two years.[182] The Commission has also exempted from its EEO requirements and provided similar relief for small multichannel video programming distributors ("MVPDs").[183]

Further, in its implementation of the Commercial Advertisement Loudness Mitigation (CALM) Act,[184] small television stations ($14.0 million or less in annual receipts or located in television markets 150-210) and small MVPDs (fewer than 15,000 subscribers as of December 31, 2011 and not affiliated with a larger operator servicing more than 10 percent of all MVPD subscribers) are exempt from performing annual spot checks for noncertified programming or channels as part of the "safe harbor" requirements.[185] The Commission also adopted a streamlined waiver request process for small television stations and small MVPDs that would suffer financial hardship in implementing the new technical standards required to reduce the

---

[182] *See* 47 C.F.R. § 73.2080(c)(2); *see also Review of the Commission's Broadcast and Equal Opportunity Rules and Policies*, Second Report and Order and Third Notice of Proposed Rulemaking, 17 FCC Rcd 24018, 24069 (¶ 160) (2002).

[183] *See* 47 C.F.R. §§ 76.75-77. MVPDs with five or fewer full-time employees are exempt from EEO reporting requirements, while MVPDs with six to 10 full-time employees or located in a smaller market only have to engage in one EEO supplemental initiative rather than two annually.

[184] *Implementation of Commercial Advertisement Loudness Mitigation (CALM) Act*, MB Docket No. 11-93, Report and Order, FCC 11-182, 26 FCC Rcd 17222, 17253 (¶ 52) (2011) ("*CALM Act Report and Order*"); *see also* Small Entity Compliance Guide, 28 FCC Rcd 6290 (2013).

[185] *CALM Act Report and Order* at 17244-45 (¶¶ 35-36); *see also* 47 C.F.R. §§ 73.682(e)(3)(iii) and 76.607(a)(3)(iii).

noise level of commercial advertisements. Qualified small TV stations ($14.0 million or less in annual receipts) and small MVPDs (fewer than 400,000 subscribers as of December 31, 2011) had one additional year to acquire the necessary loudness measuring equipment under the waiver process.[186]

In the telecommunications space, the Commission also adopted certain exemptions for manufacturers or service providers with less than 750 employees that offer two or fewer digital wireless headsets and extended compliance deadlines for non-nationwide CMRS providers under its hearing aid compatibility rules.[187]

In addition to exemptions, the Commission also has afforded smaller entities longer periods of time to comply with certain rules in light of the additional obstacles and compliance burdens those rules require. A recent example is the Commission's decision to defer the effective date of the rules adopted in the *Broadband Label Order* for providers with 100,000 or fewer subscriber lines.[188] The Commission reasoned that:

> implementing broadband labels may require providers to complete certain tasks, including compiling the information that must be presented in the label; incorporating the information into the label format; posting labels on their websites; developing and implementing procedures for making any necessary changes to the labels, including website updates; and training customer service representatives, sales agents, and other personnel. Such tasks may require more time for providers that are less likely to have in-house attorneys and compliance departments to assist in preparing their broadband labels, and thus will need to engage outside legal resources to implement several proposed requirements.[189]

---

[186] *CALM Act Report and Order* at 17253-54 (¶ 53).

[187] *See Local Number Portability Porting Interval and Validation Requirements*, Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd 6084 (2009); *Local Number Portability Porting Interval and Validation Requirements*, Report and Order, 25 FCC Rcd 6953 (2010). The Commission's Local Number Portability rules afford small carriers a longer period of time to comply with one-day porting requirements.

[188] *Broadband Label Order* at 38 (¶ 118); 47 C.F.R. § 8.1(a)(7).

[189] *Id.* at 39 (¶ 118) (citation omitted).

**App. 1314**

Likewise, the Commission exempted providers with 100,000 or fewer subscriber lines from certain recordkeeping and reporting rules in its rural call completion rules.[190]

In addition, following the adoption of the 1992 Cable Act,[191] the Commission implemented a regulatory framework that adopted a streamlined approach to rate reductions[192] and abbreviated Cost of Service filings[193] for smaller systems.[194]  The Commission also granted small cable operators serving 15,000 or fewer subscribers not affiliated with larger operators "transition relief," which permitted small operators a longer period of time to comply with the rules than the time period applicable for larger companies.[195]

As another example, following the adoption of the Twenty-First Century Communications and Video Accessibility Act ("CVAA"),[196] the Commission adopted rules to

---

[190] *See Rural Call Completion*, Report and Order and Notice of Proposed Rulemaking, 28 FCC Rcd 16154, 16164-65 (¶ 20) (2013).

[191] Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992), codified at 47 U.S.C. § 543(i) ("1992 Cable Act").

[192] *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation,* Second Order on Reconsideration, Fourth Report and Order, and Fifth Notice of Proposed Rulemaking, 9 FCC Rcd 4119, 4221-26 (¶¶ 208-217) (1994) ("*Rate Regulation Fifth Notice*").

[193] *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992:  Rate Regulation,* Report and Order and Further Notice of Proposed Rulemaking, 9 FCC Rcd 4527, 4671 (¶ 277) (1994) ("*Rate Regulation Report and Order*").

[194] In both of these instances "smaller MSOs" are defined as "multiple system operators that (1) serve 250,000 or fewer subscribers, (2) own only mall systems with less than 10,000 subscribers, and (3) have an average system size of 1,000 or fewer subscribers."  *See Rate Regulation Fifth Notice* at 4225 (¶ 216); *Rate Regulation Report and Order* at 4671 (¶ 277-278).

[195] *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992:  Rate Regulation*, Fifth Order on Reconsideration and Further Notice of Proposed Rulemaking, 9 FCC Rcd 5327, 5328 (¶ 4) (1994).

[196] Twenty-First Century Communications and Video Accessibility Act, Pub. L. No. 111-260, 124 Stat. 2751 (2010) (as codified in various sections of the Act) ("CVAA").  *See also* Amendment of the Twenty-First Century Communications and Video Accessibility Act, Pub. L. No. 111-265, 124 Stat. 2795 (2010) (making technical corrections to the CVAA).

**App. 1315**

implement CVAA Section 205 requirements for navigation devices.[197]  The Commission set a general three-year compliance deadline for covered entities, but allowed certain mid-sized and smaller MVPDs five years to comply.[198]  The Commission explained that "smaller operators generally lack market power and resources to drive independently the development of MVPD and customer premises equipment"[199] and that "small systems have a smaller customer base across which to spread costs."[200]

These examples illustrate the Commission's fidelity to its statutory mandate under the RFA and the public interest.  The Commission should follow its practice and exempt smaller businesses from any new rules it may adopt in this proceeding.  The proposed rules would burden small businesses with new obligations that are outside the scope of what smaller providers can be expected to handle with their limited resources and limited staff, and especially in light of the absence of any identifiable harm they have caused or would cause to internet openness.

### B.    The Commission Should Streamline Its Enforcement Procedures

The Commission seeks comment "on the best framework for enforcing any potential open Internet rules" and on the enforcement regime that "will be most efficient and least burdensome for customers, edge providers, and ISPs, including small entities."[201]

---

[197] *Accessibility of User Interfaces, and Video Programming Guides and Menus*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 17330 (2013).

[198] *Id*. at 17334 (¶ 5), 17401 (¶ 114).  For purposes of the CVAA, mid-sized and smaller MVPDs are defined as:  (1) MVPD operators with 400,000 or fewer subscribers (*i.e.*, MVPD operators other than the top 14), and (2) MVPD systems with 20,000 or fewer subscribers that are not affiliated with an operator serving more than 10 percent of all MVPD subscribers.  *See id.* at 17401.

[199] *Id.* at 17402 (¶ 115).

[200] *Id.*

[201] *NPRM* at 87 (¶ 189).

App. 1316

As it has in the past,[202] WISPA supports a streamlined enforcement process. Small business broadband providers have never been a source of blocking, throttling and paid prioritization disputes that the proposed rules are intended to address. Nonetheless, if such complaints are filed, even when frivolous or not germane to these issues, smaller providers will need to redirect resources to address the allegations, and even engage attorneys or other outside consultants to help resolve them.

### 1. The Commission Should Adopt A Comprehensive And Efficient Enforcement Regime

If the Commission adopts Title II rules in the proceeding and applies them to smaller providers, it should adopt an enforcement regime that encourages private resolution of disagreements, adopts specific time frames for filing and resolving complaints filed with the Commission and establishes clearly stated forfeiture amounts for violations of the Commission's Part 8 rules. As discussed above, the Commission should broaden its forbearance to eliminate federal court complaints and damages under Sections 206 and 207 of the Act, and also should not re-institute a formal complaint process under Section 208.[203] By implementing a streamlined approach that requires complainants to try to work out their differences with broadband providers before filing an informal complaint with the Commission, the Commission can achieve its goals of "effective and timely conflict resolution," often without Commission involvement, through a process that is "most efficient and least burdensome" for all stakeholders.[204] With such a regime in place, smaller providers will be better able to lower administrative cost

---

[202] *See* WISPA RIF Comments at 44-48; Reply Comments of WISPA, WC Docket No. 17-108 (filed Aug. 30, 2017), at 8-9.

[203] *NPRM* at 89 (¶ 193).

[204] *Id.* at 87 (¶ 189).

**App. 1317**

estimates and better assess and quantify risk, which will enable them to better allocate their own resources and attract capital from investors that need to understand and quantify risk in determining whether and how much to invest.

WISPA recommends several specific actions the Commission can take to streamline and improve the enforcement process complaints. First, the Commission should not re-establish a formal complaint process, but should eliminate the formal complaint process altogether. But if the formal complaint process is retained, smaller providers should be exempt. As emphasized above, smaller broadband providers are typically self-funded with few employees, and compliance with the discovery and hearing process is onerous and time-consuming. This would seriously disrupt a smaller provider's ability to serve its customers, maintain its network and expand to new service areas.

Second, the Commission should require end users and providers to attempt to resolve disputes for a 30-day period before an informal complaint can be filed with the Commission. The *2010 Open Internet Order* emphasized the importance of direct negotiations between a provider and its customer due to the potential technical nature of the disputes.[205] In the experience of WISPA members, the vast majority of complaints allege service delays, slower speeds or connectivity issues that are due to the customer's own usage habits or network congestion during peak usage periods. These issues can be easily explained and/or resolved quickly and efficiently by the broadband provider without Commission intervention. Given that private good faith discussions have proved to be useful, WISPA proposes that the Commission codify a common-sense process in which consumers must first communicate any problems with their service provider and to require both the provider *and* its consumer to participate in good

---

[205] *See 2010 Open Internet Order*, 25 FCC Rcd at 17986 (¶¶ 151-52).

faith discussions for a minimum of 30 days in an effort to resolve the problem prior to the filing of any complaint with the Commission. Such an approach will benefit both consumers and service providers and relieve the Commission of unnecessary administrative burdens.

Third, WISPA requests that the Commission place a time limit on when complaints must be filed, ideally within one year of the alleged rule violation. Broadband providers in general should not have to retain traffic records for any long period of time and one year is a sufficient period of time for a consumer to register a complaint.

Fourth, the Commission should be required to render a decision on any complaint within 60 days of when the broadband provider files its response to the Commission or any required supplemental information. A shot clock is beneficial to all broadband providers, but especially important to small providers because it provides certainty and mitigates risk from long, indefinite, and thus expensive inquiries.

Finally, the Commission should amend Section 1.80 to specify maximum forfeiture amounts for violations of Section 8 rules. The existing rules provide no guidance on the range of sanctions or forfeitures the Commission may impose. As a result, providers have no idea how to quantify a violation of a rule – is it a $1,000 forfeiture or a $1 million dollar forfeiture? Without any certainty or range of potential exposure, providers cannot know the extent of any penalty and investors cannot reasonably assess the risk. And if an investor cannot assess risk, it will simply back away from the investment opportunity.

In addition to the mitigating and aggravating factors in Section 1.80, the Commission should make clear that the size of the provider will be considered. It would be inappropriate to treat small providers like large providers when the ability to pay, for example, a $50,000

**App. 1319**

forfeiture would be a rounding error for a large nationwide broadband provider but would impose a significant hardship on a smaller provider with a few hundred customers.

### 2. The Commission Should Not Adopt An Advisory Opinion Process

In the *Title II Order*, the Commission adopted the use of Advisory Opinions issued by the Enforcement Bureau as a means to gauge in advance whether a proposed activity or service is acceptable under the Commission's general conduct standard.[206] The *RIF Order* eliminated this process.[207] The Commission now proposes to reinstitute an advisory opinion process if it adopts a general conduct standard.[208] In his dissent to the *Title II Order*, Commissioner O'Rielly opined that Advisory Opinions "appear[] utterly useless: they are only available in certain circumstances and are not binding. (I'm not sure why any party would want to refer itself to the Enforcement Bureau when its request could be used against it later.)"[209] Likewise, in his separate statement in *USTA v. FCC*, Judge Williams observed that the Advisory Opinion process imposes disproportionate costs on small providers:

> For the smaller fry, the internet service provider firms whose growth is likely to depend on innovative business models . . . , the slow and costly advisory procedure will provide only a mild antidote to those prescriptions' negative effect. *This of course fits the general pattern of regulation's being more burdensome for small firms than for large, as larger firms can spread regulation's fixed costs over more units of output.*[210]

---

[206] *See Title II Order* at 5706-08 (¶¶ 229-235).

[207] *RIF Order* at 490 (¶ 303).

[208] *NPRM* at 88 (¶ 192).

[209] *Title II Order*, 30 FCC Rcd at 5999, Dissenting Statement of Commissioner Michael O'Rielly. *See also USTA v. FCC*, 825 F.3d 674, 748 (D.C. Cir. 2016) ("*USTA*"), Williams, concurring in part and dissenting in part ("Williams Opinion") ("the Bureau is free to change its mind at will, and as the opinions will be issued only at the staff level, the Commission reserves its freedom to act contrary to the staff's conclusions at any time"), *reh'g en banc denied*, 855 F.3d 381, *cert denied sub nom. Berninger v. FCC*, 139 S.Ct. 453 (2018) ("*Berninger*"),.

[210] *USTA*, Williams Opinion at 755 (citation omitted) (emphasis added).

Accordingly, WISPA does not believe that an advisory opinion process would be practical or beneficial. Such initiatives would require providers to explain – anonymously, one would hope – the entire circumstances of a given situation such that an ostensibly reliable opinion could be provided regarding the specific proposal. The undertaking itself, while time consuming, would appear to afford uncertain benefits to the initiator, while eliciting a sufficiently *sui generis* advisory opinion as to be largely unhelpful to other service providers.

## VII. THE COMMISSION LACKS STATUTORY AUTHORITY TO CLASSIFY BROADBAND INTERNET ACCESS SERVICE AS A TITLE II TELECOMMUNICATIONS SERVICE UNDER THE ESTABLISHED "MAJOR QUESTIONS" DOCTRINE

On its face, the Act delegates very broad authority to the Commission to regulate "interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges" for a variety of public interest purposes.[211] Other language within the Act, however, establishes more defined regulatory categories that necessarily impose limitations on this seemingly expansive mandate.

For example, the scope of Title II of the Act is expressly limited to entities that are engaged as a common carrier, a term circularly defined under the statute as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy" with certain exceptions.[212] At least in the first instance, the meaning of this statutory definition could only be discerned through reference to the common law meaning of common carrier in the context of transportation, a concept that predates

---

[211] 47 U.S.C. §151, *cited in NPRM* at 45 (¶ 82).

[212] 47 U.S.C. §153(11).

App. 1321

telecommunications by centuries.  At common law, to be a common carrier is to hold oneself out as engaged in the business of providing a particular service to the public generally.[213]  As one key case has construed this undertaking:

> Whether the common carrier concept is invoked to support strict tort liability or as a justifying basis for regulation, it appears that the critical point is the quasi-public character of the activity involved.  To create this quasi-public character, it is not enough that a carrier offer his services for a profit, since this would bring within the definition private contract carriers which the courts have emphatically excluded from it.  What appears to be essential to the quasi-public character implicit in the common carrier concept is that the carrier 'undertakes to carry for all people indifferently . . ..'[214]

Additional understanding of the term is provided by the amendments to the Act adopted by the 1996 Act, which for the first time established separate definitions for "telecommunications carrier," "telecommunications service" and "information service."  A "telecommunications carrier," identical in substance to the common law term "common carrier" is identified, in pertinent part, as "any provider of telecommunications services," where the latter term is further defined as "the offering of telecommunications for a fee directly to the public,"[215] and "telecommunications" itself is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."[216]  In contrast, the term "information service" is stated to mean "the offering of a capability for generating, acquiring, storing, transforming,

---

[213] *See, e.g., Fla. Power & Light Co. v. FERC,* 660 F.2d 668, 674 (5th Cir.1981) ("Under common law, a common carrier is one who holds himself out as engaged in the business of providing a particular service to the public"); *Kelly v. Gen. Elec. Co.,* 110 F. Supp. 4, 6 (E.D. Pa. 1953), *aff'd,* 204 F.2d 692 (3d Cir. 1953); Black's Law Dictionary 226 (8th ed. 2004).

[214] *National Ass'n of Regulatory Utility Com'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (citations omitted).

[215] 47 U.S.C. §153(51).

[216] 47 U.S.C. §153(50).

processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing."[217]  The new definitions mirrored in key respects the Commission's then-effective nomenclature that distinguished between "basic" services, on one hand, which were subject to regulation under Title II, and "enhanced" services, on the other, which were not.[218]  In this dichotomy, enhanced services were precisely the kind of services now deployed by broadband internet access service providers.  Indeed, the 1996 Act elsewhere defined "interactive computer service" to include "a service … that provides access to the Internet,"[219] indicating that Congress viewed such a service not as a basic "telecommunications service," synonymous with common carrier telephone service, but as an "information service" not subject to such regulation.

Nonetheless, although the Commission expressly relies upon Title II of the Act as a linchpin for its renewed regulatory approach to broadband service, it does not engage in any detailed analysis of this history, which is particularly salient in light of recent developments in Supreme Court precedent with respect to the "major questions" doctrine.[220]  As described during the Court's 2021 Term, this doctrine "refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem:  agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."[221]  In these cases, the Court does not focus its inquiry on whether the statutory

---

[217] 47 U.S.C. §153(24).

[218] *See, e.g., Computer III Remand Proceedings,* 7 FCC Rcd 909 (1992) (explaining that in the *Computer II* proceeding, "the Commission established a regulatory distinction between enhanced services, which would be offered on a non-tariffed competitive basis, and basic services, which would be subject to Commission regulation under Title II of the Communications Act").

[219] 47 U.S.C. §230(f)(2) (adopted as the Communications Decency Act of 1996, Title V of the 1996 Act).

[220] *See NPRM* at 45-46 (¶¶ 81-84).

[221] *West Virginia*, 142 S.Ct. at 2609.

text at issue could plausibly be interpreted in a manner that supports the agency action but upon the magnitude of the regulatory change proposed in relation to the previously understood scope of the statutory language. For example, nearly a decade ago, the Court noted that in circumstances where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism."[222] This principle acts as a limitation upon the deference that may be afforded administrative agencies under *Chevron* to fill in mere gaps in otherwise unambiguous delegations of authority.[223]

Against the weight of recent precedent placing limits on *Chevron* deference, the Commission relies heavily in the *NPRM* on the Court's 2005 decision in *NCTA v. Brand X*, which it quotes for the proposition "not only that an administrative agency can change its interpretation of an ambiguous statute, but that it 'must consider varying interpretations and the wisdom of its policy on a continuing basis, for example in response to . . . a change in administrations.'"[224] It further relies upon the D.C. Circuit's subsequent ruling in *USTA* to conclude "that *Brand X* conclusively held that the Commission has the authority to determine the proper statutory classification of BIAS and that its determinations are entitled to deference, and so there is no need to consult the major questions doctrine here."[225] But a critical feature of the *Brand X* decision was that the Commission, as it continued to do for an additional decade

---

[222] *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("*Utility Air*"), *quoting Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 159 (2000).

[223] *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("*Chevron*") ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation").

[224] *NPRM* at 38 (¶ 68), *quoting NCTA v. Brand X Internet Services et al.*, 545 U.S. 967, 981 (2005) ("*Brand X*").

[225] *NPRM* at 45 (¶ 81).

thereafter, had made the determination *not* to extend Title II regulation to broadband service providers. The Court found simply that "if the Act fails unambiguously to classify non-facilities-based information-service providers that use telecommunications inputs to provide an information service as 'offer[ors]' of 'telecommunications,' then it also fails unambiguously to classify facilities-based information-service providers as telecommunications-service offerors."[226] Accordingly, as the Commission had declined to extend Title II regulation to any new category of service providers, the Court had no reason to address the statutory ambiguity it noted under the major questions doctrine as the rule under review did not produce "an enormous and transformative expansion of … regulatory authority."[227]

Notably, *USTA*, the only case to uphold the regulation of broadband internet access service under Title II, neither considered the applicability of the major questions doctrine nor reached the Supreme Court on review.[228] The only discussion of this potential aspect of the case came tangentially in the partial dissent of Judge Williams from the initial ruling,[229] and in a lengthier treatment from then Judge, now Supreme Court Justice Kavanaugh. Then Judge Kavanaugh found that the "Act does not supply *clear* congressional authorization for the FCC to impose common-carrier regulation on Internet service providers,"[230] and that the change in the

---

[226] *Brand X*, 545 U.S. at 996-997.

[227] *Utility Air,* 573 U.S. at 324.

[228] *See* n.209, *supra*. As noted in the denial of the cert petition, Justices Thomas, Alito and Gorsuch would have granted the petition, vacated the judgment, and remanded to the D.C. Circuit "with instructions to dismiss the cases as moot." *Berninger*, 139 S.Ct. at 454.

[229] *See USTA*, 825 F.3d at 774-75 (dissenting opinion of Judge Williams, criticizing under the holding of *Utility Air* the inconsistency of the Commission's application of Title II regulation to broadband providers "while forbearing from the vast majority of Title II's statutory requirements," but without discussing the major questions doctrine).

[230] *USTA*, 855 F.3d 381, 417 (2017) (denial of rehearing *en banc*) (dissenting opinion of Judge Kavanaugh).

**App. 1325**

Commission's rules to effect such regulation was indisputably "major" because "[t]he financial impact of the rule—in terms of the portion of the economy affected, as well as the impact on investment in infrastructure, content, and business—is staggering."[231]

As a practical matter, and as these Comments illustrate, there can be no doubt that the *NPRM*'s proposed rule changes invoking Title II would impose serious new regulatory compliance and cost burdens on a significant portion of the U.S. economy. Indeed, the Commission itself has very recently identified broadband internet access service as "a service that is critical to virtually every aspect of life in our country and to the U.S. economy."[232] And the consequent economic impact of internet access is evidenced in a 2021 study led by a Harvard Business School researcher and commissioned by the Interactive Advertising Bureau, which found that the internet economy grew seven times faster than the total U.S. economy (totaling 22 percent growth) during the period from 2016 through 2020, and accounted at that time for 12 percent of the U.S. gross domestic product (GDP).[233] In short, new regulation of broadband access is the type of "enormous and transformative expansion" of agency regulatory authority that the Court has found inconsistent with the Constitutional design unless fully supported by an unambiguous delegation of such authority.[234]

---

[231] *Id.* at 423.

[232] *See* FCC Fact Sheet, "Preventing Digital Discrimination," Summary of Draft Report and Order and Further Notice of Proposed Rulemaking – GN Docket No. 22-69, 1 (rel. Oct. 25, 2023), *available at* https://docs.fcc.gov/public/attachments/DOC-397997A1.pdf; FCC Web Page, "Task Force to Prevent Digital Discrimination," https://www.fcc.gov/task-force-prevent-digital-discrimination.

[233] *See* Interactive Advertising Bureau, *Study Finds Internet Economy Grew Seven Times Faster Than Total U.S. Economy, Created Over 7 Million Jobs in the Last Four Years* (Oct. 18, 2021), *available at* https://www.iab.com/news/study-finds-internet-economy-grew-seven-times-faster/.

[234] *Utility Air*, 573 U.S. at 324.

**App. 1326**

It is also plainly the case that the language of Title II that forms the primary basis for the Commission's new regulation of broadband service was not at its inception intended to encompass such services. And it is not simply because the World Wide Web and the ability to access it using a combination of computer and telecommunications capability was not yet remotely envisioned in 1934 when the Act became law. It is because the language of the statute was specifically designed to address a particular type of basic service, point-to-point telephony, offered on a network dedicated to the provision of the service by large monopolies. Such service is fundamentally distinct from today's IP networks that enable access to a vast array of services and content, deployed in a fiercely competitive environment made possible by technological advances that reduced the barriers to entry to the point that small providers can enter the market and operate successfully. As detailed above, these distinctions have existed in the Commission's regulations for as long as such advanced services have existed.

Indeed, it is precisely *because* Title II does not address broadband services at all that many proposals have been advanced in Congress over the past two decades seeking to fill this unintended "gap" by affirmatively expanding the Commission's authority over these services.[235] These determined efforts indicate a belief on behalf of the sponsoring legislators, both Democrats and a few Republicans, that some additional statutory language was required in order to implement such regulation. If Title II could readily be understood to apply to these service offerings, then these legislative efforts would have been unnecessary. That none of these bills

---

[235] *See, e.g.,* Network Neutrality Act of 2006, H.R. 5273, 109th Cong. (2006); Internet Freedom and Nondiscrimination Act, of 2006 H.R. 5417, 109th Cong. (2006); Internet Freedom Preservation Act, S. 215, 110th Cong. (2007); Internet Freedom Preservation Act of 2009, H.R. 3458, 111th Cong. (2009); The Online Competition and Consumer Choice Act of 2014, S. 2476, 113th Cong. (2014); The Open Internet Preservation Act, H.R. 3982, 113th Cong. (2014); Save Net Neutrality Act, H.R. 4585, 115th Cong. (2017); Save the Internet Act of 2019, H.R. 1644, 116th Cong. (2019); Net Neutrality and Broadband Justice Act of 2022, S. 4676, 117th Cong. (2022).

has gained passage and been signed into law shows a lack of consensus in Congress that such a change in regulatory treatment is warranted.

Recognition of the high bar imposed by the recent Supreme Court cases to the expansion of the Commission's Title II regime to encompass broadband service cuts across the ideological spectrum. It is thus not limited to the two robust dissenting opinions accompanying the Commission's 3-2 approval of the *NPRM*, including Commissioner Simington's succinct summation that the proposed rules "are unnecessary, dangerously overbroad, and unlikely to survive judicial review."[236] Recently, two former Solicitors General who served during the Obama Administration, overlapping the period during which Title II was last invoked with respect to broadband service, have stated plainly their legal understanding that "[n]othing in Title II of the Communications Act itself or in any other statute gives the Commission the clear and unambiguous authority to classify broadband as a Title II telecommunications service subject to common carrier regulation, and the Commission cannot reasonably conclude otherwise."[237] Accordingly, it would be prudent for the Commission to consider more carefully the views of these and other legal experts and scholars before proceeding further with its ambitious regulatory agenda based on the rationale provided in the *NPRM*.

---

[236] *NPRM* at 148, Dissenting Statement of Commissioner Nathan Simington.

[237] Donald B. Verrilli, Jr. and Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine* at 1 (Sept. 20, 2023), *available at* https://aboutblaw.com/bazq. As noted in this paper, Mr. Verrilli served as Solicitor General of the United States from 2011 to 2016 and held several other positions in the Obama White House and the Justice Department prior to that time. Mr. Gershengorn was the Principal Deputy Solicitor General from 2013 to 2016, and succeeded Mr. Verrilli as Acting Solicitor General, serving from 2016 until the end of President Obama's term. *Id.* at n.1.

## VIII.  THE COMMISSION HAS OTHER MEANS AND SOURCES OF STATUTORY AUTHORITY TO ACHIEVE ITS POLICY OBJECTIVES

### A.  New Title II Rules Are Not Necessary To Protect National Security

The Commission asks whether authority exists, absent reclassification, sufficient for the Commission to protect national security.[238]  The Commission itself, in combination with Executive Branch agencies, have sufficient authority to protect national security without invoking Title II.

As the *NPRM* observes, Congress and the Commission have taken steps to improve the security of the supply chain through the Secure and Trusted Communications Networks Act of 2019, the Secure Equipment Act of 2021, Section 254 of the Act with respect to the use of universal service funds and Section 302 and 303 or the Act with respect to equipment authorizations.[239]  Among other things, the Commission must update and publish the list of "covered equipment and services" that pose an unacceptable risk to national security based on determinations made by other federal agencies with national security expertise, irrespective of whether the provider of broadband service (or any other service or device) is a common carrier.[240]  In addition, broadband providers, both those that receive universal support and those that do not, are replacing Huawei and ZTE equipment under the Commission's Secure and Trusted Communications Networks Reimbursement Program to reimburse the costs providers incur to remove, replace, and dispose of covered equipment and services from their networks.[241]

---

[238] *See NPRM* at 18 (¶ 29).

[239] *See id.*

[240] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd 14284, 14311-25 (¶¶ 57-92) (2020); 47 C.F.R. § 1.50002.

[241] *See NPRM* at 18 (¶ 29).

In light of these existing laws, rules and processes, reclassification would have no effect on whether equipment presenting national security threats enters the marketplace.[242]

In addition, the Commission has long deferred to the Executive Branch in matters of national security,[243] and these agencies have extensive authority to review transactions involving broadband services companies. The Committee on Foreign Investment in the United States ("CFIUS"), an interagency group chaired by the Secretary of the Treasury, can review transactions involving foreign ownership of IP networks, broadband serving military installations, internet exchange points, submarine cables and satellite systems providing service to the Department of Defense.[244] The Department of Commerce's Information and Communications Technology and Services ("ICTS") Program provides the Secretary of Commerce with the authority to prohibit acquisitions of information and communications services by foreign adversaries, or even use of technology developed by foreign adversaries.[245] The ICTS Program encompasses technologies already designated as critical infrastructure as well as any service integral to wireless LANs, mobile networks, satellite operations, cable and wireline access points, core networking systems, and long and short haul fiber networks.[246]

The federal government has spent a great deal of time identifying specific risks to national security posed by broadband networks and related technology, and it has developed multiple effective tools to address those risks. And this is what Executive Branch agencies should do: identify vulnerable gaps and erect defenses around them. None of these agencies, nor

---

[242] *Id.*

[243] *See Foreign Ownership Order*, 35 FCC Rcd 10927, 10930 (¶ 7) & n.10 (2020).

[244] *See* 31 C.F.R. § 800, Appendix A.

[245] *See* 15 C.F.R. § 7.1(a).

[246] *Id.* at § 7.3(a)(4).

Congress, has identified any particular gaps that require action by the Commission.  While WISPA strongly supports action by the U.S. government to protect broadband infrastructure, the Commission has not explained why action is necessary to plug any particular gaps related to broadband, much less identify any huge gap that would justify broad imposition of utility regulation on a massive sector of the U.S. economy.

**B.      The Federal Trade Commission Has Authority To Regulate Privacy And Data Security**

For privacy and data security concerns, the FTC already provides sufficient oversight and consumer protection and has exercised enforcement authority for decades.  Both the Commission and the FTC have acknowledged that the FTC's authority under Section 5 of the FTC Act is comparable to the Commission's authority under Title II's Section 201(b).[247]  Unlike the FTC, though, the Commission's enforcement power does not include the ability to seek refunds for injured customers and it is limited to conduct going back only one year.[248]  Reclassifying broadband as a Title II service would remove the government's ability to provide injured customers with restitution for their privacy-related injuries.

Reclassification would also create disparate regulatory regimes for broadband providers and the over the top ("OTT") content providers with whom they compete.  Providers would be subject to opt-in approval requirements for use of personal information for advertising purposes, while OTT providers would be free from such restrictions.  The disparate treatment would

---

[247] *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, Notice of Proposed Rulemaking, 31 FCC Rcd 2500, 2596 (¶ 306) (2016) ("both Commissions have found that Section 201 of the Communications Act and Section 5 of the FTC Act can be read as prohibiting the same types of acts or practices") (citation omitted.)

[248] *See* 47 U.S.C. § 503(b)(6).

**App. 1331**

unfairly advantage OTT providers in a highly competitive market.  It would also create customer confusion regarding the use of their personal data by like providers.

The foregoing assumes, of course, that the Commission could once again impose privacy regulations on broadband internet access providers. This is not a foregone conclusion.  When Congress issued its Joint Resolution of Congress under the Congressional Review Act ("CRA") in 2017,[249] Congress not only invalidated the Commission's broadband privacy rules,[250] it also prohibited the Commission from issuing rules in substantially the same form, absent new authorization under the law enacted after the date of the Joint Resolution.[251]  As such, while the Commission could subject broadband providers to Section 222, it is unclear whether and to what extent the Commission could issue regulations applicable to broadband providers pursuant to Section 222.  If the Commission's hands were tied, reclassifying broadband as a Title II service would leave a gaping hole in privacy regulation for broadband service, as neither the Commission nor the FTC would have enforcement authority.

### C.     Title II Is Not Required To Extend Pole Attachment Rights To Broadband Providers

Ensuring that small providers have access to crucial infrastructure, such as poles, conduits and rights-of-way, on equal terms to providers of telecommunications service and cable services would substantially advance the cause of providing broadband services to the underserved, especially as small providers seek access to infrastructure to increase capacity and

---

[249] Pub. L. No. 115-22, 131 Stat. 88 (2017) ("CRA").

[250] *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, Report and Order, 31 FCC Rcd 13911 (2017), nullified by J. Res. Pub. L. No. 115-22, 131 Stat. 88 (2017).

[251] *See* 5 U.S.C. § 801(b)(1)(2) "A rule that does not take effect (or does not continue) under paragraph (1) may not be re-issued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."

coverage.  WISPA therefore urges the Commission to look instead to its authority under other provisions of the Act to extend pole attachment benefits to broadband-only providers.

In particular, the Commission has more than ample authority, outside of Title II, to exercise its ancillary jurisdiction under Section 154 of the Act, which grants the Commission authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."[252]  First there is the Commission's foundational mandate to regulate "communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination … wire and radio communication service with adequate facilities at reasonable charges."[253]  Section 157 of the Act further establishes that it is "the policy of the United States to encourage the provision of new technologies and services to the public."[254]

Section 163, adopted in 2018 as part of RAY BAUM's Act, requires the Commission to identify whether "demonstrated marketplace practices pose a barrier to competitive entry into the communications marketplace or to the competitive expansion of existing providers of communications services," including "Internet service providers, and other providers of communications services,"[255] and further mandates that "[i]n assessing the state of competition … the Commission shall consider market entry barriers for entrepreneurs and other small businesses in the communications marketplace in accordance with the national policy under section 257(b)."[256]  Section 257, in turn, instructs the Commission to identify and eliminate

---

[252] 47 U.S.C. § 154.

[253] 47 U.S.C. § 151,

[254] 47 U.S.C. § 157.

[255] 47 U.S.C. § 163(b)(1).

[256] 47 U.S.C. § 163(d)(3).

"market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services" consistent with the national policy of favoring, among other objectives, "vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity."[257]

Finally, Section 706 of the 1996 Act gives the Commission the authority to "take immediate action to accelerate deployment" of advanced telecommunications – broadband – service by "removing barriers to infrastructure investment" and "promoting competition in the telecommunications market."[258]

In light of all of these express grants of authority to the Commission to regulate the marketplace consistent with national policies to remove barriers, promote competition and ensure that consumers have access to service on reasonable terms, the Commission has more than ample authority, outside of Title II, to extend the pole attachment protections of Section 224 to broadband-only providers.

## Conclusion

The Commission cannot view in a vacuum the establishment, implementation and enforcement of new rules in this proceeding, but must consider the cumulative costs that smaller providers will incur from the totality of these unfunded mandates. Smaller providers, who will be disproportionately affected by new compliance burdens, should not be subject to utility-style regulations when they are already facing a mountain of new administrative paperwork, competing more vigorously, upgrading and expanding their networks, and considering whether to apply for government funding. To be sure, the amount of these costs is uncertain and

---

[257] 47 U.S.C. § 257

[258] 47 U.S.C. § 1302(a) & (b).

unquantifiable at this time, but increased cost burdens will certainly be incurred by every single broadband provider, regardless of size, as the Commission implements and enforces Congress' mandates.

The Commission here, however, has a choice – it is not required by any statute to adopt the proposed rules, and should abandon this proceeding. If it proceeds, it should exempt smaller providers from any of the rules it adopts. Forbearance alone from certain Title II requirements will be insufficient to meet the Commission's policy goals of safeguarding and securing the open internet while at the same time creating an environment conducive to investment, expansion and innovation and to the viability – indeed, existence – of smaller providers. Imposing heavy-handed, "one-size-fits-all" regulations on smaller broadband providers that are least likely to handle the costs, burdens and uncertainties is the antithesis of promoting investment, innovation, competition and lower costs to consumers.

> Respectfully submitted,
>
> **WISPA –**
> ***BROADBAND WITHOUT BOUNDARIES***

December 14, 2023          By:    */s/ Louis Peraertz*
                                 Louis Peraertz, Vice President of Policy
                                 200 Massachusetts Avenue, NW, Suite 700
                                 Washington, DC  20001


Stephen E. Coran
Jeffrey Carlisle
Rebecca Jacobs Goldman
David S. Keir
Shannon Sylvester
Lerman Senter PLLC
2001 L Street, NW, Suite 400
Washington, DC 20036
(202) 429-8970
*Counsel to WISPA – Broadband Without Boundaries*

**App. 1335**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |
| | ) | |
| Bridging the Digital Divide for Low-Income Consumers | ) | WC Docket No. 17-287 |
| | ) | |
| | ) | |
| Lifeline and Link Up Reform and Modernization | ) | WC Docket No. 11-42 |

**REPLY COMMENTS OF NCTA – THE INTERNET & TELEVISION ASSOCIATION, CALIFORNIA BROADBAND & VIDEO ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, INDIANA CABLE & BROADBAND ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION, NORTH CAROLINA CABLE TELECOMMUNICATIONS ASSOCIATION, INC., OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, AND TEXAS CABLE ASSOCIATION**

Rick C. Chessen
Steven F. Morris
Pamela S. Arluk
Robert N. Rubinovitz
NCTA – THE INTERNET & TELEVISION
  ASSOCIATION
25 Massachusetts Avenue, NW
Suite 100
Washington, DC 20001

January 17, 2024

Matthew A. Brill
Matthew T. Murchison
Charles S. Dameron
Michael H. Herman
Kiley S. Boland
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for NCTA – The Internet &*
*Television Association*

*(Additional signatories listed on next page)*

**App. 1336**

Jerome F. Candelaria
CALIFORNIA BROADBAND & VIDEO
  ASSOCIATION
925 L Street, Suite 850
Sacramento, CA 95814

Charles Dudley
FLORIDA INTERNET & TELEVISION
  ASSOCIATION
246 East 6th Avenue
Tallahassee, FL 32303

Brock Patterson
INDIANA CABLE & BROADBAND
  ASSOCIATION
150 W. Market St., Suite 412
Indianapolis, IN 46204

Andy Blunt
MCTA – THE MISSOURI INTERNET &
  TELEVISION ASSOCIATION
P.O. Box 1895
Jefferson City, MO 65102

Anna P. Lucey
David C. Soutter
Timothy O. Wilkerson
NEW ENGLAND CONNECTIVITY AND
  TELECOMMUNICATIONS ASSOCIATION
53 State Street, Suite 525
Boston, MA 02109

Marcus W. Trathen
BROOKS, PIERCE, MCLENDON, HUMPHREY &
  LEONARD, LLP
Suite 1700, Wells Fargo Capitol Center
150 Fayetteville Street
P.O. Box 1800 (zip 27602)
Raleigh, NC 27601

*Counsel for the North Carolina Cable
  Telecommunications Association, Inc.*

David Koren
OHIO CABLE TELECOMMUNICATIONS
  ASSOCIATION
33 N. 3rd Street
Columbus, OH 43215

Walt Baum
TEXAS CABLE ASSOCIATION
919 Congress Avenue, Suite 1350
Austin, TX 78701

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ...................................................................2

DISCUSSION ....................................................................................................4

I.    THE RECORD CONFIRMS THAT RECLASSIFYING BROADBAND UNDER
TITLE II WOULD BE UNLAWFUL ...............................................................4

    A.    The Major Questions Doctrine Precludes the Commission from Subjecting
ISPs to Common-Carrier Treatment Under Title II ...................................4

    B.    Broadband Qualifies as an Information Service Based on Its Functional
Attributes..................................................................................................9

II.    THE RECORD CONFIRMS THAT TITLE II RECLASSIFICATION IS A
SOLUTION IN SEARCH OF A PROBLEM AND WOULD CAUSE
SIGNIFICANT HARMS ...............................................................................14

    A.    The Opening Comments Demonstrate That ISPs Have Strong Incentives
To Preserve Internet Openness ...............................................................14

    B.    The Record Also Undercuts the *NPRM*'s Other Cited Rationales for Title
II Reclassification ..................................................................................22

    C.    Subjecting ISPs to Common-Carrier Regulation Would Harm the Well-
Functioning Broadband Marketplace......................................................37

    D.    These Policy Deficiencies Also Would Render Title II Reclassification
Arbitrary and Capricious........................................................................51

III.    ANY FEDERAL OPEN INTERNET FRAMEWORK SHOULD REFLECT
CERTAIN KEY PRINCIPLES ......................................................................55

    A.    Any Open Internet Mandates Should Include Exceptions for Reasonable
Network Management..............................................................................56

    B.    Any Open Internet Framework Should Continue To Permit Usage-Based
Billing and Zero-Rating ..........................................................................60

    C.    Any Open Internet Rules Should Not Extend to Non-BIAS Data Services
or to Internet Interconnection and Traffic Exchange ...............................64

    D.    Any Open Internet Regime Should Avoid Drawing Unwarranted
Distinctions Among Broadband Technologies .........................................68

E.     The Commission Should Mitigate the Harms of Reclassification by
       Granting Broad Forbearance from Title II's Requirements and Restrictions........71

F.     The Commission Should Ensure Uniformity by Making Clear That Any
       New Rules Will Serve as a Ceiling, Not Merely as a Floor .................................73

CONCLUSION...........................................................................................................................76

EXHIBIT A:  Reply Declaration of Anthony Scott (Jan. 17, 2024)

**App. 1339**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |
| | ) | |
| Bridging the Digital Divide for Low-Income Consumers | ) | WC Docket No. 17-287 |
| | ) | |
| Lifeline and Link Up Reform and Modernization | ) | WC Docket No. 11-42 |

**REPLY COMMENTS OF NCTA – THE INTERNET & TELEVISION ASSOCIATION, CALIFORNIA BROADBAND & VIDEO ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, INDIANA CABLE & BROADBAND ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION, NORTH CAROLINA CABLE TELECOMMUNICATIONS ASSOCIATION, INC., OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, AND TEXAS CABLE ASSOCIATION**

NCTA – The Internet & Television Association ("NCTA")—along with California Broadband & Video Association, Florida Internet & Television Association, Indiana Cable & Broadband Association, MCTA – The Missouri Internet & Television Association, New England Connectivity and Telecommunications Association, North Carolina Cable Telecommunications Association, Inc., Ohio Cable Telecommunications Association, and Texas Cable Association (collectively, the "State Cable Associations")—submit these reply comments in response to the Notice of Proposed Rulemaking released on October 20, 2023 in WC Docket No. 23-320[1] and the

---

[1] *See Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, Notice of Proposed Rulemaking, FCC 23-83 (rel. Oct. 20, 2023) ("*NPRM*").

Public Notice released on October 19, 2023 concerning petitions for reconsideration in WC Docket Nos. 17-108, 17-287, and 11-42.[2]

## INTRODUCTION AND SUMMARY

The opening comments in this proceeding confirm that the proposal to subject broadband Internet access service ("broadband" or "BIAS") to common-carrier treatment under Title II of the Communications Act is untenable as a legal matter and misguided as a policy matter. It is the role of Congress, not the Commission, to decide such major policy questions, and NCTA supports congressional action to codify consensus Open Internet principles into law without forcing the square peg of broadband into the round hole of Title II. The *NPRM*'s proposal to reclassify broadband as a Title II telecommunications service is fatally flawed for a number of reasons made clear in the record.

Commenters widely recognize that the *NPRM*'s proposed regulatory approach would not survive judicial review. The record leaves no doubt that the decision whether to subject broadband to common-carrier regulation as a telecommunications service under Title II is a "major question" under the Supreme Court's precedent. Title II proponents are unable to point to any provision of the Act that grants the Commission the clear authorization it would need to regulate broadband under Title II. The record also confirms that the functional attributes of today's broadband offerings make the existing information-service classification even more fitting now than when the Supreme Court upheld that classification in *Brand X.*

The record also vividly illustrates the policy flaws of the *NPRM*'s proposed regulatory approach. A wide array of parties explain that Internet service providers ("ISPs") in today's

---

[2] *See Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the* RIF Remand Order, WC Docket Nos. 17-108, 17-287, and 11-42, Public Notice, DA 23-996 (rel. Oct. 19, 2023).

**App. 1341**

competitive marketplace lack any incentive to degrade their services by engaging in non-neutral practices, and the allegations of ISP misconduct predictably dredged up by Title II proponents have been refuted many times over. Title II reclassification also would not advance, and in many cases would undermine, the other supposed rationales for reclassification on the *NPRM*'s laundry list. And there is now copious evidence in the record demonstrating that treating ISPs as common carriers under Title II would damage the well-functioning broadband marketplace, just as the Biden Administration's Broadband Equity, Access, and Deployment ("BEAD") program and other infrastructure investment initiatives are kicking into gear. These flaws would render Title II reclassification arbitrary and capricious under the Administrative Procedure Act ("APA").

The State Cable Associations joining these reply comments share NCTA's concerns regarding the Commission's proposal to reclassify broadband as a telecommunications service under Title II of the Act. In particular, the State Cable Associations, which represent ISPs of various sizes, agree with NCTA that today's broadband marketplace is competitive and would be harmed by the onerous regulatory interventions proposed in the *NPRM*. The State Cable Associations also join NCTA in cautioning that Title II regulation would stifle innovation and investment by ISPs and threaten to deter participation in the BEAD program and similar initiatives, thereby undermining the Biden Administration's broadband access and adoption objectives.

If the Commission nevertheless proceeds to adopt Open Internet rules under Title II despite these legal and policy impediments, it should (1) provide exceptions for reasonable network management; (2) permit usage-based billing and zero-rating; (3) refrain from extending those rules to non-BIAS data services or Internet interconnection and traffic exchange arrangements; (4) avoid drawing unwarranted distinctions between broadband technologies; (5) forbear from all Title II provisions that would authorize the Commission to regulate rates and mandate unbundling, as well

as from other burdensome and ill-fitting provisions of Title II, including Sections 214, 222, and 254(d); and (6) preempt state and local regulation of broadband services and reject proposals to deem any federal framework merely a "floor," as such an approach would only invite states and localities to attempt to override federal policy determinations. These recommendations are all consistent with the Commission's previous determinations when adopting Open Internet requirements, and the justifications for those determinations remain sound. As explained in detail below, advocates of more extreme regulatory intervention—such as bans or other restrictions on usage-based billing plans, zero-rating practices, and paid interconnection agreements—fail to offer any cogent basis for interfering with these well-established, market-driven, and beneficial practices, and they ignore that such intervention plainly would constitute rate regulation, which the *NPRM* has disavowed.

## DISCUSSION

### I. THE RECORD CONFIRMS THAT RECLASSIFYING BROADBAND UNDER TITLE II WOULD BE UNLAWFUL

#### A. The Major Questions Doctrine Precludes the Commission from Subjecting ISPs to Common-Carrier Treatment Under Title II

The opening comments highlight a central flaw in the regulatory approach proposed in the *NPRM*: The major questions doctrine prohibits the Commission from subjecting broadband to common-carrier regulation as a telecommunications service under Title II. As NCTA's comments explain in detail, "it is self-evident that such an approach presents a 'major question' of vast political and economic significance, and Congress has not given the Commission the clear authorization it would need to depart from the existing light-touch framework."[3] The Commission

_____

[3] Comments of NCTA – The Internet & Television Association, WC Docket No. 23-320, at 3 (filed Dec. 14, 2023) ("NCTA Comments"); *see also id.* at 4-6, 11-38.

**App. 1343**

has recognized how "major" this question is; the agency's proposed approach would foist burdensome common-carrier treatment on "the most important infrastructure of our time,"[4] and would purportedly decide "the future of the [I]nternet"—and thus "the future of everything"—in doing so.[5] There also is no doubt that the Commission lacks the "clear congressional authorization" required under controlling Supreme Court precedent to assert such sweeping authority by adopting a Title II telecommunications service classification for broadband.[6] To the contrary, Congress has embraced the exact *opposite* classification, by repeatedly enacting statutory provisions characterizing broadband as a Title I information service,[7] and declining to enact numerous bills that would have changed that classification.[8] For these and other reasons set forth in NCTA's comments, any decision by the Commission to reclassify broadband under Title II would present a paradigmatic case for vacatur under the major questions doctrine.

Numerous other commenters agree. There is broad consensus among a variety of academics and legal commentators that the *NPRM*'s proposed approach bears the "hallmark[s] of a regulatory decision that presents major questions" under the Supreme Court's precedents.[9] The

---

[4] Chairwoman Jessica Rosenworcel, Remarks at the National Press Club, Washington, D.C., at 1 (Sep. 26, 2023) ("*2023 Rosenworcel Speech*"), https://docs.fcc.gov/public/attachments/DOC-397257A1.pdf.

[5] *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311, 846 (2018) ("*2018 Order*") (Dissenting Statement of Commissioner Jessica Rosenworcel); *see also NPRM* ¶ 17 (asserting that "BIAS connections have proved essential to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, and free expression").

[6] *See, e.g., West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

[7] *See* NCTA Comments at 24-27 (discussing provisions in Sections 223, 230, and 231).

[8] *See id.* at 18 & n.51, 27 & n.83 (providing examples).

[9] Comments of Christopher S. Yoo & Justin (Gus) Hurwitz, Univ. of Pa., WC Docket No. 23-320, at 10-14 (filed Dec. 14, 2023) ("Yoo/Hurwitz Comments"); *see also, e.g.*, Comments of Jeffrey Westling, WC Docket No. 23-320, at 11-15 (filed Dec. 14, 2023) ("Westling Comments");

**App. 1344**

U.S. Chamber of Commerce concurs, explaining that "Title II classification has all the characteristics of a major question," and ticking through an array of evidence demonstrating the economic and political significance of such a decision—including the vast size of the broadband industry ("at least $150 billion" in annual revenues), the massive financial impact of actual or threatened common-carrier treatment on the industry ("rang[ing] from $5 billion to $30-40 billion" annually), and the "frequent[] debate[s]" in Congress and the "millions of comments" filed at the Commission over the years illustrating the intense public focus on the issue.[10] Moreover, a court applying the doctrine would conclude that "[t]he [I]nternet is far too important to the economy and modern life to find that Congress silently intended to give the Commission discretion to subject broadband to a bespoke Title II regime of the agency's own devising."[11]

---

Comments of Harold Furchtgott-Roth, Kirk R. Arner, and Washington Legal Foundation, WC Docket No. 23-320, at 5 (filed Dec. 12, 2023) ("Furchtgott-Roth/Arner Comments"); Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine* 10-13 (Sept. 20, 2023) ("*Verrilli/Gershengorn Paper*"), https://aboutblaw.com/bazq.

[10] Comments of the U.S. Chamber of Commerce, WC Docket No. 23-320, at 49-61 (filed Dec. 14, 2023) ("U.S. Chamber of Commerce Comments"); *see also* George S. Ford, *Investment in the Virtuous Cycle: Theory and Empirics* 1 (Dec. 12, 2023) ("Ford Paper"), https://phoenix-center.org/pcpp/PCPP62Final.pdf (finding that "the Title II regulatory approach reduced investment by $8.1 billion annually (10%), on average, between 2011 and 2020, or $81.5 billion over ten years, reducing employment in the information sector by about 81,500 jobs and total employment by about 195,600 jobs (many of them union jobs), reducing labor compensation by $18.5 billion annually"; that "Gross Domestic Product ('GDP') has been reduced by $145 billion annually, or $1.45 trillion over ten years"; and that "[t]his evidence suggests that the looming threat of Title II regulation that hangs over the industry, during both the regulatory and deregulatory episodes, is a chronic obstacle to infrastructure investment as periods of lighter regulation are perceived as temporary," a dynamic that "will likely be even worse under the FCC's new Notice of Proposed Rulemaking, which is even more far-reaching than its prior Title II proposals").

[11] Comments of USTelecom and Opposition to Petitions for Reconsideration, WC Docket No. 23-320, at 7 (filed Dec. 14, 2023) ("USTelecom Comments"); *see also id.* at 28-36; Comments of TechFreedom, WC Docket No. 23-320, at 6-7 (filed Dec. 19, 2023); Comments of CTIA, WC Docket No. 23-320, at 75-84 (filed Dec. 14, 2023) ("CTIA Comments"); Comments of the Free State Foundation, WC Docket No. 23-320, at 11-21 (filed Dec. 14, 2023) ("FSF Comments").

Most proponents of Title II tellingly shied away from addressing the major questions doctrine in their comments—and the few that did discuss it offer no cogent basis for concluding that reclassifying broadband would survive judicial review under the doctrine. Leading jurists,[12] former leaders of the Solicitor General's Office,[13] and others[14] have already debunked these parties' central claim that *Brand X* somehow precludes application of the major questions doctrine in this context.[15] As then-Judge Kavanaugh explained in his separate opinion in *U.S. Telecom*, "*Brand X*'s finding of statutory ambiguity is a *bar* to the FCC's authority to classify Internet service as a telecommunications service," as it confirms that "Congress has not *clearly* authorized the FCC" to adopt such a classification.[16] Additionally, as NCTA and others have pointed out, Title II proponents' assertion that the Commission has general "expertise" in the communications arena[17] falls well short of establishing that Congress has *clearly authorized* the agency to reclassify broadband as a telecommunications service.[18]

---

[12] *See U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 425-26 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc); *id.* at 403-04 (Brown, J., dissenting from denial of rehearing en banc).

[13] *See Verrilli/Gershengorn Paper* at 14-15.

[14] *See, e.g.*, USTelecom Comments at 26-28; CTIA Comments at 62-63, 76-77; FSF Comments at 20-21.

[15] *See, e.g.*, Comments of the National Association of Regulatory Utility Commissioners, WC Docket No. 23-320, at 8-10 (erratum filed Dec. 15, 2023); Comments of Tejas N. Narechania, WC Docket No. 23-320, at 2-5 (filed Dec. 14, 2023).

[16] *U.S. Telecom*, 855 F.3d at 425-26 (Kavanaugh, J., dissenting from denial of rehearing en banc).

[17] *See* Comments of the California Public Utilities Commission, WC Docket No. 23-320, at 42, 44 (filed Dec. 14, 2023) ("CPUC Comments"); *see also, e.g.*, Comments of Public Knowledge, WC Docket No. 23-320, at 35 (filed Dec. 14, 2023) ("Public Knowledge Comments") (asserting that an agency action can survive review under the major questions doctrine if it falls "within the scope of the agency's expected business and benefit[s] from the agency's experience and expertise").

[18] *See* NCTA Comments at 14; *see also* FSF Comments at 20; *accord Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023) (making clear that the major questions doctrine applies to agency action

**App. 1346**

Perhaps sensing that the major questions doctrine poses an insurmountable obstacle to the *NPRM*'s reclassification proposal, Public Knowledge suggests a procedural sleight-of-hand that it claims would allow the Commission to avoid application of the doctrine. Specifically, Public Knowledge portrays the pending petitions for reconsideration of the *2020 Remand Order* as providing a shortcut to reclassifying broadband under Title II—supposedly enabling the Commission to rescind both the *2020 Remand Order* and the *2018 Order* and thereby resurrect the *2015 Order* without triggering the doctrine.[19] But a reviewing court would plainly see through that gambit. For one thing, the major questions doctrine is concerned with the scope of the power asserted by the agency, not the procedural mechanism the agency uses to accomplish its objectives.[20] Common-carrier treatment of broadband under Title II thus presents a major question *regardless* of how the Commission gets there. It is also far from clear that granting petitions to reconsider the *2020 Remand Order* necessarily would result in reconsideration of the *2018 Order* as well; among other problems, the petitions at issue were filed years after the deadline for seeking

---

with "sweeping" economic or political impact even where the agency claims it is acting on matters within its general "wheelhouse").

[19] *See* Public Knowledge Comments at 2-15.

[20] *See, e.g.*, *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (invoking the major questions doctrine on the basis of the "sheer scope of the [agency's] claimed authority"). Even assuming that the Commission could treat the pending petitions for reconsideration as an opportunity to rescind the *2018 Order*, that procedural posture— "considering whether to reverse a 2018 decision reversing [the Commission's] 2015 decision," and thereby "restoring the *status quo ante*," Public Knowledge Comments at 12—would not take this case outside the realm of the major questions doctrine. The Supreme Court's seminal decision in *West Virginia v. EPA* arose in a nearly identical procedural posture, where litigants sought to vacate the EPA's 2019 rescission of its 2015 Clean Power Plan, thereby restoring the *status quo ante* reflected in the 2015 Clean Power Plan. *See West Virginia*, 142 S. Ct. 2602-06. That posture did not prevent the Court from concluding that "this is a major questions case," and that the 2015 Clean Power Plan was in excess of the agency's authority. *Id.* at 2610, 2615-16.

8

reconsideration of the *2018 Order*,[21] and the period for any *sua sponte* reconsideration of that order has long passed as well.[22] If the Commission were to grant the petitions for reconsideration of the *2020 Remand Order*, the appropriate next step would be to initiate a new rulemaking proceeding to consider alternative regulatory approaches with respect to the remanded issues that were the subject of that order, not to declare the earlier *2018 Order* immediately null and void in its entirety. Granting reconsideration on the three discrete issues addressed in the *2020 Remand Order* could not possibly justify imposing a dramatically more expansive regulatory regime under the APA. And in any event, the *NPRM* provides no notice of such an end-run around the Commission's normal deliberative processes. Pursuing Public Knowledge's suggested procedural path thus would only increase the legal peril for the Commission.

### B. Broadband Qualifies as an Information Service Based on Its Functional Attributes

As NCTA has explained, the functional attributes of broadband independently support an information-service classification, because (1) the provision of access to stored content online entails all of the statutory capabilities that define an information service, and (2) broadband providers offer critical information-processing functions that are inextricably intertwined with the telecommunications component but do not separately offer telecommunications to end users.[23]

---

[21] *See* 47 C.F.R. § 1.429(d) (providing that a petition for reconsideration in a rulemaking proceeding "shall be filed within 30 days from the date of public notice of such action"). The petitions for reconsideration of the *2020 Remand Order* were filed on February 4 and 8, 2021—nearly three years after the *2018 Order* was published in the Federal Register. *See Restoring Internet Freedom*, 83 Fed. Reg. 7852 (Feb. 22, 2018).

[22] *See* 47 C.F.R. § 1.108 (providing that "[t]he Commission may, on its own motion, reconsider any action made or taken by it within 30 days from the date of public notice of such action").

[23] *See* NCTA Comments at 39-48.

**App. 1348**

Numerous other commenters—including not only other broadband providers,[24] but also academics,[25] technologists and engineers,[26] and technology companies,[27] among other stakeholders[28]—agree, explaining that today's broadband offerings include the information-processing functions analyzed by the Supreme Court in *Brand X*, as well as a host of new capabilities that further confirm broadband's information-service classification.

In addition to Domain Name System ("DNS") and caching functionalities, which are as integrated (if not more integrated) into broadband today as they were when *Brand X* was decided,[29] NCTA has identified various other information-processing functions that since have been integrated by ISPs into their broadband offerings, including distributed denial of service ("DDoS") mitigation, botnet notification, routing and border gateway protocol ("BGP") security, and artificial intelligence ("AI")-enhanced network management and protection.[30] Commenters have

---

[24] *See* Comments of ACA Connects on the Notice of Proposed Rulemaking, WC Docket No. 23-320, at 23-29 (filed Dec. 14, 2023) ("ACA Connects Comments") ("[I]f one 'looks under the hood' today, it is evident that [ISPs] are providing, as part of broadband service, even greater data processing functionalities than before and are continually looking for new, similar opportunities."); CTIA Comments at 48-57; Comments of the Fiber Broadband Association on the Notice of Proposed Rulemaking, WC Docket No. 23-320, at 5-8 (filed Dec. 14, 2023) ("Fiber Broadband Association Comments"); USTelecom Comments at 9-27.

[25] *See* Yoo/Hurwitz Comments at 3-6.

[26] *See* Declaration of Peter Rysavy, Rysavy Research at 5-20 (appended to CTIA Comments) ("Rysavy Declaration"); Comments of Richard Bennett, WC Docket No. 23-320, at 4-6 (filed Dec. 14, 2023).

[27] *See* Comments of ADTRAN, Inc., WC Docket No. 23-320, at 6-9 (filed Dec. 14, 2023) ("ADTRAN Comments").

[28] *See* U.S. Chamber of Commerce Comments at 40-49.

[29] *Cf.* Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results* 2, Figure 2 (appended to Reply Comments of USTelecom, WC Docket No. 23-320 (filed Jan.17, 2024)) ("Recon Analytics Survey") (finding that more than 90 percent of broadband subscribers use the DNS services provided by their ISPs); Rysavy Declaration at 16 (noting that "major ISPs process trillions of DNS queries every day").

[30] *See* NCTA Comments at 43-44.

**App. 1349**

identified additional information-processing functionalities that are inextricably intertwined with ISPs' broadband offerings, such as firewalls,[31] malware detection and alerting,[32] spam and content filtering,[33] video optimization,[34] addressing schemes (e.g., IPv4 and IPv6 protocols) and protocol translation,[35] active queue management technologies,[36] and dynamic routing.[37]  Each of these components, on its own, is sufficient to render broadband an information service.  Collectively, they unequivocally foreclose the Commission's proposal to reclassify the offering as a telecommunications service.

Efforts by Title II proponents to portray broadband as an offering of pure transmission, or to discount broadband's information-processing capabilities as mere "telecommunications management" functions, fall flat.  Contrary to the claim of some commenters,[38] "broadband Internet access service [is] fundamentally different than standard telephone service."[39]  Indeed, as various commenters explain, broadband's information-processing functions result in a service that differs markedly from the pure transmission offered by telephone service providers.[40]

---

[31] *See* Rysavy Declaration at 4.

[32] *See* CTIA Comments at 51.

[33] *See* Comments of Interisle Consulting Group, WC Docket No. 23-320, at 3 (filed Dec. 13, 2023) ("Interisle Comments"); CTIA Comments at 51.

[34] *See* CTIA Comments at 51; Rysavy Declaration at 4, 18.

[35] *See* CTIA Comments at 50-51, 64; Interisle Comments at 3.

[36] *See* Yoo/Hurwitz Comments at 5.

[37] *See id.*

[38] *See, e.g.*, Comments of the Ad Hoc Telecom Users Committee, WC Docket No. 23-320, at 5 (filed Dec. 14, 2023).

[39] *2018 Order* ¶ 51 & n.182.

[40] *See* CTIA Comments at 49 ("Unlike traditional telephone service, users of BIAS do not simply 'dial up' the server they want—very few BIAS users know the precise recipient or source of the data they send and receive, much less how to send or request it in usable formats that networks

**App. 1350**

Technologist Peter Rysavy observes, for example, that if broadband entailed "simple transmission," then viruses and malware would be delivered unimpeded to all users to which such harmful traffic is addressed.[41] "But instead," ISPs' security systems "process[] the traffic addressed to a user and transform[] it by delivering only . . . the traffic that [they] deem[] safe, making the [I]nternet a safer place for subscribers."[42] ISPs' reliance on protocol translation to "allow[] users to interact with the incredibly diverse array of users and devices that connect to the Internet with different protocols to perform different functions"—such as Internet of Things ("IoT") devices—likewise belies any notion that their service offerings are limited to pure transmission of unaltered information.[43] Such a characterization also is at odds with consumer perceptions, which—to the extent they are relevant to this classification question—confirm that broadband is best understood as a functionally integrated information service. Notably, a recent consumer survey by Recon Analytics reveals that an overwhelming majority of broadband subscribers perceive the service offered by their ISPs to include at least one information-processing capability, whereas only 8 percent perceive the service as solely transmitting their information unaltered from point A to point B.[44]

Moreover, as multiple commenters confirm, DNS, caching, and the other information-processing functions that are inextricably intertwined in ISPs' broadband offerings do not fit within

---

can process."); *see also* Fiber Broadband Association Comments at 5-6 (ISPs "are not solely offering transmission service."); ACA Connects Comments at 24-25 ("[T]he Commission concluded that although broadband service contained a 'telecommunications' component . . . the providers were not offering telecommunications service to the public for a fee, either in combination with an information service or solely as a transmission service.").

[41] Rysavy Declaration at 19.

[42] *Id.*; *see also* CTIA Comments at 51 (describing an ISP's parental control feature that "allows users to, at their discretion, limit the content that minors may access").

[43] *See* CTIA Comments at 50-51.

[44] *See* Recon Analytics Survey at 1, Figure 1.

the Act's "telecommunications management" exception.[45]  While the *NPRM* suggests that these features provide information-processing capabilities only for "the management of a telecommunications service," such that they fall outside of the Act's definition of "information service," both the Commission and the Department of Justice ("DOJ") expressly acknowledged to the Supreme Court in *Brand X* that DNS and caching are "*not* used 'for the management, control, or operation of a telecommunications network,'" but rather provide "information-processing capabilities . . . used to facilitate the information retrieval capabilities that are inherent in Internet access."[46]  This remains as true today as it was then.

In addition, the telecommunications management exception—both as defined by the Act and as applied by the Commission—is limited to capabilities that principally provide utility to service providers, rather than to end users.  Specifically, to fall within the scope of the exception, the capabilities used must be ones used "for the management, control, or operation of a telecommunications system or the management of a telecommunications service."[47]  The exception accordingly "has no applicability" to broadband, because the above-mentioned information-processing capabilities do not merely "manage[], control, or operat[e]" ISPs' broadband services, but instead "are part and parcel of the capabilities that the service offers *to consumers*."[48]  DNS, for example, is not designed to help broadband providers "manage, control,

---

[45] *See* CTIA Comments at 64; Rysavy Declaration at 5-20; USTelecom Comments at 20-22; Yoo/Hurwitz Comments at 4-6.

[46] *See* Reply Brief for the Federal Petitioners at 6 n.2, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281), 2005 WL 640965.

[47] 47 U.S.C. § 153(24).

[48] CTIA Comments at 64 & n.249.

**App. 1352**

or operate" their service; instead, the primary utility that DNS provides is to consumers.[49] Moreover, a functionality cannot be characterized as mere "telecommunications management" under this exception if it is essential to the user's service experience.[50] At a bare minimum, DNS "is a must" for broadband to function properly.[51] The other functionalities likewise improve the consumer experience in ways that go far beyond mere network management, and are essential features of today's broadband offerings.

## II.     THE RECORD CONFIRMS THAT TITLE II RECLASSIFICATION IS A SOLUTION IN SEARCH OF A PROBLEM AND WOULD CAUSE SIGNIFICANT HARMS

### A.     The Opening Comments Demonstrate That ISPs Have Strong Incentives To Preserve Internet Openness

Numerous commenters confirm that ISPs have powerful, market-driven incentives to ensure their services accord with Open Internet norms, and that it would be irrational and counterproductive as a business matter for ISPs to degrade or interfere with their customers' access to the Internet. As NCTA noted in its opening comments, ISPs have no desire "to undermine the value and competitiveness of their services by engaging in blocking, throttling, or other harmful conduct."[52] The U.S. Chamber of Commerce similarly explains that ISPs today operate "in a

---

[49] *See* Rysavy Declaration at 11-12 (describing the various benefits that DNS provides to end users, including by "suggest[ing] similar pages" to a user "who has supplied an invalid address").

[50] *See Mozilla Corp. v. FCC*, 940 F.3d 1, 32 (D.C. Cir. 2019) (expounding this interpretation).

[51] *Id.* (internal quotation marks and citations omitted); *see also* USTelecom Comments at 22 ("DNS is integral to accessing and retrieving [I]nternet content — that is, the service ISPs sell and that end users purchase — as well as to improve the customer experience of using the [I]nternet to obtain content.").

[52] NCTA Comments at 64 & n.226 (citing Ford Paper at 11-12); *see also id.* at 2-4, 6, 53-54 & n.192, 72, 98 & n.341; Declaration of Mark Israel, Brian Keating & Allan Shampine ¶ 70 (appended to NCTA Comments) ("Israel/Keating/Shampine Declaration") ("[A]nti-consumer actions by broadband providers would lead to substantial costs in the form of consumer departures.").

14

competitive broadband market with significant checks on behavior that diminish the need for extensive regulation."[53]   And several other commenters similarly point out that the highly competitive broadband market "wards off the need for imposing Title II on BIAS"[54] because ISPs "lack a financial incentive to degrade their customers' service."[55]

These "competitive dynamics," as CTIA recognizes, "ensure Americans enjoy the open Internet experience they demand."[56]  Not only would consumers, edge providers, and policymakers immediately call out and respond to an ISP's attempts to "compromise[ ] . . . customers' access to tech companies' content" or engage in other non-neutral practices, but the "robust competition" that characterizes the marketplace ensures that any such attempts would be pointless.[57]  The notion

---

[53] U.S. Chamber of Commerce Comments at 5 (internal quotation marks and citation omitted); *see also* ACA Connects Comments at 12 ("[C]ompetition in the broadband market is real and increasing – acting as a restraint on the actions of [ISPs] – and consumers and edge providers are reaping its rewards.").

[54] CTIA Comments at 13.

[55] Westling Comments at 2; *see also, e.g.*, USTelecom Comments at 54 (explaining that "blocking, throttling, and paid prioritization were not issues after the Commission's brief Title II classification was reversed" because "it is in ISPs' interest not to engage in such conduct"); Comments of AT&T and Opposition to Petitions for Reconsideration, WC Docket No. 23-320, at 23 (filed Dec. 14, 2023) ("AT&T Comments") ("ISPs lack the . . . incentive to engage in such conduct, particularly . . . given the state of competition."); Comments of Mark Jamison, WC Docket No. 23-320, at 3 (filed Dec. 14, 2023) (explaining that Title II was written for conditions where "service providers had a strong incentive and the ability to engage in discriminatory activities," but "[t]hese conditions do not appear to fit today's [I]nternet markets") (internal quotations and citations omitted).

[56] CTIA Comments at 16.

[57] USTelecom Comments at 49-50 & n.194 (explaining that these "dynamics deprive any ISP of the market power necessary to discriminate anticompetitively against any [edge provider]" and "ensure that any [edge provider] can reach any ISP's customers on fair and efficient terms by interconnecting either directly or indirectly with the ISP"); *see also* Comments of WISPA – Broadband Without Boundaries, WC Docket No. 23-320, at 15-17 (filed Dec. 14, 2023) ("WISPA Comments") (noting that smaller ISPs similarly lack incentives to exploit any "gatekeeper role," in particular because the vast majority do not even offer subscription-based content services and "are in no position to try to demand fees from edge providers").  While a few commenters assert

that ISPs have an incentive to degrade consumers' broadband experience makes even less sense where, as ACA Connects notes, ISPs continue to respond to increasing consumer expectations by investing in network expansions and improvements such as new "data processing and other functionalities."[58]

The record also demonstrates that any ISP misconduct would be swiftly punished in the marketplace, including through consumer switching to competitive alternatives and widespread public condemnation. As spelled out in NCTA's opening comments, given that "Americans have more choice in broadband providers today than ever before,"[59] the economic reality is that any ISP that defies Open Internet norms "could expect to lose existing customers and fail to attract new ones."[60] In the words of other commenters, such an ISP "would promptly hemorrhage customers

---

that some ISPs may be inclined to prioritize their own services or otherwise discriminate against competing edge providers, *see* Comments of the Writers Guild of America West, Inc. & Writers Guild of America East, WC Docket No. 23-320, at 6 (filed Dec. 13, 2023) ("WGA Comments"); Comments of Philo, Inc., WC Docket No. 23-320, at 3, 6 (filed Dec. 14, 2023), the absence of examples of such discrimination in the wake of the *2018 Order* demonstrates that such concerns are baseless. Rather, broadband providers have every incentive to operate consistently with Open Internet norms and compete for customers on the merits, including through innovative service offerings. *See, e.g.*, Furchgott-Roth/Arner Comments at 9 ("[R]ather than degrade or limit access to competition for [its] traditional cable TV business[,]" Comcast "decided to compete with streamers by creating Peacock. . . . The net result is that streaming viewership today outnumbers cable and antenna TV audiences.").

[58] ACA Connects Comments at 16-17; *see also id.* at 13 (explaining that ISPs "face significant and growing competition, driving them to invest in more robust and reliable infrastructure, roll out innovative services, provide first-in-class customer service, and keep prices reasonable").

[59] NCTA Comments at 89; *see also, e.g.*, Westling Comments at 2 ("If a consumer doesn't like the service a company provides, more than ever the consumer can seek alternatives.").

[60] NCTA Comments at 54-55 & n.197 (quoting Israel/Keating/Shampine Declaration ¶ 70 ("[S]urveys indicate that consumers would switch if they felt their broadband provider started to block, slow down, or impose other restrictions on the content they demanded.")); *see also* Recon Analytics Survey at 2-3, Figure 3 (finding that an overwhelming majority of broadband subscribers are likely to switch ISPs if their current provider blocked, throttled, or prioritized certain content or applications).

**App. 1355**

and revenues to its rivals"[61] and "would not be in business for long."[62]  As CTIA explains, ISPs simply "could not and would not risk their customer bases or their reputations by taking actions that would harm Internet openness."[63]  Indeed, "consumer expectations regarding openness have become well-established,"[64] and it is a matter of "broad industry consensus" that preserving Internet openness is critical for avoiding "customer dissatisfaction and negative churn."[65]  The severe public backlash that ISPs would face for any non-neutral conduct would complicate both customer retention *and* recruitment; end users and edge providers "would quickly recognize such infractions and call them out . . . quickly and prominently," driving away an ISP's current customers and deterring new signups.[66]

Even proponents of Title II regulation recognize that it is in ISPs' best interests to ensure Internet openness even in the absence of regulatory mandates.  For instance, CWA observes that "[b]y agreeing voluntarily to comply with net neutrality, providers have demonstrated it is

---

[61] AT&T Comments at 23; *see also, e.g.*, USTelecom Comments at 50 (highlighting that, "because of the intense competition in the broadband market, customers would be able to — and would likely — switch to an alternative broadband provider if" an ISP were to degrade customer access to content); Comments of Ericsson, WC Docket No. 23-320, at 16 (filed Dec. 14, 2023) ("Ericsson Comments") (explaining that ISPs that violate Open Internet principles "risk[] losing customers to the burgeoning competitive market"); Comments of the Taxpayers Protection Alliance, WC Docket No. 23-320, at 3 (filed Dec. 14, 2023) ("Taxpayers Protection Alliance Comments") ("[I]t is illogical to think that providers would want to upset their customers . . . when those customers can, in many situations, switch to another provider.").

[62] Fiber Broadband Association Comments at 9.

[63] CTIA Comments at 16.

[64] *Id.* at 10.

[65] Ericsson Comments at 14; *see also* ACA Connects Comments at 16 (explaining that ISPs "avoid practices such as blocking and throttling because their primary mission is to keep customers"); Fiber Broadband Association Comments at 9 ("[ISPs'] incentive is to get consumers to subscribe and then keep them from going to the competition.").

[66] Fiber Broadband Association Comments at 10; *see also* CTIA Comments at 10-11 (noting that "public pressure" in the wake of any non-neutral conduct would be "predictably large" and more than "sufficient to ensure openness").

**App. 1356**

economically feasible for them to comply with net neutrality and that there is public demand for open [I]nternet practices."[67]  It thus should come as no surprise that there is no credible evidence of ISP misconduct in the broadband marketplace.  Indeed, as Free Press and other Title II advocates acknowledge, broadband providers today are *already* operating "in line with the expectations contained in the [*NPRM*]" with regard to Internet openness.[68]

Title II proponents nevertheless present a series of "problems" that supposedly necessitate a Title II "solution," but these so-called "examples" of harm or misconduct (1) lack evidentiary support; (2) have already been thoroughly discredited; and/or (3) do not represent actual threats to Internet openness.  As an initial matter, many of the allegations in the records are inscrutable, speculative, and/or put forth without any effort to provide factual support, and thus should be rejected out-of-hand.[69]  A number of other allegations—such as stale references to Comcast's

---

[67] Comments of the Communications Workers of America, WC Docket No. 23-320, at 11 (filed Dec. 14, 2023).

[68] Comments of Free Press, WC Docket No. 23-320, at 47 (filed Dec. 14, 2023) ("Free Press Comments"); *see also* Comments of AARP, WC Docket No. 23-320, at 5 (filed Dec. 14, 2023) ("AARP Comments") (acknowledging that ISPs "understood" the net neutrality "rules and policies" and continued to follow them even in the wake of their repeal); Opening Comments of Center for Accessible Technology and MediaJustice on Notice of Proposed Rulemaking, WC Docket No. 23-320, at 18 (filed Dec. 14, 2023) ("Center for Accessible Technology and MediaJustice Comments") ("Under the current rules and historical practice, broadband providers allow [I]nternet end users to access all . . . content on the [I]nternet.").

[69] *See, e.g.*, Comments of the Electronic Frontier Foundation, WC Docket No. 23-320, at 7-8 (filed Dec. 14, 2023) ("EFF Comments") (declining to offer any evidence or factual support for a collection of allegations of wrongdoing); Public Knowledge Comments at 8 (purporting to support an allegation of price gouging by citing to the same unfounded allegation); Comments of New America's Open Technology Institute, WC Docket No. 23-320, at 72 (filed Dec. 15, 2023) ("New America/OTI Comments") (speculating concern about "the *potential*" for a certain type of offering despite acknowledgment that "it is unclear how this would work in practice") (emphasis added); Comments of Lumen, WC Docket No. 23-320, at 9, 11 (filed Dec. 14, 2023) ("Lumen Comments") (claiming that the interconnection-related concerns underlying certain Charter-Time Warner merger conditions hold true today, without offering any evidence of ISPs' use of interconnection terms to disadvantage edge providers).

**App. 1357**

efforts in 2007 to remedy the adverse effects on its customers' Internet experience caused by a small number of users who consumed a significant portion of overall network resources by initiating multiple, simultaneous streams of peer-to-peer traffic over BitTorrent[70]—have been addressed ad nauseam and shown *not* to support calls for common-carrier mandates.[71]

Title II proponents also rely on allegations and anecdotes that have nothing to do with Internet openness. As NCTA and others have explained previously, a review of the "47,000 consumer complaints" cited by the National Hispanic Media Coalition[72] shows that "the vast majority of those complaints do not allege anything that even remotely implicates" Open Internet principles, and there is tellingly "no evidence that any of these informal complaints led the Commission to undertake enforcement action against any broadband provider" while its Open Internet rules were in effect.[73] In the same vein, several commenters again point to an incident in 2018 involving an unfortunate mismatch between the Santa Clara County Fire Department's

---

[70] *Compare, e.g.*, Comments of Engine, WC Docket No. 23-320, at 4 (filed Dec. 14, 2023), *with, e.g.*, Reply Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 28-29 (filed Aug. 30, 2017) (explaining that "Comcast was attempting to address a significant router design issue . . . that was causing BitTorrent traffic to adversely affect other applications," not for anticompetitive reasons, but to prevent use of BitTorrent from "undermining the Internet experience of other customers"); Harold Feld, *Evaluation of the Comcast/BitTorrent Filing – Really Excellent, Except For the Gapping Hole Around the Capacity Cap*, Wetmachine (Sept. 22, 2008) https://wetmachine.com/tales-of-the-sausage-factory/evaluation-of-the-comcastbittorrent-filing-really-excellent-except-for-the-gapping-hole-around-the-capacity-cap/ (concluding that "Comcast did not block P2P for anticompetitive reasons").

[71] *Compare, e.g.*, Comments of Stephen Renderos, Exec. Dir., MediaJustice, WC Docket No. 23-320, at 7 (filed Dec. 14, 2023) (identifying anecdotes from 2005 (Madison River), 2008 (Comcast-BitTorrent), and 2012 (Google Wallet and AT&T-FaceTime) as examples of conduct requiring rules in 2024), *with, e.g.*, Reply Comments of AT&T Services Inc., WC Docket No. 17-108, at 16-18 (filed Aug. 30, 2017) (addressing each the Madison River, Comcast-BitTorrent, AT&T-Facetime, and Google Wallet anecdotes).

[72] Comments of the National Hispanic Media Coalition, WC Docket No. 23-320, at 7-8 (filed Dec. 14, 2023) ("NHMC Comments").

[73] Opposition of NCTA – The Internet & Television Association and USTelecom to Motion Regarding Informal Complaints, WC Docket No. 17-108, at 3-5 (filed Sep. 28, 2017).

selected data plan and its network needs[74]—which has been "widely debunked as *not* a net neutrality violation and *not* something that even the 2015 Order would have regulated, much less prevented."[75] Other allegations that characterize the ordinary application of congestion management techniques and data allowances as examples of "throttling" similarly fail to represent genuine threats to Internet openness;[76] such practices are not "throttling" as the Commission has defined the term, and the Commission has consistently recognized the importance of allowing ISPs to manage their networks "to address legitimate needs such as avoiding network congestion."[77]

---

[74] *See, e.g.*, Comments of the Office of the County Counsel, County of Santa Clara, WC Docket No. 23-320, at 23-24 (filed Dec. 14, 2023) ("County of Santa Clara Comments"); Comments of the Alarm Industry Communications Committee, WC Docket No. 23-320, at 6 (filed Dec. 14, 2023); EFF Comments at 22-23.

[75] NCTA Comments at 50-51; *see also, e.g.*, Reply Comments of Verizon, WC Docket No. 17-108, at 17-18 (filed May 20, 2020) (also noting that "the government petitioners in *Mozilla*— which included Santa Clara—conceded that Santa Clara's complaints did not involve 'net neutrality' violations"); Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 7-8 (filed Apr. 20, 2020); Comments of CTIA, WC Docket No. 17-108, at 19 (filed Apr. 20, 2020).

[76] *Compare, e.g.*, Comments of the American Civil Liberties Union, WC Docket No. 23-320, at 5 (filed Dec. 14, 2023) ("ACLU Comments") (characterizing Cox Communications' efforts to maintain network stability for customers during the COVID-19 pandemic as "punish[ing] heavy broadband users"); *with, e.g.*, Decl. of Guy McCormick in Supp. of Mot. for Prelim. Inj. at 2-4, *Am. Cable Ass'n. v. Becerra*, 2:18-cv-02684 (E.D. Cal. Aug. 5, 2020) (ECF 53-3) ("Occasionally . . . a node will experience unanticipated extraordinary and sustained utilization that negatively affects subscribers served by that node. The COVID-19 crisis in particular has caused such events" that "prompted . . . targeted congestion management practices in a very small portion of [Cox's] network to ensure that customers' experiences in those areas were not materially impaired, especially during this critical time."). Moreover, Free Press's suggestion that ISPs are reluctant to offer lower-priced service tiers for fear of "cannibaliz[ing]" their other offerings ignores the fact that many broadband providers already offer low-cost options to low-income households. *See* Free Press Comments at 46 & n.87; NCTA Comments at 84-85 & nn.288-292.

[77] *See, e.g.*, *Protecting and Promoting the Open Internet,* Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 ¶ 69 (2015) ("*2015 Order*").

Meanwhile, the supposed "blocking" policy briefly announced by a small Idaho ISP was quickly rescinded after the ISP faced overwhelmingly negative backlash[78]—thus *confirming* that the marketplace will swiftly correct any apparent deviations from consensus Open Internet principles and that "consumers will not stand for any other behavior."[79] Finally, as for the interconnection-related allegations in the record,[80] the Commission has consistently and appropriately deemed Internet interconnection and traffic exchange not only to be exempt from Open Internet rules, but wholly distinct from Open Internet considerations,[81] and even leading Title II proponents are forced to admit that "the interconnection markets are functioning well."[82]

---

[78] *See* Ericsson Comments at 14 (describing the circumstances of the "example" involving an Idaho ISP).

[79] *Id.* at 15. Notably, the ISP also clarified that it was only offering its customers a "choice" to limit access to certain sites rather than blocking access to those sites on a blanket basis—a practice arguably permitted under the Commission's prior orders. *See* E-mail from Bret Fink, Owner, YourT1Wifi, <u>RE: Invoice #IN 2957 from YourT1Wifi</u>, @yes4yep, X (Jan. 11, 2021), https://twitter.com/yes4yep/status/1348509228374269952/photo/1; *see also Preserving the Open Internet, Broadband Industry Practices*, Report and Order, 25 FCC Rcd. 17905, ¶ 143 (2010) ("*2010 Order*") (noting that ISPs were "free . . . to offer . . . 'edited' services" such as "a service limited to 'family friendly' materials" for "users who desire only such content"); *2015 Order* ¶ 222 n.575 (reaffirming the *2010 Order*'s conclusion).

[80] *See, e.g.*, Comments of Scott Jordan & Ali Nikhhah, WC Docket No. 23-320, at 4-5 (filed Dec. 14, 2023) ("Jordan/Nikhhah Comments"); ACLU Comments at 5; Free Press Comments at 133-136. Moreover, while the ACLU and Lumen have suggested that a decade-old interconnection arrangement between Netflix and Comcast somehow violated principles of net neutrality, *see* ACLU Comments at 5 & n.13; Lumen Comments at 7, "Netflix receive[d] no preferential network treatment under the . . . agreement." *Comcast and Netflix Team Up to Provide Customers Excellent User Experience*, Comcast Corp. (Feb. 23, 2014), https://corporate.comcast.com/news-information/news-feed/comcast-and-netflix.

[81] *See, e.g.*, *2015 Order* ¶¶ 30, 206 ("To be clear, . . . we are not applying the open Internet rules we adopt today to Internet traffic exchange.").

[82] Free Press Comments at 68-69.

**App. 1360**

## B. The Record Also Undercuts the *NPRM*'s Other Cited Rationales for Title II Reclassification

As NCTA pointed out in its opening comments,[83] and various commenters agree,[84] the grab bag of additional purported rationales set forth in the *NPRM* for subjecting broadband to Title II mandates are pretextual. None comes close to justifying the burdens and costs of common-carrier obligations, including rate and service-quality regulation, which apply by default to all telecommunications carriers under Title II. To the contrary, injecting common-carrier regulation in the broadband arena would undermine the relevant policy goals, rather than advance them.

*National Security and Law Enforcement*. While a handful of Title II advocates parrot the *NPRM*'s asserted national security rationale for reclassification,[85] they fail to explain how Title II actually would bolster national security. For example, Free Press repeats the *NPRM*'s claim that "'reclassifying BIAS as a telecommunications service would allow the Commission to use its [S]ection 214 authority to address' national security threats" of the sort it addressed in its recent orders stripping several Chinese carriers of operating authority.[86] But far from supporting reclassification, the fact that the Commission *already* has largely excluded Chinese carriers from the U.S. marketplace by revoking their Section 214 authorizations (which they were required to

---

[83] NCTA Comments at 66-83.

[84] *See, e.g.*, USTelecom Comments at 70-92; CTIA Comments at 24-45; NTCA Comments at 17-26; *see also* Reply Declaration of Andrew J. Grotto at 29 ("Grotto Declaration") (appended to Reply Comments of USTelecom) ("Title II reclassification is not necessary to address any of the targeted security steps Congress has directed the FCC to take."); Reply Declaration of Anthony Scott at 4, 6 ("Scott Declaration") (appended hereto).

[85] *See, e.g.*, Free Press Comments at 59, Public Knowledge Comments at 64-65.

[86] Free Press Comments at 59 (quoting *NPRM* ¶ 27 and citing orders revoking Section 214 authority from China Telecom, China Unicom, and Pacific Networks and ComNet).

hold both before and after the *2018 Order*)—and that the D.C. Circuit upheld those rulings[87]—undermines the notion that there is a gap in authority that requires reclassification. To the extent that national security agencies determine that additional action is warranted to prevent such Chinese carriers from participating in IP traffic-exchange or providing broadband services to enterprise or carrier customers—activities the Commission's revocation orders did not fully address—the proposed reclassification of *mass market*, retail broadband services would have no effect on such activities, as other commenters recognize.[88] But other agencies do have appropriate authority to respond to any such threats, without regard to the classification of broadband; among other mechanisms, the Department of Commerce possesses broad authority under its ICTS Supply Chain rule to block or restrict foreign adversaries' participation in the U.S. communications marketplace.[89]

Proponents of Title II regulation likewise fail to acknowledge the array of other tools that enable the Commission and/or national security agencies to address potential national security or

---

[87] *See Pacific Networks Corp. and ComNet (USA) LLC v. FCC*, 77 F.4th 1160 (D.C. Cir. 2023); *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022).

[88] *See, e.g.*, USTelecom Comments at 75; CTIA Comments at 31; NTCA Comments at 69.

[89] *See, e.g.*, USTelecom Comments at 71-72; Comments of the Ad Hoc Broadband, Carrier and Investor Coalition, WC Docket No. 23-320, at 9 (filed Dec. 14, 2023); Comments of the Information Technology Industry Council, WC Docket No. 23-320, at 3 (filed Dec. 14, 2023) ("Information Technology Industry Council Comments"); Scott Declaration at 6 (noting the Commerce Department's "very broad authority to prohibit or condition a wide range of transactions and uses of services"); Grotto Declaration at 25. The Department of Justice (as Chair of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector) filed comments in an unrelated proceeding last year, in support of proposals to expand reporting and oversight of foreign ownership interests in applications for international Section 214 authorizations. *See* Letter of Devin A. DeBacker, Chief, Foreign Investment Review Section, National Security Division of the U.S. Department of Justice to Marlene H. Dortch, Secretary, FCC, IB Docket No. 23-119 (filed Apr. 12, 2023). But that proceeding did not raise the issue of reclassifying broadband as a Title II service, and DOJ did not make any such proposal.

law enforcement threats involving the provision of information services like broadband. These tools include the Commission's longstanding application of the Communications Assistance for Law Enforcement Act to broadband equipment; the restrictions on broadband equipment on the Covered List, pursuant to the Secure and Trusted Communications Act of 2019 and the Secure Equipment Act of 2021; the review of transactions involving broadband providers by the Committee on Foreign Investment in the United States and/or Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector; and export, trade, and government-contracting restrictions under the Export Administration Regulations, the Chinese Military-Industrial Complex Companies List, Section 889 of the National Defense Authorization Act of 2019, and other statutes and rules.[90] Parties championing broadband reclassification do not even attempt to show that such tools are inadequate, let alone that Title II would enable the Commission to fashion effective responses to any governmental concerns.

The record confirms that reclassifying broadband not only is unnecessary to address purported gaps in the federal government's national security framework, but also would be counterproductive in many respects. Several commenters agree with NCTA that the whole-of-government approach developed by Congress and Executive Branch agencies would be frustrated if the Commission were to impose sector-specific requirements in the interest of safeguarding national security (or, as discussed below, cybersecurity).[91] As Verizon notes, "[t]he Commission's assertion that its supporting role in protecting national security and law enforcement supplies a basis for reclassifying broadband — an assertion made *without* any clear statutory authority —

---

[90] *See* NCTA Comments at 70-71; *see also, e.g.*, USTelecom Comments at 71-74; CTIA Comments at 32-33; Comments of Verizon and Opposition to Petitions for Reconsideration, WC Docket No. 23-320, at 11-12 (filed Dec. 14, 2023) ("Verizon Comments"); Information Technology Industry Council Comments at 3.

[91] *See* NCTA Comments at 67-71.

**App. 1363**

would upend the whole-of-government approach that Congress designed and agencies with superior expertise have implemented."[92] The Reply Declarations submitted by Tony Scott and Andrew Grotto further demonstrate, based largely on their experience as senior officials in the Obama Administration, that treating broadband as a common-carrier service is neither necessary nor beneficial from the standpoint of national security.[93] As both experts explain, Congress has given the Commission discrete responsibilities in addressing national security and law enforcement issues, but it has looked to other agencies—including the Department of Homeland Security ("DHS"), the Department of Defense ("DOD"), and DOJ—to play the lead roles in those arenas. "None" of the *NPRM*'s "proposed oversight mechanisms depend[s] on the classification of broadband or would be rendered more effective if broadband were reclassified as a telecommunications service";[94] to the contrary, Title II reclassification could "undermine the effective and collaborative public-private partnership . . . on national security . . . and law enforcement initiatives, with deleterious effects on those relationships and the national interests they have advanced over the past decades."[95]

*Cybersecurity*. For many of the same reasons, cybersecurity policy would be hampered, rather than advanced, by Title II regulation. As with national security, proponents of Title II

---

[92] Verizon Comments at 13; *see also, e.g.*, CTIA Comments at 24-30; USTelecom Comments at 71-76.

[93] *See generally* Scott Declaration; Grotto Declaration. Mr. Scott served as Chief Information Officer for the Obama Administration, and has held the same position for several leading companies in the technology sector and more broadly. Mr. Grotto served as Senior Director for Cyber Policy on the National Security Council from 2015 to 2017 and Senior Advisor for Technology Policy to Commerce Secretary Penny Pritzker from 2013 to 2015; he also served on the staff of the Senate Select Committee on Intelligence, as the designee of Senators Sheldon Whitehouse (D-RI) and Kent Conrad (D-SD).

[94] Scott Declaration at 6.

[95] Grotto Declaration at 1-2; *see also id.* at 31-32 (explaining how the Commission's status as an independent agency could further "complicate and slow agency action and industry agility").

regulation make no serious attempt to argue that the federal interest in promoting cybersecurity bolsters the case for regulating broadband as a Title II telecommunications service. While most proponents of increased regulation simply ignore the issue, EPIC et al. posit that market forces have failed to "correct for" unspecified "cybersecurity deficiencies," and further suggest that Title II would "enable the Commission to require fundamental minimum cybersecurity practices."[96] But even apart from their failure to identify any relevant cybersecurity deficiencies *attributable to ISPs*, these commenters overlook the array of effective oversight mechanisms that are already in place today.

Congress and the Executive Branch have taken pains to develop a comprehensive regime grounded in public-private partnerships and backed by well-coordinated federal oversight led by the Cybersecurity & Infrastructure Security Agency ("CISA"), which is part of DHS. CISA serves as the government's "operational lead for federal cybersecurity and the national coordinator for critical infrastructure security and resilience," and spearheads "the national effort to understand, manage, and reduce risk to [the nation's] cyber and physical infrastructure."[97] As NCTA explained in its opening comments,[98] and other parties further confirm,[99] the relevant organizations and processes through which industry participants collaborate with CISA include the National Security Telecommunications Advisory Committee ("NSTAC"), the Communications Sector Coordinating Council ("CSCC"), and National Coordinating Center for Communications, Information Sharing

---

[96] Comments of the Electronic Privacy Information Center, Public Knowledge, Consumer Federation of America, and Demand Progress Education Fund, WC Docket No. 23-320, at 4, 17 (filed Dec. 14, 2023) ("EPIC et al. Comments").

[97] CISA, About, https://www.cisa.gov/about.

[98] NCTA Comments at 74-76.

[99] *See, e.g.*, CTIA Comments at 25, 29-30; USTelecom Comments at 76-81; Verizon Comments at 13-15; AT&T Comments at 18-20.

and Analysis Center ("C-ISAC"). As several parties argue, there is no need for the Commission's expanded involvement in these interagency processes or public-private partnerships, and nothing in Title II would facilitate the Commission's increased participation in any event.[100] Instead, as the Reply Declarations of Obama Administration veterans Tony Scott and Andrew Grotto explain, the Commission's reliance on Title II to assert new responsibilities and impose new sector-specific requirements "on a subset of entities in a complex ecosystem would threaten to impede the coordinated, whole-of-government approach Congress has taken pains to establish,"[101] which "foster[s] valuable collaboration and quickly produce[s] innovative approaches—an advantage, compared to an adversarial regulatory proceeding."[102]

Using Title II to impose cyber regulation on mass-market broadband services also would be fatally underinclusive, as such rules would fail to address the practices of dominant tech platforms, cloud providers, IP transit and peering providers, or providers that operate in the enterprise and wholesale carrier marketplace that may present significant security-related risks.[103]

---

[100] *See, e.g.*, CTIA Comments at 29 (explaining that while the *NPRM* "claims that Title II classification will enable [the FCC] to better complete its 'responsibilities' and 'task[s]' under [Presidential Policy Directive 21 ("PPD-21")]," "that assertion misconstrues PPD-21, which . . . did not actually authorize the Commission to do anything other than partner with other agencies and industry on these issues").

[101] Scott Declaration at 3-4 (explaining that while the Commission "plays an important role in coordinating with" cybersecurity agencies, reclassification "would hamper, rather than improve, public-private cooperation" and "would not improve the FCC's or other agencies' or providers' abilities to address or deter [cyber] threats" or "provide the FCC additional or unique capabilities to detect, prevent, or enforce against such threats").

[102] Grotto Declaration at 34; *see also id. at* 32 (cautioning that, as an independent agency, the Commission would "not be subject to regular input and coordination . . . through" the Office of the National Cyber Director and the National Security Council, thereby impeding "important coordination" that is "particularly vital" on matters of cybersecurity).

[103] *See* Scott Declaration at 3 ("The growth of cloud computing, the shift to conducting business from remote locations and mobile devices, the increasing interconnection between third-party software service providers and their clients, the exponential proliferation of [IoT] devices, the

**App. 1366**

Relatedly, as USTelecom notes, "the key entities that would play a role in increasing BGP security include transit ISPs and 'edge' Autonomous Systems, i.e., the infrastructure owned and operated by large entities such as corporations, government agencies, utilities, and universities that own and control their own IP space."[104] Thus, cyber rules that apply solely to mass-market ISPs would be ineffective and destructive to the cohesiveness of the regulatory scheme.[105] Indeed, the irony of the *NPRM*'s call for such regulation is that it would recreate the very type of Balkanization that prompted Congress to enact the Cybersecurity Information Sharing Act, which led to more centralized oversight via CISA.

Moreover, contrary to the unsupported assertion by EPIC et al. that Title II would authorize national cyber standards, neither those commenters nor any other party explain what specific authority in Title II would empower the Commission to adopt such requirements. In fact, nothing in Title II provides any such authority. In short, the *NPRM*'s references to cybersecurity cannot justify the proposed reclassification of broadband services.

***Public Safety and Network Reliability/Resiliency***. The record also undercuts the proposition that Title II is necessary to improve public safety or network reliability/resiliency. To

---

emergence of artificial intelligence . . . as a key business operations tool, and the prevalence of cyber-physical systems have all combined to multiply the breadth of attack surfaces that pose cyber risk threats, and intensified the potential magnitude and impact of such attacks.").

[104] USTelecom Comments at 78-79; *see also* Scott Declaration at 4 ("The important issue of BGP security underscores why Title II authority is a poor fit for advancing security in the Internet arena. Reclassification of broadband would not enable the FCC to resolve BGP vulnerabilities because unilateral action by a single country's regulator will not prevent misrouting or hijacking of data traffic. Furthermore[,] a command-and-control regulatory fix as envisioned by the [Commission] won't work because the actions needed to resolve these issues necessarily require collaboration with a broad ecosystem of Internet-related entities, not just ISPs.").

[105] CISA, for example, is "better equipped to ensure consistent and coordinated oversight" than the Commission because it "does not draw any distinctions among participants in the Internet ecosystem." Scott Declaration at 3.

**App. 1367**

be sure, "broadband plays an important role in promoting public safety."[106]  Yet while Title II proponents suggest that the increasing importance of broadband networks to public safety is sufficient without more to justify the imposition of common-carrier regulation,[107] such parties fail to identify any concrete ways in which Title II actually would improve public safety.[108]  As a threshold matter, Title II proponents largely ignore that public safety entities overwhelmingly rely on enterprise-class, dedicated Internet access services, not the mass-market services at issue in the *NPRM*.[109]  They also overlook that the current light-touch regulatory regime benefits public safety users by allowing broadband providers to prioritize their critical traffic in emergency situations without risking enforcement action for engaging in "non-neutral" practices.[110]

Moreover, insofar as the *NPRM* vaguely hints at new requirements the Commission might consider under Title II, those examples fall flat.  For instance, while the *NPRM* mentions Wireless Emergency Alerts and public safety prioritization programs,[111] reclassification would not enable

---

[106] USTelecom Comments at 83.

[107] *See, e.g.*, AARP Comments at 13-15; Comments of the Benton Institute for Broadband & Society, WC Docket No. 23-320, at 5 (filed Dec. 14, 2023); Comments of the Consumer Federation of America, WC Docket No. 23-320, at 57 (filed Dec. 14, 2023) ("Consumer Federation of America Comments"); Public Knowledge Comments at 6, 8, 62-63.

[108] *See* Comments of the American Consumer Institute, WC Docket No. 23-320, at 6-7 (filed Dec. 11, 2023) ("American Consumer Institute Comments") (explaining that the *NPRM* does not specify any problems with public safety or explain how stricter regulation would solve such problems); Comments of the Digital Progress Institute, WC Docket No. 23-320, at 15 (filed Dec. 14, 2023) ("Digital Progress Institute Comments") (same).

[109] *See, e.g.*, USTelecom Comments at 83; CTIA Comments at 36; FSF Comments at 21.

[110] *See* NCTA Comments at 72 (citing John Hendel, *VA Asking California if Net Neutrality Law Will Snag Veterans' Health App*, Politico (Mar. 24, 2021), https://www.politico.com/states/california/story/2021/03/24/va-asking-california-if-net-neutrality-law-will-snag-veterans-health-app-1369440); Digital Progress Institute Comments at 14 (noting that the prohibition against paid prioritization would foreclose benefits associated with prioritization of public safety communications); FSF Comments at 27-28 (same).

[111] *See NPRM* ¶ 35.

**App. 1368**

the Commission to compel additional provider participation, given that the WARN Act makes clear that such participation is voluntary.[112] And while commenters like the County of Santa Clara argue that consumers *receive* public safety communications through mass-market broadband connections[113]—supposedly justifying increased regulation—the increased investment and innovation fostered under the current light-touch regulatory regime has made networks more reliable than ever before, as the Commission concluded in the *2020 Remand Order*.[114] Indeed, the exemplary performance of broadband networks during the COVID-19 pandemic, when network demands unexpectedly spiked, confirms that such "success was achieved due to the significant investment that would not have been possible in a heavily regulated environment."[115]

With respect to network reliability and resiliency, proponents of reclassification again invoke Title II as a cure-all without any actual showing that increased regulation is necessary or would deliver net benefits.[116] These parties overlook the reality that broadband providers "are promoting resiliency and reliability through investment in preparedness, service continuity, rapid restoration in the face of a disaster, and resiliency by design—all in the absence of common carrier regulation of BIAS."[117] Broadband providers have invested billions in their networks to ensure they have sufficient capacity during emergencies, and "to harden broadband networks and restore

---

[112] *See* Digital Progress Institute Comments at 15.

[113] *See* County of Santa Clara Comments at 17.

[114] *See Restoring Internet Freedom; Bridging the Digital Divide for Low-Income Consumers; Lifeline and Link Up Reform and Modernization*, Order on Remand, 35 FCC Rcd. 12328, ¶¶ 33-35 (2020) ("*2020 Remand Order*").

[115] USTelecom Comments at 83; *see also* Ford Paper at 5-6.

[116] *See, e.g.*, Free Press Comments at 57-59; Consumer Federation of America Comments at 57.

[117] CTIA Comments at 37.

**App. 1369**

operations quickly when they are impacted by catastrophic events."[118]  In addition, the Commission's Mandatory Disaster Response Initiative "requires that facilities-based wireless providers work collaboratively to maintain services, including data services, during disaster and other emergency events through roaming and mutual aid obligations."[119]  As AT&T aptly concludes, given broadband providers' market-driven investments in network reliability and resiliency and existing Commission initiatives, "[n]ew oversight and new reporting requirements would be not only needless, but affirmatively counterproductive."[120]  Although increased regulation is not warranted, the Commission recently concluded that it already possesses the requisite authority—outside of Title II—to expand its outage reporting requirements to broadband providers,[121] thereby undermining any claim that reclassification is necessary to achieve that objective.

*Privacy*.  Several parties buy into the *NPRM*'s suggestion that Title II regulation might enable the Commission to adopt broadband-specific privacy rules, but they generally ignore that Congress specifically forbade the Commission from establishing such a framework under the Congressional Review Act ("CRA").[122]  Moreover, Title II proponents that do mention the CRA disapproval resolution make no effort to explain how any new broadband privacy "rules" the

---

[118] USTelecom Comments at 81-82.

[119] CTIA Comments at 38.

[120] AT&T Comments at 29.

[121] *See Resilient Networks et al.*, PS Docket No. 21-346 et al., Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC-CIRC2301-01, ¶ 68 (rel. Jan. 4, 2024) (asserting that "the statutory provisions cited in the 2016 *Notice* considering outage reporting for BIAS provide the Commission with authority to require such reporting").

[122] *See, e.g.*, AARP Comments at 9-11; ACLU Comments at 8; Consumer Federation of America Comments at 58-60.

**App. 1370**

Commission might adopt could circumvent that resolution.[123]  The bar posed by the CRA resolution is dispositive as a legal matter,[124] but in any event these commenters fail to show that imposing sector-specific privacy rules would advance the public interest.  Leading members of Congress have made crystal clear that consumers are best served by technology-neutral legal standards that apply across the Internet ecosystem, to ISPs and non-ISPs alike.[125]  By contrast, proponents of Title II regulation all fail to explain how consumers would benefit if the Federal Trade Commission ("FTC") were stripped of its jurisdiction over broadband providers, resulting in the bifurcation of federal oversight of the privacy practices of participants in the Internet ecosystem—which would occur immediately if this Commission were to follow through on its proposal to impose common-carrier regulation.[126]

*Accessibility*.  In what is now a familiar pattern, the handful of Title II advocates that address disabilities access make no effort to explain why common-carrier regulation is necessary or would be beneficial in the broadband arena.  In particular, they fail to recognize that Congress already enacted a statute—the 21st Century Communications and Video Accessibility Act

---

[123] *See, e.g.*, EPIC et al. Comments at 15; Free Press Comments at 60-61.

[124] Notably, reclassifying broadband as a telecommunications service and declining to forbear from Section 222 would be prohibited by the 2017 CRA resolution even *absent* any further Commission rulemaking action adopting new broadband privacy rules.  That is because (1) the Commission's recently adopted *2023 Data Breach Order* already subjects telecommunications service providers to data breach requirements that are substantially similar to the 2016 broadband data breach requirements invalidated by the CRA resolution; and (2) reclassifying broadband as a telecommunications service would instantly render ISPs subject to those requirements.  *See Data Breach Reporting Requirements*, WC Docket No. 22-21, Report and Order, FCC 23-111 (rel. Dec. 21, 2023) ("*2023 Data Breach Order*").  Leaving aside whether the *2023 Data Breach Order* itself complies with the CRA resolution, there is no question that the combination of that order and a Title II reclassification order in this proceeding would run afoul of that resolution by impermissibly subjecting ISPs to the very requirements Congress disapproved.

[125] *See* NCTA Comments at 78 n.268 (quoting congressional statements).

[126] *See id.* at 65-66 (citing 15 U.S.C. § 45(a)(2), which deprives the FTC of jurisdiction over common carriers).

**App. 1371**

("CVAA")—to ensure that IP-enabled services are accessible to persons with disabilities.[127] Nothing in the record demonstrates that accessibility needs are not being met through the combination of market forces and the Commission's CVAA rules, much less that Title II would result in net benefits.

*Universal Service.* Title II proponents fail to rebut the conclusions of the *2020 Remand Order*, which made clear that the Commission may support broadband networks and services under the various Universal Service Fund ("USF") support mechanisms, including Lifeline, regardless of regulatory classification.[128] Indeed, broadband networks and services are receiving billions of dollars in USF support annually, belying any argument that reclassification is necessary to enable such support. The Commission also should reject calls to add broadband revenues to the USF contribution base by reclassifying broadband as a common-carrier telecommunications service and declining to forbear from Section 254(d).[129] As NCTA has explained in the relevant USF proceedings, imposing a large tax on broadband would hamper the paramount national objective of expanding broadband adoption, especially among low-income consumers.[130] Instead,

---

[127] *See, e.g.*, Public Knowledge Comments at 54; Center for Accessible Technology and MediaJustice Comments at 9-12; CPUC Comments at 28-32.

[128] *2020 Remand Order* ¶¶ 83-103.

[129] *See, e.g.*, ACLU Comments at 15; Comments of National Consumer Law Center et al., The Affordable Broadband Groups, WC Docket No. 23-320, at 2-4 (filed Dec. 14, 2023); Comments of the National Digital Inclusion Alliance & Common Sense, WC Docket No. 23-320, at 3-4 (filed Dec. 14, 2023); New America/OTI Comments at 37-40; Comments of INCOMPAS, WC Docket No. 23-320, at 53-57 (filed Dec. 14, 2023) ("INCOMPAS Comments"); CPUC Comments at 12; Comments of Next Century Cities, WC Docket No. 23-320, at 12-13 (filed Dec. 14, 2023).

[130] *See, e.g.*, Comments of NCTA – The Internet & Television Association, WC Docket No. 21-476, at 19 (filed Feb. 17, 2022) ("2022 NCTA Comments") (explaining that assessing contributions on broadband services would undermine broadband adoption); *see also* Chairwoman Jessica Rosenworcel, Responses to Questions for the Record at 29, U.S. House of Representatives Energy & Commerce Subcommittee on Communications and Technology Hearing on "Oversight of President Biden's Broadband Takeover," Nov. 20, 2023 ("Rosenworcel QFR Responses"),

**App. 1372**

the Commission should work with Congress to develop a broad-based assessment mechanism that includes large tech platforms and others that derive enormous value from broadband networks.[131]

**_Robocalls and Robotexts_**.  Few Title II proponents even mention preventing robocalls and robotexts as a justification for reclassification, and those that do ignore the Commission's significant existing authority to address such matters under the Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act") and the Telephone Consumer Protection Act ("TCPA").[132]  Yet, again, there is no demonstration that there is any gap in existing authority or that Title II would fill it in an effective and beneficial manner.[133]  To the contrary, the Commission has touted its successful measures to combat robocalls and robotexts.[134]  Indeed, an assertion that the Commission is hamstrung by the classification of broadband as an information service would make no sense given that the classification of broadband has no bearing on the regulation of unwanted voice calls or texts.

https://www.congress.gov/118/meeting/house/116602/witnesses/HHRG-118-IF16-Wstate-RosenworcelJ-20231130-SD156164.pdf ("[The FCC's USF report to Congress] described the data on record regarding reforms that would broaden the contribution base to include assessment on consumer broadband.  The record reflected that this approach would increase consumer broadband bills by $5.28–$17.96 per month.  I believe this is an unacceptable increase in the financial burden on consumers.").

[131] *See* 2022 NCTA Comments at 21-24; *see also* Rosenworcel QFR Responses at 29 ("Other parties proposed requiring edge providers to contribute based on their digital advertising revenues. Digital advertising generates billions of dollars of revenue and is expected to continue to be a growth area. The record reflected that this approach may have a minimal or zero cost impact on consumers.  For this reason, I am intrigued by this proposition and believe it deserves further study.").

[132] *See, e.g.*, CPUC Comments at 34; EPIC et al. Comments at 13-14; Comments of the National League of Cities, WC Docket No. 23-320, at 1-2 (filed Dec. 14, 2023).

[133] *See* Verizon Comments at 16-17 (explaining that no such gap exists).

[134] *See Targeting and Eliminating Unlawful Text Messages, et al.*, Second Report and Order, Second Further Notice of Proposed Rulemaking in CG Docket Nos. 02-278 and 21-402, and Waiver Order in CG Docket No. 17-59, FCC 23-107, ¶¶ 7-13 (rel. Dec. 18, 2023) (describing the Commission's multi-pronged approach to preventing unwanted and unlawful robocalls and robotexts).

*MTEs*. Promoting competition in multiple tenant environments ("MTEs") is another issue that received little attention from Title II proponents,[135] and they fail to demonstrate any problem that would justify the imposition of common-carrier regulation. They ignore the reality that broadband-only providers represent a tiny portion of the marketplace,[136] and also overlook the Commission's existing ancillary authority to take further action in that arena, if necessary, even with respect to broadband-only providers.[137]

*Pole Attachments*. Similarly, advocates invoking access to poles as a justification for reclassification erroneously assume that there are a significant number of broadband-only providers seeking pole attachments, when in fact the evidence demonstrates the opposite, as noted above.[138] In any event, such commenters fail to offer any evidence that the relative handful of broadband-only providers in the marketplace face significant difficulties in obtaining pole attachments at reasonable rates as a result of broadband's information-service classification.[139]

*Free Expression and Digital Equity*. Finally, Title II proponents addressing free expression and digital equity largely do so in conjunction with other supposed rationales discussed

---

[135] *See, e.g.*, AARP Comments at 11-13; Public Knowledge Comments at 51-52; Free Press Comments at 56-57.

[136] *See* NCTA Comments at 80 n.274 (citing estimates that cable providers, wireline telephone providers, and fixed wireless providers account for about 96 percent of the broadband marketplace); *see also* CTIA Comments at 43 (arguing that "separate regulation of broadband-only providers would not make any identifiable difference").

[137] *See* NCTA Comments at 82 n.278.

[138] *See, e.g.*, Free Press Comments at 55-56; Public Knowledge Comments at 47-48; INCOMPAS Comments at 18-21.

[139] *Cf., e.g.*, USTelecom Comments at 88 (highlighting that the *NPRM* "cites no evidence" of broadband-only providers being "prevent[ed] . . . from obtaining just and reasonable pole attachment rates"); CTIA Comments at 41-42 (noting that the Commission, in the *2018 Order*, "found that the limited number of broadband-only providers that exist have not encountered significant pole attachment challenges").

above, and fail to identify any independent benefits that would result from reclassification.[140]  The interest in free expression overwhelmingly militates in favor of the existing light-touch regime, not increased government control,[141] and Congress has addressed digital equity in the broadband marketplace in a targeted fashion in a separate statute.[142]  These rationales accordingly provide no support for broadband reclassification under Title II.

<p style="text-align:center">*   *   *</p>

The Consumer Federation of America is wrong when it suggests that the Commission can satisfy its legal burden in this proceeding simply by positing that Title II might deliver unspecified benefits and is unlikely to cause harm.[143]  Rather, the Commission must provide a "more substantial justification" where, as here, "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."[144]  In all events, the Commission must provide "good reasons" to depart from the well-functioning, light-touch regime.[145]  The *NPRM* does not supply such reasons by pointing to a hodgepodge of interests unrelated to the Open Internet policies that animated previous calls for common-carrier regulation, and the record is likewise devoid of

---

[140] *See, e.g.*, Free Press Comments at 70-74; Public Knowledge Comments at 53-54; ACLU Comments at 3-4; NHMC Comments at 2-5.

[141] *See, e.g.*, Center for Individual Freedom Comment Opposing Proposed Rule "Safeguarding and Securing the Open Internet," WC Docket No. 23-320, at 3-6 (filed Dec. 14, 2023) ("Center for Individual Freedom Comments").

[142] *See* NCTA Comments at 82-83.

[143] *See* Consumer Federation of America Comments at 57.

[144] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

[145] *Fox Television Stations,* 556 U.S. at 515.

evidence that any of those other interests would be advanced by the imposition of Title II regulation.

### C. Subjecting ISPs to Common-Carrier Regulation Would Harm the Well-Functioning Broadband Marketplace

As NCTA explained in its opening comments,[146] and as the Israel/Keating/Shampine Declaration powerfully confirms,[147] today's broadband marketplace is more competitive than ever before. A remarkable array of commenters agree.[148] Large and small ISPs alike describe the

---

[146] *See* NCTA Comments at 49-50, 89-91.

[147] *See* Israel/Keating/Shampine Declaration ¶¶ 23-71.

[148] *See, e.g.*, ACA Connects Comments at 9-21; American Consumer Institute Comments at 8-10; Comments of Americans for Tax Reform and Digital Liberty, WC Docket No. 23-320, at 2 (filed Dec. 15, 2023) ("Americans for Tax Reform and Digital Liberty Comments"); AT&T Comments at 4, 8-9; Center for Individual Freedom Comments at 6; Comments of Thomas A. Schatz, President, Citizens Against Government Waste, WC Docket No. 23-320, at 7-8 (filed Dec. 14, 2023) ("CAGW Comments"); Comments of Comcast Corporation, WC Docket No. 23-320, at 18-28 (filed Dec. 14, 2023) ("Comcast Comments"); Comments of Consumer Action for a Strong Economy, WC Docket No. 23-320, at 1 (filed Dec. 14, 2023) ("Consumer Action for a Strong Economy Comments"); CTIA Comments at 13-17; Digital Progress Institute Comments at 3-4; FSF Comments at 8, 30-35, 38-42; GSMA response to the FCC notice of proposed rulemaking (NPRM) on Safeguarding and Securing the Open Internet, WC Docket No. 23-320, at 4-5 (filed Dec. 13, 2023); Comments of the Heritage Foundation, WC Docket No. 23-320, at 2 (filed Dec. 14, 2023); Comments of the Information Technology and Innovation Foundation, WC Docket No. 23-320, at 3-4, 7-8 (filed Dec. 14, 2023) ("Information Technology and Innovation Foundation Comments"); Comments of the International Center for Law & Economics, WC Docket No. 23-320, at 5-6, 9-18 (filed Dec. 14, 2023) ("International Center for Law & Economics Comments"); Comments of the R Street Institute, WC Docket No. 23-320, at 7 (filed Dec. 14, 2023) ("R Street Institute Comments"); Taxpayers Protection Alliance Comments at 3; Comments of the Texas Public Policy Foundation, WC Docket No. 23-320, at 2 (filed Dec. 14, 2023) ("Texas Public Policy Foundation Comments"); Comments of Scott Wallsten, Sarah Oh Lam & Thomas Lenard, WC Docket No. 23-320, at 3, 6-7 (filed Dec. 14, 2023); Comments of the United States Hispanic Chamber of Commerce, WC Docket No. 23-320, at 1-2 (filed Dec. 14, 2023) ("U.S. Hispanic Chamber of Commerce Comments"); Comments of the United States Hispanic Chamber of Commerce, National LGBT Chamber of Commerce, US Black Chambers, Inc., & the National Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship, WC Docket No. 23-320, at 1-2 (filed Dec. 14, 2023) ("U.S. Hispanic Chamber of Commerce et al. Comments"); USTelecom Comments at 40-43; Westling Comments at 2; Yoo/Hurwitz Comments at 6-7; Comments of 5G Americas, WC Docket No. 23-320, at 5 (filed Dec. 14, 2023) ("5G Americas

**App. 1376**

increasingly competitive environment in which they operate,[149] as well as the ways in which such vibrant competition benefits consumers.[150] AT&T, for example, emphasizes that the United States "boasts far greater facilities-based broadband competition than most other jurisdictions," and that "this competition will become even more intense in the coming years."[151] USTelecom similarly proffers substantial evidence showing that "[c]ompetition has intensified significantly in recent years, leading to more consumer choices and lower switching costs," and notes that increases in network investments, speeds, and coverage, coupled with sharp reductions in broadband prices, all are "hallmark[s] of a competitive market."[152] A number of ACA Connects members likewise highlight the robustly competitive nature of the broadband marketplace.[153] "Because of this dynamic," Massillon Cable TV (an Ohio ISP) explains, it "must be responsive to customer

---

Comments"); Declaration of Jason Hansen, Chief Tech. Officer, Conway Corp. ¶¶ 6, 8 (appended to ACA Connects Comments) ("Conway Declaration"); Declaration of Patrice Carroll, CEO, ImOn Communications ¶¶ 11, 13, 17 (appended to ACA Connects Comments) ("ImOn Declaration"); Declaration of Katherine Gessner, President, Massillon Cable TV Inc. ¶¶ 9-11, 14 (appended to ACA Connects Comments) ("Massillon Cable TV Declaration"); Declaration of Chris Kyle, VP, Indus. Affairs & Regul., Shenandoah Telecomm. ¶¶ 9-10 (appended to ACA Connects Comments) ("Shentel Declaration"); Declaration of Dick Sjoberg, CEO, Sjoberg's Inc. ¶ 10 (appended to ACA Connects Comments) ("Sjoberg Declaration").

[149] *See, e.g.*, AT&T Comments at 4, 8-9; Comcast Comments at 18-28; Conway Declaration ¶¶ 6, 8; ImOn Declaration ¶¶ 11, 13, 17; Massillon Cable TV Declaration ¶¶ 9-11, 14; Shentel Declaration ¶¶ 9-10; Sjoberg Declaration ¶ 10.

[150] *See, e.g.*, AT&T Comments at 23; Comcast Comments at 29-33; Conway Declaration ¶¶ 6, 8; ImOn Declaration ¶¶ 11, 17; Massillon Cable TV Declaration ¶¶ 10-11, 14; Shentel Declaration ¶ 10; Sjoberg Declaration ¶ 10.

[151] AT&T Comments at 9; *see also* CTIA Comments at 17 ("90% of net broadband adds in 2022 were by fixed wireless providers.").

[152] USTelecom Comments at 37-45.

[153] *See* Conway Declaration ¶¶ 6, 8; ImOn Declaration ¶¶ 11, 13, 17; Massillon Cable TV Declaration ¶¶ 9-11, 14; Shentel Declaration ¶¶ 9-10; Sjoberg Declaration ¶ 10.

demands, develop innovative and competitive services, and invest in [its] network."[154]  Shentel, which "ha[s] seen a significant uptick [in competition] over the past four years," similarly observes that such "[c]ompetition . . . has put downward pressure on [its] pricing."[155]

Increasingly, this competition is coming in the form of new and expanded fixed wireless broadband offerings,[156] enabled by the "nearly ubiquitous availability of 5G."[157]  Ericsson and others observe that, "[i]n the first two years that 5G [fixed wireless broadband] has been available, it has captured over 6 percent of the U.S. home BIAS market, with over 7 million subscribers," and that such offerings "accounted for over *90 percent* of U.S. home broadband net additions in 2022."[158]  These figures leave no doubt that 5G-based fixed wireless broadband already represents "'a [competitive] threat to' wired broadband."[159]  Even ardent proponents of the Commission's proposal to subject broadband to Title II's common-carrier regulatory framework are forced to concede that the rapid rise of 5G fixed wireless availability continues to be a competitive game-

---

[154] Massillon Cable TV Declaration ¶ 10; *see also* Conway Declaration ¶ 8 (describing how "intense competition" drives the company to "evolve [its] offerings to better meet and exceed . . . customer demands and expectations").

[155] Shentel Declaration ¶¶ 9, 10.

[156] *See* AT&T Comments at 9.

[157] Comments of the T-Mobile USA, Inc., WC Docket No. 23-320, at 12 (filed Dec. 14, 2023) ("T-Mobile Comments").

[158] Ericsson Comments at 6 (emphasis added); *see also* 5G Americas Comments at 5 (noting that fixed wireless "has been a major 5G success story and accounted for 90% of net broadband additions in 2022"); ACA Connects Comments at 15-16 ("[I]n the past quarter alone, Comcast lost approximately 18,000 subscribers, Altice over 30,000, and Breezeline over 9,000, and fixed 5G providers added about 1,000,000 subscribers.").

[159] Ericsson Comments at 7 (quoting Monica Alleven, *T-Mobile, Verizon FWA Pose Competitive Threat to Cable, Fiber – Analyst*, Fierce Wireless (July 19, 2023), https://www.fiercewireless.com/wireless/t-mobile-verizon-fwa-pose-competitive-threat-everybody-analyst).

**App. 1378**

changer in the industry.[160]  And this burgeoning competition from fixed wireless offerings is over and above the growing array of options consumers now enjoy from wireline, mobile wireless, satellite, and other providers.[161]

The record also demonstrates that the current light-touch regulatory approach to broadband continues to foster enormous investments in broadband networks, enabling providers to deliver ever-increasing speeds at ever-declining prices.[162]  Under the Commission's current "balanced . . . approach" to broadband regulation, ISPs have invested "trillions of dollars . . . to upgrade and expand coverage of their . . . networks."[163]  "In 2022 *alone*, capital expenditures by Comcast, Charter, AT&T, T-Mobile, and Verizon totaled more than $70 billion."[164]  The record is replete with other examples of significant capital outlays that ISPs have made or are planning to make,[165] and of how such investments are paying dividends for America's consumers, including in the form

---

[160] *See, e.g.*, Free Press Comments at 43.

[161] *See* Israel/Keating/Shampine Declaration ¶¶ 36-47.

[162] *See, e.g.*, AT&T Comments at 3, 11-14; Comments of Business Roundtable, WC Docket No. 23-320, at 1 (filed Dec. 13, 2023) ("Business Roundtable Comments"); Center for Individual Freedom Comments at 2; CAGW Comments at 7-9; Comcast Comments at 3, 29-39; Consumer Action for a Strong Economy Comments at 1; Comments of the Administrative Law Clinic at the Antonin Scalia Law School, WC Docket No. 23-320, at 4-5 ("George Mason University Antonin Scalia Law School Administrative Law Clinic Comments"); CTIA Comments at 13-15; Information Technology Industry Council Comments at 2; T-Mobile Comments at 12-15; Comments of the Telecommunications Industry Association, WC Docket No. 23-320, at 2-4 (filed Dec. 14, 2023); U.S. Chamber of Commerce Comments at 6-12; U.S. Hispanic Chamber of Commerce Comments at 1; U.S. Hispanic Chamber of Commerce et al. Comments at 1; USTelecom Comments at 37-40; 5G Americas Comments at 4; ImOn Declaration ¶ 6; Shentel Declaration ¶¶ 5-7; *see also* NCTA Comments at 86-91.

[163] ACA Connects Comments at 2.

[164] Comcast Comments at 34.

[165] *See, e.g.*, AT&T Comments at 3; T-Mobile Comments at 11-15; Verizon Comments at 4-7; Conway Declaration ¶ 4; ImOn Declaration ¶¶ 3, 6; Massillon Cable TV Declaration ¶ 4; Shentel Declaration ¶¶ 5-6; Declaration of James Gleason, President & CEO, Vexus Fiber, LLC ¶ 6 (appended to ACA Connects Comments) ("Vexus Fiber Declaration").

of dramatically increasing speeds and rapidly declining prices.[166] Indeed, the positive impacts of the existing light-touch framework are borne out by the Commission's own data, which reveal that the most popular tier of broadband service in 2015 "was, in nominal terms, 37 percent cheaper (while offering 142 percent faster speeds) in 2023 than it was in 2015, on an average-subscriber-weighted basis," and that "the highest-speed tier in 2015 was nearly 40 percent cheaper (while offering speeds that were more than twice as fast) on an average-subscriber-weighted basis in 2023."[167]

The opening comments also confirm that Title II reclassification would needlessly jeopardize this well-functioning marketplace. Other parties join NCTA in cautioning the Commission that imposing utility-style regulation on ISPs would dampen investment, decrease service quality, and hinder innovation.[168] As the studies discussed in NCTA's opening comments

---

[166] *See, e.g.*, American Consumer Institute Comments at 10-12; Americans for Tax Reform and Digital Liberty Comments at 2-4; Center for Regulatory Freedom Comments Regarding FCC's Notice of Proposed Rulemaking Regarding Safeguarding and Securing the Open Internet, RIN 2023-23630, WC Docket No. 23-320, at 11-12 (filed Dec. 14, 2023); Comments of Adam Brandon, President & Jason Pye, Pol'y Advisor, FreedomWorks, WC Docket No. 23-320, at 3 (filed Dec. 14, 2023) ("FreedomWorks Comments"); International Center for Law & Economics Comments at 6, 13-15, 23; T-Mobile Comments at 12; U.S. Chamber of Commerce Comments at 6-12.

[167] Israel/Keating/Shampine Declaration ¶¶ 66.

[168] *See* NCTA Comments at 91-93; *see also, e.g.*, ACA Connects Comments at 6, 40-45; ADTRAN Comments at 25, 27; AT&T Comments at 25-26, 30-31; Business Roundtable Comments at 1; Center for Individual Freedom Comments at 2-3; CAGW Comments at 6-8; Comcast Comments at 4-5; Consumer Action for a Strong Economy Comments at 2-3; Comments of the Competitive Enterprise Institute, WC Docket No. 23-320, at 4, 17 (filed Dec. 14, 2023); CTIA Comments at 18, 35, 97-99; Fiber Broadband Association Comments at 10-11; FSF Comments at 48-54, 56-59; FreedomWorks Comments at 1, 3; George Mason University Antonin Scalia Law School Administrative Law Clinic Comments at 2; Comments of the Hispanic Leadership Fund, WC Docket No. 23-320, at 2 (filed Dec. 12, 2023) ("Hispanic Leadership Fund Comments"); Comments of Jennifer Huddleston, WC Docket No. 23-320, at 1, 3 (filed Dec. 14, 2023); Information Technology and Innovation Foundation Comments at 4-5, 10; International Center for Law & Economics Comments at 5, 24-32; Comments of the James Madison Institute and Other

**App. 1380**

make clear, such concerns are not merely theoretical.[169]  The real-world consequences of subjecting ISPs to burdensome, common-carrier-style regulation also are illustrated by the European experience, in which "heavy-handed ex-ante and ex-post regulation" of broadband has led "to a weaker connectivity ecosystem, with negative effects on investment and innovation."[170]

It thus comes as no surprise that large and small ISPs alike warn that adoption of the *NPRM*'s proposed regulatory approach would deter them from introducing new products and services and/or proceeding with planned network investments.  For example, AT&T notes that, under the proposed Internet Conduct Standard, "the de facto requirement to seek non-binding (and slow-in-coming) 'advice' from Commission staff before undertaking any conceivably controversial business practice would slam the brakes on innovation," and that "[a]ny ISP would rather stick to traditional business practices than play this mother-may-I game, which would take months (at minimum) to complete and offer scant assurance no matter what the answer."[171] Conway, an Arkansas broadband provider, likewise expresses concern about the breadth and ambiguity of the proposed Internet Conduct Standard, which would "make [the company] think

---

Free Market Organizations, WC Docket No. 23-320, at 3 (filed Dec. 12, 2023); Comments of the National Association of Manufacturers, WC Docket No. 23-320, at 1-2 (filed Dec. 14, 2023); NTCA Comments at 27-28; R Street Institute Comments at 2, 7; Taxpayers Protection Alliance Comments at 2, 4; T-Mobile Comments at 20, 49-50; U.S. Chamber of Commerce Comments at 15-19; USTelecom Comments at 54-59, 61-64; Verizon Comments at 7; Westling Comments at 5-6; 5G Americas Comments at 4-5, 6-7, 8-10, 12-13; ImOn Declaration ¶ 16; Shentel Declaration ¶ 12; Israel/Keating/Shampine Declaration ¶¶ 72-86.

[169] *See* NCTA Comments at 91-94.

[170] Comments of the European Telecommunications Network Operators' Association, WC Docket No. 23-320, at 1 (filed Dec. 14, 2023); *see also* Americans for Tax Reform and Digital Liberty Comments at 5; Comments of Patty Judge, Co-Founder, Focus on Rural America, and Former Lieutenant Governor, Iowa, WC Docket No. 23-320, at 2 (filed Dec. 13, 2023); Furchtgott-Roth/Arner Comments at 8; Texas Public Policy Foundation Comments at 3-4; USTelecom Comments at 38.

[171] AT&T Comments at 26.

twice about developing new services or functionalities or undertaking legitimate responses to competitors."[172]  Vexus Fiber likewise cautions that, because "the limits of [the Internet Conduct Standard] are not clearly defined, . . . its adoption can be expected to chill legitimate competitive activity and innovation."[173]  For its part, Shentel explains that "[r]egulation that affects the rates, terms, and conditions of [its] broadband service offerings or imposes other service or deployment obligations would . . . significantly impact[] the return-on-investment model that Shentel utilizes to invest in [its] network," and in "particular[] deter [the company] from investing in build outs in new rural and semi-rural communities where the economics are already challenging."[174]  Iowa-based ImOn similarly notes that "[b]ecause it would increase compliance costs and the overall uncertainty of [its] business, the proposed Title II regulation will make it more costly to provide service and lead to lower investment."[175]

A number of commenters specifically highlight the harms to infrastructure investment that would result from reclassifying broadband under Title II, detailing how those harms would seriously undermine the Biden Administration's signature BEAD program and related policy priorities.[176]  For instance, the U.S. Hispanic Chamber of Commerce and a group of like-minded

---

[172] Conway Declaration ¶ 10.

[173] Vexus Fiber Declaration ¶ 13.

[174] Shentel Declaraton ¶ 12.

[175] ImOn Declaration ¶ 16; *see also* Sjoberg Declaration ¶ 12 ("The additional costs imposed by the imposition of . . . Title II regulation and the proposed [O]pen [I]nternet rules creates uncertainty for the financial health of the company in the eyes of lenders.  Once broadband services are regulated, even if many Title II obligations are initially subject to forbearance, there will be increased overhead and the potential for greater intervention by the [Commission] and possibly . . . state regulators, making it more difficult and expensive . . . to borrow money.").

[176] *See, e.g.*, AT&T Comments at 7; Comments of the Advanced Communications Law & Policy Institute at New York Law School, WC Docket No. 23-320, at 4, 14-15 (filed Dec. 14, 2023) ("ACLP Comments"); CAGW Comments at 10-11; CTIA Comments at 5-6; Ericsson Comments

**App. 1382**

associations note that "[t]he new networks built with BEAD funds can finally close the digital divide if there is broad private participation in the program and costs are kept in check," but warn that Title II reclassification may well imperil those goals.[177] The groups explain that "[b]roadband providers that are interested in applying for these funds must not only navigate complex requirements in each state, but also budget for their own matching funds and their costs of operating these networks over the long term," and that "[a]sking [them] to make these decisions at the same time as the Commission imposes sweeping new utility regulation of broadband may well be a deterrent to applying."[178] According to WISPA, such impacts will be felt acutely by smaller ISPs, which "may have reviewed compliance costs for participating in the BEAD program and decided they were manageable," but "will have to reassess that decision if Title II regulations are re-imposed."[179] Indeed, "[g]iven that such costs are highly variable and difficult to calculate precisely, it is inevitable that a certain number of smaller service providers who might otherwise have competed for BEAD grants will now decide not to do so."[180]

At a minimum, the New York Law School's Advanced Communications Law & Policy Institute ("ACLP") predicts, Title II reclassification could cause participants to "pull back on their proposed matches of [program] grants, thereby increasing the amount of [federal] funding needed

---

at 20-21; Hispanic Leadership Fund Comments at 3-4; R Street Institute Comments at 7; U.S. Hispanic Chamber of Commerce et al. Comments at 1-3; WISPA Comments at 24-26.

[177] U.S. Hispanic Chamber of Commerce et al. Comments at 2.

[178] *Id.*; *see also* ACLP Comments at 14 ("[T]he negative impacts of Title II regulation on broadband investment" could result in "less robust participation in [the BEAD program] by ISPs that are unwilling or unable to risk scarce private capital on projects . . . in high-cost areas.").

[179] WISPA Comments at 25.

[180] *Id.*; *see also* Ford Paper at 4 ("While telecommunications providers continue to invest billions annually in their networks, regulatory excess is a deterrent to infrastructure investment at the margin.").

for projects."[181]  ACLP also warns that because the BEAD program has been "devised . . . to reflect the current [light-touch] regulatory framework for broadband," Title II reclassification would necessitate considerable modifications to "key aspects of the . . . program," including relevant rules and guidance issued by NTIA.[182]  These changes would "cause significant administrative delays" and "upend core terms and conditions included in subgrantee contracts," risking to delay the distribution of BEAD funding "by months, if not years."[183]  The record thus leaves no doubt that, far from advancing efforts to bridge the digital divide, Title II reclassification would imperil the significant progress being made in this area by undermining the effectiveness of the BEAD program and other initiatives that aim to couple private investment with government support to expand broadband access and adoption.[184]

Some proponents of Title II regulation suggest that such harms must be illusory because ISPs themselves have embraced Open Internet principles.[185]  But they miss the fundamental point that ISPs oppose reclassifying broadband *not* because it would result in the imposition of bright-line Open Internet rules, but instead because it raises a host of other serious problems.  Among

---

[181] ACLP Comments at 14; *see also* NCTA Comments at 85-86.

[182] ACLP Comments at 14.

[183] *Id.* ("The confusion created by the imposition of an entirely new regulatory framework would only be compounded by the legal wrangling that will inevitably ensue" if the Commission proceeds as proposed in the *NPRM*.).

[184] Notably, reports prepared after the unsuccessful Broadband Technology Opportunities Program found that the NTIA's "ungainly" administration of the program through onerous selection criteria and the like significantly diminished the efficiency of the program—likely explaining why for-profit providers were so underrepresented among participants.  *See, e.g.*, Sarah Oh, Technology Policy Institute, "Using Reverse Auctions to Stretch Broadband Subsidy Dollars: Lessons from the Recovery Act of 2009," at 4-6, Table A1 (Jan. 2021), https://techpolicyinstitute.org/wp-content/uploads/2021/03/Oh-Reverse-Auctions-Lessons-from-BTOP-Jan-2021.pdf.

[185] *See, e.g.*, Free Press Comments at 4 (noting ISPs' "embrace of basic openness principles" and suggesting that Title II regulation "is good for ISPs").

other concerns, those bright-line rules would be accompanied by the vague, overbroad, investment-chilling Internet Conduct Standard and the extremely broad scope of Sections 201 and 202 from which the Commission has said it will not forbear, and the Commission is unlawfully proposing to impose sector-specific privacy regulations on ISPs under Section 222 (notwithstanding Congress's rejection of such regulation in the 2017 CRA Resolution).[186] The Commission also is proposing to go well beyond the *2015 Order* in various respects, including by subjecting ISPs to burdensome entry and exit regulation under Section 214 and opening the door to additional mandates touching on national security, cybersecurity, resiliency, and other subject areas. And even the forbearance the Commission intends to grant, such as from rate regulation or unbundling requirements, would be incomplete and could be rescinded at any time.[187]

Meanwhile, claims by Free Press and others that the Commission's prior Title II classification of broadband had no negative effect on broadband investment are fundamentally flawed. Free Press contends that "broadband deployment and investment increased to historic levels following the [Commission]'s 2015 vote to restore Title II" before declining after adoption of the *2018 Order*.[188] This extraordinary claim requires extraordinary proof—and Free Press's slapdash discussion of market trends comes nowhere close to demonstrating the investment effects it claims. An appropriately rigorous economic analysis would address the complexities of attempting to quantify the effects of regulation on investment—e.g., by consistently accounting

---

[186] *See supra* at 31-32.

[187] *See* NCTA Comments at 97-99 (noting that "potential for the Commission to reimpose provisions from which it previously forbore limits ISPs' ability to rely on such forbearance" and supporting congressional action to codify durable and appropriately tailored Open Internet rules); *id.* at 3 (noting that the regulation proposed in the *NPRM* would "go far beyond Internet openness goals"); *id.* at 20-23 (explaining how the limited forbearance proposed does not come close to mitigating the harms of Title II regulation).

[188] Free Press Comments at 7.

for the fact that investment decisions in this marketplace often are made years in advance, and by employing statistical controls to isolate and filter out other factors that can influence investment levels. In other words, the analysis also would include a "counterfactual" assessment—that is, a comparison of actual investments to expected investments absent the regulatory change at issue, given that the relevant question is not how investment levels changed in absolute terms over time, but instead what level of investment would have occurred *but for* that regulatory change.[189] Free Press does none of these things. Instead, its analysis falsely equates the timing of *deployment* with the timing of *investment decisions*—overlooking that the former invariably occurs well after the latter, sometimes lagging by several years, given the time it takes to design the network, procure the necessary equipment, undergo the permitting process, and take all the other steps involved in network deployment.[190] And in failing to apply statistical techniques to filter out other influences on broadband investment, Free Press offers no counterfactual analysis to show what ISPs' investment levels would have been but for the Title II regime under which they were forced to operate.

By contrast, the studies that *do* analyze the data with appropriate rigor starkly contradict Free Press's findings, and conclude that imposing Title II regulation on broadband would impede

---

[189] *See* Declaration of Mark A. Israel, Allan L. Shampine & Thomas A. Stemwedel ¶ 104 (appended to Comments of AT&T Services, Inc., WC Docket No. 17-108 (filed July 17, 2017)) ("[E]ven an increase in investment could reflect reduction in the investment that would have occurred without regulation.").

[190] *See 2018 Order* ¶ 92 (acknowledging that "companies may take several years to adjust their investment plans" in response to regulatory shifts). Free Press's analysis likewise fails to properly account for the significant role that upgrades to existing networks, which are considerably less capital intensive than new deployments, play in increasing the availability of higher-speed broadband services. *See* Free Press Comments at 113-114, 125.

ISPs' investment in their networks.[191]  Dr. George Ford has found, for instance, that "the persistent prospect of Title II policy" already results in investment shortfalls of $8.1 billion, job losses of more than 81,000 and 195,000 in the information sector and economy-wide, respectively, and approximately $18.5 billion in lost wages—*each year*.[192]  And Ford further concludes that "this will likely be even worse under the FCC's new Notice of Proposed Rulemaking, which is even more far-reaching than its prior Title II proposals."[193]  These findings are consistent with established economic principles and research, as well as the Commission's own assessments, establishing that imposing heavy-handed regulation on dynamic industries like broadband will tend to "deter investment," "impose direct costs that make deployment more costly," "limit expected future revenues, making deployment less likely," and "increase risk because of uncertain interpretation and enforcement and the possibility of regulatory creep."[194]

The record also reflects deep concern regarding the harmful impact of Title II reclassification on the well-functioning marketplace for Internet interconnection and traffic exchange.[195]  This "marketplace has always functioned efficiently," USTelecom explains, "in part

---

[191] *See supra* at Section II.C; *see also, e.g.*, Ford Paper at 16-27; George S. Ford, *Infrastructure Investment After Title II* (Nov. 1, 2018), https://ssrn.com/abstract=3299059; George S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis* (Apr. 25, 2017), https://www.phoenix-center.org/perspectives/Perspective17-02Final.pdf; Joshua D. Wright & Thomas W. Hazlett, *The Effect of Regulation on Broadband Markets: Evaluating the Empirical Evidence in the FCC's 2015 "Open Internet" Order* (Oct. 26, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2859570.

[192] Ford Paper at 5; *see also id.* at 22-23.

[193] *Id.* at 1.

[194] Israel/Keating/Shampine Declaration ¶ 74; *see also 2018 Order* ¶ 89 ("The mechanisms by which public utility regulation can depress investment by the regulated entity are well-known in the regulatory economics literature.").

[195] *See, e.g.*, USTelecom Comments at 93-94; Interisle Comments at 8-9.

because there are many routes into and out of any broadband ISP's network."[196]   Yet without "addressing any legitimate concern, the Commission's proposal has the potential to distort" this "well-functioning marketplace" "by imposing regulatory obligations on one set of players"— ISPs—"but not their counterparties."[197]   Such an approach "would allow application and content providers (which the *NPRM* correctly notes include companies as large as, if not larger than, the ISPs)," as well as cloud providers and content delivery networks ("CDNs"), "to use the threat of seeking regulatory intervention to tilt negotiations in their favor, destabilizing the Internet traffic exchange marketplace in a way that would likely only require further regulatory interventions in the future."[198]   Putting a thumb on the scale by subjecting only ISPs' interconnection practices to scrutiny under Title II thus would impede efficient traffic-exchange arrangements and encourage regulatory gamesmanship by counterparties.[199]

Additionally, the notion that Title II merely represents a benign "duty to deal" and does not constitute "utility regulation" is both wrong and beside the point.[200]   To be sure, a duty to deal (on regulated terms and conditions) is one feature of Title II—specifically Section 201(a).[201]   But Title II in general, and even Sections 201 and 202 on their own, subject telecommunications service providers to a wide array of other heavy-handed obligations, including rate and service-quality regulation—the hallmark of utility-style regulatory treatment.   Moreover, while Free Press

---

[196] USTelecom Comments at 93; *see also* NCTA Comments at 55-56.

[197] USTelecom Comments at 94.

[198] *Id.*

[199] Indeed, such a result would provide yet another reason why the Commission's reclassification decision would be arbitrary and capricious.  *See infra* at Section II.D.

[200] *See* Free Press Comments at 10-12.

[201] 47 U.S.C. § 201(a).

**App. 1388**

asserts that common-carriage principles may also apply in competitive markets,[202] it ignores that (a) the Commission may not compel providers to operate as common carriers absent a finding of market power,[203] and (b) the degree of regulation to which competitive carriers are exposed pales in comparison to vague and overbearing mechanisms like the Internet Conduct Standard, which would threaten ISPs with massive liability despite the absence of any clear notice of what conduct may be deemed unlawful.

Notwithstanding Free Press's attempt to characterize the *NPRM*'s proposed approach as merely a light-touch form of common carriage, the proposal would regulate broadband "on par with water [and] power" utilities.[204] Further confirming this transformational objective, the *NPRM* proposes a slew of requirements traditionally reserved for public utilities—such as entry and exit requirements[205]—and leaves the door ajar to impose others—such as rate regulation.[206] In all events, whatever features of common carriage its proponents prefer to highlight, the record reflects that the sort of regulatory regime proposed by the Commission is appropriate only for monopoly or near-monopoly utilities,[207] and clearly establishes that such treatment of broadband would cause

---

[202] *See* Free Press Comments at 12, 63.

[203] *See, e.g.*, *AT&T Submarine Systems, Inc.*, Memorandum Opinion and Order, 13 FCC Rcd. 21585 ¶¶ 9-11 (1998) (explaining that a provider that does "not have market power" "should not be regulated as a common carrier"), *aff'd sub nom.*, *Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999).

[204] Press Release, FCC, *FACT SHEET: FCC Chairwoman Rosenworcel Proposes to Restore Net Neutrality Rules* (Sept. 26, 2023), https://docs.fcc.gov/public/attachments/DOC-397235A1.pdf.

[205] *See NPRM* ¶¶ 27-28, 99.

[206] *See id.* ¶ 105.

[207] *See, e.g.*, Comcast Comments at 5-13.

significant harms without any counterbalancing policy benefits, as described above and in NCTA's opening comments.[208]

### D. These Policy Deficiencies Also Would Render Title II Reclassification Arbitrary and Capricious

The absence of any credible evidence of harmful conduct by ISPs, the lack of any other cogent policy rationale for reclassification, and the detrimental impact of reclassification on the broadband marketplace, as well as the unjustified singling out of ISPs for utility regulation, all confirm that subjecting broadband providers to common-carrier treatment under Title II would be arbitrary and capricious under the APA. In addition to NCTA,[209] numerous other commenters in the opening round describe why the APA represents a significant legal impediment to the *NPRM*'s reclassification proposal.[210] As the International Center for Law & Economics explains, while the Commission's proposal purports to be "rooted in the presumption of ISPs' 'incentive and ability' to engage in practices that threaten [I]nternet openness," it in fact "rest[s] on speculative foundation, rather than any substantive record of violations," which alone is fatal to the *NPRM*'s proposed regulatory approach under the APA.[211]

---

[208] *See supra* at Section II.B-.C; NCTA Comments at 83-86.

[209] *See* NCTA Comments at 48-56.

[210] *See, e.g.*, CTIA Comments at 46 (The Commission's proposal "is arbitrary and capricious, jettisons the detailed findings that the Commission made in the [*2018 Order*] without adequate justification, and fails to grapple with the serious reliance interests engendered by the Commission's existing light-touch regulatory approach."); Information Technology and Innovation Foundation Comments at 9 ("[T]he Commission proposes to change policy . . . to a Title II classification based on unfounded factual claims about the state of the broadband marketplace and the relationship of its proposal to the outcomes it seeks."); USTelecom Comments at 36-54, 70-92.

[211] *See* International Center for Law & Economics Comments at 6-7 (asserting that "[t]he mere possibility of ISPs engaging in deleterious conduct does not, in itself, warrant imposing onerous rules that could impede investment in innovative business models"); *see also* ADTRAN Comments at 3 ("The result [of the Commission's proposed rules] will be to deter investment and

None of the other purported policy rationales for Title II reclassification fares any better. With respect to each such rationale in the *NPRM*, "[e]ither there is no need for Commission intervention in the area, or Title II reclassification would not grant the Commission authority to help solve the purported problem, or both."[212] As USTelecom observes, "[t]he only reasonable conclusion that can be drawn is that these reasons are contrivances intended to support expansive and unprecedented Commission regulation and to justify a reclassification that otherwise has no support."[213] USTelecom is not alone in expressing skepticism towards the *NPRM*'s veritable grab bag of newly minted policy justifications, with several other commenters also questioning the

---

innovation in broadband services. And all of this is without the *NPRM* citing any evidence of actual problems in the last fifteen years."); CTIA Comments at 10-12.

[212] USTelecom Comments at 70; *see also* CTIA Comments at 36-45 ("The Commission's 'everything but the kitchen sink' list of possible policy rationales for reclassifying BIAS are not any more convincing than its proposal to justify Title II based on national security and cybersecurity considerations."); NTCA Comments at 66-78 (explaining why Title II reclassification is not necessary to safeguard national security or public safety, or for consumer protection and privacy purposes); Verizon Comments at 15-18 ("The [*NPRM*] raises a hodgepodge of other purported regulatory gaps, but . . . these fare no better than the previous few.").

[213] USTelecom Comments at 70; *see also* CTIA Comments at 21 ("With no sound basis to assert that Internet openness demands regulation, the [*NPRM*] concocts a series of other, similarly unconvincing rationales.").

**App. 1391**

Commission's expertise to regulate in certain areas,[214] and others cautioning that its intervention would impede, rather than advance, the stated policy objectives.[215]

As NCTA has explained, the *NPRM*'s proposed regulatory approach is arbitrary and capricious for another reason: its myopic focus on ISPs to the exclusion of other entities in the Internet ecosystem, such as dominant tech platforms, which are frequently accused of engaging in non-neutral practices, and cloud providers.[216]  USTelecom, CTIA, and other parties likewise point out that the *NPRM* "makes no attempt to grapple with the[se] . . . marketplace dynamics," noting

---

[214] *See, e.g.*, Comments of Dr. Eric W. Burger, WC Docket No. 23-320, at 7 (filed Dec. 14, 2023) ("The concept [that] the Commission might review cyber plans is not credible. . . . [T]he Commission today has but a handful of engineers that are versed on the Internet and cybersecurity."); FSF Comments at 24-25 ("The Commission is the wrong agency to be addressing national security and public safety concerns in the manner set forth in the [*NPRM*].  Executive Branch agencies such as the Department of Defense, the Department of Homeland Security, and the Department of Justice already have national security powers and expertise to address security issues in the communications sector."); Verizon Comments at 8 ("[M]ost of these alleged gaps fall outside of the Commission's bailiwick, relating only tangentially to the Commission's core charge to regulate interstate and international communications."); Scott Declaration at 6-7; Grotto Declaration at 24-25 ("Most federal authorities, programs, and expertise for cybersecurity and national security come from agencies other than the FCC, . . . [which] has explicitly noted its need to rely on the national security judgments and determinations of other 'expert' agencies.").

[215] *See, e.g.*, CTIA Comments at 28 ("[T]here appears to be serious risk that the Commission is poised to cease respecting the boundaries that define its proper security role in a manner that would upend the effective, whole-of-government and public-private framework that exists today."); Verizon Comments at 8 ("Many other arms of the federal government can and do oversee those areas, and there is no reason to think that reclassifying broadband will do more to help than to hinder that whole-of-government approach."); WISPA Comments at 93 ("Unlike the FTC, . . . the Commission's enforcement power does not include the ability to seek refunds for injured customers and it is limited to conduct going back only one year.  Reclassifying broadband as a Title II service would remove the government's ability to provide injured customers with restitution for their privacy-related injuries."); Scott Declaration at 2-4; Grotto Declaration at 29-38 ("Reclassification of BIAS under Title II . . . would profoundly disrupt – and curtail – work in collaborative initiatives.").

[216] *See* NCTA Comments at 56-61.

**App. 1392**

that this serious shortcoming compounds the arbitrariness of the *NPRM*'s proposals.[217]  Free State

Foundation, for instance, urges "the Commission [to] recognize that singling out broadband ISPs

for stringent privacy restrictions would be arbitrary and capricious because ISPs do not uniquely

possess personal information," and indeed that dominant tech platforms "are by far the largest

collectors of personal consumer data, not ISPs."[218]  Even Title II proponents warn of the

"gatekeeper" power of dominant tech platforms,[219] implicitly recognizing that the *NPRM*'s

exclusive focus on broadband providers is problematic.  And the FTC notably has grown more

concerned with "the practices of Cloud Computing Providers and their impact on end users,

customers, companies, and other businesses across the economy," and has opened an investigation

into those providers' "market power, business practices affecting competition, and potential

security risks."[220]  All of these considerations underscore the substantial hurdles the Commission

would face in attempting to defend the *NPRM*'s proposed regulatory approach under the APA.

To be clear, as explained in the opening round, NCTA is not suggesting that the

Commission *should* impose net neutrality-type regulations on dominant tech platforms, cloud

providers, CDNs, or other entities.[221]  Instead, the Commission's failure to provide a cogent

explanation for singling out ISPs for Open Internet mandates undermines the agency's stated

---

[217] USTelecom Comments at 50-53; *see also, e.g.*, CTIA Comments at 19-21; FSF Comments at 29-30, 44-45; FreedomWorks Comments at 2; International Center for Law & Economics Comments at 7.

[218] FSF Comments at 44-45.

[219] *See, e.g.*, Consumer Federation of America Comments at 32; Comments of Home Telephone Company, Inc., WC Docket No. 23-320, at 17 (filed Dec. 14, 2023).

[220] *Solicitation for Public Comments on the Business Practices of Cloud Computing Providers*, Fed. Trade Comm'n (Mar. 22, 2023), https://www.ftc.gov/policy/studies/submit-comment-cloud-computing-request-information.

[221] *See* NCTA Comments at 59.

regulatory goals. Notably, the rationale for excluding these entities *cannot* be that the Commission lacks jurisdiction over them and yet retains jurisdiction over ISPs. NCTA has shown that large platform providers, cloud providers, and other entities in the Internet ecosystem frequently make use of their own broadband transmission facilities to deliver Internet content, and thus that any assertion of jurisdiction over ISPs would extend to such entities as well.[222] And even if the Commission nevertheless were to conclude that it lacks jurisdiction over these entities, it would need to explain why it is not proposing to coordinate with the FTC to address the transparency, openness, and other concerns raised with respect to these entities. In all events, as noted in NCTA's opening comments, "[i]f there are doubts as to the Commission's jurisdiction over such entities, that provides yet another key reason to defer to Congress so it can devise a more comprehensive framework for the Internet ecosystem."[223]

## III. ANY FEDERAL OPEN INTERNET FRAMEWORK SHOULD REFLECT CERTAIN KEY PRINCIPLES

If the Commission were to adopt Open Internet rules notwithstanding the legal and policy impediments noted above and in NCTA's initial comments, it should (1) provide exceptions for reasonable network management; (2) permit usage-based billing and zero-rating; (3) refrain from extending those rules to non-BIAS data services or Internet interconnection and traffic exchange arrangements; (4) avoid drawing unwarranted distinctions between broadband technologies; (5) forbear from all Title II provisions that would authorize the Commission to regulate rates and mandate unbundling, as well as from other onerous Title II requirements including Sections 214,

---

[222] *See* Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 21-25 (filed July 17, 2017).

[223] NCTA Comments at 6.

222, and 254(d); and (6) ensure the primacy of federal regulation and national uniformity by making clear that any new requirements constitute a ceiling, not merely a floor.

### A. Any Open Internet Mandates Should Include Exceptions for Reasonable Network Management

If the Commission adopts bright-line conduct rules in spite of the overwhelming legal risks and policy harms associated with its proposed reliance on Title II, those rules should be carefully tailored to ensure that ISPs can continue to provide quality broadband service to users, including those with unique network needs. In the 2010 and 2014-15 rulemakings, the Commission incorporated into its Open Internet mandates an exception for reasonable network management. Any new rules that the Commission adopts should afford ISPs and their subscribers at least the same amount of flexibility.

In the *2010 Order*, the Commission "permitted exceptions for 'reasonable network management' practices to the no-blocking and no unreasonable discrimination rules."[224] And in the *2015 Order*, it retained a "reasonable network management" exception to the "no-blocking, no-throttling rule, and the no-unreasonable interference/disadvantage standard."[225] These exceptions, the Commission explained, were "necessary for broadband providers to optimize overall network performance and maintain a consistent quality experience for consumers while carrying a variety of traffic over their networks."[226] The availability of such exceptions to any Open Internet conduct rules remains essential today. It is particularly important to ensure that ISPs

---

[224] *2015 Order* ¶ 214; *see also 2010 Order* ¶¶ 80-92.

[225] *2015 Order* ¶ 215.

[226] *Id.*

**App. 1395**

retain the flexibility to detect and deter the flow of malicious and unlawful traffic and the use of malicious and unlawful devices on their networks, as NCTA explained in its opening comments.[227]

This includes addressing the threat of malicious and unlawful traffic from unsecured or compromised devices. Today, a significant threat to safe and secure broadband access is the constant flow of malicious and unlawful traffic over the Internet, facilitated by the exponential growth in the use of connected devices with weak or non-existent security.[228] As the Commission recently explained in its Notice of Proposed Rulemaking to establish a voluntary cybersecurity labeling program for smart devices, "[t]he proliferation of consumer IoT devices has opened the door to cyberattacks on consumer products that can have serious privacy and national security consequences, ranging from theft of personal information to disruption of critical infrastructure."[229] Cyberattacks can also result in the theft of confidential customer data, which the Commission recently found could impose myriad harms on subscribers including "financial

---

[227] *See* NCTA Comments at 76 n.260.

[228] As Commissioner Starks has noted, "every minute, bad actors—at times backed by nation states, including Russia and China—probe our broadband networks for weakness and launch potentially crippling cyberattacks." *NPRM*, Statement of Commissioner Geoffrey Starks, at 2.

[229] *Cybersecurity Labeling for Internet of Things*, PS Docket No. 23-239, Notice of Proposed Rulemaking, FCC 23-65 ¶ 4 (rel. Aug. 10, 2023) ("*Cybersecurity Labeling NPRM*"). CISA has reported that Russian cyber actors are exploiting large numbers of small office home office ("SOHO")/residential routers worldwide to enable espionage and intellectual property theft. CISA, "Russian State-Sponsored Cyber Actors Targeting Network Infrastructure Devices," Alert Code TA18-106A (Apr. 20, 2018), https://www.cisa.gov/news-events/alerts/2018/04/16/russian-state-sponsored-cyber-actors-targeting-network-infrastructure ("CISA 2018 Alert"). More recently, CISA warned that "[m]alicious cyber actors continue to exploit default passwords" on Internet-exposed systems, and "[y]ears of evidence has demonstrated that relying upon thousands of customers to change their passwords is insufficient." CISA, "Secure by Design Alert: How Manufacturers Can Protect Customers by Eliminating Default Passwords" (Dec. 15, 2023), https://www.cisa.gov/sites/default/files/2023-12/SbD-Alert-How-Software-Manufacturers-Can-Protect-Customers-by-Eliminating-Default-Passwords-508c_0.pdf. While the CISA Alert specifically mentions the threat to operational technology (OT) products, the Alert goes further to "urge every technology manufacturer to eliminate default passwords in the design, release, and update of all products." *Id.*

57

**App. 1396**

harm, . . . identity theft, theft of services, potential for blackmail, [and] the disclosure of private facts."[230]  Malicious and unlawful traffic can take any number of forms: from botnets hijacking network devices to carry out cyberattacks and other criminal schemes; to DDoS attacks on network elements and key Internet infrastructure; to malware designed to flood consumers' inboxes with spam, defraud advertisers on a massive scale through "click fraud" and ransomware, hack into consumers' accounts and steal their sensitive personal information, or even engage in surveillance of critical infrastructure.[231]

ISPs need flexibility to manage their networks and the devices attached to them to prevent these types of harm to their networks and their subscribers.  Other commenters explain that the Commission should avoid adopting "a narrowly defined reasonable network management exception that would expose operators' security practices to constant enforcement scrutiny."[232] NCTA agrees that it would be ill-advised for the Commission to adopt a narrow view of what constitutes reasonable management to deter and address cyberthreats and other malicious traffic.

Broadband providers have powerful incentives to identify and prevent the transmission of malicious and unlawful traffic on their networks and the devices connected to them.  First and foremost, they want to ensure that their subscribers can enjoy the safe and secure online experience

---

[230] *2023 Data Breach Order* ¶ 55.

[231] Indeed, it is estimated that there were more than 1.5 billion attacks against IoT devices in just the first six months of 2021, and it is anticipated that there will be more than 25 billion IoT devices in use by 2030.  *See Cybersecurity Labeling NPRM* ¶¶ 1, 4.

[232] CTIA Comments at 101; *see also* WISPA Comments at 48 (proposing to define "reasonable network management" to include "responding proactively . . . to address cybercrime (e.g., malware, distributed denial-of-service attacks)"); Comments of WTA – Advocates for Rural Broadband, WC Docket No. 23-320, at 1 (filed Dec. 14, 2023) (emphasizing that rural broadband providers will continue to need flexibility "to block cyberattacks, robocalls and similar unlawful traffic to protect their networks and customers"); *cf.* AT&T Comments at 11, 18 (highlighting the steps AT&T has taken to "address the vast majority of cyberattacks" it faces "automatically through the sophisticated tools that it has deployed").

they expect. Those incentives are heightened by the fact that ISPs bear the risks of cyberattacks directly, as IoT botnets and other forms of malware attack ISPs' network infrastructure. As the entities that connect end users to the Internet, ISPs are also well-positioned to implement cost-effective measures to detect and deter malicious and unlawful traffic. On routers that they provision to end users, ISPs can detect malicious traffic originating from compromised devices at the router-level and block that malicious traffic before it reaches the broader Internet ecosystem.[233] The Commission should make clear that "reasonable network management" encompasses ISP efforts to address malicious and unlawful traffic throughout their networks, whether that traffic enters through end-user routers and modems or middle-mile facilities.[234]

By clarifying that "reasonable network management" encompasses policies to detect and deter malicious and unlawful traffic, including by addressing the threats from unsecured or compromised devices, the Commission can empower ISPs to prevent serious harms to mass-market consumers and advance the Commission's cybersecurity goals. Empowering ISPs to adopt and implement reasonable policies to detect and deter malicious and unlawful traffic is fully

---

[233] For instance, the routers that Charter provisions have pre-set security settings that undergo regular software updates to ensure that each device is up to date and well-protected. Charter's newest Advanced Home Wi-Fi routers also include enhanced administrative security settings that enable customers to manage their home network with a unique credential rather than a traditional default administrative password. Charter's Spectrum Security Shield, installed on its Advanced Wi-Fi routers, protects customers from inadvertently visiting harmful websites, prevents known bad-actor IP addresses from connecting to customers' home devices, monitors for unusual connection activity, and isolates compromised in-home devices so they cannot participate in DDoS attacks.

[234] Such efforts are critical given the fact that, as CISA has observed, "few network devices—especially SOHO and residential-class routers—run antivirus, integrity-maintenance, and other security tools that help protect general purpose hosts." CISA 2018 Alert. In describing the risks of such equipment, CISA also noted that "[m]anufacturers build and distribute these network devices with exploitable services, which are enabled for ease of installation, operation, and maintenance. Owners and operators of network devices do not change vendor default settings, harden them for operations, or perform regular patching." *Id.*

**App. 1398**

consistent with Commission precedent regarding reasonable network management and the recognition that the benefits of net neutrality are available solely for "lawful" traffic.[235]

### B.  Any Open Internet Framework Should Continue To Permit Usage-Based Billing and Zero-Rating

The Commission also has appropriately refrained from imposing any categorical restrictions on usage-based billing options, which "enhance[] end-user control by charging customers based on the data they actually use, without interfering with the consumer's ability to reach the Internet content of his or her choice."[236]  That policy should continue.  The Commission correctly concluded in the *2010 Order* that "prohibiting tiered or usage-based pricing and requiring all subscribers to pay the same amount for broadband service, regardless of the performance or usage of the service, would force lighter end users of the network to subsidize heavier end users."[237]  Any bans on usage-based billing would be particularly harmful to consumers who are light Internet users, and who therefore would suffer disproportionately from any price increases associated with such subsidization.[238]  Moreover, in declining renewed proposals for a flat ban on

---

[235] *See, e.g.*, *2010 Order* ¶ 80 (recognizing that "a flourishing and open Internet requires robust, well-functioning broadband networks"); *id.* ¶ 92 (finding that broadband providers must have "flexibility to experiment, innovate, and reasonably manage their networks" because the Commission does not "presume to know now everything that providers may need to do to provide robust, safe, and secure Internet access to their subscribers, much less everything they may need to do as technologies and usage patterns change in the future"); *see also Preserving the Open Internet*, Notice of Proposed Rulemaking, 24 FCC Rcd. 13064 ¶ 140 (2009).

[236] *See* Daniel A. Lyons, *Innovations in Mobile Broadband Pricing*, 92 Denver Univ. L. Rev. 453, 466 (2015).

[237] *See 2010 Order* ¶ 72.

[238] *See* Geoffrey Manne & Ian Adams, "In Defense of Usage-Based Billing," Truth on the Market (July 13, 2020), https://truthonthemarket.com/2020/07/13/in-defense-of-usage-based-billing/.

usage-based billing in 2015, the Commission appropriately observed that the practice "may benefit consumers by offering them more choices over a greater range of service options."[239]

A handful of commenters urge the Commission to reverse these prior determinations and to proscribe certain forms of usage-based billing, with some commenters (such as Prof. Scott Jordan) even suggesting (erroneously) that the usage-based billing practices of fixed ISPs are somehow inherently unreasonable.[240] These arguments fail for a number of reasons. For one thing, any Commission ruling that limits an ISP's ability to engage in usage-based billing would constitute rate regulation of broadband services. There is no question that regulatory restrictions on usage-based billing—whether through outright prohibitions, *ex ante* determinations that certain pricing models for usage-based billing are unreasonable, or case-by-case enforcement action against a particular ISP's usage-based billing model—would contravene the Commission's proposed "forbear[ance] from all provisions of Title II that would permit Commission regulation of BIAS rates,"[241] as well as the Chairwoman's and Commissioners' unanimous commitments to not engage in rate regulation of broadband service.[242]

These claims also overlook that usage-based billing is a well-accepted pricing model used for communications services and for the sale of most other categories of goods and services, like food and gasoline. Such consumption-based pricing equitably and efficiently ensures that consumers who use goods or services the most pay more, without having to raise prices for all

---

[239] *2015 Order* ¶ 153.

[240] *See, e.g.*, Comments of Scott Jordan, WC Docket No. 23-320, at 32-38 (filed Dec. 14, 2023) ("Jordan Comments"); Public Knowledge Comments at 8 (alleging that ISPs' application of data allowances amounted to "price gouging").

[241] *NPRM* ¶ 105.

[242] *See, e.g.*, *2023 Rosenworcel Speech* at 5 ("They say [the *NPRM*] is a stalking horse for rate regulation. Nope. No how, no way. We know competition is the best way to bring down rates for consumers.").

consumers across the board. Indeed, the notion that requiring very heavy users of a service to pay more than light users is grounded in longstanding notions of proportionality and fairness,[243] and cannot credibly be described as pernicious.[244] It would be irrational in the extreme to prohibit some or all ISPs from engaging in usage-based billing—and thereby reduce consumer choice and drive up the baseline prices that all users pay—in the absence of any plausible harm to competition, Internet openness, or access to broadband caused by such practices. Prof. Jordan's claims regarding usage-based billing by fixed ISPs also suffer from various other flaws, including his reliance on woefully outdated information about industry practices and available service plans (drawn primarily from a paper he wrote *seven years ago containing data well over a decade old*),[245] and his erroneous assumption that the marginal cost pricing he proposes for usage-based billing

---

[243] *See, e.g.*, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Third Order on Reconsideration and Further Notice of Proposed Rulemaking, 12 FCC Rcd. 12460 ¶ 30 (1997) ("[T]raditionally, shared facilities are priced on a usage-sensitive basis . . . . We believe that this usage-sensitive pricing mechanism provides a reasonable and fair allocation of cost between the users of shared transport facilities."); *WATS-Related and Other Amendments of Part 96 of the Commission's Rules*, Notice of Proposed Rulemaking, 1986 FCC LEXIS 4188 ¶ 18 (1986) ("[I]t seems reasonable to impose proportionately more costs on those who make use of traffic-sensitive exchange facilities, such as common transport and end-office switching, during peak periods, since it is peak-period usage that causes exchange carriers to make additional investment in such facilities."); *MTS and WATS Market Structure*, Fourth Supplemental Notice of Inquiry and Proposed Rulemaking, 90 F.C.C.2d 135 ¶ 60 (1982) ("Whichever system of allocating non-traffic sensitive plant is selected, it seems reasonable to expect interexchange carriers to compensate exchange carriers for traffic sensitive costs on a traffic sensitive basis.").

[244] Title II advocates have recognized in the past that connecting usage levels to prices can help mitigate subsidization of the small percentage of subscribers representing the heaviest data users. *See, e.g.*, Gigi Sohn, *Time Warner Steps Up to the Plate on Bandwidth Usage: Updated*, Public Knowledge (Jan. 17, 2008), https://publicknowledge.org/time-warner-steps-up-to-the-plate-on-bandwidth-usage-updated/.

[245] *See* Jordan Comments at 32-38 (relying almost exclusively on Scott Jordan, *A Critical Survey of the Literature on Broadband Data Caps*, Telecomm. Policy, vol. 41, issue 9 (Oct. 2017)).

**App. 1401**

makes sense in an industry with large fixed costs.[246]  And given the robust and growing competition in the marketplace, including between and among wireline and wireless ISPs, it would be particularly irrational to put a thumb on the scale by adopting different usage-based billing rules or presumptions for different types of ISPs.

The Commission also should reject calls from some commenters to prohibit zero-rating practices.[247]  In 2015, the Commission declined to ban zero-rating outright and observed that "new [zero-rated] service offerings, depending on how they are structured, could benefit consumers and competition."[248]  The Commission also pointed to record evidence showing that "these business models increase choice and lower costs for consumers," and that such arrangements "also support continued investment in broadband infrastructure and promote the virtuous cycle."[249]  These findings are no less true today, as various parties confirm.[250]  Moreover, as is the case with usage-based billing, any Commission ruling that curtails zero-rating practices would "necessarily

---

[246] *Id.* at 36-38 (claiming that "[t]he purpose of a data cap is to recover costs associated with heavy usage if and only if the overage charge is related to the cost that a broadband provider incurs for the capacity required to carry the incremental traffic over the data cap").

[247] *Cf.* Public Knowledge Comments at 76-82; Comments of the Digital Inclusion Alliance of San Antonio, WC Docket No. 23-320, at 2 (filed Dec. 13, 2023); EFF Comments at 15-16; WGA Comments at 7-8.  Notably, some of these commenters use "zero-rating" in a manner that goes well beyond the Commission's traditional understanding of the term, to describe practices that have nothing to do with the delivery of Internet content—including when describing Comcast's treatment of Stream TV transmissions.  *See, e.g.*, WGA Comments at 5; EFF Comments at 7.  As Comcast made clear when Stream TV was available, "Stream TV is not an online or over-the-top ('OTT') video service delivered over the Internet; rather, it is a Title VI *cable* service that, just like all of Comcast's other cable services, is delivered to customers' homes over Comcast's private, managed network over Comcast's cable systems, and is subject to and abides by all the regulatory requirements that apply to other Title VI cable services."  Opposition of Comcast Corp., MB Docket No. 10-56, GN Docket No. 14-28, at 1 (filed Mar. 14, 2016).

[248] *2015 Order* ¶ 152.

[249] *Id.* ¶ 151.

[250] *See, e.g.*, CTIA Comments at 102-03; Westling Comments at 4-5; Furchtgott-Roth/Arner Comments at 8-9; FSF Comments at 54-56, 59-60.

**App. 1402**

constitute[] rate regulation"—and thus would run afoul of Chairwoman Rosenworcel's no-rate-regulation pledge and the *NPRM*'s proposed forbearance from any form of rate regulation—because it would prevent ISPs from applying "a rate charge of $0" to certain data "when a subscriber's usage exceeds his or her monthly data allotments."[251]  The Commission should refrain from seeking to micromanage ISPs' service offerings in this manner.

### C.    Any Open Internet Rules Should Not Extend to Non-BIAS Data Services or to Internet Interconnection and Traffic Exchange

Consistent with the Commission's past practice, any bright-line rules that the Commission might adopt should not extend to non-BIAS data services.  In the *2015 Order*, the Commission explained that "treating non-BIAS data services differently than broadband Internet access service . . . will continue to drive additional investment in broadband networks and provide end users with valued services without otherwise constraining innovation."[252]  This approach is even more imperative today, as the kinds of bandwidth-intensive devices and applications that may benefit from non-BIAS data services, such as individually negotiated, dedicated, or otherwise-tailored offerings, play an increasingly important role in keeping Americans connected.  For example, countless Americans have relied on connected care devices, such as heart rate monitors, to continue accessing important medical care during the COVID-19 pandemic.[253]  Moreover, services that "provide schools with curriculum-approved applications and content" have proven indispensable to the millions of students and teachers that relied on remote learning.[254]  Although such devices

---

[251] FSF Comments at 46-47; *see also* CTIA Comments at 101-03.

[252] *2015 Order* ¶ 211.

[253] *See id.* ¶ 208 (explaining that "connectivity bundled with . . . heart monitors . . . would . . . be considered other data services to the extent . . . provided by broadband providers over last-mile capacity shared with broadband Internet access service").

[254] *Id.*

**App. 1403**

and applications often use, or are provided over, the public Internet, it is critical that the Commission allow the marketplace to evolve if these or similar bandwidth-intensive offerings require quality-of-service guarantees or if other factors militate in favor of offering separate, non-BIAS data services. The Commission thus can and should simply define non-BIAS data services as any broadband-enabled offerings *other than BIAS*. And in keeping with its longstanding approach, the Commission should reject calls to establish new mechanisms for heavily scrutinizing non-BIAS data services[255]—particularly given the complete absence of any evidence of harm stemming from such services.

Additionally, any federal Open Internet regime should not apply to the dynamic and thriving marketplace for Internet interconnection and traffic exchange. As the *NPRM* observes, "the best approach with respect to Internet traffic exchange is to 'watch, learn, and act as required' but to not intervene with prescriptive rules."[256] For most of the Internet's existence, peering and other traffic-exchange agreements for Internet traffic were never subject to industry-specific regulation—and the marketplace functioned exceedingly well, marked by dramatically declining prices, an explosion in new and innovative services and apps, and the absence of any threat to competition or consumer welfare.[257] The *2015 Order*'s decision to apply Title II oversight to negotiations for Internet interconnection and traffic exchange, and to allow complaints *only* by entities negotiating with ISPs and not by ISPs themselves, significantly distorted this well-functioning marketplace.[258] When the Commission returned to its pre-2015 approach in 2018 by

---

[255] *See* Public Knowledge Comments at 67-72.

[256] *NPRM* ¶ 187.

[257] *See 2018 Order* ¶¶ 163-73; *see also, e.g.*, Ev Ehrlich, Progressive Policy Inst., *A Brief History of Internet Regulation* at 13 (Mar. 2014), http://www.progressivepolicy.org/wp-content/uploads/2014/03/2014.03-Ehrlich_A-Brief-History-of-Internet-Regulation1.pdf.

[258] *See 2015 Order* ¶¶ 194-206.

**App. 1404**

"freeing Internet traffic exchange arrangements from burdensome government regulation" and "allowing market forces to discipline this emerging and competitive market," it correctly observed that there is "no evidence" of anticompetitive conduct by ISPs and that "competitive pressures in the market for Internet traffic exchange mitigate the risk" of any such conduct in the future.[259]

A few commenters urge the Commission to return to the 2015 approach and subject ISPs to the threat of complaints in the Internet interconnection context—resurrecting worn-out claims that ISPs have a "terminating access monopoly" that they abuse by extracting anticompetitive "tolls" from edge providers and transit providers.[260]  But the Commission has dispelled this notion,[261] and even fervent Title II supporters are compelled to admit that there is no evidence of any harmful conduct in today's interconnection marketplace.[262]  As the Israel/Keating/Shampine Declaration confirms, "[g]iven burgeoning consumer choice and the precipitous decline in interconnection pricing, it is clear that no terminating access monopoly exists in the broadband marketplace"—nor is there any "evidence of market failure" that could conceivably warrant regulatory oversight of ISPs' interconnection practices.[263]  Rather, the "many routes into and out of any broadband ISP's network" ensure that "application and content providers need not even

---

[259] *2018 Order* ¶¶ 168, 170.

[260] *See, e.g.*, INCOMPAS Comments at 38-46; Lumen Comments at 5-25; Public Knowledge Comments at 60-61, 82-87; Jordan/Nikkhah Comments at 4-9; New America/OTI Comments at 9-10.

[261] *See 2018 Order* ¶¶ 135-136.

[262] *See, e.g.*, Free Press Comments at 68-69 ("Our current sense is that the interconnection markets are functioning well.").

[263] Israel/Keating/Shampine Declaration ¶ 57; *see also* Dr. Michael Kende et al., Analysis Mason, Evolution of the Internet in the U.S. Since 2015, at 28, attached as Exh. A to USTelecom Comments (filed Dec. 14, 2023) ("Kende Report") (explaining that there is "no evidence that any provider has acted as a gatekeeper, to force any interconnection conditions that require regulation to avoid or undo").

**App. 1405**

deal with an ISP directly to reach the ISP's end users," and instead can "choose transit services offered by one or more of the ISP's peers (and, for many ISPs, the ISP's own transit providers)," not to mention CDN services and other options for conveying content to an ISP's end users.[264]

The mere fact that some interconnection agreements involve payment in one direction or the other certainly does not warrant regulatory intervention. As the Commission is well aware, paid interconnection arrangements have been around for decades[265] and are the efficient result of commercial negotiations in scenarios where the exchange of traffic or economic value is significantly out of balance—in either direction.[266] While Prof. Jordan and graduate student Ali Nikkhah proffer an economic "model" that they claim supports taking the unprecedented step of restricting paid interconnection,[267] their model relies heavily on incorrect assumptions, including the notion that all ISPs are monopolists[268]—an analytical shortcut that is inconsistent with clear marketplace evidence, as Compass Lexecon and others have shown, and that wholly undermines the validity of their conclusions. Moreover, limiting paid interconnection by ISPs would increase ISPs' costs and in turn impose upward pressure on retail broadband rates, in exchange for reducing

---

[264] USTelecom Comments at 93.

[265] *See, e.g.*, *2010 Order* ¶ 67 n.209 (acknowledging the existence of paid interconnection arrangements and making clear that the Commission did "not intend [its] rules to affect existing arrangements for network interconnection, including existing paid peering arrangements").

[266] *See* Kende Report at 6, 9 (noting the prevalence of commercially negotiated "paid peering" arrangements where "traffic flows between the parties are substantially asymmetric"); *see also* Stanley M. Besen & Mark A. Israel, *The Evolution of Internet Interconnection from Hierarchy to "Mesh": Implications for Government Regulation* 26 (July 11, 2012), https://ssrn.com/abstract=2104323 ("In some cases, a CDN can even send traffic over the ISP's own paid transit connections, in which case the ISP pays for the traffic.").

[267] *See* Jordan/Nikkhah Comments at 4 (citing Ali Nikkhah & Scott Jordan, *A Two-Sided Model of Paid Peering*, Telecomm. Policy, vol. 46, issue 8 (Sept. 2022) ("2022 Jordan/Nikkhah Paper")).

[268] *See* 2022 Jordan/Nikkhah Paper at 8 (stating that they "model a single monopoly ISP" in analyzing paid interconnection).

**App. 1406**

interconnection-related costs for large online platforms and other entities—an outcome that bears no rational connection to any legitimate public interest goal. It also goes without saying that proposals to prohibit or restrict paid interconnection arrangements run counter to Chairwoman Rosenworcel's no-rate-regulation pledge. Accordingly, if the Commission adopts new conduct rules, it should maintain its hands-off approach to the Internet interconnection and traffic exchange marketplace.

## D. Any Open Internet Regime Should Avoid Drawing Unwarranted Distinctions Among Broadband Technologies

Any federal framework also should apply consistently to all ISPs and should avoid distorting the marketplace by subjecting fixed wireline, fixed wireless, mobile wireless, and/or other broadband service technologies to different rules and/or carve-outs.[269] Although the *2010 Order* distinguished between fixed and mobile broadband services and adopted different rules for each,[270] the Commission appropriately recognized in the *2015 Order* that such distinctions are untenable given the state of the broadband marketplace.[271] Consistent with the Commission's 2015 recognition that there is no justifiable rationale for regulating similarly situated providers differently, any federal framework should ensure that any Open Internet mandates apply on a competitively and technologically neutral basis going forward.

The rationale that compelled the Commission to impose the same rules to fixed and mobile service providers in the *2015 Order*—that "mobile broadband networks [were] faster, more

---

[269] *See NPRM* ¶¶ 60-61.

[270] *See 2010 Order* ¶¶ 94-96.

[271] *See 2015 Order* ¶¶ 86-88 ("Today, we find that changes in the mobile broadband marketplace warrant a revised approach. . . . We conclude that it would benefit the millions of consumers who access the Internet on mobile devices to apply the same set of Internet openness protections to both fixed and mobile networks.").

broadly deployed, more widely used, and more technologically advanced [in 2015] than they were in 2010"[272]—unquestionably holds true today and with even greater force. Indeed, with the burgeoning deployment of 5G networks, the accelerating convergence of wireline and wireless broadband services leaves no doubt that divergent requirements for such offerings would distort competition and undermine the public interest.

Based on these parity-related principles, the Commission should refrain from recognizing special carve-outs for particular broadband technologies—such as a blanket determination that 5G "network slicing" will be treated as a non-BIAS data service or that network slicing within a BIAS service constitutes reasonable network management. Network slicing "involves creating customized, software-defined, virtual networks—or 'slices'—that are each logically separated and individually optimized to meet the specific needs of each application."[273] Network slicing should not be used to provision a BIAS offering or to transmit services, applications, or content consumers access utilizing a BIAS service in a manner that circumvents the proposed Open Internet rules. The record indicates that optimization enabled through network slicing would enable a wireless provider to "establish separate slices for mobile broadband and fixed wireless traffic,"[274] which would fall within the consumer-facing, mass-market broadband services that would be subject to any future Open Internet rules. Accordingly, it would be inappropriate for the Commission to issue a blanket determination that *every* use of network slicing automatically triggers the carve-out for non-BIAS data services, given that a 5G wireless provider may well use slices in its network to provision one or more BIAS offerings or to transmit services, applications, or content accessed

---

[272] *2015 Order* ¶ 88.

[273] T-Mobile Comments at 5.

[274] *Id.* at 9

**App. 1408**

by consumers utilizing such wireless provider's BIAS service. Rather than making broad declarations that any use of network slicing represents "reasonable network management," the Commission instead should consider that issue on a case-by-case basis, as it does with other ISPs' network management practices, on a competitively and technologically neutral basis.

It would be particularly irrational—and legally indefensible—to draw distinctions in the Commission's rules or exceptions between fixed wireline and fixed wireless providers, given the pervasive and growing head-to-head competition between such types of providers today.[275] While the Commission previously found that application of the reasonable network management exception may take account of "the additional challenges involved in *mobile* broadband network management" to "accommodat[e] mobility" and address "the changing location of users" in the mobile context,[276] this rationale is inapplicable to fixed wireless broadband.[277] Accordingly, to ensure full and fair competition between wireline and wireless broadband providers, the Commission should make clear that any prohibition or restriction on blocking, throttling, or paid prioritization of particular content, applications, or services, or classes of content, applications, or services, in the new rules applies equally and uniformly to fixed wireline and fixed wireless services, and any reasonable network management or other exception is not applied more flexibly for one service than the other.

---

[275] *See supra* at 39-40; *see also, e.g.*, Israel/Keating/Shampine Declaration ¶¶ 25-35.

[276] *2015 Order* ¶ 223 (emphasis added).

[277] *See id.* ¶ 223 n.576 (citing AT&T's assertion that the "unique challenges presented by mobile users and the unpredictable demands placed on mobile networks due to the inherent mobility of their users require a robust set of tools that can be used to mitigate the impact of potential congestion on consumers' experience with a network"); *id.* ¶ 223 n.578 (citing CTIA's assertion that "as channel conditions degrade (such as when a mobile user moves toward the periphery of a cell site) '[e]ven to preserve a given data rate, the user may need 36 times more radio resources'").

**App. 1409**

### E. The Commission Should Mitigate the Harms of Reclassification by Granting Broad Forbearance from Title II's Requirements and Restrictions

As NCTA explained in its opening comments,[278] most of Title II's requirements and restrictions were intended for legacy monopoly telephone companies and services and plainly are unsuitable for today's broadband marketplace. The resultant harms cannot be fully addressed through forbearance because the measures the Commission would leave in place would inflict significant damage, and the Commission could seek to reimpose any requirement or restriction from which it previously forbore at any time, thereby limiting ISPs' ability to meaningfully rely on such relief. Nevertheless, if the Commission reclassifies broadband as a telecommunications service, it should seek to mitigate the harms that reclassification inevitably would entail by granting broad forbearance from Title II of the Act, including all provisions in Title II that would permit the Commission to regulate broadband rates and impose unbundling requirements on ISPs, as well as other burdensome and ill-fitting provisions including Sections 214, 222, and 254(d).

In particular, if the Commission is to make good on the *NPRM*'s disavowal of any form of rate regulation, it is not enough merely to assert in the abstract that the Commission is "forbear[ing] from applying [S]ections 201 and 202 to BIAS insofar as they would support adoption of rate regulations for BIAS."[279] The Commission must forbear from specific statutory language in those provisions—most notably Section 201(b)'s directive that all "charges" be "just and reasonable,"[280] and Section 202(a)'s provision addressing "unjust or unreasonable discrimination in charges."[281] Failing to do so would leave statutory language in place enabling the Commission to engage in the

---

[278] *See* NCTA Comments at 94-98.

[279] *NPRM* ¶ 105.

[280] 47 U.S.C. § 201(b).

[281] *Id.* § 202(a).

71

very kind of rate regulation that the *NPRM* has explicitly disclaimed.[282]  For the same reason, the Commission must do more than generally pledge not to impose unbundling requirements on ISPs and instead should forbear specifically from the unbundling mandates in Section 251(c)[283]—on top of the other provisions in Section 251 from which the Commission appropriately forbore in the *2015 Order*.[284]

The Commission's proposals to subject broadband providers to burdensome entry and exit regulation under Section 214 and impose sector-specific privacy regulations under Section 222 are just as problematic.  The *NPRM*'s proposal not to forbear from applying Section 214 to ISPs—a marked departure from, and expansion of, the *2015 Order*—is squarely at odds with the goals of "permissionless innovation," as it would enable the Commission to impose unfunded buildout mandates on ISPs, or to compel ISPs to seek approval before launching a new service, engaging in transfer-of-control or assignment transactions, or even discontinuing an outdated service.[285]  And the proposal not to forbear from Section 222 would provide the Commission with authority to regulate the privacy practices of broadband providers (and *only* broadband providers), notwithstanding Congress's rejection of such sector-specific regulation in its 2017 CRA

---

[282] *See supra* notes 241-242.  For the avoidance of doubt, in forbearing from rate regulation, the Commission should specify that "rate" means the amount charged by, or the pricing methodology of, a broadband provider for the delivery of broadband Internet traffic, including but not limited to the monthly or other base price, data use charge, promotional discount, or any other fee or charge.  The Commission also should specify that "regulation" means, with respect to a rate, the use by the Commission of rulemaking, adjudication, or enforcement authority to establish, declare, or review the reasonableness or lawfulness of such rate, whether by prescribing such rate in advance or by adjudicating on a case-by-case basis, and whether for retail or wholesale service.

[283] *See* 47 U.S.C. § 251(c); *see also* NCTA Comments at 96-97.

[284] *See 2015 Order* ¶¶ 513-14.

[285] *See* NCTA Comments at 22, 94-95.

Resolution.[286]  To avoid inflicting such harms on ISPs and flouting congressional directives, the Commission must forbear from Sections 214 and 222 of the Act if it reclassifies broadband as a telecommunications service under Title II.

As discussed above, the Commission also should reject some commenters' calls to decline to forbear from Section 254(d) of the Act and thereby add broadband revenues to the USF contribution base immediately following Title II reclassification.[287]  Even some Title II proponents like Free Press warn that "expanding the USF contribution burden to BIAS could result in a massive . . . wealth transfer from consumers," a "shift" that "would . . . be regressive, overburdening low-income consumers that are more sensitive to price increases than business or other consumers."[288]  "This potential major upheaval . . . is why it is imperative for the Commission to forbear from 'immediately requir[ing] new universal service contributions associated with' BIAS" if it reclassifies broadband as a telecommunications service under Title II.[289]

**F.      The Commission Should Ensure Uniformity by Making Clear That Any New Rules Will Serve as a Ceiling, Not Merely as a Floor**

Finally, if the Commission decides to adopt rules, it should heed Chairwoman Rosenworcel's call for a "uniform legal framework [that] applies to the whole country."[290]  As NCTA and a number of other commenters explain, it is well-settled and a matter of longstanding bipartisan consensus that broadband is a jurisdictionally interstate service that should be subject to

---

[286] *See id.* at 96.

[287] *See supra* at 33-34.

[288] *See* Free Press Comments at 66-67.

[289] *Id.* at 67.

[290] *NPRM*, Statement of Chairwoman Jessica Rosenworcel, at 2.

**App. 1412**

predominantly federal oversight.[291]  The Commission historically has refrained from preempting generally applicable state laws—such as prohibitions against fraud—"so long as the administration of such general state laws does not interfere with federal regulatory objectives."[292]  And it likewise has acknowledged that states validly exercise certain "functions expressly reserved to them under the Act," such as responsibility for designating eligible telecommunications carriers; jurisdiction over poles, ducts, conduits, and rights-of-way where reverse preemption has been invoked under Section 224(c); and authority to establish state universal service policies consistent with Section 254 and the Commission's rules.[293]  But the Commission has also recognized that state and local

---

[291] *See* NCTA Comments at 99-102; *2015 Order* ¶ 431 ("With respect to broadband Internet access services, the Commission has previously found that, '[a]lthough . . . broadband Internet access service traffic may include an intrastate component, . . . broadband Internet access service is properly considered jurisdictionally interstate for regulatory purposes.'"); *see also, e.g.*, ACA Connects Comments at 47-48; CTIA Comments at 103-112; U.S. Chamber of Commerce Comments at 63-65; USTelecom Comments at 97-98.

[292] *2018 Order* ¶ 196; *see also 2015 Order* ¶¶ 431-33.

[293] *2018 Order* ¶ 196.  If broadband is reclassified as a telecommunications service, the Commission should reaffirm that this would not permit state or local franchising authority regulation of broadband.  47 C.F.R. § 76.43; *see 2015 Order* ¶ 433 n.1285 (clarifying that Title II classification does not justify franchise requirements for broadband).  As implemented under the Commission's "mixed-use rule," federal law bars franchising authorities from regulating common carrier or information services.  *Implementation of Section 621(a)(1) of the Cable Communications Policy Act as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Second Report and Order, 22 FCC Rcd. 19633 ¶ 17 (2007) ("*Second 621 Order*") (citing 47 U.S.C. §§ 522(7)(C)), *recon. denied*, 30 FCC Rcd. 810 ¶ 15 (2015); *Implementation of Section 621(a)(1) of the Cable Communications Policy Act as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Third Report and Order, 34 FCC Rcd. 6844 ¶¶ 72-74 (2019) (extending the *Second 621 Order*'s mixed-use rule to information services pursuant to 47 U.S.C. § 544(b)(1) and codifying the rule), *aff'd in relevant part*, *City of Eugene v. FCC*, 998 F.3d 701, 7014-16 (6th Cir. 2021); *id*. ¶ 66 (reaffirming "application of the rule to incumbent cable operators that are also common carriers") (citing *Montgomery County v. FCC*, 863 F.3d 485, 493 (6th Cir. 2017)); *see also Comcast of Oregon II, Inc. v. City of Beaverton*, 609 F. Supp. 3d 1136, 1155-56 (D. Or. 2022) (holding that the rule preempts franchising authority regulation of broadband whether classified as an information service or a telecommunications service).

governments should *not* be permitted to develop separate Open Internet rules or other measures that directly regulate the provision of broadband service.[294]

Some Title II advocates nevertheless argue that any framework the Commission establishes in this proceeding should be a "floor" rather than a ceiling, allowing states to impose significantly more burdensome regulations on broadband service, even where the Commission expressly declines to adopt such regulations.[295] While a Title II regime would inflict significant harms, a federal common-carrier framework paired with distinct state requirements layered on top would compound the damage. The Commission should see these proposals to establish a regulatory "floor" for what they are—a hedge by the most extreme proponents of regulatory intervention, who will undoubtedly encourage states to pursue whatever regulatory measures they cannot persuade this Commission to adopt.

Such advocates attempt to downplay the risks of their proposed approach by claiming that conflict preemption would continue to apply on a case-by-case basis.[296] But their cramped conception of "inconsistency" makes clear that states would have free rein. For example, while paying lip service to the notion that broadband would be governed "principally . . . by a federal framework," Public Knowledge suggests that states nevertheless should be free to "go beyond this framework" if their laws are not "inconsistent."[297] That is oxymoronic: If this Commission were

---

[294] *See 2018 Order* ¶ 194 (recognizing that "allowing state or local regulation of broadband Internet access service could impair the provision of such service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all of the different jurisdictions in which it operates"); *see also 2015 Order* ¶ 433 (noting the Commission's "firm intention to exercise [its] preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with the carefully tailored regulatory scheme" adopted by the Commission).

[295] *See, e.g.*, CPUC Comments at 8; Public Knowledge Comments at 96-103.

[296] *See, e.g.*, Public Knowledge Comments at 98.

[297] *Id.*

**App. 1414**

to reject a categorical prohibition (e.g., by refusing to ban data caps, usage-based billing, or zero rating)—rightly finding such measures overly restrictive—then any state law that "go[es] beyond" the federal framework by imposing additional restrictions in those areas necessarily would conflict with that determination.[298]  That is why the Commission determined in its *2015 Order* that states could not disturb its "carefully tailored regulatory scheme" by regulating more *or* less stringently.[299]  Any approach that treats the Commission's rules as a floor to which state or local governments could add incremental measures would inherently create "inconsistency" with federal law, and accordingly should be rejected.

## CONCLUSION

The opening comments confirm that the Commission should maintain the existing Title I regulatory framework that has been successfully applied for virtually the entirety of the Internet's existence, and that has produced tremendous results and benefits for consumers, competition, investment, and innovation.

---

[298] *See, e.g., Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) ("[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.").

[299] *2015 Order* ¶ 433; *see also id.* ¶ 432 (noting that, under Section 10(e), a "'State commission may not continue to apply or enforce any provision' from which the Commission has granted forbearance" (quoting 47 U.S.C. § 160(e)).

Respectfully submitted,

_____/s/_____

Rick C. Chessen
Steven F. Morris
Pamela S. Arluk
Robert N. Rubinovitz
NCTA – THE INTERNET & TELEVISION
   ASSOCIATION
25 Massachusetts Avenue, NW
Suite 100
Washington, DC 20001

Jerome F. Candelaria
CALIFORNIA BROADBAND & VIDEO
   ASSOCIATION
925 L Street, Suite 850
Sacramento, CA 95814

Charles Dudley
FLORIDA INTERNET & TELEVISION ASSOCIATION
246 East 6th Avenue
Tallahassee, FL 32303

Brock Patterson
INDIANA CABLE & BROADBAND ASSOCIATION
150 W. Market St., Suite 412
Indianapolis, IN 46204

Andy Blunt
MCTA – THE MISSOURI INTERNET &
   TELEVISION ASSOCIATION
P.O. Box 1895
Jefferson City, MO 65102

Anna P. Lucey
David C. Soutter
Timothy O. Wilkerson
NEW ENGLAND CONNECTIVITY AND
   TELECOMMUNICATIONS ASSOCIATION
53 State Street, Suite 525
Boston, MA 02109


January 17, 2024

Matthew A. Brill
Matthew T. Murchison
Charles S. Dameron
Michael H. Herman
Kiley S. Boland
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

_Counsel for NCTA – The Internet &
   Television Association_

Marcus W. Trathen
BROOKS, PIERCE, MCLENDON,
   HUMPHREY & LEONARD, LLP
Suite 1700, Wells Fargo Capitol Center
150 Fayetteville Street
P.O. Box 1800 (zip 27602)
Raleigh, NC 27601

_Counsel for the North Carolina Cable
   Telecommunications Association, Inc._

David Koren
OHIO CABLE TELECOMMUNICATIONS
   ASSOCIATION
33 N. 3rd Street
Columbus, OH 43215

Walt Baum
TEXAS CABLE ASSOCIATION
919 Congress Avenue, Suite 1350
Austin, TX 78701

**App. 1416**

# EXHIBIT A

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Safeguarding and Securing the Open | **)** | WC Docket No. 23-320 |
| Internet | **)** | |

## COMMENTS OF ANTHONY SCOTT

January 17, 2024

### I.   Executive Summary:

Reclassifying broadband as a Title II service would not meaningfully advance national security or cybersecurity goals and could instead undermine or slow down current and urgent cybersecurity activities that are already underway.  Due to the complexity of today's cyber challenges, reclassification would not — and cannot — address other parts of the national security and cybersecurity environment that would be required for an effective and comprehensive solution on these important issues.  Instead, imposing common carrier regulation would shift the agency's focus from collaboration and coordination to prescriptive regulation and enforcement, which in my experience is the wrong approach in the national security and cybersecurity arena.

The FCC's assertion of expanded authority also is at odds with Congress's preference for a whole-of-government approach led by agencies with more specialized national security and cybersecurity expertise, including the Cybersecurity & Infrastructure Security Agency (CISA) within the Department of Homeland Security (DHS).  It is both unnecessary and counterproductive for the FCC to pursue Title II reclassification to achieve the cited objectives.

In over 40 years as a senior IT leader in both the private and public sectors,[1] I have learned that cybersecurity work is extremely challenging when viewed from an operational perspective

---

[1] I served as Federal Chief Information Officer (CIO) for the US government under President Obama; Chief Information Officer and Senior Vice President at VMware, Inc.; Chief Information Officer and Corporate Vice President at Microsoft; Chief Information Officer and Senior Vice President at The Walt Disney Co.; Chief Technology Officer at General Motors Corp.; and Vice President of Operations at Bristol-Meyers Squibb Co.  I am currently the CEO of Intrustion, Inc., a leading provider of cybersecurity and network monitoring services.  I have been asked by NCTA – the Internet & Television Association to share my views on the NPRM's suggestion that reclassifying broadband under Title II is necessary for national security and cybersecurity reasons.  The views expressed in this submission are my own.

1

because of the complexity of hardware and software supply chains, and because evolving and constantly morphing threats come from an expanding set of threat actors whose asymmetrical capabilities far exceed those on the defensive side. In addition, the changing regulatory environment has added both cost and complexity to the work that cybersecurity professionals must manage. To be most effective in protecting national security and cybersecurity on a national scale, private sector and government cybersecurity actors must perform their work in a collaborative environment that aligns policy, governance, law enforcement, operational activities, and regulatory action in a strong and cohesive way.

From a practical perspective, government and private sector IT and security teams have to be agile and must be able to respond quickly to threats, business innovations, and national priorities. The more diffused the regulatory environment, the more difficult this task becomes from a cost, timing, and effectiveness point of view. National security and cybsersecurity considerations are sensitive and require trusted communications between companies and government; I have been part of those discussions at senior levels of government in classified and other settings. Rather than adding a separate regulatory framework, the FCC would better serve its national security and cybersecurity goals through its efforts in federal interagency cybersecurity planning, coordination, and response activities.[2]

## II. Title II Regulation Would Undercut Congress's Directives to CISA/DHS and Other Ongoing Efforts to Address Growing Cyber Threats.

After many years of confusing and fragmented responsibility for aspects of cybersecurity across many branches of government, Congress created the Cybersecurity & Infrastructure Security Agency (CISA), a full-fledged agency within DHS, as a part of the Cybersecurity and Infrastructure Security Agency Act of 2018. One of the most successful outcomes of this consolidation has been the recognition, emergence, and growth of Information Sharing and Analysis Centers (ISACs) focused on various sectors of our economy, including ISACs specifically focused on the Communications, Information Technology, and Small Broadband sectors. These ISACs both work with private sector entities and coordinate with the government on emerging threats, response, and recovery operations. In contrast, the FCC as a practical matter lacks many of the protections Congress has provided to CISA to foster information sharing, such as the Critical Infrastructure Information Act of 2002's Protected Critical Infrastructure Information (PCII) Program and the Cyber Incident Reporting for Critical Infrastructure Act of 2022 (CIRCIA), just to name a couple. The PCII Program promotes information sharing between the private sector and CISA by protecting the confidentiality of sensitive information about critical infrastructure, including through codified procedures addressing the receipt, validation, handling, storage, and use of such information.[3] CIRCIA calls for regulations that will enable covered entities to securely report cyber incidents and

---

[2] NPRM ¶ 30.

[3] *See* 6 C.F.R. Part 29; Protected Critical Infrastructure Informaiton (PCII Program), https://www.cisa.gov/resources-tools/programs/protected-critical-infrastructure-information-pcii-program.

ransomware payments to CISA, with the intent of developing more uniform, government-wide procedures.[4]  Congress did not envision FCC participation in these mechanisms and did not authorize the FCC to provide comparable protections for information by participating companies.

This ongoing collaboration between CISA and the private sector goes far beyond mass market broadband services that are the subject of the FCC's NPRM.  Mass-market services constitute only one facet of the interconnected and dynamic set of critical infrastructure entities.  CISA's collaborative work extends to and includes cooperation with managed service providers and other cybersecurity operations pertaining to critical infrastructure entities that are rightly the government's primary cybersecurity concerns.  The FCC's proposed reclassification of broadband under Title II would unnecessarily add confusion, potential conflict, and delayed response to these ongoing cybersecurity issues.

Importantly, CISA's parent agency, DHS, serves as the sector-specific agency for both the Communications Sector and the Information Technology sector, and thus can address vital cyber defense threats and issues affecting the online ecosystem in a holistic manner – in contrast to the FCC, whose authority extends only to a fraction of the entities within a highly interdependent ecosystem.  The growth of cloud computing, the shift to conducting business from remote locations and mobile devices, the increasing interconnection between third-party software service providers and their clients, the exponential proliferation of Internet of Things (IoT) devices, the emergence of artificial intelligence (AI) as a key business operations tool, and the prevalence of cyber-physical systems have all combined to multiply the breadth of attack surfaces that pose cyber risk threats, and intensified the potential magnitude and impact of such attacks.  Holistic approaches to cybersecurity are essential to reduce the likelihood that cyber defense measures successfully implemented in some segments of the ecosystem will be negated by gaps and unaddressed vulnerabilities in others.  In this current context, the FCC's authority over only a limited subset of the digital landscape is problematic.

In particular, the FCC's proposal is not only limited to broadband access services (as distinct from cloud services, IP transit services, content delivery networks, data centers, and the like), but would apply only to "mass market" services, a category that does not include services provided to enterprise or carrier customers.  CISA, by contrast, does not draw any distinctions among participants in the Internet ecosystem and is accordingly better equipped to ensure consistent and coordinated oversight.  The FCC's imposition of new rules on a subset of entities in a complex ecosystem would threaten to impede the coordinated, whole-of-government approach Congress has taken pains to establish.

As an experienced private sector and government CIO and technology leader, I can attest to the fact that the government increasingly relies upon the private sector for information technology, research, innovation, IT operations, and human capital, as well as to provide a critical resource for defending the nation's most important assets in the event of cybersecurity threats and incidents.  Although the FCC plays an important role in coordinating with CISA and other

---

[4] *See* Cyber Incident Reporting for Critical Infrasturcture of 2022 (CIRCIA), https://www.cisa.gov/topics/cyber-threats-and-advisories/information-sharing/cyber-incident-reporting-critical-infrastructure-act-2022-circia.

agencies, its assertion of additional regulatory authority (again, over one type of service provider) would hamper, rather than improve, public-private cooperation.

### III.     Reclassifying BIAS Under Title II Would Not Enhance the Government's Ability to Deter, Prevent, or Enforce Against Cyber Attacks

The nature of the vast majority of cybersecurity threats is such that reclassifying BIAS under Title II, as this NPRM proposes, is both unnecessary and unavailing.  It would not improve the FCC's or other agencies' or providers' abilities to address or deter those threats.  Most cybersecurity attacks rely on vulnerabilities based on human behavior (phishing, social engineering, insider threats) and/or software-based flaws (unpatched vulnerabilities, malware, zero-day, SQL injection, etc.).  Reclassification of BIAS would not provide the FCC additional or unique capabilities to detect, prevent, or enforce against such threats.  The fact that some of these threats may technically travel over broadband networks is not a unique or exclusive conveyance mechanism, nor is there a substantive connection to cause and effect to justify reclassifying BIAS under Title II.

Furthermore, as noted above, the FCC's NPRM does not cover all parts of U.S. networks or the associated equipment that is used in the provision of BIAS, so it is hard to see how the FCC, by reclassifying and regulating BIAS, could address network hardware, software and non-network devices, interconnections, IXC, PoPs, and other inputs to U.S. communications networks. Imposing new regulation that applies only to a limited subset of the relevant actors would detract from preparedness and incident response, rather than improving our security posture, because subjecting service providers to overlapping and potentially inconsistent requirements undermines the effectiveness of the Government's oversight and interaction with the private sector.

The drawbacks of such limits on the FCC's authority are compounded by the global nature of cyber threats, and the resultant need to meet them with collective and coordinated action domestically and abroad.  For example, most botnet attacks originate from outside the United States, meaning that effective action to reduce such threats requires government leadership to foster globally scaled solutions and international cooperation.  The FCC is neither designed nor authorized to engage in the kind of sustained multilateral coordination and collaboration on a global scale that is necessary to develop and implement effective international solutions to key global cyber defense issues.

The important issue of BGP security underscores why Title II authority is a poor fit for advancing security in the Internet arena.  Reclassification of broadband would not enable the FCC to resolve BGP vulnerabilities because unilateral action by a single country's regulator will not prevent misrouting or hijacking of data traffic.  Furthermore a command-and-control regulatory fix as envisioned by the NPRM won't work because the actions needed to resolve these issues necessarily require collaboration with a broad ecosystem of Internet-related entities, not just ISPs.  Nation-states are not the only bad actors; transnational criminal organizations and cyber criminals also use variety of tactics and tools to engage in malicious behavior, supporting espionage, intellectual property theft, unauthorized persistent network access, etc., all of which are beyond the proposed BGP regulatory capabilities proposed by the FCC.  Notably, CISA filed

comments in response to the FCC's Notice of Inquiry on BGP emphasizing that "it is incumbent on the Federal government and its partners to identify a coordinated approach to examine the impact of [potential security] measures before going down any particular path," and that the FCC in particular should "work with its partners to examine all potential solutions and what authorities it can bring to bear to mitigate this critical task."[5] As explained above, reclassifying broadband under Title II would likely inhibit (rather than improve) public-private cooperation and inter-agency coordination, and therefore would fail to meet CISA's objectives.

The nature of the common-carrier regulatory framework the NPRM proposes to impose would further exacerbate these concerns about an expanded role for the FCC. Asserting Title II authority over broadband would inevitably result in new regulatory mandates and a significantly increased focus on enforcement penalties. Under the existing Title I classification, the FCC as noted plays a valuable coordinating role with industry and other agencies but does not impose prescriptive regulation or impose forfeitures based on asserted non-compliance. Shifting to such a model would supplant the more cooperative approach that CISA has fostered and the gains that flow from effective public-private coordination.

As a former federal CIO and private sector CIO, I have firsthand experience with the importance of capable, responsive, and experienced government counterparts. Security risks in internet routing, IP address blocking, and other areas identified by the agency in the NPRM are fundamentally operational activities and rely on the managing, governing, and sharing of actionable information in a timely fashion.

CISA staff, DoD, and law enforcement, along with a substantial pool of private sector personnel have the longstanding relationships, appropriate clearances, as well as policy, and governance expertise to effectively engage with the intelligence community and other law enforcement agencies to address cyber threats and cyber actors. Increased top-down regulation under Title II would be inconsistent with the existing model under CISA's aegis.

In addition, the uncertain legal foundation associated with Title II militates against relying on such authority to address cybersecurity (or national security) concerns. I understand that BIAS has been classified as an information service under Title I during most of the Internet's existence, except for a brief period (from 2015-17) when the FCC asserted Title II authority, before reverting to the information-service classification at the start of 2018. The classification decisions in 2015 and 2018 were subject to judicial appeals, and I understand that any new attempt to reclassify BIAS under Title II is likely to be challenged in court. Against that backdrop, any cybersecurity or national security policy could change under new FCC leadership or a court could strike down a classification decision that is a prerequisite to a certain type of regulation (i.e., under Title II). In contrast, neither CISA nor any other agency in the security space relies on authority that in any way hinges on the classification of BIAS. That provides another important reason to defer to CISA's leadership and to refrain from grounding security rules in Title II.

---

[5] Reply Comments of the Cybersecurity and Infrastructure Security Agency, PS Docket No. 22-90, at 5-6 (filed June 28, 2022), https://www.fcc.gov/ecfs/document/10707962804139/2.

## IV.    National Security

In its proposal, the FCC has raised a number of national security concerns it aspires to address. However, Congress has relied principally and deliberately on other agencies and interagency processes — including DOJ, DHS, DOD, NSA, CFIUS, and others — to address national security threats involving communications networks and equipment, given that those agencies have the relevant expertise.  For example:

- The Department of Commerce has very broad authority to prohibit or condition a wide range of transactions and uses of services under the Information and Communications Technology Supply Chain Rule (ICTS Rule).
- The Committee on Foreign Investment in the United States (CFIUS) reviews foreign investments in the U.S. communications sector, including foreign investments in companies that operate broadband networks or manufacture broadband equipment.
- The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector reviews applications for international Section 214 authorizations for potential national security issues and already considers the provision of broadband in doing so.
- Under Section 889 of the National Defense Authorization Act of 2019, all federal agencies are subject to limits on their ability to procure covered telecommunications or equipment from specified foreign entities that are deemed to pose national security risks. Federal contractors likewise must ensure that they do not use such covered equipment or services.The Commerce Department's Bureau of Industry and Security enforces Export Administration Regulations.

None of these oversight mechanisms depends on the classification of broadband or would be rendered more effective if broadband were reclassified as a telecommunications service. Notably, the FCC's proposal to reclassify *mass market* broadband services would do nothing to address national security identified threats associated with carriers like China Telecom and China Unicom; those carriers do not provide mass market services at all.  Notwithstanding the FCC's revocation of their Section 214 authorizations, national security agencies have expressed concerns about those providers' continued participation in IP traffic-exchange in the enterprise and wholesale marketplace.  But the exchange of IP traffic and the provision of private carrier services or information services would be entirely unaffected by reclassifying mass market broadband services under Title II.  In other words, broadband reclassification would not plug the gaps associated with China Telecom and China Unicom cited in the NPRM.

To the extent additional restrictions are warranted, the Commerce Department could prohibit or condition Chinese carriers' involvement in IP traffic-exchange or the provision of private carrier or information services under its ICTS Supply Chain rule.  That broad rule in no way depends on the classification of services deemed to pose national security concerns.  Even more importantly, the Department of Commerce can exercise authority cohesively over a more diverse and complex set of concerns relating to the sourcing and oversight of ICT infrastructure, and can influence international policy through NIST and other mechanisms.

## V.    Congressional Mandates

When Congress has intended a specific network security role for the FCC, it has made that role clear and targeted in enacted statutes, such as the Secure and Trusted Communications Networks Act and the Secure Equipment Act.  Although Congress has envisioned a role for the FCC in addressing national security concerns, Congress made clear that the Commission's role is both defined and limited to administering the Secure and Trusted Communications Networks Reimbursement Program. The Executive Branch likewise has delegated discrete, bounded authority to the Commission in connection with national security in issuing submarine cable landing licenses, while affirmatively obligating the Commission first to obtain approval from the Secretary of State and advice from other executive agencies.

The FCC has suggested that national security agencies have asked the FCC to assert broader authority to combat foreign threats.  But the issues those agencies raised had nothing to do with broadband classification.  In particular, DOJ (as Chair of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector, and in consultation with DOD and DHS) filed comments in an unrelated FCC proceeding supporting proposals to expand reporting and oversight of foreign ownership interests in applicants for international Section 214 authorizations.[6]  That proceeding did not propose to reclassify broadband under Title II, and neither DOJ nor any other agency has argued that such reclassification is necessary to facilitate their national security requests; the FCC can take all the actions it proposed (and that the national security agencies support) — including obtaining updated information on current international Section 214 authorization holders, requiring periodic reviews of existing authorization holders, and lowering the reporting threshold (from 10% to 5%) for foreign interests — without reclassifying broadband.

Although the FCC maintains the "Covered List" of telecommunications equipment that is deemed to pose national security threats, it has described its own role as ministerial, as all "determinations" regarding such threats must be made by national security agencies with the relevant expertise.

In turn, the threat determinations by other agencies control whether foreign entities are barred from obtaining equipment certifications under the Secure Equipment Act or receiving USF support under the Secure and Trusted Networks Act.  Those mechanisms already cover broadband equipment and services pursuant to the authority expressly delegated by Congress.

## VI.    Conclusion

Reclassifying BIAS as a Title II service is neither necessary nor beneficial to the federal government's collective efforts to secure our nation's ICT infrastructure against cybersecurity and national security threats.  Congress has thoughtfully and intentionally vested CISA, DOD, DOJ, Commerce, Treasury, and State with the authority and mandate to lead on these issues. Neither Congress nor any of these expert federal agencies have identified gaps in federal

---

[6] See Letter of Devin A. DeBacker, Chief, Foreign Investment Review Section, National Security Division of the U.S. Department of Justice to Marlene H. Dortch, Secretary, FCC, IB Docket No. 23-119 (Apr. 12, 2023).

authority or capabilities on these matters that would be effectively addressed by reclassifying broadband as a Title II service. And in fact, as explained above, reclassifying broadband under Title II could have the *opposite* effect intended by the FCC — by adding unnecessary costs and complexity to the work that cybersecurity and national security professionals must manage, and by undermining the public-private collaborative approach to addressing cybersecurity and national security risks and concerns that Congress and leading federal agencies have established and successfully implemented for many years.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| Lifeline and Link Up Reform and Modernization | WC Docket No. 11-42 |

## REPLY COMMENTS OF USTELECOM

Diana Eisner
Vice President, Policy and Advocacy

Paul Eisler,
Vice President, Cybersecurity

Nirali Patel
Senior Vice President, Policy and Advocacy

USTelecom – The Broadband Association
601 New Jersey Avenue, N.W.
Suite 600
Washington, D.C. 20001

Scott H. Angstreich
Leslie V. Pope
Alex A. Parkinson
Dennis D. Howe
Nataliia Gillespie
Kelley C. Schiffman*
Kellogg, Hansen, Todd, Figel
  & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
*Admitted only in California;
supervised by members of the firm.

*Counsel for USTelecom*

January 17, 2024

# TABLE OF CONTENTS

Page

I.    Introduction and Executive Summary ............................................................... 1

II.   Broadband Is an Information Service, and the Commission Has No Authority
      To Classify It as a Telecommunications Service .................................................. 5

      A.    Broadband Is an Information Service Under the Communications Act ................ 5

      B.    To the Extent the Communications Act Is Ambiguous, the Major
            Questions Doctrine Forecloses Common-Carrier Regulation of
            Broadband ......................................................................................................... 9

      C.    The Commission Cannot Rely on Section 706 To Justify the Rules the
            NPRM Proposes .............................................................................................. 14

III.  Reclassification of Broadband as a Telecommunications Service Would Be
      Arbitrary and Capricious..................................................................................... 15

      A.    The NPRM's Reasons for Concluding That Broadband Should Be
            Regulated as a Title II Service Are Arbitrary and Capricious.............................. 16

            1.    The Comments Confirm That No Harms Occurred as a Result
                  of the 2018 Order — Instead, the Internet Continued To
                  Flourish ............................................................................................... 16

                  a.    The Internet Has Continued To Flourish Since 2018.................... 16

                  b.    No Harms Occurred as a Result of the 2018 Order ...................... 18

                  c.    ISPs Have No Economic Incentives To Engage in
                        Conduct the NPRM Purports To Prohibit ................................... 20

            2.    The General Conduct Standard Is Not Needed and Would Harm
                  Innovation ............................................................................................ 23

            3.    Reclassification Would Open the Door to Harmful Rate
                  Regulation ............................................................................................ 23

            4.    Reclassification Would Undermine Consumer Privacy........................... 26

      B.    Reclassification Would Undermine Investment Incentives.................................. 28

            1.    Free Press's Claims That Public Utility Regulation Does Not
                  Depress Investment Is Contrary to Basic Economic Theory ................... 29

            2.    Free Press's Purported "Empirical" Analyses Are Flawed and
                  Cannot Be Given Any Weight.................................................................. 32

**App. 1427**

C. Reclassification Is Not Needed To Protect Public Safety or To Fund Broadband Through the Universal Service Fund, or To Ensure Pole Attachment Rights ................................................. 38

D. Classifying Broadband as a Telecommunications Service To Regulate Cybersecurity and National Security Would Be Ineffective, Harmful, at Odds with Federal Policy, and Contrary to Law ...................................................... 42

    1. Strong Record Evidence Shows That Reclassification for the Purpose of Security-Related Regulation Is Unnecessary and Would Be Ineffective ................................................. 43

    2. The Commission's Proposed Course of Action Would Significantly Harm Existing Work and Partnerships ............................... 47

    3. The Record Demonstrates That Reclassifying Broadband To Regulate Security Would Contravene Congressional Direction and Exceed Commission Authority ......................................... 48

E. The NPRM's Other New Justifications for Title II Are Pretextual ...................... 50

IV. The Commission Cannot and Should Not Impose Common-Carrier Regulation on One Subset of the Participants in the Internet Traffic-Exchange Marketplace ........... 54

A. Regulation of Internet Interconnection Is Unnecessary To Achieve Any Valid Policy Objective ................................................. 54

    1. ISPs Have No "Terminating Access Monopoly," as the Complete Absence of Supracompetitive Interconnection Fees Confirms ................................................. 55

    2. Proponents of Regulation Identify No Market Failures That Commission Intervention Is Needed To Address ...................................... 60

B. Regulation of Internet Traffic Exchange Would Be Disruptive and Harmful ................................................. 62

C. The Commission Lacks Statutory Authority To Regulate Internet Traffic Exchange ................................................. 67

V. The Commission Should Reject Calls for Additional Regulations Beyond Those the NPRM Contemplates ................................................. 69

A. The Commission Should Not Impose Additional Disclosure Requirements ................................................. 69

B. The Commission Should Not Regulate the Price Structure of Broadband Plans ................................................. 70

**App. 1428**

C.     The Commission Should Not Change Its Definition of Broadband Internet Access Service ........................................................................................ 72

D.     The Commission Should Forbear from Section 254(d), as the NPRM Proposes ............................................................................................................... 74

E.     The Commission Should Forbear from Sections 251 and 252, as the NPRM Proposes ..................................................................................................... 76

F.     Reclassification Would Not Help Enforce Digital Discrimination Rules ............. 77

VI.    Broadband Internet Access Service Providers Should Be Subject to a Single Set of Uniform, National Rules ......................................................................................... 78

VII.   The Commission Should Forbear from Section 214 Obligations in Addition to the Other Title II Obligations and Rules from Which It Proposes To Forbear ................. 81

A.     The NPRM Correctly Proposes To Forbear from Numerous Provisions of Title II, Including Rate Regulation Provisions ................................................... 81

B.     The Commission Should Also Forbear Broadly from Section 214(a)-(d) ............ 82

VIII.  Conclusion ................................................................................................................. 85

Exhibit A – Andrew J. Grotto, Submission on Cybersecurity and National Security

Exhibit B – Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results*

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| Lifeline and Link Up Reform and Modernization | WC Docket No. 11-42 |

## REPLY COMMENTS OF USTELECOM

USTelecom – The Broadband Association ("USTelecom") hereby submits these reply comments in the above-captioned proceedings.[1]  As explained in our initial comments, USTelecom's members support the open internet.  But the record confirms that this proceeding has little to do with the open internet.  Instead, it is a misguided attempt to regulate a vibrant, competitive marketplace in ways that will undermine the demonstrable progress of the past six years and divert attention and resources away from expanding connectivity and closing the digital divide.

## I.     Introduction and Executive Summary

The record confirms what is evident to American consumers.  The internet is thriving, and consumers have ever-increasing access to faster and cheaper broadband service.  ISPs' massive investments — a record $102.4 billion in 2022 — made this possible.  As did a

---

[1] *See* Notice of Proposed Rulemaking, *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, FCC 23-83 (rel. Oct. 20, 2023) ("NPRM"); Public Notice, *Wireline Competition Bureau Seeks Comment on Petitions Seeking Reconsideration of the RIF Remand Order*, WC Docket Nos. 17-108, 17-287, 11-42, DA 23-996 (Oct. 19, 2023).

regulatory regime that, for the past six years, has relied on competition and transparency, rather than the heavy-handed, common-carrier approach that European regulators are now acknowledging harms private investment.

Despite this record of domestic success — and failures overseas — the Commission proposes to upend the status quo, with far-reaching regulation that threatens to undo the achievements the current Title I regulatory approach has promoted. Some commenters try to rebrand the Commission's Title II proposal as "light-touch."[2] But saddling ISPs not only with 2015's common-carrier regulation, but also the strictures of Section 214 and novel Commission intrusions into areas such as national and cyber security efforts is nothing of the sort. Like the NPRM, commenters supporting common-carrier regulation cannot identify the kinds of problems that could warrant such heavy-handed intrusions into a well-functioning marketplace. Instead, they rehash decades-old events and recycle a handful of more recent — but thoroughly debunked — studies. None refutes our showing that ISPs do not engage in conduct that harms their customers or the internet because they have every incentive not to do so, lest they lose those customers to the competition.

Regulatory proponents also recycle arguments that, contrary to basic economic theory, subjecting broadband to public-utility regulation will not impact investment. In fact, the regime the NPRM envisions would increase the costs of broadband deployment, reduce the potential revenues from deployment, and increase the risk of future regulatory creep that disincentivizes investment. The one "study" that purports to show that investment "accelerated" during "the Title II era" is based on the same flawed approach that the Commission previously rejected, because it does not even attempt to use any statistical controls to account for the other factors

---

[2] *See* Free Press Comments at 17; Electronic Frontier Foundation ("EFF") Comments at 3.

**App. 1431**

that can influence broadband investment beyond regulation. In contrast, such a statistically controlled study has been done, and it concludes that the threat of Title II reduces broadband investment by billions of dollars per year at a cost of tens of thousands of jobs.[3]

Even if the Commission reclassifies broadband, regulating internet traffic exchange would be needless, harmful, and unlawful. First, internet interconnection has functioned efficiently without regulation for decades, and proponents of regulation identify no market failures that Commission intervention is needed to address. Indeed, they do not identify a single interconnection dispute over the past 10 years or a single interconnection charge that they consider excessive. Second, even the threat of regulatory intervention would subvert the commercial negotiations that have given rise to these efficient interconnection solutions over the past several decades. It would do so by inducing content-originating networks to hold out in the hope that regulators will grant them a better deal. In addition, the prescriptive "bill-and-keep" regime some commenters propose would embroil the Commission in intractable implementation disputes, suppress content-originating networks' incentives to reduce broadband network costs (*e.g.*, through digital compression), and exert upward pressure on broadband rates. Third, the Commission has no legal basis for regulating internet interconnection, even if there was a valid policy basis to do so.

The Commission would only magnify the harms Title II poses if it heeded those commenters that urge even greater regulation than the NPRM proposes. Many urge the Commission to depart from the *2015 Order*[4] and immediately subject interstate broadband

---

[3] *See generally* George S. Ford, *Investment in the Virtuous Circle: Theory and Empirics*, Phoenix Ctr. Pol'y Paper No. 62 (Dec. 2023) ("Ford Paper") (attached to Phoenix Center Comments).

[4] Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("*2015 Order*").

**App. 1432**

revenues to Universal Service Fund contribution requirements. Doing so without pursuing broader contributions reform would undermine existing efforts to increase broadband affordability and adoption and ensure the sustainability of the USF. Nor should the Commission engage in rate regulation by prohibiting usage-based pricing, which would only harm subscribers by eliminating an option that allows them to obtain service at a lower price. And the Commission should reject calls to add to the list of broadband services it subjects to Title II, such as by extending regulation into business broadband services and extending the harmful effects of common-carrier regulation into the enterprise business market segment.

There is also near-uniform opposition to the Commission's invocation of national and cyber security to bolster the case for Title II regulation of ISPs. Even commenters that support reclassification agree that the Commission is ill-suited to intervene in these areas and that Commission intervention would undermine the federal government's existing and successful efforts. Reclassification would undermine collaboration built on decades of federal policy, betraying congressional intent and exceeding the Commission's authority.

In the end, the Commission's effort to impose a Title II regime on broadband will fail in the courts. Reviewing courts will either agree that Congress classified broadband internet access as an information service, or that the major questions doctrine deprives the Commission of the classification authority it claims, or both. Commenters supporting Title II offer no plausible response. And the time it will take for the court process to play out will be costly, wasting resources and deterring broadband investment to the detriment of consumers, just as new technologies and new federal funding for broadband networks employing those technologies are coming online. That costly uncertainty will only be exacerbated if the Commission does not

**App. 1433**

adopt a uniform, national broadband regime and, instead, endorses individual state efforts to add to the federal rules.

In sum, the NPRM proposes a legally unsustainable non-solution to a non-problem. The Commission should instead "keep its focus on closing the digital divide, rather than dusting off old Title II rules that have proved to be unnecessary."[5]

## II. Broadband Is an Information Service, and the Commission Has No Authority To Classify It as a Telecommunications Service

### A. Broadband Is an Information Service Under the Communications Act

As numerous commenters agree, the Communications Act is unambiguous: broadband is an information service.[6] Statutory text, context, and history all compel this conclusion. First, broadband is clearly encompassed by the statutory definition of "information service," which is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."[7] Second, in a contemporaneously enacted provision, Congress stated explicitly that information services "includ[e] specifically a service . . . that provides access to the Internet."[8] Multiple other provisions confirm that Congress understood that broadband is an information service.[9] And the

---

[5] Hispanic Leadership Fund Comments at 2; *see also*, *e.g.*, ADTRAN Comments; American Consumer Institute Comments; Eric Burger Comments; Digital Progress Institute Comments; Focus on Rural America Comments; Foundation for American Innovation and China Tech Threat ("FAI & CTT") Comments; Information Technology Industry Council ("ITI") Comments; Roslyn Layton & Mark Jamison Comments; National Association of Manufacturers Comments; Small Business & Entrepreneurship Council Comments; U.S. Chamber of Commerce Comments; Christopher S. Yoo & Justin Hurwitz ("Yoo & Hurwitz") Comments.

[6] *See* USTelecom Comments at 9-17; CTIA Comments at 47-65; NCTA Comments at 40-49; U.S. Chamber of Commerce Comments at 40-45; Fiber Broadband Association Comments at 5-8.

[7] 47 U.S.C. § 153(24); *see also* USTelecom Comments at 9-10; CTIA Comments at 48-52.

[8] 47 U.S.C. § 230(f)(2); *see also* USTelecom Comments at 10-11; CTIA Comments at 59; NCTA Comments at 40-46.

[9] *See*, *e.g.*, 47 U.S.C. § 231(e)(4) (defining "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet . . . as part

**App. 1434**

historical regulatory distinctions that gave rise to the "telecommunications service" and "information service" categories codified in the Act leave no doubt that broadband belongs to the latter.

Few commenters contest these points, and those that do largely repeat the contentions in the NPRM,[10] which lack merit for the reasons we and others have explained. Some commenters assert that customers perceive broadband as a common-carrier service, contending that this should control the regulatory classification.[11] But the claim that consumer perception can dictate the classification of an information or telecommunications service misunderstands *Brand X*.[12] In *Brand X*, the Court considered whether the statutory term "offering" was ambiguous in the context of whether cable companies were "offering" a single integrated information service, or two bundled products — one an information service (internet access) and the other a telecommunications service (high-speed transmission from the customer's premises to the cable company's local network).[13] In that context, the Court reasoned, consumers' perceptions about whether they were buying a single product or two bundled products could have relevance to the meaning of "offering." Today, however, the NPRM does not suggest — and no commenter argues — that broadband ISPs "offer" two such services. All agree that ISPs offer a single, integrated "broadband internet access service." *Brand X* does not remotely support reliance on

---

of a package of services offered to consumers"); *id.* § 231(b)(1)-(2) (separately exempting both "telecommunications carrier[s]" and "Internet access service" providers from certain civil penalties); *see also* USTelecom Comments at 11-12.

[10] *See*, *e.g.*, Computer & Communications Industry Association ("CCIA") Comments at 2-5; Ad Hoc Telecom Users Committee Comments at 3-6.

[11] *See*, *e.g.*, Consumer Reports Comments at 3-7; Home Telephone Company Comments at 11.

[12] *NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

[13] *See* USTelecom Comments at 26-28; NCTA Comments at 28-31; U.S. Chamber of Commerce Comments at 45-49.

**App. 1435**

consumer perception to decide whether *that unitary service* meets the "information service" definition.

In any event, none of these commenters offers any data about what consumers perceive. Nor does the Commission. But such perceptions can be readily determined as an empirical matter, and they flatly refute the notion that consumers perceive broadband as a "telecommunications service."

Specifically, Recon Analytics recently conducted a survey of a large and representative group of customers that contradicts the claim that consumer perception supports the proposed reclassification.[14] When asked to identify the capabilities of the broadband service they purchase, 92% of respondents identified their broadband service as offering them the capability to store, retrieve, access, and/or manipulate information, while only 8% of respondents said that their broadband service offers only the capabilities to transmit information between or among points of their choosing, without change in form or content.[15] Thus, even if consumer perception data were relevant to the statutory classification, as the NPRM contends,[16] the only data in the record supports classifying broadband as an information service.

In addition, as multiple commenters explain, broadband is also an information service for a second, independent reason: it includes integrated information processing capabilities.[17] The most notable of those capabilities are DNS (the functionality that matches the plain-language

---

[14] The Commission has cited the work of Recon Analytics' founder and lead analyst, Roger Entner, in six Annual Mobile Wireless Competition Reports to Congress. His qualifications and those of his co-authors are set forth in Exhibit B to these reply comments. *See* Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results* 3-4 ("*Broadband Survey Results*") (attached as Ex. B).

[15] *See id.* at 1 & fig. 1.

[16] *See* NPRM ¶ 18.

[17] *See* USTelecom Comments at 17-22; CTIA Comments at 48-52; NCTA Comments at 40-46.

**App. 1436**

name by which a user identifies a website with the IP addresses of the servers containing the web content they wish to access) and caching (the storage of content in proximity to customer locations in order to enable the rapid retrieval of information by users). Both DNS and caching are indisputably information services when considered independently.[18] But both are also fundamental to the mass-market retail broadband internet access service that ISPs provide and that consumers expect to receive when they pay for broadband. Recent developments since 2015 — especially ISPs' increased investments in DNS and deployment of dynamic routing technologies — have only further cemented that reality.[19]

Following the Commission's dismissal of DNS and caching as "companion services" to broadband,[20] a few commenters assert that DNS is "not a core function" of broadband so its information-processing capabilities should not affect broadband's regulatory classification.[21] Yet the internet as we know it would not work without DNS: accessing websites would be almost impossible without DNS as consumers would have to know the IP address of every website they would want to visit. And an ISP's customers would lose access to the many features that the ISP's own DNS servers provide — including the ability to resolve a user's requests with the optimal response for that particular end user — if they switch to another DNS service.[22] The fact that broadband users may employ a third-party DNS service does not sever DNS from the broadband service that ISPs offer to their customers.[23] In all events, as an empirical matter,

---

[18] *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 705-06 (D.C. Cir. 2016); *see also* NPRM ¶ 75.

[19] *See* Yoo & Hurwitz Comments at 3-6.

[20] NPRM ¶ 75.

[21] Jon M. Peha ("Peha") Comments at 5-6; *see also* i2Coalition Comments at 14-16.

[22] *See* USTelecom Comments at 17-18; Declaration of Peter Rysavy ¶ 25 (Dec. 7, 2023) ("Rysavy Decl.") (attached to CTIA Comments as Ex. B).

[23] *See* USTelecom Comments at 18-19.

**App. 1437**

survey results suggest that the overwhelming majority of broadband users — 92% — use the DNS service their ISP provides.[24]  As a result, individual ISPs resolve more than one trillion DNS queries daily.[25]

### B.    To the Extent the Communications Act Is Ambiguous, the Major Questions Doctrine Forecloses Common-Carrier Regulation of Broadband

As numerous commenters explain, even if there were any ambiguity in the Communications Act, the Commission's proposed classification of broadband would still be unlawful because it violates the major questions doctrine.[26]  Under that doctrine, "[i]f an agency wants to exercise expansive regulatory authority over some major social or economic activity[,] . . . an *ambiguous* grant of statutory authority is not enough," and courts will strike down the agency's rule unless "Congress [has] *clearly* authorize[d] [the] agency to take such a regulatory action."[27]  Here, as previously explained, numerous features of the Commission's proposed regulation — the scope of the authority asserted, the financial impact of the proposed reclassification, and the history of public and legislative attention to the issue — make clear that the major questions doctrine applies.[28]  And the lack of clear congressional authorization for the

---

[24] *See Broadband Survey Results* at 2 & fig. 2.

[25] *See* Rysavy Decl. ¶ 30 & n.30.

[26] *See* USTelecom Comments at 28-36; ACA Connects Comments at 35-39; Center for Regulatory Freedom Comments at 11-13; U.S. Chamber of Commerce Comments at 49-63; CTIA Comments at 74-78; Digital Progress Institute Comments at 19-22; Fiber Broadband Association Comments at 12-15; Free State Foundation Comments at 15-21; Huddleston Comments at 2-3; International Center for Law & Economics ("ICLE") Comments at 37-41; Information Technology & Innovation Foundation ("ITIF") Comments at 9-10; NCTA Comments at 11-38; R Street Institute Comments at 7-9; Jeffrey Westling ("Westling") Comments at 11-15; WISPA Comments at 83-90; Yoo & Hurwitz Comments at 10-14.

[27] *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 421 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc).

[28] *See* USTelecom Comments at 29-33; CTIA Comments at 74-78; NCTA Comments at 14-23; U.S. Chamber of Commerce Comments at 51-58; ACA Connects Comments at 35-39.

**App. 1438**

Commission to impose a Title II regime of its own devising on broadband therefore dooms the agency's regulatory effort.

While several commenters assert that the Commission can evade the application of the major questions doctrine to its assertion of regulatory authority, none of their arguments holds water. First, several commenters assert that *Brand X* will preclude application of the major questions doctrine here because, they say, the Supreme Court there deferred to the Commission's conclusion that cable modem service is a single offering of an information service.[29] As discussed, that position misreads *Brand X*. Again, the question there was not whether the Commission may regulate broadband as a common-carrier service, but whether cable broadband providers offer a single, integrated information service (high-speed internet access) or two separate, bundled services (the internet access information service and the last-mile telecommunications service connection between the customer's premises and the cable company's local network). The Commission's answer to that question — that those cable providers offer a single, integrated information service not subject to Title II regulation — left no occasion to consider the major question presented here: whether the Commission may now affirmatively "assert[] highly consequential power beyond what Congress could reasonably be understood to have granted."[30] If anything, *Brand X*'s finding of ambiguity would compel application of the major questions doctrine here, where the Commission has asserted expanded regulatory authority over broadband without "clear congressional authorization" in the statute.[31]

---

[29] *See* Tejas N. Narechania ("Narechania") Comments at 2-5; Public Knowledge Comments at 30-46; National Association of Regulatory Utility Commissioners ("NARUC") Comments at 8-12.

[30] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

[31] *Id.*

One commenter asserts that classifying broadband as a common-carrier service is not a new assertion of regulatory authority, so the major questions doctrine does not apply.[32] But neither of the cited regulatory antecedents involved a high-profile "major question" subject to substantial political controversy, and neither involved classifying broadband internet access service — or anything like it — as a common-carrier service. First, when the Commission required local telephone companies to offer DSL functionality on a common-carrier basis to information service providers, that offering was limited to the high-speed transmission from a customer's premises to the telephone company's network. It did not cover the internet access service, which was provided (by an affiliated or unaffiliated ISP) as an information service regulated under Title I.[33] Second, and similarly, the Commission's 1995 *Independent Data Communications Order* addressed "frame relay service" — a "high-speed packet-switching technology used to communicate digital data between . . . geographically dispersed local area networks" — which it classified as a "basic service" after finding that it "offer[ed] a transmission capability that is virtually transparent in terms of its interaction with customer-supplied data."[34] Notably, that order imposed common-carrier requirements on "the underlying frame relay service" only — not the "enhanced services [provided] in conjunction with" it.[35] And like the other commenters supporting Title II regulation of broadband, this commenter ignores the more

---

[32] Narechania Comments at 5-6.

[33] USTelecom Comments at 34-35; NCTA Comments at 35-39.

[34] Memorandum Opinion and Order, *Independent Data Communications Manufacturers Ass'n, Inc.*, 10 FCC Rcd 13717, ¶¶ 6, 34 (Comm. Carr. Bur. 1995) ("*Independent Data Communications Order*").

[35] *Id.* ¶ 59.

**App. 1440**

relevant regulatory antecedents, which consistently classified the technological predecessors to broadband as "information services" (or "enhanced services").[36]

This is also true of one commenter who attempts to leverage the history of the Modification of Final Judgment ("MFJ") and the Commission's pre-1996 Act distinction between "enhanced" and "basic" services to support classifying broadband as a telecommunications service.[37]  Professor Scott Jordan correctly observes that Congress "intentionally and clearly" modeled the statutory definitions of information services and telecommunications services on those pre-1996 Act regimes, intending to enshrine in the statute those distinctions.[38]  But he ignores how the MFJ Court and the Commission actually applied those regimes to the predecessors of broadband internet access service.  Specifically, he does not grapple with the MFJ Court's conclusion that "any fair reading of the term 'information services'" encompasses services a communications provider offers that transmit "information services generated by others," including "teleshopping" and "electronic mail."[39]  Nor does he address the Commission decision classifying as enhanced services those services that enable "subscriber interaction with stored information," even when a third party stored the

---

[36] *See, e.g.*, *United States v. W. Elec. Co.*, 673 F. Supp. 525, 587, 592, 595 (D.D.C. 1987), *aff'd in part, rev'd in part on other grounds, and remanded*, 900 F.2d 283 (D.C. Cir. 1990) (per curiam); Memorandum Opinion and Order, *Bell Operating Cos.' Joint Petition for Waiver of Computer II Rules*, 10 FCC Rcd 1724, ¶ 1 n.3 (Comm. Carr. Bur. 1995) ("*Interim Waiver Order*"); Memorandum Opinion and Order, *Bell Atlantic Telephone Cos.' Offer of Comparably Efficient Interconnection to Providers of Gateway Services*, 3 FCC Rcd 6045, ¶ 7 (Comm. Carr. Bur. 1988) ("*Gateway Services Order*"); Memorandum Opinion and Order, *North American Telecommunications Ass'n Petition for Declaratory Ruling*, 101 F.C.C.2d 349, ¶ 26 (1985) ("*NATA Centrex Order*").

[37] *See* Scott Jordan ("Jordan") Comments at 38-50.

[38] *Id.* at 38.

[39] *W. Elec.*, 673 F. Supp. at 587 & n.275, 592, 595.

**App. 1441**

information,[40] including by providing access to "gateways to online databases."[41] As explained above and in our opening comments,[42] that history confirms the plain meaning of the statute: broadband is an information service.

The Commission should also reject the suggestion that using the pending petitions for reconsideration of the *2020 Remand Order*[43] as the vehicle to impose Title II regulation on broadband would prevent a reviewing court from applying the major questions doctrine.[44] To begin with, this argument misconceives what the Commission would have to find to reclassify broadband by means of the reconsideration petitions. It would not be sufficient to find that the *2020 Remand Order* was wrong in concluding that Title I created no meaningful problems for public safety, Lifeline, and pole attachments. To go from that finding to the further finding that, therefore, the Commission should regulate broadband under Title II, the Commission would also have to determine that, on balance, the benefits of Title I classification did not outweigh the purported harms in the context of public safety, Lifeline, and pole attachments.[45] That, in turn, would require the Commission to consider the record evidence of the past six years under the *2018 Order*[46] — the same record evidence the Commission must consider in resolving the NPRM. The reconsideration petitions therefore provide no shortcut to Title II.

---

[40] 47 C.F.R. § 64.702(a); *see also Gateway Services Order* ¶ 7; *NATA Centrex Order* ¶ 26.

[41] *Interim Waiver Order* ¶ 1 n.3.

[42] *See* USTelecom Comments at 13-16.

[43] Order on Remand, *Restoring Internet Freedom*, 35 FCC Rcd 12328 (2020) ("*2020 Remand Order*").

[44] Public Knowledge Comments at 12-13.

[45] *See Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019) (per curiam); *see also 2020 Remand Order* ¶ 18 (finding that, "even if [the alleged] negative effects" on public safety, Lifeline, and pole attachments "were substantiated," that "would not change our classification decision").

[46] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("*2018 Order*").

**App. 1442**

More generally, the major questions doctrine does not care about the procedural posture in which an agency asserts a power of "vast economic and political significance."[47]  Indeed, the Supreme Court has expressly rejected attempts to forestall application of the doctrine based on the procedural status of the rulemaking.  In *West Virginia v. EPA*, for instance, the Court applied the doctrine in reversing the D.C. Circuit's vacatur of the EPA's 2019 repeal of the original 2015 Clean Power Plan, and did so notwithstanding the current EPA's promise to forgo reliance on the original rule and conduct an entirely new rulemaking altogether.[48]  There can therefore be no doubt that the major questions doctrine would likewise apply here.  Even if the Commission were to pursue reclassification through reconsideration of the *2020 Remand Order*, the Commission would still be implementing an enormously consequential policy change on the basis of a substantially expanded record.  The fact that the *2015 Order* evaded Supreme Court review because the *2018 Order* mooted that Court's consideration of the earlier order has no effect on the major questions analysis that would apply to a Title II order here.

### C.  The Commission Cannot Rely on Section 706 To Justify the Rules the NPRM Proposes

The NPRM suggests that Section 706 can serve as an alternative to Title II reclassification as the legal basis for its "open Internet rules,"[49] a position a number of pro-regulation commenters endorse.[50]  But even if Section 706 provides the Commission with a

---

[47] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam) (cleaned up).

[48] *See West Virginia*, 142 S. Ct. at 2605-07.

[49] NPRM ¶ 198.

[50] *See*, *e.g.*, American Library Association Comments at 15; California Public Utilities Commission ("CPUC") Comments at 41; NARUC Comments at 4-5.

substantive grant of authority as to some issues,[51] it would not enable the Commission to impose the intrusive regulatory regime the NPRM proposes.

As the D.C. Circuit has confirmed,[52] the Communications Act, in Section 153(51), bars the Commission from using Section 706 to impose common-carrier rules on information services.[53] But that is what the NPRM's proposed rules would do in multiple respects. For example, the Commission acknowledges that the general conduct standard is an "interpretation of sections 201 and 202 in the broadband context."[54] The standard is thus indisputably a form of common-carrier regulation. Moreover, if Section 706 authorized the Commission to impose *non*-common-carrier obligations on broadband providers, it would do so only insofar as the Commission has a strong empirical basis for concluding that such regulation is necessary to promote broadband investment by ISPs. Section 706 addresses only regulatory measures taken to promote "infrastructure investment" in "advanced telecommunications capability," not to promote any other goal, such as the interests of application and content providers.[55]

### III. Reclassification of Broadband as a Telecommunications Service Would Be Arbitrary and Capricious

Even if there were statutory ambiguity regarding broadband's classification, and even if the major questions doctrine did not require resolving that ambiguity in favor of an information

---

[51] *But see 2018 Order* ¶ 268 ("We conclude that the directives to the Commission in section 706(a) and (b) of the 1996 Act to promote deployment of advanced telecommunications capability are better interpreted as hortatory, and not as grants of regulatory authority.").

[52] *Verizon v. FCC*, 740 F.3d 623, 657-58 (D.C. Cir. 2014).

[53] 47 U.S.C. § 153(51) (a provider may be "treated as a common carrier . . . only to the extent that it is engaged in providing telecommunications services").

[54] NPRM ¶ 168.

[55] *See* 47 U.S.C. § 1302(a), (b); *see also id.* § 1302(c) (defining "advanced telecommunications capability"). Under the controlling statutory language, the Commission cannot invoke a "virtuous cycle" justification in light of the overwhelming record evidence that reclassification would deter broadband investment and innovation. *See*, *e.g.*, USTelecom Comments at 54-59.

**App. 1444**

service classification, the Commission would still need to show why the supposed harms of that classification outweigh the benefits and thus warrant a policy reversal.[56] The Commission can make no such showing, and any reclassification decision would thus be arbitrary and capricious.

A.   **The NPRM's Reasons for Concluding That Broadband Should Be Regulated as a Title II Service Are Arbitrary and Capricious**

1.   *The Comments Confirm That No Harms Occurred as a Result of the 2018 Order — Instead, the Internet Continued To Flourish*

The record makes clear that the internet "as we know it" did not end after the repeal of the *2015 Order*, as some Title II proponents forecasted.[57] Instead, it thrived. Unprecedented investment, increased speeds and coverage, as well as continued price decreases, have allowed consumers to enjoy a world-leading service even during the challenges of the COVID-19 pandemic. And ISPs delivered broadband to consumers free of any harmful interference that the NPRM claims Title II regulation is needed to prevent.

a.   *The Internet Has Continued To Flourish Since 2018*

It is undeniable that broadband has flourished in the absence of Title II regulation. Numerous commenters document the successes that the broadband industry achieved while being regulated under Title I. Among those accomplishments is rapidly growing investment that reached a record $102.4 billion in 2022.[58] As many commenters observed, increasing investment

---

[56] *See Mozilla*, 940 F.3d at 49.

[57] Joe Concha, *CNN headline declares "end of the Internet as we know it" after net neutrality vote*, The Hill (Dec. 14, 2017), https://thehill.com/homenews/media/364959-cnn-headline-declares-end-of-the-internet-as-we-know-it-after-net-neutrality/.

[58] *See* U.S. Chamber of Commerce Comments at 6-7 (citing *2022 Broadband Capex Report*, USTelecom (Sept. 8, 2023), http://tinyurl.com/3cxdjhf9); *see also* AT&T Comments at 2-3; Verizon Comments at 4-6; ACA Comments at 2, 8-9; Scalia Administrative Law Clinic Comments at 4-8; Advanced Communications Law & Policy Institute at New York Law School ("ACLP") Comments at 6; Comcast Comments at 3-4, 33-34; Competitive Enterprise Institute Comments at 4; Focus on Rural America Comments at 1-2; GSMA Comments at 4-5; Huddleston Comments at 1; NCTA Comments at 4; Small Business & Entrepreneurship Council Comments at 2-3; T-Mobile Comments at 11-12.

**App. 1445**

resulted in even more robust and reliable networks, which positioned the U.S. broadband industry to effectively manage and overcome the extraordinary challenges the COVID-19 pandemic posed.[59]  Unlike their counterparts in Europe and elsewhere, which face heavy-handed common-carrier regimes, U.S. broadband providers met the needs of American consumers.[60]

The speeds available to broadband consumers have also increased significantly.[61]  At the same time, the price of broadband has been steadily declining, resulting in an increase in consumer purchasing power.[62]  Numerous commenters document the growth in broadband deployment, with at least 90% of the population now having access to wireline or fixed wireless services reaching download speeds of 100 Mbps and upload speeds of 20 Mbps.[63]  Finally,

---

[59] *See* ACA Comments at 2-3, 8-9; Scalia Administrative Law Clinic Comments at 8; AT&T Comments at 3-4; Comcast Comments at 37-38; Focus on Rural America Comments at 2; NCTA Comments at 7-8; 16; Small Business & Entrepreneurship Council Comments at 2-3.

[60] *See* Scalia Administrative Law Clinic Comments at 8 ("U.S. broadband outperformed more-regulated peers abroad: 54 of 108 heavily regulated countries 'experienced a speed reduction' while speeds in the U.S. remained stable") (citing Mark Jamison, *Net Neutrality Is About Control, Not Consumers*, AEIdeas (Dec. 8, 2021), perma.cc/Z52B-3FVJ); Comcast Comments at 37 & n.113; Competitive Enterprise Institute Comments at 9 & n.27; Focus on Rural America Comments at 2; NCTA Comments at 7-8; Small Business & Entrepreneurship Council Comments at 2-3.

[61] *See* Americans for Tax Reform and Digital Liberty Comments at 3 (explaining that the median download speed for fixed broadband increased by 190% in the three years after repeal of the *2015 Order*, while the speeds increased by just 44% in the short period that the *2015 Order* was in effect); *see also* AT&T Comments at 9-10; ACLP Comments at 6-7.

[62] *See* American Consumer Institute Comments at 11-12 (explaining that between 2015 and 2023, weighted average broadband prices decreased by 37%, and weighted average prices for the fastest speed tiers decreased by 38.6%; after accounting for inflation, the price of these services dropped by 54.7% and 55.8%, respectively) (citing Arthur Menko, *2023 Broadband Pricing Index*, USTelecom, at 3-4 (Oct. 11, 2023), https://ustelecom.org/wp-content/uploads/2023/10/USTelecom-2023-BPI-Report-final.pdf); *see also* Texas Public Policy Foundation Comments at 2; Digital Progress Institute Comments at 4-5; ICLE Comments at 13-15; Americans for Tax Reform and Digital Liberty Comments at 2; AT&T Comments at 9-10; Comcast Comments at 30-32; FreedomWorks Comments at 3; James Madison Institute Comments at 2; Heritage Foundation Comments at 2; CTIA Comments at 15; T-Mobile Comments at 13; ACLP Comments at 7.

[63] *See* ITIF Comments at 4; *see also* Comcast Comments at 34-35 ("terrestrial fixed broadband is now deployed to over 94 percent of broadband serviceable locations, with gigabit connections available to 88 percent of the country") (footnote omitted); NTCA Comments at 5 (noting that in rural areas alone, fiber deployments increased from 79.3% in 2022 to 83.5% in 2023).

commenters also observed an increase in competition, with 86.8% of Americans now having access to at least two terrestrial providers offering a 25/3 Mbps service and 61.9% of Americans having access to at least two terrestrial providers offering a 100/10 Mbps service.[64]  Moreover, commenters have recognized that competition now comes from numerous technological sources, including from new home fixed wireless offerings and a new generation of satellite services.[65]

### b.    *No Harms Occurred as a Result of the 2018 Order*

Multiple commenters note the NPRM's failure to identify any instances of blocking, throttling, or paid prioritization that it purports to prevent, and rightly question the Commission's proposal to impose Title II regulation as a solution in search of a problem.[66]  And none of the

---

[64] Digital Progress Institute at 4; *see also* AT&T Comments at 8-9 (providing similar numbers).

[65] *See* T-Mobile Comments at 11-12 (noting that it "has deployed carrier aggregation on its 5G network to support multi-gigabit speeds and used its 5G network investments to compete with cable companies and other entrenched fixed broadband network operators"); Comcast Comments at 27-28 (acknowledging significant competition between wireline and wireless services as well as the rapid development of the satellite broadband service that is "fast becoming a competitor").  Additionally, Comcast noted that "intense competition in the broadband marketplace is underscored by the very high advertising and promotional spending by ISPs."  *Id.* at 28.  It explained that, "in 2022, five different ISPs landed in the top 20 U.S. companies in total advertising, marketing, and promotional spending."  *Id.* (citing Bradley Johnson et al., *The 25 Biggest US Advertisers, Ranked — Leading National Advertisers 2023*, Ad Age (June 26, 2023), https://adage.com/article/datacenter/25-biggest-us-advertisers-include-amazon-comcast-and-pg/2497386).

[66] *See* Americans for Tax Reform and Digital Liberty Comments at 2 (noting that "only two examples are offered [in the NPRM] from the past 20 years that can even remotely be construed as the kind [of] anticompetitive practices that this rulemaking seeks to prevent" and concluding that, in this proceeding, "regulatory action is a solution in search of a problem"); Competitive Enterprise Institute Comments at 14 ("It is unclear, however, why the Commission feels compelled to establish these bright line rules.  ISPs already have indicated that they do not engage in blocking, throttling, or paid prioritization, and there is no evidence that beyond reasonable network management practices (such as for network security) such conduct is occurring."); Scalia Administrative Law Clinic Comments at 6 ("To date, there is no credible evidence of internet service providers engaging in blocking, throttling, or anticompetitive paid prioritization."); ADTRAN Comments at 19 ("But even in the five years after the Commission's open Internet rules were repealed by the *Restoring Internet Freedom Order*, there have been no reports of any anticompetitive blocking or throttling."); Citizens Against Government Waste Comments at 2 (stating that what the Commission "now proposes once again is little more than a solution in search of a problem"); AT&T Comments at 23 ("The NPRM fails to cite any evidence of the types of anticompetitive conduct that have traditionally animated calls for Title II regulation."); CTIA Comments at 10 (describing the NPRM's failure to offer evidence of harmful conduct that could justify the re-

**App. 1447**

commenters supporting Title II regulation identified any credible evidence of conduct such as blocking, throttling, or paid prioritization by ISPs that the NPRM's proposed rules would have prevented.

Commenters instead rehash stale incidents from one to two decades ago, which, by now, have so little relevance that even the NPRM either does not mention them at all or mentions them only in passing.[67]  None of those antiquated examples can justify imposing Title II regulation in 2024.  The only recent example of "blocking" any commenter cites involves YourT1WiFi.com, a small Idaho ISP.[68]  Yet the immediate outcry following initial reports that this small ISP was blocking content without customer consent[69] led to that ISP quickly making clear that it was offering its customers who did not want Facebook and Twitter to be accessible through their broadband service the option of blocking those services.[70]  These events merely

---

imposition of Title II); ICLE Comments at 6 (noting that proposed rules "rest on a speculative foundation, rather than any substantive record of violations").

[67] *See* EFF Comments at 6-7; Engine Comments at 2-4; American Civil Liberties Union ("ACLU") Comments at 5.  While Electronic Frontier Foundation (at 7) offers scattershot one-liners alleging other ISP misconduct, it notably omits any supporting citations as well as any meaningful discussion of who supposedly did what and when.  This is no surprise: to the extent they are even decipherable, EFF's allegations are meritless.

[68] *See* Public Knowledge Comments at 6-7; ACLU Comments at 5; County of Santa Clara et al. Comments at 22.

[69] *See, e.g.*, Karl Bode, *ISP Blocks Twitter and Facebook to Protest Anti-Trump 'Censorship'*, Vice.com (Jan. 11, 2021), https://www.vice.com/en/article/m7a5ay/isp-blocks-twitter-facebook-protest-trump-ban-censorship.

[70] Greg Mason, *North Idaho internet provider blocking Facebook, Twitter upon request over censorship claims*, Spokesman-Review (Spokane, Wash.) (Jan. 11, 2021), https://www.spokesman.com/stories/2021/jan/11/north-idaho-internet-provider-blocking-facebook-tw/; Emily Czachor, *Internet Provider to Restrict Access to Facebook, Twitter to Customers Who Request It*, Newsweek (Jan. 11, 2021), https://www.newsweek.com/internet-provider-restrict-access-facebook-twitter-customers-who-request-it-1560656.

**App. 1448**

confirm the *2018 Order*'s predictive judgment that watchdogs will help publicize — and create pressure to reverse — any actual threats to internet openness.[71]

Finally, commenters supporting Title II present no credible evidence that state net neutrality laws prevented the harms that the new Title II rules aim to remedy. Instead, as one commenter aptly noted, "broadband providers didn't engage in such behavior before the state laws went into effect, so it is unclear why these laws now restrain behavior that would otherwise occur."[72] Rather, as explained below, ISPs do not engage in such behavior because it is contrary to their economic interests.

> ### c. ISPs Have No Economic Incentives To Engage in Conduct the NPRM Purports To Prohibit

Many commenters observe that economic theory predicts the lack of any ISP conduct that would undermine the openness of the internet. Those commenters agree that the U.S. broadband market is characterized by intense competition.[73] That competition comes not only from wireline broadband providers, including those investing in new fiber deployment, but also from 5G fixed wireless providers and satellite broadband providers.[74] In a competitive market, consumers can switch providers when they are not satisfied with the service they receive. As one commenter notes, ISPs have made "it easier to switch providers by streamlining the connection process,

---

[71] *See 2018 Order* ¶ 240.

[72] Westling Comments at 3.

[73] *See* 5G Americas Comments at 5; ACA Connects Comments at 8-12; ACLP Comments at 6-7; Americans for Tax Reform and Digital Liberty Comments at 2; AT&T Comments at 8-10; Yoo & Hurwitz Comments at 6; Comcast Comments at 18-28; CTIA Comments at 13-19; Digital Progress Institute Comments at 4; Free State Foundation Comments at 7-8, 31-36; Scalia Administrative Law Clinic Comments at 4-8; Heritage Foundation Comments at 2; ICLE Comments at 9-23; Westling Comments at 2-3; National Rural Electric Cooperative Association ("NRECA") Comments at 5; NTCA Comments at 6-7; R Street Institute Comments at 3, 6-7; Small Business & Entrepreneurship Council Comments at 2-4; Texas Public Policy Foundation Comments at 2; T-Mobile Comments at 51; United States Hispanic Chamber of Commerce et al. Comments at 1; Verizon Comments at 6, 16; WISPA Comments at 11-13.

[74] *See, e.g.*, USTelecom Comments at 41-42.

**App. 1449**

including by drop-shipping modems/routers and integrated RF fixed modems/routers and providing responsive customer service."[75]  And the U.S. Chamber of Commerce, among others, explains that competition in the broadband market imposes "significant checks on behavior that diminish the need for extensive regulation."[76]

Recent consumer survey evidence confirms this.  Broadband customers were asked about their likelihood of switching providers if their current provider engaged in one of the actions that the NPRM aims to prohibit, such as blocking their favorite websites or slowing down the internet speeds for those sites.[77]  Between 65% and 74% of respondents stated that they would likely switch if their provider were to engage in one of those behaviors.  And more than 20% of respondents stated that they would be "very likely" to switch providers if their current provider engaged in any of those activities.[78]  The high willingness of a large percentage of customers to switch providers creates strong economic incentives for providers not to engage in those behaviors.

Some commenters, however, assert that the residential broadband market is insufficiently competitive because, they say, many consumers have access to "only" two providers.[79]  To begin with, such assertions typically ignore the new generation of home broadband services, including

---

[75] ACA Connects Comments at 15.

[76] U.S. Chamber of Commerce Comments at 5; *see also* Fiber Broadband Association Comments at 9 ("The NPRM fails to recognize that BSPs are dependent upon developing and retaining a satisfied end-user base.  If they were to block, throttle, or degrade internet traffic, they would lose subscribers to their competitors and suffer reputational harm that would make it harder to attract new ones.  This alone is sufficient to prevent BSPs from acting anti-competitively or 'closing' access to the Internet."); NTCA Comments at 11-13.

[77] *See Broadband Survey Results* at 2-3 & fig. 3.

[78] *See id.*  In contrast, only 5.4% of respondents answered "not at all likely" in response to all five posited actions.  *See id.* at 3.

[79] *See, e.g.*, INCOMPAS Comments at 9.

**App. 1450**

not only satellite services, but also fixed wireless broadband. A large percentage of consumers view fixed wireless broadband as interchangeable with wireline broadband offerings.[80]

Equally important, such assertions ignore the economic dynamics that, as the Commission has found, produce competitive conditions even in markets with two providers.[81] The broadband marketplace is characterized by the enormously high fixed costs of broadband deployment and the low marginal costs of serving individual customers in that area once the network is up and running. As a result, economic theory predicts — and marketplace competition confirms — that broadband rivals have strong incentives to compete fiercely to gain and retain customers.[82] In a dynamic market, the optimal number of firms is reached much more quickly than in static markets, and it tends to be smaller.[83] It is therefore unreasonable to expect the number of firms in the broadband market needed for competitive conditions to obtain to be similar to the number of firms in the markets that are more static. Further confirmation of the competitiveness of the existing U.S. broadband market is found in providers' lower profit margins as compared to other public firms.[84]

---

[80] *See* USTelecom Comments at 42 (providing data on new fixed wireless broadband subscriptions). In addition, many consumers solely rely on mobile broadband for internet access. *See id.* at 42 n.160.

[81] *See, e.g.*, Report and Order, *Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459, ¶ 120 (2017), *remanded in part sub nom. Citizens Telecomms. Co. of Minn. v. FCC*, 901 F.3d 991 (8th Cir. 2018).

[82] *See, e.g.*, USTelecom Comments at 46; Declaration of Mark Israel, Bryan Keating & Allan Shampine ¶¶ 49-50 (Dec. 14, 2023) ("Israel et al. Decl.") (attached to NCTA Comments as Ex. A).

[83] *See* ICLE Comments at 21.

[84] *See* American Consumer Institute Comments at 14.

**App. 1451**

### 2. The General Conduct Standard Is Not Needed and Would Harm Innovation

The record also shows that the general conduct standard is vague and will create uncertainty.[85] The general conduct standard may also lead to discriminatory enforcement.[86] That uncertainty will harm innovation and investment, reducing consumer choice.[87] And the NPRM's proposal to reinstate an advisory opinion process will not remedy these problems. As commenters noted, the Commission "does not have a track record of providing prompt and clear guidance on what might be a violation of the general conduct rule."[88] And because advisory opinions will not be binding on the Commission,[89] they will "not provide ISPs with certainty about whether their conduct complies with the general conduct standard or not."[90]

### 3. Reclassification Would Open the Door to Harmful Rate Regulation

Commenters express near uniform support for the NPRM's proposal to forbear from rate regulation,[91] including commenters that support reclassification.[92] But many recognize that

---

[85] *See* ADTRAN Comments at 27-28; ITIF Comments at 8; EFF Comments at 21; NCTA Comments at 7, 97-98; Telecommunications Industry Association Comments at 6; U.S. Chamber of Commerce Comments at 66-68; Verizon Comments at 7; AT&T Comments at 25-26.

[86] U.S. Chamber of Commerce Comments at 66.

[87] *See* Free State Foundation Comments at 48-54; ITIF Comments at 8; NCTA Comments at 21-22; Telecommunications Industry Association Comments at 6; Verizon Comments at 7; AT&T Comments at 26.

[88] *See* ADTRAN Comments at 28; *see also* Telecommunications Industry Association Comments at 6-7.

[89] *2015 Order* ¶ 239.

[90] Free State Foundation Comments at 52.

[91] *See* 5G Americas Comments at 4-5; ACA Connects Comments at 49-50; ADTRAN Comments at 14-15; AT&T Comments at 5-6, 26-28; Citizens Against Government Waste Comments at 11-12; Competitive Enterprise Institute Comments at 11-12; CTIA Comments at 59-60; Free State Foundation Comments at 45; Heritage Foundation Comments at 1-2; T-Mobile Comments at 47; WISPA Comments at 59.

[92] *See* Free Press Comments at 47, 60-61; INCOMPAS Comments at 59-60; California Independent Small LECs Comments at 4, 19-26.

**App. 1452**

forbearance is not enough and that the threat of rate regulation, including from the vague general conduct standard[93] and the Commission's claimed ability to undo forbearance, will lead to regulatory creep and deter innovation and investment.[94]

What limited opposition there is on this issue is grounded in misconceptions about the broadband market. For example, while one commenter asserts that rate regulation is needed because competition will not bring down prices,[95] the record shows competition has led to a consistent decline in broadband prices over time, even as speeds have increased.[96] This commenter also ignores providers' significant efforts to retain customers, including by offering discounts to those who seek to disconnect their service.[97] Moreover, some commenters note that the price of broadband may increase as a result of reclassification, as states may impose on broadband a variety of taxes that apply to telecommunications services — such as state property taxes and receipts-based taxes[98] — as well as due to the cost of compliance with Title II regulation, which would impose a particularly heavy burden on small ISPs.[99]

---

[93] For example, commenters correctly point to the prior Commission's effort to use the general conduct standard to engage in rate regulation by limiting the use of zero-rating. *See* AT&T Comments at 27-28; CTIA Comments at 101-03; Free State Foundation Comments at 46-47; WISPA Comments at 58-59. But zero-rating benefits consumers and providers. *See* Westling Comments at 4-5; CTIA Comments at 102-03; ICLE Comments at 30-32.

[94] *See* 5G Americas Comments at 4-5; ADTRAN Comments at 14-15; ACA Connects Comments at 43; AT&T Comments at 5-6, 26-27; Citizens Against Government Waste Comments at 11-12; Competitive Enterprise Institute Comments at 11-14; CTIA Comments at 97-98, 101; Free State Foundation Comments at 46; WISPA Comments at 57-59.

[95] *See* Media, Inequality & Change Center Comments at 1.

[96] *See supra* Part III.A.1.a.

[97] *See* USTelecom Comments at 47; Israel et al. Decl. ¶ 70.

[98] American Consumer Institute Comments at 2-4.

[99] U.S. Chamber of Commerce Comments at 18 (noting that "in 2020, the Wireless Internet Service Providers Association ('WISPA') reported that the [*2018 Order*'s] reclassification back to Title I created cost savings that allowed one company . . . to avoid what would have been necessary rate increases of $10-13 per customer to cover Title II compliance costs"); WISPA Comments at 42-43 (stating

**App. 1453**

Free Press purports to oppose actual rate regulation, but urges the Commission to hold out the threat of such regulation to "nudge" the marketplace.[100] But such a sword of Damocles hanging over the industry will not lead to "positive outcomes" and will in fact harm the industry — and ultimately consumers — by deterring innovation and investment.[101] The Commission previously and correctly concluded that the threat of a reversal of course on the forbearance in the *2015 Order* undermined investment incentives.[102] And the current Commission also recognized as much when it departed from the draft NPRM's proposal to forbear only from *ex post* rate regulation to the final NPRM's proposal to forbear from both types of rate regulation.[103] In the absence of any evidence of abusive pricing practices of ISPs, there is no need for rate regulation.

New America's Open Technology Institute insists that the forbearance from rate regulation must not limit the Commission's ability to "study" broadband pricing.[104] But the broadband labels that the Commission requires pursuant to the Infrastructure Investment and Jobs Act of 2021 ("IIJA")[105] will provide the agency with information on broadband prices. Title II classification is entirely unnecessary to achieve that purpose.

---

that the cost to comply with the vague general conduct standard "will ultimately be borne by consumers, via higher prices").

[100] Free Press Comments at 47.

[101] *See* 5G Americas Comments at 4-5; ADTRAN Comments at 14-15; ACA Connects Comments at 43; AT&T Comments at 5-6, 26-27; Citizens Against Government Waste Comments at 11-12; Competitive Enterprise Institute Comments at 11-14; CTIA Comments at 97-98, 101; Free State Foundation Comments at 46; WISPA Comments 57-59; *see also infra* Part III.B.

[102] *See 2018 Order* ¶ 101; Ford Paper at 12 (explaining why that conclusion was correct).

[103] *Compare* Draft Notice of Proposed Rulemaking, *Safeguarding and Securing the Open Internet*, WC Docket No. 23-320, FCC-CIRC2310-01, ¶ 104 (Sept. 28, 2023), *with* NPRM ¶ 105.

[104] *See* New America's Open Technology Institute ("OTI") Comments at 37-38.

[105] Pub. L. No. 117-58, 135 Stat. 429 (2021).

**App. 1454**

#### 4. *Reclassification Would Undermine Consumer Privacy*

Commenters recognize that Title II classification will deprive the FTC, the expert privacy agency, from exercising privacy authority over broadband, which will harm consumers.[106] In contrast to the FTC, the Commission's own privacy authority is limited to CPNI.[107] Those that disagree[108] are incorrect for reasons we previously explained.[109] In addition, the Congressional Review Act will severely limit the Commission's ability to promulgate new broadband privacy rules even if it were to try.[110]

Commenters that contend reclassification will promote privacy fail to grapple with these issues and often simply note that privacy is important.[111] But precisely because consumer privacy is important, it "should be protected by equal rules under a single enforcement

---

[106] *See* Free State Foundation Comments at 8, 42-44; WISPA Comments at 93; ACA Connects Comments at 33; CTIA Comments at 39; Digital Progress Institute Comments at 17.

[107] *See* Free State Foundation Comments at 44 (noting that Section 222 is limited to CPNI); AARP Comments at 9-10 (arguing that reclassification would support Commission's efforts to protect consumer privacy, but acknowledging that Section 222 extends only to CPNI); ADTRAN Comments at 30; ACLU Comments Part III.A (claiming that Title II reclassification will help close "privacy loopholes" while recognizing that Section 222 is limited to CPNI); CCIA Comments at 16-17; Consumer Federation of America Comments at 58; *see also* USTelecom Comments at 9-11, WC Docket No. 22-21 (Feb. 22, 2023); CTIA Comments at 10-17, WC Docket No. 22-21 (Feb. 22, 2023); USTelecom Ex Parte Notice at 1, WC Docket No. 22-21 (filed Dec. 6, 2023); CTIA Ex Parte Notice at 2-6, WC Docket No. 22-21 (filed Dec. 6, 2023).

[108] Electronic Privacy Information Center et al. Comments at 9.

[109] USTelecom Comments at 66-68 (explaining that the Commission's consumer privacy authority is limited to CPNI, contrary to the Commission's recent assertions).

[110] *See* Free State Foundation Comments at 44; Privacy for America Comments at 7-8; ACA Connects Comments at 33-34; ADTRAN Comments at 30; Consumer Action for a Strong Economy Comments at 2; CTIA Comments at 39-40; Digital Progress Institute Comments at 17; ITI Comments at 4; NCTA Comments at 22-23; U.S. Chamber of Commerce Comments at 33.

[111] *See, e.g.*, American Library Association Comments at 16; CPUC Comments at 34-35; Electronic Privacy Information Center et al. Comments at 1-18; Mozilla Comments at 7.

**App. 1455**

authority,"[112] and the FTC is best suited for that purpose as it is the only agency that can comprehensively regulate internet actors.[113]

Nor is there any reason to single out ISPs for a privacy regime that differs from the one that applies to all other online and offline business, which will continue to be regulated by the FTC. Tellingly, commenters never explain why bifurcating privacy regulation of the internet ecosystem between the Commission and the FTC is sensible. And ISPs do not uniquely possess personal information; personal information is collected across the internet ecosystem, including by Big Tech companies that may collect far more data and that are beyond the Commission's jurisdiction.[114] It makes no sense — and would confuse consumers — to regulate the same information differently based on whether it is in the hands of an ISP or a Big Tech company.

---

[112] *See* Free State Foundation Comments at 45; *see also* Privacy for America Comments at 8-9 ("[F]ar from authorizing this action by the Commission, Congress has instead worked toward creating a national privacy standard that would regulate BIAS providers outside the Communications Act and the FCC's jurisdiction entirely in order to create a consistent, technology neutral national privacy framework.").

[113] *See* NTCA Comments at 24-25; WISPA Comments at 93 ("Unlike the FTC, though, the Commission's enforcement power does not include the ability to seek refunds for injured customers and it is limited to conduct going back only one year."); CTIA Comments at 39; Free State Foundation Comments at 8; NCTA Comments at 77; Verizon Comments at 9-10.

[114] *See* Free State Foundation Comments at 44-45; Privacy for America Comments at 4 ("Imposing requirements under Section 222 for use of data collected by BIAS providers that are different from the requirements for other Internet technology and services providers, as the Commission proposes to do, would reduce competition in the online marketplace within which BIAS providers operate, and would create inconsistent privacy rules that would be difficult for consumers to understand, while degrading consumer welfare."); WISPA Comments at 93-94 (noting that treating content providers and ISPs differently would unfairly advantage content providers and confuse consumers); Future of Privacy Forum Comments at 1-2 ("Ultimately, we believe that the most effective way to protect individuals and ensure comprehension will be to reach greater national consensus on strong privacy rules for all processors of personal information."); ADTRAN Comments at 30-31; Consumer Action for a Strong Economy Comments at 2-3; Consumer Federation of America Comments at 59; NCTA Comments at 58-59; Verizon Comments at 9-10; NTCA Comments at 26.

**App. 1456**

Some commenters claim that a 2021 FTC Staff Report supports ISP-specific privacy rules.[115] But that report considered the privacy practices not just of ISPs but also of non-ISP companies, such as "advertising entities," then-affiliated with ISPs, without distinguishing between the privacy practices of the ISPs that the Commission proposes to regulate and those of the non-ISP companies that will remain subject to FTC regulation even after reclassification.[116] The FTC also did not distinguish between long-ago and current conduct, whether of ISPs or their then-affiliates that are not ISPs. In both ways, this report conflates a wide variety of conduct, without identifying which entity is engaged in the conduct identified and whether the entity is an ISP as opposed to a non-ISP. The Commission, therefore, cannot rely on the FTC Staff Report as evidence of the current privacy practices of the ISPs that the Commission proposes to subject to Title II regulation. It also provides no reason for singling out mass-market, retail ISPs — the only entities the Commission proposes to classify as common carriers — for special treatment when it comes to protecting the privacy of customers' personal information. Indeed, the FTC Staff Report notes that the practices it details also occur "across other industries, including significantly, edge providers."[117]

## B. Reclassification Would Undermine Investment Incentives

The Commission has repeatedly "recognized that regulatory burdens and uncertainty, such as those inherent in Title II, can deter investment by regulated entities."[118] The comments

---

[115] *See* Electronic Privacy Information Center et al. Comments at 5; Lawyers' Committee for Civil Rights Under Law Comments at 15.

[116] FTC Staff Rep., *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* 2-3 (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf.

[117] *Id.* at 44.

[118] *2018 Order* ¶ 88 & n.331 (citing prior Commission decisions).

**App. 1457**

overwhelmingly demonstrate that the same conclusion holds today.[119] Of Title II proponents, only Free Press seriously attempts to demonstrate otherwise,[120] but its flawed analysis provides no basis for departing from the Commission's prior findings and sound economics.

      1.    *Free Press's Claims That Public Utility Regulation Does Not Depress Investment Is Contrary to Basic Economic Theory*

Free Press's contention that broadband providers will be indifferent to imposition of Title II regulation is, as the Commission previously found, contrary to "economic theory."[121] As the Commission explained, "[t]he mechanisms by which public utility regulation can depress investment by the regulated entity are well-known in the regulatory economics literature."[122] Specifically, whether to invest in broadband depends on "(1) expected costs (including the costs of regulatory compliance), (2) expected revenues, and (3) the degree of uncertainty about costs and revenues."[123] But the regulatory regime the NPRM proposes would increase expected costs, reduce expected revenues, and make projections about costs and revenues less reliable and much riskier.[124] This can undermine not only investment in physical facilities, but also investment in innovative new services and business models.[125]

---

[119] *See*, *e.g.*, Scalia Administrative Law Clinic Comments at 3-4; Americans for Tax Reform and Digital Liberty Comments at 2-5; AT&T Comments at 25-31; U.S. Chamber of Commerce Comments at 15-19; CTIA Comments at 97-99; Ford Paper at 12-26; NCTA Comments at 91-94; Israel et al. Decl. ¶¶ 72-79; USTelecom Comments at 61-64.

[120] *See* Free Press Comments at 74-133.

[121] *2018 Order* ¶¶ 92-93; *see also id.* ¶ 88.

[122] *Id.* ¶ 89.

[123] AT&T Comments at 24; *see also* Israel et al. Decl. ¶¶ 74-76.

[124] *See* AT&T Comments at 25-31; Israel et al. Decl. ¶¶ 72-99.

[125] *See 2018 Order* ¶¶ 88-102.

**App. 1458**

Free Press concedes that, as a matter of basic economics, "regulation creates uncertainty, which in turn reduces the regulated industry's investment."[126]  But Free Press then contends that this does not matter because "regulation and . . . uncertainty are just two among many factors impacting investment."[127]  This is no response at all.  Regulation and regulatory uncertainty are within the Commission's control, and reducing those "factors" will increase investment, all else held equal.

To the extent Free Press contends that regulatory costs and risks can be ignored because ISPs are committed to preserving an open internet and not engaging in blocking and throttling,[128] it is simply wishing away the problem.  The NPRM proposes to regulate well beyond "no blocking/no throttling" rules.  For example, the NPRM presages a host of new and burdensome rules that would raise the costs of deployment, including new network reliability and resiliency requirements, national and cyber security mandates, and Section 214 restrictions.[129]

Free Press's assertion that it is "irrational" and a mere "lobbyist talking point" to contend that the Commission intends to engage in price regulation that would threaten ISP revenues[130] is long on rhetoric but short on foundation.  In fact, the NPRM expressly "propose[s] to allow the Commission to review the particulars of a certain data plan" by applying Sections 201 and 202, "which prohibit unjust and unreasonable charges,"[131] as well as to review the reasonableness of

---

[126] Free Press Comments at 89.

[127] *Id.*

[128] *Id* at 78-79, 89.

[129] *See*, *e.g.*, AT&T Comments at 26-30; Ford Paper at 24-25; NCTA Comments at 67-79; USTelecom Comments at 70-83.

[130] Free Press Comments at 132.

[131] NPRM ¶ 156.  Further, as USTelecom explained, having reclassified, a future Commission could assert authority to reverse forbearance from rate regulation.  USTelecom Comments at 60; *see also 2018 Order* ¶ 101 (noting that, notwithstanding the *2015 Order*'s use of forbearance, providers may be "less willing to invest due to concerns that the Commission could reverse course in the future and impose

the rate structure of broadband plans (such as usage-based pricing) under the general conduct standard.[132]  And under the proposed regime, the Commission would superintend the prices that ISPs charge for interconnection.[133]  Having asserted such broad legal authority, it is inevitable that the Commission will face pressure to engage in even more aggressive review, with the inevitable risk of further regulatory creep.[134]

The Commission itself has recognized that subjecting broadband to Title II is a recipe for regulatory creep.[135]  And the NPRM confirms that concern.  Even as compared to the *2015 Order*, the NPRM proposes reduced forbearance and increased regulation.[136]  And the general conduct standard is meant to put in place a regime that would allow the Commission to condemn a wide, but indeterminate, variety of conduct beyond the three bright-line rules.[137]  That standard does not limit the Commission, but instead empowers it to strike down conduct based on any

---

a variety of costly regulations on the broadband industry"); *2018 Order* ¶ 250 (discussing use of the general conduct standard to attack zero-rating practices).

[132] *See* NPRM ¶ 156.

[133] *See id.* ¶ 66.

[134] Title II proponents expressly ask the Commission to utilize its asserted regulatory authority to ensure rate plans and interconnection charges are "cost-based" and maximize "consumer surplus."  *See* Jordan Comments at 36-38 (proposing test for maximum rate for usage-based pricing); Scott Jordan & Ali Nikkhah ("Jordan-Nikkhah") Comments at 8-10 (arguing current paid-peering prices are too high, in excess of "cost" and do not maximize "consumer surplus," and that "settlement-free" peering should be mandated).

[135] *2018 Order* ¶¶ 101-102; AT&T Comments at 25-26; Israel et al. Decl. ¶¶ 75-86; USTelecom Comments at 63-64.

[136] NPRM ¶¶ 27, 99, 108 (proposing not to forbear from portions of Section 214 that the Commission did forbear from in 2015); *id.* ¶ 39 (suggesting the need for network reliability and resiliency regulation pursuant to Title II); *id.* ¶¶ 30-32 (suggesting the Commission intends to mandate "cybersecurity standards or performance goals" and require ISPs to "implement cybersecurity practices and risk management plans" under Title II); *see also* AT&T Comments at 28-30.

[137] *2015 Order* ¶ 135 (stating the general conduct standard is intended to allow the Commission to address unidentified "current or future practices" that "cause the type of harms our [bright-line] rules are intended to address").

considerations it believes appropriate.[138]  "With future regulations open to such uncertainties, Title II regulation adds a risk premium on each investment decision, which reduces the expected profitability of potential investments and deters investment."[139]

> ### 2.  *Free Press's Purported "Empirical" Analyses Are Flawed and Cannot Be Given Any Weight*

Free Press's assertion that broadband deployment "accelerated" as a result of the *2015 Order* is based on untenable analyses contrived to reach a predetermined result.[140]  That is no surprise: it is economically implausible to suggest that intrusive public utility regulation will have no dampening effect on broadband investment incentives.

**Free Press's Deployment Analysis.**  Free Press relies principally on a series of line graphs that purport to show deployment (generally from December 2014 to December 2017) using coverage and speed metrics.[141]  Free Press's approach is statistically unsound and is flawed even under its own terms.

**a.**  Most critically, Free Press's comparisons do not utilize *any* statistical techniques to isolate the potential effects of regulation.  Despite acknowledging that many factors influence broadband investment, Free Press does nothing to account for those other factors.  As a result,

---

[138] *Id.* ¶ 138 ("non-exhaustive list of factors"; "in addition to the following list, there may be other considerations relevant to determining whether a particular practice violates" the general conduct standard).

[139] *2018 Order* ¶ 101.

[140] *See* Free Press Comments at 78.  Free Press acknowledges that its comments largely reiterate prior filings from the 2017 proceeding, *see id.* at 74, but it does not address the shortcomings others identified in those comments — most notably that Free Press's analysis does not even attempt to control for the many variables that can affect investment in addition to regulation.  *See, e.g.*, AT&T Reply Comments at 54-55, *Restoring Internet Freedom*, WC Docket No. 17-108 (Aug. 30, 2017); NCTA Reply Comments at 18-19, *Restoring Internet Freedom*, WC Docket No. 17-108 (Aug. 30, 2017); George S. Ford, *Reclassification and Investment: An Analysis of Free Press' "It's Working" Report*, Phoenix Ctr. for Advanced Legal & Econ. Pub. Pol'y Studies (May 22, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2982440.

[141] Free Press Comments at 80-88.

**App. 1461**

Free Press's approach of simply comparing levels of deployment across particular years, rather than analyzing whether those levels would be greater (or lower) in the absence (or presence) of Title II regulation in any given year, is economically meaningless, as the Commission noted when Free Press submitted a similar analysis in 2017.[142]

In stark contrast, Dr. George Ford sought to isolate the impact of regulation by constructing a counterfactual for telecommunications investment absent the cloud of Title II regulation and applying standard econometric techniques to determine the difference in performance between the counterfactual and the communications industry.[143]  The result of that analysis is that the threat of Title II has reduced investment by approximately 10% — about $8 billion annually[144] — equivalent to about 81,000 information technology sector jobs and 195,000 total jobs.[145]  Dr. Ford also finds that his estimates "likely understate the effects" of the NPRM, which proposes a regime that is more intrusive than the one adopted in the *2015 Order*.[146]

---

[142] *See 2018 Order* ¶ 92 (noting that investment can be impacted by "other factors" besides regulation, "such as technological change, the overall state of the economy, and the fact that large capital investments often occur in discrete chunks rather than being spaced evenly over time"); *id.* ¶ 94 ("While some commenters contend that deployment and subscribership continued to increase after the *Title II Order*, such that nothing is amiss, this casual observation does not compare observed levels of subscribership and deployment *to a relevant counterfactual that controls for other factors*.") (footnote omitted; emphasis added) (citing and discussing Free Press comments); *id.* ¶ 98 ("[W]e disagree with commenters who assert that Title II has increased or had no effect on ISP investment, given the failure of other studies to account for complexity of corporate decision-making and the macroeconomic effects that can play a role in investment cycles.").

[143] Ford Paper at 18-19.  Dr. Ford builds on his prior work, which the Commission recognized provides a "statistical analysis [that] allows one to compare the actual level of investment with a counterfactual estimate of what investment would have been in the absence of the change in risk."  *2018 Order* ¶ 95; *see also id.* ¶ 98 (relying on Ford study because it "control[led] the most carefully for other factors that may affect investment").

[144] Ford Paper at 5.

[145] *Id.*

[146] *Id.* at 24.

**App. 1462**

Dr. Ford's findings are consistent with other empirical analyses that, unlike Free Press's, use statistical techniques to seek to isolate the impacts of regulation from other confounding variables. A recent econometric study concludes that "interventionist" net neutrality regulations have "exert[ed] a significantly negative and substantial impact" on broadband investment.[147] Comparisons with broadband investment in Europe provide another counterfactual for assessing the impact of reclassification. As Drs. Israel, Keating, and Shampine have explained, "[t]he more heavily regulated Europe has had less widespread deployment by fewer firms than the U.S. has."[148]

Free Press also fails to control for the fact that the industry has been operating under the shadow of significant regulation since 2010.[149] Although particular Commission action can exacerbate the risk to broadband deployment, Free Press's analysis is based on the false assumption that the risk of regulation only emerged in 2015 and definitely ended in 2017.[150] Again, Dr. Ford's analysis seeks to control for the potential impact of substantive rules that emerged beginning in 2010.

**b.** In addition, Free Press makes a number of errors in implementing its analysis even if its overarching methodology were otherwise sound.[151]

---

[147] *See* Wolfgang Briglauer et al., *Net Neutrality and High-Speed Broadband Networks: Evidence from OECD Countries*, 55 Eur. J. L. Econ. 533, 552 (2022); *see also id.* at 541-42 (contrasting U.S. and E.U. regulation); Scalia Administrative Law Clinic Comments at 3 (discussing econometric study).

[148] Israel et al. Decl. ¶ 87.

[149] Ford Paper at 2-3, 17.

[150] Free Press Comments at 80 ("In this section, we will focus primarily on . . . changes occurring between December 31, 2014 and December 31, 2017.").

[151] Free Press also asserts that the supposed "muted" response by ISPs supports the notion that reclassification will not undermine investment. Free Press Comments at 128-30. Even if significant inferences could be drawn from this "muted response," *cf. 2018 Order* ¶ 102, it is consistent with the expectation that the courts will promptly strike down reclassification if it occurs under the major

*First*, Free Press primarily focuses on deployment metrics, not investment.[152]  This is problematic here because deployment *lags* capital investment decisions by many months or years.[153]  As the Commission recognized in the *2018 Order*, "companies may take several years to adjust their investment plans" to changes in regulation.[154]  An ISP that wants to deploy to a particular city must make that decision, allocate capital to that deployment, buy fiber and other equipment needed for that deployment, obtain necessary permits, and hire the workforce needed to deploy it, all before any deployment occurs — and with many steps still to go before service is turned on for customers.

Accordingly, when Free Press cites increased availability of broadband in 2015-2016, the investment decisions that resulted in that increase likely occurred much earlier, long before the *2015 Order* was adopted or even proposed.  Thus, to the extent increased deployment resulted in increased broadband availability in 2015 or 2016, that is consistent with how the industry operated under the light-touch regulatory regime that was in place at the time of the key underlying investment decisions.

*Second*, Free Press's "speed" analysis fails to untangle the difference between upgrades in existing systems and new deployment.[155]  Increases in the percentage of the population covered by higher speed services primarily reflect cable ISPs implementing DOCSIS

---

questions doctrine, and there is no logical basis to conclude it is proof that ISPs do not view Title II as having meaningful impact.

[152] *See* Free Press Comments at 80-88.

[153] Further, strategic investment plans can be adopted in advance of actual investment.

[154] *2018 Order* ¶ 92.

[155] Free Press Comments figs. 5-8.

upgrades.[156]  As Free Press acknowledges,[157] these types of incremental investments are generally much less capital-intensive than new fiber deployments, because they require only electronics upgrades.  But when USTelecom's members expand or improve service by deploying new fiber, they are making investments that are both extremely costly and risky.[158]  Indeed, Free Press acknowledges that "Local Exchange Carrier ISPs . . . face and continue to face a much more costly upgrade path than cable company ISPs."[159]  If the Commission wants more fiber-based competition to cable, it should remove the threat of Title II regulation.

*Third*, many of Free Press's deployment comparisons end with 2017.[160]  But under the logic of Free Press's analysis, post-2017 data would need to be considered to assess the impact of the short-lived Title II experiment.  The Commission's own data shows substantial increases in broadband deployment since 2017 driven by massive investment — with significant expansion of fiber broadband coverage and the deployment of new fixed wireless technology resulting in the increasing availability of multiple broadband providers and substantially increased speeds.[161]

---

[156] *Id.* at 87 n.190, 113-14.

[157] *Id.* at 125 (incremental upgrade costs are "low"); *see also id.* at 113-14 (describing relatively modest costs for DOCSIS upgrades that can substantially increase speed).

[158] AT&T Comments at 22-25.

[159] Free Press Comments at 88.

[160] *Id.* figs. 5-8.

[161] *See* 2022 FCC Communications Marketplace Report, *Communications Marketplace Report*, 37 FCC Rcd 15514, ¶ 25 fig. II.A.4 (2022) ("*2022 FCC Communications Marketplace Report*") (substantial increase in fixed wireless coverage in speed from December 2017 to December 2021); *id.* ¶ 30 fig. II.A.10 (substantial increased in fixed wireline residential connections from 2018 to 2021); *id.* ¶¶ 30-31 figs. II.A.10-11 (substantial increase in download speeds from Dec. 31, 2018 to December 31, 2021); *id.* ¶¶ 57-61 figs. II.A.28-33 (substantial increase in competitive alternatives); *see also* Americans for Tax Reform and Digital Liberty Comments at 3 (showing sharply increasing median download speeds after repeal of Title II); Comcast Comments at 20 (same); Israel et al. Decl. Part II (providing numerous metrics demonstrating increased broadband deployment, competition, and output post-Title II).

**App. 1465**

Free Press tries without success to make lemonade out of lemons by purporting to show the robust deployment of fiber-to-the-home that occurred after 2017 was "expected" based on the industry's performance from 2009 to 2017.[162]  Free Press uses what it calls a "fitted" curve based on an undisclosed "third-order polynomial" to suggest that deployment would have continued increasing after 2017 at the same pace as before even if the *2015 Order* had remained in effect. This is clearly contrived.  There is no reason to think that new deployment in one period would be duplicated in the following period based on an arbitrary third-order polynomial curve.

In addition, Free Press's data set includes deployment made when broadband was classified as an information service (2009-2015) and when the Commission had reclassified it as a telecommunications service (2016-2017), but the decision to invest and deploy had been made during the prior period.[163]  Showing that broadband investment without the overhang of regulation has generally experienced an upward trajectory does not support Free Press's position — to the contrary, it supports the commonsense conclusion that broadband investment will flourish in the absence of common-carrier regulation.

**Free Press's Investment Analysis.**  Free Press also provides selected capital spending data,[164] but even it disclaims putting any significant weight on it.[165]  That disclaimer is well taken.  As with its deployment analysis, Free Press again fails to use any statistical techniques to isolate the influence of regulation from the "numerous factors" that it concedes influence investment.[166]  "[E]ven an increase in investment could reflect reduction in the investment that

---

[162] Free Press Comments at 118 & fig. 29.

[163] *See supra* Part III.B.2.b (explaining that actual deployment typically lags the decision to deploy).

[164] Free Press Comments at 89-119.

[165] *Id.* at 90 (stating this analysis is "*at best* mildly informative") (emphasis added).

[166] *Id.* at 119.

**App. 1466**

would have occurred without regulation."[167]  Absent statistical controls, Free Press cannot rule out that investment could have been even higher during the Title II era but for regulation and that factors like the 2020 economic downturn and COVID-19 depressed post-2017 investment.[168]

Beyond this conceptual flaw, Free Press's capital investment analysis suffers from many of the implementation errors discussed above with regard to its deployment analysis.  Free Press does not account for the potential impact of the *2010 Order*,[169] nor the fact that capital investment decisions are made well in advance of when deployment occurs.  Empirical analysis shows "the negative impact of net neutrality does not immediately manifest in current investment plans of ISPs but only with some delay due to considerable rigidities in broadband deployment."[170]

### C.    Reclassification Is Not Needed To Protect Public Safety or To Fund Broadband Through the Universal Service Fund, or To Ensure Pole Attachment Rights

**Public Safety.**  No commenter offers a persuasive public safety justification for Title II regulation.  Instead, commenters correctly note that the Commission already supports public safety needs under the current Title I classification.  For example, "in the context of IP-enabled services, the Commission has already applied E-911 obligations, including outage disclosure obligations," to those services even without classifying them under Title II.[171]  And the

---

[167] Declaration of Mark A. Israel, Allan L. Shampine & Thomas A. Stemwedel ¶ 104 (attached to Comments of AT&T Services Inc., WC Docket No. 17-108 (filed July 17, 2017)).

[168] *See supra* note 142 (discussing Commission findings rejecting Free Press's prior analysis for this failure).

[169] Report and Order, *Preserving the Open Internet*, 25 FCC Rcd 17905 (2010) ("*2010 Order*").

[170] Mark A. Jamison Comments at 5 (quoting Briglauer et al., 55 Eur. J. L. Econ. at 543, 549).

[171] ADTRAN Comments at 11-12.

Commission continues to implement Next Generation 911 requirements for IP-enabled services without the necessity of a Title II classification.[172]

Moreover, while some commenters assert that reclassification will help resolve outage issues by "enhanc[ing] both wired and wireless outage reporting,"[173] any benefit from reclassification would be negligible. Most ISPs also offer cable, telecommunications, or interconnected VoIP services, and each of those services is subject to the Commission's existing outage reporting rules.[174] As such, ISPs' outage reports already cover the broadband component of their commingled networks.[175] Simply put, there is no evidence that the Commission has been unable to advance public safety under its current framework.[176]

Commenters also explain that a reclassification may in fact harm public safety. It would impose an unnecessary burden on "staff-constrained provider[s], especially smaller providers, including at the worst possible time when they are working to restore any outages that do occur quickly while continuing to devote resources to extending service into unserved areas."[177] Reclassification could also harm public safety by slowing down investment in new and improved broadband networks.[178]

Additionally, commenters correctly observe that public safety agencies use services that fall outside the retail, mass-market broadband services that the Commission proposes to regulate

---

[172] *Id.* at 12 (citing Notice of Proposed Rulemaking, *Facilitating Implementation of Next Generation 911 Services (NG911)*, PS Docket No. 21-479, FCC 23-47, ¶¶ 61-62 (rel. June 9, 2023)).

[173] Next Century Cities Comments at 7.

[174] NCTA Comments at 73.

[175] *Id.*; *see also* Digital Progress Institute Comments at 15-16.

[176] *See* U.S. Chamber of Commerce Comments at 37.

[177] NRECA Comments at 7.

[178] Westling Comments at 6.

**App. 1468**

under Title II.[179]  To the extent that public safety agencies do rely on those retail, mass-market services,[180] such reliance is limited[181] and cannot be used to justify reclassification — especially in light of the absence of any identified instances of ISPs interfering with mass-market customers' use of broadband for public safety-related purposes.[182]  And to the extent that public safety entities rely on social media to communicate in emergencies,[183] it is Big Tech companies that have power over those methods of communication, not ISPs.

Finally, some commenters follow the NPRM's example and appeal to the importance of public safety officials having access to reliable broadband networks.[184]  Of course public safety is critically important.  ISPs thus continue to innovate and invest billions of dollars in building resilient and reliable networks — including networks dedicated for public safety use — to promote public safety.[185]  The fact that public safety is important, however, is not a basis for Title II regulation of broadband.

---

[179] *See* ADTRAN Comments at 13; CTIA Comments at 36; Digital Progress Institute Comments at 15; Free State Foundation Comments at 21; Westling Comments at 7.

[180] *See* County of Santa Clara et al. Comments at 17-18.

[181] *See* Free State Foundation Comments at 23-24.

[182] *See id.* at 23; Westling Comments at 7.

[183] *See* Public Knowledge Comments at 6.

[184] *See* AARP Comments at 15; National Association of State Utility Consumer Advocates et al. Comments at 8-9.

[185] *See* AT&T Comments at 15-17 (providing details about FirstNet, its public safety-dedicated network, and stating that AT&T invested more than $1.1 billion in its U.S. Network Disaster Recovery program with the sole purpose of rapidly restoring connectivity to affected areas); Verizon Comments at 15-16 (providing details about Frontline, its public safety-dedicated solution); *see also* CTIA Comments at 37 ("Wireless providers are promoting resiliency and reliability through investment in preparedness, service continuity, rapid restoration in the face of a disaster, and resiliency by design — all in the absence of common carrier regulation of BIAS."); Westling Comments at 8 ("networks need to remain operational, even in times of disaster, and thus broadband providers have invested in the reliability of their networks").

**App. 1469**

**Universal Service Fund.** While some commenters repeat the NPRM's assertion that reclassification will strengthen the Commission's ability to provide support for broadband via the Universal Service Fund,[186] they do not identify actual problems with the Commission's existing authority under Title I. Moreover, the NPRM's tentative conclusion that reclassification "protects public investments in [broadband] access and affordability"[187] ignores the fact that, in the bipartisan IIJA, Congress appropriated tens of billions of dollars for broadband deployment, adoption, and affordability without subjecting broadband to any Title II requirements.[188]

**Pole Attachments.** The record makes clear that Title II reclassification is not needed to ensure that broadband providers have pole attachment rights, as the NPRM suggests.[189] To begin with, as other commenters point out, most ISPs also provide telecommunications or cable service, so they are already afforded the protections of Section 224.[190] Moreover, while commenters that support reclassification assert that Title II will ensure just and reasonable pole attachment rates for broadband-only providers,[191] no broadband-only providers have come forward with record evidence regarding an inability to obtain such rates. Instead of "promoting infrastructure investment and deployment through pole access protections," one commenter

---

[186] *See* Ad Hoc Telecom Users Committee Comments at 36; Center for Accessible Technology and MediaJustice Comments at 7; Communications Workers of America Comments at 16-18.

[187] NPRM ¶ 51.

[188] *See* Verizon Comments at 18; CTIA Comments at 43; U.S. Chamber of Commerce Comments at 13-14. Notably, some commenters caution that reclassification may undermine BEAD by introducing "significant administrative delays," as well as by forcing smaller providers to reassess "compliance costs for participating in the BEAD program." ACLP Comments at 14; WISPA Comments at 25; United States Hispanic Chamber of Commerce et al. Comments at 1-2.

[189] NPRM ¶ 47.

[190] *See* ITIF Comments at 6; CTIA Comments at 41.

[191] *See* Benton Institute for Broadband & Society Comments at 2; Free Press Comments at 55-56; INCOMPAS Comments at 18-21; National Association of State Utility Consumer Advocates et al. Comments at 5; Next Century Cities Comments at 7-8; Public Knowledge Comments at 47-48.

**App. 1470**

warns, "the significant costs and burdens of Title II regulation will in fact undermine infrastructure deployment" by forcing providers to divert their resources away from network investment to meet new federal compliance obligations.[192]  And that harm will by far outweigh any theoretical benefits that the extension of Section 224 to broadband-only providers would provide.

**D.    Classifying Broadband as a Telecommunications Service To Regulate Cybersecurity and National Security Would Be Ineffective, Harmful, at Odds with Federal Policy, and Contrary to Law**

The record confirms that the Commission's reliance on cybersecurity and national security is misplaced and cannot justify reclassification.[193]  As USTelecom has explained,[194] the NPRM's proposal to interject the Commission into cyber and national security issues is not only unnecessary, but also would be harmful.  ISPs collaborate on cyber and national security issues with the broader communications sector and other agencies, as Congress envisioned.  By contrast, the Commission lacks the jurisdiction, tools, and expertise to regulate cyber and national security.  The commenters and national security experts, such as Andrew Grotto[195] and Tony Scott,[196] confirm USTelecom's essential concerns: reclassification would undermine collaboration built on decades of federal policy, undermining congressional intent and exceeding the agency's authority.[197]

---

[192] WISPA Comments at 73.

[193] NPRM ¶¶ 21, 30 (claiming reclassification will "enhance the Commission's ability to safeguard national security" and "enhance cybersecurity"); *id.* ¶¶ 31, 32 (asking if reclassification would provide "authority to address BGP . . . by requiring providers to deploy solutions" and enable the Commission to "require ISPs to block IP addresses that originate malicious software and ransomware").

[194] USTelecom Comments at 70-71.

[195] *See* Andrew J. Grotto, Submission (Jan. 17, 2024) ("Grotto Paper") (attached as Ex. A).

[196] *See* Comments of Anthony Scott ("Scott Paper") (attached to NCTA Reply Comments).

[197] *See* Grotto Paper at 30-38; Scott Paper at 2-4.

**App. 1471**

1. *Strong Record Evidence Shows That Reclassification for the Purpose of Security-Related Regulation Is Unnecessary and Would Be Ineffective*

Commenters confirm that there is already a robust federal infrastructure to address cybersecurity and national security. The Commission is but one small part of this whole-of-government approach.[198] ISPs devote substantial resources to security and already engage in the precise activities the Commission suggests would benefit from its oversight.[199] As experts like Mr. Grotto and Mr. Scott explain, there is a decades-long history of robust collaboration in venues like the Cybersecurity and Infrastructure Security Agency ("CISA"), National Telecommunications & Information Administration ("NTIA"), national security agencies, the Commission's Communications Security, Reliability, and Interoperability Council ("CSRIC"), the president's National Security Telecommunications Advisory Committee ("NSTAC"), the Communications Information Sharing and Analysis Center ("Comm-ISAC"), and groups like ATIS, 3GPP, and MAAWG.[200] This work is effective because it is non-regulatory and collaborative.[201]

Each security issue the Commission would address via Title II reclassification is well in hand by other federal agencies with substantial expertise in the area. Border gateway protocol

---

[198] *See* AT&T Comments at 18-20, 30; CTIA Comments at 24-35; NCTA Comments at 67-70, 73-78; U.S. Chamber of Commerce Comments at 21-25; Verizon Comments at 13-15.

[199] *See, e.g.*, AT&T Comments at 17-18 (discussing 1,300-person global security organization and annual $60 million expenses on threat analysis and security operations); Verizon Comments at 9 (discussing 1,000-person team "dedicated to implementing . . . security controls and constantly monitoring networks to identify and respond to threats").

[200] *See, e.g.*, Grotto Paper at 1, 4-22; Scott Paper at 2-3; *see also* Verizon Comments at 14; AT&T Comments at 19; Ericsson Comments at 4; Microsoft Corp. ("Microsoft") Comments at 10-11.

[201] AT&T Comments at 20; Microsoft Comments at 10; NCTA Comments at 70-71; U.S. Chamber of Commerce Comments at 28-29; Grotto Paper at 22-25; *see also Mobilizing Our Cyber Defenses: Maturing Public-Private Partnerships To Secure U.S. Critical Infrastructure: Hearing Before the H. Comm. on Homeland Sec.*, 117th Cong. 30 (2022) ("[W]e can't lose sight of the value of those voluntary relationships.") (statement of Rep. John Katko, Ranking Member, House Committee on Homeland Security).

**App. 1472**

("BGP") is being addressed by NTIA, the National Institute of Standards and Technology ("NIST"), and national security agencies, as well as through voluntary service provider best practices identified via the partnership the Commission has forged with industry through CSRIC.[202] ISPs are doing their part on substantive routing security, working with the whole of government, and setting an example that other industries should emulate.[203] There is no need for mandates. As for IP blocking, there is no indication that ISPs fail to responsibly block malicious traffic, or that mandates would prevent ransomware attacks.[204] Likewise, the record reflects substantial multi-agency supply chain and infrastructure work,[205] which is more effective than what the Commission could accomplish through Title II.

Not only is Commission regulation unnecessary, but also the record shows it would be ineffective, have unintended consequences, and be fatally underinclusive.[206] Consumer broadband is a sliver of the communications and internet ecosystem.[207] The Commission's recent workshop on internet routing made clear that internet security draws on providers of internet exchange service, IP transit and peering, operators of POPs, data centers, content delivery networks, enterprise customers including critical infrastructure providers and government agencies with Autonomous Systems, internet platforms, and wholesale and

---

[202] *See* Grotto Paper at 24; Microsoft Comments at 12.

[203] *See*, *e.g.*, Rysavy Decl. ¶ 16; AT&T Comments at 17; Verizon Comments at 14-15; Comcast Comments at 41.

[204] *See* AT&T Comments at 18; Grotto Paper at 37-38; Comcast Comments at 41.

[205] *See* Verizon Comments at 14 (discussing work with "CISA and other federal agencies through multiple organizations that provide the policy, planning, and operations framework necessary to safeguard the security of communications networks and services"); *see* ITI Comments at 3.

[206] This is not a matter of proceeding incrementally, *cf. Massachusetts v. EPA*, 549 U.S. 497, 524 (2007); the agency lacks authority to reach entities that are vital to address the issues.

[207] *See* Grotto Paper at 34; Scott Paper at 3.

44

enterprise services,[208] all of which would be outside of the Commission's proposed reclassification of retail, mass-market broadband service.[209]

With respect to BGP in particular, reclassification would at most expand Commission authority over *ISP* routing, but would not reach the many other stakeholders whose roles are central.[210]  Such regulation would threaten the worldwide, collaborative, multi-stakeholder internet governance regime.[211]  Forcing ISPs to take certain routing security measures, independent of other network operators, would "partition[ ]" the internet but would not "fix the global problem of routing security."[212]

Regulation of IP blocking is likewise almost certain to be both ineffective and burdensome.  Blocking mandates are at odds with common-carrier obligations the Commission appears eager to impose — which could give malicious or foreign adversaries additional legal protections that might *delay* needed action.[213]  And given the record evidence of the complexities of IP blocking,[214] it is unclear how the Commission could create workable rules prescribing how timely and actionable judgments will be made (and by whom) about what addresses and traffic

---

[208] FCC, Border Gateway Protocol Security Workshop (July 31, 2023), https://www.fcc.gov/news-events/events/2023/07/bgp-security-workshop.

[209] Some non-ISPs urge the Commission to regulate ISPs but leave their services unregulated. *See* Akamai Technologies, Inc. Comments at 1 (opposing treatment of "independent, third-party CDNs" as BIAS); Cloudflare, Inc. Comments at 14 (urging the exclusion from Title II of "services that are designed for and primarily used by businesses and other enterprise customers"); Mozilla Comments at 4.

[210] Grotto Paper at 34-36; *see also* Scott Paper at 3.  There is no indication that FCC rules for ISPs would convince operators of autonomous systems, non-U.S. operators, enterprises, or government agencies to sign their routes.

[211] Comments of CTIA at 12, *Secure Internet Routing*, PS Docket No. 22-90 (Apr. 11, 2022).

[212] Reply Comments of Internet Society at 4, *Secure Internet Routing*, PS Docket No. 22-90 (May 10, 2022); *see also* Comments of Cloudflare at 1, *Secure Internet Routing*, PS Docket No. 22-90 (Apr. 11, 2022).

[213] *See* Verizon Comments at 13.

[214] *See* Grotto Paper at 37-38 (describing IP blocking and associated complexities and tradeoffs).

45

are malicious, and what blocking is required or prohibited.  IP blocking mandates would turn an agile defensive tactic into a rigid task that may limit cyber threat intelligence and incident response and lead to over-blocking of legitimate traffic.[215]  Similarly, reclassification is no solution to threats from companies in hostile nations that do not provide mass-market broadband service in the United States, because the Commission's rules will not reach them.

Even beyond the difficulties inherent in the Commission trying to address these specific issues, it generally lacks expertise, tools, and resources to address cyber and national security concerns.[216] It thus typically defers to the judgments of national security agencies[217] as statutes often require because of those other agencies' comparative expertise.[218]  Further, as Mr. Grotto explains, as an independent agency, the Commission's APA "obligations and agency process may complicate and slow agency action and industry agility."[219]  In particular, the APA is "not well-suited to facilitating operational collaboration because of the months or more it typically takes

---

[215] *See id.* (describing Cloudflare outage due to mistaken IP blocking, and noting reasons not to block suspected malicious IP addresses); Microsoft Comments at 9.

[216] As USTelecom has explained in the *Secure Equipment* proceeding, the Commission has neither the resources nor institutional expertise in cybersecurity to embark on novel regulation.  *See* USTelecom Reply Comments at 2-3, *Protection Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, ET Docket No. 21-232 (Oct. 18, 2021). The FCC's Fiscal Year 2024 "Budget-in-Brief" mentions cyber in the context of the Commission's IT systems and addresses national security as in FY2023.  *See* FCC, *Budget-in-Brief* (Mar. 2023), https://docs.fcc.gov/public/attachments/DOC-391614A1.pdf.  Nothing in the agency's budget suggests the Commission is prepared for the major new regulatory role previewed in the NPRM.

[217] *See, e.g.*, Second Report and Order, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, 35 FCC Rcd 14284, ¶ 83 (2020) (the Commission is "continuing to be deferential to the enumerated [agencies] making the determination" of equipment and services going onto the Covered List); *see also Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 438, 440 (5th Cir. 2021) (stating that "[w]e would be troubled if the FCC were trying to leverage its 'public interest' authority over networks into the power to make freewheeling national security judgments"; noting that the Commission, in exercising specific authorities in Sections 214, 254, and 310(b), could consider national security issues "informed by the views of expert agencies").

[218] *See, e.g.*, 47 U.S.C. § 1601 (requiring the Commission to update its Covered List of equipment and services posing a national security threat upon a determination by a relevant security agency).

[219] *See* Grotto Paper at 33.

**App. 1475**

for an APA proceeding to run its course and because its transparency requirements complicate the exchange of confidential and sensitive information about cybersecurity threats and vulnerabilities."[220]

> 2. *The Commission's Proposed Course of Action Would Significantly Harm Existing Work and Partnerships*

Not only is the NPRM's proposed foray into security unnecessary, but also experts explain that it would cause significant harm. In purporting to act as a security regulator for broadband, the Commission is poised to disrupt decades of partnerships and work by the communications sector and agencies that Congress and the Executive Branch designated to address these issues.[221] Mr. Grotto, who helped build federal collaborative programs, explains that reclassification threatens to stifle information sharing and operational collaboration.[222] Regulatory oversight of cybersecurity and national security threatens to make stakeholders cautious and reluctant to share information or voluntarily help others in the ecosystem due to regulatory ramifications. ISPs would have valid concerns about what the Commission, with its enforcement and oversight, would do with information shared with it or that may become available through other venues.[223]

The Commission cannot dismiss concerns about chilled cooperation by pointing to the short-lived prior reclassification. In the *2015 Order*, the Commission did not target cyber and national security, nor did it threaten new regulation in this area. To the contrary, the then-Chairman sought a "new paradigm" of cyber collaboration because "[t]he pace of innovation on

---

[220] *See id.* at 32; *see also* Verizon Comments at 15.

[221] *See*, *e.g.*, Verizon Comments at 13.

[222] *See* Grotto Paper at 30-32.

[223] *See id.* at 31-32 (citing enforcement risks).

the Internet is much, much faster than the pace of a notice-and-comment rulemaking," and "[w]e cannot hope to keep up if we adopt a prescriptive regulatory approach."[224]  Then-Chairman Wheeler also assured the sector that the Commission would support "existing private or public information sharing activities."[225]  And while the *2015 Order* was in effect, Congress and the Executive Branch had not established many of the mature partnerships that the Commission now would undermine.[226]

Finally, reclassification is virtually guaranteed to disrupt federal policy by undermining harmonization; the Commission's independent status and APA obligations will make it hard to ensure that Commission policy is responsive to coordination led by the National Security Council, the Office of the National Cyber Director ("ONCD"), and White House leadership.[227]

> 3.    *The Record Demonstrates That Reclassifying Broadband To Regulate Security Would Contravene Congressional Direction and Exceed Commission Authority*

Commenters show that the muscular role in cyber and national security the Commission proposes cannot be squared with clear delegations from Congress.  The Commission's new security role would ignore the overwhelming focus of Congress and the Executive Branch on other agencies.  No major congressional actions give the Commission the authority it is seeking

---

[224] Remarks of FCC Chairman Tom Wheeler, Am. Enter. Inst., Washington, D.C., at 4 (June 12, 2014), https://docs.fcc.gov/public/attachments/DOC-327591A1.pdf.

[225] *Id*. at 5.

[226] In 2015, Congress passed the Cybersecurity Information Sharing Act of 2015, President Obama had just released his seminal executive order on cybersecurity, DHS's CISA was still uncodified, and supply-chain collaboration was barely on the government's radar.

[227] *See* ONCD, Request for Information on Cyber Regulatory Harmonization; Request for Information: Opportunities for and Obstacles to Harmonizing Cybersecurity Regulations, 88 Fed. Reg. 55,694, 55,694 (Aug. 16, 2023); White House, *National Cybersecurity Strategy* 9 (Mar. 2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/National-Cybersecurity-Strategy-2023.pdf ("ONCD, . . . with the Office of Management and Budget (OMB), will lead the Administration's efforts on cybersecurity regulatory harmonization.").

through this proceeding.[228]  Mr. Grotto notes from firsthand experience that Congress historically

has promoted collaboration, information sharing, and the primary role of DHS and CISA.[229]

Likewise, a leading role for the Commission on ISP security is inconsistent with executive orders

and memoranda on these topics under Presidents Bush, Obama, Trump, and Biden, all of which

promoted a collaborative approach and did not provide the Commission more than a limited

role.[230]  Reclassification for the purpose of developing plenary security regulation would render

superfluous the specific grants of authority to the Commission in areas like USF, supply chain,

and foreign ownership.[231]

In sum, reclassifying broadband for the purpose of regulating ISP security would be

contrary to law and arbitrary and capricious because, among other things, it would rely on

"factors which Congress has not intended it to consider," seize roles not directed by Congress,

and undermine effective existing and less burdensome approaches that are working to address

---

[228] *See* CPAC Foundation Comments at 5-7; CTIA Comments at 24, 26-35; FAI & CTT Comments at 8-13; Westling Comments at 10-11; NCTA Comments at 71, 74-76; Taxpayers Protection Alliance Comments at 4-5; U.S. Chamber of Commerce Comments at 23-24, 28-29; Verizon Comments at 12-15.

[229] *See* Grotto Paper at 10-15 (major congressional actions on cyber show no role for the Commission); *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 826 (8th Cir. 2017) ("Congress likely did not give [two agencies] separate authority to develop two potentially conflicting [sets of] rules.").

[230] *See* Grotto Paper at 4-10 (all presidential actions and executive orders show no role for the Commission).

[231] *See, e.g.*, 47 U.S.C. §§ 214, 222, 310(b); Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158.  The Commission cannot ignore or render superfluous these specific grants.  *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (where a statute contains "a detailed provision that spells out the requirements [of a specific activity]," as well as "a broadly worded provision that says nothing about [that activity]," "[t]he general/specific canon explains that the 'general language' of [the broader] clause[ ], 'although broad enough to include it, will not be held to apply to a matter specifically dealt with' in [the specific] clause").

**App. 1478**

security.[232]  The Commission cannot, and should not, reclassify broadband so that it can assert a primary role as a cyber and national security regulator.

### E.        The NPRM's Other New Justifications for Title II Are Pretextual

**Robocalls/Robotexts.**  Commenters recognize that Congress has already granted the Commission sufficient authority to address robocalls and robotexts.[233]  Additionally, commenters acknowledge that the NPRM's proposal to use Title II to compel broadband providers to block access to websites in order to combat robotexts is an overreach.[234]  As INCOMPAS explains, blocking "access to a website is an extreme measure . . . that could disrupt and severely harm legitimate organizations."[235]  The process of blocking is highly complex and if not handled properly, "can result in consumers having *less* access to the lawful websites, applications, and services of their choice, not more."[236]  Governmental blocking requirements may also raise First Amendment concerns.[237]  In short, to best address robocalls and robotexts, the Commission should rely on its existing authority and continue to work collaboratively with industry and other regulators.[238]

---

[232] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[233] *See* CTIA Comments at 40-41 (citing Pallone-Thune TRACED Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019)); RAY BAUM'S Act of 2018, Pub. L. No. 115-141, div. P, § 503(a)(1), 132 Stat. 1080, 1091-92; Second Report and Order, *Implementing Section 503 of RAY BAUM'S Act*, 34 FCC Rcd 7303 (2019); 47 C.F.R. § 64.6300 *et seq.*; FCC, *TRACED Act Implementation*, https://www.-fcc.-gov/TRACEDAct (last updated May 1, 2023); INCOMPAS Comments at 28, 31 ("INCOMPAS believes that there has been no demonstrable need for the Commission to intervene in this area or that BIAS must be defined as a telecommunications service for the Commission to act."); NCTA Comments at 76-77; Verizon Comments at 16.

[234] *See* CTIA Comments at 40; *see also* INCOMPAS Comments at 30 ("expansion of requiring blocking by BIAS providers is concerning, exceeds the FCC's statutory authority, and should not be adopted").

[235] INCOMPAS Comments at 30.

[236] Microsoft Comments at 7.

[237] INCOMPAS Comments at 31; Microsoft Comments at 9.

[238] *See* CTIA Comments at 41; NCTA Comments at 76-77.

**Free expression.** While some claim Title II is needed to protect free expression on the internet,[239] there is no need to protect what is not in any danger. The *2018 Order* did not in any way undermine free expression on the internet.[240] As CTIA correctly observed, broadband "has thrived as a vehicle for free expression under Title I."[241] And, as shown above, ISPs are not engaging in any of the conduct the NPRM aims to prohibit.[242] Moreover, these commenters fail to acknowledge that social media websites and other online platforms have more power over free expression than ISPs.[243]

**Digital equity.** Reclassifying broadband under Title II will do nothing to address the digital equity concerns some commenters raise, such as underrepresentation of minority and female participants in the film industry[244] or gender disparities in commercial broadcast station ownership.[245] Nor is Title II needed to improve current broadband affordability programs,[246] as neither the Affordable Connectivity Program nor Lifeline requires Title II regulation of

---

[239] *See* ACLU Comments Part II; *see also* Free Press Comments at 70-74 (making a similar argument).

[240] *See, e.g.*, ADTRAN Comments at 17 (finding no evidence of ISPs interfering with free expression).

[241] CTIA Comments at 45.

[242] *See supra* Part III.A.1.b.

[243] *See* NCTA Comments at 58.

[244] *See* EFF Comments at 8.

[245] *See id.* at 9.

[246] ACLU Comments at 9-12; National Hispanic Media Coalition Comments at 2-4.

**App. 1480**

broadband to function as intended.[247]  Indeed, Congress enacted numerous provisions in the IIJA aimed at advancing digital equity,[248] and none of them included reclassification of broadband.

**Accessibility.**  As discussed in the record, Congress has addressed accessibility in the comprehensive Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA"), and that legislation reflects Congress's "considered and updated approach to ensuring accessible online communications for individuals with disabilities."[249]  The CVAA is "far-reaching in scope, encompassing voice over Internet Protocol, messaging, email, mobile browsers, and video programming, among other things," and its application does not turn on how broadband is classified or regulated.[250]  While some commenters argue in favor of reclassification by claiming that Section 255 will help protect accessibility, any incremental benefit would be negligible, given the breadth of the CVAA and the Commission's current implementing regulations.

**Multiple Tenant Environments ("MTEs").**  Commenters recognize that the Commission already has authority to address issues associated with MTEs.[251]  As CTIA noted, "providers that serve the vast majority of customers in MTEs commingle [broadband] with one or more regulated services, bringing within the scope of the MTE rules these and all other

---

[247] *See supra* Part III.C; *see also* CTIA Comments at 45 ("Rapid wireless deployment promotes continued advances in digital inclusion, and Title II would unnecessarily put incentives for deployment at risk.") (footnote omitted); Hispanic Technology and Telecommunications Partnership Comments at 2 ("[r]eclassifying internet service providers as common carriers will not" aid digital equity).

[248] *See* Pub. L. No. 117-58, 135 Stat. 429 (2021) (establishing Digital Equity Act, ACP, and BEAD programs).

[249] CTIA Comments at 44; *see also* Digital Progress Institute Comments at 18-19; Verizon Comments at 17-18.

[250] CTIA Comments at 44.

[251] *See id.* at 43; NCTA Comments at 81-82; Free Press Comments at 57 (acknowledging that the "Commission has recently taken action to further open up MTEs to competitive services").

**App. 1481**

entities that provide services over their facilities as common carriers, cable operators, or providers of multichannel video programming distribution service."[252]  Therefore, using Title II to expand the MTE rules to broadband-only providers "would not make any identifiable difference to the Commission's authority with regard to broadband deployment in MTEs."[253]  Additionally, reclassification would not empower the Commission to regulate MTE owners and so would do nothing to enable the Commission to address impediments to broadband deployment MTE owners erect.  Moreover, commenters, like the NPRM itself, did not offer "any evidence of a widespread market failure attributable to the existing scope of the MTE regime"[254] that could justify the imposition of Title II on broadband.

**Network resiliency and reliability.**  The comments overwhelmingly refute the NPRM's assertions that reclassification is necessary to improve network resiliency and reliability.[255]  Contrary to the bare suggestions of some commenters,[256] ISPs have strong incentives to deploy resilient and reliable networks, and are investing billions of dollars to do so.[257]  At the same time, new federal mandates could impose substantial additional costs that would deter expansion of broadband to new areas.[258]  Tellingly, even Title II proponents recognize that the type of centralized reliability and resiliency mandates the NPRM contemplates are inappropriate.[259]

---

[252] CTIA Comments at 43; *see* NCTA Comments at 81-82.

[253] CTIA Comments at 43.

[254] NCTA Comments at 81-82.

[255] NPRM ¶ 39.

[256] *See* ACLU Comments at 12.

[257] AT&T Comments at 14-17; CTIA Comments at 36-38; NCTA Comments at 72-73; USTelecom Comments at 81-82.

[258] AT&T Comments at 29; U.S. Chamber of Commerce Comments at 38-39; USTelecom Comments at 82-83.

[259] *See, e.g.*, INCOMPAS Comments at 28 ("The Commission also tentatively concludes that reclassifying BIAS as a telecommunications service would enhance the Commission's ability to ensure

**App. 1482**

# IV. The Commission Cannot and Should Not Impose Common-Carrier Regulation on One Subset of the Participants in the Internet Traffic-Exchange Marketplace

For decades, private network-to-network negotiations have produced efficient, highly context-specific solutions to an ever-expanding array of traffic-exchange challenges, propelling the explosive growth of the modern internet. The Commission has *never* subjected these privately negotiated traffic-exchange arrangements to regulation. Indeed, it has not even asserted regulatory *authority* over such arrangements except during the brief period covered by the *2015 Order*, when the Commission announced merely that it would "watch" and "learn" but "not intervene . . . with prescriptive rules."[260] A handful of commenters nonetheless urge the Commission to abandon that long and successful tradition of non-intervention and directly regulate internet interconnection for the first time. Such regulation, and even the mere threat of regulatory oversight, would be needless, disruptive, and unlawful.

## A. Regulation of Internet Interconnection Is Unnecessary To Achieve Any Valid Policy Objective

Throughout the unregulated history of internet traffic-exchange arrangements, there has been no market "problem" that could possibly justify a regulatory solution. Indeed, the proponents of regulation do not cite a single interconnection dispute that has arisen in the six years since the Commission restored its official hands-off policy in January 2018. Nor do they cite any evidence that ISPs charge large fees for direct interconnection with content providers or their network intermediaries. As discussed below, that is no surprise, given the ubiquitous availability of transit and other low-priced options for *indirect* interconnection, which strongly

---

the nation's communications networks are resilient and reliable . . . . INCOMPAS believes that there has been no demonstrable need for the Commission to intervene in this area or that BIAS must be defined as a telecommunications service for the Commission to act.").

[260] *2018 Order* ¶ 163; *2015 Order* ¶ 31; *id.* ¶ 203 (noting that internet traffic exchange "historically has functioned without significant Commission oversight").

discipline paid-peering prices. In short, the interconnection marketplace continues to promote hyper-efficient traffic-exchange arrangements without incident and without Commission involvement.

Because they can cite no actual evidence of a problem, the proponents of regulation fall back on two rhetorical strategies: recitation of misplaced "terminating access monopoly" jargon and misleading accounts of a few traffic-exchange disputes from 10 years ago. Neither strategy is persuasive.

      *1.*     *ISPs Have No "Terminating Access Monopoly," as the Complete Absence of Supracompetitive Interconnection Fees Confirms*

Some commenters dust off the implausible theory that each broadband ISP, no matter how non-dominant and subject to retail competition, possesses a "terminating access monopoly" over access to its end users and can thus get away with charging supracompetitive "tolls" to interconnecting content networks.[261] Of course, if that were the case, ISPs would be charging monopoly rents for direct interconnection, and yet the pro-regulation comments cite no evidence that ISPs are doing anything of the kind. In fact, the record confirms that any fees charged for direct interconnection are very modest.[262]

---

[261] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at ii ("It does not matter how competitive a market may be for internet access services or how many wireline and wireless ISP options a subscriber can choose from. Once the subscriber chooses their ISP, all businesses seeking to transmit content to that subscriber must use the subscriber's choice of ISP to do so. In other words, the subscriber's ISP has a monopoly on access to that subscriber over the internet."); Free Press Comments at 21 n.29 (even "non-dominant" ISPs that "do not possess market power" vis-à-vis consumers "are all terminating access monopolies when interconnecting with other carriers"); New America's OTI Comments at 63 (ISPs have "power as terminating access monopolies" and "gatekeepers" "even in the absence of market power" in any consumer-facing market) (cleaned up); Public Knowledge Comments at 83 ("regardless of the state of competition," ISPs have "a terminating access monopoly"). *But see 2018 Order* ¶¶ 131-138 (rejecting "terminating access monopoly" rationale for regulation).

[262] Israel et al. Decl. ¶ 56; Mark Israel & Bryan Keating, *Economic Analysis of Dr. Evans' Claims as They Relate to Restoring Internet Freedom* ¶¶ 45-50 (Oct. 31, 2017) ("Israel-Keating 2017 Decl.") (attached to Letter from Jonathan Nuechterlein, Counsel for AT&T, to Marlene Dortch, FCC, WC Docket No. 17-108 (Oct. 31, 2017)); *see also* Michael Kende et al., Analysys Mason, *Evolution of the internet in*

Free Press and others nonetheless try to infer "monopoly" power from the mere fact that ISPs sometimes charge *something* rather than *nothing* for direct interconnection.[263] That argument misconceives basic economic principles. Augmenting traffic-exchange facilities to accommodate incoming traffic indisputably imposes costs on an ISP and creates value both for the ISP and for the interconnecting network.[264] Any payment of direct-interconnection fees from that network to the ISP is thus one component of a mutually beneficial bargain for the exchange of content over the ISP's broadband platform. Throughout the economy, from online retail marketplaces to credit-card companies, the providers of such double-sided platforms routinely assess fees on both sides, and it is well understood that charges to one side of the platform (here, direct-interconnection fees) exert downward pressure on charges to the other side (here, resulting in lower consumer broadband bills).[265] In any event, the proponents of regulation cite no evidence, because there is none, suggesting that the price levels for these agreements are large or even competitively significant, let alone "monopolistic."

*the U.S. since 2015*, at 20 (Dec. 12, 2023) ("Kende Report") (attached to USTelecom Comments as Ex. A).

[263] *See, e.g.*, Free Press Comments at 72 (claiming that any imposition of "access fees" is an "abus[e]" of an ISP's "terminating access monopoly"); New America's OTI Comments at 10-11 ("paid peering agreements" are "insidious" because they enable ISPs to "extract a toll"); Public Knowledge Comments at 83 ("ISPs have the power to charge access fees because there is no way to reach a user except through a last-mile network. . . . This is sometimes called 'gatekeeper' power, or a terminating access monopoly.").

[264] Israel et al. Decl. ¶ 57.

[265] *See infra* Part IV.B (discussing "see-saw" principle); *see generally Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (discussing double-sided markets). Even some advocates of regulation, such as Professor Jordan, acknowledge that a broadband network forms a "two-sided market" and that positive fees for direct-interconnection can maximize consumer welfare. *See* Ali Nikkhah & Scott Jordan, *A Two-Sided Model of Paid Peering*, 46 Telecomms. Pol'y 1, 4-5, 29-30 (2022). Although Professor Jordan asserts that ISPs have incentives to charge direct-interconnection fees above the welfare-maximizing level, he provides no empirical support for that conclusion, instead relying on a deeply flawed economic model. *See infra* Part IV.B.

**App. 1485**

Any invocation of the "terminating access monopoly" concept in this context also profoundly misunderstands the practical realities of internet traffic exchange, as set forth in an extensive body of economic analysis.[266] The "terminating access monopoly" concept first arose a quarter century ago when small local telephone entrants that lacked retail market power nonetheless assessed inflated terminating access charges on long distance carriers.[267] As the Commission acknowledged, however, this problem arose not from a market failure, but *from the application of Title II regulation itself*, including mandatory interconnection obligations at tariffed rates.[268] The broadband marketplace exhibits no such regulatory distortions precisely because it is unregulated. Network providers do not have "monopoly" power simply by virtue of serving a discrete set of end users, which explains why the marketplace for internet traffic exchange has functioned efficiently without regulation for decades.[269]

---

[266] *See* Israel et al. Decl. ¶¶ 51-57; Andres Lerner & Janusz Ordover, *The "Terminating Access Monopoly" Theory and the Provision of Broadband Internet Access* ¶ 1 (Jan. 15, 2015) ("[C]laims that wireless providers are 'terminating access monopolies' are both flawed as a matter of economic logic and inconsistent with the empirical evidence.") (attached to Verizon Ex Parte, GN Docket No. 14-28 (filed Jan. 15, 2015)); *id.* ¶ 11 (same conclusion for wireline ISPs); John Mayo et al., *An Economic Perspective of Title II Regulation of the Internet* 3 (July 2017) ("[The terminating access monopoly concept] is economically vacuous. The same 'monopoly' could be said to exist for customers who have entered a movie theater or restaurant.") (attached to Comments of Georgetown Center for Business & Public Policy, WC Docket No. 17-108 (filed July 17, 2017)); *see also* Jonathan E. Nuechterlein & Christopher Yoo, *A Market-Oriented Analysis of the "Terminating Access Monopoly" Concept*, 14 Colo. Tech. L.J. 21 (2015).

[267] *See* USTelecom Comments at 48-49.

[268] *See id.* (discussing Seventh Report and Order, *Access Charge Reform*, 16 FCC Rcd 9923, ¶ 2 (2001)). Similarly, the South Korean regime Public Knowledge criticizes (at 20), like the proposed E.U. regime INCOMPAS attacks (at 44-45), involves *prescriptive government mandates* requiring content providers to pay ISPs for handling their traffic. *See, e.g.*, Carl Gahnberg et al., *Internet Impact Brief: South Korea's Interconnection Rules*, Internet Soc'y (May 11, 2022), https://www.internetsociety.org/resources/doc/2022/internet-impact-brief-south-koreas-interconnection-rules. Neither regime is relevant to whether *unregulated* arrangements for internet traffic exchange are efficient, as the U.S. experience reveals they are.

[269] *See* Israel et al. Decl. ¶¶ 51-57.

**App. 1486**

There is likewise no evidence that any particular ISP operating today has such a large subscriber base nationwide that it enjoys "too much" leverage when negotiating direct-interconnection arrangements with tech companies' network providers, as some commenters suggest.[270] Content-originating networks come to the table with commensurate bargaining leverage of their own, which they derive from the consumer appeal of the content they deliver. No ISP, for example, can afford to deprive its customers of Netflix, YouTube, or Prime Video. In this regard, Ad Hoc simply misconceives the issue when it argues that only "the largest and most well-known content providers" have negotiating leverage and that "[s]mall start-ups" do not.[271] ISPs typically negotiate direct interconnection arrangements not with individual content providers as such, but with the operators of large content delivery networks ("CDNs") or transport networks, which benefit from the *collective* market power of their content-provider customers.

Beyond that, content-sending networks can also obtain access to any ISP's customers through indirect interconnection — for example, by purchasing transit services from the ISP's peers at low and still-plummeting rates. The availability of that transit alternative imposes substantial discipline on the prices that ISPs can charge for direct interconnection (*e.g.*, "paid peering" arrangements).[272] Moreover, transit providers and their customers almost always rely on multiple redundant paths for the exchange of traffic to customers on any ISP's network, and edge providers dynamically shift between transit providers in real time to avoid congestion. An

---

[270] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 20; Lumen Comments at 8. These commenters would need to show not only that interconnection rates are high, but also that consumers in the aggregate pay more as a result. That showing would also be surpassingly difficult to make, given that interconnection fees impose downward pressure on consumer broadband prices. *See infra* Part IV.B.

[271] Ad Hoc Telecom Users Committee Comments at 20.

[272] *See, e.g.*, Israel et al. Decl. ¶¶ 54-56; Kende Report at 20.

ISP thus could not execute a "degradation by congestion" strategy without limiting capacity across *all of its peering points* for extended periods.[273]  Any such strategy would be a nonstarter because it would radically degrade the ISP's internet access service to its mass market and business customers.[274]

Finally, if the "terminating access monopoly" *were* a genuine phenomenon in unregulated markets, it would be impossible to make sense of routine commercial interactions today.  For example, broadband ISPs often *pay* for interconnection (in the form of transit services offered by internet backbones) to connect their end users to content providers rather than *charging* anyone for access to those end users.[275]  Similarly, a typical cable TV provider does not charge content providers for access to its (single-homed) customers; instead, it typically *pays* content providers for the right to transmit their programming to those customers.[276]  As these examples illustrate, the mere fact that a network provider has retail customers that rely on it to connect them to content does not give the provider any special bargaining clout when negotiating with third

---

[273] Israel et al. Decl. ¶ 55; *see also* Memorandum Opinion and Order and Declaratory Ruling, *Applications Filed by Global Crossing Ltd. and Level 3 Communications, Inc. for Consent To Transfer Control*, 26 FCC Rcd 14056, ¶ 27 (Wireline Comp. Bur. & Int'l Bur. 2011) (finding foreclosure concerns unfounded because, "if the combined entity were to engage in connection degradation or price increases," its interconnection customers "would be able to transition easily to another provider").

[274] Israel et al. Decl. ¶ 55; Israel-Keating 2017 Decl. ¶¶ 61-70.

[275] Israel et al. Decl. ¶ 54; Stanley M. Besen & Mark A. Israel, *The Evolution of Internet Interconnection from Hierarchy to "Mesh": Implications for Government Regulation*, 25 Info. Econ. & Pol'y 235, 243-44 (2013); Peyman Faratin et al., *The Growing Complexity of Internet Interconnection*, 72 Commc'ns & Strategies 51, 63 (2008).

[276] These charges can take the form either of "affiliate fees" (for cable channels) or "retransmission consent fees" (for broadcast channels).  *See, e.g.*, Report and Order and Further Notice of Proposed Rulemaking, *Amendment of the Commission's Rules Related to Retransmission Consent*, 29 FCC Rcd 3351, ¶ 2 (2014) ("[B]roadcasters have increasingly sought and received monetary compensation [from MVPDs] in exchange for retransmission consent.").

**App. 1488**

parties about access to those customers. Any assertion of regulation authority that rests on a contrary assumption would thus be irrational and unlawful.[277]

### 2. Proponents of Regulation Identify No Market Failures That Commission Intervention Is Needed To Address

Unable to identify any present-day interconnection problem that could justify a regulatory solution, some commenters revive long-debunked claims that, more than a decade ago, ISPs unilaterally caused congestion for traffic that Cogent and other networks delivered on behalf of content providers like Netflix.[278] But it is now widely understood that the congestion at the heart of these complaints was an entirely avoidable result of routing decisions that Netflix and its transit providers made.[279]

---

[277] Public Knowledge is wrong to claim (at 83) that the D.C. Circuit has enshrined Public Knowledge's misconceptions about the terminating access monopoly into law. In *Verizon*, Judge Silberman's dissent concluded that the Commission's failure to make market-power findings was fatal to its regime and that its alternative "gatekeeper" rationale was unexplained and likely incoherent. *Verizon*, 740 F.3d at 663-64 (Silberman, J., dissenting in relevant part). The *Verizon* majority deemed that point waived because it had not been adequately raised on appeal; only in dicta did it defer to the Commission's finding that ISPs need not have retail market power "to impose restrictions on [particular] edge providers." *Id.* at 647-48. Similarly, in *U.S. Telecom*, the panel majority found that the market-power issue raised by Judge Williams — who embraced Judge Silberman's position in *Verizon* — was not presented because the Commission was not *required* to make findings on that empirical issue in order to reclassify broadband as a telecommunications service. 825 F.3d at 708. Nothing in either majority opinion keeps the Commission or any court (including the D.C. Circuit) from adopting a sound economic analysis of "terminating monopoly" or "gatekeeper" allegations.

[278] *See, e.g.*, Free Press Comments at 133-34; Lumen Comments at 6-7 (discussing Level 3).

[279] *See, e.g.*, Dan Rayburn, *Cogent Now Admits They Slowed Down Netflix's Traffic, Creating a Fast Lane & Slow Lane*, StreamingMediaBlog.com (Nov. 5, 2014) ("*Cogent Now Admits*"), https://www.streamingmediablog.com/2014/11/cogent-now-admits-slowed-netflixs-traffic-creating-fast-lane-slow-lane.html; Nick Feamster, *Why Your Netflix Traffic Is Slow, and Why the Open Internet Order Won't (Necessarily) Make It Faster*, Freedom to Tinker (Mar. 25, 2015), https://freedom-to-tinker.com/2015/03/25/why-your-netflix-traffic-is-slow-and-why-the-open-internet-order-wont-necessarily-make-it-faster/ ("Much of the popular media has led consumers to believe that the reason that certain Internet traffic — specifically, Netflix video streams — were experiencing poor performance because Internet service providers are explicitly slowing down Internet traffic. . . . These caricatures are false, and they demonstrate a fundamental misunderstanding of how Internet connectivity works, what led to the congestion in the first place, and the economics of how the problems were ultimately resolved."); *see also* David Clark et al., *Measurement and Analysis of Internet Interconnection and Congestion*, 2014 TPRC Conf. Paper, at 9-10 (rev. Sept. 10, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2417573.

**App. 1489**

It is the parties that send traffic to an ISP's end users, not the ISP itself, that make the decisions about how to route that traffic. The receiving ISP network has no control over how the traffic comes into its facilities, and it cannot prevent content networks and transit providers from teaming up to cause serious congestion problems by pushing a large amount of traffic over a small set of interconnection links.[280] And that is precisely what Cogent and others did in the years leading up to the *2015 Order*. These companies tried to leverage their status as Tier 1 peers into an artificial competitive advantage in the content delivery business.[281] For a variety of reasons, including the heavily asymmetric nature of their traffic, prominent CDNs such as Akamai have never been Tier 1 peers and therefore purchase transit services as inputs from other IP networks. Cogent and others apparently saw an opportunity to compete with these CDNs for the business of large content providers (such as Netflix) by misusing their settlement-free peering arrangements with major ISPs.

These content-originating networks pushed terabytes of unidirectional traffic to ISP peering points on a settlement-free basis, while making no provision for the ensuing congestion in the traffic-exchange facilities.[282] Instead, they demanded that ISPs pay to upgrade the capacity of those few links where they sent their traffic, even though there was more than enough capacity on other ingress links to the ISPs' networks, which they declined to use (apparently) because that would have required them to purchase transit from third parties (and thus forfeit

---

[280] *See* Israel-Keating 2017 Decl. ¶¶ 65-72; Declaration of Scott Mair ¶¶ 20-21 ("Mair Decl.") (attached to Joint Opp. of AT&T Inc. and DirecTV to Pets. To Deny, *Applications of AT&T Inc. and DirecTV for Consent To Assign or Transfer Control of Licenses and Authorizations,* MB Docket No. 14-90 (filed Oct 16, 2014)).

[281] A Tier 1 network is one of the handful of large IP networks that can connect its customers (directly or indirectly) to the customers of all other IP networks without any need to purchase transit services from intermediaries. Kende Report at 8.

[282] *See* Mair Decl. ¶¶ 22-24, 40.

**App. 1490**

their Tier 1 status).[283] Cogent and others were in effect trying to force ISPs to subsidize their CDN-type services to give them a competitive advantage against other CDNs and backbone providers.[284] And while Cogent accused ISPs of slowing Netflix traffic for anticompetitive reasons (an accusation that some commenters here continue to make), *Cogent* was the one that throttled Netflix traffic to insulate its other traffic from the consequences of its misuse of these peering relationships.[285]

Finally, during this period, Netflix itself was trying to take advantage of regulatory uncertainty to obtain the equivalent of settlement-free peering. Netflix and ISPs have since entered into mutually beneficial interconnection agreements, and Netflix itself has noted the benefits of such agreements for its profit margins.[286]

### B. Regulation of Internet Traffic Exchange Would Be Disruptive and Harmful

Any assertion of regulatory authority over internet traffic exchange would be not only needless for the reasons discussed, but also affirmatively counterproductive. The threat of regulatory intervention in private negotiations inevitably distorts them. Some parties will always hold out in the hope that regulators will grant them a better deal than the one they could negotiate through free-market dynamics, even though, in competitive markets, the negotiated outcome is almost always the more efficient one.[287]

---

[283] *See id.*

[284] *See id.* ¶¶ 32-33.

[285] *See Cogent Now Admits*, *supra* note 279.

[286] Thomson Reuters StreetEvents Edited Transcript, *NFLX – Q2 2014 Netflix Inc Earnings Call*, at 6 (July 21, 2014), ("[O]n a short-term basis, I think there's great assurances in the sense that we've been able to sign these immediate interconnect deals, and *still able to achieve our margin targets, and our guidance implies those costs are embedded.*") (emphasis added).

[287] *See* Howard A. Shelanski, *Adjusting Regulation to Competition: Toward a New Model for U.S. Telecommunications Policy*, 24 Yale. J. Reg. 55, 77-84 (2007).

**App. 1491**

Compounding the problem, the NPRM's proposed basis for regulatory oversight would result in irrationally asymmetric regulation of bilateral negotiations. Because the Commission proposes to predicate that oversight on Title II classification of retail broadband services,[288] it would convert only one side in any interconnection negotiation — the consumer-facing ISP — into a common carrier subject to complaint proceedings. That approach would leave the ISP's counterparty (*e.g.*, Cogent) an unregulated entity immune from such complaints, giving it new opportunities for regulatory gamesmanship.

Some commenters would carry this regulatory dysfunction one step further by subjecting internet traffic exchange not only to *ex post* FCC oversight, but also to *ex ante* "bill-and-keep" rules.[289] Such rules would be radically misplaced in this setting and would launch a completely unnecessary wave of intractable regulatory disputes.

In 2011, the Commission adopted bill-and-keep as its default regime for interconnection over the PSTN, requiring each carrier involved in the origination or termination of a telephone call to cover its own costs on its side of a "network edge."[290] As previously noted, the routing of telephone calls — unlike internet traffic exchange — has long been subject to regulation, including interconnection requirements.[291] As a result, *some* regulatory methodology was necessary to allocate cost recovery among the carriers subject to mandatory interconnection, and

---

[288] *See* NPRM ¶ 66.

[289] *See, e.g.*, Ad Hoc Telecom Users Committee Comments at 21-24; Free Press Comments at 135-36. Under a bill-and-keep regime, which today applies only to certain telephone calls transmitted over the public switched telephone network, the calling party's network is legally entitled to hand calls off at certain points on the called party's network and to have those calls transmitted from those points to the called parties at no cost to itself.

[290] Report and Order and Further Notice of Proposed Rulemaking, *Connect America Fund*, 26 FCC Rcd 17663, ¶ 1320 (2011) ("A critical aspect to bill-and-keep is defining the network 'edge[.]'").

[291] USTelecom Comments at 48-49.

bill-and-keep was preferable to the alternatives. But 13 years later, there are still no comprehensive rules specifying the all-important "network edge" in a range of settings. As the Commission has noted, that "critical aspect [of] bill-and-keep" is "complex."[292] The bill-and-keep regime for phone calls routed over the PSTN thus remains mired in disputes about who bears financial responsibility for various facilities and functions involved in traffic exchange.[293]

Trying to impose a "bill-and-keep" regime on internet traffic exchange with mass-market, retail broadband providers would accomplish nothing beyond the creation of an analogous and even more intractable regulatory morass — this time without any justification whatsoever. Advocates of that regime would require an ISP to exchange "Internet traffic on a settlement-free basis with requesting [networks] that are willing to *reasonably localize traffic*," subject to "reasonable limitations, such as that interconnecting parties have a *sufficient amount of traffic* to exchange."[294] Contrary to Ad Hoc's suggestion,[295] such an approach would not be remotely simple to apply because, for example, the meaning of "reasonably localized" would be subject to arcane case-by-case disputes. If regulators have found it difficult to apply the "network edge" concept even to the comparatively static PSTN, how could they possibly be expected to implement an analogous concept to the dynamic internet, across countless, ever-evolving network architectures? And what "amount of traffic" would be "sufficient" to trigger a direct

---

[292] Memorandum Opinion and Order, *Level 3 Commc'ns, LLC v. AT&T Inc.*, 33 FCC Rcd 2388, ¶¶ 18, 23 (2018) ("*Level 3 Order*") (cleaned up); *see also* Report and Order, *8YY Access Charge Reform*, 35 FCC Rcd 11594, ¶ 69 (2020) (noting that the Commission was still studying "issues relating to . . . the network edge" and refusing to prejudge those issues, particularly because "[m]andating . . . fundamental changes to carriers' interconnection obligations would have unpredictable consequences for a wide range of interconnection arrangements").

[293] *See*, *e.g.*, *Level 3 Order* ¶ 19.

[294] Lumen Comments at 14 (emphases added).

[295] Ad Hoc Telecom Users Committee Comments at 24.

**App. 1493**

interconnection requirement in the first place?  Regulatory advocates offer no answers to these fundamental questions.

Similarly, another set of commenters argues that "settlement-free peering is warranted if an edge provider or transit provider provides *sufficient localization* of exchanged traffic," such that, among other things, the parties interconnect "at a *reasonable number* of interconnection points" and "the proportion of traffic that is exchanged at an interconnection point that is *relatively close* to the end user is *sufficiently high.*"[296]  Each of the italicized terms would inevitably be the subject of gamesmanship, arbitrage, and protracted litigation.  Today, the free market successfully resolves these and similar questions about the details of interconnection on an efficient, case-specific basis, and the proponents of bill-and-keep identify no plausible reason to replace those arrangements with litigation-prone regulatory mandates instead.

Applying bill-and-keep to internet traffic exchange would be irrational in other respects as well.  First, eliminating direct-interconnection fees would eliminate price signals that, today, give content-originating networks efficient incentives to reduce unnecessary costs in their transmission of internet traffic.  For example, the prospect of such fees currently gives streaming video providers incentives to implement efficient forms of digital compression that reduce traffic loads while still providing high video quality to end users.[297]  Imposing a new obligation of settlement-free direct interconnection would undermine those efficiency-inducing price signals, generate wasteful over-expenditure of finite network resources, and thus impose on broadband

---

[296] Jordan-Nikkhah Comments at 8 (emphases added).

[297] Israel et al. Decl. ¶ 57.

App. 1494

providers avoidable costs that consumers would ultimately bear in the form of higher broadband bills.[298]

Equally problematic, imposing this proposed bill-and-keep regime would force the most cost-conscious broadband consumers to cross-subsidize streaming video companies and their most bandwidth-consumptive subscribers.[299]  Indeed, even some *supporters* of regulatory intervention recognize that bill-and-keep would have that effect.  For example, in a paper that he cites extensively in his comments here, Professor Jordan acknowledges that ISPs and content-originating networks participate in a two-sided market for the delivery of content to end users over broadband platforms.[300]  Such markets are subject to the well-known "see-saw" effect, in which a price increase on one side of the market (here, charging content-originating networks something rather than nothing for direct interconnection) exerts downward pricing pressure on other side of the market (resulting here in lower broadband prices to consumers).[301]  Professor Jordan further acknowledges that positive ISP direct-interconnection fees (as opposed to bill-and-keep) often maximize aggregate consumer welfare by reducing broadband prices more than they increase streaming-video prices.[302]

---

[298] *See id.*; Israel-Keating 2017 Decl. ¶¶ 57-60.

[299] *See* Israel-Keating 2017 Decl. ¶ 58.

[300] *See* Ali Nikkhah & Scott Jordan, *A Two-Sided Model of Paid Peering*, 46 Telecomms. Pol'y 1 (2022).

[301] *See* Israel-Keating 2017 Decl. ¶¶ 55-58; Robert Litan & Hal Singer, *The Need for Speed: A New Framework for Telecommunications Policy for the 21st Century* 43 (2013).

[302] *See* Nikkhah & Jordan, 46 Telecomms. Pol'y at 29-30 ("[I]t does not follow that settlement-free peering is always the policy that maximizes consumer surplus.  When there is a moderate incremental ISP cost per video streaming subscriber, the peering price that maximizes consumer surplus is positive . . . . This positive price is beneficial for consumers because the incremental ISP cost for video streaming is paid by video streaming subscribers.").

**App. 1495**

To be sure, Professor Jordan constructs a stylized model purporting to show that an ISP has incentives to charge fees *above* that welfare-maximizing level, thus requiring a regulator to step in and set the "right" — but still positive — price for direct interconnection.[303]  On close inspection, however, his paper supports the opposite conclusion.  In modeling prices above the profit-maximizing level, Professor Jordan counterfactually assumes both (1) "that the ISP has no significant competition for broadband service . . . within [its] footprint" (*i.e.*, that ISP is a retail monopolist),[304] and (2) that the content-originating network cannot choose "indirect connection through transit" as a "competitive alternative" to "direct interconnection."[305]  Because ISPs in fact face retail competition, and because transit is in fact an alternative to direct interconnection, the prices ISPs charge in the long-unregulated peering-and-transit marketplace are in fact likely to be welfare-maximizing, to the benefit of broadband consumers.

## C.     The Commission Lacks Statutory Authority To Regulate Internet Traffic Exchange

For the reasons discussed, the Commission has no plausible policy basis for asserting regulatory authority over internet interconnection.  The Commission also lacks any *legal* basis for asserting such authority.

The proponents of interconnection regulation rely on the NPRM's proposed legal rationale, which repeats the rationale of the *2015 Order*: the notion that "represent[ing] to retail customers that they will be able to reach 'all or substantially all Internet endpoints' " — the definition of broadband internet access — "necessarily includes the promise to make the

---

[303] *See id.* at 22-23 (identifying "$2.34" as the price that "maximizes aggregate consumer surplus" in one modeled scenario, versus "$4.59" that a hypothetical ISP monopolist would charge in that scenario); *see also id.* at 23-25.

[304] *Id.* at 12.

[305] *Id.* at 31.

**App. 1496**

interconnection arrangements necessary to allow that access."[306]  That theory of implied regulatory authority is deficient for the reasons we have explained.  Specifically, it contradicts the limits that the Communications Act elsewhere explicitly places on the Commission's interconnection authority,[307] and the Commission does not purport to — and could not — regulate internet traffic exchange itself as a Title II common-carrier service.[308]  And it is also contrary to ISPs' terms of service that disclaim any commitment to enter into internet traffic exchange with other parties.[309]

In any event, even if this theory of implied authority were sustainable, it could not support *prescriptive* interconnection rules of any kind — and certainly not the bill-and-keep regime proposed by various commenters.  Such rules are wholly unnecessary to ensure that ISPs will fulfill any expectation that their customers "will be able to reach 'all or substantially all Internet endpoints.'"[310]  Again, ISPs have been fulfilling that expectation for decades without bill-and-keep rules or any other form of prescriptive regulation.  And an ISP's negotiation of a paid-peering arrangement with content-originating networks is not "a violation of the promise [an ISP] made to its [retail] customer[s]."[311]  An ISP's customers do not care about the behind-

---

[306] NPRM ¶ 66; *see*, *e.g.*, Ad Hoc Telecom Users Committee Comments at 11; INCOMPAS Comments 38-40.

[307] *See* USTelecom Comments at 95-96 (discussing 47 U.S.C. §§ 201(a), 251(a), (c)(2)).

[308] *Id.* at 96-97.  The same commenters who advocate interconnection regulation rightly reject the NPRM's somewhat obscure suggestion (¶ 66), based on the *Verizon* decision (740 F.3d at 653), that broadband ISPs provide a separate regulable "service" to content providers with whom they have no contractual relationship.  *See*, *e.g.*, INCOMPAS Comments at 38-39; *see also* Public Knowledge Comments at 86 n.249.  And no one proposes to classify peering, transit, and other forms of internet traffic exchange as *Title II* common-carrier services for the first time.  Indeed, that outcome would be anathema to the proponents of regulation, who accurately perceive a threat that such Title II treatment would extend to their own network services.

[309] USTelecom Comments at 97 & n.352.

[310] NPRM ¶ 66.

[311] Lumen Comments at 6 n.6.

**App. 1497**

the-scenes details of traffic-exchange arrangements; they simply want high-quality broadband for themselves at affordable prices, which is what the current unregulated marketplace has delivered. Indeed, bill-and-keep would affirmatively disserve consumer interests because a flat ban on direct-interconnection fees would impose upward pressure on retail broadband prices, as discussed above.[312]

## V. The Commission Should Reject Calls for Additional Regulations Beyond Those the NPRM Contemplates

Title II proponents also offer a grab bag of additional regulatory proposals, none of which the Commission should adopt.

### A. The Commission Should Not Impose Additional Disclosure Requirements

Commenters agree that existing disclosure requirements are working and that a return to the *2015 Order*'s enhanced disclosure requirements is unwarranted.[313] The record contains no evidence that current transparency rules are insufficient to protect consumers, especially as the Commission's recent broadband label rules, adopted pursuant to the IIJA, are just now taking effect.[314] Additional disclosure requirements would impose excessive costs — especially on smaller providers — while threatening to confuse consumers by commingling essential and non-essential information.[315]

---

[312] *See supra* Part IV.A.3.

[313] *See* Lumen Comments at 4, 32-33; NRECA Comments at 9-10; WISPA Comments at 49-54; WTA Comments at i, 1-2, 7.

[314] *See* WISPA Comments at 49; Lumen Comments at 4.

[315] *See* NRECA Comments at 9-10; WISPA Comments at 49.

The Commission should reject calls for so-called "[m]aximal [t]ransparency"[316] to impose a host of novel and untested disclosure obligations. The agency recently considered the tradeoffs between disclosures necessary for consumers to choose among providers and those that would serve only to confuse them, adopting broadband label requirements that struck a balance.[317] The Commission should hold off on adopting any additional disclosure requirements "unless and until it is determined that customers actually want, need and will use more information than they receive pursuant to the existing broadband transparency and broadband label rules."[318] As those rules already mandate disclosure of key performance metrics, more detailed transparency statements would not benefit consumers; to the contrary, they would "becom[e] little more than fine print, to be predictably ignored in most cases by consumers."[319] At the same time, those additional requirements would impose excessive costs on providers, especially if collection of localized or more granular data were mandated.[320]

## B. The Commission Should Not Regulate the Price Structure of Broadband Plans

Usage-based billing plans allow broadband customers to buy broadband at a lower price in exchange for lower speeds or overage fees if they exceed a pre-agreed usage threshold during

---

[316] New America's OTI Comments at 42-45; *see* American Library Association Comments at 17; Communications Workers of America Comments at 15-16; Peha Comments at 13-14; Measurement Lab Comments at 1-9; Jordan Comments at 7-20.

[317] *See* Report and Order and Further Notice of Proposed Rulemaking, *Empowering Broadband Consumers Through Transparency*, 37 FCC Rcd 13686, ¶ 26 (2022). Some commenters rehash their claims that the Commission should have struck a different balance in the broadband labels. *See* Electronic Privacy Information Center et al. Comments at 18; New America's OTI Comments at 45-50; Jordan Comments at 21-32. But this proceeding is not the proper forum for reconsideration of that decision.

[318] WTA Comments at ii.

[319] NRECA Comments at 10.

[320] *See* Lumen Comments at 33.

a given billing period.  As the Commission previously acknowledged, such plans "may benefit consumers by offering them more choices over a greater range of service options" than they would otherwise have.[321]  Banning such plans would succeed only in raising average broadband prices by forcing all consumers to subscribe to higher-priced plans with no usage thresholds, even if they are only modest users of network capacity and thus prefer the lower-priced usage-based plans to which they currently subscribe.

In a single sentence, the NPRM nonetheless declares that the Commission "do[es] not intend to leave [usage-based] data plans without oversight" and proposes instead to subject them to case-by-case review under both Sections 201 and 202 as well as the general conduct standard.[322]  A few proponents of heavy-handed broadband regulation support that proposal in passing,[323] although most commenters ignore the issue (presumably because usage-based pricing is less common today than it was a decade ago).  Yet neither the NPRM nor any commenter identifies any reason why regulatory "oversight" — which would plainly violate the NPRM's rejection of rate regulation — is needed in the first place.  As in other competitive industries, market forces, rather than central regulators, are best equipped to set efficient prices.[324]  No government agency intervenes in rental car fuel plans, airline fares, or online data-storage fees;

---

[321] *2015 Order* ¶ 153.

[322] NPRM ¶ 156.

[323] *E.g.*, EFF Comments at 14-15; *see also* Free Press Comments at 43-45.  As discussed in USTelecom's initial comments (at 61), any oversight of usage-based plans would belie the Commission's professed commitment to steer clear of rate regulation.  Scott Jordan, a professor of computer science, invites the Commission to abandon any pretense on that issue when he proposes a rate formula that would require any "overage charge (in \$/GB)" to be "substantially less than the average price per unit volume of the service tier (i.e., the monthly service price divided by the data cap, in \$/GB)."  Jordan Comments at 36.  As NCTA explains in its reply comments, Professor Jordan's purported economic justification for such a rule rests on flawed data and insupportable assumptions.  *See* NCTA Reply Comments Part III.A.

[324] *See* USTelecom Comments at 40-43.

**App. 1500**

the Commission has no greater justification for threatening to intervene in the structure of broadband pricing plans.

Beyond that, the proposed case-by-case review under the amorphous general conduct standard would be not only unnecessary, but also affirmatively harmful. First, the threat of unpredictable forfeiture penalties would give ISPs obvious incentives to discontinue lower-priced usage-based plans and place all consumers on higher-priced plans that lack usage thresholds, harming many consumers while benefiting none. In turn, if ISPs cannot safely experiment with usage-based billing as a means of handling network congestion, they would face a riskier economic case for entering broadband markets by investing in fixed wireless and other broadband technologies that present novel and unpredictable capacity challenges. In short, exposing usage-based billing plans to the specter of punitive enforcement actions would not only deprive consumers of low-priced service options in the short term, but also reduce innovation and intermodal competition in the long term.

C.    **The Commission Should Not Change Its Definition of Broadband Internet Access Service**

The Commission has relied on the same definition of broadband internet access service since 2010.[325] Numerous commenters agree that the Commission should retain that long-standing definition.[326] It has worked well for more than a decade, and maintaining it "benefits the Internet ecosystem as a whole, as it provides a clear regulatory framework for network experimentation and innovation to flourish."[327]

---

[325] *See* NPRM ¶ 59.

[326] *See*, *e.g.*, CCIA Comments at 1-2; Ericsson Comments at 18; ITI Comments at 4; Internet2 Comments at 4-7; Lumen Comments at 21-25; T-Mobile Comments at 26-27; Transatel Comments at 2-3.

[327] *See* Ericsson Comments at 18.

**App. 1501**

Only a few commenters propose changes to the definition. The Commission should reject them all. Thus far, the Commission has limited its orders regarding broadband to "mass market" services, including "residential customers, small businesses, and other end-user customers such as schools and libraries."[328] Ad Hoc urges the Commission to expand the definition to all business services, except for those sold to enterprise customers that "contain[ ] non-standard, customized terms."[329] But it identifies no concrete problems that any of the business customers excluded from the long-standing broadband definition have faced as result of their broadband services persistently remaining under Title I. Changing the definition now will only sow confusion regarding the regulatory regime that governs the broadband services those businesses purchase.

Nor should the Commission delete the word "retail" from its definition, as INCOMPAS suggests.[330] It is not clear what the "wholesale" broadband service to which INCOMPAS refers is, let alone whether it is urging the Commission to mandate that ISPs provide broadband to resellers. And while INCOMPAS suggests that deleting the word would empower the Commission to "resolve disputes between wholesalers and resellers" of retail, mass-market broadband service,[331] it does not identify the existence of any such "resale" disputes that require Commission intervention to resolve. INCOMPAS's brief discussion provides no reason for the Commission to deviate from its long-standing decision to address only retail mass-market broadband services.

---

[328] *2015 Order* ¶ 189; *2018 Order* ¶ 21 n.58.

[329] *See* Ad Hoc Telecom Users Committee Comments at 7-11.

[330] *See* INCOMPAS Comments at 36.

[331] *See id.*

**App. 1502**

### D. The Commission Should Forbear from Section 254(d), as the NPRM Proposes

If the Commission classifies broadband as a telecommunications service, it should

forbear from Section 254(d), as the NPRM proposes and as the Commission did in 2015.[332]

Immediately subjecting interstate broadband internet access service revenues to universal service

contributions, without pursuing broader contributions reform, would significantly raise the cost

of broadband to consumers. That would undermine, rather than advance, the Commission's

broadband adoption and affordability goals. Several commenters, including some that endorse

reclassification, support forbearing from Section 254(d) for that reason.[333] As Free Press noted

in "strongly agree[ing]" with the Commission's proposal to forbear from Section 254(d), a

decision not to forbear would effectively impose a "regressive tax on broadband" that would

"overburden[ ] low-income consumers that are more sensitive to price increases" and "negatively

impact low-income broadband adoption and use."[334]

There is no doubt that reform of the Universal Service Fund contributions system is

needed to secure the Fund's long-term sustainability. However, using this proceeding to pursue a

stop-gap measure — and raising all consumers' broadband prices in the process — is not the way

to solve that problem. Instead, given "the significant and ongoing policy debate surrounding

Universal Service contribution methodologies, the Commission should forbear from imposing

any new contribution requirements on BIAS providers until the record can be more fully

developed in a separate proceeding."[335]

---

[332] *See* NPRM ¶ 105; *2015 Order* ¶ 58.

[333] *See* Communications Workers of America Comments at 21-26; Free Press Comments at 66-67; NRECA Comments at 10-12.

[334] Free Press Comments at 66-67.

[335] NRECA Comments at 11-12.

**App. 1503**

Indeed, as USTelecom has explained in the *Future of USF Report*[336] proceeding, broadband revenue by itself cannot address long-term funding requirements.[337] Rather, doing so requires a significantly expanded contributions base that would cover additional support with minimal impact on the contributions factor. Therefore, consistent with the Commission's recommendation in the *Future of USF Report*, Congress should "provide the Commission with the legislative tools needed to make changes to the contributions methodology and base in order to reduce the financial burden on consumers, to provide additional certainty for entities that will be required to make contributions, and to sustain the Fund and its programs over the long term."[338] In particular, Congress should enact legislation that provides the Commission with clear authority to assess the revenues of services whose business model substantially depends on consumer or business access to broadband, such as digital advertising, streaming video services, and app stores. Congress need not sweep in the entirety of the internet economy, but instead should focus on the Big Tech companies who benefit the most from broadband connectivity and are the largest in terms of revenues and/or market capitalization.

Adding consumer broadband to the Universal Service Fund contributions base, while excluding these massive beneficiaries of universal broadband connectivity, would be neither equitable nor sustainable, and would shift a greater portion of the burden to consumers, as opposed to businesses.[339] In contrast, expanding the base to include Big Tech would

---

[336] Report, *Report on the Future of the Universal Service Fund*, 37 FCC Rcd 10041 (2022) ("*Future of USF Report*").

[337] *See* USTelecom Comments at 8-10, *Report on the Future of the Universal Service Fund*, WC Docket No. 21-476 (Feb. 17, 2022) ("USTelecom Future of USF Comments").

[338] *Future of USF Report* ¶ 111.

[339] *See Connecting Every American: The Future of Rural Broadband Funding: Hearing Before the H. Subcomm. on Commc'ns & Tech. of the H. Comm. on Energy & Commerce*, 118th Cong. (2023) (written statement of Jonathan Spalter, USTelecom President & CEO, at 2-3); USTelecom Future of USF Comments at 8-9. Sustainability concerns arise because there is evidence that broadband revenues are

substantially reduce the contributions factor and result in a lower, more stable USF charge for broadband consumers than proposals to assess broadband revenues alone.

For all these reasons, the Commission should reject calls by those commenters that urge the Commission not to forbear from Section 254(d). They claim that Section 254(d) forbearance would hinder efforts to bridge the digital divide.[340] But that has it backward. Raising costs for broadband service would both discourage broadband adoption and also new broadband investment.[341] The Commission is thus correct in its proposal to pair the reclassification of broadband with forbearance from Section 254(d) and its contribution requirements.

### E. The Commission Should Forbear from Sections 251 and 252, as the NPRM Proposes

As part of its "broad forbearance," the Commission correctly proposes to forbear from the interconnection agreement and related requirements of Sections 251 and 252 of the Act, as it did in the *2015 Order*.[342] One commenter — the WTA — opposes this forbearance, contending that these provisions would assist smaller ISPs in their business dealings with larger providers of middle-mile and backbone transport services.[343] But the Commission is not even proposing to subject those services to Title II, so Sections 251 and 252 would not apply to them, even without forbearance. In addition, many provisions in Sections 251 and 252 govern only incumbent local

---

declining as a result of sharp competition. Thus, without expanding the contributions base to a broader base of entities, including edge providers, the Fund could once again face an increasing contributions factor. *See id.*

[340] *See* AARP Comments at 15-17; ACLU Comments at 15; Ad Hoc Telecom Users Committee Comments at 31-37; CPUC Comments at 12-13; INCOMPAS Comments at 53-57; National Consumer Law Center Comments at 2-5; National Digital Inclusion Alliance et al. Comments at 3-4; New America's OTI Comments at 37-41; Next Century Cities Comments at 11-13.

[341] *See* Free Press Comments at 66-67.

[342] NPRM ¶ 104.

[343] *See* WTA Comments at 10-12.

exchange carriers.[344]  The Commission should not impose obligations — which Congress designed more than 25 years ago to open local telephone markets to competition — on the small subset of broadband providers that were incumbent local telephone companies in February 1996 or that the Commission has treated as such since that time.[345]  Such obligations would distort the existing competitive marketplace, particularly as incumbent local telephone companies providing service over fiber networks compete with cable companies, which are the largest providers of broadband internet access service.[346]

### F.       Reclassification Would Not Help Enforce Digital Discrimination Rules

Some commenters argue that reclassification would enable the Commission to enforce its recently adopted digital discrimination rules through its Chapter 5 (Communications Act) enforcement authority, by declaring practices that violate those rules also to be unjust, unreasonable, or unreasonably discriminatory under Sections 201 and 202.[347]  This proposal, however, faces a basic legal problem: Congress decided not to enact the digital discrimination provision (47 U.S.C. § 1754) as part of the Communications Act, even though it did take that step for other IIJA provisions.[348]  Because the Commission's Chapter 5 enforcement authority

---

[344] *See* 47 U.S.C. §§ 251-252.

[345] *See id.* §§ 251(h), 252(j) (defining "incumbent local exchange carrier" for purposes of Sections 251 and 252).

[346] *See 2022 FCC Communications Marketplace Report* ¶ 17 & fig. II.A.1; Umair Bashir, *Most Used Internet Providers/Brands in the U.S. as of September 2023*, Statista (Nov. 17, 2023) https://www.statista.com/forecasts/997229/most-used-internet-providers-brands-in-the-us.

[347] *See* Lawyers' Committee for Civil Rights Under Law Comments at 11-14; Public Knowledge Comments at 52-53; National Digital Inclusion Alliance et al. Comments at 4-5; Next Century Cities Comments at 13-14.  One commenter also rehashes claims from the digital discrimination proceeding that were fully refuted there.  *Compare* Lawyers' Committee for Civil Rights Under Law Comments at 5-10, *with* Reply Comments of AT&T at 5-12, GN Docket No. 22-69 (Apr. 20, 2023) ("AT&T Digital Discrimination Reply Comments").

[348] *See* Comments of USTelecom at 43-47, GN Docket No. 22-69 (Feb. 21, 2023) ("USTelecom Digital Discrimination Comments"); AT&T Digital Discrimination Reply Comments at 29-30 (citing 47 U.S.C. §§ 344, 644(b)(2), 1752(b)(9)(C)(ii)).

**App. 1506**

extends only to provisions within the Communications Act or its implementing rules,[349] Congress's decision not to enact Section 1754 as part of the Communications Act reflects a considered policy judgment not to subject "digital discrimination" claims to the remedies or enforcement mechanisms found in Chapter 5.[350] The Commission cannot use reclassification to circumvent that congressional choice.

## VI. Broadband Internet Access Service Providers Should Be Subject to a Single Set of Uniform, National Rules

Multiple commenters agree that, whatever regulatory framework the Commission selects, it should make clear that this "national regulatory approach"[351] preempts additional state and local regulation of the broadband internet access services providers offer.[352] Allowing more than 55 other jurisdictions (the 50 states, as well as the District of Columbia, Puerto Rico, and other territories) to pursue their own regulatory agendas for broadband — a service that is jurisdictionally interstate by definition, because it offers access to "all or substantially all internet endpoints,"[353] which are located across the country and around the world — would be a recipe for confusion and chaos. The resulting regulatory patchwork would impose major inefficiencies on the entire industry, as ISPs would need to internalize these inconsistent requirements and

---

[349] *See* AT&T Digital Discrimination Reply Comments at 30-31 (discussing 47 U.S.C. § 503(b)(1)). Congress has made Title V remedies applicable to a handful of provisions outside of the Communications Act by cross-referencing those remedies in the text of those provisions. *See id.* at 31 & n.90. Here, however, the digital discrimination provision does *not* incorporate Title V enforcement mechanisms by reference, even though another provision of the IIJA does so. *Id.* at 29-30 (discussing 47 U.S.C. § 1752(b)(9)(C)(ii)).

[350] *See* USTelecom Digital Discrimination Comments at 43-47.

[351] NPRM ¶ 3; *see also id.* ¶ 16 (acknowledging the importance of "a national regulatory approach" to broadband).

[352] *See* California Independent Small LECs Comments at 22-24; ACA Connects Comments at 47; Lumen Comments at 29-31; T-Mobile Comments at 45-50; NRECA Comments at 12-13.

[353] NPRM ¶ 59. Both in the NPRM and for years prior, the Commission has recognized that this definition describes an "interstate" service. *See id.* ¶ 95; *see also*, *e.g.*, *2015 Order* ¶ 431 n.1276 (recognizing "the interstate nature of BIAS").

**App. 1507**

make frequent alterations to their business models to achieve compliance with each. Moreover, consumers would experience the inconvenience and disruption associated with the variation in the services that are available in different locations.

To the extent ISPs attempted to ameliorate these harms by adjusting their business models to comply with all regulatory regimes *nationwide*, that would replace the Commission's own considered policy judgment with the regulatory choices of the single most interventionist state for any given regulatory issue. That approach would effectively allow any individual state to control the conduct of ISPs nationwide in whatever manner it sees fit. The Commission broadly preempted state broadband regulation in the *2015 Order* to prevent states from imposing obligations "inconsistent" with the federal regulatory scheme,[354] and it should do so here as well.

A few commenters — largely the states themselves — argue against preemption to preserve their own alleged authority to address perceived policy issues.[355] But none provides a convincing justification for causing the harms enumerated above. For instance, regulators in Nebraska and Pennsylvania assert that preemption would hamper their efforts to promote broadband deployment and availability.[356] But the preemptive effect of federal regulation would not prevent states from offering their own subsidies for broadband deployment and imposing

---

[354] *2015 Order* ¶ 433 ("The Commission has used preemption to protect federal interests when a state regulation conflicts with federal rules or policies, and we intend to exercise this authority to preempt any state regulations which conflict with this comprehensive regulatory scheme or other federal law.").

[355] *See* CPUC Comments at 7-36; Pennsylvania Public Utility Commission ("PAPUC") Comments at 2-8; New York Department of Public Service ("NYDPS") Comments at 2-4; California Attorney General Comments at 1-5; Nebraska Public Service Commission ("NEPSC") Comments at 2-5; NARUC Comments at 12-19.

[356] *See* NEPSC Comments at 2-4; PAPUC Comments at 4-5.

**App. 1508**

reasonable conditions on the services that providers that voluntarily accept such funding offer over the subsidized networks.[357]

Regulators in California and New York assert a need for states to regulate broadband providers for network resiliency and emergency preparedness purposes.[358] But as previously explained, the performance of America's broadband networks during the COVID-19 pandemic and ISPs' increased investments in their disaster recovery capabilities — not to mention the existence of emergency authorities at the federal level — foreclose any claim that such state-level regulation is needed.[359] And the potential costs of such unnecessary state mandates could be staggering.[360]

Resolution of these and other policy concerns via disparate regulatory efforts at the state level would undermine the Commission's authority and impose unnecessary burdens on industry and consumers alike. As it has previously done, the Commission should make clear that its chosen regulatory framework for broadband is exclusive of any supplemental regulation by individual states.

---

[357] *See, e.g.*, *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 226-27 (1993) (explaining the "market participant" exception to preemption). *But see id.* at 228-29 (noting that state action may nonetheless remain subject to preemption where it "addresse[s] . . . conduct unrelated to the . . . performance of contractual obligations to the State").

[358] *See* NYDPS Comments at 2-3; CPUC Comments at 23-28, 33-34.

[359] *See* USTelecom Comments at 81-83; *see also* AT&T Comments at 14-17; CTIA Comments at 37-39.

[360] USTelecom Comments at 82 & n.304.

**App. 1509**

**VII. The Commission Should Forbear from Section 214 Obligations in Addition to the Other Title II Obligations and Rules from Which It Proposes To Forbear**

    **A.    The NPRM Correctly Proposes To Forbear from Numerous Provisions of Title II, Including Rate Regulation Provisions**

There is strong support, including among commenters favoring Title II reclassification, for the Commission's proposal to grant broad forbearance from Title II, just as it did in the *2015 Order*.[361] Commenters agree with USTelecom that transparent and robust forbearance is essential to provide concrete and reliable guidance to providers and to ease the administrative burdens and costs that Title II regulation will impose.[362]

Further, nearly all commenters, again including many that endorse Title II reclassification, specifically support the Commission's proposal to forbear from both *ex ante* and *ex post* rate regulation.[363] As these commenters agree, rate regulation would devastate the investment and competition that have caused broadband to flourish.[364] Indeed, many commenters share USTelecom's concern that forbearance from explicit rate regulation, while necessary, is insufficient to mitigate the harm of Title II reclassification, as even the specter of future rate regulation — which is enabled by both the general conduct standard and concerns that a future Commission may undo forbearance — will have chilling effects on innovation,

---

[361] *See* ACA Connects Comments at 48-53; California Independent Small LECs Comments at 19-21; CCIA Comments at 15-17; NCTA Comments at 94; WISPA Comments at 54-55.

[362] *See, e.g.*, California Independent Small LECs Comments at 19-21; WISPA Comments at 54-55.

[363] *See, e.g.*, 5G Americas Comments at 4-6; ADTRAN Comments at 14-15; AT&T Comments at 5-6, 26-28; California Independent Small LECs Comments at 4, 19-26; Competitive Enterprise Institute Comments at 12-14; CTIA Comments at 101-03; Free State Foundation Comments at 45-48; Heritage Foundation Comments at 1-2; INCOMPAS Comments at 59-60; T-Mobile Comments at 47-48; WISPA Comments at 57-59.

[364] *See, e.g.*, 5G Americas Comments at 4-6; Free State Foundation Comments at 45; T-Mobile Comments at 47-48.

App. 1510

investment, and deployment.[365]  The few commenters that urge the Commission to engage in, or at least leave the door open to, rate regulation all fail to adequately acknowledge these weighty considerations, as discussed above in Part III.A.3.

### B.      The Commission Should Also Forbear Broadly from Section 214(a)-(d)

Nearly all commenters agree that, if the Commission is going to classify broadband as a Title II service, it should forbear from Section 214(a)-(d), as it did in the *2015 Order*.[366]  These commenters echo the concerns that imposing Section 214 requirements on broadband will cause numerous harms to both broadband providers and consumers.

First, commenters agree that "[r]equiring licensure under Section 214 and all that it entails would be a sea change for [broadband] providers."[367]  Applying Section 214 requirements to broadband would discourage new entrants, incentivize some providers to limit services to avoid regulatory costs, reduce investment in broadband, and potentially force certain providers to maintain expensive, outdated networks rather than invest in expanding modern technology, all with the effect of harming the Commission's goals of broadband affordability and competition.[368]

---

[365] *See, e.g.*, ADTRAN Comments at 15; AT&T Comments at 5-6; U.S. Chamber of Commerce Comments at 15-16; Competitive Enterprise Institute Comments at 12-14; Nokia Comments at 7-8; WISPA Comments at 57-59.

[366] *See* ACA Comments at 51-52; Ad Hoc Broadband, Carrier and Investor Coalition Comments at 4-9; AT&T Comments at 28; CTIA Comments at 35; FAI & CTT Comments at 14-16; INCOMPAS Comments at 25-27, 57-59; ITI Comments at 4; Interisle Consulting Group Comments at 6; Westling Comments at 9-10; Lumen Comments at 25-29; NCTA Comments at 21-22; Transatel Comments at 1-2; U.S. Chamber of Commerce Comments at 28-32; WISPA Comments at 63-68.

[367] Ad Hoc Broadband, Carrier and Investor Coalition Comments at 5.

[368] *See* ACA Comments at 51-52; Ad Hoc Broadband, Carrier and Investor Coalition Comments at 5-7; AT&T Comments at 28; CTIA Comments at 35; FAI & CTT Comments at 16; INCOMPAS Comments at 58; ITI Comments at 4; Lumen Comments at 25-29.

Second, these commenters identify the heavy administrative burdens that applying Section 214 would impose on both broadband providers and the Commission.[369]  Preparing Section 214 authorization applications is costly, and delays and uncertainty in application processing can also jeopardize financing and other time-sensitive business deals.[370]  Smaller providers will feel these burdens particularly strongly.[371]  The Commission also will face the burden of processing international Section 214 applications from all existing 3,500 broadband providers, none of which could continue transmitting their customers' internet packets around the world until that processing is completed.[372]

Third, these commenters agree that the NPRM's national and cyber security rationales for requiring broadband providers to obtain international Section 214 licenses do not withstand scrutiny.[373]  Indeed, commenters that expressly focus on national security raise concerns that applying Section 214 to broadband would *harm* national security.[374]  As they explain, it would hinder the ability of domestic companies to compete internationally against China,[375] and

---

[369] *See* FAI & CTT Comments at 14-16; WISPA Comments at 63-68; U.S. Chamber of Commerce Comments at 28-32.

[370] *See* WISPA Comments at 66; ACA Comments at 51-52.

[371] *See* ACA Comments at 52; INCOMPAS Comments at 58; Interisle Consulting Group Comments at 6; WISPA Comments at 66.

[372] *See* WISPA Comments at 65; FAI & CTT Comments at 15.  As explained below, if the Commission nonetheless does not forbear from Section 214(a)-(d), it must grant blanket approval for international licenses at least for existing broadband providers.

[373] *See* ACA Comments at 51-52; Ad Hoc Broadband, Carrier and Investor Coalition Comments at 2-9; CTIA Comments at 33-35; FAI & CTT Comments at 7-9, 14-16; INCOMPAS Comments at 25-27, 57-59; Interisle Consulting Group Comments at 6; Westling Comments at 9-10; Lumen Comments at 26; NCTA Comments at 66-71; U.S. Chamber of Commerce Comments at 28-32.  But, even assuming the Commission's purported national and cyber security rationales could justify international Section 214 requirements, they provide no basis for applying domestic Section 214 requirements to broadband services.

[374] *See* FAI & CTT Comments at 7-8; Interisle Consulting Group Comments at 6; Westling Comments at 9-10.

[375] *See* Westling Comments at 9-10.

**App. 1512**

redirect resources away from more effective areas and sources of monitoring and enforcement.[376] Section 214 could also "slow down or impede the rapid response often needed" to threats and "weaken defenses against cybercrime" by thwarting collaboration with other agencies such as the FTC.[377]

Finally, at least one commenter that supports the Commission's proposed Title II classification opposes the NPRM's proposal not to forbear from Section 214.[378] INCOMPAS identifies "serious reservations," "given the incredibly burdensome implementation issues that would result."[379]

The few commenters that support subjecting broadband providers to Section 214 do not identify any meaningful benefits that would outweigh the massive costs the record identifies. One commenter points to a small cable company that ceased providing all service (including cable television) without notice.[380] But as that commenter notes, the cable company's termination of its television offering likely breached its franchise agreements as well.[381] One individual company's apparent willingness to breach a contract is no reason to impose Section 214 obligations on an entire industry.[382]

---

[376] *See* FAI & CTT Comments at 7-8.

[377] Interisle Consulting Group Comments at 6-7, 16.

[378] *See* INCOMPAS Comments at 25-27, 57-59.

[379] *Id.* at 26, 57.

[380] *See* Free Press Comments at 60.

[381] *Id*. at 60 n.137.

[382] Another commenter complains about AT&T's plans to discontinue legacy DSL services. *See* Communications Workers of America Comments at 7. Providers must be free, however, to end the provision of costly, older services to enable the transition to newer, better fiber and fixed wireless services. Further, contrary to the commenter's contentions, AT&T's actions did not leave consumers without service alternatives. *See, e.g.*, Letter from Fassil Fenikile, Assistant Vice Pres. for Regul. Affs., AT&T, to Marybel Batjer, Pres., Cal. Pub. Utils. Comm'n (Oct. 5, 2020), https://www.fcc.gov/ecfs/document/1014219026000/3. In all events, this commenter's concern — that customers might be "unable

If the Commission nonetheless chooses not to forbear from Section 214(a)-(d) in its entirety, "[a]t most, the Commission should retain the authority to revoke a provider's authority to provide [broadband] when necessary to protect national security."[383] This would mean forbearing from all of Section 214(a)-(d) other than the entry requirement in Section 214(a), while also granting blanket approval for both domestic and international licenses for broadband providers, to avoid disruption to existing services.[384] The better course of action, however, would be to forbear from Section 214(a)-(d) in its entirety, as the Commission did in the *2015 Order* and as the overwhelming majority of commenters agrees the Commission should do again.

## VIII. Conclusion

Today, more Americans have access to broadband, have more broadband choices, and have faster and cheaper broadband options than ever before. The past six years have borne out the *2018 Order*'s predictive judgments and refuted the doomsaying that prophesized the end of the internet. The Commission should abandon the NPRM and deny the petitions for reconsideration of the *2020 Remand Order*; leave the *2018 Order* in place; and devote its resources to finishing the job of closing the digital divide. Continuing on the unwarranted and unlawful course that the NPRM charts will instead cause turmoil in an industry that is critical to every aspect of modern life.

---

to connect to a POTS service," *see* Communications Workers of America Comments at 7 — has nothing to do with whether Section 214 should apply to broadband internet access service.

[383] *See* Lumen Comments at 26.

[384] *See id.*; USTelecom Comments at 101-03.

Respectfully submitted,

<u>/s/ *Scott H. Angstreich*</u>

Diana Eisner
Vice President, Policy and Advocacy

Paul Eisler,
Vice President, Cybersecurity

Nirali Patel
Senior Vice President, Policy and Advocacy

USTelecom – The Broadband Association
601 New Jersey Avenue, N.W.
Suite 600
Washington, D.C. 20001

Scott H. Angstreich
Leslie V. Pope
Alex A. Parkinson
Dennis D. Howe
Nataliia Gillespie
Kelley C. Schiffman*
Kellogg, Hansen, Todd, Figel
  & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Admitted only in California;
supervised by members of the firm.

*Counsel for USTelecom*

January 17, 2024

# Exhibit A

**Submission**

**Safeguarding and Securing the Open Internet**
Notice of Proposed Rulemaking – WC Docket No. 23-320

**Andrew J. Grotto**

**January 17, 2024**

**App. 1517**

Page No

I. INTRODUCTION AND EXECUTIVE SUMMARY.........................................................1

II. QUALIFICATIONS AND EXPERIENCE ........................................................2

III. THE UNITED STATES GOVERNMENT HAS ADDRESSED CYBERSECURITY AND NATIONAL SECURITY MATTERS FOR DECADES USING A COLLABORATIVE, "WHOLE OF GOVERNMENT" APPROACH .............4

    A. U.S. policy makers have recognized and responded to cybersecurity threats for decades with a "whole of government" approach and public-private partnerships..................................................................................4

        1. Presidential policy across Administrations has emphasized partnership and operational collaboration.................................................4

        2. Congress has taken targeted actions to facilitate collaboration and emphasize the leadership of DHS, DoD and other agencies. ...................10

    B. The whole-of-government approach has led to active operational and policy partnerships with the communications sector, built over decades........................15

        1. The Communications Sector, including ISPs, work in multiple collaborative venues to share information and coordinate responses. ........................................................................................15

        2. Communications Sector collaborations yield operational successes. ........22

IV. VARIOUS AGENCIES ARE ADDRESSING CYBERSECURITY AND NATIONAL SECURITY, WITH THE FCC BEING GIVEN SPECIFIC ROLES WHERE APPROPRIATE. ...............................................................................25

    A. Agencies other than the FCC have broad authorities that enable oversight and impacts on private sector cybersecurity and national security.........................25

    B. Key operational cyber activities are housed in other agencies and the FCC does not need to supplement operational cyber or law enforcement activities. ...............................................................................26

V. THE FCC HAS EFFECTIVELY USED TARGETED AUTHORIZATIONS FROM CONGRESS TO ADDRESS PRIOR SECURITY ISSUES. ................................29

VI. RECLASSIFICATION OF BIAS UNDER TITLE II BASED ON PURPORTED RATIONALES RELATING TO NATIONAL SECURITY AND CYBERSECURITY INTERESTS WOULD ACTUALLY UNDERMINE SECURITY COLLABORATION. ........................................................................30

    A. Reclassification of BIAS under Title II for regulatory purposes, with the threat of investigations and penalties for noncompliance, would profoundly disrupt – and curtail – work in collaborative initiatives. .......................................30

    B. The FCC's status as an independent agency and its legal obligations regarding transparent and public processes will complicate collaboration and undermine uniform federal policy...............................................................32

App. 1518

      C.     Title II reclassification and regulation would create an uneven and ineffective regulatory regime because ISPs are just one of many contributors to cybersecurity...................................................................34

VII.    CONCLUSION...........................................................................................................38

**App. 1519**

# I.    INTRODUCTION AND EXECUTIVE SUMMARY

This paper provides a national security expert's perspective on collaboration and advancement of cybersecurity and national security in telecommunications, internet, and broadband services.[1] The Federal Communications Commission ("FCC") has invoked the goal of improving the national security, law enforcement, and cybersecurity posture of the United States as a justification for changing the regulatory classification of broadband internet access service ("BIAS") providers to common carriers under Title II of the Communications Act of 1934 (as amended) and treating BIAS as a Title II telecommunications service. Reclassification would subject BIAS providers and services to an array of potential economic and operational regulations that presently do not apply because of the status of BIAS as a Title I service. It would also, as I explain below, have inadvertent negative implications for national security, cybersecurity, and law enforcement policy in the United States.

In light of the agency's proposed approach and my experience in cybersecurity and national security, I have been asked to describe and document the longstanding and effective collaborative approach of the federal government to the security of telecommunications, internet, and broadband services, as reflected in decades of public-private partnerships and multiple Executive Branch actions across Presidential Administrations, many of which I participated in.

Drawing from my experience at senior levels of government working on these issues from 2009 through 2017, and my academic research at Stanford since leaving government service, my perspective can aid the FCC as it examines the need for regulation, the consequences of reclassification, and the impacts on other agencies' work on these issues.

I have concluded that the federal government has existing and effective tools that address the national security, law enforcement, and cybersecurity posture of communications generally and BIAS in particular. These tools, coupled with longstanding operational and collaborative partnerships within the sector and between the sector and key cyber and national security agencies, make reclassification unnecessary. While the Commission asserts in the notice of proposed rulemaking ("NPRM") that reclassification is needed "to address threats to national security and public safety,"[2] it has not put forward concrete evidence to suggest that is actually the case. To the contrary, reclassification appears likely to set back U.S. national security, law enforcement, and cybersecurity by shifting the U.S. Government's relationships with BIAS providers from one of beneficial collaboration and partnership that has borne much fruit over the years to a less open, more hierarchical, and more adversarial relationship that focuses on compliance, liability, and punitive regulatory consequences.

I am concerned that if the FCC were to proceed with reclassification, it would undermine the effective and collaborative public-private partnership that has characterized the communications sector's relationship with the U.S. Government to date on national security,

---

[1] I have been retained by USTelecom – The Broadband Association to share my views in this proceeding. The views expressed in this submission are my own.

[2] *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-83, ¶ 25 (rel. Oct. 20, 2023), https://docs.fcc.gov/public/attachments/FCC-23-83A1.pdf ("NPRM" or "Reclassification NPRM").

1

cybersecurity, and law enforcement initiatives, with deleterious effects on those relationships and the national interests they have advanced over the past decades. These risks are particularly acute now, after more than a decade of expanding and enhanced collaboration on cybersecurity and national security, strengthened by statutory and operational emphasis on the Department of Homeland Security's ("DHS") Cybersecurity and Infrastructure Security Agency ("CISA") and other agencies, as detailed below.

In this submission, my analysis and conclusions are limited to the cybersecurity and national security implications of reclassification, FCC oversight, and potentially prescriptive future regulation.

## II. QUALIFICATIONS AND EXPERIENCE

My career has been focused on national security and cybersecurity, including work in federal government at senior levels, civil society, academia, and the private sector. This diverse experience has informed my views of public policy and regulation in the areas of cybersecurity and national security.

**The National Security Council.** I served as Senior Director for Cyber Policy on the National Security Council ("NSC") at the White House, a position I held in both the 44th and 45th presidencies, from 2015 to 2017. In that capacity, I advised the President and Cabinet on cybersecurity policies. I was responsible for coordinating interagency U.S. government efforts to protect U.S. critical infrastructure from cyber threats and enhance its resilience against those threats. Under President Obama, I played a central role in developing and overseeing the implementation of the Cybersecurity National Action Plan,[3] the first update of the National Institute of Standards and Technology ("NIST") Cybersecurity Framework,[4] and the implementation of the Cybersecurity Information Sharing Act of 2015,[5] among other duties. Then, I was the principal architect of President Trump's Executive Order 13800 ("EO 13800"), "Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure."[6]

**The United States Department of Commerce.** Before serving in the White House, from 2013 to 2015, I was Senior Advisor for Technology Policy for Commerce Secretary Penny Pritzker. In that capacity, I advised Secretary Pritzker and other members of the Department of Commerce's leadership team on all aspects of technology policy, including cybersecurity policies affecting critical infrastructure and the broader U.S. economy, with a particular focus on the industry-facing initiatives of NIST, the National Telecommunications and Information Administration ("NTIA"), and the Bureau of Industry and Security ("BIS"). I also represented the Department in interagency policy committee meetings convened by the NSC on cybersecurity and other matters.

---

[3] The White House, *FACT SHEET: Cybersecurity National Action Plan* (Feb. 9, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/02/09/fact-sheet-cybersecurity-national-action-plan.
[4] NIST, Framework for Improving Critical Infrastructure Cybersecurity, Version 1.1 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf.
[5] 6 U.S.C. §§ 1501-1510.
[6] Exec. Order No. 13800, 82 Fed. Reg. 22391 (May 11, 2017), https://www.federalregister.gov/documents/2017/05/16/2017-10004/strengthening-the-cybersecurity-of-federal-networks-and-critical-infrastructure.

**The United States Senate.** Before entering the Executive Branch, from 2009 to 2013 I was a professional staff member of the Senate Select Committee on Intelligence ("SSCI"), where I also served as committee designee for Senator Sheldon Whitehouse (D-RI) and, subsequently, Senator Kent Conrad (D-SD). My principal duties on the SSCI staff, in addition to supporting Senators Whitehouse and Conrad, were, on a bipartisan basis, to oversee the budget and operations of the National Security Agency and lead the SSCI staff's oversight initiatives on all aspects of cyber-related intelligence operations and analysis. In this capacity, I had a unique perspective on the U.S. government's transition from viewing cybersecurity as an issue of intelligence operations and defense to an issue of broader public policy.

While serving in the Senate, I saw first-hand – and helped promote – a shift in internet service providers' ("ISPs'") role in cybersecurity policy, from one of contractual requirements and judicially-prescribed actions to one of active partnership with the U.S. Government. On behalf of then-chairman Senator Dianne Feinstein, I led efforts to craft cybersecurity-related legislation. In that capacity, I was the principal architect in the Senate for legislation that President Obama would eventually sign in 2015, the "Cybersecurity Information Sharing Act" ("CISA 2015"), which established the legal framework for the voluntary sharing of cybersecurity threat indicators between and among the federal government and private companies, with a focus on DHS and included important protections for collaboration.

**Civil Society, Academia and the Private Sector.** My views have been shaped by a career examining the context of broader national security and international security considerations, both before my government service and after. Overall, my perspective derives from a mix of law, public policy, and the intersection of technology with security and economics. I joined the SSCI staff in 2009, following a six-year tenure at a leading Washington, D.C.-based think tank, the Center for American Progress, where I researched and wrote about U.S. national security.

Since the summer of 2017, I have held research and teaching appointments at Stanford University. I currently serve as Director of the Program on Geopolitics, Technology, and Governance at Stanford University's Center for International Security and Cooperation. I also lead the Cyber Policy and Security area of specialization for students enrolled in Stanford's Ford Dorsey Master's in International Policy program and teach the core required course "Fundamentals of Cyber Policy and Security." I have published numerous papers on cybersecurity and national security topics.[7]

I founded and now serve as the president of Sagewood Global Strategies LLC, an advisory firm providing consulting services on geopolitical risk, cybersecurity policy, and other issues involving technology and policy. I also serve on the Board of Directors of Slamfire, Inc. as the Security Director.

---

[7] *E.g.*, James X. Dempsey & Andrew J. Grotto, Vulnerability Disclosure and Management for AI/ML Systems: A Working Paper with Policy Recommendations (Nov. 2021), https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/ai_vuln_disclosure_nov11final-pdf_1.pdf; Andrew Grotto & Chaeri Park, The Silicon Allies: Achieving Allied Resiliency Against Threats to the Semiconductor Supply Chain (May 2022), https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/silicon_alliesv3_1.pdf.

I received my juris doctor from the University of California at Berkeley; my master's in public administration from the Kennedy School of Government at Harvard University; and my bachelor's degree from the University of Kentucky.

## III. THE UNITED STATES GOVERNMENT HAS ADDRESSED CYBERSECURITY AND NATIONAL SECURITY MATTERS FOR DECADES USING A COLLABORATIVE, "WHOLE OF GOVERNMENT" APPROACH

### A. U.S. policy makers have recognized and responded to cybersecurity threats for decades with a "whole of government" approach and public-private partnerships.

U.S. law and long-standing practice distributes responsibility for addressing cyber risks across the federal enterprise, with agencies having different but generally complementary responsibilities within their jurisdiction. This whole-of-government approach has been reflected in critical infrastructure resilience policy for decades. It has been augmented substantially in recent years, as Congress and Executive Branch agencies have taken important actions, as described below.

#### 1. Presidential policy across administrations has emphasized partnership and operational collaboration.

Over decades, the Executive Branch has prioritized voluntary public-private partnership and collaboration to address cybersecurity. As far back as 1984, President Reagan issued Executive Order 12472, "Assignment of national security and emergency preparedness telecommunications functions," which established the predecessor organization to the Communications Sector Information Sharing and Analysis Center ("Comm-ISAC"). [8] The Comm-ISAC facilitates the exchange of information among government and industry participants regarding "vulnerabilities, threats, intrusions, and anomalies" affecting telecommunications infrastructure.[9] The focus on collaboration has been a feature of all presidential administrations since the Reagan Administration. Some more recent examples are provided below.

**President Bush.** The George W. Bush Administration released the National Strategy to Secure Cyberspace in 2003, which identified the need for a "coordinated" effort from the whole of society, federal and state and local governments, and the private sector.[10] President Bush subsequently issued Homeland Security Presidential Directive 7, which established the national policy for collaboration with the private sector on the protection of critical infrastructure and

---

[8] Exec. Order No. 12472, 49 Fed. Reg. 13471 (Apr. 3, 1984), https://www.archives.gov/federal-register/codification/executive-order/12472.html.
[9] ISAO, *Communications ISAC*, https://www.isao.org/group/communications-isac/.
[10] The White House, *National Strategy to Secure Cyberspace* (Feb. 2003), https://georgewbush-whitehouse.archives.gov/pcipb/.

App. 1523

sharing of threat information by federal departments and agencies, particularly Sector Specific Agencies.[11]

The National Infrastructure Protection Plan ("NIPP") was released in 2006 (and updated in 2013) providing further structure to the voluntary public-private partnership model and recognizing that the private sector should be incentivized to invest in cybersecurity in order to raise national security.[12] As the NIPP noted, industry participation in public-private partnerships is "essential" and helps government officials make better decisions.[13]

In 2006, DHS created the Critical Infrastructure Partnership Advisory Council ("CIPAC"), which includes the Sector Coordinating Councils, to provide a forum for government and private sector entities to perform activities in support of critical infrastructure security and resilience, in accordance with the NIPP. The Bush Administration launched the Comprehensive National Cybersecurity Initiative ("CNCI") pursuant to National Security Presidential Directive 54 ("NSPD 54") and Homeland Security Presidential Directive 23 in January 2008, which outlined "the federal government's effort to coordinate cybersecurity policy across federal law enforcement, intelligence and executive agencies, . . . and the private sector."[14]

**President Obama.** This work continued in the next Administration. President Obama built on these initiatives in the 2009 "Cyberspace Policy Review" by directing the Executive Branch "to work closely with all key players in U.S. cybersecurity, including state and local governments and the private sector, [and] . . . strengthen public/private partnerships to find technology solutions that ensure U.S. security and prosperity."[15]

In 2013, the Obama Administration took major steps to promote public-private partnership and voluntary cybersecurity measures developed through a collaborative process. Major initiatives included the release of Executive Order 13636 ("EO 13636"), "Improving Critical Infrastructure Cybersecurity,"[16] and Presidential Policy Directive 21 ("PPD-21"),

---

[11] CISA, *Homeland Security Presidential Directive 7* (Dec. 17, 2003), https://www.cisa.gov/news-events/directives/homeland-security-presidential-directive-7.

[12] DHS, National Infrastructure Protection Plan: Partnering for Critical Infrastructure Security and Resilience, at 23 (2013), https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

[13] *Id.* at 1-2.

[14] The Electronic Privacy Information Center obtained a copy of NSPD 54 through Freedom of Information Act litigation. Electronic Privacy Information Center, *Presidential Directives on Cybersecurity*, https://epic.org/issues/cybersecurity/presidential-directives.

[15] The White House, *The Comprehensive National Cybersecurity Initiative*, https://obamawhitehouse.archives.gov/issues/foreign-policy/cybersecurity/national-initiative.

[16] Exec. Order No. 13636, 78 Fed. Reg. 11739 (Feb. 12, 2023), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/executive-order-improving-critical-infrastructure-cybersecurity.

"Critical Infrastructure Security and Resilience."[17] Both EO 13636 and PPD-21 remain in place today.[18]

- EO 13636 set in motion a range of agency actions to address critical infrastructure cybersecurity. Among them, it tasked NIST with developing a voluntary framework for critical infrastructure security by working closely with the private sector and civil society to identify existing consensus standards and industry best practices. The outcome of this collaborative effort was the seminal NIST Framework for Critical Infrastructure Cybersecurity ("CSF"). The CSF is a voluntary and flexible tool organizations can use to identify, prioritize, address, manage, and communicate cybersecurity risks. It was also designed to be adaptable to an organization's unique characteristics.[19] EO 13636 further directed the Sector Specific Agencies (now Sector Risk Management Agencies) to "establish a voluntary program to support the adoption of the [CSF] by owners and operators of critical infrastructure."[20]

- PPD-21 prioritizes the public-private partnership model. DHS was required to analyze the public-private partnership model and recommend options for strengthening it.[21] The outcomes of the evaluation aimed to "streamline processes for collaboration and exchange of information . . . minimize duplication of effort . . . [and] be flexible and adaptable."[22] PPD-21 observes that "[c]ritical infrastructure owners and operators are uniquely positioned to manage risks to their individual operations and assets, and to determine effective strategies to make them more secure and resilient."[23] PPD-21 also reflects the whole of government approach to cybersecurity. The resilience of U.S. critical infrastructure against cyber and other threats is "a shared responsibility among the Federal, state, local, tribal, and territorial (SLTT) entities, and public and private owners and operators of critical infrastructure."[24]

Significantly, both the NIPP and PPD-21 designated DHS—not the FCC—as the Sector Risk Management Agency ("SRMA") for the Communications Sector. And while PPD-21 directs the FCC to use its "authority and expertise," PPD-21 did so while directing the FCC to partner with DHS and other federal agencies, and to "[work] with industry and other

---

[17] The White House, *Presidential Policy Directive 21, Critical Infrastructure Security and Resilience* (Feb. 12, 2023), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

[18] The White House National Security Council is leading an effort to update PPD-21, according to press reporting, but as of the time of this writing, drafting remains underway. *See* Christian Vasquez, *Critical infrastructure policy rewrite expected to 'emphasize' CISA, NSC official says*, Cyberscoop (Nov. 16, 2023), https://cyberscoop.com/critical-infrastructure-policy-rewrite-expected-to-emphasize-cisa-nsc-official-says/.

[19] The White House, *Cybersecurity – Executive Order 13636*, https://obamawhitehouse.archives.gov/issues/foreign-policy/cybersecurity/eo-13636.

[20] Exec. Order No. 13636, 78 Fed. Reg. 11739, § 8(a) (Feb. 12, 2023), https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/executive-order-improving-critical-infrastructure-cybersecurity.

[21] PPD-21, Intro.

[22] *Id.*, Implementation of the Directive, § 2.

[23] *Id.*, Intro.

[24] *Id.*

**App. 1525**

stakeholders" to address vulnerabilities in communications infrastructure.[25] PPD-21 tasks the Commission with "working with stakeholders, including industry, and engaging foreign governments and international organizations to … facilitat[e] the development and implementation of best practices promoting the security and resilience of critical communications infrastructure."[26] PPD-21's designation of DHS, which has no regulatory authority over the Communications Sector, as the sector's SRMA stands in sharp contrast to the FCC's proposals for regulation under Title II.[27]

The Obama Administration was consistent in its emphasis on coordination with critical infrastructure. In 2016, the White House issued Presidential Policy Directive 41 ("PPD-41"), "United States Cyber Incident Coordination," which established principles for the Federal response to cyber incidents.[28] It delineated responsibilities for three lines of effort: threat response (led by the Department of Justice's ("DOJ") Federal Bureau of Investigation ("FBI")), asset response (led by DHS), and intelligence support (led by the Office of the Director of National Intelligence).[29] It created a "Cyber Unified Coordination Group" through which the Federal lead agencies would coordinate a Federal response to a "significant" cyber incident and serve as the mechanism for integrating private sector partners into incident response efforts.[30] Notably, PPD-41 assigns no role to the FCC.

The National Cyber Incident Response Plan ("NCIRP") released in conjunction with PPD 41 reflects the whole of government approach in national incident response. It provides a "strategic framework for operational coordination among federal and [state, local, tribal and territorial] governments, the private sector, and international partners," and includes roles for the private sector in its "threat response" and "asset response" activities.[31] Communications providers, including ISPs, are identified for an important role in "defending against and responding to malicious cyber activity" attempting to exploit or use their systems.[32] The NCIRP does not mention the FCC.

---

[25] *Compare* PPD-21, Additional Federal Responsibilities, § 8 (directing the FCC to "exercise its authority and expertise to partner with DHS and the Department of State, as well as other Federal departments and agencies and SSAs as appropriate … and working with industry and other stakeholders to address those vulnerabilities"), *with* Reclassification NPRM ¶ 26 ("[T]he FCC could, to the extent permitted by law, exercise its authority and expertise to identify and address vulnerabilities in the communications sector.").

[26] PPD-21, Additional Federal Responsibilities, § 8.

[27] *Compare* PPD-21, *with* Reclassification NPRM ¶ 30.

[28] The White House, *Presidential Policy Directive 41, United States Cyber Incident Coordination* (July 26, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/07/26/presidential-policy-directive-united-states-cyber-incident ("PPD-41").

[29] *Id.* § V.B.c.

[30] *Id.* § V.B.b.

[31] DHS, National Cyber Incident Response Plan, at 6, 10 (Dec. 2016), https://www.cisa.gov/sites/default/files/2023-01/national_cyber_incident_response_plan.pdf ("NCIRP"). DHS notes an update of the NCIRP is underway with release planned in 2024. CISA, *CISA Releases Fact Sheet on Effort to Revise the National Cyber Incident Response Plan (NCIRP)*, Alert (Oct. 20, 2023), https://www.cisa.gov/news-events/alerts/2023/10/20/cisa-releases-fact-sheet-effort-revise-national-cyber-incident-response-plan-ncirp.

[32] NCIRP at 14-15.

**App. 1526**

**President Trump**. The Trump Administration maintained the emphasis on collaboration in cybersecurity. Notable efforts include EO 13800, signed in May 2017, and the release in 2018 of the National Cyber Strategy.[33] The 2017 EO focused on DHS and the Office of Management and Budget ("OMB") to improve the cybersecurity of federal systems, and in Section 2, addressed the cybersecurity of critical infrastructure. It directed DHS and the Commerce Department to work with the private sector "to improve the resilience of the internet and communications ecosystem and to encourage collaboration with the goal of dramatically reducing threats perpetrated by automated and distributed attacks."[34] The FCC was not a leading actor in any of this; rather, the President directed DHS and the Commerce Department to "consult" other federal agencies, all SRMAs, and the "Chairs of the Federal Communications Commission and Federal Trade Commission, other interested agency heads, and appropriate stakeholders."[35]

**President Biden.** The focus on coordination led by DHS has continued in the Biden Administration. Executive Order 14028 ("EO 14028"), "Improving the Nation's Cybersecurity," directed Federal agencies to increase cyber threat information sharing, "modernize" cybersecurity on Federal networks, implement software supply chain protections, and expand federal activities to respond to identified vulnerabilities on federal networks. It also created the Cyber Safety Review Board. The EO identifies numerous roles for CISA and NIST, including for NIST to solicit feedback from the private sector in developing guidelines for secure software development.[36] Similarly, a July 2021 National Security Memorandum, "Improving Cybersecurity for Critical Infrastructure Control Systems," identified a voluntary, collaborative, "Industrial Control Systems Cybersecurity Initiative" and tasked CISA to work with NIST and other agencies to develop cybersecurity performance goals.[37]

The Biden administration is the first to have an Office of the National Cyber Director ("ONCD"), a recent creation of Congress to promote coordination and harmonization of cyber policy.[38] It can coordinate activity within the White House, and with other stakeholders, to implement the President's cybersecurity agenda. It will have a harder time coordinating the work of independent agencies, such as the FCC. Congress established independent agencies to shield them from day-to-day oversight by the White House, and presidential administrations issue

---

[33] National Security Council, *President Trump Unveils America's First Cybersecurity Strategy in 15 Years*, Trump White House (Sept. 20, 2018), https://trumpwhitehouse.archives.gov/articles/president-trump-unveils-americas-first-cybersecurity-strategy-15-years/.

[34] Exec. Order No. 13,800, 82 Fed. Reg. 22391, § 2(d) (May 17, 2018), https://www.govinfo.gov/content/pkg/FR-2017-05-16/pdf/2017-10004.pdf.

[35] *Id.*

[36] Exec. Order No. 14,028, 86 Fed. Reg 26633, 26639 (May 12, 2021), https://www.federalregister.gov/documents/2021/05/17/2021-10460/improving-the-nations-cybersecurity.

[37] The White House, *National Security Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems* (July 28, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/28/national-security-memorandum-on-improving-cybersecurity-for-critical-infrastructure-control-systems/.

[38] The White House, *Office of the National Cyber Director*, https://www.whitehouse.gov/oncd/ ("Established by Congress in 2021, ONCD is a component of the Executive Office of the President at the White House.").

restrictive guidance on White House contacts with them.[39] Based on my experience in the White House, ONCD and the NSC will not be well-positioned to coordinate FCC cybersecurity activity after reclassification, given the agency's status as an independent agency. And that would be unfortunate because ONCD has set a tone on federal cyber policy that is decidedly supportive of collaboration. In "A Strategic Intent Statement for the Office of the National Cyber Director," ONCD states that effective cybersecurity requires cooperation and coordination "across the many public, private, and international stakeholders in the ecosystem."[40] The first National Cyber Director Chris Inglis embraced Congress' "whole of government" direction and articulated how the public-private partnership is significantly advancing threat intelligence and sharing. Inglis has observed that "we're now in that place where the collaboration is going to help us discover things together that no one could discover alone."[41] Newly confirmed National Cyber Director Harry Coker, Jr. commented during his nomination hearing that "cybersecurity requires partnerships across the public sector and the private sector … [the private sector is] on the front line fighting the threats every day … a combatant command …[and] the supporting command would be ONCD and others in the federal government … ensuring that the private sector knows there is a true partnership …"[42]

There are other examples of the Biden Administration's work to encourage collaboration. Two merit brief attention. First, the National Cybersecurity Strategy[43] and its Implementation Plan[44] were released in May and July 2023, respectively, and called for and sought to operationalize various actions. Though the National Cybersecurity Strategy has a more regulatory tone than prior strategy documents, the Strategy and Implementation Plan still emphasize collaboration and do not specify a leading role for the FCC. Instead, the Implementation Plan emphasizes the roles of DHS and ONCD; for example, it directs ONCD to

---

[39] *See* Memorandum for All White House Staff from Dana Remus, Counsel to the President on Prohibited Contacts With Agencies And Departments (July 21, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/White-House-Policy-for-Contacts-with-Agencies-and-Departments.pdf?utm_source=miragenews&utm_medium=miragenews&utm_campaign=news ("Special considerations apply to independent agencies. Communication with independent boards and commissions about purely policy matters, including policy formation and development, as well as administrative, communications, or presidential appointment matters, is appropriate and permissible. But many independent agencies have their own rules about *ex parte* contacts, and it is important to understand when communications even by the White House will become part of an agency's official administrative record. Furthermore, because such communication can be misconstrued, you should consult with Counsel's Office before initiating communication with the independent agencies.").
[40] Office of the National Cyber Director, A Strategic Intent Statement for the Office of the National Cyber Director, White House (Oct. 2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/ONCD-Strategic-Intent.pdf.
[41] Council on Foreign Relations, *The Geopolitics of Cybersecurity*, Keynote Session (April 20, 2022), https://www.cfr.org/event/geopolitics-cybersecurity (remarks of Chris Inglis, National Cyber Director).
[42] *Hearing on Nominations Before the S. Comm. on Homeland Security and Governmental Affairs*, 118th Cong. (Nov. 2, 2023); *see* Adam Mazmanian, "Cyber Director nominee talks AI, collaboration at confirmation hearing," (NextGov/FCW), (Nov. 2, 2023), https://www.nextgov.com/people/2023/11/cyber-director-nominee-talks-ai-collaboration-confirmation-hearing/391745/.
[43] The White House, National Cybersecurity Strategy (Mar. 2, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/National-Cybersecurity-Strategy-2023.pdf ("National Cybersecurity Strategy").
[44] The White House, National Cybersecurity Strategy Implementation Plan (July 2023), https://www.whitehouse.gov/wp-content/uploads/2023/07/National-Cybersecurity-Strategy-Implementation-Plan-WH.gov_.pdf ("National Cybersecurity Strategy Implementation Plan").

lead an effort to "[c]ollaborate with key stakeholders to drive secure Internet routing."[45] Second, the Biden administration established the Cyber Safety Review Board ("CSRB"), as directed by President Biden's EO 14028. The CSRB reviews significant cybersecurity incidents and makes recommendations to the Secretary of Homeland Security through CISA.[46] The CSRB relies heavily on private sector expertise[47] and private sector input. CISA Director Jen Easterly has called the CSRB "a remarkable public-private initiative that has produced an important blueprint for CISA – our nation's civilian cyber defense agency – to meaningfully increase cybersecurity resilience and preparedness across our country."[48] The FCC is not a member of the CSRB.

### 2. Congress has taken targeted actions to facilitate collaboration and emphasize the leadership of DHS, DoD and other agencies.

I saw firsthand, in Congress and while in the Executive Branch, a bipartisan congressional approach to cybersecurity. Congress has addressed cybersecurity in part by authorizing government use of capabilities to increase our defensive posture and offensive capabilities. For example, Congress has addressed private sector cybersecurity, creating mechanisms for collaboration and more recently, delegating specific regulatory powers to DHS in the Cyber Incident Reporting for Critical Infrastructure Act ("CIRCIA"). Congress also authorized the creation of Cyber Mission Forces for U.S. Cyber Command ("CYBERCOM") in 2012,[49] and updated CYBERCOM's authorities in 2022. Congress has improved and streamlined how the Executive Branch is organized to address cybersecurity risks facing federal systems[50] through procurement and supply chain requirements. Congress has also weighed in on cybersecurity regulation for critical infrastructure, declining so far to mandate cross-sectoral cybersecurity requirements for critical infrastructure beyond incident notification.[51]

---

[45] *Id.* at 38.

[46] DHS, Cyber Safety Review Board Charter (Sept. 21, 2023), https://www.cisa.gov/sites/default/files/2023-09/CSRB%20Charter%2009.21.2023%20APPROVED_508c.pdf.

[47] CISA, *Cyber Safety Review Board (CSRB) Members*, https://www.cisa.gov/cyber-safety-review-board-csrb-members.

[48] Press Release, DHS, *Cyber Safety Review Board Releases Unprecedented Report of its Review into Log4j Vulnerabilities and Response* (July 14, 2022), https://www.dhs.gov/news/2022/07/14/cyber-safety-review-board-releases-report-its-review-log4j-vulnerabilities-and.

[49] U.S. Cyber Command, *Our History*, https://www.cybercom.mil/About/History/.

[50] Federal Information Security Modernization Act of 2014 (FISMA), Pub. L. No. 113-283, 128 Stat. 3073.

[51] For example, in 2009, Senate Commerce, and Transportation Committee Chairman John D. Rockefeller (D-WV) and Senator Olympia Snowe (R-ME) introduced legislation creating regulatory requirements for critical infrastructure. Cybersecurity Act of 2010, S. 773, 111th Cong. (2009), https://www.congress.gov/111/bills/s773/BILLS-111s773rs.pdf. In 2010, Senate Homeland Security and Governmental Affairs Committee Chairman Joseph Lieberman (I-CT), Senator Susan Collins (R-ME), and Senator Tom Carper (D-DE) introduced S. 3480, the Protecting Cyberspace as a National Asset Act of 2010, which also included regulatory requirements. Protecting Cyberspace as a National Asset of 2010, S. 3480, 111th Cong. (2010), https://www.congress.gov/111/bills/s3480/BILLS-111s3480rs.pdf. These bills were merged into S. 2105, introduced in February 2012 as the Cybersecurity Act of 2012, which would have authorized DHS to establish sector by sector performance requirements and to issue mandatory cybersecurity regulations for critical infrastructure. Cybersecurity Act of 2012, S. 2105, 112th Cong. (2012), https://www.congress.gov/112/bills/s2105/BILLS-112s2105pcs.pdf. The Senators subsequently dropped the regulatory requirements due to lack of support in the Senate in favor of a collaborative, voluntary regime with liability protections. *See* S. Comm. on Homeland Security and Governmental

**App. 1529**

Congress shares the Executive Branch's emphasis on the need for partnership. Congressional action on private sector cybersecurity has emphasized collaborative work, information sharing, and the protection of the private sector from risks associated with that activity, supplemented with targeted interventions aimed at empowering agencies—including the FCC—to address discrete problems. Congressional actions, beginning a decade ago, put in place formal structures for collaboration and cooperation, focusing energy and attention on DHS and new roles in the White House to coordinate cyber operational and policy activities. Congress has given the FCC just a few targeted directions in these areas. A number of examples illustrate this:

- Congress created the Protected Critical Infrastructure Information ("PCII") Program in 2002, which establishes uniform procedures for the protection of critical infrastructure security information voluntarily submitted to DHS.[52]

- Congress codified the role of DHS in 2014 as the primary hub of cybersecurity threat indicator sharing for the private sector with the federal government.[53]

- Congress passed the Cybersecurity Enhancement Act of 2014, codifying NIST's efforts to "facilitate and support the development of a voluntary, consensus-based, industry-led set of standards, guidelines, best practices, methodologies, procedures, and processes to cost-effectively reduce cyber risks to critical infrastructure."[54] Congress has repeatedly highlighted NIST's collaborative, voluntary guidance in other emerging technology areas beyond cybersecurity.[55]

- Congress passed the Cybersecurity Information Sharing Act of 2015,[56] which authorized the sharing of cyber threat indicators and defensive measures among private entities and with the government. It also established liability protections for that sharing.[57] The Senate report highlighted the importance of voluntariness in promoting collaboration between the private sector and government to address cybersecurity threats.[58]

---

Affairs, *Lieberman, Collins, Rockefeller, Feinstein, Carper Offer Revised Legislation to Improve Security of Our Most Critical Private-Sector Cyber Systems*, https://www.hsgac.senate.gov/subcommittees/FFM/majority-news/lieberman-collins-rockefeller-feinstein-carper_offer-revised-legislation-to-improve-security-of-our-most-critical-private-sector-cyber-systems/.

[52] Protected Critical Infrastructure Information, 6 C.F.R. pt. 29, (2002).

[53] National Cybersecurity Protection Act of 2014, Pub. L. No. 113-282, 128 Stat. 3066.

[54] Cybersecurity Enhancement Act of 2014, Pub. L. No. 113-274, 128 Stat. 2971 (codified at 15 U.S.C § 272 (c)(15)).

[55] *Hearing on an Overview of the Budget Proposal for the National Institute of Standards and Technology for Fiscal Year 2024 Before the H. Committee on Science, Space, and Technology*, 118th Cong. (May 10, 2023), https://republicans-science.house.gov/2023/5/chairman-frank-lucas-opening-statement-at-full-committee-hearing-on (Statement of Chairman Frank Lucas) ("I would like to commend NIST for the transparent, bottom-up approach it used to develop this framework, which ensures this voluntary guidance is useful to the broad community of AI stakeholders.").

[56] CISA 2015 is codified at 6 U.S.C. §§ 1501-1510.

[57] 6 U.S.C. § 1505(b).

[58] S. Rep. No. 114-32, at 2 (2015), https://www.congress.gov/114/crpt/srpt32/CRPT-114srpt32.pdf.

**App. 1530**

- In 2018, Congress established CISA, which reorganized and elevated the mission of DHS' former National Protection and Programs Directorate ("NPPD"), establishing CISA as the Federal leader for cyber and physical infrastructure security.[59] Also in 2018, Congress authorized the establishment of the Cybersecurity Solarium Commission, co-chaired by members of Congress.[60] The Commission produced a report with legislative recommendations, promoting the concept of "operational collaboration" between government and private sector partners and arguing that the government "must support and enable the private sector."[61] It mentions the FCC once, in passing.[62]

- In 2020, in the Fiscal Year 2021 National Defense Authorization Act ("NDAA"), Congress adopted many of the Solarium legislative recommendations that prioritized public-private partnerships, including the establishment of the Joint Cyber Planning Office ("JCPO") under CISA;[63] creating the Cybersecurity Advisory Committee;[64] requiring a DoD assessment of recommendations for improvements of public-private partnerships; creating a Biennial National Cyber Exercise with private sector partners; creating the CISA Cybersecurity State Coordinators; and creating the ONCD to advance cybersecurity and work closely with the private sector to shape cybersecurity policy.[65] Congress also codified the Sector Specific Agencies established by the NIPP and PPD-21 as SRMAs, defining requirements for assessing and assisting critical infrastructure with managing cybersecurity risk for each SRMA by "utiliz[ing] its specialized expertise regarding its designated critical infrastructure sector or subsector of such sector and authorities under applicable law."[66]

- Congress in the FY2021 National Defense Authorization Act[67] gave DHS targeted administrative subpoena power focused on digital systems, including ISPs. It allows CISA to require ISPs to produce information necessary to identify and notify an entity

---

[59] Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, 132 Stat. 4168.

[60] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1652, 132 Stat. 1636 (2018).

[61] Cyberspace Solarium Commission, Final Report, at 5 (Mar. 2020), https://drive.google.com/file/d/1ryMCIL_dZ30QyjFqFkkf10MxIXJGT4yv/view ("CSC Final Report"); Cyberspace Solarium Commission, Legislative Proposals (July 2020), https://www.solarium.gov/report/legislative-proposals.

[62] CSC Final Report at 86.

[63] William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1715, 134 Stat. 3388 ("FY2021 NDAA"). CISA converted the JCPO into the Joint Cybersecurity Defense Cooperative ("JCDC"). Center for Strategic & International Studies, *CISA Strategic Plan for 2023-2025: The Future of U.S. Cyber and Infrastructure Security* (Nov. 1, 2022), https://www.csis.org/analysis/cisa-strategic-plan-2023-2025-future-us-cyber-and-infrastructure-security (statement of Jen Easterly).

[64] One of the key focus areas of the Committee is building and strengthening public-private partnerships. The Committee is composed of private sector experts on cybersecurity who meet quarterly and produce recommendations for the Director of CISA.

[65] Federal Register, *Office of the National Cyber Director*, https://www.federalregister.gov/agencies/office-of-the-national-cyber-director.

[66] FY2021 NDAA § 9002(c) (codified at 6 U.S.C. § 665d).

[67] *Id.* at § 1716 (codified in 6 U.S.C. § 659).

related to critical infrastructure identified by CISA as vulnerable.[68] According to DHS, "subpoenas will be issued to providers of electronic communication or remote computing services to the public, such as ISPs, that have relevant customer or subscriber information to identify the owners or operators of covered devices or systems with a specific security vulnerability, often identified through their IP address."[69]

- In 2021, Congress authorized and funded the creation of the ONCD to serve as the principal advisor to the President on cybersecurity policy and strategy, lead the coordination and implementation of national cyber policy and strategy, and coordinate the development and implementation of integrated Federal incident response to cyberattacks and cyber campaigns.[70] Congress approved the appointment of the first National Cyber Director Chris Inglis and recently the second Director, Harry Coker, Jr.[71]

- In 2022, Congress passed and the President signed CIRCIA.[72] It confirmed a bipartisan consensus on the primary role of DHS and on the need for protected information sharing by critical infrastructure owners and operations.[73] Four aspects of CIRCIA are notable as the FCC contemplates a regulatory role in cybersecurity:

  1. Congress did not provide a role for the FCC in the incident reporting framework established under CIRCIA.

  2. Congress explicitly protected the information that would be reported, in a manner generally consistent with CISA 2015. CIRCIA treats shared information as confidential,[74] and protects it from disclosure (including under the Freedom of Information Act)[75] provides liability protections in litigation,[76] and prohibits use of reported information for regulatory purposes.[77]

  3. Congress appears to have been sensitive to the privacy and surveillance laws that already regulate the communications sector. CIRCIA is explicit that it does not require "a provider of an electronic communications service to the public" to

---

[68] DHS, Privacy Impact Assessment for the Use of Administrative Subpoenas for Cybersecurity Vulnerability Identification and Notification, DHS Reference No. DHS/CISA/PIA-038 (May 11, 2021), https://www.dhs.gov/sites/default/files/publications/privacy-pia-cisa38-adminsubpoenasforcybersecurityvulnerabilityid-may2021.pdf.

[69] *Id.* at 5.

[70] 6 U.S.C. § 1500(c)(1)(A), (C), (D).

[71] Reuters, *US Senate confirms new national cyber director* (Dec. 12, 2023), https://www.reuters.com/world/us/us-senate-confirms-new-national-cyber-director-2023-12-12/.

[72] Cyber Incident Reporting for Critical Infrastructure Act of 2022, Pub. L. No. 117-103, Div. Y, 136 Stat. 49115-390.

[73] *Hearing on Stakeholder Perspectives on the Cyber Incident Reporting for Critical Infrastructure Act of 2021 Before the H. Comm. on Homeland Security* (2021), https://www.congress.gov/event/117th-congress/house-event/114018/text (Statement of Rep. Andrew Garbarino) (explaining that incident reporting will help CISA "help our critical infrastructure owners and operators protect themselves."). CIRCIA is codified at 6 U.S.C. § 681b *et seq.*

[74] 6 U.S.C. § 681e(b)(1).

[75] *Id.* § 681e(b)(2).

[76] *Id.* § 681e(c)(3).

[77] *Id.* § 681e(a)(5)(A).

disclose information not permitted to be disclosed under the Stored Communications Act.[78]

4. CIRCIA created the Cyber Incident Reporting Council ("CIRC") to identify areas for harmonization of cybersecurity incident reporting across government. Its report recognized some conflicts with the FCC's customer proprietary network information ("CPNI") and outage reporting rules and found "wide disparities in terms of reporting mechanisms used by agencies" including the FCC,[79] before the FCC's proposals to reclassify BIAS and establish cybersecurity mandates and reporting obligations. The communications sector provided expertise to facilitate DHS' implementation of CIRCIA and to the CIRC.[80]

- In the FY2024 NDAA, Congress focused on critical infrastructure supporting DoD operations by including several provisions on DoD critical infrastructure and critical infrastructure systems that support DoD operations, consistent with an increased focus on adversaries such as China's and Russia's capabilities and intent to disrupt DoD deployments by hacking supporting infrastructure.[81] One provision establishes a series of exercises that will test restoration of power, water, and telecommunications infrastructure that support DoD facilities in the event of a significant cybersecurity incident that disrupts state and local infrastructure.[82] The NDAA also created programs at the NSA's Cybersecurity Collaboration Center to improve the security of the supply chain and established a fund for the State Department to advance trustworthy information and communications technology ("ICT").[83] In this legislation, Congress did not see fit to provide any new cybersecurity authorities or authorize any new cybersecurity programs at the FCC.

- Congress has on occasion granted the FCC new targeted authorities for addressing discrete national security problems. This is discussed in detail in Section V.

Through this body of work, Congress has recognized the need to create mechanisms for collaboration and frank, open exchanges between industry and government. As discussed above, CISA 2015 protects cyber threat information and defensive measures from disclosure, offers liability protection to reporting companies, and requires Federal agencies to protect information provided by the private sector. CIRCIA further adopts and extends these protections—and these

---

[78] *Id.* § 681e(e).

[79] DHS, Harmonization of Cyber Incident Reporting to the Federal Government, at 20 (Sept. 19, 2023), https://www.dhs.gov/sites/default/files/2023-09/Harmonization%20of%20Cyber%20Incident%20Reporting%20to%20the%20Federal%20Government.pdf ("CIRC Report").

[80] *See, e.g.,* Comments of USTelecom – The Broadband Association, Request for Information on the Cyber Incident Reporting for Critical Infrastructure Act of 2022, CISA 2022-010 (filed Nov. 14, 2022), https://www.regulations.gov/comment/CISA-2022-0010-0067; CISA, CIRCIA Public Listening Session for the Communications Sector Transcript (Nov. 20, 2022), https://downloads.regulations.gov/CISA-2022-0010-0140/content.pdf; *see also* CIRC Report at 8 ("DHS also reviewed written analyses of existing cyber incident reporting requirements by … CTIA—The Wireless Association …").

[81] National Defense Authorization Act for Fiscal Year 2024 §§ 1514, 1517, 1526, 2809, 2853 (2023) (Conf. Rep.).

[82] *Id.* § 1517.

[83] *Id.* §§ 1513, 6306.

laws specifically prohibit federal use of reported information for regulatory actions.[84] Similarly, venues for public-private collaboration carefully structure relationships to ensure such protections.[85] And indeed, among the most widely adopted efforts to improve cybersecurity are the voluntary, non-regulatory guidance produced by NIST in collaboration with private sector partners.[86]

These are just some examples of Congress acting to clarify, codify, or authorize executive branch cybersecurity activity and organization. A few common themes emerge from Congressional action on cybersecurity: collaboration is vital; private companies should have incentives to partner with government; NIST and non-regulatory approaches are desirable and generally preferred; and the FCC has not played a substantial role. To the contrary, Administrations of both parties designated DHS as the Sector Specific Agency for the Communications Sector, a construct ultimately affirmed and codified by Congress in the FY2021 NDAA.[87]

Where Congress has given security-related tasks to the FCC, the direction has been targeted to specific parts of the agency's regulatory programs that Congress wants to protect from misuse by actors that pose threats to national security. This includes excluding telecommunications equipment of concern from use in federal service subsidy programs run by the FCC and Universal Service Administrative Corporation ("USAC") and ensuring that equipment deemed problematic by national security agencies cannot receive approval under the FCC's equipment authorization rules for marketing, sale, and operation in the United States.

### B. The whole-of-government approach has led to active operational and policy partnerships with the communications sector, built over decades.

#### 1. The Communications Sector, including ISPs, work in multiple collaborative venues to share information and coordinate responses.

The Communications Sector and the country as a whole have benefitted from the operational collaborations and the central role of DHS, NIST and the White House in the U.S. "whole of government" approach to addressing cybersecurity risks, with a blend of public-private partnerships and outcome-based guidance.

---

[84] 6 U.S.C. § 681e(c)(3).
[85] CISA, *JCDC FAQs*, https://www.cisa.gov/topics/partnerships-and-collaboration/joint-cyber-defense-collaborative/jcdc-faqs ("JCDC participants, including both government and private sector organizations, are required to adhere to strict dissemination restrictions.").
[86] *Securing the DotGov: Examining Efforts to Strengthen Federal Network Cybersecurity: Hearing Before the H. Comm. on Homeland Security, Subcomm. on Cybersecurity, Infrastructure, and Innovation*, 117th Cong. (2022) (statement of Dr. Charles H. Romine, Director, Information Technology Laboratory, NIST), https://www.nist.gov/speech-testimony/securing-dotgov-examining-efforts-strengthen-federal-network-cybersecurity ("The collaborative, transparent, and open processes NIST uses to develop resources results in more effective and usable resources that are widely trusted, and therefore, more widely used by various organizations.").
[87] FY2021 NDAA § 9002.

The Communications Sector, including ISPs, partner on cybersecurity with the U.S. Government on a range of sensitive projects and programs.[88] ISPs work with a variety of federal national security and law enforcement agencies to protect systems, networks, and the public from cyber threats.[89]

Owners and operators of a large portion of communications infrastructure work with the federal government to help "predict, anticipate, and respond to sector outages and understand how they might affect the ability of the national leadership to communicate during times of crisis, impact the operations of other sectors, and affect response and recovery efforts."[90] Emergency Support Function #2 ("ESF#2") is a Federal Emergency Management Agency ("FEMA") program that coordinates government and communications industry efforts to restore and maintain communications infrastructure and "[d]evelops cyber and communications restoration priorities during disasters."[91] When activated, ESF#2 coordinates communications support to federal, state tribal, territorial, and local government in the impacted area.[92]

The Communications Sector has a "long history of cooperation within its membership and with the Federal Government with respect to national security and emergency preparedness."[93] The National Coordinating Center for Communications ("NCC"), the Comm-ISAC, and the Communications Sector Coordinating Council ("CSCC") in collaboration with CISA, the communications sector's SRMA, develop policy, conduct planning, and carry out operational collaboration to advance the sector's priorities including on cybersecurity. Below are some of the key formal partnerships.

---

[88] *E.g.*, CSCC, ISP Internet Routing Security Practices and Partnerships (Jan. 2024), https://www.comms-scc.org/wp-content/uploads/2024/01/CSCC-Internet-Routing-Security-2024-.pdf ("U.S. operators have participated in information exchange/periodic high side meetings with national security agencies about the latest routing security issues."). PPD-21 assigns DHS "[I]n coordination with SSAs and other Federal departments and agencies, provide analysis, expertise, and other technical assistance to critical infrastructure owners and operators and facilitate access to and exchange of information and intelligence necessary to strengthen the security and resilience of critical infrastructure …" PPD-21 at Roles and Responsibilities, § 3; The NIPP 2013 discusses sharing classified information through federal information sharing resources including the NCCIC. "The Federal Government will leverage … policies and procedures to facilitate sharing of actionable portions of otherwise classified or restricted unclassified reports with private sector …" DHS, NIPP 2013: Partnering for Critical Infrastructure Security and Resilience, at 23 (2013), https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf ("Call to Action #5: Enable Risk-Informed Decision Making through Enhanced Situational Awareness").

[89] Sandra I. Erwin, *DoD Taps Commercial Internet Providers to Help Protect Defense Industry Networks*, National Defense (May 14, 2012), https://www.nationaldefensemagazine.org/articles/2012/5/14/dod-taps-commercial-internet-providers-to-help-protect-defense-industry-networks.

[90] CISA, *Communications Sector Overview*, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/communications-sector.

[91] FEMA, Emergency Support Function #2—Communications Annex, at 2 (Sept. 2021), https://www.fema.gov/sites/default/files/documents/fema_NRF-ESF-2-annex_102021.pdf.

[92] *Id.*

[93] Comments of CSCC, Commission on Enhancing National Cybersecurity Request for Information: Current and Future States of Cybersecurity in the Digital Economy, NIST Docket No.: 160725650, (Sept. 15, 2016), https://www.nist.gov/system/files/documents/2016/09/15/cscc_rfi_response_1.pdf.

**App. 1535**

**Comm-ISAC**. The centerpiece of the partnership model for the communications sector is the Comm-ISAC, which is co-located within the NCC at CISA.[94] The NCC and communications service providers have weekly calls to share information related to incidents and events that may impact communications infrastructure, including cyber vulnerabilities, threats, intrusions, and anomalies, and to coordinate national security responses including in times of crisis.[95] I have been informed by participants in these exchanges of the following regular engagements between Comm-ISAC members and government partners:

- Cleared Comm-ISAC members meet bi-weekly with CISA for a discussion of classified intelligence reporting of interest to the sector.
- Comm-ISAC leadership meets bi-weekly with CISA Integrated Operations Division leadership to discuss direction and planning for items of interest to the Comm-ISAC.
- Government partners participate along with Comm-ISAC representatives in the government-industry component of the monthly National Council of ISACs meetings.[96]
- Finally, industry participates in an annual ESF#2/Comm-ISAC preparedness workshop on the restoration of communications infrastructure.

During incidents, Comm-ISAC members meet regularly with government partners and participate in ad hoc briefings for developing threats.[97] The FCC is one of the government members of the government side of the Comm-ISAC and engages in some of the above meetings.[98] The Comm-ISAC also issues industry information sharing reports for members, which are also shared with CISA and other sector ISACs.[99]

**CSCC**. The CSCC, composed of communications sector companies and trade associations, "is the primary communications sector liaison for interactions with the U.S. government and coordinates policy planning and execution developments with other industry and critical infrastructure sectors."[100] The CSCC works through CISA's Stakeholder Engagement Division to provide the sector's input and expertise on various lines of effort being undertaken by CISA. This includes providing the sector's responses to requests from CISA to determine the support the sector needs from government partners.

---

[94] CISA, *National Coordinating Center for Communications*, https://www.cisa.gov/resources-tools/programs/national-coordinating-center-communications. The operation of the NCC/Comm-ISAC has shifted to CISA's Integrated Operations Division ("IOD"), now part of IOD's Emergency Response Operations ("ERO") branch. "CISA Central," CISA's only 24/7 operations center, handles all the operational information sharing aspects. The NCC partners with CISA Central in the execution of the NCC/Comm-ISAC functions.

[95] CSCC, *Communications Sector partnership with Government*, https://www.comms-scc.org/communications-sector-partnership-with-government/.

[96] *See generally*, National Council of ISACs, *About NCI*, https://www.nationalisacs.org/about-nci ("Sharing and coordination is accomplished through daily and weekly calls between ISAC operations centers, daily reports, requests-for-information, monthly meetings, exercises, and other activities as situations require.").

[97] CSCC, Annual Report 2023, at 5 (Feb. 7, 2023), https://www.comms-scc.org/2023/02/07/2023-cscc-annual-report/ ("Comm-ISAC partners shared information and responded to the Russian invasion of Ukraine and multiple climate events.") ("CSCC 2023 Annual Report").

[98] CISA, *National Coordinating Center for Communications (NCC) Partners* https://www.cisa.gov/resources-tools/programs/national-coordinating-center-communications/partners.

[99] *See supra* n. 97.

[100] CSCC, Amended and Restated Operating Charter of the Communications Sector Coordinating Council, Art. II, § 1 (adopted Feb. 3, 2021), https://www.comms-scc.org/charter/.

**App. 1536**

The CSCC reviews and comments on U.S. Government plans and policies on cybersecurity and resilience, in partnership with its designated SRMA, DHS; it also participates in the development of guidance on critical infrastructure protection, information sharing, interdependencies, and risk management.[101] The CSCC collaborates with government partners such as CISA, FBI, ONCD, FCC, and NTIA through the Government Coordinating Council.[102] Over the past two years, the CSCC has engaged with CISA on the creation and evolution of the Cybersecurity Performance Goals[103] and shared input with the ONCD and NSC on the National Cybersecurity Strategy and the National Cybersecurity Strategy Implementation Plan.[104] The CSCC engaged with NIST during development of the CSF,[105] and once it was released in February 2014, continued to engage in activities to promote awareness across the sector and use of it as a voluntary and flexible cybersecurity risk management tool.[106] The CSCC Cybersecurity Committee held weekly calls on the CSF with industry participants and coordinated CSF related activities in multiple public and private venues.[107] The CSCC also engaged through NIST workshops and sector meetings with NIST to contribute to the development of CSF 2.0.[108]

Through voluntary partnerships such as participation in the CISA Joint Cyber Defense Collaborative ("JCDC"), CSCC members confirm the benefit of evolving intelligence and information sharing into joint operational collaboration.[109] In addition, the CSCC co-leads the Information and Communications Technology Supply Chain Risk Management Task Force

---

[101] *Id.*

[102] CISA, *Communications Sector: Council Charters and Membership*, https://www.cisa.gov/communications-sector-council-charters-and-membership.

[103] Comments of CSCC, CISA Cybersecurity Performance Goals (filed Feb. 18, 2022), https://www.ntca.org/sites/default/files/federal-filing/2022-02/CISA%20Cybersecurity%20Performance%20Goals_CSCC%20Comments%202.18.22.pdf.

[104] CSCC 2023 Annual Report at 6.

[105] Comments of CSCC, Developing a Framework to Improve Critical Infrastructure Cybersecurity, NIST Docket No. 130208119-3119-01 (filed Apr. 8, 2013), https://www.nist.gov/system/files/documents/2017/06/05/040813_cscc.pdf; Letter Response from CSCC to GAO Inquiry on use of the NIST Cybersecurity Framework (Oct. 13, 2017), https://www.comms-scc.org/2017/10/13/cscc-letter-response-to-gao-inquiry-on-use-of-the-nist-cybersecurity-framework/.

[106] *See, e.g.*, Comments of CSCC, Experience with the Framework for Improving Critical Infrastructure Cybersecurity, at 2 (submitted Oct. 10, 2014), https://www.nist.gov/system/files/documents/2017/01/24/20141010_cscc_condello.pdf ("Since the release of the Framework in February 2014, CSCC members participated in multiple events to promote awareness including sponsoring webinars, association forums, and key speaking engagements at various policy venues."); Comments of CSCC, Current and Future States of Cybersecurity in the Digital Economy for the Commission on Enhancing National Cybersecurity, NIST Docket No. 160725650, at 3 (filed Sept. 15, 2016), https://www.nist.gov/system/files/documents/2016/09/15/cscc_rfi_response_1.pdf (pointing to "consensus in support of the [NIST] Framework.").

[107] Comments of the CSCC, NIST RFI on Experience with the Framework for Improving Critical Infrastructure Cybersecurity (submitted Oct. 10, 2014), https://www.nist.gov/system/files/documents/2017/01/24/20141010_cscc_condello.pdf.

[108] *E.g.,* Comments of USTelecom, Evaluating and Improving NIST Cybersecurity Resources: The Cybersecurity Framework and Cybersecurity Supply Chain Risk Management, NIST Docket No. 220210-0045, at 3 (filed Apr. 25, 2022), https://www.nist.gov/system/files/documents/2022/04/26/04-25-2022%20-%20USTelecom.pdf (noting that USTelecom at the time chaired the CSCC).

[109] CSCC 2023 Annual Report.

("ICT SCRM TF") with the IT-Sector Coordinating Council and the DHS National Risk Management Center; the Task Force was established to identify challenges and develop actionable solutions to enhance global ICT supply chain resilience. The ICT SCRM TF, in its fourth year of operations after having its charter extended, has published nineteen reports and five videos providing expert guidance on managing supply chain risk.[110]

During 2022, the CSCC Emerging Technologies Committee issued a report on the transition to quantum-resistant cryptography for the Communications Sector, focusing on "the inherent challenges posed by the scale of deployments, the performance requirements of key protocols, and the international coordination required for any changes to protocol standards."[111] The report identifies the role the federal government should play in this transition, such as establishing test beds in collaboration with industry, providing funding for research, and fostering collaboration and information exchange.[112] The report is a resource for policy makers but also for other sectors as they begin to plan the transition to quantum-resistant cryptography.

**NSTAC**. The National Security Telecommunications Advisory Committee ("NSTAC"), now one of only four advisory committees that report directly to the President, was created in 1982 and includes up to thirty chief executives from major telecommunications providers and information technology, finance, and aerospace companies. NSTAC provides policy recommendations intended to assure the continuity of vital telecommunications links through any event or crisis. The NSTAC remains active, with recent reports addressing the ICT supply chain and how government and industry could partner better to improve cybersecurity, among other topics. According to NSTAC, "[a]ction by the U.S. government with industry creates more effective technical mechanisms for proving and communicating compliance with requirements to users and regulators."[113] Other reports addressed improving U.S. competitiveness in next generation wireless telecommunications[114] and communications resiliency.[115]

**CSRIC**. The Communications Security, Reliability, and Interoperability Council ("CSRIC") exists to make recommendations to the FCC about steps to promote the security,

---

[110] CISA, *ICT Supply Chain Risk Management Task Force Resources,* https://www.cisa.gov/ict-scrm-task-force-resources.

[111] CSCC, The Engineer Who Cried Quantum: Emerging Technologies Committee Impact Report on Post Quantum Cryptography, at 1 (2023), https://www.comms-scc.org/wp-content/uploads/2023/08/The-Engineer-Who-Cried-Quantum2.pdf.

[112] *Id*. As CISA has noted, an analysis by the RAND Corporation identified the four most important critical functions for the successful migration to quantum cryptography, including providing information communication services. CISA, *Post-Quantum Cryptography Initiative*, https://www.cisa.gov/quantum).

[113] NSTAC, Report to the President: Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem, at 13 (Feb. 21, 2023), https://www.cisa.gov/sites/default/files/2023-04/NSTAC_Strategy_for_Increasing_Trust_Report_%282-21-23%29_508_0.pdf.

[114] Letter from Johnathon Caldwell, NSTAC, to Joseph R. Biden, President, The White House (Sept. 26, 2023), https://www.cisa.gov/sites/default/files/2023-11/NSTAC_LtrToPresSecNxtGenWiTelecomm_508c_10-05-2023.pdf.

[115] NSTAC, Report to the President on Communications Resiliency (May 6, 2021), https://www.cisa.gov/sites/default/files/publications/NSTAC%20Report%20to%20the%20President%20on%20Communications%20Resiliency_0.pdf.

**App. 1538**

reliability, and resiliency of the nation's communications systems.[116] CSRIC (including its predecessor organization) has operated for thirty-one years and convenes technical experts from both the private sector and government to assist in addressing security issues that arise from emerging technologies. CSRIC also produces technical reports and guidance for the sector.

CSRIC has been a vital part of the public-private cooperation to address operational issues and network security challenges. As FCC Chairwoman Rosenworcel noted, CSRIC "is one of the nation's most impactful cybersecurity partnerships."[117] A few examples illustrate the breadth of its work, which reaches beyond FCC regulated entities and services. CSRIC issued the "Report on Recommended Best Practices to Improve Communications Supply Chain Security," detailing public-private collaboration on vulnerabilities and discussing the valuable work of NTIA and CISA on the Vulnerability-Exploitability eXchange, a tool to help Software Bill of Materials users integrate additional information on vulnerabilities.[118] The FCC has recognized CISA's central role in the federal cybersecurity enterprise, including its role as the SRMA for the Communications Sector, by designating CISA as a co-chair of CSRIC.[119]

Following the NIST Framework's launch, the CSRIC undertook an effort to implement the NIST Cybersecurity Framework in the Communications Sector, and in March 2015 released its landmark Framework implementation guidance tailored to each communications subsector, along with targeted recommendations for assurance mechanisms for ISPs through collaboration between DHS and the FCC.[120]

**NIST**. As noted earlier, in 2013, President Obama issued EO 13636, "Improving Critical Infrastructure Cybersecurity," directing NIST to work with industry and other government agencies to develop what is now known as the NIST Cybersecurity Framework.[121] After a year of intensive public-private collaboration with industry and civil society, NIST and its public-private stakeholders issued Version 1.0 of the Framework in February 2014.[122] Today, the Framework is

---

[116] FCC, *Communications Security, Reliability, and Interoperability Council*, https://www.fcc.gov/about-fcc/advisory-committees/communications-security-reliability-and-interoperability-council-0.

[117] Press Release, FCC, *Acting Chairwoman Rosenworcel Announces Members of Revitalized Communications Security, Reliability, and Interoperability Council* (Sept. 14, 2021), https://docs.fcc.gov/public/attachments/DOC-375737A1.pdf.

[118] CSRIC VIII, Report On Recommended Best Practices To Improve Communications Supply Chain Security, at 1, 30 (Sept. 2022), https://www.cisa.gov/resources-tools/resources/csric-report-recommended-best-practices-improve-supply-chain-security (detailing public and private sector collaboration to identify, define, and catalog publicly disclosed cybersecurity vulnerabilities and recommending more opportunities for collaboration.).

[119] Press Release, FCC, *Acting Chairwoman Rosenworcel Announces Members Of Revitalized Communications Security, Reliability, and Interoperability Council*, at 1 (Sept. 14, 2021), https://docs.fcc.gov/public/attachments/DOC-375737A1.pdf ("This collaboration with CISA, and with the additional government partners on the Council, will help advance a whole-of-government approach to security and ensure that the relevant federal expertise is informing policymaking at the FCC.").

[120] CSRIC IV, Working Group 4, Cybersecurity Risk Management and Best Practices, at 30 (Mar. 2015), https://transition.fcc.gov/pshs/advisory/csric4/CSRIC_IV_WG4_Final_Report_031815.pdf.

[121] Exec. Order No. 13,636, 78 Fed. Reg. 11739 (Feb. 12, 2023), https://www.govinfo.gov/content/pkg/CFR-2014-title3-vol1/pdf/CFR-2014-title3-vol1-eo13636.pdf.

[122] NIST updated the Framework in 2018 with Version 1.1. In 2022, NIST began the process to improve the Framework and its alignment with other cybersecurity resources through an update to Version 2.0 by providing two years of public-private engagement in the form of workshops, working sessions, opportunities to file comments and

**App. 1539**

the leading cybersecurity tool for both public and private sector organizations in the U.S. and abroad.

**JCDC.** Created by CISA using new authorities from Congress,[123] the JCDC is a public-private partnership that uses "persistent collaboration" to execute cyber defense plans and activities.[124] Its participants include private sector critical infrastructure owners and operators and cybersecurity services firms, among other stakeholders. CISA emphasizes that the JCDC adopts "co-equal partnership between government and the private sector."[125] CISA Director Jen Easterly wrote in a 2022 blog post that the JCDC aimed "to fundamentally transform how we reduce cyber risk to our country: through continuous operational collaboration between trusted partners and by conducting rigorous planning to address the most significant threats before damaging intrusions occur."[126] Easterly says it is "bringing together government partners like the FBI, NSA, and U.S. Cyber Command with private sector partners … to drive down risk to the nation at scale."[127] The JCDC "includes specific government agencies designated by Congress for the joint cyber planning office, including the Department of Homeland Security, U.S. Cyber Command, the National Security Agency, the Federal Bureau of Investigation, the Department of Justice, and the Office of the Director of National Intelligence."[128] It works with other executive branch agencies on specific tasks and coordinates with ISACs. The FCC is not a member of the JCDC.

**Enduring Security Framework**. ISPs are key contributors to the Enduring Security Framework ("ESF"), "a public-private partnership that addresses risks to critical infrastructure and National Security Systems."[129] The ESF is chartered by the DoD, DHS, Office of the Director of National Intelligence ("ODNI"), the CSCC, and the IT Sector Coordinating Council ("IT-SCC"). NSA leads the ESF in partnership with CISA and the Comms, IT, and Defense Industrial Base SCCs under DHS CIPAC authorities. The ESF has produced reports on

---

responses, and supplemental meetings with NIST staff, with a Framework 2.0 incorporating broad stakeholder input expected in early 2024.

[123] FY2021 NDAA § 1715.

[124] CISA, *JCDC FAQs*, https://www.cisa.gov/topics/partnerships-and-collaboration/joint-cyber-defense-collaborative/jcdc-faqs.

[125] *Id*.

[126] Jen Easterly, *Connecting the Dots to Drive Down Cyber Risk Together: The Superheroes Behind the Nation's JCDC*, CISA Blog (Aug. 12, 2022) https://www.cisa.gov/news-events/news/connecting-dots-drive-down-cyber-risk-together-superheroes-behind-nations-jcdc.

[127] *Id.*

[128] CISA, *JCDC FAQs*, https://www.cisa.gov/topics/partnerships-and-collaboration/joint-cyber-defense-collaborative/jcdc-faqs ("Additional federal agencies are included in specific planning and collaboration efforts based upon unique expertise or requirements, including the U.S. Department of Defense, the Transportation Security Administration, the Environmental Protection Agency, the Federal Aviation Administration, the Department of Energy, and the Department of the Treasury. In addition, JCDC enables continuous collaboration with over 100 international cyber defense organizations, often known as "CERTs," to ensure that information about cyber threats identified anywhere across the globe is rapidly disseminated and used to increase friction for our common adversaries. JCDC further works with existing information sharing hubs and groups — like Information Sharing and Analysis Centers — to ensure the rapid dissemination of actionable information across the broader community.")

[129] National Security Agency, *Enduring Security Framework [ESF]: Bringing public & private sectors together on Intelligence-driven, shared cybersecurity challenges*, https://www.nsa.gov/About/Cybersecurity-Collaboration-Center/Enduring-Security-Framework/.

**App. 1540**

numerous important security issues for critical infrastructure, including 5G network slicing,[130] software bill of materials use,[131] and identity and access management.[132] The FCC is not a chartered member of the ESF.

**NSA CCC**. ISPs also are partners in NSA Cybersecurity Collaboration Center ("CCC") Bi-Directional Partnerships where the privacy of each entity is preserved by non-disclosure agreements and ISPs participate in bi-directional threat intelligence sharing through collaborative relationships.[133]

In sum, there is an array of formal and informal collaborations that BIAS providers and the broader sector use to work with each other and with the government.

### 2. Communications Sector collaborations yield operational successes.

These venues and efforts produce results, as evidenced by the Communications Sector's contributions to the development of cyber best practices and targeted collaborations on specific challenges, such as botnets and other automated and distributed threats, internet routing, social engineering, SS7, ransomware, and internet routing, among other examples. These engagements have been fruitful in recent years as government and private sector stakeholders have increased focus on cyber and national security and as information sharing practices and collaboration norms have become more settled, including through the support of Congressional protections.

**Botnets**. Another example of the federal government's whole-of-government approach to cybersecurity is the effort to combat botnets. CSRIC developed the Anti-Botnet Code of Conduct ("ABCs for ISPs") in 2013, to help ISPs address the bot issue including through customer notification programs.[134] The ABCs for ISPs were converted into an industry standard by the Messaging Malware Mobile Anti-Abuse Working Group, which established participation requirements for ISPs in the areas of end-user education, detection of botnet

---

[130] DoD, 5G Network Slicing: Security Considerations for Design, Deployment, and Maintenance (July 17, 2023), https://media.defense.gov/2023/Jul/17/2003260829/-1/-1/0/ESF%205G%20NETWORK%20SLICING-SECURITY%20CONSIDERATIONS%20FOR%20DESIGN,%20DEPLOYMENT,%20AND%20MAINTENANCE_FINAL.PDF.
[131] DoD, Recommended Practices for Software Bill of Materials Consumption: Enduring Security Framework (Nov. 9, 2023), https://media.defense.gov/2023/Nov/09/2003338086/-1/-1/0/SECURING%20THE%20SOFTWARE%20SUPPLY%20CHAIN%20RECOMMENDED%20PRACTICES%20FOR%20SOFTWARE%20BILL%20OF%20MATERIALS%20CONSUMPTION.PDF.
[132] DoD, Identity and Access Management: Recommended Best Practices for Administrators: Identity and Access Management (Mar. 21, 2023), https://media.defense.gov/2023/Mar/21/2003183448/-1/-1/0/ESF%20IDENTITY%20AND%20ACCESS%20MANAGEMENT%20RECOMMENDED%20BEST%20PRACTICES%20FOR%20ADMINISTRATORS%20PP-23-0248_508C.PDF.
[133] National Security Agency, *Collaborative Partnerships: Scaling security through partnerships to prevent, detect, and defeat cyber adversaries*, https://www.nsa.gov/About/Cybersecurity-Collaboration-Center/Collaborative-Partnerships/.
[134] CSRIC III, U.S. Final Report: Anti-Bot Code of Conduct (ABC) for Internet Services Providers (ISPs): Barrier and Metric Considerations (Mar. 2013), https://transition.fcc.gov/bureaus/pshs/advisory/csric3/CSRIC_III_WG7_Report_March_%202013.pdf

activity on the ISPs network, notification of customers of suspected bot infections, remediation, and collaboration with other ISPs.[135]

ISPs have worked closely with the FBI to disrupt botnets including GameOver Zeus, which was "one of the most sophisticated and destructive forms of malicious software in existence."[136] ISPs collaborated with the FBI to stop the operators of GameOver Zeus from connecting the command and control to the botnet, allowing the FBI to deflect bots to FBI controlled servers.[137] Subsequent "remediation efforts by [ISPs] and victims … reduced the number of computers infected with GameOver Zeus by 31 percent."[138]

Industry, including ISPs, worked to address the Mirai botnet incident and its aftermath; much of that work took place in the CSCC, as described by the CSCC in a filing with the NTIA in its multistakeholder process on botnets.[139] Participants in the NTIA process included private sector companies (including BIAS providers), civil society, academia, and officials from a broad range of federal agencies, including DHS, DOJ, the FBI, sector-specific agencies, the FCC, and the Federal Trade Commission, among others.[140] Meanwhile, DHS issued advisories and alerts on botnet threats while the FBI and the DOJ investigated associated criminal activity.

Such collaboration is becoming routine. In 2022, the DOJ announced the court-authorized disruption of malware operations controlled by Russia's military intelligence organization, the GRU.[141] The FBI noted how it had worked with its law enforcement partners and private sector partners, including ISPs.[142]

---

[135] M³AAWG, *The Anti-Bot Code of Conduct for Internet Service Providers: A Voluntary Industry Code to Help Reduce End-User Bots*, https://www.m3aawg.org/abcs-for-ISP-code.

[136] Press Release, DOJ, *Department of Justice Provides Update on GameOver Zeus and Cryptolocker Disruption* (July 11, 2014), https://www.fbi.gov/news/press-releases/press-releases/department-of-justice-provides-update-on-gameover-zeus-and-cryptolocker-disruption.

[137] Lorenzo Franceschi-Bicchierai, *How the FBI Took Down the Botnet Designed to Be 'Impossible' to Take Down*, Vice (Aug. 12, 2015), https://www.vice.com/en/article/539xy5/how-the-fbi-took-down-the-botnet-designed-to-be-impossible-to-take-down.

[138] Press Release, DOJ, *Department of Justice Provides Update on GameOver Zeus and Cryptolocker Disruption* (July 11, 2014), https://www.fbi.gov/news/press-releases/press-releases/department-of-justice-provides-update-on-gameover-zeus-and-cryptolocker-disruption; see also Nicole Vincent Fleming, *FTC discussing ISPs contacting customers to remove the GameOver Zeus malware*, Military Consumer (June 18, 2014), https://www.militaryconsumer.gov/scam-alerts/its-game-over-gameover-zeus.

[139] *Promoting Stakeholder Action Against Botnets and Other Automated Threats*, Notice and Request for Comment, 82 Fed. Register 27042 (Jun. 13, 2017), https://www.federalregister.gov/documents/2017/06/13/2017-12192/promoting-stakeholder-action-against-botnets-and-other-automated-threats.

[140] Department of Commerce & DoD, A Report to the President on Enhancing the Resilience of the Internet and Communications Ecosystem Against Botnets and Other Automated, Distributed Threats (May 22, 2018), https://www.commerce.gov/sites/default/files/2020-07/eo_13800_botnet_report_-_finalv2.pdf.

[141] Press Release, Office of Public Affairs, Department of Justice, *Justice Department Announces Court-Authorized Disruption of Botnet Controlled by the Russian Federation's Main Intelligence Directorate (GRU)* (Apr. 6, 2022), https://www.justice.gov/opa/pr/justice-department-announces-court-authorized-disruption-botnet-controlled-russian-federation.

[142] *Id.*

**App. 1542**

**Other Automated and Distributed Threats**. Industry has worked to address other automated and distributed threats. In addition to supporting the NTIA's botnet roadmap as a "true partner",[143] BIAS providers and other partners in the Council to Secure the Digital Economy ("CSDE")—an international industry coalition reflecting communications and technology sector interests—worked with federal partners including NTIA to develop and release the International Botnet and IoT Security Guide. This annually updated document facilitates mitigation of botnets and other automated, distributed threats[144] and represents an important example of how public-private partnerships can drive innovative security practices faster and do so more effectively than regulatory approaches.

**Internet Routing**. CSRIC has addressed inter-agency and multistakeholder security challenges, and recently has been noted by NTIA for its approach and ability to address internet routing issues by bringing stakeholders together far beyond companies traditionally regulated by the FCC. NTIA highlighted CSRIC's "voluntary approach to studying BGP security," and the FCC for showing "that it can successfully coordinate and cooperate with stakeholders to respond to network security concerns." [145] As NTIA observed, "[v]oluntary compliance with these best practices [identified by CSRIC] has effectively improved network security and reliability."[146] CSRIC has also been a venue for cooperation on SS7 security, and the FCC has encouraged providers to use the best practices identified by CSRIC.[147] In addition, the CSCC and Comm-ISAC have participated in information and classified intelligence exchanges on routing security.[148] (*See* Section VI(C) for further discussion of BGP security).

**Supply Chain Security**. As noted previously, the CSCC continues to partner with the IT SCC and CISA's National Risk Management Center on the ICT SCRM TF, which has produced

---

[143] Diane Rinaldo, Acting Assistant Secretary of Commerce for Communications and Information, Remarks at Council to Secure the Digital Economy (CSDE) Forum (Nov. 21, 2019), https://www.ntia.gov/speechtestimony/2019/remarks-acting-assistant-secretary-rinaldo-csde-forum.

[144] *E.g.,* CSDE, International Anti-Botnet Guide (2018), https://securityandtechnology.org/wp-content/uploads/2020/07/CSDE-Anti-Botnet-Report-final-2018.pdf; CSDE, International Botnet and IOT Security Guide (2022), https://www.ustelecom.org/wp-content/uploads/2022/04/2022-CSDE-International-Botnet-and-IOT-Security-Guide.pdf.

[145] Reply Comments of NTIA, PS Docket No 22-90, at 2 (filed May 10, 2022), https://www.ntia.gov/sites/default/files/publications/ntia_bgp_filing_051022.pdf.

[146] *Id*. at 3.

[147] In CSRIC, "industry worked with the Federal Communications Commission ("FCC") and the Department of Homeland Security ("DHS")" through CSRIC as part of the Communications Security, Reliability and Interoperability Council ("CSRIC") 4 Working Group established to address SS7 threats and related topics in June 2016." CTIA, CTIA Statement SS7 on and FCC CSRIC Recommendations, at 1 (2017), https://www.ctia.org/docs/default-source/default-document-library/ss7-statement-2017-final.pdf.  See also CISA, FCC Promotes Use of Best Practices for SS7 Communications (Aug. 24, 2017), https://www.cisa.gov/news-events/alerts/2017/08/24/fcc-promotes-best-practices-ss7-communications, ("The Federal Communications Commission (FCC) has released a public notice encouraging communications service providers to voluntarily use security best practices recommended by the Communications Security, Reliability, and Interoperability Council ("CSRIC")").

[148] CSCC, ISP Internet Routing Security Practices and Partnerships (Jan. 2024), https://www.comms-scc.org/wp-content/uploads/2024/01/CSCC-Internet-Routing-Security-2024-.pdf ("U.S. operators have participated in information exchange/periodic high side meetings with national security agencies about the latest routing security issues.").

**App. 1543**

19 reports on supply chain risk management.[149] (*See* Section VI(C) for further discussion of supply chain security).

In sum, as the ICT sector has become more complex and the operational collaboration between and among government agencies and ISPs and other internet ecosystem stakeholders has matured, cooperation between the U.S. government and ISPs has been of vital importance to securing both private and U.S. government networks from attacks.

## IV. VARIOUS AGENCIES ARE ADDRESSING CYBERSECURITY AND NATIONAL SECURITY, WITH THE FCC BEING GIVEN SPECIFIC ROLES WHERE APPROPRIATE.

### A. Agencies other than the FCC have broad authorities that enable oversight and impacts on private sector cybersecurity and national security.

Most federal authorities, programs, and expertise for cybersecurity and national security come from agencies other than the FCC. For example:

- The Committee on Foreign Investment in the United States ("CFIUS") reviews foreign investments in the United States for national security risks, including in the communications sector.[150]

- The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom") reviews applications for international Section 214 authorizations for potential national security issues and already considers the provision of broadband services in its reviews. Team Telecom's members include the Attorney General and the secretaries of defense and homeland security. While the committee works on behalf of the FCC to make recommendations about the FCC's disposition of applications for licenses and authorizations, the FCC recognizes that DOJ, DoD, and DHS are "agencies with expertise in those areas."[151]

- The Department of Commerce has claimed broad authority to prohibit or impose conditions on a wide range of transactions and uses of services under the Information and Communications Technology Supply Chain Rule ("ICTS Rule"). The FCC's role in this process is largely consultative.[152]

---

[149] CISA, *ICT Supply Chain Risk Management Task Force Resources*, https://www.cisa.gov/ict-scrm-task-force-resources.

[150] *See* U.S. Department of the Treasury, *The Committee on Foreign Investment in the United States ("CFIUS")*, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius.

[151] DOJ, *The Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector - Frequently Asked Questions*, https://www.justice.gov/nsd/committee-assessment-foreign-participation-united-states-telecommunications-services-sector#6 (last updated Dec. 7, 2021).

[152] *Securing the Information and Communications Technology and Services Supply Chain; Connected Software Applications*, Final Rule, 88 Fed. Reg. 39353 (June 16, 2023),

**App. 1544**

- The Federal Acquisition Security Council ("FASC") was created by the Federal Acquisition Supply Chain Security Act of 2018.[153] The FASC is an executive branch interagency council, chaired by a senior-level official from OMB, and includes representatives from the General Services Administration ("GSA"); DHS; ODNI; DOJ; DoD; and Department of Commerce. There is no mention of the FCC in the enabling statute or its regulations.

- The 2019 NDAA imposes restrictions on federal contractors that use covered telecommunications equipment and services from specified foreign entities.[154] These restrictions are imposed, managed, and enforced through the Federal Acquisition Regulation.[155]

- The Commerce Department's BIS enforces the Export Administration Regulations ("EAR"). The FCC does not have a statutory role to play in export controls and their creation or administration.

The FCC is not a central actor in any of those regimes. The FCC's specific national security and cybersecurity activities have been directed by Congress at targeted areas within its traditional expertise.[156] And in implementing some of those specific directions, the FCC has explicitly noted its need to rely on the national security judgments and determinations of other "expert" agencies.[157]

**B.** **Key operational cyber activities are housed in other agencies and the FCC does not need to supplement operational cyber or law enforcement activities.**

The United States has been investing in and expanding its efforts to enhance national and especially critical infrastructure resilience against cyber threats, with a focus on DHS and DoD, and in collaborative approaches with industry and civil society. Other agencies work with ISPs under compulsory process and in other voluntary settings. It is unclear how reclassification could augment these robust and mature approaches.

---

https://www.federalregister.gov/documents/2023/06/16/2023-12925/securing-the-information-and-communications-technology-and-services-supply-chain-connected-software.

[153] Federal Acquisition Supply Chain Security Act of 2018, Pub. L. No. 115-390, Title II, 132 Stat. 5173.

[154] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 889, 132 Stat. 1636 (2018).

[155] *See* GSA, *Section 889 Policies*, https://www.acquisition.gov/Section-889-Policies.

[156] *See infra,* part V.

[157] *See Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*; *Protecting Against National Security Threats to Communications Supply Chain through the Competitive Bidding Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13493 (2022), https://docs.fcc.gov/public/attachments/FCC-22-84A1_Rcd.pdf (noting the Commission lacks discretion to stray from determinations by "other expert agencies" of which equipment to include on the Covered List).

**Cyber defense and analysis are handled by other agencies.** As discussed, the U.S. government's cyber defensive capabilities and operational authorities continue to mature and strengthen, such as through the formal establishment of CISA within DHS in 2018, U.S. Cyber Command's ascension to a DoD unified combatant command in 2017 and the expansion of its authorities in 2022,[158] and the creation of a national-security cyber section within the National Security Division of the Department of Justice just this year,[159] among other developments. This year's NDAA includes several provisions that address operational capabilities and collaboration with the private sector in government cyber operations.[160] The NDAA promotes and expands DoD's use of red teaming, including foreign adversary emulation and vulnerability assessments for DoD critical infrastructure.[161] One provision directs DoD to pilot civilian and contractor participation in its operational cyber forces, and other provisions relevant to the communications sector.[162]

**Agencies' operational work includes ISPs.** The National Cyber Investigative Joint Task Force, which includes over 30 partnering agencies from across the federal government and is chaired by the FBI,[163] is one example of an entity created to coordinate the government internally to present ISPs (and in some cases other internet stakeholders) with coherent requests for support.  And, as noted, the JCDC, which includes many of the largest U.S. ISPs, was set up "to unify cyber defenders from organizations worldwide" and includes experts from key industry partners and the government.[164] JCDC "proactively gathers, analyzes, and shares actionable cyber risk information to enable synchronized, holistic cybersecurity planning, cyber defense, and response."[165]

**BIAS providers already comply with an array of legal obligations**. ISPs have long been, and will continue to be, central to these government and critical infrastructure cyber defense and law enforcement missions. As noted above, DHS has administrative subpoena power to address compromised networks and devices. And the FBI makes use of lawful process available under the Wiretap Act, the Stored Communications Act, the Foreign Intelligence Surveillance Act, and in its use of "network investigative techniques" and authorities under Federal Rule of Criminal Procedure 41. The relationships between communications companies and law enforcement and the intelligence community are complex and shifting, depending on judicial decisions, technology, and legislation.

---

[158] *See* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 1505, 135 Stat. 1541.

[159] Press Release, Department of Justice, *Justice Department Announces New National Security Cyber Section Within the National Security Division* (June 20, 2023), https://www.justice.gov/opa/pr/justice-department-announces-new-national-security-cyber-section-within-national-security.

[160] *E.g.*, National Defense Authorization Act for Fiscal Year 2024 § 1517 (Conf. Rep.) ("Pilot Program on Assuring Critical Infrastructure Support for Military Contingencies").

[161] *Id*. § 1507.

[162] *Id.* § 1536.

[163] FBI, *National Cyber Investigative Joint Task Force*, https://www.fbi.gov/investigate/cyber/national-cyber-investigative-joint-task-force.

[164] CISA, *Joint Cyber Defense Collaborative*, https://www.cisa.gov/topics/partnerships-and-collaboration/joint-cyber-defense-collaborative.

[165] *Id*.

BIAS providers also operate under the "assistance capability requirements" in the Communications Assistance for Law Enforcement Act ("CALEA").[166] Facilities-based broadband internet access providers are already required to expeditiously isolate and enable the government, with lawful authorization, to intercept electronic communications of a subscriber.[167] Reclassification would have no impact on the legal standards that law enforcement must meet for acquiring content or metadata under the U.S. constitution, the Electronic Communications Privacy Act ("ECPA"), and other applicable laws.

BIAS providers also may voluntarily work with law enforcement investigations or related operations. Frequently, BIAS providers learn of security threats before those threats come to the attention of law enforcement entities. BIAS providers may notify law enforcement of threats and, where legally permissible, provide information to law enforcement agencies under the voluntary disclosure provisions of ECPA[168] or other aforementioned mechanisms for sharing information (such as under CISA 2015 or the PCII program). Voluntary disclosures enhance the ability of law enforcement agencies investigating security threats to move quickly to neutralize those threats, particularly in the cyber domain. Law enforcement at times will also send BIAS providers information on possible nefarious accounts for provider investigation.

In light of these examples, the FCC's suggestion that Title II reclassification could "increase law enforcement agencies' ability to seek lawful assistance, including identification and disruption of illegal activity, for investigations involving ISP networks,"[169] appears misplaced. There are myriad, well-established frameworks and venues in place today for law enforcement and the intelligence community to seek lawful assistance, including the aforementioned DHS subpoena power, Title 18 of the U.S. Code, FISA authorities, and routine law enforcement tools available to myriad law enforcement agencies. Those authorities and functions are dictated by Congress and are housed in agencies that have significant experience with investigations, face robust oversight for civil liberties concerns, and can keep investigations and associated products confidential or classified, as appropriate.

In conclusion, it is unclear what additional lawful assistance a BIAS provider would provide under the FCC's proposed Title II reclassification, and it further appears that reclassification could have a chilling effect on existing cooperation between BIAS providers and law enforcement. BIAS providers may be reluctant to share vulnerabilities, malicious IP addresses, methods of potential compromise or attack, evidence of exploitation, or any operational information that could cause a regulator or enforcer to feel compelled to follow up or investigate for potential regulatory violations or to explore compliance. If BIAS providers believe that disclosures and cooperation will be used not only to assist legitimate law enforcement objectives, but also as fodder for investigations or inquiries from the FCC's Enforcement Bureau, it could have a chilling effect on the existing and productive cooperative paradigm.

---

[166] *Communications Assistance for Law Enforcement Act (CALEA) and Broadband Access and Services*, First Report and Order and Further Notice of Proposed Rulemaking, 20 FCC Rcd 14989 (2005), https://docs.fcc.gov/public/attachments/FCC-05-153A1.pdf.
[167] 47 U.S.C. § 1002.
[168] 18 U.S.C. § 2702.
[169] Reclassification NPRM ¶ 28.

## V. THE FCC HAS EFFECTIVELY USED TARGETED AUTHORIZATIONS FROM CONGRESS TO ADDRESS PRIOR SECURITY ISSUES.

The Commission "tentatively conclude[s] that authority under applicable Title II provisions, reinforced by the Commission's existing authority, would enhance the Commission's efforts to protect the national defense."[170] However, regulations under Title II are not needed to address the specific areas where Congress has directed FCC action, such as law enforcement assistance and supply chain security.

Congress has taken action to ensure that the FCC has targeted authority to deal with specific security issues, and the Commission has acted to implement these directives.

- In the Secure and Trusted Communications Networks Act of 2019 ("Secure Networks Act"),[171] Congress required the FCC to take several interrelated actions requiring careful balancing of commercial and security needs, and significantly expanding the Commission's compliance monitoring duties. The purpose of the Secure Networks Act was to prevent the introduction and use of "untrusted" communications equipment such as items manufactured by Chinese state-owned or -controlled entities. Under the Secure Networks Act, the FCC must publish and periodically update a list of "covered communications equipment and services" that have been determined to pose national security risks (i.e., the "Covered List"); establish rules and monitor to ensure that no FCC program subsidy may be used to purchase or maintain "covered" communications equipment or services; make reimbursements to certain providers to facilitate the removal, replacement, and disposal of "covered" equipment and services; and obtain and review annual reports from providers of advanced communications services regarding their use of "covered" communications or services.

- In the Secure Equipment Act of 2021, Congress further directed the FCC to modify its equipment authorization process to address potential threats from untrusted communications equipment, including by specifically banning the Commission from issuing authorizations for radiofrequency devices manufactured by entities on the Covered List.[172] In implementing this law, the FCC made significant changes to its equipment authorization procedures while seeking to balance the need to facilitate innovation and technological advancement.[173]

The Commission "seek[s] comment on how reclassification would support the Commission's efforts to safeguard the nation's communications network infrastructure from

---

[170] *Id.* ¶ 26.

[171] Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020).

[172] Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423.

[173] *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Final Rule, 88 Fed. Reg. 7592, 7596-97 (Feb. 6, 2023), https://www.federalregister.gov/documents/2023/02/06/2022-28263/protecting-against-national-security-threats-to-the-communications-supply-chain-through-the.

equipment and services that pose a security threat."[174] Title II reclassification is not necessary to address any of the targeted security steps Congress has directed the FCC to take.

## VI. RECLASSIFICATION OF BIAS UNDER TITLE II BASED ON PURPORTED RATIONALES RELATING TO NATIONAL SECURITY AND CYBERSECURITY INTERESTS WOULD ACTUALLY UNDERMINE SECURITY COLLABORATION.

In light of my experience in federal cybersecurity policy, and the foregoing activities that are underway, effective, and maturing, I have reached several conclusions about the effects of reclassification of BIAS on cybersecurity and national security priorities.

### A. Reclassification of BIAS under Title II for regulatory purposes, with the threat of investigations and penalties for noncompliance, would profoundly disrupt – and curtail – work in collaborative initiatives.

Based on my experience, current collaborations and existing venues for such collaboration are productive for government and private sector stakeholders because the relationship is mutually beneficial for the regulator and its regulated entities, free from the threats of burdensome investigations, blame, punishment, and liability. Companies and organizations that are working in good faith to enhance cybersecurity and national security interests and to promote collaboration may be discouraged from collaboration by the risk of recrimination from a regulator that has the authority to impose penalties and assign blame.

My former boss, Commerce Secretary Penny Pritzker, underscored this point based on her background as a lawyer and a business executive:

> The problem is that today, relationships between regulators and the businesses they regulate are inherently adversarial – not collaborative. And as someone who spent 27 years building businesses, I get it. **We cannot blame executives for worrying that what starts today as an honest conversation about a cyber-threat could end tomorrow in a "punish the victim" enforcement action** … Don't get me wrong: we must hold industry to high standards. However, enabling greater cooperation and protecting consumers are not mutually exclusive. Enhancing collaboration between government and industry is not an option – it is a necessity.[175]

Secretary Pritzker points out the Commission on Enhancing National Cybersecurity's recommendation that the President establish new collaborative public-private partnerships that would delineate clear lines of responsibility for protecting critical infrastructure and promote

---

[174] Reclassification NPRM ¶ 29.

[175] Department of Commerce, Office of Public Affairs, *U.S. Secretary of Commerce Penny Pritzker Delivers Keynote on Cybersecurity Commission Recommendations at USTelecom Forum* (Dec. 6, 2016), https://2014-2017.commerce.gov/news/secretary-speeches/2016/12/us-secretary-commerce-penny-pritzker-delivers-keynote-cybersecurity.html (emphasis added).

operational capabilities and training to defend, respond and recover from major incidents.[176] This approach bore fruit. Beginning with the public-private response to the WannaCry malware crisis in early 2017, expanding through the broadband security and capacity innovations that came in response to the unprecedented demands for secure, reliable connectivity during the COVID-19 lockdown of 2020, and continuing in multiple arenas today (including the Commission's multiagency routing security initiative), these partnerships have been carried forward and informed the initiatives of the Trump and Biden administrations that followed.

The FBI has likewise emphasized the importance of collaboration and how important it is to protect victims of cyber-attacks. Over the past ten years or more, the FBI has taken meaningful steps to improve collaboration with the private sector, to encourage companies to pick up the phone and call when they see an issue or are attacked. This is a welcome continuation of work I helped promote in government. The FBI has publicly emphasized the importance of treating corporations as victims and helpful partners, including by ensuring company names do not appear unnecessarily in press releases about attacks or collaboration on take-downs. In addressing the culture of victim protection at the FBI, Director Wray has "contrasted the FBI's approach to that of other regulators and state authorities. Without naming other agencies, Wray referred to 'less-enlightened enforcement agencies,' some of which he said take a more adversarial approach."[177] That report quoted FBI Director Wray as saying, "[w]e don't view it as our responsibility when companies share information with us to turn around and share that information with some of those other agencies."[178] Director Wray recently added that many of the agency's successful cyber operations in recent years were accomplished with the assistance of private sector partners.[179]

The move to reclassify BIAS threatens to chill and change this existing collaboration on cyber and national security. Companies share information, observations, and perspectives with CISA, the FBI, and other agencies; with peers in the Comm-ISAC or CSCC; and with the broader ecosystem in CSRIC (which the FCC runs and on which the FCC has staff). Outside of the CSRIC advisory committee framework, the FCC's approach is primarily based on rulemaking and enforcement, not cooperation, information sharing, and operational collaboration. After reclassification, these companies will reasonably be concerned that the information they share about security operations, network capabilities, compliance issues, cyber and technical threats, attacker techniques, research, security incidents, or response and recovery will be used by the FCC for enforcement and oversight.

The possibility of information reaching the FCC through other collaborative venues would not deter collaboration if the FCC were continuing its consulting, convening and collaborative approach with the Communications Sector. If the agency embraces its new posture

[176] NIST, Commission on Enhancing National Cybersecurity, Report on Securing and Growing the Digital Economy (Dec. 1, 2016), https://www.nist.gov/system/files/documents/2016/12/02/cybersecurity-commission-report-final-post.pdf.

[177] Nate Raymond, *FBI chief: Corporate hack victims can trust we won't share info*, Reuters (Mar. 7, 2018) https://www.reuters.com/article/idUSKCN1GJ2QF/#:~:text=Wray%2C%20who%20took%20over%20as,as%20victims%2C%22%20he%20said.

[178] *Id.*

[179] David Jones, *FBI director urges private sector to work with the agency on cyber threats*, Cybersecurity Dive (Sept. 19, 2023) https://www.cybersecuritydive.com/news/fbi-director-private-sector-cyber-threats/694097/.

**App. 1550**

of regulator and enforcer in the context of cybersecurity and national security, however, BIAS providers that share information with other agencies, in venues like the CSCC, or in CSRIC, may pull back. They may seek assurances from those other agencies about the use and protection of confidential information regarding cybersecurity threats and vulnerabilities, or they may limit the quantity or detail of shared information. At a minimum, they can be expected to be more cautious and consult with legal counsel more often.

If the FCC proceeds to reclassify BIAS under Title II for the purpose of expanding cyber, national security, and like regulation as the NPRM proposes, ISPs and others in the Communications Sector will need to carefully consider, and will likely reconsider, their approach to voluntary information sharing in the shadow of an increasingly regulatory Commission. Cyber collaboration that occurs in a more regulatory context is inevitably filtered through the reasonable caution and aversion on the part of a regulated entity to regulatory or broader legal risk that could result from that collaboration. This risk will subject collaboration to more careful review by companies and their counsel and may lead to less voluntary sharing of information and work on shared challenges. Such caution will adversely impact the openness, and ultimately the productivity, of collaboration.

For these reasons, the government should follow the partnership model with sophisticated network operators like the ISPs that have been communications security and reliability partners with the U.S. Government for decades.

**B.      The FCC's status as an independent agency and its legal obligations regarding transparent and public processes will complicate collaboration and undermine uniform federal policy.**

Subjecting BIAS providers to Title II regulation for the goal of addressing cybersecurity and national security issues is further problematic because of the agency's independent status and its lack of statutorily provided ability to protect and limit the use of information it receives.

Agency independence may prevent important coordination. As an independent agency, the FCC will not be subject to regular input and coordination by the White House through ONCD and the NSC. This coordination is particularly vital in the areas of cyber and national security. From my time in the White House, I understand that facilitating cooperation on policy matters at independent agencies is very different from working with Executive Branch departments, as reflected in recent guidance from the White House to staff.[180] This challenge, and its consequences, were apparent in the recent rulemaking by the independent Securities and Exchange Commission. That agency's approach drew criticism from regulated entities and congressional leaders, who accused the agency of flouting congressional intent and undermining harmonization.[181]

---

[180] *See supra*, note 38.

[181] Senator Portman, the then-ranking member of the Senate Committee on Homeland Security and Government Affairs, a co-author of CIRCIA, wrote to the SEC that its approach "contradicts Congress's intent to harmonize cyber incident reporting requirements and provide appropriate protections for cyber incident information reported to the Government." Letter from Sen. Rob Portman, Ranking Member, to Vanessa Countryman, Secretary, SEC, SEC Proposed Rule on Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure, File No. S7-09-22 (May 9, 2022), https://www.sec.gov/comments/s7-09-22/s70922-20128391-291294.pdf.

**App. 1551**

The FCC's Administrative Procedure Act ("APA") obligations and agency process may complicate and slow agency action and industry agility. The FCC will have to operate consistent with the APA, which generally provides for open and public proceedings for making regulations through a process of notice and public comment. The APA is not well-suited to facilitating operational collaboration because of the months or more it typically takes for an APA proceeding to run its course and because its transparency requirements complicate the exchange of confidential and sensitive information about cybersecurity threats and vulnerabilities.

The FCC lacks tools to protect sensitive security and business information with the appropriate level of confidence. The FCC's stated goal in seeking reclassification to promote cybersecurity regulations and operational activity is to "protect U.S. communications services and infrastructure from cyber-attacks and to ensure that communications devices and equipment do not pose security risks to other critical infrastructure sectors."[182] In order to do this effectively, the agency would need access to a variety of information, like communications sector threats and vulnerabilities, which is sensitive and confidential information that should be protected from widespread disclosure. Information about security programs, defensive measures, and tools used by BIAS providers are also sensitive from security and business perspectives. The FCC does not have the tools, authorities, or structures to fully safeguard this sort of information, unlike existing cyber and national security collaborations that involve sharing sensitive security and commercial information in secure settings.

Congress has repeatedly afforded protections to companies that work with government, for example in the PCII program, in CISA 2015, and at CFIUS. Agencies like DOJ, DHS and DoD are well-positioned to assert exemptions on information disclosure and use under these statutes and other FOIA exceptions.[183] When I was in government, these reliable protections were essential to cyber collaboration and information sharing. The cyber incident reporting requirements created through CIRCIA are a recent example of the importance Congress places on the careful and confidential treatment of cybersecurity information. CIRCIA contemplates the sharing with CISA of detailed and sensitive information, such as indicators of compromise, tactics, techniques, procedures, and remediation measures.[184] But as noted previously, Congress required CISA and other federal agencies to keep confidential and protect the sensitive information that will be reported–critically, that information will not be released to the public, and the rulemaking record will not contain confidential and sensitive information that would reveal confidential practices or tip off threat actors.

The FCC has no such mechanisms and as a regulator will be expected to err on the side of transparency. The FCC has to comply with FOIA and the APA, and while it has ways to enable protection of confidential information in notice and comment proceedings as well as investigations, those tailored protections are subject to agency discretion and judicial challenge. Agency staff may have every intention to safeguard sensitive information from public disclosure,

---

[182] Reclassification NPRM ¶ 30.
[183] *See, e.g.,* 50 U.S.C. § 4565(c) (exempting information filed with CFIUS from disclosure under FOIA).
[184] *Request for Information on the Cyber Incident Reporting for Critical Infrastructure Act of 2022*, Request for information, 87 Fed. Reg. 55833 (Sept. 12, 2022), https://www.federalregister.gov/documents/2022/09/12/2022-19551/request-for-information-on-the-cyber-incident-reporting-for-critical-infrastructure-act-of-2022.

but they cannot guarantee such protection. As a former national security official, this lack of reliable statutory protections at the FCC concerns me.

**C.** **Title II reclassification and regulation would create an uneven and ineffective regulatory regime because ISPs are just one of many contributors to cybersecurity.**

As I saw in my time at the NSC, the Commerce Department and the Senate, cybersecurity in the communications and internet space is a "team sport" that involves more than just BIAS providers. Cybersecurity relies on a range of other actors, including backbone and transit providers, tech platforms, IP transit and peering providers, numbering and IP resources, operators of autonomous systems, application developers, cloud providers, internet exchange providers, content delivery networks, large enterprise networks, and international technical organizations that develop routing standards and end users. There are numerous providers of wholesale and enterprise (non-mass-market) broadband services to critical infrastructure and government agencies. The actions and contributions of these other actors are vital to cyber and national security. It can be challenging to convene the right stakeholders in the best of circumstances, but even under an expansive approach to Title II, the FCC does not explain how it would oversee or regulate the other players that are equally or more important to its stated goals.

This is why the FCC and the broader U.S. Government have to date taken a different, and, in my view, more productive path to address security concerns in the communications sector. As noted above, when faced with questions about potential vulnerabilities of signaling protocols in pre-5G networks, the FCC took a collaborative approach. CSRIC accepted the challenge of reviewing and identifying security recommendations,[185] and the FCC followed up with a public notice inviting industry to provide updates on implementation.[186] This approach fostered valuable collaboration and quickly produced innovative approaches—an advantage, compared to an adversarial regulatory proceeding.

The NPRM raises a host of potential security advantages that it suggests make reclassification necessary and future regulation appropriate. Each is premised on a misjudgment of the ability of the FCC to address the issue identified. In many cases, the issue is already being addressed in venues identified above. In others, the reach of the FCC is too narrow or limited to have the effects that the agency speculates could come from reclassification and regulation. I address a few of the NPRM's supposed justifications below.

**Internet Routing and BGP.** The FCC asks whether reclassification would "provide the Commission with additional authority to address BGP vulnerabilities."[187] I am not aware of any meaningful addition to the FCC's authorities that Title II reclassification of BIAS would provide

---

[185] CSRIC VI, Final Report – Recommendations to Mitigate Security Risks for Diameter Networks, Version 1.1 (March 14, 2018), https://www.fcc.gov/file/13925/download.
[186] *Public Safety and Homeland Security Bureau Requests Comment on Implementation of Diameter Protocol Security Best Practices*, Public Notice, 35 FCC Rcd 912 (2020), https://docs.fcc.gov/public/attachments/DA-20-141A1.pdf.
[187] Reclassification NPRM ¶ 31.

pertaining to secure internet routing. Even if we assume that reclassification and future regulation could provide the FCC some additional ability to regulate BIAS providers' routing practices, any such action would be substantially under-inclusive. This is because the ISPs that provide BIAS are only one part of the global internet routing ecosystem.[188] They are not the only autonomous system ("AS") operators: large companies, universities, and government agencies, among other organizations, also operate AS's and control IP addresses, and reclassification would not capture these important players.

Take, as an example, implementation of Resource Public Key Infrastructure-Route Origin Validation ("RPKI-ROV") for routing security. Routing security problems are only partly addressed by ISPs' RPKI-ROV practice to filter out spoofed route announcements because ISPs can only use RPKI to filter BGP updates for which Route Origin Authorizations ("ROAs") have been created by the AS operator. Only AS operators as IP address owners—not unaffiliated ISPs—can register ROAs for their network addresses.[189]

The record in the FCC's Notice of Inquiry on BGP security[190] and the BGP Security Workshop[191] hosted by the Public Safety and Homeland Security Bureau illustrated in detail the vast diversity of the global routing ecosystem, including the complexity and variety of the hundreds of large and small ISPs,[192] which does not lend itself to a prescriptive compliance approach to only one part of that ecosystem. The same is true for Title II reclassification under which only one type of service—mass market BIAS —within that one part of the global routing ecosystem would be regulated.

During that workshop, NIST described a diverse "problem space" in BGP with the multitude of ongoing standardization[193] and varied solutions.[194] This is why the FCC and the

---

[188] CSCC, ISP Internet Routing Security Practices and Partnerships, at 1 (Jan. 2024), https://www.comms-scc.org/wp-content/uploads/2024/01/CSCC-Internet-Routing-Security-2024-.pdf ("ISPs constitute only a small part of the ecosystem.") ("CSCC Routing Report"). The Broadband Internet Technical Advisory Group ("BITAG") released a report discussing steps to improve routing security, noting that solutions are complex and require action by many entities. "Deployment of these measures [updating routing protocols] only marginally contributes to the protection of the ISP, because its security is to a significant extent in the hands of other networks." BITAG Technical Working Group, Security of the Internet's Routing Infrastructure, at 24-25 (Nov. 2, 2022), https://www.bitag.org/documents/BITAG_Routing_Security.pdf ("BITAG Report").
[189] CSCC Routing Report at 1.
[190] *Secure Internet Routing*, Notice of Inquiry, 37 FCC Rcd 3471, (2022).
[191] FCC, *Border Gateway Protocol Security Workshop* (July 31, 2023), https://www.fcc.gov/news-events/events/2023/07/bgp-security-workshop.
[192] *Id.* (Statement by Tamber Ray, NTCA, at 1:36:45).
[193] Doug Montgomery, BGP Level Set Problem Space – Problem Space and Emerging Solutions, NIST, BGP Workshop (July 31, 2023), https://www.fcc.gov/sites/default/files/NIST%20BGP%20Level%20Set-Problem%20Space-Emerging%20Solutions%20-%20FCC%20BGP%20Wrkshp073123.pdf; (noting that the IETF alone has "~300" specifications that reference BGP Version 4, and that BGP interconnects "~74,000 Autonomous Systems").
[194] Doug Montgomery, NIST Efforts to Accelerate Standardization and Support Adoption of BGP Security Technologies, NIST, BGP Workshop (July 31, 2023), https://www.fcc.gov/sites/default/files/NIST%20Standardization%20and%20Support%20BGP%20Security%20Tech%20-%20FCC%20BGP%20Wrkshp073123.pdf (identifying seven domestic and global organizations: IETF, IRFT, NANOG, NCCoE, ARIN, MAAWG, and O-RAN Alliance, that are working to "advance research, standardization

broader U.S. Government have to date taken a different, and, in my view, more productive path to securing internet routing, as described earlier, involving a collaborative, multistakeholder approach to BGP security.[195] As a Broadband Internet Technical Advisory Group ("BITAG") report observed, "[u]nilateral, or even multilateral regulation may have negative consequences as operators attempt to comply narrowly with regulation;" policymakers should instead "encourage and support the multistakeholder standards process to develop solutions."[196]

Given the urgency with which the U.S. Government and the FCC took action on routing security following Russia's invasion of Ukraine in February 2022, I see this question as one of timeliness and effectiveness. Indeed, this question is perhaps the most immediate example in cybersecurity policy of the real and foreseeable damage to productive, effective whole-of-government and multistakeholder cybersecurity collaboration. If the Commission were to impose regulation on ISPs representing a sliver of the secure routing ecosystem, these mandates are likely to stifle the open, collaborative dialogue that has allowed the pathway towards more secure Internet routing to emerge. ISPs will be hesitant to discuss their routing practices and less engaged in collaboration in the face of Commission oversight and enforcement. Further, Commission regulation will send the message that routing security can be solved by ISPs alone, lessening the pressure on other participants in the multistakeholder collaboration.

**IP Transit, Peering and Interconnection of BIAS Providers**. The NPRM asks whether reclassification would empower the FCC to effectively address risks associated with IP transit and peering providers or providers operating in the enterprise or wholesale marketplace.[197] It posits that "the same national security and law enforcement threats identified in those proceedings [regarding revocations of section 214 authorizations held by certain Chinese telecom operators] equally exist with respect to entities providing BIAS, and that reclassifying BIAS as a telecommunications service would allow the Commission to use its section 214 authority to address those threats."[198] This analysis is flawed. It appears the agency may think it can regulate all internet infrastructure by targeting BIAS because those "ISPs provide BIAS through PoPs" and because from there "the network service provider offers or avails of interconnection or other Internet-related services."[199] But BIAS is only one part of ISPs' services. And reclassification of BIAS and regulation under Title II would not reach other industry players in the global internet routing ecosystem, including industry entities that are not within the reach of the FCC now – nor would be under after Title II reclassification of BIAS – such as cloud providers, internet exchange providers, content delivery networks, large enterprise

---

and adoption of technologies necessary to resolve systemic vulnerabilities in existing and emerging critical network infrastructures" including BGP.).

[195] National Cybersecurity Strategy Implementation Plan, Initiative Number 4.1.4, "Accelerate the development and standardization, and support the adoption, of foundational Internet infrastructure technologies and capabilities," at 37 (July 2023), https://www.whitehouse.gov/wp-content/uploads/2023/07/National-Cybersecurity-Strategy-Implementation-Plan-WH.gov_.pdf.

[196] BITAG Report at 30.

[197] Reclassification NPRM ¶ 27.

[198] *Id.*

[199] *Id.* n.100 (citing *China Telecom (Americas) Corporation*, Order on Revocation and Termination, GN Docket No. 20-109, File Nos. ITC-214-20010613-00346, ITC214-20020716-00371, ITC-T/C-20070725-00285, 36 FCC Rcd 15966, 16027, ¶¶ 91-92 (rel. Nov. 2, 2021)).

networks, international technical organizations that develop routing standards, and their non-U.S. equivalents. Finally, while the FCC and other agencies may be rightly concerned about interconnections with untrusted foreign carriers, since these foreign ISPs do not provide BIAS, reclassification of BIAS under Title II would similarly be irrelevant to the FCC's authorities to address those concerns. More specifically, the NPRM claims that Title II regulation of BIAS will help it prevent foreign telecom providers from posing national security risks to the U.S.[200] But none of the Chinese carriers the FCC cites as presenting risks provide mass market broadband in the United States, and thus, they would not be covered by the Title II rules the FCC claims are needed. The FCC ignores other ways to address those participants, such as through the ICT Supply Chain work at the Commerce Department and DHS, as well as trade restrictions that are otherwise available.

**IP Address Blocking**. The FCC asks whether it could "use Title II authority to require ISPs to block IP addresses that originate malicious software and ransomware?"[201] The question is premised on at least two mistaken propositions: first, that ISPs do not already engage in an effective level of IP address blocking, and second, that FCC blocking mandates would be practical and make a meaningful impact on the ransomware threats facing the U.S. economy. There is reason to be pessimistic about the validity of these premises. First, ISPs and others routinely block IP addresses that are associated with malicious software and ransomware, and do so in a careful but dynamic fashion. Second, FCC mandates are not likely to have an appreciable impact on the effectiveness of blocking. Ransomware operators are skilled at hiding the true origins of their attacks among legitimate IP addresses—themselves victims of a cyber attack—so the risk of blocking legitimate traffic is high. In addition, once their IP addresses are discovered, they move on to new addresses. This is a classic game of "whack-a-mole," with the added complication of potentially causing collateral damage to innocent victims of cyber attacks and blocking legitimate in-bound traffic that may be deemed suspicious.[202]

There is a serious risk of unintended consequences from blocking mandates, whether mandates apply to traffic coming into the network or from users attempting to reach third party sites and content. As Cloudflare reported last year, it was affected by erroneous and overbroad IP blocking overseas, which prevented end-users from reaching erroneously blocked sites.[203] And, companies sometimes wait to block incoming and out-bound traffic to suspicious IP addresses to enable reconnaissance or to cooperate with government investigations. The challenges here cannot be oversimplified, particularly in light of the need for technical information to make determinations before taking actions against potential threats, which has led to a proliferation of

---

[200] *Id.* ¶ 27.

[201] *Id.* ¶ 32.

[202] Innocent end users can also be harmed by IP blocking when assigned a shared IP address with an attacker, calling into question the ability to determine a malicious IP address with any certainty. Rishbha Bhagi, *The Block Busters: USC Researchers Find New Methods to Quantify IP Blocklisting*, USC Viterbi School of Engineering (Apr. 15, 2021), https://viterbischool.usc.edu/news/2021/04/the-block-busters-usc-researchers-find-new-methods-to-quantify-ip-blocklisting/.

[203] Alissa Starzak & Marwan Fayed, *The unintended consequences of blocking IP addresses*, Cloudflare Blog (Dec. 16, 2022), https://blog.cloudflare.com/consequences-of-ip-blocking.

**App. 1556**

tools and services to address blocking.[204] And government mandates to limit user access to IP addresses raises substantial concerns as well; who will determine what websites are "spoofed" or otherwise malicious?[205] All of this demonstrates how complex this area is. The FCC is ill suited to step into this dynamic area to impose blocking mandates. Nor is there a demonstrated need for FCC action to mandate blocking, much less a need for reclassification to enable the FCC to adopt such mandates. This rationale for reclassification fails.

**Infrastructure Supply Chain**. The FCC further asks "how reclassification would support the Commission's efforts to safeguard the nation's communications network infrastructure from equipment and services that pose a security threat."[206] Supply chain resilience and security reach far beyond BIAS and providers, making reclassification a poor way to address them. ICT supply chain issues are vast and complex, with many stakeholders; this is why DHS has a task force and why other agencies acting at the direction of Congress have been taking important steps.[207] The FCC itself has used its tailored authorities to address specific circumstances, and has referred to the importance of deferring to other expert agencies.[208] It is hard to imagine what meaningful supply chain regulation would be available and administrable under Title II for BIAS that would not be fatally underinclusive or disrupt other supply chain efforts.

In my view, collaborative and mutually beneficial initiatives that can include all stakeholders in this ecosystem – from ISPs to other private sector stakeholders to U.S. Government agencies – are better suited to advancing security than Title II regulation of BIAS providers, which would substitute an untested regime for a collaborative approach that has produced concrete beneficial results over many decades.

## VII. CONCLUSION

I have reviewed the NPRM's national security, law enforcement, and cybersecurity justifications for Title II reclassification of BIAS. Based on my experience and research, I

---

[204] As a DoD advisory notes, there are many "open source, commercial, and governmental information feeds of known malicious domains. These feeds enable coverage of domain names found at numerous points of the network exploitation lifecycle. Some solutions may also detect novel malicious domains based on pattern recognition." NSA & CISA, Selecting a Protective DNS Service, at 2 (May 2021), https://media.defense.gov/2021/Mar/03/2002593055/-1/-1/0/CSI_Selecting-Protective-DNS_UOO11765221.PDF.

[205] Reclassification NPRM ¶ 45 (asking, "to the extent robotext scams include links to spoofed websites designed to defraud consumers, would reclassification allow us to require that ISPs block traffic to IP addresses associated with those websites?").

[206] *Id.* ¶ 29.

[207] CISA, *ICT Supply Chain Risk Management Task Force Resources*, https://www.cisa.gov/ict-scrm-task-force-resources; Department of Commerce, Securing the Information and Communications Technology and Services Supply Chain; Connected Software Applications, Final Rule, 88 Fed. Reg. 39353 (June 16, 2023), https://www.federalregister.gov/documents/2023/06/16/2023-12925/securing-the-information-and-communications-technology-and-services-supply-chain-connected-software.

[208] *See Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program; Protecting Against National Security Threats to the Communications Supply Chain through the Competitive Bidding Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13493, ¶ 221 (2022), https://docs.fcc.gov/public/attachments/FCC-22-84A1_Rcd.pdf (noting the Commission lacks discretion to stray from determinations by "other expert agencies" of which equipment to include on the Covered List).

believe that the proposed reclassification is unnecessary to promote cybersecurity, national security and law enforcement interests. In fact, I believe that reclassification and a move to common carrier regulation of BIAS and providers will undermine the longstanding and effective cybersecurity and national security work capably done with other agencies and the private sector.

# Exhibit B

X[ĀRWĀYJ[]ĀJ\ĀY[X_RMRWPĀ]QNVĀLJYJKRURJRNWJXkRWN^OWMNRVXRNXWAJXQ`AeIRWOX[VJ]RXWĀ
\N[_RLN%fĀ

**)$Ā 2?;JEPĀ(EEĀ6?KIHG>?GLKĀ '%Ä!Ā;J?Ā0CD?EPĀ9KCGAĀLJBPĀC27ĀĀ?JPCC=?Ā4
8B?CJĀ)JH;><;G>Ā4JHNC>?J$Ā**

CN\YXWMNW]\Ā`N[NĀJU\XĀ\^[_NbNMĀJKX^]Ā7@DĀ]XĀJWWMĀJOPRWĀMMN[ĀXOĀ]QNĀ
]NLQWXUXPb%ĀĀ4\Ā\QX`WĀRWĀ9RP^[NĀ)#\YXWMNW]\Ā!(. "ĀLX^UMĀRMNW]ROb]ĀQNĀO^W
]QJ]Ā7@DĀYN[OX[V\1ĀLXW_N[]RWPĀ]QNĀWJVNĀXOĀJĀXNARWNAKRWJXQJĀRKNW]RORN\Ā]Q
\YNLRORLĀ<BĀJMM[N\\ĀXOĀJĀLXVY^]N[Ā\N[_N[%ĀMNQWĀNWJRWXRWĀA^NXX,"ĀX[Ā
LQX\NĀJĀO^WL]RXWJUR]bĀ]QJ]ĀR\ĀWX]Ā7@D#Ā\^LQĀJ\ĀLXWRRLVbĀRWPĀXQNĀRQNĀRW]N[WN
!(* "#ĀNW\^[RWPĀLXVY^]N[\ĀJWMĀWN]`X[TĀNZ^RYVNWĀJXX[NĀYAKXĀWPĀXOXO]`J[NĀ
!() "#ĀX[ĀKUXLTRWPĀ^WJ^]QX[RcNMĀJLLN\\ĀKbĀQJLTN[\Ā!() "%Ā

EQNĀ[N\YXWMNW]\Ā`QXĀLX[[NL]UbĀRMNW]RORNMĀJĀN\YXWMĀJ]RXWĀJQNĀXOĀ7
[N\YXWMNW]\"Ā`N[NĀ]QNWĀJ\TNMĀ`QRLQĀ7@DĀ\N[_RLNĀQNbĀX\NĀYXO^UJW\`N[Ā
`J\Ā]QNĀ7@DĀ]QJ]ĀLXVN\Ā`R]QĀ]QNĀK[XJMKJWMĀ\N[_RLNĀ]QNbĀJLKXĀ^VĀWX]Ā\^[NfĀ
!+%( "%ĀĀĀ

EQN\NĀ[N\^U]\Ā\^PPN\]Ā]QJ]Ā0) ĀXOĀ]QNĀ[N\YXWMNW]\ĀMXĀJ]ĀQNĀ\QXIMĀ]QNbĀ
J[NĀ^\RWPĀ]QNR[Ā<DBĀY[X_RMN[g\Ā7@DĀJ\Ā`NUUĀJ\ĀQXĀQJ_NĀMXWXĀJWMĀ]QX\NĀ
`QXĀTWX`Ā`QJ]ĀR]ĀMXN\ĀK^]ĀJ[NĀWX]Ā\^[NĀ`QRLQĀ7@DĀRWPĀQNĀRNĀdĀY[X_RMN[g\Ā
7@D%ĀĀ4ĀLXW\^VN[ĀWNNM\Ā]XĀJTNĀJOOR[VJ]R_NĀJLRXWĀJRĀQXWĀJWQXX[TĀ^\N%ĀĀ
6XW\^VN[\Ā`QXĀMXĀWX]ĀTWX`Ā`QJ]Ā7@DĀMXN\ĀJ[NĀ^WLNRTNUbĀ]XĀJJWMĀLXW\^VN[\Ā
`QXĀJ[NĀWX]Ā\^[NĀ`QJ]Ā7@DĀ]QNbĀ^\NĀJ[NĀ^WURTNUbĀ]XĀJWMĀJMNĀ\^

***$Ā (<HMLĀ8OH#8BCJ>KĀLHĀ8BJ??#5M;JL?JKĀH@Ā6?KIHG>?GLKĀ=BHE>Ā0CD?E
)JH;><;G>Ā4JHNC>?JKĀCGĀ6?KIHGK?Ā8HĀ)EH=DCGA"Ā8BJHLLECGA"ĀHJĀ4;
4JCHJCLCQ;LCHG$Ā**

EQNĀ\^[_NbĀJU\XĀJ\TNMĀ[N\YXWMNW]\ĀJĀ\N[RN\ĀXOĀZ^N\]RXW\ĀJKX^]ĀXOĀ
\`R]LQRWPĀK[XJMKJWMĀY[X_RMN[\Ā\QX^UMĀ]QNbĀXWQXRVĀJLN\\ĀXWĀ#ĀQLUMRWPĀ
KUXLTRWPĀJLLN\\Ā]XĀ`NK\R]N\ĀX[ĀJYYURLJ]RXW\#ĀĀUX[ĀLNN]RXWĀ`NK\R]N\ĀX[Ā
\YNNMRWPĀ^YĀ\XVNĀ`NK\R]N\ĀK^]ĀWX]ĀJUUĀ\^LQĀ\R]N\%ĀĀĀ

4\Ā\QX`WĀRWĀ9RP^[NĀ*#ĀKN]`NNWĀ-, ĀJWMĀ.+ ĀXOĀ[N\YXWMNW]\ĀJ[NĀ^ReĀJMĀ]bĀ
URTNUbfĀX[Āe\XVN`QJ]ĀURTNUbfĀ\`R]LQĀY[X_RMN[\ĀRWĀ%ĀNĀYXW\NĀ]XĀJWbĀXWĀXOĀ]QJW
ORO]QĀ!)'%- "ĀXOĀ[N\YXWMNW]\ĀJRMĀ]QJ]Ā]QNbĀ`X^UMĀ\`R]LQĀRWĀ[N\YXW\NĀ]XĀ

———————————————Ā

ÄĀ4<9ĀB9C79@E5;9DĀ8=D7FDD98Ā=@ĀE<9ĀE9IEĀ5@8ĀD<9AĀ5<9ĀF9ĀEA9<8ĀĀ8F9ĀEAĀCAF@8=@;$

ÄĀ0@Ā75>7F>5E=@;ĀE<9Ā)'ÄĀ:=;FC9"ĀH9Ā9I7>F898ĀE<9Ā'C9DBA@89@EDĀ8=8ĀFD=@;ĀL35:9-5'Ā=5MĀ,13Ā
=@G9@E98Ā,13ĀD9CG=79Ā89D=;@98ĀEAĀ9@DFC9Ā96=F9DĀ5@8Ā9DD9@E=5ĀD9>97E98Ā6JĀ?AC9Ā
C9DBA@89@EDĀE<5@Ā:AFCĀ6A@5Ā89A8Ā2B9@Ā13Ā78.F5C8+A@ECA>,"Ā5@8Ā19IE,13$ĀĀ4<9ĀA@>JĀ6A@5Ā
:=89Ā5>E9C@5E=G9Ā,13ĀD9CG=79DĀD9>97E98Ā?AC9ĀE<5@ĀA@9Ā5;9Ā5?A($%Ä!Ā5@8Ā+>AF8:>5C9Ā
&$'Ä!$ĀĀ/AH9G9C"Ā=@ĀAFCĀ9IB9C=9@79"Ā7A@DF?9CDĀA@9Ā5A>D99ĀA5>958DĀEAĀ5@ĀAG9C#D9>97E=A@ĀA
5@JĀ5@DH9CĀE<5EĀ=@7>F89DĀ.AA;>9$ĀĀ

NJLQĀXOĀ]QNĀQbYX]QN]RLJUĀJL]RXW\%ĀĀ4WMĀ [illegible]
]QJ]Ā]QNbĀ`N[NĀeWX]ĀJ]ĀJUUĀURTNUbfĀ]XĀ\`R]LQ [illegible]

**..$Ā 7MJN?PĀ1?LBH>HEHAPĀ;G>Ā6?KIHG>?GLĀ+?FHAJ;IBC=KĀ**

Ā EQNĀ\^[_NbĀ[N\^U]\ĀMR\L^\\NMĀQN[NĀ`N[NĀXK]JRW [illegible]
;XVNĀ5[XJMKJWMĀJWMĀHR[NUN\\Ā6XW\^VN[ĀB^U\NĀ\]^MR [illegible]
`NNTUbĀKJ\R\Ā^\RWPĀ]QNĀXWURWNĀD^[_NbĀ?XWTNbĀX [illegible]
bNJ[%ĀĀEQNĀYJ[]RL^UJ[Ā[N\^U]\ĀMR\L^\\NMĀQN[NĀ`N [illegible]
KN]`NNWĀ7NLNVKN[Ā))ĀJWMĀ)+#Ā)')*%ĀĀĀĀĀ

Ā <WĀ]X]JU#Ā]QNĀ\^[_NbĀ[NJLQNMĀ('#++-Ā[N\YXWMNW [illegible]
NaLU^MNMĀO[XVĀ]QNĀJWJUb\R\ĀKNLJ^\NĀ]QNbĀMRMĀWX [illegible]
]QNĀ[N\YXWMNW]ĀV^\]ĀL^[[NW]UbĀ\^K\L[RKNĀ]XĀKXJ [illegible]
cRYĀLXMNĀ`QN[NĀ]QNĀK[XJMKJWMĀY[X_RMN[Ā]QNbĀ\ [illegible]
\N[_RLN2Ā!*"Ā]QNĀ[N\YXWMNW]ĀMRMĀWX]ĀLXV [illegible]
]QJWĀ]QNĀVJaRV^VĀ]RVN2ĀJWMĀ!+"ĀJWbĀ[N\YXWM [illegible]
RMNW]RORNMĀ]QNĀQXVNĀRW]N[WN]ĀPJ]N`JbĀ]QN [illegible]
[NOUNL]Ā]QNĀJW\`N[ĀXOĀ]QNĀ-#/((Ā[N\YXWMNW] [illegible]

Ā 4\Ā\QX`WĀRWĀ9RP^[NĀ,#Ā]QN\NĀ-#/((Ā[N\YXWMNW] [illegible]
JUXWPĀV^U]RYUNĀMRVNW\RXW\%ĀĀCN\YXWMNW [illegible]
OJUURWPĀKN]`NNWĀJPN\Ā*'ĀJWMĀ-'Ā!-, "#ĀK^]ĀJ]Ā [illegible]
JWĀJUVX\]ĀNZ^JUĀ\QJ[NĀ`N[NĀKN]`NNWĀ(/ĀJWMĀ) [illegible]
`N[NĀJUVX\]ĀNZ^JUUbĀ\YUR]ĀJVXWPĀ^[KJWĀ!*+ "#Ā\ [illegible]
]N[V\ĀXOĀRWLXVN#Ā\^[_NbĀYJ[]RLRYJW]\Ā[JWPNM [illegible]
KN]`NNWĀ,'#"'ĀJWMĀ("#"'&bNJ[Ā!(/%0 "#Ā]XĀVX[NĀQ [illegible]
MNLURWRWPĀ]XĀJW\`N[%ĀĀ4WM#ĀJ\Ā\QX`WĀRWĀ [illegible]
JWMĀ]QNĀ7R\][RL]ĀXOĀ6XU^VKRJ%ĀĀĀ

Ā 9RWJUUb#ĀJ\Ā\QX`WĀRWĀ9RP^[NĀ.#Ā]QNĀ\^[_Nb [illegible]
K[XJMKJWMĀY[X_RMN[\%ĀĀ;JUOĀXOĀ]QNĀ[N\YXWM [illegible]
EQJ]ĀP[X^YĀ[NYX[]NMĀJĀ`RMNĀ_J[RN]bĀXOĀ\YNNM [illegible]
:KY\%Ā

**...$Ā (<HMLĀLB?Ā7MJN?PĀ(MLBHJKĀ**

Ā CXPN[Ā8W]WN[ĀQJ\ĀUXWPĀMN_NUXYNMĀJĀOXL^\Ā [illegible]
NaYN[RNWLN%ĀĀ;R\Ā`X[TĀQJ\ĀKNNWĀLR]NMĀRWĀ\ [illegible]
6XWP[N\\ĀJWMĀKbĀ]QNĀHQR]NĀ;X^\Ng\Ā6X^WLRUĀXO [illegible]
6XWP[N\\ĀRWĀ)'(.ĀXWĀ]QNĀRVYJL]ĀXOĀ]QNĀ`R[NU [illegible]
JU\XĀ`[R]]NWĀW^VN[X^\ĀRWOU^NW]RJUĀ]NUNLXVV [illegible]
J\ĀJWĀNaYN[]ĀRWĀ\N_N[JUĀUJ[PNĀONMN[JUĀ]NUN [illegible]
4WJUb]RL\ĀRWĀ)'((#ĀQNĀ\N[_NMĀJ\Ā]QNĀDNWRX[Ā [illegible]
ENUNLXVĀB[JL]RLNĀXOĀEQNĀ@RNU\NWĀ6XVYJWb#Ā [illegible]
RWĀLXW\^U]J]RXWĀ`R]QĀJĀ`RMNĀ[JWPNĀXOĀNUN [illegible]
GRLNĀB[N\RMNW]#Ā6XVV^WRLJ]RXW\ĀDNL]X[ĀJ]Ā<4: [illegible]

*Ā

]QNĀGRLNĀB[N\RMNW]ĀXOĀENUNLXVĀJ]Ā]QNĀ[N\NJĀLQĀYWĀMĀWLXĀQNJJĀRWWPĀORRNUN\\Ā
LJ[[RN[Ā[N\NJ[LQĀJ]ĀQNĀIJWTNNĀ:[X^Y#ĀOXL^\RWĀ̄ĀRWWĀGXĀQĀXN\RJWĀR̄ R[NUN\\Ā
UJWMˉLJYNĀJWMĀLXWˋ^VN[Ā][NWM\%ĀĀ?[%Ā8W]WNĀX[^ĀLˉNR[̄ENMˉIWRˉQĀ%ĀB]X4%̄ĀO
FWR_N[\R]bĀRWĀ7%6%ĀJWMĀJĀ5%4%ĀRWĀ5^\RWN\\ĀĀ̄ĀNJHWˉRUJ[ĀXNWWO[XVMĀJĀQĀRWĀ
8MRˉWK^[PQ#ĀF=#ĀO[XVĀ`QRLQĀQNĀJU\XĀQJ\ĀJWĀ;WWKRˉNĀLNĀLJ4X[J]NĀXOĀ

Ā  7XWĀ=NUUXPPĀR\ĀB[N\RMNW]ĀJ]ĀCNLXWĀ4WJUbĀRLJ[\%ĀĀXQ_ĀNĀˉQNJ̄[NWĀĀNĀb
LXW\^U]RWPĀ`R]QĀ]NUNLXVĀLJ[[RN[\#Ā@QJ_RWPĀ̄X[DXWW̄VRˉQQĀAˉ[SXˉN]ĀX[UˉX_RMN[̄RMN[\̄ RMN[\̄ RMN[̄JˉĀ
@N^\JJ[#Ā@ARNU\NWĀJWMĀENUNYYQRJ%ĀĀ4]ĀCNLXWĀ̄ĀOXLˉUˋbˉRX^Wˉ%̄%̄X^M^UJˉZˉJˉPˉPˉNJ[LQĀ
JWMĀMN_NUXYVNW]#ĀJ\Ā`NUUĀJ\ĀMJ]JĀJWMĀY[XMˉ̄Ā JˉˉRˉWˉĀNˉˉ%6ˉQQ̄KˉACˉNˉDˉXˉX̄M^L]\%
=NUUXPPĀP[JM^]NMĀO[XVĀ6JUROXˉX[WRJĀD]J]NĀFWˉRˉˉ̄[ˉRˉˉ%6ˉˉAˉRQˉĒĀXˉ̄WˉRˉQĀ?J[TN]RWP%Ā

Ā  5[N]]Ā6UJ[TĀR\ĀGRLNĀB[N\RMNW]ĀJWMĀ4WJUbˉ]ĀJˉRˉ%ˉJˉˉCNˉUˉJˉXWWˉPˉN4ˉWˉNˉUˉˉ RˉW%̄Ā
4WJUbˉ]ĀRL\g\Ā`NNTUbĀĀ?XKRUNJJWMĀ;XVNĀ5[XJMKJWMĀ̄ĀKWW\ĀRKWˉ[Ā̄NJˉBNˉUNˉ̄ĀXˉ[YRWPĀJWMĀ
Y^KUR\QRWPĀ]QNĀˉ\]^MRNW#ĀJ\Ā`NUUĀJ\ĀJWJWJUbccRWˉ̄PˉAˉ]̄QNJ̄WNˉ̄Wˉˉ[%4X̄V̄ĀĀ̄?[%Ā6UJ[TĀTĀ
P[JM^]NMĀO[XVĀ]QNĀ>NJ_bĀADLQXXUĀXOĀ5^\RWN\\Ā̄Āˉ NJˉ̄RˉˉJˉˉWˉĀJˉˉ6UJ[JˉˉFWR_ˉ

# Figure 1: Customer Perception of Capabilities Broadband Services Allow You to Perform



**Customer Perception of Capabilities Broadband Services Allow You to Perform**
Q: Which of the following does your broadband service offer the capability to perform? Select all that apply
Study Timeframe: 12/22/23 – 12/24/23 , n = 6,811*

# 92%
of broadband subscribers
selected at least one
information services option

Solely information service options
(1 or multiple) — 59%

Telecom option +
at least 1 information service option — 33%

Solely Telecom option — 8%

*Sample is based on Home Broadband subscribers across the US



RECON
ANALYTICS

# Figure 2: 92% of Broadband Subscribers Are Using Their ISP-Provided DNS Service



**What Does DNS Do?**
Q: In the context of broadband service, what does DNS do?
Study Timeframe: 12/22/23 – 12/24/23 ; n = 6,811*

■ Incorrect response   ■ Correct response

| Response | % |
|---|---|
| Converts the name of a website into a series of numbers that identifies a specific computer server | 17% |
| I'm not sure | 45% |
| Encrypts the information you send over the internet to prevent others from viewing your sensitive information | 13% |
| Checks to make sure that your home network and computers are running the most up-to-date versions of your software | 12% |
| Blocks unauthorized access to your computer by hackers or others seeking to access data on your computer | 12% |

**What DNS Service Do You Use at Your Home?**
Q: (asked to those who properly identified what DNS does) What DNS service do you use at home?
Study Timeframe: 12/22/23 – 12/24/23 ; n = 6,733**

| Response | % |
|---|---|
| Do not know what DNS is | 83.5% |
| The one that comes with my broadband service | 4.8% |
| I'm not sure | 4.1% |
| Google DNS | 3.0% |
| Cloudflare | 1.2% |
| OpenDNS | 1.0% |
| AdGuard | 0.9% |
| ControlD | 0.5% |
| NextDNS | 0.5% |
| Quad9 | 0.4% |

# 92%
of broadband subscribers are using ISP-provided DNS service

*Sample is based on Home Broadband subscribers across the US
**Sample excludes the 78 respondents that chose SafeFamily, which is not a real DNS service.


RECON
ANALYTICS

**App. 1565**

# Figure 3: Broadband subscribers have a high probability of switching if ISPs took measures against certain sites/apps



**Likelihood to Switch ISPs if Following Actions were Taken by Current ISP**

Q: How likely would you be to switch from your current broadband provider to a different broadband provider if your current provider took one of the following actions?
Study Timeframe: 12/2/23 –12/24/23 ; n = 6,811*

- Very likely
- Somewhat likely
- Somewhat unlikely
- Not at all likely

**74% would likely switch** — Slows down internet speeds for your favorite websites, so that the webpage loads slowly
- 48%
- 26%
- 14%
- 12%

**72% would likely switch** — Prevents your favorite applications installed on your device from working
- 54%
- 18%
- 13%
- 15%

**72% would likely switch\*\*** — Blocks you from accessing your favorite websites
- 54%
- 17%
- 12%
- 17%

**70% would likely switch** — Provides faster loading for websites that agree to pay your broadband provider, while slowing down internet speeds for websites that do not pay your broadband provider
- 42%
- 27%
- 16%
- 14%

**65% would likely switch** — Provides faster loading for websites that agree to pay your broadband provider, while internet speeds remain the same for websites that do not pay your broadband provider
- 34%
- 31%
- 20%
- 15%

*Sample is based on Home Broadband subscribers across the US
\*\*Distributions may not sum exactly due to rounding
Actions ordered by % that selected Somewhat-to-Very Likely

RECON ANALYTICS

3

**App. 1566**

# Figure 4: Survey Questions – 12.22.2023 - 12.24.2023

1.  Which of the following does your broadband service offer the capability to perform? Select all that apply  *[options presented in a random order]*

    *   Retrieve, acquire, or use information on websites
    *   Store photos and files in the cloud
    *   Make information available to other people through social media
    *   Generate, transform, or process your own information or others' information
    *   Transmit information between or among points of your choosing, without changing the information's form or content

2.  In the context of your broadband service, what does DNS do? *[first four options presented in a random order]*

    *   Converts the name of a website into a series of numbers that identifies a specific computer server.
    *   Blocks unauthorized access to your computer by hackers or others seeking to access data on your computer.
    *   Checks to make sure that your home network and computers are running the most up-to-date versions of your software.
    *   Encrypts the information you send over the internet to prevent others from viewing your sensitive information.
    *   I'm not sure

3.  *(received only if Q2 answered correctly)* What DNS service do you use at home? *["I'm not sure" listed last, other options presented in a random order]*

    *   The one that comes with my broadband service
    *   Cloudflare
    *   NextDNS
    *   Google DNS
    *   OpenDNS
    *   ControlD
    *   Quad9
    *   AdGuard
    *   SafeFamily
    *   I'm not sure

RECON
ANALYTICS

5

# Figure 4: Survey Questions – 12.22.2023 - 12.24.2023

4.  Using the scale below, how likely would you be to switch from your current broadband provider to a different broadband provider if your current provider took one of the following actions?

1 = Not at all likely
2 = Somewhat unlikely
3 = Somewhat likely
4 = Very likely

*   Blocks you from accessing your favorite websites
*   Slows down internet speeds for your favorite websites, so that the webpage loads slowly
*   Provides faster loading for websites that agree to pay your broadband provider, while internet speeds remain the same for websites that do not pay your broadband provider.
*   Provides faster loading for websites that agree to pay your broadband provider, while slowing down internet speeds for websites that do not pay your broadband provider.
*   Prevents your favorite applications installed on your device from working


RECON
ANALYTICS

# Figure 5: Respondent Pool Overview – Demographics

### Demographics

| Age | Distribution |
|---|---|
| 18-29 | 17.1% |
| 30-44 | 32.6% |
| 45-60 | 32.4% |
| > 60 | 17.8% |
| Sample | 6,811 |

| Income | Distribution |
|---|---|
| < $50K | 35.2% |
| $50K - $100K | 31.0% |
| $100K - $150K | 18.9% |
| $150K+ | 10.4% |
| Prefer not to answer | 4.6% |
| Sample | 6,811 |

| Urbanicity | Distribution |
|---|---|
| City | 33.7% |
| Suburban | 29.4% |
| Rural | 36.8% |
| Sample | 6,811 |

RECON
ANALYTICS

# Figure 6: Respondent Pool Overview – Distribution by State

| State | Distribution |
|-------|-------------|
| Alabama | 1.3% |
| Alaska | 0.04% |
| Arizona | 1.7% |
| Arkansas | 0.6% |
| California | 12.7% |
| Colorado | 1.3% |
| Connecticut | 1.2% |
| Delaware | 0.3% |
| District of Columbia | 0.2% |
| Florida | 6.8% |
| Georgia | 3.1% |
| Hawaii | 0.4% |
| Idaho | 0.3% |
| Illinois | 4.2% |
| Indiana | 2.0% |
| Iowa | 0.5% |
| Kansas | 0.8% |
| Kentucky | 1.0% |
| Louisiana | 0.9% |
| Maine | 0.3% |
| Maryland | 1.3% |
| Massachusetts | 2.0% |
| Michigan | 3.2% |
| Minnesota | 1.1% |
| Mississippi | 0.6% |

| State | Distribution |
|-------|-------------|
| Missouri | 1.5% |
| Montana | 0.1% |
| Nebraska | 0.3% |
| Nevada | 1.1% |
| New Hampshire | 0.4% |
| New Jersey | 2.8% |
| New Mexico | 0.4% |
| New York | 13.4% |
| North Carolina | 2.6% |
| North Dakota | 0.1% |
| Ohio | 3.6% |
| Oklahoma | 1.0% |
| Oregon | 1.2% |
| Pennsylvania | 4.1% |
| Rhode Island | 0.3% |
| South Carolina | 1.2% |
| South Dakota | 0.2% |
| Tennessee | 2.1% |
| Texas | 8.1% |
| Utah | 0.9% |
| Vermont | 0.1% |
| Virginia | 2.1% |
| Washington | 2.1% |
| West Virginia | 0.5% |
| Wisconsin | 1.9% |
| Wyoming | 0.04% |



RECON
ANALYTICS

# Figure 7: Respondent Pool Overview – ISP Information

## ISP Information

| Current ISP | Distribution |
|---|---|
| Xfinity / Comcast | 24.3% |
| Spectrum / Charter | 22.3% |
| AT&T Fiber | 7.5% |
| Verizon Fios | 6.0% |
| AT&T Internet (U-verse or DSL) | 5.6% |
| T-Mobile Fixed Wireless | 4.3% |
| Cox | 4.3% |
| Verizon Fixed Wireless | 4.0% |
| CenturyLink | 3.0% |
| Optimum / Altice / Suddenlink | 2.4% |
| Frontier | 1.9% |
| Google Fiber | 0.60% |
| Windstream | 0.50% |
| MediaCom | 0.47% |
| WOW! | 0.30% |
| Breezeline | 0.30% |
| Hughesnet | 0.29% |
| Other | 11.94% |
| Sample | 6,811 |

| Home Internet Speed | Distribution |
|---|---|
| < 100 Mbps | 13.3% |
| 100 to 199 Mbps | 12.6% |
| 200 to 499 Mbps | 17.8% |
| 500 to 999 Mbps | 11.2% |
| 1+ Gbps | 15.7% |
| I don't know | 29.3% |
| Sample | 3,419* |

*Sample for Home Internet Speed is lower than the overall analysis sample (6,811) due to being asked in only one of the two fielded surveys


RECON ANALYTICS



March 22, 2024

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

Re: Notice of *Ex Parte* Presentation, *Safeguarding and Securing the Open Internet* (WC Docket No. 23-320); *Restoring Internet Freedom* (WC Docket No. 17-108); *Bridging the Digital Divide for Low-Income Consumers* (WC Docket No. 17-287); *Lifeline and Link Up Reform and Modernization* (WC Docket No. 11-42)

Dear Ms. Dortch:

As CTIA and USTelecom have explained in multiple filings in this proceeding, DNS and caching are integral parts of our members' broadband internet access service ("BIAS") offerings and require classifying those offerings as information services under the Communications Act.[1] Title II proponents questioned that showing in their reply comments, but their arguments misconstrue the facts, misstate the law, or both.

**DNS.** Some Title II proponents argue that DNS is not "inextricably intertwined" with ISPs' BIAS offerings, because customers can choose to use third-party providers' DNS servers instead of their ISP's DNS servers.[2] Those commenters get the law wrong by assuming that information service parts of an offering can be ignored unless it is literally impossible for them to be disaggregated from the finished retail offering. Instead, the statutory definition of an "information service" turns on what the ISP "offers" to subscribers.[3] And the Supreme Court explained in *Brand X* that "[i]t is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product."[4] Thus, the question is whether components of an offering are "sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering."[5] As the

---

[1] *See* CTIA Comments at 49-50, 64, 80-82; Declaration of Peter Rysavy ¶¶ 17-32 ("Rysavy Decl.") (Ex. B to CTIA Comments); CTIA Reply Comments at 36-40; USTelecom Comments at 17-22; USTelecom Reply Comments at 7-9.

[2] *See* Free Press Reply Comments at 8; Peha DNS Reply Comments at 2; Jordan Reply Comments at 23.

[3] 47 U.S.C. § 153(24).

[4] *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 990 (2005).

[5] *Id.*

Supreme Court noted, it would make no sense to say that engines are not an integrated part of the cars offered to consumers — even though a sophisticated consumer can replace the engine.[6] The same is true of all sorts of aftermarket options that exist. The ability to replace the seat on a bicycle or the memory in a computer does not mean that consumers view them as discrete products that are not integrated parts of the bicycle or computer they purchase.[7]

ISPs' DNS service is integrated into their retail BIAS offerings and thus properly considered when determining whether BIAS satisfies the statutory "information service" definition. That is because, without DNS, customers' BIAS service would not work: their emails would not send, their browser would not load web pages, and the videos they want to watch would not stream. If BIAS providers did not integrate pre-configured primary and secondary DNS servers in their offerings, hundreds of millions of Americans would have to choose — and correctly set up — both a primary and a secondary DNS server on their home router or on their smartphones, tablets, and hotspots before the fixed or mobile BIAS service they bought could function. As Peter Rysavy notes, while this step is one a tech-savvy user may undertake, it "is not one that an average user understands or is inclined to pursue."[8]

As they should, consumers expect BIAS to work "out of the box" — integrated DNS service is essential for that to happen. That is why ISPs not only include DNS as an integrated part of their BIAS offerings, but also invest heavily in their own DNS offerings. This investment includes ensuring sufficient capacity and redundancies to handle consumers' demands, but also adding new features like encryption and malware protection to optimize customers' experience.[9]

Title II proponents overstate the extent to which consumers choose to replace the DNS servers integrated into their BIAS offerings with third-party alternatives. Jon Peha points to an IBM study that found extensive use of third-party DNS providers.[10] But that study did not look at what customers were choosing to do; it looked at which DNS servers were receiving requests for information.[11] That matters because Internet of Things ("IoT") devices that consumers attach to their home networks routinely hardcode the manufacturer's chosen DNS servers into their equipment, thus bypassing the ISP's integrated DNS servers.[12] IoT devices' usage of third-party

---

[6] *See id.*

[7] *See* USTelecom Comments at 17-19.

[8] Rysavy Decl. ¶ 29. The same is true of Free Press's claim (Reply at 11-12) about VPNs, which similarly replace the ISP-provided DNS servers, but with remotely selected DNS servers (those the VPN provider chooses). The fact that some customers might choose this says nothing about whether ISPs integrate DNS into their retail BIAS offerings.

[9] *See, e.g.*, NCTA Comments at 42. That ISPs integrate DNS to optimize the customer experience is one reason (among many) that DNS does not fall within the telecommunications management exception. *See id.* at 44-45; CTIA Comments at 64; USTelecom Comments at 20-22.

[10] *See* Peha DNS Reply at 2 (citing NS1, *Global DNS Traffic Report – Insights into the Health of Networks in 2023* ("IBM Study"), https://resources.ns1.com/global-dns-traffic-report-march-2023).

[11] *See* IBM Study at 2.

[12] *See* M. Hammad Mazhar & Zubair Shafiq, *Characterizing Smart Home IoT Traffic in the Wild* at 1-2 (2020), https://arxiv.org/pdf/2001.08288.pdf.

**App. 1573**

DNS servers does not reflect any choice by consumers to replace the integrated DNS servers in the BIAS they purchased. In addition, IoT devices can make constant DNS queries, increasing the relative usage of the alternative DNS servers the IoT manufacturer chose. The Google Home device, for example, sends DNS queries — to Google's own DNS servers — around the clock.[13] The IBM study makes no effort to distinguish IoT manufacturers' choices from consumers' choices. The IBM study therefore does not meaningfully address what consumers perceive as the finished service that BIAS providers offer them.

Mozilla cites a different study,[14] which also overstates the extent to which American consumers are choosing to replace their ISP's DNS servers with an alternative. This study only included data from people (predominantly Europeans) who voluntarily chose to apply for — and who were approved to receive — a RIPE Atlas probe to add to their local area network.[15] As the survey's authors acknowledge, their results are "biased by the population of RIPE Atlas probe hosts (who typically have networking experience)," so their results are "likely not fully representative of the general population."[16] If anything, the fact that 72% of sophisticated RIPE Atlas users worldwide are relying on their ISP-provided DNS service strongly suggests that very few ordinary American consumers are replacing their ISP-provided DNS.

Indeed, the record contains survey evidence of more than 6,800 Americans showing that 92% of U.S. BIAS consumers — nearly all of whom do not even know what DNS does — are likely using their ISP-provided DNS.[17] This survey evidence lacks the flaws in the studies Peha and Mozilla cite. And consistent with this evidence, major ISPs are processing trillions of DNS queries every day.[18]

We also explained that ISPs enable a DNS extension known as EDNS Client Subnet ("ECS") so their DNS servers resolve consumers' DNS queries with the optimal response based on where that consumer is located.[19] Along with ISPs' efforts to cache popular content in locations nearby their consumers, ECS ensures that consumers using their ISP's DNS service receive the best possible performance when, for example, watching streaming video. Mozilla

---

[13] BlueCat, *What DNS Data Says About IoT Devices in Your Home*, https://bluecatnetworks.com/blog/what-dns-data-says-about-iot-devices-in-your-home/.

[14] *See* Mozilla Reply Comments at 10 (citing Trinh Viet Doan *et al.*, *Evaluating Public DNS Services in the Wake of Increasing Centralization of DNS*, June 21-24, 2021, https://dl.ifip.org/db/conf/networking/networking2021/1570700957.pdf).

[15] RIPE Atlas Docs, *Become a RIPE Atlas Probe Host*, https://atlas.ripe.net/docs/getting-started/become-a-host.html.

[16] Doan at 8. The IBM study Peha cites reports that Europeans use third-party DNS servers "far more often than in other places," including the United States. IBM Study at 7.

[17] *See* Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results* at 2 (Exhibit B to USTelecom Reply Comments), https://www.fcc.gov/ecfs/document/10117636723266/3.

[18] *See* Rysavy Decl. ¶ 30.

[19] *See*, *e.g.*, *id.* ¶ 25; USTelecom Comments at 17-19.

**App. 1574**

concedes that an ISP's implementation of ECS can offer performance benefits to consumers.[20] While Mozilla notes that some third-party DNS providers, like Google, also implement ECS,[21] it does not dispute that consumers lose the benefits that their ISPs' ECS provides if they switch to alternative DNS servers.[22] And while Google may be able to use ECS information to point users to the optimal location of Google's own content, Google will lack comprehensive knowledge of the location of all the cached content within an ISP's network.

**Caching.** Title II proponents do not seriously dispute that the caching ISPs provide is an information service; it enables access to stored information. Nonetheless, some of them continue to assert that, with the widespread implementation of HTTPS encryption for internet traffic, ISPs no longer can engage in "transparent" caching — that is, caching copies of popular content to deliver it more quickly to consumers.[23] They are wrong. As Mozilla's own website explains, even when a website uses HTTPS, an ISP can still see the top level of a website.[24] ISPs can — and do — use that information to cache *entire* websites, so they can resolve requests for pages associated with that website to the cached content to deliver it to consumers more quickly.[25] This is the same kind of caching that *Brand X* found inextricably integrates an information service into BIAS providers' offerings to consumers, making it an information service.[26]

And ISPs have gone beyond this transparent caching to collocate content delivery networks ("CDNs") within their networks.[27] While this can take various forms — an ISP operating its own CDN, allowing third-party CDNs to collocate servers within the ISP's network, or allowing individual entities (like Netflix) to collocate servers within the ISP's network — in each case, it is the ISP that must work to ensure that its DNS servers direct consumers to the closest CDN for the best possible internet experience. This integrated information processing by the ISP is necessary for the collocated CDN to serve its purpose, which is true no matter who operates the collocated CDN.[28] And it is a benefit that consumers lose when switching to a third-party DNS provider. As Peter Rysavy explained — without contradiction from Title II proponents — a "third-party DNS doesn't have knowledge" of these CDNs and "will instead direct the user to an external site, creating unnecessary internet traffic,

---

[20] Mozilla Reply Comments at 10. That caching is employed to benefit consumers is one reason (among many) why caching does not fall within the telecommunications management exception. *See* CTIA Comments at 64; USTelecom Comments at 20-22; *see also* NCTA Comments at 44-45.

[21] *See* Mozilla Reply Comments at 10.

[22] *See* Rysavy Decl. ¶ 28.

[23] *See* Free Press Reply Comments at 10; Peha DNS Reply Comments at 3; Mozilla Reply Comments at 9.

[24] Dist://ed, *HTTPS and Your Online Security*, https://blog.mozilla.org/en/products/firefox/https-protect/ ("That means they can see that you regularly visit https://www.reddit.com, for example, but they won't see that you spend most of your time at https://www.reddit.com/r/CatGifs/.").

[25] *See*, *e.g.*, CTIA Comments at 50 & n.187; Rysavy Decl. ¶ 19.

[26] *Brand X*, 545 U.S. at 999-1000.

[27] *See* Rysavy Decl. ¶¶ 20, 28; USTelecom Comments at 19-20; NCTA Comments at 42.

[28] *See* Mozilla Reply Comments at 9 (noting that third parties operate some collocated CDNs); Peha DNS Reply Comments at 2 (same).

**App. 1575**

slowing response time, and undermining the user experience."[29] This is yet another way in which caching remains a fully integrated aspect of the finished retail service that ISPs offer their BIAS customers.

Finally, citing four wireless providers' web pages from mid-August 2017, Scott Jordan asserts that ISPs "routinely describe [their] caching practices as 'network management' practices."[30] He does not explain why, in early 2024, he is relying on versions of web pages that are more than six years old. But neither the old pages — or their current versions — support his assertion. AT&T's web page — then and now — does not mention caching. Instead, both discuss video optimization techniques meant to ensure that wireless network capacity is available to all users.[31] Verizon's webpage — then and now — mentions caching, but in that same video optimization context.[32] The transparent caching and collocated CDNs discussed above are not the video optimization that these webpages discuss. Jordan's citation to T-Mobile's webpage — which then and now only mentions caching one time, and each time with a reference only to "caching less data"[33] — is even farther afield. Finally, the August 2017 Sprint webpage that Jordan cites does mention "[c]ach[ing] web pages," but describes it as a "technique[] to improve overall web viewing experience," not as a network management technique.[34] A separate section of this old webpage discussed Sprint's reasonable network management techniques, but that section does not mention caching. Thus, none of the August 2017 webpages that Jordan cites — or their current versions — supports Jordan's assertion that ISPs "routinely describe" caching as a network management practice. And, as shown above, ISPs both engage transparent caching and collocate CDNs within their networks to improve consumers' experience.

In sum, even more so than at the time of *Brand X*, DNS and caching remain integral parts of providers' BIAS offerings, making those offerings information services under the Communications Act.

---

[29] Rysavy Decl. ¶ 28.

[30] Jordan Reply Comments at 24-25 & n.175.

[31] *See* AT&T, *Broadband Information*, https://about.att.com/sites/broadband/network; AT&T, *Broadband Information*, https://web.archive.org/web/20170819043936/https://www.att.com/gen/public-affairs?pid=20879 (Aug. 19, 2017). The Internet Archive's Wayback Machine does not have the August 16, 2017 versions of the web pages that Jordan references; we looked at the snapshot from the nearest date after the one Jordan cites.

[32] *See* Verizon, *Network Management*, https://www.verizon.com/about/our-company/network-management; Verizon, *Explanation of Video Optimization Deployment*, https://web.archive.org/web/20170818232618/https://www.verizonwireless.com/support/video-optimization/ (Aug. 18, 2017).

[33] T-Mobile, *Open Internet*, https://www.t-mobile.com/responsibility/consumer-info/policies/internet-service; T-Mobile, *Company Information*, https://web.archive.org/web/20170904014130/https://www.t-mobile.com/company/company-info/consumer/internet-services.html (Sept. 4, 2017).

[34] Sprint, *Open Internet Information*, https://web.archive.org/web/20171025025743/https://www.sprint.com/legal/open_internet_information.html (Oct. 25, 2017).

**App. 1576**

Respectfully submitted,

Nirali Patel
USTELECOM – THE BROADBAND
ASSOCIATION
601 New Jersey Avenue, N.W., Suite 600
Washington, D.C. 20001

/s/ Scott H. Angstreich
Scott H. Angstreich
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Counsel for USTelecom –*
*The Broadband Association*

Scott K. Bergmann
CTIA
1400 Sixteenth Street, N.W., Suite 600
Washington, D.C. 20036

/s/ Adam D. Krinsky
Adam D. Krinsky
Wilkinson Barker Knauer, LLP
1800 M Street, N.W., Suite 800N
Washington, D.C. 20036

*Counsel for CTIA*

**App. 1577**

# In Response to the FCC…

## George S. Ford, PhD[∗]

### April 18, 2024

On April 3, 2024, the Federal Communications Commission ("FCC") announced that it intends to vote on an item at its April Open Meeting which will reinstate, in large part, the FCC's controversial *2015 Open Internet Rules*.[1] Such action would reverse the Trump Administration's *2018 Restoring Internet Freedom Order* ("*RIFO*")[2]—which in turn reversed the *2015 Rules*[3]—and again regulate Broadband Internet Access Services ("BIAS") as a common carrier "telecommunications service" under Title II of the Communications Act of 1934. Such action fulfills a long-standing promise of the Biden Administration.[4]

Keeping with Commission past practices, the Commission released a draft of its order in anticipation of the April Open Meeting (hereinafter "*Draft Order*"), in which the agency outlines the basis of and rules for the reinstitution of Title II regulation for broadband services. Once again, the Commission appeals to the "virtuous cycle" hypothesis of investment, whereby the onerous, open-ended Title II regulation will (somehow) increase investment in telecommunications infrastructure. The *Draft Order* devotes an entire section to investment effects of Title II regulation, and concludes that "to determine whether Title II reclassification caused the change in investment, we would need to determine what investment would have been if Title II reclassification were not adopted."[5] Recognizing the need for counterfactual analysis is an important insight, and it is hoped this discipline will be a part of agency analysis going forward.

The *Draft Order* also states that few studies (three, in fact) have provided such a "rigorous," counterfactual analysis of the investment effects of Title II regulation, one of which was my 2018 paper that was published in the peer-reviewed journal APPLIED ECONOMICS entitled *Regulation and Investment in the U.S. Telecommunications Industry*, which was the foundation for the *RIFO Order*'s conclusion that Title II regulation poses a meaningful risk to telecommunications investment.[6] Notwithstanding the *Draft Order*'s acknowledgement of the rigor of my work (two of the three "rigorous" studies), the *Draft Order* dedicates several paragraphs and asserts "several issues" with my paper that lead the Commission "to give it no probative value in this proceeding,"[7] presumably because the evidence therein conflicts with intent to apply Title II regulation once more.

> *[U]sing the revised BEA data and selecting a valid control group plausibly meeting the model's assumptions, the investment effects are found to be large, negative, and statistically different from zero.*

In addition to the *Draft Order*'s critique of my APPLIED ECONOMICS paper, on April 11, 2024, after the *Draft Order* was released, Dr. Guilia McHenry of the Office of Economics and Analytics ("*OEA Letter*") submitted a letter into the docket which presents a brief discussion of

the Commission's efforts to replicate the findings in my paper using a revision of the Bureau of Economic Analysis' ("BEA") Fixed Assets tables used in my 2018 paper data.[8]  While the Commission's analysis using these revised data does indicate the "best guess" is that Title II reduced investment by about -6.2%, this estimate is much smaller than that reported in my 2018 paper (about -20%).

In this PERSPECTIVE, I review the Commission's effort to replicate my work and the *Draft Order*'s discussion of investment effects (among other things).  My analysis of the *OEA Letter* may be summarized as follows:  First, OEA's replication analysis erred because it used a control group which was selected based on the original BEA data.  Replication requires carrying out the "entire research process."  My analysis shows that the controls used by OEA do not abide by the model's assumptions.  Second, using the revised BEA data and selecting a valid control group plausibly meeting the model's assumptions, the investment effects are found to be large, negative, and statistically different from zero.  Third, using the revised BEA data and following the *Draft Order*'s recommended Synthetic Counterfactuals method, I also find large, negative and statistically significant impacts on investment. I likewise point out several internal inconsistencies in the *Draft Order*'s discussion of investment, including its criticisms of my recent paper *Investment in the Virtuous Circle: Theory and Empirics*, which uses USTelecom's investment series and the revised BEA data and finds negative effects on investment.[9]

### The OEA Letter

The *OEA Letter* presents a brief (barely two-pages) summary of the Commission's efforts to replicate the findings of my APPLIED ECONOMICS paper, which used a Difference-in-Differences ("DID") model to estimate the effects of the regulation on investment.  The *OEA Letter* focuses on BEA's scheduled revisions to its data, including the Fixed Assets tables upon which my work relied.  Almost all the BEA data are subject

to scheduled revisions.  Sometimes the changes are substantial, and in other cases immaterial.  It is natural to ask, as the BEA has before, "Why didn't you get it right the first time?"  To which the BEA responds, "It's not that the earlier estimate was wrong."[10]  The BEA data releases and revisions aim to balance accuracy and timeliness, and all such data are estimates subject to error.

> *[U]sing the revised BEA data and following the Draft Order's recommended Synthetic Counterfactuals method, I also find large, negative and statistically significant impacts on investment.*

Over the years, the Commission has used the BEA data for a variety of purposes, and those data were also subsequently revised.  For instance, the BEA data were used to set a cap on the Rural Health Care Program.[11]  Using the current and revised BEA data, the cap was set too low by $6 million, a small percentage change but nonetheless a large number.

While the *Draft Order* describes my work as one of two papers (ignoring my December 2023 *Investment in the Virtuous Circle* paper due to the Commission's apparent inability to compute a root mean square error which was used to construct a control group) that provides a "rigorous analysis of the effects on investment of net neutrality regulation or Title II reclassification with forbearance,"[12] the *OEA Letter* claims that the results of that paper do not survive the BEA's revisions.  In describing the Commission's analysis, the *OEA Letter* states, "staff replicated Dr. Ford's analysis exactly. Therefore, the difference in estimates is due solely to the data revision."[13]  This statement contains fallacies.

App. 1579

To see why, note that there is a difference between *reproduction* and *replication* in statistics. As explained by Nikolopoulou (2023):

(1) A research study is *reproducible* when the existing data is reanalyzed using the same research methods and yields the same results. This shows that the analysis was conducted fairly and correctly; and

(2) A research study is *replicable* (or repeatable) when the entire research process is conducted again, using the same methods but new data, and still yields the same results. This shows that the results of the original study are reliable.[14]

The *OEA Letter* does not include the results from a *reproduction* of my work. If the Commission downloaded and analyzed the BEA data from the Applied Economics paper (the 2016 BEA data) and conducted the same analysis therein, then it should obtain the same results as reported in my paper. I did so, and the results are the same.[15] There is no claim from OEA that my work was done incorrectly.

Likewise, the Commission's effort falls short of replication. While it used the revised BEA data (a new dataset), the Commission failed to perform the "entire research process" again. This is OEA's critical error: the "entire research process" includes finding a suitable set of controls for the new data (which may or may not be the same as with different data). The revisions to the BEA data result in material changes to telecommunications investment and most of the controls. Such changes demand an assessment of the continued validity of the control group in the new data. This the Commission did not do, and had it done so it would have found that with the revised data the old controls no longer meet the assumptions of the econometric model. As such, the *OEA Letter* contains neither reproduction nor replication, and is thus scientifically invalid and non-probative.

*Empirical Framework*

When applying DID analysis, it is necessary to choose a control group to serve as a counterfactual. It is essential that the selected control group for the industries of interest plausibly satisfy the parallel paths (or common trends) assumption, where the investment of the control group serves as a reliable counterfactual for the treated group during the treatment period.[16] This role of the counterfactual is all that is required—the data making up the counterfactual can be obtained almost anywhere so long as they are up to that task. Even combinations of unlike industries may serve as a valid control (such as aggregations of sub-industries into larger industry groups) if their inclusion satisfies the parallel paths assumption.[17] Also, it is the conditional mean of the control group that is of interest, not simply the raw individual series.[18] Visual inspection of the individual series, however, offers insights into whether the conditional mean may meet the requirements of a DID Model, both in terms of overall trends and slope changes near the treatment date.

Thus, the *Draft Order*'s criticisms of my control group reflect a misunderstanding of the requirements of DID models.[19] In fact, the *Draft Order* rebuts itself on this criticism by stating the method of Synthetic Counterfactuals is a better approach, since a synthetic counterfactual is a mathematical fabrication (a weighted combination of multiple series) that does not appear in nature (but still a popular approach with good theoretical properties under certain conditions).[20]

Over the years, several measures of investment have been used in discussing the effects of Title II regulation, including the BEA data, the USTelecom data, the Bureau of Labor Statistics data, various collections from the financial filings of publicly-traded broadband providers, and in some cases data that was simply made up or did not measure investment at all.[21] Say, for conciseness, there are three sources of data on

App. 1580

investment levels (sources 1, 2, and 3). Let $Y_i$ be the measure of investment from each source $i$, all of which are presumably correlated but not identical.

Since the dependent variable $Y_i$ differs among data sources, so generally will the control groups, which may be labeled $Z_i$. Because there are three data sources for investment, there are presumably three investment/control pairs $(Y_1:Z_1)$ $(Y_2:Z_2)$ and $(Y_3:Z_3)$. It may be that the $Z_i$ are similar across data sources, but they need not be so.

> *OEA Staff conducts neither a reproduction nor replication of my analysis, as replication requires the application of the "methods" and not just haphazardly running a regression suitable for one dataset on another dataset. The Commission does not offer a new and suitable control group for the revised data.*

For convenience in discussion, say my APPLIED ECONOMICS paper uses $(Y_1:Z_1)$. My December 2023 paper using USTelecom and BEA data uses the pair $(Y_2:Z_2)$. Both studies find sizable, negative effects on investment from Title II regulation. Let the revised BEA data contain investment data $Y_3$, which is comparable to but not exactly equal to $Y_1$. (The revision includes a sizable upward shift in telecommunications investment beginning around 2007, and material changes in the investment levels of the controls from that study.[22]) A proper analysis requires, therefore, the pair $(Y_3:Z_3)$, and $Z_1 \neq Z_3$. Unfortunately, OEA staff used the pair $(Y_3:Z_1)$, apparently without checking whether this pair met the requirements for DID analysis. It does not.[23] Thus, OEA Staff conducts neither a reproduction nor replication of my analysis, as

replication requires the application of the "methods" and not just haphazardly running a regression suitable for one dataset on another dataset. The Commission does not offer a new and suitable control group for the revised data. I do so below.

*Differences in Differences Model*

As in my earlier papers, the econometric model used to estimate the effects of Title II regulation on investment is the traditional two-way fixed effects regression,

$$Y_{it} = \delta T_{it} \cdot P_{it} + \lambda_t + \mu_i + \varepsilon_{it} \ , \qquad (1)$$

where $Y_{it}$ is investment by industry $i$ at time $t$, $T$ is a treatment dummy variable, $P$ is a post-treatment indicator, $\lambda_t$ is a time fixed effect, $\mu_i$ is an industry fixed effect, and $\varepsilon_{it}$ is the econometric disturbance term. The model is estimated by least squares and Driscoll-Kraay standard errors are computed.[24]

The revised BEA data are used to measure investment. Telecommunications investment is measured by the Broadcasting and Telecommunications industry group. As in the prior work, the data span years 1980-2016, though the revised data extend through year 2022, and I also present results through that year. For consistency, I choose five controls that plausibly satisfy the parallel paths assumption.

*A Review of Estimates*

Table 1 summarizes the results of three prior estimates of the investment effects of Title II regulation. Columns A and B are from my APPLIED ECONOMICS paper and my recent *Investment in the Virtuous Circle* paper. Column C is the result from the *OEA Letter*. The APPLIED ECONOMICS paper uses the prior version of the BEA data, while the more recent paper uses the USTelecom investment series along with the revised BEA data. The *OEA Letter* relies on the revised BEA data.

**App. 1581**

## Table 1. Prior Empirical Results

| | AE (2018) ($Y_1:Z_1$) | Ford (2024) ($Y_2:Z_2$) | OEA Results ($Y_3:Z_1$) |
|---|---|---|---|
| | [A] | [B] | [C] |
| $\delta$ | -0.221** (-3.59) | -0.135** (-19.69) | -0.065 (-0.96) |
| Observations | 216 | 378 | 216 |

Driskoll-Kraay t-statistics in parenthesis.
Stat Sig. *** 1% ** 5% * 10%

From Column A, the coefficient -0.221 translates to a 19.8% reduction in investment, and from Column B the coefficient -0.135 indicates a 12.6% decline in investment, both relative to the counterfactual.[25] The null hypothesis of no effect is rejected at the 5% level or better for both. The $\delta$ coefficient in Column C, which is from the *OEA Letter* and is based on control group $Z_1$, is -0.065, which indicates a 6.2% reduction in investment. Thus, the Commission's own analysis suggests that the "best guess" of the investment effect of Title II regulation is negative. While its $\delta$ coefficient is not statistically different from zero at traditional levels, about 70% of the 95% confidence interval [-0.215, 0.091] is negative.[26]

---

*[T]he Commission's own analysis suggests that the "best guess" of the investment effect of Title II regulation is negative.*

---

### Revisiting the OEA Letter's Analysis

Table 2 summarizes my reproduction of the *OEA Letter's* analysis, using the same data and control group ($Z_1$). Two estimates are presented. First, I estimate the model with all years, since clustered errors address autocorrelation in the residuals, and second, I exclude year 2010 as does the *OEA Letter*. The coefficient in Column [E] is identical to the *OEA Letter*, and in Column [D] is nearly so (-0.067). Both coefficients are statistically different from zero at the 10% level, a difference due to the use of the Driscoll-Kraay standard

errors.[27] With few clusters and one treated cluster, the standard errors may be too small, however. Nonetheless, both coefficients are statistically different from zero at better than the 5% level when evaluated using the Wild Bootstrap.[28]

## Table 2. Reproduction of OEA Letter

| | Results ($Y_3:Z_1$) | Results ($Y_3:Z_1$) | Results ($Y_3:Z_1$) |
|---|---|---|---|
| | [D] | [E] | [F] |
| $\delta$ | -0.067** (-2.14) | -0.065* (-2.03) | … |
| $\delta'$ | … | … | 0.081** (2.41) |
| Observations | 222 | 216 | 186 |

Driskoll-Kraay t-statistics in parenthesis.
Stat Sig. *** 1% ** 5% * 10%

Table 2 also reveals the problem with OEA's approach of using revised BEA data but failing to check whether the controls continued to be valid. While the pre-treatment growth rates are (statistically) the same between the treated and control groups, as shown in Column F the coefficient on a pseudo-treatment (years 2007-2010) is positive and large ($\delta'$ = +0.081) and statistically significant at the 5% level (t = 2.75). Thus, $Z_1$ is not a suitable control group for the revised data as there is evidence of a violation of the parallel paths assumption. The *OEA Letter's* replication effort is, therefore, unreliable.

## Table 3. Corrections to OEA Letter

| | Results ($Y_3:Z_3$) 1980-2016 | Results ($Y_3:Z_3$) 1980-2022 |
|---|---|---|
| | [G] | [H] |
| $\delta$ | -0.187*** (-3.40) | -0.276*** (-5.47) |
| Observations | 222 | 258 |

Driskoll-Kraay t-statistics in parenthesis.
Stat Sig. *** 1% ** 5% * 10%

Table 3 summarizes the results when a control group ($Z_3$) is chosen for the revised data. Choosing a quality control group requires a careful investigation, but a plausible group of five controls is found.[29] In Column G, covering

**App. 1582**

years 1980-2016, the effect of Title II on investment is decidedly negative (-0.187), statistically significant (at the 2% level using the bootstrap), and close to the estimate from the APPLIED ECONOMICS paper. The pre-trend growth rates between telecommunications and the controls are equal, and a pseudo-treatment is statistically insignificant.

Extending the sample through 2022 (Column H), the last year for which data are available, the $\delta$ coefficient is -0.276 (significant at the 1% level, including for the bootstrap). Thus, the investment consequences of Title II are worsening over time.



**Figure 1. Investment Trends**

Figure 1 illustrates the investment trends of telecommunications investment relative to the controls. For illustration purposes, the data are centered. Except for the investment bubble around 2001, the controls do an excellent job of tracking telecommunications investments. After 2010, telecommunication investment is well below the counterfactual. The $\delta$ coefficient from Equation (1) measures the average effect over the two periods, though the departure of telecommunications investment from the counterfactual is relatively small in the first year or so after 2010, but then rises over time.

*Synthetic Counterfactual*

The estimated effects from the models presented above depend on the control groups used; these

must be carefully selected and may be criticized for both valid and/or spurious reasons. It may therefore be sensible to consider an alternative, nearly hands-off approach. The *Draft Order* suggests the method of Synthetic Counterfactuals might be preferred in this setting, stating "[t]he proper method to choose the synthetic control group to avoid these problems is to choose a weighted combination of the potential controls where the synthetic control weights are chosen to minimize the pre-treatment differences between the treatment group and the synthetic control group…."[30]

The method of Synthetic Counterfactuals is a relatively new, and increasingly popular, method to estimate treatment effects with a single treated unit.[31] It also avoids the problems, to some extent, of selecting a control group, though thought must be put into selecting the control pool, among other considerations.[32] Hypothesis testing is non-traditional and based on placebo effects, and thus may have lower statistical power than traditional tests.

Following the *Draft Order*'s guidance, I apply the method of Synthetic Counterfactuals to the revised BEA data and allow the procedure to construct a synthetic counterfactual from the aggregated industry groups, using the Synthetic Difference-in-Differences ("SDID") method of Arkhangelsky, et al., (2021).[33] Results are summarized in Table 4.[34]

**Table 4. Synthetic Counterfactual**

|  | 1980-2016 | 1980-2022 |
|---|---|---|
|  | [H] | [I] |
| $\delta$ | -0.140* | -0.236** |
|  | (-1.81) | (-2.41) |

p-values based on large-sample approximations.
Stat Sig. *** 1%  ** 5%  * 10%

The results are comparable to the traditional two-way fixed effects regression. Through 2016, the DID coefficient is -0.140, and through 2022 the coefficient is -0.236. Both coefficients are statistically significant at the 10% level or better,

**App. 1583**

though the smaller differences in the earlier years of the treatment period reduce the coefficient (a mean effect) for the sample ending in 2016. In 2011, for instance, the difference is -7%, but increases to -24% by 2014. In any case, the effect sizes are large.



**Figure 2. Synthetic Counterfactual**

Figure 2 illustrates telecommunications investment and the synthetic counterfactual over time. The fit is quite good in the pre-treatment period, and the synthetic counterfactual (SC) is well above telecommunications investment after 2010. Note that the synthetic counterfactual is not much different than the mean of the controls illustrated in Figure 1, with smaller differences in the year treatment years.

*Summary*

The implications of the analysis above may be summarized as follows. First, OEA's so-called "replication" erred because it used a control group which was selected based on the original BEA data. To "replicate" the study, OEA should have carried out the "entire research process." My analysis shows (Table 2) that the controls used by OEA do not abide by the model's assumptions.

Second, using the revised BEA data and selecting a valid control group plausibly meeting the model's assumptions, I show in Table 3 that there are still large, negative effects on investment which are statistically significant.

Third, using the revised BEA data and following the *Draft Order*'s recommended Synthetic Counterfactual method, I also find large, negative and statistically significant impacts on investment.

**The Draft Order**

The *Draft Order* devotes three paragraphs to my APPLIED ECONOMICS paper. First, it questions the validity of the control group.[35] As discussed above, this discussion reflects a misunderstanding of the requirements of a control group in a DID Model. If the controls, whatever they may be, provide a reasonable estimate of telecommunications investment after 2010, then they are valid. With thirty years of pre-treatment data, the reasonableness of a control can be evaluated.

Second, the *Draft Order* suggests that the BEA's Broadband and Telecommunications investment series is too inclusive.[36] While this industry group includes various sorts of firms, the bulk of the investment is made by telecommunications firms which provide broadband service. If other firms in this industry group were unaffected by the regulation, then the inclusion of their spending will generate random noise, which may affect the precision of the estimate but not its magnitude. To the extent the Commission feels these data are too encompassing, my recent paper *Investment in the Virtuous Circle: Theory and Empirics* uses investment data reported by USTelecom to measure telecommunications investments, and this data may be viewed as a more direct measure of broadband investment.[37] There is no reason, however, that the effects of Title II regulation should be limited to broadband providers alone, as other telecommunications investments are presumably complementary to investments in the network core; this is, after all, the Commission's virtuous cycle argument.

Third, the *Draft Order* mentions the revision to the BEA data, and suggests the revision nullifies the results from the APPLIED ECONOMICS paper.[38]

**App. 1584**

This criticism is discussed at length above, and demonstrated to be incorrect.

> *[T]he Commission's stance is that Title II regulation will increase investment, though not a single empirical study exists to support this speculation.*

The *Draft Order* also levies two criticisms of my December 2023 *Investment in the Virtuous Circle: Theory and Empirics* paper.[39] First, the *Draft Order* suggests that mixing the USTelecom and BEA data may be improper. Yet, datasets are mixed all the time in empirical research: datasets may cover different time periods, come from different counties, and so forth. The same criticism would apply with equal force when using any data from the Organization for Economic Cooperation and Development ("OECD"), which collects data from different nations. Yet, the Commission has no problem using the OECD data in its own analysis to serve as a control group for the United States.[40] Also, the Commission does not criticize the second of two "rigorous" analyses of investment effects, this one using OECD data, on data incompatibility reasons.[41] And again, the comment demonstrates a misunderstanding of the properties of a good control group.

The Commission's second criticism is that "staff was unable to replicate this paper due to the author's not describing the twenty industries that were used in the control group."[42] While an inadvertent omission, if the Commission was serious about replicating the analysis, then it could have made a request to me for that information. It did not. Moreover, the method used to select that control group is a standard statistical procedure—something a genuine replication analysis would require in any case. Both criticisms are weak and reflect a lack of genuine intent to replicate the analysis.

More generally, the Commission's *Draft Order* also includes several internally inconsistent statements regarding the effects of Title II on investment. Many, but not all, of these inconsistencies are revealed by considering two of the overarching statements regarding such effects.

First, there is the Commission's hypothesis of the "virtuous cycle of Internet innovation and investment,"[43] which while speculative serves as the foundation of the *Draft Order's* (as well as the *2015 Open Internet Order's*) stance that such regulation will have positive effects on investment and innovation the broadband marketplace. In the *2015 Open Internet Order*, the Commission claims that this virtuous cycle "drives innovation and investment on the Internet" and encourages "improvements to network infrastructure."[44] Thus, the Commission's stance is that Title II regulation will increase investment, though not a single empirical study exists to support this speculation.

Second, the *Draft Order* states that "to determine whether Title II reclassification caused the change in investment, we would need to determine what investment would have been if Title II reclassification were not adopted."[45] Quantifying the investment effects requires a counterfactual analysis, where actual investment under the regulation is compared to investment absent the regulation. As shown above and confirmed by the *Draft Order* and the *OEA Letter's results*, all counterfactual analyses of the effects of Title II regulation find a negative effect on investment, so there is no evidence to support the virtuous cycle speculation or the claim of an absence of such effects.

The Commission also contradicts its own framework in the *Draft Order*. For instance, the *Draft Order* states that "the impact of reclassification on BIAS investment is uncertain, and it is unclear that there would be any impact."[46] Yet, by the virtuous cycle, the effect

**App. 1585**

should be positive. In saying that it is "unclear there would be any impact," the Commission rebuts its own virtuous cycle hypothesis.

*It is hypocritical for the Commission to permit non-rigorous evidence in support of its policy positions while demanding rigorous evidence that conflicts with those priorities.*

Moreover, the *Draft Order* states that the lack of an effect "comports with the [] available empirical evidence."[47] The *Draft Order* contradicts this statement by referring to only three papers that "perform any type of rigorous analysis of the effects on investment of net neutrality regulation or Title II reclassification with forbearance," all three of which find a negative effect on investment.[48]

Along the same lines, the *Draft Order* criticizes the *2018 Restoring Internet Freedom Order* for concluding that Title II reduces investment incentives by arguing that the Commission "failed to consider the evidence to the contrary, including the *2015 Open Internet Order*'s evidence that investment in mobile voice and DSL thrived during the period in which they were regulated as Title II services."[49] This statement conflicts with the *Draft Order*'s conclusions regarding how investment effects may be quantified. The contradictory "evidence" mentioned in the *Draft Order*—which the Commission specifically rejected in the *RIFO*—looked simply at investment trends without reference to a counterfactual and is thus non-rigorous and non-probative by the *Draft Order*'s own claims.[50] It is hypocritical for the Commission to permit non-rigorous evidence in support of its policy positions while demanding rigorous evidence that conflicts with those priorities.

In fact, the *Draft Order*'s statements regarding "rigorous analysis" implies that the *2018 RIFO* was correct to eschew the reliance on mere investment trends, and instead rely on a conceptually proper, "rigorous" analysis. Indeed, the *RIFO*'s conclusions on investment relied on one of two studies the *Draft Order* viewed as a "robust analysis" of investment effects (including my APPLIED ECONOMICS paper). While the current Commission leadership views the study as "inconclusive" and guilty of "methodological errors," the former Commission leadership viewed the evidence as useful and valid.[51]

The *Draft Order* also mentions, though not a critique of my work, that "network infrastructure is a long-term irreversible investment that often requires years of planning, preparation, and approvals before construction can begin."[52] While perhaps true, no one has argued that the broadband providers are slashing investment by half in the short term. The estimated effects span several years, including six years in my APPLIED ECONOMICS paper and twelve years in the analysis provided above. So, even if a "proper evaluation of the investment effects of Title II reclassification [] would require a longer time period in order to properly evaluate any potential effects on investment," there are studies that do measure investment effects over a long period of time.

In Figures 1 and 2, for instance, the detrimental effects of Title II regulation are increasing over time. Moreover, investment in the industry can turn on a dime. When the recession hit in 2008, telecommunications investment fell 12%, a large and immediate reduction in capital spending. Since 1980, the range of annual changes in capital spending is ±24%, a huge range for single year changes, and ± 13% excluding the investment bubble in 1999-2003. Capital spending can quickly change by large amounts, but no one expects or claims the industry will abandon its networks altogether. Investment effects occur at the margin, as funds for lower return opportunities are redirected to greener grass.

**App. 1586**

The *Draft Order* also is critical of empirical studies on broadband investment for failing to "adjust for macroeconomic factors such as inflation."[53] This criticism is not directed at my work. Any study that includes fixed effects for time, as all my research does, accounts for such factors.

Moving on from the empirical evidence, the *Draft Order* states that "[c]ommenters disagree as to whether reclassification of BIAS as a Title II service will discourage investment in broadband infrastructure or the Internet generally."[54] On the one hand, AT&T—a firm that invested nearly $18 billion in telecommunications infrastructure in 2023—and WISPA (rural wireless broadband providers that invest millions in broadband networks) state that Title II will reduce investment and innovation.[55] On the other hand, the *Draft Order* states that "[o]ther commenters argue that Title II reclassification would not reduce investment or innovation." Who are these "other" commenters? Two political interest groups—Free Press and the National Hispanic Media Coalition—neither of which has invested a dime in broadband infrastructure nor offered the Commission a "rigorous analysis" (by the *Draft Order*'s standards) of investment effects.[56]

As for economic theory, the *Draft Order* states that the "[e]conomics literature shows that net neutrality provisions may increase investment and innovation, and may have welfare-enhancing effects."[57] The same literature—the same papers in fact—shows that net neutrality provisions may reduce investment, innovation, and welfare. The received theory is ambiguous, and cannot be otherwise; the direction of investment effects is an empirical question. Besides, none of these theoretical papers model the specificities and threats of Title II regulation, which is not the same thing as net neutrality. In fact, it appears no regulation is required for net neutrality, as we have it now in the absence of regulation. Title II regulation, therefore, is purely prophylactic, offering speculative benefits but immediate and real costs.

Perhaps recognizing the empirical cards are stacked against its claim that Title II does not reduce investment—even the OEA's analysis finds a negative effect on investment—the Commission pivots away from its statutory obligation to increase deployment of broadband networks, instead focusing on investments from other sectors over which it has no regulatory authority, no Congressional directive, and no supporting empirical evidence. The *Draft Order* states, "we view changes in broadband investment as one of the ramifications of regulation, along with regulation's effect on the prices and quality of broadband access and edge services, and on edge provider investment and innovation."[58] The statement seems to imply that the Commission might be satisfied with worse broadband service and coverage in exchange for improvements in the tracking algorithms on TikTok. That is an odd stance for a telecommunications regulator tasked by Section 706 of the Telecommunications Act of 1996 to ensure broadband access for all Americans.[59] And, this more expansive view of investment effects by roping in more industries into the analysis, directly conflicts with the Commission's criticism that the BEA data's measure of investment is too broad. To claim that investment should be evaluated broadly while saying the BEA data are too broad—which are limited to telecommunications firms—is incongruous.

Finally, the *Draft Order*'s devotes two paragraphs to the Phoenix Center's argument that the Commission's no blocking and no paid prioritization rules appear to constitute a regulatory taking in violation of the Fifth Amendment to the Constitution.[60] The Commission's critiques lack merit.

The *Draft Order* recognizes explicitly that a broadband network "is a two-sided platform with broadband customers on one side of the market and edge providers on the other."[61] The Commission states that it "has long recognized that regulating rates is not its preferred

**App. 1587**

approach,"[62] and thus argues that because "we leave BIAS providers free to set market rates for the broadband Internet access services they offer end-users, we see no evidence that our regulatory approach 'threaten[s] an [ISP's] financial integrity' and is confiscatory."[63]

But this statement obfuscates the truth about the Commission's draft rules and the Phoenix Center's argument by nakedly ignoring the D.C. Circuit's ruling in *Verizon v. FCC*, which specifically held that the no blocking and no paid prioritization rules were in fact, zero-price regulation.[64] As Judge Silberman elaborated in his concurrence:

> [W]hile there is a possibility that a "fast lane" Internet service might be offered on a non-common carriage basis, the service that most users receive under this rule [terminating traffic to end users] would still have to be offered as common carriage, at a *regulated price of zero*.[65]

And it was for this exact reason (i.e., mandating that ISPs provide service at a regulated price of zero) that the D.C. Circuit remanded the Commission's *2010 Open Internet Rules* back to the FCC for violating Section 153(51) of the Communications Act.[66]

Thus, the issue is not about regulation of *retail* rates to the public; the issue is about the heart of the Commission's rules—the regulation of the other side of the market by the no blocking and no paid prioritization rules.

Under the *Draft Order*'s rules, broadband providers are not "free to set market rates" for the second side of this two-sided market. Those rates are regulated at a price of zero, and paid prioritization is prohibited (though the zero-price rule demands no paid prioritization, since the seller-consumer could simply refuse to pay without consequence).

Moreover, the Commission's claim that the "'edge service' is secondary, and in support of, the promise made to the end user," is economic and legal nonsense.[67] First, in a two-sided market, there is no "secondary service"; there are two, coequal services being offered. In two-sided markets, the platform may charge a non-zero price (which could be negative) to either side or both sides of the platform (*i.e.*, buyers and/or sellers). And, broadband providers have made "no promise" to consumers regarding the second side of the market, and the Commission provides no evidence that the terms and conditions of providers' offering include such a promise. Besides, if such a promise were made and legally binding, then there would be no need for the *Draft Order*'s rules.

The key question, therefore, is how does the Commission get a regulated rate of zero? It has neither conducted a cost analysis nor identified a ratemaking methodology (TELRIC, LIRC, etc.). By forcing broadband providers to carry traffic for free without adhering to basic ratemaking principles, the Commission's no blocking rule appears to fit the definition of a "confiscatory" (i.e., below cost) rate in violation of the "just and reasonable" standard of Section 201.[68] Making matters worse, the Commission's intent to forbear from Section 203 deprives broadband providers of their due process rights to challenge this apparently confiscatory rate. By failing to follow these basic ratemaking safeguards, the proposed rules are the essence of arbitrary and capricious decision making. Net Neutrality by Title II is explicitly price regulation of one side of a two-sided market; there is no escaping that basic fact, except for the failure to bring this basic disregard for due process and proper ratemaking to the attention of the reviewing courts.[69]

Undeterred, the *Draft Order* also claims that "the end result" makes the Commission's legal and economic gymnastics legitimate, as the Commission claims that its rules allow broadband providers to maintain financial integrity. Stated another way, the Commission believes that the ends justify the means. This too is legally incorrect.

**App. 1588**

First, an arbitrary and capricious decision is not legitimate simply because the resulting rate may ultimately prove to be just and reasonable. The Commission must follow basic ratemaking procedures and show its "why's and wherefore's";[70] it cannot presume a rate out of thin air.

*The Draft Order seeks to regulate price to zero on one side of that two-side market, and do so without specifying a ratemaking methodology or conducting a cost study. Absent a rate methodology and a study confirming financial integrity (ensuring competitive retail revenues are fully compensatory), the Commission cannot claim the no blocking rule is just and reasonable (the standard under Section 201).*

Second, the Commission's "end result" language cites to *Illinois Bell Tel. Co. v. FCC*, 988 F.2d 1254, 1260 (D.C. Cir. 1993) for support, a case which involved a dispute over the determination of a rate of return (*i.e.*, explicit rate regulation). In appealing to a rate regulation case as authority, the Commission essentially admits that it is engaged in rate regulation. Also, in this same decision, the court observed that "[b]y long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense. [] An agency blend of ratemaking methods so challenged is arbitrary and capricious if the expected results are so."[71] Here, we have two prices, one for each side of a two-side market. The *Draft Order* seeks to regulate price to zero on one side of that two-side market, and do so without specifying a ratemaking methodology or conducting a cost study. Absent a rate

methodology and a study confirming financial integrity (ensuring competitive retail revenues are fully compensatory), the Commission cannot claim the no blocking rule is just and reasonable (the standard under Section 201). Since the Commission did not go through the due process of setting a rate, its decision is, thus, arbitrary and capricious. Moreover, denying broadband providers their due process rights to challenge this arbitrary rate by forbearing from Section 203 raises serious Constitutional concerns.

*While the Commission's Draft Order brushes the investment effects under the rug by claiming the regulatory scheme will increase investment (or at least not reduce it), no reasonable economist believes that an overarching, open-ended regulatory framework like Title II regulation would encourage private investment.*

## Conclusion

All the rigorous empirical evidence finds that Title II regulation is a dark cloud hanging over the industry, reducing private incentives to invest in telecommunications networks. Temporary reprieves, such as the *2018 RIFO*, always an election away, are no consolation to investors. While the Commission's *Draft Order* brushes the investment effects under the rug by claiming the regulatory scheme will increase investment (or at least not reduce it), no reasonable economist believes that an overarching, open-ended regulatory framework like Title II regulation would encourage private investment. While the investment effects of Title II are surely non-positive, the size of their negative effects is an empirical question, and different data and different methods will provide a range of estimates. To date, all the rigorous

**App. 1589**

evidence suggests that Title II reduces investment, and such effects may be large. While interested parties may squabble over method, there is no doubt that the preponderance of the evidence is against Title II regulation on investment grounds, and no meaningful rebuttal to these studies, or conflicting results, are available.

As detailed here, the Commission's effort to discredit my earlier work on investment through replication falls flat. The federal government frequently revises its data, and thousands of analysts use unrevised data, even the FCC, to conduct empirical evidence and make calculations. Correcting for errors in the *OEA Letter*, which reports a negative investment effect of Title II, the revised BEA data are shown here to provide comparable results to my earlier work. The results reported in the *OEA Letter* reflect a failure to update the analysis to the revised data. Properly analyzed, including estimation using the method of Synthetic Counterfactuals as recommended in the *Draft Order*, the revised BEA data reveals large and negative investment effects.

**App. 1590**

**NOTES:**

\* **Dr. George S. Ford** *is the Chief Economist of the Phoenix Center for Advanced Legal and Economic Public Policy Studies. The views expressed in this* PERSPECTIVE *do not represent the views of the Phoenix Center or its staff. Dr. Ford may be contacted at* ford@phoenix-center.org.

1 *Safeguarding and Securing the Open Internet*, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC-CIRC2404-01 (2024) (hereinafter "*Draft Order*").

2 *Restoring Internet Freedom*, DECLARATORY RULING, REPORT AND ORDER, AND ORDER, 33 FCC Rcd. 311 (2018), *aff'd by, in part, vac'd by, in part, rem'd by Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).

3 *Protecting and Promoting the Open Internet*, REPORT AND ORDER ON REMAND, DECLARATORY RULING, AND ORDER, 30 FCC Rcd. 5601 (2015) (hereinafter "*2015 Order*"), *aff'd U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *reh'g en banc denied* 855 F.3d 381 (2017).

4 Biden Executive Order on Competition, EXEC. ORDER NO. 14036, 86 FED. REG. 36987 (July 14, 2021); *see also* L.J. Spiwak, *The FCC Returns to the Law and Economics Free Zone*, FEDERALIST SOCIETY BLOG (November 20, 2023) (available at: https://fedsoc.org/commentary/fedsoc-blog/the-fcc-returns-to-the-law-and-economics-free-zone).

5 *Draft Order, supra* n. 1 at ¶ 284.

6 G.S. Ford, *Regulation and Investment in the U.S. Telecommunications Industry*, 50 APPLIED ECONOMICS 6073–6084 (2018).

7 *Draft Order, supra* n. 1 at ¶ 287.

8 Letter from Giulia McHenry, Chief, Office of Economics and Analytics, WC Docket No. 23-320 (April 11, 2024) (available at: https://www.fcc.gov/ecfs/document/10411227464732/1).

9 G.S. Ford, *Investment in the Virtuous Circle: Theory and Empirics*, PHOENIX CENTER POLICY PAPER No. 62 (December 2023) (available at: https://phoenix-center.org/pcpp/PCPP62Final.pdf).

10 *Revising Economic Indicators: Here's Why the Numbers Can Change*, Bureau of Economic Analysis (July 8, 2013) (available at: https://www.bea.gov/news/blog/2013-07-08/revising-economic-indicators-heres-why-numbers-can-change).

11 *In the Matter of Promoting Telehealth in Rural America*, FCC 18-82, REPORT AND ORDER, 33 FCC Rcd. 6574 (rel. June 25, 2018), at ft. 47 (available at: https://www.fcc.gov/ecfs/document/06252124507219/6). Data available at: https://fred.stlouisfed.org/series/GDPCTPI#0.

12 *Draft Order, supra* n. 1 at ¶ 286.

13 *OEA Letter, supra* n. 8 at ft. 5.

14 K. Nikolopoulou, *Reproducibility vs Replicability | Difference & Examples*, SCRIBBR (June 22, 2023) (available at: https://www.scribbr.com/methodology/reproducibility-repeatability-replicability).

15 The *OEA Letter* provides the link for the older BEA data: https://apps.bea.gov/histdata/Releases/FA/2016/AnnualUpdate_August-23-2017/Section3ALL_xls.xls. It seems reasonable, therefore, to suppose the OEA did reproduce the work.

16 There is no direct test of the parallel paths assumption, but there are several ways to evaluate its plausibility.

17 For example, "Food and Beverage and Tobacco Products" and "Petroleum and Coal Products" are both members of the "Nondurable Goods Manufacturing" industry group. Simulated industries could, in fact, be created, which is exactly the mechanism of the method of Synthetic Counterfactuals.

18 *See, e.g.*, J.D. Angrist & J. Pischke, MASTERING METRICS: THE PATH FROM CAUSE TO EFFECT (2015), at Ch. 5.

19 *Draft Order, supra* n. 1 at ¶ 288-9 ("it is not clear why this diverse set of industries with very different technology and productivity shocks would be an appropriate control group for telecommunications.").

20 *Id*. at ¶ 288.

**App. 1591**

**NOTES CONTINUED:**

[21] *Investment in the Virtuous Circle, supra* n. 9; G.S. Ford, *Net Neutrality and Investment in the U.S.: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175-205 (2018); G. S. Ford, *Does Title II Reduce Infrastructure Investment? Repairing Hooton's Analysis*, PHOENIX CENTER POLICY PERSPECTIVE No. 19-06 (October 15, 2019) (available at: https://www.phoenix-center.org/perspectives/Perspective19-06Final.pdf); G.S. Ford, *A Review of the Internet Association's Empirical Study on Network Neutrality and Investment*, PHOENIX CENTER POLICY PERSPECTIVE No. 17-09 (July 24, 2017) (available at: https://www.phoenix-center.org/perspectives/Perspective17-09Final.pdf) ("Dr. Hooton has simply made his data up. In fact, these projections, possibly from multiple sources, account for 70% of his investment data during the treatment period (7 of 10 years)."); G.S. Ford, *A Further Review of the Internet Association's Empirical Study on Network Neutrality and Investment*, PHOENIX CENTER POLICY PERSPECTIVE No. 17-10 (August 14, 2017) (available at: https://www.phoenix-center.org/perspectives/Perspective17-10Final.pdf) ("Dr. Hooton's analysis of USTelecom's data on U.S. broadband investment for years 1996 through 2015 employs data that have been corrupted in some way. Dr. Hooton's results are not consistent with the actual USTelecom data, a fact easily demonstrated"); C.A. Hooton, *Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY 101869 (2020); G.S. Ford, *Testing the Economics of the Net Neutrality Debate: A Comment*, 45 TELECOMMUNICATIONS POLICY 102137 (2021); Editors, *Expression of concern: Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY 102005 (2020).

[22] One possibility for the changes is that the later BEA data includes more industry groups (79 in the 2016 data, 96 in the latest data), which may have diverted portions of investment for the relevant industries into different categories.

[23] It appears the Commission recognized this problem prior to the release of the *OEA Letter*. The *Draft Order* observes, presumably based on the revised BEA data, that "[v]isual inspection comparing the pre-2010 (pretreatment) investment trends of the synthetic control industries with the trends in telecommunications and broadcasting investment confirm that the controls are inappropriately chosen." *Draft Order*, *supra* n. 1 at ¶ 288.

[24] J.C. Driscoll and A.C. Kraay, *Consistent Covariance Matrix Estimation with Spatially Dependent Panel Data*, 80 REVIEW OF ECONOMICS AND STATISTICS 549-560 (1998).

[25] The percentage change in the dependent variable is $\exp(\delta) - 1$.

[26] *Draft Order*, *supra* n. 1 at ¶ 274.

[27] The typical clustered standard errors provide a t-statistic of -1.04, which is close the *OEA Letter*'s t-statistic of -0.96, which may be explained by differences in the estimation software or command.

[28] A.C. Cameron, J.B. Gelbach, and D.L. Miller, *Bootstrap-based Improvements for Inference with Clustered Errors*, 90 THE REVIEW OF ECONOMICS AND STATISTICS 414-27 (2008); A. Abadie, A. Diamond, and J. Hainmueller, *Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program*, 105 JOURNAL OF THE AMERICAN STATISTICAL ASSOCIATION 493-505 (2010).

[29] The control industries include: Nondurable Goods Manufacturing; Other Manufacturing; Transit and Ground Passenger Transportation; Utilities; and Wholesale Nondurable Goods. The Transportation and Warehousing industry aggregate is excluded since the Commission was skeptical of it. When choosing a control group, the analysis considers only the pre-treatment data. Here, I use visual inspection and some descriptive statistics to select a suitable control group.

[30] *Draft Order*, *supra* n. 1 at ¶ 288. The *Draft Order* also states that my APPLIED ECONOMICS paper "constructs what is known as a "synthetic control group." *Id.* at ¶288. It does not. The method of Synthetic Counterfactual creates a single counterfactual from many members of a control pool, my study uses all the controls in estimation. A proper statement would be that the paper selects industries for the control group that plausibly satisfy the parallel paths assumption.

[31] *See*, *e.g.*, S. Cunningham, CAUSAL INFERENCE: THE MIXTAPE (2021).

[32] A. Abadie, *Using Synthetic Controls: Feasibility, Data Requirements, and Methodological Aspects*, 59 JOURNAL OF ECONOMIC LITERATURE 391-425 (2021).

[33] D. Arkhangelsky, S. Athey, D.A. Hirshberg, G.W. Imbens, and S. Wager, *Synthetic Difference-in-Differences*, 111 AMERICAN ECONOMIC REVIEW 4088-4118 (2011) (available at: https://www.aeaweb.org/articles?id=10.1257/aer.20190159).

**App. 1592**

**NOTES CONTINUED:**

[34] The "Information" industry aggregate is excluded. Only three of the aggregate sectors receive zero weight. For conciseness, the weights are provided by line code: 2 (0.009); 5 (0); 9 (0.077); 13 (0.013); 14 (0.145); 40 (0.063); 43 (0.048); 48 (0.187); 62 (0.108); 73 (0); 76 (0.026); 80 (0.099); 81 (0); 84 (0.001); 85 (0); 90 (0.126); 93 (0.044); and 96 (0.052).

[35] *Draft Order*, *supra* n. 1 at ¶ 288.

[36] *Id.* at ¶ 289.

[37] *Investment in the Virtuous Circle*, *supra* n. 9.

[38] *Draft Order*, *supra* n. 1 at ¶ 290.

[39] *Id.* at ft. 1170.

[40] *See, e.g.*, *In the Matter of Communications Marketplace Report*, 2020 COMMUNICATIONS MARKETPLACE REPORT, FCC 20-188, 36 FCC Rcd. 2945 (rel. December 31, 2020) at ¶ 295 ("We selected 35 Organisation for Economic Cooperation and Development (OECD) countries to meet the statutory directive of developing a geographically diverse set of countries for comparison with the United States concerning international broadband services capability.").

[41] *Draft Order*, *supra* n. 1 at ¶¶ 291-6. The line codes for the control group from this paper are: 3, 10, 20, 21, 22, 23, 26, 30, 35, 45, 50, 68, 74, 79, 82, 87, 88, 89, 90, and 96.

[42] *Id.* at ft. 1170.

[43] *Id.* at ¶ 384; G.S. Ford, *Revisiting the ''Virtuous Circle'' Two Years Later*, BLOOMBERG BNA (July 10, 2017) (available at: https://www.phoenix-center.org/oped/BloombergBNAVirtuousCircleRevisited10July2017.pdf).

[44] *2015 Order*, *supra* n. 3 at ¶ 2, 20.

[45] *Draft Order*, *supra* n. 1 at ¶284.

[46] *Id.* at ¶ 274.

[47] *Id.*

[48] *Id.* at ¶¶ 286-296, recognizes only three studies that it concludes are "rigorous," and all three find a negative effect on investment.

[49] *Id.* at ¶ 274

[50] For a review of the economic evidence the Commission both relied upon and rejected in the *RIFO*, *see* G.S. Ford, *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, *supra* n. __.

[51] *See RIFO*, *supra* n. 2 at ¶¶ 95-98.

[52] *Draft Order*, *supra* n. 1 at ¶ 282

[53] *Id.* at ¶ 283

[54] *Id.* at ¶ 275.

[55] *Id.*

[56] *Id. See, e.g.*, G.S. Ford, *Below the Belt: A Review of Free Press and the Internet Association's Investment Claims*, PHOENIX CENTER POLICY PERSPECTIVE NO. 17-06 (June 20, 2017) (available at: https://www.phoenix-center.org/perspectives/Perspective17-06Final.pdf); G.S. Ford, *Reclassification and Investment: An Analysis of Free Press' "It's Working" Report*, PHOENIX CENTER POLICY PERSPECTIVE NO. 17-04 (May 22, 2017) (available at: https://www.phoenix-center.org/perspectives/Perspective17-04Final.pdf); G.S. Ford, *Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment*, PHOENIX CENTER PERSPECTIVE NO. 09-04 (October 29, 2009).

[57] *Draft Order*, *supra* n. 1 at ¶ 280.

[58] *Id.* at ¶ 278.

**App. 1593**

**NOTES CONTINUED:**

59   47 U.S.C. § 1302.

60   *Draft Order, supra.* 1 at ¶¶ 671-72.   *See* G.S. Ford and L.J. Spiwak, *Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service,* 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015); L.J. Spiwak, *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW JOURNAL 39 (2019).

61   *Draft Order, supra* n. 1 at ¶ 279

62   *Id.* at ¶ 279.

63   *Id.* at ¶ 671.

64   *Verizon v. FCC,* 740 F.3d 623, 658 (D.C. Cir. 2014).

65   740 F.3d at 668.

66   47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this [Act] only to the extent that it is engaged in providing telecommunications services.").

67   *Draft Order, supra* n. 1 ¶ 672.

68   For a full review of the law governing the "just and reasonable" standard, *see USTelecom and Aftermath, supra* n. 60.

69   *USTelecom and Aftermath, id.*

70   *See, e.g., American Municipal Power-Ohio, Inc., v. FERC,* 863 F.2d 70, 73 (D.C. Cir. 1988) (an "agency must make clear the 'basic data and the whys and wherefores' of its conclusions.'").

71   *Illinois Bell, id.* (citations omitted).

**App. 1594**



**Pamela Arluk**
Vice President & Associate General Counsel
☎ (202) 222-2460  ✉ PArluk@ncta.com

April 18, 2024

<u>VIA ECFS</u>

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

> **Re:** **Safeguarding and Securing the Open Internet (WC Docket No. 23-320); Restoring Internet Freedom (WC Docket No. 17-108); Bridging the Digital Divide for Low-Income Consumers (WC Docket No. 17-287); Lifeline and Link Up Reform and Modernization (WC Docket No. 11-42)**

Dear Ms. Dortch:

NCTA—the Internet & Television Association (NCTA) submits the attached ex parte white paper from Compass Lexecon in response to paragraph 466 of the Draft Order, which claims that competition is insufficient to prevent providers from engaging in conduct that could harm the open Internet.[1] As Compass Lexecon explains, the Draft Order significantly understates the level of competition in the broadband marketplace by basing its analysis on outdated data, not accounting for future deployment, and focusing solely on an 100/20 Mbps definition of broadband that excludes important competitive alternatives. The Draft Order's analysis also fails to recognize that the competitive nature of the broadband marketplace and the way broadband networks are operated provide protection for customers even in locations where they may have fewer alternatives. Indeed, as Compass Lexecon concludes and further demonstrates in its earlier filings in this proceeding, existing competition is already sufficient to prevent open Internet harms while it is driving increased investment and deployment.

---

[1] *See* Safeguarding and Securing the Open Internet, WC Docket Nos. 23-320, 17-108, Draft Declaratory Ruling, Report and Order, and Order on Reconsideration, FCC-CIRC2404-01, ¶ 466 (rel. Apr. 4, 2024) ("Draft Order").

NCTA – The Internet & Television Association  |  25 Massachusetts Ave NW Suite 100  |  Washington DC, 20001-1431  |  (202) 222-2300  ncta.com

**App. 1595**

NCTA encourages the Commission to revise the conclusions in its Draft Order accordingly.

Respectfully submitted,

**Pamela Arluk**

Pamela Arluk
*Vice President and Associate General Counsel*
*NCTA – The Internet & Television Association*

Attachment

**App. 1596**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | |
| Safeguarding and Securing the Open Internet | WC Docket No. 23-320 |
| Restoring Internet Freedom | WC Docket No. 17-108 |
| Bridging the Digital Divide for Low-Income Consumers | WC Docket No. 17-287 |
| Lifeline and Link Up Reform and Modernization | WC Docket No. 11-42 |

*Ex Parte* **White Paper**

**Mark Israel, Bryan Keating, and Allan Shampine**

**April 18, 2024**

1.	We write to dispute an important economic conclusion in the Commission's April 4, 2024 Draft Order.[1, 2]  The Draft Order asserts that broadband providers have the ability and incentive to engage in conduct that could harm the open Internet, including blocking, throttling, or otherwise harming unaffiliated edge providers.[3]  Although the Commission acknowledges that broadband competition is increasing, it asserts that competition is insufficient to prevent such conduct because many subscribers cannot switch broadband providers should they "engage in conduct that harms the open Internet."[4]  Specifically, it asserts that:[5]

> … as of year-end 2022, 37.4% of households lived in areas where only one provider offered wireline or terrestrial fixed wireless broadband Internet access services at 100 Mbps download and 20 Mbps upload speeds (100/20 Mbps), the new benchmark for defining advanced telecommunications capability, and the Commission's fixed speed benchmark for broadband, while 36.6% of households lived in areas with two providers offering 100/20 Mbps service, and only 18.2% lived in areas where they had a choice of three or more providers offering 100/20 Mbps service.

2.	There are several economic flaws with the Draft Order's conclusions.  In fact, the available evidence demonstrates that competition is sufficient today (and likely to increase even further in the future) such that broadband providers do *not* have the ability and incentive to engage in the types of conduct that the Draft Order seeks to prohibit.  Subjecting broadband

---

[1]	Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, April 4, 2024, WC Docket No. 23-320 (hereinafter *Draft Order*).

[2]	We have been asked by NCTA – The Internet & Television Association to review and respond to the analysis and conclusions contained in Paragraph 466 of the Draft Order.

	We previously filed two submissions in this proceeding.  These submissions set forth our qualifications.  (Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320; Mark Israel, Bryan Keating, Dan O'Brien and Allan Shampine, "*Ex Parte* White Paper," February 23, 2024, WC Docket No. 23-320.)

[3]	*Draft Order,* ¶ 466.

	The Draft Order refers to broadband providers as broadband Internet access service (BIAS) providers.

[4]	*Draft Order,* ¶ 466 ("While **the number of BIAS providers is increasing and BIAS providers are expanding their networks**, many consumers still lack a choice of BIAS providers or, where they do have a choice, they have a choice of only two providers and/or the services offered by competing providers are often not close substitutes." [emphasis added]).

[5]	*Draft Order,* ¶ 466.

1

providers to onerous Title II regulation would thus impose costs (discussed below and in our previous submissions) with no corresponding benefits.

3.     First, the data on which the Draft Order relies in reaching its conclusions is outdated.  Specifically, the Draft Order relies on data from the Broadband Data Collection (BDC) Version 2, which reported data as of year-end 2022.[6]  However, BDC Version 3 is now available and provides a more accurate picture of broadband current deployment relative to BDC Version 2 (although even BDC Version 3 is somewhat outdated).[7]  Specifically, it includes data through June 2023,[8] and it reflects the Commission's efforts to refine and improve the quality of the underlying data.[9]

4.     Comparison of BDC Version 3 to Version 2 reveals that the broadband industry is even more competitive than the Draft Order asserts.  Specifically:

- Reflecting ongoing deployment initiatives, total units served by fixed terrestrial broadband at 100/20 Mbps increased by four percent (151.8 million units in v.3 versus 145.7 million units in v.2).[10]

---

[6]     In our initial filing in this matter in mid-December 2023, we relied on the same version (v.2) the Commission is continuing to use, but provide updated numbers here based on the BDC v.3 data.  (Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, n. 18.)

[7]     Jessica Rosenworcel, "National Broadband Map 3.0: Thankful for Continued Improvements," November 17, 2023, Notes from the FCC, *available at* https://www.fcc.gov/news-events/notes/2023/11/17/national-broadband-map-30-thankful-continued-improvements (hereinafter *Rosenworcel Note*).  See also 2024 Section 706 Report, Dissenting Statement of Commissioner Brendan Carr, March 18, 2024, GN Docket No. 22-270 (hereinafter *Carr Statement*), pp. 2-3.

[8]     *Carr Statement*, p. 2.

[9]     *Rosenworcel Note* ("Robust participation in the challenge processes continues to play a valuable role in correcting data shown on the Map. To be specific, the results of 4.8 million challenges to provider reported availability information and over 1.5 million accepted location challenges. Since our last release, we've initiated mobile coverage audits in a number of states. We've also seen hundreds of corrections to provider reported data based on FCC-initiated verification efforts."); *Carr Statement*, p. 2.

[10]    *Carr Statement*, p. 2.

2

- Reflecting the continued expansion of and improvement in fixed wireless, total units served by fixed wireless service at 100/20 Mbps increased by 58 percent (66.0 million units in v.3 versus 41.9 million units in v.2).[11]

- Reflecting the continued investment in and deployment of satellite broadband, total locations served by satellite service at 100/20 Mbps increased by more than 500 percent (99.6 percent of locations covered in v.3 versus 16.1 percent of locations covered in v.2).[12]

These data reflect the effects of ongoing competition and investment in broadband in the United States.

5.      In particular, the ongoing expansion of fixed wireless and the Draft Order's omission of satellite broadband from its calculations mean that the Draft Order substantially overstates the percentage of households in the United States that have access to only a single broadband provider offering 100/20 Mbps service.  For example, using the BDC v.3 data, as of June 2023, 30.2 percent of U.S. locations had access to only one provider offering wireline or terrestrial fixed wireless broadband Internet access services at 100/20 Mbps, substantially lower than the 36.3 percent of locations with access to only one such provider in the BDC v.2 data.[13] In contrast, the number of locations with access to *more than* two such providers increased from 17.7 percent to 27.0 percent.

**Table 1: Share of U.S. Locations with Access to 100/20 Mbps Fixed Broadband Service**

|  | 1 Provider | 2 Providers | >2 Providers | Unserved |
|---|---|---|---|---|
| v.2 (December 2022) | 36.3% | 36.8% | 17.7% | 9.2% |
| v.3 (June 2023) | 30.2% | 35.1% | 27.0% | 7.7% |

*Source:* FCC Broadband Data Collection.

---

[11]     *Carr Statement*, p. 2.

[12]     *Carr Statement*, p. 3.

[13]     To calculate these numbers, we use the same methodology as in our December 14, 2023 submission.  Our methodology differs from the methodology used in the Commission's 706 Report in that we calculate availability by location whereas the Commission calculates availability by household.  But the directional effect is similar under either approach.  (*Draft Order*, ¶ 466 (citing 2024 Section 706 Report, March 18, 2024, GN Docket No. 22-270 (hereinafter *706 Report*), Fig. 4).  See also *706 Report*, n. 235 (explaining the Commission's methodology for identifying households).)

*Notes:* Figure includes wireline and fixed wireless providers.  Fixed wireless providers include those using Licensed spectrum, Licensed-by-Rule spectrum, or unlicensed spectrum.  Locations include both residential and business locations that the FCC considers to be serviceable with mass market broadband (as opposed to enterprise-grade service).  Locations can represent multiple households or businesses.

6.     Including satellite broadband, the vast majority of U.S. locations have access to two or more providers of 100/20+ Mbps service (see Table 2 below).  Specifically, *just eight percent* of locations have access to only a single provider of 100/20+ Mbps service (in contrast to the 37.4 percent claimed in the Draft Order), 30 percent of locations have access to two providers of 100/20+ service, 62 percent of locations have access to more than two providers of 100/20+ Mbps service, and no locations are unserved.[14, 15]

7.     Second, even the BDC v.3 data from June 2023—and even more so the BDC v.2 data from December 2022—understates current and future competition.  For example, MoffettNathanson projects new telecom fiber overbuilds in cable broadband provider footprints will be approximately seven million per year through at least 2025.[16]  Similarly, the ongoing expansion of and improvement in fixed wireless networks will continue to put competitive

---

[14]     Calculations based on BDC v.3 data.

[15]     The availability of satellite broadband is likely to continue to grow.  For example, Amazon is in the process of launching a constellation of satellites that seeks to eventually provide broadband to 400-500 households around the world.  (Amazon, "CEO Andy Jassy's 2023 Letter to Shareholders," April 18, 2024, *available at* https://www.aboutamazon.com/news/company-news/amazon-ceo-andy-jassy-2023-letter-to-shareholders ("In October, we hit a major milestone in our journey to commercialize Project Kuiper when we launched two end-to-end prototype satellites into space, and successfully validated all key systems and sub-systems—rare in an initial launch like this. Kuiper is our low Earth orbit satellite initiative that aims to provide broadband connectivity to the 400-500 million households who don't have it today (as well as governments and enterprises seeking better connectivity and performance in more remote areas), and is a very large revenue opportunity for Amazon. We're on track to launch our first production satellites in 2024.").)

[16]     See, e.g., Craig Moffett, Jessica Moffett, and Jay Li, "U.S. Broadband: The Puts and Takes of Net Adds," March 15, 2023, MoffettNathanson Research Report, Figure 10 (projecting approximately seven million telco fiber overbuilds of cable footprints per year through at least 2025).  See also Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, ¶ 29 (citing Diana Goovaerts, "Here's how much fiber US operators are planning to build in 2023," Fierce Telecom, February 24, 2023, *available at* https://www.fiercetelecom.com/broadband/heres-howmuch-fiber-us-operators-are-planning-build-2023 (estimating for 2023 "between 6.5 million and 7 million new [fiber] locations – at a minimum."); Fiber to the Future: Key Takeaways, New Street Research, April 3, 2023; and Autumn for Broadband 3Q23 – the halftime report, New Street Research, October 28, 2023 (estimating that fiber deployment has been proceeding at about 4.5 million new passings added over the trailing twelve months).)

**App. 1601**

pressure on wireline networks.[17] Finally, the effects of the Broadband Equity Access and Deployment (BEAD) program, which will disburse $42.45 billion to expand high-speed Internet access, are not yet reflected in current data and can be expected to support further broadband deployment in both unserved and underserved areas (see below for a discussion of competition between 100/20 Mbps service and service at slower speeds).[18]

8.      These increases in competition are only partially reflected even in the comparison of BDC v.3 to v.2 discussed above, and they can be expected to continue.  Any attempt by incumbent broadband providers to undertake conduct that harms consumers would accelerate this expansion in competition as it would give new or expanding rivals greater ability to attract customers and thus increase their return on investment.  Although the Draft Order acknowledges that broadband competition is increasing and broadband providers are investing in their networks, its focus on 2022 statistics means that it ignores not only current competitive conditions but also expected future increases in competition.  This is a significant mistake in light of ongoing broadband deployment.

9.      Third, by focusing solely on a 100/20 Mbps definition of broadband and excluding any competition from mobile wireless and satellite broadband providers, the Draft Order significantly understates the magnitude of current and future competition.[19]  The

---

[17]     Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, § II.

[18]     National Telecommunications and Information Administration, Broadband Equity Access and Deployment (BEAD), *available at* https://www.ntia.gov/program/broadband-equity-access-and-deployment-bead; *706 Report,* ¶ 209 ("NTIA approved the first state proposal to access BEAD funds near the end of last year.").

         The extent to which BEAD funding will increase the *number* of options available to customers will depend on the extent to which BEAD funding goes to new entrants versus incumbent providers currently offering service in a given area.

[19]     The Draft Order states: "*In most locations*, end users also have access to satellite and mobile broadband services. However, the Commission has found that fixed and mobile broadband services are not full substitutes to each other and both services are necessary to ensure that all Americans have access to advanced telecommunications capability." (*Draft Order,* ¶ 466 [emphasis added].)

         Despite concluding only that satellite and mobile broadband services are not "full substitutes" for terrestrial fixed broadband service, the Draft Order incorrectly gives them zero weight in its consideration of the incentive and ability of broadband providers to engage in the conduct of concern.

5

Commission's adoption of a 100/20 Mbps standard applied to a specific statutory context: under Section 706 of the Telecommunications Act of 1996, the Commission is directed to report whether "advanced telecommunications capability" is being deployed to Americans in a reasonable and timely fashion. The Commission acknowledged in its Section 706 Report that "advanced telecommunications capability" is *not* synonymous with broadband and, indeed, is a *narrower* category of services:[20]

> '[A]dvanced telecommunications capability' is a statutory term with a definition that is more limited than the term 'broadband.' . . . [W]hile all services providing advanced telecommunications capability are 'broadband,' not all broadband services provide advanced telecommunications capability. Thus, in this Report, we do not equate the term 'broadband' with the statutory term 'advanced telecommunications capability' . . . .

The Section 706 Report's definition of advanced telecommunications capability therefore was not designed to reflect consumer broadband substitutability and does not constitute the definition of a relevant market in economic terms.

    10.    Broadband providers compete for customers on a variety of dimensions. Download and upload speeds are one important dimension on which they compete. But so are price, quality, and customer service. Although many customers may prefer higher speeds all else equal, many customers also choose lower-speed services even when higher-speed services are available.[21] Moreover, a substantial percentage of households have access to multiple services offering speeds less than 100/20 Mbps. For example, of the locations that have just one fixed 100/20+ Mbps broadband provider, approximately 18 percent have at least one other fixed broadband provider offering service of at least 50/10 Mbps and another 30 percent have at least one other fixed provider offering between 25/3 Mbps and 50/10 Mbps. The presence of services offering, for example, 90/20 Mbps or 50/10 Mbps service are likely to be good alternatives for some customers to a higher-speed service that blocks content they would like to access.

---

[20]    *706 Report*, n. 1.

[21]    *706 Report,* ¶ 114 ("As seen in Fig. 22, above, many households continue to subscribe to slower speed tiers, even when 100/20 Mbps service is available. Several reasons can explain this such as: the needs of a household may be served at lower access speeds, a household may not be aware of the availability of service, or the service may not be affordable.").

**App. 1603**

Moreover, customers can and do switch between broadband services.[22] By artificially treating fixed 100/20+ Mbps service as the *only* relevant service, the Commission improperly treats lower-speed options as providing *no* competitive constraint.

11.    Mobile broadband also provides an important alternative option for many customers. As we explained in our initial submission, "[m]obile wireless broadband is widely available, rapidly growing, and continually improving."[23] For example, March 2024 data from Ookla indicate that mobile download speeds in the United States averaged 129 Mbps across all network generations, an increase of approximately 17 percent since December 2023.[24] 5G speeds are even higher. The average of the three main carriers' median 5G download speeds was 187 Mbps in Q4 2023, up from an average median download speed of 159 Mbps in Q3 2023.[25] Mobile 5G service is broadly available. Approximately 90 percent of the U.S. population lived in census blocks where two or more mobile-wireless broadband providers offer 5G service, and approximately 74 percent of the U.S. population lived in census blocks in which three or more mobile-wireless broadband providers offer 5G service.[26] And many adults in the United States, especially young adults (18-29 year olds), *only* use mobile wireless and do not use a home fixed broadband service.[27]

12.    Although fixed broadband offering speeds less than 100/20 Mbps, satellite broadband, and mobile broadband may not be perfect substitutes for fixed broadband service offering 100/20+ Mbps, even the Draft Order does not assert that there would be no substitution to these alternatives in the event that a broadband provider engaged in conduct detrimental to

---

[22]    Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, ¶¶ 69-70.

[23]    Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, ¶ 39.

[24]    Ookla Research, "United States Median Country Speeds March 2024," *available at* https://www.speedtest.net/global-index/united-states.

[25]    Ookla Research, "United States Median Country Speeds March 2024," *available at* https://www.speedtest.net/global-index/united-states.

[26]    Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, Figure 10. We obtain similar estimates using BDC v.3 data.

[27]    Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, ¶ 36.

**App. 1604**

consumers. To the contrary, the evidence indicates that such options are viable for many consumers and thus act as a competitive constraint on broadband providers. Accounting for these options leads to the conclusion that the Draft Order substantially overstates the percentage of locations in the United States with access to only one broadband provider. As shown in Table 2 below, limiting only to terrestrial fixed broadband (including both wired and fixed wireless) providers offering 100/20+ Mbps service, approximately 30 percent of locations in the United States have access to only one provider (as of June 2023). Lowering the threshold to providers offering at least 25/3 Mbps service, that number falls to 18 percent of locations in the United States with access to only one provider. If we include satellite broadband providers offering at least 25/3 Mbps service, essentially every location in the country has access to multiple providers. And, as described above, multiple mobile broadband providers offer increasingly ubiquitous 5G mobile service. Moreover, even these estimates overstate the number of locations with limited options as broadband deployment has continued since June 2023 and will continue in the future.

**Table 2: Share of U.S. Locations with Access to Fixed Broadband Service, by Speed and Number of Fixed Broadband Providers (June 2023)**

| Service Type | Total Locations (Millions) | Unserved | Any Provider | 1 Provider | 2 Providers | >2 Providers |
|---|---|---|---|---|---|---|
| Wired+Fixed Wireless 25/3+ | 114.1 | 5% | 95% | 18% | 28% | 49% |
| Wired+Fixed Wireless 100/20+ | 114.1 | 8% | 92% | 30% | 35% | 27% |
| Wired+Fixed Wireless+Satellite 25/3+ | 114.1 | 0% | 100% | 0% | 0% | 100% |
| Wired+Fixed Wireless+Satellite 100/20+ | 114.1 | 0% | 100% | 8% | 30% | 62% |

*Source:* FCC Broadband Data Collection (Version 3).

*Notes:* Figure includes wireline and fixed wireless providers. Fixed wireless providers include those using Licensed spectrum, Licensed-by-Rule spectrum, or unlicensed spectrum. Locations include both residential and business locations that the FCC considers to be serviceable with mass market broadband (as opposed to enterprise-grade service). Locations can represent multiple households or businesses.

13. The Draft Order thus understates the degree of competition that broadband providers face from a variety of sources and the cost to broadband providers of engaging in conduct that is detrimental to consumers.

14. Fourth, as we explained in our prior submission, competition for marginal customers protects *all* customers.[28]  From a technical perspective, it would be impractical for a broadband provider to manage its network to undertake the conduct at issue in one geographic market and not another, and we are not aware of any broadband provider that does so today.[29]  Even taking the Commission's outdated estimates of competition as given, the fact that approximately 60 percent of households with access to at least one terrestrial fixed broadband provider offering 100/20 Mbps service live in areas with two or more terrestrial fixed broadband Internet access services providing 100/20 service means that any broadband provider that undertook conduct that consumers found to be unattractive would risk losing a substantial fraction of its customer base.[30]  This risk of competitive loss benefits customers not only in the geographic areas where there is a choice of broadband providers, but also in areas where there is less broadband competition.  This conclusion is only strengthened by the increasing competition relative to the estimates on which the Draft Order relies.

15. Fifth, the Commission proposes to use a broad regulatory approach— reclassification of broadband providers under Title II of the Communications Act of 1934—to address a problem that does not exist.[31]  As even Title II proponents acknowledge, competition is

---

[28]  Mark Israel, Bryan Keating, Dan O'Brien and Allan Shampine, "*Ex Parte* White Paper," February 23, 2024, WC Docket No. 23-320, ¶ 54 ("… approximately one-fifth of broadband customers switch providers every year for reasons unrelated to interconnection fees, and competition for those customers is intense and becoming more so. An ISP that intentionally degraded its service quality would find it more difficult to attract and retain such customers. **The discipline generated by competition for those customers protects all customers, even those not inclined to switch.**" [emphasis added]).

[29]  See, e.g., Declaration of Barbara Roden, AT&T,  ¶¶ 18-20, *ACA Connects v. Bonta*, No. 2:18-cv-02684 (E.D. Cal. Aug. 5, 2020) (explaining that applying different network management practices in different geographic areas would require making significant and costly changes to broadband networks, including potentially building new "geofenc[ing]" systems that "do not exist today and would require the expenditure of substantial time and resources to construct"). Similarly, Comcast does not engage in paid prioritization in area X even where there is no 100/20 alternative to it.  (Comcast, "Xfinity Internet Broadband Disclosures," *available at* https://www.xfinity.com/policies/internet-broadband-disclosures.)

[30]  *Draft Order*, ¶ 466 ([100%-7.9% (the percent of households with no 100/20 provider)-37.4% (the percent with only one 100/20 provider)]/[100%-7.9%]=59.4%).

[31]  The Draft Order asserts that "there is evidence that BIAS providers have not refrained from this conduct."  (*Draft Order,* ¶ 486.)  However, the NCTA has demonstrated that "there is no credible evidence of ISP misconduct in the broadband marketplace."  (NCTA – The Internet & Television

**App. 1606**

pushing broadband providers to invest heavily in upgrading and expanding their networks.[32] Further, major broadband providers have pledged to not block or throttle content, and we are aware of no provider that does so today.[33] This fact indicates that existing competition is *already* sufficient to prevent such conduct, contrary to the Draft Order's conclusion. And, as discussed above and in our previous filings, this competition will increase further in the future. Moreover, if broadband providers ever were to remove their pledges not to block or throttle content, the Commission could act at that time. At the same time, adoption of Title II designation and a broad general conduct standard imposes significant costs. As we have explained, the Draft Order's proposed regulation would undermine investment incentives by increasing the risk associated with broadband deployment.[34] Imposing a broad regulatory framework now to address a non-existent problem would impose costs with no countervailing benefit.

---

Association ("NCTA")—along with California Broadband & Video Association, Florida Internet & Television Association, Indiana Cable & Broadband Association, MCTA – The Missouri Internet & Television Association, New England Connectivity and Telecommunications Association, North Carolina Cable Telecommunications Association, Inc., Ohio Cable Telecommunications Association, and Texas Cable Association, January 17, 2024, WC Docket No. 23-320 (hereinafter *NCTA Comments*), pp. 17-21.) And even advocates of Title II regulation such as the Free Press acknowledge that the conduct of broadband providers "is currently in line with the expectations contained in the [NPRM]." (Comments of Free Press, December 14, 2023, WC Docket No. 23-320 (hereinafter *Free Press Comments*), p. 47.)

[32] Free Press Ex Parte, April 1, 2024, WC Docket No. 23-320, pp. 2-3. See also Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, § II.

[33] See, e.g., *NCTA Comments*, p. 52 (collecting citations to providers' commitments to adhere to consensus Internet openness principles). See also AT&T, Network Practices, *available at* https://about.att.com/sites/broadband/network.

[34] Declaration of Mark Israel, Bryan Keating and Allan Shampine, December 14, 2023, WC Docket No. 23-320, § III. See also Declaration of Mark A. Israel, Allan L. Shampine, and Thomas A. Stemwedel, July 17, 2017, WC Docket No. 17-108, § IV.

**App. 1607**

 

April 18, 2024

<u>**VIA ECFS**</u>

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

>    **Re:**   ***Safeguarding and Securing the Open Internet*, WC Docket No. 23-320;
>    *Restoring Internet Freedom*, WC Docket No. 17-108; *Bridging the Digital
>    Divide for Low-Income Consumers*, WC Docket No. 17-287; *Lifeline and Link
>    Up Reform and Modernization*; WC Docket No. 11-42**

Dear Ms. Dortch:

>    The Draft Order in the above-referenced dockets cites a variety of allegations that parties supporting reclassification of broadband Internet access service as a telecommunications service under Title II have leveled against Internet service providers ("ISPs") in an effort to justify common carrier regulation.[1]  The comments already respond to these allegations.[2] Indeed, the overwhelming majority of these claims are a decade old—or even older[3]—and often have little to do with "net neutrality."[4]

>    As to the handful of relatively recent allegations implicating net neutrality concerns that are referenced in the Draft Order, the comments have thoroughly addressed them as well.  In a footnote, the Draft Order repeats claims that YourT1WiFi.com, an Idaho ISP, allegedly blocked its subscribers' access to Twitter (now X) and Facebook.[5]  But this small Idaho ISP quickly rescinded its supposed "blocking" policy—within a day of announcing it—after the ISP faced

---

[1] *See Safeguarding and Securing the Open Internet*, WC Docket Nos. 23-320, 17-108, Draft Declaratory Ruling, Report and Order, and Order on Reconsideration, FCC-CIRC2404-01, ¶¶ 472 & nn.1857-1864, 486 n.1920 (rel. Apr. 4, 2024) ("Draft Order").  Citations in this letter are to comments and reply comments filed in this proceeding, unless otherwise indicated.

[2] *See, e.g.*, NCTA Reply Comments at 14-21; USTelecom Reply Comments at 16-22; CTIA Reply Comments at 9-25.

[3] *See* Draft Order ¶ 472 (discussing allegations from 2005 about Madison River); *see also, e.g.*, EFF Comments at 7; MediaJustice Comments at 7; Narechania Comments at 3 n.1.

[4] *See, e.g.*, Draft Order ¶ 472 & nn.1862 (noting allegations regarding use of JavaScript code).  This claim was thoroughly refuted.  *See* NCTA Comments at 73-79; NTCA Comments at 24-26; WISPA Comments at 93-94.

[5] *See* Draft Order ¶ 486 n.1920; *see also, e.g.*, ACLU Comments at 5; County of Santa Clara Comments at 22; Narechania Comments at 3 n.1; Public Knowledge Comments at 6-7.

overwhelmingly negative backlash.[6] Notably, the ISP also clarified that it was simply offering its customers *a choice* to limit access to certain sites—a practice the Commission's prior orders not only expressly permitted but acknowledged to be potentially "beneficial"—rather than blocking access to those sites unilaterally.[7]

The Draft Order also states that the Commission has received consumer complaints since the adoption of the *2018 Order* alleging conduct at odds with Internet openness.[8] But mere unsubstantiated, uninvestigated, and disputed allegations, by themselves, are not "substantial evidence" of *actual* misconduct that could support the Commission's proposed regulation. Indeed, if ISPs were engaging in the behavior these individual customers say they experienced, the effects would have been widespread and well-documented. Yet the Draft Order makes no claim that the Commission received the same complaints from numerous customers of the same ISP involving the same alleged conduct, let alone that it investigated and determined the allegations were valid.

The Draft Order also cites to a 2019 study alleging that leading mobile broadband providers "throttled" video content.[9] The record identifies the study's multiple flaws.[10] The study—which ultimately found no "differentiation" in throughput for "the vast majority" of ISPs—engages in an apples-to-oranges comparison of actual network traffic to simulated traffic exchanged between a server and an app on a user's device. It does not account for confounding variables: consumers select data plans that best meet their needs in terms of price and performance level, with some opting to manage their throughput and use less data by specifically choosing plans that enable particular streaming video resolution levels at various price points; and online video providers themselves employ adaptive bitrate streaming to set video resolution levels, often at a lower video resolution than the network can support. The study itself explicitly acknowledges that it did not adequately control for variations in signal strength and did not control *at all* for numerous other material factors, including user locations, transmission path congestion, and variations in network traffic volume. Finally, the study does not account for providers' reasonable network management practices to prevent network congestion.

Finally, the Draft Order states that, in 2018, Verizon allegedly "throttled" the Santa Clara County Central Fire Protection District's mobile broadband service while the agency was

---

[6] *See, e.g.*, CTIA Reply Comments at 21-22; Ericsson Reply Comments at 4; USTelecom Reply Comments at 19; NCTA Reply Comments at 21.

[7] *See, e.g.*, *Preserving the Open Internet, Broadband Industry Practices*, Report and Order, 25 FCC Rcd. 17905 ¶¶ 89-90, 143 (2010); *Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 ¶ 222 n.575 (2015) ("*2015 Order*"); *see also, e.g.*, ADTRAN Reply Comments at 9.

[8] *See* Draft Order ¶ 486 n.1920.

[9] *See id.* ¶ 472; *see also, e.g.*, ACLU Comments at 4-5; Choffnes Comments at 2; INCOMPAS Comments at 12 & n.32; Measurement Lab Comments at 2; Public Knowledge Comments at 16-17; Simmons Comments at 1-2. The Draft Order also cites a related study published in 2023, *see* Draft Order ¶ 494 n.1951, but that study relies on output from the 2019 study as its starting point, so vulnerabilities there are carried over into the 2023 study. *See* CTIA Letter of April 16, 2024 at 8.

[10] *See, e.g.*, ADTRAN Reply Comments at 8-9; Americans for Tax Reform and Digital Liberty Reply Comments at 3; Comcast Comments at 16 n.58; CTIA Comments at 11-12; CTIA Reply Comments at 10-18; Ericsson Comments at 14; Ericsson Reply Comments at 5-6; U.S. Chamber of Commerce Comments at 5 & n.10.

**App. 1609**

responding to the Mendocino Complex Fire.[11]  This incident actually stemmed from an unfortunate mismatch between the Santa Clara County Central Fire Protection District's selected data plan and its network needs.  The District had purchased a data plan that was subject to speed restrictions once a certain amount of data had been used during a billing cycle.  The record demonstrates that this incident did not violate net neutrality principles: the District notably told the D.C. Circuit that it "do[es] not contend that this [practice] would have violated the *2015 Order*."[12]  That is because the *2015 Order* expressly declined to define the imposition of usage limits or speed restrictions, like those at issue in Santa Clara, as "throttling" and held that such practices were generally permissible.[13]  In addition, following the incident, Verizon retrained its staff to reinforce its policy of removing speed restrictions upon request in emergency situations, and the company has introduced a new data plan for first responders that features no speed restrictions, for no additional charge.[14]

In sum, the record is bereft of actual, recent examples of ISPs' purportedly harmful conduct that the Open Internet rules the Commission is proposing to adopt would address.

Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Rick Chessen

Rick Chessen
NCTA – THE INTERNET &
  TELEVISION ASSOCIATION
25 Massachusetts Ave.,
NW, Suite 100
Washington, DC 20001

/s/ Nirali Patel

Nirali Patel
USTELECOM – THE
  BROADBAND ASSOCIATION
601 New Jersey Ave., NW
Suite 600
Washington, DC 20001

/s/ Thomas Power

Thomas Power
CTIA – THE WIRELESS
  ASSOCIATION
1400 Sixteenth St., NW
Suite 600
Washington, DC 20036

---

[11] *See* Draft Order ¶¶ 451-52; *see also, e.g.*, Alarm Industry Communications Committee at 6; California AG Bonta Comments at 3; County of Santa Clara Comments at 23; EFF Comments at 23-23; Khouider Comments at 1.

[12] Brief for Government Petitioners at 24 n.13, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (No. 18-1051); *see also, e.g.*, Reply Comments of Verizon, WC Docket No. 17-108, at 17-18 (filed May 20, 2020); Foundation for American Innovation & China Tech Threat Reply Comments at 13.

[13] *2015 Order* ¶ 122; *see also, e.g.*, Bennett Comments at 3; CTIA Reply Comments at 18-19; Ericsson Reply Comments at 6; R Street Institute Comments at 5; TechFreedom Comments at 50-51; Westling Comments at 3; Comments of CTIA, WC Docket No. 17-108, at 19 (filed Apr. 20, 2020); Comments of NCTA – The Internet & Television Association, WC Docket No. 17-108, at 7-8 (filed Apr. 20, 2020).

[14] *See, e.g.*, CTIA Reply Comments at 18; Ericsson Reply Comments at 6; Reply Comments of Verizon, WC Docket No. 17-108, at 18 (filed May 20, 2020).

**App. 1610**

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

April 18, 2024

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

  Re: *Safeguarding and Securing the Open Internet* (WC Docket No. 23-320);
    *Restoring Internet Freedom* (WC Docket No. 17-108); *Bridging the Digital*
    *Divide for Low-Income Consumers* (WC Docket No. 17-287); *Lifeline and Link*
    *Up Reform and Modernization* (WC Docket No. 11-42)

Dear Ms. Dortch:

  Attached is a supplemental report from Recon Analytics that responds to the criticisms in the Commission's Draft Order in the above-captioned proceeding regarding the Recon Analytics survey attached as Exhibit B to USTelecom's Reply Comments.

  First, as Recon Analytics explains, the Draft Order's criticisms (¶ 143 & n.567) of the survey's first question — which found that nearly all consumers (92%) perceive broadband as providing information service capabilities, while very few (8%) perceive broadband as providing only telecommunications service capabilities — are misplaced. A question structure that offers multiple information service capability options, while directing respondents to select all that apply, does not bias the results.[1] In addition, while 41% of respondents in that survey chose the telecommunications service option, respondents chose three of the four information service options more frequently (53%, 48%, and 44%), with nearly as many respondents (38%) choosing the remaining information service option. In all, 59% of respondents selected at least one information service option without also selecting the telecommunications service option. These results confirm that the Draft Order is incorrect in asserting that consumers "do not perceive BIAS as an information service."[2]

---

[1] Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results – Response to Draft Order* at 2 (attached).

[2] Draft Order ¶ 143.

The Draft Order seeks to brush away those results by claiming that the information service options in the survey "misrepresented the statutory language by suggesting that BIAS itself has the capability to perform the functions listed in the statute."[3] That is not a valid criticism of the survey, which reveals what consumers perceive. And the fact that consumers' perception aligns with our legal arguments is an additional basis to conclude that the Draft Order errs in rejecting those arguments.[4]

In all events, in response to the Draft Order, Recon Analytics recently conducted a further survey of consumer perception of the capabilities broadband service offers that account for the Draft Order's criticisms. Participants in the new survey were given the same number of information service and telecommunications service options, with both options either described in language drawn from the statutory definitions or in plain English. The results were very similar for these two options, showing that the wording of the answer choices did not meaningfully affect the December 2023 survey results. Further, consistent with the December 2023 survey, the two new survey questions found that only a small minority of consumers (12.8% or 13.1%, depending on the answer wording) perceive broadband as offering solely telecommunications service capabilities. A much larger percentage — 46.3% or 54.9% — answered that they perceive broadband as either purely an information service or offering both telecommunications and information service capabilities, while another large percentage of respondents (40.9% or 32.0%) answered "I don't know." Like the December 2023 survey, these new survey results refute the Draft Order's assertions about what consumers perceive.

Finally, the Draft Order criticizes additional results from Recon Analytics' December 2023 survey, which found that nearly all consumers (92%) are likely using their ISP-provided DNS. The Draft Order states, without elaboration, that the survey reaches the conclusion "without substantiation."[5] But Recon Analytics explained the basis for the 92% figure — it represents the percentage of consumers "who affirmatively said they are using their ISP provider's DNS as well as those who do not know what DNS does and those who know what it does but are not sure which DNS they use."[6] Those survey results were thus substantiated.

Respectfully submitted,

/s/ *Scott H. Angstreich*

Scott H. Angstreich

*Counsel for USTelecom –*
Attachment                                              *The Broadband Association*

---

[3] *Id.* ¶ 143 n.567.
[4] *Compare* USTelecom Comments at 13-16 *with* Draft Order ¶¶ 127-131, 142.
[5] Draft Order ¶ 147 n.595 (citing CTIA/USTelecom Mar. 22, 2024 *Ex Parte* Letter at 3).
[6] Roger Entner, Don Kellogg & Brett Clark, Recon Analytics, *Broadband Survey Results* at 2 & fig. 2 (Ex. B to USTelecom Reply Comments).

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Safeguarding and Securing the Open Internet | ) | WC Docket No. 23-320 |
| | ) | |
| Restoring Internet Freedom | ) | WC Docket No. 17-108 |
| | ) | |

**ORDER DENYING STAY PETITION**

**Adopted:  June 7, 2024**                                   **Released:  June 7, 2024**

By the Chief, Wireline Competition Bureau:

## I.    INTRODUCTION

1.       On May 31, 2024, USTelecom – The Broadband Association, NCTA – The Internet & Television Association, CTIA – The Wireless Association, the Wireless Internet Service Providers Association, ACA Connects – America's Communications Association, the Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, the Ohio Cable Telecommunications Association, the Ohio Telecom Association, and the Texas Cable Association (together, Petitioners) filed a petition for the Federal Communications Commission (Commission) to stay the *Declaratory Ruling, Order, Report and Order, and Order on Reconsideration* (*2024 Open Internet Order* or *Order*) in the above-captioned proceedings pending judicial review.[1]  For the reasons discussed below, we deny Petitioners' stay request.

## II.    BACKGROUND

2.       The Commission's *2024 Open Internet Order* classifies broadband Internet access service (BIAS) as a telecommunications service under Title II of the Communications Act of 1934 (the Act), finding that such classification represents the best reading of the text of the Act, accords with Commission and court precedent, and is justified under the Commission's longstanding authority to classify services subject to its jurisdiction.[2]  As the *Order* explains, this classification decision is

---

[1] *Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, WC Docket Nos. 23-320 and 17-108, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52 (rel. May 7, 2024) (*2024 Open Internet Order*); *see* Joint Petition for Stay of USTelecom – The Broadband Association, NCTA – The Internet & Television Association, CTIA – The Wireless Association, Wireless Internet Service Providers Association, ACA Connects – America's Communications Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, Ohio Cable Telecommunications Association, Ohio Telecom Association, and Texas Cable Association, WC Docket Nos. 23-320 and 17-108 (filed May 31, 2024) (Industry Stay Petition).

[2] *See 2024 Open Internet Order* at para. 25.  In adopting this classification, the Commission's action is consistent with the framework previously adopted in 2015 and upheld in full by the D.C. Circuit, *see Protecting and Promoting the Open Internet*, GN Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601, 5603 (2015) (*2015 Open Internet Order*), aff'd *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *reh'g denied*, 855 F.3d 381 (D.C. Cir. 2017), *cert. denied, Berninger v. FCC*, 139 S. Ct. 453 (2018) (*USTA*), but subsequently abandoned in 2018, *see Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311 (2018), *aff'd in part and remanded in part, Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir.

(continued….)

supported by the Commission's statutory obligations and policy objectives as the expert agency for communications services, including the need to safeguard the open Internet, defend national security, promote cybersecurity, advance public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to BIAS, and improve disability access.[3] The *Order* also reinstates the classification of mobile BIAS as a commercial mobile service.[4]  The *Order* establishes broad, tailored forbearance under section 10 of the Act—including no rate regulation, no tariffing, no unbundling of last-mile facilities, and no cost-accounting rules—in the Commission's application of Title II to BIAS providers, while maintaining certain authority to account for the changing national security landscape, which together ensure that the regulatory environment protects consumers and achieves other important public interest responsibilities while not unnecessarily stifling investment and innovation.[5]  The *Order* reestablishes a national regulatory approach to protect the open Internet by restoring straightforward, clear rules that prohibit BIAS providers from engaging in blocking, throttling, or paid or affiliated prioritization arrangements.[6]  It also reinstates a general conduct standard that prohibits unreasonable interference or unreasonable disadvantage to consumers or edge providers, as well as enhancements to the transparency rule and a multi-faceted enforcement framework comprised of advisory opinions, enforcement advisories, Commission-initiated investigations, and informal and formal complaints.[7]  The *Order* partially grants and otherwise dismisses as moot several petitions for reconsideration filed in response to the *RIF Remand Order*.  The Commission adopted the *Order* on April 25, 2024.  A summary of the *Order* was published in the Federal Register on May 22, 2024; it will go into effect (in relevant part) on July 22, 2024.[8]

3.     On May 31, 2024, Petitioners filed a petition requesting that the Commission stay the effectiveness of the *Order* pending judicial review.  Petitioners principally argue that they are likely to prevail on the merits that the *Order* is unlawful under both the major-questions doctrine and ordinary principles of statutory interpretation.[9]  Petitioners also claim that the *Order* will impose significant, unrecoverable costs once it goes into effect.[10]  They assert that the balance of the harms and the public interest support a stay because "[t]he record does not suggest that the rules imposed by the Order are necessary to address significant present or near-term harms to the public," and that "the public would benefit from stability in the regulatory treatment of the broadband industry pending final determination of the Order's legality."[11]  Petitioners "request that the Commission rule on this stay petition by June 7, 2024, to give [them] time to seek a stay in the court of appeals, if necessary, and to give the court of appeals time to adjudicate the stay before the Order takes effect."[12]

---

(Continued from previous page) ────────────────

2019), *on remand*, 35 FCC Rcd 12328 (2020) (*RIF Remand Order*), *pet. for review pending*, No. 21-1016 (D.C. Cir. filed Jan. 14, 2021).

[3] *See 2024 Open Internet Order* at para. 27.

[4] *See id.* at para. 214.

[5] *See id.* at para. 6.

[6] *See id.* at para. 443.

[7] *See id.* at paras. 443, 581.

[8] *See Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, 89 Fed. Reg. 45404 (May 22, 2024).

[9] Industry Stay Petition at 2.

[10] *Id.* at 2.

[11] *Id.* at 2-3.

[12] *Id.* at 1.

**App. 1614**

## III.    DISCUSSION

4.    To qualify for the extraordinary remedy of a stay, a petitioner must show that (1) it is likely to prevail on the merits; (2) it will suffer irreparable harm absent the grant of preliminary relief; (3) other interested parties will not be harmed if the stay is granted; and (4) the public interest would favor grant of the stay.[13]   A stay is an "'intrusion into the ordinary processes of administration and judicial review,' . . . and accordingly 'is not a matter of right, even if irreparable injury might otherwise result'" to the movant.[14]   The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.[15]   Petitioners have failed to meet that burden.

### A.    Petitioners Have Not Shown They Are Likely to Prevail on the Merits

5.    To show likelihood of success on the merits, a petitioner must make a "strong showing" that they are likely to succeed;[16] a "mere possibility of relief" is insufficient.[17]   As the D.C. Circuit has recognized, "[w]ithout such a substantial indication of probable success, there would be no justification for . . . intrusion into the ordinary processes of administration and judicial review."[18]   Petitioners principally assert that they will prevail on the merits because the Commission's classification of BIAS as a Title II telecommunications service is a major question and because, they contend, the Commission lacks clear congressional authorization for its reclassification.[19]   But in support of these arguments, Petitioners merely repeat arguments that were already addressed in the *Order* without refuting the *Order*'s conclusions.

6.    To begin with, Petitioners jump to challenging the Commission's classification decision under the major-questions doctrine without addressing the *Order*'s lengthy explanation for why the Commission's understanding of broadband Internet access service as a "telecommunications service," not an "information service," reflects the best reading of the text, structure, and context of those statutory terms.[20]   Because the *Order* simply follows the best reading of the statute, the major-questions doctrine should not "come[] into play in this context at all."[21]

7.    For the reasons the Commission described in the *Order*, Petitioners' arguments for why the Commission's classification decision should be analyzed under the major-questions doctrine are not persuasive.[22]   In arguing that Title II classification "would 'bring about an enormous and transformative expansion' in the Commission's 'regulatory authority,'"[23] Petitioners ignore that "BIAS providers have previously been regulated under Title II," including from 2015 to 2018, as well as the scope of

---

[13] *See LightSquared Technical Working Group Report*, Order Denying Motion for Stay, IB Docket No. 11-109, 36 FCC Rcd 1262, 1266, para. 8 (2021) (*Ligado Stay Denial Order*) (citing *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).

[14] *Nken*, 556 U.S. at 427 (internal citations omitted).

[15] *Ligado Stay Denial Order*, 36 FCC Rcd at 1266, para. 8.

[16] *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

[17] *Nken*, 556 U.S. at 434 (internal citations omitted).

[18] *VA Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (*VA Petroleum Jobbers*).

[19] Industry Stay Petition at 6.

[20] *See 2024 Open Internet Order* at Section III.B.

[21] *Id.* at para. 253; *see also id.* at paras. 252-264 (explaining further why the major-questions doctrine is not implicated here).

[22] *See id.* at paras. 257-64.

[23] Industry Stay Petition at 6 (quoting *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)).

**App. 1615**

forbearance adopted in the *Order*.[24] Likewise, Petitioners' characterization of the economic and political significance of the Commission's action as "staggering" is exaggerated because they make general statements about the economic value of the broadband industry, the importance of the Internet, and political debates about Commission authority, rather than specific claims about the effect of the *Order*.[25] Petitioners also repeat previous arguments regarding the Commission's post-1996 Act treatment of "Internet access services"[26] without addressing the *Order*'s extensive discussion of Commission and court precedent that contradicts that argument.[27] Finally, Petitioners' claim that the *Order* "strays into areas well outside the Commission's 'comparative expertise'"[28] because it takes account of national security considerations while ignoring not only that "the proper regulatory classification of broadband falls squarely within the Commission's wheelhouse,"[29] but also that the Commission has "statutory responsibilities to safeguard national security and law enforcement," as courts have repeatedly recognized.[30]

8.    Even if a court were to analyze the *Order* under the major-questions doctrine, moreover, the Commission explained why its authority to classify and regulate broadband is, nonetheless, sufficiently clear.[31] As the *Order* shows, the Commission has a long history of classifying broadband services and those classification decisions have been consistently upheld in court.[32] Petitioners fail to refute the *Order*'s explanations, and they do not make a compelling case that BIAS is best classified as an information service.[33] Contrary to Petitioners' contention,[34] the Commission's forbearance action does not undermine its classification decision. As the *Order* explains, "broad forbearance where justified by the statutory criteria . . . is entirely compatible with the overall legal framework Congress enacted in the 1996 Act,"[35] and Title II classification with a highly similar forbearance framework has already been once upheld as a valid exercise of authority by the D.C. Circuit.[36] Likewise, the *Order*'s treatment of mobile BIAS also does not support Petitioners' claim that BIAS is best classified as an information service.[37] That argument relies on the contention that mobile BIAS is not interconnected with the "public switched

---

[24] *See 2024 Open Internet Order* at paras. 18, 257, 384.

[25] *See* Industry Stay Petition at 7 (citing *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023) and several of Petitioners comments in the record); *2024 Open Internet Order* at para. 257.

[26] Industry Stay Petition at 7.

[27] *See 2024 Open Internet Order* at Section III.C; *see also id.* at paras. 255, 259 (explaining further why Petitioners' invocation of the major-questions doctrine on this basis is unpersuasive).

[28] Industry Stay Petition at 7.

[29] *2024 Open Internet Order* at para. 260; *see id.* at paras. 238-242, 261.

[30] *2024 Open Internet Order* at para. 31 & n.73; *see, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 439-40, 443 (5th Cir. 2021); *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 948 (D.C. Cir. 2024); *Pac. Networks Corp. v. FCC*, 77 F.4th 1160, 1164 (D.C. Cir. 2023).

[31] *See 2024 Open Internet Order* at para. 264; *see also id.* at Section III.B.

[32] *See 2024 Open Internet Order* at Section III.C.2 (showing that the Commission's broadband service classification decisions have been upheld in *National Cable & Telecommunications Ass'n et al. v. Brand X Internet Services*, 545 U.S. 967 (2005), *USTA*, 825 F.3d 674, and *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)); *see also id.* at para. 18.

[33] *See* Industry Stay Petition at 8-9.

[34] Industry Stay Petition at 9.

[35] *2024 Open Internet Order* at para. 319.

[36] *See id.* at para. 18.

[37] Industry Stay Petition at 9.

4

network,"[38] ignoring that the Commission has the authority to define that term, as it did in the *Order*, to reflect the current technological landscape.[39] Finally, Petitioners' argument that "other statutes enacted around the time of the 1996 Act demonstrate that Congress viewed Internet access service as an information service" fails to grapple with the Commission's contrary determination in the *Order*.[40]

9.      Petitioners thus have failed to establish that their challenges to the *Order* are likely to succeed on the merits.

## B.    Petitioners Have Failed to Show They Will Suffer Irreparable Harm

10.      Petitioners likewise fail to demonstrate that they would suffer imminent and irreparable harm without a stay. To establish irreparable harm, a petitioner must show that it will suffer injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"[41] In doing so, the petitioner must present actual evidence to "substantiate [its] claim" of injury.[42] "'Bare allegations of what is likely to occur are of no value' under this factor, because we 'must decide whether the harm will *in fact* occur.'"[43] Petitioners have not met their burden to make and substantiate these showings.

11.      Petitioners allege that they will be harmed if the *Order* is allowed to take effect while litigation is pending. But Petitioners offer only conclusory assertions that their members "will be forced to delay or forgo valuable new services, incur prohibitive compliance costs, and pay more to obtain capital,"[44] without any concrete evidence to substantiate that claim, let alone evidence showing that such harm is certain and great, actual and not theoretical, beyond remediation, and—of particular importance— imminent. Indeed, they do not identify in a specific and concrete way any present or imminent practices they will be forced to cease when the *Order* takes effect. Absent such evidence, Petitioners' claims are entirely speculative and conclusory. Likewise, though Petitioners include a perfunctory assertion that great and irreparable harm is evident from the period when they were subject to the substantially similar framework in the *2015 Open Internet Order*,[45] they fail to present any cogent evidence that such harm occurred. On the contrary, the *Order* addressed and debunked claims that the *2015 Open Internet Order* harmed BIAS providers or the Internet ecosystem.[46]

12.      Petitioners' prognostications about irreparable harm are also undermined by other factual realities. For instance, although Petitioners assert that their members will forgo some (unspecified) value-creating offerings because the general conduct rule's case-by-case adjudication is vague,[47] they fail to acknowledge that the current regulatory regime likewise subjects them to case-by-case scrutiny under the antitrust and consumer protection oversight of the Federal Trade Commission, Department of Justice, and

---

[38] Industry Stay Petition at 9.

[39] *See 2024 Open Internet Order* at paras. 216-24.

[40] Industry Stay Petition at 10; *see 2024 Open Internet Order* at paras. 248-49.

[41] *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see Ligado Stay Denial Order*, 36 FCC Rcd at 1267, para. 10.

[42] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

[43] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, Order, CC Docket No. 96-98, 11 FCC Rcd 11754, 11757, para. 8 (1996) (quoting *Wis. Gas*, 758 F.2d at 674).

[44] Industry Stay Petition at 10.

[45] Industry Stay Petition at 10.

[46] *See 2024 Open Internet Order* at Sections III.H and V.H.

[47] Industry Stay Petition at 11.

state attorneys general,[48] or that they are already subject to similar obligations under state net-neutrality laws.[49] BIAS providers also were subject to the Commission's case-by-case oversight during the periods that the *2010 Open Internet Order* and *2015 Open Internet Order* were in effect,[50] yet—as noted above—they have not shown that those periods proved disruptive. Petitioners' argument also discounts that, to the extent that an entity is able to demonstrate a positive use case and the costs associated with a ban on such practices, the Commission may waive its rule prohibiting paid or affiliated prioritization.[51]

13. For similar reasons, we are not persuaded that Petitioners' members will incur "compliance costs that are qualitatively and quantitatively different from those associated with typical regulation."[52] The regulatory regime adopted in the *Order* is not atypical. Beyond the fact that a number of telecommunications carriers have been subject to Title II of the Act, BIAS providers have been largely subject to standards consistent with the bright-line conduct rules adopted in the *Order* since 2005 and have twice been subject to oversight akin to the general conduct rule and the type of enforcement framework adopted in the *Order*.[53] Furthermore, the Commission expressed its predictive judgment that any "compliance costs are likely to be small and are outweighed by the benefits of reclassification that have been identified in [its] analysis," explained the basis for this view, and noted its intent to assess incremental compliance costs, if any, as a part of any new rules that it might adopt.[54] Finally, as the *Order* notes, its broad forbearance from Title II provisions will mitigate costs and burdens on BIAS providers.[55]

14. Nor are we persuaded that a stay is warranted due to "higher capital costs."[56] To the extent petitioners contend that "the threat of future regulation" will "make it harder for the industry to raise capital,"[57] grant of a temporary stay pending review would provide them with no relief, as the possibility of the *Order* being upheld and the rules taking effect will persist through the completion of judicial review. And insofar as petitioners are concerned with possible future actions *not* taken in this *Order*, such concerns are wholly speculative, and any future actions would first have to undergo an appropriate administrative process and be subject to judicial review.[58]

---

[48] *See 2024 Open Internet Order* at paras. 23, 487-89, 640.

[49] *See, e.g., ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022) (upholding California's state net-neutrality law).

[50] Under the *2010 Open Internet Order*, all fixed BIAS providers were subject to a case-by-case prohibition on "unreasonable discrimination." *See Protecting and Promoting the Open Internet*, GN Docket No. 14-28, Notice of Proposed Rulemaking, 29 FCC Rcd 5561, 5600-01 paras. 113-14 & n.236 (2014) (demonstrating that the prohibition against unreasonable discrimination was in effect for two years from its implementation until the D.C. Circuit's holding in the *Verizon* decision).

[51] *See 2024 Open Internet Order* at paras. 502-10 (adopting a rule prohibiting paid or affiliated prioritization but noting that the Commission "may waive the ban . . . if the petitioner demonstrates that the practice would provide some significant public interest benefit and would not harm the open nature of the Internet"); *id.* at para. 644 ("[W]hile we recognize that there may also be positive use cases of paid prioritization and some costs associated with a ban on such practices, we find that such positive use cases may be addressed through the waiver rule we adopt.").

[52] Industry Stay Petition at 12.

[53] *See 2024 Open Internet Order* at Section II.

[54] *See id.* at paras. 638-40.

[55] *See id.* at para. 641.

[56] Industry Stay Petition at 13.

[57] Industry Stay Petition at 13.

[58] *Cf. 2024 Open Internet Order* at para. 641 (observing in response to speculation about "regulatory creep" that "any changes to this framework or future rules the Commission considers adopting under the Title II framework

(continued….)

15.     For the foregoing reasons, we conclude that the Petitioners have failed to demonstrate any imminent, actual irreparable harm resulting from the *Order*.

## C.     Petitioners Have Not Shown that A Stay Is In the Public Interest and Would Not Harm Other Parties

16.     Staying the *Order* is not in the public interest, as a stay would inhibit or delay the Commission's ability to fulfill policy obligations and objectives necessary to protect consumers.

17.     Petitioners' primary argument that granting a stay would benefit the public interest is that "[p]ausing the Order would ensure that ISPs continue to invest in network improvement and offer innovative new programs that benefit consumers, rather than divert those efforts toward compliance or forgo such offerings altogether."[59]  But that contention rests on Petitioners' unsubstantiated claims that BIAS providers will in fact be deterred from executing their (unspecified) investment and development plans and that allowing the *Order* to take effect will cause them to incur compliance costs.

18.     By contrast, granting a stay would be contrary to the public interest because it would delay and otherwise inhibit the Commission's ability to protect consumers.  A stay would stall the application of rules designed to ensure that all consumers across the country receive the same open Internet protections.  A stay would also deprive consumers of privacy protections under section 222 of the Act and would deprive broadband-only providers of important statutory protections under sections 224, 253, and 332 of the Act for pole attachments and other infrastructure essential for reliable, timely, and affordable deployment of broadband service.[60]  Additionally, a stay would risk hindering the Commission's ability to pursue other policy obligations and objectives that will benefit consumers, particularly those related to national security and public safety.[61]  These and other efforts may need to be shelved or modified if the requested stay were granted.

19.     Petitioners also suggest that the Commission should grant a stay to maintain the status quo on the basis that this will provide stability pending judicial review.[62]  But absent the required showings both of likelihood of success and of irreparable harm, bare appeals to preservation of the status quo are not sufficient ground for granting a stay, or else all agency regulatory action would qualify for such extraordinary relief.[63]  Petitioners also have not shown that allowing the *Order* to go into effect will actually destabilize the status quo.  As the *Order* explains, "in the period since Congress enacted the 1996 Act, the Commission's treatment of broadband service has wavered between Title II and Title I and

(Continued from previous page) ————————————————

would be subject to notice and comment and an analysis of the record, including any purported costs, prior to adoption").

[59] Industry Stay Petition at 13.

[60] *See 2024 Open Internet Order* at paras. 68, 70-82.

[61] *See id.* at paras. 30-66, 451-63.  For instance, the Commission recently adopted a Notice of Proposed Rulemaking that proposes provisions applicable to BIAS providers designed to improve the security of the Border Gateway Protocol routing.  *See Reporting on Border Gateway Protocol Risk Mitigation Progress; Secure Internet Routing*, PS Docket Nos. 24-146 and 22-90, Notice of Proposed Rulemaking, FCC 24-62, at para. 3 (rel. June 7, 2024).  The Commission is also considering whether BIAS providers should be required to report in the Network Outage Reporting System (NORS) and Disaster Information Reporting System (DIRS), which may be particularly important as the country enters hurricane season.  *See Resilient Networks; Amendments to Part 4 of the Commission's Rules Concerning Disruptions to Communications; New Part 4 of the Commission's Rules Concerning Disruptions to Communications*, PS Docket Nos. 21-346 and 15-80; ET Docket No. 04-35, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 24-5, at para. 5 (rel. Jan. 26, 2024).

[62] *See* Industry Stay Petition at 5, 13-14.

[63] *Cf. Ligado Stay Denial Order*, 36 FCC Rcd at 1271 para. 18 ("[W]ithout such a substantial indication of probable success, there would be no justification for . . . intrusion into the ordinary processes of administration and judicial review." (quoting *VA Petroleum Jobbers*, 259 F.2d at 925)).

**App. 1619**

remained unsettled."[64] And "even during much of the Title I era, the Commission repeatedly sought to enforce policies that closely resemble the open Internet rules" the *Order* adopts.[65] Petitioners gesture at new potential initiatives without providing detail about what they are and how the *Order* could contravene those initiatives. Thus, allowing the *Order* to go into effect pending litigation will not destabilize the status quo; it is consistent with the status quo.

20.     Because a stay stands to hinder the Commission from fulfilling its policy goals and responsibilities, a stay would also harm other parties.[66] Petitioners argue that consumers would not be harmed by a stay because, they say, they currently do not block, throttle, or discriminate among lawful content (even though, in the same filing, they argue the *Order* would hinder unspecified future initiatives they wish to take apparently in violation of the rules).[67] But the *Order* described at length how its decisions advanced various important policies that serve the public interest.[68] To highlight some examples, if the open Internet rules do not go into effect, consumers will be harmed if they purchase services from a BIAS provider that does not in fact already follow the full scope of the open Internet rules, and such conduct may also cause harm to edge providers. Petitioners also altogether ignore other harms to parties outside the scope of the open Internet rules. For instance, consumers will be harmed by the delay in receiving the Commission's affirmative privacy protections, and broadband-only providers will be harmed by the delay in restoration of their pole attachment rights and deployment protections.

21.     For all these reasons, we find that Petitioners have not shown that a stay is in the public interest and would not harm other parties.

## IV.     ORDERING CLAUSES

22.     Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1, 4(i), 4(j), 5, 201, 202, and 303(r) and of the Communications Act of 1934, as amended, and the authority contained in section 706 of the Telecommunications Act of 1996, 47 U.S.C. §§ 151, 154(i)-(j), 155, 201, 202, 303(r), 1302, and the authority delegated pursuant to sections 0.91 and 0.291 of the Commission's rules, 47 C.F.R. §§ 0.91, 0.291, this Order Denying Stay Petition in WC Docket Nos. 23-320 and 17-108 IS ADOPTED.

FEDERAL COMMUNICATIONS COMMISSION

Trent B. Harkrader
Chief
Wireline Competition Bureau

---

[64] *2024 Open Internet Order* at para. 255. Evidence of ongoing uncertainty is apparent, for example, from the unresolved nature of the *RIF* proceeding, as the *RIF Remand Order* has been subject to petitions for review that remain pending before the D.C. Circuit and had also been subject to unresolved petitions for reconsideration until their resolution in the *Order*. *Id.* at para. 685.

[65] *Id.* at para. 255.

[66] *See Nken*, 556 U.S. at 435 ("[T]he traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

[67] Industry Stay Petition at 11, 14.

[68] *See*, *e.g.*, *2024 Open Internet Order* at Sections III.A and V.A.

**CERTIFICATION OF COMPLIANCE**

I hereby certify pursuant to Sixth Circuit Rule 30(b)(4)(E) that the documents included as part of this appendix are properly part of the administrative record, or are otherwise required by Sixth Circuit Rule 30(b)(4).

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 12, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I electronically filed the foregoing appendix with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 12, 2024